1            UNITED STATES DISTRICT COURT

2                 DISTRICT OF MAINE

3   MAINE PEOPLE'S ALLIANCE        )
    and NATURAL RESOURCES          )
4   DEFENSE COUNCIL, INC.,         )
                                   )
5                Plaintiffs        )
                                   )              CIVIL ACTION
6                                  )
            vs.                    )   Docket No. 1:00-cv-00069-JAW
7                                  )
                                   )              BENCH TRIAL
8   HOLTRACHEM MANUFACTURING       )
    and MALLINCKRODT LLC,          )
9                                  )
                Defendants.        )

10

11                     VOLUME I

12              TRANSCRIPT OF PROCEEDINGS

13       Pursuant to notice, the above-entitled matter came on

14   for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15   Chief District Judge, in the United States District Court,

16   Bangor, Maine, on the 3rd day of June, 2014, at 8:32 a.m.

17   APPEARANCES:

18   For the Plaintiffs:          Mitchell S. Bernard, Esquire
                                  Aaron S. Colangelo, Esquire
19                                Rachel E. Heron, Esquire
                                  Jared J. Thompson, Esquire
20
     For the Defendants:          Patricia H. Duft, Esquire
21                                Sigmund D. Schutz, Esquire
                                  Jeffrey D. Talbert, Esquire
22

23                 Julie G. Edgecomb, RMR, CRR
                      Official Court Reporter
24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

INDEX OF PROCEEDINGS

Page:

Testimony:  (see below)

INDEX OF WITNESSES

Page:

JOHN RUDD  (called by Mr. Bernard)

Direct Examination by Mr. Bernard                        11
Continued Direct Examination by Mr. Bernard       85, 151

INDEX OF EXHIBITS

| Joint Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 1 | ECF No. 147 | 104 | 104 |
| 2 | ECF No. 159 | 104 | 104 |
| 3 | ECF No. 259 | 104 | 104 |
| 4 | ECF No. 382 | 104 | 104 |
| 5 | ECF No. 480 | 104 | 104 |
| 6 | ECF No. 652 | 104 | 104 |
| 7 | ECF No. 699 | 104 | 104 |
| 8 | ECF No. 699-1 | 104 | 104 |
| 9 | ECF No. 699-2 | 104 | 104 |
| 10 | ECF No. 700 | 104 | 104 |
| 11 | ECF No. 709 | 104 | 104 |
| 12 | ECF No. 713 | 104 | 104 |
| 13 | ECF No. 728 | 104 | 104 |
| 14 | CV of Richard Bodaly | 104 | 104 |
| 15 | Summary and CV of Todd Bridges | 104 | 104 |
| 16 | CV of Aram J.K. Calhoun | 104 | 104 |
| 17 | CV of David C. Evers | 104 | 104 |
| 18 | CV of Nicholas Seth Fisher | 104 | 104 |
| 19 | CV of W. Rockwell Geyer | 104 | 104 |
| 20 | CV of Gary A. Gill | 104 | 104 |
| 21 | CV of Cynthia A. Gilmour | 104 | 104 |
| 22 | CV of Reed A. Harris | 104 | 104 |
| 23 | CV of Carol Ann Kelly | 104 | 104 |
| 24 | CV of Audrey Dianne Kopec | 104 | 104 |
| 25 | CV of John Rudd | 104 | 104 |
| 26 | CV of Mark B. Sandheinrich | 104 | 104 |
| 27 | CV of Peter Hans Santschi | 104 | 104 |
| 28 | CV of Jack Siegrist | 104 | 104 |
| 29 | CV of Ralph R. Turner | 104 | 104 |
| 30 | CV of Chris G. Whipple | 104 | 104 |
| 31 | CV of James G. Wiener | 104 | 104 |
| 32 | CV of Kevin M. Yeager | 104 | 104 |
| 33 | Deposition of Todd Bridges | 104 | 104 |

```
 1      34      Deposition of Aram J.K. Calhoun 104      104
         35      Deposition of Gary Gill         104      104
 2      36      Deposition of Reed Harris       104      104
         37      Deposition of Reed Harris       104      104
 3      38      Deposition of Reed Harris       104      104
         39      Deposition of Carol Kelly       104      104
 4      40      Deposition of Mark Sandheinrich 104      104
         41      Deposition of Jack Siegrist     104      104
 5      42      Report of Gary Bigham           104      104
         43      Surrebuttal Report of Gary Bigham104     104
 6      44      Report of Michael Bolger        104      104
         45      Report of John Connolly         104      104
 7      46      Sur. Report of John Connolly    104      104
         47      Report of Dr. Charles Driscoll  104      104
 8      48      Report of Dr. Charles Driscoll  104      104
         49      Reports of Dr. Charles Driscoll 104      104
 9      50      Report of Edward Glaza          104      104
         51      Report of Dr. Philippe Grandjean 104     104
10      52      Report of Dr. Philippe Grandjean 104     104
         53      Report of Betsy Henry           104      104
11      54      Report of Betsy Henry           104      104
         55      Report of Russell Keenan        104      104
12      56      Report of Russell Keenan        104      104
         57      Report of Guy Vaillancourt      104      104
13      58      Report of Guy Vaillancourt      104      104
         59      Report of Dimitrios Vlassopoulos 104     104
14
        Plaintiffs'
15      Exhibit No.     Description             Offered   Admitted

16       1      ECF No. 200                      19       20
          5      ECF No. 390                      61       62
17      28      Phase I Report, Figures 1-7      42       42
         35      Phase II Report, Figures 1-6    133      133
18      43      Phase II Report, Figures 1-13    143      144
         46      Phase II Report, Figures 1-16   106      106
19      50      Phase II Report, App. 1-4        40       41
         57      Phase II Report, Figure 11-3.2  112      113
20      58      Phase II Report, Figure 11-3.4  117      117
         60      Phase II Report, Table 21-1     155      155
21      61      Phase II Report, Figure 23-2     82       82
         65      E-Mail String                   214      214
22     116      Phase I Report, Figures 20-23    48       49
        117      Phase I Reprot, Figure 24        56       56
23     118      Phase I Update, Figures 19, 21   65       65
        141      C.T. Driscoll, Figure 3         199      199
24

25
```

1        (Counsel present in open court.)

2            THE COURT:  Good morning.

3            MR. TALBERT:  Good morning.

4            THE COURT:  All right.  At long last, we are now

5    here in the matter of Maine People's Alliance versus

6    Mallinckrodt LLC, which is 00-cv-69-JAW.

7        Would counsel please enter their appearances.

8            MR. TALBERT:  Yes, Your Honor.  On behalf --

9            MR. BERNARD:  For the plaintiffs, Mitchell Bernard,

10   and if I may, Your Honor, just introduce my colleagues.  This

11   is Aaron Colangelo, Jared Thompson, Rachel Heron, and our

12   legal assistant, Michelle Wu.

13           THE COURT:  Welcome.

14           MR. TALBERT:  Your Honor, on behalf of defendant

15   Mallinckrodt US LLC, Jeffrey Talbert.  I'm here at counsel's

16   table with Patricia Duft from Mallinckrodt US LLC, Sigmund

17   Schutz from Preti, and Jenna MacGregor.

18           THE COURT:  Thank you.

19       What I'm going to ask counsel to do, at least for a

20   little while, until we get to recognize each other, is to

21   identify yourselves before you speak so that the record will

22   be clear.

23       Before I start with this, I'd like first to publicly

24   thank Justice Susan Calkins for her work in this.  She was

25   appointed -- I appointed her as the special master in this

5

1  case, and by my perception, she's done a truly excellent job.

2  She's a former justice of the Maine Supreme Judicial Court,

3  and I believe she's gained the substantial respect of the

4  parties in this litigation and has minimized disputes.

5      I'd also like to thank the attorneys for both the

6  plaintiffs and the defendant here for doing their work.  This

7  could have been a lot more contentious than it was, and I

8  attribute the relative efficiency and the lack of dispute in

9  this matter to the fact that you were able work to together,

10  that you here have isolated the issues that the court needs to

11  resolve, and I applaud you for agreeing, for example, that a

12  number of the exhibits that have been presented in the exhibit

13  list are joint exhibits and will not evoke any controversy.

14      I want to say a few words about scheduling and then talk

15  about where we're going from here.  We're going to be hearing

16  this case literally for the next month.  It may be shorter

17  than that, and I hope it is, but it's been set aside basically

18  for the month of June.  We're going to run an 8:30 to 2:30

19  schedule each day, with a couple of exceptions.  We'll take a

20  couple of breaks during the course of each day.  Almost every

21  day, with some exceptions, I have something scheduled at 3:00.

22  So that will mean, unfortunately, that you're going to have to

23  vacate so that other lawyers will be able to do their work at

24  the tables you're sitting at.  Those are mostly criminal

25  matters.

1     There are a few days when the 8:30 to 2:30 schedule will

2    not be available.  One of those is this Thursday.  I'm going

3    to break around 11:30 because I need to have a root canal

4    finished, and I don't think anybody wants to see me that

5    afternoon.  So I'm going to break at 11:30 on Thursday.  You

6    can plan on that.  Next Friday, the 13th, I have a sentencing

7    set for 1:00, and, therefore, we'll break earlier that day.

8    The only other potential problem may be a luncheon I'd like to

9    go to on Wednesday, June 18, I just got notice of, honoring my

10    former partner, Justice Kevin Cuddy of the Maine Superior

11    Court.  I'd like to be able to go to that, but if it's -- if

12    that's -- if the parties are not able to work around that,

13    this case will take priority.

14     I'm going to be, because this is a bench trial, flexible

15    in terms of your calling witnesses, calling witnesses out of

16    order, for example.  I'm going to make it as easy as I can for

17    the lawyers to do their job.

18     We've discussed these Daubert and Kumho issues.  My

19    suggestion at our earlier conference, as has been noted, was

20    to proceed with the witnesses and take their testimony.

21    They're so interrelated, their actual -- the substance of

22    their testimony and whether or not they meet Daubert

23    requirements are -- would be so interrelated that I don't see

24    any sense in separately having a Daubert-Kumho presentation

25    and then having him or her reiterate exactly what he said

1  before.  So I think the wiser course, because it is a bench

2  trial, is for me to hear that testimony and to ultimately rule

3  on the Daubert issues that have been presented after trial is

4  finished, when I've had the opportunity to thoroughly evaluate

5  all the evidence and decide whether or not they meet the

6  scientific standards set forth in Daubert.

7      I do actually appreciate the memoranda that have been

8  filed by both parties on those Daubert issues.  I think they

9  were very well done by both the plaintiffs and the defendant.

10  They were succinct and they were to the point, and I think

11  they've raised interesting issues.

12      Regarding the final report, I've read the final report.

13  It is a tome.  I certainly have not committed it to memory.

14  What I'm going to ask you to do, if it's possible, is to do

15  this.  I'm sure you each have a -- sort of an order of

16  witnesses that you anticipate presenting.  If you could give

17  me a little advance notice as to the areas that -- specific

18  areas that they will cover, I'll spend the evening rereviewing

19  the report and reminding myself what's in the report so that I

20  can get myself up to speed on the specific area.

21      The same thing I'm going to ask you to do for purposes of

22  the Daubert ruling.  If you have a witness who has been -- who

23  has been the subject of a Daubert motion, let me know in

24  advance, and I'll rereview your Daubert motion and remind

25  myself what the issue is.

1          I should mention, too, I know each of you have to

2    establish a record.  This case involves an awful lot of money

3    and will most certainly end up at the First Circuit Court of

4    Appeals in one form or fashion or another.  With that said, I

5    grew up around here.  I know the Penobscot River.  I've been

6    up and down the Penobscot River maybe five or six times.  I

7    know where Orrington is.  I know where Sandy Point is.  I know

8    where Frankfort is.  I've been there.  So you don't need to

9    treat me as an alien.

10         I do -- I've already learned things about the Penobscot

11   River that -- in the report that I did not know before, and I

12   expect to learn things throughout the course of this

13   presentation.

14         Now, turning to -- are there any questions thus far?

15              MR. BERNARD:  Not from the plaintiffs, Your Honor.

16              MR. TALBERT:  Not for the defendant, Your Honor.

17              THE COURT:  All right.  In anticipation of this

18   hearing, I rereviewed Judge Carter's July 29, 2002, decision.

19   It's hard to believe that over a decade -- well over a decade

20   has passed since that decision, in which Judge Carter held, in

21   effect, that Mallinckrodt is responsible for discharging

22   literally tons of mercury into the Penobscot River in the

23   Orrington plant.  Judge Carter's decision, as you well know,

24   included his order for a comprehensive study, which was -- and

25   that order was affirmed by the First Circuit on November 22,

1    2006.

2         The Study Panel then went to work and produced, as I've

3    mentioned and as you well know, a voluminous, detailed report

4    with findings and recommendations.

5         The issue here -- the primary issue here is one of

6    remedy, and from my perspective, the question is now that the

7    mercury is in the river and now the mercury has infiltrated

8    marshes and has been detected in birds and fish and others,

9    the question is what we do about it.  And that question is

10   interrelated to the question that I think Mallinckrodt has

11   raised in particular but also is an issue for the plaintiffs,

12   and that is, how bad is it?

13        So it seems to me the focus of this hearing is, how bad

14   is the problem?  How bad is it likely to be in the future?

15   And what do we do about it?

16        With that, Mr. Bernard, would you like to proceed?

17             MR. BERNARD:  Yes, Your Honor.  I think my colleague

18   may have a small housekeeping matter he wants to raise.

19             THE COURT:  Okay.

20             MR. TALBERT:  Yes, one preliminary matter, Your

21   Honor, in the lines that you were talking about earlier about

22   cooperating to make this case go more smoothly.  As you've

23   probably noted, there are a voluminous number of exhibits,

24   more so for the defendants' side.  But after discussion with

25   Mr. Bernard, we have agreed, at least with respect -- you've

1    seen the voluminous number of e-mails amongst the Study Panel

2    and others, we've agreed not to challenge the authenticity of

3    those documents to try to move this along, reserve our rights

4    to object on relevance or other grounds.

5            THE COURT:  Sure.

6            MR. BERNARD:  Just want to echo that there are, by

7    our count, of the 1,221 defendants' exhibits, there are 451

8    e-mails, and we have no objection in terms of authenticity,

9    but we do want to reserve our rights to object on any other

10   ground.

11           THE COURT:  Certainly.  Very good.

12           MR. BERNARD:  Your Honor --

13           THE COURT:  Anything else?

14           MR. BERNARD:  No.  If we may, we'll call our first

15   witness.

16           THE COURT:  You may.

17           MR. BERNARD:  Plaintiffs call Dr. John Rudd.

18           THE CLERK:  Please raise your right hand.  Do you

19   solemnly swear that the testimony you shall give in the matter

20   now in hearing shall be the truth, the whole truth, and

21   nothing but the truth, so help you God?

22           THE WITNESS:  Yes, I do.

23           THE CLERK:  Please be seated.  Please state your

24   name and spell your last name for the record.

25           THE WITNESS:  My name is John Rudd.  My last name is

1    spelled R-u double d.

2              THE COURT:  You may proceed.

3              MR. BERNARD:  Thank you, Your Honor.

4    JOHN RUDD, having been duly sworn, was examined and testified

5    as follows:

6                        DIRECT EXAMINATION

7    BY MR. BERNARD:

8    Q     Good morning, Dr. Rudd.  What is your educational

9    background?

10   A     I have a -- a Ph.D. in microbiology, and I then did a

11   postdoc at the Woods Hole Oceanographic Institution before

12   starting work in -- in Canada with the federal government.

13   Q     What was the focus of your postdoctoral work?

14   A     It was studying sulfate reduction in -- in salt marshes.

15   Q     You mentioned then you went to work at the Freshwater

16   Institute?

17   A     Yes, yes, I -- I worked there for -- for 35 years for

18   the -- for the government of Canada, at specifically a place

19   called the Experimental Lakes Area, which -- which is a

20   world-renowned site for experimental research where whole

21   ecosystem manipulation studies are done to -- to -- type of

22   applied research to -- to remedy various environmental

23   problems.

24   Q     When did you work at the Experimental Lakes Area?

25   A     Ah --

RUDD - DIRECT EXAMINATION/BERNARD

12

1   Q      As best you recall.

2   A      I start -- I worked there for 35 years.  I started in

3   the early 1980s, and I left there about -- about ten years ago

4   now.

5   Q      And what was your position when you left Experimental

6   Lakes?

7   A      I was -- I was director of the Experimental Lakes Area.

8   Q      Okay.  And just -- could you just briefly describe the

9   sort of projects you were involved in there?

10  A      The ELA, Experimental Lakes Area, and the -- the short

11  term for it is ELA, is known for doing, as I said, whole

12  ecosystem research.  That means we manipulate or we -- we

13  manipulated lakes in various ways to simulate environmental

14  problems.

15         For example, ELA was -- was the place where it was first

16  demonstrated that phosphorous is the main cause of

17  eutrophication.  In that case, phosphorus was added to a lake

18  and it became eutro -- it eutrophied without any further

19  additions.

20         I was also involved in acid rain research there, where

21  -- where nitric and sulfuric acids were added to whole lakes,

22  and that demonstrated that -- that addition of acid affected

23  the -- the food chain and fish production.  And also we

24  discovered that -- that acid is actually consumed by bacteria

25  that live in the sediments, which was a mitigating feature.

1        I then went on to study mercury at -- at the

2    Experimental Lakes Area -- that experiment is still ongoing --

3    where we added isotopic mercury to an entire lake and its --

4    and its watershed to simulate atmospheric deposition of

5    mercury.  So this -- this was always from the point of view

6    of -- of -- from a scientific experiment trying to -- to

7    decide what the remedy for -- for particular large

8    environmental problems was.

9    Q    You mentioned ecosystem research a moment ago.  What --

10   is there such a thing as ecosystem science?

11   A    Yes, there is, yeah.  That's what -- that's what --

12   that's what ELA does and what ELA is known for.  Groups of --

13   groups of scientists work there together in teams.  People --

14   geochemists, hydrobiologists, chemists, and they all work

15   together on the same problem.  Like there was a team of people

16   working on -- on each of these problems that I've just

17   described.

18   Q    Do you consider yourself to be an ecosystem scientist?

19   A    Yes, yes, I -- I started off as a microbiologist, and

20   I -- I spent so many years with these people in other

21   disciplines and working side by side with them that over the

22   years, by osmosis, you soak up a lot of what they know, and

23   the questions we were asking were ecosystem problems.  It's,

24   how does phosphorus affect ecosystems?  How does acid rain

25   affect ecosystems?  How does mercury affect ecosystems?  So

1    that --

2    Q      Did you -- I'm sorry.

3    A      That was my perspective.

4    Q      Did you work on a system called the English-Wabigoon

5    System?

6    A      Yes, actually, for -- that was the first system I worked

7    on -- actually, before I worked directly at ELA, after I was

8    hired by the -- the Canadian government.  That's a river-lake

9    system that was contaminated by a chlor-alkali plant.  This

10   was back in the -- the very early 1980s, soon after the

11   mercury problem was discovered at Minamata.  It's actually a

12   system that's very analogous to the Penobscot in many ways,

13   and we had a -- I headed a team of -- of people who studied

14   that system and -- and did a number -- tested a number of

15   different types of remedial measures.

16   Q      Is the HoltraChem plant in Orrington also a chlor-alkali

17   plant?

18   A      Yes.

19   Q      Have you done -- since the English-Wabigoon work, have

20   you done other work on mercury over the years?

21   A      Yeah, actually, for the entire time, in addition to

22   working on eutrophication of acid rain, I've worked -- I've

23   worked on mercury, and I've looked at the microbial processes

24   that produce methylmercury.  I've -- in Canada, there's large

25   reservoir mercury problems.  Whenever you build a reservoir,

RUDD - DIRECT EXAMINATION/BERNARD

1    you find that it's later contaminated by mercury.  There's

2    been no mercury added, but methylmercury's produced as a

3    result of the flooding.

4         So I've spent a lot of time studying reservoir mercury

5    problems in addition to chlor-alkali plants, and then the

6    atmospheric mercury situation that I've already described.

7    Q    Have you, during the course of your career, published

8    articles in the peer-reviewed scientific literature?

9    A    Yes.

10   Q    And have some of those articles concerned mercury?

11   A    Yes, I would say roughly -- maybe over half of them.

12   Q    Have you been involved at all in a project for CALFED

13   involving the San Francisco Bay Delta?

14   A    Yes, yes, I was involved -- I was on an advisory panel

15   there for a number of years.

16   Q    Okay.  And does that involve mercury along with some

17   other contaminants?

18   A    Yes, yes, that -- yeah, it does.

19   Q    Okay.  You mentioned a moment ago that you've worked on

20   multidisciplinary teams on ecosystem research.  Are there

21   specific areas of the research involved in the Penobscot River

22   Mercury Study in which you consider yourself to have special

23   or in-depth expertise?

24   A    I guess in my research, I've -- I've concentrated mostly

25   on -- on the production of methylmercury and also the -- the

1  transport of methylmercury through ecosystems.  Those are the

2  two main areas.  I've worked -- as I've mentioned, I've worked

3  with biologists a lot, so I'm -- I'm familiar with that.  But

4  I -- I'm most interested on what's the -- what's called the

5  biogeochemical side of mercury.

6  Q    And when you say the biogeochemical side, could you

7  briefly explain what you mean?

8  A    Well, I really got a look at -- at bacteria as little

9  bags of enzymes, and what they do is perform chemical

10  reactions in the environment.  So I started out as a

11  microbiologist, but I was a microbiologist from the point of

12  view of -- of how do bacterial reactions affect the

13  environment.  How -- and one of the things they do to affect

14  the environment is produce methylmercury, and that's -- that's

15  part of the field of biogeochemistry.  Interaction -- it's the

16  intersection between biology and chemistry.

17  Q    Aside from the areas in which you have special or

18  in-depth expertise, are you conversant with the various

19  disciplines that were involved in the Penobscot River Mercury

20  Study as a result of your prior ecosystem work?

21  A    Yeah, I -- I'd say I'm comfortable talking to biologists

22  and fish biologists who -- who I worked with for many years.

23  Yeah, most -- I'd say all of the disciplines, maybe with

24  the -- the -- the work that Rocky Geyer did on the -- on the

25  hydrodynamics of the system is probably what I'm least

1    familiar with.

2    Q    All right.  We've been discussing your background.  Is

3    there a more detailed account of your background and

4    professional work and publications and education in your CV?

5    A    Hm-hmm, yes.

6         MR. BERNARD:  Okay.  Your Honor, for the court's

7    reference, Dr. Rudd's CV is Joint Exhibit 25.

8         THE COURT:  Thank you.

9    BY MR. BERNARD:

10   Q    Let's turn, Dr. Rudd, to your involvement in the

11   Penobscot River Mercury Study.  When were you first contacted

12   about becoming involved, if you recall?

13   A    Oh, about ten years ago now.  I don't keep very good

14   track of dates.  Yeah, I was contacted by Chris Whipple, who

15   asked me if I'd be interested in taking part in the project.

16   Q    Now, when were you -- withdrawn.

17        When you were contacted, had you had any prior

18   involvement with the plaintiff, Maine People's Alliance?

19   A    No.

20   Q    How about the plaintiff, Natural Resources Defense

21   Council?

22   A    No.

23   Q    How about the defendant, Mallinckrodt?

24   A    No.

25   Q    Did you know Dr. Whipple when he -- prior to the time he

1    called you?

2    A     No, no, I did not.

3    Q     Okay.  And did you agree to become the chair of the

4    court-appointed Study Panel?

5    A     Yes, I did.

6    Q     Okay.  Why did you agree?

7    A     Well, I -- I was intrigued by the -- the idea of the

8    study.  Dr. Whipple informed me that the -- that the legal

9    aspects of the study was -- were over and that -- that an

10   independent study was -- was going to be started.  And it

11   appeared to me, in a lot of ways, to be very similar to the

12   work that I'd done at the Experimental Lakes Area, where I

13   could do independent research, sound science, with a team of

14   people working on mercury in a chlor-alkali plant in a whole

15   ecosystem.  So it was very familiar to me and -- and very

16   challenging, and I -- I thought it was a great opportunity.

17   Q     At around the time you were asked to participate, did

18   you have any communication directly with Judge Carter?

19   A     Ah, yes, after -- after talking to Dr. -- Dr. Whipple,

20   yes.

21   Q     Okay.  And what was the substance of your communication

22   with Judge Carter, if you recall?

23   A     He invited the panel to -- to come -- to come to see him

24   and explained -- explained the situation and -- and gave us

25   some -- some direction, some verbal direction, in addition to

1    the orders which we had all -- which we'd already been given

2    to read.

3    Q    And, in essence, to the best of your recollection, what

4    did he instruct you to do?

5    A    I'd say -- I'd say the thing that stuck with the panel

6    the most is he -- and I was actually very impressed -- he

7    wanted us to do sound science, and he made that very clear,

8    that he wanted us -- he wanted it to be an independent study

9    and to be conducted in a sound scientific manner, but he

10   didn't want us to do ground-breaking research.  He wanted us

11   to use established methods.  He didn't want science with all

12   the bells and whistles.  He wanted -- he wanted -- he

13   described it as a Ford rather than a Cadillac.  He wanted it

14   to be sound but -- but not with all the bells and whistles.

15   Q    Okay.  When you first took on -- did he ultimately

16   appoint you as the chair of the Study Panel?

17   A    Yes, he did.

18        MR. BERNARD:  Your Honor, for the court's reference,

19   that appointment order is Plaintiffs' Exhibit 1.

20        THE COURT:  Is -- is that agreed to, or is that a

21   joint exhibit?

22        MR. BERNARD:  You know --

23        THE COURT:  How do you want to work this?

24        MR. TALBERT:  I have no objection to -- to that

25   exhibit.

 1            THE COURT:  All right.

 2            MR. BERNARD:  There's no objection.  It was --

 3   there'll be some exhibits that are plaintiffs' or defendants'

 4   exhibits that probably could have been joint exhibits, neither

 5   party objects, and -- and this is one.

 6            THE COURT:  Sure.  Probably where there isn't a

 7   joint exhibit, it should be moved into evidence.

 8            MR. BERNARD:  Okay.

 9            THE COURT:  And I take it you're moving Exhibit 1

10   into evidence.

11            MR. BERNARD:  I am.

12            THE COURT:  And there's no objection?

13            MR. TALBERT:  No objection, Your Honor.

14            THE COURT:  It's admitted.

15   BY MR. BERNARD:

16   Q    Dr. Rudd, when you first took on the assignment on the

17   Penobscot, what, if anything, did you know concerning the

18   degree of mercury contamination in the Penobscot River?

19   A    I -- I was not aware of the problem at all.

20   Q    And did you have any preconceived idea of what the

21   extent of the mercury contamination was?

22   A    My -- my guess was, based on my previous experience with

23   working at -- in other chlor-alkali situations, that -- that

24   there was likely to be fairly extensive contamination.

25   Q    Hm-hmm.

1          THE COURT:  You're going to have to pull that

2     microphone a little bit closer to you, sir.  Thank you.

3     BY MR. BERNARD:

4     Q      Did you have any preconceived notion when you took on

5     this assignment of whether active remediation of the Penobscot

6     River would be warranted?

7     A      No, I hoped -- I hoped we wouldn't have to do that, but

8     in the end, I wasn't surprised that we recommended this.  I --

9     you know, I've worked in -- in a couple of situations, the

10    English-Wabigoon and also on Lavaca Bay and both chlor-alkali

11    situations and both situations warranted that.

12    Q      Do you consider yourself to be aligned with either side

13    in this litigation?

14    A      No.

15    Q      Do you see your responsibility as being solely to the

16    court?

17    A      Yes.

18    Q      And has that been true throughout your involvement in --

19    in this matter?

20    A      Yes, yes, that was actually very important to me.

21    Q      Was it important to you that you and your colleagues on

22    the Study Panel be independent of the parties to the case?

23    A      Yes, yes, that was one of the things that impressed me

24    most when I met with Judge Carter is he wanted this to be an

25    independent study.

1    Q      Why was that important to you?

2    A      Well, because I think that's -- that's always the way

3    I've done science, and -- and I think that's the way science

4    should be done.  You -- you should -- you should be able to

5    freely design your -- your research, perform -- perform your

6    studies, interpret your data, and then present them to your

7    colleagues and -- and -- so they can be examined.  But you

8    should -- you should be able to do the work yourself

9    independently at first, without any influence from the

10   outside, before -- before it's examined.  I think that's the

11   best way to do science.

12   Q    Do you -- can you approximate how much of your work time

13   since 2004, the last ten years, you've spent on this project?

14   A      Well, I've been semi-retired.  So most of my time, I

15   would say 80 percent of my time has been spent on this,

16   although I haven't worked on it 80 percent of my workday.  But

17   it's been my major focus scientifically since I started as --

18   as Study Panel leader.

19   Q      Okay.  Let's turn for a moment to the workings of the

20   Study Panel.  You mentioned Dr. Whipple.  And who is the other

21   member of the Study Panel?

22   A      Dr. Fisher.

23   Q      How would you characterize the working relationship

24   among the three of you during the course of the study?

25   A      Oh, I think we've worked together very well.  Um, I

1    think we all -- we all speak our minds very freely.  We

2    definitely all have our opinions and -- and there's been many

3    debates.  But I think they've been honest debates, and -- and

4    we've usually come to a consensus.

5    Q     Okay.  Are you aware that Dr. Whipple was nominated to

6    the panel by the defendant Mallinckrodt?

7    A     Yes, I am.

8    Q     Okay.  And you're aware that Dr. Fisher was nominated to

9    the panel by the plaintiffs?

10   A     Yes.

11   Q     During the course of the study, did you ever have the

12   sense that Dr. Whipple favored the defendant in any way?

13   A     No, no, not at all.  In fact, sometimes I had to remind

14   myself who appointed who.  You know, it became -- you know, we

15   became a team, which is what I hoped would happen.

16   Q     Then I take it you also didn't have the sense that

17   Dr. Fisher favored the plaintiffs in any way.

18   A     No, no.

19   Q     Did the Study Panel hire a project leader?

20   A     Pardon me?

21   Q     A project leader, did the Study Panel --

22   A     Yes.

23   Q     -- hire a leader?

24   A     Yes, we did.

25   Q     And who is that?

1    A     Dr. Bodaly.

2    Q     And what was the reason to hire Dr. Bodaly?

3    A     Well, I -- I think -- from my perspective, I was trying

4    to recreate what I had done at the Experimental Lakes Area,

5    with the experience I'd had at Experimental Lakes Area, and

6    there it was always very important to have scientists in the

7    field, and so they could make on -- on-the-ground, on-the-spot

8    decisions and organize and be experienced in the field.

9          And that wasn't my position or the Study Panel's

10   position, so I thought it was important to have a scientist

11   working in the field, organizing the research and making sure

12   it was done properly.

13   Q     Okay.

14         MR. BERNARD:  Your Honor, we'll hear from Dr. Bodaly

15   directly and hear more detail about that.

16   BY MR. BERNARD:

17   Q     Who is Dianne Kopec?

18   A     Dr. Kopec is -- was -- was hired to -- to assist

19   Dr. Bodaly.  She worked a lot on the data, became -- sort of

20   took the lead on the -- on -- on the -- the bird studies, did

21   a lot of work in the field, became another important member of

22   the team.

23   Q     Okay.  Are you involved in a business called Rudd &

24   Kelly Research?

25   A     Yes, that's -- that's our little company.  It's a --

1   it's a -- a company of two.

2   Q    And is the second person Dr. Carol Kelly?

3   A    That's right, yes.

4   Q    And is she your spouse?

5   A    Yes.

6   Q    What was Dr. Kelly's role in the Penobscot River study?

7   A    Well, ah, her role kind of grew over -- over time as the

8   project -- as the project -- as the project grew in complexity

9   and became -- and became a little more associated with

10  biogeochemical side rather than the biology side.

11       The way that the panel study was set up and Dr. Bodaly

12  was hired, it was really strong on the biology side, but not

13  nearly as strong on the biogeochemistry side.  And Dr. Kelly

14  is a biogeochemist, as well.  So she gradually became more

15  involved as the biogeochemical data came in, and it wasn't

16  really my role to -- to do the primary interpretation of it.

17  Q    Okay.  A few questions on procedure that -- procedures

18  that you followed.  Did the Study Panel file regular written

19  reports with the court concerning the progress of the study?

20  A    It filed a report at the end of -- of Phase I of the

21  study and another report at the end of Phase II, yes.

22  Q    Do you recall quarterly reports that were also --

23  A    Oh, yes.

24  Q    That were provided by the Study Panel?

25  A    Yes, I do.

1    Q      And were they to report on the progress of the study?

2    A      Yes, yes, yes.

3    Q      Did the Study Panel meet periodically with the parties

4    to the litigation?

5    A      Yes, I'd say roughly annually.

6    Q      Okay.  And were some of those meetings in person?

7    A      Yes, yes, I think they -- they -- most of them were.

8    Q      Did the Study Panel engage -- you've mentioned

9    Dr. Bodaly, Dr. Kopec, Dr. Kelly, in addition to the three

10   court-appointed Study Panelists.  Did the Study Panel engage

11   additional scientists to work on the study?

12   A      Yes, we did, particularly in -- in Phase II of the

13   study.  Then -- there we were trying to understand how

14   mercury -- what was controlling the movement of mercury

15   through the -- through the ecosystem and its distribution,

16   and -- and in order to -- to accomplish that, we needed a

17   number of experts in different fields.  So we -- we went to

18   people that we highly respected and -- and are mostly --

19   mostly international experts in their field and asked them if

20   they were interested in -- in doing different parts of the

21   study.

22   Q      Okay.  And did you meet -- can we call them

23   investigators?  Is that a fair term?

24   A      Sure.

25   Q      Okay.

 1   A     Yeah.

 2   Q     Did you -- did the Study Panel meet periodically with

 3   the investigators during the course of Phase II of the study?

 4   A     Yes, we met at least once a year.  Towards the end of

 5   the study, we met more often.

 6   Q     Okay.  You averted to this a moment ago, but I want the

 7   record to be clear.  How would you characterize the

 8   professional caliber, in general -- we'll get to individuals

 9   later on -- but, in general, how would you characterize the

10   professional caliber of the investigators that the Study Panel

11   engaged?

12   A     Oh, I -- I think it was top of the line.  I think that's

13   one of the big -- more -- from my perspective, one of the most

14   exciting parts of working on this study is we were able to

15   hire internationally renowned people.  I think everybody we

16   have on this study is -- we could -- we -- we -- because we're

17   in the field, we know who's doing a really good job and -- and

18   we had the resources and freedom to go out and hire the best

19   people.

20   Q     When the Study Panel wanted to engage in or undertake a

21   particular item of work, did it submit a proposal for that

22   work to the court?

23   A     Yes.

24   Q     And did it await the court's approval prior to

25   proceeding with that work item?

1    A      Yes, yes, they did.

2    Q      Was there a lot of open discussion during the course of

3    the study among the Study Panelists and the additional

4    scientists you've identified?

5    A      Yes, yes, there was.  Maybe not as much as I would have

6    liked, but we -- we certainly -- we certainly discussed things

7    as much as we could.

8    Q      And -- and did that include the sharing of -- of ideas

9    about what data --

10   A      Yes.

11   Q      -- might mean?

12   A      Yes, we -- at our annual meetings, people came and

13   presented their latest results, and -- and the purpose of

14   those meetings was try to put everybody's results together and

15   synthesize them into a bigger picture.

16   Q      Hm-hmm.  And did some -- some of the communications

17   involve ideas that were thrown out as preliminary ideas that

18   were later either refined or discarded when new data or new

19   analysis arrived?

20   A      Oh, yes, yes, that's a normal part of science.

21   Q      And were some of those communications carried on by

22   e-mail?

23   A      Yes.

24   Q      Okay.  Did the Study Panel attempt to reach decisions by

25   consensus?

RUDD - DIRECT EXAMINATION/BERNARD

1    A    Yes, it did.

2    Q    And how -- how well did you succeed at that; do you

3    think?

4    A    I -- I think we did very well.  There's -- there was

5    only a couple of occasions that I can really think of when

6    we -- when we had -- had, you know, what I would call serious

7    disagreements and couldn't come to -- come to a conclusion.

8    Q    Hm-hmm.  Are serious disagreements among serious

9    scientists standard in your line of work?

10   A    Yes, yes, that's -- that's how you get to the truth.

11   Q    Let's turn, just for an overview, to the substance for a

12   moment, just to provide a framework for the questions that

13   will follow.

14        What are the Study Panel's major findings?

15   A    I would say we found that -- that the system was heavily

16   contaminated with mercury.  It was -- it was contaminated

17   from -- from just below Veazie Dam to out into Penobscot Bay,

18   south of Islesboro Island.  The biota were also contaminated,

19   particularly the birds, which were at very high

20   concentrations.  Also some of the -- the shellfish and -- and

21   ducks that humans were consuming.

22        I think we found that the -- the production of

23   methylmercury was -- which is the real problem, was controlled

24   by the -- largely by the -- the input of mercury to the

25   ecosystem, and a really important thing I think we discovered

1    that we didn't expect going in was that the -- the rate of

2    cleanup of the system, sort of the nub of the problem, is --

3    is a mobile pool of sediments that -- it's -- holds a lot of

4    the -- presently holds a lot of the mercury and is retarding

5    the rate of recovery.

6    Q    Anything else by way of major findings that occur to you

7    now?

8    A    Not that I can think of at the moment, no.

9    Q    Okay.  We'll return to each of those --

10   A    Okay.

11   Q    -- in greater detail.  Before we do, was each of the

12   findings you just articulated a consensus finding of the Study

13   Panel?

14   A    Yes, I think that was, yes.

15   Q    Now, in terms of recommendations, does the Study Panel

16   recommend that the court order the pursuit of active

17   remediation of the Penobscot Estuary?

18   A    Yes, it does.

19   Q    And is that a recommendation the Study Panel reached by

20   consensus?

21   A    Yes.

22   Q    Okay.  Let's talk for a few minutes about mercury.  What

23   is inorganic mercury?

24   A    Inorganic mercury is -- is mercury that has no carbon

25   atoms attached to it.  It -- it's in a form -- it -- one form

1   of inorganic mercury is elemental mercury, which is the kind

2   of mercury you see in a thermometer.  It's liquid.

3        There's another form of mercury called ionic mercury,

4   which is slightly more oxidized than the elemental mercury.

5        And then in addition to that, there -- there is various

6   types of organic mercury, but the inorganic mercury has no

7   carbon associated with it.

8   Q    And what is organic mercury?

9   A    Organic mercury is -- the one we're most concerned with,

10  there's other types of organic mercury, but the one we're most

11  concerned with in this study is methylmercury, which is the

12  inorganic mercury with a -- a carbon atom attached to it

13  and -- and two or three hydrogen atoms.

14  Q    And what's the reason that we're concerned about

15  methylmercury?

16  A    Well, methylmercury is -- is orders of magnitude more

17  toxic than inorganic mercury.  The other -- the other

18  characteristic of methylmercury is it's bioaccumulated and

19  biomagnified very efficiently up food chains.  So it's a very

20  low concentration, for example, in water, but then there -- it

21  takes a big jump in concentration when it moves into the

22  lowest levels of the food chain and then continues to

23  bioaccumulate up the food chain into predators.  So the

24  predatory concentrations of mercury are many orders of

25  magnitude higher than the concentration in the water or

1    sediments.

2    Q     And that magnification process is referred to as

3    biomagnification?

4    A     Yes, yes.

5    Q     And what does the term bioaccumulation mean?

6    A     Bioaccumulation means if a -- if a bacteria or any other

7    type of -- of organism assimilates mercury from their

8    environment, takes it into their body and becomes attached

9    to -- to the tissues in their body.

10   Q     Is there a process pursuant to which inorganic mercury

11   is converted into organic or methylmercury?

12   A     Yes, yes.

13   Q     And is that called methylation?

14   A     Yes, it is.

15   Q     Okay.  And could you briefly describe how that occurs?

16   A     It occurs by -- by bacteria that -- that inhabit --

17   usually inhabit anaerobic environments or environments without

18   oxygen.  So the -- in the bottom of -- of -- in sediments, for

19   example, just below the -- the surface of sediments, the --

20   there's no oxygen, and these bacteria live there.  Mercury is

21   taken into their cells, and -- and through -- as a result of

22   their biochemical activity, a methyl group is attached to

23   the -- the inorganic mercury, and then it's -- it's released

24   back into the environment.

25   Q     Okay.  And where -- does methylation occur in the

1    sediment?

2    A     Mostly, not entirely.

3    Q     Okay.  Where else can it occur?

4    A     It can occur in -- in small particles.  For example,

5    even in the water column, some small particles have been shown

6    to be anoxic in their centers.  It can also occur in the

7    intestines of fish, which are also anoxic.

8    Q     When it occurs in the sediment, is there a location

9    within the sediment column, a depth within the sediment

10   column, where it generally occurs?

11   A     Yes, usually in the top 4 to 5 centimeters of sediments.

12   Q     Okay.  What is referred to as -- you've mentioned

13   methylmercury.  What is referred to as total mercury?

14   A     Total mercury is an analysis that's done in sediments in

15   water and it contains all types of mercury.  It contains both

16   inorganic mercury and methylmercury.

17   Q     So total mercury includes methylmercury --

18   A     Yes, it does.

19   Q     -- but not only methylmercury.

20   A     Yes.

21   Q     Okay.  Are you familiar with the effects that mercury

22   can have on aquatic organisms?

23   A     Yes.

24   Q     And could you please briefly describe those?

25   A     Well, mercury is -- is mostly a -- a -- thought of to be

1    a neurotoxin.  It affects usually the reproductive stages,

2    reproductive processes of -- of organisms.  I'm not a

3    toxicologist, so I'm just telling you what I've read and

4    understood from others.

5         It affects -- I've read recently it affects brain

6    development, so that it's possible that children could be born

7    with lower IQ if their mothers have -- have eaten mercury

8    while they're pregnant.

9    Q    All right.  Let me show you an exhibit.  This is

10   Plaintiffs' Exhibit 90.  It's a demonstrative exhibit, and it

11   might help us get through this fairly quickly.  Do you see

12   that on your screen, Dr. Rudd?

13   A    Yes, I do.

14   Q    All right.  So this is a timeline that we prepared of

15   Study Panel reports and party comments on the reports.

16        MR. BERNARD:  Your Honor, you'll note we've added

17   now the exhibit numbers to those documents that have been

18   marked as exhibits.

19        THE COURT:  Right.

20   BY MR. BERNARD:

21   Q    And I just want to get a sense, before we go into the

22   substance of the reports, of how the process worked.  Did the

23   Study Panel divide the study into phases?

24   A    Yes.

25   Q    Okay.  And -- and what was the reason for that?  Do you

1  recall?

2  A    I -- we -- we were essentially, I think, following the

3  order of -- Judge Carter's orders.  It seemed to us he divided

4  the orders into three stages:  The first was to look at the

5  extent of mercury contamination, both geographically and --

6  and in the -- into the -- into the biota, as well, and so we

7  investigated that first to determine whether there really was

8  a problem and how bad it was and how widespread it was.  And

9  we -- we called that Phase I of the study.  And that was -- is

10  what we interpreted to be his first statement in his -- in his

11  order.

12      The second statement then was if we found there was a

13  problem, we were -- we -- we interpreted his order to mean we

14  then needed to find out how long the problem would last,

15  and -- and we needed to understand mercury in the ecosystem

16  from a scientific perspective, to see whether there's -- at

17  some point that we could intervene to -- to possibly do some

18  type of remediation in the future.

19  Q    Okay.

20  A    And that was -- that was termed Phase II of the study.

21  Q    Okay.  In terms of the process by which the phases were

22  undertaken -- and this demonstrative exhibit in front of you

23  is meant to help you only if you need it -- but I want, for

24  the court's edification, to go through kind of how that

25  process worked.  Did -- before undertaking Phase I, did the

1   Study Panel produce a proposed plan for that Phase I study?

2   A     Yes, yes, we wrote -- we wrote a proposal to the

3   court -- a comprehensive proposal to the court, very much like

4   a scientific proposal that we would write for a -- for a

5   research project.

6   Q     And did the parties then comment on --

7   A     Yes, they did.

8   Q     -- the proposal?

9   A     Yes.

10  Q     And did the Study Panel then refine its proposal in

11  response to the -- to the --

12  A     Yes, it did.

13  Q     -- degree it deemed appropriate?

14  A     In a few cases it did, yes.

15  Q     Okay.  And then did it submit a refined proposal for the

16  court's approval?

17  A     Yes, that's my memory.

18  Q     Okay.  And then once the court approved the Phase I

19  study, you went ahead and conducted it; is that correct?

20  A     That's right, although -- although each time we came to

21  do a small subset of -- of that larger proposal, we submitted

22  a -- a smaller proposal to the court for its approval.

23  Q     Okay.  And then you -- you submitted -- you conducted

24  Phase I, and you submitted the Phase I Report, and this was in

25  January of 2008.  And do you recall whether the parties had an

1    opportunity to comment on the Phase I Report?

2    A     Yes, they did.

3    Q     Okay.  And then did the court approve the Phase I

4    Report?

5    A     Yes, it did.

6    Q     And did it direct the Study Panel to proceed to

7    Phase II?

8    A     Yes, it did.

9    Q     Okay.  And did the Phase II study go through a similar

10   process that you just described --

11   A     Yes.

12   Q     -- of a proposed study plan, party comments, refined

13   study plan, court approval?

14   A     Yes.

15   Q     Now, there was a Phase I Update Report in May of 2009.

16   Do you recall that?

17   A     Yes, I do.

18   Q     And what was the reason -- what was the occasion for the

19   update?

20   A     Well, we -- it was really kind of an attempt to move the

21   study along.  It became clear to us be -- before all -- all of

22   them -- every last piece of data was in, that -- that the

23   study was -- or that the ecosystem was actually contaminated

24   with mercury, and -- and we felt comfortable in concluding

25   that and we knew the extent of -- also the extent of

1    contamination.

2         And so we suggested to Judge Carter that we could -- we

3    could write up a report now with the -- what we were sure at

4    that time was the key data and the conclusions, and then when

5    the last pieces of data came in, we would update the report,

6    and he -- he agreed to that.

7    Q    By way of reports, then, just to clarify, there was the

8    Phase I Report; is that correct?

9    A    Yes.

10   Q    And that was in January 2008?

11   A    Yes.

12   Q    Okay.  Then there was the Phase I Update in May of 2009?

13   A    Hm-hmm.

14   Q    Then there was the Phase II Report, which was

15   April 2013?

16   A    Right, yes.

17   Q    And then was there a report on some monitoring that the

18   panel conducted in 2 -- 2012?

19   A    Excuse me?

20   Q    Was there a subsequent report -- subsequent to the

21   Phase II Report --

22   A    Yeah.

23   Q    -- of some monitoring --

24   A    Oh, yes.

25   Q    -- that the panel had done --

1    A    Yes.

2    Q    -- in 2012?

3    A    Yes.

4    Q    Okay.  And do you remember when that was submitted to

5    the court?

6    A    I'm sorry.  I'm having a little trouble hearing you.

7    Q    Okay.  How's this?  Is this a little better?

8    A    Yeah.

9    Q    Okay.  Was that submitted in December of 2013?

10   A    Yes.

11   Q    Okay.  And then, finally, was there a report on some

12   black duck monitoring that was done this past winter?

13   A    Yes.

14   Q    And was that submitted to the court in March of this

15   year?

16   A    Yes.

17   Q    Okay.  Let's turn to phase --

18            THE COURT:  Just -- I'll just note that your note

19   says April.

20            MR. BERNARD:  What's that?

21            THE COURT:  Your demonstrative says April 3.

22            MR. BERNARD:  That's my mistake, Your Honor.  It

23   is -- it -- it was submitted in April, and it's Docket

24   No. 728.

25            THE COURT:  Okay.

1          MR. BERNARD:  Sorry about that.

2    BY MR. BERNARD:

3    Q    Dr. Rudd, let's -- I'm going to ask you a series of

4    questions about Phase I so we can take this kind of

5    chronologically.

6          What was the primary objective of Phase I of the study?

7    A    I'd say the primary objective was to look at the extent

8    of contamination, both in a geographic sense, how -- how far

9    downstream from HoltraChem and upstream, to a certain extent,

10   had the -- had the mercury traveled.  And we were also

11   ordered, we thought, to -- to look at mercury in the biota and

12   to see whether there was any serious contamination in any of

13   the biota in the ecosystem.

14   Q    Now, in order to carry out the court's instructions, did

15   the Study Panel design a sediment sampling program along the

16   Penobscot?

17   A    Yes, it did.

18   Q    Okay.  And did you divide the river into reaches?

19   A    Yes.

20   Q    Okay.  Let me show you -- this is Plaintiffs'

21   Exhibit 48 -- actually, just give me one moment.  Let me first

22   show you Plaintiffs' Exhibit 50, just get a --

23          THE COURT:  I take it there's no objection to 50?

24   Are you admitting it or --

25          MR. BERNARD:  Yeah.

1          MR. TALBERT:  No objection, Your Honor.

2          MR. BERNARD:  Your Honor, we -- what we did was

3    there are -- as you pointed out earlier, the -- the reports

4    are very voluminous.

5          THE COURT:  Right.

6          MR. BERNARD:  So when we knew we were going to focus

7    on one page or two pages, we separated those out as exhibits

8    because we thought it would be easier for the court.  So this

9    is one of those documents, and there's no objection, and we

10   move its admission.

11         THE COURT:  Okay.  50's admitted without objection.

12   BY MR. BERNARD:

13   Q     What does this show, Dr. Rudd?  Do you recognize this?

14   A     This shows --

15         THE COURT:  You can -- just a second.  Just a

16   second.  You can remove that purple line.

17         MR. BERNARD:  How can I do that?

18         THE COURT:  Well --

19         MR. BERNARD:  Ah, thank you.  I'd like to say I did

20   that, but I didn't.  Thank you.

21         THE WITNESS:  I did.

22         MR. BERNARD:  Go ahead.

23   BY MR. BERNARD:

24   Q     What does this depict, Dr. Rudd?

25   A     This shows the Penobscot River from above the -- the

1    city of Bangor down to Upper Penobscot Bay.

2    Q    Okay.  And I want to now show you, now that we've looked

3    at the whole river, let's look at Plaintiffs' Exhibit 28.

4         MR. BERNARD:  And, Your Honor, this is a series of

5    figures that come from the Study Panel's report, and we would

6    just move in advance Plaintiffs' 28.

7         THE COURT:  Any objection to 28?

8         MR. TALBERT:  No objection, Your Honor.

9         THE COURT:  28's admitted.

10   BY MR. BERNARD:

11   Q    What does this depict, Dr. Rudd?

12   A    This is a depiction of -- of the reaches of the river

13   that we sampled.

14   Q    Okay.  Could you just point out for the court what the

15   reaches are?

16   A    Ah, can I point on the --

17   Q    Yes.

18   A    Ah, the --

19   Q    The judge is looking at the same screen that we are.

20   A    Oh, okay.  We -- the objective of -- of this study was

21   to try to put the -- the contamination of -- of the upper

22   estuary into perspective.  And to do that, we tried to see how

23   the concentrations of mercury in the lower estuary, below

24   Veazie Dam, compared to other areas of the -- of the river.

25   We started up at the top of the river, in what we called the

RUDD - DIRECT EXAMINATION/BERNARD

43

1    -- the EB reach and sampled -- sampled there because we

2    thought there was very little impact -- or would be very

3    little impact of industry up there.  It was -- there was no

4    upstream paper mills at that site, and we thought that paper

5    mills might have been a historical site of mercury

6    contamination and maybe there would still be some ongoing --

7    some ongoing of loss of mercury from those sites, even though

8    mercury wasn't used there anymore.  So we studied above there

9    as kind of a starting point.

10       We then moved down the river and did another study above

11   Veazie Dam, which I think is -- is here.  It's not labeled.

12   But -- and that was -- that was a study, again, to -- that --

13   that question we were asking there was, is there any

14   significant, ongoing input in the present day of mercury that

15   could have come from -- from these -- from these paper mills?

16       We then continued sampling downstream, in a couple of

17   more reaches before Bucksport that included the -- the

18   Orrington site, which is -- which is about there, and then

19   down to the -- with the next -- next reach going down to

20   Bucksport, which is just below -- just above Verona Island.

21   The purpose of this was to see what the -- how the

22   concentrations of mercury varied slightly upstream of -- of

23   the HoltraChem site and downstream, as well.

24       And then another -- another reach known as the ES reach,

25   the red line, started around Verona Island and went out

1   into -- into Penobscot Bay, and the idea of that was to see

2   how the mercury concentrations we -- we'd hypothesized they

3   would -- they would dissipate as we moved out into Penobscot

4   Bay, and we wanted to -- to study that.

5   Q    So just to get us all conversant with the initials that

6   you used, the -- the East Branch, which is in that

7   northernmost part, that's called the EB reach?

8   A    That's right.

9   Q    Okay.  And then the reach from Old Town down to the old

10  Veazie Dam is the OV reach?

11  A    That's right, yes.

12  Q    And then below the old Veazie Dam, you have a reach from

13  Brewer to Orrington, which is called the BO reach?

14  A    Right.

15  Q    And then further -- a reach further to the south from

16  Orrington to Bucksport called the OB reach?

17  A    Yes.

18  Q    And then you have a series of sites in the -- or a reach

19  in the -- called ES for estuary?

20  A    Yes.

21  Q    Okay.  Now, did you select sampling sites in each of

22  these locations to sample sediment?

23  A    Yes, we -- we randomly selected a number of sites, and

24  we also chose a couple of sites that -- that, based on their

25  sediment chemistry, that we thought might be sites where

1  methylmercury was -- was being produced and -- more quickly

2  than at other sites.  So there's a number of sites in each

3  reach.

4  Q    Okay.  So let's --

5            MR. BERNARD:  Just to pin that down, Your Honor,

6  this is also from Plaintiffs' 28, which is in evidence.  Can

7  we get rid of those arrows somehow?

8            THE COURT:  Yeah.

9            MR. BERNARD:  Thank you.

10           THE COURT:  On break, you can actually do that

11 yourself.

12           MR. BERNARD:  Yeah, I --

13           THE COURT:  And she'll teach you how to do it.

14           MR. BERNARD:  I'm eager to learn.

15           THE COURT:  Okay.

16           MR. BERNARD:  Thank you.

17 BY MR. BERNARD:

18 Q    So what does this show for the EB reach?

19 A    This shows the sampling locations within the EB reach

20 itself.

21 Q    Okay.  And I'm not going to show you -- well, I'm going

22 to show you a couple more just so it's clear.  Let me show you

23 the OV reach, which is also part of Plaintiffs' 28 in

24 evidence.  And are these -- are these maps laid out similarly,

25 in other words, within each reach, this is the OV reach, Old

1    Town to Veazie, these are the five stations at which the Study

2    Panel conducted sampling?

3    A    Yes.

4    Q    You mentioned a moment ago, Dr. Rudd, that some stations

5    were selected because they were methylmercury production

6    suspects.

7    A    Hm-hmm.

8    Q    Do you remember that?

9    A    Yes, I do.

10   Q    Was there one of these in the OV reach that was in that

11   category?

12   A    Yes, there was.

13   Q    Which one?  Do you recall?

14   A    Oh, I -- I'm sorry I don't recall right now.

15   Q    Does OV 4 ring a bell?

16   A    Could -- yeah, could very well could have been, yes.

17   Q    Okay.

18   A    I know it was a backwater site because it was highly

19   organic.

20   Q    Okay.  And just -- just to complete this picture, to

21   show where the sampling sites were in the lower river, below

22   the Veazie Dam, did these look like the sampling sites -- also

23   28 -- Plaintiffs' 28 in evidence --

24   A    Yes, they did.

25   Q    In the BO -- the Brewer to Orrington reach?

RUDD - DIRECT EXAMINATION/BERNARD

1    A      Yes.

2    Q      Okay.  And similarly for the Orrington to Bucksport

3    reach?

4    A      Yes.

5    Q      Okay.  And, finally -- it looks like you had five

6    sampling stations in each of these reaches; is that correct?

7    A      That's correct, yes.

8    Q      Okay.  And the exception to that -- and this is also

9    part of Plaintiffs' 28 in evidence -- is the estuary or ES

10   reach.  Do you see that?

11   A      Yes.

12   Q      Okay.  And these were -- these were the sampling sites

13   in that reach of the -- of the system?

14   A      Yes.

15   Q      And here it looks like there were 15 sites; is that

16   correct?

17   A      Yes.

18   Q      Okay.  Where in the sediment column did you conduct the

19   sampling?  Do you recall?

20   A      In -- in Phase I?

21   Q      In Phase I.

22   A      In Phase I, it was the top 10 centimeters.

23   Q      And why -- why did you select the top 10 centimeters for

24   Phase I sampling?

25   A      From our previous under -- knowledge and experience,

1  that it's the topmost part of the sediments that -- where

2  methylmercury's produced, and that's also -- also where the

3  benthic organisms live that -- that bioaccumulate some of this

4  methylmercury and where fish feed.  So it would be -- it would

5  move up the food web into fish.  So we concentrated -- we were

6  looking at the extent of contamination, and the most important

7  part of the sediment column from the point of the biology is

8  the -- is the topmost.

9  Q    Do you remember how many sampling periods there were of

10  sediment sampling?

11  A    Six.

12  Q    Okay.  And did the Phase I Report report the results of

13  the first four of those six sampling periods?

14  A    Yes.

15  Q    Okay.  And did you prepare charts depicting the sediment

16  mercury values at the various stations --

17  A    Yes.

18  Q    -- where you sampled?

19  A    Yes, we did, yes.

20  Q    Let me show you -- this is Plaintiffs' 116.

21      MR. BERNARD:  Which I would like to offer into

22  evidence.  It's also a series of charts that come out of the

23  Phase I Report.

24      THE COURT:  Any objection to 116?

25      MR. TALBERT:  No objection, Your Honor.

1              THE COURT:  It's admitted.

2     BY MR. BERNARD:

3     Q     Dr. Rudd, do you recognize this chart?

4     A     Yes, I do.

5     Q     Okay.  Will you please explain to the court what it

6     depicts?

7     A     These are concentrations of mercury in the -- in the

8     surface sediments at the sites that we've just been

9     discussing.  So on the -- the left-most side of the horizontal

10    axis are the EB sites, furthest upstream, and as we

11    anticipated those sites were the lowest because they were --

12    they were in the most pristine area of the -- of the

13    ecosystem.  The -- the vertical axis is concentration of

14    mercury, nanograms per gram dry weight of sediment.

15         We then -- in the -- in the next reach, which is above

16    Veazie Dam, you can see the -- I think it's -- it's evident

17    that the concentrations of mercury are somewhat higher, and we

18    thought that there was two possibilities there.  One -- one

19    might be that it's -- it's some ongoing contamination from

20    the -- from the paper mills, or maybe atmospheric transport

21    upstream from the HoltraChem site.

22         Then down below Veazie Dam, the reaches there, mercury

23    concentration is much higher, and then it decreases in a

24    northerly -- or southerly direction out into -- into Penobscot

25    Bay.

1    Q    A couple of questions on the chart.  Are -- on the X

2    axis, are those sampling stations within the reaches we just

3    went over on the maps?

4    A    Yes, they are, yes.

5    Q    Okay.  And are they arrayed geographically from

6    northernmost to southernmost?

7    A    Yes, they are.

8    Q    Okay.  So the first five there -- maybe it's -- yeah,

9    the first five are the East Branch values?

10   A    Right.

11   Q    And then the next five are the Old Town to Veazie

12   values?

13   A    That's right.

14   Q    And then when you get below the Veazie Dam, that's where

15   the BO reach begins?

16   A    Yes.

17   Q    Okay.  Now, you also mentioned that on the Y axis, these

18   values are reported in total mercury in nanograms per gram dry

19   weight.

20   A    That's right.

21   Q    What does that mean?

22   A    The -- a sediment sample is taken and it's dried, and

23   then the -- that dried material is -- is digested, and the

24   total amount of mercury in that material is -- is -- is

25   analyzed, and then the result of that is -- is expressed as

RUDD - DIRECT EXAMINATION/BERNARD

1   the -- as the total amount of mercury in nanograms per gram

2   dry weight of the -- of the dried sediment material.

3   Q     Looking at this figure in Plaintiffs' Exhibit 116, what

4   do the data arrayed in the figures show?

5   A     I think, overall, they show that the mercury

6   concentrations are very low upstream of any industrial

7   activity, that then increase downstream above Veazie Dam, and

8   then there's a large -- large -- roughly tenfold increase in

9   mercury in the reaches below Veazie Dam and down to about --

10  about Verona Island, in that -- in that area.  And then down

11  in the ES regions, in Fort Point Cove and south of that, they

12  gradually decrease.

13  Q     Okay.  What is carbon normalization?

14  A     Carbon normalization is another way to -- to express

15  mercury concentration in sediments.  Sediment contains

16  inorganic material and also organic carbon material.  Mercury

17  preferentially attaches to organic material.  So if you -- if

18  you take a sediment sample and you analyze both the mercury

19  concentration and the carbon concentration, you can then

20  express the mercury in terms of -- of -- of its -- of the

21  carbon.  So it's called normalization.  You normalize the

22  amount of mercury to the amount of carbon that's there.

23         So instead of being expressed per gram dry weight, it's

24  being expressed as per gram of organic carbon.

25  Q     And what is the -- what is the reason to look at that

1    measurement in addition to dry weight measurement of mercury?

2    A    I'd say one of -- one of the main reasons is -- is that

3    organic carbon content in sediments can vary from location to

4    location.  So it -- if you're -- if you're going from highly

5    inorganic sediments, such as you'd maybe find in the -- or

6    relatively inorganic sediments such as you'd maybe find in the

7    bottom of -- of Fort Point Cove and then comparing it to

8    another location which is very high in organic carbon

9    concentration, it's hard to make -- you end up doing an apples

10   and oranges comparison if you do it on the dry weight basis.

11        But if you assume that most of the mercury is attached

12   to carbon and you analyze the carbon that's -- that's at those

13   two locations, you can then start to understand which site

14   is -- is more contaminated.

15   Q    Did you look at the sediment mercury data normalized to

16   carbon?

17   A    Yes, we did, yes.

18   Q    Let me show you -- and this is also part of

19   Plaintiffs' 116 in evidence -- this figure from the Phase I

20   Report.  And will you please explain to the judge what this

21   shows.

22   A    Well, these are the same -- on the X axis, these are the

23   same sampling sites.  And in this case, the -- the mercury

24   values that were discussed in the previous figure have been

25   normalized to carbon, as we've just been discussing.

1        So you see the same -- you see the same general pattern

2    as -- as in the previous graph, but the numbers are different

3    because they're expressed in this -- in this different way.

4    Q        When you're looking at this as a -- as an ecosystem

5    scientist, does this -- do the data arrayed this way,

6    normalized to carbon, tell a different story from the story

7    you derived from the previous figure we looked at in dry

8    weight mercury values?

9    A        No, they really don't, and -- and the reason for that is

10   that these sediments were all sediments taken from the river.

11   So when you're sampling -- one of the big reasons to use

12   organic carbon-normalized data is when -- as I explained, when

13   you're comparing one type of site to another, but these sites

14   were deliberately chosen to be similar up and down the river

15   because we were looking at the geographic distribution of the

16   mercury.

17       So we tried to go to sites along the side of the river,

18   sandy sites or -- or sort of fine-grain sites, all along the

19   river out into the -- into the bay.  And so we -- we were

20   then -- in that -- taking that approach, you would expect to

21   see the same pattern on a gram dry weight basis as you would

22   normalized to organic carbon, because we were sampling -- it

23   was an apples-to-apples comparison.

24   Q        And did you see the same pattern when you looked at it,

25   whether you looked at the sediment mercury data as dry weight

RUDD - DIRECT EXAMINATION/BERNARD

1  values or as carbon-normalized values?

2  A     Yes, yes, we saw what we -- we expected we would see

3  here, yes.

4  Q     Did you also -- now, we've been dealing -- withdrawn.

5        These last two figures have depicted total mercury.

6  A     Yes.

7  Q     Right?

8  A     Yes.

9  Q     One figure -- the first figure in dry weight, the second

10 figure normalized to carbon?

11 A     Yes.

12 Q     Did you also look at methylmercury in these sediments?

13 A     Yes, we did, yes.

14 Q     So let me show you also part of Plaintiffs' 116 in

15 evidence, this chart, and please explain to the court what it

16 shows.

17 A     Well, this -- yeah, this is -- this figure is analogous

18 to the total mercury figure, but instead now we're -- we're

19 looking only at the portion of total mercury that is methyl

20 mercury, and it looks -- it looks very much like the total

21 mercury graph, which -- which makes sense to me because one of

22 the major conclusions of this study is that the total

23 mercury -- the methylmercury production is related to -- to

24 inorganic mercury concentration.

25        So where the inorganic mercury concentration is -- is

1    low, we would also expect to see low methylmercury, and that's

2    basically what this -- this figure shows.

3    Q    Did you also look at methylmercury normalized to carbon?

4    A    Yes, we did.

5    Q    Let me show you the chart that I believe depicts that,

6    and this is also part of Plaintiffs' 116 in evidence.  What

7    does -- what does this figure show?

8    A    Yeah, this -- this shows the -- the same data -- same

9    mercury data but normalized to carbon, and -- and it's -- to

10   my eye, it's a fairly similar pattern.  Again, because I -- as

11   I explained, we're sampling within certain type of sediments

12   over and over again, which have similar carbon concentrations,

13   so the -- the normalization in this case doesn't change the --

14   the overall pattern of the data very much.

15   Q    Is the pattern of sediment mercury you found in the

16   study consistent with what you know about mercury

17   contamination downstream of chlor-alkali plants?

18   A    Yes, yes, this is what I've seen before.

19   Q    And could you just please briefly describe to the judge

20   what that similarity is, in other words, what that consistency

21   is, what you see here that's consistent with what you've seen

22   before?

23   A    Yeah, the other two systems which I've worked on

24   directly are the English-Wabigoon System and the -- and the

25   Lavaca Bay System on -- on the Texas coast.  The system that's

1    most analogous is the English-Wabigoon System.  It's a

2    river-lake system.  Mercury in that case was added to the

3    Wabigoon River in Dryden, Ontario, and it went down the river

4    several -- maybe 20 miles or so before reaching the first lake

5    in that system, where it -- where it accumulated.  And then it

6    went through a string of lakes, and as it went through those

7    lakes the concentration gradually dissipated.

8         Above the lake -- above the -- the town of Dryden in

9    that case was Wabigoon Lake, and the concentrations of mercury

10   in Wabigoon Lake were extremely low, and then they jumped up

11   as the river passed the chlor-alkali plant and then gradually

12   decreased with distance from the plant, as we see here.

13   Q    Did you look at the relationship between total mercury

14   and methylmercury in the surface sediments for the first four

15   sampling periods?

16   A    Yes, we did.

17   Q    Okay.  Let me show you a figure, this is Plaintiffs'

18   Exhibit 117, which I'd like to move into evidence.  It's also

19   a figure from the Study Panel's Phase I Report.

20             THE COURT:  Any objection?

21             MR. TALBERT:  No objection.

22             THE COURT:  117's admitted.

23   BY MR. BERNARD:

24   Q    Dr. Rudd, do you recognize this figure?

25   A    Yes, I do.

1   Q      Will you please explain to the judge what it displays?

2   A      The X axis is the total mercury concentration in

3   nanograms per gram dry weight.  These are actually the same

4   data that we have just been discovered -- just been

5   discussing, but they are plotted in a different way.  In this

6   case, on the X axis, we've -- we've plotted the nanograms per

7   gram dry weight concentration of mercury in the -- in the

8   surface sediments up and down the ecosystem, and we've plotted

9   those against the methylmercury concentrations in the same

10  sample.

11         And I remember when -- when this first came up on the

12  computer screen, Dr. Kelly and Dr. Bodaly and I were plotting

13  this up, and when this popped up on the computer screen, I

14  found this to be very exciting.  I think this is the most

15  important figure in the entire report because what it showed

16  was that -- that the more inorganic mercury that's there, the

17  more methylmercury is produced, and it showed that this was

18  true all up and down the system.  It was a general -- it was a

19  general phenomenon.  And not only was it true, but it was true

20  in a very strong sense.  If -- if the R-squared value there --

21  I'm having a little bit hard of time reading -- I think it's

22  .862, but that -- that means that most of the variants of the

23  samples we took was explained by -- the methylmercury

24  concentration was explained by the corresponding total mercury

25  concentration.

RUDD - DIRECT EXAMINATION/BERNARD

1  Q     Could you please explain for us what an R-squared value

2  is.

3  A     An R-squared value is -- is a measure of -- of how

4  closely related one variable is to another.  So if -- if -- if

5  the -- if the total mercury concentration in a sediment sample

6  was completely -- absolutely completely related to the

7  methylmercury concentration, there was no other variables

8  involved, you'd get an R-squared of -- of 1, and if there's

9  very little relationship between the two, the R-squared

10  becomes very small, .0 something.  So the fact that this is

11  almost 1 means that the -- the inorganic mercury concentration

12  is explaining most of the -- of the concentration of the

13  methylmercury concentration in the surface sediments.

14  Q     In your experience in the natural environment, where you

15  have a number of factors in play, is a .862 R-squared high?

16  A     Yeah, that's unusual.  Usually -- usually data isn't

17  that clear.

18  Q     Now, you said that this was an important moment in terms

19  of the study and understanding the system.  What is so

20  important about this relationship?

21  A     Well, I guess going into the study, this seemed to be,

22  in some ways, a very complicated ecosystem to me, and I

23  wondered if -- if we would ever be able to put our finger on

24  anything that -- that would enable us to -- to mitigate the

25  problem.

RUDD - DIRECT EXAMINATION/BERNARD

59

1        But when I saw this, I said, you know, this -- this was

2   our first big break-through.  We -- it showed us that if

3   there's some way we could reduce the total mercury

4   concentration in the entire ecosystem, we could reduce the

5   rate of methylmercury production and the concentration of

6   methylmercury in the biota.

7   Q    Did you also sample biota during the Phase I study?

8   A    Yes, we did.

9   Q    And do you recall -- there was a lot more biota sampling

10  that went on and that was reported in the Phase II Report; is

11  that right?

12  A    That's right, yes.

13  Q    Okay.  And so we're going to deal with that a little bit

14  later.  But, just briefly, as best you recall, what did you

15  find in Phase I, the very beginning of the biota sampling?

16  A    We found that concentrations of mercury in -- in fish

17  and in -- in birds were very high.  We also looked at

18  shellfish and -- and concentrations in the worms that live in

19  the sediments.  And -- and most organisms we looked at were --

20  were high in mercury concentration, not all.  For example,

21  we -- we thought going in maybe the bald eagles would be high

22  in mercury concentration, but they didn't turn out to be

23  particularly high.

24        So it wasn't across-the-board high concentrations in --

25  in the biota, but it -- it was widespread.

RUDD - DIRECT EXAMINATION/BERNARD

60

1    Q    And did you sample songbirds in -- in the Mendall Marsh

2    area?

3    A    Yes.

4    Q    And what were those values like, if you recall?  I don't

5    mean the number, but how would you characterize them?

6    A    They were exceedingly high.  We were very surprised at

7    how high the concentrations.  In a relative sense, they were

8    much higher than the fish concentrations, which was surprising

9    to us.

10   Q    Did you also find, do you recall, some of the lobsters

11   that you sampled down in the estuary had mercury levels of

12   some concern?

13   A    Yes, yes, they generally followed the pattern of mercury

14   in the sediments, so the concentration of mercury in the -- in

15   the lobsters in Fort Point Cove was -- was definitely elevated

16   above the -- the DEP guideline, and then it decreased with

17   distance southward into Penobscot Bay.

18   Q    We'll return to the lobsters a little bit later on.

19            Did you recommend to the court, at the end of

20   Phase I, that the study proceed to Phase II?

21   A    Yes, we did.

22   Q    For what reason?

23   A    Mainly for -- for two reasons.  It was -- it appeared to

24   us that the concentrations of mercury in -- in wildlife was --

25   in some cases was high, high enough in some cases we thought

1    there was -- it might be tox -- it might be toxic.  So we were

2    concerned about the wildlife.

3         We were also concerned in some cases about -- about the

4    concentration of mercury in -- in lobsters, but also in eel,

5    if -- to the extent that people would be eating eel from the

6    river.  Those were also found to be elevated in concentration.

7         So there was two areas of concern -- one was human

8    consumption, the other was wildlife.

9    Q    Okay.  You mentioned earlier that one of the objectives

10   you understood from the court in Phase I was how bad is the --

11   how severe in the contamination; is that fair?

12   A    That's correct, yeah.

13   Q    Okay.  And is it fair to say that you found the

14   contamination to be sufficiently severe so that you

15   recommended to the court that you look at how quickly the

16   river would cleanse itself and whether active remedies might

17   accelerate recovery?

18   A    Yes.

19   Q    Okay.  And did the court approve your recommendation to

20   proceed to Phase II of the study?

21   A    Yes, it did.

22   Q    Okay.  I just want to show you one portion of a

23   document --

24        MR. BERNARD:  Your Honor, this is Plaintiffs'

25   Exhibit 5, which I'd like to move into evidence.  It's

1    document ECF 390, and it's the order -- I'll just show you the

2    first page -- order approving the Phase I Report.  It's an

3    order of Judge Carter filed on March 7th, 2008.

4              THE COURT:  Any objection?

5              MR. TALBERT:  No objection.

6              THE COURT:  It's admitted.

7    BY MR. BERNARD:

8    Q    And this is a three-page order.  I'm only going to show

9    you one paragraph, which I would like you to read into the

10   record, please.  And this is Page 2 of the three-page order,

11   and we've highlighted the paragraph that I want to call your

12   attention to.  Would you please read that into the record?

13             MR. TALBERT:  Your Honor, I object to the extent the

14   document speaks for itself.

15             THE COURT:  All right.  I don't have any problem.

16   You can go right ahead and read it.  It's overruled.

17   A    Read the high --

18   BY MR. BERNARD:

19   Q    Read the highlighted part.  Would you do that, please?

20   A    It is now established in the record that mercury

21   deposited in the Penobscot River in significant quantities

22   and -- and to substantial negative effect from the HoltraChem

23   site has and is now in the process of methylation posing a

24   danger to the health of the wildlife in the river and risks of

25   a substantial nature to the well-being of human beings who

RUDD - DIRECT EXAMINATION/BERNARD

63

1    ingest the products of the river.  This is the distillation of

2    the factual predicate on which this case is to proceed.

3    Q     And does that statement by Judge Carter comport with

4    your understanding of where you were at the end of the Phase I

5    part of the process?

6    A     Yes, it does.

7    Q     Let's move to the Phase I Update, which you mentioned

8    earlier, and just see if we can pick up any information from

9    that before we move to Phase II.

10         Did the Phase I Update include sampling periods 5 and 6?

11   A     Yes, it did.

12   Q     Okay.  So there was a more complete set of sediment

13   data?

14   A     Yes.

15   Q     Okay.  And what -- what did you -- what did you find

16   in -- in the Phase I Update in terms of its consistency with

17   what -- or inconsistency with what you reported in the Phase I

18   Report?

19   A      It was -- it was really more of the -- the same thing.

20   The sediment data continued to look -- follow the same

21   patterns that we discussed, and the -- and the biota data also

22   looked similar, with -- with many of the biota that we looked

23   at and reported on Phase II having high mercury

24   concentrations, but not all of them.

25   Q     Okay.  Let me show you --

1          MR. BERNARD:  I just need one moment, Your Honor.

2          THE COURT:  Sure.

3          MR. BERNARD:  Sorry.  Just take a second.  Let me

4   just ask my colleague for a copy of a document here.  Sorry

5   for the delay.

6   BY MR. BERNARD:

7   Q     Okay.  Did you sample wetland sites as part of the

8   sampling program in Phase I?

9   A     Yes, we did.

10  Q     Okay.  Let me show you -- this is from Joint Exhibit 5,

11  Your Honor.

12         Can you please -- do you recognize that, Dr. Rudd?

13  A     Yes, I do.

14  Q     And can you please explain to the judge what -- what

15  that shows.

16  A     This -- we did a wetlands survey to see if the

17  concentrations of -- of mercury in the wetlands on the edges

18  of the -- of the river system were -- were contaminated.  Up

19  until then, we'd concentrated mostly on the -- on the river

20  sediments.  And the yellow dots represent the -- the location

21  of the wetlands that we -- that we sampled.

22  Q     Okay.  And what does the webbing indicate?  Do you see

23  that?

24  A     Yes, I see it; but, I'm sorry, I don't remember what

25  that means.

1    Q     Well, the key says approximate extent of mercury

2    contamination.  Does that help?

3    A     Oh, yeah, yeah, yeah, that -- and -- and going forward

4    in time, that -- that hatch mark is what we are now calling

5    the upper estuary.  That's the most contaminated part of the

6    estuary.  Down below, in Fort Point Cove, concentrations begin

7    to drop off progressively.

8    Q     Okay.  Let me show you --

9          MR. BERNARD:  And, Your Honor, this is Plaintiffs'

10   118, which is also -- it's a figure from the Phase I Update,

11   and that -- the Phase I Update itself is a joint exhibit.  So

12   I'd like to move in 118, please.

13         THE COURT:  Any objection to 118?

14         MR. TALBERT:  No objection, Your Honor.

15         THE COURT:  It's admitted.

16   BY MR. BERNARD:

17   Q     Dr. Rudd, please explain to the court what this figure

18   shows.

19   A     This shows on the -- the X axis, from -- from a north to

20   south direction again, similar to the -- the river sediments,

21   the -- the concentration of -- of total mercury.  This time

22   it's normalized to organic carbon concentrations, and I could

23   explain the reason for that.

24         But it's showing a -- a similar pattern to the -- to

25   the -- to the -- to the river sediments.  The -- the first

1    wetland we sampled was actually below the dam W05 and it had a

2    low mercury concentration, and we later concluded that this

3    site must have -- just below Veazie Dam had actually

4    recovered.  It had -- it had had high mercury concentration,

5    but it had now recovered.

6        And then in what we -- I just described as the -- as the

7    upper estuary part of the -- part of the survey, the

8    concentrations in the wetlands were -- were quite high and

9    then decreased as we moved south, as the wetlands were located

10   south out into -- into the Penobscot estuary.

11       The contamination of the -- of the wetlands didn't

12   extend as far south as the bottom sediments in the bay.  But,

13   overall, a similar pattern.

14   Q    Okay.  And you say this figure depicts carbon-normalized

15   mercury values; is that right?

16   A    That's correct, yes.

17   Q    All right.  Let me show you this, which I believe is the

18   dry weight version, also part of Plaintiffs' 118 in evidence.

19   Do you see that?

20   A    Yes.

21   Q    And are those the same data -- well, those are actually

22   also normalized to carbon, aren't they?

23   A    Right.  That's methylmercury.

24   Q    Yeah, I'm sorry.  This is methylmercury?

25   A    Yeah.

RUDD - DIRECT EXAMINATION/BERNARD

67

1    Q    And what is this -- the previous figure was total

2    mercury, right?

3    A    That's right.

4    Q    This is methylmercury.  And what does this show?

5    A    This shows the same type of pattern as we saw in the

6    river sediments that -- in the wetlands, where there was high

7    inorganic mercury concentration, this resulted in the

8    production of relatively high concentrations of methylmercury.

9    Q    Now, is it fair to say that the additional data reported

10   in the Phase I Update kind of strengthened the sense you had

11   derived from the data reported in the Phase I Report?

12   A    Yes, yes.

13   Q    In what respect?

14   A    Well, very -- very often, in my experience in doing

15   research, is -- is some of the first data points, if you're

16   doing a reasonably good job, some of the first data points you

17   collect really tell you what's going on, and -- and you can't

18   publish those because you have to repeat it and confirm it.

19        But this -- this -- this was really in the same vein.

20   As we -- the picture had already emerged at the time that the

21   Phase I Report was written, and we collected more data --

22   public -- we reported more data after that, but it really just

23   strengthened our conclusions, as I -- as I was expecting it

24   would.

25   Q    You mentioned in the Phase I Update that there are a

1  couple of major lessons that emerged from the Phase I work.

2  Do you recall what those are?  I can help you if you want.

3  A     I think you should help me.

4  Q     Well, one you've already testified to, which is the

5  relationship between total mercury and methylmercury.

6  A     Yes, yeah.

7  Q     And is that a major lesson from Phase I for the reasons

8  you've already articulated?

9  A     Yes, it is, yes.

10 Q     And the second one you mentioned, I'll just remind you,

11 has to do with Mendall Marsh being of special concern.

12 A     Yes.

13 Q     And why is that?

14 A     Well, we found, to our surprise, that concentrations

15 of -- of methylmercury, particularly in the pore water, were

16 extremely high, and we think that goes a long way to

17 explaining the high concentrations of methylmercury in the

18 birds in Mendall Marsh.

19       And so in -- we thought that was important enough that

20 in Phase II of the study, we asked Dr. Gilmour to come and try

21 and understand this some more because we looked like -- it

22 looked like to us that -- that this was a site that was, for

23 some reason we didn't understand at that time, was -- was

24 particularly bad for -- with respect to production of

25 methylmercury, and we wanted to understand that some more.

RUDD - DIRECT EXAMINATION/BERNARD

1   Q      Let's move to Phase II, the tome that the court referred

2   to earlier today.  First, is the -- are the Phase I and

3   Phase I Update Reports incorporated in the Phase II Report

4   that was submitted in April of 2013?

5   A      Yes, for completeness, we put them in as an appendix to

6   Chapter 1 of the Phase II Report.

7   Q      In full; is that correct?

8   A      Yes, yes.

9   Q      What were the primary objectives of Phase II?

10  A      So there was -- there was two primary objectives, one

11  was to -- to look at the -- what we call the natural

12  attenuation rate, how -- how quickly is the -- is the system

13  cleaning itself up naturally.  So we wanted to determine the

14  rate -- the rate of recovery, essentially.

15         The second objective was -- was to take more of an

16  ecosystem approach than we had in Phase I and try and

17  understand what was controlling the transport of mercury in

18  the ecosystem, its methylation, and -- and bioaccumulation

19  into the biota with an idea of it -- being that if we could

20  understand the system well enough, we might -- it might point

21  us towards some sort of -- of remedy.

22  Q      Okay.  And are those the objectives that you pursued in

23  your conduct of the Phase II part of the study?

24  A      Yes, yes, we -- those were the two primary objectives.

25  We also got -- kind of got our feet wet a little bit with

1    some -- some remediation -- possible remediation options.  We

2    thought, well, some ideas had occurred to us and -- and we'd

3    had a remediation workshop, and we thought, well, maybe we

4    just do some very preliminary testing of a couple of ideas.

5    It wasn't a large part of Phase II, but it -- and it maybe

6    wasn't strictly part of Phase II, but we decided to do a

7    little bit of that, just to get our feet wet.

8    Q    Okay.  Now, is Phase II Report divided into chapters?

9    A    Yes, it is.

10   Q    All right.

11        MR. BERNARD:  Your Honor, Plaintiffs' Exhibit 91 is

12   a demonstrative, and it's really, I think, mostly for the

13   court's reference.  We've -- we've separated out the chapters

14   by number, the title of the chapter, the primary or

15   first-named author, and then the secondary or other named

16   authors.

17        THE COURT:  Thank you.

18        MR. BERNARD:  Just for the court's convenience.

19        THE COURT:  Thank you.

20   BY MR. BERNARD:

21   Q    Dr. Rudd, does this look like the layout of the Phase II

22   Report?

23   A    It does.

24   Q    Okay.  Now, which chapters did you write or were you the

25   primary author of?

1    A       Chapters 1, 21, and 23.

2    Q       And did various of the investigators you referred to

3    earlier write chapters covering the particular work they

4    carried out?

5    A       Yes, yes, that's how we organized the report.

6    Q       Okay.  And did Dr. Bodaly draft some chapters?

7    A       Yes, he did.

8    Q       And Dr. Kopec --

9    A       Yes.

10   Q       -- did, as well?

11   A       Yes.

12   Q       And Dr. Kelly, as well?

13   A       Yes.

14   Q       Okay.  Did you review the chapters that you yourself did

15   not write?

16   A       Yes, I did.

17   Q       Okay.  And did you approve all of the chapters?

18   A       Yes.

19   Q       Okay.  And did the Study Panel, as a group, approve all

20   of the chapters?

21   A       Yes, yes, we did.

22   Q       Was the Phase II Report peer-reviewed?

23   A       Yes, it was.  We -- we kind of took the -- took the

24   approach that we had taken in -- in our previous careers as --

25   as researchers, and -- and we sat with the data for -- for a

1   long time now as a small group, and we decided that before

2   we -- we showed it to other people, we -- we wanted to show it

3   to some of our colleagues who -- who we had a great respect

4   for in case we'd made some mistakes.

5        And so we -- we selected a few people, sent the report

6   to them, and then met with them to -- to -- to get their

7   feedback.

8   Q    What is -- I mean, just in practical terms, what is a

9   peer review?

10  A    Well, a peer review -- a peer review is -- is something

11  that's normally done in scientific research, and it can be

12  done in a couple of different ways.  After you've done a -- a

13  piece of research yourself, you -- when I was at the

14  Experimental Lakes Area, we then took it to our new -- very

15  near team, the colleagues we were working with, and said,

16  please read this and see if you can find some problems with

17  it.  And -- and they usually found things that we -- that we

18  adjusted and changed.  And then -- and then when it was

19  submitted for publication, it was -- it's submitted to a more

20  formal peer review process, where it goes out to -- to -- to

21  other scientists who you don't know who they are, and they

22  review it and send -- and send it back to you with either

23  acceptance or -- or rejection.

24  Q    And -- and what -- what was the result of the peer

25  review in this instance?

1    A      We -- we thought we got some very good comments.  We --

2    we didn't find that we made any large mistakes, but we did

3    make some adjustments as a result of these people who had read

4    our report, and those are in -- those were included in the

5    final report.

6    Q      And is that part of the normal --

7    A      Yes.

8    Q      -- scientific process?

9    A      Yes.

10   Q      Who were the peer reviewers?

11   A      Ah, Dr. Wiener.

12   Q      Is that Dr. James Wiener?

13   A      That's right, yes.

14   Q      Okay.

15   A      Dr. Gill, Dr. Sunderland.  Gee, I'm -- I'm having

16   trouble here.

17   Q      I'm not aware of any others.

18   A      I know there are.

19   Q      I'm -- no, I meant that.  I'm not -- were there more

20   than three peer reviewers?

21   A      Yes, there was, because we had more than one set of peer

22   reviewers, and I'm trying to remember back to the -- to the --

23   to the initial set of reviewers.

24   Q      But as you sit here right now, you don't recall any of

25   the additional names?

1   A      No, I'm sorry, I don't.

2   Q      Okay.  If they come to you --

3   A      Yeah.

4   Q      -- while you're testifying --

5   A      Yeah.

6   Q      -- you can fill in the record.

7   A      Yes.

8   Q      But don't worry about it.

9          Did there come a time when Special Master Calkins

10  imposed a deadline for your submission of the Phase II Report?

11  A      Yes.

12  Q      Okay.  And did you have some concern at that time that

13  there might be some errors and inconsistencies in the report

14  that you wouldn't be able to iron out fully by the assigned

15  date?

16  A      I don't think the -- I don't think the panel was

17  concerned that we wouldn't be able to come to the overall

18  conclusions, but I think there was concern that we hadn't --

19  hadn't sort of sat with the data and thought about it long

20  enough, as we had done in the past, so that -- so that we

21  weren't -- we weren't misinterpreting some of the -- some of

22  the more detailed points.  And maybe some of the reports

23  aren't written as clearly as they could be because we didn't

24  have time to work on the writing as much as we would have in

25  other -- in other situations.

1  Q      In terms of the findings and the recommendations set

2  forth in the Phase II Report, did you tell Special Master

3  Calkins that those would be firm by the deadline she set?

4  A      Yes.

5  Q      Okay.

6  A      Yes.

7  Q      And are you standing by that?

8  A      Yes.

9  Q      Okay.  Did you subsequently -- withdrawn.

10        Did you subsequently submit some errata sheets to

11  correct some errors, typos, misnumberings, and such in the

12  Phase II chapters?

13  A      Yes, we did, yes.

14  Q      Okay.

15              MR. BERNARD:  Your Honor, the parties have agreed to

16  insert those errata sheets in the back of each corresponding

17  chapter in Joint Exhibit 6, which is the Phase II Report.

18              THE COURT:  Right.  Thank you very much.

19  BY MR. BERNARD:

20  Q      Did any of the errors or inconsistencies that were the

21  subject of the errata sheets or -- or otherwise affect any

22  major findings set forth in the Phase II Report?

23  A      No, mostly they were of the nature of -- of figures

24  because we were in a rush to get the report out at the end.  A

25  lot of them were the figures had been misnumbered or tables

1    had been misnumbered, and -- and so it's sometimes difficult

2    when you're reading the chapter, you go to look at a figure or

3    table, and it's not what you expect it to be.  So it's mostly

4    that type of -- of error.  It's not -- it wasn't an error in

5    interpretation of data.

6    Q    So it didn't -- none of the errors or inconsistencies

7    affected any of the major findings --

8    A    No.

9    Q    -- set forth in the report?

10   A    No.

11   Q    And same for the recommendations, none affected any of

12   the recommendations set forth --

13   A    Yes.

14   Q    -- in the report?

15   A    Yeah, that's correct, yes.

16   Q    How long did the Penobscot River Mercury Study go on?

17   You were appointed in July of 2004, I believe, so it was about

18   nine years?

19   A    Yes, yes.

20   Q    Do you know how many samples were collected as part of

21   the -- just some rough figure -- how many samples were

22   collected?

23   A    Oh, many, many thousands.  I don't know how many

24   thousand.

25   Q    Now, were there laboratories that you engaged to analyze

1    the various sediment biota and other samples?

2    A     Yes, there was.

3    Q     Okay.  And were they high-quality labs?

4    A     Yes, yes, they were very high-quality labs.  We were

5    able -- being in the field and, you know, having done this

6    work for many years, I was aware of who's doing the best

7    analyses, and those were the labs -- two of the labs we chose.

8    Q     And did the Study Panel conduct its own review of the

9    quality assurance and quality control procedures in the

10   various labs you used?

11   A     Yes.

12   Q     And did the Study Panel also conduct an interlab

13   comparison to look at the methods and results of one lab

14   versus another lab?

15   A     Yes.

16   Q     Okay.

17                MR. BERNARD:  Your Honor, for the court's reference,

18   those analyses are included Appendix 1-1 to Joint Exhibit 6-1.

19                THE COURT:  Thank you.

20                MR. BERNARD:  And also for the court's convenience,

21   Joint Exhibit 6 is the Phase II Report, and the dashes and the

22   additional numbers refer to the chapter number.

23                THE COURT:  Okay.  Thank you.

24                MR. BERNARD:  So Joint Exhibit 6-1 is Chapter 1.

25                THE COURT:  Got it.

1          MR. BERNARD:  And this is an Appendix 1-1 to that

2    chapter.

3          THE COURT:  Thank you.

4    BY MR. BERNARD:

5    Q     Let's move to Chapter 1, Dr. Rudd, which you authored.

6    What was the purpose of Chapter 1 -- what is the purpose of

7    Chapter 1?

8    A     It's an attempt to bring all the pieces of the study in

9    and -- and present the study from a -- from an ecosystem

10   perspective.

11   Q     And does this include the Phase I, Phase I Update, and

12   Phase II data?

13   A     Yes, it does, yes.

14   Q     Okay.  You refer in Phase II to the upper estuary.  Are

15   you familiar with that?

16   A     Yes.

17   Q     Okay.  What do you define as the upper estuary?

18   A     In the report, it's defined as -- as the -- the -- part

19   of the ecosystem downstream of -- of the former Veazie Dam to

20   the southern tip of Verona Island and including both the --

21   the Orland River and -- and Mendall Marsh.

22   Q     Okay.  There's also a concept referred to in the report

23   as regional background.  You're familiar with that?

24   A     Yes.

25   Q     What is -- what is meant by regional background of

1    mercury?

2    A    Regional background in mercury I -- from my perspective

3    is -- is the concentration of mercury in sediments or -- or

4    biota that's -- that's present both as a result of -- of

5    natural sources of mercury -- mercury has naturally been

6    present in the -- in the environment as -- as long as it's

7    been there -- but also in the more recent past, mercury is --

8    has been present and is deposited in atmospheric deposition.

9         So this is added to the natural background, and that

10   atmospheric deposition varies from place to place.  For

11   example, the Northeast of the -- of the United States is an

12   area of high atmospheric deposition of mercury.  So that

13   region of the -- of the United States tends to have higher

14   mercury concentrations regionally than -- than other locations

15   in the country.

16   Q    What's the reason for -- purposes of Penobscot River

17   Mercury Study to look at regional background concentrations of

18   mercury?

19   A    Well, we wanted to see -- we wanted to demonstrate that

20   the -- that the mercury concentration in the Penobscot was

21   much higher than regional background.  We -- so it's a

22   comparative -- a comparative question.  We -- we established

23   what we thought was regional background, and then we looked in

24   the upper estuary itself in particular to see how much the

25   addition of mercury to the Penobscot had increased

1    concentrations above the regional background.

2    Q     What did you find, as best you recall, in terms of the

3    preindustrial background of mercury in the Penobscot?

4    A     We -- these are -- are results that -- that Dr. Santschi

5    produced for us in long sediment cores that were taken up and

6    down the ecosystem.  At the bottom of these cores, at a depth

7    of close to up to a meter below the sediment water interface,

8    concentrations were very low, maybe 20 nanograms per gram, and

9    we consider this to be the historic concentration of -- this

10   would be the natural mercury that was there before there was

11   any human settlement or industrialization.

12         Then up a little further in the -- in the -- in the

13   column, the concentrations increased to about 50 nanograms per

14   liter, which we -- we think are reflective of when the

15   Penobscot System was -- was first settled and industry started

16   to be developed in the ecosystem.

17   Q     And with industrialization that background increased,

18   right?

19   A     It increased to about 50 or so, yes.

20   Q     Okay.  So did you fix -- did you arrive at a regional

21   background for this area, meaning New England estuaries, did

22   you reach a background number?

23   A     Yeah, we looked at those data that I just described.  We

24   also had sampled the EB reach, which we already -- we've

25   already discussed, and we chose some estuaries up and down --

RUDD - DIRECT EXAMINATION/BERNARD

81

1   when you're establishing a background, you don't -- you don't

2   know in advance whether the site you're going to sample is

3   actually background or not.  You -- we choose -- chose a

4   number of candidate nearby estuaries which we thought would

5   likely be low and at re -- at regional background, and then we

6   went out and sampled a number of them, and most of them were

7   low.  They fell in the 50 to 100 nanogram per -- per gram

8   range of -- of mercury in the surface sediments.  One of them,

9   the Sheepscot, was a little higher, and we think is -- for

10  that reason, we think it's been contaminated by -- by some

11  nearby industry.

12        That's the normal way you select background, is you --

13  you go out and sample a number of sites, and you -- after

14  awhile, when the data comes back in, you kind of hone in on it

15  and you say these -- we're starting to see concentrations now

16  at the low end of about, say, a hundred nanograms per gram,

17  and then there's some that are above, but the lowest

18  concentrations that you see in an area are what I would term

19  to be the background concentrations.

20  Q    And did you say the regional background that you derived

21  was around 55 nanograms per --

22  A    55, yeah, maybe -- maybe even up to a hundred.

23  Q    So --

24  A    These numbers are not all terribly precise.

25  Q    So let me show you Plaintiffs' Exhibit 61.

1          MR. BERNARD:  And this is from the Phase II Report,

2     Your Honor.  I move it into evidence.  This is one of those

3     that is a figure, it's Figure 23-2 from the Phase II Report,

4     which is Joint Exhibit 6.

5          THE COURT:  Any objection to 61?

6          MR. TALBERT:  No objection.

7          THE COURT:  It's admitted.

8     BY MR. BERNARD:

9     Q     Do you remember this figure, Dr. Rudd?

10    A     Yes.

11    Q     Please explain to the court what it shows.

12    A     These are average -- these are all of the data now, if I

13    remember correctly, that -- that we've been discussing before

14    that are -- the six sampling periods that are averaged.  So

15    just to bring all of the data together in one place and get --

16    get an overall understanding of -- for these sampling periods

17    of what the concentration of mercury in the sediments was.

18    This is -- this is amalgamating of those six sampling periods,

19    all those sampling sites, and plotting them on one graph as

20    averages.

21    Q     Okay.  And that -- that regional background number that

22    you mentioned, where would you locate that on this figure?

23    A     Well, the EB reach would be -- that would be around 50

24    nanograms per gram, I would think.

25    Q     So the OV reach and down in Penobscot Bay would be a

RUDD - DIRECT EXAMINATION/BERNARD

1   little bit higher than that?

2   A      Right, right, we did a series of transects across

3   Penobscot Bay and we saw evidence of contamination out -- out

4   as far as Vinalhaven Island and maybe a little bit beyond

5   that, just gradually decreasing concentrations, but this would

6   be the average concentration of mercury in -- between

7   Vinalhaven Island, maybe a little bit below that, and Fort

8   Point.

9   Q     So just so the record's clear, look at -- well, first,

10  let me ask this.  So the longer bars, BO and OB, and is

11  that -- is that Bucksport down to Fort Point?

12  A      Yes, I guess so, yes.

13  Q     Okay.  Those would be in -- in the case -- in around

14  that upper estuary area you were referring to?

15  A      Right, yeah, not -- not completely because the Fort --

16  Fort Point is -- is out of the upper estuary.

17  Q     All right.

18  A      But this figure isn't quite plotted precisely --

19  Q     All right.

20  A      -- for that purpose.

21  Q     Fort Point goes -- is beyond the southern border of the

22  upper estuary.

23  A      Yes, it is.

24  Q     Okay.

25  A      It's the first south of the upper estuary.

1   Q     Okay.  So let's just look at the BO bar.  Would that be

2   an average of the five sampling stations you pointed out

3   earlier for all sampling periods?

4   A     Yes, yes.

5   Q     Okay.  Now, do you remember what the average

6   concentration of the surface sediments was -- all surface

7   sediments in the upper estuary, approximately?

8   A     About -- about 890 or 900 nanograms per gram.

9   Q     Okay.  And is that the -- is that the fine-grain

10  sediment you're referring to?

11  A     Mostly.  It's -- it's a -- the concentrations are

12  highest in the fine-grain sediments, but in this case, it's

13  just a -- the top 3 centimeters of sediments, the particles

14  aren't separated as to size.  It's just -- it's just the --

15  the sediments as we obtained them.  So there's a mixture of

16  sizes in those samples.

17  Q     Okay.

18              THE COURT:  Is this a good time to break?

19              MR. BERNARD:  That'd be fine, Your Honor.

20              THE COURT:  Okay.  We're going to take about a

21  20-minute break.  Enjoy your break.

22       (Court recessed from 10:29 a.m. to 10:54 a.m.)

23              THE COURT:  Mr. Bernard?

24              MR. BERNARD:  Thank you, Your Honor.

25                    CONTINUED DIRECT EXAMINATION

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    BY MR. BERNARD:

2    Q     Dr. Rudd, before the break, we were talking about the

3    Chapter 1 synthesis of data and the sediment concentrations,

4    and I believe you said the highest sediment mercury was in

5    this upper estuary area you defined; is that correct?

6    A     That's correct, yes.

7    Q     Okay.  Did you also look -- where did you find the

8    higher -- highest mercury levels in biota in the system?

9    A     The highest mercury in -- in biota was in the -- in the

10   birds in -- in Mendall Marsh.

11   Q     Did you also find -- what -- what did you find by way of

12   biota levels in other aquatic organisms within the upper

13   estuary?

14   A     Oh, yeah, generally, we did north-to-south surveys of

15   the mercury concentrations in the aquatic organisms, and we

16   found those to be highest in the upper estuary, as well,

17   although not as high as the birds.

18   Q     Now, you've mentioned birds a number of times and we'll

19   return to them in a moment, but did you look at mercury

20   concentrations in organisms that are part of the human food

21   web?

22   A     Yes, we -- we looked at -- we looked at various fish --

23   fish species -- eels, and some smaller fish species.  We

24   looked at lobster, crab, and at black ducks.

25   Q     Did you look to see whether the mercury that you found

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   in Penobscot biota posed a threat to human health through the

2   consumption of contaminated fish or shellfish or other

3   wildlife?

4   A     Well, we did -- yeah, we did.  After we -- our data came

5   back, we did -- we did observe that the concentrations were

6   higher than the guidelines that are -- that are -- are -- have

7   been instituted by the Maine government.

8   Q     And to what guidelines of the Maine government are you

9   referring?

10  A     To the human consumption guidelines.

11  Q     And do you remember what that standard is?

12  A     It's .2 in Maine, .3 in the country as a whole.  That's

13  the EPA guideline.

14  Q     And is that a parts per million?

15  A     Yes.

16  Q     And so in the EPA for national purposes, it's .3 parts

17  per million?

18  A     That's correct.

19  Q     And in the state of Maine, it's .2 parts per million?

20  A     Yes.

21  Q     And as a part -- let's take the .2 parts per million.

22  How many nanograms per gram would that be?

23  A     Let me think in my head.  It's --

24  Q     Would it be 200?

25  A     Yeah -- well, it would be point -- .2 milligrams per

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1  gram.

2  Q    And -- and do you know what the conversion is to

3  nanograms per gram?

4  A    It would be a thousand times that.

5  Micrograms/nanograms.

6  Q    Right.  And that would be 200, right, a thousand times

7  .2?

8  A    Oh, okay, yes, that's right, yeah.

9  Q    Okay.  You mentioned the black ducks.  What did you find

10  with regard to mercury levels in black ducks?

11  A    We found that they were -- they were well above the --

12  the -- the Maine guideline of .2 by a factor of two or three

13  in some cases.

14  Q    Did you report the information that you received or

15  collected to the Maine state authorities on black ducks?

16  A    Yes, we did.  We -- we asked -- we were surprised by

17  this.  We didn't -- we didn't anticipate this, and -- and --

18  and so when we -- when our data came in, we asked the court if

19  we could -- if we could pass these on to the -- to the Maine

20  government officials.

21  Q    Did the court grant that permission?

22  A    Yes.

23  Q    Did you then turn over the data to the State of Maine?

24  A    Yes, we -- Dr. Kopec wrote a report, which was -- which

25  was given to the State of Maine.

1   Q      Okay.  And was that to the Department of Inland

2   Fisheries and Wildlife, if you know?

3   A      Yes, yes.

4   Q      And do you know what, if anything, the department did in

5   response?

6   A      They instituted a -- they posted the Mendall Marsh and

7   some of the other wetlands in the upper estuary to let the

8   public know that these concentrations were above the -- the

9   guideline.

10   Q      Do people eat black ducks?

11   A      Yes, they -- they do, yeah.

12   Q      You mentioned eels.  What did you find with regard to

13   Penobscot eels?

14   A      Well, they were also above the -- the Maine guideline.

15   When -- when the study first started, we saw eel pots in

16   the -- in the upper estuary, but -- but in later years, we

17   didn't see any.  So I don't know how many -- how much eel is

18   being consumed, but they -- those that are there are above the

19   guideline.

20   Q      Are they well above the guidelines; do you recall?

21   A      They're about .5, I think.

22   Q      Okay.  Compared to a guideline in Maine of .2?

23   A      .2, yes.

24   Q      So that would be two and a half times?

25   A      Yes, yeah.

1    Q     What did you find regarding lobster?

2    A     Well, lobster were also higher.  They occurred farther

3    south in the -- in the system, and mostly -- we mostly sampled

4    them in -- in Fort Point and south of that point, but in the

5    Fort Point area we also found that they were above .2, two or

6    three times in some cases, maybe -- some extreme cases maybe

7    up to seven or eight times above the -- some individuals above

8    the guideline.

9    Q     Okay.  Was Dr. Kopec the lead kind of investigator in

10   terms of the biota work?

11   A     I -- I would say that she and -- she and Dr. Bodaly

12   were -- were -- were mostly concerned with that.  They -- they

13   received the data and did the first interpretations of them.

14   Q     All right.  And is Dr. Kopec the author of Chapter 14 --

15   A     Yes, she is.

16   Q     -- that deals with that?

17   A     Yeah.  I'd say Dr. Kopec and Dr. Bodaly are the two

18   major authors of those -- of the biota reports.

19            MR. BERNARD:  Your Honor, just to let the court

20   know, in the interest of efficiency, we're going to have

21   Dr. Rudd touch on certain subjects that we plan to delve into

22   in greater detail with other witnesses, for example,

23   Dr. Kopec, who wrote that chapter, and so we'll be leaving

24   that subject shortly.

25            THE COURT:  Okay.  Fine.

1            MR. BERNARD:  Let me also draw the court's

2       attention, if I may, to a demonstrative that we prepared,

3       which is Plaintiffs' Exhibit 92, which is a measurement

4       conversion chart, because we will hear testimony and you will

5       see in the documents references to numbers in different

6       measurement units, and this is hopefully a helpful guide to

7       the court.

8            THE COURT:  All right.  Thank you.

9       BY MR. BERNARD:

10      Q     Did you look to see, Dr. Rudd, whether the mercury in

11      biota posed any threat to the biota themselves as distinct

12      from threat to human health through the ingestion of

13      mercury-tainted wildlife?

14      A     Yes, yes, we did.  We -- we made quite a large effort in

15      that -- in that direction.

16      Q     And how did you determine -- by what standard did you

17      determine whether a mercury concentration posed a danger to

18      biota?

19      A     Well, we -- we -- we turned to the -- to the -- we hired

20      a -- what we considered to be experts in this field and got

21      expert reports.  None of us are avian toxicologists or fish

22      toxicologists, so these are one of the -- the contrast

23      investigators that we brought in -- in during Phase II of the

24      study.  For example, Dr. Evers is a -- is a renowned avian

25      toxicologist, ecotoxicologist, and we brought him in to advise

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    us both on what is known generally about -- about mercury

2    toxicity to -- to birds and also to determine -- he suggested

3    the concentration of mercury in blood, which is what we

4    finally settled on as our -- as our parameter for -- for

5    assessing whether or not birds are -- are contaminated levels

6    that -- that we were concerned about.

7         So we took the approach of -- of relying heavily on

8    experts in this field, where we weren't as experienced

9    ourselves.

10   Q    What is Dr. Evers' reputation, so far as you know it, as

11   an avian toxicologist?

12   A    I would say he's -- he's world renowned.  He -- he's one

13   of the best ecotoxicologists there is and one of the most

14   well-known.

15   Q    What did you ask him to do?

16   A    Well, he -- he -- his -- his institute was involved in

17   the -- in the -- in the sampling of the birds, but the main

18   thing I think we relied him on for was his overall

19   understanding of the -- of the toxicity of mercury in various

20   types of bird populations.  His -- not only his work that he

21   does himself, but also he's aware of the -- of the -- of the

22   literature -- the scientific literature and the latest

23   scientific literature, because there's new things being found

24   out in this field all the time.  This field is fairly new.

25   It's developing quite quickly.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

92

1       So we relied on him for his overall knowledge of the

2   ecotoxicology of birds and -- and also relied on him to -- to

3   give us advice about whether the concentrations we were

4   seeing, particularly in -- in bird blood, were high enough to

5   be of concern.

6   Q    What did he tell you about that?

7   A    Well, he -- he told us that they were.  In fact, in

8   his -- in his recent -- in his recent -- one thing that really

9   struck me in his recent testimony which I read, he referred to

10  the -- to Mendall Marsh, which is a wildlife refuge, as being

11  a sink for -- for Nelson's sparrows when it should be a source

12  of birds to other nearby wetlands.

13      I discussed this topic with him in the marsh one day.

14  We were there at the same time, and he -- he was quite

15  concerned about the bird populations in -- in Mendall Marsh.

16  Q    What did you understand him to mean when he said Mendall

17  Marsh was a sink rather than a source with regard to Nelson's

18  sparrows?

19  A    Well, Nelson's sparrows nest and reproduce in the marsh,

20  and the way he explained it to me at the time we were at the

21  marsh is that Mendall Marsh is a large marsh and there's a

22  fairly large population of Nelson's sparrows in Mendall Marsh.

23  And what they do -- the way the populations work, according to

24  Dr. Evers, is they -- they would reproduce in Mendall Marsh

25  and then fan out to -- to neighboring marshes and populate

1    those marshes.

2         And so that Mendall Marsh, if everything was in good

3    shape, should be a source of -- of Nelson's sparrows to other

4    nearby marshes, and instead, he thought it was a sink.

5    Q    And what is -- is that a scientific term, a sink?

6    A    No, I -- that's probably not terribly scientific.  But I

7    think what he was -- he was trying to paint a picture for me

8    and say that the population -- he thought the -- rather than

9    the population -- adding to populations outside of the marsh,

10   it instead was -- was reproducing probably very poorly and

11   unable to do that, as -- as it should.

12   Q    Did Dr. Evers prepare a report for the Study Panel on

13   this question of setting a toxicity threshold for bird

14   species?

15   A    Yes, yes, he did.  Dr. -- Dr. Bodaly worked quite

16   closely with Dr. Evers on this, and -- and together they set

17   the -- the target level for -- that we would hope to achieve

18   in the future or somebody would hope to achieve in the future,

19   would make concentrations in bird blood in Mendall Marsh.

20   Q    Okay.

21   A    What we consider to be nontoxic.

22         MR. BERNARD:  For the court's reference, Dr. Evers'

23   report is Joint Exhibit 6-2, Appendix 2-2.

24         THE COURT:  Thank you.

25   BY MR. BERNARD:

1    Q      Did you also enlist Dr. Mark Sandheinrich to assist

2    you --

3    A      Yes.

4    Q      -- in this exercise of setting toxicity thresholds?

5    A      Yes, yes, yes.  He wrote another report for us on -- and

6    contained information on birds, but fish species, as well.

7            MR. BERNARD:  And for the court's reference, that's

8    Joint Exhibit 6-2, Appendix 2-1.

9    BY MR. BERNARD:

10   Q      What is Dr. Sandheinrich's reputation, so far as you

11   know?

12   A      It is -- it is -- he also has a very good reputation.

13   As I said previously, the people we were -- we were able to

14   hire for this study were all top-flight people.

15   Q      Why did you do it the way you did it?  In other words,

16   why did you enlist these or engage these experts and have them

17   advise you and use toxicity values from -- that they derived

18   from the scientific literature?

19   A      Well, we had big debates about this, and -- and we -- we

20   could have taken the approach that we took, or we could

21   have -- have gone up another level in complexity and -- and

22   looked directly at the -- at the reproduction of the birds

23   themselves, done reproductive studies and gotten closer to how

24   this affected the population levels, things like how many eggs

25   are laid and how many eggs hatch and how many -- how many

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   nestlings fledge from the nests.  And we -- we decided,

2   after -- after much discussion, to -- to stay at this -- at

3   this lower level because the more complex studies to us seemed

4   to be very daunting and -- and maybe, frankly, were -- from my

5   perspective, were maybe more Cadillacs than Fords.

6   Q     Now --

7   A     More than was necessary.

8   Q     I'm sorry?

9   A     More than was necessary.

10  Q     Okay.  You described a debate among the Study Panel

11  members concerning whether or not to do field toxicity

12  studies.  Was there a disagreement within the Study Panel at

13  first about whether to do that?

14  A     Yes, yes.

15  Q     Okay.  And who was advocating such studies?

16  A     Dr. Fisher was advocating very strongly.

17  Q     And what was Dr. Whipple's view, the best you recall?

18  A     Dr. view -- Dr. Whipple's view was -- was that we didn't

19  need to go that far, that we could -- we could demonstrate the

20  toxicity or lack of toxicity without -- without going the next

21  step.

22  Q     And what was your view at the time?

23  A     My -- my view -- initially I agreed with Dr. Whipple, I

24  wavered a little bit part-way through, and this was a long

25  discussion.  And then I came back in the end to -- to agree

1    with Dr. Whipple's side of the argument.

2    Q      Did you take this issue to Judge Carter?

3    A      We -- this issue came to a head.  We'd been discussing

4    it for months, and -- and the other members of the team were

5    involved, too, not -- not just Dr. Whipple and Dr. Fisher.

6    But it came -- it came to a head when we were writing the --

7    the Phase II proposal, and we were having a discussion one

8    day, and we just couldn't agree.  We were -- we were -- it was

9    an important question, but we couldn't come to a consensus.

10   And when I started the project, I was a little concerned that

11   there was three of us and I might get outvoted as chair of the

12   panel, because we were supposed to work as a consensus.

13         So I said to Judge Carter, well, what if I -- what if I

14   really believe something is wrong at some point and -- and the

15   other two panel members are voting against me?  He said, well,

16   in that case, come to me and I'll decide.  So after we'd had

17   this debate, it had gone on a long time, I -- I contacted

18   Monica Bigley and -- and set the question out.  And we

19   discussed it on the phone, and -- and she went away and

20   discussed it with Dr. (sic) Carter and then came back and said

21   that -- or Judge Carter, and came back and said that Judge

22   Carter had -- had decided that we should -- we should stay at

23   the -- at the level that we finally decided at -- or he

24   finally decided at and not go ahead and do the -- the toxicity

25   studies

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   Q      Who is Monica Bigley?

2   A      Monica Bigley was -- I guess she's -- she's Judge

3   Carter's assistant, clerk of the court?  I'm not sure what her

4   title is.

5   Q      Are there limitations to doing -- I mean, you mentioned

6   complexity and the sort of Cadillac aspect.  But are there

7   limitations, as well, in doing in-situ field toxicity studies?

8   A      Yes, at that time I didn't know as much about it as I do

9   now, but that's what was making the biologists in the -- in

10  the group -- or some -- not all of the biologists, obviously,

11  but some of the biologists in our smaller team nervous is that

12  it was -- it was such a complex study to take on.  And, you

13  know, I think you even see this in the -- in the

14  defendants' -- defendants' reports and testimony, that one of

15  the -- one of the best studies in -- of field toxicology

16  that's been done is one by Jackson, et al., which Dr. Evers is

17  an author, but Dr. Henry found all sorts of things to

18  criticize in this.

19         It's very difficult -- what you're doing is comparing

20  the -- the reproductive success of birds in a contaminated

21  area to a noncontaminated area, and it's very hard to have

22  your reference be exactly representative of the -- of the

23  contaminated area.  There's always -- there's always things --

24  inconsistencies between these two areas of -- vegetation along

25  the side of the river is different from one place to another

1    or something like that.

2    Q     Did you have some concern, Dr. Rudd, that you could go

3    to this effort and not have a definitive answer or an answer

4    any more definitive than the one you already had?

5    A     Yeah, yeah, I thought -- we were concerned that we'd get

6    the kind of -- kind of concerns that we got from Dr. Henry.

7    Q     Now, did this issue arise again with Special Master

8    Calkins?  Do you remember any communication in early 2009

9    about the toxicity study issue?

10   A     Yeah, it did, and I'm trying to remember the details of

11   this now, but we did -- we did go over it again with her, and

12   I think -- yeah, I remember now, I think she -- she looked

13   for -- if there was some order from Judge Carter about

14   whether -- whether -- directing us to do the -- the type of

15   toxicity work that we did.  And there was no written order,

16   and I wasn't surprised at that because that -- that

17   instruction came via the phone to me.

18        And so, yeah, I think that was -- that was what I

19   remember with -- she looked for those -- those orders, and

20   they weren't there.

21   Q     All right.  And by that time -- do you remember

22   revisiting the toxicity study question later on in the

23   Phase II process?

24   A     I -- I think we're still discussing it.

25   Q     Is it fair to say that there was not much enthusiasm

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

99

1   among the Study Panel as a whole for doing toxicity studies

2   when the issue rearose with Special Master Calkins?

3   A    Yes, and I'm quite satisfied now that Judge Carter made

4   the right decision.

5   Q    And to the extent this -- I'm not asking you to repeat

6   your prior testimony, so just say if you think you've covered

7   it, but why do you think Judge Carter made the right decision?

8   A    Because I -- I -- I think in the end, I -- I decided it

9   was best on us to rely on the experts who really understand

10  this field and are intimately aware with the latest

11  developments and that we should -- it's better to take their

12  overall understanding of the ecotoxicology of -- of the birds

13  in this case than for us to do our study ourselves, and -- and

14  also it would only be one study.  Sometimes you do a study and

15  you get one result; you do another study, you get another

16  result.

17       So we thought it was best to rely on experts' advice,

18  and I'm -- I'm satisfied with that now.

19  Q    Is that still your view?

20  A    Pardon me?

21  Q    Is that still your view?

22  A    Yes, it is.

23  Q    Okay.  Did the Study Panel undertake some food web work

24  to -- to look at food webs and how they operate in the

25  Penobscot?

1    A      Yes, it did.

2    Q      Okay.  And is that written up in Chapter 16 of the Phase

3    II Report?

4    A      It is, yes.

5    Q      And is Dr. Kopec the principal --

6    A      Yes.

7    Q      -- author of that?

8    A      Yes, she is.

9    Q      Okay.  What is your understanding of the importance, if

10   any, of the benthic -- well -- withdrawn.

11          What is the benthic food web?

12   A      There can be both benthic and pelagic food webs, and a

13   benthic-based food web is a food web in which the -- the top

14   organisms in the food web, the base of their food web is -- is

15   organisms that either live on or -- or within the sediments.

16   Q      And what is the pelagic food web?

17   A      The pelagic food web is a food web that's based on

18   phytoplankton production in the water column itself so that

19   the base of the food chain in that case is phytoplankton and

20   then the food web goes up from there to -- to fish.

21   Q      What is your understanding of the importance, if any, of

22   the benthic food web within the Penobscot ecosystem?

23   A      In the -- in the upper estuary.

24   Q      In the upper estuary.

25   A      Yeah, in the upper estuary, we've concluded, and mostly

1    Dr. Bodaly and Dr. Kopec have concluded, that -- that it's a

2    benthic-based food web, and they did this by looking at stable

3    isotopes, work of carbon nitrogen, and also looking at the

4    stomach contents of the -- of the fish to see what they were

5    eating.

6    Q    Okay.  We'll go into, as I mentioned to the court, we'll

7    go into the biota data in a little more detail with other

8    witnesses.

9         But I want to show you a paragraph that we discussed in

10   your deposition.  This is from Joint Exhibit 47, and it's

11   Page 19.  Do you know Dr. Driscoll?

12   A    Yes, I do.

13   Q    And Dr. Driscoll is -- is a plaintiffs' expert witness

14   in the case; is that right?

15   A    That's correct.

16   Q    And he wrote an expert report.  Did you review that?

17   A    Yes, I did.

18   Q    Okay.  This is a page from his expert report, which we

19   discussed in his deposition -- in your deposition, and I will

20   just say that this is a summary paragraph of a section in his

21   report concerning mercury and biota --

22   A    Hm-hmm.

23   Q    -- in the Penobscot, and so let me just refer you to

24   that summary paragraph, and I'm going to read you some of this

25   and ask you what, if any -- whether you agree with it or not

1    and -- and then you're free to explain.  Okay?

2              THE COURT:  Why don't we make sure, for the record,

3    that it's in.  Is there any objection to 47?

4              MR. TALBERT:  Well, actually, this is -- we do right

5    now in light of the fact that it's a live witness that is

6    going to be testifying as an expert.  We may withdraw that

7    objection after Dr. Driscoll testifies.  Otherwise, I mean, I

8    would be fine if we put all of the expert reports in, but that

9    would be subject to the parties' agreement.  I mean --

10             MR. BERNARD:  Your Honor, if I may --

11             MR. TALBERT:  -- if this goes in --

12             MR. BERNARD:  Mr. Talbert and I have discussed this,

13   the -- the expert reports are now marked.

14             THE COURT:  Right.

15             MR. BERNARD:  And there's a question whether they

16   should all go in or not go in because all the witnesses are

17   going to be testifying live.

18        What I suggest we do is -- and if Your Honor is willing

19   to do it, that we allow testimony on the document and suspend

20   a decision about -- because I think that, in the end, all of

21   them will come in or none of them will come in, and it's

22   really more a matter of what the court wants.

23        I've been involved in cases where it goes both ways,

24   where the court doesn't want an expert report in evidence

25   because you've got a live witness, and in other cases it's

1    gone in.  And I -- I don't know what Your Honor's preference

2    is

3            THE COURT:  Well, you know, I think technically

4    they'd probably be hearsay, but if the parties are in

5    agreement that they can go in, I think they should go in.

6    Because it simply would make it better for me to place the

7    witness's testimony in proper context when I rereview it.

8            MR. TALBERT:  We have no objection to that.  In

9    fact, we would favor them going in.

10           MR. BERNARD:  That's fine with us, Your Honor.

11           THE COURT:  Okay.  Why don't we, then, put them in.

12   I take it you're moving and -- 47 in and --

13           MR. BERNARD:  That's Joint Exhibit 47.  We're moving

14   it into -- that it be admitted into evidence.

15           THE COURT:  It's Plaintiffs' Exhibit 47, right?

16           MR. BERNARD:  No, it's actually joint.  The way --

17   we stipulated, Your Honor, that a certain subset of the joint

18   exhibits --

19           THE COURT:  Well, whatever.

20           MR. BERNARD:  -- everybody reserved their -- their

21   right to object, and I think it was up to 41?  Yeah, so, in

22   other words, Joint Exhibits 1 through 41 both parties have

23   waived any objection to.

24           THE COURT:  Okay.  And this is --

25           MR. BERNARD:  Beginning with 42, we've reserved

1    objections.

2            THE COURT:  Right.  And this was 47?

3            MR. BERNARD:  It is.

4            THE COURT:  Okay.

5            MR. TALBERT:  Your Honor --

6            THE COURT:  So in light of my inclination here to

7    put them all in, is there any objection?

8            MR. TALBERT:  No objection.  And -- and just for the

9    record, that would be Joint Exhibits 42 through 59.

10           THE COURT:  So there's -- are you moving 42 through

11   59?

12           MR. BERNARD:  I think maybe I should move 1 through

13   59, because I know there are no objections to the first 41.

14           THE COURT:  Okay.  Any objection to 1 through 59?

15           MR. TALBERT:  No, Your Honor.

16           THE COURT:  Each is admitted without objection.

17   Thank you.

18   BY MR. BERNARD:

19   Q    Dr. Rudd, this is from Dr. Driscoll's report, Joint

20   Exhibit 47 in evidence, and I just want to close off this

21   section of your testimony on mercury and biota and -- and this

22   is one way to do it.

23        He writes, in summary, the information from the

24   Penobscot River Mercury Study on mercury concentrations in

25   biota is overwhelming, clearly demonstrating that:  One,

1   concentrations of mercury in many species from the Penobscot

2   System are very high in comparison to observations from other

3   areas in the Gulf of Maine.  These patterns are particularly

4   striking given that the Penobscot is a region of relatively

5   low population density and limited industrial activity.

6            Do you agree with that much?

7   A    Yes, I do.

8   Q    Let me go on:  Two, concentrations of mercury in biota

9   are consistent with mercury concentrations in surface

10   sediments, showing that the source of the mercury

11   contamination to biota in the Penobscot System is largely from

12   legacy releases of mercury associated with the former

13   HoltraChem facility.  Do you agree with that statement?

14   A    Yes, in general, yes.

15   Q    And -- well, when you say in general, is --

16   A    Well --

17   Q    -- is there something you'd like to elaborate on or

18   explain?

19   A    Not -- not every organism behaves the same as every

20   other organism, but in -- in a general sense, standing back

21   and looking at the ecosystem in general, I would agree with

22   that, yes.

23   Q    And, three, concentrations of mercury in biota in the

24   Penobscot System exceed levels of concern for:  A, human

25   health resulting from consumption; B, potential toxic effects

1    to wildlife; and, C, the health of wildlife predators.  Do you

2    agree with that?

3    A     Yes, although not all organisms.

4    Q     Okay.  So with the -- with the understanding that this

5    applies as a general statement about the system, not to every

6    last organism or species, do you agree with the substance of

7    this paragraph?

8    A     Yes, I do.

9    Q     I want to turn your attention to Mendall Marsh, and let

10   me show you -- whoops -- I think I know how to do this now.

11            MR. BERNARD:  This is Plaintiffs' Exhibit 46, Your

12   Honor, it's a map from the Phase II Report.  I'd like to move

13   it into evidence, please.

14            MR. TALBERT:  No objection.

15            THE COURT:  It's already in.

16            MR. BERNARD:  Is it?

17            THE COURT:  Right.  Because I think what was moved

18   was through 59.

19            MR. BERNARD:  I think those were the joint exhibits,

20   Your Honor.

21            THE COURT:  Oh, okay.

22            MR. BERNARD:  1 through 59, and this is a

23   plaintiffs' exhibit.

24            THE COURT:  All right.  Okay.  Any objection to -- I

25   take it there's no objection to 59?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

107

1          MR. TALBERT:  No objection.

2          MR. BERNARD:  Okay.

3   BY MR. BERNARD:

4   Q      This is just to set the stage here, Dr. Rudd, just

5   explain what this shows, please.

6   A      This shows the -- the Penobscot River, the blue areas on

7   the right, and -- and the yellowish area -- I can touch it

8   with my pen -- here and down to here is the -- is the

9   Mendall -- Mendall Marsh area.

10  Q      Okay.  Where's the Marsh River?  Do you know?

11  A      The Marsh River runs into Mendall Marsh, but there's

12  a -- from the -- there's a north Marsh River and a southerly

13  Marsh River that -- one enters the marsh down here at the

14  southern end, another at the northern end, here, just before

15  the outflow.

16  Q      All right.  How do particles containing mercury enter

17  the marsh?

18  A      Some of them -- some of them enter from those -- those

19  rivers, although not -- proportionately not very much, I don't

20  think.  But most -- most of the particles enter from the main

21  stem of the river, which is -- would be in this direction.

22  Q      Okay.  And do some of the particles that are transported

23  into the river remain there?

24  A      Yes, yes, the -- the marsh essentially acts as a large

25  sediment trap, so a lot of the particles that enter from the

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    main stem of the river remain in there and are deposited

2    there.

3    Q     What is a marsh levy?

4    A     It's a -- it's a natural -- sort of natural small levy

5    or dike along -- there's a -- there's a channel -- the

6    white -- the white zone in Mendall Marsh there, the platform

7    of the marshes, are the yellowish areas on the sides.  Running

8    down the center is a -- is a channel, and at the very edge of

9    that channel is a very slight, it's maybe only -- only as high

10   as a foot or something, elevation, right at the edge of the

11   channel before it drops down a foot or so and then goes onto a

12   very flat area, which is the -- is the platform of the marsh

13   itself.

14        And there's a -- there's an area there of heavier

15   sedimentation of particles that are deposited there just as

16   the -- as the water is flowing up under the marsh before it

17   goes under the marsh itself.  So that's called the levy.

18   Q     Do you recall what the mercury concentrations in

19   sediments in the marsh levies are?

20   A     They're about 700 or something like that nanograms per

21   gram.  I'm not quite precisely sure.

22   Q     Okay.  And do you know how that compares to background

23   sediment concentrations?

24   A     Ah, that would be more than ten times higher than --

25   than -- than concentrations in -- in reference areas on -- on

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    marsh plateaus.

2    Q      What is the marsh platform?

3    A      The platform is the -- are the -- is the yellow areas in

4    this -- in this map.

5    Q      Excuse me one second.  Do you mind if I just clear --

6    A      Oh, sure.

7    Q      -- the arrows you've made?

8    A      Yeah.

9    Q      Because maybe they're obscuring things you want to point

10   out.  Go ahead.

11   A      And it's very flat.  It kind of looks like a tabletop,

12   and it's vegetated.  And during the spring tides, which are

13   the highest tides of the month, water flows in from the --

14   from the -- from the river into the channel and then goes up

15   over the levy and onto -- onto the platform.  And then the

16   finer particles are -- are deposited onto the platform, and

17   the platform gradually accretes with time.  And as I said,

18   they're vegetative, and that's where a lot of the birds that

19   we're concerned about nest.

20   Q      Do you recall what the mercury concentrations in the

21   soils of the marsh platform are?

22   A      About 450, I think.  They're a little lower.

23   Q      Okay.  What explains their being lower than the

24   concentrations in the marsh levies?

25   A      We think -- this is work of Dr. Gilmour's now, and she

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    thinks it's because -- it's because of dilution by clean

2    organic carbon.  As I mentioned, there's -- there's plants

3    growing on the -- on the marsh plateau, and they're fixing

4    carbon out of the atmosphere, which doesn't contain any

5    mercury.  So it -- so as these plants die and decompose, the

6    carbon that they leave behind, then, is not contaminated with

7    mercury, unlike the carbon that's coming in, as we've been

8    discussing before, from the river.

9         So what this does, essentially, then, is dilute out the

10   mercury that's come in from the river, so the concentrations

11   are a little lower than you might expect.

12   Q    Now, we've been talking about total mercury

13   concentrations.

14   A    Yes.

15   Q    Is that correct?  Okay.  And I think you testified

16   earlier that the principal concern from an ecological and

17   human health standpoint is methylmercury; is that correct?

18   A    That's correct, yes.

19   Q    Now, is methylmercury sometimes referred to as a

20   percentage of total mercury?

21   A    Yes, it is, yes.

22   Q    And is that one way to measure the efficiency of the

23   production of methylmercury in a particular environment?

24   A    Right, yeah, there's -- there's a couple of different

25   ways you can look at production of methylmercury, but that's

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    one of them and often when you'll find a higher percentage of

2    methylmercury.  It's -- these are locations where -- where

3    methylmercury is being -- net methylmercury production is

4    happening most quickly.

5    Q    And what is it about the environment here in Mendall

6    Marsh that would stimulate the production of methylmercury?

7    A    Well, again, this is -- this is why we -- we had

8    Dr. Gilmour do this work for us is we were trying to

9    understand this, and -- and she came up with -- with two

10   explanations, I think.  One was there -- methylmercury is

11   produced in the -- in the pore water between the sediment

12   particles by the bacteria that live in that pore water, and

13   she found that there was a particular type of organic matter

14   in the pore water that tended to keep the -- the -- the

15   inorganic mercury more in the pore water than attached to the

16   particles themselves.  And because only dissolved mercury can

17   be methylated by the bacteria, that tended to make the

18   methylmercury production very -- very efficient in this

19   situation.

20        The other thing she found is that some -- some areas in

21   the marsh have -- have a lower-than-expected acidity, or pH,

22   and it's well-known from work that I've done and other people

23   have done that low pH stimulates the production of -- makes

24   the inorganic mercury more available to methylating bacteria.

25   Q    You mentioned, Dr. Cynthia Gilmour; does she work at the

1    Smithsonian?

2    A    Yes, she does.

3    Q    Okay.  And she is one of the scientists you engaged as

4    an investigator in the study?

5    A    Yes.

6    Q    And, in particular, she looked in the situation in

7    Mendall Marsh?

8    A    Right.  We had her concentrate her work on -- she's a

9    specialist in methylmercury production, and we had her

10   concentrate a lot of work, not all of her work, but a lot of

11   her work in Mendall Marsh because we were seeing such high

12   concentrations of methylmercury there, both in the pore water

13   and in the birds.

14   Q    What is Dr. Gilmour's reputation in the scientific

15   world, if you know?

16   A    Oh, it's very high.  I mean, this is sort of my

17   bailiwick, so I can assess Dr. Gilmour very well, and she's

18   very well-respected in the world of methylmercury

19   production -- -- small world of methylmercury production.

20   Q    Let me show you a figure from the Phase II Report.  This

21   is Plaintiffs' Exhibit 57, which I'd like to move into

22   evidence.  It's page -- it actually appears more than once in

23   the Phase II Report, but this one is Page 11-90 of Joint

24   Exhibit 6-11.

25             THE COURT:  Any objection to 57?

1          MR. TALBERT:  No objection.

2          THE COURT:  It's admitted.

3   BY MR. BERNARD:

4   Q     Do you recognize this figure, Dr. Rudd?

5   A     Yes, I do.

6   Q     Please explain to the court what it conveys.

7   A     This is one of the figures from Dr. Gilmour's report,

8   and it's -- and it's, again, similar to what we -- what

9   we've -- figure that we looked at before, in that the

10  horizontal axis is total mercury in nanograms per gram dry

11  weight, and in this case, it's from various locations.  The

12  Penobscot is the -- are the red dots, and various other

13  locations where -- where Dr. Gilmour has worked over -- over

14  the years, both lakes and -- and estuaries.

15         So in the -- on the horizontal axis is mercury

16  concentration in the -- in the marsh soils or lake sediments.

17  On the -- on the vertical axis is the methylmercury

18  concentration.  And what she's done is just plot data for

19  the -- some of the various others -- other systems that she's

20  worked on.

21         And what was striking to us is that the -- the

22  Penobscot -- and this is why we -- what I've mentioned

23  before -- that the Penobscot -- or the -- Mendall Marsh seems

24  to be a -- such a -- such an efficient site of methylmercury

25  production.  A lot of these red dots are from Mendall Marsh

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   itself, and it shows that there's a very per -- per gram or

2   per nanogram of mercury, there is -- there is more

3   methylmercury produced than at many other locations.  So

4   Mendall Marsh, and more generally the Penobscot, is a -- is a

5   very efficient site, for the reasons I've just discussed, of

6   methylmercury production.

7   Q    What is the significance, if any, of this figure and the

8   information it conveys to your Phase II work, in other words,

9   your work on the Study Panel?

10  A    Well, it -- it -- it's important to us because it --

11  it -- I think it made us realize that in order to remediate

12  Mendall Marsh you'd have to do a very good job because it's

13  producing methylmercury very efficiently.  And because it's

14  producing methylmercury so efficiently, the concentrations

15  of -- of inorganic or total mercury would have to be decreased

16  proportionately more than in the main stem of the river in

17  order to reach our target concentrations.

18  Q    And is that the due to the efficiency of the conversion

19  of inorganic mercury --

20  A    Yes.

21  Q    -- to methylmercury?

22  A    That's because of the pH in the particular type of

23  dissolved organic matter in the pore water I discussed.

24  Q    Looking at Plaintiffs' 57 again for a moment.  The

25  legend on the right, those are colored dots representing

1  mercury and methylmercury concentrations in other locations;

2  is that right?

3  A    That's right.

4  Q    And are some of those mercury-contaminated sites?  Do

5  you know?

6  A    Ah, yes, there -- well, the Everglades is quite -- quite

7  contaminated from atmospheric deposition, and I know the

8  Chesapeake is.  Lake 658 is a lake at the Experimental Lakes

9  Area, so it's not.  So it would be down in -- in this part of

10  the -- of the -- of the figure.

11  Q    What about the New Jersey Salt Marsh, do you know

12  anything about that?

13  A    I think it would be contaminated, as would the South

14  River.  I think what's also interesting about this graph is

15  you have this wide range of freshwater and saltwater

16  environments, you still see the one-to-one -- roughly the

17  one-to-one relationship of total mercury to methylmercury that

18  we've been discussing.

19  Q    Now, this is -- this figure represents measurements of

20  mercury in surficial sediments and soils in the marsh; is that

21  correct?

22  A    Yes, some of the red dots are Mendall Marsh.  Most of

23  them are, but not all of them.

24  Q    Now, what is -- you mentioned this before.  What is pore

25  water?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   A     Pore water in a -- in a wetland or in a -- in aquatic

2   sediments, which are -- which are saturated, the water --

3   rather than air being between the soil particles, there --

4   they're saturated with water, and that's called pore water.

5   Q     Okay.  And what's the importance, ecologically speaking,

6   of the pore water?

7   A     Well, the pore water is where a lot of the microbial and

8   bacterial activity occurs.  It doesn't -- bacteria tend to

9   live in the pore water, and the materials they're metabolizing

10  comes off -- come off -- tend to come off the solid particles

11  into the pore water.  And it's -- it's the dissolved substance

12  that they're able to assimilate and -- and transform in

13  various ways.

14  Q     Is it a -- is the pore water a route of exposure to

15  methylmercury --

16  A     Yes.

17  Q     -- for aquatic organisms?

18  A     Yes, yes, yes, that's --

19  Q     Do you know whether Dr. Gilmour looked at methylmercury

20  production in the pore water in the --

21  A     Yes, she did.

22  Q     -- in Mendall Marsh?

23  A     Yes, she did, and she found it to be going on at a high

24  rate.

25  Q     Let me show you Plaintiffs' Exhibit 58.

1          MR. BERNARD:  Your Honor, again, this is a -- from

2   the Phase II Report, and I'd move its admission into evidence.

3          THE COURT:  Any objection?

4          MR. TALBERT:  No objection.

5          THE COURT:  It's admitted.

6   BY MR. BERNARD:

7   Q     Let me just undo your arrows there.  Okay.

8         Are you familiar with this figure?

9   A     Yes.

10  Q     And please explain to the court what it shows.

11  A     It shows the -- it's an analogous figure to what we just

12  looked at for the -- for the -- for the entire sediment or --

13  or wetlands soil sample, and this is the pore water separated

14  from the solid sediments and the same type of -- of -- of

15  analysis done.  But, again, it -- with the similar -- with a

16  similar -- a similar result, again, showing that the Penobscot

17  has a very high efficiency of methylmercury production.

18         In fact, some of those dots there you see, there's a

19  hundred -- there's a hundred nanograms per -- per liter of

20  methylmercury on -- on the vertical axis and -- with some of

21  those red dots, and roughly a thousand of total mercury, so

22  that means like 10 percent of the total amount of mercury in

23  the pore water has -- is methylmercury, and that's -- that's

24  very high.  That's amongst the highest I've ever seen.

25          MR. BERNARD:  Just noting for the court that in the

1  figure at the bottom it says pore water methylmercury

2  concentrations, and in the previous exhibit, Plaintiffs' 57,

3  it was methylmercury concentrations in sediments or soils.

4  I'm pointing that out because within the figure, within the

5  box on the upper left, they both say surficial sediments and

6  soils.

7  BY MR. BERNARD:

8  Q     Where do songbirds feed in -- in the marsh?

9  A     Ah, on the --

10          MR. TALBERT:  Object.

11 A     On the marsh itself.

12          THE COURT:  Sorry?

13          MR. TALBERT:  Objection, lack of foundation.

14          THE COURT:  Want to establish his knowledge?

15          MR. BERNARD:  I will, Your Honor.

16 BY MR. BERNARD:

17 Q     Do -- did -- did you find songbirds within the Penobscot

18 ecosystem?

19 A     Yes.

20 Q     And did you sample -- find and sample songbirds in

21 Mendall Marsh?

22 A     Yes, we did.

23 Q     And are -- do those songbirds include the species

24 Nelson's sparrow?

25 A     Yes, they do.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   Q    And do they include the species red-winged blackbirds?

2   A    Yes.

3   Q    And are you aware whether there is any feeding going on

4   by those species of birds while they inhabit the marsh?

5   A    Yes.

6   Q    And do you know where they -- within the marsh they

7   feed?

8   A    Ah, well, not -- not precisely, no, I think you'd have

9   to ask Dr. Kopec that.

10   Q    Okay.  We will ask Dr. Kopec that.

11       You testified in your deposition that Mendall Marsh is a

12   perfect storm.  Do you remember that term?

13   A    Yeah.

14   Q    What do you mean by that?

15   A    Well, Dr. Bodaly was the first one that noticed this,

16   when he was plotting methylmercury concentrations in our MARSH

17   survey.  He -- he noticed that there was a hump in

18   methylmercury concentration right at Mendall Marsh, and -- and

19   we found that very interesting.  This was in Phase I, but we

20   didn't understand it because all of this other work hadn't

21   been done yet.

22       But now we know that there's -- there seems to be a

23   confluence of -- of two things happening:  One is that -- the

24   efficiency of methylmercury production that we've just

25   discussed; but, also, we now have Dr. Geyer involved looking

1    at the hydrodynamics and the -- and the -- how they -- what's

2    controlling the movement of particular mercury up and down --

3    up and down the estuary.  And it -- and it turns out that --

4    that around the mouth of the Marsh River, right at the

5    entrance of Mendall Marsh, is one of the places where

6    sediments are trapped.  And so there's high concentrations of

7    suspended sediments right at the -- Mendall Marsh, and these

8    fine sediments are then available at times for transport into

9    the marsh.

10        So it seems like both the hydrodynamics and the -- and

11   the -- and the production of methylmercury are both -- are

12   both sort of tuned in a way to -- to stimulate the overall

13   production of methylmercury and aggravate the situation in

14   Mendall Marsh, and that's what I meant by a -- kind of a

15   perfect storm.

16   Q    Did the Study Panel set targets based on Dr. Evers'

17   advice to protect songbirds and other birds in Mendall Marsh

18   against toxicity?

19   A    Yes, it did.

20   Q    Okay.  Let me show you -- and this is Joint Exhibit 6-23

21   at Page 23-15.

22        MR. BERNARD:  It's already in evidence, Your Honor.

23        THE COURT:  Right.

24   BY MR. BERNARD:

25   Q    And this is a table from Chapter 23, which -- of which

1   you are the primary author; is that correct?

2   A      That's correct, yes.

3   Q      Okay.  Do you remember this table?

4   A      Yes, I do.

5   Q      Okay.  Would you please explain to the judge what you

6   display in this table?  Take a moment to look at it, if you

7   need to.

8   A      These are concentrations of -- of methylmercury in the

9   blood of -- of birds, mostly, but not all -- all of them

10  located in -- in Mendall Marsh, and also for the whole body

11  of -- of mussels, we added that in along with these birds, and

12  then what we did is take -- take averages or ranges of

13  concentration for these species of birds both in the upper

14  estuary and compared them to noncontaminated sites.

15  Q      Okay.  And let me just ask you to look at a few of the

16  species there.  First is the Nelson's sparrow, that's the

17  biota group on the left, right?

18  A      Right, yes.

19  Q      And then these values are based on mercury sampled in

20  blood of the animal?

21  A      That's right.

22  Q      And then you have the range of values that you found,

23  mercury concentrations you found in the blood of Nelson's

24  sparrows in the upper estuary?

25  A      Yes.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    Q    And then you have a corresponding value for

2    noncontaminated sites that you were aware of?

3    A    That's correct, yes.

4    Q    Okay.  So what do you see there for Nelson's sparrows?

5    A    Well, I see -- yeah, I see the concentrations of -- in

6    the upper estuary of Nelson's sparrows as -- as being very

7    high, roughly ten times as high as they are in the reference

8    sites.

9    Q    I'm not going to ask you to go through all of these,

10   just two more.  Go down to the red-winged blackbird.

11   A    Yes.

12   Q    What do you see there?

13   A    Ah, again, very much higher than -- you know, at

14   least -- at least ten times higher, sometimes more than that.

15   Q    And then for the black duck?

16   A    Roughly the same, eight-fold in the case of the black

17   duck.

18   Q    You mentioned that in order to achieve protection

19   against toxicity in Mendall Marsh, you would need to reduce

20   the mercury -- the total mercury to a level lower than you

21   would in the rest of the system due --

22   A    Yes.

23   Q    -- to the efficient methylation; is that right?

24   A    Yes, and also due to the fact that -- that -- that the

25   photosynthetic carbon is diluting the mercury there, so it --

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   you -- it needs to go to a lower concentration for that

2   reason, as well.

3   Q    Do you recall your target concentration in the main stem

4   of the river, the concentration you want to bring --

5   withdrawn.

6        Do you remember the concentration that is your goal in

7   the main stem of the river?

8   A    About 450 nanograms per gram.

9   Q    And what is it in Mendall Marsh?

10  A    About a hundred.

11  Q    Okay.  And that difference is for the reasons you've

12  explained.

13  A    Yes, yeah.

14  Q    Let me turn your attention to natural attenuation.  What

15  is it?

16  A    Natural attenuation is a -- is a term that's -- that's

17  used to describe the -- the recovery of a natural ecosystem

18  after a, in this case, a point-source addition of a pollutant.

19  Q    What you do need to know in order to -- withdrawn.

20       Is natural attenuation an estimate?

21  A    Yes, yes.

22  Q    What do you need to know in order to estimate a rate of

23  natural attenuation?

24  A    Usually these are done by -- by looking at the -- the

25  decrease with time of concentrations of the -- of the

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   pollutant in the ecosystem, using -- using long cores that

2   are -- whose -- that have been dated so that you can go back

3   in time and look at what concentrations were previously and

4   compare them what -- to what they are today.

5   Q     Did you -- did the Study Panel set a present-day

6   background for the main stream of the -- the main stem of the

7   Penobscot River, in other words, after it is naturally

8   recovered, what the surface sediment total mercury

9   concentrations would be?

10  A     Yes, we -- we decided that would be about a hundred.

11  Q     And what's the basis for that?

12  A     Well, the basis for that mainly is two cores that are

13  immediately below Veazie Dam, which appear to us to have

14  recovered or almost recovered down to regional background of

15  55.

16        But if you look at the -- if one looks at the mercury

17  profiles of those cores, they've been in steady decline now

18  for a number of years, and they're roughly at a hundred, and

19  that's the most upper part of the estuary.  Water has just

20  flowed in over Veazie Dam and is comparatively clean, and

21  particles have been -- we think particles have been deposited

22  there, and it's cleaned up more quickly than -- than the

23  reservoir further -- further downstream -- or the -- the

24  ecosystem further downstream.

25        So that was, I think, the main basis for us saying,

1  well, if it could get to a hundred, it would be -- it would be

2  pretty much there.

3  Q     When -- you mentioned cores up near the Veazie Dam.

4  What are you referring to?

5  A     Long sediment cores that were taken at various places --

6  actually, 58 sites throughout the system.

7  Q     And then you looked at the top level of the core and saw

8  what you found to be recovery to about a hundred nanograms per

9  gram?

10  A     Yeah, deeper in the cores you could see that it had been

11  contaminated several decades ago, but now it had recovered to

12  concentrations in the surface sediments that were much lower

13  than further downstream.

14  Q     Did you measure mercury concentrations in water flowing

15  over the Veazie Dam?

16  A     Yes, we did.

17  Q     Okay.

18          MR. BERNARD:  And for the court's reference, the

19  Veazie Dam is not there anymore.

20          THE COURT:  Right.

21          MR. BERNARD:  But it was during the study, so --

22          THE COURT:  Right.

23  BY MR. BERNARD:

24  Q     The -- what did you find by way of mercury

25  concentrations coming over Veazie?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1  A     They were quite low.  Um, ah, you know, it's -- if -- if

2  I was to look at that water and compare it to other unpolluted

3  sites, I would say it's -- it's fairly unpolluted.

4  Q     Do you remember what the mercury levels were that you

5  found in -- in water coming over the Veazie Dam?

6  A     About 2 nanograms per liter.

7  Q     And how would that translate, if you know, to nanograms

8  per gram, or is that not a conversion factor?

9  A     That's not something we --

10 Q     2 nanograms per liter.

11 A     Yeah.

12 Q     Okay.  I understand.  I withdraw that.

13       Now, did you measure -- we've been talking about

14 measurements of water.  Did you measure mercury concentrations

15 in particles coming over the dam?

16 A     Yes, we did.

17 Q     And what did you find there?

18 A     We found out that the average was about 200 --

19 Q     Okay.  And --

20 A     -- nanograms per gram this time, yeah.

21 Q     Okay.  You have input -- and the particles coming over

22 Veazie into the lower river are at around 200, you said, and

23 yet you say recovery is at 100.  Is --

24 A     Yeah.

25 Q     Can you explain that?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   A      Not entirely.

2   Q      Do the best you can, please.

3   A      We have -- we have hypotheses, but there's -- there's a

4   process -- a general process known as diagenesis in -- in

5   sediments.  These are microbial activities in sediments, so it

6   is -- as organic material is first deposited on the surface of

7   sediments, it's -- it's -- I mean, it's well-known that it's

8   more decomposable at that point than it is after it's been

9   buried for a long time and the bacteria have worked on it.

10          So we think during the diagenetic process -- there's a

11  couple of other microbial processes that produce, in one case,

12  gaseous elemental mercury, so we think during the diagenetic

13  process -- we hypothesize during the diagenetic process, some

14  of the mercury that's on the particles that's coming over the

15  dam are -- are -- during diagenesis are converted into -- into

16  elemental mercury, which can then go off to the atmosphere.

17  But we didn't study that.  That's just a possible explanation.

18  Q      The empirical information you have, though, indicates

19  that in these cores which are in the path of the particles

20  coming over Veazie, you have concentrations at the surface of

21  around a hundred nanograms --

22  A      Right.

23  Q      -- per gram.

24  A      Yeah, and those are the data.  You know, somehow that

25  happened.  We're not exactly sure of the process.

1  Q     What controls, if you know, the rate of natural

2  attenuation of mercury contamination in the upper estuary?

3  A     I think that's controlled by the -- the -- the change

4  in -- in the -- the gradual reduction and change in

5  concentration of mercury in the mobile pool of sediments in

6  the -- in the main stem of the river.  And it -- the

7  concentration is -- has been going down since around 1967 and

8  continues to go down.  And the reason it goes down is that

9  these cleaner particles at roughly 200 nanograms per liter

10 that we've been discussing enter the -- enter the mobile pool

11 in the -- in the upper estuary, and some of the -- of the

12 dirtier particles or more contaminated particles in the mobile

13 pool are constantly sedimenting out or a few of them are

14 escaping downstream.  So in time with the cleaner particles

15 coming in and the -- and the more contaminated particles

16 leaving, the system is gradually cleaning itself up.

17 Q     How did you go about determining the rate of natural

18 attenuation in the Penobscot?

19 A     Ah, actually, Dr. Santschi and -- with Dr. Yeager's help

20 did this by -- by looking at the -- the rate of decline of --

21 of mercury -- mercury concentration in -- in the cores, and he

22 dated the -- the -- the -- the sediments or cut in -- into

23 centimeter or sometimes 5 centimeter slices, and these were

24 dated either radiochemically or in -- in some other ways.

25 And -- and from that he could calculate a rate of

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   sedimentation over the years, and he compared that to the

2   change in mercury concentration with time.

3        And then looking back in time over the last 20 years,

4   which is what he chose -- 21 years, I think, he could see that

5   over that period of time the concen -- concentration of

6   mercury had -- had decreased by a certain percentage each

7   year, and then he was able to -- to extend that into -- into

8   the future to predict likely what -- what the recovery would

9   be into the -- into the next few decades.

10  Q    We'll go into this in -- in greater detail with

11  Dr. Santschi, but I want to get some basic facts out.  First

12  of all, who is Dr. Santschi?

13  A    Dr. Santschi is -- is a professor of oceanography at

14  Texas A&M University.

15  Q    And what is his reputation?

16  A    It's -- it's -- again, he's one of the very top people

17  in his field worldwide.

18  Q    And what is his field?

19  A    Sedimentology.

20  Q    And you mentioned Dr. Yeager.  What was his role?

21  A    When I went to Dr. -- to Dr. Santschi and asked him if

22  he could do this study, he said he would be delighted to, but

23  it was too big a study for him to do it by himself.  So he

24  asked if Dr. Yeager could participate.  Dr. Yeager I think is

25  one of his former students.  He is now a professor at the

1    University of Kentucky.  So they worked on it at as a team.

2    Q    Now, how many -- when you take a sediment core, do you

3    know about how far down into the sediment column --

4    A    About a meter.

5    Q    Okay.  And how many of these were taken throughout the

6    Penobscot?

7    A    Oh, I can't remember the exact number.  There was --

8    there was many more taken than were finally analyzed; 58 cores

9    were actually finally analyzed.  A lot of the cores that were

10   taken were found for one reason or another to be not useful,

11   so they didn't undergo the final analysis.

12   Q    Okay.  Does the number 72 ring a bell in terms of

13   number?

14   A    Yeah, I would say about that, yeah, yeah.

15   Q    And is that a pretty extensive program in your

16   experience?

17   A    Ah, Peter Santschi told me it's the biggest program he's

18   aware of of coring in an estuary.

19   Q    We'll go into the specifics of the dating exercise and

20   the -- and the radionuclides with Dr. Santschi.  But let me

21   ask you, what did the sediment cores show?

22   A    I think they -- the bottom line of Dr. -- of

23   Dr. Santschi's study was that the -- that the system is

24   recovering at a -- at a fairly slow rate.  Some parts of --

25   some parts of the -- of the ecosystem are recovering more

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    slowly than others, but that overall the half-time of mercury

2    recovery is about 20 to 70 years for the upper part of the

3    estuary.

4         Half-time means that the time -- half-time, say, of

5    20 years would mean that if you had a concentration of mercury

6    of 800 nanograms per gram now, 20 years from now it would be

7    halfway towards its final concentration, and in another

8    20 years it'd be another halfway towards the final recovery

9    concentration.

10   Q    Okay.  Now, let's just say for the sake of clarity and

11   simplicity that you had mercury in the sediments that was

12   about 800 nanograms per gram.

13   A    Right.

14   Q    Okay.  And you wanted to go down to -- I'm sorry, 900

15   nanograms per gram.  Okay?

16   A    Hm-hmm.

17   Q    And you wanted to go down to 450.

18   A    Hm-hmm.

19   Q    Okay.  Would the half-time be -- the half-time number of

20   years would take you -- is the amount of time it would take to

21   go halfway between 900 and 450?

22   A    Yeah.

23   Q    And then the second half-time would be -- whatever that

24   next value is less than 900 would also be -- it would take you

25   that long to go halfway again to the 450; is that what you're

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   saying?

2   A     No, it -- what I'm saying, say we start at 900 now and

3   the final concentration will be a hundred --

4   Q     Okay?

5   A     -- then in one half-time, you'd be half -- you'd be

6   halfway between 900 and a hundred, or you'd be roughly at

7   about 500.

8   Q     500.

9   A     And then you'd start at 500, and you'd be going from 500

10  to 100, and so you'd be at, ah --

11  Q     300?

12  A     350, yeah.

13  Q     Okay.  That was a much better example than the one I

14  gave.  So the half-time represents a number of years that it

15  takes to travel from an existing concentration to halfway to

16  the final destination concentration.

17  A     That's right.

18  Q     Okay.  Let me show -- and did you do these estimates for

19  different compartments of the river?

20  A     Yes, we -- we asked Peter if -- if it was possible to --

21  or Dr. Santschi if it was possible to divide the -- the

22  ecosystem up into different zones since we had a -- quite a

23  number of cores that he had taken, and so he -- he tried to do

24  that as best he could.

25  Q     What's the reason for using the different zones?  Why

1   not use one number for the whole upper estuary?

2   A     Well, because the different -- there's different

3   sedimentation rates at different locations, and he found in

4   his analysis of -- of his data that -- that there were --

5   there were -- there tended to be different regions or

6   different areas of the ecosystem that were -- that were

7   recovering at different rates on -- on average.  I mean, there

8   was quite a bit of variance in the data, but --

9   Q     Let me show you --

10  A     -- he selected those systems out for us and -- and gave

11  them different half-times.

12  Q     Okay.

13  A     According to the data.

14  Q     Let me show you Plaintiffs' Exhibit 35.

15        MR. BERNARD:  Your Honor, this is from Joint

16  Exhibit 6-1, and I move its admission into evidence.

17            THE COURT:  Any objection?

18            MR. TALBERT:  No objection.

19            THE COURT:  It's admitted.

20  BY MR. BERNARD:

21  Q     So do you recognize the table at the top?  There's a

22  table at the bottom that I'm not going to ask you about, so

23  maybe I can actually place this a little better.  Anyway, do

24  you recognize this table?

25  A     Yes, I do.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    Q     Okay.  So please explain to the court what is displayed

2    on this table.

3    A     This is a table showing recovery half-times for -- for

4    four different areas that -- that Dr. Santschi calculated for.

5    One is the main stem of the river, and the main stem of the

6    river is -- is roughly the -- the main -- well, the main stem

7    of the river from below Veazie Dam down to -- down to the

8    southern tip of Verona Island, but not including the -- the

9    Orland or Mendall Marsh.  And he found that the recovery

10   half-time, in that case, was -- was roughly 31 years to

11   recovery of a hundred nanograms per gram dry weight.

12        And then -- or actually Dr. Kelly took these data and

13   calculated that -- that at that rate of recovery, beginning at

14   the concentration of roughly 900 nanograms per gram that it is

15   now, it would be roughly 147 years before the concentration in

16   the main stem of the river would reach -- would reach 20 --

17   within 20 percent of the final background number, which is

18   100.  And we -- we repeated the table for Mendall Marsh, which

19   Peter found to be a separate area of deposition, and the

20   Orland River, which again was separate, and then downstream

21   of -- of the upper estuary itself, which is Fort Point Cove.

22        And there's -- as you can see, there's quite a bit of

23   variability in the recovery half-times with Mendall Marsh

24   being the fastest estimated time.  These are -- these are

25   averages, though, and there's variability.  And the Orland

1    River being the slowest.

2    Q    Dr. Rudd, why did you, in going through this exercise,

3    choose 20 percent of background?

4    A    Because if it approaches -- this is what's called an

5    exponential decline, and as the -- as the concentration

6    approaches the final number of 100, it never quite gets there.

7    So it would be like thousands of years before we would have

8    estimated, if we'd gone to a hundred -- in fact, it would

9    never, ever really get there.  It just approaches it.

10        So we decided that we'd cut it off at 20 percent and

11   give some number that people at least could -- could

12   understand.

13   Q    And if we were to -- the Study Panel's best estimate,

14   then, if we were to get back to -- if we were to wait and not

15   apply any active remedy, to get to 120 percent of the

16   background mercury concentration that you derived, in the main

17   stem of the river, it would take 147 years?

18   A    That's right.  That would be to get back to the

19   background.  This would be below our target concentration by

20   then.

21   Q    I understand that.  I'm talking about getting back to

22   120 percent of background.

23   A    Right.

24   Q    That would take 147 years in the main stem if we waited

25   and did nothing?

1   A      That's right, yes.

2   Q      And in Mendall Marsh, it would take 106 years.

3   A      That's right.

4   Q      And in Orland, it would take almost four centuries,

5   390 years?

6   A      Yes.

7   Q      And in Fort Point Cove, 165 years.

8   A      Yes.

9   Q      Are there sediment cores that Dr. Santschi analyzed that

10  did not show recovery?

11  A      Yes, there's -- there's two -- two types.  Some --

12  some -- very few of the cores actually showed that mercury was

13  just now arriving at that location, so that was one type of

14  core that's -- it showed that concentrations are still

15  increasing on the peripheries.

16         There are other cores that he -- that they took and

17  worked up, but they were disturbed in some way or cut off from

18  the -- from the circulation within the ecosystem, and they

19  didn't show recovery, or they had been disturbed and -- and

20  the data was unusable.  So he took -- he had these 70 cores

21  originally, and he only interpreted 58 of them.  Not all of

22  them were -- were -- at that were even great.

23  Q      Did some of the 58 cores that were interpretable show

24  either constant or increasing mercury concentrations at the

25  surface?

1   A      Yes, yes.

2   Q      And was any of those cores considered in the calculation

3   of a recovery half-time?

4   A      I don't know.  I think you're getting to the point where

5   you should be talking to Dr. Santschi.

6   Q      Okay.  We will do that.  Do you consider the core --

7   sediment core data that you've been testifying to and the

8   recovery times calculated from those data to be the definitive

9   data produced by the study on rates of recovery of the

10  ecosystem --

11  A      Yes.

12  Q      -- from mercury contamination?

13  A      I do, yes.

14  Q      And can you explain why?

15  A      Well, because that's the only --

16  Q      Why are these the best data?

17  A      Pardon me?

18  Q      Why are these the definitive data?

19  A      Because they -- they're the only data set that we have

20  that explains, with time, what has -- what has happened since

21  mercury was -- was added to the ecosystem.  The -- the

22  cores -- it's like a historical record of -- of mercury in the

23  Penobscot right back to -- to before time as -- before humans

24  or -- or humans were living -- had populated the Penobscot

25  Estuary.  So it's a record in time.  It's not a precise

1    record, but it's the best tool that we have.

2    Q    Now, you mentioned that it's not precise.  Understanding

3    that, what is the picture that is drawn for you as a member of

4    the Study Panel from the sediment core data in terms of the

5    speed of natural recovery in the Penobscot?

6    A    What's really summarized in this table, the -- it

7    appears that mercury was -- from the -- from the sediment

8    record, mercury was -- was added as a fairly short-term event

9    of a few years, around 1967.  So we see a peak in mercury

10   concentration at that time, a very -- I mean, a lot of cores

11   that haven't been disturbed in some way, we see a very narrow,

12   defined peak.

13        And then if you look at the cores overall -- now you

14   can't look at one at a time -- but standing back and looking

15   at the data set, after that peak in concentration, which

16   seemed to happen around 1967, there's been -- been a gradual

17   decline with time until the concentration received now.

18   There's been some slowing up as -- as the blob of mercury

19   spread out, but overall there's been an exponential decrease

20   with time.

21   Q    Do the -- those peaks you refer to in the relatively

22   undisturbed or the least disturbed cores in the late 1960s, do

23   those correspond to the maximum known releases of mercury from

24   the HoltraChem facility?

25   A    Yes, they do.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    Q    In terms of your decision-making on the Study Panel,

2    does the imprecision that you have described, in other words,

3    take the main stem recovery half-time, maybe it's 31 years,

4    maybe it's a little more, maybe it's a little less, does that

5    matter?

6              MR. TALBERT:  Objection to form, vague.

7              THE COURT:  Overruled.

8    A    It doesn't matter to the overall recommendation.  It

9    matters scientifically, and -- and some of the -- I mean,

10   we -- we're able to -- to make our recommendations that we

11   made with -- with certainty.  But -- but there's a still a few

12   minor uncertainties, and imprecision, such as this, is -- is

13   related to that.

14        And I think -- I think it would be best -- the way I

15   look at these data that's in this table is I don't spend too

16   much time looking at the data from the main stem because it's

17   well-known that that's a very poor sedimentary environment, so

18   the record is preserved quite poorly there because of the

19   constant churning and currents of -- and flooding of the

20   river, which resuspends sediments and moves it other places.

21   So I -- I would put more stock in the -- in the Mendall Marsh

22   situation, which is a much better sedimentary environment.

23        And there you see, in my way of looking at the data,

24   mercury that's less variable and actually in terms of the peak

25   date corresponds very well to the dates of the cores that

1    Dr. Santschi analyzed for Southerly Cove in front of

2    HoltraChem.  So I don't know whether that's answering your

3    question, but maybe give you some idea of the -- of the

4    difficulty in this.

5    BY MR. BERNARD:

6    Q    Let's zero in on Mendall Marsh for a moment.  You look

7    at the recovery half-time of 22 years.  Do you know how many

8    recovery half-times it would take to get from the current

9    state of mercury contamination in the marsh to the target the

10   Study Panel has set forth?

11   A    Approximately three.

12   Q    So would that then -- if you wanted to know how long it

13   would take in Mendall Marsh for mercury concentrations to

14   reach the sediment -- the Study Panel target, would you

15   multiply 22 or the recovery half-time by three?

16   A    Yes, you would.

17   Q    Okay.  In your view, if we do nothing, are we looking at

18   multiple decades of mercury contamination in the Penobscot

19   estuary that exceeds levels that the Study Panel has deemed to

20   be safe for human health and the environment?

21   A    Yes, we are.

22   Q    Let's talk about sediment trapping and the mobile pool.

23   You've mentioned it earlier.  What is sediment trapping?

24   A    Sediment trapping is -- is -- particles are -- are

25   suspended in the water column, and -- and there's various ways

1    that aquatic scientists use to -- to trap those particles and

2    remove them from the water column.

3    Q    Do you have sediment trapping in the Penobscot?

4    A    Do we have?

5    Q    Yes.

6    A    Naturally we do, yes.  That's why the sediments are

7    accumulating there, yes.

8    Q    Okay.  And -- and just describe -- you mentioned it

9    earlier, and you -- you talked about it as a -- as an

10   important discovery of the -- of the study overall.  Please

11   describe for the court the mobile pool.

12   A    Well, the mobile pool of sediments is -- is a -- is a

13   large pool.  We estimate it's probably at least 500,000 tons

14   in the -- in the upper estuary.  As I mentioned before,

15   there's particles that are continually coming into the upper

16   estuary over -- over Veazie Dam, and they join the mobile

17   pool, and, intuitively, one would think in a system like this

18   that these particles would just get washed out to sea.

19        But -- and -- and we're now getting to -- to Dr. Geyer's

20   specialty.  What happens is -- in estuaries is there's an

21   interaction between the fresh water coming downstream and the

22   salt water coming upstream, and it forms what's called a salt

23   front.  And this salt front, mixed with the hydrodynamics of

24   the system in ways that I don't understand very well, results

25   in the trapping of the small particles so that the -- the

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    water itself passes through, but the particles are stripped

2    out and deposited on the surface.

3          And this happened, you know, for example, during periods

4    of high flow, the -- the trapping front, the salt front might

5    be down towards the tip of Verona Island, and then as the flow

6    -- the river slows down, the trapping front gradually moves

7    back upstream, and as it's moving back upstream, the material

8    that's been trapped and is now on the bottom is kind of picked

9    up by the tidal sloshing and moved back upstream.

10         So this -- this -- this is an ongoing process, and --

11   and the reason we think it's so important is that -- is that

12   when the mercury was added to the upper estuary, it first

13   entered the mobile pool, and it was trapped in that mobile

14   pool.  A little bit of it each year manages to make it past

15   the salt front, and that's why Fort Point Cove -- Cove is now

16   contaminated and the outer estuary less so, and some of the

17   material also deposits in areas like Mendall Marsh.

18         But because this material is there, it turns over very

19   slowly, and that's what's controlling the mercury

20   concentration in the surface sediment, which is, in turn,

21   controlling the production of methylmercury and ultimately the

22   concentration in the biota.

23         So in many ways, the mobile pool, if we could -- if we

24   could -- if we could intervene somehow in the mobile pool and

25   reduce its mercury concentration by some sort of active

1    mitigation, then we think we could do a -- take -- take a

2    whole ecosystem approach to cleaning up the situation.

3    Q     What is a consolidated sediment?

4    A     The consolidated sediment, or sediments like on the --

5    on the platform of Mendall Marsh, they're there.  They're

6    there for -- most of them are never going to go anywhere.

7    They're there -- they've been there for many, many hundreds of

8    years, and they're going to gradually accrete there unless --

9    unless a storm event moves them somewhere.

10   Q     And what is the relationship, if any, between mobile

11   sediments that you were testifying to as part of the mobile

12   pool and consolidated sediments?

13   A     Well, mobile pool become consolidated sediments.  They

14   -- they might go -- the mobile pool might go and it might be

15   deposited on top of consolidated sediments for weeks or -- or

16   months and then it'd be whisked away.  But some proportion of

17   it in these areas of long-term deposition stays there in the

18   long-term and it's gradually buried, and it makes this record

19   of mercury concentration with time that we've been talking

20   about.

21   Q     Let me show you --

22         MR. BERNARD:  This is Plaintiffs' 43 which I'd like

23   to move into evidence.  It's a figure from the Phase II Report

24   showing Exhibit 6-1.

25         THE COURT:  Any objection?

1          MR. TALBERT:  No objection.

2          THE COURT:  It's admitted.

3    BY MR. BERNARD:

4    Q    Do you recognize this, Dr. Rudd?

5    A    Yes, I do.

6    Q    And please explain to the court -- let me get the whole

7    caption in there -- but explain to the court what this shows,

8    please.

9    A    This is -- I was -- I think I put this in one of the

10   chapters that -- that I -- I worked on, and I -- and I put it

11   in there mostly -- these are Dr. Geyer's data, and this is a

12   depiction of -- of what we've been talking about.

13          The -- you see Verona Island and -- and upstream to

14   Frankfort Flats and down below into Fort Point Cove and out

15   into the bay, and the -- the green circles are -- are

16   locations that he found in his work of -- of the sediment

17   trapping.  So this is -- this is where the salt fronts would

18   be located at different times, and notice at some times, I

19   guess when -- when the river flows very high, the salt front

20   is down towards the bottom, towards the south end of Verona

21   Island.  Then as the flow goes down, it moves up to -- to

22   Bucksport.  And then as it gets a little lower, it goes right

23   up to the mouth of the Marsh River, which is what we were

24   talking about earlier and that perfect storm discussion that

25   we had.

1    So these are places at different flow rates where the --

2    where Dr. Geyer thinks that the sediments are trapped and

3    they're -- so that they're unable to move out into Penobscot

4    Bay.

5    The -- the blue ovals are -- are areas of long-term

6    sedimentation.  So these would be where the consolidated

7    sediments are -- are accumulating in -- largely in Mendall

8    Marsh and in the Orland River.  And the -- you know, I've

9    already explained the green ones.

10   Q    Do mobile sediments and the nonmobile sediments --

11   withdrawn.

12   Are -- are sediments sometimes referred to as muds?

13   A    Yes, yes, sometimes they're referred to as -- as muds

14   when they're -- that's -- mud is -- I think -- I think

15   Dr. Geyer would say is a mix -- is usually a mixture of mud

16   and -- or of clay and silt as opposed to sand.

17   Q    Okay.  Let's just pause on Dr. Geyer for a second.  He

18   was one of the investigators you engaged?

19   A    Yes, yes.

20   Q    And what is his area of expertise?

21   A    He's a -- he's a hydrodynamicist -- work -- coastal

22   hydrodynamicist.

23   Q    Al right.  And is he -- what is his reputation?

24   A    Oh, again, it's very high.  He's the chair of one of the

25   departments at the Woods Hole Oceanographic Institution.

1   Q    And is Woods Hole an eminent scientific institution?

2   A    Yes, it is, yes.

3   Q    He will -- he will come in to testify, so we will go

4   into this in greater detail with him.

5        But do you recall whether the mobile and the nonmobile

6   sediments have similar or dissimilar total mercury

7   concentrations?

8   A    At the surface of the sediments, the mobile -- the

9   mobile pool had concentrations of mercury that were very

10  similar to the surface sediments, sort of indistinguishable.

11  Q    Let me show you --

12       MR. BERNARD:  This is from -- also from the Phase II

13  Report.  So it's Joint Exhibit 6-23, and it's Page 23-37.  So

14  this is already in evidence, Your Honor.

15       THE COURT:  Okay.

16  BY MR. BERNARD:

17  Q    Do you recognize that, Dr. Rudd?

18  A    Yes, I do.

19  Q    And you put this in as a figure in Chapter 23, which you

20  authored, right?

21  A    That's -- that's correct.  It was originally in Chapter

22  8.

23  Q    Okay.  So what is this -- why did you include this --

24  what is -- withdrawn.

25       What does this show?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   A      Well, this is -- the horizontal axis is -- is the

2   locations in the -- in the upper estuary or within the upper

3   estuary, now going from the Brewer to Orrington reach on the

4   left-hand side southward to Fort Point.  So we're a little bit

5   out of the upper estuary there.  But it's showing

6   concentrations of -- of total mercury, on a gram dry-weight

7   basis in the unconsolidated muds and the consolidated muds or

8   the surface layer of -- of sediments.

9          The unconsolidated muds would be the mobile pool, and

10  the -- and the consolidated muds would be the surface, top few

11  centimeters of -- or top 1 or 2 centimeters of -- of

12  sediments.  And we -- we thought this was a very important

13  piece of data because our view is that the mobile pool is

14  controlling the concentration of total mercury in the -- in

15  the surface sediments, and for that to be the case, the mobile

16  pool would -- concentration would have to be almost the same

17  as the surface sediment concentrations because that's the

18  material that's being deposited right now, and that's what the

19  -- that's what the data show.

20  Q      And does this support, then, your earlier testimony that

21  if an active remedy were to reduce mercury concentrations in

22  the mobile pool, that that could provide a system-wide --

23  A      Yes.

24  Q      -- remedy?

25  A      Yes.

1  Q     Let me show you another figure from Chapter 23.  This is

2  Joint Exhibit 6-23 at Page 23-33, and we'll finish up on this

3  topic.  Do you recognize that?

4  A     Yes.

5  Q     Okay.  And so this is total mercury in new mud.  What is

6  new mud?

7  A     Well, new mud is the most mobile part of the mobile

8  pool.  It's -- these -- these are Dr. Geyer's terms.  And it's

9  material that's been deposited in the recent past.  It's been

10 up in the water in the recent past.  And old mud -- old mud is

11 what he calls -- it's still part of the mobile pool, but it's

12 been sitting on the -- on the surface of the sediments for a

13 while waiting to be picked up.  But these are -- are new mud

14 -- what he called new mud samples.

15 Q     And are these different, as the title indicates,

16 subareas of the estuary?

17 A     Yes, these are the same estuary -- the same -- same

18 sampling locations as on the previous graph.

19 Q     And what is the significance, if any, of the data

20 displayed here?

21 A     I think the significance of -- of it to us was that --

22 these are Dr. Geyer's samples that he took, and he is looking

23 at the -- at the -- at the movement of the particles -- that's

24 his specialty -- is how the hydrodynamics of the system

25 control the movement of particles up and down.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    So you would predict that if Dr. Geyer was correct that

2    these particles are moving up and down the upper estuary as

3    the trapping front moves up and down the estuary, you would --

4    you would predict that the mercury concentration in those

5    particles would be -- would be very similar from location to

6    location.  And that's what this -- this -- this demonstrates.

7    You notice it's starting to go -- maybe this isn't

8    significant, but it -- probably -- it's interesting to note

9    that the Fort Point Cove is lower than all of the other ones,

10   and -- and the other ones are more similar.  So from -- say

11   from here northward is the -- what we call the upper estuary,

12   which is north of the -- of the salt fronts.

13   Q    And the northern most data point is -- are sampling

14   sites in the Orrington to Bucksport reach of the river?

15   A    Brewer to Orrington, B -- well, no, you're right.

16   That's right.  No, I guess it is Orrington to Bucksport, yes.

17   Q    And these were arrayed north to south, left to right?

18   A    Right, right.

19   Q    What is referred to by turnover time?

20   A    Turnover time is the -- the average amount of time that

21   a particle would remain in the mobile pool.  As I mentioned

22   before, particles are constantly coming in from upstream and

23   leaving via long-term sedimentation and outflow to the bay.

24   So the average time of mercury in -- in -- that -- that a

25   particle spends in the mobile pool would be the turnover time

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    of that particle in the pool.

2    Q    Did you try to calculate the turnover time of particles

3    in the mobile pool?

4    A    Yes, Dr. Geyer did that.

5    Q    And what did you come up with -- or what did he come up?

6    A    He came up, if I remember correctly, with a time of

7    about seven to ten years or something like that.

8    Q    And -- now, how does that relate, if at all, to the

9    recovery half-times that you derived from the sediment cores?

10   A    Well, it's a different mathematical calculation

11   altogether, so it's an independent calculation.  But you would

12   kind of expect that those numbers should be fairly close

13   together, that the outcome of those calculations should be

14   fairly similar.

15        And it concerned us a bit that he was coming up with an

16   estimate of five to ten years, and -- and the recovery times

17   we were coming up with were -- were -- the shortest one was

18   Mendall Marsh at 22 years, and then they went up from there.

19        So that suggests to us that we don't fully understand

20   the ecosystem yet, or we think those numbers should be

21   agreeing a little bit better.

22   Q    Did you discuss with Dr. Geyer whether his data could be

23   used to predict the rate of system recovery?

24   A    Yes, he said no.  He very -- he made that very clear

25   coming in.  He said, I'm not going to give you any final

1    answers in this.  I'll tell you -- I'll be able to tell you

2    and make you understand how the system is -- is -- is

3    operating in terms of -- of the processes, the big processes

4    that are controlling the movement of a contaminant, but I

5    won't be able to do it in a terribly quantitative way.  That

6    the definitive data is going to be the core data that you get

7    from Dr. Santschi.  He made that very clear in his first

8    meeting.

9             THE COURT:  About time for another break?  Very

10   good.  Thank you.

11        (Court recessed from 12:27 p.m. to 12:59 p.m.)

12            THE COURT:  You may proceed.

13            MR. BERNARD:  Thank you, Your Honor.

14                  CONTINUED DIRECT EXAMINATION

15   BY MR. BERNARD:

16   Q    Dr. Rudd, let's turn to Chapter 21.  Is that a chapter

17   you wrote regarding recommendations?

18   A    Yes, it is.

19   Q    Did the Study Panel approve that chapter before it was

20   submitted to the court?

21   A    Yes, it did.

22   Q    What is the purpose of Chapter 21?

23   A    I think the purpose of the Chapter 21 is to point out

24   from a scientific perspective where -- where we think it would

25   be feasible to intervene and -- and maybe hasten the recovery

1  of the -- of the ecosystem.  These are very, you know, quick

2  preliminary -- they're -- they're solid ideas based in

3  science, but in terms of how they'll actually be carried out,

4  that's -- that's the next step.

5  Q    Is the foundation for the text of this chapter the

6  understanding that you and your fellow Study Panelists have

7  gained of the dynamics of mercury contamination in the

8  Penobscot System during the study?

9  A    Yes, yes, it's drawn from that study.

10  Q    How well do you believe you understand mercury

11  contamination within the Penobscot River after the study?

12  A    I think we have a very good sense of it.  I think the

13  Penobscot now is -- is the -- in terms of mercury is the most

14  well-studied estuary anywhere.  It doesn't mean there's still

15  things that are unknown, but I think we -- in a -- in a broad

16  sense, we have a very good understanding of -- of what's

17  happening, what's controlling the rate of recovery at this

18  time.

19  Q    Have you ever heard of a natural system in which, after

20  a scientific study, all unknowns were eliminated?

21  A    No.

22  Q    In your view, did the Study Panel accomplish the goals

23  you set forth for both Phases I and II?

24  A    Largely, yes, yes.  There's a -- there's a -- there's

25  some loose ends that we hope can be -- can be cleaned up.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

153

1    Q     Okay.  Well, we're going to get to those loose ends in

2    just a minute.

3         Now, did the Study Panel conclude that there's a need

4    for active remediation?

5    A     Yes.

6    Q     Okay.  And was that a -- is that a unanimous

7    recommendation of the Study Panel?

8    A     It is.

9    Q     Did the Study Panel solicit the views of Dr. Bodaly, the

10   project leader, on this question?

11   A     Yes, we did.

12   Q     And what did he say, if anything?

13   A     He was in agreement, as well.

14   Q     And did the Study Panel solicit the views of Dr. Kelly?

15   A     Yes.

16   Q     And what view, if any, did she express?

17   A     She was in agreement with -- with what we came up with,

18   as well.

19   Q     Did the Study Panel solicit the view of Dr. Kopec

20   concerning whether active remediation is necessary?

21   A     Yes.

22   Q     And what, if anything, did Dr. Kopec say?

23   A     She agreed with that overall conclusion, yes.

24   Q     What are the goals?  Putting to one side the method,

25   what are the goals, in your view, of active remediation?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    A      The goals are to -- to increase the rate of natural

2    attenuation by -- by actively doing something that will --

3    will hasten the rate of recovery to our target concentrations.

4    Q      And what, in turn, is that -- is the aim of that?

5    A      We --

6    Q      What are you trying to accomplish?

7    A      We'd like to get the concentrations down to a level that

8    we think the -- the ducks and lobster will be -- would be safe

9    for human consumption again, and -- and that the birds and

10   other organisms would be -- would be no longer at great risk

11   for toxicity.

12   Q      You mention in Chapter 1 -- 21 -- excuse me -- that

13   remediation should focus on legacy mercury in the Penobscot

14   sediments.  Are you familiar with that?

15   A      Yes.

16   Q      What's the reason for that?

17   A      Well, we think that the -- in the upper estuary, again,

18   which is the -- the part of the system we're most concerned

19   about, we think that the -- that it's a sediment-based

20   ecosystem, which means we think that most of the mercury is --

21   is coming from -- from the -- originating in the -- from in

22   the sediments, in the sediment-dwelling organisms and -- and

23   moving up into the -- the fish and birds from -- from the

24   sediments and soils, and that's where -- where we think the --

25   the legacy mercury is still stored and, you know, as it -- as

1   it comes out of the mobile pool, as we've been discussing.

2   Q    Let me show you Plaintiffs' Exhibit 60, which is a chart

3   from -- a table from Chapter 21.

4           MR. BERNARD:  So, Your Honor, this would be Joint

5   Exhibit 6-21- -- Page 3.  I move it into evidence, please.

6           THE COURT:  Any objection?

7           MR. TALBERT:  No objection.

8           THE COURT:  It's admitted.

9   BY MR. BERNARD:

10  Q    Dr. Rudd, this, you'll see, is a -- a different form

11  with some additional information of the table I showed you a

12  little while ago.  Do you remember that?

13  A    Yes, I do.

14  Q    Okay.  And do you remember this table from -- remember

15  inserting this into Chapter 21?

16  A    Yes, I do.

17  Q    Okay.  So will you please explain to the judge what is

18  displayed on the table.

19  A    This is an estimate for the upper estuary entirely and

20  for -- which would include the main stem, Mendall Marsh, and

21  the Orland River, and for Mendall Marsh itself, breaking that

22  out separately, showing the present-day concentrations of

23  mercury in the surface sediments, the percent reduction which

24  is needed in order to achieve the targets, the target

25  concentration for mercury in -- in -- in the main stem of the

1  river mostly, about 450 nanograms per gram dry weight in the

2  aquatic biota, and approximate years it will take to achieve

3  that target from 2013, and then, again, the years it will take

4  to get back to the -- within 20 percent of background

5  concentration for these -- for these two parts of the -- of

6  the system -- two areas of the system.

7  Q    Just to be sure it's clear, then, in the -- you've got

8  only two compartments listed here, right?

9  A    Right.

10 Q    You haven't separated out Orland River and Fort Point

11 Cove.

12 A    No, no, no, we've con -- we've done the upper estuary as

13 a whole and then separated out Mendall Marsh.

14 Q    Okay.  And then the second column is the current mercury

15 -- average mercury concentration in those compartments of the

16 system?

17 A    Yes, that's right.

18 Q    And then the third column is the percentage reduction

19 required to get from the current concentration to the target

20 concentration, which is displayed in the next column to the

21 right?

22 A    That's right.

23 Q    And then the next column to the right is the number of

24 years it would take to achieve that percentage reduction?

25 A    Yes.

1   Q     And then the final column on the right is the number of

2   years it would take for each of those two compartments of the

3   system to achieve 120 percent of the background mercury

4   concentration you derived for this region; is that correct?

5   A     That's correct, yeah.

6   Q     What role, if any, does your finding about the

7   relationship between total mercury and methylmercury in

8   sediments, what role, if any, does that play in the logic of

9   your remediation recommendations?

10  A     Well, the logic -- the logic is that -- that we believe

11  there's a -- there's a straight-line or a one-to-one

12  relationship between the -- the concentration of mercury and

13  total -- total mercury in sediments and the rate of production

14  of methylmercury.

15        So if we were to -- to reduce the concentration of total

16  mercury by a factor of two, we'd reduce the concentration of

17  methylmercury by a factor of two.  And you can see in the way

18  we've expressed it here for the upper estuary as a whole, that

19  if we reduce the mercury -- the inorganic mercury

20  concentration by 50 percent, we would achieve our target, and

21  the system would -- would clean up, for the most part, not in

22  Mendall Marsh or probably the Orland River, but, for the most

23  part, in about 33 years.

24  Q     Now, the 450, which is your target in the upper estuary,

25  how does that compare to the background you derived for that

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

158

1  part of the system?

2  A    That'd be about a hundred.

3  Q    So this is about four and a half times the background?

4  A    Right, right.

5  Q    And the way you get to the Mendall Marsh 60 years was

6  similar to what you described earlier, in that you would

7  have a half-time of about 20 years, but you'd need three

8  half-times --

9  A    Right.

10  Q    -- to achieve the objective?

11  A    Right, right, the objective would be reaching the target

12  concentration of -- of 1.2 nanograms per gram mercury in bird

13  blood.

14  Q    Did you find that mercury released from the HoltraChem

15  facility is widely disbursed now through the estuary?

16  A    Yes.

17  Q    Just so we're clear, what -- what do you define as the

18  -- you know, you've defined the upper estuary.  What -- could

19  you define the whole estuary, because that term is sometimes

20  used.

21  A    Well, the whole estuary would be -- would be from --

22  from below Veazie Dam to out beyond Vinalhaven Island

23  somewhere.

24  Q    So the part that's not covered in upper estuary would

25  be, say, roughly from the southern tip of Verona Island down

1   into Penobscot Bay?

2   A    That's right.

3   Q    Okay.  Does this wide disbursal throughout the estuary

4   of mercury contamination present a challenge in terms of

5   remediation?

6   A    Yes, that's one of the -- that's one of the reasons --

7   it's been 47 years now since this mercury was -- was added to

8   the -- to the ecosystem, we think, and it's spread a long way

9   since then, and that makes it very difficult to clean up.

10  That's why we -- we decided in the end that -- that

11  bank-to-bank dredging probably wasn't something that was

12  practical because of this widespread -- you know, widespread

13  nature of the problem now.

14  Q    What is bank-to-bank dredging?

15  A    That's -- I think it's a term that engineers use to --

16  for wholesale removal of -- down to a certain depth of

17  contaminated sediments.

18  Q    Hm-hmm.  Are there other forms of dredging -- do you

19  know -- other than, you know, kind of wholesale dredging of an

20  entire river system?

21  A    Yes, you could also -- you could also remove hotspots of

22  the -- in the system.  For example, I think it's already been

23  decided that -- that Southerly Cove -- the sediments in

24  Southerly Cove would be removed because of the particularly

25  high concentrations there.  There's other forms of dredging,

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

160

1   like hydraulic dredging, for example, which could be used to

2   -- without disturbing the sediments down below to just suck

3   the mobile sediments out using a hydraulic suction system.

4   Q     So by -- did the Study Panel decide that -- that

5   dredging in any form would be inappropriate, or was it just

6   the bank-to-bank dredging?

7   A     I think -- I think the Study Panel approves of removal

8   of -- of Southerly Cove or if there's other very -- hotspots

9   -- if there were other hotspots identified at some point, that

10  maybe that should be done.

11  Q     All right.  And some of the recommendations that you

12  made for sediment trapping might involve --

13  A     Yes.

14  Q     -- some dredging activity; is that correct?

15  A     Yes, and also -- also for contained aquatic disposal

16  sites would require some dredging -- some limited dredging,

17  yes.

18  Q     Okay.  Now, you -- you focused on -- your remediation

19  recommendations are focused on the upper estuary; is that

20  right?

21  A     Yes.

22  Q     Why are you -- why are you focused on that portion of

23  the ecosystem?

24  A     Well, it's actually -- in terms of -- in terms of -- of

25  remediation, it's -- it's -- the way I look at it, it's even

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   more finely focused than that.  It's focused on the main stem

2   because that's where the mobile pool is, and if we could -- if

3   we could -- or if somebody could figure out a way to -- to

4   reduce the mercury concentration in the mobile pool, then that

5   would induce the rate of recovery in the Mendall Marsh and the

6   Orland River, and also down in Fort Point Cove.

7           So if we can get at it in the main stem, that's the --

8   sort of the root of the problem.

9   Q     And how would getting at it, as you call it, in the main

10  stem, how would that help things down in the lower estuary,

11  around Fort Point Cove?

12  A     Well, the -- if we could -- for example, if we could

13  remove half of the mobile sediments and -- and replace them

14  with clean materials, then -- then immediately the -- the

15  concentration of mercury in -- in the mobile pool would drop

16  by a half, and then the -- the concentration of particles

17  escaping the salt front and being deposited on the surface

18  sediments of Fort Point Cove would immediately be lowered by a

19  half.  So that would increase the rate of recovery of -- of

20  Fort Point Cove, as well, even though we didn't do a -- a

21  direct treatment there.

22  Q     Did the Study Panel conduct an exhaustive review of all

23  possible active remedies?

24  A     We made -- we made a good effort, I think.  We -- we

25  convened a remediation workshop, tried to -- tried to invite

1    people to this workshop who had different ideas and approaches

2    to remediation.  We know a lot of people in the field, a lot

3    of colleagues we know, we were constantly sort of beating the

4    bushes for new ideas.  We were reading the scientific

5    literature.  There may be ideas out there, but we're not aware

6    of any at this point that -- that we haven't considered.

7           Actually, there aren't a lot of new ideas out there.

8    Q    You mentioned a remediation workshop.  Was that in 2009?

9    A    Yes.

10   Q    And was that the only time you convened remediation

11   experts to discuss the subject of remedial measures?

12   A    Yes, yes, it was.

13   Q    Are the remedial measures you set out in conceptual form

14   in Chapter 21, are those set in stone in your mind?

15   A    No, no, I -- I think our contribution is that we now

16   understand the system, where if somebody came along with a

17   good idea, we're able to evaluate likely whether or not it

18   will work from a scientific perspective.

19   Q    Hm-hmm.

20   A    But these were just the best ideas that -- that -- that

21   we could come up with that we think maybe should be looked at

22   in more depth in the future.

23   Q    In your deposition, you referred to these ideas in

24   Chapter 21 as a quick preliminary look at remediation

25   measures.

1   A      Yes.

2   Q      Is that a fair statement --

3   A      Yes.

4   Q      -- of your view?

5   A      Yes, yeah.  That really wasn't a major objective of

6   Phase II of the study.  That was -- that's what I look at as

7   happening in Phase III or during the remediation program.

8   Q      And is -- is a quick preliminary look at remediation

9   measures a fair characterization of what you did in Chapter

10  21?

11  A      Yes, I would say so.

12  Q      Now, in terms of the feasibility of an environmental

13  remediation measure, is there both a science component and an

14  engineering component?

15  A      Yes.

16  Q      And is your expertise in the science part?

17  A      Yes, it is.

18  Q      Okay.  Not in the engineering part?

19  A      That's correct, yes.

20  Q      And is that true of the other Study Panelists, as well?

21  A      It's true, I think, in terms of Dr. Fisher.  Um,

22  Dr. Whipple is an engineer, and so he has much more of an

23  engineering perspective than we do.

24  Q      Okay.  Does the science need to be done before the

25  engineering, in your view, when you're designing --

1    A    Yes.

2    Q    -- remedial measures?

3    A    Yes, yes, always.

4    Q    Why is that?

5    A    Well, because mistakes could be made if -- if the system

6    isn't well understood.  For -- for example, with the work that

7    I -- I discussed earlier, Experimental Lakes Area, if the

8    science hadn't showed that phosphorous was the problem with

9    eutrophication, there might have been a lot of engineering

10   work done to figure out how to take nitrogen out of sewerage,

11   and that would have been the wrong thing to do.  But, instead,

12   phosphorous was identified and then the engineers could go to

13   work removing phosphorous from sewerage and phosphorous from

14   detergents.  So science, in my view, needs to precede the

15   engineering.

16   Q    And once the science foundation has been laid, are there

17   questions concerning engineering feasibility that engineers

18   them invests have to weigh in on?

19   A    Oh, yes, yes.

20   Q    And is the Study Panel engaged in that part of the

21   process?

22   A    Very little.  At the remediation workshop, we -- there

23   were several engineers at that workshop, and -- and somebody

24   from the U.S. Corp. Of Army Engineers who -- who helped us

25   with our thinking a lot, but we could quickly see that we

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    needed other expertise in -- in the future.

2    Q    Okay.  But as you say, that was not something that you

3    felt -- nailing that down was not something that you saw as an

4    objective of the Phase II study?

5    A    No, certainly not a major objective, no.

6    Q    Now, could there also be questions with regard to active

7    remedies concerning permits from government agencies?

8    A    Yes, I guess so, but we -- we didn't -- we didn't ask

9    that question in detail.

10   Q    Did you view that as premature?

11   A    Yes.

12   Q    Now, once a design -- withdrawn.

13        Once a remedy is decided upon, a possible remedial

14   measure, would it need to be designed?

15   A    Yes.

16   Q    And would it need to be tested in the field?

17   A    Yes.

18   Q    Okay.  And these are all prior to full implementation;

19   is that right?

20   A    I would think so, yes.

21   Q    Okay.  Now, one of your -- going back to the science

22   part, is one of your conceptual -- is one underpinning --

23   withdrawn.

24        Is one of your conceptual recommendations to remove

25   contaminated mobile sediment and replace that sediment with

1    clean material?

2    A    Yes.

3    Q    Okay.  And what -- you mentioned it earlier, but I'd

4    like you to explain to the court, please, what the scientific

5    rationale is within the Penobscot System for that

6    recommendation.

7    A    Well, the scientific -- scientific basis for that, as I

8    think I -- I've alluded to before, is that the production of

9    methylmercury is dependent on -- on the concentration of total

10   mercury in the surface sediments and the concentration of

11   mercury in the surface sediments is controlled by the

12   concentration of mercury in the mobile pool.

13        And so if we can take half of those contaminated mobile

14   pool sediments out and replace them with clean sediments, then

15   it would all mix together, as -- as it does naturally, the

16   overall concentration in the mobile pool would -- would

17   decrease by a factor of two, and we think this would decrease

18   the overall production of methylmercury in the upper estuary

19   by a factor of two.

20   Q    Has the application of clean sediments to dilute mercury

21   contamination been tested before?  Do you know?

22   A    Ah, only in some work that I did back in 1980.

23   Q    And -- and can you describe that for the court, please?

24   A    Well, I was working on the English-Wabigoon System then,

25   and we did -- we did some large enclosure experiments there

1    where we added clean sediments to -- to -- to sediment -- over

2    sediments that were contaminated, and the -- the clean

3    sediments were from the clean Wabigoon Lake that I described

4    earlier, and so we took some of the clean sediments from

5    Wabigoon Lake and added them to the -- to the contaminated

6    sediments from Clay Lake, which is the first stream downstream

7    from the chlor-alkali plant, and those tests reduced the

8    movement of mercury into the biota by -- by 90 percent.

9    Q    You mentioned a corps of engineers person with whom you

10   conferred.  Is that Todd Bridges?

11   A    It is, yes.

12   Q    Okay.

13        MR. BERNARD:  Your Honor, Dr. Bridges is going to

14   testify via deposition by agreement between the parties.

15        THE COURT:  All right.

16        MR. BERNARD:  He is located in Vicksburg,

17   Mississippi.

18   BY MR. BERNARD:

19   Q    Did Dr. Bridges introduce to the Study Panel the idea of

20   confined aquatic disposal, or a CAD, C-A-D?

21   A    Yes, he did.

22   Q    What'd he tell you about that?

23   A    Well, he suggested it to me, and I think to Dr. Whipple

24   during phone conversations -- this was after the workshop --

25   and -- and he wondered if -- if this approach could be --

1  could be a useful way to -- to dispose of -- of -- if we were

2  able to -- to get mobile sediments out of the upper estuary,

3  if it would be a means of disposal of these contaminated

4  sediments, it'd be much less expensive than transporting them

5  -- first of all, dewatering them and then transporting them

6  someplace for final disposal, that this had been done in a

7  number of places before, and -- and if you essentially dig a

8  big pit in the -- in the bottom of a -- say the bottom of Fort

9  Point, further out in Penobscot Bay, and put the contaminated

10 sediments there and then cap them with a material that can't

11 be eroded, that you can permanently dispose of them there at a

12 much lower price than -- than you could in -- if you took the

13 sediments and transported them to another location.

14 Q      And is this one possibility that you think could be

15 looked into?

16 A      Yes, yes.

17 Q      And would a -- would a CAD, or confined aquatic

18 disposal, unit have to be permitted by the government?

19 A      Yes, I'm sure it would, yes.

20 Q      And is it possible there might be public opposition to

21 locating a CAD in any particular place?

22 A      Yes, yes, I think so.

23 Q      And is that something the Study Panel confronted, or did

24 you see that as beyond the scope of what you were doing?

25 A      We saw that beyond the scope of what we were -- what we

1  were considering.

2  Q     Now, in terms of Mendall Marsh, you were just talking

3  about the trapping -- the removal of contaminated sediments in

4  the main stem of the river and their replacement with clean

5  material.  Did you recommend, again, on a conceptual basis, a

6  like remedy for Mendall Marsh?

7  A     Right.  We -- we did.  It's -- it's going to be quite a

8  feat if it happens to get the mobile -- to get roughly 250,000

9  tons of mobile sediments out of the upper estuary, and so we

10  tried to think of ways that -- that we could address the

11  situation in -- in Mendall Marsh more specifically since we

12  thought that was the site that was -- that was in the worst

13  condition.

14       The difficulty with that is that -- that if you --

15  anything you do, any -- any -- any remediation of Mendall

16  Marsh, you have to keep it in mind that -- that if you don't

17  do anything to the main stem, it's going to continually be

18  recontaminated by continual movement of mercury in from the

19  main stem.  This is why the idea of treating the main stem is

20  attractive to us.

21       But nevertheless, we went ahead and -- and suggested

22  possibly trapping the sediments -- the contaminated sediments

23  as they were entering the Marsh River at the mouth of -- of

24  Mendall Marsh, trapping those sediments and preventing them

25  from moving into the marsh and -- and disbursing clean

1    sediment within the marsh to -- to mimic what was being done

2    at a larger scale in the previous idea.

3         But this would be something that would have to be

4    repeated from time to time because those traps would fill up

5    and -- and wouldn't be something that would be as -- it would

6    be a more labor-intensive approach, I guess I would say, than

7    if -- a one-time removal of mobile sediments from the main

8    stem.

9    Q    Did the Study Panel also look into an additional remedy

10   involving of -- the application of activated carbon --

11   A    Right.

12   Q    -- to Mendall Marsh?

13   A    Right, we did.

14   Q    Could you -- and was Dr. Gilmour in charge of that?

15   A    Yes.

16   Q    So we will discuss that with Dr. Gilmour.

17   A    Right.

18   Q    And that was the subject of a chapter in the Phase II

19   Report; is that correct?

20   A    It was, yeah, yeah.

21   Q    I believe it's Chapter 19?

22   A    Yeah.

23   Q    But let's just give the court, please -- let's go into

24   it a little bit.  What is -- what did -- what is the activated

25   carbon idea?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   A       The activated carbon idea is if -- is -- and it can be

2   -- we tested it in two forms as SediMite, which is a -- which

3   is a commercially-produced product -- patented product, and

4   also biochar, which is another form of -- of activated carbon,

5   and we added -- we added those directly to two small plots on

6   the -- on the platform of Mendall Marsh.

7           And there's some -- there's I guess now a fair amount of

8   evidence in the scientific literature that the -- that the

9   presence of this activated carbon -- this material binds the

10  -- the mercury very strongly, and it decreases the

11  concentration of mercury in the pore water substantially and

12  -- and keeps it bound in particles in -- in the sediments or

13  soils.  And so this -- because it's no longer -- particularly

14  the methylmercury's no longer in the pore water, this decrease

15  -- tends to decrease the mercury concentration in the food

16  web.

17          Again, though, I guess I -- I could say that you could

18  put this down in the -- in Mendall Marsh, but you've still got

19  this continual flow of mercury coming in from the main stem.

20  So it's -- it's something that needs to be looked at -- at

21  carefully, and probably it would need more than one

22  application of SediMite or biochar to -- to maintain the --

23  the system at the target for the long-term.

24  Q       You think that's something that's worth pursuing on a --

25  you did some pilot studies, right?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    A     Right, we did some pilot studies, and they were

2    reasonably successful.  I think the biochar -- the SediMite

3    has received a lot of -- a lot of -- a lot of notice in the --

4    in the -- in the reports of -- of the -- the experts from both

5    sides, but actually if you look at the data, the biochar may

6    have been a little more effective than the SediMite on the

7    long-term.

8          But I think, nevertheless, they're both -- it's worth

9    both doing larger plots to see whether this would be useful in

10   the long-term.

11   Q     So your -- the Study Panel's recommendation is to

12   continue to pursue that possible remedy?

13   A     Yes, yes, further investigation is what we're

14   recommending.

15   Q     Now, does the Study Panel also recommend long-term

16   monitoring of the ecosystem?

17   A     Yes, it does.

18   Q     What's the reason for that?

19   A     Well, we feel that whether or not the court decides to

20   do active remediation, it's important to -- to follow the

21   system on the long-term, to follow the -- the -- the -- the --

22   the recovery -- the natural recovery of the system or the

23   natural attenuation.

24         We anticipate it'll be decades before concentrations

25   reach their target levels, but I think it's important to -- to

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    follow that and -- and, for one thing, to see whether or not

2    -- whether or not our -- our targets are likely to be achieved

3    in the time that we think they are or whether it's going to be

4    longer, but also to, in the long run, to -- to know when the

5    system has cleaned itself up.

6    Q    And would monitoring also serve the purpose of checking

7    the effectiveness of any active remedy?

8    A    Yes, yes, yes.

9    Q    You mentioned earlier some lingering uncertainties that

10   -- that you may know a lot, but you don't know everything --

11   A    Right.

12   Q    -- about the system?

13   A    Yes.

14   Q    Is that right?

15   A    Yes.

16   Q    Please describe those for the court.  What are the

17   lingering uncertainties that you have?

18   A    The -- I think the two -- the two -- in my mind, the two

19   biggest ones are that Dr. Geyer's told me he doesn't -- he

20   doesn't have -- maybe I'll back up a bit.

21        We tried to do -- we tried to do a whole ecosystem model

22   of the -- of the -- of the system -- of the ecosystem, and if

23   you can get a whole ecosystem model -- process model to work,

24   that -- that's a very good indication that you understand the

25   ecosystem in a quantitative sense, and we couldn't get that --

1   we -- Dr. -- or Mr. Harris, who's working on this with us,

2   couldn't get his system to work with the parameters we gave

3   them from our study, but his work was very valuable in

4   pointing to two areas, which we need to understand further, I

5   think, in order -- in order to -- to go ahead with -- with

6   mitigation.

7          And one was -- and Dr. Geyer certainly approves of this

8   -- is that -- is that the modelling that we undertook

9   suggested that maybe the mobile pool may actually be bigger

10  than it is.  It may actually be more like -- like a million

11  tons, and Mr. Harris' model would -- would work a lot better

12  if he put -- if he estimated there was a million tons in the

13  mobile pool, rather than 500,000.  So that's one -- one thing

14  we need to know is the -- matter is the size of the mobile

15  pool.

16         The second reason why -- why that model was not able to

17  -- to function -- or a second reason, is that there may be

18  some ongoing inputs of mercury to the system, which we haven't

19  yet quantified.  We've been concerned that -- that there's

20  still a lot of mercury buried at depth in the -- in the

21  mudflats of the -- of the upper estuary, and if -- and there's

22  -- there's streams that are flowing across this estuary -- or

23  across these mudflats and eroding this -- continuously eroding

24  this material, and we're wondering if that might be a

25  significant ongoing source to the mobile pool, which would

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   retard the rate of recovery and make remediation move

2   difficult.

3        We're also a little bit concerned, we weren't able to

4   locate Pipe 001 at HoltraChem.  We -- Dr. Turner tried very

5   hard to locate Pipe 001 and the -- in discussions we had with

6   the Maine DEP, they were very concerned that ground water had

7   very high mercury concentration, might now be leaking into a

8   -- into the old Pipe 001, which is not in very good shape

9   anymore, and being put directly into the river.  That's the

10  main outfall from the plant, and it might be entering the

11  river at very high concentration, but at a very dilute -- but

12  a very -- at a very -- in a very point source manner.  And we

13  looked for this ongoing search, but couldn't find it.  So

14  those are the two areas.

15  Q    Do you know whether -- in terms of ongoing sources, do

16  you know whether -- are you familiar with a state proceeding

17  involving a cleanup of the site in which the State of Maine

18  and Mallinckrodt are engaged?

19  A    Yes.

20  Q    And do you know whether that ground water problem, to

21  the extent it may exist, is going to be the subject of

22  activity pursuant to the site cleanup?

23  A    I -- I'm not close to that, but I do know that there's

24  -- there's an attempt -- there's an effort now to intercept

25  the ground water before it flows into the system, and we

1    looked at that.

2         But the -- the 001 Pipe issue I'm not sure is part of

3    anything at this point.

4    Q    You're not sure one way or the other?

5    A    No, I don't think it is.

6    Q    Okay.

7    A    But I'm not sure.

8    Q    All right.  In terms of these other ongoing inputs, you

9    were talking about mercury in the mudflats.  Would that have

10   been -- would that have been part of the legacy mercury that

11   you're --

12   A    Yes.

13   Q    -- seeing in the sediments?

14   A    Yes.

15   Q    And how would that be reintegrating itself into the

16   system?

17   A    Well, as the -- there's small rivulets that cross the

18   mudflats, and each time the -- during -- during the tidal

19   cycles, as the mudflats are -- are flooded or sometimes these

20   mudflats are in coves, and there's fresh water streams coming

21   across, and they meander across the mudflats and dig into

22   them, sometimes to a meter depth.

23        And we know from the deep cores that there's -- there's

24   a lan -- there's a very high mercury concentration, down 20 or

25   30 centimeters of depth under the surface of the sediments in

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    many places, and as the meanders -- you know, as the river

2    meanders, it erodes one side of the meander and deposits on

3    the other side.  In the process, it remobilizes sediments.

4    And as these rivulets drain into the -- back into the river

5    after each tidal cycle, they take some particulate material

6    with them, and some of this particulate material could join

7    the mobile pool and reduce the rate of -- of recovery.

8    Q    Do any of these uncertainties that you mentioned mean in

9    your mind that possibilities for active remedies should not be

10   pursued now even if simultaneously you collect further

11   information?

12   A    I -- I think it's still a -- it's -- you know, it's

13   still an open question.  I think we need to have these -- we

14   need to have these uncertainties answered, and the engineers

15   need to go to work before a final decision is made whether to

16   go ahead.

17   Q    When you say the engineers need to go to work, what do

18   you mean?

19   A    To design -- to see if there's a way that they can

20   effectively remove mobile sediments or to see if SediMite

21   might -- or biochar might work on the long-term.

22   Q    All right.  And that would be -- that's the engineering

23   aspect you were --

24   A    Yes.

25   Q    -- referring to earlier?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   A     Yes.

2   Q     That -- that the Study Panel has not yet engaged in; is

3   that right?

4   A     That's correct, yes.

5   Q     Okay.  Is there any reason in your mind why the Study

6   Panel cannot or some other group can't engage in that process

7   now if the court were to order it?

8   A     Ah, can't engage in the process --

9   Q     In the process of putting together mercury scientists

10  with engineers?

11  A     Oh, yes.

12  Q     To consider all possible active remedies?

13  A     No, that could -- that could be ongoing right now, I

14  think.  There's no reason why we couldn't be starting to work

15  on this from a scientific or engineering perspective --

16  Q     Okay.

17  A     -- I don't think.

18  Q     Now, that -- you mentioned earlier that -- and you -- we

19  went over some material from Dr. Driscoll's expert report.  Do

20  you remember that?

21  A     Yes.

22  Q     And do you remember the recommendation he made about

23  convening mercury scientists with engineers?

24  A     Yes.

25  Q     And what was that recommendation?  Do you remember?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    A     Well, I -- I think what he was recommending is that --

2    almost -- the way -- I wouldn't really call it a hand-off

3    because I think scientists need to be involved in -- in the

4    long-term.

5         But a meeting in which the scientists involved in the

6    project and maybe some -- some others would -- would meet with

7    engineers who are very experienced at designing -- at

8    designing these remediation approaches -- would meet and

9    discuss it and we would -- we would kind of bring them up to

10   speed with what we know so that they can begin to -- to test

11   some of their ideas.

12   Q     And do you think that if such a meeting were convened,

13   all ideas for possible active remedies should be on the table?

14   A     Yes, yes.

15   Q     Okay.  And those would include the conceptual ideas you

16   set forth in Chapter 21?

17   A     Right.

18   Q     But --

19   A     Plus other ideas.

20   Q     But it would not be limited to those?

21   A     No, no.  I think it should be more than one meeting,

22   too.

23   Q     All right.  It could be more than one meeting?

24   A     I don't see how this could all be done in one meeting.

25   Q     And what's the reason not to limit the consideration of

1    active remedies to the conceptual recommendations you wrote

2    about in Chapter 21?

3    A    Well, there might be -- you know, we searched as hard as

4    we could for other ideas that we thought would apply in this

5    situation, but maybe we haven't found them all.

6    Q    Now, have some ideas occurred to you by way of what

7    might be pursued in terms of remediation since the filing of

8    the Phase II Report?

9    A    You mean new remediation approaches?

10   Q    Well, did you -- for example, you testified in your

11   deposition that there might be coves additional to the

12   Southerly Cove?

13   A    Oh, right.

14   Q    That might be explored for selective dredging?

15   A    Yes.

16   Q    Do you remember that?

17   A    Yes, I do.

18   Q    Okay.  And that is an idea that -- is that an idea you

19   think should be considered?

20   A    Well, there -- yeah, there's a number of coves -- not a

21   huge number, but several coves near -- right near Southerly

22   Cove, not far from HoltraChem, which -- which were not

23   sampled.  There's a lot of places to sample out there.  We

24   didn't sample everywhere.  And -- and it occurred to me during

25   the writing of the report that it might be a good idea to go

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   back and take some deep cores from some of those coves, just

2   to explore it to see if there's -- if there's another cove

3   like Southerly Cove close to HoltraChem which maybe should be

4   -- should be treated.

5        Because if we -- if we -- the rivulets that I described

6   before, the concentrations of mercury in Southerly Cove are

7   extremely high, and if that type of ongoing erosion is

8   happening in -- in other coves, as well as -- as in Southerly

9   Cove, this could be an important ongoing source, and if they

10  could be cleaned up -- you know, those were big sources, you

11  might not have to do anything else.  That might -- that might

12  -- that might solve the problem.

13  Q    So that's an idea that you would suggest pursuing?

14  A    Yes, yes.

15  Q    Now, could you place for the court the Southerly Cove?

16  You've referred to that a number of times, but I'm not sure

17  that's a well-known cove.

18  A    It's -- Southerly Cove is -- is adjacent to the

19  HoltraChem site.  There's a stream called Southerly Stream

20  that -- there's two streams that drain the site, one of them

21  being Southerly Stream, and at the -- there's a cove that --

22  that Southerly Stream drains into, and that -- that's -- high

23  concentrations of mercury exist in that stream in-depth.

24  Q    And do you know that because sediment cores were taken

25  there as part of this study?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   A      Yes, and earlier studies, as well.

2   Q      Yes.  And do you know whether that -- the dredging of

3   that cove is the subject of the site remediation because it's

4   just adjacent to the site?

5   A      That's my understanding.

6   Q      And that's a proceeding that's brought by the State of

7   Maine; is that right?

8   A      Yes, my understanding --

9   Q      Okay.

10  A      -- it is, that's correct.

11  Q      Now, is another thought you had after the filing of the

12  Phase II Report that this group of scientists and engineers

13  might want to look more closely at the Orland River to see if

14  there were a remedy available there?

15  A      Yeah, yeah, I think so.  We -- we -- in hindsight, I

16  think we -- we concentrated a lot on -- on Mendall Marsh for

17  good reasons and a lot on the main stem of the river because

18  that's where the -- the root of the problem is.

19         But I -- I think if I were to do it again, I would spend

20  a little bit more time on the Orland River, because as the

21  data came in and towards the end of the study, we started to

22  see that concentrations are actually very high in the Orland

23  River, and then when -- when Dr. Santschi calculated his

24  half-times, they were very long, and we haven't -- you know,

25  we didn't sample the -- the biota very -- very completely, the

1   birds and so on, in the -- there's large -- fairly large

2   marshes along the sides of the Orland River.

3        And in retrospect, I wish we'd spent a little more

4   effort on the Orland.

5   Q    Okay.  Now, do these ideas -- you've mentioned a couple

6   -- about the coves and the Orland River about places or ways

7   to remediate mercury contamination in the system, do those

8   underscore the wisdom of having an open consideration by

9   mercury scientists and engineers of all possible remedial

10  measures?

11  A    Yeah, I -- I -- I think so.  I mean, maybe somebody

12  would -- if other people get into our data, maybe they'll see

13  something that we haven't seen.

14  Q    I want to show you Joint Exhibit 86 -- 87, rather, and

15  ask you something.  Did you -- I'll show you the first page.

16  This was an exhibit to your deposition, and I'll show it to

17  you here.  This is the first page.  It's a -- it's a fairly

18  lengthy document, about 50 pages, and you see it was a

19  deposition exhibit in March.  Do you recognize this cover

20  page?

21  A    Yes, I do.

22  Q    And what is this document?

23  A    This is a cover page of a series of notes that I put

24  together as I was preparing for my second testimonies.

25  Q    Okay.  And did this include various responses to points

1   made in the parties' expert reports?

2   A      Yes.

3   Q      All right.  There was -- one sec.  Okay.  And do these

4   notes -- we'll -- we'll be returning to these a couple of

5   times during the rest of your direct examination.

6          But do these notes accurately -- accurately reflect your

7   views as of the -- March 4th, 2014, when you wrote the

8   document?

9   A      Yes.

10  Q      I want to just show you one thing right now.

11             MR. BERNARD:  Your Honor, I'd move this into

12  evidence.

13             THE COURT:  Any objection?

14             MR. TALBERT:  No objection.

15             THE COURT:  Let's -- you had moved -- I was a little

16  confused earlier, but you, I gather, had moved Joint 1 through

17  59 in without any objection, and that went in, correct?

18             MR. BERNARD:  Correct.

19             THE COURT:  And is there an objection to the

20  remaining joint exhibits?

21             MR. TALBERT:  We haven't fully discussed those.

22  There are a few that -- that may -- that we may object to, but

23  --

24             THE COURT:  Okay.

25             MR. BERNARD:  Would it be okay if we just -- if

1    counsel just discussed that?

2              THE COURT:  Oh, sure.

3              MR. BERNARD:  Okay.

4              THE COURT:  Yeah.

5    BY MR. BERNARD:

6    Q    All right.  Dr. Rudd, I just want to show you -- there's

7    a fair amount in this, and we'll look at some of it, but I

8    just want to show you one thing right now and get your thought

9    about it, and this is the last page of the exhibit.

10         So you say -- this is entitled -- this little section is

11   entitled the rate of methylmercury production and

12   methylmercury concentrations in biota are positively related

13   to the concentration of mercury in surface sediments.  Do you

14   see that?

15   A    Yes, I do.

16   Q    Okay.  And this is this idea you were articulating

17   earlier which is a major finding of the study?

18   A    Yes.

19   Q    Okay.  And I just want you to -- I'm going to read you

20   the bottom line, which -- which -- did you write that bottom

21   line section?

22   A    Yes, I did.

23   Q    I'd ask you what you mean by it.  Take a step back, just

24   sitting here today, can anyone who has looked at the Penobscot

25   River Mercury Study data truthfully say that if surface

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

186

1    mercury concentrations in the upper estuary of the Penobscot

2    were lowered, that methylmercury production would not be

3    slowed and methylmercury concentrations in biota would not

4    decrease?

5    A    Yes.

6    Q    Okay.  Explain that, please, that -- putting it in that

7    language, in that interrogatory form.

8    A    Well, just -- I mean, as I was working on these notes,

9    it just -- it just came to me that -- that it just seemed

10   obvious to me after all this work, that -- that it really

11   wasn't all that complicated.  I mean, there would be no

12   methylmercury in the environment if there wasn't inorganic

13   mercury.  So it's -- if you take a step way back, this really

14   isn't all that complicated.

15        And so it was just an effort to try and capture that.

16   Q    And is that relationship between total mercury and

17   methylmercury in sediments, is it exactly the same in every

18   habitat type throughout the ecosystem?

19   A    No, no, it -- there is always a relationship the more --

20   this is not only my research, but other -- other people's, as

21   well -- there always seems to be a relationship between if you

22   add more mercury, you get more methylmercury.  But some --

23   some sites, for example, Mendall Marsh, are more efficient at

24   methylmercury production.

25        So for a given amount of mercury you add, you get a

1    higher production of methylmercury.  That's why the -- as we

2    discussed before, the percentage of total mercury that's

3    methylmercury is higher in some places than others.

4    Q     But while -- while the relationship may be somewhat

5    different from habitat to habitat, does the relation -- did

6    you find that the relationship exists across habitats?

7    A     Yes.  So -- so it wouldn't -- in speaking generally

8    here, the -- if you have the mercury concentration in

9    different habitats, you would -- you would have the

10   methylmercury concentration.  But in one type of habitat,

11   you'd start from a higher mercury concentration because it's

12   methylated more efficiently there, and you'd drop that by

13   half, it wouldn't be the same mercury concentration as in

14   another location, where methylmercury's not produced as

15   efficiently.  But there'd be the same relationship.

16   Q     Hm-hmm.  And do you see this relationship between

17   methylmercury and -- between total mercury and methylmercury

18   as a kind of pathway to think about effective remediation?

19   A     Yes, if this -- if we hadn't seen this, we would -- we

20   would not be discussing remediation, I don't think.  That's --

21   this is the key, my way of looking at it.

22   Q     Let's turn to Chapter 23, which is the last chapter in

23   the tome, the Phase II Report, Joint Exhibit 6.  Did you write

24   Chapter 23?

25   A     Largely, yes.

1    Q      But did your fellow Study Panel members review it?

2    A      Yes.

3    Q      Did they approve it?

4    A      Yes.

5    Q      And what is the purpose of Chapter 23?

6    A      Well, Chapter 23, we decided it was important to -- to

7    clearly set out the scientific basis to try and -- try and

8    explain as clearly as we could, from a scientific perspective,

9    the underpinnings of our recommendations, which were in

10   Chapter 21.  So that was the objective of that chapter.

11   Q      Before -- withdrawn.

12          As you were considering whether to recommend active

13   remediation, did you look at whether the elevated mercury

14   currently in the system came from legacy sources or -- as

15   opposed to ongoing, new inputs to the system?

16   A      Well, I think -- I think we did demonstrate that it --

17   that the mercury in the biota now is largely legacy mercury.

18   Q      And how did you demonstrate that?  Please explain that.

19   A      Well, in -- in some of the food -- food web or food

20   chain studies that -- that were done, demonstrated the --

21   again, particularly in the -- in the upper estuary, that the

22   -- the basis of the food chain was -- was -- and, again,

23   remembering that mercury travels with carbon, which is the

24   food of these organisms -- that the basis of their -- the base

25   of their food chain was largely in the sediments, where the

1    mercury concentration was high and the methylmercury

2    concentration was high.

3    Q    Did you also look at the annual total mercury loadings

4    to the system or contributions, inputs to the system?

5    A    Yeah, we attempted to make what's called a -- a mass

6    balanced budget to look at the total amount of mercury that

7    was entering -- entering the -- number of kilograms of mercury

8    that was entering the system from the tributaries and from

9    upstream Penobscot and from -- from HoltraChem and other

10   sources, sort of a -- what's called an input-output budget to

11   try and understand what -- what -- in the present-day, where

12   is the mercury coming from, and where is it being stored, and

13   how much is -- is exiting down to Penobscot Bay?

14   Q    Let me show you from Joint Exhibit 6-1, Page 140 -- -41

15   something and ask you about it.  This is a figure called

16   annual total mercury loadings to the upper estuary.  Do you

17   see that?

18   A    Yes.

19   Q    Do you -- are you familiar with this?

20   A    Yes.

21   Q    What does it show?

22   A    It shows in the present day, the -- the -- the major

23   source of mercury to the -- to the upper estuary is -- is

24   mercury from -- from the Penobscot River flowing over Veazie

25   Dam.  There's a smaller amount, about 20 percent or so, comes

1    in from the -- from the tributaries, the smaller rivers that

2    -- that enter below Veazie Dam.  An even smaller amount we

3    estimate from what is presently entering from the HoltraChem

4    site, assuming that Pipe 001 is not an ongoing major source.

5    Then we made some effort to -- to try to codify municipal

6    sources, which were even smaller, and -- and then based on

7    what's known about atmospheric deposition in -- in the

8    northeastern United States, we -- we calculated what the

9    likely direct input from the atmosphere would be.

10   Q     Okay.  What did you find, if anything, about the

11   importance of these current sources relative to the mercury

12   that's already in the system from prior discharges?

13   A     Well, a couple of things.  The amount of mercury that

14   comes in each year is -- is very small compared to the legacy

15   mercury that's -- that's still there.  So although the -- you

16   know, the 49 looks like a really big number, it's not big when

17   you put it into the -- into the overall mass -- mass balance

18   of the ecosystem.

19         Also, we think that some of that mercury that comes over

20   the dam has particulate material that is retained, but it's --

21   and that -- and that affects the recovery, but it -- really,

22   it's cleaned the system up, but some of the mercury -- the

23   dissolved mercury goes right through and out the end.

24         So not all of the mercury in -- in that one large, tall

25   bar there remains in the system.  Some of it goes out in a

1    dissolved form.

2    Q    Is it fair to say, then, that you determined that when

3    looking at remediation, the appropriate focus was on the

4    legacy mercury in the Penobscot sediment?

5    A    Yes, yes.

6    Q    Okay.

7    A    And you can -- in the -- in another figure in that

8    report, there's a mass balance figure, and you can get some

9    sense of the size of the different pools of mercury, and --

10   and this number doesn't look big when you -- when you put it

11   next to the amount of mercury that's still in the sediments.

12   Q    One element -- withdrawn.

13        Was one element, then, in the decision to recommend

14   active remediation the severity of contamination within the

15   upper estuary?

16   A    Yes.

17   Q    Okay.  And was another element a -- an evaluation of how

18   quickly the system would cleanse itself to acceptable levels

19   via natural attenuation?

20   A    Yes.

21   Q    Now, we've talked about the first part, the

22   contamination in sediments and biota and in the wetlands or

23   marsh areas, and we've talked about the years that you project

24   it would take to get to the targets derived by the Study

25   Panel; is that fair?

1   A     That's fair, yes.

2   Q     Now, in -- did you have to -- did there come a point in

3   time when you had to determine whether in your opinion natural

4   attenuation was too slow to just allow it to happen without an

5   active remedy?

6   A     Yes, we decide -- at some point, we decided -- I think

7   we -- we didn't discuss that topic a lot for a long time.  It

8   wasn't -- you know, it took a long time for these data to come

9   in.

10        But I think at some point, we all came to the

11  conclusion, and I -- I -- I kind of think we -- we came to

12  this conclusion individually, that -- and the basis -- I

13  think, to sum it up, I think we all felt that the system had

14  already been contaminated for 47 years, and -- and if Mendall

15  Marsh was going to be -- be at -- at high concentrations for

16  another 66 years, that was just -- it was just too long.  So

17  it really came down to a value judgment, I think.

18  Q     Now, I just want to read you language from Chapter 23 on

19  this point and ask you to comment on it.

20        MR. BERNARD:  And, Your Honor, this is Joint

21  Exhibit 23-4 -- I'll actually put it up here.

22        THE COURT:  Thank you.

23        MR. BERNARD:  Sorry.  This is Joint Exhibit 6-23, so

24  it's Chapter 23 --

25        THE COURT:  Right.

1          MR. BERNARD:  -- of the Phase II Report, and this is

2     Page 23-4, get that page in there.  There it is.

3     BY MR. BERNARD:

4     Q     And I just want to show you, you have this Section 3,

5     Dr. Rudd, called the need for active remediation in the upper

6     estuary of the Penobscot River.  Do you see that?

7     A     Yes, I do.

8     Q     Okay.  And -- and it says -- and, again, you can read

9     around it for context, but I want to direct your attention to

10    right here and then to this footnote.  You write, however, we

11    have concluded that the rate of natural attenuation of the

12    upper estuary is too slow, and that active remediation should

13    take place, if feasible.  Do you see that?

14    A     Yes.

15    Q     And that accurately reflected your view when you

16    submitted the Phase II Report in April of 2013?

17    A     Yes, it did.

18    Q     And it accurately reflects your view today?

19    A     Yes.

20    Q     Okay.  Now, in -- I'm going to read you Footnote 3

21    because it's here, and then I'm going to ask you in your own

22    words to explain this to the court, if you would.  Footnote 3

23    reads as follows:  The primary scientific basis for the

24    conclusion by the Study Panel that the natural attenuation

25    rate of the upper estuary of the Penobscot is too slow, and

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    that remediation is needed, are the high concentrations of

2    methylmercury in birds and fish in the upper estuary, which

3    based on toxicological studies are above toxic levels, and

4    that it is now 46 years after the major input of mercury to

5    the Penobscot and concentrations in biota are still at toxic

6    levels.

7         So if you want to -- if that precisely states your view

8    and completely states your view, you can say so, but I'd like

9    you just in your -- now that you're here live, to explain to

10   the court the basis for your conclusion that natural

11   attenuation is too slow, and, therefore, given the level of

12   contamination in the ecosystem, active remediation is

13   necessary.

14   A    Yeah, that -- yeah, and I -- I think that, from my

15   perspective, still states pretty clear what the position of

16   the panel is.

17        We just think that the legacy mercury concentrations in

18   the mobile pool are still too high, and this is keeping the

19   mercury -- mercury concentrations in surface sediments too

20   high and the methylmercury production rate too high and the

21   mercury concentration in the -- in the -- in the biota is

22   still too high.  And we think that the -- that the -- the --

23   with the half-times that Dr. Santschi has given us, that --

24   that the recovery rate is -- is slower than -- than -- if we

25   -- if he'd been giving us recovery rates of five years, we'd

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    be -- we would have been much happier in saying, well, you

2    know, the system's been contaminated for 47 years, and if it's

3    going to clean itself up in another five years, well, let's --

4    let's not take the chances of causing any problems with

5    remediation.

6         But when we started to see six -- six or seven more

7    decades coming out as the -- as the final answers, we thought

8    -- we thought maybe we should be considering remediation.

9    Q    And that's your recommendation to the court.

10   A    Yes.

11   Q    Now I want to turn to some of the expert reports that

12   have been filed in the case and your responses to some of the

13   subject matter in those reports.  Okay?

14   A    Okay.

15   Q    Did you review the expert reports that were filed by the

16   witnesses retained by the defendant and the plaintiffs in the

17   case?

18   A    I did, yes.

19   Q    Okay.  And we've looked at Joint Exhibit 87 in which you

20   actually collected some of your responses in writing; is that

21   right?

22   A    Hm-hmm, yes.

23   Q    Okay.  And you also had a deposition in March in which

24   you testified to some of your reactions to the expert reports;

25   is that right?

1    A    Yes.

2    Q    Okay.  Now, did you read a report by Mr. Vaillancourt?

3    A    Yes, I did.

4    Q    Okay.  And is he a defendant expert?

5    A    Yes, he is.

6    Q    Okay.  And what, if you recall, did he opine concerning

7    the source of mercury in the Penobscot River?

8    A    Well, his position that -- that rather than HoltraChem

9    being the major source of mercury to the upper estuary, that

10   instead it is -- it was mercury from paper mills that had been

11   used in the past as a slimicide, and they'd come downriver and

12   contaminated the -- the -- the upper estuary.

13             MR. BERNARD:  Your Honor, I want to note for the

14   record, if I can, that notwithstanding that I'm eliciting this

15   testimony, plaintiffs believe that this subject matter is

16   irrelevant, and this is the -- we've made a motion to that

17   effect.

18             THE COURT:  Yes, you have, right.

19             MR. BERNARD:  But while the -- while the motion is

20   pending, we're going to -- we're going to address the issue.

21   BY MR. BERNARD:

22   Q    Were you asked by Judge Carter to determine what the

23   primary source of mercury to the estuary was?

24   A    No, we understood that that was the outcome of the first

25   trial, that that had been established.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   Q      Now, in studying the system, did you generate some data

2   that could be used to assess historical sources of mercury to

3   the Penobscot?

4   A      Yes, the -- the -- the core study that we've been

5   discussing, the long core study that Dr. Santschi did, it was

6   designed primarily to -- to determine the rate of natural

7   attenuation, which is what we've been discussing.  But once

8   you have that data, you can -- you can use it to -- to address

9   other questions, and some of that data is relevant to -- to

10  this issue.

11  Q      And -- and do you have a view about whether the data

12  collected in the study are consistent or inconsistent with the

13  court's prior finding that HoltraChem was a major or dominant

14  source of mercury to the lower river?

15  A      I'd say overall our -- our -- our findings are very

16  consistent with -- with the decision that Judge Carter made in

17  the previous trial.

18  Q      And what findings or information generated by the study

19  support that view?

20  A      Ah, with respect to Dr. Santschi's core data, he -- he

21  found that -- that the mercury -- he found that the mercury

22  profiles, the peak concentrations dated close to -- to 1967 or

23  within an envelope of years, which is when HoltraChem was

24  thought to have been -- to started and be adding in a short

25  period of time after that be adding -- add -- most of the

1    mercury was added to the ecosystem.

2        In -- in the -- in the most undisturbed cores in Mendall

3    Marsh and a few other places, the -- you -- it's clear that

4    the mercury was added as an event.  It was -- concentrations

5    were very low before that, below this peak of mercury

6    concentration, and then all of a sudden, they jump up into a

7    narrow peak and come back down again, and this -- this

8    suggests strongly to us that the -- the mercury must have been

9    added to the system within a -- within a very few years as an

10   event rather than a long-term -- a long-term addition of

11   mercury to the system.

12       And -- and Dr. Vaillancourt --

13   Q    I think that's Mr. Vaillancourt.

14   A    Or Mr. Vaillancourt contended that mercury -- that the

15   slimicide mercury had been added to -- had been used by the

16   paper mills over a period of 30 years, and what you'd expect

17   to see then is a very slow increase in mercury concentration

18   in the sediments and a gradual decline as they stopped using

19   the slimicide.  So the -- so the data doesn't look like that.

20       And, also, if you go right to HoltraChem, to Southerly

21   Cove, and look at those cores, you get these amazingly sharp

22   peaks of mercury concentration at very high concentration, and

23   they dated about 1967.  So the whole picture kind of fits.

24   It's not -- not every core tells that story because not every

25   -- you know, some cores aren't preserved as well as others,

1    but where the -- where the cores are well-preserved, it fits

2    what -- what is understood from the historical record very

3    well.

4    Q     Are you familiar with a set of data called the Beak

5    data?

6    A     Yes, I am, yes.

7              MR. BERNARD:  Okay.  Your Honor, this is

8    Exhibit 141, which I move into evidence.  It's a figure from

9    the expert report of Dr. Driscoll, which has already been

10   separately admitted as Joint Exhibit -- Joint Exhibit 49.

11   This is -- this is a figure from Dr. Driscoll's report.

12             THE COURT:  Any objection?

13             MR. TALBERT:  No objection, Your Honor.

14             THE COURT:  It's admitted.

15   BY MR. BERNARD:

16   Q     Have you seen this before, Dr. Rudd?

17   A     Yes, I have.

18   Q     Okay.  And what do you know about -- what can you tell

19   the court about what this figure shows?  I'm going to -- I was

20   going to try to -- I'm going to try to zoom this a little bit,

21   just bear with me.  Well, okay, that's a little better.  Go

22   ahead.

23   A     This -- this shows -- this was -- the -- you know, the

24   Panel found this to be a very interesting figure because what

25   it does is it shows surface concentrations of mercury.  The

1    Beak Consulting Firm did a -- did a survey of mercury

2    concentrations in 1971, surface concentrations that were found

3    at that time at a number of sites in the main stem of the --

4    of the river.

5        And what was -- what was amazing to us is that when --

6    when we calculated the average concentration of mercury in

7    these samples that you see here, it came to 3,300 nanograms

8    per gram in the surface sediments in 1971, which was -- which

9    was at about the time that -- that HoltraChem was apparently

10   just finishing adding its mercury to the system.

11       And if you calculate the average concentration of

12   mercury in the cores of the main stem of the river from Peter

13   Santschi's data now, excluding the two very high points in

14   Southerly Cove, it comes to 3,300 nanograms per gram.  So it

15   appears to us that this material that Beak found -- or mercury

16   concentrations that Beak found on the surface of the sediments

17   in 19 -- in 1971 stayed there and was buried and is now buried

18   to a depth of 20 to 30 centimeters in the sediments, and

19   that's what we're -- those are the deep peaks that we see now

20   in -- in Dr. Santschi's cores.

21   Q    These samples that were taken in 1971, how does that

22   date relate to the known peak mercury releases from the

23   HoltraChem plant?

24   A    Well, my understanding is the plant started operation in

25   1967, and the first big reduction in mercury input to the

1    river happened in about 1970, after the mercury problem was

2    recognized.

3        Mercury -- when the -- mercury was first being put into

4    the river, the -- the company had no idea that it was toxic.

5    This was -- this was a long time ago now.  But in Minamata,

6    Japan, it was discovered in about 1970 that mercury was very

7    toxic, and -- and so very soon after that, places like -- like

8    the Penobscot and the English-Wabigoon System, the

9    chlor-alkali plants in those systems made a big effort to

10    clear up their -- their processes.

11        So most of the mercury we think went into the river

12    between 1967 and -- and early 1970.

13    Q    Okay.  And that was just prior to the samples reported

14    in -- in this figure?

15    A    Yeah, 1971 was the figure -- yeah, and that would be --

16    my guess is that that's -- at that time was when the big --

17    the first big cleanup was -- was ongoing would be my guess.

18    Q    Now, incidentally, do you know whether these samples

19    were taken by Beak, or were they taken by the U.S. EPA and

20    reported by Beak?

21    A    Oh, actually, I'm not sure of that.

22    Q    Okay.

23    A    I -- I just know they're in a report that Beak -- that

24    Beak published.

25    Q    Back to Mr. --

1    A     Actually, it says, EPA sediment samples, so you're

2    right.

3    Q     Back to Mr. Vaillancourt, did he include in his expert

4    report an argument based on CDM -- that's Camp Dresser &

5    McKee -- data that were taken near the HoltraChem plant?  Do

6    you remember that?

7    A     Yes.

8    Q     And -- and what was the nature of -- of what he said, as

9    best you recall?

10   A     If I'm thinking of the right study, these were some deep

11   cores that were taken that -- and the surface concentrations

12   then were quite high, and they -- they decreased very quickly

13   with distance from the point sources.  Point source -- as you

14   always see in point source situations, the mercury

15   concentrations are always highest at the point source and then

16   decrease from that.

17        I think, if I remember correctly, he was making the

18   argument that most of the mercury stayed within -- within Fort

19   Point Cove itself, which didn't make any sense to me because

20   that mudflat of Southerly Cove is -- is flushed twice a day by

21   the tidal movements, and we now know about the mobile pool and

22   how it comes and goes from the surface of these sediments.  So

23   I -- it's inconceivable to me that a lot of the mercury that

24   was put there was -- didn't remain in Southerly Cove, but --

25   but was transported out into the mobile pool and the main stem

1   of the river.

2   Q     Did you review the methods pursuant to which

3   Mr. Vaillancourt estimated this large input of mercury from

4   the paper mills upstream?

5   A     I didn't.  I read his report.  I didn't go into it

6   in-depth.  Ah --

7   Q     Did you -- go ahead.

8   A     Well, there was no -- there was no actual data.  There

9   was no actual measurements of loss.  He -- he -- these are all

10  estimates based on -- on how much mercury was -- mercury-

11  containing slimicide was likely to have been used back then

12  and -- and then an estimate of how much of that material was

13  later released into the river and how much of it was retained.

14        But these are -- are very loose estimates.  For example,

15  in -- in his own report, he said that -- that there was more

16  than one type of slimicide, and the other type of slimicide

17  didn't contain any mercury at all.  Yet we don't know what

18  kind of slimicide these -- these plants were using.  So they

19  may have been using the slimicide that didn't contain any

20  mercury for all we know or -- or -- so it's a very unsure

21  estimate.  And I -- I mean, I just -- I think it's not very

22  accurate would be my guess.

23  Q     Are you familiar with a claim made by a Mr. Bigham,

24  who's another defendant expert, that -- to the effect that the

25  existence of the old Bangor dam shows that slimicides were a

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    major influence in the lower Penobscot River?

2    A    Yes, I'm familiar with that, yes.

3    Q    And do you have a view about that?

4    A    Ah, I -- I don't agree with his analysis of the data.

5    Q    And please explain.

6    A    Well, there's two cores -- two of Dr. Santschi's cores

7    were taken above the former Bangor Dam and below Veazie Dam,

8    and -- and the -- the peaks in mercury concentration in those

9    two cores are -- are both very sharp, one sharper than the

10   other, but -- but, again, reminiscent of the -- of the event

11   that I described, and it's recorded in both the Southerly Cove

12   cores and in Mendall Marsh cores.

13        So it doesn't look like to me mercury was added over a

14   30-year time period.  It looks to me like it was added over a

15   very few years.

16        Also, Dr. Santschi and Dr. Yeager date that mercury peak

17   at about 1967, which is when we think HoltraChem was adding

18   the mercury.  So my -- my conclusion is -- is that that --

19   those mercury peaks we see in those two cores are -- are

20   HoltraChem mercury, not slimicide mercury.

21   Q    Just to finish this point, I want to show you in Joint

22   Exhibit 87, Page 43 from your notes.  This is your reactions.

23   I don't know if I can get here -- but you give four reasons

24   here, and I just want you to look at those and either just

25   confirm for the court or tell us if you've changed your view

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    about any of these in terms of -- and I'll represent to you

2    that this is -- this is Page 43.  I'll show that to you here,

3    where you're talking about the -- you're kind of matching up

4    data and talking about HoltraChem as a significant source.

5    Could you just look at those four reasons, please, and explain

6    them to the court, and to the extent you've already done it,

7    just let the court know that you've done that and you have

8    nothing further to add.

9    A     Yeah, No. 1 I think -- I think I've already explained.

10   Q     And that's the beak -- or the EPA data --

11   A     The EPA data that -- with the same average concentration

12   in the surface in 1971 as we see now at a depth of 20 or

13   30 centimeters.

14   Q     What about No. 2?

15   A     Pardon me?

16   Q     Reason No. 2.

17   A     Um, yeah, that -- that -- the -- we've alluded a couple

18   of times to the fact that -- that Mendall Marsh is -- is a --

19   is a good, quiescent site where -- where sedimentation is

20   likely to happen in a way that -- that is reasonably

21   interpretable and in -- as you'd expect, in Mendall Marsh, the

22   mercury -- the mercury peaks are often -- often quite well

23   refined, quite -- quite steep, and -- and the cesium 137 peak,

24   which is one of the -- one of the radiochemicals that

25   Dr. Santschi uses to measure the date of deposition, which is

1    about 1963, which is the date of -- the peak date of nuclear

2    bomb testing -- the cesium 37 comes from nuclear bombs, and

3    the peak was in 1963 -- and the cesium peak, of course, in

4    Mendall Marsh corresponds quite well to the mercury peak in --

5    of -- of total mercury and does not correspond to -- to

6    mercury from slimicide being added in the 1940s and 1950s, as

7    -- as Mr. Vaillancourt states in his report.

8    Q    Anything to add about No. 3 in terms of the CDM data

9    from the Southerly Cove?  Take a moment and read that.

10   A    Yeah, there were -- there were -- what we noticed in --

11   I guess it was -- I don't know whether it was

12   Mr. Vaillancourt's or -- or Mr. Bigham's report -- is that

13   they were making the contention that -- that slimicide had

14   come down -- come down the river since -- since the 1930s and

15   -- and -- and so, therefore, would have contaminated the

16   Southerly Cove in the 1930s to -- to 1940s, early 1950s.

17        And -- and if that is the case, the -- the concentration

18   of mercury at depth in Southerly Cove should have been

19   contaminated at that time.  But in deep cores that they showed

20   in -- in -- in those figures, you can see a -- you see the --

21   the peak in mercury concentration that -- that we think

22   resulted from -- from the loss of mercury from the HoltraChem

23   site.  But between the -- between these cores, there's the --

24   the -- the concentrations are low.

25        So prior -- prior to the 1967 peak, below that they're

1    -- the concentrations are low, so that the sediment wasn't

2    contaminated in 1930 to 1940, as you'd think it would be.

3    Q    And just, finally, anything on No. 4 that you haven't

4    already covered?

5    A    Yeah, I -- I think -- and I think Dr. Santschi will say

6    quite a bit more about this, but as -- as -- part of the way

7    that sedimentologists look at their data is they also look at

8    known recorded history, and we know that HoltraChem started up

9    in 1967, and every other chlor-alkali plant that I know of at

10   that time was releasing a lot of mercury.

11       And -- and one thing that -- that Peter did is he looked

12   at -- he looked at -- and dated the cores based on cesium and

13   -- and lead 210 and various other radiochemical techniques.

14   And then he also made the assumption that -- that mercury was

15   added to the system in 1967 and remained there, as the beak

16   cores seemed to show that it did, and then calculated --

17   independently calculated sedimentation rates using the mercury

18   as -- as an approach and using his other radiochemicals as an

19   approach.

20       And when he came up -- when he -- when he did that

21   comparison, he found that the -- that the mercury agreed very

22   well with the cesium approach.  So this is further -- he views

23   this as further corroboration that -- that his interpretations

24   with his radiochemicals are -- are correct because he -- he

25   says it's very useful, if you also know a historical point in

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1  time that you can use to independently corroborate the results

2  that you've got using the -- the more standard methods.

3  Q    And when you talk about the relationship between the

4  mercury and the cesium, do you mean that pursuant to

5  Dr. Santschi's analysis, the -- the inputs, the peak inputs of

6  mercury in the sediment cores can be interpreted to have

7  occurred during that late 1960s period --

8  A    Right.

9  Q    -- when it is known that HoltraChem put mercury into the

10  river?

11  A    Right.  It's -- these -- these methods aren't precise.

12  They have what the sedimentologists call an envelope of time,

13  and -- and -- and it's known that the bomb -- the bomb cesium

14  peaked in 1963.  So all else being equal, you'd expect that if

15  mercury started to be put into the system in 1967 on -- for a

16  few years after that, that it would -- it would peak soon

17  after 1967.

18      So you would -- you would expect that the peak in

19  mercury concentration would be slightly above the cesium peak.

20  In some cases, this is -- if you go and actually look at the

21  data, any particular core, in some cases this is true, and

22  some cases, it's not.  But, overall, if you stand back and

23  look at all the data together, they -- they correspond quite

24  well.  The cesium peak and the mercury peak are quite close

25  together.  They're not decades apart, as you would expect if

1    -- if slimicide was the source.

2    Q    And do you recall what the Mendall Marsh cores, in

3    particular, showed about the relationship between the mercury

4    peak and the cesium peak?

5    A    They were -- yeah, that's -- that's actually number --

6    tried to be captured in No. 2.  The Mendall Marsh cores were

7    the best-quality cores, and that's where the cesium peak and

8    the mercury peak had their greatest agreement.

9    Q    One last question on the slimicide issue.  From the

10   point of view of considering active remediation, once the

11   legacy mercury is in the system, does it matter what

12   percentage one source put in versus another source?

13   A    No, no, once the mercury's there, it's there.  It

14   doesn't matter where it came from.

15   Q    Let me turn your attention to mercury stable isotopes.

16   Could you please tell the court what they are?

17   A    There's -- there's various stable isotopes of mercury,

18   and they have a slightly different atomic weight because they

19   contain more neutrons than -- than -- than others, and there's

20   several isotopes of -- of mercury that have slight differences

21   in -- in atomic weight and -- and different sources of

22   mercury, different mercury mines, in fact, have -- the

23   isotopes are in slightly different ratio.

24       So this results in a -- kind of a fingerprint or a

25   signature of -- of mercury, and there's -- and just in the

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   recent past, in the last few years, there's been sensitive new

2   instrumentation has been developed that can separate the

3   amount -- the amount of these isotopes in a sample, take them

4   and separate and say there's 20 percent of 203 and 10 percent

5   of 202 and then that varies in different types of samples, and

6   -- and that can be used -- this is a quickly developing field

7   -- that can be used at -- the fingerprinting of mercury can be

8   used to -- they think now -- to trace mercury through --

9   through ecosystems and understand the movement of mercury in

10  ecosystems.

11  Q    Did the Study Panel commence some effort to look at

12  mercury stable isotopes in the Penobscot System?

13  A    Just -- just about the time that Phase II was starting,

14  this field was -- was still pretty much in its infancy, and --

15  and two -- two investigators, Holger Hintelmann at Trent

16  University and Joel Bloom at Michigan, who were the two

17  leading experts at this, who were the pioneers in this field,

18  had these instruments and were starting to apply them to -- to

19  the natural environment.

20       And, you know, maybe we shouldn't have been doing this

21  because it's a little bit researchy, and we weren't supposed

22  to be doing research, but it was -- it was -- it was a method

23  that we thought offered some promise into -- into figuring out

24  more about how mercury was traveling through the ecosystem up

25  into fish.  We thought it might be a tool that would be useful

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    in our study some way.

2        So we went to Dr. Hintelmann and said if we took some --

3    some samples, would you -- some preliminary samples, would you

4    analyze them just to see if -- if there's differences in -- in

5    isotopic signalars -- signature from one location to the other

6    in the -- in the -- in the Penobscot System.  So -- so he did

7    this and sent back the samples and, sure enough, there was

8    differences, and, initially it looked -- it looked pretty

9    promising to us.

10       But as is often the case in isotopic studies, the more

11   we looked at the data, the more confusing it became.  So we

12   took a few more samples, but then at that time, back in 2009,

13   he advised us that we were unlikely to be able to -- to figure

14   out these data and to interpret them in a way that -- that

15   would be meaningful because we didn't know the source of

16   mercury that HoltraChem had purchased over the years for use

17   in the plant.  And if you don't know the -- the isotopic

18   signature of the source mercury, you then don't know your

19   starting point, and it's very hard to figure out what's --

20   because of various things that happen to mercury in the

21   environment, when you get your samples back from the

22   environment, it's very hard to figure out exactly what's

23   happened.

24       So what at one point was a promising tool, ended up to

25   be disappointing.

1  Q      You say you didn't know the signal -- the isotopic

2  signature of the mercury that HoltraChem used in the plant; is

3  that right?

4  A      That's right, yes.

5  Q      Is there also something called fractionation?

6  A      Yes, there is a -- there's two types of fractionation.

7  I'm not -- I -- I don't have to talk about this very long

8  before I get to the edge of my knowledge.

9  Q      Well, it's almost 2:30, so speak freely.

10  A      There's two types of fractionations.  It's called mass

11  dependent fractionation and mass independent fractionation,

12  and mass dependent fractionation I understand, so that the

13  latter isotopes tend to take part in chemical reactions and

14  move quickly than the lighter isotopes just because of

15  inertia.  So, for example, if you have elemental mercury,

16  which can be either a liquid or a vapor, the lighter isotopes

17  tend to go off to the atmosphere, and the heavier isotopes are

18  -- stay behind.

19      So -- so in -- over a period of years, the remaining

20  isotopes in the liquid tend to get heavier and they -- and the

21  -- as the lighter ones go off to the atmosphere, and that's

22  called fractionation.

23      There's another type of independent -- mass independent

24  fractionation, which I don't really understand, so I would

25  leave that for -- for -- to others

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    Q    For present purposes, is it fair to say that these

2    fractionation processes are capable of altering --

3    A    Yes.

4    Q    -- the initial isotopic signature?

5    A    Yes, yes.

6         MR. TALBERT:  I'm going to object.  It's outside the

7    scope of this expert -- or this witness's expertise.

8         THE COURT:  Overruled.

9    A    Dr. -- Dr. Hintelmann who I -- actually I've worked with

10   on another project for many years -- showed me some of the

11   first data, actually, and -- and -- that he had produced with

12   his new instrument, and -- and what happened in that case is

13   it was mercury that was in a river, and as it went downstream,

14   the mercury in the river gradually became heavier and heavier,

15   and he interpreted this to mean that there was elemental

16   mercury -- so some of the mercury in the river was being

17   converted by -- by microbial and photochemical processes into

18   elemental mercury, and the lighter isotopes were going off in

19   the atmosphere, leaving the mercury in the river as a -- as --

20   in a heavier form.

21        So -- so I -- and I think various other studies have

22   showed fractionation -- that I'm aware of -- show

23   fractionation in the -- in the environment.

24   Q    Let me just show you Plaintiffs' Exhibit 65, which is an

25   e-mail from Dr. Hintelmann to you dated January 16th, 2010.

1          MR. BERNARD:  Your Honor, I move this into evidence.

2          THE COURT:  And would you repeat the exhibit number?

3          MR. BERNARD:  Yes, it's Plaintiffs' 65.

4          THE COURT:  Thank you.  Any objection to 65?

5          MR. TALBERT:  No objection, Your Honor.

6          THE COURT:  65 is admitted.

7     BY MR. BERNARD:

8     Q     Did you have -- do you recall -- some written

9     communications with Dr. Hintelmann on this subject of mercury

10    stable isotopes in the Penobscot?

11    A     Right.

12    Q     Okay.  So I want you just to look at this e-mail and

13    you'll see that he attaches a memo; is that correct?  Do you

14    see the attachment?

15    A     That's right.

16    Q     All right.  So let me just call your attention to this

17    one sentence in his e-mail.  Will you read that into the

18    record, please?

19    A     One of the biggest unknowns -- or unknown is that there

20    is absolutely no knowledge about fractionation during

21    oxidation of Hg(0) to Hg(II).

22    Q     What is Hg(0) to Hg(II)?

23    A     Hg(0) is elemental mercury and Hg(II) is another

24    inorganic form of mercury known as ionic mercury or divalent

25    mercury.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   Q      So is this one factor -- one uncertainty factor you

2   confronted with -- in terms of the mercury stable isotope

3   work?

4   A      Yes, yes, yeah, at that time, there was -- you know,

5   this was in its infancy back then.  At that time, there wasn't

6   much known.  I understand there's more known now and -- for

7   example, there's a type of bacteria that live in sediments

8   that can oxidize Hg(0) to Hg(II), and my understanding is

9   they've -- they've found that during that microbial process,

10  there can be fractionation, but that wasn't known back then, I

11  don't think.

12  Q      Let me show you his memorandum, which is part of

13  Exhibit 65, and attended to the e-mail you just looked at, and

14  just -- I'm just going to show you two quick things in this.

15      He writes, since we have none of the original source

16  mercury for testing, we can only speculate.  Do you see that?

17  A      Yes, I do.

18  Q      And does that refer to the initial point you made of not

19  knowing the isotopic signature of the mercury HoltraChem was

20  using in the plant?

21  A      Yes.

22  Q      Okay.  Is it also unknown whether throughout the plant's

23  operation it was using this -- mercury that had the same

24  isotopic signature?

25  A      Yes, that's also -- we attempted to find -- find out.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    We did an investigation as best we could.  Apparently the

2    chlor-alkali plants buy their mercury from mercury brokers,

3    and we contacted a broker or two to try and see if there's --

4    if they kept records of previous purchases by HoltraChem, and

5    they -- they had -- they had no records.  So we weren't able

6    to find out if it purchased from one source or -- well, no,

7    that's not quite true.  They said to us that they get their

8    mercury from wherever, and so that sometimes somebody comes to

9    them to buy mercury, and it's come from Idrija, Yugoslavia,

10   and sometimes maybe it's come from some other mine, but they

11   don't keep track of that.

12   Q    So you were unable to determine what the isotopic

13   signature of the mercury was that was used at the HoltraChem

14   plant?

15   A    That's correct, yes.

16   Q    And you were further unable to determine whether, during

17   its years of operation, the plant used mercury that had the

18   same, as opposed to, different isotopic signatures?

19   A    Yes.

20   Q    Okay.  Now, just one more thing in Dr. Hintelmann's

21   memo, and I think this relates to the line in the e-mail that

22   we looked at, but let me just check.  He says, I'm also

23   unaware of any iso -- mercury isotope fractionation

24   measurements near chlor-alkali plants.  Most studies involving

25   environmental mercury contamination were done near mercury or

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    goldmining areas.  Do you see that?

2    A    Yes, I do.

3    Q    And does that relate to this fractionation issue you

4    were testifying to?

5    A    Yeah, it does.

6    Q    Okay.  Now, did you come up with various hypotheses for

7    what the limited mercury stable isotope data you collected

8    might mean?

9    A    Yeah, we came up with various hypotheses and -- and

10   presented them to -- to Holger -- Holger Hintelmann, and at

11   the end of our con -- we did this in a telephone conference,

12   and at the end of our telephone conference, he -- his advice

13   to us, if you don't know the -- if you don't know the -- the

14   signature of the material that was bought, then it -- it's --

15   you can't really choose between these hypotheses.  So it -- we

16   left it at that pretty much.

17   Q    Did you see any way to, in a scientifically valid

18   manner, select one of your hypotheses over another as an

19   interpretation of the mercury stable isotope data?

20   A    No, because it -- in the -- the data itself, your

21   hypothesis, you'd be going along and you'd say, oh, that

22   checks out, that checks out, then all of a sudden, you'd come

23   -- look at another set and say, that doesn't make any sense at

24   all.  And -- and so we -- we did that as best we could, but

25   we're not experts at this.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

218

1       And then we went to Holger and said, you know, this is

2  the best we could do with interpreting these data.  And -- and

3  he went through our hypotheses with you, is my -- is my

4  memory, and -- and at the end, he gave us -- he said, I don't

5  -- without a lot more work and knowing where -- knowing where

6  the -- where the -- where the mercury was purchased from and

7  its signal, that we were very unlikely to make much headway

8  with this.

9  Q    Is Dr. Holtermann -- Dr. Hintelmann one of the world's

10 leading experts on mercury stable isotopes?

11 A    I'd say he and Joel Bloom are the tops.

12       MR. BERNARD:  Your Honor, I have two more minutes,

13 if I can, and I'll finish this section.

14       THE COURT:  All right.

15       MR. BERNARD:  Thank you.

16 BY MR. BERNARD:

17 Q    Now, did you ultimately include the mercury stable

18 isotope data you had collected in any of the reports that you

19 submitted to the court?

20 A    No, we -- no, we did not.

21 Q    Why not?

22 A    Well, because the data were uninterpretable, and it's --

23 that's common practice in scientific research.  You don't --

24 you don't publish uninterpretable data.  It just confuses the

25 literature.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   Q    And was that your decision not to include the mercury

2   stable isotope data in the report?

3   A    Yeah, that was certainly what I recommended to the group

4   based on my conversations with Dr. Hintelmann.

5   Q    And was there any dissent from within the group about

6   whether there were --

7   A    No, not that I remember, no.

8   Q    Okay.  Now, are you familiar with Mr. Vaillancourt's

9   charge that the Study Panel omitted the stable isotope data

10  deliberately because it did not fit your hypothesis that

11  HoltraChem was a major source of mercury to the lower river?

12  A    Yes, I am.

13  Q    And what do you think of that charge?

14  A    Ah, I think it's pretty outrageous.  I mean, that's --

15  that's a very serious charge.  That means we were -- we were

16  cooking the books.  And in -- you know, in fact, one of our

17  hypotheses was that HoltraChem wasn't a major source, and

18  that's -- you know, it's one of the hypotheses we had written

19  right in our report, and he ignored that hypothesis, and I

20  mean, I -- that was kind of off the charts.

21  Q    Do you see any basis for that assertion at all?

22  A    No, none whatsoever.

23       MR. BERNARD:  Your Honor, this is as a good stopping

24  place as we can.

25       THE COURT:  Very good.  All right.  We'll -- thank

1    you very much.  We'll reconvene tomorrow at 8:30.

2         Oh, before we leave, you're going to -- can you give me

3    an idea of what's going on tomorrow?

4              MR. BERNARD:  Yes, I think that --

5              THE COURT:  You can -- you can be seated while we do

6    this.

7              MR. BERNARD:  I think that Dr. Rudd -- I will have,

8    I think, no more than 30 or 40 minutes more with Dr. Rudd.  I

9    don't know how long the --

10             THE COURT:  Sure.

11             MR. BERNARD:  -- defendant will spend.  But next

12   will be Dr. Whipple.  The best preparation I think for

13   Dr. Whipple is Chapter 22, which is --

14             THE COURT:  Okay.

15             MR. BERNARD:  -- mercifully short and is the one

16   chapter that he -- he himself wrote.

17             THE COURT:  All right.  Do you agree with that?

18             MR. TALBERT:  Yeah, I agree.

19             THE COURT:  Okay.  Very good.  Thank you very much.

20        (Proceedings concluded at 2:37 p.m.)

21

22

23

24

25

1                              CERTIFICATION

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.

4

5

6     /s/ Julie G. Edgecomb _____          June 3, 2014 _____
      Julie G. Edgecomb, RMR, CRR            Date
7     Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25