1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF MAINE

3   MAINE PEOPLE'S ALLIANCE        )
    and NATURAL RESOURCES          )
4   DEFENSE COUNCIL, INC.,         )
                                   )
5                 Plaintiffs       )
                                   )              CIVIL ACTION
6                                  )
            vs.                    )   Docket No. 1:00-cv-00069-JAW
7                                  )
                                   )              BENCH TRIAL
8   HOLTRACHEM MANUFACTURING       )
    and MALLINCKRODT LLC,          )
9                                  )
                  Defendants.      )
10

11                           VOLUME II

12                   TRANSCRIPT OF PROCEEDINGS

13        Pursuant to notice, the above-entitled matter came on

14   for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15   Chief District Judge, in the United States District Court,

16   Bangor, Maine, on the 4th day of June, 2014, at 8:32 a.m.

17   APPEARANCES:

18   For the Plaintiffs:            Mitchell S. Bernard, Esquire
                                    Aaron S. Colangelo, Esquire
19                                  Rachel E. Heron, Esquire
                                    Jared J. Thompson, Esquire
20
     For the Defendants:           Patricia H. Duft, Esquire
21                                  Sigmund D. Schutz, Esquire
                                    Jeffrey D. Talbert, Esquire
22

23                    Julie G. Edgecomb, RMR, CRR
                         Official Court Reporter
24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

INDEX OF PROCEEDINGS

Page:

Testimony:  (see below)

INDEX OF WITNESSES

Page:

JOHN RUDD  (called by Mr. Bernard)

Continued Direct Examination by Mr. Bernard          225
Cross-Examination by Mr. Talbert                     265
Continued Cross-Examination by Mr. Talbert      307, 375

INDEX OF EXHIBITS

| Plaintiffs' Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 28 | Phase I Report, Figures 1-7 | 264 | 264 |
| 29 | Phase I Update, Figures 8-13 | 264 | 264 |
| 30 | Phase II Report, Table 1-1 | 264 | 264 |
| 31 | Phase II Report, Table 1-2 | 264 | 264 |
| 32 | Phase II Report, Table 1-4 | 264 | 264 |
| 33 | Phase II Report, Figure 1-1 | 264 | 264 |
| 34 | Phase II Report, Figure 1-6 | 264 | 264 |
| 35 | Phase II Report, Figure 1-6 | 264 | 264 |
| 36 | Phase II Report, Figure 1-6 | 264 | 264 |
| 37 | Phase II Report, Figure 1-7 | 264 | 264 |
| 38 | Phase II Report, Figure 1-7 | 264 | 264 |
| 39 | Phase II Report, Figure 1-7 | 264 | 264 |
| 40 | Phase II Report, Figure 1-9 | 264 | 264 |
| 41 | Phase II Report, Figure 1-9 | 264 | 264 |
| 42 | Phase II Report, Figure 1-9 | 264 | 264 |
| 43 | Phase II Report, Figure 1-13 | 264 | 264 |
| 44 | Phase II Report, Figure 1-16 | 264 | 264 |
| 45 | Phase II Report, Figure 1-16 | 264 | 264 |
| 46 | Phase II Report, Figure 1-16 | 264 | 264 |
| 47 | Phase II Report, App. 1-4 | 264 | 264 |
| 48 | Phase II Report, App. 1-4 | 264 | 264 |
| 49 | Phase II Report, App. 1-4 | 264 | 264 |
| 50 | Phase II Report, App. 1-4 | 264 | 264 |
| 51 | Phase II Report, App. 1-4 | 264 | 264 |
| 52 | Phase II Report, App. 1-4 | 264 | 264 |
| 53 | Phase II Report, App. 2-1 | 264 | 264 |
| 54 | Phase II Report, App. 2-2 | 264 | 264 |
| 55 | Phase II Report, App. 3-6 | 264 | 264 |
| 56 | Phase II Report, App. 3-8 | 264 | 264 |
| 57 | Phase II Report, Figure 11-3.2 | 264 | 264 |
| 58 | Phase II Report, Figure 11-3.4 | 264 | 264 |
| 59 | Phase II Report, Figure 18-1 | 264 | 264 |

```
 1      60          Phase II Report, Table 21-1      264      264
        61          Phase II Report, Figure 23-2     264      264
 2      62          Phase II Report, Figure 23-7     264      264
        63          Phase II Report, Figure 23-8     264      264
 3      64          Phase II Report, Figure 23-17    264      264
        83          Maine DMR Notice                 258      258
 4      84          Maine DMR Notice                 258      258
        85          Maine DMR Map                    258      258
 5     119          Phase I Update, Figure 45        264      264
       124          CV of Charles T. Driscoll        264      264
 6     125          C.T. Driscoll, Figure 1          264      264
       126          C.T. Driscoll, Figure 2          264      264
 7     127          C.T. Driscoll, Figure 4          264      264
       128          C.T. Driscoll, Figure 5          264      264
 8     129          C.T. Driscoll, Figure 6          264      264
       130          C.T. Driscoll, Figure 7          264      264
 9     131          C.T. Driscoll, Figure 8          264      264
       132          C.T. Driscoll, Figure 9          264      264
10     133          C.T. Driscoll, Table 1           264      264
       134          C.T. Driscoll, Table 2           264      264
11     135          C.T. Driscoll, Table 3           264      264
       136          C.T. Driscoll, Figure 1          264      264
12     137          C.T. Driscoll, Figure 2          264      264
       138          C.T. Driscoll, Figures 3a-3d     264      264
13     139          C.T. Driscoll, Figure 4          264      264
       140          C.T. Driscoll, Table 1           264      264
14     141          C.T. Driscoll, Figure 3          264      264
       142          C.T. Driscoll, Figure 5          264      264
15     143          Resumé of Philippe Grandjean     264      264
       144          P. Grandjean, Table 1            264      264
16     145          P. Grandjean, Table 2            264      264
       146          P. Grandjean, Table 3            264      264
17
       Defendants'
18     Exhibit No.     Description              Offered   Admitted

19      12          E-Mail from Rudd to Bodaly       396      396
        19          E-Mail from Bridges to Luthy     273      273
20      20          Bridges' Questions/Observations  273      273
        26          E-Mail from Rudd to Bodaly       370      370
21      55          Straw Dog                        418      418
       165          E-Mail from Calkins to Bodaly    425      425
22     300          E-Mail from Bodaly to Rudd       356      356
       383          E-Mail from Fisher to Bodaly     400      400
23     427          E-Mail from Rudd to Fisher       380      380
       441          E-Mail from Rudd to Bodaly       428      428
24     461          E-Mail from Rudd to Bodaly       348      348
       659          E-Mail from Rudd to Bodaly       367      367
25     662          E-Mail from Rudd to Kelly        410      410
       663          E-Mail from Rudd to Whipple      299      299
```

1       (Counsel present in open court.)

2               THE COURT:  Good morning.

3               MR. BERNARD:  Good morning, Your Honor.

4               THE COURT:  Are you ready to proceed?

5               MR. BERNARD:  Yes, sir.

6               THE COURT:  You may do so.

7                       CONTINUED DIRECT EXAMINATION

8   BY MR. BERNARD:

9   Q     Good morning, Dr. Rudd.

10  A     Good morning.

11  Q     In the Phase II Report, did the Study Panel state or

12  estimate by how many times sediment mercury concentrations in

13  the upper estuary exceeded regional background levels?

14  A     Yes, it did.

15  Q     And are you familiar with an expert retained by the

16  defendant named Dr. John Connolly?

17  A     Yes, I am.

18  Q     Did you read Dr. Connolly's expert report?

19  A     Yes.

20  Q     And are you familiar with Dr. Connolly's assertion in

21  his expert report that Penobscot sediment mercury is not as

22  high above background, does not exceed background by as much

23  as the Study Panel said it does?

24  A     Yes, yes, I am.

25  Q     Okay.  And what do you think of that argument?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   A      I think he made a mistake in -- in the way he -- he

2   calculated his background concentration so that the comparison

3   he made then was -- the data appeared to be not as different

4   as -- as we think they actually are.

5   Q      And what -- what mistake or mistakes did he make, in

6   your view?

7   A      Well, when -- when we decided on our -- our regional

8   background, we sampled in a number of places that we thought

9   would be low in mercury concentration.  We anticipated that

10  they would be.  But then we went out with the idea of finding

11  out if they actually were low mercury concentrations.  So we

12  sampled a number of places in the -- in the EB reach, above

13  what we thought was any industrial contamination.  We also

14  sampled a number of estuaries -- neighboring estuaries that we

15  thought would be low in mercury concentration because they had

16  low populations surrounding them in their watersheds and not a

17  lot of industry.

18       So we went out and sampled a number of places.  And then

19  the way I think is best to decide what regional background is,

20  is that after the data comes back, you take a look at it, and

21  if you sampled a number of sites that are regional background,

22  you find that they cluster around some low value.  And then if

23  you see some sites that -- that are a little bit higher than

24  that, you say, well, these sites must have -- or I would say

25  some -- these -- these sites must have -- have received some

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    high mercury concentrations from some unidentified source.

2         And so you don't use that data.  That's somewhat above

3    regional background, and the regional background that you

4    establish is the cluster of -- of points that's lowest in your

5    data set.  And -- but -- and also quite repeatable.

6    Q    Did Dr. Connolly omit the East Branch reach of the river

7    from his background calculation?

8    A    Yes, he did.

9    Q    And do you disagree with that?

10   A    Yes, I do.

11   Q    Okay.  And did he include the OV reach, the Old Town to

12   Veazie reach?  Do you recall?

13   A    Yes, he did.  And that -- that actually surprised me

14   because that was part of the reach of the river which -- which

15   the defendants were contending had -- had been contaminated by

16   slimicide from mercury from upstream paper mills.  So I was

17   surprised that he did that.

18   Q    And did he include the Sheepscot estuary?  Do you know?

19   A    Yes, he did.

20   Q    What -- what do you think of that?

21   A    Well, I -- I -- that was one of the sites that we

22   sampled but we excluded because it was high -- high in mercury

23   concentration, as I -- as I've described.  And we've later

24   done -- done some -- Dr. Bodaly's gone back and looked into

25   this some more, and what he tells me, that it's part of

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    Merrymeeting Bay and -- or it's close to Merrymeeting Bay,

2    where there's a lot of -- a lot of industry and possible

3    sources of mercury.

4         So we think that probably that site which we originally

5    had hoped would be regional background was, in fact,

6    contaminated by -- by an industrial source to some degree,

7    not -- not heavily.

8    Q    Are you familiar with Dr. Connolly's use of sediment

9    concentrations from the levies and the intertidal sites in

10   Mendall Marsh?

11   A    Yeah, I think another -- another mis -- mistake that he

12   made in -- in that regard is he -- he made the point -- or he

13   tried to make the point that -- that Mendall Marsh data

14   weren't -- weren't much higher than -- only about a factor of

15   two higher than other locations -- other background locations.

16        But, in fact, I think what he did do is kind of an

17   apples-and-oranges comparison.  He -- rather than comparing

18   the concentration of mercury in the platform area where the --

19   most of the biota live, in what we thought were contaminated

20   marshes, to platform areas in reference marshes, he -- he

21   concentrated the concentration in the levies, which -- which

22   are close but not exactly at the plateau concentrations, to

23   concentrations in -- in river sediments, which are higher.

24        So that it made the -- it made the difference look -- by

25   not comparing -- not comparing the same habitats, it made the

1    difference look smaller.  The correct apples-to-apples

2    comparison would have been -- would have been plateau

3    sediments, for example, in Mendall Marsh to plateau sediments

4    in a reference marsh at low mercury concentration, which is

5    what we did.

6    Q    And just to be clear, what did he do?

7    A    He -- he -- he compared river sediments, river -- river

8    intertidal sediments, to sediments on the -- on the levy,

9    which were -- which are only about a factor of two difference

10   in concentration, and they're not representative of the

11   marsh --

12   Q    Let me show you --

13   A    -- as a whole.

14   Q    I'm sorry.  Were you done?

15   A    As a whole.

16   Q    Okay.

17   A    They're representative of the levy areas that the --

18   that's at the very edges of the -- of the river channel.

19   Q    Did you do some analysis of this after you saw his

20   report and included them in your notes?

21   A    Yes.

22   Q    Okay.

23   A    Yeah.

24   Q    Let me show you a page and ask you whether this is it.

25   This is from Joint Exhibit 87, which is in evidence.  Let me

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    see if I can -- and this is Page 36 from that exhibit.  I'll

2    just show the page number there and then come back up.  And --

3    and at the very top of the page, your -- you introduce this

4    subject that you've just introduced in your live testimony

5    about Dr. Connolly's assertion that Mendall Marsh sediment

6    mercury's only two times background.  Do you see that?

7    A     Yes, yeah.

8    Q     Okay.  And then you have a table here where you're doing

9    some calculations.  Could you please explain to the court what

10   this shows?

11   A     This shows two types of -- of sampling sites in Mendall

12   Marsh.  One is the platform, which I'm -- which I've just

13   discussed, and you can see in the third column there that --

14   that the Mendall Marsh concentration -- the average Mendall

15   Marsh concentration is 490 nanograms per gram dry weight, and

16   the -- the second type of -- of sediment is -- are the

17   intertidal mudflat sediments within Mendall Marsh itself, and

18   they're at about 1,400.

19         And then in background wetlands, the -- the -- a

20   similar -- a similar concentration would be -- would be 28,

21   and in -- on a platform around 70.  And then if you calculate

22   the factors that are different, in one -- in the one case, in

23   the intertidal site, it's 50, and in -- on the platform,

24   it's -- it's 7.

25   Q     And these are --

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   A      Not -- and -- but Dr. Connolly, with his different way

2   of calculating, came up with the number 2.

3   Q      Okay.  Does this table in Joint Exhibit 87, Page 36,

4   illustrate a comparison that you think is apples to apples --

5   A      Yes.

6   Q      -- rather than apples to oranges?

7   A      Yes, it does.

8   Q      Okay.  In terms of the ecological concern regarding

9   mercury in Mendall Marsh, is the amount of total mercury in

10  the marsh the only relevant factor?

11  A      It's the -- it's the major relative factor.  There are

12  other factors that -- that come into play, but it's the

13  overriding of the important factors, the concentration of

14  total mercury, yes.

15  Q      If you compare the total mercury in Mendall Marsh to

16  total mercury in a reference location, does that account for

17  the rate of methylmercury production in either environment?

18  A      Yes, largely I would say, yes.

19  Q      Okay.  Did you have occasion to look back at the data

20  regarding sediment mercury levels and bird blood mercury in

21  Mendall Marsh and then compare those to reference sites?

22  A      Yes, I did, yes.

23  Q      Let me show you a page in Joint Exhibit 87 -- this is

24  Page 37 of that exhibit, which is in evidence -- and ask you

25  whether this -- just showing the page number there -- whether

1   this -- Table 3 on that page reflects that analysis.

2   A     Yes, it does.

3   Q     And could you please explain to the court what you've

4   laid out here?

5   A     Well, we -- we had collected data for -- for seven

6   different bird species in Mendall Marsh, and the -- and that's

7   listed in the first column, the species.  The second column is

8   a measure of their -- of their blood mercury concentrations.

9   There's a typo there, I think.  It should be dry weight.

10  Anyway, I think that's a typo.

11       Then --

12            THE COURT:  Just so I'm clear about what you're

13  talking about in terms of the typo, you're talking about the

14  third column over where it says blood and you're talking about

15  the --

16  A     The second column over in Mendall Marsh blood.  Maybe it

17  is dry.

18  BY MR. BERNARD:

19  Q     If I -- it's in the middle column that says reference

20  wetland?

21  A     Oh, maybe that's right.  I might be making a mistake.

22  I'm surprised it's dry weight.  But maybe blood is measured

23  in --

24            THE COURT:  Well, you're going to need to clarify

25  what he's talking about there.

1   A     Yeah, I think it is, because it's wet weight in the next

2   column.  So I think there's a typo there.

3   BY MR. BERNARD:

4   Q     So just so the record is clear, Dr. Rudd, you think the

5   typo is in that third column, if species is the first column,

6   Mendall Marsh is --

7   A     Typo is -- I think -- well, I'm not a hundred-percent

8   sure.  You'd have to ask Dr. Kopec.  But my guess is the typo

9   is in the second column, and that DW should be WW.

10  Q     Okay.  So, in other words, one of those -- the -- the --

11  they should either both be dry weight or both be wet weight.

12  A     Yeah, so the ratios would end up being the same.

13  Q     Okay.

14  A     The numbers are correct.

15  Q     Okay.

16  A     The -- there's a typo in one of those two columns.

17  Q     Okay.  We will clarify that with one of the biologists.

18  A     Okay.

19  Q     Dr. Kopec is the likely one we'll clarify that with.

20        But for your purposes, in terms of explaining what

21  you've laid out in the chart, that doesn't matter, right?

22  A     No, no.

23  Q     Okay.  So please go ahead and explain further to the

24  judge what they show.

25  A     Okay.  So the second column, which is labeled Mendall

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    Marsh, is the -- I'll just call it the blood concentration of

2    those birds, and average blood concentration in Mendall Marsh.

3    We then looked at our -- our data for -- for reference

4    wetlands and calculated an average mercury blood concentration

5    for those -- for those birds in the reference wetlands.

6         We then calculated an average marsh soil concentration

7    for mercury in Mendall Marsh, which is labeled Mendall Marsh

8    soil, which was .5 micrograms per gram dry weight, and

9    compared that to -- to reference soil samples that either our

10   study had taken or Dr. Evers had taken in -- in nearby

11   uncontaminated wetlands, which was .07 micrograms per gram dry

12   weight.

13        And then we -- we -- as explained in the -- in the table

14   heading it, Table 3, it -- the result of -- of that

15   calculation is that if you -- if you look at the -- at the

16   factor difference for the -- for the marsh soils, it's about a

17   factor of seven higher in Mendall Marsh, and the bird

18   concentrations are about a factor of ten higher.  So this -- I

19   think this is an example of -- of what we're -- what we're

20   talking about when we say that -- that total mercury is the

21   main driver of methylmercury in bird blood.

22   Q    And -- and is that correspondence or -- or rough

23   correspondence of -- I think it says in Table 3 caption here

24   that it's around seven times higher in the Mendall Marsh soils

25   compared to a reference and the bird concentrations are about

1   nine times higher than in reference areas.

2   A     Yeah.

3   Q     Is that in the world -- in the natural environment, is

4   that a pretty close correspondence?

5   A     Yeah, it's very close.  It's a little bit more than we

6   would expect because we -- we would have -- if -- if

7   everything was -- was perfect, we would expect a seven-fold

8   higher concentration of the bird blood, but it turned out to

9   be nine.  But that's -- you know, that's pretty close.

10  Q     And what, if any, Dr. Rudd, is the significance of the

11  data to you displayed on this chart?

12  A     I guess the -- the significance is if we could -- if we

13  could somehow get the mercury concentration down in the soils

14  of Mendall Marsh, that the -- the bird concentrations would --

15  would drop.  And if we could get them down far enough, they

16  would reach our -- our target of 1.2.

17  Q     Did you have occasion to compare the lobster tail

18  mercury levels in the northern part of the sampling area in

19  the Penobscot to the National Coastal Assessment program?

20  A     I -- can you --

21  Q     Let me show you a page from Joint Exhibit 87.

22  A     I don't know exactly what you're referring to.

23  Q     All right.  Well, I may not have said it that artfully,

24  but this is Page 38 of Joint Exhibit 37 -- 87, rather, just

25  showing the page number there.  And this is a chart in your

1  notes.  Do you -- do you remember this figure?

2  A    Oh, yes.

3  Q    Just take --

4  A    Yes, I do.  I haven't looked at it for quite a while.

5  Q    Okay.  Well, take a look at it now and please tell the

6  judge what it shows.

7  A    This is a concentration of mercury in -- in -- in

8  lobster tail in lobsters taken from Fort Point Cove compared

9  to concentrations of mercury at a background site from the

10 coastal -- background sites from the National Coastal

11 Assessment Program.

12 Q    And you can look in the figure caption, but what does

13 it -- does it show in terms of the relative mercury

14 concentrations?

15 A    Well, it shows that mercury concentrations -- this is in

16 Fort Point Cove, not in -- not in all of Penobscot Bay, but in

17 Fort Point Cove the concentrations are about four times higher

18 than the background level.

19 Q    And did you look at the relationship between lobster

20 mercury and sediment mercury in some of the areas where

21 lobsters were captured in the Penobscot study?

22 A    Yes, I noticed -- I noticed that Dr. Connolly tried to

23 make the point that -- that the food web in the Penobscot

24 was -- was feeding out of the -- out of the -- out of the

25 water column, not out of the sediments where we think the

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    legacy mercury is located.

2         So I -- I took some of our data and replotted it in a

3    way that I -- to -- to try and -- try and examine that.

4    Q     Let me show you a page from Joint Exhibit 87 that may

5    reflect that analysis, and this is Page 39.  And you'll see on

6    the top there's a figure that I think is from the 2012

7    monitoring report of the Study Panel; is that correct?

8    A     That's correct, yes.

9    Q     Okay.  And that plots out by stations on the horizontal

10   axis north to south various mercury concentrations which are

11   marked on the vertical axis for the various sampling years?

12   A     That's right, yes.

13   Q     Okay.

14   A     Various years.

15   Q     So we're going to get into that further with Dr. Kopec,

16   who is the principal author of the 2012 monitoring report,

17   when she testifies.  But let me ask you about your figure at

18   the bottom of the page.  And will you please explain what that

19   shows.

20   A     Well, this is analysis that I -- I did after reading

21   Dr. Connolly's report, and I took the data that are -- that --

22   the same data that are in the top figure up -- up here and --

23   and replotted them with -- with sediment total mercury

24   concentration on the horizontal axis between 0 and 800.  These

25   are just all the same data now plotted so that I could relate

1    the mercury concentration in the -- in the sediments, which is

2    the horizontal axis, to the mercury concentration in -- in the

3    lobster, which is the -- the vertical axis.  And I --

4    Q    And what does it show?

5    A    I was really surprised when this came out.  Well, the

6    other thing I did was I -- I kind of grouped these -- these --

7    these sampling locations into -- into groups.  So, for

8    example, if -- in the -- in the top figure here, the first

9    group was -- was Odom Ledge, South Verona, and Fort Point.

10   These are all -- these are three sample -- the most northerly

11   sampling locations, they're sort of located within Fort Point.

12   And -- and so those data coincide to -- to these data here,

13   the highest average mercury concentration.  I averaged all

14   those together to get sort of a -- like a -- in a little bit

15   wider area.  Because lobsters move around, so I thought, well,

16   these lobsters may be moving all over Fort Point Cove, so

17   let's lump all them together and see what it looks like.

18        So I did that and broke -- and broke the lobsters in --

19   at our Penobscot Bay sampling sites into three locations, and

20   so when I broke them into these three more general locations,

21   calculated a -- sort of a grand average, and plotted them

22   against -- against the sediment, the average sediment mercury

23   concentration, I got this straight line, I got this very

24   strong relationship of .99, which said to me that -- that the

25   lobster mercury concentration is very tightly tied to the

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

239

1    concentration of mercury in the sediments.

2    Q    You discussed this yesterday, but just to review it

3    slightly, that R-squared represents what?

4    A    R-squared represents -- it's a measure of the variance.

5    So an R-squared of 1.0 would be perfect.  So this is getting

6    pretty close to perfect.  That's why I was so surprised.

7    Q    Okay.  Are you aware of Dr. Connolly's argument

8    concerning the Study Panel's use or failure to use carbon

9    normalization when it was comparing sediment mercury in the

10   upper estuary to sediment mercury in reference areas?

11   A    Yes, I am, yes.

12   Q    And did the Study Panel look at sediment mercury in the

13   Penobscot on a dry-weight basis?

14   A    Yes, it did.

15   Q    And did it also look at sediment mercury concentration

16   in the Penobscot normalized to carbon?

17   A    Yes, it did.

18   Q    Okay.  And do those data, when looked at in the two

19   different ways, tell the same story or tell a different story,

20   from your point of view?

21   A    Overall, they tell -- they tell pretty much the same

22   story.

23   Q    Some --

24   A    Yeah.

25   Q    Go ahead.

1    A     I'd say sometimes -- sometimes -- the reason we did it

2    both ways is sometimes it's -- it's correct to -- to look

3    at -- at -- at the mercury data on a dry-weight basis, and

4    sometimes it's more informative to look at it on a carbon

5    basis.  So we tried to do it both ways.

6    Q     Okay.  I just want to show you, again from Joint

7    Exhibit 87, these two figures, which are reprinted from the

8    Phase I Report.

9              MR. BERNARD:  Your Honor, these charts were admitted

10   into evidence yesterday as part of Plaintiffs' Exhibit 116.

11   BY MR. BERNARD:

12   Q     And -- and what is the story -- and so here you have

13   just the first -- you have the -- all six sampling periods,

14   right?  So this is the -- these are updates from the figures

15   we looked at yesterday that were part of Plaintiffs'

16   Exhibit 116.  And just please explain what -- what these show.

17   A     Well, these show the mercury data -- average mercury

18   concentrations at the sampling sites within each of the

19   reaches of the river, which is on the X axis or the horizontal

20   axis, starting in the most northerly site, in the EB reach out

21   into the estuary.  And these are the mercury concentration

22   data plotted in two different ways:  The first -- the first

23   way is plotted per gram dry weight of sediment, and that's the

24   top panel; and the bottom panel, these same data have been

25   taken and normalized to the organic carbon content of the

1    sediment.  So the mercury is plotted sort of relative to

2    the -- to the organic carbon content of a sediment.

3         The mercury concentration is divided by the carbon

4    concentration to -- to get the data that is plotted on the

5    bottom panel.  It's -- yeah.  Do you want me to explain those

6    now or --

7    Q    No, no, I think that's okay.  So on the -- on the top,

8    you have the dry weight, and on the bottom, you have the same

9    sampling stations, same sampling periods, and then on the

10   bottom, you have the carbon-normalized values, right?

11   A    That's correct, yes.

12   Q    So what I just want to ask is -- is as an ecosystem

13   scientist and given the charge that the court gave you, when

14   you look at it one way, the top dry weight, the bottom

15   carbon-normalized, does it make a difference to you?

16   A    The numbers are different, but the conclusion is pretty

17   much the same.  There's some details -- there's some more

18   information you can get out of it by comparing these two

19   plots, and you can -- it helps you understand better.  But

20   the -- the bottom-line message is the same, I think.

21   Q    What is the bottom-line message?

22   A    That the sampling sites below Veazie Dam and in the

23   upper estuary have very much higher mercury concentrations

24   than above Veazie Dam, and then as you go out into the -- into

25   the -- into the lower part of the estuary, these -- these

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   concentrations dissipate.

2   Q    I want to show you just one -- just one last thing on

3   this issue, and this is, again, from Joint Exhibit 87.  This

4   is Page 35.  And just this very last bulleted point, I want to

5   ask you what you mean by that.  You write, with respect to

6   carbon normalization factor being smaller, which is what you

7   just described, it just means that a little bit of mercury

8   goes a long way.  Do you remember writing that?

9   A    Yes, I do.  It -- that's -- it's not particularly clear,

10  I don't think, but --

11  Q    Well, that's why I'm asking.  Could you -- could you

12  explain what you mean by that, please?

13  A    Well, it really -- it -- it really -- really what I was

14  saying is that -- trying to say -- and these were just notes

15  to myself -- what I was trying to say there is that it doesn't

16  matter what way you look at it.  If it was ten times bigger or

17  six or seven times bigger, they're very much bigger.  If we

18  had -- if we had only looked at it in terms of -- of

19  nanograms -- of normalized carbon and hadn't calculated the

20  other way, we would have said, wow, it's seven times higher

21  below Veazie Dam, that's a lot.  But we did it both ways, and

22  it turned out to be ten times higher if you calculated it

23  another way.

24       So I was trying to just -- just remind myself that

25  there's not very much mercury in there, really, and it's

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    caused this -- this big problem.

2    Q    Let's turn briefly to recovery half-times.  When

3    Dr. Santschi conducted his analysis of recovery half-times

4    through the sediment core data, did he separate periods of

5    recovery into two 21-year periods?

6    A    Could --

7    Q    I'm sorry.  Okay.

8    A    Could you repeat that, please?  My mind wandered.

9    Q    Yeah.  It wasn't a -- it -- yes, I will repeat it.  When

10   Dr. Santschi evaluated the sediment core data --

11   A    Hm-hmm.

12   Q    -- did he evaluate recovery from a certain date going

13   forward?

14   A    Yes, he did.

15   Q    Okay.  And do you remember the date he used?

16   A    I think he -- he calculated over the last 21 years or

17   so.

18   Q    Okay.  And do you remember his rationale for that?

19   A    Well, I -- I think his rationale was that -- that -- and

20   this has to do with lateral transport of -- of mercury in the

21   system after it's added -- that when he started to look at the

22   data, overall the mercury concentration decreases kind of

23   exponentially, but when he looked more closely at all of the

24   cores and -- and studied them carefully, it appeared to him

25   that -- that the mercury concentration actually dropped a

1   little more quickly in the first couple of decades after the

2   mercury was added to the main stem of the river.

3        And -- and he thinks this was an initial period when the

4   mercury, which -- which first went into the main stem of the

5   river, was at very high concentrations, and it more quickly

6   spread to places like -- like the Orland River and -- and

7   Mendall Marsh.  So there was -- initially there was a little

8   bit faster drop than there was in the last 21 years after

9   there'd been the -- the first distribution of mercury in the

10  system.  And then it -- then the recovery, the long-term

11  recovery really started, which is now going on at the rate he

12  thinks it is, but it's at a little slower rate in the main

13  stem of the river than it was initially.

14  Q    And did Dr. Connolly conduct his own analysis of the

15  sediment cores to find his own recovery half-times?

16  A    Yes, he did.

17  Q    And did he use that 21-year period that Dr. Santschi

18  used?

19  A    No, he didn't.

20  Q    And do you have a view about -- about that?

21  A    Um, well, I think -- I think Dr. Connolly made -- made a

22  couple of mistakes, one that I noticed anyways.  He didn't --

23  he didn't include about half of the cores that Dr. Santschi

24  used, which -- which surprised me, since I -- you know, I

25  trust Dr. Santschi's judgment.  So they were left out, and --

1    and -- and he also used a shorter half-time with those cores

2    that he did use, and when he averaged the -- the half-time of

3    those cores, the -- the average came out with a smaller

4    average half-time than Dr. Santschi's.

5         So I -- you know, I -- I think that it -- it was a

6    mistake to exclude half of the cores, and he -- he justified

7    that then by saying that -- that the mercury inputs from the

8    HoltraChem site had -- had decreased about ten years ago,

9    which is true.  That's when the water treatment line -- or

10   plant came online, and there was -- there's been a number of

11   mercury input from HoltraChem has stepped down in a number of

12   statute steps.  It was really, really high in '67, and then it

13   went down -- like about a 90 percent reduction right away, and

14   then there's been gradual cleanups along the way.  And the

15   final cleanup has been -- started in 2000.

16        But by that time, from our mass balance calculations

17   that we discussed yesterday, by that time, HoltraChem was

18   already a very small source of mercury to the -- to the

19   estuary.  So when that last little cleanup happened ten years

20   ago, it wouldn't have made a detectable difference to the

21   recovery rate in the system.  There's so much mercury already

22   in the system and that small change of -- in output wouldn't

23   have -- have affected the recovery rate in my estimation.

24        So he used this argument to -- to justify his -- his

25   faster recovery time, but he didn't put the -- his argument in

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    perspective with the mass balance budget, with the other data

2    that we had collected, which showed that that justification

3    really didn't -- didn't make sense to me.

4    Q    We'll be pursuing that in greater detail with both

5    Dr. Santschi and Dr. Connolly.

6         Let me ask you one other question, though, on predicted

7    rate of recovery.  Are you familiar with Dr. Connolly's

8    prediction of a rate of recovery of the ecosystem based on the

9    biota data and the trends in the biota data that the Study

10   Panel collected?

11   A    Yes, I am, yes.

12   Q    And do you have a view concerning the validity of his

13   method?

14   A    Ah, I -- I think his method is just wrong.

15   Q    Why?

16   A    Because I don't -- he -- I don't think you can use biota

17   data, and I -- I'm not a biologist.  I'm a microbiologist, but

18   I'm not a large animal biologist.  But everything I've heard

19   in my 35 years of working with biologists is that you can't

20   use short-term changes in any particular species to predict

21   long-term changes in an ecosystem.  There's just too much

22   year-to -year variance in the -- in the -- in the biota data.

23   Nobody -- nobody does that.

24   Q    Over the course of your career, have you worked with a

25   lot of biologists who work on mercury?

1   A      Yes, yes.

2   Q      And do you know a single scientist working on mercury in

3   biota who would say that that is a valid method?

4   A      No, I do not.

5            THE COURT:  Just so I'm clear about this.  I know

6   you know what you're talking about, but I -- I'm gleaning this

7   from what you've implied.  I didn't get what Connolly's

8   opinion was.  I gather that what he did is he looked at

9   changes in the mercury levels of animals and then predicted

10  the rate of recovery from that?

11           MR. BERNARD:  Yes, and I'm sorry if I didn't make

12  that clear.  But what he did was he took the study data, which

13  at its -- at its ends goes from 2006 to 2012, although for all

14  species there wasn't sampling during that whole period of

15  time.

16           THE COURT:  I'll give you a chance to talk in just a

17  minute.  I'm just trying to clarify this.

18           MR. BERNARD:  I understand.

19           THE COURT:  No, he's -- Mr. Talbert's waving at me

20  saying he he's objecting.

21           MR. BERNARD:  Yeah.

22           THE COURT:  I'll listen to him in a moment.  I just

23  want to hear you first.

24           MR. BERNARD:  Sure.  There'll be plenty of more

25  testimony about this.  But I think I'm fairly characterizing

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    what Dr. Connolly did.  He -- he took the trends in the biota

2    during that period of time, and he used those to predict --

3             THE COURT:  Rate of recovery.

4             MR. BERNARD:  -- how long it would take to get those

5    biota down to levels that are safe.  And you will hear

6    testimony that -- including from Dr. Fisher later this week --

7    that you can't do that.  It's -- it's too short a period of

8    time to make -- to give that any scientific validity.  You

9    can't predict, as Dr. Rudd just articulated, a longer-term

10   ecosystem trend from such a short period of biological

11   sampling.

12            THE COURT:  Okay.  Mr. Talbert, you had something?

13            MR. TALBERT:  Yes, Your Honor.  Just to -- just to

14   clarify this.  What -- what he's going through in the

15   questioning is contrasting Dr. Santschi, who did some recovery

16   time estimates, and he referenced the 21-year time period.  So

17   Dr. Santschi took in an arbitrary 21-year period and -- and

18   applied it to all the cores when he did his recovery times.

19   Dr. Connolly went through and looked at each and every core,

20   and he provided his rationale in the expert report.  He had

21   several rationales, one of which was time periods of ongoing

22   discharge.  One was sedimentation rates, which you'll hear

23   more in detail from Dr. Connolly.  And then he calculated his

24   own half-time from that, looking at the Mendall Marsh cores.

25            He did justify which cores he was not looking at.  I -- I

1  do not believe it was as many as Dr. Rudd says.  But in the

2  biota check, Dr. Connolly explains that he looks at that as a

3  check to see which direction they're going, not as a wholly

4  independent basis for saying that there is recovery of a

5  specific year.

6          THE COURT:  Okay, fine.  Thank you.

7  BY MR. BERNARD:

8  Q    Just to close this off, Dr. Rudd.  In your view are the

9  sediment core data the definitive data in terms of rates of

10 ecosystem recovery?

11 A    Yes, they are.

12 Q    And in some cores, I think you mentioned yesterday, the

13 highest mercury is now near the surface, rather than down in

14 the core?

15 A    Yes.

16 Q    Okay.  And does that indicate that in some areas of the

17 system, mercury may just be arriving now?

18 A    Yes, yes, we -- my memory is we saw that at two

19 locations.  One is in the -- at the uppermost site of the --

20 of the Orland River and also further south into Penobscot Bay.

21 We saw just a few cores where there was no -- no what we call

22 deep peak, which is in so many of the other cores, but mercury

23 was -- the mercury concentration was gradually increasing to

24 the surface to the sediment water interface, and -- and that

25 we interpret as -- as telling us that the mercury is just

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    arriving at -- now arriving at those locations.

2    Q    Okay.  I want to turn your attention briefly to erosion

3    from mudflats.  You mentioned yesterday that you think that

4    erosion from mudflats may be an ongoing source of mercury to

5    the system?

6    A    Yes.

7    Q    And let me just show you, just if this helps, this is

8    Plaintiffs' Exhibit 46, which was admitted into evidence

9    yesterday, and it's one of the maps that shows Mendall Marsh.

10   Is this helpful so that you can indicate to the court where

11   these mudflats are that you're talking about?

12   A    Yes, it is.

13   Q    Where -- can you -- can you point them out, and is this

14   a reasonable map for you to do that?

15   A    Um --

16   Q    I know it's just the lower part of the system.

17   A    Yeah, I -- I don't know -- I'm having trouble

18   remembering what the different colors mean, but maybe that's

19   not your question.

20   Q    All right.  Well, I'm color-blind, so you're doing

21   better than I am, because I never knew.

22   A    I think I can answer the question without that.  I

23   just --

24   Q    Okay.  Go ahead.  The map was just to see if it would be

25   a visual aid.  If it doesn't help, just answer the question.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

251

1   A       Yeah, there -- if we take this area as -- as an

2   example -- well, I just covered it up -- the -- maybe I can

3   undo that -- this -- this is a mudflat known as -- as

4   Frankfort Flats, and these are areas -- these are areas of

5   sediments which is accreted on the side of the river.  The

6   river would flow out -- flow out this way and sediments would

7   tend to deposit at this -- at this site and that occurs in

8   various places throughout the river.  There's another one

9   here.  Along the Orland River there's a lot of them -- the

10  dark green areas, I think -- and also on the -- on the east

11  side of -- of Verona Island, there's a -- there's a big

12  mudflat area there.

13          And what we've been concerned about all along is running

14  across those -- those mudflats are -- are -- are streams,

15  tidal streams, and also streams that -- in some cases that --

16  this is a cove here and there's probably be a stream coming in

17  here, and this little cove has collected sediment, but there'd

18  be a freshwater stream running across those mudflats.  And

19  when streams or rivers get into muddy areas, they meander, and

20  they -- they cause erosion -- ongoing erosion that lasts --

21  well, that lasts forever, I guess, as the streams meander.

22          And we're concerned that some of the deep mercury which

23  is buried there now will be eroded by this meandering and

24  dumped back out into the main -- into the main stem of the

25  river and -- and rejoin some -- might rejoin the mobile pool,

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    and this would retard the rate of -- of recovery.  And we --
2    we think this might be one of the reasons why we couldn't --
3    Reed Harris couldn't get his model to work.  And if we knew
4    there was -- if we knew that this was happening at a certain
5    rate and Reed -- and Reed Harris' model, for example, was able
6    to work, then we'd know that we really understand the
7    ecosystem and -- and it would make us more confident about the
8    type of remediation that we could recommend.
9    Q    And -- and is this -- is this something that could be
10   explored as part of, you know, a further remediation phase?
11   A    Yes, this is something -- I mean, if -- if I was in
12   charge, this is -- or -- I would recommend Dr. Yeager doing
13   this.  He's familiar with the system, and I've talked to him
14   about this and about whether he thought this was possible.
15   And he's given me some ideas of, you know, if he was asked,
16   how he would go about doing this.
17   Q    Did you review Dr. Connolly's opinion concerning the
18   possibility that there is this erosion from mudflats?
19   A    Yes, I did.  He seemed to concentrate on a different
20   type of erosion, and this is erosion of the front of the
21   wetlands, sort of in this direction here that wave action
22   would -- in the -- in the -- in the system itself would -- in
23   the water itself would gradually be eroding the fronts of the
24   wetlands, and he -- he thought there wasn't a lot of evidence
25   of that -- of that happening.

1    And, actually, I agree with him on that.  There isn't a

2  lot of evidence of that happening.  But that's not the type of

3  erosion that's concerning me.  The type of erosion I'm

4  concerning is the -- is the erosion from the streams that

5  are -- tidal streams and freshwater streams that are crossing

6  the mudflats and cutting into them.

7  Q    Did you see any evidence in the field, Dr. Rudd, of the

8  kind of erosion you're referring to?

9  A    Yes, yes, there's -- this is going on in Southerly Cove

10  and -- and pretty much any -- any cove I've seen.  I -- I've

11  been up in the Orland River and -- and climbed into some of

12  these, and it -- you know, some of them have been deeper

13  than -- than I am tall.  So they're common.  I think you could

14  see them on Google Earth.

15  Q    Did you review a critique by one or two of defendants'

16  experts that the -- to the effect that the Study Panel did not

17  conduct a formal ecological or human health risk assessment as

18  part of the study?

19  A    Is this -- are you referring to like the EPA risk

20  assessment approach?

21  Q    Yes, a formal risk assessment, yes.

22  A    Yeah.  No, we -- we didn't do that.  We -- we took more

23  the approach that a science team would take.  We -- we

24  followed -- tried to follow Judge Carter's orders, and we --

25  and we developed a plan based on our -- our -- our scientific

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   experience and understanding, and -- and we let the data kind

2   of lead us.  You know, we went out and took our data, came

3   back and analyzed it, and made another plan and went out

4   again.  So we were -- it was a data-driven process rather than

5   a -- a plan that we were a -- sort of a -- a cookbook plan

6   that we were -- we followed.  We followed -- more followed the

7   data as we gathered it and our understanding grew.

8        However, lately, we have gone back and looked at the EPA

9   risk assessment process and found that pretty much everything

10  they recommend be done, we have done.  It's just that we

11  didn't -- we didn't call it that, but we've -- we've pretty

12  much done the EPA risk assessment process just by -- just by

13  doing our normal science.  Probably not surprising because

14  this -- you know, these -- the risk assessment was probably

15  recommended by scientists.

16  Q    Did Judge Carter order the Study Panel to conduct an

17  ecological risk assessment pursuant to any EPA guidance or

18  regulation?

19  A    No, it did not.

20  Q    And the same question for a human health risk

21  assessment?

22  A    Yes, yes.

23  Q    Same answer?

24  A    Yes.

25  Q    Did Special Master Calkins direct the Study Panel to

1    conduct either an ecological or human health risk assessment

2    based on EPA guidance?

3    A    No.

4    Q    In terms of the human health impact of mercury, did the

5    Study Panel use the existing State of Maine government limit?

6    A    Yes, it did.

7    Q    Okay.  And do you think that's -- do you endorse that

8    approach?  Were you part of the --

9    A    Yes.

10   Q    -- decision-making that led to that approach?

11   A    Yes, yes.

12   Q    And -- and why did you do that?  Why did you use the

13   existing State of Maine standard for human health?

14   A    That's just what I -- I mean, that's just what I've

15   always done.  I mean, I've worked on mercury for 35 years, and

16   every project that I've been involved in, it's been because

17   there's been some type of mercury contamination, and always

18   the reason for that was that the limit for -- for the -- for

19   the fish was beyond either a provincial or a state or

20   government -- federal government limit, and that -- that's --

21   that's all the evidence we needed that there was a problem and

22   we -- we tried to fix it.

23   Q    All right.

24            THE COURT:  I thought the question there was --

25   there were two different standards, correct?

1        MR. BERNARD:  Two different standards?

2        THE COURT:  Standards.  There's a Maine standard,

3   which was tighter than a national standard?

4        MR. BERNARD:  It is.  So we can --

5        THE COURT:  And I thought your question was why he

6   used the Maine as opposed to national.

7        MR. BERNARD:  Well, there were actually two

8   questions, which I should have made clear.

9   BY MR. BERNARD:

10  Q     And so one question is, why did you use a government

11  standard?  And I think you answered that.  But the judge is

12  suggesting an additional question, which is helpful, which is,

13  there's a U.S. national standard, which is 300 nanograms per

14  gram, or .3 parts per million.

15  A     Yes.

16  Q     Is that right?

17  A     That's correct.

18  Q     And the State of Maine has a tighter standard at .2, or

19  200 nanograms per gram.

20  A     Correct.

21  Q     Is that right?

22  A     Right.

23  Q     And which one did you use?

24  A     We used .2 because we were -- you know, the Penobscot is

25  located in the State of Maine, and my understanding, Dr. --

1    Dr. Whipple can say more about this, I think -- but my

2    understanding is that the -- the reference dose that is -- is

3    calculated is based on how much fish the public eats, and the

4    state of -- the toxicologist -- the state toxicologist in

5    Maine recognized that -- that people in Maine are likely to be

6    eating more -- more fish than people in the -- in the center

7    of the country.

8        So -- so when he calculated -- he started with the .3

9    EPA dose, and then -- and then tightened it somewhat because

10   he recognized that people here in Maine are likely to be

11   eating more fish.

12   Q    Do you know whether EPA encourages states to derive

13   their own state-specific standards?

14   A    I don't know that.

15   Q    Okay.

16           MR. BERNARD:  We'll go into that with Dr. Whipple,

17   Your Honor.  He's an expert in that.

18           THE COURT:  Thank you.

19   BY MR. BERNARD:

20   Q    Are you familiar with the fishery closure that has

21   recently been imposed by the State Department of Marine

22   Resources?

23   A    Yes.

24   Q    And are -- do you know on what data -- what data formed

25   the basis for the closure?

1  A     I think the data are data that we -- that we gathered in

2  our study.

3  Q     Okay.  Let me just show you -- this is Plaintiffs'

4  Exhibit 85.

5           MR. BERNARD:  And, Your Honor, I -- this is from the

6  State of Maine Department of Marine Resources Web site, and

7  it's a map of the portion of the Penobscot that was recently

8  closed to shellfish harvesting.  I'd like to move it into

9  evidence, along with Plaintiffs' Exhibits 83 and 84, which are

10  the -- the text of the rule makings, official documents of the

11  State of Maine DMR, that announced the terms of and the

12  reasons for the fishery closure.

13           THE COURT:  Any objection?

14           MR. TALBERT:  No objection, Your Honor.

15           THE COURT:  Each is admitted.

16  BY MR. BERNARD:

17  Q     Okay.

18           MR. BERNARD:  We're going to go into the text a

19  little bit more with other witnesses, Your Honor.

20  BY MR. BERNARD:

21  Q     But I just want, Dr. Rudd, if you look at this striated

22  area of the map, which is the closure area, do you see that?

23  A     Yes, I do.

24  Q     And how does that correspond to the northernmost

25  sampling stations from the Penobscot River mercury study where

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    lobsters were captured and analyzed?

2    A     There was three, I think, of our sampling sites north of

3    the red line that -- that joins Fort Point with Wilson Point.

4    Q     Okay.  Do you have a view about whether the fishery

5    closure is sensible?

6    A     Um, it was -- yeah, our data for that northern area

7    of -- of the -- of Penobscot Bay are above -- on average are

8    above the -- the -- the state guideline.  So, yes, I would

9    agree with their -- with their conclusion.

10   Q     Finally, Dr. Rudd, I just have a set of closing

11   questions for you.  Is it -- does it -- having read the expert

12   reports and done your initial notetaking, which is reflected

13   in Joint Exhibit 87, is it still your view that sediment

14   mercury concentrations in the upper estuary are ten times or

15   more higher than they are in relevant reference areas?

16   A     Yes, yes.

17   Q     And --

18   A     Roughly.

19   Q     -- is it still your view that the legacy mercury is the

20   primary cause of those elevated sediment levels?

21   A     Yes.

22   Q     And is it still your view that the HoltraChem plant,

23   which was owned and operated by Mallinckrodt in the 1960s and

24   '70s, was a primary source of that legacy mercury to the

25   system?

1   A     Yes, I think the data we collected supported the outcome

2   of the first trial.

3   Q     And is it your view that that legacy mercury is

4   primarily responsible for the current level of mercury in

5   biota in the upper estuary?

6   A     Yes.

7   Q     And is it your view that the natural attenuation

8   process, as you have analyzed it, is too slow?

9   A     Yes, in my -- in my opinion, yes.

10  Q     And is it still your view that, in the upper estuary, it

11  will take until the year 2176 for the system to recover to

12  within 20 percent of the background concentrations that you

13  have derived?

14  A     Yes, those are our estimates, yes.

15  Q     And is it your view that there is a tight relationship

16  by habitat between total mercury and methylmercury within the

17  upper estuary?

18  A     Yes.

19  Q     And is it your view that the new muds or sediments in

20  the mobile pool are a primary factor controlling recovery of

21  the system?

22  A     Yes.

23  Q     And is it your view that the recovery of the system will

24  take upper estuary sediment concentrations of total mercury to

25  approximately 100 nanograms per gram?

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1    A    Yes.

2    Q    And in Mendall Marsh, is it still your view that there's

3    a linear relationship between total mercury and methylmercury?

4    A    Yes.

5    Q    And is it your view that Mendall Marsh will not reach

6    the Study Panel's target concentration until the year 2073,

7    absent active remediation?

8    A    Yes.

9    Q    Does the Penobscot River mercury -- you said yesterday

10   that in your initial conversation with Judge Carter, he asked

11   you to do sound science.

12   A    Yes.

13   Q    Does the study the Study Panel conducted reflect the

14   sound science that the court ordered you to conduct in your

15   view?

16   A    Yes, to the best of our ability, yes.

17   Q    Let me show you one more page from Joint Exhibit 87 in

18   evidence, which is Page 47 of that document, showing the page

19   number, and this is entitled active remediation necessary and

20   is scientifically feasible.

21       Before I ask you to look at that, you mentioned before,

22   but I want it to be clear on the record, this document is a

23   set of notes to yourself; is that correct?

24   A    Yeah, this -- I was trying to get my -- my mind in order

25   before one of the depositions.

RUDD - CONTINUED DIRECT EXAMINATION/BERNARD

1   Q      Okay.  But it's not meant to be a formal document that's

2   been proofread and cite-checked and --

3   A      Oh, no, there's lots of typos here.

4   Q      All right.  So I just want you to -- there's some text

5   below, but I'm just going to ask you about the bottom line

6   because we're nearly done now.  And I want you to read that

7   into the record, and then I'm going to ask you one last

8   question.  Could you read the bottom line, please, at the top

9   of Page 47 in Joint Exhibit 87?

10  A      The -- the bottom line?

11  Q      It says at the very top of the page --

12  A      Oh, I thought you meant the bottom line of the page,

13  okay, yeah.  The data are clear that remediation is necessary

14  for songbirds, black duck, fish, shellfish, and sediments.

15  All of these media either exceed guidelines or are at toxic

16  levels according to experts in this field of bird research.

17  We support an open and -- I guess this is what I was trying to

18  rehearse myself to say.  We support an open and impartial

19  analysis of our conceptual remediation options by qualified

20  engineers and -- and mercury scientists.  The key is to reduce

21  the mercury concentrations of the mobile pool.  All options

22  for accomplishing this should be explored by a panel composed

23  of science and engineering experts.

24  Q      Okay.  So does that first sentence accurately reflect

25  your view, as you sit here today, the data are clear that

1   remediation is necessary for songbirds, black ducks, fish,

2   shellfish, and sediments?

3   A     Yes.

4   Q     Okay.  And is that the consensus recommendation of the

5   court-appointed Study Panel?

6   A     Yes, it is.

7               MR. BERNARD:  No further questions, Your Honor.

8               THE COURT:  Thank you.

9         Cross-examination?

10              MR. BERNARD:  Your Honor, excuse me one sec.

11   There's just a couple of small housekeeping things on

12   documents.

13              THE COURT:  Sure.

14              MR. BERNARD:  Can we deal with that?

15              THE COURT:  Sure.

16              MR. BERNARD:  Yesterday we moved the admission of

17   Joint Exhibit 87.

18              THE COURT:  Right.

19              MR. BERNARD:  Which we've been referring to again

20   today.  There was no objection, but I don't think the record

21   reflects that you actually accepted it into evidence.

22              THE COURT:  Oh.

23              MR. BERNARD:  We just checked the transcript last

24   night and --

25              THE COURT:  Okay.  Is there any objection?

1          MR. TALBERT:  No objection.

2          THE COURT:  87's admitted.

3          MR. BERNARD:  The second is I'd like -- there are a

4   number of plaintiffs' exhibits, as I mentioned yesterday, that

5   are excerpts of these long reports, just because we thought it

6   might be easier for the court to have them in a discrete

7   exhibit, rather than finding them in a longer document.  So

8   I'd like to move the admission of all of those because all of

9   those are now part -- excerpts from documents that themselves

10  have been admitted.

11         THE COURT:  Okay.

12         MR. BERNARD:  And those would be Plaintiffs'

13  Exhibits 28 through 64 and 119.

14         THE COURT:  Any objection to 28 through 64 and 119

15  of plaintiffs'?

16         MR. TALBERT:  No objection, Your Honor.

17         THE COURT:  Each is admitted.

18         MR. BERNARD:  And in addition, there are some

19  excerpts from the Driscoll and Grandjean, which are the

20  plaintiffs' experts reports, that yesterday were admitted into

21  evidence, and those are Plaintiffs' Exhibits 124 through 146.

22  And I would move their admission on the same ground.

23         THE COURT:  Any objection?

24         MR. TALBERT:  No objection.

25         THE COURT:  Each is admitted.

1           MR. BERNARD:  And, finally, Your Honor, I just

2    wanted to make clear on this timeline, which is Plaintiffs'

3    Exhibit 90, this demonstrative, you remember I misspoke

4    yesterday on the black duck report at the bottom.

5           THE COURT:  Right.

6           MR. BERNARD:  I just want it to be clear for the

7    record that I did misspeak because the report was docketed in

8    April, which is what is reflected here.  The date on the

9    report itself is March.

10          THE COURT:  Right.

11          MR. BERNARD:  2014.  Similarly, the Phase I Update

12   Report, which you'll see farther up in the exhibit, was

13   docketed in July, which is the date that we -- we have here,

14   July 27th, 2009, but the date on the document itself is

15   May 2009.  I'm just pointing that out.

16          THE COURT:  Okay.  Thank you very much, Mr. Bernard.

17          MR. BERNARD:  Thank you.

18          THE COURT:  Appreciate it.

19      Mr. Talbert?

20                    CROSS-EXAMINATION

21   BY MR. TALBERT:

22   Q    Good morning, Dr. Rudd.

23   A    Good morning.

24   Q    Dr. Rudd, I believe yesterday you testified that you do

25   have some experience working on sediment remediation sites; is

1    that correct?

2    A    Some, yes.

3    Q    In fact, three of the sites you referenced yesterday

4    were Lavaca Bay, the CALFED project, and the English-Wabigoon,

5    correct?

6    A    That's correct, yes.

7    Q    Okay.  The Study Panel makes a distinction between --

8    scientific feasibility and engineering feasibility are

9    distinctions that are made in the -- in the Phase II Report,

10   correct?

11   A    That's correct, yes.

12   Q    Your expertise is in the scientific feasibility; is that

13   correct?

14   A    That's correct, yes.

15   Q    In your opinion, I believe you testified to this

16   yesterday, but just to paint the context, is that the science

17   needs to be done first prior to the engineering, correct?

18   A    That's correct, yes.

19   Q    And that's because if the engineers go out and start

20   trying to work before it's been determined that a certain

21   measure is scientifically feasible, there could be big

22   problems, correct?

23   A    That's correct, yes.

24   Q    The Study Panel, as a part of Phase II, examined several

25   remedial options and made determinations regarding the

1   feasibility from a scientific perspective, correct?

2   A    Yes.

3   Q    And in the last nine years, you have learned things from

4   a scientific feasibility perspective that should inform the

5   engineering, correct?

6   A    That's correct, yes.

7   Q    In fact, you began thinking about remedial options at

8   least as early as 2007, correct?

9   A    That's -- that's correct, yes.

10  Q    Okay.  I just want to pull up Defense Exhibit 589, just

11  to ground our discussion.  And I want to refer your attention

12  to the first e-mail, this is a two-page e-mail document, and

13  there's an e-mail from you to Monica Bigley, Drew Bodaly, Nick

14  Fisher, and Chris Whipple, and you say, these are working a

15  hypothesis and thoughts, correct?

16  A    Yes, that's correct.

17  Q    Okay.  And in the first paragraph, I believe you say --

18  you reference possible remedial measures.  Do you see that?

19          THE COURT:  If we're going to refer to this, we

20  probably ought to have it in evidence.

21          MR. TALBERT:  I'd move for its admission into

22  evidence right now.

23          THE COURT:  Any objection?

24          MR. BERNARD:  No, Your Honor.  I would ask that the

25  witness be given a chance to look at the document before he

1   answers questions about it.

2          MR. TALBERT:  We'll read it together.

3          THE COURT:  Okay.

4          MR. TALBERT:  Okay.

5          THE COURT:  Can you see that well enough to read,

6   sir?

7          MR. TALBERT:  Jenna, if you could pop up the first

8   -- the bottom e-mail?

9   A     Are we supposed to be -- oh, okay.  I was reading the

10  wrong one.

11  BY MR. TALBERT:

12  Q     Okay.

13  A     Okay.

14  Q     Let's focus on the first one.  It's a progressive

15  e-mail, but the first e-mail's on the very bottom.

16  A     Okay, okay.

17  Q     Do you see that now?

18  A     Yes, I do, yeah.

19  Q     Okay.  And I'm referring to this first paragraph.  After

20  thinking about our first year of data collection, here is my

21  present working hypothesis and understanding of point source

22  mercury contamination of the Penobscot River Estuary by

23  HoltraChem and possible remedial measures.  Do you see that?

24  A     I do, yes.

25  Q     Okay.  And you go through several points.  I believe

1   point one is here on the first page, and Jenna, if you'll back

2   this out and go to the second page, you have two more points,

3   and let's expand Paragraph 2 and 3 first.  The second

4   paragraph is, as a result of this contamination,

5   concentrations of mercury in some aquatic food chain species

6   are elevated, but are not high enough to cause direct toxicity

7   to food chain biota or to top predators, including humans.  Do

8   you see that?

9   A     Is it --

10  Q     Does --

11  A     And I'm trying to get myself in context here.  Is this a

12  hypothesis that I'm stating or -- or am I talking about data?

13  Q     Well, I have a question for you.  Does this reflect your

14  thinking as of this time period?  This is 2007 when this

15  e-mail was sent around to --

16  A     Just in the way I write things, it sounds like a

17  hypothesis to me.  But, I mean, I can't remember this well at

18  all.

19          MR. BERNARD:  Your Honor, in light of that, I just

20  think if he's going to show him the e-mail, that's fine.  It's

21  not that long, I just think the witness should have an

22  opportunity to read the whole thing.

23          THE COURT:  Right.  Fair enough.

24          MR. TALBERT:  Okay, we can back out of this.  It's

25  only a two-page e-mail.  We'll back out and let you look at

1   the entire e-mail.

2   BY MR. TALBERT:

3   Q    Let's start -- this is -- so the first -- first page --

4   and you'll see it's two e-mails.  The first is from you to the

5   individuals we mentioned earlier, and the date is May 17th,

6   2007.  Do you see that?

7   A    Oh, okay.  But if you read the very first paragraph of

8   my -- started this off, I guess --

9   Q    Yeah.  It's a working hypothesis is what you state?

10  A    Yeah, it says, after thinking about our first year of

11  data collection, here is my present working hypothesis and

12  understanding of point source mercury contamination.  Yes, so

13  these are hypotheses that I am stating.  Yeah, that's what I

14  was wondering.

15  Q    Okay.  And you lay out three different hypotheses.

16  Let's go to Page 2.

17  A    Okay, okay.

18  Q    And -- and we just read the second hypothesis, and let's

19  back out and take a look at the one with respect to mitigation

20  in 4.  And, again, does this just lay out, you know, working

21  hypothesis as of this time period in 2007?

22  A    Yes.  What date was this again?

23  Q    This is 2007, May.

24  A    Okay.  So this was early.  Yeah, these were all ideas

25  that we were discussing in the group at that time.

1    Q     And the main question is, you began thinking about these

2    in -- at least as early as 2007 you were starting to think

3    about possible remedial alternatives, correct?

4    A     Right, because that was the whole purpose of why we were

5    there.  I mean, we were trying to -- that's what Judge -- that

6    was the end of our -- of the charge that Judge Carter gave us.

7    We were trying always to direct the research we did ultimately

8    towards remediation.  So we thought about it from day one.

9    Q     Okay.  I think we're finished with this document.

10                MR. TALBERT:  I would move for its admission.

11                THE COURT:  It's already in.

12                MR. TALBERT:  Okay.

13   BY MR. TALBERT:

14   Q     In 2009, you held a specific remediation workshop in --

15   in Bangor, Maine; is that correct?

16   A     That's correct, yes.

17   Q     And do you recall who you invited to that meeting?

18   A     I don't recall all of them -- Dr. Wenning, Dr. Luthy,

19   Dr. Upal Ghosh, Dr. Todd Bridges, the Study Panel was there,

20   as well, Dr. Kelly -- I think -- I'm not sure whether she was

21   at that meeting or not, but -- yeah, and I'm sure there was

22   other people that were there that -- I can't -- I don't have a

23   whole list in my head right now.

24   Q     And who is Todd Bridges?

25   A     He's a -- he's a -- a member of the U.S. Army Corps of

1    Engineers.

2    Q     And why was Todd Bridges invited to the remediation

3    workshop?

4    A     My understanding, as the Study Panel discussed, this is

5    my understanding, is that one -- one of Dr. Whipple's

6    colleagues, when we were going over the -- the list of people

7    to invite, suggested Dr. Bridges.

8    Q     And were you aware of his reputation prior to this

9    meeting?

10   A     No.

11   Q     Okay.  Did you, as a part of this meeting and process

12   working on the Phase II Report, come to know Todd Bridges?

13   A     The only time I met him personally was at that meeting.

14   I talked to him on the phone a few times after that.

15   Q     Do you consider --

16   A     Exchanged some e-mails.

17   Q     Do you consider Todd Bridges an expert in remediation?

18   A     I -- I don't know his work, but I -- I -- I mean, the

19   more I learned of him, the -- the more I respect him and --

20   and that's the kind of work that the corps does, and he's told

21   me about other people that work in his -- in his offices and

22   what they do, and he certainly sounds like an expert to me.

23   Q     In fact, some of the remedial options that you explored

24   and have recommended in the Phase II Report came from

25   Mr. Bridges, correct?

1   A     Yeah, some -- some of his ideas are in the Phase II

2   Report, that's correct.

3   Q     Okay.  I'd like to have pulled up -- these are -- we

4   have two separate documents, Defense Exhibit 19 and Defense

5   Exhibit 20.

6          MR. TALBERT:  Which I would move for their

7   admission.

8          THE COURT:  Any objection to 19 and 20?

9          MR. BERNARD:  I'd just like to see them first.

10         THE COURT:  Sure.

11  BY MR. TALBERT:

12  Q     So on the -- on the screen is Defense Exhibit 19.  This

13  is an e-mail from Todd Bridges to Richard Luthy, Chris

14  Whipple, Rick Wenning, Ralph Turner, Upal Ghosh, and cc'd

15  Susan Calkins, Drew Bodaly, and yourself, and the subject is

16  workshop, and it's dated June 24th, 2009.  And then the next

17  document I have is the attachment that he -- he references in

18  the first sentence.  So that's Defense Exhibit 20.

19         MR. BERNARD:  No objection, Your Honor.

20         THE COURT:  19 and 20 are admitted without

21  objection.

22         MR. TALBERT:  Okay.

23  BY MR. TALBERT:

24  Q     Dr. Rudd, do you recall receiving some questions and

25  observations from Mr. Bridges after the remediation workshop?

1    A    Yes, I do.

2    Q    Okay.  And is this a -- a list of some of the questions

3    and observations that he had?

4    A    Yes, yeah, I think this is -- this is some of his

5    observations after the meeting, and he wrote them down and

6    sent them to us, if I remember correctly.

7    Q    Hm-hmm.  And we'll just go through a couple of them.  He

8    has -- I think No. 3, he says, the need to quantify bird

9    exposures in Mendall Marsh.  Where and through what pathways

10   are birds being exposed?

11   A    Yes.

12   Q    Do you see that?

13   A    Yes, I do.

14   Q    Do you recall him making that observation?

15   A    Ah, not specifically, but I'm -- I'm -- I'm not -- I

16   mean, that's something we were working on, so I'm not

17   surprised that he did -- said that.

18   Q    No. 9, he -- he states, what risks are you remediating?

19   Must be explicit about this.  This is related to the critical

20   need to establish explicit objectives to guide the remediation

21   phase?

22   A    Right, right.  I think we -- yeah, I think we took that

23   one to heart.

24   Q    Okay.  No. 10 he has as, what is the status of the bird

25   populations in Mendall Marsh?  There is evidence that points

1    to significant toxicity, comparing blood levels to TRVs.  Is

2    this evidence supported by field data relevant to status of

3    these populations?

4    A     Right, yes, I see that.

5    Q     Do you recall him also making that recommendation?

6    A     Yes, yes, I do.

7              MR. TALBERT:  I think we're done with this document.

8    BY MR. TALBERT:

9    Q     One of the remedial options the Study Panel considered

10   was what's been referred to as bank-to-bank or wholesale

11   dredging, correct?

12   A     That's correct, yes.

13   Q     And from a scientific perspective, you've expressed

14   concerns about wholesale dredging of the lower -- of the upper

15   estuary, correct?

16   A     That's correct, yes.

17             MR. TALBERT:  For the court's reference, this is

18   stated in the Phase II Report, Joint Exhibit 6-21, at Pages 5

19   and 6.

20   BY MR. TALBERT:

21   Q     One of the concerns that you have is the extent -- with

22   respect to the wholesale dredging is the exposure of highly

23   contaminated or contaminated concentrations of mercury that

24   are currently buried at depth, correct?

25   A     That's correct.  I have previous experience with -- with

1   this, and it -- it reversed the trend in mercury concentration

2   in that situation.  So I -- on the one hand, that's what makes

3   me concerned about this; on the other hand, in -- in talking

4   to people, like Todd Bridges and -- and Kevin Yeager, they --

5   they say that dredging processes have improved significantly

6   since then.  I'm not -- I'm not aware of the engineering

7   aspects of that, just what I've heard, so I don't know whether

8   my fears are overblown or not, but that's -- that's where I

9   was coming from when I said that.

10  Q    And just to follow up on that, you've had prior

11  experience, I believe you just testified, that -- where

12  dredging has actually made the situation worse.

13  A    Yes.

14  Q    And can you explain for the court how it made the

15  situation worse?

16  A    Um, yeah, I guess -- I guess I'm in court so I can --

17  I'll mention the details, but I was -- I was involved in the

18  Lavaca Bay study, looking at the contamination of Lavaca Bay,

19  Texas, by a chlor-alkali plant.  In that case, we found that

20  there was a continuing ongoing input from the Lavaca Bay site

21  itself.  We identified that, and -- and -- and the source

22  was -- was shut off and the mercury concentrations in the --

23  in the fish and shellfish in Lavaca Bay began to drop, as we

24  hoped.

25        My involvement in the -- in the study ended, then, for a

1    number of years, but then -- then I was called back in, and

2    the concentrations of -- of mercury in the fish had started to

3    go back up again.  And I went down there to -- to see what --

4    you know, we had a meeting or two to see what was going on,

5    and -- and I learned that in the intervening years there had

6    been a lot of dredging done, which I think may have exposed

7    contaminated sediments and -- and sort of restarted the system

8    again, would be a new input of mercury to the system, sort of

9    the kind of thing we've been talking about in the Penobscot

10   Bay of remobilization of legacy mercury that had been buried

11   in the sediments.

12        This was exposed by the dredging, I think, and caused

13   the mercury in the -- in the biota to go back up again.

14   Q    And just to readdress ourselves to the Penobscot, do you

15   have an understanding of approximately what depth the highest

16   or the -- or the larger inventory of mercury is located?

17   A    In the Penobscot?

18   Q    Yes.

19   A    I would say usually around 20 to 30 centimeters below

20   the sediment water interface.

21   Q    And I believe we discussed this at your deposition, but

22   is it fair to say that at that depth, that -- that inventory,

23   generally speaking, is unavailable for cycling in methylation?

24   A    Well, as long as it remains there, it is, but if it's --

25   if it's -- if it's eroded by a storm or -- or by these

1    rivulets we've been talking about coming across a mudflat or

2    if it's exposed by dredging and -- and it's not all removed --

3    sometimes -- sometimes in dredging -- the attempt is to dredge

4    right down to clean sediments, and if you can get all the

5    contaminated sediments out and you're down to clean sediments,

6    then there's no problem.

7          But if you -- if your dredge doesn't go down far enough

8    and you leave exposed sediments at high mercury concentration,

9    then that can cause a problem.

10   Q    So just to make sure we understand, one risk from the

11   dredging is that you can resuspend materials that you're --

12   that you're actually dredging up.

13   A    That's right, yes.

14   Q    And then a second way is that you expose a new layer of

15   material that previously was not exposed.

16   A    Right, right.

17   Q    And --

18   A    I understand in some cases, for example, not in the

19   Penobscot, but in some cases that dredging is -- has taken

20   place one season and -- and they've taken samples and it's

21   been months before they analyzed them to find out if they've

22   dredged down far enough, and then they've found that

23   they've -- that the -- that the bottom of the dredge exposed

24   high concentration of a contaminant, but it's been sitting

25   there for months, and then later they go back and dredge it

1    out again.

2        So I think the kind of thing that -- that Todd Bridges

3    and Kevin Yeager is talking about where practices have

4    improved is that they now -- now analyze these samples quickly

5    to make sure they've gone deep enough when they're dredging,

6    and they also have better methods to prevent the escape of

7    contaminated material while they're getting it out of the

8    water and carrying it away.

9        But if they don't -- if they're not careful about that,

10   it can cause problems, yes, as I observed.

11   Q    And right now, we're just talking about the scientific

12   feasibility side of things, understanding that there's an

13   engineering component to actually --

14   A    Well, what I was just describing is I think I've heard

15   that the engineering component in the last decade or so has --

16   has improved substantially since I was involved at Lavaca Bay.

17   Q    Is it fair to say that in this system, with -- in light

18   of the mobile pool, that resuspension can be particularly

19   problematic because any resuspended materials would enter the

20   mobile pool and likely be trapped in the system?

21   A    Yeah, I think that should be -- that should be limited,

22   if possible, yeah.

23   Q    Okay.

24   A    Resuspension of contaminated materials.  Resuspension of

25   clean materials would be a benefit.

1    Q    Are you also aware of that resuspension of contaminated

2    materials occurred in the Hudson River?  I believe we had that

3    discussion --

4    A    Yes.

5    Q    -- at your deposition?

6    A    Yes.

7    Q    And what is your -- your knowledge about the Hudson?

8    A    My knowledge isn't very detailed at all.  I -- I haven't

9    spent a lot of time looking at it.  I just understand that --

10   that there's been -- there's been problems or challenges there

11   as -- as that -- as that cleanup has proceeded.

12   Q    Overall, the Study Panel found that wholesale

13   bank-to-bank dredging was impractical and had -- had risks,

14   correct?

15   A    We thought it had -- it had some of the risks that --

16   that -- that we've discussed, and, also, they -- the other --

17   I think as I said yesterday, the -- the mercury now in the --

18   in the Penobscot system is so widely dispersed, that we

19   thought it would be -- it would be very, very expensive -- and

20   even though we never estimated the costs -- we did compare it

21   to the Hudson, and it would be an effort of a similar or

22   greater size, we thought.  So we just thought there -- we

23   searched for better ideas that were maybe more practical,

24   without looking into it in great detail.

25   Q    I believe earlier this morning you testified that you

1   have reviewed Dr. Connolly's expert report; is that correct?

2   A     Yes, that's correct.

3   Q     Are you aware that one of Dr. Connolly's opinions is, in

4   agreement with the Study Panel, that this shouldn't be

5   wall-to-wall or bank-to-bank dredging.

6   A     Yes, I am aware of that.

7   Q     And you agree with Dr. Connolly's opinion on that.

8   A     I do, yes.

9   Q     The Study Panel unanimously decided not to recommend

10  bank-to-bank dredging, correct?

11  A     That's correct, yes.

12  Q     Is another remedy that you considered as part of the

13  Phase II investigation capping, bank-to-bank capping?

14  A     Ah, no, no, I don't think we ever considered

15  bank-to-bank capping.

16        MR. TALBERT:  Jenna, can you please pull up -- this

17  is Defense Exhibit 964, which is your -- I guess the second

18  day of your deposition, Page 411-24 through 412-24.

19        MR. BERNARD:  What page?

20        MR. TALBERT:  411.

21  BY MR. TALBERT:

22  Q     And I think it's -- at the very bottom you see this --

23  A     Is this from my second deposition?

24  Q     This is the second day of your deposition.  So this is

25  questioning by Mr. Bernard.

RUDD - CROSS-EXAMINATION/TALBERT

1   A      Is this the first deposition or the second depo --

2   Q      Your first deposition.

3   A      Okay.

4   Q      You mentioned earlier that you considered capping,

5   right?  That was the question.  And then the next page, yes,

6   yeah.  And what specifically did you explore -- do to explore

7   the possibility of capping?  We didn't explore it actively.

8   We discussed it on many occasions.

9          So in -- in that light, did you evaluate capping?

10  A      Yes, we did, but not bank-to-bank capping.  That was

11  my -- that was my distinction.

12  Q      Okay.  Please specify.  What type of capping did you

13  review?

14  A      Well, we were -- one thing we did discuss on several

15  occasions was whether maybe we could -- we could put some kind

16  of a cap onto Mendall Marsh and -- and reduce the surface

17  mercury concentrations in Mendall Marsh.  I don't know whether

18  that's what I -- I'm going to refer to here, but we did -- we

19  did consider that, but for a couple of reasons that I can

20  remember, you know, right now, we thought that wasn't the way

21  to go.

22  Q      And what were those reasons?

23  A      Well, one was that there was a paper that had recently

24  been -- been published during -- during the course of the

25  study was that underneath the cap, the cap is clean material

RUDD - CROSS-EXAMINATION/TALBERT

283

1    that goes onto the surface of the sediments, and so the -- the

2    sediment which is previously -- previously oxic becomes

3    anoxic, and it's -- it's at high mercury concentration because

4    that's why you capped it.  And a recent paper shows that

5    this -- this capping actually makes these sediments, which

6    were formerly oxic anoxic and actually increases the rate of

7    production of methylmercury right under the cap, so the

8    methylmercury concentrations right under the cap in this study

9    became higher.

10        And then if there's erosion of the cap by a storm or --

11   or currents, this high methylmercury could -- could escape

12   into the -- into the environment.  So that -- that was one

13   consideration.

14        The other consideration was -- was some things that we

15   learned from -- from people, like Rocky Geyer and Peter

16   Santschi in this study, is that the -- the level of the -- the

17   elevation of the plateau of both the mudflats and -- and

18   the -- not the plateaus, the elevation of the mudflats and the

19   elevation of the -- of the platforms of the wetlands is

20   controlled by the overall mean level of the -- of the -- of

21   the water level of the estuary.  And over years, this is

22   gradually going up as sea level rises, and this is why

23   sediment is gradually accumulating in the estuary.

24        But if you come along and -- and dump all at once 4 or

25   5 centimeters onto the mudflats or onto the platform of the

RUDD - CROSS-EXAMINATION/TALBERT

1    estuary, you've artificially elevated it, and that material

2    then is -- is more subject to -- to erosion than it -- than it

3    would be if it had been there -- if it had accumulated

4    naturally.

5        Another thing is if we -- you know, if we completely

6    covered the -- the surface of Mendall Marsh with, I don't

7    know, 5 or 6 centimeters of clean sediment material, that

8    would do tremendous -- you'd have to then restore the entire

9    marsh.  I think that would -- that would disrupt the

10   vegetation and the bird populations, and it's a -- you know,

11   it's a wildlife refuge.  So I -- we didn't see that as being

12   very likely to happen.

13       So we considered this, and we talked about it from time

14   to time, but we never considered it seriously.

15   Q    Are those, the reasons you just described, why the Study

16   Panel has not recommended consideration of capping?

17   A    Yeah, there -- if -- for example, if we were -- if we

18   were -- if somebody was to do -- to do the CAD approach, which

19   we discussed yesterday, in which, you know, a pit might be dug

20   in Fort Point or further south, then -- then -- and the -- and

21   the contaminated sediment's put into that CAD, it would then

22   be capped so that -- so that that contaminated material

23   wouldn't come back up into the -- and recontaminate the -- the

24   bay.

25       So the -- so some limited capping, based on, you know,

RUDD - CROSS-EXAMINATION/TALBERT

1  what the engineers might come up with, is -- I guess what

2  we're saying is you really need to know what you're doing

3  before you do any of these things, and it needs to be

4  considered carefully.  So we're not saying you should never do

5  capping.  We're just saying, do it, but do it carefully.

6  Q    Let's talk a second about the recommendations that

7  you -- you do make, and just to ground our discussion, I

8  believe you make certain recommendations that you believe are

9  at least scientifically feasible.

10 A    Yes.

11 Q    Is that correct?  In particular, the Study Panel

12 recommended consideration of -- of sediment traps and

13 SediMite; is that correct?

14 A    That's -- that's correct, yes.

15 Q    Do you recall telling me at your deposition that -- that

16 people shouldn't go too far with the recommendations in the

17 Phase II Report?

18 A    Yes.

19 Q    And what was your -- your reason for -- for telling me

20 that?

21 A    Well, I -- I think with respect to the mobile sediment

22 removal, I think what we -- what we're recommending very

23 strongly is that some -- some -- some means, if there is a

24 means, be -- be developed by -- by the engineers that could

25 replace the -- roughly half of the mobile pool with clean

1    sediments so that -- so that the overall concentration of the

2    mobile pool would be decreased by a half, which would -- we

3    think would bring things down -- improve things considerably,

4    particularly in the main stem of the river.

5         Exactly how this happens, you know, we -- we suggested a

6    couple of ideas that we had learned from Todd Bridges, but the

7    last time I talked to Todd Bridges and -- and -- in fact, I

8    think I called him after my first -- maybe after the reports

9    came in, and -- and I said that -- I guess it was Dr. Geyer

10   had said -- and I'd heard it said in his testimony -- that a

11   very -- a very big pit or a very big sediment trap might have

12   to be built, at least that was what I heard he said.

13        So I was concerned about -- about that, and I called --

14   I called Dr. Bridges about it, and I said, you know, maybe --

15   maybe this big -- the sediment trap would have to be this big,

16   but maybe not.  I mean, we don't -- we don't know.  But is

17   there any way we could -- we could get the mobile sediments

18   out without having to trap them?  And he suggested, well, you

19   know, there's other -- there's other methods of -- of sediment

20   removal.  There's -- for example, there's hydraulic dredging.

21   And so we discussed this.  And I described to him how Rocky

22   Geyer says that the sediments -- the mobile pool at times

23   piles up in places.  In fact, it piled up so high at one point

24   that it buried one of Dr. Geyer's instruments for several

25   months and they couldn't find it until it moved away.

1    So he discussed maybe another engineering approach and

2    that would be to use hydraulic dredging, where you go to a

3    site where you know these sediments have accumulated, you put

4    down your hydraulic dredge, and you suck them up without

5    digging a pit at all.

6        So I tell -- I tell this because I -- I'm -- I'm just

7    trying to illustrate that the -- these are the engineering

8    questions that need to be answered that we didn't address, but

9    there's various ways, I think, I hope, that -- that the -- the

10   mobile pool could be treated, but that wasn't part of our

11   study.  Our part of the study was to identify -- identify

12   where -- where the ecosystem could be -- could be -- where we

13   could intervene in the ecosystem to make a difference.

14   Q    Let's just be clear about where we are right now.

15   You've identified some options that you believe are

16   scientifically feasible, but you're not sure if they're

17   feasible from an engineering perspective.

18   A    Yes, I think that's -- as the way Judge Carter set

19   out -- set out the study, as I understand it, is the third

20   step of the study, which he -- he titled -- thought of as a

21   remediation program, is when these kind of questions would be

22   addressed and answered, and we're not there yet.

23   Q    Is it fair to say that the cost estimates that you have

24   in the report -- and for the record, I'm referring to Joint

25   Exhibit 6-21 at 21-6, which has already been admitted -- these

1   are rough estimates, correct?

2   A    Yes, that's what we called them in the report.

3   Q    Okay.  And the -- the sediment traps themselves, let's

4   try to under -- understand those.  The first recommendation is

5   to dig a trench in the main stem of the Penobscot such that it

6   would slow particles down and they would -- they would settle

7   out and you could collect the mobile sediments; is that

8   correct?

9   A    Yeah, I think Dr. Bridges' word is a pit rather than a

10  trench.  And, yeah, they -- they -- they would be dug at sites

11  where Dr. Geyer thought that the -- the mobile pool was likely

12  to accumulate at the sediment -- at the sediment trapping

13  sites we discussed yesterday.

14       So the mobile pool would -- would -- would -- trapping

15  site would be over top of this -- of this site, and then

16  instead of the -- instead of the -- of the particles falling

17  down in -- in the -- the sort of piles that I described when

18  it buried his instrument, instead of falling on the surface of

19  the sediment, would fall into a trap that had already been

20  built there.  And then when that trap was full of material,

21  the material would be -- would be removed and buried

22  downstream in -- in Penobscot Bay in another -- in another pit

23  that had been previously dug.  And it would be buried there

24  and covered, as we've discussed, by a clean cap.

25  Q    And then you would try to add clean sediment in --

1   A      Well, clean sediment --

2   Q      Let me just finish the question.  Then clean sediment

3   would be added to the river, and the idea would be that that

4   would join the mobile pool and it would dilute the

5   concentrations?

6   A      That's correct.  The clean sediment that was -- that

7   would have to be excavated as the -- as the second pit was --

8   in the cleaner areas downstream was being constructed would be

9   moved upstream and -- and distributed into the main stem of

10   the river and -- and it would join the mobile pool.

11   Q      Do you agree that an engineer could conclude that the

12   time that this would take to implement such a remedy may make

13   it impractical?

14   A      I -- yeah, I -- I don't have any under -- really

15   under -- direct understanding of that.

16          MR. TALBERT:  Let's pull up Defense Exhibit 963, if

17   could, and let's go to Page 200 at Lines 8 -- so this is 4

18   here.  Okay.

19   BY MR. TALBERT:

20   Q      The question, so if you had engineers that came and

21   looked at this and said, look, we don't think that this would

22   work?  You answered, right.  I asked, that would, you know,

23   and then there's a cutoff, your answer is, or maybe it would

24   take 30 years for these sediments to move into the CAD, or

25   maybe they'd work in the long run, but by the time the system

RUDD - CROSS-EXAMINATION/TALBERT

1    might be already naturally attenuated.  Do you see that?

2    A    Yes, I do.

3    Q    Do you recall our discussion about just the timing of

4    making all of these traps work could, at some point, make it

5    impractical?

6    A    Well, if it -- you know, if it took longer than, for

7    example, 66 years to do this, then, yes, Mendall Marsh would

8    have cleaned up already.  That's -- that's correct.  It

9    depends how long it takes to -- to -- to get the remedies

10   underway.

11   Q    Is one of the challenges the fact that the fine

12   sediments have the highest concentration of mercury?

13   A    Yes.

14   Q    And those would also be the sediments that would be most

15   difficult to have settle out into a pit, correct?

16   A    Yes, that's -- that would be one of the challenges of

17   designing this.

18   Q    And -- and is it fair to say the size of the mobile pool

19   could also impact the feasibility of this option?

20   A    Right, right.  I might add, though, if you did -- if you

21   did -- I mean -- and I bring this up just because I think all

22   alternatives should be -- should be considered, but if you're

23   doing hydraulic dredging, as we discussed before, you'd --

24   you'd -- you would -- maybe another advantage of hydraulic

25   dredging is you would -- you would capture the fine sediments

 1    and the course grain sediments at the same time because you'd

 2    just suck them out like a big vacuum cleaner.

 3         So that's why I think -- our ideas are -- were presented

 4    more as -- as -- as -- we call them options, you know, this is

 5    an option, there's various other ways that this could be

 6    accomplished, I think.

 7    Q    And I understand that.  We're going to later hear from

 8    Mr. Glaza, who's a practicing engineer evaluating these types

 9    of options.  Right now I'd like to just discuss what work

10    you've done --

11    A    Okay.

12    Q    -- and where you are in terms of the scientific

13    feasibility of this option.

14    A    Okay.  I just wanted to make the point that we're at the

15    early stage because we think this should be done in the

16    remediation program.

17    Q    Is it fair to say, though, that the size of the mobile

18    pool, which is currently, you believe, not well-quantified,

19    could impact the feasibility of this option?

20    A    Yes.

21    Q    Okay.  And you also agree that sed -- the sediment traps

22    or whether we call it a pit would likely be difficult to

23    pilot.

24    A    Ah, yes, but I'm not -- you know, I -- that's getting a

25    little bit beyond my expertise.  You're getting into

1    engineering very quickly with these questions.

2    Q    You could imagine, though, that that might be a

3    difficult thing to -- to do and --

4    A    Yeah, well --

5    Q    -- full scale.

6    A    But what we've accomplished already has been very

7    difficult.  You know, this is a very difficult ecosystem to

8    understand, but I think we've come a long -- just because it's

9    difficult doesn't mean it's not possible.

10   Q    Fair enough.  Let's switch gears to -- Remedial Option 2

11   is -- is very similar to Remedial Option 1, but in a different

12   location and with some -- some different details, right, in

13   terms of how often you may have to remove material from the

14   pit?

15   A    That's right, that's correct, yes.

16   Q    Okay.  You would need to remove some material from the

17   Marsh River before starting Remediation Option No. 2, correct?

18   A    Yes, that's correct.

19   Q    And I believe we discussed at your deposition, but I

20   want to make clear for the record so that everyone's clear,

21   your understanding of the grouping of these various

22   recommendations would be that you would either do Option 1,

23   the pit in the main stem, or Option 2, the pit near Mendall

24   Marsh with a combination of SediMite, correct?

25   A    Yes, if -- if -- I guess if -- my favorite would be, if

RUDD - CROSS-EXAMINATION/TALBERT

293

1    I -- if I could choose one, would be -- would be to do

2    Option 1 because that would -- that would -- that would

3    improve the situation if -- you know, if it was feasible from

4    an engineering perspective, it would improve the situation in

5    the entire upper estuary, including Mendall Marsh.  But

6    Mendall Marsh we know is going to recover -- is -- is in more

7    -- is a more serious situation than -- than -- than what is

8    presently in the -- in the main stem of the river.

9         So I think the -- the best possible solution would be to

10   do Option No. 1 and then do some kind of an amendment, like

11   sediment or -- or biochar in Mendall Marsh.  So you would both

12   be reducing the mercury concentration of particles coming into

13   the marsh, and you'd be -- you'd be sequestering the mercury

14   that's already in there, which would bring Mendall Marsh maybe

15   down to its -- its recovery target more quickly than -- than

16   if only one of these methods was used.

17   Q    And just so I understand conceptually, if the pit in the

18   main stem were successful, you would not need to also do the

19   pit in -- in front of Mendall Marsh.

20   A    No, then you wouldn't do the pit at all.  Then you --

21   you'd -- if you decrease the concentration of mercury in the

22   mobile pool by a half, by treating the mobile pool in the main

23   stem, immediately the concentration of mercury on particles

24   flowing into Mendall Marsh would be reduced by a half, and

25   that would be -- that would be a significant improvement right

1    off the top.

2         Then if, in addition to that, you did something like add

3    sediment -- SediMite or biochar to the surface of the marsh,

4    that would be a double treatment, which I think -- I think

5    would result in very quick decreases in the mercury

6    concentration in the birds.

7    Q    Dr. Rudd, you reviewed Mr. Glaza's expert report,

8    correct?

9    A    Yes, I did.

10   Q    Okay.

11        MR. TALBERT:  I'd like to pull up a page from that

12   just to ground our next discussion.  This is Joint Exhibit 50,

13   which has been entered into the record, and let's go to

14   Page 5.

15   BY MR. TALBERT:

16   Q    And what I'd like to focus on -- on this page is,

17   Mr. Glaza laid out his assumptions regarding the size of a,

18   you know, sediment trap or this -- or the pit and how large

19   that would have to be in order to attempt to -- to capture and

20   have settled out these mobile sediments.  And if you look at

21   the last sentence in this first full paragraph, he states, the

22   slower settling velocity of the particles, the larger the trap

23   would need to be.  Assuming sediment trap dimensions of

24   1 kilometer long, and he quotes Rocky Geyer for that, by

25   250 meters wide, which is the width of the river, by 3 meters

1   deep, results in a dredging volume of approximately 1 million

2   cubic yards to create a single sediment trap.

3           Do you recall reviewing that in Mr. Glaza's report?

4   A     Yes, I do.

5   Q     If Mr. Glaza's correct that installing sediment traps

6   would require significant dredging to make them large enough

7   to allow particles to settle out, wouldn't the same or some

8   similar concerns you had regarding dredging generally also

9   apply to the sediment traps?

10  A     Ah, yes, at some point, you know, if -- if a sediment

11  trap needed to be that big, I -- you know, and I don't know

12  whether it does, I don't know whether anybody does, then I

13  would start to wonder whether maybe hydraulic dredging might

14  be a better way to go.

15  Q     And the Study Panel did not examine different permits

16  that may be needed to actually implement the sediment traps,

17  correct?

18  A     That's correct, yes.

19  Q     And is it fair to say you don't have any experience with

20  permitting or implementing sediment traps of this size in

21  Maine or anywhere else?

22  A     That's correct.

23  Q     Another point, if you couldn't -- if you built the

24  sediment traps and you, as we discussed earlier -- and just to

25  remind you of our discussion, the higher concentrations of

RUDD - CROSS-EXAMINATION/TALBERT

1   mercury are attached to the fine particles, correct?

2   A      Correct.

3   Q      And as we discussed, those would be the ones that would

4   be the most difficult to have settle out into the pit.

5   A      Right.

6   Q      Correct?

7   A      That's correct, yes.

8   Q      So isn't -- it's possible, right, that we could build

9   these sediment traps and then not have the particles that

10  we're actually trying to have settle out enter the pit?

11  A      It's -- it's possible.  I've discussed this point with

12  Dr. Geyer, and, you know, he's -- he -- he agrees that the --

13  that the fine particles are -- are -- when we -- we know that

14  the fine particles are where a lot of the mercury is.  But we

15  discussed -- you know, he's not an engineer, either -- but we

16  discussed whether -- and I think we both agree that these --

17  these traps would have to be properly designed, and maybe

18  they'd have to have things like baffles in them that would --

19  that would slow down the -- the currents as -- as it passed

20  over the top, and so something to enhance the trapping

21  capability of these -- these traps that maybe would be --

22  involve more than digging a simple pit.  Maybe these would

23  have to be designed -- he is a hydrodynamicist, so he knew

24  what he was talking about here.  So -- but maybe there would

25  be ways -- ways that the traps could be designed to make them

1    more efficient to trap small particles.  That was our

2    discussion.

3    Q    Sitting here today, you acknowledge that engineers may

4    look at this and conclude that it may not be possible to get

5    the fine sediments to settle out.

6    A    Yeah, using sediment traps.  Maybe there's some other

7    way.  But use -- that's -- that's possible, yes.

8    Q    There was some discussion of a -- of a CAD earlier.

9    What is -- what is your understanding of -- of a CAD?

10   A    Well, CAD stands for confined aquatic disposal.  It's

11   a -- it's a -- it's a method that has been developed I -- I

12   don't know -- I want to say that -- by the corps of

13   engineers -- I'm not quite sure of that, though -- but it's

14   been used in various places in the United States and other --

15   elsewhere in the world, where -- and mostly it's -- I -- I

16   understand it it's -- it's -- the reason it was -- it was

17   developed was to -- to save a lot of money and -- and also a

18   lot of -- of permitting and -- and so on, because the material

19   that -- the dredge material that's -- that's taken out of a

20   contaminated water body is disposed of right in the water body

21   itself, rather than having to be dewatered, which is very

22   expensive, and transported long distance.

23        For example, the material at the Hudson, I understand,

24   is -- is being -- a lot of it is being dewatered and

25   transported to Texas on -- by railcar, and that's very

1   expensive, and so you can reduce the costs significantly, plus

2   the risks of transporting this contaminated material across

3   the country, if -- if you can dispose of it in the water body

4   itself.

5         So -- so in recent years, the -- the idea has been

6   tested, and I think now proven, where a pit is dug somewhere

7   in the -- in the ecosystem itself, and the pit is large enough

8   that the dredge materials can be disposed of in this deep pit.

9   And then they're covered by an engineered cap that's -- that's

10  designed to withstand the -- any storm flow or tidal -- tidal

11  flow of water above it so that the -- so that the material in

12  the CAD will never be able to be -- to be -- to be resuspended

13  by -- by a storm current or something and reenter the

14  ecosystem.

15  Q     And in this case, you envision that that CAD would be

16  located somewhere in Penobscot Bay, correct?

17  A     Yes, yes.

18  Q     Okay.  This idea for utilizing a CAD came from Todd

19  Bridges at the U.S. Army Corps, correct?

20  A     That's correct, yes.

21  Q     Okay.  And he provided you examples of where a CAD has

22  been implemented in other sites by sending you an e-mail list

23  of those sites.

24  A     That's correct, yes.

25  Q     Okay.  And that list --

1          MR. TALBERT:  Let's pull up -- it's Defense

2    Exhibit 663, and I believe it's on the second page.  There's a

3    list.

4    BY MR. TALBERT:

5    Q    Do you recall, is this the e-mail you received from

6    Mr. Bridges?  He sent it initially to Chris Whipple and then

7    it was later forwarded on to the rest of the Study Panel?

8    A    Yes, yes, I recall this.

9    Q    Okay.

10          MR. TALBERT:  I'd move for the admission of this

11   exhibit.

12          THE COURT:  Any objection?

13          MR. BERNARD:  No.

14          THE COURT:  It's admitted.

15   BY MR. TALBERT:

16   Q    And this is the same or very similar list that is listed

17   in the Phase II Report, correct?

18   A    Yes, I just copied this list and -- and plopped it right

19   into the report.

20   Q    Okay.

21          MR. TALBERT:  And for the record, that's in Joint

22   Exhibit 6-21 on Page 9.

23   BY MR. TALBERT:

24   Q    You did not independently research each of these sites

25   that Todd Bridges sent over that -- where CADs had been

1    implemented before, correct?

2    A     No, no, the -- the only site that we discussed in detail

3    was -- was the Boston Harbor site, which I think is listed --

4    yes, is listed down towards the bottom, 2008 to 2010, Boston

5    Harbor, and we had quite a long discussion about that.  He

6    used that as an example so I could understand what he was --

7    what he was discussing.

8    Q     And you don't know if a CAD has been implemented in a

9    bay as large as the Penobscot, do you?

10   A     No, I -- I don't, although I don't see why it couldn't

11   if it -- but --

12   Q     And is it fair to say --

13   A     They're planning to -- they're planning to do dredging

14   in Searsport, I know, and to dispose of those dredge spoils

15   somewhere in Penobscot Bay, so maybe -- and the -- and the

16   corps of engineers is -- is doing this work right now.

17   They've got to -- I wouldn't be surprised if they're going to

18   do a CAD in Penobscot Bay very soon, but I'm not sure of that.

19   Q     Are you aware that there has been citizen and political

20   opposition to putting a CAD in -- in Searsport?

21   A     Um, I'm some -- I've read a few newspaper articles.

22   That's all I'm aware of, yes.

23   Q     Okay.  And with respect to the Penobscot, you didn't

24   independently try to investigate or consider whether there

25   might be political opposition to disposing of contaminated

1    materials in Penobscot Bay?

2    A     No, no, I -- I -- I just -- we just went by what -- for

3    example, what Todd said at the bottom of his letter here, is

4    that -- is that these things have been successfully

5    permitted --

6    Q     Okay.

7    A     -- before, and we assumed, well, if -- a permitting

8    process would be needed, but that wasn't part of our -- of our

9    job, we thought.

10   Q     And aside from talking to Mr. Bridges, you haven't

11   talked to anyone from the federal government regarding whether

12   putting a CAD would be permittable in Penobscot Bay.

13   A     No, we -- we viewed this as all part of the next step of

14   the study, the remediation program.  We only wanted to go so

15   far and then -- and then that was the next -- we thought that

16   was part of the next step.

17   Q     And, similarly, you haven't talked to anybody from the

18   state about implementing a CAD in Penobscot Bay.

19   A     No.

20   Q     Correct?

21   A     No, we have not.

22   Q     Okay.  One of the recommendations in Chapter 21 is to

23   consider the use of activated carbon in Mendall Marsh --

24   A     Yes.

25   Q     -- as an amendment, correct?

1    A      That's right.

2                MR. TALBERT:  And for the record, this is on Joint

3    Exhibit 21 on Pages 15 through 17.

4    BY MR. TALBERT:

5    Q      For the record, there's been some discussion about a

6    product called SediMite.

7    A      That's correct, yes.

8    Q      Do you know what SediMite is?

9    A      It's a form of -- of activated carbon.  It's a

10   proprietary -- I'm not -- so I'm not quite sure exactly what

11   it is.  It's trademarked.

12   Q      Is it fair to say that you have a -- well, just -- just

13   to back up.  So the -- the idea would be that you would place

14   activated carbon in these capsules in a layer on the top of

15   Mendall Marsh, correct?

16   A      Yes, or -- or it would be worked into the surface a few

17   centimeters in some way that -- that we -- we don't know

18   exactly yet, but it's -- this is -- this is a -- a fairly new

19   treatment that's undergoing testing at various sites right

20   now, and I think part of the thing they're testing is -- is,

21   what's the best means of application?  So I'm not exactly sure

22   how it would be applied.

23   Q      And would Dr. Gilmour be the person best to answer that

24   question regarding --

25   A      No, I -- I would go to -- to Dick Luthy at Stanford

1    or -- Dr. Luthy or Dr. Upal Ghosh.  They -- they're the people

2    who are -- are kind of -- not kind of -- they're the people --

3    Dr. Luthy in particular is the person who -- who started

4    this -- as I understand it, who started this -- this -- this

5    field of -- of research.

6    Q    Is Dr. Gilmour the -- the person that the Study Panel

7    relied upon to evaluate the potential effectiveness of

8    SediMite in Mendall Marsh?

9    A    Yes, yes, she -- she's -- she's an expert in

10   methylmercury production, and -- and she was -- she had done

11   some other work, and she works -- she worked with Dr. Upal

12   Ghosh on other -- on other studies.  And -- and we already --

13   we already wanted her to work on Mendall Marsh because of her

14   understanding of methylmercury production, and she -- she had

15   worked with Upal Ghosh before, and so she was the natural

16   person to -- to do this type of work.

17   Q    Is it fair to say that you have a concern about

18   potential impacts of activated carbon are in plant populations

19   in Mendall Marsh?

20   A    Yes, I -- I think this is something that would need to

21   be -- to be -- need to be looked at in -- in a pilot study.

22   One thing I did notice in the data, we had a -- a person from

23   the University of Maine come out and look at the -- at the --

24   at the plots before and after, and -- and I -- I'm not a

25   vegetation expert, but I did look at her list of -- of plants

1    in -- in the -- in the control sites and the -- and the site

2    that had been treated with SediMite and noticed that one or

3    two of the plant species that was still in the control sites

4    was not present after the SediMite had been there for -- for a

5    couple of years.

6         So this made me wonder whether -- whether there might --

7    I mean, that could have been chance.  This is a -- this is a

8    repeat of one, which isn't a repeat at all, but it did make me

9    wonder whether there might -- there's a chance that SediMite

10   might -- might -- in addition to -- to binding mercury, might

11   also bind some of the trace elements that are needed for plant

12   growth.

13        So I think this is something that would need to be

14   looked at as part of a pilot study.  I mean, that -- that was

15   a -- I would say an indication of -- that there might possibly

16   be a vegetative problem, but I wouldn't make any conclusions

17   based on that one very small study.

18   Q    Is it also possible that SediMite or activated carbon

19   could adversely impact biota?

20   A    I -- yeah, I can't really answer that question.  I -- I

21   think it's probably less likely would be my guess, but --

22   because the biota are eating the -- well, I don't know,

23   maybe -- I shouldn't answer that question.

24   Q    Well, from a pragmatic standpoint, if SediMite or

25   activated carbon impacted biota that the Nelson's sparrows

1    eat, that could -- we could actually have an adverse impact on

2    the Nelson's sparrow even while we're trying to assist them,

3    correct?

4    A     Yeah, if anything you added to the marsh affected the

5    food web, then the Nelson's sparrow would be impacted, yes.

6    Q     Okay.  Is it fair to say you're also not sure at this

7    point how many times activated carbon would have to be added

8    to the marsh?

9    A     Yes.  Now, our studies were very preliminary, very

10   small, only one meter square, and very preliminary, and -- and

11   we knew going in that -- that we were just taking a very first

12   look at this, and if this -- we wanted to just see whether or

13   not this idea had any chance of success.  And then we

14   recognized that if it did look positive in some ways, that --

15   that there would need to be a -- a larger, sort of more formal

16   study done to really look at whether or not -- a proper pilot

17   study is the way I would describe it done in the -- as part of

18   the remediation program in order to -- to prove or disprove

19   what we considered to be a -- an idea that we were testing in

20   a preliminary way.

21   Q     Is it also fair to say that there right now are some

22   questions regarding the long-term effectiveness of SediMite or

23   activated carbon to reduce methylation?

24   A     Yeah, my anticipation is that at some point, you would

25   need a retreatment because, for example, there would -- if you

1    didn't treat the main stem of the river, there would

2    continuously be contaminated particles coming in and settling

3    on the surface.  So even if the SediMite worked very well over

4    a number of years, over time, there's going to be -- going to

5    be contaminated particles built up in the surface of the

6    marsh, and the whole system will reset itself.  So if SediMite

7    was working really well, after -- I don't know -- after five

8    or six or ten years, there would be enough contaminated

9    particles have come in from the main stem of the river that

10   you would require another -- another addition of SediMite,

11   even if the SediMite was working as we hope it would.

12   Q    Just -- just to summarize, then, three concerns with the

13   use of SediMite or activated carbon in Mendall Marsh would be

14   adverse effects to plant life, adverse effects to biota, and

15   also how long it would -- it would last and be effective?

16   A    Yeah, and those would -- I think those would be the

17   primary objectives of any pilot study that was done in the

18   future.

19              THE COURT:  Good time to break?

20              MR. TALBERT:  Sure.

21              THE COURT:  We'll take a 20-minute break.

22         (Court recessed from 10:30 a.m. to 10:59 a.m.)

23              THE COURT:  You may proceed.

24                    CONTINUED CROSS-EXAMINATION

25   BY MR. TALBERT:

1    Q     Dr. Rudd, I'd like to switch gears and talk about

2    nitrate additions.  Do you recall at your second deposition

3    discussing plaintiffs' experts proposal to explore, examine

4    nitrate addition?

5    A     Yes, yes, I do.

6    Q     Okay.  And what did -- this is plaintiffs' expert

7    Dr. Driscoll, correct?

8    A     That's correct, yes.

9    Q     And what did Dr. Driscoll propose?

10   A     He suggested that we might examine a remedy that -- that

11   has apparently worked in Onondaga Lake in New York where high

12   nitric concentrations in the hypolimnion of the lake, that's

13   the bottom waters, the stagnant bottom waters of Onondaga Lake

14   seem to have inhibited the production of -- of methylmercury.

15         The presence of nitrate, even though there's no oxygen

16   in the bottom of Onondaga Lake, the presence of nitrate

17   increases what is called the Redox potential which makes it a

18   little bit more like there's oxygen there than if the nitrate

19   wasn't there, and the methylating bacteria that produced the

20   methylmercury don't like working in the presence of oxygen.

21   So it's thought that the -- that the nitrate caused the -- a

22   reduction in the production of methylmercury in Onondaga Lake

23   and improved the situation there.

24         So I think in his comment, he was wondering whether this

25   -- a similar approach might be applied in -- in the Penobscot.

1    Q    And is it fair to say that you do not believe that that

2    -- that such an approach would work in the Penobscot?

3    A    I don't believe it would because it's a very different

4    situation in the Penobscot.  In Onondaga Lake, this nitrate

5    was in the bottom of a lake, and the hypolimnion of the lake

6    is very isolated from the water that flows over the top, but

7    in -- in the Penobscot, there is no hypolimnion, there is no

8    stagnant -- no stagnant layers so that if you put nitrate in,

9    nitrate is dissolved, and it would be washed out of the upper

10   estuary.  It wouldn't be trapped by the salt front, as

11   particles are, it would go right out to sea.

12        So I can't see that this could work in the -- affecting

13   the water column the way it did in Onondaga Lake.  You could

14   possibly add nitrate to sediments, but my guess is there's so

15   much microbial activity in the surface of sediments that this

16   nitrate would very quickly be reduced, that is, it would be

17   transformed by bacteria in the sediments to nitrate and

18   finally to nitrogen gas.

19        So I can't see this having much -- much application to

20   this particular situation.

21   Q    Just to make sure the record's clear, what are the

22   specific factors or characteristics of the Penobscot in the

23   upper estuary that you think would make it not a good

24   environment to add nitrogen and expect a reduction in

25   methylmercury?

1    A     Well, there is no anoxic bottom water in the Penobscot

2    system that I'm aware of, particularly in the upper estuary,

3    and the reason there's no anoxic bottom water is because it's

4    continually flushed out, and so if you added nitrate to the

5    water, it would be flushed out too.

6    Q     This is an extremely energetic system; correct?

7    A     Yes.  Yes, for the most part, yes.

8    Q     You also have fairly high tidal flux, correct?

9    A     Right.

10   Q     The Study Panel created -- I want to switch gears now

11   and talk about the mass balance.  The Study Panel created a

12   mass balance of the system, correct?

13   A     That's correct, yes.

14         MR. TALBERT:  I want to pull up -- this is Figure

15   1-17 from Joint Exhibit 6-1, and I want to go to Page 53.

16   BY MR. TALBERT:

17   Q     Is this figure, 1-17, the mass budget that the Study

18   Panel presented in the Phase II Report?

19   A     Yes.  Yes, this is our best estimate of -- of where

20   mercury is presently located in the upper estuary and how much

21   comes into the estuary and exits the estuary on an annual

22   basis.

23   Q     And let's back up a second.  Why did you think it was

24   important, if at all, to create a mass balance of the system?

25   A     Well, for one thing, it -- it puts the -- the problem

1    into -- into perspective, I think.  It -- it tells -- it tells

2    you how much mercury is buried deeply in the sediments and it

3    maybe -- and is likely not participating in the problem now.

4    It tells you how much mercury is in the mobile sediments,

5    which is one of the boxes kind of in the middle of that -- of

6    that figure, and then it shows how much mercury is coming into

7    the system on an annual basis and exiting the system on an

8    annual basis.

9        So it -- it gives you a feeling for how much mercury is

10   coming in relative to how much mercury is there.  For example,

11   the total amount of mercury coming in from all sources is --

12   is 49, and these are -- hm -- kilograms per year, I guess that

13   is, and -- but the total amount of mercury in the mobile

14   sediment pool is -- is 230.

15       So give you some -- some feeling for how -- how much

16   mercury is in the mobile pool compared to how much total

17   mercury's coming in.  This is both dissolved and particulate.

18   There's only 9 kilograms per year of mercury particulate

19   coming in, you can see on the -- on the right side here, and

20   that's the mercury that would -- we think that would join the

21   mobile pool, would join the 230 here, a little bit of it

22   dissolves as well, but it -- it -- one -- one purpose is to

23   put the system into perspective.

24       The only thing is if you're -- if you're trying to -- to

25   produce a mass balance model to predict what's going to happen

1    in the future, you need this kind -- this kind of -- of

2    understanding is needed in order to construct a model, which

3    is what we're trying to do, and we did construct some simple

4    models using this data.

5    Q    Just to make sure I understand, is one of the reasons

6    that you would do a mass balance is to take the field sampling

7    data that you've collected and -- and look at it to see if the

8    data fits together in an understanding of the system?

9    A    Right, and these are data that came from all over the

10   report.  The -- the -- the blue boxes at the bottom, the

11   bottom three boxes are data that are -- that are estimated

12   from -- from Dr. Santschi's cores and then worked up by

13   Dr. Yeager based on his understanding of where the long-term

14   deposition is.

15        The -- the water data is data that -- that the team

16   collected from above Veazie Dam, and the municipal and

17   HoltraChem sources are -- are numbers that were provided to us

18   by Dr. Turner.  The outflows are estimates from -- from

19   Dr. Geyer, and the mobile sediment pool is an estimate from

20   Dr. Geyer.

21        So this -- this -- this mass balance that we tried to

22   put together employs all -- all -- a lot of the data of the

23   study -- a lot of the chemical data of the study.

24   Q    And just to make sure we orient ourselves to make sure

25   we're on the same page, are the red boxes that we see

1    surrounding on the left side and then to the top, are those

2    inputs into the system?

3    A     Yeah, those would be inputs -- we have the data for

4    inputs to the mobile pool -- annual inputs to a mobile pool.

5    Q     And then the green on the right side?

6    A     Those would be losses from the mobile pool largely,

7    although another loss is long-term sedimentation, down to this

8    -- this box here.

9    Q     And those would be the blue boxes in the -- in the

10   center, I guess, going down from the main center box?

11   A     Right, I put a couple of blue arrows there.  I don't

12   know whether you can see those.

13   Q     Okay.  Now, you have a question mark on the green -- I

14   guess going to the wash load?

15   A     That's correct.

16   Q     Is that because that -- that number is currently --

17   A     Yes.

18   Q     -- uncertain?

19   A     Yes.  Yeah, that's -- that's another uncertainty that we

20   haven't discussed.  When talking to Dr. Geyer, he would like

21   to have the opportunity in the future to -- to more heavily

22   instrument the line from Fort Point to Wilson Point that we

23   saw in one of your previous diagrams.  He had one instrument

24   there that continuously measured particles and water flow, but

25   it was his -- his first attempt to do this, and he would like

1    to get a better idea on that to see if -- if there -- if the

2    wash load could be -- could be -- he looked at it in more

3    detail.

4            THE COURT:  Could you -- could you help me with

5    this?  There must be a difference here, but I don't understand

6    it, between particulate wash load -- that must be at Fort

7    Point Cove, FPC; is that right?

8    A      Pardon me?

9            THE COURT:  On the right, where it says, particulate

10   wash load, FPC, is that Fort Point Cove?

11   A      Fort Point Cove, to Fort Point Cove, yeah.

12           THE COURT:  Okay.  I just -- I don't think I've

13   heard the term wash load.  Can you distinguish between wash

14   load and particulate outflow and dissolved, how these

15   different ways of releasing --

16   A      These are --

17           THE COURT:  Just let me finish.

18   A      Oh, sure.

19           THE COURT:  How these different ways of releasing

20   the mercury -- mercury from the Penobscot River basin

21   differentiate between themselves.

22   A      Yeah.  I hope I can -- there's -- there's different ways

23   that -- that -- that mercury is thought to be able to -- to

24   leave the -- the upper estuary in the water itself, and -- and

25   one of them is -- are -- is flow of particulate material that

1    escapes past the salt front.  A lot of the mercury that comes

2    in in a -- in a dissolved form can go directly through, past

3    the salt form -- salt front because it's not particulate.

4        Then there's another type of mercury that -- that

5    Dr. Geyer refers to as wash load that can come in and go right

6    through the system, and it's not -- it's not in a way that he

7    can detect it very well with his instruments.

8            THE COURT:  What's the difference between the

9    particulate outflow and the particulate wash load?

10   A    Well, he thinks that might be material that goes through

11   -- my understanding it might be material that goes through at

12   very -- at very high flow times, that goes right -- zips right

13   through the system and never joins -- never joins the mobile

14   pool.

15       The -- the 9 in the lower -- in the lower box there --

16   this is a good question -- the 9 in the lower box there is

17   material that has become part of the mobile pool, but has

18   since -- is escaping.  So this is -- this is a -- this is an

19   escape route that we might not have quantified yet of material

20   that's come in and shot right through maybe at times of the

21   spring fresh up when the river is flowing very quickly

22           THE COURT:  All right.  Thank you.

23   BY MR. TALBERT:

24   Q    And I believe you anticipated my next question, which

25   is, Dr. Geyer -- is it fair to say Dr. Geyer believes that he

1   may not have a good handle right now on this -- on this wash

2   load, they may not have captured these high-flow events, which

3   could -- could trigger release of -- of material out of the

4   system?

5   A    That's right.  We did -- we did -- we were fortunate, we

6   -- he worked on the system for two years, and we were

7   fortunate to collect some very high-flow events, which we've

8   monitored very carefully.  We were there at the time of -- of

9   Hurricane Irene, and the river did flow very, you know -- it

10  was at -- that was a very high-flow event, but it wasn't as

11  high as it could have been at some times, and he didn't have

12  as much instrumentation out there as he would have liked to.

13       So he says it would -- with another -- you know, with

14  another year of work, he could have a better -- maybe have a

15  better handle on what -- on the wash load.

16  Q    Is it fair to say that at this point, the mass balance

17  is uncertain?

18  A    All mass balances are uncertain.  I'd say this is --

19  this is a pretty good one.  I've done a lot of -- I've been

20  working on mass balances for my entire career of all

21  ecosystems.  Some of the components of the mass balance are --

22  are better known than others.  The -- the inflows that --

23  these three items we think are -- are very well-known.  We

24  have good estimates from the atmosphere and from -- and we

25  think we're doing pretty well from HoltraChem unless we missed

1    from pipe 001.

2        So some components we know very well, as well as I think

3    anybody could.  The sedimentation is -- is reasonably

4    well-known, as we've been discussing in the last day or so.

5    The size of the mobile pool sediment is -- is something that

6    we would like to work on.  We might be out on that by as much

7    as a factor of two.

8        The -- the outflows, the green boxes are actually --

9    particularly the water, as we've been discussing -- actually,

10   except for the wash load, they're actually surprisingly

11   well-known.  Dr. Geyer gave us a number based on -- on his

12   work, and -- and then we were able to calculate a number based

13   on sedimentation rates from Dr. Santschi in the -- in Fort

14   Point Cove, and those numbers balanced very well.  So I think

15   the numbers 39 and 9 are actually -- are actually pretty good

16   numbers.

17       So, you know, I'd say this is a pretty good mass

18   balance.  It -- it needs some more work, but -- but it's not a

19   -- it's not a back-of-the-envelope calculation in any way of

20   looking at it.

21   Q    Is there currently uncertainty about the amount of

22   particles coming into the estuary from the ocean?

23   A    Ah, a little bit, and I've talked to Dr. Geyer about

24   this, and that's why he would like to have more instrument --

25   one of the reasons he'd like to have more instrument --

1    instrumentation going out at Fort Point so he could quantify

2    that a little better.  He made some effort to do that, but it

3    wasn't -- he wasn't totally satisfied with his estimates.

4    Q     So just to see if I can clarify the record, one of the

5    main uncertainties in the mass balance is the material that's

6    coming back and forth across Fort Point Cove?

7    A     Right, right, but the -- but the particulate

8    concentrations out at Fort Point, according to Dr. Geyer's

9    data, are extremely low, which makes them hard to quantify,

10   but it also means that there's -- that there's likely to be a

11   large flux of particles, because there's -- the water when you

12   get out is -- if -- if you're out in a boat at Fort Point, the

13   water is -- in Fort Point Cove itself, when I've been out

14   there, the water is -- is obviously turbulent, there's a lot

15   of particles in the water.  But when you get along -- out

16   beyond Fort Point, it starts to look like ocean water.

17         And he -- that's why he wants to quantify the exchange,

18   but mostly it seems like the particles are flowing that way

19   rather than that way, or the water would be -- you know, the

20   -- there aren't a lot of clean water flowing into Fort Point

21   Cove, or it would look like the water downstream would.

22   That's just my analysis of it from being out in a boat, but it

23   seems to fit with what Dr. Geyer has told me and what's in his

24   report.

25   Q     As it currently stands, this mass balance doesn't fully

1    add up, if you will?

2    A     No.

3    Q     Correct?

4    A     No, not -- not fully, but it -- but, um, you -- you

5    wouldn't expect it to because -- I'm trying to remember the

6    mass balance in more detail.  The amount of mercury -- I mean,

7    the system is cleaning itself up so there's mercury being

8    buried all the time.  So the amount of mercury -- it's not in

9    balance.  The amount of mercury coming in is not as great as

10   the amount of mercury going out.  It's close, but -- but you

11   wouldn't expect it to be dead-on because some of it is -- is

12   being buried.

13   Q     Right.  What you -- just to clarify, what you would

14   expect is the material coming into the system is either

15   accounted for as exiting the system at some point or being

16   buried --

17   A     Right.

18   Q     -- or --

19   A     So the amount of mercury coming in is larger than the

20   amount of mercury going out right now, but there's some being

21   buried as well, in -- in the system.

22   Q     Okay.  Did the Study Panel also, at some point, try to

23   create a -- a multicell model of the system?

24   A     Yes.

25   Q     Okay.  And this multicell modeling effort took several

1    years, but ultimately was not successful, correct?

2    A      That's correct, yes.

3    Q      Instead, the Study Panel decided to focus on a -- a

4    simple model of the system as opposed to the multicell model,

5    correct?

6    A      Yes, that's correct.

7    Q      What -- what -- if you could, could you please describe

8    for the record the purposes of -- of that model?

9    A      Of the -- of the multicell model?

10   Q      The simple model that you actually completed.

11   A      The modeling, as I see it, had more than one objective.

12   One -- one objective was -- was to -- if we could get a model

13   to -- to -- to work in the sense that it would predict what

14   was going on in the system right now, we would then have some

15   confidence that it would predict into the future, and then we

16   could -- if we did active remediation, the model could be used

17   to -- to -- to predict how long it would be before the -- the

18   -- the animals would reach our target concentrations.

19          A second reason for doing the model, as I mentioned a

20   couple times already, if you can get a model to work in the

21   sense that it -- that -- that the model will predict what's

22   actually going on in the system right now, if you can put all

23   the inputs in, kind of -- these mass balance kind of

24   instruments we've just been discussing into the model and --

25   and the model then predicts, say, sediment concentrations or

1    water concentrations, then you say, oh, we understand this

2    enough -- the ecosystem well enough that we can build a model

3    that -- that reflects what's going on right now today.  So

4    that's another important reason to build a model.  It gives

5    you confidence that you -- your fieldwork is essentially done.

6         A third really important reason that I've seen working

7    on ecosystems with teams in which modeling has been done is it

8    brings the team together.  In order to construct the model,

9    you have to -- everybody on the team needs to throw their data

10   into the pot, as you've seen here on this last diagram.  So it

11   really gets the team working together and thinking in a bigger

12   way about how their particular piece of the puzzle is

13   impacting the overall ecosystem.  So it's a -- it's a very

14   good team builder.

15   Q    Does --

16   A    The model was very successful at that, I think.  It was

17   successful -- it was also successful in -- in showing that we

18   still had some questions to answer, but it wasn't predictive

19   because of the -- because we found that there needs to be some

20   material -- or needs to be further work, it wasn't successful

21   in the third objective, which was to be useful for predicting

22   remediation.

23   Q    We'll get to the results in more detail in a second.  I

24   just want to fully understand.

25   A    Yeah.

1    Q    Is one helpful aspect of the model that you can test out

2    your hypothesis for what is controlling recovering the system

3    and see if that matches your estimate of recovery time?

4    A    That's right, yes.

5    Q    Okay.  So you'd be using your -- your field data as

6    inputs, and you can test --

7    A    Yeah.

8    Q    -- to see if that matches a certain recovery time?

9    A    Yeah, that was one of the three objectives I think I

10   just described.

11   Q    Let's pull up, just for our discussion, this is Joint

12   Exhibit 6-18.  In your opinion, was the simple model that was

13   done in this case, that's the subject of Chapter 18, helpful

14   to the Study Panel in evaluating its field data?

15   A    Ah, yes, I think it was.

16   Q    Okay.  And how -- how was it helpful?

17   A    Ah, it was helpful the way I just explained.  All the --

18   the data from all of the team members -- and Mr. Harris was at

19   our meetings -- was -- was put into this model as we were

20   trying to get it work -- we were all working closely together

21   as a team, and Mr. Harris himself was -- I consider him to be

22   the best mercury modeler in the world, and he was right with

23   us, and -- and he was -- he was -- you know, he's almost like

24   a coach.  He's -- the team members are in the room; people are

25   putting their data in; and we're all trying to get this --

1   this system up and running, and he's providing insights to us

2   continually that we weren't -- we weren't thinking of

3   ourselves.  He's a very knowledgeable person.

4        So it helped him develop -- helped produce this model,

5   it helped -- it helped the team tremendously, and it also, as

6   I said before, pointed us to -- towards some holes in the data

7   which -- which we need to -- hopefully somebody will work on

8   in the future.

9   Q    And for the record, Reed Harris is one of the

10  individuals that will testify by deposition transcript that

11  has been entered into the record.

12       One of the things that you learned from the modeling

13  effort was that this system is currently not well-quantified;

14  is that correct

15  A    Could you repeat that, please?

16  Q    Yeah.  Is it fair to say that at this point, where we

17  sit here today, the system is not it's -- conceptually you

18  believe you understand the system, but it's not

19  well-quantified?

20            MR. BERNARD:  Objection, vagueness.

21            THE COURT:  Overruled.  Overruled.  Can you answer

22  the question?  Do you understand the question.

23            THE WITNESS:  Yeah, I think I do.

24  A    Some aspects of the system are quite well-quantified.

25  There's some -- there's some that still do need to be

1    quantified is my answer.

2    BY MR. TALBERT:

3    Q    Okay.  And I believe you testified to this in your

4    deposition -- I can pull that up, if it's helpful -- but that

5    without fully quantifying the system, you're not in a position

6    today to firmly recommend remedial alternatives?

7    A    No, there's a couple of -- there's a couple of

8    outstanding questions which I discussed yesterday.  One is the

9    size of the mobile pool, and the other is whether or not there

10   are any sizable inputs of mercury, either from HoltraChem or

11   by erosion of these mudflat sediments, maybe from hotspots or

12   from the sediment mudflats themselves.

13        And these are kind of like -- compared to what's been

14   done, these are kind of like tying up the last details is the

15   way I look at it.  Some questions need to be answered before

16   the -- the -- I think before the -- the engineers could --

17   could be able to fully make use of our data in order to design

18   remediation approaches.

19   Q    I want to go through the conclusions in Chapter 18 just

20   as you understand them, but one of the conclusions is that the

21   current discharges of mercury from the HoltraChem site are not

22   large enough to delay recovery of the system?

23   A    Yes, but that's not an unequivocal conclusion.  Current

24   discharges we've been able to measure, but as I've mentioned

25   several times before, we've searched for that pipe 001, which

RUDD - CONTINUED CROSS-EXAMINATION/TALBERT

324

1    the Maine DEP people I know are concerned about, it may be a

2    significant ongoing source, we haven't been able to find it.

3    But if -- if that pipe -- the discharge from that pipe is

4    ongoing, HoltraChem could still be a significant ongoing

5    source, but we haven't been able to locate that.

6    Q    We will later hear from Mr. Vaillancourt in this

7    proceeding -- at least the court will -- regarding his

8    evaluation, but you did read that report, correct, of

9    Mr. Vaillancourt?

10   A    I did, yes.

11   Q    Okay.  Is one of the things you recall reading that he

12   actually identified and located that 001?

13   A    Ah, yeah, I wasn't aware that he had done any fieldwork.

14   I think -- in my remember -- memory of his report, he seemed

15   to be assuming that most of the mercury from the site was

16   coming down -- presently coming down Southerly Stream and into

17   Southerly Cove, and -- and I'm not aware that anybody has

18   measured mercury coming out of pipe 001.

19   Q    Let's set aside one of the con -- I just want to be

20   clear on the record.  Is it your understanding one of the

21   conclusions in Chapter 18 is that current discharges from the

22   HoltraChem site that you have measured are not large enough to

23   delay recovery of the system?

24   A    Yes, those are -- we have been able to measure, that's

25   correct.

1  Q     Okay.  A second conclusion was that the current field

2  data does not completely match up with a recovery -- half-time

3  for recovery of 36 years, correct?

4  A     Well, the definitive data, which -- which -- which the

5  -- which is the data we're using, are the core data.  So we

6  don't believe it is necessary that -- that every piece --

7  every other piece of the puzzle agree with -- with the -- with

8  the core data in order to make this conclusion.

9        For example, Dr. Geyer coming in, his very first meeting

10 with us, said, I'm going to study the mobile pool for you, but

11 don't use the data I produced to cover -- to -- to calculate

12 recovery rates.  The definitive data are the core data.  And

13 -- and that's been borne out.

14       We think the core data are telling us this -- the actual

15 recovery rates, and as we've been discussing, the -- although

16 the -- the existence of the mobile pool has given us a much

17 better understanding of what's going on in the system, we're

18 having trouble quantifying it, just the way Dr. Geyer

19 predicted.

20 Q     Isn't it true that there is currently uncertainty

21 regarding what is controlling recovery of the system?

22 A     I don't think so, no.  I think -- I think we're quite

23 clear that the -- what's -- what's controlling the recovery of

24 the system is the -- is the total mercury concentration in the

25 mobile pool.

1   Q     I'll show you a couple of documents.  I don't know if

2   you recall us having this conversation at our deposition -- or

3   your deposition.  This is Defense Exhibit 963, and if we can

4   go to Page 150.

5   A     Is this my first deposition or my second deposition?

6   Q     I believe this is your first deposition.  It starts at

7   Line 6 here.  My question was, I just want to understand where

8   we sit right now.  You said, yeah.  Question, is there's --

9   hopefully that's a transcription error -- uncertainty

10  surrounding exactly what is controlling the system?  Your

11  answer, that's right, that's right.  If we were sure, we would

12  -- said I think you should go out and do, but we're not quite

13  sure yet.

14  A     Yes.

15  Q     Do you recall our conversation?

16  A     Yes, I -- I recall that.

17          MR. BERNARD:  Your Honor, I object to the snippet

18  there.  The -- it's part of an answer, and the rest of the

19  answer illuminates some of what he said before.

20          THE COURT:  Sure.  I think he can handle himself.

21          MR. TALBERT:  Yeah.

22          THE COURT:  Would you like to respond to the

23  question?  Do you have a question?

24  BY MR. TALBERT:

25  Q     The question is, does this refresh your recollection of

1    -- of our conversation we had in the first deposition

2    regarding uncertainty of what's controlling recovery in the

3    system?

4    A     Yes, I -- yes, it does.

5    Q     Okay.  And --

6    A     I think what I was -- what -- this isn't inconsistent

7    with what we've been discussing right now.  What I'm saying is

8    conceptually, we understand on a scientific basis what's

9    controlling the recovery.  It's the mercury concentration in

10   the mobile pool.

11        But I think what I'm alluding to here is that we -- we

12   -- is the uncertainties we've been discussing.  We don't know

13   the -- very well the size of the mobile pool or whether or not

14   there is some ongoing inputs to the pool, and -- and we'd like

15   -- you know, we'd like somebody to work on this some more

16   before we -- we turn this whole thing over to the engineers.

17   Q     Let me ask it a different way to see if we can clarify

18   and make sure I understand.  In what ways is there currently

19   uncertainty about what is controlling recovery of the system,

20   if any?

21   A     There's uncertainty about the size of the mobile pool

22   and -- and the movement of mercury into that pool.  It -- it

23   bothers us that -- that the estimates of particle turnover

24   time in the pool doesn't match very well Peter Santschi's

25   recovery rate.  That suggests to us that we don't understand

1   -- even though we know that the mobile pool is controlling the

2   recovery rate, there's something we don't understand about the

3   mobile pool yet, and -- and until we understand that better,

4   we won't be able to give sort of, in the one sense, we won't

5   be able to give the -- the engineers precise directions of --

6   of how they should design the removal of the mobile pool.

7        They might -- they -- we might -- the mobile pool, we

8   estimate right now, is 500,000 tons.  We might say to the --

9   to the -- to the engineers, you need to -- in order to get the

10  mobile pool down to the -- to -- by a factor of two, you need

11  to remove 250,000 tons, but if it turns out, with further

12  work, that the mobile pool is actually a million tons, they

13  would have had to design a system to remove 500,000 tons.  So

14  this is what I'm referring to here as uncertainties.

15  Q    Let's take a look at the conclusions in Chapter 18 of

16  the modeling effort.  This is Joint Exhibit 6-18, and this is

17  on Page 24 -- I'm sorry -- 29, Section 7.1, and let's first

18  highlight the first paragraph.  Okay.  And I'm just going to

19  read this and then ask you questions.

20       The model analysis indicates that existing field

21  estimates of mobile solids mass and turnover rate are not

22  consistent with the hypothesis that the mobile solids pools

23  controls the rate of decline of mercury concentrations in

24  sediments, mobile and depositional, in the upper estuary.  Do

25  you agree with that conclusion?

RUDD - CONTINUED CROSS-EXAMINATION/TALBERT

1   A     Well, I think this is taken out of context.  I think --

2   I know, because I've worked very closely with Dr. -- with

3   Mr. Harris on this, that -- that he believes that the mobile

4   pool is controlling the -- is controlling the -- the surface

5   -- concentration of mercury in the surface sediments.

6         I think what he's expressing here is the -- is the model

7   that he was able to produce won't -- won't -- he can't -- even

8   though -- even though he pushed the -- the inputs to his model

9   as far as he thought was reasonable, he couldn't get the model

10  to -- to match the existing field data, and it -- it was at

11  that point that he -- that he said I can't -- I really can't

12  get this model to work, and that's what the model was telling

13  him, what's in this first sentence.

14        And -- however, he did tell me that if the mobile pool

15  was twice or three -- three times bigger than it was or -- or

16  there was some ongoing inputs of mercury, that then he could

17  get this model to work.  So this is the way a modeler would

18  write this, and it's not -- maybe it's not entirely clear in

19  this context, but I think if you look elsewhere in his report,

20  you'll see that -- that he does -- you know, that he does

21  understand what's going on, and -- and I'm sure he's in

22  agreement with the way I've been discussing this today.

23  Q     I'm not necessarily sure what you just said is

24  inconsistent with this first statement.  He says that the

25  model analysis indicates the field estimates of the mobile

1    solid mass and turnover rate are not consistent with the

2    hypothesis that the mobile solids pools controls the rate of

3    decline of mercury concentrations in the sediments.

4    A     Well, I think what I was reacting are not -- I mean, I

5    agree with what he said, the model could not -- could not

6    support the hypothesis that the mobile pool was controlling

7    the rate of -- of decline, and that's because he couldn't get

8    his model to work.

9    Q     Your point is that he may still think that the mobile

10   pool controls?

11   A     He does.

12   Q     Well, we'll get down to the rest of this in a second.

13   But I believe -- I want to correct the record, too, I think

14   you -- you mentioned you thought that the -- the mass of the

15   mobile solids was 500,000 tons.  He says, if you look at the

16   -- we'll just, for context, we'll read the next sentence.

17          It says, either the field estimates are inaccurate

18   or the conceptual model needs adjustment to include additional

19   processes affecting the rate of recovery.  Next sentence is,

20   based on estimates of the mass of mobile solids in the

21   estuary, and in parens it says 318,000 tons, and estimates of

22   solids burial and downstream export of solids from the mobile

23   pool in the upper estuary, mercury concentrations would

24   decline faster than the observed 32-year half-time if these

25   pools and fluxes governed the recovery of the system.  Do you

1  see that?

2      What is your understanding of the current estimates of

3  the size of the mobile pool?

4  A      In the area of about 500,000 tons, I think.

5  Q      You think that this number of 318,000 tons is

6  inaccurate?

7  A      No, I -- I just -- I -- I think the way that Mr. Harris

8  was working with his models, he was trying various sizes of --

9  with the mobile pool in the model.  He would -- some runs, he

10  would make it 500,000, some he would make it 318,000, some

11  700,000 maybe.  But the -- the run of the model that he's

12  describing here is one in which he set the -- the size of the

13  pool at 318,000.  But my memory is that our best estimate is

14  around 500,000.

15  Q      So --

16  A      But these estimates vary, you know.  I don't know who --

17  maybe he was talking to -- to Dr. Geyer at some point.

18  Q      I want to clarify the record.  Do you have any

19  understanding whether Reed Harris was asked to, in making this

20  assumption, that the mobile pool was 318,000 tons?

21  A      No, no, I think he was trying to -- my guess is -- I

22  mean, I don't know what's going on here exactly because Reed

23  wrote this, not me, my guess is he was trying a number of

24  different -- he was trying to get his model to work, so he was

25  putting in different sizes of mobile pool, different mercury

1    inputs.  I imagine he was varying a lot of these numbers, and

2    this -- and this is the number that he chose to present.

3    Q    Do you have any knowledge of whether this same -- this

4    318,000 tons appears at other places in the Phase II Report?

5    A    It might, it might.  I -- I -- the number that's in my

6    head is 500,000 because that's the number that we used for

7    remediation purposes.

8    Q    He then says, if burial and downstream export of solids

9    are combined, mercury concentrations in the mobile bed would

10   be expected to recover with a half-time on the order of five

11   years.

12   A    Yes.

13   Q    Is this what you were testifying about yesterday in

14   light of Dr. Geyer's evaluation of the mobile pool turnover?

15   A    Yeah, I don't -- I mean, to tell you the truth, I'm

16   having a hard time putting some of this into context.  This is

17   one paragraph out of an entire report that I haven't read for

18   months.  I don't know whether he's talking about Dr. Geyer's

19   data here or his model output, I really don't.  I mean, I --

20   Q    And my question is, do you know -- the -- the mass

21   balance numbers we looked at earlier, with the different field

22   data --

23   A    Yeah.

24   Q    -- of what's coming in --

25   A    Yeah.

1    Q    -- what's being buried, and then what's exiting, do you

2    have an understanding of whether Reed Harris is using that

3    field data into the model, and he's making the point that if

4    you just use that field data, you would come out with a -- a

5    half-time for recovery?

6    A    Yeah, I don't know whether he -- that was his starting

7    point --

8    Q    Almost -- hm --

9    A    -- were those data.  But I don't know whether he's

10   describing what's a model output here, that -- where he's

11   changed those numbers somewhat to try to get the model to

12   work, or whether -- whether he's using -- currently using the

13   data that are -- that are in that mass balance.  This is what

14   I'm having -- I mean, I would have to read the whole report to

15   figure out exactly what -- what he's referring to here.

16        A -- a lot of time modelers describe the output from

17   their models as if they're real data.  I know Reed does this

18   all the time, he says -- he gets an output from his model and

19   he says here's the data.  The scientists in the room say, no,

20   no, no, Reed, that's not data, those -- those are the output

21   of your model.  So I don't know whether this is Reed talking

22   about the data that comes out of his model or whether those

23   are scientific data.  I'd have to read this more carefully

24   Q    This next sentence says, even if just -- even if just

25   one of these removal mechanisms applied, the half-time for

1   recovery would be on the order of ten years.  Do you see that?

2   Let's --

3   A     Yeah.

4   Q     Let's --

5   A     And he's trying to describe that he was unable to get

6   this model to work, as I've said, with the assumptions that --

7   that -- or with the -- with the data that we provided to him.

8   Even if he pushed these data to their reasonable limits, he

9   couldn't get his model to work.

10  Q     And that's because -- isn't he explaining that putting

11  in the field data gave him a faster recovery time than --

12  A     Right.

13  Q     -- the 36-year half-time recovery?

14  A     One -- one of the problems was -- one of the problems

15  was -- and this goes to another big discussion in -- of -- of

16  the -- within the Study Panel -- is everybody, including Reed

17  Harris, recognized that the definitive data was the core data.

18  And -- and a lot of members of the team thought that -- that

19  the 22-year half-life of Mendall Marsh was -- was the best --

20  were the best, including Peter Santschi, were the best

21  estimate of the ecosystem recovery rate.

22        Other members of the team thought it should be a much

23  bigger number, 33 years.

24        When -- when Reed Harris put 22 years into his model, it

25  worked.  When -- but in -- in these model runs that he's

1    talking about here, the 33-year recovery rate is in there.

2    And when the 33-year recovery rate was put in, he could no

3    longer get his model to work.  So that suggests to me that the

4    22-year rate is correct.

5        So, I mean -- and I think what we've always got to

6    remember here is it's the core data that's the definitive

7    data, and when we used what a lot of the geochemists on the

8    project -- geochemical people used what we thought was the

9    correct half-time, he could get his model to work.

10   Q    And you --

11   A    But that's not the way -- you know, that's not the way

12   it happened, so it -- so Reed's modeling didn't come out the

13   wait we hoped.

14   Q    You anticipated a couple of my questions with respect to

15   adjusting that half-time for recovery and --

16   A    That's one of the -- that's probably the -- the biggest

17   -- if you can't -- if you can't get your model to -- to

18   predict what's going on in the ecosystem, the first thing you

19   look at is have I got -- have I -- have I got the right

20   recovery time from the core data, because that's probably the

21   definitive data.  Am I using -- is that number I'm using

22   right?  And a lot of us think that -- that that number's not

23   right.

24   Q    All right.  Let's pull back --

25   A    It's not that it's not right.

1    Q    I want --

2    A    We used it wrong.  We used -- we should have been using

3    22 instead of 33.

4    Q    All right.  And we'll discuss that in more detail in a

5    minute.  I want to just continue with this for a second, if I

6    may.  Right below this, Reed writes, possibilities to explain

7    the discrepancy, and if you go -- please put the -- actually,

8    he writes, possibilities to explain the discrepancy between

9    field estimates of the rate of recovery of mercury

10   concentrations in sediment and rates that would apply solely

11   due to particle turnover in the mobile bed include, and then

12   he goes on to list several possibilities.

13   A    Right.

14   Q    Okay?  One of those is, I think as you've mentioned

15   earlier, that the size of the mobile pool may be

16   underestimated, correct?

17   A    That's correct.

18   Q    And if you -- if you expand -- if we look at this, A,

19   directly under 1, he says, the mobile pool could be larger

20   than 318,000 tons.  If particle losses from mobile solids are

21   45,000 tons per year, mobile solids would have to be 2 million

22   tons for this factor alone to explain the discrepancy between

23   observed and expected recovery rates if the mobile pool is

24   governing -- is the governing factor.  Do you see that?

25   A    I do.

1    Q    Okay.  Now, is that consistent with what you have

2    discussed, I guess yesterday, in the content of, you know, how

3    large the mobile pool would have to be to -- to make the

4    36-year recovery time work?

5    A    33-year, I think it was.

6    Q    I'm sorry.  33-year.

7    A    Yes, this is -- this is what I've been describing this

8    morning, too, is what he was trying to do is push his -- his

9    model inputs to -- to what he considered to be a reasonable

10   limit beyond what you had just -- putting that -- a bigger

11   number into the model would just be ridiculous, and so he

12   increased it to that size, and even at that size, he -- he got

13   the result that's described here.

14   Q    Okay.  He provides three additional reasons that could

15   explain this discrepancy.  The second is, the mass

16   sedimentation and particle export fluxes could be smaller,

17   right?  So these -- these relate to the field sampling data we

18   discussed earlier, correct?

19   A    Ah, for which -- could you --

20   Q    This is No. 2, at the very top.

21   A    Oh, could you blow that up, please?

22   Q    Sure.  Mass sedimentation and particle export fluxes

23   could be smaller, and he notes, if the mobile bed is 318,000

24   tons, burial plus particle loss could not exceed 7,000 tons,

25   and he -- in parens, he says, with no ongoing source of

1   mercury contamination.  And then he says, this is one-sixth of

2   the current estimate of particle turnover.  So he's -- he's

3   highlighting that there could be some issue with the field

4   sampling data, correct?

5   A    Yeah, although I -- as I've mentioned, we think that we

6   know that pretty well.  So I -- I think what Reed's doing here

7   is an exercise, which is the way he is -- he's a very fair

8   person, and he puts in every possibility, but doesn't weight

9   them -- and I think that -- from my perspective of knowing the

10  data, No. 1 would be much more likely than No. 2, but it is --

11  it is a possibility.

12  Q    Let's put the same page back and I want to go to reason

13  No. 3 now and just highlight that one.  This is on Page 29 --

14  it's on, actually, 30, and No. 3 of the possibilities Reed

15  mentions, I believe what you discussed earlier, the recovery

16  rate for the upper estuary could be faster than 32-year

17  half-time currently estimated.  Is that what you're referring

18  -- I know there have been different numbers thrown out, 33,

19  36, he uses 32.  But you're talking about this using the

20  half-time recovery for the main stem as opposed to the 22-year

21  estimate for half-time recovery in Mendall Marsh, using those

22  cores, correct?

23  A    Yeah, I think maybe what the 32 years here is -- he's

24  referring to is the -- is a number that -- that you get if you

25  average the cores -- the recovery rates for the cores in the

1    entire upper estuary that -- which would include Mendall

2    Marsh.  It's a different way of looking at the same -- one --

3    one way of looking at data is to consider all of the data at

4    once; the other way is to take -- is to take -- isolate the

5    Mendall Marsh data separately, and for reasons which I could

6    explain, you use that as the -- as the -- as the actual rate.

7    And the Mendall Marsh recovery rate is 22 years, not -- not 32

8    or 33 years.  I think actually he should have said 33, but it

9    doesn't make any difference.

10   Q    And please explain for the court, if you would, why

11   would using the recovery rate for Mendall Marsh be a more

12   appropriate half-time for recovery?

13   A    Well, because Mendall Marsh is -- in terms of

14   sedimentation, Mendall Marsh is a much more quiescent

15   environment than is the river, and it's a better -- it's a

16   better -- it's -- it's a better physical situation for the

17   sediments to accumulate and record an accurate record.  I

18   think you should talk a lot more to Peter Santschi and Kevin

19   Yeager about this.

20        But particles come in from the river during each tidal

21   flux, and during the spring tides, they get dumped up on top

22   of the platform, but it's a bay -- quite isolated from the --

23   from the currents of the river and any storms that would pass

24   by, and the material tends to settle in a more even manner.

25   And so when you go and take a number of cores from -- from

1    these -- from this more quiescent environment, which Kevin

2    Yeager did, you're more likely to get cores that are -- that

3    -- that have accurately recorded the long-term trends of

4    what's happened in the marsh.

5         And -- and the other thing to -- to remember is that the

6    marsh got its -- its mercury from the river.  So the marsh

7    can't become contaminated or recover any more quickly than the

8    main stem of the river.  So it's controlling what's going on

9    in the river.  So because -- because the -- the marsh is the

10   best place to -- to make an estimate of the recovery rate and

11   because the main stem of the river is -- is controlling the

12   marsh recovery rate, even though you can't measure that as

13   precisely, it's -- a number of us think it's the best way to

14   have gone, would have been to use that recovery rate and apply

15   it to the entire upper main stem, as well as to Mendall Marsh.

16   Q    Those are the reasons that you just provided?

17   A    But that's -- those aren't the numbers that Reed was

18   asked to use, and so he couldn't get his model to work.

19   That's -- I mean, that's what we're talking about here.  But,

20   still, the definitive data are the core data, not -- not the

21   model -- we -- we never anticipate that the model would be --

22   even if he could have got his model to work perfectly, we

23   wouldn't have used it to make conclusions.  That wasn't the

24   objective of the model.

25        The data that -- the definitive data are always the core

1  data --

2  Q     Understood.

3  A     -- recovery rates.

4  Q     The model -- just to clarify for the record, the model

5  was not meant to create a half-time for recovery, it was meant

6  --

7  A     No.

8  Q     -- to test --

9  A     Yeah.

10  Q     -- the relationship between the core data, half-times

11  for recovery, and the field data?

12  A     If you put the recovery rate from the core data into the

13  model and the estimated inputs and outputs of mercury, and the

14  size of the mobile pool, and all the things we discussed, if

15  you put that all in the model, and the model then -- the

16  output of the model, then you can start to predict things as

17  -- such as the mercury concentration in the surface sediments,

18  and the -- the present mercury concentration in the water.  If

19  the whole eco -- it's an ecosystem model.

20      So if the model starts to look like the present-day

21  ecosystem, then you can say, whoa, everything I put into the

22  model must have been -- these numbers must have been pretty

23  good because I can get my model to work.

24  Q     Let's switch gears.  We're going to come back to

25  recovery times in a little bit.  Just to go in a little more

1    detail, to make sure that is clear on the record, but I want

2    to switch gears and discuss the model pool for a minute.

3         Is it fair to say the -- the work you have done in this

4    system on the mobile pool was -- was new for you?

5    A    Yes.

6    Q    This is the first time you've worked on a project where

7    there has been an observation of a mobile pool in the system?

8    A    Yes, I don't -- I don't think this is -- this has been

9    understood very widely before in the -- I mean, we're working

10   with Rocky Geyer, who's right at the top of his field, and

11   there -- my understanding from the coastal hydrodynamicist, is

12   this is a pretty new area of investigation, and there hasn't

13   been a -- a longtime understanding of the impact that this can

14   have on contaminants in estuaries.

15   Q    And Dr. Geyer will -- will testify.  So if I want to get

16   into the details of the mobile pool and the hydrodynamics of

17   the river, is it better for me to discuss that with Dr. Geyer?

18   A    Yes.

19   Q    It's fair to say, though, that with respect to the

20   mobile pool, one of the main uncertainties you've identified

21   is the size of the mobile pool?

22   A    Yes.

23   Q    I want to talk a little bit about erosion.  You

24   mentioned in your prior testimony that you believe one of the

25   potential ongoing sources may be erosion; is that correct?

1    A      That's correct, yes.

2    Q      And the erosion -- the type of erosion you're talking

3    about are rills in mudflats that lead to movement of sediments

4    into the river, correct?

5    A      Yes, well, that's one type.  There's also a -- the -- on

6    the east side of Verona Island, there's a channel that's --

7    that's -- winds its way through mudflats on the east side of

8    the island, as we saw on a previous map.  So that's actually

9    more than a rill.  That's a -- a branch of the river itself

10   that's -- that's reworking mudflats on the east side of Verona

11   Island.

12          So Kevin Yeager has pointed out on several occasions

13   that this is an area that we -- we should consider as -- as --

14   I mean, I could -- I don't know whether I want to go on, but

15   there's -- there's another type of sediments called transition

16   sediments -- and I could explain -- that -- that -- well,

17   maybe I should, because I think this might be important.

18          We've discussed the mobile pool and the long-term

19   deposition sediments -- those are permanently-deposited

20   sediments.  There's another pool of sediments known as

21   transition sediments to Kevin Yeager that are sort of halfway

22   in-between the two.  They might be deposited in -- in

23   mudflats, such as on the east side of -- of Verona Island, for

24   -- for several years at a time, and then when the meander

25   changes on the east side of -- of Verona Island, material

1    that's been deposited there for -- for maybe many years, but

2    not forever, is resuspended and moved back into the mobile

3    pool.

4         And this is part of the reason why the mobile pool is so

5    difficult to quantify because -- because he -- he's having a

6    hard time deciding, what is the mobile pool, which is in the

7    water -- some of the mobile pool's in the water twice a day

8    during the tide, some of it moves every few days, when there

9    -- when there's current -- bigger or smaller currents in the

10   river, and some of it maybe only moves every few years when

11   the river on the east side of the island changes its meander.

12        So I'm saying all of this because it -- to give you some

13   idea of how difficult it is to -- to estimate the size of the

14   mobile pool.

15   Q    There could be temporal variability, as you just alluded

16   to?

17   A    Right.  This is why we think that there needs to be a

18   bit more work done on this to -- there wasn't a lot of cores

19   taken from the east side of Verona Island, for example, so we

20   don't have an idea of -- of how often these sediments move,

21   and we need -- that's one of the questions we need -- one of

22   the detailed questions we still need to still mop up.

23   Q    And is it possible that this type of erosion that you're

24   describing of mudflats, whether they're transitional or

25   nontransitional, could also be an ongoing source from above

1    Veazie?

2    A    I guess if there was a lot of mercury up there.  There's

3    -- there's -- there's some mercury up there, but -- and then

4    there's -- there's very -- there's very -- there is -- there

5    is soft sediments up there that could erode, not a lot of

6    them, I don't think, and if -- if those mercury concentrations

7    were at high -- at -- at a high concentration, they could be a

8    source.  But the present day, it's not.

9    Q    Well -- and you -- you have not -- you've -- the

10   sediment cores that you've taken above Veazie only go down

11   10 centimeters, correct?

12   A    That's right.

13   Q    So you really don't know what is -- what concentrations

14   of mercury may be at depth?

15   A    No, we did not take any cores above Veazie Dam.

16   Q    Okay.  Is it fair to say the Study Panel has not

17   performed any quantitative assessment of erosion?

18   A    We've done some preliminary studies, but that's -- in

19   the report, that's a -- that's a -- in the list of -- of

20   things that we think should be -- you know, small chores that

21   still need to be done, yes.

22   Q    And --

23   A    We've done a little bit of work in the rills, but -- but

24   not a lot.

25   Q    Just so the record's clear, currently there is not a

1    quantitative assessment of --

2    A      No.

3    Q      -- of erosion, correct?

4    A      No, and then we said that in the report.

5    Q      Okay.  And erosion of mudflats could also come from

6    tributaries, correct?

7    A      That's correct, yes.

8    Q      Let's switch gears for a second and talk about hotspots.

9    Could you please provide your definition of what a -- what a

10   hotspot is?

11   A      I think -- my definition of a hotspot is -- is an area

12   -- is -- an example of a hotspot would be -- would be

13   Southerly Cove, where there's -- there's presently a lot of

14   buried mercury.  So if you sample those sediments, you find a

15   large mercury inventory at that site.

16   Q      And it's fair to say that hotspot removal is not

17   something that the Study Panel recommended in the Phase II

18   Report?

19   A      That's true, although we did -- we did agree with the

20   present plan to -- to remove Southerly -- the sediments in

21   Southerly Cove.

22   Q      If the sediments in Southerly Cove were removed, do you

23   believe that that would improve the system?

24   A      Well, it -- it -- it might.  We haven't -- we haven't --

25   we haven't quantified -- there -- there are rills that flow

1    across Southerly Cove, and we know there's very high mercury

2    concentrations there.  We haven't yet quantified the mercury

3    coming out of -- out of those rills as a result of erosion.

4         So it might be an ongoing source of -- of mercury to the

5    system now, and in the future -- I think I -- I'm also worried

6    that in the future, if -- if a large storm was to disrupt

7    Southerly Cove and -- and move that sediment somewhere else,

8    it might cause a -- you know, a significant input to the

9    mobile pool.

10        So I -- I think that, since we know there's a lot of

11   mercury there, and, you know, there might also be mercury in

12   some other coves that we discussed yesterday, that where

13   there's large inventories of mercury in -- sort of in

14   contained areas, that it's probably a good idea to dredge

15   that.

16   Q    I believe you testified earlier that it's your

17   understanding that Southerly Cove will be -- will be removed,

18   right?

19   A    Yes, that's correct.

20   Q    Okay.  Isn't it true that with all of the sampling that

21   has been done, you have not found -- I guess leaving aside

22   Southerly Cove, which will be removed, you haven't found

23   evidence of hotspots in other locations?

24   A    Um, no -- no -- I -- I would say we've found some areas

25   that have higher concentrations than others, but I am

1    concerned that -- that there's other -- there's other coves,

2    like right directly across the road -- the river from

3    HoltraChem and just up and down the stream from HoltraChem,

4    which, you know, there's a lot of these places, and we haven't

5    been able to sample them all yet, and I think it would be wise

6    to go out and take a -- take a very few cores from these

7    locations very close to HoltraChem and see if there are other

8    Southerly Coves out there.

9    Q    I'd like to pull up Exhibit -- Defense Exhibit 461.

10   This is a short e-mail from you --

11           MR. TALBERT:  And I guess for housekeeping, I'd like

12   to move this e-mail into evidence.

13           THE COURT:  Any objection?

14           MR. BERNARD:  No, Your Honor.

15   BY MR. TALBERT:

16   Q    This is an e-mail from you --

17           THE COURT:  Wait, wait.

18           MR. TALBERT:  Oh, I'm sorry.

19           THE COURT:  461's admitted.  You may proceed.

20           MR. TALBERT:  Thank you, Your Honor.

21   BY MR. TALBERT:

22   Q    This is an e-mail from you -- I'm looking at the top

23   e-mail, and if we could just blow that up -- the whole thing.

24   This is an e-mail from you to Drew Bodaly and Chris Whipple

25   with a cc to Nick Fisher, the subject says Penobscot Chapters

1    2 and 17.  It's dated April 2nd, 2013.  So this is a couple of

2    weeks before the issuance of the Phase II Report on April 19th

3    of 2013, correct?

4    A    Ah, yes.

5    Q    And in this e-mail, you say, I have reread Chapter 2.

6    Basically, I like it very much.  It uses a lot of the same

7    data as in 1, 18, and 19, but it does so from a different and

8    useful perspective, just as I had hoped it would.

9         Second paragraph is, I agree with Nick, though, that the

10   last paragraph should be reworked.  I think the hotspot

11   removal idea is good.  The problem with is that with all the

12   sampling we have done, literally hundreds of locations, we

13   haven't found any evidence of hotspots.

14        Is it fair to say that as of a couple of weeks before

15   the issuance of the Phase II Report, you had not found any

16   evidence of hotspots?

17   A    That's true, and this -- and -- and as you can see, this

18   was on my mind.  The mapping -- the big maps that are -- are

19   in the report was done very, very late in the process, the

20   large maps that unfold, and -- and we literally saw them for

21   the first day -- first time in their final form only a few

22   days before the -- before the report was -- was headed into

23   the court.

24        And -- and those maps -- those maps are very useful.

25   They kind of put the whole -- the whole ecosystem into -- into

1    perspective, and if you look at those -- and we spent -- so we

2    spent, just in the last few days, a lot of time looking at

3    those maps, and -- and I -- and this thought was still in my

4    mind, and I started to notice these -- these -- again, these

5    -- refreshed my memory, really, I guess, these -- these areas

6    of deposition, coves near -- near HoltraChem -- across and

7    near to HoltraChem, and they were plotted, along with the

8    mercury concentration, on these maps.

9         And I noticed because also all of the plotting -- every

10   site that had been plotted was marked on those maps, so I was

11   finally getting to see everything at once, and I started to

12   notice that some of these coves, very -- with sediments, very

13   close to HoltraChem, had never been sampled, and I guess I'd

14   never been able to look at the data that way before.

15        So, actually, during one of my depositions -- I think

16   during my first deposition -- I brought this up as something

17   that -- and it's not -- it's something that's not really

18   described in the -- in the report at all, but it was kind of

19   like a new thought because these -- this data was coming

20   together so close to the end of the project that I thought,

21   oh, boy, it's -- you know, if I'd seen this a few months ago,

22   I would have suggested we go out and take some -- some -- some

23   more cores.  It'd be a small job to take some -- some more

24   cores from these coves.

25   Q    And I want to understand that for a second, but just to

1    clarify the record, the maps you're referring to, these are

2    the kriged -- kriging maps?

3    A    That's correct, yes.

4    Q    Correct?

5    A    That's correct, yes.

6    Q    And those are in Chapter 5 of the report?

7    A    Yes.  Some of them -- so Chapter 5 and some of them I

8    brought forward into Chapter 1.  They're the same maps.

9    Q    And we will discuss those in -- in more detail later

10   today, but those -- those maps were also done by Dr. Yeager,

11   correct?

12   A    He worked with -- with -- I've lost the name of the

13   fellow at -- at Environ, he -- he and Dr. Yeager worked

14   together, and Dr. Kelly was involved in it, too, putting those

15   maps together.

16   Q    Environ did the -- did the actual kriging, correct?

17   A    That's correct, yes.

18   Q    And, again, we'll talk a little bit more about kriging,

19   but I want to make sure the record's clear on that.

20        But where we are -- so at least as of this time frame,

21   on April 2nd, 2013, this is almost nine years after the study

22   had been going, and as you note, literally hundreds of

23   locations of samples, and at this point, you had found no

24   evidence of hotspots?

25   A    Well, no, I think there wasn't hundreds of locations.

1    There was 58.

2    Q    Those were what were analyzed, correct?

3    A    No, no, there was only -- there was only 58, or maybe

4    72, depending how you look at it, deep cores taken.  And so

5    only those deep cores that Kevin Yeager and Peter Santschi

6    took could be used at -- to evaluate whether or not there was

7    a hotspot.

8         The other -- all of the other cores we had taken were

9    only 10 centimeters deep.  So it was only -- and Kevin Yeager

10   went out there to sample, and he -- when he was sampling, he

11   -- he was basing his -- selecting his sample sites on the

12   basis of where there might be a good record -- a good

13   sedimentary record, and he was -- his question was to look at

14   recovery rates, not to look at whether HoltraChem was the

15   source of the mercury or not.

16        So he was going around trying to predict where a good

17   sediment core could be obtained for the purposes of

18   calculating recovery rates, and so he just chose the -- the

19   cove that he did to take one of his 58 cores.  He didn't -- he

20   didn't say I'm going to go and sample all these coves close to

21   HoltraChem because that wasn't his objective.

22        So I'm saying now that when all the data has come in and

23   -- and the idea's come in that maybe HoltraChem isn't the

24   source of the mercury after all -- that maybe we should go

25   back and look at some of these cores, do a more targeted

1    sampling for that purpose.  I mean, that wasn't the purpose of

2    these cores.  There's only 58, not hundreds, and -- and the

3    purpose of those cores was not to check out to -- to see if

4    there was other coves like Southerly Cove.  The purpose of the

5    cores was to see what the recovery rate of the ecosystem was.

6    It's an entirely different study.

7    Q    Well, what are you referring to when you say literally

8    hundreds of locations?

9    A    Well, I -- I don't know.  What -- what are you referring

10   to?  I -- I don't know.

11          THE COURT:  I think he needs to be referred to the

12   e-mail.

13   BY MR. TALBERT:

14   Q    Okay.  Within your e-mail, in the parens it says, and

15   I'll just read the sentence, I think the hotspot removal is a

16   good -- idea is good.  The problem is that with all of the

17   sampling we have done, in parens, literally hundreds of

18   locations, we haven't found any evidence --

19   A    Yeah.

20   Q    -- of hotspots?

21   A    Yeah.

22   Q    What are you referring to when you say literally

23   hundreds of locations?

24   A    Well, we have sampled literally hundreds of locations,

25   taking -- taking -- I don't know whether it's hundreds.  I

1    mean, this is something I wrote off the top of my head.  It

2    might not be hundreds.  Taking short cores of 10 centimeters

3    and also Dr. Gilmour has sampled many, many times in Mendall

4    Marsh and a few other marshes, taking short cores.  And we

5    didn't find any hot -- we didn't find any extremely high

6    concentrations at the surface.  So we didn't see any surface

7    -- any indication sampling only the surface of the sediments

8    that there was a -- there was a hotspot out there.

9         Even Southerly Cove doesn't look like a -- particularly

10   like a hotspot anymore because the mercury is buried at depth.

11        So all I'm saying here in a -- in a very offhand way is

12   we -- we haven't seen any other hotspots based on the type of

13   sampling we've done.  But you wouldn't really -- I mean, the

14   -- the -- the rigorous way to look at it is you can't really

15   tell if something's a hotspot or not unless you take one of

16   these long cores, like -- like Dr. Yeager and Dr. Santschi

17   took, and there's really only 50 to 70 of those available, and

18   a lot of -- a lot of sedimentary sites haven't been sampled at

19   all using that definitive method.

20   Q    Isn't it fair to say that your earlier testimony was

21   that this is one of most extensively cored estuaries that

22   you're aware of?

23   A    That's correct, for the purpose of establishing recovery

24   times.  It's not -- I wouldn't say it was extensive for the

25   objective that -- that's being discussed here, to establish

1    whether or not a certain -- a certain cove has high -- has

2    high mercury inventories.

3    Q    Would you agree that there -- if hotspots are identified

4    and removed, that you would still have some concern over

5    resuspension of material?

6    A    Ah, you mean during the dredging process?

7    Q    Correct.

8    A    Yes, that would have to be done carefully, I think.  I

9    hope it will be at Southerly Cove.

10   Q    Is it fair to say that Dr. Geyer, who is the expert on

11   hydrodynamics and the mobile pool, has informed you that the

12   mobile pool works against hotspot remediation because it

13   effectively turns hotspots into warm spots?

14   A    Yeah, I don't know whether I totally agree with that

15   because the mobile -- you -- I think what Dr. Geyer is saying

16   is that the mobile pool, if it -- if the mobile pool

17   encounters a -- some sediments -- some surface sediments that

18   are -- that are high in mercury concentration, some of those

19   sediments are eroded, and they join the mobile pool, and --

20   and the mobile -- and so that those sediments that are at high

21   concentration there, then become a lower concentration in the

22   mobile pool.

23        But if you look at it from the other direction, what's

24   happened is the erosion of those sediments has increased the

25   concentration of the mobile pool slightly, so this would

1    retard the rate of recovery of the ecosystem.

2    Q    Why don't I direct you to --

3    A    I think it depends how you -- how you look at that --

4    Q    Why don't I direct you to a document just to inform our

5    discussion.

6    A    Okay.

7    Q    So this is Defense Exhibit 300.  It is an e-mail chain

8    between you and Rocky Geyer and Drew Bodaly.

9             MR. TALBERT:  And I would move for its admission.

10            THE COURT:  Any objection to 300?

11            MR. BERNARD:  No objection.

12            THE COURT:  300's admitted without objection.

13   BY MR. TALBERT:

14   Q    If you refer to Page 2 of this document -- and I'll pull

15   it up for you -- if we could pull up just the very top e-mail

16   from Rocky Geyer to you, he -- he counsels, in the third

17   sentence, he says, the mobile pool really works against

18   remediation because it turns hotspots into one really big warm

19   spot, but the advantage is that the mercury coming over

20   Mendall only needs to be reduced by a factor of two or so to

21   get into recovery mode.

22   A    Yes.

23   Q    Do you recall having this discussion with Dr. Geyer?

24   A    Ah, yes.

25   Q    Okay.

1    A      Vaguely.

2    Q      Isn't it true that another reason hotspot removal is not

3    recommended is that the apparent size of the mobile pool of

4    sediments suggests that such an approach will not work?

5    A      No, I -- I don't think he says it's -- it's not going to

6    work.  I just -- I think he says that, as -- as everybody

7    recognizes, it's not -- this isn't something that's -- that's

8    easy.  It's -- it's -- it's a job that's -- that's got to be

9    well done, and it's --

10   Q      Well --

11   A      Yeah, I don't -- I don't think this says anything

12   different than -- than what we've been discussing.

13   Q      Doesn't -- doesn't the Phase II Report itself state that

14   hotspot removal is not recommended due to the size of the

15   mobile pool?

16   A      Could you ask that question again?

17   Q      Sure.  And I'll refer you to the report, if that is

18   helpful.  Let's take a look at Joint Exhibit 6-22, Page 3.

19   A      I'm not sure --

20   Q      At the very bottom -- let me just, you know, refer your

21   -- the very last sentence in the last page -- this is 22-3 --

22   it says --

23   A      This is from the report now?

24   Q      This is from Chapter 22 of the Phase II Report.

25   A      Okay.

1    Q      It says, one type of limited treatment that is often

2    applied to large contaminated systems is specific hotspot

3    removal.  Do you see that?

4    A      Right.

5    Q      The main reason that hotspot removal is not recommended

6    is that the apparent size of the -- of the pool of mobile

7    sediments, see Chapter 7 -- that's Dr. Geyer's chapter --

8    suggests that such an approach would not work.

9    A      Can we go back to the previous one, please?

10   Q      The previous document?

11   A      The previous document.

12   Q      Sure.  That is Defense Exhibit 300.  But just for the

13   record, Chapter 22 is a -- is a chapter that you were a

14   coauthor on correct?

15   A      That's correct, yes.

16   Q      Okay.  So did you review that chapter before it was

17   submitted to the court?

18   A      Yes, I did, yeah.

19   Q      You approved that chapter?

20   A      Yes.

21   Q      Here's the e-mail.  What -- did you want to refer to

22   Dr. Geyer's statement again?

23   A      I want to go back and reread that sentence that we read

24   before.

25   Q      Okay.

1   A      I think I'd like to see what Dave Ralston was saying,

2   agree with what Dave Ralston said.

3   Q      We really don't need to --

4   A      What did Dave Ralston say?

5   Q      -- explore this e-mail further.  I really -- my -- my

6   question can be answered looking at the Chapter 22 report.

7   A      What I'm wondering is if Rocky's definition of a hotspot

8   is different than my definition.  I mean, my definition of a

9   hotspot is mercury -- high concentrations of mercury at depth,

10  and I -- I'm wondering if Rocky's definition of a hotspot or

11  Dave Ralston's definition of a hotspot is -- is high mercury

12  concentrations on the surface of the sediments, which would

13  make more sense with what we're discussing here.  But I --

14  until I know what Dave Ralston is talking about, I -- I can't

15  -- 'm having trouble putting this all together.

16  Q      I will -- I'll move past that because I'm not sure that

17  we will get to the bottom of what Dr. Geyer thinks is a

18  hotspot.  I -- he'll testify and we can ask him.  My point of

19  showing you this was that he -- he made the statement to you.

20  A      Yeah.

21  Q      If we switch documents to the Phase II Report, though,

22  in Chapter 22, this is authored by you -- or a coauthor at

23  least -- and I'd like to hear your understanding on Page 3,

24  the very last sentence, concludes that hotspot removal is not

25  recommended because the apparent size of the pool of mobile

1  sediments suggests that such an approach would not work.

2  A     Yeah, and I guess that's in Chapter 7.  I don't

3  specifically remember it.  But I guess it depends on your --

4  your definition of a hotspot, and -- and -- and I'm wondering

5  if Dr. Geyer's definition of a hotspot is not the same as

6  mine.

7  Q     Well, but you -- you -- you reviewed this document, as

8  we just established?

9  A     Yeah, yeah.

10 Q     Okay.

11 A     And I -- yeah, I don't -- I didn't focus on this

12 statement --

13 Q     Okay.

14 A     -- a lot, to tell you the truth.

15 Q     We'll move on.  Switching gears to some of the kriging

16 that you mentioned, do you know what kriging is?

17 A     Yeah, I -- I do.  I've never used kriging myself, but

18 I've used another related approach a lot, which is -- which is

19 called isopleths.  So I've never done kriging myself, but I --

20 I'm reasonably familiar with it.

21 Q     Okay.  And one of the kriging maps we referred to

22 earlier is shown in Chapter 5.  This is on -- this is Joint

23 Exhibit 6-05 on Page 18, and I believe it's 5-14.  Okay.  Is

24 this -- this is very small, I understand it's a fold-out map,

25 right, but is this the map that you were talking about when --

1    when you were talking about the kriging?

2    A    Yes, that -- that's one of the maps, yes.

3    Q    Okay.  Do you agree that -- that you can't just take a

4    map like this, a kriged map, and assume that where there's a

5    -- well, why don't we -- to start foundation, if we can

6    highlight the box up in the upper left corner, there's --

7    there's a key, and we unfortunately can't see this all that

8    well due to the -- the blurred, but essentially, the higher

9    concentrations of mercury are indicated in the red, right?  It

10   runs -- the red is the highest, and then the blue would be the

11   lowest?

12   A    Yes.

13   Q    Okay.  So if -- if we back out, is it fair to say that

14   you can't just look at a map like this, and where the kriging

15   map has created a shaded area that's red, you can't just

16   conclude that that's a hotspot and assume that if you went out

17   there and dug that out that you'd dig out high concentrations,

18   unless you had an actual data point there?

19   A    Yes, that's -- the -- the -- the -- the objective of

20   these maps was to give a -- a general visual representation of

21   where the mercury is in -- in the ecosystem.  Kriging is not a

22   very precise method.  It's -- it's used by people working on

23   whole ecosystems because it allows you to stand back and look

24   at the whole ecosystem and -- and get some idea of where

25   there's more mercury than -- than -- than -- and where there's

1   less mercury in the entire ecosystem.  It's not -- if you zoom

2   in on any one particular point, it's not very precise because

3   what the -- the kriging does is it -- it interpolates or

4   calculates -- if you have one -- one data point -- one data

5   point here and one data point here and -- and what the

6   computer program does is it estimates the -- it sees the

7   difference between these two concentrations and estimates what

8   the concentration likely would have been between two other

9   points or three other neighboring points.

10       So it's -- it's an approximation in order to draw these

11  -- these maps and visualize your data in a general way.

12  Q    And we will talk to Dr. Geyer about this in more -- I'm

13  sorry -- Dr. Turner about this in a little more detail to

14  discuss, you know, his exact locations for sediment cores that

15  he took that were the basis of creating the kriging map.  But

16  is it --

17  A    It wouldn't be Dr. Turner.  It would be --

18  Q    I'm sorry.  Dr. Yeager.

19  A    Oh, okay.

20  Q    Dr. Yeager.  Is it fair to say that there is, you know,

21  variability within the system such that you can take a sample

22  fairly close-by and have different results?

23  A    Ah, yes, there's variability, although, as we've seen,

24  the -- I mean, the concentrations below Veazie Dam, virtually

25  every core you take are higher than upstream of Veazie Dam.

RUDD - CONTINUED CROSS-EXAMINATION/TALBERT

363

1  So there's variability, but if your differences from site to

2  site are -- or from one area to another are huge, usually a

3  neighboring core might be slightly different, but it's still

4  much higher than in an uncontaminated area, so --

5  Q    Well, so the record's clear, we don't have any deep

6  cores above Veazie Dam, right?

7  A    That's correct, yes.

8  Q    Okay.  Would you agree that you shouldn't rely --

9  someone shouldn't rely on the kriging map to establish

10  specific remediation plans?

11  A    No, that wasn't the purpose, that wasn't the purpose of

12  these maps.  The specific remediation plans come from the

13  other data that we've been discussing, particularly the core

14  data.  These, as I said, are mainly to visualize the system as

15  a whole.

16  Q    Let's switch gears and -- and talk a little bit about

17  ongoing sources.  Is it fair to say that there are several

18  possible ongoing sources of mercury to the Penobscot?

19  A    Ah, presently?

20  Q    Correct.

21  A    Ah, yes.

22  Q    And -- and even the mass balance that we looked at

23  earlier has several categories of potential ongoing source,

24  correct?

25  A    That's correct, yes, yes.

1   Q     There's a source potentially coming from above Veazie?

2   A     Yes.

3   Q     There's atmospheric deposition?

4   A     Yes.

5   Q     There -- there are point sources?

6   A     Yes.

7   Q     Okay.  In fact, do you recall that as of June 2009, you

8   were made aware that there were a possible 157 different

9   sources of mercury to the Penobscot?

10  A     Ah, yes.

11  Q     And this was in a report from the Maine DEP done by

12  Sterling Pierce, correct?

13  A     That's correct, yes.

14  Q     And I won't belabor the point, but do you recall your

15  reaction, I believe, was that this -- this haunted you

16  thinking that there was 157 different potential sources?

17  A     Right, yeah, because it was my previous experience with

18  Lavaca Bay, where we had found that the ongoing source from

19  the plant was what was causing the problem to continue to the

20  present day, and when we shut it off, we -- we saw a big

21  beneficial effect.

22        So a -- one of my big goals, when I went into this

23  study, was try and see whether there was any large ongoing

24  point sources because I knew that we couldn't -- we couldn't

25  recommend any type of remediation if there was an ongoing

1    source that hadn't been identified.  So we put a lot of effort

2    into -- into ongoing sources.

3         So I wasn't happy to hear there was 157 possibilities.

4    Q    And we will talk to Dr. Turner about this later on in

5    the process, but is it fair to say that you didn't go out and

6    you weren't able to investigate all these various point

7    sources?

8    A    No, no, we weren't, and -- and Dr. Turner suggested a

9    different approach, which I thought was good.  A lot of those

10   -- a lot of those -- those possible point sources are located,

11   you know, along -- along river banks and so on, and -- and so

12   for -- for the tributaries downstream of -- of -- of Veazie

13   Dam, where we were most -- most -- did -- some of those -- by

14   the way, some of those -- some of those sites were upstream of

15   -- of Veazie Dam, and so we could capture their ongoing input

16   by the sampling we were already doing at Veazie Dam.

17        The other thing we did was we sampled the tributaries

18   because a lot of these other -- these -- these other sources

19   were -- mercury would be flowing into the tributaries that

20   flow into the river below Veazie Dam.  So Dr. Turner

21   suggested, which I thought was a good idea, to sample upstream

22   of -- of highly settled areas in these tributaries and also

23   just before -- in the river just before it flowed into the

24   river, so we would capture a number of different point sources

25   as the river flowed through the -- through the town and so on.

1      So we took a -- we took that approach rather than trying

2   to -- to find the outfall pipes from all of these locations

3   and sample them individually.  We thought that's the best we

4   could do.  And -- and we didn't find any -- any large ongoing

5   sources.

6   Q    Is it fair to say that the largest current source that

7   the Study Panel is aware of is what is coming over Veazie?

8   A    Yes, yes, about 90 percent of the mercury ascending the

9   lower estuary now is mercury coming over Veazie Dam.  But it's

10  coming over in a very low concentration, about 2-nanograms per

11  liter.

12  Q    And this is that 240 nanograms per gram on particles we

13  discussed earlier?

14  A    That's right, that's right.  Yes.

15  Q    Okay.  You noted, I believe, as early as 2006, that the

16  tributaries are a potential source of methylmercury, correct?

17  A    Yes.

18  Q    And we discussed earlier that erosion in the tributaries

19  is also a potential source.

20  A    Hm-hmm.

21  Q    Is that a yes?

22  A    Yes, yes.

23  Q    Is it fair to say that currently there is some

24  uncertainty about how much mercury is coming from tributaries?

25  A    Ah, yes, there's some uncertainty, but in terms of the

1  mass balance, it's only about between 10 or 20 percent of the

2  flow.  Most of the flow is coming over Veazie Dam, and we know

3  that very well, and we know that -- we know the -- the mercury

4  concentrations in the -- in the -- in the tributaries

5  downstream of -- of Veazie Dam fairly well.

6       So even -- you know, even if -- if our -- our estimates

7  aren't -- aren't reasonably accurate, it wouldn't affect the

8  overall mass balance very much.  Most of the mercury --

9  90 percent of the mercury roughly is coming from upstream.

10 Q    Is it correct to say that only one -- there's only one

11 sampled tributary, and that was only done once?

12 A    No, that's incorrect.

13 Q    Let's pull up Defense Exhibit 659.

14      MR. TALBERT:  I'll move for the admission of Defense

15 Exhibit 659.

16      MR. BERNARD:  No objection.

17      THE COURT:  No objection?  It's admitted without

18 objection.

19 BY MR. TALBERT:

20 Q    On the screen is an e-mail from you to Drew Bodaly, Nick

21 Fisher, Chris Whipple, cc'ing Carol Kelly, and this is sent

22 August 27th, 2010.  Do you see that?

23 A    Yes, I do.

24 Q    Okay.  You were writing to Drew Bodaly, and I'll read

25 some of it just to -- to orient you and -- and for context for

1    the e-mail.  But you say, Drew, I'm finding -- I'm assuming

2    that's a typo, some fairly significant problems with Ralph's

3    report.  Do you see that?

4    A      Yes, I do.

5    Q      Is that Ralph Turner?

6    A      That's correct.

7    Q      Okay.  What I'm -- we can read through the first couple

8    paragraphs, if you would like, but you discuss some of the --

9    the inputs, and then I want to focus on the second problem,

10   which is relevant to what we were just discussing, and you

11   say, The second problem I am having is that for the assessment

12   of the other total sources -- maybe we can blow this up -- to

13   the lower Penobscot.  Ralph sampled only one tributary, and

14   this was done only once.  So we are left with extrapolating

15   this single result to all times of the year and to all streams

16   below the Veazie.  This wasn't what I was hoping for.  The

17   main reason for this part of the study was to do our due

18   diligence so that we can make defensible conclusions about the

19   relative importance of the other ongoing sources, as well as

20   HoltraChem, to the river in our final report.

21   A      Right, these are present-day sources we're talking

22   about.

23   Q      Yes.  Does this refresh your recollection?

24   A      Ah, yes, it does.

25   Q      And what was your concern?

1   A    Well, my concern was that Ralph had only conclude -- my

2   concern was that Ralph had only included the data in his

3   report that he had actually collected, and I knew that -- I

4   knew that there was more data that we -- specifically

5   Dr. Kopec had collected on the tributary streams and -- and I

6   think this -- I think Ralph -- we hadn't really communicated

7   to Ralph well enough that in writing his report, he should use

8   all of the data that was collected by the -- by the study, not

9   just the data that he collected himself, in making his

10  estimates.

11       So I -- I think what happened after this is -- is -- is

12  we contacted Dr. Turner, and -- and Dr. Kopec turned her data

13  over that she had -- much more extensive data collection that

14  she had made on -- on several of the streams on several

15  occasions over to Dr. Turner, and he then, I thought, included

16  them in his calculations.

17  Q    Did you inform Dr. Turner that you were -- you had

18  expected more from his examination of ongoing sources from

19  tributaries?

20  A    No, because my memory was that -- I thought that

21  Dr. Turner -- and I think they were -- Dr. Turner and -- and

22  Dr. Kopec were working together on this.  They were kind of a

23  team in the field for a lot -- a lot of what was going --

24  particularly at HoltraChem, and I knew that -- that Dianne had

25  collected these samples, but somehow they hadn't made their

1  way to -- to Dr. Turner's -- onto Dr. Turner's computer.

2      And I -- this was a matter of assembling all the data

3  into one place so that -- so that it could be -- it could be

4  looked at at once.

5  Q    Dr. Rudd, I'd like to refer your attention to Defense

6  Exhibit 26.

7           MR. TALBERT:  And if I could move this into the

8  record.

9           THE COURT:  Any objection to 26?

10           MR. BERNARD:  No, Your Honor.

11           THE COURT:  26 is admitted.

12  BY MR. TALBERT:

13  Q    Dr. Rudd, this is an e-mail from you to Dr. Turner,

14  cc'ing Drew Bodaly, sent on January 25th, 2012.  So this is

15  several years after the prior e-mail we just looked at, which

16  was dated 2009.  Do you see that?

17  A    Yes, I do.

18  Q    You write to him and you say, Hi, Ralph, my responses to

19  your questions are below in caps.  So when we look at

20  Dr. Turner's e-mail to you, you -- you have responded to his

21  questions in all caps, correct?

22  A    That's correct, yes.

23  Q    We'll start with Dr. Turner's e-mail, then, and then go

24  through your responses.  But Dr. Turner e-mails, and he says,

25  based on your comments, he says, I am working on the revision

1    of the HC report for which you provided comments a while back.

2    That -- HC is HoltraChem?

3    A    That's correct.

4    Q    Based on those comments, I have four questions.  The

5    first one -- and I don't know if this is big enough for you to

6    see -- but it says, you said that you were still uncomfortable

7    about our efforts to -- and he puts in quotes -- to locate

8    other ongoing sources of mercury, e.g., Brewer, Bucksport, how

9    should I remedy that?  So far, we've relied on state data and

10   that provided to state by dischargers.  Do you mean we should

11   try to use the tributary sampling results that Dianne and/or

12   Normandeau collected?  And in response, you say, yes, I think

13   it would be good to include these results in your report.  Is

14   that part of what you were referring to earlier?

15   A    Yes, it was.

16   Q    Okay.  He then says, or should we plan to go out again

17   and sample industrial discharges directly?  I know that the

18   latter idea was discussed at one time, but I thought having

19   the state's results, where they did that, were sufficient as a

20   check on the self-reported results.  Your response is, in

21   retrospect, I'm thinking that it would have been good if we

22   had asked you to sample the tribs more often, in case we could

23   have picked up some intermittent discharges.

24   A    Yeah.

25   Q    Do -- what are you referring to when you -- when you

1    state that you wish in retrospect, the tribs would have been

2    sampled more often?

3    A    Well, scientists are always wishing they had more data,

4    and we -- you know, Dr. Kopec did go out and sample these

5    streams on a number of occasions, but I was just wishing --

6    you know, it's possible that -- that -- we weren't

7    continuously monitoring those rivers.  We were -- we were --

8    she would go out and sample them, I forget how many times now,

9    and at the times that she sampled, there was no large

10   discharge of mercury from -- from these tributaries.

11        But I was just saying here it would -- you know, it --

12   it's -- it's too bad we couldn't have sampled it even more

13   often because there might have been a time when somebody -- or

14   some plant or company discharged a whole bunch of mercury, and

15   we miss -- over a short time period, and we missed it.  That's

16   what I'm trying to say there is that you're -- you're never

17   sure, and I -- I think overall we did the best we could, but

18   it would have been nice if we could have taken even more

19   samples.  We were doing a Ford, not a Cadillac.

20   Q    Your next statement here, you say, I wish we had put

21   more effort on investigating Bucksport and Brewer and maybe

22   upstream of the Orland Dam.  This is hindsight now, and maybe

23   the best way to address it is with a caveat that all

24   possibilities for ongoing sources have not yet been exhausted.

25   Do you see that?

1  A     And continuing on, this is maybe something we can do in

2  Phase III.

3  Q     Okay.

4  A     Yes, I see that.  We did, though, try to -- try to look

5  at Bucksport in detail because Bucksport's a paper mill and

6  it's right in the -- in the upper estuary.  And so I have

7  always been concerned that -- that maybe slimicide could have

8  been used at -- at Bucksport in the past.  And at one point, I

9  -- after discussion with Drs. Bodaly and Turner, I -- I

10 approached Monica Bigley, because we -- we -- you know, they

11 didn't -- Bucksport people didn't -- I think Dr. Bodaly tried

12 to get our -- Dr. Turner tried to get onto the site and

13 couldn't, or we thought they wouldn't let us.

14       So I went to -- to Monica Bigley and said, could the

15 court talk to the people at Bucksport and -- so that we could

16 go onsite and see if there's large -- if there happened to be

17 large amount -- or large concentrations of mercury in the --

18 in the plant or the surrounding soils?  And -- and this was a

19 phone call with Monica, and -- and I don't know whether she

20 went to Judge Carter or not, but that the answer that came

21 back is no -- I think it was directly from Monica.  She just

22 -- it was like, no, we don't want to go there.  That would be

23 -- there'd be a lot of legal wranglings go on, and we just

24 don't -- wouldn't want to go in that direction.  So we weren't

25 able to -- we were stymied in our attempt to look directly at

1    the Bucksport site.

2          But we do -- luckily, Dr. Yeager did take one of his

3    cores right in front of Bucksport, one of his -- one of the 58

4    deep long cores, and -- and, fortunately, it's a -- it's a

5    very good, easily interpretable core, and I see nothing in

6    that core that would suggest that Bucksport was either a -- a

7    long-term source or a -- or a -- or a present-day ongoing

8    source.

9          So the way I look at is we kind of lucked out on that

10   one.

11   Q    Well, just as a follow-up on that sediment core that

12   you're referring to, that -- is it fair to say that the peak

13   of mercury in the sediment core taken right outside of

14   Bucksport is one of the sharpest peaks of any of the cores

15   that have been taken?

16   A    Yes, it is one of the sharpest cores that have been

17   taken, and -- and -- and one -- one of the higher

18   concentrations, and that -- that is why I think it -- it

19   cannot have been slimicide, because slimicide would have been

20   used over a period of -- of roughly 30 years, and if slimicide

21   had been -- if the mercury had gone from the Bucksport mill

22   over a period of 30 years, as -- as the way it's been thought

23   to have been used, it wouldn't have been a sharp peak.  It

24   would have been a much more gentle, gradually increasing peak,

25   and slowly decreasing peak.  But, instead, it was this very

1    sharp peak, which indicates an event to me of -- of a very

2    short duration, such as HoltraChem.

3         So I -- I concluded, when I saw that peak, which is a

4    very big peak, that -- that that was HoltraChem mercury which

5    had been added over a very short time period and had come

6    downstream from HoltraChem and been deposited there.

7         In one of the previous maps that we've looked at of

8    Dr. Geyer's data, he puts a circle right at HoltraChem as

9    being one of the trapping sites of -- of -- one of the places

10   where the mobile pool arrives and traps sediments.  So maybe

11   -- maybe the reason that that peak is so high at Bucksport is

12   because it's at one of the mobile -- the mobile trapping sites

13   that Dr. Geyer has -- has identified.

14              THE COURT:  Good time to break?

15              MR. TALBERT:  Sure.

16              THE COURT:  We'll take a 20-minute break.

17        (Court recessed from 12:41 p.m. to 1:05 p.m.)

18              THE COURT:  You may proceed.

19                   CONTINUED CROSS-EXAMINATION

20   BY MR. TALBERT:

21   Q    Dr. Rudd, I want to switch gears and talk a little bit

22   about historic sources.  Do you recall at your deposition

23   testifying that it was important to understand historic

24   sources?

25   A    Yes, I do.

1  Q     And why is that?

2  A     I think it's important, to put the study into -- into --

3  into proper context, to -- to know what was going on in the

4  ecosystem prior to the addition of mercury, and if you're

5  going to remediate a system, I think it's important to know

6  what the system looked like before it was contaminated.

7  Q     Is it also important to understand historic sources if

8  you are going to be digging these pits and -- and finding

9  material, you'd want to know what's -- what's down there?

10 A     Oh, that's correct, sure, yes.

11 Q     I believe you testified at your deposition that Sediment

12 Cores PBR-1.5-B and 4-C were part of the evidence you used to

13 conclude that HoltraChem was the main source of mercury to the

14 river.  Do you recall that?

15 A     Well, after the -- yeah, after the -- the -- I don't

16 know -- maybe I'll use the word controversy came up about

17 whether or not HoltraChem was the main source, I went back and

18 -- and -- and looked at some more of our data, and, basically,

19 you know, the data we collected, even -- even though it wasn't

20 for the purpose of establishing what the source of the mercury

21 was in the upper estuary, the data that we established -- the

22 data we collected for other purposes could then be

23 reinterpreted to reexamine that question again.

24       And -- and when we used the data we have -- I'm talking

25 mainly the -- the core data again now -- we found that our --

1    from our point of view, the -- the data is consistent with

2    HoltraChem being the major source of mercury to the upper

3    estuary.  And I did look at those cores as part of -- part of

4    that -- that analysis.

5    Q    Let's take a look at those cores just so we have a

6    context to talk from.  This is Joint Exhibit 6-1 on Page 45.

7    Could you -- did you recognize this figure as Figure 1-11 from

8    the Phase II Report?

9    A    Yes, I do.

10   Q    And what does this show?

11   A    These -- these show mercury concentrations of depth in

12   two of the cores that Dr. Yeager took --

13   Q    Okay.

14   A    -- just below Veazie Dam, between Veazie Dam and the --

15   and the former Bangor Dam.  It shows on -- on the horizontal

16   axis, it shows the mercury concentration in the sediments,

17   nanograms per gram dry weight, and on the -- on the vertical

18   axis is the estimated years of -- that those -- those cores

19   were -- were -- that that mercury was deposited based on -- on

20   Dr. Santschi's analyses of the data and the sedimentation

21   rates -- sedimentation rates at those particular sampling

22   sites.

23   Q    Is this -- when you refer to -- is this one way to

24   depict a mercury sediment core profile?

25   A    Yeah -- again, please?

RUDD - CONTINUED CROSS-EXAMINATION/TALBERT

378

1    Q     Is this one way to depict a mercury sediment core

2    profile?

3    A     Yeah, this is the -- this is the usual way, I think.

4    Q     And if we can just blow up the description, it says,

5    depth profiles of total mercury concentrations in two cores

6    taken from 1 and 4 kilometers below Veazie Dam showing 1967

7    peak in mercury concentrations at the time of high mercury

8    discharges from the HoltraChem site, followed by declining

9    concentrations to near regional background levels in 2009.

10   Details of dating techniques are given in Chapter 6.  Do you

11   see that?

12   A     Yes, I do.

13   Q     Is this a description of what you believe that the

14   figure shows?

15   A     Pardon me?

16   Q     Is this a description of what you believe these sediment

17   core profiles show?

18   A     Ah, yeah, yeah, generally.

19   Q     Okay.

20         THE COURT:  I just want to indicate, on this issue,

21   it seems to me that I'm not going to preclude the testimony on

22   it, but I do think that Mallinckrodt bears a very heavy

23   burden.  There's been a prior finding by Judge Carter which

24   says, in part, as follows, quote, the evidence was clear that

25   Mallinckrodt has been a dominant source of mercury in the

1   Penobscot River, unquote.  That finding was challenged on

2   appeal and has been upheld by the First Circuit.

3        I do take Mallinckrodt's point that -- which is, I think

4   I'm assuming the point, that given the intensity and scope of

5   the Study Panel's analysis of the river, they might come to a

6   different conclusion, but I do think that it -- they're

7   swimming hard against the tide on this one because you'd have

8   to demonstrate that the earlier finding by Judge Carter was in

9   error, and it already has been a finding that has been upheld

10  by the First Circuit.  So you'd have to demonstrate a

11  different kind of -- you'd have to demonstrate that what the

12  panel determined through its more elaborate study so

13  thoroughly contradicted the earlier finding, that the earlier

14  finding had to be negated or was void.

15            MR. TALBERT:  Understood, Your Honor.

16            THE COURT:  I'm not going to prevent you from

17  proceeding on it, but I do think, in the context of this case,

18  you bear the laboring oar on that issue.

19            MR. TALBERT:  I will focus our testimony with that

20  in mind.

21  BY MR. TALBERT:

22  Q    Dr. Rudd, in 2010, do you recall Dr. Fisher raising that

23  the mercury in these cores -- the two cores I just had on the

24  screen, PBR-1.5-B and 4-C -- appeared to have peaks of mercury

25  that predated the cesium peak of 19 -- which would be dated at

1    1963?

2    A    Ah, I don't recall that specifically, but I -- I -- I

3    think this could have very well been an -- an interchange that

4    we had.

5    Q    Please pull up Defense Exhibit 427.

6         MR. TALBERT:  I would move for the admission of this

7    exhibit.

8         THE COURT:  Any objection to 427?

9         MR. BERNARD:  No, Your Honor.

10        THE COURT:  It's admitted.

11   BY MR. TALBERT:

12   Q    This is -- there's an e-mail exchange back and forth,

13   but I want to just draw your attention to the second page of

14   an e-mail from Dr. Fisher to Drew Bodaly, cc'ing Carol Kelly,

15   Chris Whipple, and John Rudd, dated October 25th, 2010, and I

16   want to specifically look at the last paragraph -- full

17   paragraph in his e-mail where he discusses sediment Core 4-C.

18        He says, however, note in core -- and this one's MM4C09V

19   -- and I believe that's a typo because when we get to the next

20   sentence, it says, PBR-4-C -- the mercury appears to be

21   significantly younger than the cesium -- no, in fact, it is --

22   it is correct.  Let me just reread the sentence.

23        However, note that in Core MM04C9V, the mercury appears

24   to be significantly younger than the -- Cs is cesium, correct?

25   A    That's correct.

RUDD - CONTINUED CROSS-EXAMINATION/TALBERT

381

1    Q    And most odd, the total mercury in Core PBR4C09V is

2    much, much older than the Cs, for cesium.  I'll offer a cigar

3    to anyone who can explain that observation.  If the data are,

4    in fact, real, in paren, no screw-ups somewhere, then that

5    suggests that mercury can move around very differently than

6    cesium, at least in some sediments.  If the cesium -- if the

7    total mercury in Core PBR-4-C is older than the cesium peak,

8    what would that indicate?

9    A    That would indicate that it was deposited earlier, but I

10   -- I don't agree with -- with -- with what Dr. Fisher is

11   saying here.  This was the basis of our discussion, I guess.

12   That's not my -- yeah.

13   Q    Okay.  He had at least raised, though --

14   A    He's raised a point of discussion, yes --

15   Q    Okay.

16   A    -- which we had many, many of these discussions.  And --

17   and that -- actually, the people who would give you the -- the

18   most precise answer to questions like this on any individual

19   core are -- are Drs. Santschi and Yeager.  I can -- I can -- I

20   can attempt to answer questions of specific cores, but I'm --

21   I'm not an ex -- the expert at this or an expert at this, and

22   neither is Dr. Fisher.  So we were just kind of doing the best

23   we could to interpretate -- interpret the data we had without

24   being able to talk directly to -- to Yeager and -- and

25   Santschi at that point.

1      I -- my understanding was that -- from -- from recent

2    reading of Dr. -- from Dr. Yeager is that he has what's called

3    an envelope of dates based on the uncertainties of these -- of

4    these methods.  All the methods they use to date cores have

5    uncertainties, and one of them could be what -- what

6    Dr. Fisher mentions here is that cesium -- mercury's known to

7    be -- to bind to sediments very strongly and stay at -- at the

8    site that it's deposited.  But there is some -- there is some

9    understanding that under certain circumstances, cesium --

10   cesium can move a bit, which causes some error in the

11   estimation of -- of dates of sedimentation.

12      And -- and for that reason, Dr. Yeager calls it an

13   envelope.  So he would say, well, something developed -- we --

14   if we say something deposited in 1967, really, what we're

15   saying is it deposited maybe between 1962 and 1972, but that's

16   the envelope that -- that it fits in.  And I think probably --

17   I don't -- I don't know, but I think probably what Dr. Yeager

18   would say in this case is that the cesium and the mercury fall

19   within that envelope.

20      You don't expect them to be bang-on every time and

21   they're not.  This is why no one core should be used to make

22   -- make conclusions about the entire ecosystem.  You've got to

23   take, as we did, 58 cores and try and interpret them all at

24   once to -- to get an ecosystem answer, which is what the

25   objective of the core study was.

1    Q    When you analyzed these two cores, is it fair to say you

2    did not know that they were taken upstream of the former

3    Bangor Dam?

4    A    I -- I knew of the existence of the Bangor Dam, but that

5    -- you know, that wasn't what we were keying on, and I didn't

6    decide where these cores were taken -- Dr. Yeager did -- and I

7    knew they were just below the Veazie Dam, but I wasn't

8    precisely sure if they were above or below the former Bangor

9    Dam.  I didn't look at them in that way.

10   Q    In fact, the former Bangor Dam is not depicted on any of

11   the maps in the Phase II Report, correct?

12   A    No, it no longer exists.

13   Q    Okay.  I'd like to pull up Joint Exhibit 57.  This is a

14   figure from Mr. Vaillancourt's report that has now been

15   admitted into evidence, and it's on Page 28.  This is just a

16   map to orient our discussion.  And if we could just highlight

17   the area that is near the former Bangor Dam -- you can get

18   closer to it -- and the Veazie Dam.  Okay.

19           MR. BERNARD:  What page is this, Jeff?

20           MR. TALBERT:  This is -- it's Page 28, I believe,

21   Figure 2-2.

22           MR. BERNARD:  Thank you.

23   BY MR. TALBERT:

24   Q    Just taking a look at -- at this map, I want to orient

25   ourselves for the discussion.  The former Bangor Dam is

1    depicted in -- in green -- and, again, I believe you reviewed

2    Mr. Vaillancourt's report, correct?

3    A    I did, yes.

4    Q    Okay.  And is he correct that -- that the Sediment Cores

5    PBR-1.5-B and PBR-4-C are between -- were taken in a location

6    that was between the former Bangor Dam and the Veazie Dam?

7    A    Yes, that's correct.

8    Q    Okay.  Once you -- is it fair to say that the -- the --

9    strike that question.

10        Once you found out that these two sediment cores were

11   taken between the former Bangor Dam, instead of concluding

12   that the mercury in those cores in the deep sediment were

13   likely not from HoltraChem, isn't it true that you examined

14   whether the dam could be overtopped?

15   A    Yeah, actually, the first thing I did is I went back to

16   the data, and -- and I looked at the -- at the -- at the peaks

17   that we've just looked at, and -- and -- because I -- I did

18   this, actually, while I was -- was reading the Vaillancourt

19   report.  And so that was my first inclination, not to find out

20   about the former dam, just say, well, what does the data look

21   like?

22        So I went back and looked at these mercury profiles and

23   -- and the cesium profiles, that -- that we haven't looked at

24   yet, very -- very carefully, and -- and it didn't make sense

25   to me because the -- the mercury peaks in -- in those profiles

1    that we've just looked at are very steep and defined.  They're

2    -- particularly in one point, 5-B, they're the narrow peaks,

3    showing events of mercury addition, which we've been talking

4    about.

5        And there are actually very similar peaks that you find

6    more commonly in Mendall Marsh where the -- where we know that

7    the sedimentation is -- is best, and, actually, they look very

8    much like the peaks in Southerly Cove, which everybody agrees,

9    came from -- including the defendants, came from HoltraChem.

10       And what you would expect to see, instead of those very

11   narrow peaks, steep increases and decreases in mercury

12   concentration.  If slimicide had been used, you'd expect to

13   see very broad peaks lasting over a period of -- of three, or

14   maybe more, decades.  Instead, these peaks were laid down as

15   an event in very few years, you know, maybe five to seven

16   years, depending how you look at the data.

17       So I just took one look at these cores and said, well,

18   mercury must have come over the dam, and it took me about

19   literally five minutes to come to that conclusion.  And then

20   we started to look into the -- into the dam, and Dr. Kopec

21   spent quite a bit of effort looking into the dam.

22       I knew that the Bangor Dam was very low dam, like Veazie

23   Dam, so I suspected right away when I saw these data, well,

24   water must have come over the top of the dam.  That's what the

25   data looked like.  And so then Dr. Kopec looked into it a lot

1    more, and that seems to be very possible in -- in several ways

2    that water could top the -- could have topped the Bangor Dam

3    back in the -- in the '60s and early '70s before it was

4    removed and carried some of the mercury downstream upstream

5    where it was deposited.

6         So it kind of all fit together, and, to me, it was quite

7    obvious what had happened, just by looking at the data.

8    Q    I don't want to burden the time too much, but I think

9    you -- you mentioned that Dr. Kopec was tasked to look into

10   whether the dam could be overtopped, correct?

11   A    Yes, that's right.

12   Q    All right.  And so the investigation of whether that

13   occurred was really conducted by Dr. Kopec?

14   A    That's correct, yes.

15   Q    Okay.  So would she be the best person to talk to about

16   that?

17   A    Yes.

18   Q    Okay.  I believe at your deposition -- I don't know if

19   you recall this -- but I believe you stated that if

20   Dr. Santschi were to look at the dates in PBR-4-C and date

21   that core in the 1950s, the -- the mercury peak, so that the

22   two cores that we were just looking at, one of them was 1.5-B

23   and the other is 4-C --

24   A    Hm-hmm.

25   Q    -- and if Dr. Santschi were to go and date the core peak

1    at -- in the 1950s, which would clearly predate HoltraChem,

2    then that would change your opinion regarding the source of

3    the mercury in those cores.  Do you recall that?

4    A    Yeah, I guess if -- if -- if -- yeah, if Dr. Santschi

5    told me that, in general, the peaks in the -- in the system

6    were coming out -- coming out to be 1950, rather than 19 -- 19

7    -- roughly 1967, I would -- I would believe him.  But he

8    hasn't done that.

9    Q    I actually -- I deposed Dr. Santschi, and I asked him

10   that very question.

11   A    Hm-hmm.

12   Q    Just to lay that foundation, do you understand that in

13   the Phase II Report, that Dr. Santschi -- neither

14   Dr. Santschi, nor Kevin Yeager actually went through and

15   specifically dated -- applied a date to each core?

16   A    That's correct, yes.  No, we -- we -- we assigned -- we

17   decided the dates, and we -- we asked -- we asked -- we asked

18   Dr. Santschi how we would go about that, and -- and we

19   actually assigned those dates ourselves.  He did not assign

20   the dates.

21   Q    Okay.  So in his deposition, I had to ask him to

22   calculate the date, to look at the depth of cesium and then

23   look at the depth of the mercury taken --

24   A    Okay.

25   Q    -- and tell me what he thought the date of the mercury

1    peak in 4-C was.

2    A    Hm-hmm.

3    Q    And I can show you that testimony --

4    A    Yeah.

5    Q    -- right now.  This is on Defense Exhibit 969, Page 65

6    -- 65 -- I'm sorry -- 63.  And this is just providing you the

7    -- the whole context.  I think if we -- I can -- I can start

8    with -- if you take a look at 65, 16 through 17.

9             MR. BERNARD:  Jeff, what page?

10            MR. TALBERT:  Yep.

11   BY MR. TALBERT:

12   Q    This is the end, and I'll back up so you can see his

13   explanation, but the answer is right here on Lines 16 and 17.

14   I -- I'd asked him to date that core.  And my question was,

15   somewhere in the 1950s?  And he said, yeah.  And I'll back out

16   so we can -- you can read what he said earlier.  It starts on

17   Page 63, Line 16.  And I say, let's take a look at PBR-4-C, I

18   guess, in Chapter 5, which is Exhibit 3.  He says, okay.  And

19   we run through -- these are very short questions and answers

20   where we're getting oriented.  My question is, this is Core

21   PBR-4-C, and he says, okay.

22            Please turn to the next page.  Again, we're just getting

23   oriented.  It says, you see that?  And he says, okay, that's

24   the core.  Take a look at this core and tell me the profile is

25   what he would consider a reliable core.  I asked him that

1    first.  You know, was it dateable?  He said, yeah, yeah, I

2    mean, it has peaks, and it has mercury below the cesium peak,

3    yes.  My question is, the one that has the high cesium peak,

4    right?  He says, it has -- yeah, yeah.

5        Um, and then I asked him -- this is where we go on to

6    ask him to date it.  This would be one we could -- it would be

7    an interpretable core?  And he says, yes.  I say, okay.  Now,

8    if we were to date this core, we're looking at, I guess, a

9    cesium peak at 162, which is the -- the depth, right, in the

10   60 to 65 centimeter depth?  How would you date this core?

11   Would that be 1963?  And his answer is, that's what -- that

12   would be the standard way, yeah.  '63 being the cesium peak.

13       And then the next question is, and where would you date

14   the mercury peak here?  And then his answer goes on to the

15   next page, if I were to assign 1967, I would -- he says,

16   discrepancy, yes.  So, I mean, based on where cesium is, where

17   would you date mercury?  So it would have -- it would have

18   been earlier than that.  Question, is that based on depth, is

19   it somewhere in the '50s?  And you can see his answer, he goes

20   through a bunch of math in his head in terms of depths and so

21   on and says he can provide -- he says, we can do it more

22   accurately if you want, and then this says, below 77, so that

23   is 15 centimeters divided by -- that is about ten years

24   earlier, if you just take it at face value.  My question, so

25   somewhere in the 1950s?  And he said, yeah.

1      I also asked Dr. Yeager to date 4-C, and he testified

2  that it would be before 1963.  I can also show you that

3  testimony.

4      But my real question is, does that change your opinion

5  about the source of mercury in those two peaks -- to those two

6  cores?

7          MR. BERNARD:  I just want to object to the use of

8  the Santschi testimony.  There are several pages of dialogue

9  that follow the part that counsel read that are relevant to

10  this.

11          THE COURT:  All right.  Well, you can do one of two

12  things.  You can ask him to question him on those omitted

13  portions under the rule, or you can redirect on that.

14          MR. BERNARD:  I think -- Dr. Santschi's going to be

15  here, too, so that's -- that's another way to deal with it.

16  So --

17          THE COURT:  So you --

18          MR. BERNARD:  I am not asking him to do anything

19  further now.  I'm just noting my objection for the record.

20          THE COURT:  Well, there's no objection just for the

21  record.

22          MR. BERNARD:  Okay.  Then I'll -- I'll withdraw.

23          THE COURT:  Okay.

24  BY MR. TALBERT:

25  Q    Dr. Rudd, you can answer.

1    A     Could you repeat the question, please?

2    Q     Yes.  Does this change your opinion, if at all,

3    regarding the source of -- of mercury in those two cores, or

4    at least the mercury at depth in Core 4-C?

5    A     Well, maybe 4-C, but I -- I -- my understanding is you

6    can't use any one core to interpret what's going on in the

7    ecosystem in general.  As I -- I've been saying, there's --

8    there's a lot of variability in this, and this is why -- why

9    Peter pushed us to take so many cores, and we ended up taking

10   58.  It was the largest study he had ever done of this type,

11   or anybody had ever done of this type.  And he told me he

12   would -- in a -- in a study of this complexity, that he would

13   have liked to have even more cores.

14         So I'm not surprised that one core doesn't -- doesn't

15   come out with -- with 1967 as being the date.  It was 1950

16   instead.  It's -- you know, it's roughly 10 or 15 years

17   sooner, and -- and there's a lot of core variability.  I'd be

18   interested to see if you asked him to look at Core 1.5-B or --

19   or the other core, you know, how did it come out?  And I know

20   how a lot of the other cores came out, and, in general, I know

21   what Peter's conclusion is when he looks at all of the cores

22   together, which is the way this work is done.

23         That's why he wanted to take so many cores, as any one

24   core, like, for example, Core 4-C, won't tell the whole story.

25   Q     If we --

1    A      The point I was trying to make with -- with the

2    narrowness of the peak is that's -- that's an event.  I don't

3    think that represents 30 years of deposition -- that narrow

4    peak.  It's a much smaller time period, and that's what I was

5    looking at when I went to look at the data after I -- I read

6    the Vaillancourt report.

7           So I think this is -- this is picking one little piece

8    of data out of the whole data set and trying to make a general

9    conclusion, and I don't think that's what you should do.

10   Q      Just to frame our -- our discussion, if -- right now, we

11   don't have deep sediment cores so -- below 10 centimeters that

12   would tell us a long history above the Veazie Dam; is that --

13   that's correct?

14   A      That's correct, yes.

15   Q      So if these -- if these two cores -- setting aside the

16   issue of overtopping, potential overtopping that we'll discuss

17   with Dianne Kopec, but these two sediment cores may provide us

18   information about other potential sources if they were outside

19   of the influence of -- of HoltraChem, correct?

20   A      Well, if -- if this mercury came from upstream and if it

21   only came for, say, five or seven years, then it might

22   represent something.  But it doesn't, to me, represent what --

23   what -- what Vaillancourt was discussing in his report, which

24   should have been an event that -- that -- recorded in the

25   sediment profile lasting 30 years, not -- not five or six

1  years.

2  Q    Is it your understanding --

3  A    I don't think anybody has any -- I don't think anybody

4  is -- I've heard of anybody suggesting that there was mercury

5  used upstream of -- of -- of Veazie Dam for -- for a short

6  time period of five years.  That's -- that's -- that's never

7  come up, as far as I'm aware of, as a possibility.

8  Q    Is it -- is it your understanding that any -- the

9  buildup that we may see in mercury that predates the cesium

10 peak of 1963, that that mercury would not have been from the

11 former HoltraChem site?

12 A    If you look at the cores way out in Fort Point Cove, for

13 example -- and I've talked -- I've talked to Dr. Santschi

14 about this -- you some -- there -- there's the -- there's the

15 very steep, well-defined peak that we've been talking about,

16 and often below that, you see a smaller hump in mercury

17 concentration that predates the sharp, well-defined peak, and

18 -- and I asked him if that -- at one point, if that could be

19 mercury -- earlier mercury from other sources that would

20 include slimicide, and he agreed with me.

21      So I think that is an indication of an earlier source of

22 mercury to the -- to the system.

23           THE COURT:  Again, I -- you folks are very familiar

24 with all this, but I'm gathering from what is being -- what's

25 been said here, that cesium is some sort of -- has some sort

1   of a relationship to a mercury fingerprint so that you -- it

2   -- is sort of a precursor to a later mercury fingerprint; is

3   that correct?

4          MR. TALBERT:  I'll let Dr. Rudd explain it, but --

5          THE COURT:  What's the relationship?

6   BY MR. TALBERT:

7   Q    Can you -- can you explain how cesium is used as a means

8   of dating?

9   A    Yeah, cesium -- cesium comes from radio -- cesium 137

10  comes from -- is a radioactive -- radioactivity produced by

11  atomic bomb testing in the 19 --

12         THE COURT:  Oh, okay.

13  A    -- which peaked in the 1960s.  And -- and so in a

14  perfect world, you would expect to see the peak of cesium 137

15  concentration in -- in 1963 and -- and the peak in mercury, if

16  -- if -- you know, assuming it came from HoltraChem, in 1967.

17         THE COURT:  Got it.  Thank you.

18  A    If you had -- had a perfect core, which you seldom do.

19  BY MR. TALBERT:

20  Q    Dr. Rudd, is it fair to say that the -- the system has

21  recovered significantly since 1967?

22  A    Yes, definitely.

23  Q    And I think you mentioned earlier that in the Phase II

24  Report, you compared sediment samples taken in the upper

25  estuary with other areas you tried to identify as reference

1    areas?

2    A    Yes.

3    Q    Okay.  And those areas included the Narraguagus, the St.

4    George, and at one point, the Sheepscot, correct?

5    A    That -- yeah, well, that was part of our -- the suite of

6    samples we collected, yes.

7    Q    Okay.  Is it fair to say that you did not do a

8    quantitative evaluation of the population density of those

9    other reference areas?

10   A    No, we did not.  We went -- it was -- we were searching

11   for -- for sites that would likely be good -- be good -- give

12   us good -- a good reference -- average reference number, and

13   -- and we went -- we went to maps and -- and -- and -- this is

14   Dr. Bodaly and I -- and chose several nearby smaller estuaries

15   that didn't appear to us like they would have had a lot of

16   industrial input and -- or weren't having a lot of industrial

17   input at the present time or maybe in the past, and that was

18   the basis we chose those on.  And then we -- we used those

19   choices, based on just looking at a map, and went out to see

20   what we could find.

21   Q    I think at your deposition, you told me that it was

22   obvious that the population density surrounding the lower

23   Penobscot was much greater than the reference sites.  Do you

24   recall that?

25   A    Yeah, I think -- I think that's generally true, yeah,

1    from what I've -- the St. George doesn't appear to me to have

2    the same population density as -- as the Penobscot System, for

3    example.

4    Q    And one thing the Study Panel did was to compare biota

5    data from the Penobscot with -- with other reference areas,

6    correct?

7    A    That's correct, yes.

8    Q    Okay.  Let's pull up Defense Exhibit 12.

9         MR. TALBERT:  I'd like to move for the admission of

10   Defense Exhibit 12.

11        THE COURT:  Any objection to 12?

12        MR. BERNARD:  No, Your Honor.

13        THE COURT:  12 is admitted.

14   BY MR. TALBERT:

15   Q    This is a -- an e-mail -- there's a first e-mail from

16   Drew Bodaly, and it looks like this relates to the exploration

17   of species at reference sites compared to HoltraChem.  The

18   date of the e-mail from Drew is April 16th, 2007, and Drew

19   sends it to Nick Fisher, John Rudd, and Chris Whipple.  And if

20   we could just blow up the content of -- of that.

21        He says, attached is a spreadsheet with the latest

22   mammal data from the lab.  It is sorted by species and tissue

23   and whether samples are from a site potentially contaminated

24   with mercury from Orrington or whether from a reference site.

25   In parens, he says, I have asked for coordinates for the

1    stations, as well.  I calculated means by species, tissue, and

2    class of site for total and methylmercury.  He cites levels of

3    concern according to Dave Yates at BRI.  And then says,

4    differences between contaminated and reference sites are

5    generally small.  Means are not consistently higher at

6    contaminated sites.  Probably most differences are not

7    significant.  Few individuals are above the levels of concern.

8    Do you see that?

9    A    Right.

10   Q    Do you think that accurately captures the situation as

11   of that early date, that 2007 date?

12   A    Ah, yeah, although I am a little confused by it because

13   we did find high concentrations of mercury in -- in bats.  Is

14   this what we're talking about here?

15   Q    Not specifically all the -- each data.  I just want to

16   know generally, is this your impression of -- of --

17   A    I guess this is not just bat data.  This is other

18   mammals, as well?

19   Q    Yes.

20   A    Yeah, yeah, I -- yeah, I'm not -- I -- it'd be nice if

21   we knew exactly which -- which animals we're talking about

22   here.

23   Q    It's --

24   A    I thought -- I assumed when you were reading this, we

25   were talking about bats, but it -- I guess not.

1    Q      And let me just --

2    A      Sorted by species, right.

3    Q      In terms of the biology and the --

4    A      I guess I'd like to see the date he did --

5    Q      In terms of the setting of the targets and the

6    evaluation of the biota data, was that something that

7    Dr. Bodaly was -- was primarily charged with --

8    A      Yes.

9    Q      -- Dr. Kopec?

10   A      Yes, yes.

11   Q      Okay.  At the end, he says, score one for defendants.

12   Do you see that?

13   A      Yes.

14   Q      Do you know what he's referring to?

15   A      Well, you know, this is -- I mean, this is sort of a

16   shorthand way -- sometimes -- sometimes our data came out in

17   something we thought maybe the defendants might like, and

18   sometimes it came out in some ways that we thought the

19   plaintiffs might like.

20          And so it's just a -- it's the kind of way colleagues

21   talk to each other when they're -- the data's coming in.  It's

22   a shorthand way of interpreting the data really, you know.

23   That -- this is his opinion.  But it's a -- it doesn't mean

24   he's favoring the defendants -- defendants in any way.

25   Q      Let's pull the -- you e-mail him back and say, I agree

1  that the defendants will like this one.  However, we only need

2  one smoking gun to move on to Phase II.  So far, I see four --

3  two songbirds, the Mytilus, and the sediments downstream of

4  Veazie.  Do you -- do you know what you were referring to when

5  you say, we need only one smoking gun to move on to Phase II?

6  A    What I'm saying here is it's not -- and, again, this is

7  -- this is scientists talking amongst themselves, and so what

8  I'm trying to say in a very short e-mail is -- is it's not

9  necessary for every -- every mammal or animal in the -- in the

10  Penobscot Estuary to be above a toxic level in order for there

11  to be a problem.  If there's one or several species -- and we

12  found more after this -- that are above -- that are above

13  toxic levels, then -- then that's reason.

14      For one reason or another, not all mammals were -- or

15  animals were exposed to the mercury, even though -- like, for

16  example, kingfishers, we thought going in, that kingfishers

17  would -- would be very high in mercury concentration if they

18  were caught up and down the -- the Penobscot River, and we had

19  Dr. Evers' team go out and sample kingfishers, and they turned

20  out to not be high, and his explanation for that was that even

21  though they're -- they were living in the banks on the side of

22  the -- of the river, because that's where the banks -- you

23  know, sort of best to build -- where there -- best for them to

24  build a nest, they were likely feeding in the streams, in the

25  tributary streams, which were not mercury-contaminated.

1      So, I mean, it's not just a straight -- you wouldn't
2  expect to go out there and find every animal over the limit.
3  Just -- but the fact that we found several was -- was -- was
4  -- was, to me, very important, and all we needed -- that's all
5  we needed in order to satisfy the -- the conditions that Judge
6  Carter had given us.
7  Q    I saw reference to this in another e-mail.  I just want
8  to ask if they're interrelated -- Defense Exhibit 383.
9           MR. TALBERT:  I'd like to move for the admission of
10  that document, as well, just for context.
11           THE COURT:  Any objection to 383?
12           MR. BERNARD:  No objection, Your Honor.
13           THE COURT:  383's admitted.
14  BY MR. TALBERT:
15  Q    If you could just highlight the first e-mail here.  We
16  can back up in the e-mail chain, but this is an e-mail from
17  Nick Fisher sent on January 24th, 2008, to Drew Bodaly, cc'ing
18  Chris Whipple, John Rudd, and Steve Klein, and the title says,
19  data on total mercury in Southerly Cove cores, smoking gun.
20  And then in the body, it says, 24 parts per million mercury,
21  now that is high.  Are those two e-mails related?  Is this the
22  same kind of conversation you were talking about with the
23  smoking gun?
24  A    Ah, I don't think they're directly related.  I mean,
25  that's a really high concentration.  I just think Dr. Fisher

1   was -- who wrote this?

2   Q    Dr. Fisher wrote that one.

3   A    Oh, Dr. Fisher, yeah.  I think Dr. Fisher was just

4   amazed.  He probably had never seen a mercury concentration

5   like that before.

6   Q    And I think if you back out, the first e-mail actually

7   has that in the title on Page 2 from Dr. Bodaly, it just says,

8   data on total mercury in Southerly Cove, smoking gun, and,

9   again, just if you don't know, that's okay.  I'm just

10  wondering if that's a -- related concepts where you're

11  discussing those smoking guns.

12  A    Ah, yeah, I think you'd have to ask Dr. Bodaly exactly

13  what he meant by smoking gun.  I mean, it's a very high

14  concentration --

15  Q    Okay.

16  A    -- for sure.

17  Q    Okay.  Let's switch gears and talk a little bit about

18  total versus organic carbon and the normalization of -- of

19  data to organic carbon.

20       Is it fair to say there -- there are two main ways to

21  compare mercury concentrations between sites, there's the dry

22  weight and then the normalized to organic carbon?

23  A    That's correct, yes.

24  Q    Okay.  And I believe in the -- the Phase I Report, you

25  referenced that it was preferable, when you're comparing

1    sites, to look at the data normalized to organ carbon?

2    A     Under certain circumstances, yes.  If you're -- if

3    you're comparing amongst different habitats, it's often better

4    to use that -- to use that approach.  If you're comparing

5    within that one habitat type, for example, river sed -- river

6    sediments, then -- then doing it per gram dry weight is fine.

7         You need to know what you're doing.  You need to choose

8    the right method for the right situation.

9    Q     Is it true that if you're most interested in what the --

10   what mercury the biota is exposed to, you would want to look

11   at the data on a carbon-normalized basis?

12   A     Um, not necessarily.  For example, in my previous

13   research, we found the production of methylmercury was highest

14   in sediments that were very sandy and very low in organic

15   carbon.  But the car -- but the type of organic carbon that

16   was in those sandy sediments was very decomposable, so the

17   bacteria had lots of food to eat and -- and in the -- in the

18   -- as a result of their high metabolic rate, produced a lot of

19   methylmercury, and more methylmercury in that -- in that site

20   of low organic carbon concentration than -- than -- than in

21   sites that had higher concentration where there -- there was

22   carbon that the bacteria couldn't eat.

23        So there I would say that the -- the organisms living --

24   the worms or -- or benthic organisms living in the sandy

25   sediments were exposed to more methylmercury than the

1    organisms living in the highly organic carbon sediments.

2         So, I mean, you -- you have to know what you're doing in

3    order to interpret these data.  You don't -- you don't want to

4    wholesale say, we're looking at -- we're looking at movement

5    of mercury into -- into animals so we should carbon-normalize

6    all the data.  You have to be thinking about, well, yeah,

7    that's often true, but is this a site where there's a lot of

8    methylmercury?  And -- and -- because it's the methylmercury

9    you want to be looking in, not -- not the inorganic mercury.

10        So it's not that simple.  You can't -- there's no

11   cookbook here.

12   Q    Do you recall me asking you this same question at your

13   deposition?

14   A    Ah, yeah, I know we discussed this topic, yeah.

15   Q    Okay.  Let's pull up Defense Exhibit 963 and Page 56,

16   Lines 19 through 23.  If we were most interested in the

17   mercury the biota is exposed to, would we want to look at the

18   data on a dry-weight basis or on a carbon-normalized basis?

19   Your answer is, probably carbon-normalized, I would think.

20   The next sentence says, although you wouldn't be far off if

21   you looked at it in the other way either in my experience.  Do

22   you recall that?

23   A    I don't recall specifically, but I think that's --

24   that's kind of just what I said.  I said, probably carbon-

25   normalized, and I think that's just what I said.  I said, but

1   you've got to be careful, because sometimes you can look in

2   sandy sediments and that's where the methylmercury is.

3   Q    Is it fair to say with respect to the data on the

4   Penobscot compared to reference areas, that if you examine the

5   data on a carbon-normalized basis, it's not as elevated above

6   what you've defined as regional background as the data if you

7   were to look at it on a dry-weight basis?

8   A    Well, the number's not as big, but I would say it's just

9   as contaminated.  It's just a different way of looking at it.

10  Q    The --

11  A    There's a small -- it's a smaller number, but it's still

12  -- it doesn't matter what way you look at it.  It's seven

13  times contaminated or ten times contaminated.  Either way,

14  it's very contaminated.

15  Q    Hm-hmm.

16  A    Just -- these are just different methods, and sometimes

17  it's better to look at it one way and sometimes another way,

18  and we did it both ways whenever we could.

19  Q    Were there problems with your carbon-normalized data?

20  A    For certain periods of time, yes.

21  Q    Okay.  Is that one of the reasons that you didn't

22  carbon-normalize and present the data in that manner in the

23  Phase II Report?

24  A    Actually, there's a lot of carbon -- carbon-normalized

25  data in the Phase II Report.  The data that you're referring

1  to is data that the -- that the -- you know, the smaller

2  Penobscot team itself produced.  But there was other -- other

3  of the contractors, including Dr. -- Dr. Geyer and -- and

4  Dr. Santschi and, to a certain extent, Dr. Gilmour who -- who

5  were also doing organic carbon analyses and using them.

6      But -- but that's correct.  For a period of time in

7  Phase II, our data wasn't reliable, so we didn't use some of

8  it when we were writing up the data that we ourselves had --

9  had collected.  We used carbon-normalized value.  But in those

10 cases, we were very careful to only use the data when we were

11 comparing site to site within a -- within a certain type of

12 habitat.  We didn't compare one habitat to another habitat.

13 Q    Let's switch gears and talk about the -- the recovery

14 times and go back to the discussion we had earlier about the

15 Mendall Marsh cores.

16     And just as a refresher, I believe there were -- there

17 were different recovery times calculated for different areas

18 of the system, correct?

19 A    Yes, that's correct.

20 Q    And they used sediment cores that were taken within a --

21 that particular area.

22 A    That's correct, yes.

23 Q    So there were some cores taken in the main stem; there

24 were some cores taken in Mendall Marsh.

25 A    Yes.

1   Q     And I believe you said that, you know, you were of the

2   opinion that in light of the environment, Mendall Marsh cores

3   were the most reliable.

4   A     That's correct, yes.

5   Q     At some point, there was a disagreement within the Study

6   Panel, as well as others that participated, like Dr. Bodaly

7   and Dr. Kopec, about which recovery half-time to use as being

8   most representative of the whole system, correct?

9   A     That's correct, yes.

10  Q     Let's take a look at Joint Exhibit 87, which is already

11  admitted into the record, and I'd like to take a look at Page

12  45.

13        And in the middle paragraph, if that could just be

14  blown-up, you write in your document, it's interesting to note

15  that Connolly and all of the Penobscot River Mercury Study

16  people who are the most experienced with core dating/recovery

17  times, i.e., Peter Santschi, Geyer, Rudd, Kelly, Harris, think

18  that the Mendall Marsh cores are the most representative and

19  should be used to look at recovery times.  Do you see that?

20  A     Yes, I do.

21  Q     When -- when you say that, can you please explain what

22  you mean by these individuals being the most experienced with

23  core dating and recovery times?

24  A     Well, I think it's -- it's fairly self-explanatory.  The

25  people in the first list are -- are people who are -- are --

1    are biogeochemists or geochemists or hydrogeochemists or

2    hydrodynamicists or sedimentologists or -- or people who

3    understand that very -- you know, quite well, and the -- the

4    second group of people, with the exception of -- of

5    Dr. Whipple, are biologists, who haven't had as much

6    experience with this type of work and aren't as familiar with

7    it.

8        So I just -- I was just sort of sorting this out in my

9    mind and organizing things in my notes.

10   Q    Hm-hmm.

11   A    And Dr. Connolly -- and I -- yeah, and I included

12   Dr. Connolly in the first group because he clearly said in his

13   -- in his report that he thought that -- that the cores in

14   Mendall Marsh were -- were the most -- had the most accuracy

15   in terms of -- of their dating, and I agreed with him on that

16   point.

17   Q    Let's take a look at above, the bottom line, at the very

18   top.  You say, can't look at individual cores.  Need to look

19   at either all the cores at once.  Refer to Figure 6-15.  Or

20   look at average of only Mendall Marsh cores, which everyone

21   agrees are the most representative cores.  Cesium and mercury

22   work out quite well in Mendall Marsh, which is the best

23   sedimentary environment.  This is your opinion, correct?

24   A    Yeah, but it's not very accurate, though, is it,

25   because, obviously, everyone doesn't agree.

RUDD - CONTINUED CROSS-EXAMINATION/TALBERT

408

1   Q      There are others that you mentioned below that don't

2   necessarily agree with that opinion, correct?

3   A      Yes, yes.

4   Q      Okay.  At your deposition, you explained -- well, strike

5   that question.

6          The -- I think, as we stated earlier, the report doesn't

7   use the 22-year half-time as a representative half-time for

8   the whole system, correct?

9   A      That's correct, yes.

10  Q      The number used is an aggregate or average of -- of all

11  these areas, and it's a 33-year?

12  A      I -- yeah, I -- that's my memory.

13  Q      Okay.  At your deposition, you -- you explained that

14  there was a -- I think you were asked how that happened, and

15  you explained that there was a -- there was a vote on -- on

16  this issue, which half-time --

17  A      Right.

18  Q      -- should be used.  Do you recall that?

19  A      I do.

20  Q      Okay.  And I believe you said -- but please correct me

21  if I'm wrong -- that the people that voted were you, Carol

22  Kelly, Dr. Whipple, Dr. Fisher, and Dr. Kopec, correct?

23  A      That's correct, yes.

24  Q      And I believe you stated that you and Dr. Kelly were the

25  only ones that voted for the 22-year half-time.

1  A     That's -- that's correct, yes.

2  Q     Dr. Santschi, who is one of the experts on calculating

3  sediment recovery times, did not vote on that, correct?

4  A     No, this was a -- this was a -- a meeting of our smaller

5  team in Vancouver towards the end of the -- we were -- at that

6  point, we were struggling to get the report in and needing to

7  make decisions of how to go forward with the report, so not --

8  the entire team wasn't there.

9  Q     So if we were to -- to -- to line this up, really, the

10 people that voted on this did not include those individuals

11 with the most expertise in calculating recovery times,

12 correct?

13 A     I would say that's correct, yes.

14 Q     Okay.

15 A     I think -- well, I -- maybe I could go on and say that I

16 think -- we were working against a real deadline here, and I

17 think if we'd had more time to discuss this in the bigger

18 group, that this could have been sorted out.  But we -- what

19 -- I think what we're seeing here is we kind of run -- ran out

20 of time on this one.

21 Q     I believe you stated in your deposition that -- that

22 that's a number that needs to be revisited at some point?

23 A     Yes.

24 Q     Is that correct?

25 A     I think so.

1   Q    Okay.  Is it your understanding that the recovery

2   half-times, you know, whatever number we -- we use as the

3   recovery half-time, can impact remedial decision?

4   A    Yes.

5   Q    And let's take a look at Defense Exhibit 662.

6           MR. TALBERT:  Which I would like to move into

7   evidence.

8           THE COURT:  Any objection to 662?

9           MR. BERNARD:  No, Your Honor.

10          THE COURT:  662 is admitted without objection.

11  BY MR. TALBERT:

12  Q    This is an e-mail from you to Dr. Kelly, Dr. Kopec,

13  Dr. Bodaly, Dr. Fisher, and Dr. Whipple dated October 29th,

14  2012, and the subject is, new info to consider.  And if we

15  could, let's blow up the first paragraph with the first two

16  points.  You state, it seems like I no sooner finished the

17  draft of the recommendations chapter that I sent you recently,

18  when we get some new data that makes me wonder if after all we

19  should not go ahead with the mobile sediments removal/

20  replacement remediation option, which we decided on at our SSI

21  meeting.  What is the SSI meeting?

22  A    It's Salt Spring Island.  It's an island in British

23  Columbia where -- where we live.

24  Q    Okay.  And you say the new info is, one, Carol Kelly

25  finally asked a question to Peter in a way that we got a clear

1   answer about the asymptote.   What is an asymptote?

2   A     An asymptote is -- you can choose different asymptotes

3   when you're doing the kind of work that Peter was doing, and

4   Peter was using an asymptote in his predictions of -- of how

5   long it would take to get to a certain concentration.   He was

6   using an asymptote of 0 initially, and he used that asymptote

7   because he was -- that assumption would be that when the

8   system had recovered, there would be 0 mercury concentration,

9   which is obviously not true.   There's going to be some mercury

10  there from natural sources.

11        But we hadn't, at the time he started to do his

12  calculations, settled on a -- finally settled on a -- on a

13  recovery concentration, which we've been discussing the last

14  few days, is 100.   So the asymptote Peter did with his initial

15  calculations was 0 -- was 0.   And -- and later on in the

16  process, we gave him a number of -- of -- a preliminary number

17  of 400 -- I'm going by memory now -- I haven't read all this

18  yet -- and -- and so he went back and recalculated all the

19  data at -- with a 400 isotope -- or a 400 nanogram per gram

20  concentration.

21        Then we looked at our data some more and started to see

22  these Cores 1.5-B and 4-C that we've talked about that we

23  thought had recovered and were at about a hundred nanograms

24  per gram as we discussed yesterday, so we -- we decided, oh,

25  the concentration should be -- we shouldn't have given Peter

1    400, we should have given him a hundred, and by that time, it

2    was getting -- time was running short, and -- and so Dr. Kelly

3    did a lot of the calculations with 100, and we talked to Peter

4    about it, and he said, well, there's not much difference -- if

5    I'd used 100, my -- as an iso -- as an asymptote, it wouldn't

6    be much different than 0, anyway, and, in fact, when Carol

7    went and -- and did the calculations, the -- the numbers she

8    came up with were not very different than -- than the 0

9    asymptote.

10          So I mean, I haven't read all this yet, but that's my

11   memory of this -- of this topic.

12   Q    And so -- let me make sure this is understood, this

13   discussion of the asymptote.  The asymptote would be the --

14   the endpoint you select, right?

15   A    Right, as we discussed yesterday, yes.

16   Q    And that would impact the fit of the -- or the -- the

17   curve of the recovery line when you do your half-time for

18   recovery calculation?

19   A    Right.  It -- if we use an asymptote of -- of a hundred,

20   which we think it should be now, it -- the -- the core profile

21   should -- should arrive at a hundred -- I've got to think

22   about this.  Um, it -- yeah, it -- it will still arrive at a

23   hundred in the same number of years, is the mathematics of it,

24   in the same number of years, but it'll -- it'll get below the

25   -- the toxic concentration sooner because it doesn't have as

1  far to go.

2      So it affects the target concentrations and how soon

3  you'll get to target.  But Peter was saying -- and he's -- and

4  I think turned out he was correct -- that to get to the

5  target, if you use 100 or -- or 0 is not -- that's not a very

6  big difference.  The 400 did make a difference.

7  Q    The -- the asymptote is one variable when you're

8  calculating the half-time for recovery that can impact the

9  number of years?

10  A    Yeah, it affects the mathematical equation that you use,

11  yeah.

12  Q    Right.

13  A    You have to use a slight -- a different variation of the

14  equation when your asymptote isn't 0.

15  Q    Okay.  The next sentence says, it turns out that he was

16  not yet using an estimate of asymptotes in his calculations,

17  and because of 2, below, this now makes a big difference.

18  He's guessing at the moment until he finishes his

19  calculations, but thinks that the half-life estimate may be

20  reduced by as much factor of two, i.e., 11 years for Mendall

21  Marsh, instead of 22.  Do you see that?

22  A    Ah, yeah, I see that.

23  Q    Is that what you were just explaining, that changing

24  that asymptote would -- could impact the results?

25  A    Let me read this.  I haven't read it yet.  (Witness

1    looking at document.)  Yeah, I -- okay.  Just a minute.  Oh,

2    yeah, yeah, okay.  Well, yeah, this is -- this is during the

3    -- during the process.  You're seeing science in action here,

4    and, yeah, I guess this was what -- I think what Peter --

5    you'd have to talk directly to Dr. Kelly about this -- but I

6    think -- I was getting this from Dr. Kelly -- I think what

7    Peter was saying, if you give me an asymptote of 400, which we

8    then did at that time, it had a big effect on -- on the

9    recovery time, and Peter's guess was -- was -- would be

10   reduced from 22 to 11, and I don't remember if that's actually

11   what happened.

12        But the number that -- that we've -- we finally settled

13   on was not 400, 100, and that didn't make much difference to

14   the 22-year time.

15   Q    So at this point in time, making that adjustment to the

16   asymptote changed the half-time estimate, correct?  And I just

17   want to refer your attention to the second paragraph, you say,

18   as a result of the asymptote has increased from 250 to 350 to

19   400 nanograms dry weight, this means that we are significantly

20   closer to the achievable target than we thought we were.

21   A    Yeah, and see what we were -- what we were thinking at

22   that time that the -- that the achievable concentration for

23   the -- for the -- for the upper estuary below Veazie Dam would

24   -- would be maybe 350 to 400 nanograms per liter because those

25   were the concentrations of mercury in -- in particles coming

1    over the dam.

2         Then we -- then we looked again at those two cores just

3    below Veazie Dam, which appeared to have recovered to 100

4    nanograms per gram.  And that gets into the -- to the

5    discussion that I had with Mr. Bernard yesterday.  Somehow

6    that -- somehow concentrations are coming -- mercury and

7    particles are coming over the dam at 350 -- or 250 to 400

8    nanograms per gram, but when they're finally deposited in the

9    sediments, they're -- they're not at that concentration.

10   They're at a lower concentration because of some of the

11   diagenetic processes maybe that I discussed yesterday.

12        So we -- we decided that based on the data, that the

13   recoveries that we'd actually seen happen just below Veazie

14   Dam, that maybe our -- our long-term -- longer-term

15   concentration -- recovery concentration in the upper estuary

16   should be 100, not -- not 250 to 400.  So you're -- you're

17   seeing us start with an asymptote of 0, when we didn't have

18   any idea, to a -- an interim decision, when we first started

19   to understand what the particles were as they were coming over

20   Veazie Dam, and then later on, we -- we discovered the -- the

21   data in the cores just below Veazie Dam, which were lower and

22   -- and were actually surface sediment concentrations, which we

23   think are the concentrations that are achievable, and that's

24   what the ecosystem will experience after final recovery.

25        So this is a step-by-step, this is science in action.

1   Q     And as this -- as this change occurs in the -- the

2   half-life estimate, that ends up impacting some of your

3   remedial decisions.

4   A     Right.  Because if -- if -- if the -- if the sediments

5   could only go to 400 nanograms per gram dry weight in the

6   surface sediments, we'd already be at our target, which -- I

7   mean, the whole thing -- then we start to question, you know,

8   what's going on.  We would think, you know, that's -- right

9   now, what they're saying is even if we get to 450, everything

10  will be okay, and then -- maybe not explaining this very

11  clearly -- but it would mean we're a lot further along in --

12  in recovery than we thought we were.  But that -- you know,

13  with later examination to date, that turned out to not be

14  true.

15  Q     Let's take a look at the next -- so you lay out the

16  situation for the group, and then you state that these two

17  things together suggest to me that in about ten years, the

18  upper estuary surface sediments may be at about 600 to 700

19  nanograms per gram dry weight.  This makes me wonder if it is

20  worth the cost to do the mobile sediment removal/replacement

21  option.  Also, Rocky and Dave are quite lukewarm on this

22  remediation option.

23        How did this make you rethink whether doing the mobile

24  sediment removal/replacement was a good idea?

25  A     Well, it turned out that the -- you know, what we've

1    been discussing wasn't true and we were a lot farther away

2    from the targets than -- than this e-mail suggests.  So I -- I

3    think it doesn't change our recommendation.

4    Q      In the -- in the last sentence, you say, also rocky and

5    Dave are quite lukewarm on this remediation option.  What did

6    you mean there?

7    A      Yeah, they -- and -- and this is -- this is one reason

8    why I valued working with those two so much is we always knew

9    exactly what they thought, and Rocky came -- came into the --

10   into the study saying, I can't give you precise answers, and

11   -- and he wasn't able to give us precise answers.  And I -- I

12   think he's -- I think he is -- is -- is -- we see some

13   hesitancy in him because his numbers aren't -- aren't precise,

14   and yet we made the recommendation that -- that if -- if the

15   mobile pool sediments could be reduced in concentration, that

16   that would -- that would go a long way towards solving the

17   problem.

18         The reason we -- we made this decision is because, from

19   what we've learned from Rocky, if we could reduce the mobile

20   sediment concentration by a factor of two, we know from the

21   overall project, that -- that this would solve the problem.  I

22   think the advice we're getting from Rocky is that -- that I

23   can't tell you exactly what this mobile -- the size of this

24   mobile pool, and then you're going to have to figure out how

25   to -- how to deal with it.  And so he -- Rocky's always been a

1    valuable source -- a valuable reality check to us, and that's

2    what I was trying to -- that's what I've been -- was trying to

3    say in that sentence.

4    Q    Okay.  Let's take a look at Defense Exhibit 55.

5         MR. TALBERT:  And I would like to move for the

6    admission of this exhibit.

7         THE COURT:  Any objection to 55?

8         MR. BERNARD:  No, Your Honor.

9         THE COURT:  55's admitted.

10   BY MR. TALBERT:

11   Q    Dr. Rudd, I've referred your attention to a document

12   entitled Straw Dog, in parens, you say, just to get

13   discussions going.  Do you see that?

14   A    Yes.

15   Q    Do you recall this document?

16   A    Yes, I do.

17   Q    Is this a document that you drafted?

18   A    Yes, it is.

19   Q    Okay.  Let's take a look at the first full paragraph

20   here.  You state, estimated half-time in the river, i.e., the

21   Penobscot/Orland Rivers, as far south as the tip of Verona, is

22   36 years.  A reduction in presented day total mercury

23   concentrations in surface sediments by a factor of two will

24   bring the biota into an acceptable mercury concentration range

25   within about 36 years.  This natural attenuation time is on

RUDD - CONTINUED CROSS-EXAMINATION/TALBERT

1   the cusp of being acceptable, so only very safe measures

2   should be considered.  What did you mean when you said that

3   this 36-year estimated half-time in the river is on the cusp

4   of being acceptable?

5   A     Well, in the river -- I was saying in the main stem of

6   the river itself, 36 years -- I was really saying two things.

7   36 years is -- I mean, it's been 47.  36 is -- is a fair

8   amount of time, but not an enormous amount of time, and, also,

9   in the main stem of the river itself, above Verona Island,

10  there's not -- there's not a lot of problems.  The eels are

11  too high, but -- but nobody very much seemed to be eating the

12  eels.

13        So if you look at the main stem of the river itself,

14  there's not a big problem there, and 36 years, you know, it's

15  -- it's a fairly long time, but maybe it's not too long.

16        But what's not said there is that -- that the

17  concentration in Mendall Marsh where the situation is much

18  worse, won't reach acceptable levels for 66 years.  So that's

19  -- that's a part of the story.

20  Q     And, to be fair, you're focusing this first section on

21  remediation in the main stem, and then you go on to explain

22  Mendall Marsh, correct?

23  A     Yeah, and the main reason that I think Mendall Marsh --

24  or that the main stem, as I explained yesterday, needs to be

25  -- needs to be remediated is not because of the main stem

1    itself.  It's because it'll have a positive impact on places

2    like the Orland and -- and Mendall Marsh and Fort Point Cove,

3    which are -- have much longer recovery times and -- and are in

4    worse condition than the main stem of the river.

5         The main stem of the river is where the root of the

6    problem is, and if we can treat it there, the whole system

7    will start to recover more quickly.

8    Q    You say, so only very safe mitigation measures should be

9    considered.

10   A    Yeah, if you're thinking about the main stem of the

11   river, yeah -- well, in general, yeah, we -- we shouldn't

12   screw up.

13   Q    What did you mean by that?  Can you just explain what

14   the, you know, sort of safe mitigation measures would be?

15   A    Pardon me?

16   Q    Could you please explain what you meant when you said

17   safe mitigation measures?

18   A    Well, something that doesn't have an unacceptable risk.

19   You could also make the situation worse by doing -- making a

20   mistake and doing the wrong remediation.

21   Q    Okay.  Let's back out of this and let's go below in this

22   -- this document.  You -- you lay out an active remediation

23   for Mendall Marsh, and let's just below that bottom up.

24   A    Yes.

25   Q    Do you see that?  You say that active remediation of

1    Mendall Marsh.  Background, half-time of surface mercury

2    concentrations in Mendall Marsh is about 22 years.  Need at

3    least three half-times to reach acceptable methylmercury

4    concentrations in sparrows.  Is that what you were just

5    referring to?

6    A    Yes.

7    Q    Okay.

8    A    I might add, this is -- this is -- this is an early

9    document, and our thinking has, you know, improved and been

10   refined a little bit since what we're reading here.

11   Q    Yep.  Let's -- let's back out of this.  I just want to

12   refer your attention to some of the unknowns.  Can we -- can

13   we blow this section up?  You list unknowns, will mobile

14   sediments dredging need to be repeated; mass of mobile

15   sediments; size of ongoing erosional source; testing of

16   availability and efficacy of clean sediment addition; and

17   costs.  Does this reflect some of the thinking at the time

18   regarding the unknowns to be answered?

19   A    Yes, yes.

20   Q    Are these -- are these still unknowns today?

21   A    Um, yeah, the two most important ones is -- are -- are B

22   and C, I think, because, you know, if we knew the mass of the

23   mobile sediments and it wasn't too large and we knew there was

24   no -- no important ongoing source, then we probably wouldn't

25   have to repeat this -- the dredging again.  So they're --

1   they're all interrelated.

2   Q    Okay.  I think we're finished with --

3   A    That's why I've been highlighting B and C so often in

4   the last couple of days.

5   Q    Okay.  You mentioned this earlier, but I believe you

6   mentioned that it's -- it's -- it's currently not clear how

7   you can have mercury of 240 nanograms per gram coming down

8   from Veazie and yet achieve a background of 100.

9   A    Yeah, the -- the process or the mechanisms involved in

10  that -- what we think is -- must be a loss of mercury, there

11  -- there are processes that could explain it, but we didn't

12  study them.  So we have to go -- you know, we go by the data

13  that's there.

14  Q    But sitting here today, you're not sure how that would

15  occur.

16  A    No, there's ways that it could have happened, but we

17  didn't study it.

18  Q    Okay.

19  A    We didn't go -- go that far in our research or in -- in

20  our studies.

21  Q    Okay.  Let's switch gears and talk about human health

22  for just a second.  Is it fair to say that of the Study Panel

23  members, Dr. Whipple is the expert on human health risk?

24  A    Yes.

25  Q    Okay.  And would you defer to Dr. Whipple on areas of

1   human health risk assessment and toxicology?

2   A    Basic -- I haven't concentrated in that area.  I -- I --

3   the way I've oriented my research -- if the concentrations

4   have been higher than some guidelines set by some government

5   body, then -- and I haven't -- I've never, in my 35 years,

6   needed to go any further than that in order to -- to justify

7   suggesting remedial options.

8   Q    Is it fair to say the study did not explore the human

9   health effects of eating organisms from the Penobscot?

10  A    Yes, we did not.

11  Q    Okay.  With respect to ecological harm, is it fair to

12  say the Study Panel did not conduct toxicology tests --

13  toxicological studies of organisms?

14  A    Yes, we decided to not go that route.  We decided that

15  that likely would be unproductive and might be confusing, and

16  we didn't really need to do that in order to make the

17  conclusion that we did.

18  Q    Instead, you compared literature thresholds of various

19  types and species and compared those against mercury levels

20  you found in tissue or muscle or blood in biota samples --

21  A    Yeah.

22  Q    -- in the Penobscot, correct?

23  A    Yeah, but we did that in a very thorough way.  There's

24  -- there's -- in the reports that -- that Dr. Sandheinrich and

25  Dr. Evers produced to us, there was over 500 -- 500 citations

1    of -- a lot of them very recent papers, and those papers, a

2    lot of them covered the kind of reproductive tests that you're

3    talking about.  They -- they were people who did the kind of

4    tests that -- that you've just referred to, and -- and in

5    addition to that, we were -- we were getting the expert advice

6    of -- of one of the best avian toxicologists there is.

7        So we put all that together and decided that doing one

8    more test in -- in -- in Mendall Marsh and setting beside

9    these other 500, might not tell us very much additional

10   because people would say, well, you've only done this once,

11   and other people have found this and other people have found

12   that, so we decided to take the expert advice of -- of the --

13   of -- of -- you know, of people like Dr. Evers.

14       Dr. Evers would have like to have gone on and done a

15   study, and I'm sure he would have done that, but -- but the

16   court -- but we -- we weighed it back and forth, and he said

17   that he was also satisfied with us setting a limit of

18   1.2 nanograms per gram and -- or micrograms per gram.  And so

19   we -- you know, this, as you know, is one -- one of our

20   controversies, and finally the court decided for us that we

21   shouldn't do this, and I'm -- I'm satisfied with that result.

22   Q    Is it fair to say Dr. Fisher was someone that,

23   throughout the study, really wanted to do toxicological

24   studies?

25   A    Yes, yes, it is fair to say that.

1   Q     And I believe you testified earlier that you recall

2   having a conversation with Monica Bigley, who informed you --

3   and please correct me if I'm -- I'm misstating your

4   understanding of the situation --

5   A     Right.

6   Q     -- that Judge Carter didn't want you to do these

7   toxicological studies?

8   A     Yeah, this was during the time of the writing of the

9   Phase II proposal.

10  Q     Okay.  Let's put up Defense Exhibit 165.

11        MR. TALBERT:  And I would like to move for the

12  admission of that -- that exhibit.

13        THE COURT:  Any objection to 165?

14        MR. BERNARD:  No, Your Honor.

15        THE COURT:  It's admitted.

16  BY MR. TALBERT:

17  Q     Dr. Rudd, do you recall posing the question of whether

18  the Study Panel could look at and do toxicological studies on

19  the Penobscot to Special Master Calkins?

20  A     I don't -- well, maybe I could read this again.  I don't

21  recall that that was the question that we asked her, but maybe

22  -- maybe if we read this e-mail, it was.  I -- I recall --

23  Q     Let's -- let's focus on the e-mail maybe to refresh your

24  recollection.

25  A     Okay.

1   Q    The first sentence here says, following our meeting last

2   week, I decided it was best to talk with Judge Woodcock

3   regarding a few of the questions that had come up.  Do you see

4   that?

5   A    Yes.

6   Q    Okay.  I want to refer your attention to underneath the

7   fourth bullet.  So the fourth number there where she says

8   meeting with the -- the judge.  Judge would like to meet with

9   you in the summer.  And then this paragraph, if that could be

10  blown-up.  Special Master Calkins informs you, I also spoke

11  with Monica Bigley this morning.  As we suspected, she was on

12  vacation last week, and the courts were closed yesterday

13  because of a snowstorm.  She is positive that there is no

14  order prohibiting further toxicology testing.  She has a vague

15  memory that there may have been a discussion with Judge Carter

16  and possibly an e-mail.  After my discussion with her, I am

17  convinced that there is no formal order prohibiting further

18  toxicology testing, but because of the court's general

19  findings, if you want to -- further toxicology testing, you

20  should tie the need for it to remediation.  Or if there is

21  something going on now or in the future at the HoltraChem site

22  that is possibly causing more mercury to get into the river,

23  you could tie the need for toxicology testing to that.  Do you

24  recall receiving this correspondence?

25  A    Yes, I do.

1   Q    Okay.  Do you recall that after receiving this, there

2   was -- you had a discussion internally about whether to do

3   such testing?

4   A    I -- I imagine we did.  I don't recall specifically.  I

5   mean, I agree with -- with -- with -- with Susan Calkins.

6   There was no written order.  My memory is -- is a phone

7   discussion.

8   Q    Okay.  And is it fair to say that as late as -- this was

9   an ongoing discussion --

10  A    Yes.

11  Q    -- about whether to do tox studies, correct?

12  A    It was, yes.

13  Q    And as late as 2012, you left the door open for doing

14  toxicology studies as part of the next phase of work, correct?

15  A    Yeah, you never want to slam the door altogether on --

16  on something, so I wouldn't be surprised if -- I mean, if

17  somebody could come up with a really good idea and -- and

18  persuaded the group that it should be done, then -- then maybe

19  it should be done.

20  Q    Well --

21  A    So, I mean, I'm -- I think these discussions are still

22  ongoing.

23  Q    I believe you yourself, in fact, have informed the

24  group, have you not, that -- that that's still an open option?

25  A    Well, I guess if -- I guess if the argument can be -- be

1    made.  I mean, are you suggesting that it's part of -- of the

2    remedial program we do toxicity testing?

3    Q    Let's --

4    A    I don't remember -- but I could have.

5    Q    Defense Exhibit 441.

6         MR. TALBERT:  And this is also a document I would

7    like to move into evidence.

8         THE COURT:  Any objection to 441?

9         MR. BERNARD:  I'm just looking at it.  No, Your

10   Honor.

11        MR. TALBERT:  Okay.

12   BY MR. TALBERT:

13   Q    This -- this is a several-page e-mail, but what I --

14   what I want to refer your attention to -- and feel free to,

15   you know, take additional time if you need to read it -- but

16   if I can refer your attention to Page 2, I believe I can get

17   to the crux of the discussion in those e-mails.  And this is

18   an early e-mail chain at the bottom where it appears there's a

19   discussion about working with Inland Fisheries and Wildlife to

20   obtain necessary permits, and your e-mail is what I want to

21   discuss.

22        This is an e-mail dated January 27th, 2012.  It's from

23   you to Dr. Bodaly, Chris Whipple, Dr. Fisher, and Dr. Kopec,

24   and you say, update on bird sampling contractor.  That's the

25   subject re line.  You chime in, you say, also sounds very good

1   to me.  But then you say, I'm a bit hesitant to suggest this,

2   but would it take much to expand this work to a defensible

3   Nelson's toxicity test?  Do you recall raising this with

4   Dr. Bodaly?

5   A     Yes, I -- yes, I do now.  I recall -- I recall writing

6   this.

7   Q     Okay.  And what was your -- your thinking here?

8   A     Well, I -- it may have been a bit of a -- of a weak

9   moment, but I -- I was -- I wavered a little bit in this

10  discussion.  At one point, Dr. Fisher was very persuasive, and

11  at another point, Dr. Whipple was, and Dr. Kopec was, and so I

12  -- I -- we kept revisiting this over and over again, and at

13  that time, I also didn't know as much about the problems and

14  the difficulty of toxicity testing and the kind of thing

15  that's in the Jackson et al. paper that Dr. Henry cites, and,

16  you know, I've done a lot more reading about this now since

17  this was written, and I understand -- I understand how

18  difficult it would be.  So I'm -- I'm glad now that -- that

19  the group didn't take up this -- you know, this sort of tepid

20  suggestion that I made with three question marks, because I --

21  I think that would probably have not helped us and where we

22  are now is about as good as we could do under the

23  circumstances.

24        So, yes, I wrote this, but it was part of the ongoing

25  discussion.

1    Q     Take me back to your -- your thinking because, again,

2    this is January 27th, 2012.

3    A     Right.

4    Q     The -- this is several months before the report is

5    actually issued --

6    A     Yeah.

7    Q     -- to the parties, correct?

8    A     Yeah, you're right, it's also too late in the game, I

9    guess.

10   Q     So the study had been going on for about eight years at

11   this point, right?

12   A     Yeah, yeah.

13   Q     And you -- you -- what was your thinking in raising the

14   Nelson's toxicity test, you know, at this stage in the study?

15         MR. BERNARD:  Excuse me, Your Honor, I think this is

16   a year and three months.

17         THE COURT:  Right.

18         MR. BERNARD:  Not three years.

19         MR. TALBERT:  I apologize.

20         THE COURT:  I'm already there.

21   BY MR. TALBERT:

22   Q     This --

23   A     I --

24   Q     You've been sitting for quite a while at this point,

25   however.  I'm incorrect on the dates.  This is a year and

1   three months before the Study Panel issued the Phase II

2   Report, but you have already been out studying, at least since

3   2006, correct?

4   A    Yes, that's correct, yeah.

5   Q    What was your thinking in raising this at this point, in

6   2012?

7   A    Well, I -- I didn't want to -- you know, I -- as I said,

8   I -- I was -- I wavered at times in this discussion because --

9   because there was good points being made on both sides.

10  Otherwise, it would have been resolved quickly.  And so -- and

11  the other thing that -- I guess I'm going to repeat myself

12  again, I didn't understand at this time -- I'm not an avian

13  toxicologist -- I'm not even a biologist -- and I didn't

14  understand at this time how difficult it was to -- to do a

15  proper toxicity test in the field and interpret it in a way

16  that it would be definitive.

17       And I've done a lot more reading since then on -- on

18  this topic and discussions with people, and I now see -- see

19  the -- the -- the difficulties in this and the pitfalls, and

20  some of them that Dr. Henry raises in her -- in her

21  defendants' report.

22       So I wanted to keep an open mind, but I'm glad we didn't

23  go on that route in the long run.

24  Q    Did you see some value in performing such a study at

25  this point in time?

432

1    A      Well, I was still wondering if there might be some

2    value, but I'm glad -- I'm glad I didn't go there -- I'm glad

3    I didn't push it.

4    Q      Setting aside the difficulties of conducting the study,

5    would have -- what would have been the value, in your -- in

6    your mind, of performing a tox -- toxicity study?

7    A      Well -- well, what we settled on -- the reason I'm

8    comfortable with the way we went now is there's a very good

9    relationship been established between mercury concentration in

10   bird blood and mercury concentration in the eggs, and there's

11   also a good relationships of mercury concentration in eggs, my

12   understanding, and -- and the success of -- of -- of, you

13   know, the hatching and so on, when people have done -- other

14   people have done a lot of these reproductive studies.

15          So in my mind, it's not -- it's pretty simple to connect

16   those dots, mercury in blood to mercury in eggs, to other

17   studies say mercury -- mercury -- high mercury in eggs and

18   blood in many other studies have shown that the -- the eggs

19   then have some trouble hatching, and the young birds have

20   trouble fledging and leaving the nests.  So that's not many

21   steps for me.

22          But, still, it would be really nice if we could -- if we

23   could go out to Mendall Marsh and do a definitive, clear study

24   that nobody could argue with that Nelson's sparrows in Mendall

25   Marsh aren't producing -- aren't fledging as many birds -- as

1    many young birds as Mendall Marsh -- as Nelson's sparrows in

2    Rachel Carson wetland, for example, a reference wetland.  But

3    that's a -- my understanding it's an exceedingly hard study to

4    do, and it might -- it might work and it might not because of

5    confounding -- Rachel Carson Marsh won't be exactly like

6    Mendall Marsh.  There'll be some other uncontrollable

7    differences, other -- in addition to mercury, which -- which

8    will inevitably call into question that type of test, is what

9    I'm starting to understand now.

10        So I'm satisfied with what we did.  I think, you know,

11   to go back to the old analogy, I think this is a solid Ford,

12   and we -- I'm glad we didn't go for the Cadillac.

13   Q    Is Dr. Evers the expert on avian toxicity?

14   A    Yes, yes.

15   Q    One last question on this particular e-mail, if you go

16   to the -- the first page -- and I believe the response from

17   Dr. Bodaly is somewhat pointed, and -- and he had a strong

18   reaction to you raising this at this date after all the

19   discussion.  You then respond to him, and I'd like to just

20   have that blown-up, please, and you say, I was just asking if

21   the planned sampling for LT monitoring study could easily be

22   designed to double as an initial collection season for a

23   future toxicity test maybe in Phase III.  In paren, you say,

24   this could save us a year, close paren.  But if this were to

25   require a different sampling program than the one now being

1  proposed, then I'm not in favor of it.  I wasn't aware that we

2  had decided to never do toxicity testing.

3  A    Yeah.

4  Q    You -- do you recall that?

5  A    Yeah, I don't think we ever -- well, I don't think --

6  you know, we still -- we still -- what I'm saying there is

7  we're still debating this.  But I -- I think this was kind of

8  a -- this first paragraph here sort of shows my inexperience

9  when I wrote this, is that I -- now that I know more about the

10  type of toxicity testing that -- the monitoring program that

11  we were -- that we were proposing at that time, which is --

12  which is ongoing, would -- could never be jerry-rigged to --

13  to become a toxicity test.  That has to be a test on its own.

14       So what I was suggesting there wasn't a good idea.

15  Q    Okay.  Dr. Rudd, I'd like to wrap up.  Hopefully I can

16  do this quickly.  Is it fair to say that the Penobscot is a

17  challenging system to study?

18  A    Yes.

19  Q    The fact that it is an estuary means that you're going

20  from fresh water to salt water, correct?

21  A    That's correct.

22  Q    And you have tidal influences, as well?

23  A    Yes.

24  Q    These factors complicate the biology because there are

25  few organisms throughout the system that you can really

1  compare from one place to another, correct?

2  A     Yes, that's correct.

3  Q     And, to summarize, the remedies that you would not

4  recommend pursuing because they're not scientifically feasible

5  would be bank-to-bank dredging, capping that we discussed

6  earlier, and nitrate injection?

7  A     Yes, the only caveat would be we're not -- we're not --

8  I think what we're suggesting is -- is that wholesale or

9  bank-to-bank capping not be done, but certainly there could be

10  capping in certain places that would be helpful.

11 Q     The overall goals of any remediation would be to try to

12 reduce methylmercury concentrations in biota to protect humans

13 and biota themselves, correct?

14 A     That's correct.

15           MR. TALBERT:  No further questions.

16           THE COURT:  Thank you.  We'll break for the day

17 unless you want to become defense counsel -- criminal defense

18 counsel.  I don't see anybody anxious to do that.

19           MR. BERNARD:  Your Honor.

20           THE COURT:  Yes, sir.

21           MR. BERNARD:  Just quickly because we have a couple

22 of witnesses here who have travel issues.

23           THE COURT:  Right.

24           MR. BERNARD:  Some have come from a long way, so I

25 just wanted to just kind of review where we are.  I've got --

1    so I can communicate with them.

2              THE COURT:  Sure.

3              MR. BERNARD:  I would say I have 30 minutes of

4    redirect and that's it.

5              THE COURT:  Yeah.

6              MR. BERNARD:  And then I am hoping that we will call

7    Dr. Whipple early tomorrow morning.  We are going from 8:30 to

8    11:30 tomorrow?

9              THE COURT:  Right, unless you want to come to the

10   dentist with me.

11             MR. BERNARD:  I think we'll prepare for Friday, if

12   you don't mind.

13             THE COURT:  All right.

14             MR. BERNARD:  And Friday is a regular day, 8:30 to

15   2:30?

16             THE COURT:  Yes.

17             MR. BERNARD:  Okay.  All right.  Do -- may I ask,

18   Your Honor, if you have something -- I said -- you said you

19   had something most days at three o'clock.  I'm just thinking

20   about, for example, Dr. Fisher and Dr. Whipple I know have

21   travel plans, and I'd really like to finish them by the end of

22   the day Friday.

23             THE COURT:  Right.

24             MR. BERNARD:  And I'm wondering if we're very, very

25   close to 2:30 whether there's a little leeway there?

1          THE COURT:  I can see they just scheduled --

2   scheduled a videoconference for me -- well, let me finish this

3   because it may be just a break for you -- they've scheduled a

4   videoconference for me at 2:30 Friday.  I don't think that

5   will take more than 15 or 20 minutes, could be a nice break

6   for you, and then we'll come back, and we'll work until

7   basically the end of the day, as long as you folks need to --

8   I don't want to inconvenience -- I know there's an awful lot

9   of money that's gone into this project, and I don't want to

10  inconvenience the experts who've flown here.  So we'll just

11  continue to move along so long as we're not working past 5:00.

12  I would like to wrap up by 5:00, if that's possible.

13          MR. BERNARD:  Thank you, Your Honor.

14          THE COURT:  All right.  Anything further?

15          MR. TALBERT:  No, Your Honor.

16          THE COURT:  All right.  Thank you.

17      (Proceedings concluded at 2:41 p.m.)

18                       CERTIFICATION

19      I certify that the foregoing is a correct transcript from

20  the record of proceedings in the above-entitled matter.

21

22

23  /s/ Julie G. Edgecomb                    June 4, 2014
    Julie G. Edgecomb, RMR, CRR             Date
24  Official Court Reporter

25