1          UNITED STATES DISTRICT COURT

2               DISTRICT OF MAINE

3   MAINE PEOPLE'S ALLIANCE        )
    and NATURAL RESOURCES          )
4   DEFENSE COUNCIL, INC.,         )
                                   )
5               Plaintiffs         )
                                   )          CIVIL ACTION
6                                  )
        vs.                        )   Docket No. 1:00-cv-00069-JAW
7                                  )
                                   )          BENCH TRIAL
8   HOLTRACHEM MANUFACTURING       )
    and MALLINCKRODT LLC,          )
9                                  )
                Defendants.        )
10

11               VOLUME III

12          TRANSCRIPT OF PROCEEDINGS

13      Pursuant to notice, the above-entitled matter came on

14   for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15   Chief District Judge, in the United States District Court,

16   Bangor, Maine, on the 5th day of June, 2014, at 8:36 a.m.

17   APPEARANCES:

18   For the Plaintiffs:          Mitchell S. Bernard, Esquire
                                  Aaron S. Colangelo, Esquire
19                                Rachel E. Heron, Esquire
                                  Jared J. Thompson, Esquire
20
     For the Defendants:          Patricia H. Duft, Esquire
21                                Sigmund D. Schutz, Esquire
                                  Jeffrey D. Talbert, Esquire
22

23               Julie G. Edgecomb, RMR, CRR
                    Official Court Reporter
24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

INDEX OF PROCEEDINGS

                                                              Page:

Testimony:  (see below)

                        INDEX OF WITNESSES

                                                              Page:

JOHN RUDD   (called by Mr. Bernard)

Redirect Examination by Mr. Bernard                            440
Recross-Examination by Mr. Talbert                             463

CHRISTOPHER GEORGE WHIPPLE   (called by Mr. Bernard)

Direct Examination by Mr. Bernard                              464
Continued Direct Examination by Mr. Bernard                    502

                        INDEX OF EXHIBITS
Plaintiffs'
Exhibit No.      Description              Offered      Admitted

    67        Duck Warning Sign            493           493
    68        Duck Warning Sign            493           493

1        (Counsel present in open court.)

2        (John Rudd, having been previously duly sworn, resumed

3    the witness stand.)

4            THE COURT:  Where were we?  I don't remember.

5            MR. BERNARD:  I think we're on redirect, Your Honor.

6            THE COURT:  Okay.  Thank you.  Mr. Bernard?

7            MR. BERNARD:  May I proceed?

8            THE COURT:  Yes.

9                     REDIRECT EXAMINATION

10   BY MR. BERNARD:

11   Q    Good morning, Dr. Rudd.

12   A    Good morning.

13   Q    Yesterday you were shown a -- an excerpt from the

14   deposition of Dr. Santschi.  Do you remember that?

15   A    Yes, I do.

16   Q    And it involved one of the sediment cores that was taken

17   above the old Bangor Dam; is that right?

18   A    That's correct.

19   Q    Okay.  And do you understand some of defendants' experts

20   to be asserting that the core profiles of one or more cores

21   above the Bangor Dam show that mercury in the lower river

22   comes from sources other than HoltraChem?

23   A    Yes, I do.

24   Q    Okay.  Now, was Dr. Santschi -- is Dr. Santschi the

25   expert on whom the Study Panel principally relied for

1   analyzing the sediment core profiles?

2   A    Yes.

3   Q    And do you know whether Dr. Santschi reached a point of

4   view about what the core profiles show in terms of the

5   contribution of the HoltraChem plant to mercury in the lower

6   river?

7   A    Um, no, I -- I really don't because that wasn't one of

8   our -- of our objectives.  That wasn't what we asked him to

9   do.

10  Q    I understand that he was principally concerned with the

11  dating of sediment cores in order to estimate the rate of

12  recovery in the system.

13  A    That's correct, yes.

14  Q    Okay.  But there is an issue in the case that you're

15  aware of, is this -- is this fair to say, about whether those

16  cores also yield information that one can use to assign

17  responsibility or relative responsibility for the mercury in

18  the system?

19  A    Yes, I think you can -- once you have those data, you

20  can use them for various purposes.

21  Q    Well, I'd like to show you then a different excerpt from

22  -- this is Defendants' Exhibit 977, which is Dr. Santschi's

23  deposition from March 11th, 2014, and I just want to show you

24  one piece of that.

25              MR. TALBERT:  Objection to foundation.  He said he

1    doesn't -- isn't aware of this analysis.

2          THE COURT:  Overruled.  I don't think he's seen the

3    snippet yet.

4    BY MR. BERNARD:

5    Q    So let me show you this portion, and -- and there's a

6    question before -- and I've highlighted the portion that I

7    want to get your reaction to.  Question -- and this is from

8    Mallinckrodt's counsel -- right, so even where we have a

9    mercury peak that is or appears to be above or after 1967, all

10   of that mercury wouldn't necessarily be from HoltraChem,

11   correct?  And there's an objection.  And the answer is, if

12   95 percent -- my contention is that 95 percent, plus/minus, of

13   the mercury in these sediments is from HoltraChem.  If a few

14   percent comes from somewhere else, that is entirely possible.

15   But I would argue that it's 95 percent, with a plus/minus a

16   few percent, of the mercury in the system is from HoltraChem.

17   Question, I just want to understand -- answer, that's just by

18   interpreting the core profiles.  Do you see that?

19   A    Yes, I do.

20   Q    Okay.  And is that consistent with your understanding of

21   Dr. Santschi's view?

22   A    Yes, this -- in my discussions with him, this is -- I

23   think -- I can imagine he would say this.

24   Q    And is the substance of Dr. Santschi's view, as

25   articulated in this deposition testimony I've just shown you,

RUDD - REDIRECT EXAMINATION/BERNARD

443

1  consistent with this court's prior ruling that HoltraChem is

2  the dominant source of mercury to the lower Penobscot River?

3  A    Yes, it is.

4  Q    Yesterday you were asked about recovery half-times in

5  the main stem of the river and a discussion or debate within

6  the study group about whether the number in the Phase II

7  Report should be 22 years or 33 years.

8  A    Yes.

9  Q    Do you recall that?

10 A    Yes, I do.

11 Q    Okay.  Now, that just involved what number to use for

12 the main stem of the river; is that correct?

13 A    Um, not quite correct.  The -- the 33 years, as I

14 remember now, was a number that was calculated -- the number

15 came from all of the cores that were in the upper estuary,

16 including Mendall Marsh and the Orland River, and that was --

17 that was a number of 33, if you looked at the data in that

18 way.

19      But the debate was whether you should look at all of the

20 -- all of these data at once or split out Mendall Marsh

21 separately.

22 Q    Right.  And I think you said yesterday that you thought

23 there were good arguments on both sides of that question.

24 A    Ah, yeah, I think there's good arguments.  Of course, I

25 favored one.

RUDD - REDIRECT EXAMINATION/BERNARD

444

1   Q      Yes.   And the one you favored was that -- to use the

2   Mendall Marsh recovery half-time; is that correct?

3   A      That's correct, yes.

4   Q      All right.   And that is to say, you would have used that

5   for -- as a recovery half-time for the main stem of the river.

6   A      That's correct, yes.

7   Q      Okay.   Would you still have used the 22-year half-time

8   for Mendall Marsh?

9   A      Yes.

10  Q      And your calculation -- or the Study Panel's calculation

11  is that it would take Mendall Marsh three of those recovery

12  half-times in order to reach the target that the Study Panel

13  deems to be safe?

14  A      That's correct, yes.

15  Q      Okay.   So that would be approximately -- that would be

16  six decades or more; is that correct?

17  A      That's correct, yes.

18  Q      Okay.   And even if you used the 22-year as opposed to

19  the 33-year recovery half-time for the main stem, would that

20  still leave long recovery times in the Orland River portion of

21  the system?

22  A      Yes, it would.   The Orland River is recovering --

23  appears to be recovering much more slowly, much slower

24  half-life than either Mendall Marsh or the -- or the main

25  stem.

1    Q     And would that be true for Fort Point Cove, as well?

2    A     Yes, it would.

3    Q     Yeah.  So does the decision whether to apply a recovery

4    half-time of 22 or 33 years to the main stem of the river

5    affect the Study Panel's finding that we are many decades from

6    recovery to the Study Panel's target absent active

7    remediation?

8    A     Yes, yes, I think -- I think the -- the debate that

9    we've been having is a scientific debate, and -- and it -- it

10   goes -- it goes to the question of, do we understand the

11   system well enough to -- to build a model and to make specific

12   recommendations without any more study?  But it doesn't affect

13   the final bottom-line recommendations at -- at all.

14   Q     It doesn't affect at all the recommendation in which you

15   join, the consensus recommendation for active remediation.

16   A     No, no, it doesn't affect the study at that level.

17   Q     You were shown a number of e-mails yesterday, and I want

18   to go over a few of them with you.  The first is Defendants'

19   Exhibit 589, and this is a two-page e-mail, so I'll show it to

20   you in pieces, although we're mostly -- yeah, we're interested

21   in the bottom here.  Do you remember being shown this e-mail

22   yesterday?

23   A     Ah, yes.

24   Q     All right.  Let me see if I can --

25   A     I -- I'm not quite sure what -- what is the title of

1    the --

2    Q    The title -- let me show it to you, present working

3    hypothesis/thoughts.

4    A    Oh, oh, okay, yes.

5    Q    And, of course, the top one is from Dr. Fisher, but I

6    believe the one that Mallinckrodt's counsel showed you is the

7    one that you wrote on May 17th, 2007.  Do you see that, at the

8    bottom of the page?

9    A    Yes, I do.

10   Q    Okay.  Now, if my math is correct, this was before the

11   Phase I Report was written?

12   A    Ah, yes.

13   Q    Okay.  And this was approximately six years before the

14   Phase II Report was submitted to the court?

15   A    Yes.

16   Q    Okay.  And this was before a lot of the -- it says in

17   the first line here, after thinking about our first year of

18   data collection.  So does this concern some thoughts you were

19   having based on one year of data?

20   A    Yes.

21   Q    Okay.  And that was before most of the biota data in the

22   study were collected; is that correct?

23   A    Ah, yes, yes.  We had collected some at that point, yes.

24   Q    Okay.  But it was before the black duck data were

25   collected, right?

RUDD - REDIRECT EXAMINATION/BERNARD

1    A    Yes, yes.

2    Q    And before most of the lobster data were collected.

3    A    That's correct, yes.

4    Q    Now, I just want you to -- you went over some of the

5    substance of the e-mail, but I want to show you on the second

6    page of the exhibit -- oh, I'm sorry.  Let me show you one

7    other thing on the first page, which is, after thinking about

8    our first year of data collection, here is my present working

9    hypothesis.  Does that accurately state what this was, it was

10   just kind of some working thoughts --

11   A    Yes.

12   Q    -- based on some initial data?

13   A    Yes.

14   Q    Okay.  And let me show you on the second page, at the

15   very end of the e-mail, before you sign off, you say, my

16   thinking will likely change as more data comes in, but these

17   are my thoughts for now.  Do you see that?

18   A    Hm-hmm.

19   Q    Okay.  Now, we talked a couple of days ago about how the

20   Study Panel and the investigators communicated throughout the

21   study period.  Do you remember that?

22   A    Yes.

23   Q    And -- and is this typical in a way of -- of one kind of

24   communication that you had during the study period where some

25   pieces of information would come in, reactions were thrown

1    out, ideas were thrown out to the others for their

2    consideration?

3    A    Yeah, this is -- this is how we operated.  We did these

4    kinds of things in our phone conferences, as well.  This is

5    how we came to consensus was tossing ideas back and forth and

6    looking at the data in different ways.

7    Q    And some of these ideas and hypotheses were refined as

8    new data or analysis came in; is that fair?

9    A    Yeah, some of them -- some of them were correct and

10   turned out to be correct, but others were discarded, and some

11   were modified.

12   Q    Let me show you Defendants' Exhibit 427, which you were

13   shown yesterday.  This is the first page, and I just want to

14   call attention to the date.  This is -- you were asked about

15   Dr. Fisher's e-mail, which was written to Dr. Whipple -- well,

16   you were copied on it.  It was written to Dr. Bodaly, but you

17   and Drs. Kelly and Whipple were copied on it.  Do you see

18   that?

19   A    Yes, I do.

20   Q    Okay.  So this was two and a half years before the Phase

21   II Report was submitted to the court; is that correct?

22   A    Yes.

23   Q    Okay.  And did you have at this point Dr. Santschi's

24   full analysis of the sediment cores?  Do you remember?

25   A    No, I don't think so.

1    Q      Okay.  Now, Dr. Fisher, although an eminent scientist,

2    is not an expert on sediment core analysis, is he?

3    A      I'd say that's correct.  I -- I -- I'm not either.

4    Q      Now, on Page 2 of the exhibit, which is what you were

5    asked to focus on yesterday, Dr. Fisher is writing in this

6    paragraph about this core, which he says, the mercury is much,

7    much older than the cesium.  Do you see that?

8    A      Yes, I do.

9    Q      Now, what, if anything, did Dr. Santschi tell you about

10   focusing on one sediment core within the data set that was

11   collected as part of the study?

12   A      I think -- I think what he's -- what I've learned from

13   him -- and not just Dr. Santschi because I've worked with

14   other people who've done this type of work, too, and -- and

15   they -- they always caution that if you're -- if you're

16   looking at -- if your -- your question is -- is a whole

17   ecosystem question, how quickly is the whole ecosystem

18   recovering, then you need to look at as many cores as possible

19   and -- and -- and establish the overall response based on

20   averages from these cores.

21          A single core only tells you exactly what's happened at

22   that one site, and -- and there can be disturbances at that

23   site which aren't typical of the overall ecosystem.  So that's

24   why you -- you know, that's why you take as many cores as you

25   can to get a -- the best general result that you can.

1    Q    And I think you testified that this is one of the most

2    -- for radiodating purposes, this was one of the most thorough

3    coring exercises you're aware of.

4    A    Yes, yes, Peter -- or Dr. Santschi told me that.

5    Q    And is one of the advantages of that, Dr. Rudd, that you

6    are not constrained to focus unduly on a single core or one or

7    two cores, you can look at a broad set of data?

8    A    Yes, yes, that's exactly why Dr. -- Dr. Santschi pushed

9    us to -- to -- for funding to collect as many cores as

10   possible for that reason.

11   Q    You were shown yesterday Defendants' Exhibit 12, and

12   this includes some language that counsel pointed out involving

13   score one for the defendants and smoking gun.  Do you remember

14   that?

15   A    Yes, I do.

16   Q    Okay.  Now, was this document -- and you wrote the top

17   e-mail and received the bottom.  But is this a document that

18   you meant for submission to the court?

19   A    No, at that time, we had no idea that our -- we -- we

20   thought we were -- well, I think we were an independent study,

21   but we -- we thought that part of our independence was that

22   our private discussions would be -- would remain private.

23   Q    And -- and did -- did -- is the language -- withdrawn.

24        Was the language during the Study Panel's and Study

25   Group's private discussions sometimes offhand and colloquial?

1   A     Yes, yes, that's normal for scientists.  We don't have

2   to explain every step of the way each time we have a

3   conversation.  We use shorthand so that discussions can

4   proceed quickly.

5   Q     Okay.  When you wrote your quarterly report -- progress

6   quarterly reports to the court, did you use language like

7   this?

8   A     No.

9   Q     And when you wrote your formal Phase I, Phase I Update,

10  and Phase II Reports, did you attend to the language in those

11  documents differently because you knew that they were going to

12  be submitted to the court and be a matter of public record?

13  A     Yes, yes, plus we wanted them to be understandable to

14  the reader.

15  Q     Let me show you one other e-mail that you were shown

16  yesterday, and it's Defendants' Exhibit 55, and this is the

17  straw dog e-mail that I believe you said you wrote.  Do you

18  remember this?

19  A     Yes.

20  Q     Okay.  Now, do you remember when you wrote this

21  document?

22  A     Ah, no, no, I don't.

23  Q     Okay.  Well, let me just refresh your recollection and

24  put up Exhibit 54, which is the one that precedes this, which

25  -- this is Defendants' 54, which attaches Exhibit 55.  And do

1    you see the date on that?

2    A    Yes, I do.

3    Q    What is it?

4    A    Ah, April 24th, 2012.

5    Q    So this is, then, around one year prior to submission to

6    the court of the Phase II Report?

7    A    Yes.

8    Q    Okay.  So let's look back at Defendants' Exhibit 55.

9    Now, what does straw dog mean?

10   A    Oh, that's a -- that's a bit of a joke.  On another

11   project --

12   Q    If you care to let us in on it, you're -- you're now

13   free to.

14   A    Reed -- Reed Harris, the modeler we got involved, we

15   were involved -- we were working with him on another --

16   another project, and -- and he coined this phrase during a

17   meeting, and everybody laughed at him.  So I just sort of --

18   it was sort of a little carry-on of that.

19   Q    Okay.  Now, you say just underneath --

20        THE COURT:  I don't think he answered the question.

21   A    Find out really what it means.

22        MR. BERNARD:  I think that's one -- one incomplete

23   answer I'm going to let go.

24        THE COURT:  All right.

25   BY MR. BERNARD:

1   Q     Dr. Rudd, right under straw dog, you see in the

2   document, it says, just to get discussions going.  Do you see

3   that?

4   A     Yes.

5   Q     And is that a fair representation of what you were

6   intending to do --

7   A     Yes.

8   Q     -- in this document?

9   A     Yes.

10  Q     Okay.  It wasn't intended to be your final thoughts on

11  the issue of recommendations to the court, was it?

12  A     No, I -- I just thought that we were getting close

13  enough to writing -- we hadn't talked a lot about -- about

14  recommendations.  We'd -- we'd been concentrating on the

15  science.  And -- and, frankly, until we got -- almost got to

16  this point, I didn't really know where Dr. Fisher and -- and

17  Dr. Whipple stood with respect to recommendations.  We hadn't

18  -- and I -- and I was purposely not getting into it because I

19  wanted people to make up their own minds first.

20        So I thought we were starting to get -- starting to work

21  on the final report, and I thought it was time to -- for us to

22  begin to have these discussions.

23  Q     Okay.  Now, the structure of this -- this is the first

24  -- No. 1, called enhanced natural attenuation, and, here, I

25  highlighted, under the background, the estimated half-time in

1    the river.  This first recommendation involves the river; is

2    that correct?

3    A    Yes, that's correct.

4    Q    Okay.

5    A    Yes.

6    Q    And because the second -- I'm just going to show you

7    this to make it clear.  Number 2 says, active remediation of

8    Mendall Marsh.

9    A    That's correct.  But in my mind, when I was writing

10   this, I -- what's not stated there is -- is that I -- was that

11   we had the understanding by that time that if you -- if you

12   remediated the river, you would also have a positive impact on

13   Mendall Marsh and the other -- you know, Orland River and Fort

14   Point Cove.

15   Q    Yes.  And I think you've testified to that, right?

16   A    Yes.

17   Q    Okay.  So you were shown this top paragraph and the

18   language about 36 years being on the cusp.

19   A    Yes.

20   Q    Okay.  Now, then you were shown this section here about

21   the unknowns and that was highlighted to you.  Do you remember

22   that?

23   A    Yes.

24   Q    Okay.  I don't believe you were shown the material that

25   comes in-between those two sections, and I'm highlighting that

1   for you now.  And in this section, you have, as a straw

2   recommendation, further study of two possible enhanced natural

3   attenuation remediation measures:  A, dredging of mobile

4   sediments at accumulation points near Frankfort Flats in South

5   Verona Island; and, B, dredging of mobile sediments, plus

6   addition of equal mass of clean sediments.  Do you see that?

7   A    Yes.

8   Q    Okay.  So that even at this time, a year in advance, and

9   even in light of your straw thinking about what was on the

10  cusp of acceptability by way of natural recovery, you were

11  thinking about these targeted dredging ideas and the removal

12  of contaminated sediments and their replacement with clean

13  sediments; is that fair?

14  A    That's correct, yes.

15  Q    Okay.  Now -- then you go on in Page -- No. 2, you're

16  talking about the application -- and this goes on to the

17  second page, but you talk about the need to do something in

18  Mendall Marsh, and I'm going to Page 2 now -- let me see if I

19  can -- okay -- and you talk about studies of mercury-binding

20  agents, which you did in a preliminary way; is that correct?

21  A    Yes.

22  Q    Okay.  Then No. 3, what does that say?

23  A    Selective hotspot dredging.

24  Q    Right.  And so this was an idea that you were

25  considering at the time; is that -- is that fair to say?

1    A      Yes, I -- I guess it was.  I --

2    Q      And -- and look at the straw recommendation there at the

3    bottom of the text, it says, recommendation, consider doing

4    selective dredging of mudflats as below.  Do you see that?

5    A      Yes, I do.

6    Q      Okay.  And one is the Southerly Cove, which you've

7    talked about, which is part of the state administrative

8    proceeding, and then B is determine if there are other

9    hotspots, particular -- particular look in other coves and

10   mudflats near HoltraChem.

11   A      Hm, yes.

12   Q      So does that refresh your recollection that this idea

13   that you articulated in your direct testimony during this

14   trial is not brand-new, but is something that you were

15   actually considering prior to the submission of the Phase II

16   Report?

17   A      Yes, yes, I -- I'd forgotten this, but that's true.

18   Q      Now, I've shown you just four e-mails.  Do you have any

19   rough estimate of how many e-mails during the last ten years

20   you have sent and received concerning subject matter within

21   the Penobscot River Mercury Study?

22   A      I would guess the number would be in the thousands.

23   Q      Okay.  Now, if we want to know where to find the Study

24   Panel's most refined thinking, its findings and

25   recommendations, would we look to the reports that the panel

1    filed with the court?

2    A     Yes, I -- I think that's correct.

3    Q     Okay.  And to the extent -- to the degree there's been

4    any refinement in your thinking since submission of the Phase

5    II Report, through the expert reports and depositions and

6    further analysis, is your testimony here in court the best

7    source for discerning your analysis of -- of the issues

8    affecting mercury contamination in the Penobscot?

9    A     I'm sorry.  I lost you --

10   Q     Okay.  That was -- let me just withdraw that question.

11         To the extent that you've refined your thinking since

12   submission in April 2013 of the Phase II Report, does your

13   testimony that you've given the last few days in this court

14   reflect those refinements?

15   A     Yes, yes.

16   Q     Okay.  And is your testimony and the formal reports the

17   Study Panel filed with the court a more reliable and current

18   source of your thinking than the thousands of e-mails you

19   wrote that predated the filing of the Phase II Report?

20   A     Yes, yes.

21   Q     I want to turn finally to the questions you were asked

22   yesterday concerning remedy.  Bank-to-bank dredging you said

23   is not something that the Study Panel found to be a useful

24   idea in this system; is that correct?

25   A     Yes.

RUDD - REDIRECT EXAMINATION/BERNARD

458

1    Q     Are you aware of anyone throughout the study process who

2    -- any party to the case or any expert, who has advocated

3    bank-to-bank dredging of the 20 miles of river from the Veazie

4    Dam down to Fort Point Cove?

5    A     No, it was -- we -- we did discuss it amongst ourselves,

6    and we discussed it with -- with Dr. Yeager in particular.  I

7    can remember having discussions with him.  And -- but I can't

8    remember -- you know, I guess the answer to your question

9    would be no.

10   Q     Okay.  Now, in terms of the more selective or targeted

11   dredging that we've been discussing over the last couple of

12   days, dredging can carry risks; is that fair to say?

13   A     That's -- that's correct, yes.

14   Q     Okay.  So you need to be careful when you dredge; is

15   that correct?

16   A     Yes.

17   Q     Okay.  Now, are there many dredging projects going on

18   around the world?  Do you know?

19   A     Oh, yes, many, many.

20   Q     And some of them are navigational dredging?

21   A     Yes.

22   Q     And some are environmental dredging?

23   A     Yes.

24   Q     Okay.  And you mentioned that Dr. Yeager is -- has real

25   expertise in dredging?

1    A      Ah, yes, yes, ah --

2    Q      And --

3    A      I'm not -- not terribly aware of it, but -- but he

4    certainly seems to be familiar with it.

5    Q      And same for Dr. Bridges of the Corps of Engineers?

6    A      Yes, I would say more so even.

7    Q      Okay.  Now, did -- did both of them advise you that

8    there have been significant improvements in dredging

9    technology over the last decade?

10   A      Yes, they did.

11   Q      Okay.  Now, you mentioned the Hudson River.  Is there

12   environmental dredging going on on the Hudson River?

13   A      Yes.

14   Q      And do you know -- do you follow that?  Do you read the

15   reports?

16   A      Not closely, no.

17   Q      Do you know whether there are targets relating to the

18   resuspension of contaminated material as a result of that

19   dredging?

20   A      Yes, I think there are.

21   Q      And do you know whether those targets are being met?

22   A      Um, no, I don't -- I'm sorry.  I don't know that project

23   in detail.

24   Q      But that is a project that the U.S. EPA is overseeing;

25   is that correct?

1   A      Yes.

2   Q      Okay.  You said that targeted dredging can carry some

3   risks.  You also said, am I correct, that targeted dredging is

4   something that should be considered as a remedy?

5   A      Yes, the panel's in favor of the removal of --

6   Q      Okay.

7   A      -- sediments in Southerly Cove.

8   Q      Does leaving the Penobscot ecosystem alone carry risks?

9   A      Yes, yes, I -- definitely.

10  Q      And there are risks from mercury in the surface

11  sediments; is that fair to say?

12  A      Yes.

13  Q      And are there also risks that mercury contamination

14  farther down in the sediment column could be disturbed and

15  resuspended into the system?

16  A      Yes, that's why we agree that Southerly Cove should be

17  dredged.

18  Q      Now, you were asked to comment on -- yesterday on

19  Mr. Glaza's stated opinions about the feasibility of some of

20  the conceptual recommendations you made in the Phase II

21  Report.  Do you recall that?

22  A      I do.

23  Q      Okay.  Now, I want to show you a page from Joint

24  Exhibit 87.  It's Page 47.  These are your notes in response

25  to some of the expert reports that the parties' witnesses

1   filed.  Do you remember that?

2   A     Yes, I do.

3   Q     Okay.  And I'm not going to -- we read this bottom line

4   earlier in your testimony, but I want to call your attention

5   to this paragraph, and here you're talking about the

6   feasibility, as well as the necessity of active remediation.

7   And you write as follows -- can you see that?

8   A     Yes, I can.

9   Q     Okay.  You write, need a nonpartisan analysis, including

10  some testing.  My hope is that the court will order this

11  nonpartisan analysis.  We need a group charged with thinking

12  about solutions to mobile sediment removal, rather than

13  problems.  Do you see that?

14  A     Yes, I do.

15  Q     What did you mean by that?

16  A     Well, I had just finished reading the Glaza report, and

17  it -- and it seemed to me to be overly negative.  It seemed to

18  me that problems were being thought of, rather than solutions,

19  and so I -- I -- I thought it -- I thought it would be a good

20  idea to have people -- if people were going -- going to be in

21  the room to discuss this, I wanted them -- people who would be

22  looking for solutions, rather than problems.

23  Q     And -- and is your vision of this convening of mercury

24  scientists and engineers to consider the possibilities for

25  active remedies that you've articulated earlier, is that that

1  the people in the room would be open to thinking about all

2  possible solutions?

3  A     Yes.

4  Q     And that they would be creative and innovative --

5  A     Yes.

6  Q     -- about trying to find real and effective solutions to

7  this problem?

8  A     Yes, exactly, yeah.

9  Q     Okay.  And is it people who are committed to doing that,

10 rather than people who are retained and paid by a party with a

11 financial stake in the outcome --

12 A     Yes.

13 Q     -- the kind of people that you envision being in that

14 meeting?

15 A     Yeah, I was hoping it would be -- it would be set up in

16 the future sim -- like Judge Carter had done it at the

17 beginning, where there would be an independent -- another

18 independent group would come together and take -- take these

19 data and consider them in a nonpartisan way.

20 Q     People who would be answerable to the court?

21 A     Yes, yes, yes.

22         MR. BERNARD:  I have nothing further, Your Honor.

23         THE COURT:  Thank you.

24     Recross?

25         MR. TALBERT:  Very briefly, Your Honor.

1                         RECROSS-EXAMINATION

2    BY MR. TALBERT:

3    Q     Dr. Rudd, at the beginning of Mr. Bernard's cross-

4    examination -- let me turn this on -- he asked you about a

5    section of Dr. Santschi's deposition.  Do you recall that?

6    A     I do.

7    Q     Testimony that Dr. Santschi had concluded that

8    95 percent of the mercury was from HoltraChem?

9    A     Yes.

10   Q     Do you recall that?

11   A     Yes.

12   Q     Okay.  Are you aware that in questioning of Dr. Santschi

13   at this same deposition regarding how Dr. Santschi came to

14   this number, that Dr. Santschi admitted that he had not really

15   gone core by core to look at an inventory of the cores to do

16   any math?

17   A     No, I haven't read his -- his deposition.  I --

18   Q     Okay.  So you don't really know anything about what

19   methods, if any, he used to make an estimate of mercury

20   contributions.

21   A     No, I -- I don't.

22            MR. TALBERT:  No further questions, Your Honor.

23            THE COURT:  Thank you.

24         Anything further?

25            MR. BERNARD:  No, Your Honor.

1          THE COURT:  Thank you.  You may stand down, sir.

2    Thank you.

3        (The witness left the witness stand.)

4          THE COURT:  Next witness?

5          MR. BERNARD:  Your Honor, plaintiffs call

6    Dr. Christopher Whipple.

7          THE CLERK:  Do you solemnly swear that the testimony

8    you shall give in the matter now in hearing shall be the

9    truth, the whole truth, and nothing but the truth, so help you

10   God?

11         THE WITNESS:  Yes, I do.

12         THE CLERK:  Please be seated.  Please state your

13   name and spell your last name for the record.

14         THE WITNESS:  The full name is Christopher George

15   Whipple, W-h-i-p-p-l-e.

16         THE COURT:  You may proceed.

17   CHRISTOPHER GEORGE WHIPPLE, having been duly sworn, was

18   examined and testified as follows:

19                       DIRECT EXAMINATION

20   BY MR. BERNARD:

21   Q     Good morning, Dr. Whipple.

22   A     Good morning.

23   Q     Are you a member of the court-appointed Study Panel?

24   A     Yes.

25   Q     Were you nominated by the defendant?

1   A    Yes.

2   Q    Please briefly describe for the court your educational

3   background.

4   A    I have a bachelor's degree in engineering science from

5   Purdue and a master's and Ph.D. in engineering science from

6   the California Institute of Technology.

7   Q    Are you currently employed?

8   A    Yes.

9   Q    By whom?

10  A    I work for Environ International Corporation.

11  Q    How long have you worked for Environ?

12  A    14 years.

13  Q    Please briefly describe what Environ does.

14  A    We're a general-purpose environmental consulting company

15  with offices all over the world.  We have just under 1,500

16  employees worldwide.  And we -- we work on everything from

17  subsurface problems, surface problems, sediment problems, air

18  pollution.  Any kind of environmental issue, we pretty much

19  have someone who can cover it.

20  Q    Do you have a specialty or specialties at Environ?

21  A    Yes.  I -- I should mention, when I finished grad

22  school, I went to work for a nonprofit, the Electric Power

23  Research Institute, which was a research institute funded by

24  the electric power industry.  I was there 16 years, and I

25  worked on environmental and health risks of making electricity

1    and that got me into environmental mercury and also into

2    radioactive waste management.

3         So if -- if some Environ client encounters something

4    radioactive, I usually get a phone call or -- or an e-mail.

5    And there's a -- a larger group of people that do mercury.  We

6    have a pretty large sediment practice now.

7    Q    Is the Electric Power Research Institute, is that what

8    it's called?

9    A    Yes.

10   Q    Is that also referred to as EPRI, E-P-R-I?

11   A    It's the same organization, yes.

12   Q    Now, what -- what was your role at EPRI?

13   A    When I started, I worked for the president of the

14   company, who was an old Manhattan Project physicist and former

15   dean of engineering at UCLA, named Chauncey Starr, and he had

16   envisioned that the field of risk analysis would be important

17   going forward.  And I went to work for him in 1974, and his --

18   his belief that risk analysis would become established and

19   important proved true, and I was able to get in fairly early.

20   Q    Are you an expert at risk analysis?

21   A    Yes, in some areas.

22   Q    And at risk management?

23   A    Yes, in some areas.

24   Q    Okay.  And -- and is one of those areas human health?

25   A    Yes.

1    Q     Okay.  You mentioned this, but I'd like you to explain

2    it a little more for the -- for the court, please.  Did you

3    work on mercury before your work on the Penobscot River

4    Mercury Study?

5    A     Yes.

6    Q     Okay.  Can you please briefly describe some of your

7    mercury-related work experience.

8    A     Yes.  While I was at EPRI, I ended up the last five or

9    six years I was there in the environment division, and I was

10   one of several people working on developing risk assessment

11   models that could be useful in assessing risks from coal-fired

12   power plants.

13         And there were two main areas of interest:  One was the

14   criteria pollutants, sulfur oxides, nitrous oxides, and I

15   tended not to focus on those; and the other were the trace

16   elements -- mercury, cadmium, radionuclides -- and I did focus

17   on those.

18         And we -- we did a lot of work developing models and

19   running risk assessments of power plants, trying to find out

20   which were the dominant risk contributors.

21   Q     What is the --

22   A     I should -- I should continue actually.

23   Q     Please.

24   A     I left EPRI in 1990 and became the manager of a

25   consulting company's office in San Francisco.  The company was

1    called Clement Associates, and it was really the first

2    environmental risk analysis consulting company.

3         And throughout the '90s, I did a lot of work for EPRI as

4    a contractor, and the two main mercury-related events of that

5    decade at EPA were major reports, one titled The Mercury Study

6    Report to Congress, which I believe was published in '97, and

7    the other was the Utility Air Toxics Risk Analysis, and that

8    was published sometime in the late '90s.

9         And EPRI was doing work in parallel to the EPA effort,

10   and I was doing some of that work, particularly associated

11   with human exposures via fish consumption.

12   Q    We'll continue with this in a moment.  I neglected to

13   ask you, where are you located?  Where is your Environ office?

14   A    My office is in Emeryville, California, which is a town

15   right between Oakland and Berkeley.

16   Q    Okay.  Let's pick up with your mercury-related

17   experience.  What -- what is the American Forest and Paper

18   Association?

19   A    It's a company that hired me for one project, and I --

20   I, for the life of me, couldn't tell you the name of anyone

21   there or where they're located, but it -- I was actually hired

22   through a law firm --

23   Q    Okay.

24   A    -- not directly by them.

25   Q    I -- I can tell you what you did for them, but I'm not

1    allowed to testify.  So we'll --

2    A    Well, I remember what I did for them.

3    Q    Did you do mercury-related work?

4    A    Yes.  I was -- I was retained by Hunton & Williams,

5    along with a fellow from an environmental consulting company

6    that was called Amec at the time, to review an EPA proposal

7    for how it set water body contamination limits.

8         The EPA uses a process called the total mass daily load

9    analysis, TMDL, and up until this study that we reviewed that

10   EPA had done, they had been using water column mercury as the

11   point of reference for when a water body had too much mercury

12   or not.

13        But the relationship between water column mercury and

14   mercury in fish is variable and uncertain, and, in fact, at

15   that time, accurately measuring mercury in a water column was

16   -- was not something everyone did well, whereas measuring

17   mercury in fish, where the concentration might be a million

18   times higher, was -- was much easier to do reliably.

19        So EPA's proposal was to -- instead of using water

20   column mercury concentrations, if we were worried about

21   mercury in fish that humans ate, let's just look at the fish

22   and use that as the basis for deciding where we have mercury

23   problems that need to be addressed.

24   Q    What is the American Petroleum Institute?

25   A    That's the oil industry's trade association.

1   Q    Have you done mercury-related work for -- for them?

2   A    I believe they may have been a cosponsor of this review

3   of the EPA fish -- fish tissue criterion method is what that

4   method is called.

5   Q    And have you done any work for United States Steel?

6   A    I believe they may have been a cosponsor.  I think these

7   were the only times I ever worked for any of these

8   organizations.

9   Q    Okay.  Now, for EPRI, you mentioned it before, but I

10  want to tease out one aspect.  Did you evaluate the

11  cost-effectiveness of alternative approaches to controlling

12  mercury emissions from coal-fired power plants?

13  A    Yes, I'll say -- or pieces of it.  I'm not a control

14  technology expert, but EPRI had other people who were.

15       But part of the EPA's various proposed methods to

16  control mercury emissions from coal-fired power plants

17  included cost-benefit analyses that were appendies --

18  appendices, and I did write a review and commentary on EPA's

19  cost-benefit analysis for, I think it was, the Clean Air

20  Mercury Rule.

21  Q    And did part of your work for EPRI involve an evaluation

22  of data regarding blood and hair concentrations of mercury in

23  women of childbearing age --

24  A    Yes.

25  Q    -- and -- and children?

1   A     Yes.

2   Q     Okay.  Have you published work in the peer-reviewed

3   literature?

4   A     I have.  Not a lot on mercury, probably somewhat more on

5   radioactive waste management.

6   Q     Okay.

7   A     But, yes, I've got a fair number of publications.

8   Q     Okay.  And -- and does your CV describe in greater

9   detail your professional activities and experience?

10  A     Yes.

11  Q     Okay.

12          MR. BERNARD:  Your Honor, for the court's reference,

13  that's Joint Exhibit 30.

14          THE COURT:  Thank you.

15  BY MR. BERNARD:

16  Q     What specific role did you play in the court-ordered

17  study?

18  A     We -- we did not parse out the assignments, but we

19  naturally tended to focus on the areas where we were more

20  expert.

21          So -- and I guess I'll make a footnote here.  The one

22  other aspect of the study where my role differed from that of

23  the other Study Panel members was that the -- the work that we

24  did involved hiring contracts, getting contractors and --

25  contracts in place for the work, and as we quickly learned

1    from Judge Carter, the court was not allowed to enter into

2    such contracts.  He explained it's because they -- the court

3    is not an entity.  Judge Carter issued an order that contracts

4    necessary to implement the Penobscot River Mercury Study be

5    issued by Environ, and the cost would be reimbursed by the

6    court.

7           So I was the person responsible for getting contracts in

8    place with all the contractors we employed.

9    Q     That was more of an administrative task?

10   A     Yes, more than administrative, in that, first, there was

11   a risk management element to it, which is when you put people

12   in boats on a fast-moving river with 12-foot tides, you -- you

13   worry about insurance and health and safety, and -- and I did,

14   and our -- our company's people who worry about our contract

15   language did.

16          We also had a contract, in addition, that the court

17   imposed which precluded publication of the -- of any of the

18   study data without court permission, and we -- we ran into

19   pushback on that term from a number of universities, which saw

20   it as interfering with free speech or with the need for junior

21   faculty to publish to be promoted.

22   Q     In terms of your scientific or technical expertise, you

23   mentioned that each of the three Study Panelists brought to

24   the panel a particular area of expertise, right?

25   A     Yes.

1    Q      What -- what did you bring?

2    A      Compared to John, I -- I brought much less information

3    on geochemistry, but a lot more information on human health

4    risks and how human health risks are assessed.

5          I think the same -- with Nick, he had a lot more

6    information on how mercury behaves in aquatic systems, how it

7    works its way up the aquatic food chain from a -- a scientific

8    and mechanistic point of view and -- than I had.

9          I think I had a -- a different view of things because I

10   was originally trained as a fluid mechanicist.  So when Rocky

11   Geyer showed up and started doing hydrodynamics, while I -- I

12   certainly did not have his level of skill, I could -- I could

13   follow what he was doing and understand it, and I think ask

14   reasonably intelligent questions.

15   Q      Do you also have some experience -- you mentioned human

16   health risk assessment -- in ecological risk assessment?

17   A      Some, but -- but not a great amount.

18   Q      Okay.  Less than in the human health risk.

19   A      Yes, although -- yes, that's accurate.

20   Q      Okay.  Now, you wrote Chapter 22 of the Phase II Report;

21   is that correct?

22   A      Yes, although we -- we -- we made a principle that John,

23   Nick, and I would review every chapter of the Phase II Report

24   because we -- we thought that the Study Panel needed to own

25   the entire report.  So I wrote the first draft of Chapter 22,

1   but I -- and then I made revisions as I got comments from

2   Nick, John, Drew, and Dianne.

3   Q    You're listed as the primary or lead author on Chapter

4   22; is that right?

5   A    Yes, that's right.

6   Q    And you're listed as a coauthor of Chapter 1?

7   A    Yes.

8   Q    And Chapter 2?

9   A    Yes.

10  Q    And Chapter 21?

11  A    Yes.

12  Q    And Chapter 23?

13  A    Yes, that's correct.

14  Q    Okay.  Once the court appointed you to the Study Panel,

15  how did you see your role in relation to the court and the

16  parties?

17  A    I saw myself as working for the court.  And I'll

18  mention, Nick and I were picked at roughly the same time, and

19  our first charge was to recruit a Study Panel chairman, and

20  Nick and I had never met, and we had a phone call, and I think

21  we were both greatly relieved to find that -- that our -- our

22  list of possible candidates and our list of people to consult

23  for suggestions had a lot of names that overlapped.

24       And I don't think from that first phone call we ever had

25  the sense that we were doing anything other than trying to do

1   a scientifically sound job for the court.

2   Q     Okay.  You said in your deposition -- I just want to

3   read you this quote and ask you whether it's still your --

4   whether it's accurate.  I think from day one, the Study Panel

5   understood that we worked for the judge and that our job was

6   to deliver as straight an answer to the judge as we could

7   arrive at.  Does that accurately reflect your perception of

8   how things worked on the Study Panel?

9   A     Yes.

10  Q     What do you perceive to be the Study Panel's principal

11  findings?

12  A     I think our principal finding is that left to itself,

13  which I think we would all wish we could have recommended, the

14  system simply is too contaminated and will be too slow to

15  recover and that we need to consider active remediation

16  measures as a result.

17  Q     Did you join the Study Panel's recommendation to pursue

18  active remediation to accelerate recovery of the system?

19  A     Yes.

20  Q     Do you believe the findings and recommendations of the

21  Study Panel are based on sound science?

22  A     Yes, I do.

23  Q     Okay.  How well understood do you believe the Penobscot

24  Estuary is as a result of the court-ordered study?

25  A     I -- well, first, it's a terribly complicated system,

1    and as some of the -- the e-mail quotes for the last couple

2    days indicate, our understanding of that system has changed a

3    lot through the course of the study, and I'm -- I'm not

4    convinced that with more data, we wouldn't refine it in

5    certain ways and -- and our perceptions might not continue to

6    evolve.

7           With that said, I think we have a very clear picture of

8    how that system works that, at least for me, is much, much

9    different than I came into the study with.

10   Q     Is it, in your view, one of the best understood

11   estuaries anywhere in terms of mercury contamination?

12   A     Yes, I think that's true.

13   Q     Now, is the Study Panel knowledge of the ecosystem

14   imperfect?

15   A     Yes.

16   Q     Is it incomplete?

17   A     Yes.

18   Q     And do you think that's inevitable in a large, complex

19   system like the Penobscot?

20   A     It is, but I -- I have one other reason for not favoring

21   a Mendall Marsh ecological risk assessment, which is the --

22   maybe I'm getting ahead of you here.

23   Q     You're -- we're certainly going to reach that, but go

24   ahead.

25   A     All right.  The -- the critical issue in an ecosystem

1    risk assessment is not the health of an individual bird or

2    fish.  It's the overall ecosystem operation, functionality,

3    diversity of species, and to understand how the Penobscot

4    ecosystem, including Mendall Marsh, had been affected by

5    mercury, one would really need to know what the ecosystem

6    looked like before the mercury large release occurred, and we

7    don't know that.

8         And so I -- my concern and why I didn't favor field

9    studies on the toxicology to the -- the Mendall Marsh birds

10   was that I always harbored the suspicion that the two species

11   with the high mercury -- Nelson sparrows and red-winged

12   blackbirds -- were the mercury-resistant survivors of a

13   formerly more diverse population, and that studying their

14   reactions to mercury and its toxicity was missing the point of

15   species that used to be present, but were no longer present.

16   Q    Is there also a possibility that once an ecosystem

17   recovers, that species that were once present that the

18   contamination eliminated could recolonize?

19   A    Yes, that's -- that's usually the point of recovery or

20   remediation is to hope that occurs.

21   Q    We will return to the issue of field toxicity work, but

22   I appreciate your introducing it the way you have.

23        Did there come a time when the court, through Special

24   Master Calkins, set a deadline for the Study Panel's

25   submission of the Phase II Report?

1    A      Yes.

2    Q      And do you think that was a good thing for the Study

3    Panel?

4    A      Yes.

5    Q      Why?

6    A      It's -- any number of projects I have been involved

7    with, you -- you can continue to find interesting questions to

8    pursue, and the complexity of -- of the Penobscot System makes

9    that extremely true in this case, and without an externally

10   supplied deadline, you tend to work in a nonconvergent way

11   until the end of time.

12          I've heard this described among people who write

13   software, and having been involved in risk models, I know it's

14   true there, as well, which is you need some outsider to say,

15   your report will be on my desk the 1st of this coming month,

16   and I'm sorry if it's not ready, but whatever you have by then

17   is what's you're going to turn in.

18   Q      In your -- in your view, Dr. Whipple, should the focus

19   of further work now be on remediation?

20   A      Yes.

21   Q      I want to turn now to the subject of risk assessment.

22   Did the Study Panel conduct a formal human health risk

23   assessment concerning the Penobscot?

24   A      No.

25   Q      Did the court order the Study Panel to do so?

1    A    No.

2    Q    Okay.  Are you aware of criticism by some of defendants'

3    retained experts that the Study Panel shirked its

4    responsibility by -- by not conducting a formal risk

5    assessment?

6    A    Yes.

7    Q    Okay.  And are you familiar with formal human health

8    risk assessments?

9    A    Yes.

10   Q    That's within your area of expertise?

11   A    Yes.

12   Q    Okay.  Is a risk assessment, in your view, a formal

13   human health risk assessment, required to answer the questions

14   the court asked the Study Panel to answer?

15   A    No.

16   Q    Okay.  Could you please explain?

17   A    Yes, a formal human health risk assessment usually has

18   as its end product a quantitative characterization of the risk

19   to individuals from specified substances.

20        The question Judge Carter asked us was whether the

21   system posed unacceptable health and environmental risks, and

22   without needing to quantify the magnitude of those risks, we

23   were able to determine that the species in the Penobscot

24   System that humans eat were at much higher mercury

25   concentrations than reference species from elsewhere in Maine,

1    and we were able to determine that they -- they were at

2    mercury concentrations above those determined by the State of

3    Maine to be considered safe or advisory levels set by Maine,

4    and we were able to determine that some portion of the Maine

5    population was exposed in excess of -- of exposure levels for

6    methylmercury established by EPA.

7    Q    Let's talk for a moment just about the risks associated

8    with mercury.  What is the health risk, if any, associated

9    with the human consumption of mercury-contaminated fish or

10   shellfish or other wildlife?

11   A    The -- the endpoint of concern for methylmercury

12   exposure is a neurological developmental lag among children

13   exposed in -- during pregnancy.  That is, women who consume

14   high levels of methylmercury, children have been measured on

15   various performance tests, similar to IQ tests, but in many

16   cases, a little different, not necessarily IQ, but -- but --

17   I'll say physiological response-type things.  And among the

18   children born to women with -- with very high mercury levels

19   during pregnancy, their -- their performance on those tests is

20   poorer than the tests of children of the same age born to

21   women with -- with lower mercury exposures.

22   Q    This is implicit in your answer, but I want to draw it

23   out explicitly.  Are there -- is the human health risk posed

24   by mercury particularly acute for any subpopulation of human

25   beings?

1    A     Yes, it's -- it's for -- the phrase EPA and FDA use is

2    pregnant women or women who may become pregnant.

3    Q     Okay.  So women of childbearing age?

4    A     Yes.

5    Q     Okay.

6    A     I believe they also include children, although the --

7    there's a reasonably robust data set on blood levels of --

8    mercury blood levels of children that suggest that the problem

9    is much more significant for women of childbearing age than it

10   is for children.

11   Q     Okay.  And problem for women of childbearing age can

12   extend to the fetus, though; is that fair to say?

13   A     That is the problem, which is it's -- it's not a risk to

14   the woman so much as to having a child that -- that has slower

15   neurological development at ages 5 to 7 or so.

16   Q     The Study Panel didn't perform a formal human risk

17   assessment, but did it assess risk?

18   A     Yes, to some extent.

19   Q     Had -- what did you do instead, is what I want to know,

20   to answer the court's question?

21   A     Well, the first thing that we did -- at least that I did

22   was we read the transcript from the first trial, and I must

23   say I was -- I was somewhat confused because the testimony at

24   the first trial talked about mercury in eels.  And there are

25   eels in the Penobscot, and they have higher-than-recommended

1   amounts of mercury, but then it jumped to a little fish called

2   a mummichog, which is scarcely bigger than a minnow and, so

3   far as I know, humans don't eat them.  And my question at the

4   time was, where are all the fish that people might eat?

5        And as we went through the study, we found that there

6   really are not too many of those in the river itself.  And

7   that there are striped-bass, but those are not resident in the

8   system.  They swim up from the ocean and look around and --

9   but they don't live there.

10       And so the -- the first job we had to do was to identify

11  species that would be of concern for human consumption, and --

12  and in most studies I've been involved with, that's not hard

13  to do, and there are recreationally-caught fish that -- that

14  tend to be high in mercury and that are easily identifiable as

15  the problem.

16       So it took us a while in the study to identify the three

17  species that we list as the likely most important sources of

18  human exposure.

19  Q    What are those species?

20  A    Well, those are lobster, black ducks, and eels.

21  Q    Okay.  Do you include rock crabs in that group?

22  A    Yes, to a -- to a lesser extent.  I mean, we -- yes,

23  we've got to check the box that this is above guidance levels

24  for human consumption.

25  Q    You said earlier, I think, that you compared the mercury

1    concentrations in these species that you just identified to

2    applicable standards set by the State of Maine; is that

3    correct?

4    A    Yes.

5    Q    What is the Maine standard that you referred to?

6    A    Well, Maine has set a standard for recreationally-caught

7    fish of 200 nanograms per gram, or .2 parts per million.

8             MR. BERNARD:  We're going to get into a discussion,

9    Your Honor, that I just want to refer the court again to

10   Plaintiffs' Exhibit 92, which is that conversion chart --

11            THE COURT:  Right.

12            MR. BERNARD:  -- in case it's helpful.

13   BY MR. BERNARD:

14   Q    Dr. Whipple, is there a federal standard also set by

15   EPA?

16   A    There's a guidance level.

17   Q    What is the guidance level?

18   A    It is .3 parts per million, or 300 nanograms per gram.

19   Q    Okay.  So .2 parts per million, or 200 nanograms per

20   gram, is the Maine standard, and .3 parts per million, or 300

21   nanograms per gram, is the federal standard; is that correct?

22   A    Yes, although the federal standard is, in fact --

23   Q    Okay.  Is a guidance?

24   A    It's a guidance, and it's also clearly stated as the

25   starting point that the states are encouraged to adjust for

1    local conditions.

2    Q      That was my next question.  Does EPA -- is the federal

3    standard an EPA standard?

4    A      It's EPA guidance.

5    Q      Guidance.  Does EPA encourage adjustments in that

6    federal guidance by states for local consumption rates?

7    A      Yes.

8    Q      Okay.  And has Maine, to your knowledge, taken the EPA

9    guidance, done its own work, and come up with a Maine-specific

10   action level?

11   A      There's a complicated answer to that, which is, in fact,

12   EPA (sic) used a different method than EPA did.  I think the

13   EP -- the Maine method pre -- predates the EPA work.  I think

14   Maine ended up about where they would have had they followed

15   the EPA method, but they did so using a different path to get

16   there.

17   Q      Okay.  But just to try to distill this, EPA set a

18   national guidance level, correct?

19   A      Yes.

20   Q      And it encouraged the states to set their own state-

21   specific levels; is that correct?

22   A      That's correct.

23   Q      And Maine has done so.

24   A      Yes.

25   Q      And the Maine level is .2 parts per million, or 200

1   nanograms per gram.

2   A      Yeah, 200 parts per billion, yeah.

3   Q      .2 parts per million, or 200 nanograms per gram.

4   A      Yes, that's correct.

5   Q      Okay.  What's the reason for the difference, if you

6   know, between the Maine and EPA safety standards for

7   methylmercury in fish?

8   A      The -- the reason is that people along the coasts eat

9   more fish than the national average, people in the northeast

10  eat more fish than the national average.  When you put those

11  together, the rate of fish consumption -- and this includes

12  fish in restaurants and fish from grocery stores -- it's

13  simply higher in Maine than it is in the Midwest.

14        And when EPA described how states could make adjustments

15  to the 300 part per billion concentration, it said you need to

16  accommodate the mercury exposure from background consumption

17  before you consider the additional exposure from, say,

18  recreationally-caught fish.

19        And in the case of Maine, those background exposures are

20  higher than the national averages.

21  Q      So you applied in your work in the Penobscot, you

22  applied the Maine standard of 200 nanograms per gram; is that

23  correct?

24  A      We did, but we also walked back up towards what's called

25  the EPA reference dose, which is the more fundamental standard

1  of protection that -- that we think is the guidance we all

2  need to follow.

3  Q    I'm going to get to that in one second.  But let's just

4  stay with the Maine.

5  A    Okay.

6  Q    What's the accurate thing to call the Maine, is it -- is

7  it an action level or a threshold?

8  A    I -- I -- I've forgotten how they describe it, but it --

9  it's a level the State of Maine uses for setting fish

10 advisories for recreational anglers.

11 Q    Let's call it an action level.

12 A    All right.

13 Q    Okay?

14 A    All right.

15 Q    Now, referring to the 200-nanograms-per-gram action

16 level set by the State of Maine, is that something you're

17 comfortable with given your role in the -- in the study?

18 A    Yes, I think that Maine set that based on a sensible

19 method and -- and local data that is what one is supposed to

20 do.

21 Q    Okay.  Now, is there something called a reference dose?

22 A    Yes.

23 Q    Okay.  Is that also referred to as an RfD?

24 A    Yes.

25 Q    What is an RfD?

1  A     An RfD is an EPA-published value that describes the safe

2  intake level of some substance for a defined exposure group.

3  Q     And what is the relationship, if any, between the RfD

4  and the EPA or Maine action level that you described earlier?

5  A     The EPA 300 parts per billion fish tissue criterion was

6  derived using the EPA reference dose and data on fish

7  consumption rates and data on the mercury concentration of

8  fish.

9          MR. BERNARD:  Your Honor, I don't know how familiar

10  you are with this, but -- but a part per billion is also a

11  nano -- equals a nanogram per gram.

12  BY MR. BERNARD:

13  Q     Did the Study Panel ever consider a standard other than

14  the RfD?

15  A     I -- I don't think we ever seriously did.  That -- the

16  amount of work that went into the RfD was -- was really quite

17  enormous.  It had been argued for half a decade or so.  In the

18  early '90s, EPA set the reference dose at its current level

19  based on a thorough review by the National Academy of

20  Sciences, and I thought it would be completely insensible for

21  the Study Panel to challenge that body of work and to try to

22  reinvent our own standard.

23  Q     When you compared concentrations -- withdrawn.

24          You just said you thought it -- it would have been not

25  sensible for the Study Panel to apply any standard other than

1    the one that the government had set.  Does that continue to be

2    your view?

3    A    Yes.

4    Q    Okay.  When you compared concentrations in the Penobscot

5    species that you mentioned, the species that human beings may

6    consume, with Maine's published threshold or action level,

7    what did you find?

8    A    The -- the eels in the Penobscot south of Veazie Dam

9    averaged around 500 parts per billion, or .5 parts per

10   million, compared to the .2 parts per million EPA guidance

11   level.

12   Q    So that's a multiple of two and a half times over the

13   state --

14   A    Yes.

15   Q    -- threshold?

16   A    Yes.  And the eels north of Veazie were also above the

17   .2 parts per million, but not nearly as much.

18        The lobsters -- I think our first lobster data came in

19   in 2008, and they were pretty -- pretty far south in the

20   system, and we did not find a large percentage of the lobsters

21   in that first data set to be above 200 parts per billion.  But

22   we did see a -- a clearer gradient, that is, that the closer

23   you got to HoltraChem or the further north you got in the

24   system, you saw that the Penobscot levels were increasing.

25        And then in the 2010 and 2012 data sets, we got lobsters

1    from further north and all the way up to South Verona Island,

2    and there at South Verona Island, the -- the average lobster

3    was on the order, again, of -- of .5 parts per million.

4    Q    Again, two and a half times the state's --

5    A    Yes.

6    Q    -- safety level?

7    A    Whereas way out in the south end of the system, the

8    lobsters were down more like .1 part per million.

9    Q    How about the ducks?

10   A    Oh, the -- the ducks were the highest of the three, and

11   I -- I think in the first -- I think the most recent year of

12   duck data Dianne will talk about, but -- but those were not

13   quite as high as the first two years.  But the ducks were up

14   -- in Mendall Marsh up some in the range of .8 parts per

15   million.

16   Q    Let me show you, Dr. Whipple -- this is from Joint

17   Exhibit 6-14, Page 14-91, showing the page here.  Are you

18   familiar with this figure?

19   A    Yes.

20   Q    Now, this shows black -- mercury in the blood of black

21   ducks during those first two sampling periods I believe you

22   referred to, 2011 and 2012?

23   A    Yes.

24   Q    And what do you see there in Mendall Marsh?

25   A    Well, in Mendall Marsh, the -- the first year was

1    .8 parts per million, second year .75 parts per million.  And

2    somewhat lower numbers the first year in Verona Island,

3    significantly lower the second year in Verona Island.  And

4    then the Frenchman Bay Point was meant to be included as a --

5    as a reference site for, what do black ducks in uncontaminated

6    or less contaminated areas of Maine have as their mercury

7    concentration?

8    Q    During your deposition, you said there's too much

9    mercury in the black ducks in Mendall Marsh.  Do you remember

10   that?

11   A    I probably did, yes.

12   Q    And --

13   A    I don't remember it, but --

14   Q    Is that your view?

15   A    Yes.

16   Q    By what measure?

17   A    This is a high enough level that somebody that eats a

18   few duck meals a week during duck hunting season, a pregnant

19   woman, could have blood levels substantially above the blood

20   mercury levels that were the -- the point from which EPA

21   derived its reference dose.  I'll -- that number -- let me

22   come back -- is -- is -- 5.8 parts per billion was the

23   so-called point of departure.  58 points (sic) per billion --

24   excuse me -- was where the health effects were believed to

25   occur.  5.8 was where they said is the upper limit of a safe

1    blood level for a pregnant woman.

2         And someone who ate a couple duck meals a week would be

3    probably well above that blood concentration.

4    Q    What was your reaction when you first saw the black duck

5    mercury data for Mendall Marsh?

6    A    I think the whole Study Panel had the same reaction,

7    which is this is high enough that we need to let somebody in

8    the state know and --

9    Q    What -- why did you want to let somebody in the state

10   know?

11   A    We thought that if -- when the state saw this data, they

12   would likely deem it appropriate to issue warnings to advise

13   women of childbearing age to limit or avoid consumption of

14   these ducks.

15   Q    When I asked you this or a similar question in your

16   deposition -- I just want to check this -- you said -- about

17   why you wanted to tell the Maine state authorities about the

18   data, you said, because this is alarmingly high and you guys

19   should know -- know this; is that a fair characterization of

20   your reaction?

21   A    Yes.

22   Q    Okay.  Did you believe there might be people eating

23   ducks who would get more mercury than they should?

24   A    Ah, yes.

25   Q    Okay.  Now, did you seek -- you being the Study Panel --

1    seek the court's permission to -- withdrawn.

2        There had been a rule -- you adverted to it earlier --

3    that Judge Carter set that study data were to not be disclosed

4    outside the Study Panel until the court allowed that; is that

5    right?

6    A    That's correct.

7    Q    Okay.  Now, did you seek an exception to that rule from

8    Judge Carter when you saw these data?

9    A    I don't know if it was Judge Carter or Judge Woodcock,

10   but we --

11   Q    Well, let's say the court.

12   A    The court, yes.  We asked Susan Calkins whether we could

13   share this data with inland fisheries, the responsible state

14   agency.

15   Q    Okay.  And that's the Maine Department of Inland

16   Fisheries and Wildlife?

17   A    Yes.

18   Q    Okay.  And did the court grant that permission?

19   A    Yes.

20   Q    What ensued?

21   A    Dianne wrote a report that's -- that I think included

22   all of our data, summarized it, and sent it to inland

23   fisheries.  I don't know what happened inside inland

24   fisheries, but in fairly short order, there were warning signs

25   posted in Mendall Marsh warning women of childbearing age not

1  to eat ducks from the area, and warning all others, which I

2  took to be adult males -- I guess it was women and children

3  were advised not to eat the ducks -- to limit their

4  consumption to -- I've forgotten if it was one or two meals a

5  month.

6  Q    Let me see if I can help with that.  I want to show you

7  Plaintiffs' Exhibit 67.

8           MR. BERNARD:  Your Honor, I would like to move its

9  admission into evidence.  This is, I will represent, the

10  actual warning that the Department of Inland Fisheries and

11  Wildlife placed in the field.

12          THE COURT:  Any objection to 67?

13          MR. TALBERT:  No objection, Your Honor.

14          THE COURT:  67's admitted.  Do we know when that was

15  done?

16          MR. BERNARD:  I don't, but we'll find out.

17          THE COURT:  All right.

18          MR. BERNARD:  While I'm at it, Your Honor, this is

19  partly pragmatic and partly aesthetic, we have Plaintiffs'

20  Exhibit 68, which is a somewhat longer view, which shows the

21  same sign, but more in context.

22          THE COURT:  All right.  Any objection to 68?

23          MR. TALBERT:  No objection.

24          THE COURT:  It's admitted.

25  BY MR. BERNARD:

1  Q     All right.  So, Dr. Whipple, here is the actual warning.

2  So why don't you read it into the record, please, and that

3  will certainly clarify the particulars -- any particulars you

4  might have been unclear about.

5  A     All right.  The warning sign says -- it's from the

6  Department of Inland Fisheries and Wildlife.  Attention

7  waterfowl hunters.  Warning, high levels of toxic mercury have

8  been found in breast meat of black ducks taken in Mendall

9  Marsh Wildlife Management Area in Frankfort.  Safe eating

10  advice for waterfowl taken from the immediate vicinity and

11  from Orrington south to the southern tip of Verona Island is

12  as follows.  Limits for pregnant and nursing women and

13  children under age 8:  Do not eat waterfowl from these waters.

14  Limits for everyone else:  Two waterfowl meals per month.  A

15  meal is consumption of one 8-ounce duck breast.  And for more

16  information, contact phone number.

17  Q     Okay.  Do you think this is, based on what you know

18  about the black duck data and human health risk --

19  A     Yes.

20  Q     -- do you think this is a sensible warning for the state

21  to have issued?

22  A     Yes.

23  Q     Let's turn briefly to eels.  You mentioned earlier that

24  the Penobscot eels, particularly in the lower river, that is,

25  downstream of Veazie, exceed the Maine human health safety

1    standard; is that right?

2    A    Yes.

3    Q    And by -- I think you said, on average, by about two and

4    a half times?

5    A    Yes.

6    Q    Okay.  What, if anything, do you know about where

7    Penobscot eels are shipped for human consumption?

8    A    What we know is pretty incidental.  We -- we tried early

9    on to get information on how much eel is consumed by local

10   residents, and I couldn't find much.  I spoke to the wheel --

11   the eel expert at inland fisheries, and she told me that she

12   thought that most people did not eat eel.  It was all

13   anecdotal, but, clearly, this was someone who spent a lot of

14   time on the water and knew about eels.  She said she didn't

15   recall ever seeing stands where people were advertising eels

16   for sale, and that her impression was that adult eels that

17   were captured -- and -- and we did see eel pots in the river

18   on our first trip down it -- were shipped to Europe largely.

19   And having been to a few places in Europe, I recall seeing

20   vendors on the sidewalks in the Netherlands selling eel.  That

21   those were where the adult eels ended up.

22        And the elvers, which are very small -- large numbers

23   fit in a small container -- were -- were mostly shipped to

24   Japan and Korea to be farm-raised.

25   Q    Was it the larger eels that were sampled with these

1    blood -- with these tissue mercury concentrations you were

2    referring to earlier?

3    A    Yes, although I think more than half of -- I'll back up

4    a little bit.  Adult eels are called silvers, and that means

5    they're typically more than 7 or 8 years old.  They have

6    reached sexual maturity, and eels swim out and -- and meet and

7    mate in the Sargasso Sea and then return to their river of

8    origin.

9         Immature eels are called yellow eels, and I think more

10   than half of the eels we sampled were yellows, and the data do

11   suggest that over time, the concentration of mercury in eels

12   increases.

13   Q    In other words, the longer lived the animal is, the more

14   mercury will accumulate?

15   A    This is true of fish generally.  Once mercury gets in a

16   fish, very little of it gets out, and it -- as it eats other

17   fish containing mercury, it tends to increase its own mercury.

18   And eels are a top predator in this system.

19   Q    During your deposition, you may recall, you said that

20   the ducks are likely getting pretty high mercury eel snacks on

21   the sidewalk.  Do you remember that?

22   A    I did say that, yes.

23   Q    Okay.  And -- and what did -- what did you mean by that?

24   A    Well, I meant that the -- the eels from the Penobscot

25   System had higher-than-average levels of mercury compared to

1    eels elsewhere in Maine.  Although the -- the meals else --

2    the eels elsewhere in Maine are still largely above the

3    200-parts-per-billion level.

4         There are, unfortunately, a lot of commercial fish that

5    can get you to half-a-part-per-million mercury -- expensive

6    tuna fish, and certainly the fish that the FDA warn about,

7    like swordfish or, you know, mackerel or shark.

8    Q    From a human health risk assessment, does it matter --

9    does the country of origin of the human consumer matter?

10   A    No.

11   Q    In terms of lobsters, is there, in your view, too much

12   mercury in lobsters in the northern part of the study area?

13   A    Yes.

14   Q    Okay.  Let me show you a map.

15        MR. BERNARD:  This is from Joint Exhibit 6-14, Page

16   14-39.  It just may help with this discussion.

17   BY MR. BERNARD:

18   Q    And this is -- I'll show the page number.  This is a map

19   of lobster -- if you look at the caption, lobster sampling

20   locations, and then there's a little key to mean mercury

21   concentrations.  And this is from the Phase II Report, so it

22   doesn't include the 2012 data.  Do you understand that?

23   A    That's correct.

24   Q    Okay.

25   A    Yes.

1    Q    So these are the data through 2010, and it says that in

2    the -- in the legend there, lobster 2006 to 2010.

3         Now, these are stations, right, that go as far up as

4    Odom Ledge?

5    A    Yes.

6    Q    Okay.  And those three -- when it's -- when you're

7    talking about the northern part of the study area for

8    lobsters, what -- which stations are you referring to?

9    A    South Verona Island had the highest average

10   concentrations; Odom Ledge was high; and Fort Point was the

11   third point that was somewhat elevated.

12   Q    Okay.  Now, from your perspective, Dr. Whipple, does the

13   fact that a lobster has more mercury in it that -- than the

14   state says is healthy for a person to eat, is that a statement

15   that the lobster poses a risk to human health?

16   A    It -- it depends a lot on the context of whose health

17   you're worrying about and -- for example, if these lobsters

18   were shipped out of Maine for consumption, I think the

19   likelihood that somebody would get three South Verona lobsters

20   in a row, it's unlikely.  But I think the likelihood that

21   somebody -- some local resident could get three South Verona

22   lobsters in a row is quite plausible, and that that would be

23   more of a concern to me than -- than eating one of these

24   lobsters once.

25   Q    And -- and is your concern based on the fact that a

1   lobsterman capturing lobster in this area might, say, sell

2   them to local people out of the back of his truck?

3   A     Yes.

4   Q     And is it also possible that the -- the lobster fisher

5   in this area feeds that lobster on a regular basis to his

6   family?

7   A     Yes.

8   Q     And that family could include women of childbearing age?

9   A     Yes.

10  Q     Now, do lobster -- do Penobscot lobster get at least

11  some of their mercury from surface sediment?

12  A     Ah, yes.

13  Q     And as you head down the estuary -- and we'll keep this

14  map on in case it's helpful -- what do you find in terms of

15  emerging surface sediment concentrations of mercury as you go

16  down the estuary into this area you -- you referred to as the

17  northern lobster sampling zone?

18  A     Well, I think that was indicated in the barcharts that

19  you showed on Tuesday when you were taking John's statement,

20  that the -- the sediment mercury concentrations south of

21  Veazie Dam are quite elevated until you basically reach Fort

22  Point Cove, and then -- then they decline as you get further

23  south in the system.

24  Q     Are you familiar with some sediment core data that show

25  increasing concentrations of surface sediment mercury down in

1    this southern part of the estuary?

2    A     Yes.

3    Q     Okay.  And does that raise a concern in your mind going

4    forward about mercury levels in lobsters?

5    A     It does.

6    Q     What is that concern?

7    A     The concern is that we've been using the -- the

8    shorthand term recovery time as if things will only get better

9    going forward in the future.  But -- but the data can be

10   interpreted to say that as one goes further south in the -- in

11   the estuary, there are areas at which the mercury is still

12   arriving and may still be increasing.

13         And as you head further south, you're -- you're heading

14   into the area where there's an important commercial lobster

15   fishery, and that if -- if ten years from now, the

16   concentrations in those lobsters are double what they are

17   today, you've got a real mess on your hands.

18   Q     As a member of the court-appointed Study Panel, that's

19   of real concern to you; is that fair to say?

20   A     Yes, because I think that -- that unlike black ducks,

21   which can -- can be individually important, the total amount

22   of duck out of Mendall Marsh or South Verona Island consumed

23   is -- is pretty small.

24         But the total amount of pounds of lobster consumed from

25   this estuary is -- is much, much more significant.

1    Q      And that might include, might it not, lobsters consumed

2    by residents or others in this area who repeatedly eat

3    lobsters from this portion of the ecosystem; is that fair?

4    A      Yes.

5    Q      Okay.  Are you familiar with the closure of the

6    shellfish fishery that was recently imposed by the Maine

7    Department of Marine Resources?

8    A      Yes.

9    Q      This is Plaintiffs' Exhibit 85, which is the map of the

10   closed area.  And does this include some of the portion of the

11   ecosystem that is the subject of your concern?

12   A      Yes.

13   Q      Now, do you recall how much -- withdrawn.

14          Do you recall when the Study Panel sampled rock crabs?

15   A      Not exactly, no.

16   Q      Okay.  Would Dianne Kopec be the -- the right person to

17   talk to about that?

18   A      Ah --

19   Q      Or who would be?

20   A      It would be Drew or Dianne.  Between the two of them,

21   they -- they would know.

22   Q      Okay.  Then we'll -- we'll --

23          MR. BERNARD:  Your Honor, we'll suspend the

24   discussion of rock crabs until one -- Dr. Bodaly or Dr. Kopec

25   testifies.

1          THE COURT:  All right.  Maybe what we ought to do is

2    take -- because I have to leave at 11:30, maybe we ought to

3    take a break now and then come back in another 20 minutes.

4    Very good.  Thank you.

5          (Court recessed from 10:06 a.m. to 10:30 a.m.)

6          THE COURT:  Mr. Bernard?

7          MR. BERNARD:  Thank you, Your Honor.  Your Honor, in

8    response to your question, during the break, we looked, on the

9    Plaintiffs' Exhibit 67, which is the duck warning --

10         THE COURT:  Right.

11         MR. BERNARD:  -- Special Masters Calkins' order

12   granting permission to the Study Panel to turn over the data

13   to the State Department of Inland Fisheries and Wildlife is

14   Plaintiffs' Exhibit 9, and her order is dated April 28th,

15   2011.  There's also a Bangor Daily News article, which is not

16   in evidence, announcing the duck warning, and that article was

17   published on September 26th, 2011.  So I'm confident that this

18   warning was put in place in time for the 2011 hunting season.

19         THE COURT:  All right.  Thank you.  Do you agree

20   with that?

21         MR. TALBERT:  No disagreement right now.

22         THE COURT:  All right.  Thank you.

23                    CONTINUED DIRECT EXAMINATION

24   BY MR. BERNARD:

25   Q    Dr. Whipple, I just want to finish up this line of

1    questioning on mercury in animals and people.  In your

2    deposition, you stated -- I'm quoting -- we have a system here

3    that contains animals that people frequently eat that have

4    mercury concentrations that are too high according to guidance

5    from the state health department.  Do you recall that?

6    A    Yes.

7    Q    And is that an accurate reflection of your view?

8    A    Yes.

9    Q    Okay.

10   A    Mitch, if I may, during the break, Dianne educated me as

11   to the ways of eels, and I'd like to correct two things.

12   Q    Please.

13   A    We only sampled yellow eels south of Veazie, not yellows

14   and silvers.  And when the silvers go to the Sargasso Sea and

15   mate, only the offspring return.  The adult eels did not

16   return.

17   Q    Okay.  We will, I think, go into that further with

18   Dr. Kopec.

19        Incidentally, you've been using -- you know, we -- we

20   didn't prepare a demonstrative for the court with -- tying

21   first names to last names, so I want to be sure we're clear on

22   that.  When you say John, you're referring to Dr. Rudd?

23   A    Yes, that's correct.

24   Q    And Nick is Dr. Fisher?

25   A    Yes.

1    Q    And Dianne is Dr. Kopec?

2    A    Yes.

3    Q    And Drew is Dr. Bodaly?

4    A    Yes.

5    Q    Okay.  You can keep using first names, but I may keep

6    completing the record.

7         Does methylmercury do a person any good?

8    A    Not that I'm aware of.

9    Q    Is it fair to say that the lower the methylmercury

10   within the human body, the better that is for the person?

11   A    Yes, I think that's generally held.

12   Q    Okay.  Is anything you can do to lower the total burden

13   of methylmercury in a person most certainly beneficial?

14   A    I think the -- the guidance that makes the most sense to

15   me is to try to eat low-mercury fish, because fish are healthy

16   and -- and eating no fish is not a good bit of advice to --

17   particularly to a pregnant women, but -- but to avoid seafood

18   known to have high methylmercury is -- is the pretty general

19   advice.

20   Q    Other things being equal -- and we'll get into this in a

21   moment -- but other things being equal, is it beneficial for a

22   human being to lower his or her total burden of methylmercury?

23   A    Yes, all else being equal.

24   Q    Does methylmercury do an animal any good, an animal

25   other than a human being?  Do you know?

1   A      Not that I'm aware of.

2   Q      Okay.  Are you aware of the -- you may have mentioned

3   them earlier, but let me make sure.  Are you aware of the

4   blood mercury concentrations in sparrows and blackbirds in

5   Mendall Marsh?

6   A      Yes, although I probably couldn't quote you the numbers

7   right now.

8   Q      Without quoting the numbers, what is your view about --

9   if any, about those concentrations?

10  A      I think they're some of the highest ever observed in

11  those species, and they're above the toxicity reference points

12  that our literature review turned up.

13  Q      In your deposition, you said that these birds, referring

14  to the songbirds in Mendall Marsh, have way too much mercury

15  in them.  Is that -- is that a fair characterization of your

16  view?

17  A      Ah, yes.

18  Q      Okay.  Let's turn back to a subject that you anticipated

19  early on, which is toxicity studies, by which I mean in-situ

20  field toxicity studies.

21         Did the Study Panel consider conducting such a study in

22  Mendall Marsh?

23  A      We discussed it, yes.

24  Q      Okay.  And was Dr. Fisher an advocate of undertaking

25  such a study?

1    A     Yes, he was.

2    Q     Would you characterize his advocacy as fierce?

3    A     I'll say we all liked to argue over almost every

4    decision we made during the study, but this was one of the

5    more prolonged points of disagreement.

6    Q     And along the continuum of views regarding field

7    toxicity studies, where do you situate yourself?

8    A     I was never convinced that -- that it was a good idea

9    for the reason I explained earlier, which is I don't think we

10   have an appropriate ecosystem baseline from which to judge the

11   extent of -- of effects on the ecosystem.

12   Q     I know you mentioned it earlier, but I want you to just

13   either explain again or elaborate on, why is that -- why is

14   that -- why is that measure important?

15   A     One common measure of ecosystem health is the diversity

16   of species the ecosystem contains, and we don't know if the

17   diversity in 1960 was the same as today or much greater or

18   even lower than today, and any study we did in the field

19   trying to look for ecosystem effects would not be able to tell

20   us that.  And that's why I think it would be a largely

21   inconclusive study.

22   Q     Do you lack the kind of baseline information that would

23   permit that comparison?

24   A     Yes.

25   Q     Is another issue with field toxicity studies the

1  difficulty attributing any effects that may be found to

2  mercury as opposed to some other cause?

3  A    Yes.

4  Q    Could you please explain?

5  A    Yes, I think this came out when I read -- most clearly

6  when I read Jim Wiener's deposition.  He pointed out that the

7  laboratory measurements of toxicity are -- are done in animals

8  that are kept in as stress-free of an environment as one can

9  imagine.  They're fed food they like.  They don't have to hunt

10 for it or compete for it, whereas animals in the wild face any

11 number of other stressors -- predators, competition for food,

12 and so on -- and that the -- the attribution of -- of, say,

13 poor nesting fledging success rates to any single cause is

14 very difficult, but it could be, in fact, due to multiple

15 causes.

16 Q    What do you think was the likelihood that the Study

17 Panel would learn anything useful from field toxicity studies?

18 A    We probably would have learned something useful, but

19 whether we learned it in a way that was unequivocal and -- and

20 high standard of proof strikes me as less likely.

21 Q    Do --

22 A    And -- and I think John -- Dr. Rudd mentioned the -- the

23 criticisms Betsy Henry had of the Jackson paper.  Well, that

24 was exactly the kind of a toxicology field study that it was

25 suggested we do, and I think none of us believed we could have

1    done a better study than that one.

2    Q    And -- and that was a critique -- Dr. Henry is a

3    defendant-retained expert in the case?

4    A    Yes.

5    Q    And she was critiquing a study of Carolina wrens called

6    the Jackson 2011 study?

7    A    Yes, that's right.

8    Q    Okay.  Now, let's just turn to that.  Did you read

9    Dr. Henry's expert reports?  There were, I believe, two of

10   them.

11   A    I think I only read the first one, and it was one of the

12   first reports I got, and it was not on the list of things I

13   should rereview in preparation for the trial, so it's been a

14   while since I read it.

15   Q    Okay.  Well, she -- she -- are you aware that she found

16   fault with many aspects of the Carolina wrens study?

17   A    Yes.

18   Q    Okay.  And do you think that any field toxicity study

19   the Study Panel might have conducted would have been subject

20   to that same sort of critique given the complications and

21   confounding factors in the natural world?

22   A    Yes, I think so, and I -- and that's why I mentioned

23   Dr. Wiener's deposition.  He -- he -- he's more experienced in

24   this than I am, and he went through a -- a nice list of all --

25   of many of the things that can wrong when you do such a study.

1  Q    Well, he'll actually be here, so we'll talk with him.

2  A    Right.

3  Q    But I do want to remind you of one colorful response you

4  gave during your deposition and -- and ask you about it.  You

5  said that your friend, who is an epidemiologist, said that

6  epidemiologists eat their young.  Do you remember that?

7  A    I do remember that.

8  Q    All right.  We will leave the identity of your

9  epidemiologist friend out of the record.  But let me ask you,

10  what did you mean by that?

11         THE COURT:  And -- and whether they have any

12  children.

13  A    What -- what this friend of mine meant was that every

14  emerging new epidemiologist that comes through a graduate

15  program and has to do their own research for the first time is

16  picked over by more senior epidemiologists for the long list

17  of things they did wrong in the study, and there is always

18  such a list, and that no new epidemiologist has ever done a

19  good study was his subtext there.

20  BY MR. BERNARD:

21  Q    And do you think that subtext, if we draw it out of your

22  -- your deposition response, do you think that applies here in

23  terms of species-level field toxicity studies?

24  A    I think the two -- I think it's a good analogy because

25  both epidemiology and field toxicology suffer from having way

1   too many variables per the amount of real actual data to

2   explain against the variables.

3   Q    Do you think the Study Panel needed toxicity tests in

4   the field to answer the questions the court directed you to

5   answer?

6   A    No.

7   Q    Okay.

8   A    In fact, I'll -- I'll -- let me expand briefly on that.

9   We looked at the other major mercury sites that have been

10  mentioned in the trial, including Lavaca Bay and the English-

11  Wabigoon System.  So far as we know, there were not field

12  toxicology studies done, nor were there local human health

13  exposure assessments done.  It was -- the question is, how do

14  the animals -- mercury levels compare to those of the

15  reference levels for -- say, for human consumption or for

16  toxicity to the animal itself?

17  Q    And in those systems that you just identified, were

18  active remedial measures undertaken?

19  A    Ah, yes, as I understand it.

20  Q    So just to tie this up, in your view, is it scien -- as

21  a risk assessor, is it scientifically legitimate for the Study

22  Panel to have determined ecological and human health risk

23  based on either literature thresholds or existing applicable

24  government standards?

25  A    Yes.

1   Q     Briefly on natural attenuation, is it your view,

2   Dr. Whipple, that natural attenuation within the Penobscot

3   Estuary is occurring too slowly to leave the system alone?

4   A     Yes.

5   Q     Are you aware of Dr. Connolly's view -- do you know that

6   Dr. Connolly is an expert retained by the defendant?

7   A     Yes.

8   Q     Okay.  And are you aware of the view he asserts in his

9   expert report that recovery of the ecosystem, the Penobscot,

10  will occur on the order of 15 years, I think it's -- his

11  estimates vary, but I think it's either 5 to 15 years or 10 to

12  15 years?

13  A     Yeah, I think 10 to 15 years, as I read his report.

14  Q     Okay.  What is your view of that?

15             MR. TALBERT:  Objection to foundation to critique

16  his half-time for recovery.

17             MR. BERNARD:  I'm sorry?

18             MR. TALBERT:  Objection as to the --

19             MR. BERNARD:  I didn't hear.

20             MR. TALBERT:  -- foundation for the witness' ability

21  to critique half-time for recovery of Dr. Connolly.

22             MR. BERNARD:  If you -- Your Honor wants me to lay a

23  foundation, I will.  I -- I don't see why that would be

24  required here, but I'm happy to do it.

25             THE COURT:  I'm not sure the basis for the

 1    objection.  He seems to be a true expert.

 2              MR. TALBERT:  I believe he -- he is an expert in

 3    human health risk assessment.  Mr. Bernard --

 4              THE COURT:  In fact, I think he's the expert that

 5    Mallinckrodt selected, right?

 6              MR. TALBERT:  For the Study Panel, but he has a

 7    specific expertise, which I -- I believe he would admit that

 8    he's not an expert in calculation of recovery half-times or

 9    have a -- to have an opinion on what Dr. Connolly did there.

10              THE COURT:  All right.  Do you want to try and --

11              MR. BERNARD:  One of the -- one of the Study Panel's

12    key charges and decisions was to decide how quickly the system

13    would recover, and Dr. Whipple was integrally involved in that

14    decision.

15              MR. TALBERT:  I think it would be appropriate for

16    him to ask him what time period he thinks is appropriate for

17    recovery, but to have him critique Dr. Connolly's calculation

18    of half-time recovery, which relied on Lead-210, I believe is

19    outside this witness' scope of expertise.

20              THE COURT:  Okay.  Well, what I'm going to do is I'm

21    going to allow him to testify, and if you wish to explore it

22    on cross-examination, you may.  Thank you.

23              MR. TALBERT:  Yes, Your Honor.

24    BY MR. BERNARD:

25    Q    Dr. Whipple, let me reask the question in light of the

1    preceding colloquy.  You are familiar with Dr. Connolly's view

2    that recovery of the Penobscot Ecosystem will occur on the

3    order of 10 to 15 years?

4    A     Yes, I am.

5    Q     And do you have a view in response to that?

6    A     Yes.

7    Q     What is your view?

8    A     When I read the defendants' expert reports taken as a

9    whole, including the theory that the mercury, in fact, was due

10   largely to slimicides being released in the '40s, '50s, and

11   '60s, and that the recent evidence shows rapid rates of

12   recovery over the last decade or so, pointing to 10- to

13   15-year recovery half-lives, I find those to be wildly

14   inconsistent because the system today is still highly

15   contaminated, and if it were cleaning itself up with a 10- to

16   15-year half-time and we've been through 60 or 70 years of

17   recovery, we should have a pretty clean system by now, and we

18   don't.

19        So I think this is one of those if -- if you want to

20   believe that it's HoltraChem mercury and it was leaking

21   heavily until the year 2000 and only recently have we seen

22   cleanup, I tend not to believe that either, but it's at least

23   an internally consistent story, more so than the it's

24   60-year-old slimicide and it's really cleaning itself up fast,

25   except it didn't start until just recently.

1   Q      Do you think that recovery on the order of 10 to

2   15 years is consistent with the degree of residual

3   contamination we now see in the Penobscot Estuary?

4   A      No, I think it's been slower than that.

5   Q      Let's turn to the issue of the mass balance modeling

6   that -- were you in court yesterday?

7   A      Yes.

8   Q      And you heard some questioning by Mallinckrodt's counsel

9   of Dr. Rudd about Mr. Harris' work on a mass balance model of

10  the system?

11  A      Yes.

12  Q      And you're familiar with that?

13  A      Yes.

14  Q      Okay.  And that's Chapter 18 of the study report?

15  A      That's correct.

16  Q      Okay.  Now, if a mass balance is working, in other

17  words, if all the data -- I don't know if this ever happens,

18  but if it were to happen -- it -- should the numbers spit out

19  by the model match the sediment core data?

20  A      Yes, if -- if, in fact, the mass balance model is more

21  or less correct, we should see a reasonably good fit.

22  Q      All right.  And in this case, there's not that good a

23  fit at least yet; is that fair to say?

24  A      That's correct.

25  Q      Okay.  Now, as between the two, the sediment core

1   information and the information that is the output of the mass

2   balance model, which one is more reliable?

3   A      The sediment core data.

4   Q      Why is that?

5   A      It's because it can be measured with great precision,

6   whereas the mass balance model is based on a large number of

7   assumed values that we were unable to measure.

8   Q      You referred in your deposition to the sediment core

9   data as the ground truth.  Do you remember that?

10  A      Yes.

11  Q      What do -- what do you mean by that?

12  A      It's the -- the one data set that -- that describes the

13  historical record of what the -- what the surface

14  contamination concentrations were at various locations with

15  really pretty high precision through the entire time period of

16  interest.  And models can't do that.

17  Q      Do you yourself do modeling work?

18  A      Yes.

19  Q      Do you bear any grudge against models?

20  A      No.

21  Q      Do you nonetheless always prefer to measure when you can

22  rather than relying on a model?

23  A      That certainly is my prejudice, that you -- if you have

24  a choice between measurement or modeling, the measurements are

25  typically more reliable.

1    Q       All right.  And when I asked you in your deposition

2    whether this is an exception to that rule or that view you

3    just expressed, do you remember what you said?

4    A       No, but I -- my guess is I said I don't think this is an

5    exception.

6    Q       You said, no, this is a poster boy for that rule.

7    A       Okay.

8    Q       What did you mean by that?

9    A       I mean, this is -- this is a situation where the -- the

10   number and quality of the cores we got is really an

11   exceptional site investigation, and I think -- reading Kevin

12   Yeager's deposition, he emphasized he's never had so many data

13   points in his life on any system.  I -- I didn't see Peter's

14   deposition, but I -- I guess, it's similarly -- it's an

15   unusually large number of cores analyzed very carefully by --

16   by really good experts.

17           And the modeling here -- this system is really very

18   complicated, and as you heard, we were -- we were working

19   towards a multicompartmental model until a couple of years

20   ago, and the whole conceptual picture of the system changed

21   when -- when Rocky Geyer brought up the notion of the mobile

22   sediment pool, and the core samples are invariant to theories

23   about the system.  They are what they are.  But the models are

24   totally dependent upon theories about the system.

25   Q       As between the two, you choose the core data?

WHIPPLE - CONTINUED DIRECT EXAMINATION/TALBERT

1    A     Yes.

2    Q     Is that correct?  Let's turn very briefly to HoltraChem

3    as the source of mercury to the estuary.  Are you aware --

4    you've adverted to it already, but for the record, let me ask

5    you whether you're aware that defendants' experts have made

6    the argument that HoltraChem is -- is not the primary source

7    of mercury to the lower river.  You're familiar with that?

8    A     Yes, I am.

9    Q     Okay.  And in your view, are releases of mercury from

10   HoltraChem primarily responsible for the present-day high

11   mercury concentrations in sediments and biota in the upper

12   estuary?

13   A     I think the -- the bulk of the evidence strongly

14   supports that position.

15   Q     What is the evidence that is strongest to you in support

16   of that position?

17   A     Well, I'll cite two things, and -- and Dr. Rudd

18   mentioned both of them.  First is that the characteristic

19   shape of those sediment cores -- and I think one was put up

20   yesterday -- shows that the mercury concentrations are fairly

21   low and steady, except for a less-than-five-year interval in

22   which they -- they spike and -- and increase substantially,

23   and then they come back down in just a few years.  And that's

24   consistent with what we know about releases from HoltraChem,

25   that is, the plant didn't start operation until late 1967, and

1   by 1970, the Clean Water Act had passed, and EPA was pushing

2   HoltraChem to cut way back on emissions.

3         The second major pie -- piece of evidence we have is the

4   Beak data, and particularly the -- the thing that you sent us

5   to look at, which was the revised data that -- that

6   Dr. Driscoll had found, showing surface sediment

7   concentrations in, I think, 1971, I believe, or '70, that --

8   that very -- very closely matched the peak concentrations

9   found in our sediment cores.

10         That -- that tells a very clear picture that -- that

11   these spiky-peak mercury concentrations coincide in

12   concentration with -- with contemporaneous measurements taken

13   when HoltraChem was operating.

14         And I guess I'll add one final third piece of

15   information.  I think the Study Panel was surprised to see the

16   -- the theory that the slimicides were the predominant source,

17   and that I, anyway, hopped on Google, as soon as I read that.

18   I did come across a paper by Elsie Sunderland and coauthor

19   named Chmurab that looked at mercury sources in the Maritime

20   Provinces of Canada, and it was a -- kind of a systemwide

21   effort to identify mercury sources in eastern Canada, and her

22   estimate in that paper was that during her period of interest,

23   the total source term from chlor-alkali plants was between

24   4,000 and 5,700 kilograms of mercury a year to the system, and

25   the total contribution during the same period from slimicides

1   was 11 kilograms per year.

2       So I guess the other people who have tried to look at

3   the sources of mercury to Atlantic rivers and estuaries have

4   -- have come away finding that the chlor-alkali plants are the

5   big actors and the slimicides are a relatively trivial source.

6   Q    HoltraChem was a chlor-alkali plant; is that correct?

7   A    Yes, that's correct.

8   Q    Okay.  You mentioned a moment ago the Beak data.  Let me

9   show you Joint Exhibit 49.  Is this the chart you're referring

10  to?

11  A    Yes.

12  Q    Okay.  And this shows that 1971 -- I'm trying to get the

13  focus right, but I hope it looks clearer to you.  This is

14  reported by Beak, which is a consultant to Mallinckrodt back

15  in the early 1970s of EPA samples.  What was it in these data

16  depicted on this map, Dr. Whipple, that you -- that influenced

17  you?

18  A    Well, it's --

19  Q    Do you see the HoltraChem plant?  Here, I'm just --

20  A    Yes, I -- I do --

21  Q    Okay.

22  A    -- with some difficulty.

23  Q    All right.  And then you see some numbers.  I'm sorry

24  this isn't a little clearer, but you see some numbers, which

25  are surface sediment concentrations.

1   A      Yes, and they're up in the -- if I can read them

2   correctly, over a hundred thousand nanograms per gram dry

3   weight.

4   Q      That's extremely high, is it not?

5   A      Yes.

6   Q      And this would have been just after the time of known

7   peak releases from the HoltraChem plant, which I believe have

8   been dated from December 1967 through June of 1970; is that

9   correct?

10  A      That's correct.

11  Q      Okay.

12         MR. BERNARD:  Your Honor, are we breaking at 11:00

13  or 11:30?

14         THE COURT:  11:30.

15         MR. BERNARD:  Okay.  Then let me move on to mercury

16  stable isotopes.

17  BY MR. BERNARD:

18  Q      Are you familiar with the Study Panel's experimentation

19  with mercury stable isotopes?

20  A      Yes, although I -- of the Study Panel members, I -- I

21  probably am the bottom half in terms of appreciation of how

22  that method works.

23  Q      Okay.  I'm not -- I'm not going to ask you too much

24  about how the method works, but I -- I do want to ask you a

25  couple of questions about what -- your knowledge of what

1    happened.

2          Did the Study Panel get much out of the stable isotope

3    work in your view?

4    A    No.

5    Q    And were you ever able to determine the isotopic signal

6    of the mercury that the plant used?

7    A    I'm -- I -- I think at the time we thought we were not.

8    I don't -- there have been claims subsequently, particularly

9    by Mr. Bigham, that -- that he was able to see it.

10          But I -- my impression is that at the time we were doing

11   that work, that -- that everything we did had a very high

12   noise-to-signal ratio, which is to say it was just fuzzy data

13   that -- that really was pretty inconclusive.

14   Q    And in a more colloquial sense, was that work going

15   anywhere from your point of view?

16   A    No, and as I try to map the timing, I think we were

17   doing that work about the time we started getting our first

18   deep sediment cores, and the clarity of those sediment cores

19   compared to the rather inarticulate data from the stable

20   isotope work suggested to all of us that the stable isotope

21   work was -- was not worth pursuing.

22   Q    And -- and you were in agreement with that decision?

23   A    Yes.

24   Q    Are you aware of a claim by Mr. Vaillancourt, a paid

25   expert of the defendant, that the Study Panel dismissed the

1    mercury stable isotope data because it was inconsistent with

2    the panel's view that the HoltraChem plant was a primary

3    source of mercury to the river?

4    A    In truth, I didn't remember whether it was from

5    Mr. Vaillancourt or from Gary Bigham, but I recall reading it

6    from one of their expert reports.

7    Q    And -- and putting to one side who made that allegation,

8    do you have any response to it?

9    A    Yes, it's simply untrue.  Whoever made that speculation

10   was not in the room when the decision to call an end to the

11   stable isotope work was made and I was, and -- and it wasn't

12   because we thought it was pointing us in a direction we didn't

13   like.  We were all happy to follow the evidence wherever it

14   pointed, but, as I said, this was -- this was noisy and

15   expensive.

16   Q    If Vaillancourt's or Bigham's charge were true, would

17   that represent your -- in your view a breach of scientific

18   integrity on the part of the Study Panel to dismiss data

19   because it didn't comport with some preconceived notion?

20   A    Ah, yes, it would have been a -- a breach of etiquette.

21   Now, the Study Panel had other lines of evidence we pursued

22   that didn't go anywhere and that we dropped.  For example, the

23   only mammal data in the whole Phase II Report is for bats, and

24   I think one of the e-mails Dr. Rudd was asked about yesterday

25   talked about how the mammals don't seem to show much of a

1    pattern, and that was true, and that's why we quit looking at

2    mammals.  We looked at eagles first, didn't find anything,

3    dropped eagles.

4         So we -- we pursued several lines of inquiry that we

5    found uninformative, but that -- being uninformative was a

6    good reason to not put more money into it in our view.

7    Q    And is it normal in a -- in a comprehensive scientific

8    inquiry, such as the Penobscot River Mercury Study, to set

9    down on a road of -- of inquiry in a particular area and then

10   at a certain point decide it's not sufficiently worthwhile and

11   so it gets discontinued?

12   A    Yes.

13   Q    Yes, that's customary?

14   A    Yes, it's normal.

15   Q    Okay.  Back on the scientific integrity point, what is

16   your observation, if any, of the scientific integrity of your

17   fellow investigators on the study?

18   A    I have high confidence that all of them have absolutely

19   highest level of integrity.  As you've heard, we argued over a

20   whole lot of things, but -- but the standard for settling

21   those arguments was evidence.  What -- what real information

22   that we can trust do we have, and -- and whose theory does it

23   support better?  And that's how you're supposed to do this

24   work.

25   Q    Let's turn to remedy.  The Study Panel recommended --

1   has recommended that the court order the pursuit of active

2   remediation of the estuary; is that correct?

3   A      Yes.

4   Q      And the scientific rationale for that recommendation is

5   set forth perhaps, among other places, in Chapter 23, the last

6   chapter in the Phase II Report; is that right?

7   A      Yes.

8   Q      And --

9   A      That's certainly the most elaborate discussion of the

10  subject.

11  Q      And you're a coauthor of that chapter.

12  A      Yes.

13  Q      Okay.  Now, did the Study Panel also propose some

14  specific possible remediation ideas in Chapter 21?

15  A      Yes, I think 21 was the nondetailed version of 23, but

16  it -- I think they were addressing conceptually the same

17  topics.

18  Q      Okay.  But there were some actual -- at least from a

19  scientific or conceptual level, there were some actual

20  remediation proposals set forth in Chapter 21; is that your

21  recollection?

22  A      Yes, that's right.

23  Q      Okay.  Now, are the particular remedy recommendations

24  set forth in Chapter 21 a concept rather than a design from

25  your point of view?

1    A     Yes.

2    Q     Okay.  And -- and tell me what you mean by that, please.

3    A     I -- what I mean by that is we asked ourselves, how can

4    we reduce the concentration of mercury in this mobile sediment

5    pool?  And as -- as Dr. Rudd's comments have indicated, which

6    is, if -- if we could capture and remove, say, half of that

7    from the system and replace it with clean sediment, we would

8    cut the concentration in half and accelerate the cleanup of

9    the system.

10        For reasons that Dr. Geyer can explain, we did not think

11   it was feasible to remove the mobile sediment pool.  We think

12   it's probably always been there and predates mercury in the

13   system, and it's a natural feature, and we shouldn't try to

14   compete with that.

15        But the mechanisms for trying to reduce that

16   concentration involved capture of contaminated sediment and

17   its removal to somewhere else and -- and how best to

18   accomplish that I saw as being within the expertise of people

19   we did not have on the Study Panel.

20   Q     Okay.  Are engineers now needed, in your view, to assess

21   the feasibility and details of ideas for active remedies?

22   A     Yes.

23   Q     Okay.  And -- and in your view, is this now or should it

24   be an engineering project that would be either run by

25   engineers or run by engineers in conjunction with mercury

1    scientists who understand the system?

2    A    Yes, and I -- I think the reason we -- we highlighted

3    the ongoing need for people who understand the mercury science

4    as it pertains to this system is that -- that mercury has a

5    number of unusual attributes that if you've not done

6    engineering on a mercury system before, you can -- you can

7    make significant mistakes.  So it was to make sure that there

8    was still an understanding of -- of how the mercury behaves in

9    the system.  It's -- it's not just another mass to be changed.

10   There's concerns about factors that affect methylation rates

11   and so on.

12        But the -- the main questions to be answered going

13   forward is -- is, what engineering approaches could we

14   actually implemate -- implement that would do what we want and

15   not do substantial collateral damage?

16   Q    If you were asked to put together the first meeting of a

17   group of engineers and mercury scientists who would do what

18   you just set out, how long would it take you to identify the

19   people you view as the right people to put in that room?

20   A    If -- if I, you know, could -- could spend a fair amount

21   of time on it, I would think it would be a week or two.

22   Q    Okay.

23   A    I mean, I -- I think I was the person that organized the

24   remediation workshop, and that -- that was much lower-level

25   goals than we're talking about here.  But -- but I think it

1    was a -- you know, a half a day of phone calls and e-mails to

2    identify who we should invite.

3    Q    And that was the remediation workshop that took place, I

4    think, in June or July of 2009?

5    A    Yes, that's right.

6    Q    Okay.  And that was the one remediation meeting the

7    Study Panel convened during the study process; is that right?

8    A    Yes.

9    Q    Okay.  You mentioned that the knowledge of the system is

10   imperfect and incomplete earlier, right?

11   A    Yes.

12   Q    Before putting together this meeting, is there any

13   discrepancy or any -- anything else that needs to happen?  In

14   other words, could you -- from your point of view, could you

15   begin, if you were directed to by the court, put together such

16   a meeting right away?

17   A    I can tell you how I would approach it.

18   Q    Go ahead.

19   A    The report includes the list of 12 sites where confined

20   aquatic disposal had been done that came to me in an e-mail

21   from Todd Bridges.  I would look to identify a lead technical

22   person for -- for the -- the sites on that list that seem to

23   be the best match for our system and -- and see if I could

24   talk to them and find out who they recommend, find out if

25   they're willing to participate, but to -- to not limit

1    ourselves to confined aquatic disposal to an approach.

2         I mean, one of the outcomes that -- of the remediation

3    workshop that we just discussed that I don't think anyone has

4    mentioned before, but it's almost like the -- the case of the

5    dog that didn't bark, which is the Study Panel's sense at the

6    end of that workshop was we didn't get a bunch of new ideas

7    that we had never heard of before in this meeting.  And the --

8    our real purpose for holding that was to say, are we missing

9    some technical area that's just -- we don't know about?  And

10   we tried to invite a broad enough cross section of people that

11   -- that at least one or two of them would have heard of -- of

12   approaches that we hadn't thought of, and that didn't happen.

13   Q    Is there active remediation of mercury contamination

14   going on at sites around the United States?  Do you know?

15   A    I couldn't tell you which sites, but, yes, there is.

16   Q    And, also, at other sites outside the United States?

17   A    Yes.

18   Q    Okay.  I mean, it's -- is it fair to say it's an active

19   area of scientific and engineering work?

20   A    Yes.

21   Q    Okay.  Now, would you include in such a meeting people

22   who have either been involved in those projects or know about

23   them and can think of these innovative ideas that -- that you

24   say were not so much in evidence in the -- in the workshop

25   five years ago?

1    A    Yes, and -- and what's more, the -- I think the Study

2    Panel is -- is able to think about various approaches at the

3    conceptual level how they work, but -- but I don't think we

4    have as much experience at the practical level of, yes, but

5    that won't work here because, that people with real field

6    experience would -- would be able to point to.

7    Q    Now, you're -- did you read Dr. Driscoll's report --

8    A    Yes.

9    Q    -- expert report?  And he's an expert that is advising

10   the plaintiffs; is that right?

11   A    Yes.

12   Q    Okay.  And are you familiar with his recommendation that

13   if there is such a meeting convened, like the meeting you're

14   describing, all ideas should be on the table?  In other words,

15   it should not be -- it should consider the conceptual ideas in

16   Chapter 21 of the Phase II Report, but it shouldn't be limited

17   to that.  Are you familiar with that suggestion of his?

18   A    Yes, I am.

19   Q    And what do you think of that suggestion?

20   A    I agree with it.

21   Q    You mentioned confined aquatic disposal a moment ago.

22   Did you have some discussions with a Dr. Todd Bridges of the

23   United States Army Corps of Engineers concerning confined

24   aquatic disposal?

25   A    Yes.

WHIPPLE - CONTINUED DIRECT EXAMINATION/TALBERT

530

1  Q     Okay.  And is it fair to say that at first you were a

2  skeptic concerning the possibility of confined aquatic

3  disposal in the Penobscot region?

4  A     Yes, I think you're referring to an e-mail that made an

5  appearance in my first deposition.  I sent the group an e-mail

6  -- I'm getting ahead of you again I see, but --

7  Q     That's quite all right.  You can just keep galloping

8  ahead.

9  A     All right.  The e-mail said I -- I -- this concept seems

10  to me like trying to open a hazardous waste disposal facility

11  in the middle of Penobscot Bay, and if we could permit this in

12  my lifetime, I'd be shocked.  And --

13  Q     And what happened after you wrote that e-mail?

14  A     Well, Carol Kelly sent me a note that said, well, they

15  -- gee, I think this is what they did in Boston Harbor.  So I

16  sent Todd Bridges a note that said, Todd, tell me about

17  insystem disposal of hazardous materials and particularly what

18  has been the experience with people's ability to permit these

19  systems and actually implement them.  And Todd wrote back and

20  said, gee, look at the list below, it's been done a dozen

21  times and places.

22        And so that, to an engineer, is called the existence

23  proof, which -- which means that if it could be done a dozen

24  times, it could be done 13 times.

25  Q     Did that soften your scepticism?

1    A    Yes.

2    Q    Okay.  And we've been talking about confined aquatic

3    disposal, but I want to make sure we're clear that -- and I

4    think you said this earlier -- you don't think that the

5    consideration of active remediation alternatives should be

6    limited to confined aquatic disposal; is that -- is that

7    right?

8    A    Yes, that's correct.

9    Q    Okay.  Now, is there always a possible downside risk to

10   intervening actively to clean up an ecosystem?

11   A    Yes.

12   Q    Okay.  And is that one of the things that, in this

13   meeting or what follows from this meeting, should that occur,

14   would have to be on the table, also?

15   A    Oh, absolutely.

16   Q    You want to make sure you're -- you're -- you're not

17   doing more harm than good, right?

18   A    Yes.

19   Q    Okay.  And that's a consideration in any remediation

20   discussion or decision; is that fair?

21   A    Yes, it is.

22   Q    Okay.  Now, what -- what is the purpose of an active

23   remedy in the Penobscot?  What are you trying to achieve?

24   A    Well, what we're trying to do is to address the -- the

25   strong impression we have, based on our study, that natural

1    attenuation is -- is simply working too slowly to get the

2    system into acceptable concentrations within a reasonable time

3    period, and we didn't precisely define reasonable, and we

4    didn't find guidance from RCRA that helped us much, but it was

5    one of those if it were only 10 years or 15 years and it were

6    clean, none of us would think about active remediation given

7    the possible downsides and the cost.

8         But if it's 60 to a hundred years, then probably we

9    should do something.

10   Q    And --

11   A    And for me there was the one other one I mentioned this

12   morning, which is if there's a substantial likelihood that

13   contamination further down the estuary where the -- more

14   lobsters are will get significantly worse before it gets

15   better, that's one of those things where the -- the risks of

16   taking no action are fairly significant, as well.

17   Q    What risk is an active remedy meant to diminish or

18   eliminate?

19   A    The usual goal of an active remedy is to take the

20   hazardous material that either, in this case, are on the

21   sediment surface, or if it's on land, on the land surface, and

22   move them to isolate them such that they can't lead to human

23   or environmental exposures.

24   Q    And those are the exposures that now exist that you

25   described earlier.

WHIPPLE - CONTINUED DIRECT EXAMINATION/TALBERT

1    A      Yes.

2    Q      Now, is one basis for the -- withdrawn.

3           Is one conceptual basis for an active remedy the

4    relationship the Study Panel found between total mercury and

5    methylmercury in sediments in the Penobscot?

6    A      Yes.

7    Q      Okay.  And how would you characterize that relationship?

8    A      The relationship is that to -- to within any specific

9    sediment type and setting, there does appear to be a -- a

10   fairly strong one-to-one relationship between methylmercury

11   concentration and total mercury concentration.  Now, the

12   extent of that relationship differs from, say, Mendall Marsh,

13   where the methylation rate is quite high relative to the rest

14   of the system, versus sediments in the river, where the

15   methylation rate is lower.

16          But in any particular setting, our data suggests that if

17   you can reduce total mercury, you will reduce methylmercury by

18   a similar percentage.

19   Q      Okay.  Did you look at the R-squared values that

20   characterized the relationship between total mercury and

21   methylmercury in various habitats within the Penobscot?

22   A      Yes.

23   Q      And what did -- what did you find?

24   A      I think it's rare in nature to find such high

25   R-squareds.

WHIPPLE - CONTINUED DIRECT EXAMINATION/TALBERT

534

1    Q      And the R-squared value, what does that -- what does

2    that mean?

3    A      It -- it reflects the extent to which one variable --

4    the -- the variation in one variable explains the variation in

5    the other.  I think John used some examples.  I'll give you

6    one real simple one, which is if I do a graph of my age in

7    years versus my age in days, it'll have an R-squared equal to

8    1.  Those are exactly the same curves.

9    Q      Okay.

10   A      So, you know, our fit wasn't that good, but it was

11   pretty good.

12   Q      Okay.  And does that give you confidence that reducing

13   sediment total mercury concentrations in the various habitats

14   within the Penobscot will have the effect of reducing

15   methylmercury concentrations?

16   A      Yes, it does.

17   Q      You said a moment ago that it would take, I think, a

18   week or two you said for you to figure out whom to invite to a

19   meeting of scientists and engineers to formulate ideas for

20   active -- specific active remedies; is that -- do I remember

21   that correctly?

22   A      Yes.

23   Q      And how long would it take somebody who is effective to

24   get remediation going, assuming the regulators were onboard?

25   Let me go back a second.  Would you also include regulators --

1    government regulators in this process that you were beginning

2    to sketch out?

3    A    Yes, you'd have to.

4    Q    And what's the reason for that?

5    A    If there are some remedies that are complete nonstarters

6    with regulators, that is, if they say, we -- we can't allow

7    you to do that because the law says we can't, or the governor

8    says we can't, or we tried it six places and we've -- and

9    we've got a bloody nose to show for it because the public

10   hates the idea, any number of reasons, the regulators know

11   better than any of us who -- what the show-stoppers are, and

12   you really would like to try to identify and avoid those early

13   on.

14   Q    And is the converse equally true, Dr. Whipple?  In other

15   words, you might get a regulator that says, that seems like a

16   really promising idea, we would like to try to fix the

17   problem, and that looks like a viable way?

18   A    Yes, I -- I've had that experience with regulators in

19   the past.  They're -- they want to find something that works.

20   Q    Assuming you had people who were effective at

21   implementing remedies and assuming further that the regulators

22   were onboard, how long do you think it would take to get

23   active remediation going?

24        MR. TALBERT:  Objection, calls for speculation, lack

25   of foundation.

1          THE COURT:  Do you think you can answer?

2    A    I think I'm not very well-qualified to answer that.  I

3    have not been involved in real in-the-field remediation

4    projects enough to -- to tell you what it takes.

5          MR. BERNARD:  I'll withdraw the question.

6    BY MR. BERNARD:

7    Q    Let's turn to Chapter 22.  What is the purpose of that

8    chapter in the -- in the Phase II Report?

9    A    My -- my reason for writing Chapter 22 was, as I

10   mentioned, that the Study Panel asked for -- for guidance I

11   think from the parties, from Judge Calkins, from anybody we

12   could talk to on criteria for making a remediation

13   recommendation decision, and RCRA itself is -- is -- we found

14   to be not very helpful in providing criteria for when one

15   waits and lets natural attenuation do its thing versus when

16   one decides that it's too slow and -- and active remediation

17   is necessary.

18        We -- we looked at some of the CERCLA guidance, and it

19   was more specific than RCRA, but still not very helpful.

20        We asked Susan Calkins if we could hire an expert in

21   natural resource damage assessment to give us a ballpark feel

22   for what it might be worth to fix the system, and she said,

23   no, you're on your own, you make your own judgments.

24        So Chapter 22 was my qualitative walk-through, my

25   reasoning at arriving at why I supported the recommendation to

1   do active remediation, and it's -- as you know, it's only a

2   few pages.  It's fairly simple logic.

3   Q    I would like to -- on behalf of the universe of people

4   who have read the full Phase II Report, I'd like to thank you

5   for the brevity of Chapter 22.

6        Before we get to the text --

7            MR. TALBERT:  I'll second that.

8   BY MR. BERNARD:

9   Q    Before we get to the text of the chapter, you mentioned

10  earlier that -- I mean, a fundamental decision of the Study

11  Panel is to -- is to recommend to the court that it order

12  active remedies; is that fair?

13  A    I would amend that slightly.

14  Q    Okay.

15  A    We recommended that -- that you bring in the right

16  people and ask them on the feasibility of active remediation.

17  It -- it occurred to us in the Study Panel that the real

18  experts might take a look at -- at the system and all we know

19  about it and say, you know, we can't help you here.  Anything

20  we do will just make it worse.

21  Q    I understand that there is further work that you're

22  proposing be done by the engineers in terms of feasibility.

23  But is it fair to say that if you didn't think the system was

24  sufficiently contaminated and causing harm or danger, then you

25  could have stopped?  You could have recommended to the court,

1    let's just stop here and not recommend an active remedy.

2    A     Oh, no, that's correct.  We -- we strongly recommend

3    that we go ahead to look at the feasibility to doing active

4    remediation.

5    Q     Now, each of you, including you, had to make a judgment

6    based on all the data and data analyses about whether that was

7    the proper thing to recommend to the court; is that fair?

8    A     Yes.

9    Q     Okay.  Now, in your thinking about where you stood on

10   that fundamental question that the court had put to the Study

11   Panel, did this figure which is Plaintiffs' 57 in evidence

12   influence you?

13   A     Yes, it did.

14   Q     Will you please explain to the court that influence.

15   A     Yes.  This -- this figure comes from Dr. Gilmour.  And

16   on the horizontal axis, it shows total mercury; the vertical

17   axis shows methylmercury; and the different colors refer to

18   different mercury-contamination -- contaminated systems.  And

19   the -- the cluster in the top center in red is the Penobscot,

20   but you can see there's the New Jersey Salt Marsh, the

21   Everglades are there, Chesapeake Marsh, and so on.  You can

22   read some of the other ones.  South River has been getting a

23   lot of attention recently.

24         And the diagonal lines, the -- the one corner-to-corner

25   in the chart, represents the line along which 1 percent of the

1    total mercury is present as methylmercury, and the dashed line

2    above it represents the 10 percent is methylmercury line.

3        And as you can see, the Penobscot red dots are largely

4    clustered between the 1 and 10 percent, with some above

5    10 percent.  And they're also not the highest mercury numbers

6    on the page, but they're -- with a -- with a few exceptions

7    for the light blue circles, which is the New Jersey Salt

8    Marsh, they're also the highest methylmercury concentrations

9    that have been observed in mercury-contaminated systems.

10   Q    You under --

11   A    So --

12   Q    Please go ahead.

13   A    So why this was a -- a -- kind of a -- a defining figure

14   for me was we looked at the system.  It's been contaminated

15   for over 40 years, and it still has higher methylmercury

16   concentrations than we've seen almost anywhere.

17       And -- and that, accompanied with our estimates of the

18   recovery times, says that this system is simply too

19   contaminated for too long to believe it's going to clean

20   itself effectively in any reasonable period of time, and these

21   concentrations are -- are really high enough that they are

22   dangerous.

23           MR. BERNARD:  Your Honor, I think this is a good

24   stopping point.  I know that it's a minute or so before, but

25   I'm about to --

WHIPPLE - CONTINUED DIRECT EXAMINATION/TALBERT

540

1          THE COURT:  Right.

2          MR. BERNARD:  Yeah.

3          THE COURT:  No, I appreciate it.  Very good.  We'll

4  break for the day.  Unfortunately, I have an appointment, and

5  you don't want to see me after the appointment, at least until

6  tomorrow.  So I'll see you all tomorrow at 8:30.

7       (Proceedings concluded at 11:29 a.m.)

8                         CERTIFICATION

9      I certify that the foregoing is a correct transcript from

10  the record of proceedings in the above-entitled matter.

11

12

13  /s/ Julie G. Edgecomb_____          June 5, 2014_____
    Julie G. Edgecomb, RMR, CRR           Date
14  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25