1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF MAINE

3    MAINE PEOPLE'S ALLIANCE       )
     and NATURAL RESOURCES         )
4    DEFENSE COUNCIL, INC.,        )
                                   )
5                    Plaintiffs    )
                                   )               CIVIL ACTION
6                                  )
            vs.                    )    Docket No. 1:00-cv-00069-JAW
7                                  )
                                   )               BENCH TRIAL
8    HOLTRACHEM MANUFACTURING      )
     and MALLINCKRODT LLC,         )
9                                  )
                     Defendants.   )
10

11                          VOLUME IV

12                  TRANSCRIPT OF PROCEEDINGS

13        Pursuant to notice, the above-entitled matter came on

14   for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15   Chief District Judge, in the United States District Court,

16   Bangor, Maine, on the 6th day of June, 2014, at 8:33 a.m.

17   APPEARANCES:

18   For the Plaintiffs:             Mitchell S. Bernard, Esquire
                                     Aaron S. Colangelo, Esquire
19                                   Rachel E. Heron, Esquire
                                     Jared J. Thompson, Esquire
20
     For the Defendants:             Patricia H. Duft, Esquire
21                                   Sigmund D. Schutz, Esquire
                                     Jeffrey D. Talbert, Esquire
22

23                   Julie G. Edgecomb, RMR, CRR
                        Official Court Reporter
24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

1                        INDEX OF PROCEEDINGS

2                                                          Page:

Testimony:   (see below)

3                        INDEX OF WITNESSES

4                                                          Page:

5  CHRISTOPHER GEORGE WHIPPLE (called by Mr. Bernard)

6  Continued Direct Examination by Mr. Bernard            543
   Cross-Examination by Mr. Talbert                       586
7  Continued Cross-Examination by Mr. Talbert             658
   Redirect Examination by Mr. Bernard                    666
8
   NICHOLAS FISHER  (called by Mr. Bernard)
9
   Direct Examination by Mr. Bernard                      676
10 Cross-Examination by Mr. Talbert                       754

11                       INDEX OF EXHIBITS
   Plaintiffs'
12 Exhibit No.    Description              Offered   Admitted

13    75      Santerre, Fish for Your Health  586       586

14 Defendants'
   Exhibit No.    Description              Offered   Admitted
15
      1       E-Mail from Fisher to Bodaly    773       773
16    13       E-Mail from Whipple to Rudd    775       775
      38       Slide - CERCLA 9 Criteria      665       665
17   228       E-Mail from Fisher to Rudd     765       765
     282       E-Mail from Fisher to Whipple  771       771
18   298       Notes on Risk Overview         665       665
     304       E-Mail from Fisher to Rudd     775       775
19   591       E-Mail from Fisher to Bodaly   768       768
     592       E-Mail from Fisher to Monica   719       720
20   593       E-Mail from Fisher to Rudd     719       720
     885       E-Mail from Calkins to Duft    634       634
21   886       Spreadsheet                    634       634

22

23

24

25

1    (Counsel present in open court.)

2    (Christopher George Whipple, having been previously duly

3    sworn, resumed the witness stand.)

4         THE COURT:  Good morning.

5         MR. BERNARD:  Good morning.

6         MR. TALBERT:  Good morning.

7         THE COURT:  Mr. Bernard?

8         MR. BERNARD:  Thank you, Your Honor.

9              CONTINUED DIRECT EXAMINATION

10   BY MR. BERNARD:

11   Q    Good morning, Dr. Whipple.

12   A    Good morning.

13   Q    Did both parties to the case retain experts to opine on

14   human health risk issues?

15   A    Yes.

16   Q    And did you review the expert reports filed by those

17   witnesses?

18   A    Yes.

19   Q    Okay.  And do you remember the name of plaintiffs'

20   witness?

21   A    Philippe Grandjean.

22   Q    And defendants' witnesses?

23   A    Michael Bolger and Russell Keenan.

24   Q    Let's focus first on Russell Keenan's expert report.

25   Did Dr. Keenan criticize the Study Panel for not conducting a

1   formal human health risk assessment?

2   A    Yes.

3   Q    And did he perform one of his own?

4   A    Not that I would call a real risk assessment, no.

5   Q    Could you explain?

6   A    Dr. Keenan did some calculations that did look at

7   mercury exposure under various scenarios, but I first thought

8   that the -- the justification for the particular approach he

9   took was -- was lacking and often he made assumptions that

10  were nonconservative, which means that -- that found risks

11  lower than might actually exist.

12  Q    You referred yesterday to the Maine tissue action level

13  for fish at 200 nanograms per gram for methylmercury.  Do you

14  remember that?

15  A    Yes.

16  Q    Okay.  Do you recall whether Dr. Keenan derived his own

17  tissue action levels for methylmercury?

18  A    He did.

19  Q    And did he do that not in one fell swoop, but by species

20  of organism?

21  A    Yes, he -- he derived separate tissue action levels for

22  eels, lobster, black ducks, and crabs.

23  Q    Now, these are alternatives, I take it, that he was

24  proposing to the Maine standard of 200 nanograms per gram?

25  A    I suppose, but what he concluded from his derived values

1    was that all of these were safe to eat.

2    Q    Okay.  Let's look at the values.  Do you remember -- you

3    mentioned that he derived his own tissue action level for eel.

4    Do you remember what that is?

5    A    Not --

6    Q    I can show you a document.  You don't have to guess.

7    A    You know, I remember -- I forget which species -- one of

8    them came in at 490 nanograms per gram.  I think crabs and

9    lobster came in the same, maybe at 510.

10   Q    What --

11   A    I'm not sure.

12   Q    Let me just show you.

13   A    Okay.

14   Q    This is Joint Exhibit 55, which is in evidence, and it

15   is from Dr. Keenan's expert report, and this may just allow us

16   to pin it down quickly.

17        Okay.  So you see under section 3.4 here, he's

18   saying -- using data he had described, he computed refined

19   risk specific tissue concentration screening levels for these

20   various species.  Do you see that?

21   A    Yes.

22   Q    Okay.  And for fish, would that include eels?

23   A    Yes.

24   Q    Okay.  You see what he has down here?

25   A    Yes, 490.

1    Q    Okay.  And let's just get on the record what he did for
2    others.  Now, he has lobster.  And do you see what he has
3    here?
4    A    Yes, 510.
5    Q    Okay.  So just, again, to orient the judge, the 490 for
6    eel would be roughly two and a half times the Maine state
7    standard; is that correct?
8    A    Yes, that's correct.
9    Q    And the same for lobster, a little higher, but roughly
10   two and a half times?
11   A    Yes.
12   Q    Okay.  And let's go to his next page -- whoops -- which
13   is for duck.  What did he derive?
14   A    1,500 nanograms per gram.
15   Q    Okay.  And that's seven and a half times the Maine state
16   standard?
17   A    Yes.
18   Q    Okay.  And then you mentioned rock crab, and I think you
19   said correctly earlier that that was the same as lobster at
20   510 nanograms per gram?
21   A    Yes, that's right.
22   Q    Did you review the method pursuant to which Dr. Keenan
23   derived his own species-specific tissue action levels?
24   A    Yes.
25   Q    And do you have a view about the method that Dr. Keenan

1    used?

2    A     Yes, I think it's -- it's simply wrong.  I can tell you,

3    it makes one central assumption that I find is not reliable,

4    which is for each of the action levels he derived, he assumed

5    that that person's only source of methylmercury is from that

6    one particular species.  So the person that eats eels, only

7    eats eels, never eats fish, never eats duck, never eats

8    lobster, and so on.  The lobster eater never buys a fish meal

9    in a restaurant or in a supermarket.

10   Q     Do you think that's realistic?

11   A     No, I think it's completely unrealistic.

12   Q     Okay.  You mentioned earlier the word conservative.

13   What does the word conservative mean to a human health risk

14   assessor?

15   A     The -- the term conservative is used where you make a

16   set of assumptions that are all pessimistic in terms of

17   exposure and risk, and if you find that even under those

18   pessimistic assumptions, that is, high exposure conditions,

19   prolonged exposure, high concentration -- high concentrations

20   in whatever's causing the exposure, if it still comes out that

21   the risk is low, you have confidence that the risk is low.

22         But when you assume that a person only eats eels and

23   never eats fish of any other type, that is nonconservative to

24   the point of approaching silliness.

25   Q     From a human health standpoint, is the central issue how

1   much methylmercury is in a human being's body, rather than how

2   much came from any one particular source?

3   A   Yes, that's exactly right.  I can elaborate briefly, if

4   you'd like.

5   Q   Please do.

6   A   The EPA reference dose that we talked about yesterday is

7   derived from a -- a woman of childbearing age having a blood

8   level of mercury of 5.8 parts per billion, and EPA worked out

9   that that is equivalent to an intake of .1 micrograms of

10  methylmercury per day per kilogram of body weight.

11          So it's a rate -- the reference dose is -- and if

12  the reference dose rate is exceeded, EPA thinks it's a

13  situation that should be corrected, and if the reference dose

14  is not exceeded, EPA considers the situation to be safe,

15  but that intake rate is from all methylmercury sources.

16  Q   And you think that's the proper way to go about

17  analyzing this, right?

18  A   Yes.

19  Q   Now, focusing on black ducks for a moment, did

20  Dr. Keenan make an assumption concerning over what period of

21  time a person would be consuming black duck?

22  A   Yes, I believe he assumed that a duck hunter would get

23  on the average about ten ducks per hunting season, and that

24  those would go into the freezer and be consumed over the

25  course of a year.

1    Q      Do you think that's a conservative assumption?

2    A      No.

3    Q      Why not?

4    A      Because it spreads out the exposure over a year, and if,

5    in fact, the hunter's family is having duck frequently during

6    hunting season, then the exposure rate during those couple of

7    months would be much higher than if the exposure were spread

8    out over all year.

9    Q      If you take Dr. Keenan's number of total ducks per year,

10   can you construct a plausible scenario in which over a two-or

11   three-month hunting season in Maine, a pregnant woman would

12   get way too much mercury?

13   A      Yes.

14   Q      If a pregnant woman were to eat a black duck meal from

15   Mendall Marsh once a week, given the levels of methylmercury

16   in the black ducks in that marsh, would she get enough mercury

17   to exceed the EPA reference dose?

18   A      Yes.

19   Q      Did Dr. Keenan make an assumption regarding the number

20   of meals that a black duck provides?

21   A      Yes, I believed -- I believe he assumed one meal per

22   duck.

23   Q      Do you -- did you review that assumption?

24   A      I did.

25   Q      What did you find?

1    A      Well, I think it's -- Dr. Keenan didn't say we assume

2    that a duck hunter is male and his wife and the duck hunter

3    split a duck.  It -- if you look at the literature, the

4    average male black duck produces about 350 grams of meat, and

5    so if you split it in half, that'd be 175-gram portion size,

6    and I think Dr. Keenan assumed a significantly smaller portion

7    size, particularly for women.

8    Q      Is that a conservative assumption on his part?

9    A      No.

10   Q      Did Dr. Keenan say in his report that the Maine fish

11   tissue action level applies only to the consumption of fresh

12   water fish?

13   A      Yes, he did.

14   Q      And did you review the Maine guidance to which he was

15   referring?

16   A      Yes.

17   Q      And what did you find?

18   A      Well, I found that the Maine guidance was derived from a

19   recreationally -- recreationally-caught fish survey conducted

20   among consumers of fresh water fish.  So the grams per day

21   estimate used in the derivation of the fish tissue action

22   level did come out of fresh water fish consumption.

23          But I didn't see anything in the guidance, nor when I

24   called the state toxicologists and talked to them about it,

25   did I see anything that -- that said that this guidance only

WHIPPLE - DIRECT EXAMINATION/BERNARD

1   applies to fresh water fish.

2   Q     Okay.  Did Dr. Keenan criticize the Study Panel for what

3   he believes is the inappropriate application of the Maine fish

4   tissue action level to ducks?

5   A     You know, I don't recall if he did.  Probably he did.

6   Q     What -- let me ask it another way.  Do you think it's

7   appropriate to apply the Maine 200 nanograms per gram

8   threshold to the black ducks in Mendall Marsh?

9   A     Yes, I do.

10  Q     And, to your knowledge, is that the standard the state

11  itself, through the Department of Inland and Fisheries,

12  referred to when it issued the warning in -- to hunters in

13  Mendall Marsh based on the Penobscot study data?

14  A     It's certainly consistent with the action the state

15  took.  I don't know if the state officially said that we're

16  going to use 200 nanograms per gram for -- for black ducks,

17  but they certainly agreed that a woman could get way too much

18  methylmercury from black ducks.

19  Q     Do you think the state was applying Dr. Keenan's 1,500

20  nanograms per gram threshold?

21  A     No, no, certainly not.

22  Q     Do you think it's appropriate to apply the Maine fish

23  tissue action level to lobster, understanding that lobster is

24  not a fresh water --

25  A     Yes.

1   Q      -- species?  And is what the Maine Department of Marine

2   Resources did by closing the fishery consistent with your

3   point of view?

4   A      Yes.

5   Q      You've been talking about the EPA reference dose.  What

6   -- what study or studies is that reference dose based on?  Do

7   you know?

8   A      Yes.  It's based on -- well, mainly two, and slightly on

9   a third, large epidemiological studies among populations that

10  eat large amounts of food with methylmercury -- two of them

11  were fish and the third was a Faroe Island population that

12  eats pilot whale, which has high levels of methylmercury.

13  Q      Now -- so the feral island study was one of the

14  principal bases for the derivation of the EPA reference dose;

15  is that right?

16  A      It, in fact, was the study that determined the EPA

17  reference dose.

18  Q      And the fish, as you just mentioned, or -- or the

19  organism that was the subject of that study, is it the pilot

20  whale?

21  A      Yes, that's correct.

22  Q      Is the pilot whale a fish?

23  A      No, it's a mammal.

24  Q      Okay.  Now, from a human health perspective again, is

25  the issue how much mercury one ingests, rather than the source

1   of that methylmercury?

2   A    Yes, that's certainly the -- the way the EPA reference

3   dose is -- is written.

4   Q    So whether it's a pilot whale or a fresh water fish or a

5   marine fish or a black duck, it's still methylmercury coming

6   into the human body.

7   A    That's correct.

8   Q    Okay.  Now, the Mendall Marsh ducks, I showed you the

9   chart yesterday and I think you testified that there was

10  mercury -- methylmercury in the ducks at around 800 nanograms

11  per gram?

12  A    Yes, that's true in Mendall Marsh.

13  Q    Okay.

14  A    They were slightly lower in South Verona Island.

15  Q    So let's take the Mendall Marsh ducks.  Would it take

16  much consumption of the Mendall Marsh ducks to put a human

17  consumer over the reference dose?

18       MR. TALBERT:  Objection, vague.

19  A    No, it's --

20       THE COURT:  Wait.  There's an objection.

21       MR. TALBERT:  Objection, vague, what much is.

22       THE COURT:  No, overruled.

23  A    It's -- it's pretty easy math.  You -- you take the 800

24  parts per billion in the duck, times an assumed portion size,

25  times a consumption frequency, and you express that in units

1   of micrograms per day per kilogram body weight, and if it's

2   above .1 micrograms per day per kilogram body weight, it

3   exceeds the reference dose.

4   BY MR. BERNARD:

5   Q    And would it take much consumption of the black ducks in

6   Mendall Marsh at 800 nanograms per gram to exceed the

7   reference dose?

8   A    Well, I can't do the math exactly in my head, but it's

9   around a couple ounces a week would probably put you at the

10  reference dose.

11  Q    Okay.  And is that considerably less than one meal?

12  A    Yes.

13  Q    What is a NOAEL, N-O-A-E-L?

14  A    It's a -- it's -- no-observed-adverse-effect level.

15  Q    And what is a LOAEL, L-O-A-E-L?

16  A    A LOAEL is a low-observed-adverse-effect level.

17  Q    Okay.  And how, if at all, are these terms used in human

18  health risk assessment?

19  A    Well, at -- at -- for non-cancer -- non-carcinogen

20  toxins, which mercury is or methylmercury is, the NOAEL and

21  LOAEL at one time were used to derive reference doses, that

22  is, to derive safe levels of exposure when we're talking about

23  human health.  They're also used in the -- in the ecotoxicity

24  world.

25       The methylmercury reference dose was not derived using

1    NOAELs and LOAELs.  It was derived using a more modern method

2    called benchmark dose.

3    Q     Do you remember Dr. Keenan in his expert report --

4    withdrawn.

5          Are -- let's folk us on LOAELs for the moment.  Are they

6    pinned to particular endpoints?  In other words, you might

7    have a LOAEL for survival of the organism, or you might have a

8    LOAEL for growth effects on an individual?

9    A     Yes.

10   Q     Okay.  So they're pinned to a particular endpoint.

11   A     Yes, that's correct.

12   Q     And survival is one; is that right?

13   A     Yes.

14   Q     And growth is another?

15   A     Yes.

16   Q     And reproduction is a third?

17   A     I think both of those were -- were specifically cited in

18   an example in Dr. Keenan's report.

19   Q     Okay.  And reproduction is another?

20   A     Yes.

21   Q     Okay.  Now, does -- did Dr. Keenan average the LOAELs

22   for growth and survival along with the LOAEL for reproduction

23   in order to derive a representative -- what he views as a

24   representative LOAEL for a particular species?

25   A     I read his report to say that he did, and I -- I found

1   it puzzling, frankly.

2   Q    Now, what's puzzling about that?  Let's assume he did

3   for the moment, and I'm sure the record will be corrected if

4   he didn't, but what's puzzling about that to you?

5   A    Well, I'll -- I'll use the example I used in my

6   deposition.

7   Q    I was going to get to that, but --

8   A    I --

9   Q    -- you have to let me build to it.

10  A    Oh, well, all right.  Okay.  I can answer quickly, which

11  -- which is that the most sensitive effect is the adverse

12  effect that set the target level.  And if -- if an animal or a

13  human is not really affected in terms of growth by a

14  particular substance, but that it kills 10 percent of them,

15  the insensitivity to the chemical in affecting growth should

16  not matter when the level of protection is determined.

17  Q    Okay.  So let me -- let me try to illustrate this or ask

18  you to illustrate it.

19             MR. BERNARD:  Your Honor, this is Plaintiffs'

20  Exhibit 96, which is just a chart depicting data.  We could do

21  this hypothetically, but I -- I'd rather use the real data.

22  This is from a -- this is a barchart, which is Plaintiffs' 96,

23  and it comes out of a table, Table 3 in Joint Exhibit 76,

24  which I'm sure will be the subject of testimony by other

25  witnesses.

1  BY MR. BERNARD:

2  Q    But let me see if this helps visualize this.  So you see

3  here that you have a LOAEL on the vertical axis, right?

4  A    Yes.

5  Q    And you have a particular endpoint on the horizontal

6  axis, right?

7  A    Right, correct.

8  Q    Okay.  So you see that the endpoint for lethality is at

9  about -- the lowest-observed-adverse-effect level for that

10 endpoint is at about 1,900.  Do you see that?

11 A    Yes.

12 Q    And for growth, it's at 1,970 nanograms per gram.  Do

13 you see that?

14 A    Yes.

15 Q    And the reproductive endpoint is at 50.

16 A    That's correct.

17 Q    So what happens if you throw these together in a

18 blender?

19 A    Well, you -- you certainly do not protect against

20 adverse reproductive health effects.

21 Q    Why is that?

22 A    Because the -- the geometric mean of these three numbers

23 is significantly higher than 50, which is, in fact, the LOAEL

24 for reproductive toxicity.

25 Q    Now, would you like to tell the judge about arsenic in

1    bread?

2    A      Well, I've made up my own reduction out of -- starting

3    with this method, which is in the human health LOAEL for

4    arsenic is a microgram, and the human health LOAEL for bread

5    is a kilogram, you average the two, the geometric mean is, I

6    think, 30 grams, and you better not eat 30 grams of arsenic is

7    the take-away punch line.

8    Q      Okay.  What you said in your deposition is that if you

9    went through that exercise, you would get an answer that would

10   be pretty meaningless and might be highly poisonous.

11   A      Yes, that's correct.

12   Q      Is the State of Maine 200 nanograms per gram tissue

13   action level conservative in every respect?

14   A      I don't think so.

15   Q      Please explain.

16   A      The -- I mentioned yesterday that the 300 nanogram per

17   gram fish tissue criterion that EPA derived first starts by

18   considering consumption of fish from commercial sources --

19   grocery stores and restaurants -- and it allocates some of the

20   exposure to that source, and then the leftover headroom in the

21   safe exposure level is spread over recreationally-caught fish,

22   and based on more or less average consumption rates, the 300

23   nanogram per gram fish tissue criterion was derived.

24          Maine does it a different way.  They -- they assume that

25   a -- a 95th percentile upper end consumer of

1   recreationally-caught fish eats 34 grams a day, and that such

2   a consumer is so busy eating recreationally-caught fish, that

3   they have no need to eat commercial fish.  So they allocate

4   the entire reference dose to the 34 grams of

5   recreational-caught fish per day, and it comes out to be 200

6   nanograms per gram.

7   Q     What is nonconservative about that?

8   A     Well, I think it's unrealistic to assume that a person

9   who eats 34 grams of recreationally-caught fish a day does not

10  also consume commercial fish.

11  Q     What is the virtue in being conservative when you're

12  assessing human health risk?

13  A     There's a lot of variability in every step of this

14  calculation.  There's variability in the consumption rates, in

15  the fish sources, in the concentrations of methylmercury in

16  the seafood items that we eat.  And to try to set a -- a

17  guidance level or standards that protect virtually all

18  consumers is difficult, but the way the agencies usually try

19  to deal with it is to look at -- towards the high-end

20  consumer, towards the high-concentration food product, and to

21  try to make sure that the -- the high-end consumer is

22  reasonably well-protected.

23  Q     Do you think that's appropriate?

24  A     Yes.

25  Q     Okay.  Let's go to -- we'll move off Dr. Keenan.

1      Are you ever asked advice by pregnant women, given your

2 known knowledge about human health risk, are you ever asked

3 advice by pregnant women concerning their -- what they should

4 or shouldn't eat during pregnancy?

5 A      Yes, it happens -- hasn't happened in probably the last

6 year, but I think births to women that work in my office kind

7 of come and go in cycles, and I've had a number of people who

8 say, hey, I hear you know something about mercury.

9 Q      Okay.

10 A      And --

11 Q      Putting aside the reproduction news in your office, the

12 -- the -- the -- when you're asked advice, do you -- do you

13 give out a document that you think is a good, succinct

14 statement?

15 A      Yes, I do.

16 Q      Okay.  Let me show you that document, which is

17 Plaintiffs' Exhibit 75 and let me see if I can -- do you

18 recognize this document?

19 A      Yes, I do.

20 Q      And who -- who is the author -- who is its author?

21 A      The author of this document is Dr. Charles Santerre,

22 he's a professor of food and nutrition at Purdue University.

23 Q      Okay.  Now -- and you think this is a pretty good

24 statement about what a pregnant woman -- pretty good advice to

25 a pregnant woman?

1  A     Yes, and, in fact, the origin of this document was the

2  Indiana Health Department became concerned that many pregnant

3  women, and especially low-income pregnant women, were getting

4  a message that they should not eat any sort of fish at all

5  during pregnancy, and they thought that was bad guidance.

6  Q     So the first thing in the dock -- would you call this --

7  what can we call this?  I'll try not to mess this up

8  completely.

9  A     I'll call it advice.

10 Q     Okay.  So this advice, what is the first piece of advice

11 that Professor Santerre gives?

12 A     The first piece of advice is to eat fish.

13 Q     Right.  And -- and from a human health standpoint, do

14 you want to encourage people generally to eat fish?

15 A     Yes.

16 Q     Because of the health benefits that fish provides?

17 A     Yes, it's a healthy protein source, and there are

18 studies that have shown that -- that consumption of fish oils

19 during pregnancy lead to develop -- developmentally good

20 outcomes.

21 Q     Now, is it fair to say that the more methylmercury there

22 is in a fish that a pregnant woman consumes, the more she is

23 offsetting those health benefits with health risk?

24 A     Yes.

25 Q     Okay.  Now, this came out of your deposition, so it's a

1    matter of record.  I don't mean to pry.  But do you have a
2    daughter?
3    A    I have a daughter who has two children and a
4    daughter-in-law who also has two children.
5    Q    Okay.  So each of them has been pregnant?
6    A    Twice.
7    Q    Okay.  And during their pregnancy -- pregnancies, what,
8    if anything, did you tell them about consuming methylmercury
9    through eating fish or shellfish?
10   A    Pretty much the same advice I give anyone, which is
11   consistent with Charlie Santerre's advice sheet here.
12   Q    And -- and is one way to summarize that to -- that they
13   should get what they need by way of benefits of eating fish
14   while consuming as little methylmercury as possible?
15   A    Yes, that's right.
16   Q    Okay.  I just want to show you one or two other things
17   here.  He's got some fish as to which he says do not eat.  Do
18   you see that?
19   A    Yes.
20   Q    And these are fish with high level of either mercury or
21   PCBs?
22   A    Yes, that's right.
23   Q    Okay.  And do you take that to mean what it appears to
24   say, which is, don't eat even a single meal?
25   A    Yes, I think that the -- the simple advice to a pregnant

1    woman not to eat any of those species is pretty sensible.

2    Q    Okay.  Now, I just want to note for the record because

3    it's here, that lobster is listed in this moderate category.

4    Do you see that?

5    A    Yes.

6    Q    Okay.  Now, this document was -- is a general advice

7    document, right?

8    A    Yes, that's right.

9    Q    It's not tailored to any ecosystem or -- right?

10   A    Yes.

11   Q    Okay.  And it's -- it was prepared in 2009; is that

12   right?

13   A    That says that, yes.

14   Q    Okay.  So -- so this -- you know, this putting a -- a

15   lobster in the moderate category doesn't have any relationship

16   to, say, the lobsters off South Verona Island in the

17   Penobscot, right?

18   A    No, I think he's working from the Food and Drug

19   Administration data of large amounts of lobster collected over

20   long periods of time.

21   Q    Okay.  So it's not specific to any -- any -- to a

22   species that inhabits a particular ecosystem.

23   A    No, that's correct.

24   Q    Okay.  Did you review the report of Dr. Philippe

25   Grandjean, who is plaintiffs' expert witness?

1    A    Yes, I did.

2    Q    And you said during your deposition that to the degree

3    you have differences with him on -- in -- they're more style

4    than substance.  Do you remember that?

5    A    I do.

6    Q    Okay.  And could you just briefly explain.

7    A    Yes, I -- I remember reacting, as I read his report, to

8    a statement he made in which he said there's -- there's really

9    two things that matter about out mercury exposure from

10   seafood, which is, first, it's the average exposure -- or --

11   excuse me -- the average concentration, and, second, it's the

12   peak concentration.

13        And my reaction was, gee, what about meal frequency?

14   What about portion size?  That's what I meant about

15   stylistically, more than simply the concentration matters.

16   Q    Okay.  Did Dr. Grandjean conduct the Faroe Island

17   studies on which EPA bases its reference dose for mercury?

18   A    Yes.

19   Q    You mentioned that there was a table in Dr. Grandjean's

20   report that you found to be, I think useful is the word you

21   used, but we'll ask you again.

22        This is Plaintiffs' Exhibit 146, which is a -- an

23   excerpt from Joint Exhibit 51, which is Dr. Grandjean's

24   report.

25              MR. BERNARD:  Your Honor, I -- just because I think

1    it's going to be easier to refer to it, I move this into

2    evidence.

3              THE COURT:  Any objection?

4              MR. TALBERT:  No objection.

5              MR. BERNARD:  It's admitted.

6    BY MR. BERNARD:

7    Q    Is this that table from Dr. Grandjean's report to which

8    you were referring?

9    A    Yes.

10   Q    Okay.  So -- so let's -- with a focus -- and I know

11   there are three kind of sections here, there's an FDA limit, a

12   U.S. EPA limit, and a revised EPA limit.  Do you see that?

13   A    Yes.

14   Q    And there are two columns for each, one is average, one

15   is high?

16   A    Yes.

17   Q    Okay.  So I want to focus on the middle column, which is

18   the existing EPA limit, right?

19   A    That's correct.

20   Q    All right.  So could you explain your understanding of

21   what Dr. Grandjean is depicting in that middle column?

22   A    Yes.  He is calculating for a 60-kilogram woman -- by

23   the way, that was disputed by some of the other experts as to

24   whether that was conservative or nonconservative, but it's

25   close enough it makes little difference -- he was computing

1   the frequency with which a woman could eat a 6-ounce meal of

2   -- for the two columns, either the average eel or the highest

3   mercury eel in the data set.  And, similarly, the average

4   lobster or the highest concentration lobster in the data set

5   and the same with the black duck.

6   Q    When you say data set, to what are you referring?

7   A    We're referring to the data we collected in the Phase II

8   study.

9   Q    So these are levels -- average and maximum levels for

10  the different species, eel, lobster, and black duck, that were

11  captured and analyzed as part of the Penobscot study?

12  A    Yes, that's correct.

13  Q    Okay.  Please go ahead.

14  A    Okay.  What this shows for eel is that if a woman ate an

15  average south of Veazie Dam eel every 15 days, a 6-inch

16  portion of eel, and no other seafood and no other food with

17  methylmercury, she could eat that eel every 15 days, and she

18  would be right at the EPA reference dose.

19  Q    What would happen if, during that 15-day period, she

20  ingested any other methylmercury from any other source?

21  A    Ah, her blood level would be higher and on average above

22  the reference dose.

23  Q    Okay.  And then there's the same explanation would

24  apply, then, for lobster and black duck?

25  A    Yes, that's correct.

1  Q     So, for example, if you use the high range for -- let's

2  take lobster.  If a woman ate a lobster at the high end of

3  what was found in the Penobscot, then for 33 days, she could

4  not ingest any additional methylmercury without driving her

5  mercury blood level beyond the EPA reference dose?

6  A     Yes, that's correct, and, in fact, if the woman is

7  eating this lobster every 33 days and nothing else, her blood

8  level will average the EPA reference dose, and part of the

9  cycle will be above it, and part of the cycle will be below

10 it.  So it's not that she can eat this every 33 days and stay

11 under the reference dose.  It will be averaged at the

12 reference dose.

13 Q     And there would be days, even during that 33-day period,

14 when her mercury blood level would exceed the EPA reference

15 dose.

16 A     Yes, that's correct.

17 Q     What did you find to be useful about this table?

18 A     It -- for me, it helped assess the -- the plausibility

19 of scenarios in which pregnant women were receiving too much

20 mercury from the Penobscot system.  If this had come back and

21 it said that she had to eat a lobster twice a day, I might

22 think that's just not likely to happen.

23 Q     All right.

24 A     If it said that she has to have a black duck every --

25 twice a week, I might think that's not going to happen.  But

1    to ask whether it's feasible for a woman to have black duck

2    every two and a half weeks through the course of duck hunting

3    season, that strikes me as highly plausible.

4    Q      And problematic from the point of view of her health?

5    A      Yes.  It's more mercury than a pregnant woman should

6    consume.

7    Q      And just turning back to lobster for a second, is it --

8    is it hard for you to come up with a credible scenario in

9    which a pregnant woman eating a Penobscot lobster would get

10   more methylmercury than she should?

11   A      Not hard at all.

12   Q      Now, what is referred to -- what is meant by an

13   exposure?  That's a term that's used in human health risk

14   assessment, right?

15   A      Yes.

16   Q      What does it mean?

17   A      Well, in this context, the exposure is the amount of

18   methylmercury consumed per unit time.

19   Q      Okay.

20   A      I mean, if -- other contexts, you might be talking about

21   inhalation exposures or things that are not at issue here.

22   Q      And for methylmercury, does it make sense to look at

23   exposure over a lifetime?

24   A      Not really.

25   Q      What's the time period that does make sense?

1    A      The -- the -- the time during a pregnancy at which

2    methylmercury is most dangerous I think is not known.  It's --

3    it's only known from things like the Faroe's study, that women

4    who had high blood levels during their pregnancies had

5    children who could show reduced performance on developmental

6    tests.

7          So I -- I don't know what the duration is.  I think the

8    typical advice is that if a woman has got high blood mercury

9    for a few months of her pregnancy, that's really probably a

10   bad idea.

11   Q      Let me ask you just a couple of questions about

12   Dr. Bolger's report.  He's one of defendants' witnesses,

13   right?

14   A      Yes.

15   Q      Now, did Dr. Bolger conclude that there's no human

16   health risk from eating Penobscot fish or shellfish or

17   wildlife?

18   A      He did.

19   Q      And that was for any species; is that right?

20   A      I don't recall whether he qualified it or not.

21   Q      Okay.  Do you remember whether he concluded that there's

22   no reason to avoid consumption of -- of any organism from the

23   Penobscot?

24   A      I think he did.

25   Q      Okay.

1    A     But I couldn't point to the quote right now.

2    Q     And did he support his conclusions to your satisfaction?

3    A     No.

4    Q     Please explain.

5    A     Well, when asked about this table, I think is an easy

6    way to explain it, Dr. Bolger basically said, gee, if you eat

7    one high-mercury meal -- meal, it makes just a little bump,

8    and I think he's referring to the woman's blood mercury

9    levels, and then it calms back down, and unless she meets --

10   eats a high-mercury meal, you know, every other day or more

11   frequently, it just doesn't make any difference.

12         And that -- that statement simply is not true.  What

13   he's talking about falls under the category of toxicokinetics,

14   which is, how does the intake of a mercury-heavy meal affect

15   the blood level, and how does it decay with time.  And the

16   math is not that hard.

17         The -- in humans, methylmercury in the blood level

18   with no new sources of exposure tie -- tends to decay with a

19   half-life of maybe 50 to 60 days.  This is a different

20   half-life than those cores, but it's -- it's the blood

21   concentration level.

22         And I -- the only way I could read Dr. Bolger's opinion

23   is to making any sense was he may be assuming that the woman

24   is starting with zero blood mercury, and she's had no fish in

25   the previous half-year or so, and she eats one meal.  And I

1   agree, one meal, unless it's worse than these here, is

2   unlikely to put her at the reference dose. But two or three

3   will, and -- and if the woman comes in having a normal seafood

4   diet, she's not starting from zero.

5        So, I mean, I simply think that Dr. Bolger was capable

6   of doing the calculation of how consumption of any of these

7   three eels, lobsters, and duck affect a woman's blood level.

8   He didn't do it, but he asserted that blood levels would be --

9   would be safe.

10  Q    And is it fair to say that you don't -- you don't agree

11  with that?

12  A    No.  I, in fact, have made a few of my own calculations,

13  and -- and just a simple reference point, a 70-kilogram woman,

14  who eats one 6-ounce portion of fish a week, of -- of a fish

15  at 300 parts per billion methylmercury, will on average be

16  right at the reference dose. So 6 ounces a week of .3 parts

17  per million fish was not a -- an excessive amount of

18  consumption. It's one can of albacore tuna, and if she eats

19  any other fish, she can be above the reference dose.

20  Q    And this goes back to the point you were making earlier,

21  I take it, about it being nonconservative to look at a

22  consumer as if she has no baseline or no other input of

23  mercury other than the particular Penobscot fish we're talking

24  about.

25  A    Yes, that's correct.

1    Q    Okay.  Dr. Whipple, just to close this off, the Study

2    Panel relied on the State of Maine's official action level of

3    200 nanograms per gram; is that correct?

4    A    Yes, we did.

5    Q    And did you assume that that number separates an

6    acceptably low exposure from an unacceptably high exposure to

7    methylmercury?

8    A    I -- I wouldn't say it's that black and white.  It is --

9    Q    How would you say?

10   A    It represents a level that pregnant women would be

11   well-advised not to exceed, and they also need to be conscious

12   of consumption frequency.  I mean, there's -- you can eat too

13   much low-mercury fish and get an excess of mercury, as well.

14   Q    Let's turn to Chapter 22 and let me ask you to just move

15   a little bit -- either move the mic a little bit away from you

16   or back up a little bit, just because I think for the

17   reporter, that might be helpful.

18   A    All right.

19   Q    Let me show you Joint Exhibit 6-22, which is Chapter 22

20   of the Phase II Report.  Is that the Chapter that you wrote?

21   A    Well, I wrote --

22   Q    Of which you are the primary author?

23   A    Yes.

24   Q    And this is a short chapter, and so I'm just going to

25   take you through it.  We don't have to linger on for it for

1    too long, because I think you've testified about a lot of the

2    subject matter.

3         This is the cover page that just shows that the

4    co-authors are your fellow Study Panel members, plus Drs.

5    Bodaly, Kelly, and Kopec; is that right?

6    A    Yes, that's right.

7    Q    Okay.  So, again, we'll go through this with relative

8    dispatch, but it has some important things in it.

9         It's only a two-page document, so let's -- I'm not going

10   to ask you about everything in it, but I just want to take you

11   through it so that the court understands the logic of what you

12   wrote here.

13        So the -- what -- what's the purpose of this chapter?

14   A    I think I explained yesterday, the panel found the --

15   the guidance that was available to us for determining whether

16   or not to recommend remediation under CERCLA was quite vague

17   and hard to interpret, and this is a qualitative walk-through

18   what for me were kind of important decision factors regarding

19   that recommendation.

20   Q    That's what I want to focus on.  So let's just look at

21   this.  First, I just want to say that -- let's look at --

22   sorry about the primitive nature of my underlining.

23        Based on work done in the Phase I study and also

24   work in Phase II, the panel has determined that the system is

25   significantly contaminated with mercury.  And then you go on

1    to talk about mercury levels in some biota are high enough to

2    harm the animal and pose a risk to predators who consume them.

3    And then you mention what you've been talking about the last

4    two days, which is these species you looked at -- lobster,

5    eel, and black duck -- that present problems in terms of human

6    exposures.  Do you see that?

7    A    Yes.

8    Q    Okay.  And -- and this is the sentence I want to focus

9    on because it comes up again later, too.  This provides an

10   impetus for remediation.  Okay?

11   A    Yes.

12   Q    What's the impetus, just in your own words there?

13   What's the impetus that you're describing here for active

14   remediation?

15   A    The -- the question Judge Carter asked the committee at

16   the outset of the study was whether the mercury concentrations

17   in the system were high enough to cause environmental harm or

18   human health risk.  And I think that statement that you read

19   is the answer to that is yes.

20   Q    So the -- okay.  Withdrawn.

21        Then you go on -- and, again, I don't mean to skip

22   anything critical here, but -- so if I do, please point that

23   out.  But then you talk about the estimates of half-times in

24   various parts of the upper estuary are long and note that

25   these are half-times only.  So this refers to the natural

1    attenuation issue?

2    A    Yes.

3    Q    Okay.  And what do you mean note that these are

4    half-times only, the -- the 22 to 36-year periods?

5    A    In particularly for Mendall Marsh, our estimate was that

6    the mercury concentrations need to come down by perhaps three

7    or four half-times to reach a level at which we would judge

8    that no environmental harm was occurring.

9    Q    And that would be roughly with a -- with a half-time of

10   20 or 22 years, that would be roughly six to eight decades?

11   A    Yes.

12   Q    Now, you point here -- point out in the second paragraph

13   that there were very high concentrations as -- at the time of

14   the peak releases from the HoltraChem facility, and you say --

15   that's that number -- and you say, they've fallen in the upper

16   estuary to around this number, 885 nanograms per gram, right?

17   A    Yes.

18   Q    Okay.  Now, you then cite the background concentration

19   that you derived, regional background, as being on the order

20   of 55 nanograms per gram, correct?

21   A    Yes, that's right.

22   Q    Okay.  And then you say, we've concluded that mercury

23   contamination of the river will remain at levels higher than

24   regional background for many decades until the river cleans

25   itself, absent some remediation, right?

1  A     Yes.

2  Q     And then you say, Mendall Marsh will likely take longer

3  given the degree of reduction needed.

4  A     That's right.

5  Q     Correct?  All right.  Then you say, even if you didn't

6  come down to regional background, but just came down to half

7  of what there is in the main stem and down to a hundred

8  nanograms per gram in Mendall Marsh, that the consequent

9  contamination of resident biota in those regions of the river

10 would be unlikely to pose serious risks.  Do you see that?

11 A     Yes.

12 Q     Okay.  So the 450 in the main stem would be roughly half

13 of what exists now?

14 A     Yes, that's correct.

15 Q     Okay.  And the Mendall Marsh would be lower than that

16 because of the special situation there.

17 A     That's correct.

18 Q     Okay.  Now, you say these factors provide an incentive,

19 there's a repetition of that phrase, these factors provide an

20 incentive for active remediation.

21       Do you have anything to add to what you've said in

22 terms of what factors you're referring to there?

23 A     No, it's an elaboration on the fact that we think that

24 the time for natural attenuation is -- is really quite long.

25 Q     Okay.  Now, let me -- in the next paragraph, you cover a

1    point that you discussed in your testimony yesterday, and it's

2    short, so I'll read.

3            The rate of recovery estimated based on sediment

4    core profiles indicates that not only is the recovery rate

5    highly variable depending on location, but that mercury in the

6    upper most sediment levels is still increasing in the southern

7    part of the estuary.  This suggests that the potential for

8    significant human exposures, via lobster consumption, may

9    actually be increasing as mercury concentrations south of Fort

10   Point Cove increase.  Do you see that?

11   A    Yes.

12   Q    And that's what you testified to yesterday?

13   A    Yes, that's correct.

14   Q    How did this factor into your decision to recommend

15   active remediation?

16   A    It -- it -- I guess as we -- as our understanding of the

17   system evolved with the data we got, at least I went through,

18   starting with the belief that this was a fast-flowing river

19   with 12-foot tides and that all the mercury must be out in the

20   Atlantic Ocean by long ago, to us having data that says,

21   actually, that's not true, to us having data that says,

22   there's a large mobile pool of sediments that circulates,

23   deposited, gets resuspended, and that the actual loss rate

24   from the system and cleanup of the system is really pretty

25   slow.

1       The -- the idea, as we looked at the southern most coast

2   with peak mercury concentrations at the top, that, in fact,

3   it's not getting better everywhere, and it could be getting

4   worse on the fringes of the system, it changed from a question

5   of if natural attenuation is too slow to will areas get worse

6   if we do nothing?

7   Q    In the next paragraph -- I'm sorry -- I'm just going to

8   clear my annotations here -- you talk about the need to be

9   careful in terms of dredging, if dredging were adopted as a

10  remedy, because you don't want to disturb buried sediment that

11  has exceptionally high mercury; is that fair?

12  A    Yes, that's correct.

13  Q    Okay.  And -- now, in the following paragraph, which

14  carries over to the next page, you talk about the lobsters,

15  and we've discussed that at some length, so I don't think we

16  need to go over that more, and you talk about the lobsters

17  just -- being above -- many of them -- the 200 parts per

18  billion.

19       Just for the court's -- just for clarity of the

20  record, 200 parts per billion is the same as 200 nanograms per

21  gram?

22  A    Yes, that's right.

23  Q    Okay.  And then you talk about the eels having

24  concentrations that might harm not only human consumers, but

25  the eels themselves, correct?

1   A    I'll say they're at a borderline level for that, but

2   that's not my main expertise.

3   Q    Okay.  And then you talk about the ducks and the warning

4   that the state issued.  Do you see that?  And you wrote this

5   -- do you see that?

6   A    Yes.

7   Q    Okay.  And you wrote this chapter before the Department

8   of Marine Fisheries closed a portion of the -- of the

9   shellfish fishery down at the southern part of the river; is

10  that correct?

11  A    That's correct.

12  Q    Okay.  Now, I want to just call your attention to one

13  thing in this penultimate paragraph of the chapter.

14       You say that -- you talk about toxicity thresholds,

15  and you say based on these concentrations, mercury toxicity to

16  resident biota probably has already resulted from this

17  contamination and is still expected to be occurring.  Does

18  that accurately reflect your view?

19  A    Yes.

20  Q    Okay.  And then you say or write, the extent to which

21  populations are still in decline in response to this

22  contamination is uncertain, but the extremely high

23  concentrations in song birds in Mendall Marsh exceed acutely

24  toxic levels in other bird species, and the panel concludes

25  that the regional population of Nelson's Sparrows in

1    particular may be imperiled.  Is that your view?

2    A    It is, although that is really pretty derived from some

3    of the other chapters, and -- and I pulled that from the rest

4    of the report.  It's -- it's not an opinion, I'm -- I arrived

5    at by myself.

6    Q    Okay.  And this is the last thing in this paragraph that

7    I want to call your attention to because -- sorry about that

8    -- given that the mercury concentrations in the Penobscot

9    system exceed widely-recognized toxicity thresholds, and given

10   the slow rate at which natural attenuation is cleansing the

11   system, the panel concludes that active remediation steps

12   would be appropriate to reduce the biologically available

13   mercury in some targeted regions within the Penobscot region,

14   most particularly, Mendall Marsh.  Do you see that?

15   A    Yes.

16   Q    Okay.  So I just want to, even though it's a short

17   chapter, I just want to try to distill it.

18        Is one impetus for the active recommendation -- the

19   active remediation recommendation the degree of mercury

20   contamination in the system?

21   A    Yes, and I think we discussed that with Dr. Gilmour's

22   slide yesterday.

23   Q    And is another impetus for the active remediation

24   recommendation the length of time that the Study Panel

25   believes that contamination will remain in the system, absent

1    intervention?

2    A     Yes.

3    Q     Now, just briefly on the bottom paragraph, which was

4    shown to Dr. Rudd, I believe, during his testimony -- and this

5    talks about hotspots.  Do you see that?

6    A     I do.

7    Q     Okay.  Given the size of the Penobscot system -- I'm

8    just going to read rather than mucking up the document with my

9    markings -- given the size of the Penobscot system, it's

10   reasonable to consider whether limited treatment of hotspots

11   makes more sense than the systematic remediation that is

12   recommended in Chapter 21.

13          Now, just going back for a second, the conceptual

14   recommendations of the Study Panel in Chapter 21 are kind of

15   -- especially the first recommendation -- is a systemic

16   recommendation; is that fair?

17   A     Yes, that's correct.

18   Q     You want to try to deal -- find a remedy, if possible,

19   that would deal with the entire system, right?

20   A     Yes.

21   Q     And that's because the contamination has become so

22   widely dispersed?

23   A     Yes.

24   Q     Okay.  Now, you go on to say one type of limited

25   treatment that is often applied to large contaminated systems

1    is specific hotspot removal, and then you go on to say that

2    the reason that's not recommended -- I assume in Chapter 21 --

3    is that you have this mobile pool to deal with, and so it's

4    not a question of there being one hotspot, it's a question of

5    a more systemic problem; is that fair or --

6    A    Yes, but I should clarify and then -- it was a

7    conversation we -- the group had last night, that my

8    definition of a hotspot is different from Dr. Rudd's.

9    Q    What's your definition?

10   A    Because when you asked Dr. Rudd about this the other

11   day, he -- he talked about Southerly Cove and -- and other

12   spots where there might be very high mercury concentration at

13   depth.  I was using the term hotspot in the sense it's often

14   used on -- on land contaminated sites, where you have surface

15   soils in particular areas that you can remove and solve a

16   large portion of the site's problem, and I used it here in the

17   same sense of thinking about surface sediments.

18        But the -- but the problem here and why I wrote what I

19   wrote is that the mobile sediment pool tends to mean a large

20   part of the system has more or less the same methyl -- or same

21   mercury concentration, and it gets stirred and redistributed,

22   but you don't find locations with ten times the mercury per

23   gram of sediment on the surface as other areas that you could

24   go selectively pick off the hottest ones, because the mobile

25   pool stirs everything up and keeps it stirred.

1   Q      If, as part of the remedy process, it were found that in

2   mudflats or coves there was significant ongoing source of

3   mercury to the mobile pool, do you mean to rule out by this

4   paragraph dealing with that -- with that source as part of an

5   overall active remedy?

6   A      No, no, that -- that would be an obviously important

7   thing to do if there were significant ongoing sources.

8   Q      One miscellaneous question.  Do you know a mercury

9   scientist named James Wiener or Jim Wiener?

10  A      Yes.

11  Q      What do you know about his reputation?

12  A      His reputation is excellent.

13  Q      Um --

14  A      In fact, I -- let me mention that.  We've had outside

15  advisors reviewing our work since we started, and Jim Wiener

16  is the one continuous thread through that entire chain of

17  work.  We -- we asked him to be involved in looking over our

18  shoulders from the time we started, and he was one of the

19  reviewers of our final Phase II Report.

20  Q      Do you value his judgment?

21  A      Very much so.

22  Q      Okay.  Dr. Whipple, do you view this work you've done on

23  the Penobscot River Mercury Study as an important assignment?

24  A      Yes.

25  Q      And -- and is that, in part, is you are dealing with a

1    -- we are all dealing with a very important resource to the

2    State of Maine -- natural resource?

3    A      Yes.

4    Q      And that the river is the home to many animals and a lot

5    of wildlife?

6    A      Yes, that's correct.

7    Q      And it is the source of food for many, many people?

8    A      Certainly if you get further south and get the lobsters,

9    that's true.

10   Q      Okay.  And we're also dealing with mercury, which is a

11   pollutant that can cause serious harm to both animals and

12   human beings?

13   A      Yes, that's correct.

14   Q      Okay.  And have you ever been appointed by a court

15   before to do scientific work?

16   A      No, I don't think so.

17   Q      And did you take that responsibility seriously here, the

18   fact that you were working for, you know, a federal court?

19   A      Yes.  I think we all found that a really highly

20   desirable situation in which to work because all we want to do

21   is get the -- get the science right and get the answer right.

22   Q      Okay.  And -- and did you see your job, then, as

23   bringing to bear your experience and expertise to exercise

24   independent judgment to answer the questions the court posed

25   to the Study Panel?

1    A     Yes.

2    Q     So based on the last ten years of work on this project,

3    let me just ask you three questions.  Do you recommend active

4    remediation because you believe mercury contamination in the

5    upper estuary of the Penobscot River is a significant danger

6    to ecological and human health?

7    A     Yes.

8    Q     And do you recommend active remediation because you

9    believe that danger, if left alone, will last too long?

10   A     Yes.

11   Q     And do you recommend active remediation because you

12   believe there is a real chance that something effective can be

13   done to accelerate recovery of the system and diminish the

14   danger?

15   A     I'll give you a qualified yes there, which is, this is

16   not something I'm expert in, but I certainly think the people

17   who are expert in that ought to be given a chance to

18   exhaustively look at -- at ideas that might work.

19   Q     And is that the next step the Study Panel is unanimously

20   asking the court to set in motion?

21   A     Yes.

22           MR. BERNARD:  No further questions.

23           THE COURT:  Thank you.

24      What I'm going to do is I'm going to take a break at this

25   time.  We're going to be going all day, basically, so I'm

1   going to take periodic breaks so that I can go do my jumping

2   jacks.

3           MR. BERNARD:  When do you want us back, Your Honor?

4           THE COURT:  10 minutes, 15 minutes.  Thank you.

5       (Court recessed from 9:39 a.m. to 10:03 a.m.)

6           MR. BERNARD:  Your Honor, I neglected to move the

7   admission into evidence of Plaintiffs' Exhibit 75.

8           THE COURT:  Any objection?

9           MR. TALBERT:  No objection.

10          THE COURT:  75's admitted.

11                      CROSS-EXAMINATION

12  BY MR. TALBERT:

13  Q    Dr. Whipple, your primary area of expertise is in human

14  health risk assessment, correct?

15  A    Yes.

16  Q    Are you familiar with the term screening level risk

17  assessment?

18  A    Yes.

19  Q    And can you explain for the court what a screening level

20  risk assessment is?

21  A    It's very similar to the discussion I had when asked

22  about conservative and nonconservative.  A screening level

23  risk assessment is one done with more or less worst-case

24  assumptions regarding the concentration, duration, or quantity

25  of exposure, and if -- if under such conditions, risks are

1   found to be acceptably low, then you -- you can argue that a

2   more refined assessment is not necessary because it would only

3   confirm that low risks are present.

4   Q     If a risk comes in above a screening level, usually you

5   have to do a more refined assessment after that; is that

6   correct?

7   A     If you're doing a risk assessment, yes.

8   Q     Okay.  Have you done a screening level risk assessment

9   before?

10  A     Yes.

11  Q     And can you just walk us through the steps that you

12  would take in -- in doing a screening level risk assessment?

13  A     All right.  Well, to put it in a -- make up an example

14  in the Penobscot context, I would pick the highest

15  concentration that we found in any species consumed by humans,

16  in this case, it would be the highest-concentration black

17  duck, I think, although there was -- there were a few lobsters

18  over 1 part per million, and ask, what if a pregnant woman ate

19  such a lobster every day or every other day for, you know, a

20  large portion of her pregnancy, would she have an exposure

21  above the reference dose?  And if that -- if the answer was

22  no, I would say that had been screened.

23  Q     And if it -- if it is below the screening level, at that

24  point, you can draw a conclusion that the particular material

25  at issue at the site does not pose a significant human health

1    hazard, correct?

2    A     That's correct.

3    Q     If it does not screen, it's above the level, you cannot

4    make a human health conclusion without doing a more refined

5    analysis.

6    A     That's correct.

7    Q     And what would a more refined analysis entail?

8    A     You would look for, say, more representative

9    concentrations, that is, more average concentrations, at least

10   within the location of interest.  I'm not -- you should not

11   average over hundreds of square miles of water.  You should

12   try to get more representative consumption data, which we

13   don't really have here.  It's -- it's either largely based on

14   literature values or on alternative scenarios that we've

15   considered.  And then you might also try to find out what

16   other evidence supports the notion that such people exist and

17   such exposures are occurring.

18   Q     I think you mentioned last this human exposure.  That's

19   -- that's one element of the next level risk assessment,

20   correct?

21   A     Well, the -- I mean, they're all looking at human

22   exposure, but the -- the question is, how -- how much detail

23   in the -- in the -- in the information applied to that

24   exposure assessment do you -- do you do?

25   Q     And to make a conclusion that there's actual harm, you

1    would need some site-specific information, correct?

2    A     Yes.

3    Q     Is it fair to say that the Study Panel did not do a

4    human health risk assessment for the Penobscot?

5    A     Yes.

6    Q     Instead, I believe, as you testified earlier, you

7    compared concentrations in species that humans eat with state

8    agency's published advisory levels?

9    A     That's one of the things we did, yes.

10   Q     Just to clarify some of your testimony earlier, I

11   believe you -- you had some testimony regarding NOAELs and

12   LOAELs, and I just want to make the record clear, those relate

13   to ecological risk assessment, correct?

14   A     No, LOAELs and NOAELs are also used in human health risk

15   assessments for non-carcinogens.

16   Q     But your discussion regarding Dr. Keenan's use of NOAELs

17   and LOAELs, that was related to ecological risk assessment?

18   A     Yes, it was.

19   Q     Okay.  In this case, you did not conclude that there's a

20   human health risk to people from eating lobsters, ducks, eels,

21   or crabs from the Penobscot?

22   A     I believe we phrased it as we think there may be a human

23   health risk --

24   Q     Okay.

25   A     -- from those situations.

1    Q      So, in other words, you did -- you did not conclude that

2    there was a human health risk to people from eating eels,

3    lobsters, ducks, or crabs from the Penobscot.

4    A      No, we did not.

5    Q      The most you can say is that lobsters or other species

6    that contain mercury levels above what the state has listed in

7    its -- its action level may pose a risk, correct?

8    A      Actually, we can say more than that, but we -- we felt

9    that was sufficient to answer Judge Carter's question.

10   Q      Absent consumption data, we're unable to conclude that

11   people are being exposed in excess of the reference dose,

12   correct?

13   A      Not exactly.  The -- I guess when I got started

14   yesterday, Mr. Bernard asked me if I had done work with

15   something called the NHANES data, NHANES stands for National

16   Health Evaluation and Nutrition Study, I think, I may have

17   gotten the letters out of order.

18           But this is a long-running study by the Center For

19   Disease Control, and in our context, it involves a very

20   substantial data set on blood mercury levels, surveys of

21   seafood consumption, and -- and lots of other data on women of

22   childbearing age.  And the survey's been running in two-year

23   cycles starting in 1999, and so -- in fact, one of

24   Dr. Bolger's comments was, gee, they should have gone out and

25   taken blood samples out of lobstermen.  In fact, NHANES did

WHIPPLE - CROSS-EXAMINATION/TALBERT

1    that.  They took blood samples out of thousands of people, and

2    it's been analyzed and published.

3          And oddly -- I mean, I've downloaded and analyzed

4    the data myself, but oddly if you're not a government

5    employee, you can't get the geographic information that goes

6    with the NHANES data.

7          But a woman at EPA, Kathryn Mahaffey, being at EPA, did

8    such a study and published data, and her data shows that when

9    you first look by region of the country, roughly 9 percent of

10   women of childbearing age in the northeast have blood levels

11   above the EPA reference dose.  This is Pennsylvania north to

12   Maine.  And she also found that people who lived along the

13   coast had higher blood levels and ate more seafood than people

14   inland, which is not very surprising.

15         So it -- while we haven't pinned down to which women and

16   where do they live, we know from the aggregate statistics that

17   the Centers for Disease Control has collected that something

18   of the order of 10 percent or more of women in Maine of

19   childbearing age have blood levels above the reference dose.

20   Q    Do you recall testifying at your deposition when I -- I

21   asked you a series of questions about exposure, that absent

22   consumption data, you were unable to conclude that people are

23   being exposed in excess of the reference dose in the

24   Penobscot?

25   A    I may have answered that, conditioned on absence of

1    consumption data.

2    Q    Right.  Do you -- do you agree with that?

3    A    Yes, but it's -- it's sort of an abstraction because

4    there's a lot of consumption data out there.  NHANES collects

5    it, the Agriculture Department collects it.  So I -- if it's

6    abstract absent consumption data, yes, I would agree, but if

7    I'm allowed to go online and pull down data, then I'm less

8    inclined to agree.

9    Q    Well, let's just put it in context with respect to the

10   Penobscot.  You know, in the Phase II Report, did you go down

11   and download such data and analyze that to make -- to render

12   your opinions in the -- in the Phase II Report?

13   A    No, as I answered, we did not attempt to do a risk

14   assessment in the Phase II Report.

15   Q    Okay.  I think at your deposition, you also testified

16   that -- this is a quote -- I can pull it up if you'd like --

17   but you said, I think that someone who eats any of these foods

18   infrequently is probably safe.

19   A    Yes.

20   Q    Do you recall --

21   A    I probably said that.

22   Q    Do you agree with that?

23   A    Yes, although I may qualify that a little bit with the

24   black duck.  One black duck meal gives a pretty healthy amount

25   of methylmercury in one -- in one sitting.

1    Q      You considered, but did not do or create an angler --

2    angler survey in this study, correct?

3    A      Correct.

4    Q      And is one reason that you did not do that type of

5    survey is you talked to local fish and game people, and they

6    told you that really they weren't aware that there was much

7    fishing going on in the Penobscot?

8    A      Yes, that was one reason.

9    Q      With respect to the EPA reference dose that you

10   discussed earlier, do you have an opinion about the level of

11   protection that's afforded by the EPA reference dose?

12   A      Yes, I'll use EPA's own language.  They define a

13   reference dose as being a virtually safe dose over a lifetime.

14   Q      And you believe that the EPA reference dose is

15   protective, right?

16   A      Yes, I do.

17   Q      Do you also agree with Dr. Keenan's characterization

18   that the EPA reference dose is designed to be a safe level of

19   exposure with a safety factor?

20   A      Ah, I think EPA's own language is -- is that it has an

21   uncertainty factor in it, not a safety factor.

22   Q      You -- you testified earlier about the Faroe Island

23   study for which the EPA reference dose was based.  Do you

24   recall that?

25   A      Yes.

1    Q    Okay.  And I believe at your deposition, you testified

2    regarding some criticisms of that study?

3    A    Yes.

4    Q    What are your criticisms of the Faroe Island study?

5    A    The -- there were two that I mentioned in my deposition,

6    and one was that the study, as I recall reading it -- and it's

7    -- it's not a single study, it's a collection of -- of many

8    papers over five or six years.  I don't recall that they

9    really addressed whether -- and how it controlled for Fetal

10   Alcohol Syndrome, and since the Faroe Islands are in the North

11   Atlantic and in an area where high alcohol consumption,

12   particularly in the winter, occurs, where that was adequately

13   controlled for.

14        The second one was that they used a two-year exposure

15   period, and the pilot whale that gets consumed is not only

16   high in methylmercury, but it's also high in chlorinated

17   organics, such as PCB, and they had controls on PCB exposures

18   for only one of the two years.

19   Q    I think you also mentioned that the Faroe Island study

20   is somewhat in contrast with the study in the Seychelles?

21   A    Yes, the Seychelles studies was the other big human

22   health study looking at children born to women who ate a lot

23   of fish during pregnancy, and the average exposure in the

24   Seychelles was actually slightly higher than in the Faroe's,

25   but the -- the Seychelles study was -- was generally reported

1   that they did not find an effect.

2   Q    And I believe that you testified that the National

3   Academy of Sciences has been unable to really determine why

4   those two studies came to different results, correct?

5   A    Yes, that's correct.

6   Q    But you had -- I believe you offered some -- the two

7   reasons you offered earlier, I believe you said could explain

8   some of those differences, correct?

9   A    It could, but it -- I also -- I was a reviewer of that

10  National Academy report, and the committee was -- was very

11  clear and direct in saying that these -- these are two large,

12  well-run studies, and we don't know why one got a positive

13  answer and one got -- one got a negative.  But the fact that

14  presented with that result, I think EPA had no choice but to

15  use the Faroe's study as the basis for setting a reference

16  dose.

17  Q    Let's switch gears and talk about lobster.  After the --

18  the Study Panel took the samples in 2007 of lobster, do you

19  remember reviewing that data and observing that the Penobscot

20  lobsters appeared to be similar to other sites in Maine?

21  A    Yes.

22  Q    Do you agree with Dr. Keenan that approximately

23  20 percent of the lobsters is edible?

24  A    Yes.

25  Q    I believe this is something else you stated at your

1    deposition, I just want to ask you a couple of questions about

2    it.  I believe you said, I don't think there's anything that's

3    been shown that says there's a narrow window of high

4    vulnerability during pregnancy that a single high-mercury meal

5    could trigger something.

6    A    Well, I'm not sure you're exposing it that way, it's

7    probably how I said it, but I think the similar answer is

8    there's not much known about when during a pregnancy the

9    vulnerability is -- is high or low or whether it's a short

10   high exposure or a long elevated exposure that -- that poses a

11   risk.  That whole situation's poorly understood.

12   Q    Would you agree that individuals who are -- are not

13   pregnant or, I guess, are not of -- of that age, females,

14   there's likely a low risk posed by a lobster because they're

15   not all that elevated above the -- above the guidance

16   thresholds?

17   A    Yes, I have sometimes noted when I order a seafood dish

18   that I'm not pregnant.

19   Q    This is a colloquy that occurred, I believe, in response

20   to a question during the deposition.  You were asked if a -- a

21   pregnant woman colleague of yours came into your office, I

22   think much like Mr. Bernard asked you earlier this morning,

23   and said that she was going to spend the weekend on Verona

24   Island and -- and wanted to know whether she could eat the

25   lobster.  And I believe your response was, I'd say I think you

1   shouldn't eat Verona lobster three days in a row, but a couple

2   in the time you're there and lay off other fish and -- and you

3   should be fine.

4   A    Okay.  I'm not sure I worded it exactly like that, but I

5   do remember the -- the discussion of the scenario.

6   Q    Okay.  Do you agree with that final statement?

7   A    Well, let me -- let me point back to the calculation I

8   mentioned this morning, which is a 6-ounce portion of .3 PPM

9   seafood once a week, sustained once a week, will put a woman

10  at the reference dose.

11       So if this is -- Verona Island lobster is about .5 PPM,

12  I don't think I would advise a pregnant woman to have it two

13  days in a row or two days out of five.  I think that's

14  probably pushing it.

15  Q    Do you agree that we don't know where lobsters caught

16  from the Penobscot System end up in the marketplace?

17  A    Yes, that's -- I don't, anyway.

18  Q    I'd like to ask you a couple questions about one of the

19  lobster data charts we have.  This is on Joint Exhibit 87, and

20  let's go to Page 39.  Okay.  And if we can just have the chart

21  on the top blown up.  Are you familiar with this -- this --

22  A    Yes.

23  Q    What does this show?

24  A    It shows the spatial and temporal data from lobster tail

25  meat.

WHIPPLE - CROSS-EXAMINATION/TALBERT

1   Q     And what do we have on the X axis?

2   A     The -- the horizontal axis is the location north to

3   south, and the vertical axis is the total mercury

4   concentration.

5   Q     Okay.  And if we can just identify -- can you point on

6   your screen and identify for us the -- the Maine state action

7   level?  It's the 200 nanograms per gram.

8   A     Well, actually, the Maine action level is 200 nanograms

9   per gram methylmercury and this is total mercury.  The

10  lobsters were -- I forget -- I'm sure Dianne can tell you, but

11  they were something like 90 percent of the mercury was methyl

12  in the lobsters.  I could be wrong by a bit.  But that would

13  be a typical level.  So 200 nanograms per gram methylmercury

14  probably translates into -- let's call it 220 nanograms per

15  gram total mercury.  So it would be a line around here.

16  Q     So in light of that, and I guess can you just walk us

17  through the -- the boxes -- we have colored boxes.  Are

18  those -- do those correspond to the various years when the

19  samples were taken?

20  A     Yes, the -- and -- and those are organized oldest to

21  newest, left to right.

22  Q     Okay.

23  A     And if you notice, we -- in 2008, we did not have

24  lobsters for -- from Fort Point Cove, South Verona Island, or

25  Odom Ledge.

1    Q     Right.  You only had them from three locations, correct?

2    A     That's correct.

3    Q     And in -- let's --

4            THE COURT:  2008 or 2006?

5            MR. TALBERT:  2006.

6    A     Oh, excuse me.  2006.

7    BY MR. TALBERT:

8    Q     2012 data is designated in the -- in the pink, correct?

9    A     Yes.

10   Q     And those pink levels, with the exception of South

11   Verona Island, are all below the Maine state action level,

12   correct?

13   A     Yes, that is correct.

14   Q     And if we -- we just focus, then, on the South Verona

15   samples, and I'm not asking you whether there's a

16   statistically significant trend, but is it fair to say that

17   this is a -- appears to be a -- a downward movement of levels

18   that we are observing on this chart?

19   A     Yes, what these data show, yes.

20   Q     Let's switch gears and talk about mussels.  Isn't it

21   true that neither mussels, soft shell clams, smelts, nor

22   flounder pose an unacceptable risk to human health?

23   A     In our system, yes, the -- the mussel data we got --

24   I'll back up.

25            One of the features about mussels is that perhaps

1   40 percent of the mercury present in a mussel is

2   methylmercury, and the rest is -- is inorganic mercury.

3   And at the concentrations we found in mussels, they do not

4   pose a threat to consumption.

5        Similarly, the -- the winter flounder that we sampled

6   from the Penobscot are tiny little fish that humans don't eat,

7   as far as I understand it.

8        Smelt I guess people do eat sometimes, but we did not

9   find especially high concentrations in smelt.

10       And I forget, was there another species that --

11   Q    Soft-shelled clams.

12   A    Soft-shelled clams.  I don't recall the data.  But I do

13   recall that we didn't put them on the list of things to worry

14   about from a human health point of view.

15   Q    In light of that, I won't spend more time on -- on -- on

16   those.

17       Let's talk a little bit about black ducks.  Is it your

18   understanding that very few ducks are -- are shot per year?

19   A    It depends what region you count.  And, actually,

20   Dr. Keenan's report had some useful data about ducks.  It

21   appears that somewhere in the ballpark, on an average year,

22   about 40,000 ducks are taken in hunting season every year in

23   Maine, and of those 40,000, in the ballpark of 10 percent are

24   black ducks.  So that might be 4,000, or a little less than

25   4,000, black ducks taken every year in Maine.

1    But when you get down specifically to Mendall Marsh or

2  Verona Island, the -- the numbers get smaller, and -- and

3  there are not 4,000 black ducks resident in those places, let

4  alone shot each year.

5  Q    Do you agree, after reviewing Dr. Keenan's data, that

6  we're not talking about a major population exposure here with

7  respect to Mendall Marsh black ducks?

8  A    Yes, I think that's probably correct.

9  Q    Yesterday you were shown a figure which was -- was Joint

10  Exhibit 6-14, and it was Figure 14-46 regarding levels of

11  mercury in -- in black ducks.  Do you recall that?

12  A    Yes.

13  Q    I want to show you some of the most recent data that I

14  don't believe you discussed yesterday, which is in the last

15  black duck monitoring report we received.

16  A    Yes, this came in after the Phase II Report was

17  completed.

18  Q    Correct.  This is Joint Exhibit 13, and let's go to

19  Page 7.  Do you -- do you recognize this figure?

20  A    Yes.

21  Q    And what does this figure show?

22  A    This shows mercury in black duck from 2011 -- excuse

23  me -- 2010, '11, and '13 at three locations.

24  Q    Hm-hmm.  And, again, if you would, I understand we

25  are -- we are talking on the vertical axis we have total, not

1   methyl.

2   A     Yes.

3   Q     So the caveat you discussed earlier will also apply to

4   this.  But can you please mark for us where the state action

5   level would be.

6   A     Yes, it would -- but I think, again, duck, like lobster,

7   was perhaps 90 percent or even more methylmercury.  This is

8   something Dianne Kopec will be able to answer accurately.  So

9   that's somewhere in there, maybe a little -- my line may be a

10  bit high.

11  Q     And just so the record is clear, I believe yesterday you

12  discussed a federal action level that was at 300 nanograms per

13  gram.

14  A     Yes.

15  Q     Is that correct?  So on this, that would be -- that

16  would be .3 micrograms per gram; is that correct?

17  A     Correct.

18  Q     And I believe you said that one of the rationales for

19  the state having a .2 or 200 nanogram per gram limit was that

20  this was a high fish-eating population because we're on the

21  coast.

22  A     Yes, that's correct.

23  Q     Now, would that same rationale apply to black ducks?

24  A     Well, you -- you would consider the fish consumption as

25  part of the background to -- to consider and then look at the

1    black duck consumption as an increment over that.  So, yes, I

2    think that the -- the fact that the people eating these ducks

3    probably are eating a lot more fish than a duck hunter in Iowa

4    is would be a relevant consideration for a regulator.

5    Q    So you would still apply this, I guess we'll say it's

6    about .25 here on the total chart that you've drawn your line?

7    A    Yeah, I -- as I say, it's probably a little high, but

8    that's ballpark.

9    Q    Okay.

10   A    That's about right.

11   Q    Okay.  And if we just look at this data, you have it

12   organized by various location on the horizontal axis, and then

13   you have listed different seasons, correct?

14   A    Ah --

15   Q    The data for different seasons is --

16   A    No, it's different years, but they're all in duck

17   hunting season.

18   Q    I apologize.

19   A    Or winter season.

20   Q    Let's clarify the record.  All taken in the winter

21   season, but for various years, correct?

22   A    Yes, that's my understanding.

23   Q    Okay.  And this year, this last year, when -- when you

24   got the samples back, the levels were quite a bit lower than

25   prior years, correct?

1   A     Yes, that's right.

2   Q     Okay.  In fact, by your drawing of the line, they're --

3   they're very close to the Maine state action level, correct?

4   A     Yes, that's right.

5   Q     All right.  Is it fair to say it's -- it's -- strike

6   that.

7         Is it fair to say you're not -- you're not sure exactly

8   why that dropped?

9   A     Well, we --

10  Q     There's some uncertainty regarding why that dropped,

11  correct?

12  A     Well, I should say the Study Panel reviewed Dianne's

13  report before we sent it in, and we discussed what looked to

14  us to be a fairly significant change.  And the -- what seems

15  to be the -- the, by far, most likely explanation was that it

16  was an unusually cold winter and that the normal duck feeding

17  grounds, which is on Mendall Marsh sediments, were covered

18  with ice.  And our -- our guess was that the ducks had to

19  adopt a much larger feeding area in order to stay fed than in

20  prior winters when the edges of the marsh were not

21  ice-covered.

22  Q     But at this point, that's just a hypothesis, correct?

23  A     Ah, yes, that's correct.

24  Q     I mean, you -- you -- you really don't know the reasons

25  that they've dropped, correct?

1    A      No, that -- as I say, we -- we -- we noticed that the

2    data were significantly different, and we discussed whether we

3    had a -- an idea of why it happened, and that was the -- the

4    leading candidate.  But as -- I would agree, I don't know how

5    to prove it.

6    Q      Well, there was no sort of, you know, survey taken of

7    accessible areas in the marsh or anything like that that

8    you're aware of, correct?

9    A      Only that the black duck report was late because they

10   had trouble catching black ducks compared to prior years.

11   Q      That's --

12   A      But this is really a question for Dr. Kopec.

13   Q      Okay.  But that -- that ability to catch them, that's --

14   that's more of an availability of the ducks or -- or you

15   seeing them, correct?

16   A      Well, but if the ducks are elsewhere feeding because

17   they can't find snails through the ice, that -- that may go

18   with the weather-related explanation.

19   Q      Isn't the converse also true, then, that if the ducks

20   are feeding somewhere else, then they could be getting mercury

21   that keeps them at or slightly elevated from the Maine action

22   level by feeding in other locations?

23   A      Well, yes, if they're eating at other locations not on

24   the Penobscot, and as a result, lower mercury burdens, that

25   that's a possible explanation.

1    Q    Okay.  Let's switch gears and talk a little bit about

2    eel.  You concluded that there is little human exposure to

3    Penobscot eel, correct?

4    A    That -- that is certainly my belief, yes.

5    Q    Okay.

6    A    Ah --

7    Q    Little --

8    A    Correction, little human exposure in the -- to the

9    residents of the Penobscot Estuary.

10   Q    Okay.  And this was based, I believe, on the fact that

11   you did -- could not find much evidence that local populations

12   were consuming these eels, correct?

13   A    That's correct.

14   Q    Let's talk a little bit about the -- the eels above

15   Veazie.  You also took samples of eels that -- above the

16   Veazie Dam, correct?

17   A    Yes, that's correct.

18   Q    And do you recall what level on average you found for

19   mercury in eels above the Veazie Dam?

20   A    No, I don't recall.

21   Q    Okay.  We can go to the report, but does the range 350

22   to 450 sound reasonable?

23   A    It sounds plausible.  It's been -- I did read Chapter 14

24   in the last couple weeks, but I'm -- there's so much data in

25   Chapter 14 which gives the wildlife results and trends and --

1   and geographic trends, that any particular number doesn't tend

2   to stick.

3   Q    Do you recall at least that the eel above Veazie were

4   elevated above the state action levels?

5   A    Yes.

6   Q    Are you aware that there is a statewide fish consumption

7   advisory that applies to all fish in Maine?

8   A    Yes.

9   Q    The Study Panel set targets of a 50-percent reduction

10  for mercury in eel, correct?

11  A    Um, yes, I think that's right.

12  Q    And I -- I believe we discussed this in your deposition,

13  but your view is that -- that that's a little ambitious.

14  A    Yes, it may be.

15  Q    I think one of the reasons that you testified that may

16  be ambitious is, looking above Veazie, that those -- those

17  eels were elevated above 200, correct?

18  A    Yes, I should explain.  That -- that while we would, in

19  an ideal world, think it desirable to get eels below 200 parts

20  per billion, we -- we thought it was infeasible to recommend

21  target concentrations below the levels observed in reference

22  systems in Maine.  And for eels, the concentrations in

23  reference systems are above 200 parts per billion.

24  Q    So if we -- even if you set that target level to try to

25  get below 200, the pragmatic reality is that that may be

1   unachievable.

2   A      Yes, that's correct.

3   Q      It's fair to say that eels live a long time?

4   A      That's my understanding, yeah.

5   Q      What's your understanding about how long eels live, on

6   average?

7   A      I think I mentioned yesterday, my understanding is

8   that -- is that mature eels can be seven or eight years old

9   or -- or much older, and at that age, they then -- at

10  maturity, they swim out to the Sargasso Sea, mate, and only

11  the -- the tiny elvers make their way back to the river from

12  which the parents came.

13  Q      Do you recall explaining at your -- at your deposition

14  that exporting eels from the Penobscot does not present the

15  same risk that local consumption does?

16  A      Yes.

17  Q      And can you explain that, please?

18  A      The -- the notion of a -- a local kind of hotspot for

19  eels or ducks or lobsters, my concern is to the local resident

20  who has them repeatedly, and if, in fact, we're shipping adult

21  eels to Europe, it seems to me much less likely that the -- to

22  characterize it, the Dutchman who stops for an eel snack on

23  the sidewalk, the likelihood that the snack came from the

24  Penobscot three weeks in a row -- is -- that would be quite --

25  quite an odd supply chain issue.  I also, I think, commented

1    that I know nothing about that supply chain.

2         But -- but, again, the likelihood that someone is

3    consuming seafood from the same location in the Penobscot

4    System who's a local resident seems to me to be a much more

5    plausible scenario, and -- and probably worth a little more

6    concern.

7    Q    In other words, it'd be unlikely that there would be a

8    sustained exposure over time to Penobscot eels, correct?

9    A    I think so, yes.

10   Q    The EPA reference dose, isn't it true that -- that the

11   EPA reference dose is premised on an intake rate over an

12   annual basis?

13   A    It -- it normally is, but mercury -- methylmercury

14   and -- during pregnancy is -- is, I think, an exception

15   because the -- I mean, the duration of pregnancy is less than

16   a year, and -- and as I've mentioned, the vulnerable period

17   during pregnancy is not well-characterized.

18   Q    Part of the nature of the fish advisories is to avoid

19   high-mercury species, but another part is to control frequency

20   of consumption, correct?

21   A    Yes, you can go at it both ways.

22   Q    And we talked earlier just about fish consumption

23   advisories, again, that apply to the entire state of Maine,

24   correct?

25   A    Right.

1    Q     Are there also advisories for pregnant women that apply

2    to consumption of swordfish and tuna and -- and other fish

3    that may have elevated levels of mercury?

4    A     Ah, yes.

5    Q     Did you review Dr. Keenan's report?

6    A     Yes.

7    Q     Did you agree with his opinion that eels really, in this

8    context, may not be relevant for looking at risk assessment

9    due to the fact that they do not appear to be targeted and --

10   and consumed locally?

11   A     I largely agreed with that, yes.  We -- we looked for

12   and did not find much evidence -- or any evidence that there's

13   much local consumption of eel.

14   Q     Okay.  And the river study compared fish tissue

15   concentrations to fish tissue action levels without

16   considering species consumption rates, correct?

17   A     That's correct.

18   Q     All right.  And I believe we talked about this a little

19   bit earlier, but the Study Panel did not identify rainbow

20   smelt as a species that may cause an unacceptable risk to

21   human health, correct?

22   A     That's correct.

23   Q     I believe you stated in your deposition that when you

24   started on this project, you went out with the goal of

25   designing a sampling plan to sample every fish that -- that

WHIPPLE - CROSS-EXAMINATION/TALBERT

1  people eat on the river.  Do you recall that?

2  A    Yes.

3  Q    And you were surprised to find that there weren't many

4  on that list.

5  A    Yes, that's correct.

6  Q    In fact, you couldn't find evidence that a lot of people

7  were eating fish out of the river, right?

8  A    Yes, that, in fact, was one of the factors that I think

9  led us not to go through and -- and to conduct a creel survey.

10  Q    With respect to -- the Maine fish tissue action level,

11  this comes from two studies of -- of fish consumption by

12  freshwater sport fisheries, correct?

13  A    Yes.

14  Q    And do you agree with Dr. Keenan that the freshwater

15  rate may not be representative of what is actually consumed?

16  A    Ah, yes, I agree.

17  Q    You would have to eat a lot of fish at that

18  concentration rate to approach the Maine fish tissue reference

19  dose, correct?

20  A    Ah, no, I don't think it would take an unusual amount of

21  consumption of 200 parts per billion fish to -- to get to the

22  reference dose.  I -- I think it would be an above-average

23  fish consumer, but -- but not an extreme case.

24            MR. TALBERT:  Can we pull up Page 95 from Defense

25  Exhibit 971?

1    BY MR. TALBERT:

2    Q    I believe we had this discussion at your deposition, and

3    I thought that one of the things you told me was that you'd

4    have to eat a lot of fish at that concentration.  Let's take a

5    look at -- at Line 23.  At the bottom I think it starts, 23,

6    so clearly the focus is on just that species.  I mean, can you

7    explain -- I think I understand your general point that -- and

8    then it goes on to the next page -- you've got to look at

9    everything that someone is consuming for the total mercury

10   that they would be intaking, and so it's hard to just isolate

11   one species.  But that's kind of how it works in practice,

12   right?  Your answer was, that's right.  But I think you -- by

13   and large, I'm unaware of any advisory for fish species below

14   200 or so parts per billion.   But the notation that -- and to

15   look at how Maine did the calculation, you would have to eat a

16   lot of fish at that concentration to approach the reference

17   dose.

18           Do you recall that?

19   A    Yes, obviously, I said it.  The math is pretty easy to

20   do.  So I'll -- I guess I'll stand on that statement.  Well, I

21   can -- I can expand a little bit.  The example I gave earlier

22   of a 6-ounce portion once a week at 300 parts per -- per

23   billion, putting a 70-kilogram woman at the reference dose, if

24   you drop that from 300 to 200 parts per billion and you

25   increase the 6 ounces a week to 9 ounces a week, I think

1    you're back at the reference dose.

2         And -- and so the question of whether 9 ounces of a fish

3    a week is -- is a lot or a very lot is -- I think that's

4    debatable.  I think it's above average, but I don't think it's

5    extreme.

6    Q    Okay.  Prior to this case, did you know plaintiffs'

7    expert Dr. Philippe Grandjean?

8    A    I have met him, but I wouldn't say I know him very well.

9    Q    Okay.  Do you recall at your deposition I asked you what

10   Dr. Grandjean's reputation was in the scientific community?

11   And I can pull this quote up, but I believe you say, it's

12   maybe because I hang out with people who don't think the

13   Faroe -- Faroe study was perfect, it's mixed, I mean, you

14   don't get to be a professor at Harvard by not knowing what

15   you're doing.  Clearly he's published as much as anyone on

16   mercury studies, but there are a number of people who are not

17   impressed with his work, and it's not out of professional

18   jealousy.  Do you recall that?

19   A    Yes.

20   Q    What did you mean when you said there are a number of

21   people who are not impressed with his work and it's --

22   A    Well, I'll go back to my history of how I got into

23   mercury that we discussed yesterday morning.

24        I was largely doing work on mercury in connection with

25   whether mercury from coal-fired power plants is a hazard.

1    And, not shockingly, a lot of the people who worked on that

2    issue for the power companies didn't like the results from the

3    Faroe study, and some of them I considered to be quite good

4    scientists.  And it may well be that they were more critical

5    of Grandjean's work than, to pick another person in the field,

6    Tom Clarkson, who was the leader of the Seychelles Study

7    because they liked the answer that Clarkson's groups got

8    better than the answer that Grandjean's group got.

9        But it -- it -- it kind of turned a spotlight up on,

10   what -- what can we pick at in that study that can explain why

11   we shouldn't believe it?  And the -- the two that I've

12   mentioned earlier today -- the fetal alcohol syndrome and the

13   PCB compounding -- for me struck me as scientifically valid

14   criticisms, not just nitpicks.

15   Q    Understood.  Do you agree with Dr. Grandjean's -- well,

16   let me back up.

17        Have you read Dr. Grandjean's expert report?

18   A    Yes.

19   Q    And do you agree with Dr. Grandjean 's opinion that food

20   items with the levels of methylmercury measured in the

21   Penobscot should not be eaten by consumers?

22   A    I think that's a bit too strong, and it's a bit too

23   vague -- food items in the Penobscot.  I mean, as we said, we

24   think the mussels are just fine.

25   Q    Hm-hmm.  I believe you testified, also, that you had

1    seen Grandjean present at meetings, and there was an element

2    of revered truth that came out in his presentations.  I think

3    you said it means that he's certain he knows the answer better

4    than the rest of us because he is the mercury toxicity guy,

5    and I'm sure the things I don't know are not very important is

6    the message that comes across.  What --

7                MR. BERNARD:  Objection to relevance.

8                THE COURT:  Overruled.

9    BY MR. TALBERT:

10   Q    What -- what -- what meetings, if any, were you

11   referring to where you've seen Dr. Grandjean present?

12   A    Well, I think most recent one I attended that he

13   presented at was the -- there's an international mercury

14   meeting every few years, and I believe the last one I attended

15   was four or five years ago in Madison, Wisconsin, and I

16   believe Grandjean presented there.

17        But this -- this may be a restatement of the question

18   that Mr. Bernard asked me about my thin skin with respect to

19   stylish -- stylistic issues.

20   Q    Do you agree with Dr. Grandjean's opinion -- and just

21   for the record, it's -- this is -- I believe it's Joint

22   Exhibit 51 -- that environmental mercury pollution in the

23   Penobscot leads to a substantial excess in human exposures to

24   methylmercury from contaminated food items and that this

25   exposure is a serious health problem?

1   A     That's -- that overstates the evidence that I think we

2   have here.  As I said, we don't have information on

3   consumption rates of Penobscot-specific items, and therefore

4   can't conclude the extent of the public health problem.

5   Q     Do you think that Dr. Grandjean has data to support that

6   statement?

7   A     Ah, ah, I don't know.  I doubt he has consumption data

8   because, if it were easily obtained, we would have it, as

9   well.

10  Q     I think in your deposition you said, no, I don't think

11  he focused on exposure.  Is that --

12  A     I think that's probably -- I probably did say that, and

13  I would agree with that.

14  Q     Is your main critique of Dr. Grandjean that he did not

15  focus on exposure?

16  A     No, I think that -- that if you look at the way we did,

17  you don't need a lot of evidence to decide whether or not

18  people eat lobsters in Maine, but we did not attempt to

19  characterize the extent of any public health risk absent

20  exposure data.  I don't think Dr. Grandjean was required to go

21  get exposure data.  I -- but I think his -- his conclusions

22  absent exposure data were somewhat too strong.

23  Q     And do you recall that one of his conclusions was that

24  a -- a single lobster meal could be risky to the health of

25  someone eating it?

1    A      I don't recall that exactly, but it would not surprise

2    me that he -- he said that.

3    Q      And I believe I asked you at your deposition that

4    what -- what you thought about that opinion, your answer was,

5    a single meal is unlikely to be risky to the health of someone

6    eating it.  Do you recall that?

7    A      No, but I -- I wouldn't argue too much with it.

8    Q      You agree with that -- that statement?

9    A      It depends what else they're eating I guess is the

10   critical factor.

11   Q      One thing I also believe you noted was that,

12   interestingly, Dr. Grandjean is looking at a single meal in

13   this context, and in the Faroe Islands, they -- they looked at

14   averages.  Do you recall that?

15   A      Yes, although -- although the Table 3 from Grandjean

16   that I just discussed earlier this morning is not looking at a

17   single meal so much as it's looking at a meal frequency

18   associated with a given size and concentration of mercury.

19   And I -- I think that is a useful way to look at these mercury

20   concentrations.

21   Q      Do you recall that Dr. Grandjean in his report had a --

22   a list of different adverse effects he thought were possible

23   from mercury exposure?

24   A      Yes.

25   Q      And I believe you said that there were a couple that you

1   did not agree with.

2   A     Well, there were a couple I said that I think the -- the

3   majority of the scientific community views as not proven.

4   Q     Do you --

5   A     Cardiovascular effects, for example.

6   Q     Yeah, I was just going to ask.  Do you recall which --

7   which ones you thought had not been proven?

8   A     Yeah, that's -- that's -- that's one.  And I -- I

9   actually -- it's been a long time, but I have read the

10  literature on that, and there is some evidence to support a

11  claim, but some of it comes from contexts that are far removed

12  from the present one.  Very, very high mercury fish with no

13  omega acids in northern Finland kind of a situation.

14  Q     Was the -- was the other one nervous system diseases

15  that you thought may not have the evidence at this point to

16  conclude?

17  A     I -- I don't recall.  I -- the only one I specifically

18  remember was cardiovascular effects.

19  Q     Cardiovascular disease, it's certainly not a basis

20  for -- that EPA used for the reference dose, correct?

21  A     No, that's right.

22  Q     I think you told me at your deposition that one of your

23  first reactions when you read Dr. Grandjean's report was,

24  doesn't it matter how much people eat?

25  A     Yes, I think I repeated that in response to a question

1    from Mr. Bernard.

2    Q    Yeah.  Can you just explain what -- what -- why that

3    struck you when you -- when you first read it?

4    A    Well, I -- it's -- it's the same question I was asked by

5    Mr. Bernard, that it's -- it's not sufficient to look at the

6    mercury concentration of the food item absent portion size and

7    absent frequency, that you need all three to understand

8    whether exposure is above or below recommended levels.

9    Q    Do you agree with Dr. Grandjean's opinion that it's

10   appropriate to look at exposure based on one lobster meal?

11   A    I -- I suppose it's -- it's not as important -- or not

12   as informative as is looking at a -- an exposure from a

13   lobster meal with some premise about consumption frequency.

14   Q    I believe you told me at your deposition that mercury

15   toxicity, it's really more helpful to look at the average

16   level in the woman's bloodstream over a several-month period

17   to determine whether there's a risk or not.

18   A    Well, I mentioned this morning that the -- the -- the

19   elimination rate of mercury from humans is, with a 50 or so,

20   50- or 60-day half-life, and so it -- it's -- you're -- you're

21   going to be at -- at fairly smooth levels over time in most

22   humans anyway.

23        As I say, if you take a woman whose blood level's

24   exactly at the reference dose, and she eats no seafood, in a

25   week her blood level is down by 9 or 10 percent from where she

1    started, which is not much of a change.  And then if she eats

2    more seafood, it pumps it back up.  And so it's -- it's got

3    some ripples on the surface.  But anybody who eats seafood

4    weekly is going to be within a plus or minus 10 percent window

5    because the elimination rate in humans is pretty slow.

6    Q    Do you know Dr. Bolger?

7    A    Excuse me, doctor --

8    Q    Yeah.  Do you know who Dr. Bolger is professionally?

9    A    I met him once maybe ten years ago, but, yes, I know who

10   he is.

11   Q    Okay.  And what do you know about him professionally?

12   What's his reputation?

13   A    He was FDA's mercury toxicologist and highly engaged in

14   their work on developing policies with respect to mercury in

15   seafood in -- in terms of advice to the public, regulation,

16   and just whatever FDA does with mercury in seafood.  He was a

17   leading player.

18   Q    And what's your impression of his work?

19   A    I think he's always had a pretty good reputation.

20   Q    Do you consider Dr. Bolger an expert in mercury risk

21   assessment?

22   A    Ah, yes.

23   Q    Did you read his expert report?

24   A    Yes.

25   Q    And do you recall his criticisms of Dr. Grandjean?

1   A      Ah, yes.

2   Q      Is it fair to say that you agreed with most of

3   Dr. Bolger's points that he made in his critique of

4   Dr. Grandjean's report?

5   A      That's -- that's perhaps too much of a generalization.

6   I -- no, I'm not sure at this point I recall what specific

7   criticisms he made, except maybe the ones I mentioned before,

8   which is the insufficient evidence on exposure and consumption

9   rates.

10  Q      Would that also relate to the reliance on a single meal

11  as leading to --

12  A      Yes, but I -- I guess I agree with Dr. Bolger less

13  having read his deposition.  He -- he repeated this assertion

14  that a single meal makes just a little bump, and blood levels

15  return almost immediately to trivial levels.  And that result

16  I just gave you of dropping from a hundred percent to 91 or 90

17  percent, I was inspired to do that calculation because of

18  Dr. Bolger's comment about the lack of effect of a single

19  meal.

20         I was also inspired after reading his deposition to go

21  look up a paper that I -- if I had seen it, I had forgotten

22  about it, that was written by two people in the Connecticut

23  Department of Public Health on guidance for avoiding high

24  mercury doses from single meals.  It was a paper published in

25  the Journal of Risk Analysis.  And as I say, I -- I think I

1    had forgotten about it because it was published in 2000.

2         And, again, it showed that -- that, without constructing

3    highly unusual scenarios, a high-mercury single meal could

4    have a significant effect on a person's body burden of

5    mercury.

6    Q    And this is additional work that you did after receiving

7    Dr. Bolger's deposition?

8    A    Yes, that's correct.

9    Q    So this was after both of your depositions.

10   A    That's correct.

11   Q    Do you agree with Dr. Bolger's opinion that

12   methylmercury in the United States is relatively low?

13   A    Yes.  On average, that's a -- that's a fair statement.

14   Q    And why is that?

15   A    I mention again the NHANES data.  For the country taken

16   as a whole, something on the order of 4-1/2 percent of women

17   age 16 to 49 have blood levels above the reference dose.  In

18   contrast, if you go to some other country -- almost any other

19   country, fish consumption is higher than in the U.S., and that

20   number is hugely higher, say, in Japan than the U.S.

21   Q    The reference dose is supposed to have some -- I guess

22   we talked about this a little bit earlier -- but some margin

23   of safety built into it, correct?

24   A    Yes.

25   Q    And I believe you just presented an example about

1   Japanese populations and -- and their rate of exposure.  Do

2   you agree with Dr. Bolger that, assuming that someone can have

3   the highest eel measured in the Penobscot each meal, just

4   through amazing bad luck, is not really an informative thing

5   to calculate?

6   A    Well, I think I characterized Dr. Grandjean's Table 3 as

7   having a -- a different and actually a useful purpose, which

8   is asking the question of, how often could someone eat such a

9   meal and stay out of trouble?

10  Q    Okay.  At least as your -- as far as your last

11  deposition, do you recall making that statement to me?

12  A    I -- I may have, yes.

13  Q    Did you also review -- I believe you testified earlier

14  you reviewed Dr. Keenan's report, as well?

15  A    Yes.

16  Q    Okay.  And is it fair to say there were certain points

17  that you disagreed with Dr. Keenan, but there were also some

18  that you agreed with him?

19  A    Well, in a 300-page report, I'm certain that's true.

20  Q    You agreed with Dr. Keenan that the Penobscot River

21  Study Group does not state consumption rates for eel or black

22  duck or rock crab, that those cause an unacceptable risk to

23  human health?

24  A    I'm sorry.  Could you repeat that?

25  Q    I'll restate that.  That was a -- a messy question.  Do

1   you agree with Dr. Keenan's finding that the Penobscot River

2   Study Group does not conclude that eel or lobster, black duck,

3   and rock crab have a -- pose an unacceptable risk to human

4   health?

5   A    I agree in that I -- I think absent exposure data, we --

6   we were -- we limited ourselves to saying they may create an

7   unacceptable exposure or health risk.

8   Q    Let's switch gears to talk a little bit about ecological

9   risk.  The Study Panel did not do an ecological risk

10  assessment in the Penobscot, correct?

11  A    Correct.

12  Q    And, therefore, without doing such a risk assessment,

13  the most that you can say regarding ecological risks is that

14  you found levels of mercury in blood or tissue in certain

15  biota that are above literature thresholds, correct?

16  A    Well, we can certainly say that.  I'm not sure that's

17  all we can say, but I'm -- I -- you should save that for the

18  ecological experts on -- on the committee and the contractors,

19  rather than me.

20  Q    Is it fair to say that you have not observed actual harm

21  to biota in the Penobscot?

22  A    Yes, that is correct, at least that's my understanding.

23  Q    I believe that yesterday you testified that in your

24  opinion, in order to do toxicological studies to evaluate

25  harm, you would need to have some baseline?

1    A      Ah, I think there were two different issues.  I -- I --

2    the comment I made about a baseline was to do an ecosystem

3    risk assessment.  To do toxicological field studies for

4    specific species, it would -- it would be possible to do those

5    absent a baseline, but also thought that these -- these could

6    be difficult studies from the point of view of identifying all

7    of the various stressors to a given species and trying to

8    figure out what's causing what result.

9    Q      Okay.  I just want to clarify that for the record.  With

10   respect to looking at specific toxicity in an organism, it's

11   not your testimony that you need a baseline in order to do

12   that first.

13   A      That's correct.

14   Q      Okay.  Is it fair to say that in the ecosystem sense,

15   when you're evaluating harm, the focus is on a -- a community

16   basis, not necessarily on an individual animal basis?

17   A      Yes, at least that's my understanding for what a -- an

18   ecosystem risk assessment is -- is intended to describe.

19   Q      I believe you told me at your deposition that the -- the

20   notion of harm in that context is, does it affect the

21   reproductive success of the colony, and is the population

22   stable or is it declining?

23   A      Yes, that's correct.

24   Q      I want to talk a little bit about the -- the predator

25   number for -- the target for predators.

WHIPPLE - CROSS-EXAMINATION/TALBERT

1          Do you agree that the 50 nanogram per gram target that

2     is in the -- the Phase II Report to protect predators may be

3     too low?

4     A     I'm -- I think I said that in an earlier deposition.

5     We've since had some conversations about that, and I think --

6     I forget which of the expert reports it was -- I guess

7     Keenan's, he compares that to the mercury concentration of a

8     list of different fish, but as Dr. Bodaly pointed out to me

9     after the fact, that none of those fish were prey fish, these

10    were all predator fish, and that the comparison was

11    inappropriate as a result.

12         Back to your question of whether 50 nanogram per gram is

13    reasonable for a prey fish, let me refer that to Drs. Bodaly

14    and Wiener, because that's really up their alley and not up

15    mine.

16    Q     When -- when I deposed you, do you recall telling me

17    that you really can't get many -- many prey species that --

18    that low?

19    A     Yes, and, again, I -- I think -- I got some pushback

20    from Dr. Bodaly saying some of the really, you know, small

21    prey fish that we measured in the system or in the reference

22    areas were, in fact, in that range.

23         But I also -- in the part of -- the group did talk about

24    this.  We think that our overall conclusions and

25    recommendations are completely independent of that number.

WHIPPLE - CROSS-EXAMINATION/TALBERT

1    Q      Is it fair to say that -- that you did not find predator

2    species up in the food chain that appeared to be at high

3    mercury levels or risks from what they were eating?

4    A      Mostly, yes.  The -- the eels are the top predator fish

5    in that system, and they're at levels at which, again,

6    according to their literature values, toxic effects in the

7    eels could be occurring.  I'm not sure what other predators

8    I'm leaving out, but I'm sure the group will remind me when

9    I'm done.

10   Q      It sounds like they will.

11   A      Yeah, and this is -- I'm the worst person on the

12   committee to be asking that question, I think.

13   Q      Okay.  Switching to biota trends, absent the ability to

14   document a statistically meaningful trend, a weight of

15   evidence approach -- isn't it fair to say a weight of evidence

16   approach could be applied to look at the data?

17   A      I suppose in theory that's -- that's correct.

18   Q      Okay.  This isn't something that after your deposition,

19   others talked to you and said, we can't -- we can't look at a

20   weight of evidence approach?

21   A      No, but I -- it's been a while since I read

22   Dr. Connolly's report, and that's where I recall weight of

23   evidence and biota trends being discussed.  But I don't recall

24   a methodology was described in a repeatable or traceable way.

25   So to ask if -- if I think weight of evidence in the abstract

1    will work absent an illustration of -- of a clear methodology

2    is -- it's hard for me to answer and say yes or no.

3    Q    Okay.  And leaving aside Dr. Connolly's opinions in

4    his -- his expert report, do you recall at your deposition us

5    having a discussion about the -- looking at the trends in

6    species where you had three or more years of data?

7    A    Yes, vaguely.

8    Q    Okay.  And do you recall agreeing that where you had

9    three or four years of data, that, generally speaking, that

10   the trends were downward?

11   A    Certainly that was true of the ones that were called to

12   my attention.

13   Q    Would you agree that the system is -- is recovering?

14   A    Ah, generally, yes, I think that's what the cores show.

15   Q    The -- the core data shows that the sediment is overall

16   getting cleaner.

17   A    Yes, and to me that's much more informative than the

18   biota.

19   Q    Do you agree that people should be cautious to label

20   natural recovery half-lives as acceptable or unacceptable?

21   A    Yes.  In fact, I've mentioned the panel looked, without

22   great success, for guidance on -- on that and were kind of

23   told to use our own judgment.

24   Q    I want to go back to something that I believe you

25   testified to yesterday with respect to Dr. Connolly's

1  calculation of a 15-year half-time for recovery.  Do you -- do

2  you recall that?

3  A    I recall reading his report.  I -- I've forgotten what I

4  was asked about that yesterday, but --

5  Q    And you can correct me if I'm wrong, but what I -- I

6  heard you say was, well, if there's a 15-year half-time, then

7  the system should be clean by now.  Do you recall that?

8  A    Ah, I think I said -- well, first, I think

9  Dr. Connolly's time was 10 to 15 years, and I said, when you

10 couple that with the opinion he offers at -- about the mercury

11 source being slimicides from the '40s, '50s, and '60s, that

12 the -- that source, coupled with the relatively short recovery

13 time he estimates, seemed to me to be incompatible.  That, in

14 fact, if the -- the peak contamination was in 1950s and the

15 half-times were 10 to 15 years, yes, I would expect the system

16 would be a lot cleaner than it is.

17 Q    Do you understand that both Dr. Santschi and

18 Dr. Connolly are trying to calculate recovery times for the

19 future utilizing the recent past?

20 A    Yes.

21 Q    Okay.  In other words, they -- neither one of them go

22 back to 1967 and calculate a half-time from that?

23 A    No, although Dr. Santschi, his interpretation of his

24 core data was that there was an initial period of -- of rapid

25 recovery followed by a slower period, and -- and my

1    understanding is Dr. Connolly interprets the data to show the

2    reverse, that was to say, a period of slow recovery followed

3    by a more rapid recovery.

4    Q      From a time period standpoint, though, Dr. Santschi just

5    simply applies an arbitrary 21-year time period, and he

6    analyzes the last 21 years for -- for all the cores.

7    A      Yes, although I understand that Dr. Santschi's rationale

8    was not arbitrary so much as when he plotted the data and

9    looked at it, he thought there was a -- kind of a change in

10   the slope at about 21 years, and that the -- the past 21 years

11   represents a relatively smooth exponential record on which he

12   could base an estimate.

13   Q      In other words, though, would you agree that

14   Dr. Santschi is not going back and he's not calculating a

15   half-time for recovery from the '60s?

16   A      Yes, as I understand what he's done, that's the case.

17   But you should ask him.

18   Q      If this is outside your area of expertise, I want to --

19   A      Well, I -- I, among others on the panel, was happily

20   putting the data into spreadsheets and doing curve fitting and

21   calculating recovery times for various asymptotes.  It's kind

22   of fun to do the math, and I was doing it along with Reed

23   Harris and Carol Kelly and Drew.  So we -- yeah, we -- we

24   chewed on this data a bit.

25   Q      Do you consider yourself an expert in the calculation of

1    half-times for recovery?

2    A    No.  But this is -- as I say, this is math within my

3    capabilities.

4    Q    Is it fair to say that there is more mercury coming --

5    currently coming over the Veazie Dam in a dissolved phase than

6    you would expect for the relative sediment levels?

7    A    I'm not sure I have expectations is the way to start.

8    But I do have a somewhat different theory than John

9    presented -- or Dr. Rudd presented earlier this week, which

10   is, as been noted in several questions, that if you have a

11   distribution of particle sizes, since mercury sticks to the

12   surface of particles, you -- you tend to have the highest

13   mercury concentrations on the finest particles and somewhat

14   lower mercury concentrations on larger particles.

15        And the -- the apparent paradox of having 240 parts per

16   billion mercury -- whatever the unit is -- I may have that

17   wrong -- in the water coming over Veazie Dam and only a

18   hundred in the sediments immediately below the dam seems to me

19   to be something you can explain by the fact that the fine

20   particles don't -- don't tend to settle and the -- the larger

21   particles do, and the larger particles are going to have lower

22   mercury on them.

23        So that -- that discrepancy of how do you get 240 over

24   the dam and only 100 in the sediments just below the dam, I

25   can explain with kind of simple hydrodynamics.  I'm not sure

WHIPPLE - CROSS-EXAMINATION/TALBERT

632

1    that was your question.

2    Q    What is the -- I want to understand the level at this --

3    what you understand the level of uncertainty to be right now

4    regarding the explanation for how you could have 240 nanograms

5    per gram on the particles coming above Veazie and get down to

6    a target level that is 100 nanograms per gram?

7    A    Well, I -- I would hate to lead you to believe that I

8    can explain how it works.  I -- I think I -- I gave you my

9    working hypothesis.  But that's -- that's a question for one

10   of the sediment experts, like Dr. Geyer, Santschi, Yeager, to

11   chew on.

12   Q    Hm-hmm.  Is it fair to say that you disagree with

13   plaintiffs' expert Dr. Driscoll that the Study Panel should

14   have set a target based on preindustrial times?

15   A    Well, I'm -- first, I will state I do not think that the

16   Study Panel should have set a target based on preindustrial

17   times, and it's -- it's not clear that Dr. Driscoll says we

18   should have.

19        I -- I think the only thing I agreed with was a little

20   bit of a dispute between Drs. Driscoll and Connolly was on

21   possible role of the atmospheric contribution to determine

22   present-day targets, which -- which is really kind of a

23   second-order effect.

24   Q    You agree with Dr. Connolly that you should consider

25   atmospheric deposition in setting the targets?

1    A      Yes, to the extent that atmospheric deposition today is

2    higher than in preindustrial times is -- is a reason that the

3    preindustrial targets are probably inappropriate.

4    Q      I want to step back for a second and -- and understand

5    the role that Environ, you know, played in the Penobscot study

6    itself.

7           I believe earlier you testified that Environ assisted

8    with contracting directly with these other, you know, primary

9    authors that we see in the -- in the Phase II Report and --

10   and contractors; is that correct?

11   A      That is correct, yes.

12   Q      Okay.  And can you just briefly describe Environ's role

13   in that capacity.

14   A      Judge Carter told us that the court was not able to

15   enter into contracts, and we told Judge Carter that

16   environmental services companies and consultants were not

17   willing to go out in the field and work for a year without a

18   contract, and that the solution to that impasse that we

19   discussed with -- within the panel and then with Monica

20   Bigley, Judge Carter's clerk, was -- resulted in Judge Carter

21   issuing an order that Environ would be the organization that

22   contracted for work done to implement the -- the study he

23   called for.

24   Q      Did Environ charge a fee for that -- that service?

25   A      Yes, we -- we marked up the contractors' costs by

1  10 percent.

2  Q    Okay.  And do you recall what the total amount was that

3  Environ received based upon those -- those markups?

4  A    No, I don't recall.

5  Q    Let's pull up, if we could, Defense Exhibit 885, and I

6  don't think we need to bore the record with this, but this is

7  a -- just a cover e-mail from Susan Calkins.  I'm providing it

8  because she attaches a version of the -- the projection of

9  expected billings for the next quarter from first quarter of

10 2014, which is Defense Exhibit 86.

11         MR. TALBERT:  At this time, I would move for the

12 admission of -- of both of those documents into the record.

13         THE COURT:  And you've got 885 and 886; is that what

14 you said?

15         MR. TALBERT:  Correct.

16         THE COURT:  Any objection?

17         MR. BERNARD:  No, Your Honor.

18         THE COURT:  Each is admitted.

19 BY MR. TALBERT:

20 Q    What I'd like to focus on -- we recognize this is a very

21 blurry document, but if we could, just go in the corner right

22 down here and blow that area up.

23 A    Oh, thank you.  I'm pleased not to be asked to read

24 that.

25 Q    Okay.  And I'd like to refer your attention to this

1  line -- and I guess just to back up, is this a -- this

2  spreadsheet was compiled by Dr. Bodaly, the project leader?

3  A      I think so.

4  Q      Okay.  And in this --

5  A      I don't recognize it as one of mine.

6  Q      Okay.

7  A      So I'm pretty sure it's his.

8  Q      He basically goes through and accounts for various funds

9  and does the budget, keeps track of invoicing?

10  A      Yes, that's right.

11  Q      And one of the line items here he has is, subtotal of

12  costs subject to Environ 10 percent markup.  Do you see that?

13  A      Yes, I do.

14  Q      Okay.  And do you have any reason to question this

15  number as the subtotal of costs that are subject to the

16  markup?

17  A      No, I don't.

18  Q      Okay.  And then right below we have Environ 10 percent

19  administrative fee on above does not include a markup on costs

20  for Tasks 1 and 2.  And does this amount here of

21  $1,134,435.56, do you have any reason to question that number

22  as the markup?

23  A      No, this -- this -- these seem reasonable to me.

24  Q      Okay.  I'd like to also talk about a document that you

25  discussed a little bit with Mr. Bernard yesterday.

1            MR. TALBERT:  If I could have pulled up Joint

2      Exhibit 6-11 and go to Page 11-90.  And if we could just blow

3      this chart up so we could actually read it.

4      BY MR. TALBERT:

5      Q      Do you recall reviewing this --

6      A      Yes.

7      Q      -- yesterday?

8      A      Hm-hmm.

9      Q      And just to orient ourselves again to have this

10     conversation, I believe that the different sites on the -- on

11     the right-hand side that are listed have different-colored

12     dots, right?

13     A      Yes.

14     Q      That are -- that are plotted?  But are -- are you

15     familiar with these sites around the country?  These are some

16     of the bigger mercury projects in the -- in the country,

17     correct?

18     A      That is my understanding from Dr. Gilmour.

19     Q      Okay.  Is the New Jersey salt marsh, is this Berry's

20     Creek?

21     A      Yes, I think so.

22     Q      Okay.  And you've got the -- the South River here?  Is

23     it your understanding that -- and I just want to talk

24     conceptually because, as an employee of Environ, Environ is a

25     consultant that will work for sometimes potentially

WHIPPLE - CROSS-EXAMINATION/TALBERT

1   responsible parties at -- at contaminated sediment sites,

2   correct?

3   A      Correct.

4   Q      And as a part of that work on these sites, is it

5   commonplace for the potentially responsible party to -- to

6   direct what work they want done at the particular site in

7   terms of investigation and sampling and so on?

8   A      Yes, although that is often subject to discussion with a

9   regulator.

10  Q      Understood.  Is it your understanding that, for example,

11  Berry's Creek, are you aware that Anchor QEA is performing

12  work on -- on that particular site?

13  A      I'm really not familiar with who's doing what on that

14  site.

15  Q      Okay.  So you're not aware that, you know, Dr. Gilmour

16  is -- is working on that site, as well, examining --

17  A      Actually, I -- I think I probably did know that, but --

18  Q      Okay.

19  A      -- what she's doing I don't -- I don't know the details

20  of this site.

21  Q      Okay.  How about the South River, are you aware that

22  John Connolly's firm, Anchor QEA, is doing the work on that

23  South River site?

24  A      No, I wasn't, but it doesn't surprise me.

25  Q      Okay.  Let's back up a little bit and talk about current

1    sources.  Is it your understanding that the -- the former

2    HoltraChem site is currently a small source of mercury to the

3    system?

4    A    Yes, that's -- as Ralph Turner has -- has estimated it

5    and I -- I think we all have the very highest regard for

6    Ralph's work, and his work tends to match pretty well with

7    what the state agencies have estimated, which all lead to the

8    conclusion that as an ongoing source, the HoltraChem site is

9    not significant.

10   Q    With respect to looking at historic sources, do you

11   recall that some work was done by Karen Merritt?

12   A    Yes.

13   Q    And what work did she do?

14   A    Karen -- Karen wrote a report for us at the very start

15   of the project, and it was -- it's just been so long since

16   I've read it that I tend to get it commingled with another

17   report done for us very early in the project by a firm named

18   Woodlot Associates.  But -- but both of them were to look at

19   the system perhaps as a naturalist would, to tell us about

20   what biota are present, what processes affecting environmental

21   quality are going on.  That -- that's kind of the -- that

22   vague description is about the best I can remember because it

23   was almost -- almost a decade ago.

24   Q    Do you recall Karen creating a list of potential

25   historic sources of mercury to the Penobscot?

1    A    I -- I don't recall it, but it wouldn't surprise me that

2    she did.

3    Q    Okay.  Do you recall Karen Merritt identifying that

4    mercury in slimicides could be a -- a historic source of

5    mercury to the Penobscot?

6    A    Well, we -- I certainly recall that we had that on our

7    radar from an early time in the study, yes, that -- that that

8    was a source we considered.

9    Q    Okay.  And the Study Panel was aware that there were

10   paper mills north of the Veazie Dam that could have been a

11   source of mercury to the Penobscot.

12   A    Yes, and, in fact, one of the reasons we chose the East

13   Branch of the Penobscot as a reference system is because that

14   branch was, as far as we were able to determine, that was

15   north of all known paper mills, and we thought that would be

16   of -- a reference system that -- where we wouldn't have to

17   worry about mercury from paper mills.

18   Q    And just to make sure the -- the record is clear, the

19   Study Panel selected reference sites to compare to the

20   Penobscot that had no known point sources of mercury; is that

21   correct?

22   A    Yes, that's correct.

23   Q    And can you explain for the court what is meant by a

24   point source?

25   A    A point source is any source of mercury that is at a

WHIPPLE - CROSS-EXAMINATION/TALBERT

1    specific location, and it's in contrast to an area source,

2    such as atmospheric deposition.

3    Q    Is it fair to say that prior to reading the defendants'

4    expert reports, you did not know about the Bangor Dam?

5    A    Yes, that's correct.

6    Q    And when you read defendants' expert reports, you were

7    surprised to find out that the Bangor Dam was downriver of

8    certain sediment cores that were taken; is that fair?

9    A    Yes.

10   Q    To your knowledge, was there any discussion amongst the

11   Study Panel members of the existence of the Bangor Dam prior

12   to the issuance of Mallinckrodt's expert reports?

13   A    Well, in -- in the wisdom of hindsight, I think someone

14   mentioned that the Bangor Dam was mentioned or discussed in

15   Karen Merritt's report, which -- which would say that, if I

16   had a better memory, I might have recalled that the Bangor Dam

17   existed, but, no, I -- I had no memory of that.

18   Q    Okay.  And at this point, do you recall in your

19   deposition I asked you whether you had sufficient research to

20   know whether overtopping of the dam may have been a -- you

21   know, an unusual or an extraordinary event?

22   A    Yes, I do recall that.

23   Q    And I think you said that you thought it would be

24   unusual.

25   A    I think that was my impression.  I -- I think I -- if I

1    didn't say that, I really don't have much information.  I

2    should have, and it has not changed much.

3    Q    Do you also recall that at your deposition I asked you

4    if you were aware of what evidence, if any, would support the

5    proposition that the HoltraChem site is not the primary source

6    of mercury to the Penobscot?

7    A    Gee, I thought I read my depositions recently, but I --

8    I don't remember that question.

9    Q    Well, at your deposition, I believe you testified that

10   the strongest data that would support this is, in fact, the

11   dating points to an older source for mercury spikes, and I can

12   show you the clip from your deposition, but I just wanted

13   to --

14   A    Okay.  I could very well have said that.  Yes, if --

15   that makes sense.

16   Q    Do you -- do you agree with that statement?

17   A    Yes.

18   Q    Is it fair to say that you do not currently have data to

19   show that erosion is occurring -- or -- or to any significant

20   degree?

21   A    I think we -- it's fair to say that we don't have data

22   showing the extent to which erosion is an ongoing source.

23   We -- we worried about it, but we -- we just don't have good

24   data on it, either suggesting that it's a trivial source or a

25   significant source.

1   Q     Okay.  And do you agree with the -- the finding in the

2   Phase II Report that the size of the mobile pool is currently

3   uncertain?

4   A     Yes.

5   Q     I believe we also discussed this at your deposition, but

6   in light of the mobile pool, is it fair to say that any

7   potential mercury sources that could have been downstream of

8   the HoltraChem plant could have been picked up and -- and

9   moved upriver in light of the hydrodynamics of the river?

10  A     Yes, I think that's possible.

11  Q     Until Rocky Geyer raised the idea of the salt wedge and

12  the spring freshet and the mobile pool, is it fair to say that

13  the Study Panel had a very different understanding of the

14  hydrodynamics of the lower part of the Penobscot?

15  A     Very much true to say that.

16  Q     And he first, I believe, when I asked you your

17  recollection was that you learned about this in approximately

18  2010, the Chicago meeting?

19  A     Ah, that sounds right.  I'm -- if -- if you put a piece

20  of paper that said it was 2009 or 2011, I -- I -- it's plus or

21  minus 2010.

22  Q     Back on erosion for a second, I believe you also

23  testified to, but -- I'll ask you live in person.  Is it fair

24  to say you believe it's -- it's unlikely that there could be

25  an extreme storm event strong enough that it would erode

WHIPPLE - CROSS-EXAMINATION/TALBERT

643

1   sediments down to the very high concentrations?

2   A    Well, I guess I -- my somewhat uninformed opinion is

3   that it's pretty unlikely.

4   Q    Okay.  Let's switch gears and talk about remediation.

5   A    Actually, let me amend that.

6   Q    Okay.

7   A    One of the other things that I learned during the course

8   of the study that I did not know beforehand, and I think this

9   also is largely attributable to Rocky Geyer, is the extent to

10  which the dynamics of the river are influenced by the spring

11  freshet, that that's a terribly important event for sediment

12  distribution.  And I tend to -- as I mentioned yesterday, I

13  tend to think of the Penobscot as a river with very strong

14  tides all year-round, and that I incorrectly assumed that

15  the -- that was the main motive force for -- for

16  redistributing sediments.  And Rocky said, no, no, the heavy

17  lifting happens in the spring.

18  Q    And we will -- we will talk to Dr. Geyer I believe later

19  on in this trial.  But is it your understanding that at

20  present, that amount of material that -- that may be coming

21  downstream over Veazie during the spring freshet may not

22  currently be well-quantified?

23  A    Well, I think we've got a lot of data on the

24  concentrations that come over the dam, and I -- I don't recall

25  that the -- looking at data on the extent to which they vary

WHIPPLE - CROSS-EXAMINATION/TALBERT

644

1   seasonally.  So I -- I really should say I don't know to that.

2   Q     Okay.  With respect to remediation, would you agree that

3   we need to balance the risk of accelerated recovery with the

4   possible damage that could be done?

5   A     Yes.

6   Q     And this involves really a -- a balancing of harms,

7   correct?

8   A     That's right.

9   Q     Would you agree that there is a significant chance that

10  remediation options -- if remediation options will make things

11  worse, that living with longer recovery times may be

12  preferable?

13  A     Well, as a general statement, yes, I would agree with

14  that.  I don't think as a general statement it's a very useful

15  question.  The question is, what are the specifics?

16  Q     Well, is it -- is it possible here that active

17  remediation risks could be significant, especially in light of

18  the -- the mobile pool?

19  A     I'm less concerned about the mobile pool than perhaps I

20  am about the deep sediments.

21  Q     And what -- what concerns you about the deep sediments?

22  A     Well, there's a lot of mercury down there, and it's not

23  bothering anybody right now so far as we know, and if it were

24  released back to the system, you'd have a much more

25  contaminated system than we have today.

1    Q    Would you agree that -- and you deal in risk.  So we had

2    some of this discussion at your deposition -- I can refer you

3    to that testimony -- but would you agree that the

4    uncertainties currently surrounding risk at the site are

5    likely greater than a factor of two?

6    A    Boy, I'm -- I'm not sure --

7    Q    I'll pull up the testimony and see if that --

8    A    Okay.

9    Q    -- refreshes your recollection.

10   A    Well, I'll answer generically.  This is a very

11   complicated system, and many of the factors we looked at are

12   uncertain to within a factor of two.

13        But others, such as the -- the concentrations of mercury

14   in biota, are -- are pretty well characterized.  The recovery

15   times are probably uncertain to less than a factor of two, but

16   they're spatially variable.  And certainly our knowledge of

17   ongoing sources are uncertain to greater than a factor of two.

18   Q    Let's take a look at Page 195 of your -- this is your

19   first deposition, and I believe this is Lines 3 -- if we can

20   pull out 3 through 6.  Would you agree that the uncertainties

21   surrounding risk at the site are likely greater than a factor

22   of two?  Yes, I would agree with that.

23        And here I guess it would be related to risk to human

24   health or --

25   A    Well, that's what I'm struggling with is risk at the

1    site is -- is -- is such a vague term, I'm not sure what it

2    refers to, and for that reason, it's hard to say how large the

3    uncertainties associated with it are.

4    Q    Do you -- do you recall me asking you this question in

5    your deposition?

6    A    I actually don't, but I'm sure you did.

7    Q    Just in -- in weighing these various risks, is one way

8    to look at, when we get into remedial decisions, weighing

9    uncertainties of risk in implementation of the remedy against,

10   you know, uncertainties in risk of what we know to -- to biota

11   and --

12   A    Yes, I do agree with that.

13   Q    Okay.  Do you recall after the 2009 remediation workshop

14   in -- in Bangor here, you received advice from some of the

15   attendees?

16   A    Ah, yes.

17   Q    Okay.  And is -- was one of those attendees Todd

18   Bridges?

19   A    Yes.

20   Q    Okay.  And do you have any prior experience or knowledge

21   of -- of Todd Bridges prior to working on this -- this

22   project?

23   A    No, and, in fact, not until shortly before that meeting

24   here in Bangor.

25   Q    Okay.  Do you recall that one of the pieces of advice

1    that Bridges provided -- and I believe I discussed this with

2    Dr. Rudd yesterday -- was the importance of quantifying bird

3    exposures in Mendall Marsh?

4    A    I heard the discussion.  I, in fact, don't remember Todd

5    Bridges bringing that up in the workshop, but he may have, or

6    he may have brought it up with John on the side.  I don't

7    know.

8    Q    Hm-hmm.  Do you recall Dr. Bridges providing advice to

9    the -- the Study Panel that, with respect to remedies at these

10   complex sediment sites, that what they're finding is there is

11   often not a silver-bullet remedy that can address contaminated

12   sediment?

13   A    I don't recall that he said it, but I certainly believe

14   that to be true and that -- that there is not a -- a -- kind

15   of a one-size-fits-all solution that has been applied at

16   contaminated sites.

17   Q    And what was the extent of Dr. Bridges' involvement in

18   the Study Panel process looking at remedial alternatives?

19   A    Well, Todd Bridges was -- was a -- I'll say after the

20   remediation workshop, the consensus of the Study Group is,

21   gee, I'm really glad we invited him.  He had a lot of useful

22   things to say, and he has more experience with remediation of

23   large sediment systems than -- than we do, and being from the

24   corps of engineers, he -- he's informed on the -- on the

25   engineering end of things.

1     But -- but Todd did -- you know, we paid him for one day
2  of his time is my recollection, and -- and he did not have an
3  ongoing working relationship for him.  We didn't retain him,
4  and -- and he was kind enough to answer e-mails and phone
5  calls occasionally going forward, but that was the extent of
6  his involvement.
7  Q     Were you really obtaining ideas from Todd Bridges about
8  potential remediation alternatives?
9  A     Yes, and other things.  I recall that when we were
10  putting the Phase II Report together, Dr. Rudd wanted to try
11  to get some estimates for ballpark remediation costs, whether
12  it's per ton or yard of material removed or -- or whatever
13  metric you use, and he called Todd Bridges and got some
14  information from him.
15  Q     The Study Panel examined certain remedial options,
16  correct?
17  A     I'll say we -- we examined certain remedial concepts.
18  Q     Okay.  And I believe you said at your first deposition
19  that what survived were the ones that weren't obvious bad
20  ideas.
21  A     Yes, I think I did say that.
22  Q     Do you agree with that?
23  A     Ah, yes, I think I still do.
24  Q     I think that you stated that you wished the Study Panel
25  had characterized some of the remediation techniques that they

1    felt were promising as a -- as examples or a for instance that

2    could be considered.

3    A    Yes, I did say that.

4    Q    Okay.  Can you just explain why -- why you feel that

5    way?

6    A    Well, I -- I guess that -- that thought was heightened

7    when I read Dr. Driscoll's report, who -- who said, I hope

8    that the Study Panel doesn't think that their list of proposed

9    approaches is the end of the subject and that other ideas

10   aren't welcome.  And I very much agreed with that thought.

11   Q    Do you also agree that the cost estimates that are

12   provided in the report are -- are highly uncertain?

13   A    Yes.

14   Q    Is it fair to say that you are somewhat skeptical

15   regarding the effectiveness of SediMite?

16   A    Ah, yes and no.  I -- I'm skeptical that we have

17   certainly not done enough experimentation to do anything other

18   than to recommend somewhat larger-scale experimentation, so

19   I'm withholding judgment for that reason.

20   Q    Right now, you don't really know the extent to which

21   there may be adverse effects from the application of -- of

22   SediMite, correct?

23   A    Ah, that's correct.

24   Q    And there were relatively small test plots that were

25   placed in Mendall Marsh, and you believe those weren't really

1    sufficient to answer the questions regarding adverse effects.

2    A    Yes, I think that's -- that's -- that's accurate.

3    Q    Do you agree with Dr. Henry's opinion that there could

4    be adverse effects from activated carbon, could be actually

5    harmful to the marsh?

6    A    It's -- of course there could be.  I mean, I don't know

7    how you could disagree with that.

8    Q    Hm-hmm.  Is it also fair to say that the current data

9    from the test plots showed that the effectiveness of SediMite

10   was relatively short-lived?

11   A    That's how I read those studies, yes.

12   Q    The data indicates that after a couple of years, the --

13   the benefits will disappear, correct?

14   A    Or you need to reapply more.

15   Q    At least the benefits from the first application.

16   A    That's right.

17   Q    Just to make sure it's clear on the record, the -- the

18   application from the -- the first application, the benefits

19   may disappear after a couple years.

20   A    Yes, the -- the benefits from a single application

21   tended to wear off over a few years.

22   Q    And do you have a sense for how much activated carbon

23   you would have to apply to the marsh?

24   A    No, not a good sense of that.  Let me mention, though,

25   and I don't think I mentioned this before, that in rereading

WHIPPLE - CROSS-EXAMINATION/TALBERT

1    all the materials in preparing for this, the -- the -- the

2    simple measure that we need -- it would be desirable to get

3    Mendall Marsh to clean up faster than the main stem of the

4    rhythm -- river, rather, points to the potential benefits from

5    an activated charcoal approach because it would be applied in

6    Mendall Marsh, and if it -- if it could move Mendall Marsh

7    ahead faster than the main stem of the river, we might get to

8    a clean environment more quickly than just relying on doing

9    things in the river.

10   Q     Would -- would -- are you familiar with what SediMite

11   looks like, what -- what that activated carbon looks like?

12   A     Ah, no.

13   Q     You -- you're not aware it's these little black pellets?

14   A     I guess I've seen pictures of it, but I've never touched

15   it, no.  I have not been to Mendall Marsh since it was

16   applied.

17   Q     Okay.  But if that were applied, I mean, you'd have to

18   apply that to the -- to the entire marsh, correct, these --

19   these black pellets?

20   A     Ah, I don't know.  That's -- that's outside my

21   expertise.

22   Q     So you don't know whether or not that could easily turn

23   the entire marsh -- visually would turn it black?

24   A     No, I don't know what it would do.

25   Q     The Study Panel also put in its report recommendations

1    to consider sediment traps, correct?

2    A    Yes.

3    Q    And I don't know if you recall this from your

4    deposition, but when I asked you about Dr. -- or -- I'm

5    sorry -- Mr. Glaza's conclusion regarding the amount of

6    material that would have to be dredged in order to create

7    these sediment traps, I believe you testified you were -- you

8    were somewhat surprised.

9    A    Yes, that's correct.

10   Q    And do you agree with Dr. Connolly, who did some

11   modeling to look at fine -- the fine sediments and whether

12   those would actually settle out, you agree that -- that

13   getting the fine sediments to settle out into the traps could

14   be quite a challenge?

15   A    Yes, fine sediments settle slower than large sediments.

16   Q    Hm-hmm.

17   A    But I don't -- I don't recall the details of

18   Dr. Connolly's calculation, only that he raised the point that

19   the -- that the fines would be harder to capture than -- than

20   the larger particles.

21   Q    Okay.  And at this point, you don't really know from an

22   engineering feasibility standpoint whether the sediment traps

23   would or could be effective?

24   A    At -- at this point, I think the more appropriate

25   question to ask of the engineers is, how could one make

1    sediment traps effective?

2    Q    Let me ask you this because Dr. Rudd talked a little bit

3    about an alternative looking at hydraulic dredging.  I don't

4    believe you've expressed an opinion regarding that.  But do

5    you have a view on hydraulic dredging?

6    A    Well, I think this points to the discussion we just had

7    about not limiting ourselves to technologies described in

8    Chapter 21 but rather to let the appropriate experts use all

9    the tools they think are -- are useful.

10   Q    Well, you understand working for Environ as a -- as a

11   consultant.  Have you ever worked on a project that has

12   involved a feasibility study?

13   A    I'm -- I -- I have, but in some periphery way.  I've not

14   been the lead author on a feasibility study.

15   Q    Okay.  Has anyone on the Study Panel ever performed

16   personally a feasibility study to look at remedial

17   alternatives?

18   A    I don't know.

19   Q    Are you aware that Mr. Glaza from Parsons has performed

20   such evaluations in his role as an engineer?

21   A    So I gathered from his report and from my prior

22   deposition.

23   Q    Okay.  Is it fair to say this is a very energetic river

24   that has strong tides in -- this is a very energetic river

25   system, correct?

1    A    Yes.

2    Q    And it has a strong spring freshet, as you discussed

3    earlier?

4    A    Correct.

5    Q    And so there's a lot of hydraulics that could stir up

6    sediments and move them around?

7    A    Well, I -- I think the -- if you accept that there's a

8    mobile sediment pool, that -- that question's long been

9    answered.

10   Q    I believe you note this in Chapter 22, but you

11   summarized to say that all of these various dynamics of the

12   river and this particular system make remedial alternatives

13   complicated.

14   A    Yes, I think that's a fair statement.

15   Q    Regarding permitting, do you agree that the Study Panel

16   hasn't looked into permitting aspects of any of these

17   particular remedial alternatives?

18   A    That's correct, with a minor footnote that came up in

19   my -- one of my depositions, which -- which was I think you --

20   you showed me an e-mail I had written in which I said, gee, it

21   looks like we're trying to locate a hazardous waste disposal

22   facility at the bottom of Penobscot Bay.  I can't imagine we

23   could permit that in my lifetime.

24        And the follow-up was a -- an e-mail back to me from

25   Carol Kelly saying, well, that's what they did in Boston

1   Harbor.  And that led me to e-mail Todd Bridges and say, Todd,

2   what's -- what's the story here with confined aquatic

3   disposal?  Are you able to permit these things with, you know,

4   a whole lot of difficulty, or has it been reduced to routine

5   practice?  And -- and Todd wrote back with a list of the 12

6   sites where confined aquatic disposal had been performed as

7   the -- as the selected remedy.

8       And I -- I took great relief in the fact that in -- the

9   fact that this had been done a dozen places meant that it was

10  clearly possible.

11  Q    Was part of your reaction the fact that you would be

12  trying to locate and permit this confined aquatic disposal

13  facility out in Penobscot Bay, where there's active lobster

14  fishers?

15  A    Well, and I did see the section in Mr. Glaza's report

16  talking about a controversy over some other proposal to

17  dispose of some dredged spoils somewhere in the estuary and

18  concern that -- that it would affect lobster, and that struck

19  me as a -- as clearly an issue you'd have to pay a lot of

20  attention to.

21  Q    You agree with Mr. Glaza that could be a -- a hurdle to

22  that implementation of a CAD.

23  A    I'd say it's -- it's on the fairly long list of problems

24  you'd have to solve along the way.

25  Q    In Chapter 1, there's a statement that recovery would

1    take an estimated five years after implementation of the

2    sediment traps.  Do you recall that?

3    A    Yes, I guess it's in there, but -- I think that's a

4    guess.

5    Q    That was my next question.  That -- that -- that's

6    nothing more than a rough estimate, correct?

7    A    Yes, I think Mr. Bernard asked me a similar question

8    yesterday, and I declined to say that I could give him a -- an

9    informed answer.

10   Q    Do you recall telling me at your deposition that you

11   agreed that it -- it was possible it could take a decade or

12   more for active remediation to result in a -- in reaching the

13   target goals?

14   A    Ah, I'm -- since you asked the question that way, I'm

15   sure I said it.  I'm not sure I recall saying it.  I have low

16   confidence in my ability to predict the times to implement any

17   such system as we're suggesting.

18          MR. TALBERT:  Your Honor, we are at a good breaking

19   point, if you want.

20          THE COURT:  Okay.  Let me get an idea of where we

21   are.  How much longer do you think you'll be on cross?

22          MR. TALBERT:  I think maybe an another half an hour

23   to an hour.

24          THE COURT:  Okay.  And where does that lead you in

25   terms of where we're going the rest of the afternoon?

1          MR. BERNARD:  So far I think the redirect will be

2    ten minutes long, and then we have Dr. Fisher, the third Study

3    Panel member, who is ready to begin testifying as soon as you

4    dismiss Dr. Whipple.

5          THE COURT:  Okay.  So -- let me think about this.

6    So a total maybe another hour and a half?

7          MR. TALBERT:  Yeah.

8          THE COURT:  And how long -- do you have any idea how

9    long Dr. Fisher's going to be?

10          MR. BERNARD:  I would say my direct of Dr. Fisher

11    will be --

12          THE COURT:  Are we going to finish him today?

13          MR. BERNARD:  We are going to try hard because he's

14    from out of town.  We'd rather not have him spill over into

15    next week.  So I -- Mr. Talbert and I have both talked about

16    trying hard to do that, but I can't say for sure whether I

17    think that'll happen.  I think we can get at least most of the

18    way through Dr. Fisher today.

19          THE COURT:  Okay.  Well, I'll -- what I'm sort of

20    trying to think about is how long we can reasonably break.

21          MR. BERNARD:  Well, of course, that's up to Your

22    Honor, but I would say --

23          THE COURT:  Yes, it is.

24          MR. BERNARD:  I would say -- yeah, sorry, I -- at

25    risk of saying the obvious.  I would -- I would just vote for

1    as short a break as possible so that we can do -- take as much

2    testimony as we can.

3             MR. TALBERT:  I would agree.  I'd be fine with that.

4             THE COURT:  Okay.  Well, I don't want to -- let's do

5    it this way.  I want to give the court reporter a break, so

6    what we're going to do is break for a half an hour and then

7    we'll come back.

8         (Court recessed from 12:00 p.m. to 12:37 p.m.)

9             THE COURT:  Mr. Talbert?

10                  CONTINUED CROSS-EXAMINATION

11   BY MR. TALBERT:

12   Q    Dr. Whipple, earlier we were discussing Todd -- some of

13   Todd Bridges' recommendations to the Study Panel after the

14   remediation workshop in Bangor in 2009.  Do you recall that?

15   A    Ah, yes.

16   Q    I have an exhibit that I believe has already been

17   admitted into evidence as Defense Exhibit 20, and this is an

18   attachment to an e-mail that references a number of

19   Mr. Bridges' observations.  I'd like to show you Defense

20   Exhibit 20.

21        We already talked about No. 3, the need to quantify bird

22   exposures.  But do you recall Dr. Bridges also raising this

23   item 10, the status of the bird populations in Mendall Marsh?

24   He states, there is evidence that points to significant

25   toxicity comparing blood levels to TRVs.  Is this evidence

1   supported by field data relevant to status of these

2   populations?  Do you recall that?

3   A    I -- actually, I didn't until you showed it to me.

4   Q    Okay.  He also raises 14, are the sediments directly

5   toxic to sediment invertebrates?  Do you see that?

6   A    Yes.

7   Q    Is that something that the Study Panel investigated?

8   A    Ah, I -- my short answer is I don't know.  I'm unaware

9   what we did, but Dr. Bodaly can tell you whether we did

10  anything that addressed that.

11  Q    Okay.  At least as far as this point in time, Todd

12  Bridges states existing evidence is not compelling.  Do you

13  see that?

14  A    Yes.

15  Q    And do you recall discussing that at the remediation

16  workshop?

17  A    No, I actually don't.

18  Q    Is it fair to say that a lot of work has been done in

19  the last nine years, but there are still significant

20  uncertainties regarding the -- the system?

21  A    Ah, yes.

22  Q    With respect to dredging, wholesale dredging of the

23  system is something that the Study Panel did not recommend in

24  the Phase II Report; is that correct?

25  A    Yes, that's correct.

1    Q    Do you agree with that recommendation?

2    A    Yes.

3    Q    Everyone on the Study Panel agreed that wholesale

4    dredging was not something that should be pursued further,

5    correct?

6    A    Yes, as far as I'm aware of.  I've never heard anyone

7    suggest it was a good idea.

8    Q    What about capping of the system, do you also agree that

9    there are concerns that should be considered regarding

10   capping?

11   A    Yes, and I -- I'm not sure we spent a lot of time on

12   capping.  I think John gave -- Dr. Rudd gave a -- an argument

13   yesterday noting recent literature showing you can get

14   methylation under a cap.  I -- I think my own reason for not

15   thinking it was attractive was that, first, it wouldn't deal

16   with the mobile sediment pool which is, of course, mobile;

17   and, second, capping has been applied, I know, in -- in lakes,

18   but whether it -- it could be installed and endure in an

19   energetic system like the Penobscot was something we thought

20   unlikely.

21   Q    Do you recall telling me at your first deposition that

22   human health risk -- there are human health risks from the

23   implementation of -- of active remediation?

24   A    I think I told you that there can be and that they need

25   to be considered.

1    Q     Right.  What -- what did you have in mind with respect

2    to potential human health risks?

3    A     I'm not sure what I meant in the time because that was a

4    while ago, but certainly when you have a construction project

5    working on an energetic river, it can be dangerous to the

6    people doing the work.

7    Q     I believe you pointed out risks of -- of drowning and

8    other potential risks due to underwater construction?

9    A     Yes.

10   Q     I believe earlier you testified that you found some of

11   the CERCLA criteria to be vague and not that helpful?

12   A     Ah, yes, that's right.

13   Q     Okay.  And when you say CERCLA criteria, were you

14   talking about the nine criteria for remedy evaluation and

15   selection?

16   A     Yes.

17   Q     I'd like to pull up now Defense Exhibit 38.  This was

18   attached to an e-mail that you circulated to the Study Panel,

19   but does this appear to be a list of the CERCLA nine criteria

20   for remedy evaluation and selection?

21   A     Yes.

22   Q     What's your level of understanding of these nine

23   criteria?  Have you -- have you applied them before in other

24   sites?

25   A     I -- I've not applied them at other sites.  I have seen

1    them a number of times, but to -- to -- I don't really know

2    their -- much in the way of the case histories of how they've

3    been interpreted in -- in specific decisions.

4    Q    Are you aware that these nine criteria have been used to

5    evaluate remedies at a number of contaminated sediment sites

6    across the country?

7    A    Yes.

8    Q    And I understand that these CERCLA nine criteria were

9    not legally required for the Study Panel to consider, but do

10   you understand that consideration of these criteria have been

11   found to be useful in evaluating different remedial

12   alternatives at other contaminated sediment sites?

13   A    Yes.

14   Q    And at the end of the day, though, the Study Panel did

15   not utilize these nine criteria for evaluation of remedial

16   options, correct?

17   A    Certainly not explicitly.  I mean, we -- we clearly

18   considered overall protection of human health and the

19   environment as a primary driver.  We did not consider the

20   second one on compliance.  We did consider long-term

21   effectiveness.  I don't know that short-term effectiveness was

22   much of an issue, and so on.

23        But, yes, we -- we had some of these same goals in

24   mind -- reduction in toxicity, mobility and volume of

25   contamination and so on.  And, clearly, as Dr. Rudd testified,

1   we did try to consider cost-effectiveness.

2   Q    I'd like to show you now Defense Exhibit 298.  This --

3   this document is -- is undated, but it was produced by the

4   Study Panel to us.  It appears to be a draft of -- draft of

5   the risk overview chapter that you drafted.

6        Did you -- when did you start drafting the risk overview

7   chapter, Chapter 22?

8   A    I don't really remember.  Probably sometime within a

9   year of the report coming out.

10  Q    Okay.  Let's take a look at Page 2 of this particular

11  document, and in the last paragraph -- let's see if we can

12  blow that up -- I'd like you to just take a look at that.  The

13  first sentence is, the point of trying to understand the

14  nature of the adverse consequences is to gain a perspective on

15  the value of remediation that would accelerate cleanup of the

16  system.  Do you -- do you recall writing -- writing this?

17  A    No.

18  Q    Do you agree with the statement?

19  A    Yes.

20  Q    You state, we have not attempted to assign a cost to the

21  environmental harm in the system from mercury.  Given that no

22  endangered species are apparently threatened, that human

23  exposures are likely little different than those that are

24  experienced elsewhere in Maine, and that affected species have

25  been through the worst, it is difficult to justify extremely

1    large expenditures.  Do you recall writing that section?

2    A    Yeah, this is vaguely familiar, but it -- it was a while

3    ago.  I -- maybe earlier than I said.

4    Q    Okay.  Do you agree with that statement?

5    A    Ah, yes.

6    Q    Those statements?

7    A    Well, to a certain extent.  I -- I think we -- we may

8    not have had the black duck data in hand when I wrote this.

9    Those -- those exposures are really pretty high, and I'm not

10   sure I would characterize them as little different than those

11   that are experienced elsewhere in Maine.

12   Q    You say exposures are high.  You mean levels?

13   A    Concentrations.

14   Q    Concentrations.  And is it also true you did not have

15   the most recent data, this 2013-'14 winter black duck

16   monitoring data that I showed you earlier, in hand?

17   A    Ah, certainly that's true.

18   Q    Okay.  And those are quite a bit lower, correct?

19   A    Yes, although I'll note that during the break, some of

20   the group noticed what I hadn't, which was that the -- the

21   data you showed me was actually blood data, not muscle data.

22   Q    Okay.

23   A    So the -- to draw a bright line at 200 PPB is

24   inappropriate.

25   Q    Okay.  So at least with respect to the drop that we're

1    talking about, I mean, your recommendation, if you were

2    comparing the various data in that manner would change whether

3    you're looking at the 2013 and '14 data or the -- the older

4    data, correct?

5    A    Well, I mean, certainly whether you're looking at blood

6    or muscle, the most recent-year data did show lower numbers

7    than the previous years.

8    Q    Okay.

9             MR. TALBERT:  No further questions.

10            THE COURT:  Thank you.  You may have another

11    question?

12            MR. TALBERT:  Your Honor, I neglected to try to move

13    in 297 and 298 into evidence.

14            THE COURT:  297?  I don't -- I don't think you

15    referenced 297.  You referenced 298.

16            MR. TALBERT:  298.  I -- I apologize.

17            THE COURT:  And then you referenced 38.  Did you

18    want that in?

19            MR. TALBERT:  Yes.

20            THE COURT:  Is there any objection to 38?

21            MR. BERNARD:  No, Your Honor.

22            THE COURT:  38's admitted without objection.

23        Also, is there any objection to 298?

24            MR. BERNARD:  No.

25            THE COURT:  298's admitted without objection.

1       Redirect?

2                   MR. BERNARD:  Thank you, Your Honor.

3                       REDIRECT EXAMINATION

4   BY MR. BERNARD:

5   Q    Dr. Whipple, let's just pick up with Defendants' Exhibit

6   298 that you were just shown and commented on.  That was a

7   draft of what ultimately became Chapter 22?

8   A    Ah, I think so.

9   Q    Okay.  And the final form of that is what we went over

10  this morning during your -- when I was asking you questions?

11  A    Ah, yes.

12  Q    And your best recollection is that that draft was

13  written by you a year or more before the final version?

14  A    I -- the timing is a guess.

15  Q    Putting to one side the precise timing, did that

16  document go through editing by your colleagues?

17  A    Ah, they commented on it and provided those comments to

18  me, and then I did the final edit.

19  Q    Okay.  And is the substance of -- was the substance of

20  the draft subject not only to those additional comments but

21  further thinking on your part?

22  A    Yes.

23  Q    And also perhaps further data that -- that came in after

24  the draft?

25  A    Yes.

1    Q     If one wanted to know your final -- not final, but your

2    current thoughts on the subject matter that is addressed in

3    Chapter 22, would we look to the final version that was

4    published in the Phase II Report?

5    A     Yes.

6    Q     You said early on in Mallinckrodt's examination that

7    there's not much fishing in the Penobscot River.  Do you

8    recall that?

9    A     Yes, as far as we were able to determine, that -- that

10   is accurate.

11   Q     Are you referring in there to recreational fishing?

12   A     Yes.

13   Q     Okay.  There is commercial fishing in the Penobscot; is

14   that right?

15   A     I know there were eel pots when we were there.  I don't

16   know about other commercial fishing in the Penobscot.

17   Q     You don't know whether there's a lobster fishery on the

18   lower Penobscot Bay?

19   A     Oh, on the lower Penobscot, yes.

20   Q     Okay.

21   A     I -- I made one trip down the river by boat, and due to

22   engine trouble, we didn't make it to the north end of Verona

23   Island, and we saw one boat with fishing poles in it.

24   Q     Okay.

25   A     And that -- that's the -- the data point that I took

1    when I talked to the person at Inland Fisheries and Wildlife.

2    Q    You're aware that there's a stretch of the lower river

3    from Verona Island down to Fort Point Cove, right?

4    A    Yes, yes.

5    Q    And that -- that is where the -- do you know that there

6    is lobster and crab fishing that goes on in that part of the

7    river?

8    A    Yes, the -- the map where you showed the closures

9    yesterday, I --

10   Q    Okay.

11   A    -- I do know where that is.

12   Q    And is it fair to say that prior to the state closure of

13   that area, that even if you don't know who they are or where

14   they are, there are -- were people consuming shellfish from

15   the Penobscot River?

16   A    Yes.

17   Q    Okay.  Now, Mr. Talbert showed you a chart of lobster

18   data, and it was a barchart, and he asked you whether you saw

19   a downward trend in time looking at those bars.  Do you recall

20   that?

21   A    Yes.

22   Q    Is that how you determine whether there is a trend in

23   mercury concentrations in biota -- do you know -- just by

24   eyeballing a barchart?

25   A    Ah, no, that -- in fact, one does statistics to

1  determine.

2  Q    And do you know whether a statistical analysis was

3  performed on the lobsters at South -- at South Verona station

4  that was pointed out to you to see whether there was a

5  statistically significant decline during that period of time?

6  A    Ah --

7  Q    That is, ending with 2012.

8  A    I'm sure there was because Dr. Kopec did statistical

9  analysis on locations, and in species, wherever we had time

10  series data.

11  Q    Do you know what the result of that -- Dr. Kopec's

12  statistical analysis was?

13  A    I suspect it did not show a statistically significant

14  trend.  And -- and I must say, most of us were firmly of the

15  view that -- that, you know, three years' worth of data in a

16  system contaminated 40-something years ago is simply a measure

17  of noise in the system and seasonal variability.  All sorts of

18  confounders, such as weather, and none of us took it as -- as

19  a trend you could hang your hat on to predict future data.

20  Q    That duration of sampling is not, in your view, a --

21  long enough to draw a scientifically valid conclusion

22  concerning trends?

23  A    That's correct, and -- and it's also that -- as -- as we

24  tried to note, there are confounders here, such as the -- the

25  ice that kept the ducks from feeding at Mendall Marsh in the

1   most recent year, that -- that are going to show up from year

2   to year and that -- that there's a lot of factors that can

3   affect mercury in biota, and time is only one of them.

4   Q    One last question on the black duck data from last

5   winter.  Do you know whether there was a statistically

6   significant decline in mercury in the breast muscle of black

7   ducks as distinct from the blood of black ducks in Mendall

8   Marsh?

9   A    I don't recall what that analysis showed.

10  Q    Should we ask Dr. Kopec about that?

11  A    Yes.

12  Q    Okay.  You mentioned that -- I think perhaps you said

13  you were unsure, but -- but you mentioned a figure about the

14  percentage of total mercury that is methylmercury in lobster

15  in the system.  Do you remember that?

16  A    Yes.

17  Q    Okay.  And do you remember what percentage that is?

18  It's reported in the Phase II Report.

19  A    I know it's in there.  My recollection it's somewhere

20  around 90 percent, perhaps in the low 90s.

21  Q    Okay.

22  A    But if you pulled up the page and showed me I was wrong,

23  I wouldn't be shocked.  It's a 3,000-page report with a lot of

24  numbers in it.

25  Q    I -- I fully understand, and I'm not say -- I'm doing

1    this only to clarify the record because you testified to it.

2         Let me just show you from Joint Exhibit 6-14 -- this is

3    a page in Chapter 14 of the Phase II Report -- I'll just point

4    you to it and see if this refreshes your recollection.  You

5    see they're talking about lobster tail samples exceeding the

6    action level, and then the proportion of total mercury that

7    was methylmercury was 99 percent in tail muscle in the

8    combined data set?

9    A    Yes, I see that.

10   Q    Okay.

11   A    So I -- I underestimated.

12   Q    And, also, for black duck, could that percentage have

13   been 99, too, so far as you recall?

14   A    Yes, it could be.

15   Q    Okay.  We'll -- we'll pin that down with Dr. Kopec.

16   A    Okay.

17   Q    You testified about Dr. Grandjean and the Faroe style --

18   the Faroe Island study.  The Faroe Island study is an

19   imperfect study; is that fair to say?

20   A    Is what?

21   Q    Is an imperfect study, it has imperfections.

22   A    Oh, the complexity of that study makes the Penobscot

23   System look easy.

24   Q    Okay.  And the Seychelles Study, which you also referred

25   to, that, too, has imperfections; is that fair?

1  A     Yes, these are very complicated studies.

2  Q     Right.  All epidemiological studies have imperfections;

3  is that fair?

4  A     Well, that's not only fair, normally you're looking at

5  the effect of something on a population.  Here you're looking

6  at the effect on something on the offspring of a population,

7  and, boy, talk about confounders, it's a very difficult

8  problem.

9  Q     Putting to one side his persona or the perception of

10  some of your colleagues of his persona, is Dr. Grandjean one

11  of the foremost experts in the world on the effects of mercury

12  on human health?

13  A     Yes.

14  Q     Mr. Talbert asked you about Environ's markup of the

15  contracts in the study.  Do you recall that?

16  A     Yes.

17  Q     Did Environ undertake that work at the request of this

18  court?

19  A     Yes.

20  Q     And did Environ actually have to do work to administer

21  these contracts?

22  A     Yes.

23  Q     Okay.  And did the court ask Environ to do that without

24  compensation?

25  A     No.

WHIPPLE - REDIRECT EXAMINATION/BERNARD

1   Q      Okay.  And is it standard -- do you know -- in the

2   environmental consulting world for a -- kind of a prime

3   contractor, if that's the right term, to take a fee for

4   administering contracts that -- for other people who work on a

5   project?

6   A      Yes.

7   Q      It is standard.

8   A      Yes, it is.

9   Q      Okay.  And were these costs, this 10-percent markup,

10  were they disclosed to the court and to the parties as they

11  were being charged?

12  A      Yes, every -- every invoice showed the invoices we

13  received from the contractors, and on a separate line our

14  markup of that contractor invoice.

15  Q      Do you recall any objection being raised with you or

16  anyone else, to your knowledge, at Environ about these

17  charges?

18  A      No, I don't recall any objections.

19  Q      Do you recall any alternative being proposed by the

20  parties or the court during the course of this study in terms

21  of how to deal with these contracts?

22  A      The only thing I recall at the very beginning of the

23  study was that the defendants said that they would prefer to

24  have the whole job turned over to an environmental company.

25  Q      The court did not accept that suggestion; is that

1    correct?

2    A     Correct.

3    Q     Did the fact that Environ was charging a fee to

4    administer these contracts in any way influence your work on

5    the substance of the study?

6    A     No.

7    Q     Finally, with regard to remedy, you were asked whether

8    active remedies carried risk.  Do you remember that?

9    A     Yes.

10   Q     And they do; is that fair to say?

11   A     Yes, they do.

12   Q     Okay.  Have you ever heard of adaptive management?  Do

13   you know what that -- are you -- are you familiar with that

14   term?

15   A     I've heard of it.  I couldn't give you a definition of

16   it.

17   Q     Okay.  Do you know whether, when active remedies are

18   applied to a contaminated natural system, there is monitoring

19   that goes on during the remediation process in order to

20   determine whether any negative effects are occurring from the

21   active remedy?

22   A     Yes, we raised that question about whether there would

23   be monitoring during the remediation of Southerly Cove.  I

24   think we asked the state people that, and that was part of the

25   plan, as I recall.

1   Q     Okay.  Now, the risks that may be associated with active

2   remedies, are those to be considered as part of the process

3   that the Study Panel is proposing to the court?

4   A     I -- I think if we brought in remediation experts, it's

5   a natural part of how they look at proposing a remediation

6   approach to consider the risks of those approaches and -- and

7   what can be done to mitigate those risks and not to propose

8   something that has a high likelihood of causing either harm to

9   the workers or to the ecosystem.

10  Q     And do you have every expectation, Dr. Whipple, that if

11  the court accepts the Study Panel's recommendation to initiate

12  such a process, that those risks will be weighed and

13  considered as part of that process?

14  A     Yes, and also the -- to implement any real remediation

15  program is -- is going to take the approval of the state

16  agencies, and -- and they're going to look to see that the

17  management of the risks is -- is somehow built into the plan.

18  Q     So that would provide an additional layer of protection.

19  A     Yes, that's right.

20         MR. BERNARD:  Nothing further, Your Honor.

21         THE COURT:  Thank you.

22         MR. TALBERT:  Nothing further, Your Honor.

23         THE COURT:  Anything further?

24         MR. TALBERT:  No questions.

25         THE COURT:  Thank you very much, Dr. Whipple.

1           THE WITNESS:  Thank you.

2        (The witness left the witness stand.)

3           THE COURT:  Next witness?

4           MR. BERNARD:  Plaintiffs call Dr. Nicholas Fisher.

5           THE CLERK:  Please raise your right hand.  Do you

6    solemnly swear that the testimony you shall give in the matter

7    now in hearing shall be the truth, the whole truth, and

8    nothing but the truth, so help you God?

9           THE WITNESS:  Yes, I do.

10          THE CLERK:  Please be seated.  Please state your

11   name and spell your last name for the record.

12          THE WITNESS:  Nicholas Fisher, F-i-s-h-e-r.

13   NICHOLAS FISHER, having been duly sworn, was examined and

14   testified as follows:

15                     DIRECT EXAMINATION

16   BY MR. BERNARD:

17   Q    Dr. Fisher, are you a member of the court-appointed

18   Study Panel?

19   A    Yes.

20   Q    Were you nominated by the plaintiffs?

21   A    Yes.

22   Q    Were you then approved by the court?

23   A    Yes.

24   Q    Please briefly describe your educational background.

25   A    I have a bachelor's from Brandeis University in biology.

FISHER - DIRECT EXAMINATION/BERNARD

1    I have a doctorate in marine biology from the State University

2    of New York at Stony Brook.  I was a postdoctoral investigator

3    at the Woods Hole Oceanographic Institution in the chemistry

4    department.  I'm -- was there for three years.  I moved to

5    work in -- for the ministry for conservation in Melbourne,

6    Australia, for three years.  I then went to work for a UN

7    affiliated agency, the International Atomic Energy Agency, in

8    Europe for five years.  I was at the Brookhaven National Lab

9    for two years.  And since 1988, I've been at the State

10   University of New York, where my current title is

11   distinguished professor.

12   Q    And in addition to being a distinguished professor, do

13   you direct something called the consortium for

14   Interdisciplinary Environmental Research?

15   A    Yes, I do.

16   Q    Could you please briefly describe to the court the work

17   of the consortium?

18   A    Yes, it's an entity to foster interdisciplinary research

19   among faculty at Stony Brook University from different

20   departments.  Very often people are siloed into different

21   departments and don't get to talk to one another as much as

22   they should.  So it's a mechanism by which faculty from

23   various science and engineering and medical departments, and

24   even humanities departments, can collaborate and bring in

25   funding from external sources to foster their research.

1    Q     Are you an expert in marine biology?

2    A     Yes, that's a large field.

3    Q     Why don't you briefly describe what your expertise is.

4    A     Yes, it's in -- I would call it marine biogeochemistry,

5    and I focus primarily on the cycling of metals and metalloids.

6    Metalloid would be an element that has some behavior similar

7    to metals, like arsenic and selenium.  The cycling and the

8    bioaccumulation and in some cases toxic effects of metals and

9    radionuclides in marine ecosystems, not just marine, in -- in

10   the past 15 years or so, I've also included increasingly

11   freshwater environments, as well.

12   Q    Is one focus of your work, Dr. Fisher, the interactions

13   between marine organisms and toxic contaminants?

14   A     Yes, it is.

15   Q     Okay.  And is mercury one of your specialties?

16   A     Yes.

17   Q     Okay.  Please briefly explain your mercury expertise and

18   experience.

19   A     Okay.  Most of the work -- the work goes all over the

20   place, but most of the work deals with the roots of

21   bioaccumulation of mercury, inorganic mercury, and

22   methylmercury separately into plankton and the transfer from

23   one trophic level to another in aquatic food webs.

24         And we've done some toxicological studies with that

25   dealing with zooplankton, which are -- you can think of them

1    as miniature shrimp-like animals.  They're small crustaceans

2    that are just barely visible with the naked eye, but they're

3    very important in aquatic ecosystems.  So we've done some

4    toxicological work with mercury, but it's mostly accumulation

5    in food chains, and most recently, it's dealt primarily with

6    the other end of the food chain, where we're looking at

7    methylmercury accumulation in bluefin tuna from both the

8    Atlantic and the Pacific.

9    Q    Have you consulted for the U.S. Government before?

10   A    I've consulted for the Brookhaven National Lab and the

11   EPA, so, yes.

12   Q    Have you consulted with industry ever?

13   A    Yes, I -- for a short period of time, I was doing some

14   work for Kodak where they were concerned about the behavior

15   and toxicity of silver, which they were using in their

16   industry, the behavior of silver in aquatic ecosystems, so I

17   did a little bit of work for them.

18   Q    Have you published in the peer-reviewed literature?

19   A    About 250 times.

20   Q    Okay.  And does your CV contain a more complete

21   description of your work experience and professional

22   activities?

23   A    Sure, yes.

24        MR. BERNARD:  Your Honor, that's Joint Exhibit 18.

25        THE COURT:  Thank you.

1   BY MR. BERNARD:

2   Q    Before you were nominated to the Study Panel, do you

3   remember an interview you had with me?

4   A    Yes, I do.

5   Q    Do you remember what you told me?

6   A    Well, I -- not everything, but I remember that you asked

7   what my experience was working with mercury, and I told you

8   that.  And I also told you that you -- I didn't want you to be

9   disappointed that I would say exactly what I thought and it

10  may not -- I would go where the data would lead, and it may

11  not be what you want to hear.  And I said, if that's something

12  you can't live with, well, then I'm not the right guy for you.

13       But the most important thing to me is my research

14  reputation, and I'm not willing to trade that in for anything.

15  Q    Is that what you did here as a member of the Study

16  Panel, do you -- do you believe that you've followed the data

17  where it led you?

18  A    Yes, I think we all did.

19  Q    Do you join in the major findings of the Penobscot River

20  Study Panel?

21  A    Yes.

22  Q    Okay.  Briefly, how would you characterize those

23  findings?

24  A    Um, the river is heavily contaminated with mercury.  It

25  seems that the overwhelming likelihood is that most of the

1    mercury comes from the HoltraChem plant, but that mercury was

2    discharged from that plant accidentally or intentionally a

3    long time ago.  There's very little that's being released from

4    that site right now.

5         The sediments are very contaminated with mercury.  The

6    marsh sediments -- or -- and the marsh environment is

7    strikingly enriched in methylmercury, which is the form of

8    mercury we most worry about, and that concerns us quite

9    considerably.

10        We -- I was very surprised that the organism that seems

11   to be most -- or the organisms that seem to be most imperiled

12   are songbirds.  I expected that if there were any birds that

13   were going to be endangered, they would be fish-eating birds,

14   and, yes, there was -- there were elevated levels of mercury

15   in fish-eating birds, but it just never occurred to me that

16   insect-eating birds and spider-eating birds and

17   amphipod-eating birds would be so contaminated.

18   And so that was a big surprise, and it's a striking finding

19   of -- of the study.

20        All the other bits of the study, which are all important,

21   like the mobile pool, for example, are -- influenced the rate

22   at which the system seems to be cleaning itself up, but the --

23   for me, the overwhelming story is the degree of contamination

24   in the sediments and the biota, and this is quite some many

25   years after the initial contamination events.

1        So, you know, sort of the obvious, I mean, it's just

2   obvious that the system has not cleaned up very quickly.  It's

3   still very contaminated compared to reference sites that we

4   can find, and I think that the -- I think it is appropriate to

5   explore remediation options.

6   Q    Okay.  You did join -- you do join in the Study Panel's

7   recommendation that the court order the pursuit of active

8   remediation to accelerate recovery of this -- of the

9   ecosystem?

10  A    Yes, I do.

11  Q    Okay.  I want to ask you a few questions given your

12  expertise about mercury and aquatic organisms.  Did each of

13  the panel members bring a particular strength to the Study

14  Panel?

15  A    Yes, of course, yeah.

16  Q    Okay.  And what was yours?

17  A    Mine was mechanisms of mercury accumulation in marine

18  and aquatic organisms in general.  I learned a lot about

19  birds.  I knew nothing about birds prior to -- to this study.

20  I knew quite a bit, as well, about the interaction of metals

21  with suspended particles, both living and abiotic suspended

22  particles.  An example of a living suspended particle would be

23  a phytoplankton cell, which would be -- these are unicellular

24  algae that serve as the base of many aquatic food webs.

25       I know a lot about metal association with -- with

1    sediments -- contaminated sediments, and I've done a lot of

2    work on that over the years.

3         So my focus was more on the cycling of mercury and --

4    and methylmercury in aquatic systems, including sediments, and

5    their -- and its bioaccumulation in aquatic organisms.

6    Q    Okay.  We'll be pursuing some of that later on.

7         Is the Penobscot an estuary?

8    A    Yes.

9    Q    What is an estuary?

10   A    An estuary is where a river basically meets the ocean,

11   where usually there's a bay involved, and in this case, it's

12   Penobscot Bay.  And there's a gradient of salinity that one

13   typically sees, which tends to complicate the chemistry of

14   metals, because some metals have a strong affinity for

15   chloride, so you see sodium chloride in seawater, right, and

16   so the -- the chemistry of metals changes with the salinity

17   changes.

18        It changes -- there's also different types of dissolved

19   organic matter that's found in freshwater environments and

20   marine environments, and it gets messy and complicated, and

21   it's still largely uncharacterized by the best aquatic

22   chemists.  Only about a third or so of the dissolved organic

23   matter in natural waters has ever been characterized.  But we

24   know it's there.  We know it complexes metals.  And so estuary

25   systems are important but difficult to get your arms around

FISHER - DIRECT EXAMINATION/BERNARD

1    with regard to metal behavior.

2    Q      Are estuaries productive habitats for aquatic organisms?

3    A      Usually extremely productive, yes.

4    Q      And, briefly stated, why?

5    A      Usually there -- there's high nutrients that -- and the

6    nutrients are primarily nitrogen, phosphorus, and iron, but

7    others, as well, vitamins even, that fuel the production of

8    phytoplankton so -- at the base of the food chain, and then

9    the phytoplankton are eaten by little animals, as well as

10   larger animals, such as mussels and oysters and clams are --

11   eat phytoplankton often as their principal food source.

12          But you have in -- in the water column, you have little

13   animals -- zooplankton, usually -- that eat phytoplankton,

14   larval fish will eat the zooplankton, bigger fish will eat the

15   larval fish and so on up the food chain.  And -- and because

16   the nutrient supply is high and because of peculiarities of

17   hydrodynamics in estuaries, one typically sees very high

18   productivity both at the plankton level and it builds up

19   because that's where the food is, so that's -- you know,

20   that's where the fish are.

21   Q      In what ways does -- withdrawn.

22          In what ways can mercury affect aquatic organisms?

23   A      Mercury is probably the most toxic metal there is on the

24   periodic table.  Plutonium is more toxic if it's inhaled, but

25   marine organisms don't inhale things.  Mercury is -- is

1 extremely toxic, both in the inorganic form and the methyl

2 form.  They're both extremely toxic.

3     And it's -- it's toxic because it has such a strong

4 affinity for sulfur, and sulfur is primarily found in

5 proteins, including enzymes, which are specialized proteins.

6 And so almost all the sulfur in marine or aquatic organisms is

7 associated with protein, not all, but I'd say 98 percent of

8 them.  And you can interfere with enzyme function leading to

9 metabolic poisoning if there's sufficiently high

10 concentrations of mercury or methylmercury.

11     Methylmercury turns -- turns out to be more difficult

12 because marine or aquatic animals in general cannot release it

13 as effectively or excrete it, whereas inorganic mercury is

14 lost very rapidly sometimes from fish, methylmercury is lost

15 barely at all.  So, generally, it just builds up the longer

16 the fish lives, the more it takes in, and so you generally see

17 a very strong correlation between fish age, for example, and

18 mercury concentration, and it's all due to the methylmercury.

19 Q    Can mercury -- withdrawn.

20     At very high concentrations, can mercury be lethal to an

21 aquatic organism?

22 A    Oh, yes, and it can be lethal, and at lower

23 concentrations, we have something called sublethal toxicity.

24 Q    Let's focus on the sublethal toxicity.  Just briefly

25 describe what you mean by that.

1    A     Sublethal toxicity is the toxicity of any substance --

2    it doesn't -- it's not innate to mercury -- where the organism

3    is affected in such a -- either an individual organism or a

4    population can be affected such that the organism is not --

5    doesn't keel over and drop dead in the presence of -- of

6    the -- the contaminant, but its reproductive capability may be

7    impaired or its behavior may be impaired, so it can't swim

8    straight or it can't avoid predators or -- or catch prey.  It

9    can be more susceptible to disease.  These are all very

10   well-documented for many, many years, impacts of all kinds of

11   contaminants, including mercury and methylmercury, on aquatic

12   organisms.

13   Q     At relatively low concentrations, can methylmercury

14   produce adverse sublethal effects on aquatic organisms?

15   A     Yes, it can.

16   Q     Okay.  You mentioned an effect on enzyme -- enzyme

17   function.  Can -- can the effect of methylmercury on the

18   enzyme function of an aquatic organism cause toxicity?

19   A     Yes, that's, in fact, what causes that toxicity.

20   Q     Okay.

21   A     Yes.

22   Q     And what is the reflection -- if there's an aquatic

23   organism that has an impaired enzyme function, what happens?

24   What does that mean?

25   A     Well, it -- all of our metabolic pathways, for all

1    living organisms, from bacteria up to people, are regulated by

2    enzymes, that are carried out by enzymes.  Without enzymes,

3    things would move too slowly and life would not be possible.

4        So if you -- and there are, you know, many types of

5    enzymes in all kinds -- in all organisms, and each enzyme

6    catalyzes a reaction that's specific to a particular metabolic

7    function.  So there could be enzymes that are -- that are

8    associated with respiration.  There could be enzymes that are

9    associated with digestion.  There could be enzymes associated

10   with -- all sorts of enzymes associated with behavior and so

11   on and so forth.

12       So depending on which enzyme or set of enzymes is bound

13   to the mercury, if the mercury is at sufficiently high

14   concentrations, then it can interfere with that enzymic

15   function, leading to an inability of the organism to perform a

16   particular function.

17       Now, it may turn out that it's not a critical function,

18   and so organisms can just kind of cough along, but they're

19   doing okay, and in some cases they're essential, and if the

20   enzyme does not work, the animal or plant dies.

21   Q    Can mercury, even at low levels, methylmercury interfere

22   with nerve functions --

23   A    Yes.

24   Q    -- of aquatic organisms?

25   A    Yes.

1   Q     How so?

2   A     Well, mercury in general is a -- it's not really a

3   toxin, it's a neurotoxicant.  A toxin is a toxic substance of

4   biological origin, like bee venom is a toxin.  Metals are not

5   toxins, but they're toxicants.  So the -- the metal -- the

6   mercury can bind to nerve cells in such a way that they can --

7   there are different ways that they can impair the nerve

8   function.

9        So, for example, they may not be able to transfer a

10  neuro transmitter properly across gaps from one axon to

11  another.  They -- in human beings, it's not really known that

12  well.  We know that methylmercury is -- is insidious in that

13  it binds with cysteine, which is one of the two common

14  sulfur-containing amino acids.  Amino acids are

15  building-blocks of proteins.  And it gets in the blood, and

16  the -- the combination of the methylmercury with the cysteine

17  looks to the brain like the other common sulfur-containing

18  amino acid, which is called methionine.  And so it says, a-ha,

19  there's some methionine, so it takes it into the brain, so it

20  crosses the blood-brain barrier, it's another reason that

21  methylmercury is so much more dangerous to people than the

22  inorganic mercury, which does not get into the brain.

23       So once the methylmercury gets into the brain, it can

24  interfere with the nerves in the brain, and at high

25  concentrations, even in adult males, it can impair nerve

1    function, it can -- I -- I know individuals who have been

2    poisoned from mercury from eating too much contaminated

3    seafood, for example.

4         So this is -- this is a well-known attribute of mercury.

5    Q    Just to finish up on the sublethal effects that you were

6    testifying to, you said that one of the effects of

7    methylmercury at low levels would be to have adverse sublethal

8    effects on aquatic organisms, right?

9    A    Yes.

10   Q    And those sublethal -- is it fair to say that one of

11   those sublethal effects, whatever the particular mechanism,

12   could be to interfere with the organism's ability to avoid

13   predation?

14   A    Yes.

15   Q    And could it interfere with the organism's ability to

16   capture prey?

17   A    Yes.

18   Q    And could it interfere with the organism's ability to

19   reproduce successfully?

20   A    Most definitely, and that's usually the most sensitive,

21   it's not always, but it's often the most sensitive.

22   Reproduction is the most sensitive step for contaminant biota

23   interactions, not always, but often.

24   Q    What is -- what do you mean by most sensitive?

25   A    By that, I mean, you -- it's sensitive to a lower

1    concentration of -- of a contaminant than, let's say, growth.

2    Okay.  So that you need less of the contaminant to impair

3    reproduction -- reproduction, for example.

4    Q    Okay.  Than to impair growth.

5    A    Yes.

6    Q    In your example.

7    A    Yes.

8    Q    Okay.  Do aquatic animals assimilate methylmercury?

9    A    They do, and it's one of the most prominent features

10   about methylmercury in aquatic animals.  So many animals will

11   eat contaminated food, and they will assimilate anywhere from

12   0 to 20 percent of a metal, depending on the metal.  So a

13   metal like cadmium or zinc, for example, they might assimilate

14   like 10 to 20 percent of what they ingest.  And by assimilate,

15   I mean that if they ingest a hundred atoms of cadmium, and

16   after emptying their guts of unassimilated food, if 20 atoms

17   of the cadmium cross the gut lining and ended up in the

18   tissue, we would say the assimilation efficiency is

19   20 percent.

20        In the case of methylmercury, it's often in the

21   90-percent range, or even close to a hundred percent.  It's

22   very striking.

23   Q    And --

24   A    And it's, by far, the highest of any metal.

25   Q    Is assimilation, then, the crossing of a contaminant

1    through the gut lining and winding up in the tissue of the

2    organism?

3    A      Yes.

4    Q      Does mercury biomagnify?

5    A      Methylmercury does, but inorganic mercury does not.

6    Q      Does methylmercury biomagnify?

7    A      It does.

8    Q      And just briefly explain that.

9    A      It very -- you know, the simplest definition I could

10   give you for biomagnification is the concentration, in this

11   case of methylmercury, is higher in the predator tissue than

12   in the tissue of the prey.  So the concentration builds up as

13   you go up the trophic levels in the food chain.

14         So concentrations of methylmercury are higher in tuna

15   than they are in minnows.  Okay.

16   Q      You mentioned earlier, but I want to ask you to go back

17   to it.  I think you said fish can excrete or aquatic organisms

18   can excrete inorganic mercury.

19   A      Yes.

20   Q      And can they excrete methylmercury?

21   A      They do, but it's painfully slow.  So, for example,

22   in -- in our experimental work with methylmercury, we see, for

23   freshwater fish, they lose methylmercury, it's a tiny fraction

24   of 1 percent per day.  It's almost not detectable.

25   Q      Okay.  You mentioned earlier that inorganic -- that

1   methylmercury is the form of mercury that we're most concerned

2   about in terms of effects on organisms; is that correct?

3   A    Yes.

4   Q    But you also said that inorganic mercury is not benign?

5   A    It's definitely not benign.  In fact, it's -- it's

6   almost equally toxic to many organisms.  The -- the problem

7   with the methylmercury is that it remains in the organism,

8   whereas the organisms can usually rid themselves of inorganic

9   mercury over a period of days to weeks.

10       So the -- you tend not to see build-up of -- of

11   inorganic mercury in food chains, whereas you see substantial

12   build-up of methylmercury.  And, therefore, if you cut open a

13   fish and you analyze the mercury, it's like almost always

14   close to a hundred percent methylmercury.

15   Q    Once it is introduced into the natural environment, the

16   aquatic environment, does mercury persist there?

17   A    Yes, it does.

18   Q    For a very long time?

19   A    Forever.  I mean, it doesn't break down the way an

20   organic compound breaks down.  So mercury -- it's an element.

21   So it's -- it's there for always.  Now, we can -- it can move

22   around, right, so it can get buried in sediments or get

23   carried out to sea, or in the case of mercury, which is

24   unusual, it can volatilize and move up into the air and then

25   rain down somewhere else.  Most metals don't do that at room

1    temperature.

2    Q    And is the -- is the fact that mercury does not break

3    down but persists in the environment an important feature in

4    terms of the danger it presents to organisms?

5    A    Yes, in all metals, at elevated concentrations, can be

6    problematic because they don't break down, right.  You know,

7    if you take a molecule, like a -- some pesticides, they may

8    break down within the presence of sunlight within a few days

9    or a few weeks.  Some of them are much more persistent.

10        But organic compounds, you know, can break down, and

11   they can be metabolized by bacteria, for example, and

12   converted into different forms that are less dangerous.  But

13   metals are there forever, and so mercury's not unique in that

14   regard.

15   Q    Let's talk about mercury within the Penobscot Ecosystem.

16   Did the study data demonstrate in your view that the Penobscot

17   Estuary is contaminated with mercury?

18   A    Yes, it did.

19   Q    And how do you characterize the extent or severity of

20   that contamination?

21   A    Well, it was -- it was very pronounced, and more -- more

22   substantially than I had anticipated, to be honest.  I -- I

23   mean, I went in not really knowing what to expect, but I was

24   surprised at how contaminated the sediments were in -- in the

25   upper river, and I was particularly alarmed at the high rates

1   of methylation in Mendall Marsh, so -- leading to very high

2   concentrations in aquatic -- in organisms inhabiting the

3   marsh.

4        So levels were -- were very high, and clearly higher

5   than in what we considered to be appropriate reference sites.

6   Q    In your view, is the finding of the Study Panel that the

7   Penobscot Estuary is heavily contaminated with mercury a close

8   question?

9   A    Is it a --

10  Q    Is it a close question?

11  A    Closed question?

12  Q    Close, c-l-o-s-e?

13  A    I mean, I think it's -- it's extremely evident.  It's

14  not one where we had to rack our brains to say, is this really

15  contaminated or not?  That was not in any way a question.

16  Q    What's your definition of a reference site?

17  A    Well, a reference site would be a site that does not

18  have a point source that's contributing that particular

19  contaminant, in this case, mercury, to -- to, let's say, a

20  river in the same region.  And one wants to not compare

21  reference sites in Arizona or Washington state or something

22  like that because there are -- there's atmospheric fallout of

23  mercury, often from coal-fired -- mercury is released from

24  coal-fired power plants, for example, and so if you're

25  downwind, as the northeast is, downwind of some coal-fired

1   power plants, then the atmospheric fallout may be higher than

2   in some other regions.

3        So it's important to -- to take reference sites in the

4   same general region, but without a specific known source of --

5   of contaminants.  So we -- we can say, okay, this is what the

6   mercury should be like without a polluting source present.

7   Q    How does mercury contamination in the Penobscot compare

8   to what you deem to be the relevant reference sites?

9   A    Oh, it's much more contaminated.  I mean, you -- if you

10  just look at the -- I recall that you showed the sediment

11  contamination in the Penobscot to -- graphs to John Rudd in

12  his earlier testimony, and it's just so obvious.  I mean,

13  anyone can see that the mercury levels are much higher in the

14  sediments in the region around HoltraChem.

15       Does it mean all of it comes from HoltraChem?  No,

16  probably it doesn't mean that.  But it certainly seems likely

17  that much of it has come from HoltraChem.

18  Q    What is a benthic organism?

19  A    A benthic organism is an organism that lives on the

20  sediments or in the sediments, at the bottom of the water

21  column.

22  Q    Is -- and do animals that feed in the benthos acquire

23  mercury from organisms or organic debris associated with

24  sediment?

25  A    Yes.

1    Q     Okay.  Is a worm a benthic organism?

2    A     Yes, it is.

3    Q     Okay.  Could you just describe for the court, if a worm

4    is slithering around in mercury-contaminated sediment, how

5    might that work its way up the food web?

6    A     Sure.  So you could have a worm slithering around in

7    contaminated sediment.  It will -- worms ingest sediment.

8    That's what they eat.  And if there's mercury associated with

9    that sediment, the worm may assimilate some of the mercury out

10   of the ingested sediment.

11        A fish -- say a flounder comes along and eats the worm.

12   I come along, and I eat the flounder.  So that's one way that

13   you can have contaminants be transferred from contaminated

14   sediment to man or to other -- other aquatic animals.

15   Q     Can a -- what is the pelagic food web?

16   A     Pelagic food web is -- the simplest way of defining it

17   is simply the -- the food web, the collection of organisms up

18   in the water column that's not necessarily tightly bound to

19   the sediment.  It's most commonly used when talking about

20   things like open ocean situations, but you can use it, as

21   well, to characterize Penobscot Bay, for example.

22   Q     And do some aquatic organisms feed in what's called the

23   benthic food web?

24   A     Yes.

25   Q     And others feed in what's called the pelagic food web?

FISHER - DIRECT EXAMINATION/BERNARD

1    A    Yes, and some do both.

2    Q    What is an omnivore?

3    A    An omnivore is not necessarily benthic or pelagic.  An

4    omnivore is -- is an animal that eats whatever it can get,

5    basically.

6    Q    Dr. Fisher, if -- are even fish who aren't directly

7    eating the sediment -- or aquatic organisms that aren't

8    directly eating the sediment, are they sometimes eating things

9    for which the sediment is the food source?

10    A    Yes.

11    Q    Okay.  So that would connect them to the benthic food

12    web, even if they themselves were not feeding --

13    A    That's correct.

14    Q    -- in the sediment?

15    A    Yes.

16    Q    Okay.  Do you have any concern regarding the impact on

17    benthic animals of the mercury that you found in Penobscot

18    sediments?

19    A    I need to think about that.  I think that -- the answer

20    is I don't know.  The concentrations in the sediment are

21    known -- are much higher than levels that are needed to impact

22    invertebrates that live -- invertebrates are animals without

23    backbones -- so invertebrates that live in or on sediments.

24    There's a compilation by Long, et al., for example, which is a

25    NOAA publication, National Oceanic and Atmospheric

1    Administration, which basically summarizes the threshold

2    levels of various contaminants that are known to impact all

3    kinds of benthic invertebrates -- worms, amphipods, which are

4    tiny little crustaceans that hop around and eat debris on

5    the -- on the surface of the sediment, all sorts of

6    invertebrates.

7         And the levels that were detected in most of the

8    Penobscot sediments exceeded levels that were deemed to be

9    toxic by NOAA.

10   Q    Is NOAA a federal agency?

11   A    Yes, it is.

12   Q    Okay.  Part of the Department of Commerce?

13   A    Correct.

14   Q    Do you believe mercury levels in some Penobscot biota

15   are high enough to harm the animals?

16   A    Yes.

17   Q    And to pose a risk to the predators of those animals?

18   A    I think so.  And here I rely a lot on some of the

19   toxicologists that we consulted with, most particularly in

20   this case Jim Wiener from the University of Wisconsin, and

21   he's -- he led us to believe that there's no uncertainty in

22   that.

23   Q    What did Dr. Wiener tell you specifically?  In other

24   words, there's no uncertainty in that.  Were you referring --

25   A    I'm sorry.  Yeah.

1          MR. TALBERT:  Objection, hearsay.

2          THE COURT:  Overruled.  It's a little late.

3  BY MR. BERNARD:

4  Q     Go ahead.

5  A     So he -- he said that the concentrations in some of the

6  organisms that are likely prey for larger organisms in the

7  system are at concentrations that would definitely be toxic to

8  the predator if they ate them.

9          And -- and in part, methylmercury is so insidious

10  because it shows -- that might not be so if, for example,

11  there was plutonium in those invertebrates because there's no

12  assimilation as you go up the food chain.  So the animal would

13  excrete all of the plutonium it ingested, but they assimilate,

14  in effect, almost all of the methylmercury that they ingest,

15  and so it's available for interfering with enzyme function,

16  for example.

17  Q     Do you have reason to trust or have confidence in the

18  advice of Dr. Wiener on this subject?

19  A     Yes, I do.

20  Q     For what reason?

21  A     Well, I think he's probably regarded as the preeminent

22  mercury toxicologist for aquatic ecosystems anywhere in the

23  world.  He's -- he's great, you know.

24          MR. BERNARD:  We'll be hearing from him later during

25  the trial, Your Honor.

1   BY MR. BERNARD:

2   Q     Are you familiar with mercury levels in Penobscot

3   mussels?

4   A     Yes.

5   Q     And what are you -- how would you characterize them?

6   A     They are high.  They're among the highest anywhere in

7   the United States.  Mussels are interesting.  There's -- it's

8   the common blue mussel which we're referring to, I believe,

9   it's called Mytilus edulis, and it's used as a biomonitor or

10  an indicator organism of coastal contaminations not only in

11  the United States, but all over the world, and there's a very

12  large databank of contaminant concentrations in Mytilus edulis

13  from the United States since 1976, when the national -- NOAA's

14  National Status and Trends Program began.

15         But it's also -- it's -- this program exists in Europe,

16  Asia, and South America, as well, and the concentrations of

17  mercury in the Mytilus around the Penobscot are among the

18  highest anywhere in the world, including the United States.

19  Q     Did you review the lobster mercury data that the study

20  generated?

21  A     Yes.

22  Q     Did those data surprise you?

23  A     You know, I was -- I guess I was surprised, but I

24  probably shouldn't have been.  The levels were high, but

25  primarily in the Verona Island area.  If you go out into

FISHER - DIRECT EXAMINATION/BERNARD

701

1    Penobscot Bay, they were not at dangerous levels and I don't

2    think of concern.

3        So it's -- it's restricted to a fairly small area, and

4    this area's been deemed to be closed to lobster and crab

5    fishery by the state.

6        The -- I guess what I found shocking is -- is not the

7    fact that the levels were high, but that as a non-Maine

8    person, although I do go here for summers, but as a non-Maine

9    person, when I think of Maine, I think of lobster.  I think if

10   you go around the United States, the first word that comes to

11   mind when you mention the state of Maine, you think of

12   lobster.  And to see lobster at levels that might be dangerous

13   for human consumption, that -- you know, that set off alarm

14   bells to me, and so that was something that definitely got my

15   attention.

16   Q    Do eels within the lower river have enough mercury to

17   create human exposures above recommended levels?

18   A    Do eels?

19   Q    Yes.

20   A    Yes.

21   Q    Okay.  And how about black ducks in Mendall Marsh, same?

22   A    Yes.

23   Q    Now, you mentioned earlier, but I want to go -- I want

24   to return to it, you're familiar with the mercury levels in

25   the songbirds that feed in Mendall Marsh?

FISHER - DIRECT EXAMINATION/BERNARD

702

1   A      Yes.

2   Q      And I think you said in your deposition that those

3   levels shocked you.  Did they?

4   A      They were very high, yes.

5   Q      And -- and was that in any species in particular?

6   A      The red-winged blackbirds and the Nelson's sparrows in

7   particular, but all of them were pretty high.

8   Q      Hm-hmm.

9   A      I think the Virginia rails were high, if I remember

10  correctly, but certainly the Nelson's sparrows were extremely

11  high.

12  Q      Do you think the avian species in Mendall Marsh are in

13  peril?

14  A      I think -- well, here I rely on our avian specialist,

15  which was David Evers, and -- who's very highly regarded, very

16  well-known for contaminants in birds, including mercury.  He's

17  published extensively on this.  And he's -- he seemed alarmed

18  at the high concentrations.  He said, boy, those levels, the

19  Nelson's sparrows are going to Mendall Marsh to die.  That was

20  his phrase almost word for word, you know.  He said, these are

21  really scary levels.

22  Q      Do you --

23  A      So I -- I don't -- I just noticed how high the blood

24  levels were compared to reference sites and to, you know,

25  other birds, but I didn't know how to interpret that because I

1    had no experience working with bird toxicity.  But when we

2    went to our bird toxicologist, he said, you know, this is

3    serious.

4    Q     Do you have reason to trust the advice of Dr. Evers on

5    the question of the toxicity to avian species in Mendall Marsh

6    of the mercury concentrations found there?

7    A     Yes, I absolutely do.

8    Q     For what reason?

9    A     Just to give you a -- you know, illustrate the point,

10   when the BP oil spill hit the Gulf of Mexico, the U.S.

11   Government turned to David Evers to handle all the bird -- as

12   I understand it, all the bird toxicology, in that case, for

13   oil contaminants and detergent contaminants in -- in the gulf.

14         And he's very highly thought of, and he's much sought.

15   So I have met him through this meeting.  I have heard

16   excellent reports about him from colleagues at Dartmouth and

17   at Harvard.  They think he's, you know, the last word on the

18   subject, and in my dealings with him, I had no reason to

19   question that.

20         MR. BERNARD:  Your Honor, Dr. Evers, also, will be

21   testifying later during the trial.

22   BY MR. BERNARD:

23   Q     Dr. Fisher, what is meant by species composition within

24   an aquatic habitat?

25   A     It's just the collection of different species that might

1   be present in a community.  So you could have, for example, in

2   the phytoplankton community, at the base of the food chain,

3   you may have many different species present in the

4   phytoplankton community, likewise the zooplankton community,

5   likewise the fish, and be many different species.  So that's

6   the species composition.

7   Q    Can mercury contamination alter the species composition

8   within an aquatic habitat?

9   A    Oh, yes.

10  Q    How so?

11  A    Not all organisms have the same sensitivity to mercury.

12  So, for example, for phytoplankton, we know that there's some

13  species that can tolerate high levels -- relatively high

14  levels of mercury by precipitating it out with sulfide within

15  the cell.  Other -- most species cannot do that.

16       So if you have mercury present in the water, it's taken

17  in by the phytoplankton at sufficiently high concentrations,

18  many of the sensitive species die and get replaced by the more

19  tolerant species.  So you get a change in the species

20  composition in the phytoplankton community, which can have a

21  ripple effect as you go up the food chain.

22  Q    What effect -- what effect, if any, can that have on the

23  environment, a changed species composition?

24  A    Sure.  So -- so, for example, many animals that eat -- I

25  mean, this is not unique just to plankton, by the way, but

1    I'll illustrate it for plankton as an example.  So you can

2    have phytoplankton eaters, like zooplankton, miniature

3    animals, that -- that will eat -- that when they eat

4    phytoplankton, they're very specific as to what they can

5    either ingest or digest.  And so if you change the

6    phytoplankton community, you can change the zooplankton

7    community, which, in turn, can influence the critters that eat

8    the zooplankton, such as larval fish, and so you can get a

9    change in species composition all the way up the food chain.

10        And this is one way that mercury can -- can change

11   population dynamics and community structure in aquatic

12   environments, even without directly impairing the animal, you

13   know, that you care about, the fish that you care about.

14   You're basically removing its food supply -- its normal food

15   supply.  And this has happened in many aquatic environments,

16   including some of the Great Lakes, such as Lake Erie, and this

17   is very well-known, and again it's not unique to mercury.

18   Q    You've used a couple of terms I just want you to briefly

19   define.  What is plankton?

20   A    Plankton are miniature organisms, very -- usually

21   microscopic, not always, that either do not swim or can swim

22   so weakly that they get carried by currents.  And the

23   phytoplankton are the plant plankton, and the zooplankton are

24   the animal plankton.

25   Q    Okay.  For aquatic organisms, is it fair to say that the

1   lower the mercury concentration, the better?

2   A    Oh, yes.

3   Q    Is there any known use for mercury in an aquatic

4   organism?

5   A    Not that I know of.

6   Q    Is there any such thing as a mercury level in an aquatic

7   organism being too low?

8   A    Not that I know of.

9   Q    Is that true, incidentally, for all other metals?

10  A    No, no, there are many metals that are essential.  So

11  iron, zinc, copper, it's surprising some of the metals that

12  are essential, manganese, cobalt, so on and so forth.  There

13  are many metals that -- that almost all living organisms,

14  including human beings, require, usually at varying

15  concentrations.  And that's true for aquatic organisms, as

16  well.  Those are known as essential metals.  And the

17  nonessential metals can -- you know, if they're absent,

18  they -- they're not a problem for organisms.  If they're

19  present at high enough concentrations, they're poisonous, so,

20  lead, mercury, those would be -- plutonium, those would be

21  examples.

22  Q    Okay.  You said in your one of your depositions that

23  mercury should be perceived as -- should not be perceived as

24  innocent until proven guilty.  It should be perceived as

25  guilty until proven innocent.

1        So leaving aside the kind of criminal law implications

2   of that --

3   A     Yeah.

4   Q     -- what -- what -- what were you talking about?

5   A     Yeah, um, just simply that if -- if a -- an industry,

6   for example, spreads a contaminant, it could be mercury, it

7   could be anything, in large quantities out in the environment,

8   I don't think we should regard those contaminants as having

9   human rights and as being perceived as innocent until proven

10  guilty.

11        And very often, I get the impression from environmental

12  litigation that, well, you have to prove that this contaminant

13  is -- is harmful.  Otherwise, you know, it's fine to spread it

14  all over the place.

15        Now, my feeling is that contaminants should not be

16  granted human rights in that regard.  On the other hand, I do

17  not believe that at very trace levels these contaminants are

18  necessarily harmful, either for the aquatic organisms or to

19  human consumers of seafood.  So there's sort of a tolerable

20  level often that, you know, very low levels are probably

21  pretty harmless.

22        And -- and we see that all over the world.  But in this

23  case, we have a very elevated concentration in the Penobscot.

24  I mean, I think everybody recognizes that.  And so I would not

25  make the assumption that they're harmless.

1    Q     Okay.  Let's talk about toxicity studies.  First of all,
2    just for the record, what is toxicity?
3    A     Toxicity is simply the impairment of an organism or a
4    suite of organisms by some chemical, for example.
5    Q     And are the sublethal effects you described earlier,
6    are --
7    A     That's a form of toxicity, yes.
8    Q     Okay.  Now, did you propose to your colleagues on the
9    Study Panel that field toxicity studies be conducted within
10   the Penobscot?
11   A     Yes, more than once.
12   Q     As part of the Phase II study effort?
13   A     Yes.
14   Q     Okay.  Now, we've heard a term called in situ, two
15   words, i-n, second word s-i-t-u.  What is an in situ field
16   toxicity study?
17   A     Very often toxicity studies are done in a laboratory in
18   a beaker or in -- in an aquarium or something like that.  But
19   it's not -- it's not in the natural environment.  So an in
20   situ study is one that occurs in the natural environment.
21   Q     Did you feel strongly about doing toxicity work in the
22   Penobscot?
23   A     Yes, um, and my thinking keeps varying on this, but,
24   yes, I did feel strongly about that.
25   Q     Okay.  And you expressed those views in a forthright

1   manner to your colleagues; did you not?

2   A      Well, I -- I tried to be as persuasive as I could be.

3   Q      Right.  And you wrote a series of e-mails setting forth,

4   in no uncertain terms, your view that toxicity studies should

5   be undertaken; is that fair?

6   A      I guess that's fair.

7   Q      Okay.

8   A      Yes.

9   Q      Now, are you an experimentalist, would you characterize

10  yourself that way?

11  A      Yes, I am.

12  Q      Okay.  And does that -- do you think that colors your

13  approach to a problem like the one in the Penobscot?

14  A      It probably did, yes.

15  Q      Okay.  And -- and what is an experimentalist?

16  A      Someone who conduct experiments.  In this case, we

17  observed very elevated concentrations of mercury in the

18  tissues of a variety of organisms, not just the birds, but the

19  birds were -- really stood out as being particularly

20  prominent.  And so what I wanted to do was say, okay, so we've

21  made this observation, we've gone to our toxicologists, and

22  they say, oh, yeah, that's definitely toxic.  But we did not

23  make our own measurements of toxicity.

24         So we could infer from the literature that those birds

25  were -- or whatever organisms -- were probably being impaired,

1   but I wanted to -- I mean, maybe it was my natural curiosity

2   or -- or my experimental approach to science in general, to

3   actually confirm that there was toxicity either occurring or

4   not occurring in the natural environment in the Penobscot.

5        And there were many confounding factors, as we've been

6   hearing all week, that can influence the toxicity or the

7   well-being of organisms in general, not just toxicity, and so

8   these become extremely tricky experiments to do.  And however

9   you do them, you're -- on the one hand, you're subject to

10  criticism that you didn't do it right, you didn't have the

11  right reference site, you didn't have the right controls, you

12  didn't dose them in the proper way, whatever.

13       On the other hand, I felt that our study might have been

14  somewhat vulnerable had we not done some of the toxicity

15  studies, and so I expressed that opinion.

16  Q    Okay.  And was there a -- a robust debate within the

17  Study Panel concerning whether or not to undertake these

18  toxicity studies as part of the Phase II effort?

19  A    Yes, and, I mean, it wasn't, you know, torches and

20  pitchforks or anything like that, but -- but, you know, we --

21  we had a lively debate that lasted weeks or months -- I can't

22  recall.

23  Q    And in the end, did your colleagues agree with you about

24  the desirability of conducting toxicity studies in the field?

25  A    Um, a couple of them wavered back and forth.  Chris was

 1   pretty adamant against doing it.  I was pretty adamant in

 2   favor.  We couldn't really come to unanimity.  I think in the

 3   end I was the only one that was really pushing for it, and the

 4   others eventually thought it best not to do that but just to

 5   rely on our toxicologists' viewpoints.

 6        So we approached the court, as John Rudd explained to

 7   you, and the court -- it was our understanding that the court

 8   said, no, you don't have to do the toxicology studies.  The --

 9   the tissue concentrations are evidence enough that these

10   organisms are likely being impaired.

11        My concern -- I really want to comment on this, if I

12   may.

13   Q    You may.

14   A    My concern in favor of doing it was two-fold:  One was

15   that we know that different species have different degrees of

16   sensitivity to any contaminant, including mercury; and there

17   were no other studies in the literature that I was aware of or

18   that any of us were aware of that had the -- that studied the

19   impact of methylmercury on Nelson's sparrows or red-winged

20   blackbirds.  So we had to rely on different bird species, and

21   that's commonly done, but it's also true that there -- there

22   may be a different degree of sensitivity.  It may be that the

23   Nelson's sparrows are actually more sensitive or it may be

24   that they're less or equally.  We didn't know.  So that kind

25   of bothered me.

1          The other thing and that's tied to remediation is as

2     follows:  That, on the one hand, we know that the levels

3     exceed threshold levels that were deemed to be toxic by the

4     toxicologists that we conferred with, and I had no reason to

5     doubt them.  The question was whether in the field the

6     organisms were just sort of limping along, but no one was

7     dropping dead currently, and so how -- I mean, that was one

8     possibility.  And so how would -- we needed -- I needed to

9     know -- or I felt I needed to know how badly impaired the

10    resident organisms were before spending a lot of money on a

11    remediation program.

12         So if I felt that we unearthed evidence that organisms

13    were -- were dying or not breathing properly or some -- you

14    know, some serious population effects, then I thought we would

15    have a stronger argument for a large and expensive remediation

16    program, and all remediation programs are expensive.

17         If, on the other hand, I thought that the system was

18    just sort of coughing and limping along, but it was not really

19    that dangerously impaired, then maybe it would be best to

20    leave well -- leave everything to clean itself up, even if it

21    were to -- to take decades.

22         And so that was a rationale that I presented to my

23    colleagues.

24    Q    Okay.  And your colleagues didn't -- do you feel they

25    heard you out?

1    A      Oh, they absolutely did, and they also offered many, I

2    thought, convincing counterarguments, as well.

3    Q      Okay.

4    A      And --

5    Q      What's an example of a convincing counterargument that

6    one of your colleagues offered?

7    A      Well, an obvious one is, well, maybe we just picked the

8    wrong species.  So we picked a species that happens to be very

9    tolerant, but there were many other species present that are

10   particularly sensitive and had we chosen those species, we

11   would have shown a great deal of harm.

12         I couldn't argue against that; that's true.  Chris

13   talked about a -- a baseline with regard to the impact of

14   mercury that presumably came from HoltraChem in the late '60s,

15   and it may -- and he's right in the sense that it may have

16   been that there were many sensitive species that were wiped

17   out in the late '60s and early '70s by that mercury, but we

18   don't know because we don't really know what was there prior

19   to that.

20         And so what we know is what's present now, and what's

21   present now may have been the more tolerant critters that

22   replaced the initially more sensitive species that were

23   displaced.  That's true.  I can't -- I can't dismiss that

24   argument.

25         And -- and I also listened carefully to the

1    toxicologists.  They did not waiver.  They did not say, hm, it

2    might be dangerous.  They -- they thought it was an

3    open-and-shut case in almost every -- almost every individual

4    we asked.  And so I found that convincing, too.  I mean,

5    these -- this is why we go to experts, and so I -- I took them

6    at their word.

7    Q    The experts you're referring to there include Dr. Evers?

8    A    Dr. Evers, Dr. Sandheinrich, and Dr. Wiener.

9    Q    Okay.  And Dr. Sandheinrich is Dr. Mark Sandheinrich?

10   A    Yes, he is.

11        MR. BERNARD:  Okay.  For the court's reference, he

12   wrote the report that the Study Panel commissioned which is

13   part of Joint Exhibit 6-2, Appendix 2-1.

14        THE COURT:  Let me -- let me interrupt for a moment

15   because I'm going to have to break shortly.  I want you, over

16   the weekend, to think about this, and maybe I've

17   misinterpreted or misevaluated this, and it's only an initial

18   impression.  I don't want you to -- anytime a judge speaks,

19   there's always a worry that it'll be taken too seriously.  I

20   haven't -- I've just begun to hear this, so I haven't begun to

21   make up my mind about it, and I haven't received all the back

22   and forth yet.

23        I wonder, just listening to the testimony to date,

24   whether we haven't jumped the gun a little bit, and what I'm

25   thinking is this:  That the Study Panel has documented its

1    view of the problem and has suggested further study on the

2    solution.  If you were to compare this to a medical condition,

3    for example, the Study Panel, as scientists, would be

4    internists or diagnosticians, and I suppose what the diagnosis

5    is is up to some debate.

6        But in order to evaluate what to do next, if anything, in

7    a medical condition, you'd then -- let's assume it's a

8    surgical condition -- turn to the surgeon and say to the

9    surgeon, what do you think?  And the surgeon might well say,

10   tincture of time, leave it alone, the risk of surgery is

11   greater than the possible benefit.  In a legal context, you'd

12   also put in, obviously, the cost, which is not always relevant

13   in the medical context.

14       But the surgeons are like the engineers here, and I'm

15   beginning to wonder, as I listen to this, whether if -- let's

16   assume that the engineers were to take a look at this and

17   they -- they had in their mind a number of factors, but the

18   primary factor would be, is there a solution?  What is the

19   effectiveness of the solution, if any, and what's the cost?

20       And I'm not sure yet -- and I'm sure there'll be

21   something presented here about what we're talking about to

22   evaluate the remedy -- we're hopefully not going to be talking

23   another ten years down the road before you came to the remedy,

24   and a remedy that will be at least addressed by the court --

25   but I'm beginning to wonder whether we haven't, as I say,

1    jumped the -- the gun a little bit in terms of my ability

2    to -- what I'm concerned about is this, I come to a conclusion

3    other than the conclusion, which I'm sure Mallinckrodt is

4    pressing here, that I can determine that the Penobscot is

5    curing itself and there's no need for anything further.

6    That's one possibility.

7        The other possibility is that I find that the Penobscot

8    is not curing itself, and I need to know what the -- what the

9    potential remedies might be, and for that, I order that, and

10   in another year or two or whatever it might be, we're back

11   here again arguing about the remedy.

12       So I'm -- I don't want an answer now because I'm sure

13   it's something you've given thought to, but I want you to

14   think about it and let me know what I'm missing as to -- and I

15   realize this is something that you're doing not because you

16   wanted to do it, because the court has imposed orders and

17   phases and has sort of directed the -- the order of priorities

18   for you.

19       But I'm the court, so I can change that if I need to, but

20   I wouldn't do so without the acquiescence of the parties.  So

21   I don't -- again, I don't want you to take this too seriously,

22   but it's -- it seems to me to be a question that I'd like to

23   throw out and have you respond to, not right now because I've

24   got to jump, but in due course.

25           MR. BERNARD:  We will do that, Your Honor.

1           THE COURT:  All right?

2           MR. TALBERT:  We'll do that, Your Honor.

3           THE COURT:  Okay.  Thank you.  I have a meeting.  I

4    think I'll be done with the meeting maybe -- well, let's --

5    let's assume I'll be done with the meeting at ten of 3:00, and

6    if I get out early, I'll let you know.  All right?  Thank you.

7         (Court recessed from 2:13 p.m. to 3:12 p.m.)

8           THE COURT:  Sorry for the delay.  It took a little

9    longer than I expected.

10          MR. BERNARD:  May I proceed?

11          THE COURT:  Yes, you may.

12   BY MR. BERNARD:

13   Q    Dr. Fisher, did the Study Panel ultimately bring the

14   toxicity test question to the court?

15   A    Yes.

16   Q    And did you express -- I'm showing you Defendants'

17   Exhibits 592.  Did you express your views on the issue

18   directly to Judge Carter's law clerk?

19   A    I guess I did.  I don't honestly remember, but it seems

20   that I did here.

21   Q    Well, look at this e-mail.  It's from you to Monica --

22   Monica --

23   A    Yes.

24   Q    -- at the U.S. Courts.  Do you recognize that -- the

25   addressee to be Monica Bigley?

1   A     Yes, it is.

2   Q     And was she Judge Carter's law clerk?

3   A     Yes.

4   Q     Okay.  And you copied Dr. Bodaly, plus your fellow Study

5   Panelists.  Do you see that?

6   A     Yes.

7   Q     Okay.  And if you need to glance at the e-mail to answer

8   my question, go ahead and do so.  But did you essentially lay

9   out your argument in favor of field toxicity studies in this

10  e-mail?

11  A     If I may read it just a moment for, please?

12  Q     You may.

13  A     (Witness reading.)  Okay.  So what's the question?

14  Q     Did you lay out --

15  A     Yes, I did.

16  Q     -- in substance your argument directly to Judge Carter's

17  law clerk?

18  A     Yes, I did.

19  Q     Now, I'm showing you -- this e-mail was dated

20  February 21st, 2008; is that correct?

21  A     Yes.

22  Q     Now I want to show you Defendants' Exhibit 593, which is

23  an e-mail from Dr. Rudd to you and Dr. Whipple and Dr. Bodaly

24  dated four days later, February 25th, 2008.  Do you remember

25  receiving this communication from Dr. Rudd?

1   A     Yes, I do.

2   Q     And what did he say in it?

3   A     Essentially saying that the court has decided that we do

4   not need to conduct toxicological work.

5   Q     Okay.  And he acknowledges your letter, I take it that's

6   the e-mail that you wrote to Monica Bigley?

7   A     I believe so.

8   Q     Okay.  Now, when you received this news, is it fair to

9   say that you disagreed with the court's decision?

10  A     Yes.

11  Q     Okay.  And -- and let me show you Defendants'

12  Exhibit 593, which is roughly two hours after Dr. Rudd's

13  e-mail on February 25th, 2008.

14          THE COURT:  Are you sure that's 593?  The other one

15  was 593.

16          MR. BERNARD:  You know, I checked this with my

17  colleagues, and I believe there's more than one e-mail that's

18  in 593; is that correct?  Maybe it was an e-mail chain.

19          MR. TALBERT:  It's an e-mail chain.

20          MR. BERNARD:  So it all got placed by the defendant

21  under the same exhibit number, Your Honor.

22          THE COURT:  Okay.  Now, do we -- you mentioned 592

23  and 593; is that right?

24          MR. TALBERT:  We were moving for --

25          MR. BERNARD:  I did.

1          MR. TALBERT:  -- the admission of those in any

2     event, Your Honor.

3          MR. BERNARD:  And we have no objection.

4          THE COURT:  All right.  So I'll admit Defendants'

5     592 and Defendants' 593.

6     BY MR. BERNARD:

7     Q     Dr. Fisher, is this an e-mail you wrote after you heard

8     about Judge Carter's decision?

9     A     Yes.

10    Q     And does it express your disagreement with that

11    decision?

12    A     Yes.

13    Q     In the end, you say you disagree -- respectfully

14    disagree with the court's wisdom in this case; is that

15    correct?

16    A     Yes.

17    Q     Okay.  And that's a fair characterization of how you

18    felt at the time?

19    A     Yes.

20    Q     Okay.  Now, did this issue about field toxicity work

21    arise around a year later, in early 2009, with Special Master

22    Calkins?

23    A     Yes, I believe it did.

24    Q     And do you remember whether that generated another round

25    of e-mails in which you were trying to persuade your

1   colleagues of your point of view?

2   A     You know, there were something like 35,000 e-mails, so I

3   don't really remember, you know, specific ones.  But I do

4   remember hearing from Special Master Calkins that the -- there

5   was no formal ruling against doing toxicological work, and I

6   was quite surprised to learn that because I was under the

7   impression that the court had ruled against it.

8   Q     Well --

9   A     And I think we all were under that impression.

10  Q     Is it possible that the court had ruled against it, but

11  that it hadn't ruled against it necessarily for all time?

12  This was a year later.

13  A     I don't know.

14  Q     Okay.  And --

15        THE COURT:  The court works in mysterious ways

16  sometimes.

17  BY MR. BERNARD:

18  Q     So do you recall whether this was an occasion for

19  reopening this robust discussion among the Study Panelists

20  about whether to do field toxicity work?

21  A     I suppose it was.  But I think it came rather late in

22  the game.  We were well into the Phase II work at that time,

23  and to do a proper toxicological evaluation of whatever

24  species we chose to examine would have involved a lot of time,

25  getting the right personnel involved, you know, it's not

1    something that you sort of do on your lunch hour.  It might

2    take a couple of years.  We didn't really have a -- a good

3    handle as to what the expense would be.

4         And, again, we were guided by the toxicologists, who,

5    said, man, you don't need to do this.  I mean, this is -- this

6    is such a polluted place, it's obvious.  So we chose not, late

7    in the game, to -- to pursue the toxicological work at that

8    point.

9    Q    Now, is it fair to say that you would have preferred to

10   do field toxicity studies?

11   A    Yeah, because -- not -- yes, the answer is yes, and if I

12   may be allowed, it would be simply because that's my

13   scientific approach to doing things.  I'm not saying it's

14   superior to anyone else's approach.  It's just my approach.

15   So I -- I would have preferred to satisfy my curiosity and get

16   some quantitative information about just how badly impacted

17   certain species were.

18   Q    From your -- from your perspective as an experimental --

19   as an experimentalist, is there any such thing as too much

20   data?

21   A    No, there's never too much of that.

22   Q    Is it fair to say that while you might have preferred to

23   do tox -- toxicity studies in the field, that you think it's

24   legitimate scientifically for the Study Panel to have inferred

25   harm from the literature values?

1    A      Yes, I do.

2    Q      We've been -- withdrawn.

3           You said in your deposition that, based on the

4    scientific literature and the mercury values in the Penobscot,

5    you had no doubt that biota are sick or dying or being

6    impaired in some way.  Do you recall that?

7    A      Yes, I do.

8    Q      And is that -- is that an accurate reflection of your

9    view?

10   A      Yes, it is.

11   Q      Okay.  Now, we've been talking about current harm.  Do

12   you have any view about what harm might have been caused by

13   mercury in the system between the late '60s, when the known

14   peak releases from HoltraChem went into the river, and the

15   present time?

16   A      I could speculate, and my speculation would be that

17   there would be -- would have been greater harm at that time

18   than there is currently.  And that's because there was an

19   enormous slug of mercury introduced into the system, and if --

20   if there were any sensitive species present, they -- they

21   would have borne the brunt of that and probably would have

22   been forced to move elsewhere or die, and they might

23   eventually have been replaced by more tolerant species or -- I

24   don't know.  You know, but I -- so I would speculate that the

25   impact was greater in 1972 than it was in 2002, for example.

FISHER - DIRECT EXAMINATION/BERNARD

724

1   Q     Does the absence of toxicity studies undercut your

2   confidence in any of the Study Panel's findings in the Phase

3   II Report?

4   A     No, it does not.

5   Q     And does it undercut in any -- the absence of toxicity

6   studies in the field undercut your confidence in any of the

7   recommendations the Study Panel set forth in the Phase II

8   Report?

9   A     No, it does not.  But if I may be allowed, I would say

10  that I would have preferred to have further toxicological

11  information to help guide us in possible remediation actions

12  that we would suggest to the court.

13  Q     Did you ever propose to your colleagues on the Study

14  Panel a specific study or an outline of study that would have

15  accomplished that purpose?

16  A     In a very, I would say, superficial way, yes, I did.

17  I --

18  Q     What do you mean by superficial?

19  A     Well, it was not a formal written document or anything

20  like that, but when we were together in some meetings, I would

21  say, well, how -- and this was my naiveté there, but --

22  speaking by the way, but I -- I thought, well, how difficult

23  would it be to just go around the nests of the Nelson sparrows

24  in Mendall Marsh and count the number of babies born?  And is

25  -- how hard can that be?  It's not very -- it's not -- it's

1   not very intrusive into their -- into their nests.  You just

2   -- a visual observation, and we compare it with known numbers

3   of eggs that hatch from an average Nelson sparrow nest

4   elsewhere in the world.

5       And so I thought that -- that sounds simple.  It could

6   be straightforward.  And so I suggested that -- that to my

7   colleagues.

8   Q    Why was that naive?

9   A    Well, it turns out it's naive because there -- first of

10  all, I know less than everybody else in this room about birds.

11  So I did not know about all of the confounding factors -- I

12  just was not aware of them -- that might have reared their

13  ugly heads in -- in making a data set unambiguous and easily

14  interpretable.

15      And so, for example, there could be, you know, weather

16  factors.  There could be a degree of -- one -- one obvious one

17  would be degree of methylation that particular year in the

18  marsh, and that varies from year to year.  There could be the

19  presence of predators that I was not taking into account that

20  might have stolen some eggs from the nest, various issues

21  about vegetation and comparing vegetation at the Mendall site

22  with any other reference site, for example.

23      So -- and a lot of these were brought up in -- in the

24  defendants' experts' criticism of the Jackson, et al., study,

25  and -- and I thought that was, you know, from what I know, was

1    a pretty carefully done study, and yet, even there, it was

2    subject to criticism.

3         And so I'm not sure -- what I was proposing was very

4    simpleminded, and so it probably would have been better not to

5    do a poor study and just rely on our toxicologists' advice,

6    and -- and I accepted that.

7    Q    Do you think it was reasonable for the Study Panel to

8    rely on the advice of the toxicologists whose advice it

9    sought?

10   A    Yes.

11   Q    Okay.  Do you know, incidentally, whether it's common to

12   rely on literature values to assess toxicity?

13   A    I believe it is.

14   Q    Let's talk very briefly about natural attenuation.  When

15   you thought about natural attenuation and -- and the speed at

16   which the system is recovering, what -- on what data did you

17   rely?

18   A    Well, we -- we relied primarily, not exclusively, but

19   primarily on the sediment core data and the degree of

20   contamination in the sediments, but also -- I'm tempted to say

21   equally important, but less certain, the -- the high degree of

22   contamination in the biota.  And, ultimately, we're trying to

23   protect the biota.  We're not trying to protect sediments.  So

24   -- so we're, you know, particularly concerned about the biota.

25   Q    Let's --

FISHER - DIRECT EXAMINATION/BERNARD

727

1   A     And biota, I mean, everything that chirps and peeps and,

2   you know, swims in the ocean and so on, so forth.

3   Q     Let's just take those in order.  In terms of the

4   sediment core data, do you have confidence in the analysis and

5   advice of Dr. Santschi?

6   A     Oh, yes, yes, I do.

7   Q     And did you rely on his analysis?

8   A     Yes, I do.

9   Q     Okay.

10  A     We all do.

11  Q     Now, this second factor you mentioned, which was the

12  degree of contamination in the biota, how does -- what's the

13  connection between that and your view about the speed at which

14  the system is recovering?

15  A     Okay.  So -- so we want to know if -- first of all, are

16  the biota contaminated compared to other areas in Maine?  And

17  we unequivocally convinced ourselves that they were very

18  contaminated compared to other regions, such as in reference

19  sites.  Not just clean reference sites, even other

20  contaminated sites, they were among the highest that have been

21  observed.  So -- so very contaminated.

22        We also realized that the mercury, if it was introduced

23  by HoltraChem, was introduced in the late '60s.  If it was

24  introduced by slimicides, as Vaillancourt suggests, it was

25  even introduced earlier than the late '60s, introduced in the

1   '40s and '50s.

2        So the system's clearly been contaminated for many

3   decades, and yet it's very obvious, I mean, to anybody who

4   looks at the data, that -- that the organisms are very

5   contaminated, not every single organism, but many species that

6   we've identified are contaminated, and it's not like

7   10 percent above reference levels.  It's like ten times above

8   reference levels in -- in some cases.

9        So it's, you know, a much higher degree of

10  contamination.  So that suggests that the system is not

11  cleaning itself up very rapidly at all.

12       Um, then -- well, let me just end there.

13  Q    All right.  Do you agree with the Study Panel's finding

14  that natural attenuation is occurring too slowly to leave the

15  system alone if an active remedy can be found?

16  A    Yes.

17  Q    Let's turn to the parties' expert reports.  Did you read

18  the report of Dr. John Connolly?

19  A    Yes.

20  Q    Okay.  And he's a defendant expert witness; is that

21  correct?

22  A    Yes, he is.

23  Q    Okay.  And did you understand Dr. Connolly to opine that

24  the Penobscot System is -- is not all that contaminated with

25  mercury?

FISHER - DIRECT EXAMINATION/BERNARD

1   A     That was the tone of his report.

2   Q     And -- and do you have a response to that?

3   A     I don't know what data he's looking at because I think

4   he's quite incorrect, and he's just ignoring most of the data

5   that we presented in the report.  That seems to me to be the

6   case.

7   Q     Did you -- are you -- are you aware of his prediction of

8   how quickly the system will clean itself -- clean itself up

9   naturally?

10  A     Yes.

11  Q     And -- and do you remember his range of years?

12  A     Um, well, for -- I believe he estimated 10 to 15 years

13  half-life.

14  Q     Okay.  And was one basis that he articulated in his

15  expert report the trends he discerned in mercury contamination

16  in Penobscot biota?

17  A     Yes, it was.

18  Q     And do you have a view about that?

19  A     I have several views about that, and they're not very

20  charitable, I'm afraid.  I thought that he selected only those

21  very few sites that actually conformed with his idea that the

22  system was cleaning up very rapidly, and I could give you an

23  example.  But there are many examples.

24        So, for example, he said tomcod -- you know, the decline

25  of mercury concentrations in tom -- tomcod over the period of

FISHER - DIRECT EXAMINATION/BERNARD

730

1   2006 to 2010 -- and I forget the exact years, but something

2   like that -- is cleaning itself up pretty -- you know, it's

3   declining, and -- and so we can calculate a cleansing rate, if

4   you will, of the mercury in tomcod.

5        So I -- I thought, you know, let me take another look at

6   the data that we generated.  Maybe John's right.  And I looked

7   at all of the data, not -- all the data for tomcod and for

8   mussels, for the various birds, for the eels, for Fundulus,

9   and so on and so forth, and for the tomcod, there seemed to be

10  -- there were like ten, or so, sites where we had several

11  years of data for mercury concentration, and only one site,

12  which was the site I think he chose, only one site showed what

13  appeared to be a pretty steady decline.  And I -- and the

14  other sites were bouncing, as we would have expected, were

15  bouncing up and down from year to year.

16       And so I thought, you know, that's -- that -- it's --

17  it's not very persuasive.

18  Q    I just put in front of you a page from Joint

19  Exhibit 6-14 which is from -- at Page 14-15 of the Phase II

20  Report, and -- and this -- do you recognize this figure?

21  A    I do.

22            MR. BERNARD:  And just let me show the court.  It's

23  Figure 14-4.

24  BY MR. BERNARD:  And does this help to depict what you were

25  just describing orally?

1   A      Yes, it does.

2   Q      Could you explain that to the judge, please, show the

3   judge what --

4   A      Certainly.

5   Q      -- you were saying?

6   A      So what we have is on the horizontal axis, we have

7   different sites in -- in the Penobscot, and on the vertical

8   axis, we have the total mercury concentration in nanograms per

9   gram wet weight in tomcod, and for some of these -- and -- and

10  we have data for up to four years -- 2006, '8, '9, and '10.

11        And what you see at each -- not all sites do we have all

12  four years, but many of the sites we have four years.  And for

13  any one site, you can see that the level -- the concentration

14  of mercury can decline in one year and go back up the next

15  year and go back up further the following year, such as

16  OB1E-4, for example, or ES11N.  In effect, almost all of the

17  sites.

18        Now, there were a couple of sites where we only had two

19  years' worth of data, the first the northernmost sites, the --

20  the -- shown on the left-hand -- the first three sites, but we

21  only have two years of data, and there it looks like, well,

22  there might be a decline there, but even John Connolly in his

23  testimony said he would never rely on only two years of data.

24        So I -- you know, I think this was -- you can't just

25  rely on -- on two years of data to -- to infer anything, any

1   kind of trend.

2       And the only site that there seems to be a steady

3   decline, if -- if it's -- it's probably not statistically

4   significant, by the way, but a steady decline is right in the

5   middle, OB1S-1, where it looks like for a three-year period,

6   there looked like some decline.  But all the other sites,

7   there was no decline.

8       And so to take that, you know, as an example of a

9   decline in -- in a -- and say, well -- and then we look at

10  other species and we see declines in the same span of years,

11  so the -- the -- his phrase was the weight of evidence -- the

12  weight of evidence suggests that they're all going down --

13  even if it's not statistically significant, the trend is

14  they're all going down at more or less the same rate, and so

15  we can calculate a -- a biological attenuation rate, if you

16  will.  And, you know, I -- I wasn't buying it at all.

17  Q   Let's just look at OB1E-4, which is the fourth station

18  from the left on the horizontal axis, and that's in the

19  Orrington to Bucksport reach; is that correct?

20  A   Ah, yes.

21  Q   Okay.  So if you just look -- there are four bars there;

22  is that correct?

23  A   Yes.

24  Q   And each represents a particular year of sampling data?

25  A   Yes.

1    Q     Okay.  If you just looked at the first three years,

2    let's say you were looking at this in 2009 and you had data

3    from '06, '08, and '09 --

4    A     Yes.

5    Q     -- you could say, if you were just eyeballing, that that

6    looks like a decline, right, between the first year and the

7    last year of sampling?

8    A     I'm not even sure I would say that.

9    Q     Well, it -- let me put it to you differently.  The --

10   the 2009 total mercury level is lower than the 2006.

11   A     But higher than the 2008.

12   Q     Correct.  But if you -- here's -- here's the question

13   I'm asking.  If you were to stop at -- if you were to say

14   after three years, well, you know, it looks like it's lower,

15   and then you looked at the fourth year of data, you would have

16   been wrong.

17   A     Correct.

18   Q     Is that correct?

19   A     Yes, that's correct.

20   Q     Okay.  Now, is it difficult to discern trends in mercury

21   and biota over short sampling periods?

22   A     It's extremely difficult.  It's -- I -- in my view, it's

23   only possible if the decline or if -- if the changes are

24   traumatic, that is, it goes down by 50 percent each year, or

25   something like that, but and -- and sort of a steady decline.

1   But we don't see that sort of traumatic change from year to

2   year here, nor would we expect to see one.

3        And for all of the sites, we see that, you know, there's

4   pretty much -- any change that occurs from year to year is

5   fairly small, and it -- some of them go up and some -- from

6   year to year and some go down.  But I could not, from this

7   graph or from the other biota graphs that we have, for eels,

8   for flounder, for mummichog, you name it, I could not discern

9   any pattern of -- of a decline that John Connolly seems -- he

10  seems to see it, but I don't see it.

11  Q    Is the Penobscot what you'd call a variable ecosystem?

12  A    Yes, I guess, and -- and rivers, especially fast-flowing

13  rivers, things change, yeah.

14  Q    And does that mean there's a lot of interannual

15  variation --

16  A    Absolutely.

17  Q    -- that is, variation in mercury, in this case, values

18  or concentrations from year to year?

19  A    Yes, it does.

20  Q    And that depends on a host of environmental factors?

21  A    It does.

22  Q    Okay.  And does that mean you need a longer time in

23  order to have confidence in any trend, whether it's increasing

24  or decreasing of mercury concentration?

25  A    I believe it does.  In fact, I -- I would only use the

1    word trend if -- you know, if we have a clear, sort of

2    consistent pattern over, you know, many years.  Otherwise,

3    it's just sort of bouncing around from year to year.

4    Q      Do we have -- it -- for most organisms, did the Study

5    Panel find any consistent trend in mercury concentrations

6    during the course of the study?

7    A      For most organisms, no.

8    Q      How do mussels acquire food?

9    A      Okay.  Mussels acquire their mercury almost exclusively

10   -- in fact, all -- all marine animals or all aquatic animals

11   almost exclusively from their food and not from water, so it's

12   -- and we've actually quantified that for many different

13   aquatic species, and it's like 98 to a hundred percent from

14   food, and that's -- other people have found similar findings.

15        Mussels each phytoplankton, those single-cell plant

16   cells, and so they filter them out of the water, and if the

17   mercury happens to be associated with those phytoplankton

18   cells, the mussels will assimilate the mercury out of the

19   phytoplankton diet.

20        So, basically, they're eating food that's up in the

21   water column, and some of it settles toward the bottom, and --

22   and mussels live often either on the bottom or near the

23   bottom, and so they're -- they acquire their food that way,

24   and they can pick up their mercury from the phytoplankton food

25   up in the water column, unlike the benthic feeders, which are

1   acquiring it more from a sediment-based food chain.

2   Q    Could a decline in mercury and mussels be unrelated to

3   what's going on in the local sediment?

4   A    Um, yes.  I wouldn't necessarily assume no relationship,

5   but I would assume a much weaker relationship for mussels with

6   sediment than, say, for flounders with the sediment.

7   Q    Okay.  Chapter 14 of which this figure is -- is a part,

8   talks about -- uses language trends, temporal trends.  You're

9   familiar with that?

10  A    Yes, I am.

11  Q    Okay.  Now, to you, does -- does there being a trend, in

12  other words, something that's going down or up over time, is

13  -- is that equivalent of there being a meaningful trend, that

14  is, something that shows an actual reliable increase or

15  decrease in mercury contamination?

16  A    No, it does not.

17  Q    Let's turn to the report of Dr. Keenan briefly.  Did you

18  read his report?  He's a -- he's an expert witness for the

19  defendant, right?

20  A    Yes.

21  Q    Did you read his report?

22  A    Yes.

23  Q    Do you remember whether he conducted an ecological risk

24  assessment?

25  A    I believe he did.  I had trouble making sense of some of

1   what he wrote, but, yes.

2   Q      Let me just ask you this.  Did he in his report rely on

3   toxicity studies that measured lethality?

4   A      Yes.

5   Q      Do you recall?  And do you have a view about that?

6   A      Well, that's interesting information, I mean, lethal

7   toxicity is certainly important if it occurs, but it's not the

8   only form of toxicity that occurs, and it's rarely the only

9   form.  In fact, it's usually not present.  It's usually the

10  sublethal effects that appear in most natural ecosystems.

11  Even pretty contaminated systems, like the Penobscot,

12  concentrations are often not at such high levels that -- that

13  organisms are just dropping dead.

14        So lethal toxicity work is -- it's of interest, but it

15  -- it has limited application to most natural systems.

16  Q      Has there been a trend -- do you know -- in the toxicol

17  -- toxicol -- toxicological literature to deal with sublethal

18  effects?

19  A      Oh, yes, and this -- I mean, this is no -- nothing new,

20  actually.  This is over the last 30 years or something that

21  increasingly we're finding levels that were previously thought

22  to be tolerable to be not so tolerable as our ability to tease

23  apart physiological processes, for example, or to work on

24  immunological functions and -- for some organisms or

25  biochemical indicators of stress, so -- and, also, our ability

to study reproductive impairment.

And, often, reproduction, as Jim Wiener says, and I've found that in my own work, as well, that reproduction is often the most sensitive of the endpoints that one typically sees for sublethal. So the -- the adult animal may not be impaired at all, but it can't reproduce as effectively as it could if it were not contaminated, for example.

Q If one were to look exclusively or primarily at lethal effects, could you be missing sublethal effects that could have severe adverse impacts on a population of aquatic organisms?

A Absolutely, yes.

Q Did Dr. Keenan -- do you recall -- criticize the Study Panel for not measuring selenium in Penobscot biota?

A Yes, he did.

Q And do you work on selenium in -- in your own lab?

A Yes, for many years.

Q And in your work there, have you seen any clear evidence that selenium detoxifies mercury?

A No, we've looked at that, but we haven't looked at -- we've only looked at that in phytoplankton and zooplankton, so we haven't looked at other types of organisms, but we've seen no significant, either antagonistic or synergistic, effects, just no effects.

And -- and we work with environmentally-realistic

1  selenium and mercury concentrations.  I think that's very

2  important.  It turns out that selenium is very well-regulated

3  by animals.  It's an essential element, and it behaves very

4  similar to sulfur, so that's why there's an interest in

5  selenium as a possible mitigant for -- for mercury impacts,

6  and it turns out that aquatic animals have pretty constant

7  concentrations of selenium.  There's -- there's a very modest

8  difference within a species or even among species, whereas

9  mercury levels can vary tremendously because it's not

10  regulated at all.

11      So the key thing that selenium advocates suggest is to

12  look at selenium-to-mercury or mercury-to-selenium ratios in

13  organisms, and that's driven entirely by the mercury

14  concentration because the selenium levels are pretty constant.

15  And in almost all cases, selenium levels exceed mercury

16  levels, and yet one sees mercury toxicity to -- to organisms.

17  So I have my doubts about the selenium story.

18      Selenium, if I -- one other last bit is, it's -- the

19  biochemistry is even more complicated than the mercury.  So

20  there are many different forms of selenium that are out in the

21  -- in the water, different forms that are taken up by

22  organisms.  Once selenium gets into an organism, it gets

23  converted into another form.  And so it's still -- it's still

24  an area that's actively being researched in, so I don't want

25  to completely dismiss it, but so far, I haven't seen

1   compelling evidence.

2   Q     Did you read the expert report of Dr. Henry?

3   A     Yes, I did.

4   Q     And she's also one of defendants' expert witnesses; is

5   that correct?

6   A     Yes.

7   Q     And did she criticize the Study Panel for not conducting

8   field toxicity tests of the birds in Mendall Marsh?

9   A     Yes.

10  Q     And is it fair to say you're sympathetic with her

11  perspective on that in light of our prior discussion?

12  A     Um, to -- to a degree, I'm sympathetic.  On the other

13  hand, I think she was too dismissive of the approach that we

14  took, and I guess I have come to accept and even endorse the

15  approach that we took about not doing toxicological work

16  because of some of the problems associated with it.  And so I

17  -- I think she and I would -- would not see entirely eye to

18  eye on that.

19  Q     Just pursuing that, during your deposition, you

20  testified that despite your predilections as an

21  experimentalist, you think there is wisdom -- I think that's

22  the word you used -- in the approach the Study Panel

23  ultimately took to determining to -- or assessing toxicity.

24  Do you remember that?

25  A     Yes.

1  Q     Please explain.

2  A     Well, again, this goes back to many of the comments that

3  my colleagues suggested to me, such as, can we do the -- a

4  proper sublethal toxicological study well in -- in a finite

5  amount of time, and how would we know exactly what species or

6  several species to focus on, and is it practical to do, can we

7  do it, and can we do it at an affordable rate?  So those were

8  -- those were one set of issues.

9        If we couldn't select the right species or do the study

10 properly, then we would be more vulnerable than if we did

11 nothing and relied on the world's best toxicologists to -- to

12 give us guidance on that, which is what we did.  That's my

13 answer, I guess.

14 Q     Did Dr. Henry opine about the use of sublethal effects

15 in assessing toxicity, sublethal effects other than

16 reproduction?

17 A     Yes, she did.

18 Q     Do you remember what she said?

19 A     Yes.  Well, we -- we were talking about some biochemical

20 endpoints and -- and other physiological-type endpoints and --

21 including behavioral, which is something, again, that I'm not

22 very used to because I deal with plankton, which have very

23 little behavior, and -- and I think that, you know,

24 increasingly, toxicologists are recognizing that some of these

25 biochemical endpoints are very sensitive and not just

1   sensitive to the exposure history of the organism to whatever

2   contaminant, but, as well, they may lead to the organism

3   getting sick or becoming more vulnerable to predator attack or

4   things like that.

5        Often organisms in the wild get sick.  They get diseased

6   in the way humans do, and if certain functions are impaired,

7   their ability to fight off, you know, a bacterial infection or

8   a fungal infection is diminished, and so they can get sick.

9        So this has been recognized in the toxicological

10  literature for quite a long time now for a variety of

11  different contaminants, in fact, mostly not mercury, mostly

12  pesticides and other substances.  And -- so she did not seem

13  to recognize the value of those endpoints, and we thought they

14  should be considered.

15  Q    Did Dr. Henry -- do you remember -- lump together

16  organisms from different locations and -- and evaluate mercury

17  according to a so-called grand mean?

18  A    As I recall, yes, she did that.

19  Q    What is -- what is a grand mean?

20  A    A grand mean would be a mean of -- of all the organisms

21  from all different locations, for example, or different ages

22  or different sexes or different sizes, that sort of thing.

23  Q    Do you have any view about her use of the grand mean in

24  -- in -- in this context?

25  A    It's not very helpful.

1    Q      And, just briefly, why?

2    A      Well, um, we know, for example, that -- just to take a

3    simple example, if you take animals that are different ages,

4    we know that fish, for example, increase their methylmercury

5    concentration with age.  So if you were to lump young fish

6    with old fish and you took a grand mean, it's not really

7    reflective of -- of what's present in that -- in that mixture

8    that you have.

9          Likewise, if you took samples from a fairly clean

10   environment and you mixed it with samples from a very

11   contaminated environment and you took a grand mean and you

12   would say, not so bad.  But, in fact, it might be very bad

13   for, you know, some of the organisms and for other organisms

14   not at all.

15         So it's -- it's not helpful to take a grand mean in this

16   way.

17   Q     Is it appropriate, in your view, to average mercury in

18   bird blood over a one-year period?

19   A      No, that's -- that's just plain silly.

20   Q     And -- and can a bird be harmed at a particular point in

21   time when mercury levels are -- are high?

22   A      Yes, of course.

23   Q      And is that why it's silly?

24   A      Yes.

25   Q      Okay.

FISHER - DIRECT EXAMINATION/BERNARD

744

1   A     So, for example, I mean, I could give you a poison

2   today.  I could give you arsenic, and you could drink it and

3   get sick and die if the concentration was high enough.

4         But if we measured the arsenic in your body over a

5   period of six months and took the average arsenic over that

6   six-month period, we'd say, oh, the arsenic is so low, you're

7   -- you're perfectly safe.  But at the time when the arsenic is

8   really high, you're not safe at all.

9   Q     Have you become convinced over time that bird toxicities

10  on the Penobscot are unnecessary in terms of the mission of

11  the Study Panel?

12  A     I guess I would say yes, but the caveat is that I would

13  want to know just how -- I believe the toxicologists when they

14  tell me, oh, those birds are sick or dying, if they have

15  tissue concentrations like that, they're not well.  I don't

16  have any reason to doubt that.

17        But I guess I want to know just how unwell are they, and

18  I want to know that in terms of advising on remediation

19  strategies.

20  Q     Okay.  Now, did you read the report of plaintiffs'

21  expert witness Charlie Driscoll?

22  A     I did.

23  Q     What'd you think of it?

24  A     I thought it was, um -- I have very few criticisms of

25  it.  I liked it.

1    Q    Well, when you say you liked it, did you --

2    A    I thought -- I thought he was very perceptive.  I mean,

3    of course, I appreciated the fact that he thought ours was a

4    good study.  I thought he articulated the ideas of moving

5    forward with remediation meetings with engineers, he did that

6    better than we did in our Chapter 21.  I thought he -- he just

7    was more persuasive.

8         I disagreed with some of his suggestions, but in the

9    long run, I thought they were relatively minor disagreements.

10   Q    Do you agree with his suggestion that if there is a

11   further remediation phase that includes mercury scientists and

12   engineers, that all ideas should be on the table?

13   A    Yes, I definitely agree with that.

14   Q    Not just the ideas --

15   A    Correct.

16   Q    -- conceptual ideas set forth in the Phase II Report?

17   A    Those were just ideas that came to us, and we suggested

18   them, and -- and I think all of us are very open-minded to

19   other approaches.

20   Q    Let's turn for a moment to the connection, if any,

21   between total mercury and methylmercury in sediment.  Do you

22   remember Dr. Rudd's and, I guess, Dr. Whipple's testimony

23   about that?

24   A    Yes, I do.

25   Q    Okay.  And that's an issue that the Study Panel took up

1    and wrote about in the Phase II Report?

2    A    Yes.

3    Q    Are you persuaded that for each section of the Penobscot

4    Ecosystem, the data support this connection the Study Panel

5    found between total mercury and methylmercury in sediment?

6    A    Yes, I am.

7    Q    And are there factors other than the amount of total

8    mercury that drive the amount of methylmercury in sediment?

9    A    I think there are.  I think, for example, the particular

10   microbial consortia that are present, the factors that are

11   influencing their physiology at the time because, after all,

12   it's -- it's bacteria that are doing the methylating, and so

13   if the bacteria are limping along because they don't have

14   sufficient supplies of carbon or nitrogen or something like

15   that, then their methylation rate may be lower than it would

16   if those nutrients were in greater abundance.

17        So there are other factors that influence the metabolism

18   of the methylators, but we -- clearly, we saw that for each

19   section of -- of the Penobscot System, whether it's the marsh

20   or the -- the main stem of the river or Orland or whatever,

21   that we saw a very clear relationship between -- in -- for

22   total mercury and methylmercury.

23   Q    Does the existence of additional factors that may affect

24   the production of methylmercury nullify the correlation the

25   Study Panel found between total mercury and methylmercury in

1  sediment?

2  A     I don't think so, no.

3  Q     Do you believe there's any connection in the Penobscot

4  between methylmercury in sediment and methylmercury in

5  organisms?

6  A     Yes.

7  Q     Please explain.

8  A     Well, many of the organisms that live in the Penobscot

9  System rely on feeding in the benthos, that is, you know, a

10  sediment-based food chain, and so if you have more

11  methylmercury in the sediment, it's going to translate to more

12  methylmercury that's biologically available to animals that

13  eat there.

14      So, I mean, let's take an extreme example.  If there was

15  zero methylmercury in the sediment and the animal eats only in

16  the sediment, then you would expect to see zero methylmercury

17  in the animal.

18  Q     If sediment mercury -- withdrawn.

19      If -- if an active remedy were to succeed in reducing

20  sediment mercury, do you expect a proportionate reduction in

21  mercury in Penobscot biota?

22  A     Ultimately, yes.  It may not be immediate because, for

23  example, the -- the methylmercury in fish is very long-lived.

24  So if you change the methylmercury in the sediment, even for a

25  fish that feeds in the sediment, such as a flounder, the --

1    the rate of change in the -- you may not see the decline that

2    you see in the sediment in the fish very quickly, it may take

3    months or it may take a year, or so.  I don't know.  It

4    probably depends on, you know, the particular species that's

5    present.  So I don't know that.

6        But, ultimately, yes, I mean, ten years from now, I

7    would expect to see that if you drop the methylmercury level

8    in the sediment by 70 percent, you would see 70 percent lower

9    levels of mercury in benthic feeders.

10   Q    And then would that translate over time up through

11   the --

12   A    Yes.

13   Q    -- benthic food web?

14   A    Yes, it would.

15   Q    There's been some testimony about risk that's inevitably

16   associated with any active remedy.  Have you listened to some

17   of that?

18   A    Sure.

19   Q    Okay.  In your view, if an active remedy were to be

20   carried out with due care, do you believe it's likely to cause

21   harm?

22   A    Well, here I'm somewhat out of my expertise.  So --

23   Q    Let -- do --

24   A    -- I suspect it would not if it were done with due care,

25   but I don't know.

FISHER - DIRECT EXAMINATION/BERNARD

1    Q     Let me just ask you some closing questions, then.  Are

2    you proud of the Penobscot River Mercury Study?

3    A     Very much so.

4    Q     And to your knowledge, is the most comprehensive study

5    of mercury in any environment that you know of?

6    A     Yes.

7    Q     Does it constitute high-quality science by your

8    standards?

9    A     Yes, it does.

10   Q     How would you characterize the degree of consensus on

11   the part of the study scientists?

12   A     Oh, well, on -- on -- each little issue was debated and

13   discussed extensively, but everybody, I believe, on the panel

14   and Drew Bodaly and Dianne and Carol, all, I believe, fully

15   support the overall document and the recommendations and the

16   interpretation of the data.  So I don't think there's much in

17   the way of disagreement there.

18         And -- and I think we benefited tremendously from a

19   remarkable group of experts.  I mean, we really picked -- I

20   mean, I know Dr. Whipple and Dr. Rudd said, you know, these

21   guys were very competent.  They weren't just very competent.

22   They were outstanding scientists.  These are the best guys out

23   there, in my opinion -- Santschi, Dave Evers, Cindy Gilmour.

24   Q     Who's not -- who's not a guy, right?

25   A     Not a guy.  Well, she's lumped into the collective -- we

1    say guys in New York.

2    Q    Are you firm to any -- you mentioned Dr. Santschi,

3    Dr. Evers, Dr. Gilmour.  Who else are you putting in this

4    group?

5    A    Wiener, ah, um.  Who am I not thinking of?

6    Q    Dr. Geyer?

7    A    Geyer, yeah, Rocky, I mean, you know, Rocky's the chair

8    of the physical oceanography department at the Woods Hole

9    Oceanographic Institution, which is the preeminent

10   oceanography place on earth -- or at least he used to be

11   chair.  I don't know if he still is.  And he's -- he's very

12   fine.  He's very good.

13   Q    All right.

14   A    He's very experienced.  I mean, we went to the best

15   people we could get, and they all agreed to do it, and so we

16   were delighted that they did.  And we also went to excellent

17   reviewers to steer us right if we were, you know, off course,

18   and they did.  They -- they made suggestions to improve, and

19   -- and we listened to them carefully.

20   Q    During your deposition, you characterized the work of

21   the group as showing remarkable cohesion for a group of

22   scientists; is that a fair characterization?

23   A    I think it is, I think it is.  I mean, every -- so it's

24   not just the panel, but also all of the experts that we went

25   to.  They -- they were all convinced that the system was very

1    contaminated.  They were all concerned about figuring out some

2    solutions to what were clear problems, and -- and people had

3    disagreements, but they wanted to work together and cooperate,

4    and I thought they did, and I thought they did it very well.

5    I was just very proud to be part of that group.

6    Q    What in particular moved you to join the study -- you

7    know, within this mass of information --

8    A    Yeah.

9    Q    -- and analysis, what in particular moved you to join

10   the Study Panel's decision to recommend active remediation?

11   A    It's fairly simple, actually.  The -- the system is very

12   contaminated, has been contaminated for a long time.  If the

13   system was cleaning itself up rapidly, then we would not see

14   the high degree of contamination that we see in the sediment

15   and biota.

16        So the -- in my view, the weight of evidence is the

17   system is very contaminated and not cleaning itself up as

18   quickly as we would like.  If we can figure out a way to help

19   the system along without hurting it -- right -- then we'd like

20   to do that.  I think we can do it without hurting it.  The --

21   the issue is whether or not it -- we would clean it up as

22   effectively as we can, and there we need the help of guys who

23   move around dirt for a living and -- and get -- get the

24   engineers' advice.  They may tell us it's not possible.  I

25   kind of doubt that.

1        And I think the approach that -- that was proposed in

2    the final report was one where we recognized that the system

3    is -- the mercury is disbursed all over the place.  It's not

4    just in one location where you can dig it up and be done with

5    it.  And so we wanted to figure out a way that we could lower

6    the -- the mercury in the sediment, which we think is the

7    ultimate source for much of the methylmercury in the biota,

8    and we wanted to figure out a way to -- to do that without

9    horribly expensive dredging operations and without introducing

10   other contaminants that -- that could be catastrophic to the

11   ecosystem.

12        Whether or not the approach that we suggested -- and

13   it's just, you know, a concept, as -- as Chris and John have

14   said -- whether that's the best approach, I don't know, and,

15   again, it's out of my discipline.  So I am not sure, but I --

16   I think it's worth exploring.

17   Q    And you join the Study Panel's recommendation to put the

18   right people in the room to conduct that -- to -- to --

19   A    Sure.

20   Q    -- carry out that exploration?

21   A    Sure, sure.

22   Q    During your deposition, you pointed to this figure,

23   which we've seen before.  This is Plaintiffs' Exhibit 57 in

24   evidence.  I don't know if you recall.  But do you remember

25   the figure?

1   A     Yes, I do.

2   Q     And -- and when I asked you what in particular moved you

3   to join the Study Panel's recommendation to the court that it

4   order active remedies in the river, you pointed to this

5   document.  Could you -- or this figure.  Could you briefly

6   describe what it is in this figure that -- that moves you?

7   A     Well, simply, if you look at the red dots -- well, I'm

8   -- like you, I'm color-blind, so I think they're red dots.

9   But if you look at the dots that are depicting Mendall Marsh,

10  and they're -- they're way up there.  You know, they're very

11  high.  This is very high methylmercury concentrations and --

12  and higher than most other sites that we've had information

13  on.  And if we can figure out a way to lower that -- the

14  extent of methylmercury contamination in the marsh, we think

15  we can protect the organisms that live in that marsh, and --

16  and we think they are likely being impaired now based on their

17  tissue concentrations.  So we want to see if we can help them.

18  Q     At your deposition, the second thing you said that moved

19  you is the high mercury concentration in edible animals in the

20  ecosystem.  Do you remember that?

21  A     Yes.

22  Q     And is that your view today, as well?

23  A     Yes.

24  Q     And does that include ducks?

25  A     Yes.

1    Q      Does it include lobster?

2    A      Yes.

3            MR. BERNARD:  Nothing further, Your Honor.

4            THE COURT:  Thank you.

5        Cross-examination?

6            MR. TALBERT:  Yes, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. TALBERT:

9    Q      Good afternoon, Dr. Fisher.

10   A      Hello.

11   Q      Earlier you had a discussion with Mr. Bernard regarding

12   a critique of Dr. Connolly's expert report, and, specifically,

13   I think you critiqued what he did with -- with tomcod and

14   looking at --

15   A      Well, the tomcod is an example, but, yes.

16   Q      Okay.  And just so we frame and I understand that

17   critique, I believe you said your critique was that he -- you

18   believed he cherry-picked some data; is that what you said?

19   A      Well, that seems to be the case, yes.

20   Q      Okay.  Why do you say that?

21   A      Because he did not use all the data to -- to discern a

22   trend.  He just used data from a nonrepresentative of the

23   total group of -- of sites.  He used one particular site or

24   one or two sites -- I forget -- that -- that suggested a

25   decline and did not show information about the many other

1    sites where there was no decline.

2    Q     Let's --

3    A     And -- and, you know, there were a few sites for the

4    tomcod where there were only two years of data, and it looked

5    like there was a decline in those -- the -- the northernmost

6    sites, if you will recall.  But it's only two years of data,

7    and even John says he would never use only two years of data

8    to infer that there's a trend.  I mean, I believe he -- he

9    said that in his deposition, and I would agree with that.

10        I -- it may well be, it may well be that the biota are

11   declining throughout the system.  I -- I don't dismiss that as

12   a possibility, but we don't see clear evidence for it.  We

13   certainly don't see any statistically-significant evidence for

14   it.  And it -- for many organisms, there's absolutely, you

15   know, no trend at all, and he did not really discuss those

16   organisms.

17        So I thought it was a bit of wishful thinking.  I -- I

18   hope they are declining, but I don't see clear evidence for

19   it.

20   Q     Okay.  Let's orient ourselves so that we're on the same

21   page of what we're talking about.  Let's take a look at Joint

22   Exhibit 45 and go to Page 31 of that.  This is a -- this is

23   John Connolly's expert, and on Page 31, there's a section on

24   biota trends, and I just want to orient you to the

25   introduction here.

FISHER - CROSS-EXAMINATION/TALBERT

1    A    Okay.

2    Q    I think it starts with this -- okay.  And so John is --

3    is stating here, the fact that decreasing trends are far more

4    frequent than increasing trends is evidence of recovery,

5    despite the fact that interannual variability makes it

6    difficult to assess trends at individual locations with the

7    short data record that is available.

8         And now let's take a look at the tomcod on the next

9    page.  Let's -- if you can blow that section up.  So here's

10   what John reports on tomcod.  He says, five stations have data

11   spanning 2006 to 2010 or 2006 to 2012.  He cites your report.

12   Two stations show a clear downward trend, and the others

13   exhibit no consistent trend, though none exhibit an upward

14   trend.

15   A    Okay.

16   Q    So he -- he was acknowledging, correct, that he looked

17   at that data and -- and he said those others don't have a

18   trend?

19   A    Yes.

20   Q    And --

21   A    But he's inferring from these data and data from some of

22   the other biota that if there's a trend at all, it's -- would

23   appear to be downward.  And I would say that, for one thing,

24   there was, in most cases, no statistically-significant change

25   from year to year, not always, but often.

1       And I think even John would agree that we would like to

2  have a longer period of time before we could infer that there

3  is a trend.  We could say, well, yeah, it seems to be going --

4  it seems to be -- looks like it's going down for a couple of

5  years, but, I mean, it's very hard to say that there's a -- a

6  trend there, and we need a longer-term data set.  And I -- I

7  think John said that, too, and I -- I think we are -- agree on

8  that.

9  Q    Yeah.  I mean, my point is, isn't -- isn't John really

10  just looking at seeing downward versus upward trends and

11  saying, the system's recovering, in his view?

12  A    Yeah, but it's not recovering.  I mean, it -- in the

13  sense that we -- for many of those species, okay, we might not

14  see an increase, but we don't see any change with time.  And I

15  would actually like to see those two stations that he says

16  there's a decline.  I only saw one in the -- in the Table 4 --

17  Figure 14-4.  So --

18  Q    Well, let's -- we can pull up -- that was Joint

19  Exhibit 14-4 at 14-15, Page 15.  Okay.  So I believe the two

20  stations -- one of them I think you already acknowledged you

21  thought that at least it was -- it was downward, granted there

22  weren't --

23  A    Weren't significant, but there's -- the trend was down.

24  Q    And the other is, ESO2E, and, again, John is looking at

25  the end, so these last -- right?

FISHER - CROSS-EXAMINATION/TALBERT

1   A    Would you say that's a downward trend?

2   Q    Well, I think vis-a-vis what he is saying is that

3   there's -- there's no upward trend, there's no upward upticks

4   as opposed to down.

5   A    Well, there's an increase from 2008 to 2009, pretty --

6   in fact, the biggest change was from 2008 to 2009 when it went

7   upward.  I -- I mean, if I looked at those data or if I showed

8   them to the man on the street, I don't think anyone would say

9   that's a -- an -- evidence of a declining trend.

10  Q    Would you at least agree that it's certainly not

11  cherry-picking when you tell someone what you're doing and

12  what you're observing?

13  A    I mean, I don't want to quibble about terms, but I don't

14  -- I don't see that as, in any way, convincing evidence that

15  there's a decline in -- in those tomcod at that location over

16  that four-year span.

17  Q    Let's switch gears and talk a little bit about

18  toxicological studies.  I believe you mentioned that one area

19  that such studies could be relevant or important is helping to

20  inform potential remediation decisions.

21  A    Yes.

22  Q    Can you --

23  A    Yes.

24  Q    Can you explain that?

25  A    Yes.  Um, so my feeling, as I expressed to the panel on

FISHER - CROSS-EXAMINATION/TALBERT

1    a number of occasions, was that if we demonstrated that the

2    system was -- that there were species or organisms that were

3    really imperiled right now, and they were -- they were dying,

4    their population was declining, what have you, there was, you

5    know, serious threat -- I'm not dealing with human health

6    issues now, but just ecological effects -- then I would say,

7    boy, we better fix the system fast, if we can and if it's

8    affordable.

9         If, on the other hand, we -- the outcome of our

10   toxicological explorations is that, well, everyone's kind of

11   limping along, but none of the populations are showing

12   pronounced declines, we're not seeing change in species

13   composition, you know, and so on and so forth, it just -- it

14   looks -- coughing and limping, but it's not dying, it's not

15   seriously imperiled, then that would color my view -- I'm not

16   sure I share this, by the way, with the other panelists, but

17   it would color my view as to whether or not we needed to

18   implement a remedy.

19        And then it would depend on the cost of the remedy.  So

20   if the remedy was $10 billion, I would say it's not -- it's

21   just not worth it.  If the remedy were $12, I would say let's

22   fix it, right?  So it's a matter -- obviously, it's not going

23   to be 12 or $10 billion, but -- but I think to be more

24   informed about the risk if we do nothing would have been

25   helpful in guiding decisions about what sort of remediation

1    strategies.  And that was one reason I wanted to do the

2    toxicology.

3    Q    And isn't it possible that when engineers go and -- and

4    look at the system and, you know, try to make decisions, if

5    they're weighing, you know, these various potential remedies,

6    some of which may be extreme and, as we talked about, almost

7    every active remedy has some potential harm, correct?

8    A    Sure.

9    Q    So in weighing that decision, couldn't it also -- it

10   would be helpful in the way that you're suggesting, as well,

11   because you could then help -- help weigh your various

12   remedial alternatives?

13   A    Yes.

14   Q    Correct?

15   A    Yes.

16   Q    So if we thought that there were significant population

17   effects, then maybe the potential remedy that we implement,

18   we'd be willing to take on more risk in -- in the remedy to

19   help what would be a more severe problem?

20   A    Yeah, not just taking on more risk, but taking on a more

21   ambitious remedy strategy.

22   Q    Yeah.  Isn't it also possible that toxicological studies

23   could help inform the remedial options in the sense that you

24   would have additional information regarding the populations

25   that you were trying to ultimately protect?

1    A      Yes.

2    Q      I mean, in this way --

3    A      I don't think they're necessary to do that, but I think

4    -- you know, I'm of the view that, you know, there's never too

5    much data, and -- and data of this sort might be helpful in

6    guiding.  It might not.  I mean, we may not come to a more

7    advanced conclusion than we already have, but -- so, you know,

8    that's my view.

9    Q      I'll give an example.  If there -- if the study were to

10   yield information regarding the migration of the birds, better

11   defined the timing, when they arrive, what they're eating when

12   they arrive, you know, where they nest, and then -- and then

13   which birds return there each year, would that information be

14   potentially helpful if we're looking at various remedial

15   alternatives?

16   A      Well, I think we know a lot of that already.  I mean, I

17   would -- I would defer to Dianne Kopec, Dr. Kopec, about this,

18   but I think we -- we know where these birds come from, we know

19   what their mercury levels are when they first arrive, we know

20   what their life history/strategy is, we know what they eat, we

21   know when they leave.  So a lot of that is known.

22          What we don't know is whether or not the populations in

23   Mendall Marsh, for example, are -- are seriously in decline or

24   not.  We -- we can only infer that from the blood

25   concentrations.

FISHER - CROSS-EXAMINATION/TALBERT

1   Q     Well, we'll have this conversation a little bit with

2   Dr. Kopec, too --

3   A     Sure.

4   Q     -- about what we do or don't know at this point.  But at

5   this point, is it your understanding that we know whether the

6   same birds return each year or whether --

7   A     Oh, the same individual birds?

8   Q     Yeah.

9   A     I -- I remember we discussed that, but I don't remember

10  what the outcome was.  I don't know that.

11  Q     And it's my understanding -- but, again, we'll talk to

12  Dr. Kopec later -- about some of the food web study, the

13  timing of the study, my understanding is that some of that

14  data was taken after the nesting season, so we don't exactly

15  know the exposure prior to the birds nesting and arriving at

16  the marsh.

17  A     Again, I'm not sure if that's correct, but I would defer

18  to Dr. Kopec to -- to respond.

19  Q     You -- I believe you testified earlier that Dr. Evers

20  would be the avian tox -- toxicologist that you would defer to

21  on these decisions.

22  A     Well, um, he's excellent, and if he's available and

23  could put resources to bear to -- to do the study, then I

24  think he be would an excellent choice, but there are other

25  individuals, as well, who are excellent, as well.  So -- but

1   Evers would be the first guy I would think to go to, and it
2   would depend on what the panel as a whole thought.
3   Q      If Dr. Evers stated that he could do such a study and
4   that he thought he would recommend it because it would be
5   helpful -- yield helpful information, would you defer to his
6   opinion on that?
7   A      I think I would.  I -- I would certainly listen very
8   carefully to -- to what he had to say, to what he proposed to
9   do, and what he thought were the possible outcomes, and then
10  if I thought that the possible outcomes would be helpful in
11  remediation, then I would -- I would go along with that -- or
12  I would recommend going along with it.
13  Q      We will talk to Dr. Evers, but we -- we did have an -- I
14  did have an opportunity -- we did have an opportunity to
15  depose him and asked him that question.  I'd like to just show
16  you a little clip and ask your -- your thoughts on this.  Page
17  -- this is Defense Exhibit 988, and if we could please go to
18  Page 116.
19         And start here on Line 14, would you recommend
20  additional field study of Nelson sparrow and/or red-winged
21  blackbird in the marsh?  Witness says, recommend in the sense
22  of a scientific standpoint of better understanding the effects
23  of mercury at a population level of Nelson sparrows?  Question
24  is, yeah.  The answer, yes, I would.  Question, and, again, to
25  reiterate -- let's just go to the next page -- I would

1    recommend that on, again, the objective to best understand

2    population-level impacts of Nelson's sparrow at Mendall Marsh

3    simply on -- that's the best way to understand the issue of

4    mercury contamination on that species at that site.

5        Whether or not red-winged blackbirds are included within

6    that effort I would want to think about more.  Red-winged

7    blackbirds have a larger territory; they're more likely to be

8    confounded by mercury from upland areas; they feed in upland

9    areas commonly.  But we do use red-winged blackbirds often in

10   our studies.  They're big; they're common; and they give us

11   insight.  The Nelson sparrow are -- provide a truer and purer

12   signal of what's happening in the marsh.

13       Question, so isolating or removing red-winged blackbirds

14   from the picture and isolating the question of Nelson

15   sparrows, why would you recommend additional field study of

16   Nelson sparrow in Mendall Marsh?  Answer, I would recommend it

17   with the same reason that we had recommended it before.  And

18   he's referring to his proposal, correct?

19   A    I believe.

20   Q    At the question of are there population-level impacts?

21   Are there reproductive impacts even at an individual level of

22   Nelson sparrows in the marsh?  Question, and such a study

23   would provide information on whether there are impacts and

24   also the nature and extent of any impacts that -- that may

25   exist.  Answer, it would.

1    A      Yeah.

2    Q      What do you think of his --

3    A      Yeah, I -- I don't dispute any -- any of what he says.

4    Q      Okay.  Just to back up, I believe that, as Mr. Bernard

5    asked you, you -- you started out this study being a -- being

6    a proponent of doing toxicological field studies, correct?

7    A      Correct.

8    Q      And I believe that at the beginning, you believed that

9    it was more than just curiosity, it was actually something

10   that was essential for the study to do.

11   A      Well, I believed we would be vulnerable had we not done

12   it.

13   Q      Let's take a look at Defense Exhibit 228.

14           MR. TALBERT:  Which I will move in the record.

15           THE COURT:  Any objection to 228?

16           MR. BERNARD:  I just want to look at it for a

17   second, Your Honor.

18           THE COURT:  Sure.

19           MR. BERNARD:  Can we get better focus on that

20   somehow?  No objection.

21           THE COURT:  228's admitted without objection.

22   BY MR. TALBERT:

23   Q      Let's see if you could just blow up just the content of

24   the e-mail starting here and going up.  Okay.  So this is --

25   -- it looks like you're in the first line pointing out --

FISHER - CROSS-EXAMINATION/TALBERT

1   you're saying, my recollection of the judge's orders to us are

2   that we need to assess the impacts of the mercury from

3   HoltraChem on the Penobscot System and to figure out if any of

4   it is remediable, if there appears to be evidence of problems,

5   or something pretty close to that.  I would submit that

6   assessing toxic effects is part of our assessment of impacts

7   of the mercury in the system, in fact, an important part.

8        You go on to say, if we do not do any toxicity work in

9   Phase II, that would be a major change in our original plans

10  and should be discussed by us as a group.  I think any

11  interested party, certainly including folks in Maine, may

12  wonder, so what if the concentration of mercury or

13  methylmercury is such -- and such in the mussels or fish or

14  lobster or birds, is it likely to have an effect on them or on

15  human consumers?  Those are surely among the key questions

16  that need to be answered.

17       And then I -- I think you make this -- there are a lot

18  of analogies to this Ford-Cadillac approach, and I believe you

19  said, in my opinion, this is not building a Cadillac; it's

20  part of the basic engine.  Do you see that?

21  A     I do.

22  Q     And what did you mean when you said it was part of the

23  basic engine?

24  A     Well, it's -- it's -- it's an essential component of the

25  car or of the study, yes.

1    Q    This isn't fringe stuff.  This isn't --

2    A    Correct.

3    Q    -- extra bright headlights --

4    A    Right.

5    Q    -- and stuff like that.  You say, imagine if someone

6    said, hey, you already know what the mercury concentration is

7    in the sediments, so why build a Cadillac and measure

8    methylation rates in the Penobscot, just to apply methylation

9    rates determined at other estuaries to figure out how much

10   methylation is going on in the Penobscot.

11        So here you make the point that if -- you know, where

12   does that logically end if you're just going to rely on what's

13   known out there about certain scientific facts, correct?

14   A    Yeah.

15   Q    And in the case of methylation, when you did the

16   investigation of methylation at Mendall Marsh, you actually

17   learned valuable information, correct?

18   A    We did.

19   Q    You learned that from a systemwide comparison, it has

20   higher methylation rates than some other sites?

21   A    Correct.

22   Q    In 2008, I believe that you -- you also continued to

23   have the strong view that doing these studies would be

24   important for the study, correct?

25   A    I don't remember the years.  They all blend.  I'm sorry.

1   Q    Let's -- let's pull up Defense Exhibit 591, which I

2   believe has already been admitted into evidence.

3            THE COURT:  I don't think so.  At least I don't have

4   it marked as being admitted.

5            MR. TALBERT:  If it's not, I will -- I'll move for

6   its admission now.  But --

7            THE COURT:  Is there any objection to 591?

8            MR. BERNARD:  No, Your Honor.

9            THE COURT:  591 is admitted if it already -- if it

10  has not already been.

11           MR. TALBERT:  Okay.

12  BY MR. TALBERT:

13  Q    And I want to focus on the toxicity paragraph.  If we

14  could just blow the first part of this up.  Okay.  You state,

15  we have not demonstrated that concentrations are toxic to

16  anything in the Penobscot, only that levels exceed those that

17  can affect generic benthic organisms in sediments or greater

18  than levels that are toxic to other sorts of organisms,

19  comparing one bird to another, for example.  While I do

20  believe that the levels we are finding are -- are probably

21  toxic, unless we show that, at least for one or two major

22  types of organisms, we're being derelict in our duties.

23  Further, sediments vary notoriously from one location to

24  another, so using the Long compilations that NOAA relies on,

25  which it, in turns, relies on many very questionable toxicity

FISHER - CROSS-EXAMINATION/TALBERT

1   studies.  Often assessing acute toxicities with wholly

2   inadequate approaches is clearly problematic.

3       So here you're -- you're raising, in part, the -- the

4   NOAA studies and how good those are.  Do you have an opinion

5   on that?

6   A    I think I expressed it in this e-mail.

7   Q    You believe that they're -- they could be deficient,

8   correct, in certain ways?

9   A    Yes.

10  Q    Can you, for the court, just explain what -- what ways

11  in which the NOAA --

12  A    You know, so -- so very often, you know, some of those

13  studies were done a long time ago, and these were -- like EPA

14  studies, for example, where they would pretend that animals do

15  not eat.  So they would put some animal into a beaker with

16  water, and they would add different concentrations of the

17  contaminant, and they would figure out at what concentration

18  the animal stopped hopping around and died, and they would

19  come up with what's called an LC50, a lethal concentration,

20  that would kill off half the animals over some period of time.

21  So often it's a 96-hour LC50, that kind of thing.

22      And that's bordering on junk science.  Um, it's -- it

23  was well-meaning, but we now know and have known for many

24  years that animals acquire their contaminants, such as most

25  metals, not all metals, from their diet, not from the

1    dissolved phase.

2         And, furthermore, if they pick up any metal that comes

3    in in the dissolved phase, it often ends up on the surface of

4    the animal, it's the kerapis (phonetic) of the animal, or

5    something like that, where it's not able to interfere with

6    metabolic processes in the same way as if it came in through

7    diet.

8         So normally we see, for example, in zooplankton, we

9    published a series of papers that showed that small

10   crustaceans, if they acquired a whole range of different

11   metals, including mercury, from the aqueous phase, dissolved

12   in water, it would mostly end up on the exoskeleton of the

13   animal and it was really harmless to the animal unless you got

14   to ridiculously, unrealistically high concentrations.

15        Whereas if the metal was presented in the form of food

16   to the animal, you saw toxicity to -- not to the adult, but to

17   the reproduction.  So the -- the females stopped producing

18   eggs -- I mean, there was a decline in egg production, and the

19   eggs that were produced didn't hatch with the same success

20   rate.

21        So it's because the metal got into a different place in

22   the animal because it was eaten rather than just sticking to

23   the surface.  So that's an example of, you know, a more, I

24   would say, refined toxicological approach, that I would

25   generally, you know, espouse for any study and not necessarily

1   doing it my way, but -- but at least doing something other

2   than sort of blunt force, sort of thoughtless, cookbook recipe

3   kind of stuff.

4        And so my concern was that we -- we do both sediment

5   toxicology, avian toxicology, we do it right.  But I caution

6   that this is a very involved process, and it's not cheap.

7   Science is not cheap.  And in the end, we may know not much

8   more than we know now.  I think, in fact, that's likelier than

9   not for most of the organisms I'm talking about, but I don't

10  know that.

11       And so I wanted to -- you know, my approach is to go out

12  and get some numbers and do it properly, but I understood the

13  counterargument, and I thought -- like I said, I thought there

14  was a lot of wisdom in it, and I, in the end, agreed to go

15  along, and especially when we learned the court said you don't

16  need to do that, I thought, okay, let's move forward.

17  Q    If we -- I'd like to show you Defense Exhibit 282.  This

18  is also in 2008, but I -- I think you're making a -- a little

19  bit different point in -- in this -- in this e-mail.  If we

20  can just have it blown-up.

21            MR. TALBERT:  I'd move for the admission of 282 if

22  that's not already in.

23            THE COURT:  Any objection?

24            MR. BERNARD:  No, Your Honor.

25            THE COURT:  282's admitted.

1    BY MR. TALBERT:

2    Q     Here I believe that your -- you were making the point

3    that one reason to do a site-specific toxicological study is

4    that you can have variability between different species?

5    A     Yes.

6    Q     And so even, you know, where we have Nelson's sparrows,

7    you know, taking a study of -- of Carolina wren, they may have

8    different tolerances to mercury, and it may impact them

9    differently.

10   A     Yes.

11   Q     All right.  And then I believe that there was a point,

12   as you -- as you mentioned, that the court -- you put this

13   question to the court, and I believe that you -- you saw the

14   e-mail earlier where you had made -- you had made your points

15   to Monica Bigley, and then there was a response back on that

16   stating that -- at least she e-mailed saying the judge had

17   decided to take the toxicity work out.  Do you recall that?

18   A     Yes.

19   Q     Okay.  Let's pull up Defense Exhibit 593, and let's blow

20   up -- this is an e-mail that you write literally, you know,

21   hours after receiving word on the tox studies, and you said --

22   you say, well, if that's what the judge wants, so be it.

23   However, as you know, I fear that ultimately ours will be

24   viewed by serious ecologist, in parens, not tree huggers,

25   close parens, and other scientists as a flawed and off-balance

1   study.  To spend literally millions of mercury analyses all

2   over the Penobscot System and absolutely zero on assessing

3   whether there are any toxic effects is going to leave us open

4   to question over the long-term and may possibly compromise our

5   ability to make wise decisions on remediation.  I honestly

6   don't know if this is the case, but no one does now -- that's

7   the point.  For a comparative few bucks, we could have put

8   this to rest.  I'd say we've built a Bentley with respect to

9   analysis and not even a Lada with respect to the consequences

10  of those measurements.

11        And this may be just me, but at the time I didn't know

12  what a Lada was.  Can you tell the court -- a Lada is an

13  inexpensive car?

14  A     It is, made in eastern Europe.

15  Q     Okay.  And then after this point, there was a time

16  period where this question was put back to -- it was actually

17  posed to Susan Calkins, correct?

18  A     I believe so, yes.

19  Q     And Susan Calkins responded -- I just want to show

20  you -- this is Defense Exhibit 1 --

21              MR. TALBERT:  And I would move for the admission of

22  Defense Exhibit 1 at this time.

23              THE COURT:  Any objection to 1?

24              MR. BERNARD:  No.

25              THE COURT:  1's admitted.

1    BY MR. TALBERT:

2    Q    And this is -- actually, if you can back out of the

3    whole thing.  I want to see the -- let's go back to the very

4    first -- no -- page -- just go page down.  Actually, I'll use

5    the elmo for this, if I can switch over.

6              MR. TALBERT:  Can I do that?  All right.  Hopefully

7    I can switch back.

8    BY MR. TALBERT:

9    Q    So this is -- this is an e-mail from Susan Calkins where

10   she responds on the question of toxicity studies and then, in

11   all caps, it looks like John Rudd responds to her -- I'll just

12   show you the -- so this is the e-mail from John Rudd, and we

13   have the e-mail from Susan Calkins, the question on toxicity

14   testing starts right here at the very bottom, saying, I also

15   spoke with Monica Bigley this morning.  As we suspected, she

16   was on vacation.  She's positive that there is no order

17   prohibiting further tox -- toxicology testing.

18        And then I just want to refer your attention to

19   Dr. Rudd's response.  I agree with Drew that we already have a

20   quite full plate for Phase II, but I can see a big advantage

21   to being more quantitative about our desired remediation

22   level, which we could be, if we know the toxicity level of

23   certain key species.  Is this another possible benefit that we

24   haven't discussed so far is actually target setting?

25   A    I'm not sure I would use the phrase target setting, but

1  it would -- again, it would be useful information.

2  Q    Okay.  Then you -- you respond, and you make the point,

3  even in the first line, you say, I understand your comments --

4  this is, I guess, in response to Drew Bodaly, who at this

5  point in time was not in favor of doing those tox studies, and

6  you say, I understand your comments, but with that reasoning,

7  we didn't need to do a study of mercury in the Penobscot at

8  all.  We could have argued along similar, not identical, lines

9  that if mercury was really high, we just confirmed what the

10  court found in its ruling.  If we found little evidence to

11  support the ruling, it could be argued we looked in the wrong

12  way or the wrong place.

13       In some way, is that true that -- I mean, if you were

14  just going to compare levels, you could have taken data that

15  you had in 2006 or 2007, compared those against literature

16  values, and -- and if they were above, you would -- you would

17  come to the same conclusion?

18  A    Yeah.

19  Q    Okay.  I want to switch gears a little bit and talk

20  about erosion.  Just for the record, I'm going to try to

21  expedite this.

22            MR. TALBERT:  But at this time, I would like to move

23  for the admission of Defense Exhibit 304 and Exhibit 13.

24            THE COURT:  Any objection to 13 and 304?

25            MR. BERNARD:  None to 13.

1          THE COURT:  13's admitted without objection.

2          MR. BERNARD:  I'm just going to take a look at 304,

3   if I may, Your Honor.

4          THE COURT:  Sure.

5          MR. BERNARD:  No objection.

6          THE COURT:  304's admitted.

7          MR. TALBERT:  Thank you, Your Honor.

8   BY MR. TALBERT:

9   Q     With respect to erosion, do you recall at your

10  deposition I asked you some questions about what you thought

11  about whether erosion was ongoing and whether it was likely to

12  be a significant source?

13  A     I remember discussing it very briefly with you.

14  Q     Okay.  Do you have an opinion regarding whether erosion

15  you believe is a significant ongoing source?

16  A     I don't know.

17  Q     We talked a little bit earlier about the relationship

18  between total and methylmercury?

19  A     Yes.

20  Q     Do you agree that methylation rates in Mendall Marsh are

21  a function of a number of different factors?

22  A     Sure.  I mean, every -- everything's a function of many

23  different factors, and -- and that's one of them.

24  Q     And -- and -- and let's -- we'll be more precise, but

25  for the record, going from total to methylmercury, the

1    percentage of methylation can depend on a number of different

2    geochemical conditions or factors; is that correct?

3    A      I think that's correct.

4    Q      And if -- if you can, can you just describe what some of

5    those factors are?

6    A      Yes.  So the methylation is performed by bacteria, so

7    it's largely, I believe, the -- of -- let's see.  It's a

8    number of factors:  One is the availability of inorganic

9    mercury to the bacteria as -- as a substrate to -- to

10   methylate; it also depends on the metabolic activity of the

11   bacteria, which, in turn, is influenced by physical factors,

12   like temperature, possibly salinity, although I'm not sure

13   about that; it might be influenced by sulfur concentrations or

14   iron concentrations in the soils there; it would probably, to

15   some extent, be influenced by the amount of organic matter

16   that -- that is available for the bacteria because they

17   require -- they don't produce their own food the way plants

18   do, so they -- they require access to organic carbon, as well

19   as other essential elements, like nitrogen and iron and so on

20   and so forth.

21        I'm not an expert on methylation.  Dr. Rudd would be the

22   guy to ask these questions of.  But that's my understanding.

23   Q      Okay.  And is it also your understanding that within one

24   system, you can have some variability in the methylation

25   rates?

1    A      Yes.

2    Q      So if we were standing in Mendall Marsh, it could be

3    that one portion of the marsh has a higher methylation rate

4    than another portion?

5    A      Yes, I suppose.

6    Q      Because of the different relationship that you just

7    discussed, that different factors could be different in one

8    area than another?

9    A      Yes, but having said that, we still see, and we present,

10   I think, Cindy Gilmour's data convincingly shows that in

11   different regions of Mendall Marsh, the methylation rate is

12   much higher than it is out in the bay or in the main stem of

13   the river.

14          So, yes, there's some heterogeneity in the marsh and --

15   and so a spot here may have a -- a methylation rate slightly

16   different than a spot over here, but they're both going to be

17   maybe a -- you know, five times greater than what it is in

18   the -- in the middle of the river.  So, yes, there's

19   heterogeneity among -- among locations, but the -- there's

20   a -- one can also generalize, I think you would agree that,

21   you know, if you look at the methylation data for Mendall

22   Marsh, you can certainly generalize that, even though there is

23   that heterogeneity, the degree of methylation is far greater

24   in the marsh than it is in the river, right?

25   Q      If you have -- and I just want to make sure this is

1    clear -- in order to figure out how much mercury a -- say, a

2    Nelson's sparrow is exposed to, you're going to have to -- the

3    chain would be going from total to methylmercury and then

4    methylmercury into lower organisms that potentially the bird

5    eats.

6    A    Yes, I agree with that.

7    Q    And then up -- up the chain.

8    A    Yes.

9    Q    Okay.  So the better you can understand that chain and

10   relationship may yield information that you can figure out how

11   to reduce methylation or -- or prevent exposure.

12   A    Yes.

13   Q    And that's, in fact, one of the ideas behind the

14   SediMite, correct?

15   A    Yes.

16   Q    Is -- is an attempt to try to reduce methylation?

17   A    Yes.

18   Q    All right.  Would you agree with respect to SediMite,

19   that at this point there are some uncertainties outstanding

20   regarding potential harm that could be caused from the

21   application of SediMite in Mendall Marsh to -- to biota?

22   A    Yes, although I -- I can tell you I learned of a paper

23   last night from Cindy Gilmour that was published in 2013 in

24   the Journal of Environmental Toxicology and Chemistry, that

25   she pointed out -- I forgot -- it was a review of maybe a

FISHER - CROSS-EXAMINATION/TALBERT

780

 1   dozen different studies -- aquatic studies around the country

 2   using SediMite, where no adverse effects were reported in any

 3   of those studies, which surprised me, to tell you the truth.

 4        The -- I also asked -- and you can, you know,

 5   interview -- or question Dr. Gilmour when she gets here.  But

 6   I asked her -- a concern I had with SediMite is being a form

 7   of activated car -- or activated charcoal, that those are

 8   notoriously effective at binding metals like -- including

 9   essential metals like manganese and iron, so plant life, which

10   relies on those elements, because they're essential metals,

11   might be impaired.  And she actually measured the iron and

12   manganese concentrations in pore water and did not see any

13   change in -- as a result of the SediMite.

14        So I thought that -- I took that as a good sign, but,

15   nevertheless, I agree with what Dr. Henry said that, you know,

16   we need more studies to evaluate the risks associated with

17   SediMite application, and, in fact, we explicitly stated that

18   in -- in our report.  So there's no disagreement there.  We

19   did some small pilot scales, but -- pilot-scaled studies, but

20   they were, you know, very small plots with only one type of

21   application of the SediMite, and, you know, for like a year or

22   two years, I forget.  So it was not a thorough, large-scale

23   evaluation, and before we apply it to the entire marsh, we

24   would recommend doing some further scaled-up, pilot-scaled

25   studies.

1  Q    Do you also agree that there may be some concern

2  regarding the long-term effectiveness of -- of SediMite?

3  A    It's -- yes, we don't know what that would be, and

4  that's one reason we would need to do a pilot-scale study.

5  Q    Isn't it true that at one point you circulated a paper,

6  a study to the other Study Panel members that suggested that

7  maybe applications of activated carbon may not be innocuous,

8  there may be problems?

9  A    I don't remember.  I may have.

10 Q    We had this discussion at your deposition, I believe,

11 but one of the questions is, even if we were to go out and --

12 and implement an active remedy, do you agree that it's -- it's

13 possible that we may see no change after implementing that

14 remedy in -- in fish, for example, fish tissue?

15 A    Well, anything's possible, but I think a well-designed

16 study that's carefully implemented, that's not a likely

17 outcome, but, yes, that -- is it possible?  Yes.

18 Q    Well, there could also be some -- there's some

19 relationship in potential lag time, correct?

20 A    Yes.

21 Q    Between --

22 A    Yes.

23 Q    I think as noted by Dr. Whipple, some of these fish and

24 eels, they live -- they live a long time.

25 A    Yes, that's true.  So some species would respond very

1   quickly, and other species might take a few years to respond.

2   Q     We had a discussion regarding the appropriate scope

3   of -- of monitoring in the long-term.

4   A     Yes.

5   Q     Do you recall that?

6   A     I do recall.

7   Q     Okay.  One thing that the Study Panel's recommended

8   is -- is monitoring over time to measure recovery, correct?

9   A     Yes.

10  Q     And I believe you stated that your view was that we

11  could structure the monitoring in a way to just identify

12  certain target species?

13  A     Yes.

14  Q     And for the court, can you outline those species you

15  believe could be targeted that --

16  A     Well, this won't be a comprehensive list, but I would --

17  I would choose some benthic feeders, and I would choose some

18  pelagic feeders.  I would choose organisms that showed

19  considerable site fidelity, so they don't move around from one

20  location to another to a great extent.  I would -- I would

21  choose some marsh species, probably birds.

22        I would try and keep the numbers down, so I don't want

23  to propose to monitor 35 species of -- of organisms.  On the

24  other hand, I don't want to propose to monitor something like

25  two or three species.  I would say something on the order

FISHER - CROSS-EXAMINATION/TALBERT

783

1   of -- and this is a guess -- ten, on that order, ten species,

2   maybe eight, maybe 15, but something like ten.

3       And -- and then the question came up with the frequency

4   of sampling, and I would -- I wouldn't get into a fistfight

5   over this issue, but -- but I think that if we do not

6   implement an active remediation, we just let natural

7   attenuation go as it's going, I think sampling every other

8   year would be sufficient.

9       If, on the other hand, we put some active remediation

10  into play, then we would expect to see changes that would

11  occur more rapidly, and under those circumstances, I think, at

12  least in the near -- near-term, say, for the first five to ten

13  years, we should monitor on an annual basis.

14          MR. TALBERT:  Your Honor, I understand it's five

15  o'clock now.  I'm at a decent breaking point if --

16          THE COURT:  It is the witching hour.  You may stand

17  down.  Thank you.

18      (The witness left the witness stand.)

19          THE COURT:  We were not successful, I gather, in

20  finishing up Dr. Fisher.  So I'm happy to do whatever is best,

21  and you can talk between -- or among yourselves as to how you

22  want to proceed.  I've seen him.  I've evaluated him.  You can

23  either complete him by deposition, if you prefer, or you can

24  bring him back.  I'm sure he wouldn't mind spending the

25  weekend in Maine since it's going to be sunny.  But whatever

1  you'd like to do is fine with me.

2        MR. TALBERT:  I believe we may be able to do it by

3  deposition, but I'll talk to Mr. Bernard so doesn't have to

4  come back.

5        MR. BERNARD:  We'll work that out is what he's

6  saying.

7        THE COURT:  All right.

8        MR. BERNARD:  Your Honor, if I may, you had asked us

9  for a little preview a day in advance?

10        THE COURT:  Oh, right.  Thank you.

11        MR. BERNARD:  I didn't know if you were looking for

12  weekend reading, but --

13        THE COURT:  I've got some sentencings to do over the

14  next week, too, but anyway --

15        MR. BERNARD:  If you want to know, on Monday

16  morning, we're going to have Dr. Grandjean, and the only

17  document I can think of really is his expert report, which is

18  Joint Exhibit 51.  And following Dr. Grandjean, we'll have

19  Dr. Bodaly, and I think the most relevant reading material for

20  him is Chapter 2 of the Phase II Report, which is Joint

21  Exhibit 6-2.

22        THE COURT:  All right.

23        MR. TALBERT:  Your Honor, I would recommend reading

24  Dr. Bolger's expert report.  A lot of the cross-examination of

25  Dr. Grandjean will -- will come out of that.

1        THE COURT:  And where's --

2        MR. TALBERT:  And possibly --

3        THE COURT:  Where is that?

4        MR. TALBERT:  I'm sorry?

5        THE COURT:  Where is that?

6        MR. SCHUTZ:  Joint 44.

7        MR. TALBERT:  Joint Exhibit 44.

8        THE COURT:  Okay.

9        MR. TALBERT:  Joint Exhibit 55, Your Honor.

10       THE COURT:  44 and -- it's 55, not 44?

11       MR. TALBERT:  One of them is Joint Exhibit 44, and

12  then Dr. Keenan's is Joint Exhibit 55.

13       THE COURT:  Okay.  Good.  Anything further?

14       MR. TALBERT:  Nothing, Your Honor.

15       MR. BERNARD:  Nothing, Your Honor.

16       THE COURT:  All right.  Have a nice weekend.

17       MR. TALBERT:  You, too.

18     (Proceedings concluded at 5:02 p.m.)

19                    CERTIFICATION

20     I certify that the foregoing is a correct transcript from

21  the record of proceedings in the above-entitled matter.

22

23

24  /s/ Julie G. Edgecomb_____        June 6, 2014_____
    Julie G. Edgecomb, RMR, CRR            Date
25  Official Court Reporter