1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF MAINE

3    MAINE PEOPLE'S ALLIANCE        )
     and NATURAL RESOURCES          )
4    DEFENSE COUNCIL, INC.,         )
                                    )
5                    Plaintiffs     )
                                    )              CIVIL ACTION
6                                   )
             vs.                    )    Docket No. 1:00-cv-00069-JAW
7                                   )
                                    )              BENCH TRIAL
8    HOLTRACHEM MANUFACTURING       )
     and MALLINCKRODT LLC,          )
9                                   )
                     Defendants.    )

10

11                          VOLUME V

12                  TRANSCRIPT OF PROCEEDINGS

13        Pursuant to notice, the above-entitled matter came on

14   for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15   Chief District Judge, in the United States District Court,

16   Bangor, Maine, on the 9th day of June, 2014, at 8:33 a.m.

17   APPEARANCES:

18   For the Plaintiffs:            Mitchell S. Bernard, Esquire
                                    Aaron S. Colangelo, Esquire
19                                  Rachel E. Heron, Esquire
                                    Jared J. Thompson, Esquire
20
     For the Defendants:            Patricia H. Duft, Esquire
21                                  Sigmund D. Schutz, Esquire
                                    Jeffrey D. Talbert, Esquire
22

23                     Julie G. Edgecomb, RMR, CRR
                          Official Court Reporter

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

INDEX OF PROCEEDINGS

                                                          Page:

Testimony:  (see below)

                    INDEX OF WITNESSES

                                                          Page:

PHILIPPE GRANDJEAN  (called by Mr. Colangelo)

Direct Examination by Mr. Colangelo                         790
Cross-Examination by Mr. Schutz                             826
Continued Cross-Examination by Mr. Schutz                   855
Redirect Examination by Mr. Colangelo                       900
Recross-Examination by Mr. Schutz                           918

RICHARD ANDREW BODALY  (called by Mr. Bernard)

Direct Examination by Mr. Bernard                           927

                    INDEX OF EXHIBITS

Joint

| Exhibit No. | Description | Offered | Admitted |
| --- | --- | --- | --- |
| 84 | FDA Brochure | 875 | 875 |
| 85 | Bureau of Health Fish Tissue Action Levels | 824 | 825 |

Plaintiffs'

| Exhibit No. | Description | Offered | Admitted |
| --- | --- | --- | --- |
| 76 | Development of a Single-Meal Fish Consumption Advisory | 913 | 913 |
| 86 | The Maine Family Fish Guide | 903 | 903 |
| 123 | Toxicological Effects of Methylmercury | 801 | 801 |

Defendants'

| Exhibit No. | Description | Offered | Admitted |
| --- | --- | --- | --- |
| 512 | Maine CD Freshwater Fish Safe Eating Guidelines | 852 | 852 |
| 513 | EPA Trends in Blood Mercury Concentrations | 855 | 855 |
| 514 | USDA Dietary Guidelines | 842 | 842 |
| 515 | U.S. DHHS Letter | 861 | 861 |
| 517 | Mercury Concentrations in Fish | 839 | 839 |
| 575 | FAQ - Penobscot River Closure | 877 | 877 |
| 576 | Maine CDC Saltwater Fish and Lobster Tomalley Guidelines | 853 | 853 |

| | | | | |
|---|---|---|---|---|
| 1 | 717 | Karimi, et al., A Quantitative Synthesis of Mercury | 829 | 829 |
| 2 | 718 | Karimi, et al., Supplemental Material | 829 | 829 |
| 3 | 720 | ATSDR, Addendum to the Toxicological Profile for Mercury | 849 | 849 |
| 4 | 749 | ATSDR Toxicological Profile for Mercury | 849 | 849 |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

1      (Counsel present in open court.)

2           THE COURT:  Good morning.

3           MR. TALBERT:  Good morning, Your Honor.

4           THE COURT:  I hope everyone had a nice weekend.  The

5  weather certainly cooperated.

6      There was some question, I gather, with Dr. Fisher's

7  deposition that you wanted to raise, somebody wanted to raise?

8           MR. BERNARD:  Only, Your Honor, what we do about a

9  court reporter; in other words, should we just engage a

10  private person, as we would for a deposition, and then put in

11  the rest of the transcript as an exhibit, or how should we

12  handle that?

13           THE COURT:  Sure.  Everything you just said is fine

14  with me.

15           MR. BERNARD:  Okay.  That's what we'll do.

16           THE COURT:  Right.  Very good.  Next witness?

17           MR. BERNARD:  Yes.  Before we do that, Your Honor,

18  you -- regarding the comments you made on the record --

19           THE COURT:  Yes.

20           MR. BERNARD:  -- on Friday, I just want to let you

21  know that Mr. Talbert and I had a discussion yesterday, and we

22  have agreed to talk again later in the week, and there's

23  nothing further to say about that now.

24           THE COURT:  Okay.  Well, good.  I'll look forward to

25  your further edification.

```
 1              MR. BERNARD:  The plaintiffs' next witness is
 2    Dr. Philippe Grandjean.  Your Honor, Mr. Colangelo will
 3    examine Mr. Grandjean.
 4              THE COURT:  Very good.  Mr. Colangelo.
 5              MR. COLANGELO:  Plaintiff calls Dr. Grandjean.
 6              THE CLERK:  Please raise your right hand.
 7              THE WITNESS:  You have to speak up.  I don't hear so
 8    well.
 9              THE CLERK:  Please raise your right hand.
10              THE WITNESS:  Okay.
11              THE CLERK:  Do you solemnly swear that the testimony
12    you shall give in the matter now in hearing shall be the
13    truth, the whole truth, and nothing but the truth, so help you
14    God?
15              THE WITNESS:  I do.
16              THE CLERK:  Please be seated.
17              THE WITNESS:  Thank you.
18              THE CLERK:  Please state your name and spell your
19    last name for the record.
20              THE WITNESS:  My name is Philippe Grandjean.  Last
21    name is spelled G-r-a-n-d-j-e-a-n.
22    PHILIPPE GRANDJEAN, having been duly sworn, was examined and
23    testified as follows:
24                        DIRECT EXAMINATION
25    BY MR. COLANGELO:
```

GRANDJEAN - DIRECT EXAMINATION/COLANGELO

1    Q     Good morning, Dr. Grandjean.

2    A     Good morning.

3    Q     What is your profession?

4          THE WITNESS:  The acoustics cannot -- I have a

5    hearing problem.

6          THE COURT:  I have a suggestion.  We do have -- we

7    have some hearing earphones that people can use in this

8    situation.  Do we have them available?

9          THE CLERK:  Right here.

10         THE COURT:  We have some hearing phones that people

11   use for -- for this situation.

12         THE WITNESS:  Okay.  That --

13         THE COURT:  Do you want to try and see if they work?

14         THE WITNESS:  Okay.  Maybe.  Okay.  But,

15   Mr. Colangelo, maybe if you speak closer to the mic and you

16   speak up, maybe that'll do it.

17         MR. COLANGELO:  I will.

18         THE WITNESS:  Okay.

19         MR. COLANGELO:  Okay.

20         THE WITNESS:  I think that's -- because I have a

21   hearing aid, so this is maybe not working.

22         THE CLERK:  If you take out your hearing aid and you

23   put these in your ears, it might work better.

24         THE WITNESS:  Okay.

25         THE CLERK:  And there's also -- there's a volume

 1    here, too.  Underneath there's a volume.

 2              THE WITNESS:  Okay.  Let's try.

 3              THE CLERK:  Stick them like right in your ears.

 4              MR. COLANGELO:  Okay.  We'll try this and -- does

 5    this work better?

 6              THE WITNESS:  No.

 7              THE COURT:  Oh-oh.

 8              THE WITNESS:  I'm sorry.

 9              THE COURT:  That's all right.

10              MR. COLANGELO:  I'll speak up.

11    BY MR. COLANGELO:

12    Q    Dr. Grandjean, what is your profession?

13    A    I'm a physician and epidemiologist.

14    Q    What is your educational background?

15    A    Well, I'm -- I'm a doctor -- medical doctor, and -- and

16    then I did a dissertation that you would call a Ph.D. later

17    on.

18    Q    What is epidemiology?

19    A    Epidemiology is the science of the occurrence of

20    disease.

21    Q    What is toxicology?

22    A    That's the science of adverse effects of chemicals.

23    Q    Do you conduct research?

24    A    I do.

25    Q    What does your research focus on?

GRANDJEAN - DIRECT EXAMINATION/COLANGELO

793

1   A     For the last, I would say, almost 30 years, I have

2   focused on mercury and the adverse health effects of mercury

3   exposure.

4   Q     Have you published the results of your research?

5   A     I have.

6   Q     And have you written articles about the adverse health

7   effects of exposure to mercury?

8   A     I don't hear so well.  So --

9   Q     Have you -- have you written articles about the adverse

10  effects of exposure to methylmercury?

11  A     If I have been?

12  Q     Have you published articles?

13  A     Oh, okay.  Published on the adverse effects of mercury.

14  I have.  I think about a hundred publications in scientific

15  journals.

16  Q     Do you currently teach?  Do you currently teach?

17  A     If I teach, yes, I do.

18  Q     Where do you teach?

19  A     Well, I -- I teach here at -- at Harvard, Harvard School

20  of Public Health, and I teach at the French National School of

21  Public Health in Paris, and I teach at the medical school at

22  the University of Southern Denmark.

23  Q     Have you served on expert committees that evaluate the

24  health effects of methylmercury?

25  A     Yes, many.

GRANDJEAN - DIRECT EXAMINATION/COLANGELO

1    Q      Okay.

2           MR. COLANGELO:  Your Honor, Dr. Grandjean's CV is at

3    Page 22 of Joint Exhibit 51, which is in evidence.

4           THE COURT:  Thank you.

5    BY MR. COLANGELO:

6    Q      Dr. Grandjean, what is a neurotoxicant?

7    A      It's a substance that causes adverse -- adverse effects

8    on the brain.

9    Q      Is methylmercury a neurotoxicant?

10   A      It is.

11   Q      How are people typically exposed to methylmercury?

12   A      Methylmercury is formed in the water environment, and

13   then it concentrates in various marine and fresh water

14   organisms.  So you would be exposed through fish and

15   shellfish.

16   Q      And what happens when people eat fish contaminated with

17   methylmercury?

18   A      Can you say that again?  There was some noise, so I --

19   Q      What happens when people eat fish contaminated with

20   methylmercury?

21   A      All right.  When the methylmercury comes into your

22   gastrointestinal tract, it is virtually completely absorbed.

23   It's taken up into the blood, and it circulates in the body,

24   and it can penetrate into the brain, and then a small part

25   will be excreted.

1          THE COURT:  Mr. Colangelo, you have a soft voice.

2   What you're going to have to do is talk like I'm talking.

3          MR. COLANGELO:  I will, Your Honor.

4          THE COURT:  Almost shout so it's very clear.  He

5   can't miss your questions.  We need to be sure that he

6   understands your questions.

7          MR. COLANGELO:  Yes, Your Honor.

8          THE COURT:  Can you hear me?

9          THE WITNESS:  Very well.

10          THE COURT:  Okay.  Well, do what I'm doing.

11          MR. COLANGELO:  I will, Your Honor.

12   BY MR. COLANGELO:

13   Q     How long does methylmercury stay in the body once it's

14   ingested?

15   A     It stays for several months.  The standard -- the

16   standard conclusion is that you can excrete about half of it

17   in a month and a half.  So in 45 days, you can eliminate

18   50 percent of what you have today.

19   Q     Can the fetus be exposed to methylmercury through the

20   mother's diet?

21   A     Yes, the fetus gets exposed because methylmercury

22   penetrates the placenta and it gets right into the fetal

23   circulation and -- and also the fetal brain.

24   Q     Is methylmercury detected in umbilical cord blood?

25   A     Yes.

1    Q    And in what ratio to the mother's blood, if you know?

2    A    We have found that it's -- it's about 40 to 50 percent

3    higher in the umbilical cord blood than in the pregnant

4    mother's blood.

5    Q    Can that methylmercury reach the fetal brain?

6    A    It -- it can.

7    Q    Have you conducted epidemiological studies related to

8    methylmercury exposure?

9    A    I -- I have since 1986.

10   Q    And have you observed harmful effects as a result of

11   that exposure?

12   A    I have.

13   Q    What harmful effects have you observed?

14   A    In -- in the doses that we're talking about here,

15   methylmercury impairs brain development so that when the child

16   reaches school age, you can document slower motor speed, poor

17   concentration span, poor memory, delay in language

18   acquisition, and various cognitive functions like that.

19   Q    Where did you conduct this research?

20   A    What did I -- yeah, where?

21   Q    Where did you conduct this research?

22   A    The main studies were conducted in the Faroe Islands.

23   It's a Nordic nation between -- between Norway and Iceland.

24   Q    How many children did you examine?

25   A    Well, the first study comprised just about 1,000

1    children.

2    Q     And at what ages did you study those children?

3    A     Well, first, we got samples of umbilical cord blood when

4    they were born, and -- and we examined most of them at age

5    1 year.  But the main studies were done at age 7, 14, 22, and

6    -- and now we actually are examining them again at age 28.

7    Q     Did you find any developmental harm in children exposed

8    to methylmercury?

9    A     Yes, and I'll refer to what I said before.  We -- we saw

10   those cognitive delays, and we first discovered that at age 7,

11   and when we reexamined the cohort at age 14 and 22, the delays

12   were still there.  So the dysfunctions or deficits were

13   permanent.

14   Q     Have similar studies been conducted in the United

15   States?

16   A     Similar studies, yes, but -- but not yet with such a

17   long follow-up as we have done.

18   Q     What studies are those?

19   A     There was one study, the so-called Project Viva in

20   Boston, and it -- it was a somewhat smaller study, and another

21   study was conducted in New York City after the 9/11.  They

22   looked at births in New York City.  And in both cases, they

23   were actually examining mothers -- pregnant mothers who were

24   eating, you know, what Americans normally eat in regard to

25   fish and -- and shellfish, and both studies documented that at

1    the levels that are common on the east coast, the children

2    showed delays, the higher the mother's methylmercury exposure

3    was.

4    Q       What is a confounder?

5    A       In epidemiology, a confounder is a factor that somehow

6    affects the outcome and may be associated with the exposure.

7    Q       Why do you need to look at the confounders?

8    A       We do because let's say that mercury exposure is

9    associated with alcohol drinking, just to take an example, and

10   if we were not looking at alcohol exposure of the mother

11   during pregnancy, we would conclude that mercury was a cause

12   of something which, in reality, was due to alcohol, for

13   example.  I mean, we looked at alcohol in the Faroes, and --

14   and the Faroes, until 1993, they had a prohibition, and

15   Faroese women basically don't drink alcohol.  So it wasn't an

16   issue.  We still recorded it, but -- and it wasn't a

17   confounder.

18   Q       Did you look at any other possible confounders in the

19   Faroe study?

20   A       Yes, one important one was polychlorinated biphenyls.

21   Those are industrial chemicals that, like mercury, concentrate

22   in seafood.  So we measured the -- the PCBs, as they're

23   called, in -- both in umbilical cord tissue and umbilical cord

24   blood, and we also examined the children's own blood for PCBs.

25   And doing the statistical calculations, it -- it was clear

1  that PCB did not affect the mercury associated deficits.

2  Q    Does methylmercury perform any useful function in the

3  human body?

4  A    No.

5  Q    Is there a current medical consensus on the health

6  effects of fetal exposure to methylmercury?

7  A    Yes, most recently at the initiative of the U.S. EPA

8  when there was an international conference on mercury here in

9  the United States, a consensus document was produced, which

10 was very much in accordance with -- with what I have written

11 in my publications.

12 Q    And what is that consensus?

13 A    That is that developmental neurotoxicity, that is

14 adverse effects on brain development, is a critical effect of

15 methylmercury exposure and that it begins to happen at

16 exposure levels that are close to the reference dose, close to

17 the current EPA exposure limit.

18 Q    Are there health benefits to eating fish?

19 A    Yes.

20 Q    What are they?

21 A    Fish is -- is an excellent source of -- of major

22 nutrients, proteins, for example, but also vitamins and

23 certainly minerals, like selenium and -- and fish oil, fatty

24 acids, and, therefore, we always recommend pregnant women to

25 include preferably two fish meals every week during pregnancy.

1    Q     Does methylmercury have any effect on the health

2    benefits of eating fish?

3    A     Well, you could say that -- that -- that is perhaps a

4    balance because it's bad if you don't eat fish, but if you eat

5    the -- the right fish with low mercury, you really get all the

6    benefits you -- you -- you should have.  But if there's

7    mercury, then that takes away some of the benefit, and if you

8    eat the wrong fish, so to speak, with a lot of contamination,

9    it -- it takes away the advantage of eating fish at all.

10   Q     Have government agencies relied on your work in setting

11   standards for methylmercury?

12   A     They have.

13   Q     Which ones in the United States?

14   A     The U.S. EPA developed a reference dose.  I think it was

15   published in 2001.  But this was at the recommendation of the

16   National Academy of Sciences, and they -- they decided to --

17   to use my work from the Faroes as the -- the critical study

18   for developing the standard.

19         But I should say that the National Academy actually

20   looked at three major studies, and when they used all of them

21   together, they found the same results as -- as if they only

22   used my work.  But my study was the largest.

23   Q     Okay.  Let me show you a document, Dr. Grandjean.

24   A     Okay.

25   Q     This is Plaintiffs' Exhibit 123.

1          MR. COLANGELO:  Your Honor, this was Joint

2    Exhibit 28 from the 2002 trial.  This is an excerpt from the

3    National Academy of Sciences Report.  I'd like to offer it

4    into evidence.

5          THE COURT:  Any objection to Plaintiffs' 123?

6          MR. TALBERT:  No objection.

7    BY MR. COLANGELO:

8    Q    And, Dr. Grandjean, I'm showing you a page from the

9    National Academy Report.  Let me just highlight this sentence

10   here.  It says, the best available data for assessing the risk

11   of adverse effects for methylmercury are from the Faroe

12   Islands study.  Do you see that?

13   A    Yes.

14   Q    And is that consistent with your understanding of what

15   the National Academy of Sciences concluded?

16   A    Yes.  They asked me to appear in -- in Washington, D.C.,

17   and they also asked me to calculate some tables for them,

18   which I did.  So they had all the insight into the work that I

19   had done that they wanted.

20   Q    Let me show you another page from the National Academy

21   Report.  And this is a discussion of -- of the possible

22   confounder, PCBs, and it says, the Faroe Islands population

23   was also exposed to relatively high levels of polychlorinated

24   biphenyls, PCBs.  However, on the basis of an analysis of the

25   data, the committee concluded that the adverse effects found

1    in the Faroe Islands study were not attributable to PCB

2    exposure.  Do you see that?

3    A    I see that.

4    Q    And is that consistent with your understanding of what

5    the National Academy concluded?

6    A    Yes, it is.

7    Q    You've mentioned the term reference dose a few times.

8    What is the reference dose?

9    A    The reference dose is a term used by the U.S. EPA

10   because we -- we would like to have thresholds, but -- but

11   thresholds cannot be observed in epidemiology or biology.  So

12   a reference dose is based on statistical calculations with the

13   aim of reaching a level of exposure that is considered

14   virtually safe over a long period of time.

15   Q    Did the National Academy make any recommendations to EPA

16   about development of the reference dose for methylmercury?

17   A    They did.

18   Q    And what were those recommendations?

19   A    The -- the recommendation was from calculations, using

20   my -- my study, was that the reference dose should be

21   0.1 micrograms, that is, millionths of a gram, per kilogram

22   body weight per day.

23   Q    And is that the reference dose that EPA adopted?

24   A    It is.

25   Q    Why is it expressed in those units of measurement?

GRANDJEAN - DIRECT EXAMINATION/COLANGELO

1    A     Well, it -- it's expressed in -- it's -- first of all,

2    it's micrograms, so -- so it's the amount of methylmercury,

3    and then that is per kilogram of body weight, because a large

4    adult can obviously tolerate a larger amount than a small

5    infant say.  So it's in relation to body size.  And then it's

6    per day because it's really a dose rate.  It -- it's like over

7    time.  And the standard practice in the EPA is to use the

8    exposure -- the intake per day.

9    Q     A kilogram is how many pounds?

10   A     A kilogram, how many ounces?

11   Q     How many pounds?

12   A     Pounds, how many pounds?  2.2, yeah, something like

13   that.

14   Q     How is EPA's reference dose used?

15   A     It -- it is used to determine whether an exposure in a

16   particular exposure -- particular population group is

17   acceptable or not.

18   Q     What exposure period should you use to measure whether

19   the reference dose has been exceeded?

20   A     Well, EPA expresses this in terms of the exposure per

21   24 hours, and given that people's diet varies from week to

22   week, especially from day to day, I would say a per-day

23   exposure is not realistic.  And given the kinetics of mercury

24   in the body, that it takes a while for you to excrete the

25   amount that you have observed, I would say one day is not --

1    it's not necessary.

2         On the other hand, on the other hand, since we're

3    dealing with adverse effects on brain development, then we

4    can't average this over a year say, because pregnancy lasts

5    for much less than a year, and -- and these sensitive periods

6    during brain development, it's primarily from our work, it's

7    primarily in the third trimester.  So I would say that even

8    short-term peaks could have adverse effects.  So I would

9    recommend -- and -- and this is a consensus also among my

10   colleagues -- I would recommend that we average over one week.

11   Q    Are you familiar with the Maine fish tissue action

12   level?

13   A    Yes.

14   Q    What is it?

15   A    It -- the level is 0.2 ppm, so that's 0.2 micrograms per

16   gram of fish.

17   Q    Let me show you Joint Exhibit 85.  And this is the Maine

18   -- at the time, it was the Bureau of Health -- fish tissue

19   action level.

20        MR. COLANGELO:  Your Honor, I'd like to move this

21   into evidence.

22        THE COURT:  I think it's in.  Didn't you move all

23   the joint exhibits in?  No, not in.  All right.  Any

24   objection?

25        MR. SCHUTZ:  No objection.

GRANDJEAN - DIRECT EXAMINATION/COLANGELO

1          THE COURT:  It's in.

2    BY MR. COLANGELO:

3    Q     And, Dr. Grandjean, have you seen this document before?

4    A     Yes.

5    Q     What assumption does the State of Maine make about the

6    body size of a woman of childbearing age?

7    A     I'm not sure I remember.  Can you move -- move it up --

8    Q     I can show you Page 2.

9    A     -- a little bit?

10   Q     Oh, I gave you the wrong page.  Okay.  Here at the very

11   bottom of Page 2.

12   A     Okay.  So what they did was to -- to use a -- an average

13   seafood intake per week, and then take into account the body

14   weight for an adult, which is 60 kilograms for a -- an adult

15   woman, and then in order to stay below the reference dose,

16   then the Maine CDC calculated that the fish should not contain

17   more than 0.2 ppm of mercury.

18   Q     Okay.  I can show you that page.  And that's based on an

19   average body weight of what?

20   A     Yeah, 60 -- that's -- I mean, some women weigh more,

21   some people weigh less.  60 kilograms is a reasonable number.

22   Q     Okay.  And this is the next-to-last page of Joint

23   Exhibit 85.  And the developmental methylmercury fish tissue

24   action level is listed here.  And what is that number again?

25   A     Right.  So -- so, first, the second column from the

1    left, that's the reference dose, and -- and using that, they

2    end up with a -- an action level of 0.2 ppm in the fish

3    tissue.

4    Q    Okay.  Did you evaluate whether consumption of seafood

5    from the Penobscot Estuary would be unsafe?

6    A    I did based on the analysis conducted in the Penobscot

7    River Mercury Study.

8    Q    What species did you consider?

9    A    Well, there were three species that were particularly

10   relevant -- American eel, American black duck, and American

11   lobster.

12   Q    Where did the data come from?

13   A    Where the data came from?

14   Q    Yes.

15   A    Well, it came from the Penobscot River Mercury Study.

16   Q    And did you summarize those data?

17   A    I had access to the tables -- I received locked Excel

18   spreadsheets that I worked on to calculate my own averages and

19   to, you know, redo some of the calculations that were also in

20   Chapter 14 of the report.  So that was the basis of my own

21   report.

22   Q    This is a copy of a table from your report.  This is

23   Plaintiffs' Exhibit 144.

24            MR. COLANGELO:  Your Honor, I'd like to move this

25   into evidence.

```
1              THE COURT:  Any objection to Plaintiffs' 144?

2              MR. SCHUTZ:  No objection.

3              THE COURT:  It's admitted.

4    BY MR. COLANGELO:

5    Q    Dr. Grandjean, did you prepare this table?

6    A    I did.

7    Q    And what data did you use to prepare this table?

8    A    Well, if you look at the column on the left that says

9    average, those are the average results from the Penobscot

10   River Mercury Study where American eel that is -- those are

11   the 400 or so samples from below the Veazie Dam.  The lobster,

12   those data are from the upper estuary, so north of Fort Point.

13   And the American black duck are from, you know, the -- the

14   marsh land.  It -- I don't think they sampled more than 25 or

15   so ducks, and so -- so that the material was somewhat limited,

16   but -- but that was the -- the marsh land near Bucksport and

17   -- and Verona Island.

18   Q    Okay.  And what average methylmercury levels did you see

19   in those species?

20   A    What average methylmercury?  Yeah.  So that -- that's a

21   column named average, with American eel, that was 0.532, and

22   lobster was 0.3, and American black duck was 0.6, and you can

23   see the next column, that's a range, total from the very

24   lowest to the very highest, and you can see there's some

25   variation.
```

1  Q     Okay.  And -- and I actually misspoke.  I asked what

2  levels of methylmercury you saw.  Is it your understanding

3  that these samples were for mercury concentrations, not

4  methylmercury?

5  A     Some of them were actually methylmercury, but -- but the

6  American eel, I think it -- it was something like 90 percent

7  of the total mercury that was methylmercury, and for both

8  lobster and -- and the black duck, it was virtually a hundred

9  percent.  So -- I mean, I think we can safely assume that what

10 we're talking about here is methylmercury; it's not something

11 else.

12 Q     What does the comparison column in this table refer to?

13 A     Right.  I -- I had to look to find appropriate numbers

14 to compare this to see if this was elevated, and the -- for

15 the American eel, that average of 0.186, that comes from a --

16 a large study of American eel on the market, and -- and these

17 are wild eel, because it's lower in farmed eel and you can see

18 that -- so that's 0.186.

19       The lobster, what I did was to look at the FDA Web site

20 because it was hard to find comparison data, and -- but FDA

21 only had nine samples of American lobster on the Web site, and

22 I understand now, having seen the State of Maine notice on the

23 ban of lobstering here in the Penobscot, that there is

24 actually a study that I did not have access to, but that the

25 Maine CDC has data from, and that the average background here

1  is 0.05, so -- so half of the FDA number.  So, I mean, the --

2  if I was rewriting the report, I would correct that.  So 0.1

3  -- 0.107 is too high.  It's -- it's twice the correct number.

4       And, likewise, American black duck, because the ducks

5  that are here in winter, they come from the north, and -- and

6  the comparison data is from Canada, those are black ducks

7  taken during the summer.

8  Q    What does the column under the heading ratio refer to?

9  A    Okay.  That is the Penobscot average divided by the

10  comparison average.  So it -- the number is 3 for American eel

11  and for lobster, it -- it should be 6 because, as I said, the

12  comparison average is 0.05.  So -- so the ratio is really 6,

13  and it's also 6 for American black duck.

14  Q    So that means that the lobster from the study area that

15  you refer to here is how many times higher than the reference

16  lobster you've just referred to?

17  A    On the average, it's -- it's six times higher than it

18  should be, but there are, as you can see from the -- from the

19  table there, lobsters that are up to 23 times as high as the

20  average background.

21  Q    Do you know whether the lobster data you evaluated

22  included only legal-size lobster?

23  A    I -- I understand from the tables that some lobsters we

24  included in the analysis for feasibility reasons that were

25  really below legal-size, and that may mean that the mercury

GRANDJEAN - DIRECT EXAMINATION/COLANGELO

810

1    concentrations here are skewed toward lower levels, simply

2    because the lobsters haven't had enough time to -- to

3    accumulate mercury.

4        But I -- I simply decided not to try to adjust for that.

5    I -- I simply used the numbers from the report as they were,

6    and -- and so I -- I may have ended up with a result --

7    average result that was a little bit too low.

8    Q    What part of the lobster itself do these data reflect?

9    A    I relied on -- I mean, the number here represents the

10   tail, and -- and there are two reasons for that.  This is --

11   that was a data set that was complete and claws and -- and

12   tomalley were not analyzed for all of the specimens, and,

13   therefore, I decided simply to rely on the complete data set.

14       The second reason is that if -- when people eat lobster,

15   they usually eat the tail, and some people eat a little bit of

16   the -- the claws.  Many people don't eat the tomalley.  So --

17   and since the tail represents maybe two-thirds of what a

18   lobster, the -- the edible part of a lobster, anyway, this --

19   I thought that would be a reasonable way of conducting this

20   calculation.

21       But -- but, obviously, if the meal includes claw, then

22   this is a little bit too high.

23   Q    What's your overall impression of the data set that you

24   used here?

25   A    I -- I think it -- it's of high quality.  The sampling

1    stations have been carefully selected.  The numbers are

2    reasonable.  It's possible to conduct calculations that --

3    that I've done here, and I'm very satisfied with the

4    documentation that I was able to get about the study.

5    Q     How do the levels that you looked at here, the --

6    compare to the Maine fish tissue action level for

7    methylmercury?

8    A     Well, the -- the action level is 0.2, and American eel,

9    you can see that there were single samples -- you can see that

10   from the range -- there were single samples, also for lobster

11   and black duck, that were below 0.2, but -- but these were

12   like exceptions because more than 90 percent of all three of

13   them were above the Maine state action level.

14   Q     In this region studied that's reflected here?

15   A     Right.  So that's American eel south of the Veazie Dam

16   and it's -- it's lobster from the north estuary and black duck

17   from the Mendall Marsh and -- and Verona Island.

18   Q     Okay.  Let me show you a page from Chapter 14.

19   A     Okay.

20        MR. COLANGELO:  And, Your Honor, this is Joint

21   Exhibit 6-14 in evidence on Page 14-2.

22        THE COURT:  All right.

23   BY MR. COLANGELO:

24   Q     And, Dr. Grandjean, it states here, the mercury target

25   concentration to protect human health, 200 nanograms

1    methylmercury per gram of muscle wet weight, was exceeded by

2    more than 90 percent of American eels in the vicinity of

3    HoltraChem, American black ducks from Mendall Marsh, and

4    lobster in the area north of Fort Point.  Do you see that?

5    A    Yes.

6    Q    And is that consistent with your analysis of the data?

7    A    I drew my conclusion from the data material, and as you

8    can see, this -- my conclusion is the same as the study

9    group's conclusion.

10   Q    Let me show you a map of the study region.

11   A    Okay.

12        MR. COLANGELO:  This is Plaintiffs' 47, Your Honor.

13   This is in evidence.

14        THE COURT:  Thank you.

15        MR. COLANGELO:  This is a figure from the Penobscot

16   Study Report.

17   BY MR. COLANGELO:

18   Q    And, Dr. Grandjean, could you indicate with your finger

19   on the screen there what part of the Penobscot estuary that

20   sentence refers to?

21   A    Okay.  I don't know if you can see my finger, but --

22   Q    If you -- if you use it on the screen.

23   A    Okay, okay.

24   Q    Okay.  There you go.

25   A    All right.  Oh, my God.  So -- all right.  It's actually

GRANDJEAN - DIRECT EXAMINATION/COLANGELO

1    -- I think the eel is all the way down to here, to Bucksport.

2    So from the -- from the Veazie Dam and all the way down to

3    Bucksport, that's -- that's where the contaminated eel has

4    been caught.

5         And -- and the Mendall Marsh is that -- that's this area

6    here, it actually goes a little bit, depending on the tide, it

7    goes a little bit up here, that's where the black ducks are,

8    and I think they caught some over here at Verona Island.

9         And so the lobsters were -- they were from this area and

10   all the -- all the way here down to Fort Point.

11   Q    And Fort Point is just below the bottom of the screen;

12   is that right?

13   A    Yeah.

14   Q    Okay.  Now, you also mentioned the EPA reference dose.

15   A    Right.

16   Q    How would you compare the mercury concentrations in the

17   foods sampled here to the reference dose to determine whether

18   consumption is unsafe?

19   A    Right.  The reference dose takes into account how much

20   fish you actually eat.  The Maine state action level just

21   assumes that you eat the average amount of -- of seafood, and

22   that's how they ended up at 0.2.  And -- and you can imagine,

23   if we -- we do the same calculation, you know, using seafood

24   intake levels, then we'll see that these food items here, with

25   their mercury concentrations, they will exceed the reference

1  dose because the reference dose was also the basis of the

2  Maine state calculation.

3  Q    Let me show you a table from your report.

4  A    Oh, okay.

5  Q    And this is Table 2.

6         MR. COLANGELO:  Your Honor, this is Plaintiffs' 145.

7  I'd like to move it into evidence.

8         THE COURT:  All right.  Any objection to 145?

9         MR. SCHUTZ:  No objection.

10        THE COURT:  Thank you.

11  BY MR. COLANGELO:

12  Q    And, Dr. Grandjean, what does this show?

13  A    All right.  If -- if we take the left column, and now

14  I'll try to point to this here -- okay.  So the averages

15  there, they are the same as the averages -- I just chopped off

16  the numbers to simplify the calculations.  These are the same

17  numbers as in Table 1 that we looked at before.  So those are

18  the averages from the Penobscot River Mercury Study tables.

19  And you can see American eel is 0.5; lobster's 0.3; American

20  duck 0.6.

21  Q    And then what is the middle column here?

22  A    All right.  So I guess -- if I should walk you through

23  this table, the -- the way I did this was to say, all right,

24  so you have -- let's just take the American eel here, for

25  example.  Then with that concentration, if you eat 180 grams

1    of American eel -- that's a normal portion size -- then

2    0.5 micrograms per gram times 180 grams, a portion size,

3    that's 90.  And then what I assumed was that the person eating

4    this would weigh 60 kilograms, and we talked about body weight

5    before.  So those -- those 90 micrograms of mercury contained

6    in the average meal of American eel would be distributed in,

7    you know, a 60-kilogram person, so that's 90 divided by 60,

8    that's 1.5.  And the same for lobster and American duck, the

9    same calculations, and I also repeated them using the highest

10   levels observed in the study so that you can see what -- what

11   the maximum might be.

12   Q    Why did you do this calculation in these units of

13   measurement?

14   A    Well, the -- the unit of measurement in -- on the

15   right-hand side, the right columns, those are the same as the

16   units used in the reference dose; so these are directly

17   comparable.  And to give you an example, if -- if you take the

18   American duck -- American black duck, the average corresponds

19   to 1.8 micrograms per kilogram of body weight, and the

20   reference dose is 0.1 micrograms per kilogram body weight per

21   day.

22        So 1.8 is really -- that really corresponds to the

23   reference dose for 18 days, and the maximum corresponds to

24   33 days.

25   Q    And could you walk through that for the average lobster,

1    just to give one more example?

2    A     Okay.  So the average concentration in the lobster is

3    0.3.  And in a portion size, you multiply the 1 -- the 0.3

4    with 180, that's 54.  And the woman weighs 60 kilograms, so

5    that's -- then you divide the 54 by 60, and that's 0.9.

6    Q     And how does that compare to EPA's reference dose?

7    A     That -- that is nine times of the reference dose.  So --

8    so if you, essentially, if you eat a lobster today, you have

9    -- you are covered for the next nine days.  I mean, you are at

10   the maximum, you are at the reference dose.  You can't eat any

11   seafood for the next nine days because then you'll exceed the

12   reference dose.  In a way, you already have exceeded it by

13   eating that lobster.  And then if you eat another lobster

14   after nine days, again, you cannot eat any other seafood, or

15   if you eat an American duck, it's like just 180 grams of -- of

16   breast tissue from the duck, that is 18 days at the reference

17   dose.

18   Q     If you assume a heavier woman than 60 kilograms, how

19   would that change your calculations here?

20   A     Well, I would think -- I mean, if it's a bigger person,

21   that person will also eat more.  So I decided to stick to a

22   standard meal size of 180.  That's about 6 ounces.  And if you

23   want -- I don't know.  The size of a computer mouse, you know,

24   a standard comp -- that's 180 grams, about that.  It's like

25   two-thirds of a cup.  This is not a big portion.  But,

1    obviously, I mean, I could eat 200 grams, 225 grams probably,
2    but I also weigh more.
3         And so if you calculate this for a larger person, you
4    also have to take into account that the portion size is
5    larger.  So I think this is reasonably representative.
6    Q    Let me show you the third table from your report.
7    A    Okay.
8    Q    This is Plaintiffs' Exhibit 146.  It's already in
9    evidence.  And can you tell me what this shows, focusing on
10   the middle column here, the U.S. EPA limit.  What is that
11   limit?
12   A    Right.  I -- I actually went through this calculation
13   just a minute ago.  So -- so what -- what I did to -- was to
14   take the numbers from the right-hand columns of the previous
15   table, and using the U.S. EPA reference dose, I calculated
16   that the American eel -- and I'll make a little arrow here --
17   we found out that that corresponded to 1.5 micrograms per
18   kilogram of body weight, and that means that the dose from one
19   portion of American eel corresponds to 15 days of the U.S. EPA
20   reference dose, and likewise, lobster nine days, American
21   black duck 18 days.
22        And if you -- if you look at the highest concentrations
23   found in eel, lobster, American black duck, it's like one to
24   two months of the U.S. EPA reference dose, where you are
25   essentially -- you are at the limit for that duration, and --

1   and you cannot eat any -- any additional seafood -- actually,

2   the American black duck means that you cannot eat any -- it

3   doesn't count as seafood.  You don't get the seafood benefits

4   from eating American black duck, but it occupies your allowed

5   exposure for between 18 days and -- and 33 days.

6   Q    Do your calculations here factor in other sources of

7   methylmercury in a person's diet?

8   A    No, I mean, this is just based on these three species

9   that I have access to.  And I saw that the -- the State of

10  Maine also banned crabbing, but I've not seen any data on

11  crab.  There may be crabs out here or there may be various

12  kinds of shellfish that are not -- that have not been

13  analyzed, but that would also contribute if you eat them from

14  the local environment here.

15  Q    Is there data available regarding background exposures

16  to methylmercury on women of childbearing age in the state of

17  Maine?

18  A    Right, right.  I mean, there's -- the national data from

19  the so-called NHANES study that EPA has worked on, and then

20  the State of Maine has actually carried out a study, I think

21  about ten years ago, of a representative sample of women in

22  childbearing age groups, and the -- the Maine study showed

23  that on the average, on the average, the hair mercury

24  concentration, which is the marker of exposure that they use,

25  the mercury concentration in hair corresponds to about

GRANDJEAN - DIRECT EXAMINATION/COLANGELO

1  two-thirds of the reference dose on the average in Maine.

2        And as far as I recall, something like 20 percent of

3  women in reproductive age groups in Maine were at the

4  reference dose or higher.

5  Q    If you factored in that average background exposure

6  among women of childbearing age in Maine, how would that

7  change the calculations in your table here?

8  A    Well, I think -- since this was a representative study,

9  I think very few women from this -- from Bangor and -- and the

10 Penobscot environment, very few women would have contributed.

11 Maybe some of them -- them were among the highest in that

12 study; I don't know.

13       But if we just take the average, that means that, you

14 know, the tuna fish salad that -- that you eat, the shrimp

15 cocktail, the flounder, you know, all of these other sources

16 of -- of methylmercury exposure, for an average woman in

17 Maine, it already occupies two-thirds of -- of the reference

18 dose.  If you then add this, let's say that a woman who's

19 already at two-thirds of the reference dose, she's eating a

20 lobster -- an average lobster from the Penobscot, then the

21 nine days that I calculated here have to be multiplied by

22 three, because there's only one-third of the reference dose

23 available.

24       And so this single lobster will then occupy 27 days

25 where she can't eat anything in addition to her normal

1    background seafood intake.  So 27 days, no more Penobscot lob

2    -- Penobscot lobsters during that period.

3    Q    What is your conclusion about the safety of consuming

4    any of these foods at the average levels reflected here?

5    A    Given the fact that the exposure on average in Maine is

6    already close to the reference dose, I -- I would recommend

7    against eating any of these sources of methylmercury exposure.

8    Q    And is it sufficient to base consideration of harm only

9    on the average levels observed?

10   A    Well, the study documented that -- I mean, if -- if

11   you're unlucky, you -- you can get a very bad lobster or -- or

12   a black duck with an extremely high mercury concentration, and

13   you can't tell from the way the lobster looks or the way it

14   tastes, and that, as you can see here, that -- that would

15   cover you for 33 days, and if you multiply this by three, it's

16   a hundred days of mercury exposure at the reference dose if

17   you start out with the Maine average.

18        This is -- I don't think anybody should take that risk.

19   Q    When was the EPA reference dose set?

20   A    Well, the history goes back into the 1990s, but most

21   recently, on the basis of the National Academy of Sciences'

22   Report, this was in 2001.

23   Q    Have you learned more about the health risks of exposure

24   of -- prenatal exposure to methylmercury since then?

25   A    Yes, we -- we were concerned already that the reference

GRANDJEAN - DIRECT EXAMINATION/COLANGELO

1    dose might not be fully protective, and -- and I think that

2    what we've learned since then, that concern has increased.

3    Q    Are there studies showing evidence of harm at exposure

4    near the reference dose?

5    A    Yes.  I mentioned the two studies that have been carried

6    out in the United States on, you know, just -- just normal

7    Americans giving birth on the east coast, and both studies

8    showed significant deficits in the children associated with

9    increased exposures of the mother during pregnancy to

10   methylmercury from seafood.

11        So I think -- and -- and those deficits occurred at

12   exposures at the reference dose or slightly higher.  I mean,

13   these were not excessive doses.  The -- like the Faroes were

14   much higher, but it -- when you can see that in relatively

15   small studies of a couple hundred children or so, I think this

16   is very strong evidence that the reference dose is not really

17   as protective as we would like it to be.

18   Q    Did you conduct an exposure study here in which people

19   consume contaminated seafood from the Penobscot and then you

20   measure resulting health effects?

21   A    It would be possible to do, but -- but I didn't do it

22   and it hasn't been done in -- in connection with -- with this

23   study.

24   Q    Why didn't you do that?

25   A    I think given the -- the wealth of information available

1    already from looking at mercury in those three important

2    species, I think we know enough to be able to estimate the

3    health risks given the -- you know, also we have the U.S. EPA

4    reference dose and -- and we have the epidemiology studies

5    that have been carried out in many countries by now.

6    Q    Have you done that kind of a study before?

7    A    What kind of a study?

8    Q    A study to measure exposure to contaminated foods and to

9    monitor the health effects over time?

10   A    Yes, this is essentially what we did in the Faroe

11   Islands, but -- but, you know, if you are worried about

12   effects on the developing brain, you have to measure the

13   exposure in connection with pregnancy, let's say you measure

14   the mercury in cord blood, and you have to wait until the

15   child gets older before you can really assess the -- the brain

16   development because you can't get much out of just looking at

17   an infant and doing reflexes and stuff like that.

18        The best studies wait for three, five, seven years

19   before they look at the outcomes.  So this kind of a study

20   would take many, many years to carry out.

21   Q    Is it expensive to do?

22   A    Indeed.

23   Q    As part of formulating your opinions in this case, did

24   you spend any time on the Penobscot River?

25   A    Yes.

1    Q     What did you do?

2    A     Well, I -- I got in touch with a lobsterman because -- I

3    mean, I told him I was interested in knowing, you know,

4    whether he was actually catching lobsters in the Penobscot

5    estuary, and I wanted to -- I wanted to see for myself what

6    was going on, and -- and this man was -- was a professional,

7    and he had his own lobster pots, and so he took me down to

8    Fort Point, just about that level, and he also took me up and

9    showed me the Mendall Marsh -- we didn't go all the way up to

10   -- to -- to Bangor, but we -- we went up and down the river,

11   around Verona Island, and so I -- I saw the setting.

12         And he told me he had -- I think he had something like 6

13   or 800 lobster pots and that's -- you know, to make a living,

14   and he would -- on each trip, he would take between 1 and

15   2,000 pounds of -- of lobster that would be necessary for --

16   for this to make -- for his business to be in existence.

17         And so -- so on each trip, he would essentially take as

18   many lobsters as the whole Penobscot River Mercury Study

19   analyzed, and, obviously, from different locations, but I

20   could also see that -- because we pulled up some of his

21   lobster pots, we could see that some of them were -- had

22   different color markings.  So that there are -- I don't know

23   how many lobstermen are operating, but he was certainly not

24   the only one.

25   Q     And how did this correspond to the region in the estuary

GRANDJEAN - DIRECT EXAMINATION/COLANGELO

824

1    with the lobster samples that you analyzed?

2    A     Okay.  We -- we essentially covered the area between

3    Bucksport and around Verona Island all the way down to Fort

4    Point, so we didn't go beyond.  There was -- I just wanted to

5    see the most heavily contaminated area and to get a feel of,

6    you know, how much -- obviously, this is not happening

7    anymore, but this must have been happening for decades.

8    Q     Did you testify previously in this case?

9    A     Did I?

10   Q     Did you testify previously in this case?

11   A     Did I testify in this case?

12   Q     Yes.

13   A     Yes, in 2002.

14   Q     Have there been any advances in knowledge about

15   methylmercury health effects since that time?

16   A     In regard to exposure, I remember that there were some

17   eel analysis way back, and -- but that was essentially all

18   there was.  So -- so the current database is quite impressive

19   compared to what was available in 2002, and in regard to

20   adverse effects, we've already discussed the -- the Boston

21   study and the New York City study and -- and the whole

22   understanding of adverse effects of methylmercury.

23         So in both aspects, we're much better off today.

24   Q     Are you aware of any action taken by the State of Maine

25   to limit the consumption of black ducks from Mendall Marsh?

1    A     I understand that they have posted warnings that

2    pregnant women should not eat black duck and -- and that --

3    pregnant women and children, I think it says, and that others

4    should limit their consumption to, I think, one or two meals

5    per month.

6    Q     In your opinion, is it unsafe to consume foods with the

7    levels of methylmercury measured in the black ducks in Mendall

8    Marsh?

9    A     It is unsafe.

10   Q     Are you aware of any action taken by the State of Maine

11   to limit consumption of lobster from the northern estuary?

12   A     I understand that in February, the state temporarily

13   banned lobstering and also crabbing in the upper estuary and

14   that that ban, just a few weeks ago, was made permanent.

15   Q     Do you think that was a good idea?

16   A     Definitely.

17   Q     Did you review the state rulemaking that described that

18   fishery closure?

19   A     Did I review?

20   Q     The state rulemaking --

21   A     Hm-hmm.

22   Q     -- that described that fishery closure?

23   A     Yes.

24   Q     Do you recall what basis the state offered for the

25   closure?

1    A      They -- they have access to the same mercury analyses,

2    and then they simply compared it to the -- the fish action

3    limit and the reference dose.

4    Q      Based on your experience and expertise, do you believe

5    that closure of the lobster fishery in the northern estuary

6    was necessary to protect public health?

7              THE COURT:  Wait, wait, just a second, sir.  Would

8    you repeat it?

9    BY MR. COLANGELO:

10   Q      Based on your experience and expertise, do you believe

11   that closure of the lobster fishery in the northern estuary

12   was necessary to protect public health?

13   A      It -- it was indeed necessary and I would say it -- it

14   -- the time was overdue, but -- but apparently the state

15   didn't have access to the analysis until just before they

16   actually issued that ban.

17             MR. COLANGELO:  Thank you, Dr. Grandjean.  That's

18   all I have.

19             THE WITNESS:  Thank you.

20             MR. COLANGELO:  Thank you.

21             THE COURT:  Cross-examination, Mr. Schutz.

22                      CROSS-EXAMINATION

23   BY MR. SCHUTZ:

24   Q      Good morning, Professor.  How are you?

25   A      Good morning.

1   Q     All right.  I am not going to try to pronounce your last

2   name.  Is it okay if I refer to you as professor?

3   A     That's okay, as long as you speak into the mic.

4   Q     Okay.

5   A     Thank you.

6   Q     Now, you are not a licensed medical doctor; is that

7   right?

8   A     I am.  Not in the United States, though, in Europe.

9   Q     You haven't engaged in a clinical practice of medicine

10  for many, many years?

11  A     Right, I left clinical work very early in my -- my

12  professional life.

13  Q     And your primary focus, then, is as a research

14  epidemiologist?

15  A     Indeed.

16  Q     I'd like to bring up a section of your report that you

17  discussed earlier this morning, the section that begins on

18  Page 5, titled Methylmercury Exposure from Penobscot Food

19  Items, and in that section, you point out that there are three

20  species sampled for the study that are highly relevant to

21  human dietary exposure to methylmercury.  They are the

22  American eel, American lobster, and American black duck; is

23  that right?

24  A     Yes.

25  Q     And if we go to the next paragraph at the bottom of that

GRANDJEAN - CROSS-EXAMINATION/SCHUTZ

828

1    page, you say that in considering dietary methylmercury,

2    exposures from these two species, two considerations are

3    relevant, one is the average methylmercury content of eel,

4    lobster, and duck; is that right?

5    A    Yes.

6    Q    And then in the following sentence, you say that the

7    other major consideration is the maximum content; is that

8    right?

9    A    Right.

10   Q    And if we can go to Table 1, which you just discussed

11   earlier this morning, you compared mercury concentrations in

12   eel, lobster, and black duck with certain reference values,

13   and then you report a ratio between the concentrations

14   measured by the Study Panel and concentrations that you

15   selected as reference values, correct?

16   A    Yes.

17   Q    And if we can go to the section of your report where you

18   discuss eel, you point out that mercury concentrations in eel

19   -- this is on Page 6 of your report -- it's actually the

20   second full paragraph, right?  You point out that mercury

21   concentrations in eel are similar in the Brewer-Orrington and

22   Orrington-Bucksport reaches with a joint average of .534 parts

23   per million?

24   A    Right.

25   Q    And in the next paragraph, you cite a recent study

1    showing the U.S. average concentrations of methylmercury -- or

2    mercury in wild eel are 0.186 parts per million?

3    A    Yes.

4    Q    And your source for that study is referenced in -- in a

5    footnote on this page as this Karimi, et al. study?

6    A    Yes, these are from upstate New York, yeah.

7    Q    And -- and, actually, Dr. Fisher was a coauthor of that

8    study.  Are you aware of that?

9    A    I don't remember.

10   Q    I think if we look at Footnote 3, we can see that

11   Dr. Fisher is listed as one of the coauthors of that study.

12            MR. SCHUTZ:  And I'd like to move into evidence

13   Defense Exhibit 717, which is the Karimi study, as well as

14   Defense Exhibit 718, which is a listing of supplemental data

15   associated with that study.

16            THE COURT:  Any objection to 717 and 718?

17            MR. COLANGELO:  No objection, Your Honor.

18            THE COURT:  Each is admitted.

19   BY MR. SCHUTZ:

20   Q    And looking at the same paragraph where you referenced

21   the .186 parts per million, you also say that eel above Veazie

22   Dam average .340 parts per million?

23   A    Yes.

24   Q    And are you aware, Professor, that the Study Panel

25   determined that eel above Veazie Dam are outside the aquatic

1   influence of the HoltraChem facility?

2   A    I understand.

3   Q    Well, let's bring up what the Study Panel wrote in

4   Chapter 14, Joint Exhibit 6-14, Page 11, first paragraph.  The

5   Study Panel wrote that the OV reach above Veazie is upstream

6   of the Veazie Dam and so outside the aquatic influence of the

7   HoltraChem facility, but would be subject to the same mercury

8   inputs from municipal and industrial facilities upstream of

9   the dam and from aerial depositions of the Penobscot water

10  shed.  Do you see that, Professor?

11  A    I see that, but it -- I -- I have -- I don't have any

12  comments on it because all I can say is I -- I agree this is

13  what the study report says.

14  Q    Well, would you agree that it would be reasonable for

15  purposes of a reference value to compare eel below Veazie Dam

16  to eel in the same river above Veazie Dam?

17  A    I would not agree.

18  Q    And if we do compare eel concentrations below Veazie Dam

19  to eel concentrations above Veazie Dam, they're in the same

20  river, but not influenced by HoltraChem, the ratio drops to

21  1.5 or so between below and upriver -- downriver and upriver

22  eel, correct?

23  A    Well, the way you propose to do it, the calculation is

24  correct, but -- but I think it's misleading.

25  Q    So if we wanted to reduce eel upriver of the dam to the

1    state's action level of .2, we would need a 40 percent

2    reduction in mercury concentrations in those eel; and if we

3    wanted to reduce eel below the dam to the state's background

4    level, we'd need a 60 percent reduction in mercury

5    concentrations, correct?

6    A     I can't comment on it, and I -- it's an observation that

7    you have made, and -- and I have no reason to challenge that.

8          But -- but I don't think that the numbers that you refer

9    to represent the background.

10   Q     But they represent the background in the Penobscot

11   River, correct?

12   A     I don't think so because, as it says here, that they are

13   subject to the same mercury inputs from municipal and

14   industrial facilities upstream of the dam and from aerial

15   deposition from the Penobscot watershed.  So some of that

16   mercury probably comes from the HoltraChem facility, and the

17   question is also whether the Veazie Dam completely prevents

18   mercury from coming upstream at -- at very high tides.

19   Q     We'll get back to aerial deposition of mercury

20   throughout the state of Maine.

21         But let's turn to duck.  On Page 7 of your report, first

22   full paragraph, you refer to duck sampling, and are you aware

23   that the Study Panel collected their duck samples in wintering

24   grounds in --

25   A     That's what I understand.

1   Q     And you've compared the duck concentrations measured at

2   wintering grounds with duck concentrations measured at -- in

3   the summer on Canadian breeding grounds, correct?

4   A     Correct.

5   Q     And so the Study Panel also found that concentrations of

6   mercury in duck in the wintering grounds in all of the areas

7   sampled by the Study Panel within the Penobscot and outside

8   the Penobscot are the same on the summer -- on the summer

9   breeding grounds.  Are you aware of that?

10  A     I'm not sure that I followed what you just said.

11  Q     Well, in other words, you're comparing mercury

12  concentrations in duck found in the Penobscot in the winter

13  with mercury concentrations in duck found in Canada in the

14  summer, correct?

15  A     That -- that is correct.

16  Q     And you may be actually comparing mercury in the same

17  duck.

18  A     You can only kill the duck once.

19  Q     Right.  But these duck are -- have the same

20  concentrations in their summer breeding grounds in all of the

21  areas sampled by the Study Panel based on feather analysis,

22  correct?

23  A     The -- I think the Study Panel approached this question

24  by looking at methylmercury in feathers, and that's how you

25  can look at past exposures.  So they -- they elucidated this

1    question.  And, therefore, I think my comparison from the

2    summer levels in -- in the less contaminated environment north

3    of the border with the concentrations accumulated in -- in the

4    same species here at the Mendall Marsh, I think that's

5    appropriate.

6    Q    Well, if we look at Chapter 14, Page 93, Joint

7    Exhibit 6-14, we can see that the Study Panel found that the

8    black ducks in Mendall Marsh are exposed to uniformly low

9    mercury concentrations in the summer before they arrived at

10   wintering sites in Maine.

11   A    I see that.

12   Q    And we can actually blow up the chart above that on the

13   same page of the Study Panel's report and find that black duck

14   mercury concentrations in the summer are the same across all

15   areas sampled by the Study Panel.  Are you aware of that?

16   A    Yeah, I saw that.

17   Q    So by comparing summer and winter mercury

18   concentrations, you're comparing apples and oranges, aren't

19   you?

20   A    I -- I'm not sure I follow your conclusion.

21   Q    Let's move on to lobster.  That's the next species you

22   address in this section of your report.  If we go back to your

23   report, on Page 6, fourth full paragraph, you refer, as you

24   did earlier on your direct examination, to the fact that

25   lobster concentrations in Odom Ledge, south of Verona and Fort

GRANDJEAN - CROSS-EXAMINATION/SCHUTZ

834

1    Point or the north estuary are higher than lobster

2    concentrations found in the south estuary?

3    A    Yes.

4    Q    And you've grouped the Odom, South Verona, and Fort

5    Point together because they're a homogeneous group you say?

6    A    That's what --

7    Q    And average across?

8    A    Yeah, this is what the Study Group concluded, and I

9    agree.

10   Q    And you say that lobster tail had the highest number of

11   samples and these data are used for further consideration?

12   A    Yes.

13   Q    The lobster tail data set is 127 total lobsters?

14   A    Correct.

15   Q    And lobster claws are 107.

16   A    Right.

17   Q    So not much difference in sample size.

18   A    Right, but I told you before why I relied on the lobster

19   tails and -- and if you want, you can make some adjustment,

20   that's -- that's entirely possible.  But as I explained before

21   when I was asked by Mr. Colangelo, the numbers are pretty much

22   the same anyway.

23   Q    Well, actually, the lobster claws have half the

24   mercury --

25   A    Right.

GRANDJEAN - CROSS-EXAMINATION/SCHUTZ

835

1    Q     -- that's found in lobster tails according to results

2    reported by the Study Panel?

3    A     Right.

4    Q     And a lobster claw, according to results reported by

5    Dr. Keenan, a defense expert, lobster claw has about one-third

6    the meat of a lobster tail.  Does that sound reasonable?

7    A     Right.

8    Q     And so we could combine lobster claw and tail meat and

9    arrive at an average mercury concentration of claw across all

10   edible lobster meat, right?

11   A     It's possible, but you have to assume a certain ratio.

12   I mean, I think most people eat the whole tail, but, I mean,

13   from --

14   Q     You mean --

15   A     -- watching --

16   Q     -- the whole lobster tail?

17   A     The whole tail of the lobster.  They eat the whole tail.

18   But -- but if you look at people who come to Legal Sea Foods

19   or some other restaurant like that, you will see that some of

20   them don't eat the claws.  Some of them just eat the big claws

21   and not what's in the body.  They don't eat the -- the

22   tomalley.  So it -- I decided not to do those calculations and

23   simply rely on the tail, and then admit that it's a slight

24   overestimate, you know, if people eat a lot of claw.

25              THE COURT:  We can all agree that people from

1    Massachusetts don't know how to eat a lobster.

2    BY MR. SCHUTZ:

3    Q    But I do ask if you agree that if we -- if you would

4    agree that lobster tail has about 125 percent the mercury

5    concentration found in lobster meat overall, that's tail and

6    claw?

7    A    That -- that's possible.

8    Q    It's not just possible, it's based on the data reported

9    by the Study Panel; that's about right?

10   A    Again, it depends on what you -- what you actually eat.

11   Q    And let's go to your comparison data, which is on Page

12   6, last paragraph of your report.  You point out that there's

13   an FDA value of .107 parts per million.  Then there is a

14   higher value listed by the United States Environmental

15   Protection Agency and their data set of close to .2 parts per

16   million; is that right?

17   A    That's correct.

18   Q    And you also point out that a recent overview reports a

19   lobster concentration of .2 parts per million, correct?

20   A    Correct.

21   Q    And that's the Karimi paper coauthored by Dr. Fisher

22   that we just moved into evidence a few minutes ago?

23   A    I believe so.

24   Q    Now, if we compare the EPA and Dr. Fisher lobster value

25   of .2 to the value -- the concentration of mercury in all

1    lobster meat, the ratio drops to about 1.5, doesn't it?

2    A     But you can't do that conclusion because if you do, then

3    south estuary lobsters are deficient in mercury because

4    they're below 0.2.  So it's very clear the 0.2 here is

5    contaminated, and I don't know what the sources are, but that

6    overview simply did not look into, you know, whether the

7    lobsters represented the background or not a background.

8         And what I'm interested in is, what would a lobster

9    contain in the Penobscot had the Mallinckrodt facility not

10   been there and, therefore, as I explained to Mr. Colangelo, I

11   would rely on the Maine data that the state recently concluded

12   from, rather than these overviews that simply pulled in any

13   lobster analysis that -- that has been done in the past

14   without looking at whether it was background or not.

15   Q     Well, let me just ask you if you'd agree, just with my

16   arithmetic, if we compare lobster in the north estuary of .3

17   to the EPA in Dr. Fisher-Karimi paper values, that ratio is

18   about 1.5, the ratio between 1. -- .3 and .2 is 1.5, correct?

19   A     The arithmetic is correct, but it is -- it is

20   misleading.

21   Q     If we compare not -- and that's the -- the .3 is the

22   tail only.  If we compare tail and claw, all edible lobster

23   meat at about .2, a little over .2, to the EPA and Karimi

24   reference value, the lobster concentrations in the north

25   estuary are about the same as reference, correct?

1          MR. COLANGELO:  Objection, Your Honor.  To compare
2    the tail and the claw, you have to adjust for the different
3    proportion, you can't just take .3 down to .2.
4          THE COURT:  Well, I -- I'm going to overrule the
5    objection.  I think Mr. -- Professor Grandjean can certainly
6    respond.  You may respond, sir.
7    A    Can I hear the question again, please?
8    BY MR. SCHUTZ:
9    Q    Well, if we compare the concentration in all lobster
10   meat, which is .230, to the reference concentrations reported
11   by EPA, and Dr. Fisher's paper of .2, the ratio is 1.15, isn't
12   it?
13   A    My problem with that is that I am not sure if the 0.2
14   and the 0.149 are based on tail only, claw only, or some
15   mixture.  I don't remember and I'm not sure that the data
16   sources reflect that.
17   Q    Are you sure about the FDA data source that you used?
18   Are you any more sure about the FDA data source that you used?
19   A    All I can say is that I looked at the Web site at FDA,
20   and there were nine samples only identified as American
21   lobster, and there were also some spiny lobster and some
22   unidentified lobsters, and that number 0.107, I think it was,
23   is very close to the lowest averages at the furthest distance
24   from the Mallinckrodt facility that were analyzed in the
25   Penobscot River Mercury Study.

1        And, therefore, I thought that the FDA average of about

2   0.1 was more -- was closer to a background than the 0.2 and

3   0.149, which clearly contained contaminated samples from

4   whatever sources.

5   Q    And would you agree that .230, which is the

6   concentration found in north estuary claw and tail meat is

7   15 percent higher than .2, the concentration reported by EPA

8   and Dr. Fisher's paper?

9   A    If you say so, but, again, I would like to indicate that

10  I think that that calculation is misleading.

11  Q    In your report, second paragraph from the bottom on Page

12  7, you state that the average lobster tails are higher than

13  the highest concentrations reported by the FDA?

14  A    Right, and that's assuming that the FDA level is based

15  on lobster tail, and, again, the FDA doesn't tell.

16  Q    Let's look at the FDA data.

17        MR. SCHUTZ:  And I'd like to move into evidence

18  Defense Exhibit 517.

19        THE COURT:  Any objection to 517?

20        MR. COLANGELO:  I'd like to see what it is first.

21        THE COURT:  Sure.

22        MR. COLANGELO:  No objection, Your Honor.

23        THE COURT:  517's admitted without objection.

24  BY MR. SCHUTZ:

25  Q    If we blow up the very top of Exhibit 517, we see this

1    is mercury concentrations in fish FDA monitoring program 1990

2    to 2010.  Do you see that?

3    A     I see that.

4    Q     And at the very bottom of the page, we see that this is

5    a -- available on the Internet and was printed February 24th,

6    2014.  Do you see that?

7    A     I see that.

8    Q     And if we turn to Page 74 of this data set, which is

9    where the lobster data is found, we see that FDA is reporting

10   mercury concentrations in lobster at .2, as well as at .3?

11   A     I see that.

12   Q     And if we go to the next page of this data set from FDA,

13   we see that FDA is reporting lobster concentrations, .3, .2,

14   as high as .4.  Do you see that?

15   A     I see that.  And -- and just to clarify, I looked, when

16   I wrote my report, I looked at a summary table prepared by the

17   FDA, and they identified apparently the nine sample set in

18   your larger table are referred to as American lobsters.  That

19   number that I extracted with an average of 0.107 is from a

20   summary table that the FDA published, and apparently the --

21   the lobsters that -- in your table are identified as American,

22   that is the same species as we have here in the Penobscot.

23   Those are the ones that were included in the summary table by

24   the FDA identified as American lobster.

25         I can't comment on the others, whether they are tail or

GRANDJEAN - CROSS-EXAMINATION/SCHUTZ

841

1   claw or another species of lobster.  It -- it's hard -- I

2   mean, I would like to see the raw data, and -- and then I can

3   really comment on it.  I can't comment on something like this.

4   Q     Would you agree that FDA is reporting multiple lobster

5   over .2 and some above .3 and .4 parts per million?

6   A     I agree, but I don't know what it means.

7   Q     In your report, you had said that the average lobster

8   tails in the study area are higher than the highest

9   concentrations in lobster reported by FDA.  Would you like to

10  amend your report?

11  A     I -- I don't remember what I said.

12  Q     Well, let's bring up -- bring up that paragraph, which

13  is on Page 7, where you state that the average lobster tail's

14  .307 are higher than the highest concentrations reported by

15  FDA, second paragraph from the bottom?

16  A     Oh, yeah, I see it, yeah, right.

17  Q     I mean, would you agree that FDA is reporting

18  concentrations in lobster at .3 and .4 in their database?

19  A     I refer to American lobster in the FDA analysis.  As I

20  said, I don't know what the other lobsters are.

21  Q     Well, there are two types of lobster -- American lobster

22  and spiny lobster -- in the database.

23  A     I don't think we should, in your words, compare apples

24  and oranges because if they're spiny lobsters, I -- I think

25  that it's a different story.

1    Q     Spiny lobsters have much lower concentrations than

2    American lobsters on average, correct?

3    A     I don't know.

4    Q     And if we go back to the FDA data set that we were just

5    talking about, they do list separately concentrations in spiny

6    lobster.  Do you recall that?

7    A     I don't recall.

8    Q     Let's look at Page 75 of that data set at the bottom.

9    FDA reports concentrations in spiny lobster.

10   A     I have not studied spiny lobster, so I cannot comment.

11   Q     Let's -- let's turn to a different document, the United

12   States Department of Agriculture and the United States

13   Department of Health and Human Services Dietary Guidelines for

14   Americans 2010, Defense Exhibit 514.

15            MR. SCHUTZ:  I'd like to move that into evidence.

16            THE COURT:  Any objection to 514?

17            MR. COLANGELO:  No objection, Your Honor.

18            THE COURT:  It's admitted.

19   BY MR. SCHUTZ:

20   Q     And, Professor, you can see on the second page of this

21   document that this is dated December 2010.  Do you see that?

22   A     I see that.

23   Q     And on the next page of the document, a message from the

24   Secretary of Agriculture and the Secretary of Health and Human

25   Services, they explain that this document's based on the

1   recommendations put forward by the 2010 Dietary Guidelines

2   Advisory Committee.  The committee was composed of scientific

3   experts who reviewed and analyzed the most current information

4   on diet and health and incorporated -- and incorporated it

5   into a scientific, evidence-based report.  Do you have any

6   reason to disagree with that?

7   A    I have no reason to -- to doubt if it says so.

8   Q    And there is a section of this report that addresses

9   mercury in seafood, isn't there?

10  A    I see it.

11  Q    And in this report, Page 39, these federal agencies

12  report that moderate consistent evidence shows that the health

13  benefits from consuming a variety of seafood in the amounts

14  recommended outweigh the health risks associated with

15  methylmercury, a heavy metal found in seafood in varying

16  levels.  Do you agree?

17  A    I -- I -- I see what they conclude.

18  Q    Let's go to the next paragraph.  At the bottom of this

19  paragraph on the right-hand column of this report, the federal

20  agency has advised that it's recommended that women who are

21  pregnant or breast-feeding consume at least 8 and up to

22  12 ounces of a variety of seafood per week from choices that

23  are lower in methylmercury.  Do you agree with that?

24  A    I agree.

25  Q    And let's move on to the next paragraph.  It says that

1   women who are pregnant and breast-feeding should not eat four

2   types of fish because they're high in methylmercury, tilefish,

3   shark, swordfish, and king mackerel.  Women who are pregnant

4   or breast-feeding can eat all types of tuna, including white

5   albacore and light canned tuna, but should limit white tuna to

6   6 ounces per week because it's higher in methylmercury.  Do

7   you think this is unsafe advice being given by the federal

8   government?

9   A     Do I think it's unsafe?

10  Q     Yes.

11  A     To eat tuna?

12  Q     Do you think this is unsafe advice being given by the

13  federal government?

14  A     Okay.  I -- usually we recommend to pregnant women to

15  simply stay away from tuna because it can be substantially

16  contaminated with methylmercury, and sometimes you can't see

17  from the can whether it's light or white.  Those are sometimes

18  confused.  And I think it's much easier for a pregnant woman

19  simply to stay away from tuna.

20  Q     So then it's fair to say that you disagree with this

21  advice?

22  A     I wouldn't say I disagree, but -- but it's a simplified

23  version of the advice that the administration representatives

24  ended up with.

25  Q     Do you think it's safe for women who are pregnant or

1   breast-feeding to eat all types of tuna?

2   A     If it's safe for pregnant and breast-feeding women to?

3   Q     Eat all types of tuna.

4   A     All -- all types of?

5   Q     Tuna, yes.

6   A     No.

7   Q     In this paragraph, there's a reference to Appendix 11.

8   Let's look at Appendix 11 to this same document.  And this

9   table lists estimated omega 3 fatty acids, EPA and DHA, and

10  mercury content in 4 ounces of selected seafood varieties.  Do

11  you see that?

12  A     I see it.

13  Q     And so salmon is high in omega 3 fatty acids that are

14  good for you and low in mercury.  Do you agree?

15  A     Correct.

16  Q     And then the table lists a number of other

17  concentrations of mercury in micrograms per 4-ounce portion?

18  A     I see.

19  Q     And if we look down on this table, we see that there are

20  mercury concentrations listed for tuna, bluefin and albacore,

21  54 to 58 micrograms per 4-ounce portion?

22  A     Yes, I see that.

23  Q     And if we go down further in this table, we see a

24  mercury concentration in lobster listed as 47 micrograms per

25  4-ounce portion.  Do you see that?

GRANDJEAN - CROSS-EXAMINATION/SCHUTZ

1    A     I see that.

2    Q     And we could calculate what that means in parts per

3    million, could convert that -- those units to parts per

4    million?

5    A     I'm not sure I understand because this is something from

6    an FDA report on some assumptions and using a database that

7    I'm not sure is appropriate, and -- and for me to comment on

8    this, I'm not sure that I'm prepared to do that.

9    Q     You could, though, just calculate as a matter of

10   arithmetic what 47 micrograms per 4-ounce portion means in

11   parts per million, correct?

12   A     Can I see -- I'm not -- what is the unit?  It says 47,

13   but -- but what's a unit?  What does it come from?

14   Q     Micrograms per 4-ounce portion.

15   A     So this is a 4-ounce portion.  And what is it you want

16   me to do?

17   Q     Well, 47 micrograms per 4-ounce portion converts to

18   .4 parts per million, doesn't it, roughly?

19   A     Um, okay.  So 4 ounces, let's say that is 120 grams, and

20   to get to 47 micrograms of mercury in 120 grams, you have to

21   have a mercury concentration of 0.4.  That will be quite

22   obviously common in the Penobscot.  But it doesn't agree with

23   the numbers that we just looked at.

24         So I -- I can't comment on this calculation.  It may be

25   wrong.

1   Q     What's the ratio between the concentration reported in

2   north estuary lobsters by the Study Panel and .4 parts per

3   million?

4   A     What's the ratio between the mercury -- average mercury

5   concentration in the north estuary here in the Penobscot and

6   what?

7   Q     .4.

8   A     It's about the same, so it's about a unit.  But -- but

9   I'm not sure what that ratio should reflect because, as I said

10  before, I -- I think there may be an error in this

11  calculation, and I would like to see the -- the data that

12  formed the basis of this report.  That there are all sorts of

13  footnotes apparently, as I can see from the table.  I mean,

14  right here, there's -- it looks like there's a footnote for

15  the American lobster, but I can't comment on -- on a -- a

16  number taken out of context.

17  Q     Let's just look at the footnotes, the units at the top,

18  where we had mercury per -- mercury micrograms per 4-ounce

19  portion.  If we go to the next page, we can see that those --

20  that -- that refers to C and D, it says here that a total of

21  39 micrograms of mercury per week would reach the EPA

22  reference dose limit for a woman who's pregnant or

23  breast-feeding and weighs 124 pounds, 56 kilograms?

24  A     I -- I -- I see that.  But I was noting that the

25  footnote here, that's a footnote from the American lobster.

1    It says seafood variety is included in mercury values

2    reported.  That doesn't tell me anything.  I -- so I can't

3    comment on that number.

4    Q    Let's take a look at the concentrations reported by the

5    Study Panel in their latest 2012 monitoring report, Joint

6    Exhibit 7 already in evidence.  And, actually, the figures are

7    at Joint Exhibit 8.  I would like to take a look at Figure 24.

8    And this figure shows total mercury in lobster tail 2006 to

9    2012, and if we convert these concentrations to total mercury

10   in all edible lobster meat, they go down by 25 percent; is

11   that fair?

12   A    Can you -- can you repeat the last sentence?

13   Q    If we convert these concentrations from tail to tail and

14   claw, they go down by 25 percent?

15   A    Okay.  I mean, the -- this is for lobster tail only.

16   Q    Right.

17   A    So -- and I don't see any data for -- for claws in this

18   histogram.

19   Q    Right.  I'm just going back and asking you if you agree

20   that mercury in lobster tail's 125 percent of mercury in

21   lobster claw and tail.

22   A    Ah, I haven't done that calculation right -- I mean,

23   it's possible.

24   Q    And .4 runs across right about there, correct?

25   A    Yeah, I see that, yes.

GRANDJEAN - CROSS-EXAMINATION/SCHUTZ

849

1   Q    Let's move on to another document.  Are you aware that

2   within the U.S. Centers for Disease Control, there's an agency

3   called the Agency for Toxic Substances and Disease Registry?

4   A    I'm aware of that.

5   Q    And that's abbreviated ATSDR?

6   A    Yes.

7   Q    And ATSDR issued a 1999 report, Toxicological Profile

8   for Mercury.  Are you aware of that?

9   A    I think I was a reviewer of it.

10          MR. SCHUTZ:  That's Defense Exhibit 749, which I'd

11  like to move into evidence.

12          MR. COLANGELO:  No objection.

13          THE COURT:  Any objection -- no objection to 749?

14          MR. COLANGELO:  No.

15          THE COURT:  It's admitted.

16  BY MR. SCHUTZ:

17  Q    And ATSDR also issued an update to its Toxicological

18  Profile for Mercury in 2013.  Are you aware of that?

19  A    I'm not sure I've seen that.  Oh, here it is.  Okay.  I

20  don't think I've seen it.

21          MR. SCHUTZ:  That's Defense Exhibit 720, which I'd

22  also like to move into evidence.

23          THE COURT:  Any objection to 720?

24          MR. COLANGELO:  No objection.

25          THE COURT:  It's admitted.

1   BY MR. SCHUTZ:

2   Q    And ATSDR has determined a -- its own reference value

3   for assessing risks associated with methylmercury, haven't

4   they?

5   A    That's correct.

6   Q    ATSDR's minimal risk level is .3 micrograms per kilogram

7   per day, correct?

8   A    Correct.

9   Q    Which compares to U.S. EPA's value of .1, correct?

10   A    Correct.

11   Q    What I'd like to turn to in this ATSDR addendum from

12   March 2013 is Table 6.  In Table 6 summarizes mercury

13   concentrations in -- concentrations in tuna, sold and caught

14   in the U.S.  Do you see that?

15   A    I see.

16   Q    And tuna concentrations sold in the U.S. range from .1

17   up to about .6, depending on the variety and the source?

18   A    It seems so.

19   Q    Many varieties of tuna sold in the U.S. and commonly

20   available are over .3, correct?

21   A    Yeah, it looks like that.

22   Q    So would you agree that the methylmercury levels in

23   lobster in the north estuary, the highest of the sample

24   stations, are in the range of levels generally found in

25   commercial seafood eaten in the United States?

1   A       I disagree because we're here talking about tuna; we're

2   not talking about commercial seafood in general.

3   Q       But methylmercury in lobster is no more or less

4   hazardous than methylmercury found in any other seafood item,

5   correct?

6   A       More or less than what?

7   Q       Methylmercury is the same whether it's found in lobster,

8   tuna, or any other seafood item, correct?

9   A       I think the question is wrong because there are many

10  types of seafood that contain very little mercury and that are

11  safe to eat that are very nutritious sources of seafood that a

12  pregnant woman -- and all of us -- should actually should eat.

13  And then there are types of seafood that oftentimes contain

14  more, like tuna.

15  Q       It doesn't matter, does it, whether methylmercury comes

16  from a duck or a lobster or an eel in the study area or a

17  fourth species, it's the amount of methylmercury taken in that

18  counts, right?

19  A       The -- the amount of mercury -- I mean, the effects of

20  mercury do not depend on the source of that -- that mercury.

21  Q       So the risk associated with lobster, accepting the

22  .3 parts per million, are no greater than the risks associated

23  with eating many varieties of canned tuna in the United

24  States?

25  A       That is not correct because the state -- the Maine state

1   CDC recommends the population to eat lobster as a low mercury

2   source of seafood, and everybody knows that tuna may contain a

3   lot of mercury.  But with regard to lobster, the state is

4   actually recommending it as a safe source with low mercury

5   concentrations.  So that's a very important difference.

6   Q     Let's take a look at what the state recommends.  The

7   state has issued fish consumption advisories.  You're familiar

8   with that?

9   A     If the state has issued a fish advisory?

10  Q     Yes.

11  A     Yes.

12         MR. SCHUTZ:  And the state's freshwater fish safe

13  eating guidelines have been marked as Defense Exhibit 512,

14  which I'd like to move into evidence.

15         THE COURT:  Any objection to 512?

16         MR. COLANGELO:  No objection.

17         THE COURT:  512's admitted.

18  BY MR. SCHUTZ:

19  Q     And on the first page, under safe eating guidelines --

20  A     Yes, I've seen that.

21  Q     The state recommends limiting consumption of certain

22  seafood.  You've seen this.

23  A     I see it.

24  Q     And would you read that this advisory applies to all

25  inland waters in Maine?

1    A    That's what it says.

2    Q    And if we turn to the next page of this advisory, we can

3    see that the state has specifically said that the advisory

4    applies to the Penobscot River below Lincoln?

5    A    I see that.

6              MR. SCHUTZ:  And if we turn to the Maine CDC's

7    saltwater fish consumption advisory, Defense Exhibit 576,

8    which I'd like to move into evidence.

9              THE COURT:  Any objection to 516?

10             MR. COLANGELO:  No objection.

11             THE COURT:  516 is admitted.

12             MR. COLANGELO:  Your Honor, I'm sorry.  I think it's

13   576.

14             THE COURT:  Did you say 5 -- did you say 576?  I'm

15   sorry.

16             MR. SCHUTZ:  576.

17             THE COURT:  576 is admitted.

18   BY MR. SCHUTZ:

19   Q    And we can turn to Page 2 of this advisory, and you can

20   see that the state says that pregnant and nursing women can

21   eat tuna, but they should limit consumption?

22   A    I -- I see that.

23   Q    Which you disagree with.

24   A    As I said before, I -- I think it's easier to say stay

25   away from tuna because it oftentimes has elevated mercury

1    concentrations that are unsafe.

2    Q    The state also has an advisory for all ocean fish and

3    shellfish, including canned fish and shellfish, for pregnant

4    women, and suggests consumption of not more than two meals per

5    week.  Do you see that?

6    A    I see that.

7    Q    So if we were to mark in red all areas in Maine subject

8    to the state's fresh and saltwater advisories, the state would

9    look like -- something like Defense Exhibit 1069, which is a

10   demonstrative.  Would you agree?

11   A    I've not seen this before, but, yeah.

12   Q    And where's the study area on this map?

13           THE WITNESS:  Can I ask you a question?

14           THE COURT:  You can -- sorry.

15           THE WITNESS:  I'm running out of batteries.  Can we

16   take a break?

17           THE COURT:  Oh, sure.  Good time to take a break

18   anyway.  Dr. Grandjean tells me that he's run out of batteries

19   for his hearing aids, so he needs to get those batteries in

20   his hearing aids so he can hear you.  But it's a good time to

21   take a break anyway, and we'll let Dr. Grandjean reenergize.

22           THE WITNESS:  Okay.  Thank you.

23           THE COURT:  Court will stand in recess for about --

24   until quarter of 11:00.

25       (Court recessed from 10:23 a.m. to 10:48 a.m.)

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

855

1           THE COURT:  Are we all set?

2           THE WITNESS:  All set.  Thank you.

3           THE COURT:  Good.

4                   CONTINUED CROSS-EXAMINATION

5    BY MR. SCHUTZ:

6    Q     Dr. Grandjean, your -- your hearing is okay?

7    A     I believe so.

8    Q     Or -- or as good as possible.

9    A     If you could speak close to the mic, that would help.

10   Q     Will do.  I'd like to turn to Defense Exhibit 513.

11          MR. SCHUTZ:  I move that into evidence, the NHANES

12   results, 1999-2010.

13          THE COURT:  Any objection to 513?

14          MR. COLANGELO:  No objection.

15          THE COURT:  It's admitted.

16   BY MR. SCHUTZ:

17   Q     And, Professor, you had mentioned NHANES during your

18   direct examination.  You're familiar with that --

19   A     I am.

20   Q     -- program by the U.S. EPA?

21   A     I'm familiar with this report.

22   Q     And this is a July 2013 report issued by U.S. EPA

23   reporting the results of their NHANES survey of mercury blood

24   concentrations in the United States?

25   A     That's correct.

1   Q      And if we turn to the introduction, Roman numeral VII,

2   of the report, EPA is reporting that mercury blood levels in

3   the U.S. have decreased over the past ten years?

4   A      That's correct.

5   Q      And EPA is reporting here that there's been a 34-percent

6   decrease in methylmercury blood levels over the period

7   1999-2000 to 2001-2010?

8   A      That's correct.  They refer to the total mercury

9   concentrations in blood, not methylmercury, but it's probably

10  the same.

11  Q      And let's turn to Page 18 of this report, Section 2.83.

12  Would you agree that as of the date of this report, July 2013,

13  it's EPA's position that the blood mercury level that relates

14  to the reference dose is 5.8 micrograms per liter?

15  A      All I can say is that that's what it says here, but --

16  but there is a discussion within the EPA whether the

17  translation of the reference dose to a blood concentration is

18  correct.

19        The original level that was stated in the Federal

20  Register was 5.8, and EPA later recognized that 5.8 was wrong,

21  and it should be 3.5 for the reason that I discussed with

22  Mr. Colangelo, that the 5.8 refers to cord blood, which has 40

23  to 50 percent more mercury than the mother's own blood, and

24  for the mother's own blood, for adult blood, the correct

25  conversion is 3.5 micrograms per liter, and the EPA recognized

1    that.

2         But for -- I think for administrative reasons, they

3    continue reporting the 5.8, even though it's too high.

4    Q    Well, in the third sentence in this July 2013 report,

5    says, additionally, a blood methylmercury value of 5.8 is the

6    concentration that forms the basis for the EPA reference dose

7    for methylmercury.  Do you see that?

8    A    Can you point it out with an arrow or otherwise?

9    Q    The sentence that begins additionally.

10   A    Okay.  But -- but that -- again, it refers to the

11   original calculations where the EPA had not taken into regard

12   that that concentration is for cord blood, that the -- the

13   blood you get from the umbilical cord.

14   Q    Right.  But it's U.S. EPA's position, as reported in

15   July 2013, that the correct value remains 5.8, right?

16   A    I have to refer to the previous answer I gave you, that

17   EPA does -- they are aware that it -- 5.8 is too high, but

18   that is what they originally put in the Federal Register, and

19   for some reason, they have -- they have reported this in the

20   scientific literature that the correct value is 3.5.

21   Q    Right.  And that's -- your -- your view is that the

22   reference dose is two-fold too high, correct?

23   A    But -- but that has nothing to do with this calculation.

24   Q    No, no.  But I'm asking, your position is that the

25   reference dose is twice as high as it should be?

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

1  A     If the reference dose is not as high as it should be?

2  Q     No.  Your position is the reference dose is too high,

3  correct?

4  A     Is too high.  I think that if we were to -- to determine

5  a reference dose today, that the National Academy and the EPA

6  and -- and all the -- my colleagues who work in this field

7  would agree that we should have a lower reference dose than

8  the one that was determined 14 years ago.

9  Q     So just to try to put a pin in this, would you agree

10 that it is EPA's formal position that a blood methylmercury

11 level of 5.8 is the concentration that forms the basis for the

12 reference dose?

13 A     I think I already responded to this, and -- and EPA

14 knows that 5.8 is not the correct number, but they're

15 referring to the documents that were created in 2001, and

16 because that's part of the Federal Register report, then they

17 -- there are probably administrative reasons that they have

18 not updated this.

19 Q     Let's bring up the answer you gave me at your deposition

20 to this very question, Page 27 of your deposition.  I asked,

21 on Line 18, would you agree that EPA has said as of the date

22 of this report, July 2013, that a blood methylmercury value of

23 5.8 is the concentration that forms the basis for the EPA

24 reference dose?  And your answer, the way you phrase the

25 question, I would say yes, but I disagree with the value of

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

1   5.8.   Is that still accurate?

2   A     I -- it's exactly the same that I'm telling you now.

3   Q     Let's go back to Page 18 of this NHANES report, and the

4   same paragraph that we were just talking about.  The sentence

5   prior to the one that we were discussing says, using a safety

6   factor of 10, the blood methylmercury value of 5.8 micrograms

7   per liter is one-tenth of the lower 95-percent confidence

8   limit of the cord blood mercury concentration associated with

9   neurologic effects on the fetus.

10        My -- and my question is, EPA refers to safety factor of

11  your 10.  In your opinion, would a more accurate way of

12  expressing that be uncertainty factor?

13  A     Nowadays we would use the term uncertainty factor.

14  Q     But what EPA is expressing here is that the

15  5.8 micrograms per liter has a built-in safety factor of 10

16  and is one-tenth of the lower 95-percent confidence limit of

17  the cord blood mercury concentration associated with

18  neurologic effects on the fetus.  Do you see that?

19  A     I think it's an inappropriate summary of a very detailed

20  and -- and I think very balanced report from the National

21  Research Council and the National Academy of Sciences.  I

22  don't think that the EPA thought a lot about that sentence

23  before they wrote it because, No. 1, the -- the safety factor

24  is an uncertainty factor, and 5.8 is certainly wrong, and to

25  say that it's one-tenth of a lower confidence limit for

1    neurological effects on the fetus, I -- I -- I would have

2    phrased this in a different way.

3    Q    Let's turn to Page 22 of this same report by EPA and

4    look at Table 5.  And would you agree that this table is

5    showing the percent of women of childbearing age with blood

6    methylmercury levels over the 5.8 micrograms per liter?

7    A    That's what it says, I agree.

8    Q    And that EPA is using the 5.8 micrograms per liter

9    because that's the blood mercury concentration that correlates

10   to the reference dose?

11   A    As we discussed before, that -- that's -- they continue

12   doing that.

13   Q    And what this shows is that in the most recent NHANES

14   survey release available, 2.184 percent of women of

15   childbearing age have blood methylmercury levels over 5.8?

16   A    So -- so that percentage exceed the reference dose by

17   more than 50 percent.  That's how I -- I would interpret it

18   today.

19   Q    Because you think the reference dose is twice as high as

20   it should be.

21   A    It -- no, I -- I -- you know, referring to the reference

22   dose, if you translate that into a blood concentration, then

23   5.8 is 50 percent higher than 3.5 that EPA has admitted is the

24   correct transfer -- conversion.  And so if you refer to 5.8, I

25   have to say, well, that corresponds to about 50 percent in

1    excess of the reference dose because 5.8 is about 50 percent

2    above 3.5.

3    Q    Right.  The Professor Grandjean value is 3.5, but the

4    U.S. EPA value used in this July 2013 report is 5.8, correct?

5    A    This is what it says, and I think we have gone over this

6    point, and I've given you my -- my position.

7    Q    All right.  Let's move to a different document.  Now,

8    you're aware that the United States Food and Drug

9    Administration has an action level for methylmercury in

10   seafood?

11   A    I'm aware of that.

12   Q    And that the U.S. FDA's action level for methylmercury

13   in seafood is 1 parts per million?

14   A    That's correct.

15   Q    And is that FDA's position today, as we sit here?

16   A    That's what I understand.

17   Q    And you disagree with U.S. FDA's action level?

18   A    I'm a scientist.  I'm not an administrator.  So if

19   that's what they think is appropriate, I -- I can't challenge

20   that.

21   Q    And I'd like to talk about Defense Exhibit 515.

22             MR. SCHUTZ:  And move that into evidence.

23             THE COURT:  Any objection to 515?

24             MR. COLANGELO:  No objection, Your Honor.

25             THE COURT:  515's admitted.

1    BY MR. SCHUTZ:

2    Q    And, Professor, you're aware that FDA responded to a

3    petition to lower the action level for methylmercury in

4    seafood from 1 parts per million to .5 parts per million in

5    2013?

6    A    I understand that happened.

7    Q    And FDA issued a response to a petition to lower the

8    action level to .5 in a letter signed -- if we can move to the

9    last page -- a letter signed by that agency's director of the

10   Center for Food Safety and Applied Nutrition?

11   A    I see that.

12   Q    And if we go back to the beginning of this letter, Page

13   2, third full paragraph, FDA summarizes that the petition

14   primarily requested that the agency lower the action level to

15   .5.  And if we go to the third full -- the next page, Page 3,

16   at the very end, near the section that begins background --

17   no, I would say above -- above that paragraph, the paragraph

18   prior to the background section -- we see that the agency says

19   that they've reviewed the information in the petition, and at

20   the very end, they say that they examined relevant studies of

21   which FDA is aware.  Do you see that?

22   A    I see that.

23   Q    If we move to Page 4 of this document, there's a list of

24   fish species.  And FDA reports that these species of fish

25   contain at least some samples in their database that exceed

1   .5 parts per million and some that do not.  Do you see that?

2   A    I see that.

3   Q    And assuming that this list of species is accurate,

4   assuming that it's accurate that some individual samples of

5   this species contain specimens over .5 parts per million, your

6   advice would be not to eat any of these species of fish?

7   A    I can't respond to that because I don't know -- I mean,

8   I saw the letter at the deposition.  I have not read the full

9   letter, and I don't know what the source of these analyses of.

10  So -- so in -- in order to respond to your question, I would

11  request to see the data that are underlying this.

12  Q    Well, I'm going to ask you to assume that this is

13  correct.  Assuming that it's correct that some samples in the

14  FDA's database for these species exceed .5 parts per million,

15  your advice, then, would be to avoid any consumption?

16  A    It -- it's -- it's a hypothetical question --

17  Q    Right.

18  A    -- because if, let's say, the bluefish was taken right

19  out here in the -- the lower Penobscot Estuary, I would say it

20  would be much more appropriate to ban fishing of bluefish

21  right there than it is to ban bluefish on the market in all of

22  the United States.

23       So if single exceedances above 0.5 occur and they can be

24  related to particular contamination issues, I would think it

25  would be much more appropriate to deal with those specific,

1    local concerns rather than banning seafood in -- in the entire

2    United States.

3    Q     If we go to Page 6 of this 2013 document and the last

4    paragraph, FDA states that they are aware of the Dietary

5    Guidelines for Americans 2010.  That's the document that we

6    referred to earlier in your testimony, Defense Exhibit 514?

7    A     It looks familiar.

8    Q     Let's go to Page 7 of this letter to the paragraph that

9    starts with the underlined topic exposures relative to FDA's

10   acceptable daily intake level.  Now, FDA did publish an

11   acceptable daily intake level comparable to the reference

12   dose.  Are you aware of that?

13   A     Can I read that paragraph and --

14   Q     Yes.

15   A     -- and then respond to your question afterwards?

16   (Witness reading.)  Okay.  I've read the paragraph.  So can

17   you repeat the question?

18   Q     FDA's acceptable daily intake level for methylmercury is

19   .5 micrograms per kilogram of body weight per day?

20   A     It was in 1979.

21   Q     And FDA reports, at the very end of this paragraph, that

22   the acceptable daily intake includes a margin of safety and is

23   not intended to be a dividing line between risk and no risk.

24   Is that your understanding of the ADI?

25   A     That was the philosophy back in 1979.

1   Q     And if we can go to the top of the next page, Page 8,

2   FDA reports that 99.9 percent of adults in the NHANES survey

3   have been exposed below the ADI.  Do you see that?

4   A     I see that.

5   Q     And then the FDA says, given the tenfold margin of

6   safety in the ADI, we have determined that it's not necessary

7   to lower the action level or even to enforce any action level

8   in order to bring --

9         (Interruption by the court reporter.)

10            THE COURT:  Wait just a moment.  She -- the court

11   reporter asked that he repeat the question.

12            THE WITNESS:  Yeah.

13            THE COURT:  So we're going to have him repeat the

14   question for the court reporter.

15        Would you repeat the question, Mr. Schutz?

16   BY MR. SCHUTZ:

17   Q     FDA writes here, given the tenfold margin of safety in

18   the ADI, we have determined that it is not necessary to lower

19   the -- the action level or even to enforce any action level in

20   order to bring exposures generally below the ADI.

21   A     Is this something that has been written recently?  I

22   mean, it sounds like something the FDA would have written in

23   1979.

24   Q     And in the next paragraph -- this isn't written in 1979,

25   though, is it?  This is written in 2013, correct?

1  A     If you say so.  I mean, my concern is that this deals

2  with adverse effects in adults because that was what the ADA

3  was based on -- adverse effects in adults, not in fetal brain

4  development.  So I think this sentence is inappropriate.

5  Q     Well, I'm -- and you -- you disagree with FDI's (sic)

6  statement, correct?

7  A     All I can say is that the sentence that you have

8  extracted from this long letter is not in accordance with

9  current-day understanding of methylmercury toxicity.

10  Q     And if we can go back to Page 8 of the letter under the

11  section whether there's a reasonable possibility of injury

12  notwithstanding exposures generally below the ADI, FDA poses

13  the question of whether there's a reasonable possibility of

14  injury to health from commercial fish that have mercury

15  concentrations at or greater than .5 parts per million

16  notwithstanding the fact that the population is generally

17  exposed below the ADI.  Do you agree that that's an important

18  question?

19  A     Let me read that paragraph, please.  (Witness reading.)

20  Okay.  It seems that it continues.  There's a colon, and then

21  it continues.  So can I see the rest of that section to

22  understand what's going on here?

23  Q     Yes.

24  A     (Witness reading.)  Okay.  It seems to me -- it seems to

25  me that the -- this doesn't address what we've been discussing

1    previously today, that methylmercury is a -- is a hazard that

2    can cause harm to brain development if pregnant women are

3    exposed to methylmercury.  So it doesn't deal with that.  So

4    it's --

5    Q    We'll get to that.

6    A    -- hard for me to relate to this paragraph.  It seems to

7    be taken out of an -- an administrative context that -- that

8    is difficult for me to relate to.

9    Q    Let's go to the conclusion on Page 10.  It's

10   conclusion -- the general population.  FDA states that it's

11   not persuaded that commercial fish with more than .5 parts per

12   million mercury pose a reasonable possibility of injury.  Do

13   you agree that's the FDA's position as it stands today?

14   A    I can read the sentence.

15   Q    Let's move to susceptible subpopulations, such as

16   pregnant women, which is addressed in the next section of this

17   document.  FDA did consider in 2013 whether risk to pregnant

18   women and children warrants the lowering of the federal action

19   level for methylmercury to .5 parts per million.  Would you

20   agree with that?

21   A    I can read the sentence.

22   Q    And, actually, on the top of Page 11, FDA states that

23   perhaps the most important issue raised by the petition is

24   whether and under what circumstances there might be a

25   reasonable possibility of neurodevelopmental injury when a

1  pregnant woman eats a fish or eats some quantity of fish over

2  time that equals or exceeds .5 parts per million of mercury.

3  Do you see that?

4  A     I see that.

5  Q     And so FDA did evaluate the single-meal theory that a

6  fish with methylmercury over .5 parts per million poses a

7  reasonable possibility of injury.  Do you agree with that?

8  A     I can see it says that, but -- but I haven't seen the

9  documentation that they've actually done it.

10 Q     On Page 12 of this letter, under alleged new scientific

11 studies and case studies, FDA says that, the petition did not

12 identify any case studies of possible individual injuries from

13 prenatal exposure to methylmercury in the United States, nor

14 are we aware of any.  Are you aware of any case studies of

15 individual injuries from prenatal exposure to methylmercury in

16 the United States?

17 A     It's the same as saying, can I point out the smoker who

18 necessarily died from his smoking habit when he got lung

19 cancer?  We can never say those things for sure, so it -- I

20 think it's a meaningless question --

21 Q     Let's go --

22 A     -- with all respect.

23 Q     Okay.  Let's go to Page 14 of this document, middle

24 paragraph.  Page 14, in the second sentence of this paragraph

25 -- well, let's go to the first sentence.  FDA asks -- or

1    states that, a key question raised by the petition is whether

2    the 8 to 12 ounces per week of fish lower in methylmercury

3    recommended by USDA, the Dietary Guidelines for Americans

4    2010, should only involve fish with mercury concentrations

5    below .5 parts per million.  And you agree that is a key

6    question?

7    A    That's a key question.

8    Q    And then FDA says, that one way of addressing that

9    question is by considering how much consumption is needed for

10   the fish with samples equal to or greater than .5 parts per

11   million mercury to pose a reasonable possibility of injury.

12   Do you agree that that is a way of addressing that question?

13   A    That -- that's fine.

14   Q    And then FDA notes that they're aware of a recent

15   quantitative assessment of the net effects of fish

16   consumption, and they refer to an assessment conducted by

17   experts from around the world under the auspices of the Food

18   and Agricultural Organization of the UN and the World Health

19   Organization.  Are you aware of that assessment?

20   A    I think FDA wrote the draft, and -- and so I'm aware of

21   that.

22   Q    And FDA then reports here that the UN/World Health

23   Organization paper estimated whether individual species are

24   likely to benefit or harm neurodevelopment when a pregnant

25   woman consumes one, two, four, or seven servings of that

1    species per week with a serving equal to a hundred grams.  Do

2    you see that?

3    A     I see that.

4    Q     And in the Food and Agriculture Organization/World

5    Health Organization assessment fish species with samples in

6    the FDA database that equal or exceed .5 parts per million

7    mercury were estimated to be beneficial through at least seven

8    servings per week, about 24.5 ounces.  Is that what the World

9    Health Organization found?

10   A     That -- I think that's what one of the experts

11   calculated that was then put into the report.  So I wouldn't

12   say that this is the World Health Organization position.  This

13   is what some particular experts, including a -- a

14   representative of the FDA, agreed.

15   Q     And FDA is also saying here that in that assessment,

16   they looked at a worst-case scenario.  Do you see that?

17   A     I see that.

18   Q     A worst-case modeling in which the strength of the

19   adverse effect for methylmercury was increased four-fold, most

20   of these fish were still estimated to be beneficial through

21   seven servings.

22   A     I'm very surprised that they felt so certain about the

23   beneficial effects because I happen to know that new

24   advisories are on their way and they are at the new

25   secretary's desk and will be published very soon, and one of

1    the concerns is that it is so hard to evaluate what the

2    benefits are.

3         And I myself have a concern about this kind of

4    calculation, and -- and that is that I think it's unreasonable

5    to count the benefits as, let's say, a trade-off so that you

6    allow more pollution, more exposure to methylmercury as long

7    as there's some benefits that can cancel them out or outweigh

8    them.

9         I think that we owe the next generation that they get

10   all of the nutrients that they need for brain development and

11   keep the neurotoxicants away, and -- and I think that is the

12   goal of prevention.  Our goal is not to balance pollution with

13   -- with nutrients.  Our goal is to get the nutrients that we

14   need and that the next generation needs.

15   Q    All right.  And eating a fish is like eating a bag of

16   chemicals, you can't separate the good chemicals from the bad

17   chemicals, the nutrients and any toxins in the fish, correct?

18   A    Well, there are ways to do this, but -- but my -- my

19   concern is that we need to optimize the diet for all Americans

20   and, in particular, pregnant women, and we can only do that if

21   -- if we secure ample supply of healthy seafood without

22   contaminants, especially methylmercury.

23   Q    Let's move down to the last paragraph on this page where

24   FDA states its position on the single-meal theory.  FDA says

25   that, it's worth noting that all the estimates in the FAO/WHO

1    assessment relate to effects from consuming fish over time.

2    Then the FDA writes, an individual fish that is above the mean

3    for a particular species is not assumed to have a significant

4    impact on the overall effect from eating fish during

5    pregnancy; is it fair to say you disagree with that?

6    A    I mean, I -- I can read what -- what it says here, but

7    -- but it -- I would like to see how they reached that

8    conclusion because it sounds to me that there's something that

9    they have misunderstood in -- in regard to what I just stated

10   before.

11   Q    And do you also disagree with the next sentence that the

12   FDA included in this document, FDA is not aware of any

13   evidence in humans that a single fish serving can dominate the

14   net effects from fish consumed over time during pregnancy, and

15   it says, and -- and let's go to the next page -- and,

16   therefore, pose a reasonable possibility of injury?

17   A    I can't disagree because the FDA says that they're not

18   aware, and I think that there -- there are some issues that

19   they're not aware of.

20   Q    And you disagree with FDA's position, correct?

21   A    It -- they wrote that letter from their point of view,

22   and -- and I think that's quite acceptable for an

23   administration to do.

24        I -- I would say, as a physician, that my goal is to

25   optimize safe nutrition, especially for vulnerable

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

1  subpopulations, and -- and I think that the FDA is not quite

2  dealing with that.  How they reached that -- those conclusions

3  and this particular wording, I -- I am -- you know, I can't

4  judge.

5  Q    And FDA, on Page 15, the same page, includes an

6  assessment with respect to children, and FDA concludes, after

7  reviewing various studies, that there's no consistent evidence

8  that young children are a susceptible subpopulation for

9  methylmercury or that they might be especially vulnerable to

10 adverse effects from fish containing .5 parts per million or

11 greater.  Do you disagree with that?

12 A    Again, what I -- what I can say is that the evidence is

13 weaker in regard to children's vulnerability toward

14 methylmercury.  Most of the evidence regards pregnant women.

15      But to conclude, just because we don't have the evidence

16 that, there's nothing to worry about is something I would be

17 very careful about because we're talking about real people.

18 We're talking about the next generation's brains, and -- and

19 simply to say just because the studies do not provide

20 consistent evidence, that is to conclude, well, let's continue

21 exposing the population until the scientists gather enough

22 information so that they can convince us that we now have

23 consistent evidence.

24      And that judgment, I think the administration would have

25 to think about on its own.  I can have my opinion as a

1   physician because I have the Hippocratic Oath to live up to.

2   But I understand what you're saying.  This is what the FDA has

3   written in a letter.

4   Q     And if we can bring up the paragraph prior to this one.

5   FDA does summarize various studies concerning methylmercury's

6   potential effects on children.  Do you see that?

7   A     I see that.

8   Q     And at the very end, FDA says, collectively, four

9   studies reported beneficial associations -- I'm sorry --

10  strike that.

11  A     I see.

12  Q     FDA says, the four studies that reported beneficial

13  associations involved just under 10,000 children?

14  A     Yeah, I see.

15  Q     So there has been quite a bit of study on whether methyl

16  --  methylmercury in seafood at these levels causes adverse

17  effects, correct?

18  A     I -- I see -- I mean, I can read, so I see what FDA is

19  saying.  But I happen to know the Freire study from Spain, and

20  -- and they also cite my own work from the Faroes, and -- and

21  I would say this summary is --

22  Q     Do you agree with the summary?

23  A     I -- it -- it is very brief, and it could be

24  misunderstood.  It doesn't really represent what these studies

25  say.

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

875

1   Q     Let's -- let's turn to another document, Joint
2   Exhibit 84.
3             MR. SCHUTZ:  Which I'd like to move into evidence.
4             THE COURT:  Any objection to Joint Exhibit 84?
5             MR. COLANGELO:  No objection, Your Honor.
6             THE COURT:  Joint 84's admitted.
7   BY MR. SCHUTZ:
8   Q     And, Professor, you're familiar with this publication by
9   the U.S. FDA and the U.S. EPA what you need to know about
10  mercury in fish and shellfish?
11  A     I've seen it before.
12  Q     And what this document represents is the current advice
13  to the public concerning mercury in fish and shellfish by the
14  Food and Drug Administration and the Environmental Protection
15  Agency?
16  A     Yes, it -- it was something that was agreed many years
17  ago.
18  Q     But it's still current, correct?
19  A     I --
20  Q     It's the current advice.
21  A     I mean, all I know from the news media is that some --
22  some new advisories are being prepared.
23  Q     Let's turn to Page 2 of Exhibit 84.  Under frequently
24  asked questions on the right-hand column, there's a question.
25  What if I eat more than the recommended amount of fish and

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

1    shellfish in a week?  And the federal government advises the

2    public, one week's consumption of fish does not change the

3    level of methylmercury in the body much at all.  If you eat a

4    lot of fish one week, you can cut back for the next week or

5    two.  Just make sure you average the recommended amount per

6    week.  And is it your opinion, Professor, that this is unsafe

7    advice being provided by the federal government to the

8    American people?

9    A    I -- I think that when a new advisory comes out very

10   soon, that it's likely this wording will be revised.  I can

11   give you calculations, if you want, of how much methylmercury

12   a pregnant woman has in her body so that you can compare that.

13   I can calculate that for you so that you can compare it with

14   the amount of -- of methylmercury in -- in the meals that

15   we've been discussing here this morning.

16   Q    And those types of calculations aren't contained in your

17   expert report in this case, are they?

18   A    I don't hear you.

19   Q    Are those calculations contained in your expert report

20   in this case?

21   A    The meal calculations are, and -- and they are --

22   Q    But not calculations on blood methylmercury levels.

23   A    No, but -- but they're very easy to do.

24   Q    If one week's fish consumption does not change the level

25   of methylmercury in the body much at all, would you agree that

1    a single meal of fish containing mercury in levels seen in the

2    United States does not pose an unreasonable risk?

3    A    I -- I think the statement here is wrong, and,

4    therefore, I must also agree -- disagree with you.

5    Q    In your report, did you express an opinion on the extent

6    to which blood methylmercury concentrations would change after

7    consumption of a single meal of fish?

8    A    Can you repeat the question?

9    Q    In your report, did you express any opinion on the

10   extent to which blood methylmercury concentrations would

11   change after consumption of a single meal of fish?

12   A    I don't remember the specific wording.  I -- I think I,

13   you know, commented on that.

14   Q    But you didn't include those kinds of calculations in

15   your report, did you?

16   A    I don't remember.

17   Q    Let's turn to Defense Exhibit 575.

18           MR. SCHUTZ:  Which I'd like to move into evidence.

19           THE COURT:  Any objection to 575?

20           MR. COLANGELO:  No.

21           THE COURT:  575's admitted.

22   BY MR. SCHUTZ:

23   Q    And this is a set of frequently asked questions and

24   responses posted to the State of Maine's Web site.  Do you see

25   that?

1  A     I see it.

2  Q     And if we can enlarge the third question.  How can I be

3  sure that the area closed is sufficient and that lobsters from

4  outside the area are okay to eat?  Now, do you understand that

5  this refers to the closure of the north estuary?

6  A     If you say so.

7  Q     What the state says, it's important to understand that

8  lobsters from within the closed area are still safe to eat.

9  You disagree, correct?

10  A     I'm confused here because the question is, how can I be

11  sure that the area closed is sufficient and that lobsters from

12  outside this area are okay to eat?  But that's not what you

13  referred to in the sentence, the -- the first part of the

14  answer, then that sentence refers to lobsters within the

15  closed area.

16        I think there's a -- there's a mistake here because the

17  question is about whether the area closed is sufficient, and

18  that means that there's a concern about lobsters outside the

19  closed area, and now that sentence seems to refer to lobsters

20  from within the closed area.  That doesn't make sense to me.

21  Is this -- is this a draft or something?

22  Q     Well, we can bring up the information at the bottom of

23  the page, which will show that this is downloaded from the

24  state's Web site --

25  A     Okay.

1  Q    -- on March 17, 2014.

2  A    And -- and it hasn't been corrected since March?  I

3  mean, it --

4  Q    I think --

5  A    -- you can see there's a -- there's a clear discrepancy

6  here.  The question relates to lobsters outside of the closed

7  area if they're safe to eat, and then the first sentence says,

8  that lobsters within the closed area are safe to eat, why did

9  the state then close the area?  That doesn't make -- I think

10  there's an error here.

11  Q    The last sentence says, this data set gave the state

12  confidence that the samples taken from areas outside the

13  closure are below action levels.  Do you see that?

14  A    Okay.

15  Q    So the state's confident that lobster outside the closed

16  area are safe to eat.

17  A    Right.  If -- if they're below 0.2, I would agree.

18  Q    What the first sentence suggests is that the state

19  believes that lobsters in the closed area are safe to eat, but

20  that they would advise limitations on consumption of lobsters

21  from that area.  Do you see that?

22  A    It -- I see it.  But, again, I don't think that that's

23  the answer to the question posed, and -- and, therefore, I am

24  wondering if something happened when that Web page was

25  designed and something -- some error occurred.

1   Q    Well, if, Professor, we could go to the state's Web site

2   today and find that same information on the state's Web site,

3   your position would be that this is incorrect?

4   A    I -- I think we ought to alert the state to the -- the

5   concern that the question is about lobsters outside the closed

6   area and then they start responding about lobsters within the

7   closed area, and --

8   Q    But there's --

9   A    -- it doesn't -- I think there's -- maybe they didn't

10  discover it yet.

11  Q    The state closed that area as a precautionary measure to

12  protect the brand of lobster in the state, didn't they, not

13  because lobster are unsafe to eat in that area, correct?

14          MR. COLANGELO:  Objection, Your Honor.  That

15  mischaracterizes the evidence.

16          THE COURT:  Well, he can answer the question as to

17  whether or not it's correct to his knowledge.  You may answer

18  the question, sir.

19  A    My understanding -- and -- and I'm a scientist -- I'm

20  not an administrator -- so my understanding is that the

21  lobster analysis carried out in the Penobscot River Mercury

22  Study showed such clear excesses above the 0.2 action level,

23  that that caused the state to act and to close the area.

24  That's my understanding.

25  BY MR. SCHUTZ:

1    Q     Let's bring up the next question and answer in the same

2    document.  It says here, what is the CDC -- that's the Maine

3    Centers for Disease Control -- action level for mercury in

4    fish?  Do you see that?

5    A     I see.

6    Q     And the state responds, the level of mercury in fin fish

7    that warrants consideration of a consumption advisory for the

8    most sensitive population is 200 nanograms.

9    A     I see that, 0.2, yeah.

10   Q     And so the state -- the state then is distinguishing

11   between fin fish and shellfish, correct?

12   A     The -- the state doesn't distinguish between the two,

13   no.

14   Q     But aren't they in this very answer distinguishing

15   between fin fish and shellfish?

16   A     It's the same action level.

17   Q     Well, if you read further along, the state reports, the

18   two average-sized whole lobsters would yield approximately

19   8 ounces of meat, and then the state says, there is currently

20   no lobster-specific action level, and, therefore, the state

21   toxicologist and DMR, Department of Marine Resources, used the

22   fin fish action levels in making a determination for this

23   action.

24   A     I -- I see that, but it --

25   Q     So what --

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

1   A     -- to me, it would make sense to have the same action

2   level and the -- maybe an administrative reason why they have

3   based that on fin fish at first, but why should you have

4   anything different for -- for lobsters and shell -- other

5   shellfish.  It doesn't make sense.

6         So I think that there's an administrative reason behind

7   this.  This is not science.

8   Q     But you would agree that the state is distinguishing

9   between fin fish and shellfish, correct?

10  A     Well, there's a -- these belong to different taxes

11  within, you know, the biological classification of species.

12  So, yes, there's a difference, but in regard to the kind of

13  food we eat, we call it seafood, and -- and that encompasses

14  both fin fish and -- and shellfish.

15  Q     And we'll get into later the method by which the state

16  calculates its fin fish action levels and whether that is, in

17  fact, an appropriate action level for lobster.

18        But I'd like to turn to Table 3 in your report.  Now,

19  Table 3, which you discussed on your direct, is the product of

20  simple arithmetic, right?

21  A     Can you repeat, please?

22  Q     This is simple arithmetic reflected here, correct?

23  A     I -- I think it's simple at least.

24  Q     And you've got American eel, lobster, American black

25  duck listed there, but those are listed simply because you're

1   using concentrations as measured by the Study Panel and as

2   used in Table -- as you included in Table 1 as the starting

3   point for these calculations?

4   A    This is correct.

5   Q    Okay.  And so you've got mercury concentrations in the

6   -- in the food item times grams consumed, divided by weight,

7   and, in the middle column, divided by the .1 reference dose.

8   A    This is in Table 2, not Table 3.

9   Q    Well, this gives you a number of days -- this table

10  gives you a number of days.

11  A    Yeah, number of days, yeah.

12  Q    And the concern with regard to health of pregnant women

13  and children, the fetus, is not directly with whether the

14  reference dose is exceeded, but rather whether there's enough

15  consumption to elevate the blood methylmercury level; is that

16  right?

17  A    This is the -- the -- the table shows the number of days

18  where you cannot eat any other seafood -- any seafood in case

19  of duck, you cannot eat any because you well exceed the

20  reference dose.  These number of days, that's what a single

21  meal of those three kinds of food represent.

22  Q    Right.  But the concern health-wise is not whether you

23  exceed the reference dose.  It's whether there's consumption

24  in a quantity and at a rate that's sufficient to elevate the

25  blood methylmercury level of a pregnant woman, correct?

1    A      The -- you -- you have to take into consideration that

2    people in Maine eat a lot of seafood, and you don't start at

3    zero if you live in Bangor or -- or in Bucksport.

4    Q      And I'm not disagreeing with that.

5    A      Okay.

6    Q      I just want to know whether for purposes of health, the

7    concern is the pregnant mother's blood methylmercury level,

8    correct?

9    A      Right.  If --

10   Q      And so then the question for assessing risk is the

11   extent to which consumption of a food item will increase the

12   pregnant woman's blood methylmercury level, right?

13   A      This is why the reference dose was calculated in order

14   to prevent the blood mercury to exceed the 3.5, essentially,

15   in -- in adults or 5.8 in cord blood mercury concentrations.

16   That's why we have the reference dose, and that's why it

17   shouldn't be exceeded.

18   Q      If consumption of a food item does not appreciably

19   increase a pregnant woman's blood methylmercury level, there's

20   no change in risk to the fetus, correct?

21   A      If there is no change, and that means that she should

22   avoid Penobscot seafood.

23   Q      And would you agree with the FDA that right now, science

24   has not proven that a small change in maternal blood

25   methylmercury will have an impact in utero?

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

885

1  A     If the small change is below the reference dose -- and

2  -- and I would -- to be on the safe side, I would say below

3  half of the reference dose, as I argue in -- in my report and

4  that many of my colleagues would agree with me about -- if

5  there are small changes at that low level, I would say it

6  wouldn't impact on the risk.

7       But as soon as you approach the reference dose, we have

8  data from Boston and New York City that document very clearly

9  that there are risks to the fetal brain development that you

10 can see when the child grows up.

11      So I would say even small increases, the adverse effect

12 is represented by IQ points, and -- and, you know, if the kid

13 is ready for school and how the kid is developing, maturing, I

14 would say, please, let's keep blood mercury concentrations low

15 so that the exposure is clearly below the reference dose.

16 Q     And when I asked you at your deposition whether science

17 has proven that a small change in blood methylmercury levels

18 would have an impact, you said that you doubted science would

19 ever be able to approve -- ever be able to prove that a small

20 change in maternal blood methylmercury concentrations would

21 have an impact on the brain development of the fetus.  Do you

22 recall that?

23 A     It -- it's the same as saying, will science ever prove

24 that smoking one more cigarette today will impact your lung

25 cancer risk?  Science cannot do that.  But we have to use our

1    -- or I at least have to use my medical judgment and -- and

2    try to protect people's health the best I can with the advice

3    that I give.

4    Q    How small a change in maternal blood methylmercury

5    levels is dangerous, in your opinion, Professor?

6    A    It -- well, we now talk about uncertainties, and -- and

7    there are uncertainties here, and -- and the -- my bias is

8    that I would like the benefit of the doubt to benefit the next

9    generation.  And, therefore, I would say even small increases

10   should be avoided, and we should always keep the exposures

11   below the reference dose because that is where we start seeing

12   adverse effects on the -- on children's brain development.

13   Q    And when any person consumes a meal, the methylmercury

14   contained in that meal is diluted in about 5 liters of blood,

15   correct?

16   A    Can -- can you say that again?

17   Q    In other words, someone eats a meal, and whatever

18   methylmercury may be in that meal that enters the bloodstream

19   is diluted in 5 liters of blood that's in the body?

20   A    Yeah, about 5 liters.  It depends on the body size.

21   Q    Now, you've written on the subject of risk assessment

22   methods, Professor?

23   A    If I have?

24   Q    You've written on the subject --

25   A    Yeah.

1   Q      -- of risk assessment?

2   A      I have.

3   Q      And to perform a risk assessment, one must do a hazard

4   assessment, an exposure assessment, and also understand dose

5   response?

6          (Interruption by the court reporter.)

7   BY MR. SCHUTZ:

8   Q      So to perform -- I'm asking you if you agree, Professor,

9   that perform a risk assessment, one must do a hazard

10  assessment, an exposure assessment, and also understand dose

11  response.

12  A      Correct.

13  Q      And you've heard the saying dose makes the poison, dose

14  makes the poison?

15  A      The dose makes a poison?  That is the traditional

16  paradigm, but the scientific insight during the last ten years

17  or so adds that the timing is important, as well.

18  Q      And you would agree that there are specialists --

19  specialists in the field of exposure assessment?

20  A      Well, you can specialize in -- in any corner of science,

21  if you want.  But -- but I think the important thing, if

22  you're an exposure assessment specialist, that you also

23  understand the purpose of the exposure assessment.

24  Q      So human health risk from exposure to methylmercury

25  depends on the dose, correct?

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

888

1    A     The dose and the timing of that dose.

2    Q     And dose depends on intake, portion size, frequency, and

3    the concentration of the actual fish or seafood item?

4    A     That is correct.

5    Q     And so to accurately and precisely assess risk from a

6    chemical, one needs to understand, among other things, the

7    dose to which a person is exposed?

8    A     Can you speak a little more slowly so that I can hear

9    better?

10   Q     To accurately and precisely assess human health risk

11   from methylmercury, one would need to establish a relevant

12   dose?

13   A     You need to understand the exposure in order to assess

14   the risk, that's correct.

15   Q     And would you agree that portion size, frequency of

16   consumption vary between species of seafood?

17   A     It -- it varies between people.

18   Q     But also between species?

19   A     That -- do you mean that you eat larger portions of

20   lobster than you do of sardines, for example; is that what

21   you're saying?

22   Q     Right.

23   A     Okay.  Well, I -- I don't challenge that.

24   Q     And would you agree that if there's no consumption of

25   eel from the Penobscot, there's no risk to human health?

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

1  A    It's a hypothetical question.  I mean, why catch the eel
2  if nobody is eating them?  If -- does it go for cat food or --
3  I mean, I don't -- I don't have any information on that.
4  Q    Right.  I -- I am asking you a hypothetical.  If there
5  is no -- if there is no consumption of eel, there's no human
6  health risk.
7  A    Okay.  In theory, you're correct.
8  Q    And do you have any information on actual consumption
9  rates of eel in the Penobscot?
10 A    I -- I haven't done that.  My assumption is that if the
11 eel is caught, somebody is eating them, and that's why I did
12 the calculations I did.
13 Q    Are you aware of information that over 90 percent of the
14 eel caught is used as bait?
15 A    I -- I don't know.
16 Q    What information do you have concerning the frequency of
17 consumption of American lobster in the United States or Maine?
18 A    Um, I can look it up.  What I decided to do was
19 something different, as we've been through already.
20 Q    And, in fact, you didn't take any steps to get
21 information on the frequency of consumption of American
22 lobster, right?
23 A    I -- I looked at it, and I decided it was not as
24 important for this case as the calculation -- what happens if
25 you happen to eat a lobster from the Penobscot, what would the

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

1   dose be, and how is that -- how should that be interpreted in

2   terms of harm?

3   Q     That's the single-meal theory.

4   A     Say that again?

5   Q     That's the single-meal theory, right, one meal?

6   A     Yeah, or -- or multiple meals.  I mean, I -- I assume

7   people who live here eat the local seafood, and -- and that's

8   what my concern is.

9   Q     No one's disputing that people who live here eat

10  lobster.  I think the question is whether we have any data on

11  the frequency of consumption of American lobster, and the

12  answer is you don't, right?

13  A     That is not the answer.  The -- my answer is, I looked

14  into this.  I got hold of a lobsterman, and -- and I got out

15  -- with him on his boat, and he told me that -- I think it was

16  800 traps that -- that he had, and he was bringing in 1 to

17  2,000 pounds of lobster every time he went out, several times

18  a week, and to me, that is enough information -- I mean, he is

19  not catching lobsters for them to be processed into cat food

20  or something.  They are obviously sold on the market.

21  Somebody is eating them.

22        And -- and, I mean, those numbers, I think for the upper

23  Penobscot Estuary, I think the mercury study included

24  something like 170 analyses.  Now, he -- every time he goes

25  out, he catches about that number, and -- and so there are

1   people here -- obviously, I don't know who they are -- but

2   people who are eating those lobsters, and that's what my point

3   is.

4   Q     Yeah.  And I would -- and -- and I'm going to move on,

5   from whether -- I think I've given you some chances to state

6   whether you have any actual data on how often Mainers or

7   anyone else eats lobster, to duck.

8         Do you have any data on black duck consumption rates?

9   A     None -- no specific data other than I understand that

10  there are hunters -- obviously, there are bag limits -- but,

11  anyway, those -- those black ducks are being bagged and -- and

12  eaten, I presume.

13  Q     And let's turn to body weight.  Body weight's important

14  because any methylmercury that's taken in is diluted in -- in

15  the -- in the consumer's blood, and, therefore, higher body

16  weights equal lower methylmercury levels, assuming the same

17  consumption rate?

18  A     It -- it's a matter of the distribution volume.  But --

19  but the tendency is that a larger por -- a larger -- a person

20  would also eat a larger portion.

21  Q     And did you make any effort to determine a realistic

22  portion size for the particular Penobscot food items of

23  concern here?

24  A     No.

25  Q     All right.  And in your report, Page 5, under basis of

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

892

1    opinions, which we can bring up, you write, I believe

2    referring to the Study Panel's report, second sentence in the

3    first paragraph we've pulled up under methylmercury exposure,

4    the report substantially extends the data that were available

5    in 2002 and provides a much more detailed basis for assessment

6    of human health risks from consumption of food contaminated by

7    methylmercury in the Penobscot environment.  And would you

8    agree the only additional information from the Study Panel is

9    concentrations of methylmercury in various organisms?

10   A    The only information is?

11   Q    Concentrations of methylmercury in organisms.

12   A    Right, that's within -- in the study report.

13   Q    Okay.  You can take that down.

14        In conclusion, Dr. Grandjean, in your judgment, the U.S.

15   Department of Agriculture is providing unsafe advice to the

16   public in its Dietary Guidelines for Americans, right?

17   A    Can you repeat, please?

18   Q    You disagree with the advice provided by the U.S.

19   Department of Agriculture in its 2010 Dietary Guidelines for

20   Americans that eating tuna by pregnant women is safe?

21   A    I would like to see that sentence that your referring to

22   before I say whether I agree or disagree with that.

23   Q    And --

24   A    Also, I'd like to know if -- if it's something that's

25   outdated like the 1979 ADI, because it's easy to disagree with

1   that because it's outdated.

2   Q    Well, USDA is advising pregnant women that they can eat

3   tuna, they should just limit the consumption.

4   A    Can you show it to me so that --

5   Q    Are you familiar with that advice?

6   A    I would like to see it.

7   Q    I think the document's in the record.

8        You also disagree, Professor, with U.S. EPA and U.S.

9   FDA's advice in their what you need to know about mercury in

10  fish and shellfish advisory; is that true?

11  A    I would like to see if before I tell you whether I agree

12  or disagree.

13  Q    Well, this was the advisory that we discussed earlier

14  that said that eating a week's intake of fish over the

15  reference dose won't raise blood methylmercury levels much at

16  all, and someone who does that ought to just cut back a few --

17            MR. COLANGELO:  Objection, Your Honor.  That's not

18  what the document said.

19            THE COURT:  All right.  The objection's overruled.

20  He can -- you can answer if you can, sir.

21  A    Yeah, but -- but I'd like to see what it is that -- that

22  I -- I am supposed to agree with or disagree with, and if it's

23  something we already discussed, I think we should go back to

24  that and then take it from there, and I can supplement to the

25  extent that you -- you want me to.

1  BY MR. SCHUTZ:

2  Q    I think we've already discussed this.  So let me move

3  on, and the document's in the record.

4       The State of Maine's frequently asked questions that we

5  talked about where they say that lobster in the closed area

6  are safe to eat.  Is it safe to say that you disagree with

7  that?

8  A    Can -- can you -- I'm sorry.  I -- I -- I want to hear

9  this again before I say if I agree or disagree.

10 Q    We put up on the screen a page from the State of Maine's

11 Web site where they report that lobster in the closed area are

12 safe to eat.  And is it is safe to say --

13 A    Okay.

14 Q    -- that you disagree with that?

15 A    It's easy to disagree because it's not in agreement with

16 the notice from the state, as far as I can tell.

17 Q    And you disagree with much of the information in the

18 FDA's 2013 response to a petition that we discussed earlier?

19 A    I -- I think that some of the sentences were incomplete

20 and that there must be administrative reasons for the FDA to

21 have phrased the sentences in that way, but because I have not

22 looked at and critically examined the letter in total, it's

23 hard for me to say whether some of those somewhat erroneous

24 sentences are defensible from some administrative point of

25 view.

1      So all I can say is that I -- I don't think that the FDA

2 position is in agreement with what the National Academy of

3 Sciences said way back in 2000 and also the EPA -- U.S. EPA

4 reference dose and the IRIS documentation.

5 Q    And you then disagree with FDA's decision to deny a

6 petition to lower the action level for --

7      (Interruption by the court reporter.)

8 A    I can't --

9           THE COURT:  Wait, wait, just a second, sir.  Would

10 you repeat the question, please, for the court reporter?

11           MR. SCHUTZ:  I'm going to strike the question.

12 BY MR. SCHUTZ:

13 Q    FDA's action level for methylmercury in fish at 1 -- 1

14 part per million is too high, in your opinion?

15 A    It is an administrative decision.  I think it's

16 difficult to justify from the science, but I'm sure that FDA

17 thought hard about this, and -- and so it's hard for me to

18 disagree because they may have some administrative reasons,

19 and as I said, if something is above 1 ppm, for example, here

20 in Penobscot, where you can -- I mean, lobsters are way above

21 the action level of -- of the State of Maine, and -- and those

22 are not like outliers.  That's what you can expect.

23      And I would say this is where prevention should happen,

24 not, let's say, the national fish market where single fish

25 samples may exceed some level.  So I think these are totally

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

896

1    different situations.

2    Q     And you believe that the federal agency on toxic

3    substances and disease registry's minimal risk level for

4    methylmercury is not protective?

5    A     As you --

6    Q     Yes or no.

7    A     Yeah, it -- it is -- it is not protective.  And you can

8    see, anybody can see that it is way higher than the U.S. EPA's

9    reference dose, which is based on the National Academy of

10   Sciences.  I -- I think that ATSDR had some special concerns

11   in regard to -- and -- and, you know, this is about chemical

12   waste.  This is not based on seafood.

13         ATSDR is an agency that focuses on chemical waste.  So I

14   think they had a different viewpoint that doesn't relate to

15   what we're looking at here.

16   Q     Are you familiar with an acronym JECFA, J-E-C-F-A?

17   A     Can you repeat, please?

18   Q     Are you familiar with the acronym, JECFA, J-E-C-F-A?

19   A     Yeah, JECFA, yes, I am, that's the -- the -- you

20   referred to the World Health Organization and the Food and

21   Agricultural Organization of the United Nations.

22   Q     Right.  JECFA is an expert committee bringing together

23   the UN's Food and Agriculture Organization and the World

24   Health Organization's expert committee on food additives; is

25   that right?

1   A      I'm aware of that.

2   Q      And that JECFA's an international, independent expert

3   scientific committee that's been meeting since the 1950s to

4   provide scientific advice on many subjects, including human

5   health risk?

6   A      That is correct.

7   Q      And that JECFA's provisional tolerable weekly intake for

8   methylmercury is 1.6 micrograms per kilogram per week?

9   A      That's correct.

10  Q      Which you also disagree with?

11  A      The history is that it took JECFA until 2002 to

12  recognize that the developing brain is more sensitive to

13  methylmercury than the adult brain, so it took them a very

14  long time.  EPA knew that already in the 1990s.

15         So -- and if you want to compare JECFA's most recent

16  assessment, then I think you should compare it to the U.S.

17  EPA's reference dose document.  And -- and I would say that

18  for JECFA to conclude that fish is beneficial and, therefore,

19  we can tolerate a little bit of mercury risk, I don't think

20  it's appropriate.  That's -- in other words, that is what it

21  says in that document.

22  Q      So the JECFA value is calculated in a -- at a weekly

23  intake level, but if we convert that to daily, we simply

24  divide by seven?

25  A      Right.  So --

1   Q      And then that's about .23 compared to EPA's .10?

2   A      Yeah, yeah, it's about twice as high.

3   Q      And JECFA came to that conclusion after EPA set its

4   reference dose at .10?

5   A      That is correct.  But -- but if you read the document,

6   you will see that they have to -- to make some, I think,

7   unreasonable arguments in order to defend that position, and I

8   don't think that EPA would agree with that if you asked them.

9   Q      And the European Food Safety Authority has also set a

10  tolerable weekly intake for methylmercury, correct?

11  A      That is correct.  It's similar to JECFA's.

12  Q      Similar -- it's just slightly lower, but similar?

13  A      It's similar.  But you also have to -- there are two

14  reports from the European Food Safety Authority, and before

15  they actually set the limit -- and, you know, the people were

16  the same, some of them were the same -- the members of the two

17  committees.  So it's not surprising that they would -- and

18  they made the same argument that because fish is beneficial,

19  then it's okay to have some mercury, even though it's toxic.

20         And this is the argument I don't buy, and if you look at

21  the first report from EFSA, the European Food Safety

22  Authority, they actually said, their conclusion was,

23  methylmercury should be as low as possible, and I think that

24  is much more in agreement with the science because we really

25  don't know how low the threshold is.

GRANDJEAN - CONTINUED CROSS-EXAMINATION/SCHUTZ

899

1    Q    Well, they may have set that, but their tolerable weekly

2    intake for methylmercury is 1.3 micrograms per kilogram, or

3    approximately .18 micrograms per kilogram per day; is that

4    right?

5    A    I don't remember the number, but if you're -- you're

6    reading it from the report, I'm willing to trust you.

7    Q    Which you disagree with?  Yes or no.

8    A    I -- I disagree because it's higher than the U.S. EPA

9    reference dose, which is --

10   Q    All right.  Let's talk about --

11   A    -- which we've argued about before.

12   Q    Okay.  Let's talk about the reference dose.  The

13   reference dose, which is the lowest screening threshold of any

14   body anywhere in the world at .1 micrograms per kilogram?

15   A    I think it is.

16   Q    And in your opinion, EPA's reference dose is two times

17   too high, isn't it?

18   A    Given the most recent science, I have to -- I have to

19   say that it's not as protective as it should be.

20            MR. SCHUTZ:  No further questions.  Thank you.

21            THE WITNESS:  Thank you.

22            THE COURT:  Do you want to take a break now, or do

23   you want to proceed?

24            MR. COLANGELO:  Either way is fine with me, Your

25   Honor.  I think redirect will take maybe 45 minutes to an

1  hour.  So if that will take us too long, I'm happy to break

2  now.

3          THE COURT:  Yeah.  Why don't we break now then.

4  We'll break for about 20 minutes.  I'll see you all in about

5  20 minutes.

6      (Court recessed from 12:05 p.m. to 12:35 p.m.)

7          THE COURT:  Mr. Colangelo?

8          MR. COLANGELO:  Thank you, Your Honor.

9                    REDIRECT EXAMINATION

10 BY MR. COLANGELO:

11 Q    Dr. Grandjean, there was some discussion about the best

12 comparison data of lobster to use to compare to the lobster

13 from the Penobscot Estuary.  Do you recall that?

14 A    Yes, I remember it.

15 Q    Okay.  And you were shown this table -- this is From

16 Defendants' Exhibit 517 -- and it indicates that some species

17 are American lobster, some species are spiny lobster, and some

18 have no indication.  Do you see that?

19 A    Yes.

20 Q    Okay.  Do you have any idea, for those that are not

21 designated here, what type of lobster they are?

22 A    I have no idea, and what FDA did was to summarize the

23 ones that are called American lobster in a table where it said

24 there were nine analyses done on American lobster, and that

25 was the number I used in my report because I would not use

1   species of unknown origin.

2   Q     And I believe you testified that you think the best data

3   to use for comparison purposes were reported by the State of

4   Maine; is that right?

5   A     Yes.

6   Q     Let me show you those numbers.  This is from Plaintiffs'

7   Exhibit 84 in evidence.  Is this what you were referring to as

8   the background data that you believe are most appropriate to

9   use when comparing the lobsters from the Penobscot Estuary to

10  lobsters from uncontaminated areas?

11  A     Yes, I -- I see that.  That -- and this is what I was

12  referring to in my oral response.

13  Q     And how does this level here of 51 nanograms per gram

14  compare to the lobster reported from the northern estuary?

15  A     51 nanograms per gram is the same as 0.05 micrograms per

16  gram.  So the average from the northern estuary is more than

17  six times higher than this level.

18          MR. COLANGELO:  And just to make the record clear,

19  Your Honor, this is from the agency rulemaking adoption

20  announcing the lobster fishery closure, Plaintiffs' 84.

21  BY MR. COLANGELO:

22  Q     Dr. Grandjean, you were asked whether you believe that

23  it is safe for a pregnant woman to eat all types of tuna.  Do

24  you remember that?

25  A     I remember.

GRANDJEAN - REDIRECT EXAMINATION/COLANGELO

1   Q      Okay.  And do you believe that that is safe, for a

2   pregnant woman to eat all types of tuna?

3   A      Nope.

4   Q      Why not?

5   A      Because some types of -- of tuna compare -- contain very

6   high concentrations of mercury, and this has become even more

7   difficult because the tuna canners have started putting some

8   of the large tunas also in the cans, so that it's not just

9   jack fish, which is a small tuna species, it's also the

10  larger.

11         And -- and I personally advise pregnant women simply to

12  stay off tuna.  You -- you have canned salmon or mackerel that

13  is just as nutritious, actually more nutritious, and they're

14  low in mercury.  So that will be much better.

15  Q      Does FDA recommend that pregnant women limit their

16  consumption of tuna?

17  A      No.  Well, they do in regard to certain types of -- of

18  tuna, but -- but, again, I think this can be a difficult

19  distinction for many pregnant women, and it's much easier to

20  say, don't -- don't eat it because there's so many healthy

21  types of seafood that you can eat instead.

22  Q      Are you aware of anything prior to the state fishery

23  closure that recommended that pregnant women in Maine avoid

24  consumption of lobster?

25  A      I'm -- I'm not aware of any.

1    Q     And do you know whether the State of Maine recommends

2    lobster consumption?

3    A     Yes, there is a Web site that advises the population

4    about healthy diet, and lobster is listed among the species of

5    seafood that are very low in mercury and, therefore, recommend

6    it, and -- and that is why I have been particularly concerned

7    about the -- the high mercury concentrations in the Penobscot.

8    Q     Can you explain why that is, just so that's clear?

9    A     If -- if the state says that mercury is -- is low in --

10   if a lobster is low in mercury and, therefore, advises the

11   population, including pregnant women, to -- to eat lobster as

12   part of a varied and healthy, nutritious diet, and the

13   lobster, against expectation, contains six times as much

14   mercury, that it is actually levels above the state action

15   level, then this advice is actually against the interest, the

16   health interest, the public health interest here in -- in the

17   Bangor area, the Penobscot environment because the mercury

18   levels are so high.

19   Q     Let me show you Plaintiffs' Exhibits 86.  This is the

20   Maine Family Fish Guide, Advice from the Maine CDC.

21         MR. COLANGELO:  And, Your Honor, I'd like to move

22   this into evidence.

23         THE COURT:  Any objection to 86?

24         MR. SCHUTZ:  No objection.

25         THE COURT:  86 is admitted.

1    BY MR. COLANGELO:

2    Q     And, Dr. Grandjean, do you see that this says fish low

3    in mercury, and it includes lobster here.  Is this what you

4    were referring to?

5    A     This is our -- what I was referring to.  I had forgotten

6    that the state referred to the lobster being a fish, which I

7    don't think is appropriate.  But that's another story.

8    Q     Okay.  And do you see that the State of Maine also gives

9    advice about certain other fish.  And what does the state say

10   with respect to swordfish, shark, king mackerel, and tilefish?

11   A     Okay.  That that's the same as what the FDA says, that

12   you shouldn't eat those very heavily contaminated species.

13   Q     Not at all.

14   A     Not at all if you're pregnant or a child under 8.  So

15   that -- that's -- it's almost verbatim as the FDA recommends.

16   Q     You were shown some data indicating that there are other

17   seafood from elsewhere that is also contaminated.  Do you

18   recall that?

19   A     I remember.

20   Q     Does eating contaminated seafood from elsewhere lessen

21   the health risks of eating contaminated seafood from the

22   Penobscot Estuary?

23   A     No, no, on the contrary.  The more of contaminated

24   seafood you eat, then one adds to the other, and -- and if you

25   then, in total, get above the reference dose, I would say

1    you're putting your child in harm's place.

2    Q    There was also some discussion, Dr. Grandjean, of the

3    level of methylmercury in blood that corresponds to the

4    reference dose.  Do you recall that?

5    A    I recall.

6    Q    Okay.  And you were shown a page from your deposition

7    transcript that dealt with this question.  And you were read

8    this passage here, would you agree that EPA has said as of the

9    date of this report, that a blood methylmercury value of

10   5.8 micrograms per liter is the concentration that forms the

11   basis for the EPA reference dose for methylmercury?  Do you

12   see that?

13   A    I see that.

14   Q    Okay.  You were not read the next question and answer,

15   which says, but you agree that it's EPA's position that 5.8 is

16   the appropriate blood mercury value that forms the basis for

17   the EPA reference dose?  And your answer here is, yes, but you

18   will note that they refer --

19              MR. SCHUTZ:  I object.  There is no publication from

20   EPA to that effect anywhere.

21              THE COURT:  Overruled.  You can recross if you'd

22   like.

23   BY MR. COLANGELO:

24   Q    Your answer is, yes, but you will note that they refer

25   to a publication from 2000, and the more recent publication

1    from the EPA that they have overlooked here has revised this

2    figure to 3.5 micrograms per liter.  Do you see that?

3    A    Yes.

4    Q    And what publication are you referring to there?

5    A    I think there are several.  The best is probably the

6    publication by Kathryn Mahaffey in a scientific journal -- I

7    think it's from 2003 or '4.  It's cited in my own report.

8    Q    And, Dr. Grandjean, you were asked about a letter from

9    FDA denying a petition to reduce the FDA action level.  Do you

10   recall that?

11   A    Yes.

12   Q    Okay.  Had you -- have you ever read that letter before?

13   A    No.

14   Q    Have you read the petition to which the letter responds?

15   A    No, it -- I was shown it at the deposition.

16   Q    Okay.  Do you know what FDA's action level is used for?

17   A    I think it's being used to trigger possible recall of

18   food from the market, and the difficulty that FDA has is that

19   the food is most often already consumed at the point of time

20   when the analysis result comes back, and, therefore, it -- it

21   hasn't been used very much.

22        But I'm not very knowledgeable on the administrative

23   procedures of -- of the agency.

24   Q    Let me show you a sentence from this letter -- or a

25   paragraph from this letter that you were asked about, and it

1   spans two pages.  And if you want me to zoom in, I'm happy to

2   make this more legible.  But it states at the bottom here, an

3   action level, on the other hand --

4           THE COURT:  Could you just identify the exhibit for

5   the record?

6           MR. COLANGELO:  I'm sorry, Your Honor.  This is

7   Plaintiffs' Exhibit 515.

8           THE COURT:  Thank you.

9           MR. COLANGELO:  In evidence.

10          MR. SCHUTZ:  Defendant.

11          MR. COLANGELO:  Defendant -- Defendants'

12  Exhibit 515.  I'm sorry.

13  BY MR. COLANGELO:

14  Q    An action level, on the other hand, is a level of

15  contamination at which a food may be regarded as adulterated.

16  Action levels provide guidance on the circumstances under

17  which the agency would consider taking regulatory action,

18  including removing food from commerce that equals or exceeds

19  the action level, or supporting an enforcement proceeding that

20  the food was adulterated.  Do you see that?

21  A    I see that.

22  Q    Does that have any relevance to the analysis that you

23  were undertaking, which was whether consumption of Penobscot

24  seafood at the level shown here is safe?

25  A    Again, I'm -- I'm not an expert on FDA procedures.  But

1    it seems to me that -- that it is not relevant, and that my

2    calculations are a whole lot more relevant to evaluating the

3    possible harm in these circumstances.

4    Q    You were also asked about this passage from Page 7 of

5    Defendants' 515 regarding exposures relative to FDA's

6    acceptable daily intake level for the general population.  Do

7    you see that?

8    A    Yes.

9    Q    Okay.  And let me know if you'd like to take a minute to

10   read this paragraph.  But, first, what is the date referred to

11   here for FDA's ADI, the acceptable daily intake level?

12   A    Right.  This -- this was fixed at a time when it was

13   believed erroneously that the fetus is no more sensitive to

14   mercury than an adult.  So the -- the ADI is -- as far as I

15   remember, it's actually based on rat experiments, so it's

16   animal experiments.  It's not based on human studies.

17        And certainly it relates to protecting against -- and it

18   says that in lines 6 and 7 -- neurological effects like

19   numbness and tingling and paresthesia, and that is not what we

20   see in children.  We see decreased cognitive function, delays

21   in development, if you will, that from which the subject does

22   not recover.  And -- and it's a whole other picture, and so

23   I'm very surprised that FDA would -- would refer back to

24   something that is clearly outdated.

25   Q    Do these neurological effects discussed here apply to

GRANDJEAN - REDIRECT EXAMINATION/COLANGELO

909

1   adult exposures to methylmercury?

2   A     That -- that is correct.

3   Q     Do these -- are these the effects of concern when you're

4   looking at prenatal exposure to methylmercury?

5   A     No, because these effects only occur at very high

6   exposures of adults, and -- and, therefore, it's

7   understandable that the limits that the FDA refers to here are

8   so dramatically higher than the U.S. EPA reference dose.  It's

9   simply they are -- they're barking up the wrong tree.

10  Q     And let me read you this next sentence below the

11  paragraph you were shown, which you weren't shown previously,

12  which states, the ADI was developed in the 1970s, before there

13  were adequate data on the extent to which there could be

14  heightened sensitivity to prenatal exposure to methylmercury.

15  Do you see that?

16  A     Right.

17  Q     Is that consistent with what you just testified to?

18  A     That -- that is consistent with what I just said.

19  Q     You were also asked about a discussion on Page 14 of

20  this letter regarding repeated consumption of species from

21  particular data sets, and the discussion focused on this part

22  of the paragraph here.  Let me know if you'd like to take a

23  minute to read it.

24        But you were read this sentence, in the FAO/WHO

25  assessment, fish species with samples in the FDA database that

1   equal or exceed .5-part per million mercury were estimated to

2   be beneficial through at least seven servings per week.  Do

3   you see that?

4   A     I see that.

5   Q     Okay.  Does that say that eating fish at .5 parts per

6   million mercury is safe through seven servings?

7   A     Nope.

8   Q     What does it say?

9   A     It -- it says that if you're eating fish with a lot of

10  nutrients, then you derive benefits from that that can

11  compensate for the mercury toxicity.  That's what it says.

12  But I think it's a wrong question to ask.

13  Q     You were also shown the FDA fish advisory -- the joint

14  FDA/EPA fish advisory, and this is Joint Exhibit 84, and you

15  were asked towards the end of the cross-examination whether

16  you disagreed with FDA that one week's consumption of fish at

17  the reference dose not change the level of methylmercury in

18  the body.  Do you recall that?

19  A     Right, I -- I remember --

20  Q     Okay.

21  A     I'm just trying to understand what it says here.  I

22  don't think the language is very clear, because one week's

23  consumption of fish, I would say it depends very much on what

24  you're eating.  I -- I -- I mean, this is like a blanket

25  statement -- I mean, it could be misunderstood to be a blanket

GRANDJEAN - REDIRECT EXAMINATION/COLANGELO

911

1    statement that you can eat any type of fish for a week, and --

2    and certainly if you were eating a lobster or two or a duck

3    breast, if you were unfortunate enough to -- to eat those

4    within a week, I can tell you that your blood mercury

5    concentration would probably get up to twice the level that

6    corresponds to the reference dose.  So you would -- you would

7    definitely -- this is not a matter of not changing the level

8    of methylmercury in the body much at all, no.  This is a very

9    substantial change here in the Penobscot --

10   Q     Does this sentence here refer to the concentrations of

11   methylmercury in the fish when it says one week's consumption

12   of fish?

13   A     Yeah, it talks about the level of methylmercury in the

14   body.  That's -- that language is a little strange to me

15   because we normally measure mercury in -- in hair or mercury

16   in blood.  But, I mean, the -- at the reference dose, a woman

17   would -- if she was consuming the reference dose, her amount

18   of methylmercury in the body would be about 350 to 400

19   micrograms.

20         And you can compare that number to the intake levels

21   that I calculated in my table, Table 1, I think it is -- no,

22   Table 2, and you can see that those doses, at -- at the higher

23   mercury concentration levels, that are present here in the

24   Penobscot, they are the same order of magnitude as a total

25   amount of methylmercury in the woman's body.

1    So, I mean, for the FDA to say this doesn't change the

2    level of methylmercury in the body at all, it -- it -- I

3    wonder if -- if they did the calculations they should have

4    done, or if -- if -- I mean, one week's consumption of fish,

5    if they were just eating sardines and -- and salmon, I can

6    understand it, but -- because they're low in mercury.  But --

7    Q    And that was my question, Dr. Grandjean.  Does this

8    sentence refer to what levels of methylmercury are in the fish

9    that constitute that one week consumption?

10   A    It -- I mean, it just says fish.

11   Q    Okay.

12   A    And that's why I think it -- I -- I think the agency --

13   agency should have thought a little bit more -- more about the

14   wording before they published this.

15   Q    And let me show you from -- also on the same page, Joint

16   Exhibit 84 -- let me try to zoom in -- FDA refers to -- and

17   EPA certain recommendations so women and young children will

18   receive the benefits of eating fish and shellfish and be

19   confident that they have reduced their exposure to the harmful

20   effects of mercury.  And let me show you their very first

21   recommendation here.  Do not eat shark, swordfish, king

22   mackerel, tilefish.  Are you familiar with that advice?

23   A    Right, I am.

24   Q    Okay.  And do you understand that could be saying do not

25   eat even a single meal of these species?

GRANDJEAN - REDIRECT EXAMINATION/COLANGELO

913

1  A      I -- I notice that.

2  Q      And why is that?

3  A      It is simply that even a small meal of those fish will

4  add substantially to the total exposure, and I think that --

5  they oftentimes exceed 1 ppm.

6  Q      There was some discussion earlier of whether exposure to

7  one serving can pose any harm to the developing fetus.  Let me

8  show you Plaintiffs' Exhibit 76.  This is a study by Ginsberg

9  and Toal from 2000.

10              MR. COLANGELO:  Your Honor, I'd like to move this

11  into evidence.

12              THE COURT:  Any objection to Plaintiffs' 76?

13              MR. SCHUTZ:  No objection.

14              THE COURT:  76 is admitted.

15  BY MR. COLANGELO:

16  Q      So, Dr. Grandjean, let me show you on the second page of

17  the exhibit, this is Page 42 of the published scientific

18  paper, it states -- talking about fish advisories, these

19  advisories have, until now, been based on subchronic or

20  chronic fish ingestion, have not addressed potential risks

21  from a single fish meal.  And then note here, it states, the

22  relatively long half-life of methylmercury, approximately

23  50 days, indicates that even a single exposure would be

24  available to the fetus for a considerable fraction of

25  pregnancy.  Do you see that?

GRANDJEAN - REDIRECT EXAMINATION/COLANGELO

914

1    A      I -- I see that, and I agree with it.

2    Q      And this paper is from 2000.  Is this statement still

3    true today?

4    A      Yes, I -- I would agree.

5    Q      And can you just explain why that is?  Why is exposure

6    available to the fetus because of the half-life for a

7    considerable fraction of pregnancy?

8    A      All right.  It -- it follows the discussion we had just

9    moments ago that a meal of contaminated seafood will

10   substantially increase the -- or can substantially increase

11   the blood concentration or -- and the body burden of

12   methylmercury in the pregnant woman.

13          And that will not go away right away.  It will take time

14   because, as they say here, the half-life of methylmercury -- I

15   would say it's 45 days -- but 50 days -- that's fine -- about

16   50 days.  So that will take a month and a half before that

17   increase, that -- that bump, if you will, on the curve, has

18   come down to safe levels again.

19          So -- so it's not just a matter of comparing the dose

20   from the individual meal with the reference dose and seeing

21   how many days it responds to, but, also, the recognition that

22   once the methylmercury is in the pregnant woman's body, she

23   shares that with the fetus, and the blood concentration in the

24   fetus is actually 50 percent higher than hers, and the fetus

25   has no way of getting rid of the methylmercury.

GRANDJEAN - REDIRECT EXAMINATION/COLANGELO

1    So a -- I think -- I mean, this is what we know today.

2    So I think that statement from -- I think the authors are from

3    the Connecticut Environmental -- or Health -- State Health

4    Department.  I think it's -- it's a very wise statement.

5    Q    You were asked earlier about the maxim that the dose

6    makes the poison.  Do you recall that?

7    A    Right.

8    Q    Okay.  And you answered that the timing makes the

9    poison, as well?

10   A    Right.

11   Q    Do you remember that?

12   A    Exactly.

13   Q    Why -- why is that?

14   A    It -- it is a new recognition that we now realize that

15   organ functions and disease risks oftentimes are laid down

16   early in our development because the human body, especially

17   the human brain, are such complex structures that stressors of

18   various kinds -- chemical, physical, psychological even --

19   stressors can impact on our early development and thereby

20   affect our health in the long-term.

21        And that is a realization that has only surfaced during

22   the last ten years or so.  And -- and so the methylmercury is

23   much less toxic to you and me because our brains are mature,

24   and we essentially don't depend on further development.

25   There's no hope.  And so, therefore, we are much less

1   sensitive to methylmercury compared to a fetus that has to,

2   you know, develop like 200 new nerve cells every second and --

3   and about a thousand synapses per second, when development is

4   at the fastest rate, close to birth.

5        And so that's a fundamental difference that I think the

6   EPA is right now trying to figure out how to deal with this

7   new knowledge, this new paradigm in science.

8   Q    Okay.  You were asked whether you disagree with a series

9   of international guidance regarding methylmercury.  Do you

10  remember that?

11  A    I remember it.

12  Q    Do you agree with the Maine fish tissue action level?

13  A    I -- I agree with it.

14  Q    And is that what applies here?

15  A    It -- does what?

16  Q    Is the Maine action level the safety standard that

17  applies here?

18  A    Yeah, it -- it's appropriate and it's -- it's in

19  accordance with the reference dose.

20  Q    And to the extent that you do disagree with other

21  standards outside of the State of Maine, does that have any

22  relevance for your conclusion that the contamination seen here

23  is unsafe when compared to the Maine action level?

24  A    The -- the chair of the Japanese Nutrition Council for

25  the Japanese government is a good friend, and when they

1    revised their safety limit for methylmercury some years ago, I

2    said to him, you are way behind the science, and he said, I

3    can't do anything different because we are a fish-eating

4    nation.

5         And this is exactly what the point is.  FDA also has to

6    protect the interests of -- of the nutrition available in this

7    country.  If they are too strict about mercury, it will affect

8    the food supply.  So there are tradeoffs here, but the science

9    is behind the U.S. EPA reference dose.  It may actually be too

10   high, but it should certainly not be higher than -- than it

11   is.

12   Q    And you were also asked about whether the State of

13   Maine, based on its Web site, believes that lobsters in the

14   estuary are safe.  I want to show you the rulemaking regarding

15   the lobster fishery closure.  This is Plaintiffs' Exhibit 84

16   in evidence.

17        And it states, this regular rulemaking would make

18   permanent the emergency rulemaking effective February 2014

19   that was necessary in order to protect public health.  Do you

20   see that?

21   A    I see it.

22   Q    Okay.  And do you agree that the lobster fishery closure

23   was, as the State of Maine says, necessary to protect public

24   health?

25   A    I agree, and it's in accordance with my own report.

1          MR. COLANGELO:  Thank you.  That's all I have,

2    Dr. Grandjean.

3          THE COURT:  Recross?

4                    RECROSS-EXAMINATION

5    BY MR. SCHUTZ:

6    Q    Good afternoon again.  You testified about a .05 part

7    per million concentration found in lobster referenced in a

8    State of Maine rulemaking, Plaintiffs' Exhibit 84.  Do you

9    recall that?

10   A    Yes, I -- I remember.

11   Q    And that's a -- not actually a State of Maine program,

12   that's a National Coastal Assessment Program run by U.S. EPA.

13   Are you familiar with that?

14   A    Can you repeat?

15   Q    Are you familiar with the National Coastal Assessment

16   Program?

17   A    It -- I'm not sure I am; but if you could show me what

18   you referred to, maybe I can relate to it.

19   Q    Right.  On Plaintiffs' 84 that you were shown, there's a

20   reference to U.S. EPA's National Coastal Condition Assessment

21   Program?

22   A    Right, I -- I know what you're referring to now, yeah.

23   Q    Are you familiar with that program?

24   A    Not the details of it.

25   Q    Do you know where those samples were taken?

1   A    No.

2   Q    Do you know what the sampling protocol was?

3   A    No.

4   Q    Do you know whether they're composite samples, meaning

5   they gathered together a number of lobster, put them in a

6   blender, and then sampled the composite tissue?

7   A    I would doubt it.

8   Q    Do you know whether those are claw and tail, tail only,

9   claw only, or some combination?

10  A    I don't know.  All I know is that the state refers to it

11  as a proper comparison basis for their rulemaking, and I'm

12  willing to believe that.

13  Q    Well, the state also refers to a lobster concentration

14  in Odom Ledge in the closed area at 134 nanograms per gram.

15  Do you see that?

16  A    I see that.

17  Q    And if the lobster concentrations in that area were at

18  that level, there'd be no reason for closure, would there?

19  A    I would have to go back to the data to -- to see if it's

20  the same as in the Penobscot River Mercury Study.

21  Q    Now, everyone here, I think, agrees that the Penobscot

22  River Mercury Study was a very robust -- robust sampling

23  program.  But did they take any samples of lobster in

24  comparable estuaries elsewhere in Maine?

25  A    Not that I know of.

GRANDJEAN - RECROSS-EXAMINATION/SCHUTZ

920

1  Q      And it's possible -- and you're not a lobster biologist;
2  is that correct?

3  A      Is it possible?

4  Q      You're not -- you don't know much about lobster biology,
5  right?

6  A      Ah, I -- I -- I know a little bit about lobsters.  I can
7  tell males from females, and I'm willing to tell you how to do
8  it if you're interested.

9  Q      Okay.  But in terms of a database of comparative
10 lobsters sampled where fresh water rivers, like the Penobscot,
11 are entering into saltwater bays, we don't have any data for
12 comparative purposes here, do we?

13 A      Um, I don't think that I need to know that.  What I need
14 to know is that, how much methylmercury gets into the food
15 supply?  And that's what I have related to.

16 Q      Now, you testified a few minutes ago about EPA
17 publications and whether the reference value equates to a
18 blood mercury content of 5.8 or a lower value.  Are you
19 referring to publications in the literature by Kathryn
20 Mahaffey?

21 A      Correct.

22 Q      And Kathryn Mahaffey was an EPA scientist for a number
23 of years, now deceased?

24 A      She's world-famous -- or was -- because she died.

25 Q      And she's published such articles as this one, Blood

1   Organic Mercury and Dietary Mercury Intake and so forth?

2   A    I remember that paper.

3   Q    And this paper, dated April 2004, it's in a

4   peer-reviewed publication, Environmental Health Perspectives,

5   correct?

6   A    This is what you see in any publication, even when EPA

7   does agree.

8   Q    Views expressed in this manuscript are the professional

9   perspectives of the authors and should not be interpreted as

10  the policies of the U.S. EPA; isn't that right?

11  A    That is a standard clause that you'll see in any

12  publication from EPA employees.

13  Q    And have you ever worked at EPA?

14  A    I'm sorry?

15  Q    Have you ever worked at the U.S. EPA?

16  A    Nope.

17  Q    Or at the U.S. FDA?

18  A    Nope.  I've been a consultant to them.

19  Q    You were asked some questions about a Ginsberg and Toal

20  article published in Risk Analysis in 2000?

21  A    Right.

22  Q    So all of the FDA documents that we've talked about and

23  admitted were authored after this publication came out?

24  A    Right.  This even came out before the National Academy

25  of Sciences Report, so it's -- it's 14 years old, yes.

GRANDJEAN - RECROSS-EXAMINATION/SCHUTZ

1    Q     And what this paper reports is a technique for modeling

2    how intake of seafood or other food with methylmercury may

3    change blood methylmercury levels?

4    A     That -- that's what it refers to, yes.

5    Q     And in this article, they talk about how intake of a

6    certain amount of blood methylmercury will -- could increase

7    methyl -- I'm sorry -- intake of a certain amount of

8    methylmercury in a food item could increase blood

9    methylmercury concentrations?

10   A     Right, right.  I --

11   Q     So --

12   A     -- see that, yeah.

13   Q     So Figure 3 of this article, they report on how intake

14   of fish with known mercury content two to four times per week

15   for 96 days could increase someone's blood methylmercury

16   level, correct?

17   A     Right.  This -- this is what the curve shows.

18   Q     And they go -- and in the text, they report Figure 3

19   compares model predictions, and it goes on, and they talk

20   about methylmercury in halibut one to three -- 1.3 to

21   2.8 parts per million, and then they report meal sizes two to

22   four times per week for 96 days, correct?

23   A     Right, that's what it says.

24   Q     And so if you're eating halibut with methylmercury

25   between 1 and 3 parts per million two to four times per week

1    for 96 days, your blood methylmercury might be as reflected in

2    Figure 3 in this publication?

3    A     Right, that's what I see.

4    Q     And where is 58 in this -- on this figure?  Where does

5    that fall?

6    A     Where do you see 58?

7    Q     58 because that's ten times the methylmercury level that

8    corresponds to the reference dose.

9    A     Oh, but that's in cord blood.

10   Q     Where does 58 --

11   A     We're not talking about cord blood here.

12   Q     I'm asking where -- where would 58 fall on this figure

13   -- it's a log scale for a nontechnical person like me, it's

14   not obvious --

15   A     Around there.

16   Q     So a blood mercury -- a methylmercury level of 58

17   corresponds to roughly the fourth box from the left on the

18   upper curve, as shown in Figure 3 of this exhibit?

19   A     That -- apparently so.

20   Q     And how many days in is that -- that box, the fourth

21   box?

22   A     It looks like about one half-life, so about 45 to

23   50 days.

24   Q     So 45 to 50 days after starting to consume halibut at 1

25   to 3 parts per million two to four times per week, one might

1    get up to a blood methylmercury level of about 58?

2    A      Apparently.

3    Q      Now, in this article, the authors also made clear that

4    they're advising only that there be a recommendation

5    concerning consumption if individual species are elevated to

6    2 parts per million, in other words, individual specimens are

7    elevated to 2 parts per million, they suggest considering an

8    advisory?

9    A      I mean, like your 58 level, this is outdated, and I

10   think if Dr. Ginsberg, if -- who I know well and respect, I

11   think if he were to write this paper today, after the National

12   Academy Report, he would have ended up with some different

13   numbers, but it's -- I agree with the principle, that's what I

14   told Mr. Colangelo, of doing this kind of a calculation.

15   Q      What this paper reports on Page 45, second column, is

16   the major uncertainty in the current analysis with respect to

17   the importance of short-term elevations in blood and hair

18   concentrations -- I'm sorry -- the major uncertainty in the

19   current analysis is with respect to the importance of

20   short-term elevations in blood and hair concentrations

21   relative to in utero development?

22   A      Yes, I see that.  But -- but he -- Ginsberg refers to

23   hair, and I referred to blood, and obviously, in hair you

24   would see this -- it would be sort of flattened in regard to

25   hair because you analyze like 1 centimeter at a time, which is

1    -- represents a whole month.

2        With blood, essentially, you get the current mercury

3    balance between the intake and the elimination, and,

4    therefore, blood would be a better medium because that is a

5    medium where you share the methylmercury with the fetus.

6    Q    And what these authors say, it's uncertain that this

7    degree of exposure for this length of time is sufficient to

8    increase -- increase risks, correct?

9    A    That would be the perspective in -- in 2000, when they

10   wrote this paper, yes.

11   Q    And they also report, further down in their paper,

12   although it may be possible that such short-term spikes are

13   important to fetal risk, the type of dose rate pharmacokinetic

14   studies needed to evaluate this possibility have also not been

15   conducted?

16   A    Right, I see that.

17   Q    And this paper was published in the year 2000?  Have

18   such studies been conducted since then?

19   A    I don't -- I don't think so.  It -- it would be very

20   difficult to do because I don't think any ethical review

21   committee would approve of us doing experiments with

22   methylmercury to see how fast the blood mercury concentration

23   goes up.

24       That British experiment that you referred to in the

25   curve before, those concentrations, I think that you would be

1   fired from your academic position if you proposed to do an

2   experiment like that today.

3        But, obviously, those data -- I think they're from the

4   1980s, so -- but, again, those were the times.  It's different

5   today.  We know a whole lot more about the risks.

6             MR. SCHUTZ:  Thank you very much, Professor.

7             THE WITNESS:  Thank you.

8             THE COURT:  Anything further?

9             MR. COLANGELO:  Nothing further, Your Honor.

10            THE COURT:  Thank you, Professor Grandjean.

11            THE WITNESS:  Thank you.

12       (The witness left the witness stand.)

13            THE COURT:  Next witness?

14            MR. BERNARD:  Dr. Drew Bodaly.

15            THE CLERK:  Please raise your right hand.  Do you

16  solemnly swear that the testimony you shall give in the matter

17  now in hearing shall be the truth, the whole truth, and

18  nothing but the truth, so help you God?

19            THE WITNESS:  I do.

20            THE CLERK:  Please be seated.

21            MR. BERNARD:  I think the -- do you have water up

22  there?  Is there any in that?

23            THE WITNESS:  Yes.

24            THE CLERK:  Please state your name and spell your

25  last name for the record.

1          THE WITNESS:  My full name is Richard Andrew Bodaly,

2     B-o-d-a-l-y.

3     RICHARD ANDREW BODALY, having been duly sworn, was examined

4     and testified as follows:

5                         DIRECT EXAMINATION

6     BY MR. BERNARD:

7     Q     Dr. Bodaly, did you play a role in the Penobscot River

8     Mercury Study?

9     A     Yes, I was hired in early 2006 to be the project leader

10    for the study.

11    Q     And please briefly describe your responsibilities as

12    project leader.

13    A     I had two major roles:  One was administrative.  I was a

14    liaison to the court and to contractors and Environ

15    International Corporation regarding a lot of the financial

16    matters of the study.  For example, I approved all invoices on

17    a quarterly basis.  I wrote, drafted most of the proposals to

18    the court.

19          The other major role I played was scientific.  Um, I was

20    the supervisor of field activities by contractors.  I was the

21    liaison to outside principal investigators, or PIs.  I

22    received all data from analytical labs, at least for work that

23    we had contracted.  And I, in many cases, analyzed those data.

24    I was the -- the keeper of the repository of all data, and was

25    asked to participate in writing various parts of reports and

1    chapters.

2         It was initially thought that I would do all data

3    analysis, but that quickly proved to be too big a task.

4    Q    When did you say you began work on the project?

5    A    February 2006.

6    Q    Did you live in Maine for part of the year while you

7    served as project leader?

8    A    Yes, I lived in Maine for five to five and a half months

9    a year for five years, 2006 to 2010.

10   Q    Where do you live the remainder of the year?

11   A    Canada.  I first lived in Winnipeg, and now I live in

12   British Columbia.

13   Q    What is your educational background?

14   A    I have a bachelor of science in biology.  I have a Ph.D.

15   in zoology.

16   Q    Did you work at the Fresh Water Institute?

17   A    That's correct.  I was a scientist at the Fresh Water

18   Institute in Winnipeg, which is a federal research lab, for

19   29 years.  I was adjunct professor at the University of

20   Manitoba in the department of zoology and at the Natural

21   Resources Institute.

22   Q    Have you worked on mercury projects other than the

23   Penobscot study?

24   A    Ah, yes.  I started getting involved in mercury research

25   in the late 1970s.  We were looking at the environmental

1   impacts of northern hydroelectric reservoirs and found that

2   flooding increased mercury in fish and the food chain in those

3   reservoirs.  We started to document that and look at the --

4   the causes and dynamics of it.

5        I was involved in a study of mercury in natural lakes in

6   northwestern Ontario, and then I was involved in two

7   experimental flooding projects at the experimental lakes area;

8   one flooding a wetland and one flooding some forested upland

9   areas, and that was all looking at the dynamics of mercury in

10  hydroelectric reservoirs.

11  Q    How would you characterize your area of scientific

12  expertise?

13  A    I would say that I am most familiar with the area of the

14  uptake of mercury by fish and by food chains.  I'm a -- I'm a

15  fish biologist by training.  That's my graduate work and my

16  early career.  So I'm -- I'm a fish guy.

17       I've done a very small amount of work in -- in

18  toxicology, but really not very much at all.  I have a couple

19  of published papers, but that's all.

20  Q    And is there a fuller description of your educational

21  background and professional experience and publications in

22  your CV?

23  A    Yes.

24            MR. BERNARD:  Your Honor, that's Joint Exhibit 14.

25            THE COURT:  Thank you.

1  BY MR. BERNARD:

2  Q    Did the Study Panel set mercury targets for surface

3  sediments in the Penobscot?

4  A    Yes.

5  Q    And are those targets set forth in Chapter 2 of the

6  Phase II Report?

7  A    Yes, they are.

8  Q    Now --

9  A    The Study Panel, um, asked me to develop those targets

10 and to be the primary author of Chapter 2.

11           MR. BERNARD:  Your Honor, this is Joint Exhibit 6-2.

12           THE COURT:  Thank you.

13 BY MR. BERNARD:

14 Q    Let me just show you the cover page there.  Is this the

15 cover page of the chapter you're referring to, Dr. Bodaly?

16 A    Yes, it is.

17 Q    Okay.  And you're listed as the first author.  And the

18 Study Panelists and Dr. Kopec are also listed as authors?

19 A    Correct.

20 Q    Okay.  Did the Study Panel members approve the targets

21 that are set forth in Chapter 2?

22 A    Yes, they did.

23 Q    What is the purpose of setting these sediment targets?

24 A    Well, we quickly realized that we wanted to have some

25 indication of how high levels in biota were in the Penobscot

1    in relation to a number of criteria, and, therefore, we wanted

2    to get an indication -- excuse me.

3    Q    Take your time and have something to drink if you need

4    to.

5    A    Thank you.  If -- if we were going to be recommending

6    remediation in the Penobscot, remediation of -- of the mercury

7    contamination, the question immediately became, how far did we

8    have to reduce the levels in biota to meet various criteria?

9    Obviously, one of those criteria is to think about how low the

10   levels in biota would have to be to remove risk to human

11   consumers of those species that are consumed by people.

12        Another obvious one is to lower those levels down to a

13   level where it would be thought that the mercury would no

14   longer be causing toxic adverse effects to various species of

15   biota.

16        So to do that, the first step was to say, okay, what --

17   what levels would we like them -- like the mercury in biota to

18   be to get rid of those various risks?  And that was the main

19   purpose of Chapter 2.

20   Q    Now, are the sediment targets set for total mercury?

21   A    Yes.

22   Q    And what is the rationale for setting targets for --

23   withdrawn.

24        Are they also -- are they set for total mercury in the

25   surface sediments?

BODALY - DIRECT EXAMINATION/BERNARD

1   A      Yes.

2   Q      And how do you -- go ahead.

3   A      We typically and operationally define surface sediments

4   as 0 to 3 centimeters.  We didn't do specific work on the

5   depth distribution of methylation in sediments, but it's

6   generally accepted that methylation of mercury occurs in

7   surface sediments.

8   Q      What's the rationale for setting targets for total

9   mercury in surface sediments?

10  A      We observed that there was usually a strong relationship

11  between methylmercury and total mercury in sediments.  That

12  the percentage of the variation in methylmercury in various

13  samples could be -- a fairly high percentage of the variation

14  could be explained by the concentration of total mercury.  In

15  other words, total mercury was an important factor in

16  controlling the amount of methylmercury.  And there's

17  certainly many other factors, and they've been talked about

18  last week, but the observation of the relationship between

19  methylmercury and total mercury in sediments certainly

20  suggested and all of the scientific literature on mercury

21  dynamics certainly supported the supposition that if you could

22  reduce total mercury, which, of course, is mostly inorganic

23  mercury, in surface sediments, you would reduce methylmercury

24  in surface sediments, and you would reduce methylmercury in

25  biota.

BODALY - DIRECT EXAMINATION/BERNARD

933

1  Q     Do you believe that if there is less inorganic mercury

2  or total mercury in Penobscot sediment, there'll be less

3  methylmercury in those sediments?

4  A     Yes, I do, on average.  I think that there's certainly a

5  variation in that relationship within a given habitat.  Total

6  mercury does not explain all variation in methylmercury.

7  There's a lot of variation that happens due to other factors,

8  temperature, chemical factors, things like that, probably

9  salinity, sulfur chemistry, things like that.

10       But, yes, I think over the average and over the

11 long-term, and probably even the medium-term, methylmercury in

12 sediments will respond to reductions in total mercury in

13 sediments

14 Q     And for this additional link in the chain, do you

15 believe in general that if you reduce methylmercury

16 concentrations in surface sediments, there will be less

17 methylmercury in fish, shellfish, and birds who feed in the

18 Penobscot?

19 A     Yes, I do.  I think the scientific literature on mercury

20 dynamics is -- is pretty clear.  Whether they are

21 observational studies or whether they are experimental

22 studies, when you put more mercury in a system, you get more

23 methylmercury in the food chain and biota.  And when you

24 reduce mercury in the system, you get less mercury in the food

25 chain and biota.

1      Most of those studies are in lakes, but I don't think we

2   have any reason to believe that the relationship would not

3   also hold true in an estuary, and the relationship that we see

4   between methylmercury and total mercury certainly confirms

5   that view.

6   Q    What process did you follow to set specific sediment

7   targets?

8   A    We basically did two things.  In fact, we laid this out

9   fairly explicitly in the Phase I Update Report.  We basically

10  said what we're going to do.  We compared -- we surveyed the

11  scientific literature and looked at what levels had been

12  reported in the scientific literature to cause effects on

13  biota in various groups of biota, and we commissioned two

14  large reports from experts in the field.  Dr. Evers provided

15  us with a report on birds, and Dr. Sandheinrich provided us

16  with a report on fish and invertebrates.  He also included

17  sections on birds, as well.  Pardon me.  Dr. Evers' report

18  also included mammals.

19  Q    Let's just step back for one second in terms of the

20  steps you followed, which I think you adverted to earlier.

21       Did you first determine what you thought safe levels

22  would be set -- safe methylmercury levels would be in various

23  biota?

24  A    The -- the process was reviewing the scientific

25  literature and getting expert reports from those two advisors,

1    which allowed us to set the -- the safe levels.

2    Q    Okay.  And then did you compare those levels you derived

3    safe levels to the levels that you measured during the study

4    in those same biota in the Penobscot?

5    A    Yes, we did.

6    Q    Okay.  And then did you determine the percentage

7    reduction required in order to get from the measured level to

8    what you set as the safe level?

9    A    That's correct.

10   Q    And then -- and then did you set a sediment target by

11   reducing the current level of mercury in the surface sediment

12   by that percentage?

13   A    That's correct, we assumed a one-to-one relationship.

14   We -- we did not always feel that we could set a target which

15   was, in fact, a safe level, whether for effects on the biota

16   or human consumption, because sometimes we didn't think the

17   system would go that low if left to clean up or if cleaned up.

18        For example, the -- for eels consumed by people, the

19   limit for -- the Maine action level, as we've talked about

20   today, is 200 nanograms per gram wet weight.  So that would be

21   one reason to -- that would be a criteria to set it at 200.

22        But we observed that in the OV reach, Old Town to

23   Veazie, the eels there were around 250, 260, which is above

24   the 200 that you'd like to see it at, but we didn't think the

25   eels downstream would go any lower than that because they were

1    getting -- those reaches were probably going to come

2    eventually to resemble OV, and we didn't think the eels would

3    ever go below 250 or 260.  So that became our target.

4    Q     I'm sorry.  Go ahead.

5    A     If it wasn't practical to get down to our target, we

6    felt we had to recognize that.

7    Q     So in that instance -- and I'm going to show you a chart

8    on this in a moment -- in that instance, you set a target

9    above the 200 nanograms?

10   A     Correct.

11   Q     Let me just focus for a moment because you've mentioned

12   a couple of studies on the wildlife side.  But one of the

13   purposes you articulated for setting the sediment targets was

14   to protect human health; is that right?

15   A     Correct.

16   Q     And -- and that -- does that relate to the -- the -- the

17   animals in the Penobscot that are part of the human food web?

18   A     Yes, and we -- we assumed that list was eels, lobster,

19   crab, and black duck.

20   Q     Now, in terms of those species, did you use the State of

21   Maine safety standard for mercury in edible tissue of 200

22   nanograms per gram?

23   A     Correct.

24   Q     And is that sensible to you?  In other words, as someone

25   who worked closely with the Study Panel, that the Study Panel

1   would have adopted and applied the State of Maine standard?

2   A      It was sensible to me.  I thought it made sense.  It's

3   based on a lot of science.  It's endorsed by the local state

4   agencies.  And I didn't see that we could adopt any other

5   limit.  I didn't feel we could go and produce or -- or develop

6   or derive a limit of our own.  I suppose we could have hired

7   someone to -- to do that.  I didn't feel we could have any

8   justification to go higher.  We would be soundly criticized by

9   some for doing that.  And I didn't feel we had any

10  justification to go lower.

11       So I felt this -- it was a simple decision, but I think

12  that was the appropriate decision.

13  Q      So moving from the human health side to the fish and

14  wildlife side.  For fish and wildlife, did you have a

15  government -- an applicable government standard on which to

16  rely?

17  A      No, and that's the problem.  There are no national or

18  state standards for levels of methylmercury in fish or -- or

19  birds or mammals that we could simply adopt.  There were no

20  accepted levels.

21       And so we -- we had to look at it -- look at the

22  information available and make our own decisions.

23  Q      And for fish, you turned to an outside expert?

24  A      Yes.

25  Q      Is that right?

1   A     Yes.

2   Q     And was that Dr. Mark Sandheinrich?

3   A     Yes.

4   Q     Why did you turn to Dr. Sandheinrich?

5   A     Dr. Sandheinrich is a very respected researcher in the

6   field of toxicity of methylmercury to fish.  He's had a number

7   of graduate students.  He's published extensively.  He's

8   director of the River Study Center at the University of

9   Wisconsin-La Crosse.  We knew him.  We'd met him and talked to

10  him.

11        The other person we got a lot of advice from was

12  Dr. James Wiener, who I guess you'll all hear from later this

13  week, also at the University of Wisconsin-La Crosse.

14        So one of the documents we relied on there was the

15  report that Dr. Sandheinrich produced for us.  I think

16  Dr. Wiener might have been a coauthor on that, but I'm not

17  sure.

18  Q     Let me just show you the cover page.

19  A     Okay.  It was --

20           MR. BERNARD:  Your Honor, this is Joint Exhibit 6-2,

21  Appendix 2-1.

22  BY MR. BERNARD:

23  Q     Is this the cover page of the report you -- that

24  Dr. Sandheinrich produced for --

25  A     That's correct.

1  Q      -- the Study Panel?

2  A      That's correct.  And the other important document was

3  the paper that Sandheinrich and Wiener published I think in

4  2011, which was in the peer-reviewed scientific literature,

5  and we certainly took a look at that, as well.

6  Q      And that report, that 2011 Sandheinrich publication, is

7  cited in Chapter 2; is that correct?

8  A      Yes.

9  Q      Okay.  So you see that Dr. Sandheinrich is the lone

10 author of the Appendix 2-1, right?

11 A      I see that now.

12 Q      And he wrote -- it looks here like he wrote an original

13 report for you in 2008 and then revised it in early 2010?

14 A      That's correct.  He -- he wrote the original report --

15 maybe we were overoptimistic as to how quickly we were going

16 to finish the study and thought it would still be fresh when

17 we were writing the report.  It wasn't.

18        We realized that a lot of new literature was coming out,

19 and we wanted something that was more recent and asked him to

20 revise it and incorporate more recent scientific literature.

21 Q      And -- and what did Dr. Sandheinrich's review entail, as

22 best you recall?

23 A      He looked at pretty much everything he could find in the

24 scientific literature that -- that -- you know, to bring to

25 bear on the question of toxic effects and the levels of

BODALY - DIRECT EXAMINATION/BERNARD

940

1    mercury that cause toxic effects in -- in fish and -- and also

2    looked at invertebrates, as well, and made -- we specifically

3    asked him to make recommendations to us as to what threshold

4    levels he thought would be appropriate.

5         We wanted not only to get his review because of his

6    familiarity with the literature, but because of his expertise

7    and experience, we wanted to have his recommendations.  And we

8    didn't always follow them exactly, but, you know, to whatever

9    -- we certainly considered them.

10   Q    Did Dr. Sandheinrich recommend a range of mercury

11   concentrations in muscle of fish tissue that he thought would

12   be appropriate?

13   A    Yes, he did.

14   Q    Do you remember what the range was?

15   A    It was on a -- if -- if converted to muscle

16   concentrations, it was 400 to 900, I think, nanograms per gram

17   wet weight in muscle.  I think the original was a whole body

18   concentration that was converted to a muscle concentration.

19   Q    And it was the muscle concentrations that you ultimately

20   were dealing with?

21   A    That's correct.

22   Q    Okay.

23   A    We -- the data we'd collected on fish were almost all

24   muscle, not whole-body.

25   Q    Okay.  So you say he recommended a range of between 400

1    and 900.  Was that in nanograms per gram?

2    A     Correct.

3    Q     Okay.  400 to 900 nanograms per gram in muscle of fish,

4    did the Study Panel set a protection target within the range

5    that Dr. Sandheinrich suggested?

6    A     Yes, we -- we chose 500 as the -- as the threshold

7    limit.

8    Q     That's not at the lowest end of his range; is that

9    correct?

10   A     No, it's not.

11   Q     Why did you choose a safety target that was not at the

12   low end of the range Dr. Sandheinrich suggested?

13   A     Good question.  Um, we -- we wanted to be protective.

14   We wanted to afford the animals in the river with a reasonable

15   degree of protection.  We -- we chose a level that was towards

16   the bottom, but was not right at the bottom.  I'm having

17   trouble remembering exactly how we settled on 500 versus, say,

18   400 or 600.  You know, it's always a difficult judgment call,

19   but we certainly could have said 400, but we felt it was a

20   little more reasonable if we came a little bit off the lowest

21   part of the range.

22   Q     Okay.  Let's shift to bird toxicity.  Did -- did you set

23   a level to protect bird health?

24   A     Yes, we did, both mercury in bird blood and mercury in

25   bird eggs.

1   Q     And to whom did you turn for -- for advice on that

2   subject?

3   A     We relied heavily on the review of Dr. Evers.

4              MR. BERNARD:  Your Honor, this is Joint Exhibit 6-2,

5   Appendix 2-2.

6   BY MR. BERNARD:

7   Q     Does this look like the report from Dr. Evers?

8   A     Yes.

9   Q     Now I'm getting the Evers in there.

10  A     Yes, it does.

11  Q     Okay.  And this was 2012, after Dr. Sandhein --

12  Sandheinrich's report; is that right?

13  A     Correct.

14  Q     Okay.  Now, what, if you know, did Dr. Evers do to --

15  withdrawn.

16            What, if you know, did Dr. Evers' review entail?  Was it

17  the same as Dr. Sandheinrich's, but just related to birds?

18  A     Very similar to what Dr. Sandheinrich did.  Dr. Evers

19  always recommended a single level as a threshold value.  And

20  for bird blood and eggs, he based it on what he called an

21  EC20, which was a level of methylmercury that would translate

22  to a reduction of 20 percent in the reproductive success of

23  the bird.

24            So if you're judging a reproductive success by number of

25  birds fledged from the nest during the -- the breeding season,

BODALY - DIRECT EXAMINATION/BERNARD

943

1     that would be a 20 percent reduction of the number of birds

2     that would fledge from the nest.

3           We felt that was a reasonable criteria and level, um,

4     ah, and, therefore, we generally adopted his levels.  We -- I

5     guess we adopted his levels for blood.  We -- we changed the

6     level for eggs.  I recall that he recommended 650 nanograms

7     per gram wet weight in eggs.  We went a little higher in

8     recognition of the fact that the main species of concern we

9     had in the Penobscot was the double-crested cormorant, and it

10    was known to be a little less sensitive to methylmercury than

11    the mallard and other species where that 650 limit was -- was

12    based on.

13          So we adopted a level of 800.

14    Q     Let's go back to the EC20.  Do you know what EC stands

15    for?  Effects concentration, does that ring a bell?

16    A     Yes.

17    Q     Okay.  Do you remember for bird blood -- well,

18    withdrawn.

19          What is an invertivore?  Do you know?

20    A     An animal that eats invertebrates.

21    Q     Okay.  And that would include insects?

22    A     Yes.

23    Q     Okay.  And is that distinct from a piscivore?

24    A     Piscivore is an animal that eats fish.

25    Q     Okay.  Now, what did Dr. Evers recommend as a target for

1   mercury in the blood of insect-eating birds?

2   A    He recommended 1.2 micrograms per gram wet weight.

3   Q    Okay.  And is that the equivalent of 1,200 nanograms per

4   gram?

5   A    Correct.

6   Q    Okay.  And do you know whether that was, just to tie --

7   tie this together, was that his effects concentration, or EC20

8   level that you described earlier?

9   A    Correct, yes.

10  Q    Okay.

11  A    And he recommended 2 micrograms per gram wet weight in

12  the blood of piscivorous birds, recognizing the evidence that

13  they are less sensitive than insect-eating birds, and that

14  2 micrograms per gram is equivalent to 2,000 nanograms per

15  gram.

16  Q    Did you adopt both of those recommended thresholds from

17  Dr. Evers, the one for invertivores and the one for

18  piscivores?

19  A    Yes, we did.

20  Q    Okay.  Now, is -- is toxicity to birds a specialized

21  field of science?

22  A    Yeah, I think so.  Um --

23  Q    Does any member of the Study Panel possess that

24  particular expertise?

25  A    No, definitely not.  Um, we had very little knowledge of

1  bird biology, although Dr. Kopec had certainly become a pretty

2  good knowledge source for bird biology.  None of us had done

3  any sort of toxicology work on birds at all.

4  Q    Okay.  Do you think it was prudent for the Study Panel

5  to rely on the advice of Dr. Evers regarding toxicity

6  thresholds for birds?

7  A    Yeah, he was -- he -- he's a very well-respected expert.

8  He's one of the top sort of handful of -- of bird toxicology

9  experts in the world.  He was a person we knew and trusted.

10      So, you know, he -- and he's -- he's not throwing out a

11  level based on his personal feeling or his -- you know, his

12  view of toxic chemicals in the world.  He's -- he's providing

13  a recommendation which is based on the scientific literature,

14  some of which is his own, he's conducted research himself.  So

15  we felt comfortable with that.

16  Q    Let's look away from birds for a moment and talk about

17  fish predators.  Did the Study Panel set a target to protect

18  -- protect predatory fish?

19  A    Yes, we did.

20  Q    And is there a particular reason the Study Panel was

21  concerned about the health of fish predators in connection

22  with mercury contamination?

23  A    Well, we knew that the levels in, for example, in eels,

24  were fairly high, and I had a general knowledge of the

25  literature that they may be up into the range, close to the

BODALY - DIRECT EXAMINATION/BERNARD

946

1    range where toxic effects on the eels themselves might --

2    might be -- might be a -- a factor.

3    Q     Does mercury biomagnify up the food web?

4    A     Yes, it does.

5    Q     And does that give particular importance to fish

6    predator health?

7    A     Yes, I think so.  Ah, as you go up the food chain, you

8    get generally much higher concentrations with each step of the

9    food chain, and the question for us was, are the levels,

10   particularly in eels, high enough that they might be suffering

11   the effects of -- of methylmercury.

12   Q     And just to be clear, because you mentioned eels, now,

13   eels are eaten by human beings, correct?

14   A     Eels are eaten by?

15   Q     Human beings.

16   A     I -- that's what I understand.

17   Q     So you have the 200 nanograms per gram level that

18   applies to human con -- safety for human consumers of the eel.

19   A     Yes.

20   Q     Correct?

21   A     Yes.

22   Q     But then you have the threshold adapted from

23   Dr. Sandheinrich of 500 nanograms per gram?

24   A     Yes.

25   Q     Is that to protect the eel, the animal itself, not its

1  human consumer?

2  A    That's to protect the eel, correct.  Obviously, it's

3  much higher than the level that is generally thought to be

4  protective of human health, as well.  So if you can get the

5  eels down to the 200 limit, then you will protect human

6  consumption, and you will also, as a beneficial byproduct,

7  protect the fish themselves, as well.

8  Q    And did you -- did you set a target for mercury

9  concentration in prey fish as a means of attempting to predict

10  -- protect their predators?

11  A    Yes, in --

12  Q    Okay.  Was -- go ahead.

13  A    In the last decade, there's been more and more attention

14  to the issue of the prey of predatory fish.  It's well-known

15  that fish get essentially all of their mercury from their

16  food.  They might get a small proportion directly from the

17  water that passes over their gills, but, essentially, their

18  whole intake of mercury is -- is through their food.

19      And recent attention has focused on the levels in the

20  prey of predatory fish and how high they might have to be if

21  they are causing or potentially causing toxic effects in the

22  predators themselves, and it's a new -- kind of a new emphasis

23  in mercury research, but it turned out there was a very good

24  paper, Depew, et al., 2012, which came out fortuitously just

25  before we were writing the Phase II Report, and we were able

1  to -- to use that as a -- as an important source.

2  Q    Speaking of Depew, et al., let me show you the cover

3  page from Joint Exhibit 76.  Is this the Depew paper to which

4  you just made reference?

5  A    That's correct, and -- and you'll notice that our two

6  advisors, Dr. Sandheinrich and Dr. Wiener, were coauthors on

7  this paper.

8  Q    Okay.  Now, did Depew look at the sensitivity of various

9  prey fish to adverse effects from mercury?

10 A    Ah, they -- they looked at the question of what

11 concentrations of mercury in the prey would be likely to cause

12 adverse effects in the predators.

13 Q    Okay.  And did they look at various endpoints in doing

14 that analysis -- let me show you a table which may make it

15 easier.  This is from Page 7 of Joint Exhibit 76.  I'm going

16 to refer you to Table 3 because it's a summary table.  Have

17 you seen this before?

18 A    Yes.  It's been a while since I read the paper, but I

19 have it in front of me, so --

20 Q    Well, I want you to take a look at -- did -- at this,

21 and this is -- says Summary of Dietary Threshold

22 Concentrations of Methylmercury for Fish.  Do you see that as

23 the caption?

24 A    Yes.

25 Q    Okay.  And then it has, on the left-hand column,

1   different endpoints; is that correct?

2   A    Correct.

3   Q    Okay.  So, for example, lethality would be, you know,

4   one, and then it goes on, and it has five different endpoints;

5   lethal, growth, behavioral, reproductive, and biochemical,

6   right?

7   A    Yes.

8   Q    Okay.  Now, there's been testimony before -- and I'm not

9   going to ask you to go through it again -- about what an

10  N-O-A-E-L is and an L-O-A-E-L, and I really just want to go

11  over to the fifth column of sixth in the table, which is

12  Depew's proposed thresholds.  Do you see that?

13  A    Correct.

14  Q    Okay.  And you're familiar with those?

15  A    Yes.

16  Q    Okay.  So he has for these different endpoints a

17  proposed dietary threshold for adverse effects; is that

18  correct?

19  A    Correct.

20  Q    Okay.  Now, just to help the judge, and perhaps all of

21  us, understand the units of measurements, in the -- in Chapter

22  2 of the Phase II Report, you set limits based on a unit of

23  nanograms per gram; is that right?

24  A    Correct.

25  Q    Okay.  And these are in micrograms per gram, if you look

1    at the caption?

2    A     Correct, so they are one-thousandth -- the number is

3    one-thousand times smaller.

4    Q     Okay.

5    A     Than on a nanogram per gram.

6    Q     Okay.  So --

7    A     So the 40 is -- or the .04 micrograms per gram is 40

8    nanograms per gram.

9    Q     Okay.  And so let's look at -- at that one.  In the --

10   the reproductive endpoint, it's 0.04 micrograms per gram,

11   which is 40 nanograms per gram?

12   A     Correct.

13   Q     And you understand that to be Depew and his fellow

14   authors' proposed toxicity threshold for prey fish using

15   reproduction as the endpoint?

16   A     Correct.

17   Q     Okay.  Now, what is the endpoint for biochemical

18   effects?

19   A     .06 or -- .06 micrograms per gram, or 60 nanograms per

20   gram.

21   Q     Okay.  Now, was the Study Panel concerned about

22   reproductive effects in biota species in the Penobscot?

23   A     Absolutely.  This was, you know, one of the -- one of

24   the effects areas that we, you know, were concerned about the

25   most because it potentially meant that there would be

BODALY - DIRECT EXAMINATION/BERNARD

1    impairment of reproduction in the -- in the predator

2    population.

3    Q    And could that --

4    A    From eating fish which had that amount of mercury in

5    them.

6    Q    And could reproductive -- it -- withdrawn.

7         Can an impairment in reproductive success affect the

8    well-being of an entire population of a species?

9    A    Certainly.

10   Q    Okay.  What's an example, again, just for the court,

11   what's an example of a reproductive effect?

12   A    I -- I knew you were going to ask that, and I was trying

13   to think of what the paper came up with as far as what the

14   particular reproductive effects it observed.  I remember -- I

15   recall one was swimming behavior or locomotion in very young

16   fish, which, of course, would potentially affect the ability

17   of that very young fish to -- to move to avoid predation, to

18   capture food, and -- and I -- I see in the table that it says

19   four species were -- I guess that meant there was information

20   on four species for reproductive effects, but I don't recall

21   what the other ones were.

22   Q    Okay.  Would spawning success be a measure of

23   reproductive success?

24   A    Absolutely.

25   Q    And --

BODALY - DIRECT EXAMINATION/BERNARD

952

1   A     I don't know whether that -- whether spawning success

2   was one of the ones that was summarized here in this paper.

3   Q     All right.  What threshold did the Study Panel set for

4   prey fish?

5   A     The Study Panel adopted a -- a threshold of

6   .05 micrograms per gram, or 50 nanograms per gram.

7   Q     So that's higher than the -- the threshold Depew and

8   others proposed for their reproductive endpoint; is that

9   correct?

10  A     That's correct.

11  Q     Why didn't you go down -- if you were concerned about

12  reproductive effects, why didn't you go down to the 40

13  nanograms per gram, where -- where Depew was?

14  A     Yeah, again, a good question.  We were -- we -- we were

15  -- thought we were trying to be reasonable.  Those levels are

16  pretty low.  The scientific community is still kind of mulling

17  them over, and the last mercury conference I was at, people

18  were wandering around the hallways pretty shocked saying, boy,

19  how low is this going to go?  Those levels are pretty low.

20        So we wanted -- wanted to be protective, but we also

21  wanted to be reasonable, and, you know, there's some

22  recognition that these levels are fairly low in relation to

23  those often seen in nature, even in reference systems.

24  Q     Okay.  Let's turn to mammals for a moment.  Did the

25  Study Panel set targets for mammals?

1   A      Yes.

2   Q      What is a mammal?  How do you define a mammal?

3   A      A mammal is a vertebrate that lactates its young.

4   Q      And did Dr. Evers advise on a -- did he propose to the

5   Study Panel a -- a target or safety threshold for mammals?

6   A      Yes, yes, and the level that he recommended was

7   10 micrograms per gram fresh weight in hair or fur.

8   Q      And is that, by your prior conversion, is that equal to

9   10,000 nanograms per gram?

10  A      That's correct.

11  Q      Okay.  And do you know what the basis for that is?

12  A      There were three lines of evidence:  One was a paper on

13  stress, tolerance, and locomotion in mice; one was about

14  chemicals effects paper on -- I've forgotten the species; and

15  the other reference that Dr. Evers made was to what he said

16  was a generally accepted toxic limit in humans, which was

17  10 micrograms per gram.

18         The -- the limit on the mice paper, the lower part of

19  the range of effects on mice was, as I recall, 7.8, and then

20  there was an upper range that was somewhere slightly over 10,

21  I think 10.8.  We decided to adopt 10 because it was in line

22  with other studies and seemed like a reasonable effects

23  threshold.

24  Q      Okay.  So you adopted the 10,000 nanograms per gram wet

25  weight threshold for mammals?

1    A     Correct.

2    Q     Okay.  Now, once the Study Panel set various targets,

3    did you look at the mercury concentrations in biota relative

4    to those targets?

5    A     Correct.

6    Q     Okay.  Now, there's a series of tables in Chapter 2.

7    This is Page 2-10.  I'm not going to show you all of them, but

8    I want the court to see an example.  This is 2-10, so this is

9    Joint Exhibit 6-2.  And this is Table 2-1, which deals with

10   lobster.  Do you see that?

11   A     Yes.

12   Q     Okay.  And I just want to understand what you've done

13   here.  So you have -- in the second column over from the left,

14   you have various sampling stations from the study?

15   A     That's right.

16   Q     Okay.  So Penobscot Bay, South Verona, would be the

17   South Verona sampling site?

18   A     Yes.

19   Q     Okay.  And then you have -- incidentally, this is --

20   these are data through 2010, right?  They don't include the

21   2012 data that are -- that were set forth in the 2012

22   monitoring report?

23   A     That's correct.  The 2012 data came out after we had

24   written this chapter and submitted the Phase II Report.

25   Q     Okay.  And -- and those data are reported in a separate

1   2012 monitoring report that was --

2   A    That's correct.

3   Q    -- filed with the court; is that right?

4   A    Yes.

5   Q    Okay.

6   A    And I would note here that the means given in the third

7   column are unadjusted.  Typically in analyzing data on mercury

8   in biota in the Penobscot, we've adjusted those data for age

9   or size of the animal because, generally, as the animal gets

10  older and bigger, the amount of mercury in it, the

11  concentration of mercury in it increases.

12       We felt that if we were looking at these targets, we

13  should go back to the raw, unadjusted data, and that's what

14  these numbers are.  And I point that out because there will be

15  discrepancies between these means and means shown in other

16  parts of the report.

17  Q    And we will look at length and age-adjusted data, which

18  are reported elsewhere, when Dr. Kopec testifies.

19       But for now, why did you use the unadjusted values for

20  this purpose?

21  A    Well, those are the actual concentrations in the animals

22  that were sampled, so it seemed appropriate to do that.  The

23  adjusted values and the unadjusted values are usually not very

24  different unless the size or age of the particular sample is

25  very different from the overall mean of all the samples.

BODALY - DIRECT EXAMINATION/BERNARD

1       But we felt we should use the actual concentrations, not

2   statistical calculation -- or calculated concentration.

3   Q    If a human consumer is eating a lobster, would he or she

4   ingest the unadjusted methylmercury concentration?

5   A    If -- if you want to put it that way, yes, the con --

6   sorry.  The consumer gets what's in the animal, yes.  What --

7   the consumer doesn't get the adjusted concentration.

8   Q    Okay.  So just to go to the next column now, you have

9   total methyl -- total mercury.  And do you know how much of

10  the total mercury in the lobsters was methylmercury, in the

11  lobster tails?

12  A    Ah, I believe it was 99 percent.

13  Q    Okay.  So --

14  A    Dianne nodded at me, so, yes, that's correct.

15  Q    All right.  So just to see what you've done here, you

16  have total mercury nanograms per gram wet weight in tail, and

17  then it says means and percentage over 200.  What -- what do

18  you mean by that?

19  A    Well, we had decided in the previous section of this

20  report that 200 nanograms per gram wet weight was our target

21  based on the criteria -- possible criteria of background

22  concentrations, human consumption, any knowledge of toxic

23  effects on the animals themselves, and then through that

24  decision tree decided that our limit was 200 nanograms per

25  gram.

BODALY - DIRECT EXAMINATION/BERNARD

957

1        So I thought it would be instructive to look at the

2    percentage of the sample that was over that 200 limit.

3    Generally in this kind of work, you -- you work with means,

4    and you might say, well, for example, in South Verona, the --

5    the average concentration is 485 nanograms per gram, which is,

6    obviously, about two and a half times what your target is, but

7    I thought it would also be useful to have that information on

8    the proportion of the samples that were analyzed that were

9    over the target.

10   Q     So -- so does this notation in South Verona mean that

11   96 percent of the lobsters analyzed as of the date of the

12   Phase II Report from that station had methylmercury in their

13   tails exceeding the Maine safety standard of 200 nanograms per

14   gram?

15   A     That's correct.

16   Q     Let's turn to rock crabs for a moment.  Was there

17   sampling of rock crabs during the study?

18   A     Yes.

19   Q     And when were rock crabs sampled, if you recall?

20   A     I believe we sampled them only once, and that was in

21   2007.

22   Q     Are you sure that wasn't 2006?

23   A     I -- if you say so.

24   Q     All right.  It was 2006.

25   A     Thank you.

1          MR. BERNARD:  The record will reflect that.

2   BY MR. BERNARD:

3   Q     Let me show -- do you remember where you sampled rock

4   crabs?  Let me show you a map, and you can describe for the --

5   for the judge.  This is the Phase I Update, Joint Exhibit 5,

6   at Page 55.  And let me just show you the caption here.  It's

7   map of total mercury concentrations in rock crab.  And you see

8   there it says 2006, right?

9   A     Correct.

10  Q     Okay.  So please explain for the judge -- and let me

11  zoom back to try to get all of this in, if I can.  That's not

12  going to work.  Well, explain for the judge what this map lays

13  out.

14  A     Each of those dots, color-coded dots, are sampling sites

15  where rock crab were caught and analyzed for mercury, and

16  there are additional sites further north on this map, if you

17  could slide it down a bit, Mr. Bernard.

18  Q     I will do that.

19  A     So those are the ones further up, and I -- yeah, you can

20  keep on going.  And --

21  Q     I think that's --

22  A     -- all of these sites are south of Fort Point.

23  Q     All right.  And -- and do you remember what the thinking

24  was there, why there was no -- withdrawn.

25          Are there rock crabs north of Fort Point, farther north

1   in the estuary than is depicted on this map?

2   A    I would certainly predict that there would be.

3   Q    And do you know what the thinking was back in 2006 about

4   ending the sampling at this point, which looks like it's

5   roughly eastward of Sears Island?

6   A    I -- I think, in hindsight, the sampling should have

7   been done further north, as well, but it wasn't.  If -- if I

8   could have done this over again, I would have made sure that

9   there were more sampling stations further north.

10  Q    Okay.  And when you say further north, would that be in

11  the Verona Island to Fort Point area where you focused some

12  later -- some of the lobster sampling?

13  A    Correct.

14  Q    Do you recall how many of the rock crabs that you

15  sampled in 2006 at these more southern locations exceeded the

16  200 nano -- nanograms per gram State of Maine limit?

17  A    You mean at the more southern locations that we sampled?

18  Q    Well, just overall.  I was characterizing the stations

19  as being more southerly than the Fort Point to Verona Island

20  area you just described.

21       But do you remember how many, if any, of these rock

22  crabs were above the 200 nanograms per gram mercury limit?

23  A    I recall that none of the rock crab samples that were

24  taken further south down by Islesboro exceeded the 200

25  nanograms per gram limit, and some, but I don't think ever a

1    majority, of the samples sampled further north, up by

2    Searsport and in that area, some of those samples exceeded the

3    200 nanograms per gram.

4    Q    Let me just show you on Page 2-10, so this is Joint

5    Exhibit 6-2, something that might help you remember that.  And

6    if you look down here, see if this refreshes your

7    recollection.  And you say, the proportion of these samples --

8    and you can look above if you want to define this -- exceeding

9    200 nanograms per gram was -- it looks like -- between 25 and

10   40 percent, depending on the sampling location.

11   A    Yes, and those are the -- the four sites which were the

12   furthest north of the sites that were sampled in 2006.

13   Q    Okay.

14   A    And -- and as -- as you know from the report, the

15   concentration of mercury in rock crabs generally decreased as

16   you went further south.

17   Q    Okay.  And is that a similar pattern to the one the

18   study found in terms of lobsters?

19   A    Yes.

20   Q    Okay.  And is the increasing concentrations as you go

21   north one of the reasons that, if you were to do this again,

22   you would have sampled rock crabs more intensively in that

23   northern estuary?

24   A    Yes.

25   Q    Okay.  Let's turn to American eel, which you mentioned

BODALY - DIRECT EXAMINATION/BERNARD

961

1   before, and let me show you -- this is Page 2-12 of Chapter 2,

2   Joint Exhibit 6-2.  And this is a similar lay -- is this a

3   similar layout to the lobster table, but it just deals with

4   eels?

5   A     Correct.

6   Q     Okay.  So this is kind of a long table.  I'm not going

7   to be able to show all of it here, but let me just -- now,

8   here you've got a target of 260, and you mentioned it earlier.

9   Why did you go from 200, which is the Maine standard, up to

10  260 for eels?

11  A     We didn't think that the eels occurring in the river

12  below Veazie Dam, once the river was clean -- even if the

13  river was cleaned up completely, we didn't think that the eels

14  would come down below 260.

15        And the reason for that was that they were 260 in the

16  Old Town to Veazie reach, in other words, upstream of the

17  Veazie Dam, and we thought that was our -- our basement or

18  background concentration.

19        Based on mercury sources upstream of the Veazie Dam and

20  the food chains there and the environment there, the eels were

21  at 260, and we supposed that the eels downstream of the Veazie

22  Dam would not ever come below that 260 limit.

23  Q     How did -- how did the mercury concentrations in eels

24  downstream of the Veazie Dam compare to mercury concentrations

25  in eels in the OV reach above the dam?

1   A      They were about twice as high on average.

2   Q      In the lower river?

3   A      Yes, downstream of -- between -- we -- we were able to

4   catch eels between -- well, we were able to catch eels between

5   Brewer and Bucksport, in those reaches, Brewer to Orrington

6   and Orrington to Bucksport.

7   Q      So that would be the -- as you abbreviated them in the

8   report, the BO reach and then the OB reach?

9   A      Correct.

10   Q      Okay.  Now, here in the -- you have different stations

11   here, two in the BO reach and two in the OB reach.  I just

12   want to make clear that the -- so that the mean concentration

13   -- let's take the BO reach.  The mean concentration would be

14   498 of the eels sampled, that's nanograms per gram?

15   A      Correct, that's --

16   Q      And then --

17   A      -- total mercury.

18   Q      And then 90 percent of the eels sampled exceeded the

19   target of 260?

20   A      That's correct.

21   Q      Okay.  And then just one more station in BO4, the

22   average was 619 nanograms per gram?

23   A      Correct.

24   Q      With 87 percent of the samples exceeding the 260?

25   A      Correct.

1   Q    Okay.  And I just want to note that in the OV reach,

2   which is above the dam, you had a mean of 333, which also

3   exceeded the 260; is that correct?

4   A    Yes.  Again, the 333 would be unadjusted, and the 260 is

5   adjusted.  I'm not -- I'm not sure, to tell you the truth, why

6   260 differs from 333.

7   Q    Okay.  The -- but what is clear is that 60 percent of

8   the eels that you sampled in the OV reach exceeded the target

9   of 260.

10  A    Correct.

11  Q    Okay.  So --

12  A    If you've got a -- if you've got a mean of the sample

13  that's near your target, on average, half of the animals in

14  the mean, if it's a -- a normal distribution, are going to be

15  above the target and half are going to be below.

16       And as -- as I said earlier, you're generally using

17  means of population samples.  That's accepted in -- in -- in

18  this kind of work, and recognizing that if we got all the eels

19  down to the target of, say, 260, half those eels are still

20  going to be above the target.  But that's -- that's the

21  accepted way to do it.

22  Q    Let's move to Nelson's sparrows.  Did you look at what

23  you would need to do to get Nelson's sparrows down to the

24  target that the Study Panel set?

25  A    Yes.

BODALY - DIRECT EXAMINATION/BERNARD

964

1   Q    Okay.  Let me show you Page 2-15 on -- in Chapter 2, so

2   that's Joint Exhibit 6-2, Table 2-4.  And, again, is that a

3   similar type of site -- well, why don't you tell us what's in

4   this table.

5   A    As you say, it's the same format as the previously shown

6   tables for lobster and for eels, with the same kind of

7   information.  In this case, for Nelson's sparrows, our target

8   was 1,200 nanograms per gram wet weight in blood, or

9   1.2 micrograms per gram wet weight in blood.

10        And I list here the raw data for six sites in Mendall

11  Marsh and W17, which is a wetland just north of Mendall Marsh,

12  for 2006 and 2010.  These are all adults, which, in the bird

13  business, is defined as after hatch year, and that's noted

14  there.

15        You can see that the means ranged from about 3 to about

16  5,000 nanograms per gram, obviously, much higher than the

17  reference sites that were compared, and shows our target

18  concentration of 1,200 nanograms per gram and provides the

19  assessment that these levels would have to come down about

20  75 percent to get the means in the samples down to the target

21  concentrations.

22        So these are much greater reductions needed to get down

23  to the target for toxic effects than in other species that

24  we've been talking about, like eels or -- or rock crab or --

25  or lobster.

BODALY - DIRECT EXAMINATION/BERNARD

965

1   Q      Did you look at other bird species, as well?

2   A      Yes, we looked at swamp sparrows, song sparrows,

3   red-winged blackbirds, and Virginia Rails.

4   Q      Okay.  And they're reported here.  Now, this says --

5   just for the record, this says Table 3-5.  Is that a typo?

6   A      Ah --

7   Q      It's Chapter 2.

8   A      Yes.

9   Q      Okay.

10  A      It should be 2-5.

11          MR. BERNARD:  Your Honor, this is one of those

12  errors that's corrected in an errata sheet at the back of

13  Chapter 2 in the exhibit book.

14          THE COURT:  All right.  Thank you.

15  BY MR. BERNARD:

16  Q      So this should be Table 2-5.  And just -- let's not go

17  through every species, but I'd like you to just describe to

18  the court, please, what you found for the red-winged blackbird

19  and what you found for the Virginia Rail.

20  A      First, the red-winged blackbird shows -- um, this

21  table's set up differently than the other ones.  In this

22  table, I used the second column to provide background

23  concentrations, rather than putting them on different lines,

24  as I did on previous tables.  So this shows two entries for

25  background concentrations for red-winged blackbirds.

BODALY - DIRECT EXAMINATION/BERNARD

966

1          We did some sampling ourselves in a reference marsh

2     called Spurwink in Maine, and we also got some data from the

3     literature in the Meadowlands in New Jersey.  So that provides

4     a reference for the concentrations in the Penobscot, which

5     are, obviously, as you can see in the third column, much, much

6     higher than the reference sites.

7          And we had data for red-winged blackbirds from eight

8     different sites.  I believe most of those were in Mendall

9     Marsh, and those in -- that includes W17, as well.  And

10    similar to the Nelson's sparrow, the levels of mercury in the

11    red-winged blackbirds would require reductions of up to

12    80 percent to get them down to the target concentration of

13    1,200 nanograms per gram wet weight in blood.

14         And which other species did you want me to go through?

15    Q     Just the Virginia Rail, the one below it, please.

16    A     Virginia Rail?  Okay.  That's shown in the bottom of the

17    table.  We had two reference sites in -- shown in the second

18    column, which were from our own sampling.  They were clean,

19    uncontaminated reference sites.  And we had Virginia rails

20    from ten sites that we sampled ourselves in the contaminated

21    zone of the Penobscot River.

22         You can see that the Virginia Rail are about an order of

23    magnitude, or ten times, higher than -- the Virginia rail in

24    the contaminated zone of the Penobscot are about an order of

25    magnitude, or ten times, higher than the reference sites that

1   we sampled in Maine, and that they would require reductions of

2   about 70 percent to come down to the target concentrations of

3   1,200 nanograms per gram.

4        So if -- if you -- if you're trying to get down to a

5   concentration that you think is going to protect the birds

6   from toxic effects, the three species -- Virginia Rail,

7   red-winged blackbird, and Nelson's sparrows, which we talked

8   about previously -- are -- are going to require you to get

9   them down by about three-quarters.

10  Q    Let me show you one final table on Page -- it runs over

11  from Page 2-18 to 2-19.  And just really this is for the

12  court's reference.  Is this a summary table of the -- of the

13  tables we've been going over?  Do you recall?

14  A    Yes.

15  Q    Okay.  And so you have a species on the left, and then

16  you have a type of habitat in the middle, and then you've kind

17  of summarized the percentage reductions in current

18  methylmercury levels that would be required to meet the

19  targets that the Study Panel set?

20  A    Correct.

21  Q    Okay.

22       MR. BERNARD:  So, Your Honor, we've gone over these.

23  I just wanted you to know that there was a summary there.

24  BY MR. BERNARD:

25  Q    And let me just ask you one thing that we didn't go

BODALY - DIRECT EXAMINATION/BERNARD

1    over, which is the black ducks, which is listed on Page 2-19,

2    which is the carryover of Table 2-6.  What did you find with

3    regard to black ducks, Dr. Bodaly?

4    A    We looked at levels of mercury in the blood of black

5    ducks, and quite similar to other birds that were feeding in

6    Mendall Marsh and other wetlands, a reduction of about three-

7    quarters, 75 percent, would be required to get the black ducks

8    down to a -- a level that was thought to provide protection

9    for the birds.

10        We -- we tried to set a toxic threshold for the muscle

11   -- for mercury in the muscle of the black ducks, and there

12   just wasn't very much information in the literature.  We

13   eventually decided that any sort of limit there would probably

14   be too much speculation and wouldn't -- wouldn't be based on

15   enough solid data.  So we decided not to set a limit, and at

16   least, in part, because we did have bird -- or blood data for

17   black ducks, in fact, we had more because you can get blood

18   samples from them without causing the bird to die.  So we had

19   more data for the blood in black ducks than we did for the

20   muscle.

21   Q    Did you examine the relationship between mercury in

22   blood and mercury in muscle in black ducks?

23   A    Yeah, and I -- as I recall, it was -- looked pretty

24   good, as we'd expect.

25   Q    Pretty good meaning what?

BODALY - DIRECT EXAMINATION/BERNARD

1   A     A good correlation.

2   Q     And just to confirm, one advantage in sampling blood

3   rather than muscle in black duck is that the animal can

4   survive?

5   A     Yes.  Um, almost all the sampling of songbirds was done

6   by capturing the birds alive, um, making an assessment of the

7   bird, including age and -- and size of the bird, weight,

8   things like that, taking feathers as samples, which did not

9   harm the bird, and taking blood samples, which allowed the

10  bird to be released back.

11        There was a very small number of birds that died in the

12  sampling, but that was quite unusual.

13  Q     Does -- in your view, Dr. Bodaly, does the information

14  reported on the chart -- the table I just showed you, the

15  summary table, 2-6, and you look in the right-hand column, and

16  you look at those percentage reductions that the Study Panel

17  calculates are needed to get these animals down to safe

18  levels, either for human health or for the animals themselves,

19  do you think this information and the percentage reductions

20  set forth in the table provide an impetus for active

21  remediation?

22  A     Yes, yes.

23  Q     Why?

24  A     Well, I think they're based on defensible threshold

25  concentrations for toxic effects and defensible concentrations

1    for human health effects, or -- and in the case of the eels,

2    on -- on what's reasonable for background concentrations or

3    what you might be able to get down to.

4         So I think they are solidly-based and reasonable

5    reduction targets.  I feel comfortable with them.

6    Q    To your knowledge, has there been a trend over the last

7    decade or two in the scientific research regarding at what

8    level of mercury contamination adverse effects are found in

9    aquatic organisms?

10   A    Very definitely, and that trend has been quite dramatic

11   in the last ten years or so.  New -- as new studies come out,

12   the level of methylmercury that has been established to cause

13   toxic effects keeps going down, and as our ability to assess

14   those effects increases and as the -- I think the

15   sophistication of the studies improves, we are seeing levels

16   that are going down.

17        And it's a -- it's an argument that you can make, and

18   certainly Dr. Wiener makes it, I think quite elegantly, in his

19   depositions -- and you will hear from him -- that, in his

20   mind, this is a very important consideration that -- that we

21   should be thinking conservatively about these limits because

22   almost certainly future studies will lower them even lower

23   than they are now.

24   Q    Why do you say that with such confidence?

25   A    Ah, because they've gone down so rapidly in the last

1    decade or 15 years.  I think there's -- there's no reason not

2    to believe that they won't be lower in another 10 years.

3    Q    You heard some testimony last week -- you were in court

4    last week, weren't you?

5    A    I was.

6    Q    Okay.  And you heard testimony about sublethal effects?

7    A    Yes.

8    Q    Okay.  And -- and, just briefly stated, what are

9    sublethal effects?

10   A    I guess I would call a sublethal effect one that impacts

11   or harms an animal, but does not kill it.

12   Q    And in your view, can sublethal effects cause

13   significant adverse harm?

14   A    Yes, absolutely.

15   Q    Please, could you elaborate on that?

16   A    Well, a sublethal effect that, for example, impairs

17   reproductive success, but does not kill the adult bird, can be

18   important in the size of the population or even maybe whether

19   a population can exist in a contaminated area.

20        We -- studies have consistently shown that the impact of

21   methylmercury on adult animals is relatively slight.  In other

22   words, it takes a lot of methylmercury to impact, or

23   especially to kill, an adult animal.  It takes a lot less

24   methylmercury to cause effects on reproduction or behavior or

25   -- and there's certainly even more subtle effects than that.

BODALY - DIRECT EXAMINATION/BERNARD

972

1        The -- and that was -- that's true for people, too.  We

2   heard -- we heard all day today that we are much less

3   concerned about the impact of methylmercury on adults, and

4   maybe even children, as we are in the developing fetus, in

5   other words, a reproductive effect, and that's certainly true

6   of -- of animals in the wild, as well.

7        The -- the biochemical effects you mention are a little

8   more controversial, and they haven't yet really been put into

9   context of whether they will be causing reproductive

10  impairment, for example, in wild populations.  I think -- I

11  think that's, at least partly, due to the fact those studies

12  are just getting under way, we're just starting to learn how

13  to do those kind of studies, and I think we'll understand more

14  in the future.

15       But I would note that all of the toxic limits that we

16  set and derived in Chapter 2 are based, at least in part, on

17  reproductive effects.  None of them are based solely on

18  biochemical effects, and by biochemical, I mean, brain enzyme

19  or level of a hormone or some sort of something that affects

20  -- an indication of stress levels or something, a biochemical

21  effect in the animal of the bod -- or the body of the animal.

22       So all of our limits were based on -- on at least

23  reproductive effects and not just solely biochemical effects.

24            MR. BERNARD:  Okay.

25            THE COURT:  Good place to stop?

 1              MR. BERNARD:  Yes.

 2              THE COURT:  So --

 3              MR. BERNARD:  Can we talk about schedule for just a

 4      moment?

 5              THE COURT:  Sure.

 6              MR. BERNARD:  Okay.  I would say that I have maybe

 7      30 minutes more of direct with Dr. Bodaly in the morning.  I

 8      don't know how long Mallinckrodt will have on cross.

 9          Dr. Geyer is coming up from Woods Hole tomorrow, and he's

10      the author of Chapter 7.

11              THE COURT:  Okay.

12              MR. BERNARD:  And he has to leave at the end of the

13      day tomorrow.  We -- we've -- you know, we've been juggling,

14      as you can imagine, and trying to fit everybody in.

15              THE COURT:  Right.

16              MR. BERNARD:  And I'm wondering -- we won't have

17      very long on direct with Dr. Geyer, but depending on when he

18      starts and how much Mallinckrodt has, I really would like to

19      finish him tomorrow so that we can let him go because he's got

20      a -- he's got a scheduling problem after tomorrow.

21          And so I'm wondering if -- if we don't finish by 2:30, I

22      don't know if tomorrow is one of the days when Your Honor

23      might be able to sit long --

24              THE COURT:  It's going to be a tough day.  I've got

25      a sentencing at 3:00 --

1          MR. BERNARD:  Okay.

2          THE COURT:  -- tomorrow, and, unfortunately, it's a

3     sentencing that's going to take a little time.

4          MR. BERNARD:  Okay.  Well, we'll -- then we'll do

5     the best we can to move along and finish both Dr. Bodaly and

6     Dr. Geyer, if we can, tomorrow.

7          THE COURT:  All right.

8          MR. TALBERT:  Your Honor, one question, too, just a

9     housekeeping matter regarding the parties have exchanged

10    demonstrative and -- and -- within the exhibit list, as well,

11    and have been discussing potential objections to those, and to

12    the extent that we are unable to reach a resolution on all of

13    them, I just wanted to raise procedurally how you would like

14    to handle that, if we should bring those to your attention.

15         THE COURT:  Well, you're talking about

16    demonstratives.  Demonstratives don't get into evidence

17    anyway.  They're just demonstratives.

18         MR. TALBERT:  I -- I think really -- I think

19    spanning into the issue of -- once the demonstratives were

20    exchanged, there are some opinions that may respond to

21    something that, for example, a Study Panel member, you know,

22    submitted after a deposition, and, you know, one of our

23    experts is -- you know, wants to say it doesn't change their

24    opinion, in any event.

25         So it would -- it would be a discussion that would lead

BODALY - DIRECT EXAMINATION/BERNARD

975

1    from, you know, whether it's an appropriate demonstrative, or

2    whether the subject matter itself is appropriate.

3             MR. BERNARD:  Your Honor, we're meeting at 2:30 to

4    go through the demonstratives and our objections to them and

5    see how many of them -- hopefully, all of them -- we can

6    resolve with the defendant.  So I suggest that we maybe take

7    this up in the morning when we know what we're dealing with.

8         But, briefly, we got -- we were served with 200 pages of

9    demonstratives the Sunday before trial began, and some of them

10   suggest new opinions by the defendants' experts that were not

11   previously disclosed and weren't the subject of any

12   supplemental disclosure under Rule 26.  And that's our

13   fundamental problem.

14        We're going to try to work that out this afternoon with

15   Mallinckrodt, and we'll try to at least limit, if not

16   eliminate, the number of disputes, and maybe we should do that

17   before we burden the court.

18            THE COURT:  Right.  Well, just keep in mind that,

19   first, it's a bench trial, and, second, that any demonstrative

20   exhibit is an exhibit which is purely demonstrative and

21   subject to the validity and admissibility of the underlying

22   evidence.  If the underlying evidence is not admitted, then

23   the demonstrative is not very demonstrative.

24            MR. BERNARD:  Understood.

25            THE COURT:  All right?  Is there anything further?

1        You may stand down, sir.

2          (The witness left the witness stand.)

3              THE COURT:  Thank you.

4              THE WITNESS:  Thank you.

5              THE COURT:  Is there anything further?

6              MR. BERNARD:  Not from the plaintiffs.

7              THE COURT:  Anything further?

8              MR. TALBERT:  Nothing further, Your Honor.

9              THE COURT:  Okay.  Thank you.

10         (Proceedings concluded at 2:35 p.m.)

11                         CERTIFICATION

12       I certify that the foregoing is a correct transcript from

13  the record of proceedings in the above-entitled matter.

14

15

16  /s/ Julie G. Edgecomb_____          June 9, 2014_____
    Julie G. Edgecomb, RMR, CRR          Date
17  Official Court Reporter

18

19

20

21

22

23

24

25