1           UNITED STATES DISTRICT COURT

2               DISTRICT OF MAINE

3   MAINE PEOPLE'S ALLIANCE        )
    and NATURAL RESOURCES          )
4   DEFENSE COUNCIL, INC.,         )
                                   )
5            Plaintiffs            )
                                   )              CIVIL ACTION
6                                  )
         vs.                       )    Docket No. 1:00-cv-00069-JAW
7                                  )
                                   )              BENCH TRIAL
8   HOLTRACHEM MANUFACTURING       )
    and MALLINCKRODT LLC,          )
9                                  )
             Defendants.           )
10

11                  VOLUME VI

12            TRANSCRIPT OF PROCEEDINGS

13      Pursuant to notice, the above-entitled matter came on

14  for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15  Chief District Judge, in the United States District Court,

16  Bangor, Maine, on the 10th day of June, 2014, at 8:35 a.m.

17  APPEARANCES:

18  For the Plaintiffs:              Mitchell S. Bernard, Esquire
                                     Aaron S. Colangelo, Esquire
19                                   Rachel E. Heron, Esquire
                                     Jared J. Thompson, Esquire
20
    For the Defendants:              Patricia H. Duft, Esquire
21                                   Sigmund D. Schutz, Esquire
                                     Jeffrey D. Talbert, Esquire
22

23                  Julie G. Edgecomb, RMR, CRR
                      Official Court Reporter
24

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer.

INDEX OF PROCEEDINGS

Page:

Testimony:  (see below)

INDEX OF WITNESSES

Page:

RICHARD ANDREW BODALY  (called by Mr. Bernard)

Continued Direct Examination by Mr. Bernard          981
Cross-Examination by Mr. Talbert                     999
Continued Cross-Examination by Mr. Talbert          1051
Redirect Examination by Mr. Bernard                 1130

WAYNE R. "ROCKY" GEYER  (called by Mr. Bernard)

Direct Examination by Mr. Bernard                   1143

INDEX OF EXHIBITS

| Joint Exhibit No. | Description | Offered | Admitted |
| --- | --- | --- | --- |
| 76 | Depew, et al., Toxicity of Dietary Methylmercury to Fish | 980 | 981 |

| Defendants' Exhibit No. | Description | Offered | Admitted |
| --- | --- | --- | --- |
| 36 | E-Mail from Kopec to Bodaly | 1081 | 1081 |
| 76 | E-Mail from Kopec to Bodaly | 1030 | 1030 |
| 78 | E-Mail from Kopec to Bodaly | 1036 | 1037 |
| 79 | Dianne Kopec's Notes | 1037 | 1037 |
| 109 | E-Mail from Bodaly to Kopec | 1112 | 1112 |
| 139 | E-Mail from Kopec to Bodaly | 1103 | 1104 |
| 140 | Outline of Introductory Section for Mercury in Biota Chapter | 1103 | 1104 |
| 153 | E-Mail from Bodaly to Kopec | 1103 | 1103 |
| 201 | E-Mail from Hintelmann to Bodaly | 1060 | 1060 |
| 202 | Notes from Phase I Update | 1060 | 1060 |
| 268 | E-Mail from Bodaly to Rudd | 1106 | 1106 |
| 283 | E-Mail from Fisher to Bodaly | 1117 | 1118 |
| 371 | Notes Stable Isotope Data | 1060 | 1061 |
| 377 | E-Mail from Bodaly to Hintelmann | 1060 | 1060 |
| 378 | E-Mail from Bodaly to Mason | 1117 | 1118 |
| 381 | E-Mail from Rudd to Fisher/Bodaly | 1117 | 1118 |
| 382 | E-Mail from Bodaly to Hintelmann | 1060 | 1060 |
| 391 | E-Mail from Bodaly to Fisher | 1052 | 1053 |
| 509 | E-Mail from Santschi to Kelly | 1115 | 1115 |
| 549 | E-Mail from Bodaly to Rudd/Kelly | 1115 | 1115 |

| | | | | |
|---|---|---|---|---|
| 1 | 550 | Report on Grain Size | 1115 | 1115 |
| | 565 | NOAA Data re Narraguagus | 1009 | 1009 |
| 2 | 649 | E-Mail from Bodaly to Kopec | 1082 | 1082 |
| | 805 | Heinz, et al., Species Differences | 1051 | 1051 |
| 3 | | | | |
| | 892 | ECF No. 320 | 1117 | 1118 |
| 4 | 895 | ECF No. 368 | 1054 | 1054 |
| | 900 | ECF No. 426 | 1121 | 1121 |
| 5 | 902 | ECF No. 439 | 1121 | 1121 |
| | 905 | ECF No. 462 | 1075 | 1075 |
| 6 | 910 | ECF No. 485 | 1121 | 1121 |
| | 915 | ECF No. 510 | 1121 | 1121 |
| 7 | 920 | ECF No. 521 | 1121 | 1121 |
| | 921 | ECF No. 522 | 1121 | 1121 |
| 8 | 947 | ECF No. 741 | 1117 | 1118 |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

1          (Counsel present in open court.)

2          (Richard Andrew Bodaly, having been previously duly

3     sworn, resumed the witness stand.)

4               THE COURT:  Good morning.  I gather the public

5     display screens are not working, so I apologize for members of

6     the public who have been following along, but they're working

7     on it.  They just can't figure out what's -- what the matter

8     is.

9          Just in terms of scheduling, I -- I wanted you to know

10    that I looked at the schedule.  I think what happened is you

11    will recall that the matter was actually set for last month,

12    and so -- and was continued for good reason, but because of

13    that, there are all sorts of criminal matters scheduled.  And

14    I have a criminal matter, at least one or two criminal

15    matters, every single day from now until the end of June.

16         So I usually have flexibility, but I just don't have any

17    flexibility for you.  I'm sorry about that.

18              All right.  Are we ready to proceed?

19              MR. BERNARD:  I am, Your Honor.

20              THE COURT:  Good.  Please proceed.

21              MR. BERNARD:  Your Honor, yesterday I showed the

22    witness Joint Exhibit 76, which is that Depew article that we

23    discussed, and I don't think I offered it into evidence and

24    would like to do so now.

25              THE COURT:  Okay.  Any objection?

1          MR. TALBERT:  No objection.

2          THE COURT:  Who -- 76 is admitted without objection.

3                CONTINUED DIRECT EXAMINATION

4   BY MR. BERNARD:

5   Q    Dr. Bodaly, good morning.

6   A    Good morning.

7   Q    Did you expend study effort on determining regional

8   background concentrations of mercury?

9   A    Yes, we did.

10  Q    And are those efforts written up in Chapter 17 of the

11  Phase II Report?

12  A    Yes, they are.

13  Q    And are you the author of that chapter?

14  A    I was the first author.

15          MR. BERNARD:  Your Honor, that's Joint Exhibit 6-17.

16  BY MR. BERNARD:

17  Q    Dr. Bodaly, do -- do all natural systems contain some

18  amount of mercury?

19  A    Yes, mercury is a naturally-occurring element in the

20  environment.  It comes from weathering of the earth's crust

21  and from volcanos and degassing from the ocean and lakes.

22          In addition to that, in remote areas, i.e., areas

23  without any point sources of mercury, there have been, since

24  the beginning of industrial times, increased atmospheric

25  deposition of mercury, and in the northern hemisphere, that's

1    generally been about two to -- it's brought the level of

2    atmospheric deposition up to about two or three times what it

3    was before industrial times.

4         So, yes, even in areas that are pristine, away from

5    human settlement or industrial activity, there is mercury in

6    the environment.  And usually when we're trying to define what

7    we're often calling background concentrations, what we're

8    trying to define are those concentrations in areas that are

9    away from significant human activity, and that's what we

10   defined in our work on Chapter 17.

11   Q    You mention the term point sources.  What -- what does

12   that refer to?

13   A    I just meant by that any particular source of mercury

14   that goes into, in our case, of course, a river from a

15   particular point, and it would be a human -- some sort of

16   human activity, a sewerage treatment plant, for example.

17   Q    Or a chemical or industrial facility?

18   A    Yes, of course.

19   Q    What -- could you give the court an example, please, of

20   what a source is of atmospheric deposition?

21   A    There are a very great number.  Right now in the

22   northern hemisphere, the biggest source is probably coal-fired

23   power plants.  There are trace amounts of mercury in all

24   fossil fuels, but especially in coal.  Mercury is used much

25   less now in industrial processes than it used to be.  It used

BODALY - CONTINUED DIRECT EXAMINATION/BERNARD

1    to be used a lot in switches, but now they're solid state.

2    Used to be used in batteries, but most batteries now are

3    mercury-free.

4         So there are -- there are many sources -- hospital

5    waste, crematoriums, things like that.

6    Q    What are the reasons that the Study Panel sought to

7    establish a regional background concentration for mercury?

8    A    We recognized that it would not be practical for us to

9    recommend remediation targets for mercury and sediments or

10   biota that were below the regional background, that no matter

11   what you did to the river, no matter how pristine you could

12   get it, you weren't going to get it below the regional

13   background.  And we felt we should establish that regional

14   background, and that was a consideration in formulating

15   targets for remediation.

16   Q    Does regional background also give you a benchmark from

17   which to measure whether sediment mercury in the lower

18   Penobscot is elevated?

19   A    Yes, that was part of the examination of the amount of

20   elevation of the sediments in the Penobscot.

21   Q    Okay.  Where did you -- did you -- withdrawn.

22        Did you sample in order to obtain data to estimate or

23   calculate a regional background?

24   A    Yes, we did.

25   Q    Okay.  Let me show you Plaintiffs' Exhibit 33.

1              MR. BERNARD:  Let me offer this into evidence, if
2    it's not already in.  I believe it is.  This is a figure
3    from --
4              THE COURT:  I think 33 is in.
5              MR. BERNARD:  It is in?  Okay.
6              THE COURT:  Is that correct?
7              MR. BERNARD:  So here's 33.
8              THE COURT:  No, it's not in.
9              THE CLERK:  I'm sorry.  I'm looking at Defendants'.
10             MR. BERNARD:  So this would be Plaintiffs' 33.
11             THE CLERK:  Yes, it is.
12             THE COURT:  Plaintiffs' 33 is in.
13   BY MR. BERNARD:
14   Q    Okay.  Here is Plaintiffs' 33 in evidence.  Dr. Bodaly,
15   do you recognize this chart?
16   A    Yes, I do.
17   Q    Okay.  Please tell the court what it shows.
18   A    This is a map of the Eastern Maine coast.  It shows the
19   different reaches that we established in the Penobscot River
20   and Penobscot Bay for sampling.  It also shows two of the
21   reference estuaries that we sampled -- the Narraguagus and the
22   St. George.  The third reference estuary that we sampled was
23   the Sheepscot, which is further west.
24   Q    And is not depicted on the map?
25   A    Correct.

BODALY - CONTINUED DIRECT EXAMINATION/BERNARD

985

1    Q    And what is the East Branch up at the top of the figure?

2    A    The East Branch is what we established in Phase I of the

3    study as an internal reference within the Penobscot River.  We

4    were initially thinking that, to make comparisons between the

5    Penobscot and background concentrations, it would be ideal to

6    have a reference river, and after looking at all the potential

7    candidates in the state of Maine and -- and nearby, we

8    realized that there weren't any rivers of any at all

9    comparable size to the Penobscot that were pristine.  Rivers

10   like the Androscoggin, the Kennebec were known to be

11   contaminated with mercury, not to the degree that the

12   Penobscot is, but -- so we abandoned that and set up the

13   system or the division of the Penobscot into these reaches.

14        The East Branch was upstream of any appreciable human

15   settlement.  No -- it had no industrial activity.  So it was

16   kind of an internal control or reference for the Penobscot.

17   Q    Did you actually go up and see the East Branch?

18   A    Oh, yeah.  It was sampled regularly in the first seven

19   sampling periods in 2006, 2007.  It wasn't easy to sample

20   because it was pretty -- it was shallower and rocky, but the

21   people from Normandeau managed.

22   Q    Normandeau is a contractor who conducted sampling?

23   A    Correct.

24   Q    Let me show you a barchart, which is Page 17-6 of the

25   Phase II Report, so this is Joint Exhibit 6-17.  And let me

1    see if I can zoom in on that just a little bit.  And does this

2    depict -- what does this depict, Dr. Bodaly?

3    A      This graph shows the total mercury concentrations on a

4    nanogram per gram dry weight basis in the top 3 centimeters of

5    surface sediments in -- at a number of sites.  Obviously, they

6    are ordered in an artificial way.  And starting on the left is

7    the concentration of mercury in a core we took in Fort Point

8    Cove, which was D-01.  This really represented the

9    preindustrial concentration of mercury in the area; in other

10   words, these slices were very deep in the core.  I recall they

11   were the late 1800s.  So this is before there is appreciable

12   amount of additional mercury coming down from the atmosphere.

13         So this is not -- this is an interesting comparison, but

14   it's not the present-day reference or background.

15         The next ones -- the Narraguagus, St. George, and the

16   Penobscot East Branch -- are sites that we sampled to

17   establish the regional background.  And -- and judging by the

18   concentrations in them, we now have confidence that they are

19   at the regional background.

20   Q      Dr. Bodaly, you -- just for a moment, you have, by the

21   Narraguagus and St. George, a notation called subtidal for

22   three of the sites and intertidal for two of the sites.  Could

23   you please explain what that stands for?

24   A      Ah, subtidal just means sediments at the bottom of the

25   estuary, which are below the level that the tide would ever go

BODALY - CONTINUED DIRECT EXAMINATION/BERNARD

1    to, so they are never uncovered from water.

2        Intertidal just means in the zone between the low tide

3    and the high tide.  So they sometimes have water on them, and

4    sometimes they're exposed to the air.

5        The next one is Penobscot E-05, and that's a transect we

6    did way out in Penobscot Bay, and it -- down by Vinalhaven.

7    You can see it's a little bit higher than the Narraguagus, St.

8    George, at least some of those samples, but it's -- it's

9    pretty low by the time you get way out there.

10       The next are the Sheepscot, we sampled it with the

11   expectation that it might be also helping to establish the

12   regional background.  As you can see, those two samples are

13   much higher than the other truly background areas, and we did

14   not use that as part of the calculation of a regional

15   background.

16       And, likewise for OV, so OV is the Old Town to Veazie

17   reach, so it's the area immediately upstream of the Veazie

18   Dam.  It's outside of the aquatic influence of HoltraChem, and

19   you can see it's -- it's noticeably higher than the other

20   background sites.  And, of course, it has pulp mills upstream,

21   it has settlements, and it looks like it has received a modest

22   amount of mercury from at least some sources up there.

23       You can put the whole thing in perspective by noting

24   that the highest level there is around 150 nanograms per gram,

25   whereas the contaminated sediments in the Penobscot are around

BODALY - CONTINUED DIRECT EXAMINATION/BERNARD

988

1    850, or somewhere in that range, so way off this chart.

2    Q     Did you use the OV reach in calculating your regional

3    background?

4    A     We didn't think that was appropriate, so, no, we didn't.

5    Q     And -- and so now you've said that you didn't use either

6    the Sheepscot or the OV reach.  And why did you decide not to

7    use those concentrations?

8    A     We felt they were outside of the range of what the other

9    sites showed to be the regional background.

10   Q     Okay.  So what -- I mean, we can look at the chart,

11   and -- and we see that horizontal line of about 50.  But

12   what -- do you remember what value or range you assigned to

13   the regional background for surface sediments?

14   A     I recall 55, although it looks like the mean should be

15   lower than that, but --

16   Q     Now --

17   A     -- somewhere in that area.

18   Q     Now, did the Study Panel ultimately fix a recovery level

19   or a -- a mercury concentration, a level to which it believes

20   the lower river will recover over time?

21   A     Yes.

22   Q     What is that?

23   A     We felt it would probably come down to about a hundred.

24   Um, the reason for that is that the OV reach was sitting at

25   around a hundred, and there seemed to be enough in the way of

1   sort of general regional sources and point sources that we

2   didn't think that the lower river would come down any lower

3   than about a hundred.

4   Q    Okay.  You write in the -- in Chapter 17 that the

5   baseline for mercury in sediments that you used to derive

6   regional background is very robust.  What do you mean by that?

7   A    I guess -- I don't recall writing it, but I guess it

8   meant that we felt that it -- it was based on a reasonable

9   number of samples, and we had some confidence in it.

10  Q    And you have samples from outside the Penobscot, as well

11  as within the -- the Penobscot?

12  A    Yeah, and -- and we had the NOAA definition of

13  background, which is 51.  So it fit pretty much right in

14  there.  And, of course, we looked at other systems, both

15  natural and contaminated, and compared those values, and it

16  seemed to be consistent.

17  Q    Going back to -- this is kind of the combination of

18  Chapters 2 and 17, but to what level is the Study Panel

19  proposing to reduce mercury in surface sediments in the main

20  stem of the river?

21  A    We -- we felt that they should come down to about half

22  of what they are now to protect human -- risk to human

23  consumers and risk to animals living in the river.  So if

24  they're 850 now, maybe 425, somewhere in that range.

25  Q    And is that around four times the level that you believe

1    the river will recover to ultimately on its own as a

2    background value?

3    A     That's correct.

4    Q     And is it around eight times of the background that you

5    calculated as reflected in this Figure 17-2 that we've been

6    discussing?

7    A     It's eight times the background that we felt the lower

8    Penobscot would eventually come down to if left for long

9    enough, and it's about ten times the regional background in --

10   in the region of Eastern Maine.

11   Q     I want to ask you a few questions about stable isotopes.

12   Do you recall the mercury stable isotope work that the Study

13   Panel undertook?

14   A     Yes, I do.

15   Q     And do you remember your deposition last fall in

16   Vancouver?

17   A     Yes.

18   Q     And did you testify during the deposition -- during the

19   first day of the two-day deposition that you had written a

20   summary of the mercury stable isotope data but had forgotten

21   to include it in the Phase I Update Report?

22   A     Yes, I did testify to that.

23   Q     And were you corrected the following day?

24   A     Yes.

25   Q     And what was the correction?  Do you recall?

1    A     The correction was that I was shown an e-mail from, I

2    believe, John Rudd and the rest of the panel which said the

3    decision had been made not to include that as a chapter in the

4    Phase I Update Report, and I had forgotten that.

5    Q     Okay.  Now, did you review the expert report of

6    Mr. Vaillancourt, who's one of defendants' experts?

7    A     Yes.

8    Q     And did you read what he wrote about the Study Panel's

9    decision not to include the stable isotope data in its written

10   report to the court?

11   A     Yes, I believe he wrote that it was not included because

12   the results were not consistent with what Dr. Rudd wanted,

13   and, therefore, it was left out.

14   Q     Is that what happened?

15   A     No.

16   Q     What did happen?

17   A     Ah, I was asked to write a draft of that chapter, which

18   I did, and the plan was to include it in the Phase I Update

19   Report.  The -- in the meantime, Dr. Rudd was working

20   Dr. Hintelmann at Trent University and Dr. Santschi at Texas

21   A&M to try to resolve the question of what the data meant and

22   whether we could make anything out of it.

23         The answer from them was, you don't have any hope of

24   figuring out this data set and -- and making it interpretable.

25   There were too many unknowns.  I think we were -- when we did

1    the first sampling in 2006, we only did six samples, and they

2    seemed to show promise of being able to differentiate sources

3    of mercury by their mercury stable isotope ratios.  So we took

4    more samples, and it just got muddier and muddier.

5         Then we tried to get an idea of what was coming -- what

6    had been used on the HoltraChem site in terms of mercury and

7    its stable isotope ratios.  We failed to get those samples.

8    Drs. Hintelmann and Santschi just said, you aren't going to be

9    able to figure this out.

10        And the -- the other consideration -- and I noticed that

11   Mr. Bigham commented on this in his report for the

12   defendants -- was that this was early days for mercury stable

13   isotope research in the environment.  We were trying to do

14   something when it wasn't really very well known.  There's been

15   a fair amount of work done since then, but it's, in fact,

16   still early days in terms of learning about fractionation and

17   the environment, how isotopes change.

18        Mercury's very complicated.  It's got seven stable

19   isotopes.  They fractionate mass dependent and they

20   fractionate mass independent and -- which I don't even

21   understand, and this was just getting too complicated.  And

22   the samples are 500 bucks each to run them through the mass

23   spectrometer.  So this was something that we decided to drop

24   in terms of following up the research.

25        I think looking back, obviously, not including at least

1    the data in the report was a mistake.  It looked like we were

2    hiding it; we weren't; that was not our motivation.  But I

3    think we should have at least had an appendix somewhere that

4    put the data in.  My attempt to write it up, now that I read

5    back on it, was pretty lame, pretty feeble.  I didn't have

6    much experience with mercury stable isotopes.  So that's my

7    view of what happened.

8    Q    Were all the data turned over to the parties --

9    A    Yes.

10   Q    -- during the discovery process?

11   A    Yes, as part of -- as part of the requests from the

12   court at various points in times, we were asked to give all

13   data to the defendants, and we, of course, did that.

14   Q    And to the plaintiffs, as well?

15   A    Yes, pardon me.

16   Q    Okay.  I think you said you started working on the study

17   in 2006?

18   A    Yeah, February 2006, yes.

19   Q    So during those eight-plus years, did you see any

20   evidence that any member of the Study Panel set out to prove

21   any point?

22   A    No, I would say completely the opposite.  When I was

23   brought on as project leader, I -- I wondered how that would

24   be.  I knew that Dr. Whipple was appointed by the defendants;

25   I knew that Dr. Fisher was appointed by the plaintiffs; I knew

1    that Dr. Rudd was chosen by the two panel members to be the --

2    the chair, presumably the deciding vote in cases of

3    differences.  And I wondered to what degree the -- the

4    appointees of the plaintiffs and the defendants would ever

5    take a point of view or -- or, as you say, try to prove a

6    point.

7         I never once heard Dr. Whipple say, I was appointed by

8    the defendants, and I think we are going in the wrong

9    direction here.  We need to take into account the defendants'

10   point of view.  And I never once heard Dr. Fisher say, I'm

11   here on the recommendation of the plaintiffs, and I think

12   we're being unfair to the plaintiffs' side or -- or, you know,

13   we've got to find a way to, you know, make sure the company

14   pays for cleanup or anything like that.

15        These people are all highly-principled, very experienced

16   scientists with very good track records, well-published,

17   well-regarded.  I assume that's why they were appointed, and I

18   think they lived up to it.  And their motivation and my

19   motivation was to do good science, to do objective science.

20        We always reminded ourselves that we were appointed by

21   the court and that we were working for the court and that we

22   were independent of the -- the plaintiffs and the defendants.

23   And we were science people, and we were trying to do good

24   science and to find out what was out there.  And we set up the

25   sampling plans, we set up the study plan, statistical

1    analysis, consideration of data, you know, drawing conclusions

2    from the data on the basis of what the data told us, not on

3    the basis of what we were trying to prove or which side we

4    were trying to favor.  It was never like that.

5    Q     What do you deem to be the principal findings of the

6    Penobscot River Mercury Study?

7    A     I would say our principal findings in terms of the data

8    we collected are that the Penobscot is significantly

9    contaminated with mercury.  The contamination is relatively

10   extensive, it extends from, in present-day terms, in other

11   words, surface sediment concentrations, extends from about

12   Brewer to south end of Verona-Fort Point area, and then

13   gradually tapers off since -- after that.

14         I would say the distribution of mercury in the sediments

15   and the biota is consistent with HoltraChem as the primary

16   source of mercury in the river.  That mercury in biota, in --

17   in many species of biota, are elevated above background, not

18   in all.  We got a few surprises there, but many species of

19   biota in the Penobscot are elevated with mercury high enough

20   for a concern for human consumption of those species that are

21   consumed by people and high enough in some species to cause

22   concern over harm to the -- the animals themselves.

23         I would say another major finding is that the river is

24   not cleaning itself up quickly.  The thinking is that the main

25   amounts of mercury went in in the late '60s, early '70s, which

1    is, you know, 45 years ago.  The river is still significantly

2    contaminated.  It's less contaminated than it was in the late

3    '60s, early '70s, but it's still significantly contaminated,

4    indicating that it's not cleaning itself up very quickly.

5          The best estimate, as I understand it now, is that the

6    river -- the upper river and the marsh areas adjacent to the

7    river are now cleaning themselves up at a -- with a half-life

8    of around 22 years.

9          I would say the other very important finding is the

10   reason for the river not cleaning itself up very quickly, and

11   that is the presence of a large mobile pool of sediments that

12   are -- are trapped by tidal movements and the salt wedge that

13   comes in from the bay.  And I'm not an expert in this area,

14   but the experts that were associated with the study say this

15   is -- this is probably the reason that this river is not

16   cleaning itself up very quickly.

17         Ah, I think those are the major findings from the --

18   from the data that we collected.

19   Q    Do you concur in each of those findings that you just

20   articulated?

21   A    I do.

22   Q    Were you asked to weigh in by the Study Panel before it

23   filed a -- its Phase II Report on whether the panel should

24   recommend to the court that it order active remediation of the

25   river?

1    A    Yes, yes.  It was discussed in the meetings that we had.

2    I don't remember exactly when we first started discussing it,

3    but probably somewhere early on.  We knew this was something

4    that we were asked -- going to be asked to do and we should

5    do, so we certainly discussed it, you know, as the study was

6    going along and as we were writing the Phase II Report.  This

7    was when we had to face up to making a decision, and it was

8    actively discussed.  All six of the study team -- that's the

9    panel, myself, Dr. Kopec, Dr. Kelly -- were in on those

10   meetings, and that question was discussed, yes.

11   Q    What is your point of view concerning the question

12   whether the court should order active remediation of the

13   river?

14   A    I supported the panel's decision that active remediation

15   was necessary and that we should recommend it.

16        In addition to the -- well, I mentioned earlier that one

17   of our major study findings was that the half-life of cleanup

18   in the river is now believed to be about 22 years, plus or

19   minus.  That translates -- if you -- if you want to reduce the

20   mercury in the surface sediments in the main stem of the river

21   from, say, the 850 that they are now to -- to half, which is

22   what we're saying is going to remove most of the risk for

23   animals living in the river and risk -- potential risk to

24   human consumers, then you're going to wait 22 years and it

25   will be down to approximately that level.

1        But Mendall Marsh and other marshes need to go much

2   lower, and the reason for that is that the birds in areas like

3   Mendall Marsh are much higher in mercury, we think due to the

4   fact that areas like Mendall Marsh are very efficient at

5   methylating mercury and the food chains there are conducive to

6   bioaccumulating up to the birds.

7        So whereas we felt that getting the biota in the river

8   down by about a half would remove most of the risk, we felt

9   that the biota in areas like Mendall Marsh had to come down by

10  about three-quarters, and this is going to mean a much longer,

11  multidecadal recovery period.

12       What convinced me that recommending remediation was a

13  good thing -- excuse me, I'm having trouble talking.

14  Q    Take some water if you need it.

15  A    Thank you.  Was an imaginary conversation that I had

16  with a -- a resident who lived around the Penobscot River and

17  was familiar with the situation.  And the resident said, well,

18  what did you guys find out?  And I would outline the findings,

19  like I outlined to you.  Well, the river's contaminated with

20  mercury and it's pretty high, and we think it's -- it's high

21  in animals, and this is causing risk and probable harm to

22  them.  And there's areas in the river that are high and pose a

23  risk to human consumers, and -- and, you know, the State of

24  Maine has closed an area to lobster and crab fishing, and --

25  and the State of Maine has posted black duck hunting areas.

1    And the person then asks me, well, but isn't it cleaning

2    itself up?  And the answer is, well, yeah, it is, but a lot

3    slower than we thought it would be.  And the river's going to

4    be clean if we leave it alone in maybe 22 years, if our

5    estimates are right, but Mendall Marsh is going to be even

6    longer than that.  And -- and then he asks me, well, are you

7    going to recommend it be cleaned up?  And the obvious answer

8    is absolutely.  If you'd say no to that person, then what?

9    This -- this doesn't make sense.  You've documented this --

10   these high levels of contamination, you've documented this

11   harm, and then you say you're not going to recommend that it

12   be cleaned up?

13       To me, that's -- that's not reasonable.

14            MR. BERNARD:  Nothing further.

15            THE COURT:  Cross-examination, Mr. Talbert?

16                      CROSS-EXAMINATION

17   BY MR. TALBERT:

18   Q    Good morning, Dr. Bodaly.

19   A    Good morning.

20   Q    You are a biologist by training, correct?

21   A    Correct.

22   Q    And most of your work is related to the uptake of

23   mercury in fish?

24   A    Correct.

25   Q    Do you agree that the Penobscot River Mercury Study is a

1   multidisciplinary study in the sense that there are numerous

2   areas of expertise represented in the final report?

3   A       Correct.

4   Q       Is it also fair to say that some of these areas of

5   expertise are outside of your particular area?

6   A       I agree.

7   Q       One of those is hydrodynamics and -- and another is

8   sediment core work?

9   A       I agree.

10  Q       How about human health risk analysis?

11  A       I know nothing about that.

12  Q       Do you consider yourself an expert in ecotoxicity or

13  performing ecological toxicity tests?

14  A       I have done very little research of my own on toxicity

15  testing.

16  Q       Is it also fair to say that you're not an expert in the

17  remediation of contaminated sediment sites?

18  A       Very true.

19  Q       Before this project, you had not worked on another

20  project that involved potential remediation of contaminated

21  sediments, correct?

22  A       I advised Environment Canada in, I believe, the 2000s on

23  a chlor-alkali plant contamination at a place called Marathon,

24  Ontario, which I -- as I recall is on Lake Superior.  My

25  advice was not extensive, and it did involve the question of

1    whether sediments should be dredged, but I had no involvement

2    in the -- in the final decision or on the possible dredging

3    techniques or -- or how that would be done.

4         So -- but I think -- I think I recall that's the only

5    peripheral involvement I'd had before in a contaminated site.

6    Q    And you do not consider yourself a -- a bird biologist,

7    correct, in any way?

8    A    I -- correct.  I -- I think I have -- I think I have

9    learned a bit about these peripheral subjects, you know, in

10   project meetings.  I think I understand a lot of what's going

11   on, but I don't disagree with your questions.

12   Q    Okay.  Chapter 2 of the Phase II Report contains certain

13   targets, correct?

14   A    Correct.

15   Q    And I guess, getting into that chapter, one of the

16   things you did was to summarize scientific research on toxic

17   effects on biota and then try to select a target; is that

18   correct?

19   A    Correct.

20   Q    When we discuss toxic effects, isn't it true that

21   there's a range of -- of toxic effects?

22   A    I'm not quite sure what you mean.  I -- I would agree

23   with you that the -- the endpoints or the effects on animals

24   of a contaminant, for example, methylmercury, are very -- the

25   amount of mercury it takes to produce adverse effects of

1  different kinds of endpoints are very different.  For example,

2  it takes a lot of methylmercury to kill a fish.  It takes very

3  little methylmercury to disrupt and affect reproduction.  So

4  if that's what you're trying to get at, yes, the levels that

5  it takes to cause different types of effects are very

6  different.

7  Q    Okay.  And in terms of different effects, I mean, you

8  have -- as you just described, there's a range, you have a

9  range of lethal effects down to biochemical effects, correct?

10 A    Yes.  Although I don't quite agree with the way you

11 characterized it because, for example, in adult fish and in

12 setting limits, in fact, it's reproductive effects that are

13 the most sensitive, biochemical effects almost as sensitive,

14 and, as you say, lethal effects and things like growth are

15 much less sensitive.  So I -- I wouldn't characterize the

16 biochemical effects as being the most sensitive.

17 Q    Well, and for that, are you citing to the Depew paper

18 that --

19 A    Yes.

20 Q    -- was discussed yesterday?

21 A    Yes, that's what I was thinking of, yes.

22 Q    Okay.  You're aware, correct, that the Depew paper

23 relayed results of toxic studies that were performed in a lab

24 setting, correct?

25 A    Yes.

BODALY - CROSS-EXAMINATION/TALBERT

1003

1    Q     Okay.  So those were not field studies.

2    A     Ah, some were field studies; some were lab studies.  Um,

3    I think the most sensitive levels that were listed in the

4    paper for reproductive effects I believe are lab studies.  You

5    know, which is an interesting point, and one of the things

6    Dr. Wiener -- one of the points Mr. Wiener made in his

7    deposition, and I'm sure he'll make it again tomorrow when

8    he's on the stand, is that lab studies may, in fact,

9    underestimate how sensitive animals are to toxic chemicals.

10   And the reason is that the -- the laboratory experiments tend

11   to be set up in a way that make sure that the animals are very

12   unstressed, that they are growing well, getting lots of food,

13   surviving, they don't have predators chasing them, they don't

14   have adverse weather.

15        And, in fact, that might lead to underestimates of how

16   sensitive those animals are to these toxic chemicals.  And I

17   think that's an important point, although it has been noted

18   that generally the results from laboratory experiments of

19   toxic effects and the levels required to produce those effects

20   are pretty similar to what are observed in field studies, and

21   that's in, as I recall, the Sandheinrich and Wiener paper 2011

22   that was published and that we relied on, as well.

23        So, yeah, it's an interesting question in the scientific

24   community about laboratory versus field studies.

25   Q     And you're familiar with the Heinz study, correct?

1  A     Yes.

2  Q     And what did that study find?

3  A     I assume you're referring to the study where they

4  injected the birds of eggs (sic) with methylmercury?

5  Q     Yes.

6  A     Ah, the purpose of the work was to look at the

7  interspecies variability, the variability among and between

8  species and their sensitivity to methylmercury at the egg

9  stage.

10      Heinz and his coworkers recognized that the levels from

11  that experiment would not be useful to actually set toxic

12  limits because it turned out that, if you injected the eggs

13  with methylmercury, they were much more sensitive than they

14  were thought to be in -- in a natural situation.

15      But it allowed them to define how variable species were

16  in their sensitivity, and it allowed them to -- and they

17  tested quite a few different birds and different families of

18  birds and allowed them to say, well, this family of bird is

19  much more sensitive than -- than the average, and this family

20  of bird, on the other hand, is much less sensitive.  So it

21  allowed the -- a sort of relative ranking of the sensitivity.

22      And the answer was that, depending on which bird you

23  look at, there's a lot of variation in the sensitivity.

24  Q     And to take that and apply it to a -- a target-setting

25  scenario, isn't it true that when you're looking at setting

1  these targets and -- and pulling literature values, that if

2  you notice some effects in a population, it could be a very

3  sensitive population, but you would report the effects from --

4  from that study?

5  A    Yes, I agree.

6  Q    And so, therefore, if some of these, you know,

7  reproductive effects that were observed in the lab setting in

8  Depew could very well have been on species that may be more

9  sensitive than other species to mercury, correct?

10 A    Yes, absolutely.  On the other hand, they could have

11 been on species that were less sensitive.  There's -- there's

12 uncertainty there, and you -- you take the information that

13 you have available to you, and you do what you can with it,

14 and you extrapolate it not only to the species that you're

15 interested in, probably from other species, because probably

16 the species you're looking at haven't been looked at in the

17 lab or in the field.  And, of course, you're extrapolating the

18 information perhaps from the lab to your field setting or from

19 somewhere else to your field setting.

20      So somebody looked at toxicity to cormorants in

21 Washington state or Norway or something like that, and you --

22 you -- you are stuck with making those -- transferring that

23 information and trying to apply it to your situation.

24 Q    And just so I understand what we -- what you're looking

25 at in terms of being able to set the targets in Chapter 2, the

1  literature that you examined reported a sort of range of

2  different endpoints that you used to set the targets in

3  Chapter 2.

4  A      Correct.

5  Q      In other words, those were not all studies where there

6  were specific population-level effects.

7  A      Correct.

8  Q      Do you agree that the -- just the fact that you find a

9  sublethal effect occurring does not necessarily mean that

10 there would be a population-level effect, as well?

11 A      I agree it does not necessarily mean.

12 Q      Okay.  And in -- in this case, in the Penobscot, I

13 believe we've already discussed this, but you did not conduct

14 any specific field studies relating to population-based

15 effects.

16 A      That's correct.  We laid out in the Phase I Report, as I

17 mentioned yesterday, that the method we were going to use to

18 determine toxic levels and to set targets was to survey the

19 scientific literature and to take advice from recognized

20 experts in the field of ecotoxicology, and that's what we did.

21 Q      And you also didn't study other contaminated systems and

22 what targets they set for biota and try to take those to use

23 in the Penobscot, correct?

24 A      Correct.

25 Q      Let's take a look at some of the effects' thresholds

1    that you -- you -- you derived in Chapter 2.  And part of

2    Chapter 2 -- you also, I guess, between Chapter 2 and

3    Chapter 17, you also set targets for background concentrations

4    for sediments, correct?

5    A    Ah, we set, yes, the -- the information collected on

6    background systems helped guide us in making decisions about

7    target concentrations in sediment, yes.

8    Q    Okay.  Let's take a look at Chapter 2, and this is Joint

9    Exhibit 6-02, and I'd like to turn to Page 2.  Actually, let's

10   go to Page 3, please.  I'm sorry.  2-4, next -- next page

11   over, and let's blow this paragraph up.  Okay.

12        I believe you discussed this a little bit earlier with

13   Mr. Bernard, but just to frame our discussion, one of your

14   statements here is, it would be unreasonable and unachievable

15   to suggest remediation strategies that had the objective of

16   reducing concentrations of mercury below regional background

17   levels, whether in sediments or biota.  And then you say --

18   and I don't think you discussed this one -- we define the

19   regional background as the concentrations of mercury found in

20   sediments and biota in estuaries along the central Maine coast

21   subject only to atmospheric deposition.  Do you see that?

22   A    Yes.

23   Q    Okay.  Do you agree that, with respect to the Penobscot,

24   even taking out mercury from the HoltraChem site, there would

25   be numerous other sources of mercury to the Penobscot other

1 than just atmospheric deposition?

2 A     Yes, there are, and -- and Dr. Turner estimated those in

3 one of the chapters in the Phase II Report.  He got most of

4 his information from the State of Maine.  There's a pretty

5 good estimate of atmospheric deposition in the region, and he

6 estimated those, and, of course, in addition to that the

7 present input of mercury from the HoltraChem site.

8 Q     Do you agree that in other lakes and rivers in Maine,

9 just the mercury from atmospheric deposition alone has been

10 enough in certain circumstances to raise levels of mercury in

11 fish above what are deemed to be acceptable levels?

12 A     Often that is the case, yes.

13 Q     Do you agree that the population density surrounding a

14 watershed can impact the amount of mercury in that watershed?

15 A     I do.

16 Q     And in this particular case, I believe we discussed

17 this, but you -- you didn't look at how the populations and

18 development compared between the Penobscot and the reference

19 sites that were selected, correct?

20 A     We didn't look at it in detail, and as you'll recall

21 from my deposition in Vancouver, I had it wrong, that the

22 population density in the Penobscot is actually similar to the

23 population density in the Sheepscot watershed.

24      And I think -- I think to a certain degree, you -- you

25 can't define your background concentrations until you actually

1  get the samples and the results back, and that certainly

2  happened with regard to the Sheepscot, but, yes, I agree with

3  your premise.

4  Q    And with respect to the St. George and the Narraguagus,

5  you'd agree that the population densities are -- are much less

6  than the Penobscot.

7  A    They appear to be low to me looking at the Maine atlas,

8  and the samples did prove that the concentrations were about

9  as low as we see them in any of the sites we've looked at.

10 Q    Okay.

11        MR. BERNARD:  For the record, Defense Exhibit 565

12 contains a NOAA coastal watershed screen shots of population

13 density, and I would like to move for the admission of that

14 exhibit at this time.

15        THE COURT:  Any objection to Defense Exhibit 565?

16        MR. BERNARD:  No objection.

17        THE COURT:  565 is admitted.

18 BY MR. TALBERT:

19 Q    And, Dr. Bodaly, you also did not compare the salinity

20 in the Penobscot with salinity in the reference systems,

21 correct?

22 A    Correct.  We only sampled intertidal sediments, subtidal

23 sediments, and blue mussels.

24 Q    And is it fair to say that looking at differences in

25 salinity when comparing reference site data could be

1    important?

2    A    Well, I -- I'm -- I'm not sure how -- yeah, I guess

3    salinity could affect the concentration of mercury in the

4    surface sediments, yes.

5    Q    And is it fair to say that in the selection of different

6    reference rivers to determine background, you did not employ a

7    formal process or specific methodology to select those

8    reference sites?

9    A    Correct.

10   Q    I'm sorry?

11   A    That's correct.  You know, in the end, we decided we had

12   to rely on how much mercury was in the sediments in the Old

13   Town to Veazie reach above Veazie Dam, because we didn't think

14   that the lower Penobscot would come any lower than that.

15        We were criticized in that by the plaintiffs' expert,

16   Professor Driscoll, who said, do you have this wrong?  Is it

17   possible that the lower Penobscot could come down to a level

18   lower than the OV, which is about a hundred nanograms per

19   gram?  And he suggested that the regional -- regional

20   background is around 55.  So he agreed with us on that but

21   suggested that maybe the lower Penobscot would come down to

22   lower than that.

23        In the end, I'm not sure it mattered that the targets

24   that we recommended for, for example, eels and other fish in

25   the river, as Mr. Bernard pointed out earlier this morning,

1  still only bring the lower Penobscot down to maybe 400

2  nanograms per gram, which is ten times the OV reach and -- and

3  20 times the regional background.

4  Q     And we'll get to this in a second, but, I mean, is one

5  of the challenges of determining background for the Penobscot

6  below Veazie and finding a realistic level that it could get

7  down to the fact that you have documented about 240 nanograms

8  per gram of mercury on particles coming from above Veazie?

9  A     Absolutely, yes, I agree.

10 Q     Do you agree that Dr. Connolly identified some suitable

11 additional reference sites?

12 A     Yes, I do.  I believe he also used reference sites which

13 were not appropriate, and I don't agree with his calculation

14 of the regional background.

15 Q     Let's pull up Joint Exhibit 45 and take a look at

16 Dr. Connolly's Figure 3-1, which is on electronic Page 78.  I

17 don't know if there's any way to rotate this.  Apparently

18 there is.

19       This is a figure from Dr. Connolly's report.  You -- you

20 reviewed Dr. Connolly's report, correct?

21 A     I did.

22 Q     Okay.  And do you see some of the reference sites that

23 Dr. Connolly also included in his evaluation of regional

24 background?

25 A     Yes, I do.

1  Q     Okay.  And can you circle ones that you agree are useful

2  reference sites.

3  A     Do I do that using the pen or my finger or --

4  Q     It's a touch screen, so you can just use your finger.

5  A     Okay.  (Witness complying.)  Those are the sites that I

6  would agree with Dr. Connolly that they're appropriate

7  background.  I think that he made a useful contribution to

8  this discussion by finding data from Mt. Desert Island and

9  Stover Point.  I -- as I mentioned earlier, talking with

10  Mr. Bernard, I don't think the Sheepscot's an appropriate

11  reference.  I think including Pickering Island, which is, in

12  fact, in Penobscot Bay is not appropriate.  And I don't think

13  that the Penobscot Old Town to Veazie reach is an appropriate

14  background because it is about twice what the regional

15  background is.

16         So those are the ones that I would include.

17         Um, the other possible site is, of course, the East

18  Branch of the Penobscot.  Dr. Connolly did not include that.

19  The -- and I guess on the rationale that it's a freshwater

20  reach of the river, and -- and I guess I wouldn't argue with

21  that.

22         He also, I think, mistakenly excluded the subtidal

23  samples from the Narraguagus.  If I read his report correctly,

24  there were some samples there that were missed.

25  Q     Were the subtidal samples in the Narraguagus very

1   similar to the intertidal?

2   A      Yes, they were, yeah.

3   Q      And just to backtrack, I think the -- the Sheepscot is

4   one reference site that I believe -- is it fair to say the

5   Study Panel identified in Chapter 2 as one of the sites that

6   were relatively uncontaminated and worthy of consideration?

7   A      I -- I don't recall exactly, but -- but certainly it

8   was a -- it was a candidate as a reference site.  I mean,

9   that's why we sampled it.

10  Q      I -- I can pull it up if it refreshes your recollection.

11  This is in Joint Exhibit 6.

12  A      I'm not disagreeing with you.

13  Q      Okay.  You -- you agree?  Okay.  And so I guess -- I

14  mean, leaving aside the Sheepscot, which the Study Panel

15  initially looked at, and I believe in your same Figure 2-1 in

16  the report, you also -- that you looked at earlier, also at

17  least included for that purpose the OV reach, correct?

18  A      The -- a number of sites were put on that graph, ah,

19  first of all, for the sake of completeness and for the sake of

20  comparison.  For example, we included the deep slices of a

21  core taken in Fort Point Cove, and that's -- that was the bar

22  on the far left side of that figure.  We did not feel that

23  the -- that that core represented the present regional

24  background.  We put it on the figure for comparison.  It -- as

25  I mentioned earlier, it represented preindustrial

1    concentrations of mercury in the sediment at Fort Point Cove.

2        And, similarly, we put the OV and the Sheepscot on that

3    figure for the sake of completeness and for comparison.  But

4    when we calculated the regional background in Chapter 17, we

5    did not include the deep slices of core D-01, we did not

6    include the OV reach, and we did not include the Sheepscot.

7    We also didn't include Stover Point and Mt. Desert Island.  We

8    did not have those data.

9        And if I was going to do it today, I would include those

10   two additional points that Dr. Connolly brought into his

11   report.

12   Q    With respect to defining the background for fish, would

13   you agree that that's something that the Study Panel struggled

14   with?

15   A    Yeah, I guess I would agree with that.  Um, there's not

16   that much information out there in the easily-retrievable

17   scientific literature.  We made comparisons where we could.

18   We certainly missed some data.  I would -- if I was going to

19   write some of those words today, I would have more complete

20   data.

21       In fact, we missed some of our own data in establishing

22   a background which, in fact, I realize now is useful.  So I

23   think that's a fair statement.

24   Q    And with respect to one of the -- the targets I want to

25   discuss or -- is the target for predators, and so you're

1    setting a target in -- in prey fish to protect the predator.

2    A     Correct.

3    Q     Okay.  And you set a target for prey fish at 50

4    nanograms per gram, correct?

5    A     Correct.

6    Q     In that, wouldn't -- wouldn't the best thing to look at

7    be the predators themselves to see, you know, what levels of

8    mercury they -- they have in their -- their muscle or blood to

9    see if they may be impacted?

10   A     You could.  I believe that the appropriate thing to do

11   is to look at prey fish in -- in other areas, and if you're

12   trying to set a target for prey fish, comparing them to

13   background levels in prey fish in the same species in similar

14   environments is the appropriate thing to do.

15        We recognized that that 50 nanograms per gram target is

16   low, surprisingly low.  The results of this research, setting

17   these very low targets, is shocking the scientific community.

18        We decided we needed to look at, as -- as far as we

19   could -- and I would agree with you, maybe we should have

20   spent more effort on this -- on the levels in prey fish.

21        I very strongly disagree with the material that

22   Dr. Keenan presented as portraying as background levels of

23   mercury in prey fish.  They were from lakes.  They were

24   large-bodied, older fish for the most part.  They were mostly

25   predatory species, including large-mouth bass and chain

1    pickerel and -- and species like that.  So I -- I did not feel

2    they were appropriate to establish a background.

3        We -- we looked at the scientific literature to try and

4    find mercury in the same species that we were dealing with for

5    prey fish, like tomcod, flounder, rainbow smelt, Fundulus, I

6    might have forgotten one, and we had a bit of information in

7    the Phase I Update Report.  For example, we included a

8    reference to background levels in Fundulus in the New York-New

9    Jersey Harbor.  That was a paper by Iannuzzi, et al., that --

10   those levels were 20.  So we're trying to define a -- a target

11   in prey fish that might be harmful to the predatory fish that

12   eat those prey fish of 50 nanograms per gram.  And as I said,

13   that's pretty low.  But, in fact, in the New York-New Jersey

14   Harbor, the Fundulus there, as reported in that paper, were

15   20.  So that gave me some comfort that we are not saying

16   anything too outrageous in -- in establishing that target.

17       We looked and presented in the Phase II Report data on

18   the background levels in flounder from Frenchman Bay, and that

19   was from Dr. Kopec's Ph.D. thesis, and the levels there were

20   8 nanograms per liter, so quite a bit less than our target of

21   50.

22       And, in fact, we realized just recently that, in fact,

23   we had data of our own that at least speaks to this because in

24   these sites in the ES, or estuary, sampling reach in the

25   Penobscot Bay, the levels of mercury in flounder at many of

BODALY - CROSS-EXAMINATION/TALBERT

1   those sites are below 50 nanograms per gram, and the levels of

2   mercury in rainbow smelt, another prey species that we're

3   dealing with here, are at or below 50 nanograms per gram.

4   They may be somewhat elevated because they're in the lower

5   part of the Penobscot Bay, but the -- I lost my train of

6   thought there.  But, anyway, that there were levels there that

7   were below 50.

8        So it gave me a bit more comfort, as I said, to -- to

9   establish that the target levels we set may, in fact, be

10  achievable.

11       The other consideration here is that we -- in setting

12  those -- those target levels, we got a -- they didn't -- they

13  didn't play a central role in setting the targets for the

14  reduction in the mercury and sediments in the contaminated

15  zone of the -- of the Penobscot River.  And -- and we said,

16  okay, we think that those sediments should come down by about

17  a half and -- and the main considerations there were human

18  health risk based on lobster and eels and crabs and risk to

19  large fish, perhaps eels.  And -- and we -- we basically said,

20  well, if we get those sediments down by a half, it's also

21  going to bring the prey fish down hopefully by a half, and we

22  should be certainly greatly improving that situation, as well.

23       And now that I've -- you know, have a little more

24  complete data on the background of levels in mercury in prey

25  fish for the same species in similar environments, it seems to

1  me that is achievable and that should work.

2  Q    Didn't you note in the Phase II Report itself that, even

3  within the reference sites that you looked at, that the levels

4  in prey fish were above the 50 nanograms per gram?

5  A    I don't remember that, to tell you the truth.

6  Q    Well, we can -- we can circle back to that.

7  A    Sure.

8  Q    But, again, getting back to this purpose of setting the

9  target for prey fish to protect predators, is it fair to say

10  that, when you sampled predator fish, that there were very

11  few, if any, that were above what you deemed to be target

12  levels for the predator fish?

13  A    Ah, in terms of fish health, do you mean?

14  Q    Correct.

15  A    Um, well, if you look at the eel data in the BO, Brewer

16  to Orrington, and OB, Orrington to Bucksport, reaches, a very

17  significant portion of those populations were above the 500

18  nanograms per gram, which is thought to cause health problems,

19  toxic effects in predatory fish.

20      So I don't think I would agree with you on that.  The

21  average levels in those reaches between Brewer and Bucksport

22  were over the 500 nanograms per gram target, which obviously

23  is ten times the -- the prey target.  And I forget the exact

24  numbers, but they -- you know, certainly half -- usually half

25  or somewhat above half because the averages were, I think, 535

1   or something like that.

2   Q    But leaving aside the eels, there really weren't many

3   predator fish that had levels elevated above 500.

4   A    Correct, the -- the eels were our main concern for toxic

5   effects on predatory fish in the Penobscot.

6   Q    And since you mentioned the eels, let's -- let's take a

7   look -- let's turn to Joint Exhibit 6-02, and I want to take a

8   look at Table 2-2 on Page 2-12.

9        Now, yesterday you had a discussion with Mr. Bernard on

10  this, so I don't want to take too much time, but just to

11  orient ourselves, this is -- you're looking at the target

12  setting for American eel, correct?

13  A    Correct.

14  Q    And what you're doing is you're -- you're comparing your

15  target level, which you set at 260, correct?

16  A    That's correct.

17  Q    And you set that slightly above the state's -- the Maine

18  state action level of 200 nanograms per gram in recognition of

19  the reality that, even above the Veazie Dam, these eels are --

20  are elevated.

21  A    Correct.

22  Q    And you have -- I guess my -- my first question is, with

23  respect to the concentration you say in -- in reference areas,

24  and -- and one of the reference areas you list is this Old

25  Town to Veazie, correct?

1    A     Correct.

2    Q     And even in the Old Town to Veazie reach, you have --

3    you note a level of 333, and in parens, you note that

4    60 percent of the eels sampled in that reach were over the 260

5    nanogram per gram target.

6    A     Correct.

7    Q     So if that is what you're using as a reference to

8    compare the lower Penobscot area, shouldn't that target be

9    higher than 260, if 60 percent of the eels in OV are above

10   that?

11   A     Yes, and Mr. Bernard pointed that out yesterday, and I

12   said at the time that I was perplexed by that 333 value.  I'm

13   not sure why it isn't 260 because that should be what we

14   measured in eels in the OV reach.  I attempted last night to

15   go through my data files and find the file where I calculated

16   these numbers for these tables.

17         Because of all the comparisons, temporal and spatial

18   comparisons that were done by Dr. Kopec using various species

19   of biota, including eels, were done using adjusted values, in

20   the case of eels they're adjusted for the age of -- of each

21   fish, I went through, as I said yesterday, and recalculated

22   and using raw values determined the means, and that's what

23   these should be.

24         I was perplexed at the 333.  I attempted to find the

25   Excel file where I did those calculations, and I did not

1    locate it in a reasonable amount of time last night.

2         So I'm not sure of the 333.  It could be a typo.  I hope

3    it isn't, but I'm not sure why it's different than the 260.

4         I agree with you that for the purposes of the Penobscot

5    and for eels, the background value is certainly moderately

6    high.  It is above the 200 nanograms per gram action level set

7    by the State of Maine for human consumption of -- of women and

8    children.  It is -- it is not near the 500 nanograms thought

9    to cause toxic effects in eels.  And -- and I would like to be

10   able to find that data file and go back and confirm that

11   number, but I'm not disagreeing with you, just explaining the

12   situation.

13   Q    Okay.  Well, assuming, I guess, right now that the data

14   that we're seeing here is -- is correct, that it's a

15   compilation of what you found over the last almost nine years

16   of study, taking a look at the various reaches, I want to just

17   orient ourselves, the target level you set for fish, to be

18   protective of fish, was 500 nanograms per gram.

19   A    Correct.

20   Q    And if we look at the Penobscot BO 3 reach, at least

21   the -- the number there, the average is below that 500 limit,

22   correct?

23   A    Correct.

24   Q    If we look at the OB1 reach at 454, those numbers are

25   also below the 500.

1    A    The mean is, yes.

2    Q    The mean is below.

3    A    And the -- the number in parentheses after that is the

4    proportion of the population that's above the background.

5    Q    The --

6    A    Or target.

7    Q    260.

8    A    Yes, correct.

9    Q    Now, would you agree that the -- the mean ranges, then,

10   the highest one you're reporting, is in the range of BO 4,

11   correct?

12   A    Correct.

13   Q    The BO 4 you're reporting a mean of 619?

14   A    That's correct.

15   Q    So that would be the only reach in which the average for

16   the eels is above the 500 target?

17   A    That's correct.

18   Q    Okay.  Let's take a look down at the column here, you

19   have Maine reference sites.  Do you see that?

20   A    Yes, I do.

21   Q    And -- and how is that -- the Maine reference sites set?

22   You cite Leaman 1999.

23   A    We -- yes, and we included all those data for the sake

24   of completeness, but the comparisons are pretty much apples to

25   oranges.  Most of those samples are silver eels, in other

BODALY - CROSS-EXAMINATION/TALBERT

1023

1    words, they are mature eels that are getting ready to go out

2    into the ocean to spawn, and the direct comparison to our

3    samples, which are yellow eels, which are immature eels living

4    in fresh water and are not to the silver stage yet, is very

5    uncertain.

6         So we -- we put the numbers in.  We felt that we should

7    because they were out there in the scientific literature.  But

8    it -- it's -- it's very hard to compare the two, and -- and

9    I -- I wouldn't want to hang my hat on it too strongly.  You

10   can see that the various reference areas, for example, Europe,

11   Georgia, are much lower than anything in the Penobscot River,

12   whereas other sites are sometimes lower and, as you point out,

13   sometimes much higher than what's in the Penobscot.

14   Q    So -- and an example of what would be higher, this Nova

15   Scotia number is 720?

16   A    I believe -- and you should ask Dr. Kopec about this --

17   but I believe that was another example of a sample of eels

18   that were silvers and were really not comparable to the ones

19   in the Penobscot.

20   Q    And the Leaman one, just for the sake of completeness,

21   at least the range that you report -- and leaving aside that

22   we're not sure exactly how those two sets of data compare, but

23   at least in your chart, what you list as the range for Maine

24   reference sites is 330 to 642, correct?

25   A    Correct.

1   Q      And that's -- isn't that very much in line with the

2   ranges we're seeing in the Penobscot reaches?

3   A      Yes.

4   Q      Okay.  Let's switch gears and talk a little bit about

5   carbon normalization.

6   A      Always a fun topic.

7   Q      Dr. Connolly looked at background sediment

8   concentrations on a carbon-normalized basis, and one of the

9   things he points out is, if you look at the data on a

10  carbon-normalized basis, it's not -- the ratio is not as

11  elevated as if you looked at it on a dry-weight basis.  Do you

12  recall that?

13  A      Yes, I do.

14  Q      Okay.  And -- and just from that high level -- not

15  getting into the specific numbers, but do you agree that when

16  you look at the mercury data on a carbon-normalized basis,

17  that the ratio between background and the Penobscot is lower

18  than if you looked at it on a dry-weight basis?

19  A      When I looked at the degree of elevation in both wetland

20  soils and intertidal sediments on a carbon-normalized and a

21  strictly nanogram per gram dry weight basis, I found that the

22  degree of elevation did decrease somewhat.

23         My calculations of the degree of elevation in the

24  contaminated zone of the Penobscot in the intertidal zone on a

25  nanogram per gram dry-weight basis, in other words, not

1     carbon-normalized, was that they were ten times elevated, and

2     my calculation of the degree of elevation based on carbon

3     normalization of the same data was that they were six times --

4     six and a half times elevated.

5           I strongly disagree with Dr. Connolly's calculation that

6     those sediments were only three times elevated.

7     Q     Does it refresh your recollection that -- and I can

8     bring the report up, but I believe Dr. Connolly said his range

9     was three to five times.

10    A     Okay.  Well, my -- my calculation was six and a half on

11    a carbon-normalized basis and ten on a dry-weight basis.  I

12    didn't agree with many of the sites that he included as the

13    regional background, as we've talked about.

14          For the wetlands, he said they are, I believe, at most

15    two times elevated, and I think then he was referring

16    specifically to Mendall Marsh.  My calculation of Mendall

17    Marsh elevation is that it's seven times elevated above

18    background in salt marshes, both in the Penobscot and in

19    reference systems.

20          My calculation of the degree of elevation of the wet --

21    contaminated wetlands in the Penobscot is that they are 12

22    times elevated over reference wetlands in the Penobscot on a

23    dry-weight basis and nine times elevated on a

24    carbon-normalization basis.

25          So I agree with Dr. Connolly that the carbon -- if you

1   carbon-normalize the data, you get somewhat more -- or

2   somewhat less dramatic degrees of elevation.  Still, my carbon

3   elevation figures for wetlands are seven times elevated, for

4   intertidal are six and a half times elevated.

5        And the other thing Dr. Connolly didn't do was he didn't

6   look at birds.  You know, when he was talking about wetlands,

7   he talked about them only being twice elevated, which I think

8   is erroneous because he -- his reference he used for that were

9   intertidal sediments, which I don't think is appropriate, and

10  the birds are around 7 to 14 times elevated compared to birds

11  at reference systems.  The average is around nine or ten

12  times.

13       So the -- I don't think there's any question the

14  Penobscot is significantly contaminated.

15  Q    The -- is it fair to characterize the differences

16  between your calculations and Dr. Connolly's relate to what --

17  the data you each are using, both to define a reference site

18  and then the data you're using to make your calculations of

19  carbon-normalized?

20  A    I agree.

21  Q    Let's switch gears and -- and talk a little bit more

22  about the targets to protect fish health, and I'll try not to

23  go over too much of the same ground that you covered with

24  Mr. Bernard.

25       We started discussing this topic earlier about various

1  ranges in the literature for -- for effects levels.  Do you

2  recall that?

3  A    Yes.

4  Q    Okay.  And in -- in Chapter 2, one of the things you did

5  was you looked at this -- the ranges that you found in the

6  literature.  And I believe, as we discussed earlier, some of

7  the endpoints in those -- the literature values are for

8  different effects.

9  A    Correct.

10  Q    And then there was a point where you had to select a

11  specific number as the target, correct?

12  A    Correct.

13  Q    For the fish, you selected 500 nanograms per gram wet

14  weight, correct?

15  A    Correct.

16  Q    And do you agree that you didn't -- in -- in making that

17  selection for a target, you didn't apply any specific

18  methodology?

19  A    I agree.  I -- I believed I -- in my deposition, I used

20  the term something like could have been more rigorous, and in

21  hindsight, I agree with that.  I think perhaps we could have

22  more strictly defined a method to -- to choose those target

23  concentrations based on definitions in the literature, and --

24  and so the reader would know exactly what we did and -- and

25  what methods we followed and so that they -- they would have

1   been more quantitative and objective.  No, I shouldn't use the

2   word objective because I think they were objective.

3        So I'm not disagreeing with you.  We -- we examined each

4   one separately, and we examined the literature.  We examined

5   the recommendations that we received from the experts that --

6   that we got reports from.  And we made our best judgment in

7   each case as to what that target should probably be, and I

8   think the targets that we chose are reasonable.  I think

9   they're soundly based on the advice we got and on the

10  scientific literature that we looked at, and I stand behind

11  them.

12       I -- I don't think I would change them very much.  Um,

13  but you're correct in characterizing the method that we used

14  to get there.

15  Q    And just to under -- make sure I understand this better.

16  You -- you set targets for fish, for birds, for mammals,

17  and -- and -- and then when you did that, you didn't always

18  pick -- in other words, one way you could have looked at this

19  was you could have picked the -- the average in the literature

20  values.

21  A    Correct.

22  Q    Another way you could have done it was to always pick

23  the -- the lowest value.

24  A    Right.

25  Q    Or, you know, or -- or -- or rely on specific study

1  endpoints and have that be your gauge for selecting the

2  target, correct?

3  A    Right.

4  Q    And instead, as you just described, there wasn't a set

5  methodology, but you looked at each individual one and then

6  made your -- your selection based on judgment, correct?

7  A    Correct.

8  Q    Okay.  Switching gears to the targets to protect bird

9  health.

10 A    Okay.

11 Q    Is it fair to say that you determined that Dr. Evers'

12 2012 review, I guess one of the papers that he used, this

13 Carolina wren study, and that was -- that formed part of the

14 basis for selecting the target level of 1,200 nanograms per

15 gram for -- for birds?

16 A    That's correct.  It -- it served as part of the basis.

17 Q    Okay.  And he used -- I believe you talked about it a

18 little bit yesterday -- but an effects concentration level of

19 interest where a 20 percent or greater loss within a wild bird

20 population would be occurring, that was -- that was called the

21 EC20?

22 A    Correct.

23 Q    Is it fair to say that there was at least some

24 scepticism expressed at first about relying on that particular

25 study, the Carolina wren study?

1    A       Ah --

2               MR. BERNARD:  Objection, vague, scepticism by whom?

3               THE COURT:  Overruled.  If you understand the

4    question, you can answer it.

5               THE WITNESS:  Yes, yes, I understand the question.

6    A    I don't recall scepticism within the Study Group when we

7    talked about that as a level.  I recall that all -- all of

8    these targets were -- were discussed and mulled over and

9    argued about.  I don't recall a lot of pushback when I -- when

10   I proposed this from the panel or other members of the group.

11   BY MR. TALBERT:

12   Q    Well, let's -- I'll try to be less vague, and let's pull

13   up a document so we can discuss.  This is Defense Exhibit 76,

14   and I believe that this is an e-mail from Dr. Kopec.  And

15   let's see if we can -- well, this is an e-mail from Dr. Kopec

16   to you dated February 13th, 2013.

17              MR. TALBERT:  At this time, I'd like to move for the

18   admission of this exhibit.

19              THE COURT:  Any objection?

20              MR. BERNARD:  No, Your Honor.

21              THE COURT:  It's admitted.

22   BY MR. TALBERT:

23   Q    Let's first blow up this first paragraph so we can

24   actually read that.  Dr. Kopec writes, okay.  Evers bases his

25   recommendation, in parens, given in the abstract of Evers

BODALY - CROSS-EXAMINATION/TALBERT

1    2012, for a bird blood target of 1.2 micrograms per gram wet

2    weight exclusively on the Carolina wren study on the South

3    River that he was involved in.  That paper uses very slick

4    modeling to predict bird and calculated feather and egg

5    concentrations associated with predicted reductions in

6    reproductive success in Carolina wren.  I can't judge the

7    accuracy of -- of the model.

8        And then she goes on to discuss this.  What I -- I took

9    from her e-mail was some difficulty in -- in understanding

10   exactly what he did because he relied on modeling, and you

11   didn't have the underlying data; is that right?

12   A    Yes, yes, and we continue to talk about this paper.  We

13   spent most of our lunch yesterday talking about it.  I -- and

14   I think it should be recognized that this is a conversational

15   e-mail among two Study Group members and -- and terms like

16   slick modeling is, you know, obviously a slang expression.

17       I disagree with Dr. Kopec about the importance of the

18   study and the -- and how solid the results are.  A lot of what

19   Dr. Kopec focused on in this e-mail is that in the Jackson, et

20   al., paper on the Carolina wren that we're talking about, the

21   data -- the raw data were actually not presented, and I think

22   that was a mistake.  If I had been a reviewer or editor of

23   that paper for that journal, I would have said, let's get

24   the -- the data in that paper.

25       The -- as you know, your expert, Dr. Henry, has received

BODALY - CROSS-EXAMINATION/TALBERT

1    the raw data, at least the data on reproductive success in

2    mercury for this study, and it has been gone through with a

3    fine-tooth comb.

4         I disagree with Dr. Kopec when she says that our bird

5    target of 1.2 micrograms per gram wet weight in blood is based

6    exclusively on this study because it's not.  Dr. Evers

7    mentioned a few papers in his deposition.  In Chapter 2, we

8    present a number of studies, as well, that present evidence

9    for effects at quite low levels, around the 1 and 2 microgram

10   per gram level.  So I don't think it all hinges on this.

11        Dr. Henry I thought made some very good points in her

12   expert report.  I might be getting -- I might be getting ahead

13   of your questions a little bit here, but -- and I think she --

14   she raises some legitimate concerns about the study.  The --

15   and the reason for that is confounding.  Are the -- are the

16   results based on mercury concentrations confounded with things

17   like land use or predation or the age of the female, which can

18   be factors affecting reproductive success?

19        I think -- I think the bottom line for Dr. Henry's look

20   at that is that, well, they might be, but she wasn't able to

21   go far enough in her analysis to say they definitely are, and

22   I guess we will see about that.  So it's an interesting point.

23        The -- the study design for the South River Carolina

24   wren study, boy, it sure looks solid.  It's about as good as

25   you can do in these kind of studies, that they had an upstream

1   and downstream area, a contaminated -- or an uncontaminated

2   and a contaminated area.  Unless you've got a before and after

3   comparison, it's very hard to get a better study design, and,

4   you know, you do try and -- and think about confounding

5   effects.

6        Anyway, and -- and I would again emphasize that the 1.2

7   level is not based entirely on this study.  It's based on a

8   number of studies.  And I thought Dr. Evers made a very good

9   point in his deposition.  He said, you know, Dr. Henry's

10  arguing for 3 or even 4 as an effects level.  Evers said he

11  just couldn't see that.  His -- most of his research has been

12  on loons, a different kind of bird, a fish-eating bird, so

13  probably less sensitive to -- to birds like Carolina wren that

14  eat invertebrates.  And he said, we see -- the loon research

15  community sees with very -- a solid number of studies, a bunch

16  of people that have done work in different areas, they see a

17  40-percent reduction in reproductive success in loons at

18  3 micrograms per gram.

19       So what he's saying is, how could the level for a more

20  sensitive group of birds, like these insect-eating birds,

21  possibly be 3 or 4 when it has very noticeable effects on a

22  group of fish-eating birds, and these we know are more

23  sensitive?  And -- and it seems to me the results of the

24  Jackson, et al., study in Carolina wrens is consistent with

25  the -- the results are consistent with the -- what is known

1    about the impact of mercury on loons and that the level must

2    be somewhere around there.  It must be significantly less than

3    3.

4         So I probably anticipated your next five questions,

5    but --

6    Q    I think I'm going to sit -- no.

7    A    Sorry.

8    Q    Well, let's back up.  I mean, you've contrasted now

9    loons with Carolina wrens and -- I mean, doesn't -- in some

10   sense, that just highlights the variability between effects in

11   various species, correct?

12   A    Yes, it does, but it is generally thought that the

13   birds, such as Carolina wrens, because they're insect-eating,

14   probably are more sensitive to mercury than birds that eat

15   fish.

16   Q    But we don't know.  I mean, there's certain birds that

17   may have built up certain tolerances for various chemicals in

18   the environment, correct?

19   A    Yes, and -- and you certainly have the factor that the

20   birds that you find in a contaminated site may be the ones

21   left over.  They're the ones that survived, and there could be

22   other ones that didn't survive, and they're not there anymore.

23   Q    Let's -- just to cap off what you know about the

24   Carolina wren study itself, you mentioned Dr. Henry now has

25   the underlying data for that.  Do you currently have the

1   underlying data?

2   A     No, I did not request it.

3   Q     Okay.  And -- and as of writing the Phase II Report, you

4   had not reviewed the underlying data for the --

5   A     Correct.  I -- I do not feel I have the expertise in

6   bird toxicology to go through that raw data and analyze it

7   independently from what the authors did.

8   Q     You concluded -- let's switch gears regarding -- for

9   cormorants.  You concluded that 800 nanograms per gram was a

10  protective value for cormorants in the Penobscot?

11  A     That's correct.

12  Q     Would you at least agree -- I believe we discussed this

13  at your deposition, but, again, closing the loop on the

14  discussion on bird levels.  Would you agree that 1,200

15  nanograms per gram is a fairly low threshold value?

16  A     Yes, I agree.

17  Q     And I think you determined, as well, that the feather

18  tissue concentration of 5,000 nanograms per gram of mercury in

19  bird feathers was reasonable, correct?

20  A     I -- I think I recall that.  I'm not as familiar with

21  the feather levels and haven't reviewed them recently.

22  Q     I believe that's right out of the report.

23  A     I will take your word for it.

24  Q     Was -- was that another area -- I'm just saying, you --

25  you looked at threshold values in the literature independent

1    of measured concentrations observed in Penobscot birds to set

2    these target levels, correct?

3    A    Yes, you're referring to the -- the levels in bird eggs?

4    Q    Yes.

5    A    Okay.

6    Q    And when you had a point where you needed to decide on a

7    specific level, was that something that you and Dr. Kopec

8    debated?

9    A    Sometimes.  Um, I recall that I presented a -- as

10   Dr. Rudd would put it, a straw dog proposal for these -- these

11   levels at our meeting in British Columbia when we were

12   starting to think about our final conclusions in the report,

13   and I had a PowerPoint presentation that I gave to the group

14   with some early thinking on these levels.

15        I think we all debated them at various times, but I

16   think that Dr. Kopec and I and, to a certain extent,

17   Dr. Fisher were more active in discussing them.  We were the

18   biologists in the group, and the geochemists weren't as

19   interested or didn't have the -- didn't have the expertise.

20   So I would agree with that.

21   Q    Let's just take a look at -- at one of these as an

22   example.  This is Defense Exhibit 78, and this is an e-mail

23   from Dr. Kopec to you dated February 20th, 2013.

24             MR. TALBERT:  I'd like to move for the admission of

25   this exhibit at this time, as well as the attachment to that

1    exhibit, which is Defense Exhibit 79.

2              THE COURT:  Any objection to 78 and 79?

3              MR. BERNARD:  No, Your Honor.

4              THE COURT:  Each is admitted.

5    BY MR. TALBERT:

6    Q    Let's take a look at this.  It's a -- it's a pretty

7    short e-mail.  She says, please have a look at this -- this is

8    the attachment.  Perhaps we could compromise with a feather

9    target of 5 micrograms per gram?  I really think 3.4 is too

10   low, especially as it is a number estimated from a model for

11   blood, then another model that converts blood to feather

12   concentrations.

13        Alternatively, we could do what Ackerman did, say feather

14   mercury is associated with toxicity somewhere between 5 and

15   10 micrograms per gram, and I could report both numbers

16   percent above for each bird.  When the P1 feather is sampled,

17   the level associated with toxicity is greater than when a

18   breast or body feather is sampled.

19        And this last paragraph, yes, I'm okay with 5.  Most of

20   the Nelson's feathers from our reference site will be above

21   that, so the blood levels at the reference site will be below

22   the blood target, while most of the feathers will be above the

23   target, but so be it.  The Penobscot P1 mercury concentrations

24   are high enough to erase any doubt of elevated exposure.

25        Do you see that?

1    A      Yes.

2    Q      Does this illustrate one of the discussions that you had

3    regarding what the appropriate target levels were?

4    A      Yes.

5    Q      Okay.

6    A      And -- and here, as in the case of the blood level,

7    Dr. Kopec is arguing for a more conservative, or higher,

8    target value than I was.

9    Q      In this, she also notes that the -- at least the

10   feathers would be above the target, and -- and that would be

11   in the reference sites, correct?

12   A      Yes, she is saying that, based on the data that we've

13   collected, the feathers at the reference site, if we chose

14   3.4, would be above that target value.

15   Q      Hm-hmm.  And just to understand how this process works,

16   to make clear on the record, when you're looking at various

17   papers and there's a study where there are no effects at a

18   certain mercury concentration in biota, those are -- are

19   studies that you do not really consider, weigh, in selecting

20   the target, correct?

21   A      Correct.  If we had clear evidence from solid -- studies

22   that we thought were solid that were below those levels, then

23   we wanted to be protective of the populations present there,

24   and we went with the lower levels.

25   Q      So if you have four studies and three of them show no

BODALY - CROSS-EXAMINATION/TALBERT

1  effects at 20,000 nanograms per gram and you have one study

2  showing an effect of some -- of some sort, some endpoint, at a

3  thousand nanograms per gram, you would -- the level would be a

4  thousand nanograms per gram.

5  A    I doubt if we would have done that.  I feel that the --

6  the targets that we chose were defensible.  They were always

7  based on a number of studies.  They weren't just based on one.

8  They were based on a number of different species.  And if

9  there was a case -- as you point out, there was ten studies

10  that said 10,000 and one study that said 1,000, I -- I think

11  that would have put doubt in our minds that the -- the study

12  that said 1,000 was valid, and we would at least have a strong

13  look at it, and -- and, you know, that would -- that would

14  introduce some doubt in our mind as to whether the 1,000 would

15  be reasonable.

16      So I think that we -- we only picked studies that were

17  based on -- we only chose targets that were based on a number

18  of studies.

19  Q    I'm going to -- I'm going to move ahead a little bit to

20  talk about this particular topic of -- of selecting the target

21  where you have limited number of studies.  And let's -- let's

22  take this off and pull up Joint Exhibit 6-2, and let's go to

23  Page 2-9, which I believe is the targets to protect mammal

24  health, and let's -- please blow up this middle paragraph.

25  Okay.

1       So just to orient ourselves, this is in the section of

2  the report where you're setting a target for mammal health,

3  correct?

4  A       Correct.

5  Q       And first -- first the way that this is structured is

6  you report some of the studies that you looked at and then,

7  based on -- on those, you identify a specific target that

8  you're selecting.

9  A       Correct.

10  Q       Okay.  So here you say, there are few relevant studies

11  to determine what might be toxic concentrations of mercury in

12  bats in the Penobscot System.  Toxic effects of mercury in

13  humans are thought to start at around 10,000 nanograms per

14  gram wet weight in hair.  You cite a number of studies.  And

15  then you say, Burton, et al., found decreased swimming ability

16  and deviant behavior in mice at fur mercury concentrations of

17  7,800 to 10,800 nanograms per gram wet weight.  And this other

18  study, Sleeman found tissue abnormalities in otter with fur

19  concentrations of mercury of 183 nanograms per gram wet

20  weight.

21       Effects on adrenocortical levels in big brown bats at a

22  contaminated site in Virginia were not evident at 28,000

23  nanograms per gram wet weight in fur and 110 nanograms per

24  gram wet weight in blood.  Neurochemical changes were also not

25  found in little brown bats sampled at the same

BODALY - CROSS-EXAMINATION/TALBERT

1   concentration -- contaminated site.  It is important to note,

2   however, that just because effects are not found in a

3   particular study, it does not necessarily mean that effects

4   did not exist because effects could be taking place on some

5   response that was not measured.  So, a reasonable limit for

6   mercury in bat fur for toxic effects might be 10,000 nanograms

7   per gram wet weight.

8        So my question is, isn't this an example where you

9   have -- you have this study specifically of bats, and they

10  find no toxic effects at 28,000 nanograms per gram wet weight,

11  but you have a -- a study where there were effects found at

12  10,000 and then I guess you have this other study of -- of

13  mice swimming and, leaving aside what deviant behavior is in

14  the mice, you have a range of 7,800 to 10,800 nanograms per

15  gram.

16       So isn't this an example where, you know, you're

17  really -- you're picking this very close to low range, but

18  you've got -- you know, you have no effects in the specific

19  species that you're setting a target for?

20  A    Yes, and that's a good point, and it points out, you

21  know, some of the uncertainty in -- in this kind of exercise.

22  I would say, first of all, that, as we pointed out in this

23  paragraph, just because a study didn't find effects in some

24  parameter does not necessarily mean that there aren't effects

25  taking place, because they measured one thing and they didn't

1   measure a number of many other things they could have

2   measured.  So that's an area of uncertainty.

3       We have no knowledge -- I have no knowledge of how the

4   different species of mammals included here, we're talking

5   about bats, we're talking about mice, we're talking about

6   people, how they might differ in their sensitivity to

7   methylmercury, and that is an uncertainty.  But, again, we

8   have no reason to believe they would necessarily be very, very

9   different.  They might be.

10      I think that this was what was recommended by Dr. Evers

11  to us based on his judgment and his experience.  We -- we used

12  the term might in that final sentence, and I think that's a

13  recognition of some of the uncertainty related to mammals.  It

14  certainly would have been nice to have more studies.  But I

15  think, in the end, we chose a reasonable level, and Dr. Evers,

16  when you talk to him, I'm sure will stand behind it.  So

17  that's the situation.

18  Q    Isn't it also fair to say, just to cap this off, that,

19  you know, some of the different effects that you could observe

20  in -- in one species, for example, decreased swimming ability

21  in a -- in a mouse, may not necessarily directly apply to

22  another species or be relevant to its survival in the

23  population?

24  A    It may not, but the assumption is that they're both

25  mammals, and it -- it may apply.

BODALY - CROSS-EXAMINATION/TALBERT

1    Q    In other words, like swimming ability in a mouse may be

2    more important than swimming ability in a -- in a bat,

3    correct?

4    A    As far as I know bats don't swim, so I agree with you.

5    Q    Okay.

6    A    Absolutely.  But, you know, something that affects

7    decreased -- something that -- that causes decreased swimming

8    ability you're saying causes -- has deleterious effects on

9    mobility, in other words, muscle and nerve function directing

10   that mobility, and could be very, very important for any

11   mammal in terms of catching food, avoiding predators,

12   migrating, mating behavior.  So that -- that study seemed

13   relevant to me.

14        It is an older study, and that was a bit of a concern.

15   On the other hand, they reported effects down to 7,800 with an

16   upper limit of 10,800, and the limit that we chose was towards

17   the top end of that range.

18   Q    Let's -- let's go back -- actually, let's -- let's

19   switch gears now and talk about the various biota.  Is it fair

20   to say that the Study Panel studied a wide range of biota in

21   the -- in the Phase II Report and -- and the entire study?

22   A    Yes, I agree.

23   Q    Do you have any offhand count of -- of the number of

24   different fish and mammals and birds that were studied?

25   A    Must be 20 or thereabouts.

BODALY - CROSS-EXAMINATION/TALBERT

1    Q    And when you -- would you agree that there are numerous

2    species that you studied where there was not evidence of any

3    elevated levels of mercury that would be above concern?

4    A    Some of the species we looked at, particularly

5    fish-eating mammals, mink and otter, and fish-eating birds,

6    osprey, bald eagles, kingfishers, did not have elevated

7    concentrations in contaminated areas of the river compared to

8    uncontaminated areas of the river.

9         We did not get very good samples of the mammals, and I

10   would say that those results probably are going to have some

11   difficulty getting into a peer-review journal just because of

12   small sample sizes and uncertainty.

13        The fish-eating birds, we assumed going in that they

14   would have elevated concentrations of mercury, and it looks

15   like there's a lot of other factors that affect that.  But

16   you're correct that they did not show elevated concentrations.

17   Q    Is it fair to say that the Study Panel's not concerned

18   about the health of invertebrate or shellfish in the system?

19   A    There's very little information in the literature about

20   the toxic effects of mercury on invertebrates or shellfish.

21   Dr. Sandheinrich, in his report to us, made that point, and we

22   basically had to leave that as an uncertainty and felt we

23   could not, based on the present state of the science, make any

24   decisions about that.

25   Q    Do you also agree that there is insufficient information

1    to set a toxic effects threshold for the lobster?

2    A    Yes.

3    Q    And --

4    A    You're referring to the -- the possible impact of the

5    mercury on the lobsters themselves?

6    Q    Correct.

7    A    Yeah, yes, I agree with you.

8    Q    And there's no evidence currently that cormorants are at

9    risk, correct?

10   A    Correct.

11   Q    We -- we looked at the levels in cormorant eggs at a

12   number of sites up and down the lower Penobscot.  We were able

13   to get cormorants from some sites quite far up the river.  One

14   was around Bucksport.  In fact, I think it was just a bit

15   upstream of Bucksport.  When we first sampled them, it

16   appeared the levels were a little bit higher than they are

17   now.  We -- we chose a fairly high protective level -- or a

18   target level for cormorant eggs in recognition of the fact

19   that fish-eating birds appear to be more resistant to mercury,

20   as you might expect, than nonfish-eating birds.  So we went --

21   Dr. Evers recommended 650 nanograms per gram in bird eggs as a

22   target; we went to 800 based on the studies by Heinz that we

23   talked about.

24        And presently none of the samples that we took in the

25   later years of the study of cormorant eggs are above the 800

1    nanograms per gram target.

2        Unfortunately what also happened was that we were unable

3    to get samples of cormorant eggs at those stations further up

4    the river, which had higher levels.  For some reason, the

5    cormorants stopped nesting up there, and that site north of --

6    slightly north of Bucksport was no longer a breeding and

7    egg-laying site for cormorants.  So we could not collect

8    samples there.  They may have been a bit higher than the ones

9    down.

10       But I agree with your statement.  The present samples

11   that we've received or sampled of cormorant eggs and analyzed

12   show indications that they are below our target of 800

13   nanograms per gram.

14   Q    Do you agree with Dr. Henry that the panel applied the

15   wrong threshold value to the black guillemot?

16   A    Yes, yes, I made that mistake in writing Chapter 2.  I

17   should have applied the blood value of 1 or 2, rather than

18   1.2.  Because the guillemot is a -- a fish-eating bird, it's

19   thought that they are less sensitive to mercury.  And in the

20   errata for the Phase II Report, I corrected that.  It meant

21   that none of the samples of guillemots taken in Penobscot Bay

22   had blood levels over the -- the new target of 2 micrograms

23   per gram fresh weight in the blood.  It did not change the

24   fact that the majority of the eggs of the guillemot sampled

25   were above the toxic threshold for fish-eating birds.

1    So that -- that was a mistake, and it was corrected.

2  Q    Switching gears to toxic effects studies, do you recall

3  at your deposition one of the things we discussed was that one

4  of the reasons you stated that you may have shied away from

5  performing tox studies was that you had not performed one

6  yourself?

7  A    Yes, I did say that, and I -- I agree with it.  It was

8  one factor, at least in my mind.  I recall feeling like, um,

9  boy, we've got a lot of things going on here, and I'm trying

10  to keep a lot of balls in the air, and this would be one thing

11  that is not only going to be a big job, but, um, it was

12  something I wasn't that familiar with and was going to add on

13  to, you know, the -- the sort of total burden of the study.

14    Most of the discussion that went on between the -- the

15  panel and the rest of the Study Group centered on more

16  theoretical considerations, and I'm sure that's your next

17  question.

18  Q    Yeah.  Do you agree with Dr. Henry that tox studies can

19  be valuable?

20  A    Yes, I agree.  You know, I think there's a lot of

21  advantages to doing them.  You potentially can get information

22  on the toxic effects of mercury on your species at your site,

23  and that's -- can be more valuable than information just from

24  the literature.

25    On the other hand, they're hard to do.  You know, we

1  talked about the -- the South River study on the Carolina

2  wren.  It's easy to fall into traps of confounding influences

3  in -- in trying to interpret your results.  That study took

4  four years to get those results.  I can imagine spending two

5  years on Nelson's sparrows just trying to prove out methods of

6  finding nests and how are you going to evaluate reproductive

7  success and how are you going to deal with the issue of

8  confounding factors.

9      And in the Penobscot, we don't even have a stretch of

10  the river with those kind of species breeding in -- in salt

11  marshes that we could use as a reference.  The South River

12  study was -- was more amenable to that kind of study design.

13  We'd probably have to go to a reference area off the system,

14  and then you run into problems of, well, is it -- are the

15  results confounded by salinity differences or vegetation

16  differences or even local weather or things like that, so --

17  food supply.

18      So, yes, I -- I agree that, in theory, the -- the

19  advantage of doing those kinds of studies are great.  Um,

20  they're not easy.  They probably would be expensive.  I would

21  make the point that I think Dr. Fisher made eloquently, and

22  that is that maybe what we've got there left in terms of the

23  bird community is what's left over, it's what survived.

24      The level of mercury contamination in the Penobscot

25  River in, say, the early 1970s is certainly -- was certainly

1   much higher than it is today.  Maybe there were whole species

2   that were eliminated from the Penobscot River, and we don't

3   have them there.  They, of course, would be the more sensitive

4   ones.  Maybe the ones we have there today are the less

5   sensitive ones, and that's why they have survived.

6        So I think that is a -- a theoretical consideration that

7   gives you some, you know, reason to think, gee, you know,

8   there's some pitfalls here.  Um, so those were all the kinds

9   of debates that we had.

10        I recall that when we started the debates, I was on the

11   side of doing toxic studies.  Um, I recall that Dr. Rudd was

12   against them.  Dr. Fisher was always for them.  And

13   Dr. Whipple was always against them.  And around the time,

14   which Dr. Fisher never ceases to remind me of, that he -- that

15   Dr. Rudd said, no, I've changed my mind, I think we should be

16   doing them, I changed my mind, and I said, I don't think we

17   should be doing them.

18        So, you know, it was -- it was -- it was an honest

19   debate among people who had different points of view, and it

20   was interesting, but, you know, those were the kind of

21   considerations we talked about.

22   Q    And --

23             THE COURT:  Do you want to take our break?

24             MR. TALBERT:  Sure.  Ten seconds just to --

25             THE COURT:  Sure.

BODALY - CROSS-EXAMINATION/TALBERT

1        MR. TALBERT:  Just to close the loop on -- on

2   this -- this line.

3   BY MR. TALBERT:

4   Q     We earlier talked about that -- that Heinz study on

5   variability between species.  That figures into our -- our

6   last discussion, right, that there could be this variability

7   between sites, and doing tox studies, you would actually get

8   site-specific information?

9   A     Yes, I agree.

10       MR. TALBERT:  I'd just like to enter -- I don't

11   think I entered into the record that Heinz study, which is

12   Defense Exhibit 587.

13       THE COURT:  Any objection to 587?

14       MR. BERNARD:  No objection.

15       THE COURT:  587's admitted.

16       MR. BERNARD:  Your Honor, my colleagues tell me that

17   587 is not the Heinz study, so maybe we can just clarify that?

18   Jeff, do you have the number?

19       MR. TALBERT:  Yeah, I'll check that.

20       MR. BERNARD:  587 is an e-mail.

21       MR. TALBERT:  I apologize, Your Honor.  I'll find

22   that -- the correct cite at the break.

23       THE COURT:  Okay.  Very good.  So I'll withdraw the

24   admission of 587 for the time-being.

25       MR. TALBERT:  Yes.

1        THE COURT:  We'll take a break for about 20 minutes.

2        (Court recessed from 10:30 a.m. to 10:56 a.m.)

3        THE COURT:  Mr. Talbert?

4        MR. TALBERT:  Your Honor, the defense exhibit for

5   the -- the Heinz study I meant to cite was -- is Defense

6   Exhibit 805.

7        THE COURT:  805.  Any objection to 805?

8        MR. BERNARD:  No objection.

9        THE COURT:  805's admitted.

10                  CONTINUED CROSS-EXAMINATION

11  BY MR. TALBERT:

12  Q    Dr. Bodaly, would you agree that there is statistically

13  significant evidence of declines of mercury concentration in

14  mussels?

15  A    Yes, I would agree.

16  Q    Is it fair to say that mussels are an important species

17  in terms of tracking trends?

18  A    They are.  Mussels have been historically very important

19  because NOAA, National Oceanographic Atmospheric

20  Administration, set up the Mussel Watch program I think in the

21  1980s, and they provided an important historical background.

22        Unfortunately, mussels are -- and the reason they did it

23  was they're easily collected.  They can be collected by

24  interested public -- members of the public.  But the -- the

25  data seems to indicate, as far as I can tell, that they tend

1   to go in long-term cycles as far as mercury is concerned, and

2   that's evident in the -- in the Mussel Watch site, which is in

3   our ES reach and very close to one of our sites.  So there's

4   some limitations, but I agree they're very important.  And, of

5   course, they're eaten by people.

6   Q    Would you also agree that there is evidence of declining

7   concentrations of mercury in rainbow smelt?

8   A    Yes, I agree.  I think not -- not all of the sites in

9   the upper estuary, but -- but certainly, I think most of them,

10  as I recall.

11  Q    Okay.  Let's switch gears, then, and talk a little bit

12  about mercury stable isotopes.  You spoke a little bit about

13  that with Mr. Bernard, and I just want to -- to go through a

14  couple of points with you.

15       In 2006, there were some sediment samples that were

16  collected to be analyzed for mercury stable isotopes, and

17  those were taken from close to the HoltraChem site, as well as

18  some other locations thought to be outside the influence of

19  HoltraChem, correct?

20  A    Correct.

21  Q    And the results were analyzed in 2007?

22  A    As I recall, yes.

23  Q    Let's take a look at Defense Exhibit 391.

24       MR. TALBERT:  I'd like to move for the admission of

25  that exhibit at this time.

1        THE COURT:  Any objection to 391?

2        MR. BERNARD:  No, Your Honor.

3        THE COURT:  391's admitted.

4    BY MR. TALBERT:

5    Q    And this is an e-mail from you to Nick Fisher, John

6    Rudd, and Chris Whipple with a cc to Holger Hintelmann, and

7    it's dated January 1st -- I'm sorry -- January 19th, 2007.

8    And first line, you say, gentlemen, here is stable isotope

9    data, fresh from the lab, they are pretty exciting,

10   exclamation point.  And I -- if we could blow that paragraph

11   up.

12        You say, see the attached spreadsheet and graph.  The

13   data consistently shows for different isotopes that samples

14   taken from the Orrington site are significantly different that

15   all of the reference samples --

16   A    I think that should have said different from all of the

17   reference samples.

18   Q    1 and 2 are the most different.  3 appears to be partway

19   between a site signal and a regional atmospheric signal, and

20   in parens says, 3 was taken a little bit further from the cell

21   building on the Southerly Stream than the other two samples.

22        Is it fair to say at this point in time that you were

23   very optimistic about what the mercury stable isotope

24   information could provide?

25   A    Yes, I -- I was interested in these results, and I was

1   promoting the idea that we should take more samples and that

2   they might be interested not only for looking at sources, but

3   also the movement and dynamics of mercury in the system.

4         MR. TALBERT:  And for the record, the proposal to

5   conduct studies on mercury in sediments for mercury stable

6   isotopes with some other proposals is Defense Exhibit 895, and

7   I'd like to move for the admission of that document at this

8   time.

9         THE COURT:  Any objection to 895?

10        MR. BERNARD:  I just want to look at it for a

11  moment, Your Honor.

12        THE COURT:  Sure.

13        MR. BERNARD:  No objection, Your Honor.

14        THE COURT:  895's admitted.

15  BY MR. TALBERT:

16  Q    Dr. Bodaly, a preliminary -- a description for the

17  preliminary sampling of mercury stable isotope signatures is

18  provided in the Phase I Report, correct?

19  A    I think so, yes.

20  Q    Let's pull up the Phase I Report.  This is Joint

21  Exhibit 4, and I believe there's a discussion about the

22  mercury stable isotopes on Pages 87 through 89.  And here if

23  we could just -- okay.

24        I -- I won't read all of this, but just for the record,

25  again, at this point in time, it appears that you -- you

1    believed that the mercury stable isotopes showed different

2    signatures for the HoltraChem site as opposed to other

3    reference areas, correct?

4    A    That's correct.

5    Q    And you explain in here that this holds some promise or

6    potential for examining sources?

7    A    Yes.

8    Q    Sites?

9    A    That's correct.

10   Q    Let's go down to the next page, over a page or two --

11   yes.  And if we could just expand this box.  Okay.  What does

12   this figure show?

13   A    This figure shows the ratios of two stable isotopes of

14   mercury, mercury 202 and mercury 198, at the six sites that

15   were sampled in 2006.  The data's expressed as a positive or

16   negative value, and you can see that the first three samples

17   on the left-hand side of the graph were taken from the

18   HoltraChem site.  That's what Orrington 1, 2, and 3 mean.  And

19   the three samples on the right-hand side of the graph were

20   taken at sites that were outside of the aquatic influence of

21   HoltraChem -- one in the East Branch, so our control area

22   right upstream in the Penobscot, the second one from the

23   St. George, one of our control reference estuaries to the west

24   of the Penobscot.  And the last one is the Penobscot River at

25   Eddington, and that was upstream of the Veazie Dam, again

1    outside the aquatic influence of HoltraChem, and it seemed to

2    show that the mercury 202/198 ratio on the Orrington site --

3    and keeping in mind that these are samples of sediment taken

4    on the site itself -- seemed to be quite different,

5    well-differentiated between samples that are outside of the

6    aquatic influence.

7         So this -- this seemed to me at the time to have some

8    potential to maybe be worth looking at in more detail.

9    Q    And just to make sure it's clear, the signal for the

10   mercury stable isotopes associated with the HoltraChem site,

11   as indicated by the Orrington 1, 2, and 3, had a -- had a

12   positive stable isotope ratio?

13   A    Yes, the 3 was barely positive.  I would say it's about

14   0, but, yes, the other two were definitely quite positive.

15   Q    Okay.  And then -- then the other samples we see here,

16   those -- those are all the ones that are -- that are negative,

17   correct?

18   A    Yes.

19   Q    Okay.  I think you mentioned earlier that there came a

20   point in time, then, when you collected some additional

21   samples.  And let's just -- if we could back out of this

22   blowup and take a look at -- okay.  And I think you reference

23   a number of additional samples were taken in 2007 to test

24   further the utility of mercury stable isotope ratios to trace

25   mercury from the HoltraChem site, including from off-shore

1 sediments in the estuary, from wetlands adjacent to the lower

2 river and upper estuary, and in sediment cores taken from

3 sites in the lower river, but those results were not available

4 for this report.  Do you see that?

5 A    Yes.

6 Q    And for the court, can you explain where -- we've talked

7 about geographically where these were taken, but can you, if

8 you recall, discuss a little bit about the numbers of samples

9 taken in these other locations and your thinking for taking

10 them in the locations you did?

11 A    Sure.  As I recall --

12        THE COURT:  I don't -- I don't mean to --

13        MR. TALBERT:  Sure.

14        THE COURT:  -- interrupt here, but I thought they

15 indicated that basically they -- that the isotope tracing was

16 a false path, that they thought they had something that was

17 going to help them fingerprint the HoltraChem mercury, and yet

18 they determined, after a period of time, that it was simply

19 not as useful because of the number of variables that they

20 came upon.

21    Now, why are we going through in detail something that

22 they decided not to pursue?

23        MR. TALBERT:  To -- exactly to probe into the -- the

24 reasons for that.

25        THE COURT:  But I've got the reason.  What -- I

1   mean --

2        MR. TALBERT:  Well, I haven't had an opportunity yet

3   to cross on the -- on the reason.  I believe the reason

4   provided was that fractionation -- they believed that

5   fractionation occurred --

6        THE COURT:  Why does the reason matter?

7        MR. TALBERT:  Well, we have a different -- and

8   you'll hear from Dr. Bigham -- I'm sorry -- Mr. Bigham, as

9   well.  He believes that the data was, in fact, interpretable

10  and shows a different signature than these other sites, and my

11  questioning gets at, when these other sites -- samples were

12  taken in 2007, they also showed a signal that was different

13  than the positive HoltraChem signal, and that's in the draft

14  report that I was just going to show him next.

15       THE COURT:  Okay.

16       MR. TALBERT:  And so what you see --

17       THE COURT:  Okay.

18       MR. TALBERT:  -- is some differentiation.

19       THE COURT:  So you've got an expert that says that

20  they basically -- the false path was not a false path and they

21  should have pursued it and it would have shown something

22  different than the conclusions they've drawn in the report.

23       MR. TALBERT:  Correct, Your Honor.

24       THE COURT:  Okay.  You may proceed.

25  BY MR. TALBERT:

1    Q      So, again, just -- just to orient ourselves, can you

2    explain for the court your thinking behind selecting these

3    different areas.  You referenced that you were going to take

4    some samples in the estuary, from wetlands adjacent to the

5    lower river and upper estuary, and the sediments taken from

6    sites in the lower river.  You know, why select those -- those

7    other sites?

8    A      Well, the samples taken from the contaminated zone in

9    the Penobscot River in surface sediments would give us an idea

10   of the ratio -- stable isotope ratio of mercury that was there

11   presently and might provide some clues about the utility of

12   this method in looking at sources and movement of mercury.

13          The samples taken from sediment cores would allow you to

14   go back in time.  As you went down through sediment core,

15   you're looking at slices that were laid down starting from the

16   present, at the surface, down through time, and if you can

17   date those cores by the mercury or by other methods, you can

18   get an idea of what the stable isotope ratios were in the

19   sediments that were laid down back into time.

20          And one of the ones that we did look at was a core that

21   we took on the Southerly Cove site adjacent to HoltraChem, and

22   that would perhaps provide some indication of what the ratio

23   of the stable isotopes that were coming off the site when most

24   of the mercury was coming off the HoltraChem site.  So that --

25   that was the thinking behind that.  And I think I recall it

1   was about 30 samples that were -- that were run.

2   Q    And after you got the results of -- of those samples, I

3   believe you testified earlier today that you -- you did draft

4   a report for the Phase I Update; is that correct?

5   A    That's correct.

6   Q    Let's -- let's take a look at -- at that draft, and I'm

7   going to cut through some of the other exhibits and -- and

8   just get right into this chapter, but I would like to circle

9   back, and there is a couple that I would like to have admitted

10  into the record.

11              MR. TALBERT:  One of them is Defense Exhibit 391.

12              THE COURT:  Now, I have that as admitted.

13              MR. TALBERT:  Okay.  How about 382?

14              THE COURT:  Any objection to 382?

15              MR. BERNARD:  One second.  No objection to 382.

16              THE COURT:  382's admitted.

17              MR. TALBERT:  Defense Exhibit 377?

18              THE COURT:  Any objection?

19              MR. BERNARD:  No, Your Honor.

20              THE COURT:  It's admitted.

21              MR. TALBERT:  Defense Exhibit 201 and 202?

22              MR. BERNARD:  No objection to either 201 or 202.

23              THE COURT:  Each is admitted.

24              MR. TALBERT:  And the one I'd like to discuss right

25  now is Defense Exhibit 371.

1         MR. BERNARD:  No objection.

2         THE COURT:  371's admitted.

3    BY MR. TALBERT:

4    Q    Let's pull up Defense Exhibit 371.  Does this appear to

5    be a copy of the notes you drafted on stable isotope ratios

6    for the Phase I Update Report?

7    A    Yes.  I don't recall what relationship this document had

8    to the eventual draft of the chapter.

9    Q    Hm-hmm.

10   A    I think this was an early document that -- that was

11   later expanded and became the draft chapter.

12   Q    Hm-hmm.  And you received some -- some comments,

13   correct?  Let's pull up Defense Exhibit 202.  There's a --

14   some red-line comments I believe you got from Holger

15   Hintelmann; is that --

16   A    I don't recall who those comments were from, but -- but

17   if you say so.

18   Q    Let's -- let's take a look at Page 7 in this document.

19   And if we can -- I don't know if we can expand this a little

20   bit bigger.  But if you can see on the screen, it looks like

21   a -- this is a larger figure, map -- is there a way to slide

22   this in the center, if we can?  Okay.  Do you know what this

23   figure shows?

24   A    It's not a very good figure, is it?  It's hard to read.

25   Q    Well, does this represent the -- is this similar to the

1  figure that was reported in the Phase I Report, but now

2  including the data results that you received from 2007

3  samples?

4  A    Yes, I -- I believe that's what it is.

5  Q    Okay.  And what I wanted to draw your attention to is

6  the HoltraChem site data up here in this -- in this box, you

7  have the -- the two HoltraChem samples that were -- were

8  positive up there, correct?

9  A    I believe, actually, there's the three HoltraChem

10 samples are there, the two that were quite positive and then

11 the third one that was near 0.

12 Q    Correct.

13 A    I think those were the ones -- the three bars on the

14 right, but you can't really see the 0 bar because it's -- it's

15 right on the 0 line.

16 Q    Yeah.  And then if we're looking at this, this is data

17 that you have taken throughout the estuary at various points,

18 and you're reporting the mercury stable isotope signature,

19 correct?

20 A    Correct.

21 Q    And looking at these bar graphs, is it fair to say that

22 these predominantly are negative as opposed to positive for

23 the HoltraChem site signature?

24 A    The -- the samples that were taken of surface sediments

25 throughout the Penobscot Bay in wetlands and in -- I -- I --

1    unfortunately, I can't read the -- the -- the titles on each

2    of the bar graphs.  But --

3    Q    Let's --

4    A    They -- yeah, the surface sediments ran around at minus

5    0.6 to minus 0.7, yes, they were negative.

6    Q    Let's -- and you've done this by region, so we could

7    blow them up kind of like a section like that, to take a

8    closer look, if you would like.

9    A    They were fairly consistent, as I recall, around minus

10   .6 to minus .7.

11   Q    And we can run through the various e-mails that I just

12   put into the record.  But is it fair to say that when you got

13   those results back, you were a little perplexed because you

14   expected that the signature of those stable isotopes would be

15   either positive or -- or much closer to the signatures you

16   were seeing from the HoltraChem site?

17   A    Yes, we certainly were perplexed.  We were having

18   trouble interpreting these data.

19        One other very key sample here -- and I'd really like to

20   see it to refresh my memory -- was the stable isotope ratios

21   in the SC cores -- SC is Southerly Cove, which -- and the

22   samples were taken in the core when -- placed in the core when

23   the mercury concentrations were very high, so it would be

24   assumed to represent sometime in the late '60s-early '70s.

25   And they didn't -- that didn't make sense either.

1    I think it might be the -- the bar graph in the upper

2  left corner.  Is it possible that that could be blown up just

3  to refresh my memory?

4  Q    Let's back out of this and let's blow up this little

5  corner.  So is this the SC core you were talking about from 0

6  to 2 centimeters?

7  A    Yes, and it -- it was quite negative, as well, if I've

8  got the right one.  SC1 -- well, no, that's -- that's SC01, 0

9  to 2 centimeters, which would be the surface of the Southerly

10  Cove core.

11    Anyway, I recall that the mercury in the Southerly Cove

12  core that was deep in the core and where the concentrations

13  were very high and would be assumed to be around the time when

14  most of the mercury from HoltraChem was going into the river,

15  that the signal was very different, as well, and I -- and I

16  can't remember what it was.

17    I agree with you that based on the samples that were

18  taken at the HoltraChem site, which, as you say, were

19  somewhere in the range of 0 to plus 1 or something -- they

20  were positive -- and most of the sites at the surface were

21  negative, usually around .6 -- negative .6, negative .7, and

22  there was a lot of unexplained things in this data set.

23    One of them was that the -- if you've got fractionation

24  of mercury isotopes in nature, you would tend to expect that

25  whatever reactions they're undergoing, the lighter isotopes

1    would react faster because they're lighter.  It's the same

2    element, but they have less neutrons in the nucleus, and the

3    -- the atoms are therefore lighter and would tend to be more

4    reactive.

5         And so if you fractionate it, you would expect that it

6    would be getting more heavy.  What's left over didn't react

7    and go away to the atmosphere, for example, it would be

8    heavier, and this didn't really fit to that.

9         But, yes, it did not fit to our expectation that these

10   samples would be more similar to what was on the HoltraChem

11   site.

12   Q    Isn't it true that one of the things that was perplexing

13   was that the samples taken in other areas of the system were

14   more consistent with what you had identified as being

15   potential background?

16   A    They -- they appeared to be a mixture of the two.

17   Q    Okay.

18   A    At least on the face of it.

19   Q    And one of the things, as you just alluded to, was the

20   Study Panel tried to figure out whether or not fractionation

21   had occurred that could explain these results, correct?

22   A    Yes.

23   Q    And part of the reason was the results really didn't fit

24   the hypothesis at the time?

25   A    Yeah, we were trying to use the data we collected to --

1  and try and make sense of it.  And as you heard from Dr. Rudd

2  last week, he reached out to Dr. Hintelmann and also to

3  Dr. Santschi, who have expertise in these areas, and -- and

4  said, okay, here's our data set.  Could you please have a look

5  at it?  And, you know, let's -- we're trying to make sense of

6  this, we're trying to write it up, and we need help.  We can't

7  figure it out.

8  Q    Isn't it true that at your deposition, you explained to

9  me that if the results had come back and shown that they fit

10 the HoltraChem signature, that the Study Panel likely would

11 not have invoked fractionation and would have included these

12 results in the Phase I Update?

13 A    If I said that, I think I was not speaking correctly

14 because it -- it is known that mercury does fractionate in the

15 environment, although that's more of a more recent discovery.

16 So if we had simply said, those samples out there are the same

17 as the ones we took at HoltraChem and, therefore, we say that

18 mercury's from HoltraChem, that would have been a little bit

19 naive, I think.

20      Please understand that I really don't think I'm an

21 expert in stable isotope fractionation behavior in the

22 environment.  I don't -- I think I understand

23 density-dependent fractionation.  I'm pretty sure I could

24 never explain to anyone what density-independent fractionation

25 is or how it could possibly work.  It is, in fact, the fact

1 that the even-numbered isotopes tend to fractionate relative

2 to the odd-numbered isotopes.  That doesn't make any sense to

3 me, but apparently it happens, and I guess smarter guys than

4 me can figure it out.

5      But, anyway, I'm struggling to get through these --

6 these answers because I'm not very good at this, didn't have

7 much experience, and when I was asked to write this up, when I

8 read it back, as I said earlier today, I don't think I did a

9 very credible job.

10 Q    Let's take a look at Defense Exhibit 954 and go to Page

11 415, Line 14, which I think is electronic Page 155, and we're

12 on Line 14, and we can just blow that up.  Here's my question

13 to you at the deposition:  If the samples had come back and

14 they were positive, do you think you would have looked at them

15 and said, fractionation may be an issue.  Maybe they should be

16 -- should be negative.  Mr. Bernard objected, and we -- and

17 you said, well, that's a reasonable point.  Yeah, I hear what

18 you're saying, if it had confirmed our view of the system and

19 the source of mercury based on other points of view, we

20 probably would not have questioned the issue of fractionation.

21 A    Yeah, and as I said in response to your -- your previous

22 question, I think that's a naive view based on my lack of

23 knowledge at the time about fractionation.  I actually don't

24 have much more knowledge now.

25      You know, we -- we had -- we felt we had so much solid

 1    data that HoltraChem was the primary source of mercury in the

 2    Penobscot.  We encountered a data set that was puzzling to us,

 3    but that which we could not reasonably interpret, certainly

 4    was -- we didn't feel we had enough data about sources of

 5    mercury and enough knowledge about fractionation.

 6         The fundamental problem we had and that Dr. Keenan had

 7    in his report is that we had no idea what the stable isotope

 8    ratio of mercury that was released from the HoltraChem site

 9    was.  We don't know how much it fractionated on the site or

10    later fractionated, therefore, it changed.  We don't know

11    whether the source of mercury changed over the life of the

12    HoltraChem plant.  We don't know to what degree those early

13    three samples that -- that we talked about earlier -- the

14    Orrington 1, 2, 3 -- we don't know to what degree they're

15    representative at all of what originally came off HoltraChem.

16    We don't know what the stable isotope ratio of any mercury and

17    any slimicide used by any pulp mill in the -- in the Penobscot

18    was.

19         And -- and what Dr. Hintelmann and Dr. Santschi told us

20    was, you guys don't have enough solid background data here to

21    interpret your data set, and that was our basic conclusion.

22    We weren't going to -- we -- we -- we tried to look at

23    sources.  The original idea was that probably HoltraChem might

24    have been around 0, and we had some indication of that, and we

25    -- we also knew that some mercury mines were producing mercury

1  that might have been around 0.  Now, a couple of recent papers

2  have come out that says that the original source of mercury

3  from some mercury mines -- one in China, and I believe the

4  other one was California -- were, in fact, around minus .6 or

5  minus .7.

6        But we didn't know what mercury the plant had used.

7  Q    Are you referring to the Feng and Donovan papers?

8  A    Yes.

9  Q    Okay.  Do you realize that in Feng and Donovan, they

10  report a large range of potential mercury stable isotopes from

11  those facilities?

12  A    I did not realize that.

13  Q    At the time, there was a proposal to take additional

14  samples, correct, of some --

15  A    Yes.

16  Q    And those additional samples were never taken, correct?

17  A    I believe that I was asked to draft a proposal at one

18  point, but I believe that was never submitted to the court for

19  approval.

20  Q    And as you --

21  A    That's my recollection.

22  Q    And as you alluded to earlier, the chapter that was the

23  -- the follow-up of the report in Phase I never made it into

24  the Phase I Update, correct?

25  A    That's correct.  And I -- as I indicated earlier, I

1    believe that that was a mistake.  It was something that I'd

2    forgotten about, as -- as you noted in my deposition.  I

3    believe we should have at least included the raw data in the

4    report so it would be there.  Of course, it was provided to

5    the parties.  And we might have provided a short explanation

6    that we collected these data, here they are, and we don't feel

7    we have a reasonable prospect of figuring them out and

8    explaining them.

9    Q     I want to switch gears and talk about some of the early

10   sediment core dating that was done for the Phase I and the

11   Phase I Update Report.  Do you know what -- what role the

12   Flett Research lab played in the Penobscot River Mercury

13   Study?

14   A     Yes, Flett Research was one of our main contractors for

15   mercury analyses.  They did a large proportion of biota and

16   sediment samples right from the beginning of the study right

17   to the end.

18         Flett Research also has expertise in radionuclide

19   analysis and did, as I recall, all of the radionuclide

20   analysis for the early deep cores that were taken in 2007, and

21   they also were coordinated with the labs of Dr. Yeager,

22   Dr. Santschi, and did parts of the radionuclide and other

23   analyses for the cores that Dr. Yeager took in 2009.

24   Q     And let's take a look at Joint Exhibit 5, and we'll look

25   at Page 34 of that exhibit.  This is the update to the Phase I

1   Report.  It's electronic Page 58.  And let's just -- maybe

2   this figure is -- is large enough for us to see.

3       But the figure below says, Figure 15, total mercury

4   concentrations, lead-210, and cesium-137, dating of sediment

5   core, D-01 taken at Fort Point Cove.  Do you see that?

6   A    Yes.

7   Q    Okay.  Is it your understanding that Flett did the

8   analysis of this core?

9   A    Ah, yes, I recall that they did the -- excuse me -- I

10  recall that they did the cesium and lead-210, and I believe

11  they also did the mercury analyses.

12  Q    And you have age -- I think right here you have age

13  lead-210 of sediment core sample?

14  A    Correct, the -- the horizontal axis is the calculated

15  age of each slice taken from the sediment core based on the

16  lead-210 model.  The lead-210 model is the -- this -- this

17  line here, I believe, and you -- you measure lead-210 in

18  various slices, and then you model it down into the sediment

19  core and then get an age.

20      The other ages, of course, shown here are cesium-137,

21  and there is one shown here, and there is one shown here.  As

22  we talked about -- or I guess Dr. Rudd talked about,

23  cesium-137 is an atmospheric nuclear bomb testing product, and

24  generally in sediment cores, the cesium-137 peak comes out at

25  around 1967, I believe.

1    Q     Is it --

2    A     So, yes, I --

3    Q     1963 for cesium?

4    A     Oh, pardon me, 1963, yes.

5    Q     All right.

6    A     And the vertical axis is going down in the sediment core

7    depth from the top at 0 centimeters, the bottom of this one's

8    about 73, and then the other horizontal axis on the top of the

9    graph is the total mercury concentrations in the various

10   slices.

11   Q     Okay.  So -- just so this is clear or an attempt to make

12   it clear, this -- the dots right here that I'm highlighting in

13   -- in yellow, that is -- those are -- those are mercury

14   levels, but using cesium to date different points; is that

15   correct?

16   A     Well, those are the mercury levels in the core slices at

17   the depths corresponding to the vertical axis.

18   Q     And the dates --

19         MR. BERNARD:  Excuse me a second, Your Honor.  The

20   -- Jeff, if I'm unclear, I'm sorry -- but it says lead-210 on

21   the horizontal axis.

22         MR. TALBERT:  Right, but he said -- as he explained,

23   they also used cesium-137.  That's the 1963 right here, as

24   well.

25   BY MR. TALBERT:

1    Q    Right?  There are two methods that --

2    A    My understanding of this is that the -- the dates shown

3    in black are the lead-210 dates, and the two dates noted as

4    cesium-137 are two dates calculated or inferred by the

5    cesium-137 concentrations.

6    Q    Okay.  So the dates that we see, those are based on the

7    lead-210 dating?

8    A    The -- the dates in black are based on lead-210, and the

9    dates with the cesium designation are based on cesium-137.  So

10   there's dates on this core from two different ways of dating

11   it.

12   Q    From both, correct?

13   A    Yeah.

14   Q    Can you explain for the court how you would date using

15   lead-210, just the basics?

16   A    I don't understand it.  I -- I'm sorry, I can't explain.

17   Q    Okay.

18   A    I understand the general principle, and that is that as

19   you go down in the core, the lead-210 concentrations decrease

20   because it decays -- radioactively decays, and I don't even

21   know what it decays to, but --

22   Q    Okay.  And we will go into this later with Drs. Yeager,

23   Santschi, and Dr. Connolly, as well as Dr. -- Mr. Bigham.

24        But for purposes of this core D-01, is it your

25   understanding that utilizing lead-210 to date the mercury in

1 this core resulted in a finding of the mercury peak here at --

2 at 1959?

3 A    That's my understanding.

4 Q    Okay.  And it's fair to say that 1959 preceded the

5 operation of the HoltraChem facility, correct?

6 A    That's correct.

7 Q    Is it your understanding that the HoltraChem facility

8 came into operation in -- in 1967?

9 A    That's my understanding.

10 Q    Let's switch gears and talk a little bit about Chapter

11 16 and some of the food web analysis.

12      Chapter 16 provides that determining how mercury enters

13 the food web is of importance to understanding how to reduce

14 exposure in upper-level organisms to mercury; is that correct?

15 A    I would agree.

16 Q    And in order to conduct food web analysis, the Study

17 Panel retained Biodiversity Research Institute to conduct

18 studies; is that correct?

19 A    Yes, they were retained to conduct the food web studies

20 in the salt marshes.  The samples for the aquatic food web

21 studies were taken under our supervision by Normandeau

22 Associates.

23 Q    And one of the reasons they were retained was that there

24 were concentrations of mercury observed in the songbirds and

25 shorebirds that were elevated in the wetlands adjacent to

1    Penobscot -- the Penobscot River, and it was important for the

2    Study Panel to understand the source of the mercury to the

3    dire of these birds, correct?

4    A     We felt that that would be an important addition to the

5    study and that would firm up our understanding of how the --

6    how those birds obtained their mercury, yes.

7    Q     Okay.  And -- and the food web work was supposed to help

8    differentiate, in some ways, sources of mercury in the food

9    chain to help differentiate where mercury was coming from

10   vis-a-vis the food of the -- the organism.

11   A     Yes.

12   Q     Let's take a look at the proposal to do this work, which

13   I believe is Defense Exhibit 905.

14         MR. TALBERT:  And I'd like to move for its admission

15   at this time.

16         THE COURT:  Any objection to 905?

17         MR. BERNARD:  No, Your Honor.

18         THE COURT:  905's admitted.

19   BY MR. TALBERT:

20   Q     Let's pull up -- this is a proposal to conduct studies

21   on the wetland food chains supporting songbirds and

22   shorebirds.  Do you see that?

23   A     Yes.

24   Q     And the date was May 4th, 2009, and this was drafted by

25   you?

1    A    That's correct.

2    Q    Okay.

3    A    The way the proposals worked is the panel and I, and

4    often others, would talk about the general topic.  We would

5    talk about a study plan.  I would be asked to draft a proposal

6    which included background, a general description of what we

7    were proposing to do, and a proposed budget, what we thought

8    it was going to cost, and that was then sent back to the panel

9    and others for comment.

10        And often if there was a contractor involved, often a

11   contractor would be involved in making sure that the proposal

12   was accurate, and -- and when everyone was satisfied, it was

13   submitted to the court by the panel.

14   Q    Does this proposal also contain the justification for

15   performing this work?

16   A    It should.

17   Q    Let's take a look at -- at Page 2, and then we'll flip

18   over to Page 3.  This just says justification.  This proposed

19   work originates from a strong recommendation by our review

20   panel that the Phase II study plan is not attaching enough

21   emphasis to the study of food chains of wetland birds.  Do you

22   see that?

23   A    Yes.

24   Q    And what are you referring to there?

25   A    Ah, we had a -- we had annual meetings -- review

1    meetings with the Study Group and all of the principal

2    investigators, um, and I'm referring there to a recommendation

3    from people that were brought into our annual meeting.  I

4    think that was the one in Chicago.  I recall Dr. Wiener was

5    there.  I think Dr. Luthy was there, and I'm not sure who

6    else.  I think we invited three people to come in.

7         And the written comments we received after the meeting

8    made this point, that -- that we weren't -- we needed to pay

9    more attention to documenting how the birds got their food.

10   Q    Let's go to Page -- the next page, where the

11   justification continues, and -- and let's have the top

12   paragraph expanded.

13        You state, there are several other bird species in the

14   marsh that have mercury concentrations between these extremes,

15   but nonetheless are high enough to be of concern for mercury

16   toxicity.  Methylmercury concentrations are bi -- biomagnified

17   at each step in the food chain.  Thus if several of the bird

18   species that are at toxic concentrations had short food

19   chains, an active remediation approach designed to lower the

20   rate of production of methylmercury and the concentration of

21   methylmercury in wetland soils could reduce the concentration

22   of methylmercury in several bird species to below toxic

23   levels.  On the other hand, if all of the bird species have

24   very long food chains, remediation measures to lower

25   methylmercury concentrations in wetland soils would have less

1    chance of success.  After meeting with our review panel, we

2    have decided that we need this type of in-depth understanding

3    in order to recommend or not recommend active remediation of

4    Mendall Marsh.  Do you see that?

5    A    Yes.

6    Q    So is it fair -- fair to say that you believed at this

7    point that obtaining this information would be important to

8    evaluating whether to recommend active remediation or not?

9    A    When I read it now, it sounds a little overstated, to

10   tell you the truth, but, yes, that was our rationale.

11   Q    Okay.  And in this case, is it fair to say that you had

12   problems actually getting this work done by BRI, Biodiversity

13   Research Institute?

14   A    I think the main problem we had was that the collection

15   of food chain organisms was not done at the same time as the

16   collection of the birds, so that was a concern in interpreting

17   the results.

18   Q    Is that a -- a flaw in the methodology of the -- the

19   study?

20   A    I would have -- I would have preferred that the food

21   chain organisms were correct -- collected around the same time

22   as the birds were collected.

23   Q    Okay.  And can you explain why that would be important?

24   A    Well, you're trying to get -- you're trying to match up

25   the samples in time.  You're hoping to get an idea of the --

1  of the mercury content and stable isotope ratios of carbon and

2  nitrogen in the food organisms at the same time that you're

3  measuring them in the birds.  So I think that wasn't ideal.

4      On the other hand, the stable isotope ratios, especially

5  in animals like birds, are averaging what the birds are eating

6  over longer periods of time, and that's the whole reason for

7  doing them.  You can get a snapshot of what an animal is

8  eating right now, in the case of a person, you might ask the

9  person what they've been eating.  In the case of an animal,

10  you can look at their stomach contents, and that's what they

11  -- the person or the animal ate today, maybe yesterday, but

12  the stable isotope ratios integrate those food sources over

13  longer periods of time.

14      And so if -- if you asked me what I had for supper last

15  night, it might be one thing, but the stable isotope ratios of

16  carbon and nitrogen in my tissues might be quite different

17  because what I had last night was an unusual menu item for me.

18          So what I -- the point I'm trying to make is the

19  stable isotope ratios in the animals do integrate over time

20  and give you some comfort that you're looking at what the

21  animal has been eating over a protracted period of time.  And

22  I -- I would expect that the period of time would vary

23  depending on the animal

24  Q     And -- and is it fair to say that one of the flaws in

25  the study design or execution was that the samples in the

1   stomach were not taken prior to the time period when you would

2   expect the birds to be laying their eggs?

3   A    We didn't look at the stomachs of the birds.  There --

4   there was -- there was to be some observation of feeding by

5   the birds.  We were -- not much came out of that.  So we

6   didn't actually look at the stomachs of the birds.  We weren't

7   allowed to sacrifice them.

8   Q    I'll correct that.  The samples that you took were --

9   were blood samples, correct?

10  A    Correct.

11  Q    And those blood samples were not taken prior to the time

12  period when the birds were thought to be laying their eggs,

13  correct?

14  A    I -- I don't recall.  I'm sorry.

15  Q    We can pull up -- just to refresh your recollection,

16  this is Defense Exhibit 972 and Page 196.  It's Lines 16

17  through 21.

18       And I asked you at your deposition, at this point, is it

19  fair to say we're not really sure what they're eating prior to

20  laying eggs?  Your answer, I would say it's fair to

21  characterize our studies of direct observation of feeding by

22  birds as incomplete.

23  A    Yes, and that's what I was referring to earlier when I

24  said that we didn't get a very good data set on actual

25  observations of birds eating.  We couldn't look at their

1    stomachs.  So this -- I'm agreeing with you, and I'm standing

2    behind the statement I made here, and -- but I -- I would

3    again go back to the fact that the stable isotope ratios

4    integrate over a longer period of time.

5         I -- I don't recall when the stable isotope samples were

6    taken in relation to the period of time when the birds are

7    laying their eggs, so that's the part I could not recall.

8    Q    Let's take a look at Defense Exhibit 36.

9              MR. TALBERT:  And I would like to move for the

10   admission of this document.

11             THE COURT:  Any objection to 36?

12             MR. BERNARD:  No, Your Honor.

13             THE COURT:  36 is admitted.

14   BY MR. TALBERT:

15   Q    If this paragraph can be expanded, that would be

16   helpful.  This is an e-mail from Dianne Kopec to you dated

17   November 18th, 2010, and she observes, we have no empirical

18   evidence on what our target sparrows are eating at Mendall

19   Marsh or W17.  Do you see that?

20   A    Yes.

21   Q    Do you know what she's referring to?

22   A    I assume she's -- I don't recall the e-mail, but I

23   assume she's referring to the fact that we were disappointed

24   by the data set on -- on direct observations of sparrow

25   feeding in Mendall Marsh and W17.

1  Q     Okay.  Let's -- let's go to Defense Exhibit 649.

2            MR. TALBERT:  And I'd like to move for the admission

3  of this exhibit.

4            THE COURT:  You said 649?

5            MR. TALBERT:  Yes.

6            THE COURT:  Any objection to 649?

7            MR. BERNARD:  None.

8            THE COURT:  649's admitted.

9  BY MR. TALBERT:

10  Q     Let's please blow up -- just to orient you, this is an

11  e-mail from you to Dr. Kopec dated December 18, 2012, and the

12  subject is comments on draft wetland food chain chapter, and

13  there's a -- an attachment of a draft wetland section, and

14  let's have this second paragraph expanded.

15        You state, in general, I think that this part of the

16  chapter needs some work.  I know it has been a hard slug, and

17  I know that things didn't work out the way we wanted, open

18  parens, i.e., a reasonable study design with some thought that

19  had gone into it, and a decent data analysis and report from

20  Dave Buck that we could actually use, close parens.

21  Therefore, you deserve a huge amount of credit for going back

22  to the raw data, making some sense of it, and getting it

23  written up.  Do you see that?

24  A     Yes.

25  Q     What are you referring to there?

1  A    I'm referring to the -- well, I'm referring to a number

2  of aspects.  I am commending Dr. Kopec for all the work she

3  put into it and all the insight and all of the hard work that

4  she always does in going back to the literature and

5  understanding the situation.

6       I am pointing out that we were disappointed by the study

7  design as carried out by BRI, and I'm pointing out that the

8  report that we received from Dave Buck, who's a staff member

9  at BRI, had all the data in it, but we felt it was unusable.

10      We ended up -- Dr. Kopec ended up going back and using

11 the raw data and writing it up from scratch.  So our contract

12 with BRI required them to produce a report.  We felt it was

13 not in good enough shape to use and present to the parties and

14 to the court, and, therefore, we had to have a lot of time

15 spent on reanalyzing those data and writing them up.

16 Q    Do you recall how much that study by BRI cost?

17 A    I don't recall exactly, but with all the analytical

18 costs and time of a lot of people in the field, I would guess

19 it was somewhere north of a hundred thousand dollars.

20 Q    And do you recall how long it took?

21 A    I think I -- I think it was based on one year's

22 fieldwork.  Getting the report out of Dave Buck was a

23 protracted process, let's say, and I don't recall exactly how

24 long that took, but perhaps another year and a half.

25 Q    And was there a point in time when Dave Buck and -- at

1  least BRI was -- their contract was terminated for this work?

2  A    Their contract for this particular piece of work was --

3  was not terminated.  It was taken to the end.  We received

4  their report, and we paid them based on the contract.  We

5  didn't ever terminate a contract with BRI.  We chose in the

6  last one or two -- I forget -- monitoring periods to go with a

7  different group, yes.

8  Q    All right.  Let's back off of this -- this section and

9  go down two paragraphs to this one.  So at this point in time,

10  you're providing comments to Dr. Kopec on how to write up this

11  chapter, correct?

12  A    Correct.

13  Q    And you attached some comments, but here you say, I've

14  also tried to insert comments that encourage you to de-

15  emphasize the flaws in the study design and to emphasize more

16  what we did find out.  I think the study design can be laid

17  out in the methods, without pulling any punches, and phrases

18  like results should be treated with caution can be used in the

19  conclusions, stemming from the disconnects between the site

20  locations and sampling times.  But I think the flaws do not

21  have to be repeatedly pointed out in the results sections.  Do

22  you see that?

23  A    Yes.

24  Q    So did you then make comments to that effect to

25  de-emphasize the flaws in the study?

1   A    I assumed that I inserted comments in the draft of the

2   chapter and provided those as an attachment to Dr. Kopec.  In

3   fact, it does say attachment to this e-mail is final draft

4   wetlands section, blah, blah, blah, DB comments, so, yes, my

5   comments were put on it.

6        I -- I recall at the time I felt that a level of

7   frustration of Dr. Kopec with the BRI work and -- and Dave

8   Buck were coming through rather strongly in the report.  I

9   felt she should certainly point out shortcomings in the design

10  and in the results, but I felt that repeatedly pointing them

11  out in the report was not appropriate.  It didn't make BRI

12  look good, didn't make us look good, and certainly mention

13  them, certainly discuss their -- the implication of those

14  shortcomings to the study results, but don't keep pointing

15  them out in -- repeatedly in the document, and that's what I

16  was trying to point out to her.

17  Q    Let's take a look at the document.  I won't go through

18  all of the comments, but let's take a look at a couple of

19  examples.  Let's take a look at Page 10.  This is the

20  introduction.  Same exhibit, 649, just Page 10, and there may

21  be some adjustment because of the electronic version, but

22  we'll -- we'll move through it to find -- next page, so it's

23  Page 11.  Okay.  Please blow up the beginning part -- this.

24  Go down to the further -- a couple sentence -- yep, that's

25  good.  Okay.

1        So is the text -- the text is what Dr. Kopec wrote, and

2   then you have some comments on the sides, correct?

3   A    Yes, I think so.

4   Q    She states, as noted below, at certain marshes, sample

5   dates for birds and invertebrates were not consistent, with

6   bird samples collected up to six weeks prior to collections of

7   invertebrate samples.  Given that prey availability is

8   expected to change over the summer, invertebrates sampled in

9   August may not reflect prey available to foraging birds in

10  June, prior to the birds' sampling dates.

11       Do you -- does this reflect one of the primary flaws

12  of that -- that food web sampling we were discussing?

13  A    Yes, I agree, and I agree it also points out a frame of

14  mind that she was in when she wrote it, rather than say that

15  the bird samples were collected an average of two weeks prior

16  to the collection of invertebrate samples, she wrote it as

17  were collected up to six weeks, in other words, was

18  emphasizing the -- the length of time.  So that -- that's the

19  kind of comment that I felt was not objective and was

20  emphasizing the flaws in an undue manner.

21  Q    Okay.  Next sentence of the next paragraph says,

22  further, the location of invertebrate collection sites did not

23  match the location of bird sample sites used in 2009.  Is that

24  another flaw of the study?

25  A    Yes.  We felt that the setting up of the transects,

1    which are -- are noted in the next sentence in that paragraph,

2    was not the appropriate thing to do.  That the sample sites

3    should have been -- that the invertebrates should have been

4    collected in correspondence with sites where the birds were

5    collected.

6         So I think it's fair to say that we collected some

7    general information about stable isotope ratios of

8    invertebrates in the marsh, and we got some indications of

9    feeding given the -- the flaws and the gaps, but I don't -- I

10   think it's fair to say we didn't -- the results we got were

11   not -- were not contradictory to what we thought was happening

12   and to reports in the literature, but I would say we didn't

13   collect a lot of really reliable, independent information on

14   feeding of birds in the marsh from our own studies.

15   Q    Let's back out of this, and I -- again, I won't go

16   through all the examples I have.  The document's in the

17   record.  But I will -- would like to discuss one other point

18   Dr. Kopec makes in here.  It's on Page 13, same -- the same

19   exhibit.  I'm sorry.  Back -- I was -- back to Page 12, and if

20   you could just blow up this section right here.  You can

21   include -- okay.  Okay.

22        Dr. Kopec writes, Song Sparrows are not obligate marsh

23   feeders.  They have a varied diet in the summer that may

24   include up to 60-percent plant material, though if they are

25   foraging on the marsh, snails and worms, both of which are

1   missing from this data set, contribute significantly to their

2   diet.

3           Is that, again, yet another potential flaw that you

4   were discussing earlier?

5   A      Just give me a second.  I'd like to read that again.

6   (Witness reading.)  Yeah, I -- I don't recall this.  It's

7   always been my assumption that they were not feeding heavily

8   on things like snails or worms or -- or amphipods, and it's my

9   -- I think that the results confirm that they probably are not

10  and that -- or using plant material extensively, and that it

11  did confirm that they were mostly feeding on insects and

12  spiders and animals like that.

13          I realize that's a big of a vague answer, but I just

14  don't feel I'm familiar enough with the details of the results

15  to be able to say.

16  Q      And you -- you comment that you are -- you ask her to

17  rephrase this; is that correct?  You're not happy with it.

18  A      Yes, and -- and refers to my earlier statement that

19  Dr. Kopec was frustrated in having to rewrite -- reanalyze the

20  data, rewrite the chapter given the shortcomings in the study

21  and in the write-up and the data analysis, and I felt that

22  that was coming out too strongly, and I asked her, is -- is

23  there a better way to say this?

24  Q      Is it fair to say that you also struck some of the

25  language yourself directly in this document?  If we go to --

1  two pages back, on Page 14, I think there's an example of

2  that.

3       And it's this last sentence here I think you strike.

4  Again, it is not clear that the katydids and leafhoppers were

5  available for foraging Nelson's given the four-week delay

6  between when the Nelson's were sampled and when the

7  invertebrates were collected.  Do you see that?

8  A    I took that as another statement, sort of an indication

9  of frustration by Dr. Kopec, and I believe it's actually up to

10 a four-week delay.

11 Q    Okay.

12 A    And I believe that was stated earlier in the report, and

13 that was simply a restatement of that and -- and said --

14 suggested to her that this was not appropriate to restate that

15 and emphasize that any more.

16 Q    Do you agree that the Study Panel did not investigate

17 the range of birds in Mendall Marsh and whether they reside in

18 and feed in areas other than the marsh?

19 A    That's correct.  We did not conduct studies on the

20 movements of the birds, either by observation or by -- by

21 radio tagging, and as I said earlier, I don't think we got a

22 very good idea of the direct feeding behavior of the birds

23 themselves.  Of course, if the birds were feeding outside the

24 marsh, which was contaminated, their mercury concentrations

25 would be lower then if they had fed only in the marsh.

1    Q    That would be an assumption, correct?

2    A    Yes, I think it's based on pretty good data that we know

3    where the contaminated zone is.

4    Q    Well, you didn't investigate the birds' diets throughout

5    the year, correct?

6    A    That's correct.

7    Q    I mean, you don't know whether or not a bird arriving at

8    the marsh could have a high level of -- of mercury when it

9    comes from south, correct?

10   A    The -- the birds that we looked at early in the season,

11   in fact, had lower concentrations than the ones that had been

12   in Mendall Marsh for a while.  That's my understanding.

13   Q    And when were those samples taken?

14   A    I -- I cannot point you to specific samples.  You should

15   ask Dr. Kopec that.

16   Q    And just to make sure the record's clear, you didn't

17   take samples of birds, you know, throughout a particular year,

18   correct?

19   A    That's correct.

20   Q    So we don't really know how much mercury a bird is

21   exposed to within a particular year.

22   A    Ah, we -- we characterized their mercury exposure when

23   on the breeding grounds in places like Mendall Marsh.  We did

24   not measure their concentrations when they were away from the

25   Penobscot.  I agree with you.

1    Q    Okay.  Do you agree that there's no direct evidence of

2    the link between methylmercury and mercury in bird blood in

3    Mendall Marsh?

4    A    I guess that's -- I guess it depends on how you define

5    direct.  We sampled birds on Mendall Marsh which were known to

6    be there for breeding purposes, for laying eggs, and

7    incubating the eggs.  There were some observations of birds

8    feeding on Mendall Marsh.  We sampled invertebrates using

9    stable isotope techniques and looked at mercury in those

10   invertebrates and compared them to the birds, and -- and we've

11   emphasized the flaws or the shortcomings in the study, but

12   those results were consistent with known studies on bird

13   behavior of those species and feeding behavior and, to me,

14   does not -- those results do not contradict the assumption

15   that most, if not all, of the feeding of those birds were on

16   the contaminated zone of Mendall Marsh.

17   Q    Do you recall testifying at your deposition that there

18   is no direct evidence of the link between methylmercury and

19   mercury in the bird blood in Mendall Marsh?

20   A    Ah, no.

21   Q    I can -- I can pull that up if it -- if it's helpful.

22   A    I'll take your word for it.

23   Q    Do you -- just to provide an answer, but in what way do

24   you agree with that statement, if at all, that there's --

25   A    Well, I -- you know, what I just stated was that I -- I

1  think that the data we -- we did collect and the evidence we

2  do have is -- does not contradict the -- the point of view

3  that -- that they are feeding in Mendall Marsh and that's

4  where they're getting their food from and their mercury from.

5  Q    Is the converse also true, that this didn't show that

6  they are?

7  A    Yeah, if you want to state it that way, yes.

8  Q    I believe you stated this as well at your deposition,

9  but I'll ask you, isn't it possible that even if sediment

10 mercury concentrations in the marsh decreased, bird

11 concentrations could still increase if there were a change in

12 the bird's diet or in the food chain links?

13 A    Yes, I think that's possible.  Of course, all of those

14 factors, such as where the birds are foraging, the length of

15 the food chain, what the birds are eating, will directly

16 affect the amount of mercury in the birds.  So I agree with

17 that.

18     And, of course, if -- other factors, such as the rate of

19 methylation in the marsh, can vary from year to year; we think

20 it varies from year to year.  However, I would still expect

21 that on average, we would see a decrease in the methylmercury

22 concentrations in pore water in --

23     (Interruption by the court reporter.)

24 A    That if -- I'm not sure exactly how I phrased it.  But I

25 think I said that we would expect to see decreases in the

1    concentration of methylmercury in pore water, p-o-r-e water,

2    if we can reduce the concentrations of total mercury or

3    inorganic mercury in -- in the marsh, and -- and that will be

4    subject to year-to-year variation and all the factors,

5    including the ones that you mentioned, but I think on average,

6    we should see those decreases.

7         The other thing -- the other point is that I think that

8    the marsh should respond very quickly.  If we can go towards

9    an application of something like SediMite, where we showed

10   that the methylmercury concentrations in pore water were

11   reduced very soon after the application of the activated

12   carbon by about 90 percent, and they were still down about 60

13   or 70 percent after a couple of years, those concentrations

14   should respond to that remediation treatment very quickly.  So

15   we should have pore water concentrations of methylmercury very

16   much lower and -- and very quickly lower.

17        And I would expect that the concentrations of mercury in

18   animals which are being eaten by the birds, at least some of

19   them, would -- might respond quickly, as well.  So this could

20   be a fairly quick process in getting those levels down.

21   BY MR. TALBERT:

22   Q    Well, I hadn't planned to go into this on remediation as

23   you told me you weren't necessarily an expert on remediation,

24   but I'll ask a couple of follow-ups questions on this --

25   A    Sure.

1   Q      -- that come to mind.  Isn't it true that at this point,

2   we don't necessarily know the full relationship between how a

3   -- a spider, for example, that a Nelson's Sparrow may be

4   eating would get its mercury in terms of uptake from -- from

5   pore water?

6   A      Yes, I -- I agree with that.  That's an uncertainty.

7   Q      And the SediMite would only address -- and at this

8   point, I believe that's the current plots that were taken only

9   showed that it was effective for a limited duration -- two

10  years, correct?

11  A      Well, we only sampled the plots for two years, so we

12  have no data beyond two years.  And as I mentioned, the

13  methylmercury concentrations in pore water were still reduced

14  60 to 70 percent after two years.  We don't -- we don't have

15  any data as to what happened after that.

16  Q      It's your testimony and belief that you do not have data

17  showing no difference between the control site and the site

18  that was applied after a period of approximately two years?

19  A      Ah, it's my understanding that the treatment plots were

20  reduced in methylmercury concentrations in pore water by 60 to

21  70 percent after two years.

22  Q      You don't recall -- we'll discuss this with Dr. Gilmour

23  on Friday.

24  A      Sure.

25  Q      But you don't recall that those levels dropped down and

1    basically equaled the control plot after a relatively short

2    period of time?

3    A    That's not my understanding.

4    Q    Getting back to this link, again, between how a spider

5    gets its mercury and reductions of methylmercury in pore

6    water, the SediMite would only -- if it were effective, would

7    only address methylation in the -- in the pore water, correct,

8    as well some concentrations in the sediment?

9    A    It appears the SediMite does not affect the rate of

10   methylation.  It -- it affects the partition in the

11   methylmercury between pore water and the solid phase.  So it

12   reduces concentration of methylmercury in the pore water and

13   may, in fact, increase the concentration of pore water in the

14   solid phase of the soil.

15       So -- so, yes, it -- it -- it doesn't affect the rate of

16   production -- as far as we can tell right now -- Dr. Gilmour

17   would be better to answer that than me -- does not affect the

18   rate of production of methylmercury.

19   Q    And isn't it fair to say at this point, we don't really

20   know exactly what levels we would have to reduce the total

21   mercury down to in Mendall Marsh in order to impact the

22   availability of methylmercury for a spider to have uptake that

23   mercury that would ultimately lower mercury in the birds?

24   A    I agree, and -- and in our Phase II Report, we said,

25   these experiments are preliminary.  They show promise -- I

1  believe they show promise, and we have not collected any

2  definitive data set on how much these treatments have reduced

3  mercury in animals.  You mentioned spiders, also, snails and

4  -- and other semi-aquatic organisms.

5      We have not investigated application rates.  We put

6  SediMite on at a kilogram per square meter.  Um, we don't know

7  what application rates of greater or lesser amounts would do.

8  We followed the plots for only two years.

9      Um, so there's a lot, I think, to be done.  I still

10  believe that those experiments show promise and are -- are

11  worth following up on and -- and they're worth further

12  investigations.

13  Q    Would you agree that there is not a -- the data

14  indicates for eel, that there is not necessarily a one-to-one

15  relationship between mercury concentrations in eel and

16  sediment?

17  A    Yes.  We'd talked about that in my Vancouver deposition.

18  We uncovered a lot of significant relationships between

19  mercury in sediment and mercury in biota.  We were assuming it

20  would be a one-to-one relationship, and we were advised on

21  that from Mr. Harris, our modeler, and a lot of information in

22  the literature would -- would lead you in that direction.

23      And as we talked about in my deposition, it looked like

24  that relationship was not one-to-one.  You are -- you are

25  trying to -- when you do the -- make those kind of

1   relationships, you're trying to infer the temporal changes

2   that might occur; in other words, if, in the future, you

3   reduce the concentration of mercury in the sediments, what

4   will the concentration in biota be, using spatial data, and in

5   the spatial data, things change.  You've got differences in

6   the environment and the river and -- and the bay, and -- and

7   the -- all of the factors that we talked about earlier that

8   can affect bioaccumulation and the concentration in the

9   animals can affect how those spatial relationships -- what the

10  relationship is, so it's uncertain.

11          I -- I took some encouragement from the fact that

12  there were relationships between mercury in biota and mercury

13  in sediments.  That the mercury in biota did appear, as we

14  would expect, to depend on mercury in sediments.

15  Q    Do you recall telling me at your deposition that in

16  light of the lack of one-to-one relationship between mercury

17  in eel and mercury in the sediment, that that caused you to

18  rethink some of the remediation targets?

19  A    I recall talking about what the slope of the line in the

20  regression was and that it -- it wasn't one, and it seemed to

21  me at the time I concluded -- and I haven't gone back and

22  looked at them -- that the regression slope suggested that

23  maybe the concentrations in biota might come -- might not come

24  down as fast as one-to-one; in other words, if you reduced

25  mercury in sediments, you might not get a proportional

1   decrease in the mercury in the animal.

2       But I would still, despite that, assume that the

3   relationship probably is one-to-one in the long-term if you

4   can, you know, get away from the problems of spatial analysis

5   that have all those confounding factors in it.

6   Q    Would you agree that that current relationship is

7   somewhat uncertain?

8   A    Yeah, I would say that the data is -- is interesting and

9   still open to some discussions.

10  Q    With respect to -- to lobsters, would you agree that

11  it's currently unknown what the primary sources of mercury are

12  in the Penobscot lobsters' diet?

13  A    I agree with that.  I think we define well that it is a

14  benthic -- benthically-based food chain for lobsters based on

15  the stable carbon and nitrogen isotope ratios.  I think that

16  we -- so, therefore, this confirmed our view that lobsters get

17  most of their mercury from animals that are getting their

18  mercury from the sediments, with the exception that lobsters

19  eat a lot of bait when they go into the traps, and most of the

20  bait that lobster fishers use is marine herring, which is a

21  mostly pelagic food source.  So that -- that's a complication

22  there.

23  Q    And does their bait also have mercury in it?

24  A    Certainly, yes, and we measured that.  We got samples of

25  bait from various lobster -- lobstermen and looked at how much

BODALY - CONTINUED CROSS-EXAMINATION/TALBERT

1   mercury was in it.

2   Q    And I believe we discussed this at your deposition, but

3   you said a large portion of their diet, you're learning, comes

4   from the bait in the traps.

5   A    I don't recall what we said then, and I don't have in my

6   head right now what the proportion is, so I'm uncertain about

7   that.  What proportion it would be from the bait versus

8   natural food present in the bay.

9        I would -- you know, certainly the -- the signal and the

10  geographic distribution of mercury in lobster in the bay, like

11  many animals, shows higher concentrations further up in the

12  bay, towards the river, than lower down in the river.

13  Assuming that lobstermen use similar bait and that lobster eat

14  similar ratios of bait versus natural food, it certainly looks

15  like there is a signal of mercury coming from the river.

16  Q    I think I also asked you this, but if -- if lobsters get

17  a significant portion or -- or a large portion of their food

18  source from the bait and also their mercury intake, then

19  performing a remediation in the Penobscot River may not

20  entirely address mercury issues in lobster.

21  A    I would agree it would not entirely address because the

22  lobsters would still be getting mercury from the -- from the

23  bait.  But the point I was trying to make in my previous

24  answer, where I perhaps didn't speak very clearly, is that if

25  we see a lobster up in the bay that is, for example, has about

1    twice as much mercury as a lobster further down in the bay,

2    and if we can remediate the river, presumably we should be

3    able to get that lobster high up in the bay to more resemble

4    the one further down in the bay, at least in its mercury

5    content.

6         And we assumed in -- in recommending remediation of

7    mercury sediments -- mercury-contaminated sediments in the

8    river, that those remediation actions would benefit animals

9    like the crabs and lobsters of -- in the upper part of the bay

10   in Fort Point Cove.

11   Q    I want to switch gears for a second.  You served as the

12   project leader for -- for the Penobscot River Mercury Study,

13   correct?

14   A    Correct.

15   Q    And you were a full-time employee of the study?

16   A    That's correct.

17   Q    You received an annual salary?

18   A    I did.

19   Q    And you were appointed to this role in 2006?

20   A    That's correct.

21   Q    Would you agree that you were responsible for

22   implementing Phase I and Phase II study plans?

23   A    Yes.

24   Q    And you also had a financial and administrative role on

25   the study, correct?

1    A    That's correct.

2    Q    You managed the project bank account?

3    A    Yes, I did.

4    Q    Okay.  And you wrote proposals seeking funding for

5    different aspects of the study?

6    A    That's correct.

7    Q    Okay.  And you were involved in identifying and

8    selecting various contractors retained in the study, correct?

9    A    Yes, I was.

10   Q    Did you also supervise contractors?

11   A    Yes.

12   Q    Did you supervise Dr. Kopec?

13   A    Yes.

14   Q    And you also did some fieldwork?

15   A    Yes.  My -- my involvement in fieldwork varied from

16   having contractors do essentially all the work and going out

17   with them at the beginning and in various phases to -- to, you

18   know, make sure everything was going smoothly to -- all the

19   way to being directly involved in some aspects of the

20   fieldwork and going out myself and doing things.

21   Q    Do you recall that in doing some of the sediment

22   sampling to look at sediment trends, that there's a point in

23   time that you realized samples were not taken at the same

24   locations year after year, so that made it difficult to

25   examine trends?

1  A     Yes.  We had some issues with a contractor who were --

2  who was looking at taking samples of -- of wetland and

3  intertidal samples.  We had defined a site, for example, an

4  intertidal site, as a 50-meter stretch of shoreline with

5  sediment fine enough to be able to sample it in a -- in a

6  sampling core tube, in other words, it would stay in the core

7  tube, and we did have some concerns about that.

8        We tried to -- we rectified it by making sure that the

9  field crews were trying to be consistent in the area within

10  the sampling reach that they were sampling.

11  Q     And do you agree that there can be, I guess, intersite

12  variability for sediments?

13  A     Intersite?

14  Q     Yes.

15  A     Do you mean samples taken at different times at the same

16  sampling reach, or do you mean between sample -- sampling

17  stations?

18  Q     I'm -- I'm going to get there next.  But between

19  sampling reaches, there's fair to say there's intersite

20  variability, correct?

21  A     Absolutely.

22  Q     And there's also intrasite variability?

23  A     Definitely.

24  Q     We've already discussed the biota trends a little bit.

25  But is it fair to say that the sample location -- changing

1  sample locations for various biota makes it difficult to

2  compare trends over time?

3  A    Yes.  It's a limitation in some of our data that we, in

4  the early Phase I part of the study, sampled animals from

5  particular sites, and those sites were sometimes changed,

6  sometimes changed in later years.

7       We tried not to change sites unless we had a really good

8  reason to do so for exactly the -- the question you're talking

9  about -- consistency over years, but that was not always the

10  case.

11  Q    And I think that we discussed this earlier, but one of

12  those issues was maintaining consistent locations to take a

13  look at mercury in wetland sites and some biota?

14  A    Yes.

15            MR. TALBERT:  Your Honor, I'm not going to discuss

16  this with the witness, but I'd like to introduce Defense

17  Exhibit 153 at this time.

18            THE COURT:  Any objection to 153?

19            MR. BERNARD:  I'm not sure, Your Honor.  If I could

20  have one second?

21            THE COURT:  Sure.

22            MR. BERNARD:  No objection.

23            THE COURT:  It's admitted.

24            MR. TALBERT:  Another defense exhibit, this is a

25  cover letter on Defense Exhibit 139, and then the attachment,

1    which is an outline of introductory section for mercury in

2    biota for Phase II Report, and that's Defense Exhibit 140.

3              THE COURT:  Any objection to 139 and 140?

4              MR. BERNARD:  No objection to either one.

5              THE COURT:  Each is admitted.

6    BY MR. TALBERT:

7    Q    Let's take a look, you know, just to orient you, there

8    is an e-mail, which I can show you -- it's just very short --

9    saying attached is an outline of introductory section.  But if

10   we pull up Defense Exhibit 140, and if we can blow up this and

11   this box.

12           There's a -- a comment on this draft saying, have since

13   realized that we only sampled two sites on 2007 and those

14   sites were never sampled either before or since -- oops, not

15   yelling.  And the -- the tag for that goes to the blue

16   mussels.  Do you know what is the issue that's referred to

17   there?

18   A    No, I don't.  I don't recall it.  First of all, I don't

19   know who made the comment.  I'm not sure who WU-4 is.  That

20   doesn't correspond to anybody on the project.  We only sampled

21   sites in 2007, and those sites were never sampled either

22   before or since.  That's certainly not my recollection of what

23   went on in any year.

24              MR. BERNARD:  Your Honor, without knowing who wrote

25   the comment, I don't see why we're having testimony about it.

1   BY MR. TALBERT:

2   Q     Well, let's pull up Defense Exhibit 139.  This is the

3   cover e-mail, which is from Dr. Kopec, and you -- you -- your

4   e-mail to her at the bottom was, comments, please.  Some of

5   the sampling details are a bit sketchy, Drew.  And she

6   responds, did I already send this to you, question mark?  My

7   program doesn't show that I replied, so here it is again if

8   not and the attachment was this document that you and I were

9   just discussing.

10        So I don't know, the W1 and these comments I had assumed

11  were from Dr. Kopec.

12  A     That's an assumption.  Many of these pieces went back

13  and forth among various members of the study, so I'm not sure.

14        The comment about mussel data for 2007, I would have to

15  go back and look at the data and the sampling sites, and I'm

16  not sure what's referred to there

17  Q     Substantively, do you have any -- you don't have any

18  recollection of that --

19  A     Correct.

20  Q     -- sampling -- potential sampling issue?

21  A     Correct.

22  Q     Okay.

23  A     We -- we set up the sampling sites in Phase I of the

24  study in the ES reach, in other words, in Penobscot Bay.

25  Those were the samples called ES.  My recollection is that we

1 stuck with those original sampling sites that we first sampled

2 in 2006.  We certainly reduced them in later years, but I

3 don't recall that we sampled very many, anyway, sites other

4 than those original sampling sites.

5        MR. TALBERT:  Your Honor, at this time, I'd like to

6 also introduce into evidence Defense Exhibit 268.

7        THE COURT:  Any objection to 268?

8        MR. BERNARD:  No, Your Honor.

9        THE COURT:  It's admitted.

10 BY MR. TALBERT:

11 Q    Let's pull this document up, Defense Exhibit 268.  This

12 is an e-mail from you to John Rudd cc'ing Nick Fisher and

13 Chris Whipple dated January 20th, 2009, and you state, I

14 thought you had a really good idea to try to relate patterns

15 of mercury in biota with those in the river.  You inserted the

16 following paragraph into the report.  And let's just pull that

17 up.

18        One of the most difficult aspects of the Penobscot study

19 is that because of the transition from fresh to -- I guess

20 that's supposed to be -- salt water in the Penobscot

21 River/estuary, very few species exist throughout the system,

22 so geographical patterns are difficult to establish.  We have

23 attempted to minimize this difficulty by looking for species

24 with widespread distributions, by sampling different species

25 that feed in a similar way in fresh and saltwater habitats and

1   by trying to relate concentrations of mercury in biota to

2   concentrations of mercury in nearby -- I guess that's --

3   streams and water.

4        If we pull back -- actually, just keep that -- let's

5   blow that up for a second again.  Do you agree with the

6   statement that one of the most difficult aspects of the study

7   is because the transition from fresh to salt water in the

8   Penobscot River/estuary, very few species exist throughout the

9   system, so geographical patterns are difficult to establish?

10  A    Yeah, and perhaps overstates the problem a little bit,

11  but, yes, you had -- in the upper part of the river, you had a

12  basically freshwater environment, and in the lower part of the

13  bay, you have basically a saltwater environment, and animals

14  tend to be adapted to survive in one or the other, or

15  sometimes in the transition zone between them, and we didn't

16  -- we can sample lobsters up to the south end of Verona

17  Island, and they don't occur north of there, so you -- you

18  can't get lobsters further up in the river, and that's --

19  that's the reality of the situation.

20  Q    Let's drop this line and go down a couple more.  I think

21  that then you explain that you -- you get into the data and

22  look at all the patterns, and you point out, basically,

23  animals can feed on particles or organisms in the water column

24  or feed based on a sediment-based food chain.  So I think that

25  two patterns could be there.  If biota are reflecting mercury

1    in sediments, then we should expect to see concentrations that

2    are low in EB and OV, then jumping up in BO and OB and upper

3    ES sites, then declining over the lower ES sites.  If biota

4    are reflecting mercury in suspended particles, we should see a

5    pattern of concentrations that are -- I think this is -- low

6    in EB, OV, and BO, then jumping up in OB and the upper ES

7    sites, then declining over the lower ES sites.  But we don't

8    have much evidence for either patterns.  Here's my summary,

9    that includes all of our biota data from both the Phase I

10   Report and the Phase I Update.  Let's back off -- out of this.

11        And you -- you then provide a list, and it looks like

12   you -- you indicate whether there's some pattern that's shown,

13   and if we go to the second page, you state here, so I think we

14   are going to have a hard time to make convincing arguments out

15   of trying to relate mercury in biota to either suspended

16   particles or sediments.  Do you see that?

17   A    Yes.

18   Q    Do you recall what you meant by the statement?

19   A    I don't recall the e-mail.  Um, it was a long time ago.

20   I think it's typical of e-mails that went back and forth among

21   the Study Group, where we were trying out ideas and we were

22   testing each other as to what we thought and developing our

23   ideas, and I -- I certainly see what I wrote at that time.

24   Q    For the record, what would be the importance of trying

25   to find a relationship between mercury in the biota and

BODALY - CONTINUED CROSS-EXAMINATION/TALBERT

1   identify whether that's related to the suspended particles or

2   sediments?

3   A      Well, it was -- this seemed to be a mental exercise of

4   -- of looking at -- based on the knowledge that an animal is

5   probably either getting its mercury from a sediment-based food

6   chain or a water column-based food chain, we might be able to

7   discern from the pattern of mercury in that animal which --

8   which pathway it's getting its mercury from.

9          In this e-mail, I seem to be making -- I'm coming up

10  with ideas that are unrelated to HoltraChem, at least in the

11  sense that -- I don't -- I don't see the word HoltraChem or

12  Orrington in that e-mail anywhere.  We know that the

13  geographic pattern of mercury in particles in the water column

14  and the geographic pattern of mercury in sediment on the

15  bottom are -- are somewhat different.  The mercury in

16  particles in the water column does seem to bump up more when

17  you get a little further downstream than the mercury in

18  sediments.

19         I guess I've forgotten your question.  Sorry.

20  Q      Well, I was tying that into, could there be potential

21  implications for remediation knowing where the biota are

22  getting their mercury from?

23  A      Right, yeah, okay.  Yeah, you know, what we do know from

24  our stable isotope work on feeding is that -- and confirms

25  what we expected -- that some animals get their mercury mostly

BODALY - CONTINUED CROSS-EXAMINATION/TALBERT

1  from the water column and some animals get their mercury

2  mostly from the sediment.

3       The birds in the marsh are based on a sediment-based

4  food chain.  The eels, tomcod, flounder, Fundulus are based on

5  a sediment-based food chain.  The rainbow smelt -- and lobster

6  in the sediment and the rainbow smelt and the mussels are

7  water-column food chain.

8       So if you're going to be able to remediate mercury in

9  sediments, you're not going to change what's coming over

10  Veazie Dam.  You're going to be able to change what's in the

11  surface sediments.  That should directly affect all of the

12  species that are based on a sediment-based food chain.

13       The animals that are getting their mercury from the

14  water column, our look at the particles as you go down the

15  river is once you get into a contaminated zone -- and keeping

16  in mind that we only ever sampled on a falling tide to -- to

17  keep the -- keep the comparison among sampling times

18  consistent, we saw a jump in the mercury in particles as you

19  get lower down the river.  So the river is picking up

20  contaminated particles from -- from the sediment surface.

21       The concentration of particles goes up by about 2x, and

22  the concentration of mercury in those particles goes up by

23  about 2x.  So the -- the total amount of mercury in particles

24  in -- in the water column goes up by about 4x.  It's a factor

25  of both of those.

1       So, you know, in theory, if we can remediate the

2  sediments, we should also improve the situation for mercury in

3  particles in the water column.

4       I must admit I haven't thought much about this -- this

5  line of thinking and haven't really thought it through that

6  well perhaps.

7  Q     Let's switch -- I've got a couple --

8              THE COURT:  Why don't we take a break at this time.

9              MR. TALBERT:  Sure.

10             THE COURT:  We'll take a break for about 20 minutes

11  and reconvene about one o'clock.

12       (Court recessed from 12:38 p.m. to 1:06:00 p.m.)

13             THE COURT:  You may proceed.

14                    CONTINUED CROSS-EXAMINATION

15  BY MR. TALBERT:

16  Q     Dr. Bodaly, did the Study Panel retain a company called

17  Applied Biomathematics?

18  A     Yes, we did.

19  Q     And what did Applied Biomathematics do?

20  A     They advised us on biostatistics techniques and

21  procedures and the interpretation of statistical results.

22  Q     And why did you retain them?

23  A     We felt we needed a little more expertise, horsepower in

24  that area.

25  Q     Is it fair to say that you, at times, found it difficult

1  to understand their advice and actually implement it?

2  A    Ah, yeah, I would agree with that.  Um, we -- sometimes

3  -- they seemed to be people who really knew what they were

4  doing, but sometimes had trouble translating that into

5  practical advice for people who didn't know as much as they

6  did.

7            MR. TALBERT:  At this time, I'd like to admit into

8  evidence Defense Exhibit 109.

9            THE COURT:  Any objection to 109?

10           MR. BERNARD:  May I have just one moment, Your

11  Honor?

12           THE COURT:  Sure.

13           MR. BERNARD:  No objection.

14           THE COURT:  It's admitted.

15  BY MR. TALBERT:

16  Q    Dr. Bodaly, would you agree that the study experienced

17  some quality problems with respect to total organic carbon

18  data?

19  A    Yes, we did.

20  Q    Can you explain those, please?

21  A    We, um, ran into problems in the -- when I was analyzing

22  data for mercury and methylmercury in sediments post-Phase I,

23  in other words, the first six sampling times in 2006-2007, I

24  noticed anomalies in the data for our total organic carbon.

25           We had really paid a lot of attention to the mercury

1  analyses, which are very tricky, where you have to do -- make

2  sure the standards are being met, interlab comparisons, things

3  like that, I think we did a really good job with that.

4      We wrongly assumed that the data we were going to get

5  for total organic carbon in sediments was so routine that it

6  was very unlikely there would be any problems with it, and we

7  were wrong.  And by the time we got around to analyzing those

8  data and realized that there were problems with that data set,

9  it was very difficult to go back and sort them out, which

10 we've never really been able to do.

11     We think that the total organic carbon data from the

12 first -- from the Phase I sampling is reliable.  We think that

13 because they are consistent and we reanalyzed some samples

14 using a new and reliable lab that have proved to be

15 comparable, as well.  The samples mostly in the range of 2008

16 to 2010 we do not think are reliable.  All of the samples run

17 by independent principal investigators, like Drs. Yeager,

18 Santschi, Gilmour, Dr. Geyer, as far as we can tell, are all

19 completely reliable.

20     We -- we retained labs that were certified, and we

21 expected that the results would be reliable.  Unbeknownst to

22 us, in at least one case, labs were contracting out their

23 analyses to another lab without informing us, and it was very

24 hard to get to the bottom of it all.  But, anyway, that --

25 that's the history of it.

1   Q      Once you identified that there were problems with some

2   of the data, did -- did the labs acknowledge that there was an

3   issue?

4   A      We had a very difficult time going back.  We talked to

5   various people in various labs.  Most of them were not able to

6   help us very much in identifying either the cause of the

7   problem or to identify how it might be rectified, in other

8   words, maybe there was some calculation errors that might be

9   relatively easy to fix.  And we -- we weren't able to

10  resurrect those data.

11  Q      Did the lab -- or any of the labs offer to refund some

12  of the money spent on data samples that were inaccurate?

13  A      No, and we didn't request it.

14  Q      Okay.  Do you know how much time and money was spent to

15  fix errors regarding the total organic carbon data?

16  A      There would be many hundreds of samples involved.  Um, I

17  don't recall offhand what the total value of each analysis

18  would be.  It would be low.  I would guess in the $10 range

19  because it's a pretty straightforward and relatively automated

20  procedure; so the cost per analysis would not be high.

21         Anyway, that's -- that's -- I haven't sat down and

22  calculated it.

23  Q      Some of the samples were reexamined or other samples you

24  had were examined by a different lab, right, Columbia Labs?

25  A      Correct.

1  Q    Was there a point where there were some inconsistencies

2  noticed between the data sheets of Dr. Santschi and Dr. Yeager

3  that had to be rectified?

4  A    Yes, I recall something about that.  I'm not the person

5  to ask about that.  I -- I was not deeply involved in it, and

6  I'm really not a sediment expert, and I don't even recall the

7  nature of it.  But as far as I know, those were all resolved.

8  Q    Do you recall how much time or money was spent to

9  address that reconciliation of -- of data?

10 A    Um, not really.  I recall that we extended the contract

11 of Dr. Santschi at one point, and I -- but I -- and it may

12 have been related to that issue, but I -- I don't recall very

13 well.

14        MR. TALBERT:  Your Honor, I'd like to move into

15 evidence some of the documents related to the two issues we

16 just discussed, Defense Exhibit 549, 550, and 509.

17        THE COURT:  Any objection to 509, 549, and 550?

18        MR. BERNARD:  None, Your Honor.

19        THE COURT:  Each is admitted.

20 BY MR. TALBERT:

21 Q    Dr. Bodaly, are you aware that there were some errors in

22 the Phase II Report that required the submission of errata

23 sheets?

24 A    Yes, I am.

25 Q    Okay.  Do you know how much time or money it cost to

1  perform the errata sheets that were added to the report?

2  A    I recall that it was done by Dr. Kelly.  She coordinated

3  that.  We all were invited by Dr. Kelly to submit errata to

4  her, and she put that together and forwarded that to the

5  court.

6       I -- I approve all invoices, but I do not approve the

7  invoices of the Study Panel.  I -- I see them and I -- I know

8  what they're for, but I do not go over them in -- in a sense

9  of approving them.  It would have taken a few hours of

10  Dr. Kelly's time -- I'm guessing ten -- so -- and I -- so it

11  would be somewhere in the range of a thousand dollars or

12  something.

13  Q    Is it your understanding that Mallinckrodt had to pay to

14  address those errors?

15  A    Ah, if it was time billed by Dr. Kelly and went through

16  the normal process of billing as part of the panel expenses,

17  yes, Mallinckrodt would have paid for that, yes.

18  Q    Do you recall work that was performed by an individual

19  named Rob Mason, the University of Connecticut?

20  A    Yes, I do.

21  Q    And what was he asked to do, just briefly?  I don't need

22  a full description.

23  A    Sure.  He was asked to look at the uptake of mercury and

24  the toxicity of mercury to plankton, phytoplankton and

25  zooplankton.

1  Q     And did the Study Panel believe that this was important

2  work to perform?

3  A     Yes.

4  Q     Do you know how long that work took?

5  A     Ah, it was quite a few years ago.  I believe that that

6  work went on for approximately one year.

7  Q     Do you recall how much that work cost?

8  A     The original contract was for $90,000.  Dr. Mason was

9  cut off from his contract at about $70,000.

10  Q     And is it true that ultimately this work was not usable?

11  A     That's correct.

12        MR. TALBERT:  Your Honor, I'd like to have admitted

13  some documents related to this issue, Defense Exhibit 892 and

14  947, 378, and 98 and 99.

15        MR. BERNARD:  What were those last two?

16        MR. TALBERT:  98 and 99.

17        MR. BERNARD:  Your Honor, may I have a moment?

18        THE COURT:  Sure.

19        MR. BERNARD:  Your Honor, no objection to 892 or

20  947.  No objection to 378.  Jeff, do you -- 98 looks like a --

21  like a Dr. --

22        MR. TALBERT:  I'm sorry.  8 -- it's -- I'm sorry.

23  381 and 283.

24        THE COURT:  Wait, wait, wait, wait, just a minute.

25  You got 892, 947, 378, 98, and 99.

1          MR. TALBERT:  Instead of 98 and 99, it should be 381

2     and 283.

3          THE COURT:  381 and 283.

4          MR. TALBERT:  Correct.

5          MR. BERNARD:  381, no objection.  283, no objection.

6          THE COURT:  Each is admitted without objection.

7     BY MR. TALBERT:

8     Q    Dr. Bodaly, do you also recall that the Study Panel

9     attempted to create a multicell model?

10    A    Yes.

11    Q    And can you just briefly describe what that model was

12    meant to do?

13    A    It was meant to simulate the dynamics of the movement of

14    water, of salinity and of particles, in the Penobscot River

15    and Penobscot Bay.

16    Q    Do you recall how many years it took to work on the

17    multicell model?

18    A    Ah, there was an initial effort with Tetra Tech, which,

19    as I recall, went on for about half a year, and then the work

20    -- the emphasis shifted, the work expanded, and it became one

21    that involved Mr. Harris, a mercury modeler, Dr. Hamrick, and

22    Dr. Geyer, who -- Dr. Hamrick's a modeler, a multicell

23    modeler, and Dr. Geyer at Woods Hole, who was a

24    hydrodynamicist who was actually conducting field studies and

25    collecting field data on the movement, especially of

1    particles, in the river and the estuary.

2    Q    Was there a point in time that a decision was made to

3    stop the effort on the multicell model and, instead, focus on

4    a simple single-cell model?

5    A    That's correct.

6    Q    Do you recall how much money was spent on the multicell

7    modeling effort?

8    A    Ah, do you mean specifically Dr. Hamrick's effort?

9    Q    Correct.

10   A    Okay.  I don't recall specifically.  It could have been

11   somewhere around $75,000.

12   Q    Do you recall a -- do you have any sense -- I understand

13   that there -- probably some work associated with the model was

14   useful.  But did you -- did you calculate a total amount that

15   was spent on the modeling effort for the multicell model?

16   A    I did not calculate the total amount.  I agree with you

17   that -- that many aspects of the model were useful, especially

18   Dr. Geyer's work on the movement of particles and the mobile

19   sediment pool in the estuary, and also Mr. Harris' involvement

20   in the study in providing advice throughout the study.

21        So I think that many aspects of that modeling was

22   useful.  It's -- it's always advantageous to have a modeler

23   involved.  You get a more synthetic view of the system.  You

24   get to learn more about the unknowns, what you don't know,

25   what you do know.  It forces people in the group to come

1  together and -- and to -- to talk and to be more synthetic,

2  rather than specialized, as -- as scientists tend to be.  So I

3  think there was a lot of value on both sides of that.

4       Dr. Hamrick started having trouble.  There was a model

5  that he had that he had to interface with a model that was

6  developed by the EPA.  It was thought at the time it was going

7  to be a simple matter to get that interface to work.  It

8  wasn't working, that dragged on for months and months and

9  months.

10      And in the end, it was realized that the view of the

11 system provided by Dr. Geyer was such that this multicell

12 model was not going to be appropriate and was not going to

13 characterize the estuary.  And with all the trouble we'd had

14 trying to get the interface between Hamrick's model and the

15 EPA model and the fact that this just wasn't probably going to

16 work anyway, convinced us that it was the time to stop this

17 effort.

18 Q    And when did you decide to stop the effort?

19 A    Oh, 2011-2012.

20 Q    If I wanted to go through and understand the beginning

21 of the multicell model effort, as well as its cost, should I

22 refer to the docket entries with the various proposals and

23 just add those up?

24 A    Yes, and you can also refer to the quarterly financial

25 spreadsheets and financial projections that I provided to the

1    court every quarter, where the amount of money invoiced and

2    paid out is shown by a contractor or principal investigator or

3    individual involved in the study and projected amounts for the

4    next -- I think I usually did the next three quarters.  So you

5    could trace it all through that.

6              MR. TALBERT:  Your Honor, I'd like to have admitted

7    some other exhibits that relate to this issue -- Defense

8    Exhibit 900, Defense Exhibit 920, Defense Exhibit 921, Defense

9    Exhibit 902, Defense Exhibit 910, Defense Exhibit 915, Defense

10   Exhibits 885 and 886.  That's it.

11             THE COURT:  I think 885 is already in and 886; is

12   that right?

13             MR. BERNARD:  Our records show those are both in

14   evidence.

15             MR. TALBERT:  Okay.

16             THE COURT:  Yes, each of those is already in.  Any

17   objection?

18             MR. BERNARD:  No, Your Honor.

19             THE COURT:  900, 920, 921, 902, 910, and 915 are

20   each admitted without objection.

21   BY MR. TALBERT:

22   Q    Dr. Bodaly, I'd like to pull up now Defense Exhibit 886,

23   and I recognize this is a little difficult to read.  Maybe we

24   can just have blown up this upper caption.

25             MR. TALBERT:  Your Honor, I'd like to have admitted

1   into the record -- well, actually, I think these two are

2   already admitted.  This is -- 885 is the cover e-mail from

3   Susan Calkins, and -- and then 886 is the spreadsheet we're

4   looking at now.  I believe those are both admitted.

5            THE COURT:  Each has -- each has been admitted.

6            MR. TALBERT:  Thank you.

7   BY MR. TALBERT:

8   Q    Dr. Bodaly, does this appear to be the quarterly update

9   regarding billings that you referred to earlier?

10  A    Yes, it does.

11  Q    Okay.  And this was, it says, compiled by Drew Bodaly,

12  project leader?

13  A    Yes.

14  Q    Okay.  This last one we're looking at is dated

15  April 14th.  Is this the most recent -- April 2014?

16  A    Yes, that would have been done after the completion of

17  invoices from the first financial quarter of 2014, would list

18  all of the disbursements of funds, and I think it shows the

19  projection for the next quarter only.

20  Q    If we can zoom out of this, and let's highlight -- can

21  you just -- just talk us through, very briefly, about what --

22  what the categories are here that you report on your quarterly

23  update?

24  A    Certainly.

25  Q    That's too small.

1   A      The --

2             THE COURT:  Can you see that?

3             THE WITNESS:  No, not very well.

4   BY MR. TALBERT:

5   Q    Let's back this out and let's just go section by

6   section.

7   A      That's okay.  I've worked on it every quarter for the

8   last seven years, so I'll be able to figure it out.

9        Each line is a particular category of costs, and -- and

10   they're divided into tasks, so I've -- I prepare one of these

11   at the end of each financial quarter, and I guess I would have

12   started in 2006, first for Monica Bigley and Judge Carter, and

13   then later for Judge Calkins and Judge Woodcock.

14        So the -- task No. 1 is the Study Panel, cost of the

15   Study Panel, and Dr. Kelly.  Later, Dr. Kelly's hourly

16   billings and travel were separated out.  You can see there's

17   blanks for the -- for that line under that, and also Special

18   Master -- Special Master Calkins.

19        Task 2 was my salary, Dr. Kopec's salary, and other

20   various related expenses generally related to Environ

21   International.

22        Task 3, field sampling, and I -- I brought that out

23   separately, and this was mainly contractors who were retained

24   to provide field sampling.  The main ones, as you can see

25   obviously from the costs, are Biodiversity Research Institute,

1  that's bird sampling; Normandeau, aquatic sampling.  There was

2  also aspects in there of the sediment coring done by

3  Dr. Yeager; the contract for the Smithsonian ended up in

4  there, as well; Reed Harris Environmental was the -- some of

5  the modeling work; Tetra Tech, some of the modeling work.

6  Geyer means Dr. Geyer from Woods Hole and -- and the fieldwork

7  he was doing.  Do you want me to go through in this manner, or

8  is this too much detail or --

9  Q    I think that's helpful.  I think the general categories,

10  as we go to the next one just to understand.  So 4 is

11  analytical?

12  A    Yes.

13  Q    And what's contained under analytical?

14  A    Mainly, um, the analytical labs that were hired to

15  provide analysis of the samples of -- of mercury, grain size

16  analysis, total organic carbon, the sediment core analysis

17  done at Texas A&M was split out into this category.

18  Q    And the -- here you've separated out the total organic

19  carbon analysis for Columbia that we were discussing earlier.

20  Where was the initial -- which lab did the initial analysis

21  and how was that displayed on this chart?

22  A    They were done in a variety of labs, and the -- some of

23  it is shown under a line of the University of Maine, but

24  mostly the total organic carbon was part of contracts let to

25  Normandeau Associates, and we paid them for the field

1   sampling, including some of the analyses.  They sent the

2   samples off to the lab, and the particular lab would bill

3   Normandeau, and then they would bill us for that.  So their

4   part is subsumed in the Normandeau contract.

5   Q      Okay.  And that would be -- just going up in the field

6   sampling, that would be consumed in that Normandeau line that

7   we see?

8   A      That's correct.

9   Q      And then you have a category for miscellaneous?

10  A      Yes.

11  Q      What's in the miscellaneous category?

12  A      Um, the -- the first line is University of Wisconsin,

13  that was money mainly to Dr. Sandheinrich for the review that

14  he conducted for us on toxic limits.  Charette HoltraChem safe

15  groundwater, the second line that says Charette,

16  C-h-a-r-e-t-t-e, was a contract that we had with Dr. Matt

17  Charette of Woods Hole.  He did work in conjunction with

18  Dr. Turner on the releases of mercury from the -- present

19  input of mercury from the HoltraChem facility.

20         You can see Applied Biomath that we talked about

21  earlier.  Um, we paid Dr. Turner separately to attend our

22  annual meeting in Jackson Hole one year.  I'm not sure why it

23  ended up in a separate line like that.  Then we had three main

24  external reviewers for the Phase II Report -- Drs. Wiener,

25  Sunderland, and -- that should actually -- that should read

1  Dr. Gill -- that's actually Dr. Gary Gill of Battelle.

2  Q     This line right here should be Dr. Gary Gill?

3  A     That's a mistake.  Yes, that should read Dr. Gary Gill.

4        The USGS, we entered into cooperative agreements with

5  the USGS to continue and extend their monitoring of flows and

6  water parameters at the USGS site at Eddington, which is at

7  the Veazie Dam, and that's -- they were running into financial

8  problems, and they were going to cut a lot of that monitoring.

9  We didn't want them to end it, and we -- and they -- they paid

10 part of it.  There was a third group which also worked to fund

11 it, and we paid part of it, and that's the money there.

12 Q     Okay.  Let's just -- for the sake of completeness, the

13 last -- the very last category if you can back out of this,

14 and let's go right below, to the last category.  And I noticed

15 just above, there was then the 10 percent charge to Environ

16 for those -- the contracts, correct?

17 A     That's correct.

18 Q     And then --

19 A     And I think Dr. Whipple explained that on Wednesday.

20 Q     Correct.  And then this last category is completed

21 contracts.  What does -- what do those relate to?

22 A     That's correct.  Um, you can refer to our previous

23 conversation about Dr. Mason at the University of Connecticut.

24 I recalled $70,000, and as you can see, it's actually 78,000.

25 The Woodlot contract was a contract we let to Woodlot, a

BODALY - CONTINUED CROSS-EXAMINATION/TALBERT

1    natural resources consulting company here in Maine, where we

2    asked them to do a compilation of the biota occurring in

3    different parts of the system.  We did it, in part, to get

4    information on what was out there, and, in part, because we

5    thought Woodlot -- Woodlot was going to be our aquatic

6    contractor.  In the end, we didn't choose them, but it was

7    kind of taking them out for a bit of a test-drive.

8         Telesto was the company associated with Dr. Steve Klein,

9    who is in Colorado, and he did a lot of coring work and

10   sediment work with us in 2007.  Trent University was

11   analytical work related in part to -- I guess it should be

12   mostly to the analysis of stable isotope mercury samples.

13        Studio Geochimica was an analytical company that we

14   started with on the project in 2006.  We terminated their

15   contract in -- later in 2006 when we were dissatisfied with

16   the performance of the company.  And that's when we switched

17   to Battelle as our other main lab.

18        We -- and as you can see, they received $122,000.

19   Q    Is this Tetra Tech line, is that also associated with

20   Dr. Hamrick's work on the multicell model, or is that

21   something different?

22   A    No, that was the initial attempt we had at modeling that

23   was done through Dr. Steve Gherini of Tetra Tech in

24   California.  We got him involved.  He was working with

25   Mr. Harris.  There was some talk about how the modeling was

1  going to be conducted.  They did some preliminary work.  And

2  then it was decided to switch gears and to get Dr. Hamrick

3  involved.

4        As I recall in that initial work with Tetra Tech,

5  Hamrick was not involved.  Dr. Hamrick did work for Tetra

6  Tech, but out of a different office.  So that was some initial

7  modeling work that -- that was later supplanted by the

8  multicell model.

9  Q    Okay.  Let's back out of this, and I just want to ask a

10  question about the field sampling section right here.  No,

11  let's go back, try to capture --

12  A    I found out in all this that I hope I'm a much better

13  scientist than accountant, and I have a lot more respect for

14  accountants now than I used to because I didn't find this

15  stuff easy at all.

16  Q    I can understand that.  The birds, bats, wetland food

17  chain here, Biodiversity Research Institute, is this some of

18  the work we were talking about earlier with the food web

19  analysis?

20  A    Yes, that was part of it.  Most of it would be sampling

21  of eagles, ospreys, kingfishers, songbirds, cormorants in --

22  in most of the years of the study.

23  Q    And is this amount we see in the -- the -- where we

24  actually have dollar signs there, this says $919,240.62, is

25  that the amount that has been paid out?

1    A      Ah, no, that is the amount -- the total amount of

2    contracts that we entered into with BRI.

3    Q      Okay.

4    A      So to find out what's actually paid, you need to go

5    further down the spreadsheet and -- and see what was paid and

6    what is left in the contract, if any.

7    Q      Okay.  And that's these top columns here?  Let's just

8    zoom in and pull those out, please.

9    A      No, way to the right, over in here.

10   Q      Okay.  And you do have some pay, and then I guess you

11   have a total over here?  Okay.

12   A      Yes, each of the columns --

13   Q      Let's blow this up.

14   A      Each of the columns are amounts paid in each individual

15   quarter.  Then the spreadsheet calculates from the total

16   amount contracted, adds up all the amounts paid out, and then

17   contracts what -- or calculates what would be left in the

18   budget and, in fact, in the contract, if it's a contractor.

19          So if you go a little further down there, you'll see

20   many contracts have no money left in them; some contracts have

21   money left in them.

22   Q      Okay.  So if we wanted to see the total paid, what's the

23   -- just point out the column for us -- want to see --

24   A      The total paid?

25   Q      Yes, to date.

1   A    It's not explicitly shown.  You would have to take the

2   amount in the budget in the -- in the third -- fourth column,

3   here --

4   Q    Yeah.

5   A    -- and then subtract from that the amount remaining in

6   the contract.

7   Q    Okay.  So let's just blow this up -- this section here

8   in the bottom.  And so the total in the -- the budget is

9   $17,903,190, correct?

10  A    Correct.

11  Q    Does this also include the discretionary fund that you

12  had to -- to make --

13  A    Yes, it does.  It's accounted for in a line item further

14  up in the spreadsheet.  Anytime the -- there was money

15  disbursed from the court that went into the project budget,

16  that's part of the accounting.

17  Q    Okay.  And you're saying all we would need to do is then

18  subtract the -- the number in this --

19  A    Yes, yes.

20  Q    Okay.

21          MR. TALBERT:  No further questions.

22          THE COURT:  Redirect?  I think you may -- I think

23  you may want to switch out of -- thank you.

24          MR. BERNARD:  Thank you.

25                          REDIRECT EXAMINATION

1   BY MR. BERNARD:

2   Q    Dr. Bodaly, is it fair to say in the -- during the term

3   of the study project, there were many components of the study

4   that led to the letting of contracts to begin work?

5   A    Yes.

6   Q    And did some of those contracts not lead to usable work

7   -- usable data and analysis?

8   A    Yes.

9   Q    And did many of the contracts lead to usable data and

10  analysis?

11  A    I would characterize the situation by saying that most

12  of the things that we did and most of the money that was spent

13  were successful and led to useful data for the project.

14  Q    Is it customary -- do you know -- in a comprehensive

15  scientific study to have some proportion of false starts or

16  starts that don't result in usable data or analysis?

17  A    That's certainly been my experience, and I -- I could

18  add, if I may, that I think we -- when we had problems, I

19  think we dealt with them in a timely manner.  It's always a

20  difficult decision to make to know if you have a contract with

21  someone and -- and you think they're underperforming, whether

22  you give up on them or whether you -- you hope they're going

23  to come through, but that's -- those are the judgment calls

24  you have to make when you go along.

25  Q    Shifting to carbon data for a moment, for what years are

1   you confident that the study data for carbon are accurate?

2   A     All the years for work that was done by Dr. Geyer,

3   Dr. Yeager, Dr. Santschi, Dr. Gilmour.  For project data, all

4   of the Phase I sampling in 2006, 2007, and by the time we

5   switched labs, the monitoring done in 2012.

6   Q     You answered a few questions about eels.  How do the

7   mercury concentrations in eels in the two reaches below the

8   Veazie Dam compare to mercury concentrations in eels in the OV

9   reach above the dam?

10  A     They are approximately twice as high.

11  Q     Okay.  Now, with regard to the Leaman data that you

12  referred to in your testimony and that are included or

13  mentioned in one of the tables in Chapter 2 of the Phase II

14  Report, is Dr. Kopec the most knowledgeable person to talk to

15  about that?

16  A     Definitely.

17  Q     Okay.  We -- we will do that.  You were asked about the

18  500 nanogram per gram target and the method or process the

19  Study Panel used to reach that target.  Do you remember that?

20  A     Yes.

21  Q     And that's the target for the health of biota within the

22  ecosystem -- fish?

23  A     Fish, yes.

24  Q     Okay.  Now, that flowed, as you discussed in your direct

25  testimony earlier today, did it not, from Dr. Sandheinrich's

1    report that you commissioned, which is Appendix 2-1 to Joint

2    Exhibit 6-2, which is Chapter 2?

3    A    Yes, and also the published paper by Sandheinrich and

4    Wiener, I believe, 2011.

5    Q    Yes.

6    A    And that was important, as well.

7    Q    Okay.  Now, as distinct from the human health standard,

8    which you said you relied on because it was set forth by the

9    government, for the fish standard, did you have a definite

10   standard like the government standard for human health on

11   which to rely?

12   A    No, we didn't, and that's why we felt we had to derive

13   them ourselves.

14   Q    And Dr. Sandheinrich provided a range within which he

15   thought the scientific literature showed the correct

16   threshold; is that right?

17   A    That's correct.

18   Q    And did the Study Panel then exercise its judgment to

19   select a value within that range to set its target?

20   A    Yes.

21   Q    And -- and do you think that exercising judgment in that

22   way is one of the tasks the court assigned to the Study Panel?

23   A    Yes, and, in fact, we asked the court at one point for

24   advice, how should we -- how should we derive these targets?

25   We explained what we're going through and what our -- what our

1  purpose was, and -- and the direction back from the court was,

2  well, you're the guys, you're the experts, you use your --

3  your judgment, and you figure out how to do it.

4  Q    And that's what you did?

5  A    Yes.

6  Q    Now, Mallinckrodt's counsel showed you a -- this is

7  Defendants' Exhibit 391 on the subject of stable isotopes.  He

8  showed you this e-mail that you wrote.  And could you just

9  read that date into the record?

10  A    January 19th, 2007.

11  Q    Now, this was -- was this -- I believe you testified

12  this was your kind of first reaction to some of the stable

13  isotope data that were coming in?

14  A    Yes.

15  Q    And are you an expert in stable isotopes -- mercury

16  stable isotopes?

17  A    No, I'm not.

18  Q    Okay.  Is Dr. Hintelmann an expert in mercury stable

19  isotopes?

20  A    Yes, he is.

21  Q    And did the Study Panel subsequently seek his view on

22  interpreting or whether one could reasonably interpret the

23  mercury stable isotope data?

24  A    Yes, they did.

25  Q    Now, were you in court when I showed Dr. Rudd

1    Plaintiffs' Exhibits 65, which is -- this is the cover e-mail

2    from Dr. Hintelmann to Dr. Rudd, and you're copied on it.  Do

3    you recall this?

4    A    I recalled it when you showed it in court last week,

5    yes.

6    Q    Okay.  This is approximately three years after the

7    e-mail that Mallinckrodt's counsel showed you?

8    A    Correct.

9    Q    Okay.  And do you remember what Dr. Hintelmann advised

10   the Study Panel?

11   A    Well, he basically said you're going to have a tough

12   time interpreting these data.  In his e-mail, he emphasized

13   the unknown of fractionation of mercury stable isotope ratios

14   in the environment, but I -- I think perhaps a bigger question

15   was what -- what mercury -- what was the stable isotope ratios

16   of the mercury used in the HoltraChem site and -- and did it

17   change over the years.  So I think those are the -- two of the

18   big unknowns.

19   Q    As to one of those two, would you please read into the

20   record from Plaintiffs' Exhibit 65 the sentence from

21   Dr. Hintelmann's e-mail that I've highlighted?

22   A    Yes, I -- I guess I jumped the gun on your question

23   there.  I will read it.  Since we have none of the original

24   source mercury for testing, we can only speculate.

25   Q    And is this -- the substance of Dr. Hintelmann's advice

BODALY - REDIRECT EXAMINATION/BERNARD

1   in this regard, to your knowledge, what the Study Panel relied

2   on in its treatment of the mercury stable isotope data?

3   A    Yes, and I recall that Dr. Rudd also contacted

4   Dr. Santschi and sought his advice, as well.

5   Q    And was that advice -- Dr. Santschi's advice, was it

6   consistent with Dr. Hintelmann's advice?

7   A    That is what I recall, but I don't remember the e-mail

8   specifically.

9   Q    You were also shown from Defendants' Exhibit 905 one of

10  the many proposals that were submitted to the court for work.

11  Do you remember this?

12  A    Yes, I do.

13  Q    Okay.  And this was a proposal regarding food web

14  studies?

15  A    Yes.

16  Q    Okay.  And the date of this was when?

17  A    May 4th, 2009.

18  Q    Okay.  So that would have been almost four years before

19  the Phase II Report was submitted to the court?

20  A    Yes.

21  Q    Okay.  And was this before the mobile pool data and

22  analysis from Dr. Geyer was made available to the Study Panel?

23  A    Yes, it was.

24  Q    And was this before the black duck sampling in Mendall

25  Marsh was gathered and reviewed by the Study Panel and, with

1    the court's permission, turned over to the state Department of

2    Inland Fisheries and Wildlife?

3    A    I think so, yes.

4    Q    Okay.  You were shown Defendants' Exhibit 649, which is

5    an e-mail you wrote to Dr. Kopec attaching some editing

6    comments on a draft of, I guess, Chapter 16 of the report on

7    food webs?

8    A    That's correct.

9    Q    Okay.  Now, you were shown a bunch -- was this in the

10   nature of a -- of an editing e-mail?  In other words, were you

11   recommending edits to draft work that Dr. Kopec was preparing?

12   A    That's correct.

13   Q    Okay.  Now, were you asking her to write in a way that

14   was clearer and more presentable, in your view, to the reader

15   as -- or were you asking her to hide information?

16   A    I wasn't asking her to hide anything.  I was asking her

17   to not repeat certain pieces of information, which I felt had

18   been stated clearly for the reader, and that to repeat them

19   was to emphasize them in an undue manner.

20   Q    Now, you were shown a bunch of text in this e-mail about

21   some of the flaws in the study that were discussed.  Do you

22   remember that?

23   A    Yes.

24   Q    You were not shown this paragraph in the e-mail.  Will

25   you please read that?

1  A     The paragraph says, please try to keep in mind what

2  results will actually be useful and central to the Phase II

3  Report.  The main point is that we now have some idea what

4  some of these birds eat, and it looks like they eat food from

5  the contaminated marshes, as we expected.  Therefore,

6  remediating the marshes to lower mercury will be useful for

7  lowering mercury in the birds, as we had hoped.  And it would

8  be useful to say that in the summary.

9  Q     And does this set forth some of that food web work that

10  you think was actually useful to the Study Panel's

11  deliberations?

12  A     Yes, and I agreed with defense counsel that there were

13  some gaps and flaws, but I thought it was useful.  I was

14  simply trying to provide editing comments to Dr. Kopec which I

15  thought would de-emphasize her frustration with the

16  contractors and how they did the study and -- and wrote up the

17  data, and -- and bringing out the main findings of the study

18  more clearly, to help the reader get that easily from the

19  chapter.

20  Q     Now, one of the things you were shown from the draft

21  document on which you commented -- and this is Page 10 of

22  Defendants' Exhibit 649 -- was this comment D-12 which follows

23  this sentence.  Do you see that?  Could you just read that

24  into the record?

25  A     The sentence states, given that prey availability is

1  expected to change over the summer, invertebrates sampled in

2  August may not reflect prey available to foraging birds in

3  June, prior to the birds' sampling dates.

4  Q    Now, I'd like to show you a page from the final Phase II

5  Report.  This is Joint Exhibit 6, Chapter 16, so it's Joint

6  Exhibit 6-16 at Page 16-8.  The focus seems a little funny on

7  this.  I don't know why.  Can you read that?  Can you see it?

8  A    Okay.

9  Q    I'm sorry.  Can you?

10 A    Yes, yes, I can.

11        THE COURT:  I think you may be able to focus it in.

12        THE WITNESS:  That's better.

13        MR. BERNARD:  Ah, thank you.

14 BY MR. BERNARD:

15 Q    So this is -- I just want to show you, this is Page 16-8

16 from Joint Exhibit 6-16, which is the Phase II Report.  Will

17 you please read this sentence into the record?

18 A    Given that prey availability is expected to change over

19 the summer, invertebrates sampled in August may not reflect

20 prey available to foraging birds in June, prior to the birds'

21 sampling dates.

22 Q    Does this reflect that the flaw in the study that you

23 and Dr. Kopec perceived was disclosed fully in Chapter 16 of

24 the Phase II Report?

25 A    Yes, I think so.  I -- I was simply trying to say to

1  her, you don't have to keep repeating it.  The reader gets the

2  idea.

3  Q    You were asked a question about -- or a series of

4  questions about whether the relationship between mercury in

5  sediment and mercury in biota is a one-to-one relationship.

6  Do you recall that?

7  A    Yes, yes.

8  Q    Now, if, and to the degree, that there is less than a

9  one-to-one relationship, in other words, the mercury in the

10 sediment -- the mercury in the biota does not follow

11 reductions in the sediment in a one-to-one relationship, is it

12 fair to say that in order to attain the biota targets the

13 Study Panel has set, you would then have to set the sediment

14 targets even lower?

15 A    Yes, and that's what we talked about in my first

16 deposition, and it -- and it was a curious characteristic of

17 those data sets.

18      As I said earlier this afternoon, there are explanations

19 for that.  When you're trying to use spatial data to infer

20 what might happen over time, you have a lot of factors that

21 could impose on that.  So it still could be a one-to-one

22 relationship, but other factors, like feeding or the length of

23 the food chain, could be changing, or it might not really be a

24 one-to-one data set -- or one-to-one relationship, and -- and

25 the direction of the relationship seemed to imply that you

1   might have to -- to clean up even more to reach your target.

2   So I agree with you.

3   Q    Now, to reach the sediment targets that the Study Panel

4   has set and that are set forth in Chapter 2 of the Phase II

5   Report, I think you mentioned that for the main stem of the

6   Penobscot River, it would take two to three decades, depending

7   on whether you used that 22-year figure or 33-year figure, as

8   a recovery half-time; is that correct?

9   A    That's correct.

10  Q    Now, in -- so that's two to three decades?

11  A    Yes.

12  Q    Right?

13  A    Yes.

14  Q    And in Mendall Marsh, it would be three times the 22

15  figure -- 22-year figure; is that correct?

16  A    That's correct.

17  Q    So that's more than six decades.

18  A    Correct.

19  Q    And for the Orland River and Fort Point Cove, it would

20  be even longer than that by the Study Panel's estimate; is

21  that correct?

22  A    Yes, the estimated return times for those areas were

23  longer than in the main stem of the river, so, yes.

24  Q    Well, they were -- they were also longer, weren't they,

25  than the three half-time calculation for Mendall Marsh?

1   A       Ah, yeah, we didn't explicitly look at the targets in

2   those areas.  Um, those half-times are assuming no

3   remediation, of course; that's natural attenuation.  Um, would

4   they be longer than Mendall Marsh?  The return times were

5   longer, but for aquatic animals, they would -- the target for

6   the sediment would only have to be a reduction -- would depend

7   on the current concentrations in surface sediments.  Then you

8   would have to apply the half-life remediation target for

9   aquatic life.  Then for wetlands, for example, wetlands in the

10  Orland, if you assumed that the birds were as high there as in

11  Mendall Marsh, you would have to do that calculation for

12  there.

13          But, yes, it -- it would be -- they would be long

14  periods of time.

15  Q       Without doing the calculation here, is it fair to say

16  that by the Study Panel's estimates, recovery of the whole

17  ecosystem via natural attenuation, absent active remediation,

18  would be many decades?

19  A       Yes.

20              MR. BERNARD:  Nothing further, Your Honor.

21              THE COURT:  Recross?

22              MR. TALBERT:  No recross, Your Honor.

23              THE COURT:  Thank you.  You may stand down, sir.

24  Thank you.

25              THE WITNESS:  Thank you.

 1        (The witness left the witness stand.)

 2            MR. BERNARD:  Plaintiffs call Dr. Rocky Geyer.

 3            THE CLERK:  Please raise your right hand.  Do you

 4    solemnly swear that the testimony you shall give in the matter

 5    now in hearing shall be the truth, the whole truth, and

 6    nothing but the truth, so help you God?

 7            THE WITNESS:  Yes, I do.

 8            THE CLERK:  Please be seated.  Please state your

 9    name and spell your last name for the record.

10            THE WITNESS:  My name is Wayne R. Geyer, but I

11    normally go by Rocky, and it's G-e-y-e-r.

12    WAYNE R. "ROCKY" GEYER, having been duly sworn, was examined

13    and testified as follows:

14                        DIRECT EXAMINATION

15    BY MR. BERNARD:

16    Q     Is it okay if I call you Dr. Geyer?

17    A     That's fine.

18    Q     Are you employed?

19    A     Yes.

20    Q     Where?

21    A     At the Woods Hole Oceanographic Institution.

22    Q     What is the Woods Hole Oceanographic Institution?

23    A     It's a nonprofit research organization dedicated to

24    understanding the oceans and -- and educating future

25    oceanographers.

1    Q      For how long have you worked at Woods Hole?

2    A      I'm not sure.  I started in 1985.

3    Q      Okay.  I think we can do --

4    A      Getting on 30 years.

5    Q      Right.  What is your position at Woods Hole?

6    A      I'm a senior scientist.

7    Q      And please briefly describe for the court the work you

8    do there.

9    A      I, for the most part, do government-funded research

10   projects, basic research in the circulation processes in

11   estuaries and the coastal ocean and sediment transport

12   processes in estuaries and the coastal ocean.

13   Q      Have you worked, prior to your work on the Penobscot, on

14   other river systems?

15   A      Yes, quite a few.

16   Q      Okay.  And have you worked on the Amazon River?

17   A      Yes.

18   Q      Can you briefly describe what you did on the Amazon?

19   A      I studied the -- the salt front and the -- the in -- the

20   interaction between the freshwater outflow and the tides as

21   they influence the -- the trapping of sediment and the -- so

22   the -- an important finding of that was a very intense

23   trapping of sediment, very high concentrations of sediment

24   that were highly mobile and that had seasonal and tidal and --

25   and intermediate time scales of variability.

GEYER - DIRECT EXAMINATION/BERNARD

1   Q     Did you -- have you done any work on the Hudson River?

2   A     Yes.

3   Q     And please briefly describe that.

4   A     I've done a number of different studies on sediment

5   trapping processes in the Hudson River, and one of the

6   important findings of our studies was seasonal variation of

7   the trapping due to changes in river flow, where the --

8   approximately 400,000 tons of sediment would -- would migrate

9   seasonally about 10 kilometers up and down the estuary.

10  Q     Have you worked on any river systems in New England

11  before the Penobscot?

12  A     Um, yes, the Connecticut River, did a little work on the

13  Kennebec River, um, the -- ah, some -- the, ah, New Bedford

14  Harbor, it's a little river called the Acushnet River.

15  Q     What is physical oceanography?

16  A     That's the -- the physical processes that affect the

17  movement of water and salt.  When we start talking about

18  sediment, then -- then the -- some people call themselves

19  physical oceanographers that study sediments.  Some people are

20  -- are sedimentologists, so you get into a gray area when you

21  get into sediment.

22  Q     What is meant by hydrodynamics?

23  A     The -- the physical forces on the -- that affect the

24  movement of water.

25  Q     And what is meant by sediment transport?

GEYER - DIRECT EXAMINATION/BERNARD

1146

1    A     The movement of sediment that's -- that's either

2    suspended in the water, which means that it's -- it's floating

3    above the bottom, or that it's bedload transport, which means

4    that it's -- it's rolling along the bottom.

5    Q     How would you define your own area or areas of

6    scientific expertise?

7    A     My -- my number one area is estuarine dynamics,

8    understanding the -- the forces that affect the movement of

9    water in an estuary and the development of salt fronts and the

10   associated effects of those processes on sediment transport.

11   Q     Will you briefly describe your educational background?

12   A     I have a bachelor's degree from Dartmouth College, a

13   master's degree and a Ph.D. from the University of Washington.

14   Q     What is your Ph.D. in?

15   A     Physical oceanography.

16   Q     Okay.  Is there a fuller description of your

17   professional activities and publications in your CV?

18   A     Yes.

19         MR. BERNARD:  Your Honor, for the record, that's

20   Joint Exhibit 19.

21         THE COURT:  Thank you.

22   BY MR. BERNARD:

23   Q     Were you involved in the Penobscot River Mercury Study?

24   A     Yes.

25   Q     Starting when?  Do you recall?

1   A     Yes, in -- I started writing a proposal in 2009, and we

2   started doing fieldwork in 2010.

3   Q     And did somebody ask you to become involved?

4   A     Yes, um, John Rudd, I believe, contacted me.

5   Q     And what were you -- what were you asked to do?

6   A     I was -- I started out being asked to be involved with

7   the -- providing field data in association with calibration of

8   a model and -- and the development of a model.  I'm not -- I'm

9   not exactly sure how the conversation evolved, but the -- but

10  the modeling was the -- was the -- the initial -- the main --

11  the main theme of the conversation to start with.

12  Q     And what did you end -- what did you wind up doing as --

13  A     I -- fieldwork and -- and analysis, so -- I actually

14  tried to talk them down from the heavy dependence on modeling,

15  um, right from the get-go because I recognized that the -- in

16  a system that -- that we don't have a lot of field data about

17  physical processes, we don't know what we're going to be

18  modeling.

19  Q     Did you take field measurements in the Penobscot

20  Estuary?

21  A     Yes.

22  Q     And could you just define the geographical boundaries of

23  your field measurements?

24  A     We -- we made moored measurements, measurements where we

25  put instruments out and left them there, from Winterport to

GEYER - DIRECT EXAMINATION/BERNARD

1    Fort Point, so pretty much the -- the -- most of the study

2    area.  We made shipboard measurements from Fort Point to

3    almost Bangor, so probably within about a kilometer of Bangor.

4    Q      You mentioned a moored measurement.  You just leave it

5    out in the environment?

6    A      Yes.

7    Q      What is a shipboard measurement?

8    A      Shipboard measurement means we are on a ship -- you

9    might think of as a boat -- but it's -- and we lower

10   instruments over the side and make measurements of -- of

11   properties, either -- either in the water column or on the

12   bottom at that time.

13   Q      Do you recall during what months and years you took

14   these measurements?

15   A      Yes, we started in April of 2010, and we measured -- we

16   made measurements, um, ah, April, May, and June 2010, and then

17   we -- we went back in 2011, and we -- we deployed instruments

18   in March of 2011, the idea being to -- to get the full

19   resolution of -- of what we call the freshet, which is when

20   the large -- the peak of fresh water comes.  We wanted to be

21   early enough to catch the peak of freshwater flow.

22          So we started the moored measurements in March of

23   2011, and we made shipboard measurements March, April, I think

24   May and June, and then we pulled the instruments out in June,

25   and we went back in August and made additional, um, ah,

1    sediment samples, and we recovered a tripod that had gotten

2    buried in -- in Bucksport.

3    Q    Well, we'll -- we'll returned to the buried tripod.

4         But for the moment, could you -- could you just

5    succinctly say, what was the purpose of these measurements?

6    What were you trying to -- what were you investigating?

7    A    We were trying to characterize the transport processes,

8    particularly the -- the transport processes in the water

9    column as they affected the -- the movement of sediment, with

10   the understanding that the -- that the mercury is mostly bound

11   to the sediment, so that the -- the transport of mercury is

12   mostly associated with the transport of sediment.  So we were

13   trying to understand the transport processes and the trapping

14   of -- of sediment.

15        But, initially, the design of the study was -- was for

16   model calibration, and -- and so the study -- the measurement

17   and interpretation evolved in terms of providing a full

18   characterization of those transport processes.

19   Q    Who designed the sampling?

20   A    Me.

21   Q    Did you participate in the field?

22   A    Yes.

23   Q    Please describe that.

24   A    I -- I -- I've described all of the fieldwork that was

25   done.  There was only one trip that I didn't go on, and that

1    was April of 2010.

2    Q    Otherwise, you were out in the field?

3    A    I was in the field all the other times, yeah.

4    Q    And did you participate in analyzing the results?

5    A    Yes.

6    Q    What are the major findings of the study you undertook?

7    A    The -- the key findings are that the -- the system has a

8    -- a modest amount of sediment input from over the Veazie Dam

9    -- or modest input of sediment in total compared to -- to

10   other systems in the northeast that I've worked in.

11        For instance, about an order of magnitude less -- a

12   factor of 10 less than the Hudson, for example, and yet the

13   system is very energetic because of the tides, the tidal flow,

14   and the -- and the fairly constricted channels, so that the --

15   that the tidal energy provides ample energy for -- for

16   suspension of sediment.

17        So in spite of the small amount of -- of sediment input,

18   there's actually quite a lot of sediment resuspension that

19   takes place within the system.  And so the system's highly

20   mobile with respect to suspended sediment, and the -- the

21   concentrations of sediment that we observed were more than a

22   factor of 10 greater within the estuary than the -- than the

23   concentrations coming in via the dam.

24        And so this is -- this is actually not uncommon in

25   estuaries.  It's called the estuarine turbidity maximum, that

1    estuaries tend to be muddier, more turbulent than either the

2    source waters coming from the river or -- or further

3    downstream in the -- in the ocean.

4        And then the third important finding is the -- the

5    system is a very effective trap, in that the -- we saw very

6    little sediment -- very little evidence of sediment leaving

7    the system to the south.  So the -- so that by the time we get

8    to Fort Point, we see very little concentrations of suspended

9    sediment.  So the system is a very effective trap, but it's --

10   but it's -- but it's very mobile.

11   Q    Okay.  You mentioned turbidity.  What -- what, if any,

12   is the relationship between turbidity and suspended sediment?

13   A    Turbidity is the -- technically is the -- is the

14   obscuring of the -- of transmission of light, but it's -- but

15   it's the way we typically measure suspended sediment.  So we

16   use a -- we often use optical instruments to -- so we -- so we

17   used -- so turbidity is used somewhat synonymously with --

18   with suspended sediment and concentration.

19   Q    You mentioned that there's a modest amount of input, and

20   I -- I think you said an order of magnitude less than there is

21   in the Hudson river.  What are you comparing there?  In the

22   Penobscot, you were talking about particles coming over the

23   Veazie Dam?

24   A    Yeah, we typically talk about the number of tons per

25   year that -- that enter the system from -- via fresh water.

1  Q    Okay.  Are you familiar with the term mobile pool of

2  sediments?

3  A    Yes.

4  Q    And -- and -- and did one of the findings of your work

5  relate to a mobile pool of contaminant -- mercury-contaminated

6  sediment?

7  A    Yes.

8  Q    Please explain to the court what the mobile pool is.

9  A    It's -- it's the term that we use to describe the -- the

10 sediment, which is -- which is moving, um, seasonally or

11 tidally or at somewhat longer time scales.

12      When we talk about the mobile pool of mercury, we're

13 talking about the -- the sediment which is remobilized on time

14 scales that might be between tidal time scales and -- and

15 something like up to -- up to five years because the input of

16 mercury occurred over a long enough time scale and the -- and

17 the decline of mercury is occurring over a long enough time

18 scale, that the -- that we can't distinguish between the --

19 the processes that might have occurred on a tidal cycle from

20 the processes that might occur once every five years in terms

21 of how they affect the -- the concentration of mercury within

22 this, quote, unquote, mobile pool.

23      And so -- so the sediment gets stirred up at -- at -- by

24 some process on some time scale, which is short compared to

25 the residence time of the -- of the mercury in the system, and

1    that leads to the homogenization of the -- of the mercury.

2         And just from a dynamical point of view, the key process

3    that's -- that's responsible for this homo -- the mobility and

4    the homogenization is the seasonal variation of frontal

5    trapping.  The front forms further to the north during low

6    discharge conditions and forms further to the south during

7    high discharge conditions, and that -- that change in position

8    of the salt front leads to a seasonal migration of the

9    sediment.  So not all the sediment is stirred up into the

10   water column at any given time, but it's -- but a bit at a

11   time is -- is resuspended and moved from one frontal zone to

12   the other, leading to the -- the mixing of sediment that came

13   into the -- into the estuary at different times and with

14   different mercury concentrations.

15        But over -- over time, the -- the differences in

16   concentration are eliminated by that -- by that continual

17   remobilization and -- and re-deposition.

18   Q    Okay.  So you -- you've said a lot, and we're -- we're

19   going to go into some of that to make sure it's clear.

20        But -- but before we do, or to start that, in plain

21   terms, what -- how -- how would you define the mobile pool?

22   A    It's a -- um, it's -- it's a -- you could -- well, one

23   way of identifying it is -- and the way we did identify it --

24   is by finding sediment that has, in various parts of the

25   system, has similar geochemical characteristics, so that's a

1  signature of the mobile pool, is that you -- you take

2  sediments from different parts of the system and they look the

3  same, particularly with respect to mercury concentration, and

4  -- and particularly with respect to mercury normalized to

5  organic carbon because it's important -- sometimes you get a

6  little sand mixed in, which is going to lower your mercury

7  concentrations.  But if you normalize to organic carbon or

8  normalize to fines, then we see similar mercury

9  concentrations.  So that's a way of saying, okay, this is a

10  mobile pool.

11  Q    I think during your deposition, you said that one way to

12  define the mobile pool or to describe it is sediment

13  continually getting picked up and being put back down.

14  A    Okay.

15  Q    That's --

16  A    I agree with that.

17  Q    Okay.  Have you seen mobile pools in other environments?

18  A    Yes.

19  Q    Where?

20  A    The -- the Hudson River has a distinct mobile pool, and

21  this is -- this is the environment that I first encountered

22  it, and then I started looking in the literature to see

23  whether other people had found mobile pools.

24       And the first literature reference I found was a -- was

25  in the Gironde Estuary, a paper by Migniot, in -- published in

1   1971, and that's a very muddy estuary, and he -- he identified

2   a mobile pool based on changes in bathymetry of the Gironde

3   Estuary, that change seasonally, with about a meter change in

4   depth where the -- where it shoals a meter to the south -- or,

5   I mean, to the -- to the downstream direction during high

6   flow, and then it shoals a meter further in the upstream

7   direction during low-flow conditions.

8       So it -- so I realized that the -- in systems with --

9   with a strong seasonal variation in river flow and a strong

10  sediment input, there's going to be this migration of the --

11  of the pool of sediment.

12      And what's -- one thing that's important about this is

13  that we normally think of the mixing of sediment just in terms

14  of what can go up in the water column in -- within the tidal

15  cycle, and the amount of sediment that can go in the water

16  column within a tidal cycle is -- is quite small, And when --

17  when you put it back down on the bed, it might represent 1 or

18  2 millimeters.

19      But if we move sediment horizontally, we can involve

20  much more sediment in the -- in this mobility.  It's not all

21  getting lifted at once, but -- but through the course of a

22  season, we can -- in the case of the Gironde, we're talking

23  about a meter of sediment.  In the case of the Hudson, we're

24  talking about 20 centimeters of sediment.  And in the case of

25  the Penobscot, to tell you the truth, we're not 100 percent

1   sure, but we know that it's -- it's probably on the order of

2   -- of 5 centimeters.

3   Q     Hm-hmm.  Were there places in the Penobscot where you

4   found sediment that you identified as part of the mobile pool

5   that completely filled your 10-centimeter instrument?

6   A     Yes.

7   Q     So in those places, at least, it would be some unknown

8   depth, but beyond 10 centimeters?

9   A     That's correct.

10  Q     You mentioned the term bathymetry.  Could you please

11  define that for the court?

12  A     That's just a long word that means the depth of the

13  water.

14  Q     Now, what role does the mobile pool play, if any, in the

15  distribution of mercury in the Penobscot Estuary?

16  A     The -- an important impact of the mobile pool is that --

17  that within the time scale of -- of significant remobilization

18  of sediment, like I said, on the order of -- of -- of seasons

19  to years, the -- the -- the movement of the mobile pool is

20  going to erase the spatial structure of -- of mercury

21  concentration that might have resulted from -- from local

22  inputs.

23        So if there was a local input of mercury in one location

24  and then this -- that sediment that -- that was contaminated

25  with mercury is subject to this seasonal remobilization,

GEYER - DIRECT EXAMINATION/BERNARD

1157

1    migration, and -- and blending, then that -- that local

2    signature is going to be -- is going to be spread out to --

3    over -- over the distance of the excursion of the mobile pool.

4    Q    And have you found that to be the case in the Penobscot?

5    A    Yes, yes, we -- we did find it to be the case, although

6    the way we identified it was -- was by -- by looking at

7    sediment which we -- which we had evidence had been

8    remobilized.

9    Q    Okay.  I'd like you to identify, please, the ways in

10   which, the mechanisms through which sediment is -- moves

11   within the system.  One of the things you mentioned is tides;

12   is that correct?

13   A    That's correct.

14   Q    So the tides lift up the sediment and move -- move some

15   sediment to a different location?

16   A    Right.

17   Q    And then you -- you mentioned seasonal events, and then

18   you said it could happen up to five years.  What events, other

19   than tides, could cause the mobile sediment to redistribute to

20   a different location?

21   A    Okay.  The tides provide the energy for lifting the

22   sediment up.  The -- the tidal flow is the -- is always the

23   dominant source of energy in the system, except for in places

24   very near shore, where waves -- where surface waves, due to

25   wind, can also provide mobilization.

1     But in the -- for the most part, in the mobile pool, the

2  tides provide the energy, but they don't determine the

3  direction, because tides go both directions.  And so -- so

4  they don't provide a preferred direction.

5     The direction of the transport is -- is set by the --

6  the opposing forces of the freshwater outflow, which is --

7  which is directing the -- the near-bottom sediment to the

8  south, and the -- what we call the estuarine circulation,

9  which is a flow due to the density difference between fresh

10  and salt water, which -- which has the opposite direction.

11     So that the estuarine circulation tends to push the

12  near-bottom water to the north, and so that the -- so during

13  low-flow conditions, when there's -- there's less influence of

14  the river, but we still have a strong salinity gradient, the

15  estuarine circulation wins out, and it pushes the -- pushes

16  the set -- it provides the net direction of sediment transport

17  to the north, and then during high flow, the reverse happens.

18  Q    Are there also storm events that can move sediment

19  around?

20  A    Storm events -- like I said, the -- the storms are going

21  to have -- mostly affect -- well, they provide this additional

22  wave resuspension, and they -- they -- there are storm surges.

23     But the long-term interannual variability that I

24  referred to, I believe is -- is probably mostly due to the --

25  the occurrence of -- of strong-flow events in combination with

1    spring tides, which are going to lead -- so -- so -- so you're

2    going to get rare events, which have the superposition of

3    strong -- strong river flow and spring tide, spring tide being

4    the -- either the full moon or the new moon, when the tides

5    are stronger, which is going to lead to more resuspension and

6    then more extreme movement of the -- of the -- of the -- of

7    the sediment.

8         So there's going to be some -- some amount of sediment

9    that only moves during these really extreme events.

10   Q    You mentioned a moment ago that the Penobscot Estuary is

11   an energetic system.  Do you remember that?

12   A    Yes.

13   Q    What are you referring to?

14   A    It's -- it's -- I mostly referred to the -- to the

15   strength of the tidal flow.  We can measure the energy in

16   terms of the kinetic energy, which is basically the --

17   proportional to the square of the -- of the velocity, and the

18   -- and what's particularly important is the near-bottom

19   velocity.

20   Q    Now, you -- you've talked about two kinds of movement of

21   sediment in the mobile pool -- one is vertical and another is

22   horizontal -- and I think you were just discussing vertical

23   movement.  How does this horizontal movement occur?

24   A    The horizontal movement occurs due to the -- well, over

25   short-time scales, the tidal current provides horizontal

GEYER - DIRECT EXAMINATION/BERNARD

1160

1   movement, and the -- the tide -- the tidal currents move --

2   can move near-bottom water and sediment up to about 10

3   kilometers, just given the -- the strength of the currents.

4        But the -- but the -- but the sediments can get moved

5   back by the subsequent ebb tide, or the flood tide.  And so --

6   so the net movement of sediment over multiple tidal cycles is

7   going to be due to what we call the residual circulation,

8   which, as I said, is due to the -- to the balance between the

9   river outflow and the -- and the estuarine circulation.

10  Q    What is consolidated mud?

11  A    That means mud that's -- that's, um, attained some

12  strength due to -- probably to being buried under other mud,

13  and it's been sitting in -- in the seabed long enough that

14  it's -- that it's gained some strength.

15  Q    And is mud the same as sediment?

16  A    Mud is a type of sediment.

17  Q    Okay.

18  A    It's a -- mud means -- it's -- it's a mixture of silt

19  and clay.

20  Q    So it's a subcategory of sediment.

21  A    That's right.

22  Q    Okay.  What is unconsolidated mud?

23  A    Unconsolidated mud means mud that -- that -- that's much

24  more easily resuspended.  If -- if it was -- if you were

25  holding consolidated mud in your hand, you could hold it

1    between two fingers, and if it's -- if it's unconsolidated,

2    then you would have to hold it in the palm of your hand.  And

3    -- and even in the palm of your hand, if it's -- if it's,

4    let's say, very unconsolidated, like some of the sediment we

5    found, it would dribble from the side of your -- it's -- it's

6    less -- it's more like sour cream than yogurt, let's say.

7    Q    Is the -- is unconsolidated mud also called new mud?

8    A    New you really have to put in quotes.  I don't think you

9    would find too many refereed literature that -- that refers to

10   new mud, but the -- but we chose this designation in our -- in

11   our fieldwork, and then our report stuck with the -- with the

12   category.

13        Um, and the new mud -- yeah, sorry about that -- the --

14   the new mud is -- is -- what we meant by new was -- was newly

15   deposited.  That's -- so when we say new, it's shorthand for

16   newly deposited.

17   Q    And how would you define new in terms -- in a time

18   scale?

19   A    It would be, um, roughly -- most likely less -- less

20   than a month since it had been deposited.  But -- but we

21   probably can't distinguish between one tidal cycle and about

22   two months.

23   Q    Okay.  And is consolidated mud sometimes, at least by

24   you, called old mud?

25   A    Yes.

GEYER - DIRECT EXAMINATION/BERNARD

1162

1    Q    Okay.  And is the distinction between consolidated and

2    uncon -- one -- one distinction between consolidated and

3    unconsolidated --

4    A    Well, the color is the -- is the easiest and the most

5    readily-identifiable difference.

6    Q    All right.  So why don't we get into that now.  I was

7    going to ask you, how do you tell the difference between

8    consolidated and unconsolidated mud?  You've mentioned color.

9    Are there other factors?  And then we'll go through them one

10   by one.

11   A    Right.  So the color is one, and the color, according to

12   my geochemist colleagues, is -- is due to the oxidation state

13   of iron, and if the -- if the iron is in the plus-3 oxidation

14   state, which means it's been exposed to -- to -- to oxygen in

15   the -- in the time scale of -- of, let's say, 30 to 60 days,

16   then it -- then it gets this -- this light brown color.

17        And if it's -- if it's been isolated from oxygen for --

18   for long enough, which is probably on the order of 60 days,

19   then -- then it turns black, and then it's in the -- in the

20   plus-2 oxidation state, which is the -- that's iron

21   monosulfide.

22        And then if it's long enough, it goes to a grayish

23   color, which is iron disulfide.

24   Q    And does observing the color of sediment allow you to

25   classify it either as consolidated or unconsolidated sediment?

1  A      No, I'd say that it's -- it's more that it -- it let's

2  us know that it was -- that it -- that in -- on that time

3  scale of -- of 60 days, it was in contact with oxygenated

4  water.

5        The consolidation state is really -- um, what we find is

6  that there's a consistency between -- that the -- that the

7  light-colored mud was -- was always unconsolidated, and so --

8  so -- so we -- empirically we found that -- that the light-

9  colored mud was also unconsolidated, and that's consistent

10 with the fact that it -- it didn't have enough time and it

11 never had enough overburden to be consolidated.

12        But consolidation can be -- that can be directly

13 observed by -- we didn't -- we didn't do measurements, but

14 there's a number of -- we did -- we -- we did informal

15 measurements on deck to identify that when we -- that

16 oftentimes the -- the black mud was -- was much stiffer.

17        So that -- that provides a more direct -- you know,

18 looking at the consistency of it, provides more direct

19 assessment of whether it's consolidated.

20 Q    What --

21            THE COURT:  This is probably -- I think we ought to

22 break.

23            MR. BERNARD:  Yes.

24            THE COURT:  I've got a sentencing at 3:00 I have to

25 review and prepare for, as well.

1        MR. BERNARD:  This is a good time, Your Honor.

2        THE COURT:  Very good.  Thank you very much, sir.

3   You may stand down.

4        (The witness left the witness stand.)

5        MR. BERNARD:  Your Honor, may I ask one question

6   about documents (sic) exhibits?

7        THE COURT:  Yes.

8        MR. BERNARD:  We're not clear about whether if we

9   may use -- and we don't know yet -- but the deposition

10  transcripts of defendants' experts in -- during cross-

11  examination of those witnesses.  Do you want us to mark those

12  now as exhibits?

13       THE COURT:  Well, I was watching what you were doing

14  there, and traditionally you wouldn't mark them.

15       MR. BERNARD:  That -- that's what we thought, and so

16  we haven't.

17       THE COURT:  Yeah.  This is a bench trial, so it's a

18  little bit different, and I don't see any harm in marking them

19  and admitting them, as long as there's no objection.  If

20  there's an objection to it, then we can deal with it.  But I

21  -- I'm going to have the exhibit, and I'm going to be able to

22  look it up, so it's sort of six of one or half a dozen of the

23  other.

24       MR. BERNARD:  I think in light of that, Your Honor,

25  we'll just add them to the -- we'll make copies and add them

1   to the plaintiffs' exhibit binders, and we'll provide an

2   updated index, along with a few other documents, that I've

3   already discussed with opposing counsel.

4         THE COURT:  How do you want to handle that?

5         MR. TALBERT:  And -- and, Your Honor, we've actually

6   put those transcripts in -- as defense exhibits --

7         THE COURT:  Right.

8         MR. TALBERT:  -- pursuant to earlier conversations

9   along those lines, that this is a bench trial and that they

10   would be helpful for you to review.

11         THE COURT:  Right, right.  It seems to me to make

12   sense.  So I think we have an agreement on that.

13     What I'm going to urge you to do is make sure with the

14   clerk that what you think is admitted is admitted at some

15   point so that we don't get to the end of this thing and

16   discover that you have a raft of documents you think you put

17   in that have not yet been admitted.

18         MR. BERNARD:  We were planning to do that, Your

19   Honor -- I mean, we're doing it as we go along, but we were

20   planning to do that just before we rest.

21         THE COURT:  And that makes sense, too.

22         MR. TALBERT:  Yeah, we may be able to enter into a

23   stipulation and just get a bunch of exhibits in at once.

24         THE COURT:  Right.  Very good.  Thank you.

25         MR. TALBERT:  Thank you.

1     (Proceedings concluded at 2:33 p.m.)

2                       CERTIFICATION

3     I certify that the foregoing is a correct transcript from

4   the record of proceedings in the above-entitled matter.

5

6

7   /s/ Julie G. Edgecomb                    June 10, 2014
    Julie G. Edgecomb, RMR, CRR             Date
8   Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25