1          UNITED STATES DISTRICT COURT

2              DISTRICT OF MAINE

3  MAINE PEOPLE'S ALLIANCE        )
   and NATURAL RESOURCES          )
4  DEFENSE COUNCIL, INC.,         )
                                  )
5           Plaintiffs            )
                                  )              CIVIL ACTION
6                                 )
         vs.                      )   Docket No. 1:00-cv-00069-JAW
7                                 )
                                  )           BENCH TRIAL
8  HOLTRACHEM MANUFACTURING       )
   and MALLINCKRODT LLC,          )
9                                 )
           Defendants.            )
10

11                  VOLUME XIII

12           TRANSCRIPT OF PROCEEDINGS

13      Pursuant to notice, the above-entitled matter came on

14  for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15  Chief District Judge, in the United States District Court,

16  Bangor, Maine, on the 19th day of June, 2014, at 8:37 a.m.

17  APPEARANCES:

18  For the Plaintiffs:            Mitchell S. Bernard, Esquire
                                   Aaron S. Colangelo, Esquire
19                                 Rachel E. Heron, Esquire
                                   Jared J. Thompson, Esquire
20
    For the Defendants:           Patricia H. Duft, Esquire
21                                 Sigmund D. Schutz, Esquire
                                   Jeffrey D. Talbert, Esquire
22

23                Julie G. Edgecomb, RMR, CRR
                    Official Court Reporter
24

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer.

INDEX OF PROCEEDINGS

                                                            Page:

Testimony:  (see below)

                    INDEX OF WITNESSES

                                                            Page:

CHARLES T. DRISCOLL  (called by Mr. Bernard)

Continued Direct Examination by Mr. Bernard          2127
Cross-Examination by Mr. Talbert                     2180
Redirect Examination by Mr. Bernard       2238, 2272, 2278
Recross-Examination by Mr. Talbert              2260, 2276

PHILIP MICHAEL BOLGER  (called by Mr. Schutz)

Direct Examination by Mr. Schutz                     2281

                    INDEX OF EXHIBITS

Joint
| Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 96 | Beak Consultants, Review of Environmental Impact of Penobscot River Mercury Deposits | 2142 | 2142 |

Plaintiffs'
| Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 14 | Memo - DeAngelis to MacDonald | 2143 | 2143 |

Defendants'
| Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 1223 | Federal Register Notice | 2291 | 2291 |
| 1224 | New Advice:  Some Women and Young Children Should Eat More Fish | 2288 | 2288 |
| 1225 | Fish:  What Pregnant Women and Parents Should Know | 2294 | 2294 |
| 1226 | Quantitative Assessment of the Net Effects on Fetal Neurodevelopment from Eating Commercial Fish | 2296 | 2297 |

1         (Counsel present in open court.)

2         (Charles T. Driscoll, having been previously duly sworn,

3    resumed the witness stand.)

4              THE COURT:  Good morning.

5              MR. BERNARD:  Good morning.

6              THE COURT:  You may proceed.

7              MR. BERNARD:  Thank you, Your Honor.

8                   CONTINUED DIRECT EXAMINATION

9    BY MR. BERNARD:

10   Q     Dr. Driscoll, I want to turn your attention to target

11   setting, please.  Did the Study Panel set sediment targets for

12   recovery of the Penobscot Estuary?

13   A     Yes, that's my understanding.

14   Q     What is your understanding of the Study Panel's approach

15   to setting those targets?

16   A     Well, based on the discussion we had yesterday and

17   the -- the idea that they, I think, clarified that sediments

18   are a critical controller of mercury in biota, they set

19   values -- target values for mercury concentrations -- total

20   mercury concentrations in surface sediments.

21   Q     And were those keyed to projected reductions that would

22   be necessary in mercury and biota to get those biota down to

23   safe levels?

24   A     Yes.  So in the -- in the report, in the Penobscot River

25   study report, they went through individual observations for

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2128

1    different types of biota -- fish, songbirds, lobster -- and,

2    um, projected the level of decrease that would be needed to --

3    to set to -- to reach safe limits, and then they keyed that to

4    a reduction in sediment mercury that would be necessary,

5    assuming a proportional decrease.

6         And my recollection was that they set a target for the

7    riverine sediments, I think, of 450 nanograms per gram, and

8    given the sensitivity and the efficiency in which

9    methylmercury is converted in Mendall Marsh, they set a

10   lower -- lower target for that system, at a hundred nanograms

11   per gram dry weight of sediment.

12   Q    From a scientific perspective, what do you think of the

13   Study Panel's target-setting methodology?

14   A    I think the methodology is sound.  It's relatively

15   simple, but it's comprehensive.  So I really admired the

16   approach that they took, where they looked at a diverse suite

17   of biota, very impressive, very comprehensive -- looking at

18   terrestrial organisms, aquatic organisms, and then looked at

19   them together to try to see, you know, what would be the

20   targets that would accomplish that.

21        So I think that their approach hangs together quite

22   well.

23   Q    In terms of the human health implications of consuming

24   mercury-contaminated wildlife, did the Study Panel use the

25   existing State of Maine standard of 200 nanograms per gram?

1   A      That was my understanding, yes.

2   Q      And do you have a view about the validity of that or the

3   appropriateness of that?

4   A      Well, the State of Maine provides oversight for this,

5   and I -- I wouldn't, you know, second-guess their decisions.

6   I'm sure that a lot of attention went into that.  It's a --

7   it's an important issue, and so I'm not familiar with the

8   exact procedures that the State of Maine uses.

9          I am familiar with other procedures that have gone on in

10  other states, and I know that matter's taken seriously and

11  with a fair amount of care and deliberation, so I assume

12  similar approaches were used here in the state of Maine.

13  Q      If you had been on the court-appointed Study Panel,

14  would you have applied the State of Maine human health

15  standard of 200 nanograms per gram to the situation in the

16  Penobscot?

17  A      Yes.

18  Q      Now, did the Study Panel base some biota targets on a

19  review of the existing scientific literature?

20  A      Yes, I think they were virtually all based on an

21  understanding and review of the literature.

22  Q      And is that method or approach appropriate in your view?

23  A      Yes, I think that's, you know, science and decisions are

24  based on sound science, and I think that the Study Panel did a

25  comprehensive review of the literature.

1       In my opinion, they had terrific people involved or they

2   provide -- got input from really highly qualified folks who

3   know that literature very well.  So I think they were getting

4   the best science available to inform their decisions.

5   Q    Is it customary -- do you know -- in remediation

6   projects to set targets for sediment?

7   A    Yes, I think it's routinely done, in my experience.

8   Q    Okay.  And are -- is it routinely -- withdrawn.

9       Are those sediment targets routinely set on a dry weight

10  basis?

11  A    Yes, all the targets that I'm aware of are set on a dry

12  weight basis.

13  Q    Now, you mentioned that for the main stem of the

14  Penobscot River, the court-appointed Study Panel selected 450

15  nanograms per gram as -- dry weight as a target; is that

16  right?

17  A    That's my understanding, yes.

18  Q    And for Mendall Marsh, it was a hundred nanograms per

19  gram dry weight?

20  A    Yes.

21  Q    Okay.  In your view, are the Study Panel targets as

22  aggressive as they could be?

23  A    I had a little concern about that.  Um, I think the

24  approach is reasonable, and, um, I guess I don't like to

25  second-guess them, but I -- I did have some concerns.  So

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2131

1  we -- we talked, for example, about some of the lobster data,

2  and I think that was just one example that I had in my report,

3  where if you looked at the existing measurements, again, these

4  were on the high end of measurements, but I think it's good to

5  look at the extremes in values to get an idea of a -- a

6  comprehensive picture of the -- of the contamination.

7      So in the case of lobster, and in a few other cases, if

8  you projected downward that there would be a proportional

9  decrease in the sediment concentrations, that certain targets

10 would not be met for human health or to protect wildlife.  So

11 I have some concerns about that.

12 Q    Okay.  Would you call the Penobscot Estuary a sensitive

13 ecosystem?

14 A    I would.

15 Q    And what do you mean by that?

16 A    Well, I think that -- um, I should clarify that, that I

17 think much less is known about estuaries than freshwater

18 systems.  We know a lot about freshwater systems and what

19 dictates their sensitivity to mercury inputs.

20     Um, but I think that a case could be made that the

21 Penobscot's quite sensitive to -- to mercury for a variety of

22 reasons.  Um, first of all, it's -- it's a cold system, and

23 cold conditions result in greater trophic transfer of mercury,

24 a greater extent of trophic transfer of mercury, so a greater

25 level of bioaccumulation occurs with -- with higher latitudes.

1           Another factor that's, I think, quite important is

2     productivity.  If a system receives large inputs of nutrients,

3     those nutrients can mitigate the effects of mercury, and the

4     Penobscot, I think, is a relatively unproductive system,

5     relatively low levels of urbanization and inputs of nutrient

6     from human activities.  So that -- that would tend to make it

7     more sensitive to the transfer of inorganic mercury to

8     methylmercury.

9           So for those reasons and other reasons, um, I think

10    it's -- I think it could be characterized as sensitive.

11    Q     Did the Study Panel set any separate sediment target for

12    the Orland River?  Do you recall?

13    A     Not to my knowledge.

14    Q     And is that a source of some concern to you?

15    A     Ah, I -- I was a little surprised that a little bit more

16    attention was not paid to the Orland -- Orland River.  A lot

17    of attention was focused on Mendall Marsh, which I think makes

18    sense.  It looks like a very sensitive system.  We saw very

19    high concentrations in -- in birds in that system, very high

20    rates of methylmercury production, very high methylmercury

21    efficiency.  And I think that the -- the concentrations that

22    were measured of sediment mercury and surface sediments in

23    Orland River were quite high, and there were really, I think,

24    few additional measurements.

25          So I think Orland River is an area that might be

1    considered for further examination because I think it is a

2    wetland system.  It seems like it's quite important to the

3    overall reach of the river, and I think it has the potential

4    for, um, methylmercury production and -- and maybe

5    contamination in biota.

6    Q    Do you think that some further explanation --

7    exploration may be warranted, as well, regarding other marshes

8    that fringe the main stem of the river?

9    A    Yes, I think wetlands are important areas in terms of

10   mercury -- methylmercury supply.  We talked about this

11   yesterday.  There's a considerable amount of methylmercury

12   produced within wetlands, and so they are -- um, they're areas

13   of particular concern with respect to -- to mercury.

14       There was some studies done in riverine wetlands

15   adjacent to the river, and -- and I think there could be some

16   additional follow-up work on the significance of that, as

17   well.

18   Q    Is it possible that either the Orland River or one of

19   these smaller wetlands fringing the main stem of the river may

20   turn out to be an appropriate target for active remediation?

21   A    Possibly, but I think -- um, I guess we're -- we're

22   maybe moving ahead a few steps, but, you know, one could

23   project if remediation was underway and there were concerns

24   about Mendall Marsh -- it's -- it's an important system -- one

25   could do a pilot study at one of these smaller wetlands to try

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2134

1    to try out ideas and see their effectiveness in a more
2    controlled setting.
3        So I think that these smaller wetlands could be -- could
4    be valuable to -- to better understanding particularly
5    remediation options going forward.  And as I said, the Orland
6    River is -- it's relatively large and it would appear to be
7    very important and probably warrants some additional
8    attention.
9    Q    And could that additional attention be paid, in your
10   view, during a remediation phase as an aspect of that phase
11   should the court order that?
12   A    Yes, I think so.  I think that there's no reason why
13   planning and -- and maybe initial implementation towards
14   remediation couldn't proceed in parallel with other supporting
15   studies to inform the remediation or -- or long-term
16   monitoring or -- or better understanding of systems, gaps in
17   knowledge that were apparent from the Phase II Study.
18   Q    Let me turn your attention briefly to the mobile
19   sediment pool.  Are you familiar with that concept as it was
20   articulated in the Penobscot River Mercury Study report?
21   A    Yes.
22   Q    Okay.  And did the Study Panel identify a mobile pool of
23   mercury-contaminated sediment within the estuary?
24   A    Yes.
25   Q    And what importance or relevance, if any, does the

1  concept of the mobile pool have in terms of comprehending the

2  mercury contamination within the estuary?

3  A    Well, I think it's a critical concept in terms of

4  contaminant fate and transport in estuaries.  Estuaries are

5  particles, sediment traps, if you will.  They retain these

6  materials.  That's part of the reason why they're so

7  productive.  It's a natural, very important part of their

8  function.  Um, so they tend to retain particles, and -- and

9  their -- and particularly the Penobscot's a very turbulent --

10  excuse me -- regime.

11      So you have a constant dynamic situation where you have

12  deposition of sediments, resuspension of sediments,

13  mobilization of sediments, but they're not transported out of

14  the estuary very efficiently, relatively slowly, and so they

15  tend to get spread around.

16      Um, so if you -- in the -- in the Penobscot River study,

17  the characterization of mercury in sediments showed relatively

18  uniform concentrations across this mobile pool, suggesting

19  that it's relatively well-mixed.

20  Q    Have you been out on the Penobscot?

21  A    I have, actually, many times.

22  Q    Okay.  And did you tour the river as part of your work

23  in this case?

24  A    I did.

25  Q    Let's turn to recovery half-times.  Are you familiar

1   with the sediment core data that the Study Panel gathered?

2   A    I am.

3   Q    And are you familiar with the Study Panel's

4   interpretation of those data?

5   A    I am.

6   Q    Do you agree with the Study Panel that in terms of

7   estimating natural recovery of the Penobscot ecosystem, the

8   core data are the definitive and most accurate data that are

9   available?

10  A    I think that they provide the best resource to estimate,

11  um, recovery times, um, of mercury within the system, yes.

12  Q    Do you have any experience working with sediment cores

13  and sediment core data?

14  A    I have a fair amount of experience, yes.

15  Q    Please briefly describe that to the court.

16  A    Okay.  Well, we -- I do a lot of work on air pollution

17  effects and climate change effects, and we routinely collect

18  sediment cores to look at the historical record of principally

19  lake systems.  We -- I largely work in lakes and reservoirs.

20       We collect cores.  We section those cores.  We date

21  those cores.  We look at the patterns, the horizon patterns.

22  We sometimes make chemical measurements.  We look at

23  biological indicators, such as diatoms and chrysophytes,

24  and -- and evaluate changes in community.

25       So we look -- we use that -- I think it's a tremendous

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2137

1    resource to try to get an idea of the historical record of a

2    particular water body or watershed that we're studying, and I

3    think one -- I think it's always good to have multiple cores

4    across multiple space to help interpret the pattern.

5         So, um, yeah, they're a terrific tool to use, and I try

6    to take advantage whenever possible.

7    Q    How comprehensive is the sediment core data set in --

8    that was collected during the Penobscot River Mercury Study?

9    A    Well, I think it's a remarkable data set.  Usually

10   studies only have a handful of cores, but in this case,

11   they -- they collected more than 50 cores.  It's an extremely

12   comprehensive picture.

13        But that said, it's an extremely dynamic and turbulent

14   system, and I think they really -- really needed a large

15   number of cores to characterize that heterogeneity.  So I

16   think they -- they did a good job capturing that, and they

17   collected it along the main stem into the lower estuary,

18   within Mendall Marsh, the Orland River.  So I think there's

19   a -- a pretty good understanding of the -- the patterns

20   through their core effort.

21   Q    What is the advantage, if any, of having a relatively

22   large set of sediment cores?

23   A    Well, I think you can get a relatively comprehensive

24   picture of the dynamics of the system and the recovery rate of

25   the system.  And if you -- I think, you know, the tendency is

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2138

1    to try to look at one individual core and, if you will,

2    cherry-pick this core and say this shows this and this shows

3    that.

4         But often a core nearby will show a very -- you know,

5    different pattern.  So I think that if you -- I think in this

6    case, you have to sort of embrace the complexity, and you have

7    to use it and -- and think of it in a positive sense.  This

8    gives an idea of the magnitude and the variability of the

9    system.

10        And so I think that really requires discipline, and you

11   really need to look at all the cores together and try to

12   indicate what are the story, you know, collectively these

13   cores are telling you about the dynamics of this system?

14   Q    Did you yourself review all of the core information

15   generated by the study?

16   A    I did.

17   Q    Before we get into specifics, let me just follow on the

18   testimony you just gave, which is that it's important to kind

19   of look at the -- the whole story that the cores tell.

20        Before we get into specifics, what is the story the

21   cores tell, in your view?

22   A    Well, I think that the cores tell a story that's

23   consistent with the -- um, the basic knowledge of the system,

24   that there was a release of mercury as a contaminant in the

25   late '60s, early '70s, a relatively large release, so that's

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2139

1    approximately 45 years ago, and the contamination remains.

2    And so I think the cores tell a story that's consistent with

3    that, that the recovery rate is slow, very slow.

4    Q    What did you do when you reviewed the cores?

5    A    Okay.  Well, I felt that the cores were a critical piece

6    of information, so I actually looked at every individual core.

7    I plotted every core, looked at it in detail, and I did my

8    best to try to reproduce what -- the analysis that

9    Dr. Santschi did.

10        I did do things slightly different than he did, but I

11   also tried to repeat what he did.  So I wanted to really

12   verify the cores and look at them carefully, so I spent quite

13   a bit of time on the cores.

14   Q    Okay.  You mentioned this initial pulse of mercury in

15   the late '60s or early '70s.  Do the cores reveal what

16   happened after that initial pulse?

17   A    Ah, yes, I think you can see elevated concentrations of

18   mercury at depths in most of the cores, and then you see

19   decreasing concentrations as the core moves towards the

20   surface in the more recent -- in some of the cores, but not

21   all of the cores.

22        Some of the cores, actually a fairly large fraction of

23   the cores, show concentrations increasing over time, so not

24   recovery, but actually increasing contamination.  So you see a

25   lot of diversity across those -- across those cores, and I

1    think it's important to look at them individually and then try

2    to analyze them collectively.

3    Q     Does the -- does the variability within the cores in the

4    Penobscot System surprise you?

5    A     No, if you go out there, it's a very turbulent, dynamic

6    system.  And, um, I was very impressed with Dr. Geyer's work.

7    I think he may be -- I got the impression that he would have

8    liked to have done a little bit more work, but to -- you know,

9    to understand the -- the dynamics, the particle flows, the

10   hydrodynamics of the system, ah, I thought that was very

11   instructive.

12        So just with my own eyes, looking at the system, how

13   turbulent it is, and -- and reading his report, I think it's

14   not surprising that there's a lot of heterogeneity in the

15   sediment deposition patterns.

16   Q     Are you aware of the so-called Beak data?

17   A     Yes, I am.

18   Q     Okay.  And were those actually data collected by EPA

19   that were reported by Beak, a consultant to Mallinckrodt?

20   A     So let me clarify what I think you're trying to say.  So

21   Beak -- as I understand, this was a report that was in the

22   early '70s.  It was a consulting report on the -- on the

23   contamination and the -- um, in the Penobscot.  And Beak

24   relied on a subset -- I didn't realize it was a subset at the

25   time -- but a subset of data that were collected by the EPA a

 1    little bit earlier for a survey of sediments, I think in 1971,

 2    if I'm not mistaken.

 3    Q    Let me show you Joint Exhibit 96.  This is the cover

 4    page, and it's a March 1972 review of environmental impact of

 5    Penobscot River mercury deposits.

 6          MR. BERNARD:  Your Honor, I believe this was an

 7    exhibit during the liability trial.

 8    BY MR. BERNARD:

 9    Q    Is this the report that you were just referring to?

10    A    Yes.

11    Q    Okay.  Now, in that report, it's not paginated, but it's

12    the third page from the end, I'm going to show you what looks

13    like a map.  You see Verona Island down there at the bottom?

14    A    I do.

15    Q    Okay.  So does this map -- in this map, does Beak report

16    some sediment mercury levels at various locations down here on

17    this side of the page?

18    A    Correct.

19    Q    Okay.  And did you end up adapting that map in order to

20    look at the sediment mercury that was measured in the river in

21    the early 1970s?

22    A    Yes, I did.

23    Q    Now --

24          MR. BERNARD:  Your Honor, I'd move the admission of

25    Joint Exhibit 96.

1           THE COURT:  Any objection to Joint 96?

2           MR. TALBERT:  No objection.

3           THE COURT:  It's admitted.

4    BY MR. BERNARD:

5    Q    Now, you said there came a time when you recognized that

6    Beak did not plot all of the EPA data.  Did you say that?

7    A    Yeah, that was one of the problems.  There were several

8    problems with the Beak report that I didn't discover entirely

9    when I had prepared my expert report, but, yeah, later I did.

10   Q    Okay.  Did you subsequently see this document, which is

11   Plaintiffs' Exhibit 14, which encloses sediment analyses, and

12   this is a letter from Mr. DeAngelis, who was the plant manager

13   at the time, to Mr. MacDonald of the environment --

14   Environmental Improvement Commission in Maine?

15   A    Yes.

16   Q    Okay.  And did this contain some additional data that

17   you then incorporated into an adjusted map?

18   A    Correct.  I believe this includes the raw data.  This

19   was the data I used in -- in the revision to the map.

20   Q    Okay.  And just to show you a few pages into the

21   document, are these the kind of raw data that -- station and

22   wet and dry-weight mercury concentrations that you're

23   referring to?

24   A    Yes.  And if you don't mind, maybe I can point out here

25   that in the original Beak report, the data were reported on a

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2143

1    wet-weight basis, and that's not typically done, as we've

2    talked about, generally in -- in the Penobscot River report.

3    They're reported on a dry-weight basis, and the original data,

4    not surprising, they were reported on a dry-weight basis, but

5    in the Beak report, they chose to plot them on a -- a

6    wet-weight basis.

7         The other issue is that -- and I didn't realize that --

8    that some of these sites here were not included in the Beak

9    map.

10        And -- and, third, there are some transcription errors

11   in some of the data from the original data set to the Beak

12   report.

13        So I discovered all those problems later in the day.

14   Q    When you discovered those problems, did you then use

15   this additional information to plot your own map based on the

16   initial Beak report, plus this additional raw data?

17   A    Yeah, I used these data, the dry-weight data, all of the

18   data, not part of the data, to -- to redo the map.  So the map

19   reflects, I think, more accurately the -- the complete data

20   set that EPA collected at the time.

21             MR. BERNARD:  Your Honor, I move the admission of

22   Plaintiffs' Exhibit 14.

23             THE COURT:  Any objection to Plaintiffs' 14?

24             MR. TALBERT:  No objection.

25             THE COURT:  Plaintiffs' 14's admitted.

1   BY MR. BERNARD:

2   Q     Now, after you went through this process, did you derive

3   a map that you believe incorporates the -- all of the data of

4   which you're aware?

5   A     Yes.

6   Q     Okay.  And let me show you -- and this is from

7   Plaintiffs' Exhibit 49, at Page 2, let me show you this map.

8   And I'll just show you the whole thing, and then for ease of

9   reference, we'll just kind of -- but you see Verona Island

10  down here at the bottom, right?

11  A     Yes.

12  Q     And then just describe to the court, please, what --

13  what is plotted here?  And we'll go back up to the -- it seems

14  to go up to -- you know, pretty much to the Veazie Dam.  So

15  why don't you point out -- could you point out the HoltraChem

16  facility?

17  A     I believe it's right around here.

18  Q     Okay.  And could you point out for the judge, please,

19  what you've depicted on the map?

20  A     Sure.  So those individual observations and, um, in the

21  report, there was actually notes on the location of the site,

22  which would allow for a more accurate pin-pointing of where

23  the -- where the points were.

24        So each of these little circles, such as this one right

25  here, represents a data point from that EPA survey.  So on the

1    map here, so you've got -- you've got the USGS map in the

2    background, and then you've got the overlay here from the Beak

3    report.  Um, so you see there -- there's some additional sites

4    here that weren't consistent with lines in the Beak report.

5    Those represent the additional sites that were in the EPA data

6    set.

7         So each one of these points represents a sampling point

8    from that EPA survey, and the -- the magnitude of the dry

9    weight total mercury concentrations are shown, and I've also

10   got a color coding here.  So it grades from blue colors, which

11   reflect lower concentrations of mercury, down to orange and

12   red colors, which reflect higher concentrations of mercury.

13   Q    Now, these data are from samples that were taken in

14   1971.  Is that what the legend indicates?

15   A    Yes.

16   Q    What do you see here in terms of the levels, first,

17   around the HoltraChem facility?

18   A    Well, I think, in general, the levels are consistent

19   with the observations from the -- the Santschi core data,

20   quite high concentrations.  Presumably this reflects a pulse

21   release of mercury from the facility.  You can see relatively

22   high concentrations, where I've circled here, around the

23   facility, and elevated concentrations move southward

24   primarily, but a little bit northward, too, down from the

25   facility, down to around Verona -- Verona Island.

1       So I think, you know, this is -- in terms of this

2   overall problem, I think this is potentially a very valuable

3   data set because it provides a snapshot of the mercury

4   contamination shortly after the -- the period of peak

5   discharge, so it gives an idea of the magnitude of the

6   contamination, the spatial extent of the contamination shortly

7   after the -- the discharges.

8   Q     And when you say the time of the peak discharges, does

9   that -- what are you referring to?

10  A     I'm referring to the period in the late '60s, early '70s

11  where discharges from -- mercury discharges from the

12  HoltraChem facility were thought to be elevated.

13  Q     Okay.  Now, what happened -- you've described the

14  initial pulse into the river.  What do you see here or in the

15  sediment cores that informs what happened after that?

16  A     Okay.  So my -- my vision of the situation is that in

17  the late '60s, early '70s, there's this pulse release.  It

18  moves a little bit north of HoltraChem facility and then down

19  southward towards Verona Island, and so there is relatively

20  widespread contamination.

21      But I think it's also instructive to point out that, you

22  know, interspersed with these hotspots, these yellows and

23  orange concentrations, there are also some blue concentrations

24  or blue lower values, so there's a lot of variability even

25  shortly after the -- after this release.

1          And then after that, the -- the release is curtailed and

2   so then the -- the reach of the river embarks on a recovery

3   period.  So what happens is materials come in with lower

4   mercury concentrations.  They bury some of these materials, so

5   the concentrations are elevated at depth.  They -- they

6   decrease towards the surface in some of the sites.

7          But then in the periphery, where there are those lower

8   concentrations and we have this mobile pool of sediments

9   that's constantly reworking over the -- over the decades, then

10  you can get areas in the periphery that were initially lower,

11  that now are resulting in higher concentrations.

12         So, if you will, it's sort of spreading out.  There is

13  -- some of it has obviously been lost to the system, either

14  through river discharge out into the lower estuary or it goes

15  off to the atmosphere; some of it is buried.  But a lot of it

16  is associated with these mobile sediments, and those mobile

17  sediments spread out the contamination in the intervening

18  decades.

19  Q    Is that still happening?

20  A    The core data suggests that it is happening, yes.

21  Q    Let's look at the core data.  You said that you analyzed

22  each individual core; is that right?

23  A    Yes.

24  Q    And did you calculate your own recovery half-time for

25  each individual core?

1   A     I did, and I used a variety of methods, yes.

2   Q     Okay.  Well, let me show you a figure in Joint

3   Exhibit 48, and there are actually four figures, and these are

4   on Pages 19 and 20 of Joint 48.

5         And -- and just to get the layout, is this what you're

6   referring to in terms of your own calculation of recovery

7   half-times?

8   A     It is, but this is sort of a summary of all the -- the

9   legwork I did to get to this point, yeah.

10  Q     Okay.  We'll -- we'll get into the legwork in a minute,

11  but I just want to get the layout.  So the -- you have four

12  different figures here.  What does this one show, 3A?

13  A     Okay.  3A is for the, um, upper -- or lower -- excuse me

14  -- Penobscot River, upper estuary, the upper reach, and along

15  the Y axis here, the vertical axis, that is the recovery

16  half-time.

17        So if you assume that the behavior of the contaminant is

18  in the early years high and decreases exponentially at an

19  ever-decreasing rate, assuming like an exponential decay, what

20  would be the time to reach its half-way point.  So this is the

21  years to -- to reach half the -- the projected recovery point.

22        And in this case, I assumed a background concentration

23  of a hundred.  So that is similar to what the Penobscot River

24  Mercury Study assumed, but it's different -- a little bit

25  different than what Dr. Santschi assumed.  Dr. Santschi

1    assumed a value of 0.  I did it both ways.  I actually did it

2    for 0, 50, and a hundred nanograms per gram, ah, but it seemed

3    to me that this was a little bit more conservative.  It was

4    consistent with the assumption of the background values, so it

5    made sense to project it this way.

6         So this is a little complicated, but these represent

7    along the -- along the horizontal axis all the individual

8    sites from the cores in this reach of the river.

9    Q    And are those arrayed from north to south?

10   A    Yeah -- thank you -- that's -- that's correct.  And the

11   size of the bar represents the time in year for recovery.  So

12   you see that they're -- they're highly variable.

13        I should point out that there's a series here that are

14   sort of pegged to the top, and those are the cores that are

15   not recovering.  They are showing an increase in concentration

16   towards the surface.  They're not showing a decreased

17   concentration.

18        So most of them are recovering, but a lot of them are

19   not recovering, and as you can see from this, there's a lot of

20   variability in the -- in the overall recovery.

21   Q    When you're looking at the exponential decline of

22   mercury concentrations toward the surface of a core, how, if

23   at all, do you factor in the cores, such as the seven you have

24   in this Figure 3a, where there's not a decline toward the

25   surface, but an increase?

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2150

1    A      What do you mean by factor in?

2    Q      Well, do you -- do those factor -- if you're going to

3    create an average recovery half-time for this reach of the

4    river, can you consider the -- can you consider arithmetically

5    the cores that -- in that average, the cores where you have

6    increasing mercury?

7    A      Well --

8    Q      -- at the surface?

9    A      It's an infinite value.  It's not -- it doesn't have a

10   specific time, so you can't include that in the average.  So

11   you have to -- so in the averages that were reported by

12   Santschi and the Penobscot River study and myself, when I give

13   an average value and a standard deviation, I don't include

14   those.  They're -- they're -- they're ignored.

15          So I think that's an important point, because it doesn't

16   reflect the -- you know, the entirety of the system.  There

17   are a few -- there are some of these that are not recovering.

18   Q      When you say it doesn't reflect the entirety of the

19   system, do you -- do you mean the average recovery half-times

20   for a particular component of the ecosystem?

21   A      Correct.  That's why I say you really have to look at

22   this in a comprehensive way because it's so variable, and you

23   have to get a sense of, you know, what is -- you know, what's

24   the magnitude of this variability?  So I think you just have

25   to -- you just have to go with the variability I think is the

1    best approach.

2    Q    Okay.  You mentioned earlier the legwork, that this

3    shows the results of legwork, but doesn't explain the legwork.

4    Is there any part of that you want to explain?

5    A    Well, you know, I just sort of view this as an empirical

6    exercise.  We're trying to take this information, and we're

7    trying to use them to project, you know, how fast the system

8    is going to recover.

9         And so there's a variety of ways you can do this.  You

10   can assume an exponential decay.  I think that's what theory

11   would suggest that the contaminant would follow.  But you

12   could also assume a linear change, and you could assume other

13   types of models, and I did.  I went through and I looked at

14   these various models.

15        And as we've said, there's a lot of variability, and a

16   given site might assume a linear model is better than an

17   exponential model or another model.  But, in general, I found

18   that the exponential model was overall probably the best fit,

19   and so that's what I've -- I've looked at here.  I think if

20   you assume an exponential model versus another model, like a

21   linear model, you'll get a slightly different value, but I

22   think the conclusion is pretty much the same.  So I think my

23   analysis was fairly robust.

24   Q    Did Dr. Santschi also select the exponential approach?

25   A    That's my understanding, yes.

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2152

1   Q     Okay.  So anything else about these PBRs -- this is the

2   main stem of the Penobscot, right?

3   A     Right.

4   Q     Okay.  Anything further on this figure that you want to

5   explain to the court?

6   A     No, I think that's -- that's satisfactory.

7   Q     All right.  Then let's go down on Joint Exhibit 48, and

8   this is Page 19, to this Figure 3b.  And what is that,

9   Dr. Driscoll?

10  A     This is a similar analysis for Mendall Marsh.  So,

11  again, the measured or estimated half-lives or half-times are

12  shown here.  These are expressed in years.  And you can see

13  that there is a lot of variability, although it seems to be a

14  little bit more homogeneous than the main stem of the river,

15  but, still, there's a couple sites here that are not showing

16  recovery.

17  Q     And let's go to the next page, which is Page 20 of Joint

18  Exhibit 48, and there are two figures here.  3C is the top

19  one.  What does this depict?

20  A     This is the Orland River, and, again, a fair amount of

21  variability.  The recovery here is a bit longer, longer than

22  for Mendall Marsh, you know, two out of five are not showing

23  recovery, three are showing recovery; and those three do have

24  quite a bit of variability, but even though there's quite a

25  bit of variability, they're pretty long.  They're on the order

1    of decades.

2    Q    And, finally, let's look at Figure 3d at the bottom of

3    Page 20 of Joint Exhibit 48.  What does this depict?

4    A    So these are the estuary sites, and, again, they show

5    variability.  They show a -- you know, a sizable fraction are

6    not recovering.  Um, so it's a -- it's a similar plot to what

7    we've talked about.

8    Q    Did you prepare a table setting forth the results of

9    your recovery half-time analyses?

10   A    I did.

11   Q    Let me show you that table, which is Joint Exhibit 48,

12   at Page 17.  Is this the table you're referring to?

13   A    It is.

14   Q    I'll just show the court that this is Page 17 of Joint

15   Exhibit 48.  Please explain to the court what you've depicted

16   here.

17   A    Okay.  So these are the mean recovery half-times or

18   recovery times, and I think the recovery time is -- it's

19   defined here in the footnotes, but it's the time to reach the

20   -- the target value.  So these are in units of years.  These

21   are the average values, so they don't include those sites that

22   are -- that are -- that are not recovering.

23        Um, and this is from Santschi, who used a background

24   value of 0.  These middle pieces right here were from my

25   analysis.  They assumed a value of a hundred.  And this is the

1    results from the Study Panel, who I believe took -- and I am

2    not sure of the exact procedures that they used -- they

3    indicated that they took the Santschi results, and they

4    adjusted them for a background of a hundred.  Whether they

5    used the same procedure as I did or a different procedure, it

6    wasn't detailed that I saw in the report.

7        So this gives you really just an idea of the magnitude

8    of the recovery times, and I think these values need to be

9    taken with a grain of salt.  But, you know, my interpretation

10   is, you know, these are large numbers.  These are long

11   periods.  And so I think this is consistent with what we see

12   with the observed data, that the event, the discharge

13   happened, you know, 45 years ago, and we still see it

14   contaminated today.  It's recovering, but it's not recovering

15   at a very fast rate.  And I think these analyses, um, they

16   reflect that.

17   Q    Now, you have two columns under this analysis.  This

18   analysis is your own?

19   A    Correct.

20   Q    Could you just explain to the court what those two

21   different columns represent?

22   A    Sure.  So the first column is the recovery half-time.

23   So that's the -- the metric that we talked about previously,

24   where if you assume an exponential decay, it's the time it

25   takes to reach half of the background concentration.

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

1      Um, and then the recovery time is that if you project to

2  reach the target, so, for example, for the -- if you remember

3  the target is to reduce the concentrations by half.  If you go

4  down to 450, how long would it take to reach that target for

5  the main stem of the river?  And you remember the target is

6  different for Mendall Marsh.  It's a hundred, not 450.  So

7  what's the time, if you assume the exponential decay, you

8  assume that the average values are indicative, what's the time

9  to reach that target?

10     And I think it's a similar approach to what the Study

11 Panel did.

12 Q    Now, is it fair to say, Dr. Driscoll, that these

13 recovery half-times are not absolutely precise?

14 A    There's a fair amount of variability in these

15 projections.  If you look at the individual plots, that's why

16 I think it's instructive to look at the individual plots.

17 Some of them are relatively tight; the fit is quite good.

18 Some of them there's a lot of variability, which could be due

19 to a variety of reasons.  But there is a -- a lot of

20 variability in some of the cores.

21 Q    Okay.  There's a little wrinkle here concerning this

22 core --

23 A    Right.

24 Q    Penobscot River core 27B, which could you just briefly

25 explain that?

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2156

1   A     Sure.  Um, there were some subtle differences between

2   what Santschi obtained and what I obtained.  I don't think

3   they're worth worrying about.  They were -- I was surprised

4   they were as close as they were.  I think this is one example

5   of this.

6       Um, Santschi did not calculate a half-time for this

7   particular core.  If I just use sort of the mathematical

8   relationship, you could calculate a half-time, but it's very,

9   very slow, very, very long, and about 300 years.  So I -- it

10  was really -- um, even though there were cores that weren't

11  recovering, this was a core that was recovering, but it really

12  inflated the value, um, and it just seemed to affect the

13  overall -- well, you can see it affected the overall average.

14      So if you pull that out, I think it's more -- more

15  reflective because it's -- it's a very long half -- half-time.

16  Q     Okay.  So just, finally, on this table, if you take the

17  recovery times that you derived, understanding that there may

18  be some variability and imprecision, and you look at the whole

19  data set and ask yourself, well, how quickly is this ecosystem

20  cleansing itself of mercury, what -- what do you say -- what

21  do you see there?

22  A     I see it's recovering on the order of multiple decades.

23  It's a long time to recovery.  So I think that's an important

24  consideration in -- in decisions concerning restoration.

25  Q     What part of the sediment core record, if you recall,

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2157

1   did Dr. Santschi use to calculate his recovery half-times?

2   A     Okay.  So my understanding of what he did is he looked

3   at the record -- the sediment record, the individual record,

4   and he saw a pattern of from the peak mercury concentrations

5   towards the surface, it looked like there was an initially,

6   for the first few years after the -- the release in the late

7   '60s, early '70s, rather rapid recovery for a few years, and

8   then it attenuated, slowed toward the recent.

9       So he -- so when those were collected, my understanding

10   was there were 42 years of sediment record from the peak to

11   the surface.  So my understanding is he divided these up into

12   two, 21-year periods, the period of rapid recovery, and then

13   he focused on the more recent record of slow recovery.  And so

14   that's what I did.  I used those 21 years.

15       Um, it's not perfect.  There are a lot of variability --

16   there's a lot of variability across those cores.  Some of

17   them, the sedimentation rates are high, others lower.  But I

18   think it -- it made sense.  Ah, he was using a consistent

19   approach across all the cores to try to use as many as

20   possible, and I think it was a good decision because in those

21   recent sediments, I think there were enough observations that

22   you could have some confidence in the projection because there

23   were a relatively large number of observations that you could

24   base this projection on.

25       I would be concerned if you -- if you narrowed the

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2158

1   interval further, you would only have a few observations, and

2   that would increase the variability and decrease the

3   confidence in the projection.  So I think -- so I -- I looked

4   at it.  I went with his judgment.  I thought it was sound.

5   Q    Did Dr. Connolly, the defendants' expert witness, use a

6   different time period than Dr. Santschi and you used?

7   A    Yes, I believe he used a shorter period.

8   Q    And what is your view, if any, about that?

9   A    Well, as I said, I have concern about that because he

10  was relying on, um, a more narrow interval.  It seemed to me

11  that many of these cores showed variable patterns.  So I think

12  more observations are better, and it provides more confidence.

13  Um, ah, I think obviously you want to look at the more recent

14  record.  That's informative, but I think over 21 years, that's

15  a -- I think a reasonable period to make these projections.

16  Q    Okay.  Now, I want to come back to something you

17  mentioned earlier when we were looking at the barcharts.  Do

18  the calculated recovery times here in Table 1 fully address

19  the issue of the time it will take the whole Penobscot Estuary

20  to recover from its current state of mercury contamination?

21  A    Well, I think what I -- what I anticipate you're getting

22  at is that this is really sort of an underestimate of the

23  recovery time because of a fraction of the cores, a

24  significant fraction of the cores are not recovering.  So if I

25  calculated the average, there'd be infinite values in there,

1    and it would -- it would inflate the numbers.

2         So this only reflects those cores which are showing

3    recovery, except for that one core that had a very long

4    recovery rate.

5    Q    Let me show you from Joint Exhibit 48, at Page 21, this

6    map called Figure 4.  I'm going to see how much of it I can

7    get on the page here.  There's a little bit of a trade-off

8    between clarity and scope.  So maybe I'll show it to you this

9    way, where there's a legend.  Then you have kind of the

10   northern part of the system.  And then you go down here to the

11   estuary; is that right?

12   A    Yes.

13   Q    Now, did you prepare this map?

14   A    Yes.

15   Q    Okay.  Please describe to the court what you did.

16   A    Okay.  So this is my attempt to try to capture the

17   variability and to look at the spatial patterns.

18        So what I did was I took the -- um, the half-times in

19   years and -- we just talked about, based on this exponential

20   decay, and I projected those spatially on a map to -- you

21   know, for those individual 50-plus cores, and they're

22   color-coded to show the rate of recovery.  So the blue colors

23   represent relatively rapid recovery, and they grade to the red

24   colors with the long half-life values.

25        The circles represent values where there are actual

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2160

1    determined half-lives.  That they're actually showing some

2    recovery.

3         The triangle are those that are not recovering, either

4    the surface concentrations remain flat, or are increasing.

5         So if you look at this, I think where you are now is

6    reasonable.  Around the facility, you can see that there are a

7    number of blue circles.  That means right around the site,

8    there is --

9    Q    Could you point that out?

10   A    Yeah, that's like up in here, I think.  This is the --

11   oops.

12   Q    Sorry.

13   A    And so you can -- you can see that there those are

14   recovering at, you know, a moderate -- a moderate rate.  Um,

15   as you move out away in the periphery, the rates of recovery

16   seem to be slower, and then if you get in the edges, such as

17   these up here, and then if you go down to the southern area

18   into the estuary, you know, maybe at here, that's another good

19   example, and here you can see that the rates are very slow or

20   not recovering.

21        Um, so I think this is -- helped -- helped inform my

22   sort of conceptual model of the dynamics of the mercury.  It's

23   not perfect.  There are some aspects of it that I don't

24   understand.  I could speculate why we see certain patterns

25   that we see, but I think it gives an idea of the -- of the

1    variability across the system.  So I think it's a good way to

2    -- to look it.

3         It does include the cores that are not recovering, and I

4    think it's in -- it's important that they have some

5    representation.

6    Q    What, if anything, do you make -- you've pointed out the

7    triangles, which are the cores that are increasing in mercury

8    toward the surface sediment.

9         But you see these here around Mendall Marsh, these three

10   triangles?

11   A    Yeah.

12   Q    What, if anything, do you make of those?

13   A    Well, I'm not sure about those.  I don't really -- those

14   were a bit of a head-scratcher for me.  It may be that's a --

15   a deposition zone that I think that Dr. Geyer identified.

16   Maybe that contributed.  There might be some disturbance.  I

17   don't really know.  I was a little surprised.

18        I think, for the most part, this hangs together, but

19   those -- those in particular I think, um, I -- I'm not really

20   sure why they're not showing a recovery pattern.

21   Q    Based on your experience working on complex ecosystems,

22   is it -- is it shocking to you that not everything absolutely

23   hangs together?

24   A    Well, yeah, there's always -- there's always room for

25   additional, you know, understanding.  But I think, you know,

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2162

1     there is a lot of variability.  It's a very dynamic system.

2     It doesn't surprise me that there is this variability.  And I

3     think that, you know, this is a lot of cores.  I mean -- I

4     mean, I think this is an amazing amount of work, and it, I

5     think, does a really terrific job capturing it, and I think

6     the message is twofold.  First of all, it's highly variable;

7     and, second of all, it's recovering at a relatively slow rate.

8     Q     Do the recovery half-times you calculated support, in

9     your opinion, the need for active remediation of the

10    Penobscot?

11    A     Yes.

12    Q     For what reason?

13    A     Because it's recovering at a relatively slow rate.  So

14    if it was recovering on the order of years, then I think, um,

15    it wouldn't be necessary.  But if it's recovering on the order

16    of multiple decades -- and we already have severe

17    contamination in biota -- I think that that -- that gives me

18    pause, and so I -- I think that's a -- an important piece of

19    information to -- to guide future -- future management

20    decisions, and I think it would support the idea for

21    remediation.

22    Q     You opined at one point that you believe the need for

23    active remediation is urgent.  Do you remember that?

24    A     Yes.

25    Q     And what's the basis for that?

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

1    A      Well, I think -- you know, I think it's pretty clear

2    that the resource has been impaired.  There are high

3    concentrations in songbirds.  The lobster fishery and the crab

4    fishery are closed.  Ah, the concentrations are elevated in

5    sediments and biota.  Um, it's been 45 years, approximately,

6    since the release, and the -- the available evidence -- the

7    best available evidence through these sediment cores suggests

8    it's not recovering any time soon.  It is recovering, for the

9    most part, although on the periphery, it's also spreading out.

10         So -- but in the most severe areas appears to be

11   recovering, but it's not recovering very fast.

12   Q      Let's talk about remediation.  Do you have any

13   experience in the remediation of contaminated ecosystems?

14   A      Yes.

15   Q      Please explain.

16   A      Um --

17   Q      Or please describe your experience.

18   A      Sure.  Well, as we talked about yesterday, I'm an

19   engineer by training.  I'm interested in applied work.  Um, I

20   also mentioned that I'm interested in ecosystem disturbance.

21   So I am -- I'm quite interested in -- in remediation in

22   solutions and evaluating solutions.

23         So a lot of my work is on air pollution impacts.  I've

24   done a number of studies looking at remediation projects to

25   remediate the effects of air pollution, liming studies in New

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2164

1    England and the Adirondacks.  I think I mentioned yesterday

2    that I was involved -- I am involved in the Everglades

3    remediations which is arguably one of the biggest, most

4    complex, most comprehensive remediation programs undertaken by

5    the U.S.

6         I'm involved in the remediation in Onondaga Lake.  I was

7    involved in activities that led up to the remediation of the

8    Lavaca Bay area.  So those are some examples of my experience.

9    Q    Did you review the specific recommendations for

10   remediation that this court-appointed Study Panel laid out in

11   Chapter 21 of the Phase II Report?

12   A    I did.

13   Q    And did the Study Panel recommend, among other things,

14   that appropriate engineering and mercury science experts

15   convene to consider the question of active remedial measures?

16   A    Yes.

17   Q    Do you agree with that recommendation?

18   A    Most definitely.

19   Q    Now, do you think that a group, if it convenes, should

20   consider the conceptual remedial proposals set forth by the

21   Study Panel in the Phase II Report?

22   A    I think they should consider those recommendations, but

23   I don't think they should be constrained by them.

24   Q    Why not?

25   A    Well, I think that -- I have a lot of confidence in the

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2165

1  engineering community um, and, ah, I've been fortunate to be

2  involved in some terrific remediation projects, and, um,

3  there's a lot of smart people out there, and there's a lot of

4  very interesting and innovative technologies that are coming

5  online.

6       And I just think that why -- why close the box?  Why not

7  look at all options and try to develop the most cost-effective

8  approach?  So if you're -- if you're asking smart people to --

9  to weigh in on a -- you know, on a complex problem, why

10 constrain them?  Why not just, you know, hear what they have

11 to say.  You can always reject it at the end of the day, but

12 why not listen to what they have to say.

13 Q    And you say that there's a lot of activity in the world

14 of active mercury remediation; is that right?

15 A    Yes.

16 Q    And innovative technologies and techniques being brought

17 to bear on contaminated sites?

18 A    Yes.

19 Q    Can you give an example of what you mean by that?

20 A    Well, I mentioned I am involved in -- I've been very

21 fortunate to be involved in this remediation in Onondaga Lake.

22 It is a -- it's a terrific study.  I just can't, you know,

23 speak more positively about it.

24      Um, ah, Onondaga Lake, you know, I grew up in the

25 Syracuse area, and Onondaga Lake was always the butt of jokes.

1    It's been called the dirtiest lake in the world.  And so there
2    -- there has been a big effort to clean it up, and now it's
3    meeting virtually all water quality standards.

4         There is a -- a very innovative program that's underway
5    by Honeywell, being led by Honeywell, and it involves a
6    multifaceted approach.  It's -- my understanding is they're
7    trying to finish up the dredging phase this -- this summer,
8    but then there's some additional habitat restoration.  It's an
9    extremely impressive project.  It uses a multitiered approach
10   to -- to eliminate and -- mercury deposits and to reduce the
11   formation of methylmercury, improve habitat.

12        And it's -- even though it's still, you know, in -- in
13   the middle of it, we're seeing impacts.  The concentrations of
14   fish mercury have dropped probably 50 percent over the last
15   five years.  I never thought I would see such remarkable
16   success so quickly in this system.  That's just one example.

17        Um, I was at a meeting last -- or -- excuse me -- two --
18   no, last summer.  Um, every two years, we have a big mercury
19   meeting, the mercury community, about a thousand people, and I
20   was really surprised and impressed at this last year's meeting
21   in Edinburgh.  There were a lot of people working on mercury
22   remediation.  There's a large effort in the State of
23   California, in the -- in the San Francisco Bay area from
24   legacy goldmining, trying all sorts of new ideas and different
25   things, a lot of interest and energy.

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2167

1    So I think that the time is right to look for innovative

2    approaches.

3    Q    In terms of possible strategies for active remediation,

4    what is referred to as an interim control strategy?

5    A    Okay.  So an interim control strategy is one in which --

6    because the process tends to be extended, an interim control

7    strategy is things that a group can do to try to minimize the

8    effects and to address the -- um, ah, you know, the long-term

9    nature of a remediation effort.

10    So it's -- you know, this -- you might say, well, the

11    horse is already out of the barn, and what can we do about it?

12    But, you know, maybe there's opportunities for community

13    engagement, informing them about the problem, you know,

14    planting the seeds towards a remediation effort so there is

15    community buy-in.  I think that's an extremely important part

16    of the process.

17    So I think there can be some community communication

18    efforts that would strengthen and reinforce a -- you know, an

19    ultimate remediation.  So I think there are some steps that

20    could be taken in that -- in that score.

21    Q    What is an in-situ -- two words, i-n s-i-t-u, management

22    strategy?

23    A    Means in place.

24    Q    What's that?

25    A    In place, in-situ.

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

1    Q     So what's an in-situ management strategy?

2    A     So that's where it would be -- the system would be

3    treated in place.  So that could involve a variety of

4    approaches.  It could involve capping.  A great example is

5    something that's being done in Onondaga Lake, where a chemical

6    calcium nitrate is injected just above the sediment water

7    interface to curtail methylation of mercury.  So you're --

8    you're using the natural system, if you will, you're not --

9    you're not taking things out.  You're trying to do the -- do

10   the treatment in place.

11   Q     Do you think capping is a -- is a strategy that should

12   be considered by a group of engineers and mercury scientists

13   if one is convened -- if they are convened to look at active

14   remedies in the Penobscot?

15   A     Of course.  It's a -- it's a proven technology, and I

16   think I -- I would definitely keep it on the table, for sure,

17   yeah.

18   Q     Now, are you familiar with Dr. Geyer's mapping of

19   sediment-trapping areas around the Penobscot?

20   A     Yes.

21   Q     And what, if any, relevance might that have -- or

22   application might that have to thinking about remediation

23   approaches?

24   A     Well, I think that should be considered.  I mean, those

25   are natural deposition zones.  Is there possible --

1    possibility of taking advantage of those for collecting --

2    efficiently collecting contaminated sediments?  I think that's

3    -- something like that should be on the table.

4    Q    What is referred to as ex-situ remediation?

5    A    So that's where they would be removed -- the materials

6    would be removed and then somehow encapsulated or stored

7    adjacent to the site or peripheral to the site.

8    Q    Okay.  Now, do you think there will be challenges

9    associated with active remediation in the -- in the Penobscot

10   if the court orders that it be pursued?

11   A    Of course.

12   Q    Okay.  What are -- just give an example or two of what

13   you think the particular challenges might be.

14   A    Well, it's a very dynamic system, as we've talked about.

15   The contamination was released many decades ago, so it's

16   spread out a lot.  Um, it's -- it's a very turbulent

17   environment.  It's got a high tidal range.  Um, it's a cold

18   system.  Um, I think there will be undoubtedly, um, issues

19   with local community.  There are also -- there are always

20   social issues and political issues associated with -- with

21   restoration efforts.

22        Ah, so there will clearly be challenges.

23   Q    Do you think if there is a process going forward, that

24   government regulators should be part of it?

25   A    I would think they would have to be.  Every program that

1  I've been involved in has had some involvement of the

2  government.

3  Q      Now, does every -- you talked about some challenges that

4  would exist in the Penobscot in terms of active remediation.

5  Does every remediation program you know of involve particular

6  challenges?

7  A      Yes.

8  Q      Are there aspects of the Penobscot situation that may

9  diminish the complexity of active remediation?

10  A      Sure.

11  Q      What are they?

12  A      Well, I think it's a relatively remote area compared to

13  other remediation efforts that I've seen and -- and been

14  involved in.  Um, I think -- so there could be -- I know

15  nothing about this.  I'm just -- this is just speculation on

16  my part.  But I think there could be the acquisition of land

17  that could, you know, facilitate a -- adjacent to the -- to

18  the reach that could facilitate an effort.

19       Um, it appears that there's only a single contaminant,

20  and that's mercury, to my knowledge.  There may be others, but

21  that's the only one that's been identified.  Many of the --

22  many of the restoration problems that I've been involved in

23  involve multiple contaminants, which have their own suite of

24  challenges.  So there's really only one target, and I think

25  that makes life a little easier.

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2171

1        I think that there's a lot of information from this

2    study, the Penobscot River study, that could be -- could be

3    highly relevant to guide and inform a remedial effort.  So I

4    think that there's good information.  So that would -- I would

5    think would jump-start the -- the project.

6    Q    Is one of the pieces of information from the study that

7    might be relevant the connection the Study Panel found between

8    total mercury and methylmercury in Penobscot sediments?

9    A    That's one thing, yes.

10   Q    Okay.  Now, given what you know about developments in

11   the field and about the Penobscot, what degree of confidence,

12   if any, do you have that an effective active remedy or set of

13   active remedies can be found in this system?

14   A    I have a tremendous degree of confidence in the

15   engineering community.  I think there are a lot of bright

16   people, a lot of bright engineers.  There's a lot going on.  I

17   certainly don't know the answer.  I wouldn't presume to -- to

18   judge what the final solution is.

19        But, um, I am very confident that a -- cost-effective

20   remedies could be, you know, implemented that would improve

21   the situation -- highly confident.

22   Q    What is a pilot study?

23   A    Pilot study is an intermediate-scale study that -- that

24   would evaluate the effectiveness of a particular approach, you

25   know, like a -- some sort of treatment approach.

1   Q     And there's been some testimony -- and you've testified

2   to some limited further data collection that may be helpful to

3   inform and guide remediation.  Do you -- do you recall that?

4   A     Yes, I made some suggestions.  Those suggestions could

5   vary depending on input from -- input from experts if this was

6   the path that was going forward.  But I think, you know, some

7   additional data collection might be -- might be helpful to

8   guide a remediation effort.

9   Q     And, in your opinion, can such additional information be

10  gathered concurrently with the conduct of pilot studies for,

11  you know, specific promising active remedies?

12  A     Definitely.

13  Q     What is adaptive management?

14  A     Adaptive management is a procedure where a group takes

15  an action, let's say, a remedial action and evaluates its

16  effectiveness, and either continues it or modifies it or maybe

17  even abandons it and tries something else.  It's a -- sort of

18  a build and measure approach.  You build something, you look

19  at how it's working, you learn from that, and that helps guide

20  you in the future.

21        And, you know, one critical aspect of adaptive

22  management is monitoring, long-term monitoring to look at how

23  the system is responding to remedial actions.  So I mentioned

24  the experience in Onondaga Lake.  In my opinion, one of the

25  most valuable aspects of that has been the existence of data,

1    a lot of data that were collected prior to remediation, and

2    then the continued monitoring that really has helped inform

3    how effective these -- these measures are.  It also gives

4    confidence to managers and the community that we're moving --

5    or, you know, the -- the action is moving towards a -- a

6    solution and -- and improvements in the function of the

7    resource.

8    Q    Is it standard, in your experience, Dr. Driscoll, in

9    remediation projects to continue to gather targeted

10   information as you pursue remediation?

11   A    Sure.  You want to see -- if you're -- if you're

12   embarking on expensive undertakings, you want to make sure

13   that they're -- they're useful and they're -- they're doing

14   the job.

15   Q    In your view, should adaptive management be employed for

16   active remediation in the Penobscot should the court order

17   pursuit of active remediation?

18   A    I think that having long-term monitoring is extremely --

19   is extremely important.  Um, I mean, the key is to understand

20   the -- the -- you know, the temporal extent and the -- or the

21   temporal detail and the spatial extent that's necessary to --

22   you know, to guide that.  If you embark on pilot programs, you

23   want to understand whether they're -- whether they're

24   effective, whether or not they're -- um, they're getting the

25   job done in terms of remediation.

1       So I think monitoring is -- is a key to all of that.

2   Q       Knowing what we know and knowing what we don't know, in

3   your opinion, can a remediation phase begin now were the court

4   to order it?

5   A       Sure.  I think there's a lot of interest in mercury and

6   mercury remediation.  I think that -- um, my understanding is

7   that there was a remediation workshop that was -- ah, that was

8   conducted as part of this project.  I did look through the

9   minutes of that, but I didn't get much out of it.

10       But I think -- I think there's a lot of information, and

11  I think that it would be good to -- to start that discussion.

12  I think that would be very helpful to think about, you know,

13  if there's a decision to try to move forward on this.  I think

14  that that would be a good way to -- um, to engage the

15  community because I think that a group would need to be

16  engaged over an -- you know, an extended period.  I think one

17  meeting wouldn't do it.  It's a relatively complicated system,

18  and I think you would want to try to get a -- a team together

19  that would be committed to, um, you know, to working through a

20  solution if that's the path that you want to move forward.

21  Q       Do you believe a remediation program -- a remediation

22  process can begin now?

23  A       Yes.

24  Q       Let me turn your attention to some of the defendants'

25  expert reports.  Did -- did you review some of those reports?

1    A    I did.

2    Q    Okay.  And did you form opinions concerning some of the

3    content of those reports?

4    A    I did.

5    Q    I just want to ask you about a few items.  Did you see

6    in Dr. Connolly's report that he used USGS, or U.S. Geological

7    Survey, mercury data in forming or defending one of his

8    opinions?

9    A    Um, he did use some historical data, yes.

10   Q    And were those -- were those data from the 1970s and

11   '80s?  Do you recall?

12   A    Yes, they were.  They were old data, yes.

13   Q    And do you think -- are you familiar with the USGS

14   mercury data from that time period?

15   A    I am.

16   Q    Do you have a view as to their reliability?

17   A    They're not reliable.

18   Q    Why not?

19   A    They were not collected under conditions of clean

20   techniques.  Um, you need to take a fair amount of care in

21   collecting mercury samples in water.  It's extremely easy to

22   contaminate samples.  It's very well-known, probably dating

23   back to the '70s, that for trace metal analysis, one needs to

24   take -- use clean techniques.  Otherwise, the data are not

25   valid, and this is clearly the case.

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2176

1    So they should not be considered.  They should be --

2    they should be ignored.

3    Q    Are you familiar with Dr. Connolly's prediction of

4    system recovery based, in part, on biota trends from the

5    Penobscot River Mercury Study data?

6    A    Yes.

7    Q    And do you have a view about his method in that regard?

8    A    Yes.

9    Q    What is your view?

10   A    Well, I had concern when I saw that because, first of

11   all, the period is very short of the measurements.  Um, there

12   is a lot of variability.  And, um, I think it's not prudent to

13   make projections based on data that are highly variable, not

14   statistically significant, and over a very short period of

15   time.

16        So I don't see any basis for -- for making projections

17   based on such a short variable record.

18   Q    Would you use the Penobscot River Mercury Study biota

19   data for the purpose of predicting ecosystem recovery?

20   A    Not based on current data.  I think if there was a

21   long-term program and there was a period of extended data and

22   there was a consistent pattern, then I think yes, but not with

23   four or five years' worth of data, no.

24   Q    Let me just rephrase it for clarity.  Would you use the

25   existing biota data set from the Penobscot River Mercury Study

1    to project the recovery of the ecosystem for mercury

2    contamination?

3    A      No.

4    Q      Okay.  Now, are you familiar with a -- an assertion put

5    forward in some of the defendants' expert reports that the

6    court-appointed Study Panel should have conducted a former --

7    a formal ecological and/or human health risk assessment?

8    A      Yes.

9    Q      Okay.  Let's just focus on the ecological area.  There

10   are other witnesses who addressed the human health area.

11          What do you think of the Study Panel's approach to

12   evaluating ecological risk in the Penobscot?

13   A      I think it was terrific.

14   Q      Do you think, as a matter of science, it was sound for

15   the Study Panel to have sought and relied on the advice of

16   Drs. Sandheinrich and Evers to establish toxicity thresholds

17   for biota?

18   A      Yes.

19   Q      And is it sound, as a matter of science, for the Study

20   Panel to have relied on human health standards promulgated by

21   the State of Maine and EPA?

22   A      Yes.

23   Q      Are you aware of an opinion on the part of a couple of

24   the defendants' experts that only site-specific toxicity

25   studies can answer definitively the question of harm to biota

1    from mercury?

2    A    I am aware of that opinion.

3    Q    Do you agree with that?

4    A    I do not agree with it.

5    Q    And what -- what is the basis for your disagreement?

6    A    Well, it's my understanding of those approaches that

7    they're relatively narrow.  Um, I really admire the approach

8    that the -- um, the Study Panel used because they looked at a

9    broad swath of organisms.  So it really gives a -- more of a

10   holistic or more ecosystem perspective of the contamination

11   and potential effects.  So I -- I admire the approach.  It was

12   very comprehensive, very thorough.  I think it showed a

13   consistent pattern.  I think it hung together, and so I -- I

14   think it was a -- it was a good approach.

15   Q    In closing, is it fair to say you've spent a lot of time

16   on this endeavor?

17   A    Yes.

18   Q    You've done a lot of reading?

19   A    Yes.

20   Q    And you've looked at a lot of data?

21   A    Yes.

22   Q    And you've done a lot of calculating and plotting and

23   your own analyses of data?

24   A    A lot of calculating and plotting, yes.

25   Q    And you've read a lot of expert reports and -- and

DRISCOLL - CONTINUED DIRECT EXAMINATION/BERNARD

2179

1    you've listened to a little testimony here at the trial?

2    A    Yes.

3    Q    Okay.  Is it your belief and opinion that there's an

4    urgent need for active remediation of the mercury

5    contamination in the Penobscot Estuary?

6    A    Yes, I think all information points to that.  I think

7    that, um, clearly there is substantial contamination in the

8    fisheries and the wildlife.  It's consistent with these legacy

9    mercury deposits that were released decades ago.  The

10   contamination in sediments has remained high over an extended

11   period.  There is some evidence of recovery, but the rate of

12   recovery is extremely slow.  There's also a lot of evidence

13   that the contamination is spreading into the periphery of the

14   system.  Um, the lobster fishery's been closed.

15        I think that there's an urgent need to move forward with

16   remediation, and that would be my recommendation.

17   Q    If the court adopts the Study Panel's recommendation,

18   are you confident -- withdrawn.

19        If the court adopts the Study Panel's recommendation to

20   pursue active remediation, are you confident, based on your

21   experience and expertise, that effective active remedies can

22   be found?

23   A    Yes.

24             MR. BERNARD:  No further questions.

25             THE COURT:  Thank you.

1      What do you want to do?  Do you want to take a break, or

2  do you --

3           MR. TALBERT:  I think it may make sense where we're

4  fairly close to the morning break.

5           THE COURT:  Sure.  That's fine.  We'll take a break

6  for about 20 minutes.

7      (Court recessed from 9:59 a.m. to 10:24 a.m.)

8           THE COURT:  Mr. Talbert?

9           MR. TALBERT:  Yes.

10                        CROSS-EXAMINATION

11  BY MR. TALBERT:

12  Q    Good morning, Dr. Driscoll.

13  A    Good morning.

14  Q    Yesterday you discussed a couple of tables in your

15  expert report, and I want to start with Table 1 from Joint

16  Exhibit 47.  This is a table where -- that presents mercury

17  concentrations in sediments.  Do you recall that table?

18  A    Ah, yes.

19  Q    Let's -- if we could turn the elmo on, that would be

20  helpful.  Okay.  Sorry, just to situate this.

21      Do you recall this table?

22  A    I do.

23  Q    Okay.  Now, in this table, you say mercury

24  concentrations in sediments in nanograms per gram dry weight

25  of the major physio regions of the Gulf of Maine, and then in

1    parens, you say adapted from Sunderland.  Do you see that?

2    A    Yes.

3    Q    2012?

4    A    Hm-hmm.

5    Q    When you say adapted from Sunderland, do you really mean

6    that you just copied this chart from Sunderland, the table,

7    and pasted it into your report?

8    A    I -- frankly, I don't recall.  Usually if I say adapted,

9    that means I make some modifications -- minor modifications,

10   and this was done a while ago.  I'm not sure if I did that or

11   not.  I think it -- it's close to what she had put in her

12   original paper, if not identical.

13   Q    Let's take a look.  Is this the Sunderland 2012 article

14   that you were referring to?

15   A    Yes.

16   Q    I'd just like to turn to Page 32 in the Sunderland

17   article, and she has a Table 4.  Is this the table that you're

18   referring to?

19   A    Yes.

20   Q    Okay.  Now, you said you -- you can't recall whether you

21   made any changes or not.  Let me see if I can overlay these

22   two tables and -- and get them in the same screen.  Let's see

23   if I can zoom out a little bit.  I think that's the farthest

24   it goes.

25        So just to orient ourselves, you have -- at the top, Bay

DRISCOLL - CROSS-EXAMINATION/TALBERT

2182

1    of Fundy, looks like that's the same, right?

2    A     Yes.

3    Q     Passamaquoddy Bay.  You've got that.  Um, just looking

4    across the -- the -- the entire area, it looks like everything

5    is -- is basically the same?

6    A     Looks very similar, if not identical, yes.

7    Q     Okay.  Do you recall any changes that you made?

8    A     So looking at Elsie's table, I think what I was -- what

9    I did were more cosmetic.  I was -- I thought there might be

10   some confusion on the categories, so I think I separated them

11   out.  I put lines in.  I think I did the region, subregions in

12   italics, things like that, to try to make it a little clearer.

13   But I think -- I think I pretty much reproduced what she had

14   put in her paper, yes.

15   Q     Okay.  Let's -- let's zoom into the Sunderland one --

16   actually, let's just take a look at the Sunderland with yours.

17   And, again, I'll try to zoom out, and really what I want to

18   focus on is the -- is the bottom area here.

19         Sunderland has a few notes, right, at the very bottom?

20   Sunderland is this one right here?

21   A     Ah, yes.

22   Q     And she puts a note at the very bottom that says,

23   Penobscot River received large amounts of industrial mercury

24   contamination from several pulp and paper mills and a

25   chlor-alkali facility that closed in 2000, and that's the

1    footnote for the Penobscot River.

2    A     Right.

3    Q     Do you see that?

4    A     Yes.

5    Q     Now let's take a look at yours.  Your chart omits that,

6    doesn't it?

7    A     It does.

8    Q     That was the only change I could see between the two.

9    A     Okay.

10   Q     Do you know why you omitted that section that said that

11   the Penobscot River received large amounts of industrial

12   contamination from several pulp and paper mills?

13   A     I think it was probably a mistake on my part, but I

14   think, if I -- if my memory serves me, I had a conservation

15   with Elsie about that, and I asked her if she had any

16   information about pulp and paper discharges, any specific

17   information, and she said she didn't.  So I remember being a

18   little bit concerned about that.

19         But I don't think that would have been for me to modify

20   that.  Did I -- I guess I eliminated -- yeah, it looks like

21   it's intentional, but I don't know why I would do that.

22   Q     Do you know -- I mean, other than that, you lifted this

23   from Dr. Sunderland's article, and I've -- I've read her

24   article, and I can't see where there's any discussion of the

25   depths from which the total mercury readings are from.  Do you

DRISCOLL - CROSS-EXAMINATION/TALBERT

2184

1   have -- do you have that information?

2   A     I've read a lot of these individual -- some of them are

3   not published, but I've read a number of these papers.  Um, so

4   I think that the depths are, um, indicated in the paper, and

5   my recollection is that they are mostly from surface

6   sediments, and I'd have to go back to the original papers to

7   see how consistent they are across the studies.

8   Q     You believe these are from the surface?

9   A     Yeah, surface sediments, yeah.

10  Q     Do you know of anywhere in the Penobscot where the

11  surface sediments are 86,000?

12  A     Oh, I see, yeah, yeah, you've got a good point, yeah,

13  although that's an earlier study, right, 1998 to 2000?  So I'd

14  have to go back.  I actually don't know if I've read that

15  Camp, Dresser, and McKee report.  But as I said, I would have

16  to go back and evaluate what are the -- what are the -- where

17  those samples were -- were collected.

18  Q     Isn't it true that from the Sunderland paper, you don't

19  really know what the depths are for these total mercury, where

20  those are in the sediment column?

21  A     I can't recall, but as I said, I've read a number of

22  these papers.

23  Q     You'd have to go back to each of these articles,

24  wouldn't you, and try to figure out where -- where the depths

25  are?

1    A    Yes.

2    Q    And that's not something that you've portrayed on this

3    chart or that Dr. Sunderland presented, correct?

4    A    Ah, no.

5    Q    Without knowing that, do you agree that it could be

6    somewhat misleading to compare concentrations that are --

7    could be buried at depth with other concentrations that could

8    be near the surface?

9    A    Sure.

10   Q    Let's take a look at Table 2 from your report, and this

11   is on Page 11.  This is Joint Exhibit 47, Electronic Page 14.

12   And if we can just blow up Table 2.

13       Now, just to orient ourselves, I think yesterday you

14   said that, you know, Table 2 -- and you've got that in the

15   caption -- you have taken data from the upper estuary of the

16   Penobscot, and then you've compared that with National Coastal

17   Assessment data?

18   A    Correct.

19   Q    Is it fair to say that your comparison here of the

20   National Coastal Assessment data, these are all for -- for --

21   for bays, correct?

22   A    Correct.

23   Q    The National Coastal Assessment data is not for

24   estuaries, correct?

25   A    My -- I'd have to look at the specific location of each,

1  um, one of these, but, um, um, yeah, I think they're for

2  coastal waters.

3  Q    Well, and in that way, I mean, wouldn't you expect there

4  to be slightly different values between estuaries and bays?

5  A    Um, yes, I think that that's the case.

6  Q    And, in general, wouldn't bays, because of their large

7  nature and connection with the ocean, typically have lower

8  concentrations?

9  A    That's true, yes.

10  Q    Let's take a look -- I know you're familiar with the

11  Sunderland paper -- if we could switch over to the elmo --

12  this is Table 5 in -- in Elsie's paper. And are you -- are

13  you familiar with this? She appears to grab National Coastal

14  Assessment data, as well, and plot that for the coast of

15  Maine, as well as going down to Massachusetts?

16  A    Yes.

17  Q    Okay. And if we zoom in on -- on her data, taking all

18  of this collectively, the Penobscot doesn't necessarily stand

19  out, correct? I mean, we have levels in Boston that are in

20  the red. We have levels in Casco Bay, and then you've got the

21  Penobscot.

22  A    Yeah, I don't think these are her data. Aren't these

23  National Coastal Assessment data? Is that -- that's correct,

24  right?

25  Q    That's correct. They're just presented by her, right?

1    A    Well, I think that, you know, as summarized in this

2    figure and in my report, those four areas have the highest

3    concentrations of mercury in -- in sediments.

4    Q    Let's -- let's take a look at your map.  This is Figure

5    2, on Page 12 of your report.  And if we could just zoom in on

6    the map.  I don't know if that's going to help a whole lot,

7    but we'll try.  So here you -- this is essentially you

8    plotting that National Coastal Assessment data and then adding

9    in data for the Penobscot Estuary, correct?

10   A    Correct.

11   Q    And you've created these little or, in some cases,

12   larger bubbles to depict different ranges of mercury

13   concentrations, correct?

14   A    Correct.

15   Q    Now, for the Penobscot, I mean, you colored these red.

16   Those are the only ones you color red, so those appear to

17   stand out more in the map, correct?

18   A    Well, I think I wanted to distinguish between the

19   National Coastal Assessment data and the Penobscot River data,

20   so I wanted to use two distinct colors, so I chose two

21   distinct colors.

22   Q    Well, by not coloring the -- the concentrations in some

23   sort of gradient, it looks like there's a hotspot in the

24   Penobscot, where if you look at the size of these circles,

25   using the National Coastal Assessment data, it -- it would be

DRISCOLL - CROSS-EXAMINATION/TALBERT

2188

1    more similar to Elsie Sunderland's, where you have some larger

2    bubbles in the Massachusetts area.  These, it's difficult to

3    tell, but you've got New Hampshire there.

4    A    Did you ask a question?

5    Q    Do you agree?  I mean, it's somewhat -- it draws your

6    eye into the red as opposed to depicting it on larger bubbles

7    to depict the concentrations that are greater.

8    A    Well, the -- my intent was to have the size of the

9    circle proportional to the concentration, and I wanted to

10   differentiate between the two data sets, so, therefore, I used

11   two different colors.

12        So the larger the circle, the greater the concentration,

13   um, and I believe that this is the same National Coastal

14   Assessment data set that Elsie Sunderland used.

15   Q    And as we said, just -- if we could switch back to the

16   elmo -- hers -- hers, in contrast, paints a -- a different

17   picture, doesn't it?

18   A    Um, well, it's different in that she, um, used colors

19   rather than size, and mine is different in that I added in the

20   Penobscot River study on top of the National Coastal

21   Assessment.  But other than that, they're the same data set

22   and the same observations.

23   Q    Is it your understanding that in the most contaminated

24   portions of the Penobscot between Brewer and the southern tip

25   of Verona, the total mercury in surface concentrations are on

1    average about 700 nanograms per gram dry weight?

2    A    That's my understanding.

3    Q    And you testified that you have done some work on the

4    Onondaga Lake project?

5    A    Yes.

6    Q    I believe you testified that Onondaga Lake was

7    contaminated by a chlor-alkali facility; is that correct?

8    A    Well, and other sources, but I think the chlor-alkali

9    contamination was the dominant source.

10   Q    Okay.  What were those other sources?

11   A    Well, ah, Onondaga Lake receives air pollution from

12   atmospheric deposition.  There are combined sewer overflows,

13   which have been going on for a number of years.  So there are

14   combined sewer, um, events that run off the streets and

15   eventually drain into the lake.

16        For a number of years -- well, there's a wastewater

17   treatment plant that has an affluent on the lake.  There's

18   been advanced treatment that's been implemented over the last

19   few years, but it still discharges directly to the -- to the

20   lake.

21        So the chlor-alkali is -- I think it's a major source,

22   but there are other sources, as well.  It is an urban area,

23   too.

24   Q    Is it -- is it fair to say that the mercury

25   concentrations in the surface sediments in Onondaga Lake are

DRISCOLL - CROSS-EXAMINATION/TALBERT

2190

1  significantly higher than the Penobscot?

2  A    I've not done a side-by-side comparison, um, but I have

3  looked at the surface mercury concentrations in Onondaga Lake.

4  Q    In fact, isn't the sediment remediation goal at Onondaga

5  approximately 2,200 nanograms per gram?

6  A    My understanding is that there are two goals.  There's

7  one based on, um, toxicity, probable effects goal, and then

8  there's one for bioaccumulation.  Um, so my understanding is

9  that there are two goals.

10  Q    And is it your understanding that the target for

11  bioaccumulation is approximately 800 nanograms per gram, and

12  the one for sediment is about 2,200 nanograms per gram?

13  A    My understanding is that these both are for sediment.

14  Q    But -- but based on the bioaccumulation target, that

15  target would be 800 nanograms per gram in sediment, correct?

16  A    Ah, the bioaccumulation target is 800, as I understand

17  it, yes.

18  Q    Okay.

19  A    Nanograms per gram dry weight.

20  Q    Okay.  And just so the record's clear, that's the target

21  that the remediation is designed to bring the system down to,

22  correct?

23  A    Correct.

24  Q    Okay.  And is --

25  A    There -- should I point out that there are other

1  targets, as well?  My understanding there are other targets,

2  but those are the two sediment targets that I know of.

3  Q     Right now we're just talking about sediment targets.

4  A     Okay.

5  Q     And then we'll try to compare that.  In the Penobscot,

6  again, the -- the current average in the most contaminated

7  reaches is 700 nanograms per gram, correct?

8  A     Correct.

9  Q     So that's -- the current conditions are already under

10  the target for sediments, the lowest sediment target at

11  Onondaga, correct?

12  A     The bioaccumulation target, yes.

13  Q     And in the Penobscot, the target set for the main stem

14  is 450 nanograms per gram, correct?

15  A     That's my understanding, yes.

16  Q     Okay.  So that's five times lower than the target that

17  was set for Onondaga bioaccumulation -- I'm sorry -- for the

18  sediment toxicity target of 2,200.

19  A     Yes.

20  Q     And the target concentration in Mendall Marsh is a

21  hundred nanograms per gram, correct?

22  A     That's my understanding, yes.

23  Q     And that would be 22 times lower than the sediment

24  toxicity target for Onondaga, correct?

25  A     Correct, yes.

1    Q     Would you agree that your primary professional focus is

2    on teaching and research?

3    A     Ah, yes.

4    Q     Would it be fair to say that you spend a significant

5    amount of your time developing papers for publication?

6    A     I work on papers, yes.

7    Q     In fact, I believe you testified yesterday you've --

8    you've published about 400 papers, correct?

9    A     Approximately.

10   Q     And I believe you told me in your deposition, you

11   publish around ten papers per year?

12   A     Approximately.

13   Q     Okay.  I think you stated that you worked on the Lavaca

14   Bay project in Texas; is that correct?

15   A     That's correct.

16   Q     And that work completed in -- sometime in the -- the

17   1990s, correct?

18   A     You mean my work?

19   Q     Yes.

20   A     Yes.

21   Q     Did you work with defendants' expert John Connolly at

22   Lavaca Bay?

23   A     Yes, he -- so he was -- there was some overlap between,

24   um, my work and his work.  I think he extended after I was

25   done, and I started before he started, if my recollection is

1    correct, but there was some overlap, yeah.

2    Q    In this case, the Study Panel produced an almost

3    2,000-page report, 23 chapters, about 25 different authors,

4    spanning a significant range of different disciplines and

5    study, and I believe you have stated that you believe you're

6    qualified to review and comment on all of those chapters; is

7    that correct?

8    A    Um, well, I think I'm qualified to review the overall

9    study.  I've spent more time on some chapters than others.

10   Um, there may be one or two chapters that I actually haven't

11   read.  Um, there are other chapters that I've read multiple

12   times.  Um, but I do believe I am qualified to -- to examine

13   the overall study, yes.

14   Q    Are you aware that the Study Panel hired three different

15   reviewers, none of which had the specific expertise to examine

16   the entire study?

17   A    I have no knowledge of that.

18   Q    One of the things that you did was you examined the

19   sediment remediation targets set by the Study Panel, correct?

20   A    Correct.

21   Q    And in rendering an opinion on background concentrations

22   and the appropriate sediment remediation targets, you did not

23   evaluate ongoing sources to the system, correct?

24   A    Could you clarify that?

25   Q    Yes.  In other words, in evaluating the Study Panel's

1   establishment of targets for background, you did not examine

2   ongoing sources and how that might influence the target for

3   background, did you?

4   A     What do you mean by ongoing sources?

5   Q     Any additional sources of mercury to the upper

6   Penobscot.

7   A     I looked at atmospheric deposition.

8   Q     Is that all you looked at?

9   A     Yes.

10  Q     Okay.  So setting aside atmospheric deposition, did you

11  examine any other sources that might influence the -- the

12  background level?

13  A     Um, I would say no.

14  Q     Isn't it true that the ongoing sources could impact

15  whether or not the sediment remediation targets are, in fact,

16  achievable?

17  A     Yes.

18  Q     And in this case, are you aware that there's

19  approximately 240 nanograms per gram that the Study Panel's

20  measured that's coming down from above Veazie?

21  A     I know that's been stated in the report, but I looked

22  through the report -- report fairly carefully after the

23  deposition, and I think it's somewhat inconsistent about that

24  value.  I looked at -- Ralph Turner did an analysis for the

25  mass balance -- I forget what chapter that is, maybe 3, at the

1   end in an appendix -- and he did a long-term average of the

2   mercury concentrations.  And I'm assuming you're referring to

3   the particulate mercury concentrations that are coming in from

4   the Penobscot River.

5   Q    Yes.

6   A    So the long-term average that he calculated was a bit

7   lower than that, I believe it was about 200 nanograms per gram

8   dry weight.

9   Q    Well, is it your understanding -- I don't know if we

10  need to pull it up -- but that the Study Panel reported their

11  number in Chapter 1 of what is coming down from above Veazie

12  on sediment particles as 240 nanograms per gram?

13  A    I'm aware of that, but I'm also pointing out it's

14  inconsistent with other parts of the report.

15  Q    Well, we'll leave aside your taking issue with them

16  selecting that number.  But it's your understanding that's --

17  that's what they reported in Chapter 1.

18  A    Yes, I understand that.

19  Q    Okay.  Do you think that quantifying ongoing sources is

20  an important consideration from a remediation standpoint?

21  A    Of course.

22  Q    Otherwise, if we don't have a good handle on what

23  ongoing sources are, we could conduct a remedy and still have

24  elevated levels of mercury, correct?

25  A    Correct.

DRISCOLL - CROSS-EXAMINATION/TALBERT

2196

1   Q     And those unidentified potential ongoing sources could

2   impede recovery beyond what the half-time for recovery

3   calculations are, correct?

4   A     Ah, yes.

5   Q     In evaluating mercury concentrations in systems, is it

6   fair to say that you can -- you can compare systems based on

7   dry weight -- a dry-weight basis versus normalized to organic

8   carbon?

9   A     I think it's sound science to look at mercury

10  concentrations a variety of ways and determine a number of

11  factors that's driving those concentrations.  And, typically,

12  concentrations of mercury are correlated -- usually fairly

13  strongly correlated with organic carbon concentrations,

14  although I should point out, you know, not universally.

15        Um, so I think it's good to do both -- both approaches.

16  Q     And you agree that it's -- it's useful to examine

17  mercury on a carbon-normalized basis because it provides

18  insight on mercury behavior in the entire system.

19  A     It can, yes.

20  Q     In examining -- is one of the things that you did -- did

21  you look at mercury data on a carbon-normalized basis to try

22  to see how elevated you thought the system was?

23  A     I did look at it on a sediment -- surface sediments on a

24  carbon-normalized basis, yes.

25  Q     Do you agree that if you look at the data on a

1   carbon-normalized basis, that it is not as elevated as if you

2   were to look at the system on a dry-weight basis?

3   A     You know, we talked about this during the deposition,

4   and, ah, I went back and did the calculations, and I think

5   it's very similar both ways.  I found an enrichment of about a

6   factor of 14, calculating it two different ways on a

7   carbon-normalized basis.

8         So it may not be quite as enriched, but I think it's --

9   it's considerably enriched even when it's expressed on a

10  carbon-normalized basis.

11  Q     One of the things you did, I believe, in a supplemental

12  report was to try to chart out organic carbon over total

13  mercury.  Do you recall that?

14  A     Yes.

15  Q     And what you were trying to do was compare mercury in

16  the upper portion of the river, in East Branch and Old Town to

17  Veazie, adding in some of the reference sites, comparing that

18  to the lower river and -- and the estuary from Orrington to

19  Bucksport and Brewer to Orrington; is that correct?

20  A     Correct.

21  Q     And so what you did was you -- you took -- took data and

22  normalized for organic carbon.  You -- you plotted the data on

23  this chart, and we have -- we basically have two slopes,

24  correct?

25  A     Correct.

DRISCOLL - CROSS-EXAMINATION/TALBERT

2198

1  Q    And I believe we talked about this in your deposition,

2  but isn't it true that the -- the slopes effectively equal the

3  mass of mercury for organic carbon?

4  A    Yes, that's my understanding, yes, and I -- after we

5  spoke previously, I went back, because I was concerned that

6  maybe I made a mistake.  So I did it an additional way that I

7  thought was what you were talking about.  So I took the

8  individual observations on each of the legs of this plot, and

9  I calculated for each of the individual observations the

10 mercury on a per-carbon basis.  And then I took the mean of

11 those two values, and I obtained virtually identical values,

12 the two -- what is shown here in this plot, in terms of the

13 enrichment of mercury on a per-carbon basis.

14 Q    And let me try to -- I'm going to try to walk through

15 this, hopefully in a way that is understandable.

16      The -- the slope for the lower line that you have which

17 encompasses the upper river, East Branch, Old Town to Veazie,

18 the Sheepscot, and then the coastal reference areas of the

19 St. George and Narraguagus, you have a slope of 9.12, correct?

20 A    That's correct.

21 Q    So that would indicate that the carbon-normalized

22 average for those would be approximately 912 nanograms per

23 gram, correct?

24 A    I believe that's correct, yeah.

25 Q    Here's part of my confusion.  If you take a look at --

1    I'm going to show you the chart.  This is a chart from the

2    Phase I Update Report, and this is in one of the appendixes to

3    Joint Exhibit 6-1, and this is -- we've got Page 14 in the

4    introduction.  This is Figure ii.  And the Study Panel has

5    plotted the data on a carbon-normalized basis.  Have you

6    reviewed this data?

7    A    I've reviewed the data for the same data that I just

8    plotted, but I -- I don't recall ever seeing this plot

9    previously.

10   Q    Did you review the Phase I Update Report?

11   A    I reviewed a Phase I Report.  I don't know if it was the

12   updated report.  I got that when I was originally asked to

13   think about, um, working on this case, and I read that a while

14   ago.  Um, whether it was an updated report or another

15   report -- I know it was a Phase I Report, but beyond that, I

16   don't -- I don't recall.

17   Q    So here's -- here's part of my -- here, the Study Panel

18   is presenting the data on a -- on a carbon-normalized basis in

19   the Phase I Update Report.  It does not appear in the Phase --

20   the body of the Phase II Report.  It's an attachment to

21   Chapter 1.

22        But they have for the OV reach, in this box, it appears

23   to be about 3,000 nanograms per gram of -- of mercury on a

24   carbon-normalized basis.  Do you see that?

25   A    Yes.

DRISCOLL - CROSS-EXAMINATION/TALBERT

2200

1    Q    And so if you were to take that OV reach and compare it

2    to the highest reach, where you have approximately, what,

3    15,000 nanograms per gram of organic carbon -- I'm sorry --

4    mercury on organic carbon basis, it's about, you know, five

5    times elevated.

6    A    I see that.

7    Q    And -- and even taking the EB, you know, that -- that

8    appears to be maybe somewhere in the 2,000 range, correct?

9    A    Maybe.  Maybe 1,500.  I'd have to go back and check the

10   numbers.

11   Q    And so if we look at your -- your chart, your slope

12   where you have the average for the slope at 912 nanograms per

13   gram, you've -- you've plotted the data points for the upper

14   river East Branch and Old Town to Veazie, but they would be --

15   from an organic carbon standpoint, I mean, they should be much

16   higher than 912, just from that chart we looked at.  It looks

17   like they're -- they're closer to the -- you know, 1,500 to

18   3,000 range, which would put them above that line.

19   A    Are you asking me a question?

20   Q    Yeah.  Is that correct?  Does something like -- look

21   strange to you?

22   A    Well, you -- you have me at a bit of a disadvantage.

23   I -- I don't really know the data sets for the Phase I Report,

24   if they're consistent with these data sets.  These data sets

25   were based on the data that I obtained for the Phase II

1    Reports.  They may be the same; they may be different.

2         Ah, I was concerned about this after the deposition.  I

3    don't like to make mistakes.  I like to -- you know, if I make

4    a mistake, I want to evaluate it.  Um, and, you know, I

5    checked this out both ways, and it seemed to be consistent.

6         I think that it's useful to look at mercury on a

7    carbon-normalized basis, but also on a dry-weight basis.  From

8    my experience, most standards -- most target values are set on

9    a dry-weight basis.  I've never heard it established on an

10   organic carbon basis.  That doesn't mean it couldn't be done.

11        I think a plot like this is useful because it suggests

12   there are really two mercury-carbon relationships:  One for

13   the contaminated reach; and one for the reference area.  So,

14   to me, it hangs together, and it shows a degree of enrichment.

15   I don't want to quibble with you about the magnitude of that,

16   um, and I think, you know -- but it may be a function of

17   different data sets and different time periods.  I'm just

18   speculating on the nature of the differences.

19   Q    I just want to understand, is the data set that you took

20   for your chart from that Phase I Update report?  I think we

21   ran through that a little bit in your deposition, the

22   different stations and data that -- that you pulled.

23   A    I thought this was from the Phase II Report.  It was

24   from the data set for the six sampling periods over the -- you

25   know, associated with the spreadsheets from the 2,000-page

1    report that you referred to.

2         So I don't know the differences in the number samples

3    and whether the Phase I Report is all of the data or part of

4    the data.  I -- I'm just not privy to that level of detail.

5    I've only been brought in over the last year.  So I don't

6    really have a strong understanding of the Phase I effort and

7    how, you know, the different data sets are similar or

8    different.

9    Q    And this may be part of the problem.  Are you aware that

10   there were some problems with the carbon-normalized data that

11   the Study Panel obtained, and they had gone back to the labs

12   to have those checked and -- and changed?

13   A    I had heard about problems with measurements of

14   methylmercury from distillation and lack of distillation, and

15   I knew that there had to be some reanalysis and adjustment.

16        I'm not familiar with any problems -- well, wait a

17   second.  I think I do remember some conversation about -- I

18   think it was carbon, right?  Wasn't there problems with the

19   carbon analysis?  Um, yeah, I did -- I do believe I heard

20   about that, yeah, but I don't know any details.

21   Q    Okay.

22   A    It is -- it is a bit of a challenge to measure carbon in

23   estuarine systems because you can -- um, you can, um -- well,

24   there are problems in terms of the -- the measurement, but you

25   can also get a -- it also proves as inorganic carbon.  So if

1    the inorganic carbon's not removed, you can get some -- there

2    can be some challenges with the analysis, so --

3    Q    Why I'm asking is, my real issue is the magnitude of

4    difference between the upper and lower, and it sounds like you

5    are not necessarily -- let me ask you this.  You know, how

6    high is your degree of confidence in that -- the magnitude as

7    opposed to your -- your purpose to be pointing out a

8    relationship between the lower and the -- the upper estuary?

9    A    I can only tell you what I did with the data.  I didn't

10   collect the data.  I'm just using data that were supplied to

11   me.  Um, ah, if there were analytical problems with the data,

12   um, I didn't see any metadata that would inform me about those

13   analytical problems other than the problems that we just --

14   that we just spoke about.  I thought that the organic

15   carbon -- sediment organic carbon analysis was -- was

16   clarified and the data that I were using reflected the -- the

17   most accurate data that were available.

18        I went through and did the calculation two ways.  I've

19   got virtually identical numbers, and I think the bottom line

20   to me is that there's enrichment in the reach, whether you

21   express it on a dry-weight basis or an organic carbon basis,

22   and I think it's useful to look at it both ways.

23   Q    Right.  I'm just probing the calculation difference

24   because I asked Dr. Bodaly -- he did go back and recalculate

25   the organic carbon data, and he calculated that comparing

1   those reaches with the same reference sites that you used,

2   he -- he got seven times difference, and yours is 14.  So

3   that's why I'm asking that question.

4   A    Yeah.

5   Q    And I just --

6   A    I can't explain it.  I've not talked to Drew in -- in

7   years.  So I -- and we obviously haven't talked about this, so

8   I don't -- you know, I don't -- I don't know.  But I've gone

9   back and done the calculation twice, so I don't think I've

10  made a mistake.  There might be problems with data sets.

11  Maybe he's using different data sets than I'm using different

12  data sets -- different data sets than I'm using.  I can't

13  explain the difference.

14  Q    Would you agree that the plots you have on your -- I

15  believe it's Figure 5, do not indicate levels of organic

16  carbon in OV that -- that go up to or average 3,000 nanograms

17  per gram on -- on a carbon-normalized basis?

18  A    I don't have those numbers at the top of my head.

19  Q    Well, but this slope would be different, wouldn't it, if

20  all those --

21  A    Yes, ah, it would be different, but I also went through

22  and calculated the mercury to carbon values for each of the

23  individual points and summed them up for the -- the individual

24  reaches, and I just don't recall those numbers off the top of

25  my head.

1    Q    Let's switch gears and go to discuss total and
2    methylmercury.
3         Did you do any independent investigation of the
4    relationship between total and methylmercury?
5    A    Ah, I looked at the data that were collected by the
6    Penobscot River study for total and methylmercury, if that's
7    what you mean by independent analysis, yes.
8    Q    Would you agree that the relationship between total and
9    methylmercury is not as strong in wetlands as it is in -- in
10   riverine and the main stem estuary?
11   A    Yes.
12   Q    And Mendall Marsh is a wetland area of potential
13   concern, correct?
14   A    Can you define potential concern?
15   Q    It's an area where there are -- where we have known
16   species in them with mercury concentrations, correct?
17   A    Yes.
18   Q    I mean, the Nelson's sparrow resides for some part of
19   the year in Mendall Marsh, correct?
20   A    Yes, that's my understanding.
21   Q    Okay.  Let's take a look at Figure 11-2.27b in Chapter
22   11.  This is Joint Exhibit 6-11.  And if we could just --
23   let's blow this area up.  Okay.
24        Do you recognize this figure?
25   A    I think I've seen it before, yes.

1  Q    We discussed this at your deposition, didn't we?

2  A    Could be.  I -- I can't recall, but I know I've seen it

3  before.

4  Q    Okay.  This is -- we've got total mercury on the X axis,

5  and on the Y axis we have methylmercury, and the caption says,

6  correlation between total bulk phase mercury and methylmercury

7  in Mendall Marsh surface soils.  Data include all marsh

8  surface soils from 2009 to 2011.  Within surface marsh soils,

9  total mercury accounts for 40 percent of the variability in

10  bulk methylmercury, based on linear regression of the log

11  transformed variables.  Do you see that?

12  A    I do.

13  Q    And based on this figure, plotting total to methyl,

14  would you agree that this shows that, at least within these

15  marsh areas, total mercury only accounts for 40 percent of

16  the -- the variability in methylmercury?

17  A    Yeah, I didn't do the statistical analysis, but I

18  believe Cindy Gilmour, I'm sure she did the analysis properly,

19  so -- and it looks about right, I would say.

20  Q    And that would mean that the other 60 percent of the

21  variability would be factors other than total mercury that

22  would influence methylation rates, correct?

23  A    Yes.

24  Q    And you're aware that there are a number of different

25  factors that impact mercury methylation, correct?

1    A    Yes.

2    Q    And those factors would include redox, anoxic conditions

3    within sediments, nutrient content of the sediments, organic

4    matter, chemistry of the pore water, and temperature?

5    A    Among others, yes.

6    Q    What others?

7    A    Well, the supply of inorganic mercury, the lability of

8    the organic carbon, the concentrations of various electron

9    receptors, the productivity of the -- of the wetland area, to

10   name a few others, yeah.

11   Q    Is it fair to say that it's important to have an

12   understanding of the geochemistry of the environment in order

13   to evaluate methylation?

14   A    Yes.

15   Q    And it's also important to understand the physical

16   environment and the plant community, correct?

17   A    Yes.

18   Q    Is it fair to say that understanding as many of these

19   factors as possible is necessary to understand whether you can

20   predict a change in one factor and whether that would lead to

21   a change in methylmercury in the system?

22   A    Can you rephrase that question?

23   Q    Sure.  Is it fair to say that you would want to

24   understand those factors so that you could, as best you -- you

25   could, try to predict whether a change in -- in one factor

1   would lead to a change in methylmercury?

2   A    Yeah, I think that's a -- that's a noble goal, yes.

3   Q    In light of all the various factors that influence

4   methylmercury production and in light of the variability

5   within the wetlands, isn't it true that it may be possible to

6   reduce total mercury and have either no change in

7   methylmercury or a slight reduction in methylmercury?

8   A    Um, yeah, I think that wetlands are -- are complicated.

9   They respond in terms of methylation, the methylation responds

10  to a variety of factors.  And, um, I think it's possible that

11  you could, um, you know, at a given site, you could reduce

12  the -- the inorganic mercury, and you could see a limited or

13  even no response.  I think that's certainly within the realm

14  of possibility.

15  Q    Would you agree that from a remediation standpoint,

16  wetlands are important because they can be a driver of -- of

17  methylation for biota?

18  A    Yes.

19  Q    And wetlands are also important habitats for wildlife,

20  so we need to be careful in conducting a remediation in a

21  wetland area, correct?

22  A    Well, I think we have to be careful in conducting a

23  remediation in any area, but wetlands certainly, as well,

24  yeah.

25  Q    Well, wetlands, in particular, right, due to the

1    sensitivity of the habitat?

2    A    Yeah, wetlands are important, but other resources are

3    important, as well.

4    Q    Let's switch gears to talk about human health impacts a

5    little bit.

6         Apart from reviewing the study report information on

7    concentrations in biota and comparing those to consumption

8    advisory levels, you did not do anything to investigate human

9    health risks, correct?

10   A    Correct.

11   Q    You are not a -- a human health toxicologist, are you?

12   A    No.

13   Q    And you don't do your own research on toxic effects of

14   mercury on humans, correct?

15   A    That's correct.

16   Q    With respect to ecological toxicity, other than review

17   the Phase II Report, did you do anything to independently

18   evaluate ecological toxicity?

19   A    No.

20   Q    In the section of your report on mercury in biota, is it

21   fair to say that you effectively summarized what the Study

22   Panel found?

23   A    Yes.

24   Q    Do you know defendants' expert Betsy Henry?

25   A    I do.

1    Q     And you work with her on the Onondaga Lake project,

2    correct?

3    A     Yes.

4    Q     And is it fair to say that in the past you have sought

5    her opinion on toxicological studies?

6    A     Ah, we -- we talk on occasion about a variety of things,

7    including toxicological studies, yeah.

8    Q     Would it be fair to say that she has a good reputation

9    in the mercury community?

10   A     She has a lot of experience.  I think she has a -- I

11   think she does have a good reputation, yes.

12   Q     With respect to the mobile pool, I want to discuss a

13   little bit of your expertise as it relates to mobile pools.

14   Is it fair to say that you have not worked on a project where

15   you personally evaluated hydrodynamics of a mobile pool?

16   A     Um, I have done a fair amount of work on sediment

17   transport and -- and hydrodynamics.  Um, I guess it depends

18   specifically on what you're referring to, but I have done a

19   number of studies on sediment transport in riverine systems

20   and lake systems, um, and involving, you know, particulate

21   matter.  So that's -- you know, that's something I've spent

22   quite a bit of time on.

23   Q     In terms of prior projects, though, where you yourself

24   have evaluated the hydrodynamics of a mobile pool, is it fair

25   to say that you have not worked on such a project?

1    A      No, I would not say it's fair to say that.

2    Q      All right.  Let's pull up Defense Exhibit 986, and this

3    is on Page 154.  Let's pull up Lines 6 through 9.

4           Question at your deposition:  Have you worked on prior

5    projects where you yourself have evaluated the hydrodynamics

6    of a mobile pool?  Answer:  No.

7    A      Yeah, I see that, and I remember reading that, and I was

8    thinking to myself I -- I understated my -- my experience.

9    I -- I have done some work on, um, mobilization of sediments

10   and transport of sediments.

11   Q      Isn't most of your work conducted in lake environments?

12   A      Ah, I do work on lakes, but I do a lot of work on

13   uplands, wetlands, and we're doing quite a bit of work on

14   marine systems, as well.

15   Q      Is it fair to say that with respect to the Phase II

16   Report information regarding the mobile pool, that you simply,

17   within your report, took that information and -- and

18   summarized it in your report?

19   A      I summarized it in my report, yes.

20   Q      In other words, you didn't do any independent

21   investigation of the mobile pool or --

22   A      I didn't do any independent analysis or any independent

23   data interpretation, that's correct.

24   Q      Okay.  And that being said, when -- within your expert

25   report, you state that you believe the mobile pool needs to be

1    characterized well prior to evaluating remedial options of the

2    mobile pool, correct?

3    A    I don't want to prejudge what remedial options might be,

4    you know, embarked on, but I would think that would be a

5    critical piece of information that would be -- that would be

6    needed, in my opinion.

7    Q    Right.  I mean, that's one of the things if you sat down

8    with -- with engineers, looking at remedial options regarding

9    the mobile pool, they're going to want to have the mobile pool

10   characterized relatively well before they look at remedial

11   options, correct?

12   A    I would think so.

13   Q    Do you agree that currently the characterization of the

14   mobile pool by the Study Panel is uncertain?

15   A    Everything is uncertain, but I think that -- I think

16   that is -- is an important piece of information, and reading

17   Dr. Geyer's report, I got the sense that he would have liked

18   to have seen it, um -- the -- you know, understanding the --

19   the magnitude of it improved.

20        So I think it is -- it is somewhat uncertain, yeah.

21   Q    Right now, there's uncertainty regarding the size of the

22   mobile pool, correct?

23   A    Well, I think that's one of the uncertainties.  I think

24   there are other aspects of uncertainties that are -- that are

25   important, as well, but I think that clearly is important,

1    yes.

2    Q    Also, the location of the mobile pool and -- and what

3    mass resides in what locations would be important, correct?

4    A    Yeah, that's another -- another important piece, yeah.

5    Q    And there's also uncertainty regarding the -- the

6    inflows and outflows in terms of mass of sediments, correct?

7    A    Yes.

8    Q    Are there other uncertainties?

9    A    Well, I think one thing that was identified is the

10   connection between the immobile and the mobile pool.  Do they

11   really understand that -- the level of that connection?  Um,

12   so I think that that's important.  Maybe that's part of the

13   reason why -- I think there was concerns that the mobile pool

14   was underestimated, and so maybe the nature of that dynamic

15   exchange is, um, maybe there's more interaction between the

16   mobile and immobile pool than -- you know, than the Study

17   Panel had -- had thought.  I think that was another thing that

18   they had suggested might warrant further study, and I would

19   agree with that, as well.

20   Q    Do you agree that the mobile pool and -- and fluxes of

21   mobile sediments is something that's very difficult to

22   quantify?

23   A    It's a challenge for sure, yes.

24   Q    Let's talk a little bit about recovery half-times.

25   A    Sure.

DRISCOLL - CROSS-EXAMINATION/TALBERT

2214

1    Q    You -- as you stated earlier, you evaluated the Study

2    Panel's findings with respect to recovery half-times, correct?

3    A    I did, yes.

4    Q    And it's your understanding that the mercury study

5    collected sediment cores, sectioned them, and then applied

6    radiochemical tracers to evaluate those cores.

7    A    Yes.

8    Q    In the past, I believe you stated in your deposition

9    that you've primarily evaluated sediment cores using cesium

10   and -- and lead-210; is that correct?

11   A    Yes, primarily lead-210.  I mostly -- my sediment work

12   has been primarily in -- sediment coring work has been

13   primarily in lake systems, and I primarily rely on lead-210,

14   although I have used cesium on occasion.

15   Q    Is it fair to say that you have never used lead-210

16   to -- to date mercury in sediment cores in a river or

17   estuarine system?

18   A    No.

19   Q    And you've not published about dating mercury using

20   lead-210 in a river or estuarine system, correct?

21   A    That's correct.

22   Q    Is it also fair to say you've never used plutonium to

23   calculate the sedimentation rate or -- or date sediment cores?

24   A    That's correct.

25   Q    And apart from working on Lavaca Bay, I believe you said

DRISCOLL - CROSS-EXAMINATION/TALBERT

2215

1   that in Lavaca Bay, you worked with Dr. Santschi a little bit

2   on sediment cores, but aside from that, have you ever had to

3   date mercury in sediment cores in a riverine or estuarine

4   system?

5   A      I have not.

6   Q      And in the Lavaca Bay project, Dr. Santschi was the

7   person who was primarily doing the sediment core evaluation,

8   correct?

9   A      Yes.

10   Q     I believe we discussed this at your deposition, but is

11   it fair to say you do not have publications where you've

12   calculated recovery half-times using sediment cores in

13   mercury?

14   A     That is correct.

15   Q     In your analysis of the Study Panel findings, you

16   attempted to look at what Dr. Santschi did and effectively

17   replicate his work, correct?

18   A     Well, that's how I -- how I would not characterize it.

19   I wanted to -- well, first of all, I think it's -- when you're

20   looking at environmental data, I think it's really important

21   to plot the data and to look at the patterns, and so I wanted

22   to look at the individual cores and look at the variability,

23   look at the pattern to evaluate the assumptions that

24   Dr. Santschi -- Santschi used to try to look at different

25   mathematical relationships to try to evaluate, you know, the

1  recovery, the half-time, and the -- the rate of recovery, and

2  then to look at the sensitivity of the calculation to the

3  assumption of background and to verify to myself that the

4  numbers that Dr. Santschi obtained were similar to numbers

5  that I -- I obtained.

6       So I -- I think it was more than replicate.  I think I

7  tried to look critically at what he did, and I think I pretty

8  much followed his procedures where I thought they made sense,

9  and I think where I thought, you know, they might be better, I

10  -- for example, I thought the background concentration, I

11  thought that it made more sense to use the background

12  concentration that the Study Panel was recommending.  So I --

13  I tweaked what he did a little bit.

14  Q    And you're aware that Dr. Santschi used an exponential

15  decay rate to calculate recovery half-times, correct?

16  A    Yes.

17  Q    And I think you've -- we've discussed this before, but

18  that's not a technique that you've used previously?

19  A    I use it all the time.  I mean, that's a fundamental

20  engineering calculation.  I teach it to my sophomore class.

21  We do it in example problems.  It's -- you know, exponential

22  decay is a -- you know, is a mathematical relationship that's

23  used in all sorts of applications.

24  Q    Let's pull up Defense Exhibit 986, deposition clip --

25  let's go to Page 118.  And let's just blow up Lines 19 through

1    25.

2         You stated, I have not used the same approach that

3    Santschi used, assuming an exponential decay, to calculate the

4    recovery time.  But I have looked at rates of change and

5    extent of change in these cores, and you know, tried to look

6    at how they've changed over time in recent decades.  Do you

7    recall stating that?

8    A    I don't recall, but it's here, and I believe I stated

9    it, but this is somewhat different than what you just asked

10   about, at least my understanding.

11        I have not used this approach in sediment cores, ah,

12   because I've not experienced the type of mercury input, um, in

13   applications that I've dealt with that is comparable to what

14   we see here, where there's a pulse input.

15        My work is looking at sort of long-term chronic inputs,

16   and so I've done a lot of core work trying to evaluate rates

17   of change on that.  However, I have used exponential

18   relationships a lot in the course of my work, as do most

19   engineers.

20   Q    I think you testified earlier that when you looked at

21   the cores to calculate recovery times, you -- you looked at

22   all of the cores?

23   A    Yes.

24   Q    Is that correct?

25   A    I did use all the cores, yeah.

1   Q     And are you aware that Dr. Santschi evaluated the cores

2   and determined that some of them should not be included in his

3   analysis of half-time recovery?

4   A     I did read that, yes.

5   Q     And do you know his reasons for excluding some of the

6   cores for half-time recovery calculation?

7   A     So my understanding -- it's been a while since I've read

8   this, but I think my understanding is he looked -- and I think

9   also Dr. Yeager, as well, looked through the cores and looked

10  for evidence of disturbance, looked at the stratigraphy,

11  looked at the integrity of the cores, and if they made a

12  judgment that the cores were compromised, then they excluded

13  them from the analysis.  So I think there was a subset that

14  were not considered because it's expensive to measure and to

15  date these.  So if they were visually disturbed, I think they

16  -- they weren't considered.

17  Q     Are you aware that there were some cores that they did

18  the radiochemical analysis for, but then when they went to

19  evaluate the half-times for recovery, excluded because the

20  radiochemical data indicated to them that the core was

21  disturbed?

22  A     Yeah, I may have read that.  I'm -- I'm not a

23  hundred-percent sure.  But it may very well be the case.  It

24  wouldn't surprise me.

25  Q     Are you aware that, you know, one technique for dating

1    is using cesium, correct?

2    A      Correct.

3    Q      And the cesium date, what you would do in a sediment

4    core would be to look for the -- the peak cesium, and that

5    would -- you would make an assumption that that corresponds to

6    1963, correct?

7    A      Right.

8    Q      Okay.  So if you were to look at a sediment core and

9    find the highest cesium towards the surface, would that

10   indicate to you that this was a disturbed core?

11   A      Yeah, there might be a variety of reasons why the -- the

12   dating would look like the core's disturbed.  That happens in

13   my work all the time, so I -- I certainly understand this,

14   yeah.

15   Q      But that would be one of the -- the indications,

16   correct?

17   A      Yeah, yeah.

18   Q      And do you know why Dr. Santschi or Dr. Yeager would

19   want to exclude cores that are disturbed when they're

20   calculating a recovery half-time?

21   A      I would think they would want to, um, if there was some

22   sort of physical disturbance that would compromise the core

23   and the sedimentation pattern, that they would -- they would

24   probably want to -- might want to exclude it.  Um, I mean I

25   don't want to -- I mean, I have not talked with them at --

DRISCOLL - CROSS-EXAMINATION/TALBERT

2220

1   about their work and about how they made decisions.  I just

2   read what they wrote and tried to follow and use the data that

3   they used to calculate the half-times.

4   Q    Is it fair to say that examining a core that has been

5   disturbed, through either lateral or -- or vertical transport,

6   may not be -- may not tell us much about the recovery time in

7   that particular area?

8   A    Well, it certainly would make things confusing, or I

9   could see where it would make things confusing.

10  Q    Would you agree?

11  A    Yes.

12  Q    Let's take a look at Joint Exhibit 48, at Page 19.  I

13  believe this is your rebuttal report, correct?

14  A    Ah, yes.

15  Q    And just to clarify the record, the half-times for

16  recovery, that evaluation is something you did in your -- in

17  your rebuttal report, correct?

18  A    Yes.

19  Q    And here can you just -- we want to reorient ourselves,

20  but these are the two -- these are two figures I believe you

21  discussed earlier with Mr. Bernard, correct?

22  A    That's correct.

23  Q    And these are where you have put on a barchart different

24  recovery times for various cores.  Let's just start for a

25  second with -- with Mendall Marsh.

1      One of the -- one of the -- then you have -- you have

2   two cores that you have plotted on this -- this chart, and

3   you've said, increasing concentration.  Do you see that?

4   A    Yes.

5   Q    Okay.  One of those is Mendall Marsh 12C, correct?

6   A    Yes.

7   Q    And you've got the barchart going up basically up to

8   60 years, but is that to indicate that it -- it's just

9   increasing almost into infinity?

10  A    Yeah, I just wanted to include it, but it's -- it's not

11  60.  It -- it doesn't have a -- it doesn't have a value.  I --

12  you know, it's an increase.  It's not -- not a decrease for

13  these -- these cores.  So I wanted to illustrate that they

14  were part of the cores that were sampled, but it didn't have a

15  calculatable half-time.

16  Q    Let's take a look at Joint Exhibit 89, and just keeping

17  in mind this Mendall Marsh 12C.

18      This is a table -- have you reviewed Dr. Santschi's

19  chapter, Chapter 6?

20  A    Yes.

21  Q    So this is a table that was corrected from

22  Dr. Santschi's Chapter 6, Joint Exhibit 6-6, and what he has,

23  if we could, let's -- let's just blow up this first portion of

24  the chart, and what -- this is -- this is where he has

25  displayed the Mendall Marsh cores and his recovery half-times.

1        And this value here, is this your understanding that

2   it's -- it's -- this is mercury at the surface, correct, he

3   has mercury and then in parens, 0?

4   A    I think that's his nomenclature, if I remember right.

5   So could we clarify something?  You said that these were

6   corrected.  What did you mean by that?

7   Q    Well, Dr. Santschi -- his initial table had a couple of

8   errors in it that he subsequently corrected and then sent to

9   the parties.  So we can look at either version, but I thought

10  that looking at the corrected version might be more correct in

11  this context.

12  A    Okay.

13  Q    And I don't think it makes much of a difference to our

14  discussion, but I can show you the other one if you'd like.

15       What I want to talk about is Mendall Marsh 12C, this is

16  one of the cores that Dr. Santschi did not use in his recovery

17  half-time calculation, correct?

18  A    Well, it looks like he didn't, yeah.

19  Q    And what I want to talk about is at the surface, the

20  concentrations in that Mendall Marsh 12C are 88 nanograms per

21  gram.  Do you see that?

22  A    Yeah.

23  Q    And so that's under the 100 nanogram per gram target?

24  A    Yes.

25  Q    Correct?

1    A    Yes, you're right.

2    Q    So, I mean, from a pragmatic perspective, this is --

3    this core is already under the target, right?

4    A    Right.

5    Q    So to say that -- if we go back to your chart on Joint

6    48, at Page 19, to -- to depict that core as increasing

7    concentration for recovery half-times indicates that it's

8    somehow delaying recovery in Mendall Marsh, correct?

9    A    No.  Why?

10   Q    Well --

11   A    It just simply means that it's increasing.

12   Q    Well, but it indicates that then if you were to use

13   these other cores, that that core is somehow -- means that the

14   recovery half-times would -- would take longer than what

15   you're estimating because this is increasing toward the

16   surface.

17   A    So I would have to go back and look at my plot for this

18   core 12, but I think all it simply means is that the pattern

19   is increasing.  So the surface concentration is 88.  The

20   concentrations were below that, and in the recent 21 years,

21   those concentrations are -- are increasing.

22   Q    In this particular core, 12C, though, as we just looked

23   at, that's already -- this -- this core is already under the

24   target.

25   A    Yes.

DRISCOLL - CROSS-EXAMINATION/TALBERT

2224

1    Q      So in terms of delayed recovery, that's certainly not a

2    core that would be delaying recovery of -- within Mendall

3    Marsh getting down to the hundred nanogram per gram, correct?

4    A      Did I say that core was delaying recovery?  I think all

5    I said was that it was increasing in concentration.

6    Q      So when you -- you have included these areas of -- we

7    can just take a look at the -- the actual data.

8           And just to clarify the record, so in any core where

9    there is an uptick in the top 1 centimeter, you would say that

10   that is increasing toward the surface?

11   A      No, the procedure that I used was I looked at the, um,

12   the 21 years, the upper portion of the record towards the

13   surface, and then I would take the -- I would subtract out the

14   background concentration from the concentrations that were

15   measured in the sediments, and then I would do a -- I would

16   take the logarithm of those values, and then I would do a

17   linear regression of those values with depth to determine the

18   slope, the rate of change, the half-time, and if the slope was

19   increasing, if the concentrations were increasing, I indicated

20   that the concentrations were increasing.

21          So the half-time calculation reflects an exponential

22   decay, an exponential decrease in concentrations towards the

23   surface, and so I can calculate the half-time for that.  If

24   the concentrations are steady or increasing, then I report

25   those as steady or increasing concentrations.  And so those

1    were the bars that were pegged at the top of those barcharts.

2    Q    So just -- just to complete this, the fact that you've

3    listed certain cores as increasing toward the surface tells us

4    nothing about the time to reach the target concentration.

5    A    Well, the assumption that I'm working on is that the

6    cores that are problematic are above the target concentration,

7    and I'm trying to look at the time it takes them to decrease

8    towards the target concentrations.  Those cores that are

9    increasing are increasing.  They're not decreasing.

10        And so I just clarified those as showing increasing

11   concentrations.  Um --

12   Q    Let's take a look at another example.  Let's go to Joint

13   48, at Page 19.  In the PBR reach, half-time for recoveries,

14   one of -- just as an example, let's blow up this top area.

15        And you took a look at 27B, correct?  And --

16   A    Yeah, I looked at all the cores, yeah.

17   Q    Okay.  And I think that -- and we can go to your chart

18   on the prior page, but I think that 27B is a core that you

19   specifically singled out as a core that you used that

20   Dr. Santschi did not use, correct?

21   A    Oh, yes, yes, yes, that's the one that had the very long

22   calculated recovery half-time, yes.

23   Q    You said in this particular core, you calculated a

24   recovery time of about 300 years, and you've got that -- that

25   line here, right?

1   A      Yeah, that's my recollection, yes, yeah.

2   Q      Okay.  So earlier we had a discussion about what it

3   would mean if you saw cesium near the peak, that that would

4   indicate a disturbed core, correct?

5   A      Hm-hmm, yes.

6   Q      Let's just take a look at the profile, the radiochemical

7   data for that particular core, and this is from Table 5 of

8   Joint Exhibit 6-5.

9          And we can see, if you -- if you look through the cesium

10  inventory on concentrations, that we effectively have a -- a

11  dual cesium peak, and you've got -- one of the peaks is

12  effectively right at the surface, correct?

13  A      Yes, it would appear that way.

14  Q      And wouldn't that indicate to you that this is a

15  disturbed core?

16  A      It might, but I took what -- Dr. Santschi and

17  Dr. Yeager's, um, view on disturbed cores, and if they dated

18  them and they did the analysis of the sedimentation rate for

19  cesium, I used -- I used their values.  So I did not -- um, I

20  did not, um, go back and evaluate the integrity of the cores

21  and make a judgment on whether an individual core was

22  disturbed or not.

23  Q      Do you agree that that type of evaluation could be

24  important?

25  A      Oh, yeah, of course.

1    Q     Let's switch gears and talk a little bit about activated

2    carbon as a -- as an amendment.

3          Do you agree that Dr. Gilmour's study on activated

4    carbon was not comprehensive?

5    A     Yes.

6    Q     And is it fair to say that you have some doubts of

7    whether or not activated carbon would be a viable remedial

8    alternative for Mendall Marsh?

9    A     I really -- I think it's an option.  I think it should

10   be considered.  I think it is being used in a variety of

11   applications.  Um, I -- I don't -- I mean, I don't really have

12   any -- I mean, I think you said the word doubts.  I -- I don't

13   view it that way.  I think it's an option.  I think it should

14   be considered.  Um, I -- I have not discussed with her or the

15   Study Panel their thinking behind their carbon and other

16   amendments.

17         But when reading that section of the report, I viewed

18   this as sort of a preliminary -- a preliminary assessment of

19   potential remedial options, carbon being one of a few

20   possibilities -- activated carbon being one of a few

21   possibilities.

22   Q     I think that in your deposition, the words you used was

23   the jury's still out with respect to activated carbon?

24   A     Yeah, I think in terms of interpreting the results, yes,

25   yeah.

DRISCOLL - CROSS-EXAMINATION/TALBERT

2228

1    Q     Is it fair to say that with respect to remediation

2    expertise, you have some concern about the level of expertise

3    and experience of the Study Panel members?

4    A     I think that, um, that's not their forte.  I think that

5    -- I think that they're primarily mercury scientists and their

6    primary objective was to characterize the -- the nature of the

7    mercury contamination of the Penobscot River, and then to make

8    some recommendations with respect to remediation.  But I think

9    that the remediation community is a relatively large community

10   and I think increasingly that remediation community is

11   addressing problems with mercury.

12          So I think that if the decision was made to go forward

13   with remediation, I think it would make sense to bring in

14   additional people with -- with some additional remediation

15   experience, you know, to get the benefit of their wisdom.

16   Q     Are you -- are you familiar with what a -- a feasibility

17   study is?

18   A     Yes.

19   Q     And is it your understanding that a feasibility study in

20   the RCRA context, at least, evaluates different criteria for

21   remedy selection?

22   A     Yes.

23   Q     Do you have any familiarity with these criteria in the

24   CERCLA context, as well?

25   A     No, not really.

1   Q      Are you -- are you aware of those factors being applied

2   in CERCLA cases?

3   A      I -- that's my understanding, yes.

4   Q      Okay.  I'll just show you this -- this list and see if

5   this -- this is Defense Exhibit 38, and this is a list of

6   CERCLA -- the nine criteria for remedy evaluation and

7   selection.  Do these criteria look familiar to you?

8   A      Yes.

9   Q      And do you agree that the structure of a feasibility

10  study is a useful tool in reaching remedial decisions?

11  A      Ah, yes, it's a useful tool, yes.

12  Q      Okay.  Is it your understanding that when you evaluate

13  different remedial options, that often one of the options that

14  are evaluated is something called monitored natural

15  attenuation?

16  A      Yes.

17  Q      And is it fair to say that monitored natural attenuation

18  would not necessarily be considered active remediation?

19  A      Yes.

20  Q      In the feasibility study, you generally go through and

21  -- and evaluate and weigh various factors, correct?

22  A      Yes.

23  Q      And those help evaluate the balance of risks and costs

24  and some benefits to determine what's the best remedy.

25  A      Yes.

DRISCOLL CROSS-EXAMINATION/TALBERT

1    Q      And one reason for doing that is active remediation

2    inherently has risks, correct?

3    A      Yes.

4    Q      And is it fair to say that active remediation has risks

5    because there are often unintended consequences with our

6    activities in the environment?

7    A      There can be unintended consequences, yes.

8    Q      So this is a way to, again, just evaluate those options

9    and -- and weigh those benefits, risks, and -- and costs to

10   help come to a decision.

11   A      Did you ask a question?

12   Q      Correct?

13   A      I'm sorry.  Oh, yes.

14   Q      And you're familiar with the feasibility study process

15   from the Onondaga Lake project?

16   A       I was not directly involved in it, but I read the

17   report, so I -- I'm somewhat familiar with what was done.

18   Q      Okay.  And at Onondaga, I think you mentioned earlier

19   the responsible party is Honeywell?

20   A      Yes.

21   Q      And is Honeywell very involved in the remediation

22   process?

23   A      Can you repeat the question?

24   Q      Is Honeywell involved in the remediation process?

25   A      Yes, yes, yeah.

DRISCOLL - CROSS-EXAMINATION/TALBERT

1  Q     Okay.  You did review the feasibility study for

2  Onondaga, though, correct?

3  A     Yes.  It was a number of years ago, I should point out,

4  though.

5  Q     I won't quiz you.  With respect to investigating

6  remedial alternatives, you've never drafted or been the lead

7  on conducting a feasibility study, correct?

8  A     That's correct.

9  Q     And aside from Onondaga and Lavaca Bay, you've not been

10 involved in other contaminated mercury sediment sites,

11 correct?

12 A     That's correct.

13 Q     Do you know defendants' expert Ed Glaza?

14 A     I do know Ed Glaza, yes.

15 Q     Ed is a practicing engineer, correct?

16 A     Yes, he is an engineer, yeah, and practices, yeah.

17 Q     And Ed was the lead on conducting the feasibility study

18 at Onondaga Lake, correct?

19 A     That's my understanding, yes.

20 Q     Does Mr. Glaza work for Parsons?

21 A     Yes.

22 Q     And is it your understanding that Parsons works on large

23 contaminated sediment sites across the country?

24 A     That's my understanding, yes, among other projects,

25 yeah.

DRISCOLL - CROSS-EXAMINATION/TALBERT

1   Q     You yourself are not a licensed professional engineer,

2   correct?

3   A     I am not.

4   Q     And it -- would it be fair to say you're not in a

5   position to evaluate the engineering skills of another -- of a

6   practicing engineer?

7   A     Um, I have on occasion.

8   Q     I can pull your deposition clip.  I'm not sure it's a

9   big point.  But I believe you said at your deposition, I'm not

10  really in a position to evaluate -- well, you used as an

11  example Mr. Glaza's engineering skills, but --

12  A     Well, I don't provide oversight of Ed Glaza, if that's

13  what you're referring to.  I know him.  He actually lives in

14  the same community that I do, so I see him quite a bit.  I've

15  interacted with him on Onondaga Lake, but I don't -- I don't

16  evaluate his day-to-day operations, no.

17  Q     Let's take a look at Defense Exhibit 986, and I want to

18  refer your attention to Page 43, and let's start on 23 just

19  with my question.  I want to read you a passage from this and

20  -- and get your thoughts.

21        I asked, when -- when you were talking about Ed, you

22  said you weren't able -- and I may be not stating this

23  correctly -- but not able to -- we need to go into the next

24  page -- fully evaluate his skills.  Let's not pull that up

25  because we're going to read more.  You said you didn't live in

DRISCOLL - CROSS-EXAMINATION/TALBERT

1   that world.  And your answer was, well, I'm an academic.  He's

2   a practicing engineer.  I'm very interested and involved in

3   different remediation studies, but, you know, he's sort of a

4   boots on the grounds type of guy.  He's actually designing

5   systems, working with contractors, making sure everything

6   works.  So he's making all the pieces fit together, making

7   sure the design is proper, overseeing the monitor if there's a

8   problem.  You know, he's dealing with a lot of the overall

9   operation of -- I mean, it's a half-billion dollar project and

10  it's going on over many, many years.  It's a lot to keep track

11  of.

12       Does this fairly encapsulate your thoughts on the

13  difference between Ed, as a practicing engineer, and -- and

14  yourself?

15  A    Well, I don't want to give you the wrong impression.  I

16  have provided oversight on projects.  I've been involved in a

17  number of remediation projects.  I've led these remediation

18  projects.  They've not involved, you know, toxics, but for

19  other aspects of remediation.  I've been the principal.  I've

20  designed the solution.  I've seen it implemented, and I've

21  evaluated the monitoring data to track the success of the

22  project.

23       So maybe not to the extent and -- and number of people

24  as what Ed is doing in Onondaga Lake.  That's a very large

25  project involving a number of people, number of components.

DRISCOLL - CROSS-EXAMINATION/TALBERT

1   But I have done -- I have led some remediation programs, and,

2   um, it's -- it's a big job to keep on top of everything and to

3   make sure the calculations are done properly and to provide

4   oversight on all the pieces.

5        So, you know, I have a lot of respect for what he does

6   to ensure this project is successful.

7   Q    And you would agree, your primary focus, however, is --

8   is teaching, correct?

9   A    Well, I do teaching.  I do research.  I've done a number

10  of large-scale projects.  I've done a variety of, um, whole

11  ecosystem manipulation studies.  Some of them have been

12  directed towards getting information concerning remediation.

13  Um, so I serve on committees.  I do a lot of different things.

14  Q    Is it fair to say -- I believe we talked about this in

15  your depo -- but you describe yourself as an academic,

16  correct?

17  A    I have a university position.  I am an academic, that's

18  correct.

19  Q    In terms of next -- next steps, I also want to take a

20  look at two clips that we discussed in your deposition and get

21  your thoughts.  This is Page 261, Line 3.

22       And I asked you, basically, what you -- what you thought

23  of for next steps.  I say, when you look at next steps, beyond

24  Phase II, you've identified additional research that could

25  further inform our understanding of the system and may be

DRISCOLL - CROSS-EXAMINATION/TALBERT

1  relevant to remediation, but I want to talk through those in a
2  comprehensive way.  Have you given thought -- any thought in
3  terms of the next steps?

4          And you say, I have, but I don't feel very
5  comfortable because I have no idea what the next steps are.  I
6  don't know.  You know, I've been thinking about, you know,
7  what are -- what are the possibilities and what could be some
8  of the possibilities -- could possibly be done either to --
9  for some sort of aspect of remediation or what sort of
10 information could be useful to help guide a remediation
11 program.

12         And I want to get -- if we switch over, I want to go to
13 Page 277.  I think I asked that in a slightly different way.
14 And you said, as we talked about earlier, this seems to be a
15 unique process and one that I'm not familiar with.  And so I
16 don't really want to prejudice the direction that it might go
17 because I really have no idea.  I'm just, you know, a
18 professor and I'm making a recommendation that I think this
19 could be helpful in the process.

20         And I believe you said that one of the things you're
21 recommending to the court is a meeting take place between
22 scientists and -- and engineers, correct?
23 A     Well, I would -- I think for it to be meaningful and
24 effective, it would be more than a meeting.  There's --
25 there's already been a meeting on remediation.  I think that

DRISCOLL - CROSS-EXAMINATION/TALBERT

2236

1    -- you know, I think that if there -- if the decision is made

2    to go forward with remediation, I think that the process would

3    benefit from, um, developing a team and doing some initial

4    brainstorming.

5         What the time frame of that was, the number of

6    engagements, but it's a fairly complicated, um, system.

7    There's been a lot of good information that's been obtained

8    that I think would be relevant to -- to guide a remedial

9    effort.  I think if that could be distilled and presented to a

10   team that had experience in remediation, I think it may be --

11   I think -- I'm confident that some good ideas could come of

12   this and that could be helpful in the process if the decision

13   was made to go forward with remediation.

14   Q    And one of the things you would want to do is you would

15   want to get input from practicing engineers that have

16   experience in remediating contaminants -- contaminated

17   sediment sites, correct?

18   A    I think that's part of it, but I also think that there's

19   -- it would be necessary to get, um, input from managers and I

20   think also mercury scientists, um, that understand the nature

21   of the contamination and the dynamics of the system.

22   Q    Is Ed Glaza the type of person that you would want to be

23   involved in that type of a meeting?

24   A    Possibly.  Um, I think that there are a lot of good

25   people out there.  Um, I could suggest some names of people

1    who are -- you know, that I've worked with that are -- that

2    are very bright and I think very capable engineers that have a

3    lot of experience with, um, innovative solutions.  Um, so I

4    think that there -- you know, as I said before, I've got a lot

5    of confidence in the engineering community.  I think that --

6    that there could be some -- um, I think some good

7    cost-effective solutions could be developed.

8    Q    And is Ed Glaza a person who could provide some valuable

9    input in that process?

10   A    Well, I think Ed knows the mechanics of overseeing a

11   project well, you know, the various pieces and the

12   interactions between the various groups.  I think he could be

13   -- provide valuable input in -- in that regard.

14        I just -- actually, I had a conversation with Ed a

15   little while ago, um, and he -- he admitted that he wasn't

16   terribly comfortable with mercury science, um, and he -- and

17   he learned a lot from interacting with mercury scientists.

18        So I think a partnership is -- is a good approach for

19   people who are remediation experts and managers and

20   scientists.

21   Q    But from the engineering side, Ed is a person that could

22   provide valuable input on the engineering side?

23   A    I think Ed's got a lot of -- as I said, Ed's got a lot

24   of valuable experience, yes.

25            MR. TALBERT:  No further questions.

1              THE COURT:  Do you want to break now, or do you want

2      to -- okay.

3              MR. BERNARD:  I think it would be better.

4              THE COURT:  Okay.  That's fine.  We'll stand in

5      recess for 25 minutes.

6          (Court recessed from 11:55 a.m. to 12:27 p.m.)

7              THE COURT:  Mr. Bernard?

8              MR. BERNARD:  Thank you, Your Honor.

9                       REDIRECT EXAMINATION

10     BY MR. BERNARD:

11     Q     Dr. Driscoll, you were asked on cross-examination about

12     the issue of carbon normalization.  Do you remember that?

13     A     I do.

14     Q     And did you look at surface sediment contamination --

15     mercury contamination in the Penobscot on a dry-weight basis?

16     A     I did.

17     Q     And did you look on a carbon-normalized basis?

18     A     I did.

19     Q     And did you find both ways that in -- in your term the

20     mercury in the Penobscot surface sediments is enriched?

21     A      It's enriched in the lower river, upper estuary relative

22     to reference areas, yes, that's correct.

23     Q     Now, for your purposes in analyzing the ecological

24     situation in the Penobscot, if the Penobscot surface sediment

25     mercury is five times or seven times or ten times or 14 times

1    relevant reference or background areas, does that make much

2    difference?

3    A      Ah, no, I don't think so.

4    Q      Now, do you think the proper way to look at surface

5    sediment mercury contamination is to look at both dry-weight

6    and carbon-normalized values?

7    A      I think it's prudent to look at data a number of ways,

8    look at -- try to look at factors that are influencing the

9    concentrations, yes.

10   Q      Is that your understanding of what the Study Panel did?

11   A      Yes.

12   Q      Now, do you have any doubt that the surface sediment in

13   the -- in the -- in the Penobscot Estuary is elevated in

14   mercury?

15   A      It's elevated in mercury.

16   Q      And do you have any doubt that that mercury from the

17   sediment is entering the food web in the Penobscot?

18   A      No.

19   Q      And do you have any doubt that that mercury that enters

20   the food web from the sediment is in biota in the Penobscot?

21   A      Ah, the concentrations are elevated in biota in the

22   Penobscot, yes.

23   Q      Now, you were asked about remediation targets in at

24   least one other system, Onondaga Lake.  Do you remember that?

25   A      Yes.

1    Q     Now, when you're evaluating the need for remediation in

2    a particular system, do you look at the situation in that

3    system that is the subject of your inquiry?

4    A     Yes, every system is different.  It's always good to

5    look across systems, but I think it's most appropriate to set

6    target values for that individual system to account for

7    differences across systems.

8    Q     Now, in evaluating whether a system is in need of

9    remediation, is it more complicated than just looking at a

10   particular surface sediment mercury value?

11   A     Can you clarify that?

12   Q     Yes.  Do you look at rates of methylation when you're

13   considering whether a system is sufficiently contaminated to

14   warrant active remedies?

15   A     That's an important consideration, yes.

16   Q     Okay.  And -- and I believe you testified that the rates

17   of methylation in the Penobscot System are very, very high; is

18   that correct?

19   A     They're high, particularly in Mendall Marsh, yes.

20   Q     Okay.  Now, do you remember what the fine-grain sediment

21   mercury values are in the upper estuary that the Study Panel

22   found?

23   A     They're enriched over bulk sediments.  My recollection

24   is something on the order of 900 nanograms per gram dry weight

25   of mercury.

1    Q      And do you believe that the Study Panel has identified

2    an ecological and human health problem associated with that

3    degree of sediment mercury contamination in the Penobscot?

4    A      I think that the -- the values that they observed in

5    biota, in songbirds, and in -- and in fish, um, along the

6    contaminated areas are highly elevated, yes.

7    Q      Now, you were asked about ongoing sources and whether

8    they could change predicted recovery rates of the system.  Do

9    you remember that?

10   A      Yes.

11   Q      Now, are ongoing sources to the system recorded in the

12   sediment cores that you reviewed?

13   A      The sediment cores should incorporate all inputs of

14   mercury.  They should reflect the total input and deposition

15   of that mercury, correct.

16   Q      Then -- then do the recovery times include the effects

17   from ongoing sources?

18   A      Yes.

19   Q      Okay.  You were also asked about input of sediment in an

20   ongoing way coming over the old Veazie Dam.  Do you remember

21   that?

22   A      I do.

23   Q      Do you recall what the Study Panel found in terms of the

24   magnitude of that input in relation to the legacy mercury that

25   resides in the sediments of the lower river?

DRISCOLL-REDIRECT EXAMINATION/BERNARD

2242

1    A     Well, those concentrations are lower.  That's the

2    particulate mercury concentrations that are in the Penobscot

3    River going over to the Veazie Dam are lower than the

4    concentrations that we've been discussing in surface

5    sediments, considerably lower than the concentrations in

6    surface sediments in the contaminated reach of the Penobscot

7    River and -- and upper estuary.

8    Q     Do you have any thought about the relative loadings or

9    magnitude of the mercury coming over the Veazie Dam in an

10   ongoing sense versus the magnitude of mercury that's lodged in

11   the sediments in the lower river?

12   A     Ah, yes, I do.  So I think the Study Panel did a pretty

13   good job characterizing the current inputs and outputs of

14   mercury to the -- the reach of the Penobscot River and upper

15   estuary, and that they found the inputs -- the current inputs

16   are relatively low in comparison to the pool of mercury that

17   is in the mobile sediments.  So, in other words, it appears

18   that the legacy mercury from past inputs dominate the mercury

19   dynamics in the current system.

20   Q     And do you think the data support that finding of the

21   Study Panel?

22   A     Most definitely.

23   Q     Okay.  Now, you were shown a figure from Dr. Gilmour's

24   chapter regarding the relationship between total mercury and

25   methylmercury in Mendall Marsh.  Do you remember that?

1    A      I do.

2    Q      And do you also remember that yesterday you commented on

3    some figures from the Phase II Report that also showed

4    relationships between total mercury and methylmercury, both in

5    the main stem of the river and at different elevations in the

6    marsh?

7    A      Yes.

8    Q      Okay.  Now, is the marsh a heterogenous environment?

9    A      It is highly heterogenous, yes.

10   Q      And there's a lot of variability in it?

11   A      Yes.

12   Q      And is it possible that the relationship between total

13   mercury and methylmercury might vary from location to location

14   within the marsh?

15   A      I think that the Study Panel report clearly demonstrated

16   that there was variabilities in this relationship due to

17   position in the marsh and also time period I think they found

18   was also quite important, as well.

19   Q      So is it possible -- I think you testified to this on

20   cross-examination -- is it at least conceivable that in some

21   part of the heterogenous marsh, you might reduce total mercury

22   and have a limited effect on reducing methylmercury in that

23   particular -- at that particular site?

24   A      It's possible.

25   Q      Okay.  Now, overall in Mendall Marsh, if you were to

DRISCOLL-REDIRECT EXAMINATION/BERNARD

2244

1    reduce total mercury concentrations, do you have a view

2    whether that would reduce -- reduce overall the methylmercury

3    concentrations in the sediment soils and pore water of the

4    marsh?

5    A    Yeah, I think what you suggest is correct, that, um, it

6    appears that the methylmercury concentrations are, at least in

7    part, driven by the total mercury concentration.  So if you

8    reduce the total mercury concentrations in the surface

9    sediments of the marsh, I find it very likely that there would

10   be reductions in methyl concentrations in the -- methylmercury

11   concentrations in the surface sediments in the marsh, as well.

12   Q    And what you just articulated, Dr. Driscoll, is that a

13   finding that the Study Panel made?

14   A    Yes.

15   Q    And do the data support that finding, from your point of

16   view?

17   A    Yes.

18   Q    You were asked about a section in your expert report in

19   which you summarized biota data and findings from the Phase II

20   Study.  Do you remember that?

21   A    Yes.

22   Q    Okay.  Now, to the extent you summarized without

23   criticizing the biota findings, is that because you thought

24   the biota finding were sound?

25   A    Yeah, I said -- I think I said previously that I was

1    quite impressed with the -- the biotic information that was

2    compiled.  The Study Panel looked at a diverse group of

3    organisms, multiple organisms within different types, made

4    multiple measurements in space and time.  So I think it's a

5    pretty impressive data set.  So I think it's a lot of

6    information to base a decision on.  So I -- I'm quite

7    supportive of what they did.

8    Q    And is the same true of the description of the mobile

9    sediment pool in Dr. Geyer's chapter?

10   A    Yeah, I think -- you know, I've never met Dr. Geyer, but

11   from the papers of his I've read, I'm very impressed with him.

12   He seems to do very high quality work, and I think -- I

13   learned a lot from reading his chapter, and I think he -- his

14   work provided a lot of insight in a very complex process.

15        Um, but I think as we discussed, that mobile pool could

16   be very important in terms of remediation.  So I would guess,

17   based on Dr. Geyer's chapter, that he would agree with me that

18   I think -- if it could be improved, that could -- that could

19   also provide some valuable information.  But it's a very

20   valuable contribution in my opinion

21   Q    Did the discussion in the Phase II Study Report of the

22   mobile sediment pool of mercury-contaminated mobile sediments,

23   did that make sense to you?

24   A    Yes, it's consistent with what estuaries do, yes.

25   Q    Now, you were asked about the use of lead-210 as a

DRISCOLL-REDIRECT EXAMINATION/BERNARD

2246

1   tracer in sediment cores.  Do you remember that?

2   A    Yes.

3   Q    What do you think about the use of lead-210 in an

4   estuarine environment?

5   A    I don't -- I don't consider it a good tool in that

6   environment.  I would -- I would never use it.  Um, it's -- I

7   use it in lakes.  It requires a constant supply to be valid,

8   and, um, the Penobscot River is a very dynamic system.

9        So I would think of the tracers that were used, cesium

10   would be the tracer of -- of preference, in my opinion.

11   Q    Okay.  I want to ask you about the sediment cores that

12   have mercury that's increasing at the surface, and let me show

13   you from Joint Exhibit 48, Page 19 these Mendall Marsh --

14   Marsh cores that we looked at earlier.  Do you remember that?

15   A    Yes.

16   Q    Okay.  And the two within this set that you found --

17   where you found increasing concentrations are 11B and 12C.  Do

18   you see that?

19   A    Yes, I do.

20   Q    Okay.  And now I want to shift to Joint Exhibit 89,

21   which Mallinckrodt's counsel showed you.  Remember this?

22   A    Yes.

23   Q    Okay.  And this is from Dr. Santschi?

24   A    Yes.

25   Q    Okay.  And counsel showed you this Mendall Marsh 12C,

1    which -- and these blanks here indicate that it was not dated

2    by -- not -- that -- that it -- Dr. Santschi didn't use it in

3    the calculation of exponential decline because it wasn't

4    declining; is that correct?

5    A    Yes.

6    Q    And he showed you this mercury surface -- let me get

7    that off -- mercury surface sediment value of 88 nanograms per

8    gram.  Do you see that?

9    A    I do.

10   Q    And he asked you whether that was beneath, below the 100

11   nanogram per gram Study Panel target for Mendall Marsh.  Do

12   you remember that?

13   A    I do.

14   Q    Okay.  Now, this is a core in which there is increasing

15   mercury at the surface, correct?

16   A    Yes, that's my recollection, yes.

17   Q    And do you know whether it will -- that mercury

18   concentration will continue to increase in the future?

19   A    If I could predict the future, I would be out of this

20   business.  I -- I don't know.  It's projected to increase, so

21   if it continues on its path, it likely will increase, but --

22   Q    And it might increase to above a hundred nanograms per

23   gram; is that fair to say?

24   A    It could, yes.

25   Q    Okay.  Now, counsel did not show you -- I don't know why

1   -- 11B, which is immediately above it.  Do you see that?

2   A     I do see that.

3   Q     Also not dated by -- also not calculated -- part of the

4   calculation by Dr. Santschi because it's increasing at the

5   surface, right?

6   A     Correct.

7   Q     What's the surface sediment concentration in that core?

8   A     It appears to be in excess of a thousand nanograms per

9   gram dry weight -- dry weight -- excuse me.

10  Q     And does that make it in excess of ten times the Study

11  Panel target for Mendall Marsh?

12  A     Ah, it is, yeah.

13  Q     Okay.  Now, let's look at the Penobscot River cores and

14  some of the ones that were not dated -- I mean, sorry -- that

15  have increasing concentrations.  Let's look at 13B.  That's

16  one that has -- is increasing at the surface, right?

17  A     It would appear so, yes.

18  Q     And what's the surface mercury level there?

19  A     In excess of 1,100 nanograms per gram.

20  Q     And is that more than twice the 450 nanograms per gram

21  target for the main stem of the river?

22  A     That's correct.

23  Q     How about 14C, that also has increasing mercury at the

24  surface; is that right?

25  A     That's correct.

DRISCOLL - REDIRECT EXAMINATION/BERNARD

1   Q     And what's the surface mercury value?

2   A     Ah, a little over 1,300 nanograms per gram.

3   Q     And is that nearly three times the Study Panel target

4   for the main stem?

5   A     Yes.

6   Q     Let's look at 9A.  That also is increasing at the

7   surface, right?

8   A     Correct.

9   Q     What's the mercury surface?

10  A     Ah, almost 2,000 nanograms per gram.

11  Q     Many times the Study Panel target for the main stem; is

12  that correct?

13  A     Correct.

14  Q     Let's look at 26A.  Also increasing at the surface,

15  correct?

16  A     Correct.

17  Q     What's the surface value?

18  A     Ah, a bit over a thousand nanograms per gram.

19  Q     More than twice the Study Panel target?

20  A     Correct.

21  Q     Okay.  Let's look at the Orland River cores on the

22  second page of Joint Exhibit 89.  What about 2B here, is that

23  increasing at the surface?

24  A     Yes, it appears to be.

25  Q     What's the mercury concentration at the surface?

DRISCOLL - REDIRECT EXAMINATION/BERNARD

1   A     About 1,900 nanograms per gram.

2   Q     And let's just look at one estuary core to finish this

3   up.  Let's look at 18B.  Is that increasing at the surface?

4   A     Yes.

5   Q     What's the surface sediment concentration?

6   A     Ah, 872 nanograms per gram.

7   Q     Considerably above the Study Panel target, about two

8   times?

9   A     Yes.

10  Q     Do you confirm your testimony of earlier today,

11  Dr. Driscoll, that it's important when considering the degree

12  of mercury contamination in the river and the length of time

13  it will take to cleanse itself, that it is important to

14  consider the cores in which mercury is increasing in the

15  surface sediments?

16  A     Yes.

17  Q     Counsel mentioned to you core 27B, the one with the very

18  long half-time.  Do you remember that?

19  A     Yes.

20  Q     Now, I'm going to show you in Joint Exhibit 48, on Page

21  17, your table, where you -- you laid out your half-times, and

22  we discussed this in your direct testimony.  Do you remember?

23  A     I do remember.

24  Q     Okay.  Now, did you display recovery half-times here for

25  the main stem of the Penobscot River both with 27B and without

DRISCOLL - REDIRECT EXAMINATION/BERNARD

2251

1    27B?

2    A      I did.

3    Q      And why did you do that?

4    A      Well, I think I had mentioned this previously.  I was

5    concerned that that one value was a very large value and

6    inconsistent with the other observations for the main stem, so

7    I thought it was more -- if I want to -- you know, I -- I was

8    concerned that it had a disproportionate influence on the mean

9    calculation because it was so high.  So I -- I did it both

10   ways.

11   Q      And that was to be balanced?

12   A      I try to be balanced.

13   Q      You were asked about activated carbon.  Do you recall

14   that?

15   A      I do.

16   Q      And you testified in your deposition about activated

17   carbon on Page 274 of Defendants' Exhibit 986, and counsel

18   asked you about part of this testimony, so this is Defendants'

19   Exhibit 986, at Page 274.  And he asked you about your

20   statement that, I think the jury is still out, and you didn't

21   think that Dr. Gilmour's studies were comprehensive; is that

22   right?

23   A      Yes.

24   Q      Okay.  Now, is there a lot of work going on in the world

25   of mercury remediation involving activated carbon?

1    A     There seems to be a number of studies, and I've seen

2    some papers over the last year, yeah, I think there's quite a

3    bit of activity.

4    Q     And its -- its exact effectiveness or for how long that

5    effectiveness may last, that's -- that's being tested now in a

6    variety of places?

7    A     Yes.

8    Q     Okay.  And is that what you meant by the jury's still

9    out?

10   A     Yeah, I -- my -- you know, maybe it was a poor choice of

11   words, but I think what I meant to say was that I viewed her

12   studies as being preliminary scoping studies, and -- um, and I

13   think that there is, um, ah -- you know, and my understanding

14   was that those were interim values and that there were going

15   to be additional measurements that hadn't been reported.

16         So I -- you know, my -- what I was intending was that

17   this was work in progress and not, you know, to the point

18   where we can make a definitive statement about it.

19   Q     Now, Dr. Gilmour's studies on behalf of the Study Panel

20   were small test plots, right?

21   A     That's my understanding, yes.

22   Q     They were not meant to be comprehensive studies, were

23   they?

24   A     Ah, yes, that's my understanding, as well.

25   Q     Okay.  So let me just go up on a part of your testimony

1    that you were not questioned about on cross-examination, and

2    this is on Page 274 of Defendants' Exhibit 986, beginning on

3    Line 6.

4         Question from Mallinckrodt's counsel, I may be wrong.

5    You don't sound all that bullish about activated carbon.

6    Answer, no, no, no.  I am bullish about activated carbon.  I

7    think it's a technology, I think it should be pursued.  I

8    didn't mean to give you that impression.  Is that an accurate

9    statement of what you believe today?

10   A    Yeah, no, I think activated carbon is good.  It's --

11   it's -- it's something that needs to be evaluated.  I think

12   there have been some successes with activated carbon, and I --

13   as I say here, I think it should be evaluated.

14        I think a variety of options should be evaluated.

15   Q    Including activated carbon.

16   A    Including activated carbon, yes.

17   Q    And that might involve -- is it fair to say -- more

18   comprehensive pilot studies to test how effective it would be

19   at reducing the uptake of methylmercury by biota at Mendall

20   Marsh?

21   A    Well, I think if activated carbon was determined to be

22   the best absorbent -- best sorbent, then I would think you

23   would want -- you would want to implement a larger-scale

24   program to really evaluate it more completely, yes.

25   Q    And that could be done as part of a remediation program;

Case 1:00-cv-00069-JAW   Document 784   Filed 06/19/14   Page 130 of 188   PageID #:
10665
DRISCOLL - REDIRECT EXAMINATION/BERNARD

2254

1   is that fair to say?

2   A     Yeah, that would be a -- a pilot study that -- that, you

3   know, might be part of a next step in evaluation of the

4   potential options.

5   Q     Now, you testified -- or you were questioned at some

6   length about a Mr. Glaza.  Do you recall that?

7   A     I do.

8   Q     Okay.  And you know Mr. Glaza?

9   A     I do know him.

10  Q     And he's a competent engineer?

11  A     Seems to be a competent engineer, yes.

12  Q     Is he a -- a mercury expert?

13  A     No.

14  Q     Okay.  And the -- I want to show you something from your

15  deposition.  This is Defendants' Exhibit 986, also something

16  you were not shown when you were questioned about this, and

17  it's on Page 47, I believe, Defendants' 986, Page 47, this is

18  after an extensive discussion at your deposition about

19  Mr. Glaza.

20        Starting at Line 8:  I should also say that I think I

21  know a lot more about mercury than he does, and I know about

22  other things that he -- you know, he's more concerned on the

23  engineering side, where I sort of bridge the science and

24  engineering side, I think.  Is that an accurate statement from

25  your point of view?

DRISCOLL/REDIRECT EXAMINATION/BERNARD

2255

1    A       Yeah, I think so.

2    Q       And -- and should a remediation program, if the court

3    orders one, involve both competent engineers and competent

4    mercury scientists?

5    A       Yes, I think so.

6    Q       And is that a necessary combination in order to -- in

7    order to devise and carry out effective remediation?

8    A       I think it could be very valuable, yes.

9    Q       Now, there were some questions that seem to suggest that

10   you're merely an academic.  Do you remember -- remember that?

11   A       Well, I am an academic.

12   Q       Yes, and -- and we brought that out on direct

13   examination.

14           The question I have for you is whether you also have

15   practical experience in working on remediation projects?

16   A       I enjoy remediation projects.  I mean, I think a good

17   engineer needs to understand the discipline and the nuances

18   and the practicalities, um, so I, ah -- you know, I'm quite

19   interested in -- in aspects of -- of remediation projects --

20   all aspects of remediation projects.

21   Q       And have you been involved in various aspects of

22   remediation projects in the past?

23   A       I have.

24   Q       Okay.  Now, is one of the remedial measures being

25   applied at Onondaga Lake the addition of nitrates?

DRISCOLL REDIRECT EXAMINATION/BERNARD

2256

1    A      Yes, calcium nitrate.

2    Q      And how is that working out?

3    A      I think it's terrific.  I think it's been a -- a real --

4    a great success story.

5    Q      And whose idea was it to apply nitrates in Onondaga

6    Lake?

7    A      Well, I think it was an observation that a group I'm

8    involved with, involving my lab, um, observed shortly after

9    some domestic waste treatment technologies came online and we

10   noticed a -- um, with a, ah -- a step increase in nitrate

11   loading to the lake, there was marked reductions in sulfide

12   and particularly methylmercury.

13          And so we started thinking about, um, could this be used

14   as a remedial approach?  And there was a lot of give and take,

15   some lab studies, and -- and developing the approaches to do

16   the application.  But I think it's been -- it's been used for

17   a number of years, and I think it's been -- it's been quite

18   successful, very successful, I would say.  I'm quite proud of

19   it, actually.  I think it was a great idea.

20   Q      Did the idea come, in part, from you?

21   A      Yeah.

22   Q      You were shown -- withdrawn.

23          One more question on that.  Is the -- is the success of

24   nitrates -- not that particular measure, but the fact that an

25   innovative idea arose in connection with remediation that had

1    a salutary impact on a contaminated system, is that a

2    reflection of the kind of work that you think can happen in

3    this situation in the Penobscot?

4    A    Yes, I'm confident that -- you know, I think as I said

5    previously, I think there's a lot of smart people over there

6    that are looking into techniques concerning remediation.

7    There's a lot of focus on mercury, um, in remediation.  And,

8    um, I think that, um, there are opportunities to do some --

9    some effective approaches to try to remediate a site here, if

10   that's the path that -- that it's decided on to go.

11   Q    Let me show you one more thing from Defendants' 986,

12   which is your deposition transcript, and this is part of a

13   very extended colloquy of which you were shown a tiny piece.

14   And I want to see if we can spare the length of the discussion

15   and just get to the point.

16        You remember you were shown this quotation about you

17   have no idea what the next steps are?

18   A    Ah, can I read up above a little bit?

19   Q    Sure, sure.  You can also read below it, which is

20   relevant.  If you want to see the next page, let me know, and

21   I'll put it up.

22   A    Okay.  No, I think I understand the sense of this.

23   Q    Okay.  I don't know, do you recall this part of your

24   deposition, by any chance?

25   A    Ah, yeah, I think so.

1    Q    Okay.  Now, were you referring, Dr. Driscoll, here to --

2    when you say you don't know what the next steps are, that you

3    don't know what the court is going to decide?

4    A    Right.

5    Q    And --

6    A    I mean, I have no standing in this matter.  I think it's

7    the court's decision.  I'm just providing information.

8    Q    And did you mean, also, in part, that if the court

9    decides to order remediation, you don't know who's going to be

10   in charge of it?

11   A    I know nothing, know nothing.

12   Q    Okay.  And is that what you were referring to?

13   A    Yeah.

14   Q    When you said you don't know what the next steps are?

15   A    Right.

16   Q    In terms of the next steps that you would recommend to

17   the court, do you know what those are?

18   A    Oh, definitely.  I think I -- I've tried to articulate

19   those.

20   Q    Okay.  And you've testified about them at some length

21   today; is that right?

22   A    That's correct.

23   Q    Okay.  Now, finally, Dr. Driscoll, you were asked about

24   the risks that can be associated with active remedies.  Do you

25   recall that?

DRISCOLL - REDIRECT EXAMINATION/BERNARD

2259

1    A     I do.

2    Q     Okay.  And when you act on an ecosystem, do you have to

3    be careful?

4    A     Yes.

5    Q     And are there always some possible risks associated with

6    taking affirmative steps to remedy a contamination problem?

7    A     Yes, there are always risks.

8    Q     And is it part of sound remediation practice to consider

9    those risks?

10   A     Yes.

11   Q     And to monitor as you go along in an adaptive management

12   approach that you articulated and described earlier so that

13   you check yourself at each step along the way to make sure

14   those risks are under control?

15   A     Yes, that's fundamental to adaptive management.

16   Q     Are there risks from doing nothing?

17   A     Clearly, in -- in this context, yes.

18   Q     Are those risks high, in your opinion?

19   A     Yes, I think the concentrations in biota are very high;

20   the lobster fishery is closed; the concentrations in songbirds

21   around Mendall Marsh are very high.  So I think, clearly,

22   there are -- clearly, the system is impaired, and there are

23   risks associated with that.

24   Q     When you say risks associated with that, do you mean

25   risks associated with leaving it the way it is?

1   A      Yes.

2   Q      Do you believe we have enough information and insight to

3   start remediation now?

4   A      Yes.

5           MR. BERNARD:  Nothing further, Your Honor.

6           THE COURT:  Thank you.

7       Recross?

8           MR. TALBERT:  Yes, Your Honor.

9                           RECROSS-EXAMINATION

10  BY MR. TALBERT:

11  Q      Dr. Driscoll, Mr. Bernard just asked you a couple of

12  questions about your half-time for recovery calculations in

13  your -- in your Figure 3-a of your report.  Do you recall

14  that?

15  A      Yes.

16  Q      This is your rebuttal report, which is Joint Exhibit 48?

17  A      Yes.

18  Q      Let's pull up Joint Exhibit 48, Page 19, just to get

19  oriented again.

20          Now, you have -- I'd like to highlight this section.

21  You have included a number of different cores in here, and my

22  understanding is that you have plotted on this line where you

23  do not indicate that the concentration is increasing, you have

24  tried to measure and estimate a recovery half-time in that

25  core; is that correct?

DRISCOLL - RECROSS-EXAMINATION/TALBERT

1    A     Correct, I have estimated a -- a recovery half-time

2    based on an assumption of an exponential decrease to a

3    background concentration of a hundred nanograms per gram.

4    Q     Okay.  So -- so except where you have noted that the

5    core has an increasing concentration, you believe that the

6    core is decreasing, correct?

7    A     Yes.

8    Q     So --

9    A     The con -- the concentration of mercury in the sediments

10   of the core are decreasing towards the surface of the core,

11   correct.

12   Q     So let's just take a look, as an example, you have 4C

13   here, which is a core where the mercury concentrations are

14   decreasing toward the surface, and you note that it has some

15   recovery half-time of -- what would you say that is, five,

16   seven years?

17   A     It's pretty low.  I -- I -- yeah, that's probably a good

18   guesstimate.

19   Q     Let's take a look -- if I could switch to the elmo for a

20   second.  Let's take a look at -- this is the core profile for

21   that core, 4C, and if you look at the surface, we're at 108.

22   A     Yeah.

23   Q     Do you see that?  So we're essentially right at the

24   target --

25   A     Very close, yeah.

DRISCOLL - RECROSS-EXAMINATION/TALBERT

2262

1   Q      -- for that particular core.

2   A      Yep.

3   Q      And as you said, this is decreasing.

4   A      Yep.

5   Q      So, I mean, in this case, doesn't it illustrate that

6   that half-time for recovery is somewhat misleading because

7   here we have a core that's basically right at the -- right at

8   the target?

9   A      Well, it's close, but if you leave it up there for a

10  second, if you look at some of these others, you can see that

11  over these -- this period, they're progressing, all these

12  right here, in the -- in the surface sediments, you can see

13  that they're progressing towards that -- marching towards

14  lower and lower values.  So I think that, as you had

15  indicated, I don't remember the exact half-time there, but

16  it's probably less than ten years, so I think that's -- that's

17  consistent with these -- these observations.  If it continues

18  on its current trajectory, that it will get below a hundred

19  within, you know, a handful of years.

20  Q      But, I mean, we're effectively right at the target here,

21  and it's continuing to decrease, correct?

22  A      Well, as I said, I selected a background concentration

23  of a hundred, so it is above a hundred and it's marching

24  towards that, and it should get there within a few years, yes,

25  that's what the projection would suggest.

1    Q      For some of these cores, I think you mentioned with

2    Mr. Bernard -- and I'm just going to present an example of

3    this, but we can -- we can look at a number.  If you pull up

4    Figure 3a again, this is on Joint Exhibit 48, Page 19.  Yes.

5           Let's take 14RC.  This is one that you say is increasing

6    toward the surface, correct?

7    A      Yeah, I believe that's what I calculated there.

8    Q      Now, isn't it fair to say that when you're evaluating

9    whether a core is increasing toward the surface, it -- it

10   matters incredibly what period you choose to measure that core

11   from?

12   A      Well, as I indicated, the procedure that I used was

13   similar to the procedure of Dr. Santschi.  So I focused on the

14   most recent 20, 21 years of the sediment cores.

15   Q      Let's switch over to the elmo for a second and take a

16   look at the profile just for that core to illustrate this

17   point, that here is a core that you said is increasing towards

18   the surface, but if we're to look down through this core, you

19   know, within 9 to 10 centimeters out, we are -- we are looking

20   at 2,000 to 2,100 nanograms per gram, and -- and from that

21   10 centimeters towards the surface, we've almost had a -- a

22   decrease by, you know, 40, 50 percent.

23   A      Um, yes, that's true, but if all -- you also look at the

24   individual values, there's a lot of variability here.  There's

25   a lot of up and down.  And so I think this is an example of a

1    core where there's a lot of uncertainty because of the -- you

2    know, the up and down pattern.  So the projection is not going

3    to be as accurate as another core with less variability.

4    Q    Well, that's -- that's my point.  You could go down --

5    and if we were to take a period in the -- in the 17 to

6    18 inches down, we would say this is increasing at the surface

7    because you have a thousand, and the surface is 1,300,

8    correct?

9    A    Yes.

10   Q    So it really depends on the individual core and which

11   time period you select.

12   A    Well, as I indicated previously, I think that if you

13   look at an individual core, you can find any core there to

14   tell you the story that you want to -- to see, and I think

15   that the -- really what I tried to do is I tried to look at

16   all of the cores, ah, and look at what all the cores are

17   telling, and some cores are showing patterns that -- well, the

18   patterns are highly variable.

19       And, um, some of the individual cores have a lot of the

20   variability in the projection; some have less variability.  So

21   that's why I tried to summarize all the information to try to

22   look in total what the -- the pattern was in the overall

23   system.

24   Q    But isn't it fair to say that these -- these sediment

25   cores that are either disturbed or increasing toward the

DRISCOLL - CROSS-EXAMINATION/TALBERT

1    surface may not tell us a whole lot about recovery of the

2    system as a whole?

3    A      Well, um, I -- you know, I -- I don't know Peter

4    Santschi really well.  I've never met Dr. Yeager.  But I do

5    have a lot of respect for, um, Peter Santschi.  I think he

6    knows sediment cores very well, and I -- and they collected

7    the cores and they over -- they oversaw the operation.

8          And so I'm going to trust their judgment if they decide

9    a core is -- is disturbed or not.  I did not look at the

10   individual cores.  I did not make that call.  I -- I just took

11   their values.

12         I looked at -- I looked at the assumption about the

13   21-year sort of two-phase approach, where it declines rapidly

14   initially and then a slow decline.  To me that seemed

15   reasonable.  It varies from core to core.  But in general that

16   seemed to be a good cutoff in my opinion.  And so based on

17   that I used the same procedures.

18         And I think the -- there are disadvantages when you look

19   at individual cores, but I think it's useful to use the same

20   procedure in all cores, so you're consistent, and so that's

21   what I tried to do.

22   Q      Would you agree that when you're looking at various

23   cores within the system, so taking all of the Mendall Marsh

24   cores, for example, there is less variability between the

25   cores' half-time for recovery within Mendall Marsh as compared

1    to the other areas of the system?

2    A    I think that's correct.  I think my recollection was --

3    they're all heterogenous, but I thought Mendall Marsh showed a

4    more consistent pattern than -- than some of the other sites,

5    but they're still all fairly variable.

6    Q    And is one of those reasons that Mendall Marsh is a

7    relatively quiescent environment as opposed to the main stem

8    of the river or other areas of the system?

9    A    Yeah, I would think so.  It may exhibit less

10   heterogeneity; it may experience less disturbance.  I'm not

11   entirely sure.  But they do -- the cores do seem to tell a

12   more consistent pattern there.

13   Q    And Mendall Marsh, I mean, those cores would be much

14   more consistent to what you would see in like a lake-type

15   system, in that there's less turbulence in that environment.

16   A    There can be a lot of variability in lake systems, too,

17   I can attest to that.  Possibly.  I, you know -- you might be

18   right.  I'm not sure.

19   Q    You said earlier that -- when Mr. Bernard was

20   questioning you about reductions in total mercury meaning

21   reductions in methylmercury, you recall just the general

22   conversation about the relationship between total and methyl?

23   A    Can you say that again?  I'm not following you.

24   Q    I'll rephrase.  In other words, I believe Mr. Bernard

25   asked you that, if you reduced total mercury, whether you

1   would expect there to be some reduction in methylmercury in

2   the system.

3   A     Yes.

4   Q     Okay.  And is it fair, just to clarify for the record,

5   that the question -- you're not sure, if you reduced total

6   mercury, what percentage there would be a reduction in

7   methylmercury, correct?

8   A     I think there would be variability, but, in general, you

9   would expect it to be proportional if the environmental

10  conditions remained the same.

11  Q     Well, but we both know the environmental conditions

12  are -- are not the same, right?

13  A     Right.  They could change.  Very, very true.

14  Q     And we discussed earlier the variability within Mendall

15  Marsh in particular, correct?

16  A     Yeah.

17  Q     Now, we talked a little bit about ongoing sources.

18  Mr. Bernard asked you about the 240 nanogram per gram estimate

19  of what is coming from above Veazie.  Do you recall that?

20  A     I thought you asked me that.

21  Q     I did, and I believe he asked you to discuss that, as

22  well.

23  A     Okay.  Yeah.

24  Q     My question is, isn't it true that -- that if you're

25  trying to get down to a concentration of a hundred nanograms

1    per gram ultimately in the main stem, having 240 nanograms per

2    gram on particles coming from above Veazie will pose quite a

3    challenge for remediation to get down to that target of 100?

4    A    Well, first I said that I'm not -- I know that the --

5    the introductory channel -- introductory chapter for the panel

6    said 240, but I think, in Ralph Turner's chapter, the values

7    were somewhat lower than that, around 200.

8         But I think that, you know, it's really instructive to

9    look at the core that you just showed me, the one that you

10   said that was very near the -- I can't remember which one it

11   was -- 4 or 1C, which is almost immediately below the Veazie

12   Dam.  So those values are very close to a hundred.  So,

13   obviously, it somehow gets that way.

14        Now, there could be a number of mechanisms by which

15   mercury coming in could be lost.  There could be diagenetic

16   processes, which I think Dr. Rudd talked about.  There could

17   be release of mercury and then evasive losses.  There could be

18   accumulations of carbon.  There could be mixes -- mixing from

19   the open ocean, and as we've talked about, those mercury

20   concentrations are lower.  So I think there are a variety of

21   pathways by which those mercury particles can get to a

22   concentration of around a hundred, and the proof in the

23   pudding is that some of those values immediately below the dam

24   are very close to a hundred, as you -- as you appropriately

25   pointed out.

DRISCOLL - RECROSS-EXAMINATION/TALBERT

1    Q     Well, that -- that's part of where I'm getting at.  If

2    you're looking at recovery in the system, you're not looking

3    at individual cores, correct?  You're looking at averages

4    throughout the system to see whether the system has gotten

5    down to a specific target level.

6    A     I think you want to look at the whole system, as we've

7    talked about, yes.

8    Q     And given the heterogeneity within the system and

9    sediment cores, you would expect that you may have one area

10   that's somewhat low and another area that's somewhat elevated,

11   correct?

12   A     There -- there's clearly variability across the

13   sediments there, yes.

14   Q     So the -- but the broader question is, if we have

15   this -- and I understand you -- you disagree with whether it's

16   240 nanograms per gram or 200 nanograms per gram, but assuming

17   it's within that range coming from above Veazie, overall in

18   the system, doesn't that pose challenges for remediation to

19   get down to a hundred nanograms per gram on average in the

20   system?

21   A     I thought that the Study Panel recommended a target of

22   450.

23   Q     Correct, as a target, and then the background

24   concentration of 100.  But for Mendall Marsh, they have

25   recommended a target of 100, correct?

DRISCOLL - RECROSS-EXAMINATION/TALBERT

1    A    Correct.

2    Q    And would you agree that Mendall Marsh is in

3    communication with the main stem of the river?

4    A    It is, yeah.  It appears to be, yeah.

5    Q    Do you believe that Mendall Marsh can recover faster

6    than the main stem?

7    A    Um, I guess it depends on what you mean by recover.  Um,

8    the rates of recovery -- the recovery half-times based on the

9    calculations appear to be somewhat faster than the other

10   segments of the system, but it has a, um, tendency to

11   effectively form methylmercury.

12       So, um, it's -- and I think that's why the Study Panel

13   recommended a value of a hundred as the target concentration.

14   So I think, um, while Mendall Marsh appears to be decreasing

15   more quickly, it has challenges in that it's more sensitive

16   than other parts of the system, at least apparently.

17   Q    You spoke a little bit -- we've had a discussion about

18   Mr. Glaza and his experience.  I just want to make clear for

19   the record -- I mean, Mr. Glaza has a lot of experience on

20   mercury remediation; is that -- is that fair to say?

21   A    He has a lot of experience on Onondaga Lake, and I think

22   other projects, as well.

23   Q    Are you aware -- I mean, he's currently working on

24   Berry's Creek, as well.

25   A    Yes, he spoke to me about that, yeah.

DRISCOLL - RECROSS-EXAMINATION/TALBERT

1  Q     And Berry's Creek is a very large mercury-contaminated

2  sediment site, correct?

3  A     I have only good things to say about Ed Glaza.  He's a

4  good friend of mine.

5  Q     And I believe you said earlier, he's a fairly

6  understated individual.

7  A     Well, I think he's -- you know, he's -- he's a good man.

8  I think he's doing a good job.  I -- I told you, I'm very

9  impressed with what he's done in Onondaga Lake.  It's a

10 complex project, and it's -- it's a real success story, so --

11 Q     You've now -- I believe you testified you've worked on

12 this project for about a year; is that correct?

13 A     Yes.

14 Q     And other than recommend a meeting between scientists,

15 is it fair to say that in your expert report -- none of your

16 expert reports do you recommend a specific alternative to

17 address the Penobscot?

18 A     So I think I recommended that a group of people be

19 brought together to discuss remediation and brainstorm about

20 the possibilities.  Scientists were one of the groups, but I

21 think I also recommended engineers and managers to discuss

22 options for remediation.  I -- if I am making a -- a

23 recommendation that all options should be on the table, I

24 don't think I should constrain that.

25       In my expert report, I suggested some ideas that I think

1    are fruitful to consider, such as amendments in Mendall Marsh,

2    such as taking advantage of natural deposition zones, and I

3    think I made other recommendations, but I would not want to

4    constrain a group.  I think you'd want to let the group, you

5    know, look at the data, make observations.  If people asked me

6    for my opinion, I would be happy to -- to -- to weigh in.

7         But I think that, you know, I -- um, anyway, that's the

8    approach that I used here.

9    Q    You have not recommended in your expert reports or your

10   opinion a specific remedial alternative, correct?

11   A    No.

12            MR. TALBERT:  No further questions.

13            THE COURT:  Anything further?

14            MR. BERNARD:  May I briefly, Your Honor?

15            THE COURT:  Yes.

16                      REDIRECT EXAMINATION

17   BY MR. BERNARD:

18   Q    Just quickly, Dr. Driscoll.  You were shown a profile.

19   These are from Dr. Yeager's chapter, so this is Joint

20   Exhibit 6-5, Page 5-132.  You were shown one core, that one

21   that is nearly at the Study Panel 's background of just below

22   the Veazie Dam.  Remember that?

23   A    The one that was approaching a hundred?

24   Q    Yes.  The one that -- and that was decreasing.  I wanted

25   just to show you this example, which is Penobscot River core

DRISCOLL–REDIRECT EXAMINATION/BERNARD

2273

1   26A.  Do you see that?

2   A     I do.

3   Q     And this -- what do you see here in the -- you know, in

4   the 5 centimeters -- or top 5 centimeters or so by way -- by

5   way of the pattern?

6   A     Well, I see values that are around a thousand at -- or

7   1,300 at 6 to 7.  I think it decreases for a period up to 3 or

8   4, and then it goes back up again up to over a thousand in the

9   surface sediments.  So it's a -- it's got a complex pattern of

10  decreases and then marked increases.

11  Q     So the marked increases from, let's say, the

12  4-centimeter mark up to the surface now?

13  A     Yeah.

14  Q     And is this an example of one of the things you found in

15  a number of cores which is increasing mercury concentrations

16  to the surface of the sediment?

17  A     Right, this is a good example, actually.

18  Q     Now, you were asked about Mendall Marsh and it being a

19  more quiescent environment with maybe a more faithful sediment

20  deposition record.  Do you remember that?

21  A     Well, I wouldn't -- did you say faithful or --

22  Q     Well --

23  A     -- less variable?

24  Q     What --

25  A     It's more -- more homogeneous, but still quite

1    heterogenous, I should say.

2    Q    Okay.

3    A    I don't want to give you the wrong impression here.

4    It's still quite variable.

5    Q    I appreciate that.  I stand corrected.  Less variable.

6    A    All right.

7    Q    Okay.  So this is also from Dr. Yeager's chapter, Joint

8    Exhibit 6-5 at Page 5-107.  And this is one of the Mendall

9    Marsh cores, right?

10   A    Ah, yes.

11   Q    11B?

12   A    Yes.

13   Q    And what do you see here as a trend?

14   A    I see in the deeper sediments, you know, relatively low

15   concentrations on the order of 20-30 nanograms per gram, and

16   then starting around 15 -- 10 to 15, they go up in the tens

17   and hundreds, and then towards the surface, they're quite

18   high.  They're over a thousand from maybe 5, 6 centimeters on

19   up.

20   Q    And this is one of those cores in the Mendall -- within

21   the Mendall Marsh environment, where you found increasing

22   mercury toward the surface of the sediment, right?

23   A    Yes.

24   Q    Finally, with regard to specific recommendations for

25   remedial measures, were you asked to do that in preparing your

1  expert report?  Did the plaintiffs ask you to recommend a

2  specific remedial measure?

3  A     No, I was asked to review the panel's recommendations

4  and, um -- and -- yeah, I was not asked to make specific

5  recommendations for remediation.

6  Q     You were asked whether you -- in effect, the implication

7  was that what you've recommended is just a meeting.  Are you

8  recommending just that there be a meeting?

9  A     No, I'm recommending that, um -- I think that there's

10 compelling information to -- to go forward with a -- a

11 remediation approach.  I think one step in this process could

12 be to bring parties together that have information to explore

13 innovative solutions, cost-effective solutions for

14 remediation.  That's one of, I think, several recommendations

15 I made with remediation.

16       Um, so I made a number of recommendations.

17 Q     Is the meeting that you've been talking about meant to

18 initiate a more thoroughgoing process to arrive at effective

19 active remediation measures for the Penobscot?

20 A     Yes.

21 Q     And have you found, in the course of your review, that

22 there is a need for such active remediation?

23 A     Yes.

24 Q     And that that need is urgent?

25 A     Yes.

DRISCOLL - REDIRECT EXAMINATION/BERNARD; RECROSS-EXAMINATION/TALBERT
2276

1    Q     And that process can begin now?

2    A     Yes.

3              MR. TALBERT:  One last second, Your Honor.

4              THE COURT:  Sure.

5                        RECROSS-EXAMINATION

6    BY MR. TALBERT:

7    Q     The two cores that Mr. Bernard just showed you, 11B and

8    26A, have you reviewed the cesium profile in those cores?

9    A     I have, but you're really challenging me.  I don't know

10   if I've committed that to memory.

11   Q     Well --

12   A     I did look at -- I did look at the cesium.

13   Q     I will show you both of them, but I guess consistent

14   with our conversation earlier, the cesium in both of those

15   cores is elevated towards the surface.

16   A     Yes, I note that, yeah.

17   Q     And that -- that indicates a disturbed core, correct?

18   A     Well, I -- as I said before, I didn't -- um, I didn't

19   throw out cores that professor -- or Dr. Santschi and

20   Dr. Yeager accepted for their analysis.  I just simply did the

21   analysis for them.

22         Ah, so I think some of those cores have better cesium

23   profiles than others, so I just took the information that they

24   have.

25         But that core does look problematic, yeah.

1   Q      Here's -- here's the other one.  This is 11B, and that

2   also has cesium elevated right at the surface, right?

3   A      Yes.

4   Q      And those -- the sediments at the surface were not

5   deposited in 1963, as the cesium peak would indicate.

6   A      Yes.

7   Q      In terms of remedial options, we talked earlier about

8   the feasibility study, and -- do you recall that?

9   A      Ah, yes.

10  Q      Wouldn't you agree that it's possible that after

11  examining the remedial alternatives, one of which would be

12  monitor natural attenuation, that there could be a conclusion

13  that monitoring natural attenuation is the best option?

14  A      A variety of things could be included, including -- I

15  mean, could be recommended, including monitoring natural

16  recovery, yes, sure.

17  Q      But that's one option that could occur, correct?

18  A      Sure, yeah.

19  Q      And that would not be active remediation, correct?

20  A      Yeah, that's correct.

21          MR. TALBERT:  No further questions.

22          THE COURT:  Thank you.

23      Anything further?

24          MR. BERNARD:  Yes.

25                      REDIRECT EXAMINATION

1    BY MR. BERNARD:

2    Q    Two things.  You've been shown a bunch of individual

3    core profiles.  Is the point that you were trying to make

4    before that, with a data set this comprehensive, the best

5    scientific way to evaluate the information is to evaluate the

6    whole data set?

7    A    Yeah, that's what I was trying to convey.  That's

8    correct.

9    Q    And that focusing too much on any individual core is not

10   the best way, in your view, to go about analyzing the core

11   data?

12   A    Yes, that's correct.

13   Q    And is looking at the whole data set what Dr. Santschi

14   did?

15   A    Yes, I -- that -- that was the impression that I got.

16   That's certainly the approach that I used.

17   Q    And is that what you did?

18   A    Yes.

19   Q    Okay.  Now, in terms of monitored natural attenuation,

20   is it possible that if you embark on a course of remediation,

21   that the engineers and mercury scientists will come back and

22   say, there's nothing we can do about this.  Is that within the

23   realm of possibility?

24   A    I would be surprised, but it's within the realm of

25   possibility, yes.

DRISCOLL/REDIRECT EXAMINATION/BERNARD

2279

1    Q     Is it also within the realm of possibility that the

2    engineers and the mercury scientists will come back and say,

3    we can do something, but it'll cost a trillion dollars?

4    A     Yes, it's possible, yes.

5    Q     How likely do you think either of those outcomes is?

6    A     I don't think they're very likely.  I think engineers

7    try to do things in a cost-effective way.  I have a lot of

8    confidence in the engineering community, and I think that

9    engineers -- you know, they're professionals.  They want a

10   cost-effective solution.  That's -- you know, that's -- that's

11   what we try to do.

12         So I -- I have confidence in my colleagues, and I think

13   that, you know, that is the goal, to come up with a -- a

14   cost-effective solution in -- in remediation cases, yes.

15   Q     Are you confident that can be done here?

16   A     Sure, yes.

17              MR. BERNARD:  Thank you.

18              THE COURT:  Anything further?

19              MR. TALBERT:  I do, but I'll let it go, Your Honor.

20              THE COURT:  Thank you.  You may stand down, Doctor.

21   Thank you very much.

22              THE WITNESS:  Thank you, sir.

23         (The witness left the witness stand.)

24              MR. BERNARD:  Your Honor, that's it for plaintiffs'

25   witnesses.  There are a couple of things.

1          One is we have a bunch of documents that have not yet

2     been offered into evidence.  We've provided the defendant with

3     a list.  They have lodged some questions or objections with

4     regard to a number of those documents, and if Your Honor is --

5     if it's okay, we'd like to try to work --

6               THE COURT:  Sure.

7               MR. BERNARD:  -- out as many of those as we can.

8               THE COURT:  Yeah, why don't -- why don't we defer --

9     we'll leave the record open to the extent that you're going to

10    be -- you may -- you may stand down, sir, unless you want to

11    sit on the jury.

12              MR. BERNARD:  Actually, I think that would be okay

13    with us.

14              MR. TALBERT:  I think he's tried to do that already.

15              MR. BERNARD:  So if we can leave the record open,

16    Your Honor, for the -- the offering of additional documents

17    and also subject to any rebuttal evidence plaintiffs may -- we

18    may want to adduce, the plaintiffs rest.

19              THE COURT:  Okay.  Thank you.

20         And you have no objection to leaving the record open to

21    allow a narrowing down of any objections on the exhibits that

22    seem to be objected to at this time?

23              MR. TALBERT:  We do not, Your Honor.

24              THE COURT:  All right.  Thank you.  The plaintiff

25    rests.

1          MR. TALBERT:  We will call Dr. Bolger from the FDA,

2    and Mr. Schutz, my colleague, will do the direct examination.

3          THE CLERK:  Please raise your right hand.  Do you

4    solemnly swear that the testimony you shall give in the matter

5    now in hearing shall be the truth, the whole truth, and

6    nothing but the truth, so help you God?

7          THE WITNESS:  I do.

8          THE CLERK:  Please be seated.  Please state your

9    name and spell your last name for the record.

10         THE WITNESS:  Philip, one L, Michael Bolger,

11   B-o-l-g-e-r.

12   PHILIP MICHAEL BOLGER, having been duly sworn, was examined

13   and testified as follows:

14                    DIRECT EXAMINATION

15   BY MR. SCHUTZ:

16   Q    Good afternoon, Dr. Bolger.

17   A    Good afternoon.

18         THE WITNESS:  Your Honor.

19   BY MR. SCHUTZ:

20   Q    What's your area of expertise?

21   A    I'm a board-certified toxicologist.  I have been doing

22   exposure, hazard, safety, risk assessment of natural and

23   anthropogenic chemical contaminants in foods for over

24   30 years.

25   Q    Did you recently retire from a position with the U.S.

1    FDA?

2    A     I retired a little under two years ago, and at the FDA,

3    I was the head of the chemical hazards assessment group, which

4    performed these kinds of work.

5    Q     How long were you at FDA?

6    A     I started in 1978 and retired in 2012.

7    Q     And can you provide to the court a thumbnail sketch of

8    your career at the FDA?

9    A     Well, I was a staff fellow at the FDA in toxicology my

10   first two years, 1978 to 1980.

11        I then accepted a position as a staff toxicologist

12   full-time in the chemical hazards assessment group, um, and

13   worked there for the remainder of my tenure at the FDA.

14        I eventually became head of that group in about 19 --

15   the early '90s and remained in that position until I left.

16        Um, during that time, I served on various committees,

17   both national and international.  I am still currently a food

18   safety expert with the World Health Organization and have

19   served on various committees that the -- have been convened by

20   the World Health Organization to deal with the hazards, risks

21   of chemical contaminants in foods.

22   Q     How familiar are you with mercury in seafood?

23   A     One of the chemicals that I spent a large amount of my

24   time dealing with during my tenure at the FDA was dealing with

25   methylmercury, particularly starting in 1990, um -- and,

1    actually, that was the first year I served on a W -- a World

2    Health Organization special consultation on methylmercury, and

3    so ended up spending over 20 years dealing with methylmercury

4    in seafood.

5    Q    Do you have experience with FDA's work on fish

6    consumption advisories related to mercury?

7    A    Ah, yes.  In 1994, the FDA issued its first fish

8    advisory regarding methylmercury.  I was a coauthor of that

9    advisory.

10        In 19 -- in 2001, we issued a revision on that.  That

11   was in response to the National Academy of Sciences committee,

12   ad hoc committee, on methylmercury, and I was part of that --

13   the team that dealt with that, and also we performed a

14   revision in 2004.

15        And then at that time, we undertook a major effort to do

16   a net benefit assessment on the issue of fish consumption and

17   was a major -- was a major player in that effort.

18   Q    Are you familiar with FDA's efforts to monitor mercury

19   levels in commercially available seafood in the United States?

20   A    As part of my responsibilities as head of the chemical

21   hazards assessment group, on an annual basis, I -- I was

22   responsible for identifying samples for analysis for total

23   mercury and methylmercury.  This particularly became important

24   in 2 -- particularly in 2002, when the FDA convened a special

25   committee, a food advisory committee, and one of the

1    recommendations that came out of that consideration was that

2    the FDA needed to do more monitoring, so we significantly

3    expanded our monitoring at that time.

4    Q    I'd like to bring up Defense Exhibit 517, which has

5    already been admitted into evidence.  This is a list of

6    mercury concentrations in fish, FDA monitoring program.  Are

7    you familiar with this database?

8    A    Yes, I am.

9    Q    If we can turn to Page 74, which is a section I

10   discussed briefly with Professor Grandjean.  That -- on that

11   page we find some lobster data?

12   A    Correct.

13   Q    And if we go to the next page, we see lobster and

14   American lobster?

15   A    Correct.

16   Q    And then at the bottom of the page, there's spiny

17   lobster?

18   A    Correct.

19   Q    And if we go to the next page, there are additional

20   spiny lobster listed?

21   A    Correct.

22   Q    And let's go back to Page 75, prior page.  Can you

23   explain which samples are American lobster, which samples are

24   spiny lobster?

25   A    Well, the difficulty here was -- and -- and this was in

1    response to the recommendation of -- of the Food Advisory

2    Committee to expand our monitoring.

3         At that point, we had no samples on spiny lobster, and

4    so questions were raised about, what about the methylmercury

5    in spiny lobster?  So as -- as part of our expanded effort, we

6    asked our investigators in -- in our field offices to obtain

7    samples on spiny lobster.

8         Up until that point when we had lobster in our

9    monitoring -- yearly monitoring effort, um, the investigator

10   would go obtain the sample, but it was always North American

11   lobster, but the problem was sometimes they would not put

12   it -- they would not file that information as part of the

13   sample collection.

14        So everything you see above spiny, those are all North

15   American lobster.

16   Q    We can move on from this.

17        You mentioned that you're board certified in toxicology?

18   A    Correct.

19   Q    What does it take to become board certified in

20   toxicology?

21   A    Ah, one has to pass a rather extensive examination

22   process that goes on for a day and a half and after -- there

23   are three major parts to that, and after you do -- are

24   successful in passing that, you are board certified.  You then

25   have to go through a recertification process every five years.

1    I just went through my last re -- revision process and -- to

2    maintain your certificate of diplomacy by the American Board

3    of Toxicology.

4    Q     And have you published on the subject of human health

5    risk assessment, exposure assessment, and similar subjects?

6    A     For methylmercury or for contaminants as a whole?

7    Q     Contaminants as a whole.

8    A     For contaminants as a whole, but including a number of

9    publications on methylmercury where we did exposure modeling,

10   we did dose response modeling, we did safety hazard risk

11   characterization.

12         I served on -- as I said, in 1990, the WH -- excuse

13   me -- the World Health Organization, special consultation in

14   methylmercury.  I served on three committees convened by the

15   World Health Organization and the Food and Agriculture

16   Organization.  This committee is called the Joint Expert

17   Committee on Food Additives that deliberated on methylmercury.

18         I also served on a number of federal interagency

19   committees dealing with methylmercury and then published

20   peer -- in the peer-reviewed literature on -- in all the

21   subject matter that I've just described.

22   Q     Have you received awards for your work in toxicology?

23   A     Ah, in 2010, I believe it was, I received the Arthur J.

24   Lehman award by the Society of Toxicology, which is an award

25   that's given out on an annual basis for recognition of

1    superior performance in toxicology.

2         And two years after that received the special

3    commendation -- I don't remember the exact title of the

4    award -- from the Society of Risk Analysis, the Risk

5    Practitioner of the Year award I think is what it's called.

6    Q    What's your educational background?

7    A    I received my bachelor's in science degree from

8    Villanova University in 1971.  I received my Ph.D. in

9    physiology and biophysics in 1976, and then was a postdoctoral

10   research fellow for three years before joining the FDA as a

11   staff fellow in toxicology in 1978.

12   Q    So, again, you spent your entire professional career at

13   the U.S. Food and Drug Administration?

14   A    I did.

15   Q    And were you one of the federal government's leading

16   experts on methylmercury risks in seafood?

17   A    Ah, I was the lead on methylmercury for many years.

18        MR. SCHUTZ:  Dr. Bolger's CV with greater detail is

19   Appendix A to Joint Exhibit 44.

20        THE COURT:  Thank you.

21   BY MR. SCHUTZ:

22   Q    When you -- Dr. Bolger, when you were at FDA, did you

23   work on a net benefit assessment to assess risks associated

24   with mercury in seafood?

25   A    I did.

1    Q    And earlier in this trial, we heard from Professor

2    Grandjean that EPA and FDA are working on an updated advisory.

3    Last week, did the federal government issue a final net

4    benefit assessment and related draft advisory on mercury in

5    seafood?

6    A    It did, hm-hmm.

7    Q    Bring up Defense Exhibit 1224.

8         MR. SCHUTZ:  Which I'd like to move into evidence.

9         THE COURT:  Any objection to 1224?

10        MR. COLANGELO:  No objection, Your Honor.

11        THE COURT:  1224's admitted.

12   BY MR. SCHUTZ:

13   Q    So if we turn to the last page of Exhibit 1224, we can

14   see that this is an article posted to FDA's Web site on

15   June 10th, 2014.

16   A    Correct.

17   Q    And the title is new advice:  Most women and young

18   children should eat more fish.

19   A    Correct.

20   Q    If we go to Page 2 of Exhibit 1224 --

21        MR. COLANGELO:  Just to correct that, Your Honor, I

22   think it says some women and young children should eat more

23   fish.

24        THE COURT:  Right.  That's what I see on your

25   description here.  Is it most or some?

1                MR. SCHUTZ:  Most.

2                THE COURT:  I think I -- I read the word some.

3                MR. SCHUTZ:  Oh, you're quite right.

4                THE COURT:  Do you want to rephrase?

5    BY MR. SCHUTZ:

6    Q     The title is new advice:  Some women and young children

7    should eat more fish.

8    A     And I guess we'll get into this, the reason is some

9    women don't eat enough fish.

10   Q     Excellent.  Let's look at the middle two paragraphs on

11   the second page of this article.  Actually, maybe we can bring

12   up the third paragraph, too.

13   A     Okay.

14   Q     What is FDA's new advice to pregnant women, those who

15   might become pregnant, breast-feeding mothers, and young

16   children?

17   A     Well, it -- the advisory changes in terms of tone.  The

18   essence of the advisory doesn't differ a great deal from that

19   given in 2004.  But in -- in the new draft advisory, the

20   recommendation is that for some women, they need to eat more

21   fish.  They're not eating enough fish to receive the -- the

22   maximum benefits that can be realized, and -- and this is to

23   be -- to be consistent with federal dietary guidance that was

24   published in 2010, where the recommendation was that women

25   needed to eat -- consume 8 to 12 ounces on a weekly basis.

BOLGER - DIRECT EXAMINATION/SCHUTZ

2290

1   Q      And at the -- the bottom paragraph that we've enlarged

2   starting with -- by the way, do you know FDA's acting chief

3   scientist, Stephen Ostroff?

4   A      No, I was gone by the time he arrived.

5   Q      The bottom paragraph that we've pulled up and enlarged

6   starts, Dr. Ostroff adds, and then it goes on and refers to

7   science behind the USDA's recommendation not being -- having

8   been available when the agency last issued fish consumption

9   advice in 2004?

10  A      This is correct.  And this is why the net benefits

11  assessment was started at that time.  One of the problems with

12  the -- the advisories that were given beforehand was that the

13  focus was on the risks of methylmercury.  We did not have the

14  time -- and I would have to say the science wasn't probably

15  quite ready -- to -- although there was a fairly robust amount

16  of information in the scientific literature about benefits,

17  both neurological, cognitive, cardiovascular, immunological

18  benefits of fish consumption, but we didn't do at that time a

19  consideration -- a quantitative consideration of the

20  nutritional risks and benefits of fish consumption.

21         And -- and it was being perceived as a -- to limit your

22  consumption of fish.  So as part of our -- an effort to get a

23  more holistic picture of what is going on in terms of -- of

24  fish consumption, we really thought it was critical that we

25  evaluate the entire body of scientific knowledge that was

1    available that looked at just not only methylmercury, but also

2    looked at benefits.

3    Q     And we'll get to that new science shortly.

4          I'd like to move on to Defense Exhibit 1223, Federal

5    Register notice.

6               MR. SCHUTZ:  Which I'd like to move into evidence.

7               THE COURT:  Any objection to 1223?

8               MR. COLANGELO:  No objection, Your Honor.

9               THE COURT:  It's admitted.

10   BY MR. SCHUTZ:

11   Q     And we can see that this is a Federal Register notice

12   published Wednesday, June 11th, 2014, establishing a docket

13   and providing notice of an opportunity to comment on the draft

14   new guidance to the American public concerning seafood and

15   mercury?

16   A     Correct.

17   Q     And if we go to the second page of this notice under

18   background, we can see that this advice applies to fish and

19   shellfish?

20   A     Correct.

21   Q     And if we go to the bottom paragraph in this column

22   under background, on the far left of the second page of this

23   exhibit, the agency states that the 2004 consumption advice is

24   no longer entirely consistent with the most current U.S.

25   Dietary for Guidelines for Americans, jointly issued by Health

1    and Human Services and the U.S. Department of Agriculture?

2    A    That's correct.

3    Q    What's the inconsistency?

4    A    Well, the 2004 advisory was -- was a limited advisory.

5    It was eat no more than.  And after a particular consideration

6    of -- of the available information on how much fish women in

7    the United States were actually eating, it turned out that

8    women in this country were eating a lot less than that, and

9    some of them even -- particularly a lot less, and as part of

10   the 2010 new dietary guides provided by the federal

11   government, it was felt that the tone of the advisory had to

12   change to encourage the consumption of fish consumption,

13   particularly for some portion of the population of -- of women

14   of childbearing age, pregnant women to -- to enhance their

15   consumption of fish so that the maximum benefit could be

16   realized.

17   Q    And is that to encourage additional consumption

18   notwithstanding the known presence of mercury in fish?

19   A    Oh, no, methylmercury is a vital consideration in -- in

20   the net benefits assessment, very clearly.

21   Q    And let's move on to the middle paragraph, middle of the

22   page.  And if we can -- actually, let's bring up this section.

23   There's a reference to a World Health Organization report,

24   expert consultation on the risks and benefits of fish

25   consumption?

BOLGER - DIRECT EXAMINATION/SCHUTZ

1    A      Correct.  It was a World Health Organization and Food

2    and Agriculture Organization, special consultation on the net

3    benefits of fish consumption.  I was a member of that

4    committee.

5    Q      Were there other members of that committee?

6    A      Well, it was a body of international scientists.  So

7    there were over 30, 40 of us, yes.

8    Q      And if we can go back to the text and bring up this

9    section, has there been peer review of the FDA's net benefits

10   assessment?

11   A      The -- the draft assessment was issued initially in

12   2009, after undergoing extensive peer review, went on for

13   several years, and both internally within the federal

14   government, and this involved the Environmental Protection

15   Agency, the U.S. Department of Agriculture, the National

16   Institutes of Health, the Centers for Disease Control and

17   Prevention, Agency for Toxic Substances and Disease Registry,

18   and then there was external peer review by expert scientists.

19   Q      And in formulating the net benefit assessment, did the

20   agency consider all available scientific literature?

21   A      Ah, both on the -- in terms of the hazards of

22   methylmercury, as well as the extensive body of information on

23   publications that dealt with fish consumption that -- that

24   didn't specifically deal with methylmercury.  But if you're

25   looking at fish consumption, you're looking at methylmercury.

1    It may not be overt, but it's -- it's part of the assessment.

2         So all of that information was considered.

3    Q    Let's move to Defense Exhibit 1225.

4              MR. SCHUTZ:  Which I'd like to move into evidence.

5              THE COURT:  Any objection to 1225?

6              MR. COLANGELO:  No objection, Your Honor.

7              THE COURT:  It's admitted.

8    BY MR. SCHUTZ:

9    Q    And, Dr. Bolger, is this the draft updated advice by FDA

10   and EPA concerning fish consumption?

11   A    It -- that's correct, it is.

12   Q    If we can turn to Page 4 of the draft advice.  There's a

13   list of commonly consumed seafood, including American lobster,

14   information on mercury content, and omega 3 fatty acid

15   content?

16   A    Correct.

17   Q    And has the agency in the draft advice issued last week

18   suggested a mercury content of 47 micrograms of mercury per

19   4 ounces of cooked fish?

20   A    I believe that -- that's -- that's correct, yes.

21   Q    And if we can compare this to Defense Exhibit 514, which

22   I discussed with Professor Grandjean and pull up Appendix 11,

23   we can compare those values to the 2010 dietary guidelines

24   that I discussed with him.  And if we can enlarge in Appendix

25   -- this is 1.  We can bring up -- actually, let's back out of

1    that and bring up the values for lobster, which is what I'd

2    like to compare, which is right here.

3        Are the values for mercury and omega 3 nutrients used in

4    the USDA and DHHS's Dietary Guidelines for Americans, Defense

5    Exhibit 514, the same values just published by the agency in

6    the draft advice?

7    A    Yes, I believe they come from the same data set,

8    correct.

9    Q    Okay.  And if we can go back to Defense Exhibit 1225,

10   Page 4, we can see that the values are the same.  Do you see

11   that?

12   A    Yes.

13   Q    Okay.

14   A    As I said, they are the same, same data set.

15   Q    Let's move to question number 10 in this document.

16   There's a section Q and A.  Let's see if we can enlarge that.

17   The agency, in its draft guidance, asked, should I -- or poses

18   a question, should I be concerned if I eat one serving of the

19   four fish you recommend against eating?  And then provides an

20   answer.  What's the agency's answer?

21   A    Well, the agency answered this, no, you don't have to

22   worry about that if you do it on an infrequent basis.  This

23   gets to the issue of a single meal, whether it poses a risk.

24   And in the agency's opinion -- and I agree with it -- a single

25   meal is not -- does not represent a risk issue.  It's -- for

BOLGER - DIRECT EXAMINATION/SCHUTZ

2296

1   methylmercury, it requires consistent, ongoing exposure over a

2   period of time of weeks to months.

3        So if -- if you were pregnant and you had a swordfish

4   meal, would this be a cause of concern?  And the answer is no.

5        The answer is here, you know, try to abide by these

6   recommendations as -- as well as you can.

7   Q    And if we can to questions 11 and 12 on this same page,

8   I had some discussion with Professor Grandjean about the

9   safety of eating tuna.  What's the agency's draft advice

10  suggest concerning tuna?

11  A    Well, canned white tuna -- okay -- which is the most

12  common canned tuna in -- in the marketplace has on average

13  levels about 0.1 methylmercury, and -- and is actually

14  identified as a low methylmercury fish in -- in the new

15  guidance as one to seek out.

16       Then you have the issue of albacore -- canned albacore

17  tuna, which has about threefold higher level of methylmercury.

18  And this -- this arose as a concern back when the 2004

19  advisory was being considered, and so the advice here is still

20  consistent.

21       If you have one -- and it says here, 6 ounces of canned

22  albacore, which can be really two cans, a week, then you

23  should eat other low-methylmercury fish.

24  Q    I'd like to move on to Defense Exhibit 1226.

25            MR. SCHUTZ:  Move that into evidence.

BOLGER - DIRECT EXAMINATION/SCHUTZ

2297

1          THE COURT:  Any objection to 1226?

2          MR. COLANGELO:  No objection, Your Honor.

3          THE COURT:  It's admitted.

4    BY MR. SCHUTZ:

5    Q    Is this the final net benefit assessment issued by the

6    agency last week?

7    A    It is.

8    Q    If we can go to Page 6 of the document.  Was -- in the

9    top of Page 6, second paragraph, is there text confirming that

10   this has been peer-reviewed?

11   A    It does.

12   Q    The agency received over 460 public comments?

13   A    Ah, it did, yes.

14   Q    And this document was reviewed by government scientists

15   both within and outside FDA?

16   A    Ah, numerous times, went back and forth more times than

17   I care to recount, yeah.

18   Q    Were you personally involved in preparing the draft of

19   this document?

20   A    I was.

21   Q    Does this net benefit assessment reflect the best, most

22   currently available information on methylmercury risks in

23   seafood?

24   A    It's the best available consideration of the totality of

25   the science, including that of methylmercury, on the net

BOLGER - DIRECT EXAMINATION/SCHUTZ

2298

1  effect of fish consumption and on health, yes.

2  Q    I'd like to move to Page 33, second paragraph of this

3  document and ask you to comment for some historical

4  perspective.  I mean, was there a time when we were more

5  concerned only with the risks of mercury in fish without

6  considering the benefits of fish consumption?

7  A    Um -- and this is not just pertaining to methylmercury.

8  This is always a problem when you deal with a contaminant in

9  food.  You're so focused on the risk issues and you have your

10 blinders on.

11      But with food, it's a package of chemicals, so it's not

12 just methylmercury, it's lots of other things.  So one of the

13 things that I was always concerned about and -- was that there

14 was -- and I was aware of the body of information about

15 benefits, that we needed to bring this into the -- into the

16 assessment process.

17 Q    And if we can go to Page 17, Paragraph 4 of this

18 document.  Let me ask, is the only benefit of eating fish

19 omega 3s, or are there other benefits in terms of nutrients

20 and so forth?

21 A    Oh, clearly, yeah.  Fish are not omega 3s, and, you

22 know, they're not -- they're not a matter of taking a fish oil

23 capsule.  There are lots of other beneficial constituents,

24 vitamins, essential nutrients.  So one has to be cognizant of

25 the fact that when you're looking at the benefits of fish

1   consumption, omega 3s are clearly part of the -- of the

2   consideration, but they're not the whole story.

3   Q     And if we can move to Page 25, second paragraph of this

4   document.  Also for some perspective, how long has

5   methylmercury been found in fish?

6   A     Ah, as long as fish have been around and you've had

7   volcanos, basically.  Mercury in the ecosystem has been part

8   of the ecosystem well before humans started walking the

9   planet.  Ah, so it's part of the -- of the consideration, the

10  totality of mercury burden in the ecosystem.

11  Q     Let me move to Page 20 of this document and ask if we

12  can enlarge the top half of the page.  Can you give us an

13  overview of the methodology used by the agency to complete its

14  net benefit assessment?

15  A     Sure.  This is a thumbnail sketch of what -- what the

16  assessment involved, which is a very, very complicated

17  assessment.  I mean, you know, the -- the details are very

18  complex.

19        But, first of all, there was an identification of certain

20  health -- you know, what were the key adverse health effects

21  that occur from eating fish.  And in the 2009 draft, we

22  identified, obviously, the effects on fetal development,

23  cognition, in utero risk.  We looked at the cardiovascular

24  outcomes.

25        As part of the revision process on that draft, it was

1    decided that the cardiovascular outcomes would be left for

2    later consideration, and -- and the focus in the newest

3    rendition of the net assessment is focused entirely on the

4    fetal outcomes.

5    Q    Is there a scientific consensus on whether mercury poses

6    a cardiovascular risk?

7    A    Um, that whether methylmercury does?

8    Q    Yes.

9    A    Ah, there is some -- I would have to call it equivocal

10   evidence.  It's -- there's not -- there's not a lot of

11   evidence.  Some of it is one way; some of it's another way.

12   It -- as part of the -- the international committees I dealt

13   with, I was on, we considered it, but as -- we just could not

14   conclude that for methylmercury, that it was having a

15   detrimental effect on cardiovascular outcome.

16   Q    And in studies looking at whether seafood -- consumption

17   of seafood has net cardiovascular benefits?

18   A    Right.  Now, that evidence is much more robust, and that

19   -- that literature has been in place for many, many years.

20   Q    And what's the relevance of that literature in

21   understanding whether mercury has adverse effects on

22   cardiovascular outcomes?

23   A    Well, in the 2009 draft, our analysis indicated that

24   there was a clear net benefit when you looked at

25   cardiovascular outcomes.

1        Um, it was also clear that you -- that methylmercury may

2   be playing a -- an attenuation.  It may -- it may somewhat

3   reduce that benefit, which is what we found with the fetal

4   outcome, too, so -- but, again, the new document is focused

5   entirely on fetal outcomes.  Okay?

6   Q    Yeah.  And let's turn back to the methodology.  And was

7   the next step after identifying health effects, assessing

8   exposures in the U.S. to commercial fish?

9   A    Went through an extensive consideration of potential

10  exposures to -- to fish as -- as a whole in the marketplace

11  and to the individual 47 species that could be found in -- in

12  the -- in the marketplace.

13       We then undertook an extensive dose-response analysis

14  using all the available human epidemiology literature on fetal

15  outcomes.  This included the Faroe Island study, the

16  Seychelles Island study, the New Zealand study, the -- the

17  Avon Study in the UK, and so we're talking about a huge data

18  set here.

19       That's one of the -- the -- the incredibly -- we have an

20  incredibly robust data set here, unlike anything I've ever

21  seen for any other chemical.

22       And so we -- we looked at all the available information

23  on the net -- negative outcomes in terms of neurocognitive

24  development and -- and also the net effect on fetal outcomes

25  in terms of fish consumption.

1    We then integrated that exposure assessment with a dose

2    response to -- to give an overall net assessment of -- of --

3    of effects on IQ and verbal development in -- in children --

4    infants and children.

5    Q    And if we can go to Page 19 of -- of this exhibit,

6    fourth paragraph, was this quantitative risk assessment

7    conducted using standard practices and procedures?

8    A    For risk assessment?  Yes.  So in risk assessment, there

9    are four major steps:  You -- you identify the hazard; you

10   estimate what levels are found of the contaminant in the food;

11   you estimate how much food people consume; you estimate what

12   the exposure is; you do a dose-response assessment; and then

13   you get -- you do your quantitative-risk characterization.

14   Q    Let me pull up Footnote 4 at the bottom of this page and

15   just ask you to comment on the difference between a

16   quantitative risk assessment, such as the net benefits

17   assessment, and a safety assessment.

18   A    Well, this goes way back.  Most people, when they talk

19   about risk assessment, they're -- what they're really

20   referring to is what I call a safety assessment, and what I

21   mean by that is, um, the safety assessment paradigm was -- was

22   developed in 1954 by Lehman and Fitzhugh, and what it involves

23   are really two major considerations:  One is a consideration

24   of the -- of the hazard and the dose that's associated with

25   that effect and what we call a no observed adverse effect

1    level.  In other words, that's the dose level at which you're

2    not seeing adverse effects, but if you go higher, you start to

3    see adverse effects.

4         You then divide that NOAEL by what was called and is

5    still called a safety factor.  You'll hear another term.  It's

6    called an uncertainty factor, a UF.  An SF and a UF are one in

7    the same.  And -- but it does confuse people because it sounds

8    like they're dealing with two different concepts, and, no,

9    they're -- they're one in the same concept.

10        And you take that NOAEL, and you divide it by a default

11   factor of generally 10 to get at a -- a threshold value.

12   Okay.  And this threshold value can be called an acceptable

13   daily intake; it can be called a minimal risk level; it can be

14   called a tolerable daily intake; or it can be called a

15   reference dose, RfD.

16        You then compare that to an estimate of your exposure.

17   If your exposure estimate is below the -- let's say the RfD,

18   you -- you determine that there's -- it's safe or there's no

19   risk, you're done.  If you're over -- your estimate of

20   exposure is over this threshold value, it's unsafe, or you are

21   defined in a qualitative way as being at risk.

22        But you're not quantitating the risk.  You're just over

23   this threshold value, but there is no quantitative estimate of

24   the probability of an effect occurring above that threshold

25   value.

1    Q     So where it says here, a safety assessment calculates a

2    single low level of exposure to a potential food safety

3    hazard, e.g., methylmercury, that's deemed to be without

4    appreciable risk, although not necessarily free of all risk

5    over a long period of time, for example, a lifetime of

6    exposure, the -- that -- an example of that would be the

7    reference dose?

8    A     Correct.  The reference dose -- and, actually, if you

9    look at the definition, you can see it on the Environmental

10   Protection Agency's Web site, is defined as a chronic value.

11   Q     And the next sentence suggests that a safety assessment,

12   such as what was involved in arriving at the reference dose,

13   does not quantify that risk or estimate the magnitude of an

14   adverse effect or estimate the consequences of exposure above

15   the safety assessment level?

16   A     No, it does not do that.

17   Q     And what you were describing then is a safety or

18   uncertainty factor, a margin of 10?

19   A     That's the default factor.  You can use less than 10.

20   If you have specific data to that chemical contaminant, you

21   could then reduce that factor to some lower factor.

22   Q     So is it correct to say that an exceedance of the

23   reference dose puts someone at some quantifiable risk of an

24   adverse outcome?

25   A     No, because the paradigm doesn't allow you to make that

1    estimation.  All -- all it is is you've exceeded the threshold

2    value, and it's -- it's qualitatively described as being at

3    risk.  But you don't know how that risk has changed once you

4    go over that threshold value.  That risk -- your risk may not

5    change one iota until you go many fold above it.

6    Q    Is there still a margin of safety built into these kinds

7    of threshold factors, like the reference dose?

8    A    That's another misconception.  That somehow if you go

9    over this threshold value, your safety margin disappears; it

10   goes instantly to 0.  No, it does not.  If you're slightly

11   over, it may not be 10, it may be 9.5, it may be 8, but you

12   still have a margin of safety there.

13   Q    In its net benefit assessment, did the federal

14   government look at effects on populations and on a population-

15   level basis, as well as effects related to consumption of

16   particular species of fish?

17   A    Yes.  One of the comments that we got after we issued

18   the 2009 draft, because we looked at fish consumption in toto,

19   and the issue there was that there are five species that

20   dominate the marketplace, and so when you're looking at

21   consumption and, therefore, exposure and risk, it's really

22   coming from these five fish -- your tuna, your shrimp, your

23   pollock, your salmon, and your catfish -- and then you have a

24   lot of other species.  There are 47 species in the

25   marketplace.

BOLGER - DIRECT EXAMINATION/SCHUTZ

2306

1    And so one of the comments we -- well, from a number of

2    individuals was, well, what about the individual species?

3    Shouldn't you do an estimation of the risks for salmon and for

4    orange roughy and for swordfish and etc.?  So we -- we

5    undertook that and added that to the assessment, and so you

6    have 47 different net benefit assessments now.

7    Q    Let's look at the population-level results first, and if

8    we can turn to Page 155, Paragraph 1, get right to the heart

9    of the matter.

10   What did the agency find after assessing the risk posed

11   by methylmercury in seafood in the United States?

12   A    Now, this is for overall consumption of commercial fish,

13   for 99.9 percent of the population, there was a net -- there

14   was a net benefit no matter what -- how we looked at it.

15   There was no net negative benefit.

16   And the net -- for the baseline -- okay -- the -- it was

17   estimated that there was an improvement in IQ of .67 to .69,

18   and I know that doesn't sound like a lot, particularly on an

19   individual basis, but on a population basis -- ah, we've

20   always tended to look at these impacts on IQ on a population

21   basis.

22   Q    Let's -- let's move on to the individual species --

23   A    Sure.

24   Q    -- because I think we can have a little bit of a longer

25   discussion there.

1    A        Hm-hmm.

2    Q        If we can move to Page 224, Figure D-3.

3    A        Right.  So here is the -- are three models.

4    Q        And if we can just bring up --

5    A        Okay.

6    Q        -- the bottom graph.

7    A        Sure.  And this is look -- looking at verbal for ages 9

8    -- 6 through 9, and what you have here is a graph where on the

9    Y axis, you have the change in IQ, and on the horizontal axis,

10   you have grams of fish consumed per day.

11        The central estimate, which is the dark line, and then

12   you have your bounding estimates, your 5 and 95 percent

13   confidence limits, you -- what you see here is you consume up

14   to 50 grams a day and then you hit a plateau; in other words,

15   you hit -- you could eat more fish, but you are not going to

16   see an improvement in benefit, and it stays flat until you get

17   out to almost 200 grams.

18        And we saw this -- no matter which way we looked at it,

19   you know, that -- it would vary, you know, slightly less than

20   50, a little over 50, but you always saw this plateau when you

21   looked at fish in toto.

22   Q        And this is showing us the effect of consumption of the

23   average fish -- average concentrations of methylmercury?

24   A        Correct.

25   Q        And we can move then to Page 227, which shows us what?

1    A    Well, this is looking at an analysis, again, the figures

2    are the same.  Okay.  On the Y axis, you have your change in

3    IQ.  On your horizontal axis, you have grams of fish per day.

4    For -- this is for, again, canned albacore.  Canned albacore,

5    again reiterate, has higher methylmercury levels than the

6    average fish in the marketplace, which is the -- the average

7    is about .17, I believe, whereas with albacore, it's .3.

8         But you see the same kind of pattern here, where you --

9    you get your maximum benefit.  Here it's about 45 grams a day.

10        Now, with albacore, though, what happens is as you

11   consume more fish, the benefit starts to reduce.  Okay?  Now,

12   you -- in the central estimate, you never get into a negative.

13   Now, your lower confidence bound starts to go negative when

14   you get up to 150 grams a day.

15   Q    So is this telling us that even with canned albacore,

16   with .3 parts per million mercury, there's a net benefit --

17   A    Right.

18   Q    -- no matter what reasonable con -- consumption rate is

19   applied?

20   A    Right.  And what's happening, once you go beyond the

21   point out here, what's happening is methylmercury is -- is

22   attenuating that benefit because of the higher level of

23   methylmercury.

24   Q    And if we can go to Page 104, this same information is

25   found in a chart -- you can bring up the top third or so of

1   the chart.

2   A      Right.

3   Q      And if you'd just slide it down a little bit to -- to

4   get albacore, which we were just looking at.  Canned albacore

5   tuna, .35 parts per million methylmercury level.  And can you

6   walk us through the columns and what they're showing us.

7   A      Sure.  This is the impact on IQ.  Now, this is

8   different.  Okay.  Before I was looking at verbal outcomes,

9   but, as I said, we looked at IQ.  Verbal is used because

10  that's the earliest index of a possible adverse effect.  Okay?

11  IQ integrates a lot of other measures of development besides

12  verbal.

13      So this is IQ for 9 years of age.  And what you have

14  here in the first column are the species of -- of the fish.

15      They are sorted in the next column by the mean

16  methylmercury level.

17      And then in the -- in the middle column, you have the

18  ounces per week to reach the maximum benefit, like I showed in

19  the several graphs.  So with albacore, it's 9 ounces per week.

20  Okay.  That's to reach the maximum benefit.

21      The size of that maximum benefit is 2.8 IQ points, and

22  they're -- in the parentheses, you have your confidence

23  bounds.

24      Okay.  And then the final column is the ounces per week

25  required to realize a net negative outcome.  And in this case,

1    it's 67 ounces per week.

2    Q     And what's the take-away?  What -- what is this telling

3    us for purposes of risks of methylmercury in seafood?

4    A     Well, again, no matter how we looked at it, whether we

5    looked at fish as a whole, we looked at all the individual

6    species -- and I want to point out that, you know, look at

7    these -- these two, swordfish and shark.  Now, these are two

8    on the do not eat list, but even for these two species, there

9    is a benefit achieved.  Now, you get to a point where you

10   start seeing a net negative earlier because they have much

11   higher levels of methylmercury.

12         So it's clear that you achieve a net benefit to a

13   certain level of consumption.  It varies from species to

14   species.  And that benefit -- okay -- will still remain

15   positive -- okay -- until you get, for some species, like

16   swordfish and shark, where you -- the net effect becomes

17   negative, but you have to eat a lot of that fish, and for

18   other fish, you have to eat amounts that are well beyond what

19   people would reasonably be expected to consume.

20   Q     If we can go to Page 101 of this net benefit assessment,

21   second paragraph.  Do you agree with the agency's position

22   that all 47 fish are estimated to be beneficial when consumed

23   in amounts per week that are not unusually high?

24   A     Correct.

25   Q     Is lobster one of those fish?

BOLGER - DIRECT EXAMINATION/SCHUTZ

2311

1    A      It's on the table, yes.

2    Q      And if we assume the lobster in some of the areas that

3    are in discussion in this trial have higher parts per million

4    mercury, say they get up as high as what we were just looking

5    at, .35 albacore tuna, what's the take-away there?

6    A      That -- that you will still realize a net benefit.  Um,

7    you will realize a net benefit.  You will achieve it at a

8    certain level of consumption that's probably very similar to

9    albacore.  If you go over that, you will still see a net

10   benefit.  It will be attenuated.  It won't be at what you saw

11   at the maximum, but it will still be a net positive.

12   Q      And if we can go back to the chart we were just looking

13   at and bring up the top quarter again, is this suggesting,

14   then, that eating fish with .35 parts per million mercury has

15   a net benefit so long as one doesn't eat more than 67 ounces

16   in a week?

17   A      Ah, that's -- that's -- that's right, hm-hmm.  But to

18   realize the optimum, it's 9 ounces a week.

19          MR. SCHUTZ:  Your Honor, this might be a good place

20   to stop.

21          THE COURT:  All right.  Very good.  We'll stop for

22   the day, and we'll reconvene at 8:30.  Thank you.

23      (Proceedings concluded at 2:20 p.m.)

24

25

2312

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Julie G. Edgecomb                    June 19, 2014
Julie G. Edgecomb, RMR, CRR             Date
Official Court Reporter