```
 1                    UNITED STATES DISTRICT COURT

 2                        DISTRICT OF MAINE

 3   MAINE PEOPLE'S ALLIANCE      )
     and NATURAL RESOURCES        )
 4   DEFENSE COUNCIL, INC.,       )
                                  )
 5              Plaintiffs        )
                                  )              CIVIL ACTION
 6                                )
          vs.                     )    Docket No. 1:00-cv-00069-JAW
 7                                )
                                  )              BENCH TRIAL
 8   HOLTRACHEM MANUFACTURING     )
     and MALLINCKRODT LLC,        )
 9                                )
                Defendants.       )
10

11                        VOLUME XIV

12               TRANSCRIPT OF PROCEEDINGS

13       Pursuant to notice, the above-entitled matter came on

14   for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15   Chief District Judge, in the United States District Court,

16   Bangor, Maine, on the 20th day of June, 2014, at 8:36 a.m.

17   APPEARANCES:

18   For the Plaintiffs:          Mitchell S. Bernard, Esquire
                                  Aaron S. Colangelo, Esquire
19                                Rachel E. Heron, Esquire
                                  Jared J. Thompson, Esquire
20
     For the Defendants:          Patricia H. Duft, Esquire
21                                Sigmund D. Schutz, Esquire
                                  Jeffrey D. Talbert, Esquire
22

23                   Julie G. Edgecomb, RMR, CRR
                        Official Court Reporter
24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

INDEX OF PROCEEDINGS

Page:

Testimony:  (see below)

INDEX OF WITNESSES

Page:

PHILIP MICHAEL BOLGER  (called by Mr. Schutz)

Continued Direct Examination by Mr. Schutz          2315
Cross-Examination by Mr. Colangelo                  2350
Continued Cross-Examination by Mr. Colangelo        2389
Redirect Examination by Mr. Schutz                  2426
Recross-Examination by Mr. Colangelo                2440

RUSSELL EDWARD KEENAN  (called by Mr. Schutz)

Direct Examination by Mr. Schutz                    2445

INDEX OF EXHIBITS

| Joint Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 86 | Burger, et al., Mercury and Selenium Levels in 19 Species | 2414 | 2414 |

| Plaintiffs' Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 97 | U.S. FDA, Mercury Levels in Commercial Fish and Shellfish | 2366 | 2366 |

| Defendants' Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 753 | Knobeloch, et al., Critical Review of Mercury Toxicity | 2382 | 2382 |
| 1024 | Bolger - Female Blood Mercury | 2437 | 2437 |
| 1071 | Keenan - Location- and Food-Specific Factors | 2464 | 2464 |
| 1072 | Keenan - Exposure Point Concentrations for Penobscot | 2478 | 2478 |
| 1082 | Keenan - Risk-Specific Concentrations in Edible Tissues | 2486 | 2486 |
| 1085 | Keenan - Mercury in Edible Lobster Tissue | 2489 | 2490 |

1          (Counsel present in open court.)

2          (Philip Michael Bolger, having been duly sworn, resumed

3     the witness stand.)

4                THE COURT:  Good morning.  Are you ready to proceed?

5                MR. SCHUTZ:  Yes, Your Honor.

6                THE COURT:  You may do so.

7                MR. SCHUTZ:  Thank you.

8                     CONTINUED DIRECT EXAMINATION

9     BY MR. SCHUTZ:

10    Q     Dr. Bolger, good morning.  Welcome back.

11    A     Good morning.

12                THE WITNESS:  Your Honor.

13    BY MR. SCHUTZ:

14    Q     Yesterday we were talking about FDA's final quantitative

15    assessment of the net effects on fetal neurodevelopment from

16    eating commercial fish.  To what extent does this assessment

17    advance our understanding of the risks of mercury in seafood?

18    A     From my perception, it's a major advancement.  It's

19    really a game-changer because, as I briefly indicated

20    yesterday, when considering a contaminant like methylmercury,

21    we tend to focus on the risk issue, and, of course, food

22    involves lots of other factors, many of which are beneficial

23    to health -- essential for health exactly.

24          So in order for us to integrate all this information

25    together and to come up with a holistic quantitative estimate

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2316

1   of the net effect on health, we undertook this major effort to

2   devise a new approach to quantitating the net effect, the net

3   risks to health of consumption of fish, which includes

4   methylmercury.

5   Q    Now, you testified yesterday that you had worked on this

6   document in draft while you were at the FDA?

7   A    We started this effort right after the 2004 advisory.

8   We -- we had really wanted to do it before then, but time just

9   didn't allow it.  This is a major undertaking, because we

10  realized that while we said that fish were good to eat in our

11  advisory, we hadn't done any kind of quantitative analysis to

12  consider what that meant -- meant in terms of health.  So this

13  was started in 2004, so it's been about a ten-year effort.

14  Q    Did the FDA add additional analysis before finalizing

15  this document, in other words, after you had left the agency?

16  A    Yes, they did.  One of the comments that was received

17  from a number of individuals when we issued the draft

18  assessment in 2009 was that we needed to do an assessment on

19  individual species, that's all 47 species in the marketplace.

20       So -- so what you have now in this new assessment is --

21  is this substantial additional analysis, assessment of the

22  risks from individual species of consumption of the species.

23  Q    And if we can bring up Table V-7 from this document.

24  Now, assuming hypothetically that lobster contained .35 parts

25  per million methylmercury on average, same as albacore tuna,

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

1   how much lobster would a pregnant woman have to consume per

2   week to be at risk of net adverse effects?

3   A     Well, what we have here is an analysis that involves the

4   impact on IQ at 9 years of age involving a number of

5   epidemiological studies -- including, I should say.

6         So what you have here in this table in the first column

7   is the species, and in this case, it's albacore tuna.  The

8   mean level in the next column is .35 parts per million, or

9   350 parts per billion.

10        The next column is the number of ounces you would have

11  to consume per week -- and, again, this is for a pregnant

12  woman -- to reach the maximum net effect, net beneficial

13  effect.  That's 9 ounces.

14        The maximum size of that net increase in IQ is 2.8, next

15  column.

16        And then the last column is the number of ounces you

17  would have to consume per week for the net effect to go from

18  net beneficial to net adverse, and that point is 67 pounces

19  per week.

20  Q     The values in this table are expressed on a per-week

21  basis.  Why use a per-week metric versus a per-day or

22  per-month or some other time period?

23  A     Well, I -- I alluded to this yesterday.  When you're

24  dealing with a contaminant like methylmercury, where the

25  hazards are associated with steady-state blood levels or hair

1    levels that require a consistent level of exposure over a

2    period of time of weeks to months, it is more appropriate to

3    express exposure over a longer period of time.  If you express

4    it over -- on a daily basis, there is the temptation to

5    compare that to some single event consumption exposure, but in

6    regards to methylmercury, that's not appropriate.  We're not

7    talking about an acute toxin here.

8    Q    Will a single meal of seafood yield a benefit at any of

9    the concentrations listed on this table?

10   A    A single meal of -- by itself?  No.  You have to

11   consistently eat the fish over a period of weeks to months.

12   Q    And will a single meal of seafood at any of these

13   concentrations cause an adverse net effect?

14   A    No, again, you have to eat the fish over a period of

15   weeks to months.

16   Q    Let's look at how these rates of consumption per week

17   compare to consumption rates in the American population.  And

18   if we can turn to Exhibit 513.  Is there data on rates of

19   seafood consumption by women of childbearing age in the United

20   States?

21   A    Yes, this is the NHANES study that we briefly touched

22   upon yesterday.

23   Q    And are you familiar with the NHANES program?

24   A    Ah, yes, and I'm specifically familiar with the work

25   that's been done in mercury and methylmercury.  We asked the

1    Centers for Disease Control, which manages this program, back

2    in 1998 to include mercury and methylmercury, along with our

3    compatriots at the Environmental Protection Agency.  And so

4    this was started in -- in 1999, and the latest results were

5    reported by EPA in its 2013 report, up to 2010.

6    Q    Did you personally play a role in adding mercury to the

7    NHANES program?

8    A    Well, that was what we did in 1998.  We -- we went to

9    the Centers for Disease Control and requested that this be

10   included, along with a lot of other biomarkers that they

11   normally look at every year.

12   Q    Is this the most recent report of blood mercury

13   concentrations in U.S. women of childbearing age?

14   A    It is.

15   Q    We can turn to Table 5, in this report, on Page 22.  Can

16   you walk us through what this table is showing us?

17   A    All right.  This is the percent of women age 16 to

18   49 years of age, that's women of childbearing age, whose blood

19   levels exceed the blood level that's equivalent -- equivalent

20   to the RfD.  The RfD is expressed as a daily amount that you

21   ingest.  Okay.

22        So what we need to do is because NHANES reports the data

23   in blood is to compare it to the blood level that corresponds

24   to the reference dose, which is 5.8 part per billion of

25   micrograms per liter.

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2320

1        So what you have in the left-hand column are the years
2    of the survey release.  Okay?  And as you can see in the first
3    two years of release, 1999 to 2000, about 7.13 percent of the
4    women in the survey population exceeded the reference dose.
5    They slightly exceeded it.  There was not a -- this was not a
6    major exceedance, but a -- it was slightly over 5.8.  And that
7    was for total mercury.  And for methylmercury, the percentage
8    was 6.77.  Okay.
9        Then as you go to subsequent releases, you can see that
10   the next reported year, which was 2001 and 2002, this
11   exceedance for total and for methylmercury was roughly halved.
12   So now for total 3.67, the women were over the reference dose
13   equivalent blood level and 3.14.  Okay.
14       The next release, the levels went down further, but not
15   as -- not as -- not as -- to the same amount.
16       And then in the -- in the following two releases,
17   actually, in '05 and '06, there was a slight increase, as you
18   can see here.
19       And in -- in '7 and '8, it -- basically unchanged.  All
20   right.
21       And then in -- in the most recent release, '9 and '10,
22   we're at 2.3 over the reference dose for total, and 2.14 for
23   methylmercury over the reference dose blood level.
24   Q    And so the FDA, EPA, the federal government have been
25   aware that a certain percentage of American women of

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

1  childbearing age have blood levels in excess of the blood

2  level equivalent to the reference dose for many years?

3  A     For ten years.

4  Q     And has the response by the federal government been to

5  ban the sale of seafood containing higher levels of mercury?

6  A     No, the response was to devise a more appropriate risk

7  management approach, and that was to advise women of

8  childbearing age to limit consumption, particularly of certain

9  fish that had high levels of methylmercury.

10  Q     Has the response been even to require point-of-sale

11  labelling on cans of tuna fish or in fish markets?

12  A     No, there -- there was a petition filed with the FDA to

13  do that, and the -- the agency recently -- I think it was last

14  year -- rejected that -- that proposal.

15  Q     So the federal response to this information has simply

16  been to issue advice to American women?

17  A     Well, it's not simply -- simply issue advice -- issuing

18  the advice is not simple.

19  Q     Okay.

20  A     So let me correct you on that matter.  This is a very,

21  very complicated process of devising a message that will be

22  understood by the population of concern -- okay -- and that

23  they will act accordingly.

24        One of the major concerns we had all along in devising

25  advisories is what we call spill-over.  That other members of

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

1    the population who are not at risk would perceive the message

2    that they ought to avoid fish or avoid certain species of fish

3    when, in fact, they were not at risk.  So that was a major

4    concern all along.

5         So tailoring the message so that women of childbearing

6    age would act accordingly to minimize their methylmercury

7    exposure is a very, very dicey matter.

8         In -- oh, I think it was in 2003, Emily Oken at Harvard

9    published a study, she at that time was looking at a cohort of

10   women of childbearing age in the Boston area, and right --

11   halfway between her study our advice came out, and it was an

12   amazing coincidence.  She was measuring fish consumption of

13   these individuals.  Right when the advice came out, fish

14   consumption in the study population tanked.  It really was a

15   remarkable response, and it was probably because they had

16   heard this message about fish consumption and minimized their

17   intake of fish.

18   Q    And is part of the concern that that advice has caused

19   American women to eat less fish, which is actually a greater

20   hazard?

21   A    Well, that was a major concern all along and why we

22   undertook the net benefit assessment because of that very

23   concern, because there are risks associated with -- if you

24   don't eat fish, what do you substitute it with?  Are you going

25   to eat a hot dog?  You know, there are -- you know, there are

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

1    unintended consequences when you come out with advisories, and

2    you need to be mindful of them.

3    Q    And are these advisories issued strictly for scientific

4    reasons, or are political considerations, policy

5    considerations factored in?

6    A    I wouldn't say political.  I would say policy

7    considerations certainly are a matter.  Yes, the -- the

8    consideration of risk is an important matter, but there are

9    other risk communication issues that are very important.  How

10   do you -- how do you effectively craft a message that will be

11   reaching the target -- target audience?

12         I think those are the major considerations in devising

13   the advisory.

14   Q    Now, we discussed yesterday the difference between a

15   quantitative risk assessment, such as FDA's net benefit

16   assessment, and a safety risk assessment.  Very broadly, can

17   you summarize the distinction between the two?

18   A    Well, we went over this yesterday, and I'll briefly go

19   over it again.

20         In a safety assessment, you are taking a dose level from

21   a study, and, in this case, a human study.  I'll use the RfD

22   as an example.  You're taking the benchmark dose -- okay --

23   from that study of 58 parts per billion -- that's the blood

24   level -- and you're dividing by a factor of 10.

25         So you're coming up with a threshold hazard level of

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

1    concern, and the problem is -- and this -- and I don't want to

2    pick on the RfD.  This -- this pertains to an ADI or TDI or an

3    MRL, all the ones I talked about yesterday, the minimum risk

4    level, total daily intake, and acceptable daily intake.  If

5    you slightly exceed that value, what does that mean?  Does

6    your risk change?

7        And the problem is this paradigm doesn't tell you.

8    Okay.  All it says, you are in exceedance of the reference

9    dose.  In the case of the NHANES, it was -- it's 2.3 percent

10   of the women are slightly over.  Well, has their risk changed?

11   Okay.  And this paradigm doesn't inform us at all as to how

12   that -- how that may change.

13       And so what you really need to think about then is what

14   is the next assessment that's required.  You know, you don't

15   want to go to these -- these very extensive complicated

16   assessments unless you need to.  This is the fit for purpose.

17   Using RfDs 98 percent of the time is entirely appropriate.

18   You can screen-out problems.

19       But when you're over the level and it's a very important

20   public health issue, there needs to be some way of coming up

21   with quantitative estimates of risk as exposure changes; in

22   other words, as you go over the reference dose, how does your

23   risk change?  Does it change if you're slightly over, if

24   you're twofold over, if you're threefold over?  And so the net

25   benefit assessment is an attempt to actually do that, to take

1    dose response information, to integrate it with consumption

2    and exposure assessment to get quantitative estimates of the

3    impact on IQ.  How does the IQ change as you -- as your level

4    of consumption of fish increases?

5    Q    And we discussed yesterday the steps in a safety risk

6    assessment, hazard identification, dose response, exposure

7    assessment, risk characterization.  I don't want to ask you to

8    go over those four elements again, but I -- I do want to focus

9    on exposure assessment.  Again, what is dietary exposure

10   assessment?

11   A    Okay.  It can be very complicated or very simplistic.

12   Okay.  In its simplest form, what you want is a -- you can

13   have a point estimate, a single value for the level, in this

14   case, of methylmercury in the food or the fish of concern.

15   You want to know how much of that fish is consumed.  Okay.

16   And you want to know about the frequency.  Is it consumed

17   daily?  Is it consumed twice a week?  Is it consumed two times

18   a year?  To come up with an estimate of exposure -- all right

19   -- over an identified period of time.

20   Q    Now, you've reviewed Professor Grandjean's opinion, his

21   report?

22   A    I have.

23   Q    And in his report, does he have or include exposure

24   information specific to the food items in the Penobscot?

25   A    He does not.

1  Q     Are you critical of that?

2  A     I am.  I think it's using default factors that are not

3  based on empirical evidence specific to the -- the food is

4  fraught with all kinds of problems, in my opinion.  I think it

5  could give you a very incorrect and very imprecise estimate of

6  exposure to the contaminant of concern.

7  Q     What would the benefit be of gathering information on

8  meal sizes, rates of consumption of the specific food items of

9  concern in terms of understanding the risks associated with

10  consumption of those items?

11  A     I would have much greater confidence that the estimates

12  -- okay -- of exposure from the consumption of the specific

13  food -- okay -- are tailored -- again, this is fit for purpose

14  -- because I'm going to then compare that to some threshold

15  value and reach a decision as to whether there may be a risk

16  or may not be a risk.

17        So I, as a risk assessor, as a safety assessor, I want

18  to have information that is as specific as I can get it to

19  that particular food from a consumption exposure standpoint.

20  Q     Let's talk about the reference dose in a little more

21  detail.  That was issued by the U.S. Environmental Protection

22  Agency when?

23  A     I believe it was in 2001.

24  Q     And the reference dose for methylmercury is

25  .1 micrograms per kilogram of body weight per day?

1    A    Correct.

2    Q    Is the reference dose meant to be a guideline applicable

3    to per-day consumption?

4    A    It is not.

5    Q    Why is it expressed on a per-day basis?

6    A    I wish it weren't.  This is why -- and I pointed this

7    out yesterday -- the World Health Organization, the Joint

8    Expert Committee on Food Additives expresses it on a weekly

9    basis for that very concern that people will use that on a

10   single-occasion basis, in other words, a single-day basis, to

11   compare to some level of consumption and exposure, and as

12   stated by the WHO, that's inappropriate.

13        It was -- the reference dose is not designed to do that.

14   As I pointed out yesterday, for an acute toxin, EPA devises

15   what is known as acute reference doses.  So they -- EPA makes

16   a clear distinction.  But it's unfortunate it's expressed that

17   way because it -- it can be used that way.

18   Q    Has EPA issued acute reference doses?

19   A    For pesticides, it has, as has the World Health

20   Organization.

21   Q    Is there an acute reference dose for methylmercury?

22   A    No.

23   Q    And you mentioned earlier that the reference dose

24   relates to a steady-state concentration of methylmercury in

25   the blood?

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2328

1    A    Correct.

2    Q    Now, is blood the exposure of concern for mercury?

3    A    It's the -- it's the dose metric that is used in the

4    epidemiological studies.  Hair can be used, but some of the

5    studies don't use hair; some use toenail, but everybody tends

6    to use blood.  The only draw-back to blood is, again, it's an

7    -- there's an assumption of steady state that -- that what

8    you're looking at is a metric of -- of consumption over a

9    period of weeks to months.

10   Q    Has anyone been able to measure the change in mercury

11   blood level before and after consumption of a meal of seafood?

12   A    Ah, there are several studies, very -- very limited

13   study populations.  I don't -- and these -- these were done

14   over 20 years ago.  They were done in adult men -- all right

15   -- where they measured blood levels -- you have to do this on

16   a serial basis; in other words, you have to follow the blood

17   -- the blood levels hourly over a period of 24 hours, and

18   there were several publications 20 years ago that looked at

19   that.

20   Q    And those are studies involving repeated consumption --

21   A    No, no, this is single meal.

22   Q    Single meal?

23   A    Yeah, single meal.

24   Q    Is a single meal of seafood containing mercury at the

25   levels found in the United States market sufficient to cause a

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2329

1    meaningful change in blood mercury level?

2    A    No.

3    Q    And if a single meal of seafood doesn't cause an

4    appreciable change in blood mercury levels, is there a risk?

5    A    No, because you're -- you have to sustain that level

6    because all the epidemiology evidence is based on steady-state

7    blood levels.  So if you compare a slight rise over a period

8    of hours in blood lead, that's an apples to oranges

9    comparison.  It's an inappropriate comparison.

10   Q    Now, we heard earlier in this trial that Professor

11   Grandjean was involved in the Faroe Islands epidemiological

12   study?

13   A    He was one of the principal investigators, that's

14   correct.

15   Q    And one of the other large-scale epidemiological studies

16   of methylmercury in a population was conducted in the

17   Seychelles Islands?

18   A    That's correct.

19   Q    Where are the Seychelles Islands?

20   A    They are in the middle of the Indian Ocean.

21   Q    Were the investigators in that study affiliated with any

22   U.S. research institution?

23   A    They are -- they are -- or they were and still are.  The

24   team -- the research team is at the University of Rochester

25   School of Medicine.

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2330

1   Q     Did the federal government provide grant support for

2   that study?

3   A     Ah, the primary funding agency was NIH and -- National

4   Institutes of Health, National Institute of Environmental

5   Health Sciences.  They have funded that study for -- Lord --

6   it's been 15 years now.  The U.S. Food and Drug Administration

7   also supplied some additional funding for about six to seven

8   years.

9   Q     Did you visit the Seychelles while that study was under

10  way?

11  A     I did.

12  Q     What did you -- did you observe the investigators

13  testing children for neurodevelopmental deficits?

14  A     I did.

15  Q     What did the Seychelles study show, broadly?

16  A     What they have reported -- and there have been a number

17  of publications, like there have been out of the Faroe Islands

18  study -- and their levels of exposure are fairly similar to

19  the Faroe Islands, the difference is that in the Faroe

20  Islands, the participants in that study consumed pilot whale.

21  That was a major source of methylmercury.  They did consume

22  cod, which has a very, very low level of methylmercury.

23       So most of their exposure was coming from pilot whale,

24  whereas in the Seychelles, it's all fish, and they eat a

25  variety of fish in those islands.

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2331

1    Q     Based on your experience at the FDA, is pilot whale

2    consumed to any appreciable degree in the U.S.?

3    A     No.

4    Q     How do the rates of mercury exposure among the

5    Seychelles islanders compare to rates of mercury exposure in

6    the U.S. population among women of childbearing age?

7    A     Ah, well, the -- the rates of methylmercury exposure in

8    both studies are far in excess of what we see in the NHANES

9    blood survey data information.  They're, you know, 5 to 6 part

10   per billion, whereas in the NHANES, it's well down -- it's in

11   the, you know, 1 to 2 part per billion.

12   Q     And how does the rate of methylmercury exposure in Japan

13   compare with the U.S. rate of exposure?

14   A     Well, the Japanese rely heavily on the seafood -- on

15   seafood, and they're -- on average, their rates of consumption

16   of seafood are five times greater than in the United States.

17   Q     Is there evidence of adverse effects on the Japanese

18   population as a result of mercury exposure?

19   A     Ah, to date, none.  There is an ongoing study, but it's

20   not far enough along to -- that's roughly equivalent to the

21   kind of study that was done in the other two areas, but so

22   far, no.

23   Q     Now, did EPA derive the reference dose from the Faroe

24   Islands study?

25   A     They did.

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2332

1    Q      And is the reference dose protective of women of

2    childbearing age and pregnant women?

3    A      It is.

4    Q      Why?

5    A      Well, because you're using a -- you're relying on a

6    large, robust, well-designed study, and you're using a tenfold

7    default uncertainty safety factor.  So I have the utmost

8    confidence that that threshold value of concern is very

9    protective of even the most sensitive segments of the

10   population.

11          Remember, the Faroe Islands study included over a

12   thousand subjects.  That's -- that's -- I mean, we are blessed

13   with information here in regards to methylmercury.  When I

14   compare it to the lead studies, I mean, this is substantial

15   improvement.

16          So the sensitive subjects are going to be in the Faroe

17   Islands study, so they are accounted for in terms of the

18   results that have been reported out of that study.

19   Q      To give some perspective on the reference dose, let me

20   bring up Defense Exhibit 1070, a demonstrative.

21   A      Yes.  Okay.  What you have here is a presentation of the

22   various human health reference levels for methylmercury, and

23   on the Y axis, you have the reference level expressed as

24   milligrams per kilogram of body weight per day.  We've been

25   hearing it expressed as micrograms.  So this is a thousandfold

1   higher, but it -- so the -- but the units are the same.  Okay.

2   I just want to point out.  If you would express it as

3   micrograms, it'll be expressed as, for instance, the reference

4   dose would be not .0001; it would be .1.  Okay.  I just wanted

5   to point out that distinction.

6        So here you have on the -- along the Y axis, you have

7   the -- the various health -- human health reference levels.

8   On the left-most column, you have the EPA reference dose.  On

9   the next, you have the value that was devise -- devised by

10  Health Canada in 2007.  All right.  So you can see it's

11  slightly higher.

12       In the next column, we have the level developed by the

13  European Food Safety agency -- that's the European FDA -- all

14  right -- and you can see that it's fairly similar to what was

15  developed by Canada, but, again, in -- higher than the

16  reference dose.

17       You can see in the next column, which is Europe

18  described as Europe.  It's actually the Food and Agriculture

19  and World Health Organization Joint Expert Committee on Food

20  Additives, and it -- you can see it -- it, again, a little bit

21  higher than the other two, and, again, higher than the

22  reference dose.

23       And in this column here is the minimal risk level

24  developed by the Centers for Disease Control, and, again, it's

25  even a little higher than the others and, obviously, higher

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2334

1    than the -- the reference dose.

2         And the last column, here, this is the benchmark dose

3    that was developed in the Faroes.  This is the 58, you know,

4    parts per billion blood level, and -- which was divided by a

5    tenfold uncertainty factor to develop the reference dose.

6         So the EPA reference dose is the lowest and most

7    conservative value that's been developed of these five

8    different organizations.

9    Q    Is it, to your knowledge, the most conservative value

10   anywhere in the world?

11   A    It is.

12   Q    And although the Footnote A uses a 2013 reference, the

13   reference dose was actually developed prior to the Canadian

14   dose, the European dose, the World Health Organization dose?

15   A    Right.  It was 2001, um, and EPA has -- has maintained

16   that level since then.

17   Q    So we've talked about the reference dose and some of

18   these screening benchmarks, the NHANES data on the

19   distribution of methylmercury levels in the U.S. population.

20   Let's integrate that and bring up Defense Exhibit 1024, a

21   demonstrative.

22   A    All right.  I'm going to take a little time to go

23   through this figure.  It's -- what I tried to do here was

24   capture all of -- of the relevant information.

25   Q    And, actually --

1    A    Yeah.

2         MR. SCHUTZ:  Although we marked this as a

3    demonstrative, I think it is a summary of information.  I

4    would like to move it into evidence.

5         THE COURT:  Any objection?

6         MR. COLANGELO:  One second, Your Honor.  Can I hold,

7    Your Honor, to check the data source at our next break?

8         THE COURT:  Well, that's a little awkward.  I mean,

9    you're going to ask questions on it, right?

10        MR. SCHUTZ:  I don't mind proceeding with it as a

11   demonstrative, and we can allow opposing counsel to consider,

12   if that's acceptable to the court, or --

13        THE COURT:  Okay.  What I'm going to do is I'm going

14   to admit it subject to your further objection.

15        MR. COLANGELO:  Thank you, Your Honor.

16        THE COURT:  So we don't lose track of it.

17        MR. COLANGELO:  Thank you.

18   BY MR. SCHUTZ:

19   Q    So -- and we need to walk through this slowly.  First of

20   all, what I would like to start with is the blue line to the

21   left.

22   A    Okay.  Now, what this is -- okay.  I'd like to start

23   with title.

24   Q    Okay.

25   A    This is a presentation -- graphical presentation of the

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2336

1    latest results, 2009, 2010 from NHANES of the blood levels in

2    -- there's -- in the study population.  This is thousands of

3    subjects.

4         And so what you have here in the blue line is what we

5    call cumulative frequency, and really what this is is -- is

6    the percent of the population.  So let's start with 0.2.  That

7    means 20 percent of the women are below this level, and then

8    we go up to 0.5.  That means 50 percent -- okay -- of the

9    population.  Then we go up to 0.9.  That means 90 percent of

10   the subjects are -- on -- of the study population are below

11   that, and 1 is a hundred percent.

12   Q    When you say below that, below what?

13   A    90 percent of the subjects in the study population are

14   on this blue line below that .9 level.

15   Q    Right.  In mercury in blood in parts per billion?

16   A    Is along the Y axis here.  Okay.

17   Q    So 50 percent --

18   A    I mean, the X axis -- sorry.

19   Q    -- of the U.S. population has approximately what mercury

20   level?

21   A    Could you repeat that?  Could you repeat that, please?

22   Q    So 50 percent of the U.S. population is at or below the

23   blood mercury level found next to the .5?

24   A    Correct.  And that level would correspond to about 1

25   part per billion, down here.

1    Q     And so what this is showing is that 90 percent of the

2    U.S. population has a blood mercury level at or below

3    approximately what?

4    A     Oh, it's probably around 2 part per billion.

5    Q     Okay.  And then let's walk through the three --

6    A     So what you have --

7    Q     -- vertical lines to the left.

8    A     Sure.  So what you have here in the first line, the

9    dashed red line, is the reference dose.  Okay.  And so what

10   you see here is -- and we talked about a table previously.

11   This is where the 2.3 percent of the women in the study

12   population were slightly over the reference dose.  Okay.

13         You then go to the next line -- the dashed green line --

14   and this is the -- the W -- World Health Organization, Food

15   and Agriculture Organization, and there less than 1 percent of

16   the subjects are over that -- slightly over that value.

17         And then you go to the next line, the purple dashed

18   line, that is the minimal risk level of the Centers for

19   Disease Control and almost none are over that level.

20   Q     Let me ask you, generally, what are the three lines to

21   the right-hand side of this exhibit?

22   A     Okay.  These are -- generally, these are the values that

23   were used by these three organizations to develop their

24   threshold hazard levels.

25   Q     And what does the gap between the -- the three lines to

1    the left and the three lines to the right represent?

2    A     Well, this is your margin of safety.  So in the case of

3    the EPA, it's tenfold.  In the case of the other two groups,

4    it's less than tenfold.  World Health Organization used 6.4, I

5    believe it was, and the CDC used a factor of 4.5.

6    Q     Can you walk through which -- you've got the no adverse

7    effect level, CDC, which --

8    A     Which is which?

9    Q     Which is which, yeah.

10   A     Okay.  We'll start with the -- and I'm here right now.

11   Okay?  We'll start with the first one on the left.  That's the

12   grashed -- the dashed green line, and that's the WHO value,

13   which was based on a consideration of both the Seychelles and

14   the Faroe Islands study, and they came up with a numerical

15   average that they then used -- okay -- and divided by a safety

16   factor of 6.5 to come up with their value right here.  Okay?

17         Then CDC -- right here -- the gold line or yellow line,

18   they used -- they relied on the Seychelles Island study

19   entirely, and they used an uncertainty factor, safety factor

20   of 4.5 to derive their minimal risk level.

21         And then the middle line here, the dashed red line,

22   that's the benchmark dose lower confidence limit from the

23   Faroe Islands study of 58 parts per billion that EPA used with

24   a tenfold uncertainty factor to derive the reference dose.

25         So bear in mind, these values here are either no

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2339

1   observed adverse effect level; in other words, there's no

2   adverse effect.  So any adverse effect that was -- would have

3   had occurred in those studies would have been at higher

4   levels, out in this direction.  Okay.

5       So the benchmark dose lower confidence is the minimal

6   threshold dose associated with a 5 percent increase in risk --

7   okay -- and you would have to go to much higher levels of

8   exposure to see more substantial, more overt effects.

9   Q    So for someone who -- and the 5.8 is -- corresponds to

10  the reference dose, that's the steady-state blood level that

11  corresponds to the reference dose?

12  A    Correct.

13  Q    So if someone consumes enough fish to get their blood

14  mercury level up to 20 parts per billion, what is this

15  showing?

16  A    Well, what it shows me is that you're over these

17  threshold values.  But you're still well below these dose

18  levels that have either been noted as being no observed

19  adverse effect level or over the most conservative estimation

20  of the minimum effect level noticed in the study population.

21  So you don't have a -- a margin of safety as large as what you

22  have with these threshold values, but you still have a margin

23  of uncertainty safety there.

24  Q    And if someone eats enough fish to get up to 30 parts

25  per billion, same thing?

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2340

1   A     Yes.

2   Q     Now, to the extent that -- and this blue line represents

3   individual data points?

4   A     Yes.

5   Q     The women of childbearing age?

6   A     Yes.

7   Q     So that's actual data, not the results of a model or

8   projection?

9   A     No, these are measurements in the large study population

10  that -- that's part of the NHANES study.

11  Q     And this blue line represents thousands of survey

12  responses by actual U.S. citizens?

13  A     By women of childbearing age, yes.

14  Q     So if an individual on this blue line, say, someone at

15  the .7 --

16  A     Hm-hmm.

17  Q     -- starts to consume a lot more seafood, what happens to

18  their blood mercury level?

19  A     On an individual basis now?

20  Q     Right.  An individual dot on this line starts eating

21  more seafood?

22  A     They'll start moving this way.

23  Q     They'll start moving up the blue line?

24  A     Right, their blood level is going to go higher, right.

25  And bear in mind, when you -- if you can get rid of this

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

1    yellow, please -- thank you.  What you have up here, these

2    individuals, they're heavy consumers of fish.  Okay.  I mean,

3    NHANES has captured -- okay -- the people in the upper percent

4    are people who are eating fish.  Okay.  The people down here

5    are not eating fish or very little of it.

6          And so what you have up here and other studies have

7    shown that the higher blood levels are associated with

8    subjects who have access to the fishery and they tend to live

9    along the coast.

10   Q    So we've talked about what happens to an individual.

11   They move up the distribution curve, shown in blue here, if

12   they start consuming more fish.

13   A    Right.

14   Q    Let's talk about at a population level.  How would this

15   blue line look in Japan?

16   A    Ah, well, it's -- you'd shift the whole curve to the

17   right fivefold, right.  So it's going to be somewhere out like

18   this.  Okay.  I mean, I -- you know, I'm just drawing this

19   graphically, but, you know, simplistically.

20   Q    Conceptually?

21   A    Yeah, that's what's going to happen.

22   Q    And if we look at a population in a state like Maine

23   that's coastal, likely higher levels of fish consumption, how

24   would the blue line look in Maine, conceptually?

25   A    Well, again -- before I begin.

1    Q     Yeah.

2    A     They're right here, they're right up there.

3    Q     Okay.  So they're already in?

4    A     They're in there.  These are the heavy -- Maine is

5    represented in the survey -- okay -- along with the other 49

6    states.  And the heavy consumers are going to be up here.

7    They're going to be the folks who live along the coast, who

8    rely on seafood more than if you live in Iowa.

9    Q     Now, based on what we know about the risks associated

10   with mercury in seafood, is it reasonable scientifically to

11   assume substantial risk if someone is over the reference dose?

12   A     Again, as I pointed out before, the safety assessment

13   doesn't inform me.  I don't know -- it doesn't tell me

14   anything about how risk changes over that threshold value.

15   Q     Now, we've heard testimony -- and I want to, to quote

16   Mr. Talbert, switch gears.

17         We've heard testimony earlier at this trial that the

18   reference dose may be too high.  Do you agree?

19   A     No.

20   Q     Has the position that the reference dose is too high

21   been accepted by the U.S. Government?

22   A     Ah, no.

23   Q     Is that the consensus scientific position that the

24   reference dose is too high?

25   A     No.

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

2343

1   Q     Now, we've heard testimony about a closure of an area to

2   lobstering and a black duck advisory.  Is it reasonable from a

3   lay perspective to think that that suggests some kind of

4   significant human health risk?

5   A     I think that's a reasonable conclusion, yes.

6   Q     But from a scientific perspective, does that tell us

7   anything?

8   A     No, there are many reasons why -- that go into closures.

9   Human health risk may be one of them.

10  Q     And are there policy factors that go into decisions like

11  closing an area or issuing advisories?

12  A     Yes.

13  Q     And that's distinct from scientific considerations,

14  correct?

15  A     It's an important factor, yes, but distinct from, yes.

16  Q     We heard some testimony earlier in this trial that we

17  should consider maximum mercury concentrations in particular

18  seafood items?

19  A     Yes.

20  Q     And a position is, well, someone's going to eat that

21  lobster or duck, what's your response?  Do you think that's a

22  helpful way of looking at risk?

23  A     No, I think it's uninformative, and it's misrepresenting

24  what the potential public health risk may be.  If you were

25  dealing with an acute hazard, that's -- you know, that's one

1  issue, but we're not dealing with an acute hazard here.  We're

2  dealing with a -- a contaminant requires a steady-state level

3  of exposure over a period of weeks to months.  So it's

4  inappropriate to look at a single event like that.

5       And the likelihood that someone would eat that high

6  level all the time is exceedingly remote, and, therefore, you

7  can't use the highest level to represent -- okay -- the --

8  what value is found -- the range of values that are found in

9  that food on a day-to-day basis.

10  Q    And we had some discussion earlier in this trial about

11  -- with Professor Grandjean about some default values, body

12  weights, and meal sizes.  What's the problem with using

13  default assumptions?

14  A    Well, if you're -- if you're going to devise a screening

15  value, that's fine as a first cut, as a first attempt to try

16  to get a handle on what the risk is.  But -- and -- and it

17  works a lot of times because then you look at your exposure,

18  you're below that.  You don't have to go any further.

19       But if you're over that value, then you need to refine

20  your estimate.

21  Q    And would a way of refining the estimate be to gather

22  information on reasonable actual meal sizes, consumption

23  frequency associated with particular food items of concern?

24  A    Most definitely, yeah.

25  Q    And we heard testimony earlier at this trial that

1    someone who eats a seafood item with 3 parts per million

2    mercury shouldn't eat seafood for some particular number of

3    days, a week or more.  What's your response?

4    A      Ah, well, not numerically, I mean, I -- you know, to put

5    a precise estimate of the number of days, that's -- that's

6    merely a math exercise.  That's not based on the biology

7    because remember when you ingest a meal that -- of fish and it

8    contains methylmercury -- and this is in women of childbearing

9    age -- that's being diluted in 4 and a half to 5 liters of

10   blood, so you have a substantial dilutional event going on

11   here.

12        It's bound by the red blood cells, and if it's bound by

13   the red blood cells, it's not available, and then it's

14   distributed throughout the body.  And that increase in blood

15   is transient and dissipates over a -- a matter of hours.

16   That's why you have to sustain consumption and exposure in

17   order to maintain the increase in the blood mercury level.

18   Q      And you referred earlier -- and I think just now alluded

19   to -- a steady-state blood mercury level.  What does that

20   mean?

21   A      That means the day-to-day -- okay -- consistent level of

22   exposure, where you have a blood level that is sustained over

23   a period of weeks to days because, again, the metric of hazard

24   in the epidemiology studies is the steady-state blood level.

25   So if you're going to compare exposure, you have to have an

BOLGER - CONTINUED DIRECT EXAMINATION/SCHUTZ

1    apples to apples comparison.

2    Q     And we've talked a little about epidemiology, and we

3    heard earlier at this trial from a research epidemiologist.

4    Is that a distinct discipline from risk assessment and dietary

5    exposure assessment?

6    A     Very distinct, yes.

7    Q     Can you explain?

8    A     Well, an epidemiologist investigates the potential

9    association between exposure to a compound and some health

10   outcome.  In this case, it's the impact on verbal skills or IQ

11   in children -- okay -- at certain ages, 2 years, 6 to 9, etc.

12   So that's one -- that's epidemiology.

13        An exposure analyst is a -- an expert in -- I'm talking

14   about dietary exposure, because there are exposure analysts --

15   there's inhalation, there's dermal, there's all sorts of

16   avenues of exposure -- but dietary exposure, they need to

17   understand food consumption surveys, how they're divined, how

18   they're developed, what the information means, they have to

19   understand what residue levels, in other words, the range of

20   levels of methylmercury in the fish.  They then compute all

21   that to devise estimates, either point estimates of exposure

22   or range of exposures.

23        And a risk assessor takes the evidence from -- in the

24   case of methylmercury, of the evidence provided by those two

25   disciplines to integrate it into an overall estimate of risk

1    per degree of exposure.  All right.

2    Q    Let me ask you to comment on kind of a binge consumption

3    scenario, someone -- do you assess risk based on what it's

4    humanly possible to consume over a period of time?

5    A    No.

6    Q    How --

7    A    It's inappropriate.  I mean, if you're trying to do -- I

8    mean, you could do that on an individual basis if you had a --

9    if you were -- let's say, a physician, and you were trying to

10   treat.  But as a -- as a -- as a risk assessor, no, I have to

11   look at -- at exposure for a population.

12        And heavy consumers are going to be at the upper

13   percentile, so they're included in what I'm trying to come up

14   with in terms of risk estimates.

15   Q    Now, you were at the FDA for many years.  In all of your

16   years at the FDA, did you ever hear of a single case in the

17   U.S. population of methylmercury poisoning as a result of

18   seafood consumption?

19   A    I never heard or saw a documented case, no.

20   Q    Dr. Bolger, let me ask you some wrap-up questions.  Does

21   an exceedance of the reference dose equate to a meaningful

22   risk of harm associated with mercury consumption?

23   A    Does a slight exceedance or -- I mean, what do you mean

24   by exceedance?

25   Q    I'll let you explain.

1   A      Well, slight exceedance -- I would be -- you have to be

2   careful about the degree here.  So a slight exceedance is not,

3   no, it is not a meaningful.

4   Q      And how do you define slight?

5   A      Well, maybe a -- as we saw in the NHANES data.

6             MR. SCHUTZ:  Actually, we don't need that exhibit.

7   BY MR. SCHUTZ:

8   Q      Let me -- let me ask you, do we need to consider FDA's

9   quantitative risk assessment in understanding mercury risk at

10  this time?

11  A      Oh, clearly.  I mean, this has really been in my -- and,

12  obviously, I have some stake in the matter -- but I think it's

13  been a long overdue advancement in how we consider chemical

14  contaminants in the diet and the overall impact on public

15  health, yes.

16  Q      And what do the results of that assessment tell us about

17  the likelihood of risk associated with consumption of seafood

18  containing mercury at levels found in the U.S. marketplace?

19  A      That you're going to see a net benefit no matter what

20  fish you look at, even when you look at shark and swordfish.

21  There is a -- there -- for women of childbearing age, there is

22  a benefit realized.

23            Now, for certain species, that can go quickly negative

24  -- okay -- shark and swordfish, once you go above the level of

25  consumption that's associated with the maximum benefit,

1    whereas for the rest of the -- the rest of the fish supply, it

2    -- you can't achieve a level of consumption that would result

3    in a net negative outcome.

4    Q      Let's see.  We've already heard testimony at this trial

5    about where the levels of mercury found in the Penobscot study

6    area fall in relation to levels of mercury in

7    commonly-available seafood in the U.S. marketplace.  What does

8    that tell you about the extent of risk associated with

9    consumption of food items in the study area?

10   A      In looking at the -- I'm -- in terms of lobster -- okay

11   -- the levels look very similar to and below levels that are

12   found in fish that are normally consumed on an everyday basis

13   around the country, of which no concern has been expressed.

14          In regards to the eel and the duck, my opinion is really

15   predicated on I didn't see any evidence of consumption.  So if

16   you look at the absolute levels, again, I believe that duck

17   was below 1, but up around .6 or 7, I think.  And the eel was

18   slightly -- I think was about a half part per million.

19          Again, you see those kinds of levels in grouper, orange

20   roughy, other species that are consumed on a -- on a daily

21   basis.

22              MR. SCHUTZ:  Thank you very much, Dr. Bolger.

23              THE WITNESS:  Thank you.

24              THE COURT:  Thank you, Mr. Schutz.

25          Mr. Colangelo?

1          MR. COLANGELO:  Yes, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. COLANGELO:

4    Q      Good morning, Dr. Bolger.

5    A      Good morning.

6    Q      You were first contacted by the defendant on January 1st

7    of this year?

8    A      Ah, it was about that time.  I don't remember the exact

9    date, but I think that's correct.

10   Q      You were retained on January 3rd?

11   A      That's correct.

12   Q      You did no work between January 1st and January 3rdrd.

13   A      No.

14   Q      And you didn't review any materials related to the case

15   before you agreed to offer an opinion on behalf of the

16   defendant?

17   A      I did not.

18   Q      You signed the report that you submitted in this case on

19   January 9th?

20   A      Correct.

21   Q      Is that right?

22   A      Right.

23   Q      Which was six days after you were retained?

24   A      Right.

25   Q      You did not review the Penobscot Study Panel report

BOLGER - CROSS-EXAMINATION/COLANGELO

2351

1   before you drafted your report; is that right?

2   A      My focus was on the report by Dr. Grandjean.

3   Q      You didn't have the Penobscot Study Panel report when

4   you drafted your report; is that correct?

5   A      Ah, no, I did not have it.

6   Q      And you didn't review the underlying data from the Study

7   Panel report before you drafted your report either; is that

8   correct?

9   A      Um, I think I had maybe a copy of one set of the residue

10  data, but that was it.  You know, I -- very -- I didn't have a

11  lot of time.  I gave it a brief scan.

12  Q      And that -- you're referring to the 2012 monitoring

13  update?

14  A      Ah, yes, I believe that was it, yeah.

15  Q      And that, you said that you raced through it and put it

16  aside; is that right?

17  A      That would be a good way to describe it, yes.

18  Q      Okay.  You also made a supplemental disclosure -- expert

19  disclosure late Tuesday night of this week; is that correct?

20  A      Ah, correct.

21  Q      How much time did you spend on that disclosure?

22  A      It was a very brief one, outlining a few items that I

23  was going to be commenting on.

24  Q      And what you were asked to do was evaluate the report

25  filed by Dr. Grandjean; is that correct?

BOLGER - CROSS-EXAMINATION/COLANGELO

2352

1   A     Ah, initially, that's correct, yeah.

2   Q     Okay.  You did not evaluate the risk of exposure to

3   methylmercury measured in the Penobscot; is that correct?

4   A     No.

5   Q     You did not?

6   A     That's correct, I did not.

7   Q     Okay.  Let's talk about the net benefits assessment that

8   you discussed yesterday and today.

9         Methylmercury doesn't provide any benefit to the human

10  body; is that right?

11  A     That's correct.

12  Q     Okay.  There's no amount of methylmercury that's a good

13  thing to consume.

14  A     Of and by itself, that's correct.

15  Q     Okay.  Now, generally, it's healthy to eat fish,

16  correct?

17  A     Clearly.

18  Q     And those benefits of eating fish are greater if

19  methylmercury is lower; is that right?

20  A     It -- no, no, it depends on how much fish you eat and

21  what fish you're talking about.  If you recall the figures

22  that I talked about yesterday, for all fish, you achieve a

23  maximum benefit between 8 and 12 ounces, and then it plateaus

24  and it stays there.  Okay.  And you have to eat a great deal

25  before you start to see it turn in a downward direction, and

BOLGER - CROSS-EXAMINATION/COLANGELO

2353

1    what that's telling me, that you have to eat this excessive

2    amount for you to start seeing the impact of methylmercury.

3        Now, with shark and swordfish, you only have to go over

4    the maximum consumption amount ever so slightly, and it's --

5    that net effect starts to dramatically decrease, and what

6    that's telling me is that methylmercury, because these fish

7    have much higher levels, is having a net negative effect.

8    Q    The beneficial effect of eating fish is diminished by

9    methylmercury contamination; is that correct?

10   A    Not -- you know, you can't make a general statement like

11   that.  Again, if you look at those figures, you don't see an

12   impact of methylmercury until you get to very high levels of

13   consumption overall.  So you're trying to make a general

14   statement for all fish, and you can't do that.

15       I would agree with that statement for shark and

16   swordfish, where it goes -- clearly, you start to see the

17   impact of methylmercury when you slightly go over the max

18   benefit.

19   Q    So you have to make a species-specific assessment, is

20   what you're saying.

21   A    Correct, and that's why that was added to the assessment

22   at -- the draft assessment.

23   Q    And why do you have to make a species-specific

24   assessment if you want to learn about the net benefits or

25   adverse effects of eating contaminated fish?

1   A      Could you -- I'm not --

2   Q      Yeah.  Could you explain why you have to make a

3   species-specific assessment?

4   A      Oh.  Ah, when we issued our assessment in '09, we looked

5   at fish overall in the marketplace, and as I pointed out

6   yesterday, overall consumption and exposure is dominated by

7   five species.  Okay.  There are 47 species in the marketplace,

8   and five of them are dominated by -- I mean, is dominated by

9   these five species.  So the question came up, well, what about

10  the others?  What impact are they having?

11      And because they're adding, you know, on a percentage

12  basis to the market so little, you can't see the impact of the

13  species, so the suggestion was made that we evaluated each

14  species by itself to see the impact because, remember, we had

15  advised women of childbearing age not to eat four species, but

16  we had no assessment really to back that up.  We didn't have

17  any quantitative assessment of the impact of shark, swordfish,

18  tilefish, and king mackerel on IQ, and -- nor did we have one

19  on any other species individually.  Tuna was another major

20  question.

21      So if you're evaluating fish consumption generally,

22  you're not looking at individual species.  So that's why --

23  and we thought about that before we issued the '09 draft, but

24  it required a substantial level of effort.  After the draft

25  was issued, we got a fair number of comments that we ought to

BOLGER - CROSS-EXAMINATION/COLANGELO

2355

1    do that, and that's why it was done.

2    Q    And that's important to do because different species

3    have different amounts of mercury in them; is that correct?

4    A    Clearly.

5    Q    And also because different species have different

6    amounts of the beneficial chemicals that contribute to the

7    advantages from eating fish; is that correct?

8    A    Fish vary in that regard, that's correct.

9    Q    Okay.  Take a look at -- this is Defendants'

10   Exhibit 1226, Page 104, and this is from the net benefits

11   assessment issued last week that you discussed yesterday and

12   today.  And you were asked about this table earlier today.

13   And, in particular, you were asked about albacore tuna, and

14   you were asked to compare that to lobster because the mercury

15   levels in albacore tuna are similar to the levels of lobster

16   in the northern estuary here.  Do you recall that?

17   A    Correct.

18   Q    Okay.  Now, look at the top of this page, it says Table

19   5-7, IQ by nine years of age when all fish are identical

20   packages of nutrients that are the source of the beneficial

21   effects.

22        Now, we know that is not true, correct?

23   A    That's an overall general statement, correct.

24   Q    But it is not true that all fish are identical packages

25   of nutrients.  That was an assumption made for this table,

BOLGER - CROSS-EXAMINATION/COLANGELO

2356

1    correct?

2    A    For this table, that's correct.

3    Q    Okay.  So with that assumption and looking at tuna at

4    this level, you said it takes 67 ounces per week of

5    consumption to become adverse; is that right?

6    A    Correct.

7    Q    Okay.  FDA does not advise pregnant women to eat

8    67 ounces per week of tuna; is that right?

9    A    Oh, no, not at all.

10   Q    It advises women -- pregnant women and children to limit

11   their consumption of tuna to no more than 6 ounces per week?

12   A    Of albacore tuna.

13   Q    Albacore tuna, which is what's here.

14   A    Right.

15   Q    Okay.  Now, albacore tuna has substantially more of the

16   beneficial chemicals than American lobster does; is that

17   correct?

18   A    I don't know that.  If you look at -- you know, if you

19   look at omega-3, but omega-3 is only one beneficial, so I'm

20   not willing to draw that conclusion.  It has less omega-3 than

21   tuna, but there are other nutrients, vitamins, protein, so,

22   no, I would not agree with that.

23   Q    And omega-3, that's the proxy that FDA uses in this net

24   benefits assessment to measure the beneficial effects of

25   eating fish; is that right?

1  A      In an attempt to try to tease out the benefit component,

2  um, omega-3 was used as a proxy with a clear understanding

3  that it was not -- there were many other constituents in fish

4  that it was not accounting for.

5  Q      Okay.  And let me show you Defendants' Exhibit 1225.

6  This is another document that came out the same day last week.

7  This is the FDA and EPA draft advisory, the title page says,

8  Fish:  What Pregnant Women and Parents Should Know.  Do you

9  see that?

10 A      Yes.

11 Q      Okay.  Now, on -- the third page of this document, this

12 limits the -- or it lists the micrograms of mercury relative

13 to the fatty acids in fish.  And you see the value for

14 albacore tuna here --

15 A      Yes.

16 Q      -- is 1,000.

17 A      Correct.

18 Q      Okay.  And then on the other page, you see the value for

19 American lobster is 200.

20 A      Correct.

21 Q      Five times lower.

22 A      Correct.

23 Q      Okay.  And the net -- the net benefit of eating a

24 particular fish is a function of both the beneficial chemicals

25 in that fish and the harmful effects of methylmercury in that

 1    fish; is that right?

 2    A    Correct.

 3    Q    FDA in the net benefits assessment modeled by individual

 4    fish what those benefits would look like; is that right?

 5    A    Correct.

 6    Q    Okay.  This is that assessment again, Defendants' 1226,

 7    at Page 227.

 8    A    Correct.

 9    Q    And you were asked about this figure yesterday.  This

10    shows the net effect estimates -- let me zoom out a little

11    more.  This shows net effect estimates for canned albacore

12    tuna with the consumption range shown on the X axis, two

13    different graphs.  The top graph presumes that all fish are

14    equally beneficial, while the bottom graph presumes that the

15    benefit is proportional to concentrations of DHA and EPA.

16    A    Right.

17    Q    And those are the omega-3 fatty acids that we talked

18    about earlier; is that right?

19    A    Correct.

20    Q    So you see they're slightly different, and this is just

21    the example for albacore tuna?

22    A    Right.

23    Q    And this is the example you discussed yesterday?

24    A    Right.

25    Q    Assuming albacore tuna is the same as every other fish,

BOLGER - CROSS-EXAMINATION/COLANGELO

2359

```
 1   the benefit follows this upper solid curve, with an increase

 2   in IQ up to about 3.  You see the Y axis --

 3   A     Right.

 4   Q     -- is delta IQ here?

 5   A     That's right.

 6   Q     And then it starts to decline?

 7   A     Hm-hmm.

 8   Q     Okay.  What causes that decline?

 9   A     Well, the decline is probably methylmercury.

10   Q     In the bottom graph, you see relating the net benefit to

11   the omega-3s in the fish, the albacore actually does a little

12   better.  It goes above 3 before it starts its decline.

13   A     I wouldn't attribute a great deal to that difference,

14   yes.

15   Q     Okay.

16   A     Pretty close.

17   Q     So it's essentially the same you'd say.  Pretty close?

18   A     Yeah.

19   Q     Okay.  Now, let's look at another fish, because EPA mod

20   -- and FDA -- this was a joint document; is that right, or an

21   FDA-alone document?

22   A     FDA.

23   Q     Okay.  So FDA modeled this for a range of fish, but not

24   for every commercially-available fish; is that right?

25   A     Well, let me -- EPA -- excuse me.  FDA did model, I
```

BOLGER - CROSS-EXAMINATION/COLANGELO

2360

1    believe, some sports fish in here.

2    Q    Okay.

3    A    And -- and it went through a rigorous peer-review

4    process with EPA back and forth numerous times.

5    Q    Okay.  There's no model for American lobster in here; is

6    that right?

7    A    Ah, like what we just looked for?

8    Q    Correct.

9    A    No, it's in the table, but it's not -- graphically was

10   not displayed.

11   Q    Okay.  And you were shown this figure from albacore tuna

12   as an analogy for lobster or a comparison for lobster because

13   the mercury levels are similar.

14   A    Correct.

15   Q    Yesterday.  Okay.  So let's look at another example.

16   This is Page 230 of Defendants' Exhibit 1226, and this is

17   tilapia.

18   A    Yes.

19   Q    Now, how does tilapia compare to tuna in terms of its

20   mercury levels?

21   A    We're talking about albacore tuna?

22   Q    Yes.

23   A    Okay.

24   Q    Albacore tuna, I'm sorry.  I'll be specific.

25   A    Yeah, you have to be because there is a difference.

BOLGER - CROSS-EXAMINATION/COLANGELO

2361

1   It's about threefold lower.  It's down -- actually, I think

2   it's below canned light tuna.

3   Q     Okay.

4   A     Okay.

5   Q     I'll show you the number.

6   A     Yeah.

7   Q     In --

8   A     It's in the -- in the report.

9   Q     Okay.  So here, Defendants' Exhibit 1226, Page 230, you

10  have the same two types of charts again.  This is the net

11  effects, the top graph presumes that all fish are equally

12  beneficial; while the bottom graph presumes that the benefit

13  is proportional to concentrations of DHA and EPA.

14  A     Hm-hmm.

15  Q     And now here in the top graph, you see the solid line is

16  showing an increase that stays relatively steady.

17  A     Right.

18  Q     Once it increases.  In the bottom graph, though, looking

19  at tilapia as an individual fish, there is very little

20  benefit.  It seems, at least in this lower bound line, to dip

21  below slightly and only after substantial consumption does it

22  increase.  Do you see that?

23  A     When you only look at PUFA or omega-3 fatty acids.

24  Q     Correct.

25  A     So what is happening here is there are other

BOLGER - CROSS-EXAMINATION/COLANGELO

2362

1   constituents in tilapia that are accounting for the benefit,

2   and it's not omega-3s.

3   Q     But FDA, in compiling these tables that you testified

4   about yesterday and today, only looks at those chemicals,

5   those omega-3s as proxies for the benefits to do this

6   modelling; is that right?

7   A     Ah, because they're -- the -- the reason it was

8   presented that way was the evidence for omega-3 was fairly

9   robust, fairly substantial.  Investigators have spent a lot of

10  time looking at omega-3s.

11        The evidence for the other nutrients is less robust, so

12  there wasn't enough real information to do an -- and the

13  agency says this in the report -- to do an analysis of the

14  impact of other nutrients in a quantitative way.

15  Q     Understood.

16  A     Yeah.

17  Q     So just to understand what is reflected here.

18  A     Hm-hmm.

19  Q     These are projected models assessing projected net

20  benefit.

21  A     Right.

22  Q     When you compare those two factors in particular fish,

23  mercury and the omega-3s?

24  A     Correct.

25  Q     And this one for tilapia shows a different pattern

1  looking at the individual fish than for albacore tuna which we

2  just looked at; is that right?

3  A    Right, here the benefit is not coming from omega-3s for

4  tilapia.

5  Q    Well, there is no benefit indicated up to about 70, 80,

6  90 grams a day; is that right?

7  A    Right, when you're just looking at omega-3.  So -- so

8  something else in the fish is giving you the benefit when you

9  look at the fish as a whole.

10 Q    And just looking at omega-3 is what FDA did for this

11 table.

12 A    Ah, for this analysis.  That was the one nutrient they

13 -- they could quantify, correct.

14 Q    Sticking with tilapia from Defendants' 1225, this is the

15 FDA draft guidance, you see that those omega-3s in tilapia are

16 much closer to the omega-3s in American lobster, 150 and 200?

17 A    Yes.

18 Q    Do you see that?

19 A    Hm-hmm.

20 Q    Okay.  So that might be a closer comparison to the net

21 benefits of eating lobster than the albacore tuna chart.

22 Would you agree?

23 A    Not necessarily because the tilapia comparison with

24 omega-3 tells me there's something else in tilapia that is

25 giving you the benefit.  Well, that may be the case with

1    lobster, too.

2    Q       But --

3    A       You can't -- you can't all attribute it to omega-3.

4    Q       In the chart we're looking at --

5    A       Yes.

6    Q       -- where is the benefit you're talking about?

7    A       I'm talking about -- whoops.

8    Q       I'm sorry?

9    A       This -- I'm looking at this figure up here, at the top

10   one.  There is a net benefit when you look at tilapia as a

11   whole.  This analysis is just -- just looking at the omega-3

12   content.  Okay?  It's not looking at the -- it's trying to

13   account for -- okay -- what you see in the fish as a whole.

14   So when you looked at albacore, the two assessments looked

15   very similar, and that told us -- or tells them that in

16   albacore, the benefit -- okay -- is coming from omega-3.

17          In tilapia, the benefit is not coming from proof for

18   omega-3, it's coming from something else in tilapia.

19   Q       That's not what this figure says, is it?  It says the

20   top graph presumes that all fish are equally beneficial.  Do

21   you see that?

22   A       But there are other nutrients in the fish.  Okay.  So

23   the bottom one is just trying to account for the contribution

24   -- okay -- from omega-3.  So when you did it with albacore,

25   they looked very similar.  When you look with tilapia, they

1  don't.  So something else in tilapia is giving you this

2  benefit here.

3  Q     All fish --

4  A     It's not -- it's not omega-3.

5  Q     All fish aren't equally beneficial; is that right?

6  A     No, but you're -- when you look at tilapia -- okay --

7  you're -- tilapia contains methylmercury and all these others.

8  When you just look at omega-3, the curves look very different.

9  So that tells us here that the benefit you're seeing here is

10  not coming from omega-3s, versus albacore, where the curves

11  look very similar, there the benefit's coming from omega-3.

12  If it were like tilapia, it would look very different and

13  something else, then, would be accounting for the benefit you

14  see when you look at the whole fish.

15  Q     And what you need to do, as you said at the outset, is

16  look at each fish individually to get an accurate picture of

17  the benefits from eating those fish.

18  A     As a whole, you look at each fish as a whole.

19  Q     Okay.

20  A     Yeah.  Because, see, people over the years have tried to

21  equate the benefits of fish consumption solely to omega-3s,

22  and we know that's not the case.  So a fish may be low in

23  omega-3, but still be beneficial.

24  Q     Let me show you the mercury levels in tilapia for the

25  sake of comparison.  This is Plaintiffs' Exhibit 97, an FDA

BOLGER - CROSS-EXAMINATION/COLANGELO

2366

1    summary of mercury levels in fish and shellfish.

2           MR. COLANGELO:  Which I'd like to move into

3    evidence.

4           THE COURT:  Any objection to -- you said Plaintiffs'

5    97?  Any objection to Plaintiffs' 97?

6           MR. SCHUTZ:  No objection.

7           THE COURT:  Plaintiffs' 97 is admitted without

8    objection.

9    BY MR. COLANGELO:

10   Q    So here you see on Plaintiffs' 97 mean mercury in

11   tilapia is .013.  Do you see that?

12   A    Yes.

13   Q    Okay.  And the mean mercury in Penobscot upper estuary

14   lobster is .3.

15   A    Correct.

16   Q    Correct?  So about 25 times higher than the mean mercury

17   in tilapia?

18   A    25?  Are you sure about that?  It's .3, .0, okay, that's

19   -- yeah, yeah.

20   Q    About 25 times higher?

21   A    Yeah, hm-hmm.

22   Q    Okay.  So this figure, back to Defendants' 1226, Page

23   230, for tilapia, is showing no net benefit from eating

24   tilapia up to about a hundred grams a day at a mercury level

25   that is 25 times less than mercury in lobster in the Penobscot

1   upper estuary; is that right?

2   A      No.   What it says -- what this shows you is that no net

3   benefit if you're just looking at PUFA.   You do see a net

4   benefit when you look at the whole fish.

5   Q      And looking at -- what do you mean by PUFA, that's the

6   omega-3s?

7   A      Omega-3s.

8   Q      Okay.   And PUFA is the proxy, you testified earlier,

9   that FDA uses for the beneficial chemicals in fish?

10  A      It's not a sure-proof proxy.

11  Q      Sure.

12  A      You have -- this tells us here that you can't account

13  for the benefits if you look solely at omega-3 for some fish.

14  Q      Now, you also mentioned orange roughy.   Do you recall

15  that?

16  A      Yes.

17  Q      Okay.   And do you know what the levels are in orange

18  roughy?

19  A      Of methylmercury?

20  Q      Yes.

21  A      You'd have to go back to that table.   I believe they're

22  about .5 or over.

23  Q      Okay.   This is Plaintiffs' 97 again.   And the levels in

24  orange roughy here are .57.   Do you see that?

25  A      Hm-hmm, yes.

BOLGER - CROSS-EXAMINATION/COLANGELO

2368

1   Q     And did FDA look at the net benefits of orange roughy

2   consumption?

3   A     It did.

4   Q     Okay.  Let me show you that figure.

5   A     Sure.

6   Q     That's Plaintiffs' 229.

7   A     Right.

8   Q     I'm sorry.  Defendants' Exhibit 1226, Page 229.  Okay.

9   So here, looking at orange roughy, assuming all fish are

10  equally beneficial, you follow the solid-line benefit here --

11  A     Yes.

12  Q     -- in the upper graph, and then the decline.

13  A     Correct.

14  Q     In the lower chart, looking at omega-3s in orange

15  roughy, it's all negative.

16  A     Because it has very low omega-3s.

17  Q     Correct.  Now, has FDA taken any recent steps regarding

18  advice related to consumption of orange roughy?  Do you know?

19  A     Um, in its release of the draft advisory, it

20  specifically notes this analysis.  It does point out that if

21  you look at orange roughy as a whole, you still see a net

22  benefit over a small range of consumption, and then it goes

23  negative, about 50, and identified this species, along with

24  Marlin, as species of concern, but could -- could not resolve

25  what the potential risk in public health impact and has

1   solicited comments as part of its announcement in the Federal

2   Register.

3   Q    So right now, FDA has four species on its do-not-eat

4   list; is that right?

5   A    That's correct.

6   Q    Okay.  Shark, swordfish, king mackerel and gulf

7   tilefish?

8   A    Gulf tile, right.

9   Q    And FDA is soliciting comment now on whether to add

10  orange roughy on that list of species that people should never

11  eat?

12  A    And Marlin.

13  Q    And Marlin.  Orange roughy and Marlin?

14  A    Correct.

15  Q    Okay.  So in looking at the net benefits of fish

16  consumption, it changes fish to fish?

17  A    Correct.

18  Q    And it changes based on the mercury and the beneficial

19  chemicals in those fish?

20  A    Correct.

21  Q    And this is a useful -- what FDA did here in Defendants'

22  1226 is useful if you're thinking about national advice; is

23  that right, eat more fish?

24  A    No, I think that this -- this tool could be used at any

25  level.  If you're -- if you're considering providing advice to

BOLGER - CROSS-EXAMINATION/COLANGELO

2370

1    people, which is really important, because you -- of what I

2    indicated before about tailoring the message to the

3    appropriate audience, making sure you get it right, and -- and

4    you don't have unintended adverse consequences.

5        So I'm not advocating this to be used across the board,

6    but when it's important, I think this is a tool, an approach

7    that can be used at any level.  I don't -- I wouldn't restrict

8    it just to the federal government, to national, no.

9    Q    What do you know about the beneficial chemicals in duck?

10   Is duck a seafood?

11   A    I don't -- you know, I know nothing about the benefits.

12   I haven't looked at ducks, so I don't know.

13   Q    Okay.  Do you know whether ducks have these same omega-3

14   fatty acids that are present in seafood?

15   A    As I just said, I don't -- I haven't looked at black

16   duck or any duck, so I don't know.  But it's a food -- okay --

17   can be a food, let's put it that way.  So there are obviously

18   nutrients that could be considered if one were going to

19   undertake such an effort.

20   Q    And duck -- the levels in black duck in Mendall Marsh,

21   you testified earlier, are a little higher than the levels in

22   orange roughy nationwide?

23   A    Ah --

24   Q    About .6?

25   A    Yeah, that was my --

1    Q      Compared --

2    A      -- recollection, yeah.

3    Q      .61 --

4    A      Right.

5    Q      And the orange roughy you said was .57?

6    A      Correct.

7    Q      Okay.  So orange roughy has some beneficial chemicals,

8    and yet looking at the omega-3s in orange roughy alone, you

9    see net negative from consumption; is that right?

10   A      And -- and this tells me that you're wasting your time

11   looking at omega-3s because that's not accounting for this

12   benefit right here.

13   Q      Yet FDA included an analysis of omega-3s as the proxy

14   for the beneficial chemicals in fish?

15   A      Again, because that's the best they could do as a proxy.

16   They didn't have enough information on the other nutrients to

17   do analysis like this for the other nutrients.  If they had

18   information like they had for omega-3s, they would have done

19   that kind of analysis.  And they -- and they indicated that,

20   but they didn't have it.

21   Q      And --

22   A      To try -- to try to account for what was going on here.

23   Q      And you have no information about what, if any,

24   analogous beneficial chemicals might be in black duck?

25   A      No, I don't.

BOLGER - CROSS-EXAMINATION/COLANGELO

2372

1    Q    But we do know that the mercury levels in black duck are

2    similar to the levels in orange roughy?

3    A    They are roughly similar, that's correct.

4    Q    You were the lead author of FDA's 2004 fish advisory; is

5    that right?

6    A    I wasn't.  I was part of the group.  I wouldn't, you

7    know, say I was the lead author.  I was a major player, yes.

8    Q    Let me show you your expert report.  This is Joint

9    Exhibit 44.  Is this your report?

10   A    It is.

11   Q    Okay.  On Page 4 here, up at the top, you say, I was the

12   lead author on several methylmercury in fish advisories that

13   were published in '96, 2000, and 2004.

14   A    And I was referring generally to those three exercises:

15   1996, I was the lead author; in 2000, I was; and in 2004, I

16   was one of several.

17   Q    And you agree with the recommendations in -- let's stick

18   with the 2004 advisory.  You agree with the recommendations in

19   that advisory; is that right?

20   A    Correct.

21   Q    And that advisory includes the do-not-eat warning we've

22   been talking about earlier?

23   A    Correct.

24   Q    For those four species of fish.

25   A    Correct.

BOLGER - CROSS-EXAMINATION/COLANGELO

2373

1   Q     And that warning was based on average mercury levels in

2   those species; is that right?

3   A     They were the ones that were closest to 1 part per

4   million on average, correct.

5   Q     Okay.  And the fact that people have other alternatives.

6   In other words, if people avoid swordfish, they can eat

7   salmon, which is safer; is that right?

8   A     That basically was the rationale, correct.

9   Q     Okay.  So for those four species, then, FDA advised

10  women of childbearing age and children just don't eat them; is

11  that right, just avoid them entirely?

12  A     The children advice was added in '04.  It was not in

13  2000 or '96.  Ah, and as a matter of prudence, right, it was

14  -- you know, because there were many more available

15  alternatives, sources of fish, it was just prudent to avoid

16  these four.

17  Q     And that's because, in your words, it's just not worth

18  the risk.

19  A     At that point, we didn't know enough about it.

20  Q     At that point, 2004.

21  A     Yeah.

22  Q     So it just wasn't worth the risk.

23  A     It -- it was -- it was an easy one.  We had -- remember

24  in 2000, the National Academy of Sciences methylmercury ad hoc

25  committee had issued a report, and the agency was under a

1    great deal of pressure to respond.  So we had to say something

2    about methylmercury and risk.  You know, the agency had been

3    talking about shark and swordfish for years.  You know, we had

4    been in court over swordfish in 1978 and '79.

5         So to say nothing about swordfish, in particular, would

6    have, you know, raised immediate questions, where's the FDA in

7    regards to swordfish?  So --

8    Q    Let me show you what you said before.

9    A    Hm-hmm.

10   Q    This was not a matter of any modelling or exposure

11   assessment we did.  It was a matter of these species -- it's

12   just not worth the risk.

13   A    Correct.

14   Q    Okay.  Now, FDA just reiterated that advice last week;

15   is that right?

16   A    Correct.

17   Q    Simultaneous with its release of the net benefits

18   assessment.

19   A    Correct.

20   Q    And it's still -- the agency still says for those four

21   species, women of childbearing age and children should

22   completely abstain.

23   A    That's a policy call.

24   Q    Okay.

25   A    That's correct.

BOLGER - CROSS-EXAMINATION/COLANGELO

2375

1    Q    And FDA is considering adding -- you testified a few

2    minutes ago, considering adding two more species to that list.

3    A    That's what they're asking for comment on, correct.

4    Q    Orange roughy and Marlin.

5    A    Correct.

6    Q    And those levels are quite a bit lower -- mercury in

7    those two species is quite a bit lower than in the four that

8    are already on the do-not-eat list?

9    A    But it's also a matter of looking at the net benefit; in

10   other words, you know, you -- you achieve a net benefit when

11   you eat a certain amount of each, but then it goes negative

12   when you go slightly above it rapidly.

13        So that's -- it's still positive, but you're heading in

14   a downward direction.  That's why the agency did not put it on

15   the do-not-eat list and asked for comment on what people

16   thought about it.

17   Q    You testified earlier this morning about exposure

18   assessments.  Do you recall that?

19   A    Yes.

20   Q    That's when you measure a specific population's exposure

21   to a particular contaminant in food.

22   A    Correct.

23   Q    Okay.  FDA did not do any exposure assessment before

24   issuing that national do-not-eat guidance; is that right?

25   A    Correct.

BOLGER - CROSS-EXAMINATION/COLANGELO

2376

1    Q    The agency didn't do the type of analysis that you argue
2    should be done here; is that correct?
3    A    Um, again, it was a matter of we were under a great deal
4    of pressure to respond very quickly.
5    Q    A decade has passed since then, and the agency has
6    reiterated that advice; is that right?
7    A    That's correct.
8    Q    And the agency has still not done an exposure assessment
9    to support the do-not-eat warning; is that right, modelling
10   consumption of particular fish?
11   A    Oh, no, shark and swordfish and king mackerel and
12   tilefish are modeled in the -- in the net assessment.
13   Q    I'm sorry.  I meant to say measuring consumption of
14   particular fish.  The agency does not have consumption data
15   for those species that it is advising people not to eat.
16   A    Well, no, it does because it modeled those species in
17   its net assessment.  So it has consumption information, unless
18   I'm misunderstanding your question.
19   Q    Maybe you are.  I'm asking --
20   A    Yeah.
21   Q    -- FDA warns people not to eat those four species of
22   fish.
23   A    Correct.
24   Q    Correct?  And it did that without collecting consumption
25   information specific to those fish before issuing the advice.

1    A     Right, I understand that part, right.

2    Q     Okay.  And FDA has limited information about consumption

3    of those fish; is that right?

4    A     No, I mean, I think it does have, if you go back and

5    look at -- at the -- at the report, there was a fair amount of

6    information on levels and on consumption levels of individual

7    species.  Now, sometimes some species, there's more

8    information than was available in other species.  So but there

9    was consumption information.

10   Q     FDA does not have good information about tilefish

11   consumption, for example?

12   A     Well, that was one of the ones that was less so, yeah.

13   Q     And FDA does not have good information on king mackerel

14   consumption; is that right?

15   A     Correct.

16   Q     And to --

17   A     It has some, but -- you know, less so than tuna, let's

18   put it that way.

19   Q     Yeah.  I'm asking about the four do-not-eat species.

20   A     Right.

21   Q     To the extent FDA knows, the market for king mackerel is

22   a small market and a very regional market; is that right?

23   A     That's my understanding, correct.

24   Q     Okay.  Now, the -- let me go back to Page -- Exhibit 97

25   -- Plaintiffs' 97, which is the mean in each species.

BOLGER - CROSS-EXAMINATION/COLANGELO

2378

1          And you have these four at the top, these are the

2    do-not-eat species.  King mackerel, the mean is at .7, shark

3    and swordfish, the mean is just under .1, and tilefish, the

4    mean is 1.45.  Do you see that?

5    A    I do.

6    Q    Okay.  So the highest of these four do-not-eat species

7    is gulf tilefish at 1.45, correct?

8    A    Correct.

9    Q    Okay.  Now, you're familiar with the expert report

10   prepared by Dr. Keenan for the defendant in this case?

11   A    Ah, I've read it over, yes.

12   Q    Okay.  And you're aware that he derived a

13   species-specific safety standard for the three species -- or

14   the various species that are at issue in this case, including

15   lobster, eel, and duck; is that right?

16   A    That's my understanding, yeah.

17   Q    Okay.  You've reviewed his -- you've reviewed his

18   report, correct?

19   A    Um, I -- I read a -- his -- his draft before -- just

20   before it was finalized.  I didn't comment on it.

21   Q    Okay.  So, in other words, instead of using the -- the

22   State of Maine safety standard --

23   A    Right.

24   Q    -- Dr. Keenan derived a different species-specific

25   threshold for each of those species I mentioned; lobster, eel,

1    and duck, correct?

2    A    That's my understanding.

3    Q    Okay.  And you're aware that Dr. Keenan proposed a safe

4    level for black duck of 1.5 parts per million, correct?

5    A    I -- I'd have to rely on your -- yeah, I haven't looked

6    at that in a while, and I don't remember.

7    Q    Okay.  I'll represent to you that that's his number, 1.5

8    parts per million, or 1,500 nanograms per gram.  Okay.  That

9    target is higher -- that's his safe threshold.

10   A    Hm-hmm.

11   Q    Is higher than the highest of these four FDA -- four

12   species that FDA says do not eat; is that right?

13   A    That's -- that -- that appears to be the case, yes.

14   Q    Okay.  FDA -- FDA's advisory also -- I'm talking about

15   the 2004 advisory -- that also includes advice for women who

16   could have children, but isn't pregnant; is that right?

17   A    Yes.

18   Q    Okay.  And there's a statement in that document -- I'll

19   show it to you in a second, but let me know if you recall --

20   the agency says, methylmercury levels in the body can take

21   over a year to drop significantly and can, therefore, be

22   pregnant in a woman even before -- present in a woman even

23   before she becomes pregnant.  Do you recall that?

24   A    That's a general statement that was made, that's

25   correct.

BOLGER - CROSS-EXAMINATION/COLANGELO

2380

```
 1    Q     Okay.  You remember that statement?

 2    A     Hm-hmm.

 3    Q     And that's based on methylmercury's half-life in the

 4    body, correct?

 5    A     Correct.

 6    Q     And because of methylmercury's half-life in the body, in

 7    order to reduce your blood level significantly, you have to go

 8    out about 250 days; is that right?

 9    A     Ah, to reduce it by half, that's correct.

10    Q     And that's assuming no additional input of methylmercury

11    in the meantime, correct?

12    A     Ah, that would be correct, yeah.

13    Q     Okay.  You testified earlier about the percent of women

14    nationally who exceed the reference dose.  Do you recall that?

15    A     I do.

16    Q     Okay.  And let me show you -- this is Defendants'

17    Exhibit 513.  This is the document that you were asked about.

18    A     Yes.

19    Q     Earlier.  Okay.  And this is reporting on the NHANES

20    data; is that right?

21    A     Correct.

22    Q     Okay.  And this shows that in the most recent year,

23    about 2 percent of women nationally have blood mercury levels

24    that match 5.8 micrograms per liter.  Do you see that?

25    A     That's slightly exceeded.
```

BOLGER - CROSS-EXAMINATION/COLANGELO

2381

1   Q      Slightly exceed.  Okay.  Now, do you have information on

2   -- that's 2 percent nationally.  Do you have information on

3   how many women in Maine have equivalent body burdens of

4   methylmercury that meet or exceed the reference dose?

5   A      Specific to Maine, the only data I've ever seen was a

6   report by Lynda Knobeloch, et al., where she reported from

7   using the NHANES data, I believe, from earlier data sets in

8   the NHANES.  So I think, in fact, she was using the 1999-2000

9   data set.  I'd have to go back and look at the paper, but it

10  was an earlier data set.

11         So if you took that number -- and I don't remember -- I

12  think the blood level was, oh -- oh, no, no, I think the

13  percentage over the RfD from that was something like

14  6 percent.  I don't -- you know, I'm trying to recall now.

15  But, anyway, if you accounted for the reduction that we've

16  seen over NHANES in the ten years, you could come up with an

17  estimate for the State of Maine.  I haven't done that.

18             But -- but bear in mind, in NHANES, the upper

19  percentiles are women who eat a lot of seafood and would --

20  people from Maine would be included in that portion of the

21  distribution, but you couldn't specifically identify them, no.

22  Q      Let me show you the number from the study you're

23  referring to.  Let me show you the first page.  This is

24  Defendants' Exhibit 753.  The title is Fish Consumption

25  Advisory Awareness and Hair Mercury Levels Among Women of

BOLGER - CROSS-EXAMINATION/COLANGELO

2382

1   Childbearing Age.  Is this the study you're talking about?

2   A      Correct.

3           MR. COLANGELO:  Okay.  Let me check just to see if

4   this is in evidence.  Your Honor, may I move this in?

5           THE COURT:  Any objection to your own exhibit, 753?

6           MR. SCHUTZ:  No objection, Your Honor.

7           THE COURT:  It's admitted.

8   BY MR. COLANGELO:

9   Q      Okay.  So Page 225 of Defendants' 753 reports the values

10  for Maine.  Now, this is based on hair mercury levels, not

11  blood.

12  A      Correct.

13  Q      But hair mercury levels at 1 part per million, that's

14  the hair mercury correspondent to the reference dose; is that

15  right?

16  A      That's my understanding, correct.

17  Q      Okay.  And here it reports that women in Maine, about

18  20 percent, just over 20 percent are above the hair mercury

19  level that corresponds to the reference dose.  Do you see

20  that?

21  A      From the data set from 1999 to 2000, correct.

22  Q      And what's the basis for your statement that this data

23  set was 1999 to 2000?

24  A      Well, we have to go back and look at the paper, but she

25  talks about what data set she was using, and it's -- it's an

BOLGER - CROSS-EXAMINATION/COLANGELO

2383

1   earlier data set.  It is not -- well, this paper was published

2   in '05.

3   Q    Correct.

4   A    So it has to be an earlier data set.  I recall looking

5   at the methodology section.  It's -- you know, you just have

6   to go look at the paper, but it's an earlier data set.

7   Q    Okay.

8   A    So this doesn't reflect the reductions that have been

9   seen since then.

10  Q    Are you aware of any more recent data regarding levels

11  in women in Maine?

12  A    Not specific like this, no.

13  Q    I'd like to clear up a discussion from yesterday about

14  lobster and spiny lobster.

15  A    Correct.

16  Q    Do you recall that?

17  A    Hm-hmm.

18  Q    Okay.  You were asked about a large FDA data set.

19  A    Correct.

20  Q    That reports some values for lobster, some values for

21  spiny lobster, and some values no indication.  Do you remember

22  that?

23  A    Correct.

24  Q    Okay.  And you testified that the species listed with no

25  designation, you know those to be American lobster.

BOLGER - CROSS-EXAMINATION/COLANGELO

2384

1    A      Yes.

2    Q      But it just doesn't say so.

3    A      Because when those samples were obtained, the

4    investigators -- the assignment was to get North American, you

5    know, lobsters but the investigator didn't write it down on

6    the data sheet.  So, you know, it wasn't noted as North

7    American lobster.  But the -- the assignment was issued for

8    North American lobster.

9    Q      Okay.

10   A      Not for spiny lobster.  That's why we went out and got

11   spiny lobster because we didn't have any samples.

12   Q      Okay.  I didn't quite follow the explanation yesterday,

13   and I'm still confused.

14   A      Okay.

15   Q      Can you explain what happened between American lobster

16   and spiny lobster and -- and when?

17   A      Ah, well, I'm trying to -- you know, when we started

18   collecting spiny lobster was we had a Food Advisory Committee

19   meeting -- um, I'm trying to remember now -- maybe it was

20   2002, I think it was -- yes, after we had issued our advisory

21   in 2000, and the purpose of the committee meeting was to get

22   input from experts about our advice.  You know, did we get it

23   right?  Is something wrong?  What do we need to consider?

24          And one of the issues that came up was we needed to get

25   more samples for fish across the board, for the 47 species of

BOLGER - CROSS-EXAMINATION/COLANGELO

2385

1    fish.  And so in response to that, we ramped up our

2    monitoring.

3         And one of the things I noted was we had no spiny

4    lobster samples -- none.  We had no samples.  So in response,

5    we included in this -- in the request to get samples in -- is

6    to specifically get spiny lobster, and then from that point on

7    -- and tell us if you don't get a spiny lobster, you're

8    getting a regular North American lobster so we can note it as

9    such, because before that time, the investigator was not

10   specifically writing down on the data reporting sheet North

11   American lobster.  They just got lobster, and they assumed we

12   knew it was North American because that's what they were asked

13   to get in the assignment.

14   Q    So let me show you Plaintiffs' 97, which is the FDA

15   summary table of that data.

16   A    Right.

17   Q    Okay.  So in this summary table, the agency -- and this

18   -- this version is current as of 2013.

19   A    Right.

20   Q    This is actually reprinted recently, but this is from

21   2013.  So the agency designates here spiny lobster, .093.  Do

22   you see that?

23   A    Correct.

24   Q    Okay.  And then on the second page, you have North

25   American lobster, .107?

BOLGER - CROSS-EXAMINATION/COLANGELO

2386

1    A     Right.

2    Q     And lobster, species unknown, .166?

3    A     Right.

4    Q     Right?  And you're saying that all of the lobster

5    species unknown, that's really American lobster?

6    A     Yes, but --

7    Q     Although it's --

8    A     But the agency just didn't feel comfortable, you know,

9    enough to designate it as North American lobster, and I

10   understand it.  So they reported it this way.

11   Q     Okay.  And that's because prior to 2002, this meeting

12   you've been talking about --

13   A     Right.

14   Q     -- the agency had collected only North American

15   lobster --

16   A     Right.

17   Q     -- so that's what it all was.

18   A     Right.

19   Q     Okay.  Now, this comes up, just to provide the context,

20   because Dr. Grandjean compared the levels in North American

21   lobster in the Penobscot Estuary to this number that FDA

22   reports as American lobster, .107, correct?

23   A     Yeah, because there are nine samples, and that's what he

24   used.

25   Q     Right.

1    A    Hm-hmm.

2    Q    Because that's what the agency reports as American

3    lobster.

4    A    Sure.

5    Q    And then was criticized for not using this value, even

6    though it designates species unknown, correct?

7    A    Correct.

8    Q    Okay.  So let me show you the data summary that you're

9    talking about.  I think this is Defendants' 517.  So this is

10   where the -- this is Page 74 of 517.

11   A    Right.

12   Q    And the lobster data start here.  These are the years,

13   and these just have no designation, correct?

14   A    Hm-hmm.

15   Q    Okay.  And then let me show you the next page, Page 75.

16   Here you have some American, some no designation.

17   A    Right.

18   Q    Correct?

19   A    Right.

20   Q    And then at the bottom, you have the spiny lobster?

21   A    Correct.

22   Q    But the date for the spiny lobster is '91, '93.  I don't

23   understand --

24   A    Right.  Spiny lobster goes on to the next page, though.

25   Q    Correct.

BOLGER - CROSS-EXAMINATION/COLANGELO

2388

1   A    Right.

2   Q    Here you have more --

3   A    Right.

4   Q    -- spiny lobster -- 1993, 2005.

5   A    Right.

6   Q    I don't understand how that matches with your

7   understanding of the collection of these data.

8   A    Again, this is based on what -- in my discussions with

9   -- with the field and how they were doing the assignment, and

10  -- and my concern that -- they were not being clear on which

11  lobster samples they were getting, and it was leaving us in

12  this gray area -- okay -- what lobster are we talking about

13  here, spiny or North American?

14  Q    So to pick just one year, for example, we -- 2005, there

15  are reports of spiny lobster from 2005.  Then on the earlier

16  page, there are reports of American lobster from 2005.

17  A    Right.

18  Q    And other lobster from 2005.

19  A    And they still weren't doing it.

20  Q    This data set starts -- this is the first page of the

21  document -- starts in 1990, and it goes to 2010.  Do you see

22  that?

23  A    Yes.

24  Q    Okay.  So back to Page 75, where the lobster data are.

25  A    Hm-hmm.

1    Q     There are spiny lobster from the very first years of the

2    data set -- '91 and '93.

3    A     Right.

4    Q     Do you see that?

5    A     Right.

6    Q     Okay.

7    A     Not many.

8          MR. COLANGELO:  Your Honor, this is a fine time to

9    take a break.

10         THE COURT:  Okay.  Very good.  We'll take a break

11   for about 20 minutes.

12         (Court recessed from 10:27 a.m. to 10:58 a.m.)

13         THE COURT:  Mr. Colangelo?

14                    CONTINUED CROSS-EXAMINATION

15   BY MR. COLANGELO:

16   Q     Dr. Bolger, your view is that to determine health risk

17   related to mercury in the Penobscot, you must do a dietary

18   exposure assessment using actual consumption data specific to

19   the species you're evaluating; is that correct?

20   A     Or reasonable surrogates.  Get as close as you can to

21   what people are actually eating, how much they're eating, and

22   how frequently they're doing so.

23   Q     But you didn't do that kind of assessment here; is that

24   right?

25   A     I -- I was not asked to do that.  Dr. Keenan was asked

1    to do that.

2    Q    And Dr. Keenan did not do the kind of assessment here

3    that you say needs to be done; is that correct?

4    A    Generally speaking, I think he did, yes.

5    Q    Let me show you a statement from your deposition.  Okay.

6    So here I'm quoting a page -- this is Page 160 from your

7    deposition.

8    A    Okay.

9    Q    Which is Joint Exhibit -- I'm sorry -- Plaintiffs'

10   Exhibit 161.  And I asked you to read something from your

11   report, in which you said, a scientifically defensible

12   assessment requires a very sophisticated assessment and

13   up-to-date dietary exposure methods that are much more

14   accurate and more realistic than the simple -- than the simple

15   estimates of consumption against a reference value involved in

16   a simplified exposure assessment of the sort in the Grandjean

17   report.  Do you see that?

18   A    I do.

19   Q    Okay.  And then I said, what up-to-date dietary exposure

20   methods are you referring to here?

21           And your answer, where you use actual consumption

22   information specific to the food, where you use frequency of

23   the consumption of that food.  Do you see that?

24   A    Correct.

25   Q    Okay.  And your testimony is that that's what Dr. Keenan

1    did, he used --

2    A      General --

3    Q      -- actual consumption?

4    A      Generally speaking.  I didn't say he did everything I

5    was talking about.  But I -- he did a much better job of it,

6    yes.

7    Q      Did Dr. Keenan collect actual consumption information

8    relative to lobster from the Penobscot Estuary?

9    A      He was using actual consumption information for lobster.

10   I mean, you're taking -- what I've said here is specific to

11   the Penobscot consideration.  No, I'm talking about used the

12   best available information.

13          If you have that kind of information available for that

14   site, that's great.  But then use the next-best information,

15   and that is actual lobster consumption information.

16   Q      So your testimony is that Dr. Keenan used actual lobster

17   consumption information, not assumptions, regarding lobster

18   consumption to reach his conclusions; is that right?

19   A      I believe he did consider lobster consumption data.

20   Q      Okay.  And is your testimony that Dr. Keenan also used

21   actual black duck consumption data to reach his conclusions?

22   A      That was more problematic based on my reading his report

23   because it was harder to get specific information on black

24   duck, so he used what I would call surrogate information to

25   try to get a better handle on what the consumption could be,

1    rather than assuming, you know, that it was this, that, or

2    whatever.

3    Q    Do you know whether the defendant ever asked the Study

4    Panel to collect consumption information relative to these

5    species?

6    A    Whether the defendant asked the -- who now?

7    Q    The Penobscot River Mercury Study Panel to collect

8    consumption information.

9    A    I don't know.

10   Q    To do the type of analysis that you say must be done to

11   assess health risk.

12   A    Ah, from the time at which I commented until the

13   present?  No, I -- I'm unaware of that, no.

14   Q    At -- at any point.

15   A    I'm unaware of that.

16   Q    Okay.  And for the exposure assessment you think needs

17   to be done, after collecting that consumption information, you

18   would also need to collect blood samples and measure mercury

19   levels in consumers' blood; is that correct?

20   A    No, I think I was responding to a what-if question from

21   you.  I was merely responding to, well, if you could, what

22   would you do?  I'm not advocating that as something that must

23   be done.  I was asked, well, if you could do something more

24   specific to the Penobscot consideration, what would you do?

25   And I said, well, you could -- you could actually try to find

1    out who these people are, who the lobstermen are, interview

2    them, see if they'd be willing to participate in a study, get

3    blood samples.

4            But that was merely a -- you know, a nice to-do, I'm

5    not saying it's essential.  I think it would be helpful, but

6    that's -- again, I was responding to your question about if

7    you could do that kind of thing.  I wasn't advocating it.

8    Q    Okay.  So you're not saying that it is a necessary step.

9    You're saying it would be a nice thing to do.

10   A    It's a nice to-do, yes.

11   Q    Not necessary.

12   A    No, I think what Dr. Keenan did would -- is -- is -- for

13   my purposes is -- is -- is good enough and useful, but if you

14   had the time, resources, and the interest, you may consider

15   doing something like this.  But I'm not saying it's a must-do.

16   Q    I asked you about this at your deposition.  Let me show

17   you Page 110.

18   A    Yes.

19   Q    Of the transcript.  And I asked:  You mentioned earlier

20   that you think it would be -- correct me if I misheard this,

21   that it would be appropriate to do a population study in the

22   Penobscot Bay; is that correct?  Correct.  Of exposure you

23   say.  And then we go on to discuss what that would involve.

24   A    Hm-hmm.

25   Q    And you say you would look at lobstermen, how often do

1    you eat lobster, who eats the lobster in your family, how much

2    do you eat, and I'd get a blood level.  Do you see that?

3    A    Correct.

4    Q    Okay.  And then the conversation continues, and you're

5    talking about duck hunters now on Page 116, and you say:  I

6    would ask -- okay -- how often do you hunt?  How often do you

7    eat this?  Who eats it?  Do you eat it?  And then can I have a

8    blood sample?

9         And then at the end of the discussion, on Page 17, I

10   said -- 117, do you think this is a necessary step to

11   evaluating health risk from these species in the Penobscot?

12   Answer, if I want to know what the health risks are, yes.  I

13   think that's -- I mean, I'm kind of surprised it wasn't done

14   before.

15   A    Right.

16   Q    Dr. Keenan did not do that kind of assessment here; is

17   that correct?

18   A    What we just reviewed, in terms of going out and

19   interviewing people, no.

20   Q    Correct.  Let's turn back to the net benefits

21   assessment.  I was little unsure about a point you made

22   earlier.

23   A    Sure.

24   Q    So this is Defendants' Exhibit 1226, and I'm showing you

25   Page 230.  This is the figure for tilapia.

1   A      Hm-hmm.

2   Q      Okay.  Now, the two charts here, the one on the top, net

3   effects assuming all fish are equally beneficial; the bottom

4   graph, proportional to concentrations of omega-3s in that

5   fish, correct?

6   A      Correct.

7   Q      Okay.  And tilapia is a low-mercury fish, about 25 times

8   lower than the lobster here and comparable omega-3s, correct?

9   A      To?

10  Q      To American lobster.

11  A      I believe that's correct.

12  Q      Okay.  Now, in this upper graph, you said other things

13  must be contributing to the benefit you see here because

14  there's a net benefit demonstrated.  Do you see that?

15  A      Correct.

16  Q      Are those other things specific to tilapia included in

17  this graph?

18  A      There are other constituents in tilapia, undefined, that

19  are -- that are accounting for this -- this net benefit

20  increase.  And from this analysis here, it's very clear it's

21  not omega-3 fatty acids.  There's something else in tilapia

22  that's responsible for this outcome.

23  Q      Here's my question, in the bottom chart here, the

24  information about omega-3s reflected in this modelling

25  exercise is specific to tilapia, correct?

1  A     That's my understanding.

2  Q     FDA used omega-3 information specific to tilapia?

3  A     Right.

4  Q     To measure the net benefits, assuming that the omega-3s

5  are what contribute to the benefits, correct?

6  A     Well, that's what they were trying to figure out here,

7  whether it was or was not accounting for what they were seeing

8  here.

9  Q     Okay.  Now, in the upper chart, does this similarly use

10 information specific to tilapia, beneficial chemicals in

11 tilapia other than omega-3s to measure the net benefit of

12 those other chemicals specific to tilapia?

13 A     No, see, here you just -- you're just modelling the --

14 the tilapia.  And so down in -- in the bottom part, you're

15 trying to figure out and account for the contribution from

16 omega-3, and what this is showing us, that omega-3 is not

17 contributing to what you're seeing in the whole fish, in the

18 tilapia.

19 Q     I'm sorry.  I think you said two different things there

20 or at least I misunderstood.  You said no to my question that

21 this is not based on information of other nutrients specific

22 to tilapia, but then you said you're just modelling tilapia.

23 So I'm still unsure --

24 A     No, because you don't have any specific information on

25 the other nutrients in tilapia.  Okay?  Or any other fish.

1    Q     Okay.

2    A     And that's why the -- the -- the attempt was made to use

3    omega-3 as a surrogate, and it works for some fish.  It

4    doesn't work for other fish.  Albacore it -- it worked -- it

5    looks beautiful because it accounts for what you see in the

6    whole fish.  In tilapia, it's not accounting for it.  It's --

7    something else is responsible for what you're seeing here in

8    tilapia.

9    Q     Assuming that tilapia matches this average of all other

10   fish reflected here.

11   A     Yeah, there are other nutrients in tilapia that are --

12   that are accounting for this outcome.

13   Q     And the same then holds for orange roughy, this is

14   Defendants' 1226 on Page 229.

15   A     Yes.

16   Q     FDA modeled based on information specific to orange

17   roughy.  Mercury concentrations and omega-3s as the beneficial

18   effect only in this bottom graph, and found a net negative,

19   correct?

20   A     Right.  Because there's so little omega-3s in orange

21   roughy.

22   Q     Now, in the upper graph, just like for tilapia, this is

23   not based on any information about other potentially

24   beneficial chemicals specific to orange roughy; is that right?

25   A     No, it's just looking at -- yeah, that's correct.  It's

 1    just looking at orange roughy as a whole package, with no

 2    specific consideration of -- of the nutrients.

 3          So like the previous one, you see this net -- over a

 4    very small range of consumption, a net benefit that quickly

 5    goes -- starts to go towards -- in a -- in a downward slope,

 6    but it's -- you -- you would expect this because orange

 7    roughy, at least from an omega-3 standpoint, is not

 8    contributing much to the net benefit because it's so low.  So

 9    there's something else in orange roughy here initially that's

10    beneficial, but it's very, very transient.

11    Q    You say there's something else in orange roughy that's

12    beneficial.  How do you say that if this figure, this upper

13    figure is not based on any information specific to orange

14    roughy?

15    A    Because you're modelling the --

16          THE COURT:  I think the question is, how do you

17    graph something you can't measure?

18    A    Well, you're graphing the -- just the consumption of the

19    whole fish.  Okay?  And looking at the impact on IQ of the

20    whole fish.  You're not able to separate out how the

21    individual constituents in the fish are contributing to that

22    overall effect.  Okay?

23          The bottom graph attempts to account for that by looking

24    at omega-3.  Obviously, the omega-3 is not accounting for what

25    this -- what you're seeing right here in terms of this small

1    -- this increase in IQ.  There's something else in tilapia

2    that's beneficial -- or -- excuse me -- orange roughy.

3    BY MR. COLANGELO:

4    Q      But there is no information about what those other -- in

5    other words, you said you're modelling consumption of the

6    whole fish?

7    A      Correct.

8    Q      In this upper graph?

9    A      Right.

10   Q      But you are not modelling the consumption of an orange

11   roughy based on all the information about orange roughy in

12   this graph, are you?

13   A      No, you're assuming that orange roughy, the benefit

14   package in orange roughy is the same as the benefit package in

15   the other 46 species.

16   Q      Which is not necessarily true.

17   A      Again, that -- that is an assumption, correct.

18   Q      In fact, you testified very early this morning, when we

19   first started speaking, that we know that not to be true.

20   A      No, we -- we know it can vary.  Okay.  But I think, no,

21   I -- I -- I can see where you're going, I think based on what

22   we know in terms of the science, that is a tenable assumption

23   that the agency was able to defend doing in this analysis.

24   They got a lot of comment on it.  I remember this being a

25   cause of concern that -- along the lines of what you're

1    suggesting.

2        But based on what we know about the benefits of fish

3    consumption, assuming that for individual species was a

4    tenable assumption to make in this kind of analysis.

5    Q    So you're saying to assess the net benefits of fish

6    consumption relative to methylmercury contamination in those

7    fish --

8    A    Right.

9    Q    -- it's appropriate to assume that all fish are the same

10   in terms of the benefits they provide?

11   A    In this kind of modelling exercise, it's an appropriate

12   assumption to make.

13       Now, in the case of omega-3, it didn't -- this is not

14   accounting for it.  So there's something else there that's

15   responsible for what's going on, unlike albacore, where the

16   albacore analysis, when looking at omega-3, was identical when

17   -- as comparison to the total fish.

18   Q    Does FDA assume that all fish are the same in terms of

19   benefits?

20   A    No, only in this analysis.  Okay.

21   Q    So this is a modelling exercise?

22   A    It's -- it's based on what we know about constituents of

23   essential nutrients in fish that do vary from fish to fish.

24   But fish, as a rule, are a package of beneficial chemicals.

25   They do vary from species to species in the absolute amounts

1    of each one, but there are net -- excuse me -- there are

2    beneficial constituents in fish apart from omega-3.

3    Q    And those vary from fish to fish.

4    A    They can vary, but the implication is that they vary

5    greatly?  No.  They may be very similar.  You know, so I think

6    the -- the tenable assumption that the agency took here of

7    assuming that -- that fish could be treated this way I think

8    is a -- a defensible scientific assumption to make.

9    Q    And the agency made two assumptions, just to be clear:

10   One, they modeled assuming all fish are the same, correct?

11   A    In this upper bound -- I mean, this upper graph, that's

12   correct.

13   Q    Okay.  And, two, they modeled assuming that omega-3s are

14   the beneficial chemicals, correct?

15   A    In the lower one, correct.

16   Q    Okay.  And you see, based on those two different

17   assumptions, very different benefits assessments, depending on

18   the fish; is that correct?

19   A    In this case, omega-3 is not responsible for what -- is

20   not accounting for what you're seeing in the upper graph.

21   Q    Do you have any specific information about the suite of

22   potentially beneficial chemicals in lobster relative to orange

23   roughy?

24   A    Ah, I have not done a specific consideration like that,

25   no.

1  Q     Do you have any information about the suite of

2  potentially beneficial chemicals in lobster relative to

3  tilapia?

4  A     Here and now, no.  I mean, there is information in the

5  scientific literature where that could be considered, yes, but

6  I -- I don't have that right in front of me, no.

7  Q     And do you have any specific information about the

8  beneficial -- potential beneficial chemicals in lobster

9  relative to albacore tuna?

10 A     Again, my -- similar answer, there is -- right here, I

11 can't provide that information.  There is information in the

12 scientific literature where you could get some information on

13 that to come up with some relative comparison, but that -- I

14 don't have that here.

15 Q     So without that information, it's impossible to say

16 whether the net benefit of eating methylmercury-contaminated

17 lobster is more similar to the modeled profile for albacore

18 tuna or orange roughy or tilapia; is that right?

19 A     No, based on omega-3, I would say no.  I mean, I think

20 you could say, no, it's closer to albacore than -- than it is

21 to the other two species because the omega-3 content is

22 closer.  I mean, orange roughy has very little omega-3 in it.

23 Q     I think you might have misspoken.  The levels in lobster

24 -- I can show you if you'd like --

25 A     Okay.  They're lower than -- than what you find in

1   albacore, I understand that, right.

2   Q    I think they're about five times lower.

3   A    Right.

4   Q    And they're very close to the levels you find in

5   tilapia; is that right?

6   A    Ah, I believe we went over that this morning, correct.

7   Q    Okay.

8   A    So -- um, but, again, the -- the comparison to albacore

9   was just -- just that, to point out, here's one way of looking

10  at it.  I wasn't advocating as the way to look at it.  Okay.

11  I wasn't advocating that albacore tuna is a surrogate for

12  lobster, no.

13       But I think it's more of a surrogate than orange roughy

14  is.

15  Q    And do you think it's more of a surrogate than tilapia

16  is?

17  A    I think it's -- I think it's closer to albacore than I

18  would say to tilapia.

19  Q    What's the basis for that statement if you don't have

20  specific information about the suite of potential beneficial

21  chemicals --

22  A    I --

23  Q    -- in lobster --

24  A    Right.

25  Q    -- to allow you to compare to either albacore or to

1    tilapia?

2    A    I have -- I'm just saying I can't -- I don't -- I can't

3    do that here and now, but I think that's something that's --

4    that's -- that's doable, yeah.

5    Q    The information that is available in the benefits

6    assessment is specific to omega-3s, and it shows that lobster

7    is, relative to tilapia, not albacore tuna; is that right?

8    A    In terms of the omega-3 content, correct.

9    Q    Correct.  Okay.

10   A    Yeah.

11   Q    And --

12   A    With other beneficial constituents.  So whether the

13   profile is closer to albacore or closer in terms of the other

14   nutrients or closer to tilapia, I -- I can't answer that

15   question right now.

16   Q    Okay.  And this is the figure for tilapia, and we also

17   know that the levels of methylmercury in Penobscot lobster are

18   about 25 times higher than the levels in tilapia modeled here;

19   is that right?

20   A    Yeah, tilapia has one of the lowest levels of

21   methylmercury.  It's -- it's an aquaculture fish, right.

22   Q    I also asked you earlier about whether methylmercury

23   diminishes the benefits of eating fish, and I'm still a little

24   confused about that, too.  So my question is, if you have a

25   pool of fish, you know, same nutritional benefit that has --

1    has methylmercury contamination at .3, the same resource with

2    methylmercury levels at .05, which provides a better net

3    benefit?

4    A      In that scenario that you just described, obviously the

5    latter would.  Again, it depends on consumption, and it

6    depends on the relative con -- amounts of methylmercury and

7    the amounts of beneficial constituents in fish, so --

8    Q      But here I was talking about a level of .3

9    methylmercury.

10   A      Right.

11   Q      And .05 methylmercury in a comparison set.

12   A      With a -- with a -- with a similar level of nutrients.

13   Q      Equivalent.

14   A      Equivalent.

15   Q      Same thing.

16   A      Right.

17   Q      Same fish.

18   A      Right.  In that scenario, the -- obviously, the -- the

19   methylmercury is going to have a bigger impact in the fish

20   that has the lower nutrient beneficial burden.

21   Q      And the methylmercury in that scenario diminishes the

22   benefit you achieve from eating that fish.

23   A      Right.  We saw that in the shark and swordfish.  I mean,

24   that's very clear, that methylmercury is having a mitigating

25   -- clear mitigating effect.

1    Q      You reviewed Dr. Grandjean's expert report, correct?

2    A      Yes.

3    Q      Okay.  Let me show you Table 2 from his report.  You

4    referred to this earlier today.  This is Plaintiffs'

5    Exhibit 145 in evidence.  You're familiar with this table?

6    A      Yes, I am.

7    Q      Okay.  Now, this shows the calculated intake by a person

8    with an assumed weight of 60 kilograms from a meal size of

9    6 ounces, or 180 grams, of food items from the Penobscot.  Do

10   you see that?

11   A      I do.

12   Q      Okay.  And now you agree that he didn't make any errors

13   in his math here; is that right?

14   A      The math is straightforward, correct.

15   Q      Okay.  And so if you have a 60-kilogram woman who eats

16   an average lobster from the Penobscot --

17   A      Hm-hmm.

18   Q      -- that has .3 micrograms per gram of mercury in it, and

19   in this portion size, that's 180-gram portion size, and you

20   multiply those two, .3 micrograms per gram, times 180 grams,

21   that means you ingest 54 micrograms of mercury in that

22   portion.  Do you see that?

23   A      Yes, I do.

24   Q      Okay.  And if the woman weighs 60 kilograms --

25   A      Correct.

1  Q      -- and you want to know micrograms ingested per kilogram

2  of body weight, you divide 54 by 60, and you have

3  .9 micrograms per kilogram body weight ingested under that

4  scenario; is that right?

5  A      Under this scenario, that's correct.

6  Q      Okay.  And now .9 micrograms per kilogram is nine times

7  higher than EPA's reference dose of .1 microgram per kilogram

8  of body weight per day; is that right?

9  A      Ah, that's correct.

10  Q      Okay.  And then if you did the same thing for the high

11  end lobster measured in this data set, 1.1 micrograms, that

12  gives you an ingestion of 198 micrograms for that meal size.

13  And for this 60-kilogram woman scenario, that's an ingestion

14  of 3.3 micrograms per kilogram of her body weight, which is 33

15  times higher than EPA's reference dose; is that right?

16  A      That's correct.

17  Q      Okay.

18  A      But you're making a huge assumption here that this

19  6 ounces is done on a daily basis.  You're comparing this to

20  one meal.  You can't do that.  This is not an acute toxin.

21         And, number 2, you're using 60 kilograms.  For an

22  American, that's low.  Okay.

23  Q      Do you know the body --

24  A      So you're -- huh?  So the 60 kilograms is not going to

25  have a big impact.  The average American woman is around 72,

1    so 60 is a low figure to use for U.S.

2         But you're comparing this to one meal.  Now, you're

3    assuming someone is doing this every day for a period of time.

4    I don't think that's a tenable assumption.

5    Q    My question, Dr. Bolger, was not comparing this to one

6    meal, it was asking in this scenario with this ingestion how

7    much -- how many micrograms of mercury the person would

8    consume.

9    A    But you'd --

10   Q    Do --

11   A    -- have to do that over a period of time.

12   Q    So let's say you have a woman at 60 kilograms body

13   weight.  Do you know what body weight assumption the State of

14   Maine uses --

15   A    I don't know what the State --

16   Q    -- to --

17   A    -- uses.  I know from the NHANES data, something like 72

18   is the average, yeah.

19   Q    I think Dr. --

20   A    It's not going to change the math that much.  Okay.

21   Q    Okay.

22   A    And the other -- the other problem I have with this is

23   using the high value.  Representing the high value is

24   inappropriate.  You cannot use the -- the highest value to

25   represent what you find in a -- in a fishery or in a food item

1    over a long-term period of -- over a period of time of

2    exposure.

3    Q    Let's walk through just the average value first.

4    A    You have to use the average that's representative of it,

5    right.

6    Q    Let's walk through just the average value first.

7    A    Right.

8    Q    And I'll represent to you that the State of Maine uses

9    60 kilograms per day as the assumed body weight of a woman in

10   setting its fish tissue action level.

11   A    Right.

12   Q    We can do it at a higher level, too.  I agree with you

13   that doesn't make much difference.

14   A    Right.

15   Q    But if you have the average lobster --

16   A    Right.

17   Q    -- and you agreed that the 60-kilogram woman, which is

18   the State's assumed body weight for a woman of childbearing

19   age, that meal would give you an ingestion nine times greater

20   than EPA's reference dose.  You agreed with that just a minute

21   ago.

22        So if you ate the average lobster from the Penobscot

23   Estuary once a week, you would be eating nine times the

24   reference dose once a week; isn't that correct?

25   A    Ah, if you had one meal -- okay -- you would exceed the

1    -- I'm repeating what you're saying.  You're -- you're -- you

2    would be exceeding the EPA reference dose, but you're only

3    doing that once a week, and the problem is that you're -- you

4    have to -- this is where the frequency of consumption is

5    important because if you're going to compare it to a value

6    like the reference dose, which is a value that you have to

7    consider over a period of time, then you have to look at the

8    kinetics -- the toxicokinetics of that one meal and how that

9    relates to changes in blood lead.

10        And so doing this can be misleading in terms of reaching

11   a conclusion as to potential risk.  So I -- I understand the

12   math -- okay -- but I -- I don't agree with the process here.

13   Q    I wasn't asking about one meal in that question.

14   A    Oh, I thought you said once -- once a week?

15   Q    Correct.

16   A    Okay.

17   Q    Once a week, the average lobster once a week?

18   A    Right.

19   Q    A woman at this assumed body weight is ingesting nine

20   times the reference dose once a week.  Do you agree?

21   A    If you do the simple math exercise, that's correct, but

22   I don't think that -- that -- that -- the problem with doing

23   that is that you're ignoring the toxicokinetic consideration

24   of how that translates into -- into a blood level change,

25   which is the key issue here.  So I would want to -- I would be

1    -- I would want to consider that before I would make a simple

2    comparison like this.

3         So I think what -- you could end up with a -- in a

4    determination of risk that could be misleading.  That's my

5    only point here.

6    Q    And this modelling here assumes there is no other

7    mercury consumption at all, correct?  I mean, the scenario

8    we've been talking about, an average lobster once a week --

9    A    Right.

10   Q    -- gives you an ingestion nine times the reference dose

11   once a week, assuming no other consumption, correct?

12   A    That's my understanding what was -- one of the premises

13   of this calculation, yes.

14   Q    Okay.  And you're aware that the average woman in Maine

15   has a blood level relative -- that equates to two-thirds of

16   the reference dose as a baseline; is that correct?

17   A    Where is that coming from now?

18   Q    That's coming from Knobeloch.

19   A    But, see, the Knobeloch data is from the NHANES

20   1999-2000 data.  We know from the most recent NHANES data,

21   that blood levels in pregnant women, women of childbearing age

22   have come down considerably.  So you can't use the Knobeloch

23   as a reference point where we are here now.

24        That was -- that pertained to what was going on ten

25   years ago.  A lot has happened since that time.

1   Q     Just to correct you on that -- and I'll show you the

2   exhibit if I can find it in the pile here --

3   A     Hm-hmm.

4   Q     The Knobeloch data comes from a survey conducted by

5   Maine's CDC --

6   A     Oh, I thought it was --

7   Q     -- not the NHANES data.

8   A     Oh, okay, but I thought the survey information was from

9   the early -- late '90s, early -- early 2000.

10  Q     That's correct.

11  A     Right.  So that's -- that's the equivalent time period

12  of the -- of the NHANES 1999-2000 survey.  So my point is, we

13  have information from NHANES that indicates that blood mercury

14  levels have come down since then.

15  Q     How much?

16  A     I'd have to go back to the N -- it's in the EPA 2013

17  report.  I believe, ah, they started off at about 7 -- oh, no,

18  no, no, no.  It's been -- again, I would have to go to the

19  report.  I don't have it right in front of me.

20  Q     Do you have information on the average blood mercury

21  levels among women in Maine?

22  A     I'm not specifically talking about Maine.  I'm talking

23  about the NHANES survey.

24  Q     Okay.

25  A     Right.

1    Q      So regardless of --

2    A      I do not have specific information in Maine.

3    Q      Regardless of the precise level, you can assume that

4    women of childbearing age in Maine have some background level

5    of exposure to methylmercury; is that correct?

6    A      Um, for those who eat seafood, that's correct.

7    Q      Okay.  And for those women who are eating other things

8    and who have some background level of methylmercury exposure,

9    this assumed consumption of one average lobster meal once a

10   week at nine times the EPA reference dose would be on top of

11   their existing background exposure; is that right?

12   A      You could take into account the background exposure --

13   background body burdens.

14   Q      You're familiar with a study by Burger and Gochfeld,

15   2011?

16   A      Yes, I am.

17   Q      Okay.  And that was published in the peer-review journal

18   Science of the Total Environment?

19   A      I don't recall the journal, but if you say so, that's

20   correct.

21   Q      Okay.  Is that a reputable journal?

22   A      It's a journal.  I -- you know, I -- I can't put a -- a

23   rating on the journal, no, I can't.

24   Q      You've served as a reviewer for that journal?

25   A      Ah, over -- I think I have reviewed journals --

1    manuscripts for that journal, yes.  I've reviewed a lot of

2    manuscripts for a lot of journals.  I can't remember them all.

3    Q      This is Joint Exhibit 86.

4    A      Hm-hmm.

5    Q      This is the study by Burger and Gochfeld.

6           MR. COLANGELO:  Which I'd like to move into

7    evidence, Your Honor.

8           THE COURT:  Any objection to 86?

9           MR. SCHUTZ:  No objection, Your Honor.

10          THE COURT:  It's admitted.

11   BY MR. COLANGELO:

12   Q      Now, this study looked at mercury in New Jersey fish.

13   Do you recall that?

14   A      That's what the title says, correct.

15   Q      Okay.  And let me show you Page 1427 of the study.  And

16   let me -- I'll zoom in a little bit and just read you this

17   passage.  And this was a study conducted by the -- officials

18   with the State of New Jersey.  Do you recall that?

19   A      I haven't read the paper in a while, so I'll have to

20   take your word for it, yeah.

21   Q      Okay.  We also reported the percent of fillets that were

22   above .5 ppm because of the need to know the percent of times

23   an exposure in a single meal may approach the tolerable daily

24   intake.  A 60-kilogram woman consuming an 8-ounce meal at .5

25   ppm would consume 113 micrograms, which is 19 times higher

1   than the EPA's reference dose of .1 micrograms per kilogram

2   per day.  Even if this were averaged out over a week, it would

3   exceed the reference dose.  Do you see that?

4   A     Correct.

5   Q     And that's a similar analysis to what Dr. Grandjean did

6   here?

7   A     Um, going back -- well, the key part here is -- is when

8   you compare to the average over a daily basis.  I believe what

9   you were showing me from Dr. Grandjean's report was on a

10   weekly basis, I think the estimate of exposure you gave me was

11   on a weekly basis, that table we were -- Table 2?

12   Q     I did ask you to assume a weekly consumption, yes.

13   A     And so you didn't divide it by seven to put it on a week

14   -- on a daily basis?

15   Q     Well, you can divide 9 by 7.

16   A     I'm just saying, so that's -- because what they're doing

17   -- again you're comparing -- upfront they're comparing the

18   single exposure to a chronic value.  It's better to divide by

19   7 to compare, you know, to a chronic -- you're assuming that

20   this is what this -- the subject is doing on a day-to-day

21   basis.  So -- so it's slight -- yeah, so if you do it -- if

22   you divide by 7 -- okay -- these estimates will all go down by

23   sevenfold, and you will slightly exceed the reference dose at

24   that point.

25   Q     So you're saying that to divide the --

1    A    Right.

2    Q    -- 19 times by 7?

3    A    Yeah.

4    Q    Okay.  So in this Burger and Gochfeld study, they assume

5    a 60-kilogram woman, a slightly larger meal size than

6    Dr. Grandjean assumes --

7    A    Right.

8    Q    -- would ingest 113 micrograms of mercury, which is 19

9    times higher than the EPA's reference dose, and then as it

10   goes on to say, even if this were averaged out over a week --

11   A    Right.

12   Q    -- which is what you're saying should be done --

13   A    Correct.

14   Q    -- it would exceed the reference dose?

15   A    But not the MRL.  That's the point.  Yes, it would

16   exceed the reference dose, but not the MRL.

17   Q    And the same scenario I presented to you from

18   Dr. Grandjean's table is true, even if you average out that

19   consumption over a week, it would exceed the reference dose?

20   A    You could exceed the reference dose, that's correct.

21   Q    What do you mean you could exceed the reference dose?

22   A    No, I agree with your math.  The math tells me I would

23   be over the reference dose, correct.

24   Q    Okay.

25   A    By the way, what section are we reading from?  Is this

1   the discussion?  Where are we?

2   Q    This is -- I'm happy to let you see the entire paper if

3   you'd like to look at it.

4   A    I just didn't know what section we were in.  Whether we

5   were -- yeah, we're in the discussion.  Thank you.

6   Q    And we discussed this paper at your deposition; is that

7   correct?

8   A    Yes, yes, no, we talked about it.

9   Q    In fact, you brought it to your deposition with you; is

10  that correct?

11  A    That I believe is correct, hm-hmm.

12  Q    Okay.  And let me show you Defendants' Exhibit 514.

13  This was shown to you earlier this morning.  This is the U.S.

14  Dietary Guidelines for Americans; do you see that?

15  A    USDA and Department of Health and Human Services, that's

16  correct.

17  Q    Okay.  2010, and this is Defendants' 514.  Okay.  And

18  this has a table -- you were shown this table yesterday, which

19  reports omega-3 fatty acids in fish and mercury in cooked

20  fish, correct?

21  A    Correct.

22  Q    Okay.  Now, there's a --

23  A    Wait, wait, excuse me.  Could we go back?

24  Q    Sure.

25  A    Is that cooked fish?  Right.  4 ounces of -- you'd have

1   to go down to the bottom because it -- does it say 4 ounces of

2   cooked fish?

3   Q    It does somewhere.  I'm not sure it's on --

4   A    That's not obvious here.  I just wanted to make sure.

5   Q    That's not relevant to my question, but I'm happy to

6   clarify it, if I can.

7   A    Because when you cook fish, you lose water, therefore

8   you concentrate the mercury.  That's the only reason I'm

9   raising it.

10  Q    Right.  So the reported mercury concentrations would be

11  higher in cooked fish than uncooked fish, correct?

12  A    Yeah, because you lose water, yeah.

13  Q    Okay.  So assuming that these are cooked fish values,

14  you couldn't compare the mercury concentrations in these

15  directly to uncooked fish; is that right?

16  A    Oh, right, you have to account for the water loss.

17  Q    Okay.  Now, let me show you -- there's a footnote --

18  okay.  In this column -- it's hard to see -- but at the very

19  top under mercury -- there's a column for mercury.

20  A    Yes.

21  Q    So we have seafood on the left, omega-3s in the middle,

22  mercury?

23  A    Right.

24  Q    And there's a footnote C next to mercury.  Do you see

25  that?

1    A      I do.

2    Q      And mcg is micrograms.  That's the same unit of

3    measurement we've been talking about, correct?

4    A      Correct.

5    Q      Okay.  And in the USDA HHS 2010 document, under that

6    footnote --

7    A      Hm-hmm.

8    Q      -- footnote C, they state, a total of 39 micrograms of

9    mercury per week would reach the EPA reference dose, .1

10   micrograms per kilogram per day for a woman who is pregnant or

11   breast-feeding and who weighs 124 pounds --

12   A      Hm-hmm.

13   Q      -- 56 kilograms.  Do you see that?

14   A      I do.

15   Q      Okay.  So a slightly smaller body size than assumed by

16   Dr. Grandjean, but this is the same type of analysis as in the

17   Table 2 that I showed you, correct?

18   A      Ah, it looks to be similar, yes.

19   Q      You're familiar with something called the FDA action

20   level for methylmercury; is that right?

21   A      I am.

22   Q      Okay.  That action level is 1 part per million?

23   A      It is.

24   Q      But that's not a suitable benchmark for assessing fetal

25   health risk; is that right?

1    A      Correct.

2    Q      Fetal impacts weren't considered in its design?

3    A      As the agency said in its 1979 pronouncement after it

4    lost the Anderson Seafood case and promulgated an action level

5    1 part per million, it specifically said that because of

6    concerns about fetal exposure, that we -- the agency did not

7    have very good information about potential fetal effects, it

8    was not accounting for that potential adverse health outcome.

9    Q      Okay.  And that level was set based on neurological

10   effects in adults --

11   A      Correct.

12   Q      -- correct?  Like concentric vision or tingling?

13   A      It came from the Japanese and Iraqi poisoning events.

14   Q      Okay.  And FDA decided in the 1990s that the action

15   level of 1 part per million is not a useful regulatory

16   instrument; is that right?

17   A      Correct.

18   Q      You're aware of the Maine fish tissue action level of .2

19   part per million?

20   A      I'm aware of it, yes.

21   Q      But you're not familiar with how the State derived that

22   level?

23   A      The formula they used?

24   Q      Are you familiar with how the State derived that level?

25   A      I believe they used the EPA reference dose, and then

1    they used some specific information on fish consumption to --

2    to develop the number.  But that's all I know, yeah, and I

3    wasn't a party or participant in any of that.

4    Q    You don't have any opinion about the State's

5    methodology?

6    A    No, no.

7    Q    And you haven't evaluated the State's lobster and crab

8    fishery closure; is that right?

9    A    No, based -- all I've read is what they posted on their

10   Web site.  That's it.

11   Q    Okay.  You said you don't have an informed opinion about

12   it?

13   A    No.

14   Q    You don't?

15   A    No, no.

16   Q    And you didn't take any efforts to learn more about it

17   after you heard about it; is that right?

18   A    I just -- what was -- what was posted on their Web site,

19   just as a matter of interest, I read, but that -- that's it.

20   I mean, I don't know what went into their thinking at all.

21   Q    Okay.  Let me show you Plaintiffs' 84, which is the

22   notice of agency rulemaking adoption.  Is this a document you

23   reviewed?

24   A    Pardon me?

25   Q    Have you seen this document before?

1   A      Ah, could we go down a little bit?  Was this posted on

2   their web page?

3   Q      It was.

4   A      It was.  I think -- this looks like something I read

5   briefly from the Web site, yeah.

6   Q      Okay.  And you see the agency states that this regular

7   rulemaking would make permanent the emergency rulemaking that

8   was necessary in order to protect public health, correct?

9   A      Ah, that's -- that's what they state there, yes.

10  Q      Okay.  And you said you don't have an informed opinion

11  about the State's decision.

12  A      No.

13  Q      In your view, there's no health risk from consumption of

14  lobsters, eels, or duck from the Penobscot; is that correct?

15  A      That's my overall view, yes.

16  Q      And you're aware that 90 percent of the lobsters in the

17  northern estuary exceed the Maine fish tissue action level; is

18  that right?

19  A      The fish tissue action, that's my understanding, yes.

20  Q      Okay.  And that the average in lobster tail is above .3?

21  A      That's my understanding.

22  Q      Okay.  And you're aware that the average level in eel

23  below Veazie Dam is above .5?

24  A      That's my understanding.

25  Q      And that the average in duck is above .6?

1    A      That's my understanding.

2    Q      Okay.  Now, FDA warned women of childbearing age to

3    limit consumption of albacore tuna?

4    A      Correct.

5    Q      To protect against the health risks.

6    A      Correct.

7    Q      Because of methylmercury.

8    A      Correct.

9    Q      And you agree with that advice.

10   A      As a matter of risk policy, yes.

11   Q      You were the lead author of that advisory you said.

12   A      No, I was one of the -- you asked me that before.  I was

13   -- that was -- the albacore advisory was in the 2004 advice.

14   I was one of the authors.  I was not the lead author, no.

15   Q      You agree with the decision?

16   A      But I signed off on it, sure, yeah.

17   Q      And FDA just repeated that advice last week, correct?

18   A      Correct.

19   Q      And the levels in lobsters in the northern estuary are

20   about the same as the levels in albacore tuna?

21   A      Correct.

22   Q      FDA's fish advisory also says pregnant women should

23   completely avoid four species.  We've talked about these.

24   A      Right.

25   Q      One of those is king mackerel; is that right?

1  A     Correct.

2  Q     Okay.  And the FDA repeated that advice last week, too,

3  correct?

4  A     Correct.

5  Q     At the same time as it issued the net benefits

6  assessment you discussed?

7  A     Correct.

8  Q     Okay.  Now, the average level in king mackerel is about

9  .7, correct?

10 A     That's right.

11 Q     Okay.  And here in the Penobscot, the average in the

12 black ducks is .6, correct?

13 A     That's right.

14 Q     Okay.  So at .7, you advise women and children to

15 completely avoid the species because, in your words, it's just

16 not worth the risk.

17 A     As a matter of risk policy, right.  We had no specific

18 determination.  We did not do a specific risk assessment as --

19 to back that up, I want to point that out.  Okay?

20 Q     The State, using the same data that you've seen, posted

21 a warning telling women and children not to eat black duck

22 from Mendall Marsh.  Are you familiar with that?

23 A     I'm aware of that, correct.

24 Q     Okay.  And it warned all over consumers to limit their

25 consumption, correct?

1    A      Ah, that's correct.

2    Q      Okay.  And that's because of the mercury levels in the

3    duck?

4    A      Yes.

5           MR. COLANGELO:  One second, Your Honor.

6           THE COURT:  Yes.

7    BY MR. COLANGELO:

8    Q      So going back to the king mackerel, this is the level we

9    were talking about.

10   A      Hm-hmm.

11   Q      At just about .7, and this is a species FDA says do not

12   eat.

13   A      Right.

14   Q      And the duck at .6, do you disagree with the State's

15   decision to post a warning advising people not to eat the

16   duck?

17   A      What the State did is ultimately a risk policy

18   deliberation, and there are many factors that they're going to

19   take into account, and I'm not going to second-guess them, and

20   I wasn't party to that and -- nor were aware of all the

21   factors they had to account for.  So I can't disagree with it.

22          MR. COLANGELO:  That's all I have.  Thank you.

23          THE COURT:  Thank you.

24      Mr. Schutz?

25          MR. SCHUTZ:  Thank you, Your Honor.

```
 1                    REDIRECT EXAMINATION

 2   BY MR. SCHUTZ:

 3   Q     And I would like to ask some questions to clarify a few

 4   points.

 5   A     Excuse me.

 6   Q     At the outset, you were asked about the time you had

 7   available to assess and issue a report in this case.  Did you

 8   read Professor Grandjean's report?

 9   A     I did.

10              MR. SCHUTZ:  And I'd like to make the court aware of

11   ECF No. 696, which set deadlines for expert disclosures and

12   provided a deadline for plaintiff to disclose experts by

13   December 30th, 2013, with a deadline January 13, 2014, for the

14   defense to disclose experts, for the record.

15   Q     Were you contacted during that time period, Dr. Bolger,

16   to take a look at Professor Grandjean's report?

17   A     I was.

18   Q     And you were able to make time to give it a careful

19   review?

20   A     Ah, I worked over the weekend, that's right.

21   Q     And did you see any information in his report concerning

22   exposure related to the particular food items in the Penobscot

23   of concern here?

24   A     I did not.

25   Q     And when you say you didn't evaluate the risk of
```

1  exposure, are you referring to a dietary exposure assessment?

2  A      Specifically, yes, hm-hmm.

3  Q      But you did assess the concentrations reported by

4  Professor Grandjean in his report based on your over 30 years

5  of knowledge working at the FDA?

6  A      And relative to what I knew about levels in fish that

7  are commonly consumed by people on an everyday basis, correct.

8           So, yes, I mean, I formed my opinion not in a

9  vacuum, but based on over 20 years of work in dealing with the

10 hazards and risks of methylmercury in fish.

11 Q      Now, there was some discussion about Defense

12 Exhibit 1226, FDA's quantitative risk assessment, and you were

13 asked about the nutrients in fish and -- at Page 17, which we

14 discussed briefly yesterday.

15 A      Right.

16 Q      And did FDA note that little is known about each

17 nutrient thought to be beneficial in fish?

18 A      In terms of the content in individual species of fish?

19 Q      Or more broadly.  You were asked about omega-3s --

20 A      Right.

21 Q      -- and other nutrients in fish.

22 A      Right.

23 Q      So is the agency aware of the fact that fish contain an

24 array of nutrients?

25 A      Yes, they're aware of -- there's a body of scientific

1   literature out there that indicates there's a -- there's an

2   array of nutrients that are found in fish.

3   Q    So if we only look at the beneficial -- beneficial

4   effects of fish related to omega-3s, that's missing a large

5   portion of the picture.

6   A    It can be misleading, yes.  Yes, fish are more than

7   omega-3.

8   Q    And you were asked about various graphs, tilapia,

9   albacore, and so forth?

10  A    Yes.

11  Q    Let's go back to Page 104 of this same exhibit, which is

12  the chart, Table V-7.

13  A    Yes.

14  Q    Now, in this table, the agency reports the results of

15  all of its species-specific modelling?

16  A    This is a summary table for IQ for 9 years of age,

17  correct.

18  Q    So we were talking about different species of fish, but

19  if we go down this table, we do find modelling for lobster at

20  .11 parts per million.

21  A    Correct.

22  Q    And you can see -- if I just remind you about the top

23  column, how many ounces per week to become adverse is

24  determined by the FDA for lobster at that concentration?

25  A    214 ounces per week.

BOLGER — REDIRECT EXAMINATION/SCHUTZ

2429

1   Q    And if we go to the next page, we can see a number of

2   other species.  How many ounces per week to become adverse was

3   determined for tilapia?

4   A    Ah, 1,811.

5   Q    Now, the agency also includes ounces per week to reach

6   maximum benefit.  Do you see that?

7   A    Correct, yes.

8   Q    And for tilapia, they estimated 10 based on their

9   assessment?

10  A    That's correct.

11  Q    And if we go up to the top of Page 105 on this table,

12  it's 9 ounces per week for mackerel?

13  A    Ah, for mackerel.  That may not be king mackerel, so be

14  careful.  There are difficult types of mackerel species, yeah.

15  Q    Atlantic mackerel?

16  A    Yeah.

17  Q    And we go back to the first page of this table.  You can

18  also look at the ounces per week to reach maximum benefit.

19  And up and down this table across the entire concentration

20  gradient, at 9 ounces per week, you're seeing maximum benefit

21  in all of these species?

22  A    Correct.

23  Q    Now, in this report, FDA didn't include a graph for

24  American lobster, but they did assess the extent to which

25  lobster is a nutritious seafood item?

BOLGER - REDIRECT EXAMINATION/SCHUTZ

1   A     The -- the assumption is it contains a nutrition package

2   similar to other fish.  Now, I'd like to point out, if you

3   take this .11 level and, you know, use a factor of 3 to

4   account for a higher level of methylmercury in American

5   lobster, you could do a corresponding math exercise in terms

6   of the amount that would be consumed to exceed.

7           So if you assume that the American lobster was .3,

8   then you would divide the 214 by 3, and that would give you

9   the maximum amount -- I'm just doing a simple math exercise

10  here -- would give you the amount that you have to consume at

11  that level in American lobster to start realizing a net

12  negative.  So that would be 70 ounces a week, about.

13  Q     And for context, a typical 1-pound lobster contains

14  about 4 ounces of edible meat?

15  A     That's my understanding.  But I'm not an expert on that,

16  so I -- yeah.  I'm a consumer.  That's all.

17  Q     You were also asked some questions about Defense

18  Exhibit 753, the Knobeloch paper.  Let me bring up Page 221 of

19  the paper, the second page of the exhibit, and can you see

20  whether the authors reported the time frame during which they

21  conducted their survey?

22  A     1998 through -- December of 1998 through August of 1999.

23  Q     And the significance of that is that if we look at the

24  NHANES data, Defense Exhibit 513, Table 5, on Page 22, that

25  time period corresponds to a time period where there's about

1    twice the level of methylmercury in women of childbearing age

2    nationally?

3    A    Correct.

4    Q    Now, is hair a way of assessing methylmercury exposure?

5    A    Is hair, did you say?

6    Q    Yes, hair, mercury in hair.

7    A    Is a biomarker of exposure, correct.

8    Q    And that is a metric that is used commonly by

9    researchers in this field?

10   A    It is.  By epidemiologists, yeah.

11   Q    And you were asked about Table 4 in this same exhibit,

12   753.

13   A    Correct.

14   Q    Is Table 4 showing hair mercury levels?

15   A    Ah, that's -- yes, it says right here, hair mercury

16   level 1 part per million.

17   Q    And we talked about the blood mercury level 5.8 that

18   corresponds to the reference dose.

19   A    Correct.

20   Q    What's the conversion from -- is there an accepted

21   conversion between --

22   A    2 -- going from hair to blood?

23   Q    Let me finish my question.

24   A    Okay.

25   Q    Is there a conversion -- accepted conversion between

1    mercury concentrations in hair and mercury concentrations in

2    blood?

3    A      There is.

4    Q      What is that?

5    A      It's 250.

6    Q      So is this table -- would it be accurate to understand

7    this Table 4 as showing a 21 percent of Maine women have a --

8    a mercury exposure greater than the reference dose?

9    A      Well, I was told that this 1 part per million was

10   equivalent to the EPA reference dose.  But if you used a 250

11   factor, you end up with a lower reference dose than the EPA

12   reference dose.

13          So I haven't had a chance to go back and look at this

14   paper, whether this is a revision of the EPA reference dose,

15   um, that's unclear to me.

16   Q      You were also asked shown Joint Exhibit 86, this Burger

17   and Gochfeld paper?

18   A      I was.

19   Q      And those are two researchers out of New Jersey?

20   A      Correct.

21   Q      Now, the paragraph below the paragraph you were shown

22   contains a discussion of what the authors are suggesting.  Do

23   you see that?

24   A      Right, we discussed this.

25   Q      What the authors were suggesting is that a pulsed

BOLGER - REDIRECT EXAMINATION/SCHUTZ

2433

1   exposure should be examined and that the federal government

2   should consider additional risk communication related to that.

3   A    That's my understanding of what they were recommending.

4   Q    Has the agency decided to update its risk communication

5   in light of a consumption of a single meal?

6   A    As part of the release of the new draft advisory and the

7   Q's and A's that were issued with it, there's a specific

8   question about single meal consumption, as to whether it poses

9   a risk, and the agency -- the agencies -- EPA -- Environmental

10  Protection Agency and the Food and Drug Administration --

11  stated that it was not a risk issue.  I'm paraphrasing.  I

12  don't have the exact words in front of me, but that's --

13  Q    To your knowledge, does this paper report any scientific

14  information suggesting that a single meal of fish containing

15  methylmercury poses a risk?

16  A    It provides a suggestion and indication that this may be

17  an issue that needs to be pursued further, as the authors so

18  indicated.

19  Q    You mentioned on direct -- cross-examination, rather,

20  that to reduce blood methylmercury levels by half would

21  require -- would take about 250 days of no consumption of

22  fish?

23  A    Correct.

24  Q    What -- what does that tell us about what it takes to

25  increase blood methylmercury levels through consumption of

1   fish?

2   A    Well, it's -- there's a similar time frame you have to

3   take into account.  In other words, you know, if you're

4   plotting, you know, like on the Y axis, if this is blood

5   mercury level right here, and -- and this is, you know,

6   frequency of consumption, in order to sustain the increase,

7   you have to -- and you see this all the time, you have to --

8   you get these pulses in the blood, one after another.  In

9   other words, if you wait too long between meals, what happens

10  is if it comes back down to the baseline.

11       So in order to sustain this, you have to maintain this

12  over a period of time, to a point in which you reach and you

13  stay at steady-state level, okay, and this takes days -- weeks

14  -- weeks of continuous exposure in order for this to occur.

15  It doesn't happen over a day or two days or a week.  You have

16  to do this over a period of time.

17  Q    Now, you were just drawing on the screen.  I mean, how

18  -- how does that look if someone -- and we take the same graph

19  that you just put up -- if someone eats a lobster, then a

20  tilapia, then a shrimp, then a duck, how -- how does the graph

21  look?  Can you kind of demonstrate what that might look like

22  in terms --

23  A    Well --

24  Q    -- of blood methylmercury levels?

25  A    If you had -- the first meal would be what?

1    Q     Just take any assumption you wish -- a variety of

2    seafood over time.

3    A     Okay.  Well -- well, we'll say the first fish you have

4    is a tilapia.  Okay.  Well, there would be no change because

5    they're such low levels.  And if you then had a shark meal,

6    you would see a small rise, followed by a decay fairly rapid

7    over a period of hours back to baseline, and so you -- in

8    order to sustain this increase, you've got to have another

9    pulse followed soon thereafter of a fish that has a similar

10   kind of level, and you have to do that for a period of time.

11   Q     You were asked some questions about federal and state

12   advisories.  Now, are those advisories the result of risk

13   policy considerations, not strictly scientific considerations?

14   A     You know, I -- I would hate to categorize how -- I mean,

15   there are a lot of fish advisories issued by all -- all of the

16   states.  So I -- I would not want to come up with one general

17   characterization.  I mean, the -- the Environmental Protection

18   Agency, the Office of Water does have a program for fish

19   advisories, and, of course, methylmercury is there -- is the

20   key contaminant in their program, and they have a methodology

21   that they recommend that the states follow, and so I believe

22   that most of the states tend to follow that methodology.

23         But I -- you know, I'm not going to categorize what goes

24   on in every state as being the one and only process.  There

25   may be other factors taken into account.  You know, I can't

BOLGER - REDIRECT EXAMINATION/SCHUTZ

2436

1    comment on that.

2    Q    When you talked about FDA's guidance, is FDA's guidance

3    on fish consumption based on the reference dose?

4    A    No.

5    Q    Is that guidance based on risk policy considerations?

6    A    Oh, clearly, because we -- when we -- in 2000, first

7    issued, the do not eat these four species, there was no risk

8    assessment done as part of that.

9         Um, it was -- well, as I said this morning, um, we had

10   been -- the agency had been heavily involved with mercury and,

11   of course, the focus had always been on swordfish, and so the

12   agency had to say something about swordfish, and, of course,

13   shark was part of that discussion.

14        And then during those -- during those deliberations, um,

15   tilefish and king mackerel were brought into the discussion

16   because they have, on average, levels of about 1 part per

17   million.  So, um, the decision was made, as a matter of

18   prudence, to say to pregnant women, because there really was

19   no nutritional risk -- what I mean by that, if you didn't eat

20   these four species, your diet wouldn't suffer.  You could find

21   other food, particularly other fish, to eat.  And so that's

22   how that advice was constructed.

23        I -- I know that sounds very simplistic, but in a way,

24   that's how it happened, yeah.

25   Q    I want to go back to Defense Exhibit 1024.

1           MR. SCHUTZ:  And I guess a question for

2    Mr. Colangelo, do you have any objection to this?

3           MR. COLANGELO:  No objection.

4           THE COURT:  1024 is admitted without objection.

5    BY MR. SCHUTZ:

6    Q    So I just want to take us back to this -- this figure we

7    spent some time on earlier, and just to make sure we have

8    clarity.

9           If someone has a blood methylmercury level at 58 parts

10   per billion, which is the benchmark dose -- derived benchmark

11   dose that is the basis for the reference dose, what does that

12   mean in terms of risk for that person at a blood mercury level

13   at 58 parts per billion

14   A    Well, these are population estimates, so it's not

15   individual.  Okay.  And so this is --

16   Q    Well, let's assume you have a population, then.

17   A    Right.  So this is the -- the lower bound confidence

18   limit on the benchmark dose, so it's the most conservative

19   estimate of an increase of 5 percent risk in a population of a

20   small decrement in IQ.  So it's -- it's the -- what I would

21   say the barely detectable -- okay -- demonstrable evidence of

22   an adverse effect of methylmercury on neurocognitive

23   development.

24   Q    When you were talking earlier about exceedances of the

25   reference dose, are you talking about the top 10 percent of

BOLGER - REDIRECT EXAMINATION/SCHUTZ

2438

1  women of childbearing age as surveyed by NHANES being slightly

2  over the reference dose?

3  A     No, it's -- it's -- it's a little over 2 percent, or

4  slightly over the reference dose, right in here.  Okay.  And

5  what I mean by that is they're -- they're over -- I mean, the

6  reference dose -- the blood level that's equivalent to the

7  reference dose is 5.8.  Their blood level would be something

8  like 6 or 7.

9  Q     So the concern then is not whether someone is consuming

10 at the rate suggested by the reference dose, but whether

11 they're consuming enough to significantly and maturely elevate

12 their blood methylmercury level?

13 A     Well, that's what I was trying to get at before.  When

14 you go through these simple math exercises and you're over the

15 reference dose, fine, but you still have a significant margin

16 of safety built in here.  So you've gone over the reference

17 dose, but that doesn't mean you're going to start seeing

18 adverse effects within a population.  What it means is you're

19 over the reference dose.  Okay.

20        In order to -- to have a significant probability of

21 being able to measure an adverse effect, you have to go to

22 substantial larger increases in blood mercury.  It's the blood

23 mercury that's the marker of -- of outcome here.

24 Q     Having considered the concentrations of mercury found in

25 lobster, duck, crab, and eel in the Penobscot, in your

1    opinion, is there evidence of any material human health risk?

2    A     Well, my appraisal of that information was that, first

3    of all, looking at the level in lobster and based on my

4    20-some-odd years experience looking at methylmercury in fish,

5    that this level was not out of line with levels I've seen in a

6    lot of fish that people eat on a regular basis.

7          In regards to the eel and black duck, eel I didn't see

8    any evidence that anybody was even eating eel.  I did not see

9    that.  It was not clear to me at all.

10          And in terms of black duck, the information that I was

11    able to -- that I was able to glean from -- was that there are

12    very few animals that are resident in the -- in the -- in the

13    area, and the likelihood that someone would be eating this on

14    a -- on a basis that would represent a risk issue, I -- I was

15    not convinced of that, no.

16                MR. SCHUTZ:  If I may have one moment?

17                THE COURT:  You may.

18    BY MR. SCHUTZ:

19    Q     So in a word, is it your judgment that human health risk

20    in the Penobscot's negligible?

21    A     That's my -- my -- my conclusion, yes.

22                MR. SCHUTZ:  Thank you.

23                THE WITNESS:  Hm-hmm.

24                THE COURT:  Recross?

25                MR. COLANGELO:  Yes, Your Honor.

BOLGER - RECROSS-EXAMINATION/COLANGELO

2440

                         RECROSS-EXAMINATION

1   BY MR. COLANGELO:

2   Q    Dr. Bolger, to confirm, you have no Maine-specific

3   information about fish consumption; is that right?

4   A       Personally, no, uh-uh.

5   Q    And you have no information specific to the state of

6   Maine about how many people are above the reference dose in

7   terms of blood mercury levels; is that right?

8   A       No, I do not.

9   Q    Okay.  And you're not sufficiently familiar with the

10  State's fish tissue action level to offer an opinion on how

11  they derived it; is that right?

12  A       That's correct.

13  Q    And the State, when it set that level, had information

14  before it about fish consumption in Maine; is that right?

15  A       About fish consumption, not lobster.  Right, I believe

16  it was -- the emphasis is on fish here, right?

17  Q    And the State had access to all of the studies that you

18  discussed that underlies the EPA reference dose; is that

19  right?

20  A       Ah, that's correct.

21  Q    And you're not second-guessing the State's safe fish

22  tissue action level of .2 part per million; is that right?

23  A       It's a risk policy call, and, you know -- no, I will not

24  second-guess someone.

1    Q     Now, let me show you Defendants' 1080 -- 1024.  First,

2    the blue line here on this exhibit, this is the national data

3    that you talked about earlier, right?

4    A     Ah, correct.

5    Q     Okay.  This is not information specific to people in the

6    state of Maine; is that right?

7    A     Correct.

8    Q     Okay.  Now, there's a red dotted line here that

9    corresponds to the EPA reference dose; is that right?

10   A     That's correct.

11   Q     And EPA, in evaluating the science almost 15 years ago,

12   set the reference dose there; is that right?

13   A     That's correct.

14   Q     Okay.  Now, you're saying that was derived from a

15   benchmark dose --

16   A     Correct.

17   Q     -- with an application of an uncertainty factor of 10,

18   right?

19   A     Correct.

20   Q     Okay.  EPA decided to impose that uncertainty factor to

21   account for variability in the human population; is that

22   right?

23   A     That's correct.

24   Q     And the fact that some people are more sensitive than

25   others; is that right?

1    A    That's what they did, correct.

2    Q    Okay.  So because even in a large, well-designed study,

3    there's a concern that you're not accounting for the full

4    risk, and that's why the agency applied an uncertainty factor,

5    to include that in.

6    A    Right.  But other bodies have come up with conclusions

7    that are contrary to that.

8    Q    We're talking about the EPA reference dose.

9    A    I understand that.

10   Q    Okay.

11   A    But there are other levels that are different.

12   Q    Okay.  And EPA, based on the reference dose, set a fish

13   tissue criterion of .3 part per million; is that correct?

14   A    Ah, that's correct.

15   Q    Okay.  Now, the State of Maine set a slightly lower

16   level of .2 part per million?

17   A    For fish tissue, correct.

18   Q    For fish tissue.  Now, you're not saying that exposure

19   in this range all the way up to the benchmark dose is

20   perfectly safe, are you?

21   A    Oh, not at all.  I didn't say that.  I just said that --

22   first of all, I don't know how risk changes, as I exceed the

23   reference dose.  I don't know.  It doesn't tell me anything

24   about that.

25        But I do know that the margin of safety didn't go to

1    zero when it went over it.  There's still a margin of safety.

2    Now, that margin of safety -- okay -- becomes smaller and

3    smaller as I get up here, and I know at this point, the most

4    conservative estimation of risk is -- is -- is what EPA based

5    that on.

6         So -- but we're well below that.  Okay.  So the -- the

7    application of a tenfold factor, default factor now, to

8    account for the sensitive members of the population, other

9    groups have deliberated and have concluded that was

10   unnecessary.

11        These are large, large epidemiological studies where

12   sensitive subjects are part of it, so applying a default

13   factor could be argued was unnecessary.

14   Q    And the State of Maine, when it set its fish tissue

15   action level, could have set a level higher than EPA's, right?

16   A    It's a risk policy call, correct.

17   Q    It could have decided that that uncertainty factor was

18   overprotective and -- and set a level at .5, .6?

19   A    They could have, but -- but the reality is when you look

20   at fish advisories for methylmercury issued by states, almost

21   all of them will follow the recommendations of the

22   Environmental Protection Agency.

23   Q    And here the State of Maine chose to go lower, at .2.

24   A    Well, they used the reference dose, yeah.

25   Q    And they set a fish tissue action level lower than EPA's

1    fish tissue criterion.

2    A     That's correct.

3              MR. COLANGELO:  That's all I have.

4              THE COURT:  Thank you.

5         Anything further?

6              MR. SCHUTZ:  Nothing further.  Thank you.

7              THE COURT:  All right.  We'll take.  You may stand

8    down, sir.  Thank you very much.

9              THE WITNESS:  Sure.

10        (The witness left the witness stand.)

11             THE COURT:  We'll take our second break.  We'll be

12   back in about 20 minutes.

13        (Court recessed from 12:15 p.m. to 12:46 p.m.)

14             THE COURT:  Mr. Schutz?

15             MR. SCHUTZ:  The defense calls Dr. Russell Keenan.

16             THE CLERK:  Please raise your right hand.  Do you

17   solemnly swear that the testimony you shall give in the matter

18   now in hearing shall be the truth, the whole truth, and

19   nothing but the truth, so help you God?

20             THE WITNESS:  I do.

21             THE CLERK:  Please be seated.  Please state your

22   name and spell your last name for the record.

23             THE WITNESS:  Yes, it's Russell Edward Keenan,

24   K-e-e-n-a-n.

25             THE COURT:  You may proceed.

1    RUSSELL EDWARD KEENAN, having been duly sworn, was examined

2    and testified as follows:

3                         DIRECT EXAMINATION

4    BY MR. SCHUTZ:

5    Q     Good afternoon, Dr. Keenan.

6    A     Good afternoon.

7              THE WITNESS:  Good afternoon, Your Honor.

8              THE COURT:  Good afternoon.

9    BY MR. SCHUTZ:

10   Q     What's your field of expertise?

11   A     Um, well, my field of expertise is over 25 years of

12   experience in human health and ecological risk assessment

13   designed to look at cleanup decisions on contaminated sites.

14   Q     Do you have experience with river environments?

15   A     Yes, I do.

16   Q     Could you describe that?

17   A     Um, yes, I've led a team of researchers for -- over the

18   course of my career that have specialized in aquatic

19   environments.  I've conducted a number of studies, as well, to

20   try to assess exposure to contaminated aquatic environments.

21   Q     What's your current position?

22   A     It's principal toxicologist and vice president for

23   Integral Consulting, which is a national science and

24   engineering firm.

25   Q     Do you have expertise in exposure assessment?

1   A       Ah, yes, I do.

2   Q       Could you describe that?

3   A       Ah, yes.  Well, um, my expertise in exposure assessment

4   goes back, um, to really the beginning of my career, as I

5   mentioned, over 25 years, and I've conducted a number of

6   site-specific studies to try to better ascertain exposure.

7   Q       Have you been involved in angler surveys?

8   A       Yes, I have.

9   Q       What is an angler survey?

10  A       An angler survey is -- it can be either a recall survey

11  or it can be direct interception of anglers on a river or

12  waterway to try to ascertain how much fish they catch and how

13  much they consume to enhance the risk assessment assumptions

14  and parameters, to get actual information.

15  Q       Have you done angler surveys in Maine?

16  A       Ah, yes, I have.  Um, the -- the angler survey that I

17  did in Maine, um, was published in the peer-reviewed

18  literature.  I was co-investigator on that.  It's commonly

19  known as the Maine anglers survey, and that's been used by

20  U.S. EPA as one of their key studies for assessing freshwater

21  fish consumption.

22  Q       Have you worked with United States Environmental

23  Protection Agency to improve human health risk assessment

24  methods?

25  A       Yes, I have.

1    Q      Could you describe that?

2    A      Sure.  Um, I had the first -- I was principal

3    investigator of the first cooperative research and development

4    agreement.  It's called the -- the acronym is CRADA, under the

5    Federal Technology Transfer Act, and it was the first one that

6    the federal government had in the field of risk assessment.

7           And what I did there is -- I was more on dose-response

8    analysis, looking at probabilistic techniques to enhance the

9    risk assessment process.

10   Q      And have you worked with the Maine Department of

11   Environmental Protection on human health risk assessment?

12   A      Um, yes, I have.  Um, one of the first risk assessments

13   I did, way back at the beginning of my career, began for the

14   Wastewater Treatment Association of Maine and a number of

15   municipalities, and from that point forward, Maine Department

16   of Environmental Protection also came onboard that effort so

17   that they used that in their rulemaking proceedings back at

18   the Board of Environmental Protection back in the -- in the

19   late 1980s, and that standard has stood the test of time.

20   It's had some modifications, but it's still out there today.

21   Q      Let me move to your experience in the ecological risk

22   assessment world.  Have you performed ecological risk

23   assessments at contaminated sites?

24   A      Ah, yes, I have.

25   Q      At hazardous waste and Superfund sites?

1    A     Yes, I have.  And, um, a number of -- there's been a

2    number of sites where my risk assessments have been used in

3    the determination of cleanup.

4    Q     And have you submitted risk assessments and had them

5    accepted by the United States Environmental Protection Agency

6    and used as the basis to make decisions on remediation?

7    A     Um, yes, I have.  The -- the latest -- um, well, I think

8    the most recent ones have been the -- the BROS, B-R-O-S,

9    Superfund site in New Jersey in region 2, and that ecological

10   risk assessment was really the -- the driver for the remedial

11   decision at that site.

12         And, also, most recently, the Copperas Pond Superfund

13   site, also in region 2, this time in New York state.  Um, in

14   that particular situation, the ecological risk assessment has

15   been accepted by EPA, but a cleanup decision hasn't been

16   rendered yet.

17   Q     And when working with the U.S. Environmental Protection

18   Agency on these sites, do they accept parties' ecological risk

19   assessments with no questions asked?

20   A     Oh, no, not -- not in any way.  They -- they're very

21   rigorous.  They go through, and you'll -- you'll get comments,

22   and -- and it's a very deliberative process, yes.

23   Q     And have you been involved in sites where mercury is a

24   contaminant of concern?

25   A     Yes, I have.

1    Q      Could you describe your experience with mercury as a

2    contaminant for purposes of ecological and human health risk

3    assessment.

4    A      Sure.  I think the first mercury site that I worked on

5    was a hazardous waste site in the state of Vermont.  That was

6    probably the late 1980s, early 1990s.  But from there, there

7    have been -- there have been other sites I did.

8             I -- I authored the Mercury in Maine report that was

9    sponsored by the Maine Pulp and Paper Association, and

10   actually worked with Dr. Evers on that particular report.  Um,

11   he was -- I retained him as part of our team.

12        Um, in -- then there were -- there's other Superfund

13   sites that I've -- where mercury has been a contaminant, um,

14   and many of those are still underway.

15   Q      And you mentioned that you've published in peer-reviewed

16   literature?

17   A      Yes, that's correct.

18   Q      Have you been active in professional societies related

19   to human health and ecological risk assessment?

20   A      Ah, yes.  I've been most active in the Society of

21   Toxicology, the Society of Risk Analysis, and also I'm -- I'm

22   on the science advisory board of the Association For

23   Environmental Health and Sciences.  Um, and every -- every

24   year for that association, I put on a special symposium on --

25   sort of advancements in risk -- in risk assessment.

1    Q     What's your educational background?

2    A     Um, I have -- my bachelor's degree is in biology from

3    Bates, and my Ph.D. is in environmental biology from Duke

4    University.

5    Q     Where is your office?

6    A     Oh, it's located on Exchange Street in Portland.

7    Q     How long have you lived in Maine?

8    A     Ah, I've lived in Maine since 1981, so that makes it

9    33 years.

10              MR. SCHUTZ:  For the record, Dr. Keenan's full CV is

11   Appendix A to Joint Exhibit 55.

12              THE COURT:  Thank you.

13   BY MR. SCHUTZ:

14   Q     Let's turn, Dr. Keenan, to your opinions in this case.

15   A     Sure.

16   Q     What issues have you looked into?

17   A     Well, my -- I looked at human health and ecological risk

18   issues.

19   Q     Ecological risk to any particular receptor?

20   A     Yeah, yes, I should qualify that.  The ecological risks

21   were to -- to fish.

22   Q     Do you have an understanding of what the Study Panel did

23   to screen human health risk in the Penobscot?

24   A     Yes, I do.

25   Q     What did they do?

1    A     Well, they compared -- they compared mercury levels in

2    the various items, in the various food items to the -- the

3    State's fish tissue action level.

4    Q     Are you familiar with Maine's fish tissue action level?

5    A     Yes, I am, yeah.

6    Q     Did you -- prior to this case?

7    A     Yeah.  Prior to this case, because the fish tissue

8    action level was actually developed, and it was developed by

9    the previous state toxicologist, but then when Dr. Smith

10   became the state toxicologist, I've worked with him on a

11   couple of other cases.  He wanted to evaluate whether -- you

12   know, things have changed, exposure parameters change over

13   time, and new science, new information, so he wanted to make

14   sure that it was still protective.

15         And he -- one of the yardsticks that he used for that

16   was he looked at, um, my fish consumption study, the Maine

17   anglers study, and he used that as part of the basis for the

18   FTAL.

19   Q     When was your Maine anglers study published?

20   A     It was published in 1983.  The publication is Ebert, et

21   al.  There's also another version of it, there's a report

22   version that's a bit earlier, I think it's called ChemRisk

23   1992.

24   Q     You -- you said it was published in 1983, did you mean

25   '93?

1  A     I meant '93.  Did I say '83?  I'm sorry.

2  Q     Okay.  What's your reaction to the Study Panel's use of

3  the Maine fish tissue screening level for consideration of

4  consumption advisories --

5  A     Well --

6  Q     -- assessing risk -- for purposes of this remedial

7  project?

8  A     Well, a fish tissue action level is a screening device,

9  but it's practically exceeded through -- it's exceeded

10 throughout the state of Maine.  So I don't think it's

11 particularly informative or particularly useful in -- for the

12 Penobscot River situation, trying to make a decision about

13 remedial options.  So I would disagree with the use of the

14 FTLA for that purpose.

15 Q     If we could bring up Defense Exhibit 512, that's the

16 Maine freshwater fish consumption advisory.  This is a

17 document you're familiar with?

18 A     Yes, it is.

19 Q     And what's the geographic scope of the advisory in

20 Maine?

21 A     Well, the geographic scope here is the Maine freshwater

22 fish --

23 Q     Right.

24 A     -- in this particular -- yes.  And throughout the state

25 of Maine, the -- the actual -- yes, the advisory is statewide.

1    It's all freshwater water bodies in the state of Maine.

2    Q    And this advisory applies to the Penobscot River,

3    specifically below Lincoln?

4    A    Yes, it does, hm-hmm.

5    Q    And are you also familiar with the State's saltwater

6    fish consumption advisory, Defense Exhibit 576?

7    A    Yes -- yes, I am.

8    Q    And what's the geographic scope of that advisory?

9    A    Well, this advisory also is the entire coastline of

10   Maine.  Our entire coastline is covered by this.

11   Q    And if we look at Defense Exhibit 1069, a map of Maine,

12   did you prepare this?

13   A    Ah, yes, I did.

14   Q    What does this show?

15   A    Well, this is just a graphic to show how extensive that

16   fish tissue act -- that -- that Maine freshwater fish

17   consumption, um, advisory is, um, both the fresh water and the

18   salt water, essentially covers all the water bodies of Maine.

19   Q    Why is this significant in understanding human health

20   risk and whether the fish tissue action level's relevant here?

21   A    Well, I think this is important because what the

22   question is in the Penobscot River is -- has to be placed into

23   the context of the exposure that people are getting from

24   mercury by eating seafood or -- or fish from other sources.

25   Q    Have you also looked at data on mercury concentrations

1    in commercially-available seafood eaten in the United States?

2    A    Ah, yes, I have.

3    Q    I'd like to bring up Defense Exhibit 1087.

4         MR. SCHUTZ:  Which I'd like to move into evidence.

5         THE COURT:  Is there any objection to 1087?

6         MR. COLANGELO:  Your Honor, no objection to this

7    one, but I'd like to note that we -- we were previously

8    advised by defendants' counsel that all of these were

9    demonstrative only.

10        So although I've reviewed many of the data sources

11   underlying this table, I have not had an opportunity to look

12   at every one, which I would have preferred to do had I known

13   that this would be moved into evidence.

14        THE COURT:  Okay.  Well, you've got a weekend

15   assignment, then.

16        MR. COLANGELO:  I do, Your Honor.

17        THE COURT:  All right.  If you'd like to -- I'm

18   going to move it -- I'm going to allow it into evidence, as I

19   did the prior exhibit, and if you come back and object with a

20   basis, I'll review your objection later.

21        MR. COLANGELO:  Thank you, Your Honor.

22        THE COURT:  Thank you.

23        MR. TALBERT:  And, Your Honor, just for the record,

24   we actually did make it clear to plaintiffs -- maybe not clear

25   enough -- that we reserved the right to enter some of these

1    into the record, as well.

2            THE COURT:  All right.  Thank you.

3    BY MR. SCHUTZ:

4    Q     And, Dr. Keenan, did you prepare this figure?

5    A     Yes, I did.

6    Q     Let me enlarge the data sources at the bottom --

7    A     Hm-hmm.

8    Q     -- and ask you to summarize the sources that you used in

9    this figure.

10   A     Yes.  The sources in this figure come from a number of

11   U.S. Government sources, including the -- including, for

12   instance, U.S. FDA, the Centers for Disease Control, their

13   agency for toxic substances and disease registry.  In 2013,

14   they updated or sent -- or essentially published an addendum

15   to their toxicological profile for -- for mercury.

16          And then C is just -- is the lobster data from the

17   Penobscot River and came from my expert report, so that's why

18   I cited myself on that one.

19          Um, and, um, the same thing for D.

20          E is a report where Dr. Fisher is a co-author of that,

21   and -- and back a couple of years ago, Dr. Fisher and his

22   associates took a comprehensive look at a number of data

23   sources of mercury in all kinds of different seafood and --

24   and fish, including fresh water -- or sea -- seafood and

25   published their -- sort of a -- a comprehensive database and a

1    paper, which -- where they summarized their information.

2         And then, finally, the dietary guidelines for Americans,

3    which was a joint publication of U.S. Department of

4    Agriculture and U.S. Department of Health and Human Services

5    in 2010.

6    Q    Okay.  We can go back to the -- the chart.  And so

7    you've included types of seafood at the bottom on the

8    horizontal axis.  On the vertical axis mean mercury

9    concentrations in nanograms per gram?

10   A    Yes, in nanograms per gram or parts per billion.  It's

11   the same measurement.

12   Q    What do the green bars represent?

13   A    The green bars are the lobster data from the -- the

14   first green bar, the one furthest to the left, is from -- is

15   from the -- the entire Penobscot River study area.

16        And then the other green bar, the one that's slightly to

17   the right, is from the now closed part of the estuary, the

18   so-called lower river or Upper Estuary, and then that is

19   bracketed -- there is other lobster data from -- from these

20   reporting sources -- whoops -- that can be located here.  It

21   sort of brackets the -- the data.

22   Q    So how do the lobster concentrations found in the study

23   area and in the closed area compare with other reported

24   concentrations of mercury in lobster?

25   A    Well, our -- the lob -- the mercury concentrations in

1    the Penobscot lobster are well within the range of lobster

2    mercury concentrations reported elsewhere.  There's some that

3    are reported lower and some that are reported higher, and --

4    but the -- for the entire study area, it really is at the low

5    end of the range of the -- the -- of the lobster reporting

6    from these federal publications, and also from Dr. Karimi.  I

7    should point out this is -- the Karimi and Fisher paper,

8    that's where they synthesized the information from the various

9    repositories.

10   Q    So based on their synthesis of all available data sets,

11   the mean lobster concentration equals the level that the Study

12   Panel's using to screen risk?

13   A    That's correct.

14   Q    There's been a discussion -- quite a bit of discussion

15   about tuna in this case.  What's the significance of tuna for

16   purposes of exposure to methylmercury from consumption of

17   seafood in the US?

18   A    Well, tuna's important because tuna is one of the -- is

19   the most heavily-consumed seafood item, and so, again, we have

20   to put this all into the -- into the paradigm of -- of

21   assessing exposure and knowing how much exposure people are

22   receiving.  It's just not just concentration that's important.

23        So if we look at tuna, we can see that there are various

24   tuna measurements.  We've got the canned chunk white; we've

25   got solid white here; fresh-frozen; canned albacore.  And

1    there are some lower ones like the canned light and the chunk

2    light tuna.  So you can see that there's a wide range of tuna

3    concentrations, many of which, of course, are above the

4    screening concentrations for the -- the Penobscot River.

5    Q    Where do the lobster mercury concentrations in the

6    closed area fall in relation to concentrations of mercury in

7    canned tuna sold in Maine and throughout the country?

8    A    Well, it's within the range.  Here is the -- here's the

9    lobster concentrations from the closed portion of the estuary,

10   you know, compared with canned tuna.

11   Q    There's been some discussion about the USDA dietary

12   guidelines for Americans, the lobster value derived from that

13   publication.  Did you take a closer look at that reported

14   value?  It's Exhibit 514 found in Appendix 11.

15   A    Yes, I did.

16   Q    And what mercury concentration corresponds to the value

17   reported in the USDA's dietary guidelines for Americans 2010,

18   Appendix 11?

19   A    Well, I -- I believe they report it as per 4 -- per 4

20   -ounce serving.  When you actually put that on a grams per day

21   basis -- or -- excuse me -- when you put that on a grams

22   concentration basis, that's 310 nanograms per gram, or

23   310 parts per billion.

24        And I -- and that was on my previous graph.  I -- well,

25   yeah.

1    Q     Let's bring up Defense Exhibit 1087.  So that's the

2    value that's shown here with Footnote F?

3    A     That's -- that's correct.

4    Q     From a human health standpoint, what's the take-away

5    from this figure?

6    A     The take-away from this figure is that the -- really the

7    consumption of -- the consumption of food items from the

8    Penobscot River and the estuary is no different than the

9    consumption of seafood items that are found in supermarkets

10   and sold throughout Maine and throughout the United States.

11   These values are -- are well within the range of what we see

12   everyday and, you know.

13   Q     Let's bring up Defense Exhibit 1065 and move on to human

14   health risk assessment methodology.

15   A     Yeah.

16   Q     And you are familiar with the methodology for performing

17   human health risk assessments?

18   A     Yes, I am.

19   Q     And we brought up a demonstrative, 1065, that has three

20   boxes.  Let's start with risk characterization.  What elements

21   go into characterizing a human health risk?

22   A     Well, to characterize risk, you have to have information

23   about the -- the hazard, so the chemicals of concern, um, and

24   there -- and information about the chemical concentrations.

25   You have to know something about their toxicity and dose

1    response of those chemicals of concern and then, as well, a

2    very important component is exposure, where we're looking at

3    the frequency, duration, and magnitude of contact with the

4    chemical in the environment.

5         And when we're talking about a food safety assessment,

6    as Dr. Bolger mentioned, we're talking about the levels of

7    those contaminants in the food item, and we're talking about

8    the frequency, duration, and magnitude of consumption for that

9    item.

10        And then that is -- all that information is synthesized

11   into the characterization of risk.

12   Q    Can one accurately characterize risk without an exposure

13   assessment?

14   A    No, you can't.

15   Q    Let's go to Defense Exhibit 1066, which is another

16   demonstrative.  Did you prepare this?

17   A    Yes, I did.

18   Q    What is -- and you've shown a risk-specific

19   concentration.  What is a risk-specific concentration?

20   A    The risk-specific concentration would be the -- um,

21   would be use -- would be like a screening level, screening

22   level of the contaminant of concern, after you've gone through

23   all the steps of hazard ID and the exposure assessment, risk

24   characterization.  It would be the allowable level or a

25   screening level of that particular compound so that exposure

1    would not exceed the reference dose, in this case, for mercury

2    would not exceed the, um, .1 microgram per kilogram day.

3    Q    And we discussed with Dr. Bolger the distinction between

4    a quantitative risk assessment such as the FDA's net benefit

5    assessment, and a safety risk assessment?

6    A    Yes, that's correct.

7    Q    And what approach did you take?

8    A    Well, I took the approach of really a safety risk

9    assessment, but refining the parameters that went into it.

10   Q    Why?

11   A    Well, it was not necessary I felt -- well, let me back

12   up.  This whole process is meant to be iterative, and so the

13   first step you would take would be a screening-level

14   assessment or -- or a safety assessment, in Dr. Bolger's

15   words.

16       Only then if you needed to have more information would

17   you need to go through the -- the so-called, you know,

18   quantitative risk assessment where you're going -- you're

19   using perhaps alternative metrics and more sophisticated

20   techniques.  I have done those plenty of times in the past,

21   but for this step, did not appear to be necessary to -- to

22   take a more refined look at the situation in the Penobscot

23   River.

24   Q    So a risk-specific concentration would be a

25   concentration above which one would determine that there's a

1   need for further evaluation, it would be essentially a

2   screening level?

3   A     It essentially would be a screening level.  You would

4   use it for then -- to perhaps to help design what further risk

5   evaluations you might do if -- you know, if you had an

6   exceedance.

7   Q     Is the state's fish tissue action level a risk-specific

8   concentration?

9   A     It is, in fact.  It is a form of a risk-specific

10  concentration.

11  Q     But is it calibrated in any way to risks associated with

12  the particular Penobscot food items?

13  A     No, and that's -- that's the difficulty with it.  It's

14  really meant for a screening for fish advisory purposes, um,

15  and it's not -- it's not designed for these particular food

16  items.

17        Again, the data that went into its derivation was

18  freshwater fish consumption.

19  Q     And deriving a risk-specific concentration here, did you

20  come up with a methodology from scratch?

21  A     Ah, no, I didn't.  I -- I wound up using really the same

22  methodology the State uses and --

23  Q     Let's bring up --

24  A     Yeah.

25  Q     -- Joint Exhibit 85 and -- which is a Bureau of Health

1  fish tissue action level document dated 2001.  And on the

2  first page of that document, they report an equation for

3  determining action levels for noncancer toxicological

4  endpoints?

5  A    Ah, that's correct.

6  Q    Is this the equation that you used to derive a

7  risk-specific concentration for food items in the Penobscot?

8  A    It is -- it is the same equation.  Um, in -- instead of

9  referring to it as an action level, I referred to as a

10  risk-specific concentration.  That's the more technically

11  accurate term in the risk assessment literature.

12  Q    And can you walk us through how the equation works?

13  A    Sure.  Um, well, the action level or risk-specific

14  concentration is equal to the reference dose, which we've

15  talked about that being the -- the .1 micrograms per kilogram

16  day, times the individual's body weight, divided by, um -- in

17  this case, it's a fish consumption rate, but what I did is I

18  put in values.  For instance, when we're looking at black

19  duck, black duck are not fish, put in a black duck consumption

20  rate, rather than the fish consumption rate.

21  Q    So, again, if you're put in -- if you use a different

22  body weight than what the State used in 2001 or you use a

23  different consumption rate, you come up with a different

24  screening value?

25  A    Yes, the numbers will -- will change, hm-hmm.

1  Q     Let's look at the consumption rate information that you

2  thought was relevant or you used.

3  A     Okay.

4  Q     And I'm going to bring up Defense Exhibit 1071.

5           MR. SCHUTZ:  Which I'd like to move into evidence.

6           THE COURT:  Any objection to 1071?

7           MR. COLANGELO:  One second, Your Honor.  No

8  objection, Your Honor.

9           THE COURT:  1071's admitted.

10  BY MR. SCHUTZ:

11  Q     Dr. Keenan, before we go to 1071, let me just jump back

12  to your report -- or, actually, to Defense Exhibit 1067.  Is

13  this an -- is this an equation from your report?

14  A     Ah, yes, it is.

15  Q     And, again, aside from the change in terminology from

16  action level to risk-specific concentration, is this the same

17  equation used by the Maine Bureau of Health?

18  A     Yes, it is, and the only other change in your -- if

19  you're comparing the two equations, Your Honor, is that here

20  the CR is an abbreviation for consumption rate.  I think the

21  -- the Maine formula had something like -- had different

22  letters in there, but --

23  Q     And we can --

24  A     -- it's the same thing, yeah.

25  Q     All right.  And we can just jump back quickly to Joint

1    Exhibit 85 and see that the equation that the State's using is

2    the same approach that you took.

3    A    Yes, it is, hm-hmm.

4    Q    All right.  Let's move to 1071.  Now, does this table

5    pull together the information that you used to derive a

6    risk-specific concentration?

7    A    Ah, yes, it is, and this summarizes the information

8    that's in my executive -- I mean -- excuse me -- that's in my

9    expert report.

10   Q    Let's just to get oriented, can you go through the very

11   top column of this table and walk us through it and then walk

12   us through the assessor.

13   A    Sure.  Um, would you like me to go through the row going

14   across, the top -- the top row?

15   Q    Yes, please.

16   A    So under the assessor, that's just who did the analysis.

17        The location is for each of those analyses that were --

18   that was done, where did it apply to?  Did it apply statewide,

19   or did it apply to some other location?

20        Um, third column is just the food item being assessed.

21        The next column is just the meal frequency in terms of

22   meals per year.

23        Then the next column is the meal size in terms of grams

24   per meal.

25        The next column is the consumption rate, which is --

1   which is really just, um, the product of the meal frequency

2   times the meal size, divided by 365 days per year.  That's

3   just to make the math work.  And there had been some

4   discussion earlier this morning, there -- a lot of times in

5   risk assessment, you're just putting in correction factors to

6   make the math work, to get the units to work out.

7        Next column is the body weight of the individual and

8   then the reference dose.  Here, again, to make the units come

9   out right, it's expressed in terms of milligrams per kilogram

10  day, but that is the same EPA RfD or of .1 micrograms per

11  kilogram day.

12       So then if we go down this column, the first assessor is

13  the Maine CDC for the statewide freshwater fish advisory.

14       The next is the -- the Maine Bureau Of Health and the

15  Maine Bureau of Health is the predecessor agency to the Maine

16  CDC, and back in 1998, after the Julie N oil spill in Portland

17  Harbor, the bureau did an assessment of lobster consumption --

18  or they did a risk analysis of lobster consumption for

19  Portland Harbor and Casco Bay, and that's the only information

20  we have in the entire state, or anywhere, on lobster, where

21  anyone's done a lobster-risk assessment.  So I thought it was

22  appropriate to use the Maine Bureau of Health data because

23  they're the predecessor agency.

24       The next assessor is the Study Panel, and the Study

25  Panel really just took the Maine CDC freshwater fish tissue

1    action level and just compared all these different food items

2    to the freshwater fish tissue action level.

3    Q    So they didn't make any attempt to derive

4    species-specific exposure for purposes of assessing human

5    health risk in the Penobscot?

6    A    No, they didn't.

7    Q    And then the last assessor is you.

8    A    Yes, it is, from the expert report, correct.

9    Q    And, obviously, some of your values are derived from

10   Maine CDC or Maine Bureau of Health, and we can walk through

11   that.

12   A    Yes.

13   Q    Since we just were talking about the reference dose, I

14   just want to ask, did you use the reference dose in your

15   assessment?

16   A    Yes, I did.

17   Q    Now, if we go to Defense Exhibit 1070, we discussed this

18   with Dr. Bolger.  If you had used instead of the reference

19   dose the U.S. Centers for Disease Control screening value,

20   what would that do to the concentrations that you derived?

21   A    Well, that would have made my risk-specific

22   concentrations threefold greater.

23   Q    If we can go back to 1071, we're going to go through

24   these factors to better understand your consumption rate.

25        And I want to start with meal frequency.  What was the

1   basis for your use of 22.6 estuarine fish meals per year?

2   A     Okay.  Well, um -- well, the lower Penobscot River is

3   really an estuarine environment, and we needed to use an

4   estuarine fish consumption rate because fish consumption

5   varies by the type of -- of environment, whether it's fresh

6   water, lakes and ponds, rivers and streams, or whether it's --

7   it's estuarine.

8       So this value here comes from the Exposure Factors

9   Handbook, which is U.S. EPA's authoritative encyclopedia, if

10  you will, of exposure factors intended to be used at -- well,

11  certainly at all hazardous waste sites, and then also for

12  other purposes, for looking at -- at products or -- or other

13  types of risk assessments.

14      So U.S. EPA's Exposure Factors Handbook, their data on

15  estuarine -- on freshwater and estuarine fish consumption, the

16  22.6 meals per year comes from an actual dietary survey of

17  Americans that was conducted by USDA, and that represents the

18  95th percentile of the distribution; in other words, a -- the

19  high end of the distribution of estuarine and freshwater fish

20  consumers.

21  Q   Now, in the table here, you haven't listed eel.  We've

22  heard some discussion of eel.

23      Are you putting eel under the estuarine fish category?

24  A     I did, and I did that for a reason because the Study

25  Panel had no -- had no information to indicate that anybody

1    was consuming eel, and from even our own observations and

2    talking with State people, eel consumption is just not -- is

3    just -- if anyone does it, it's very rare.

4          So that I thought it was much more appropriate to have

5    the category be estuarine fish, to include other fish that

6    might be there.  But I did -- I did -- I want to make it clear

7    I also did the assessment for eel.  I made -- made the

8    assumption that all the estuarine fish that was consumed would

9    be eel.

10   Q    So 22.6 meals of eel per year?

11   A    That's correct.

12   Q    Let's move to the meal frequency for lobster.  You've

13   listed 52.

14   A    Yes.

15   Q    What's the basis for that?

16   A    The 52 meals per year comes from, again -- comes from

17   the Maine Bureau of Health from their assessment after the

18   Julie N oil spill in Portland Harbor, and so it's 52, 1 to

19   1-and-a-quarter pound lobsters being consumed over the course

20   of a year.

21   Q    So one per week?

22   A    One per week, that's correct.

23   Q    Did you take steps to assess whether that was a

24   reasonable assumption?

25   A    Ah, yes, I did.

1   Q     If we can go to Defense Exhibit 1080.  Did you prepare

2   this?

3   A     Yes, I did, hm-hmm.

4   Q     And can you orient us to the green and blue bars?

5   A     Sure.  Um, on this particular demonstrative or graph,

6   there are two things plotted on the vertical axis or the Y

7   axis.  You've got the percentage -- or let me point out -- let

8   me back up.

9         This study was -- this Knobeloch study was a survey of

10  women of childbearing age in a number of states, of which

11  Maine was one of those states.  And so what's reported in the

12  green bars corresponds to this Y axis the percent of the

13  respondents that reported eating this -- the particular food

14  item, and I've got plotted on the X axis or the horizontal

15  axis the different categories that the authors reported on.

16        One category being all fish and shellfish, another being

17  fish, shellfish, and then sport-caught fish.  So all fish and

18  shellfish encompasses everything, from fish sticks to what --

19  what -- restaurant consumption, what you get in the

20  supermarket, all forms, all sources, marine and freshwater.

21  And so 93 percent of the Maine women, 535 Maine women reported

22  -- or answered the survey.  93 percent reported eating some

23  form of fish and shellfish over the course of a year.

24        Um, the blue bars report the number of meals consumed

25  per year.  So, for instance, in the all fish and shellfish

1    category from all sources, 50 meals per year.

2        Now, what's important here for the purpose of the

3    assessment that I did on the Penobscot River is under the

4    sport-caught fish category, because there are no commercial --

5    there's no commercial estuarine fish -- fisheries in -- in the

6    Penobscot, so any fish that would be eaten would be

7    sport-caught.  And so I think the interesting thing here is

8    that 21 percent of the Maine women reported eating some

9    sport-caught fish over the course of a year.

10        Keep in mind this is from throughout the state when

11   we're making the comparison here just the Penobscot River, and

12   those -- that 21 percent reported a mean consumption rate of

13   11 fish meals per year compared to my -- in my assessment of

14   the 22.6 meals per year.

15   Q    Let's move to the -- the shellfish.

16   A    Okay.

17   Q    Based on this data, what percent of Maine adult women

18   reported eating shellfish at least once?

19   A    Well --

20   Q    In a year?

21   A    -- 66 percent did.

22   Q    And what was the mean number of meals reported over a

23   12-month period?

24   A    They reported 17 meals, and that's all shellfish, yes,

25   so that would include shrimps, clams, mussels, lobster, um,

1    any shellfish.

2    Q    And if we go back to 1071, your assumed 52 meals per

3    year compares to a mean of 17 meals per year of all shellfish?

4    A    That's correct.

5    Q    But you've assumed 52 meal -- meals a year just of

6    lobster.

7    A    That's correct.  And I -- I did that because I was,

8    again, trying to do things as much as I could in conformity to

9    what had been done before.  The Maine Bureau of Health, that

10   was the assessment that they performed on lobster.

11   Q    Moving down to duck, you've got a meal frequency listed

12   of ten.  What's your source for that?

13   A    Um, this came from -- the meal -- ah, yes, the ten comes

14   from U.S. Fish and Wildlife Service, and it's based upon

15   hunting success for -- of duck for the State of Maine.

16   Q    So this is federal data on average duck hunter success

17   in Maine?

18   A    Yes, yes, for all -- for all ducks, and it's an average

19   over the course of, um, three or four years.

20   Q    And we've been talking about black duck.  Does that data

21   cover all duck?

22   A    These data here -- the ten meals per year -- covers all

23   duck, but, you're right, we're concerned here with black duck,

24   which is only a subset of the ten meals that is reported.

25   Q    And if we can bring up Defense Exhibit 1079.  Did you

1    look at the distribution of the waterfowl harvest in Maine as

2    reported by federal data?

3    A     Ah, yes, I did, and you can see the various duck species

4    that are reported, and that black duck represented 9 percent

5    of the total catch.

6    Q     If you had made an adjustment for the fact that the

7    average duck hunter gets ten duck, 10 percent of the duck

8    caught are black duck, what number would you arrive at?

9    A     Well, you'd be at one duck on average, but I didn't make

10   that adjustment.  I just made the assumption instead -- again,

11   this is a conservative health protective assessment.  I made

12   the assessment that -- or the -- the assumption that all the

13   black -- all the ducks taken are black duck.  So the ten meals

14   per year came from -- directly from the Fish and Wildlife

15   Service data.

16   Q     And for purposes of your assessment, were you assuming

17   that all of the duck were caught in Mendall Marsh?

18   A     I made the assumption that all the duck were caught in

19   the lower part -- I think it was Mendall Marsh and Verona

20   Island.

21   Q     And did you factor in the population size of black ducks

22   in any way in your assessment?

23   A     I did not.  But -- although the population size is

24   reported, we've heard it in some of the previous testimony,

25   it's -- it's small.

1    Q    So if we go back to 1071, what's the likelihood, in your

2    judgment, of someone eating more than ten meals of black duck

3    from the study area per year?

4    A    I don't think it will happen.  I believe it's a -- it's

5    a very small -- a very small, unlikely event.  There is -- and

6    I think there's other -- let me just point out a couple

7    factors behind that.

8         Ah, there are bag limits on black duck.  There are

9    limits -- and these bag limits are meant to protect the

10   population from overharvesting, over -- over-hunting, and

11   that's in place for the entire state, not just Mendall Marsh

12   or -- or the study area.  But you're allowed to have only one

13   duck per day, and you cannot have any more than three in your

14   catch.  So that means that you have to be out there for three

15   days to be within the legal requirements of not having more

16   than three duck with you.

17        And so the -- just the likelihood of that from the small

18   -- there's a small population of black duck in the study area,

19   um, small number of hunters, very unlikely that anyone would

20   exceed that type of consumption rate.

21   Q    What do you -- could one duck yield more than one meal?

22   A    You know, it is possible.  There are large ducks; there

23   are small ducks.  Yes, it's very possible you could get more

24   than one meal from a black duck.  Oftentimes, if that

25   happened, one would share that with another family member.

1   Q      What's your level of confidence that ten is a reasonably
2   conservative number for purposes of assessing the risk to the
3   public from consumption of American black duck?
4   A      I'm very confident of that.
5   Q      And rock crab, basically same considerations as lobster?
6   A      Yes, we had very little information on -- on rock crab,
7   so I made the conservative assumption that it was the same as
8   lobster, even though we know that the -- the size of the crab
9   catch is much smaller than that of lobster.
10  Q      Okay.  Let's move to meal size.  For estuarine fish,
11  you've used a meal size of 227 grams per meal?
12  A      That's correct.
13  Q      What's your source?
14  A      Well, again, that source is -- is -- comes from the USDA
15  survey information.  It was implicit in the survey that was --
16  that was done, and that's the data behind -- that went into
17  the Exposure Factors Handbook.  So the short answer is,
18  Exposure Factors Handbook, the underlying data is the USDA
19  survey.
20  Q      And for meal size for lobster?
21  A      Meal size for lobster, um, well, I was relying upon the
22  Maine Bureau of Health for that.  But that's -- that's very
23  close to what the lobster industry will -- lobster industry
24  reports and also any type of sources on the amount of meat
25  that comes out of a lobster -- out of a 1-pound lobster.

1    Q      And what's the source for your meal size of 165 for

2    duck?

3    A      Um, that, again, comes from -- if we look at that value

4    here, I think the references are down below -- yes.  It comes

5    from the -- again, from the Exposure Factors Handbook, and

6    that value -- the hundred -- well, the Exposure Factors

7    Handbook value of 165 grams per meal comes from information on

8    poultry consumption, so we're talking here chicken and duck --

9    I mean, chicken and turkey specifically, which I'm

10   extrapolating to duck.

11          Um, but I'm not the only one who has done this because

12   U.S. EPA has used this same value for their risk assessment

13   for the Housatonic River/Rest of River site, which is a very

14   comprehensive risk assessment that EPA had done, and also the

15   Wisconsin Department of Natural Resources also used that same

16   value for their human health risk assessment of the -- of the

17   lower Fox River in Wisconsin.  Those are two, um, very

18   well-known river sites with -- with contamination

19   Q      And was that value accepted by EPA as the basis for

20   making remedial decisions?

21   A      Yes, it was.  And by Wisconsin DNR in the Fox River

22   case.

23   Q      And, again, consumption rate's the product of meal

24   frequency and meal size divided by 365?

25   A      Right.

1        (Interruption by the court reporter.)

2    BY MR. SCHUTZ:

3    Q     Well, let me -- let me strike the question and ask you

4    if you can explain how you derived consumption rate.

5    A     Yes, I derived consumption rate by taking the product of

6    the meal frequency, in terms of meals per year, times the meal

7    size in grams per meal, and then dividing by 365 in order to

8    put the units on a grams-per-day basis.

9    Q     And you've used a body weight of 69 kilograms?

10   A     Yes, I've used 69 kilograms because that's the most

11   recent, um, information, again, from the Exposure Factors

12   Handbook, the most recent edition of that is 2011.  So, again,

13   updating those values, as I have updated some of the others.

14   Q     And that compares to the 60-kilogram body weight used by

15   Maine CDC in their freshwater fish?

16   A     Yes.

17   Q     In enacting their freshwater fish action level?

18   A     It compares to Maine CDC's 60 kilograms, and also

19   compares to Maine Bureau of Health's 70.  It's just slightly

20   different.  But Maine Bureau of Health used 70 in their

21   Portland Harbor lobster assessment.

22   Q     There was some testimony earlier in this trial that if

23   we increase the body weight, we should increase the meal size

24   because we should assume that larger people eat more.  What's

25   your response?

1   A       Well, that might -- that might be true on an individual

2   basis, but all these data are contemporary with one another.

3   So if you go to the Exposure Factors Handbook and you're using

4   their most recent data on -- on body weight, then you would

5   use their most recent data on consumption rate, as well.  The

6   -- the information is contemporaneous with -- with itself.

7   Q       Now, using this data, you can derive a risk-specific

8   concentration calibrated to the risk associated with

9   consumption of eel, lobster, duck, or rock crab out of the

10  Penobscot?

11  A       That's correct.

12  Q       And in your judgment, would it be appropriate to just

13  use the default value freshwater fish values for assessing

14  risk at a site like this one?

15  A       No, it wouldn't be.

16  Q       Now that we have the screening values -- we can derive

17  the screening values, I'd like to move to a chart where we

18  summarize the concentrations that you thought were relevant

19  for considering risk in the Penobscot.  If we can bring up

20  Defense Exhibit 1072.

21              MR. SCHUTZ:  I'd like to move 1072 into evidence.

22              THE COURT:  Any objection to 1072?

23              MR. COLANGELO:  No objection, Your Honor.

24              THE COURT:  1072's admitted.

25  BY MR. SCHUTZ:

1  Q     Now, in -- and you referred to this as exposure point

2  concentrations.  What does that mean in lay terms?

3  A     Um, that's a -- that is a -- a risk assessment term

4  which -- um, it's essentially a conservative estimate of the

5  mean value.  That's what -- what is typically used in risk

6  assessment.  So -- and that's termed the exposure point

7  concentration.

8  Q     So that's the concentration of the contaminant found --

9  A     Found in the -- in the food item or in the exposure

10 medium, but in this case, it's in the -- in the food item.

11 Q     And your units, nanograms per gram wet weight

12 corresponds to parts per billion?

13 A     It does.

14 Q     And, again, you've referred to 95 -- you've used 95 UCL?

15 A     Yes, the 95 UCL is the upper confidence limit on the

16 mean, and what that means, it just means that, um, the -- that

17 this mean that I've -- I've calculated here will be greater

18 than the true population mean 95 percent of the time.

19        So it's -- when you have a lot of data, this UCL and --

20 and the -- the mean are very close to one another.  But,

21 generally, the UCL is higher.  It's generally a higher value

22 than -- than the sample mean that's calculated because when

23 you have -- when you don't have very many data points, um,

24 this is a statistical bounding approach which provides an

25 upper bound estimate of what the true -- what the true mean

1    might be, and it's a -- it's a U.S. EPA, um, standard human

2    health risk assessment parameter that's used.

3    Q     In comparing concentrations of mercury found in

4    potential food items in the Penobscot, did the Study Panel use

5    the 95 USL -- UCL?

6    A     Ah, no, they didn't.

7    Q     What'd they use?

8    A     They used, um -- they used means from -- from the --

9    from the data that they had.  Some were -- some were adjusted

10   in various ways.  I think some had age -- age adjustments and

11   some had length adjustments, but --

12   Q     Did you think that making those sorts of adjustments was

13   appropriate for purposes of human health risk?

14   A     Ah, no, not at all because people are -- people are

15   eating what's out there.  You know, so you want to have your

16   best estimate of what they might actually consume.

17   Q     Let's go through the species of concern and the basis

18   for your exposure point concentrations for each, starting with

19   eel.

20   A     Okay.

21   Q     Can you explain the source for your 483 parts per

22   billion figure for eel?

23   A     Sure.  I took the 532 samples that the Study Panel had

24   reported from all years below Veazie Dam.  Now, the 2012 data

25   are not in the Study Panel Phase II Report.  That's in a

1    supplemental report, but I used those, as well.  So it's all

2    the data from all the years below Veazie Dam.

3         I used the Study Panel's correction of 88 percent to go

4    from total mercury to methylmercury, and these also repre --

5    this represents axial muscle sample because we're looking,

6    again, at edible tissue.

7    Q    Let's move to lobster.

8    A    Okay.

9    Q    What was the -- what were the concentrations you used

10   for purposes of your assessment of lobster?

11   A    Sure.  For the entire study area, I used 186 nanograms

12   per gram, or parts per billion.  And here I made, you know,

13   the assumption that all the mercury present was present as

14   methylmercury.  Um, but I looked at the edible claw and tail.

15        So we had 782 samples, and these were all locations and

16   all years, again, from 2006 to 2012, and where I was -- where

17   the Study Panel -- the Study Panel reported a number of

18   samples that had both tail and claw values, so I used a

19   correction -- standard correction to come up with a total --

20   to get the mercury in the total edible lobster with -- because

21   -- because Maine people eat the entire lobster.  They eat the

22   claws and the tail.

23   Q    And what about lower Penobscot River, is that the closed

24   area?

25   A    That is now the closed area, right, and here we had 177

1   samples taken from Verona, Odom Ledge, and Fort Point, and,

2   again, combined over all the years, assumption that all the

3   mercury present is methyl, and, again, looking at an edible --

4   total edible portion claws and tail.

5   Q    Do you think it's appropriate, for purposes of human

6   health risk assessment, to look at tail only?

7   A    Ah, no, I don't.

8   Q    Why not?

9   A    Because people aren't eating just the tail.  They're

10   eating the claws, too, and we need to have an adequate

11   representation of what that exposure might be.

12   Q    And if we can bring up Defense Exhibit 1074.  Did you

13   look at the proportion of edible lobster meat between claw and

14   tail?

15   A    Ah, yes, I did.

16   Q    And what did you find?

17   A    Well, I found that, um, about two-thirds of -- about

18   two-thirds of the lobster is tail and about one-third is claw

19   in terms of edible portion.

20        And then I also looked at the concentrations, and -- and

21   the Study Panel reported data that -- reported data on this,

22   as well, where they had, um, certain lobsters they had -- they

23   had tails and claw, and so one could come up with a -- a

24   correlation --

25   Q    So --

1    A    -- between mercury in the tail and the claw.

2    Q    So where the Study Panel collected data only for a tail,

3    you calculated a claw -- a claw concentration, combined the

4    two, and included that in your assessment?

5    A    I did.

6    Q    And is the same true where the Study Panel only

7    collected a claw sample, you calculated a tail concentration,

8    combined the two, and used it?

9    A    Yes.  In fact, um, the -- the lobster with the highest

10   mercury level in my data set here was actually one where the

11   Study Panel had only collected claw data, but I extrapolated

12   up to get the tail data and then combined it, and that -- that

13   was the highest, um, concentration of -- of methylmercury in

14   -- in the lobster from all 782 samples.

15   Q    And did you yourself assess whether there was a strong

16   relationship between mercury concentrations in claw and tail?

17   A    Yes, I did.

18   Q    What did you find?

19   A    I found there was a -- there was a strong relationship,

20   and it was -- it's about -- the concentration in the tail is

21   about -- a little over two times that in the claw, and it was

22   a very -- it was a very tight correlation.

23   Q    And if we can go back to 1071 -- actually -- yes.  If we

24   can go back to your exposure point concentration slide.  Let's

25   talk about black duck.  What was the basis for your black duck

1    concentration?

2    A     Um, the black duck -- um, my concentration there is 742

3    nanograms per gram.  Again, this is, um, treating all the

4    mercury as methylmercury.  This represents only muscle tissue

5    sample.  So it's 25 samples from Mendall Marsh and Verona

6    Island for the two years that I had available at the time that

7    I did the -- the report, for 2010 and 2011.

8    Q     And at the time you did your report, was the winter --

9    last winter's black duck data available?

10   A     No, it wasn't.

11   Q     And after you rendered your report, did you see some

12   criticism that you should have considered blood -- black duck

13   blood data?

14   A     Yes, I think I had mentioned in my report that using

15   just the muscle tissue samples would be conservative.  It

16   would tend to overestimate the risk, but there was that

17   criticism, so I thought, well, I ought to look at the blood

18   data and see whether, you know, I should use that, too, or I

19   could use it.

20   Q     And did you also look at last winter 's black duck data

21   to see how that might affect the concentration you used to

22   assess risk?

23   A     Yes, I did.

24   Q     Let's bring up Defense Exhibit 1078.  Now, does this

25   exhibit show how the concentrations compare between the one

1    you used, 742 parts per billion, against concentrations that

2    would have been derived had you looked at last winter's data

3    and blood data?

4    A     Yes, it does.

5    Q     What does the green bar show?

6    A     So -- okay -- the green bar is showing my exposure point

7    concentration.  This is the exposure point concentration for

8    just the muscle tissue data, and that is with -- for Mendall

9    Marsh and Verona Island combined.

10          Um, the blue bars represents muscle tissue and blood

11   tissue sampling, and it also represents, um, the addition of

12   last winter's blood mercury data.

13          So the -- I think the appropriate comparison here is for

14   the combined area for Mendall Marsh and Verona Island if you

15   consider the last year of data and if you also consider all

16   the blood measurements, then that number goes down from 742 to

17   579.

18          And then there was also some discussion about perhaps

19   breaking up the data into Mendall Marsh and Verona Island as

20   separate units.  When I just had the muscle tissue samples, I

21   didn't have enough data to really -- to break it up.  There

22   were insufficient samples to make a meaningful comparison, but

23   now with the blood tissue numbers, that could be done, and so

24   Mendall Marsh would be 660 and Verona Island 242.

25   Q     And in assessing human health risk associated with

1   methylmercury, is the concern steady-state blood levels?

2   A    Yes, it is.

3   Q    And is it appropriate to look just at maximum

4   concentrations?

5   A    No, not -- not for a human health risk assessment, no.

6   Q    Okay.  And if we go back to the exposure point

7   concentrations summary, these are the concentrations in parts

8   per billion that you used to compare to the screening

9   thresholds you calculated for each of the relevant food items?

10  A    Ah, yes, that's correct.

11  Q    And if we can bring up Defense Exhibit 1082, does this

12  -- did you prepare this?

13  A    Yes, I did.

14        MR. SCHUTZ:  I'd like to move 1082 into evidence.

15        THE COURT:  Any objection?

16        MR. COLANGELO:  No objection, Your Honor.

17        THE COURT:  1082's admitted.

18  BY MR. SCHUTZ:

19  Q    And can you walk us through what the green bars

20  represent and then the blue bars.

21  A    Yes.  Um, the green bars represent the risk-specific

22  concentrations.  So, in other words, the risk-specific

23  concentration is the value -- the screening value that I

24  calculated using the food-specific exposure parameters, which

25  we discussed a little bit earlier today.

1           The blue bars are the 95 U -- it says 95 UCL.  That's

2      the -- really the conservative estimate of the mean

3      concentration in that particular food item.

4      Q     And what does the gap between the top of the blue bars

5      and the top of the green bars represent?

6      A     That represents really, um, a margin of -- a margin of

7      safety of -- on the exposure side of the equation.  So, um, in

8      other words, the value -- the -- the risk-specific

9      concentration that, um, I derived for all lobster of 510 parts

10     per billion, or nanograms per gram, there's a -- there is a

11     sufficient -- there's a large margin of safety between that

12     and what the actual upper confidence limit of the mean of 186

13     part per billion.

14     Q     So is this telling us that you could eat one, 1-pound

15     lobster with a mercury concentration of 510 parts per billion

16     per week without exceeding the reference dose?

17     A     Ah, yes.

18     Q     And using the same concentrations that you calculated

19     for claw and tail, a conservative estimate of the mean, did

20     you look at how many lobster meals per year one could have

21     without exceeding the reference dose?

22     A     Ah, yes, I did.

23     Q     If we can bring up Defense Exhibit 1083, now, what's the

24     -- what's in the green bar?

25     A     The green bar are -- is the number of lobster meals that

1   I used in my exposure assessment -- the 52 meals per year.

2   Q     And how many lobsters per year could be consumed per

3   week without exceeding the reference dose if you just ate

4   lower Penobscot River lobsters out of the closed area?

5   A     That would be 97.

6   Q     And how about lobster out of the entire study area, how

7   many lobster per year could one eat without exceeding the

8   reference dose?

9   A     142.

10   Q     And how do these values compare with the data published

11   in the Knobeloch paper surveying adult women in Maine and

12   assessing how many -- how much shellfish they eat?

13   A     Well -- and she is reporting the number of shellfish

14   meals per year, but she reported a mean of 17 total shellfish

15   meals.  So lobster would be some -- presumably some fraction

16   of the 17.  But -- so all of these values exceed that 17 by

17   quite a bit -- substantially so.

18   Q     Now, there has been some question about whether this

19   assessment should have factored in some background exposure.

20   And what -- what's your response to that?

21   A     Well, um, my response is that that really would not be

22   necessary because what we're talking about here is a very

23   conservative assessment where people are consuming a lot of

24   these seafood items, and background exposure comes from

25   consuming seafood.  So from a number of reasons, you would --

1   you would be more of a substitution than something in

2   addition.

3        But even so, I am confident, because of the -- just the

4   conservativeness of my assessment, that we're not going to be

5   elevating people's background, you know, exposure to where

6   they're in a situation of incurring risk.

7   Q    And if, based on a refined type of screening assessment

8   like you have conducted, one determines that there is a risk,

9   could you go forward and do an assessment incorporating

10  background exposures and how consumption of Penobscot food

11  items versus other food items might change someone's mercury

12  concentration?

13  A    Yes, you could do that.  You could develop -- you could

14  develop a toxicokinetic model, and you could do that, yes.

15  Q    Do you think that's necessary here?

16  A    No, I don't.  I don't think it's necessary.  The

17  approach that I've used is essentially the same approach that

18  the State uses in developing a fish tissue action level.  I've

19  just made it specific to the food item of concern.

20  Q    I'd like to go back to the maximum concentration issue

21  and bring up Defense Exhibit 1085.  Did you prepare this?

22  A    Ah, yes, I did.

23            MR. SCHUTZ:  I'd like to move 1085 into evidence.

24            THE COURT:  Any objection?

25            MR. COLANGELO:  No objection, Your Honor.

1          THE COURT:  1085's admitted.

2    BY MR. SCHUTZ:

3    Q    What is 1085 showing?

4    A    1085 is just a plot, um, on the vertical axis, number of

5    observations, so that's, um, number of lobsters.  Okay.  And

6    then on the horizontal axis is the mercury concentration.  So

7    this is just showing that, for instance, that the number of

8    lobsters in each -- at each concentration.

9          Um, what this is showing is that we have a lot of

10   lobster at the low end of the distribution and a few that are

11   -- that are more heavily contaminated.

12   Q    And did you calculate the likelihood of repeatedly

13   selecting maximum-concentration lobsters?

14   A    Yes, I did.

15   Q    Let's bring up Defense Exhibit 1084.  What's the

16   likelihood of -- well, first of all, what does this show?

17   A    Well, this is showing -- if you remember that bar graph

18   in the previous demonstrative, it was showing, um, the number

19   of lobsters at -- at each concentration gradient, if you will,

20   and this is showing what's the probability of selecting the

21   maximum lobster, and then what's the probability of selecting

22   the next highest lobster, in terms of mercury level, and I

23   just repeated this consecutively for about -- for five times

24   until the -- the numbers get to be infinitesimally small, and

25   they're really not meaningful, really beyond picking one or --

1   one or two highest-concentration lobsters.

2   Q    So what's the likelihood of selecting two maximum-

3   concentration lobsters consecutively?

4   A    It's essentially a little over 1 and a half in a

5   million.

6   Q    What about selecting the top four highest-mercury

7   concentration lobsters consecutively?

8   A    It's -- well, the math tells you it's 2.7 in a trillion,

9   but really it's -- it's not nonexistent.  It's a very low

10  probability.

11  Q    What's the likelihood of being struck by lightning?

12  A    It's about 1 in a million.

13  Q    And this is showing the likelihood of selecting the

14  max-concentration lobsters in the entire study area?

15  A    This is -- um, yes, it's in the entire study area,

16  that's correct.

17  Q    Did you do anything to take a look at the risk

18  associated with eating a lot of lobster quickly?

19  A    Yes, I did, yeah.  I did another analysis.

20  Q    Let's bring up Defense Exhibit 1086.  Did you prepare

21  this?

22  A    Yes, I did.

23  Q    What's on the X axis and Y axis?

24  A    Okay.  On the Y axis, the vertical axis is a predicted

25  blood mercury level.  Now, this is -- this is in humans.  And

1    on the X axis, um, this is a cumulative probability

2    distribution, so, in other words, it's showing percent of the

3    population.  So the way you read this is when you get up to

4    like, for instance, if you're up at the 80th percentile, that

5    means that 80 percent of this population would be predicted to

6    have an instantaneous blood mercury elevation of less than the

7    1 part per billion.

8    Q    How many times did you iterate this model to generate

9    this figure?

10   A    Ah, 10,000 times.

11   Q    So one way of looking at this is what the distribution

12   of mercury would be in a population of 10,000 people eating

13   two, 2-and-a-half-pound lobsters over a two-day period?

14   A    That's correct, and that -- and, again, this is -- this

15   is -- they're sort of -- they're instantaneous.  For

16   short-term blood elevation, those levels would start to

17   decline almost immediately.  As soon as they go up, they start

18   to go down, um, as Dr. Bolger had talked about earlier this

19   morning.

20   Q    And what is this telling us?

21   A    Well, this is telling us that for the typical

22   individual, they're going to see even -- for the typical

23   individual, they're going to see practically no elevation in

24   their blood mercury concentration, and even if we're talking

25   about the high end, around the 90th percentile, it's saying

1    that perhaps, um, their instantaneous elevation after this

2    binge lobster eating, and again, the probability distribution

3    would have picked up the high lobster in that case, their

4    elevation would have been maybe 1 part per billion and very

5    unlikely to have exceeded the reference dose.

6    Q    And so these boxes at the far right between 90 and a

7    hundred, those are the unlucky people eating the

8    higher-concentration lobsters?

9    A    No, I should have pointed out that in any type of

10   probable -- probabilistic analysis like this, or it's called a

11   Monte Carlo analysis, you have to be careful of the tails of

12   the distribution.  The analysis falls apart above the 90th

13   percentile and also at the -- at the very low end of the

14   range, too.

15        So you're really looking at interpreting this between

16   the 10th and the 90th percentiles.

17   Q    Well, so to correct myself, the people around the 90th,

18   are those the people eating two higher-concentration

19   2-and-a-half-pound lobsters from the area?

20   A    Those -- those would be people who happen to get the

21   highest -- or the higher-concentration lobsters.  Again, I

22   made the assumption that these are 2-and-a-half-pound lobsters

23   and you're consuming two of them over the course of a 48-hour

24   period.

25   Q    And this is highest instantaneous --

1    A      That's --

2    Q      -- mercury level?

3    A      That's correct.  To do the type of Monte Carlo analysis

4    and toxicokinetic model that models the blood levels for all

5    the other types of seafood consumption is a very involved

6    affair, and it's -- I just did not think it was necessary in

7    this particular case because I'm confident on the results of

8    this screening analysis that this is not a problem.

9    Q      Now, Professor Grandjean would say if you eat two,

10   2-and-a-half-pound higher-concentration lobsters, you

11   shouldn't eat lobster, you know, almost indefinitely.  What is

12   this telling us?

13   A      Well, this -- this is telling us that, um -- well, I

14   would disagree with Dr. Grandjean's conclusion there, and that

15   there would be a slight elevation for the typical person.  It

16   would be -- it would be small, and it's likely to come down

17   very quickly.  They would have to continue this behavior over

18   and over and over again to see any type of elevation for a

19   longer period of time.

20   Q      So the point is, then, that consumption of two,

21   2-and-a-half-pound lobster meals does not put someone over the

22   blood methylmercury level that the reference dose is supposed

23   to protect against.

24   A      That's correct, that's correct.  And even -- yes, even

25   assuming that they started with a background level that was

1    higher.

2    Q    So, again, even if we start with a background and just

3    simply add this --

4    A    Right.

5    Q    -- pulse of methylmercury, do we see any appreciable

6    risk?

7    A    No, we don't, and I should mention that that would be

8    inappropriate, you know, and that's why I didn't do that

9    analysis, um, because adding this to background, it's not a

10   simple addition.  You would have to subtract out what seafood

11   item they're not eating while they're eating these

12   2-and-a-half-pound lobster meals.

13   Q    Now, we looked at Defense Exhibit 1087, and just as a

14   reminder of what that was, we can pull that up.  That's the

15   graph showing various concentrations of mercury in different

16   seafood items.

17        And if we go back to 1086 -- 1086, does this

18   distribution look any different if you substitute other food

19   items?

20   A    No, I mean, um, if you go back to that previous graph

21   and you substitute any of those seafood items that are in the

22   same range as the lobster, you're going to see a very similar

23   display here, and, in fact, you have food items that are --

24   some -- some of the fish that are higher, I think you'll have

25   a very -- you'll have a -- a curve that goes up higher,

1    greater, because they're also consuming greater portion sizes,

2    and a lot of factors go into it, but, no, you would not see

3    any different pattern.

4    Q      Are duck from Mendall Marsh-Verona Island safe for human

5    consumption?

6    A      Yes.

7    Q      What about lobster from the closed area?

8    A      Ah, yes, they are.

9    Q      How about crab from the closed area?

10   A      Yes, they are.

11   Q      Is there a human health risk associated with

12   methylmercury in the Penobscot that would justify active

13   remediation?

14   A      No.

15   Q      Why not?

16   A      Because there's -- to justify remediation, you would

17   have to show an appreciable -- you'd have to show a human

18   health risk, and we're just not seeing one here, and then you

19   would have to put that risk in -- you have to evaluate it in

20   terms of benefits and -- and other factors, and we're just not

21   -- we're not even getting to the first stage of -- of seeing a

22   human health risk when we use food-specific exposure

23   information.

24          MR. SCHUTZ:  Your Honor, we've just completed the

25   human health portion of Dr. Keenan's testimony.  We can either

2497

1    press on or continue.

2            THE COURT:  Well, why don't we -- it's been a long

3    week.  Why don't we freshen our minds up over the weekend and

4    come back on Monday.

5            MR. SCHUTZ:  Thank you.

6            THE COURT:  Court will stand in recess.

7        (Proceedings concluded at 2:09 p.m.)

8                         CERTIFICATION

9        I certify that the foregoing is a correct transcript from

10   the record of proceedings in the above-entitled matter.

11

12

13   /s/ Julie G. Edgecomb            June 20, 2014
     Julie G. Edgecomb, RMR, CRR      Date
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25