1          UNITED STATES DISTRICT COURT

2               DISTRICT OF MAINE

3   MAINE PEOPLE'S ALLIANCE      )
    and NATURAL RESOURCES        )
4   DEFENSE COUNCIL, INC.,       )
                                 )
5            Plaintiffs          )
                                 )              CIVIL ACTION
6                                )
         vs.                     )     Docket No. 1:00-cv-00069-JAW
7                                )
                                 )              BENCH TRIAL
8   HOLTRACHEM MANUFACTURING     )
    and MALLINCKRODT LLC,        )
9                                )
            Defendants.          )
10

11                    VOLUME XV

12            TRANSCRIPT OF PROCEEDINGS

13       Pursuant to notice, the above-entitled matter came on

14  for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15  Chief District Judge, in the United States District Court,

16  Bangor, Maine, on the 23rd day of June, 2014, at 8:36 a.m.

17  APPEARANCES:

18  For the Plaintiffs:              Mitchell S. Bernard, Esquire
                                     Aaron S. Colangelo, Esquire
19                                   Rachel E. Heron, Esquire
                                     Jared J. Thompson, Esquire
20
    For the Defendants:             Patricia H. Duft, Esquire
21                                   Sigmund D. Schutz, Esquire
                                     Jeffrey D. Talbert, Esquire
22

23              Julie G. Edgecomb, RMR, CRR
                    Official Court Reporter
24

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer.

1                        INDEX OF PROCEEDINGS
                                                            Page:
2
    Testimony:  (see below)
3
                          INDEX OF WITNESSES
4
                                                            Page:
5
    RUSSELL EDWARD KEENAN  (called by Mr. Schutz)
6
    Continued Direct Examination by Mr. Schutz           2500
7   Cross-Examination by Mr. Colangelo                   2537
    Continued Cross-Examination by Mr. Colangelo  2572,  2636
8   Redirect Examination by Mr. Schutz                   2680

9                        INDEX OF EXHIBITS
    Plaintiffs'
10  Exhibit No.     Description              Offered    Admitted

11       9        ECF No. 567                2659       2659
        174       Data Summary, U.S. FDA     2650       2651
12
    Defendants'
13  Exhibit No.     Description              Offered    Admitted

14      708       U.S. EPA, Integrated Risk   2624       2625
                  System Information System
15      759       Issuance of Final Guidance: 2501       2501
                  Ecological Risk Assessment
16     1091       Keenan - Comparison of Total 2517      2518
                  Mercury Concentrations
17

18

19

20

21

22

23

24

25

1         (Counsel present in open court.)

2         (Russell Edward Keenan, having been previously duly

3    sworn, resumed the witness stand.)

4              THE COURT:  Good morning.

5              MR. SCHUTZ:  Good morning.

6              THE COURT:  It was a beautiful weekend.  I hope some

7    of you got some natural light.  You may proceed.

8                   CONTINUED DIRECT EXAMINATION

9    BY MR. SCHUTZ:

10   Q    Good morning, Dr. Keenan.

11   A    Good morning.

12             THE WITNESS:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14   BY MR. SCHUTZ:

15   Q    Let's tackle ecological risk to fish in the study area.

16   First I'd like to ask you some questions about the methodology

17   for performing an ecological risk assessment.  Is ecological

18   risk a common issue at contaminated sites?

19   A    Yes, it is.

20   Q    Have federal agencies developed guidance for purposes of

21   assessing ecological risk at contaminated sites?

22   A    Yes, they have.  In particular, U.S. EPA has an

23   extensive set of guidance on ecological risk.

24   Q    Are you familiar with that guidance?

25   A    Yes, I am.

1    Q    Have you applied that guidance in preparing ecological

2    risk assessments for submission to the federal government?

3    A    Ah, yes, I have.

4    Q    I'd like to ask you some questions about Defense

5    Exhibit 759.

6           MR. SCHUTZ:  And I'd like to offer that into

7    evidence.

8           THE COURT:  Any objection to 759?

9           MR. COLANGELO:  No objection, Your Honor.

10          THE COURT:  759's admitted.

11   BY MR. SCHUTZ:

12   Q    Let's bring up the top half of the first page of this --

13   this exhibit.  What is this document, Dr. Keenan?

14   A    This document was put forth by U.S. EPA's Office of

15   Solid Waste and Emergency Response, and this is a -- what is

16   -- it's termed the issuance of final guidance on ecological

17   risk assessment and risk management principles.  And what this

18   does is, um, it integrates the earlier U.S. EPA ecological

19   risk guidance and sets this forth to all the people within the

20   agency who are practicing ecological risks and -- and directs

21   them to follow it.

22   Q    Is this guidance still operative?

23   A    Yes, it is.

24   Q    Let's bring up the purpose section on -- on Page 1.  Let

25   me ask you to comment on the purpose of this document.

1    A      Um, yes, as -- this guidance, again, is -- is intended

2    to help -- to help our risk assessors and risk managers within

3    the agency make risk management decisions based on sound

4    science.  It speaks to consistency throughout the United

5    States and to present the characterization of risk in a

6    transparent fashion so that the public and risk managers and

7    any of the users of the ecological risk assessment can

8    understand it.

9    Q      And -- go ahead.

10   A      No, I'm -- that's fine.

11   Q      I was just going to point out that there's a reference

12   to an eight-step process.  Are you familiar with that?

13   A      Um, yes, I am, and that eight-step process is described

14   in detail in the ecological risk assessment guidance for

15   Superfund, what we commonly call as the process and design

16   document.

17   Q      Let's turn to Page 2 of this document, last paragraph.

18   Does the agency suggest that site-specific information be

19   considered in assessing risk at a site?

20   A      Um, yes, it does, and the reason for that is because

21   there's such tremendous variation between sites, and you're

22   looking at a variety of receptors, a variety of media, and

23   really to make sound ecological risk assessments, um, the best

24   way is to do it on a site-specific basis.

25   Q      Let's turn to Page 3 of Exhibit 759.  There are a series

1   of principles that the agency suggests that risk managers

2   should adhere to.

3   A      That's correct.

4   Q      Let's bring up principle No. 1, Superfund's goal is to

5   reduce ecological risks to levels that will result in the

6   recovery and maintenance -- and maintenance of healthy local

7   populations and communities of biota.  Why the focus on

8   populations and communities?

9   A      Um, because that's the endpoint that we're trying to

10  protect in doing -- in ecological risk, ecological risk

11  management.  We're trying to protect thriving and sustainable

12  populations of -- of ecological receptors.

13  Q      Why not focus on individuals?

14  A      Um, because there's always a -- an effect on an

15  individual does not mean that there will be an effect on the

16  population.  Again, the goal is -- is to protect the

17  population so that it is sustainable and so that it -- that

18  sustainable population thrives.

19         You know, all types of actions occur all the time where

20  individual organisms are harmed, like you talk about any type

21  of building, any type of construction project reduces habitat,

22  eliminates a number of organisms.  The important thing,

23  however, is, is the population still thriving, the local

24  population, is it still thriving, and is it stable?

25  Q      Is this a reason why looking at a mean concentration

1   across a population is appropriate in assessing ecological

2   risk?

3   A     Yes, because, again, you're looking at central tendency

4   and you're looking at the best measure of that as the mean.

5   Q     Let's turn to principle No. 4 in this document,

6   characterize site risks.  Now, in characterizing risk, is it

7   important not just to understand whether there's a risk, but

8   also the magnitude, severity, distribution of the risk?

9   A     Yes, that's correct, and this paragraph here points that

10  out.  It points out that site risk is characterized in terms

11  of magnitude, severity, the distribution, in other words, how

12  far and wide is the effect likely to be seen.  And also very

13  importantly, is there the potential for recovery to occur.  So

14  it may be that a transient effect, um, actually has an impact

15  on a population, but if the population is able to recover and

16  still thrive, then that it would not be considered to be a

17  severe risk.

18  Q     Let's turn to the Q and A portion of this document, Page

19  5, Question 2.  The agency poses the question, is there an

20  unacceptable risk at the site?  And then suggests a way one

21  might answer that question.  And let's turn to the next page,

22  first full paragraph, is the agency suggesting that we focus

23  on particular types of endpoints in assessing the severity of

24  a risk?

25  A     Um, yes, and this is also articulated in the Superfund

1    risk guidance.  Um, the agency is directing that those effects

2    be focused on increased mortality, or in other words, a way of

3    looking at that is diminished survival, diminished growth, and

4    impaired reproduction.  Those three general areas of impact

5    are the ones that have direct bearing on -- on populations.

6    Q    Is the agency suggesting that any effect as a result of

7    exposure to a contaminant is unacceptable?

8    A    Um, no, not at all.  Again, it's talking about severity,

9    and it's also talking about sustained effect, sustained

10   impacts, um, such that very short-lived or reversible impacts

11   are not considered to be actual risks to the local population.

12   Q    Let's look at the next paragraph.  The agency talks

13   about collecting sufficient information to assess the risk.

14   A    Yes, yes, that's correct.  Um, and that's talking --

15   that's talking about the need to collect site-specific

16   information, and that site-specific information is properly

17   interpreted in -- in light of reference conditions, in other

18   words, locations that have similar physiographic

19   characteristics, similar habitats, background conditions that

20   might include development, just not the contamination from the

21   particular site in question.

22   Q    And the agency is suggesting that we look at whether the

23   observed or predicted adverse effect on the site's local

24   population or community is of sufficient magnitude, severity,

25   areal extent, and duration that they will not be able to

1    recover and/or maintain themselves in a healthy state?

2    A      Yes, and this -- this -- again, this paragraph repeats

3    what we discussed earlier, um, the whole issue of population

4    and community effects which are severe enough, of sufficient

5    magnitude, duration, areal extent, and such that they're not

6    just transient effects, but they will -- they will not allow

7    that population to -- to recover in a reasonable period of

8    time.

9    Q      And let's look at question No. 4 on Page 7 of this

10   document.  What cleanup levels are protective?  And turn to

11   the next page, Page 8, first full paragraph.  The agency

12   writes:  The difficulty is in determining the acceptable level

13   of adverse effects for the receptors to be protected, e.g.,

14   what percent reduction in fish survival or in benthic species

15   diversity is no longer protective?

16         Now, is the concern in drawing a line between what

17   effects are acceptable and what are unacceptable?

18   A      Um, no.  As it points out, there 's no magic number that

19   can be used.  It talks about how that -- that level -- that

20   protective level is dependent upon the assessment endpoints

21   that are selected, the risk assessment techniques that are

22   used.  It includes gathering chemical and biological data from

23   the site in question, um, comparing the range of contaminant

24   levels to reference locations.  And, you know, it points out

25   the fallacy of trying to take the easy approach and establish

1    a numerical standard and -- and try to draw that across the

2    board, and that just isn't how ecological risk assessment is

3    done, according to best practices, which I believe this memo

4    does a very good job at pointing out.

5    Q    Dr. Keenan, what, from your perspective, is the -- or

6    are the key take-aways from this EPA guidance?

7    A    I think I could summarize it in two points.  Basically,

8    that ecological risk assessment, ecological risk management

9    focuses at the level of the population or community; and,

10   secondly, that the effects that one looks at are -- are the --

11   those -- those that are severe enough to affect a population,

12   in other words, impacts on growth, on survival, or on

13   reproduction.

14   Q    Let's look at the eight-step ecological risk assessment

15   process, and you included in your expert report Figure 4-1, a

16   chart.  What's your source for this chart?

17   A    Um, this is from the U.S. EPA risk assessment guidance

18   for Superfund -- excuse me -- the ecological risk assessment

19   guidance for Superfund, the process and design document that

20   I've been referring to.

21   Q    Is this the same eight-step process that was referenced

22   on the first page of Exhibit 759?

23   A    Ah, yes, it is.

24   Q    I'm not going to ask you to go through every box on this

25   chart, but I do want to bring up Exhibit 1090.

1    A     I think the court will appreciate that.  That's a rather

2    complicated diagram with -- it's not the -- not the most

3    visually friendly design.

4    Q     Is this Exhibit 1090 something you prepared?

5    A     Ah, yes, it is.  It -- it just summarizes the eight-step

6    process.  I have, um, placed a lot of the elements that were

7    in the -- the long and detailed chart into the box called

8    baseline ecological risk assessment.

9    Q     Let's start with the top box, screening level ecological

10   risk assessment.  Can you summarize that?

11   A     Yes, um, that is the first step in the eco risk

12   assessment process.  It is a comparison to -- of tissue

13   levels, for instance, with some sort of screening value that

14   is obtained from values that can be found in the literature.

15   Q     Now, if tissue concentrations are below the screening

16   value, what then?

17   A     If they're below the screening value, then you're done.

18   You essentially have no ecological risk, and you can conclude

19   the exercise at that stage.

20   Q     What if concentrations are above the screening value?

21   A     Um, then you go to that decision point that I have

22   referenced, um, over here, um, the right-hand side, and that

23   decision point involves, um, well, what further study needs to

24   be done?  Um, that study may be as simple as looking at the

25   screening values that one used, seeing whether they were

1  appropriate, whether some refinement needs to be made in the

2  screening value to make it a bit more applicable and a bit

3  more site-specific to the -- the question at hand, or whether

4  additional data and analyses needs to be conducted, and that

5  would take you into the -- the next steps of the analysis.

6  Q    And the next step would be a baseline ecological --

7  A    Would --

8  Q    -- risk assessment?

9  A    Would be the baseline ecological, yes.

10 Q    And what does a baseline ecological risk assessment

11 involve?

12 A    Well, the baseline -- the baseline eco risk assessment

13 involves -- it's a much more detailed and intricate analysis.

14 It involves additional studies of the site and comparison to

15 reference.  It may include the design and conduct of

16 population and community studies.  It might involve, um, the

17 design and, um, conduct of site-specific toxicity studies, um,

18 might involve surveys of the organisms at the site.

19      Um, there's a number of steps that could be included in

20 that, and that is all part of this -- well, on the expanded

21 diagram, there's a number of iterative steps where you -- you

22 discuss this and you have this type of -- of interaction to

23 decide what -- what is needed next.

24 Q    Once you have the results of the baseline ecological

25 risk assessment in hand, the next step is ecological risk

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2510

1   characterization?

2   A     Yes, that's correct.  I'm sorry?

3   Q     I was just going to say in simple terms, what does that

4   involve?

5   A     Um, that's -- really that step is just a determination

6   whether you have a risk or not and what is the extent of that

7   risk and how severe might it be.

8   Q     Is the risk unacceptable?

9   A     Yes, whether the risk is unacceptable or acceptable.

10  Q     And then the final step is ecological risk management?

11  A     Yes, that step involves you take the results of the

12  ecological risk characterization, and you look at, um, what do

13  you do about it?  That's where you make the decision as to

14  whether any type of remedial action or monitoring or -- or

15  whatever is needed.

16  Q     What did the Study Panel do to assess ecological risk?

17  A     Um, the Study Panel essentially was in the screening

18  level eco risk assessment stage.  They had an extensive set of

19  data on tissue concentrations, which they then compared to

20  screening values that they had, um, put forth.  So that --

21  that was the step that they did.

22  Q     What's the limitation of stopping at that stage?

23  A     Um, you -- when you stop at that stage, um, and if -- if

24  your conclusion is that you may have some risk present, um,

25  you really need to do further work.  Stopping at this stage

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2511

1  and suggesting remedial action is just not appropriate.

2  That's -- that's not done at these sites.

3  Q    So then what the Study Panel has done is skipped from

4  the screening level stage straight to ecological risk

5  management?

6  A    Um, that's correct.  And the problem with that is that

7  the tools are just not refined enough to make a remedial

8  action decision.  Um, they really are just that.  They're

9  screening; they're for the purposes of that initial phase, to

10  see what other further work needs to be done.

11  Q    Let's focus in on the screening level ecological risk

12  assessment phase and the methodology for developing screening

13  values.

14       Now, are there relevant tissue-based regulatory

15  standards for fish adopted by U.S. EPA or Maine?

16  A    No, there aren't.

17  Q    Then how do you decide how to set a screening value for

18  an organism like -- or a category of organisms like fish?

19  A    Well, one has to -- one has to then, um, develop -- if

20  there are no regulatory guidelines or nothing that has been

21  used in practice, one then needs to adopt a method of

22  determining what a screening value might be, and you're

23  generally looking at a myriad of studies of different

24  receptors for different fish species, different endpoints to

25  try to derive what a screening value might be.

1    Q      What is an endpoint?

2    A      Um, an endpoint would -- as I mentioned earlier, um, the

3    endpoints that we use is, in best practices in eco risk

4    assessment to make decisions at Superfund and other hazardous

5    waste sites are those based on impaired growth, um, diminished

6    survival, or diminished reproductive effects.  So you'd want

7    to look at those endpoints; reproductive endpoints, growth,

8    and survival that can impact populations.

9    Q      Are those the endpoint that -- endpoints that population

10   modelers look at?

11   A      Yes, and -- and that's important because -- that's a

12   really important point because any of the population models

13   for looking at, um, at sustainable populations, they use those

14   three endpoints.  All three are necessary.

15   Q      What about, you know, biochemical or behavioral

16   endpoints, studies that affect -- assess effects on fish

17   behavior?

18   A      There's -- um, there's been a lot of research going on

19   in that area, and those are useful research projects.  But we,

20   first of all, have no way of knowing whether those effects

21   really are adverse to individuals, um, let alone to

22   populations in the natural environment.

23          And so we have no way of translating effects on those

24   subtle -- on those subtle effects like biochemical, like, um,

25   um, sometimes there are changes in enzyme levels and other

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2513

1    markers of exposures, whether they are deleterious or not and

2    whether they have any impact on a population's ability to

3    thrive.

4    Q    Let's bring up something the Study Panel included in its

5    report, Joint Exhibit 6-2, Chapter 2, Page 2-5.

6         The Study Panel wrote, the population significance of

7    biochemical effects is less clear than those that directly

8    affect parameters such as growth and spawning behavior.

9    What's your reaction?

10   A    Um, well, I'm -- I'm glad that the Study Panel pointed

11   that out, that the significance is less clear, but I think,

12   ah, less clear is -- it provides too much weight or too -- for

13   something that really we have not been able to attribute

14   anything concerning, um, population effects.  It's -- it's too

15   generous a term, um, for really we have no knowledge at all,

16   and we have no way of linking that to population survival.

17   Q    And in assessing published studies for purposes of

18   setting a screening level in an ecological risk assessment, do

19   you also consider whether the studies employed adequate

20   controls, whether the results were bounded or not?

21   A    Yes, you do, you do, and, um --

22   Q    Why are controls important?

23   A    You need controls because in order to measure any type

24   of effect, it's a fundamental tenant of science and of

25   ecotoxicology in particular that you have to compare an effect

1    in a laboratory study, for instance, with the control.  You're

2    looking at whether -- um, what is the difference and whether

3    there is a statistically-significant difference from the test

4    condition versus the control.

5        Otherwise, you're not able to say really anything about

6    what that study has shown.

7    Q    Earlier at this trial, there was some discussion about

8    unbounded no effects levels.  What is that?

9    A    An unbounded no effect level is when you have a study

10   and you've -- you've tested a given concentration, for

11   instance, and looked at whether there is an effect, and you

12   find no effect in that study.  That's fine.  That adds to the

13   body of -- of literature, and that's information out there.

14       The problem comes in is when you try to establish a

15   screening level or a criteria based on that because you don't

16   know whether -- you don't know at what level the effect might

17   have occurred; in other words, if you test -- say, you test a

18   -- you have a control and then you have a dose of 10 and

19   that's -- and you've seen no effect at 10, but -- but you

20   don't know whether there would have been any effect at a

21   hundred or at 200 or whatever.

22       So that's why it's -- it's really the application of an

23   un -- what we call an unbounded no effect level in developing

24   criteria that is the problem.

25   Q    And so, in your judgment, should studies that lack

1    adequate controls or that report unbounded no effects levels

2    be used in setting screen thresholds for purposes of

3    ecological risk assessment?

4    A     No, they shouldn't.

5    Q     Let's turn to the Study Panel's target to protect fish

6    health.  What was their target?

7    A     Their target to protect fish health was 500 nanograms

8    per gram on a wet-weight basis, and by that, I mean, 500

9    nanograms of mercury per gram of fish tissue.

10   Q     And nanograms per gram could also be expressed in parts

11   per billion?

12   A     That can also -- yes, parts per billion, it's the same

13   thing, hm-hmm.

14   Q     And were the Study Panel's samples on a whole body

15   basis or on an axial muscle basis?

16   A     They based that on an axial muscle basis.

17   Q     Which means what?

18   A     Which -- which means it -- the fillet tissue or the --

19   um, yes, the nonvisceral tissues of the -- of the fish.

20   Q     Now, in Section 2.3 of Chapter 2, the Study Panel refers

21   to the Sandheinrich and Wiener 2011?

22   A     Um, yes, it does, hm-hmm.

23   Q     Are you familiar with that?

24   A     Ah, yes, I am.

25   Q     What is it?

1   A      Um, the Sandheinrich and Wiener is a -- um, it's a

2   literature review that was published as a book chapter.  It

3   looked at -- um, it tried to consolidate and report effects on

4   -- on fish, and -- and they reported -- and, actually,

5   Sandheinrich and Wiener reported a concentration, their effect

6   level between 500 and 1,200 on nanograms per gram.

7   Q      On a muscle basis?

8   A      On a muscle basis, right.

9   Q      And in the last sentence of Page 2-5 of Chapter 2, what

10  does the Study Panel suggest --

11  A      The Study Panel --

12  Q      -- that Sandheinrich and Wiener reported?

13  A      -- is suggesting or reporting that Sandheinrich and

14  Wiener reported 400 to 900, but they actually reported 500 to

15  1,200.

16  Q      Let's go to Joint Exhibit 77, Page 185.  Is this the

17  Sandheinrich and Wiener chapter --

18  A      Yes, it is.

19  Q      -- that's referenced?  And if we bring up the conclusion

20  section on Page 185, last sentence, what do they report as a

21  proposed range of effects?

22  A      Well, they report this in different units.  They report

23  it on a -- on a microgram per gram basis, but it's the same

24  thing.  They've reported it at 500 to 1,200 nanograms per

25  gram, or parts per billion, and the effects that they've

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2517

1    included -- I think this is -- this is an important

2    consideration because their range of effects is not just on

3    the effects that we use in best practice and eco risk

4    assessment to determine what might have effects on

5    populations, in other words, reproductive effects, um,

6    survival effects, and growth effects.

7         They're -- they're reporting effects on biochemical

8    processes, damage to cells and tissues, and, of course,

9    reduced reproduction.  They have those included in there, as

10   well.

11        So I would -- I would say that, um, Drs. Sandheinrich

12   and Wiener have reported here a conservative, um, threshold,

13   if you will, for -- that could be used for screening between

14   500 and 1,200 nanograms per gram.

15   Q    And let's look at how fish tissue concentrations

16   measured by the Study Panel compare to this range of effects,

17   as well as the 500 nanograms per gram standard the Study Panel

18   suggested, Defense Exhibit 1091.

19             MR. SCHUTZ:  And I'd like to offer this into

20   evidence.

21             THE COURT:  1291?

22             MR. COLANGELO:  No --

23             MR. SCHUTZ:  1091.

24             THE COURT:  1091.

25             MR. COLANGELO:  No objection, Your Honor.

1           THE COURT:  1091's admitted.

2   BY MR. SCHUTZ:

3   Q     First, can you orient us to the X and Y axis?

4   A     Sure.  Um, what I've reported on the Y axis is total

5   mercury in terms of nanograms per gram.  And the reason I've

6   reported this is total -- as total mercury, um, is because

7   many of the papers that have gone into these, um, studies are

8   -- are reporting total.  It's a mixture between total and

9   methyl.  So I've taken, again, a conservative approach by

10  expressing it on a total basis.  So that's parts per billion,

11  or nanograms per gram, of total mercury.

12          And what I've plotted on the -- on the X axis or in

13  these bars are the Study Panel's tissue data that -- that they

14  took from the study area, um, and in -- for instance, here's

15  American eel, in parentheses, I've got N equals 592.  That

16  means there were 592, um, fish sampled for that -- to create

17  that mean.  This is the mean concentration, and that's

18  approximately 536 nanograms per gram.

19          Then I've also plotted the other species that they've

20  collected -- the golden shiners, the mummichogs.  Golden

21  shiners had 20 samples, mummichogs, 187, rainbow smelt, 639,

22  and tomcod, 644.  So, again, very extensive, um, reporting of

23  -- of tissue data.

24  Q     And so just using the Study Panel's own proposed 500

25  nanograms per gram threshold, what do you conclude?

1   A      Well, I conclude that, um, the bulk of the fish species

2   are below even the Study Panel's very conservative 500

3   nanogram per gram bottom end of the range from Sandheinrich

4   and Wiener, which would be in this -- you know, this whole

5   area in here.

6          Um, and American eel are at or about the bottom end of

7   that -- of that very conservative range or the -- the Study

8   Panel's value of 500 part per billion.  Ah, the American eel,

9   um, had about -- the mean was about 7 percent higher than that

10  bottom end of that conservative screening range.

11  Q     And did you report the eel concentration on an

12  age-adjusted basis?

13  A      No, I didn't.  Ah, I found no relationship between

14  mercury concentration and age.

15  Q     And if we can bring up Figure 3-1 from your report,

16  Joint Exhibit 55.  Well, let's go to Page 3-12 of your report.

17  A      Sure.

18  Q     Okay.  Here's Figure 3-1.  Did you prepare this?

19  A      Ah, yes, I did.

20  Q     Is this included in your report?

21  A      Ah, yes, it is.  It's Figure 3-1 of the report.

22  Q     And what does this show?

23  A      Well, this is showing -- what I've plotted here is total

24  mercury on the Y axis in parts per billion, or nanograms per

25  gram.  I've graphed each eel taken below the Veazie Dam and

1    have plotted it according to its age, so I've plotted total

2    mercury concentration versus age, and this shows a scatter

3    plat with really very little relationship between age and

4    mercury concentration.

5         Age is a very poor predictor of concentration in -- in

6    lobster.

7    Q    In eel.

8    A    Excuse me -- in eel, yes.

9    Q    So can you give us a for example?

10   A    Ah, yes, for instance, if -- if one were to look at,

11   say, for instance, um, right around the 800 nanogram, or part

12   per billion, range and went just across here, we find that we

13   have eel at around, um, 800 part per billion, ranging in age

14   from about 3 years to 15 years.

15        Another example is we can go up to a thousand part per

16   billion, and we can look here and age between -- eels age

17   between 4 years and approximately 17 years.

18        So you can draw -- you know, you could draw a line

19   through these data.  There are statistical programs that you

20   can pump in the numbers and they'll generate a line, but that

21   doesn't mean there's a relationship.

22   Q    And did you actually run statistics to assess the extent

23   to which there's a relationship?

24   A    Yes, I did.

25   Q    And we can go to Page 3-12 of your report, second

1     paragraph up from the bottom.

2          What did you find when you ran statistics to assess

3     whether age of eel's a good predict of mercury concentration?

4     A     Well, in fact, I found that age only predicted about

5     5 percent of the mercury variability in these eel.  So that

6     makes it an extremely poor predictor of -- of mercury

7     concentration in these fish.  95 percent of the explanation

8     comes from other sources, which, you know, are not determined.

9     Q     Let's go back to Defense Exhibit 1091.  So, again, even

10    if we accept the Study Panel's proposed target for fish health

11    at 500, are fish in the Penobscot at risk due to mercury

12    exposure?

13    A     No, I don't believe they are.

14    Q     Now, we've been talking about this blue line, the Study

15    Panel screening value.

16    A     Yes, that's correct.

17    Q     On 1091.  And there's also a green line further up in

18    the figure.  What's that represent?

19    A     Um, that represents a number that I derived as a

20    screening level using a statistical approach that has been

21    used by, um, authors that the Study Panel has referenced, and

22    it's also -- but, more importantly, it's a technique that is

23    widely used in ecological risk assessment, um, and it's -- we

24    use it at hazardous waste sites for -- for the purposes of

25    screening levels, for the purposes of conducting what's called

1    a screening level ecological risk assessment.

2    Q     And let's bring up Joint Exhibit 101, a paper published

3    in the literature by Nancy Beckvar as the first author.  If we

4    can go to Page 2096 of this paper and enlarge this -- this

5    paragraph, in the lower left-hand corner starting with the

6    third method.

7          Is this the method you used?

8    A     Um, yes, it is.  It's the -- it's the method that I

9    used, and, um, it is, as I mentioned, a statistically-based

10   approach.

11   Q     The second sentence in this paragraph says, by

12   definition, the incidence of effects below the sediment TEL is

13   predicted to be rare?

14   A     That's correct.

15   Q     What does TEL stand for?

16   A     The -- that stands for the threshold effects level, and

17   this is a method that was developed by, um, Drs. MacDonald and

18   Long, was used for setting sediment screening values in the

19   State of Florida.  It's also used by the Canadian Council of

20   Ministers of the Environment.  Canada uses this as a screening

21   method for contaminated -- at contaminated sediment sites.

22   And it's widely used throughout, um, the United States at U.S.

23   EPA hazardous waste sites for -- again, for -- as a -- as a

24   screening level method of determining whether further study is

25   needed or whether the -- the site screens out.

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2523

1  Q    What's the advantage of this statistical approach?

2  A    The advantage is it doesn't make any a priori decisions

3  about which authors, which studies, which laboratories, which

4  methods, um, are appropriate.  It takes -- it takes all of the

5  -- all the studies that meet minimum data requirements that

6  look at serious adverse effects or effects that are predictive

7  of populations, such as reproductive, um, growth, and survival

8  endpoints, and incorporates them into a statistical method so

9  that essentially neither the highest, nor the lowest value

10  from that array of studies drives the screening level.

11  Q    In calculating your threshold effect level, did you use

12  this same formula that's reported here?

13  A    I did use the same formula.  Ah, I did change the

14  nomenclature a little bit.

15  Q    All right.

16  A    Okay.

17  Q    Let's go to your report --

18  A    Okay.

19  Q    -- and pull up the relevant page from your report, Joint

20  Exhibit 55, Appendix D, Page 8.  And I'm sorry for

21  interrupting, but can you again -- do you use the same

22  formula?

23  A    Yes, I did use the same formula.  I just wanted to

24  inform the court that I just used a more standard acronym

25  here, the lowest observable adverse effect level and the no

1   observable adverse effect level.

2   Q     So can you just walk us through, then, how this works?

3   A     Sure.  So what -- what one does is you take the array of

4   studies.  Many of these studies have multiple endpoints on

5   growth, reproduction, or survival.  You separate out the low

6   effect levels from the no effect levels.  You array the low

7   effect levels from lowest to highest; you do the same with the

8   no effect levels, arraying them from lowest to highest.

9        And then what -- what you do is you take the geometric

10  mean of the 15th percentile of the LOAEL values on a

11  concentration basis, and the 50th percentile of the NOAEL

12  values on a concentration basis, you take the geometric mean

13  of those two terms, and that provides the tissue threshold

14  effects level, right here.

15  Q     So let's turn to the -- one of the steps you've just

16  mentioned, rank-ordering the studies?

17  A     Yes.

18  Q     Bring up Defense Exhibit 1093.  Does this graphically

19  depict in rank order the studies you considered?

20  A     Ah, yes, it does, and I've -- and I've identified in

21  this particular graphic, this particular demonstrative, what

22  class of endpoint each of the studies was in, whether it was a

23  growth, a mortality, a reproductive study, whether it was a no

24  effect level or a low effect level, and I've rank-ordered them

25  with tissue mercury concentration increasing on the X axis,

1    again, this is in nanograms per gram, or parts per billion,

2    and the percentile of the study, so that here you're down at

3    the -- well, 0 percentile up to 100 percent.  So a hundred

4    percent of the studies up here.

5    Q     So -- and in the blue and green bars?

6    A     Oh, yes.  The -- um, the blue -- the blue bar or the

7    blue line is the -- is the Study Panel's conservative, um,

8    screening level value.  I just put it on here just for

9    purposes of reference.  And the green line, um, is the number

10   that I derived using the statistically-based approach, and it

11   came out to 1,600 nanograms per gram.

12   Q     So let's take, for example, the orange triangle -- first

13   orange triangle to the right of the green line.  What does

14   that represent?

15   A     That represents a low effect level for reproductive

16   effects.

17   Q     And if we take the first orange triangle to the right on

18   this chart, what does that represent?

19   A     Um, that's also a -- a low effect level for reproductive

20   effects.

21   Q     Now --

22   A     You've -- yes, yeah, and you have -- you have

23   reproductive effects here and here.  All right.

24   Q     And there are also growth effects reported on this

25   chart?

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2526

1   A    Growth effects are -- are reported here.  Growth effects

2   are shown by the -- the diamonds.

3   Q    Now, your green line is to the right of some studies.

4   A    Yes, that's correct.  That's -- that's implicit in -- in

5   this method, and what I found particularly, um, interesting,

6   um, and sort of as a little bit of corroboration is that that

7   line appears right at about the 20th percentile of the studies

8   in this -- in this -- um, in this graphic, and the 20-percent

9   line is -- I don't want to more significance into it than --

10  than is warranted, but it's sort of a rough rule of thumb of

11  what ecologists and ecological risk assessors believe is -- is

12  no impact on populations.

13       And, again, all of these studies are on surrogate

14  species; they're on a variety of organisms, many of which are

15  not present in the Penobscot River or in this system.  So

16  that's why we're extrapolating from a number of laboratory

17  studies, trying to come up with something reasonable for

18  screening purposes in the Penobscot River.

19  Q    Now, did you do a sensitivity analysis to check your

20  result?

21  A    Ah, yes, I did.

22  Q    If we can bring up Defense Exhibit 1095.  What does this

23  reflect?

24  A    Um, again, I've got mercury concentration on the Y axis

25  in parts per billion, or nanograms per gram.  And then let's

1    just look at the -- this bar on the left, the tissue threshold

2    effects level.  This represents the results of a sensitivity

3    analysis that I performed.

4         What I did is, um, I wanted to see whether these results

5    would be stable or not, and so I removed studies sequentially;

6    in other words, I took one -- I took the first study out of

7    the array and recalculated the threshold effect level.  I then

8    put that study back in, took out the second study, ah,

9    recalculated the thresholds effect level, put that study back

10   in and took the third one out, and I did that sequentially

11   until each and every study was removed and then replaced, and

12   then that allowed me to calculate these error bars, um,

13   concluding that it's a fairly tight range and the effects of

14   one -- of any one study do not have a large impact on the

15   overall result.

16   Q    And if we bring up Defense Exhibit 1091 again, how do

17   concentrations of mercury in fish in the Penobscot compare to

18   the threshold effects level derived using the statistical

19   approach you propose?

20   A    Well, all of them are below that threshold effects

21   level.

22   Q    And, again, the Sandheinrich and Wiener range from their

23   chapter?

24   A    Well, the Sandheinrich and Wiener range was between 500

25   and 1,200, and, again, all of the fish are below that range.

1   Um, eel are -- the eel are just slightly higher than the very

2   lowest end of that range.

3   Q    Is there a risk to fish health associated with mercury

4   in the Penobscot?

5   A    No, there isn't.

6   Q    Let me turn to a 50 part per billion standard that there

7   was some testimony about earlier in this case.

8        What's your understanding of what that represents?

9   A    The 50 part per billion number was derived as a -- as an

10  attempt to look at what level could be present in prey species

11  and not affect the health of predacious fish species.

12  Q    Is it standard practice, in your experience, to set a

13  screening value based on the mercury concentrations in fish

14  that might be eaten by other fish?

15  A    No, it isn't.

16  Q    Has that approach ever been followed at any site -- any

17  contaminated site you're aware of?

18  A    Not to my knowledge, no.

19  Q    In concept, what's your reaction to setting a screening

20  value for purposes of ecological risk assessment considering

21  remediation?

22  A    Um, well, I -- I believe it's -- it's inappropriate.

23  First of all, it's -- it brings all kinds of uncertainty into

24  the analysis because you'd be looking -- you'd make -- you'd

25  be making the tacit assumption that all fish behave the same,

1   that they're eating -- they're -- they're eating similar prey

2   species, that they're assimilating the mercury and

3   metabolizing it in a similar fashion, that their life habits

4   and histories are similar or the same.

5        Um, it's like trying to fit a one-size-fits-all approach

6   to something where it's just not warranted, especially when we

7   have information on the predators themselves and the fish that

8   are in the Penobscot River.  I don't see the need to go

9   through another step to try to answer that question.

10   Q    If we have evidence concerning mercury concentrations in

11   the fish predators, does it make sense to look at mercury

12   concentrations in what they might eat for purposes of

13   assessing the health of the predators?

14   A    No, I don't believe it's necessary at all.

15   Q    What about predator fish in the Penobscot, like salmon

16   or striped bass?

17   A    Um, well, those species are only present for a short

18   period of time, so they're -- they're getting most of -- of

19   their food and, consequently, most of their mercury exposure

20   from the marine food web, not from the Penobscot River.

21   Q    Now, if we can bring up Page 2-8 of the Study Panel's

22   report, Chapter 2, Paragraph 1 under Section 2.5, the section

23   of the report that addresses this subject.

24        What did the Study Panel conclude concerning risk to

25   fish-eating birds and mammals?

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2530

1  A     Well, the Study Panel, ah, actually sampled some

2  fish-eating birds and mammals, and they concluded that they

3  were generally not at risk from eating contaminated fish.

4  Q     And yet the Study Panel also sampled fish-eating fish in

5  the Penobscot, specifically, eels?

6  A     Yes, that's correct.  So -- so one wonders if -- if you

7  arrive at the conclusion -- if the Study Panel arrives at the

8  conclusion that because of the fish-eating birds and mammals

9  that they sampled, um, that those were generally not at risk,

10 then when you sample so many fish and you find that -- that --

11 you find that they're below -- that they're not at risk as --

12 as we've just shown, why would there be a need to go through

13 this other method with -- with considerable more uncertainty

14 to try to predict through diet.

15 Q     Now, if we can go to the next page of Chapter 2, Page

16 2-9 and bring up the end of the first paragraph.

17       How does the panel's 50 part per billion threshold

18 compare to mercury concentrations in natural fish populations?

19 A     Well, the Study Panel itself -- well, the Study Panel

20 itself said it's very low compared to those often seen in

21 natural fish populations, and I would agree, only I think I

22 would take it, um, further that these levels are exceeded in

23 natural populations of Maine fish throughout the state, and

24 so, um, the 50 part per billion screening criteria, um, is

25 just not a useful tool to make any type of remedial decision.

1   Q    Now, in your report, you've included Table -- Table 4-3.

2   I've just brought that up.

3   A    Okay.

4   Q    What does this show?

5   A    Well, this is showing, um, mercury concentrations in a

6   variety of Maine fish from -- from -- from sources -- or from

7   locations without industrial impacts, and -- or no known

8   mercury impacts, so this is all presumably coming from

9   atmospheric deposition.

10       So we've got ranges -- or -- or mean concentrations that

11  range, you know, anywhere from 255 to, I think, the high is

12  around 868 for white perch, yellow perch at 586, and you can

13  see on each of these means, it gives the range in

14  concentration here, um, you know, as high as, I guess, 1,500

15  part per billion in some yellow perch.  And, also, these are

16  all fillet samples or muscle tissue samples.  The white sucker

17  are reported on a whole body basis with an average of 158

18  nanograms per gram.

19  Q    Now, it's been pointed out that -- that -- and we've

20  been talking about a mercury concentration in prey fish, it's

21  been pointed out that some of the fish on this table could be

22  considered fish predators?

23  A    Yes, that's true.  I acknowledge that.  This is just

24  showing the -- what you find in native Maine populations, and

25  -- but some of these are also prey fish, um, at certain times

1    in their life, and certainly yellow perch and white sucker are

2    fish that are -- are very common prey fish.

3         In fact, Drs. Wiener and Sandheinrich, in a publication

4    back in 2006, they studied mercury in populations of fish in

5    pristine lakes in the upper Midwest, I believe it was in

6    Minnesota, and they found yellow perch to be an important and

7    a crucial food item in the -- in the food chain of predacious

8    fish species.

9         And the yellow perch -- the yearling yellow perch in

10   their study were well above the 50 nanogram per gram value

11   that the Study Panel has proposed as a screening level

12   threshold for -- for diet in this particular case.

13   Q    So, in summary, in your judgment, should we be using a

14   fish tissue concentration of prey fish as a screening value

15   for assessing the need for remedial action in the Penobscot?

16   A    No, certainly not.  It's not warranted, and the science

17   doesn't support it.

18   Q    Now, despite these concerns, did you apply the same

19   statistical approach that you discussed earlier to set a

20   threshold for prey fish?

21   A    I did, with reservations about the method.  Um, I

22   believe it's -- it's much better to look at, um, the predators

23   themselves and the fish higher in the trophic level, but I

24   went through this approach, yes, I went through and derived a

25   statistical approach similar to what I had done for the tissue

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2533

1   derivation earlier.

2   Q    And if we bring up Defense Exhibit 1094, is that also a

3   graphic representation of the rank order of studies similar to

4   what we looked at earlier for fish health?

5   A    Ah, yes, it is, again, plotting percentile of studies on

6   the Y axis, the dietary mercury concentration reported in each

7   of these studies that I -- I examined, and the green line, the

8   green bar is the dietary threshold effects level that I

9   calculated through the statistical method, and just for

10  reference purposes, I also put the Study Panel's value of 50

11  nanogram per gram on the chart.

12  Q    What threshold did you derive using this approach?

13  A    I derived a threshold of 680 part per billion, or

14  nanograms per gram.

15  Q    And what are the -- what -- what are the orange boxes

16  that are the first -- that first appear to the right?

17  A    Well, the most -- again, we're looking at -- across an

18  array of studies, and the most sensitive endpoints in this

19  particular case were -- were effects on survival.  They were

20  no effect levels on survival or mortality.

21  Q    And then there are a range of other studies to the left

22  of your green --

23  A    Yes.

24  Q    -- bar that represents your proposed screening value?

25  A    Yes, the next, um, set of studies or endpoints were no

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2534

1   effect levels on growth, um, followed by low effect level on

2   growth, followed by, um, for low effect levels on reproductive

3   effects, followed by another no effect mortality study.

4   Q     Now, again, is the fact that there are studies reporting

5   either no effects or low effects at lower concentrations than

6   your proposed threshold a problem?

7   A     No, no, they're not.  I mean, that's -- again, you're --

8   you're extrapolating across a range of organisms, a range of

9   conditions, range of laboratories, range of study designs,

10  many researchers, what you're trying to do is come up from

11  this with a -- with a level that we can use for screening

12  purposes that's predictive for ecological risk.

13  Q     Now, some judgment has to be exercised in deciding what

14  studies fit the criteria for inclusion?

15  A     That's correct.

16  Q     But after that, is this an objective statistical

17  approach?

18  A     It is.  And, again, interestingly enough, you're --

19  here's the 20-percent level, and only about 20 percent of the

20  studies have been excluded.

21  Q     And are all prey fish sampled by the Study Panel under

22  the threshold you propose?

23  A     Ah, yes, they are.

24  Q     And if we go back to Defense Exhibit 1095, did you also

25  pursue a sensitivity analysis to check whether your threshold

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2535

1   was stable?

2   A    Yes, I did.  Um, I went through the same exercise of

3   sequentially removing one study after another and

4   recalculating the threshold effect level after each removal,

5   and, again, um, this is showing that there is a very narrow

6   set of -- of uncertainty bars representing the 95th percent

7   confidence level, showing that the results are stable, just as

8   the results are stable for the tissue threshold effect level

9   calculation.

10  Q    Okay.  We can -- we can take that exhibit down.

11       Now, is there a Maine state program tracking mercury

12  levels in fish?

13  A    Yes, there is.

14  Q    Now, are --

15  A    It is --

16  Q    Go ahead.

17  A    Through the Department of Environmental Protection,

18  there is a monitoring program that is tracking levels of

19  mercury, and, um, the results of that monitoring program have

20  shown that, unfortunately, mercury levels are not declining in

21  the state.

22  Q    Dr. Keenan, let me ask you some questions in conclusion.

23       Do we have enough information now to make decisions

24  concerning risk to fish populations in the Penobscot?

25  A    Yes, we do.

KEENAN - CONTINUED DIRECT EXAMINATION/SCHUTZ

2536

1  Q      Are you recommending additional ecological assessment

2  work concerning fish in the Penobscot?

3  A      No, I'm not.

4  Q      Are you recommending further monitoring of mercury

5  levels in fish in the Penobscot?

6  A      Ah, no.

7  Q      How many fish has the Study Panel killed as part of

8  their program?

9  A      Um, well, I think the Study Panel has sampled well over

10  2,000 fish -- fish which were taken and euthanized, yes.

11  Q      Is there any documented case of fish mortality in the

12  Penobscot as a result of mercury?

13  A      No, there isn't.

14  Q      Does mercury in the Penobscot pose a risk to fish

15  populations?

16  A      No.

17  Q      Is a mercury remediation program necessary to protect

18  fish?

19  A      No, certainly not.

20         MR. SCHUTZ:  Nothing further.  Thank you.

21         THE COURT:  Thank you.

22       Cross-examination?

23         MR. COLANGELO:  Yes, Your Honor.

24                      CROSS-EXAMINATION

25  BY MR. COLANGELO:

KEENAN - CROSS-EXAMINATION/COLANGELO

2537

1   Q      Good morning, Dr. Keenan.

2   A      Good morning, Mr. Colangelo.

3   Q      You testified that the Study Panel, in your view, should

4   have conducted an ecological risk assessment; is that right?

5   A      I'm sorry.  Would you repeat that?

6   Q      Yep.  You testified that in your view, the Study Panel

7   should have conducted an ecological risk assessment; is that

8   right?

9   A      That's correct.

10  Q      Okay.  And your suggestion was that they should have

11  followed Superfund guidance, correct?

12  A      Ah, they should have followed Superfund guidance and

13  best practices.

14  Q      Okay.  And you discussed this document, which is

15  Defendants' Exhibit 759, and it refers to final guidance for

16  ecological risk assessment principles for Superfund sites.  Do

17  you see that?

18  A      Ah, yes, that's correct.

19  Q      Okay.  Now, the Penobscot is not a Superfund site; is

20  that right?

21  A      That's correct.

22  Q      Okay.  And are you aware that Special Master Calkins

23  concluded in an order that the Study Panel did not need to

24  follow Superfund guidance?

25  A      Um, I was not aware of that, but this guidance that I'm

 1    talking about here is not just particular to Superfund.  It's

 2    particular really to any contaminated site, and most state

 3    agencies now use the -- the process and design document that

 4    EPA -- 1997, as well as EPA's other set of comprehensive risk

 5    assessment guidance for ecological risk assessment, the -- the

 6    1998 document.

 7    Q    Let me show Plaintiffs' Exhibit 10, and this is a

 8    decision by Special Master Calkins regarding guidance to the

 9    Study Panel on the Phase II Report.

10         And you'll see that Special Master Calkins was

11    considering whether the Study Panel should follow criteria

12    from CERCLA.  CERCLA is the same as Superfund; is that right?

13    A    Um, that's a legal question.  Superfund comes within the

14    Comprehensive Environmental Response Compensation and

15    Liability Act, but it's a -- it's a subset of -- of CERCLA

16    requirements.

17    Q    And Special Master Calkins ordered that given that there

18    are no statutory or regulatory criteria or framework that the

19    Study Panel is required to follow, the Study Panel in the

20    exercise of its scientific expertise and objectivity should

21    develop and articulate its recommendations and reasons in a

22    manner that, in its opinion, best meets the requirements of

23    the orders of the court in this case.  Were you aware of that?

24    A    No, I wasn't, but I think that's great.  I mean, this is

25    what -- if you'd put that back up.

KEENAN - CROSS-EXAMINATION/COLANGELO

2539

1    Q      Sure.

2    A      It's saying in its scientific expertise and objectivity.

3    Ah, U.S. EPA's ecological risk assessment guidance is a

4    monumental work which defines best practices.  It -- it's not

5    just applicable to Superfund.  It's -- as I've mentioned, it's

6    used at most of the contaminated hazardous waste sites where

7    ecological risk assessment is done, both state-led sites,

8    sites that are under -- under resource -- under RCRA or under

9    CERCLA.

10   Q      And for purposes of your analysis, you did not conduct

11   an ecological risk assessment; is that correct?

12   A      Um, what I did is I did a refined screening level step

13   within the ecological risk assessment process.

14   Q      So you did not conduct a full ecological risk

15   assessment; is that correct?

16   A      Right, I did not conduct a BERA, or the baseline

17   ecological risk assessment, because one isn't needed, at --

18   for -- for the aquatic receptors because that's all I looked

19   at.  I looked at fish.  I didn't look at, um, um, birds and --

20   and Dr. Henry will address that later.

21   Q      And you -- for purposes of your analysis of risk to

22   fish, you recalculated the Study Panel's targets; is that

23   correct?

24   A      Ah, what I did was I examined what the Study Panel had

25   done.  The Study Panel cites the Sandheinrich and Wiener book

1    chapter.  Um, so I went to Sandheinrich and Wiener, found out

2    that Sandheinrich and Wiener actually have a range between 500

3    and 1,200, and then I went and used a method that the Study

4    Panel had cited in Beckvar and other sources, and -- and, yes,

5    recalculated that to include newer studies and to use specific

6    study criteria.

7    Q    Okay.  So the Study Panel set targets of 500 for fish

8    health and 50 for prey fish; is that right?

9    A    That's correct.

10   Q    Okay.  And as a result of the methodology that you

11   described earlier, you set new targets above those of, I

12   think, 1,600 for fish health was the low end of your range,

13   and 680 for prey fish; is that right?

14   A    Um, I set targets of -- yes, of 1,600 for fish health

15   and 680 for prey fish; but, more importantly, I put that into

16   context that, again, um, that's just one line of evidence.  I

17   was also looking at what the Study Panel had done.  I do not

18   think that a dietary number actually needs to be calculated

19   because I think we have our answer by looking at the predators

20   themselves.

21   Q    And you said that you added some new studies that the

22   Study Panel had not considered when you derived your fish

23   health targets; is that right?

24   A    Ah, that's -- let me rephrase that.  I added studies

25   compared to the -- the statistical approach that was cited in

KEENAN - CROSS-EXAMINATION/COLANGELO

2541

1    the Beckvar, et al., paper from 2006.  Um, there has been --

2    seven or eight years have transpired since that paper was

3    published.  So there are some additional studies out there,

4    and I included those studies when I -- when I did my -- my

5    tissue threshold effect level calculation.

6         In fact, some of those studies were also cited in a

7    paper that Dr. Beckvar coauthored with -- with Dillon and

8    other authors, I believe it's Dillon, et al., 2010.  So I

9    think there are a couple of additional papers that might have

10   been in Dillon, that weren't in Beckvar.  I looked at those,

11   included them.  And there's -- I think there were also a

12   couple more studies since that time.

13   Q    And you also excluded some studies that the Study Panel

14   had referred to in setting your targets for fish health; is

15   that right?

16   A    I had excluded some studies that were in the Beckvar

17   paper, yes.

18   Q    Okay.  And are you familiar with the Depew paper?

19   A    Yes, I am.

20   Q    Okay.  Did you also exclude some studies that were in

21   the Depew paper?

22   A    Um, yes, I did.

23   Q    Okay.  What were your criteria for excluding studies?

24   A    Um, I excluded studies that did not have a control

25   value.  I also excluded, um, studies that were based on an

KEENAN - CROSS-EXAMINATION/COLANGELO

2542

1   unbounded NOAEL or unbounded no effect level.  And I also

2   based my values on the three classes of -- of effects that are

3   useful for predicting effects on populations, and that's the

4   most critical piece, effects on reproduction, effects on

5   growth, and effects on survival.

6   Q    When you say you excluded studies that did not have a

7   control value, do you mean that you excluded those studies

8   entirely?

9   A    Ah, yes, generally in that case, you have -- as I

10  recall, you had a control and one dose group, perhaps.

11  Q    Okay.  So if a study reported simply a control value,

12  you would exclude it; is that what you're saying?

13  A    If -- if it had a control value, um, that would -- that

14  would have come into the -- probably into the unbounded NOAEL

15  territory.

16  Q    Okay.

17  A    The unbounded no observable adverse effect level.

18  Q    Okay.  So just to be clear on what you did, if you had a

19  study -- let's say Depew cites a study that, in your view, did

20  not report a control value, you would exclude that study

21  entirely?

22  A    I don't believe there were -- hm, I -- I would have to

23  look at that.  I don't think that case occurred.  I did

24  exclude, um -- I know there -- I excluded a study where the,

25  um, control was -- showed a -- a high effect level; in other

KEENAN - CROSS-EXAMINATION/COLANGELO

2543

1   words, the -- the fish died in the control, and there was no,

2   um, good comparison with the -- with the dose levels.  They --

3   they showed also similar mortality in the -- in the test

4   doses.

5   Q    So let's discuss the issue of an unbounded NOAEL that

6   you talked about.

7   A    Hm-hmm.

8   Q    If there's a treatment that's reported as a NOAEL and

9   then there's another dose for the same endpoint above that

10  that's reported as a LOAEL, you would include both of those

11  values; is that right?

12  A    Yes.

13  Q    Because in that case, the lower value is not an

14  unbounded NOAEL, correct?

15  A    That is correct.

16  Q    There is a LOAEL above it, correct?

17  A    That's correct.

18  Q    Okay.  But if a study reports a value for a NOAEL with

19  no value for a LOAEL above it, you believe you should exclude

20  that value.

21  A    That's correct, and that's -- that is a -- a basic tenet

22  of the method.

23  Q    Okay.  So it would be inappropriate to include a

24  reported NOAEL that has no LOAEL value above it.

25  A    I believe so, yes.

1    Q    Okay.  And that's because, as you described earlier, if

2    you have a no observed adverse effect level reported at 10,

3    but nothing to bound above it, you don't know at what level

4    you begin to see an effect.

5    A    Right.  And the important thing here is that, again,

6    you're -- you're using an array of studies of a number of

7    different laboratories, number of different researchers, so

8    you're trying to introduce some level of standardization to

9    try to make these comparisons across studies.  It's a -- a

10   meta-analysis approach, and so that's why you -- you wind up

11   doing that.

12        And I tested -- realize, I tested the stability of the

13   approach, um, in that uncertainty analysis that we discussed,

14   where I removed a study and put the study back in and

15   sequentially went through that, and you saw that there were

16   very tight error bounds around that.  So I -- the method is

17   stable.

18   Q    And --

19   A    It doesn't -- it doesn't depend upon the results of any

20   one particular study.

21   Q    Now, that sensitivity analysis you're referring to, that

22   looks at what would happen to your values if you took out a

23   particular study that you used, correct?

24   A    Yes, that's correct.

25   Q    And you say that that shows that your numbers are stable

1  because it wouldn't change very much if you just took out a

2  study.

3  A     That's correct.

4  Q     But you didn't look at what would happen if you took out

5  two or three or four studies, correct?

6  A     Um, well, yes, I actually did.

7  Q     Is that reported --

8  A     I --

9  Q     -- in the sensitivity analysis you presented?

10 A     No, it isn't.  But I -- for instance, I removed, um -- I

11 removed all the mortality studies, and when I removed all the

12 mortality studies, for the dietary tissue effect level, um, it

13 had absolutely no impact.  The number did not change

14 whatsoever.

15       When I removed all the survival studies from the tissue

16 threshold effect level studies, it brought the number down

17 slightly I think from -- instead of 1,600, I believe it came

18 down to something like 1450, but, again, it was showing

19 stability.

20       Now, I didn't present that because I don't believe

21 that's appropriate.  You need to look at all three endpoints.

22 You need to look at mortality, growth, and survival, and

23 that's necessary for population modelers to model effects on

24 populations.

25       So I don't believe it's appropriate.  I didn't report

1    it, but I did go through that, um, sensitivity analysis.

2    Q    And on the question of NOAELs and LOAELs, if you have --

3    if a study finds no adverse effect at a level of 5, and then

4    it reports the lowest adverse effect at a level of 10, then

5    your NOAEL is bounded by the 10; is that correct?

6    A    That's correct.

7    Q    Okay.  And you know that the level at which effects

8    occur is somewhere between 5 and 10.

9    A    That's --

10   Q    The level at which adverse effects occur is somewhere

11   between 5 and 10, correct?

12   A    That's correct.

13   Q    Okay.

14   A    That's correct, and that's why one uses this statistical

15   approach.  That's why the T TEL -- and I didn't go into the --

16   well, if the -- if the court will permit, there's -- there's

17   also a probable effects level.  Counsel -- counsel had

18   reported that the bottom end of my range -- well, I didn't

19   wind up, um, reporting here today what I call the probable

20   effects level.  That's a level much higher.

21        And above that level, you expect to see adverse effects.

22   Um, I didn't bother reporting that.  I didn't think that that

23   was important for the purposes of -- of screening.

24   Q    And now on the question of adequate controls, you said

25   you would exclude studies if they lacked adequate controls.

1   Does that mean that you would not report any value from that

2   study if you found that it lacked adequate control?

3   A    Yes, if the study didn't have a control, it was out.  I

4   didn't include it.

5   Q    Let's talk about the Depew study.  Are you familiar with

6   the Depew study?

7   A    Ah, yes, I have read it.

8   Q    Okay.  And the Depew study proposes safe threshold

9   concentrations for fish health; is that right?

10  A    Um, reportedly, they report safe concentrations.  I -- I

11  don't know -- I would have to look at whether they call them

12  safe concentrations or they -- they reported levels.  I don't

13  know what they -- how they referred to them.

14  Q    Okay.  So let me show you, this is Defendants'

15  Exhibit 750, and this is a study by Depew, toxicity of dietary

16  methylmercury to fish, derivation of ecologically meaningful

17  threshold concentrations.

18       And this study has been peer-reviewed; is that correct?

19  A    That's correct.  It's appeared in, um, the journal of

20  Environmental Toxicology and Chemistry.

21  Q    Okay.  And you used the data from Depew, the study cited

22  in Depew, as a base data set when you began calculating your

23  prey fish targets; is that correct?

24  A    Yes, I used this as a base data -- data set and also,

25  um, searched for any newer literature or literature that

1  wasn't included.

2  Q    Okay.  So you added some new studies that weren't

3  reported here; is that right?

4  A    I -- I would have to check.  I don't -- I believe so.  I

5  looked at newer studies.

6  Q    Okay.

7  A    Yeah.

8  Q    And you excluded some values that are reported here when

9  you derived your levels; is that right?

10  A    Ah, yes, that's correct.

11  Q    Okay.  For the two reasons that we've discussed; is that

12  correct?

13  A    Ah, those two reasons being --

14  Q    And --

15  A    I'll tell you what my -- the two reasons were if it

16  lacked a control, if the endpoint was not predictive of

17  populations and communities, those were the two major reasons.

18  Q    Okay.  So there may be three reasons, then; one is it

19  lacks a control; two, you excluded certain endpoints, like

20  biochemical, correct?

21  A    Yes.

22  Q    And then, third, if there was an unbounded NOAEL?

23  A    That's correct.

24  Q    So three general reasons?

25  A    Three general reasons, right.

1    Q    So I want to talk about some of the studies in Depew and

2    let's look at the codes reported first.  So if you see on this

3    Table 1 -- this was discussed with Dr. Wiener -- Depew

4    categorizes a range of endpoints -- this is Page 1538 of

5    Defendants' Exhibit 750 -- and these are classified as either

6    severe, high, or moderate.  Do you see that?

7    A    Ah, yes, that's correct.

8    Q    Okay.  And so the severe endpoint, severe adverse

9    effects, that's acute or chronic lethality, that's the dose

10   that kills the fish; is that right?

11   A    Ah, no, not necessarily.  That's the dose that would

12   kill individuals within the study population, but many times

13   what we -- what we should be looking at is a statistically

14   significant reduction in survival compared to the control.

15   This is not like a study worth like a -- let's -- the old

16   LC50 test where, you know, wiping out half the population.

17   Q    And then high severity effects here are listed as

18   adverse effects on growth and development or reproductive

19   success.  Do you see that?

20   A    That's correct.

21   Q    Okay.  And those have these codes here, 2a and 2b, this

22   will be useful when we look at the later table.  Do you see

23   that?

24   A    That's correct, yes.

25   Q    Okay.  And then -- then there's this third subgroup

1    referred to as moderate effects, and these are biochemistry,

2    cellular changes in altered behavior.  Do you see that?

3    A    That's correct.

4    Q    Okay.  And you excluded this category entirely you said?

5    A    I included those because even as these authors point

6    out, adverse effects with unknown or poorly characterized

7    ecological consequences.

8    Q    Right.

9    A    So they point out, I think, in more detail in the text

10   that there's -- there's not a good -- there's not a way of

11   translating these changes that are observed in these

12   laboratory studies into effects on populations or communities

13   that we can use for ecological risk assessment purposes.

14   Q    Okay.

15          THE COURT:  Can you clarify?  Your question was and

16   you excluded this category entirely, and he responded, I

17   included those because -- etc., etc., and I -- and then he

18   went on as if he was -- had said excluded.  So I'm not quite

19   clear what he meant.

20   BY MR. COLANGELO:

21   Q    You meant to say that you excluded this category,

22   correct?

23   A    Yes, I -- yes, I meant excluded.

24   Q    Okay.

25   A    And I apologize if I misspoke or mis --

1          THE COURT:  That's all right.  I just wanted to

2    clarify.

3          THE WITNESS:  Yes.

4    BY MR. COLANGELO:

5    Q    So behavioral and biochemical effects you excluded

6    entirely.

7    A    That's correct.

8    Q    Okay.  Now, Depew in this study includes a table listing

9    all of the -- summarizing all of the studies, listing the

10   endpoints and the different NOAELs and LOAELs.  Are you

11   familiar with this table?

12   A    I've looked at this table.  It was months ago.  It's --

13   it's a very dense table, but, yes, I've seen it before.

14   Q    Okay.  And this is Table 2.  This is on Page 14-34 of

15   Defendants' Exhibit 750, and I'd just like to walk through

16   some of the examples in this table and compare to how you

17   treated the same studies in your summary table.

18         And did you prepare a summary table in your report that

19   lists all of the studies and endpoints that you included in

20   deriving your prey fish targets?

21   A    Yes, I did.

22   Q    Okay.  And that's Table 4-5?

23   A    Ah, I believe that's the -- the number.

24   Q    Let me show that to you because we'll be comparing these

25   two.  So this is Table 4-5 from your expert report; is that

KEENAN - CROSS-EXAMINATION/COLANGELO

2552

1    right?

2    A    Ah, yes, can you move it over a little bit?  I want

3    to --

4    Q    Sure.

5    A    Right.

6    Q    Okay.  This is a table that you prepared?

7    A    Ah, yes, it is.

8    Q    Okay.  And you'll see -- this table spans two pages, but

9    just to walk through what it shows, this is your summary of

10   the dietary -- this is the NOAEL and LOAEL.  You use a

11   different acronym, but that's the same thing; is that right?

12   A    It's -- yeah, the acronym is no observed adverse effect

13   concentration, um, because this is a dietary exposure, so,

14   yes, it'd be in concentration.  Could you go to the bottom of

15   the table.

16   Q    Sure.

17   A    Because I wonder if this has the summary.

18   Q    Sure.  The second page has the summary.  Would you like

19   me to flip to that page?

20   A    Yes, could you?

21   Q    Okay.

22   A    Yes, okay.

23   Q    Okay.  And now this -- at the very bottom of the second

24   page of Table 4-5 is the summary you're referring to; is that

25   right?

1    A    Yes, that's correct.

2    Q    Okay.  Now, you earlier were discussing a plot and --

3    that had a -- let me just show it to you.  This, I think, was

4    Defendants' Exhibit 1094.

5         Okay.  So there was some testimony about Defendants'

6    Exhibit 1094; is that right?

7    A    That's correct, hm-hmm.

8    Q    Okay.  And this is a graphic depiction of the values you

9    reported in your Table 4-5; is that right?

10   A    That's correct.

11   Q    Okay.

12   A    Hm-hmm.

13   Q    Okay.  So on Table 4-5, let me zoom in so it's a little

14   more legible.  So just to walk through an example, here you

15   have a walleye study.  Do you see where I am?

16   A    Ah, yes, I do, hm-hmm.

17   Q    Okay.  And then you identify the endpoints, survival

18   endpoint, growth endpoint, whether it's a NOAEL or a LOAEL,

19   here these are NOAELs, then the value, and then the study

20   author and year.

21   A    Ah, that's correct.

22   Q    Okay.  And what I'd like to do is compare the values

23   that you included to the values that are reported in Depew

24   that the Study Panel referred to.

25        So let me walk through one example.  This is in

1    Defendants' Exhibit 750, the table from Depew that the Study

2    Panel referred to.  And look at this study here, this is the

3    second study listed.  This is for the species walleye, and it

4    reports a mortality endpoint, weight gain -- I'm sorry -- this

5    is reduced weight gain.  Do you see the kind of downward arrow

6    there?

7    A    Um, yes.

8    Q    Okay.  And then reduced or -- or -- reduced GSI, the

9    gonadosomatic index, and that's a reproductive endpoint,

10   right?

11   A    Ah, that's correct.

12   Q    Okay.  And then below that, there's another endpoint,

13   plasma cortisol, but that has a code of 3, that means it's a

14   biochemical, and so we know that you didn't include that one.

15   A    That's correct, hm-hmm.

16   Q    Okay.  So looking at the mortality and reproductive and

17   growth endpoints, Depew reports a range of different values

18   here.  There's a value of .04 for a NOAEL for this

19   reproductive endpoint GSI?

20   A    Which -- which was, again -- these are unbounded NOAELs

21   when they've got the greater than, I believe.  We should go to

22   the bottom of that chart --

23   Q    Yeah, I'll show you.

24   A    -- to verify that.

25   Q    The chart shows -- let me zoom in here -- unbounded

1   NOAEL is denoted by greater than sign.

2   A     Yes, okay.

3   Q     Okay.  So going back to this example we were looking at,

4   we have walleye, these endpoints, mortality, weight gain, and

5   GSI.  Now, a value of .04 here, that's an unbounded NOAEL you

6   say or reported as.

7   A     Yes, that's correct.

8   Q     Okay.  But you see for the same endpoint, there is a

9   LOAEL reported of .137.  Do you see that?

10  A     I do.

11  Q     Okay.  So as you defined the term earlier, this .04 is

12  not unbounded because there is a LOAEL above it for the same

13  endpoint; is that right?

14  A     No, this is actually a control value.

15  Q     Okay.

16  A     So this was a control value, and if I'm remembering this

17  paper correctly, um, these authors made an assumption that

18  even if they could not detect mercury in -- for instance, in

19  the control, they assigned it a value of 0.04 and called it a

20  -- and called it a NOAEL.

21  Q     I can show you the summary of that paper if it would be

22  helpful.

23  A     I would have to go through the detail of the paper

24  because, um, I'm not sure it would be in the summary.

25  Q     Okay.  So we'll get -- you wrote up a summary of that

1   paper, which I'll show you in a minute, but I'd just like to

2   understand your criteria for including and excluding values.

3        So if you look at this study, walleye, which reports a

4   control value, NOAEL of .04 for a reproductive endpoint, and

5   then a LOAEL of .137, in your view, what's the appropriate way

6   to treat these values for deriving the -- the prey fish

7   target?

8   A     Well, the -- the reproductive -- this whole study, um,

9   should actually not have been included, and I -- and I would

10  not have included it in, um, my report because there were

11  problems here with really poor survival in -- in the controls,

12  as well as, um, in the dose groups.  These walleye do not do

13  well in captivity.  Um, they're very difficult to -- to rear

14  in a fish tank.  They're aggressive.  They were, um,

15  essentially cannibalizing one another.

16       So in looking at this here today, I would not have

17  included this study at all, and I apologize to the court, I do

18  not think it would have made a difference in the end result,

19  as I've shown through the sensitivity analysis.

20       In fact -- in fact, I remember -- particularly remember

21  taking this study out.  It affects the -- um, the upper end of

22  that range, the probable effects level, but does not affect

23  the -- the threshold effect level.

24  Q     Okay.  So, in your view, this study, because it reports

25  a control value as a NOAEL, should not be used at all.

1   A      No, I didn't say that.  I -- I said that, um, because it

2   -- because it lacked an appropriate control where you had high

3   mortality in the control group.  There -- there were also --

4   there are also other issues with this paper, in that, um, for

5   the reproductive endpoint, um, they had to -- they had to

6   change their statistical approach, and I believe they had to

7   combine the male and female fish together in order to show a

8   statistically-significant difference, whereas in the other --

9   in their other comparisons, for instance, like weight gain,

10  it's shown here, um, that little sign showing males because

11  they only had a difference in the males and not in the

12  females, ah, that's the way they set up their study in the

13  first place to keep the sexes separate.

14       But when they showed, in fact, no effect on this

15  reproductive effect, they had to combine the two in order to

16  show a slight difference.  But, again, with the number of the

17  problems and the interpretation of this study, I would have

18  excluded the whole thing.

19  Q      Okay.  And just to cover the final number and then let's

20  look at your treatment of this study, do you see here -- I've

21  just highlighted this value of .987, that is a NOAEL for

22  mortality for this study.  Do you see that?

23  A      Ah, yes.

24  Q      Walleye mortality NOAEL reported as .987.

25  A      That's correct.

KEENAN - CROSS-EXAMINATION/COLANGELO

2558

1   Q    Okay.  And there is no LOAEL above that, so this is an

2   unbounded NOAEL.

3   A    Um, the .987 was the highest dose tested, you're right.

4   Q    Okay.  So turning to your Table 4-5 -- oh, I'm sorry,

5   one step in-between.  This is denoted here in Depew,

6   Exhibit 750 with a reference code, you see over here on the

7   far right-hand column, it says reference, and then there's a

8   code number 714 for that study.  Do you see that?

9   A    Ah, S -- yeah, S14.

10  Q    Okay.

11  A    Yeah.

12  Q    And then the paper includes -- the Depew paper,

13  Exhibit 750, includes a table of supplemental references.

14  You're familiar with that?

15  A    I am.  Now, are you referring to the -- is this in the

16  erratum?  This paper they issued -- they made -- they made

17  mistakes in this analysis, as it's easy to do, and they issued

18  an addendum to this -- to this report.  It came out in -- a

19  couple issues later in the -- in the journal.

20  Q    Yes.  And the table I'm showing you is from that

21  addendum.

22  A    Okay.  Thank you.

23  Q    Okay.  So this is the supplemental references.  I just

24  want to match up that walleye study we've been talking about.

25  And you saw --

1    A    So you -- that was, I think, S14.

2    Q    Correct, S14.

3    A    And where was -- so in the reference list, what was S14?

4    Q    Let me show you.

5    A    It should have been Friedmann, right?

6    Q    So S14 in the reference list is Friedmann 1996.

7    A    Okay.

8    Q    Okay.  So to compare to your table, we'll look for

9    Friedmann 1996.

10   A    It's important you match up the right reference because

11   Friedmann also had another paper in 1996.  He -- um, it was --

12   it was a -- just really a survey of, oh, yellow perch and --

13   and a few other species in -- in Lake Champlain, I believe,

14   and he was just looking at natural populations and --

15   Q    Okay.  So let's look at your table.  This is Table 4-5

16   from your report, and to look for the Friedmann study, 1996.

17   Okay.  You see here --

18   A    That's --

19   Q    Here's Friedmann '96.

20   A    Hm-hmm.

21   Q    And Friedmann '96.  And I'll try to get this on the

22   screen here.  This is the walleye study.

23   A    That's correct.

24   Q    Okay.  So this is the same study as in Depew.

25   A    That's correct.

KEENAN - CROSS-EXAMINATION/COLANGELO

2560

1   Q    Okay.  So these values from Friedmann you included in

2   your table the value of 987.  Now, just to clarify, this is

3   reported in different units of measurement; is that right?

4   A    I'm reporting it in nanograms per gram, or parts per

5   billion.

6   Q    Okay.

7   A    Wet weight.

8   Q    So where Depew reported this as .987, you're reporting

9   it as 987.

10  A    Yes.

11  Q    Correct?

12  A    I'm --

13  Q    It's the same thing.

14  A    That's correct.

15  Q    Okay.  So here, to calculate your targets, you used the

16  high value from Friedmann of 987, which was reported as an

17  unbounded NOAEL, correct?

18  A    That's correct.

19  Q    Okay.  And you used this intermediate value of 137.  Do

20  you see that?

21  A    I see that.

22  Q    Okay.

23  A    Hm-hmm.

24  Q    And then --

25  A    And, again, as I mentioned earlier, um, looking at this

1     today, um, I would not have included that study.  In fact, I

2     had excluded that study for those reasons in the -- in the

3     tissue threshold effect level calculation.

4     Q     Okay.

5     A     In the earlier -- yeah, in the earlier analysis, in the

6     -- in the, um -- not earlier, the previous analysis that

7     looked at levels to protect fish health, and this paper should

8     not have been included here.  Um, again, um, due to that

9     sensitivity analysis, it would not affect the results

10    significantly at all by removing it, but, yeah.

11    Q     Okay.  And just to be comprehensive, there is another

12    value from Friedmann at the very bottom of the table.  This,

13    again, is that high value of 987.

14    A     That's correct.

15    Q     Which is reported as a LOAEL.  Okay.

16    A     Right.

17    Q     Okay.  But in including Friedmann in your table, you did

18    not report the lowest value that Depew reported for Friedmann,

19    which was .04, or 40, correct?

20    A     That's correct, because that was, um, again, an

21    unbounded NOAEL, an unbounded NOAEL for that reproductive

22    endpoint.

23    Q     Okay.  But although this value of 987 up here, the

24    highest value reported, was also an unbounded NOAEL, correct?

25    A     Correct, and, again, seeing this today, I would have

1   taken that whole study out.  That study should not have been

2   in there.

3   Q    Okay.

4   A    For those -- the -- I did not include that study in the

5   tissue effect level.

6   Q    Okay.

7   A    Um, so this -- so, you know, this constitutes, you know,

8   a study that should -- that should have been removed.

9   Q    Understood.  Although you did not include the numbers

10  from Friedmann wholesale; is that right?  You reported the 987

11  and the 137, but you did not report the 40, correct?

12  A    Um, yeah, that's -- that's correct, hm-hmm.

13  Q    Okay.  Now, back to Defendants' Exhibit 750 to look at

14  this Depew -- again, this is Defendants' Exhibit 750, Table 2,

15  and this is the Depew data set that served as the base data

16  for your review.  Let me ask you about a second study, and

17  this one is S10.

18       So do you see S10 over here?  Do you see where I am?

19  A    Yes, I see -- um, yes.

20  Q    Okay.  So this is a study on fathead minnow, and it

21  reports a mortality endpoint coded with a 1, and then three

22  different reproductive endpoints coded with a 2b.  Do you see

23  that?

24  A    Ah, that's correct.

25  Q    Okay.  And the values reported here are .015 as a NOAEL

1    and .218 as a LOAEL for the three different reproductive

2    endpoints.  Do you see that?

3    A    That's correct.

4    Q    Okay.  And the greater than sign means that this is --

5    this .015, or 15, is an unbounded NOAEL, as Depew reports it,

6    correct?

7    A    Yes, hm-hmm.

8    Q    Okay.  But these values do have a LOAEL for the same

9    endpoint above them, so they are bounded by a low observed

10   adverse effect level above the 15, correct?

11   A    Ah, yes.

12   Q    Okay.  And then for the mortality endpoint, there's a

13   value reported of 983, .983 here, and that value has no LOAEL

14   above it.  Do you see that?

15   A    Um, I see that in the table, but I would have to go

16   through the analysis to be able to tell you whether that, in

17   fact, is true.

18        I know what Depew did is, um, she took a number of the

19   fathead minnow studies and combined them prior to doing the

20   analysis.  Now, these are separated out, but you have to look

21   at them in toto.

22   Q    Okay.  And as reported here, this high value is an

23   unbounded NOAEL, both because of the greater than sign and

24   there's no value above it, correct?

25   A    Okay.

1   Q    Okay.  So this is a study -- we're looking at study S10.

2   Let me just show you the supplemental references so we can see

3   what paper that is and compare it to your treatment of that

4   paper.

5        Okay.  So for S10, this is Sandheinrich and Miller 2006.

6   Do you see that?

7   A    Ah, yes.

8   Q    Okay.  So now let's look at your Table 4-5, and for the

9   NOAELs, you don't report any value from Sandheinrich and

10  Miller 2006.  For a LOAEL, you do report a 218.  Do you see

11  that?

12  A    Ah --

13  Q    I'm --

14  A    Yes.

15  Q    My --

16  A    Yes.

17  Q    -- line is in the wrong place here, but --

18  A    Yeah, right.

19  Q    -- Sandheinrich and Miller 2006, a value of 218 for a

20  reproductive endpoint.  Do you see that?

21  A    Ah, yes, I do, hm-hmm.

22  Q    Okay.  And so for this study, you reported the 218, you

23  excluded the low value of 15; is that right?

24  A    Again, I'd have to look at the paper.  Um, that's --

25  yes, it looks -- that's what it looks like.

1   Q    Okay.  Let's turn back to the Depew paper for a third

2   example, and look at S8.

3   A    Well, let's go back.  I want to go back to the other

4   paper --

5   Q    Sure.

6   A    -- because I really wanted you to -- so what you're

7   saying is I included the 218 --

8   Q    Correct.

9   A    -- let's at the footnote for the -- for the .015 dose

10  level.

11  Q    Hm-hmm.  The footnote indicates -- you're referring to

12  the unbounded NOAEL footnote?

13  A    Well, I know that's an unbounded no effect level, but

14  there was a footnote -- okay.  That's just talking about how

15  they converted.  What I -- well, I'm not going to speculate on

16  that.

17       But, again, I'd have to look at the paper itself

18  because, um, there could very likely have been a control value

19  that was reported as the unbounded NOAEL.

20  Q    Okay.  But I thought that you testified earlier that if

21  a control value was reported as a NOAEL, you would not use

22  that paper at all; is that correct?

23  A    I don't -- I did not intend to -- to say that.

24  Q    Okay.  So you would -- if a study reports a control

25  value as a NOAEL, you would use other values from that study,

1   you just would not use the control value NOAEL; is that

2   correct?

3   A     That's correct, yes.

4   Q     Okay.

5   A     You have to be -- in every case, you have to be

6   comparing a test dose with a control.  It's not appropriate to

7   use the control as a test dose itself.

8   Q     And so if you testified earlier that a study that

9   reported a control value as a NOAEL should be excluded

10  entirely, you did not intend to say that?

11  A     I intend -- I was thinking of a specific instance.

12  There were a number of studies from the Beckvar paper that

13  only reported controls.  They analyzed or determined what the

14  mercury level was in those controls, and those cases there was

15  nothing tested.  Those were -- that's what I was thinking of

16  when I said I excluded those studies.

17  Q     Okay.  So before we go through more examples, I want to

18  be clear about what you think is the appropriate treatment of

19  a control value reported as a NOAEL.

20        And so, in your view, if a control value is reported as

21  a NOAEL, you cannot use that value; is that correct?

22  A     I would not use that value, that's correct.

23  Q     Okay.  Regardless of whether there is a LOAEL reported

24  above that value?

25  A     I would just use -- right.  I would just use the LOAEL.

KEENAN - CROSS-EXAMINATION/COLANGELO

2567

1   Q     Okay.  So if you have a study like the one we just

2   looked at that reports a control value NOAEL of 15 and a LOAEL

3   of 218, you would use the 218, but not the 15; is that

4   correct?

5   A     Is the 15 a control -- no, what you're talking about is

6   you -- I think as a test dose at 15, correct?

7   Q     No, a control value -- you said that you thought that in

8   the paper we just discussed, the low value of 15 might have

9   been a control value.

10  A     Again, I'd have to look at the paper.

11  Q     Okay.  So --

12  A     I'd have to look at that to see if that was indeed a

13  control value.

14  Q     Understood.

15  A     Yeah.

16  Q     Okay.  Now, assuming that it was a control value,

17  assuming that the no -- the low value reported as a NOAEL was

18  a control value, what is your view of the appropriate way to

19  treat the results from that paper?  Which values would you

20  include in calculating your prey fish targets?

21  A     I would want to see a statistically-significant

22  difference between the test dose and the control, and if there

23  was a significantly different -- difference in whatever

24  endpoint that was, um, then I would report that as a low

25  effect level.

1   Q      Okay.

2   A      Ideally, what you want are studies that are showing

3   multiple dose levels, not studies that are just showing one

4   dose level versus a control or studies that are, you know, no

5   control and just -- just a dose level, or studies that are

6   just a control and nothing reported for a test dose.

7   Q      There was some discussion of this at your deposition,

8   and let me show you the discussion there to make sure we're

9   talking about the same thing.

10          Okay.  So look at page -- this is Plaintiffs' Exhibit

11   No. 190 -- 165, the transcript from your deposition, and look

12   starting at Page 203, Line 7.  Question, you excluded control

13   values that were reported to correlate with a NOAEL; is that

14   correct?  Answer, correct.  Question, okay.  For those control

15   values that you excluded, was a LOAEL reported?  Answer, no,

16   I've only excluded things where only a control was reported,

17   but it was reported as a NOAEL.  If there was -- if there was

18   a LOAEL, it got reported.  Question, okay.  My last question

19   might have been unclear.  If you have one study, it has a

20   control value reported as a NOAEL.  It also reports a LOAEL,

21   would you include the LOAEL?  Answer, yes.  Question, and

22   would you exclude the control value/NOAEL?  Answer, no.

23   Question, okay.  Answer, I only excluded the control value

24   NOAEL when it was an unbounded NOAEL.  Had no bounding -- had

25   no LOAEL to bind it -- to bound it and also no other NOAEL at

1    an experimental dose.

2         So then down to Line 20 of Page 204, so by definition,

3    then, are the excluded control value studies -- are the

4    excluded control values studies for which a single number was

5    reported?  Answer, generally, yes.  Question, what do you mean

6    generally?  Answer, well, a study might have had -- back up to

7    205 here, I'm thinking that there might have been a study with

8    multiple endpoints.  They might have reported something for

9    one endpoint and not for another.

10        Okay.  Do you see that?

11   A    I do.  I -- I'm kind of missing the train of -- of where

12   this is going.  I know when you asked me those things, I

13   didn't have the papers in front of me.  I tried to be

14   accurate.

15   Q    Let me just read you the concluding question --

16   A    Sure.

17   Q    -- and answer from this passage.  This is bottom of 205,

18   Line 19 to 23.  Question, because you said that if you had a

19   control value reported as a NOAEL and the same study had a

20   LOAEL for the same endpoint, you would have reported them

21   both?  Answer, yes.  Do you see that?

22   A    Yes, I do see that.

23   Q    Okay.  So here we're about a control value reported as a

24   NOAEL, and the same study has a LOAEL for the same endpoint,

25   and your answer was, you would report them both.

1    A     Right, and I was mistaken, because I would not --

2    thinking today, that's -- that's not how, um, I would have

3    done it or the way I had done it.

4    Q     Did you review your transcript after the deposition?

5    A     Ah, no, I didn't.  Um, I didn't see this, no.

6    Q     You didn't review the transcript at all?

7    A     Ah, no, I didn't.

8    Q     And here, that was the third question in a series of

9    three questions about the same thing.  So let me just say --

10   A     Okay.

11   Q     -- this is inaccurate -- what you're saying here, this

12   was incorrect.  It is not true that a control value reported

13   as a NOAEL with a LOAEL for the same endpoint, you should

14   report them both; is that what you're saying?

15   A     Right, a control should be a control.  It should not be

16   reported as a NOAEL.

17   Q     Okay.  Now, what does this mean about the values that

18   you would use -- that you deem appropriate to use from a

19   particular study, if it reports a control value as a NOAEL and

20   it reports a LOAEL for the same endpoint, which value, do you

21   believe would be appropriate to report from that study for

22   deriving targets?

23   A     Um, well, given if the study met other data-quality

24   requirements and if there was a significant difference, I

25   would report the LOAEL.

KEENAN - CROSS-EXAMINATION/COLANGELO

2571

1    Q    And not the NOAEL.

2    A    Well, all -- all things considered, yes.

3    Q    Okay.  But regardless, if you have an unbounded NOAEL,

4    meaning no LOAEL for that endpoint, you would never report

5    that unbounded NOAEL.

6    A    Again, I'd have to -- I would have to see the studies.

7    I don't -- I don't believe so, right.

8    Q    Why would you need to see the studies?  I thought your

9    point was that an unbounded NOAEL was unreliable.

10   A    Right.  It's unreliable because it does not give you a

11   dose which you have seen in effect.

12   Q    Okay.  So the principle --

13   A    The principle, right.

14   Q    Okay.  And so the principle that you're asserting is

15   that an unbounded NOAEL should not be reported?

16   A    That's correct.

17   Q    Okay.  And then the second principle that you're now

18   asserting is that a control value NOAEL, even if it is bounded

19   by a LOAEL above it for the same endpoint, that should not be

20   reported either?

21   A    That's correct.

22   Q    Okay.

23   A    And -- yes, that's correct.

24   Q    Okay.  And so this statement from your deposition, Page

25   205, that is incorrect?

1   A    I -- sitting here today, that's what it looks like, yes.

2   Q    Okay.

3        THE COURT:  Why don't we -- is this a good time to

4   take a break?

5        MR. COLANGELO:  Sure.

6        THE COURT:  Very good.  We'll take a break.

7        (Court recessed from 10:30 a.m. to 10:57 a.m.)

8        THE COURT:  Mr. Colangelo?

9        MR. COLANGELO:  Thank you, Your Honor.

10                  CONTINUED CROSS-EXAMINATION

11   BY MR. COLANGELO:

12   Q    Dr. Keenan, let's return to Table 2 from Defendants'

13   Exhibit 750.  This is the Depew study we've been talking

14   about, and I'd like to discuss a third example, S8.

15        Now, S8 is a -- you see on the far left here, a fathead

16   minnow study.

17   A    Ah, yes, hm-hmm.

18   Q    And it reports results related to three different

19   endpoints -- mortality and two reproductive endpoints.  Do you

20   see that?

21   A    Ah, yes, that's correct.

22   Q    Okay.  And the values reported here for the reproductive

23   endpoints are NOAELs of .015, or 15, and LOAELs of .22, or

24   220.  Do you see that?

25   A    Ah, that's correct.

1    Q    Okay.  And the value reported for mortality is a NOAEL

2    of 2.12, which converted to the units you use, would be 2,100

3    something; is that right?

4    A    Ah, that's correct.

5    Q    Okay.  And you see that the mortality rate, there's no

6    LOAEL reported above that NOAEL, correct?

7    A    That's correct.

8    Q    Okay.  Now, this is study S8.  So looking at the

9    supplemental references, you see that S8 is Hammerschmidt,

10   Hammerschmidt 2002.

11   A    That's --

12   Q    Do you see that?

13   A    Yes, I do, hm-hmm.

14   Q    Okay.  Now, let's look at your treatment of

15   Hammerschmidt, and, again, just to summarize, Depew reports

16   these three values -- 15, 22, and 2,100 -- I'm sorry -- 15,

17   220?

18   A    220.

19   Q    And about 2,100.  Okay.  So back to Table 4-5, this is

20   the summary of data points that you chose to include to set

21   the prey fish target, and we were talking about Hammerschmidt

22   2002.  You report that high value.  Do you see that here?

23   A    Yes, I do.

24   Q    And 2115 was your conversion of what they reported as

25   2.12; is that right?

1   A      Correct.

2   Q      Okay.  And you report that high value four times in this

3   chart; is that right?

4   A      Ah, yes, hm-hmm.

5   Q      Okay.  And here you have growth, reduced growth,

6   survival, reduced survival, and then those are repeated,

7   growth, reduced growth, and survival, reduced survival.  Do

8   you see that?

9   A      Ah, that's correct.

10  Q      Okay.  So you've got that value four times, and then

11  further down in the table, you have the intermediate value

12  from Hammerschmidt, that's a value of 220.  Do you see that?

13  A      That's correct.

14  Q      Okay.  You don't report the low value from

15  Hammerschmidt, which was a value of 15, correct?

16  A      I would, again, have to look at the table.  I --

17  Q      Well, this is your Table 4-5, and you're reporting the

18  values of 220 and the high values of 2,115, reported four

19  times, but you don't on this table report a value of 15.

20  A      Um, that's -- yes, that's what it looks like.

21  Q      Okay.

22  A      I think the important point with this is that when you

23  look at the table in Depew, the Depew study served as the

24  basis, the initial step for sort of a repertoire of studies

25  that I looked at, as well as some -- some newer ones.

1        Um, but my team and I did -- went through each and every

2    study and read each and every study and did our own

3    independent analysis of that.  Um, I didn't go back afterwards

4    and critique the Depew table as to how, um, you know, David

5    Depew and coauthors characterized the various dose levels.  I

6    was not performing a critique of Depew.  I was doing an

7    independent analysis

8    Q     Understood.  And you testified earlier that you used the

9    values in Depew as your base data set; is that right?

10   A     I used the studies reported in Depew as the base data

11   set.

12   Q     And what I'd like to do is compare the values reported

13   by Depew to the values that you used.

14   A     Fair enough.

15   Q     Okay.  And so for this example we were just talking

16   about, S8, Depew reports that value for one endpoint.  You

17   reported -- that -- that high value, above 2,100, you report

18   that value four times in your table, correct?

19   A     Again, I've not gone through this table today to see how

20   many times that value is -- is reported.  I'm -- I'm taking it

21   on -- you know, on your analysis of that.

22   Q     Well, this is the table.

23   A     Yes.

24   Q     This is Table 4-5.

25   A     That's correct.

1    Q    From your report.

2    A    Hm-hmm, and I reported for growth and survival.

3    Q    Twice.

4    A    Right.

5    Q    Growth twice?

6    A    Right.

7    Q    And survival twice.

8    A    Right.

9    Q    Okay.  And then the low value from that same study, S8,

10   which is reported for two different endpoints in Depew, you

11   don't report for either; is that correct?

12   A    That's correct.

13   Q    Okay.  And let's look -- this is still Page 7 --

14   Defendants' Exhibit 750, Page 1435, Table 2.  Let's look at

15   another example.  This is S9.  So here we have another fathead

16   minnow study, and S9 in the far right column.

17        And this study also reports a level for mortality of

18   983.  Now, that's an unbounded NOAEL; is that right?

19   A    Again, I'd have to look at the study.  This is what

20   Depew reports it as, but what I did is looked at each study

21   independently.

22   Q    And is that reflected in Appendix E in your report?

23   A    Is what reflected?

24   Q    Your review of each study independently.

25   A    I believe so, yes.

1    Q     Okay.  Now, look at these other endpoints, GSI and

2    spawning success.  These are two reproductive endpoints from

3    the same study.

4    A     That's correct.

5    Q     And this reports values of -- low values of 15.

6    A     That's correct.

7    Q     And -- and the higher values -- these are the LOAELs, of

8    218 for S9.  Do you see that?

9    A     Yes.

10   Q     Okay.  So the three values here are 15, 218, and 983 for

11   S9.  So back to the supplemental references, S9 is Drevnick

12   and Sandheinrich 2003; is that correct?

13   A     That's correct.

14   Q     Okay.  So to look at your treatment of Drevnick and

15   Sandheinrich 2003, this is your Table 4-5, you report, again,

16   the high value of 983, which Depew reported as a -- an

17   unbounded NOAEL you included here.  Do you see that?

18   A     I do.

19   Q     For two endpoints.  Okay.  And you report the

20   intermediate value of 218 as a LOAEL.  You did not report the

21   low value summarized by Depew.

22   A     Again, I'm -- that's what Depew reports in there.  I'd

23   have to go through the study.  I did not go back and make a

24   comparison with -- with the chart in Depew.

25   Q     Okay.  Looking, again, at the Depew table, this is

1    Defendants' Exhibit 750.  There's a rainbow trout study, S5.

2    Do you see this?

3    A    Ah, yes.

4    Q    On the far right column?

5    A    Hm-hmm.

6    Q    Okay.  So this is a study in rainbow trout.  It reports

7    a mortality NOAEL of 23.7, which converts to 23,700 in the

8    units it used; is that right?

9    A    Ah, that's correct.

10    Q    Okay.  And then some other endpoints that you've

11    testified already you excluded, these -- that are coded 3,

12    biochemical or behavioral endpoints?

13    A    Yes, also in this case occurring at some pretty high

14    dose levels.

15    Q    And then you have weight gain down here, so that's a

16    growth endpoint, and it reports a NOAEL of .025 and a LOAEL of

17    5.8.  Do you see that?

18    A    I do.

19    Q    Okay.  So study S-5, looking at the supplemental

20    references, is Rodgers and Beamish, 1982.  Do you agree with

21    that?

22    A    Yes.

23    Q    Okay.  And looking at your table 4-5, you include this

24    high value from Rodgers and Beamish that was an unbounded

25    NOAEL 23,700.  Do you see that?

1   A      I see the 23,700, yes.

2   Q      And you include the intermediate value from Rodgers and

3   -- Rodgers and Beamish of 5,975.  Do you see that?

4   A      Yes, hm-hmm.

5   Q      And you did not include the low value from Rodgers and

6   Beamish, you excluded that one.

7   A      Right.

8   Q      So looking at your Exhibit 1094, this is figurative plot

9   of the values that you included and excluded; is that correct?

10  A      No, this is a plot of the values I included.

11  Q      I'm sorry.  Yes, it does not show the values you

12  excluded.  This is a plot of the values you included from the

13  subset of studies we've been talking about.

14  A      That's correct.

15  Q      Okay.  So that value from Rodgers and Beamish, that high

16  value we were just discussing, 23,700, which was reported as

17  an unbounded NOAEL, where is that value on this chart?

18  A      It -- well, it's somewhere up in here.  If it's -- I

19  would imagine, somewhere up in here.  I'm looking at -- it's

20  probably one -- one of those.

21  Q      And the low value, the LOAEL for weight gain reported in

22  that study was 25.  Had you included that, where would that be

23  in this chart?

24  A      Did you say it was 25 nanograms per gram?

25  Q      It was 25 as converted to the units that you used.

1   A      Yes, okay.

2   Q      Nanograms per gram.

3   A      Converted to those units, it would be somewhere around

4   here.

5   Q      And we talked about S14, that was a study that you said

6   you mistakenly included; is that right?

7   A      That's correct.

8   Q      That's the --

9   A      If we're talking about -- yeah, Friedmann.

10  Q      Okay.

11  A      Et al.

12  Q      Okay.  And so -- and what was the reason that that was a

13  mistake?

14  A      Oh, there's a number -- number of reasons.  Um, the --

15  on the -- on the reproductive effects, the -- the unbounded

16  NOAEL, but the more serious problem, lack of adequate

17  controls, high mortality in the control and the treatment

18  groups, um, lack of a dose response in -- as I recall, lack of

19  a dose response in, um, I believe it was the growth endpoint,

20  and they wound having to do, um -- change their statistical

21  design, um, after they saw their results in order to -- to --

22  to separate things out by -- or they had to combine -- excuse

23  me -- they had to combine the males and females together to

24  show an effect.

25  Q      Okay.  So let's summarize the low values reported in

1    Depew that you excluded -- let's walk through the ones that we
2    discussed.
3        We talked about the values from S8, right here, the
4    fathead minnow study, and the low values of 15 you excluded,
5    but you included the 220 and the 2,100, correct?
6    A    Right, right, and, again, you'd have to go into the
7    paper to -- this is a -- looking at all these studies in toto
8    and evaluating them independently, and I'm not basing it on
9    what -- what Dr. Depew reported for each particular endpoint.
10   Q    But you can't explain now why you excluded the low value
11   of 15 for S8 and included the unbounded NOAEL that was a very
12   high value of 2,100; is that right?
13   A    No, as I told you before, I would have -- I would have
14   to pull out the paper and go through it and look at that
15   evaluation.
16   Q    And that's true for every paper that we've discussed.
17   A    Well, I would think so, yes.
18   Q    And so does that mean that in Defendants' Exhibit 1094
19   -- now, this is a figurative representation of all of those
20   values that you included; is that right?
21   A    Yes, correct.
22   Q    Okay.  And --
23   A    And it has -- it has some very low values down in --
24   down in this range, and it has some high values, as well.
25   Q    Okay.  The values that we've talked about that you

1   excluded, there were three values of 15 from S9, there was a

2   value of 15 from S8, a value of 25 from S5, and a value of 40

3   from S14; is that right?

4   A     That's what we've talked about today, yes.

5   Q     Okay.  And the high value unbounded NOAELs that you

6   included at the upper end include a value of, for example,

7   23,000 from the Rodgers and Beamish study; is that right?

8   A     The Rodgers and Beamish number is up there, I believe,

9   yes.

10  Q     Okay.  Now, you did a sensitivity analysis to look at

11  what would happen if you took out one study, how it would

12  change your spread here; is that right?

13  A     Yes, core -- correct, and when I did that sensitivity

14  analysis, I took out the entire study.  So if a study went

15  out, um, I took out all the endpoints at once.

16  Q     Did you do a sensitivity analysis to look at what would

17  happen if you excluded low values from the four studies, but

18  included the highest values from those four studies?  Did you

19  look at how that would affect your range?

20  A     I did not, no.  I did a sensitivity analysis where --

21  because it had been purported that the mortality values may

22  have been high, so I did a sensitivity analysis of removing

23  all the mortality studies, and when I removed all the

24  mortality studies, it did not change, um, the detail at all.

25              It -- um, it did change the upper bound of the

1    range, which I haven't even presented.  It -- it moved that

2    one, um, down a bit, but not the -- not the -- the dietary

3    threshold effect level.

4    Q    And to be clear on your position about studies that

5    report a control value as a NOAEL, is your view, as you

6    testified earlier, that studies reporting a control value as a

7    NOAEL should not be used at all?

8    A    Yes, that -- I -- that's -- that's correct, but one has

9    to go into the individual study to see what was actually done,

10   not what Depew reports as either a LOAEL or a NOAEL or a -- or

11   a control value.

12   Q    And are you confident that you excluded all studies that

13   report a control value as a NOAEL?

14   A    I believe so.

15   Q    So, then, none of these studies we've been discussing

16   report a control value as the NOAEL.

17   A    The studies that you've mentioned?  No, I have -- I -- I

18   don't know that those are control values or not.

19   Q    I'm sorry.  I thought you just said that you're

20   confident that you did not use any studies that report a

21   control value as a NOAEL.

22   A    No, what I -- what I said was that I did not use

23   reported no effect levels.  I -- I did not use control values

24   as reported no effect levels.

25   Q    But you would use other values from that same study?

1   A    Yes.

2   Q    I understood you to just say that if a control value was

3   reported as a NOAEL, you would not use any value from that

4   study.

5   A    No.  I'm sorry, I did not -- did not intend to say that.

6   Q    Okay.  So you would -- if a control value is reported as

7   a NOAEL, you would reject that value alone --

8   A    Yes, and that's what I said to you before the break,

9   yes.

10  Q    And you previously said that you would reject unbounded

11  NOAELs entirely; is that right?

12  A    I would have to look at the -- again, at the study

13  protocol and things.  Yes, I -- I believe so, though.

14  Q    And that's --

15  A    As a general principle, yes.

16  Q    The principle is that an unbounded NOAEL is unreliable.

17  A    Right.

18  Q    Okay.  And at least as reported by Depew, there are a

19  number of unbounded NOAELs that you included in your table; is

20  that correct?

21  A    They appear to be all -- um, yes, they appear to be

22  mortality values, the ones that you had picked out.

23  Q    That you included as unbounded NOAELs in your table; is

24  that correct?

25  A    I don't know if they were unbounded NOAELs.  Again, I

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2585

1    would have to look at the study.

2    Q    And they were all reported by Depew as unbounded NOAELs.

3    A    Ah, yes.

4    Q    Now, in choosing the studies to derive your fish health

5    targets, you used lethality, growth, and reproductive

6    endpoints; is that right?

7    A    Right, I used survival, growth, and reproductive

8    endpoints, correct.

9    Q    Okay.  And reproductive harm is -- is one separate set

10   of effects independent from growth and mortality, correct?

11   A    No, the -- the three -- those three effects are used to

12   be able to predict a healthy population or to -- um, they're

13   used by population modelers when they're looking at, um,

14   whether a -- a population is predicted to be thriving or not.

15   Q    In deriving your fish health targets, you averaged the

16   values across all three endpoints; is that right?

17   A    I did not average the values.  I put them into the

18   statistical, um, program, the statistical approach, which

19   takes, again, the 15th percentile of the low effects values

20   and the 50th percentile of the no effect values.  It takes the

21   geometric mean of those two numbers, and that becomes the

22   threshold effect level.

23   Q    I was imprecise when I said average.  I didn't mean that

24   in a strict sense.

25   A    Right, yeah.

1   Q    In setting your targets, you've combined the endpoints

2   -- the effects for reproductive lethality and growth endpoints

3   together in setting your safe targets; is that right?

4   A    I did, because we need all three endpoints in order to

5   predict the health of fish populations, and, again, this was

6   used as a surrogate when one lacks site-specific data, and

7   it's used as a screening level, um, in conjunction with, um,

8   with other -- with other things, like the range that, um,

9   Sandheinrich and Wiener have talked about, although they

10  included some other endpoints, like behavioral, in their -- in

11  their range.

12  Q    So let me show you -- this is Plaintiffs' Exhibit 96 in

13  evidence, and it's a summary of the values reported in Depew.

14       And, by the way, you said earlier Depew was a

15  peer-reviewed paper; is that right?

16  A    Yeah, I mean many -- all the literature that we're

17  using, all the papers that I evaluated were also all

18  peer-reviewed.  Peer review is -- is what happens when things

19  get published in the literature, but that doesn't make, um, a

20  value from that study appropriate as a -- as a regulatory

21  requirement or even a -- a screening level.

22  Q    And -- and your analysis setting fish tissue -- safe

23  targets for fish, did you submit that for peer review?

24  A    No, because it's a -- it's a matter in -- of -- it's a

25  matter in this case.  No, I have not done that.

1    Q     So looking at Plaintiffs' 96 in evidence, this indicates

2    the lowest LOAEL for the lethality endpoint reported by Depew,

3    the lowest LOAEL for growth endpoint reported by Depew, and

4    the lowest LOAEL, meaning lowest observed adverse effect

5    level, for reproductive endpoint reported by Depew.  Do you

6    see that?

7    A     I do see that, yes.

8    Q     Okay.  And so if you were to combine these values to

9    derive a single measure, you would end up with something much

10   higher than 50 reported for reproductive; is that right?

11   A     No, but I wouldn't -- that would be inappropriate to do

12   that because you're only looking at the reported, um, low

13   effect levels here.  You've not considered the no effect

14   levels.

15   Q     If you -- looking at the low effect levels, which are

16   levels at which adverse effects have been found, if you

17   combine these endpoints into a single measure, you'll end up

18   with a number much higher than the LOAEL for reproductive

19   effects reported here; is that right?

20   A     I don't know that to be true, no, because if you -- yes,

21   if you took -- if you took a simple average of these three

22   numbers, but that would be meaningless, you really need to use

23   a statistical approach, like I've done, like the ministers of

24   the environment of Canada use, like Drs. MacDonald and Long

25   use, and like Dr. Beckvar has used.

1          So just taking a simple combination of these three

2     numbers would be totally inappropriate.  I -- I could not

3     endorse that.

4     Q     And are you aware what the health Canada did --

5     Environment Canada -- I'm sorry -- in setting a prey fish

6     target?

7     A     Um, I -- yes, I've -- I've heard hearsay, yes, that they

8     have -- that they have used, um, a low number.

9     Q     And, in fact, they used the reproductive value reported

10    here, of 50?

11    A     Right, and then -- but it's very -- it's really

12    interesting, in that practically all their lakes, rivers, and

13    streams, the values in native fish populations exceed that

14    number.  So I'm not sure to what level they use it or for what

15    purpose they use it.  All I've heard is it's been reported

16    that they've used a target based on prey fish.

17    Q     And with respect to prey fish, you offered the opinion

18    that the Study Panel's targets are lower than background

19    concentrations of fish in Maine lakes; is that right?

20    A     Well, I believe that was the Study Panel's -- yes, first

21    of all, yes.  But I believe, also, that that was the Study

22    Panel's conclusion, um, where they stated, I'm paraphrasing,

23    that native populations are -- are at that level.

24    Q     And do you recall what the prey fish are here that were

25    being studied in the Penobscot?

1   A       The -- the prey fish that we're studying here?   There

2   were -- there were several prey fish.

3   Q       Do you recall the species?

4   A       I think we were talking about, um, um, mummichogs.   I

5   don't recall the others.

6   Q       Okay.   Golden shiners?

7   A       Golden shiners, yes.

8   Q       Tomcod?

9   A       Yes, tomcod.

10  Q       And rainbow smelt, I believe.   Now, this is your Table

11  4-3 from your report that you used to compare the prey fish

12  target to background levels in Maine; is that correct, or at

13  least what you referred to as levels seen in fish in Maine,

14  correct?

15  A       Yes, um --

16  Q       Okay.

17  A       -- I used this just to provide a perspective of what

18  fish tissue levels are like in natural fish populations in

19  Maine unaffected by discharged sources of mercury.

20  Q       And none of those four species that you're comparing to

21  are listed on this table; is that correct?

22  A       Um, that's -- that's correct.   This is -- this was what

23  was available in Maine fish.

24          But I'll point out that yellow perch serve as prey,

25  white suckers -- practically every fish serves as prey -- as

1    prey during some period of their lifespan.

2    Q    You said this is what was available.  But didn't the

3    Study Panel also report background levels from the lower

4    estuary specific to the prey fish that were being studied?

5    A    Yes, they did.

6    Q    Okay.  And so let me show you Page 14-20, which is the

7    levels for rainbow smelt oriented across the various reaches

8    of the estuary, generally from north to south.  And you see

9    that the -- and just to mark it here, the Study Panel's target

10   was at 50.

11   A    Hm-hmm.

12   Q    And you see that as you -- now, this is adjusted for

13   length, these values here.  You see that as you go further

14   down into the outer estuary, many of the mean values are below

15   50.

16   A    Well, again, what -- what you're comparing here are that

17   you're comparing, first of all, the antilog of the least mean

18   squares, and then you also have the length adjustment.  What I

19   would like to see is a comparison of the raw data because when

20   you're looking at those studies, they're not adjusted data, so

21   we really should be looking at unadjusted data.

22   Q    That's not what -- in your comparison, you didn't

23   compare it to these particular species, correct?  You looked

24   at in -- at a national lake survey reporting results for Maine

25   lakes, correct?

1    A     That's correct, um, because these species, um, were in

2    -- were in the impacted area, were in the study area of the

3    Penobscot River.

4    Q     Okay.  And you see in this discussion now I'm showing

5    you Page 14-21 of Joint Exhibit 6-14, and this summarize --

6    this provides a geographic comparison of mercury in rainbow

7    smelt, and you see that the OB samples range from 110 to 210

8    nanograms per gram wet weight, and down here, you see 25 miles

9    to the southwest, total mercury ranged from 44 to 51 nanograms

10   to gram wet weight, very close to the Study Panel's proposed

11   target for prey fish health.  Do you see that?

12   A     I do see that, hm-hmm.

13   Q     Now, back to your table 4-3, do you know how many sample

14   -- samples were reported in that table?

15   A     Ah, not offhand.

16   Q     If I can pull it up again, I'll show it to you.  Okay.

17   So these are different fish.  These are not the prey fish that

18   are being discussed by the Study Panel, but you compared these

19   other fish to the prey fish.  This is Table 4-3 of your

20   report, which is Joint Exhibit 55.  And you see -- look at

21   some of these examples.  For chain pickerel, the average is

22   767, and the range is 767 to 767.

23   A     Sure.

24   Q     Does that suggest there was one sample?

25   A     That there was probably one sample there.

1   Q     And for largemouth bass, the average was 454, and the

2   range is 454 to 454.  Same thing?

3   A     That's correct.

4   Q     Okay.

5   A     And, again, and I reported that certainly to disclose

6   the range, yes.

7   Q     Okay.  And the splake average is 653, and the range is

8   653 to 653.  So that's a single sample, too?

9   A     Yes.

10  Q     Is that correct?

11  A     I believe so.

12  Q     Okay.  And did you undertake in making this comparison

13  to identify and compare the trophic levels of these fish to

14  the prey fish that were being discussed?

15  A     Not particularly.  Again, this was to show background

16  levels in native Maine fish populations.  But we can look at

17  Drs. Wiener and Sandheinrich's paper from 2006 that looked at

18  yellow perch as an important prey item.  And we're talking

19  there about pristine lakes and ponds in northern Minnesota

20  which well exceeded the 50 nanogram per gram screening level

21  or target that the Study Panel had developed.

22  Q     And you're referring to a different study reporting on

23  yellow perch in Minnesota; is that right?

24  A     Yes, I am, yes.

25  Q     Okay.  Let's turn to health risk.  You've never

1   published any articles on health risk from exposure to

2   methylmercury; is that correct?

3   A      That's correct.

4   Q      In your opinion, the Penobscot food studied here are

5   perfectly safe for human consumption?

6   A      Um, I said that the -- the consumption of food from the

7   Penobscot River did not present a risk to human health.

8   Q      So, in your view, they're safe.

9   A      That's correct.

10  Q      Okay.  So you stated that the Maine fish tissue action

11  level applies only to freshwater fish; is that right?

12  A      I said that the Maine -- the Maine fish tissue action

13  level was derived based on freshwater fish consumption rates.

14  Q      But your --

15  A      And so, therefore, it should be applicable to freshwater

16  fish and not to estuarine or marine species, nor should it be

17  applicable to lobster or to black duck.

18  Q      The State of Maine does not, in practice, limit its

19  application only to freshwater fish; is that correct?

20  A      Um, they have issued the advisories for -- originally

21  for freshwater fish.

22  Q      But the State does not limit the application of the fish

23  tissue action level to only freshwater fish; is that correct?

24  A      Ah, that I don't know.

25  Q      Let me show you Plaintiffs' Exhibit 84 in evidence, and

1    this is the State's announcement of the lobster fishery

2    closure for the northern Penobscot Estuary.  And it states,

3    the justification for the chosen boundary is based on recent

4    data, indicates that lobsters in this area may have mercury

5    levels above the Maine CDC action level.  State agencies use

6    action levels as a guide to determine whether they should

7    issue a consumption advisory warning -- consumption advisory

8    warning consumers to limit meals of fish from certain waters.

9    Do you see that?

10   A    I do, hm-hmm.

11   Q    Okay.  So the State does not, in practice, limit its use

12   of the action level to only freshwater fish?

13   A    Well, in other cases, I've seen the State -- in other

14   references to this, the State has mentioned that they use

15   their -- their fish tissue action level and they applied it

16   here to the -- the lobster for this -- for the purpose of this

17   closure.

18   Q    And in terms of the health risk from consumption, it

19   doesn't matter whether the mercury comes from fish or duck or

20   lobster; is that correct?  Once you ingest it, the health risk

21   is the same.

22   A    The -- ah, the calculated health risk using U.S. EPA

23   health risk assessment methods indicates that the health risk

24   would -- would be the same based upon a given level of

25   exposure.

1    Q    And instead of using the State's fish tissue action

2    level to compare to the levels in foods measured here, you

3    derived your own safe target for each particular species of

4    food; is that right?

5    A    What I did is I used cites -- I used fish or

6    food-specific exposure parameters to do that, yes.

7    Q    Okay.  And what I had was a more basic question.

8    A    Okay.

9    Q    Instead of using the State's target level for the safety

10   of consumption of food, you derived a specific target level

11   for each particular species under consideration; is that

12   right?

13   A    That's correct.

14   Q    Okay.  So you came up with a different level for duck

15   and a different level for eel and a different level for

16   lobster; is that correct?

17   A    That's correct.

18   Q    Okay.  And your number for eel is 490 nanograms per

19   gram; is that right?

20   A    That's correct.

21   Q    Which is about two and a half times higher than the

22   State's fish tissue action level, correct?

23   A    That's correct, based upon differences in exposure

24   parameters.

25   Q    And your safe target for lobster is 510, again, about

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2596

1   two and a half times the State's fish tissue action level; is

2   that correct?

3   A     That's correct.

4   Q     And your safe target for duck, you derived a value of

5   1,500, which is seven and a half times higher than the State's

6   target level, correct?

7   A     That's correct.

8   Q     Okay.  And you testified on Friday that you've

9   calculated these numbers based on the EPA reference dose, that

10  was one component in the formula you used; is that right?

11  A     Ah, that's correct, yes.

12  Q     Okay.  But in response to a question from counsel, you

13  said that you could have used a different level of concern set

14  by -- that you referred to as a level from the U.S. CDC.  Do

15  you recall that?

16  A     I don't recall the question.

17  Q     The -- the question was, had you used the level set by

18  CDC instead of the EPA level, what that would have done to

19  your safe targets for these three species.  Do you recall

20  that?

21  A     Oh, yes, now I recall, yes, and I mentioned that -- that

22  it would have increased the target approximately threefold.

23  Q     Okay.

24  A     All things being equal.

25  Q     Okay.  And that's because the -- what you're referring

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2597

1  to as a CDC level is a level of .3 micrograms per kilogram of

2  body weight; is that right?

3  A     That's correct.

4  Q     And the EPA reference dose is .1; is that right?

5  A     That's correct, yes.

6  Q     Okay.  So your -- your testimony was that had you used

7  the CDC level instead of the EPA level, you would have tripled

8  your safe targets for these foods?

9  A     Ah, that's correct.

10 Q     Okay.  And do you think that would have been a

11 reasonable thing to do?

12 A     Um, I didn't evaluate whether that was a reasonable

13 thing to do.  I certainly think it would have been

14 health-protective, but it's not what I did.

15 Q     Okay.

16 A     I used the -- the value that U.S. EPA has -- has issued.

17 Q     In your view, then, using -- deriving numbers from the

18 CDC value would have been health-protective?

19 A     That's correct, yes.

20 Q     And then you would have come up with levels of 4,500

21 nanograms per gram as the safe target in duck; is that

22 correct, three times higher than your safe level of 1,500?

23 A     That's correct, yes.

24 Q     Okay.  And about 1,500 each in lobster and eel, correct?

25 A     That's correct, yes.

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2598

1   Q     Okay.  And your testimony is that those are reasonable

2   targets, had you chosen to go that way.

3   A     I believe they would be reasonable, but it's sort of --

4   it's not what I used.

5   Q     Okay.  But your testimony on Friday was that the CDC

6   level would give you another reasonable approach that would

7   increase your targets threefold, correct?

8   A     That's correct, yes.

9   Q     And you would then be comfortable with a safe level for

10  duck of 4,500; is that correct?

11  A     That's correct, yes.

12  Q     Now, in calculating your standards, you increased the

13  assumed body weight of a woman of childbearing age from

14  60 kilograms used by the State of Maine to a value of

15  69 kilograms; is that right?

16  A     Yes, the State of Maine use -- used the 60-kilogram body

17  weight from an older EPA value, which was current at the time,

18  but, again, um, as I mentioned in my direct testimony, I -- my

19  -- I was endeavoring to use the most up-to-date exposure

20  parameters that we had, so I went to the common source, the

21  U.S. EPA's Exposure Factors Handbook, and that's where the

22  69-kilogram body weight comes from.

23  Q     And increasing the assumed body weight from 60 to 69, 60

24  used by the State of Maine, to 69, that has the effect of

25  raising your safe targets for each of these three species; is

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2599

1  that correct?

2  A     Ah, it does, but I need to qualify -- or need to remind

3  that, um, that the State of Maine had earlier done a lobster

4  assessment, and in their lobster assessment, they had used a

5  -- a 70-kilogram body weight.

6      So my use of a 69 slightly reduces that.

7  Q     The lobster assessment you're referring to was for a

8  different contaminant; is that correct?

9  A     It was the only, um, lobster assessment that we have.

10 Yes, the -- the concern was a -- for a different contaminant.

11 Q     And the contaminant there was PAHs; is that right?

12 A     That's correct, and petroleum hydrocarbons.

13 Q     Correct.  And Maine Bureau of Health was not assessing

14 developmental harm in that case, is that correct, they were

15 using a long-term exposure scenario; is that right?

16 A     Ah, that's correct, but it wouldn't matter.  They were

17 still using the same reference dose, noncancer risk assessment

18 methodology.

19 Q     For the difference between developmental harm and a

20 carcinogen, doesn't the State apply different body weight

21 because developmental harm applies to women of childbearing

22 age?

23 A     Um, yes, the State -- the State uses different -- yes,

24 the State uses different body weights and -- and good practice

25 does.  I mean, we have body weights for males, for females,

1   and we have a combined body weight, as well.

2   Q    So the value that the State of Maine uses for

3   developmental harm is an assumed body weight of women of

4   childbearing age of 60 kilograms, correct?

5   A    Yeah, that's -- that's what the State had used back in

6   their -- yes, in their fish tissue action level.

7   Q    And the 69-kilogram body weight number that you used is

8   not based on any data specific to Maine, correct?

9   A    It's based on national data from Exposure Factors

10  Handbook.

11  Q    So it's not based on any data specific to Maine.

12  A    Not specific, no.

13  Q    And you have no information about the average body

14  weight of women in Maine, correct?

15  A    Ah, right here, as I sit here, no, I don't, but neither

16  -- you know, in a way, I was just thinking, the 60 is also a

17  national number that -- that was used back in the, um, early

18  to mid-1990s.

19  Q    And you didn't do anything to try to find out what the

20  average body weight of women in Maine was?

21  A    I did not do a survey or -- no.

22  Q    Okay.  That body weight change makes a difference in

23  terms of whether at least one of your safety standards

24  identifies a risk; is that correct?

25  A    I don't believe so.

2601

1    Q     Let's look at Defendants' Exhibit 1082, and this is a

2    figure that you showed -- that you testified about on Friday.

3    So this lists -- Defendants' 1082 lists the risk-specific

4    concentration.  That's your term for the fish tissue action

5    level, correct?

6    A     That's correct.

7    Q     Okay.  And here you have a level of -- the bars in green

8    are your safe levels, and the bars in blue are your

9    calculations of the 95 UCL, correct?

10   A     Ah, that's correct.

11   Q     Okay.  An assessment of the mean, correct?

12   A     Ah, yes, it's -- it's a -- a conservative estimate of

13   the mean.

14   Q     Okay.

15   A     The true mean is -- is not likely to above -- to be

16   above this calculated mean 95 percent of the time.

17   Q     Okay.  So your safe target for eel is 493 -- I'm sorry

18   -- 490.  Do you see that?

19   A     Ah, that's correct based upon an extremely conservative

20   exposure assumption when the Study Panel itself and State

21   officials don't know of anyone consuming eel anywhere to this

22   extent.

23   Q     Understood.  But just looking at --

24   A     Yeah.

25   Q     -- what your projections show --

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2602

1    A     Sure.

2    Q     -- you've -- you've established a safe target for eel of

3    490, correct?

4    A     That's correct.

5    Q     And the value that you derived that reflects the eel in

6    the Penobscot Estuary -- the northern estuary is 483.  Do you

7    see that?

8    A     That's correct.

9    Q     Just below the safe target that you derived.

10   A     That's correct.

11   Q     Okay.  And had you, instead of raising the assumed body

12   weight for women in Maine from 60 to 69, had you kept it the

13   same, this target level would be lower; is that right, the 490

14   would be lower?

15   A     It -- it would -- it would have been lower, yes.  Um,

16   again, the target is in -- is about the same range as the

17   conservative estimate of the mean.

18   Q     Okay.  And let me just show you the formula that you

19   used.  This is Joint Exhibit 55.  This is Page 3-25 from your

20   report.  And you used -- so your RSC down here is reference

21   dose times body weight, divided by fish consumption; is that

22   right?

23   A     That's right, yes.

24   Q     Okay.  So if you do the calculation and you change the

25   body -- you derived a value of 490?

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2603

1    A      Hm-hmm.

2    Q      Using a body weight of 69?

3    A      Right.

4    Q      If you reduced the body weight to 60, the value would be

5    425.  Does that sound about right?

6    A      It sounds about right.  It sounds reasonable.

7    Q      Okay.  And so had you kept the body weight at the same

8    value as used by the State, your level here would be 425,

9    which would be below what you're reporting as the 95 UCL for

10   eel, correct?

11   A      It would be -- yes, it would be below -- let's see.  It

12   would be about -- um, yeah, that's -- that's reasonable.

13          Again, in doing my risk assessment, um, what I had used

14   was a category of estuarine fish consumption which, um, ranges

15   to something like a more reasonable consumption of rainbow

16   smelt.  Um, and I also evaluated as a sensitivity analysis,

17   what if you were to substitute various levels of rainbow smelt

18   or some other fish for -- for eel with the maximum being a

19   hundred percent substitution.

20   Q      So --

21   A      Yeah.

22   Q      Let me just follow what would happen next because I

23   believe what you're saying is that you made conservative

24   consumption estimates when you derived these targets; is that

25   correct?

1    A    That's correct.

2    Q    Okay.  So let's say you had set the target for eel at

3    425 using that lower body weight.  Okay?

4    A    Hm-hmm.

5    Q    And you see that the -- your projected value exceeds

6    that target of 425.  Would that then to you identify a health

7    risk?

8    A    No, it wouldn't identify a health risk.  It would mean

9    an exceedance of a screening value.

10   Q    And what would you do then, would you refine the

11   screening value to include less conservative assumptions?

12   A    I would look at the degree of conservatism.  I'd also

13   put this into perspective and look at, um, the protection

14   afforded by the RfD, that simple exceedance of the RfD doesn't

15   constitute a -- a health risk.

16   Q    And that's because, in your view, the RfD has an

17   uncertainty factor built in that protects against any health

18   risk even exceeding the RfD?

19   A    That's correct.

20   Q    Okay.  In your view, by how much can you exceed the RfD?

21   A    I haven't looked into that.  I don't -- I haven't, um,

22   done that analysis, but I do know that, um, the first evidence

23   of any indication of -- of any indication of a -- of a health

24   risk was tenfold higher.

25   Q    So let's go back through how you identify kind of the

1    level at which you would be comfortable saying, this presents

2    a health risk.

3         So you set your targets at about 500 for eel and

4    lobster, and 1,500 for duck, correct?

5    A    That's correct.

6    Q    Okay.  And you testified a few minutes ago that you

7    think that you could comfortably triple those values just by

8    using the CDC number instead of EPA's number.

9    A    No, I didn't -- I don't think I said that.  I -- I

10   believe it would be health-protective, but I've not done that

11   analysis, so -- and I'm not going to here -- sitting here

12   today do that analysis.

13   Q    So, then, you're not comfortable saying 4,500 in duck is

14   a reasonable safe target?

15   A    No, I didn't say that.  I guess -- I guess you're using

16   the word perfectly comfortable and you're qualifying that.

17   What I was saying is I haven't done that analysis.

18        What I did say is that the U.S. Centers for Disease

19   Control number is also health-protective.

20   Q    Okay.  And so just using the U.S. Centers for Disease

21   Control number instead of the EPA number, you would come up

22   with a safe target for ducks of 4,500, correct?

23   A    If one did the analysis, that's what they would come up

24   with, yes.

25   Q    Okay.  And you just said that the CDC number is a

1    conservative protective number, correct?

2    A    That's correct.

3    Q    So you would be comfortable with a safe target in ducks

4    of 4,500, correct?

5    A    That's correct, yes.

6    Q    Okay.  And then does that mean, just making that one

7    change, also for lobsters and eels, you would be comfortable

8    with a safe level in lobster of 1,500, instead of 500?

9    A    This is a hypothetical analysis.  We don't have --

10   that's not what the mean lobster concentrations are anywhere

11   close to.  So I'm not suggesting that we're talking about, um,

12   lobster -- mean lobster concentrations being anywhere near

13   1,500.

14   Q    My question is how, following your methodology, you

15   would derive -- you would identify a health risk, and your --

16   A    Because in what I did, following this methodology, I

17   specifically used a conservative approach for that screening.

18   Q    Understood.

19   A    So you asked me a different question, whether the CDC

20   number was also health-protective, and I answered yes.

21        But for a screening-level purpose, I used the U.S. EPA

22   RfD, and I stand by this analysis.

23   Q    And your testimony is that if the levels exceed -- if

24   the levels in the Penobscot Estuary do exceed the levels

25   you've identified, that would not demonstrate to you any

1    health risk because the reference dose is conservative.  You

2    said it has a safety factor of 10 built in.

3    A    You asked me whether a health risk occurred at that

4    level, and I -- I answered it does not occur at that level.

5    Q    Okay.  So what I'm trying to get at is, how would you

6    know, following your methodology, where to draw the line,

7    where to identify the level at which you would be comfortable

8    saying health risk occurs?

9    A    Um, I would not use the screening level analysis to

10   identify health risk.  I would use it to exclude health risk,

11   and that's what I've done.

12   Q    And if something failed your screening level test,

13   correct?

14   A    Yes.

15   Q    You testified that you would change the assumptions to

16   make them less conservative.

17   A    Not necessarily.  I would look at the assumptions.  I

18   would look to see whether they were, um, realistic and how

19   realistic they may be, and it might mean that I would do, um,

20   additional study, if needed.

21   Q    On the -- on how realistic your assumptions are?

22   A    No, I said -- not only on how realistic the assumptions

23   are, um, I would also look to see whether any further analysis

24   needed to be done, whether a more, um, detailed step of health

25   risk assessment needed to be accomplished.

1    Q     Okay.  So is your opinion that you can't right now

2    identify a target that you would be comfortable saying above

3    that level is unsafe?

4    A     I haven't done that, yes.

5    Q     Okay.  But you did say that you could comfortably triple

6    the values that you've identified here.

7    A     Using the U.S. Centers for Disease Control and the

8    science behind their analysis, um, I think it would be

9    reasonable to say that the Centers for Disease Control numbers

10   would be also health-protective.

11   Q     Okay.  And so just to confirm, you would be comfortable

12   setting safe targets at 4,500 for duck and 1,500 for eel and

13   lobster.

14   A     That's not what I did.  I would not use that as my

15   screening level assessment, and I didn't use it as my

16   screening level assessment.

17         I used the U.S. EPA reference dose.  I kept it

18   conservative.

19   Q     I understood your testimony on Friday to be that you

20   could increase your values threefold and that would still be

21   conservative; is that your view?

22   A     I was asked the question, what would happen if I used

23   the U.S. Centers for Disease Control value, and I said, it

24   would increase the value threefold.

25   Q     Okay.  But you're not saying you would be comfortable

1    using the U.S. Centers for Disease Control value.

2              MR. SCHUTZ:  Objection, Your Honor.  We've been over

3    this.

4              THE COURT:  Overruled.

5    A    So your question -- your question was?  Can you repeat

6    that?

7    BY MR. COLANGELO:

8    Q    Yeah.  You said you were just asked what would happen if

9    you used the CDC value, and you said it would increase the

10   numbers threefold.

11   A    Okay.

12   Q    And my question is, you're not saying that you would be

13   comfortable doing that, you were just describing what would

14   happen if you did that?

15   A    I was describing what was happening.  I would be

16   comfortable that we would not have a health risk represented

17   by that, but that's not what I used for my screening

18   assessment.

19   Q    Okay.  But you would be comfortable saying that duck at

20   4,500 nanograms per gram does not present a health risk.

21   A    That's correct.

22   Q    And you would be comfortable saying that lobster at

23   1,500 nanograms per gram does not present a health risk.

24   A    That's correct.

25   Q    And if the lobster -- now, your lobster values were also

1  derived based on assumptions regarding consumption of lobster,

2  correct?

3  A    That's correct, yes.

4  Q    A certain rate of consumption?

5  A    A conservative rate of consumption that assumed a

6  lobster meal, um, 52 times a year, once per week.

7  Q    Right.  And the same for eel and duck, your values were

8  derived based on assumptions, in your view, conservative

9  assumptions, about rates of consumption of eel and duck; is

10 that right?

11 A    Well, they were based on actual survey information.  For

12 instance, the estuarine fish consumption rate was based on,

13 um, 95th percentile of estuarine fish consumption, as reported

14 in the -- in the U.S. EPA Exposure Factors Handbook, which

15 tracks back to a dietary recall survey that U.S. Department of

16 Agriculture had performed.

17 Q    Do you recall when that survey was?

18 A    Um, it was -- the survey was performed in the mid-1990s.

19 Q    And do you have any more recent data?

20 A    On estuarine fish consumption?

21 Q    Correct.

22 A    No.

23 Q    Okay.  And that data is not specific to Maine, correct?

24 That's a nationwide survey of estuarine fish consumption.

25 A    That's correct.

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2611

1   Q      Okay.

2   A      And that's why I used the 95th percentile from that.

3   Um, and I bracketed that information with the study from

4   Knobeloch, et al., which was a survey of Maine women, as well

5   as women from other states.

6          And when you look at that survey, the incidence or the

7   frequency of -- of sport-caught fish meals, because you'd have

8   to put the estuarine fish consumption in her category of the

9   sport-caught fish meals, because we have no commercial

10  estuarine fishery there, and that, I believe, was 11 meals a

11  year.

12  Q      So let's just take it one species at a time.  For eel,

13  you used national estuarine fish consumption data from a USDA

14  survey in the mid-1990s to estimate consumption of eel when

15  you set your safe targets; is that right?

16  A      Right, but reported in U.S. EPA 2011, the most recent

17  data that U.S. EPA has assimilated and reported.

18  Q      And you did not rely on any data specific to the

19  Penobscot Estuary; is that correct?

20  A      We don't have any, that's correct.

21  Q      Okay.  And for lobster, your consumption rate for

22  lobster was based on assumptions from the Julie N oil spill in

23  Portland Harbor in 1991; is that correct?

24  A      It is correct.  I used the -- the rate of consumption

25  that the predecessor agency to the Maine CDC used at that

1    point.

2    Q    And you did not use any actual consumption data

3    regarding lobster from the Penobscot Estuary; is that correct?

4    A    We -- it was lacking, that's correct.

5    Q    Okay.  And for duck, your safe target for duck was based

6    on -- was not based on any actual consumption data regarding

7    black duck from Mendall Marsh; is that right?

8    A    That's correct.  I believe it would be much lower than

9    what I've projected.

10   Q    Okay.  And instead, you used assumptions from a

11   different site in New York and then projections of -- based on

12   an estimated number of meals per year; is that right?

13   A    No, that's incorrect.

14   Q    You used the values from meal size from an EPA site in

15   New York; is that correct?

16   A    No, it's incorrect.  I used -- let's see.  Where do I

17   start here?  The -- um, I used the -- the meal size reported

18   again from U.S. EPA Exposure Factors Handbook based on a study

19   of chicken and turkey consumption, which likely overestimates

20   the size of -- the size of a meal for duck.  So I based it on

21   that, and that number of 165 grams per day, was then used by

22   U.S. EPA for a site in Massachusetts, the Housatonic River in

23   Massachusetts, and it was also used by both the Wisconsin

24   Department of Natural Resources in the State of Wisconsin, as

25   well as U.S. EPA region 5 for their assessment of health risk

1    from duck consumption in the Lower Fox River.

2    Q    And you assumed that the consumption was ten ducks

3    averaged over an entire year; is that correct?

4    A    That's correct, and plus in the -- in the technique.

5    Q    Okay.  And you assumed that each duck provides a single

6    110-gram meal, correct?

7    A    165-gram meal.  The 110, um, is the cooked weight.

8    Q    So you assumed that each duck provides a single 110-gram

9    cooked meal?

10   A    That's correct.

11   Q    Okay.  Now, you don't have actual information about

12   whether black ducks in Mendall Marsh provides two meals or

13   one, correct?

14   A    That's correct.  Ducks will vary in size.  I -- I'll

15   give you that.  You might get two meals out of a duck.

16   Q    Okay.  And you did not look at -- you did not see what

17   would happen to your safe level if you assumed that the ducks

18   were consumed over the hunting season instead of spaced out

19   over an entire year; is that correct?

20   A    Um, that's correct.

21   Q    Okay.  And so you don't know, for example, whether if

22   those ten ducks were eaten during the hunting season, they

23   would exceed your safety target, correct?

24   A    I don't believe they would.

25   Q    How do you know that?

1    A    Because I was using the reference dose for a comparison.

2    Q    Now, for lobster, you did not make any changes based on

3    seasonal differences in lobster consumption, correct?

4    A    That's correct.

5    Q    So you didn't look at what would happen if there were

6    greater rates of lobster consumption during the summer, for

7    example.

8    A    Well, what I didn't do is I didn't factor out that

9    perhaps there would be no lobster consumed from the study area

10   during certain months of the year.  No, I didn't do that.

11   Q    And --

12   A    And I think that was a conservative assumption.

13   Q    And, likewise, you did not look at whether there would

14   be increased, greater than average consumption of lobster

15   during other parts of the year; is that correct?

16   A    Right, because I used a really conservative, um,

17   consumption rate of 52 lobster meals a year, which, again, if

18   we look at the only survey information that we have on this

19   subject from Dr. Knobeloch, et al., of which Andy Smith, the

20   state toxicologist, was one of the authors, their total number

21   of shellfish meals was a lot less than my 52 meals of lobster

22   alone.

23   Q    So to understand how your safe levels work in practice,

24   you set a safe target of 510 for lobster.

25   A    That's correct.

1    Q     Okay.  Which you're comfortable tripling to 1,500 for

2    lobster.

3    A     Well, let's just keep it in this current analysis.

4    Otherwise, I'm going to get lost with all the numbers floating

5    around.

6    Q     Okay.  We'll go through the current analysis first.

7    A     Okay.

8    Q     But I do think you've testified that you're comfortable

9    tripling that value to 1,500, so then we'll go through it

10   again at that level.

11   A     Again, I didn't do that analysis.  You asked me whether

12   I thought that number was safe, and --

13   Q     And, in your view, that number is safe, correct?

14   A     It is.  But that's not the screening level analysis that

15   I did.

16   Q     Okay.  So if you -- using your target of 510 for

17   lobsters --

18   A     That's correct.

19   Q     -- which is based, as you testify, on a conservative

20   consumption rate --

21   A     Right.

22   Q     -- of one lobster a week, if the levels measured in the

23   Penobscot Estuary exceeded that target, what would you do?

24   A     If they exceeded that target?  Um, I think I would look

25   at refining the risk assessment or perhaps gathering some

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2616

1   additional data, and -- and that would probably be the next

2   step.

3   Q    And, for example, would a refined risk assessment

4   include more specific or precise information about consumption

5   rates of lobster?

6   A    It may or may not.

7   Q    Well, what else --

8   A    Again, I think with a conservative -- it's a

9   conservative rate of -- of lobster consumption.  I don't

10  believe I would have to do a survey or gather more information

11  on that.  We have no evidence that there's any consumption,

12  um, greater than that.

13       We've -- as I've said, we've got the survey by

14  Dr. Knobeloch of total shellfish consumption in the State of

15  Maine by women of childbearing age, and all of that lends

16  evidence that we don't have to do any more analyses.  I mean,

17  you are asking a number of hypothetical questions, and you can

18  construct a hypothetical scenario about which you'd have to go

19  out and do lots of work, but I don't believe that's necessary

20  in this case.

21  Q    My question is really trying to understand where you

22  would draw the line for lobster, for example, and how you

23  would know where to draw the line if you wanted to set a safe

24  target.

25  A    Well, I've told you where I've drawn the line.  It's in

1    -- it's in my report.

2    Q    It's at 500.

3    A    Yes, 500, 510.

4    Q    510?

5    A    Something like that.

6    Q    Okay.  So does that mean, then, in your view, if the

7    lobsters in the northern estuary exceed 510, you've identified

8    a health risk?

9    A    Not a health risk, but I've identified -- I -- I've

10   identified at that point that perhaps I would -- that I would

11   look at this in more detail.

12        I'm using this to screen out, to say whether there is --

13   to say whether there is no risk or whether there is perhaps a

14   need for some further investigation.

15   Q    And if you, for example, learned that people consumed a

16   third as much lobster as you assumed in setting your safe

17   targets, what would that do to your standard?  Would you

18   increase your standard?

19   A    Well, in my -- oh, excuse me.  In -- in my analysis, ah,

20   when you -- when I looked at the levels of -- of methylmercury

21   in the entire study area, I think, um, my safe target was

22   nearly threefold higher than the mean concentration from the

23   entire study area.  And even from the closed study area, my

24   safe concentration was double that that we found in the -- the

25   closed -- the now-closed area.

1    Q      In order to determine the mean levels in lobster that

2    you're talking about, you generated some data that weren't

3    reported by the Study Panel; is that correct?

4    A      I used the Study Panel's data and calculated claw data,

5    where that was missing, and tail data, where -- where that was

6    missing.

7    Q      Okay.  And so you generated new data to fill in those

8    gaps; is that correct?

9    A      That's correct.

10   Q      Okay.  So those numbers reported in your mean don't

11   reflect actual samples.  They reflect numbers that you

12   generated; is that correct?

13   A      They reflected appropriate numbers that should be used

14   for health risk comparison purposes um, just as, for instance,

15   my generation of a upper confidence limit, or what's known as

16   the UCL, on the mean is necessary in order to do a

17   conservative risk assessment.  That represents a generated

18   number, as well.

19   Q      And the numbers that you generated don't reflect actual

20   samples, that's not actual sampling data collected by the

21   Study Panel, correct?

22   A      Well, no, I would disagree.  They are actual sampling

23   data.  It's the interpretation of that data that's at issue.

24   Q      You generated numbers to include in your -- deriving

25   your mean for lobster that are not the result of -- that did

1   not reflect actual samples taken from the Penobscot Estuary;

2   is that correct?

3   A      They reflect actual samples, but they include

4   corrections to derive a total edible lobster mercury

5   concentration.

6   Q      And the effect of those -- including those generated

7   data is to pull the number down slightly; is that right, from

8   the mean reported by the Study Panel?

9   A      I don't -- yes, I believe that's correct.  Hm-hmm.

10  Q      In other words, you came up with a mean of around 273

11  nanograms per gram for lobster, correct?

12  A      That's correct.

13  Q      Okay.  Now, that level still exceeds the State's fish

14  tissue action level, correct?

15  A      Based on freshwater fish consumption rates and which was

16  derived originally to protect freshwater fish consumption

17  from, you know, Maine's destination fisheries, lakes and ponds

18  and -- and streams.

19  Q      Okay.  You also looked at the probability of getting the

20  single highest lobster every time you ate a lobster from the

21  Penobscot Estuary; is that right?

22  A      I did a sensitivity analysis.  That was in my

23  surrebuttal report, correct.

24  Q      Okay.  And you're aware that 90 percent of the lobsters

25  in the northern estuary exceed the State standard of 200; is

1    that right?

2    A    I'm -- I've not looked at that.

3    Q    Okay.  So you're unfamiliar with the Study Panel's

4    conclusion that 90 percent of the lobsters in the study area

5    exceed the safe standard?

6    A    No, I'm familiar with that, but I would disagree with

7    the analysis that was done to make that conclusion.

8    Q    Okay.

9    A    That's a more precise way of answering your question.

10   Q    And the average is at about .3 in -- if we're looking at

11   northern estuary compared to the --

12   A    That's correct, yes.

13   Q    -- State level of .2, correct?

14   A    The average level that the Study Panel reported was

15   about .3.

16   Q    Okay.

17   A    Yeah.

18   Q    Did you look at the probability of getting the average

19   lobster every time you eat a lobster from the Penobscot?

20   A    I did not look at that, no.

21   Q    In --

22   A    But the central -- it -- we use means all the time, and

23   we use, um, to be even more protective, we use the upper

24   confidence level on the mean, because when we do exposure

25   assessment, um, really, the central limit theorem of

1    mathematics tells you that the arithmetic mean is the best

2    predictor of the concentration in the entire population.

3    Q    And in calculating your safe standards for each species,

4    you assumed that the exposure from that particular species was

5    the only source of methylmercury exposure in a person's diet;

6    is that right?

7    A    I assumed that that was the -- the level of exposure,

8    that's correct.

9    Q    Okay.  So, for example, you assumed that the lobster

10   eater eats only lobster and derives methylmercury from no

11   other source, correct?

12   A    No, because we already -- we know that people derive

13   their methylmercury, um, body burden from eating seafood

14   items.  So essentially what we're talking about is a

15   substitution.  Um, if you're eating lobster, you're not eating

16   some other food for those particular meals.  You're not eating

17   some other fish or shellfish item.

18   Q    In setting your safe targets, you did not factor in

19   background exposure in deriving your levels; is that correct?

20   A    I could have done that.  It would have been a more

21   in-depth and intricate analysis, and instead, I did a

22   sensitivity analysis on that to show that even consuming --

23   even sort of being on a binge lobster diet of eating 5 pounds

24   of lobster in a 48-hour period did not materially raise the

25   person's body burden.

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2622

1   Q     And you did not consider current -- the preexisting

2   blood mercury levels in women in Maine in setting your safe

3   targets, correct?

4   A     Um, well, I did consider it, and if you look at -- um,

5   for instance, if you look at the typical person in my

6   distribution from consuming the 5 pounds of lobster and if you

7   looked at, for instance, the NHANES survey of a typical

8   American, it would not elevate that -- that person's body

9   burden of mercury materially or anywhere near the reference

10  dose.

11  Q     So in setting your safe targets, then, you did assume a

12  background concentration of methylmercury in women's diets?

13  A     No, I put that into perspective afterwards when I --

14  when I did the -- the assessment.  That assessment is just the

15  way like -- like -- it's the same way the State does their

16  fish tissue action level.  They're looking -- they're not

17  considering background in addition to that, and when the Study

18  Panel, for instance, compared with the fish tissue action

19  level, again, they took the same approach.

20  Q     Okay.  So just --

21  A     Again, this was a -- it was a screening level analysis,

22  and we didn't go into an elaborate toxicokinetic model to

23  predict body burden.

24  Q     So just to be clear, because I may have misunderstood,

25  in setting your safe targets, you did not assume -- you

1    assumed no background concentration of methylmercury in

2    people's diets when you set these levels for lobster, eel, and

3    duck; is that correct?

4    A    That's correct, when I set those levels, right.

5    Q    Okay.

6    A    But then --

7    Q    Now --

8    A    -- put it into perspective later on.

9    Q    There's been some discussion -- you just alluded to the

10   blood levels as they relate to the reference dose; is that

11   right?

12   A    That's correct.

13   Q    Okay.  And I believe your testimony is that what you

14   care about is not an exceedance of the reference dose, but

15   whether the blood level reaches the level of concern for

16   harmful health effects; is that right?

17   A    That is the -- yeah, that is the theory behind the

18   reference dose, that what you are protecting against is

19   getting the blood level, um, to a certain point.

20   Q    Because the reference dose was derived from the blood

21   level that EPA deemed to be of concern; is that right?

22   A    The reference -- yes, the reference dose was derived

23   applying a tenfold safety factor from that level in the blood

24   at which EPA, um, would start to have a concern about possible

25   effects.

1    Q     So the reference dose is EPA's measure of the amount of

2    consumption that would put you at the blood level that the

3    agency deems to be of concern.

4    A     Ah, no, I don't believe so.  I think it would put you at

5    a blood level which is tenfold lower than any blood level that

6    is indicated a possible increase in concern.

7    Q     Is it your view that going above that blood level, that

8    the tenfold uncertainty factor provides a window of tenfold

9    increase that would be entirely safe?

10   A     I didn't say entirely safe, no.  I'm just saying that

11   there's a margin of safety in there.

12   Q     Okay.  So the reference dose is EPA's, um, calculation

13   of the amount of consumption that puts you at the blood level

14   of concern factoring in the uncertainty factor the agency

15   applied; is that correct?

16   A     I would need to see their language for how they would --

17   how they would describe it.  But the -- the -- the concept is

18   there, that it is a -- that there is a tenfold margin of

19   safety between the level which from their benchmark dose

20   model, they started to see or they believed to see a possible

21   concern.

22   Q     Okay.  Let me show you -- this is Defendants'

23   Exhibit 708.

24         MR. COLANGELO:  Which I'd like to move into

25   evidence.

Case 1:00-cv-00069-JAW   Document 788   Filed 06/23/14   Page 128 of 203   PageID #: 11239
KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2625

1          THE COURT:  Any objection to Defendants' 708?

2          MR. SCHUTZ:  No objection.

3          THE COURT:  708's admitted.

4    BY MR. COLANGELO:

5    Q    Okay.  Dr. Keenan, this is EPA's Integrated Risk

6    Information System, that's the IRIS document for

7    methylmercury.  Do you see that?

8    A    That's correct.

9    Q    Okay.  And you're familiar with this document?

10   A    Yes, I am.

11   Q    Okay.  And you'd agree that this -- that this document

12   is the agency's summary of the safety standard and how EPA

13   derived it; is that correct?

14   A    That's correct.

15   Q    Okay.  So -- now, look at Page 5 under dose conversion,

16   and this relates the blood level to the reference dose.  And

17   it states, the biomarker of choice for the Faroese data --

18   now, that's the Faroes Islands study that EPA used to derive

19   the reference dose; is that right?

20   A    That's correct.

21   Q    Okay.  The biomarker of choice for the Faroese data was

22   cord blood, umbilical cord blood, and the BMDLs, benchmark

23   dose levels, were reported in units of parts per billion

24   mercury in the cord blood.

25   A    Let me just correct you on that.  That's the -- that's

1   the lower bound on the benchmark dose, the BMDL is the 5th

2   percentile lower confidence bound on the benchmark dose.  It's

3   not just a nuance.

4        I think it's important because when they modeled this,

5   when they modeled the result on the -- on the Boston Naming

6   Test, which was the most sensitive of the neuropsychological

7   battery that was administered to children, um, the benchmark

8   dose level comes out to a -- a certain amount.  I don't recall

9   what that was, but it was some amount greater than 58 part per

10  billion in blood -- in blood.

11       And the lower bound on that brings it down to 58 part

12  per billion.

13  Q    You're referring to here just above, the $BMDL_{05}$?

14  A    Yes, that's correct.

15  Q    Okay.  So back on this paragraph in Defendants' 708,

16  Page 5.  It states, in order to calculate an RfD, it is

17  necessary to convert this figure to an ingested daily amount

18  that would result in exposure to the developing fetus at the

19  BMDL level in terms of part per billion mercury in blood.  Do

20  you see that?

21  A    That's correct, yes.

22  Q    Okay.

23  A    Hm-hmm.

24  Q    And then it goes on to explain the model the agency used

25  and that the agency found good fit for that model in mercury

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2627

1  blood level changes.

2       So is it correct to say that the reference dose is EPA's

3  calculation of the amount of consumption of methylmercury that

4  puts you at the blood level, factoring in the safety factor

5  you've described, that the agency set as a target?

6  A    I think so.  What this is saying is that this is talking

7  about using the blood conversion to bring -- to get a blood

8  level at the BMDL, or the lower bound on the benchmark dose,

9  and then the reference dose represents that they add another

10  tenfold safety factor, and that's where you get the 5.8 part

11  per billion blood level.

12       I think that's what you said, but I wasn't sure it was

13  exact, and --

14  Q    Okay.  The --

15  A    Yeah.

16  Q    -- the State of Maine has set two fish tissue action

17  levels for methylmercury.  Are you aware of that?

18  A    If you would show them to me, I can comment on them.

19  Q    Sure.  The State set one level for reproductive harm at

20  .2, that's what we've been talking about all through the

21  trial.

22  A    Okay.  Now -- yes.

23  Q    And a second level for neurological harm in adults; is

24  that right?

25  A    That's correct.

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2628

1   Q     Okay.  And that's because mercury at higher levels can

2   cause direct neurological impairments in adults, not just

3   developmental harm in -- in the fetus in utero; is that right?

4   A     That's correct.

5   Q     Okay.  So I can show you those standards.  This is from

6   Joint Exhibit 85 in evidence and this is the Bureau of Health

7   fish tissue action level.  Do you see that -- action levels?

8   A     Yes.

9   Q     Okay.  And then on the sixth page of Joint Exhibit 85,

10  the State reports the two different levels that it derived for

11  harm from exposure to methylmercury.  And you see that the

12  developmental harm safety standard is .2, or 200 parts per

13  billion?  We've been talking about that.  And the level for

14  harm in adults is .65.

15  A     Yes, and it's the -- it's the .2 number that they've

16  used in their -- in their freshwater advisory statewide that

17  applies to all waters of the state.

18  Q     Correct.  And the point --

19  A     And -- right.  So I -- I'm saying that it -- it

20  recognizes that there are background sources of mercury in the

21  environment.

22  Q     And the .2 number that the State -- this is the same

23  number that the State used to determine to close the lobster

24  fishery in light of the levels reported by the Study Panel; is

25  that right?

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2629

1    A     I believe so, yes.

2    Q     Okay.  Now, there's a higher level that the State uses

3    to protect against neurological effects, the endpoint reported

4    here is paresthesia.  Are you familiar with that?

5    A     Ah, yes, I'm familiar with that level.

6    Q     Okay.  And what's paresthesia?

7    A     Um, it's a -- it's a nerve -- it's a nervous system

8    disorder.

9    Q     Okay.

10   A     And that is from a different study, um, which, again,

11   um, the more recent studies have sort of supplanted it in

12   terms of any of the recent mercury advisories.

13   Q     Now, this is still the State's standard for adult

14   neurological harm from exposure to methylmercury; is that

15   right?

16   A     It's a -- it's a fish consumption advisory, is what it

17   is.

18   Q     Correct.

19   A     Not a standard.

20   Q     Correct.

21   A     Right.

22   Q     Okay.  The fish tissue action level?

23   A     Yes.

24   Q     For neurological harm in adults --

25   A     Hm-hmm.

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2630

1   Q      -- set by the State is .65.

2   A      That's correct.

3   Q      Okay.  The um, average -- or the State standard -- the

4   risk-specific concentration for black duck that you've

5   proposed in -- converted to these units of measurements is

6   1.5; is that right?

7   A      That's correct.

8   Q      Okay.  So you're --

9   A      But, again, what the difference -- the difference is

10  totally in exposure.  This, again, was set for freshwater fish

11  consumption, and it was based on a very high rate of fish

12  consumption that was assumed, and then -- um, and then even

13  when it was verified, by looking at the angler study that I --

14  that I conducted in Maine, the Maine anglers study, it led the

15  state toxicologist at the time to say, okay, this is

16  protective, and he would use this for a screening value.

17         But, again, it was set at a freshwater fish consumption

18  rate, not at rates of consumption of black duck or lobster or

19  other food items.

20  Q      And the safe target that you've set for duck of 1.5, or

21  1,500, is two and a half times the State's fish tissue action

22  level for neurological harm in adults?

23  A      We -- we can compare the numbers.  They don't -- they

24  don't really apply, but, yes, ah, my number is bigger than

25  this number.

1  Q    And you testified that you were comfortable tripling

2  your number to 4.5, which would make your assumed safe amount

3  of methylmercury in duck about seven or eight times higher

4  than the State's fish tissue action level for neurological

5  harm in adults.

6  A    Again, that's not what I did.  I didn't use that for

7  screening.  I never, um, stated I would use it for screening.

8  I -- you asked me whether it would be safe.  Um, I said I

9  believed it would be safe.  We were looking then at the

10 endpoint of neurodevelopmental effects, too.

11 Q    Okay.  And the endpoint of neurodevelopmental effects is

12 a much more sensitive endpoint?

13 A    That's correct.

14 Q    Okay.  So you believed that 4.5, or 4,500, would be safe

15 for the more sensitive endpoint of neurodevelopmental effects

16 in utero, correct?

17 A    That's correct.

18 Q    Okay.  And that's approximately 20 times higher than the

19 State's fish tissue action level for developmental harm,

20 correct?

21 A    Again, we're -- these comparisons are -- are not

22 applicable because this is based on freshwater fish

23 consumption, and we're talking about black ducks.

24 Q    And your testimony earlier was that the -- when you

25 ingest it, whether methylmercury causes harm in the body, it

1  doesn't matter whether it comes from fish or duck or lobster,

2  correct?

3  A    That's correct.

4  Q    Okay.  And you also --

5  A    When you were talking about the ingested dose -- when

6  we're talking about the amount that's actually inside a

7  person.

8  Q    Correct.

9  A    Okay.  But how it gets there matters greatly.

10 Q    And you testified that you were comfortable tripling

11 your safe target for lobster, from 510 to -- that would be

12 1,530, correct?

13 A    I said that the U.S. Centers for Disease Control value

14 would be protective.

15 Q    Okay.  And so if --

16 A    But I did not -- but that's not what I did for the

17 screening level purposes.

18 Q    But, in your view, that's a protective value?

19 A    It's a protective value.

20 Q    Okay.  So at that level, that would be 1.5 in these

21 units, that would be 1.5 parts per million, and that would be,

22 again, about 2 -- 2.3 times higher than the State's level for

23 neurological harm, the fish tissue action level for

24 neurological harm in adults, correct?

25 A    I -- well, I will agree with your math, yes.

1    Q    And the State, in the northern estuary, has applied this

2    level, the fish tissue action level, to consumption of

3    lobster.

4    A    They have -- they have used that for the purposes of

5    closing that fishery for, um, for further study.

6         But to be consistent, you would have to apply that

7    action level.  You could -- you take -- practically every --

8    every can of tuna fish in the marketplace, many other seafood

9    items would not pass that standard either.  So, again, it's --

10   you're using -- you're comparing the -- this level, but it's

11   not really the appropriate comparison or the appropriate

12   yardstick to be using.

13   Q    The level that you proposed for duck of 1,500 nanograms

14   per gram --

15   A    Right, based upon the ten -- the ten duck meals.

16   Q    Right.

17   A    Right.

18   Q    That -- you're talking about comparing to other species

19   in the supermarket, for example, that level exceeds the mean

20   concentration in every single commercial fish measured by FDA,

21   correct?

22   A    I don't know that to be true.  It's not, um, the levels

23   that have -- that have been portrayed by a number of

24   government bodies that have published these data.

25   Q    Let me show you FDA's summary of mean mercury

1   concentrations in fish.  This is from Defendants'

2   Exhibit 1226, Page 29 to 30, and this reports levels in about

3   50 commercial fish, all the species that FDA monitors.

4        And your proposed target for ducks here is 1.5 parts per

5   million, so that is higher than -- just to go down the -- just

6   as far as the columns here, on the left at the top of

7   Defendants' 1226, you have the name of the fish, the market

8   share percentage is the next column, so this is how much of

9   the fish is consumed --

10  A    Hm-hmm.

11  Q    -- and then the mean mercury concentration in that fish.

12  A    Okay.

13  Q    Okay.  So every value in this far right-hand column --

14  I'll show you Page 29 -- on this page, there's a value as high

15  as 1, that's in swordfish, which FDA says do not eat, correct?

16  A    On swordfish?  Well, you'd have to qualify that a little

17  bit more.

18  Q    FDA advises pregnant women and children not to eat

19  swordfish?

20  A    Yes, that's one of the four species, yes, yeah.

21  Q    Okay.  And that's at a level of 1 part per million?

22  A    Hm-hmm, that's correct.

23  Q    Okay.  And your safe level for duck is 1.5.  And looking

24  at Page 30, this is the conclusion of FDA's summary of mean

25  mercury concentrations in commercial fish, the highest value

1   is in gulf tilefish, 1.45.

2   A    Okay.

3   Q    And that's another species that FDA says women of

4   childbearing age and children should avoid entirely; is that

5   correct?

6   A    Okay.  That's correct.  But, again, what you're talking

7   about here are -- it's all a matter of exposure and different

8   consumption rates, and you have to put that into perspective,

9   um, before you can make these comparisons.

10  Q    Do you know whether FDA had information about

11  consumption rates of gulf tilefish before issuing its

12  do-not-eat advisory?

13  A    I don't.

14  Q    And we talked about swordfish, do you know whether FDA

15  had information about consumption rates of swordfish before

16  issuing that advisory?

17  A    Ah, I don't.

18          MR. COLANGELO:  I'm about to turn to a new topic,

19  Your Honor, if you would like to take a break.

20          THE COURT:  That's fine.  Very good.  Thank you.

21  We'll take a 20-minute break.

22      (Court recessed from 12:27 p.m. to 12:57 p.m.)

23          THE COURT:  Mr. Colangelo?

24          MR. COLANGELO:  Thank you.

25                  CONTINUED CROSS-EXAMINATION

1   BY MR. COLANGELO:

2   Q    Dr. Keenan, two quick things on fish health before we go

3   back to human health.  This Table 4-3, again, from your

4   report, Joint Exhibit 55, and these are the fish that you

5   compared to the prey fish in the Penobscot to support your

6   opinion that it was unrealistic to try to get prey fish below

7   a target of 50.

8        You discussed yellow perch, and you said that in a study

9   in a lake in Minnesota, yellow perch were reported as prey

10  fish -- an important prey fish there.  Do you have any

11  information for the fish you've included in this table about

12  the size of the fish?

13  A    Well, um, I believe that these fish are larger.  Um, the

14  yellow -- the yellow perch in the lakes in Minnesota was

15  actually 17 lakes, and, um, they had exceeded the -- the value

16  in -- in -- by far in 14 of those 17 lakes.  These would be

17  larger.  I believe they're 6-inch.

18  Q    These yellow perch you're saying or all of these fish?

19  A    Um, I believe all of these fish.

20  Q    And where is that data?

21  A    Well, I believe it's in the, ah, U.S. EPA National Lake

22  Fish Contamination Study.

23  Q    And you believe that the average length for all of these

24  fish is 6 inches?

25  A    Um, no, I'm -- I'm just saying I think -- I believe that

1    there is some length information, and I think they're

2    6 inches.

3    Q    Okay.  Are you confident in the information about --

4    that --

5    A    No, I'm not.  I'm not confident of that.  I -- that's my

6    recollection.

7    Q    Let me show you Joint Exhibit 6-14, Page 14-113.  This

8    is the -- one of the data tables from Chapter 14 of the study

9    report.

10         Now, you said you did not compare the prey fish target

11   to the levels measured in prey fish here.  This is one of the

12   prey fish, rainbow smelt.  And I showed you the earlier table

13   that was the length-adjusted values, and you said, well, those

14   are length-adjusted, so I wanted to show you the actual

15   data --

16   A    Okay.

17   Q    -- the raw data.  So you will see here on the far left

18   for rainbow smelt, this is arranged by year.  So this group is

19   2006, the first box here, and by site, from the northernmost

20   sites in the estuary to the most -- southernmost sites, and

21   you see that the values reported here, these mean values are

22   generally higher in the northern estuary, and then as you go

23   further south, some of these values, 51 and 53, approach the

24   Study Panel's target for prey fish of 50.  Do you see that?

25   A    Ah, yes, hm-hmm.

1   Q      Okay.  And that's in -- that's for one year, 2006.

2          And for other years, looking at 2008, you see the same

3   pattern, higher values in the northern estuary and approaching

4   the Study Panel's target of 50 as you get further out into the

5   outer estuary, and some of the sites, like this site, ES13S in

6   2008, based on 15 samples, is below the target, is at 46.  Do

7   you see that?

8   A      I do.

9   Q      Okay.  And that pattern is repeated in these --

10  A      Yeah.

11  Q      -- other years, just one last example, generally

12  speaking, and this is --

13  A      Well, pointing out -- and, of course, pointing out that

14  there are exceedances and -- yeah.

15  Q      Sure.

16  A      Hm-hmm.

17  Q      And looking at 2010, these southernmost stations for all

18  four of them are below the target, whereas the northernmost

19  stations, in many years, are above.  Do you see that?

20  A      Again, but, you know, I haven't analyzed the food web

21  where these fish are at, and -- um, right, I understand for

22  comparison purposes.

23  Q      Okay.  Let's turn back to human health.  You prepared a

24  table -- a figure that you testified about on Friday.  This is

25  Defendants' Exhibit 1087, and this is mean mercury nanograms

1    per gram wet weight in fish and shellfish.  Do you recall

2    that?

3    A    Yes, I do.

4    Q    Okay.  And you were trying to put the levels in

5    lobsters, measured here, which are reported in green, in

6    context compared to other things that people eat; is that

7    right?

8    A    Yes.  Can you just push that up a little bit so we can

9    see the legend on the bottom?  Thank you.

10   Q    Sure.

11   A    That's great.

12   Q    So the legend on the bottom indicates your data sources,

13   and you have six different footnotes reflecting five different

14   data sources here.  Do you see that?

15   A    Yes, that's correct.

16   Q    Okay.  Now, this lobster lower Penobscot River value,

17   this is the value for the closed portion, the northern

18   estuary, correct?

19   A    That's correct.

20   Q    Okay.

21   A    Hm-hmm.

22   Q    And that's the value as you calculated it with some

23   generated data to make up for missing claw or tail, correct?

24   A    That's the value that I calculated to come up with an

25   edible tissue concentration.

1      I sort of object to your characterization as generated

2 data.  It makes it sound that it's less reliable than it

3 really is, and it's -- I believe it's the most reliable data

4 set that we have.

5 Q    Okay.  How would you characterize it?  When the Study

6 Panel was missing data for claw or for a tail, what did you do

7 to derive a value to use in calculating your mean?

8 A    Well, I used the Study Panel's own regression and their

9 -- their relationship between claw and -- and -- I mean,

10 between mercury concentrations in claw and lobster tail, and I

11 used, ah, the Department of Marine Resources, the one-third --

12 you know, one-third claw/two-thirds tail comparison to

13 calculate those missing values.

14 Q    Okay.  So those are calculated values that you created

15 to fill in for the missing values.

16 A    For missing values, yes.

17 Q    Okay.  And I believe you testified earlier the effect

18 was to pull the average down slightly --

19 A    Yes.

20 Q    -- so that it's under 3 instead of just over 3.

21 A    That's -- the -- going through that exercise to come up

22 with a value that reflects the edible portion does bring that

23 concentration down a bit.

24 Q    Okay.  Now, the -- let me show you a table from

25 Defendants' 1226 -- or a statement.  I'm sorry.  This is the

1    FDA document that was discussed last week, and this is a

2    summary -- this includes a summary of methylmercury

3    concentrations in fish.

4         So on Page 28 of Defendants' 1226, FDA includes a

5    discussion of the top 20 fish, and it states, the mean

6    concentrations in the top 20 most consumed commercial species

7    in the U.S. range from .01 to .13, with the exceptions of

8    albacore canned tuna and fresh tuna.  Do you see that?

9    A    I do, hm-hmm.

10   Q    Okay.  And the top 20 species comprise approximately

11   84 percent of commercial fish consumed in the United States.

12        So in your table, to compare lobster values to other

13   values, you included those two exceptions from the top 20, the

14   albacore tuna at .35 and the fresh tuna at .39, and those are

15   reflected -- let me zoom out so you can see the references

16   again -- and those are reflected here, albacore tuna, Footnote

17   A says FDA, and the fresh tuna, same footnote, that's the FDA

18   source.

19   A    Okay, yes.

20   Q    Okay.  Now, most of the other top 20 fish listed in

21   FDA's table, all of which were below .13, which is a value

22   about here, most of those other species you did not include in

23   this figure; is that right?

24   A    I -- I don't know whether I did or I didn't.

25   Q    Okay.  Let me --

1   A    I -- I took these from, ah, a number of data sources,

2   and -- yeah.

3   Q    Okay.  Let me show you FDA's ranked list.  This is by

4   fish consumption.  We talked about this a few minutes ago.

5   This is Defendants' 1226, Page 29.  And looking at the top 20

6   fish species, which comprise 84 percent of consumption, these

7   are the mean mercury concentrations on the right.

8        In your table for comparison purposes, you included

9   albacore tuna, and you included fresh tuna; is that correct?

10  A    Ah, yes.

11  Q    Okay.  And those are just --

12            MR. SCHUTZ:  I'm just going to object, Your Honor.

13  This document was prepared by FDA after Dr. Keenan prepared

14  the table, and I think there should be clarity as to what

15  documents he relied on or didn't.

16            THE COURT:  Overruled.  It's cross-examination.  You

17  may redirect.

18  BY MR. COLANGELO:

19  Q    The -- the other top 20 species, just to list the ones

20  that you did not include in your table, pollock -- we can go

21  back to your table to look -- pollock, tilapia, catfish,

22  crabs, anchovies, squid/calamari, clams, perch, freshwater

23  trout, scallops, and sardines.  These values you did not

24  include in your chart; is that correct?

25  A    I would have to compare with my chart.  I don't -- I

1    don't believe I included these.

2    Q    Okay.

3    A    But I did include some of the other species that you

4    have not highlighted here.

5    Q    Well, right, I was listing the ones in the top 20 that

6    you did not include.

7    A    Right.  But earlier you said I -- I did include the two

8    tuna varieties.  I just wanted to mention that there are other

9    varieties in here that I did include.

10   Q    Correct.

11   A    But, again, um, as was just pointed out, this came from

12   -- this came from the recent EPA document.

13   Q    This is reprinting a table that FDA has had on its Web

14   site for many years.

15   A    Ah --

16   Q    Are you familiar with that?

17   A    No, I'm not.

18   Q    Okay.  This lobster number, FDA reports a lobster number

19   of .11.  Do you see that?

20   A    I do.

21   Q    Okay.  Now, you did not use that value as a comparison

22   value for lobster; is that right?

23   A    I didn't use that value because that's only a portion of

24   the data set.

25   Q    Okay.  So back to your table -- I mean, your figure --

1   I'm sorry -- you have three different numbers for lobster --

2   this number lobster -- putting aside the Study Panel values,

3   which are in green -- you have American lobster, Footnote E,

4   North American lobster, Footnote F, and lobster, Footnote A,

5   which you report is an FDA value; is that right?

6   A    Ah, that's correct.

7   Q    Okay.

8   A    Hm-hmm.

9   Q    Now, this is not American lobster, correct?  This is the

10  value that FDA reports as species unknown?

11  A    No, that is -- that is American lobster.

12  Q    Does FDA report that as American lobster?

13  A    They report that on their Web site as lobster, and they

14  differentiate it from spiny lobster.

15  Q    And they differentiate it from American lobster; is that

16  right?

17  A    These lobsters reported here include the nine samples

18  that are separately reported as American lobster, so it is the

19  American lobster.

20  Q    Let me show you the FDA table I'm talking about.

21  A    Where is this from?

22  Q    This is Plaintiffs' Exhibit 97 in evidence.  This is

23  from FDA's Web site, and this reports a value for spiny

24  lobster of .09, and then on the other page, it reports a value

25  for American lobster of .107, and lobster species unknown of

1    .166.

2         And for your comparison chart, you did not include this

3    value for lobster American, correct?

4    A    I did include it.  They are included -- you have to go

5    behind here -- behind this, and you find that the data behind

6    it -- you have to go to the individual lobsters, and there are

7    80 lobsters reported by FDA which come into the category as

8    American lobster.

9    Q    FDA reported nine lobsters in the category of American

10   lobster.

11   A    On this particular page, they report nine lobsters, and

12   then they report 71 lobsters.  Um, it has the -- I haven't

13   seen this before, but the species unknown.  But you look

14   elsewhere, and those 71 plus nine are reported together as 80

15   lobsters.

16   Q    What document are you referring to?

17   A    I'm talking from the -- I'm talking from an FDA Web

18   site.

19   Q    Is this the data -- the list of all data reported by

20   FDA?

21   A    I believe so.

22   Q    Okay.  And it's a long chart of data with each

23   individual sample?

24   A    I believe so, yes.

25   Q    Okay.  And your testimony is that in that table, FDA

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2646

1  reports them 80 samples as American lobster?

2  A    I -- I can't testify to that without seeing the table,

3  but -- um, but the American lobster represented by this sample

4  are the -- the nine reported here plus the 71.

5  Q    So FDA, in its summary table here, Plaintiffs' Exhibit

6  97, reports a value for American lobster of .107, you did not

7  use that value as an individual entry in your chart; is that

8  correct?

9  A    That's correct.

10  Q    Okay.  And FDA in its recent table from last week

11  reports the same value, rounded up to .11 for American

12  lobster, you did not use that value in your report, correct?

13  A    I did not have that -- that table for my report, no.

14  Q    This is FDA's value here, American lobster, .11.

15       Okay.  Instead you reported a slightly higher number

16  that you say includes other FDA data, correct?

17  A    Right, which I -- I believe that's 171 part per billion.

18  Q    Okay.  Now, this also excludes the background number for

19  lobster reported by the State of Maine; is that correct?

20  A    The State of Maine -- I'm not aware of what you're

21  referring to.

22  Q    Okay.  The State of Maine reports a reference value for

23  mercury in American lobster of .05, or about 50 nanograms per

24  gram.  Are you aware of that?

25  A    I'm -- I did not report it here.

1    Q    Let me show you Plaintiffs' Exhibit 84, and this is from

2    the lobster fishery closure, the State's document.

3         And it states --

4    A    Okay.

5    Q    -- that, for monitoring contaminants in Maine lobster,

6    the State relies on data from the U.S. EPA National Coastal

7    Condition Assessment program, and you see the values here,

8    data from the 2010 NCCA revealed that background mercury

9    levels in Maine lobster were well below the Maine CDC action

10   limit that would warrant a consumption advisory, averaging 51

11   nanograms per gram.  Do you see that?

12   A    Yes, and this is comparing apples and oranges.  Once you

13   mentioned that this is the National Coastal Condition

14   Assessment, this is an entirely different data set than what

15   the Study Panel has collected.

16        In fact, if you're going to make this comparison -- and

17   this is based on very limited number of samples -- but you've

18   got the 51 nanograms per gram here, and then you've got Odom

19   Ledge at 134.  The 134 is a much lower number than what the

20   Study Panel has -- has reported for the closed area.

21        So these are perhaps -- well, these are composite

22   samples.  It's -- it's a different collection, and we don't --

23   we don't know the detail behind it.

24   Q    Okay.  So the State reports a background concentration

25   in lobster of 51 nanograms per gram.  You did not include that

1   value in your figure; is that right?

2   A    That's correct.

3   Q    Okay.  Let me show you the data summary that I believe

4   you were referring to earlier.

5        Now, is this the concentration data table that you say

6   supports the FDA number that you included?

7   A    I have -- I've seen this before.  This may be in here.

8   Q    Okay.  Well, let me show you -- this is Defendants'

9   Exhibit 517, and if you see the hyperlink at the bottom here,

10  I'll show you this matches the hyperlink at the -- the

11  reference in your table.

12  A    Okay.

13  Q    Okay?

14  A    Hm-hmm.

15  Q    So just as a code here, you see it ends --

16  A    Right.

17  Q    -- with 191007 in the hyperlink.  Okay?

18  A    Yes, that's correct.

19  Q    Okay.  Now, in your table, that's the same reference; is

20  that right?

21  A    Yes, that's correct.

22  Q    Okay.  So you said this reports -- I forget how many --

23  170-some American lobster; is that right?

24  A    No, um, 171 is the mean concentration.  It's, um, 71

25  plus -- yeah, it's 71 plus nine.

1    Q      Okay.

2    A      It's a data set of 80.

3    Q      So --

4    A      And I -- and I believe that I confirmed that with the

5    lobster reported in Dr. -- in the paper that Dr. Fisher is a

6    coauthor of, the Karimi and Fisher paper.

7    Q      So let me show you the table here.  This is Page 75 of

8    Defendants' 517, and this reports some species as American

9    lobster and some species as lobster, no designation, and then

10   as you get to the bottom, it reports some species as spiny

11   lobster.  Do you see that?

12   A      I do.

13   Q      Okay.  So for the number that you used --

14   A      Could we got to -- excuse me.  Could we go to the next

15   page?

16   Q      Sure.  The next page has, I think, only spiny lobster.

17   A      Yes.  And if you noticed, all the spiny lobster are

18   listed together; in other words, you've got -- you've got

19   American lobster, and you've got lobster that does not say

20   American lobster, but if it's not designated as American

21   lobster, it's assumed to be American lobster.

22   Q      So what -- for your -- for the number that you used, you

23   combined the values of American lobster and the ones that just

24   say lobster.

25   A      That's correct.

1    Q    Okay.  And the exhibit that I showed you earlier, FDA's

2    summary of this table, FDA does not do that, it reports them

3    separately, correct?

4    A    On that page -- on that page, it reports them

5    separately, yes.

6    Q    FDA reports them as American lobster and lobster,

7    species unknown.

8    A    That's what's reported.

9    Q    Dr. Connolly's report -- let me show you a page from

10   Dr. Connolly's report.  This is Joint Exhibit 45.

11        And Dr. Connolly's report also reports this background

12   data for lobster in Maine of 50 nanograms per gram wet weight.

13   Do you see that?

14   A    Yes, I do.

15   Q    Okay.  Let me show you Plaintiffs' Exhibit 174, which is

16   a data summary of the data reported in Defendants' 1226, the

17   FDA report ranking mercury concentrations in the top 20 most

18   consumed species.

19            MR. COLANGELO:  Your Honor, I'd like to move this

20   document into evidence.

21            THE COURT:  And that was again?  I'm sorry.

22            MR. COLANGELO:  It's Plaintiffs' 174.

23            THE COURT:  Any objection to Plaintiffs' 174?

24            MR. SCHUTZ:  No objection to using it as a

25   demonstrative.

1      MR. COLANGELO:  I'd like to move it into evidence,

2 Your Honor, as a data summary.

3      THE COURT:  Any objection to its admission as a data

4 summary?

5      MR. SCHUTZ:  No objection.

6      THE COURT:  It's admitted.

7 BY MR. COLANGELO:

8 Q    In this figure, Dr. Keenan, now this reports the top 20

9 most consumed species -- commercial species listed by FDA in

10 blue, and then the species in green are the Penobscot species.

11 Do you see that?

12 A    Um -- excuse me -- yes, I do.

13 Q    Okay.  And this includes the black duck from the lower

14 Penobscot River, which was not in your figure, and the eel

15 from the Penobscot River, which was not in your figure; is

16 that right?

17 A    Well, the eel no one consumes, and the black duck are

18 not a fish.  Yes, they're not in my figure.

19 Q    And this includes a slightly different number for

20 lobster, but that's because of the adjustment that you made to

21 that number to account for the calculations you included for

22 the missing data.

23      But if we used your number, it would be about here, at

24 .273, instead of where it is at .31.  Do you see that?

25 A    I do see where -- you know, where the 273 should have

1    appeared.

2    Q     Okay.  And this is the number reported by the Study

3    Panel reflected here in green.

4    A     But, again, it's lobster tail, and we're not reporting

5    lobster tail from the FDA numbers, um, fine.

6    Q     So you'll see that the lobster tail is higher than every

7    species in FDA's top 20 consumed species, except the albacore

8    tuna and the fresh tuna.  Do you see that?

9    A     I -- yes, I see that.

10   Q     Okay.  And if we just used your number, which is 273,

11   the same would be true, correct?

12   A     Ah, that's correct.

13   Q     Okay.  Now, albacore tuna, FDA advices pregnant women

14   and children to limit their consumption to no more than

15   6 ounces a week; is that right?

16   A     That's correct.

17   Q     Okay.  And the eel and duck are higher than all of the

18   other top 20 consumed commercial species; is that right?

19   A     Ah, that's correct.  Now, my -- my assumption here --

20   and maybe you can clarify -- these, of course, are -- are

21   nationally-consumed species.  These are not Maine-specific

22   data, correct?

23   Q     Correct.  This is FDA's nationally-reported data.

24   A     FDA's national, correct, data.  And as you mentioned,

25   um, the tuna albacore is the -- with the consumption advisory

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2653

1    on consuming 6 ounces per week, and, um, my assessment was

2    based on the consumption of about that amount of lobster per

3    week because 52 lobster meals a year is essentially at that

4    rate of consumption.

5         Um, so I think what's important here is that you put

6    exposure into perspective, and that's -- all of these

7    different fish species -- this is like really a -- a

8    comparison of apples and oranges unless you have that exposure

9    information there.

10   Q    So let me show you your figure.

11   A    Yes.

12   Q    This is Defendants' 1087.  Do you have the exposure

13   information here?

14   A    No, these are mean -- these are mean mercury

15   concentrations.

16   Q    And is this limited to Maine consumption or Maine

17   species?

18   A    No, no, it isn't.

19   Q    Okay.

20   A    But it's -- it's representing data from a variety of

21   sources, not just limited to U.S. EPA.  So I would attest it

22   to be a more reliable data source.

23   Q    And just to indicate the species at the far end of your

24   figure, Defendants' 1087, shark and swordfish, these are two

25   of the do-not-eat species; is that right?

1    A      That's correct.

2    Q      Okay.  You testified on Friday, you referred to fish

3    consumption advisories elsewhere in the state; is that right?

4    A      Ah, you'd have to refresh my memory.  I'm -- I'm not

5    recalling.

6    Q      You presented two figures, one referred to freshwater

7    consumption advisory and one referred to marine fish

8    consumption advisories --

9    A      Oh.

10   Q      -- in the state of Maine.

11   A      Yes, correct.

12   Q      Okay.  And you testified that there are a lot of

13   consumption advisories for a lot of other fish throughout

14   Maine.

15   A      That's correct.

16   Q      Okay.  Now, notwithstanding those advisories, isn't it

17   true that until February of this year, there was no health-

18   related closure of the lobster fishery in the northern

19   Penobscot Estuary?

20   A      Right, there was no closure of the -- of the lobster

21   fishery.

22   Q      And that closure of the lobster and crab fishery was

23   based on the data reported by the Study Panel; is that

24   correct?

25   A      Ah, that's correct.

1    Q     Okay.  So the figures you showed on Friday indicating

2    other advisories, none of those applied to lobster and crab in

3    the northern estuary, correct?

4    A     That's correct.  I believe what I had shown was -- was a

5    freshwater fish -- no, let me back up.

6          That was a freshwater fish consumption advisory for

7    Maine's lakes, rivers, ponds, and streams, and then I showed

8    marine fish advisories, which included a variety of species.

9    Q     And neither of those advisories restricted consumption

10   of lobster or crab from the northern Penobscot Estuary,

11   correct?

12   A     Well, it's a closure, so it does -- it does restrict

13   consumption.

14   Q     The advisories that you referred to, putting aside the

15   State's February closure --

16   A     Right.

17   Q     -- the advisories you referred to --

18   A     I think the advisories that I had cited on there, um,

19   that we -- that were shown did not include the -- the closure

20   of the lobster fishery.

21   Q     And the same is true for the black duck; is that

22   correct?  Those advisories did not apply to black duck in

23   Mendall Marsh, correct?

24   A     I was not showing a duck advisory, right.

25   Q     Okay.  So prior until -- prior to September of 2011,

1    when Inland Fisheries and Wildlife posted the black duck

2    warning, there was no consumption advisory for black duck in

3    Mendall Marsh, correct?

4    A      That's my understanding, right.

5    Q      Okay.  And that decision was based on the data reported

6    by the Study Panel; is that right?

7    A      Um, I would have to look at that.  I believe that that's

8    -- that that's the case.

9    Q      You've reviewed the data underlying the black duck

10   monitoring data before; is that correct?

11   A      Yes, that is correct.

12   Q      Okay.  And --

13   A      But not for the purpose of establishing a consumption

14   advisory.

15   Q      You've looked at the data that was submitted to the

16   State to recommend the closure that the State subsequently

17   acted on -- I'm sorry -- to recommend the warning that the

18   State subsequently acted on in issuing the black duck

19   consumption warning, correct?

20   A      No, I don't believe so.  I don't -- I don't know what --

21   for what purpose that may have been submitted.  I was not

22   looking at it from the subject of addressing human health

23   concerns.

24   Q      Did you look at the data regarding black ducks in

25   Mendall Marsh that was submitted to state Inland Fisheries and

1    Wildlife?

2    A    I did.

3    Q    Okay.  And did you comment on that data at the time that

4    it was submitted to Inland Fisheries and Wildlife?

5    A    I did.  I commented on that data, but I did not comment

6    in any context of a black duck consumption advisory.

7    Q    Okay.  To your knowledge, the black duck -- there was no

8    warning against consumption of black duck in the state prior

9    to the State's decision in September of 2011; is that right?

10   A    That's correct, to my best knowledge, yes.

11   Q    Okay.  Let me show you Plaintiffs' Exhibit 9.

12        Before I do, you -- you recall a time in 2011 when the

13   Study Panel sought to submit data regarding black ducks to the

14   State so that it could issue a consumption warning; is that

15   right?

16   A    Um, the last part of your -- your sentence, so it could

17   issue a consumption advisory, that was not to my

18   understanding.  I understood that the Study Panel was

19   submitting data to the State.

20   Q    Okay.  So your understanding at the time was that the

21   Study Panel was submitting data on methylmercury in black

22   ducks to the State, but you did not -- you did not have any

23   understanding of the purpose of that submission.

24   A    That's correct.

25   Q    Okay.  And did Mallinckrodt retain you to offer an

1    opinion on the Study Panel's submission of the data to the

2    State?

3    A    Ah, yes, they asked me to review that preliminary data,

4    the preliminary report, and to issue a -- an opinion.  It was

5    really like a scientific paper, and I pointed out sort of the

6    limitations of, you know, what one could surmise from that

7    preliminary data and suggested that some further work be done.

8    Q    And the Study Panel made an interim finding related to

9    the black duck data that you were commenting on; is that

10   right?

11   A    Um, I don't remember whether if it was an interim

12   finding.  I remember there was a preliminary report --

13   Q    Okay.

14   A    -- that I commented on.

15   Q    And did you review that report prior to providing your

16   response?

17   A    Yes, I did.

18   Q    And did you provide a written response?

19   A    I provided a written response that I recall was in the

20   form of a letter.

21   Q    Okay.  I'd like to show you that interim finding from

22   the Study Panel and your response.

23   A    Okay.

24   Q    This is Plaintiffs' Exhibit 9.

25             MR. COLANGELO:  Your Honor, I'd like to move this

1    document into evidence with the exception of a two-page letter

2    from counsel attached to this document -- it's the last two

3    pages -- that defendants' counsel have advised that they

4    object.  So I'd like to move in this document, Plaintiffs' 9,

5    except for the last two pages.

6            THE COURT:  Any objection?

7            MR. SCHUTZ:  No objection, Your Honor.

8            THE COURT:  Plaintiffs' 9 is admitted, except for

9    the last two pages.

10   BY MR. COLANGELO:

11   Q    Okay.  And the first page of this document, it says,

12   decision of special master granting Study Panel's request on

13   interim finding on black ducks.  I'd like to show you the

14   Study Panel's interim finding and then your letter in

15   response.

16        So this document within Exhibit 9, this begins on Page

17   4, is this the Study Panel report that you reviewed?

18   A    Could we go to the next page, and so I -- it was -- it

19   was -- I remember it was a short report, but it was several --

20   at least several pages long.

21   Q    Yeah.  This is --

22   A    I believe this is it.

23   Q    Okay.  This is --

24   A    Yes.

25   Q    -- the second page of the report.

1    A      Yeah.

2    Q      It includes the sampling sites and dates, and then the

3    third page of the report includes a discussion of biology and

4    the analysis of mercury in the black duck muscle.  Do you see

5    that?

6    A      Yes, and I remember it was on the individual black

7    ducks.  There were about seven or eight black ducks, I think.

8    Q      Okay.  And then this is the fourth page that looks at

9    mercury in blood and muscle.  And now the fifth page includes

10   a regional comparison, comparing the ducks in Mendall Marsh to

11   ducks in Frenchman Bay.  Do you see that?

12   A      Ah, yes.

13   Q      Okay.  So is this the report that you reviewed prior to

14   writing your response?

15   A      Ah, yes, it is.

16   Q      Okay.  And were you aware that the issue was whether the

17   State should be informed about the high levels of

18   methylmercury in the black ducks in the marsh?

19   A      No, I don't believe so.

20   Q      Okay.  Let me show you the first page of the interim

21   finding, and this is the document you responded to.  It

22   includes a summary of the sampling and a summary of the

23   mercury concentrations in the duck, and it states, these

24   levels are over three times greater than the Maine action

25   level for methylmercury in fish muscle.  To put these data in

1   perspective, if the screening levels for fish muscle developed

2   by the State of Maine and the U.S. EPA are applied to duck

3   muscle, the mercury concentrations in black duck muscle from

4   Mendall Marsh may warrant limits on consumption, especially

5   for the most sensitive human populations, and it goes on to

6   say, such a determination would be made solely by personnel

7   from the relevant Maine state agencies.  Do you see that?

8   A     Yes, I do.

9   Q     Okay.  And in your letter in response, did you comment

10  on the comparison between methylmercury levels in the ducks in

11  Mendall Marsh and the ducks in the reference site, Frenchman

12  Bay?

13  A     Um, I believe I did.  Um, my recollection is that I was

14  pointing out that one would need to look at different

15  characteristics of that Frenchman Bay, you know, reference or

16  collection area and -- and issues like that.  I was looking at

17  it more from a -- you know, a scientific paper and what --

18  what additional data and analysis might be needed before one

19  could conclude certain things.

20  Q     Okay.  So looking at this figure, this is from Page 5 of

21  the interim finding submitted to the State, and this is Figure

22  4.  It includes a bar here for the total mercury in the blood

23  from the black ducks in Mendall Marsh and then a comparison to

24  Frenchman Bay.  Do you see that?

25  A     I do.

1  Q     Okay.  And the text above this figure says, the average

2  total mercury concentration in duck blood from Mendall Marsh

3  was an order of magnitude greater than found in ducks from

4  Frenchman Bay.  Do you see that?

5  A     Ah -- excuse me -- I do see that, yes.

6  Q     Okay.  And an order of magnitude is a tenfold increase,

7  correct?

8  A     Ah, that's correct.

9  Q     Okay.

10 A     However, can we go back to that?

11 Q     Sure.

12 A     Again, um, I'd have to see the number of samples and

13 things, but if we look at the uncertainty bounds here, this is

14 a huge range, the .81 plus or minus .52.  So, in other words,

15 this is -- this is down to around, what, .29, and then if we

16 take the .08 plus or minus .23, we're up to about .31.

17       So with those broad uncertainty bounds, even though it

18 looks impressive when you look at it on a graphic, it's not

19 entirely clear that we actually have significant differences

20 here.

21 Q     And let me show you your letter in response.  This is

22 also an attachment to Plaintiffs' Exhibit 9.  Is this the

23 letter that you wrote in response to this interim finding by

24 the Study Panel?

25 A     Ah, yes, it looks like it is.

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2663

1    Q    Okay.  And now turning to the last page of your letter,

2    you say, the data doesn't show that the ducks are uniquely

3    elevated compared to the ducks in Frenchman Bay.  Let me see

4    if I can find that.

5         I'm sorry.  It's on the prior page.  This is now Page 2

6    of your letter.

7    A    Okay.

8    Q    And it states, even under a rebuttable presumption that

9    the data are reflective of the sampling locations, the

10   comparison between the mercury levels in ducks collected at

11   Mendall Marsh and Frenchman Bay do not demonstrate that the

12   Mendall Marsh ducks are uniquely elevated with mercury.  Do

13   you see that?

14   A    Ah, yes, I do.

15   Q    Okay.

16   A    And I was pointing out that the bioavailability of

17   mercury in the environment is highly dependent upon the

18   biogeochemical characteristics of the specific habitat and the

19   habitats that you're comparing, and without further

20   information, I couldn't tell whether the reference location

21   was an appropriate reference location because, you know, it

22   should have been the same type of marsh environment and all of

23   that type of thing.

24   Q    Okay.  And looking at the interim finding today, is that

25   still your view, that the data do not show that the levels in

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2664

1    the ducks in Mendall Marsh are uniquely elevated compared to

2    the levels in Frenchman Bay?

3    A      Well, I wouldn't go back and look at these data.  Are

4    you -- is your question given current data?

5    Q      Well, I'll ask both.  Is your question (sic), given

6    current data, that the levels in Mendall Marsh are not

7    uniquely elevated compared to the levels in Frenchman Bay?

8    A      No, based on -- based on current data, you know, um, I

9    wouldn't say that's the case.

10   Q      Okay.  So you would now agree that the levels in Mendall

11   Marsh are uniquely elevated compared to levels in Frenchman

12   Bay.

13   A      I would -- yeah, I would say that they are elevated,

14   yes.  But based on these data, I don't -- you know, I still

15   think that the -- this particular data set still suffers from

16   the same limitations that I pointed out back in 2011.

17   Q      You've testified on behalf of Mallinckrodt in various

18   other proceedings; is that correct?

19   A      Um, yes, I believe it was two proceedings -- the earlier

20   version of -- of this particular proceeding, and then on the

21   matter of the BEP hearing, before the Board of Environmental

22   Protection --

23   Q      And you've --

24   A      -- on the remedy at Orrington.

25   Q      Okay.  That's the --

1    A      The plant site.

2    Q      Right.  Okay.  So you're aware of a State cleanup order

3    relative to mercury contamination at the plant site in

4    Orrington, correct?

5    A      Yes, that's correct.

6    Q      Okay.  And the -- and the defendant, Mallinckrodt,

7    litigated that cleanup order, correct?

8    A      I believe so, yes.

9    Q      Okay.  And Mallinckrodt retained you for that

10   proceeding?

11   A      For the Board of Environmental Protection proceeding,

12   correct.

13   Q      And you filed written testimony during that proceeding;

14   is that right?

15   A      That's correct.

16   Q      Okay.  And in that proceeding, you made an argument

17   based on risks from traffic accidents; is that correct?

18   A      Ah, yes, that was part of my analysis.  My -- the major

19   part of my analysis was to look at, as I believe, was the --

20   the various remedies that were put out there to determine

21   whether there was any difference in human health risk between

22   the various remedies.

23         And I believe what I concluded was that each and every

24   one of the remedies was health-protective and you could not

25   use human health risk assessment as a determining criteria to

1  select the remedy.  In other words, they all passed, they all

2  were safe, they were all health-protective, so you had to look

3  at other matters

4  Q    Okay.  And then in looking at other matters, one of the

5  opinions that you offered was that cleaning up the site would

6  result in an increased incident of traffic accidents; is that

7  correct?

8  A    I -- I looked at transportation risks, which included,

9  um, fatalities and -- and also injuries.

10  Q    Okay.

11  A    Based on insurance industry data.

12  Q    And you offered an -- let me show you.  This is from

13  Plaintiffs' Exhibit 107.  This is your expert report in the

14  case.  Do you recall offering an opinion that the cleanup

15  alternatives would lead to more property damage from traffic

16  accidents?

17  A    I'd have to refresh my memory.  It sounds familiar, yes.

18  Q    Okay.  And do you recall offering an opinion that the

19  cleanup remedy proposed by Maine DEP was associated with the

20  highest anticipated incidence of death, ranging as high as

21  0.36 fatalities over the course of implementation from traffic

22  accidents?

23  A    Ah, that's correct, yes.

24  Q    And you also testified in that case that there are other

25  sources of mercury in Maine and that cleaning up this site

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

2667

1    would not make a difference in terms of health risk; is that

2    right?

3    A      Um, yes, but that was specifically in terms of -- of

4    additional impact to the river.  So what -- so the issue at

5    hand was, did -- would any one remedy be more effective than

6    others at reducing any residual mercury from -- from entering

7    the river environment.

8    Q      And one of the sources -- the additional sources of

9    mercury you talked about was atmospheric deposition; is that

10   right?

11   A      I believe atmospheric deposition and upstream sources,

12   yes.

13   Q      Okay.  And do you recall that you also testified in that

14   proceeding that the State of Maine itself was adding mercury

15   to the environment?

16   A      I don't recall that.

17   Q      Okay.  Do you recall an opinion you offered related to

18   compact fluorescent light bulbs?

19   A      I don't recall that either.  I think -- I -- I think I

20   had a -- it's possible in the beginning part of the report, I

21   remember looking at sources of mercury to the environment in

22   general, and I may have listed these other sources.

23   Q      Let me show you -- this is a page from Plaintiffs' 109,

24   which is your pre-filed rebuttal testimony.  Let me just show

25   you the first page.  Is this the pre-filed rebuttal testimony

1    you prepared in that case?

2    A      Could I see some more?  Yes, I believe it is.

3    Q      Okay.  Just to see if this refreshes your recollection

4    on Page 16 -- and this was from 2009 -- if you read the

5    statement at the bottom, you write, the State has also

6    undertake initiatives that add mercury to the environment.

7    The State has an aggressive program to promote the use of

8    mercury-containing -- get you the next page -- now Page 17 --

9    compact fluorescent light bulbs.  Do you see that?

10   A      Yes, I do.

11   Q      And does this refresh your memory about the opinion you

12   offered regarding compact fluorescent light bulbs?

13   A      Yes, now that you mentioned that it was rebuttal

14   testimony.  This was not in the main portion of my report.  It

15   was in response to, I guess, something that Mr. Littell must

16   have said.

17   Q      Okay.  And what you state here is that the State is

18   promoting fluorescent light bulbs.  There are an estimated

19   2.43 million light bulbs in Maine that combined contain a

20   total of 26.8 pounds of mercury.  Do you see that?

21   A      That's correct, yes.

22   Q      Okay.  And then you state -- you go on to state that if

23   these light bulbs are not properly disposed of and if they

24   break, this mercury is released into the environment; is that

25   right?

KEENAN - CONTINUED CROSS-EXAMINATION/COLANGELO

1   A     That's correct.

2   Q     Okay.  Now, did you have any data on how many compact

3   fluorescent light bulbs used in the State of Maine break?

4   A     I don't believe I -- I don't recall.

5   Q     Do you have any data on how much mercury has been

6   released from broken light bulbs in the State of Maine?

7   A     I don't -- I can't come up with that data right here

8   now, no.

9   Q     Was that data that you had before you when you offered

10  this opinion?

11  A     I don't recall.  I was -- believe this was from the

12  State of Maine's own data regarding use and disposal of

13  compact fluorescent light bulbs.

14  Q     You also opined in that proceeding that there was no

15  health risk from consumption of fish in the lower Penobscot.

16  Do you recall that?

17  A     In this particular proceeding?

18  Q     Yes.

19  A     Yes, what I recall is that I was -- again, was to

20  evaluate the various remedies, and the issue at hand was not

21  whether there was a health risk or not, but was any one remedy

22  any more effective than any of the other remedies at reducing

23  the risk from fish consumption in the lower Penobscot River.

24        And my answer to that was, no, they're all equally

25  effective.

1   Q     And do you recall that in reaching that opinion, you did

2   not consider background exposure to methylmercury when looking

3   at the risks from consuming Penobscot fish?

4   A     That's correct.  It didn't need to be considered

5   because, again, it was a relative risk comparison, so I was

6   looking at evaluating amongst the remedies and everything else

7   would be held constant.

8   Q     Do you recall that the Maine State toxicologist filed

9   written testimony disagreeing with your health risk

10  assessment?

11  A     I don't recall.  I recall he filed testimony.

12  Q     Okay.  Let me show you -- this is from -- this is

13  from --

14          MR. SCHUTZ:  Your Honor, I do object to this.  This

15  is -- looks like we're getting into undisclosed expert

16  testimony by someone who hasn't been called as a witness.

17  This is not admissible as a public record either.  If we're

18  going to have sworn statements by nonwitnesses, be cross-

19  examining based on those, I believe that that is improper.

20          THE COURT:  Mr. Colangelo?

21          MR. COLANGELO:  I'm asking about whether he recalls

22  the response to his opinion offered by the State toxicologist.

23  I'm not offering it for the truth of the statement.

24          THE COURT:  So you're offering it to refresh his

25  recollection only?

1           MR. COLANGELO:  Yes.

2           THE COURT:  For that purpose, the objection's

3    overruled.

4    BY MR. COLANGELO:

5    Q     Are you familiar with this document, which is the

6    pre-filed rebuttal testimony of Andrew Smith, State

7    toxicologist?

8    A     Um, I can't say that I am, no.

9    Q     Let me show you Page 3 and see if this refreshes your

10   memory.  He states, towards the top of this page, I have

11   reviewed Dr. Keenan's comparative risk assessment.  Do you see

12   that?

13   A     I see that, yes, hm-hmm.

14   Q     And he states, I believe his conclusion about

15   consumption of fish from the lower Penobscot -- his conclusion

16   that consumption of fish from the lower Penobscot will not

17   result in methylmercury intake above the EPA IRIS RfD is wrong

18   for the population we are most concerned with, the developing

19   fetus exposed to methylmercury by maternal fish consumption.

20   Do you remember that?

21   A     Um, vaguely, yes, hm-hmm.

22   Q     And do you recall that he also testified that it was

23   error for you to exclude background exposure to methylmercury

24   from other fish when looking at the health risk?

25   A     No, I don't, but, you know, the answer to this is it --

1    it really doesn't matter because all of the options that I was

2    evaluating in that assessment suffered from that same

3    limitation, if you will, so it was really a comparative risk

4    analysis between the remedies that were proposed for the site.

5    Q    So looking at just the discussion a little further down,

6    furthermore, Dr. Keenan's risk assessment did not include

7    background exposure to methylmercury from consumption of

8    store-bought fish such as canned tuna, haddock, cod, halibut,

9    or lobster.  You're saying you do not recall that criticism

10   from the State toxicologist?

11   A    Well, I can see it now.  Whether I recall it or not, I

12   see it now, but I think it's immaterial for the type of

13   assessment that was fit to its purpose.  You know, it's -- one

14   could have done that, but it would not have changed the

15   results of any of those assessments, you know, looking --

16   looking at -- I think there were four different remedies that

17   were proposed.

18   Q    Do you recall the State toxicologist's opinion that had

19   you done that, it would have changed your conclusion?

20   A    Um, I don't -- no, I don't -- I would disagree with

21   that, that it would change the conclusion.

22   Q    Let me show you Page 13 from the same exhibit, and he

23   states, Dr. Keenan did not consider background exposure to

24   methylmercury in his comparative risk assessment.  If he had

25   done so, he would have reported total exposures to

1   methylmercury above the EPA IRIS RfD.  Do you recall that?

2   A     I'm recalling it now, yes.  But I disagree with it

3   because I'd like to know on what basis would that have

4   exceeded the EPA reference dose.

5   Q     And in reaching your conclusions here in this case, you,

6   again, did not include background exposure to methylmercury in

7   setting your safe targets from fish consumption?

8   A     That's correct, but I used the same methodology that

9   Andy Smith has used when he developed the fish tissue action

10  level.  So what the State has done would suffer from that very

11  same criticism, if you will.  I don't believe it's valid, but

12  we -- we could have it apply there, as well.

13  Q     Your conclusion overall on health risk is that mercury

14  in the Penobscot -- that the levels of mercury in the seafood

15  studied here are safe for human consumption.

16  A     That's correct.

17  Q     Okay.  But you don't have an informed opinion about the

18  State's lobster fishery closure; is that right?

19  A     Um, to what -- to what respect?  I -- I understand that

20  it was -- it was closed as a response to, um, the screening

21  level values that the State had in its file or that the State

22  -- when the State applied a fish tissue action level to

23  lobster, they decided that they would close it for the purpose

24  of additional study.

25        Just -- and, again, that is -- that is a screening level

1   step in risk assessment.  They decided to investigate it

2   further.

3   Q    And are you aware that the State rulemaking document

4   announces -- the closure states that it's for the purpose of

5   -- that it's necessary to protect public health?

6   A    I -- you know, I didn't comment on that.  That was not

7   part of my opinion.  The State has various reasons for closing

8   the lobster fishery, one of which could be protection of brand

9   name, protection of -- or to study it further.

10       But, um, the State toxicologist believed -- was also --

11  I mean, the -- the Web site I know on the closure did say that

12  the lobster is still safe to eat.

13  Q    Do you have --

14  A    So --

15  Q    -- any basis to support the suggestions you just made

16  that the basis for the fishery closure is other than what the

17  State reported in the rulemaking announcing the closure?

18  A    Yes.

19  Q    What is --

20  A    The --

21  Q    -- that basis?

22  A    The Maine Department of Marine Resources web page that

23  was put out, I mean, earlier this -- this spring.

24  Q    Now, I'm showing you --

25  A    And it offered -- it had a FAQ sheet, and I recall that

1    it stated that they were taking steps to investigate this

2    further, but it reminded people that lobster consumption was

3    still safe.

4    Q    I'm showing you Plaintiffs' Exhibit 84.

5    A    Okay.

6    Q    Which is the rulemaking for the lobster fishery closure.

7    Have you seen this document before?

8    A    Hm, I may have scanned it.  I did -- it was really not

9    part of my opinion, but, yes.

10   Q    And it states here, this rulemaking would make permanent

11   the emergency rulemaking that was necessary in order to

12   protect public health due to the risk of mercury contamination

13   in lobsters and crabs found in the mouth of the Penobscot

14   River.  Do you see that?

15   A    I see that, and what that is talking about is they took

16   an emergency action.  They needed to go through a public

17   hearing and through rulemaking in order to make that emergency

18   action legal.

19        So I believe the closure is for a two or three-year

20   period.  Permanent doesn't mean for all time.

21   Q    Do you disagree with the State's closure of the lobster

22   fishery?

23   A    No, I don't have an informed opinion as to why the State

24   -- or what their reasons are.  I'm sure there are a number of

25   reasons, and -- but for the purposes of protecting health

1   risk, I do not believe it was necessary.

2   Q    So you disagree with the statement here that the closure

3   was necessary in order to protect public health.

4   A    That's correct.

5   Q    And what about the black duck warning, do you disagree

6   with the State's decision to post a black duck warning in

7   Mendall Marsh to protect public health?

8   A    No, I wasn't -- you know, again, I wasn't -- ah, my

9   opinion does not extend to why the State issues advisories or

10  why they don't.  The State has, you know, different --

11  different objectives, and they have to consider many things in

12  terms of whether to close a lobster fishery or whether to post

13  a black duck warning.

14       But we're talking about whether something is needed for

15  the purpose of protecting health risks involving, um, remedy.

16  In other words, is remedial action necessary to protect public

17  health, and, no, remedial action's not necessary to protect

18  public health.  It's very different.

19  Q    Asking just about the State's decision to post a warning

20  advising women of childbearing age and children not to eat

21  black duck from Mendall Marsh, do you disagree with that

22  decision?

23  A    I don't believe it was necessary for the purpose of

24  protecting public health, but the State would not have known

25  that at the time because they didn't do a food-specific

1    exposure assessment.  They simply applied the freshwater fish

2    tissue action level to black duck and said at a screening

3    level, this -- these levels are over the FTAL, so we'll post

4    the -- the warning.

5    Q    So one measure of unacceptable risk is whether the

6    levels exceed the State standard, and you disagree with the

7    use of that measure of unacceptable risk, correct?

8    A    Well, that isn't a measure of unacceptable risk.

9    Q    You disagree with the State's use of the State action

10   level to post warnings for black duck consumption and a

11   lobster closure to protect public health?

12   A    Well, that's -- that's not what I said --

13        (Interruption by the court reporter.)

14            THE COURT:  Wait, wait, wait.  Excuse me.

15   BY MR. COLANGELO:

16   Q    Let me rephrase it.  One measure of unacceptable risk is

17   whether the levels measured in foods people consume exceed the

18   State's fish tissue action level; is that correct?

19   A    No, it isn't.

20   Q    You disagree that that is an appropriate measure of

21   acceptable risk?

22   A    Yes, I do.

23   Q    Okay.  So do you disagree with the State's decision to

24   use that level to post a warning against consumption of duck

25   from Mendall Marsh?

1  A     No, and I -- I do not have an opinion as to the State's

2  action, so I can't disagree with it.  But what I am saying is

3  that it is not necessary to have that warning to protect

4  public health.

5  Q     And is the same true for the lobster fishery closure,

6  you don't disagree with the State's decision?

7  A     That's correct.

8  Q     To close the lobster fishery?

9  A     That's correct.

10 Q     But your view is that it is not necessary to protect

11 public health.

12 A     That's correct.

13 Q     Okay.  At what level would you deem it necessary to

14 close the lobster fishery to protect public health?

15 A     I would have to do an analysis to tell you that.

16 Q     Is that an analysis that you've done yet?

17 A     Um, the analysis that I've -- my analysis that's in my

18 expert report is informative on that matter, yes.

19 Q     At what level would you deem it necessary to close the

20 lobster fishery to protect public health?

21 A     Um, I believe the letter -- the level that I used in my

22 -- in my report, 510 nanograms per gram, I would use that as

23 the screening level to make a decision whether further action

24 was needed.

25 Q     Does that --

1    A    Whether further study was needed.

2    Q    Does that mean that at 510 nanograms per gram, you would

3    deem it necessary to close the lobster fishery to protect

4    public health?

5    A    I'm not in the business of closing fisheries or

6    determining whether that's appropriate.  A way of addressing

7    that might have been to issue a consumption advisory or it may

8    have been to -- to do what the State has decided to do, the

9    Department of Marine Resources to do more investigation at

10   that particular area to get their own samples of lobster.

11        I think the State -- the State Department of Marine

12   Resources wanted to -- wanted to look at the -- the Study

13   Panel data.  They looked at the National Coastal Assessment

14   data, and they wanted their own data because they saw the

15   discrepancy between the other two data sets.

16   Q    And speaking about black duck now, at what level seen in

17   the black duck would you deem it necessary to post a warning

18   advising people not to eat the black duck?

19   A    Again, I did not evaluate it for that purpose, but I

20   would use the screening criteria that I developed of the --

21   for black duck, and I would use that, um, as the basis of a

22   decision point whether further study or action were needed.

23   Q    But that doesn't mean that at that level, you would post

24   a warning for black duck; is that right?

25   A    Because I'm not in the business of posting a warning.

1    I'm not the state toxicologist.  I'm not the state bureau of

2    health or Centers for Disease Control.  They have other

3    considerations and other constituencies to which they're

4    beholden.  And I don't -- I'm not trying to second-guess the

5    action of the state toxicologist in that matter.

6    Q    So you have no opinion, then, on the State's lobster

7    closure fishery and black duck warning?

8    A    That's correct.

9            MR. COLANGELO:  That's all I have.  Thank you.

10           THE COURT:  Thank you.

11       Redirect?

12                        REDIRECT EXAMINATION

13   BY MR. SCHUTZ:

14   Q    Where to begin?  I think at the outset of your cross-

15   examination, Dr. Keenan, you were shown Plaintiffs'

16   Exhibit 10, this order from Special Master Calkins of

17   November 10, 2011.

18       Now, this order refers to factors applicable under

19   Superfund to evaluate multiple remedial alternatives?

20   A    Ah, I believe so, yes.

21   Q    Did you see anything in what I've just shown you or what

22   Mr. Colangelo showed you that had anything to do with

23   ecological risk assessment?

24   A    Ah, no, not at all.

25   Q    Are you aware of anything that would have prevented the

1    Study Panel from consulting with someone skilled in ecological

2    risk assessment?

3    A    No.  In fact, I would believe that they would be

4    compelled to do so, and to just -- to state that we're going

5    to totally ignore or we're not going to pay attention to U.S.

6    EPA eco risk assessment guidance does not seem to be a

7    reasonable approach, and I would be very surprised if the

8    Study Panel actually took that approach.

9    Q    And, in fact, are you aware of whether the Study Panel

10   consulted with anyone qualified in ecological risk assessment?

11   A    I am not aware that they actually made that

12   consultation.

13   Q    And EPA's guidance isn't just applicable to sites under

14   federal control.  Does the guidance set forth best practices?

15   A    It really does.  I mean, it's -- it's a resource, and

16   it's -- um, it's a resource for practitioners in eco risk

17   assessment.  It -- it is a tremendously useful document, and I

18   know that it's used at many, um, state sites.  It's used at --

19   for investigating many other questions about -- about

20   ecological impact.

21   Q    You were asked questions about your proposed target to

22   protect fish that eat other fish?

23   A    Yes, that's correct.

24   Q    And is it your view that we should even be getting to or

25   using a standard that is set based on theoretical impacts to

1  fish that eat other fish?

2  A    No, as I tried to point out in my direct testimony, I

3  think there's so much uncertainty using that approach.  We're

4  far better off looking at the predators.  We have information

5  on fish in the lower Penobscot, and there's no need to -- to

6  derive this dietary level.

7       I went ahead and derived a level, but I placed all types

8  of caveats on it, say that it was preliminary, it was to

9  produce something, um, because of what the Study Panel had

10  done.

11  Q    And you were asked questions about a chart in the Depew

12  paper?

13  A    Oh, yes, that's correct.

14  Q    Now, did you simply take that chart and import into your

15  analysis the values reported in that paper?

16  A    No, not at all.  In fact, um, what I did is I took the

17  studies that were reported in Depew, and I looked at each and

18  every one of those studies and looked at what the true effect

19  levels were, what doses had been tested, and used those in --

20  in my analysis, in my expert report.

21       I never went back afterwards and made a comparison

22  between what I said and what Depew said.  In other words, I

23  never went in to correct, um, the table in the Depew report.

24  I don't know whether those footnotes are relevant or not, or

25  whether they're -- they're correct or not.

KEENAN - REDIRECT EXAMINATION/SCHUTZ

2683

1    Q      So you haven't gone back to make any assessment of

2    whether the Depew-reported values of -- unbounded values are

3    consistent or not consistent with what you used?

4    A      Exactly.  I did not do that.

5    Q      Your evaluation was based on your independent

6    professional judgment?

7    A      Yes, it was an independent evaluation of the studies on

8    their own merit.

9    Q      And you were asked some questions about your standard

10   for including or excluding studies.  And didn't Beckvar, in

11   their paper, also suggest standards for including and

12   excluding studies?

13   A      Um, yes, she did.  She said that basically she -- you

14   should use data from studies using only paired effect and no

15   effect numbers, thereby -- she says, thereby ensuring that the

16   threshold for adverse effect for each study was bounded.

17          So I used, as a guiding principle, the analysis that she

18   had done and the methodology as set out in the Beckvar paper

19   and tried to follow that as closely as I could and -- and use

20   those ground rules.

21   Q      And there was some discussion earlier at this trial

22   about the fact that the Depew threshold to protect fish

23   reproduction boils down to one paper on walleye?

24   A      Yes, that's correct.

25   Q      Is that your understanding?

KEENAN - REDIRECT EXAMINATION/SCHUTZ

2684

1   A       The Friedmann paper, yes, correct.

2   Q       And does the Beckvar paper caution against setting a

3   threshold based only on one study?

4   A       Um, yes, it does.  In fact, it -- the highlighted text

5   here indicates, we caution against the approach of using

6   tissue residue information from only one study of a species

7   that closely -- that closely is related to the species of

8   interest.  It says that this approach severely sensors an

9   already limited database and forces one to rely exclusively on

10  the design, conditions, and endpoints of one or perhaps a few

11  experiments.  And it talks about the advantages of using the

12  paired data, the paired no effect level and low effect level

13  values from multiple studies and that it has an advantage of

14  including a variety of study designs and species to help

15  ameliorate interexperimental variability.

16          And that's exactly what I did.  I did not make those a

17  priori decisions and say, well, we need to exclude, for

18  instance, the mortality studies, or we need to exclude this.

19  We want to have a variety of endpoints; we want to have a

20  variety of laboratories, a variety of researchers; and we're

21  stuck with a variety of species that these tests have been

22  done on, which may or may not represent species in the

23  Penobscot River.  That's why it's a screening approach.

24  Q       And, again, does this statistical approach that's

25  described in the Beckvar paper prevent results from any one

1    study from unduly altering the derived threshold?

2    A    Um, yes, it does, and then I -- I verified that by doing

3    my own sensitivity analysis of -- of sequentially removing a

4    study one at a time and putting them back in and saying that

5    the method is stable.  It does not depend upon the results of

6    any one study.

7         So, you know, you -- one can quibble with whether a

8    given study was in or not, but at the end of the day, it

9    doesn't have a large bearing on the -- on the effects -- or on

10   the -- on the results, I should say.

11   Q    Any more so than would looking at a study on some

12   species that may be very unrelated to the species of concern

13   in the Penobscot?

14   A    Well, that's -- that's correct.  In fact, um, the --

15   many of these species are heavily weighted toward freshwater

16   species, and, um, you know, it's generally thought that the

17   marine species, saltwater species, are more resistant to the

18   effects of methylmercury, and I believe that comes out even in

19   the Depew paper, um, where they mention that Depew tried to

20   eliminate the marine species from her -- from the -- his

21   comparison because they wanted to derive a level as low as

22   they could get.

23        They ultimately weren't successful at doing that, but

24   it's just showing the need for -- for using a variety.

25   Q    Now, were all of Mr. Colangelo's questions related to

KEENAN - REDIRECT EXAMINATION/SCHUTZ

2686

1  the threshold that you derived to -- to protect fish-eating

2  fish?

3  A     That's correct, I believe so.

4  Q     Let's look again at Defense Exhibit 1021, and this is

5  the slide we talked about earlier concerning the threshold to

6  protect fish health?

7  A     This is to protect -- yes, this is to protect fish

8  health.

9  Q     Now, in reaching a conclusion concerning risk to fish in

10  the Penobscot, are you relying solely on the threshold effects

11  level you derived statistically?

12  A     No, I'm -- I'm relying upon the -- really the

13  Sandheinrich and -- and Wiener, um, range between 500 and 800

14  and the 500 being the --

15  Q     500 and 1,200?

16  A     500 to 1,200, rather, yeah.  500 to 1,200.  Um, the 500

17  value being at the lowest end of that range, and that's the

18  value the Study Panel had picked.  Um, keep in mind that the

19  Sandheinrich and Wiener range includes some of those effects,

20  like biochemical and behavioral, which, um, the Study Panel

21  itself has said is -- are not easily transferable or

22  interpretable in terms of effects on populations, and that's

23  also the opinion of best practices in ecological risk

24  assessment, that you can't interpret those.

25          But even -- even given that, that range, we find these

1    Maine species are -- in the Penobscot are below that range.

2    Q    Has anything Mr. Colangelo discussed with you altered

3    your opinion in that regard?

4    A    No, it hasn't.

5    Q    Move on to human health, and you were asked some

6    questions about the reference dose and the U.S. CDC screening

7    value -- dietary screening value.  Defense Exhibit 1070 is a

8    depiction we talked about on Friday.

9         What's the point of putting the reference dose in

10   context?

11   A    To point out that it is the most conservative

12   toxicological criteria for methylmercury used anywhere in the

13   world, and so when you're using the U.S. EPA reference dose

14   for screening-level purposes, it is the most conservative

15   value that's out there that's been used by any health or

16   regulatory agency.

17   Q    Now, are you proposing that for purposes of screening

18   risk in the Penobscot, we use the U.S. CDC minimal risk level?

19   A    No, I'm not.

20   Q    And did you?

21   A    No, I didn't.  I -- I'm not proposing it; I didn't use

22   it; um, I'm sticking with the U.S. EPA value for the

23   screening-level analysis that I did.

24   Q    Now, are you proposing that we use the World Health

25   Organization or European Food Safety Administration or Health

1  Canada screening values for purposes of assessing risk?

2  A    No, I'm not.

3  Q    But if you had, the result would be?

4  A    The result would -- the results would be larger, they

5  would be greater than -- um, than the risk-specific

6  concentrations that I had derived.  Had I used the Canada or

7  the European values, they'd roughly have been twofold higher.

8  If I had used the U.S. CDC number, it would be -- it would

9  have been three times higher.

10 Q    You were asked some questions about the blood mercury

11 level that relates to the reference dose or from which the

12 reference dose is derived.  Let me show you Page 8 from

13 Plaintiffs' Exhibit 123.  This document is entitled

14 Toxicological Effects of Methylmercury, National Research

15 Council.

16 A    Yes.

17 Q    Are you familiar with this document?

18 A    Yes, I am.  It's also known as the National Academy of

19 Sciences' report on methylmercury.

20 Q    And --

21 A    There's a copy right at the bottom, NAS.

22 Q    And what blood mercury level is the basis -- the

23 proposed basis for the reference dose as reported in this

24 document?

25 A    Well, the 58 parts per billion, which was the level at

1   the lower confidence-bound or the benchmark dose model, so the

2   $BMDL_{05}$ is 58 parts per billion.

3   Q    And in Footnote 7 in this document, reports the BMDL of

4   58 parts per billion is calculated statistically and

5   represents the lower 95 percent confidence limit on the dose

6   or biomarker concentration that is estimated to result in a

7   5 percent increase in the incidence of abnormal scores on the

8   Boston Naming Test.

9   A    That's correct.  That's long and involved.  There's a

10  lot of words in there, but that was a -- one test in a

11  psychological battery of tests that were administered to

12  children.  And so that's what that's reporting.  That's the --

13  that's the adverse effect.

14  Q    And how does 58 parts per billion blood mercury level

15  relate to the reference dose?

16  A    Well, the 58 parts per billion is ten times higher than

17  the blood level associated with the reference dose, which is

18  5.8 parts per billion.

19  Q    And you were also shown Defense Exhibit 708, which is a

20  document -- an IRIS document from U.S. EPA.  Are you familiar

21  with this document?

22  A    Yes, I am.

23  Q    Let me turn to the second page of the document and ask

24  you to comment on the oral reference dose summary in the

25  middle of the page.  What is this showing?  Or if you would

1    like, I could ask a more specific question.

2    A    Well --

3    Q    What does UF mean?

4    A    Oh, UF is uncertainty -- is uncertainty factor, which is

5    the same thing as safety factor.  And so -- so you wanted me

6    to comment on the paragraph or the --

7    Q    Well, can you comment on the daily intake rate that's

8    referenced here?

9    A    Um, yes, the -- the daily intake rate here is the --

10   what this showing is the --

11   Q    Well, let me ask you this, Dr. Keenan.  What's the daily

12   intake rate associated with the reference dose?

13   A    That daily intake is .1 micrograms per kilogram of body

14   weight per day.  Um, they have it expressed in these units in

15   milligrams per kilogram day, and so -- so that's the intake

16   rate associated with the reference dose.

17        Um, but because we're trying to protect, um, an unborn

18   child, you have to convert that -- we need to have a maternal

19   intake rate, and so what's expressed here is the maternal

20   intake rate, again, this is in micrograms per kilogram day in

21   this case, so it's .857 to 1.472 micrograms per kilogram day.

22   Q    So, again, this reflects the fact that the reference

23   dose builds in a tenfold margin of safety?

24   A    It does, yes.

25   Q    You were shown some concentrations by Mr. Colangelo from

1  Joint Exhibit 85, Bureau of Health document, associated with

2  methylmercury.  Do you recall that?

3  A      Ah, yes, hm-hmm.

4  Q      And, specifically, the .65 concentration and the .2

5  concentration?

6  A      Yes, hm-hmm, correct.

7  Q      What's the mean concentration in swordfish available in

8  the U.S. market?

9  A      Oh, I believe the mean concentration is somewhere about

10  1 part per million, maybe -- maybe higher.

11  Q      The State of Maine suggests that .65 -- .65

12  concentration here.  Do you see that?

13  A      Yes, I -- I see that.

14  Q      Why aren't our hospitals full of people who ate

15  swordfish for dinner last night?

16  A      Well, again, it -- this is showing the conservative

17  nature of this.  This is for the purpose of developing an

18  advisory on -- on consumption -- of fish tissue consumption.

19         We're not seeing it because exceeding that level doesn't

20  mean we have a health risk.  It -- it -- there is that

21  adequate -- or there's a large margin of safety between, um,

22  the reference dose and any indication that there is a health

23  effect.

24  Q      Is the State's fish tissue action level based on a

25  consumption of 8 ounces per week of a food item?

1    A      Ah, yes, it is.

2    Q      In your judgment, is it reasonable to assume for

3    purposes of assessing risk that anyone would eat 8 ounces

4    of -- per week of black duck from only Mendall Marsh?

5    A      No, it would not be reasonable at all whatsoever.

6    And -- I mean, with -- there are bag limits on black duck.

7    There's -- Mendall Marsh has a very limited population of

8    black duck to begin with.  We would exterminate that

9    population if we had those types of consumption rates for any

10   length of time.

11   Q      And is it reasonable to assume that anyone is eating

12   8 ounces per week of eel from the Penobscot River?

13   A      No, we have -- we have no evidence that anyone is

14   consuming eel at any appreciable rate, if at all.

15   Q      And is that, in effect, what the Study Panel is asking

16   the court to assume by using the .2 part per million screening

17   value?

18   A      Well, that would logically follow, yes.  That -- that

19   would be the assumption there, which, um, I just don't believe

20   is -- is appropriate in terms of evaluating the need for a

21   remedy.

22   Q      And did you go through and look for any available

23   information on actual consumption rates that might be used to

24   assess actual exposure to the food items of concern in the

25   Penobscot?

1   A     Yes, I did.

2   Q     Let me show you Defense Exhibit 1081 and ask if you can

3   remind us what -- what this figure is showing.

4   A     Okay.  What this is showing, um, this goes back to the

5   paper by Dr. Knobeloch, which was an actual survey of men --

6   excuse me -- of Maine women of childbearing age and how many

7   meals did they consume over the course of a year.

8         And so from that survey of Maine women, we had a mean

9   number of shellfish meals -- total shellfish of 17 per year,

10  versus what I assumed in this Penobscot River assessment of

11  52 meals per year.  And by the same token, from her paper, she

12  had the mean number of -- of sport-caught meals at 11 meals

13  per year, and I assumed essentially double that amount, 22.6

14  meals, in my assessment, to arrive at a screening level which

15  would be safe for consumers.

16  Q     So does this give you confidence that your assessment is

17  reasonably conservative?

18  A     Yes, it does.  It's good to have data like this that

19  helps back up the -- the assumptions that I used and the data

20  that I used in my assessment.

21  Q     You also testified to the extent to which fish in

22  pristine water bodies in Maine, fish populations in pristine

23  waters -- water bodies in Maine exceed .2 parts per million?

24  A     Ah, yes.

25  Q     Now, if we used .2 parts per million to screen whether

1    we pursue remediation, to what extent would we be pursuing

2    remediation projects in the state of Maine?

3    A    We would be pursuing remediation practically everywhere

4    because we have -- we have fish in excess of the .2 part per

5    million, or 200 part per billion.  So it does not serve as a

6    useful screening tool.  It does not serve as a useful

7    determinative of whether remedial action needs to be taken.

8    Q    Is Maine DEP, to your knowledge, pursuing plans for

9    remediation at all lakes and rivers that have fish populations

10   over .2 part per million?

11   A    No, certainly not.

12   Q    You were asked about fish consumption guidelines and

13   whether lobster's subject to a fish consumption guideline?

14   A    Yes, that's --

15   Q    Do you recall this exhibit, Defense Exhibit 576?

16   A    Yes, that's correct.

17   Q    And you can see that it's got a date of June 3rd, 2009,

18   a revision date?

19   A    That's correct, yes.

20   Q    And on the next page of the document, does this

21   advisory, in fact, apply to fish and shellfish?

22   A    It does.  It -- it includes shellfish, which includes --

23   which lobster would presumably be a shellfish and would be

24   included under this.

25   Q    You mentioned a document on the State's Web site.  Let

1    me show you Defense Exhibit 575.  Are you familiar with this?

2    A    Ah, yes, I am.

3    Q    Is this the document that you were referring to earlier?

4    A    Yes, it is.  This was the Web site FAQ sheet that I was

5    referring to, and where it points out that the department

6    believes immediate action is warranted as a precautionary

7    measure.  And it talks about the State collecting more data

8    over the course of the two-year period, and it -- exactly,

9    that's -- that's what I was referring to.

10        And lower -- down below, this is where the state

11   toxicologist has given his opinion that consuming lobsters

12   from the closed area is still a safe thing to do.  They're

13   still safe to eat.  But he just, in the interest of

14   precaution, advised that sensitive populations limit their

15   consumption from the area.

16   Q    How -- how is it possible for the state toxicologist to

17   conclude that lobster from the closed area are still safe to

18   eat, and yet they're -- they've closed that area?

19   A    Well, I don't know.  It's not based on a health-risk

20   decision, and it points right out, right down here, that there

21   is no lobster-specific action level, but the state

22   toxicologist used the fish consumption level for finfish, for

23   -- what I've been saying all along, from the freshwater

24   finfish, in making a determination for this action.

25   Q    And based on what you know about human health risk,

1    would you consider the State's decision to issue these kinds

2    of advisories and closures a risk policy decision?

3    A    I would -- yes, I would call it a policy decision.

4    Q    How many species of lobster, to your knowledge, are

5    consumed widely in the United States?

6    A    Two, American lobster and spiny lobster.  Spiny lobster

7    are down in Florida.

8    Q    You were shown a figure by Mr. Colangelo comparing

9    concentrations in black duck, eel, and lobster to the top 20

10   most consumed species.  Are black duck or eel among the top 20

11   most consumed species?

12   A    No, they're not, not on a statewide level, not a

13   national level.

14        I think -- I remember when I was preparing my report and

15   looking into eel consumption rates, there is a -- there is

16   some information nationally on eel consumption, and it's

17   something like one eel over the course of almost an entire

18   human lifetime.  That's the consumption rate that's -- that's

19   out there on a national basis.  So it's very rarely consumed.

20   Q    And so what's the point, then, of comparing to something

21   like canned tuna, comparing the concentrations found in the

22   Penobscot to concentrations of mercury in something like

23   canned tuna?

24   A    Um, the importance is to compare versus an activity -- a

25   similar activity that people engage in every day.  So people

1   are eating canned tuna all the time, and it's at similar

2   levels to -- at which the lobster -- similar mercury levels

3   that the lobster are at.

4        So in order to put that exposure from lobster into

5   context, comparing it with canned tuna seemed to be like a

6   reasonable way to go.

7   Q    And even in Maine, is that a reasonable comparison,

8   where lobster's prevalent?

9   A    Lobster's prevalent, but compared -- but canned tuna is

10  also heavily consumed.  If we go back to Knobeloch's study, we

11  find that the vast majority of seafood consumed was in that

12  all category.  The sport fish and the shellfish was a lower

13  number of meals per year than the bar -- the bar graph that

14  showed all fish from all sources was -- was a much higher

15  level.

16  Q    Is --

17  A    And that was primarily -- that was primarily tuna and

18  fish sticks.

19  Q    Obviously we're not cordoning off aisles in supermarkets

20  as hazardous waste sites and doing cleanups?

21  A    No, we're not even posting warning notices.

22  Q    You were asked some questions about testimony you gave

23  in litigation with the State over cleanup of the Mallinckrodt

24  plant site in Orrington?

25  A    That's correct.

KEENAN - REDIRECT EXAMINATION/SCHUTZ

2698

1    Q      Now, in that litigation, had Mallinckrodt proposed an

2    approximately hundred million dollar remedy?

3    A      They had.

4    Q      And so there was a dispute with the State over whether

5    the remedy proposed by Mallinckrodt was sufficient?

6    A      That's correct.

7    Q      And your role primarily was to evaluate whether any of

8    the proposed remedies were more or less protective as it

9    relates to consumption of fish from the river?

10   A      That's correct.  We wanted to see if any one remedy was

11   more protective than -- than another remedy for that purpose,

12   and I concluded that there were no differences.

13   Q      And is it your understanding that the Study Panel

14   themselves concluded that mercury from the plant site is not

15   posing a risk to fish in the river?

16   A      Yes, I believe that's correct.

17   Q      You were asked some questions about the risk associated

18   with traffic accidents or truck transit.  Is one of the issues

19   at that site the fact that the State was proposing to dig up

20   and haul an enormous quantity of material to Quebec, Canada,

21   for disposal?

22   A      That's correct.  And so those transportation risks came

23   about is if that landfill -- I can't remember the number of

24   it -- but if the landfill were dug up and put on trucks or

25   shipped by rail to Canada, those are actuarial statistics

1    based upon insurance and transportation industry data to

2    indicate the incidence of increased morbidity due to accident

3    or mortality due to death.

4    Q     And was there also a consideration of the likelihood

5    that there could be a spill in one of the small Maine towns

6    along that route?

7    A     Ah, I didn't include that.  That would be an additional

8    risk in addition to what I had calculated from transportation.

9    So there -- there could have been spills.

10         I didn't -- I didn't evaluate any additional mercury

11   exposure, for example, that could have occurred through, you

12   know, an accident or a spill in a Maine town.

13   Q     Dr. Keenan, how important is understanding exposure in

14   evaluating human health risk?

15   A     It's exceedingly important.  You can't do a risk

16   assessment -- you can't evaluate risk without exposure.

17   Q     And, to your knowledge, has anyone proposed any other

18   exposure information beyond what you've presented for the

19   species of concern in the Penobscot?

20   A     Ah, no, they haven't.

21   Q     In summary, what's the extent of the human health risk

22   posed by black duck, eel, or lobster in the closed area?

23   A     Um, these species don't present a risk to human health.

24   I believe there is no risk, ah, to human health from the

25   consumption of eel, black duck, or lobster from the study

KEENAN - REDIRECT EXAMINATION/SCHUTZ

1   area.

2           MR. SCHUTZ:  If I can have a moment, Your Honor?

3           THE COURT:  Yes.

4           MR. SCHUTZ:  I'd like to suspend my redirect, if I

5   may.

6           THE COURT:  That's fine.

7           MR. SCHUTZ:  Thank you.

8           THE COURT:  So we'll continue tomorrow?

9           MR. SCHUTZ:  Yes, please.

10          THE COURT:  All right.  Court will stand in recess.

11       (Proceedings concluded at 2:32 p.m.)

12                      CERTIFICATION

13      I certify that the foregoing is a correct transcript from

14   the record of proceedings in the above-entitled matter.

15

16

17   /s/ Julie G. Edgecomb                    June 23, 2014
     Julie G. Edgecomb, RMR, CRR             Date
18   Official Court Reporter

19

20

21

22

23

24

25