1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF MAINE

3    MAINE PEOPLE'S ALLIANCE          )
     and NATURAL RESOURCES            )
4    DEFENSE COUNCIL, INC.,           )
                                      )
5               Plaintiffs            )
                                      )              CIVIL ACTION
6                                     )
            vs.                       )     Docket No. 1:00-cv-00069-JAW
7                                     )
                                      )              BENCH TRIAL
8    HOLTRACHEM MANUFACTURING         )
     and MALLINCKRODT LLC,            )
9                                     )
                Defendants.           )

10

11                  VOLUME XVIII

12           TRANSCRIPT OF PROCEEDINGS

13        Pursuant to notice, the above-entitled matter came on

14   for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15   Chief District Judge, in the United States District Court,

16   Bangor, Maine, on the 26th day of June, 2014, at 8:37 a.m.

17   APPEARANCES:

18   For the Plaintiffs:              Mitchell S. Bernard, Esquire
                                      Aaron S. Colangelo, Esquire
19                                    Rachel E. Heron, Esquire
                                      Jared J. Thompson, Esquire
20
     For the Defendants:             Patricia H. Duft, Esquire
21                                    Sigmund D. Schutz, Esquire
                                      Jeffrey D. Talbert, Esquire
22

23              Julie G. Edgecomb, RMR, CRR
                   Official Court Reporter
24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

1

INDEX OF PROCEEDINGS

Page:

2

Testimony:   (see below)

3

INDEX OF WITNESSES

4

Page:

5

EDWARD C. GLAZA   (called by Mr. Talbert)

6

Continued Direct Examination by Mr. Talbert          3118
7   Cross-Examination by Mr. Thompson                    3141
    Continued Cross-Examination by Mr. Thompson          3195
8   Redirect Examination by Mr. Talbert                  3203
    Recross-Examination by Mr. Thompson                  3214

9

JOHN CONNOLLY   (called by Mr. Talbert)

10

Direct Examination by Mr. Talbert                    3218
11   Continued Direct Examination by Mr. Talbert          3259

12

INDEX OF EXHIBITS

13

(None for the record.)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Counsel present in open court.)

2          (Edward C. Glaza, having been previously duly sworn,

3     resumed the witness stand.)

4               THE COURT:  Good morning.

5               MR. TALBERT:  Good morning.

6               THE COURT:  You may proceed.

7                    CONTINUED DIRECT EXAMINATION

8     BY MR. TALBERT:

9     Q    Mr. Glaza, we left off yesterday afternoon with

10    short-term effectiveness and the primary balancing criteria.

11         Let's move on now to long-term effectiveness and -- and

12    permanence.  Can we pull up Defense Exhibit 1178.

13         And, Mr. Glaza, can you please explain for the court

14    what long-term effectiveness and permanence entails.

15    A    Certainly.  Long-term effectiveness pertains to how long

16    will the remedy continue to provide protectiveness, and during

17    that period, what level of effort, operation, maintenance, and

18    monitoring might be required?  For example, if you were to do

19    a removal action, take a volume of contaminated material to an

20    off-site landfill or a treatment facility, that would be

21    considered to have a high-level of long-term effectiveness and

22    permanence.

23         For Onondaga Lake, both the monitored natural recovery

24    and capping aspects of that project were considered to have a

25    high-level of long-term effectiveness and permanence because

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

3119

1    once the contaminated sediments were covered by a cleaner

2    layer, either through natural deposition or through placement

3    of an engineered cap, the opportunity for reexposure of that

4    material to the environment was minimal.

5         On the other hand, if you are looking at a site, say,

6    for instance, a contaminated groundwater site, where the

7    long-term effectiveness relies on your ability to continue

8    operating a pump and treat system, that would be considered to

9    have a lower-level of long-term effectiveness and permanence.

10        Similarly, a significant concern would be if only a

11   portion of a site was remediated or if potential upgradient

12   sources to a site were not addressed, so there was a

13   significant opportunity for recontamination after you

14   completed your remedy, that also would be considered to have a

15   -- a low-level of long-term effectiveness.

16   Q    What did you do to evaluate this factor?

17   A    I looked at the design -- excuse me -- the concept as --

18   as I developed it, and considered it within the framework of,

19   would this remedy likely -- be likely to achieve its goal, and

20   if it did, would it remain protective in the long-term?

21   Q    Did you also consider the ability to pilot-test this

22   remedy?

23   A    Um, I did.  The -- a significant concern -- sediment

24   traps would be very much considered an innovative technology.

25   I'm not aware of any contaminated sediment site where sediment

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

1    traps have been contemplated or implemented, so this would be

2    a very innovative approach.  And sediment traps really only

3    work at full-scale.  It would be very difficult to pilot-test

4    it to get to the level of confidence that you would normally

5    be required to proceed with a remedy.

6         A half-size sediment trap doesn't work.  It needs to be

7    full-size before it effectively captures the sediments, and --

8    and this would be a very significant concern because this is a

9    very complex system.

10        The Study Panel, um, had two years of data collection

11   and has spent another two years evaluating that data, and at

12   the end of that process, admittedly had a lot of uncertainty

13   regarding exactly what was happening in the river -- how large

14   the sediment pool is, what its behavior is, what's driving a

15   lot of that, um, and where that -- that mobile pool is at any

16   given point.

17        So to think that you can go out and design a very

18   large-scale change to that system, um, and think that you can

19   predict exactly how that river system is going to behave after

20   that change, would be very, very challenging, especially

21   without the ability to pilot-test it and -- and build that

22   level of confidence beforehand.

23   Q    And after evaluating long-term effectiveness and

24   permanence, what did you conclude?

25   A    Um, there was another aspect to the long-term

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

1    effectiveness and permanence, but overall, I concluded that it

2    would be unlikely to provide long-term effectiveness or

3    permanence.

4    Q     Is recontamination a problem that has occurred at other

5    sites?

6    A     Yes, it is.

7    Q     Can you explain some of the other sites you're aware of?

8    A     Um, yes.  There's -- again, this is one of those basic

9    tenets of sediment remediation that is very well documented,

10   both in the guidance documents, as well as in case-study

11   literature.

12         There was a -- a paper published a couple years ago by

13   Steve Nadeau and Mel Skaggs, where they took a look at, based

14   on publicly-available information, how many sites had been

15   recontaminated, and they identified 20 sites where, after the

16   cleanup was done, it became recontaminated.  Um, that

17   recontamination was due to a variety of sources, um, that

18   included adjacent or upstream areas that were contaminated

19   that had not been addressed.

20         It also included, um, ongoing contribution from point

21   sources or a significant source sometimes is combined sewer

22   overflows from metropolitan treatment plants.  And that

23   included some -- some very high-profile sediment remediation

24   projects, including the Fox River, Puget Sound, the

25   Housatonic, and it's really because of that significant

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

1   potential for recontamination, that it's -- it's a basic tenet

2   that has been identified by the EPA that needs to be

3   addressed.

4        In their 2005 guidance document, remediation of sediment

5   sites, EPA came up with a list of, I believe, 11 basic

6   principles.  And No. 1 on that list of principles is to make

7   sure your sources are addressed before you proceed with

8   remediation.

9   Q    Do you have a concern with ongoing sources in the

10  Penobscot?

11  A    Um, yes, I do.  Based on the information presented in

12  the Phase II Report, as well as the information that was

13  presented in the -- the depositions and the testimony to date,

14  particularly that by Rocky Geyer, I do have concerns about

15  that.

16       There is some concern about what's continuing to come

17  over Veazie Dam, but I guess what rises to the top of my list

18  of concerns is the way in which Rocky Geyer has defined the

19  mobile pool.  He's defined it as those sediments that are

20  mobilized, um, anywhere on a frequency from with the tidal

21  cycle to something that occurs only on a once-every-five-years

22  basis.  So if you were -- and those five-year events might be

23  more significant flows, a combination of tidal-forcing events

24  and particular flow conditions.

25       So you could go out there and remediate, remove half of

1   that contaminated material today, and within a couple years, a

2   more significant event would be remobilizing that material and

3   recontaminating that sediment pool that you've cleaned up.

4        So I would consider that an internal source of

5   recontamination, but I think it would be a very significant

6   issue.  Obviously, if you've completed the remedy, and within

7   a short period of time, your sediment -- mobile sediment pool,

8   the mercury concentrations are right back where they started

9   from, that would not achieve the degree of risk reduction that

10  was targeted for this approach.

11  Q    Let's move on to implement ability.  What does that

12  criteria entail?

13  A    Implementability considers both technical

14  implementability and administrative implement -- excuse me --

15  implementability.

16       On the administrative side, it refers to, how difficult

17  or easy will it be to get the necessary regulatory approvals

18  and permits and all of those things that are necessary to

19  allow the project to go forward?

20       I think a good example of that is if you were to send

21  something to an existing permitted landfill, that would be

22  administratively easier than trying to site and permit a

23  brand-new landfill.

24       The other aspect of it is technical implementability,

25  and that refers to, can this actually be done technically?  A

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

3124

1   good example is sometimes there might be an innovative

2   technology, um, or something that is, you know, a concept, but

3   if, um, for instance, maybe it's a treatment technology that's

4   identified that's been done at the bench scale, but it's not

5   available commercially, so there's no opportunity to actually

6   make that technology available, that would be an

7   implementability challenge.

8        Um, it also considers, um, um, the ability to pilot-test

9   innovative technology and your ability to get to the level of

10  comfort with the technology before it's implemented at

11  full-scale.  So from that aspect, there is some overlap with

12  the -- the long-term effectiveness and permanence that I've

13  discussed.

14  Q    And what did you do to evaluate this factor?

15  A    Um, I looked at, um, the -- the remedy as I developed it

16  and considered it from the -- um, from the -- primarily from

17  the aspect of the technical implementability, the

18  administrative -- the administrative implementability could be

19  very challenging, as it would be a tremendous amount of

20  permits and approvals that would be required for this type of

21  project.

22       However, I did not really focus on that.  I focused on

23  the technical side of it.

24  Q    Did you look at uncertainties associated with

25  implementing the remedy?

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

3125

1   A      Um, yes, yes, I did.

2   Q      And did you also consider effectiveness and inability to

3   pilot-test?

4   A      Um, yes, I did.  Um, as I mentioned previously, a

5   sediment trap really needs to be full-scale to work.  Um, this

6   is a very innovative technology, one that has not been

7   implemented at any other site, um, for this purpose.  So that

8   would be a significant challenge.

9         And it would be similar on the tail end, after you built

10  this, but it would be very, very difficult to verify that you

11  did what you thought you were going to do.  Um, as I said

12  before, um, there was two years of field investigation,

13  another two years of data interpretation to try to understand

14  exactly how big that sediment pool is and what its

15  characteristics are, um, where it is at any given point in

16  time.

17        Um, Dr. Geyer, both in his deposition and in his

18  testimony, talked about the -- you know, the need to perhaps

19  do several hundred cores multiple times in a season to really

20  understand what the characteristics of the sediment pool are

21  under existing conditions.

22        You would have to go through a similar level of effort

23  at the tail end to understand what the conditions were of that

24  sediment pool to see if you had truly changed it, um, the way

25  you thought you were going to do, and that's -- that's very

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

1    much a challenge.  If you built this huge capital project and

2    then you have to spend a year or two determining, okay, did it

3    work as intended?  At that point, it's very difficult to go

4    back and adjust on the fly or make modifications to it, so --

5    Q    Are there implementability concerns related to the

6    staging area?

7    A    Um, yes, yes, there are.  Um, finding adequate space

8    that would meet the requirements of the project, um, I believe

9    would be a significant challenge.

10        First of all, it would need to be proximate to the river

11   so that you could easily, um, transfer the sediments from the

12   water to the land, and then transport it up to the, um, the

13   management area, the temporary staging area.  You know, 60 or

14   70 acres is a very large parcel of land, um, to find, um, and

15   you would need to take into consideration -- first of all, it

16   would need to be relatively level because you're trying to

17   build this very large facility.  And another really

18   significant concern -- um, and this is, you know, borne out on

19   site after site -- is it's very difficult to find a site where

20   there wouldn't be concerns regarding the adjacent community.

21        These are really large construction projects.  Um, it

22   requires importing thousand and thousands of cubic yards of

23   material to construct it, so there's lots of traffic.  Um,

24   it's typically a 24/7-type construction project, so certainly

25   the construction activities themselves have a significant

1    impact and footprint.

2         But, also, there is concerns with the storage of the

3    sediment itself.  These sediments, as Dimitri mentioned, are

4    reduced in sulfur.  They're going to put out an odor, and the

5    odors from large sediment management projects can be

6    significant, so you would want to make sure that those types

7    of community concerns are addressed.

8         Kind of in that same vein is you put a large volume -- a

9    million cubic yards of sediment in a large area, it dries out.

10   There's going to be dust that's generated from that.  So just

11   a tremendous amount of -- of concerns from that standpoint.

12        You also have to site the water treatment plant.  So

13   there's a significant infrastructure, you know, such as

14   electric and water and all of those things.

15        So there are some significant challenges that are

16   associated with that.

17   Q    Are there sequencing-related implementability

18   considerations?

19   A    Um, yes, yes, I believe there are.  The -- as I

20   mentioned before, there's a little bit of a -- maybe a

21   disconnect in the way the concept was presented within the

22   Phase II Report regarding when material is -- the clean

23   material's generated and when the mobile pool itself is

24   removed.

25        In -- in section 21 of the Phase II Report, they said,

1    well, you need to put the mobile pool, you need to add back to

2    it what you've removed so that you're not changing the

3    hydrodynamic changes of the system and causing erosion or

4    other unintended consequences.

5         However, in this situation, there would be a prolonged

6    period where we are reducing that -- size of that sediment

7    pool before we've added material back, so that issue that was

8    raised by the Study Panel would be present in this situation.

9         Um, the alternative would be to add the clean material

10   before you remove the dirty.  However, that would also

11   significantly change the hydrodynamic conditions of the

12   system.  Plus, then you build a sediment trap, and you'd be

13   capturing -- half of what you captured would be the clean

14   material you just put back in, um, so you'd have to oversize

15   it so that it contained twice as much material, which would

16   have ripple effects on all of the dredge volumes and

17   everything else down the road.

18        So, um, yes, I would conclude that there are very

19   significant challenges associated with the overall sequencing

20   of the project.

21   Q    Would there be concerns in terms of adding clean

22   sediment and making sure that that sediment is of a type that

23   would actually end up back in the mobile pool as opposed to

24   just creating new depositional areas in the river?

25   A    Um, yes, absolutely.  Um, the -- the mobile pool is made

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

1   up of the finest fraction.  That's why it remains mobile.

2        The material that would be generated from the bottom of

3   Penobscot Bay, um, has settled, it's stable there, and I

4   looked at the grain-size analysis from some of those cores,

5   and it's typically less than 50 percent and often less than

6   25 percent of that material that they categorized as fine

7   material.

8        What that means is that material that you're adding back

9   to the river, most of it would just fall to the bottom where

10  you added it, rather than joining that mobile pool.  Um, so

11  that material would fall into the bottom, and, again, that

12  would change the hydrodynamics of the system, and, you know,

13  present something that would have to be given serious

14  consideration.

15  Q    If, for some reason, you were unable to permit the

16  confined aquatic disposal unit, how would that impact your

17  analysis in terms of implementability?

18  A    Um, if we're working on the assumption that the sediment

19  traps were to be implemented as envisioned, um, without the

20  use of the CAD, that would require some type of alternative

21  sediment management facility.  That would either be a

22  specially constructed, what we would refer to as, onsite or

23  near-site disposal area, or taking it to a -- an off-site

24  landfill that would -- could easily double or triple the cost

25  associated with the disposal of the material.

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

1    But, really, it would not change the conclusions that

2  the CAD, while there are significant problems associated with

3  it, that's not the fatal flaw.  The fatal flaw is with the

4  sediment trap concept itself and the challenges associated

5  with the sizing and the implementability and the effectiveness

6  and all of the other things that we've stepped through as

7  we've gone through these criteria.

8  Q    Are there any implementability concerns with respect to

9  constructing the -- the sediment trap itself?

10 A    Um, well, certainly one of them is, you know, depending

11 on the depth, um, you know, this is a bedrock geology.  I

12 don't know how deep it is to bedrock, ah, beneath the river,

13 but certainly if, you know, you specified that it needed to be

14 5 meters deep, but bedrock was 2 meters down, um, it would be,

15 needless to say, very challenging to remove bedrock and create

16 the necessary trap.

17    So that would certainly be a significant limitation.

18 Q    What was your overall conclusion with respect to

19 implementability?

20 A    Ah, based on all of the factors that I considered, um,

21 the innovative nature of it, um, and all the other challenges,

22 ah, I concluded that, um, there would be significant, um,

23 implementability challenges.

24 Q    Let's move on to cost in the balancing criteria.  What

25 is your evaluation of the cost here?

1    A     Ah, well, cost considers all of those factors that go

2    into a remedy.  That includes the -- the obvious thing, such

3    as construction costs, um, the direct construction costs.  It

4    also includes all of the indirect costs, all of the oversight

5    costs.  It includes the up-front data collection, the design,

6    as well as any long-term maintenance components.

7          And, typically, when you're at the feasibility study

8    level, evaluation, you would add on some type of contingency.

9    Typically, when you're cost-estimating at this stage, it's

10   impossible to clearly identify all of those things that are

11   going to drive cost.  So typically 30 percent on top of your

12   best estimate at the time is -- is customary.  I think EPA

13   recommends somewhere between 17 and 45 or -- or somewhere,

14   so --

15   Q     And what did you do to evaluate cost of recommendation

16   1?

17   A     Well, first of all, I want to be clear that really the

18   cost evaluation was -- did not significantly inform my

19   recommendation.  However, I did look at the cost to see if the

20   cost estimates they provided were anywhere near -- in the

21   ballpark of what I thought this project would cost.

22   Q     And what did you find?

23   A     I concluded that they significantly underestimated the

24   likely cost of this remedy.

25   Q     In what ways?

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

3132

1    A       Um, you know, it's -- it's the material management which

2    is the single biggest challenge.  They estimated $20 million

3    to move the 400,000 cubic yards required for excavation of the

4    CAD, estimated another $20 million for moving the material out

5    of the sediment trap and to the CAD.  So they priced out

6    moving 800,000 cubic yards of sediment.

7           As we discussed before, the big piece that they

8    neglected to consider was what it takes to actually build the

9    sediment trap itself.  The sediment trap itself, at a very,

10   very low-end estimate, is a million cubic yards of material

11   that would have to be moved.  You have to remove another 1

12   million cubic yards to construct the CAD, and then you've got

13   this million cubic yards, which is temporarily sitting up in

14   your storage area, so you have to move that again.  So that's

15   another million cubic yards of material that has to be moved.

16          So that's essentially 3 million cubic yards that has to

17   be moved as opposed to their estimate of 800,000 cubic yards.

18          So, ah, just looking at it from that standpoint, that's

19   four times as much material that has to be removed compared to

20   what they estimated.  So if you simply take and multiplied

21   their estimate by four, that would be a better estimate.  So

22   that would bring you up to, um, $160 million, and that's

23   before you consider the costs of the temporary staging area,

24   ah, which could easily be in the tens of millions of dollars.

25   It doesn't include the cap of the CAD or the cap of the

1   sediment trap itself.

2        So -- and it just -- at a very high level, um, this

3   could easily be in the 150 to 200 million or higher range.

4   Q    Let's move on to the modifying criteria.  What is

5   community acceptance, what does that criteria entail?

6   A    Um, community acceptance is -- is a very important

7   criteria.  It's usually not evaluated until you have gone

8   through the process of selecting a recommended remedy.  At

9   that point, there would typically be a significant level of

10  community outreach, where you have public meetings, where you

11  release the documents that describe the proposed plan.  You

12  meet with people individually or in groups if they have

13  special concerns and a desire to do so.  You solicit their

14  comments and then evaluate which of those comments have merit

15  and, you know, it's -- it's not uncommon for that public

16  comment period to result in changes to the remedy.

17       Sometimes those changes might be minor, or it might be

18  to -- um, you know, let's call it tweaks to the -- the remedy.

19  In other cases, it might lead to a wholesale change in the

20  remedy.

21  Q    And in this case, what did you do to evaluate community

22  acceptance?

23  A    Um, in this case, um, you know, based on the remedy

24  proposed and the components associated with it, and my

25  experience at other significant sediment remediation sites, I

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

3134

1   -- I gave some thought as to what would be those components

2   which would be most likely met with concern by the community.

3   Q     And what were those?

4   A     Um, I believe that the -- um, that the placement of the

5   material in a CAD out in Penobscot Bay, um, would likely be

6   that aspect of the remedy that would -- would present the --

7   the most significant likelihood of community pushback.  Um,

8   and that's based on concerns about, you know, the short-term

9   risks that we identified and discussed previously about the

10  release of contamination to the Penobscot Bay, which is a -- a

11  very prime lobster-fishing ground.

12  Q     Did you do any -- conduct any research to try to

13  determine what community response could be to a CAD in

14  Penobscot Bay?

15  A     I did.  Based on, you know, publicly-available

16  information, there had been a couple of instances in the past

17  where similar proposals had been put forth.  In, I believe, it

18  was 2000, the Department of Transportation proposed a

19  large-scale navigational dredging project near Sears Point,

20  um, and they proposed to put that material into a CAD in

21  Penobscot Bay, and there was very significant public

22  resistance and concern raised at that time.

23        Based on that, the -- the DOT and I believe it was a

24  joint effort with Army Corps of Engineers, stepped back,

25  reconsidered, developed some additional information and

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

3135

1    analysis, and then in 2013, put forward a -- a similar

2    proposal, and based on, again, information that's

3    publicly-available, newspaper reports, that was also met with

4    significant resistance.

5         The Friends of Penobscot Bay submitted a very long

6    letter outlining their concerns with it, and certainly one of

7    those was identification of the concerns that this would have

8    on the lobster fishery.

9         Similarly, um -- I'm sorry -- I'm not sure of the

10   pronunciation.  Cianbro.

11              THE COURT:  Cianbro.

12   BY MR. TALBERT:

13   Q    Cianbro.

14   A    Cianbro -- thank you -- Corporation proposed as part of

15   a site redevelopment project of one of the old paper mills to

16   do some near-shore dredging within the Penobscot River so that

17   they could bring, you know, ships up close to shore, and they

18   wanted to dispose of this material, um, in Penobscot Bay in a

19   CAD similar to what was proposed in the Phase II Report.  And,

20   again, that was met with a significant level of public

21   resistance, and as a result of that, they changed their plans,

22   decided that they were not going to dispose of that material

23   there and, in fact, ended up managing it onsite.

24        So based on that, I concluded that the likelihood of

25   significant public concern would be very high and -- and

1    justified in this case

2    Q     In addition to community-acceptance concerns with the

3    CAD, could there also be community-acceptance concerns with

4    digging the sediment trap in the Penobscot itself and then

5    also the -- the staging area?

6    A     Um, certainly.  Ah, the -- um, the impacts to the river,

7    um, as we talked about previously, it would present

8    significant risks of contaminant release, um, increases in

9    mercury in biota as a result of those activities.

10         So certainly should anticipate that that would be met

11   with a significant level of concern, as well as the siting of

12   the staging area or -- for the reasons we discussed

13   previously.  These are very large construction projects that

14   do have impacts on the surrounding community.

15         So certainly those would be of concern, also.

16   Q     After conducting your analysis, did you reach a

17   conclusion as to whether or not recommendation 1 should be

18   pursued further in the Penobscot?

19   A     I did.

20   Q     And what's your conclusion?

21   A     Based on my consideration of all of these criteria, um,

22   I do not believe that a sediment trap in the Penobscot River

23   would be effective, would not provide long-term effectiveness,

24   and would present significant uncertainty, as well as

25   significant short-term risks of release of contamination to

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

1   the environment.

2        And based on that, as well as the implementability and

3   the other concerns that we've talked about today, I don't

4   believe that this alternative should be -- should be pursued

5   any further.

6   Q    Did you also evaluate recommendation 2?

7   A    I did.

8   Q    And what is your understanding of what recommendation 2

9   entails?

10  A    Um, recommendation 2 is somewhat similar to

11  recommendation 1, in that it also includes a sediment trap.

12  Um, this one would be located at the entrance to Mendall

13  Marsh.

14       However, it differs in that the goal of the sediment

15  trap at the mouth of Mendall Marsh is to trap a hundred

16  percent of the sediments that are suspended before they can

17  get into the marsh, and then you would add clean sediments on

18  the other side of the sediment trap to allow the -- the marsh

19  continuing to -- to function as it does currently, you would

20  add an equal amount of sediment upstream of that.

21       And they envisioned that this, as opposed to the one in

22  the river, where that would be a large capital project, but

23  when it was done, it was done, this was envisioned as

24  something that would be a -- literally a perpetual operation

25  and maintenance project, where every year you dredged out what

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

3138

1    was accumulated into that trap and every year you were going

2    out and putting that additional material into the CAD and

3    every year were adding this clean sediment to the -- the

4    upriver portion.

5    Q      What did you do to evaluate recommendation 2?

6    A      Similar to my evaluation of recommendation 1, the first

7    up was to try to develop the recommendation in enough detail

8    to allow me to put it through the same level of evaluation.

9           However, I wasn't able to get very far down in that

10   process.  I was not able to really come up with a -- even a

11   minimum-sized trap or a concept that would work because there

12   is significant challenges in this approach that were not

13   presented by the other one.

14          In the river, the -- you're just trying to remove half

15   of the sediment particles.  That would probably be most

16   effective on those particles which are the largest particle

17   sizes and the least contaminated.

18          In the marsh, they want to pull out 100 percent of that

19   sediment in a single pass.  It would also need to function

20   under high-flow conditions as opposed to just some of the time

21   or average conditions.

22          So the design of a sediment trap to achieve the goals

23   that they had for the marsh would be much, much harder than it

24   would be to achieve the goals that were identified for the

25   sediment trap in the river.  So based on that, I concluded

GLAZA - CONTINUED DIRECT EXAMINATION/TALBERT

3139

1   that the -- the sediment trap would be much, much larger, to

2   the point where it really wasn't even feasible to -- to

3   consider.

4         And I think that that was verified by the sediment trap

5   evaluation that John Connolly did independent of my evaluation

6   where he concluded that even if you were to construct a

7   sediment trap, um, in that vicinity, that even if you

8   constructed a sediment trap by removing 5.6 million cubic

9   yards of material, that it would be only marginally effective

10  in removing a small percent of the sediments.

11        So based on that, certainly it would be a massive,

12  massive removal, one that was beyond my capability to -- to

13  develop.  But certainly if it was even feasible, it would

14  present all of the same challenges that I discussed previously

15  to an even greater degree.

16  Q    Did you make an effort to try to optimize or work with

17  the concept to actually make the recommendation 2 work?

18  A    Well, as I said before, ah, there was really no

19  opportunity to optimize it.  I couldn't even envision a -- a

20  way of making it work, let alone optimizing it.  So based on

21  that, I did not carry forward any further with attempting to

22  develop that alternative.

23  Q    So what was your final conclusion with respect to

24  recommendation 2?

25  A    That it would be unfeasible, um, impractical, and would

1   have all of the same challenges associated with the river

2   trap, but to an even greater degree.  Therefore, I would

3   recommend that alternative 2 would not be pursued any further.

4   Q    In your opinion, should the court order further

5   evaluation of recommendations 1 and 2?

6   A    Um, no, I think we have more than sufficient information

7   at this point to conclude that neither recommendations 1 or 2

8   should be pursued any further.

9   Q    In order to evaluate options at the Penobscot, would you

10  need additional information than you have now?

11  A    Um, yes, absolutely.  The -- the -- the point at which

12  you can reasonably start to evaluate what an appropriate

13  remedy might be is you really need to know what problem you're

14  trying to fix.  You really need to know what those risks are.

15  Um, you need to know how significant those risks are.  And

16  then you need to know what's causing those risks.  If there is

17  a certain level of mercury present in biota or in a receptor,

18  how is it getting there?  Is it getting there from the water

19  column?  Is it getting there from the sediment?  Is it getting

20  there from widespread, diffuse sources?  Are there localized

21  areas?  Is it coming from a mudflat versus a marsh?

22       So to get to the point where you're able to start

23  identifying and going through an evaluation process, you

24  really need to get to that point, and I -- we're certainly not

25  at that point yet.

1            MR. TALBERT:  No further questions.

2            THE COURT:  Cross-examination?

3            MR. BERNARD:  Your Honor, Mr. Thompson will

4    cross-examine Mr. Glaza.

5            THE COURT:  Very good.  Thank you.

6            MR. TALBERT:  Your Honor, I did want to make one

7    correction for the record.  I misspoke yesterday.  Mr. Glaza's

8    CV is in Exhibit 50, not 54.

9            THE COURT:  Okay.  Thank you.  I'm sure I would have

10   found that, Mr. Talbert.

11        Mr. Thompson?

12            MR. THOMPSON:  Thank you.

13                        CROSS-EXAMINATION

14   BY MR. THOMPSON:

15   Q    Good morning, Mr. Glaza.

16   A    Good morning.

17   Q    Yesterday, you said that you're a senior project manager

18   at Parsons; is that correct?

19   A    That's correct.

20   Q    And your role is to provide project management and

21   technical direction on large sediment remediation projects?

22   A    Um, that's correct.

23   Q    So you're not a mercury scientist.

24   A    Um, I am not a mercury scientist in the same definition,

25   say, as -- as Betsy Henry.  However, my schooling included

1   chemistry, and 90 percent of the work that I have done over

2   the last 10 to 15 years has been associated with mercury-

3   contaminated sites, so I certainly have a very good

4   educational background, as well as experience-based working

5   knowledge with the fate, transport, and chemistry of mercury.

6   Q     Do you consider yourself an expert in mercury chemistry?

7   A     Um, no, I do not.

8   Q     And do you consider yourself an expert in biology?

9   A     Um, again, that's one of those areas where during the

10  design and implementation of -- of remediation projects, I've

11  gained a very good working knowledge of those issues, as well

12  as my educational background includes those aspects.  So I

13  have a very good working knowledge of all of the aspects that

14  go into a holistic evaluation of a remedy.

15        But I certainly am not a degreed biologist.

16  Q     Are you an expert in the trophic transfer of mercury

17  through food webs?

18  A     Um, again, I have, based on the educational background

19  and my 15 years of experience in evaluating technologies and

20  evaluating innovative methods for addressing, um, mercury and

21  preventing it from getting into the food web, I believe that I

22  have a very good working knowledge of that process, so I'm

23  very comfortable in that area.

24  Q     Is that something that you're usually responsible for at

25  the contaminated sediment sites you work on?

1    A     Um, by responsible, can you define what you mean?

2    Q     Well, are you the one who has the primary role in

3    assessing how mercury is moving through food webs at

4    contaminated sediment sites?

5    A     Um, no, and typically, for instance, on a lot of the

6    projects that I've been involved in, Betsy Henry has also been

7    involved in, so certainly -- typically tapped into the

8    knowledge base of somebody like Betsy to provide additional

9    depth.

10   Q     Do you consider yourself an expert in hydrodynamics?

11   A     Um, no, but, again, my educational background and the

12   experience that I've gained in assessing, designing, and

13   actually implementing remedies, um, in river and lake

14   environments has certainly made that an area that I'm very

15   comfortable in working in, um, and I have a very good working

16   knowledge of -- of the processes that are associated with

17   that.

18   Q     And your -- your core expertise is not in

19   biogeochemistry; is that correct?

20   A     Um, that's correct.

21   Q     So that would -- that -- biogeochemistry includes things

22   like mercury methylation and how mercury is formed and what

23   factors affect that?

24   A     Again, as I said before, I have a very good working

25   knowledge of that based on my extensive experience.  Um, but

GLAZA - CROSS-EXAMINATION/THOMPSON

3144

1    certainly, um, you know, on a project of this magnitude of

2    this or Onondaga Lake, I would also tap into that deeper level

3    of experience from somebody like Betsy Henry.

4    Q    In working at contaminated sites, you mentioned that one

5    of your clients is Honeywell?

6    A    That's correct.

7    Q    And another one of your clients is the Dow Chemical

8    Company?

9    A    Ah, that's correct.

10   Q    And another has been Consolidated Edison?

11   A    That's correct.

12   Q    And you've worked for other private companies?

13   A    Um, yes, and if -- if that was not the case, I would not

14   have the practical experience I do because it is those

15   responsible parties that always lead the effort.  Um, so, you

16   know, those are the people that have the lead in evaluating,

17   designing, and implementing these remedies.  So, naturally,

18   that is who I would work for.

19   Q    So you have always worked for responsible parties when

20   you're working at contaminated sediment sites?

21   A    Yes, that's correct, but they've also been -- all of the

22   projects that I've worked on have been -- had a very

23   significant level of oversight by regulatory agencies, that

24   includes the -- you know, the state, as well as the federal

25   agencies, and those federal agencies obviously provide a -- a

GLAZA - CROSS-EXAMINATION/THOMPSON

1    significant level of oversight, but they also bring technical

2    resources and -- and valuable input.

3        So on all of the projects that I have been involved in,

4    I would consider it a collaborative effort that included the

5    regulators, um, even though the person who has the primary

6    responsibility for executing the project is the responsible

7    party.

8    Q    You've never worked directly for a regulatory agency,

9    have you?

10   A    Um, no, I have not.

11   Q    And you've never worked at a contaminated sediment site

12   for some other entity, like a community group that's

13   interested in the project, but not a responsible party?

14   A    Um, no, as I said before, if that was my primary focus,

15   I would not have the experience that I do.

16   Q    Let's talk a bit about your involvement in the cleanup

17   at Onondaga Lake.  That's one of the sites that you've worked

18   on, correct?

19   A    Yes.

20   Q    And you were involved in both the feasibility study and

21   the remedy design at Onondaga Lake?

22   A    Yes, that's correct.

23   Q    And that's a site that was contaminated by a

24   chlor-alkali plant, correct?

25   A    That is correct.

1   Q     Which is the same type of plant that the former

2   HoltraChem plant is?

3   A     That's correct.  There was mercury resulting from a

4   chlor-alkali facility resulting in very high levels of mercury

5   in the sediment.  The levels of mercury in the Onondaga Lake

6   sediments in the areas where we're doing active remediation

7   were ten to a hundred times the concentrations that are

8   present in the Penobscot River.

9         Onondaga Lake also included other stressors -- volatile

10  organic compounds, PCBs, semivolatile organic compounds.  But

11  mercury was a significant risk-driver there, as well, because

12  of the fish tissue.

13  Q     When you say the concentrations were ten to a hundred

14  times higher at Onondaga, is that throughout the entire lake?

15  A     Um, no, that would only be in the areas where we're

16  doing active remediation.  There's actually 2,000 acres of

17  lake bottom where the concentrations are typically in the --

18  the 2,000 to 3,000 nanograms per gram concentration, which are

19  three times higher than the Penobscot River.  Those areas,

20  monitored natural recovery was the selected remedy for that

21  portion.

22  Q     So at Onondaga Lake, there are multiple elements of the

23  remedy; isn't that correct?

24  A     That is correct.

25  Q     And part of it, like you just described, is monitor

1    natural recovery?

2    A    Um, yes.

3    Q    And then there's another part that involves capping?

4    A    That is correct.

5    Q    And how large is the capping?

6    A    Um, the cap -- the entire lake is about 3,000 acres.

7    Um, the monitored natural recovery addresses about 2,000

8    acres.  There is about 500 acres that requires no action.  And

9    it's about 500 acres that requires capping.

10        A portion of what's capped, there is dredging prior to

11   capping.

12   Q    And you're using two different types of capping at

13   Onondaga Lake; is that correct?

14   A    Um, define what you mean by type?

15   Q    Well, there's an area of the lake that uses what's

16   called thin-layer capping, correct?

17   A    Yes, that's correct.

18   Q    And that's where you're putting down roughly 2 to

19   5 inches of sand to accelerate natural recovery of that area?

20   A    Um, that's correct.  Um, um, in these areas of lower

21   contamination, um, we did a monitored natural recovery

22   evaluation, and we said if certain concentrations are too high

23   or if we predict that it won't meet our goal, um, that we

24   would actually implement a thin-layer cap.

25        The thin-layer cap is only about 18 acres, I think, so

1    that represents a very small percent of the area.

2    Q    And so the rest of the area that's being capped is

3    what's known as a chemical-isolation cap?

4    A    That's correct.

5    Q    And that's where you're putting down about 2 and a half

6    to 4 feet of material to segregate those contaminated

7    sediments underneath the cap?

8    A    Um, yes, some areas where it's -- it's a little bit

9    thinner than that, but, in general, yes, we're putting down a

10   foot and a half to 3 feet.

11   Q    So that's about 480 acres, then?

12   A    Um, yeah, I rounded it up to 500 acres, but I think it's

13   maybe 460 acres.

14   Q    And then the remedy also includes dredging; is that

15   correct?

16   A    Ah, yes, that is correct.  The dredging, in many cases,

17   like I said, the material in Onondaga Lake has very high

18   levels of contamination of mercury and other compounds.  The

19   capping remedy is applied in near-shore areas where it's

20   shallow.  If you put a cap down without doing removal first,

21   you're filling in the lake, you're creating land.  So probably

22   half of the dredging that we're doing is simply to make room

23   for the cap.

24        The other portion where we're doing dredging is -- the

25   state of New York has a very strong regulatory preference for

GLAZA - CROSS-EXAMINATION/THOMPSON

3149

1    mass removal, if you will, a removal just -- removal for the

2    sake of removal, ah, with no inherent risk reduction.  So

3    there is some dredging for mass removal, as well.

4    Q    So are you saying that the state of New York has chosen

5    to do dredging in a location where you think there's no need

6    to do dredging?

7    A    Um, yes, I would say that that is the case.  When we

8    finished the feasibility study, we developed a -- a

9    recommended approach, um, that provided, um, overall

10   protection, but, again, the DEC has a regulatory preference

11   for removable above and beyond that.  So there was some

12   additional concession based on that.

13   Q    So that's an example where a regulatory agency decided

14   that the remedy proposed by a responsible party didn't fit

15   what the regulatory agency wanted; is that correct?

16   A    Um, yes.  Um, the last step in the feasibility study

17   process is that, you know, the regulatory agency approval

18   process or input.

19        So, obviously, these things are all subject to

20   regulatory oversight and approval.  So --

21   Q    And it's the regulatory agency that has the final say in

22   what gets done?

23   A    Um, yes.

24   Q    And as far as the volume of dredging, you're dredging

25   about 2 million cubic yards of sediment in Onondaga Lake; is

1    that right?

2    A     That's correct, yeah.  And, again, the decision to

3    dredge was very much a -- a site-specific determination where

4    in the feasibility study process, we went through all of the

5    evaluation criteria that I just outlined, um, and based on

6    that detailed evaluation concluded that it did make sense to

7    do some dredging in this case, as I said before, to make room

8    for the cap, and the concentration levels were very high.

9          We're also in a lake environment, dredging in shallow

10   water, where we can successfully implement things to manage

11   the risks.

12         First of all, it's not a flowing water body.  So when

13   you're dredging, you're not spreading the contamination over a

14   large area.  We're also able to use silt curtains to surround

15   the dredge area so that we don't result in the spread of

16   contamination during dredging operations, which, as I

17   mentioned previously, would not be feasible at this site.

18         So based on the consideration of all of those criteria,

19   we concluded that -- that it did make sense for that

20   particular site.

21   Q     And the remedy implementation has begun at Onondaga

22   Lake, correct?

23   A     Um, yes, it has.

24   Q     And throughout that process, there's monitoring going

25   on, correct?

1    A     Um, yes, a very significant monitoring program.

2    Q     And there's also a contingency plan that would provide

3    for some additional capping if the monitoring shows that

4    natural recovery is not proceeding as predicted?

5    A     Um, that is correct.

6    Q     And that would be an example of adaptive management?

7    A     Um, yes, I would agree with that.

8    Q     Where you're using the results of your monitoring to

9    adjust things as needed to make sure you get the result you

10   want?

11   A     Um, yes, that's -- that's correct.  In this particular

12   case, that was actually written into the remedy that if we

13   evaluate the -- the path of monitored natural recovery, I

14   believe it's every three years, and if it's not progressing as

15   projected, that's a point at which -- point at which we

16   reevaluate and determine whether something else is -- is

17   required, so, yes.

18   Q     Now, during the feasibility study for Onondaga Lake, one

19   of the options that was considered was oxygenation in the deep

20   waters of the lake; is that correct?

21   A     That is correct.

22   Q     And there was a plan to do some pilot testing on adding

23   oxygen to those deep waters?

24   A     That is correct.

25   Q     But then sometime along in that process, there was an

1  upgrade at the local county sewerage treatment plant, correct?

2  A    Um, yes, that is correct.

3  Q    And the sewerage treatment plant began discharging more

4  nitrate instead of ammonia?

5  A    Correct.

6  Q    And as a result of that increased nitrate in the lake,

7  scientists monitoring the lake noticed that methylmercury

8  levels were going down?

9  A    Um, yes, that's correct.

10 Q    And as a result of that, there was some further testing

11 on the effects of nitrate on methylmercury production?

12 A    Um, there was.  Based on those observations, we did

13 determine that nitrate might be a viable alternative.

14      What it does is it prevents sulfate reduction.  The

15 bacteria would prefer to use oxygen or nitrate rather than

16 sulfate.  Um, if you prevent sulfate reduction, um, you reduce

17 or eliminate the methylation process.  So based on the

18 identification of that concept, we entered into about a

19 six-year evaluation phase, um, where we did steadily

20 increasing sizes of treatability testing, bench scale testing,

21 small lake testing and building our way up, so that over about

22 a six-year process, we got to the point where we are

23 comfortable -- and everybody agreed -- that it was a -- a good

24 idea to be implemented as we thought it should be and didn't

25 present any risks.

1   Q      Now, I believe you testified during your deposition that

2   that was a remedy that couldn't be pilot-tested in Onondaga

3   Lake; is that correct?

4   A      No, that's not correct.  We did pilot-test it.

5   Q      When nitrate was added to the lake, was that a lake-wide

6   pilot test?

7   A      Um, what we did was we started out with bench scale

8   studies to verify the concept, and one of the more significant

9   steps was to -- then we had to determine how we could get the

10  nitrate distributed, so we went out and we did dye traits or

11  studies, where we injected dye and then tracked it to see

12  whether or not -- and that would simulate nitrate.  We did

13  that for a year.

14        Then another year, we did injection of the actual

15  nitrate to see if we could get it where we wanted it, could

16  get the distribution we wanted, um, and to make sure that as a

17  result of that small-scale application, in a limited part of

18  the lake, that it didn't present any risks, such as increased

19  algae blooms because you're adding nitrate to the water or

20  disruption at the bottom, um, and so a significant level of --

21  of monitoring that finally took us to the point where we were

22  enter -- able to enter into, um, a full-scale -- we called it

23  a pilot study, but at that point, it did become full lake.

24        However, at any point, you're adding nitrate and

25  monitoring it very closely, and if you see it's not working or

1    if you see that it's causing unintended consequences or harm,

2    you stop.  So it wasn't a one and done.  You have to go out

3    there three times a week and add the nitrate.

4         So it was a very steady progression of confidence

5    building and bench scale and pilot studies, um, and a very

6    controlled implementation of it that led us to the point where

7    we were finally able to agree.  And, actually, right now we're

8    in the final process of getting regulatory approval, but it is

9    part of the final remedy.

10   Q    But with respect to evaluating whether the nitrate

11   additions were working in the lake, you had to do that on a

12   lake-wide scale, correct?

13   A    Um, to fully realize the benefits of it, um, that is

14   correct.  We had a clearly-identified problem.  We knew that

15   the methylmercury that was occurring in those deep waters of

16   the lake was contributing significantly to the methylmercury

17   in the surface water.  That methylmercury was then getting

18   into the zooplankton and working its way up the food chain.

19        So we had a very well identified baseline condition.  We

20   knew what the risks were, and we knew exactly what we were

21   trying to do.  So at that point, we had some very

22   clearly-defined goals and were able to, over a very phased and

23   -- and long-term approach, able to get to the point where we

24   would implement it successfully.

25   Q    So, again, to evaluate whether it was working, you had

GLAZA - CROSS-EXAMINATION/THOMPSON

3155

1    to do that on a full-scale basis; is that correct?

2    A    Um, to realize the full benefits, yes, but as I said

3    before, we did do less than full-scale to get to the point

4    that we knew that we could implement it successfully.  So we

5    did less than full-lake application.

6         Um, you don't realize the full benefits until you've

7    implemented it for multiple years at full-scale, but we knew

8    what we were doing by the time we got to that point because of

9    the phase buildup to that point.

10   Q    And those nitrate additions have been an overwhelming

11   success; is that correct?

12   A    Um, yes, they've worked very well.

13   Q    And at the time nitrate was considered, that had never

14   been used before at a contaminated mercury site; is that

15   correct?

16   A    Yes, that's correct.

17   Q    So that's an example of an innovative idea that came up

18   during the process?

19   A    Um, yes, it is.  Yes, it is, and I -- I was a project

20   manager and provided the directions throughout that process.

21   Q    And it was an idea that you hadn't anticipated during

22   the initial feasibility study for Onondaga Lake?

23   A    Um, yes, that's correct.

24   Q    Now, Onondaga Lake is a large, complex system, is it

25   not?

GLAZA - CROSS-EXAMINATION/THOMPSON

3156

1    A      Um, yes, it is.

2    Q      I think you said yesterday that it was similar in

3    magnitude and complexity to the Penobscot?

4    A      Um, it's a very different system, um, and I don't

5    believe that I was comparing the two systems.  I was comparing

6    the remedies.  Even though the remedies are very different, I

7    said that implementation of this sediment trap concept would

8    be on a par with Onondaga Lake from a technical complexity and

9    magnitude.

10   Q      Okay.  So, to be clear, to the remedy that you

11   understand the Study Panel to be proposing would be of a

12   similar magnitude and complexity to the remedy in Onondaga

13   Lake?

14   A      Roughly, yes.  The Penobscot and Onondaga Lake are very,

15   very different systems.  Onondaga Lake is a site where we had

16   some very localized areas of very, very elevated

17   concentrations within a lake system, where the Penobscot River

18   is a very low-level, diffuse distribution of contamination and

19   a tidal estuary system.  Onondaga Lake is a lake, so it's

20   quiescent.  So the systems are very, very different.

21   Q      Given the scale and complexity at Onondaga Lake, is it

22   fair to say there were many challenges in designing the remedy

23   that you ultimately selected for the lake?

24   A      Ah, yes.

25   Q      And as part of the feasibility study, you needed a wide

1    variety of people with diverse areas of expertise?

2    A     Um, absolutely.  The -- the feasibility study process,

3    once you're to the point where you know what your problem is,

4    certainly then is an appropriate time to have scientists and

5    engineers working together to figure out how to solve that

6    problem.

7    Q     And that feasibility study process involves something on

8    the order of about 30 different people; is that correct?

9    A     Well, more than that, but it involved a significant

10   input from a lot of different people with a lot of different

11   areas of expertise.

12         Um, as I said before, when we started the feasibility

13   study process, the site characterization was complete.  We had

14   a very good understanding of the system -- how it was

15   functioning, what the relationship was between the shallow and

16   deep-water sediments.  We had gone through the risk assessment

17   process, determined what the risks were, what those risk

18   pathways were.

19         So at that point, we were in a very good position to

20   bring that team together and, you know, identify a range of

21   alternatives and then select the best of those -- of those

22   options.

23   Q     And would you say that so far the -- the remedy at

24   Onondaga Lake has been successful overall?

25   A     Um, yes.  We're in the third year of construction, um,

1   so as far as meeting all of the long-term goals, that's going

2   to be a much longer period of time to assess as we continue to

3   monitor fish and biota and other things.  But, um, yes, I

4   would consider it very much a success to date.

5   Q    And the estimated cost of the remedy at Onondaga Lake,

6   at least in the feasibility study, was about $450 million,

7   correct?

8   A    Um, yes, that's correct.

9   Q    Now, in your deposition, I think you said that Honeywell

10   has been highly motivated to move the Onondaga Lake

11   remediation along as fast as possible; is that correct?

12   A    Um, yes, that is correct.

13   Q    Onondaga Lake is a Superfund site, correct?

14   A    Yes, it is.  It's -- it's officially an EPA Superfund

15   site, but they have allowed the DEC to assume the lead agency

16   role.  So, um, it's really the DEC, the state agency, which is

17   primary, but EPA retains oversight and continued to prior --

18   oversight and input.  So it's a joint effort between the EPA

19   and the state agency in this case.

20   Q    And has Honeywell accepted responsibility for the

21   cleanup of Onondaga Lake?

22   A    Um, yes, yes, they have, and they have been obviously

23   the party that has led the entire effort and provided the

24   funding and been the driving force behind -- behind completion

25   of the project.

1    Q    Honeywell has entered into consent decrees with EPA and

2    the New York DEC that govern the -- the remedy process; isn't

3    that correct?

4    A    Um, yes, that's correct.  For Onondaga Lake, I believe

5    it was -- the record of decision documenting the decision, um,

6    I think it was 2006, at which point, Honeywell, because as I

7    said before, they were anxious to move the project forward, we

8    started the actual design process then.  So we actually

9    started the process a year before the actual legal document

10   was signed, obligating them to do so.

11   Q    At any time during your involvement in Onondaga Lake,

12   was Honeywell litigating over whether it needed to clean up

13   the lake?

14   A    Um, not that I recall.  I don't believe so, no.

15   Q    And, to your knowledge, at any time during your

16   involvement with Onondaga Lake, was Honeywell litigating over

17   how it should clean up the site of its former chlor-alkali

18   plant?

19   A    Um, not that I'm aware of or I've been involved in.

20   Q    And so there hasn't been any litigation over the rate of

21   the natural recovery in Onondaga Lake, for example?

22   A    Um, not that I'm aware of, no.

23   Q    And there hasn't been any litigation by Honeywell over

24   the degree of risk to human and ecological health at Onondaga

25   Lake?

GLAZA - CROSS-EXAMINATION/THOMPSON

1    A      Um, no.  All of these issues, certainly as you're going

2    through the process, um, there has been significant regulatory

3    involvement and oversight, um, so there has certainly been --

4    the regulators have certainly been involved and have, you

5    know, influenced the evaluations and the design and all of

6    those activities, so I would characterize it more as a -- as a

7    collaborative process with ultimate oversight by the agency as

8    opposed to anything that has been the focus of a lot of

9    litigation.

10   Q      Would you say overall, in your experience, at Superfund

11   sites that it's typical for responsible parties to reach some

12   sort of a negotiated settlement with the government agencies

13   that are involved?

14   A      In all of the projects that I have been involved with,

15   it has been the responsible party who has reached agreement

16   with an oversight agency to implement a remedy.

17   Q      So --

18   A      Is that the question?  I'm not sure.

19   Q      Yes.  So the responsible parties have not been actively

20   litigating with the regulatory agencies about the nature of

21   the cleanup?

22   A      Um, I know that that happens within the -- within the

23   industry.  The project that I have been involved with, that

24   has not been a significant part of it.

25   Q      Let's turn to your work on this specific case.  You

1    first got involved in about July or August of last year; is

2    that correct?

3    A    That's correct.

4    Q    And then about six months later, in January, you

5    submitted your expert report in this case?

6    A    Um, that's correct.

7    Q    And you wrote that report yourself?

8    A    Um, yes, I did.

9    Q    Did anyone review your technical analyses or

10   conclusions?

11   A    Um, there -- there was another senior manager in my

12   office that I did, you know, provide some discussion with, um,

13   and to -- a little bit of back-and-forth discussion on it, but

14   it was primarily my evaluation and my recommendations based on

15   my understanding of the report and the recommendations and

16   also based on my experience base.

17   Q    Let me show you something from your deposition.  This is

18   Plaintiffs' Exhibit 163.  Starting at the bottom of Page 11,

19   and I asked you, did anyone review your report before you

20   submitted it?

21            Answer, administrative aide, just from a

22   nontechnical review standpoint.  You know, grammar and

23   punctuation and all that.  Other than that, no.

24            Is that an accurate statement of how your report was

25   prepared?

1    A     Um, yes, and I think that's consistent with what I just

2    said.

3    Q     Okay.  So you wrote the report and reached the

4    conclusions yourself?

5    A     That's correct.

6    Q     You haven't done any additional analyses since you

7    submitted your report in January; is that correct?

8    A     Um, no, I have not.

9    Q     And that final report contains about 21 pages of text?

10   Do you recall?

11   A     Sure.  I don't know the exact number of pages.  I'm

12   sorry.

13   Q     Okay.  And it has one figure at the end, that chart that

14   was shown, showing the -- the sequencing process?

15   A     That's correct.

16   Q     Now, you've testified that when you were brought on to

17   this case, you were asked to evaluate the feasibility from an

18   engineering perspective of the first two remedial approaches

19   recommended by the Study Panel, those recommendations 1 and 2;

20   is that correct?

21   A     That's correct.

22   Q     And that's what you did?

23   A     That's correct.

24   Q     And those are limited to just the two proposals related

25   to sediment trapping, correct?

GLAZA - CROSS-EXAMINATION/THOMPSON

1    A      That is correct.

2    Q      So you did not review recommendation 3 related to using

3    activated carbon in Mendall Marsh?

4    A      Um, I reviewed the entire report, just so I had a full

5    understanding of what was contained in it.  Um, however, no, I

6    did not review it or develop an opinion on that.

7    Q      You didn't evaluate the engineering feasibility of

8    recommendation 3; is that correct?

9    A      That is correct.

10   Q      And you did not consider any remedial options other than

11   recommendations 1 and 2; is that correct?

12   A      Um, I'm sorry.  Could you repeat the question?

13   Q      You did not consider any remedial options other than

14   recommendations 1 and 2 from the Phase II Study Report; is

15   that correct?

16   A      Um, as part of my formal review, ah, no.  I believe

17   during my deposition, there was some questioning regarding

18   some alternative approaches, and I believe I may have offered

19   some on-the-spot thoughts or input based on -- on that, but,

20   no, I did not do any detailed evaluation or development of

21   alternative approaches.

22   Q      Your evaluation was just focused on what the Study Panel

23   proposed, correct?

24   A      Um, that's correct, and I'll admit that, um, at a

25   personal level, um, there's a little frustration with -- there

1   because engineers, I think, are problem-solvers.  That is the

2   part of my job that I like the best and I think I'm the best

3   at.  So I would -- that's what I would have liked to have

4   done, but in the absence of a clearly-defined problem, it

5   really is not the stage where we're ready to do that.

6        So because of that, I did not attempt to conceptualize

7   or develop alternative approaches.

8   Q    So this is not what you've done at previous contaminated

9   sediment sites; is that correct?

10  A    Ah, well, I would say it's very similar.  When you're --

11  you know, there's a technology-screening step.  So this --

12  this evaluation is very consistent with the evaluation that I

13  have done at numerous other sites.

14  Q    Well, but I -- I think -- you just said that typically,

15  one of the things you enjoy is sort of looking for all the

16  various options that are available; is that correct?

17  A    Yes, that's correct.  Once you've got a -- a

18  clearly-defined baseline condition, understand what a -- how a

19  system is functioning, and know exactly what it is that you're

20  trying to fix, that's the point at which you start to exercise

21  those -- that problem-solving, if you will.

22  Q    And that was not something that you did in this case.

23  A    That's correct.

24  Q    You wrote in your expert report on Page 1 that your

25  evaluation was in no way intended to support any conclusions

1    regarding the need for remediation of the Penobscot River; is

2    that correct?

3    A      That is correct.

4    Q      And that's still the case?

5    A      That's correct.  I'm not in a position to -- um, you

6    know, make a judgment on the degree of risk presented or, for

7    that matter, I took at face value the properties and estimated

8    size and significance of the mobile pool.  I did not attempt

9    to determine whether or not the assumption of the mobile pool

10   or the size of what was found.

11   Q      So you did not conduct your own assessment of what

12   risks, if any, are presented in the Penobscot from mercury

13   contamination?

14   A      I did not.

15   Q      And you did not independently evaluate what the pathways

16   are by which mercury gets into biota in the Penobscot

17   ecosystem?

18   A      Um, no, no, I did not.  You know, certainly on a -- from

19   a comparison standpoint, as I mentioned before, the Penobscot

20   River is ten to a hundred times lower in contamination than

21   other -- any other site that I've ever been involved in.

22          Um, however, I did not attempt to determine whether or

23   not the -- the contamination represents a risk and, if so,

24   what it is.

25   Q      You personally don't have any opinion about whether

1    there's an unacceptable risk from mercury contamination in the

2    Penobscot; is that correct?

3    A    Um, I personally -- you know, my -- my impression would

4    be informed by what I have read from others in the court case,

5    but I'm certainly not in a position to make any determination

6    or decision on risk.

7    Q    So do you or do you not have an opinion about whether

8    there's unacceptable risk from mercury contamination in the

9    Penobscot ecosystem?

10   A    That's beyond the -- the task that I was charged with

11   and -- and beyond what, you know, the determination that I

12   would be qualified to make.

13   Q    So when you say that the risks are not yet well-defined,

14   you're relying in part on the opinions from other experts,

15   like Dr. Henry?

16   A    Um, that's correct.

17   Q    And since you feel that the risks are not fully

18   understood, you also have no opinion about whether there is a

19   need to go forward with active remediation in the Penobscot;

20   is that correct?

21   A    I would say that's correct.  You know, you need to

22   determine what the risks are, what the pathways are, what the

23   degree of risk is, and then in looking at alternatives, you

24   know, you look at active and you look at more passive, you

25   know, that lead to effective remedies like monitor natural

1    recovery, but, no, I'm not in a position to make that

2    judgment.

3    Q    So similarly, you have not ruled out the possibility

4    that there might be some effective active remedy in the

5    Penobscot?

6    A    No, no, I certainly have not.

7    Q    I think you alluded to this a moment ago, but in your

8    report, you wrote that your evaluation was not intended to

9    support any conclusions regarding specific site conditions

10   like the presence of the mobile sediment pool.  Do you

11   remember that?

12   A    Yes.

13   Q    And by that, as I think you just said, you took at face

14   value the Study Panel's statements about the size of the

15   mobile pool and how it behaves; is that correct?

16   A    Um, that's correct.

17   Q    You agree that the concept of a mobile sediment pool in

18   a river is not unique to the Penobscot, correct?

19   A    I would say that any aquatic system likely has sediments

20   which are periodically mobilized and transported.  Whether

21   that's a river system or a lake system, certainly there will

22   be some sediments that are mobile under certain conditions,

23   certainly.

24   Q    And you said that you reviewed Dr. Geyer's work in

25   Chapter 7 of the Phase II Report?

1    A    Yes, I did.

2    Q    And from that chapter, you're familiar with the concept

3    of the salt front that he says is in the Penobscot Estuary?

4    A    Ah, that's correct.

5    Q    And you understand that the salt front is what prevents

6    the mobile pool from exiting the estuary and getting out to

7    the bay?

8    A    That's certainly the way Dr. Geyer described it, yes.

9    Q    And so you understand that the salt front has a

10   significant influence on where sediments fall out of the water

11   column and accumulate in the estuary, correct?

12   A    Again, that's consistent with Dr. Geyer's depiction of

13   it.

14   Q    But you yourself have no opinion about what the size of

15   the mobile pool is, correct?

16   A    Um, that's correct, and I would say that the size of the

17   mobile pool, um, is relatively independent of my

18   recommendation.

19        When I sized my sediment traps conservatively small,

20   that was sized around what it would take to set -- trap one

21   grain of sediment.  I did not size it to accommodate any

22   additional sediment that might accumulate in it.  So my

23   recommendation is really independent of the size of the mobile

24   pool.

25   Q    But you have no opinion about what the size of the

1   mobile pool might be?

2   A     No, I do not.

3   Q     You haven't evaluated that?

4   A     No.

5   Q     And you also don't have any opinion about the degree to

6   which, if any, the mobile pool is contributing to risk in the

7   Penobscot, correct?

8   A     Um, ah, other than what I've read in the reports and the

9   deposition and in the works of others, ah, but, no, I'm not in

10  a -- in a position to make an opinion on that.

11  Q     Okay.  And you -- as part of your evaluation of

12  potential remedies, you did not evaluate whether mobile

13  sediments could be collected from natural trapping areas,

14  correct?

15  A     Um, I did not evaluate that.  I think we had some

16  discussion on it during my deposition, and I've seen it

17  brought up in other contexts, but, no, I did not focus on that

18  as a -- as a particular approach.

19  Q     And you also did not analyze the degree to which

20  contaminated mobile sediments are currently moving around in

21  the estuary, correct?

22  A     No, beyond what was presented in Chapter 7, I did not do

23  any independent analysis of that.

24  Q     Now, with respect to recommendations 1 and 2, is it fair

25  to say that those recommendations were poorly developed in the

GLAZA - CROSS-EXAMINATION/THOMPSON

3170

1    study report?

2    A    Um, I would say that that's true, yes.

3    Q    And they were really presented as something to consider;

4    is that accurate?

5    A    I would agree with that, yes.

6    Q    And as far as their substance, they were more of a

7    high-level concept as opposed to a detailed plan; is that

8    correct?

9    A    Um, yes, and that's why I needed to take it to that next

10   step of development of it before I could provide a reasonable

11   engineering analysis.

12   Q    And, to your knowledge, none of the Study Panelists is

13   an expert in sediment remediation, right?

14   A    Um, you know, I can't speak to that.  I -- I don't know.

15   My understanding is that they're more focused on the, um, the

16   science and research end of it, but I -- I can't speak as to

17   what their -- their capabilities are.

18   Q    So based on those limitations of the proposals that are

19   in Chapter 21, the first thing you had to do was further

20   develop them a bit so you could evaluate them; is that

21   correct?

22   A    That's correct.

23   Q    And so you added things like the -- the on-land sediment

24   storage area?

25   A    Um, yes.  One of the key things that they had failed to

GLAZA - CROSS-EXAMINATION/THOMPSON

3171

1   address was the sequencing, as well as they had failed to

2   identify the fact that creation of the traps themselves

3   created a dredge volume --

4       (Interruption by the court reporter.)

5   A    I said, they failed to acknowledge that the creation of

6   the sediment traps would also entail a required dredge volume.

7   BY MR. THOMPSON:

8   Q    And another element that you added was the capping of

9   the sediment traps as opposed to emptying them; is that

10  correct?

11  A    Right.  That reduced the required size of the CAD by

12  400,000 cubic yards and eliminated the risks associated with

13  picking up and moving that material one more time.

14  Q    And these were enhancements that you added without

15  conferring with other engineers or anyone else?

16  A    Um, that's correct.  They made good sense.

17  Q    Let's focus on the on-land storage area for a little

18  bit.  That would be the first step in the sequence that you've

19  outlined for how to implement recommendations 1 and 2; is that

20  correct?

21  A    That's correct.

22  Q    And you assumed that that would be located somewhere

23  down roughly near Verona Island?

24  A    Um, I did not make any assumptions on where it would be

25  located.  I only identified some of the criteria that would be

1    need to be taken into consideration in identifying a location.

2    Q    Well, I thought you said earlier this morning that you

3    assumed that it would be located near the river near where the

4    sediments would be generated and used; is that correct?

5    A    Um, that would be a goal.  You would like to have it

6    located as close as possible to where that material is

7    generated.

8    Q    Did you put any effort into looking for suitable sites

9    where you might locate an on-land sediment storage facility?

10   A    Ah, no, I did not.

11   Q    So you don't know whether there might be suitable sites

12   in the Penobscot area that could work for that?

13   A    No, I do not.

14   Q    It was not some -- withdrawn.

15        Possible locations for the on-land sediment storage

16   facility were not something that you took into significant

17   consideration in reaching your conclusions; is that fair so

18   say?

19   A    Um, that's correct, that's correct.  However, you know,

20   the onsite -- the onsite temporary storage area and the CAD

21   itself, um, they go hand in hand, obviously, and I certainly

22   identified some significant challenges that were presented by

23   the CAD and the storage area.

24        However, quite frankly, you could eliminate those

25   aspects of the remedy and it would not change my

GLAZA - CROSS-EXAMINATION/THOMPSON

3173

1    recommendation.  In my opinion, the critical flaw is the

2    sediment traps themselves for a lot of the reasons that we've

3    covered today, so --

4    Q      And you said that the sediment storage area would be

5    similar in size to the sediment disposal area that was

6    developed at Onondaga Lake; is that correct?

7    A      Um, possibly, yes, it would be managing a significant

8    volume of material, and it would be a large facility, yes.

9    Q      And were there challenges in getting that -- that

10   facility permitted and -- and constructed?

11   A      Um, in that particular site, um, the -- um, Honeywell

12   owns about 900 acres in former waste beds in Syracuse, so in

13   this particular case -- and those are big, large, flat,

14   unoccupied areas that are owned by Honeywell.  So at this

15   particular application, it was relatively easy to find a site.

16          If we hadn't had those available to us, it would have

17   been a much more significant challenge.

18   Q      Let's talk about confined aquatic disposal for a bit.

19   You did not make any specific assumptions about where the

20   confined aquatic disposal sites would be located; is that

21   right?

22   A      I did not.  The Study Panel identified three potential

23   locations out in Penobscot Bay, but my -- my evaluation was

24   relatively independent.  It was just based on them being in

25   Penobscot Bay somewhere.

GLAZA - CROSS-EXAMINATION/THOMPSON

3174

1   Q     So you just assumed that they would be somewhere in

2   Penobscot Bay?

3   A     That's correct.

4   Q     Did you make any attempt to optimize the -- the design

5   of the confined aquatic disposal sites?

6   A     Um, by optimization -- I'm sorry, are you talking about

7   optimization of the location or the design of the trap -- of

8   the CAD itself?

9   Q     Well, you talked about how in developing the proposals

10  further, you added enhancements like the on-land sediment

11  storage facility and the capping of the sediment traps.  Did

12  you do anything similar to that to sort of further develop the

13  study plan -- the Study Panel's ideas related to confined

14  aquatic disposal.

15  A     No, I did not.

16  Q     So, for example, you didn't evaluate whether the

17  confined aquatic disposal sites perhaps could be located in

18  the river instead of in the bay?

19  A     Um, that would certainly be a possibility, ah, and there

20  would be pros and cons to that.  You know, for instance, the

21  velocities in the river would be higher than they are in the

22  bay, so you'd be much more likely to spread contamination, and

23  it would be much harder.  You know, the river is 10 to

24  20 meters deep with high currents.  So now, you're dropping

25  contaminated sediment mass through a rapidly flowing stream.

1      Um, so, you know, there's pros and cons to any approach.

2  Um, however, as I said before, you could eliminate the CAD

3  entirely and it would not change my recommendation.

4  Q      I think you said yesterday that in New Bedford Harbor,

5  they're using CADs that are constructed with sheet piling

6  along the shore in the harbor; is that correct?

7  A      That's correct.

8  Q      And you didn't evaluate whether a method similar to that

9  could be used somewhere in the Penobscot River?

10 A      Ah, no, I did not.

11 Q      And if the disposal sites could be located somewhere in

12 the river, that might make a difference in community

13 acceptance of that proposal; is that correct?

14 A      Um, in what way?  Sorry.  You're supposed to be asking

15 the questions.

16 Q      Well, if you could locate the disposal sites in the

17 river, which is already contaminated, instead of down in

18 Penobscot Bay, do you agree that that might make a difference

19 in whether the community has concerns about those disposal

20 sites?

21 A      Um, possibly, but I think a -- you know, a lot of the

22 same risks and issues would still be present.  But it might be

23 -- you know, further evaluation might conclude that that would

24 be a -- a better approach.

25      But as I said before, you know, the CAD, in my mind,

GLAZA - CROSS-EXAMINATION/THOMPSON

3176

1    there are problems with it no matter how you implement it, and

2    you could eliminate them entirely or, you know -- and it would

3    not change my recommendation.

4    Q    So your ultimate recommendation is really based on the

5    sediment traps themselves, not on the other elements, like the

6    CADs or the on-land sediment storage facility?

7    A    That's correct.

8    Q    Nonetheless, it's your view that confined aquatic

9    disposal should not even be considered going forward for the

10   Penobscot; is that right?

11   A    Um, I don't think that the site-specific conditions, um,

12   are suitable for consideration of -- of a CAD.  That is the --

13   it is the most economical way to manage long-term sediments

14   that have been excavated, as I said previously.  If it was a

15   good idea, everybody would be doing it, and yet it's a very

16   limited subset of sites where it's determined that makes

17   sense.

18        Um, and I don't believe that the site-specific

19   conditions at this site would support you to lead to a

20   conclusion that a CAD is a good idea.

21   Q    So it's your view that the short -- that the risks of --

22   of using CADs rule them out in the Penobscot?

23   A    Ah, yes.

24   Q    Did you make any attempt to quantify how much sediment

25   would be resuspended during the construction, filling, and

1    capping of confined aquatic disposal sites?

2    A    Um, no, I did not.

3    Q    And did you make any attempt to quantify how much

4    mercury would be mobilized during the construction, filling,

5    and capping of confined aquatic disposal sites?

6    A    Ah, no, I did not quantify it.  However, I did

7    specifically look at site-specific conditions which might lead

8    to higher or lower levels of recontamination, and that,

9    combined with my own personal experience on, you know,

10   sediment dredging and management projects, you know, led me to

11   the conclusion that those potential releases would be

12   significant.

13   Q    You testified earlier that you did not analyze how much

14   contaminated mobile sediment is already moving around in the

15   system, correct?

16   A    I did not.

17   Q    You did not analyze that.

18   A    I did not analyze that, that is correct.

19   Q    And so you don't know exactly how much mercury is moving

20   around with those contaminated sediments in the existing

21   system, correct?

22   A    Beyond what the conclusions were in Section 7, which is

23   that the average is, I think, about 900 nanograms per gram.

24   That's a little bit different, I think, than Dr. Geyer's

25   testimony.  And that it was 320,000 tons, which I equated to

1    be 800,000 cubic yards, those were the conclusions in the

2    Phase II Report.

3           I don't have any opinion on it above and beyond that.

4    Q     But you didn't have the information to compare how much

5    mercury is moving around in the system today as opposed to how

6    much might be mobilized and moving around in the system if you

7    use confined aquatic disposal sites; is that correct?

8    A     Um, I did not, but thinking about it in the context of

9    the presence of this mobile pool, in my mind, that amplified

10   the risks.  At a lot of sites, you're concerned that you

11   dredge or you place material in a CAD.  This material spreads

12   a certain distance, settles to the bottom, and it stays there,

13   so you've impacted an area, but that area is finite.

14          In this case, the material that would be mobilized is

15   the finest sediments.  Those finest sediments, um, are the

16   ones that have the highest levels of mercury.  So they would

17   join the mobile pool and then be distributed over a large

18   area.

19          So, in my mind, the presence of this mobile pool, um,

20   amplified the risks associated with releases due to dredging

21   or cap -- or CAD -- placement in a CAD.

22   Q     Well, I'm talking specifically about CADs, and you said

23   that you thought the CADs would be located down in Penobscot

24   Bay, correct?

25   A     Yes.

GLAZA - CROSS-EXAMINATION/THOMPSON

3179

1    Q      And the mobile pool is up in the upper estuary, correct?

2    A      Um, that's correct, but there are still tidal influences

3    out in the bay, and so any fine, light-grained material is

4    likely going to be moved back and forth with that tidal

5    action, and if you think about the, um -- one of the exhibits

6    that I showed previously, that, on average, once a particle is

7    suspended, um, in the water column, under average flow

8    conditions, it'll travel one kilometer before it drops 4

9    kilometers.  The fine-grained material is going to travel even

10   farther.

11         So there are still significant currents out in the

12   bay itself, so that material, once released to the

13   environment, is going to move a long ways.

14   Q      So is it your understanding that material from the bay

15   moves back up into the estuary and reenters the mobile pool?

16   A      Um, no.  No, what I'm saying is that even out in

17   Penobscot Bay, if you were to release a fine-grained mobile

18   sediment, that it would be transported back and forth by the

19   tidal action.  I don't want to attach the name mobile pool to

20   it, but that sediment is very fine-grained and it has the

21   highest levels of contamination.

22         Once you put it into the water column in Penobscot Bay,

23   with the tidal currents and the fine-grained nature of these

24   materials, they are going to move.

25   Q      Now, confined aquatic disposal has been used at other

1    contaminated sediment sites, correct?

2    A    Um, that is correct.  As I mentioned previously, of that

3    list of 30 that was provided in the report, only three of

4    those were in the last ten years, and the oldest of those was

5    about, I think, six to eight years old.

6         So there are site-specific applications where they make

7    sense.

8    Q    Let's take a quick look at that list in Chapter 21.  So

9    this is Joint Appendix -- sorry -- Joint Exhibit 6-21 on Pages

10   21-8 to 21-9.  Let me see if I can get most of it onto the

11   screen here.  Okay.

12        So are you familiar with this list from Chapter 21

13   A    Um, yes, I believe that this was a list provided from --

14   by Todd Bridges of the Army Corps of Engineers.  Quite

15   frankly, it's the same list that has shown up in numerous

16   places, including public presentations to gain acceptance of

17   the CAD at New Bedford Harbor.  So it's a list that's been

18   circulated in various venues.

19   Q    And so just looking at sites in the northeast or in New

20   England, we've got a site in New Bedford Harbor in

21   Massachusetts, right?

22   A    Hm-hmm.

23   Q    And we've got a site in Newark Bay in New Jersey; is

24   that correct?

25   A    Hm-hmm.

1   Q      We've got a site in Boston Harbor that was for

2   1.2 million cubic yards of sediment?

3   A      Hm-hmm.

4   Q      Is that correct?

5   A      That is correct.

6   Q      We've got a site in Hyannis Harbor in Massachusetts; is

7   that correct?

8   A      Hm-hmm.

9   Q      We've got a site in Providence Harbor in Rhode Island;

10  is that correct?

11  A      Um, they're on the list, yes.

12  Q      And a site in New London Harbor, that's in Connecticut,

13  I believe; is that correct?

14  A      Um, yes.

15  Q      And then you mentioned that there's been another project

16  at New Bedford Harbor more recently?

17  A      Right.  As I pointed out, if you scroll down a little

18  bit farther on the list, there are -- of these, there's only

19  three of them that are in the United States in the last ten

20  years.  That's, um, the New London Harbor, the Norwalk Harbor,

21  and Port Hueneme, given that those are the most recent, I did

22  attempt to research those a little bit.

23         Um, there is no information available anyplace that I've

24  been able to locate on the -- the Norwalk or the New London

25  Harbor.  So I -- I was not able to identify any information on

1      that.

2             Um, the Port Hueneme site, as I mentioned previously,

3      was a site on the west coast where it was entirely contained

4      within a naval shipyard turning basin.  It was on property

5      that was owned by the Navy, and it was in a completely

6      enclosed area with just a narrow exit to the waterway.  So it

7      was in an area that was effectively already contained.

8             And, also, I'd like to point out that as the sediment

9      remediation industry has developed over the last ten years,

10     there's been a greater and greater acknowledgment,

11     documentation of realization of the risks associated with

12     dredging and other water activities.

13             So, you know, if you go back to old decisions, a lot

14     of those were made prior to the understanding of the risks and

15     challenges presented by those.

16             So I did not personally put a whole lot of credence on

17     projects that are 15 or 20 years old or that were in Norway or

18     -- or some other location.

19             So -- but, again, I'm not trying to say that CADs are

20     always a bad idea.  That needs to be a site-specific

21     determination, um, and there are certain times where it makes

22     sense, like the New Bedford Harbor site where I mentioned

23     where they're siting it in an area of existing contamination.

24     Um, in shallow water, the water's shallow enough so that you

25     can actually build a sheet pile wall around it, so you're less

GLAZA - CROSS-EXAMINATION/THOMPSON

3183

1    concerned about the spread of contamination.

2         Port Hueneme, where it's all within an enclosed naval

3    turning basin, if you will, I can understand why that would

4    make sense.

5         There's other sites where they -- the material that's

6    being placed might be a lot coarser-grained or areas that are

7    a lot less sensitive.  So I'm not saying that CADs never make

8    sense.  I'm saying that at this particular site, based on

9    site-specific concerns and considerations, um, that it's not a

10   good idea, and even if -- even if you got rid of the CAD, my

11   recommendation would stay the same.  The sediment traps are

12   not a good idea.

13   Q    Just one last one on this list, in 2008, a CAD was used

14   in Melbourne, Australia, for 23 million cubic yards of

15   sediment; is that correct?

16   A    Um, beyond seeing it on the list, I have no information

17   on that.

18   Q    Okay.  Now, you mentioned that confined aquatic disposal

19   was rejected at Onondaga Lake by the regulators; is that

20   correct?

21   A    That's correct.

22   Q    But you haven't spoken with any federal regulators about

23   the Penobscot, have you?

24   A    I have not.

25   Q    And you haven't spoken with any state regulators about

1    the Penobscot, correct?

2    A    I have not.

3    Q    And you understand that the Study Panel got the idea for

4    confined aquatic disposal from Todd Bridges; is that correct?

5    A    You know, that's my understanding, but also I noted that

6    in reading Todd Bridges' deposition, that he identified it as

7    an idea that was presented for consideration, um, during a one

8    or two-day brainstorming session.  And in his deposition, he

9    was very clear to point out that he was not saying it should

10   be done; he was throwing it out there as a concept and one

11   that had been done at other sites.

12        Todd Bridges made clear in his deposition that he was

13   not in the position of recommending it for this site.

14   Q    And Todd Bridges is a scientist who works for the U.S.

15   Army Corps of Engineers, correct?

16   A    At their west research station, yes.

17   Q    And the U.S. Army Corps of Engineers is one of the

18   regulatory agencies that would be involved in issuing the

19   permits for confined aquatic disposal, correct?

20   A    That's correct.

21   Q    And so he was the one who suggested that this is an idea

22   that they should at least consider?

23   A    Hm-hmm.

24   Q    Now, with respect to assessing possible community

25   acceptance of confined aquatic disposal for the Penobscot, you

GLAZA - CROSS-EXAMINATION/THOMPSON

3185

1    did a search online and found negative reactions to some

2    similar proposals; is that correct?

3    A       That's correct.

4    Q       But you didn't actually speak with anyone from local

5    community groups?

6    A       Ah, no, obviously, that would be way premature and

7    inappropriate.

8    Q       And you didn't speak to anyone in the local governments?

9    A       No, I didn't.

10   Q       And you didn't speak with anyone from, say, the

11   lobster-fishing industry?

12   A       Um, no, I did not.  Again, this is based on my

13   experience on what people might be concerned about and their

14   reactions to prior proposals, but, ah, no.  No, it was --

15   Q       So with respect to confined aquatic disposal, it's a

16   method that's been used at other sites, correct?

17   A       Um, where site-specific conditions made it a good idea,

18   yes.

19   Q       And it was suggested to the Study Panel by a scientist

20   who works at one of the relevant regulatory agencies, the Army

21   Corps of Engineers, correct?

22   A       Suggested it as something that should be considered,

23   yes.

24   Q       And you haven't spoken with anyone in the local

25   community about what their reaction to it would be?

1   A      That's correct.

2   Q      And you haven't spoken with any regulators about what

3   their reactions to it would be?

4   A      That is correct.

5   Q      And you didn't make any specific assumptions about where

6   the confined aquatic disposal would be located?

7   A      Um, that is correct, other than that it would be located

8   somewhere in Penobscot Bay, consistent with their evaluation.

9   Q      And I think you mentioned that confined aquatic disposal

10  is generally the least expensive way of disposing of

11  contaminated sediments?

12  A      Yes, it is.   Typically, yes.

13  Q      When you were working at Onondaga Lake for Honeywell or

14  working at Berry's Creek for Dow, is one of your goals to find

15  a cost-effective remediation solution?

16  A      Ah, yes.

17  Q      And would you agree that there's no reason to spend more

18  on a site remediation than is really necessary?

19  A      I would agree with that.

20  Q      So is -- is it typically your practice to rule out a

21  technology that's been used before and is the least expensive

22  option and hasn't been discussed with any regulators or

23  community representatives?

24  A      Um, based on a reasonable engineering evaluation, I

25  would conclude that, um, it is not a good idea.   Um, yes, then

1    it is appropriate to rule it out, even if it is, you know, the

2    cheapest.

3    Q    And even though you haven't explored ways you might

4    optimize it by locating it in other locations or confining it

5    with sheet pile or something like that?

6    A    Um, at this point, based on the site-specific

7    considerations, um, I -- I feel it's justified to rule it out.

8    Q    Well, let's turn now to your evaluation of the sediment

9    traps themselves.

10        Now, in evaluating the sediment traps, you relied on

11   your own calculations about how big the sediment traps would

12   have to be; is that correct?

13   A    Um, well, in part.  As I mentioned previously, I relied

14   on Dr. Geyer's estimate of how long it would need to be, um,

15   and that also, um, you know, I compared what I came up with

16   with Dr. Connolly's independent analysis that concluded that

17   the sediment traps, even if much larger than what I assumed,

18   would be marginally effective or not effective at all, so --

19   Q    Had you reviewed Dr. Connolly's report when you were

20   preparing your report?

21   A    Um, no, I did not.  Um, I had gone through the -- my --

22   the majority of my evaluation, and Dr. Connolly was doing his

23   evaluation in parallel at the time.  So his results were not

24   available to me throughout the majority of my evaluation.

25   Q    So you reached your conclusions based on your

1   calculations; is that correct?

2   A    Um, I reached my conclusions based on my calculations.

3   But as I mentioned previously, certainly those conclusions

4   were validated by Dr. Connolly's results.

5   Q    But they were validated after you'd already reached

6   those conclusions based on your calculations.

7   A    Um, you know, to be honest with you, I can't remember

8   exactly when I first saw Dr. Connolly's estimates, um, where I

9   was in the process or -- or -- I don't believe I had

10  completely written my report.

11          I believe that those results were available at some

12  point along the -- my evaluation process.  I'm sorry.  I --

13  I'm not sure exactly what the timeline on his was compared to

14  mine.

15  Q    Well, let's talk about how you evaluated the sediment

16  traps.  So one of the factors that you considered were the

17  current speeds in the river; is that correct?

18  A    Um, that's correct.

19  Q    And you estimated that they were about half a meter per

20  second?

21  A    Um, on average.  That was a conservative estimate of the

22  average speed.

23  Q    And then you also considered the settling velocity of

24  fine particles in the river, correct?

25  A    I considered the -- the settling velocity of average

1    particles, not fine particles.  Those -- that average

2    velocity, as reported in the Study II report, I would assume

3    would be a -- an average, some settling faster and some

4    slower.

5    Q    Okay.  So I stand corrected.  So you used the average

6    settling velocity for particles of all sizes in the river.

7    A    That had been mobilized, yeah, based on Dr. Geyer's

8    measurements.

9    Q    You did not account in your calculations for the salt

10   front in any way; is that correct?

11   A    Um, that is correct.

12   Q    And so using the calculations that you did, you couldn't

13   predict that there would be natural trapping zones in the

14   river where Dr. Geyer says there are trapping zones; is that

15   correct?

16   A    Um, I did not attempt to -- I'm sorry.  Could you repeat

17   the question?

18   Q    Yeah.  So using your calculations based off of the

19   average current speed in the river and the average settling

20   velocity of particles, you couldn't predict where the natural

21   trapping zones would be located in the river, correct?

22   A    Um, that's correct.  That's why I sited mine at the area

23   where Dr. Geyer identified was the currently-existing

24   strongest trapping zone, which was the area that's just

25   adjacent to Bucksport in the main channel.

GLAZA - CROSS-EXAMINATION/THOMPSON

3190

1    Q    But your calculations didn't in any way take account of

2    the fact that there's already natural trapping going on in

3    that area?

4    A    No, nor are they intended to.

5    Q    Now, you spoke earlier this morning about the part of

6    recommendations of 1 and 2 that involved dispersing clean

7    sediment into the river or into Mendall Marsh.  Do you

8    remember that?

9    A    Hm-hmm.

10   Q    And that was sort of one of the later steps in the

11   process that you -- you laid out, correct?

12   A    Um, yes, and the timing was consistent with what they

13   identified in the -- Section 21 of the report.

14   Q    Was the way to go about dispersing clean sediment

15   something that you'd really developed as part of your

16   evaluation?

17   A    No, it really wasn't.

18   Q    It wasn't a big factor in reaching your conclusions?

19   A    No, it was not.

20   Q    Let's talk a bit about administrative feasibility for a

21   moment.

22        You said that issues related to permitting and

23   regulatory agency involvement were not a big part of what you

24   evaluated; is that correct?

25   A    Um, that is correct.

1    Q    And you've already said you didn't contact anyone at

2    regulatory agencies to discuss potential remediation in the

3    Penobscot.

4    A    No, that -- that's correct.  And if you'll notice on the

5    schedule that I developed, I assumed that all of that

6    regulatory approval and permitting would be done in parallel

7    with the design.  Therefore, it did not add anything onto my

8    assumed schedule, so I assumed that it would not be anything

9    which resulting in a -- a -- you know, a delay or a -- a

10   challenge that we could not overcome.

11   Q    But sitting here today, you don't know how Maine state

12   regulators would react to proposals to do active remediation

13   in the Penobscot?

14   A    I do not.

15   Q    And you also don't know how federal regulators would

16   react to proposals to do active remediation in the Penobscot?

17   A    No, I do not.

18   Q    As far as looking at the community acceptance factor

19   that you spoke about earlier this morning, you were focused on

20   issues that might cause concern in local communities, correct?

21   A    That's correct.

22   Q    Things that might cause people to object to -- to an

23   active remedy?

24   A    That's correct.

25   Q    And that's typically how that factor is -- is looked at

1    under the CERCLA factors that you laid out; is that correct?

2    A    Um, well, the community participation process, the

3    community has an opportunity to comment on all aspects of the

4    remedy.  Um, so I'm not sure I understand your question

5    exactly.

6    Q    Let me rephrase the question.  So I think in your

7    deposition you said that the community acceptance factor's

8    usually looking for reasons why the community might object to

9    a remedy; is that correct?

10   A    The community -- the community participation process,

11   people comment on all aspects of the remedy, and you'll see

12   that those comments range anywhere typically from, why are you

13   bothering to do anything, leave it alone, to clean up the

14   entire world and return everything to a pristine condition.

15   Um, so you'll find that full range of comments.  And then

16   you'd normally find also comments that are more focused on

17   specific aspects of a remedy that might be of particular

18   interest or have impact to a -- a smaller group of people,

19   such as siting of -- of a storage or disposal area or risks

20   presented to the water column.

21        So community input would cover all aspects of a remedy.

22   So I'm not sure if that answers your question or not.  I'm

23   sorry.

24   Q    Well, would you agree that the community acceptance

25   factor is broad enough to also consider whether there is a

1    significant desire within the local community to have a remedy

2    implemented?

3    A    Yes.

4    Q    But you didn't evaluate any of those potential factors

5    as part of your evaluation, did you?

6    A    I did not.

7    Q    So, for example, you didn't consider the degree to which

8    the local population may want the lobster fishery reopened

9    down in the lower river?

10   A    I did not.

11   Q    And you did not consider the degree to which local

12   residents may want to be able to use the Penobscot River for

13   swimming or fishing or boating without concerns about mercury.

14   A    I didn't realize there was concerns being raised on

15   swimming or boating on the river, but, ah, no, I did not take

16   those into consideration.

17   Q    And you did not consider the degree to which local

18   residents or businesses might want to see more robust

19   populations of songbirds or waterfowl in Mendall Marsh?

20   A    Um, I guess I'm a little confused by the question

21   because so far, there has not been, based on my interpretation

22   of the testimony of -- and report of, for instance, Dr. Henry,

23   there has not been a decrease in the population of the

24   songbird population identified.  So to say that they want to

25   see an increase in the population, I'm not sure how that's

GLAZA - CROSS-EXAMINATION/THOMPSON

3194

1  relevant when we haven't at this point even identified that

2  there is a risk or a decrease in the population.

3  Q    Did your evaluation focus at all on songbird populations

4  in Mendall Marsh?

5  A    It did not.

6  Q    Okay.  And you're aware that there's an advisory against

7  eating waterfowl hunted in Mendall Marsh, correct?

8  A    Correct.

9  Q    So -- so as part of your community acceptance criterion,

10  you didn't look at whether the local community might have

11  concerns about Mendall Marsh and want to see the marsh cleaned

12  up; is that correct?

13  A    No, I did not.

14  Q    Okay.  And you also did not consider the degree to which

15  local residents may feel that it's appropriate for companies

16  to clean up the pollution that they've put into public

17  resources; is that correct?

18  A    Ah, I guess I'm not in a position to comment about who

19  put what where, but it -- that was not part of my

20  consideration.

21  Q    And you also did not consider whether there might be

22  concerns among the public or among lobster fishermen that

23  contamination currently in the river could spread to other

24  areas?

25  A    Um, no, as I said before, I -- I did not consider that

GLAZA - CONTINUED CROSS-EXAMINATION/THOMPSON

1     aspect of it.

2            MR. THOMPSON:  Your Honor, this might be a good time

3     for our first break.

4            THE COURT:  Very good.  Thank you.  We'll take a

5     20-minute recess.

6        (Court recessed from 10:28 a.m. to 10:55 a.m.)

7            THE COURT:  Mr. Thompson?

8                    CONTINUED CROSS-EXAMINATION

9     BY MR. THOMPSON:

10    Q    Mr. Glaza, earlier this morning, you discussed the

11    importance of controlling ongoing sources to a contaminated

12    system; is that correct?

13    A    That's correct.

14    Q    Was assessing potential ongoing sources a primary focus

15    of your evaluation in the Penobscot?

16    A    Ah, no, it was not.  My -- my conclusions regarding that

17    were -- were based on what was in the report and the

18    depositions and testimony of others.  And like I said, the

19    primary concern was that issue that was identified by

20    Dr. Geyer regarding the long-term disturbance and additions to

21    the mobile pool.

22    Q    But you yourself do not have a view on whether the

23    magnitude of any ongoing sources would be enough to

24    recontaminate the system; is that correct?

25    A    That is correct.

1  Q    And, similarly, you don't know whether ongoing sources

2  would interfere with -- with some active remedy; is that

3  correct?

4  A    Um, that is correct, but, again, that's based on the

5  opinion of Dr. Geyer, who certainly has significant knowledge

6  on the system.  And it also was consistent with what I would

7  call commonsense considerations that there will be less

8  frequent events that are more significant flow events that

9  would mobilize contaminants over a longer period of time.

10      So I think my conclusion is -- is well justified, based

11  on those considerations.

12  Q    But you didn't attempt to evaluate that in any

13  quantitative or detailed way?

14  A    No, I did not.

15  Q    Let's turn to talking a bit more about feasibility

16  studies at contaminated sites.  That's something you've been

17  involved in throughout your career; is that correct?

18  A    That's correct.

19  Q    And I believe you said yesterday that in evaluating

20  recommendation 1, you did not conduct a full feasibility

21  study; is that correct?

22  A    That's correct.

23  Q    And, similarly, you did not conduct a full feasibility

24  study for recommendation 2?

25  A    Um, that's correct.  Um, a feasibility study would come

1    after you have the risks identified, and it would also

2    consider a multitude of alternatives to come up with the best

3    one.  I used that framework as a method of determining whether

4    or not recommendations 1 and 2 made sense and should be

5    considered further.

6    Q    Well, let's just talk through, to make sure we're clear

7    on the record, of how a feasibility study works.

8         The first step is that you convene a multidisciplinary

9    team of people, correct?

10   A    Ah, no, that's not correct.  The first step is that you

11   have the site well characterized, and you've identified what

12   your risks are, um, so you have a basis for moving forward and

13   developing the right team to develop and evaluate

14   alternatives.

15   Q    Okay.  Well, I'm talking specifically about the

16   feasibility study stage of the process.  Once you have the

17   risks defined, once you understand the system, your first step

18   is to bring together all the people you need to do a

19   feasibility study, correct?

20   A    That's correct.

21   Q    All right.  And that team involves many diverse areas of

22   expertise, correct?

23   A    That's correct.

24   Q    So, for example, you would bring experience in technical

25   direction and project management?

1   A     Um, as well as, you know, practical experience on

2   methods of sediment remediation, um, and concerns -- or, you

3   know, advantages or disadvantages associated with implementing

4   them.  So it would certainly be well beyond the project

5   management aspect.  It would also be technical input.

6   Q     And you would also need scientists involved in that

7   process?

8   A     That's correct.

9   Q     And other engineers involved in that process?

10  A     That's correct.

11  Q     And I believe at your deposition, you referred to

12  constructability people?

13  A     Um, yes.  Ah, certainly people who have a long history

14  of the actual implementation and construction bring valuable

15  insight to a project.

16  Q     So, for example, at Onondaga Lake, you said there were

17  over 30 people involved in various parts of the feasibility

18  study.

19  A     Um, there was -- yes.

20  Q     So it's fair to say a feasibility study is not something

21  that you would conduct all by yourself; is that right?

22  A     Um, that's correct.

23  Q     And as far as the feasibility study process goes, the

24  first thing you do is pull together all the data and results

25  from your remedial investigation and your risk assessments; is

1    that right?

2    A    Ah, typically that's already been all pulled together in

3    a comprehensive remedial investigation report as -- as the --

4    the risk assessment with clearly-identified, you know, risks

5    and the basis for development of some type of risk-based goal.

6    Q    Okay.  And then once those are defined, the next step is

7    develop -- is to develop remedial goals for the site; is that

8    right?

9    A    Um, that's correct.

10   Q    And then once you have your remedial goals in mind, you

11   go through a process of assessing various different

12   technologies and different remedial alternatives; is that

13   right?

14   A    That's correct.

15   Q    And for each of those alternatives, you develop a -- a

16   fairly detailed assessment of that alternative; is that

17   correct?

18   A    Um, yes, that's correct.

19   Q    And you use that to weigh the pros and cons of each

20   possible approach?

21   A    Right, that's the five primary balancing criteria

22   involved ultimately to determine which would be the best

23   approach based on all those considerations.

24   Q    And throughout that process, you would be open to

25   innovative ideas, new ways of doing things?

GLAZA - CONTINUED CROSS-EXAMINATION/THOMPSON

1    A    Um, yes.

2    Q    And then at the end of that, finally, you get to a stage

3    where you select some preferred remedy for the site, correct?

4    A    Ah, that's correct.

5    Q    Or I should say, the team proposes some preferred remedy

6    for the site?

7    A    That's correct.

8    Q    And then it's the regulatory agency, typically, that

9    actually selects if that's the remedy that's going to go

10   forward?

11   A    Um, correct.

12   Q    Now, at Onondaga Lake, the feasibility study that you

13   prepared resulted in hundreds of pages of documents and

14   figures and tables; is that correct?

15   A    Um, yes, it was a very extensive evaluation, that is

16   correct.

17   Q    These are large, voluminous projects, correct?

18   A    Yes.

19   Q    Now, are you familiar with the recommendation by

20   plaintiffs' expert Dr. Driscoll that the next step in the

21   Penobscot should be to convene a group of mercury scientists

22   and engineers and perhaps regulators to begin exploring

23   potential remedial options?

24   A    Um, yes, I am, and I certainly agree in concept that

25   it's valuable to have a multidiscipline team, but I don't

1    believe that we're at that stage yet.

2         Ah, we need further definition of the site conditions,

3    such as the mobile pool, what role it may be having in

4    contributing to any potential risks, and a clear definition of

5    what those risks are.  So I agree with the concept; I disagree

6    with the timing.

7    Q    Okay.  So you understand that the Study Panel has a --

8    has spent years evaluating the Penobscot and has made a

9    unanimous recommendation that we're ready to move forward to

10   evaluating remedy approaches; is that right?

11   A    Um, yes.

12   Q    But you disagree with them on that point.

13   A    Um, I would disagree with that based on the expert

14   reports and the other information that I've heard on this

15   front that further definition of the risks and further

16   definition of what's causing those risks is warranted.

17   Q    And, similarly, you disagree with Dr. Driscoll that

18   we're at the point where we can move to starting to evaluate

19   potential remedies.

20   A    That's correct.

21   Q    And the -- your understanding of whether or not there's

22   risk in the system is based largely on the work that other

23   people have done in this case.  That wasn't the primary

24   purpose of your evaluation; is that correct?

25   A    That's correct.

1    Q     Now, assuming that we do need some further information

2    about the Penobscot, as you've said, once we get that

3    information, I think you just said that you agree that the

4    next step would be bringing together a multidisciplinary team

5    to look at remedy options?

6    A     Yes, once we have those risks and those site conditions

7    of concern better quantified and if it is determined that

8    there is an unacceptable risk, um, that appropriate -- would

9    be appropriate.

10   Q     And if there was a determination that there were

11   unacceptable risks, do you envision that that team would look

12   broadly and -- for solutions, wherever they could find them?

13   A     In general, yes.  But I certainly think that there's

14   been a lot of valuable information gained, and -- and I think

15   the current information available and the amount of evaluation

16   that -- that I've done, and that was also done by the Study

17   Panel, gives us a basis for focusing that effort down to

18   specific efforts that are targeted specifically at those risks

19   and pathways.

20         And based on that, I think that there are things that

21   should be ruled out, such as massive dredging or bank-to-bank

22   capping, um, you know, the elimination of the large-scale

23   dredging is consistent with recommendations of the Study

24   Panel, and I -- I think the sediment trap concept needs to put

25   in -- to be put into that category of not considering it

 1  further.

 2      But certainly I -- you know, beyond that recommendation,

 3  I think that there is value in allowing a -- a consideration

 4  of, you know, a range of alternatives to address those --

 5  those focused risks.

 6  Q    And if there were a team like that put together to look

 7  for remedial -- remedial options for the Penobscot, is that

 8  something that you could participate in?

 9  A    Um, it's certainly a role that I have played in the

10  past.  Um, as I said, you know, once -- once you know what

11  problem you're trying to solve, you know, engineers are good

12  at problem-solving, and that's how I view the -- the

13  feasibility study processes that I've been involved in.

14            MR. THOMPSON:  No further questions.

15            THE COURT:  Redirect?

16            MR. TALBERT:  Yes, Your Honor.

17                    REDIRECT EXAMINATION

18  BY MR. TALBERT:

19  Q    Mr. Glaza, you were earlier asked about your work for

20  potentially responsible parties?

21  A    That's correct.

22  Q    And in your experience, most of these sites, the

23  potentially responsible party's leading the cleanup effort?

24  A    That's correct.

25  Q    Is that why most of your work has been working with

1  potentially responsible parties because you're in the business

2  of looking at and evaluating options to clean up contaminated

3  sediment sites?

4  A     Looking at them, and then designing them and

5  implementing them, that's correct.  It's the -- it's the

6  potential responsible parties who are taking the lead and --

7  and doing those phases, correct.

8  Q     There aren't many community nonprofit groups funding

9  large remediation sites, correct?

10 A     Not that I'm aware of.

11 Q     At Onondaga Lake, I believe you discussed some of the

12 nitrate additions as an amendment that are being examined?

13 A     Yes.

14 Q     Is it your understanding that Dr. Driscoll is involved

15 in that effort?

16 A     Yes, from an academic standpoint, he has provided, ah,

17 some limited input, but valuable input.  He certainly has a --

18 a good understanding of mercury cycling and has certainly been

19 part of the process of conceptualizing the idea.

20 Q     Would you characterize his overall role at the Onondaga

21 site as fairly limited?

22 A     Um, yes, I would.  He's provided a -- more of a -- a

23 review capacity on certain very limited aspects of the remedy,

24 primarily as it pertains to the -- the theory behind the

25 nitrate cycling, as well as helping us to develop and

1    interpret some of our long-term fish sampling data.

2    Q    How long have you worked on Onondaga?

3    A    Um, I believe, ah, the feasibility study started in

4    2002, so that's about 12 years now, and we still have, um,

5    after this year, two more years of construction.  So a very

6    long-term project.

7    Q    And I believe you discussed in cross-examination some of

8    the differences between lake conditions in Onondaga and the

9    Penobscot.  Do you recall those?

10   A    Um, yes, that's correct.  Just physically they're very

11   different systems, um, the lake being a relatively quiescent

12   system where you don't have flows, and the other significant

13   difference is just in the levels of contamination.  Um, for

14   Onondaga Lake, where we had levels of mercury and other

15   contaminants, particularly the mercury was ten to a hundred

16   times higher than it is in the Penobscot River.  In those

17   areas, it was determined that, you know, active remediation

18   was appropriate, removal of some hotspots via dredging.

19        And then in the lower areas of contamination, after we

20   knew that the internal and external sources had been

21   addressed, then monitor natural recovery, you know, was the

22   approach.

23   Q    Are you aware that in the Penobscot, Mallinckrodt is

24   planning to remove the Southerly Cove?

25   A    Ah, yes, I am.

1    Q    And based on your review of the Phase II Report, is that

2    one of the only areas identified as a potential hotspot?

3    A    Um, that's consistent with my understanding.  Um, I

4    can't speak to its contribution to ongoing risk, but certainly

5    just purely based on a concentration basis, um, that is the

6    only area that I've seen presented where there is clearly an

7    elevated level of mercury.

8    Q    And just so we understand the perspective by which

9    you've reviewed the Phase II Report, you've reviewed the --

10   basically the entire report, correct?

11   A    Um, that's correct.

12   Q    And you also reviewed the expert reports submitted by

13   the parties?

14   A    Um, that's correct.  I -- my -- my reading was certainly

15   broader than the more focused nature of what I was asked to

16   evaluate.

17   Q    And you -- you evaluate -- you also read numerous

18   depositions in this matter, correct?

19   A    That's correct.

20   Q    And your focus has been from an engineering perspective

21   of looking at remedial options, correct?

22   A    That is correct.

23   Q    You testified earlier that you're not aware of any state

24   or federal involvement at this -- at the -- in the Penobscot

25   River for this case; is that correct?

1    A    Um, that is correct.

2    Q    In your experience, do federal and state agencies

3    typically get involved in sites that are significantly

4    contaminated?

5    A    Um, that's certainly been my experience.  Um, yes, every

6    site that I have ever been involved in, where there has been

7    regulatory involvement, um, um, there has been a significant

8    level of contamination and a significant risk presented.

9         I have been involved in other sites where initially the

10   regulators looked at it and then made the determination that

11   there, you know, was not a significant risk or a significant

12   concern, and -- and determined that -- you know, there was no

13   need for their ongoing involvement.

14   Q    You were asked on cross-examination about natural

15   trapping areas.  Do you recall that?

16   A    Yes.

17   Q    And were you able in this case, even if you wanted to,

18   to review whether you could go in and remove sediment from

19   natural trapping areas?

20   A    Um, no, I was not specifically asked to evaluate that in

21   detail.

22   Q    But would you -- would you have been able to in light of

23   the information presented in the Phase II Report?

24   A    Um, no, ah, there was really -- the -- the

25   identification of the natural trapping zones was identified

1    because there was high levels of particulate matter in the

2    water column in those areas.  They did not specifically do

3    cores and say that we've got a thick deposit of mobile

4    material here.

5         So certainly would not -- there would be significant

6    additional information that would be required to evaluate

7    whether that was viable or not.  I don't think we've got

8    enough information right now to rule it out, but I can also

9    certainly envision some challenges with that.

10   Q    In light of what you've reviewed in Chapter 7 regarding

11   these natural trapping areas, if you did want to go in and try

12   to evaluate from an engineering perspective how to remove

13   those, what additional information would you want?

14   A    Well, first of all, I want to say that I'm not sure even

15   if you were able to identify them that dredging would be the

16   right approach.  My -- my -- I tend more to turn to -- if you

17   could identify and say, here's a significant area where

18   there's temporarily-trapped sediments, I would tend to lean

19   more toward a capping approach, um, because the capping would

20   achieve the same goal, but isolate them from the environment,

21   but it wouldn't present the short-term risks.

22        And, also, a concern I would have with dredging is

23   dredging is not a surgical piece of equipment.  These are very

24   large pieces of construction equipment.

25        In Dr. Geyer's Chapter 7, he said that the average

1    thickness of the mobile sediment pool is 5 to 10 centimeters,

2    so that's a very thin layer.  That's not ideal conditions for

3    a dredge to go out and remove.  If you tell a dredge that he

4    needs to remove 6 inches minimum, he's going to remove

5    anywhere from 12 to 18 inches to make sure he gets that

6    6 inches.  You do that, you're dredging that cleaner layer of

7    surface material and exposing the deeper material.

8        So, again, I'm not saying at this point that we have

9    enough information to rule it out, but certainly additional

10   data collection regarding the thickness, um, of the deposits,

11   where they might be at any one time throughout the season or

12   an annual basis would certainly be important to identifying

13   whether a capping or dredging remedy had merit for further

14   consideration.

15   Q    You were asked earlier about online -- on-land sediment

16   storage area and whether you looked into a location where it

17   could be sited along the Penobscot.  Do you recall that?

18   A    I do.

19   Q    Did your evaluation -- well, for the purposes of your

20   evaluation, did you assume that it -- it -- that the on-land

21   storage facility for sediment could be sited along the

22   Penobscot?

23   A    Um, that would certainly be preferred.  You'd like to

24   limit the -- the distance that you would have to transport

25   that material, so you'd want to have it as close to the -- the

1    river as possible.

2    Q    But you didn't eliminate that as an option based on

3    siting conditions?

4    A    No, that -- that's right.  The -- the siting concerns is

5    an issue that has eliminated that from consideration at some

6    sites, and at other sites, that is a challenge that has been

7    overcome.  So I'm certainly not saying that that was a -- a

8    fatal flaw in the plan.  I was merely pointing out that there

9    would be significant issues and would be a very significant

10   consideration in the overall recommendation.

11   Q    On cross-examination, you were asked about the list of

12   sites that Todd Bridges provided where CADs have been

13   implemented?

14   A    Hm-hmm.

15   Q    Do you recall that?

16   A    Yes.

17   Q    Is it your understanding, based upon your review of --

18   of Todd Bridges' deposition, which, for the court, is Joint

19   Exhibit 33 in evidence, did he essentially cut and paste that

20   list from a PowerPoint presentation that he gave?

21   A    Ah, well --

22   Q    And sent it on to the Study Panel for review?

23   A    Um, I'm not sure which came first, the list in a -- some

24   other report, but it is certainly a -- a list that has shown

25   up in -- in PowerPoint presentations by him, as well as

1    others.

2         Beyond that, I can't speak to the -- the basis or the

3    origin of that list.

4    Q    And, again, he wasn't -- your understanding that he

5    wasn't presenting that list as a list to say that this could

6    actually be done in the Penobscot, but that it was an idea and

7    a concept.

8    A    That was my understanding of the context of it, and I

9    think -- I think he was clear to point that out in his

10   deposition, as well, that this is -- this is -- they have been

11   done at other sites.  It is possible, but he was not saying

12   that it should be done for this site.

13   Q    You were asked on cross-examination whether or not

14   you've checked with state or federal regulators on their

15   reaction to recommendations 1 and 2.  Do you recall that?

16   A    I do.

17   Q    For purposes of your evaluation, you -- you assumed that

18   there would be regulatory acceptance and approval, correct?

19   A    Correct, yes, I did not use that as a basis or a

20   consideration in coming to the conclusion that it should not

21   be pursued further.

22   Q    And in that way, your evaluation's conservative because,

23   in reality, there could be regulatory hurdles that are run

24   into with those two options, correct?

25   A    Certainly, yes.

GLAZA - REDIRECT EXAMINATION/TALBERT

3212

1    Q     With respect to ongoing sources, you were -- is it fair

2    to say that your identification of the issue of ongoing

3    sources as a means of recontaminating the system was based on

4    your review of the Phase II Report?

5    A     Um, it was the Phase II Report, um, but certainly a lot

6    more detailed information regarding the likelihood of

7    mobilization of impacted sediments on a longer time frame I

8    believe was explained more explicitly in Dr. Geyer's

9    deposition and in his testimony.

10   Q     Are you also aware that there is -- the Study Panel has

11   estimated an amount of material that's coming from above the

12   Veazie Dam?

13   A     Um, yes.

14   Q     Was that a -- a source of contamination that you

15   considered in terms of ongoing sources?

16   A     Um, yes, it certainly is.  Um, and that's a -- a

17   consideration at any river site.

18   Q     Is it your understanding that the Study Panel themselves

19   in the Phase II Report identified additional work that needs

20   to be accomplished in evaluating remedial options?

21   A     Um, I don't recall the exact context, but I do recall

22   that there was recommendations for further data collection.

23   Q     Are you aware that the Study Panel identified certain

24   uncertainties surrounding the mobile pool, for example?

25   A     Um, certainly the mobile pool, um, there were

1    significant uncertainties regarding its -- the quantification

2    of its size and its behavior, um, and, you know, where it is

3    at any given time.  So certainly there was significant

4    uncertainties identified by the Study Panel on that.

5    Q     To your knowledge, has the Study Panel conducted any

6    feasibility study in this case?

7    A     Ah, not that I'm aware of.

8    Q     And, in your opinion, are the Study Panel members

9    experts in remediation?

10   A     I don't know if I'm really in a position to comment on

11   what their qualifications are, but, you know, based on, you

12   know, what they focused on, um, within the report and from

13   what I know, it appears that they are primarily focused on,

14   you know, research and the up-front investigation aspects of

15   -- of a project, as opposed to the design and implementation,

16   but it -- and, again, I'm not in a position to make a judgment

17   on their capabilities.

18   Q     In your opinion, should recommendations 1 and 2 be

19   pursued further?

20   A     No, they should not.

21   Q     And after some time period where additional information

22   is gathered, do you believe that remedial options, if they are

23   necessary, should be focused on specific areas of the site?

24   A     Yes, they need to be certainly very focused on the -- on

25   any unidentified risks, um, and specifically the exposure

1   relative to what's causing those risks.  So it'd be very

2   appropriate to focus any efforts on that.

3            MR. TALBERT:  No further questions.

4            THE COURT:  Recross, Mr. Thompson?

5            MR. THOMPSON:  Very briefly, Your Honor.

6                        RECROSS-EXAMINATION

7   BY MR. THOMPSON:

8   Q    Mr. Glaza, you were just talking about a comparison of

9   the levels of contamination in Onondaga Lake and in the

10  Penobscot.  Do you remember that?

11  A    I do.

12  Q    And in making that comparison, are you talking about the

13  levels of total mercury in sediments in those two sites?

14  A    Yes I am.

15  Q    You're not talking about, for example, methylation

16  rates?

17  A    That's correct.

18  Q    Between those two sites?  And you're not talking about

19  methylmercury levels in biota at the two sites?

20  A    No, I'm not.

21  Q    You were also asked about the -- the removal of

22  sediments from Southerly Cove.  Do you remember that?

23  A    Yes.

24  Q    And, to your knowledge, has the Study Panel sampled any

25  other coves around the HoltraChem site?

1    A     You know, I can't speak to that.  I don't know.

2    Q     Okay.  So you don't know if there might be other

3    hotspots other than Southerly Cove in that part of the river?

4    A     Um, I don't believe that there were any identified in

5    the Phase II Report, and, you know, it appeared that this is a

6    very widespread, low-level, dispersed level of contamination,

7    so I wouldn't expect that there are, but, again, I can't

8    really speak directly to that.

9    Q     You're not aware of any sampling that was done looking

10   for that?

11   A     I know there was a lot of sampling, but I can't

12   specifically say whether or not they were specifically

13   searching for hotspots.

14   Q     Then, finally, you -- you said that your understanding

15   is that the mobile sediment pool is about 5 to 10 centimeters

16   thick; is that correct?

17   A     Ah, I believe Dr. Geyer characterized it as being, on

18   average, 5 centimeters thick, um, and that the maximum length

19   of the cores that he, um, collected was 10 centimeters.  So if

20   it ever exceeded 10 centimeters, he wasn't able to determine

21   how much thicker, but his conclusion and the basis of his

22   estimates was, I believe, a 5-centimeter thickness.

23   Q     And is it your understanding that that's -- also applies

24   in the trapping zones that he identified?

25   A     Um, I'm not aware that there was information collected

GLAZA - CROSS-EXAMINATION/THOMPSON

3216

1    within those trapping zones to -- to assess that, um, but it

2    was typically characterized as a -- a widespread, dispersed

3    thin layer.  But, again, that would certainly be something

4    that you would identify as an area where future data

5    collection might be appropriate to help you assess that.

6         But, again, that -- his conclusion on the

7    sediment-trapping zones was based on the -- the observation of

8    high levels of particulate matter in the water column over the

9    tops of those areas, which led him to the conclusion that if

10   it's in the water, it must be settling out, and, therefore,

11   there must be a lot of sediment on the bottom.

12        I don't believe there was any significant direct

13   evidence of that, except maybe at the mouth of Mendall Marsh,

14   again, an area where -- to allow further evaluation of that

15   might be a potential area where you collected additional data.

16   Q    Are you familiar with Dr. Geyer's testimony that one of

17   his tripod instruments was buried in the Bucksport trapping

18   area by over a meter of sediment for a period of time?

19   A    Um, yes, and, also, um, in his deposition, he identified

20   a new phenomena which had not been previously been postulated

21   to explain it, which is a -- a sand wave, if you will, or a

22   moving bedload of sediment as opposed to something that he

23   would characterize as a -- a mobile pool.  So, again, an area

24   perhaps where additional data collection would help clarify

25   that.

1   Q     So it's possible that we might learn more that might

2   make using the trapping areas as a way to collect mobile

3   sediments a more plausible option, in your view?

4   A     Ah, I certainly don't think we have enough information

5   at this point to rule it out.

6   Q     Okay.

7   A     So, yes, I would agree.

8              MR. THOMPSON:  No further questions.

9              THE COURT:  Thank you.

10             MR. TALBERT:  No further questions.

11             THE COURT:  Thank you.  You may stand down, sir.

12  Thank you.

13        (The witness left the witness stand.)

14             THE COURT:  Next witness?

15             MR. TALBERT:  Yes.  We call Dr. Connolly -- Dr. John

16  Connolly.

17             THE CLERK:  Do you solemnly swear that the testimony

18  you shall give in the matter now in hearing shall be the

19  truth, the whole truth, and nothing but the truth, so help you

20  God?

21             THE WITNESS:  I do.

22             THE CLERK:  Please be seated.  Please state your

23  name and spell your last name for the record.

24             THE WITNESS:  My name is John Connolly,

25  C-o-n-n-o-l-l-y.

1    JOHN CONNOLLY, having been duly sworn, was examined and

2    testified as follows:

3                         DIRECT EXAMINATION

4    BY MR. TALBERT:

5    Q    Dr. Connolly, what is your area of expertise?

6    A    My area of expertise has to do with fate and transport

7    of contaminants in surface waters, um, their accumulation in

8    food webs, the evaluation of source contributions to surface

9    waters, and the evaluation of remedial alternatives, including

10   the development of mathematical models that are used to

11   predict fate, transport, and bioaccumulation for purposes of

12   evaluating various remedial alternatives.  And I've also been

13   involved in the design of remedial alternatives -- remedial

14   options.

15   Q    What is your educational background?

16   A    I have a bachelor's in civil engineering from Manhattan

17   College.  I have a master's in environmental engineering from

18   Manhattan College.  And I have a Ph.D. from the University of

19   Texas in environmental engineering.

20   Q    How many contaminated sediment sites have you worked on?

21   A    Roughly 30 or so.

22   Q    Have you worked on contaminated sediment sites across

23   the country?

24   A    I have.

25   Q    Have you worked on contaminated sediment sites in other

CONNOLLY-DIRECT EXAMINATION/TALBERT

3219

1    countries?

2    A    I have.

3    Q    In your career, have you worked on some of the largest

4    contaminated sediment sites in the U.S.?

5    A    Yes, I have.

6    Q    How many years have you worked on contaminated sediment

7    sites?

8    A    Approximately 36 years.

9    Q    And can you please describe for the court what your role

10   is -- or role has been at these contaminated sediment sites?

11   A    I've been involved in contaminated sediment sites from

12   the beginning of the investigation all the way through the

13   design of the remedy.  So that typically would involve, at the

14   early ends of a site investigation, the design of the field

15   programs that are used to collect all of the data that are

16   used for site characterization, um, and for risk assessment.

17       I've been involved in the interpretation of those data

18   to characterize the site, the identification of contaminant

19   pathways, by which contaminants are moving through the site,

20   natural recovery of the site.

21       Um, and then I've been involved in, as I said, the

22   development of these mathematical models that characterize the

23   fate and transport processes, characterize bioaccumulation,

24   and then using those models to evaluate various remedial

25   options for the site, given certain objectives, and then those

1    models are used in the feasibility study for contrasting the

2    different alternatives and their effectiveness.

3         And then I've been involved in the predesign work that's

4    associated with the remedy.  Once a remedy's chosen, typically

5    there's a fair amount of work that still needs to be done in

6    the field to craft the remedy.  So I've been involved in the

7    design of those programs, the collection of the data itself,

8    and the interpretation of that data, the design of the remedy.

9         And then I've also been involved in the design of the

10   long-term monitoring programs, as well as the monitoring

11   programs that occur during the remediation to evaluate impacts

12   of the remedy itself.

13   Q    Are you an expert in calculating half-times for recovery

14   using sediment cores and radionuclide tracers?

15   A    Yes.

16   Q    How many sites have you calculated half-times for

17   recovery using sediment cores and radionuclide tracers?

18   A    Hm, roughly ten sites.

19   Q    Do you have expertise in evaluating biota data?

20   A    Yes, I do.

21   Q    At how many sites have you done that?

22   A    I've done that on most of the sites that I've worked on,

23   so it's something close to the 30 sites that I've worked on.

24   Q    Have you worked on behalf of plaintiffs, as well as

25   defendants in litigation?

CONNOLLY - DIRECT EXAMINATION/TALBERT

3221

1   A     Yes, I've worked for the government on a number of

2   sites, and I've worked for what we've been calling PRP's on a

3   number of sites.

4   Q     In your experience, is the responsible party typically

5   involved in remedial action decision-making?

6   A     Yes.  As I think sitting here, Ed Glaza testified that

7   the responsible party is typically intimately involved.  In

8   most sites, it conducts the remedial investigation to

9   characterize the site, the risk assessment, and then the

10  feasibility study.

11  Q     Where are you currently employed?

12  A     Anchor QEA.

13  Q     And does Anchor QEA work on some of the largest and most

14  contaminated sediment sites in the United States?

15  A     It does, and Anchor QEA probably has more experience

16  working on contaminated sediment sites than any other

17  consulting firm in the United States.

18  Q     How many contaminated sediment sites have you worked on

19  where mercury was a contaminant of concern?

20  A     I've worked on four, including the Penobscot.  I've also

21  worked on Lavaca Bay.  I've worked on the Peconic River on

22  Long Island, which is a mercury site, and I've worked on the

23  Passaic River, where mercury is one of the contaminants of

24  concern.

25  Q     What percentage of your time is spent on work related to

CONNOLLY - DIRECT EXAMINATION/TALBERT

3222

1  contaminated sediment sites?

2  A    I would say about 90 percent.

3  Q    Have you published on topics related to contaminated

4  sediment sites?

5  A    I have.

6  Q    Have you received any awards in your career?

7  A    Yes, I have.

8  Q    Could you please explain those?

9  A    I was inducted by eminence into the American Academy of

10  Environmental Engineers.  I was inducted as an honor member

11  into Sigma Psi, which was the National Scientific Honors

12  Society.  I was inducted into the National Academy of

13  Engineering.  And I was inducted into the University of Texas

14  School of Civil, Architectural, and Environmental Engineering

15  Academy of Distinguished Alumni.

16         MR. TALBERT:  Your Honor, a full copy of

17  Dr. Connolly's CV is in Joint Exhibit 45.

18         THE COURT:  Thank you.

19  BY MR. TALBERT:

20  Q    When did you begin working on the Penobscot River?

21  A    In 2000.

22  Q    And were you retained by Mallinckrodt?

23  A    Yes, I was.

24  Q    What were you asked to do?

25  A    At that time, I was asked to evaluate conclusions that

1    had been drawn by another expert that levels of mercury in

2    biota that he had examined within the Penobscot River were

3    similar to levels in neighboring estuaries despite the fact

4    that the sediment mercury concentrations in the Penobscot

5    appeared to be higher, and I was brought in to try to provide

6    an explanation of how that could be.

7    Q      And was this in connection with the liability phase of

8    -- of the trial --

9    A      Yes.

10   Q      -- in this case?

11          After the trial, did you continue to work on the

12   Penobscot River?

13   A      I did.

14   Q      And in what capacity?

15   A      Um, after -- after the trial, I was asked to craft a

16   field program that would address the questions that had been

17   posed by the court in the liability case.

18          Subsequent to that, I was asked to review the field

19   program that was developed by the Study Panel.  I was asked to

20   review their Phase I Report when it was issued, and I was at

21   that time also following along, to the extent that I could,

22   the work that was being done by the Study Panel, interacting

23   with the Study Panel at various points, or -- particularly

24   early on in the project, providing comments and

25   recommendations to the Study Panel, based upon my

1   interpretation of the information that was being generated.

2          And then, ultimately, when the Phase II Report was

3   released, the Study Panel provided all the data that they had

4   collected, and at that time, I became involved in trying to do

5   a whole range of analyses using the data that was provided at

6   that time.

7          And on the basis of that, evaluate questions posed by

8   the court and then review the Study Panel's Phase II Report

9   and provide comment.

10  Q     So you've been working on the Penobscot project for

11  approximately over 13 years?

12  A     Yes, I have.

13  Q     From the time period after the liability trial to the

14  issuance of the Phase II Report, did you draft written

15  memorandum in connection with this work that was submitted to

16  the Study Panel?

17  A     I did.

18  Q     And when you produced those written memorandum, did you

19  receive input from others at your firm, QEA, which later

20  became Anchor QEA?

21  A     Yes, I drew on a variety of expertise within the company

22  to assist me in reviewing data and providing comments.

23  Q     You're not an expert in all of the areas that you

24  provided comments on throughout this process?

25  A     No, I am not.

1    Q    Were there time periods from 2002 to the issuance of the

2    Phase II Report when you did not have all the Study Panel data

3    to make full and meaningful comments?

4    A    Yes, that occurred from the -- the start of their work

5    up until they finally released all the data with the issuance

6    of the Phase II Report.

7    Q    Let's take a look now at -- at some of the comments that

8    you provided.  Let's pull up Plaintiffs' Exhibit 149, at Page

9    -- it's Electronic Page 15.

10        You mentioned you provided some comments on the initial

11   study plan?

12   A    Yes.

13   Q    And this is -- these are comments from February 7th,

14   2005?

15   A    Yes.

16   Q    Do you recall this document?

17   A    I do.

18   Q    Let's go to Page 46 of this document.  And within this

19   document, you made several comments on the study plan,

20   correct?

21   A    Yes.

22   Q    Was one of those comments that the Study Panel should

23   take samples of bald eagles?

24   A    It -- it was, based on the fact that there had been

25   observations of bald eagle nests in the vicinity of the plant,

1   and there was reproduction data available, so I thought that

2   using that data and collecting some additional data would be

3   useful to evaluate whether there were any impacts on the bald

4   eagles.

5   Q     Let's go to Page 51.  Did you also make some comments

6   regarding what the process should be for evaluating

7   toxicological impacts?

8   A     Yes, the Study Panel had proposed in their initial work

9   to do some toxicity testing, and I suggested that they phase

10  the work and first collect information on the levels of

11  contamination, compare that to literature-based metrics of

12  toxicity, and if levels in the biota exceeded those metrics,

13  that that would then kick off toxicity testing that would

14  occur in a later phase.

15  Q     To the best of your knowledge, is that consistent with

16  Mallinckrodt's position in this case?

17  A     Yes.

18  Q     Let's take a look at Page 55.  Did you also make a

19  recommendation regarding how the evaluation of human health

20  risk assessment should take place?

21  A     Yes.  Similarly, I suggested that there -- there be a

22  phased approach and that the first step would be to evaluate

23  levels in biota, compare them to the regulatory thresholds,

24  both the Maine DEP and the U.S. EPA thresholds for human

25  health, and if there was a finding that levels exceeded those,

1  then that could be followed up by further investigation of

2  potential impacts.

3  Q     In your experience, is that a phasing that has been used

4  at other sites?

5  A     Yes.

6  Q     Did you also make comments on the Phase I Report itself?

7  A     I did.

8  Q     Let's pull up Plaintiffs' Exhibit 153, at Page 13.  Were

9  your comments presented on February 20th, 2008?

10 A     They were.

11 Q     I'm not going to go through all of your comments, but

12 let's just turn to Page 29.

13       At this point in time, when the Phase I Report was

14 issued, after you reviewed the Phase I Report and evaluated

15 the statements in there, did you comment that there should be

16 a focus on specific areas of the system?

17 A     Yes.

18 Q     And what was your recommendation?

19 A     My recommendation was that based upon the Phase I

20 information, that Phase II should have a primary focus in

21 understanding of the wetlands as a mercury source,

22 particularly to songbirds.

23 Q     Is it your understanding that that's a -- a primary

24 focus still today?

25 A     Yes.

1   Q     Let's take a look at Page 55 -- I'm sorry -- Page 30.

2   At this point in time -- and let's pull up this paragraph here

3   -- when the Phase I Report was issued, did you have all of the

4   data necessary to evaluate the report?

5   A     No, the -- the Study Panel did not provide a significant

6   fraction of the data they had collected, um, which -- which

7   hampered my ability to fully evaluate the information.

8   Q     In other words, you could see charts within the Phase I

9   Report and read the text, but really not fully understand how

10  that data and information was put together?

11  A     Yes.

12  Q     Did you also make comments on the Phase II Study Plan?

13  A     I did.

14  Q     Let's pull up Plaintiffs' Exhibit 155 at Electronic Page

15  12.  Did you provide those comments on March 26th, 2008?

16  A     I did.

17  Q     Let's go to Page 15.  And if we could, this -- in this

18  section, this introductory section, you present some

19  statements and conclusions after reviewing the Phase I Report,

20  and then informing some of your comments on -- on the Phase II

21  Study Plan, correct?

22  A     Yes.

23  Q     And can you just walk us through some of your comments?

24  A     Yes, I identified that coastal background sources were

25  not insignificant, particularly for biota in Penobscot Bay,

1    and that within what is characterized as the upper estuary,

2    the area between Veazie Dam and south of Verona Island, ah,

3    that perhaps background sources accounted for maybe a third to

4    two-thirds of what was there, levels being about three times

5    higher than they were on the coast.

6         And that upstream sources were responsible for some

7    contribution to the system, and that within the system, the

8    mercury is fairly widely dispersed, particularly within the

9    upper estuary, and there was a general pattern of decreasing

10   concentration as you moved down from the upper estuary and out

11   into the bay.

12        And then finally, here, that some of the marshes may be,

13   in fact, some substantial sources of mercury to local biota

14   because there are high mercury concentrations and high rates

15   of methylation in the marshes.

16   Q    With respect to your evaluation of additional sources,

17   is it your understanding that after the Phase II Report was

18   issued, that the Study Panel found that currently the largest

19   ongoing source of mercury to the upper estuary is coming from

20   above the Veazie Dam?

21   A    Yes, I believe the Phase II Report says that about

22   80 percent of the ongoing sources come from above Veazie Dam.

23   Q    Let's go to the next page.  Did you also note at this

24   time, consistent with your prior comments, that songbirds in

25   Mendall Marsh appear to have high mercury concentrations?

1    A    Yes, and -- and that the highest methylmercury

2    concentrations occurred at the -- at the marsh.

3    Q    Let's take a look at your next comment.  You note, as

4    well, that the HoltraChem facility is likely not a substantial

5    -- a substantive ongoing source of mercury to the river.

6    A    Yes, I think the Phase I data made that clear.

7    Q    And why was that?

8    A    Because the measurements of mercury in the water column

9    from upstream to downstream going past the HoltraChem facility

10   showed no evidence of an increase that would be associated

11   with a source at the HoltraChem facility, and that -- that

12   data was sufficient to conclude that the -- at the present

13   time, the present time being the data they were collecting

14   then, being 2006-2007, the facility was no longer a

15   significant contributor.

16   Q    Okay.  Did you provide a comment in this report that

17   spending additional money to try to quantify discharges from

18   the HoltraChem facility, in light of the available evidence,

19   did not make sense at this stage.

20   A    I did.  I recommended not doing that work.

21   Q    Did the Study Panel accept your recommendation?

22   A    No.

23   Q    Is it your understanding that after the Phase II Report

24   was issued, the Study Panel concluded that the HoltraChem site

25   is not a significant ongoing source of mercury?

1    A    That's what they concluded in the report, yes.

2    Q    If we can pull up Joint Exhibit 6-18.  This is Page

3    18-2.  Let's pull up that.

4         Based on the modeling, ongoing residual releases of

5    mercury from HoltraChem site on the order of 2.2 kilograms per

6    year are too small to meaningfully delay the rate of recovery

7    of mercury levels in sediments.

8    A    Yes, that's --

9    Q    Is that the --

10   A    -- the conclusion the Study Panel came to.

11   Q    And that's consistent with the -- some of your

12   observations after reading the Phase I Report.

13   A    Yes.

14   Q    Let's go back to Plaintiffs' Exhibit 155 and go back to

15   that second page, 16, and let's pull this up.  Were these

16   bullets of your conclusions after reviewing the Phase I

17   Report?

18   A    Yes.

19   Q    And can you just walk us through these.

20   A    Yes, I had three major conclusions based upon my review

21   of the Phase I Report.

22        The first was that the contamination is -- is

23   widespread, um, that the water column levels were -- seemed to

24   be controlled by what was coming over the Veazie Dam, and that

25   as a result of the widespread nature of the contamination and

CONNOLLY - DIRECT EXAMINATION/TALBERT

3232

1    the source -- residual sources coming from above Veazie Dam,

2    that system-wide remediation was not a possibility.

3         The data they collected showed that natural recovery was

4    occurring and that it should continue into the future.

5         And that the mercury levels in marsh-associated biota

6    may be reducible if mercury methylation in the marshes can be

7    reduced.

8    Q    Did you also provide comments and recommendations on the

9    revised scope of the Phase II study?

10   A    I did.

11   Q    Let's pull up Plaintiffs' Exhibit 157, at Page 12.  And

12   before your report, did you prepare an affidavit that

13   accompanied your comments and recommendations?

14   A    I did.

15   Q    This affidavit, you -- you detail a call that you

16   participated in -- on June 5th, 2008?

17   A    Yes.

18   Q    Do you recall that?

19   A    Yes, I do.

20   Q    Okay.  Do you recall the -- the purpose of this call?

21   A    The purpose of this call was to discuss the revised

22   study plan.

23   Q    Let's move back off of this and go to the second page.

24   Let's go to your first -- No. 6 at the very top.  At this

25   point in time, was it still the case that you -- you didn't

1    really have all the data and information that had been

2    collected by the Study Panel?

3    A     No, we did not.  They had not released much of the data.

4    Q     And did that also make it difficult for you to

5    meaningfully comment on what they'd found?

6    A     Yes, it -- it hampered that ability.

7    Q     Did it also hamper your ability to comment on their

8    plans in the future, not knowing exactly what they'd already

9    collected?

10   A     Yes.

11   Q     If we go to the next page, on Page 3, at the I think

12   bullet 14, you make that point in your affidavit, this has

13   significantly hindered my ability to adequately and fully

14   comment on the Phase I Report and the proposed Phase II Study

15   Plan.

16         Let's go back a page, Page 2.  Just the -- so let's go

17   back to Page -- let's go to Page 13.  Okay.  And let's

18   highlight 7 and 8, please.

19         Can you just explain what your observations from the

20   call were, these two points?

21   A     Ah, during the call, the Study Panel stated that they've

22   had gathered data from the HoltraChem facility from -- what

23   they characterized as seeps, where they measured mercury in

24   them, but they had not included them in the Phase I Report.

25   They indicated that they had forgotten to include them.

1          And we had no knowledge that they had even conducted

2     this -- this sampling program, and so it was kind of a

3     surprise on the call.  So that's why I noted it.

4          The next one refers to questions -- Dr. Livingston and I

5     were the technical representatives, in my case for

6     Mallinckrodt, and in Dr. Livingston's case for -- for the

7     plaintiffs, and we posed a number of technical questions on

8     the call to the Study Panel about the details of what they

9     were proposing -- how they were going to collect the samples,

10    what kind of protocols they would use for collection and

11    analysis -- and the Study Panel members, in several instances,

12    were unable to answer those questions.  They didn't understand

13    many of the details of what they were proposing, which was a

14    concern to me.

15    Q     And why were you concerned?

16    A     Um, because they were making decisions on -- on how to

17    move forward and proposing studies for which they had

18    apparently not spent a considerable amount of time thinking

19    about in terms of implementability, quality of the data that

20    they would obtain as a result of that.

21    Q     If you look at your point on 7 where they noted that

22    they forgot to include data in the Phase I Report, did that

23    cause you some concern, as well, about what else may not have

24    been in the Phase I Report that they had collected?

25    A     Yes, it -- it -- it indicated that they had been

1    conducting studies that they hadn't made known -- known to the

2    parties, and this was one instance of it, and, obviously,

3    there was a question of whether there was anything else like

4    this.

5    Q    There was -- to your knowledge, there was no proposal

6    made for them to conduct that seep data prior to the time that

7    they discussed this?

8    A    Not that I'm aware of.

9    Q    Let's go down to .11 here.  Can you just explain what

10   your comment was here?

11   A    One of the points I made during the -- the call was that

12   as they were going through each of the elements for what they

13   were proposing for Phase II, that they really should consider

14   the likelihood of the success of that element, that it would,

15   in fact, achieve the goals that they set out, and that there

16   were several elements that they proposed that I believed

17   appeared to have a low possibility of success.  And that I

18   counseled them not to conduct.

19        The response that I received from the Study Panel was

20   that they would pursue those elements, nonetheless, even --

21   even if they agreed with me that the probability of success

22   was small because they were not very expensive, as they

23   characterized them.

24   Q    And they characterized not too expensive as a -- a level

25   somewhere under $1 million?

CONNOLLI - DIRECT EXAMINATION/TALBERT

3236

1    A    Yes.

2    Q    I guess apropos of that, was there a point in time where

3    the Study Panel proposed to conduct a multicell model system?

4    A    Yes.

5    Q    And did you make a comment on that proposal?

6    A    Yes.

7    Q    Let's pull up Defense Exhibit 234 and let's highlight

8    that range.

9         Could you just explain for the court what your -- your

10   comments were on the multicell model proposal?

11   A    Yes, they had proposed to develop this very complicated

12   fate and transport model for mercury in the Penobscot, which

13   would involve modeling the hydrodynamics of the river,

14   modeling sediment transport within the river, including

15   modeling the dynamics of the mobile sediments, and then

16   modeling mercury in the system.

17        And the counsel to them was that that was an effort that

18   had a fairly low probability of success, in large part,

19   because it required a tremendous amount of information, much

20   of which did not exist, um, and that the system was complex

21   enough that it would be extremely challenging to develop a

22   credible model, a model that could replicate the data in the

23   system, and that the attempts to do that would delay the

24   project and that their proposed budget and schedule were

25   insufficient to conduct such a study.

1   Q     And did you note for the panel that they had already

2   been studying the Penobscot since 2004 and had already spent

3   over $11 million, and it looks like your request is for them

4   to really focus on Mendall Marsh area, where there are

5   songbirds that have elevated levels of mercury.

6   A     Yes, I -- I felt that the Phase I information was

7   sufficient that they -- they should have been focused to a

8   greater extent on trying to understand what was going on in

9   Mendall Marsh, the relationship between what -- the sediments

10  of the marsh, methylation in the marsh, and the levels in the

11  birds, which is necessary if you were going to try to design a

12  remedy to reduce levels in the birds.

13  Q     If we go to the next page in this document, you lay out

14  a number of -- of red flags for the Study Panel on the

15  multicell model.

16  A     Yeah, some of these were red flags, actually, that

17  pertained to the proposal itself, some pertained to the study

18  they were proposing.

19        The first is what they were proposing was essentially a

20  research project.  This kind of modeling in this complex

21  system is -- is not a routine undertaking by any means.

22        The proposal itself didn't provide sufficient

23  specificity and detail to understand how they were going to

24  accomplish the task.

25        They didn't propose sufficient field studies to collect

1   the data that they would need to construct the model.

2        One of the concerns is these models work with a grid

3   system, and that the grid resolution they would need to

4   simulate this would be so fine that it would create a model

5   that would take months of computer time to do simulation, and

6   so that's why grid resolution's problematic.

7        And they -- they really just didn't provide a whole lot

8   of information on how they were going to do quality control

9   and -- and logistical issues of conducting the studies.

10       And that I believed that the budget that they proposed

11  was insufficient for the work they were proposing, and that

12  they could not accomplish the work in the schedule that they

13  had laid out.

14  Q    In summary, were you concerned about the amount of costs

15  for the multicell model, the time that it would take, and then

16  what information, whether that would actually be useful?

17  A    Yes, whether at the end of the day, they would have a

18  tool that would help them.

19  Q    Did the Study Panel agree with your advice?

20  A    No, the Study Panel disagreed.

21  Q    And what did they do next?

22  A    They funded the modeling study.

23  Q    And do you know how long they worked on the multicell

24  model?

25  A    Approximately two years.

CONNOLLY - DIRECT EXAMINATION/TALBERT

3239

1    Q    And was there a point in time when they decided to

2    abandon the multicell model?

3    A    Yes.

4    Q    Let's pull up Defense Exhibit 878.  Let's pull up this

5    -- well, hold on a second.  Let's pull the first one up, the

6    first sentence.  Subsequent to the Boston meeting last week,

7    the panel, with Dr. Bodaly's concurrence, has decided that we

8    should no longer pursue the EFDC/WASP option for modeling

9    mercury in the Penobscot Estuary.

10   A    Yes, and that -- the EFDC/WASP were the names of the

11   models for hydrodynamic sediment transport and mercury fate

12   that they were using.

13   Q    Let's pull back out of this box and highlight the next

14   paragraph.

15        Did the Study Panel note two primary reasons why they

16   had decided not to pursue that multicell model further?

17   A    Yes, the first was that they've recognized that the

18   model was incapable of predicting movement of mobile sediments

19   in the system, and that it was very unlikely they were going

20   to be able to achieve the ability to do that with the

21   modeling.

22   Q    And was the second reason that they are seriously behind

23   schedule?

24   A    Yes, they were very, very far behind schedule.

25   Q    Did you also provide some comments with respect to biota

1    thresholds, as well as comments on what criteria the Study

2    Panel should use when they evaluate potential remedial options

3    at the site?

4    A    Yes, I did that in response to a meeting I had attended

5    where those issues were discussed.

6    Q    Let's pull up Plaintiffs' Exhibit 112, and just to

7    orient us, the date of this memo is October 11th, 2010.  And

8    is this the meeting that you referred to?

9    A    Yes, it was a meeting that occurred on September --

10   September 13th of 2010.

11   Q    And that's noted in the -- in the re line, correct?

12   A    Yes.

13   Q    Okay.  Let's back out of this and go to the page -- the

14   next page.

15        Is one of the things that you did was to provide some

16   suggested criteria that the Study Panel could use in

17   evaluating remedies?

18   A    Yes, one of the topics that was discussed at the meeting

19   was how the Study Panel was going to go about trying to

20   evaluate remedial options for the system, and so I provided

21   them a framework that I thought they should work within in

22   attempting to do that, and that any alternatives that they

23   were going to consider, they needed to look at whether those

24   would be likely acceptable from a regulatory standpoint,

25   whether they could be implemented, whether they would achieve

CONNOLLY - DIRECT EXAMINATION/TALBERT

3241

1    risk reduction and achieve it more quickly than natural

2    recovery would, and what negative impacts would occur with

3    that remedy, and then, finally, what the cost of the remedy

4    was.

5    Q    Are these consistent with the feasibility study

6    balancing criteria?

7    A    Yes, these -- these follow certainly in spirit the

8    feasibility study steps that you would conduct at a Superfund

9    site.

10   Q    All right.  Let's pull this -- this back, and in this

11   same memorandum, I believe plaintiffs used this with Dr. Henry

12   to ask about avian thresholds.

13        And just for the record, with respect to the thresholds

14   that are stated in this document, are these thresholds that

15   you received input from others at Anchor QEA?

16   A    Yes, I consulted with -- with one of the eco risk

17   assessors at Anchor QEA and used information he provided me in

18   constructing that table.

19   Q    And this information here was not focused on particular

20   types of birds, whether they're pisciverous or insectivorous?

21   A    No, I didn't -- I didn't make that division.

22   Q    Was there a point in time in which the Study Panel --

23   where it was made clear to you that -- that -- strike that

24   question.

25        Was there a point in time where you were no longer able

CONNOLLY-DIRECT EXAMINATION/TALBERT

3242

1   to provide comments to the Study Panel on proposals?

2   A    Yes, the Study Panel cut off communication with the

3   outside parties.

4   Q    After the Phase II Report was issued, shortly after

5   that, were you provided with the underlying data that the

6   Study Panel had collected?

7   A    Yes.

8   Q    And you were provided with the data that they had

9   collected as a part of Phase I and Phase II, correct?

10  A    Yes.

11  Q    So that was the first point in time where you -- you

12  actually had all of the data available to -- to you?

13  A    Yes, and -- and it actually came in pieces, so we got

14  data, and then realized that it wasn't complete and had to go

15  back to the Study Panel and ask them again, and then they

16  would provide some more information, and then we'd go back and

17  ask them again.

18       So it was a little bit like pulling teeth to get all the

19  data, but we did eventually get all the data.

20  Q    It was an iterative process, correct?

21  A    Yes.

22  Q    What were you asked to do with respect to the Phase II

23  Report?

24  A    I was asked to do an independent analysis or series of

25  analyses that would, independent of the Study Panel's work,

1   address the issues that were pertinent to the questions that

2   the court had raised.

3        And on the basis of that independent analysis, to review

4   this Phase II Report and to review the analyses in the

5   Phase II Report and the conclusions and recommendations of the

6   Phase II Report and provide comment on that.

7   Q    And what did you do to conduct your review?

8   A    Once we had compiled all the data, um, brainstormed a

9   series of analyses that we wanted to conduct that we thought

10  were important to understand what was going on at the site,

11  conducted those analyses, ah, it was a fairly intensive work

12  effort to do that, and on the basis of the -- the learnings

13  from that analysis, then reviewed and critiqued the Phase II

14  Report.

15  Q    And did you do some of your own independent evaluation

16  and modeling?

17  A    Yes.

18  Q    You've read the entire Phase II Report, correct?

19  A    I have.

20  Q    Some chapters many times, correct?

21  A    Yes, some chapters many times, some figures many, many

22  times.

23  Q    Based on your review and evaluation, what are your major

24  findings and conclusions?

25  A    I find that a fair amount of what's in the Phase II

1    Report is very good, and I agree with a lot of the work that

2    they did and a number of the conclusions that they drew.

3         I did arrive at different conclusions for a subset of

4    issues associated with the report.  So I did differ from the

5    Study Panel in terms of several things that they did and

6    several conclusions that they made.

7         The -- they probably fall into a few categories:  The

8    first -- the first is the level to which, um, the lower

9    Penobscot is contaminated relative to background.  I arrived

10   at a different conclusion than the Phase II Report portrays.

11        The rate at which the system is recovering, the report

12   characterizes it as recovering with a half-time of 30-some-odd

13   years.  I think that the half-time is considerably less than

14   that.

15        Um, with regard to what's controlling the recovery of

16   the system, ah, the Study Panel posited several alternatives

17   for what was controlling the system.  I evaluated those and

18   came to some different conclusions about what might be

19   controlling the system.

20        The -- whether or not there had been a demonstration of

21   harm.

22        And then I evaluated the remedial options that they had

23   proposed and whether, in fact, those were feasible.  I -- I

24   looked at the proposal for additional work, ah, agree that

25   additional work needs to be conducted, but I have a different

1   perspective on what the additional work should be, and that

2   included the additional monitoring that should go on in the

3   system.

4   Q     And what is the -- what is the -- did you evaluate next

5   steps and -- and provide an opinion on what you think is

6   appropriate for the next steps?

7   A     Yes.

8   Q     And -- and what are those?

9   A     I -- I think the -- the next steps are to -- to evaluate

10  whether, in fact, there is harm.  And I think the place where,

11  if there is harm, the most likely harm is -- is to the

12  songbirds in the marsh.  And so there should be some focus, as

13  I indicated at the end of Phase I, on trying to understand

14  whether there -- there is harm to the birds, and then also

15  trying to understand the relationship between that harm and

16  the concentrations in the environment.

17        Um, because I think, as Ed Glaza testified, engineers --

18  and I'm an engineer -- cannot design remedies until we

19  understand what harm we're trying to remedy and what we're

20  trying to interdict in order to reduce that harm.  So we

21  really have to understand the relationship between the harm

22  and levels in the environment so you know where to go in the

23  environment to address contamination in order to effect a

24  reduction in risk.

25        And so that should be a big focus of -- of what they do.

1        There's this open issue about the mobile sediments and

2    whether they're important, whether there's any way to deal

3    with them.

4        Um, and then, finally, I think there -- there should be

5    an ongoing monitoring program, and I think that that

6    monitoring program should be focused on assessing whether the

7    estimates of recovery that have been made for this system are

8    accurate and that the system is, in fact, recovering as it's

9    predicted to recover.

10        And so I think those should be the central elements of

11    next part of what's conducted.

12   Q    In your opinion, is the Penobscot a complex system?

13   A    Extremely complex system, and in large part because of

14   the multitude of environments that exist here -- all right --

15   and we've got this very, very energetic river with extreme

16   tidal fluctuations, high velocities.  We've got near-shore

17   coves, mudflats that behave differently than -- than the main

18   part of the river.  We have these marsh environments.  And

19   then we open up to this large lower estuary and bay with very

20   complex hydrodynamics, complex sediment transport that's

21   occurring.

22        So this is an extremely complicated system.

23   Q    And how does that impact the prospects for active

24   remediation?

25   A    Well, I think the complexity of the system and the --

1    the energy of the system make it hard to implement active

2    remediation.  So those are challenges to it.

3        But I think one of the other challenges is just the

4    diffuse nature of the contamination.  Within the main body of

5    the -- what's been called the upper estuary and then down into

6    Penobscot Bay, the contamination's widely distributed.  Um,

7    there really aren't evidence of hotspots in the system, and so

8    it's hard to conceive of remedies that can address that kind

9    of wide-scale contamination effectively.

10       So I think that that raises concerns and cautions with

11   regard to how you would approach active remediation.

12       Ah, the one exception appears to be the marsh area,

13   where we're looking at a much smaller environment, but,

14   nonetheless, a very complicated environment, where we don't

15   fully understand the relationships between the levels in

16   receptors -- birds -- and levels in the environment, and that

17   needs to be understood before you would conduct active

18   remediation.

19   Q    Let's back up and focus on I think you said the first

20   area where you have some disagreement with the findings in the

21   Phase II Report, and that is how contaminated the system is.

22   A    Yes.

23   Q    You said that you investigated how contaminated the

24   system is relative to background, correct?

25   A    I did.

1    Q     And what did you do?

2    A     I first looked to characterize the background itself.

3    What are -- what are the levels that are associated with

4    upstream, which would be above Veazie Dam, and downstream,

5    Penobscot Bay to the coastal ocean?  So that there are two

6    boundaries to this system -- the upstream boundary and the

7    downstream boundary, so I attempted to characterize what the

8    levels are in those two boundaries.

9          And then to compare those levels to the levels within

10   the system, and within the upper estuary and then in -- out

11   into the lower estuary, and then, finally, into Penobscot Bay.

12   Q     And is this an exercise that you have done in numerous

13   other sites throughout your career?

14   A     Yes.

15   Q     Let's pull up the finding in the Study Panel report that

16   you are -- that you reacted to.

17   A     Hm-hmm.

18   Q     Let's take a look at Joint Exhibit 6-23 on Page 23-2,

19   and let's blow up this portion here.

20   A     So -- so my concern is that, when I looked at the level

21   of contamination in the system, I did not come up with

22   anything close to what they've contended here, that, you know,

23   we know that mercury concentrations in surface sediments are

24   10- to 20-fold higher in the upper estuary than they are in

25   the sediments upstream of the Veazie Dam or south of Fort

1    Point.  My analysis indicated something much different than

2    that.

3    Q     So your reaction wasn't that there are elevated levels

4    of mercury in the Penobscot, but the degree to which the Study

5    Panel has stated that they are elevated.

6    A     Yes, I thought that misrepresented the extent to which

7    they're elevated.

8    Q     Let's take a look at Defense Exhibit 1158 -- 1185.

9    Sorry.

10         What does this demonstrative show?

11   A     Okay.  This -- this is my analysis of the data in the

12   way that I understand that the Study Panel conducted their

13   analysis of the data, which was to look at mercury

14   concentrations in surface sediments on a total-sediment basis,

15   or what is called a dry-weight basis.

16   Q     And --

17   A     So what's plotted here is total mercury.  See it says

18   nanograms per gram, and that's nanograms per gram of dry

19   sediment, the total amount of sediment in the sample.

20         And what they did was to present with the average by

21   reach, so I averaged in the same way.  The designations at the

22   bottom are the reaches.  EB is the East Branch of the

23   Penobscot; OV is Old Town to Veazie; BO is Brewer to

24   Orrington; OB is Orrington to Bucksport; B to FtPt is

25   Bucksport to Fort Point; and then P Bay is Penobscot Bay.

CONNOLLY - DIRECT EXAMINATION/TALBERT

1       And if you look at upstream, just above the Veazie Dam,

2  so the Old Town to Veazie reach, the average surface sediment

3  concentration is approximately a hundred or so.

4       Ah, downstream, in the Brewer to Orrington, on a

5  dry-weight basis, the average concentration is about 900 or

6  so, so -- so about nine times or so.

7       So -- so this is the way that they looked at the data.

8  I'm not sure how they concluded 10 to 20, unless they were

9  looking at the bounds indicated by the error bars, perhaps,

10  here to make that characterization.

11       My concern is -- is that doing spatial comparisons like

12  this really shouldn't be done with the sediment data expressed

13  this way, as nanograms of mercury per gram of dry sediment,

14  that the appropriate way to do these comparisons is with the

15  data what is called carbon-normalized, which means it's

16  nanograms of mercury per gram of organic carbon in the

17  sediment is the appropriate way to do spatial comparisons, and

18  when you do things that way, you get a different perspective.

19  Q    And can you just try to explain for the court why you

20  would look at the data on a carbon-normalized basis as opposed

21  to a dry-weight basis?

22  A    Yes.  Now, organic carbon is the measurement that's made

23  of organic matter.  So it is -- it is the metric by which we

24  measure organic matter in the environment -- particulate

25  organic matter.

1      And when mercury enters a river system, it basically

2   winds up in two phases.  This is a simplistic view of it, but,

3   nonetheless, I think it's okay, that the mercury either

4   dissolves into the water, or it adsorbs, and it adsorbs

5   principally to organic matter, and so the concentration on the

6   organic matter, because it is what it adsorbs to, is directly

7   related to the magnitude of the source.

8      So if the source is twice as great, the concentration on

9   the organic matter will be twice as great.

10      When you express things on a dry-weight basis, you're

11   including within that measurement inorganic material that the

12   mercury doesn't adsorb to, and so it can provide a false sense

13   because it will change the apparent concentration.  When you

14   look at organic matter, you're looking at, this is what the

15   mercury's adsorbed to, so this is the concentration on that

16   phase it's adsorbed to, and that's directly related to the

17   magnitude of the source that came in.

18      So when you compare locations and you're -- you're

19   comparing the magnitude of the source when you compare things

20   normalized to organic carbon as opposed to normalized to dry

21   weight.

22   Q    What does this demonstrative show?

23   A    This is a cartoon illustration that shows essentially

24   the same thing.  All right.  So it's just a representation of

25   the river, the water, the sediment underneath the water.  You

1    know, there's a mercury source, the mercury comes in, some of

2    it dissolves, some of it adsorbs to the organic matter,

3    there's actually an interaction between those two.

4         What's adsorbed to the organic matter can settle to the

5    bottom, and -- and that's why we have mercury in the sediments

6    of the Penobscot River because mercury came into the system,

7    adsorbed to particulate organic matter, and settled to the

8    bottom.  And so the amount of mercury either in the water

9    column, on particles in the water column, expressed on an

10   organic-matter basis, or in the sediment is an expression of

11   the magnitude of the source.

12   Q    What does it mean when you take a sample and you measure

13   the mercury on a dry-weight basis?  What is that providing you

14   a picture of?

15   A    It's -- it's providing -- providing you information.

16   I'm not suggesting it doesn't provide information, but it is

17   not useful if you're trying to compare one location to

18   another, because the inorganic matter in the sample kind of

19   confounds things.

20        If I'm at a location where there's a lot of inorganic

21   matter that would essentially dilute the sample, it will look

22   like there's lower mercury on a dry-weight basis when, in

23   fact, the concentration of the organic matter in that sample

24   might be the same as in another sample that has less inorganic

25   matter and appears on a dry-weight basis to have a higher --

1          (Interruption by the court reporter.)

2    A     And that appears on an organic-matter basis to have --

3               THE WITNESS:  Well, you have to read it back because

4    I've actually lost track of what I was saying.

5          (The reporter read back Page 3252 Lines 23-24.)

6    A     When, in fact, the concentration on an organic-matter

7    basis is the same between the two locations.

8               THE WITNESS:  Thank you.  I'm sorry.  I'll -- I'll

9    try to talk slower.

10   BY MR. TALBERT:

11   Q     And if what we're most interested in is what the biota

12   are exposed to in a particular system, would you want to look

13   at the mercury data on a dry-weight basis or a carbon-

14   normalized basis?

15   A     No, you -- in that case, you also want to look on an

16   organic-carbon basis, and the reason for that is the food web

17   starts with organic matter.  All right.  If the food web is in

18   -- starting in the water column, it starts with phytoplankton,

19   which are organic particles.  If it's in the sediment, it's

20   starting with organic matter that invertebrates are eating.

21          And so zooplankton in the water column will eat, you

22   know, so many grams of organic matter a day.  A worm in the

23   sediment will eat so many grams of organic matter a day.  If

24   there's inorganic matter in the sediment, he may -- the

25   organism may process it, but he's not getting energy from it,

1    so he adjusts his ingestion rate to make sure he gets the

2    amount of food that he needs, the amount of organic matter.

3        So -- so an organism that, say, eats one gram of organic

4    matter a day, if you want to understand how much mercury that

5    organism is exposed to, you need to understand how many

6    nanograms of mercury there was on a gram of organic matter

7    that the organism ate.

8        And so expressing the concentration in nanograms per

9    gram organic carbon, which is the measure of organic matter,

10   tells you the dose that the worm is getting, or it tells you

11   that the dose that the zooplankton in the water column was

12   getting for eating phytoplankton.

13       And so if I'm comparing two locations and one location

14   has twice the concentration per unit of organic matter, that

15   location's going to give twice the dose to the base of the

16   food web, which will then transfer up to the fish.  And so you

17   would expect, then, that that area the fish will be twice as

18   high in mercury as the area where the concentrations per unit

19   organic matter are half.

20       So it -- it's another way to -- to look at a relevant

21   metric in terms of whether you would expect biota to be more

22   elevated at one place than another place and by how much when

23   you compare things on an organic-carbon basis.

24   Q    And just to make sure that this is clear, looking at the

25   data on a carbon-normalized basis, does it essentially remove

CONNOLLY - DIRECT EXAMINATION/TALBERT

3255

1   one of the confounding variables when you're comparing sites

2   that have mercury levels in their sediments?

3   A    Yes, yes, the inorganic matter is a confounding variable

4   in that comparison.

5   Q    Let's take a look at Defense Exhibit 1187.  And -- and

6   what does this show?  Is this what you were just discussing?

7   A     This is just what I was just describing.  This is just

8   the cartoon illustration, again, of the water in the sediment

9   showing that, you know, the base of the food web being organic

10  matter, which then gets processed by the invertebrates, which

11  get consumed by forage fish, which get consumed by predatory

12  fish, and the mercury is traveling up the food web through

13  these pathways.

14       And the concentration that winds up in the fish is

15  directly determined by the concentration of mercury on the

16  organic matter itself at the base of the food web.

17  Q    In the Phase I Report -- let's pull that up -- let's

18  pull up Joint Exhibit 4, at Page 52.

19       In the Phase I Report, did the Study Panel specifically

20  explain why it was important to look at the data on a

21  carbon-normalized basis?

22  A     Yes, and I think that's clear in the first sentence

23  here, where they say that, although the scientific literature

24  concentrations of mercury in sediments are commonly presented

25  on a dry-weight basis, site-to-site comparisons using this

1    metric are problematic.  And they go on to provide essentially

2    the same explanation that I just gave for why that would be.

3    Q    In the Phase I Update Report, did the Study Panel

4    evaluate levels of contamination in different reaches of the

5    Penobscot by looking at data on a carbon-normalized basis?

6    A    They did.

7    Q    Let's take a look at Joint Exhibit 5 at Electronic Page

8    14.  This is Figure II from the Phase I Update.  Do you

9    recognize this figure?

10    A    I do.

11    Q    And what does this show?

12    A    This -- this is the -- the same organization of the data

13    by these reaches, and the designations on the bottom are the

14    same as what was in the figure that we were looking at

15    earlier.

16         So OV is Old Town to Veazie, again, and now -- now

17    they're looking at average concentrations expressed on a

18    carbon-normalized basis, so on the vertical axis, you can see

19    it says nanograms mercury T, total mercury, per gram C, per

20    gram carbon.

21         And so in the Old Town to Veazie reach, you can see that

22    this is about 3,000.  So upstream of the site, the sediments

23    on average have about 3,000 nanograms of mercury per gram of

24    organic carbon.

25         Then when we go down and look at the Brewer to Orrington

CONNOLLY - DIRECT EXAMINATION/TALBERT

3257

1   reach, here it's about 13,000.  When we look to the Orrington

2   to Bucksport reach, the average here is about 15,000.

3       To in comparison to the upstream background, Old Town to

4   Veazie, 3,000 to 13,000 is a little more than a factor of 4.

5   3,000 to 15,000 is a factor of 5.  So that on the basis -- on

6   a carbon basis, the upper estuary, represented by Brewer to

7   Orrington, Orrington to Bucksport, is four to five times

8   higher than the upstream background.

9   Q   And is the Study Panel's graph here in Figure ii in the

10  Phase I Update consistent with -- with your evaluation of how

11  elevated the Penobscot is?

12  A   Yes, we conducted an independent evaluation of the data

13  once we obtained it and essentially were able to replicate

14  this figure so that we were comfortable, then, that this was

15  an accurate representation of -- of the data, and that it --

16  the conclusion that I drew from it was that the upper estuary

17  is four to five times higher than the upstream background.

18  Q   When the Phase II Report was issued -- and we already

19  read the text from Chapter 23 of the Phase II Report -- but

20  the citation to that text was Figure 23-2, and this is at

21  Joint Exhibit 6-23, at Electronic Page 18.

22      The Study Panel did not present the data on a

23  carbon-normalized basis, did it?

24  A   In the Phase II Report, they did not.  Now, the Phase I

25  Report was attached to the Phase II Report, so if you dug into

1   the report to the appendices of the report to find the

2   Phase I, you could find the figure that we just looked at.

3       But in the body of the Phase II Report, they did not

4   present their carbon-normalized patterns.  They presented only

5   the dry-weight base patterns.  And so when they were citing it

6   being 10 to 20 times higher than the upstream background, it

7   was based on the dry-weight comparison, and this is the figure

8   they -- they referred to, which is very similar to the figure

9   that we looked at earlier, which was our analysis of the same

10  data and came to basically the same result.

11      So that the Old Town to Veazie reach is about a hundred

12  on a dry-weight basis, and the Brewer to Orrington reach is

13  about 900 on a dry-weight basis, which is what we had seen

14  before.  So on an average basis, the upper estuary is perhaps

15  nine times background.  The characterization of 10 to 20 I

16  don't understand, but perhaps is because they look at the

17  upper error bar here as the upper limit.

18  Q   Is it your opinion that it was misleading of the Study

19  Panel to in the body of the Phase II Report only present the

20  data on a total basis when discussing how elevated it was?

21  A   Yes, I -- I think it provides a biased sense of the

22  extent to which the system is contaminated above background.

23          MR. TALBERT:  Your Honor, we're at a good breaking

24  point.

25          THE COURT:  Very good.  We'll take about a 20-minute

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3259

1   break.

2        (Court recessed from 12:27 p.m. to 1:00 p.m.)

3          THE COURT:  Mr. Talbert?

4                CONTINUED DIRECT EXAMINATION

5   BY MR. TALBERT:

6   Q    Dr. Connolly, did you make an effort to identify

7   appropriate background sites in order to compare them with

8   levels of mercury in the Penobscot?

9   A    I did that for the downstream background.

10  Q    Let's take a look at Defense Exhibit 1188.  Can you just

11  explain what this -- what this demonstrative shows?

12  A    This demonstrative shows averaged carbon-normalized

13  surface sediment mercury concentrations at various locations.

14       Um, the different colors show the sources of the data.

15  The green-colored bars are data collected by the Study Panel

16  as part of the Phase -- Phase I and Phase II Study.

17       The blue bars are from the Maine Mussel Watch.

18       And the yellow bar is from a journal article published

19  by Chen, et al.

20       And what they show are essentially average

21  concentrations at locations that may be characterized as

22  background locations.  The Study Panel shows the locations in

23  green as reference locations for the coast, and the other

24  locations here are locations that I've added based on my

25  analysis of data.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3260

1        And all the way on the left here is one location that

2   we've looked at already, which is the upstream background

3   location between Old Town and Veazie, where if you recall the

4   mean concentration on a carbon basis is about 3,000.  The rest

5   of these are all the coast -- coastal background locations.

6        And they're -- the way they're organized here is based

7   on proximity to the Penobscot.  So the ones to the left are

8   closer; the ones over to the right are further away.

9        So if we look at the first one, that's transect E05,

10  outer Penobscot Bay, that's this location here, um, which is

11  one of the Study Panel's reference locations at the outer edge

12  of Penobscot Bay.  Pickering Island is a little bit further

13  in, but still pretty far out in Penobscot Bay from Maine

14  Mussel Watch.

15       Then we have the St. George, a little bit to the south

16  here, Mt. Desert Island, over here, and then getting further

17  away, we have the Sheepscot, here, the Narraguagus, up here,

18  and Stover Point, down here.

19       Each of these locations is supposedly representative of

20  a location that is representative of regional conditions.  So

21  locations that are not influenced by point sources of mercury,

22  more by the regional condition associated with atmospheric

23  background, etc.

24       Um, the study -- the Study Panel, after conducting this

25  work, began to question whether they believed the -- the

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3261

1    Sheepscot was -- was, in fact, an appropriate reference site.

2    Um, they were a little concerned because of the value that

3    they got there, which was a little over 8,000.

4         In the -- in the report, they indicate that that concern

5    relates to the population density in the watershed draining

6    there.  I checked on that, and the population density draining

7    to the Sheepscot is really not much different than the

8    Penobscot.  So I'm not sure population density would be an

9    appropriate reason to exclude it.

10        Ah, I think subsequent to that, they've -- they've argued

11   that perhaps there are some point sources up there.

12        So we can potentially discount it if we choose to.

13        But if we look at the locations closest to the

14   Penobscot, which are probably the most relevant as coastal

15   background for what -- the water that comes into the Penobscot

16   on flood tide, um, the transect EO5 at the outer edge has

17   about 6,000 or so -- a little more than 6,000

18   carbon-normalized concentration.

19        If we look at Pickering Island, close by, it's about

20   4,500 or so.

21        And then if we look at the St. George, that's just under

22   5,000.

23        And Mt. Desert Island is about 5,000.

24        So all of these are very similar to each other, and a

25   rough average here is about 5,000.  So -- so these four

1    locations that are closest to the Penobscot average about

2    5,000.  Sheepscot's higher, but further away; Narraguagus is

3    lower, but further away; Stover Point further away.

4         So on the basis of looking at these levels at these

5    regional background sites, I simply sort of ball-parked an

6    average here about 5,000, so if you -- which, if you can in

7    your head, just mathematically average the results for the

8    transect E05, Pickering Island, St. George, and Mt. Desert

9    Island, that's about what you get.

10        So on that basis, I characterized coastal background

11   mercury concentrations in surface sediments as about 5,000

12   nanograms per gram of carbon.

13   Q    You mentioned that there were on this a couple of sites

14   that the Study Panel did not use.  Mt. Desert Island was one,

15   Stover Point was another, and Pickering Island.

16   A    Yes.

17   Q    Are you aware that Drew Bodaly, after having reviewed

18   your report, acknowledged that a couple of those sites would

19   have been good sites to include?

20   A    Yes, I believe that he agreed that Mt. Desert Island and

21   Stover Point would be good sites.  Mt. Desert Island is about

22   5,000; Stover Point's a little over 4,000.  He questioned

23   Pickering Island.  I'm not sure why because Pickering Island

24   is also sitting a little over 4,000, so there's no evidence

25   that it's elevated there.  And including it or excluding it

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3263

1  really doesn't change things much so.

2  Q    That was my next question, would removing Pickering

3  Island do much in light of the fact that Mt. Desert Island is

4  at about 5,000 nanograms per gram carbon and Stover Point

5  looks to be a little bit above Pickering Island?

6  A    Yes, ah, it really would not change things.  I think

7  5,000 is still a reasonable central tendency for regional

8  background concentrations on the coast of Maine.

9  Q    Let's take a look at Defense Exhibit 1190.  So after you

10  evaluated background levels for different coastal sites, what

11  did you do next?

12  A    What I next did was compare it to the carbon-normalized

13  concentrations within the Penobscot, um, and that comparison

14  showed that -- and if you recall from an earlier plot, um, in

15  the Orrington to Bucksport reach, the average

16  carbon-normalized concentration was approximately 15,000.

17      So that would be three times 5,000, the coastal

18  background, five times 3,000, which was the Old Town to Veazie

19  upstream background.  So on that basis, I characterized the

20  upper estuary as perhaps elevated three to five times

21  background.

22      What this set of graphs are showing are the different

23  conclusions that you get when you do look at things on a

24  carbon-normalized basis as compared to looking at things on a

25  dry-weight basis.  And in order to make this comparison, what

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3264

1    I've done here is to divide the average concentration in each

2    reach by the concentration in the Old Town to Veazie reach,

3    the upstream background reach.  So that in both of these, on

4    the dry-weight and the carbon basis, you can see that OV, the

5    Old Town to Veazie reach, sits at 1, because it's just divided

6    by itself.

7         And so on a dry-weight basis, Brewer to Orrington is

8    about ten times Old Town to Veazie and so on.  And then if we

9    do things on a carbon-normalized basis, Brewer to Orrington is

10   about four times, Orrington to Bucksport is about five times

11   the upstream background.

12        And so you get a very different picture of the extent to

13   which the system is contaminated above background, looking at

14   a carbon-normalized basis, which I -- as I indicated, is the

15   appropriate way to do spatial comparisons, as compared to the

16   dry-weight based, which gives you a biased sense of the level

17   of contamination relative to background.

18   Q    Are you aware that plaintiffs' expert Dr. Driscoll also

19   did his own evaluation of the amount to which the Penobscot

20   was elevated above background locations on a carbon-normalized

21   basis?

22   A    Yes.

23   Q    And let's take a look at Joint Exhibit 49, at Page 4.

24        Just so the record is clear, what is your opinion

25   regarding how elevated the upper estuary is compared to

1    background?

2    A    Three to five times higher than background, depending

3    upon whether you're looking at the upstream background or the

4    coastal background.

5    Q    And just to orient us, this is within Dr. Driscoll's

6    supplemental expert report.  And did you review that

7    supplemental report?

8    A    I did.

9    Q    Did you review these two graphs that he has?

10   A    I did.

11   Q    Do you believe that he evaluated the comparison between

12   the lower river and the upper river with reference sites

13   correctly?

14   A    I -- I do not.  I think -- I think there's an error in

15   this presentation.

16   Q    Can you just explain for the court why you think there's

17   an error?

18   A    Um, the slopes that he presents on this graph are, in

19   essence, the carbon-normalized concentration.  Um, they're --

20   they're expressed -- rather than nanograms per gram organic

21   carbon, they're expressed as nanograms per percent organic

22   carbon.  To convert them to nanograms per gram organic carbon,

23   you'd have to multiply them by a thou -- by a hundred.  I'm

24   sorry.

25        So the slope that he shows here, which is 132,

1    represents a carbon-normalized concentration of 13,200, and

2    what he's plotted here are the data for the Penobscot

3    itself -- all right -- the upper estuary, and that's actually

4    a fairly good representation.  If you recall the Study Panel's

5    carbon-normalized graph, um, the concentrations in Brewer to

6    Orrington and Orrington to Bucksport were 13 to 15,000 on a

7    carbon basis.  So the fact that he gets 13,200's reasonable.

8        The bottom plot here supposedly represents the upstream

9    background data.  Um, the slope here is 9.12, multiply that by

10   a hundred, that slope's equivalent to 912 nanograms per gram

11   carbon.

12       The Study Panel's presentation of the carbon-normalized

13   data shows values in the thousands -- all right -- and the Old

14   Town to Veazie reach shows an average of 3,000.

15       When we independently analyzed the data, we replicated

16   the Study Panel's result.  So we got the same answer as the

17   Study Panel.  So Old Town to Veazie is 3,000, and even the

18   East Branch is higher than 900.

19       So there must be an error here.  I have no way to

20   explain why he has this slope and why it's 900, but that's not

21   a proper representation of the background.

22   Q    Dr. Connolly, does it matter, I guess, for remediation

23   purposes whether the system is three to five times -- elevated

24   three to five times background versus 10 to 20 times

25   background?

1    A      It does, um, and it does because background represents

2    sort of the -- the level below which you cannot go because the

3    upstream -- what comes in from upstream and what comes in from

4    the coast is contaminated at the background levels and will

5    tend to keep the system contaminated at those levels.

6         So even if you, for example, remediated the system

7    completely and -- by some imaginary way, um, it would get

8    recontaminated by the solids coming in over the Veazie Dam, by

9    the solids that come in on flood tide from the coast, and it

10   would reach eventually back to the background levels.

11        So they represent the -- sort of the minimum that you

12   could ever get to.

13        And so -- so if you -- if you believe the system is

14   contaminated three to five times background, then, in theory,

15   you could never accomplish this because you could never do

16   enough remediation to drive the entire system to background.

17   But, in theory, the most you could do is effect a reduction of

18   three to five times.  If you present it as 10 to 20 times

19   background, you believe that, in theory, you could effect a

20   10- to 20-fold reduction through remediation.

21        So it gives you a very different perspective on the --

22   the potential efficacy of remediation.  As I said, though, you

23   know, you -- remediation never gets the system really to

24   background, so you never really quite get there, but at least,

25   in theory -- all right -- you understand sort of the maximum

1  benefit you could ever achieve in the system, and I think the

2  appropriate way to look at that is that, no matter what we do

3  in the Penobscot, the most we can do is to reduce things three

4  to five times where they are now.  We can't reduce them 10 to

5  20 times where they are now.

6  Q    Is that particularly important if we're looking at how

7  much we can reduce levels in -- in Mendall Marsh to have a

8  positive impact on biota in the marsh?

9  A    Yes.

10  Q    Can you explain it?

11  A    Well, again, the -- the -- Mendall Marsh has a strong

12  connection to the river.  All right.  So solids come in and

13  out each tidal cycle, and through that connection to the

14  river, solids deposit in the marsh, and so the contamination

15  that exists in the marsh is directly related to what's coming

16  in and out from the river.

17      And so the best you can do in the river is drive it to

18  background.  So the best you can do is reduce the levels

19  coming into the marsh by three to five times.  And so you

20  would expect, at most, a three- to five-time reduction in the

21  marsh.

22      The one caveat there is -- is if you are able to craft

23  some remedy that cut off methylation, for example, you might

24  be able to achieve a better benefit because you've not only

25  reduced the total concentration three to five, but somehow

1    you've reduced the rate of methylation.

2         So if you were able to come up with some way to effect

3    that, perhaps you could achieve more than three to five in the

4    marsh because the levels in the birds, for example, in the

5    marsh, in part are related to the extent to which methylation

6    is occurring, as well as the total concentrations that are

7    coming in.

8    Q    What is your understanding about the amount of mercury

9    that's currently coming from Veazie?

10   A    The -- the Study Panel did some measurements of what is

11   on particles that are actually coming over the dam.  It was

12   fairly limited what they did.  The average concentration on a

13   dry-weight basis was 240.

14        They unfortunately didn't measure the organic carbon

15   content of the particles, so you don't know how to translate

16   that into a carbon basis for purposes of comparison.  But on a

17   dry-weight basis, it's 240 compared to the average in the

18   upper estuary is about 900.

19   Q    Would the amount of contamination coming over the Veazie

20   Dam also provide a pragmatic limit on how low you could lower

21   mercury concentrations in the lower part of the river?

22   A    Yes.

23   Q    In your opinion, is the Penobscot upper estuary a highly

24   contaminated system compared to other sites?

25   A    No, I would characterize it as moderately contaminated

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3270

1    compared to other sites.

2    Q      And why is that?

3    A      Um, the typical site that is being actively investigated

4    and considered for active remediation around the country is

5    much more highly contaminated than three to five times

6    background.

7           So many of the sites in the country that are the focus

8    of remedial investigations and remediation are PCB sites, and

9    those PCB sites are typically in the range of ten to a hundred

10   times background.

11          Ah, if we look at the Passaic River, where mercury is a

12   contaminant, but one of the other risk drivers is dioxin, um,

13   the Passaic River, dioxin levels in surface sediments are more

14   than a hundred times background.

15          If -- if we look at some of the mercury sites, one of --

16   one of the sites currently being investigated is the South

17   River in Virginia, um, the mercury levels in the South River

18   are about 30 times background.

19          Um, at the Sudbury River, which is part of the Nyanza

20   site in Massachusetts, the levels in the sediment average 20

21   to 30 times background.

22          Another site is in Nevada, the Carson River in Nevada.

23   The mercury concentrations there are about a hundred times

24   background.

25          So -- so the typical focus, the sites of the most

1    concern that are being investigated and looked at for active

2    remediation, tend to be much more -- much higher multiples of

3    background than what we see at the Penobscot.  So that -- it's

4    with that in mind that I characterize it as moderately

5    contaminated above background.

6    Q    Are the targets that have been set by the Study Panel

7    relatively low compared to other sites?

8    A    Yes, they are.

9    Q    Can you explain?

10   A    Um, the Study Panel has set a target on -- now, we're --

11   unfortunately, these things are expressed on a dry-weight

12   basis.  I think they should be on a carbon basis, but they're

13   not.  So we're going to talk on a dry-weight basis.

14        The Study Panel has set a target for the Penobscot

15   River, the main stem of the river, of about 450 nanograms per

16   gram dry weight.  If we -- if -- and the current level is

17   about 890, 900.

18        If we -- if we look at other sites, so there's been a

19   lot of discussion here of Onondaga Lake, um, the target on

20   Onondaga Lake is to achieve an average concentration of 800.

21   So the target there is about twice the target on the Penobscot

22   and about where the Penobscot sits today on a dry-weight

23   basis.

24        On an another site that I worked on, the Peconic River

25   on Long Island, it's a -- Brookhaven National Laboratory is

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3272

1    there, and on that site, there was a target to hit 1,000 on

2    the site property and 700 downstream as compared to the 450

3    here and the current levels of 890.

4         Um, at the Sudbury River site, there is no sediment

5    target, but remediation -- active remediation is targeting

6    sediments with greater than 10,000.  And the objective there

7    is to achieve a fish level of 480 nanograms per gram.  Um,

8    that level is higher than many of the fish species that have

9    been sampled in the Penobscot.

10   Q    Let's take a look at Defense Exhibit 1191.

11        Does this demonstrative contain your understanding about

12   what the targets are in the upper estuary and Mendall Marsh?

13   A    Yes.

14   Q    And -- and what else are you doing here?  You've got a

15   comparison to --

16   A    These are very -- estimates of the average

17   concentrations in the upper estuary and in -- on the Mendall

18   Marsh platform as presented in the Phase II Report, so 890 and

19   490, and these are the targets that the Study Panel had set

20   for the upper estuary, 450, and for Mendall Marsh, 100.

21   Q    In your opinion, are the 2009 levels relatively close to

22   the targets that have been set?

23   A    Yes, it's -- as we just discussed, in the upper estuary,

24   in essence, it's about a factor of 2-drop, and it's about a

25   factor of 5-drop on the Mendall Marsh platform.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3273

1   Q      Did you evaluate how fast the system is recovering?

2   A      I did.

3   Q      And how did you go about evaluating how fast the system

4   is recovering?

5   A      I evaluated it by looking at the high-resolution cores

6   that had been collected by the Study Panel and relied, for the

7   most part, on the cores collected in Mendall Marsh because I

8   believe those are the cores that provide the best estimates of

9   how quickly the -- the site is recovering.

10  Q      Is it your understanding that the system has recovered

11  significantly over the last four years?

12  A      Yes, it has.

13  Q      And what is that based upon?

14  A      Um, the high-resolution cores themselves, as -- as well

15  as Dr. Driscoll made a presentation in his report of some data

16  collected in the early 1970s, and on the basis of comparing

17  the -- the peak concentrations that are buried in the cores

18  and the concentrations that were measured in the '70s to the

19  concentrations that exist today in surface sediments, it's --

20  it's evident that a significant recovery has occurred from

21  that earlier time period to today.

22  Q      Let's take a look at Defense Exhibit 1192.

23         And what does this demonstrative show?

24  A      This demonstrative is meant to illustrate the principle

25  behind this idea of collecting sediment cores and using them

1    to infer rates of recovery, and what this shows is a

2    cross-section of the river -- hypothetical cross-section of

3    the river, and in the near-shore area here, I've shown a

4    cartoon illustration, again, of what the river bottom might

5    have looked like back in 1950.  So that's this level.

6        And if this location is a location that's depositional,

7    which means that sediment falls out of the water column and

8    deposits here, and continues to deposit over time, the river

9    will shallow up.  Right.  And so what I've here is that, you

10   know, it -- by 2009, this deposit looks like this.  So -- so

11   this material here has accumulated in this area between 1950

12   and 2009.

13       So the fact that there is -- there are deposited

14   sediments there provide you an opportunity to core and look at

15   mercury levels, and the objective is -- is to find deposits of

16   sediment where this deposition has occurred continuously over

17   time in -- in very much a layer cake fashion.  So sediments

18   are laid down and never moved again.  Sediments lie on top of

19   the low sediments and are never moved again, and continuing

20   and continuing and continuing.

21       So that if you then can sort of look vertically through

22   the sediment column, the stuff that was laid down in 1950 in

23   this representation will have mercury concentrations

24   associated with the particles that were moving through the

25   water column, what we might call the mobile particles, in

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3275

1   1950.  Sediment that gets laid on top of it, let's say in

2   1960, will have mercury concentrations associated with the

3   mobile sediments in 1960 and so on, 1970, 1980, 1990.

4        And if you can find such a location where there's been

5   no disturbance and you can look at the profile of how the

6   mercury has changed in the sediment as you move up through the

7   sediment column, that provides you some understanding of what

8   the concentrations were in the mobile sediments over time, and

9   you can look at that and particularly focus on the recent time

10  period to -- to look whether, in fact, those concentrations

11  have been dropping.

12       So as we move, say, to -- to the more recent time,

13  through the '90s and the 2000's, if -- if we see that the

14  levels in this location where things are just depositing on

15  top of each other are dropping, it's because the levels in the

16  mobile sediments that are lying down here must have been

17  dropping, so they provide a way to assess how fast the levels

18  in the mobile sediments that are moving up and down the river

19  have been dropping over time, because those are -- the mobile

20  sediments are the ones that are the source of things that

21  deposit.

22       So that's the objective, to find such locations and to

23  analyze the data that you would collect.

24  Q    And now are there certain areas within the system, then,

25  that -- where sediments have not been deposited in that layer

1    fashion you described and may not be, therefore, good to look

2    at in determining sediment concentrations of mercury at

3    various time periods?

4    A     Yes.  I mean, what -- what we want here is a location

5    that's not been disturbed, so that the time record is -- is

6    recorded vertically as we move through the sediment column.

7          If you have a location that's subject to periodic

8    disturbance, so, for example, stuff has been laid down and so

9    we now have ten years' worth of record that's sitting there

10   and a high-flow event comes through and takes some of it away,

11   erodes some of it, well, now some of the record's gone, and

12   you no longer have that part of the record.

13         Or perhaps some material from a nearby location got

14   eroded and deposited on top of this, well, that is perhaps

15   from another time period and provides a confused record.

16         Or perhaps the sediments got mixed, so the time record

17   got scrambled because of mixing.

18         And all of those things obscure your ability to see

19   what's been happening in the mobile sediments over time

20   because the time record is either incomplete or scrambled in

21   some way.

22   Q     When we take a sediment core, how do we know whether it

23   is a core that has been disturbed as opposed to a core that's

24   -- that's good for looking at a history of what has been

25   deposited over time?

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3277

1    A    This -- there's a -- a field of science devoted to this,

2    and what that field of science has come up with is a set of

3    tracers, they're -- they're radiochemicals -- all right -- so

4    they're radioactive chemicals -- whose history you know so you

5    know what to expect their profiles to look like in the

6    sediment if the sediment hasn't been disturbed.

7         So you can look at the vertical profiles of these

8    tracers and see whether, in fact, they conform to what you

9    would expect them to conform to if the location has not been

10   disturbed, and so it's on the basis of examining these

11   radiochemicals and their profiles in the sediment where you

12   say there's clear evidence of some disturbance occurred here,

13   or, no, the record here looks like it was preserved based upon

14   the profiles I see for these radiochemicals.

15   Q    Let's take a look at Defense Exhibit 1194.

16        What does this map show?

17   A    This map shows all of the locations that the Study Panel

18   collected cores at, um, that they then sectioned very finely

19   in order to try to see the vertical patterns of mercury and

20   the vertical patterns of these tracers within -- within the --

21   each of the samples.

22        So they've basically sampled the entire system.  They

23   sampled in the main stem upstream, so the upper estuary,

24   they've sampled in Mendall Marsh, they've sampled down into

25   the lower estuary, and also in the Orland River.  Almost --

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3278

1    most of these samples, in fact, nearly all of these samples

2    are not collected in the main stem of the river.  They tend to

3    be collected in near-shore areas because those are the areas

4    that are more quiescent, where if you're going to get an

5    undisturbed core, that's where you would get it.

6         So the -- these samples tend to be in near-shore areas

7    for that reason.

8    Q    And just so we can follow this later, are the sediment

9    cores that were taken in the main stem designated as PBR

10   cores?

11   A    PBR is the designation that's used for cores collected

12   in -- from Veazie Dam down to the south end of Verona Island.

13   Q    And then below Verona Island into the bay, do those have

14   the designation ES for estuary?

15   A    Yes, they have the designation ES.

16   Q    And then within the Orland River, are those samples

17   designated OR?

18   A    Yes.

19   Q    And how about the ones in Mendall Marsh?

20   A    Those are designated MM.

21   Q    Let's take a look at Defense Exhibit 1193.

22        Can you just talk us through what these examples show?

23   A    These are examples of mercury profiles in three of the

24   cores that were collected in Mendall Marsh.

25        Um, the cores are numbered, and then there's an A, B, or

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3279

1    C that sits next to them, and A, B -- A, B, or C reflect the

2    fact that at each location, the Study Panel collected three

3    cores, core A, core B, and core C.

4         They would choose among those cores the one they thought

5    had the best record of the three, and that would be the one

6    that they then subject to all these analyses.  Ah, so that's

7    why there's a B or an A associated with the core names.

8         And what this shows is the mercury profile going through

9    the core, and you can see each -- each circle here is a

10   measurement, so you can see how many measurements are taken.

11   There's a tremendous amount of data that's -- that's here.

12        And the way this is represented is we start at 0 at the

13   surface.  So -- so that's the surface of the core.  And then

14   going in this direction, you're going down into the core, and

15   the scale here is in centimeters, so 20 centimeters,

16   40 centimeters, 60 centimeters, 80 centimeters, a hundred

17   centimeters down into the core.  And the scale on the bottom

18   here are the mercury concentrations, total mercury.

19        So what you can see in core 2B is starting at the

20   surface, as you progress down into the core, mercury levels

21   are rising.  And then there's a period here where they're

22   pretty flat, and then there's a peak here, drops off a little

23   bit, then there's a major peak here, drop-off, and then a peak

24   underneath it here, and then things drop off.

25        So -- so if, in fact, that is an undisturbed location,

1  then that is a representation over depth and equivalently over

2  time of the concentrations that were on the mobile sediments

3  that were moving into the marsh river and onto the marsh levee

4  where these happened to be collected over time.

5       This particular location was a fairly highly

6  depositional location, so over this -- this time period, a

7  meter of sediment has accumulated.  So we -- we've got

8  3.3 feet of sediment has built up at this location over that

9  time period.

10      If we look at the core in the middle, core 7A, you can

11  see that the -- it's kind of compressed compared to 2B, and so

12  the -- this core accumulated less sediment over time, and if

13  we look at the pattern here of where things are elevated, we

14  actually can see some things that are very similar to what we

15  see in core 2B.

16      So if we start at the surface and go down, we see

17  mercury concentrations are increasing -- all right -- which

18  means, in reverse, as we move towards the surface of the core,

19  concentrations are decreasing, and that's the recovery.

20      And then what we see here is we -- we have this small

21  peak here that perhaps corresponds to the small peak here, a

22  large peak here, which perhaps corresponds to this peak, and

23  then a drop, and a peak underneath that, which perhaps

24  corresponds to that peak.

25      So the vertical pattern is very similar, only more

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3281

1   compressed because not as much sediment accumulated here.  The

2   fact that these two patterns are very similar to each other

3   suggests that these may, in fact, be these kinds of

4   depositional locations that have just accumulated over time

5   and have preserved a record of what was in the mobile

6   sediments over time in the system, which appears to be very

7   low concentrations, and then a rise, a drop, a rise, and a

8   drop, and then they drop to the surface.

9        Core 8A has a -- has a very similar pattern.  It's very

10  similar in terms of the total amount of material that's

11  deposited to core 7A, and if we look, there's increase from

12  the surface, you don't quite see the first kind of little

13  peak, then there's a bigger peak here, a drop, and then a

14  secondary peak, which is similar to the secondary peak here,

15  and then this drop down.

16       So the pattern, again, is very similar.  So we have

17  three cores in Mendall Marsh that all show very similar

18  patterns of mercury concentration, which starts to make you

19  think that these cores may have, in fact, recorded the

20  historical changes in mercury concentrations in mobile

21  sediments.

22  Q    Is it oftentimes difficult in -- difficult in very

23  dynamic settings to find cores that are undisturbed?

24  A    Yes, it -- it's extremely difficult in dynamic settings.

25  In fact, um, sort of the ideal setting for doing this work are

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3282

1   -- are lakes, and so this is done in lakes, and sometimes in

2   the deep ocean.

3        Um, when you're in an energetic environment, it's very

4   difficult to find undisturbed cores.  Mendall Marsh is -- is

5   not nearly as energetic as the main stem of the Penobscot,

6   which -- which may be why, um, these cores collected here show

7   these very similar patterns among them and may have preserved

8   the record.

9   Q    Let's take a look at Defense Exhibit 1196.

10       And before we go into your evaluation in this

11   demonstrative, can you just explain for the court what the

12   radiochemical tracers are that you would use to help determine

13   whether a core has been disturbed?

14  A    Yes, the -- the tracers that are typically used are

15  lead-210 and cesium-137 and plutonium-239, 240.  And there are

16  expected patterns, as I said, to see in the sediment that

17  would be suggestive or indicative of disturbance or lack of

18  disturbance in the core.

19  Q    And can you just explain how each of those radiochemical

20  tracers are used somewhat differently --

21  A    Yes.

22  Q    -- to evaluate cores?

23  A    Lead-210, the expectation, if you have an undisturbed

24  core, is that the lead-210 concentration is dropping,

25  continuing to drop as you go deeper into the core.  And the

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3283

1    reason for that is that the source of lead-210 is the

2    particles that are settling to the bottom.  And once they're

3    on the bottom, the lead-210 begins to decay, and lead-210 has

4    a 22-year half-life.

5         So as the stuff sits in the sediment and is slowly

6    getting buried, the lead-210 is decaying away, and so if -- if

7    things aren't disturbed, the older sediments that sit

8    underneath should have less lead-210 because they've been

9    there longer and there's been more time for the lead to decay,

10   and the sediments closer to the surface should have higher

11   lead-210 because they've been there shorter and there's been

12   less time for decay.

13        So that's the pattern you expect to see for lead-210.

14        For both cesium-137 and plutonium-239, 240, you expect

15   to see the same thing because they have the same source.  Both

16   of those are atmospheric fall-out from atmospheric nuclear

17   weapons testing that was occurring in the '60 -- '50's to

18   early '60s, and there are known levels in fall-out, because it

19   was being measured in fall-out, over time.

20        So people understand what the -- the amount of lead --

21   I'm sorry -- the amount of cesium and plutonium that was

22   falling out of the atmosphere in the '50's into the '60s and

23   thereafter, and what that shows is that it peaks in 1963, a

24   very sharp peak, and so you have this rise of cesium and

25   plutonium to a peak in 1963, and then a decline from then to

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3284

1    the present time.

2        And so the expectation, if you're looking at an

3    undisturbed core, is that you see that pattern.  Very deep in

4    the core, you see either nondetect or very low cesium or

5    plutonium, and then you see it, as you move up in the core,

6    you see it rise to a peak, a clear peak, that represents 1963,

7    and then it -- as you continue to go up in the core towards

8    the surface, you see it dropping towards the surface because

9    of the decline in the atmospheric's fall-out.

10   Q    Let's take a look at some examples.  The demonstrative

11   we have up is two core profiles with lead-210.  Can you just

12   explain for the court what -- what these are?

13   A    Yes.  Um, these are here to illustrate the pattern that

14   you would expect to see for lead-210 in a core that has not

15   been subject to significant disturbance.

16       Um, and I'm comparing that to a core that has been

17   disturbed so that I can illustrate the differences.

18       Um, I think we -- we need to recognize that none of

19   these profiles is ever perfect because there are always the

20   potential for some level of disturbance.  Um, there's smearing

21   that can occur at the surface because there's some mixing in

22   the top couple of centimeters because there are organisms

23   living in the sediment.  And so you can see in this one, right

24   near the surface, actually, the lead doesn't go down, it goes

25   up, and that may -- funny behavior there may be associated

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3285

1    with this little surface mixing.

2         To the -- as long as the core is deep enough, that

3    surface mixing doesn't appreciably alter the pattern.  But

4    below that layer, what you see is this drop, and lead-210

5    continues to drop as you go deeper into the core.  Now, you

6    can see some noise here, some things sort of fall off it, so

7    these things are never perfect.

8         Ah, but this one is a representation of what we would

9    consider to be a core that likely does contain the historical

10   record because of this continued drop.

11        In comparison, this core from the Penobscot, core 6C,

12   shows sort of a funny pattern here -- all right -- got this

13   drop.  And then -- then you've got this zone from about

14   5 centimeters down in the core to 11 centimeters down in the

15   core where things aren't really dropping, they're kind of

16   flat.  Ah, they shouldn't be flat because flat would suggest

17   that all of those sediments are about the same age -- all

18   right -- because they have about the same amount of lead-210.

19        Um, now, what that means is either there was an event

20   that deposited 6 or 7 centimeters of sediment all at once, all

21   about the same age, or there was mixing that was going on that

22   effectively homogenized this layer, mixed it up, so all wind

23   up with about the same lead concentration because we

24   homogenized it.

25        But it is clear evidence that this core is disturbed in

1    some way and, therefore, does not likely contain the

2    historical record of what were the concentrations over time in

3    the mobile sediments.

4    Q     Would you agree that in evaluating these sediment core

5    profiles, there is often some professional judgment in terms

6    of which cores are disturbed and which are -- did not?

7    A     Yes, it's very much professional judgment.

8    Q     But in -- in some of the core profiles, is it fairly

9    clear that there is -- the core has been disturbed?

10   A     Yes.

11   Q     And in those cores, if you use those cores in trying to

12   evaluate the history and then make a prediction about

13   recovery, what would that do to your estimate?

14   A     It would -- it would give you a false sense of recovery

15   because you're -- you're not looking at a complete record that

16   is telling you the mobile sediments had this concentration in

17   2009, this concentration in 2008, and so on.

18         You've got a record that's either incomplete or

19   mixed-up, and so you don't have the sequence anymore.  And

20   without the sequence, you have a confused profile that would

21   give you some false impression of what's been happening in the

22   mobile sediments over time.

23   Q     If you look at a -- a disturbed core for a particular

24   location, does that necessarily mean that at that location,

25   there has been no recovery?

1   A      No, it means at that location, there has -- there has

2   been some sort of disturbance, um, and either there's been an

3   erosion event, a large deposition event, or a mixing event, or

4   multiple erosion, deposition, or mixing events, that have

5   confused the profile.

6   Q      And could -- in light of the heterogeneity within the

7   system, is it possible that it's just the particular location

8   where the core was taken where the core has been disturbed?

9   A      Certainly.

10  Q      I mean, you could -- you could go a short distance away

11  and potentially get a very clean core.

12  A      I think that's certainly possible.

13  Q      Let's pull up Defense Exhibit 1197.

14         Can you just explain this demonstrative for the court --

15  A      Yes.

16  Q      -- using cesium?

17  A      Yes, this is -- this is the -- a comparison of the same

18  two cores we looked at for lead-210, only now we're looking at

19  the cesium-137.

20         Um, the Mendall Marsh core A, if we start down at the

21  bottom here and work our way up -- right -- very low

22  cesium-230 -- I mean, cesium-137, rising to a very sharp peak,

23  and then dropping and declining towards the surface.  Again,

24  not perfect.  All right.  There's some things bouncing around

25  here, but these are never perfect.

1    But there's a clear pattern of this increase to a sharp

2    peak and then this decline towards the surface, which is what

3    we expect to see based upon the changes in cesium in fall-out

4    over time and provides, again, the support that this location

5    is relatively undisturbed.  It's preserved the profile of

6    cesium that you would expect if it was continuously

7    depositional.

8    This is the same Penobscot core, core 6C, and it's got

9    this odd pattern.  The cesium actually is going down instead

10   of -- or -- I'm sorry -- going up towards the surface instead

11   of going down towards the surface in -- in the beginning,

12   which is backwards to what you would expect.  So that's

13   evidence that there's some disturbance in the surface.

14   And then there's this rise, but there's no peak, and,

15   interestingly enough, over the same interval that we saw that

16   the lead-210 was fairly constant -- right -- between 5 and

17   about 11 centimeters, the cesium is constant.

18   Q    And what does that indicate to you?

19   A    That indicates that either two things have happened:

20   Either 6 or so centimeters of sediment all of the same age, so

21   it has the same cesium, it has the same lead-210, got

22   deposited all at once; or there was a mixing event here that

23   mixed up that 5 or 6 centimeters of sediment and homogenized

24   the lead-210 and homogenized the cesium, but it's a clear

25   indication of disturbance.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3289

1        And the way that you would actually try to date a core

2   using cesium is to use the peak, which is why over here the

3   peak is shown -- it says 1963, and what's typically done when

4   you're using cesium to try to put a timescale to this is you

5   say, okay, 1963 was at 20 centimeters.  I took the core in

6   2009; that's 46 years later.  20 centimeters has accumulated

7   over 46 years.  And so you can say, then, the rate of sediment

8   accumulation is 20, divided by 46, in terms of centimeters per

9   year.

10        And so that's how you -- you try to translate this depth

11   scale into a timescale.

12        Because there's no peak in the core 6C that would

13   designate 1963, in addition to the fact that there's evidence

14   of disturbance, you have no basis to -- to date this core.

15   Q    Let's take a look at Defense Exhibit 1196.  I'm sorry.

16        Did you evaluate all of the core profiles in the entire

17   system that were taken?

18   A    Yes, I did.

19   Q    And when you evaluated those, did you look at the

20   radiochemical tracers --

21   A    Yes.

22   Q    -- that you just discussed --

23   A    Yes.

24   Q    -- for each of them?

25   A    Yes.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3290

1   Q      And after conducting that evaluation, was there a

2   particular location where you found a greater collection of

3   undisturbed cores?

4   A      Yes, the -- most of the Mendall Marsh cores looked

5   relatively undisturbed, and when you move out into the upper

6   estuary, most of the cores looked disturbed.  When you go down

7   into the lower estuary, most of the cores looked disturbed.

8   And so -- so the -- the one area of this system that has a

9   large fraction of the cores that are collected that appear to

10  be relatively undisturbed was Mendall Marsh.

11         And that makes some logical sense since Mendall Marsh --

12  the levy on Mendall Marsh is a much more quiescent environment

13  where things once deposited will likely stay there, as

14  compared to locations within the estuary or down towards the

15  bay, where there is much more energy associated with the tides

16  and associated with high-flow events that occur when there's a

17  -- a flood from upstream.

18  Q      Let's take a look at some examples.  Let's pull up

19  Defense Exhibit 1198.

20  A      This -- this just --

21  Q      What does this demonstrative show?

22  A      This just illustrates some of the types of patterns of

23  cesium that you see in cores in the upper estuary, what's

24  designated as PBR, and it illustrates the fact that there's

25  evidence of disturbance in these particular cores, and these

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3291

1  are examples.  There are many other cores that have similar --

2  similar types of profiles.

3       These are here because they illustrate sort of three

4  different patterns of potential disturbance.  So if we look at

5  the one at the left here, which is PBR9A, we see the low --

6  the low cesium at depth, which we expect, and we see a rise,

7  and, in fact, we get a peak.  So on that basis, you would

8  think that perhaps you can date this as 1963.  And we have

9  this decline.  But rather -- rather than a continued decline

10  towards the surface, which is what we expect, from about

11  30 centimeters in that core to the surface, the cesium's not

12  going down, and, in fact, from about 12 centimeters to

13  surface, it's rising.

14       That's not consistent with it being undisturbed.  All

15  right.  So -- so there's some indication of disturbance in

16  this core.

17       A different pattern is seen in 11B, and this is --

18  occurs in several of the cores.  There is low and rising to a

19  peak, but it's not the only peak.  Right.  There's a decline,

20  and then there's a secondary peak, and then a drop towards the

21  surface.  Well, there should only be one clear peak associated

22  with 1963.

23       So -- so the fact that there are two peaks here suggest

24  that there's been some disturbance here, perhaps some younger

25  sediments got laid down, then some older sediments got laid

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3292

1   down on top of them, which caused this secondary peak.

2        The core at the right here has what we would call a very

3   confused profile.  There's -- there's some cesium very deep in

4   this core, 80 to 90 centimeters down.  Then it goes to very

5   low cesium, so you wouldn't expect that.

6        That would suggest that the sediments at 80 centimeters

7   are younger than the sediments at 60 centimeters, which could

8   only occur if there was an erosion and deposition event.

9        And then you get some rise, but there's no peak, and you

10  get things bouncing around here, and then you get towards the

11  surface, and all of a sudden, it starts to rise towards the

12  surface, and it's just kind of bouncing around and it drops

13  immediately.  It's a very confused pattern, um, indicating

14  probably multiple events of disturbance at this location.

15  Q    Let's pull up Defense Exhibit 1199 and just take a look

16  at some of the just example estuary cores.

17  A    So these are, again, just examples.  So here are three

18  estuary cores that show evidence of disturbance.

19       Estuary core 8A, you can see we have no cesium until

20  about 26 centimeters, but then there's no peak.  It just

21  rises.  It's flat.  There's one high value there near the

22  surface, but the -- the pattern is not the pattern we expect,

23  and we don't expect this interval from 20 to 10 centimeters

24  where things are just kind of constantly bouncing around.  So,

25  again, disturbance.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3293

1        Core 13 has this odd pattern where there's cesium at

2    depth, dropping to no cesium here, which would say that these

3    sediments are older than these sediments.  So older sediments

4    got laid on top of younger sediments.  And then we see some

5    rise, but then no peak, and things just bouncing around

6    towards the surface.  Again, not the expected pattern.

7        Um, and 20C shows that these are old sediments.  They

8    have no cesium.  We do get a rise, but no peak at all, and

9    then there's just kind of bouncing around, bouncing around,

10   bouncing around.  Again, that bouncing around with a lack of a

11   peak indicates that there was some disturbance associated with

12   this core.

13   Q    After conducting your entire investigation and

14   evaluation, what is your opinion regarding which location is

15   the best location to use for evaluating half-times for

16   recovery?

17   A    I think Mendall Marsh is far and away the best region of

18   this system to look at recovery because it has a collection of

19   cores that appear to be relatively undisturbed.

20       Um, I think the other parts of the system show too

21   frequently signs of disturbance to provide enough information

22   to -- to confidently look at recovery.

23   Q    Is it appropriate to use Mendall Marsh cores as

24   indicative of recovery for the entire system?

25   A    Certainly recovery for the upper estuary -- all right --

1    so the region between Veazie and the downstream end of Verona

2    Island.  Because the Mendall Marsh mercury that it's receiving

3    that we're seeing the record in the cores is mercury that is

4    -- largely has come from the river.  All right.  Each tidal

5    cycle, solids come into the Marsh River and they go out on ebb

6    tide, and they carry the mercury, and they're the -- the

7    source of the mercury that ultimately gets deposited.

8         So the mobile sediments in the system, some portion of

9    them are -- whoop -- excuse me -- coming into the Marsh River,

10   depositing on the marsh.  And so the Marsh River or the

11   Mendall Marsh cores can't recover faster than the system

12   because it's the system that's controlling the levels.  All

13   right.

14        And, again, what we're -- the way to interpret what

15   we're seeing in these cores is that it's the record of what

16   was on the mobile sediments, and those mobile sediments, as I

17   think has been testified to here, are widely distributed

18   through the system.  And what we're looking at is the recovery

19   of what some people have called the mobile pool.

20   Q    Therefore, is it your opinion that it's appropriate to

21   use the Mendall Marsh cores and the half-times associated with

22   Mendall Marsh cores as indicative of recovery in the upper

23   estuary?

24   A    Yes.

25   Q    After you reviewed the sediment cores and evaluated the

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3295

1  radiochemical tracers, did you calculate recovery times?

2  A     I did.

3  Q     And can you explain in -- in more detail what you did to

4  calculate recovery times?

5  A     Okay.  I started with the set of cores that Dr. Santschi

6  calculated recovery times for.  So I figured that -- that was

7  the easiest place to start were all the cores that he had

8  used, so that was the set of cores I -- I -- I looked at.

9         We're interested in looking at recovery in the surface

10  sediments, and so Dr. Santschi included within his analysis,

11  in essence, the sediments from the surface down to about half

12  the distance to the mercury peak as he identified the mercury

13  peak.  He termed that the last 21 years.  I'm not so certain

14  it's the last 21 years, but it's the -- from the surface to

15  halfway down to the mercury peak, in essence, in each of these

16  cores.

17        So I -- I looked at the data within that interval,

18  essentially the same interval that Dr. Santschi was looking

19  at, and I looked at whether the lead-210 profile in that

20  interval showed a decline that indicated that you could

21  perhaps date that interval using lead-210.

22        I rejected those cores for which I didn't think I could

23  reasonably date that interval using lead-210.  So that left me

24  with a subset of the cores that Dr. Santschi had looked at.

25        I then looked at the sedimentation rates that

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3296

1   Dr. Santschi had computed for these intervals himself and

2   rejected cores that had very low sedimentation rates, and I

3   used an arbitrary threshold, but that threshold was

4   .2 centimeters per year of deposition.

5       I did some calculations that I presented in my report

6   that show that the smaller the deposition rate, the more the

7   pattern you see in the core is not representative of the time

8   sequence in the mobile sediments, and that -- that occurs

9   because remember in the surface sediments, there is some

10  mixing.  The Study Panel believed that that mixing occurred

11  over perhaps the top 1 to 2 centimeters.

12      If -- if we have a core that has a deposition rate of

13  .2 centimeters a year, in ten years, you would accumulate

14  2 centimeters.  In 20 years, which is the time period that

15  Dr. Santschi believed he was looking at, you would get

16  4 centimeters.  4 centimeters is 1 and a half inches.  So

17  we're looking at 1 and a half inches of sediment, and we're

18  trying to infer a recovery rate.

19      Some significant fraction of that may have, in fact,

20  been mixed at the surface.  That mixing will affect what you

21  believe is the recovery rate, and I was able to demonstrate in

22  my report that what that does is make the recovery rate look

23  longer than it really is.  So there's a bias that would happen

24  in cores with very low sedimentation rates.  You would get

25  artificially-elevated recovery rates, or -- maybe I should say

1    that differently.

2         The recovery rates that you'd get would be slower than

3    they actually are.  The way that the recovery rate has been

4    expressed is half-time.  You would get longer half-times than

5    actually exist.

6         So I took his set of cores and then rejected cores that

7    had .2 centimeter per year or less in his analysis.

8         What I did next was to take this remaining subset of

9    cores and look at the mercury profiles in those cores.  And

10   what I wanted to -- to ensure was that the trend that I saw

11   from the surface on downward continued through the entire

12   interval because if these are undisturbed, I'm going back in

13   time, and so the deeper I go in the core, the more I'm looking

14   at older sediments.

15        The older the sediments are, probably the less relevant

16   they are in terms of telling me how things are recovering

17   today and likely to recover in the future.  So if the trend is

18   consistent going downward, I will keep it.  But if I see some

19   break in the trend as I get deeper into the core, then I'm

20   concerned that I'm going to allow a different trend that's

21   representative of an earlier time period to influence my

22   estimation of what I think is the current trend.

23        So I did this analysis looking down through the cores.

24   If the entire interval that Dr. Santschi looked at seemed to

25   have a consistent pattern, I kept it all.  If I saw a break in

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3298

1   the pattern, I would stop at the point where it broke, and I

2   would analyze that subset of the section that Dr. Santschi

3   looked at for purposes of calculating recovery.

4         The one other thing that I did was if there was some

5   evidence in my mind -- and this is professional judgment --

6   some evidence that there was mixing at the surface, I would

7   not look at the trend all the way to the surface.  I would

8   look at the trend starting a little bit below the surface, to

9   try to get below the layer that was being mixed, and start the

10  trend analysis there.  So that was the other judgment that I

11  made.

12        Once I did all of that, I used the lead-210 profiles to

13  estimate how fast the sedimentation rate was, and I used the

14  mercury profiles to estimate how fast things were recovering,

15  and from that, I computed half-times for each of the cores.

16  Q     Even though you believe that the Mendall Marsh cores are

17  the best cores to look at for recovery of the entire system,

18  did you also evaluate and calculate half-times for recovery

19  for cores in other areas besides Mendall Marsh?

20  A     Yes, as I -- as I said, I -- I started with the set of

21  cores that Dr. Santschi used, and then based upon the criteria

22  that I just outlined, I accepted or rejected those.

23        That left me with a subset of cores that included nearly

24  all of the Mendall Marsh cores and much fewer cores out in the

25  river and in the estuary, but if I didn't reject them based

1    upon the criteria that I just used, I did do an analysis for

2    those cores.

3    Q     And why did you decide to use lead-210 as a tracer to

4    calculate your half-times for recovery as opposed to cesium or

5    plutonium?

6    A     As I indicated, when -- when you're using cesium or,

7    equivalently, plutonium to get a sedimentation rate, what

8    you're -- what you're doing is identifying 1963, and as I

9    indicated in that one core, where there was 20 centimeters of

10   sediment sitting above 1963, you say that those 20 centimeters

11   have accumulated over the 46 years between 1963 and when that

12   core was collected in 2009, and you say, okay, if

13   20 centimeters accumulated over 46 years, the sedimentation

14   rate is 20, divided by 46.

15        Well, that's the average sedimentation rate since 1963,

16   and that may or may not be representative of the sedimentation

17   rate in the section of the core that we're looking at

18   recovery.

19        The lead-210 data are, in essence, apples and apples.

20   They are in the same core sections as the mercury data that

21   we're trying to -- to look at and date.  So I believe that the

22   lead-210 provides the most apples-to-apples comparison with

23   regard to trying to get a sedimentation rate in the section of

24   the core for which we are trying to look at the mercury trend.

25   Q     In your experience, is using lead-210 to calculate

3300

1    recovery half-times common?

2    A    Yes, it's -- it's commonly used, and, in fact, it's

3    commonly used by Drs. Santschi and Yeager.  They've used it at

4    multiple sites around the country.  Other -- other people who

5    work in this field use lead-210, as well.

6    Q    Have you used lead-210 at -- at other sites that you've

7    worked on?

8    A    Yes.

9    Q    And, to your knowledge, what other sites has lead-210

10   been used on to calculate recovery times?

11   A    Well, I -- I know Drs. Yeager and Santschi have -- have

12   used it, for example, in the Gulf of Mexico, Mississippi River

13   Delta, they've used it in Tampa bay, they've used it in

14   Galveston bay, they've used it in Lavaca Bay.

15        I've used it in Lavaca Bay myself.

16        Some other locations where -- where it's been -- been

17   used would include, for example, Lake Hartwell, which is a PCB

18   site used to -- so we used dating there to look at PCB

19   recovery, at a PAH site out on the west coast, Eagle Harbor.

20   All right.  And there are other sites that are just not coming

21   to mind right now, but --

22   Q    Are both lead-210 and cesium appropriate radiotracers to

23   use when you're calculating recovery half-times?

24   A    They are.  I think for the purpose we have here, the

25   lead-210 provides a better estimate of -- for the section of

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3301

1    the core we're looking at.

2         And just -- just to be clear, when Dr. Santschi was

3    calculating recovery rates, he actually didn't use either of

4    his radiotracers.  He calculated sedimentation rates by

5    looking and picking out what he thought was the mercury peak

6    and saying mercury's the tracer I'm going to use, and so he

7    declared the mercury peak to be 1967, and then calculated a

8    sedimentation rate using that as his tracer.

9         So, in fact, he did not use either of his radiotracers

10   in calculating his recovery rate.

11   Q    Dr. Santschi was using 1967 because he believed it

12   correlated with discharges from the HoltraChem site?

13   A    Yes.

14   Q    Let's take a look at Joint Exhibit 45, Electronic Page

15   117, and this is -- Joint Exhibit 45 is your expert report,

16   and we're going to take a look at one of the figures in your

17   expert report, which contain profiles for different cores that

18   you used in calculating your half-times for recovery.

19   A    Yes.

20   Q    Can you explain for the court what this figure is and

21   what it shows?

22   A    Yes, what this shows is the interval of the core that

23   Dr. Santschi examined.  Um, the left panel is the mercury in

24   the core; the middle panel is the cesium; and the panel to the

25   right is the lead-210.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3302

1          And it's the same presentation as we've seen before,

2     where the surface sits at the top here, at 0, and move down

3     into the core.  So in this core, which is Mendall Marsh core

4     7A, um, Dr. Santschi examined data down to about

5     14 centimeters into the core.

6          I included this core because, as you can see, the

7     lead-210 profile does show the -- the decline that I expect.

8     All right.  So we are dropping in lead-210 as we go deeper

9     into the core.

10         This gray area shows the portion of Dr. Santschi's

11    interval that I actually used to calculate recovery, and the

12    way that I did that was I started at the surface, or if I felt

13    there was some mixing, I would start, you know, below the

14    surface, perhaps the first there or perhaps down there, um,

15    and I had followed the trend, and where I was seeing the

16    consistent trend, so here we see levels are increasing,

17    increasing, increasing.  I used that, but then I see there's a

18    break, so this -- this increase doesn't persist.

19         What happens is that below about 9 centimeters in this

20    core, the levels are fairly constant.  So there's a period

21    that's further back in time, because remember the top of the

22    core is essentially the most recently-deposited sediments, and

23    the older sediments are down below.  So further down in the

24    core in older sediments, there's a period where things weren't

25    changing.

1          That's not reflective of what's happening most recently

2    because the last 9 centimeters of sediment that have gotten

3    deposited at this location have had progressively lower and

4    lower mercury concentrations.

5          In my view, that trend is the best estimate of the trend

6    that would extend into the future, and so for that reason, I

7    restricted my analysis to that portion here.

8          Had I included the deeper portion -- all right -- where

9    -- which is a deeper section where there was no evidence of

10   recovery over that period, it -- it would give you the sense

11   that the rate of drop is slower than the rate that you

12   actually see from 9 centimeters to the surface, and I felt

13   that that -- that put some bias into the analysis if I did

14   that.

15         So for that reason, I just cut it off at 9 centimeters

16   and examined from 9 centimeters to the surface in this core.

17   Q    I won't take the court through every one of these cores,

18   but --

19              THE COURT:  I think I -- I think I do get the point.

20              MR. TALBERT:  Understand.

21   BY MR. TALBERT:

22   Q    Is there -- some of these, I think you mentioned

23   earlier, where there's an uptick towards the surface, the top

24   couple of centimeters, you've -- you've also excluded that --

25   that portion?

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3304

1   A     If there was an uptick or -- or if there was indication

2   that the concentrations were flat for either mercury or lead,

3   that would suggest that perhaps there was mixing, recognizing

4   that Drs. Santschi and Yeager's analysis indicated that in

5   some of these cores, there is mixing down through the top 1 or

6   2 centimeters, I would start below that level, which is sort

7   of the standard way to -- to -- to do this analysis in the

8   field.

9   Q     Okay.  Let's go to Page 43 in this same document.  And,

10  actually, if you -- let's go to the page before -- two pages

11  before.  There we go.

12        So in your text in your expert report, did you

13  articulate which cores you were including versus excluding in

14  your analysis?

15  A     Yes.

16  Q     And you explain here that you've taken a -- a refined

17  approach at evaluating the recovery half-times.  As opposed to

18  taking a 21-year interval for every core, you've -- you've

19  individually evaluated each core.

20  A     Yes, I individually evaluated each core in the way that

21  I've just described to you.

22  Q     Hm-hmm.

23  A     Um, one of the other things that I did, which is

24  described in this section of the report, was because I

25  frequently saw, as I went deeper into the cores -- right -- so

1    I'd typically see this rise in concentration and then a period

2    where things were flattening out, I -- I -- I surmised that

3    that was a period where we weren't getting much recovery, must

4    be because sources to the system are preventing the system

5    from recovering for that time period.

6        And so what could those sources be?  Um, and they're

7    either external sources or internal sources.  And so I

8    speculated that perhaps levels coming over the Veazie Dam were

9    higher at that time.

10       I had previously looked at some data collected in the

11   late '70s, early '80s by the USGS that would suggest that was

12   the case, although there's some concern about those data

13   because they didn't use the -- what's called clean techniques

14   for measuring mercury, and so there may have been bias in that

15   data, so they're probably not as strong evidence.  But I would

16   suspect that the levels coming over Veazie Dam in the '80s

17   were probably a lot higher than they are now.  Um, back then,

18   residual releases from the HoltraChem facility may have been

19   higher.  Um, levels in the coast -- coastal waters may have

20   been higher.

21       And so perhaps that's what explains why things were sort

22   of flat for that period, but -- but I don't really understand.

23   I was offering those as, you know, possible explanations for

24   why we might see this pattern of increase and then a flat

25   period beyond that.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3306

1   Q     Was another data set the -- the mussel watch data?

2   A     Yes, which -- which tended to show things kind of

3   bouncing around for a period of time until you got into the

4   mid-'90s or so, and then they -- then they seemed to be

5   declining after that.

6   Q     I want to clarify one thing in your expert report, if we

7   go to the -- the following page.

8         Towards the top, if we can blow this language up, you

9   state, for those cores with a sedimentation rate of

10  .2 centimeters per year or greater, the mercury recovery rate

11  was calculated by fitting the mercury concentrations to a

12  first-order model.

13        In this -- the language in your report, did you mean to

14  say .2 or less were excluded?

15  A     Yes, or -- or perhaps greater should go in front of .2.

16  Those cores with sedimentation rates greater than

17  .2 centimeters per year, the recovery rate was calculated.

18  Q     Okay.  Let's take a look at Joint Exhibit 6-6, at

19  Appendix -- on Page 6-46, and this is in Chapter 6.  These are

20  the cores that Dr. Santschi analyzed that you -- that you

21  began with, and let's just highlight the Mendall Marsh cores.

22        And can you just explain for the court which -- which of

23  these cores you did not evaluate --

24  A     Okay.

25  Q     -- or calculate a half-time for recovery for?

1    A     Dr. Santschi included core 1B.  Core 1B has a very low

2    sedimentation rate.  Um, you can see -- this is his

3    sedimentation rate, and you can see it says sedimentation rate

4    Hg.  He's designated -- he's estimating sedimentation rate

5    from the mercury as a tracer.

6          Ah, he estimated for that core that the sedimentation

7    rate was .2, again, which would mean over the 20-year period,

8    you only accumulated an inch and a half of sediment, and I --

9    based on my analysis, that bias is your estimate, and so I

10   excluded it because of that low sedimentation rate.

11         I also excluded 6A.  Now, 6 -- t -- 6A I carried through

12   the analysis because it has a lead-210 profile that suggests

13   that you can date it, and Dr. Santschi had a sedimentation

14   rate of .5, so it was greater than .2.

15         But when I analyzed the sedimentation rate using

16   lead-210 data, it indicated a sedimentation rate of

17   .18 centimeters a year, which, again, would indicate that over

18   the period we're looking at, we've accumulated very little

19   sediment and we can't rely on the recovery rate, so it's

20   probably a biased recovery rate.  So I did the calculation for

21   6A, but I did not rely on that calculation in terms of

22   estimating recovery rates.

23   Q    And in evaluating which cores to include or exclude, did

24   Santschi's calculated half-times for recovery come into play

25   at all?

 1    A      No, no, I -- I didn't consider them at all in making

 2    decisions.

 3    Q      In other words, you weren't just targeting cores that

 4    had a higher half-time for recovery than other cores?

 5    A      No.

 6    Q      If we can back out of this, let's -- let's pull up the

 7    PBR cores.  In fact, several of the PBR cores you excluded,

 8    correct?

 9    A      Yes.

10    Q      You excluded PBR23B?

11    A      I did.

12    Q      And that has a -- Santschi calculated a half-time for

13    recovery of nine years?

14    A      He did.

15    Q      How about 21C?

16    A      I excluded that, as well.

17    Q      That had a relatively low half-time for recovery

18    calculated by Santschi, correct?

19    A      Yes.

20    Q      How about 10A?

21    A      I excluded 10A, as well.

22    Q      How about 6C?

23    A      I excluded 6C.

24    Q      6C also had a fairly low half-time for recovery,

25    correct?

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3309

1    A      Yes.

2    Q      And 16A, 16 years?

3    A      I believe I excluded 16A, as well.

4    Q      Let's back out of this and go to the next page.

5           And in the estuary cores, did you include estuary core

6    3C?

7    A      I did not.

8    Q      And that had the lowest half-time for recovery

9    calculation that Santschi calculated, correct?

10   A      Yes, yeah, as I indicated, I didn't even look at his

11   recovery rates when I was making the decisions.  I had very

12   specific criteria that related to sedimentation rate and

13   lead-210 profile that were my decision points for including or

14   excluding --

15   Q      Okay.

16   A      -- cores, and I never even examined his recovery rates

17   in making those decisions of what to include or exclude.

18   Q      Let's take a look at Defense Exhibit 1202.

19          What is this equation?

20   A      This is the equation that's used to try to estimate

21   sedimentation rate from the lead-210 data.  Um, radioactive

22   decay is a -- what's called a first-order process, so it

23   proceeds according to an equation, that's a first-order

24   equation, which looks like the craziness here.

25          Ah, and so that equation actually -- I can describe, so

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3310

1   hopefully we understand it.  Ah, the lead-210 concentration at

2   any depth below the surface is Z, so Z is some distance below

3   the surface, is the lead-210 at the surface, times a term that

4   defines the rate at which it's decaying, and this is an

5   exponent -- all right -- so this is an exponential equation

6   which is what a first-order reaction is described by.

7          And the parameters in that include the decay constant

8   for lead-210, so this is the constant that's associated with

9   the half-life of lead-210 of 22 years.  So that's a known.

10  The depth that you're looking at, so that's known, and the

11  sedimentation rate, that's the only unknown.

12         And so the objective here is to try to fit this

13  equation, or what we might call this model, to the lead-210

14  data to determine what's the appropriate value of V that best

15  fits the lead-210 data, so what's the appropriate value of

16  sedimentation rate to fit lead-210 data.

17         So that's the procedure that is used.  And I used it,

18  but this is how everybody does it pretty much.

19  Q    Let's take a look at Defense Exhibit 1203.

20         And what does this show?

21  A    These -- these are examples for two cores of the fit of

22  that model to the lead-210 data, and so this is core 2B in

23  Mendall Marsh, and you can see that I start below the surface

24  here, in part because the lead-210 levels look pretty constant

25  up here, so I'm thinking that's probably some indication of

1    mixing so I don't want to include that.

2          So I start here and use all of the data that you see

3    here, and this is essentially a best fit model to this.  That

4    line is the result of the equation.  And the sedimentation

5    rate that produces that line is 1 centimeter a year.  So -- so

6    that's the estimate of sedimentation rate.

7          Now, recognize that the data kind of bounce around the

8    line, so we have to understand there's some uncertainty in

9    that number.  So I'm using 1.  It's not necessarily precisely

10   1, given the uncertainty in the data.

11         This is core 7A, and here there -- there was not much

12   evidence of mixing, so I started at this first surface sample,

13   and the model you can see with its best fit to the data is a

14   sedimentation rate of .4 centimeters per year.

15         So that's the procedure that I used for each of the

16   cores to estimate what the sedimentation rate was in the

17   interval I was examining the mercury change or the mercury

18   recovery.

19   Q    Let's take a look at Defense Exhibit 1204.

20         Are these your -- the results of your analysis?

21   A    These are the results of the analysis in terms of the

22   sedimentation rates that come from lead-210 for each of the

23   cores in Mendall Marsh.

24   Q    And after you conducted your evaluation, did your

25   sedimentation rates differ very much from Dr. Santschi?

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3312

1   A       For the most part, they were remarkably similar to

2   Dr. Santschi's.  There were a couple of cores where -- where

3   there were some significant differences, but for the most

4   part, they were fairly close to his.

5   Q       Let's take a look at Defense Exhibit 1208.

6           And can you explain for the court what this shows?

7   A       This is an example of the recovery rate calculation.  So

8   for -- for core 7A, um, the sedimentation rate is

9   .39 centimeters a year, so that's what comes out of the

10  lead-210 analysis.

11          Use -- using that -- all right -- there there's a --

12  another first-order model that both Dr. Santschi and I use to

13  estimate the drop in mercury concentration that occurs from

14  deeper in the core to the surface.  And so if you look at the

15  horizontal axis, the left -- left is 9 centimeters below the

16  surface, and if we move towards the right, we're getting to

17  lower numbers, we're going shallower and shallower, so over

18  here is the surface of the core, and this is the mercury

19  scale.

20          So remember these -- these samples are in 1-centimeter

21  increments, so they're plotted in the midsection here, but

22  this number actually is the -- is the average concentration in

23  this sample that represents 1 centimeter of sediment.

24          And so back 8 to 9 centimeters below the surface, the

25  measurement is about 1,700 parts -- I mean, 1,700 nanograms

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3313

1    per gram dry.  And as you move towards the surface in the

2    core, the concentrations are declining.  This is the best fit

3    of the model to that data in the same way that the earlier

4    model was used to best fit the lead-210 data.

5         What we're looking at here, since the sedimentation rate

6    is .39, or roughly .4, centimeters a year, each centimeter is

7    two and a half years.  So what this represents, then, if you

8    go through 9 centimeters, is at .4 centimeters a year, 9

9    centimeters will be 23 years.

10        Now, Dr. Santschi, examining the same interval,

11   attributed it to be 21 years.  Whether it's 20 years,

12   21 years, 23 years is all in the noise.  Um, the point here is

13   it's recovering, and with a sedimentation rate of .39, the

14   half-life her is about 15 years, and you can see that in the

15   model fit.

16        So if we look here, the model and the data at the

17   surface are about 600.  So if you go back to double that --

18   all right -- so we go back and find 1,200, so the model says

19   that 1,200 is right there, and -- which is the best fit to the

20   data.

21        That's at 6 centimeters.  So 6 centimeters in, we've

22   doubled the concentration.  Well, if each centimeter is two

23   and a half years, two and a half years, times 6 centimeters,

24   is 15 years.  So we've gone back in time 15 years from the

25   surface to 6 centimeters, and the concentration has dropped by

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3314

1   a factor of 2.

2       So therein is the basis for the statement up here that

3   in this core, it appears it took 15 years to halve the

4   concentrations.

5       And so the best estimate of the recovery rate from the

6   data in this core is that things are recovering such that it

7   took 15 years to drop the concentration from about 1,200 to

8   about 600, 15 years to halve the concentration.

9   Q   Let's take a look at Defense Exhibit 1209.  Does this

10  demonstrative contain the results of your analysis of the

11  Mendall Marsh cores?

12  A   It does.  And so the analysis we just looked at for core

13  7A was conducted for every one of these cores, and there's a

14  range of half-times that come from this, and that range

15  reflects the uncertainty of -- of this whole analysis.

16      I think Dr. Santschi said the same thing that, you know,

17  this analysis is not precise, and the uncertainties associated

18  with the fact that the cores -- while they are good cores, may

19  not be perfect cores.  There is uncertainty in the data

20  itself.

21      And so that imparts uncertainty into the whole analysis,

22  and the analysis is making several simplifying assumptions.

23  So as a result, each of the cores has an estimate -- it's own

24  estimate of how fast the system's recovering, and they vary

25  from core 8A, where that estimate was recovering as fast as

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

1    seven years, to 23B and to 4C, where it was 23 years.

2         Now, what we're trying to estimate is how fast the

3    mobile sediments are dropping -- all right -- and so they're

4    truly dropping with one real half-life.  Um, these are giving

5    a range of what the possibilities are, and so one way to look

6    at this is that that -- that mobile sediment pool is dropping

7    with a half-life somewhere between seven and 23 years.

8         What's the best estimate of what that rate of drop is is

9    probably just -- let's average these, and that's probably the

10   best estimate of central tendency here.  And so if you

11   averaged these, the average of these is 15 years.

12        So that's certainly an uncertain estimate, but it is the

13   best estimate from these cores of how quickly the mobile

14   sediment concentrations have been dropping and are likely to

15   drop going forward, that they are dropping so we would expect

16   concentrations to be halved again in another 15 years or so --

17   all right -- remembering there's uncertainty here.

18   Q    Can you please summarize for the court your main

19   conclusions after evaluating all of the sediment cores and

20   looking at the radiochemical tracers?

21   A    My main conclusion is that the only area of this system

22   where you have reliable estimates of recovery come from

23   Mendall Marsh, and that within Mendall Marsh, there is

24   consistent evidence of recovery.  All of the cores in Mendall

25   Marsh show recovery.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3316

1    The rates of recovery in the individual cores are

2 variable, based upon just the uncertainty of the analysis and

3 the uncertainty of the data.

4    The best estimate of how fast the system's recovering is

5 the average of those individual measurements, which, based on

6 my analysis, is approximately 15 years.  So that the best

7 estimate of what to expect going forward, in my view, is that

8 the concentration in mobile sediments is dropping such that we

9 would expect them to drop again in half in about another

10 15 years or 15 years from when the data were collected, which

11 is 2009.

12         MR. TALBERT:  This is a good time for a break.

13         THE COURT:  All right.  Thank you very much.  We'll

14 see you all tomorrow at 8:30.

15    (Proceedings concluded at 2:33 p.m.)

16                         CERTIFICATION

17    I certify that the foregoing is a correct transcript from

18 the record of proceedings in the above-entitled matter.

19

20

21 /s/ Julie G. Edgecomb          June 26, 2014
   Julie G. Edgecomb, RMR, CRR           Date
22 Official Court Reporter

23

24

25