1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF MAINE

3   MAINE PEOPLE'S ALLIANCE        )
    and NATURAL RESOURCES          )
4   DEFENSE COUNCIL, INC.,         )
                                   )
5             Plaintiffs           )
                                   )              CIVIL ACTION
6                                  )
         vs.                       )   Docket No. 1:00-cv-00069-JAW
7                                  )
                                   )              BENCH TRIAL
8   HOLTRACHEM MANUFACTURING       )
    and MALLINCKRODT LLC,          )
9                                  )
              Defendants.          )
10

11                    VOLUME XIX

12              TRANSCRIPT OF PROCEEDINGS

13       Pursuant to notice, the above-entitled matter came on

14   for BENCH TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

15   Chief District Judge, in the United States District Court,

16   Bangor, Maine, on the 27th day of June, 2014, at 8:38 a.m.

17   APPEARANCES:

18   For the Plaintiffs:              Mitchell S. Bernard, Esquire
                                      Aaron S. Colangelo, Esquire
19                                    Rachel E. Heron, Esquire
                                      Jared J. Thompson, Esquire
20
     For the Defendants:             Patricia H. Duft, Esquire
21                                    Sigmund D. Schutz, Esquire
                                      Jeffrey D. Talbert, Esquire
22

23                    Julie G. Edgecomb, RMR, CRR
                         Official Court Reporter

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

3318

1                          INDEX OF PROCEEDINGS
                                                             Page:
2
Testimony:   (see below)
3
                           INDEX OF WITNESSES
4
                                                             Page:
5
JOHN CONNOLLY   (called by Mr. Talbert)
6
Continued Direct Examination by Mr. Talbert            3321
7   Cross-Examination by Mr. Bernard                        3375
Continued Cross-Examination by Mr. Bernard             3471
8   Redirect Examination by Mr. Talbert                     3528

9                          INDEX OF EXHIBITS
    Plaintiffs'
10  Exhibit No.      Description            Offered    Admitted

11      2          ECF No. 235                 3468       3468
    170-A        Penobscot Biota Data - Data CD  3468     3469
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Counsel present in open court.)

2          (John Connolly, having been previously duly sworn,

3    resumed the witness stand.)

4               THE COURT:  Good morning.

5               MR. TALBERT:  Good morning.

6               MR. BERNARD:  Your Honor, Mr. Talbert and I -- we're

7    all hoping to finish today with --

8               THE COURT:  No, you're going to finish today.

9               MR. BERNARD:  Okay.  We've discussed the posttrial

10   briefing schedule that we'd like to propose.

11              THE COURT:  Okay.  I need to talk to -- I'm glad to

12   hear your thoughts on it.  I think at the end of the day, I'll

13   have some comments, as well, as to what happens next, but

14   please go right ahead.

15              MR. BERNARD:  Okay.  We were -- we wanted to propose

16   that on August 28th, the parties simultaneously submit

17   posttrial briefs, and the plaintiffs would submit a set of

18   proposed findings of fact, and those briefs would be limited

19   to 60 pages in length.

20              THE COURT:  Okay.

21              MR. BERNARD:  Two weeks later, roughly on

22   September 12th, both sides would simultaneously file

23   responsive briefs, and the defendant would file its markup or

24   counter statement of proposed findings of fact.

25          We don't foresee the proposed findings of fact document

1    as having any limit in terms of pages.  It would just be a

2    listing of the facts.  And we would propose to do it, perhaps,

3    as some courts do, where the plaintiffs would put their

4    proposed findings in a column on the left, and defendants

5    would have a column -- defendant would have a column on the

6    right, and so Your Honor could just see for each fact exactly

7    whether they were -- whether there's a dispute or not.

8         And then, finally, on September 19th, plaintiffs would

9    have the opportunity to reply only on the defendants' counter

10   proposed findings of fact.  And the responsive briefs due on

11   September 12th we were going to propose be no longer than 20

12   pages each.

13            THE COURT:  Okay.  Well, let's sort of put it aside

14   for the moment.  I don't have any problem with your suggested

15   schedule.  I've begun to rethink the notion of findings --

16   proposed findings, and the reason basically is that there'll

17   be a temptation, I think, on the part of even counsel as fine

18   as the ones before me to view this not as so much as an

19   assistance to the trial court as a chess game for the

20   appellate court.

21        And I'm not entirely sure that it will be necessarily a

22   means of efficiency as so much a means of preserving

23   argumentation.  So I'm not sure.  I'll get your thoughts on

24   it, but I consulted some other wiser people than I am, and

25   they said their experience with this type of thing has been

1    that it sounds better than it really is.

2         So I'm not prejudging it.  I want your thoughts on it and

3    whether or not you think it will be helpful, but my view is

4    perhaps -- I have some suggestions about maybe some other ways

5    to approach it that I think may be even more efficient and

6    less prone to trying to maneuver the record.

7              MR. BERNARD:  And those -- that's what you'd like to

8    discuss at the end of the day today?

9              THE COURT:  Right, right.

10             MR. BERNARD:  Okay.

11             THE COURT:  But I have no problem with this

12   suggested schedule.  I know this is an extremely complicated

13   matter, and I -- I'm going to lean on counsel to help me come

14   to the right decisions.

15             MR. TALBERT:  Understood.

16             MR. BERNARD:  Okay.  Thank you.

17                  CONTINUED DIRECT EXAMINATION

18   BY MR. TALBERT:

19   Q    Dr. Connolly.

20   A    Good morning.

21   Q    Yesterday you discussed your approach for calculating

22   half-times for recovery.  And is it fair to say that there are

23   -- there are other approaches for calculating recovery

24   half-times?

25   A    Yes.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3322

1    Q     Why do you believe that the approach you used -- or why

2    did you use lead-210 as your approach in this case?

3    A     I used lead-210 because it, in my view, gave me the most

4    apples-to-apples comparison because I was trying to get

5    sedimentation rates in the same section of the core at which I

6    was looking at mercury trends.

7          And so I analyzed the lead-210 in the same interval of

8    sediment.  And I think that gives you the sedimentation rate

9    within that section.

10         Um, the alternative is -- is to use the deeper peaks,

11   cesium, or, as Dr. Santschi did, mercury, which gives you an

12   average sedimentation rate since the 1960s, which may or may

13   not be reflective of the sedimentation rate in the recent

14   sediments.

15   Q     Let's take a look at Joint Exhibit 45 at Page 34.  And

16   if we can just have the bottom blown up.

17         Is this where you tried to explain your reasons for

18   using lead-210 and -- and some of your approach, what you were

19   aiming to do?

20   A     Yes.

21   Q     You say, for the purpose of estimating how quickly

22   mercury concentrations have been dropping in the surface

23   sediment and on depositing particles, the focus is on the

24   section of the sediment core that records the recent past.

25   A     Yes.

1   Q      And that's the reason for -- partly for using lead-210?

2   A      Yes, it is.

3   Q      You say, how far one goes back in time to examine

4   recovery rate depends on how recovery has progressed.

5   A      Yes.

6   Q      And by that, do you mean as you're examining down

7   through the -- the core, there's a point at which you -- you

8   need to determine when you -- when you stop?

9   A      Yes, you have to stop at some point, and you're

10  progressing from the surface, which is the most recent time,

11  into the past as you move down in the core, and you have to

12  decide how far back in time you will go.

13  Q      And at that point, I mean, regardless of how -- what

14  method you're using, you have to select some period of time

15  where you're going to stop.

16  A      Yes.

17  Q      You're -- you either go through the entire history of

18  the core, from the very beginning, or you choose some other

19  period, some sort of arbitrary period in-between, or you have

20  a method for determining when you're going to stop.

21  A      Yes.

22  Q      You state in the next sentence, in the Penobscot River

23  system, there is evidence suggesting that ongoing sources

24  inhibited recovery at least into the 1980s and perhaps into

25  the mid-to late 1990s.  What did you mean by that sentence?

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3324

1    A      The -- the first indication of that to me was the cores

2    themselves as I examined the mercury profiles starting from

3    the surface and progressing downward into the core.

4    Particularly in the Mendall Marsh cores, which I think have

5    the best record, you would see this increase as you progressed

6    down, and then it would trend off that to a period where

7    levels were relatively constant.

8           I interpreted the relatively constant to mean that for

9    some period of time, levels in the mobile sediments that are

10   depositing were not changing, and if they're not changing, it

11   is because something must have been inhibiting the recovery at

12   that earlier period, and the only thing that can inhibit the

13   recovery are sources.

14          And so I interpreted the fact that that period was a

15   period where things were not dropping, that ongoing sources

16   must have been significant enough to be inhibiting the

17   recovery during that earlier period.

18   Q      And then do you go on to postulate some of the potential

19   reasons or evidence available that there were ongoing sources?

20   A      Yes.

21   Q      One of them you mentioned is USGS measurements?

22   A      Yes.

23   Q      And then if we can go to the next page.  You mentioned

24   some evidence of additional loading from the HoltraChem

25   facility, and you also mentioned -- I guess you're referring

1  to the mussel watch data?

2  A    Yes.

3  Q    And can you just explain, were these -- did you know

4  exactly what could have caused the leveling-off that you were

5  seeing in the core?

6  A    No, I don't really know.  I was, in essence, just

7  saying, based upon the information that's available, there's

8  some indication that sources were higher back in the '80s into

9  the early '90s.

10       Um, the USGS data I mentioned earlier, we have to be

11  careful relying on because the techniques that were used

12  potentially introduce some bias into the samples.  So they're

13  -- they're probably not strong estimates of what the actual

14  mercury loads coming over Veazie Dam were, but they're

15  indicative of likely higher levels back then.

16       The time history of the HoltraChem facility as estimated

17  by the Study Panel shows that prior to the late '90s, the

18  discharges were higher.  Um, I think the estimates are pretty

19  uncertain of what those discharges were, but perhaps those

20  discharges back in the '80s and '90s when a residual was

21  coming from the plant site at that point in time was high

22  enough to be impacting recovery.

23       And then there's some suggestion in the mussel watch

24  data that there was a period of time where things were

25  bouncing around and didn't seem to really be dropping.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3326

1        Um, none of those individually are strong evidence of

2   ongoing sources, but I -- but I think collectively, they

3   provide some indication, and there has to be some explanation

4   for why there's this period of time that's pretty consistently

5   seen in the cores where things didn't seem to be changing, and

6   ongoing sources is really the only explanation I can think of

7   for why there would have been a period of time earlier in

8   these cores where things flattened out.

9   Q    You state, therefore, it is prudent to focus on recovery

10  that has occurred since the mid- to late 1990s.

11       When you're evaluating the cores, are you able to

12  precisely date the historical record in the core?

13  A    No, I'm -- and when I wrote this, I was -- I was really

14  reflecting on -- Dr. Santschi had estimated that the interval

15  of the core that I was examining, which is the same interval

16  that he was examining, represented a period that went back to

17  about 1988.

18       So, therefore, within that period, you see this

19  flattening out.  So I initially interpreted that to mean that

20  that flattening out had to be occurring post-1988.  Um, and so

21  that's why I wrote that the recovery we see from the surface

22  on down probably progressed back into the '90s sometime.

23       Um, but that's not precise at all.  I think we all need

24  to recognize that this whole dating exercise is -- is an

25  approximation, and there is some uncertainty associated with

1    the dating.

2         Ah, there's also uncertainty because of the resolution

3    of the cores relative to the rates of sedimentation.  So the

4    cores are sectioned in 1-centimeter intervals.  In many of the

5    cores, for example, sedimentation rates are, say,

6    .4 centimeters a year, which means within 1 centimeter is

7    already at least two and a half years worth of data in -- in a

8    1-centimeter interval because at .4 centimeters a year, it

9    would take two and a half years to move 1 centimeter.

10        Um, and there's likely more than three -- two and a half

11   years in there because of mixing.  All right.  Remember at the

12   surface, there can be mixing which can mix things deeper than

13   1 centimeter.  So it's very difficult to precisely date these,

14   and so it's an approximation.

15        Um, I think the broader point here is that within the

16   period that Dr. Santschi examined, there appears to be a

17   progressing increase with depth and then a flattening.  And

18   it's my view that the progressing increase with depth, which

19   reflects the most recent past, is the reflection of the most

20   recent rate at which concentrations have been changing in the

21   mobile sediments that are depositing there.

22             MR. TALBERT:  If we could switch over to the elmo.

23   BY MR. TALBERT:

24   Q    I put on the screen an exhibit created by the

25   plaintiffs, and they have added approximate date ranges to

1   Table 5-1 of your report where you've reported -- and it's the

2   updated version -- where you've reported the cores that you

3   analyzed.

4        Is it -- is it appropriate to assign a -- a date range

5   similar to this?

6   A    No, I think that -- that's attempting to apply more

7   precision to this analysis than actually exists.

8        It also, for example, um, the first -- first core,

9   Mendall Marsh 2B, where I started the analysis 3 centimeters

10  below the surface, 3.5 is the center of the 3- to 4-centimeter

11  section, because I thought -- I believed, based upon the data,

12  that there was some evidence of mixing in the upper

13  3 centimeters, what appears below the upper 3 centimeters is

14  actually some combination of material that entered that

15  3-centimeter mixed layer, which is several years worth of

16  mercury, and what's coming out there is not 2005.9.  What's

17  coming out there is some mixture of stuff that deposited in

18  2009, 2008, 2007 that is now coming out below the mixed layer.

19       So -- so these dates are -- on the left are, for the

20  most part, meaningless, and the ones on the right indicate a

21  level of precision that just doesn't exist with -- with this

22  technique.

23  Q    Nevertheless, if we were to look at -- and this is just

24  a -- those same date ranges in tabular form, do -- do most of

25  those date in the general time period that you're suggesting?

1    A      They do.

2    Q      They're a little bit lower, but you're suggesting the --

3    the mid-'90s?

4    A      Yeah, and the -- we should exclude this core 6A, which,

5    after doing the analysis, I concluded the sedimentation rate

6    was extremely low, um, .18 centimeters a year, such that there

7    is too little sedimentation there to reliably evaluate the

8    core.

9           So I don't believe that -- that date range is meaningful

10   at all.

11   Q      Let's take a look at Defense Exhibit 1200.

12          MR. TALBERT:  If we could switch back.  Thank you.

13   BY MR. TALBERT:

14   Q      Is this an analysis that you did of that Mendall Marsh

15   core 3B to explain why you excluded that one?

16   A      Well, I didn't -- I didn't exclude Mendall Marsh core

17   3B.  Um, this, I think, illustrates a different point related

18   to half-times.  Um, Mendall Marsh core 3B, I achieved a

19   half-time that was significantly different than

20   Dr. Santschi's, and this illustrates why that -- that

21   difference is what it is.

22   Q      Mendall Marsh core 3B is the one that once you

23   calculated it, it was at -- it was below .2, correct?

24   A      No.

25   Q      I'm sorry.  Could you explain for the court again?

1    A    It -- it was -- the core that I did not include is core

2    6.  Um, if -- if we look back at that table.

3    Q    I'm sorry.  I misspoke.  I meant 6A.

4    A    6A.

5    Q    Mendall Marsh 6A.

6    A    Is the core that I did not include.

7    Q    And that was the one that when you calculated the

8    sedimentation rate, it was about .18, correct?

9    A    Yes, yes.

10            MR. TALBERT:  If we could switch back over to the

11   elmo.

12   BY MR. TALBERT:

13   Q    At the end of the day, after comparing your half-time

14   calculations that you did compared to Dr. Santschi's, were

15   there significant differences between your calculations?

16   A    In -- in some cases, no, and in some cases, yes.  So

17   what this table shows are the -- that -- half-times, which

18   remember the half-times are the time -- the time it takes to

19   cut the concentration in half.

20        So if the -- we're looking at things at 600, it is the

21   time it takes for the concentrations to drop to 300.  And for

22   each of the cores, from my report, Table 5-1, I've listed the

23   half-times that I determined based upon my analysis.  And the

24   half-times obtained by Dr. Santschi, based on his analysis of

25   the same data.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3331

1        So, for example, core 2B, I came to a half-time of

2    23 years; Dr. Santschi came to 19 years.  Um, 3B, there is a

3    significant difference.  I came to 10 years, and he calculated

4    39 years.

5        So those are examples of, you know, two cases where we

6    actually had fairly close correspondence and where we had very

7    different correspondence -- very different half-times.

8    Q    Let's just pause for a second and -- and take a look at

9    3B.  This was the exhibit that I was referring to earlier.

10       Is this a demonstrative you created to explain, in part,

11   why you exclude -- or excluded 3B --

12   A    Why I -- why I --

13   Q    -- chose a different range?

14   A    Why I excluded part of the range that Dr. Santschi

15   considered in 3B, what this shows are the mercury measurements

16   progressing from the surface down into the core, and you can

17   see that there is a rise during this period -- right -- which

18   represents the most recent sediments; so from the surface of

19   the core to about 20 centimeters, concentrations are rising.

20       Below about 20 centimeters, down to 56 centimeters,

21   concentrations are flat.  Dr. -- Dr. Santschi used this full

22   record to estimate what -- what the half-time was.  I used

23   only the period where concentrations were increasing.

24       Recall my methodology was to start at the surface,

25   progress downward into the core, following the trend until the

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3332

1    trend broke, and the trend breaks at about 20 centimeters, and

2    then there's this period that I pretty consistently saw, where

3    things just were not changing.

4         And so my view is that the trend that we see from

5    20 centimeters to the surface represents what's happening most

6    recently and our best estimate of what will happen going

7    forward.  And if you include this period where things were not

8    recovering, it results in estimating a much longer half-time,

9    which is why we have the difference we do.

10        So when you look just at the period from the surface

11   down to 20 centimeters, you obtain -- at least I obtained a

12   ten-year half-time.  When you look all the way down, include

13   this period with no change, you get Dr. Santschi's 39-year

14   half-time.

15   Q    I'm sorry.  Now, can you please continue your comparison

16   of the cores?

17   A    Sure.  In -- in Mendall Marsh core 4C, both he and I

18   obtained the same half-time, 23 years.

19        5C, I obtained a shorter half-time, and it's basically

20   for the same reason that we just demonstrated in -- in 3B.  I

21   have 16 years; he had 25 years.

22        Core 7A, we obtained essentially the same half-time,

23   15 years.

24        Core 8A, again for the same reason, I obtained a shorter

25   half-time, 7 versus 18.

3333

1        And in core 9B, we're fairly close, I had 14-year

2   half-time, and he had 11-year half-time.

3   Q    And after averaging these half-times, how does your

4   calculations for half-times for recovery compare to

5   Dr. Santschi's?

6   A    Dr. Santschi reported an average half-time for Mendall

7   Marsh of 22 years, so 22 years to cut concentrations in half.

8        The average of the half-times that I computed is

9   15 years, so 15 years to reduce concentrations in half.

10  Q    And what did Dr. Driscoll, the plaintiffs' expert,

11  calculate for a half-time?

12  A    Dr. Driscoll, my understanding, attempted to replicate

13  Dr. Santschi's analysis, and in doing so, got something

14  slightly different.  I think, as I recall, his estimate of the

15  average half-time in Mendall Marsh was 19 years.

16  Q    So after having three different experts calculate

17  half-times for Mendall Marsh, in your opinion, are these

18  average half-times all that different?

19  A    I don't think they're all that different.  I mean, the

20  range here is 15 years to 22 years for the average.  The

21  individual numbers certainly encompass that range and are

22  greater than that range.

23       So -- so while I believe that what I did is perhaps

24  closer to what the actual half-time is, all of these are

25  estimates.  None of them is precisely the half-time.  And I

1  think the difference between 15 and 22 years, given the

2  uncertainty inherent in this type of analysis, is actually

3  fairly small.

4  Q     And you -- can you connect the dots for us to explain

5  how long it would take to meet various targets that the Study

6  Panel has set for recovery using these different half-times?

7  A     I can, and I think it's important to understand that

8  when we're looking at the time it takes to meet a target, that

9  this is -- this is not binary in the sense that it's not --

10  okay, the concentrations -- the average concentration the

11  Study Panel concluded in the upper estuary is 890 nanograms

12  per gram on a dry-weight basis.  Their target is 450, which is

13  approximately half of that.

14      So it takes one half-time to go from 890 to 450, but

15  it's not as if the system is sitting at 890 until -- until

16  that half-time occurs and instantly drops to 450.  It's

17  actually progressing downward the entire time.

18      So that if we -- I guess this works.  All right.  We

19  start at 890, and we get this downward progression of

20  concentrations over time, so in one half-time, which I

21  estimate to be about 15 years, it goes from 890 to 450, but

22  it's progressing downward the entire time.  So after half of

23  that time, the concentration is significantly below 890,

24  progressing towards 450, um, and would achieve 450 in

25  approximately 15 years.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3335

1   Q     And how about for Mendall Marsh?

2   A     For Mendall Marsh, ah, they estimated that the current

3   average concentration on the marsh platform is 490, and that

4   their objective was to get it to 100, and that's a -- just a

5   little bit more than two half-times.

6         So if you think 490, in one half-time, you will have

7   dropped concentrations to 245 -- all right -- half of 490.  In

8   another half-time, you would have dropped them to about 122.

9   So you would be now very close to their target in two

10  half-times, so that would be on the order of 30 or so years.

11  Q     And how long would it take using Dr. Santschi's

12  half-time for recovery estimate?

13  A     Dr. Santschi's half-time for recovery estimate at

14  22 years would take -- two half-times would take approximately

15  44 years.

16  Q     And how about Dr. Driscoll?

17  A     Dr. Driscoll, two half-times would be 38 years.

18  Q     Did you also evaluate biota trends?

19  A     Yes, I examined biota trends as a confirmatory line of

20  evidence, to determine whether or not there was evidence in

21  the biota trends that levels have been dropping, which is what

22  we would expect if we believe the core information, which says

23  the concentrations on mobile sediments, which is what we're

24  trying to estimate, have been dropping.  To the extent that

25  the mobile sediment concentrations are, in fact, controlling

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3336

1    exposure to the food web, you would expect to see drops

2    occurring in the biota.

3        So I examined the biota data to see whether there was

4    evidence of declines.

5    Q    And just to clarify the record, are all of the half-time

6    for recovery estimates, do all of them run from the year 2009

7    when the samples were taken?

8    A    Yes.

9    Q    So can you please just walk us through what you did with

10   respect to the -- the -- your examination of -- of biota

11   trends?

12   A    Biota -- biota trends are difficult to look at because

13   there -- there are a lot of confounding variables associated

14   with levels we see on biota.

15       Um, one of those confounding variables is that a lot

16   of -- a lot of these species move around, so that their

17   exposure changes as they move around in the system, and you

18   want to try to eliminate that as a confounding variable.

19       So you really want to focus on biota that move the least

20   in the system, so that their exposure isn't changing spatially

21   in ways that you don't understand.

22       You -- you also want to look in the region of the system

23   where you expect the recovery.  So the -- when we get out into

24   Penobscot Bay, it's -- the system is getting close to

25   background, and so when you approach background, the recovery

1    is very slow because you're already near background, so things

2    don't change that much.

3         Um, the half-lives we're talking about really reflect

4    how things are dropping in the most contaminated region, the

5    upper estuary.  So you really want to focus on the

6    measurements of biota that are further upstream.

7         And so the second thing is to look at locations that are

8    in -- further upstream, and for that I used Fort Point.  So I

9    looked at locations above Fort Point.

10        And then the last criteria is you want as long a record

11   as possible.  Because of the inherent variability in the biota

12   data, the longer the record, the more likely you are to see

13   trends, if trends do exist.  The shorter the record, the more

14   difficult it is because of the -- the year-to-year variability

15   that exists in the biota data.

16   Q    And is the evaluation of biota trends something that is

17   commonly done at contaminated sediment sites?

18   A    Yes, it's routinely done.

19   Q    And, again, in this case, you were performing that

20   analysis as -- as a -- somewhat of a check on the recovery

21   half-times?

22   A    Yes, it was -- it was a check, sort of a confirmatory

23   check.  Are things declining because the -- the datable

24   sediment cores indicate that they should be?

25   Q    And did you evaluate all the biota in looking for

1  trends?

2  A     No.

3  Q     Can you explain your methodology, then, just for

4  selecting certain biota?

5  A     Yes, again, biota that were measured at locations north

6  of Fort Point, biota that moved the least in the system, and

7  stations that have the longest record.  And with those

8  criteria, I chose four species among all the species that were

9  sampled, and that were mussels, mummichog, rainbow smelt, and

10 tomcod.

11 Q     And what -- what did you find?

12 A     I found that, while there's certainly uncertainty in all

13 of this, downward trends occurred fairly frequently, not

14 always, and I think because of the difficulty in seeing trends

15 in short-term records, um, I would not expect to be able to

16 see them everywhere.

17     But for mussels, for example, trends were pretty

18 consistently downward at the stations.  For mummichog, they

19 were downward pretty consistently.  Rainbow smelt, they were

20 pretty consistently downward.  For tomcod, it was a mixed bag.

21 There were two stations that I believed over the longest --

22 longer record showed evidence of drop.  The other stations you

23 couldn't tell.

24     Um, but the preponderance of downward trends is

25 presumptive evidence that things are getting better.  If they

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3339

1   weren't getting better, what you would expect to see is just
2   noise, and noise would give you upward trends as often as
3   downward trends, just based upon random behavior.  But that's
4   not what you see.  Organized upward trends where things seem
5   to consistently be getting higher are rare in the record.
6   Downward trends are fairly common in the record for these
7   species.
8        So I think that's good confirmatory evidence that levels
9   are dropping as indicated by the sediment cores.
10  Q    Does the evaluation of biota trends involve some
11  professional judgment?
12  A    Yes, a fair amount of professional judgment.
13  Q    Let's talk now about what can be done to accelerate
14  recovery.  Before identifying whether you can accelerate
15  recovery, do you need to understand what is controlling
16  recovery?
17  A    Yes, you do.
18  Q    And do you agree that it's currently unclear what is
19  controlling recovery of the system?
20  A    Yes.
21  Q    There is at least one theory postulated by the Study
22  Panel that the mobile pool controls recovery.
23  A    Yes.
24  Q    Is that correct?  What's your understanding as to the
25  level of uncertainty regarding the size of the mobile pool?

1  A     I think there's a high uncertainty associated with the
2  size of the mobile pool.
3  Q     If we wanted to better understand the mobile pool for
4  remedial -- remediation purposes, what -- what additional
5  information would we need?
6  A     I think we need to understand how dispersed the mobile
7  pool is.  The initial work that Dr. Geyer did where he
8  characterized mobile sediments by looking at the color of
9  sediments throughout the system, he identified these mobile
10 sediments pretty much throughout the entire system, which
11 would suggest, at least in the first instance, that they are
12 very dispersed throughout the system.
13      Um, I think you need to do some further work to confirm
14 whether, in fact, it is very dispersed.  Um, to the extent
15 that the mobile pool is very dispersed, it would be very --
16 very difficult to do anything to address the mobile pool.
17      Dr. Geyer believes that there are what he calls
18 temporary trapping zones, where portions of the mobile pool
19 tend to congregate.  Um, that's based on some very preliminary
20 analysis and is, I would think, right now a hypothesis more
21 than anything else.
22      And so you'd have to do some work to determine whether,
23 in fact, what he believes is happening is, in fact, happening.
24      Um, but you also have to decide whether it is the mobile
25 pool itself that is controlling recovery because, if it is

1    not, attempting to remediate or collect mobile sediments may

2    not increase recovery rate.

3    Q     Did you do an independent evaluation of the mobile pool

4    to determine whether it has a multi decadal residence time?

5    A     Yes.

6    Q     And could you please explain for the court what you did?

7    A     The issue of the residence time of the mobile pool is

8    governed by the size of the mobile pool and the rate at which

9    sediments enter the mobile pool and leave the mobile pool,

10   either because of depositing on the bottom, so they're no

11   longer in the mobile pool, or being flushed down into the bay.

12       Um, the Study Panel did some preliminary work to try to

13   estimate the size of the mobile pool and to try to estimate

14   the solids fluxes.  How much solids come into the mobile pool?

15   How much solids are deposited on the bottom of the river?  And

16   how much solids exit out into the bay?

17       Um, that analysis is uncertain, as well.  It is probably

18   the best way, given the existing data, to estimate the

19   existence of the mobile pool -- I'm sorry -- the residence

20   time of the mobile pool.  That data suggests a turnover time

21   of about five years, and I think the mobile pool size has been

22   overestimated so if it, in fact, is smaller than it has been

23   estimated, the turnover time would be even faster than five

24   years.

25       So there's considerable uncertainty, but I think the

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3342

1   data that they have collected have pointed to it likely having

2   a much shorter half-time than this multi-decadal half-time

3   that they postulated.

4   Q     Let's take a look at Defense Exhibit 1210.

5         What does this demonstrative show?

6   A     Um, this is another way that I looked at what -- how

7   fast the mobile pool must be turning over, and this is just

8   one core, and in this core, you can see there is a period --

9   it's -- this is not a clean core because rather than a -- this

10  is mercury versus depth, rather than a solid peak in mercury

11  where you get a -- a region here where things are sort of

12  bouncing around for a while at higher concentrations.

13        But then above that region -- all right -- things drop

14  off, and they drop off fairly quickly.  Presumably, this

15  period where things are bouncing around reflects a period

16  where the mobile sediments have fairly high mercury

17  concentrations.

18        If we -- if we believe for the moment that these numbers

19  reflect the concentrations that were in the mobile pool at

20  that time, they were around 4,000 or so.  Well, in a fairly

21  short period of time, they drop to under 2,000.

22        So the -- the drop in mercury concentration that occurs

23  in the mobile sediments would occur by diluting them with

24  cleaner sediments, and the rate at which you dilute them

25  controls how fast the concentrations would drop.  The fact

1    that the drop occurs fairly rapidly here indicates that the

2    mobile pool sediments were -- must have been turning over

3    fairly quickly, um, with cleaner sediments in order to allow

4    the concentration in the mobile sediments to decline that --

5    that rapidly.

6         So I think these data -- and there are cores that are

7    much cleaner than this -- but the -- the cores that are -- do

8    show this sort of pattern of increase and decrease pretty much

9    all show this fairly rapid drop, um, which would indicate the

10   mobile sediments had declined fairly quickly in concentration,

11   which could only occur if they were turning over fairly

12   quickly.

13   Q    If the mobile pool is controlling recovery of the

14   system, would the turnover rate in the mobile pool equal the

15   half-time for recovery in the upper estuary?

16   A    Pretty much.  I mean, it's not a one-to-one because the

17   sediments that are mixing into the mobile pool aren't exactly

18   clean, but -- but roughly.  If the mobile pool were

19   controlling recovery, you would expect the turnover in the

20   mobile pool to be on the order of, say, 15 to 20 years.

21   Q    In light of your evaluation that you believe the mobile

22   pool is turning over in about five years, does that give you

23   confidence that your half-time for recovery is appropriate for

24   the system on the -- on the lower end, your 15-year recovery

25   half-time is much closer than what is stated in the Phase II

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3344

1   Report for the entire system?

2   A     Yes, I mean, there's a closer correspondence between

3   that half-time and the inference from these profiles, for

4   example, of how fast the mobile pool would be -- have been

5   turning over.  There's still some difference -- difference

6   here, but it is closer in terms of how fast the mobile pool

7   might be turning over and how fast the system seems to be

8   recovering.

9   Q     Let's talk a little bit about hotspots.  There has been

10  some testimony that there may be hotspots within the system.

11  Are you aware of that?

12  A     Yes.

13  Q     Did you evaluate the potential for hotspots in the

14  system?

15  A     I did.

16  Q     And what did you find?

17  A     I think I should first define what I think the Study

18  Panel meant by hotspots and what I mean by hotspots.

19        Hotspots would be localized areas that are significant

20  sources of mercury to the system because there are high

21  mercury concentrations at the surface, and that mercury is

22  being made available to the system likely through periodic

23  erosion events, let's say, and the data don't show evidence of

24  that.  There -- the cores themselves show, in most cases, the

25  concentrations at the surface are lower than the

1   concentrations at depth.  And so we haven't found too many

2   places where the concentrations are particularly high at the

3   surface.

4        The concentrations at the surface are variable from core

5   to core, but much more in a random patchwork kind of sense

6   than in an organized sense, where you can have identified that

7   there's an area of consistently elevated concentrations at the

8   surface that appears to be subject to erosion so that it is

9   feeding the mobile sediments.

10        Um, and the other line of evidence comes from the

11   patterns of mercury in the water column.  As you move from

12   upstream to downstream through this system, the mercury

13   concentrations in the water column continually decline.  Um,

14   if there were localized areas that were significant sources to

15   the system, what you would expect is that you would see them

16   in the water column data, that the water column data would be

17   dropping, and as you went past this significant hotspot, you

18   would get an uptick in the water column because it's feeding

19   the system mercury.

20        And there's no evidence of that in the water column

21   data.  Now, that's not to say that sediments aren't

22   contributing mercury to the mobile pool.  I think they are,

23   but probably in a much more diffuse manner than identifiable

24   local hotspots.  So -- so I think that the evidence we have

25   doesn't support the idea of these hotspots.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3346

1      It's also a little bit inconsistent with this idea of a

2   mobile pool that sloshes back and forth through the system

3   and -- and tends to homogenize surface concentrations in the

4   system.

5   Q    Would you recommend to the court that there be an

6   investigation of potential hotspots, or do you believe that

7   there's enough information to conclude that there are not

8   hotspots within the system?

9   A    I'd say that the evidence we have shows no indication of

10  hotspots, and without an indication of hotspots, it's likely

11  they don't exist.  But even if they did exist, the -- the

12  information we have wouldn't give you a clue where to look.

13      So -- so it -- it would be a fishing expedition for

14  something that there's no evidence exists, which is not the

15  way that we've ever conducted investigations at contaminated

16  sediment sites.

17      We try to investigate hotspots, for example, when we see

18  evidence in the data that they exist and evidence of where

19  they exist.  And with that evidence in hand, you can begin to

20  investigate that area, um, so the data show concentrations go

21  up, you see where they go up, and so you -- you suspect that

22  that's an area of higher concentration, and you go out and

23  conduct sampling to try to identify it and characterize it.

24      But without any evidence that they exist, particularly

25  in a system as large and complex as this, it really just would

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3347

1    be a fishing expedition for something that may not exist.

2    Q     Let's talk a little bit about erosion.  Did you also

3    consider whether erosion of mudflats is a significant ongoing

4    source in the Penobscot?

5    A     I did.

6    Q     And what did you do to evaluate that?

7    A     I looked at the -- the same data that I looked at for

8    hotspots.  Ah, eroding mudflats are another type of hotspot,

9    potentially.  All right.  So that if we had some particular

10   mudflat that was a significant source of mercury to the

11   system, it would be a hotspot -- all right -- just a different

12   kind of hotspot.

13         Again, because there's no evidence in the sediment data

14   or the water data of hotspots, this type of hotspot we don't

15   have evidence exists.

16         That's not to say that there's no evidence that there's

17   erosion in mudflats.  In fact, there is evidence that there's

18   erosion in mudflats, but that erosion is what you typically

19   see in these mudflats.  It -- it -- mudflats, as water drains

20   off the mudflat, ah, you create rills, so these tiny channels

21   that water's running through.  They're typically a few

22   centimeters deep, um, so they're not digging deeply into the

23   system.

24         Um, the mudflats do contain much deeper cuts, but those

25   are permanent channels that exist in the mudflat, and they've

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3348

1    probably been there for decades, ah, and water runs through

2    those channels.  But there's no evidence those channels are

3    eroding.

4          Ah, and the mudflats themselves overall are accreting

5    because that's the nature of mudflats.  They tend to -- and

6    that's why they're there, because they're areas where sediment

7    has accumulated.  And people who've studied mudflats in

8    systems, such as this, find that they're accreting, and the --

9    the kind of shallow erosion that you get that I just described

10   with these rills is somewhat ephemeral, and so they'll occur

11   and they'll fill back in, they'll occur, they'll fill back in,

12   but it's all happening in the surface layer and not

13   progressing deep into the sediment to expose deeper higher

14   concentrations, and it's not a substantial erosion that's

15   eroding significant amounts of material into a river and,

16   therefore, bringing significant amounts of mercury into the

17   river.

18   Q     Just to follow up on that, every day, if you had erosion

19   from the mudflats, there is other material that's then being

20   replaced on the mudflat?

21   A     Yes, that's -- that's what who -- people who have

22   studied mudflats see, that there's this shallow erosion, and

23   then material comes and lays on top of that, and that process

24   just continues without any significant long-term erosion of

25   the mudflat.

1    Q    And if erosion were a significant source of mercury, you
2    should see some evidence of that in the water column data.
3    A    To the -- yes, to the extent that it's -- it's a
4    localized source, you've identified a particular mudflat that
5    you think is a source.  We would have had evidence from it,
6    either in the core data or the water column data.
7    Q    Would it be difficult to quantify erosion?
8    A    It would be difficult to quantify mercury sources that
9    would be coming off of mudflats because, as you can imagine,
10   there's this huge exchange of water in the tidal cycle.  These
11   are intertidal mudflats, so they're underwater for part of the
12   tidal cycle, they're exposed for part of the tidal cycle.
13   Water is flushing across them on and off.  And trying to
14   understand the difference between the amount of mercury that's
15   moving onto the mudflat in flood tide and the amount of
16   mercury that's leaving the mudflat on ebb tide would be
17   extremely challenging to do.
18        And, again, with no evidence that we've got a mudflat
19   that is a significant source, there would be no reason to
20   attempt to do that.
21   Q    Would it be expensive to try to quantify mercury coming
22   from erosion?
23   A    It would be very expensive and have a pretty low
24   prospect of success.
25   Q    Would it be time-consuming, as well?

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3350

1   A     Yes.

2   Q     Let's talk about, um, remedial options.  Based upon your

3   experience at other contaminated sediment sites, can you just

4   provide a brief overview of the -- the broad categories of --

5   of options for cleaning up contaminated sediment sites?

6   A     Yeah, the -- there are basically four categories of

7   options for cleaning up sites:  One is dredging, um, and

8   that's targeted dredging or large-scale dredging, depending

9   upon the site; um, capping, so you -- you try to isolate the

10  contaminated sediments from the biota and the river by capping

11  them with clean material, um, and that can be done in a

12  targeted fashion or larger; um, the third is amendments to the

13  sediment to try to sequester the contamination; and the fourth

14  is natural recovery, which is always a component of remedies.

15  Q     Did you evaluate the findings and conclusions made by

16  the Study Panel regarding remedial options?

17  A     I did.

18  Q     And were there certain findings and conclusions that you

19  agreed with?

20  A     Yes.

21  Q     What were those?

22  A     The Study Panel, I think correctly, identified that

23  given the broad, diffuse nature of the contamination in the

24  system, the huge complexity of this system, the high energy

25  associated with the system, the large depths, that broad-scale

1   dredging would not be a choice here.  All right.  There is --

2   there is pretty significant environmental risks associated

3   with that in a system as energetic as this.  Um, we've got

4   sensitive environments here that would be disrupted.  And so I

5   think they correctly said that broad-scale remediation of this

6   system is not a good choice.

7        Ah, they recommended that there be an ongoing monitoring

8   program to continue to evaluate the system going forward, to

9   document the recovery that's occurring in the system, and to

10  ensure that we're seeing continued recovery.  And although I

11  disagree with some of the elements of that program, I think

12  that's important and -- and should be conducted.

13       Um, they -- they indicate there needs to be some focus

14  on the marsh, and while I don't agree that we should continue

15  to pursue SediMite as a remediation option for the marsh, I do

16  agree continued focus on -- on the marsh is important.

17  Q    You mentioned that while you agree with their proposal

18  for ongoing monitoring, you do have some difference of opinion

19  regarding what should be monitored?

20  A    Yes.

21  Q    And can you explain for the court what -- what your main

22  points of disagreement are?

23  A    My view of the monitoring is that the real objective of

24  the monitoring is -- is to evaluate recovery of the system,

25  and for purposes of evaluating recovery of the system, you --

1    you want to have the least confounding information.

2        Sediments are a poor choice for monitoring because

3    there's huge spatial variability in mercury concentrations in

4    sediments, and that spatial variability really confounds your

5    chance to see temporal variability.

6        Biota are the best tool we have, and it's the tool that

7    is used at most sites to try to look at long-term trend

8    analysis.  It's important because it's a relative metric to

9    risk because it's the biota that we're looking at, either from

10   an ecological risk standpoint or a human health risk

11   standpoint.

12       For biota, for measuring trends, as I indicated, you

13   want to try to minimize as many confounding variables as you

14   can, so you want to choose the biota that are moving around

15   the least in the system, so you're not confounded by this

16   spatial variability.

17       So I -- so I think a subset of the species that they had

18   been sampling, particularly the ones that I looked at recovery

19   in, are the best choices, and I would refer to them as

20   sentinel species for monitoring trend analysis.

21       That said, there should be ongoing work in the marsh

22   because there is this open question about the birds, so you

23   would be monitoring the birds going forward, for example, for

24   purposes of trying to evaluate whether there's harm in the

25   birds.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3353

1    Q    Did you also consider the Study Panel's proposal, I

2    guess it's recommendations 1 and 2, to build sediment traps?

3    A    I did.

4    Q    And what did you do to evaluate the sediment traps?

5    A    I looked at the information that the Study Panel

6    collected on velocities in the system, because how fast the

7    water's moving in the system is a key variable as to whether

8    you could effectively trap sediments in the system.

9         And I also looked at actually modeling the traps, um, so

10   we constructed a mathematical model to simulate the traps and

11   to do calculations about how much additional deposition would

12   occur if you built a trap and whether the traps could

13   effectively catch the fine sediments that you're trying to

14   capture.  I think there's an important distinction here.

15        The -- the sediments of most concern are the finer

16   sediments.  The mercury concentrations are high on fine

17   sediments; they're low on coarse sediments.  Traps are

18   probably much more effective at catching coarse sediments,

19   sand and gravel.  The question is whether they can catch the

20   finer sediments that are moving in the water column and are

21   carrying mercury through the system and represent the most

22   significant component of the mobile sediments.

23   Q    I want to talk about the evaluation you did of particles

24   staying within the cap -- in the trap.

25   A    Yes.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3354

1   Q     But, first, are you aware that Mr. Glaza has done some

2   estimates regarding how large these traps would have to be and

3   how much material would be involved in -- in actually creating

4   them?

5   A     Yes, I am.

6   Q     Are your concerns with dredging generally also -- do

7   those also apply to the amount of dredging that would be

8   needed for building these sediment traps?

9   A     Yes, there's a huge volume of material that would have

10  to be removed over fairly large distances because the traps

11  themselves would -- would be incredibly large.

12  Q     Do you have any specific concerns with respect to

13  dredging in the Penobscot System based upon what you know?

14  A     They're the concerns that I just expressed before.  This

15  is a very energetic system, very high velocities.  One of the

16  experiences that we have in the dredging that we've been doing

17  on the Hudson River, for example, is that the spread of, in

18  that case, PCBs increases as the velocity of the Hudson River

19  increases.  So when the Hudson is flowing fairly quiescently,

20  the spread of PCBs as you're trying to take them out is

21  actually not all that great.

22        But as the velocities increase, we start to lose more

23  and more material as we're trying to take it out.  And if you

24  extrapolate that kind of information to the Penobscot, where

25  the velocities in the Penobscot are much greater than we ever

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3355

1   see on the Hudson, there's a potential for significant release

2   of the mercury that you're trying to take out as you're doing

3   that.  So that's a -- that's a concern.

4        Um, the other concern is just the depth of water that

5   you're working in.  Dredging becomes more difficult and

6   there's more opportunity for problems with dredging as you

7   are -- environmental dredging, where you're trying to minimize

8   the residual you leave behind and the resuspension you cause

9   as you're having to go very far below the surface.

10       And then the last is what I talked about that there are,

11  you know, important habitats here in the near-shore areas that

12  you would have negative impacts to if you dredged them.

13  Q    Historically, based on your experience, has dredging

14  been used as a -- as a primary remedy?

15  A    Dredging has been used as a component of a remedy at

16  many sites.  It's rare that it is the primary remedy, although

17  on the Passaic River, there's a proposed plan right now that

18  is fairly significant dredging.  That has not been accepted

19  yet.  The government is in a phase of getting public comment,

20  and so there's no decision that that actually will move

21  forward.

22       Um, but outside of that, um, usually dredging is much

23  more targeted.

24  Q    Let's take a look at Defense Exhibit 1211.

25       I want to talk about the analysis you did to evaluate

1    the sediment traps.  Can you explain what this demonstrative

2    shows?

3    A    Yes, the -- the idea of a sediment trap is -- is you

4    make the river deeper, and the reason you're making the river

5    deeper is you're trying to slow the river down.  The velocity

6    in the river is -- depends upon the cross-sectional area.  So

7    if you think of the river as if it were a pipe, if you're

8    trying to put a certain amount of water through that pipe,

9    the -- the smaller the pipe, the faster the water moves.  All

10   right.  The larger the pipe, the slower the water moves.

11       So what you're doing in the trap is trying to expand the

12   cross section of the river to slow the river down, and the

13   reason that you want to slow the river down is our

14   understanding of sediment deposition is such that the kind of

15   fine particles we're talking about here will not stick on the

16   bottom of the river if the velocities are greater than about

17   .3 meters per second.  So particles will settle through the

18   water column, um, but they won't remain on the bottom.  When

19   the velocity of the river is above about .3 meters per second,

20   there's enough turbulence on the bottom that a particle that

21   hits the bottom comes back off the bottom.  So you need to

22   slow the river down so that at least for part of the time, the

23   velocities are less than .3 to allow things to stay on the

24   bottom when they hit the bottom.

25       The other thing we know from sediment transport theory

1    is that, if the velocity gets above about .5 meters per

2    second, something that stayed on the bottom is now going to be

3    eroded off the bottom.  So the -- so the other thing that

4    you're attempting to do is to make sure that the maximum

5    velocities are less than .5.  Greater than .5, and you'll get

6    erosion off the bottom.

7         So -- so the idea is make this river deep enough so that

8    velocities are less than .3 for a considerable amount of the

9    tidal cycle and are -- don't progress above .5 meters per

10   second, so that you don't erode the material that's settled

11   into the trap.

12   Q    Let's take a look at Defense Exhibit 1212.

13        Did you evaluate the Study Panel data they collected on

14   river velocities?

15   A    Yes, and this map is from the Phase II Report, and it

16   shows locations where the Study Panel placed moorings.  The

17   blue ones are the moorings they placed in 2010; the black ones

18   are the locations where they placed moorings in 2011.

19        And at those moorings, they -- they had devices to

20   measure the velocity of the river, so they have velocity

21   records of the river moving at these various locations.

22   Q    Let's take a look at Defense Exhibit 1213.  Can you

23   explain what this -- this demonstrative shows?

24   A    This is a figure from the Phase II Report, Figure 7-5,

25   and it's the measurements that come from one of those

1    moorings.  Um, this is in the Frankfort Channel.

2         And what they're measuring is velocity near the surface

3    and velocity near the bottom.  If we -- if we focus on, let's

4    say, the bottom, which are in red, the scale on the vertical

5    axis is the velocity of the river.  All right.  Zero is in the

6    middle; positive numbers are the river moving in one direction

7    on flood tide or tide; then the negative values are the river

8    moving in the other direction.  So these are the tidal

9    velocities, as the river moves up and down over a tidal cycle.

10        And what you can see from these is that their

11   measurements show that the river routinely reaches 1 meter per

12   second in the bottom waters, and if we look at the red dots

13   down here it's reaching 1 meter per second.

14        So in -- in this area of the river, the velocities are

15   too high for deposition to occur under present conditions.  If

16   you wanted to build a trap in this area of the river, in order

17   to get the velocities so they don't go above .5, when they

18   currently go above 1, you would have to double the

19   cross-sectional area of the river.

20        The river in this area is, you know, 20, 25 feet deep on

21   average.  So you would actually have to dig down to 45,

22   50 feet, which is completely impractical, to create something

23   that would slow the river down enough to let sediment

24   accumulate.

25        And -- and that's hugely greater than anything that Ed

1    Glaza considered in his analysis -- all right -- the amount of

2    dredging that would go on if you were trying to dig out, you

3    know, 25 feet of the river is huge, and the traps are

4    1 kilometer long.  So it's really impractical.

5         We also know, as Ed Glaza indicated, that this is a

6    bedrock environment, and some distance below the soft

7    sediments, you're going to hit bedrock, and may very well hit

8    bedrock before you could ever dig it deep enough.

9    Q    Let's take a look at Defense Exhibit 1214.

10        And can you explain what -- what this demonstrative

11   shows?

12   A    Yes, these are measurements from some of the other

13   moorings.

14   Q    Hm-hmm.

15   A    And you can see in the top panel, measurements that they

16   took at Winterport, Verona Island, and Fort Point.  Um, and

17   the bottom panel, what they took at Frankfort Flats, Mendall

18   Marsh, and the Orland River.

19        What I did here on the right is just sort of a bullet

20   summary of what the velocities reach in each of these areas.

21   So in Winterport, the velocities routinely reach 1 meter per

22   second.  At Verona Island, they routinely meet .7.  At Fort

23   Point, further downstream, the -- the river's flowing with

24   lower velocity, largely because the river -- excuse me -- the

25   river has now expanded its cross section.  It's much bigger

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3360

1    down by Fort Point, and so it moves more slowly.  At Frankfort

2    Flats, it's up at .8.  The entrance to -- to the Marsh River

3    is at .5.

4         And at the entrance to the Marsh River, the Study Panel

5    collected a couple of cores to try to look at sedimentation,

6    and those cores showed very little sediment was accumulating

7    there, which you -- when you reach .5, you would erode things

8    that had dropped out, so that makes some sense.

9         Interestingly, in the Orland River, the velocities don't

10   go above about .3 meters per second.  We know that there are

11   thick sediment deposits in the Orland River, and so that makes

12   sense because the Orland River has low velocities, so I think

13   this is a demonstration of the fact that if you want to

14   collect sediments, you have to get velocities down to the kind

15   of things that we might see in the Orland River, where we --

16   we have these thick deposits, for example.

17        Um, and in these other areas, um, you would have to make

18   incredible changes to the cross section to build effective

19   traps.

20   Q    And what did you conclude from evaluating the velocities

21   in these additional areas?

22   A    That the river is too energetic, moving too fast to

23   practically consider sediment traps as a remedial alternative.

24   Q    Let's take a look at Defense Exhibit 1215.

25        Did you also evaluate the areas that have been

1    identified as depositional areas?

2    A     Yes.  This comes from the Study Panel report.  The Study

3    Panel broke the river up into what they call depositional

4    areas and nondepositional areas.

5         And in each one of these panels here is a blowup of a

6    section of the river, and in the panels, the lighter color is

7    the nondepositional area; the darker color is the depositional

8    area.

9         So if you look at the panels to the left here, we're

10   progressing down the river, and you can see that the only

11   place where there's deposition are in these coves.  The vast

12   majority of the river is nondepositional.

13        We get down -- the lower panel here gets us down to the

14   Marsh River.  This is the Marsh River right here.  And you can

15   see even in this area, the only places where the river's

16   depositional are in these near-shore areas.  Most of the river

17   is nondepositional, which is consistent with the velocity data

18   they collected.  The velocities of -- of this river, for the

19   most part, are too high to allow sediments to accumulate on

20   the bottom.

21        And so this is evidence of that.  And if we look over on

22   the right, um, the Verona channel is the one on the bottom,

23   and, again, you can see there is depositional areas on the

24   edges, but most of that channel is nondepositional.

25        When you progress into the Orland River, which is right

1    here -- right -- the middle panel, you can see that, again,

2    the center is not, but now there are -- there are more -- more

3    depositional areas because the velocities are lower.

4    Q    Let's take a look at Defense Exhibit 1216.  This is

5    Figure 8-4 from your expert report.

6         Can you please explain what this demonstrative shows?

7    A    Yes, this is -- this is the depth of the river.

8    Starting upstream here is just starting north of Verona Island

9    in the Bucksport area.  And as we move from left to right on

10   this figure, we're moving down past Bucksport and down the

11   west channel of Verona Island, which is the channel where the

12   river flows.  The east channel of Verona Island's very

13   shallow.  There's not a lot of flow there.

14        And what you can see is that as we move from Bucksport

15   into the Verona Island channel, the river deepens very

16   quickly.  All right.  The scale here is in feet, and it's feet

17   above mean low, low water.  So these are the minimum

18   elevations.  So, at minimum, you know, the river's about 15,

19   17 feet up here, and then it progresses to coming down to

20   about 70 feet deep in the Verona Channel.

21        What's interesting here is -- is that as you move

22   through the Verona Channel, you have this area where it's

23   fairly flat, and the scale here is in kilometers, so the river

24   deepens, and now moving down from the Verona channel from

25   about kilometer 19.5 to about 18.5, the river's flat.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3363

1        But then there's a depression.  All right.  The river

2   becomes deeper, and it becomes about 85 feet deep here.  This

3   -- this is akin to a sediment trap.  All right.  It's an area

4   where you've deepened the river.  It's actually naturally

5   deeper.  But you can imagine if this whole thing had been

6   flat, and you dug this hole -- right -- that might be a

7   sediment trap.  So we have an example in the river itself of

8   what might be akin to a sediment trap.

9        Yet if you recall back to the

10  depositional/non-depositional areas, the Verona channel is

11  nondepositional, except in the near -- near-shore cove areas.

12  So despite this depression, it's not accumulating sediment.

13  It's nondepositional.  And that's because that's not big

14  enough to slow the river down enough to allow sediment to

15  accumulate.

16       And if you go further downstream, the river shallows up

17  and it gets a little bit deeper, and it shallows up, and then

18  there's this deep pocket here, and the river flattens here.

19  So this is akin to another sort of natural depression, and,

20  again, the -- the data show that that's largely a

21  nondepositional area.

22       And so it confirms the sense that the river moves too

23  fast to allow sediments to accumulate, except in the

24  near-shore cove areas, and -- and so the -- that the idea of,

25  you know, artificially building these kind of things is not

1   going to change the river enough to cause things to

2   accumulate, at least the fine sediments to accumulate.

3   Q     Let's take a look back at Defense Exhibit 1215 on the

4   map, just to make sure it's clear.  This is -- if we can

5   highlight the area right --

6   A     Yes, so here's the -- the Verona Channel, so we were

7   progressing from the Bucksport area here down through the

8   Verona Channel, and the only place where there's deposition is

9   in the near-shore area of the Verona Channel.  All right.  The

10  main part of that channel is nondepositional.

11  Q     Okay.  Let's take a look at Defense Exhibit 1217.

12        And what does this map show?

13  A     This shows two locations where -- where we simulated the

14  creation of sediment traps, and -- and we -- we did this just

15  sort of as a first-cut-level analysis of the efficacy of

16  traps.  So we constructed a mathematical model, ah, one that

17  predicted velocities.  Right.  So it was a hydrodynamic model.

18  Predicted salinity, so we were predicting the salinity

19  distributions through here, and the model's tidal, so it shows

20  salinity moving upstream and downstream.

21        And we predicted sediment deposition, so we modeled

22  sediment -- fine sediment moving through.  And what we did,

23  then, was to artificially deepen the river in this area --

24  right -- and what we did was to make -- artificially make the

25  river 5 meters deeper in this area.

1        And then recalculate deposition to see how much

2   additional deposition we would get if we artificially deepened

3   the river there by 5 meters, which is about 18 feet to

4   simulate a trap.

5        And then we did the same thing down here in the north

6   part of Verona Island.  So we artificially deepened the river

7   by 5 meters, simulating a trap, and then evaluated whether we

8   would get additional deposition in the trap relative to the

9   condition before deepening.

10  Q    Let's take a look at Defense Exhibit 1218.

11       What did you find after you did the model?

12  A    This is -- this is a way in which we summarized the

13  results, and what -- in order to make it so that we could

14  easily see things, what we did was to divide the deposition

15  rate, so the rate at which sediments deposit on the bottom,

16  um, at every one of these -- these are each simulations, to

17  the deposition rate that would -- that occurred in that

18  Frankfort trap, which was the northern trap, at a fairly high

19  river flow.  This -- this is river flow, so that's the river

20  flowing at 50,000 cubic feet per second.

21       So all of these bars are referenced to that result.  So

22  the comparison here is to the deposition that would occur in

23  the Frankfort area with no trap, which is why that bar sits at

24  1.

25       And what we did was to simulate three conditions in the

1   river.  We simulated the river when the flow coming through

2   the river is 12,000 cubic feet per second; when the flow

3   through the river is 36,000 cubic feet per second; and when

4   the flow through the river is 50,000 cubic feet per second.

5        And to give some perspective on that, this panel up here

6   on the right is from the Phase II Report, and it's a

7   presentation of the -- the river flow, and so this is a record

8   of the river flow as measured by the Study Panel.  And there

9   are three horizontal lines on here that represent these three

10  flow conditions to 12,000, 36, and 50,000.

11       So what you can see is the 12,000 is a fairly low flow

12  in the river, right.  The 36,000 is a moderately high flow.

13  And the 50,000 is a relatively high flow.  So we simulated a

14  range of conditions in the river.

15       Deposition goes up as the river flow goes up because

16  there's more sediment moving through the river at high flow

17  than there is at low flow.

18       The -- the darker bars are with no trap -- the blue

19  bars, let's say, and then the green bars are with the trap in

20  place, and, again, it's a 5-meter trap, so it's about 18 feet

21  deepening of the river.

22       And what we can see at this Frankfort trap is that it

23  basically makes no difference.  All right.  The -- the

24  deposition rates with and without the trap are essentially

25  identical.  So the trap basically did -- does nothing.

1       Down at Verona, what we can see is that there's very,

2   very little deposition to begin with -- all right -- because

3   these bars are reference to the deposition that would have

4   occurred at the Frankfort area.  These are very tiny bars

5   because the model says very little sediment would ever settle

6   in that area to begin with.  And you put the trap in, and you

7   get just modest, slight increases in the rate at which you

8   would accumulate sediment, but very small, and so this area

9   would still be very ineffective as a trap.

10  Q    Could you please summarize for the court your overall

11  conclusions regarding sediment traps?

12  A    That sediment traps are just impractical.  That you

13  would -- the river flows too fast.  You would have to increase

14  the depths of the river to so much that it's just not

15  practical as a solution.

16  Q    Dr. Connolly, you've worked on a number of contaminated

17  sediment sites across the country.  What are the steps usually

18  taken to evaluate remedial decisions at these sites?

19  A    I mean, the -- the first step is to fully characterize

20  the site.  All right.  In order to make remedial decisions,

21  you have to have identified that there is harm; you have to

22  have identified the cause of that harm; um, the environmental

23  conditions and the locations in the environment that account

24  for that harm, so that if you want to evaluate remedial

25  alternatives, you can fairly say if I do X, I expect to impact

1    harm in this way.

2        So that -- that requires this complete characterization

3    what in Superfund parlance is typically called a remedial

4    investigation, to fully characterize the site so you

5    understand all the fate and transport pathways, you understand

6    the pathways by which the contaminants get from the

7    environment, sediment and water, into the biota that you're

8    evaluating in a risk assessment for purposes of harm.

9        So that you now fully understand that relationship.

10   Once you understand that relationship, you can progress to

11   what's called a feasibility study phase, where you now begin

12   to look at alternatives, saying, I understand -- so, for

13   example, if we're looking at the birds in the marsh, I

14   understand that if I do option A in the marsh, it will reduce

15   the levels in the birds by X.  And so you can fairly evaluate

16   whether that would effective, and then you can contrast that

17   with other alternatives.  If I do Y, that will have this

18   impact on the levels in the birds.

19       And so you need that understanding.  Um, without that

20   level of understanding, you can propose to do something, and

21   you're not sure exactly what the benefit will be, and so you

22   -- it's -- you don't do the feasibility study until you

23   understand how to calculate the benefits of each remedial

24   option.

25       And then you go through the feasibility study in the way

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3369

1    that Dr. -- Ed Glaza laid out -- all right -- evaluating the

2    different alternatives in terms of their effectiveness in

3    reducing the harm, and then you use all the other criteria

4    that he discussed in -- in comparing the alternatives in order

5    to make a decision.

6    Q    What's your understanding of -- of where we currently

7    are in that process with respect to the Penobscot?

8    A    We're not at the point in the Penobscot where we

9    understand if we do remedial option A, what the impact of that

10   will be on levels in biota.  So we don't understand if we do

11   option A whether we're going to impact biota by 5 percent,

12   10 percent, 50 percent, a hundred percent.

13        We also don't understand what the harm is that we're

14   trying to alleviate, whether, in fact, there is harm.  So I

15   think there's still work to be done to quantify whether, in

16   fact, there is harm, the extent of that harm, and then the

17   relationship between that and the concentrations in the

18   environment so that you can do -- fairly do this evaluation

19   that says if I do option A, here 's how I expect to impact the

20   harm, to reduce the harm so that you can evaluate the

21   effectiveness of that option.

22        We're not at that point.  There's too much uncertainty

23   that remains here in all of those relationships.

24   Q    If there is harm, is it important to understand the

25   severity of that harm when you're selecting remedial options?

1    A    Yes, because there's a -- there's a balancing that goes

2    on here because any active remediation has negative

3    environmental consequences, and so that was some of the

4    balancing criteria, for example, that Ed Glaza talked about.

5         You're balancing -- you're -- the severity of the harm,

6    your ability to reduce that, with the negative impacts

7    associated with the active remediation in order to -- to make

8    a decision about whether it makes sense to move forward with

9    that remediation.

10   Q    What do you recommend as the next steps?

11   A    I think there -- there needs to be some further work to

12   evaluate whether there is harm and the severity of the harm.

13   Dealing with the birds, the songbirds in Mendall Marsh, the

14   sort of screening risk evaluation that the Study Panel did

15   indicates a potential for harm.  We don't have a demonstration

16   of that harm, though, so we don't really understand, as you

17   characterized it, the severity of that harm, whether there are

18   significant population impacts occurring, for example.

19        So I think there needs to be work to -- to more closely

20   evaluate that.

21        To the extent that there is harm, there needs to be work

22   to understand the effectiveness of any remedial option, which

23   means we have to understand the relationship between

24   concentrations in the environment, so, for example, in the

25   marsh, the relationship between concentrations in the marsh

1    and concentrations in the birds.

2        In the marsh, there are -- there are tremendous

3    concentration gradients through the marsh.  So as you progress

4    from the levies of the marsh and move into the marsh,

5    concentrations decline fairly rapidly, and so we don't

6    understand where the birds get their mercury from.  We don't

7    understand whether we should remediate one portion of the

8    marsh or another portion of the marsh.  What's the relative

9    benefits of doing one or the other?  We don't fairly

10   understand how doing that remediation would affect methylation

11   in the marsh.  We don't fairly understand the level to which

12   that might be recontaminated by water coming in.

13       And so all of that really needs to be looked at before

14   you could evaluate remedial alternatives associated with the

15   marsh.

16       For the broader river -- right -- the contamination is

17   -- is very diffuse, and so it would be very, very difficult to

18   design an active remediation for the broader river.

19       Um, the Study Panel's target is one half-time away, and

20   the best estimate I believe now of how long to reach that is

21   about 15 years.  And so in the broader river, natural recovery

22   may very well be the best alternative.

23       But in order to ensure that -- that that's occurring,

24   there needs to be ongoing monitoring.  All right.  So we've

25   done all this analysis.  We have some sense of how fast it's

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3372

1   -- things are recovering.  We need to document that that is,

2   in fact, occurring.  So we need monitoring, and -- and

3   monitoring, I believe, of the sentinel species for trend

4   analysis to document that the recovery we believe is happening

5   is, in fact, happening.

6   Q     One of the things that the plaintiffs have proposed is

7   that there be a meeting between scientists and engineers to

8   discuss remedial options.  Are you aware of that?

9   A     Yes.

10  Q     And is there any reason why such a meeting couldn't take

11  place in parallel with the work that you just described?

12  A     I'm not sure what you would accomplish at such a meeting

13  at this point.  The engineers, in order to evaluate remedial

14  options, have to understand the relationships I just

15  described.  They have to understand that it's these sediments

16  in this part of the system that are controlling the harm, if

17  there is harm.  And that addressing these sediments in this

18  way will effectively reduce the harm for them to begin to

19  evaluate alternatives to address those sediments, for example.

20        In the absence of that, the engineers don't know what to

21  do, and the scientists can't tell the engineers right now that

22  here's -- we fully understand the system, we can explain to

23  you that it's these sediments in this area of the system that

24  are driving the harm, so that the engineers can say, okay, I

25  can design a remedy to deal with that.

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

1        So I think if you got the scientists and engineers

2   together, they'd all talk about the uncertainty here and

3   they'd all walk away -- the engineers certainly would walk

4   away scratching their heads saying, we need a lot more

5   information before we could ever evaluate remedial

6   alternatives.

7        So I -- I really think it's premature and not productive

8   at this point.

9   Q    Do you think it's premature to conclude that active

10  remediation is necessary in the Penobscot?

11  A    Yes, um, I think there -- there needs to be this -- this

12  demonstration of significant harm, which there's some

13  indication of potential harm, but no demonstration of

14  significant harm.  And I think that's necessary before you

15  would design active remediation.

16  Q    After further evaluation, if it is determined that there

17  is harm and some better delineation of the severity of harm

18  and the link to mechanisms within the system that are

19  controlling mercury recovery, do you believe that the Study

20  Panel has gathered enough information and information has been

21  gathered over the last nine years to focus remedial options on

22  certain portions of the Penobscot Estuary?

23  A    I think we understand enough that there -- there's this

24  focus on the marsh.

25       Um, the -- in the broader river, there's this hypothesis

CONNOLLY - CONTINUED DIRECT EXAMINATION/TALBERT

3374

1    that the mobile sediments are what control recovery, and we

2    don't understand -- fully understand that.

3         Um, we also don't understand whether the mobile

4    sediments are addressable at all at this point in time.  So

5    that -- that, I think is -- is an ongoing uncertainty, as

6    well.  So we don't know enough information about that to think

7    about remediation in -- outside of the marsh, I would think.

8    Q    I'd like to summarize your points.  Is it your opinion

9    that the Penobscot River system is less contaminated than the

10   Study Panel suggests?

11   A    Yes.

12   Q    Is it your opinion that the Penobscot River is

13   recovering faster than the Study Panel suggests?

14   A    Yes.

15   Q    Are the cores from Mendall Marsh the best cores for use

16   in calculating how fast the system is recovering?

17   A    Yes.

18   Q    Is your half-time for recovery calculation in Mendall

19   Marsh, the Study Panel's calculation, and Dr. Driscoll's

20   calculation all within the same margin of error for such

21   calculations?

22   A    I -- I would agree with that.

23   Q    Do we have enough knowledge of the system to begin -- or

24   to conclude that active remediation is necessary?

25   A    Not at this time.

1   Q    Is it your opinion that full-scale dredging should be
2   removed from further consideration?
3   A    Yes.
4   Q    Is it your opinion that full-scale capping should be
5   removed from further consideration?
6   A    Yes.
7   Q    Is it your opinion that digging trenches to capture
8   sediment should be removed from further consideration?
9   A    Yes.
10  Q    Should hotspot removal be removed from further
11  consideration?
12  A    Yes.
13           MR. TALBERT:  No further questions.
14           THE COURT:  Do you want to take a break now, or how
15  do you want to --
16           MR. BERNARD:  However you want to do it, Your Honor.
17  Happy to take the break now, and then I can start?
18           THE COURT:  Okay.  Why don't we -- why don't we take
19  a break now, and we'll come back in about 20 minutes.
20      (Court recessed from 10:10 a.m. to 10:40 a.m.)
21           THE COURT:  Mr. Bernard?
22           MR. BERNARD:  Thank you, Your Honor.
23                     CROSS-EXAMINATION
24  BY MR. BERNARD:
25  Q    You became involved in this matter in around the year

CONNOLLY - CROSS-EXAMINATION/BERNARD

3376

1    2000?

2    A    Yes.

3    Q    And did you testify for Mallinckrodt at the liability

4    trial in 2002?

5    A    I did.

6    Q    And you're aware that the court held Mallinckrodt

7    liable; is that correct?

8    A    I am.

9    Q    And that it ordered a study of the ecosystem?

10   A    I'm sorry.  I didn't --

11   Q    And that the court ordered as a remedy a study of the

12   ecosystem?

13   A    Yes.

14   Q    And did you recommend to Mallinckrodt that it propose a

15   three-member Study Panel to conduct the court-ordered study?

16   A    I believe I did.

17   Q    And you recommended that one member of the panel be

18   nominated by the plaintiffs, one by the defendant, and that

19   those two members would choose a third?

20   A    I believe I did.

21   Q    Okay.  And Mallinckrodt conveyed that proposal to the

22   court; is that correct?

23   A    That's my understanding.

24   Q    And the court adopted Mallinckrodt's recommendation; is

25   that correct?

1    A    Yes.

2    Q    And so far as you know, did that idea originate with

3    you?

4    A    I know I expressed that idea.  I'm not sure whether I

5    was the only one.

6    Q    But you told -- you suggested it to Mallinckrodt.

7    A    I did make that suggestion, yes.

8    Q    And you're aware that that's ultimately what came to

9    pass, right?

10   A    Yes.

11   Q    Now, have you been the principal technical advisor to

12   Mallinckrodt throughout the remedy process?

13   A    I believe so.

14   Q    Okay.  Let's talk about regional background for a

15   moment.  Your -- your opinion is that mercury in the upper

16   estuary is not highly elevated above regional background; is

17   that correct?

18   A    My opinion is it's elevated three to five times regional

19   background.

20   Q    Okay.  Well, the -- the -- in your expert report, the --

21   the title of your opinion 1 is mercury in the upper estuary is

22   not highly elevated above regional background.

23   A    I -- yes, I think in my earlier testimony I

24   characterized it as moderately contaminated --

25   Q    Okay.

1    A     -- above background.

2    Q     Now, you take issue with the Study Panel because in the

3    Phase II Report, it did not display carbon-normalized sediment

4    concentrations in the upper estuary; is that fair?

5    A     Ah, no.  I take issue with the Study Panel because they

6    characterized the level of contamination as 10 to 20 times

7    background in the Phase II Report.

8    Q     Now, in the -- the purpose of the Phase I Report was to

9    explore the extent of contamination downstream of the

10   HoltraChem plant in the Penobscot; is that correct?

11   A     That was one of the objectives, yes.

12   Q     Okay.  And in terms of that objective, it is appropriate

13   to compare sediment mercury concentrations in that part of the

14   river to sediment mercury contaminations in other or reference

15   environments; is that correct?

16   A     Yes.

17   Q     Okay.  And in the Phase I Report, the Study Panel

18   displayed both dry-weight and carbon-normalized sediment

19   mercury concentrations for the Penobscot; is that correct?

20   A     As I recall, yes, they presented it both ways.

21   Q     And they did so -- the same in the Phase I Update

22   Report?

23   A     I -- I believe so.

24   Q     Okay.  And the court approved the Phase I Report that

25   was submitted by the Study Panel; is that correct?

1   A    I'm not -- I'm not sure of the approval process, so I

2   don't know that it was a -- it was a formal approval.

3   Q    Are you aware that the court directed the Study Panel to

4   proceed to Phase II?

5   A    Yes.

6   Q    And the purpose of Phase II was not to compare sediment

7   mercury concentrations in the Penobscot to other locations; is

8   that correct?

9   A    The Phase II work had many purposes, one of which I

10  believe was to use the additional data they had collected, as

11  well, and to also characterize the system.  I -- I'm confused

12  because one of the first paragraphs of their Chapter 23

13  summary report is a characterization of how contaminated the

14  system is to background, so --

15  Q    The phase -- go ahead.  I'm sorry.

16  A    So that clearly was, in their view, something that they

17  were to make conclusions on in their Phase II Report.

18  Q    Did the Phase II Report incorporate the Phase I Report

19  and the Phase I Update Report?

20  A    As appendices, I believe, yes.

21  Q    Are they there in the report for any reader to see?

22  A    They're -- they're there in the report for anybody who's

23  willing to dig through the report to that extent, yes.

24  Q    To dig through the court (sic) to that extent, you mean

25  to go to an appendix to Chapter 1?

CONNOLLY - CROSS-EXAMINATION/BERNARD

3380

1    A     Yes.

2    Q     Is that difficult?

3    A     Perhaps not difficult for someone like myself who's

4    technical and reading all the details, but for others perhaps

5    who just want to go to the conclusions and summaries, so they

6    would go to Chapter 1 and Chapter 23, um, they would have the

7    impression 10 to 20 times background and no citation to the

8    appendices, nothing that would guide them to go to the

9    appendices, and unless they, as I said, were willing to dig

10   through hundreds and hundreds of pages, they would never have

11   seen what was in the appendices.

12   Q     Do you think the Phase II Report enjoyed a wide

13   readership?

14   A     It certainly enjoyed a readership among the people

15   concerned with the case.  I don't know whether it had a large

16   readership outside that.

17   Q     People concerned with the case are likely to be careful

18   readers of the report, including its appendices; would you

19   agree with that?

20   A     I can't say one way or the other about each individual

21   and what they did and did not do.  I do understand from some

22   testimony that some of the experts did not read the entire

23   report, for example.

24   Q     You conducted your own calculation of carbon-normalized

25   differences in sediment mercury between the Penobscot and

1    other locations, correct?

2    A    I did.

3    Q    And you found that on a carbon-normalized basis, the

4    mercury in sediment of the upper estuary exceeded those in the

5    reference areas you deemed to be appropriate by three to five

6    times?

7    A    Yes.

8    Q    Okay.  Now, that calculation depends on a comparison

9    between measured values in the Penobscot and some site or

10   number of sites that are deemed to be appropriate as reference

11   areas; is that right?

12   A    Measured values in the Penobscot compared to measured

13   values in other sites, yes.

14   Q    But is it a matter of judgment which -- to which sites

15   you compare the mercury sediment concentrations in the

16   Penobscot?

17   A    Yes, it is.

18   Q    Okay.  Now, by your own selection criteria, is a

19   suitable background location one that is subject to regional

20   sources of mercury contamination?

21   A    Yes.

22   Q    But not to local sources of mercury contamination?

23   A    And by that, I meant sources within the Penobscot or

24   local point sources, for example, in other -- other estuaries

25   I characterized as reference.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3382

1    Q    So is it fair to say that you're looking for a site that

2    says -- that, say, collects mercury via atmospheric

3    deposition, which occurs everywhere, but doesn't get it

4    locally, let's say, from an industrial point source?

5    A    Are you referring to the work I did on the coastal

6    background?

7    Q    No, I'm just asking you a question.

8    A    Um, the -- in -- there's a difference here, ah, that I

9    think is important.  The upstream background for the Penobscot

10   is what comes in from over the Veazie Dam.  The sources that

11   may have contributed to that I don't understand, but I know

12   what the levels are just above the Veazie Dam, and I think

13   that is appropriate as the background.

14        Now, whether that also was impacted, for example, by

15   slimicides from the paper industry or whatever, it represents

16   the condition at the upstream end of the site and is

17   effectively a background level in terms of what the site could

18   attain going forward.

19   Q    Were there local sources of mercury to that Old Town to

20   Veazie reach upstream of the old Veazie Dam?

21   A    I think the belief is that -- that the paper industry

22   used slimicides that contained mercury, and so there -- those

23   may, in fact, have had some influence on concentrations in

24   that reach.

25   Q    Did the eastern branch of the Penobscot have any local

1    point sources of mercury, so far as you know?

2    A    Um, I'm uncertain.

3    Q    Okay.  Now, in your Figure 3-3, this is Joint

4    Exhibit 45, 3-3, you see this?  You -- you remember this

5    figure, right?

6    A    I do.

7    Q    Okay.  So the top panel is dry weight -- a display of

8    dry-weight concentrations in various sections of the

9    Penobscot, and you have the OV reach and the EB reach of the

10   river, correct?

11   A    Yes.

12   Q    And then in the bottom, the same array of sites, but for

13   carbon-normalized values; is that fair to say?

14   A    Yes.

15   Q    Okay.  So let's just look at the EB reach for a moment.

16   What do you -- what do you think that dry-weight value is in

17   the EB reach?

18   A    Um, it looks to be perhaps 50.

19   Q    Okay.  And what is the value in the BO reach?

20   A    The OV reach?

21   Q    The BO reach?

22   A    BO reach.

23   Q    Right here.

24   A    I'm sorry.  It's about 900.

25   Q    Okay.  So that would be a factor of what, between the BO

1   reach and the East Branch?

2   A    18.

3   Q    Okay.  And looking at the carbon-normalized values here,

4   what do you -- where do you think that EB reach is?

5   A    It seems to be just under 2,000.

6   Q    Okay.  And where is the OB reach up there?

7   A    15,000.

8   Q    Okay.  So that's a factor of how much?

9   A    Approximately seven.

10  Q    Okay.  Now, do you think that a reasonable scientist

11  looking at this figure in which you've arrayed study data

12  could draw the conclusion that, by either measure, dry-weight

13  or carbon-normalized, the Penobscot -- the upper estuary

14  values are elevated over the upstream what you call

15  background?

16  A    Yes, and that's how I characterized it.

17  Q    By a large margin?  Do you think a reasonable scientist

18  could draw the conclusion that the values in the upper estuary

19  on both a carbon-normalized at the bottom and dry-weight on

20  the top, exceed the values in the reach of the river upstream

21  of the old Veazie Dam by a large margin?

22  A    They exceed by a factor of five, and scientists can

23  choose how they want to characterize that.  I have no idea how

24  individuals would respond that.

25  Q    You said -- did you just say by a factor of five?

1   A    From -- from the OV reach to the OB reach is a factor of
2   five.
3   Q    But the EB reach to the OB reach is a factor of at least
4   seven, correct?
5   A    Yes, but that's not what's coming into the site.
6   Q    I understand.  I asked you about the EB reach.  Did you
7   understand me to be asking about that?
8   A    Ah, no, but if the EB reach is -- is seven, I -- I think
9   I --
10  Q    Okay.  And the EB reach is a factor of 18 up to the
11  upper estuary values on a dry-weight basis; is that correct?
12  A    Yes.
13  Q    And the EB reach is, so far as you know, a reach of the
14  river, that same river, that is influenced by atmospheric
15  deposition, regional sources, but not by a local point source
16  of mercury; is that correct?
17  A    I think I said that I'm uncertain whether there were any
18  sources up there other than atmospheric.
19  Q    Okay.  You don't know of a source of mercury to the East
20  Branch that's a -- that's a point source, do you?
21  A    No, I do not.
22  Q    Okay.  In terms of remediation targets, you think the
23  difference between five times background, which is the upper
24  end of your range, and ten times background is a relevant
25  difference; is that correct?

1  A     I'm not sure I understand what you mean by a relevant

2  difference.

3  Q     Well, it's relevant because, in your view, it influences

4  how much you can expect to achieve through an active remedy.

5  A     Yes.

6  Q     Okay.  Because the background provides kind of a floor;

7  is that a fair characterization?

8  A     Yes.

9  Q     And you're not going to be able to remediate beneath the

10 floor; is that correct?

11 A     And if you do, it will recover to the floor.

12 Q     Okay.  Now, if you're five times background, then the

13 most you can do is reduce mercury levels by a factor of five;

14 is that right.

15 A     Yes.

16 Q     And three times, same calculation, you can reduce, at

17 most, three times.

18 A     Yes.

19 Q     Okay.  Now, what is the Study Panel proposing by way of

20 a sediment target in the main stem of the Penobscot?  Do you

21 remember?

22 A     A factor of 2-drop.

23 Q     So that's less than the low end of your range; is that

24 correct?

25 A     Yes.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3387

1    Q     Okay.  And you concede that the Study Panel target of

2    450 nanograms per gram in the main stem is above relevant

3    background and can be achieved; is that correct?

4    A     Yes.

5    Q     And also based on your three to five characterization

6    and the discussion we just had, do you concede that a

7    reduction beneath 450 nanograms per gram in the main stem can

8    be achieved?

9    A     I believe so.

10   Q     Okay.  Now, you found, in terms of Mendall Marsh, that

11   total mercury concentrations were, I think, twice as high

12   as -- as your calculated regional background?

13   A     On an average basis, the carbon-based concentrations --

14   and this was in the high-resolution cores that we were looking

15   at, that on a carbon-basis, the surface sediments in those

16   high-resolution cores were about twice the background levels.

17   Q     And -- and is -- does that correspond to the three to

18   five?  In other words, in the main stem, you found that there

19   was a three to five times difference, and in the marsh, you

20   found that there was a two times difference over regional

21   background?

22   A     Yes, as I recall, the carbon basis in the upper estuary,

23   the average was 13 to 15,000, and in the marsh, on -- on

24   the -- in the highest cores, it was about 7,000.

25   Q     What form of mercury poses the greatest danger to biota?

1    A    Methylmercury.

2    Q    Okay.  And did the Study Panel measure methylation

3    fractions in Mendall Marsh?

4    A    Yes.

5    Q    And do you understand the methylation fraction to be

6    the -- the percentage of total mercury that is methylmercury?

7    A    Yes.

8    Q    And that's a function of or one way to evaluate the

9    efficiency of the conversion of inorganic mercury to organic

10   mercury?

11   A    To methylmercury.

12   Q    To methylmercury.

13   A    Yes.

14   Q    Okay.  Now, what did the Study Panel find -- do you

15   remember -- in terms of the methylation fractions or

16   methylmercury fractions in Mendall Marsh versus the main stem

17   of the river?

18   A    In Mendall Marsh, they found quite a range of

19   methylation fractions.  Ah, at the lower end, they were

20   similar to the methylation fractions in the main stem.  At the

21   upper end, they were much above the methylation fractions in

22   the main stem.

23   Q    Were they about ten times above at the upper end?  Do

24   you recall?

25   A    I believe that's about right.

1   Q   Okay.  Now, is the rate of methylation in Mendall Marsh

2   elevated, in your view, above the norm for uncontaminated

3   marsh sites, if you know?

4   A   I -- I've seen a number of sites where methylation in

5   the marshes is -- is fairly high.  I don't recall having seen

6   enough uncontaminated sites to say one way or another whether

7   it's lower than it is in Mendall Marsh.

8   Q   Did you look at methylmercury fractions in any of the

9   reference areas you considered when you compared mercury in

10   Mendall Marsh to mercury in a reference area?

11   A   I did not.

12   Q   Okay.  So let me just show you -- this is Plaintiffs'

13   Exhibit 58.  You've probably seen this, right?  This is one of

14   the Gilmour -- Dr. Gilmour charts in Chapter 11 of the Phase

15   II Report.  So it's Plaintiffs' 58.  It's also Joint Exhibit

16   6-11, Page 11-92.  You've seen that before?

17   A   Yes, I have.

18   Q   Okay.  And this shows methylmercury levels in pore water

19   in the Penobscot and compares it to some other locations.  Are

20   you familiar with that?

21   A   Yes.

22   Q   Okay.  Now, if you took two sites with equal total

23   mercury concentrations, but one site has a methylation rate

24   ten times the other, then will that site contain roughly ten

25   times more methylmercury?

1   A    Yes.

2   Q    Okay.  And, further, if the total mercury in that site

3   is two times greater in Mendall -- in -- in Mendall Marsh

4   soils or pore water than it is at a background site, and the

5   methylation rate is ten times higher than at the background

6   site, how much more methylmercury would you have in Mendall

7   Marsh?

8   A    Can you repeat that?

9   Q    Yes.  You're comparing Mendall Marsh to another

10  location.

11  A    Yes.

12  Q    And we're assuming that the methyl -- methylmercury

13  fraction in Mendall Marsh is ten times greater than it is in

14  the other location.  Are you with me so far?

15  A    Yes.

16  Q    And you just said that you would expect that the

17  methylmercury concentrations would be ten times higher in

18  Mendall Marsh, all other things being equal.

19  A    Yes.

20  Q    Okay.  Now let's just add, if you had twice the total

21  mercury in Mendall Marsh as you do in the second site --

22  A    Yes.

23  Q    -- and ten times the percent methylmercury in Mendall

24  Marsh than you have at the other site --

25  A    Yes.

1    Q      -- how much more methylmercury do you get in Mendall

2    Marsh?

3    A      The math works out to 20 times.

4    Q      Okay.  Now, when you compared Mendall Marsh total

5    mercury to a reference site, did you address this issue at

6    all, this -- this issue of the efficiency of methylation in

7    Mendall Marsh versus a reference area?

8    A      At my deposition, we had a discussion about this topic,

9    and what I indicated was that work that I had done subsequent

10   to writing the report led me to conclude that that statement

11   that Mendall Marsh is twice background is probably not

12   accurate, and that we do not understand Mendall Marsh well

13   enough to characterize how much it is above background and

14   what levels could ultimately be attained in the marsh.

15          That there are some unique characteristics of the marsh,

16   including the senescence of the plants, that generates a huge

17   amount of carbon in the marsh that complicate the

18   interpretation of the marsh data.  And so in my deposition, I

19   told you that I no longer believed that Mendall Marsh was

20   twice background and that I now did not understand what

21   Mendall Marsh was above background.

22          So all of that makes me a little confused by this line

23   of questioning.

24   Q      Okay.  I was -- I was actually asking about something

25   else, but now that you've mentioned this, which I was going to

1    go to later, why don't we stay with it.

2         You said in your expert report that -- well, let's go

3    back -- withdrawn.

4         What is the target that the Study Panel has fixed for

5    total mercury in Mendall Marsh?  Do you remember?

6    A    Yes, it's about a hundred.

7    Q    Okay.  A hundred nanograms per gram, right?

8    A    Yes.

9    Q    And you expressed in your expert report that you thought

10   the background -- that that could not be achieved, correct?

11   A    In my expert report, I said yes.

12   Q    Yes.

13   A    And in my deposition, I told you I no longer believed I

14   understood that.

15   Q    Understood.  Let's take it step by step.  Okay.  So you

16   said in your expert report that you didn't believe a hundred

17   nanograms per gram could be achieved, correct?

18   A    Yes.

19   Q    And that's because you thought the background in the

20   marsh was considerably higher than a hundred nanograms per

21   gram, correct?

22   A    Yes.

23   Q    Then you did some further work between the time you

24   filed your report in January of this year and the time I

25   deposed you in March --

1    A    Hm-hmm.

2    Q    -- and you withdrew that portion of your opinion; is

3    that fair -- fair enough?

4    A    Yes.

5    Q    And you said, I now think that I don't understand the

6    marsh well enough to offer an opinion on what the achievable

7    target would be in Mendall Marsh; is that fair?

8    A    That is fair, yes.

9    Q    Okay.  Now, when you say senescence, just for those who

10   may not know what the word means, what do you mean?

11   A    The -- the plants in the marsh die back -- all right --

12   that's called plant senescence, and then decay, and that decay

13   produces a bunch of organic matter that's now down in the

14   marsh sediment.

15   Q    Okay.  This new thought that calls into question, in

16   your mind, what can be achieved in the marsh, that didn't

17   occur to you before you filed your report in January?

18   A    It did not.

19   Q    Okay.  And it hasn't occurred to you in all the years

20   that you've been working on the project?

21   A    One of the difficulties here was not having access to

22   the data until the Phase II Report was issued, and try as we

23   might to -- to do analysis, we certainly weren't able to do

24   all the analyses I would have liked to have done by the time I

25   had to issue my expert report.

1           So I continued to do analyses that informed my opinion.

2    Q      Okay.

3    A      And I don't think it's fair to characterize what was

4    happening earlier because most of the data was not available

5    to us.

6    Q      Do you -- let's just shift to the present.

7    A      Yes.

8    Q      Do you believe you need some further information in

9    order to analyze the situation in Mendall Marsh such that you

10   could form an opinion concerning what's an achievable mercury

11   level in the soils of the marsh?

12   A      Yes.

13   Q      Okay.  Now, let's turn to biota.  You also looked at

14   some biota data, not just sediment data; is that correct?

15   A      Yes.

16   Q      Okay.  Now -- and you compared Penobscot biota mercury

17   data to regional background areas?

18   A      Yes.

19   Q      Okay.  And you found that some species in the Penobscot

20   are elevated over regional background; is that fair?

21   A      Yes.

22   Q      By how much?

23   A      Depending on species, the range was perhaps two to four

24   times higher.

25   Q      Okay.  Now, you wrote in your expert report -- and I'm

1    quoting this -- I'll show you the language, if you like, if

2    there's anything --

3    A      Hm-hmm.

4    Q      -- about it that you want -- want to see -- you wrote

5    elevation above regional background is not an indicator of

6    harm if the concentrations are below established human health

7    and ecological health risk levels.  Do you remember writing

8    that?

9    A      I do.

10   Q      Okay.  And is that your view?

11   A      Yes.

12   Q      Is there an established human health risk level in

13   Maine?

14   A      There's an established level that is used to set

15   consumption advisories.

16   Q      What is that level?

17   A      0.2 parts per million.

18   Q      And that would be 200 nanograms per gram?

19   A      Yes.

20   Q      Okay.  And are Penobscot eels above that level?

21   A      Yes.

22   Q      And are Penobscot lobsters above that level?

23   A      At some locations, yes.

24   Q      Are black ducks in Mendall Marsh above that level?

25   A      I've not really looked at the black duck data, so I

1    can't comment.

2    Q     Have you looked at the rock crab data; do you know

3    whether they exceed the Maine threshold of 200 nanograms per

4    gram?

5    A     Yeah, I have not looked at the rock crab data either.

6    Q     Okay.  You would agree that all four of those species

7    are consumed by human beings; would you not?

8    A     Yes.

9    Q     Okay.  And are you aware -- you said you're familiar

10   with the lobster data, right?

11   A     Yes.

12   Q     And are you aware that at some locations, there are

13   lobsters that exceed the Maine safety threshold by five times

14   or more?

15   A     My recollection is there are some individual samples

16   that do exceed by that magnitude.

17   Q     Did you include in your expert report, which runs for

18   63 pages, not counting figures, any mention that the mercury

19   levels in any one of the species you looked at exceed the

20   human health safety threshold established by the State of

21   Maine?

22   A     I, in my report, was not focused on interpreting the

23   levels relative to those standards, and so I didn't speak

24   about it one way or the other.

25   Q     Okay.  Putting aside what you focused on -- and you

1   made --

2   A     Yes.

3   Q     -- this statement I just read you a moment ago, did you

4   mention any in your report?

5   A     No.

6   Q     Okay.  One of your opinions is that mercury

7   concentrations in the upper estuary are declining such that

8   the levels should drop by half within 5 to 15 years; is that

9   correct?

10  A     Yes, I recall that.

11  Q     Okay.  And as I understand it, there are two bases for

12  that opinion, one is biota trends; correct so far?

13  A     Yes.

14  Q     And the other is your analysis of the sediment core

15  data; is that correct?

16  A     Yes.

17  Q     Okay.  So let's look at biota trends first.

18  A     Certainly.

19  Q     Now, you assert that trends in mercury accumulation in

20  aquatic biota are useful for estimating recovery of the whole

21  upper estuary; is that fair?

22  A     In -- in certain biota in certain locations, yes.

23  Q     Okay.  We'll get into that -- we'll get into the details

24  in a moment.

25        And using the data that you selected, you calculate that

1    the system is recovering with a half-time, I think you say, in

2    the rough range of 5 to 15 years, correct?

3    A       Yes, and -- and I would emphasize the word rough.

4    Q       Now, when you looked at the data, the biota data you

5    looked at -- and -- and we will go into it species by species

6    in a minute, but just to get your method on the record -- when

7    you looked at the biota data, did you account for statistical

8    significance?

9    A       I did not.

10   Q       Did you just eyeball barcharts?

11   A       What I did was to look at the trends, estimate a

12   recovery, if there was a recovery, and a -- and a half-time

13   associated with that.

14           The issue of statistical significance I approached in a

15   different manner.  The -- I think I acknowledged that the

16   trends are -- tend to be noisy, and the record is such that

17   getting statistical significance is -- is very difficult

18   because individual -- the individual tests of whether a trend

19   is statistically significant, you would declare it not to be

20   significant unless there's less than a 5-percent chance that

21   it's not occurring.

22           So you can have up to a 94-percent chance that you

23   believe there's a downward trend, and you would reject it or

24   you would say it's not statistically significant.

25           Um, it's hard to meet that bar with this short record.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3399

1   Um, but in my report, what I said was that there's another way

2   to think about this problem, and that is, if there really is

3   no trend and what we are looking at is just noise in the data,

4   you would expect that you would, just based on random

5   behavior, see upward trends as frequently as you see downward

6   trends.

7        And when you analyze data in this way and you see

8   downward trends frequently and rarely see an upward trend,

9   that that in and of itself provides you some understanding

10  that the trends are real, even from a statistical standpoint,

11  because it's sort of like flipping a coin, and if -- if I look

12  at ten trends, six of them are -- or seven of them are going

13  down, none of them are going up, what's the likelihood if

14  things aren't going down that I wouldn't get that result?  And

15  it's the likelihood of getting head after head after head on a

16  coin flip, and it becomes vanishingly small.

17       And so the commonality of the trends and the lack of

18  trends in the opposite direction are in equivalent providing

19  some statistical significance to the fact that there are

20  downward trends.

21  Q    Now, what you did was you looked at bars at a particular

22  site for a species of biota, the bars representing years, and

23  you looked at whether you thought the trend was downward,

24  correct?

25  A    Yes.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3400

1   Q    And you did not do any statistical analysis to verify

2   whether there was a statistically significant downward trend

3   in order for you to use those data; is that correct?

4   A    I did not because I fully expected that in many cases

5   they would not be statistically significant, and I questioned

6   the value of the statistical test for the data that I was

7   looking at.

8   Q    Now, there is a point of view in science, is there not,

9   that if a difference between values is not statistically

10  significant, that you can't conclude that there was any

11  effect, that there was any change.  Are you familiar with that

12  point of view?

13  A    For individual comparisons, yes, but -- but there is

14  a -- there is a view in science that I've just expressed that

15  is equally held to, which is that the commonality of trends,

16  even if none of the individual trends are statistically

17  significant, provides statistical significance to the overall

18  patterns.

19  Q    Let me just show you some testimony and ask whether

20  you -- see if we can get to it this way.

21      If it's not statistically significant -- this is not

22  your testimony necessarily -- we cannot conclude there was any

23  effect.  That's the only way we can observe an effect.  Do you

24  agree with those statements?

25  A    I do not.

1  Q    Okay.  Now, do you know that those were articulated by
2  Dr. Vlassopoulos, sitting where you're sitting, earlier this
3  week?
4  A    I -- I do not.
5  Q    Okay.  You know who he is?
6  A    No.
7  Q    Do you know that he's an expert witness for the
8  defendant?
9  A    Um, Vlassopoulos.  I'm sorry.
10  Q    Vlassopoulos.
11  A    Yes, yes, I certainly know Dr. Vlassopoulos.
12  Q    Doesn't he work for your firm?
13  A    Yes, he does.
14  Q    Okay.  You disagree with him about this?
15  A    Yes.
16  Q    Okay.  Now, you do agree that there's uncertainty
17  associated with the biota trends that you observed.
18  A    Most --
19  Q    Is that right?
20  A    Most definitely.
21  Q    Okay.  And that's because, among other things, the
22  sampling of Penobscot biota has gone on for a relatively short
23  period of time; is that true?
24  A    Yes.
25  Q    And you agree that it would be preferable to base

1   decisions regarding recovery or projections regarding recovery

2   with reference to longer-term trends?

3   A    Yes.

4   Q    Now, how many species did you use in your trend

5   analysis?

6   A    I -- I examined four species.

7   Q    And out of how many species that the Study Panel looked

8   at in -- or measured in the Penobscot?

9   A    Um, I don't recall the total number of species.

10  Q    Okay.  It was a lot more than four; is that fair?

11  A    Yes.

12  Q    Okay.  Now, the four species you looked at were mussels,

13  mummichog, tomcod, and rainbow smelt?

14  A    Yes.

15  Q    And of those four species, how many of them feed

16  primarily in the benthic food web in the Penobscot?  Do you

17  know?

18  A    It's -- it's not clear that you can declare that they

19  feed in the benthic food web.  Those species in part can feed

20  in the benthic food web, certainly not the mussels.

21       The other -- the other three do have some benthic

22  component to their diet, yes.

23  Q    Okay.  Which is the one that doesn't?

24  A    Mussels do not.

25  Q    Okay.  Now, one of your criteria for species selection

 1   for this exercise you ran through was strong site fidelity,

 2   correct?

 3   A    Yes.

 4   Q    And you found that both mussels and mummichog met that

 5   standard.

 6   A    They had the strongest site fidelity among the species.

 7   Q    Tomcod do not have particularly strong site fidelity; do

 8   they?

 9   A    It's certainly not strong as mussels, who are not moving

10   at all, and mummichog, who move very -- very little.

11        The spatial patterns in the data for the tomcod mirror

12   the spatial patterns in the water column.  That fact means

13   that their movements cannot be extensive because they're

14   following the trend in exposure in the environment, and if

15   they were extensively moving, they would have sort of averaged

16   things out, and their spatial trend would not look like the

17   trend in the water, but it, in fact, does.

18        So that, to me, provides evidence that while, yes, there

19   potentially is some movement that occurs, it cannot be

20   extensive.  Otherwise, they would have kind of homogenized out

21   the spatial trends.

22   Q    Does rainbow smelt have particularly strong site

23   fidelity?  Do you know?

24   A    The -- the fish that are sampled here mostly are younger

25   fish, and the younger fish have stronger site fidelity

1    typically than the older fish.  And -- and the rainbow smelt,

2    while, again, they don't have extremely strong site fidelity,

3    do appear to have reasonable site fidelity.

4         And -- and understand here, what I was trying to do was

5    to pick those species that had the strongest site fidelity,

6    not saying that they never move at all.

7    Q    Is it true for all species that the juveniles have more

8    site fidelity than the adults do?

9    A    I don't know that it's true for all species.  It's true

10   for -- for a large number of species.

11   Q    Okay.  One of the other things you looked for was a

12   fairly long record over time, correct, under -- understanding

13   that we're talking about a short duration -- you've already

14   testified to that -- but within that duration, as long a

15   record as possible?

16   A    What -- what -- what I was focused on was looking at

17   stations that had records that extended from 2006 to at least

18   2010, and if -- if the 2012 data provided additional data,

19   then 2006 to 2012.

20   Q    Would you ever use two years, Dr. Connolly, to discern a

21   biologically meaningful trend?

22   A    I think one of the comparisons -- I included a chart

23   that actually had only two years' worth of data on it, but

24   I -- I think that as a general statement, I would -- I would

25   agree that two years' worth of data are not sufficient to draw

CONNOLLY - CROSS-EXAMINATION/BERNARD

3405

1   conclusions about trends.

2   Q     How about three, would that be a minimum, or is that

3   also too few?

4   A     Now you're talking about three -- three consecutive

5   years?

6   Q     Well, you tell me.  I'm asking you what you're looking

7   for and when you -- when you want to establish a fairly long

8   record, which was one of your criteria, you said two years is

9   not -- as I understand it, you said two years is not really

10  enough.  I'm asking about three.

11  A     Um, three years would be an absolute minimum.  I would

12  not really be comfortable with just three years' worth of

13  data.

14  Q     Okay.

15  A     Unless they were separated fairly far in time.

16  Q     Okay.  Now, is one of the reasons you want more than two

17  or three years of data -- and maybe -- maybe the number is

18  higher -- but -- but you want more data because there's

19  considerable interannual variation in terms of the

20  accumulation of mercury in biota?

21  A     Yes.

22  Q     Okay.  Now, have you seen systems in which contaminant

23  levels rise and then fall -- contaminant levels in biota?

24  A     Yes.

25  Q     And you've -- have you seen systems in which they --

1    contaminant levels in biota fall and then rise?

2    A     Yes.

3    Q     And have you seen systems in which mercury in biota rise

4    and then fall and then rise again?

5    A     Yes.

6    Q     Okay.  Is it possible to be misled by a short-term

7    fluctuation in mercury concentrations in biota?

8    A     It is possible to be misled, yes, by a very short-term

9    record.

10   Q     Now, you noted with regard to mussels a general downward

11   trend at four stations north of Fort Point.  Do you remember

12   that?

13   A     Yes.

14   Q     Okay.  And you have a figure in your report about this.

15   I want to show you a figure from the Phase II Report, and this

16   is Joint Exhibit 6-14 at Page 14-52.  Do you recognize that

17   chart?

18   A     Yes, I do.

19   Q     Okay.  Now, this shows mussel concentrations over time;

20   is that correct?

21   A     Yes, it does.

22   Q     All right.  So we have data from 1986 over on the

23   horizontal axis all the way up to, say, 2010 it looks like,

24   right?

25   A     Yes.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3407

1   Q    Okay.  And is it your understanding that these are all

2   from the Penobscot, the blue ones are from the Mussel Watch

3   program and the -- I know it's another color, it may be red --

4   are from the Penobscot River Mercury Study?

5   A    Yes.

6   Q    Okay.  So is it fair to say that what you see here over

7   time, from 1986, so this is about roughly 25 years of data --

8   A    Hm-hmm.

9   Q    -- that you have a -- kind of an upswing -- sorry -- you

10  have kind of an upswing and then kind of a downswing and then

11  looks like kind of getting an upswing again?  Is that what it

12  looks like to you?

13  A    I wouldn't draw it that way, but --

14  Q    Well --

15  A    Yeah, I --

16  Q    Is that a fair characterization?

17  A    Sure.

18  Q    Okay.

19  A    I would not pay much attention -- well, I would draw

20  sort of like that, and then it's dropping, and you might even

21  characterize the drop like that, or you can do what you did,

22  characterize it like that, and then like that.

23  Q    Right.  But this right in here, you've got kind of a

24  relatively high value, in it looks like 1996, right?  And then

25  it seems to be going down for about ten years.  And then the

CONNOLLY - CROSS-EXAMINATION/BERNARD

3408

1   value in -- I guess that's 2005, rather, and the five years

2   after that, the values look considerably higher, right?

3   A    They do, yes.

4   Q    Okay.  And so if we were eyeballing this, in the way you

5   were eyeballing barcharts in your biota trends analysis, we

6   would be hard-pressed to look at any period of five years,

7   say, and find a trend that lasted; is that fair?

8   A    I want to go back to what I said earlier, which is

9   that --

10  Q    Could you just answer the question first, and then you

11  could go back to whatever you like if you need to explain?

12  A    Yes.  If you took a five-year record here, you --

13  depending upon the record that you picked, you'd get a

14  different trend.

15       And the difficulty is with an individual station -- all

16  right -- you get a trend, and perhaps it's just noise and

17  we're getting fooled.

18       But if I examine a number of stations and get the same

19  trend across the stations, you begin to believe that it's a

20  real trend.

21  Q    Hm-hmm.  What's -- do you see a real trend here?

22  A    This is a single station.

23  Q    Understood.

24  A    And --

25  Q    At this single station, do you see a real trend?

CONNOLLY - CROSS-EXAMINATION/BERNARD

3409

1   A      No, this is a station that's out fairly -- fairly far

2   south, Sears Island, and so this -- this station is probably

3   more influenced by background sources and -- I don't

4   understand at this point how to interpret these data by

5   themselves.

6   Q      Okay.  Now, with regard to mummichog, do you remember

7   how many stations you looked at?

8   A      I think there were three, one of which I just indicated

9   I think only had two years of data, so I --

10  Q      So this one you actually have a figure in your report,

11  which we can use, which is Figure 5-4.  Let me see if I can

12  find it.  Here we go.  This is from Joint Exhibit 45, your

13  expert report, Figure 5-4.  Do you see that?

14  A      Yes, I do.

15  Q      Okay.  And these are the mummichog data -- did you just

16  kind of replot these using the Study Panel data?

17  A      Ah, yes.

18  Q      Okay.  So this is one species that you used in your

19  trend analysis, correct?

20  A      Yes.

21  Q      How many stations are there in the river?

22  A      There are three stations.

23  Q      Okay.  And one of them, W-21, over on the right, has

24  only two years of data, right?

25  A      Yes.

1    Q    Okay.  And you said in your report that there are

2    downward trends at all three stations; is that what you see?

3    A    Yes.

4    Q    Okay.  Now, if you discount this, which you said is two

5    years --

6    A    Hm-hmm.

7    Q    -- and put to one side whether three years is enough, do

8    you think there -- these -- these are now two stations for the

9    entire upper estuary; is that correct?

10   A    Yes.

11   Q    And -- and do you believe that you've derived meaningful

12   biota trend information from two stations of mummichogs in --

13   in the -- within the entire upper estuary?

14   A    Let me correct one of the things that you -- that you

15   said, because I think you misunderstood one of the things that

16   I said.

17        Um, three years' worth of data being enough -- I'm

18   referring to three consecutive years' worth of data.  As data

19   are spread farther in time, they become more meaningful.  So

20   there's a point at which even two years' worth of data would

21   be useful if suppose we're in a system and we have a

22   measurement fish in 1980 and a measurement in 2010, and we

23   know the system has recovered and the 2010 data are a lot

24   lower than 1980.  I think even those two years of data are

25   useful.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3411

1        Um, in these cases, we're looking over four years or six

2   years, and these data in and of themselves are confirmatory

3   evidence that recovery is occurring, in part, not just because

4   there are downward trends here, but there are downward trends

5   in other species, as well.  And it is the totality of the

6   analysis that provides some strength to it.

7        And, also, recall that -- that the way in which I'm

8   using the biota trends are confirmatory to the cores.  I think

9   that the core recovery rates are the best estimates we have of

10  what's been happening in the system.

11  Q    Hm-hmm.

12  A    And this information is confirmatory.  As I indicated in

13  my testimony, I've estimated that the system's recovering -- I

14  think everybody's estimated the system is recovering.  The

15  issue here is how -- how fast.  I said a half-time of

16  15 years.  Dr. Driscoll got 19 years.  And Dr. Santschi got

17  22 years for half-time in Mendall March.  And I think

18  everybody pretty much agrees that Mendall Marsh is the best

19  place to be looking for recovery, so everybody agrees the

20  system's recovering.

21       So you would expect that there's some recovery going on

22  in the biota.

23       And I was checking the biota to see whether that, in

24  fact, confirmed that, and the commonality of downward trends

25  is confirmation that the system is recovering.

3412

1   Q     Let's look at one of the other species, which is tomcod.

2   I'm going to show you -- this is Joint Exhibit 8, the 2012

3   monitoring report figure --

4   A     Hm-hmm.

5   Q     -- Figure 8.

6   A     Yes.

7   Q     Are you familiar with this?

8   A     Yes, I am.

9   Q     Now, this is one of the species that you looked at,

10  right?

11  A     Yes.

12  Q     Okay.  And there was -- how many sites were sampled in

13  three or four -- in three or more years here?  Do you -- do

14  you know?

15  A     I -- I'm recalling maybe six or eight.  I don't --

16  Q     Okay.

17  A     -- remember.

18  Q     I think it's actually seven, but --

19  A     Okay.

20  Q     Why don't we agree on seven, okay?

21  A     Okay.

22  Q     And there was a significant decline -- this is

23  statistically -- at one of those three sites --

24  A     Yes.

25  Q     -- that was sampled three or four -- three or more

CONNOLLY - CROSS-EXAMINATION/BERNARD

3413

1    years; do you see that?

2    A    Yes.

3    Q    Okay.  So six of the seven sites that were sampled three

4    or more years did not show a statistically-significant

5    decline; is that -- is that right?

6    A    Yes.

7    Q    Okay.  Now, when you look at these data, is it fair to

8    say that at a number of the stations, you see, you know, let

9    me call it bouncing around?

10   A    Yes, you do see some bouncing around.

11   Q    Okay.  This is one of the species that you found to be

12   confirmatory of the 5- to 15-year system recovery; is that

13   correct?

14   A    When we say 5- to 15-year system recovery, I think the

15   best estimate is the 15-year.  The fastest that the biota

16   trend is suggesting this might be going down is five years.

17   But I think, as we discussed in my deposition, I don't really

18   believe the system is recovering with a 5-year half-life.

19   Q    You know what, you got the Phase II Report in April of

20   2013, right?

21   A    Yes.

22   Q    And you filed your expert report in January of 2014,

23   right?

24   A    Yes.

25   Q    So that was about nine months later.

1   A     Yes.

2   Q     Okay.  You don't really believe the system is

3   recovering -- that the biota trends show that the system is

4   recovering in 5 years, right?  Is that what you just said?

5   A     Correct.

6   Q     Why didn't you write that in your report?

7   A     I --

8   Q     You wrote in your report the biota trends show a

9   recovery in the rough range of 5 -- you wrote it -- to

10  15 years.  Isn't that different from what you just said?

11  A     I reported the range of recovery rates that I observed

12  from the biota, the fastest of which was about 5 years, and I

13  reported that.

14        I think I also then backed off that, and I think in the

15  report I was characterizing it as more like 10 to 15 years.

16  But the biota are suggesting perhaps it's faster than

17  15 years.

18        So I think if you closely read the report, you'll see

19  statements that it's probably more in the range of 10 to

20  15 years.  Five years is the fastest trend that I saw in -- in

21  the biota, and so I reported it that way.

22        I -- I agree that it's not likely that they're

23  recovering with a half-life of 5 years, and I think the best

24  estimate is what comes from the cores.  So the most likely

25  rate of recovery is a half-time of about 15 years.  Some of

1   the biota suggests that perhaps that's faster, but the biota

2   trends, because of the noise we're talking about, are less

3   reliable as estimate -- absolute estimates of the rate of

4   recovery.

5   Q    Let me just show you in Joint Exhibit 45, Page 57, this

6   is your expert report.  And this occurs more than once, but

7   this is one citation that I -- that I recall.

8        You talk about what you found in the cores, which is 7

9   to 23 years in Mendall Marsh.  Do you remember that?

10  A    Yes.

11  Q    Then you say, the trends in the aquatic biota that are

12  suitable to such analysis indicate that 50-percent reductions

13  will be obtained in approximately 5 to 15 years, right?

14  A    Yes.

15  Q    Okay.  Are any of the qualifications you just

16  articulated written in your expert report?

17  A    I don't recall whether -- I think there is language

18  about the uncertainty of the biota trends themselves in my

19  report, and I'm reporting here the range that I saw, that

20  that's what that analysis indicated.

21       Um, I'm telling you now -- and I believe I talked in my

22  report about the uncertainty of the individual trends in

23  associated biota -- that it is my opinion that the best

24  estimate comes from the cores.  The biota are supportive.  The

25  fastest trend I saw in the biota was a half-life of 5 years.

1    Q      Now, when you did your biota trend analysis, did you

2    look at winter flounder?

3    A      I did not.

4    Q      Did winter flounder meet your criterion for strong site

5    fidelity?

6    A      For the most part, they do.

7    Q      Did it meet your criterion of having enough stations

8    with a long record?

9    A      Once the 2012 data were collected, a number of stations

10   would have met that criteria, yes.

11   Q      Okay.  And it had a comparable number of stations with

12   at least three years of data to the other species you looked

13   at; is that correct?

14   A      I don't recall precisely, but that may be the case.

15   Q      Okay.  And did you look at the sample size?  Was there

16   any issue about winter flounder being inadequate in terms of

17   sample size relative to the other species you did consider?

18   A      Um, I don't think there's a difference.

19   Q      How about in variability, did you look in the appendices

20   to Chapter 14 or in the 2012 monitoring report to see whether

21   there was any significant difference in terms of mean --

22   variability in mean mercury concentrations between winter

23   flounder and other -- the other -- the other species you

24   looked at?

25   A      No, I don't -- I don't believe I did that.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3417

1   Q      Did it -- did the winter flounder have a comparable

2   number of stations in -- in the Penobscot River Mercury Study

3   in the upper part of the system that we're most concerned

4   about?  Do you remember?

5   A      Um, I don't recall precisely.

6   Q      Okay.  Would you accept my representation that they did,

7   that it was comparable?

8   A      Sure.

9   Q      Okay.  I mean, that doesn't violate any recollection you

10  have, does it?

11  A      No.

12  Q      Okay.  Now, let's look at Joint Exhibit 8, Figure 6.

13  This was for winter flounder?

14  A      Hm-hmm.

15  Q      Do you see that?

16  A      Yes, I do.

17  Q      You've seen it before?

18  A      Yes.

19  Q      Okay.  No significant declines at the sites sampled

20  three years or more.  Were you aware of that?

21  A      Yes, I'm aware of that.

22  Q      Okay.  But you didn't include winter flounder in this

23  biota trends analysis; is that correct?

24  A      I did not because I had a concern the -- the winter

25  flounder, particularly the juvenile winter flounder, are

CONNOLLY - CROSS-EXAMINATION/BERNARD

3418

1    intimately associated with sediment.  They bury themselves in

2    the sediment.  And so some of the temporal variability could

3    be spatial variability because of the -- the sediment

4    concentrations are very variable spatially.

5         So I was concerned about using them for trend analysis,

6    so I did not.

7    Q    Did you explain any of this in your report, in other

8    words, you considered winter flounder, but for reasons A or B

9    or C you decided not to consider them?

10   A    No, I explained it in my report only about the species

11   that I did include and why I included them.  I didn't go

12   through the other species and explain why I did not include

13   them.

14   Q    Did you look at eels when you were doing your biota

15   trend analysis?

16   A    I did not.

17   Q    Let's look at Joint Exhibit 8, Figure 4.  Do you see,

18   using your method -- and I'll let you know that there was a

19   significant decline at one site sampled three or more years,

20   and that site was not in the upper estuary.  It was this OV4

21   site.

22   A    Hm-hmm.

23   Q    Do you see that?

24   A    Yes.

25   Q    So no significant declines in the area of the river that

1    we're talking about.

2          Does that show declines to you?  Does that support your

3    biota -- biota is declining, you know, to -- to 50 percent

4    within 5 to 15 years?  Does this -- do these data support

5    that?

6    A    Ah, they do not, but I would not use the eel data

7    because I'm not so sure about the site fidelity of the eels.

8    Q    What do you know about site fidelity of eels?

9    A    Um, well, some -- you can see that there's no spatial

10   difference anywhere.  No matter where you are, the eels are

11   all about the same concentration, which would suggest to me

12   that they're moving around.

13   Q    Did you look at any literature to check that suggestion?

14   A    Um, I may very well have.  I don't recall at this time.

15   Q    Nothing in your report explains that, right?

16   A    Again, in my report, I only gave the reasons for the

17   species I included.  I didn't discuss the species I excluded.

18   Q    What do you know about the site fidelity of Nelson's

19   sparrows?

20   A    Nelson's sparrows, as far as I know, are migratory.

21   Q    They are migratory.  But when they breed, what do you

22   know about their site fidelity, when they breed and spend time

23   on Mendall Marsh?

24   A    I was not -- I was focused just on aquatic animals,

25   trying to -- because the core data are telling me something

1    about what's happening to the mobile sediments in trends, and

2    I was looking at the aquatic biota because they're associated

3    with the river and the trends there.

4        The -- the birds I did not look at, and, in part,

5    because I don't understand the relationship between the birds

6    and the environment, and so they -- they were different in

7    terms of trying to simply check the recovery rates that come

8    from the cores.

9    Q    The cores you were most interested in were in Mendall

10   Marsh; is that correct?

11   A    Yes.

12   Q    You thought they provided the best record of the history

13   of deposition within the system?

14   A    Yes.

15   Q    And you used them to calculate your recovery half-times,

16   right?

17   A    Yes, which I believe are representative as -- of the

18   system as a whole, representative of the -- what's going on in

19   the mobile sediments, but as I indicated before, I don't

20   understand what's going on in the marsh all that well.

21       Um, as you indicated, there are variable rates of

22   methylation going on in the marsh.  Um, there -- there are

23   huge concentration gradients through the marsh.  And so -- so

24   the behavior in the marsh I think is an open question.

25   Q    Understood.  The cores, though, that you focused on were

1    in the same part of the system where Nelson's sparrows feed.

2    Do you understand that much?

3    A    They are there on the edge of the marsh or what some

4    people refer to as the levy of the marsh.  They are not in

5    the -- on the marsh platform.

6    Q    So let's look at Joint Exhibit 8, Figure 14.  This is

7    for Nelson's sparrow.  Have you seen that before?

8    A    I have.

9    Q    Using your method -- I understand you didn't do it as

10   part of your exercise for your expert report, but I'm asking

11   you to do it now.

12        Using your method, what do you see here by way of biota

13   trends, if anything?

14   A    They're -- they're variable year to year.  Ah, I don't

15   understand how much variability to expect in the sparrows

16   because I don't understand their -- the marsh all that well.

17        So -- but just on face value, these data don't look like

18   they're telling you anything about trends.  They're noisy.

19   They bounce up and down.

20   Q    You don't see a trend upward in Mendall Marsh southeast

21   and southwest by your -- by your method?

22   A    No, I see -- I see a confused trend.  It goes down,

23   down, down, and then up.  So it's -- it's not a consistent

24   upward trend.  It's down and up.  But I've not attempted to

25   interpret these data.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3422

1    Q     Okay.  But interpreting them here right now, you don't

2    see any increasing trend at any sites?

3    A     Perhaps you would argue that WS -- W17 you might say,

4    yeah, that's an increasing trend.

5    Q     Well, let's not argue.  Just tell me what you -- you

6    would say.  Is that an upward trend at W17?

7    A     That -- that looks like it's an upward trend, but it's

8    2008 to 2010 data.

9    Q     How about where we have 2012 data at either -- you know

10   -- you take -- this is an average, I understand it, Mendall

11   Marsh southeast and southwest, an average of the two stations

12   that are adjacent to it on the -- on the horizontal axis --

13   A     Hm-hmm.

14   Q     -- do you see any trend there at Mendall Marsh southeast

15   and southwest?

16   A     It appears down and up at both of those stations, yes.

17   Q     Okay.  Now, let's just look at Joint Exhibit 8, Figure

18   16.  This is red-winged blackbirds.  Have you seen this chart

19   before?

20   A     Yes, I have.

21   Q     Okay.  Now, this is another species you did not consider

22   in your trend analysis, right?

23   A     Again, I -- I only considered aquatic species.

24   Q     Okay.  So just --

25   A     My concern is I don't particularly understand what's

1    going on in the marsh.

2    Q    You say you don't understand it.  But are there people

3    who work at Anchor QEA who understand about birds?

4    A    The issue here is -- is the variability on the marsh in

5    terms of exposure.  All right.  There's great spatial

6    variability on the marsh because there are huge concentration

7    gradients across the marsh.  There's great variability in

8    methylation rate across the marsh.  And a lot of that

9    variability is not understood.

10           So concentrations are varying, methylation is

11   varying.  There's probably interannual variability in

12   methylation on the marsh, as well as interannual variability,

13   therefore, an exposure, that may be overwhelming any trends

14   for the moment.

15       And I -- I think that -- it's not whether you understand

16   birds.  It's -- it's whether we understand the marsh and we

17   understand methylation on the marsh, and I don't think it's

18   understood well enough to make statements or to infer from

19   these data something more broadly about the system.

20       Again, recognize the core data, which is what I'm

21   principally relying on, I believe is an estimate of what the

22   trends are in mobile sediments, and that's a downward trend.

23   The closest way to look at that is the aquatic biota.  What --

24   the birds on the marsh, I think, are not a way to look at that

25   because of all of the confounding factors that exist here, and

CONNOLLY - CROSS-EXAMINATION/BERNARD

3424

1   some of these upward trends may be interannual variability in

2   methylation for all I know.

3   Q     Are you saying there is no such variability among

4   aquatic organisms as distinct from the birds?

5   A     The data that we have doesn't show the kinds of

6   variability that we see on the marsh, for example, in

7   methylation rates.

8   Q     So -- so let me -- let me just get straight your

9   testimony.

10        You, in looking at Joint Exhibit 8, Figure 16, is it

11  your testimony that you don't understand the marsh well enough

12  to form an opinion about whether these values at Mendall Marsh

13  southeast and southwest indicate an upward trend in mercury

14  concentrations in red-winged blackbirds; is that your

15  testimony

16  A     That is not my testimony.

17  Q     Okay.  Do you see a trend here upward in Mendall Marsh

18  southeast and southwest?

19  A     What I see is -- is levels that are kind of bouncing

20  around and then the 2012 data are -- are much higher.  Whether

21  you call that an upward trend or something happened between

22  2010 and 2012 such that the concentrations in the birds went

23  from a range of three to four over the period from 2007 to

24  2010 -- all right -- so they're bouncing around in a fairly

25  tight range -- and then, all of a sudden, they're 13.  Um,

CONNOLLY CROSS-EXAMINATION/BERNARD

1    what happened between 2010 and 2012 to cause them to triple

2    their concentration, I have no understanding of that.

3         I think it relates to, obviously, changes in exposure

4    that occurred between those two years that are not understood,

5    and that these data, because of all of that, are not

6    appropriate to use as simple confirmation of the cores, which

7    are telling us that the mobile sediments appear to be

8    recovering.

9         Um, this data is not informative with regard to that

10   question.

11   Q    There are cores, including cores in Mendall Marsh, at

12   which mercury concentrations toward the surface sediment are

13   increasing now; is that correct?

14   A    There are two cores in Mendall Marsh that are towards

15   the entrance of the marsh that have not accumulated sediment

16   consistently and appear as if they are locations that are

17   subject to the kind of disturbance that I talked about

18   earlier.

19        And the concentration profiles in there I don't think

20   are useful for trend analysis.  I don't think that they are

21   clear depositional sites that have recorded this time history

22   of the mobile sediments.  So their behavior, I think, is not

23   relevant to trend analysis.

24   Q    Okay.  Now, understanding that, though not accepting it,

25   just understanding it, I want to just ask you one more

1   question about Figure 14 --

2   A      Hm-hmm.

3   Q      -- which is Joint Exhibit 8, Figure 14.  And I want you

4   to look at this Mendall Marsh southeast and southwest.

5   A      Hm-hmm.

6   Q      And I -- it's clear on the record that you did not

7   review these for biota trend purposes and -- and don't -- and

8   for the reasons you explained, but I'm asking you now, just in

9   terms of your method, I want to zero in on your method.

10  A      Sure.

11  Q      If you had looked at these data at Mendall Marsh

12  southeast and southwest --

13  A      Hm-hmm.

14  Q      -- in 2009 by your method, what would you have found?

15  A      Um, by my method, I would probably not have relied on a

16  two-year record, 2007 to 2009.  But had I, I would have

17  concluded that was downward.

18  Q      And then if you went back in 2012 and reviewed that, you

19  would have been wrong; is that correct?

20  A      I would have, yes.

21  Q      Now, are you aware -- you know who Dr. Fisher is?

22  A      Yes.

23  Q      And are you aware of the testimony he gave to the effect

24  that biological data over the duration that the Study Panel

25  collected data cannot be used to determine trends?

1    A    I'm aware that he -- he had that testimony.

2    Q    Is Dr. Fisher a trained biologist?

3    A    He's a trained biologist, but I am not aware that he has

4    any experience in looking at trend analysis in biota.

5    Q    Is he a trained biologist?

6    A    He is a trained biologist.

7    Q    Are you?

8    A    I am not.

9    Q    Let's turn to the sediment cores.  A second basis for

10   your predictive recovery times are -- is the half-times you

11   calculated from the sediment core data, correct?

12   A    Yes.

13   Q    And you performed your own rather extensive analysis of

14   the sediment core information that Drs. Yeager and -- Yeager

15   and Santschi generated for the study, right?

16   A    Yes.

17   Q    Okay.  And your assertion is that your analysis supports

18   the five to 15-year estimate you make of half-time for

19   recovery of the system, correct?

20   A    My assertion is -- is that that analysis supports

21   15 years.  And as I testified earlier, that 15 is the average

22   of numbers that had a fairly broad range, and so it is an

23   approximation and the best estimate I think for how fast the

24   system is recovering.

25   Q    Let me just go back to one thing that I neglected to ask

CONNOLLY - CROSS-EXAMINATION/BERNARD

3428

1   you about.  We discussed it during your deposition.  You may

2   recall.

3       Did any species you looked at show overall a five-year

4   recovery time by your biota trend method?

5   A    Overall, no.

6   Q    Okay.

7   A    That -- I was reporting on the fastest --

8   Q    All right.

9   A    -- trend I had seen.

10  Q    And the fastest trend would have been for one station

11  and one species, correct?

12  A    Yes.

13  Q    Okay.  Now, when we looked at the mussel data earlier,

14  you said, when I asked you about the trend going back up,

15  that's one station, I didn't look at one station.  Do you

16  remember that?

17  A    Yes.

18  Q    But you did look at one station when you derived your

19  low end five-year recovery time based on your biota trend

20  work; is that correct?

21  A    I reported the range that I got, which was as fast as

22  five years.  I also indicated, now that I believed that the

23  system is not recovering as quickly as that, that that is the

24  -- simply the fastest range that came out of the individual

25  comparisons.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3429

1   Q     In your report, you wrote five to 15 years, correct?

2   A     Reporting on the range, yes.

3   Q     And the low end of the range, the five years, was based

4   on one site for one species, correct?

5   A     It was.

6   Q     Okay.  Let's turn back to the cores.  You have a Table

7   5-1.  I want to clarify something.  And this kind of sets out

8   your analysis of the -- kind of a summary of your analysis of

9   the cores, right?

10  A     Yes.

11  Q     All right.  So the initial 5-1, which is in your expert

12  report, so that would be Joint Exhibit 45, is here.  Do you

13  recognize that?

14  A     Yes, I do.

15  Q     Okay.  And it doesn't include Mendall Marsh core 6A,

16  correct?

17  A     It does not.

18  Q     Okay.  You then a few nights ago -- or your lawyer --

19  sent over a revised Table 5-1, which I'm showing you now --

20  A     Hm-hmm.

21  Q     -- see 5-1 update?

22  A     Yes.

23  Q     And it does include Mendall Marsh 6A.  Do you see that?

24  A     Yes.

25  Q     And I think I heard you say this morning that you didn't

CONNOLLY - CROSS-EXAMINATION/BERNARD

3430

1  analyze Mendall Marsh core 6A, or you didn't use it in your

2  recovery calculations.

3           Can you just straighten out the record on that?

4  A    Certainly.

5  Q    Or tell me what I'm not understanding.

6  A    Yes.  The methodology that I used was to include cores

7  for which -- of the universe of cores that Dr. Santschi had

8  looked at, cores for which his estimate of sedimentation rate

9  was above .2 centimeters a year.

10          I then did my own analysis of what I calculated as a

11 sedimentation rate in the same interval that I was looking at,

12 the mercury recovery, and when I did that for core 6A, I got a

13 sedimentation rate of .18 centimeters per year, and on that

14 basis rejected the core.

15          Um, but there was some confusion because since I

16 initially kept it and did an analysis of it, it appears in the

17 body of the report in the figures, but not in the table, and

18 so to clarify that confusion that I, in fact, did an analysis

19 for core 6A, but once finding that the sedimentation rate was

20 so -- so low, decided that the half-time estimate for that

21 core was not reliable and, therefore, did not include it in

22 the cores that I averaged to get the 15 years.

23 Q    Okay.  So it's in the -- the updated Table 5-1, but you

24 did not use it, correct?

25 A    I did not use it in computing that 15-year average.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3431

1    Q    The other -- did you use all of the other cores in

2    computing -- that are on the updated 5-1?

3    A    I did.

4    Q    Okay.  Now, weren't there three other cores that also

5    weren't included here, that were in the back, that were in the

6    same category as 6A; am I remembering that correctly?

7    A    That were ones that I rejected before doing this

8    analysis, yes.

9    Q    Okay.  So they're not in the updated 5-1.

10   A    Um, no, because I never did the analysis on them.

11   Q    Okay.  Okay.

12   A    6A is in there --

13   Q    All right.

14   A    -- because I did the analysis on it.

15   Q    Okay.  Thank you.  That's helpful.

16        Now, this table, I guess we'll use the updated one,

17   although with the clarification you just gave, I think there

18   are 21 cores on this table, right?

19   A    I forget exactly, but that sounds about right.

20   Q    Okay.  If -- I'm sure someone will correct me if my --

21   if I miscounted, but let's say there are 21.  But you didn't

22   consider 6A, so there are -- there are -- should we say there

23   are 20?

24   A    Yes.

25   Q    Okay.  How many cores were there in the -- the

1    Yeager-Santschi coring effort?

2    A    Um, cores that they actually analyzed for -- for mercury

3    and radionuclides, I think there were 56.

4    Q    I think 58.

5    A    58.

6    Q    Okay.  So that means there were 37 cores that you

7    omitted from your analysis?

8    A    I started with the cores that Dr. Santschi used, and he

9    -- he actually omitted a number of cores himself.

10   Q    I believe he used 44.  Does that ring a bell?

11   A    I don't remember the number, but perhaps that's how many

12   he used.  And so mine are a subset of that 44.

13   Q    Okay.  So that subset would be less than half of the 44,

14   correct?

15   A    Yes.

16   Q    Okay.  Now, all of the cores that are listed here in the

17   left-hand column of Table 5-1 met your criteria; is that what

18   it means that they landed on the table?

19   A    They met the criteria that I was using for selecting or

20   rejecting cores from Dr. Santschi's subset, yes.

21   Q    And so it looks like there are around eight cores for

22   Mendall Marsh, and then -- or, I guess, seven if you don't

23   include 6A.

24   A    Hm-hmm.

25   Q    And then there are 13 cores from other locations in the

CONNOLLY - CROSS-EXAMINATION/BERNARD

3433

1   system, correct?

2   A     Yes.

3   Q     All right.  Now, there are cores in the system, are

4   there not, that show either steady or increasing mercury

5   concentrations toward the surface sediment?

6   A     Yes, there are.

7   Q     Okay.  And have you seen -- maybe -- maybe just to make

8   this clear, let's look at Dr. Driscoll's report.

9         You've seen his -- his report, right, his expert report?

10  A     I have.

11  Q     Okay.  So that's -- I think it's in Joint Exhibit 48

12  where he has an analysis of this, and he included a useful

13  table, so I want to show it to you.  Here it is.

14        So have you seen this before?  This is Page 19 of Joint

15  Exhibit 48, Dr. Driscoll's rebuttal expert report.  And you

16  recall this, that he sort of plotted all the cores and then he

17  depicted on a figure how many of them -- or which ones show

18  increasing concentrations toward the surface?

19  A     Or I guess no trend towards the surface.

20  Q     Yes.  Steady or increasing?

21  A     Yes.

22  Q     Okay.  And he did this for each compartment of the

23  river, right, including the Penobscot -- the main stem cores

24  up here at the top and then the Mendall Marsh cores, and then

25  he has a page for Orland River and estuary.  Do you remember

CONNOLLY - CROSS-EXAMINATION/BERNARD

3434

1   that?

2   A    Yes.

3   Q    Okay.  So he also included a map of all the coring sites

4   that -- and this is Joint Exhibit 48, at Page 21.  Do you

5   remember seeing this?

6   A    Yes.

7   Q    Okay.  And he's got triangles here for all the cores

8   that are in this category we've been discussing, that either

9   have constant or increasing mercury toward the surface, right?

10  A    That -- yes, that's his interpretation.

11  Q    Okay.

12  A    I've not gone back to try to evaluate it one way or the

13  other.

14  Q    Did you count how many cores there are in Dr. Driscoll's

15  figures here or on the map that show either -- that show an

16  increase or no decrease in sediment mercury at the surface?

17  A    I have not.

18  Q    Okay.  So will you accept my -- my representation that

19  there are 16?  Does that seem about right?

20  A    Um, I --

21  Q    Okay.

22  A    I could count them, but I guess that's about --

23  Q    Okay.  I don't think we need to again.  If my arithmetic

24  is wrong, someone will correct me.

25  A    Okay.

CONNOLLY CROSS-EXAMINATION/BERNARD

3435

1    Q     So that would be -- you considered 20 cores, correct?

2    A     Yes.

3    Q     And there are 16 cores for which there's no decrease

4    and, in some cases, an increase in mercury towards the surface

5    of the sediment, correct?

6    A     Apparently.

7    Q     So that's nearly the same number as -- those -- those

8    are very close?  In other words, the number of cores that show

9    increase in concentrations or steady --

10   A     Hm-hmm.

11   Q     -- to the surface is nearly equivalent to the number of

12   cores you considered in your analysis, right?

13   A     Yes, and that's not surprising in this environment.

14   Q     Now, did any of these cores that do not show decline

15   toward the surface figure into your analysis in any way?

16   A     Probably not.  Ah, I would have to go core by core just

17   to confirm one way or the other.

18         But, again, recall that the focus of the analysis was to

19   find locations that had been consistently depositional over

20   their history so that they were providing a record of what was

21   depositing from the mobile sediments.

22         This system is no different than any other system that

23   I've worked on.  The patterns that you see in the sediments

24   are -- are a mosaic.  There are locations that are

25   consistently depositional.  There are locations that are

1    subject to various disturbances.  There are locations for

2    which recovery was occurring and -- and then burial was no

3    longer occurring.

4         Those stations are representative of the different

5    behaviors that are occurring within the system, but they are

6    not information useful to assessing what has been happening to

7    the levels in the mobile sediments over time.

8         If I have a location that had some lower

9    concentrations and then there was an erosion event that took

10   some material from another location that was a little bit

11   higher and put it on top, it's going to look like it goes up.

12   But it's because there was erosion and deposition, not because

13   that location has consistently been depositional.

14        If I have a location that was accumulating sediment, but

15   reached some sort of steady state or equilibrium depth so that

16   it stopped accumulating, there may be older sediments sitting

17   at the surface that represent sediments that are 20 years old,

18   let's say.  Um, that's the condition at that location.

19        But it tells me nothing about the time trend in mobile

20   sediments because it stopped recording that time trend

21   sometime in the past.

22   Q    Understood.  Those 16 locations are real locations,

23   though; is that correct?

24   A    Yes, they are.

25   Q    They are actual places in the ecosystem where mercury

CONNOLLY - CROSS-EXAMINATION/BERNARD

3437

1    towards the surface of the sediment is increasing.  Do you

2    agree with that?

3    A     I wouldn't say increasing.  I would say that mercury at

4    the surface is higher than it was underneath it.  Increasing

5    implies some long trend of -- in my mind, and -- and it's rare

6    that we -- we saw that.  I mean, I think there may be one or

7    two examples of it, but a lot of times, it's sort of a

8    confused thing, and there -- yes, there's higher at the

9    surface.

10   Q     Some of this lateral -- there's lateral distribution of

11   mercury-contaminated sediment within the system, correct?

12   A     Yes.

13   Q     And you were talking yesterday about this kind of

14   vertical, you know, a perfect historical record which I think

15   you said doesn't exist, but what you're looking for as best

16   you can is this kind of vertical layer cake, just kind of

17   drops gently in, and nothing disturbs it, right?  That would

18   be an ideal core?

19   A     Yes.

20   Q     Okay.  So that's vertical in nature.  Isn't there also

21   horizontal flux going on in the system that creates mercury

22   contamination or that shows up as mercury contamination toward

23   the sediment surface in various areas?

24   A     There -- there is erosion and deposition that occur in

25   this estuary, like every estuary.  Those erosion and

CONNOLLY - CROSS-EXAMINATION/BERNARD

3438

1    deposition patterns -- all right -- affect the concentrations

2    that we see at various locations.  They also potentially

3    impact the concentrations of the mobile sediments because if

4    we have an erosion event, that stuff is mixed into the mobile

5    pool and gets sort of homogenized within the mobile pool in

6    some cases.  So those sediments are potentially a source to

7    the mobile sediments.

8        The objective of the coring analysis that I did and

9    Dr. Santschi did was to get this time history of what's

10   happening in the mobile sediments.  That time history reflects

11   all the sources of mercury to the mobile sediments -- mercury

12   coming from upstream, mercury coming from point sources, and

13   mercury coming from other sediments that got eroded into the

14   water column and moved around.

15       Um, and because these disturbed locations -- all right

16   -- are having erosion and depositional lateral transport to

17   them, they can have odd-looking patterns of -- of mercury in

18   them, and they are what they are, certainly, but they're not

19   indicative of the time trend that's been occurring in the

20   mobile sediments as they've been moving through the system.

21   Q    Can those lateral disturbances influence recovery?

22   A    It's possible, but the -- well, let me back up.  All

23   right.

24       If it turns out -- all right -- and I don't think we

25   know this -- but if it turns out that, let's say, the mobile

1  pool turns over with less than a five-year half-time, yet the

2  system's recovering with a 15-year half-time, well, what's

3  controlling the recovery of the mobile pool may be this

4  lateral transport process that keeps the mobile pool somewhat

5  contaminated over time.  We don't understand that.  That's one

6  of the, obviously, open questions here.  But all we can say is

7  that it's recovering.

8           The system is getting better.  We can see that

9  because the mobile sediments are a reflection of the system,

10  and the reflection of the influence of all the sources,

11  including lateral movement, whatever, and that record is

12  telling us that the system is getting better.  It's

13  recovering, that those sources must be going down because the

14  levels in the mobile sediment are going down.

15  Q     The question is not whether the system is recovering, is

16  it?  The question is, at what rate is the system recovering;

17  is that fair?

18  A     Yes, and the range here between Dr. Santschi and I and

19  even Dr. Driscoll is 15 to 22 years.

20  Q     Well, let's look at some of your methods, then.  One

21  major departure from Dr. Santschi and your method is what

22  portion of the core to analyze -- of a particular core to

23  analyze to calculate a recovery half-time; is that correct?

24  A     Yes.

25  Q     And Dr. Santschi's view, looking at all the data, was

CONNOLLY - CROSS-EXAMINATION/BERNARD

3440

1    that if you took this 40-year period from the late 1960s

2    roughly to 2009, he saw -- or 1967, so it was a 42-year

3    period --

4    A      Hm-hmm.

5    Q      -- he saw overall two phases of recovery in 21-year

6    intervals, correct?

7    A      I think the choice of 21 years was fairly arbitrary.

8           What he saw was a -- a faster initial recovery and a

9    slower subsequent recovery.  He chose to sort of divide it in

10   half.

11   Q      Yeah.  And he --

12   A      But I --

13   Q      His judgment -- his judgment --

14   A      But that was his judgment.

15   Q      Right.

16   A      I don't -- I know that that was the inflection point

17   between the two recoveries.

18   Q      Okay.  You -- you made a different judgment, which is

19   you -- you used what you call a more refined approach, which

20   looked kind of core by core to see what interval you ought to

21   analyze; is that right?

22   A      Within the interval that he analyzed.

23   Q      Okay.  Now, the reason you did that, as I understand it,

24   is you believed that ongoing sources were showing that the

25   system was recovering more slowly until up into the mid-to

1    late 1990s; is that right?

2    A     I would say that a little bit differently.

3    Q     Go ahead.

4    A     Ah, I started at the surface of the cores and looked

5    downward, and particularly in the Mendall Marsh cores, which I

6    think are the best cores, although you can see it elsewhere,

7    concentrations increase as you go downward, and then there's

8    this leveling off, and it appears to happen in a number of

9    cores.

10           And so it appears to be a real phenomenon, and so I was

11   speculating on, why would that be?  Why was this -- this

12   period further back in time, where things were -- looked like

13   they weren't recovering?  And the only explanation for that is

14   that sources had to be controlling the system, and so I then

15   said, well, how could that be?

16           Well, it would be external or internal sources, right.

17   So internal sources, perhaps residual releases from the

18   HoltraChem facility; external sources, what's coming over

19   Veazie Dam or what's coming from the coastal ocean.

20   Q     So what's coming up from the coast, you -- in terms of

21   that influence, you looked at the mussel data, correct?

22   A     Only in the most casual way to say, well, what was

23   happening on the coast?  Well, we had this one station, and,

24   again, we discussed the limitations of looking at one station.

25   But we -- we saw things bouncing around, and so I said,

1    perhaps the levels were not dropping in the coastal ocean at

2    that point, but -- but understand that I would not

3    characterize this as more than sort of a possible explanations

4    for why the cores look the way they look.

5        It is not definitive by any means, and it's not a clear

6    indication that that is what is happening.

7    Q    And you're not qualifying this now because you want to

8    walk back from the USGS data that we're about to talk about,

9    are you?

10   A    Not for that reason, but I -- I -- as I clear -- and I

11   was clear in my deposition to you, that I -- I agree with the

12   concerns about the USGS data, and while the numbers that you

13   would compute from the USGS data in terms of, what is the

14   magnitude of the load that was coming over the Veazie Dam in

15   the late 70s, early '80s is probably not accurate with that

16   data.  It is some indication, probably not a very strong

17   indication, but some indication that levels were higher back

18   then.

19       Ah, we also have some independent information on that

20   because we have the cores that were above the Bangor Dam, that

21   if you trace back in time were higher values back in the '70s

22   and '80s.

23       Um, but it -- it's all sort of casual inference to try

24   to say, why are -- why are the patterns in the cores looking

25   like this?

1   Q    Dr. Connolly, do you think this is an important case?

2   A    I do.

3   Q    Okay.  It deals with a very important resource, right?

4   A    Yes.

5   Q    It's been going on a long time, right?

6   A    Yes.

7   Q    And you're a key witness for the defendant; would you

8   agree with that characterization?

9   A    I -- I'd let others characterize, you know, how they

10  view my role in this case.

11  Q    And you've spent up to 20 percent of your work time on

12  this case during the last 14 months; is that correct?

13  A    That's probably about accurate, yeah.

14  Q    Okay.  And you filed a very extensive, more than a

15  hundred-page expert report in January?

16  A    Yes.

17  Q    And are you saying that what you put in your report is

18  just a casual observation?  Is that how you're characterizing

19  it now?

20  A    I think we need to back up here.  I think you're putting

21  a characterization around the report that is nonsensical.

22       What I'm saying is, for this particular element, I see

23  these patterns in the cores, where you go down in the core,

24  things increase and then they tend to flatten out.  And what I

25  did in the report was to offer, well, what might that be?  My

1    belief is the sources must have been higher and controlling

2    recovery back then.  Well, how could that be?

3         And so I offered some possible explanations for that.

4    It's got nothing to do with the importance of the resource.

5    It has nothing to do with the importance of this case.  It's

6    simply an expression of, what might have been going on at that

7    point in time?

8    Q    You wrote in your report that there was evidence

9    suggesting that ongoing sources to the Penobscot inhibited

10   recovery perhaps into the late 1990s; is that correct?

11   A    Yes, and I think the --

12   Q    And --

13   A    I think the important --

14   Q    Is it correct?

15   A    The -- yes, but I think the important word there is

16   suggests.

17   Q    Okay.  We'll get to that.

18        Now, the two sources that you cited that might be

19   inhibiting recovery, are loading from upstream of the Veazie

20   Dam

21   A    Hm-hmm.

22   Q    Correct?

23   A    Yes.

24   Q    And ongoing loading from the HoltraChem plant, correct?

25   A    Yes.

1   Q      All right.  Let's talk about loading from upstream.

2   A      Hm-hmm.

3   Q      You calculated loadings based on flow measurements at

4   Veazie, correct?

5   A      Flow measurements and USGS measurements of mercury in

6   the water.

7   Q      Okay.  So the validity of those measurements -- those

8   loading measurements, depend upon the validity of the mercury

9   data generated at Eddington by the USGS, correct?

10  A      They do.

11  Q      And when were those measurements made by the USGS?

12  A      In the late 1970s, early 1980s.

13  Q      Okay.  So your loading measurements, then, depend upon

14  the accuracy of those data; is that correct?

15  A      Yes, they do.

16  Q      And those data are not accurate, are they?

17  A      They are not.

18  Q      Okay.  Now, they're not accurate because the data were

19  collected at a time prior to the introduction of clean methods

20  in mercury sampling; is that correct?

21  A      Yes.

22  Q      And those clean methods weren't introduced until roughly

23  2000?

24  A      Um, they began to be introduced earlier than 2000.

25  Q      But many years after the data that -- that you were

1    relying on; is that fair to say?

2    A     Yes.

3    Q     Okay.  Now, is it fair to say that it is well-known fact

4    among mercury scientists that the USGS data generated during

5    the period of time that you were using them are unreliable, if

6    you know?

7    A     It's my understanding that there are concerns about the

8    reliability of that -- those data.  Um, the extent to which

9    they're biased high is an issue.  Of course, there's also an

10   issue of whether you could actually have real concentrations

11   high enough to overcome the bias that occurs because of the

12   contamination in the samples.

13         So, initially, I used the data, um, and then subsequent

14   to issuing the report -- and, again, this was in a time

15   sequence where I never got to do this before I issued the

16   report -- I went to see whether the kind of concentrations I

17   was measuring there were above the noise level, let's say, due

18   to contamination or not and concluded, based upon subsequent

19   work, that they -- they probably are not above the noise

20   level, and, therefore, there is a bias potentially.

21         And so I now agree that I -- that we probably shouldn't

22   rely on those data.

23   Q     Did you issue any supplement to your report disavowing

24   the use of these data once you reached this epiphany?

25   A     No, I don't know that there was an opportunity to do

1    that.

2    Q    There was an opportunity on -- on your direct

3    examination, wasn't there?

4         Did you disavow it then during -- when -- when

5    Mallinckrodt's lawyer was questioning you?

6    A    I think I did.

7    Q    The record will reflect what you did.

8         Let me show you Plaintiffs' Exhibit 70.  Do you know

9    Dr. Jim Wiener?

10   A    Ah, I know of him, yes.

11   Q    Is he a respected mercury scientist?

12   A    Yes.

13   Q    Okay.  And are you aware that he wrote some handwritten

14   comments on your expert report?

15   A    Yes.

16   Q    Okay.  Have you seen this handwritten comment?

17   A    Um, no, I don't recall.

18   Q    Okay.  Let me read it to you.  It's a little difficult

19   because -- so we'll have to turn the figure around.  But this

20   is Dr. Wiener's handwritten comments on Page 21 of your expert

21   report, and the handwritten comments, the document I'm showing

22   you, is Plaintiffs' Exhibit 70.

23   A    Hm-hmm.

24   Q    Okay.  And he's talking about your reference to the USGS

25   data.  Do you see that?  This is -- this is the --

CONNOLLY - CROSS-EXAMINATION/BERNARD

3448

1    A     Hm-hmm.

2    Q     This is where you're talking about.

3    A     Yes.

4    Q     Okay.

5    A     Hm-hmm.

6    Q     So he says -- or he writes, this sampling preceded the

7    development and application of clean techniques in preventing

8    contamination of dilute samples, such as water, with mercury

9    during sample collecting, handling, storage, and analysis.

10   Such contamination typically increased mercury concentrations

11   in samples by 100- to 1,000-fold.  Moreover, the large errors

12   in estimated concentrations measured in the 1970s and early in

13   the 1980s are well-known by scientists involved with

14   biogeochemical studies of mercury involving the sample --

15   sampling and analysis of dilute media, such as surface waters.

16   Do you see that?

17   A     I do.

18   Q     Okay.  Do you agree with that statement?

19   A     Um, I don't know that I agree it's a hundred- to a

20   thousand-fold.  Um --

21   Q     Do you have any information on that one way or the

22   other?

23   A     The concentrations measured at the time in '79 and '80,

24   in many -- in several cases were below the detection limit.

25   As I recall, the detection limit was a hundred nanograms per

1    liter.  Um, a hundred- to a thousand-fold would mean that the

2    real concentration was a tenth to one nanogram per liter.

3         I think subsequent measurements with clean techniques

4    show that total mercury concentrations, um, were clearly

5    higher than that.  So I don't know I agree that it's a

6    hundred- to a thousand-fold, but I certainly agree that it

7    introduces a bias.

8    Q    And it introduces a bias high, correct?

9    A    Yes, it does.

10   Q    Now, is there anything else in the substance of

11   Dr. Wiener's comment with which you disagree?

12   A    Ah, known by scientists I agree with.  I -- I knew that

13   without clean techniques, there -- that this data had some

14   potential issue, which is why I was doing the checking that I

15   did that we discussed at my deposition.

16   Q    When -- when did you do the checking you did that we

17   discussed at the deposition?

18   A    Um, I did it shortly after issuing the report.  We

19   continued to try to find more USGS data for comparison

20   purposes.

21   Q    You didn't check before you issued the report?

22   A    I didn't have the opportunity.  There was just too much

23   data, too much analysis that we were doing.

24   Q    Okay.  So, you know, I shouldn't have characterized this

25   as a disagreement with Dr. Wiener.  It sounds like his two to

CONNOLLY - CROSS-EXAMINATION/BERNARD

3450

1    three orders of magnitude statement there is something you're

2    just not sure one way or the other whether that's accurate?

3    A    I don't believe it's that high --

4    Q    Okay.

5    A    -- based upon the data that we're collecting.

6    Q    Okay.  So you know it's skewed, and you know it's skewed

7    high, but you're not sure whether -- you're -- you're not

8    agreeing with him that it's two to three orders of magnitude

9    high?

10   A    Correct.

11   Q    Now, when did you first realize that the USGS data on

12   which you were relying were unreliable?

13   A    I don't remember precisely, but it was several months

14   after issuing the report.

15   Q    Okay.

16   A    We managed to find some other data.

17   Q    Now, in your practice, is there a point when data become

18   sufficiently unreliable such that you discard them?

19   A    Yes.

20   Q    And you don't let them factor into your analysis or

21   conclusions?

22   A    Yes.

23   Q    Okay.  Did the USGS mercury data at Eddington cross that

24   threshold for you?

25   A    At this point, I would say, yes, it does cross that

CONNOLLY CROSS-EXAMINATION/BERNARD

3451

1   threshold.

2   Q     But they didn't before today?

3   A     I -- I wouldn't say before today.  I think there is -- I

4   think they perhaps provide -- I think I said earlier -- some

5   indication, but they're not really reliable, so you can't use

6   them to make determinations of loading.

7   Q     Is today the first time that you're aware of that you

8   have stated that -- withdrawn.

9         At any time before today, have you disavowed your

10  reliance on the USGS data in this case?

11  A     I don't recall.

12  Q     Now, at the time --

13  A     Can -- let me just follow that up with, this -- this

14  issue is really kind of a side issue in the sense that we're

15  back to the cores do this, why could it be that?  Well,

16  perhaps loads were higher at Veazie Dam.

17        I still stand by that, whether the USGS data are

18  reliable or not, and so disavowing them doesn't change

19  anything in terms of my view or my opinion.  It simply says

20  that, well, I believe they were likely higher and probably

21  since sources do have to account for the flattening, probably

22  contributed to it.  Can I use the USGS data as a demonstration

23  of that?  No.

24  Q     Whether this is a side issue will be for others to

25  decide.

CONNOLLY - CROSS-EXAMINATION/BERNARD

3452

1    A    Okay.

2    Q    Now, before writing your expert report, did you check

3    with anyone at USGS about the reliability of the data you were

4    using?

5    A    No.

6    Q    Did you have anybody from your firm do that?

7    A    We had -- we had some conversations about we need -- we

8    need to follow up because there -- there potentially could be

9    some issues, and that was part of the motivation for

10   continuing to look at those data after issuing the report.

11   Q    Now, just in terms of sequence, you filed your expert

12   report on January 13th, I believe; is that correct?

13   A    Yes.

14   Q    And then Dr. Driscoll filed a rebuttal report ten days

15   later.  Do you remember that?

16   A    Yes.

17   Q    And do you remember his taking issue with your use of

18   the USGS data?

19   A    Yes.

20   Q    Okay.  And just for the record -- I won't read it -- but

21   it's Joint Exhibit 48, at Pages 8 to 9.

22        And he criticized your use of this data, saying they

23   shouldn't be used, they're unreliable.  Do you remember that?

24   A    Yes.

25   Q    And then you submitted a surrebuttal report --

CONNOLLY - CROSS-EXAMINATION/BERNARD

3453

1    A       Hm-hmm.

2    Q       -- following Dr. Driscoll's report --

3    A       Yes.

4    Q       Right?  Did you say anything in your surrebuttal report

5    about your reliance on the USGS data in response to what

6    Dr. Driscoll had written?

7    A       I don't recall one way or the other.

8    Q       Now, at some point, I think you mentioned you looked at

9    some additional USGS data for Lake Champlain; is that correct?

10   A       Yes.

11   Q       And you did that because you thought, well, that's a

12   pretty pristine environment, so maybe that'll give me a sense

13   of whether -- you know, how unreliable the USGS data really

14   are?

15   A       Yes.

16   Q       And you found that -- that confirmed -- what you saw in

17   Lake Champlain confirmed the unreliability of the data; is

18   that fair?

19   A       Yes.

20   Q       Okay.  When did you do that?  Do you remember?

21   A       We managed to obtain that data several months after

22   issuing the report, but I don't remember the -- the time

23   sequence.

24   Q       And at that point, did you issue any supplemental

25   disclosure or correction to what you had submitted in your

1    expert report?  Do you recall?

2    A    I did not.

3    Q    Okay.  Now, you testified yesterday on direct

4    examination, in words or in substance -- I just took a

5    handwritten note, I haven't seen the transcript -- that you

6    have to be careful about using these USGS data.  Is that -- do

7    you recall that?

8    A    Ah, I don't remember my exact testimony, but --

9    Q    Well, do you think it's fair to characterize your

10   testimony on direct examination as retreating a bit from the

11   use of the USGS data?

12   A    Yes.

13   Q    Okay.  Now, is any of that qualifying testimony that you

14   gave about those data, is any of that in your expert report?

15   A    No.

16   Q    Okay.  Now, are you familiar with something called the

17   Beak data, the so-called Beak data?

18   A    As I recall, that's the sediment data from the '70s?

19   Q    Yes.  So it's actually EPA data that was reported by

20   Beak, who was a consultant to Mallinckrodt at the time.  Does

21   that ring a bell?

22   A    Yes.

23   Q    Okay.  So Dr. Driscoll submitted -- and you -- you may

24   even remember these data from back in the liability trial, but

25   Dr. Driscoll submitted a -- a version of this map, which is

CONNOLLY CROSS-EXAMINATION/BERNARD

1    Joint Exhibit 49, Page 2.

2    A    Hm-hmm.

3    Q    So this is Dr. Driscoll's supplement.  You recognize

4    that?

5    A    Um, there were two versions of this map.

6    Q    Yeah.  So this is the more recent version, and I can

7    tell you that I'm asking for a different -- I know there was a

8    -- there were questions that went back and forth between you

9    and Dr. Driscoll about the numbers on it.  But those are

10   irrelevant to what I'm going to ask you about.

11   A    Okay.

12   Q    Okay.  So these are the EPA 1971 sediment data from

13   around the plant, correct?  I mean, they emanate from the

14   plant, which is right here?

15   A    Hm-hmm.

16   Q    And they go downstream and upstream, and they took some

17   sediment data, and there are figures there of -- in, I think,

18   nanograms per gram dry weight of values that were found at

19   various stations, correct?

20   A    Yes.

21   Q    Now, these are not data that you mention or address in

22   your expert report, correct?

23   A    No.

24   Q    And I believe you testified during your deposition that

25   you didn't know how the data were taken, and so you didn't

CONNOLLY - CROSS-EXAMINATION/BERNARD

3456

1    want to use them, is that correct?

2    A      And -- and I didn't understand the comparability of them

3    to the meth -- methods used by the Study Panel --

4    Q      Okay.

5    A      -- so I didn't know about the comparability of the

6    numbers, the analytical techniques used to analyze for

7    mercury, whether they're comparable.

8           So I was a little nervous about using them for

9    comparative purposes to the Study Panel data.

10   Q      Okay.  Do you have any view as to the relative validity

11   or usefulness of these data compared to the USGS data?  I

12   understand they're about different things, but in terms of

13   quality of data?

14   A      This issue of clean techniques is certainly very

15   important in the water column, um, also important in the

16   sediment, but to a lesser extent, so the issue is not as great

17   with these data as it is for the water column data.

18   Q      Okay.  Let me just close this off by reading you

19   something from your deposition, which I think will be a more

20   efficient way to finish this line of questioning, and this is

21   Plaintiffs' 162, at Page 208.

22          And here -- and, again, you're talking about the use of

23   the USGS data --

24   A      Hm-hmm.

25   Q      -- and explaining that it's only -- you know, you're not

1    overplaying it, but let me just read you what you said here.

2         Okay.  We're talking about ongoing sources here, and

3    we'll get to HoltraChem in a minute, but that's on Page 207.

4         Okay.  And you're saying it's more blue skying at this

5    point, which I think you addressed earlier, right?

6    A    Yes.

7    Q    And let me just read you this.  And the other is the

8    data that we talked about that I agreed is not highly

9    reliable, USGS data.  But, nonetheless, provides at least some

10   sense of the possibility that there were still significant

11   sources coming from upstream into the '80s.  And so, you know,

12   that's a piece of information that, while I would not heavily

13   rely on it, is still sort of a suggestion of something.

14        See that?

15   A    Hm-hmm.

16   Q    Okay.  Now -- then you say, so, yes, there may have been

17   something from HoltraChem, there may have been something from

18   upstream, I can't say anything more than that.

19        I want to know whether you're standing by this statement

20   now that the USGS data provides some sense of the possibility

21   that there were still significant sources coming from upstream

22   into the '80s?

23   A    Yes, and -- and for the following reason.  While --

24   while I'm concerned -- so, for example, when I look back at

25   the data from Lake Champlain, which I expected to all be low,

CONNOLLY/CROSS-EXAMINATION/BERNARD

3458

1   there are -- as I indicated, the detection limit was .01, I

2   think, and occasionally at Lake Champlain, you get a value

3   above the detection limit.

4       At -- the data -- the USGS data at Eddington, I think it

5   was 12 or 13 of 17 measurements were above the detection

6   limit.  So the frequency of detection was higher than I saw at

7   Lake Champlain.  So that's what I mean that, you know, perhaps

8   there's some suggestion, but the data are not really reliable

9   and I would not use them for anything more than just perhaps a

10  suggestion.

11  Q    Okay.  You said in your deposition, when I asked you if

12  you were writing the report as of the date of your deposition,

13  you would omit the section on the USGS data at Eddington.

14       You said -- and I'm quoting now from Plaintiffs'

15  162, Page 123, you said, I would say that I would have

16  seriously considered possibly omitting it, yes.

17  A    Hm-hmm.

18  Q    How about today?

19  A    Same.

20  Q    Same.  In other words, you still want to use it for

21  still sort of a suggestion of something?

22  A    I think it -- it -- it is, at best a weak suggestion.

23  If I was rewriting the report today, I probably would not

24  include it.  Um, but I think -- as I said in my deposition,

25  I'd think about that, but I think my ultimate decision would

CONNOLLY - CROSS-EXAMINATION/BERNARD

3459

1   be not to include it.

2   Q     You have a chance now to retract your use of the USGS

3   data.

4   A     Hm-hmm.

5   Q     For the purposes that you used it in your expert report.

6   Will you do that?

7   A     Yes.

8           MR. BERNARD:  Okay.

9           THE COURT:  Good time to break?  All right.  We'll

10   take our break.  See you in about 20 minutes.

11       (Court recessed from 12:36 p.m. to 1:02 p.m.)

12           THE COURT:  Mr. Bernard?

13           MR. BERNARD:  Thank you.

14           MR. TALBERT:  Your Honor, before we proceed, I just

15   wanted to ask a question on timing in light of your comments

16   this morning and this being our last day of trial.

17       A couple of things, I just want today see if we could

18   allocate enough time to address the last exhibits.  We've had

19   some discussion with plaintiffs about coming to an agreement

20   on admission of the exhibits and reached agreement on most of

21   those.  There's a couple that we have not reached agreement

22   on.

23           And then the other issue was I was going to ask if we

24   could have some small amount of time allocated for -- for

25   redirect, if that's possible.

1           MR. BERNARD:  Well, there's also the posttrial

2    briefing to discuss.

3           THE COURT:  Right.

4           MR. BERNARD:  And you know, I'll stop whenever you

5    ask me to, obviously.

6           THE COURT:  Right now -- no.

7           MR. TALBERT:  No objection.

8           MR. BERNARD:  I'd like to appeal that.

9           THE COURT:  Well, I have -- I have a change of plea

10   set for 3:00 and then two matters set for 3:00 -- one for 3:30

11   and one for 4:00.  So I'm sort of boxed.

12       There really -- I don't -- I don't want to step on your

13   cross-examination.  As you have pointed out, this is a very

14   important case.

15       In terms of -- what I had thought of doing was taking

16   sort of a short break to collect my thoughts before I came in

17   here and talked about my suggestions concerning what we do

18   after trial.  In terms of admitting exhibits, it seems to me

19   that you can do so in one of two ways:  You can -- it may be

20   easier simply to list the exhibits that you have agreed to.

21       Typically in a -- in a case like this, what I would do is

22   ask counsel to go through with the clerk and make sure that

23   the exhibits you think have been introduced are actually

24   introduced because she's the official record keeper, and you

25   may have thought something got in that didn't, and I basically

3461

1   would keep the record open.

2       If -- if it had been a different kind of situation where

3   I could come back into court after you had done that, then I

4   would do that, but it doesn't appear that that's going to be

5   -- that's going to happen today.

6       So the alternative is for you to -- after we complete the

7   testimony, to take some time with the clerk and make sure that

8   what you think is in is in, and then you could do presumably a

9   stipulation, which you could just simply -- I already have the

10  exhibits sitting here.  You could follow up with a posttrial

11  stipulation indicating those exhibits that you all agree

12  should be in.

13      Now, in terms of what you do about exhibits that you're

14  arguing about, how many do you think you might have?  Do --

15  and do you know what those are?

16              MR. TALBERT:  21, and I --

17              THE COURT:  21 that you disagree about?

18              MR. TALBERT:  Yes.

19              MR. BERNARD:  Out of about 1,200.

20              THE COURT:  Oh, I know.  Look, you guys are

21  terrific.  You guys are the -- the lawyers here are wonderful.

22  But -- it's not always the case I get such professional

23  lawyers.  Sometimes we get battles about every single thing,

24  and you have worked together.  I'm not complaining.

25      What you could do is in your posttrial briefing, you

1    could highlight those exhibits -- or -- or you could do it

2    actually, I think for your purposes, you need to have that

3    ruling before you write your memoranda, so why don't you talk

4    to each other and get to -- get back to me with -- or those

5    exhibits that are in dispute, why they're in dispute, and then

6    I can just rule on them and issue a very brief order

7    posttrial, indicating those things that do get in and those

8    things that don't get in.  That seems to me the most sensical

9    way to do it.

10           MR. BERNARD:  That would be fine with the

11   plaintiffs, Your Honor.  We can state our objections very

12   succinctly.

13           THE COURT:  Or how do you -- do you want to do it

14   today just --

15           MR. BERNARD:  You mean.

16           THE COURT:  Set forth the objections and -- and -- I

17   mean, I don't know what the exhibits are, and I don't know

18   what the objections are.

19           MR. BERNARD:  Right.

20           THE COURT:  Are they hearsay-like objections, or

21   what's going on here?

22           MR. BERNARD:  Yeah.

23           THE COURT:  They are?

24           MR. BERNARD:  There are some hearsay objections,

25   yes.  Do you -- well, how do you want to do that?

1           MR. COLANGELO:  Well, we can do it however is

2    fastest.  We can do it today.  I think the only concern is it

3    may inhibit the testimony of Dr. Connolly.  There are about 20

4    or so.  We have a hearsay and prejudice objection for 20 of

5    them.  The 21st is a different objection.  It's -- it's an

6    exhibit that was used with a witness, but the witness

7    testified that it was inaccurate.  So our -- our objection is

8    that it's inaccurate.

9           THE COURT:  So -- you know, my attitude generally

10   about exhibits on a bench trial is that I'm going to admit

11   them for what they're worth, and I can hear your objections

12   and make an evaluation as to the extent to which they're going

13   to influence my decision.

14      If they're -- if someone has admitted the exhibit and

15   then a witness has said it's inaccurate, that may help your

16   side, so in not admitting the exhibit, it may be you've

17   undercut yourself.

18          MR. COLANGELO:  I understand.

19          THE COURT:  So my thought is -- and I don't know

20   which exhibit you're talking about -- but in the context of

21   thing -- things, I'd be likely to admit that exhibit and treat

22   it for what it's worth.

23          MR. COLANGELO:  We withdraw our objection to that.

24          THE COURT:  Okay.  Having thought it through more.

25          MR. COLANGELO:  Having thought it through.

3464

1        The other point of our objection is hearsay and

2   prejudice, and many of them are documents written by

3   scientists who have not testified or have been deposed and

4   they're their comments on different issues in dispute in this

5   case.

6            THE COURT:  Right.  And it's hard for me, without a

7   context, to know whether or not -- I mean, they clearly would

8   be technically hearsay if they're in for the truth of the

9   matter stated.

10       But we have admitted by -- throughout the course of this

11  a lot of things that would be otherwise hearsay.  For example,

12  the reports themselves would be hearsay, and expert reports

13  would be hearsay.  But they do -- they do assist me generally

14  in allowing me to place all these things in context.

15       So I'm not sure where you're going with -- I can -- if

16  you really think they're -- a statement is prejudicial, I can

17  either admit it and take a look at it, or I can take -- if

18  it's really prejudicial and the statement is hearsay, then I

19  -- I think I'd be bound to exclude it under the rules.

20       What's your position on it?

21           MR. TALBERT:  Our position is actually that they're

22  exceptions to the hearsay which would apply as -- a lot of

23  these are records.  You could argue a business record of the

24  Study Panel, which is an official panel assigned by the court.

25  Other, you know, potential -- it was --

1          THE COURT:  Well, we're not going to argue about the

2     Study Panel because it's already in, so --

3          MR. TALBERT:  Sure.

4          THE COURT:  Are you talking about comments from

5     members of the Study Panel?

6          MR. TALBERT:  Well, a lot of these are e-mails from

7     the Study Panel members themselves and other e-mails, as you

8     know, have already been admitted and discussed with them.  So

9     I think it's consistent with the practice we've had so far.

10         THE COURT:  You want some of them in, but not all of

11    them?

12         MR. COLANGELO:  Our position was that they were all

13    hearsay, but we didn't object to the vast majority of them.

14    But we've consented now to an additional 500 going in.  The

15    ones that we're objecting to are not just hearsay, but

16    prejudicial.

17       And the particular concern is they were never shown to

18    the witness, either in deposition or at trial.  And so the

19    witness never had an opportunity to say what many of them

20    said, which was, I later changed my mind, or that's not what I

21    meant, or that's out of context, or there's another e-mail

22    that explains it better.

23         THE COURT:  All right.

24         MR. TALBERT:  I don't think that's any different

25    than memos and other documents that have been admitted that

1   haven't been -- you know, we haven't used all of the documents

2   with witnesses.  They may have a different take on a document,

3   different context.

4           THE COURT:  Okay.  Well, I think the -- I think I

5   got the gist here.  Why don't you -- I think we -- we sort of

6   resolved this.  You've had your argument on it.

7       Why don't you list those exhibits that you think fall

8   into that category; you can tell me why you think they're

9   prejudicial; I'll -- you can tell me why you think they ought

10  to be admitted.

11      Why don't -- how long do you think you might need to do

12  that post -- posthearing?

13          MR. COLANGELO:  Two hours.

14          THE COURT:  Two hours.

15          MR. COLANGELO:  Not long.

16          THE COURT:  Yeah.  So why don't -- why don't we do

17  it -- you've got -- you guys have earned a break, and you're

18  going to take one, I assume, I hope you are.

19          MR. BERNARD:  I hope so.

20          THE COURT:  I'm not, by the way.  I've got a trial

21  down in Portland that's going to take about three weeks on the

22  10th, so --

23          MR. BERNARD:  It's tough to be a judge.

24          THE COURT:  Yeah, it is, every once in a while, but

25  it's good, too.

```
 1        What -- why don't you tell me when you want to file

 2   something.

 3             MR. BERNARD:  Okay.  Just one second.

 4        (Mr. Bernard speaking with Mr. Talbert.)

 5             MR. BERNARD:  Your Honor, can we file -- I think

 6   everybody does want to take next week off, if possible, how

 7   about Thursday of the following week?  I don't think I know

 8   the date.  Can somebody get that?

 9             MR. COLANGELO:  10th.

10             MR. BERNARD:  July the 10th, July 10th, would that

11   be okay?

12             THE COURT:  That's fine.

13             MR. BERNARD:  We can just submit simultaneously and

14   then --

15             THE COURT:  That's fine, and then I can kick out a

16   ruling on whether or not I'm going to admit them and then you

17   can know what's in evidence for purposes of your argument.

18   All right?

19             MR. BERNARD:  Sure.

20             THE COURT:  Now, was there anything else -- I'm --

21   is there anything else we need to discuss before you proceed?

22             MR. BERNARD:  Actually, while we're on exhibits, can

23   I just take care of one little just housekeeping matter.  I

24   neglected, just because of a misnumbering to offer into

25   evidence, I don't think there's an objection, Plaintiffs'
```

3468

1    Exhibit 2.

2         It's just when you -- when you admitted a bunch of

3    them, that wasn't one of them.  So I'd like to offer into

4    evidence Plaintiffs' Exhibit 2, please.

5              THE COURT:  Any objection?

6              MR. TALBERT:  No objection.

7              THE COURT:  Okay.

8              MR. BERNARD:  And one --

9              THE COURT:  Plaintiffs' Exhibit 2 is admitted.

10             MR. BERNARD:  And one other, sorry.  One other

11   thing, we have Plaintiffs' Exhibit 170 in evidence.  It's a

12   data summary.  We have the disk which provides the data that

13   the Exhibit 170 summarizes now as part of Exhibit 93, and so

14   the question is whether we should move that disk from 93,

15   which is not in evidence, to become part of 170 as the basis

16   for the data summary?  And I -- I would move that we do that.

17             THE COURT:  All right.

18             MR. BERNARD:  I think that's the better way.

19             THE COURT:  That's fine.  So what are you going to

20   mark that as 170-A or something?

21             MR. BERNARD:  Yes.  So we'll mark the disk, which is

22   now part of Plaintiffs' 93, as 170-A, and the disk provides

23   the data that Exhibit 170 summarizes.

24             THE COURT:  Any objection to 170-A?

25             MR. TALBERT:  It sounds like a reasonable suggestion

1    if it's already in.

2              THE COURT:  Formerly 93?

3              MR. TALBERT:  Yes.  Yeah, that's fine.

4              THE COURT:  Okay.  170-A, formerly 93 is admitted.

5              MR. BERNARD:  Just one other thing, Your Honor, if

6    -- we're going to talk, I assume -- you're going to give us

7    your thoughts about what we do next, and if you -- I just

8    would like a sense of when you want to do that so I know how

9    long I have.

10             THE COURT:  Well, had you -- just give me an idea of

11   what -- if you had control of the schedule, how far would you

12   go?

13             MR. BERNARD:  I would take --

14             THE COURT:  How much longer?

15             MR. BERNARD:  Hm, probably 'til 2:30.

16             THE COURT:  Okay.

17             MR. BERNARD:  But, you know, I can cut and move

18   faster and do it in an hour if -- and that would leave us

19   15 minutes.

20             THE COURT:  And what do you -- how much do you --

21   would you have on redirect?

22             MR. TALBERT:  10 -- 10 minutes, 15 minutes.

23             THE COURT:  Well, I'll leave it up -- my thought

24   about it is you have one of two options.  I think he has -- I

25   think he should be able to redirect the ten minutes that he's

3470

1    asked for, so I'm going to cut you off about an hour from now
2    or so to give him an opportunity.
3              MR. BERNARD:  Okay.
4              THE COURT:  To redirect.
5              MR. BERNARD:  That's fine.
6              THE COURT:  If you do need -- if you feel, as you
7    did with another witness, that you haven't gotten important
8    points and you need to depose him, you might be able to
9    arrange it later this afternoon?
10             MR. BERNARD:  Okay.
11             THE COURT:  I do -- I've seen him.  He's testified.
12   I have a sense for his credibility.
13             MR. BERNARD:  All right.
14             THE COURT:  So that's not an issue.
15             MR. BERNARD:  I appreciate that.  I'm going to do my
16   best to finish so we can all be finished.
17             THE COURT:  Okay.  Now, the only other thing is if
18   you wrapped up at 2:30, I want to take a bit of a break and
19   just collect my thoughts before I come back in.
20        I'm going to take about ten minutes at 2:30, and then
21   we'll go -- we'll talk for about ten minutes because I -- I do
22   have a three o'clock hearing here.
23             MR. BERNARD:  Okay.  Okay.  So you want me to stop
24   at around an hour; is what you're saying, right?
25             THE COURT:  Yes, but I'm also indicating to you -- I

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

1   do want you to stop at 2:30, and the court reporter's going to

2   be leaving at 2:30, so we'll do this on the --

3       (Court speaking with the court reporter.)

4           THE COURT:  Okay.  So she's agreed to stick around.

5   What we're going to do then is we'll take a break at 2:30.

6   I'll come back in in about ten minutes, and then just about a

7   ten-minute colloquy with you given -- I'll give you some

8   thoughts about what I'm looking for.  All right?

9           MR. BERNARD:  Yes.

10          THE COURT:  Good.

11          MR. BERNARD:  Okay.

12                  CONTINUED CROSS-EXAMINATION

13  BY MR. BERNARD:

14  Q    So, Dr. Connolly, we're going to try to move as swiftly

15  as we can.  Okay?  All right.  I just want to finish up on

16  ongoing sources.  We've talked about the USGS data.

17      A second possible ongoing source that you thought might

18  have influence into the late 1990s was ongoing releases of

19  mercury from HoltraChem; is that right?

20  A    I thought that was a possibility.

21  Q    Okay.  Now, I don't -- I don't want to belabor this, but

22  would you agree that whatever might have been coming in from

23  HoltraChem was -- was relatively small?

24  A    The -- the estimates are relatively small.

25  Q    Okay.  So if you look at the back of Chapter 3, so this

 1   would be Joint Exhibit 6-3, at Page 3-103, do you recognize

 2   this?

 3   A     Yes.

 4   Q     Okay.  So this is a chart, I guess Dr. Yeager -- no,

 5   maybe Dr. Turner prepared, but, in any event, it's -- it deals

 6   with, by year, both by source, outfalls in streams and then a

 7   total gram per day discharge from the plant to the river,

 8   right?

 9   A     Yes.

10   Q     And it's very, very high in these early years of the

11   plant's operation, right?

12   A     Yes.

13   Q     Okay.  When we get down into the period we're talking

14   about, into the '80s or so, in the late '80s, Dr. Santschi's

15   cutoff was here in 1988, right?

16   A     Yes.

17   Q     Okay.  So the total in that column with the 42 is the

18   total grams per day discharge from the plant, right?

19   A     Yes.

20   Q     Okay.  So according to this chart, it stays at 42, down

21   through 1995, then if you go to the next page, 3-104, it stays

22   at 42 grams per day through 1999.  Do you see that?

23   A     Yes.

24   Q     Okay.  And then it dips down by 10 grams a day, and then

25   again by another 25 grams a day or so in about 2005?

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3473

1    A    Yes.

2    Q    Okay.  So does this kind of support the testimony you

3    just gave, that any change -- any input from the plant at this

4    point in time would have been -- would have been very small?

5    A    This estimate of it is -- is very small, and, again, I

6    was -- I was just positing the possibility that there were

7    higher discharges.

8    Q    Okay.  But compared to the legacy mercury that was in

9    the sediments of the river, this input from the plant would be

10   -- would be inconsequential; is that fair?

11   A    In terms of the inventory of mercury in the system, yes.

12   Q    Okay.  So now, we've talked about the USGS data or

13   what's coming over Veazie Dam.  We've talked about inputs from

14   the plant.  And the third element you said that provided some

15   evidence, um, was the mussel data, right, from Penobscot Bay?

16   A    Yes.

17   Q    Okay.  And we looked at a chart -- I don't want to go

18   over that again because this -- I would show you the same

19   chart we looked at earlier.

20   A    Hm-hmm.

21   Q    Do you remember when we looked at that?

22   A    Yes.

23   Q    Okay.  And that is the chart that would have the data

24   that would provide the basis for that possible evidence of an

25   ongoing source?

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

1    A    Yes.

2    Q    Okay.  So I want to show you now -- I want to talk about

3    some of the cores that you analyzed.

4    A    Hm-hmm.

5    Q    And let me show you from Joint Exhibit 45, which is your

6    expert report, Figure 4-1.  So this is Joint Exhibit 45,

7    Figure 4-1.  Do you recognize that?

8    A    I do.

9    Q    Okay.  And this is a map of the coring locations for the

10   study?

11   A    It is.

12   Q    Okay.  Let me see if I can zero in -- whoa.  Okay.  So I

13   just want to ask one thing to get clarity on.  So here are the

14   Mendall Marsh cores in here, right?

15   A    Hm-hmm.

16   Q    So where -- just highlight core 3B in Mendall Marsh,

17   please, for the judge.

18   A    Right there.

19   Q    Okay.  And where's 4C?

20   A    Right there.

21   Q    Okay.  So those are very close together, right?

22   A    Yes, relatively close together.

23   Q    Okay.  Now, would you expect that the effect of ongoing

24   sources on these two cores would be similar, or would you --

25   based on their geographic proximity, or would you not?

1  A     Yes.  The complicating factor is differences in

2  sedimentation rates, which do vary considerably from location

3  to location.

4  Q     Okay.  So I just want to show you 179 -- Plaintiffs'

5  179, which you referred to earlier, and this is, as

6  Mallinckrodt's counsel pointed out, a chart that -- let's see

7  if I can get this to be more visible.  Okay.  Good.

8        So you recognize this, right?  We --

9  A     Yes, I do.

10 Q     This -- this is a chart from your expert report, right?

11 A     It is not.

12 Q     No, I'm sorry.  This is an adaptation -- this is your

13 Table 5-1 with some information added, right?

14 A     Yes.

15 Q     Okay.  So what's added here are -- are these date

16 ranges, right?

17 A     Yes.

18 Q     Which you testified to.  And then the second page of

19 Plaintiffs' Exhibit 179 is this kind of -- I don't know what

20 you call it.  Is that a scatter plot, something?

21 A     Hm-hmm.

22 Q     Okay.  And this sort of arrays the data by core, and it

23 shows what interval in the core by year you analyzed; is that

24 fair?

25 A     It -- it shows somebody's interpretation of that, which

1    I don't agree with.

2    Q    Okay.  So you don't agree that that's accurate?

3    A    No, for the reasons I gave before about the fact that in

4    these cores, we're looking at several years, in some cases,

5    within a single layer.

6    Q    Okay.

7    A    And also just the uncertainty with dating these cores.

8    So none of these estimates are precise --

9    Q    Okay.

10   A    -- by any means.

11   Q    Understanding that, the -- you see that the data, which

12   I represent to you are -- are, I think, faithful

13   representations of these approximate date ranges,

14   understanding that you're -- what you've said about those

15   approximations, for 3B --

16   A    Hm-hmm.

17   Q    -- and 4C, there's a little overlap, but they're very

18   different, aren't they, in terms of what you -- what you

19   selected for analysis?

20   A    Yes, and I don't think you can look at the top -- and

21   the date range there is really uncertain and actually maybe

22   all the way up to there.  But, yes, there is difference in how

23   far back in time I looked at in 3B and 4C.  Again, I was being

24   guided by looking at trends from the surface to where the

25   trends broke, and they -- they did appear to break differently

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3477

1    in these two cores.

2    Q    Okay.  So let's just look at a few of the -- and, again,

3    you did a lot of them, and so -- and we're going to look at

4    just a couple that I want to ask you some questions about, and

5    these are the -- just give me one second.

6         These are the figures that you prepared for the cores

7    that you analyzed, and I want to show you 5-2D, which I

8    believe is one of the Mendall Marsh cores.

9         Okay.  So this is your expert report, Joint Exhibit 45,

10   Figure 5-2D, and this is Mendall Marsh core 5C, right?

11   A    Yes, it is.

12   Q    Okay.  Now, you derived -- do you remember the half-time

13   you derived for this core?

14   A    I do not.

15   Q    I believe it's 16 -- 16 years?

16   A    Hm-hmm.

17   Q    But the record will clarify that if it's not -- if it's

18   unclear or if it's wrong.

19        Now -- and you don't remember what's -- Santschi --

20   Dr. Santschi came up with 25 years for this core.

21   A    Okay.

22   Q    That's just background.

23   A    Hm-hmm.

24   Q    Now, you cut out here -- this whole section here in

25   total mercury down to the dotted line, is that what

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

1    Dr. Santschi would have considered?

2    A    Yes.

3    Q    Okay.  So you cut out something at the top --

4    A    Hm-hmm.

5    Q    -- and something at the bottom, right?

6    A    Yes.

7    Q    Two data points at the top and two data points at the

8    bottom?

9    A    Yes.

10   Q    Okay.  Now, is the effect of cutting out those points --

11   do you know -- to give you a faster recovery time, as compared

12   to using the whole 21-year section?

13   A    Yes, I -- using the data this way -- right -- that's the

14   line you would get.  If you used all the data, the line might

15   look more like that.  So there's considerable overlap, but,

16   yes, it would have been a slightly shallower line.

17   Q    Okay.  So that might account for the difference between

18   the 16 and 25 years that you came up with and Dr. Santschi

19   came up with?

20   A    It accounts for certainly part of that difference.

21   Q    Okay.

22   A    The other may be just some differences in estimates of

23   sedimentation rate.

24   Q    Now, one of the things you look for, as I understand

25   it -- correct me if I'm wrong -- is you look for decreasing

1    lead with depth, right?

2    A    Yes.

3    Q    And would you say you have that throughout this core?

4    A    Yes.

5    Q    Okay.  And another thing you look for is reasonably flat

6    cesium, right?

7    A    Yes, although that was -- I didn't pay a lot of

8    attention to it, but I was just looking to make sure there

9    wasn't any kind of crazy pattern to the cesium.

10   Q    Okay.  And do you see anything crazy there?

11   A    No.

12   Q    Okay.  Do you agree that it's better, all things being

13   equal, to have more data points or observations than fewer

14   when you're analyzing a core this way?

15   A    I guess the key is all things being equal.  Um, all

16   things being equal, more data is always better.

17   Q    Because it gives you a little more confidence.

18   A    Yes, all things being equal.

19   Q    Okay.  Was there anything about the top here in total

20   mercury or the bottom that sort of disqualified those sections

21   of the core from consideration for you?

22   A    One of the issues in the top is there is evidence in the

23   cores that Drs. Santschi and Yeager note -- noted of mixing,

24   and mixing that might occur over the first several

25   centimeters, so I was sensitive to that, looking to see

1   whether there was any evidence of mixing.

2       Um, because the profile flattened out here and because

3   the cesium was flat, the -- the lead doesn't support that, but

4   it's kind of an odd pattern because there's this rapid drop,

5   which, if you believed it, was -- suggests that there wasn't

6   much deposition going on right here.

7       Um, I decided that I would begin below that.

8   Q    Okay.  Anything further?

9   A    No.

10  Q    Okay.  Let me show you another one, which is

11  Figure 5-2F, also from Joint Exhibit 45, your expert report.

12  A    Hm-hmm.

13  Q    And this is Mendall Marsh core 7A.  Okay?

14  A    Yes.

15  Q    All right.  Now, here -- you testified to this

16  yesterday, I think -- from 9 to 13 centimeters or so, down

17  here on the mercury --

18  A    Yes.

19  Q    -- you excluded that, right?

20  A    Yes.

21  Q    Now, on the lead, you have a pretty steady decline

22  through that 9- to 13-centimeter section?

23  A    Yes.

24  Q    Okay.  That is a decline with depth, right?

25  A    Yes.

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3481

1   Q      And you see anything crazy about the cesium down in that

2   section?

3   A      I do not.

4   Q      Okay.  And yet you cut out five data points here, right?

5   A      Ah, recall that what I did -- the procedure I was using,

6   criteria that I used was to start at the surface and continue

7   down and stop where the trend breaks, um, because the

8   sediments closest to the surface are the most recent ones.

9          So -- so if you look at this core, the surface is

10  sitting at about 600, and it's getting higher and higher and

11  higher, and we hit about 1,200 at about this point in the

12  core.  So that information is important to me to tell me that

13  over that period of time, whatever that represents,

14  concentrations went from about 1,200 to 600.  So that -- that

15  portion of the core is giving me the half-time already.

16         I can continue to go back, and if the trend remains the

17  same, that won't change, but if I begin to incorporate this

18  period, I would -- I would get a model that would say we

19  didn't reach 1,200 until deeper in the core, which would be

20  inconsistent with the data there.

21         So one of the concerns is when you combine one trend,

22  like we see from the surface down to about 9 centimeters, with

23  a different trend below it, that different trend below it

24  begins to influence your view of what's going on in the upper

25  9 centimeters.  And I didn't think that was appropriate, and

1   so that's why I -- I cut it as I did.

2   Q    How do you --

3   A    But that's professional judgment.

4   Q    That was -- I'm sorry.  You say that's a matter of your

5   judgment.

6   A    That's a matter of my judgment.

7   Q    Okay.  And someone else could reach a different judgment

8   about that; is that fair?

9   A    Someone else could look at this and reach a different

10  judgment, yes.

11  Q    All right.  Now, had you included the bottom five data

12  points below 9 centimeters --

13  A    Hm-hmm.

14  Q    -- would you -- how would that have affected the

15  recovery time?

16  A    It would have caused the recovery time to -- to be

17  longer, as I indicated, because it would have caused you to

18  have included a period where things weren't changing.

19  Q    Okay.  Let me show you just one more, and then we'll

20  move on, and this is 5G --

21  A    Hm-hmm.

22  Q    -- which is Mendall Marsh core 8A, and this is, again,

23  from Joint Exhibit 45, your expert report.

24  A    Yes.

25  Q    Do you recognize this?

1    A       I do.

2    Q       Okay.  So, here, you used three data points; is that

3    right?

4    A       I did.

5    Q       Okay.  Now, are those the three data points in the

6    mercury profile that give you the fastest recovery time?

7    A       They are.

8    Q       And I think you said earlier that the fewer data points

9    you have -- well, let's put it this way.  Withdrawn.

10           You said earlier that the more data points you have, the

11   more reliable the estimate is?

12   A       The less uncertain the estimate is.

13   Q       Okay.  I --

14   A       The fewer data points, the more uncertainty in the

15   estimate.

16   Q       I stand corrected.  Do you see anything in the cesium

17   throughout that profile?

18   A       Ah, no --

19   Q       Anything crazy?

20   A       Nothing's odd about the cesium profile.

21   Q       Okay.  And what about the lead?

22   A       The lead suggests mixing because there's no drop in the

23   surface sediments, ah, in lead content.

24   Q       But you have a fairly -- I mean, up until this point

25   above 2 centimeters, I mean, you -- it doesn't -- I mean,

1   there's certainly a declining trend; wouldn't you say?

2   A    Yes.

3   Q    Okay.  All right.  Now, I want to show you a couple of

4   profiles to just pick up on something we talked about earlier.

5   Let me represent to you this is Plaintiffs' Exhibit 180.

6   These are taken from Dr. Yeager's data, and I don't know if

7   you yourself -- this is Plaintiffs' 180, and this works off

8   Dr. Yeager's data.

9        And this is -- you mentioned earlier that there were two

10  cores in Mendall Marsh that you did not analyze -- or you

11  analyzed but didn't use in your calculations, right?

12  A    And Dr. Santschi came to that same conclusion.  He did

13  not include them.

14  Q    I'm sorry.  Please complete your answer.

15  A    Yes, Dr. Santschi did not include them either.

16  Q    Right.  And that's because there was increasing mercury

17  toward the surface of the core?

18  A    No.

19  Q    No?

20  A    That was -- that was because the evidence in the core

21  from the radio tracers and the mercury was that this was not a

22  location that has continuously accumulated sediment over

23  history.

24  Q    Now, this is in Mendall Marsh, right?

25  A    This is in Mendall Marsh, yes.

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3485

1    Q    Okay.  So the profile you have here, down here at about

2    90 centimeters or a little less, you have very low mercury,

3    right?

4    A    Hm-hmm, yes.

5    Q    And then it goes up, and then you get a -- kind of a

6    spike, and then a back and forth, and now it's -- or 2009,

7    when the core was taken, somewhere looks like 1,050 to 1,100

8    nanograms per gram at the surface?

9    A    Hm-hmm, yes.

10   Q    Okay.  Now, if you wanted to calculate a recovery

11   half-time here for this core, could you do it?

12   A    No, it's inappropriate to do it.

13   Q    Okay.  And is it inappropriate, in part, because

14   there's -- there's no exponential decline, or are you

15   referring to a different reason?

16   A    It's inappropriate because this core does not contain a

17   continuous record of what was depositing out of the mobile

18   sediments.

19   Q    Okay.  But you would agree that it is a core, the most

20   recent data for which indicates that at the surface you've got

21   over a thousand nanograms per gram of mercury?

22   A    Yes.

23   Q    Okay.  So let me show you -- I'm going to just show you

24   a few of these.  We talked earlier about the Orland River, and

25   do you remember how many cores there were in the Orland River?

1    A    Five or six.

2    Q    Four or five -- five or six?  And you analyzed -- I

3    think it was calculated one of them, right?

4    A    Yes.

5    Q    Because you didn't find the others to be suitable.

6    A    Correct.

7    Q    Okay.  So this is also part of Plaintiffs' Exhibit 180.

8    This is Orland River core 1B.

9    A    Hm-hmm.

10   Q    What do you see here?

11   A    You see an increasing trend towards the surface and the

12   maximum at the surface.

13   Q    Okay.

14   A    The radio tracer data, along with this, indicate that

15   this is not a location that has accumulated sediments to the

16   present.

17   Q    Okay.  But it is a -- a location where mercury

18   is accumulating now near the surface, right, or -- or as of

19   2000 --

20   A    No, I actually have a different interpretation for this

21   core.

22   Q    Okay.  So you -- you wouldn't look at this and say

23   mercury's accumulating.  Maybe I misspoke.

24        It's a location at which, when it was sampled, there was

25   mercury increasing at the surface relative to what was beneath

1    the surface; is that fair?

2    A     Mercury is higher at the surface than it is beneath the

3    surface at this location.

4    Q     Okay.  So let's look at another one.  This is Orland

5    River 2B, so this is another Orland River core.

6    A     Hm-hmm.

7    Q     And this is not one that factored into your

8    calculations, right?

9    A     It did not.

10   Q     Okay.  And you see here that you've got this kind of

11   spike up to about 2,600 or so nanograms per gram, and then it

12   comes back down, and then it -- it trends back up to about --

13   it looks like -- maybe 1,900 or so nanograms per gram at the

14   surface when the core was taken?

15   A     Yes.

16   Q     Okay.  And, again, that's not -- this is not a core that

17   factored into your calculation, right?

18   A     The radio tracer data for this core don't support that

19   it is a location that continually accumulated sediments, you

20   know, uninterrupted over time to the present.

21   Q     Okay.  But -- but it is a location where there is high

22   mercury at the surface level of the sediment, right?

23   A     Yes.

24   Q     Okay.  Now, I show you just a couple of Penobscot River

25   cores.  13B, this is not -- this is Plaintiffs' Exhibit 180

1    still.  This is not one that you calculated, right?

2    A    No, again --

3    Q    You didn't calculate the half-time?

4    A    This is -- this is a core that doesn't qualify.

5    Q    Okay.  Now, what you see in this core is a -- kind of a

6    very significant jump toward the surface to somewhere around

7    1,100 nanograms per gram, right?

8    A    Yes.

9    Q    Okay.

10   A    And I think that that's a core that's clearly disturbed,

11   and the radio tracers say it's disturbed.  And this jump here

12   at the surface I think is an indication of the deposition of

13   some material from another nearby location that had high

14   concentrations at the surface that had been deposited there.

15   Q    Okay.  So one of the things that goes on in the estuary

16   is that mercury moves around, and it may land at a place, and

17   if you -- you take a core sample in that place at a point in

18   time, there may have been a recent arrival of

19   mercury-contaminated sediment, which gets picked up in the

20   core and measured.

21   A    Possibly.

22   Q    Is that right?  Right.  So let me just show you one last

23   one.  This is 26A.

24   A    Hm-hmm.

25   Q    This is not one for which you calculated half-time,

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3489

1    right?

2    A    Again, the radio tracer data did not support --

3    Q    Okay.

4    A    -- that it's a depositional -- continuously depositional

5    location.

6    Q    And this shows a trend, at least with these last four

7    data points, up to about maybe 1,040 micro -- nanograms per

8    gram at the surface, right?

9    A    Yes.

10   Q    Okay.  So one of the things you said earlier I wanted to

11   ask you about is that the Mendall Marsh cores, in your view,

12   kind of represent the whole ecosystem in terms of recovery

13   rates; is -- am I characterizing that fairly?

14   A    What they represent, in my view, is the rate at which

15   the mobile sediments are recovering.  All right.  And so we've

16   got these sediments that are getting mobilized at various

17   frequencies and moving around in the system through the water

18   column.

19        At locations where they can deposit and not be

20   disturbed, over time, we get a record of what's been happening

21   in those mobile sediments.  That record shows that the mobile

22   sediments have been declining in mercury concentration.

23        That decline in mercury concentration reflects declines

24   in all the sources of mercury to the mobile sediments, which

25   would include external and internal sources, some of which is

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3490

1    erosion from sediments in other places.

2         So the -- the sources to the mobile sediments have been

3    declining, and those sources, I think, include a lot of

4    diffuse sources from sediments within the system.  We see no

5    evidence of hotspots in the system.  So I'm pretty convinced

6    there's this sort of random mosaic of concentrations, and

7    there are locations that have higher concentrations at the

8    surface that probably and may very well be contributing to the

9    mobile pool and, in fact, influencing the rate at which it is

10   able to decline.

11        And if, in fact, they were hotspots, identify --

12   identifiable local hotspots, then that would be useful

13   information.  But as of right now, the data suggests that

14   they're -- they're sort of a patchwork around the system.

15   Q    The Study Panel calculated recovery half-times for

16   different -- different compartments of the ecosystem; is

17   that -- is that right?

18   A    They did.

19   Q    So they did one for the main stem, right?

20   A    They did.

21   Q    One for -- I'm not asking you whether you agree.

22   A    Yes.

23   Q    I'm just asking you whether -- okay.  One for Mendall

24   Marsh?

25   A    Yes.

1    Q     One for the Orland River?

2    A     Yes.

3    Q     And one for kind of the lower estuary, kind of Fort

4    Point area?

5    A     Yes.

6    Q     Okay.  Do you think that's the wrong way to look at it?

7    Do you think there should be just one recovery time for that

8    whole area, recovery half-time?

9    A     I think that there's one recovery half-time for the

10   mobile sediment pool, which the Study Panel believes transits

11   the upper estuary and is sort of spending most of its time in

12   the upper estuary and slowly bleeding out.

13         And so what the Mendall Marsh cores are reflecting,

14   since they see those mobile sediments, is what that pool is

15   doing.  So the estuary downstream, the bay downstream may, in

16   fact, be recovering at a different rate than the upper

17   estuary, but I believe the Mendall Marsh cores are giving us

18   the best estimate we have of how quickly the mobile sediments

19   in the upper estuary are declining.

20   Q     Let's say I want to know when the Orland River part of

21   the system is going to reach 450 nanograms per gram, and right

22   now, I think -- do you recall the -- it's over a thousand,

23   right, the -- the surface mercury sediment in the Orland

24   River?

25   A     I believe the average is over a thousand.

1   Q    Okay.  Are you saying that the Mendall Marsh cores cover

2   that, or is that a different question?

3   A    I think that's a different question.

4   Q    Okay.  Now, on that, you agree with Dr. Santschi, right,

5   because his view is that, while the Mendall Marsh cores are

6   the -- the best representation rel -- not the only

7   representation, but the most quiescent area, that that doesn't

8   cover the Orland River?

9   A    Likely not because the -- unless we find evidence that

10  there's close communication between this mobile sediment

11  that's moving back and forth and the Orland River, then it

12  would -- it would not necessarily be the appropriate number

13  for the Orland River.

14  Q    So your half-time for Mendall Marsh does not answer the

15  question, when will the Orland River recover to 450 nanograms

16  per gram from its current state of mercury contamination; is

17  that correct?

18  A    I -- I think likely not.  I think that would be an

19  extrapolation beyond the area that we understand is the

20  connection.

21  Q    So you say likely not, is the answer to my question yes,

22  or should I say it again?

23  A    I think you have to say the question again.

24  Q    Okay.  Are you saying that the -- if I want to know when

25  the Orland River is going to recover to 450 nanograms per gram

1  in total mercury in surface sediment, I would not look to the

2  Mendall Marsh recovery half-time you have calculated to answer

3  that question; is that correct?

4  A    I would agree with that.

5  Q    Okay.  Now, in terms of Mendall Marsh, you testified --

6  and this is a confusing area, but it's arithmetic, I think,

7  and it has to do with asymptotes and half-times.  So if you

8  could help just clarify this, I'd appreciate it.

9       Mendall Marsh is now at about 500 nanograms per gram?

10  A    The marsh platform is --

11  Q    The marsh platform.

12  A    The marsh platform is about 500.

13  Q    And is that the relevant figure to use if we want to

14  look at how long it's going to take Mendall Marsh to get to a

15  hundred nanograms per gram, or should we use a different

16  number?

17  A    I think we need to go back to what I had indicated to

18  you earlier, that the behavior on -- on that marsh platform,

19  it's tough to generalize right now because there are these

20  tremendous concentration gradients on the platform, and -- and

21  there are complications we talked about in terms of

22  methylation and variability of methylation.

23       So what is happening on the marsh platform in terms of

24  recovery, limits to recovery, I think is an issue that still

25  needs to be explored.

1    Q     I understand.  I'm trying to ask a simpler question.

2    A     Okay.

3    Q     But I may not have done it well.

4          Let's assume Mendall Marsh is at 500 nanograms per gram.

5    A     Yes.

6    Q     Okay.  And let's assume that we aim to get it down to a

7    hundred nanograms per gram.

8    A     Yes.

9    Q     Okay.  And so -- and let's assume the half-time is --

10   the average half-time is 15 years.

11   A     Yes.

12   Q     Okay.  How long will it take me to get from -- take us

13   to get from 500 to 100?

14   A     One half-time will take you from 500 to 250.

15   Q     Why is that?  Are you using an asymptote of 0?

16   A     That is using an asymptote of 0.

17   Q     Why wouldn't you use an asymptote of 100?

18   A     Because I don't know that that's the asymptote for

19   Mendall Marsh.

20   Q     But I'm -- is the asymptote equal to the concentration

21   you want to get to?

22   A     No, no, not at all.

23   Q     Okay.  So how do you -- so why are you using 0 as the

24   asymptote?

25   A     Because I don't know what the asymptote is in Mendall

1   Marsh.

2   Q    Okay.  So I'm going to ask you to assume that we're at

3   500 -- are you with me -- and that we want -- that the

4   asymptote is 100.

5   A    Yes.

6   Q    Okay?  And that the half-time -- average half-time is

7   15 years.

8   A    Right.

9   Q    Okay?  Please take me from 500 to 100 in time.

10  A    If the asymptote is 100, now that we're -- this is a

11  hypothetical.

12  Q    Yes, it's a hypothetical.

13  A    So the portion that's recovering, since you -- the

14  asymptote is fixed, would be the difference between 500 and

15  100.  So you have a 400 delta that can recover.

16       In one half-time, that 400 delta would get you to 200 --

17  I'm -- 200 plus the 100 underneath it, the asymptote, so the

18  actual number would be 300.  Right.  The delta is declining in

19  half, so --

20  Q    Okay.  So in 15 years, in my hypothetical, you'd be at

21  300.

22  A    It go from 500 to 300.  And then in two half-times, that

23  delta would go from 200 to 100, so in two half-times, you

24  would be at 200.

25  Q    Okay.  So now we're at two half-times.

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3496

1    A    Yes.

2    Q    We're at 200.  What happens next to get me to 100?

3    A    That -- that delta goes from 100 to 50, and so in three

4    half-times, now it's the asymptote of 100 plus the increment

5    of 50, it's 150.

6    Q    So to get to 150, it would take me three half-times,

7    which, using your number, not Dr. Santschi's, not

8    Dr. Driscoll's, so that would be 45 years to get to 150; is

9    that correct?

10   A    In this hypothetical.

11   Q    Yes.

12   A    Yes.

13   Q    And then what would happen in the next 15-year segment?

14   A    You would take that increment of 50, and it would become

15   25, and -- and so on.  And --

16   Q    Okay.

17   A    In the sort of world of half-times, you never actually

18   truly get there.

19   Q    All right.  But to get close, to get to 125 --

20   A    Yes.

21   Q    -- it would take four half-times, correct?

22   A    Yes.

23   Q    To get from 500 to 125?

24   A    Right, recognizing that -- that in the previous

25   half-time, you've -- you've already gotten pretty close, so

1    the -- the levels are dropping.

2    Q    Yes.

3    A    But to answer your question, to get to that number of

4    125 would take that many half-times.

5    Q    It would take four half-times, or using your average,

6    60 years, correct?

7    A    Yes.

8    Q    Okay.  Let's turn to remedial alternatives.

9         When you rendered your opinions concerning active

10   remedies, did you consider any possible remedy other than the

11   ones set forth in Chapter 21 of the Phase II Report?

12   A    No.

13   Q    Do you view the Study Panelists as being experts in

14   mercury remediation?

15   A    No, my understanding of their expertise is -- is that it

16   does not include remediation.

17   Q    Putting to the side -- putting to one side whether you

18   thought they were good conceptual ideas, would you agree that

19   what they put forward in Chapter 21 was really a -- kind of a

20   set of concepts?  I mean, it wasn't really a remedial plan.

21   Would you agree with that?

22   A    It was not a remedial plan.  It was a set of approaches

23   to remediation that they presented as recommendations.

24   Q    Now, you oppose bank-to-bank dredging in the Penobscot,

25   correct?

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3498

1    A     Yes.

2    Q     Okay.  Do you know of anyone who favors that?

3    A     Um, I do not, no.

4    Q     And do you also oppose selective dredging?  Is that

5    something that you think should be ruled out, in other words,

6    dredging on a smaller, more targeted scale?

7    A     I think that's actually going to happen in the system.

8    I think Southerly Cove is going to be dredged, so there --

9    there is going to be targeted dredging.

10         Whether -- whether it's appropriate to have dredging

11   beyond that, I don't think there's evidence that would

12   indicate that there are hotspots that you could go after in

13   the same way you would go after Southerly Cove.

14   Q     Do you rule that out?

15   A     I think there's no evidence that would lead you to it at

16   this point.

17   Q     Okay.  You're not ruling it out, I take it, for all

18   time, then, because there may be some additional evidence that

19   appears that would cause you to rethink that?

20   A     Um, if -- if such evidence appeared, it -- it could

21   change, and I think there'd have to be a consideration of the

22   pluses and minuses of dredging versus alternative ways to deal

23   with what was found in the future, which could, for example,

24   include capping or perhaps amendments to the sediment.

25   Q     Did you work for General Electric on the Hudson River

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

1   PCB cleanup?

2   A      Yes, I did.

3   Q      And did you supply technical support for GE's argument

4   that dredging in the Hudson would be ineffective?

5   A      What I did was provide support through various analyses

6   and mathematical modeling that indicated that dredging would

7   provide, at most -- and the way -- the way that we were

8   looking at this was in terms of hitting targets for fish, that

9   it would provide a marginal benefit in terms of shortening the

10  time to hit the targets relative to natural recovery.

11  Q      And EPA disagreed with you; is that fair to say?

12  A      Yes.

13  Q      Okay.  And the dredging -- it ordered dredging, which is

14  now ongoing?

15  A      Yes.

16  Q      Okay.  Now, one of the things you did was you warned

17  that resuspension could cause significant negative impacts on

18  the Hudson, right?

19  A      Yes.

20  Q      From dredging?

21  A      Yes.

22  Q      Okay.  And are you aware of how the dredging project is

23  going on that score right now?

24  A      The -- the dredging project is showing that there is, in

25  fact, resuspension, um, and I think I indicated in my direct

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

1    testimony that that resuspension really depends upon how fast

2    the river's moving.

3         And for most of the time now, when they're dredging, the

4    river's actually fairly quiescent, it's moving fairly slowly.

5    And what they're finding now is that about 1 percent of the

6    PCBs that they're trying to take out wind up being released to

7    the river.

8         And so when the dredging program is operating under

9    those conditions, that's about what occurs.  But when the

10   velocities go up, that velocity starts to increase to fairly

11   significant levels at higher velocities in the river.

12   Q    Is there a target for PCB resuspension for the dredging?

13   In other words, does the project have a target it aims to

14   meet?

15   A    It has a target that's related to the drinking water

16   standard.  Um, the objective is to try to keep levels in the

17   water column below 500 nanograms per liter, which is the

18   drinking water standard.

19   Q    Okay.  And are you aware of whether those standards are

20   being met?

21   A    In large part, they are.

22   Q    Okay.  Now, with regard to activated carbon, one of the

23   things you wrote in your expert report is that the application

24   of activated carbon to Mendall Marsh -- I'm now quoting -- can

25   be expected to greatly change the nature of the marsh

1   sediments and likely would cause eco --

2         (Interruption by the court reporter.)

3            MR. BERNARD:  Sorry, sorry.  Let me just start

4   again.  Okay?

5   BY MR. BERNARD:

6   Q     Can be expected to greatly change the nature of the

7   marsh sediments and likely would cause ecological damage.  Do

8   you remember it?

9   A     Yes.

10  Q     Do you have any empirical data to support that

11  statement?

12  A     The -- the applications that they examined included

13  adding activated carbon at about 5 percent of the dry weight

14  of the sediment in a single application.  The data that they

15  collected indicated that if -- if you were going to use this,

16  you would have to have multiple applications.  If each

17  application is adding 5-percent dry weight of activated

18  carbon, after several applications, a significant fraction of

19  the sediment is now organic carbon, so the statement that it

20  would greatly change the nature of the sediment relates to the

21  fact that you are making the sediment more and more highly

22  enriched with organic -- activated carbon over time.

23  Q     Is there any empirical data to support the statement

24  that that would cause ecological damage?

25  A     Well, I -- I think the -- the one empirical evidence

1    is -- is that there -- in their pilot studies, there was some

2    evidence of changes in the plant community as a result of

3    that.

4    Q    So you did mention that there were changes in the plant

5    community.  How do you know that?

6    A    I know that from reading and also from having

7    discussions with other experts on the project.

8    Q    You mean defendants' experts?

9    A    Yes.

10   Q    Was there any survey done before the application of

11   activated carbon in Mendall Marsh of the vegetation and the

12   test plots?  Do you know?

13   A    I don't recall.

14   Q    Okay.  Would you agree that the only way to know whether

15   there had been an alteration in the plant community within the

16   test plot would be to have done a survey before application of

17   activated carbon and then repeat the survey after?

18   A    That would be the way I would do it.

19   Q    And you're not aware of whether that was done here.

20   A    Ah, no, I am not.

21   Q    Okay.  Now, one of the things you've testified to -- and

22   you wrote it in your expert report, as well -- is that it's

23   unclear whether there is currently any harm to Penobscot

24   biota; is that -- is that your view?

25   A    Yes.

1    Q     Okay.  And as a result, it's difficult to determine

2    whether there's a need for active remedies; is that also your

3    view?

4    A     Yes.

5    Q     Okay.  Now, the defendant is proposing toxicity studies

6    in the field in Mendall Marsh regarding Nelson's sparrows and

7    red-winged blackbirds, correct?

8    A     Yes.

9    Q     And you support that?

10   A     Yes.

11   Q     And is it your belief that the toxicity studies will

12   determine whether there is -- if they occur, will determine

13   whether there is any harm to those two species?

14   A     I think they will determine whether there is significant

15   harm at the population level.

16   Q     Now, Plaintiffs' Exhibit 111 is a memo that was

17   discussed.  Were you here when Dr. Henry testified?

18   A     Ah, for -- for portions of her testimony.

19   Q     So there was a memo that you wrote to the Study Panel

20   that was mentioned -- or that was the subject of discussion

21   with Dr. Henry.  Do you remember that?

22   A     Yes.

23   Q     Okay.  And I think you testified on direct, but I didn't

24   quite get it, that when you wrote this memo -- and I'll just

25   show you the first page -- this is Plaintiffs' Exhibit 112,

1    see that?  That's your memo, right?

2    A     Yes, it is.

3    Q     You were writing this in behalf of Mallinckrodt; is

4    that -- is that fair to say?

5    A     Yes.

6    Q     Okay.  Now, for the portion on birds, remember there's a

7    table where you were talking about toxicity thresholds for

8    birds?

9    A     I do.

10   Q     I show you the table.  Now, did you say this morning

11   that you conferred with somebody at Anchor QEA about the

12   substance of what you wrote about bird toxicity thresholds in

13   this memo?

14   A     Yes, and I -- I had one of the ecological risk

15   assessment experts in Anchor QEA assemble the table.

16   Q     Okay.  And -- and was that a he or a she?

17   A     That was a he.

18   Q     Okay.  And is he a qualified ecological risk assessor?

19   A     Yes.

20   Q     Okay.  And is there anything about this table that you

21   don't stand by today?

22   A     Nothing I'm aware of.

23   Q     Okay.  Now, are you aware of the response to your memo

24   from Dr. Sandheinrich?  Did you see that?  He wrote a letter

25   to the Study Panel a couple of months after this responding to

1   your memo, and I don't know whether you've ever seen it.

2   A    I -- I've never seen it.

3   Q    Okay.  Now, you recommended a LOAEL, lowest observed

4   adverse effect level, of 3.0 for birds in the Penobscot.  Do

5   you remember that?

6   A    Yes, and -- and what I was doing with this memo and the

7   other memos I sent to the Study Panel was -- was not to try to

8   tell them what to do but to simply provide them additional

9   information and suggestions of what they should also consider.

10  Q    Okay.  And are you aware of what has now happened to

11  Mallinckrodt's proposed toxicity threshold for birds that --

12  that -- is it still at 3, as far as you know?

13  A    That -- that's not my area, and --

14  Q    Okay.

15  A    So I've --

16  Q    Okay.

17  A    -- really not --

18  Q    You're not aware that it's gone from 3 to 3 to 4?

19  A    I observed some of Dr. Henry's testimony, and, actually,

20  that was the first time that I saw that information.  And,

21  yes, I saw her testifying --

22  Q    Okay.

23  A    -- that she believed the appropriate range was 3 to 4.

24  Q    Okay.  In this memo that you wrote in October in behalf

25  of Mallinckrodt, did you say to the Study Panel, you shouldn't

1    really be using literature toxicity values, you really need to

2    go out and do field toxicity tests?

3    A    In this memo?

4    Q    Yes.

5    A    I don't recall saying that one way or the other.

6    Q    And do you think it's fair to read this memo as

7    accepting the methodology that the Study Panel was using, but

8    simply arguing for a different threshold based on the

9    literature, which you cite here in Table 3?

10   A    I wouldn't categorize it as accepting their approach as

11   much as simply reacting to what they were doing.  They -- in

12   the meeting that I had attended, they had discussed

13   thresholds, and so I asked the ecological risk -- risk

14   assessor at Anchor QEA to give me some perspective on the

15   thresholds, and then I provided that to the Study Panel.

16        But I wasn't advocating that that be the way in which

17   they did this evaluation.

18   Q    Did the risk assessor say to you, in words or in

19   substance, while you were preparing the memo, wait, we

20   shouldn't -- we shouldn't be going this route with

21   literature-derived values, we should tell them to go do field

22   studies?

23   A    I didn't provide the risk assessor with that -- enough

24   perspective to do that.  Um, I was really simply asking him,

25   you know, what do you think are appropriate literature-based

1    thresholds, or what are thresholds from the literature?  And

2    he provided me with this table.

3    Q    Do you think that -- withdrawn.

4         At any time during the study process, Dr. Connolly, did

5    Mallinckrodt recommend to the Study Panel or urge the Study

6    Panel to conduct field toxicity tests regarding birds in

7    Mendall Marsh?

8    A    I -- I did not, and all I know is what I was

9    communicating with the Study Panel.  I don't know to what

10   extent Mallinckrodt was having other experts communicate with

11   the Study Panel or not.

12   Q    That's a fair amendment, which I accept, and -- and let

13   me just rephrase the question.

14        To your knowledge, did Mallinckrodt during the study

15   process propose to the Study Panel that it do field toxicity

16   studies regarding songbirds in Mendall Marsh?

17   A    I don't recall seeing that, but, again, I don't know one

18   way or the other.

19   Q    And -- and you were the key technical advisor to

20   Mallinckrodt during the study period; is that right?

21   A    Not for purposes of toxicity work.

22   Q    Okay.  But you're not aware of any such request by

23   Mallinckrodt or proposal or urging of the Study Panel to

24   undertake such work.

25   A    I am not.

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3508

1    Q    Okay.

2    A    But, again, you know, it may very well have occurred

3    without me knowing about it.

4    Q    Okay.  Now, Mallinckrodt wrote comments on the draft

5    Phase I Report that the Study Panel prepared; is that correct?

6    A    Yes.

7    Q    And you were involved in that, right?

8    A    Yes.

9    Q    And they wrote comments on the draft Phase II Study Plan

10   that the Study Panel put forward, right?

11   A    Yes.

12   Q    And you were involved in that?

13   A    Yes.

14   Q    Okay.  And in neither of those documents, to your

15   knowledge, or any other document, did Mallinckrodt during the

16   study period recommend to the Study Panel that it conduct

17   field toxicity studies regarding songbirds in Mendall Marsh,

18   correct?

19   A    I -- I don't know that that's precisely correct for two

20   reasons:  One, early on, when the Study Panel first proposed

21   their study plan, they -- they proposed toxicity testing.  And

22   I suggested that they take a phased approach, where the first

23   thing they do is these kind of literature-based comparisons,

24   and if those showed that there was some potential for

25   toxicity, that they then conduct toxicity studies in a second

1   phase.

2       I later, in commenting on the Phase I Report, indicated

3   that the Phase I data that they had collected were showing

4   levels in songbirds that indicated that there was a potential

5   for impact and that their Phase II work focus on Mendall Marsh

6   and on the birds.  I wasn't more specific about what that

7   should or should not be, but I was encouraging them to focus

8   on the birds and on the marsh.

9   Q    I'll show you the documents if I need to, but let me see

10  if you just recollect it enough.

11      In response to the Phase I Study Plan, did Mallinckrodt

12  suggest that the Study Panel eliminate both fish and bird

13  toxicity studies at that point in the study?

14  A    They may have at that point --

15  Q    Okay.

16  A    -- in the study.

17  Q    And then there was a statement that they might be

18  appropriate -- such studies might be appropriate in Phase II,

19  correct?

20  A    Yes.

21  Q    And then the Study Panel proposed a -- found high levels

22  in the songbirds --

23  A    Hm-hmm.

24  Q    -- in Phase I, right?

25  A    Yes.

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3510

1   Q     And they proposed a Phase II Study Plan, correct?

2   A     Yes.

3   Q     That study plan did not include provision for any

4   toxicity studies on the songbirds in Mendall Marsh, correct?

5   A     I don't remember the -- fully the details, but I don't

6   recall them proposing that.

7   Q     And then you, Mallinckrodt, with your participation,

8   commented on that Phase II Study Plan, correct?

9   A     Yes.

10  Q     And it did not, in those comments, take issue with the

11  absence from the Study Panel's proposed Phase II Study Plan of

12  toxicity studies in the field regarding songbirds in Mendall

13  Marsh; is that true?

14  A     I think that's correct, yes.

15  Q     Okay.  Now, did Mallinckrodt, during the study period,

16  to your knowledge, urge the Study Panel to conduct a formal

17  ecological risk assessment?

18  A     We -- our communications with the Study Panel began to

19  get cut off, and so our ability to interact with them was

20  getting less and less.  We didn't have a full understanding of

21  what they were doing and what they were relying on.

22        I know, for purposes of trying to address the question

23  of risk and in enough detail to support remedial

24  decision-making, that you need to do what we would call a

25  baseline ecological risk assessment.

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3511

1      I don't think we understood, one way or another,

2  whether, in fact, they were performing that.  And I think it

3  was with the issuance of the Phase II Report that we finally

4  understood the limits of what they actually did with regard to

5  looking at ecological risk.

6  Q    Did you know whether the Study Panel, in Phase I or

7  Phase II, was conducting a formal ecological risk assessment?

8  A    As I -- as I said, we did not know one way or the other.

9  Certainly in Phase I, we know they didn't, and it wouldn't

10 have been appropriate to do it in Phase I.

11      Um, in Phase II, it's not clear whether they were doing

12 such work or not, and so I don't think we understood.

13 Q    In your comments on Phase II Study Plan, did you say in

14 words or substance, we don't know whether you're doing a

15 formal ecological risk assessment, but you should?

16 A    I don't think we said that because I -- I actually

17 didn't think it necessary to say that, that I would think the

18 Study Panel, with their expertise, particularly Dr. Whipple,

19 whose expertise includes having conducted formal risk

20 assessments, that -- that they didn't need that instruction.

21 Q    You just assumed they were doing one?

22 A    I assumed that I -- we didn't have to instruct them that

23 they needed to do one.

24 Q    And you assumed that, even though on review of their

25 proposed Phase II Study Plan, you saw that it didn't include a

1    formal ecological risk assessment.

2    A    What I saw in the Phase II Study Plan were a series of

3    elements -- study elements that they were proposing.

4         Um, subsequent to that, they periodically would propose

5    additional study elements, um, and as far as we could tell,

6    too, they were doing things we were not fully aware of.

7         So -- so what they were or weren't doing and the extent

8    to which they were conducting a baseline ecological risk

9    assessment, which can -- can be done with or without field

10   studies.  I think the field studies are important to fully

11   answer the question.  We -- I don't think we -- we understood

12   how they were analyzing all the data they were collecting in

13   terms of the detailed risk assessment work that they were

14   doing.

15   Q    Okay.  Is the same true on human health risk assessment,

16   did Mallinckrodt, to your knowledge, ever instruct the Study

17   Panel or urge the Study Panel or propose to the Study Panel

18   that it conduct a formal human health risk assessment?

19   A    Um, I'm not aware of that formal request, no.

20   Q    Are you aware that Mallinckrodt witnesses have come into

21   court during the last week insisting that formal risk

22   assessments are essential?

23   A    Yes.

24   Q    Okay.  And one of those is Dr. Keenan, correct?

25   A    Yes.

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3513

1    Q    Okay.  And are you aware that witnesses have come in

2    saying that field toxicities must be carried out before

3    there's any movement at all on an active remedy?

4    A    I -- I didn't hear all the testimony, so I don't know --

5    Q    Okay.

6    A    -- if it was expressed like that.

7    Q    Okay.  I want to ask you a few questions about your 2002

8    trial testimony and then a few closing questions, and then

9    we'll be done.  Okay?

10   A    Yes.

11   Q    Now, you testified -- oh, I'm sorry.  Before I get to

12   that, you mentioned communications between the Study Panel and

13   Mallinckrodt, really, the parties, right, plaintiffs, as well,

14   being cut off at a certain point.  Do you remember that?

15   A    Yes.

16   Q    Do you know whether that was done with the approval of

17   the special master appointed by the court to oversee the

18   remedy process?

19   A    I believe it was.

20   Q    Now, you testified at the remedy trial in 2002, correct?

21   A    Yes, I did.

22   Q    And you were asked to evaluate whether mercury in

23   Penobscot sediments were getting into biota; is that correct?

24   A    I -- I would state it a different way just to be

25   clearer.

1    Q    Go ahead.

2    A    And that is to explain why, based upon the levels in the

3    biota -- and at that point, I was looking at one single

4    species, the killifish -- did not appear elevated relative to

5    neighboring estuaries despite higher mercury concentrations in

6    sediments.  Why were the higher mercury concentrations in

7    sediments not causing an elevation in the killifish beyond

8    what levels were in neighboring estuaries.

9    Q    And did you testify at the liability trial that

10   sediments were not a significant source of mercury to biota

11   downriver of the HoltraChem plant?

12   A    I think what I testified was that that could explain why

13   the fish would not have been elevated, that an ex -- a

14   plausible explanation of why those fish might not be elevated

15   is if methyl -- if methylmercury gets produced deeper in the

16   sediment, it may not be able to get out of the sediment.  And

17   I looked at the data that existed at the time, and the data

18   were consistent with that idea, although we didn't have a

19   tremendous data set, nothing like what we have now, to

20   evaluate that question.

21   Q    To support the opinion you expressed, you analyzed two

22   sets of sediment data back then.  Do you remember that?

23   A    Yes.

24   Q    And one was collected by Dr. Livingston, right?

25   A    Yes.

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3515

1  Q      And the other by Camp, Dresser, and McKee?

2  A      Yes.

3  Q      Okay.  And the Livingston data I think went down from 0

4  to 2 centimeters in the sediment?

5  A      Yes.

6  Q      And the CDM data went down, I think, to 6 centimeters?

7  A      Yes.

8  Q      Okay.  And your hypothesis was that if methylmercury

9  concentrations were higher in the 0 to 2 data set, then that

10 might indicate bioavailability of the methylmercury to biota,

11 but if they were not higher than what was in the 0- to

12 6-centimeter data set, that might indicate that the

13 methylmercury being produced was sequestered and buried and

14 not available to the biota; is that a fair summary?

15 A      Yeah, just -- just to be clear, there is empirical data

16 from other sites that show that when methylmercury is produced

17 right in the surface -- near the surface sediments, it's

18 highly bioavailable, and at some other sites, where it gets

19 produced much more deeply in the sediments, it's much less

20 bioavailable.

21     So I started with information from other sites that

22 suggested the depth at which methylation was occurring really

23 could control its bioavailability.  And what I found with the

24 two data sets was that the methylmercury concentrations were

25 higher in the 0- to 6-centimeter samples than in the 0 to 2,

1   from which I hypothesized meant that the methylation was

2   occurring below the top couple centimeters and, therefore, may

3   be less bioavailable.

4   Q    Okay.  And your testimony -- and now I'm quoting a

5   portion of it -- was that as a result of what you just

6   described, most, and perhaps even all, the methylmercury being

7   produced is sequestered and buried.  Do you remember that?

8   A    Yes.

9   Q    Okay.  And that was consistent with Mallinckrodt's

10  litigation position, that the mercury it had deposited into

11  the Penobscot was lodged in the sediment and was not the cause

12  of any endangerment downriver; is that fair to say?

13  A    Um, I -- I believe so.

14  Q    Okay.  Now, at the time you formed your opinion and

15  testified in court in 2002, you didn't have any measurements

16  concerning the depth in the sediment later -- layer at which

17  methylation was actually occurring, correct?

18  A    No.

19  Q    Yes, it's correct, no, you didn't have it?

20  A    I did not have it.

21  Q    Okay.  Now, the Livingston and CDM data sets were not

22  taken in the same year; is that correct?

23  A    That's correct.

24  Q    And they weren't taken in the same season; is that

25  correct?

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3517

1   A     I don't recall.

2   Q     Do you recall whether they were taken in the same

3   location?

4   A     Um, they were -- they were not.

5   Q     Okay.  And methylation varies by year, doesn't it?

6   A     Yes.

7   Q     And by location?

8   A     Yes.

9   Q     Okay.  And, also, the benthos, which could be picking up

10  the methylmercury, could burrow down to about 10 centimeters

11  or so.  Did you concede that at the 2002 trial?

12  A     In theory, that's true.  We've now learned that they

13  probably occupy just the top 1 to 2 centimeters.

14  Q     Now, a second point you made at the trial was that there

15  might be a large mass of methylmercury coming over in the

16  water over the Veazie Dam.  Do you remember that?

17  A     I don't know I called it a large mass.

18  Q     Well, okay.  You -- I don't want to characterize it one

19  way or the other.  You testified about methylmercury coming

20  over the Veazie Dam into the lower river, correct?

21  A     Yes, and -- and I did so because, based upon the work

22  that I did in Lavaca Bay, I was able to find a relationship

23  between methylmercury in sediments and mercury in killifish in

24  Lavaca Bay.

25        The same data in the Penobscot when I looked at it, I

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3518

1   could not find a relationship between the methylmercury in

2   the -- in the sediments and the mercury in the killifish.

3        So that led me to hypothesize that they were probably

4   getting it from the water column, rather than the sediment,

5   and the water column could be largely controlled by what's

6   coming in from upstream; and, therefore, what's coming in from

7   upstream may be important to what's in the fish.

8   Q    Now, your analysis was based on three Camp, Dresser, and

9   McKee samples taken on three days in April of 2001; is that

10  correct?

11  A    The measurements in the water column.

12  Q    Measurements in the water column.

13  A    Yes.

14  Q    And you averaged those, correct?

15  A    Yes.

16  Q    And CDM did not measure how much methylmercury was in

17  dissolved form, correct?

18  A    As I recall, they did not.

19  Q    So you didn't have that information.

20  A    Correct.

21  Q    And you used total suspended solids in your calculation

22  from other samples, not from the Camp, Dresser, and McKee

23  samples, correct?

24  A    Yes.

25  Q    And you extrapolated some numbers, which you needed to

1   do in order to make your calculations, from Lavaca Bay,

2   correct?

3   A     I don't recall.

4   Q     Okay.  Did you concede at the 2002 trial on cross-

5   examination that these calculations were back-of-the-envelope?

6   That's a quote.

7   A     I may have.  I don't recall.

8   Q     Do you think that was a -- I mean, that was an accurate

9   statement at the time, based on what you recall?

10  A     At -- at -- back-of-the-envelope in the sense as

11  estimates of the magnitude of the mercury load coming from

12  upstream.

13  Q     Okay.  Now, going back to the methylation --

14  methylmercury point, it's now 12 years later, and we have more

15  data on that; is that fair to say?

16  A     Tremendously.

17  Q     Okay.  And we know that methylation, in fact, is

18  occurring downstream of the old HoltraChem plant, correct?

19  A     Interesting -- interestingly enough, what the Study

20  Panel's measurements of methylmercury in the water column show

21  is no evidence of methylmercury coming out of the sediments

22  into the water column.  The methylmercury concentration

23  patterns in the river can be simply explained by the

24  methylmercury coming from upstream mixing with ocean water and

25  diluting.

1    So -- so the data suggests that the flux of

2   methylmercury from the sediments is probably not great.  Um,

3   that's not to say there's not methylmercury in the sediments,

4   but it -- it -- in terms of flux to the water column, it

5   appears not to be a great source.

6   Q    Do you agree that sediment is a significant source of

7   mercury to at least some species of biota downriver of the old

8   Mallinckrodt or HoltraChem plant site?

9   A    Yes.

10  Q    Okay.  And you would agree that, in Mendall Marsh in

11  particular, the methylation rates are extraordinarily high?

12  A    In places within the marsh, yes.

13  Q    And that that methylmercury's being taken up by both

14  songbirds and black ducks in the marsh?

15  A    Yes, methylmercury is being taken up by songbirds and

16  black ducks.

17  Q    And on the second point you testified to about sources

18  coming over Veazie Dam, you're aware that the court found in

19  2002, in adjudging Mallinckrodt liable, that it was a dominant

20  source of mercury to the estuary?

21  A    I think that determination related to the view of

22  accounting for the inventory of mercury in the system as

23  opposed to the relative importance of what might be coming

24  over the dam contemporary -- in modern time compared to what

25  was coming from the plant.

1    Q      You are aware of the finding the court made that

2    Mallinckrodt was a dominant source of mercury to the Penobscot

3    Estuary?

4    A      Yes.

5    Q      And you're aware that Mallinckrodt has elected not to

6    contest that finding in this trial?

7    A      I'm aware that there's been no testimony to that effect

8    in this trial.

9    Q      Just a few questions as we close.  Dr. Connolly, you --

10   you suggested to Mallinckrodt that it propose to the court a

11   three-person Study Panel to conduct the remedy study, correct?

12   A      Yes.

13   Q      And the court accepted that proposal, correct?

14   A      Yes, and as I testified earlier, I'm not sure I'm the

15   only one who made that suggestion.

16   Q      I understand that.  And the Study Panel, as well as some

17   scientists that it engaged, spent eight years or so conducting

18   this study, correct?

19   A      Yes.

20   Q      Now, I understand one of your opinions to be that the

21   Penobscot Estuary is moderately contaminated, correct?

22   A      Relative to background.

23   Q      All right.

24   A      Yes.

25   Q      And that's with mercury, correct?

1    A    Yes.

2    Q    Okay.  Now, in terms of your characterization of how

3    contaminated the system is, do you agree that that puts you at

4    odds with Dr. Rudd, Dr. Whipple, Dr. Fisher, Dr. Bodaly, and

5    Dr. Kopec?

6    A    I don't know necessarily what it means, at odds.  What

7    I -- what I know is -- is what I see, which is the biota in

8    the upper estuary are perhaps three to four times background.

9    The sediments in the upper estuary on a carbon basis are three

10   to five times background.

11       My term for that is it's moderately contaminated because

12   the sites that I'm normally involved with that active

13   remediation's being considered are great multiples above

14   background.  That's the basis for my characterization.

15       I'm not sure of the basis for their characterization,

16   and so they can fairly disagree with me, but the absolute

17   numbers are the absolute numbers, and someone can say three

18   times background in their mind is severe or five times

19   background's severe.

20       In my view, based upon all of the sites that I've been

21   involved with and my knowledge, I classify that as moderately

22   contaminated.

23   Q    Putting to side -- putting to one side the basis for the

24   opinion, you've read the Phase II Report, right?

25   A    Yes.

1    Q      Do you understand the Phase II Report to set forth a

2    finding that the estuary is more heavily contaminated than you

3    have testified it is?

4    A      That's a subjective judgment, and I think it's, in part,

5    based upon a biased view because in the Phase II Report, they

6    looked at the sediment contamination in a way I think is not

7    correct.

8           But, nonetheless, it's -- it's a subjective assessment.

9    It's someone's subjective characterization of absolute

10   numbers, and I think we're all say -- better off just looking

11   at the absolute numbers.

12   Q      Now, taking that group who -- all of whom were

13   responsible in one way or another for drafting or approving

14   the Phase II Report, Drs. Rudd, Whipple, Fisher, Bodaly, and

15   Kopec, none of them works for the defendant; is that right?

16   A      No.

17   Q      All of them work for the court, correct?

18   A      That's my understanding.

19   Q      I understand a second opinion of yours to be that the

20   estuary will cleanse itself quickly, with reasonable speed,

21   correct?

22   A      Given the objective to reduce concentrations by a factor

23   of 2 that the Study Panel laid out and my assessment of

24   half-times of 15 years, I've characterized a 15-year time

25   period to achieve that level as relatively quickly.

1   Q     Now, there are -- you think it's fair to say that

2   there's at least two layers of subjectivity in that, one

3   you've already testified to, which is there's a lot of

4   judgment involved in interpreting cores to derive recovery

5   half-times, right?  That's not a precise science.  You have to

6   apply a lot of discretion when you do that.

7   A     And I think we can see that in the range of estimates.

8   Mine is 15 years; Dr. Driscoll's was 19; and Dr. Santschi's

9   was 22.  So I --

10  Q     That's only for the Mendall Marsh, right?

11  A     That's the marsh, yes.

12  Q     Okay.

13  A     Which I think there's a general consensus is

14  representative of not only the marsh, but the upper estuary.

15  Q     Is there -- well, it's not representative -- according

16  to your testimony before, it's not representative of the whole

17  ecosystem, is it?

18  A     No, I'm not contending that.

19  Q     Okay.  So a second layer of subjectivity is how long is

20  too long, right?  In other words, there's an estimate of

21  natural recovery, and is that long enough so that there should

22  be active remediation pursued, or is it not?  That also is a

23  question of judgment, would you say?

24  A     Yes.

25  Q     Okay.  Now, on that issue, your opinion is contrary to

1   the opinion of Drs. Rudd, Whipple, Fisher, Bodaly, Geyer,

2   Yeager, and Santschi; is that correct?

3   A     I think that has to be parsed a little, because I think

4   there -- there's differences, for example, Mendall Marsh, and

5   songbirds in Mendall Marsh, and -- and whether there's harm

6   there and how quickly the marsh is recovering and what all

7   this high methylation means, which is, aside from that -- the

8   half-lives in the estuary, and if you accept the Study Panel's

9   view that they have to come down by a factor of 2, then it's

10  15 to 22 years based upon the range of the estimates.

11        And -- and so I've heard some characterizations a little

12  bit -- I've been in court -- of, you know, lifetimes and

13  things, and -- and I don't think that's very scientific.  I

14  think it's 15 to 22 years.  And everybody can judge fairly

15  what that means, whether that is fast or not fast.

16  Q     Putting --

17  A     I think you have to recognize active remediations have

18  negative environmental consequences, and that's based on my

19  experience working on contaminated sediment sites and I think

20  testified by Ed Glaza.

21        Any active remediation that you do here involves a

22  considerable time frame associated with actually setting it up

23  and executing it, and so that -- the negative consequences,

24  the time associated with that have to be compared with the

25  duration over -- until you reach a level that has been deemed,

CONNOLLY - CONTINUED CROSS-EXAMINATION/BERNARD

3526

1    in at least in that part of the system, to be acceptable.

2    Q    Do you understand your opinion about whether natural

3    attenuation is sufficiently quick to avoid active remediation

4    to be different from the opinion of the study scientists that

5    I mentioned a moment ago?

6    A    Yes.

7    Q    And all of those scientists I mentioned a moment ago

8    work for the court; is that correct?

9    A    Yes, but few of them have much experience in working on

10   practical contaminated sediment problems.

11   Q    Did you hear me as asking you about their level of

12   expertise, or did you hear me as asking you whether they work

13   for the court?

14   A    They do work for the court, but I think it's important

15   to understand how much they've been involved historically in

16   working on -- evaluating remediation at contaminated sediment

17   sites.

18   Q    And none of those scientists works for the defendant; is

19   that correct?

20   A    Correct.

21   Q    Okay.  So one final thing, I understand your opinion is

22   that active remediation should not be pursued now; is that

23   correct?

24   A    I think there are too many unanswered questions and too

25   many uncertainty.  An engineer cannot decide what's the right

1    thing to do at this point in time.

2    Q    And on that question, your judgment is different from

3    the judgment of the three Study Panel members -- Dr. Rudd,

4    Dr. Whipple, Dr. Fisher -- and the people who work closely

5    with them, Dr. Bodaly and Dr. Kopec; is that correct?

6    A    Yes, it is, and, again, they don't have much experience

7    in the kind of work that we're now talking about.

8    Q    All right.  They were appointed by the court -- the

9    three panelists, one of them nominated by Mallinckrodt -- to

10   advise the court on the proper answer to this question; is

11   that correct?

12   A    Yes, they were.

13   Q    And all of them -- and none of them works for the

14   defendant; is that correct?

15   A    That's correct.

16   Q    All of them work for the court, correct?

17   A    Yes.

18        MR. BERNARD:  Thank you.  Nothing further.

19        THE COURT:  All right.

20        MR. TALBERT:  Very briefly.

21        THE COURT:  Well, I'm not -- I didn't want to step

22   on Mr. Bernard's soliloquy.

23        MR. BERNARD:  I appreciate that.

24        THE COURT:  But just take as much time -- we'll just

25   move the three o'clock hearing back.  I don't want to step on

1    yours either.

2                MR. TALBERT:  Thank you, Your Honor.

3                      REDIRECT EXAMINATION

4    BY MR. TALBERT:

5    Q    I want to start out -- there are a number of points I

6    want to ask you about that Mr. Bernard raised, but the first

7    off is the Study Panel's relative experience on -- working on

8    and working remediation projects of contaminated sediment

9    sites.

10        What is your understanding of their experience in that

11   area?

12   A    My understanding is -- is that they have very little

13   experience in that case.  The one of them who probably has the

14   most experience is Dr. Whipple, and my understanding of his

15   experience is that it's more in the narrow area of risk

16   assessment and not in the broader area of site

17   characterization and evaluating a site to the level where you

18   understand it and can design remedial options.

19   Q    And, in fact, in the Phase II Report, doesn't the Study

20   Panel acknowledge that they're not engineers and, therefore, a

21   lot of the details in terms of selecting a remedial option are

22   outside their area of expertise?

23   A    Yes.

24   Q    Study Panel -- are you aware of any of the Study Panel

25   members who have ever worked on a feasibility study to weigh

1   options for remedial remedies?

2   A    I am not.

3   Q    And as a part of weighing different options, is it often

4   very important to understand the risk that you're remediating?

5   A    Yes.

6   Q    You also need to understand the source of contamination

7   well enough so design engineering options to address that,

8   correct?

9   A    That's critical.  You have to understand the

10  relationship between the harm and the environment so that you

11  can decide what to do where and fairly predict what the

12  benefit of doing that will be.

13  Q    Mr. Bernard asked you about recovery in the Orland

14  River.  What did you calculate in terms of a recovery time

15  from the core that was actually -- that you were actually able

16  to evaluate?

17  A    Um, the recovery half-time I calculated was 39 years.

18  Q    Again, as we discussed, how many cores were taken in the

19  Orland River?

20  A    Five or six.

21  Q    Okay.  And it's possible that within a certain location,

22  as we discussed, you can literally move a foot or two and take

23  a core and -- and end up with a core that is, in fact,

24  something that you could date and calculate a sedimentation

25  rate for, correct?

1    A    Yes.

2    Q    In that way, you can't just take a -- a single core and

3    say that what you're seeing in that core is indicative of the

4    entire area surrounding the core?

5    A    No, what you see in a -- in a core is indicative of

6    what's happened at that location.

7    Q    And when you say that location, you mean that precise

8    location?

9    A    That precise location where you took the core.

10   Q    All right.  Mr. Bernard asked you about -- he tried to

11   contrast a statement that you made regarding statistical

12   significance in the context of looking at biota trends with

13   something that Dr. Vlassopoulos stated with respect to his

14   evaluation of sediment -- SediMite in the plot amendments that

15   were used by the Study Panel.  Do you recall that?

16   A    I didn't -- I didn't understand the context of what

17   Dr. Vlassopoulos was testifying to.  All I was shown was his

18   statement about statistical significance.

19   Q    Okay.  So in -- in the -- can you just explain the

20   context in which you were discussing statistical significance

21   in the biota trends.

22   A    Yes, it was -- the point that I was making that even if

23   an individual trend is not significant -- all right -- so if

24   -- if you were doing a sort of standard analysis where you had

25   a treatment and a control and you're trying to see whether

1  they're different and you would conclude whether statistically

2  they are or not, there's value in that.

3      What I was saying is that even in the absence of being

4  able to say whether there is statistically significant

5  difference, um, when you see it at multiple locations, each --

6  even though there's enough uncertainty that each one, by

7  itself, is not significant, it is overall significant.

8  Q    And, again, your whole purpose for looking at those

9  biota was more to look at a weight-of-the-evidence approach to

10 see if there were declines, correct?

11 A    Yes.

12 Q    Was that different than what Dr. Gilmour was doing and

13 Dr. Vlassopoulos when they were comparing --

14 A    Yes, yes, very different.

15 Q    You were asked for quite a while about that USGS data,

16 and, again, for the court, the context of that was that you

17 were presenting one reason why we may see the changes in the

18 cores as you went down in-depth, correct?

19 A    One potential explanation.

20 Q    You mentioned in your report a number of different lines

21 of evidence that could explain that change, correct?

22 A    Yes.

23 Q    This was merely just one of those.

24 A    It was merely one of those, and as I indicated, it -- it

25 -- it was just inferential trying to say sources must have

1    been higher.  Perhaps they were higher coming over the dam as

2    -- as one of three possibilities.

3    Q    And removing entirely that USGS data wouldn't impact

4    your overall opinions, correct?

5    A    Not at all.

6    Q    And you explained that to Mr. Bernard at your

7    deposition, didn't you?

8    A    Yes.

9    Q    For the sediment cores, in contrast to Dr. Santschi,

10   where he arbitrarily applied a 21-year interval, you examined

11   each and every core, correct?

12   A    Yes, and start at the surface, went down and followed

13   the trend until the trend broke.

14   Q    You were asked earlier about the Hudson River and the

15   dredging project.

16         Have you also tracked whether biota in the Hudson

17   have improved in terms of levels of PCBs?

18   A    It's -- the jury's still out on that question.  The

19   dredging's still going on, but there's a section of the river

20   where the dredging's completed, and the information we have so

21   far is not sufficient for us to evaluate whether that dredging

22   has achieved its objective in terms of reducing the levels in

23   fish.

24   Q    It's possible that all that dredging could be -- could

25   have been done without a corollary reduction in biota,

1    correct?

2    A     Well, I expect there's going to be some reduction in

3    biota.  The question is whether or not we're going to achieve

4    what the government hopes we are going to achieve by the

5    dredging program.

6    Q     You were asked about the impacts of -- of SediMite on

7    vegetation.

8    A     Yes.

9    Q     And I believe you were asked your basis for stating that

10   there could be delirious (sic) effects from using SediMite on

11   vegetation in Mendall Marsh.  Do you recall that?

12   A     Yes.

13   Q     Is it your understanding the Phase II Report itself

14   reported that there was some delirious (sic) effect from --

15   from SediMite on vegetation?

16   A     That's my recollection, yes.

17   Q     You were asked questions about your testimony at the

18   2002 trial.  Do you recall that?

19   A     Yes.

20   Q     One of your opinions was that there was a lot of mercury

21   coming from above the Veazie Dam, correct?

22   A     That -- that there were -- there was a significant

23   amount of Penobscot mercury coming from above Veazie Dam.

24   Q     It was a relative -- opinion relative to other sources,

25   correct?

1    A     Yes.

2    Q     And was that found to be true in -- after the Phase II

3    Report was issued, did the Study Panel conclude the same

4    thing?

5    A     I believe the Study Panel concluded that the

6    contemporary loadings to the system, 80 percent comes from

7    above the Veazie Dam.

8    Q     You have recommended as a next step that there be some

9    toxicological studies on Nelson's sparrows, correct?

10   A     Yes.

11   Q     What's your reason for making that recommendation?

12   A     To determine whether, in fact, there is significant harm

13   to the population, which I think you need to do to consider

14   active remediation because active remediation in that marsh

15   may have very significant negative environmental consequences

16   itself.

17   Q     Do you remember at the 2002 trial no one in EPA

18   testifying?

19   A     Vaguely, yes.

20   Q     Dr. Connolly, in your opinion, this is a complex system?

21   A     Extremely complex system.

22   Q     And can any active remedy cause harm?

23   A     Yes.

24   Q     In your opinion, is it important before we evaluate

25   potential remedial options to understand that harm better?

1    A     Yes.

2    Q     Are you aware that Dr. Fisher and Dr. Evers have also

3    held the opinion regarding the importance of conducting

4    site-specific field studies?

5    A     That's my understanding.

6              MR. TALBERT:  No further questions.

7              THE COURT:  Thank you.

8              MR. BERNARD:  I'm done, Your Honor.

9              THE COURT:  Thank you.  You may stand down, sir.

10   Thank you very much.

11             THE WITNESS:  You're welcome.

12        (The witness left the witness stand.)

13             THE COURT:  Okay.  What they've managed to do, one

14   of the Portland judges is up here, and they're going to take

15   the three o'clock plea, which is very nice of her, so what I'm

16   going to do is take a break for about 15 minutes and then come

17   back here, and then we'll discuss what we do next.

18        (Court recessed from 2:42 p.m. to 3:00 p.m.)

19             THE COURT:  All right.  I want to start this by

20   thanking the lawyers.

21        First, it's very clear that the experts to a man and

22   woman are the smartest kids on the block.  You've done well in

23   choosing these people.  I am -- as I listened to them testify,

24   I kept thinking how grateful I am that they weren't in my

25   science classes because they would have ruined the bell curve.

1        But more particularly, I want to thank each of the

2   lawyers here.  This was a very difficult case to try, and it

3   has been exceptionally well tried.  It's not that often I get

4   to express my admiration and respect for the attorneys who

5   practice before me, but this is one of those occasions.

6        I have a sense for how hard it is to try a case of this

7   magnitude and one of public significance and with thousands of

8   exhibits and very capable, smart experts, and I just want to

9   express the appreciation of the court for -- to each of you

10  and also to your staffs for what I consider to be a job well

11  and professionally done.

12       I want to talk to you about the motions I now have before

13  me and see whether or not I really need to rule on them.  You

14  filed a number of pretrial motions.

15       Mallinckrodt filed a motion involving Dr. Grandjean,

16  which is Docket No. 732.  You also filed one on Dr. Wiener,

17  which is 730.  Are those still pending?  Do you want me to

18  rule on them?

19            MR. TALBERT:  We'll withdraw them, Your Honor.

20            THE COURT:  All right.  So I will consider each --

21  both those motions withdrawn.

22       There was a motion by the plaintiff on Dr. Frank Woodard.

23            MR. BERNARD:  He didn't testify, Your Honor, so that

24  motion is moot.  We withdraw it.

25            THE COURT:  Okay.  I'm glad that your recollection

1   comports with mine.  If I thought he testified, I would have

2   been in trouble.

3        There's a Daubert motion that the plaintiffs filed on

4   Mr. Bigham and a Dr. Vaillancourt, and then also on

5   Dr. Connolly.  Are you pressing that?

6            MR. BERNARD:  No, Your Honor.  Mr. Bigham and

7   Mr. Vaillancourt did not testify, and we questioned

8   Dr. Connolly on that issue, and we're happy to have the court

9   consider it as it sees fit.  We'll withdraw the motion.

10            THE COURT:  Okay.  Fine.  Thank you.  That will be

11   deemed withdrawn.  And then there was a motion to exclude

12   proposed testimony on nonparty contributions, but I take it

13   that that's been eclipsed, as well?

14            MR. BERNARD:  It has been, Your Honor.

15            THE COURT:  All right.  So that motion, which is

16   729, is deemed withdrawn.

17        Now, let's turn, then, to what I think is going to be a

18   complicated matter, and let me suggest to you instead of

19   proposed findings, which I've been convinced by my judicial

20   colleagues, that it's probably not worth the candle, but I

21   still would like a sort of synoptic view of this trial.

22        What I'm going to try and do -- there's just a huge

23   amount of detail here, and what I'm worried about is I'm going

24   to get into the sediment if I don't -- if I'm not careful.

25        What I'd like each of the parties to do is to -- for each

1    expert, both for the proponent and for the opponent, to

2    prepare a very brief, maybe one paragraph, statement about

3    what it is you think they said and then, second, what is the

4    scientific significance of what they said and then, third,

5    what's the legal significance in the context of the case.  And

6    that will help me understand why it is you -- the proponent

7    who called them and, on the other hand, what it is that the

8    opponent thinks or how it is the opponent thinks I should view

9    the testimony.

10       The -- the way I think about this, in effect, is there

11   are two main questions I'm going to have to answer for the

12   testimony or the evidence, and that is, what happened and so

13   what?

14       Now, with that in mind, I have a couple of issues, and

15   I'd like you to address them not right now, but in due course.

16   And the first is the lobster closure by the State.  It seems

17   to me that that's an issue that is sort of the elephant in the

18   room in many ways, and it came pretty late -- it came after

19   the Phase II Report came out, and it is obviously a matter --

20   of public significance, and I would like to know, from both

21   the parties, how you think I should consider that.

22       The second issue really is the Orland River because I

23   think they -- the testimony from the Study Panel members was

24   that they began to, I think properly, focus on the Mendall

25   Marsh question and realized, sort of late in the game, that

1    they had another issue on the east side of Verona Island, and

2    they didn't really -- they took a couple of samples out of the

3    Orland River, but some of those -- I'm not sure exactly what I

4    should make of the Orland River and how I should play the

5    Orland River into this decision.

6         I -- I have in my head sort of a decision tree, but I'm

7    not going to reveal it to you because I think if I do, I'll

8    only make life more complicated for you.  I haven't obviously

9    arrived at a decision.  I respect counsel, and I will look

10   forward to your arguments on it.  But if I start talking about

11   where I think I might go on, I think you're going to be

12   tacking to the wind, and I'm not so sure that that's the right

13   thing for me to do because I may get to the middle of this

14   thing and discover I need to revise my view.  So I don't want

15   to sort of show my hand because I think it may affect the way

16   you argue the case, and I think if I do that, it might be

17   inappropriate.

18        So with that, I'm happy with the schedule that you've set

19   up in terms of your briefing schedule.  My thought is this.

20   That -- and I'll tell you what I do on every case, and I don't

21   see any reason to vary here, that I will write the decision,

22   and then I assume from what counsel have said before, that you

23   do want to have an oral argument.  And what I'll do is -- I'm

24   not going to give you the decision, but you'll know what it is

25   pretty soon during the course of the oral argument, and I tell

3540

1   people this in summary judgments, I do the same thing, the
2   person who is on the losing side will get most of the
3   questions.
4       Here, if I've made an error of fact, it may be very
5   important for me to know that, so I'll layout, probably in
6   some detail, what it is -- how I'm coming to the decision and
7   give you opportunity to respond if I've made a mistake of
8   fact.  Most of these -- most of the cases, and a case like
9   this, will be founded on fact.
10      So I'm not talking about something that is merely a
11  matter of interpretation.  If I've got it dead-wrong, I'd
12  prefer to know now rather than have the First Circuit tell me,
13  you know, in another year and a half from now.
14      I will appreciate some education on what you think the
15  law is and how I should apply it.  I don't really -- because I
16  think this is more of an equitable remedy than anything else,
17  I'm not so sure that the law's going to be as decisive as it
18  often is, but if I'm wrong on that, I'd like to know.
19      And what I'll do is just simply, once I've gotten the
20  decision written, I'll notify counsel.  We'll get together at
21  a time that is convenient for everybody, and I'll hear what
22  you have to say.  If you're able to convince me -- I -- I do
23  keep my mind opened up until the time the decision is actually
24  filed and docketed.
25          Your job, if you're on what appears to be the losing

1   side, will be to convince me that I'm wrong.  It'll be a

2   last-ditch effort to convince me I'm making a mistake.  I'll

3   listen to you, and if I -- you manage to change my mind, I'll

4   change the opinion.  But if you don't manage to change my

5   mind, then you'll get it posthaste.

6        All right?  Anything further from anyone?

7             MR. BERNARD:  One question, Your Honor, on form.

8   The -- the -- you said you want a statement for each witness,

9   just a paragraph, about what they said and the scientific

10  significance and the legal significance.

11            THE COURT:  Right.  You can put that as an addendum.

12            MR. BERNARD:  An addendum to the brief?

13            THE COURT:  Sure.

14            MR. BERNARD:  Okay.

15            THE COURT:  Yeah.

16            MR. BERNARD:  Okay.

17            THE COURT:  I'm not going to limit you on the pages

18  that you want to present.

19            MR. BERNARD:  In terms of the brief, it'll just be a

20  straight posttrial brief, not in the form -- do you want it in

21  the form of proposed findings of fact and conclusions of law,

22  or just a posttrial brief?

23            THE COURT:  Well, what I'm afraid is if you do it in

24  terms of proposed findings, then we're going to get into what

25  I'm afraid of, and that it will be a fencing episode.

3542

1          MR. BERNARD:  Okay.

2          THE COURT:  And I don't -- I don't think that really

3    will advance the case and my understanding of the case very

4    well.

5       I do think, actually, the more I've listened to it, I

6    wonder how much -- and you might think about revising your

7    schedule this way because I'm not sure that simultaneous

8    memoranda might -- would be as effective on this, and if you

9    -- whatever you think, but I -- my impression is that, within

10   some sort of fundamental disagreements, there's an awful lot

11   that you actually agree on, and if the plaintiff here proposed

12   a set of facts and said, these are the essential facts we

13   think are important, and the defendant had an opportunity to

14   respond, and you then had an opportunity to respond to the

15   defendant, there might be more coherence than if you were to

16   file, sight unseen, anticipating -- anticipatory briefs, but

17   I'll leave that to you.

18          MR. BERNARD:  I agree with that myself.  I mean,

19   sometimes with simultaneous filings, it's kind of ships

20   passing in the night.

21          THE COURT:  Yes.

22          MR. BERNARD:  And it's less helpful than if in the

23   traditional order the plaintiffs layout their case, and the

24   defendant responds, you know, as it sees fit, and then there's

25   a brief reply.

```
 1              THE COURT:  Right.

 2              MR. BERNARD:  And I'd be happy to go that route.

 3              THE COURT:  Yeah.  I think it may be more helpful

 4    here because I really think -- now, there are some things you

 5    clearly don't agree on, but as I listened to it, I began to

 6    think that there were substantial portions of the case that,

 7    if you both sat in a room and -- you guys are terrific

 8    lawyers, and you've dealt well with each other -- I bet you

 9    could have come -- come to a common understanding on.

10              MR. TALBERT:  Yes, Your Honor, whatever's helpful to

11    the court.

12              THE COURT:  All right.  Well, why don't you -- if

13    you want to just propose a -- you can talk to each other, and

14    if you want to propose a revised briefing schedule.  That's

15    fine with me.  All right?

16              MR. TALBERT:  Your Honor, we'd also like to thank

17    you for sitting over this matter.  I know it's been a long

18    trial, very complicated.

19              THE COURT:  All right.

20              MR. BERNARD:  And in addition, I would also like to

21    thank -- my personal thanks for having granted the

22    continuance.

23              THE COURT:  I'm glad you were able to make it in

24    June, as it were.

25              MR. BERNARD:  Thank you.
```

1              THE COURT:  And I suspect I don't need to tell you

2    to enjoy the weekend.

3        Court will stand in recess.

4        (Proceedings concluded at 3:16 p.m.)

5                        CERTIFICATION

6        I certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.

8

9

10   /s/ Julie G. Edgecomb                    June 27, 2014
     Julie G. Edgecomb, RMR, CRR              Date
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25