UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MAINE PEOPLE'S ALLIANCE and NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>           Plaintiffs,<br><br>     v.<br><br>HOLTRACHEM MANUFACTURING COMPANY, LLC and MALLINCKRODT US LLC,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

                            Case No. 1:00-cv-00069-JAW

**<u>DEFENDANT MALLINCKRODT US LLC'S PRE-FAIRNESS-HEARING BRIEF</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 4

I.      Agreed-Upon Factual Record ................................................................................ 4

II.     Fishery Closure ...................................................................................................... 7

III.    Wood Conclusions and Proposals......................................................................... 10

IV.     Phase III Discovery and Settlement Negotiations ............................................... 15

V.      Details of Settlement............................................................................................. 16

VI.     Public Outreach..................................................................................................... 18

LEGAL STANDARD......................................................................................................... 20

DISCUSSION ..................................................................................................................... 22

I.      Scientific and Technical Context for the Proposed Remedies............................. 22

        A.  There is No Conclusively Safe and Effective Remedy or Set of Remedies. ............. 22

        B.  The Remedies Should Do No Harm. ......................................................... 25

        C.  Risks of Harm from Mercury Contamination are Relatively Low. ........................... 26

        D.  Natural Recovery is Occurring, and Readily Observable Conditions of the
            Penobscot River Estuary Have Improved. ................................................... 27

II.     Applying the Foregoing Principles to the Remedial Alternatives Proposed .................. 28

        A.  Targeted Dredging Strikes an Appropriate Balance Between Risk, Cost, and
            Uncertainty, on the One Hand, and Potential Acceleration of Recovery, on
            the Other; Widescale Dredging is Not Justified and Should be Avoided.................. 29

        B.  Capping is a Viable Remedy for the Orrington Reach that Avoids Risks of
            Dredging. ................................................................................................. 30

        C.  Marsh Projects are an Appropriate Alternative to Intrusive Remedies in
            Mendall Marsh. ........................................................................................ 30

        D.  The Flexible Approach Proposed for the Orland River and the Channel East
            of Verona Island is Appropriate Given the Uncertainties Associated with that
            Reach........................................................................................................ 31

III.    The Public Commenters Overwhelmingly Support Adoption of the Consent
        Decree. ................................................................................................................. 32

IV.     A Bar Order is Appropriate To Give Finality Considering Its Nine-Figure
        Commitment, the Passage of 50 Years Since the Releases, Long Public Notice
        of the Contamination and the Litigation, and the Opportunity for Public to
        Participate in the Litigation and to Comment Here ......................................... 33

CONCLUSION..................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*City of Bangor v. Citizen Communications Co.*, 2007 WL 1557426 at *6 (D. Me. May 25, 2007), *aff'd* 532 F.3d 70 (1st Cir. 2008) ................................................................... 20, 21

*Conservation Law Foundation of New England, Inc. v. Franklin*, 989 F.2d 54, 58 (1st Cir. 1993) ......................................................................................................................... 20

*Durrett v. Housing Authority of Providence,* 896 F.2d 600, 604 (1st Cir. 1990) ........................ 20

*Maine People's Alliance v. HoltraChem Mfg. Co.*, No. 1:00-cv-00069-JAW, 2015 WL 5155573, at *20-21 (D. Me. Sept. 2, 2015) .............................................................. 12, 14

*Meghrig v. KFC Western, Inc.* 516 U.S. 479, 483 (1996) ........................................................... 21

*U.S. v. Charter Intern. Oil Co.*, 83 F.3d at 510, 521 (1ˢᵗ Cir. 1996) .......................................... 21

*U.S. v. Davis,* 261 F.3d 1, 23 (1st Cir. 2001) ............................................................................ 21

*United States v. Cannons Engineering Corp.*, 899 F.2d 79, 86 (1st Cir. 1990) .................... 20, 21

**Statutes**

42 U.S.C. § 6902(B) ................................................................................................................ 21

42 U.S.C. § 6928(a), (g) .......................................................................................................... 32

42 U.S.C. § 6972(a) ................................................................................................................. 32

42 U.S.C. § 6972(a)(1)(B) ......................................................................................................... 5

Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ............................................ 4

Defendant Mallinckrodt US LLC ("Mallinckrodt"), through undersigned counsel, submits this Pre-Fairness-Hearing Brief to support entry of the proposed settlement and Consent Decree (ECF No. 1114-1) between Mallinckrodt, the Maine People's Alliance ("MPA"), and the Natural Resources Defense Council ("NRDC") (collectively, the "Parties"). After twenty years of litigation and study, this settlement, if approved, means that measures to reduce mercury concentrations in the Lower Penobscot River Estuary will move forward now and with the support of all Parties. As explained below, the Parties will prove during the Fairness Hearing, that this settlement is fair and reasonable and will provide the public, the Court, and the Parties greater benefits in a shorter amount of time than continued litigation.

## INTRODUCTION

Nearly twenty years of court-ordered study served as the foundation for the Parties' negotiations and proposed settlement. While there remains uncertainty among the preeminent engineers and scientists responsible for the studies as to what remedial options, will effectively accelerate recovery of the system, there is general agreement that the selection of active remedies should balance potential benefits against potential harms. The Parties' proposed resolution embodies this approach. The negotiated settlement represents balance and compromise, takes into account uncertainty and complexity of the system, and attempts to accelerate recovery while minimizing the possibility of doing more harm than good.

After decades of study, the following conclusions emerged that impacted this settlement:

- **There is no "silver bullet" to address mercury in the Penobscot River Estuary** – After two decades of study by dozens of scientists and hundreds of engineers no one identified a particular remedy or set of remedies that would conclusively reduce or eliminate mercury in key biota with any high level of certainty, not to mention doing so in any meaningful timeframe and without potentially causing more harm than good. If there was an obviously solution that could be implemented safely and cost-effectively studies would not have lasted two decades;

- **The Penobscot River Estuary is extremely complex** – The system is extremely large, includes 10-14 foot tides, and has there is a saltwater freshwater interface that causes trapping of materials in the system and a mobile mass of sediment.

- **Levels of mercury are relatively low, diffuse, and pose relatively low risks** – The levels of mercury in the Penobscot are lower than at all of the mercury sites where remediation has been undertaken and below cleanup levels established for other sites. Amec Foster Wheeler's (n/k/a Wood Environment & Infrastructure Solutions, Inc.) (hereinafter, "Wood") findings demonstrate low risk to human health, and risks to the environment are limited to a few species that have not been shown to be experiencing actual harm. The aggressiveness of remedies selected should take this into account;

- **Active remedies have the potential to cause harm** – Wood recognized that active remedies could themselves cause harm and that less risky remedies should be pursued as much as reasonably possible.

- **Most of the mercury is buried, not causing harm, and natural recovery is occurring** – The highest concentrations of mercury were discharged in the 1960s and are now buried.  Conditions have improved significantly since the late 1960s and early 1970s.

- **Mercury enters the Lower Penobscot Estuary from above the Veazie dam on a daily basis at levels approximating Maine's fish-tissue action levels** – Wood recognized that it would be technically impractical to remediate to background levels of mercury.

The Parties acknowledged these points and identified remedial measures, using the findings from Phase I, II, and III studies, that can reduce levels of mercury in the system to accelerate recovery while doing so as expeditiously and safely as possible.

Under the terms of the settlement, Mallinckrodt commits to funding at least $187 million, and up to $267 million, in projects to remediate the Penobscot River Estuary. The proposed remedial actions are broadly based on the recommendations of the court-appointed engineering firm Wood. The Parties' settlement proposal mirrors Wood's in terms of concept, purpose, and areas targeted, but opts for less invasive and disruptive remedies where there is uncertainty as to efficacy and potential harm caused by the remedy itself.

The primary differences between the suite of remedies agreed upon by the Parties and those recommended in Wood's Phase III Engineering Study Report are: (1) thin layer capping

instead of dredging in the Orrington Reach; (2) beneficial environmental projects instead of thin layer capping in Mendall Marsh; and (3) the extent of dredging. The proposed remedy further commits funding to remediation in the Orland River and the channel east of Verona Island.

The proposed settlement was deliberately and thoughtfully crafted. It brings to bear the knowledge acquired over decades of study. It results from more than a year of negotiation between the Parties, who were advised by their technical consultants. The Parties' negotiations benefitted from mediative guidance from United States Magistrate Judge Nivison during a lengthy judicial settlement conference. As a result of these efforts, the settlement is substantively and procedurally fair and reasonable, and the projects it calls for are in the public interest. The Parties respectfully request that the Court find the proposed Consent Decree to be fair, reasonable, and in the public interest, *see* Consent Decree ¶ 75, and enter the Consent Decree as drafted.

This settlement should afford Mallinckrodt a meaningful degree of finality. In conjunction with the settlement, Mallinckrodt has filed a motion for entry of an order barring certain future claims against Mallinckrodt relating to mercury contamination in the Penobscot Estuary. *See* Def.'s Mot. for Entry of a Bar Order (ECF No. 1116). Such finality is a necessary inducement to the significant financial commitment Mallinckrodt is making. Moreover, the requested order is not prejudicial to potential future claimants given its scope and the posture of this case. The requested order does not prohibit claims to enforce this settlement. Members of the public would not be prejudiced because they have had ample opportunity to join this lawsuit, bring separate claims in the 40 years since Mallinckrodt's predecessor sold the HoltraChem facility, and comment upon the proposed settlement. In addition to providing finality, the bar

order would allow the remedies agreed upon by the parties to proceed unimpeded by conflicting or distracting claims.

## BACKGROUND

### I.        Agreed-Upon Factual Record

The Parties agree to, and have requested that the Court make, the following findings (Consent Decree § XII.51): Mercury discharges from the HoltraChem Site commenced when the chlor-alkali plant on the site began operations in late 1967.[1] In 1970, the United States brought suit against Mallinckrodt's predecessor, then owner and operator of the HoltraChem Site, related to those discharges. In 1972, Mallinckrodt's predecessor entered a consent decree with the United States authorizing some limited discharge of mercury into the Penobscot River. Mallinckrodt's predecessor sold the HoltraChem Site to Hanlin Group, Inc. ("Hanlin") on or around April 30, 1982, and Mallinckrodt is not responsible for any mercury discharge from plant operations at the HoltraChem Site after that date.

In 1986, the United State Environmental Protection Agency ("EPA") filed a Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, ("RCRA") administrative action against Hanlin related to discharges of hazardous substances, including mercury, from the HoltraChem Site. That action resulted in a consent agreement entered that same year.

EPA brought a subsequent action in 1991 to enforce the 1986 consent agreement, and, in 1993, the Court entered a consent decree between EPA and Hanlin that superseded the 1986 consent agreement. In the ensuing years, the Maine Department of Environmental Protection

---

[1] As defined in Paragraph 1.s. of the Consent Decree, "HoltraChem Site" shall mean the location of the former chlor-alkali facility on the east bank of the Penobscot River in Orrington, Maine, which was most recently operated by HoltraChem and is undergoing a separate cleanup being overseen by the Maine Department of Environmental Protection. The plant operated under several owners from 1967 through 2000, including a corporate predecessor to Mallinckrodt.

("MDEP") worked closely with EPA in commenting on and overseeing work performed under the 1993 consent decree.

In 2000, Plaintiffs filed their complaint in this matter under RCRA's citizen suit provision, 42 U.S.C. § 6972(a)(1)(B), alleging that mercury contamination in the Penobscot River Estuary presented or may have presented an imminent and substantial endangerment to health and the environment. (ECF No. 1.) The Court previously found in 2002 and 2015 that the mercury contamination in the Penobscot River Estuary presents or may present an imminent and substantial endangerment to health and to the environment under RCRA. (ECF No. 147 at 22; ECF No. 829 at 39.) Evidence of such endangerment was presented publicly during the trials in this matter in 2002 and 2014, and in the Court's orders in 2002 and 2015.

The Court found in 2002 that mercury concentrations in various Penobscot River Estuary organisms, including killifish, lobster tomalley, blue mussels, and cormorants, were elevated. (ECF No. 147 at 17-20.) The Court further found that individuals who lived on or near the Penobscot River suffered injuries fairly traceable to the mercury discharged from the HoltraChem Site, including from elevated levels of mercury in fish and shellfish. *Id.* at 26-27.

In November 2003, the Court ordered the creation of a Study Panel to conduct a two-phase study of mercury in the Penobscot River Estuary. (ECF No. 159.) The purpose of the study was to determine the following: (1) the extent of the existing harm resulting from mercury contamination to the Penobscot River Estuary south of the HoltraChem Site; (2) the need for and feasibility of a remediation plan to effectively address the present effects of such existing harm, if any; and (3) the elements of and timetable for the execution of the appropriate remediation plan to address the harm existing as a result of mercury contamination. *Id.* at 1-2. Among the questions the Study Panel was charged with answering was whether mercury in the Penobscot

5

River Estuary was "having significantly adverse effects on populations of organisms" in the Penobscot River Estuary. *Id.* at 2.

The Study Panel submitted a 117-page report ("Phase I Report") on January 25, 2008. (ECF No. 382.) The Phase I Report concluded that the Penobscot River Estuary was "contaminated with [mercury] to an extent that poses endangerment to some wildlife species and possibly some limited risk for human consumers of fish and shellfish." *Id.* at 5. It further concluded that the data justified the study proceeding to a second phase. *Id.*

In March 2008, the Court ordered the Study Panel to proceed to its second phase (the "Phase II Study") to address "whether it is necessary and feasible to ameliorate mercury and the methylation of mercury in the Penobscot River now and in the future by means that will exceed the benefits likely to be had by allowing the natural attenuation processes in operation in the River to accomplish over time and, if so, what reasonable human processes will accomplish that end." (ECF No. 390.) The Study Panel submitted its Phase II Report on April 19, 2013. (ECF Nos. 652-1–652-65.)

The Plaintiffs and Mallinckrodt each filed objections to the Phase II Report. (ECF Nos. 663, 664.) The Court dismissed the objections address the challenges in the course of the anticipated bench trial. (ECF No. 721.)

The Court held a bench trial between June 3, 2014 and June 27, 2014 to hear testimony and evaluate the findings and recommendations in the Phase II Report. As a result of the 2014 trial, the Court found that the mercury contamination of the Penobscot River Estuary caused by Mallinckrodt continued to present an imminent and substantial endangerment to human health and the environment. (ECF No. 829 at 39.) The Court ordered that an engineering firm be

appointed to investigate the feasibility of potential remedies to the mercury contamination. *Id.* at 1, 61.

In January 2016, the Court selected Wood to perform an evaluation of potential active remedies to speed the recovery of the Penobscot River Estuary from its state of mercury contamination. (ECF Nos. 836, 845.) In September 2018, Wood completed its Phase III Engineering Study Report containing the conclusions of its evaluation, which was filed with the Court in October 2018. (ECF Nos. 972—972-2.)

Throughout Phases I, II, and III, various State of Maine and federal government agencies were kept apprised of the studies and had involvement in various aspects of the studies. In 2011, the Maine Department of Inland Fisheries and Wildlife advised that pregnant women and young children not consume waterfowl from Mendall Marsh due to elevated mercury levels found in the tissue of black duck taken from Mendall Marsh. By emergency and permanent rulemakings in 2014, the Maine Department of Marine Resources ("DMR") closed an area of the upper Penobscot estuary to lobster and crab fishing due to elevated levels of mercury found in lobster tissue taken from the closed area. (ECF No. 829 at 52-53.) By emergency and permanent rulemakings in 2016, the DMR expanded the closed area.

## II.        Fishery Closure

The DMR's closures of portions of the lobster and crab fisheries in 2014 and 2016 were discretionary decisions based on a variety of factors, not an action mandated by public health concerns. The DMR does not have in-house expertise regarding toxicology or the public health implications of mercury contamination, and it defers to the Maine Center for Disease Control & Prevention ("MCDC") to advise it on those issues. (Dep. Tr. of DMR Rule 30(b)(6) designee Meredith Mendelson in the matter of *Wyman v. U.S. Surgical*, *et al.*, 1:18-cv-00095-JAW ("DMR Dep. Tr."), excerpts attached as **Exhibit 1**, at 20:21-21:23, 34:23-24, 35:9-36:17, 73:14-

23.) The MCDC consulted with the DMR regarding closures of portions of the lobster and crab fisheries in Lobster Management Zone D, but it did not have any decision-making authority with respect to the closures. (Dep. Tr. of MCDC Rule 30(b)(6) designee Andrew Smith in the matter of *Wyman v. U.S. Surgical*, *et al.*, 1:18-cv-00095-JAW ("MCDC Dep. Tr."), excerpts attached as **Exhibit 2**, at 35:22-36:11; DMR Dep. Tr. 25:2-14.)

In consulting with DMR regarding mercury levels in the Penobscot River Estuary, the MCDC did not consider commercially harvested and consumed lobsters in the closed area to pose a public health concern and did not recommend a commercial advisory or a closure. (MCDC Dep. Tr. 140:15-21, 157:10-158:3 ("we would not have been recommending a commercial advisory. That I'm confident of.").) The MCDC merely recommended that the DMR consider whether an advisory was appropriate to account for the possibility that certain recreational harvesters or commercial harvesters using their catch for personal or household consumption might be catching a high percentage of their product from discrete areas with high mercury concentrations. (DMR Dep. Tr. 94:6-17.) DMR does not have any data as to whether such harvesters are indeed doing this. (DMR Dep. Tr. 52:14-53:8.) The MCDC believed an advisory for non-commercial lobster harvesting would have been health protective if it were effectively communicated and people responded to it. (MCDC Dep. Tr. 146:20-24.) Moreover, neither the MCDC nor the DMR is aware of any adverse health consequences caused by past consumption of lobster or crab from the now-closed area. (MCDC Dep. Tr. 165:13-16; DMR Dep. Tr. 130:3-11.)

The DMR's primary concern is the conservation of marine resources; it is also concerned with the economic strength of Maine fisheries. (DMR Dep. Tr. 19:22-20:13.) Ultimately, the decision to implement the 2014 and 2016 fishery closures rested with a single individual, Maine

DMR Commissioner Patrick Keliher. (DMR Dep. Tr. 29:22-30:13.) While protection of public health is part of his mandate, Mr. Keliher's decision to take management action was not statutorily mandated and involved certain judgment calls. (DMR Dep. Tr. 114:9-25.)

A number of factors influenced the DMR's decisions to implement the fishery closures, DMR Dep. Tr. 99:3-7, including the following:

- The public's perception of the Maine lobster market and consumer confidence in Maine lobster (DMR Dep. Tr. 66:25-67:15, 135:16-24, 154:20-24);

- The small number of commercial lobster and crab harvesters in the closed area (DMR Dep. Tr. 85:19-22, 102:13-23, 151:13-19, 168:25-169:7, 169:20-24);

- The limited, seasonal nature of the closed area of the lobster fishery (DMR Dep. Tr. 166:20-167:9, 168:25-169:7, 169:20-24);

- Support from lobster industry association leaders and dealers for the closure (DMR Dep. Tr. 97:6-98:12, 98:20-99:2);

- The belief expressed by industry association leaders and dealers that lobster marketability would be less severely impacted by a closure than a consumption advisory (DMR Dep. Tr. 99:19-100:3, 103:16-23);

- The negative impacts of a 2008 lobster tomalley advisory on the Maine lobster industry; the DMR was particularly concerned about the perception of Maine lobster in Asian markets, which are particularly sensitive to advisories (DMR Dep. Tr. 125:18-126:18, 156:11-18);

- DMR's statutory authority for regular rule-making requires that it consider numerous factors in adopting a rule, including the impact on small business, economic and environmental considerations, fiscal and social impact, and public comments, all of which DMR took int account in adopting the closures (DMR Dep. Tr. 105:21-107:12, 122:24-123:6);

- The lack of public opposition to a closure during the public comment period (DMR Dep. Tr. 131:23-132:6); and

- Issues of enforcement (DMR Dep. Tr. 107:13-15);

The DMR did not consider any management actions other than an advisory or a closure to address mercury concentrations in lobster. (DMR Dep. Tr. 109:16-24) Nor did it consider a

closure applicable only to recreational harvesting, deciding that creating a closure only for recreational harvesting would be difficult to enforce. (DMR Dep. Tr. 110:19-23.)

## III.      Wood Conclusions and Proposals

Following Phase II, the Study Panel did not have any concrete remedial proposals, only a list of options "that weren't obvious bad ideas." (Phase II Trial Tr. 648:18-20.) Following Phase II, the Court ordered an engineering study "in order to understand the range, practicality, and cost of potential solutions." (Order on Remediation Plan (ECF No. 829) at 57.) The Court explained that in evaluating the recommendations of the engineering firm it would consider at least the following factors: "(1) whether the proposed solution has been successfully attempted previously or is innovative; (2) the likely cost of the solutions; (3) the length of time to complete the recommendations; (4) the likely effectiveness of the solution; and (5) any potential environmental harm that may be caused by the proposed solution." *Id.* at 59. From 2016 through 2018, Wood carried out the engineering study as directed by the Court.

In September 2018, Wood submitted its Phase III Engineering Study Report containing the conclusions from its evaluation. (Phase III Engineering Study Report (ECF No. 972) ("Phase III Report").) The Phase III Report recommended a combination of remedial alternatives with an estimated total cost between $246,068,000 and $333,376,000. (Phase III Report at ES-3 to ES-4, ES-10.) Wood's proposed remedies were (1) thin layer capping in Mendall Marsh; (2) dredging of five deposits of sediment in various locations in the river and estuary; (3) dredging of intertidal areas and marsh platforms on the east bank of the Orrington reach; and (4) long-term monitoring. (Phase III Report at ES-10.)[2]

---

[2] In addition, Wood posited two potential adaptive management remedial alternatives that could evaluated, and potentially implemented, based on ongoing data collection and analysis: (1) enhanced monitored natural recovery in the Orland River; and (2) dredging of Verona East, Verona Northeast, and the Orland River. (Phase III Report at 8-17-8-20.) Wood estimated the capital costs of enhanced monitored natural recovery in the Orland River would be

Wood made clear that more remediation is not necessarily better. For example, Wood did not recommend system-wide dredging because it would take decades to implement, would destroy habitat, had the potential for increased mercury uptake by biota during and after dredging, and would be particularly expensive. (Phase III Report at 8-5.) Wood further noted that the relatively high background mercury concentrations in the Penobscot system limited the extent to which remediation could be effective. The particulate mercury concentrations coming from upstream of the Orrington plant average somewhere between 150 and 300 nanograms per gram ("ng/g"). *See* K. Merritt Jan. 29, 2019 Dep. Tr., excerpts attached as **Exhibit 3**, at 444:9-17 (testifying to average concentration of approximately 220 ng/g). And Wood concluded that remediation to, or below, background mercury concentrations—which it calculated at 180 ng/g—"would be technically impractical." (Phase III Report at 6-3.)

Wood acknowledged that its proposed remedies, even if successful, present an uncertain timeline for recovery. Wood's proposal focused on reducing the surface-weighted average concentration ("SWAC") of total mercury in sediments to a Preliminary Remediation Goal ("PRG") of 500 ng/g or less. Wood estimated that at the current rate of natural recovery it would take at least 45 years to reach the PRG of 500 ng/g. (Phase III Report at ES-7.) In comparison, Wood estimated that it would take approximately 13 years to implement the capping and dredging it proposed, *see* Phase III Report, Figure ES-2, Conceptual Timeline for Remedy Implementation (ECF No. 972 at 14 of 172), followed by at least an additional 25 years for the system-wide SWAC to reach 500 ng/g, *see* Phase III Report at ES-5, ES-6, 8-1. The 25-year figure is itself an estimate based on many assumptions and with a great deal of uncertainty. (K.

---

$15,070,000. *Id.* at 8-27. And Wood estimated dredging of Verona East, Verona Northeast, and the Orland River would cost $496,640,000 if beneficial reuse were available and $675,900,000 if landfill disposal were required. *Id.* at 8-27-8-28.)

Merritt Jan. 29, 2019 Dep. Tr. 436:3-437:9.) Thus, the acceleration of recovery contemplated by Wood's proposal is relatively modest.

Once sediments finally reach a SWAC of 500 ng/g, ecological recovery would take an unknown period of time. *See* Phase III Report at 8-16. Because the relationship between total mercury concentrations in sediment and methylmercury concentrations in relevant ecological receptors is uncertain and varies throughout the system, the relationship between reduction in sediment concentrations and ecological recovery is unknown.[3] *See id.*; K. Merritt Jan. 29, 2019 Dep. Tr. 274:6-25 (because only "a very small part of the total mercury" methylates, "one could remediate a significant fraction of the mass and not be able to predict the impact of that remediation on the methylation rate in the environment").

During its study, Wood also assessed risk to human and ecological receptors as a necessary step in determining whether remedial action is necessary. *See* Phase III Report at 4-1. This assessment revealed a lack of any serious threat to human health or the environment from mercury contamination in the Penobscot. The primary author of the Phase III Report agreed that surface sediment concentrations are not driving a significant human health risk or a need for remediation. (K Merritt Oct. 23, 2019 Dep. Tr., excerpts attached as **Exhibit 4**, at 120:20-122:9.) At other remediation sites with similar surface sediment mercury concentrations, other contaminants were also present and necessitated the remedy. *Id.* at 122:4-9. Indeed, Mallinckrodt expert Betsy Henry observed that concentrations of mercury in Penobscot sediments are lower than at all of the mercury sites where remediation has been undertaken. (Expert Report of Betsy Henry, attached as **Exhibit 5**, at 9.) She further observed concentrations of mercury in Penobscot

---

[3] The Court concisely and adeptly discussed the distinction between total mercury and methylmercury at *Maine People's Alliance v. HoltraChem Mfg. Co.*, No. 1:00-cv-00069-JAW, 2015 WL 5155573, at *20-21 (D. Me. Sept. 2, 2015).

sediments are already below the MDEP and USEPA cleanup level for the Southern Cove at the HoltraChem Site. *Id.* at 9-10.

Wood looked beyond total concentrations to determine whether efficient methylation in parts of the system presented a risk despite the relatively low total mercury concentrations. It found that methylmercury in the Penobscot poses relatively little risk to human health and the environment. With respect to environmental risk, the only species Wood studied in which it found *potential* risk for adverse effects were the Nelson's sparrow and red-winged blackbird. (Emmett Curtis Jan. 14, 2019 Dep. Tr., excerpts attached as **Exhibit 6**, at 167:20-169:23.) But Wood does not know whether there are actual effects on those species because no site-specific study had been conducted. *Id.* at 169:24-170:3. Wood's ecological risk specialist testified that if a site-specific study showed that songbird reproduction, as represented by Nelson's Sparrow, is not adversely affected by exposure to mercury in Mendall Marsh, remediation of Mendall Marsh would not be warranted. (E. Curtis Sept. 13, 2019 Dep. Tr., excerpts attached as **Exhibit 7**, at 108:11-18.)

Shortly after the Phase III Report was released, Mallinckrodt asked University of Delaware Professor of Wildlife Ecology, Dr. W. Gregory Shriver, to conduct a site-specific study to address the informational gap. Dr. Shriver performed a two-year field study of Nelson's sparrows in Mendall Marsh. *See* Expert Report of W. Gregory Shriver, Ph.D. (Nov. 1, 2019), attached as **Exhibit 8**, at 4, 9, 19.) As a result of his study, Dr. Shriver concluded that mercury contamination was not reducing the species' reproductive success. *Id.* at 4, 9, 34-35. Thus, irrespective of whether there is a potential risk to marsh songbirds, there does not appear to be actual harm.

With respect to human health, Wood found that the mercury concentrations in lobsters, mussels, soft-shell claims, rainbow smelt, tomcod, and black duck do not pose a risk requiring remediation. (E. Curtis Sept. 13, 2019 Dep. Tr. 44:20-45:2; L. Smith Feb. 12, 2019 Dep. Tr., excerpts attached as **Exhibit 9**, 55:6-56:22.) Given the economic importance of the lobster fishery in the State of Maine, Wood applied a particularly conservative risk-assessment approach to its evaluation of lobster, but still concluded that it did not pose a risk requiring remediation. (L. Smith Feb. 12, 2019 Dep. Tr. 64:7-65:11.) According to Wood's human health risk assessment, the only organism with a potential for adverse health effects was American eel, if ingested by young children. (L. Smith Feb. 12, 2019 Dep. Tr. 55:6-56:22.) But Wood concluded that American eel in this area are unlikely to be ingested by humans and therefore unlikely to pose an unacceptable risk. (L. Smith Feb. 12, 2019 Dep. Tr. 52:4-13; 58:16-59:4.) Moreover, the risk from hypothetical consumption of eel cannot be extrapolated to other fish because there is not sufficient data to show that eel is representative of other finfish at its level on the food chain. *Id.* at 57:23-58:5; 81:3-15.

Wood's risk-assessment resolved a lingering question from Phase II as to whether Maine's so-called fish tissue action level for methylmercury ("FTAL") provides an appropriate remediation target. During the Phase II trial, there was a dispute as to whether the FTAL of 200 ng/g represented an appropriate target for remediation. *See Maine People's Alliance v. HoltraChem Mfg Co.*, No. 1:00-cv-00069-JAW, 2015 WL 5155573, at *8 (D. Me. Sept. 2, 2015). A Wood risk specialist testified that the FTAL tends to be overly conservative, in part because it is not based on species-specific consumption rates, especially for species like lobster, eel, and black duck. (L. Smith Feb. 12, 2019 Dep. Tr. 45:18-46:19.) Using that figure "would cause you to remediate to a lower level than necessary." *Id.* at 46:18-19. Wood acknowledged

14

that even its own PRG of 500 ng/g—two-and-a-half-times higher than the FTAL—is so conservative as to be potentially "overly protective," leading to more remediation than necessary. *Id.* at 124:5-125:18.

## IV.        Phase III Discovery and Settlement Negotiations

After submission of the Phase III Report, the Parties commenced discovery to better understand Wood's study and resulting report. The Parties deposed Wood personnel and designated their own experts to analyze and comment upon the report. The Parties shared their experts' reports with certain Wood personnel then began a second round of Wood depositions to ascertain their reactions to the Parties' experts' analyses.

The depositions helped the Parties better understand Wood's findings and conclusions and informed settlement discussions. Wood testified, for example, that if capping in Orrington could be implemented that would help reach the SWAC, but without the risk of dredging. *See* K. Merritt Jan. 29, 2019 Dep. Tr., 304:20-22, 307:16-308:4, 413:17-414:5, 418:18-419:25. It testified that if site-specific studies showed no population level impacts on species, active remedies may not be necessary. (E. Curtis Sept. 13, 2019 Dep. Tr. 108:11-18.) It testified to the risks inherent in environmental dredging. (K. Merritt Jan 29, 2019 Dep. Tr. 307:16-308:4.) And it testified that active remediation should be as uninvasive as reasonably possible. *See* K. Merritt Jan. 28, 2019 Dep. Tr., excerpts attached as **Exhibit 10**, at 33:19-25 ("in thinking about remedial design, one of our drivers was thinking about, essentially, lower impact as reasonably possible); *also* Corry Platt Feb. 5, 2019 Dep. Tr., excerpts attached as **Exhibit 11**, at 68:3-8 ("if two remedies could achieve the objective, but one is less invasive it would be better to do the remedy that is less invasive"); Eugene Shephard Jan. 23, 2019 Dep. Tr., excerpts attached as **Exhibit 12**, at 32:12-33:22 (testifying that a balance needs to be struck between "what would be termed as a

nuclear option" and options that will be "protective of the environment, but at the same time not necessarily destroy the ecosystem").

As a result, beginning in late 2019, the Parties shifted their focus to settlement discussions. On November 6, 2019, the Parties sought to continue litigation deadlines to allow them to focus on settlement negotiations, ECF No. 1041, which the Court granted on November 18, 2019. On February 27, 2020, the Parties sought a stay of all scheduling order deadlines, notifying that Court that they were making progress and wished to continue to focus their efforts on settlement discussions. (ECF No. 1057.) On March 5, 2020, the Court granted that request. (ECF No. 1060.)

On July 21, 2020, the Parties requested assignment for a judicial settlement conference to help them reach settlement and avert the need for trial. (ECF No. 1073.) The Court granted this request, ECF No. 1074, and the Parties participated in a judicial settlement conference with Magistrate Judge Nivison on September 30, 2020, ECF No. 1084. Through the judicial settlement conference, and with some additional follow-up communication, the Parties were able to reach agreement in principle on remediation activities and associated funding commitments to resolve this litigation.

The Parties spent the next several months negotiating and drafting the proposed Consent Decree and the associated trust agreements and statements of work. The Parties finalized and filed those documents, as well as a joint motion to approve the proposed Consent Decree, on March 19, 2021.

## V.        Details of Settlement

The Consent Decree provides for a suite of remedies agreed upon by the Parties. The proposed remedies are focused on the areas and characteristics of the River for which they can do the most good with the least risk. As detailed below, these include the Orrington Reach,

Orland River, mobile sediments, and beneficial environmental projects, and long-term monitoring. They proposed remedial activities are as follows:

- **Orrington Reach - $50 million in primary remedies; $10 million in contingent remedies.** Remediation work in the Orrington Reach will include $50 million in committed funding for capping of intertidal sediments, primarily on the east side of the Orrington Reach. $10 million in contingency funds will be used, if needed, to complete the work or for future cap monitoring and maintenance.

- **Mendall Marsh - Monitoring and Possible Marsh-Related Projects.** The primary remedy in Mendall Marsh will be monitored natural recovery, in which the marsh will be monitored while natural sedimentation gradually buries mercury contamination below the biologically active layer of the marsh. In addition, a portion of the funds for Beneficial Environmental Projects may be allocated to projects that would benefit Mendall Marsh.

- **Orland River - $30 million in primary remedies.** $30 million will be dedicated to primary remedies for the region that includes the Orland River and the channel east of Verona Island. The trustees will have discretion as to the remedial activities selected, but measures may include a combination of targeted capping and/or removal, or enhanced monitored natural recovery, a process by which clean sediment is naturally dispersed by tides and currents to dilute contamination and accelerate natural recovery.

- **Targeted Removal of Mobile Sediment - $70 million in primary remedies; $50 million in contingent remedies.** The settlement commits $70 million to targeted removal of contaminated sediment that may be caught in the Estuary by tides and currents. The specific locations and amounts will be determined by the trustees. Sediment removed from the Estuary would be beneficially reused if possible, by recycling it for use in upland infrastructure or construction projects. $50 million in contingency funds is also allocated to pay for safe landfill disposal if it is not possible to beneficially reuse some of the sediment.

- **Beneficial Environmental Projects - $20 million for beneficial projects.** $20 million in committed funds will be allocated for projects designed to provide tangible environmental or public benefits to the community. These may include restoration projects, tidal marsh projects, and any project that benefits the natural environment of the Penobscot River Estuary or improves recreational or aesthetic enjoyment of the Penobscot River Estuary. Specific projects will be determined later by the trustees.

- **Long-Term Monitoring - $10 million in primary remedies; $10 million in contingent funding.** In addition to remedy-specific monitoring, the settlement dedicates at least $10 million for 30 to 45 years of long-term monitoring of the Penobscot River Estuary. Sediment, water, and wildlife will be monitored at regular intervals to track the recovery of the Penobscot River Estuary.

- **Project Management - $7 million in primary remedies; $10 million in contingent funding.** In addition, Mallinckrodt has committed $7 million to cover project management funds, with contingent funding of an additional $10 million in the event further project management funds are needed.

*See* Consent Decree § VI. All told, Mallinckrodt is committing at least $187 million in funding to remedial projects, and up to an additional $80 million if certain contingencies are met, for a total possible commitment of $267 million.

The terms of the proposed Consent Decree provide for the establishment of two trusts to administer the settlement funds and remedial projects. The Parties submitted the trust agreements with the Consent Decree. (ECF Nos. 1114-3, 1114-4.) The work provided for in the Consent Decree would be funded through the trusts, which would be managed and directed by independent trustees that are affiliates of Greenfield Environmental Trust Group, Inc. ("Greenfield"). The Parties selected Greenfield because it specializes in administering complex environmental remediations and has thirty years of experience overseeing similar environmental response trusts nationwide. The Parties would be beneficiaries under the trusts, and their consultants may provide advice and information to the trustees, *see* Consent Decree ¶¶ 1.d, 26 but the trustees have ultimate discretion over decisions not prescribed by the Consent Decree or trust agreements. The Parties have been consulting with Greenfield for the past several months to exchange information regarding Penobscot River Estuary.

## VI.      Public Outreach

Since lodging the Consent Decree, the Parties have engaged in substantial outreach to apprise stakeholders and the general public of the proposed settlement and their opportunity to comment at the fairness hearing. The outreach has proceeded as described in the Parties' Joint Motion to Approve the Proposed Plan for Fairness Hearing and Set a Hearing Schedule (ECF No. 1136) (the "Joint Plan").

From May through September of 2021, the Parties held meetings with numerous stakeholders, presenting details of the proposed settlement and answering questions. During this process, the Parties met with representatives from the towns of Bucksport, Hampden, Orrington, and Searsport; the economic development directors of Bangor and Brewer; certain state representatives and senators; representatives of The Nature Conservancy; officials with the Maine Department of Environmental Protection; Special Master Susan Calkins, and the Wood personnel in charge of the Phase III engineering study.

In parallel with those meetings, the Parties took steps to provide broader notice to stakeholders and the general public. The Parties prepared a public notice that described the terms of the proposed settlement, identified sources of further information, and explained how to submit public comments and participate at the fairness hearing. The court approved the language of the public notice on August 6, 2021 (ECF No. 1141). The Parties published the court-approved public notice for three days in mid-August in the *Portland Press Herald* and the *Bangor Daily News*. In addition, the Parties sent the public notice via email to stakeholders identified in the categories in Section I(A)-(K) of the Parties' Joint Plan. The notice provided the URL for a website created by the Parties with information regarding the settlement at www.PenobscotRiverRemediation.com. That website includes a contact page that members of the public could use to provide comments on the proposed settlement.

The notice further advised the public of online public meetings scheduled for September 9 and 14. Those meetings were held as scheduled. During the meetings, the Parties presented details of the proposed settlement, informed attendees how to comment, and answered attendees' questions.

## LEGAL STANDARD

In determining whether the proposed Consent Decree should be approved, the Court should consider whether the Consent Decree is fair, reasonable, and consistent with the purpose of the statute. *City of Bangor v. Citizen Communications Co.*, 2007 WL 1557426 at *6 (D. Me. May 25, 2007), *aff'd* 532 F.3d 70 (1st Cir. 2008) (applying standard applicable to review of CERCLA consent decrees to proposed consent decree involving RCRA claims; noting the court had not found any authority indicating a different standard of review should be utilized for RCRA consent decrees); *see also Conservation Law Foundation of New England, Inc. v. Franklin*, 989 F.2d 54, 58 (1st Cir. 1993) (quoting *Durrett v. Housing Authority of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) (internal quotations and citations omitted) ("District courts must review a consent decree to ensure that it is fair, adequate, and reasonable; that the proposed decree will not violate the Constitution, a statute or other authority; and that it is consistent with the objectives of Congress"). In performing this task, the district court's review "must acknowledge the wide range of potential problems and possible solutions and thereby leave it to the parties to resolve highly technical issues and relatively petty inequities." *City of Bangor,* 2007 WL 1557426 at *6 (citing *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 86 (1st Cir. 1990)). "The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." *Cannons Engineering Corp.*, 899 F.2d at 84 (citing to *Durrett v. Housing Authority*, 896 F.2d 600, 603-04 (1st Cir. 1990).

In examining a consent decree's fairness, a court must consider both procedural and substantive fairness. "To gauge procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *City of*

*Bangor v. Citizens Communications Co.*, 532 F.3d 70, 96 (1st Cir. 2008) (quoting *Cannons Engineering Corp.*, 899 F.2d at 86) (internal quotations omitted). When evaluating CERCLA consent decrees, prior courts have concluded that "a finding of procedural fairness may also be an acceptable proxy for substantive fairness, when other circumstantial indicia of fairness are present." *U.S. v. Davis,* 261 F.3d 1, 23 (1st Cir. 2001) (internal citations omitted). Substantive fairness goes to the fairness of the final result, "introduc[ing] into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Cannons Engineering Corp.*, 899 F.2d at 87.

A district court's reasonableness inquiry is a pragmatic one not requiring precise calculation, but rather whether the decree provides for efficient cleanup and adequately compensates the public for its costs in light of foreseeable risks of loss. *U.S. v. Charter Intern. Oil Co.*, 83 F.3d at 510, 521 (1st Cir. 1996) (citing *Cannons Engineering Corp.,* 899 F.2d at 89-90). When evaluating whether a proposed consent decree is consistent with RCRA, prior courts have focused their analysis on determining whether the consent decree will meet the intended purpose of the statute. Whereas the purpose of CERCLA has been found to include the "expeditious remediation of waste sites, adequate compensation to the public fisc and the imposition of accountability," *Davis,* 261 F.3d at 26, by comparison RCRA's purpose has been found to be more focused on the simple goal of ensuring the proper treatment, storage and disposal of hazardous waste so as to minimize the present and future threat to human health and the environment. *City of Bangor,* 2007 WL 1557426 at *9 (internal quotations omitted) (quoting *Meghrig v. KFC Western, Inc.* 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(B))).

**DISCUSSION**

The Parties' selection of remedies in the proposed Consent Decree represents a balance of the benefits and risks of remedial activity, with consideration given to the substantial uncertainty as to the outcome of any remedial activity and the relatively low degree of risk currently presented by mercury contamination. The proposed remedies are reasonably likely to accelerate recovery of the system—and all but assured to do good for the environment—while largely avoiding risk of further harm.

**I.        Scientific and Technical Context for the Proposed Remedies**

In considering the appropriateness of the remedies proposed in the Consent Decree, it is important to understand the scientific and technical conclusions underpinning them. The complexity of the system, uncertain efficacy of the various options presented by Wood, and risks of invasive remedies caused Mallinckrodt to favor remedies that are (1) well established, (2) focused on well-characterized elements of the system, (3) unlikely to cause harm, and (4) likely to achieve the greatest results per dollar committed. The scientific and technical background justifies the Parties' decision to propose targeted dredging—less extensive than Wood had proposed, and focused on areas that will have the most potential impact. And the scientific and technical background justifies the Parties' decision to propose a less invasive approach to Mendall Marsh and to provide the trustees flexibility in selecting Beneficial Environmental Projects and remedies for the Orland River and the channel east of Verona Island.

A.   There is No Conclusively Safe and Effective Remedy or Set of Remedies.

The Parties' settlement discussions were colored by uncertainty as to what would safely and effectively accelerate recovery of the Penobscot River Estuary. One of the complications of remediating mercury contamination is that removal or sequestration of a mass of mercury does not necessarily equate to a reduction in toxicity. Mercury becomes toxic when it is converted to

22

methylmercury. As the Phase III Report's lead author Karen Merritt put it, "one could remediate a significant fraction of the mass [of mercury] and not be able to predict the impact of that remediation on the methylation rate in that environment." (K. Merritt Jan 29, 2019 Dep. Tr. 274:17-25.) There are sites where total mercury has been reduced in surface-weighted average concentrations but methylmercury concentrations have not decreased, or have even increased. (K. Merritt Oct. 23, 2019 Dep. Tr. 18:23-19:21.) Due to this and other complexities associated with mercury, there is no easy, obvious solution to reducing mercury concentration in key biota receptors. (K. Merritt Jan. 29, 2019 Dep. Tr. 278:23-279:3.)

Indeed, Dr. Merritt testified that "predictions about the timing and magnitude of recovery resulting from remedial action are speculative" and that nobody has successfully demonstrated an ability to reach ecological targets through remediation at mercury sites. (K. Merritt Oct. 23, 2019 Dep. Tr. 126:21-128:9; Wood Rule 30(b)(6) 6, 2018 Dep. Tr., attached as **Exhibit 13**, at 163:13-164:10 (explaining that Karen Merritt was the primary author of the Phase III Report)).

Wood's engineering study confirmed that there is no perfect remedy that would reliably, safely, and efficiently ameliorate all potential harm. Wood concluded that even the most aggressive remedial alternatives evaluated would not lower mercury concentrations in lobster tissue in the 2016 closed area below the FTAL. (Phase III Report at 6-4.) The alternatives that Wood concluded would get closest to this level were system-wide dredging and enhanced monitored natural attenuation to achieve a system-wide sediment mercury concentration goal 300 nanograms per gram. *Id.* Yet, for various reasons, neither option is advisable.

Wood did not recommend system-wide dredging because it would take decades to implement, would destroy habitat, had the potential for increased mercury uptake by biota during and post dredging, and would be particularly expensive. (Phase III Report at 8-5.) Wood

estimated that system-wide dredging to a sediment concentration of 300 nanograms per gram would cost more than $5.5 billion. *Id.*

And Wood did not recommend enhanced monitored natural attenuation to a sediment concentration of 300 nanograms per gram "based on the uncertainty as to how this remedial alternative would be applied system-wide and the potential for negative effects from its application." (Phase III Report at 8-4.) Enhanced monitored natural attenuation is

> innovative and has not been demonstrated on field scale for open systems such as estuaries. System-wide application of this alternative would require extensive pre-design modeling to determine the implementation strategy. There is the concern that added material might deposit in unintended areas such as in shipping channels and adversely impact navigation. In addition, permits for this alternative could be difficult to obtain due to the increased turbidity and particulate load that would result from material addition which could affect biota (e.g. burial of fish eggs).

*Id.*

Even if remedial alternatives could feasibly lower mercury concentrations in lobster tissue below the FTAL in the closed area, there is no telling whether that would result in lifting of the closure. As explained above, the closure was a discretionary decision made for a variety of reasons, many having to do with the perception and marketability of Maine lobster. While public health was part of this calculus, the MCDC did not determine there to be a public health risk from the commercially caught lobster that is subject to the closure. Because the reasons for the closure are multi-faceted and discretionary, there is no telling what effect any remedial activity might have on the closure.

Wood further concluded that background levels of mercury concentrations in the Penobscot River Estuary impose constraints on the efficacy of remedial options. Wood found that remediating to or below background mercury concentrations "would be technically impractical" and that background levels in the system approximate Maine's FTAL for

24

methylmercury. (Phase III Report at 6-3.). Thus, Wood's focus on a PRG of 500 ng/g was appropriate. Implementing aggressive measures in an effort to reach a lower SWAC would be doomed to fail and not worth the risk and disruption such measures would cause.

Permitting the various remedial alternatives presents another difficulty. The remedial activities considered by both Wood and the Parties require various state, federal, and local permits. Like Wood, the Parties took the permitting processes into account in considering the various remedial alternatives. Mallinckrodt's expert Dana Valleau opined regarding the federal, state, and local permits required for various remedial activities considered and the processes for obtaining those permits. *See* Expert Report of Dana Valleau, attached hereto as **Exhibit 14**. His opinions demonstrate that permitting the remedies proposed by the Parties will be a significant task but not as challenging as permitting Wood's proposed remedies. (Valleau Report at 18-23.) In particular, the Parties' selection of thin layer capping in areas where Wood proposed widescale dredging should make the permitting process more efficient and likely to succeed. *See id.* Moreover, the selection of Beneficial Environmental Projects in lieu of thin layer capping in Mendall Marsh will provide the trustees greater flexibility in pursuing alternatives that can be permitted by the relevant regulators.

B. The Remedies Should Do No Harm.

In light of the uncertainties and challenges surrounding remediation, the Parties have endeavored to select remedies that will not create or exacerbate any harm to the system. Indeed, Mallinckrodt's guiding principle throughout Phase III has been "do no harm."

During discovery, Wood witnesses testified that an important principle of environmental remedial action is to do no further harm than would exist absent active remediation. Dr. Merritt testified as follows:

25

> In the environmental engineering field, there is a growing—and I think very appropriate—focus on minimizing impacts in the process of creating remedy. And so the phrase one might use is nobody would want a situation in which the operation is a success, but the patient dies. That's sort of the colloquialism that people use. And so in thinking about remedial design, one of our drivers was thinking about, essentially, lower impact as reasonably possible.

(Karen Merritt Jan. 28, 2019 Dep. Tr. 33:19-25; *see also* Corry Platt Feb. 5, 2019 Dep. Tr. 68:3-8 ("if two remedies could achieve the objective, but one is less invasive it would be better to do the remedy that is less invasive"); Eugene Shephard Jan. 23, 2019 Dep. Tr. 32:12-33:22 (testifying that a balance needs to be struck between "what would be termed as a nuclear option" and options that will be "protective of the environment, but at the same time not necessarily destroy the ecosystem").)

According to Wood, dredging is a particularly risky and high-impact remedy. It is the most invasive and risky of all of the remedial alternatives Wood considered. (K. Merritt Jan 29, 2019 Dep. Tr. 307:16-308:4; *see also* Phase III Report at 8-5 (describing potential habitat destruction and increased mercury uptake by biota from widescale dredging.) Even with best-management practices, dredging poses a risk of resuspending and redistributing mercury. (K. Merritt Jan 29, 2019 Dep. Tr. 307:16-308:4.) Resuspension and redistribution of mercury caused by dredging can lead to increased mercury concentrations in ecological receptors. *Id.* at 414:16-415:5. And features of the Penobscot system render it particularly susceptible to these risks. *Id.* at 418:18-419:25. Wood did not evaluate potential resuspension from dredging or its likely impact on biota. *Id.* at 413:17-414:4.

C.   Risks of Harm from Mercury Contamination are Relatively Low.

The relatively low risk of harm presented by the current condition of the Penobscot River Estuary underscores the imperative to do no harm. As discussed above, Wood's Phase III study revealed a lack of any serious threat to human health or the environment from mercury: (1) Total

mercury concentrations are low relative to other mercury sites where active remediation has been undertaken; (2) the only species Wood studied in which it found *potential* risk for adverse effects were the Nelson's sparrow and the red-winged blackbird; (3) a site-specific study established that the potential for adverse effects on these species is more theoretical than factual since mercury contamination is not reducing reproductive success; (4) the only organism posing a potential for adverse health effects in humans—American eel—is unlikely to be ingested by humans; and (5) Maine's FTAL is overly protective and does not represent a realistic remediation target. *See supra* at p. 15, 24-25. Moreover, the lobster fishery closure should not be viewed as a proxy for public health risk, because the MCDC determined that the commercially harvested and consumed lobster subject to the closure do not pose a public health concern. The relatively low risks presented by the status quo should temper any impulse to pursue the most aggressive—*i.e.*, risky and disruptive—remedies.

D. <u>Natural Recovery is Occurring, and Readily Observable Conditions of the Penobscot River Estuary Have Improved.</u>

Remedial activity should avoid disrupting the natural recovery and thriving use of the Penobscot River Estuary. There is no dispute that the system is recovering, albeit more slowly than one might expect. Wood estimated that at the current rate of natural recovery it would take on the order of 45 years for sediments to reach the preliminary remediation goal of 500 ng/g. (Phase III Report at ES-7.) But even with aggressive remedial options, estimated recovery times are on the order of multiple decades. *Id.* at Figure ES-2 (estimating approximately 30 years to implement Wood's primary and adaptive management remedies).

In addition, it is apparent to the layperson that the Penobscot River Estuary is in far better shape than it was during much of the twentieth century. Numerous commenters who have observed the system for decades noted the improved condition of the system compared to

decades ago, the thriving commercial and recreational use of the Penobscot River Estuary, and the opportunities it presents for the region's future. These individuals shared their concerns that overly aggressive remedial activity could jeopardize present and future uses of the river. In particular, they expressed concern for widescale dredging both because it could cause ecological harm and disrupt commercial and recreational use of the Penobscot River Estuary. *See* Aff. of Dean Bennett, attached hereto as **Exhibit 15**; Aff. of Sheila Dassatt, attached hereto as **Exhibit 16**; Aff. of Jim Gillway, attached hereto as **Exhibit 17**; Aff. of Ernie Kilbride, attached hereto as **Exhibit 18**, Aff. of Richard Rosen, attached hereto as **Exhibit 19**; Aff. of Tom Sawyer, attached hereto as **Exhibit 20**.

The natural recovery of the system, its visible improvement in recent decades, and its thriving present and future uses are important considerations when striking the balance between aggressive cleanup measures and the potential adverse consequences of remediation.

## II.       Applying the Foregoing Principles to the Remedial Alternatives Proposed

The Parties will demonstrate to the Court that the proposed remedies strike an appropriate balance between the benefits of taking action to accelerate recovery and the risks of overly aggressive action that could do greater harm or present diminishing returns. The proposed remedies provide a reasonable likelihood of accelerating recovery despite the challenges endemic to remediating mercury and the complexities presented by the system. Consistent with the Court's criteria, the proposed remedies are well-established, relatively cost-effective, can be permitted and implemented relatively quickly, present a reasonable likelihood of accelerating recovery, and pose less potential for environmental harm than other remedies that have been considered. *See* Order on Remediation Plan at 59. Given the need to move forward in the face of lingering uncertainty after nearly 20 years of study, this approach is in the public interest and should be adopted by the Court.

A. <u>Targeted Dredging Strikes an Appropriate Balance Between Risk, Cost, and Uncertainty, on the One Hand, and Potential Acceleration of Recovery, on the Other; Widescale Dredging is Not Justified and Should be Avoided.</u>

The proposed settlement calls for targeted dredging of mobile sediments but involves less extensive dredging than proposed by Wood. The Parties propose dredging of mobile sediments, as Wood had recommended, but propose to do so in a more targeted fashion. The Parties' proposal commits $70 million to dredging mobile sediments (or up to $120 million if beneficial reuse is not available), whereas Wood's proposed mobile-sediment dredging was estimated to cost $107 million to $175 million. *See* Phase III Report at Table ES-1. Moreover, the Parties' proposal provides the trustees with greater discretion as to the specific areas to target for dredging. This is appropriate since the surface deposits targeted in Wood's proposal were not definitively delineated. In addition, the Parties propose thin layer capping in the Orrington Reach, as opposed to the dredging proposed by Wood. As discussed below, thin layer capping is a safe and effective remedy.

Scaling back the amount of dredging from what Wood proposed is appropriate in light of the risks and costs associated with dredging and its uncertain efficacy. As explained above, Wood agrees with Mallinckrodt that dredging is a particularly risky and high-impact remedy. Although Wood proposed dredging on a larger scale than agreed to by the Parties, Wood personnel expressed during discovery concerns with the widescale dredging proposed and agreement that other alternatives could achieve the same goals. *See* K. Merritt Jan. 29, 2019 Dep. Tr. 304:20-22, 307:16-308:4, 413:17-414:5, 418:18-419:25. In sum, the proposed remedy is designed to remove a significant volume of mercury from the system, but the dredging is tailored to account for risk, uncertain efficacy, disruption to the system, and return on investment.

B. <u>Capping is a Viable Remedy for the Orrington Reach that Avoids Risks of Dredging.</u>

The proposed settlement would fund thin layer capping in the Orrington Reach, where Wood had proposed dredging. Compared to dredging, thin layer capping is a lower impact remedy that has the benefits of "[l]ess overall ecological impact, while still achieving a stated ecological recovery goal." (K. Merritt Jan. 29, 2019 Dep. Tr. 304:20-22.) Wood recognized that thin layer capping is a safe and effective remedy. The Phase III Report states that it is "a proven technology" (albeit not on marsh platforms as Wood had proposed to use it) (Phase III Report at 8-8.)

Danny Reible, a preeminent expert in the application of environmental capping, will explain that thin layer capping can be safely, effectively, and efficiently implemented. He will explain that a cap can readily be engineered to withstand the strongest currents in the Orrington Reach and will present far less risk than dredging.

C. <u>Marsh Projects are an Appropriate Alternative to Intrusive Remedies in Mendall Marsh.</u>

In Mendall Marsh, the Parties have proposed long-term monitoring and beneficial environmental projects in lieu of the more invasive thin layer capping of the marsh platform that Wood proposed. Unlike subaqueous capping, which the parties propose to undertake in the Orrington reach, capping on a marsh platform has not been established as an effective or safe remedy. Caps have been placed on marsh platforms at other sites for fill, erosion control, or to address marsh disturbance, but, to Wood's knowledge, not for the purpose of contaminant control as Wood had proposed. (K. Merritt Jan. 29, 2019 Dep. Tr. 468:11-19.) Risks associated with capping a marsh platform include impacts on vegetation and invertebrates living in the marsh soil and the extent and frequency of inundation of the marsh. (K. Merritt Jan. 28, 2019 Dep. Tr. at 43:4-22.)

The Parties do not consider these risks worthwhile given the relative health of Mendall Marsh. This is underscored by Dr. Shriver's post-Phase-III study, which established that songbird reproduction was not adversely affected by exposure to mercury in Mendall Marsh. Where, the risk to marsh songbirds is theoretical, not factual, disrupting and potentially harming this delicate ecosystem through thin layer capping is not justified in this otherwise healthy marsh.

As an alternative to thin layer capping in Mendall Marsh, Mallinckrodt has committed $20 million to Beneficial Environmental Projects. These are projects "undertaken to provide tangible environmental or public benefits to affected communities or the environment that are intended to mitigate or offset potential adverse impact(s) directly or indirectly caused by mercury contamination at the Site." (Consent Decree § II.1.b.) Beneficial Environmental Projects may include Tidal Marsh Projects, *see* Consent Decree § VI.13.b, which are "a subcategory of Beneficial Environmental Projects that are reasonably anticipated to restore, enhance, or preserve tidal marsh functions and habitat anywhere in the State of Maine," *Id.* § II.1.vv. The trustees have discretion as to the projects that are ultimately selected and may obtain input from the Parties and the public. These projects provide an opportunity to provide tangible benefits for the local environment, including similar marsh ecosystems, without disrupting Mendall Marsh.

D.  <u>The Flexible Approach Proposed for the Orland River and the Channel East of Verona Island is Appropriate Given the Uncertainties Associated with that Reach.</u>

The Orland River remains a particularly vexing portion of the system. There, Wood proposed an adaptive management approach, which involved monitoring the Orland River as other remediation progressed to determine whether additional action there might be appropriate. (Phase III Report at 8-17.) This was justified, Wood concluded, based on the uncertain impacts of remediation on the Orland River. *Id.*

31

The Parties' proposal is in keeping with Wood's approach insofar as it provides funding to address the Orland River and the nearby channel east of Verona Island, but it does not prescribe any particular remedial alternative or earmark how those funds are to be used. Mallinckrodt has committed $30 million to remediation of these areas, and the trustees are provided flexibility put these funds to their best use. This approach is appropriate given ongoing uncertainties associated with this portion of the system.

III.    **The Public Commenters Overwhelmingly Support Adoption of the Consent Decree.**

All written comments were received by September 21, and individuals who wish to comment in person at the fairness hearing submitted summaries of their anticipated comments by the same date. On the whole, the public comments overwhelmingly support adoption of the Consent Decree. Unsurprisingly, there is a spectrum of support, with some supporting further remediation, others supporting less remediation, and many others supporting the settlement without reservation. But there has been little, if any, outright opposition to the settlement.

With respect to commenters who urge action other than what is contemplated in the proposed Consent Decree, Mallinckrodt encourages the Court to consider those comments in context of the knowledge of the system we have gained over the decades, including the following: this system is highly complex, risks are relatively low, environmental remediation requires balance, and doing more is not necessarily better.

The Court should disregard comments to the extent they call for punishing Mallinckrodt. RCRA's citizen suit provision is designed to enjoin RCRA violations, including imminent and substantial endangerment to health or the environment. *See* 42 U.S.C. § 6972(a). It is not intended to be punitive, and the civil penalties available under RCRA do not include punitive

damages. 42 U.S.C. § 6928(a), (g). The impulse to punish Mallinckrodt is not an appropriate consideration in these proceedings.

Several commenters stated that remediation should be implemented to reach the FTAL so the DMR will lift the lobster closure. But the studies have provided the Court enough information, including background concentrations and the challenges endemic to mercury remediation, to know that remediation to the FTAL is not feasible. Moreover, the discretionary nature of the DMR's closure decision counsels that the fishery does not open or close based solely on a particular concentration of mercury in lobsters.

From a procedural standpoint, the proposed settlement presents a binary choice—either it is approved or it is not. The Parties' settlement is carefully negotiated and cannot be modified without risk that the whole deal falls apart. Among commenters who expressed preference for different or additional remedies, none purported to press those preferences at the expense of returning the case to litigation.

**IV.    A Bar Order is Appropriate To Give Finality Considering Its Nine-Figure Commitment, the Passage of 50 Years Since the Releases, Long Public Notice of the Contamination and the Litigation, and the Opportunity for Public to Participate in the Litigation and to Comment Here**

In addition to approval of the settlement, Mallinckrodt seeks entry of an order barring certain future claims against Mallinckrodt relating to mercury contamination in the Penobscot Estuary. *See* Def.'s Mot. for Entry of a Bar Order (ECF No. 1116). Plaintiffs support that request in part and oppose it in part. *See* Pls.' Response to Mot. for Entry of Bar Order (ECF No. 1118). The request for a bar order is fully briefed, and Mallinckrodt will be prepared to answer any questions the Court may have and provide further argument at the fairness hearing. The bar order would provide Mallinckrodt some finality in consideration of its significant financial commitment and would allow the remedies agreed upon by the parties to proceed unimpeded by

conflicting or distracting claims. Given the passage of time since the mercury releases at issue, the public's longstanding notice of the contamination and this litigation, and the opportunity for public comment on this settlement, such an order would be consistent with due process and not prejudicial to potential future claimants.

One change to Mallinckrodt's should be noted, however. Since submitting its request for a bar order, Mallinckrodt has been in discussions with the United States and the State of Maine. As a result of those discussions, Mallinckrodt has agreed to exclude from its requested bar order future claims by the United States and State of Maine. The request is therefore more limited than when originally made as it does not bar claims the state or federal government might bring on behalf of the public.

**CONCLUSION**

The Parties' proposed settlement and Consent Decree is the product of twenty years of litigation, nearly as many years of study, and more than a year of negotiations. It commits nine-figures of funding to an effort which the Parties and their technical consultants reasonably believe will accelerate the recovery of the Penobscot River Estuary without doing further harm. This is far more beneficial to the public and more efficient than continued litigation, allowing remedial efforts to begin right away. Mallinckrodt respectfully requests that the Court endorse and enter the Consent Decree, commencing another promising chapter in the ongoing revitalization of the Penobscot River Estuary.

Respectfully submitted,

Date: September 24, 2021

*/s/ Jeffrey D. Talbert*

Jeffrey D. Talbert, Esq., Bar No. 4358
Benjamin S. Piper Esq., Bar No.   4720
Preti Flaherty Beliveau & Pachios LLP
One City Center, P.O. Box 9546
Portland, Maine 04112-9546
Phone: 207-791-3000
jtalbert@preti.com
bpiper@preti.com

Attorneys for Mallinckrodt US LLC

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2021, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record in the above-captioned matter.

/s/Jeffrey D. Talbert
Jeffrey D. Talbert, Esq., Bar No. 4358
Preti Flaherty Beliveau & Pachios LLP
One City Center, P.O. Box 9546
Portland, Maine 04112-9546
Phone: 207-791-3000
jtalbert@preti.com

Attorney for Mallinckrodt US LLC