UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MAINE PEOPLE'S ALLIANCE and NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br> Plaintiffs, <br><br> v. <br><br> HOLTRACHEM MANUFACTURING COMPANY, LLC and MALLINCKRODT US LLC, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:00-cv-00069-JAW |

## <u>PLAINTIFFS' PREHEARING BRIEF</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

I.      Introduction .................................................................................................. 1

II.     Factual and Procedural Background ........................................................... 2

        A.      Case origin and liability trial ........................................................... 2

        B.      Phase I and II studies ...................................................................... 4

        C.      Closure of lobster fishery and black duck warning ....................... 5

        D.      Remedy trial and decision ............................................................... 6

        E.      Phase III Engineering Study ........................................................... 7

        F.      Post-Phase III Study discovery and pre-trial work ....................... 8

        G.      Settlement negotiations ................................................................... 9

        H.      Summary of Proposed Consent Decree ....................................... 10

III.    Standard of Review ..................................................................................... 13

IV.     The Proposed Consent Decree should be approved ................................. 16

        A.      The Proposed Consent Decree is fair ........................................... 16

        B.      The Proposed Consent Decree is consistent with RCRA's
                remedial purpose ........................................................................... 17

        C.      The Proposed Consent Decree is reasonable and adequate ....... 17

                1.      Targeted active remediation is necessary ........................... 18

                2.      Orrington capping ............................................................... 19

                3.      Mobile sediment and surface deposit removal .................. 21

                4.      Orland River and East Channel around Verona Island ..... 24

                5.      Beneficial environmental projects ...................................... 25

                6.      Long-term monitoring .......................................................... 27

7.   The trusts and project administration...................................................... 28

8.   The Parties' proposed remediation program strikes
     a reasonable balance ...................................................................... 29

D.   Injunctive relief continues to be justified.......................................... 31

V.   Conclusion .................................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Calvary Chapel of Bangor v. Mills,*
    459 F. Supp. 3d 273 (D. Me. 2020) ..............................................................................27

*Calvary Chapel of Bangor v. Mills,*
    984 F.3d 21 (1st Cir. 2020)...........................................................................................27

*City of Bangor v. Citizen Commc'ns Co.,*
    No. 02-cv-183-B-S, 2007 WL 1557426 (D. Me. May 25, 2007) ..................................14

*City of Bangor v. Citizens Commc'ns Co.,*
    532 F.3d 70 (1st Cir. 2008).............................................................................13, 14, 15

*Conservation Law Found. of New England, Inc. v. Franklin,*
    989 F.2d 54 (1st Cir. 1993)...........................................................................................13

*Durrett v. Housing Auth. of Providence,*
    896 F.2d 600 (1st Cir. 1990).........................................................................................14

*Emhart Indus., Inc. v. U.S. Dep't of the Air Force,*
    988 F.3d 511 (1st Cir. 2021)...................................................................................13, 14

*Healey v. Spencer,*
    765 F.3d 65 (1st Cir. 2014)...........................................................................................31

*Maine People's All. v. Mallinckrodt, Inc.,*
    471 F.3d 277 (1st Cir. 2006)...................................................................................31, 32

*Meghrig v. KFC W., Inc.,*
    516 U.S. 479 (1996)...............................................................................15, 16, 17, 30

*United States v. Cannons Eng'g Corp.,*
    899 F.2d 79 (1st Cir. 1990)..........................................................................14, 15, 16, 17, 30

*United States v. Charles George Trucking, Inc.,*
    34 F.3d 1081 (1st Cir. 1994).................................................................................14, 17

## Statutes

42 U.S.C. § 6902(b)........................................................................................................16, 17

42 U.S.C. § 6972(a)(1)(B) ..............................................................................................3, 17

42 U.S.C. § 9601 *et seq.*......................................................................................................... 13

## I.    Introduction

Dangerous, widespread mercury contamination from a former chlor-alkali plant in Orrington has haunted the Penobscot River Estuary for more than 50 years. Plaintiffs Maine People's Alliance and Natural Resources Defense Council filed this case two decades ago to secure a cleanup. In the intervening years, the Court held two bench trials, twice found that the mercury contamination may present an imminent and substantial endangerment to health and the environment, and ordered three phases of rigorous, independent scientific and engineering studies to evaluate the severity of the problem and what can be done about it. At the conclusion of those studies, in 2013 and again in 2018, the Court-appointed independent experts recommended active remediation to speed the River's recovery. In the meantime, their data spurred the State of Maine to close a portion of the lobster and crab fishery at the mouth of the River and to warn vulnerable residents not to eat waterfowl from the Estuary.

After extensive, arm's length negotiations, Plaintiffs and defendant Mallinckrodt US LLC filed a proposed Consent Decree in March that would settle the remaining issues in this case and avert a third complex, vigorously contested trial. The Proposed Consent Decree would establish a carefully targeted remediation program that is informed by the Court-ordered studies and intended to accelerate the recovery of the ecosystem and abate the endangerment to human health and the environment. Mallinckrodt would commit at least $187 million to the remediation and up to a maximum of $267 million if certain contingencies occur. The Proposed Consent Decree would bring about one of the largest environmental cleanups in Maine history, all

1

underwritten by private funds, and the work would be supervised by experienced, independent remediation trustees.

The Proposed Consent Decree is an inflection point for this case and heralds a rebirth for the Penobscot River Estuary. The evidence and testimony that will be presented at the upcoming Fairness Hearing will demonstrate that the Proposed Consent Decree is a fair, adequate, and reasonable solution to a complicated, enduring contamination problem. It appropriately balances competing concerns and interests and is responsive to the remedy evaluation factors prescribed by the Court. By reducing the present and future risks to human health and the environment posed by mercury in the Penobscot River Estuary, it would fulfill Plaintiffs' purpose in bringing this case and the intent of Congress when it enacted the Resource Conservation and Recovery Act (RCRA). And it garners widespread public support in Maine. Plaintiffs urge the Court to approve the proposed Consent Decree and allow this much-needed remedial work to begin.

## II.    Factual and Procedural Background

### A.    Case origin and liability trial

Between 1967 and 2000, the former HoltraChem chlor-alkali plant in Orrington, Maine, discharged vast amounts of mercury-laden wastes into the Penobscot River. Order on Remediation Plan, ECF No. 829 at 2-3, 36.[1] Most of the plant's mercury releases occurred in the late 1960s and early 1970s, while the plant was owned and

---

[1] Unless otherwise noted, all citations to documents filed with the Court cite to the original pagination in the document, not the ECF system pagination.

operated by a corporate predecessor to defendant Mallinckrodt US LLC. *Id.* It caused a pollution disaster for the Penobscot River Estuary that has lasted over 50 years.

"Mercury is probably the most toxic element on the periodic table." *Id.* at 39-40. When inorganic mercury is introduced to the environment, it is taken up by bacteria and converted into toxic organic methylmercury. *Id.* at 40. In the River ecosystem, mercury bioaccumulates in wildlife and biomagnifies up the food chain as predators eat their prey, concentrating mercury in predator species. *Id.* at 41. Mercury does not break down over time and can be remobilized repeatedly. *Id.* at 41-42.

Mercury in the River threatens both human and ecological health. People are most commonly exposed to mercury through eating contaminated fish and shellfish. *Id.* at 42. When a person eats mercury-tainted shellfish, the mercury is almost completely absorbed through the digestive process. *Id.* Mercury is a potent toxin. *Id.* at 40-41. Children exposed to high mercury levels in utero suffer a host of depressed neurological outcomes, from slower motor speed to delays in language acquisition. *Id.*

Given these dangers, Plaintiffs brought this case in April 2000 under the citizen suit provision of RCRA, 42 U.S.C. § 6972(a)(1)(B). Plaintiffs alleged that the Orrington plant's mercury discharges, which created pervasive mercury contamination in the Penobscot River Estuary, may present an imminent and substantial endangerment to human health and the environment. ECF No. 1. For relief, Plaintiffs sought an order requiring an independent scientific study of mercury contamination in the Penobscot and the implementation of a remediation plan based on that study. Order on Remediation Plan, ECF No. 829 at 4.

Following a liability trial in 2002, the Court (Judge Carter) found that the mercury in the Penobscot River may present an endangerment to public health and the environment under RCRA, held Mallinckrodt jointly and severally liable as "a dominant source" of the mercury, and ordered Mallinckrodt to fund an independent study of the need for, feasibility of, and elements of a remediation plan for the mercury. ECF No. 147 at 22, 29-31. The First Circuit affirmed in all respects. ECF No. 321 at 48.

### B.    Phase I and II studies

The scientific study stemming from the 2002 trial lasted from 2004 to 2013. Order on Remediation Plan, ECF No. 829 at 4-10. It proceeded in two phases, ultimately resulting in a Phase I Report, ECF No. 382, an Update to the Phase I Report, ECF No. 480, and a Final Report ("Phase II Report"), ECF Nos. 652-1 — 652-65. A Study Panel of three scientists directed the scientific work: one nominated by Mallinckrodt, one nominated by Plaintiffs, and a chairperson selected by the other two. ECF Nos. 166, 169. The Study Panel also engaged other independent scientists, including leading experts in mercury, hydrodynamics, and biogeochemistry. *See* ECF No. 814 at 5 (citing 2014 trial testimony); Order on Remediation Plan, ECF No. 829 at 36-37.

The Study Panel's Phase II Report synthesized a vast body of scientific study in 23 chapters spanning over 1,800 pages. The Study Panel determined that the Orrington plant discharged six to twelve metric tons of mercury during its lifetime, primarily between 1967 and the early 1970s, but continuing at lower rates until the plant closed in 2000. Phase II Report, ECF No. 652 at 1-24. The Phase II Report estimated at least nine metric tons of mercury remain in Estuary sediments, at concentrations ten to twenty

times higher than background concentrations elsewhere in the region. *Id.* at ES-6. The Study Panel concluded that high concentrations of mercury are widely dispersed in the Estuary, resulting in risks for marsh birds, predatory fish and birds, and human consumers of ducks, eels, and lobsters. *Id.* It noted that, in some species, mercury concentrations were found "at remarkably high levels, exceeding known toxicity thresholds for these animals." *Id.* And it concluded that the rate of natural recovery is slow, on the order of many decades, due to a large pool of mercury-contaminated mobile sediments that are trapped in and periodically transported around the Estuary by tides, storms, and runoff. *See id.* at ES-6—ES-7. Because of the continuing risks and slow recovery, the Study Panel unanimously recommended that the Court establish an active remediation program. *Id.* at ES-7.

### C.     Closure of lobster fishery and black duck warning

The Phase I and II study data spurred Maine to take action to protect residents from the mercury pollution. The Maine Department of Marine Resources (DMR) closed a portion of the lobster and crab fisheries south of Verona Island "to protect the public health." Order on Remediation Plan, ECF No. 829 at 52-53 (internal quotation omitted). After conducting its own additional sampling, DMR expanded the lobster and crab fishery closure area at the mouth of the River. ECF No. 1116-2. In addition, the Department of Inland Fisheries and Wildlife posted an advisory warning pregnant women and young children not to consume waterfowl from the lower Penobscot River. *See* Order on Remediation Plan, ECF No. 829 at 12; ECF No. 814 at 16 (citing 2014 trial evidence).

D.     **Remedy trial and decision**

In June 2014, the Court heard nineteen days of testimony justifying and

critiquing the Study Panel's Phase II Report and recommendations. Order on

Remediation Plan, ECF No. 829 at 1, 11. The Court subsequently concluded that "the

Penobscot River estuary continues to suffer irreparable injury from ongoing mercury

contamination caused by Mallinckrodt" and reaffirmed the finding of an "imminent

and substantial endangerment." *Id.* at 54. The Court noted that, thirteen years after the

2002 Court order, the "estuary remains unacceptably contaminated with mercury." *Id.*

In particular, the Court found that "the level of mercury in Mendall Marsh, in the

Orland River, and being recirculated by the mobile [sediment] pool constitutes

irreparable harm." *Id.* at 54-55. The Court also described Maine's closure of the lobster

and crab fisheries as "a game-changer" and as further irreparable harm "directly related

to the level of mercury in the Penobscot estuary." *Id.* at 55.

The Court concluded that a Phase III engineering study was essential "to

understand the range, practicality, and cost of potential solutions." Order on

Remediation Plan, ECF No. 829 at 57. Citing public trust and the desirability of having

"engineers whose loyalty runs to the Court make remedial suggestions," the Court

declined Mallinckrodt's request to lead the engineering study. *Id.* at 58. The Court also

declined to "artificially constrain the engineers from considering all possible

alternatives." *Id.* at 59. Instead, the Court ordered the appointment of an independent

engineering firm to develop cost-effective remedies to clean up the mercury and

mitigate the harm to the people, biota, and environment of the Penobscot River. *Id.* at 1,

61; *see also* ECF No. 836 at 1. The Court also set forth five evaluation factors for the engineering firm to consider in deriving its recommendations. Order on Remediation Plan, ECF No. 829 at 59; *see infra* Section III.

###### E. Phase III Engineering Study

To conduct the Phase III Engineering Study, the Court appointed Amec Foster Wheeler, a firm now known as Wood Environment & Infrastructure Solutions (Wood).[2] Wood was jointly proposed by the Parties and Special Master following a competitive bidding and interview process. *See* ECF Nos. 836 at 2-3; 845. Wood was charged to develop and evaluate a suite of potential remedies and recommend a remedial plan that would be effective and cost-justified, or explain why, in the firm's expert judgment, there is no viable remedy. ECF No. 836 at 4-5. The engineering study culminated in Wood's Phase III Engineering Study Report ("Phase III Report"), ECF Nos. 972—972-2.[3]

In the Phase III Report, Wood recommended a "feasible, effective, and cost-effective remedial strategy for the Estuary" based on the Court's evaluation criteria. Phase III Report, ECF No. 972 at ES-2. Wood recommended a suite of initial remedies that included: (1) dredging 215,000 cubic yards of sediment from about 130 acres of

---

[2] During the Phase III Engineering Study, Amec Foster Wheeler became part of Wood Environment & Infrastructure Solutions, Inc. *See* ECF No. 964-2. For clarity, this brief refers to the Court-appointed engineering firm as Wood, its current name.

[3] Wood also produced seventeen other reports and technical memoranda during the development of the Phase III Engineering Report that have been filed with the Court. *See* ECF Nos. 903, 944-45, 973-86. For ease of access, Wood's full suite of reports, and the reports from Phases I and II, are on its project website: https://www.penobscotmercurystudy.com/information-repository.

contaminated intertidal and marsh areas along the eastern bank of the River near Orrington and backfilling with clean sediment; (2) placing a thin-layer cap of clean sediment over about half of Mendall Marsh; (3) dredging 950,000 cubic yards of contaminated sediment and wood waste from five "surface deposits" where mobile sediments accumulate near Frankfort Flats, in the Orland River, and east of Verona Island; and (4) long-term monitoring of sediment, water, and biota at three-year intervals for 45 years or more. *Id.* at ES-3—ES-7. Wood also recommended two potential adaptive management options: placing clean sediment in the Orland River to be distributed naturally, a remediation strategy called enhanced monitored natural recovery (EMNR), or dredging about 1.8 million cubic yards of contaminated sediment from the Orland River and areas on the northeast and east sides of Verona Island. *Id.* at ES-7—ES-9.

Wood estimated that its initial suite of remedies would cost about $246 to $333 million. *Id.* at ES-9—ES-10. If needed, the adaptive management options would cost $25 million for EMNR or $496 to $676 million for dredging. *Id.* at Table 8-2. Consistent with standard engineering practices, Wood's cost estimates had a target accuracy range of plus 50 percent to minus 30 percent. *Id.* at ES-9. As a result, the full range of potential costs for Wood's initial remedies is about $172 to $500 million, and the cost of the adaptive management remedies could be up to an additional $1 billion.

F.    **Post-Phase III Study discovery and pre-trial work**

In late 2018 and 2019 the Parties conducted extensive discovery to prepare for a trial regarding Wood's remediation recommendations. The Parties identified 64

8

potential witnesses for trial, and discovery included depositions of the Parties' expert and fact witnesses, several state agency officials, and many of the Wood experts and contractors who conducted the Phase III Engineering Study, some of whom were deposed twice. *See* ECF Nos. 987, 996, 998, 1007. Unsurprisingly, the various witnesses had diverging views on Wood's Phase III Engineering Study and teed up a multitude of complex scientific and engineering disputes for trial. Plaintiffs' witnesses generally supported Wood's remediation recommendations or opined that more remediation was justified, Mallinckrodt's witnesses generally opined that less or no remediation was justified, and Wood witnesses generally stood by their recommendations.

### G.   Settlement negotiations

Prior to the conclusion of the Phase III Engineering Study, in April 2018, the Parties agreed to extend the schedule for the completion of the Study, in part to allow time for settlement discussions. *See* ECF No. 967-1 at 2. In November 2019, when discovery was nearly complete, the Parties asked to postpone the scheduled trial to focus on settlement negotiations. *See* ECF No. 1041. The Parties continued to negotiate through mid-2020. ECF Nos. 1050, 1060, 1065, 1066, 1068. In July 2020, the Parties requested a judicial settlement conference, ECF No. 1073, which led to a full-day settlement conference with Magistrate Judge Nivison on September 29, 2020. ECF Nos. 1077, 1082. The settlement conference continued on October 15, 2020. ECF No. 1084. On November 6, 2020, the Parties informed the Court that they anticipated that they would be able to agree on a settlement by January 2021. ECF No. 1090. After some further

extensions of the schedule, the Parties ultimately agreed upon and filed the Proposed Consent Decree on March 19, 2021. *See* ECF Nos. 1107, 1113, 1114.

### H.    Summary of Proposed Consent Decree

The Proposed Consent Decree would require Mallinckrodt to provide at least $187 million in private funding—and up to $267 million if certain contingencies are triggered—for active remediation in the River and beneficial environmental projects. Proposed Consent Decree ("Proposed CD"), ECF No. 1114-1, ¶ 18. It would provide for four categories of active remediation actions, plus long-term monitoring. This structure is modeled on, but not identical to, Wood's recommendations. The work would be administered and managed by an experienced, independent trustee firm.

First, in the Orrington Reach, about 130 acres of intertidal sediment, primarily on the east side of the River, would be capped. *Id.* ¶ 10(a). The capping would place clean sediment over the contaminated sediment to create a barrier between contamination and the water column or biota. *Id.* ¶ 1(e). Mallinckrodt would commit $50 million for this capping, to fund remedy design, permitting, implementation, monitoring, and maintenance. *Id.* ¶ 10(a). If the cost of this capping exceeds $50 million, Mallinckrodt would pay up to an additional $10 million. *Id.* ¶ 10(b).

Second, to address mercury-laden mobile sediments and surface deposits, $70 million in settlement funds would be used to dredge and remove contaminated mobile matter from the Estuary. *Id.* ¶ 11(a). The $70 million would fund delineation, design, permitting, implementation, and remedy-specific monitoring. *Id.* The specific amounts and locations of material to be dredged would be determined during the delineation

and design process. If possible, material removed from the Estuary would be beneficially reused for upland construction, infrastructure, or other projects, rather than being deposited in a landfill. *Id.* ¶¶ 11(b), 1(c). However, if some or all of the material must be disposed in a landfill, Mallinckrodt would pay up to an additional $50 million for those disposal costs. *Id.* ¶ 11(b).

Third, in the Orland River and eastern channel around Verona Island (East Channel), the Proposed Consent Decree would commit $30 million for remediation. *Id.* ¶ 12(a). The Proposed Consent Decree does not prescribe a particular remedy for this area, but rather would fund remedy selection, design, implementation, and remedy-specific monitoring for whatever remedy the Trustee ultimately selects. *Id.* Possible remedies include enhanced monitored natural recovery (EMNR), capping, dredging, or some combination of these activities. *Id.* ¶ 12(b); *see also id.* ¶ 1(p).

Fourth, the Proposed Consent Decree would commit $20 million for Beneficial Environmental Projects that would provide tangible benefits to affected communities or the environment and are intended to mitigate or offset harm caused by mercury contamination in the River. *Id.* ¶¶ 1(b); 13(a)-(b). Subject to the agreement of authorized state and federal agencies, some of these projects also may be used to satisfy or offset natural resource damages claims against Mallinckrodt. *Id.* ¶¶ 1(nn), 13(b).

If any funding allocated to a particular remedy is not used, the remaining funds would be redeployed to supplement other remedies or fund additional Beneficial Environmental Projects. *Id.* ¶ 17. Such remaining funding may be available for reallocation if the cost of a particular remedy is less than anticipated or if it is

11

determined that implementation of some or all of a particular remedy is not feasible. *See id.* ¶¶ 1(q), 1(ll), 10(a), 11(a), 12(a), 17(a), 39.

In addition to the active remedies, the Proposed Consent Decree would commit $10 million for long-term monitoring. *Id.* ¶ 14(a). Monitoring would take place at three-year intervals for a minimum of 30 years and a maximum of 45 years. *Id.* Mallinckrodt would provide up to an additional $10 million if the costs of long-term monitoring exceed $10 million. *Id.* ¶ 14(b). After the initial 30 years, the ultimate duration of the long-term monitoring program would be determined based on various factors including measured mercury concentrations, trends in mercury concentrations, input from regulatory agencies, and the then-current science regarding mercury risks. *Id.* ¶ 14(c).

To carry out the remediation work, the Proposed Consent Decree would establish two trusts: the Penobscot Estuary Mercury Remediation Trust (Remediation Trust), and the Penobscot Estuary Beneficial Environmental Projects Trust (Project Trust). *Id.* ¶ 21. The two trusts would hold the remediation funds and carry out the remediation outlined in the Proposed Consent Decree. *Id.* The Remediation Trust would be responsible for most of the work. *Id.* ¶ 22(b). The Project Trust would only carry out Beneficial Environmental Projects, including those projects that may qualify as "Restoration Projects" because they could help to satisfy separate natural resource damages claims against Mallinckrodt. *Id.* ¶¶ 1(nn), 13, 23(b).

The Parties have selected Greenfield Environmental Trust Group to serve as the Trustees of the Remediation and Project Trusts. *See id.* ¶¶ 25(a), (b). Greenfield is a

professional service provider and fiduciary with over 30 years of experience that manages complex environmental remediation projects at hundreds of sites around the country. *See* Greenfield Env't Trust Grp., https://greenfieldenvironmental.com (last visited Sept. 23, 2021). The Proposed Consent Decree would commit $7 million for project administration costs, and up to an additional $10 million if needed. Proposed CD ¶ 15(a).[4]

## III.    Standard of Review

When reviewing a consent decree, a court "must . . . ensure that it is 'fair, adequate, and reasonable; that the proposed decree will not violate the Constitution, a statute or other authority; [and] that it is consistent with the objectives of Congress.'" *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 93 (1st Cir. 2008) (alteration in original) (quoting *Conservation Law Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 58 (1st Cir. 1993)); *Emhart Indus., Inc. v. U.S. Dep't of the Air Force*, 988 F.3d 511, 523 (1st Cir. 2021).

Because caselaw on RCRA consent decrees is sparse, the Court may wish to draw guidance from cases reviewing the fairness of consent decrees under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* Although CERCLA is not the basis for any claim in this case, CERCLA caselaw generally provides an appropriate standard of review to inform

---

[4] Mallinckrodt has also moved for a bar order, ECF No. 1116, and, on September 21, filed an amended motion for a bar order. ECF No. 1151. Plaintiffs will brief in normal course the issues raised by Mallinckrodt's amended motion.

judicial review of RCRA consent decrees. *See City of Bangor v. Citizen Commc'ns Co.*, No. 02-cv-183-B-S, 2007 WL 1557426, at *6 (D. Me. May 25, 2007), *aff'd* 532 F.3d 70.

When evaluating the fairness of consent decrees under CERCLA, courts consider the procedural and substantive fairness of the decree. "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990). Determining substantive fairness of a consent decree involves the consideration of "corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Id.* at 87. However, assuming that the negotiation process is fair, courts generally "treat private parties in . . . settlement cases as entities who can protect themselves." *City of Bangor*, 532 F.3d at 98. "There is little need for a court to police the substantive fairness of a settlement as among settling parties" because "[s]ophisticated actors know how to protect their own interests, and they are well equipped to evaluate risks and rewards." *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1088 (1st Cir. 1994); *see also Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) ("[A] district court's discretion is restrained by the clear policy in favor of encouraging settlements." (internal quotation marks and citation omitted)). Also, "procedural and substantive fairness are not entirely discrete concepts; it is 'appropriate' . . . 'to consider the adequacy of the process' in evaluating substantive fairness." *Emhart Indus., Inc.*, 988 F.3d at 529 n.10 (quoting *Cannons Eng'g Corp.*, 899 F.2d at 87 n.4).

14

Courts consider at least three factors to decide whether a consent decree is adequate and reasonable under CERCLA: (1) "the decree's likely efficaciousness as a vehicle for cleansing the environment;" (2) "whether the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures;" and (3) "the relative strength of the parties' litigating positions." *Cannons Eng'g Corp.*, 899 F.2d at 89-90; *City of Bangor*, 532 F.3d at 94 (describing adequacy as "ensur[ing] a proper cleanup" of the contamination). However, unlike CERCLA, "RCRA's citizen suit provision is not directed at providing compensation for past cleanup efforts." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). Consistent with RCRA's purpose, rather than considering compensation for past costs, the second reasonableness factor should examine whether a RCRA settlement satisfactorily funds anticipated remedial costs and "provide[s] a remedy that ameliorates present or obviates the risk of future 'imminent' harms," *id.* at 486.

In addition, the Court previously outlined five evaluation criteria that bear on the adequacy and reasonableness of the Proposed Consent Decree: "(1) whether the proposed solution has been successfully attempted previously or is innovative; (2) the likely cost of the solutions; (3) the length of time to complete the recommendations; (4) the likely effectiveness of the solution; and (5) any potential environmental harm that may be caused by the proposed solution." Order on Remediation Plan, ECF No. 829 at 59.

Finally, courts consider a consent decree's consistency with relevant statutory objectives, the evaluation of which often overlaps with the inquiries into fairness and

reasonableness. *Cannons Eng'g Corp.*, 899 F.2d at 90. The primary purpose of RCRA is "to minimize the present and future threat to human health and the environment" posed by hazardous waste. *Meghrig*, 516 U.S. at 483 (citing 42 U.S.C. § 6902(b)).

IV.   **The Proposed Consent Decree should be approved**

The testimony and exhibits at the Fairness Hearing, along with the Court's prior decisions and documents already filed in this case, will demonstrate that the Proposed Consent Decree is fair, fulfills the purposes of RCRA, and presents an adequate and reasonable resolution of the remaining scientific and engineering issues presented by this case. After more than two decades of contentious litigation, the Proposed Consent Decree would finally implement targeted, concrete actions to abate a half-century of public health and environmental endangerment.

A.   **The Proposed Consent Decree is fair**

The Proposed Consent Decree is both procedurally and substantively fair. Procedurally, the Parties reached the Proposed Consent Decree following extensive arm's length negotiations over a three-year period, capped by over a year of focused negotiations that included a productive judicial settlement conference. After agreeing in principle to settlement terms, the Parties spent many additional months finalizing all the details. *See supra* Section II(G). The length and extent of these negotiations, between sophisticated and long-represented Parties, demonstrates procedural fairness. *See Cannons Eng'g Corp.*, 899 F.2d at 86.

The Proposed Consent Decree is also substantively fair. It balances the Parties' goals and risks and finds a middle path that will accelerate recovery of the Estuary,

which has been Plaintiffs' core objective since they filed suit. *See* ECF No. 1 at 16. After more than 20 years, the Proposed Consent Decree would achieve that goal and allow remediation to proceed without further litigation risks, costs, and delays. In addition, the Proposed Consent Decree would satisfy Plaintiffs' interests in "corrective justice and accountability" by ensuring that Mallinckrodt, which has been held liable, would "bear the cost of [remedying] the harm for which it is legally responsible." *Cannons Eng'g Corp.*, 899 F.2d at 87. For Mallinckrodt, the Proposed Consent Decree would provide certainty concerning the extent of its financial obligations in this case and avoid litigation risks and costs. In short, the Parties have succeeded in "protect[ing] their own interests," and "[t]here is little need for [the] court to police the substantive fairness of [the] settlement as among [the] settling parties." *Charles George Trucking*, 34 F.3d at 1088.

### B.    The Proposed Consent Decree is consistent with RCRA's remedial purpose

The Proposed Consent Decree would fulfill RCRA's purpose by "minimiz[ing] the present and future threat to human health and the environment" posed by mercury contamination in the Penobscot River Estuary. *Meghrig*, 516 U.S. at 483 (citing 42 U.S.C. § 6902(b)). As discussed in detail below, it would provide a reasonable, adequate, and effective "remedy that ameliorates present or obviates the risk of future 'imminent' harms." *Id.* at 486 (quoting 42 U.S.C. § 6972(a)(1)(B)).

### C.    The Proposed Consent Decree is reasonable and adequate

The Proposed Consent Decree, as a whole and in its individual components, is reasonable and adequate. It accounts for and balances the Court's remedy evaluation

factors and would create a much-needed remediation program that is effective, cost-effective, timely, safe, and designed to earn public trust and confidence.

### 1. Targeted active remediation is necessary

Active remediation of mercury contamination in the Penobscot River Estuary is long overdue. In 2013, after nine years of Court-ordered scientific study, the Study Panel recommended an active remediation program because of the continuing risks to biota and human consumers and the slow rate of recovery in the Estuary. *See* Order on Remediation Plan, ECF No. 829 at 9-10. Sediment and biota data from the Phase III Engineering Study show that the dangerous conditions underlying the Study Panel's recommendation have not changed materially. Some sampled species of wildlife have shown tepid (and perhaps temporary) recovery, other species show no change, and still others show increased mercury concentrations. Phase III Report, ECF No. 972 at 3-37. And the rate of natural recovery in sediments, already slow, is slowing down. *Id.* at 3-31.

The Court charged Wood, the independent engineering firm recommended by the Parties and the Special Master, to "endors[e] a remedial plan or plans, or explain[] why, in the firm's expert judgment, there is no viable remedy." ECF No. 836 at 4. After nearly three years of studies and evaluations, Wood answered by recommending a suite of targeted, active remedies intended to "balance viability, effectiveness, and cost-effectiveness." Phase III Report, ECF No. 972 at 8-1. In doing so, Wood considered and rejected alternatives at both ends of the remediation spectrum. The firm did not recommend system-wide monitored natural recovery (essentially, waiting for the

ecosystem to cleanse itself) because, without active intervention, it would take at least 45 to 100 years to meet Wood's risk-based remediation goals for the Estuary. *Id.* at 8-4. Wood also did not recommend system-wide dredging intended to meet the risk-based remediation goals as quickly as possible because of the anticipated duration (22 years or more), cost ($1.7 to $5.5 billion or more), and risk of harm to habitat and wildlife. *Id.* at 8-5. Instead, after balancing these factors, the Court-appointed engineers recommended a moderate suite of remedies that would accelerate recovery of the ecosystem but was not anticipated to meet risk-based remediation goals immediately. *See id.* at 8-1. Specifically, Wood recommended that active remedies focus on targeted areas with unacceptable levels of risk, locations where materials enriched in mercury may accumulate or be eroded, and/or locations with the highest sediment mercury concentrations. *Id.*

The Proposed Consent Decree would build on the foundation laid by the three phases of Court-ordered studies. Similar to the balance that Wood struck, it would target active remediation in specific parts of the Penobscot River Estuary where work is most likely to accelerate recovery and hasten abatement of the mercury endangerment.

### 2. Orrington capping

The Proposed Consent Decree would prescribe the capping of about 130 acres of intertidal areas in the Orrington Reach, mostly coves that are immediately downriver from the former plant site. Proposed CD ¶ 10(a). Consistent with Wood's recommendations, these areas would be targeted because the sediments have some of highest average mercury concentrations in the Estuary, are a source of mercury to local

biota, and may be a source of mercury to other areas through erosion. *See* Phase III Report, ECF No. 972 at 8-22 & Table 5-2.

Capping is a proven remediation technology, employed successfully at sediment remediation sites worldwide. The cap would isolate and dilute the mercury-contaminated sediments, preventing and minimizing erosion and direct biota exposures. *See* Proposed CD ¶ 1(e). The Parties' engineering experts will testify at the Fairness Hearing that a cap can be designed and implemented successfully in this region because, in part, the intertidal areas to be capped are peripheral zones that are not subject to the strongest currents in the main channel of the River. Compared to Wood's recommendation of dredging with backfilling in these areas, capping offers similar remediation benefits but can be implemented faster and with lower costs. Capping also presents less risk of remobilizing contaminated sediments than dredging and avoids generating 215,000 cubic yards of sediments that would need to be disposed on land. Although the cap materials would bury the existing intertidal habitat, the mudflats are anticipated to reestablish relatively quickly on top of the cap, with minimal long-term environmental harm from the cap itself.

The funding allocated to Orrington Reach capping—$50 million in Committed Funding and $10 million in Contingent Funding—is grounded in a conceptual design that estimated costs of about $29 to $54 million for this work. The Proposed Consent Decree funding would more than cover this cost range, and the contingency would ensure that funds are available for cap monitoring and maintenance, if needed, to sustain the integrity of the cap over time. *See id.* ¶ 10. The range of proposed funding is

similar to the approximately $54 to $74 million that Wood proposed for dredging and

backfilling this region, *see* Phase III Report, ECF No. 972 at Table 8-2.

The precise length of time to design, obtain permits for, and implement the

Orrington capping is not yet known, but there is every reason to believe that it can be

completed within a reasonable period. For its proposed dredging remedy in this region,

Wood estimated a total of five years: three years for design and permitting and two

years for implementation. *Id.* at 8-26. Capping is a less complex remedy than dredging.

But even if capping takes about five years or somewhat longer, the duration would be

modest compared to the five decades and counting that the Estuary has been

contaminated and Wood's estimate that natural recovery would take at least another 45

to 100 years.

### 3.   Mobile sediment and surface deposit removal

The Proposed Consent Decree would fund dredging to remove a portion of the

contaminated mobile sediments in the Estuary. Mercury-contaminated mobile

sediments were first identified in the Phase II Study, which concluded that recirculation

of these sediments explains the slow pace of natural recovery. *See* Order on

Remediation Plan, ECF No. 829 at 44-46. The Phase III Engineering Report built on this

insight. It identified additional mobile material (including large volumes of mercury-

contaminated legacy wood waste from sawmills), located "surface deposits" where

contaminated mobile sediment and wood waste particles accumulate at least seasonally

in piles or layers on the riverbed one to six feet thick, and estimated that removing

approximately 950,000 cubic yards of these materials could accelerate the Estuary's

recovery by about 20 years. Phase III Report, ECF No. 972 at ES-4 — ES-5, 3-11, 3-26 —

3-28.

The surface deposits are good targets for remediation because they contain

materials with significantly elevated mercury concentrations and are likely to be mobile

or prone to erosion and redistribution. *See id.* at 8-10, 8-14 — 8-15. Targeting some of

them for removal is an efficient way to remove otherwise mobile sediments at locations

where they naturally accumulate and is akin to hot spot removal — taking out smaller

areas with especially high contaminant concentrations. Also, removing some of the

surface deposits is expected to have broader benefits for the ecosystem. For example,

removing the surface deposit at Frankfort Flats may reduce mercury transport into

Mendall Marsh, an area of concern for birds, and removing contaminated mobile

sediment from deposits on the eastern side of Verona Island may reduce mercury in the

food web in upper Penobscot Bay, including in lobsters. *See id.* at ES-4, 8-8, 8-12, 8-20.

Dredging is a proven remediation technology, used all over the world, and is not

anticipated to cause long-term environmental harm in the Estuary. *Id.* at 8-11. The

Proposed Consent Decree calls for the dredging of contaminated sediments that are

already mobile or easily erodible, so the long-term benefits of removing these sediments

to accelerate recovery outweigh any risks of increased short-term resuspension, which

is already occurring naturally. All remediation work would be required to "minimize[]

environmental risks and adverse impacts" and incorporate "monitoring and control

measures to protect human health and the environment." Proposed CD, Appx. A,

Statement of Work ¶ 9(e)-(f), ECF No. 1114-2. For example, best management practices,

such as using closed buckets, taking measures to limit spillage, and working during

seasons when the most sensitive fish are reduced or absent can help to reduce

resuspension of contaminated sediment and potential effects on biota during dredging.

Phase III Report, ECF No. 972 at 8-11—8-12. As a further safeguard, all remediation

work would go through normal federal, state, and local permitting and regulatory

approval processes, ensuring that expert regulators approve the work and providing

public opportunities to review and comment on specific remediation work designs once

they are developed. *See* Proposed CD ¶¶ 16, 40.

The Proposed Consent Decree allocates $70 million in Committed Funding for

removal of mobile sediments and surface deposits, with beneficial reuse of the dredged

materials. Proposed CD ¶ 11. Beneficial reuse—using the dredged materials as fill for

upland construction or infrastructure projects—is preferred because it is less expensive

and more sustainable than landfill disposal. *See* Wood, Alternatives Evaluation Report,

ECF No. 985 at 6-9—6-10. However, if beneficial reuse is not possible for some or all of

the materials, the Proposed Consent Decree would provide up to $50 million to pay for

landfill disposal. Proposed CD ¶ 11. By allocating a total of $70 to $120 million for

mobile sediment and surface deposit removal, rather than the estimated $107 to $175

million for Wood's recommended dredging, *see* Phase III Report, ECF No. 972 at Table

8-2, the Proposed Consent Decree would narrow the scope of this remedy, allocating

enough funding to accelerate recovery through this remedy but in a more targeted way.

The Proposed Consent Decree does not specify exactly which surface deposits

will be removed or how much mobile sediment will be removed, so it is not possible to

predict the precise duration of this work. Additional design work is needed to better delineate the surface deposits and decide which to target for removal. *See id*. at 8-11, 8-15. Wood projected that surface deposit dredging would take about seven years— three years for design and permitting and four years for implementation. *Id.* at 8-25. Even if the smaller amount of dredging contemplated by the Proposed Consent Decree takes a similar amount of time, or slightly longer, removing some of this material is a critical measure to help accelerate the system recovery. Such a timeline would be reasonable in light of the central role that mobile sediment plays in slowing the rate of natural recovery in the Estuary.

### 4.      Orland River and East Channel around Verona Island

The Proposed Consent Decree would commit $30 million for remediation in the Orland River and East Channel around Verona Island. Proposed CD ¶ 12. This region has high mercury concentrations in surface sediments, it provides habitat for species of concern including black ducks, and remediation here is likely to accelerate recovery in upper Penobscot Bay, including the lobster fishery closure area. *See* Phase III Report, ECF No. 972 at 8-20 & Table 5-4. The ecological importance of remediation in this region is underscored by Wood's recommendation to remove four surface deposits in this area and to focus both of Wood's potential adaptive management remedies here. *Id.* at 8-17—8-20 & Fig. 8-3.

The Proposed Consent Decree, by design, leaves flexibility regarding the specific remediation actions in the Orland River and East Channel, which may include EMNR, capping, or dredging. Proposed CD ¶ 12(b). EMNR is an innovative technique

somewhat like thin layer capping, in which clean sediment would be added and allowed to disperse naturally to mix with, dilute, and bury contaminated sediment. Phase III Report, ECF No. 972 at ES-8—ES-9, 8-18—8-19. Although EMNR requires further testing to determine whether it would be effective, it offers the possibility of a lower impact remedy that would be faster, easier, and less expensive to implement. *Id.; see id.* at 8-27. If EMNR is not viable for any reason, the proven technologies of capping or dredging could be employed in this region instead, possibly in concert with surface deposit dredging. *See* Proposed CD ¶ 12(b).

The $30 million in funding for remediation in the Orland River and East Channel is enough to test EMNR and then implement it at full scale or have a substantial sum available for other remedies. Wood estimated that EMNR pilot studies would cost about $10 million and full-scale implementation would cost about $15 million. *Id.* at 8-27 & Table 8-2. So, even after testing EMNR, approximately $20 million would be available for active remediation. The duration of remedies in the Orland River and East Channel will be uncertain until specific remedies are selected but, for EMNR, Wood estimated about seven years—four years for design and permitting and three years for implementation—which is similar to the duration of other recommended remedies. *Id.* at 8-27.

### 5. Beneficial environmental projects

The Proposed Consent Decree would commit $20 million for Beneficial Environmental Projects that provide tangible environmental or public benefits to affected communities and the environment. Proposed CD ¶¶ 1(b), 13. Beneficial

Environmental Projects may include Tidal Marsh Projects that restore, enhance, or preserve tidal marshes in Maine or provide benefits to the avian species that use Mendall Marsh. *Id.* ¶¶ 1(vv), 13(b). They may also include Restoration Projects that help satisfy separate natural resource damage claims against Mallinckrodt. *Id.* ¶ 1(nn). Credit for any such Restoration Projects would be negotiated between Mallinckrodt and the state and federal agencies that serve as Natural Resource Damage Trustees. *Id.* ¶¶ 1(z), 1(nn), 32(c). The Proposed Consent Decree explicitly leaves undisturbed the full discretion of the state and federal Trustees to seek natural resource damages from Mallinckrodt. *Id.* ¶ 32(c)(ii).

The Proposed Consent Decree departs from Wood's recommendation of thin-layer capping in Mendall Marsh and would not require any specific remedies in Mendall Marsh. However, the Beneficial Environmental Projects provision in the Settlement would allow flexibility for projects in Mendall Marsh or in other places that would benefit the wildlife that uses Mendall Marsh. *See id.* ¶¶ 1(b), 1(vv), 13(b). As the Court recognized in 2015, the Parties and their experts have strongly held, diverging positions regarding the severity of mercury contamination in Mendall Marsh and what, if anything, to do about it. *See* Order on Remediation Plan, ECF No. 829 at 47-51. Mendall Marsh is also a state wildlife management area, *id.* at 47, and Wood noted that, given its ecological sensitivity, there may be permitting limitations or mitigation requirements for work in the Marsh, Phase III Report, ECF No. 972 at 8-10. Wood recommended about $7.5 million in pilot testing prior to a full-scale remedy, *see id.* Table 8-2, which creates a risk that substantial funds could be expended on pilot tests

but yield no substantial remediation benefits if a full-scale remedy is not permitted. The Parties' agreement to fund Beneficial Environmental Projects is a reasonable compromise and provides a path through this thicket of complexities and conflicting positions that will ensure that remediation funds are spent on effective, practical projects that provide tangible, verifiable, near-term benefits to the affected environment. Based on publicly available data regarding wetland projects in Maine, $20 million is anticipated to fund many substantial Beneficial Environmental Projects.[5]

### 6. Long-term monitoring

The Proposed Consent Decree would commit $10 million for 30 to 45 years of triennial long-term monitoring, with an additional $10 million in Contingent Funding if needed. Proposed CD ¶ 14. Long-term monitoring of mercury concentrations in biota, sediments, and water is essential to provide information about mercury contamination trends in the Estuary and assess the long-term results of active remediation.[6] The need for long-term monitoring is undisputed, having been recommended by the Study Panel,

---

[5] *See, e.g.*, Maine Natural Resource Conservation Program (MNRCP), Fixing Furbish Phase I, http://mnrcp.org/node/5222 (last accessed Sept. 18, 2021) (describing a tidal marsh restoration project to improve habitat for saltmarsh sparrows and total costs of $202,550); MNRCP, Past Projects, http://mnrcp.org/past-projects (last accessed Sept. 18, 2021) (listing dozens of wetland restoration, enhancement, and preservation projects in Maine with costs ranging from $6,342 to $495,000 per project). The Court may take judicial notice of these cost data consistent with Federal Rule of Evidence 201(b). *See Calvary Chapel of Bangor v. Mills*, 459 F. Supp. 3d 273, 281 & n.10 (D. Me.), *appeal dismissed,* 984 F.3d 21 (1st Cir. 2020) (taking judicial notice of facts from a State website).

[6] Each active remedy would also include remedy-specific monitoring during and after implementation to track immediate effects. Proposed CD ¶¶ 1(t), 10(a), 11(a), 12(a); Proposed CD Appx. A, Statement of Work ¶¶ 9(f), 31(e), ECF No. 1114-2.

Wood, and the Parties. Phase II Report Ch. 13; Phase III Report, ECF No. 972 at 8-28—8-36; Order on Remediation Plan, ECF No. 829 at 38. Most recently, Wood recommended triennial monitoring for at least 45 years at an estimated cost of about $25 million. Phase III Report, ECF No. 972 at 8-31 & Table 8-2. The Parties' proposed long-term monitoring is similar in duration and potential cost but leaves flexibility to adjust the specific duration depending on future data and monitoring needs and anticipates that some cost efficiencies will be possible.

### 7. The trusts and project administration

The Proposed Consent Decree would be implemented through independent trusts managed by trustee entities affiliated with Greenfield Environmental Trust Group. Proposed CD ¶¶ 21, 25. The independence of the trusts and trustees will help to secure public trust in the remediation process. *See* Order on Remediation Plan, ECF No. 829 at 58.

Greenfield has over 30 years of experience managing and directing complex environmental cleanups, is responsible for hundreds of sites nationwide, and has over $1 billion in remediation funds under its management. *See* Greenfield Env't Trust Grp., https://greenfieldenvironmental.com (last visited Sept. 23, 2021). The firm manages other sediment remediation projects in and adjacent to tidal rivers and creeks, and Greenfield's proposed project manager has extensive experience with sediment remediation. As a trustee and fiduciary, Greenfield will manage the trusts and remediation funding and will direct the remediation work at a high level. For specific design and implementation work, the trusts will contract with specialized experts,

contractors, and consultants to ensure that the work is carried out by qualified, experienced professionals. *See* Proposed CD ¶¶ 22(b), 23(b), 38. To mitigate the effects of inflation on the funding for remediation projects that will span multiple years—and monitoring that will span decades—Greenfield will also responsibly invest trust assets that are not yet allocated to near-term work.[7] *Id.* ¶ 24(d)

Experienced, cost-effective project administration is critical to the success of the proposed remedies. In general, project management costs are about 4 to 6 percent of remediation costs. *See* Phase III Report, ECF No. 972 at Table 8-2 (estimating these costs at 5 percent). The total remediation costs in the Proposed Consent Decree are $180 to $250 million. Applying the 4 to 6 percent range yields estimated project administration costs of $7.2 to $15 million. To pay for these essential services, the Proposed Consent Decree allocates up to $17 million: $7 million in Committed Funding, with up to $10 million more if needed. Proposed CD ¶ 15(a).

### 8.   The Parties' proposed remediation program strikes a reasonable balance

The Proposed Consent Decree reasonably balances the Parties' competing interests. Each side bears litigation risk, and further contention would consume valuable time and money better spent on active remediation. The specific measures embedded in the Proposed Consent Decree represent compromises: there would be

---

[7] Mallinckrodt would pay all of the Committed Funding to the trusts within seven years, or sooner if needed, to ensure that the purchasing power of the funding is not materially diminished by inflation prior to receipt by the trusts. Proposed CD ¶ 19. Mallinckrodt's future payments would be secured by a surety bond. *Id.* ¶ 20.

capping instead of dredging in the Orrington Reach; there would be targeted, not widespread, dredging of mercury-infused surface deposits; there would be beneficial projects rather than a thin-layer cap covering half of Mendall Marsh. In each instance, there is a remedy that is somewhat less than what Plaintiffs would like and more than what Defendant would like.

Taken as a whole, the costs and scope of the Proposed Consent Decree reflect a reasonable balance. After accounting for cost estimate uncertainties, Wood's initial remedies could cost about $172 million to $500 million, and its adaptive management remedies could add up to about $1 billion more. Phase III Report, ECF No. 972 at ES-9 & Table 8-2. The Proposed Consent Decree would commit at least $187 million, and up to $267 million, for remediation work in the Estuary, in addition to over $30 million already spent on prerequisite scientific and engineering studies. This represents a reasonable compromise—brokered by a Magistrate Judge—between Plaintiffs' interest in securing sufficient funding to abate the endangerment in the Estuary and Mallinckrodt's interests in minimizing cost and achieving a degree of financial certainty.

The balanced terms of the Proposed Consent Decree follow a central command of RCRA: They compel the defendant to "provide a remedy that ameliorates" the risks and harms in the Estuary caused by Mallinckrodt's mercury discharges, *Meghrig*, 516 U.S. at 486, and, by ensuring that the remediation costs are not borne by the public, they "compensate[] the public for the [anticipated] costs of remedial and response measures," *Cannons Eng'g Corp.*, 899 F.2d at 90.

30

### D.      Injunctive relief continues to be justified

RCRA evinces "a congressional thumb on the scale in favor of remediation" when considering equitable remedies. Order on Remediation Plan, ECF No. 829 at 34 (quoting *Maine People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 297 (1st Cir. 2006)). To the extent that the Court's endorsement of the Proposed Consent Decree would be a form of injunctive relief, *see, e.g.*, *Healey v. Spencer*, 765 F.3d 65, 75 (1st Cir. 2014) ("A consent decree is both a settlement and an injunction."), the four-part injunction test is easily met, largely for the same reasons the Court set forth in 2015. *See* Order on Remediation Plan, ECF No. 829 at 39-57; *Maine People's All.*, 471 F.3d at 296 (setting out injunction factors).

The Court held in 2015 that "the Penobscot River estuary continues to suffer irreparable injury from ongoing mercury contamination caused by Mallinckrodt." Order on Remediation Plan, ECF No. 829 at 54. The facts underlying that conclusion— including the extent and severity of mercury contamination and the slow rate of natural recovery—have not changed materially since 2015. *See infra* Section IV(C)(1). Likewise, there continues to be no adequate remedy at law. *See* Order on Remediation Plan, ECF No. 829 at 55-56. Although the Proposed Consent Decree would commit funds for remediation, the funding provides effective relief only as part of the prescribed remediation program. By agreeing to the Proposed Consent Decree, the Parties have already balanced any hardships themselves. And the public continues to have "an obvious and compelling interest in reducing mercury contamination in the Penobscot River." *Id.* at 56.

## V.      Conclusion

In the First Circuit, "[o]nce liability has been found, equitable relief in RCRA citizen suits is largely in the informed discretion of the trial court." *Maine People's All.*, 471 F.3d at 298. The Proposed Consent Decree is a fair, adequate, and reasonable resolution of more than two decades of complex litigation. It is the result of persistent, laborious, arm's length negotiations between sophisticated parties. It vindicates the essential purpose of the RCRA citizen suit provision and is a resounding victory for the people of Maine, committing a massive sum of private funds to abate severe, longstanding harm to a precious public resource. Plaintiffs respectfully urge the Court to approve the Proposed Consent Decree.

Respectfully submitted,

Date: September 24, 2021            /s/ Mitchell S. Bernard
                                   Mitchell S. Bernard, Esq., *pro hac vice*
                                   (NY Bar No. 1684307)
                                   Jared J. Thompson, Esq., *pro hac vice*
                                   (DC Bar No. 1004120)
                                   Lauren Phillips, Esq., *pro hac vice*
                                   (NY Bar No. 5749965)
                                   Natural Resources Defense Council, Inc.
                                   40 West 20th Street
                                   New York, New York 10011
                                   Phone: (212) 727-4469
                                   mbernard@nrdc.org
                                   jared.thompson@nrdc.org
                                   lphillips@nrdc.org


Date: September 24, 2021            /s/ Eric J. Uhl
                                   Eric J. Uhl, Esq., Bar No. 7244
                                   Richardson, Whitman, Large & Badger
                                   465 Congress Street, P.O. Box 9545
                                   Portland, Maine, 04112-9545
                                   Phone: (207) 774-7474
                                   euhl@rwlb.com

                                   Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 24, 2021, I electronically filed Plaintiffs'

Prehearing Brief with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to all counsel of record in the above-captioned matter.

<div style="margin-left:45%;">

/s/Jared J. Thompson

Jared J. Thompson, Esq., *pro hac vice*
(DC Bar No. 1004120)

Attorney for Plaintiffs

</div>