1            UNITED STATES DISTRICT COURT

2                DISTRICT OF MAINE

3   MAINE PEOPLE'S ALLIANCE      )
    and NATURAL RESOURCES        )
4   DEFENSE COUNCIL, INC.,       )
                                 )
5              Plaintiffs        )
                                 )              CIVIL ACTION
6                                )
           vs.                   )   Docket No. 1:00-cv-00069-JAW
7                                )
                                 )       FAIRNESS HEARING
8   HOLTRACHEM MANUFACTURING     )
    COMPANY, LLC, and            )
9   MALLINCKRODT US LLC,         )
                                 )
10             Defendants.       )

11               VOLUME I of III

12            TRANSCRIPT OF PROCEEDINGS

13      Pursuant to notice, the above-entitled matter came

14  on for FAIRNESS HEARING before the HONORABLE JOHN A.

15  WOODCOCK, JR., in the United States District Court, Bangor,

16  Maine, on the 1st day of October, 2021, at 8:41 a.m.

17  APPEARANCES:

18  For the Plaintiffs:          Mitchell S. Bernard, Esquire
                                 Lauren Patricia Phillips, Esquire
19                               Jared J. Thompson, Esquire

20  For the Defendants:          Patricia H. Duft, Esquire
                                 Benjamin S. Piper, Esquire
21                               Jeffrey D. Talbert, Esquire

22

23                  Julie G. Edgecomb, RMR, CRR
                       Official Court Reporter

24

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer.

INDEX OF PROCEEDINGS

Page:

Opening Statement by Mr. Bernard:                    11

Opening Statement by Mr. Talbert:                    29

Proposed Consent Decree Overview by Mr. Bernard:     49

Proposed Consent Decree Overview by Mr. Talbert:     60

Testimony:  (see below)


INDEX OF WITNESSES

Page:

NELSON WALTER (called by Mr. Thompson)

Direct Examination by Mr. Thompson                      69
Examination by the Court                         113, 163
Continued Direct Examination by Mr. Thompson  117, 153, 164
Cross-Examination by Mr. Piper                         173

CHARLES DRISCOLL  (called by Mr. Bernard)

Direct Examination by Mr. Bernard                      119


INDEX OF EXHIBITS
Joint

| Exhibit No. | Description | Offered | Admitted |
| --- | --- | --- | --- |
| 1 | Proposed Consent Decree | 49 | 49 |
| 2 | Statement of Work | 49 | 49 |
| 3 | Remediation Trust Agreement | 49 | 49 |
| 4 | Project Trust Agreement | 49 | 49 |
| 5 | Phase III Engineering Study Report | 49 | 49 |
| 6 | Integral Consulting, Penobscot River Orrington Reach Thin-Layer Capping Preliminary Conceptual Design Overview | 49 | 49 |
| 7 | Daniel Reible CV | 49 | 49 |
| 8 | Charles Driscoll CV | 49 | 49 |
| 9 | Nelson Walter CV | 49 | 49 |
| 10 | Cynthia Brooks CV | 49 | 49 |
| 11 | Lauri Gorton CV | 49 | 49 |
| 14 | Legal Notice of Settlement | 49 | 49 |
| 15 | Proof of Publication of Legal Notice in Portland Press Herald | 49 | 49 |

| 16 | Proof of Publication of Legal Notice in Bangor Daily News | 49 | 49 |
| 17 | PenobscotRiverRemediation.com Website Screenshots | 49 | 49 |
| 18 | PowerPoint Slide Deck for Public Outreach Meetings | 49 | 49 |
| 19 | 9/10/21 E-Mail Notice to Stakeholders | 49 | 49 |
| 20 | List of Recipients of 9/10/21 E-Mail Notice to Stakeholders | 49 | 49 |
| 21 | Expert Report of Janet Anderson | 49 | 49 |
| 22 | Rebuttal Expert Report of Janet Anderson | 49 | 49 |
| 23 | Expert Report of Betsy Henry | 49 | 49 |
| 24 | Rebuttal Expert Report of Betsy Henry | 49 | 49 |
| 25 | Expert Report of Craig Jones | 49 | 49 |
| 26 | Rebuttal Expert Report of Craig Jones | 49 | 49 |
| 27 | Expert Report of Russell Keenan | 49 | 49 |
| 28 | Rebuttal Expert Report of Russell Keenan | 49 | 49 |
| 29 | Expert Report of Dana Valleau | 49 | 49 |
| 30 | Rebuttal Expert Report of Dana Valleau | 49 | 49 |
| 31 | Expert Report of Michael Palermo | 49 | 49 |
| 32 | Rebuttal Expert Report of Michael Palermo | 49 | 49 |
| 33 | Expert Report of Danny Reible | 49 | 49 |
| 34 | Rebuttal Expert Report of Danny Reible | 49 | 49 |
| 35 | 9/10/19 Amended Expert Report of Greg Shriver | 49 | 49 |
| 36 | 5/24/19 Rebuttal Expert Report of Greg Shriver | 49 | 49 |
| 37 | 11/1/19 Amended Expert Report of Greg Shriver | 49 | 49 |
| 38 | 12/22/20 Supplemental Expert Report of Greg Shriver | 49 | 49 |
| 39 | Rebuttal Expert Report of Brian Olsen | 49 | 49 |
| 40 | Rebuttal Expert Report of Edward J. Calabrese | 49 | 49 |
| 41 | Rebuttal Expert Report of Edward Glaza | 49 | 49 |
| 42 | Rebuttal Expert Report of Guy Vaillancourt | 49 | 49 |
| 43 | Rebuttal Expert Report of Paul LaRosa | 49 | 49 |
| 44 | Expert Report of David Burdick | 49 | 49 |

| 45 | Rebuttal Expert Report of David Burdick | 49 | 49 |
| 46 | Expert Report of Daniel Cristol | 49 | 49 |
| 47 | Rebuttal Expert Report of Daniel Cristol | 49 | 49 |
| 48 | Expert Report of Charles Driscoll | 49 | 49 |
| 49 | Rebuttal Expert Report of Charles Driscoll | 49 | 49 |
| 50 | Expert Report of Adam Finkel (with 5/15/19 Errata) | 49 | 49 |
| 51 | Rebuttal Expert Report of Adam Finkel | 49 | 49 |
| 52 | Rebuttal Expert Report of Edward Garvey | 49 | 49 |
| 53 | Expert Report of Roxanne Karimi | 49 | 49 |
| 54 | Rebuttal Expert Report of Roxanne Karimi | 49 | 49 |
| 55 | Expert Report of Darren Ranco | 49 | 49 |
| 56 | Expert Report of Theodore Willis | 49 | 49 |
| 57 | Rebuttal Expert Report of Theodore Willis | 49 | 49 |
| 58 | 11/8/19 Deposition Transcript of Todd Bridges | 49 | 49 |
| 59 | 1/14/19 and 1/15/19 Deposition Transcripts of Emmet Curtis | 49 | 49 |
| 60 | 9/13/19 Deposition Transcript of Emmet Curtis | 49 | 49 |
| 61 | 1/28/19 and 1/29/19 Deposition Transcripts of Karen Merritt | 49 | 49 |
| 62 | 10/23/19 Deposition Transcript of Karen Merritt | 49 | 49 |
| 63 | 2/5/19 and 2/6/19 Deposition Transcripts of Corry Platt | 49 | 49 |
| 64 | 10/15/19 Deposition Transcript of Corry Platt | 49 | 49 |
| 65 | 12/4/18 and 12/5/18 Deposition Transcripts of Rod Pendleton | 49 | 49 |
| 66 | 10/21/19 Deposition Transcript of Rod Pendleton | 49 | 49 |
| 67 | 1/23/19 and 1/24/19 Deposition Transcripts of Eugene Shephard | 49 | 49 |
| 68 | 10/18/19 Deposition Transcript of Eugene Shephard | 49 | 49 |
| 69 | 2/12/19 Deposition Transcript of Laura Smith | 49 | 49 |
| 70 | 9/25/19 Deposition Transcript of Laura Smith | 49 | 49 |
| 71 | 2/8/19 Deposition Transcript of Rocky Geyer | 49 | 49 |

| | | | | |
|---|---|---|---|---|
| 1 | 72 | 8/16/19 Deposition Transcript of | 49 | 49 |
| 2 | | Maine Department of Marine Resources Deputy Commissioner Meredith Mendelson | | |
| 3 | 73 | 2/11/19 Deposition Transcript of Maine Department of Marine Resources | 49 | 49 |
| 4 | 74 | Rule 30(b)(6) Designee Meredith Mendelson 8/21/19 Deposition Transcript of | 49 | 49 |
| 5 | | Maine State Toxicologist Andrew Smith, Sc.D. | | |
| 6 | 75 | 2/14/19 Deposition Transcript of Maine Center for Disease Control | 49 | 49 |
| 7 | | and Prevention Rule 30(b)(6) Designee Andrew Smith, Sc.D. | | |
| 8 | 76 | 8/29/19 Deposition Transcript of Janet Anderson | 49 | 49 |
| 9 | 77 | 8/8/19 Deposition Transcript of Betsy Henry | 49 | 49 |
| 10 | 78 | 8/26/19 Deposition Transcript of Craig Jones | 49 | 49 |
| 11 | 79 | 8/20/19 Deposition Transcript of Russell Keenan | 49 | 49 |
| 12 | 80 | 8/2/19 Deposition Transcript of Dana Valleau | 49 | 49 |
| 13 | 81 | 8/9/19 Deposition Transcript of Michael Palermo | 49 | 49 |
| 14 | 82 | 7/31/19 Deposition Transcript of Brian Olsen | 49 | 49 |
| 15 | 83 | 8/30/19 Deposition Transcript of Danny Reible | 49 | 49 |
| 16 | 84 | 10/10/19 Deposition Transcript of Ed Glaza | 49 | 49 |
| 17 | 85 | 7/31/19 Deposition Transcript of Edward Calabrese | 49 | 49 |
| 18 | 86 | 10/4/19 Deposition Transcript of Guy Vaillancourt | 49 | 49 |
| 19 | 87 | 10/11/19 Deposition Transcript of Paul LaRosa | 49 | 49 |
| 20 | 88 | 9/24/19 Deposition Transcript of Adam Finkel | 49 | 49 |
| 21 | 89 | 8/23/19 Deposition Transcript of Charles Driscoll | 49 | 49 |
| 22 | 90 | 8/7/19 Deposition Transcript of Roxanne Karimi | 49 | 49 |
| 23 | 91 | 8/28/19 Deposition Transcript of Theo Willis | 49 | 49 |
| 24 | 92 | 7/30/19 Deposition Transcript of Darren Ranco | 49 | 49 |
| 25 | 93 | 9/26/19 Deposition Transcript of Ed Garvey | 49 | 49 |

| | | | | |
|---|---|---|---|---|
| 94 | 11/6/18 Deposition Transcript of Amec/Wood 30(b)(6) Designee Nelson Walter | 49 | 49 |
| 95 | 3/11/19 and 3/12/19 Deposition Transcripts of Nelson Walter | 49 | 49 |
| 96 | 10/25/19 Deposition Transcript of Nelson Walter | 49 | 49 |
| 97 | Affidavit of Dean Bennett | 49 | 49 |
| 98 | Affidavit of Sheila Dassatt | 49 | 49 |
| 99 | Affidavit of James Gillway | 49 | 49 |
| 100 | Affidavit of Ernest Kilbride | 49 | 49 |
| 101 | Affidavit of Richard Rosen | 49 | 49 |
| 102 | Affidavit of W. Tom Sawyer | 49 | 49 |
| 103 | Notice of Written Public Comments | 49 | 49 |
| 104 | Public Comments Submitted to PenobscotRiverRemediation.com Website | 49 | 49 |
| 105 | Public Comments from MPA Members | 49 | 49 |
| 106 | Public Comments from NRDC Members | 49 | 49 |
| 107 | Nelson Walter Demonstrative - Penobscot Project Organizational Chart | 49 | 49 |
| 108 | Nelson Walter Demonstrative - Phase III Supporting Reports | 49 | 49 |
| 109 | Nelson Walter Demonstrative - Summary of Phase III Remedies | 49 | 49 |
| 110 | Danny Reible Demonstrative - Site Reach Map | 49 | 49 |
| 111 | Danny Reible Demonstrative - Intertidal Zone Image | 49 | 49 |
| 112 | Danny Reible Demonstrative - Capping Image 1 | 49 | 49 |
| 113 | Danny Reible Demonstrative - Capping Image 2 | 49 | 49 |

1    (Counsel present in open court.)

2        THE COURT:  Good morning.

3        MR. TALBERT:  Good morning.

4        MS. DUFT:  Good morning.

5        THE COURT:  This is sort of like déjà vu all over

6    again.

7    We are here in the matter of Maine People's Alliance

8    versus Mallinckrodt, which is 00-cv-69-JAW.

9    Would counsel please enter their appearances.

10        MR. BERNARD:  Good morning, Your Honor.  For the

11    plaintiffs, Mitchell Bernard and with me at counsel table is

12    Jared Thompson and Lauren Phillips, and we have our legal

13    assistant Alyssa Brown sitting just behind us.

14        THE COURT:  Good morning.

15        MR. BERNARD:  Good morning.

16        THE COURT:  It's nice to see you again.

17        MR. BERNARD:  Same.

18        MR. TALBERT:  Your Honor, Jeff Talbert on behalf of

19    Defendant Mallinckrodt US LLC.  With me at counsel table is

20    Benjamin Piper, also for Mallinckrodt US LLC, and in-house

21    Patricia Duft.

22        THE COURT:  Good morning.  It's nice to see you

23    again.

24    So I want to first describe a little bit about this

25    proceeding, but first I want to address the COVID-19 issue.

1   As you all know, we've had a spike nationally and in the state

2   of Maine, especially in Penobscot County, caused by the delta

3   variant, and it would be, it seems to me, ironic in the

4   extreme if this judicial hearing, which is focused on the

5   health and safety of one of the country's great rivers, became

6   itself a risk to the health and safety of the hearing

7   participants, and I'm anxious to avoid this hearing becoming a

8   superspreader event.

9        So in light of that, we have consistently, meaning we the

10  court, has consistently consulted with an epidemiologist and

11  other experts, and they have advised us about proper

12  procedure.  One of the things we have done, which is not

13  particularly evident here, although a little bit, is we've

14  revamped the courtroom itself in terms of air exchange and

15  also, as you can see, some partitions.  But they -- the

16  experts tell us apart from vaccination, and what we can do

17  internally to minimize the risk, the best prevention is

18  masking and distance.

19       And so what I'm going to do is I'm going to ask everyone,

20  as you're all doing, to wear a mask if you're not speaking or

21  when you're not speaking.  For the attorneys, as you're all

22  doing, I expect you all to wear masks except when addressing

23  the court or questioning witnesses, and for that purpose, I'm

24  going to ask you to go to the podium.  That will keep you six

25  feet from anybody else.  And when you're at the podium, I will

1   allow the lawyers to remove their masks.  For witnesses, they

2   may unmask while they testify, but otherwise they should mask.

3   And for members of the public, I'm going to ask you to remain

4   masked, as you're doing, except when you wish to make a

5   comment to the court.  And then, as with the attorneys, you

6   can approach the podium and unmask, if you wish to.  Not

7   necessarily -- I'm not going to order you to do so, but you

8   may do so, if you wish, if you want to address the court.

9        In terms of social distancing, I think you're all trying

10  to follow the outlines that we have here.  In terms of social

11  distancing, you may sit together if you're in the same group

12  and you're comfortable doing that; but if you're not in the

13  same group, I'm going to ask you to sit six feet away.

14       I don't know if there are people who are -- who have been

15  unable, with the limitations in our seating capacity now, to

16  be in the courtroom.  Do you know, Julie?

17            THE CLERK:  There hasn't.

18            THE COURT:  There are none.  Anyway, if there are --

19  if some people come in and it's difficult to seat them, we do

20  have an overflow area, which is not ideal, but at least people

21  will be able to observe the proceedings.

22       With that, what we're going to be doing is, over the next

23  three days, holding a fairness hearing.  Today the attorneys

24  had planned to call witnesses and also to call witnesses on

25  Monday.  On Tuesday, October 5th, we've reserved that time for

1    some witnesses, but mostly for public comment.  The attorneys

2    have told me that approximately 12 to 15 people have indicated

3    they'd like to make a public comment to the court, and I'm

4    willing to accept those comments.

5        We're going to be doing a court schedule of 8:30 to 2:30

6    each day, with a couple of breaks in-between, but that will be

7    the routine daily schedule.  And with one -- I'll end this by

8    saying that I'm sure the people are aware, but in this really

9    momentous case the parties have, after 20 years-plus of

10   litigation, presented the court with a joint motion to approve

11   a Proposed Consent Decree.  That's available to the public and

12   you're able to review that proposed decree.  Under the law,

13   the Resource Conservation and Recovery Act, it is my

14   obligation to ensure that the Proposed Consent Decree is,

15   quote, fair, adequate, and reasonable, unquote -- that is the

16   standard -- will not violate the Constitution, and is

17   consistent with the objectives of Congress.

18       This is a complicated issue, and it has been my view,

19   having sat through about three weeks of testimony in 2014, in

20   effect, that it was science that caused this problem because

21   science somehow devised mercury as an appropriate use in an

22   industrial process and then people committed what has to be,

23   in my view, an act of environmental barbarism in releasing

24   literally tons of mercury into the Penobscot River, this great

25   resource for the people of Maine and this country, and at the

1  same time, it is my conviction that it is science that has the

2  solution.  That as science has brought us to this point, it

3  will lead us out.  And I think what you will hear over the

4  next couple of days, today, and Monday, and Tuesday as well,

5  is a description of the problem and a description of the

6  potential solutions.

7      And the final point I'll make is that the lawyers here

8  are really remarkable.  It's rare that I've seen such fine

9  lawyers actively representing their opposing interests, but

10 ultimately coming to a resolution in such a complex and

11 difficult matter, and I think, as you watch the lawyers in

12 action, and the witnesses in action, you'll be encouraged.

13     So with that, Mr. Bernard, would you like to address the

14 court?

15         MR. BERNARD:  I would, Your Honor.  Thank you.

16     May it please the court, we've traveled a long road to

17 reach this point.  When we tried the liability phase of the

18 case in March of 2002, my daughter was in third grade.  When

19 we delivered our closing arguments in this courtroom in June

20 of 2015 (sic), after the remedy trial, she was a college

21 student and she was here because she was interested in seeing

22 a proceeding like this.

23     On Monday, having finished law school, she will begin a

24 clerkship with a federal district court judge.  So --

25         THE COURT:  Well, my only regret is that she

1  couldn't be my clerk.

2        MR. BERNARD:  Well, I think I regret that, too, Your

3  Honor.  But children have grown into adults during the

4  pendency of this litigation.  And in reviewing the history of

5  it, the long road, I found a clear and linear progression that

6  brings us here today to what I hope will be the culminating

7  moment, which is the court's endorsement of the parties'

8  Proposed Consent Decree.

9        Just to go over the history a little bit to set the

10  context, plaintiffs filed their complaint on April 10th, 2000,

11  21-and-a-half years ago, but it started before that when we

12  heard about a possible problem with mercury from the

13  chlor-alkali plant in Orrington and we sent an aquatic

14  oncologist, Dr. Robert Livingston, out to sample in the

15  Penobscot because we wanted to see what was going on, and sure

16  enough, he found elevated sediment, mercury concentrations, in

17  a distribution, in a pattern downstream of the plant that

18  pointed to the plant as a source.

19        And so that was the first look, even though that was 30

20  years after the first discharges into the river, that was the

21  first real look at what was going on downstream.  And so

22  knowing what we knew then and know now about mercury, which is

23  that it's a potent neurotoxin with particularly pernicious

24  effects on the developing brain, that it doesn't biodegrade in

25  the environment, it just stays there, and that it biomagnifies

1    up the food web.  I think in your 2015 order, Your Honor, the

2    October 2nd, 2015, remedy order, you called mercury probably

3    the most toxic element on the periodic table.

4         And so we alleged, knowing what we know about mercury,

5    that releases from the plant may create an imminent and

6    substantial endangerment to health and the environment

7    downstream, and that's, of course, what the RCRA citizens suit

8    allows, and it empowers the federal courts to act to abate

9    endangerments if it finds such an endangerment.

10        So we filed a complaint.  Mallinckrodt filed a slew of

11   pretrial motions to dismiss the complaint.  Magistrate Judge

12   Kravchuk decided -- recommended decisions in plaintiffs'

13   favor.  Judge Carter, who was then presiding over the case,

14   adopted her recommended decisions, and we went to trial in

15   March of 2002, and as you know, that July, Judge Carter ruled

16   in plaintiffs' favor.  And he held that the mercury downriver

17   of the plant may endanger both human health and the

18   environment and that Mallinckrodt was a dominant source of the

19   mercury.

20        In terms of remedy, we didn't know enough then to know

21   the full extent and nature of the problem -- how severe was

22   it, how long would it last, is there a viable means to address

23   it -- and so the plaintiffs requested a study because we

24   wanted to know what could be done, if anything.  And so Judge

25   Carter granted that request, and he ordered a scientific study

1  of the ecosystem, and he made a critical decision at that

2  moment, which is he assigned that task to independent

3  scientists, over Mallinckrodt's objection.  Your Honor

4  referred to that as visionary and I agree.

5      The First Circuit in December of 2006 affirmed Judge

6  Carter's liability and remedy rulings in full and we proceeded

7  to the study.  And so for eight years, the court appointed

8  scientists to study the Penobscot -- the Penobscot, and they

9  issued their 1,800-page report in April of 2013, and they

10  found, in essence, that the plant had released up to 12 metric

11  tons of mercury.

12      To give some sense of that, Dr. Livingston testified

13  during the liability trial that one teaspoon of mercury can

14  contaminate a railroad car full of fishes, to give you a sense

15  of what 12 metric tons can do.  So the Phase II Study Panel --

16  the court-appointed Study Panel -- it was Phases I and II --

17  found that the plant had released up to 12 metric tons of

18  mercury to the river from December 1967, when it began

19  operations, up through 2000 when it closed, though most of the

20  releases occurred during the early years, the late 1960s,

21  early 1970s, when a corporate predecessor to Mallinckrodt

22  owned and operated the plant.

23      So the mercury had been released.  Naturally, it had

24  migrated downriver.  It had lodged in sediments where it was

25  available to biota.  There was methylation occurring where

1  inorganic mercury transforms to the toxic form methylmercury,

2  becomes bioavailable, had gotten -- had entered -- taken --

3  been taken by biota, had entered the food web, and

4  biomagnified up the food web, including into lobster, eels,

5  black ducks, all consumed by human beings.

6     In addition, the scientists found that the salt wedge

7  flowing north from the bay had effectively trapped these

8  mercury-laden sediments in the estuary with little escape.

9  Tides and storms created this mobile pool of contaminated

10 sediment, which was constantly redistributed around the

11 ecosystem so the mercury-tainted sediment remained available

12 to biota.  And since mercury doesn't biodegrade, they found

13 that the problem would likely last for many decades or longer.

14    And in some parts of the system, you may recall, Your

15 Honor, they found that natural recovery was not -- was not

16 occurring at all.  That surface mercury concentrations were

17 actually steady or actually increasing.  And so the

18 court-appointed Study Panel recommended, after Phases I and II

19 of their study, that the court explore ways to accelerate

20 recovery of the ecosystem.

21    Mallinckrodt challenged the Study Panel's findings and

22 recommendations, and we had a month-long trial in June of 2014

23 before Your Honor, and in your decision in October of 2015 you

24 found that plaintiffs -- and I'm quoting -- continue to suffer

25 irreparable injury from ongoing mercury contamination caused

1  by Mallinckrodt.  And in updating and confirming Judge

2  Carter's findings from back in 2002, now based on a lot more

3  scientific data and evidence, and those findings, of course,

4  had explicitly been affirmed by the First Circuit, you ruled

5  that -- and I'm quoting again -- the Penobscot River Estuary

6  remains unacceptably contaminated with mercury.

7       So the court appointed an engineering firm, Amec Foster

8  Wheeler, now called Wood.  They were taken over by another

9  company and so we'll refer to them, for ease of reference, as

10 Wood.  Wood is a firm that was recommended jointly by the

11 parties and the Special Master Susan Calkins, and the

12 appointment was, the task was to explore whether effective and

13 cost-effective remedies were available to accelerate recovery

14 of the river.  And, again -- and I want to emphasize this,

15 Your Honor, because it's so unusual and so significant -- the

16 court chose not to give that engineering study task to the

17 defendant, but rather to a firm independent of the parties who

18 would report directly to the court.  I think that is one of

19 the most significant rulings in the case.

20      Wood studied the problem for nearly three years.  They

21 issued a final engineering report in September of 2018, and as

22 to the fundamental question the court posed, is there a

23 reasonable remedy to accelerate recovery of the estuary, the

24 court-appointed engineer said, yes, there is.

25      They recommended a set of primary remedies, and I'll

1    focus on those for the sake of clarity.  And the primary

2    remedies included removal of mercury from intertidal coves in

3    the Orrington Reach of the river near the plant site, a

4    thin-layer cap over a large portion of Mendall Marsh, that

5    large marsh area south of Winterport on the west side of the

6    main stem of the river, the dredging of a number of

7    contaminated surface deposits that Wood found comprised part

8    of this mobile pool of mercury-infused sediment, and a number

9    of those surface deposits were located in the Orland

10   River-East Verona Island portion of the ecosystem, which has

11   been a persistent cause of concern, and, in addition, the

12   engineers recommended long-term monitoring.

13       Wood also determined in Phase III, through additional

14   sediment and biota sampling, that mercury concentrations have

15   not changed appreciably in the system since the Phase II Study

16   Panel, and in terms of natural recovery in sediments, that not

17   only has not accelerated, it has apparently slowed down.  So

18   these findings, of course, underscored the need for active

19   remedies in the river.

20       Mallinckrodt intended to challenge Wood's

21   recommendations, which the engineers estimated would cost

22   hundreds of millions of dollars to implement.  Plaintiffs

23   supported the Wood recommendations, though, in some respects,

24   we didn't think they went far enough, and we were preparing

25   for a third trial to contest those issues, and we engaged in

1  intensive discovery in anticipation of that trial, and then

2  both sides decided to see whether there was another way,

3  whether there was a way finally to resolve their remaining

4  differences and agree on a reasonable remediation program, a

5  cooperative path forward.

6      So with the help of Magistrate Judge Nivison, last fall

7  we reached an agreement in principle and then hammered out the

8  details of the proposed decree that we have filed with the

9  court, and we presented that to the court in March of this

10  year, and today we're here to seek the court's endorsement of

11  the Consent Decree, and the plaintiffs urge the court to do

12  so.

13      The plaintiffs, Your Honor, are two -- are two nonprofit

14  organizations that together represent more than 30,000

15  citizens in Maine, and they've already achieved a great deal

16  in the case.  The Court of Appeals decision in this case was

17  the first in the First Circuit to rule on the reach of the

18  citizen suit provision of RCRA, so significant law has been

19  made.  The Penobscot Estuary, according to the experts we've

20  talked to, is now perhaps the single best studied estuary in

21  the world in terms of mercury contamination, which is a real

22  contribution to science, and thanks to the court orders it has

23  been studied by independent scientists and engineers, and we

24  hope that, too, will create useful legal precedent going

25  forward in future cases.

1        The data generated by the court-ordered studies resulted

2   in a partial and, we hope, temporary closure of the lobster

3   and crab fisheries in the lower river.  First the Department

4   of Marine Resources closed seven square miles; that was in

5   2014.  Then they did some further sampling of their own and

6   extended the closure another 5.5 square miles to that -- down

7   south -- downriver to the south, and that closure is

8   protective of public health.

9        The Department of Inland Fisheries and Wildlife has

10  issued a warning on consumption of black ducks that feed

11  within the system.  That, too, is protective of public health.

12       Without this case, Your Honor, no one would even know

13  about the contamination downstream of the plant site, and the

14  plaintiffs, I think, have indicated a cardinal principle

15  embedded in federal environmental law, including RCRA, which

16  is polluter accountability.  The plant was a private

17  enterprise, and the actions of the plant polluted the

18  Penobscot River, which is a public resource.  And Judge Carter

19  found that in the 1990s, when the government, both the State

20  of Maine and the federal government, asked Mallinckrodt to

21  collect data downriver of the plant to determine whether

22  mercury had migrated, was methylating, was causing any adverse

23  effects, the defendant -- I'm quoting Judge Carter -- took

24  very few steps to comply with that request.  The First Circuit

25  expressly affirmed that finding, and the finding by Judge

1    Carter was that the failure to look downriver, notwithstanding

2    the requests of the government, was by design.

3       The state and federal governments elected not to pursue

4    the problem downriver, and so through the RCRA citizens' suit

5    provision, Congress conferred on citizens the right to seek

6    redress under circumstances precisely like these, where

7    there's an endangerment, or there may be an imminent and

8    substantial endangerment, and the government, for whatever

9    reasons, decides not to act, citizens have the power to sue,

10   and Congress has empowered the courts to act to eliminate any

11   risk posed by hazardous pollutants like mercury.

12       The defendant resisted active remediation in the river

13   for more than 20 years, but we've turned a corner now.  To its

14   credit, Mallinckrodt has made a commitment of significant

15   resources and has pledged to work cooperatively to implement

16   the remedies the parties have agreed to.  And so after more

17   than two decades of sharp contention, the parties appear

18   jointly and cooperatively before the court to seek endorsement

19   of the agreement they've entered into.

20       This has been a long and hard-fought battle.  If the

21   court approves the decree, long years of litigation will cease

22   in favor of a constructive, collective effort to enhance the

23   environment and human health.  And enhancing the environment

24   and human health was and remains the sole purpose motivating

25   plaintiffs' complaint and their persistent prosecution of this

1   case.

2       After our opening statements, Mr. Talbert and I will

3   present to the court the basic terms of the Consent Decree,

4   and then we'll hear from six witnesses:  First, Nelson Walter,

5   who is the project manager from Wood, who is in charge of the

6   Phase III inquiry, and he'll testify about the Wood process

7   and the results and the recommendations, and I believe that he

8   will support entry of the Consent Decree.

9       Then, Dr. Charlie Driscoll, who is an expert professor at

10  Syracuse University and an environmental engineer who's

11  working -- been working with the plaintiffs, who's been

12  involved in Phase III, will testify about his view of the

13  Proposed Consent Decree, and he will support its entry.

14      Then Dr. Danny Reible, who's a professor at Texas --

15  Texas Tech University and a -- an expert on capping of

16  sediments, who's been working with Mallinckrodt throughout

17  Phase III, will testify, and I believe he will support

18  endorsement of the Consent Decree.

19      And then we'll hear from one person each, one witness

20  each from the plaintiffs and from the defendants, Jesse

21  Graham, who's the co-executive director of the Maine People's

22  Alliance, the lead plaintiff in the case.  He will testify

23  that his organization supports the settlement, and then David

24  Kelley from Medtronic, which is now the corporate parent of

25  Mallinckrodt, will testify, and I expect he will testify to

1    the same effect.

2         And, finally, you'll hear, Your Honor, from Cindy Brooks,

3    who is the head of the Greenfield firm that the parties are

4    proposing be appointed as the trustee if Your Honor endorses

5    the Consent Decree, and she'll testify about the firm and its

6    experience and how they would handle the assignment as

7    trustee, should they get it.

8         And then, of course, on October 5th, we'll hear from

9    members of the public, and I think, Your Honor, the number of

10   people who have signed up to testify has increased.  I think

11   it's up to maybe around 23 now.  And so we'll be hearing from

12   people in the public, and we don't know exactly what they'll

13   say, but I expect -- I anticipate there -- there will be solid

14   support for entry of the Consent Decree.

15        In its decision in 2006, the -- the First Circuit said

16   that once liability has been found, equitable relief in RCRA

17   citizen suits is largely in the informed discretion of the

18   trial court, and we're here to ask the court to find that the

19   proposed settlement is fair, adequate, reasonable, in the

20   public interest, and then to exercise its discretion to

21   endorse the decree, and I believe the evidence at the hearing

22   over these three days will support that outcome.

23        As a matter of procedure, the settlement is fair.  As

24   Your Honor is aware, this has been a fiercely contested

25   litigation.  Each side has had ample opportunity to make their

1    case at each stage of the proceedings.  There was a long

2    negotiation that was informed by prior proceedings.  There was

3    an extensive discovery concerning the Phase III report.  And

4    there was, of course, the mediation that was presided over by

5    Magistrate Judge Nivison.  So there was a very careful process

6    of negotiation that led to the proposed decree.

7         And as a matter of substance, I think it's fair and

8    adequate and reasonable.  It's not all that the plaintiffs

9    want, and I'm sure that it's not all that Mallinckrodt wants,

10   or it's more than Mallinckrodt wants.  That's what a

11   settlement is.  I think each side compromised to some degree.

12   It is patterned on the Wood Phase III engineering report.

13   It's not -- it's not identical to it, and we will explain,

14   when we explain the -- the terms of the settlement, we'll talk

15   in greater detail about some of the differences, but it is

16   patterned very much on the work of Wood, the independent,

17   court-appointed engineers.

18        In the Orrington Reach, they proposed dredging 130 acres

19   of intertidal sediment because it -- there are high mercury

20   concentrations there and there's also a risk of erosion and

21   concentration to the mobile pool downriver.  And we're

22   proposing instead capping instead of dredging 130 acres, the

23   same kind of area, and we think that that remedy can work and

24   will accomplish what Wood set out to accomplish in that part

25   of the system.

1          There'll be -- the settlement provides for surface

2    deposit dredging less than what Wood recommended, but still a

3    substantial amount, and it provides for $30 million for work

4    over in the Orland River and East Verona Island, which is a

5    very, very important part of the system, in part, because we

6    believe that -- and the experts believe that the sediment

7    mercury in that region may be contributing to the high lobster

8    concentrations at the south Verona sampling site, which

9    consistently through the years have shown the highest mercury

10   concentration in lobsters.  So there's $30 million to try to

11   address that part of the system.

12          And although there's no specific remedy prescribed for

13   Mendall Marsh, there is $20 million in beneficial

14   environmental projects which can be used for salt marsh

15   restoration and other measures that may benefit the wildlife

16   that feed and otherwise use Mendall Marsh.

17          And, of course, there's -- there's long-term monitoring,

18   which is quite similar to what Wood recommended.  There's

19   money for project administration.  Again, we'll describe this

20   in a -- in a little while, but I think the point here, Your

21   Honor, is that I believe that the -- the fact that the

22   settlement is patterned in substantial measure on the

23   recommendations of the independent, court-appointed engineers

24   is probative of its reasonableness.

25          So if we went to trial, plaintiffs would argue that we

1    should do more than what the Wood engineers recommended and

2    Mallinckrodt would argue that we should do less or nothing at

3    all, and nobody knows what the court would do.  And so I think

4    the settlement reasonably balances the parties' litigation

5    risks and their objectives.  The defendant gets a cap, it gets

6    certainty in terms of its financial exposure.  Under the terms

7    of the Proposed Consent Decree, it will not be required to

8    spend more than $267 million on the mediation, 187 million of

9    which is committed and 80 million of which is contingent.

10   Again, we'll describe this in greater detail later.  But they

11   get a cap, which I think is very important to them, and

12   Mr. Talbert will speak for the defendant, but I think that's a

13   -- a real benefit to the defendant.

14       What the plaintiffs get are real remediation measures,

15   active remediations, starting now, to accelerate recovery of

16   the river, not a potentially long further delay before that

17   would happen.  And also, the remedial measures the parties

18   have agreed on focus on the parts of the ecosystem that the

19   experts have identified as meriting the closest attention, and

20   it includes a suite of approaches, capping, dredging,

21   environmental projects, long-term monitoring.  These are all

22   good from the plaintiffs' point of view.

23       So these measures, while there are no guarantees of what

24   they will accomplish, there's no such thing as a guarantee in

25   advance, they -- the measures in the proposed decree are

1  reasonably designed to reduce the endangerment that the court

2  has found to human health and the environment and that makes

3  those measures in the decree itself consistent with purposes

4  of RCRA.

5       Finally, I just want to address what does the public get.

6  You know, the plaintiffs get something through to the

7  settlement, the defendant gets something through the

8  settlement.  In 2015 Your Honor wrote that -- and I'm quoting

9  -- the public has an obvious and compelling interest in

10  reducing mercury contamination in the Penobscot River.  If

11  endorsed and implemented, the Consent Decree will serve that

12  interest.  The estuary has been contaminated for decades by a

13  dangerous pollutant.  It is manifestly in the public interest

14  to accelerate its recovery.

15       The public has already weighed in to some degree pursuant

16  to the court's direction.  We gave public notice of the

17  proposed decree and the opportunity to comment.  Through the

18  website, we received 34 comments.  The plaintiffs' members and

19  supporters have produced 478 comments.  There's a letter

20  that's been submitted to -- that's in the record that's signed

21  by 30 different organizations.  The Maine DEP has written a

22  letter to say it supports efforts to remediate and accelerate

23  recovery of the river.  The Penobscot Nation supports the

24  settlement, and you'll hear from a witness on Tuesday from the

25  tribe.

1          And so we perceive, and I think the evidence will show,

2     Your Honor, that there is overwhelming support for the

3     settlement, and that's understandable.  The Penobscot is the

4     largest estuary in New England.  It supports abundant wildlife

5     and recreation.  It's a major source of food.  It's a critical

6     and precious natural resource, and it belongs to the people of

7     Maine.  We should help return it to them.  We have that

8     opportunity if the court endorses the Proposed Consent Decree.

9     It will free up hundreds of millions of dollars in purely

10    private funds to enhance the environment and public health.

11    The studies' prerequisite to any remedy -- Phases I, II, and

12    III -- the science and the engineering which would have had to

13    be done no matter what to build a foundation to make

14    remediation decisions -- they cost around $33 million.  This

15    part of the -- this settlement requires Mallinckrodt to commit

16    another 187 million and up to 267 million.

17         So all told, that's 220 to $300 million all for

18    remediation that will accelerate recovery of the Penobscot

19    River.  Not a penny of that will come from public funds.

20         As the court pointed out in its 2015 remedy decision, the

21    First Circuit perceived in RCRA, quoting, a congressional

22    thumb on the scale in favor of remediation.  The Proposed

23    Consent Decree vindicates that important legal principle by

24    providing active remedial measures designed to reduce the

25    ongoing endangerment to human health and the environment.

1     The alternative to settlement would be continuing

2  litigation.  Each side would press its position; the court

3  would have to decide a host of complex scientific and

4  engineering questions in order to determine whether to accept

5  the Wood recommendations, accept them with modifications, or

6  reject them.  The parties have determined at arm's length, and

7  after much deliberation and negotiation, to go another route,

8  to lay down their arms and move to active remediation.  We

9  hope the court will approve so that we can move from

10  contention to cooperation and focus our time, effort, and

11  resources exclusively on the river.

12     Finally, Your Honor, plaintiffs have worked long and hard

13  on this case, and they've had much success so far.  There is a

14  clear linear progression that I see from the initial

15  investigation we conducted, to the filing of the complaint, to

16  determining liability, to the scientific study of the nature

17  and extent and severity and duration of the contamination in

18  the river, to an engineering study looking at how we can clean

19  it up -- whether we can clean it up, and if so, how.

20     There's only one thing left -- the remediation itself.  I

21  myself have spent 21 years and thousands of hours working on

22  this case.  If it ends this way, if we resolve the litigation

23  and move to active and cooperative remediation, and if that

24  remediation results in accelerated recovery of this great

25  river, then every hour will have been well-spent.  This is

1    what Congress intended; this is the logical and promising

2    result of the prior decisions of this court and the First

3    Circuit.  We have a firm scientific basis for proceeding; we

4    have agreement between the parties; we have in the offing

5    hundreds of millions of dollars in private funds to remediate

6    and enhance a precious public resource in Maine.

7        We respectfully urge the court, after hearing the

8    evidence, to endorse the Proposed Consent Decree.  Thank you,

9    Your Honor.

10            THE COURT:  Thank you very much, Mr. Bernard.  I

11   appreciate your comments.

12       Mr. Talbert.

13            MR. TALBERT:  Your Honor, I have a few slides, and

14   I'm not sure exactly how we get those turned on.

15            THE CLERK:  Are you doing them from your laptop?  Is

16   it your laptop?

17            MS. SURKIN:  Yes.  Yes.

18            THE CLERK:  Okay.  You should be live.

19            MR. TALBERT:  Apologies, one question on this, in

20   terms of advancing, is it possible to advance from the podium?

21   No, only from there.  Okay.

22       Your Honor, this settlement represents the culmination of

23   20 years of litigation and over a decade of study to determine

24   what measures, if any, can be implemented to address mercury

25   in the Penobscot River.  Over the course of three phases of

1    study, 250 scientists, including 30 Ph.D.s, have examined this

2    issue.  There were thousands of sediment samples taken in the

3    river, including 35 or more species of biota that have been

4    sampled.  The cost of the study alone has been 27 million.

5        The proposed settlement represents the best possible

6    means of moving forward now with active remediation in

7    portions of the estuary outside of the former HoltraChem site.

8    The measures agreed to by the parties represent a compromise

9    that acknowledges all of the work that has been performed to

10   date and balances numerous competing interests, including the

11   court's six criteria.  On balance, the settlement is fair,

12   reasonable, and in the public interest, and should be entered

13   by the court.

14       After all the study, the following key findings impacted

15   our remedy selection.  First of all, there's no silver bullet

16   to reduce or eliminate mercury in key biota with any high

17   level of certainty in any meaningful time frame and without

18   potentially causing more harm than good.

19       Second, the Penobscot Estuary is extremely complex.  It's

20   a large estuary, one of the largest in New England; it

21   includes 10 to 14-foot tides, and has a salt water freshwater

22   interface that creates a mobile pool of sediments that moves

23   throughout the system.

24       Third, the levels of mercury are relatively low, diffuse,

25   and pose relatively few risks.  In comparison to other mercury

1    sites around the country, the target for remediation at some

2    other sites is close to an order of magnitude higher than the

3    levels that currently exist in the Penobscot River.   In

4    addition, the mercury has spread throughout the system, aided,

5    in part, by the mobile pool.  Wood examined the risks and

6    found that there overall was little risk to human health or

7    the environment.

8         Fourth, active remedies themselves have the potential to

9    cause harm.   In particular, dredging can release mercury that

10   is buried in sediments and cause additional harm, particularly

11   with a contaminant like mercury that has a propensity to

12   methylate depending on the environment it gets into.

13        Fifth, most of the mercury is buried, not causing harm,

14   and natural recovery is occurring.   The highest concentrations

15   were discharged in the late 1960s and are now buried.

16   Conditions have improved significantly since that time.

17        Finally, mercury above the Veazie Dam continues to come

18   down on a daily basis approximating levels that are close to

19   Maine's fish tissue action level, placing a pragmatic barrier

20   and limitation on what can be remediated and the goals that

21   can be achieved.  Wood recognized that it would be technically

22   impractical to remediate below background levels of mercury.

23        This has been a long road -- three phases of study.  What

24   started as a chlor-alkali facility that supplied chlorine to

25   the pulp and paper industry, in 1967 when it opened, used

1    mercury as a cathode in that process.  At the time that

2    primarily the discharges occurred, it was not illegal to do so

3    under federal law.  All of the other entities that owned this

4    facility are now defunct.  A predecessor to Mallinckrodt owned

5    this facility for a period of time, which is why they are --

6    have been the -- the party that has stepped up.

7         There were three phases of study.  Phase I began by

8    appointing a Study Panel, three members, in 2004, and Phase I

9    concluded in March of 2008 with a report and then an a

10   acknowledgment to move on to Phase II.  The Phase II Report

11   was issued in April of 2013 and then was followed by the

12   hearing -- 19-day hearing.  Phase III began in January of 2016

13   when Wood began its engineering study and culminated with the

14   report in 2018.

15        In Phase I of the study, the purpose was to study the

16   extent of existing harm from mercury contamination in the

17   Penobscot Estuary.  Numerous species were studied.  I will not

18   name all of them, but they included mussels, lobster, tomcod,

19   eel, and numerous birds.  There were sediment samples taken in

20   the main stem of the river, Mendall Marsh, the Orland River,

21   Fort Point Cove, and Penobscot Bay.

22        The Phase I study evaluated the potential risks to

23   numerous biota, including risks to human health as well as

24   ecological risk, and of the 24 species that were studied, they

25   narrowed the focus to approximately seven species that had

1    potential risk for human health or ecological risk.

2         In the next phase, Phase II, examined the feasibility of

3    a remediation plan to effectively address mercury in the

4    Penobscot River.  There was further study of the

5    concentrations in sediments and biota and analysis of the

6    historical versus present-day sources, examination of natural

7    recovery, and an evaluation of the mobile sediments in the

8    estuary.  There was also an examination of methylation rates

9    in Mendall Marsh.

10        What emerged was that this is an extremely complex system

11   with numerous uncertainties.  Importantly, in Phase II,

12   towards the end of that study, the Study Panel identified a

13   hydrodynamic feature that exists in a lot of estuaries but is

14   particularly prevalent in the Penobscot River, which is a

15   mobile pool of sediment.  The figure on your screen shows the

16   hydrodynamic mechanisms that occur, where you have freshwater

17   meeting salt water, there can be a trapping zone that will

18   trap sediments and move them around in the estuary.  So with

19   the tides, you have this mobile pool of sediments that

20   effectively disperses the contaminants, as well as sediment,

21   up and down the river, creating challenges for how you

22   remediate in a system like this.

23        Second, mercury methylates.  So once total mercury gets

24   into the environment, depending on the area of the environment

25   that it gets into, it will have varying different methylation

1  rates, and are uptaken by biota, and there's bioaccumulation

2  in the organism.  It is unknown currently what level of total

3  mercury will result in certain methylmercury and then up into

4  an organism, which creates pragmatic issues for remediation

5  because it's unclear what level of total mercury you would

6  need to meet to lower mercury concentrations in biota to any

7  reasonable degree.

8      At the end of Phase II, there was also limited

9  information regarding certain geographic areas in the system.

10 In the Orland River, there was very little focus in that part

11 of the system and how mercury was getting up there.

12     In terms of the findings regarding the remediation,

13 several of the quotes from Study Panel member Dr. Whipple

14 summed up where we were in terms of remediation relatively

15 well.  He stated, the Penobscot is a very complicated system,

16 and many of the factors we looked at are uncertain within a

17 factor of two, which is significant.

18     The Study Panel was unsure what to do in terms of

19 remedial measures.  Dr. Whipple described the remedial

20 measures recommended in the Phase II Report as what survived

21 were the ones that weren't obvious bad ideas.

22     And there was no clear silver bullet to reduce mercury

23 concentrations in the system.  If there were an easy solution,

24 these individuals would have found it and the parties would

25 have discussed it much earlier.

1          The culmination of Phase II, there was a 19-day hearing

2    in front of Your Honor, testimony from over 26 Ph.D.

3    scientists, and the court concluded and issued an order on

4    remediation, appointing an engineering firm, then known as

5    Amec Foster Wheeler, now known as Wood, and I'll refer to them

6    as Wood for the rest of this, to develop a cost-effective and

7    effective remedies to clean up the remaining mercury in the

8    Penobscot River.

9          The court provided some helpful guidelines in terms of

10   evaluating remedial recommendations:  First, has the proposed

11   solution been successfully attempted or is it innovative; two,

12   the likely cost of the recommendation; three, the length of

13   time to complete the recommendation; four, the likely

14   effectiveness of the solution; and, five, the potential

15   environmental harm that may be caused by the proposed solution

16   itself.

17         Wood made several findings that were relevant to

18   remediation and the parties' discussions.  One of its findings

19   was that more remediation is not necessarily better.  As an

20   example, Wood did not recommend system-wide dredging in the

21   system because it would take decades to implement, would

22   destroy habitat, had the potential for increased mercury

23   uptake by biota, and would be extremely expensive, estimating

24   at a cost of 5.5 billion to dredge the entire system.

25         Second, the effectiveness is uncertain in light of the

1    complexities of the system and the contaminant at issue.

2    Karen Merritt, who is one of the principal authors of the

3    Phase III report, summed up in her deposition very well, the

4    predictions about the timing and magnitude of recovery

5    resulting from remedial action are speculative and nobody has

6    successfully demonstrated an ability to reach ecological

7    targets through remediation at mercury sites.  Nobody knows

8    how to do it.  Nobody has done it successfully.  This

9    highlights the issues the parties are facing.

10        Third, background concentrations coming down into the

11   system from above the Veazie Dam limit the extent and

12   effectiveness of active remedies.

13        In addition, Wood made several findings regarding risk.

14   With respect to environmental risk, ecological risk, he found

15   that there were two species at potential risk -- the Nelson's

16   sparrow and the red-winged blackbird.  They noted, however,

17   that site-specific studies had not been conducted regarding

18   risks posed to those species.  In other words, it was not

19   clear whether there were population-level impacts impacting

20   those -- those birds.  Dr. Shriver, a professor at the

21   University of Delaware, undertook a site-specific study that

22   no one had done so far of Nelson's sparrows in Mendall Marsh

23   and whether the mercury was, in fact, impacting them at a

24   population-level impact, whether it was affecting

25   reproduction.  If this went to trial, the court would have

1   heard testimony from Dr. Shriver that mercury contamination

2   was not impacting the Nelson's sparrow at a population level.

3        Instead, he found that sea-level rise due to climate

4   change was the threat to the Nelson's sparrow and impacting

5   their reproduction.  This is also consistent with findings the

6   SHARP program that studied sparrows throughout the coast have

7   also found.

8        Wood also examined risks to human health.  It found that

9   mercury concentrations in lobster, mussel, soft-shell clam,

10  rainbow smelt, tomcod, and black duck do not pose a risk

11  requiring remediation.

12       In addition, the Maine CDC has been clear that, although

13  they support the closure, commercially harvested and consumed

14  lobster in the closed area does not pose a public health

15  concern.

16       Eel was the only species presenting a potential risk for

17  adverse human health effects.  And thus far there has been no

18  documented, at least in this study, evidence of eel

19  consumption in this area.

20       So what did Wood recommend?  After a two-year study that

21  cost approximately $7.5 million, Wood recommended primary

22  remedies and then adaptive management remedies.  Going north

23  to south, Wood recommended that in the Orrington Reach there

24  be dredging of contaminated sediments.  With respect to -- to

25  Mendall Marsh -- that's the Orrington Reach -- with respect to

1    Mendall Marsh, Wood recommended that there be thin-layer

2    capping placed on the marsh as an isolation barrier between

3    potential mercury and end-feeding birds.

4        In addition, it recommended the removal of several what

5    they refer to as piles of sediment, which were -- involved

6    wood chips contaminated with mercury that they believed had

7    elevated levels of mercury that if removed would have benefits

8    in the system.  All of these had a cost -- estimated cost of

9    between 246 million and 333 million.

10       In addition, Wood recommended that, if these alternatives

11   were unsuccessful, there could be an exploration of adaptive

12   management remedies, which are often implemented in

13   environmental sites to address situations where there's

14   significant uncertainty.  One of the remedies listed was

15   something called enhanced monitored natural recovery, which

16   would involve putting clean sediment in the water in the

17   Orland River and allowing it to naturally disperse.  The cost

18   for that was estimated at 25 million.

19       In addition, potential adaptive management remedies

20   included additional dredging in the Verona East, Verona

21   Northeast, and Orland River.  Those remedies would cost an

22   estimated 497 million to 676 million.

23       In looking at these remedies in accordance with the

24   court's five criteria, the first one was -- is are the

25   remedies innovative?  Several of the Wood recommendations

1    were, in fact, innovative.  Enhanced monitored natural

2    recovery has not been tried in any remediation site to date

3    and was therefore innovative with speculative benefits.

4        In addition, the placement of a thin-layer cap in Mendall

5    Marsh was also somewhat innovative in that thin-layer caps

6    have typically not been placed in healthy, functioning

7    marshes.  Examples across the country indicate that they are

8    typically used in distressed marshes.

9        In terms of costs, the cost ranges are in the hundreds of

10   -- of millions of dollars, and the time to complete these

11   remedies was significant -- several decades to complete the

12   remedies.  In terms of effectiveness, there was a concern that

13   these remedies could be implemented, and given the

14   uncertainties involved in remediating mercury, we may not see

15   reductions in key biota.

16       There is also potential harm from the proposed solution

17   due to the dredging, and you would have heard testimony from

18   experts that dredge material, even with the implementation of

19   best management practices, can result in residuals and

20   resuspension of mercury on the order of potentially 7 percent

21   of the dredged material being released.

22       With respect to timing, it was a particular concern and

23   focus for the parties in discussing settlement.  Part of the

24   reason for that is not only getting the remedies moving

25   quickly but also the impact on the public.  Remedial measures

1    in various parts of this system that take place over decades

2    would have to be done in the summer and fall months, the

3    primary times when people want to enjoy the river, which would

4    be extremely disruptive.

5        Wood estimated that natural recovery -- if the system

6    were left alone -- would take approximately 45 years for it to

7    meet their numeric goals that they set, 500 nanograms per gram

8    of total mercury in sediments.

9        When you look at several of the remedies, the timing is

10   impacted by several components.  You initially have a

11   permitting phase.  You would -- you would first go through a

12   design and then each of the remedies would need to be

13   permitted to allow them to go forward, and then there would be

14   an implementation phase, and then you would wait a period of

15   time to see if there were reductions in the sediment, and then

16   you would wait another potential decade or more to see if

17   there were reductions in the key biota.  So we would literally

18   implement a remedy, and then, in some instances, for example,

19   in the dredging, have to wait 25 years to see whether there

20   was even any success.  This -- this weighed on our discussions

21   and helped lead to the parties believing that it was best to

22   work together to move this process forward.

23       The permitting issues that I mentioned should also not be

24   understated.  In order to implement active remedies in the

25   Penobscot River, it will require several layers of permitting:

1    First, the local permitting, individual landowner access.   A
2    lot of these remedies involved hundreds, if not thousands, of
3    houses along the Penobscot River where you would need
4    individual access.   If any of those landowners refused to
5    provide access, it could undermine the success of the
6    remedies.
7         Second, the towns would also need to issue permits
8    because work would be done in the shoreland zone.   In addition
9    to that, there are numerous state permits that would have to
10   be obtained, many of which are listed here, as well as federal
11   permits.   These all provide pragmatic challenges to the
12   selection and implementation of successful remedies in the
13   Penobscot River and were things that the parties took into
14   account in their settlement discussions.
15        Next, there were the uncertainties that impact
16   effectiveness itself and potential harm:   First, the mobile
17   pool size.   It was extremely difficult for the studies that
18   were undertaken to determine and quantify the size of the
19   mobile pool, which has an impact on the estimates of success
20   with remedies in the river.
21        You'll see the quotes that we have cited by Nelson
22   Walter, who you'll hear from later; he's the project manager.
23   There's lots of uncertainty still with regards to the mobile
24   sediment deposits and includes exactly where they are.   We
25   don't know exactly how they move or when they move.   We don't

1    know how deep they are in some cases.

2         In addition, that relationship between total mercury to

3    methylmercury in sediments to biota pose pragmatic challenges.

4    Karen Merritt stated that it's very difficult to push these

5    links between methylmercury and ecological impacts back to

6    effect a remedy and get some sense of ecologically what

7    success is going to look like.

8         In addition, the hydrodynamics.  It's still not entirely

9    clear what the hydrodynamics are impacting the Orland River.

10        In addition, the observation by Wood in Phase III was

11   that wood chips may have some role to play in the system and

12   the mercury potentially bound to wood chips, there were

13   questions regarding whether it was bioavailable, whether it

14   could get into biota, and the mass of mercury on the wood

15   chips, whether that represented anything significant.

16        Contributions from above the Veazie Dam provide a

17   pragmatic limitation, as well as the effectiveness and the

18   risks of dredging and marsh capping.  There was particular

19   concern about capping in Mendall Marsh, where you have a

20   successful area right now for Nelson's sparrows to breed.

21   Experts expressed significant concern about what a cap would

22   do in that area and whether it would adversely impact those

23   birds that are currently doing relatively well aside from the

24   sea level rise impacts mentioned before.  In addition, the

25   time and ability to permit is another uncertainty.

1    The parties were guided by several principles, one of

2    which has become more of a focus recently in environmental

3    remediation, which is, if possible, do no harm.  There is a

4    recognition that some of the remedies implemented can cause

5    more harm than good.  Dr. Bridges, who's a senior research

6    scientist at the U.S. Army Corps of Engineers, offered his

7    time and testimony in this case.  He's the national lead of

8    the U.S. Army Corps of Engineers Engineering With Nature

9    program and a program manager of their dredging operations.

10   He literally works on the dredging projects and oversees them

11   nationally.  He was asked about whether you should first try

12   to do no harm, and he answered unequivocally, yes, I do agree

13   with that.

14       In addition, Wood also acknowledged that principle and

15   agreed that, if possible, we should try to find measures that

16   would minimize impacts.  It's something that the parties took

17   to heart in their settlement discussions and that the proposed

18   settlement reflects.  In particular, Dr. Merritt testified of

19   the growing and important focus in environmental engineering

20   on minimizing impacts in the process of creating a remedy.

21   She testified that remedial design should try to achieve the

22   lowest impact as reasonably possible.  And Eugene Shephard

23   testified, he was an engineer lead for Wood, that a balance

24   needs to be struck between what would be termed as a nuclear

25   option and options that would be protective of the environment

1    but at the same time not necessarily destroy the ecosystem.

2         Based on all of this information, it was apparent that

3    the best way to manage these issues was for the parties to try

4    and reach agreement on a path forward that would, one, benefit

5    the environment and the citizens of Maine; two, accelerate the

6    time frame for recovery of the system; three, allow the

7    parties to work together to address these uncertainties,

8    minimize the risk, and increase the chance of success,

9    particularly in the permitting process and the implementation

10   phase.

11        The proposed settlement measures follow and are generally

12   consistent with the Wood recommendations.  We examined the

13   same areas and reaches that Wood identified for remediation

14   and then worked together to try to find measures and agree

15   upon them that could benefit the environment, accelerate

16   recovery, and minimize impacts.

17        Starting with the Orrington Reach, instead of dredging,

18   the parties have agreed to capping of 130 acres of intertidal

19   sediment.  What the capping would do is help accelerate

20   natural recovery.  It would isolate the mercury from the key

21   biota and help accelerate this process of -- of recovery.

22   Capping has the benefit of not involving removal and the

23   resuspension that can occur.  You also do not have to deal

24   with the disposal of materials after they're removed, and so

25   there are numerous benefits.  The parties asked Wood and their

1    employees whether they would support capping as an

2    alternative, and they agreed that if capping could be

3    implemented, it could be a viable alternative to dredging in

4    that reach.

5        The area of Mendall Marsh was also examined, and the

6    concerns regarding thin-layer capping in that area, based upon

7    that, the parties agreed not to do a thin-layer cap in Mendall

8    Marsh.  The parties agreed that what we would do is have

9    projects, certain amounts of money that are set aside for

10   environmentally beneficial projects that could be used to

11   address potential natural resource damages, as well as benefit

12   human health and the environment in this area.  Twenty million

13   dollars has been set aside for such projects, which can do a

14   lot of good in this area.  Some of those projects can also

15   involve improvements to marsh areas in other locations that

16   may be distressed or may have -- have issues that -- that need

17   to be studied.

18       In addition, the parties have dedicated some money to

19   targeted removal of mobile sediments.  These are consistent

20   with the areas that Wood identified for dredging and removal.

21   There are certain mobile sediment piles of material, wood and

22   sediment, that can be targeted.  We have left open to the

23   discretion of the engineers involved in the design or

24   implementation exactly which areas they would target, but 70

25   million has been set aside for that, with a contingency of 50

1   million for disposal.

2       In addition, there's $30 million set aside for remedies

3   in the Orland River.  That is also left to the discretion of

4   engineers examining that area to figure out the best possible

5   means of utilizing those funds to enact benefits for the

6   river.

7       The parties have also agreed to long-term monitoring.

8   There's 10 million set aside for that with a 10 million

9   contingency, and administrative fees for a trustee that would

10  help manage this work, including the permitting process, as

11  well as the money to make sure that it is used effectively and

12  would be used to the greatest extent possible for

13  environmental improvements.  Seven million has been set aside

14  for the trustees and a contingency of 10 million.

15      So what are the benefits of the settlement?  In the City

16  of Bangor v. Citizens Communications case, it was found that

17  to gauge procedural fairness, a court should ordinarily look

18  to the negotiation process and attempt to gauge its candor,

19  openness, and bargaining balance.  The settlement before you,

20  the proposed settlement, is the result of over 20 years of

21  litigation and two years, approximately, of negotiation.

22  Twenty-three experts retained by the parties helped evaluate

23  remedies and participate in the discussions that led to the

24  settlement.  This settlement is the quickest path forward for

25  active remediation in the river.  The alternative is

1    additional litigation and conflict regarding the appropriate

2    approaches.  The settlement accounts for uncertainties in the

3    system and is consistent with prior work done by the Study

4    Panel and Wood.  It also balances the risk of harm against the

5    benefits of taking action and provides for an effective use of

6    funds that are capped but also have management built in.

7        In this fairness hearing, you will hear from the

8    following individuals:  Nelson Walter, who is the project

9    manager from Wood; Cynthia Brooks, who from Greenfield

10   Environmental Trust Group that has been the individual and

11   their group identified as a trustee to manage the trust;

12   Charlie Driscoll, Dr. Driscoll, who's a professor at Syracuse

13   University, who is the plaintiff's primary expert; Danny

14   Reible, Dr. Reible from the university of -- or Texas Tech

15   University, he is the expert for Mallinckrodt US LLC; and you

16   will also hear from witnesses from the plaintiffs and

17   defendant -- Jesse Graham for the plaintiffs and David Kelley

18   for defendant, and then the public comments

19           THE COURT:  I also have Cindy Brooks, correct?

20           MR. TALBERT:  Yes, Cindy Brooks, as well, from the

21   Greenfield Trust.

22           THE COURT:  Right.

23           MR. TALBERT:  Yes.

24       In conclusion, looking at the proposed settlement

25   compared to the court's remedy criteria, applied to the

1    proposed remedies, it involves proven technologies -- capping

2    and dredging.  It has capped costs that are managed by a

3    trustee in two trusts with 187 million committed, another 80

4    in contingent, the total of 267 million.  The time to complete

5    the remedy should be faster because they're more narrowly

6    tailored and targeted.  The parties believe that the remedies

7    would be effective in helping to accelerate recovery while

8    recognizing the uncertainty of seeing specific results in key

9    biota and minimizing the potential harm that these remedies

10   may have on the environment.

11       All things considered, we urge you to enter the Consent

12   Decree because it's fair, reasonable, and consistent with the

13   purpose of RCRA.

14            THE COURT:  Thank you very much, Mr. Talbert.

15       Is the plaintiff prepared to proceed with its first

16   witness?

17            MR. BERNARD:  We are, Your Honor, except that I

18   think Mr. Talbert and I were going to give a brief

19   presentation of the terms of the proposed decree.

20            THE COURT:  That's fine.

21            MR. BERNARD:  Okay.  Thank you.

22            THE COURT:  Yes, you may proceed.

23            MR. BERNARD:  And then we'll have a witness.  Sorry,

24   were you able to hear me even though I had my mask on?  Okay.

25   Your Honor, may we take care of one housekeeping item first,

1  please, which is I think we filed last night an updated list

2  of joint exhibits, Nos. 1 through 113.

3          THE COURT:  Yes.

4          MR. BERNARD:  And I think we would like --

5  Mr. Talbert and I have conferred -- we would like to jointly

6  move the admission of those exhibits into evidence.

7          THE COURT:  Thank you.

8      There's no objection?

9          MR. TALBERT:  No objection.

10         THE COURT:  Joint Exhibits 1 through 113 are all

11  admitted.

12         MR. BERNARD:  Your Honor, I think we can go through

13  this presentation we have pretty quickly because I think

14  Mr. Talbert and I covered a number of these points during our

15  opening.  So we have a -- a PowerPoint.  Why don't we put that

16  up.  Do you have that?  Okay.

17      So this is just a summary of the Proposed Consent Decree.

18  Let's go to the first slide.  I'm going to take the first half

19  of these, Your Honor, and then Mallinckrodt will take the

20  second half.

21         THE COURT:  Okay.  Thank you.

22         MR. BERNARD:  So here's the structure of the decree

23  and the basic terms.  Mallinckrodt would fund at least $187

24  million and up to $267 million for targeted remediation

25  activities along the Penobscot River, and this would also fund

1   to the -- in the amount of $20 million beneficial

2   environmental projects.

3       The focus, scope, and objectives of the remediation

4   proposed in the decree is generally modeled on the

5   recommendations set forth in the court-ordered Phase III

6   Engineering Study.

7       The work would be managed by an experienced, independent

8   remediation trustee from whom you will hear on Monday; that's

9   Ms. Brooks.

10      And the court would retain -- this is the parties'

11  request -- retain jurisdiction over implementation of the

12  terms of the Consent Decree.  The paragraph numbers noted in

13  this presentation, Your Honor, correspond to the relevant

14  paragraphs in the Proposed Consent Decree.

15      So let's go to the next slide.  You probably remember

16  this map or you don't need to see it, but it -- it kind of

17  depicts the areas of the system that -- well, it -- it depicts

18  the system and allows us to identify where we would remediate,

19  but we'll -- and we'll get to the specific reaches in a

20  moment.

21      But, as you know, Your Honor, up in the Orrington Reach,

22  here is one area of concern that would be addressed.  Then

23  there are these surface deposits.  There's one in kind of

24  Frankfort Flats that we've identified, which is near the

25  entrance to Mendall Marsh, and then there are four of them

1    actually in the Orland River and East Verona area.  That's

2    kind of where they're concentrated.  So this just is a general

3    map of the estuary to just kind of give us a little geographic

4    footing.

5        I think we can go to the next slide now.  Okay.  So let

6    me clear this, if I can.  Okay.  So here's the funding, and it

7    explains, Your Honor, or sets out the difference between

8    Committed Funding and Contingent Funding.  So the Committed

9    Funding is what Mallinckrodt will pay into the trust no matter

10   what; that's decided.  And the way that's broken down is that

11   for the capping of 130 acres in the Orrington Reach, which

12   we'll get to in a moment, $50 million is allocated to that,

13   and then there's a contingent amount, if you go down the

14   chart, Orrington capping of 10 million.  So if it turns out

15   that that work costs more than 50 million to cap the 130

16   acres, there's an additional 10 million that will be made

17   available at the discretion of the trustee for that -- to

18   accomplish that task.

19           THE COURT:  This -- this may be -- this may be

20   obvious or implicit in what you've told us, but let's assume

21   for a moment the Orrington capping turns out to cost less than

22   50 million, it turns out to be 45 million, and the Orland

23   River/East Channel turns out to be 35 million, is the -- how

24   does that work?  Does the -- is the Orland River amount still

25   capped at 30, or can you use the 5 million that turned out to

1  be advantageous on the Orrington capping?

2           MR. BERNARD:  We can use the five million and

3  transfer it to work in the Orland.

4           THE COURT:  Thank you.

5           MR. BERNARD:  And the trustee will have that

6  discretion.

7           THE COURT:  Thank you.

8           MR. BERNARD:  In the Orland River/East Channel

9  there's $30 million allocated.  As Mr. Talbert mentioned, the

10  precise remedy is yet to be determined.  It might be this

11  so-called enhanced monitored natural recovery where you put

12  clean sediment in the system and let hydrology take it

13  hopefully to where it belongs and will do some good, but

14  there's also the possibility of additional dredging and

15  capping over in that part of the system.  More work needs to

16  be done on that to design a precise remedy, but $30 million

17  has been set aside for that, $20 million for the beneficial

18  environmental projects.

19      I should have mentioned, on the contingency, the removal

20  -- I don't think I mentioned this -- this is the -- the

21  excavation or the dredging of surface deposits -- there's $70

22  million allocated to that, and then 50 million in contingent

23  money.  And the specific reason for that, Your Honor, is that

24  there are two things you can do with dredged sediment.  You

25  can either beneficially reuse it, if it meets the criteria for

1    beneficial use, and just put it to -- put it to use for some

2    purpose -- upland, not in the river, or you have to dispose of

3    it in a landfill.  If it's the latter, it's more expensive,

4    and so the 50 million allows for the possibility, the

5    contingency, that some or all of the dredged sediment will

6    have to be disposed of in an appropriate landfill.

7        The beneficial environmental projects I covered, that's

8    $20 million.

9        The long-term monitoring, which will go for 30 years or

10   maybe as long as 45 years, it's 10 million; but if it costs

11   more than that, there's an additional 10 million in contingent

12   funds, so up to $20 million will be spent on that.

13       And project administration, the trustee's efforts,

14   there's a committed $7 million but also a $10 million

15   additional contingency fund if that turns out to cost more.

16       So the -- in addition to what Mallinckrodt has already

17   spent on Phases I, II, and III, the committed funds now would

18   be 187 million with an additional $80 million in contingent

19   and that would be it; that's the cap.

20       Okay.  Now we'll look at each one briefly.  The Orrington

21   Reach capping, you see these kind of cross-hatched areas,

22   that's on the east side of the river, Your Honor.  That's what

23   Wood identified as the kind of candidate areas for dredging

24   because they either have high mercury concentration or they're

25   strong candidates for erosion and, therefore, mercury-tainted

1   sediment migrating downstream, joining the mobile pool, and

2   creating trouble downriver.  So the capping, you'll hear more

3   about this from -- maybe a little from Dr. Driscoll but I'm

4   sure much more from Dr. Reible on Monday, involves the

5   placement of clean materials over the contaminated sediment,

6   and so you create a barrier.  And the idea is to keep the --

7   you isolate the mercury so it doesn't -- beneath the bioactive

8   zone so it's not taken up by biota and doesn't cause harm.

9   You don't remove the mercury from the system but you isolate

10  it.  And so there's at least $50 million, as I mentioned, for

11  130 acres of intertidal sediments, which would be capped along

12  the east bank of the river.  And I mentioned the 10 million

13  that would be available, if necessary, in contingent funds.

14       That's about the amount of -- that's about the acreage

15  that Wood proposed for dredging, not capping, but as

16  Mr. Talbert said, and Mr. Walter will be asked about this,

17  capping may be, even in their view, a reasonable alternative

18  method if it can be made to work, but it's about the same

19  amount of area in the river that would be addressed as between

20  the settlement and the Wood recommendations.  Let's go to the

21  next.

22       Okay.  The targeted removal of sediment.  So this is 70

23  million for targeted removal.  Your Honor, I should mention

24  that Mr. Talbert, you know, in his opening remarks and in the

25  prehearing brief, you know, there was quite a lot of citations

1   to expert reports and depositions about -- I -- it may go

2   without saying, but I want to say it and make it explicit, if

3   we were to go to trial, those assertions would be contested,

4   so -- about the dangers of dredging and -- and all of that,

5   but I think the important thing for this moment is that the

6   parties, whatever their competing views may be on these

7   issues, have decided to join together.

8       So the dredging, there's $70 million for that.  In Amec

9   -- in Wood's, rather, primary remedy for surface deposit

10  dredging, I think they allocated $107 million.  So this is

11  about two-thirds of what would be in the primary remedy, and

12  that doesn't count the East Verona Island, which we'll get to,

13  and Orland River, which we'll get to in a moment.

14      The specific locations, again, Wood identified five

15  surface deposits -- Frankfort Flats and then four in the

16  Orland River/East Verona region, but the trustee would have to

17  figure out where the most productive dredging can be done for

18  this amount of money.  Let's go to the next slide.

19      So sediment disposal, as I mentioned.  The hope of the

20  parties is that the sediment -- dredged sediment will be

21  beneficially reused -- better for the environment, less

22  expensive -- and that's what we hope.  But if that's not

23  possible, there is $50 million of Contingent Funding in the --

24  provided for in the settlement to -- to accomplish landfill

25  disposal.

 1          And the benefit, of course, Your Honor, of -- and

 2     Dr. Driscoll can testify to this -- the -- the benefit of

 3     dredging is that the mercury is gone.  The mercury is the

 4     problem, and if you remove mercury from the river -- you may

 5     recall Dr. Geyer testifying in 2014, the scientist from Woods

 6     Hole, and he said that every molecule of mercury -- mercury

 7     you remove from the system is good, it's a good thing, and

 8     that, of course, is what dredging aims to accomplish.  Let's

 9     go to the next.

10          Okay.  So Orland River, Your Honor I'm sure remembers the

11     testimony from 2014 from the remedy trial, about the high

12     concentrations in this area, and so I think both parties agree

13     that we should look at whether something productive can be

14     done over here, and there's $30 million set aside for that.

15          Wood had set aside 25 million for this enhanced monitored

16     natural recovery.  It's not clear that that's going to work;

17     that is an innovative method; it might be worth trying that

18     with a pilot test.  That also might run into some permitting

19     issues from the government.  We'll see.  But $30 million could

20     support more capping or dredging or perhaps enhanced monitored

21     natural recovery, but something that would help accelerate

22     recovery here.

23          And, Your Honor, one of the reasons this is of concern is

24     that right here is that sampling station where the lobsters

25     are the highest in the system, and there's a reasonable belief

1   that mercury from the Orland in this East Verona area may be

2   feeding that site and hurting the lobsters, and so we're all

3   eager to do something in that part of the ecosystem.  Let's go

4   to the next.

5       Beneficial environmental projects, this is a -- you know,

6   this is just all good.  In other words, it's just $20 million

7   to do good things for the ecology of the river, and it could

8   include, you know, salt marsh restoration and other works and

9   things that would help Mendall Marsh or help the wildlife

10  species that -- that use the marsh, and it's the intent of the

11  settlement to leave open what the specific projects will be

12  and to allow the Maine state agents, the resource agencies,

13  members of the public, environmental groups, other interested

14  parties, to recommend projects, and this will be a very

15  democratic kind of process where we'll gather the best ideas

16  and work together and then with the trustee to allocate the

17  $20 million in the way that will be most productive for the

18  environment.

19      Next, long-term monitoring.  This is critical.  You'll

20  hear Dr. Driscoll testify about this this afternoon, but you

21  have to monitor.  We have to see over a long period of time

22  what the effects are of any natural recovery that may occur

23  and of the implementation of the remedies.  And so we have at

24  least 30 years and at least $10 million for that, but it could

25  go up in the trustee's discretion, depending on the results

1    and what's happening at the 30-year mark, it can go as long as

2    45 years, and we have a contingency of another $10 million.

3    So we'll have 20 million available -- $20 million available in

4    toto to deal with long-term monitoring, and that'll be

5    sediment, water, biota, really have a careful,

6    well-constructed program which will help inform remedies going

7    forward, it will also be very good for the public and the many

8    state agencies who will be able to utilize this information to

9    make decisions of their own and carry out their

10   responsibilities.

11        So remedy design.  There is -- as Your Honor has seen,

12   there's the main Consent Decree, which is 90-plus pages, and

13   then there are various appendices.  Appendix A is called

14   Statement of Work, and that all does is set out in greater

15   detail procedures and requirements that the trustee will

16   follow in carrying out the remediation tasks, and it'll

17   include things like community development, recordkeeping,

18   financial management, insurance, permitting, and regulatory

19   compliance.  It just lays it out in greater detail than what's

20   in the decree.

21        There are further appendices, which are trust agreements,

22   we'll go through some of those terms with Ms. Brooks when they

23   testifies on Monday.

24        So all of these work designs -- and this is important and

25   picks up on something Mr. Talbert said, which is obviously of

1    concern to the plaintiffs, as well -- all the work designs,

2    all the work tasks, have to reckon with, have to -- have to

3    address how implementation, how they'll be implemented in a

4    way that will minimize any environmental risk and adverse

5    impact.  And that's, of course, important, I think, to both

6    parties.  And it'll also include -- include monitoring and

7    control measures to protect human health and the environment.

8    That's all provided for in the Statement of Work.

9         And the final slide before I turn this over to

10   Mr. Talbert for his portion is that all of the remedies, Your

11   Honor, that are embedded in the Proposed Consent Decree will

12   go through the customary permitting processes prescribed by

13   federal, state, and local authorities.  So that provides, of

14   course, an additional layer of both the public participation

15   because many of those regulations, as you know, mandate the

16   public participation or the opportunity for public

17   participation, and also provide a layer of protection in terms

18   of minimizing risk.  Because typically when permits and

19   approvals are granted, they include the imposition of

20   conditions which minimize environmental and health risk.  So

21   there will be this opportunity for -- for public

22   participation, which is -- I think the parties agree on this,

23   but I'll speak for the plaintiffs, the plaintiffs are

24   nonprofit membership organizations, and so public

25   participation is central to their guiding principles.

1          And there will also be -- you'll hear about this from

2     Ms. Brooks on Monday -- there'll be community -- special

3     community involvement activities.  In other words, beyond what

4     permitting regulations will require, part of the trustee's

5     responsibility, under the decree, will be to provide a -- a

6     series of consistent opportunities for the public to be

7     informed and participate as the remedy proceeds.

8          So I'll turn this over to Mr. Talbert now.

9          THE COURT:  Very good.  Thank you.

10     Mr. Talbert?

11          MR. TALBERT:  Yes.

12     This next aspect -- I should mention that the public

13     outreach started with, you know, a very similar presentation

14     to this.  So what you heard Mr. Bernard just go through, a lot

15     of this was what we used to brief the public, as well.

16          This next slide gets at one of the questions you had,

17     which is, if there -- if the work does not cost as much as

18     it's anticipated for a particular reach, can it be used in

19     other areas?  And the answer is -- is yes, there is

20     flexibility built into the -- the funding.  If the Committed

21     Funding is allocated to a particular remedy, is not used, it

22     can be used to supplement funding for other remedies.

23          In addition to that, funding may be available for

24     reallocation if that particular remedy costs less.

25          So the trusts.  Mallinckrodt created -- has created two

1    trusts:  There is a -- what we're calling the Remediation

2    Trust, the Penobscot Estuary Mercury Remediation Trust; and

3    the Penobscot Estuary Beneficial Environmental Projects Trust,

4    referred to as the Project Trust.  They will carry out most of

5    the -- the Remediation Trust is really where the bulk of the

6    work is -- is going to be funded from, and the Project Trust

7    is where the money for the beneficial environmental projects

8    will come from.

9        And just a note on the Project Trust, so it will be used

10   to carry out the beneficial environmental projects.  These may

11   include restoration projects to satisfy natural resource

12   damage claims.  They're subject to agreements with the state

13   and federal trustees.  That was a negotiated part of -- of

14   this deal.  That said, the Consent Decree does not constrain

15   the discretion of these trustees to accept any projects or

16   deny them, and the trustee is going to make all efforts to

17   commit these funds within the next four years, and -- and

18   spend them within the next six.  So the parties are

19   incentivized to work diligently to identify suitable projects

20   and -- and move them forward as expeditiously as possible.

21       The trust structures, the Remediation Trust, this is

22   getting into the exciting part of the settlement Mr. Bernard

23   left for me.  The Remediation Trust will be a qualified

24   settlement fund.  It's governed by the Consent Decree, but the

25   Project Trust is not a qualified settlement fund.  This allows

1    greater flexibility for funding the beneficial environmental

2    projects.  The trust will hold remediation funds and

3    administration funds in separate accounts to offset inflation

4    and will invest those funds -- the responsibility to invest

5    those funds will not be allocated to near-term work.  So we

6    make sure the money available for work that's going to take

7    place in the short-term is readily available, and then the

8    investment of other funds would be more for long-term --

9    long-term spending.

10        The trust would file quarterly reports with the court,

11   and those agreements are in Appendices B and C for the court's

12   review.

13        The Greenfield Environmental Trust Group, that you'll

14   hear from Cindy Brooks about, has established two affiliated

15   entities to serve as the trustees.  They are very experienced

16   in managing these kind of trusts.  They have over 30 years of

17   experience conducting complex environmental clean-ups.

18   They've managed over one billion in cleanup funds for work at

19   other -- at over 2,600 individual sites.  They will have

20   fiduciary obligations to act consistently and in furtherance

21   with the purposes of the trusts and the Consent Decree.  Seven

22   million has been allocated for the trustee's project

23   management and administration with up to ten million in

24   Contingent Funding, if needed in the life of the project.

25        So the parties are the beneficiaries of the trusts, will

1    stayed involved in the process, have some feedback and input

2    as appropriate.  Each trust will have an informal advisory

3    committee, including at least one representative each from

4    plaintiffs and Mallinckrodt.  You'll hear from two individuals

5    later that may be part of that committee -- Dr. Driscoll and

6    -- and Dr. Reible.  The parties will not receive fees or costs

7    from the trusts for participation in -- in those committees.

8    So they will be funded by the parties.

9        The trustees will carry out the work set forth in the

10   Consent Decree, but they're going to prepare budgets and work

11   plans so we can review those and comment on them.  They will

12   retain environmental, engineering, and technical consultants,

13   contractors, other third-party professionals, as needed, to

14   assist in the work, and the parties will have the opportunity

15   to comment and object to certain decisions.

16       Part of this is that -- not to inhibit the process, but

17   the parties have spent, as you well know, two decades studying

18   this -- this issue and have a lot that we think we can help to

19   bear, but we envision working together to try to move this

20   forward.  The trustees will have presumptive decision-making

21   authority, subject to the dispute resolution provisions.

22       As far as dispute resolution, we hope that doesn't occur,

23   but if it does, we have tried to think through how to address

24   that.  The first step would be to -- through informal

25   negotiations, try to address any problems that we have.  If we

64

1  cannot resolve the dispute, we've agreed to present that to a

2  magistrate judge for mediation, which obviously was successful

3  in this case with Judge Nivison.  If remediation does not

4  resolve the dispute, the parties may request that the court

5  refer the dispute to -- for formal dispute resolution to

6  magistrate.  And we do not propose a continuing role for a

7  special master; although, Special Master Susan Calkins has

8  done an excellent job in this case.

9      Financial assurance.  Mallinckrodt will pay the Committed

10  Funding to the trust within seven years.  So that -- that

11  minimizes, I think, some of the concern regarding whether the

12  funds will -- will actually be paid because of the short

13  timeframe for funding that.

14      In addition, Mallinckrodt has agreed to secure financial

15  assurance in the form of a surety bond, initially for 65

16  million, for the benefit of the trusts, which may be drawn

17  down, if necessary.

18      Mallinckrodt and the trustees will monitor the adequacy

19  of the financial assurance and the amounts in the trust.  The

20  budgeting process should help keep this -- this on track as

21  those are supplied, and there's a kind of forward-looking

22  nature to the remediation costs that will be necessary.  The

23  form of the surety bond is set forth in Appendix D for the

24  court's review.

25      Termination of the trusts.  The Project Trust will

1    terminate when remediation projects are complete and no more

2    restoration projects are contemplated.  When restoration

3    projects are complete, the trust will begin the process of

4    termination and transfer any remaining assets and liabilities

5    to the Remediation Trust.  The Remediation Trust would

6    terminate then when all remediation work required by the

7    Consent Decree, including long-term monitoring, is complete.

8        As a part of this process, one of the benefits of this

9    settlement is to hopefully obtain finality for the company.

10   This has been a long, arduous process, and the company has

11   agreed to commit significant funds for remediation and to

12   resolve this -- this liability.  As part of that, and as is in

13   common in other cases, courts have issued bar orders to try to

14   provide parties settling in a private context some level of

15   finality.

16       If this were a settlement with the federal government, it

17   would be a Consent Decree and contribution protection would be

18   provided, but because it's a private-party settlement, the

19   plaintiffs cannot provide any contribution protection.  So

20   there's been a request to issue a bar order.

21       The other concern is, as you can probably appreciate,

22   these measures have been carefully planned over many years,

23   and there is a concern that the implementation of these

24   measures, which will take incredible amount of design and then

25   permitting and then implementation, the parties do not want to

1    be or have concerns about being wood-sawed by additional

2    measures or lawsuits that would request other, you know,

3    remedies or activities in the river that could either conflict

4    or undercut the value of those -- those remedies.

5        We have agreed recently not to include the state or the

6    federal government in the bar order after discussions with

7    those -- those entities, and the proposed bar order would also

8    exclude claims for natural resource damages by state or

9    federal trustees.

10       NRDC and Maine People's Alliance support the bar order,

11   in part, with respect to the contribution aspect, but have

12   concerns over how broad it is with respect to other private

13   claims.

14       My understanding is that the bar order issue would be

15   heard later, after this fairness hearing, and we can fully

16   brief the court at that time.

17       In terms of public notice, public -- notice was published

18   for three days in the Bangor Daily News, and the Portland

19   Press Herald, and was picked up in other news stories.  There

20   was an online website that was created that -- that posted the

21   -- the notice and was a central source of information for the

22   public.  Plaintiffs also publicized and proposed a settlement

23   and hearing on their websites and social media.

24       And there's been an effort to engage in outreach with the

25   public.  The parties reached out to a variety of stakeholders

1    that may be interested in the case, including state, tribal,

2    and local officials, NGO's, business associations, and others,

3    to inform them about the settlement and the opportunity to

4    submit comments.  There were also public meetings held on

5    September 9th and 14th that included a presentation of the

6    litigation history, similar to what you've received this

7    morning, a summary of the settlement terms and remediation

8    program, and an opportunity to ask questions that we could

9    answer.

10        That's it.

11            THE COURT:  All right.  Well, we're at the time we

12   usually take about 15 or 20 minutes for a break.  Why don't we

13   take a break at this time and then we'll proceed with the

14   first witness.

15        Court will stand in recess.

16        (Court recessed from 10:30 a.m. to 10:53 a.m.)

17            THE COURT:  Before we move to the first witness, the

18   clerk has reminded me that I think Joint Exhibits 12 and 13

19   were actually removed, and I admitted them.  So we don't like

20   to admit removed exhibits, and I take it that I don't need to

21   have admitted 12 and 13; is that right?

22            MR. BERNARD:  That's right, Your Honor.  There -- it

23   turned out there was a confidentiality issue there with those

24   exhibits, and so they are withdrawn, and I think the parties

25   agree on that.

1          MR. TALBERT:  That's correct.

2          THE COURT:  Not -- not to move -- not to have 12 and

3    13 as part of the admitted exhibits, correct?

4          MR. TALBERT:  Correct.

5          MR. BERNARD:  That's correct.

6          THE COURT:  Okay.  Very good.  Thank you.

7       You may proceed.

8          MR. BERNARD:  Your Honor, the parties jointly call

9    Nelson Walter.  We're going to divide his examination.

10   Mr. Thompson will examine him for the plaintiffs and Mr. Piper

11   for the defendant.

12      Your Honor, just a reminder from our prehearing

13   conference, at 12:30 we've agreed to take Dr. Driscoll

14   wherever we are with Mr. Walter

15          THE COURT:  Very good.  Thank you.

16          MR. BERNARD:  Thank you.

17          THE CLERK:  Can you please raise your right hand.

18   Do you solemnly swear that the testimony you shall give in the

19   matter now in hearing shall be the truth, the whole truth, and

20   nothing but the truth, so help you God?

21          THE WITNESS:  I do.

22          THE CLERK:  Thank you.  Please be seated.  Can you

23   please state your name for the record and spell both your

24   first and last name?

25          THE WITNESS:  Yes, Nelson Walter, N-e-l-s-o-n

1    W-a-l-t-e-r.

2              THE COURT:  You may proceed.

3    NELSON WALTER, having been duly sworn, was examined and

4    testified as follows:

5                      DIRECT EXAMINATION

6    BY MR. THOMPSON:

7    Q     Good morning, Mr. Walter.

8    A     Good morning.

9    Q     What is your educational background?

10   A     I'm a chemical engineer with a Bachelor's of Science

11   degree from Rensselaer Polytechnic Institute.

12   Q     Do you hold any professional licenses or certifications?

13   A     Yes.  I'm a professional engineer in seven states.  I'm

14   a licensed site professional in Massachusetts, a licensed

15   environmental professional in Connecticut, and I'm a

16   professional project manager.

17   Q     And are you currently employed?

18   A     Yes.  I work at Wood, formerly Amec Foster Wheeler.

19   Q     So throughout your testimony today we're going to refer

20   to your employer as Wood, regardless of the name of the entity

21   at any given time.  Is that okay?

22   A     Yes, great.  Thank you.

23   Q     What is your role at Wood?

24   A     I'm a project and program manager, so I lead remediation

25   projects, and I also serve as a technical director on other

WALTER - DIRECT EXAMINATION/THOMPSON                70

1   projects where there's another project manager that leads the

2   project, but I -- but I provide strategic direction for the

3   project.

4   Q      Could you give an example of one or two of your

5   representative past projects, please?

6   A      Yes, sure.  One of my projects was a combination of RCRA

7   corrective action and radiological decommissioning at a

8   facility in Connecticut where we cleaned up soils and

9   groundwater.  We decontaminated buildings for radiological

10  contamination and demolished buildings.  We cleaned up waste

11  disposal areas.  We cleaned up sediments in a -- in a creek.

12  So that's one.

13         Another one was the Stratford Army Engine Plant where we

14  again did RCRA corrective action-type studies and designs

15  which involved both groundwater, soils, and sediment

16  contamination in the tidal flats.

17  Q      And could you give us an example of a current project

18  that you're working on?

19  A      Yeah.  One of my current projects is working on the

20  English Wabigoon River up in northern Ontario, and the -- the

21  river's been contaminated with mercury, similar from a

22  chlor-alkali plant, in similar quantities, ten times or so of

23  mercury.  There's approximately a hundred miles of

24  contaminated river system, and some of the First Nations have

25  been significantly impacted to the extent that the health of

1    some of the community members has been degraded.

2              THE COURT:  Can you bring the microphone a little

3    bit closer to you, sir --

4              THE WITNESS:  Yeah, sure, yeah.

5              THE COURT:  -- or move up so we can all hear you.

6    Thank you.

7              THE WITNESS:  Great.

8    BY MR. THOMPSON:

9    Q    I think you can even -- does it move?

10   A    It does.

11   Q    Maybe slide it closer to you.

12   A    Oh, great.  Thanks.

13   Q    Thank you.  Mr. Walter, what do you consider your areas

14   of professional expertise?

15   A    Primarily project management, and evaluation of remedial

16   alternatives, and then implementation of remedial

17   alternatives.

18   Q    And is that work on evaluation of remedial alternatives

19   work that you've been doing throughout much of your career?

20   A    Yes, for 30-plus years in many different -- on many

21   different sites and many different scenarios.

22             MR. THOMPSON:  Your Honor, Mr. Walter's CV is Joint

23   Exhibit 9 that was previously marked for your reference in the

24   future.

25             THE COURT:  Thank you.

1  BY MR. THOMPSON:

2  Q    Mr. Walter, how did you first become involved with this

3  case?

4  A    I -- I was first involved in 2015 when there was a

5  request for proposal sent out by the parties to engage the

6  Phase III engineer, and I worked with our project team to

7  develop a proposal.  We put together a project team and

8  developed a proposal for the project, and then we interviewed

9  with the special master and the parties, and then were

10 successfully awarded the contract to do the Phase III

11 engineering work.

12 Q    And when did you start work on the Phase III Engineering

13 Study?

14 A    It was at the very beginning of 2016.

15 Q    What was your individual role in the Phase III

16 Engineering Study project?

17 A    So I was the named project manager, and I was also --

18 provided technical direction to the project.

19 Q    At the outset of the Phase III Engineering Study, what

20 did you understand your task to be that Wood had been charged

21 with?

22 A    All right.  So the court -- the court had asked us to

23 identify whether there were feasible, effective, and

24 cost-effective remedies to clean up the mercury in the

25 Penobscot River.  So that -- and we also understood that our

1    role was to be an independent evaluation, that we were working

2    specifically for the court and directed by the special master,

3    and that we were to -- very specifically charged to be

4    independent of either one of the parties to the litigation.

5    Q    So you understood your client to be the court for this

6    project?

7    A    Correct, yeah.

8    Q    At the outset, did Wood have any preconceived notions

9    about what recommendations it would make at the end of the

10   Phase III Engineering Study?

11   A    No.  We didn't -- we didn't -- we didn't know where the

12   study was going to turn out.  We -- as part of the proposal

13   process, we actually broke our team up into groups who read

14   through the entire Phase I and Phase II studies and then

15   summarized that information, but yet even with that

16   information, we -- we didn't have a preconceived notion about

17   what the right remedy was for the project and whether there

18   was an available remedy that would really be feasible,

19   effective, and cost-effective.

20   Q    So let's go back to that time period in January 2016 as

21   you were getting started on the Phase III Engineering Study.

22   What was the overall plan at the outset of the Phase III

23   study?

24   A    In -- in general terms, we -- we knew that, you know,

25   the Phase II study was a comprehensive study done by many

1   different researchers, and -- but the -- the data was -- the

2   data and the information was done by -- by each researcher

3   independently and hadn't been completely pulled together.  So

4   -- so our initial plan was to pull the data together in one

5   place, get it in a database, and into an GIS system,

6   Geographic Information System, to be able to better understand

7   what the current data was telling us about the river, and then

8   to evaluate the risk to biota, based on the data and based on

9   additional studies, and then to identify technologies that

10  might be helpful in cleaning up the river, and assemble them

11  into alternatives, and then evaluate those alternatives.

12      And as part of that assembly of the data and evaluation

13  of the existing data, we also planned to identify data gaps

14  and propose additional investigations, additional sampling the

15  river to fill those data gaps.

16  Q    As you got started on the Phase III study, how did the

17  plan play out in -- in practice?

18  A    Well, it -- we -- I think we -- we identified some

19  initial data gaps, and they were -- they were -- they were

20  probably a little bit more than we had originally anticipated,

21  and then as we worked through the project and worked towards

22  the evaluation of alternatives, we identified additional data

23  gaps that needed to be filled.

24  Q    So we'll come back to the -- the sampling and the data

25  gap filling that you did in just a moment, but before we turn

1    to that, I want to talk a little bit about how you staffed the

2    project at Wood.

3        And if we could pull up Joint Exhibit 107, which is a

4    organizational chart for Wood.  Mr. Walter, have you seen this

5    Joint Exhibit 107 before?

6    A    Yes, I have.

7    Q    And what does this exhibit show?

8    A    So this shows the way we structured our organization to

9    accomplish the Phase III study.

10   Q    And could you please describe how you structured the

11   team for the Phase III study?

12   A    Yes.  Starting at the top, you know, obviously -- in the

13   middle of the top, we -- the U.S. District Court and Susan

14   Calkins, as a special master, directed the project, and she

15   received input from the two parties.  We reported directly to

16   the special master, and -- and you see in the project

17   management box in the middle, I was the named project manager,

18   and then Rod Pendleton was the assistant project manager and

19   helped with many of the administrative and coordination tasks

20   for the project.

21       And then down -- down on the bottom, from left to right,

22   it flows a little bit in terms of the sequence of the project.

23   There was -- you know, we had some additional data, but then

24   we identified additional sampling or characterization that was

25   needed, and Rod Pendleton generally led up that work.  We used

1   that data both in terms of sediment and water and biota to

2   evaluate risks to biota and to humans, and that risk

3   assessment task was led up by Emmet Curtis with help from

4   Louise Venne and others.

5        Mercury fate and transport was important, especially in

6   understanding the mobile pool, and Karen Merritt led that

7   work, along with others.

8        For remedial engineering, the remedial engineering in

9   this -- in this case applies to identified -- identification

10  of technologies to clean up the river and evaluation of

11  alternatives and that was led by Gene Shephard with help from

12  Corry Platt and Tony Delano.

13       And then, finally, we had a communications and community

14  involvement tasks that we conducted to assess input from the

15  community, and Mary Kelly led that work.

16  Q    And, overall, do you recall approximately how many staff

17  at Wood participated in the Phase III project?

18  A    All told, approximately 200 people participated.

19  Q    And out of that group, was there some sort of a core

20  project team?

21  A    Yes.  The people on this organizational chart were

22  basically the core project team, plus a couple of others.

23  Q    And how did that core project team function?

24  A    So we -- we worked closely together from the -- from the

25  development of the proposal right through the end of the

1    project, through the development of the final recommendations

2    in the Phase III report, and the -- and the team functioned, I

3    would say, collaboratively.  We made decisions together both

4    in terms of what -- what kind of data gaps existed and what

5    sampling would be proposed, how the risk assessment results

6    were interpreted, and then especially in terms of what

7    remedial alternatives would be finally recommended.

8    Q     So is it fair to say that -- that this core team that

9    you put together was an interdisciplinary team drawing from

10   multiple different scientific and -- and engineering

11   disciplines?

12   A     Yes, certainly.  We had -- we had people that were, you

13   know, specialists in sampling, and specialists in evaluating

14   risks, and specialists in evaluating mercury, and specialists

15   in understanding construction, and, you know, how the -- how

16   remediation would be done in a river, and specialists in

17   evaluating remedial technologies.  We also had specialists in

18   chemistry and -- and report production and other facets.

19   Q     And you alluded to this, but could you elaborate a

20   little bit on how decisions were made throughout the project?

21   A     Yes.  We -- we definitely -- maybe this is a little bit

22   of personal preference or personal style, but -- but I really

23   believe that -- that the -- the best decisions are made by a

24   collaborative team.  And so throughout the project, we -- we

25   received -- you know, we would get together in a conference

1    room and talk about the status of the project, and what --

2    what was going to happen next, and, you know, what -- what

3    data gaps were present, and how we would do characterization.

4        And then as we got near the end of the project -- you

5    know, we met -- this core group met several times, often on a

6    weekly basis, and then towards the end of the project this

7    core team came together again, and we sat in a conference room

8    and -- and made decisions about what final recommendations

9    would be made as part of the Phase III study.

10   Q    And did this core team reach consensus on what the final

11   recommendations should be in the Phase III Engineering Study

12   report?

13   A    Yes, definitely, yep.

14   Q    Let's just touch briefly on, how did you interact with

15   the special master throughout this Phase III Engineering

16   Study?

17   A    Yeah, so the special -- the special master was our

18   client, and we reported directly to her.  So she -- I

19   communicated through -- with her through e-mail and with phone

20   calls, but her direction to us was largely that we should be

21   independent, and that we should do our work, and that we were

22   hired as the engineer and that we should do that work

23   independently and -- and give our best recommendations back to

24   the court.

25       And I would -- I would add, you know, she also gave us

1    very explicit instruction that we were to be independent of

2    the two litigating parties.  And one example of that is that

3    as we got -- you know, we got many comments on reports.  You

4    know, we got a lot of input from both sides on what -- what

5    their opinions were about some of our investigations and

6    conclusions, and the special master's direction to us was that

7    we should be -- that we should look at the comments that we

8    got from the parties, we should incorporate the comments that

9    we agreed with as an independent entity, and that comments

10   that we didn't agree with, we would not need to address.

11   Q    Did you have any regular meetings or interactions with

12   the special master and the parties throughout the process?

13   A    Yes.  Yeah, good point.  We had -- we had quarterly

14   meetings in person with the special master and the parties,

15   and then in addition to that we had monthly telephone

16   conference calls with -- with the special master and the

17   parties.

18   Q    Let's switch gears a little bit and start talking about

19   the substantive work that was done throughout the Phase III

20   study and -- and what you concluded, and I want to start by

21   talking a little bit about the conceptual site understanding

22   that was developed for the Penobscot River Estuary.

23        First of all, what is a conceptual site understanding?

24   A    In -- in broad terms, conceptual site understanding or

25   conceptual site model is an understanding of where the

1   contamination originates from, where it's traveled to, and how

2   it's traveling, and then what are the impacts of that

3   contamination where it is now, what are the impacts to biota,

4   and what are the impacts to humans as a result of the

5   contamination.

6   Q     And for the Penobscot River Estuary specifically, what

7   were the key components of the conceptual site understanding

8   that the Wood team developed?

9   A     The -- our understanding was that the -- that the

10  mercury had been discharged from the facility in Orrington and

11  that ten tons, plus or minus, had been discharged to the

12  river, and that -- that mercury had spread throughout the

13  river, and -- and through the actions of tides and river flow,

14  the mercury had dispersed widely down through the channel of

15  the Penobscot River, up into the marshes, into Mendall Marsh,

16  up into the Orland River and East Channel, and down into

17  Penobscot Bay.

18        We also conceptually understood that -- that the mercury

19  was still there, there was -- there was still mercury that was

20  not buried safely and was still present and available to

21  biota.

22        And then also one of the complicating factors that --

23  that many people have discussed here today, and previously, is

24  the mobile pool or these surface deposits.  That -- that

25  mercury has been bound up in sediments, and wood chips, and

1    wood waste, and has -- and is still present and moving in the

2    river.  And we -- we've seen evidence of that by -- we saw

3    evidence of that by our sampling.  We sometimes -- we would

4    identify these surface deposits and -- and know that they

5    moved by a few different -- a few different lines of evidence.

6         One is Rocky Geyer had some of his equipment buried by

7    the sediment that moved in the river and then deposited, and

8    then moved again and the sed -- and the equipment was

9    recovered.

10        We also saw deposits of wood chips appear on tidal flats

11   and then disappear again.  We had eel traps that -- that were

12   designed to collect eels for sampling, but would fill chockful

13   of wood chips within a day just because of the movement of the

14   wood waste and sediment in the river.  And -- and then we also

15   identified these surface deposits through geophysical methods,

16   like sonar methods.

17   Q    So when you're talking about wood waste or wood chips,

18   could you just clarify what you're referring to, please?

19   A    Yeah.  So we have to go back a hundred years or more, so

20   into the 1800s.  So there were over a hundred sawmills along

21   the Penobscot River, way over a hundred sawmills in the 1800s,

22   and these sawmills -- and these sawmills existed into the

23   1900s, and they -- they largely disposed of their sawdust and

24   wood chips into the river.  So -- so at one point, the river

25   was chockful of -- of wood waste material, and much of that --

1   much of that wood waste is still in the river and we -- we see

2   it traveling around and can identify it.

3       Did I answer your question?  I think I only partially

4   answered it.

5   Q    Yeah.  Let me then ask, what's the significance of the

6   mobile pool and this -- this wood waste that you identified

7   when you're thinking about remedial alternatives for the

8   river?

9   A    Yes.  The -- so the -- the mobile pool has elevated

10  concentrations of sediment -- elevated concentrations of

11  mercury in the sediment and in the wood chips, and the

12  significance is that -- that the -- these -- these sediments

13  and wood chips continue to move around the river and can

14  redeposit in tidal flats or in marshes and -- and slow

15  recovery.  In other words, they -- they can deposit in areas

16  and increase the concentrations of mercury where biota may be

17  exposed to it.

18      I think -- I think another factor of these wood chips is

19  that -- that we understand from other studies that the wood

20  chips degrade over time, they erode and are degraded by

21  natural processes.  And so -- so even though, you know, a fish

22  or a mussel or a lobster may not eat an entire wood chip, as

23  it degrades into small pieces, or small organic carbon, with

24  the mercury still attached, it becomes -- it can become more

25  available to biota.

1   Q      And turning back to sort of your broader overall

2   conceptual site understanding for the Penobscot River Estuary,

3   would -- did that also look at the sort of natural recovery

4   processes within the system?

5   A      Yes.  We -- you know, the Phase II study looked at

6   natural recovery, and, you know, Dr. Kevin Yeager did

7   geochronology studies to look at recovery rates that were

8   evident based on mercury contamination -- mercury levels in

9   sediment, and by measuring the mercury concentrations at

10  different depths, and also measuring the time -- and

11  evaluating the time that those had been deposited, he could

12  estimate recovery times.

13         We updated that.  We worked with Dr. Yeager again during

14  the Phase III study, and, you know, reevaluated the recovery

15  times and found that the recovery times had slowed over the

16  period of time from the Phase II study to the Phase III study.

17  Q      And, in general, so what types of recovery times were

18  you seeing based on the data that had been collected?

19  A      That we didn't expect recovery back to natural

20  conditions in -- in a -- in a very long period of time, and I

21  -- I can't remember exactly what the specific recovery time

22  was to get to an acceptable level of risk.  It may have been

23  75 years or 45 years, I don't -- I don't recall.

24  Q      Okay.  We can touch on that in a few moments as we move

25  forward.

1     Let's talk, though, a little bit about, as you started

2   in on the Phase III study, how did Wood approach facilitating

3   knowledge transfer from all the work that had come before in

4   the Phase I and Phase II studies?

5   A     At the very beginning of the project, in January 2016,

6   we met with the special master and the -- and the litigants,

7   but also with the Phase II Study Panel.  So three of the four

8   panel members were able to attend that meeting.  John Rudd was

9   not available, R-u-d-d.  And in addition, I believe that Dr.

10  Yeager and Rocky Geyer were also present at that initial

11  meeting with the -- with the special master and the parties.

12  So we were able to ask them questions and provide input.

13      And then we met with that same group again in April of

14  2017 to give them an update on what we had done and what we'd

15  found so far and see what their opinions were based on their

16  knowledge of the river.

17      And in addition to that, we -- we had communications

18  with some of the Study Panel or researchers through the

19  project, and, in fact, we -- we engaged Dr. Gilmour and Dr.

20  Yeager to do some additional studies as part of the Phase III

21  Engineering Study.  They worked closely with us and did

22  additional studies.  And we had several discussions with Rocky

23  Geyer and actually reviewed our proposed recommendations with

24  Rocky Geyer towards the end of the project.

25  Q     After reviewing the data from the Phase I and Phase II

1    studies, what were the data gaps that Wood identified?

2    A     One of the most significant data gaps was the density of

3    sampling in the river.  The -- the sampling density at -- at

4    the beginning of the project, you know, after the Phase II

5    study, was about one sample location per 23 acres.  And so,

6    you know, one -- one of the things that -- that you need to do

7    in evaluating remedial alternatives and doing remediation is

8    you need to find out where the contamination is, so that --

9    that sampling density was not very good in terms of the level

10   of characterization and -- and the detail in locating where

11   the mercury was and what kind of concentrations were present

12   along the system.  So we -- we approximately doubled the

13   number of samples throughout the course of the Phase III study

14   so that our -- our sample density was approximately one every

15   12 acres or so.

16        One of the other data gaps -- one of the other --

17   there's several, so I don't want to ramble too long.  But one

18   of the other data gaps was the understanding of the mobile

19   pool.  Rocky Geyer had sort of developed a basic understanding

20   and a description of the mobile pool of sediments, these

21   sediments that would deposit in some locations in the river

22   and then would move again, sometimes on a daily or on a

23   seasonal basis.  And we -- the Phase II Study Panel understood

24   that these were important, but -- but there was still

25   questions about exactly how -- how much material was in the

1   mobile pool, and where it was, and how it moved, and so those

2   are some of the questions that we also tried to answer.

3   Q    Did you also identify any data gaps with respect to

4   biota sampling?

5   A    Yes.  We -- the -- the data was a few years old from the

6   Phase II Study Panel, and there was still questions about what

7   was the rate of recovery, were the -- were the conditions

8   improving in terms of biota mercury concentrations, you know,

9   were the -- were the biota getting better on their own or were

10  they somewhat stagnant.  So we collected biota samples --

11  fish, birds, bird blood, insects, shellfish samples -- to try

12  to answer some of those questions.

13  Q    And then were there any data gaps that needed to be

14  filled with regard to sort of engineering questions and the

15  evaluation of alternatives that you alluded to earlier?

16  A    Yes.  As we started to identify technologies and

17  alternatives, questions would come up on some of the

18  alternatives -- some of the technologies that we thought would

19  move forward.  An example of this is dewatering, you know, if

20  a -- if a dredging technology was used, the sediments would

21  likely be taken to shore and then dewatered, and the -- and

22  the question was in terms of cost and practicality is how

23  would that -- how would that dewatering take place.  So we

24  collected samples of sediment and -- sediment and wood chips

25  and -- and did tests on them to evaluate different dewatering

1    technologies and to understand what the costs of those

2    technologies might be.

3    Q    And over the course of the Phase III study, did you

4    document the results of all of this sampling that you -- that

5    you've been describing?

6    A    Yeah, we developed many reports on the work that we did,

7    and I believe it was 23 or 24 total reports that we produced

8    overall.  So some of these were about -- some -- and there was

9    different kinds of reports.  Some of these were reporting on

10   the biota sampling; some were reporting on these -- on these

11   studies on the mobile pool; some were on the -- on the studies

12   to support the engineering, for example, the dewatering study;

13   and then there was also risk assessment reports and

14   alternative for technology evaluation reports.

15   Q    Let's just pull up for a moment Joint Exhibit 108.

16   Mr. Walter, we're displaying what's previously been marked as

17   Joint Exhibit 108, which is titled Supporting Reports and

18   Technical Memoranda Described in the Phase III Engineering

19   Study Report.  Have you seen this document before?

20   A    I have, yes.

21   Q    And is this, to your knowledge, an accurate list of all

22   of the various supporting reports and technical memoranda that

23   are discussed throughout the Phase III Engineering Study

24   Report?

25   A    Yes, I believe that it is.

1   Q    So just to run through this quickly, the first 18 or so

2   reports and -- and memoranda listed on this are described

3   throughout Chapter 2 in the Phase III study report; is that

4   correct?

5   A    That's correct.

6   Q    And then you've got the Risk Assessment and Preliminary

7   Remediation Goal Development Report that's described in

8   Chapter 4 of the Phase III report; is that right?

9   A    Correct, yeah.

10  Q    And then the Technology Screening Report and

11  Alternatives Evaluation Report, those two reports are

12  described in Chapter 5; is that correct?

13  A    Correct, yeah.

14  Q    And then there's -- there was a Risk Reduction Report,

15  which is described in Chapter 6?

16  A    Yes.

17  Q    Is that right?

18  A    Yes, yeah.

19  Q    And then in addition there was also a Communication and

20  Community Involvement Plan, which is described in Chapter 7 of

21  the Phase III Engineering Study report; is that right?

22  A    Yes.

23  Q    So all told there were about two dozen or so reports

24  that were issued throughout the course of the Phase III study?

25  A    Yes, that's right.  And just to provide a little bit of

1    the context, largely for those first 18 reports that you

2    mentioned, they were about the studies that were done, the

3    actual -- mostly about the field sampling or the different

4    actual physical studies that were completed.  And then -- and

5    then No. 19 and No. 22 were about evaluation of risk, and then

6    20 and 21 were -- -- were developing technologies and

7    alternatives really looking at what could be done in the river

8    to clean it up.  And then, finally, not listed here is the

9    Phase III report that -- that summarized all the information

10   and made recommendations.

11   Q    So would it be fair to say that the Phase III reports

12   sort of drew from all of this body of work to summarize it and

13   then moved to the ultimate recommendations?

14   A    Yes, definitely.

15          MR. THOMPSON:  We can take the exhibit down, please.

16   BY MR. THOMPSON:

17   Q    Let's talk briefly about the risk assessment work that

18   you just alluded to.  Why did Wood undertake a risk

19   assessment?

20   A    So, you know, our charge -- you know, back to our

21   original charge.  Our charge was to identify whether there was

22   remedial options that were feasible, effective, and

23   cost-effective.  So effective in -- in this sense means

24   reducing -- to us means reducing risk to acceptable levels.

25   So the -- you know, the risk assessment was done initially to

1    identify whether there was risks to biota or humans and then

2    what were those risks, and then, secondly, that risk

3    assessment forms a basis of evaluating what -- how much

4    cleanup needs to be done.  In other words, you know, if our --

5    if -- if there's risk to large -- large-bodied fish or to

6    humans who consume large-bodied fish, how much sediment

7    cleanup would need to be done and what kind of levels would

8    need to be achieved in order to reduce those mercury levels in

9    the fish.

10   Q    So as part of the risk assessment and preliminary

11   remediation goal development report, was part of that sort of

12   a back calculation from those biota mercury levels back to

13   sort of what you thought needed to be achieved in the

14   sediments?

15   A    Yes, exactly, yeah.

16   Q    And could you just explain what a preliminary

17   remediation goal is, please?

18   A    So -- so it -- a preliminary remediation goal is a

19   remedial goal that's developed to be protective of human

20   health and biota.  So that -- that goal -- it's basically a

21   back calculation from the risk assessment.  So, you know, if

22   -- if the -- if the -- if the current risks were acceptable,

23   the remediation goal would be whatever the current conditions

24   were, so there would be no remediation necessary.  But, you

25   know, in rough numbers, if the -- if the -- and this isn't an

1    exact calculation, but just sort of an example -- so if the --

2    if the concentrations in fish were twice as high as they

3    should be, then you may need to reduce the sediment

4    concentrations by half.

5    Q    And what remediation goals for sediment did Wood

6    ultimately arrive at during the Phase III study?

7    A    So we had -- we had two remediation goals that we

8    developed:  One was to meet acceptable risk levels and that

9    remediation goal was 500 nanograms per gram; and then the

10   second risk level was to achieve the Maine CDC advisory for

11   fish concentrations of 200 nanograms per gram in edible fish

12   tissue.  And that -- so the numbers get a little confusing

13   because that remediation goal to get to 200 was 300 nanograms

14   in sediment to get to a 200 nanogram level in fish tissue.

15   Q    So to be clear, both of the goals you just described,

16   the 500 nanograms per gram and 300 nanograms per gram are

17   sediment -- total mercury in sediment goals; is that right?

18   A    That's correct, yes.

19   Q    Let's turn to talking a bit about the process of

20   screening and evaluating remediation alternatives.  How did

21   Wood go about screening potential remedial technologies that

22   might be applicable in this system?

23   A    We -- we -- and let me just say we cast a wide net.  We

24   identified all kinds of different remedial technologies that

25   might be helpful, and -- and so -- and let me just explain

1    technologies just a little bit.  So -- so a technology is a

2    piece of a remediation step that would need to be achieved.

3    So, for example, if -- if we were looking at a -- a dredging

4    technology, for example, a dredging -- the dredging

5    technology, for example, mechanical dredging would be one that

6    would be evaluated or hydraulic dredging or -- or others.

7          And then -- and then along with that, other technologies

8    that aren't necessarily remediation technologies would be

9    evaluated to support those primary remediation technologies.

10   For example, the dredged material would have to be dewatered

11   and then the water would have to be treated and then the

12   sediments -- the dried sediments would need to be disposed.

13   So there would be technologies for dewatering, technologies

14   for water treatment, and then technologies for disposal or

15   placement of sediment.

16   Q    At the early screening stages, you were looking at all

17   of these various technologies, what criteria were applied for

18   screening the various technologies?

19   A    Right.  So, as I said, we cast a very wide net for

20   technologies.  So we identified -- I don't know -- 50

21   technologies, you know, some large number of technologies that

22   might be applicable.  And then -- and then we screened those

23   with those -- with those three criteria from the court --

24   feasible, effective, and cost-effective.  So -- and -- and --

25   and, in large part, technologies that were similar, had

93

1   similar effectiveness and feasibility, if one was much less

2   expensive than another, it would be retained.

3   Q      So then once you screened the -- the technologies, how

4   did you go about assembling those into potential remedial

5   alternatives?

6   A      So, again, we -- we tried to have a fairly wide range of

7   alternatives that we thought were feasible.  So we would

8   identify a primary technology that would be used to actually

9   clean up the river and then -- and then assemble that with the

10  supporting technologies to make a complete alternative.

11  Q      And I want to talk a little bit about what criteria you

12  used in evaluating remedial alternatives.  If we could pull up

13  Joint Exhibit 5, which is the Phase III Engineering Study

14  Report, and look at Pages 5-4 and 5-5.  I think we can get

15  them -- yes -- both pulled up on the screen here.  Are you

16  seeing those on your screen, Mr. Walter?

17  A      Yes, more or less, without my reading glasses, yes.

18  Q      Do you see the six numbered items that start on Page 5-4

19  and carry over to Page 5-5 in Joint Exhibit 5?

20  A      Yes, correct.

21  Q      Could you please describe what those six numbered items

22  are?

23  A      Yes.  Do you want me to run through these because I just

24  need to --

25  Q      Yes, please.

1   A     So viability of the remedy basically evaluates

2   feasibility, the feasibility charts that we were given from

3   the court, so that's the ability to construct or operate the

4   remedial alternative.  Whether the -- whether the -- how

5   difficult or how many permits would be needed to implement

6   that alternative and community acceptance.

7          And then the other -- the other five criteria were

8   provided explicitly in the court order.  We added this

9   viability criterion to reflect the feasibility direction from

10  the court, also.  So these other -- the -- the second -- the

11  next five were whether -- basically, whether this -- whether a

12  proposed solution was innovative or had been successfully

13  completed; the -- No. 3 was the likely cost of the solutions,

14  which we normally look at capital costs and operation and

15  maintenance costs to get a total life cycle cost; the length

16  of time to complete the recommendations, and we added

17  subcriteria to that, which included the time to implement the

18  remedy and the time until the remedial -- RAOs is remedial

19  action objectives, or to meet the remedial goals; the likely

20  effectiveness of the alternative is reduction is the amount of

21  mercury and methylmercury in the system and reduction of the

22  risk to people and biota; and then the -- then -- also the

23  permanence of the remedy, will it -- will it stay for a long

24  period of time, do we feel confident in that, and will it

25  reduce risk in the long-term; and then, finally, potential

1  environmental harm, so these are adverse environmental

2  impacts, short- and long-term impacts, and also sustainability

3  or green remediation factors.

4  Q    So these six factors were the evaluation criteria that

5  were applied as you were looking at different remedial

6  alternatives; is that right?

7  A    Correct, yes, yeah.

8  Q    And you mentioned that five of them had come from the

9  court's 2015 order; is that right?

10  A    Right.

11  Q    And -- and then the sub bullets that you were just

12  talking through, where did those come from?

13  A    So we -- we developed those to -- to provide a framework

14  for a more detailed evaluation of the technologies and to also

15  make sure that our alternatives were consistently evaluated

16  against each other.

17  Q    So once you --

18  A    Let me just add, and a -- a lot of these sub bullets are

19  also consistent with the Superfund process that -- the CERCLA

20  guidance for feasibility studies.  So some of these ideas came

21  out of the Superfund process, but we believed that they were

22  applicable to this situation where we were evaluating remedial

23  alternatives.

24  Q    And was it Wood's judgment, at the end of the day, that

25  these were appropriate evaluation criteria to be using in

1    assessing what remedial alternatives should be considered for

2    this --

3    A    Yes.

4    Q    -- system?

5    A    Yes, definitely, yes.

6    Q    So, broadly, how did Wood move from this alternatives

7    evaluation process to actually making recommendations?

8    A    Broadly, we -- you know, we identified remedial

9    alternatives and then conducted an evaluation of remedial

10   alternatives that -- that looked at these six factors and, you

11   know, feasibility, effectiveness, and cost-effectiveness in

12   broad terms.

13        So we completed a report on that, the alternatives

14   evaluation report, and then as we moved towards making

15   recommendations for the court -- I believe this is your

16   question -- moving to recommendations?  Am I answering the

17   right question?

18   Q    Yeah.

19   A    Yes, okay.

20   Q    So -- so as you were moving into making recommendations

21   and applying these criteria, were there particular criteria

22   that sort of rose to the top or seemed particularly important

23   as you were deciding what recommendations to make?

24   A    All these were certainly important, but -- but the --

25   you know, the basic three of -- of feasibility, effectiveness,

1    and cost-effectiveness were sort of primary in our minds.  For

2    example, whether a technology was innovative or not was not as

3    important as whether our understanding of -- of whether we

4    thought it would be implementable and effective in the long

5    term.

6    Q    Let's turn to talking a bit about the actual remedial

7    alternatives that you came up and which ones you recommended

8    and which ones you did not recommend.  And I'm going to have

9    us turn to Page 8-4 in Joint Exhibit 5, which is the Phase III

10   Engineering Study Report, and I want to start by just talking

11   through the remedial alternatives that were not ultimately

12   recommended in the Phase III Engineering Study Report.

13        Do you see Page 8-4 on your screen here?

14   A    Yes.

15   Q    And the -- in this Section 8-2 of alternatives not

16   recommended, the first one that's listed here is monitored

17   natural recovery.  Do you see that?

18   A    Yes, I do.

19   Q    What does that refer to?

20   A    So monitored natural recovery is allowing -- is

21   basically not doing anything except doing monitoring.  It's no

22   -- no active remedy.  And it -- it relies on the fact that

23   there's clean sediments coming down the river or cleaner

24   sediments coming down the river from upstream that would mix

25   with and potentially cover contaminated sediments and then

1    make them less available to biota so that the -- the mercury

2    in the contaminated sediments would not be near the surface or

3    readily available or available for methylation.

4    Q     Why was this remedy of monitored natural recovery not

5    recommended in the Phase III Engineering Study Report?

6    A     It was based on time frame.  That -- you know, there was

7    existing risk, and to do nothing would require many years -- I

8    believe it says 45 years here -- to get to -- to get to an

9    acceptable risk level.

10   Q     Looking down at the bottom of Page 8-4, the next

11   alternative that's listed is system-wide enhanced monitored

12   natural recovery.  Do you see that?

13   A     Yes.

14   Q     What does that refer to?

15   A     So enhanced -- enhanced monitored natural recovery

16   refers to the addition of clean sediment.  So, basically, it

17   accelerates the process of natural recovery by intentionally

18   placing additional clean sediments into the estuary and then

19   allowing those sediments to be distributed and mixed with and

20   cover existing contaminated sediments.

21   Q     Why was system-wide enhanced monitored natural recovery

22   not recommended in the Phase III report?

23   A     It -- so this -- this technology is a -- is a -- we

24   thought was a good idea, but it hasn't been tested previously

25   in other systems.  So we thought there was a -- there was some

1   real questions with how effective it would be in terms of how

2   well would the -- how well would the additional sediment

3   distribute themselves and whether it would be permittable to

4   place a lot of additional sediments in the river and how well

5   it would reduce risk.

6   Q    Let's turn to Page 8-5 in Joint Exhibit 5 of the Phase

7   III Engineering Study Report, and Alternative 3 that's listed

8   here is dredging.  What does this alternative refer to?

9   A    So -- so dredging is -- is removal of sediments from the

10  river.  So there's different technologies that can be used,

11  you know, excavation or mechanical or hydraulic dredging, but

12  basically it's removal of the sediments and getting them out

13  of -- and removal of the contamination along with it.

14  Q    And what aspects of dredging were not recommended in the

15  Phase III Engineering Study?

16  A    So system-wide dredging was not recommended, so

17  large-scale dredging was not recommended, and -- and the

18  reason for that was partially due to the time it would take to

19  implement it, the potential for ongoing adverse impacts to

20  biota as a result of the dredging, and -- and, of course,

21  because of the cost, you know, we estimated a cost of 1.7 to

22  $5.5 billion.

23  Q    Billion with a B.

24  A    Right, yeah.

25  Q    Let's turn, then, to Page 8-6, the next remedial

1    alternative that was not recommended, at the top of Page 8-6

2    in Joint Exhibit 5 it says amendment application.  What does

3    that refer to?

4    A    So this was a technology that would be applied in

5    Mendall Marsh, and additives would be placed in the marsh or

6    mixed with materials in a thin-layer cap.  And the -- the

7    amendments are intended to either absorb or mitigate

8    methylmercury availability to biota so that -- it doesn't

9    necessarily clean up the system, but what it does is it keeps

10   the methylmercury from getting into insects and birds.

11   Q    Why was amendment application not recommended in the

12   Phase III report?

13   A    There was -- there was really questions about its -- we

14   did additional studies with Dr. Gilmour during the Phase III

15   study and -- and the conclusions of those studies were that --

16   that it wasn't necessarily apparent that -- that those

17   amendments would be effective over the long term.

18   Q    Let's turn, then, to Page 8-7 and I believe this -- or

19   -- I'm sorry -- the bottom of Page 8-6 in the Phase III

20   Engineering Study Report, Joint Exhibit 5.  There's

21   Alternative 6, dredging in intertidal and subtidal zones and

22   thin-layer capping.  Do you see that alternative?

23   A    Yes.

24   Q    What does that one refer?

25   A    So this is also an alternative for Mendall Marsh, and

WALTER - DIRECT EXAMINATION/THOMPSON                    101

1    it's a combination of dredging in the -- dredging in the river

2    portion of the system and then capping in the marsh areas.

3    Q    And why was this not recommended?

4    A    Right.  And this one was not recommended because it --

5    it appeared that capping alone would -- would achieve the

6    remediation goals in the marsh and would be less -- and would

7    be less expensive and as effective.

8         MR. THOMPSON:  All right.  We can take down the

9    exhibit, please.

10   BY MR. THOMPSON:

11   Q    Let's start to talk, then, about the -- the recommended

12   remedies in the Phase III Engineering Study Report, and first,

13   at a high level, what characteristics made locations within

14   the estuary stand out as good candidates for potential active

15   remediation?

16   A    So number one, our goal was to reduce risk in the river,

17   so we wanted to find locations where we thought that removal

18   or treatment or capping would reduce risk.

19        Number two was focusing on areas where there were the

20   highest mercury concentrations.  You know, part of our

21   development of the remediation goals was to, you know, get the

22   -- get the river -- the sediment concentrations down to an

23   acceptable level of 500 nanograms per gram.  So by attacking

24   those areas with the highest sediment concentrations, it would

25   get us there faster with less disturbance.

1        And then the -- the third goal was -- was addressing the

2    mobile pool, like addressing the surface deposits or these

3    sediments that could move and recontaminate other areas.

4    Q    So we'll run through them in more detail, but could you

5    please just describe what were the active remediation

6    alternatives that are recommended in the Phase III Engineering

7    Study Report?

8    A    Yes, certainly.  So, number one, really three

9    recommendations.  Number one was in the Orrington Reach up

10   near the original plant site was to dredge and remove

11   sediments from approximately 132 acres of area.  So that -- so

12   that -- that would be a dredging remediation.

13        The second one was removal of sediments associated with

14   the mobile pool, and we estimated that there was 950,000 cubic

15   yards of material that could be removed relatively

16   efficiently.  Excuse me.  And those -- in those mobile pool

17   sediments, the recommendations for those were in five areas --

18   one in the Frankfort Flats area, three in the eastern channel

19   of the river east of Verona Island, and one in the Orland

20   River.

21        The third -- the third recommendation was addressing --

22   addressing elevated concentrations of mercury in Mendall

23   Marsh, so -- and that was a capping remedy placement of three

24   -- approximately 3 inches of clean sediment or sand over

25   approximately half of the marsh area.

1  Q    And, broadly speaking, what were those three recommended

2  active remediation activities intended to accomplish?

3  A    The -- the concept was that, you know, we would remove

4  some of the highest levels of mercury and -- and address areas

5  of risk, but that that would not immediately remediate the

6  river to acceptable levels, that they would also take an

7  additional, we estimated, 25 years-plus, to get monitored

8  natural recovery in addition to those technologies.

9  Q    So the idea was to sort of accelerate the recovery of

10 the system with a period of -- of natural recovery continuing

11 thereafter?

12 A    Correct, yeah, that's accurate.

13 Q    And you sort of addressed this, but did you expect that

14 these remediation -- the recommended remediation alternatives

15 would achieve the sediment goals that Wood had established

16 immediately?

17 A    No, no.  We -- we -- I don't think I -- can you repeat

18 the question?

19 Q    Yeah, let me restate that.

20 A    Yeah.

21 Q    Did you expect that the recommended remedial

22 alternatives would immediately achieve the sediment goals that

23 Wood established for the estuary?

24 A    No, we -- we expected that this would -- this would get

25 us started towards meeting remedial goals, but it would take

1   an additional 25 years or more to get there.

2   Q      But it would get there eventually over time.

3   A      Right, correct.

4   Q      So would it be fair to say that sort of -- from a

5   big-picture perspective, the conclusion was that there are

6   active remedies that can accelerate recovery in this system,

7   but there's not a silver bullet that will just magically fix

8   the problem immediately?

9   A      Yes, we -- that's definitely true.  There's not really a

10  silver bullet that's -- that we thought was feasible,

11  effective, and cost-effective.  You know, we evaluated

12  dredging options that would get us to the remedial goals at

13  the end of the dredging, but as I said before, they were --

14  they were at 1.7 million to $5.5 million in cost and would

15  take, I forget the exact number, 20 years to implement or

16  something.  And then there's, you know, disturbance in the

17  river and permitting issues and other things that go along

18  with that.

19         So -- so we concluded that the recommendations that we

20  made for a partial remedy, plus some monitored natural

21  attenuation to get to a final acceptable risk level, was a

22  better choice.

23  Q      I'm sorry.  Just so the record's clear, when you were

24  citing the costs for that system-wide dredging, was that

25  million or billion?

1    A     I'm sorry, yes, billion, that's correct, yeah.  Thank

2    you.

3    Q     Let's turn to talking a bit about -- in more detail

4    about the Orrington Reach dredging that you just mentioned,

5    and let's pull up in Joint Exhibit 5 Figure 8-5 from the Phase

6    III Engineering Study Report.  Do you see the figure on your

7    screen, Mr. Walter?

8    A     Yes, yep.

9    Q     What does Figure 8-5 in Joint Exhibit 5 show?  And we'll

10   start sort of up at the top of the figure just to make it a

11   little easier to see.

12   A     So it -- it shows a couple things.  You know, these --

13   these rounds -- these round circles that are different colors

14   show -- show locations where mercury samples were collected,

15   and -- and the hatched areas show areas that we proposed for

16   remediation.

17   Q     And where are those areas that are proposed for

18   remediation?

19   A     So they're -- they're in the -- they're along the

20   eastern side of the river, and they're in the intertidal and

21   marsh platform areas.

22   Q     And can you elaborate a little bit on -- on exactly what

23   measures were proposed to be implemented in the Orrington

24   Reach?

25   A     Yes.  So these -- these would be ex -- dredging --

1    basically, dredging and/or excavation of contaminated

2    sediments in the intertidal flats and the marsh platforms.

3    And then the -- and then to follow with it -- with the other

4    technologies that go along with that remedy, the -- the

5    sediments would be taken up on land, dewatered, the water

6    would be treated and discharged back to the river, and then

7    the sediments would be either beneficially reused or would be

8    disposed in a landfill, for example.

9         And let me just say, you know, I think people have

10   talked a little bit about beneficial reuse, but I just wanted

11   to explain that a little.  We met with the Maine Department of

12   Environmental Protection about what to do with sediments that

13   were removed from the river, and one of the suggestions that

14   they had was to beneficially reuse the sediments in another

15   location and that -- and that was that -- the concept was

16   potentially finding quarries where there was deep pits that

17   needed to be filled with -- that needed to be filled for sort

18   of safety reasons that could be used for placement of these

19   sediments.  So that was one -- that's one -- one of the

20   options that would -- we thought was viable for a beneficial

21   reuse.

22   Q    And I think you mentioned this earlier, but how large an

23   area in total was proposed to be remediated in the Orrington

24   Reach?

25   A    Yeah, I believe it was 132 acres.

1    Q     And you mentioned the dredging component.  In the areas

2    that were dredged, would anything happen after the dredging in

3    those places?

4    A     Yes, material -- clean material would be placed back in

5    the dredged areas, and then the marsh -- marsh platforms would

6    need to be restored.

7    Q     Why were these intertidal and marsh areas on the east

8    side of the Orrington Reach targeted for active remediation?

9    A     Yeah, two reasons -- to address localized risk in these

10   areas, reduce mercury concentrations for local biota, and

11   then, also, that these were some of the highest concentrations

12   of mercury still remaining in the river.

13         And -- and just to clarify, you know, when we looked at

14   -- when we looked at this and we looked at the concentrations

15   of mercury in this area, there had been a partial remedy

16   conducted in the river right outside the -- in the sediments

17   right outside the Orrington facility; but even with that

18   partial remedy, we felt that there still was -- there still

19   was a lot of mercury in this area.

20   Q     This is the area that was sort of immediately downstream

21   of the former discharge point?

22   A     Right, adjacent to and immediately downstream, and --

23   and actually even a little bit upstream.  The -- because of

24   the tidal action in the river, there's -- there was definitely

25   contamination that went upstream in addition to going

1   downstream.

2   Q      Was there also any concern about transport of mercury

3   from this part of the system to other parts of the estuary?

4   A      Yeah, definitely.  By -- by removing the mercury from

5   this area, it reduced the risk of erosion and these

6   mercury-contaminated sediments moving and ending up in the

7   mobile pool or ending up in the marsh or recontaminating other

8   parts of the system.

9   Q      As you were evaluating this dredging remedy in the

10  Orrington Reach, were there any uncertainties or data gaps

11  that you identified?

12  A      Yes, there's many uncertainties in this river.  You

13  know, first of all, the density of sampling.  You know, as --

14  as you see on the figure right now, you can see, you know,

15  there's -- you know, it looks like there's a lot of dots on

16  this map where samples have been collected, but when you think

17  about the actual size of these areas, you know, there's --

18  there's definitely uncertainty in terms of where the mercury

19  is.  So -- so that was number one.

20         There was also, in terms of implementing the remedy,

21  there was uncertainties in terms of being able to get permits

22  to implement the remedy.

23         And then, also, in some cases, the -- the private

24  property owners along the river actually own to the -- own

25  part of the intertidal flats, and so there may be permissions

1    that need to be granted by private property owners.

2    Q    Did Wood also evaluate the risks of environmental harm

3    from doing dredging in the -- in the Orrington Reach?

4    A    Yes.  So as with -- with any dredging, it's -- as part

5    of the dredging operation, some of the sediments are

6    resuspended and then move with the water column.  So there --

7    there's certainly a little bit of risk that goes along with

8    that -- that you -- that you would get the bulk of the

9    material out, but some would be resuspended and able to

10   migrate.

11   Q    And since you recommended the remedy, did you ultimately

12   conclude those risks were manageable in this part of the

13   system?

14   A    We did.  That -- we -- we concluded that the -- the

15   benefit outweighed the risks.

16   Q    Let's turn to talking about the surface deposit

17   dredging, the mobile sediment dredging that you referred to

18   earlier, and let's pull up Joint Exhibit 5 Figure 8-3.  So

19   this is Figure 8-3 from the Phase III Engineering Study

20   Report.  Do you see the figure on your screen here?

21   A    I do.

22   Q    And can you please describe what are we looking at on

23   this figure?

24   A    So -- so it's a little hard to see, but the -- these are

25   the locations of the -- what we term the surface deposits,

1    deposits that -- that had elevated concentrations of mercury,

2    but that were not always stable and that can move with tides

3    or seasonally.  And these -- and these -- these deposits are

4    labeled, up near the top of your screen you see FF-1, which is

5    the large -- largest deposit in Frankfort Flats, and then

6    there's actually three in the East Channel, east of Verona

7    Island, VE-1, VE-2, and VE-3, and then the fifth surface

8    deposit is up in the upper part of the Orland River and

9    labeled OR-1.

10   Q    And what was the proposed remediation for these surface

11   deposits?

12   A    So that was dredging, also, so removal of this material

13   from the river so that it would not be available to move

14   around and recontaminate other areas.

15   Q    And I think you alluded to this earlier, but what would

16   be the total amount of material removed?

17   A    Nine hundred and fifty thousand cubic yards.

18   Q    How were these surface deposits identified during the

19   Phase III Engineering Study?

20   A    So we -- we knew something about the surface deposits

21   from the work that Rocky Geyer had done during the Phase II

22   study, and then in addition, we did geophysical studies to

23   look at where these deposits appeared to be and then also took

24   samples of them.  We -- we took samples to identify the levels

25   of mercury in the deposits and in some case to try to identify

1  the thickness of the deposits.

2  Q    Why were these five deposits ultimately recommended to

3  be dredged and actively remediated?

4  A    The -- the primary reason was the -- the concern about

5  the movement of this -- the contaminated sediment in the

6  surface deposits.  We knew that the surface deposits had

7  higher levels of mercury contamination, some of the higher

8  levels, and -- and we also knew that they moved from the

9  evidence, you know, that I talked about earlier, seeing them

10 in the eel traps and seeing them deposit up on the -- on the

11 intertidal flats, et cetera.

12 Q    So the idea was to -- both to address sort of the -- the

13 elevated mercury levels in the deposits themselves, but also

14 prevent them from spreading mercury throughout the system?

15 A    That's correct, yes, yeah.

16 Q    Were there any specific benefits sort of on the

17 system-wide level that you anticipated associated with

18 particular surface deposits or that you hoped to achieve from

19 dredging particular surface deposits?

20 A    Yes.  So in Frankfort Flats, the -- one of the concerns

21 was that these surface deposits may be connected with Mendall

22 Marsh and that the -- and that the material, when it started

23 to move, could be washed into the marsh and then deposit onto

24 the marsh platform and then obviously be available to biota

25 there.

1       And then in the Orland River and Verona East area, the

2   concern was partially for the -- the local biota there, the

3   black ducks, and then also contributing to contamination in

4   the upper part of Penobscot Bay and exposure of lobsters and

5   crabs to the mercury-contaminated sediments.

6   Q    And are there uncertainties associated with how the

7   removal of these surface deposits will have those types of

8   broader benefits that you just described?

9   A    Yes, there's uncertainties with everything in this

10  project.  It's really -- it's a really complicated system and

11  -- and nothing is certain.

12      The uncertainties with -- with removal -- you know,

13  first is finding -- finding the -- we know that these surface

14  deposits move somewhat, so that the first task is part of --

15  remediating these is actually finding the exact locations and

16  finding the limits of them, and they -- and they sometimes

17  move throughout the year, so also understanding exactly where

18  they are when the -- when the removal happens.

19      And are you talking about -- are you also asking about

20  environmental benefit uncertainties?

21  Q    Yeah, I was actually trying to ask about sort of other

22  uncertainties associated with the benefits expected to be

23  achieved by dredging these surface deposits.

24  A    Yes.  We -- we -- we know that removal of these will

25  reduce the average concentration of mercury in the system, and

1   we know that -- and we know that these surface deposits move,

2   but predicting exactly what the environmental benefit is is

3   difficult.

4   Q     And did Wood make any calculation of approximately how

5   much acceleration of recovery was anticipated from removing

6   some of these surface deposits?

7   A     The -- the answer is yes, and I don't know the exact

8   number of years that we projected.

9   Q     Okay.  But that would be in -- in the report --

10  A     It is.

11  Q     -- in Joint Exhibit 5.

12  A     Yes.

13             THE COURT:  So could I -- could I ask a couple of

14  questions -- or two areas of questions about dredging.

15                           EXAMINATION

16  BY THE COURT:

17  Q     If you think of -- what I learned the last time is that

18  over the course of decades there has been a layering impact on

19  the mercury concentrations at different layers.  And so every

20  spring you'd have a rush of water coming down from the

21  northern part of the river and it would cover over some part

22  of the mercury, and as we -- as it layered down, the further

23  down you go, the higher concentrations of mercury would be

24  found, in general.

25  A     Hm-hmm, yeah.

1  Q      And then what I think we all know from just living in

2  this area and being aware of the river, this is a powerful

3  river.

4  A      Yes.

5  Q      It's -- it's not a pond.

6  A      Yeah.

7  Q      It's not a static body of water.  It's a very powerful

8  body of water.

9         And so you've got two factors that I think looking at

10 some of the comments which have been raising concerns about

11 dredging is that, once you begin to dig into an area that is

12 on the edges of the Penobscot River, suddenly you may release

13 a huge amount of mercury that has been buried so that you've

14 caused, perhaps, or at least the concern is you've caused more

15 environmental harm by unearthing, with the intent to replace

16 with clean fill, the buried mercury than you would have if

17 you'd just let it sit.

18 A      Hm-hmm.

19 Q      So I wondered if you could address those issues:  One,

20 is there some means by which you envision the dredging would

21 occur that would calm the worries of the public in terms of

22 remediation here?

23 A      Hm-hmm.

24 Q      And give us an idea of what exactly the -- the dredging

25 is so that it convinced you as an expert to recommend dredging

WALTER - EXAMINATION/COURT

1    above other remedial measures.

2    A    Okay.  I think there's sort of two -- two parts to that

3    question.  So -- so for the surface deposits, especially in

4    the Frankfort Flats area or in the deeper areas, the -- the

5    dredging would likely consist of use of a clamshell bucket,

6    which would go down and -- and close and enclose the

7    sediments, and -- and we would recommend using it -- what's

8    called an environmental bucket that -- that closes tightly and

9    doesn't allow much water to leak out of it.  So there's

10   definitely some disturbance of those sediments during that

11   process and some would migrate because, as you know, with the

12   -- with the tides and the -- the flow in this river, you can't

13   really set up a silt curtain or something that would really be

14   effective.  So, yes, there's some -- some potential migration

15   of sediments as a result of that dredging process.

16        Then that -- that material would be, you know, as it --

17   the bucket comes up, it would be placed in a barge or a scow

18   and then that would be taken to land for processing, so -- so

19   without spilling material out of the -- out of the barge.  It

20   would -- it would all get to land and no more would end up in

21   the water without future treatment.

22        But the -- the thing I would mention -- I would sort of

23   emphasize with that is that we know that these surface

24   deposits are moving regardless.  So not to say it's

25   insignificant, but -- but by removing the bulk of the material

1    we do environmental good, whereas if we don't do anything,

2    these surface deposits are just going to continue to move

3    around.  And if people have concerns about migration of

4    material during dredging, that migration is happening all the

5    time right now.

6         So then the -- the second -- I want to -- then I want to

7    move up to the Orrington Reach.  And one other thing about the

8    -- the surface deposits is it's our understanding -- and the

9    is limited sampling that we have is that these deposits are

10   not covered by clean material, that because of their movement,

11   they're -- they're well mixed already and that there's

12   significant concentrations of mercury at the surface.  So --

13   and -- and because of their movement, they're not really

14   susceptible to monitored natural recovery or this, you know,

15   covering with clean sediments that come down the river.

16        So let me -- then I want to just move up to the

17   Orrington Reach.  So in Orrington, there's some of the -- the

18   highest concentrations that we've seen of mercury in the

19   river, and some of those concentrations are still there even

20   after the limited remediation that was done by Mallinckrodt

21   three years ago or something or four years ago.  And -- and in

22   that case, where you're nearer the shoreline, there may be

23   some technologies that you can use to limit the migration of

24   sediment as you do the remediation, and I think Mallinckrodt

25   used something called a moon pool to do some of their

1    remediation.  There's also the possibility that some of it

2    could be done at low tide so that you excavate materials in

3    the dry.

4         And then with regards to sort of natural recovery there,

5    there definitely has been some natural recovery in that reach

6    where there's some cleaner sediments that cover contaminated

7    sediments, but as you said with the -- with the -- the flow

8    velocities in this river and the strength of the river and the

9    spring floods and the ice flows, our concern was that, if you

10   didn't get that mercury out, that there's -- that some of it

11   would erode and -- and some of it would continue to move and

12   -- and contribute to the mobile pool again.

13   Q    All right.

14   A    Does that help?

15   Q    Yes.  Thank you.

16   A    Yeah.

17                    CONTINUED DIRECT EXAMINATION

18   BY MR. THOMPSON:

19   Q    Turning back to the surface deposit dredging remedy, in

20   evaluating remedies for the surface deposits, did Wood also

21   consider capping for the surface deposits?

22   A    Yes, we did.

23   Q    And what did you conclude about potential capping of the

24   surface deposits?

25   A    Yeah.  We -- you know, as I just mentioned, that

1    capping, we concluded that capping wasn't likely going to be

2    an effective remedy.  These surface deposits are, you know,

3    sort of unconsolidated sediment mixed with wood waste and are

4    low-density.  So as -- to use a comparison I've used earlier,

5    it's like putting strawberries on whipped cream and not

6    expecting the whipped cream to come up through the

7    strawberries, that these materials are soft and that if you

8    put heavier material that might stay in place on top of it,

9    that sometimes the -- the -- the material that you're trying

10   to cap squishes out and -- and comes up through the surface.

11   Q    So for these surface deposits and the mobile material,

12   ultimately did Wood find any viable, feasible remedial

13   alternatives other than dredging the material?

14   A    No, no, nothing else.

15        THE COURT:  I'm going to interrupt.  I think we need

16   a second break, and we usually take a break about this time,

17   and I know that Dr. Driscoll is going to be coming about

18   12:30.  So if we're going to get a break, we need to do it

19   now.  Okay.

20        MR. THOMPSON:  Thank you, Your Honor.

21        THE COURT:  Court will stand in recess.

22      (Court recessed from 12:13 p.m. to 12:41 p.m.)

23        THE COURT:  Mr. Bernard?

24        MR. BERNARD:  The plaintiffs call Dr. Charles

25   Driscoll.

1        THE CLERK:  Can you please raise your right hand?

2  Do you solemnly swear that the testimony you shall give in the

3  matter now in hearing shall be the truth, the whole truth, and

4  nothing but the truth, so help you God?

5        THE WITNESS:  I do.

6        THE CLERK:  Thank you.  Please be seated.  Can you

7  state both your first and last name and spell them for the

8  record?

9        THE WITNESS:  Yes.  Charles, C-h-a-r-l-e-s,

10  Driscoll, D-r-i-s-c-o-l-l.

11        THE COURT:  You may proceed.

12        MR. BERNARD:  Thank you, Your Honor.

13  CHARLES DRISCOLL, having been duly sworn, was examined and

14  testified as follows:

15                      DIRECT EXAMINATION

16  BY MR. BERNARD:

17  Q    Good afternoon, Dr. Driscoll.  Welcome back.

18  A    Good afternoon.

19  Q    What is your educational background?

20  A    I have a BS degree in civil engineering from the

21  University of Maine, and I have two graduate degrees, both in

22  environmental engineering, from Cornell University.

23  Q    What is environmental engineering?  What -- what

24  disciplines does it involve?

25  A    Well, environmental engineering is a relatively new

1   discipline of engineering.  It involves, I think, the

2   quantitative understanding of either physical or contaminant

3   disturbances to systems and then the development and

4   application of technologies to mitigate those disturbances.

5   Q     And by mitigate, that also includes remediation?

6   A     Yes.

7   Q     And are you employed?

8   A     Yes.

9   Q     By whom?

10  A     Syracuse University.

11  Q     And are you a professor there?

12  A     I am.

13  Q     And just briefly for the court, what -- what courses do

14  you teach?

15  A     I teach a number of -- of courses.  I'm teaching a

16  course in biogeochemistry this semester, and I taught a field

17  course over the summer in methods for sampling lakes, water,

18  and sediments.

19  Q     Do you publish scientific articles or papers?

20  A     Yes, I try to, yeah.

21  Q     And have you published on the subject of mercury?

22  A     Yes.

23  Q     And have you published on the subject of mercury in

24  aquatic environments?

25  A     Yes.

1    Q    How many of your papers concerning mercury have been

2    published during the last year?

3    A    Seventeen.

4    Q    Are you familiar in your professional capacity with the

5    risks that mercury presents in the environment?

6    A    Yes.

7    Q    And briefly stated, because we've -- there's been a fair

8    amount of history here, but briefly stated for the record,

9    what are the ecological and human health risks associated with

10   mercury, the -- the -- the principal risks?

11   A    Well, mercury is a neurotoxin.  Exposure largely occurs

12   through a form of mercury called methylmercury, which is

13   produced in the environment and bioconcentrates and

14   biomagnifies up to high levels among food chains.

15        In terms of human effects, generally those are through

16   consumption of fish that are contaminated.  It's probably

17   important to point out that there's no safe concentration of

18   methylmercury.  It's quite a -- a toxic substance.  Most

19   studies have been concerned with development exposure from

20   children through their mother at -- before birth and -- and

21   early on, and then that will result in IQ and motor function

22   deficits throughout their life.  It's also been linked to a

23   number of other health outcomes, such as cardiovascular

24   disease, diabetes, immune function problems, a number of

25   outputs.

1    Q     Okay.  It's a potent neurotoxin; is that fair to say?

2    A     Yes.

3    Q     Have you yourself been involved in any environmental

4    remediation projects?

5    A     Yes.

6    Q     Could you give the court an example, please?

7    A     Well, the project that I was most prominently involved

8    in was a local lake, Onondaga Lake, which had a chlor-alkali

9    facility adjacent to the lake and there was considerable

10   contamination.

11   Q     And you say a chlor-alkali facility, is that similar to

12   the process that was used at the Orrington facility along the

13   banks of the Penobscot?

14   A     Yes.

15   Q     Okay.  And that involved mercury; is that right?

16   A     Yeah, it involved some mercury cell.

17   Q     You said Onondaga Lake was a local project.  Where is it

18   located?

19   A     It's adjacent to Syracuse in central New York.

20   Q     And did the -- were there remedies put into effect in

21   Onondaga Lake?

22   A     Yes.

23   Q     And was -- did the remedies include dredging?

24   A     Yes.

25   Q     And did they include capping?

1    A      Yes.

2            MR. BERNARD:  Your Honor, Dr. Driscoll's CV is in

3    evidence as Joint Exhibit 8.

4            THE COURT:  Thank you.

5    BY MR. BERNARD:

6    Q      When did you first become involved in this case,

7    Dr. Driscoll?

8    A      Towards the end of the Phase II study.

9    Q      Okay.  And briefly describe for the court, please, your

10   involvement in Phase II.

11   A      I was brought in to review the reports, which I did, and

12   then developed -- do some additional analysis on the data and

13   develop my own report, and then I was asked to testify during

14   the hearing.

15   Q      And did you file expert reports in advance of the 2014

16   trial?

17   A      Yes.

18   Q      And were you deposed in connection with the -- in

19   advance of the 2014 trial?

20   A      Yes.

21   Q      And did you testify here in court during that -- during

22   the remedy trial in 2014?

23   A      Yes.

24   Q      What involvement, if any, did you have in Phase III?

25   A      I was involved in the Phase III study from the beginning

1   in terms of the selection of the firm that would do the work,

2   Wood, then Amec Foster Wheeler.  I participated in

3   approximately quarterly meetings on the summary of -- of the

4   work that was being done and plans for the future work.  I

5   reviewed, I think, all of their reports and provided comments

6   on their reports.  Yeah, so I think that summarizes it.

7   Q     Okay.  So is it fair to say you've continued to advise

8   the plaintiffs in a technical capacity?

9   A     Yes.

10  Q     And have you been compensated, if modestly, for your

11  work on behalf of the plaintiffs?

12  A     Yes.

13  Q     I want to just cover briefly some of your prior

14  testimony and then see how it relates to where we are now.

15        In 2014, you testified to -- and I'm quoting -- an

16  urgent need to initiate remediation in the Penobscot system.

17  Do you remember that testimony?

18  A     Yes.

19  Q     And did that accurately reflect your view at the time?

20  A     Yes.

21  Q     Is it still your view?

22  A     Yes.

23  Q     Please describe the basis for that view.

24  A     Well, the contamination was initiated quite a while ago,

25  in the late '60s, early '70s, and it's a very complex and

DRISCOLL - DIRECT EXAMINATION/BERNARD                          125

1    dynamic system -- Penobscot River.  There's been a lot of

2    transport dispersion of the contaminants, concentrations in

3    biota I consider to be relatively high.  And so I thought, you

4    know, given the circumstances and the fact that it's not

5    recovering, evidence suggests it wasn't recovering at a very

6    fast rate, that action is warranted.

7    Q    And what is your understanding, Dr. Driscoll, of the

8    available remediation approaches to address mercury

9    contamination in the Penobscot Estuary?

10   A    Well, I'm familiar with what was recommended in the

11   Phase III report, so I think that those are traditional

12   approaches to try to -- to remediate mercury-contaminated

13   sites.

14   Q    Okay.  So is -- is one approach -- we'll get to the

15   Phase III report in a moment.  But is one approach to

16   remediate mercury contamination to isolate the contamination

17   in the environment?

18   A    Yeah, I think broadly speaking, there's a few approaches

19   you can take.  You can basically do nothing, let it recover by

20   itself.  You can remove it, and you can try to isolate it,

21   remove it from the system, but let it remain in place.

22   Q    Then let's move to the Phase III report for a moment.

23   Have you read the Phase III engineering report prepared by

24   Wood?

25   A    Yes.

1   Q     Okay.  And what is your understanding of the remedy

2   approaches that Wood recommended to the court?

3   A     Well, they divided the system into different components

4   and they made recommendations for those components.  So those

5   included dredging, removing materials along the Orrington

6   Reach.  They -- they proposed doing capping in Mendall Marsh.

7   They proposed dredging select areas, particularly at Frankfort

8   Flats and some areas over in the East Verona Reach and also in

9   the Orland River, and I think there was suggestion that there

10  might be some additional work that could be done, sort of

11  adding clean sediments to try to accelerate recovery, also in

12  the Orland River as a -- as a potential approach.

13  Q     And did Wood also recommend long-term monitoring?

14  A     Yes, that's very important.  Long-term monitoring, that

15  was -- that was an important part of the recommendation, yes.

16  Q     I'll ask you a few questions about that just a little

17  later.

18        These approaches that you just recited that are set

19  forth in the Wood recommendations to the court, are those

20  reasonable approaches, in your view, based on your expertise

21  and knowledge of this ecosystem, reasonable in terms of their

22  being designed to try to accelerate recovery of the ecosystem?

23  A     Yes, I think so.  I think that it's -- as we've said,

24  it's a very complex system, and I think that they did a good

25  job sort of striking a balance to try to look at costs, look

1    at -- at different technologies.  They -- they looked at the

2    systems systematically, but I think they also thought about

3    the whole, trying to -- to recover the whole system.  So,

4    yeah, I think it's a -- I think it's a reasonable approach.

5    Q    Okay.  And did their approach focus, in your view, on

6    logical parts of the ecosystem if your objective is to

7    accelerate recovery?

8    A    Yeah, I think so.  There are a few problem areas of

9    particular concern.  Mendall Marsh is an area that has shown

10   very high rates of methylmercury production.  I think

11   Dr. Gilmour said it was amongst the highest she's ever seen

12   and she has done a lot of work in a lot of different systems,

13   and there were high concentrations in biota in that system, so

14   that's obviously an area of concern.

15        Along the Orrington Reach, there are high concentrations

16   of mercury in the -- in the mudflats in some of those

17   sediments.  It's close to the site of discharge.  So that, I

18   think, clearly is another area of concern.

19        And then there's concern about the lobster fishery.  And

20   so I think the area around the Orland River and Verona East

21   are maybe a logical place to look at the source of the mercury

22   that's supplying the lobster fishery in that -- that general

23   area.  So I do think these make sense.

24   Q    In 2014, just one more question about your testimony

25   then, you said that you were confident that engineers

DRISCOLL - DIRECT EXAMINATION/BERNARD

1    appointed by the court would find feasible, cost-effective

2    remedies.  Do you remember that?

3    A     I do.

4    Q     Do the approaches that Wood recommended to the court fit

5    that -- in the Phase III engineering report fit that

6    description, in your view?

7    A     Yes, I think so.

8    Q     Let's turn now to the parties' Proposed Consent Decree.

9    Have you read -- are you familiar with the contents of that

10   document?

11   A     Yes.

12   Q     And -- and what is your understanding of the remedies

13   that the parties have proposed in the Consent Decree?

14   A     Well, I wasn't involved in -- in that directly, but the

15   way I understand it, I think it -- it sort of takes the

16   recommendations from Amec, and -- and they're modified

17   certainly, but I think they -- they are generally consistent

18   with, you know, the approach and -- and what they looked at.

19         So there are some -- some differences.  There is

20   thin-layer capping, instead of dredging, along the Orrington

21   Reach.  There -- there was the suggestion of not doing

22   anything in Mendall Marsh, so that's clearly different.  There

23   was still proposed dredging to remove materials, so I think

24   that that's consistent.  And I think also maybe looking in the

25   Verona East/Orland River Area, and long-term monitoring I

1   think is -- is a critical piece to that agreement, as well.

2   Q    Okay.  And all that is consistent with the

3   court-appointed engineers' recommendations; is that right?

4   A    Right.  And then there are these community projects, as

5   well, that I think make a lot of sense to me, yeah.

6   Q    Okay.  Well, we'll get into them in a little greater

7   detail now.

8        Before we do, you mentioned Amec earlier.  Is that the

9   firm that is now called Wood?

10  A    Yes, I apologize.

11  Q    Yeah, no need to apologize.

12       Now, the approaches in the Consent Decree, generally --

13  and we'll get into the specifics in -- in a minute, do you

14  believe that the approaches that are set forth in the Consent

15  Decree are reasonable if the objective is to accelerate

16  recovery of the ecosystem?

17  A    I do.

18  Q    Okay.  And with the exception of Mendall Marsh, do they

19  focus on areas within the ecosystem that the Wood

20  recommendations also focused on?

21  A    Yes.

22  Q    Okay.  We'll come back to Mendall Marsh in a moment, but

23  let's focus for a moment on capping.

24       Are you familiar with capping as an environmental

25  remediation measure?

1    A    Yes.

2    Q    To your knowledge, has capping been implemented in other

3    contaminated aquatic ecosystems as a remediation measure?

4    A    Yes.

5    Q    And has it been implemented successfully, to your

6    knowledge?

7    A    Yes, capping was used in Onondaga Lake.  I think it's

8    been quite successful.  And it's been used in a number of

9    other places, too, as well, yeah.

10   Q    Is capping in your view, Dr. Driscoll, a mature --

11   A    Yes.

12   Q    -- technology that is employed in -- at sediment

13   remediation sites?

14   A    Yes.

15   Q    What are the advantages of capping in the Orrington

16   Reach?  You mentioned earlier that the Phase III engineering

17   report recommends dredging about 132 acres there.  The

18   Proposed Consent Decree calls for capping of 130 acres in that

19   same reach of the river.  What are the environmental

20   advantages of capping in this reach?

21   A    Well, it's certainly a relatively inexpensive approach.

22   I think it's also relatively benign.  So I think that those --

23   you know, those are the -- the high-level advantages, I would

24   say.

25   Q    Okay.  And if it is successful, could it isolate the

1  contamination and put it beyond -- place it beyond the reach

2  of biota?

3  A    Yes.

4  Q    Okay.  Are there any risks, in your view, associated

5  with capping in the Orrington Reach?

6  A    Yes.

7  Q    What are they?

8  A    Well, I think there are -- there are a few risks:  One

9  is that the capped material could become recontaminated.  It

10  could be recontaminated relatively quickly, and organisms that

11  -- that move into this area could become contaminated because

12  the mobile pool is -- is still there, materials are moving

13  around.

14       There's also the potential that the -- as we've said,

15  it's a fairly turbulent system, so there could be some

16  problems with the structure of the cap.  There could be some

17  erosion and -- and movement of the cap, as well.

18  Q    And if there were erosion or movement of the cap, that

19  -- what would be the effect of that?  Could that undermine the

20  efficacy of the remedy?

21  A    Yes.

22  Q    Okay.  Now let's just stay with that for a second.  Is

23  there a way to track and manage the issue of the -- of the

24  structural integrity of the cap, let's say through monitoring

25  or some other means?

1    A    Yeah, from my experience, I mean, when the -- when the

2    system is designed, I think there would be a -- a detailed

3    hydrodynamic model that would be used to try to -- to help in

4    terms of the overall design of the cap, and so hopefully that

5    work would be effective in terms of informing the design and

6    application process.

7         And then, generally, the cap is inspected at some

8    interval to make sure that it remains intact, and if there are

9    problems there's maintenance associated with it and it's --

10   it's repair or improved.

11   Q    So that is a risk that can be tracked and managed; is

12   that fair to say?

13   A    Yes.

14   Q    Okay.  And you mentioned possible recontamination.

15   Would you recommend monitoring in order to determine whether

16   that's occurring after a cap has been put in place?

17   A    Yes.

18   Q    Okay.  And is that a measure that can be effective in

19   tracking and then potentially managing that risk?

20   A    Yes, I believe so.

21   Q    Okay.  Did you -- after the Phase III report was issued

22   and you read it, did you prepare an expert report in -- in the

23   case -- that would be after the Phase III report, but before

24   the parties reached a settlement agreement?

25   A    Okay.  So just to -- to clarify things, so I -- I

1    prepared comments upon reading the individual reports, but

2    then at the end I prepared a -- a general summary report, yes.

3    Q     Okay.  So, just to try to refresh your recollection,

4    when the parties were not heading towards settlement, but were

5    heading toward another trial, did you prepare an expert report

6    in anticipation of continuing litigation?

7    A     Yes, I did.

8    Q     Okay.  And in that report, did you endorse the removal

9    of sediment, as Wood had recommended, from the Orrington

10   Reach?

11   A     Yes.

12   Q     Okay.  Now, Wood focused -- and there was a map that I

13   think you saw that was shown to the court earlier today with

14   the areas that Wood had -- Wood recommended for removal in the

15   Orrington Reach, and which side of the river were there on --

16   were they on?  Do you remember that?

17   A     Yes, on the east side.

18   Q     And were they exclusively on the east side?

19   A     That's my understanding.

20   Q     And did you recommend in your expert report,

21   Dr. Driscoll, that we look also at the west side of the river

22   for possible candidates for sediment removal?

23   A     Yes, I did.  I was concerned that the sampling was

24   rather sparse on the west side, and I thought it would be

25   prudent to -- to look to see contamination on the west side,

1    as well.

2    Q     Okay.  And did you also recommend that areas be looked

3    at, or explored, both north and south of the locations that

4    Wood identified to see whether there were other strong

5    candidates for remediation within the Orrington Reach?

6    A     Yes, I did.

7    Q     Okay.  Let's turn to dredging.  Are you familiar with

8    dredging as an environmental remediation technique?

9    A     Yes.

10   Q     To your knowledge, has dredging been implemented in

11   other contaminated aquatic ecosystems?

12   A     Yes.

13   Q     And has it been implemented successfully, in your view?

14   A     Yes.

15   Q     Would you call dredging a mature technology that is used

16   to remediate contaminated sediments?

17   A     Yes.

18   Q     What would be the environmental advantages of dredging

19   in the Orrington Reach?

20         Now we'll get to the surface deposits later, but what

21   would be the environmental advantages, if any, of dredging in

22   the Orrington part of the river?

23   A     It would remove the contaminated material from the

24   system.

25   Q     This may seem like an obvious question, but what's the

1    advantage of that?  In other words, versus some other

2    technique, let's say, to isolate the mercury.

3    A     Well, it's gone and -- and it's -- it's out of the

4    system, and, therefore, it doesn't have the potential to --

5    for organism exposure, so it's -- it's removed from the

6    system.

7    Q     Okay.  What risks, if any, would be associated with

8    dredging in the Orrington Reach?

9    A     Well, I think one of the problems is it's relatively

10   expensive, and I suppose there's possibilities of mobilization

11   of -- of material, but it's -- on the shore, I think there's

12   potential for containment of material in that -- that area.

13   So I think the big downside is cost.

14   Q     Okay.  What would be the -- let's turn now to the other

15   dredging that Wood recommended and that is included in the

16   Proposed Consent Decree that the parties have presented to the

17   court, which is dredging of the surface deposits downstream.

18   You're familiar with that --

19   A     Yes.

20   Q     -- right?

21   A     Yes.

22   Q     Okay.  And so what would be the environmental advantages

23   of dredging surface deposits in the Penobscot system?

24   A     Again, it would remove mercury from the system, and it

25   would remove mercury that potentially is connected to the

1   mobile pool.

2   Q    And just elaborate on that a little bit.  Why is it

3   important to remove from the system mercury that is part or

4   could become part of the mobile pool?

5   A    Well, I think there is mercury associated with the fine

6   particle matter.  It's -- it has a relatively high organic

7   carbon content, has a high affinity for mercury, and it can be

8   resuspended and transported throughout the system.  I think

9   that's the major mechanism by which it's been dispersed

10  throughout the system these past few decades.

11  Q    Are you concerned about the possible resuspension of

12  contaminated sediment if there is dredging of surface deposits

13  in the Penobscot?

14  A    I think that's a problem with dredging.  There's the --

15  there will be some material, some fraction of material that

16  will be lost and then could be resuspended.  But, you know,

17  when I've been on the system, my observation is that it's a --

18  it's an extremely turbulent system.  It has very high

19  concentrations of suspended matter; that's a recurring event.

20  Yeah.

21  Q    Do -- were you in court when Mr. Walter was testifying a

22  little while ago?

23  A    Yes.

24  Q    And do you recall that the judge asked a question about

25  the resuspension of mercury and -- and did you hear that

1    exchange?

2    A    I did, yes.

3    Q    And one of the things -- and, again, the record will

4    correct me if I'm wrong -- but one of the things Mr. Walter

5    indicated is that some of the material that would be dredged

6    in the surface deposits is already being resuspended.  Did you

7    hear that?

8    A    I did, yes.

9    Q    What do you think of that view?

10   A    Yeah, that's consistent with my thinking.  There's a lot

11   of sus -- resuspension deposition, resuspension deposition.

12   That's the nature of the mobile pool.  It's -- it's mobile,

13   that's why we call it the mobile pool.  And so I think it's a

14   -- a chronic feature of the system.

15        And so I think that these surface deposits, as I

16   understand them, are -- are deposits that can be mobilized and

17   -- and that's part of the reason for -- for targeting them.

18   Q    Is there any way to remove mercury from the system

19   without dredging?

20   A    Well, it can be isolated.  It can be put in some sort of

21   a containment system.  Maybe -- maybe not completely removed

22   from the system, but it would be isolated.  I mean, those are

23   possibilities, as well.

24   Q    To completely remove mercury from the system, is there

25   an alternative to dredging?

1   A     I think dredging is pretty much it, or it could be

2   exported to the ocean.  Eventually it will happen or be

3   buried, but that occurs to a limited extent, yeah.

4   Q     Do the data show that that phenomenon are happening in

5   the Penobscot at an extremely slow rate?

6   A     That is -- that is correct, yeah, they happen, but at a

7   slow rate.

8   Q     Are you familiar with permitting processes or the -- the

9   requirement that before dredging is undertaken in an aquatic

10  system, permits from government regulators need to be

11  obtained?

12  A     I am certainly not an expert.  I -- I do know the

13  process occurs, and I know it can be somewhat challenging to

14  work through.  That's about the extent of my knowledge.

15  Q     Okay.  Do you know -- and if you don't, just say so --

16  but do you know whether those permits sometimes provide

17  conditions that aim to minimize any negative impact from

18  dredging activity?

19  A     Yes, I do know that, yes.

20  Q     Okay.  And -- and they do; is that fair to say?

21  A     Pardon me?

22  Q     And -- and -- and those conditions are sometimes

23  imposed; is that fair to say?

24  A     Oh, yes, most definitely, yeah.

25  Q     Okay.  Now, in the expert report, back to that, that you

1   submitted in the litigation prior to the settlement, did you

2   support the surface deposit dredging that Wood recommended?

3   A    Yes.

4   Q    And did you also opine that more surface deposits than

5   those recommended by the Wood engineers should be removed from

6   the system?

7   A    I believe I did, yes.

8   Q    And do you remember where one of those was?

9   A    I think adjacent to Bucksport.

10  Q    And why did you recommend that that surface deposit, for

11  example, be added to the list of sediment areas to be

12  remediated by dredging?

13  A    Well, I thought when reviewing the Wood reports, I

14  thought that -- that those deposits had potential for -- for

15  removal.  I think that if we could remove a certain fraction

16  of the mobile pool, I think that that would accelerate the --

17  the recovery.  I mean, that, to me, is the most clear-cut way

18  of -- of accelerating the recovery, and so I think I -- I was

19  supportive of that approach.

20  Q    In lay terms, is it -- is it your view, Dr. Driscoll, or

21  can your view be described as the more mercury you take out of

22  the system, the better?

23  A    Yes.

24  Q    Okay.  Let's turn to the Orland River and East Verona,

25  which you mentioned earlier.  Is this an important part of the

1   ecosystem, in your view?

2   A    I think it is.  Some of the sediments there have

3   relatively high concentrations.  It's proximate to the -- to

4   the lobster fishery, where there's quite high concentrations

5   of mercury.  So, yeah -- and -- and there's also concern about

6   black ducks in that area, as well.  So I think it is an

7   important area.

8   Q    And do you think it's important to explore specific

9   remedial measures there?

10  A    I do, but, I mean, can I say something else that -- a

11  concern I have?  I really feel that that's been sort of an

12  understudied area.  I don't think it's -- it's received as

13  much attention as some of the other areas, but it is, as I

14  said, I think an area of concern because of the proximity to

15  the lobster fishery and because of the concentrations of -- of

16  sediments.  So I think it's worthy of some attention going

17  forward.

18  Q    And is that an area of the system, Dr. Driscoll, where

19  you might recommend a little further study or exploration in

20  advance of prescribing specific remedial measures?

21  A    Yeah, in general, I really would like to see that things

22  move forward as quickly as possible with the

23  restoration/remediation, but I think in that case I think

24  maybe some additional analysis would be -- would be useful so

25  some cost-effective approach could be identified because, as I

1    -- as I said, I think it's understudied.

2    Q     If -- if the Consent Decree is approved by the court, do

3    you think the trustee should consider dredging or capping to

4    remove or isolate mercury in that part of the system if

5    further inquiry demonstrates that that might be effective?

6    A     Yeah.  I mean, I think in terms of sequence, I mean,

7    maybe something could be done as part of the -- the primary

8    remedy.  I mean, we've talked a little bit about dredging of

9    surface deposits in the Verona East.  Maybe the impact of that

10   could be monitored and maybe that might inform future

11   activity, monitoring in the Orrington Reach or -- thin-layer

12   capping and then followed by monitoring in the Orrington Reach

13   might also inform things, as well.

14         So I think it would make sense if something could be

15   done there because I think the -- the lobster fishery is, I

16   think, an area of primary concern.

17   Q     The surface deposits that Wood identified and

18   recommended for dredging in its report, there were five of

19   them; is that -- do you remember that?

20   A     Yes.

21   Q     And four of them were over in the Orland River/East

22   Verona vicinity; is that right?

23   A     Correct.

24   Q     So is what you're saying that the funds for surface

25   deposit dredging in the Consent Decree might be used to target

1    some of those areas that were identified in that part of the

2    system?

3    A    Yes, hopefully they will help -- help the recovery in

4    that part of the system, yes.

5    Q    Okay.  Let's turn to beneficial environmental projects.

6    Are you familiar with that concept?

7    A    Yes.

8    Q    And are you familiar with projects that help restore

9    aquatic habitat?

10   A    Yes.

11   Q    And that help restore marsh habitat?

12   A    Yes.

13   Q    Have you done any work in the Everglades that relates to

14   this?

15   A    Yes.  And there were actually several projects in this

16   -- using this type of approach in Onondaga Lake, as well, in

17   terms of improving wetland function and stream function, yes.

18   Q    Okay.  And those were beneficial projects that were

19   associated with the remediation work in Onondaga Lake?

20   A    Yes.

21   Q    And what, if anything, can you say about the Everglades

22   that might add something to this?

23   A    Well, the Everglades is also a very complex system, and

24   I think it's -- I'm actually quite excited about it because

25   it's been going on since the Clinton Administration, and

1    really for the first time we're starting to see some -- some

2    progress.  And so I think a critical sort of lesson learned

3    from the Everglades is monitoring has been really essential

4    into the process to really evaluate the impacts of actions and

5    then inform future decisions, and so I -- I think it would be

6    prudent to follow a similar course here.

7    Q    We'll -- we'll deal with that in just a -- a moment.

8    But before we do, I want to stay on beneficial environmental

9    projects.

10        Are you aware that $20 million is set aside in the

11   Consent Decree for the purpose of funding beneficial

12   environmental projects?

13   A    Yes, that's my understanding.

14   Q    Do you support that provision?

15   A    I do.

16   Q    And do you think some -- at least some of those funds

17   could be used to assist wildlife, for example wildlife that

18   uses Mendall Marsh?

19   A    Yeah, I think wetlands would be a logical target for

20   those funds.  Wetlands are very important in terms of the

21   function of the system.  It's -- I think they're -- they're

22   quite important going forward.  You know, under sea level rise

23   and climate change, I think they're going to be, you know,

24   critical to -- to protect the system that they're functioning

25   well.  So I think those funds could be used very effectively,

1   actually.

2   Q      Based on your knowledge of beneficial environmental

3   projects in other systems, do you have a view you can share

4   with the court concerning the amount of money that's set aside

5   in the settlement for these initiatives, $20 million?

6   A      Yeah, I think a lot of -- a lot of very good projects

7   could be done for that -- those funds.  I'm -- I'm encouraged.

8   That could be a great opportunity for the region.

9   Q      Now, let's turn to, I know, a favorite subject of yours,

10  which is long-term monitoring.

11         The Consent Decree, as you know, provides for up to $20

12  million, if you count the contingent funds, over a minimum of

13  30 years and a maximum of 45 years.  Are you familiar with

14  that?

15  A      Yes, I am.

16  Q      And this an important provision, in your view, in the

17  Proposed Consent Decree?

18  A      Yeah, I think it's absolutely critical.

19  Q      And could you explain to the court why, please?

20  A      Well, it really tracks -- it helps track what is the

21  rate of recovery, and I think that that's important, and I

22  think it's also somewhat -- somewhat uncertain.  So I think it

23  can help refine that.  And it also provides guidance on the

24  effectiveness of remediation -- remedial measures that have

25  been implemented.

1        And so from learning from those what works and what

2    doesn't work, then going forward the funds can be used more

3    effectively, you know, in the future.

4    Q     And is that because you could adapt or adjust remedial

5    techniques or measures in response to the results of long-term

6    monitoring?

7    A     Most definitely.

8    Q     Okay.  Now, would you recommend that consistent

9    monitoring be done in terms of methods, species, locations?

10   A     Yeah, I can't emphasize that enough.  I think one of the

11   challenges we've seen in this project is that methods have

12   changed, procedures have changed during the course of the

13   investigation, and there is a lot of year-to-year variability

14   just due to climatic factors, and so it's really critical to

15   follow -- to establish methods that you think make sense on

16   the front end and then really follow those through as much as

17   possible.  I mean, if something is not working, obviously, you

18   want to go to an alternate approach, but I think consistent

19   methodology going forward so you're making the same types of

20   measurements.  And change is not due to a -- a change in

21   method; it's due to some environmental change that you want to

22   track.  I think that that's -- I mean, if you want to use

23   monitoring as an effective tool, I think having methods that

24   are consistently applied is -- is absolutely essential.

25   Q     And is it important, in your view, Dr. Driscoll, to

1   monitor across a range of trophic levels in biota?

2   A    Yeah, well, that's a very interesting and important

3   question.  I think it's important to monitor sort of the --

4   the media, the sediments, and maybe the water, and then I

5   think that the biggest advantages, I think, where you can see

6   things happen the quickest, are in the small organisms, the

7   organisms that have shorter life history stages that are --

8   generally tend to stay in one particular area.

9        I know in Onondaga Lake part of the monitoring program

10  and one of the goals was to recover the prey species, the very

11  small fish that the bigger fish eat, and I was astounded how

12  rapidly they recovered.  They recovered virtually

13  instantaneously and achieved those remediation goals in very,

14  very short order.

15       Now, people don't care about small fish; they care about

16  big fish.  And so I think, also, you know, so the community

17  understands what is happening, I think some of the resources

18  need to be targeted towards game fish that people are

19  concerned with, and other organisms maybe, maybe ducks and

20  birds.  But those recover -- those have a much larger range, a

21  lot of variability, and so it's -- it's -- it's hard to track.

22  So, you know -- and for -- going back to Onondaga Lake, which

23  is a much simpler system.  I mean, we started the remediation

24  in 2001, and the fish -- the game fish have come down a long

25  ways, they've come down more than 50 percent, but they're

1  still a long ways away from the target level.  They're much,

2  much better than they were.  But they're still -- they're not

3  yet a consumable fishery, even though the prey fish responded

4  virtually.  So they -- they take a much longer time to -- to

5  recover.

6      So I think going across the system makes a lot of sense

7  because you're going to get a better handle on -- on what is

8  happening and what are the dynamics of recovery.

9  Q    And when you say across the system, do you mean sampling

10  at a -- across a range of trophic levels?

11  A    Yes, and spatially, across different areas within the

12  system, as well.

13  Q    I want to ask you a few questions about Mendall Marsh.

14  Amec recommend -- not Amec -- Wood recommended thin-layer

15  capping in Mendall Marsh.  You're familiar with that?

16  A    Yes, I am.

17  Q    And they were going to cap, I think Mr. Walter said and

18  the report reveals, about half of the acreage in the marsh; is

19  that right?

20  A    That's my understanding.

21  Q    And would you support -- again, this is outside the

22  context of settlement -- but when you looked at that, would

23  you support pilot testing of that remedy that Wood

24  recommended?

25  A    You know, I -- I -- I did at the time.  I think that

1    Mendall Marsh is an important piece of the system, and it has

2    very high concentrations of methylmercury.  It produces

3    methylmercury very effectively, and concentrations in the

4    organisms in there are fairly high, so it's consistent with

5    this.  But I also understand that wetlands are very important

6    and sensitive habitat, and we want to protect them, we want to

7    make sure that they function effectively over the long-term.

8         I think -- you know, my opinion, I think it's a

9    reasonable approach to take and there is obviously some risk

10   associated with it.  That's why doing some pilot testing, I

11   thought, would be -- would be advised.  I also am concerned

12   about sea level rise.  I think that this area is potentially

13   experiencing relatively high rates of sea level rise, and I

14   think, you know, there might be some opportunities to have

15   co-benefits associated with some of the remediation to try to

16   mitigate against the sea level rise and climate change.

17   Q    And would those benefits flow from cap that would, in

18   effect, raise the marsh platform?

19   A    Potentially.  I mean, this is somewhat out of my area of

20   expertise --

21   Q    Yeah.

22   A    -- but I do deal with sea level rise down in the

23   Everglades, and I know it's a pretty challenging issue.

24   Q    Understanding it's not in the center of your expertise.

25   Are you aware, though, that -- withdrawn.

1          Is there a risk, in your view, that the thin-layer cap

2   that Wood proposed for the marsh wouldn't work?

3   A    Yes.

4   Q    And was one of the reasons why you favor the pilot test

5   to explore that because there is a risk that it might not

6   work?

7   A    Most definitely.

8   Q    Okay.  And is there also a risk, if you're aware of

9   this, that regulators, in light of the sensitivity of marsh

10  environments, that state regulators might not allow a

11  thin-layer cap in Mendall Marsh?

12  A    Yeah, I think that's a very likely potential occurrence,

13  yeah.

14  Q    And so is there a risk that pursuing that remedy in the

15  context of this situation might consume a lot of time and

16  money and not lead to any actual remediation on the ground?

17  A    Yes.  Yes.  I think Mendall Marsh is an interesting sort

18  of case study.  I think it -- it sort of has -- it's extremely

19  important because of production of methylmercury, but it's --

20  it's a challenging site to work in so -- for -- for sure.

21  Q    Okay.  I'm going to ask you a series of closing

22  questions because I think you've covered most of the ground

23  that -- that we needed to cover, and just elicit your views on

24  a number of subjects here.

25          Is there, Dr. Driscoll, a foolproof way to cleanse the

1    Penobscot of mercury?

2    A    No.

3    Q    Okay.  And if you removed all of it, let's say you

4    dredged all of it, that would take a very long time, wouldn't

5    it?

6    A    Yes.

7    Q    And it would cost billions of dollars?

8    A    Yes, and I'm sure it would change the system forever,

9    yes.

10   Q    It could create considerable disruption in the system

11   and in the communities; is that correct?

12   A    Yeah.

13   Q    Okay.  Is it a matter then, in your view, not of

14   cleansing the system immediately, but rather speeding its

15   recovery?

16   A    Yes.

17   Q    And in that light, are the approaches proposed in the

18   parties' Consent Decree reasonable from an environmental

19   engineering standpoint?

20   A    I believe so, yes.

21   Q    And just reinforcing a point I think you've made, is

22   there a need to monitor carefully the effects of whatever

23   actions are taken?

24   A    Yes.  As I said, I think that's critical.

25   Q    Okay.  And the Consent Decree does provide a substantial

1   amount of money for that; is that correct?

2   A    Yes, I was happy to see that.

3   Q    Okay.  Do you think the Phase I, Phase II, and Phase III

4   studies provide a firm basis for implementing the remedial

5   measures that are proposed in the Consent Decree?

6   A    Yeah, I think we've learned a lot from that, and I think

7   that this is a -- this is a reasonable outcome, yes.

8   Q    And are the studies, such as the ones that were done in

9   this case, are they prerequisite to designing effective

10  remediation?

11  A    Well, hopefully we've learned a lot and that will help

12  inform the design.  I think certainly they've informed what

13  Wood came up with, so yes.

14  Q    Okay.  Do you know of any mercury-contaminated coastal

15  aquatic ecosystem anywhere that has been studied as thoroughly

16  as the Penobscot Estuary?

17  A    No, not to my knowledge.  I think there's a lot of

18  information in the Penobscot, yes.

19  Q    Yeah.  And is it fair to say you -- you're familiar --

20  you're familiar with literature in this area?

21  A    Yes.  Yes, I am, yeah.

22  Q    Can any remaining data gaps, in your view, be filled in

23  during the remediation process?

24  A    Sure.  Sure.  And I think additional measurements would

25  have to be made to try to delineate areas that would be

1    targeted for remediation.

2    Q    Okay.  Is there any guarantee that the remedial measures

3    embedded in the Consent Decree will produce a particular

4    result within a particular period of time?

5    A    No.

6    Q    That said, do you have professional confidence that the

7    measures embedded in the Proposed Consent Decree, if

8    implemented, will be effective in accelerating, to some

9    degree, recovery of the Penobscot Estuary from the persistent

10   mercury contamination that is the subject of this case?

11   A    Yes.

12   Q    And if the court endorses the Consent Decree and the

13   trustee overseeing the implementation of remedies forms an

14   advisory committee to help guide it through the implementation

15   of remedial measures, will you be willing to serve on that

16   advisory committee?

17   A    Yeah, if asked, I'll be happy to help out.

18        MR. BERNARD:  I have nothing further, Your Honor.

19   Thank you, Dr. Driscoll.

20        THE COURT:  Thank you very much.

21     Cross-examination?

22        MR. TALBERT:  Your Honor, as Mr. Bernard stated

23   earlier, the parties don't agree on all of the facts in the

24   case.  Obviously, we have Dr. Reible that we'll call later.

25   In the nature of the settlement and compromise, we've decided

1    and agreed upon not cross-examining the witness.

2              THE COURT:  Okay.  Fine.  Thank you very much.  Nice

3    to see you again, doctor.

4              THE WITNESS:  Yes.  Good to see you.  Thank you.

5              THE COURT:  Thank you.

6         (The witness left the witness stand.)

7              MR. BERNARD:  Your Honor, may we recall Mr. Walter?

8              THE COURT:  Yes.

9         (Mr. Walter resumed the witness stand and the following

10   proceedings transpired.)

11             THE COURT:  You may proceed.

12             MR. THOMPSON:  Thank you.

13                    CONTINUED DIRECT EXAMINATION

14   BY MR. THOMPSON:

15   Q    Good afternoon, Mr. Walter, welcome back.

16   A    Thank you.

17   Q    You understand you're still under oath?

18   A    Yes, thanks.

19   Q    So when we left off earlier we were just talking about

20   the surface deposit dredging that Wood had recommended as part

21   of a Phase III Engineering Study report; do you remember that?

22   A    Yes, yeah.

23   Q    And I have a couple of lingering questions about the

24   surface deposit dredging.  First, were there any further data

25   gaps or sort of data needs for implementing and designing that

1   remedy that were identified as part of the Phase III study?

2   A     Yes.  There was relatively few samples that were

3   collected within the surface deposits, so additional sampling

4   to identify the depth of the deposits --

5        Are you hearing me okay?

6             THE COURT:  Yeah.

7   A     The depth of the deposits and then also defining the

8   location of the deposits would be helpful.

9   BY MR. THOMPSON:

10  Q     And then I think you mentioned several times that the

11  deposits are thought to move around the system seasonally and

12  at different times.  Were there any concerns that the deposits

13  might move so much that it would be difficult to target them

14  for removal?

15  A     I think that's a -- it's a possibility, but I think a

16  small possibility.  We -- we saw them back in the same place

17  in two -- two different sequential years, and that we believe

18  that there's places that -- that trap sediments within the

19  estuary.

20  Q     All right.  Let's turn to talking about the thin-layer

21  capping in Mendall Marsh that was another of the

22  recommendations in the Phase III Engineering Study report, and

23  I'd like to pull up an exhibit which is Figure 8-2 from the

24  Phase III Engineering Study report, Joint Exhibit 5.  Do you

25  see that figure in front of you on the screen?

WALTER - CONTINUED DIRECT EXAMINATION - THOMPSON          155

1    A      Yes, I do, yeah.

2    Q      And just to recap for us, what exactly is the remedy

3    that was proposed in Mendall Marsh in the Phase III

4    Engineering Study report?

5    A      The -- the remedy for Mendall Marsh that was proposed

6    was to cap the lower elevations of the marsh.  So those are

7    the pink and dark blue locations that are less -- the

8    elevation less than 7.5 feet, and then in addition, to cap 20

9    percent of the higher elevation of the marsh which is greater

10   than 7.5 feet and shown in the light green color on the

11   figure.

12   Q      And what -- could you describe the cap that's proposed

13   in a little bit more detail?

14   A      Yes, the cap would have been a three-inch -- three-inch

15   sediment or sand cap that would be placed on top of the marsh.

16   So the -- the concept would be that the -- the cap materials

17   would be either like land-applied or sprayed on to the marsh

18   to achieve this thickness of a cover.

19   Q      Why was this area in -- this Mendall Marsh area targeted

20   for active remediation, or proposed to be targeted?

21   A      So I think as other people have mentioned before, you

22   know, there's -- there's high levels of mercury in the marsh.

23   There's -- I mean, No. 1, there's high levels of mercury in

24   the birds that frequent Mendall Marsh, which -- which drove

25   the risk decisions for us to suggest capping of the marsh, and

1  then -- and then as other people have mentioned, there's high

2  levels of mercury in the marsh sediments, and -- and also

3  efficient methylation, changing that total mercury into

4  methylmercury.

5  Q    As Wood was evaluating the concept of doing thin-layer

6  capping in Mendall Marsh, did you identify any risk of

7  environmental harm from the thin-layer capping in the marsh?

8  A    Yeah, definitely.  We thought there was a risk.  As I

9  said to our project team over and over again, we don't want a

10  big swath of dead grass in the marsh.  That we want to make

11  sure that whatever we do in the marsh doesn't kill the -- the

12  habitat and the -- and the marsh vegetation.

13  Q    What uncertainties or sort of further data gaps existed

14  with respect to designing and implementing a thin-layer cap in

15  Mendall Marsh?

16  A    There were also questions -- there was also -- is that

17  me?  Maybe I'm too close.

18      There were also questions about the -- the effectiveness

19  of capping in the marsh.  There has not been a lot of capping

20  done for -- for environmental -- for remediation in marshes.

21  And the question was whether there would be sufficient or

22  adequate biota recovery as a result of the capping.

23  Q    And as part of the recommendation for thin-layer capping

24  in Mendall Marsh, was there a pilot testing component to that?

25  A    Yes, we suggested two pilot tests.  We suggested an

1    initial pilot test to look at impacts to the plant life in the

2    marsh and then a second pilot test to look at sort of wider

3    scale pilot test to look at the effects on biota.

4    Q     And would that wider scale pilot test also help evaluate

5    the stability of the cap and whether it stays in place on the

6    marsh over time?

7    A     Yes.  Yes.

8    Q     Okay.  Did the Wood team look into the life of the cap,

9    how long a cap would remain effective over time within Mendall

10   Marsh?

11   A     I think we projected -- I don't recall exactly -- maybe

12   25 or 30 years for an effective life for the cap, considering

13   that the cap may be -- may be recontaminated over time.

14   Q     So would that create a risk that with capping there

15   might be a need to reapply the cap at some period?

16   A     Yes, certainly, yeah.

17   Q     And then what about permitting or regulatory-type

18   issues, did Wood look into permitting issues for a cap in

19   Mendall Marsh at all?

20   A     Yeah, there was definitely concerns about being able to

21   obtain permits and approval for placement of material in the

22   marsh.  The marsh is a sensitive habitat, and there's lots of

23   restrictions on what can be done in -- in wetlands.

24   Q     Let's talk a little bit about long-term monitoring.  Was

25   long-term -- or let's talk first about monitoring in general,

1    actually.

2         What monitoring was recommended as part of the Phase III

3    Engineering Study report?

4    A     In general terms, we recommended three types of

5    monitoring -- preremediation monitoring or predesign

6    monitoring to -- to conduct some of these evaluations before

7    the remedies are implemented, and then remediation during and

8    immediately after monitoring to -- to make sure that the

9    remedy was in removing sediment, for example, or capping, or

10   like cap thickness, and then, third, would be like long-term

11   monitoring which would go on for a period of time, I think we

12   recommended 45 years, to assess the long-term biological

13   recovery as a result of the remediation.

14   Q     And what did -- as part of that long-term monitoring

15   program, what would be monitored over that 45 years?

16   A     In general terms, water, to look at the water column in

17   the river, sediment in various places, and then I believe it

18   was ten species of biota.

19   Q     And how -- did Wood make a recommendation about how

20   frequent the monitoring should be?

21   A     Yeah.  In general, every third year, so triannually.

22   Q     Let's turn to talking a bit about the costs and

23   durations that were estimated for each of the recommended

24   remedies in the Phase III Engineering Study report.

25        First of all, on cost estimates, how did Wood go about

1    deriving cost estimates sort of at a -- at a high level?

2    A     They were -- the cost estimates that we developed were

3    bottoms-up cost estimates and used -- and also used, you know,

4    prices.  So, for example, in some cases we used -- we

5    estimated the amount of equipment that would be used and the

6    cost of the equipment, the length of time it would take, the

7    -- the labor that would be involved for that duration of time,

8    and then -- and then developed a cost estimate using that

9    approach.

10         And then in other cases, we used unit price estimate.

11   For example, we might estimate it takes -- I don't know --

12   $300 a cubic yard to dredge sediment and used that as a -- as

13   a unit price-type estimate and multiplied times the number of

14   cubic yards of sediment.

15   Q     So to be clear, you were basically getting cost

16   estimates for kind of each different piece of a remedy and

17   then adding them up to get to the total cost; is that a

18   summary?

19   A     Yes, that's correct, yeah.

20   Q     What was the target accuracy for the cost estimates that

21   were generated in the Phase III Engineering Study report?

22   A     We targeted an accuracy of plus 50 percent or to minus

23   30 percent.  So the -- the range would be that a remedy may

24   cost up to one-and-a-half times the cost we estimated or may

25   be a third less the cost.

1    Q     And what's -- what's the basis for that accuracy range?

2    A     That's a typical -- that's a typical level of accuracy

3    for a feasibility study-level estimate in an engineering

4    study, and that's consistent with the Superfund process, which

5    -- which has specific criteria of plus 50 and minus 30 for

6    feasibility studies.

7    Q     Let's talk briefly about the actual cost and duration

8    estimates, and I'd like to pull up Joint 109 so we have

9    something to look at for this part of the discussion.  All

10   right.

11         Mr. Walter, do you see what has been previously marked

12   Joint Exhibit 109 on your screen?  It's a document entitled

13   Summary of Estimated Costs and Duration of Recommended

14   Remedial Alternatives in Phase III Engineering Study Report?

15   Do you see that?

16   A     Yes.

17   Q     And have you seen this document before?

18   A     Yes, I have.

19   Q     And does this table accurately summarize the total costs

20   and duration estimates that are embodied for the recommended

21   remedies in the Phase III Engineering Study report?

22   A     Yes, for the recommended remedies, yes.

23   Q     So starting with the costs, could you take us through

24   how -- how the -- the costs for the individual component

25   remedies add up to the total costs that we see over on the

1    right-hand side of Joint Exhibit 109?

2    A    So I think I explained a little bit earlier about

3    beneficial reuse versus landfill disposal, and that's sort of

4    the difference in the two levels of cost estimates.  So for

5    beneficial reuse, the sediment that's dredged from the river

6    would be put to beneficial reuse at a lower cost or disposed

7    of in a landfill at a higher cost.

8         So -- so looking at the column under the Orrington

9    Reach, this $54 million estimate assumes beneficial reuse and

10   the $73 million estimate assumes landfill disposure --

11   disposal.  So -- and then these costs are added across that

12   row to produce a total cost, and those total costs were

13   estimated at basically $250 million to $330 million.

14   Q    And so the low end is if the dredging was with

15   beneficial reuse and the high end cost estimate is if the

16   dredging had to use landfill disposal?

17   A    That's correct, yeah.

18   Q    And then looking at the estimated durations for each of

19   these recommended remedial alternatives, could you just walk

20   us through how you went about deriving duration estimates for

21   each of the alternatives?

22   A    The -- so there's three different parts -- there's two

23   different parts to the -- to the time estimate:  One is sort

24   of the -- the lead time, the predesign investigation and

25   design and permitting part; and then there's the actual

WALTER - CONTINUED DIRECT EXAMINATION - THOMPSON                    162

1    implementation part.  And then, of course, following that is

2    the -- is the long-term monitoring.

3         So -- and the design and permitting was basically

4    estimated based on past projects' experience.  Recognizing

5    that it's a complex system, that there's a fair amount of data

6    that would be needed to be obtained prior to design and

7    permitting, and that the permitting process may take some

8    time.

9         And then the implementation was based on probably a more

10   exact science of the amount of equipment that would be used

11   and the amount of labor, and then the length of time that it

12   would take to implement those remedial actions.

13   Q    And looking at the total duration for sort of the three

14   active components of the remedy -- the Orrington Reach

15   dredging, the surface deposit dredging, and the Mendall Marsh

16   thin-layer capping -- is it accurate that the total durations

17   for those ranged from five years for the Orrington Reach to --

18   and then seven years estimated for the surface deposit

19   dredging, and 13 years for the Mendall Marsh capping; is that

20   correct?

21   A    Correct.  And these -- these would be done concurrently,

22   basically, but with the caveat that, you know, the Mendall

23   Marsh pilot testing and -- would be done concurrently with the

24   other remedies, but the actual remedy in Mendall Marsh would

25   not be implemented until the other -- until the dredge

1    remedies were completed.  The concept being that, you know, as

2    we mentioned earlier, that if sediments are disturbed during

3    the dredging process, we don't want them to redeposit on a

4    newly capped Mendall Marsh.

5    Q    And then --

6         THE COURT:  I'd ask a question about this beneficial

7    reuse and landfill disposal.

8                         EXAMINATION

9    BY THE COURT:

10   Q    So you get a bucketful of mud --

11   A    Hm-hmm.

12   Q    -- from the Orrington Reach and you place it on the

13   land, then you dewater it.  Is there a way to leach mercury

14   out of the soil?

15   A    It's -- yes -- I'm going to give you two answers.  So

16   the first answer is that as you dewater it, there's likely

17   going to be some mercury that travels with the water into the

18   water column, and then the water would have to be treated

19   prior to discharge back to the river.

20        And then the second part of the answer that you may have

21   really been asking about is, is there a way to treat the

22   sediment to remove the mercury, and people have tried

23   different things to do that, but -- but it's very expensive

24   and not very effective.  The mercury's really tightly bound to

25   the organic material in the sediment.

1    Q     So if you know the amount of mercury, which I assume you

2    do because you've recommended that it be dredged in that area,

3    for example --

4    A     Hm-hmm.

5    Q     -- why can't you predict whether or not the amount of

6    mercury would be subject to beneficial reuse as opposed to the

7    landfill disposal?

8    A     I think the -- the question is, is whether there would

9    be a place to put it.  The -- the Maine Department of

10   Environmental Protection suggested to us that there may be

11   quarries.  You know, this is -- this is a lot of material.  So

12   it's over a -- we recommended over a million cubic yards of

13   material.  So that's -- you know, if a regular dump truck

14   holds, say, 10 cubic yards, that's 10,000 truckloads of

15   material.  It's a lot of stuff.  So -- so we would have to

16   find a place that would be -- have sufficient capacity to take

17   that amount of material.

18              THE COURT:  Okay.  Thank you.

19              THE WITNESS:  Does that help?  Yeah.

20                    CONTINUED DIRECT EXAMINATION

21   BY MR. THOMPSON:

22   Q     So just to follow up on that.  With respect to

23   beneficial reuse, as part of the Phase III study and the

24   alternatives evaluation, did -- did Wood do some work to try

25   to evaluate whether sediments from the estuary might be able

1   to be beneficially reused?

2   A     Yes, we -- well, primarily we explored it with the Maine

3   DEP to see if -- if that reuse would be acceptable.  So we met

4   with them a few times over the course of the project to -- to

5   go with various questions about the river and what would be

6   acceptable and what would be permittable, and -- and some of

7   those discussions were -- was about beneficial reuse, and we

8   had specific discussions with them about that.

9         Let me -- I want to just add, also, just sort of

10  informationally, you know, mercury is a real problem in

11  aquatic systems.  You know, we -- we came up with a -- a

12  cleanup goal of 500 nanograms per gram total mercury, but in

13  -- in -- in upland areas where people may be exposed to

14  mercury directly and it's not bioaccumulating through the

15  aquatic cycle, you know, levels ten or a hundred times that

16  might be acceptable.  So -- so I do -- I just want to mention

17  that in terms of beneficial reuse, that -- that placing it

18  someplace upland where it's not exposed to water is -- is a

19  good solution.

20  Q     And I believe it was as part of the alternatives

21  evaluation report, did Wood do some testing to look at sort of

22  the chemical composition of the sediments and see whether it

23  would meet beneficial reuse criteria?

24  A     Yes, we did.  And -- and to look at whether it would be

25  acceptable to place in a landfill because some of the

1   landfills have also acceptance criteria that they use.

2   Q    And what did you find from doing that analysis?

3   A    We -- we thought that the material would be acceptable

4   for both -- for beneficial reuse and for land filling -- with

5   the one caveat that it needed to be stabilized enough or dried

6   enough or mixed with cement dust to -- to stabilize the

7   material and make it dry enough to -- to transport and then to

8   place in a landfill or other beneficial place.

9   Q    So at the end of the day, it wasn't sort of the chemical

10  composition that you thought would be the limiting factor for

11  beneficial reuse, it was more the question of are there

12  projects or places where this material could be beneficially

13  reused?

14  A    Correct, yes, yeah.

15  Q    Let's just talk briefly about the duration of the

16  long-term monitoring.  You estimated 45 years for long-term

17  monitoring, correct?

18  A    Right.

19  Q    And would there also then -- within that sort of 45-year

20  period, what did Wood estimate by way of sort of how quickly

21  we would see changes in sediment and then in biota after

22  active remedies are implemented?

23  A    I believe that we estimated that after about 25 years

24  that we would see sufficient recovery to mitigate risk.

25  Q    So the idea is that there would be implementation of

1    remedies and then you'd start -- you'd see the effects in the

2    sediment and then eventually you'd see effects in the biota

3    and that would be revealed over the course of that long-term

4    monitoring --

5    A     Right.

6    Q     -- period; is that accurate?

7    A     Right, and we recommended longer monitoring in the event

8    that -- that recovery didn't take place as fast or that

9    recovery stalled or that -- or that we saw some negative --

10   negative impacts after the -- after the -- after the system

11   had recovered.

12   Q     Let's talk just briefly about the evaluation criteria

13   that you mentioned earlier about whether a technology was

14   innovative or had been used successfully before in other

15   locations.

16         With respect to the dredging in the Orrington Reach,

17   what did Wood conclude about whether it was a proven or

18   innovative technology?

19   A     So we concluded that dredging is a proven technology and

20   has been widely used.

21   Q     And is that applicable both in the Orrington Reach and

22   for the surface deposits?

23   A     Yeah, for both, yeah, correct.

24   Q     And what about the thin-layer capping in Mendall Marsh?

25   A     We concluded that was innovative, that it's been used in

1   other places for -- for repair of damaged marshes, but really

2   hasn't been used very much, or if at all, for remediation.  So

3   that would be an innovative use.

4   Q     I also want to talk a little bit about the adaptive

5   management options that were presented in the Phase III

6   Engineering Study Report.

7         So, first of all, were there adaptive management

8   remedies that were described in the report in addition to the

9   recommended remedies we've been talking about?

10  A     Yeah, we -- we recommended two adaptive management

11  remedies, and -- and the concept being that if -- if the

12  original three recommended remedies didn't look like -- that

13  it was -- that -- that the river was going to recover fast

14  enough, that some of these other remedies might be tried.

15        So the two remedies were -- one was use of enhanced

16  monitored natural attenuation in the Orland River, so that

17  would be adding clean sediments to the Orland River and having

18  those sediments mix with and cover the contaminated sediments.

19  And the second one was a more aggressive remedy, which was

20  dredging up to 1.8 million cubic yards of material in the East

21  Channel of the -- the East Channel by Verona Island and in the

22  Orland River.

23  Q     Let's take a quick look at Figure 8-6 in Joint Exhibit

24  5, the Phase III Engineering Study report, to sort of

25  illustrate these adaptive management remedies.  And do you see

1    Figure 8-6 on your screen in front of you?

2    A    I do, yes.

3    Q    So just at a high level, let's start by talking about

4    the enhanced monitored natural recovery as an adaptive remedy

5    in the Orland River.

6         First of all, where would that take place?

7    A    So the Orland River is the -- is the section of the

8    river in the upper right-hand part of the figure.

9    Q    I think you can sort of draw a circle around it on the

10   map --

11   A    Oh, okay.

12   Q    -- if you'd like.

13   A    Oh, I didn't know that.  Thank you.  So right -- right

14   in here.

15   Q    And could you describe, please, what enhanced monitored

16   natural recovery in the Orland River would entail?

17   A    Yes, it would be adding -- adding clean sediment to the

18   river and allowing it to disperse and mix with and cover the

19   contaminated sediments.  And I don't recall the exact volume

20   that we recommended; it might have been a hundred thousand or

21   200,000 yards of material.

22   Q    And earlier you testified that enhanced monitored

23   natural recovery is a system-wide remedy, had -- was not

24   recommended; is that correct?

25   A    Correct, yes.

1   Q     So why did Wood think that enhanced monitored natural

2   recovery in the Orland River was an alternative worth

3   retaining, at least as an adaptive approach?

4   A     One reason is it's a smaller area, so there's less

5   disturbance, and that it's a -- it's a little bit more limited

6   and might be easier to obtain permits and approvals to -- to

7   do this.

8         The other reason was that we felt that it was -- be

9   difficult to do a dredging remedy in the Orland River or a

10  capping remedy because of the shallow depths.  It would be

11  difficult to be able to get equipment in to do a dredge or a

12  cap remedy.

13  Q     Where did the idea for enhanced monitored natural

14  recovery come from?

15  A     The first -- it came out of the Phase II study.  I think

16  John Rudd had recommended it as part of the Phase II study.

17  Q     And as far as being a proven or innovative remedy, what

18  did Wood conclude with respect to enhanced monitored natural

19  recovery?

20  A     That -- that it's an innovative remedy.  We don't know

21  of any place that it's been used before.

22  Q     In light of that, what further studies or uncertainties

23  would need to be resolved before proceeding with enhanced

24  monitored natural recovery in the Orland River?

25  A     All right.  So during design or prior to design, it

1   would be important to develop a -- a flow model, a

2   hydrodynamic flow model, and to try to predict where sediment

3   might be transported as it's added to the river.  I think that

4   -- did that answer your question?  I'm sorry.

5   Q    Yeah, so there would be a -- a modeling component as an

6   initial step to evaluating enhanced --

7   A    Right.

8   Q    -- monitored natural recovery?

9   A    Yes.

10  Q    And then would there also be any pilot tests or further

11  studies needed after the modeling?

12  A    Yes, yeah, pilot study would be important also to just

13  verify the results of the model and make sure that if we put

14  clean sediment in that it ends up where we think it will end

15  up.

16  Q    And if enhanced monitored natural recovery were to go

17  ahead in the Orland River, what would -- what would you be

18  trying to accomplish in the end?

19  A    The goal would be to reduce the surface levels of

20  contamination in the Orland River and therefore -- do a couple

21  things, reduce the -- the levels of mercury that would be

22  exposed to biota locally and then also if there was erosion in

23  the river that sediments would be at a lower concentration

24  that would be transported down into the upper Penobscot Bay.

25  Q    Let's talk briefly, then, about the adaptive management

WALTER - CONTINUED DIRECT EXAMINATION - THOMPSON                   172

1    dredging option that you described -- the dredging on the east

2    side of Verona Island and the Orland River.

3    A      Hm-hmm.

4    Q      What would that adaptive management remedy entail?

5    A      So that -- that's another dredging remedy that would be

6    implemented similarly to the Orrington Reach, where sediments

7    would be dredged and then taken to a land site facility for

8    dewatering and then eventual disposal.  And -- and as I've

9    said before, I believe the volume estimate for that was large,

10   1.8 million cubic yards.

11   Q      And looking at Figure 8-6 from Joint Exhibit 5, the

12   Phase III Engineering Study Report, could you please explain

13   where that dredging would take place in this part of the

14   system?

15   A      Yeah, I think it's probably better if I don't draw on

16   the map, but all the places where you see cross-hatched areas.

17   So it's -- it's not in the channel of the river, but it's in

18   the intertidal -- primarily in the intertidal areas along the

19   river and in -- in some of the marshes.

20   Q      Let's turn briefly to look quickly at the cover page of

21   the Phase III Engineering Study Report.  And is that your

22   signature on the cover page of the report, Joint Exhibit 5?

23   A      Yes, that's correct.

24   Q      What does it signify that you signed the Phase III

25   Engineering Study report?

1    A     So as -- as a project manager, you know, we learn in --

2    in consulting that if you're the project manager, you own the

3    project.  If it goes badly, you -- you own it, no matter if

4    somebody else made a mistake on it or not, you -- you're

5    responsible for it.  So that's -- that's what it means, that

6    -- that I'm responsible for this project and that -- that I

7    led it and -- and that I agree with the recommendations in the

8    report.

9    Q     And do you stand by the recommendation in the Phase III

10   Engineering Study Report to pursue targeted active remediation

11   in the Penobscot River Estuary?

12   A     I do.  I think it was a good recommendation and I -- and

13   I fully stand by it.

14         MR. THOMPSON:  All right.  Your Honor, at this

15   point, I'm going to turn the examination of Mr. Walter over to

16   Mr. Piper.

17         THE COURT:  Very good.  Thank you.

18       Mr. Piper?

19         MR. PIPER:  Thank you.

20                     CROSS-EXAMINATION

21   BY MR. PIPER:

22   Q     Good afternoon, Mr. Walter.

23   A     Hi.  How are you?

24   Q     Good.  How are you?

25   A     Good.  So far.

WALTER - CROSS-EXAMINATION/PIPER                          174

1    Q      Are you familiar generally with the terms of the

2    parties' proposed settlement and Consent Decree in this

3    matter?

4    A      I am, yes.

5    Q      And do you recall when and how you first became aware of

6    that?

7    A      Yes, I learned about it in March when the -- when the --

8    when it was first published.

9    Q      And have you done anything since then to familiarize

10   yourself with the Proposed Consent Decree?

11   A      Yes, I've read the -- the summary that's published on

12   the NRDC website, and I've also read through the Consent

13   Decree.

14   Q      So are you aware of the work, the remedial alternatives

15   that are proposed in the Consent Decree?

16   A      Yes, I am.

17   Q      And what is your overall reaction to that?

18   A      Overall positive.  It's -- the -- the remedies that are

19   proposed in the Consent Decree are similar to what was

20   proposed in the Phase III Engineering Study.

21   Q      Okay.  And I'd like to walk through some of that work

22   one by one, if that's okay.

23          Turning first to the Orrington Reach, as you covered

24   with Mr. Thompson a moment ago, the Orrington Reach was

25   addressed in Wood's recommendations, correct?

1   A      That's correct, yeah.

2   Q      And I want to clear something up for the record.   I

3   think when you were answering a question of the court's, you

4   mentioned some dredging that Mallinckrodt had done in that

5   area.  That wasn't dredging that had been recommended by Wood,

6   correct?

7   A      No, that was part of a different project.

8   Q      That --

9   A      I believe it was part of the settlement work that

10  Mallinckrodt had done with the Maine Department of

11  Environmental Protection.

12  Q      Was that southern cove dredging?  Does that ring a bell?

13  A      That's correct.

14  Q      Okay.  Did you have an understanding of whether the

15  Consent Decree proposes work in the Orrington Reach?

16  A      Yes, the Consent Decree proposed capping of a hundred --

17  about 130 acres of area within that same area that we

18  recommended with a -- with an estimated budget of $50 million.

19  Q      Okay.  So, generally, how does that differ from Wood's

20  proposal?

21  A      So the differences that we -- we recommended dredging,

22  so removal of that material from the river, whereas the

23  Consent Decree recommends capping or covering of the sediments

24  to try to prevent biological exposure.

25  Q      And is capping generally an established remedial

1   technology?

2   A       Yes, yeah.

3   Q       Can it be an effective remedy?

4   A       Yes, it can, if it's designed correctly and constructed

5   correctly.

6   Q       And can it be effective in keeping mercury out of the

7   food web?

8   A       Yes.

9   Q       How does it do that?

10   A       The capped materials basically -- the clean cap

11   materials basically separate the biota from the mercury.  So

12   by -- by placing those cap materials over the contaminated

13   sediment, insects and bugs and small fish that may feed in

14   that -- in those areas are not exposed to the mercury in the

15   contaminated sediments below.

16   Q       Are there any potential benefits to capping compared to

17   dredging?

18   A       There's -- there's a couple:  One is that it's less

19   expensive generally than dredging; and dredging sometimes, as

20   we've talked about before, can disturb sediments and cause

21   transport of contaminated sediments downstream.  And so

22   capping would generally be less -- less disturbance and -- and

23   not have as many risks with regards to recontamination.

24   Q       Provided that it's designed to remain in place in a

25   particular location, can capping accomplish the same goals as

1    dredging?

2    A    Yes, yeah.

3    Q    And do you think it's possible that a cap could be

4    designed to stay in place in the Orrington Reach?

5    A    I believe that it can be.

6    Q    Are you familiar with Dr. Danny Reible?

7    A    Yes.

8    Q    Do you think his expertise on capping would be helpful

9    in determining whether a cap could remain in place in that

10   area?

11   A    Yes, I -- I don't know him well personally, but I

12   understand that he's worked on several different capping

13   projects and is -- is an expert in that area.

14   Q    So do you think capping is a reasonable alternative to

15   Wood's dredging proposal in the Orrington Reach?

16   A    Yes, but with the caveat, you know, we -- we recommended

17   dredging for a specific reason.  We were concerned about the

18   strong flow in the river and the potential for erosion or --

19   and then future recontamination.  So I believe that capping

20   can be an effective remedy and -- and can be adequate, but

21   with the caveat that we would -- certainly had some

22   nervousness about a capping remedy being sufficient.

23   Q    And is it your understanding that the Consent Decree

24   would include some monitoring and potential maintenance of the

25   cap in the Orrington Reach?

1    A     Yes, yeah.

2    Q     And could that address some of the concerns that Wood

3    had regarding a cap remaining in place?

4    A     Yes, I believe so.  I'll just add, I think there's a lot

5    of uncertainties in this system.  We made the best

6    recommendation we could and we -- and we thought that a

7    dredging remedy would be better in that -- in that reach, but

8    we also understand how other professionals could have other

9    opinions about how capping might be a better remedy.  So -- so

10   we understand that there's a difference of opinion, but we do

11   believe that it could be effective.

12   Q     Sure.  And I guess generally given all the uncertainties

13   in this system, is it fair to say that reasonable minds could

14   differ about what to do?

15   A     Yeah, absolutely, yeah.

16   Q     Okay.  I want to turn to the mobile sediments and

17   surface deposits.

18         This is a characteristic that Wood proposed addressing,

19   right?

20   A     Correct, yep.

21   Q     And proposed some removal?

22   A     That's right, yeah.

23   Q     Is it your understanding that the Consent Decree

24   proposes addressing mobile sediments and surface deposits, as

25   well?

1  A     Yes, and I'm -- I'm just going to talk a little bit

2  about the difference between our remedy and the -- and the

3  Consent Decree.

4        So the way -- the way I think about the -- the Consent

5  Decree remedy is a 30-70 -- 50-70-30-20-10 remedy.  So the

6  Consent Decree is largely based on like the amount of funding

7  that would be available for these tasks, whereas the Phase III

8  Engineering Study recommended specific tasks, like removal of

9  950,000 yards or removal of these -- removal of these surface

10 deposits which had about 950,000 yards.

11       So we -- so the -- so even though -- even though the --

12 the -- the remedies are generally similar, there's a little

13 bit difference in terms of we recommended that you do this and

14 the -- and the Consent Decree says do as much as you can with

15 this much money.

16       So -- and so our -- and I'll just answer the -- the

17 answer that you really asked, which is, yeah, I think -- I

18 think they're similar.  We recommended the removal of five

19 specific surface deposits, and the Consent Decree says remove

20 surface deposits and has a budget for that, and that budget is

21 the $70 millions and our estimate was $107 million, assuming

22 beneficial reuse.  So the -- the two are similar.  There's a

23 little bit less money than we would have allocated for it, but

24 the two are similar in terms of the approach.

25 Q     So would it be fair to say that the Consent Decree

1  generally proposes the same remedy, but on a slightly smaller

2  scale?

3  A     Correct, yes.

4  Q     And despite the smaller extent of dredging, do you think

5  that the dredging proposed in the Consent Decree is still

6  reasonably likely to accelerate the recovery of the system?

7  A     Yes, I do, yep.

8  Q     And I think you testified earlier that there is some

9  uncertainty as to the size of the mobile pool; is that right?

10  A     Yes, definitely, yeah.

11  Q     And other characteristics of the mobile pool?

12  A     Hm-hmm, yes.

13  Q     And also some uncertainty as to the precise delineation

14  of the surface deposits identified by Wood?

15  A     Yes, definitely.

16  Q     Is that right?

17  A     Yes.

18  Q     So do you think some flexibility as to the precise

19  locations for dredging is appropriate given the uncertainty as

20  to the characteristics?

21  A     Yes, I do, yep.

22  Q     I want to turn to the Orland River and the East Channel,

23  and this is where Wood proposed some adaptive management

24  remedies, correct?

25  A     Hm-hmm, that's right.

1   Q      And are you familiar with what the Consent Decree

2   proposes in these areas?

3   A      Yeah, so this is -- this is the $30 million

4   recommendation, so the 50-70-30 -- so now we're in the 30.  So

5   it proposes $30 million to be used to address the -- for

6   eastern channel and Orland River area, and I believe that the

7   Consent Decree is not specific on what exactly would be done,

8   but the money would be available for some type of remediation

9   in that area.

10  Q      And do you think it's appropriate to commit funds to

11  these areas?

12  A      Yes, definitely, yes, we -- we thought that -- that

13  those areas should be addressed.

14  Q      Do you think it's appropriate to maintain some

15  flexibility as to precisely how these areas are addressed,

16  given some lingering uncertainties?

17  A      Yes, yeah, we -- and I'll add, as I -- as I mentioned

18  before, that there's definitely some uncertainties with the

19  level of characterization that's been done in the river, and

20  even with our adaptive management remedies that are -- like a

21  little bit innovative or large and allowing some decisions to

22  be made in the future about exactly what was done in that area

23  we're supportive of.

24  Q      Mendall Marsh is another area that Wood had

25  recommendations for, right?

1   A      Yes.

2   Q      And I believe you testified to some uncertainties

3   regarding the thin-layer cap that Wood had proposed; is that

4   right?

5   A      Yeah, definitely.

6   Q      Some uncertainties regarding effects on vegetation; is

7   that right?

8   A      Right, and on -- and on the ability -- on the -- the

9   long-term effectiveness and the ability to have biota recover

10  as a result of the capping.

11  Q      And it's somewhat innovative to use thin-layer capping

12  for this particular purpose, right?

13  A      That's correct, yeah.

14  Q      Given these uncertainties, again, do you think

15  reasonable minds could differ as to whether to have or whether

16  to implement any active remedies in Mendall Marsh?

17  A      Yes.

18  Q      And is it your understanding that the Proposed Consent

19  Decree does not call for any active remedies in Mendall Marsh?

20  A      Yes, absolutely.

21  Q      But do you also understand that it proposes some

22  beneficial environmental projects?

23  A      Right.

24  Q      And is it your understanding that those projects could

25  be used to improve marsh habitats?

1    A    Yes, absolutely.

2    Q    I want to turn to long-term monitoring.  In your view,

3    is the long-term monitoring proposed by the Consent Decree

4    similar to the long-term monitoring proposed by Wood?

5    A    Yes, it has -- it's similar in that monitoring is

6    proposed on several biota species and sediment and water and

7    on a -- on a three-year cycle similar to the -- the Phase III

8    engineering report.

9        The difference is that we propose long-term monitoring

10   for a period of 45 years and the Consent Decree proposes 25

11   years.

12   Q    Is it your understanding that the Consent Decree

13   proposes 30 years and up to 45 years?

14   A    Oh, I'm sorry, thank you, now -- now it is.

15   Q    Does that ring a bell?  And do you have an understanding

16   of the funding allocated to long-term monitoring in the

17   Proposed Consent Decree?

18   A    Yes, I believe there's -- this is the 10 million part,

19   $10 million for long-term monitoring.  We -- and then,

20   additionally, I believe that there's a $10 million contingency

21   fund also for long-term monitoring -- monitoring in the

22   Consent Decree, which is similar to what we recommended.  I

23   believe we estimated $25 million.

24   Q    And so in your view, is the funding devoted to long-term

25   monitoring in the Consent Decree appropriate?

1  A      Yes, it's generally similar to what we proposed.

2  Q      And is the duration of the long-term monitoring proposed

3  in the Consent Decree appropriate?

4  A      Yes, yeah.

5  Q      Overall, what similarities do you see between what's

6  proposed in the Consent Decree and what Wood had proposed?

7  A      So, in general terms, generally, similar locations for

8  remediation and generally similar types of remediation.  So,

9  you know, starting -- starting sort of upstream to downstream,

10 the Consent Decree proposes capping; we propose dredging in

11 the Orrington Reach.  The surface deposits, both remedies

12 propose dredging.  The Consent Decree did not propose any kind

13 of active remediation in Mendall Marsh but has some money for

14 beneficial projects.  And then there's some money in the

15 Consent Decree, also, for work in the Orland and Verona East

16 area.

17 Q      And to your understanding, does the Consent Decree have

18 a similar objective to Wood's of accelerating recovery in the

19 system?

20 A      Yes, yeah.

21 Q      And in your view, are the remedies proposed in the

22 Consent Decree reasonably likely to accelerate the rate of

23 recovery of mercury in the system?

24 A      Yes, I do.

25 Q      Overall, do you support the entry of the Proposed

1   Consent Decree?

2   A      Yes, I do, yeah.

3            MR. PIPER:  Thank you, Mr. Walter.

4            THE WITNESS:  Yeah.

5            MR. PIPER:  Nothing further.

6            THE COURT:  Thank you, Mr. Piper.

7        Any questions, Mr. Thompson?

8            MR. THOMPSON:  No, no further questions for

9   Mr. Walter, Your Honor.

10           THE COURT:  Okay.  Thank you very much, sir.  You

11  may stand down.

12           THE WITNESS:  Yeah, thank you, yeah.

13       (The witness left the witness stand.)

14           THE COURT:  What do we want to do, Mr. Bernard?

15           MR. TALBERT:  Your Honor, we're -- obviously with 10

16  minutes left or so, 15 minutes left, we would request that we

17  adjourn and -- and pick this up tomorrow.  We'll call our next

18  witness, which is Dr. Reible.

19           MR. BERNARD:  I'd be happy to continue tomorrow, but

20  I'm not sure the court would be.

21           MR. TALBERT:  Apologies, Monday.  I will be ready

22  and available, but, no, Monday is fine.

23           THE COURT:  All right.  That's very good.  We'll

24  reconvene, then, on Monday at 8:30.  Thank you.

25           MR. TALBERT:  Thank you.

1          THE COURT:  Court will stand in recess.

2       (Proceedings concluded at 2:15 p.m.)

3                      CERTIFICATION

4       I certify that the foregoing is a correct transcript from

5  the record of proceedings in the above-entitled matter.

6

7

8  /s/ Julie G. Edgecomb              October 1, 2021
   Julie G. Edgecomb, RMR, CRR        Date
9  Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25