1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF MAINE

3    MAINE PEOPLE'S ALLIANCE        )
     and NATURAL RESOURCES          )
4    DEFENSE COUNCIL, INC.,         )
                                    )
5                 Plaintiffs        )
                                    )              CIVIL ACTION
6                                   )
             vs.                    )    Docket No. 1:00-cv-00069-JAW
7                                   )
                                    )         FAIRNESS HEARING
8    HOLTRACHEM MANUFACTURING       )
     COMPANY, LLC, and              )
9    MALLINCKRODT US LLC,           )
                                    )
10                Defendants.       )

11                      VOLUME II of III

12                  TRANSCRIPT OF PROCEEDINGS

13        Pursuant to notice, the above-entitled matter came

14   on for FAIRNESS HEARING before the HONORABLE JOHN A.

15   WOODCOCK, JR., in the United States District Court, Bangor,

16   Maine, on the 4th day of October, 2021, at 8:41 a.m.

17   APPEARANCES:

18   For the Plaintiffs:         Mitchell S. Bernard, Esquire
                                 Lauren Patricia Phillips, Esquire
19                               Jared J. Thompson, Esquire

20   For the Defendants:         Patricia H. Duft, Esquire
                                 Benjamin S. Piper, Esquire
21                               Laura A. Rideout, Esquire
                                 Jeffrey D. Talbert, Esquire

22

23               Julie G. Edgecomb, RMR, CRR
                    Official Court Reporter

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

1                      INDEX OF PROCEEDINGS
                                                        Page:
2

3      Testimony:  (see below)

4
                       INDEX OF WITNESSES
5                                                       Page:

6      DANIEL REIBLE (called by Mr. Talbert)

7      Direct Examination by Mr. Talbert                     4

8      CYNTHIA BROOKS (called by Mr. Bernard and Mr. Talbert)

9      Direct Examination by Ms. Rideout                    33
       Direct Examination by Mr. Bernard                    46
10     Examination by the Court                         69, 80

11     JESSE GRAHAM  (called by Mr. Bernard)

12     Direct Examination by Ms. Phillips                   82

13     DAVID KELLEY  (called by Mr. Talbert)

14     Direct Examination by Mr. Piper                      94

15
                       INDEX OF EXHIBITS
16     Joint
       Exhibit No.    Description          Offered   Admitted
17
         114     Joint Settlement Overview      3         3
18               Presentation to the Court

19

20

21

22

23

24

25

1      (Counsel present in open court.)

2          THE COURT:  Good morning.

3          MR. BERNARD:  Good morning.

4          MR. TALBERT:  Good morning.

5          MS. DUFT:  Good morning.

6          THE COURT:  Mr. Bernard.

7          MR. BERNARD:  Good morning, Your Honor.  Just one

8  little housekeeping item, the parties thought it might be

9  useful to have in evidence a copy of the slide presentation

10  that Mr. Talbert and I used on Friday to describe the basic

11  terms of the settlement, so we would like to -- we've provided

12  a copy to the court this morning and we'd like to move its

13  admission as Joint Exhibit 114.

14          THE COURT:  Excellent.  Any objection?

15          MR. TALBERT:  No objection.

16          THE COURT:  114's admitted without objection.

17      Who's next?

18          MR. TALBERT:  Your Honor --

19          THE COURT:  Who's up?

20          MR. TALBERT:  Defendant calls Dr. Daniel Reible.

21          THE COURT:  Very good.

22          THE CLERK:  Can you please raise your right hand.

23  Do you solemnly swear that the testimony you shall give in the

24  matter now in hearing shall be the truth, the whole truth, and

25  nothing but the truth, so help you God?

1              THE WITNESS:  I do.

2              THE CLERK:  Thank you.  Please be seated.  Can you

3    please state your name for the record and spell both your

4    first and last name?

5              THE WITNESS:  My name is Danny Reible.  First name

6    D-a-n-n-y.  Last name R-e-i-b-l-e.

7              THE CLERK:  Thank you.

8    DANNY REIBLE, having been duly sworn, was examined and

9    testified as follows:

10                        DIRECT EXAMINATION

11   BY MR. TALBERT:

12   Q    Dr. Reible, would you please summarize your educational

13   background?

14   A    I hold bachelor's, master's, and a Ph.D. in chemical

15   engineering, the master's and Ph.D. from California Institute

16   of Technology, where I pursued studies on the fate and

17   behavior of contaminants in the natural environment.

18             MR. TALBERT:  And for the court's benefit,

19   Dr. Reible's curriculum vitae is at Joint Exhibit 7.

20             THE COURT:  Thank you.

21             MR. TALBERT:  And his expert report is at Joint

22   Exhibit 33.

23             THE COURT:  Thank you.

24   BY MR. TALBERT:

25   Q    Dr. Reible, where are you currently employed?

1  A     I'm employed by Texas Tech University.

2  Q     And what does this position entail?

3  A     I hold the Donovan Maddox Distinguished Engineering

4  Chair and Paul Whitfield Horn Distinguished Chair, and these

5  positions are for me to lead a group of faculty to develop and

6  strengthen an environmental engineering program, including

7  hiring faculty in the area of environmental engineering, and

8  over the past eight years, I've hired six faculty to add to

9  their existing faculty in environmental engineering and to

10  strengthen the program.

11       I also conduct research in environmental engineering and

12  lead a group of graduate students and postdoctoral fellows.

13  Q     Could you please walk us through your professional

14  background prior to accepting this position?

15  A     I started my career at Louisiana State University after

16  completing my Ph.D.  I was there for 21 years.  As part of

17  that time, I served as director of an EPA research center, the

18  Hazardous Substance Research Center South and Southwest, that

19  was a consortium of Louisiana State University, Georgia Tech,

20  Rice University, and Texas A&M University.

21       In 2004, I joined the University of Texas as the Bettie

22  Margaret Smith Chair and conducted -- continued my research

23  activities and ultimately also served as director of their

24  center for research and water resources before joining Texas

25  Tech University in 2013.

1   Q     Dr. Reible, you may want to slow down a little bit for

2   the court reporter's benefit.

3   A     I can.

4   Q     What is your current professional focus?

5   A     My focus throughout my career has been on the assessment

6   and management of contaminated sites and the fate and behavior

7   of contaminants in the environment.

8   Q     And how many years have you worked in this field?

9   A     I completed my Ph.D. in late 1981, so it is almost 19 --

10  it is almost 40 years at this point.

11  Q     And over this time period, how many contaminated

12  sediment sites have you worked on?

13  A     I've worked at at least -- in a significant role of 25

14  contaminated-sediment sites.

15  Q     And do you publish in your field?

16  A     I do publish in my field.

17  Q     And how many publications do you have?

18  A     I've authored or edited six books.  I have coauthored

19  eight National Academy of Sciences reports on environmental

20  issues.  I have published more than 40 chapters in books and

21  more than 175 articles in scholarly journals.

22  Q     And have some of your publications focused on sediment

23  remediation and, in particular, capping?

24  A     A large number of those publications have been focused

25  on contaminated sediments and, in particular, capping as one

1    of the focuses of those papers.  The -- my efforts in

2    contaminated sediments began in the late 1980s and it very

3    rapidly took over my career, and the hazardous research center

4    that I mentioned, its primary focus was contaminated

5    sediments, and contaminated sediments remain the primary focus

6    of my research.

7    Q    Have you received any awards for your work?

8    A    I have.  Most notably, being elected to the National

9    Academy of Engineering in 2005 for the development of widely

10   used means of managing contaminated sediments.

11          MR. TALBERT:  At this time, I would offer Dr. Reible

12   as an expert in remediation of contaminated-sediment sites.

13          THE COURT:  I don't think that that's the way it's

14   done anymore.  I think that was the old way of doing things,

15   but I don't think that I'm required to designate him as an

16   expert or accept an offer as an expert.  His expertise, unless

17   objected to, is a matter of record.

18          MR. TALBERT:  We'll let the record reflect --

19   reflect that.

20   BY MR. TALBERT:

21   Q    Dr. Reible, when did you first become involved in the

22   Penobscot case?

23   A    I became involved in the summer of 2016 when I was asked

24   to review activities by Amec at that time, now Wood, in their

25   Phase III evaluations.

1  Q    And what did you do?

2  A    I attended quarterly meetings, reviewed the documents

3  that were being prepared as part of Phase III, examined the

4  previous reports from Phase II and earlier data that had been

5  collected in the estuary.  I evaluated both the Wood

6  activities and their conclusions that they were achieving and

7  also pursued independent analysis to better understand the

8  river system and the appropriate response to that system on my

9  own.

10 Q    In particular, what independent analysis did you do?

11 A    I conducted analyses of the -- the data that was being

12 collected and attempted to evaluate again both developing a

13 conceptual model of the system, building on the existing

14 models, as well as understand how we might respond to -- to

15 the remedy -- what might be appropriate remedies to address

16 the contamination.

17 Q    And as part of that, you evaluated the Phase III

18 engineering report, correct?

19 A    I did.

20 Q    And what were your conclusions after reviewing that

21 report?

22 A    I believe that the report appropriately focused on the

23 surface concentrations of the con -- mercury contamination.

24 It is the surface contamination that it most leads to

25 exposure, that most leads to risk, and by focusing on that and

1  defining remedies to control that surface concentrations, I

2  believe that the -- the goals of the report were appropriate.

3      I did have differences in views with some of the

4  details, but the overall objective and the general thrust of

5  the report I thought was quite appropriate.

6  Q     Is natural recovery occurring in the lower Penobscot

7  Estuary?

8  A     Natural recovery is occurring.  In a system as

9  complicated as this, there are areas that are recovering more

10 quickly and areas that are recovering less quickly, but there

11 is evidence of natural recovery, and we have seen significant

12 amounts of natural recovery over the period of time since the

13 releases were -- began.

14 Q     What features of the system, if any, inhibit recovery?

15 A     There are a variety of complications in the system --

16 the hydrodynamics, the -- the relatively rapid velocities, the

17 large tidal ranges, give rise to resuspension of sediments

18 that redistributes contaminated mercury from certain portions

19 to into other areas.  There is deposition going on in many

20 parts of the river, but, again, not in all parts, and that

21 complicates it.

22     There is also some degree of -- of mercury contamination

23 that is moving into the lower system from upriver and that

24 also complicates the recovery of the system.

25 Q     Let's have a discussion of the system.  Let's put up

1    Joint Exhibit 110.  Do you recognize this figure?

2    A     I do.

3    Q     And what is this?

4    A     This is a picture of the lower river from Bangor to --

5    Bangor to -- to the Penobscot Bay.

6    Q     Do you agree that the low Pasaic River (phonetic) is a

7    complex system?

8    A     The lower Penobscot --

9    Q     Penobscot.

10   A     -- is a complex system --

11   Q     Apologies.  Estuary.

12   A     -- and, again, complicated by issues such as the large

13   tidal range, the resulting flows from that, and then the --

14   the wide differences in the various conditions from Mendall

15   Marsh to Orland River to the main channel.  There is quite a

16   variation across the river system both in character and their

17   ability to recover.

18   Q     Is this a difficult system to remediate?

19   A     It is.  The tidal range, in particular, means that

20   working in the river is quite difficult, especially in the

21   near-shore areas.  The flows make it difficult to do any work

22   from the water, and in addition, the lack of access on the

23   riverbanks means that most of that work must be done in the

24   river, which is a very dynamic environment.

25   Q     Are there issues with land-site access?

REIBLE - DIRECT EXAMINATION/TALBERT                              11

1    A      Yes, the land-site access means that much of the work

2    needs to be done from the river because there is not access to

3    most of the areas of the river.

4    Q      Are the total mercury concentrations relatively low

5    compared to other mercury sites you're familiar with?

6    A      Certainly in many other contaminated sites, mercury

7    concentrations are higher.  By example, the Onondaga Lake that

8    was brought up on Friday, the average concentration in the

9    contaminated areas at the surface is about four milligram per

10   kilogram mercury.  I'll use that measure of concentration, or

11   part per million, that is one part mercury in a million parts

12   of the sediment, the -- the sand, silt, and clay that make up

13   that sediment.  That would be a milligram per kilogram.  And

14   in the contaminated area of the Onondaga, the concentrations

15   average about four milligram per kilogram, whereas here the

16   concentrations are much lower.

17         In the remediation in Onondaga, all concentrations above

18   2.2 milligram per kilogram were targeted for remediation, and,

19   again, there are -- there are essentially no areas at the

20   surface where those concentrations still exist within the

21   Penobscot.

22   Q      What are the average concentrations in the Penobscot?

23   A      The concentrations in the Penobscot average somewhere

24   below one milligram per kilogram, with some areas slightly

25   above one milligram per kilogram.

1    Q     Do you agree with Wood that natural recovery can be

2    accelerated through active measures?

3    A     I believe that active measures could indeed accelerate

4    natural recovery, and in a system as complicated and as large

5    as this, perhaps the only viable approach, that is, to speed

6    recovery through implementation of active remedies that are

7    consistent with the natural recovery processes and speed them.

8    Q     In your opinion, what are the best ways to do that?

9    A     Some of the best ways to do that would be to address

10   those areas where there are higher concentrations at the

11   surface, or where there are areas that are not recovering as

12   quickly, or areas that might be subject to erosion in

13   high-flow events.  These are areas that are slowing recovery

14   and these are areas that may, in fact, lead to enhanced

15   natural recovery.

16   Q     Let's take a look at Joint Exhibit 33, Figure 20.  What

17   areas do you believe are the most important to target in order

18   to achieve these goals?

19   A     As I just identified, those areas where there is

20   concentrations that are elevated relative to the average, and

21   in particular areas where the surface concentrations are above

22   one milligram per kilogram are especially appropriate to

23   address, and those are found most commonly in the Orrington

24   Reach and in the Orland River east side of Verona Island.

25   Q     Let's start from the -- the stop of the system.  What do

1    you think is an appropriate remedy for the Orrington Reach?

2    A     I believe that the Orrington Reach, the areas where

3    these elevated concentrations remain, are in these intertidal

4    areas, or the areas in the near-shore area on the east side of

5    the Orrington Reach.  These are areas that are recovering.

6    The concentrations below a foot -- a foot below the surface

7    exceed 20 part per million on average, that is, 20 milligrams

8    per kilogram.  Between six inches and a foot, they are about

9    five milligram per kilogram on average, but at the surface,

10   they're still above one milligram per kilogram.

11        So, again, that is evidence that recovery is occurring

12   and deposition is occurring, the fact that those

13   concentrations at depth have been buried, but it also is

14   evidence that these areas are stable in general under normal

15   flow conditions, and therefore, using an approach, such as

16   capping, to further stabilize that, to ensure that even under

17   extreme events or unusual events, that there will not be

18   erosion into those higher concentrated areas, would be

19   effective, and this is a -- a situation where there is

20   concentrations at the surface in a predominantly stable

21   environment that I think capping is most appropriate.

22   Q     What are intertidal sediments?

23   A     Intertidal sediments are those sediments between the

24   mean low tide and mean high tide, that is, they're not

25   underwater a good portion of the day.  On a daily basis, they

REIBLE - DIRECT EXAMINATION/TALBERT                    14

1    are exposed, and so these are sediments that while on occ --

2    at high tide would be underwater, at low tide they would be

3    exposed.  They are -- again, during the time that they are

4    submerged, they are receiving sediments, they're depositional

5    areas, but during the period that they're exposed, they also

6    provide opportunities for terrestrial exposure to organism.

7    Q    We've just put on the screen Joint Exhibit 111.  Is this

8    a -- a figure that depicts intertidal, subtidal, and other

9    areas?

10   A    It does.  It shows the subtidal, which are areas that

11   are underwater even at low tide, and then the area that is

12   regularly exposed and regularly inundated between tides, and

13   then areas that are only inundated under extreme events, or

14   very high tides, which would be that supratidal zone.

15   Q    And what are the remedial options to remediate

16   intertidal sediments?

17   A    The options could be for removal.  They also include

18   capping, which is simply a placement of clean material to

19   isolate the contaminated sediments.  Both of those are -- are

20   remedial approaches -- active remedial approaches that might

21   be employed in this system.

22   Q    And what do you recommend for the Orrington Reach?

23   A    I recommend capping, in particular, because of the fact

24   that these are a stable situation.  They have been depositing

25   cleaner sediments over time.  They have been recovering.  And

1   the use of -- of capping, by placing clean sediments, avoids

2   the movement into or the -- the excavation into those much

3   higher concentrations at depth.  The fact that these areas are

4   currently stable means that they are likely to remain stable,

5   and, again, the use of a cap could just be to ensure that even

6   under extreme events, they remain stable and that the

7   contaminants remain isolated.

8   Q     Let's take a look at Joint Exhibit 33, Figure 22.  What

9   does this figure show?

10  A     This figure shows a conceptual model of capping in this

11  intertidal zone.  So the intertidal zone is -- is the area

12  between the mean level, mean water level or the low water

13  level, which is the -- to the right-hand side, and the high

14  water level.  That zone could be capped with a clean material

15  and could be as -- as simple as a sand cap.  Mercury does not

16  migrate through this with any degree of significance, and so

17  it is contained effectively, even by something as simple as a

18  sand layer, and that sand layer could be typically of the

19  order of six inches, just to discourage any organism

20  interactions with the contaminated sediment.  And, again, a

21  sand layer in this case, I believe, would be ensuring that the

22  finer-grained sediments underneath, even under extreme events,

23  would not be mobilized.

24        As we move to the edge of the intertidal area, there is

25  a zone where I believe that coarser transitional armoring

1  would be needed, and that is simply recognizing that in the

2  subtidal region there are higher flows and higher erosive

3  forces, and, again, this coarser transition is simply to

4  ensure that there are not forces eroding away the base or the

5  foot of this cap.

6  Q     And why are you recommending capping and not dredging

7  this area?

8  A     The primary reasons for recommending capping is that it

9  is consistent with the natural depositional processes in this

10 system, and it is -- so it builds upon the natural recovery

11 processes, but also ensures that you do not have to excavate

12 into these much higher concentrations at depth, which, as I

13 indicated in the Orrington Reach, a foot below the surface of

14 the current sediments average more than 20 times higher

15 concentration.

16 Q     Are you familiar with something called the four Rs of

17 dredging?

18 A     I am.  The four Rs for dredging represent resuspension,

19 contaminant release, the residuals that are left from

20 dredging, and the -- the risk of these resuspension and

21 release processes.

22 Q     This is a pretty commonly documented phenomenon?

23 A     There is always a degree of resuspension during dredging

24 activities and there is always a residual left.  The typical

25 assumption is that the residual that's left after dredging is

1    equal to the average of what's been dredged, and -- and as so

2    as you dredge into the higher concentrations, that will leave

3    a -- a surface layer that is the average of what's been

4    dredged.  So, for example, it might be five to ten milligram

5    per kilogram at the surface.

6        As a result, after dredging, the standard of practice

7    now is to come back with a thin-layer cap.  It's usually

8    called backfill to avoid the -- the use of the word cap.  But

9    the actual risk reduction immediately after dredging is

10   through that capping process, that backfill process,

11   immediately after dredging.

12   Q    Is one of the risks in the system if you cap that there

13   could be recontamination on top of the cap?

14   A    There could in -- as a result of two processes in the

15   river:  One is the continued release of mercury from upstream,

16   which comes into the system; and the other is to the degree

17   that there is resuspension -- resuspension in the river.

18       I do believe in particular in the Orrington Reach that

19   that is -- is going to be of lesser concern because for much

20   of the year the reversals are -- in flow are more confined

21   further down into the river.

22       At this time of year during relatively low flow in the

23   river, you see reversals as we saw during our boat trip on

24   Saturday, we see reversals all the way up further even near

25   the site and perhaps all the way up to Bangor, but that --

1  Bangor, but that is un -- not common throughout the year, and

2  so I believe that even any sediment resuspended in --

3  throughout much of the year will not be impacting a cap in the

4  Orrington Reach.

5  Q     Because dredging would likely also involve the placement

6  of material after there's dredging, would you also have

7  recontamination potential if you were to use dredging?

8  A     You would, and, in fact, in any sediment remedy, there

9  -- the concern for recontamination is an important one.

10 Q     After material is dredged, what -- what happens to that

11 material next?

12 A     Once material is dredged, it is then brought to shore.

13 The sediments, which typically contains large amounts of -- of

14 water, how much water depends on the nature of the dredging

15 operation, but even with mechanical dredging, which introduces

16 the least amount of water, there is significant water

17 associated with those sediments, and that sediment needs to be

18 dewatered.  The water then needs to be treated before it's

19 returned to the river, at least the standard of practice

20 requires that, and then the dewatered sediments, which are --

21 typically the dewatering is done in a staging area near shore,

22 which poses difficulties in some portions of the site, may

23 require transportation to wherever the staging area might be,

24 and then after being dewatering, the sediment could be

25 disposed of either as beneficial -- beneficial uses, if there

1    are some, or for movement into a landfill.

2         I often refer to sediment remediation, for a contaminant

3    such as mercury, is largely due to containment.  It's either

4    whether nature does the containment, we contain through

5    capping, or we contain our dredged material in a landfill.

6    But there's very little other -- fewer other options other

7    than containment.

8    Q    And capping has the benefits in not having to go through

9    the dewatering process and the disposal process?

10   A    Capping has the benefit of -- it's less invasive during

11   the actual action of placing a cap.  It does not disturb the

12   sediments nearly as much.  And, again, you do not have

13   dewatering, you do not have the -- the staging, you do not

14   have the -- the disposal of the sledge -- the dredged

15   material.

16   Q    What have you done, if anything, to evaluate whether

17   capping would be appropriate in this region?

18   A    So I examined both the reports of the -- in the -- from

19   the Phase III, in particular.  There was information at Phase

20   II, as well, studies on the hydrodynamics of the river.  Also

21   worked with another consultant, Integral Consulting, that did

22   preliminary modeling of the hydrodynamics in the system to try

23   to better sense what would be the erosive forces that would be

24   present on these intertidal zones in the inner -- in the

25   Orrington Reach.

1         And as a result of that, believe that a coarse sand

2    would be able to, even under extreme events, keep those

3    intertidal sediments stable.  So that was the primary analysis

4    that was -- that I accomplished as part of this effort.

5         I should also mention again that the No. 1 indicator

6    that capping would be appropriate is the sediments are largely

7    stable now, and they have been continuing to collect, albeit

8    slowly, sediment and recover over time, and we're attempting

9    to enhance that.  One view of capping in this area is

10   effectively we're applying 10 to 20 years of clean sediment

11   deposition at one time to speed natural recovery.

12   Q    In addition to examining the hydrodynamics, have you

13   also made efforts to look at a design of the cap in the

14   Orrington Reach?

15   A    I have, and as you saw from that conceptual model, I

16   believe on the basis of the hydrodynamic forces that we expect

17   in this area, that a coarse sand is appropriate for much of

18   the intertidal zone, but that a coarser transition to the

19   subtidal area is needed to keep it in place.  Again, for not

20   normal events, but for potential extreme events, especially as

21   we move forward in time where these extreme events may be

22   occurring more frequently.

23   Q    What level of confidence do you have that a cap can be

24   designed and implemented in the Orrington Reach?

25   A    I have a high degree of confidence that capping can be

1    placed here.

2    Q    The settlement calls for an advisory committee to advise

3    the trustee.  If asked, would you be willing to serve on the

4    advisory committee to help make sure, among other things, that

5    a cap is designed appropriately for the Orrington Reach?

6    A    I would be happy to serve in that capacity.  Having

7    worked on the river for a number of years, not nearly as long

8    as some in this room, but I have worked on the river for a

9    number of years, and I would like to do anything possible to

10   help move the recovery forward.

11   Q    Do you also contemplate that there would be some

12   monitoring of the cap, if it's implemented?

13   A    Absolutely.  As with any sediment remedy, there are

14   uncertainties, and you address those uncertainties through

15   monitoring, and long-term monitoring is -- is certainly an

16   appropriate activity on this river.

17   Q    Let's go back to Joint Exhibit 33.  Apart from the

18   intertidal areas in the Orrington Reach, were there any other

19   areas in the system you felt needed to be addressed through

20   active remediation?

21   A    I believe that the area on the east side of Verona

22   Island and in portions of the Orland River are also areas

23   where the surface concentrations exceed that one milligram per

24   kilogram, or that one part per million.  These are areas where

25   -- these areas -- these zones were addressed.  Again, you

1    could speed recovery of the system by removing that source of

2    exposure and risk.

3    Q    Amec recommended the removal of surface deposits.  Are

4    you familiar with that?

5    A    I am.

6    Q    And what are your thoughts about the need and value of

7    remediating the surface deposits?

8    A    I believe that the information that was collected on the

9    surface deposits by Amec, or Wood, do not provide a compelling

10   basis for removal of those deposits.  There's inadequate

11   characterization of the vertical and lateral extent of those

12   deposits, but perhaps most importantly, those deposits exhibit

13   very low density, and that means that the mass of mercury

14   associated with those is -- is quite low.

15        Even if the concentration is comparatively of the order

16   of 1 milligram per kilogram, the fact that they have very low

17   density suggests there's very little mass with that.  And so I

18   believe that those deposits, at least based on current

19   information, is -- that that information is insufficient to

20   suggest that removal of those deposits would significantly

21   enhance natural recovery of the system.

22        The one possible exception to that is a deposit that is

23   at the mouth of Orland River, which exhibits both elevated

24   concentrations, that is of the order of 1 milligram per

25   kilogram, but also the density is somewhat greater.  The

1  challenge in that, which is this deposit that is identified as

2  VE-1, the challenge there is that there's really very little

3  information based on the Phase III characterization.  There's

4  essentially one core that was collected on the northern tip of

5  this drawing, of that deposit drawing, and there were several

6  samples collected at the other end.  We really don't know what

7  that deposit looks like, and there are also consolidated

8  deposits, which means that they have higher density that

9  contain mercury at milligram per kilogram in the immediate

10 area.

11      So I think I'm uncertain as to the -- again, the lateral

12 extent of the zone that would be effectively remediated by

13 dredging in this area, but I do believe that it would be -- of

14 the deposits, this is the one that is likely to lead to the

15 most benefit.

16      The area on the southern end of the Verona Island is

17 also an area where lobsters have been found at elevated

18 concentrations, and this -- the high concentrations at the

19 mouth of the Orland River and potentially in this deposit,

20 whatever its final shape may be, are potentially linked to

21 those high elevated -- those elevated concentrations in the

22 lobster.

23 Q    Okay.  Let's -- let's take a look -- just to back up,

24 I've put on the screen Joint Exhibit 5, and this is Figure 8-3

25 from the Phase III report.  Can you just explain to the court

24

1  what these -- what these are on the screen?

2  A     So the black areas are the deposits that were identified

3  in the Wood proposal, and I would say that the -- the deposits

4  show a -- a much higher level of -- they imply a higher level

5  of precision than the data would support.

6        So it -- it is unclear in FF-1, for example, whether --

7  what is that -- shape of that deposit, what is the lateral

8  extent.  And I believe that the representative from Wood on

9  Friday alluded to that, is that they do not have full

10 characterization of that.

11       The density is -- is quite low in much of the deposit,

12 as shown, although there are areas with, you know, again,

13 adjacent there with consolidated sediment with near 1

14 milligram per kilogram.

15       The VE-2, VE-3, OR-1, and FF-1 -- actually, VE-2, VE-3,

16 and FF-1 are the ones where a lot of that is low-density

17 deposits, often characterized by wood chips, with this low

18 density, even though concentrations are of the order of 1

19 milligram per kilogram.  The VE-1 has a higher density, and,

20 again, that's -- and the fact that it is also adjacent to the

21 area that -- where the elevated lobster concentrations are

22 found and also adjacent to sediment at the mouth of the Orland

23 River which exceeds 1 milligram per kilogram is the reason

24 that I'm -- I'm more focused on that.

25       The OR-1 at the top of the Orland River, there are a lot

1  of difficulties to address that and there are also

2  alternatives, potentially, again, capping, because this is

3  also an area that isn't generally stable.  And so, again,

4  there it's uncertain whether removal of that deposit is

5  warranted or will particularly enhance natural recovery, in my

6  view.

7  Q    So just to be clear, if you were to target any of these

8  five deposits, it would be VE-1.

9  A    That is the one that I believe the information gives

10 rise to -- to -- suggests to me that it may be most helpful in

11 terms of speeding natural recovery.

12 Q    Let's go back to Joint Exhibit 33.  Amec recommended a

13 thin-layer cap in Mendall Marsh.  What are your opinions about

14 performing active remedies in Mendall Marsh?

15 A    I believe that there has been expressed a great deal of

16 concern about the -- any active remedies in Mendall Marsh.  I

17 certainly share those concerns.

18      The problem with thin-layer capping in this area is that

19 it will change the marsh platform, and the marsh platform is

20 critical to its function, and I could not at this point state

21 whether thin-layer capping would reduce the function of the

22 marsh, and this is a very important marsh and -- and one that,

23 again, deserves concern about any active remediation.

24      I -- also, in examination of the data, you find that

25 Mendall Marsh is recovering comparatively quickly compared to

1  many parts of the system, at least in terms of total mercury

2  concentration, and the average concentration at the surface in

3  Mendall Marsh is also below one-half part per million, or .5

4  milligram per kilogram.

5  Q    So based on all of the considerations you just

6  mentioned, you do not recommend active remedies in Mendall

7  Marsh.

8  A    I do not at this time recommend active remedies in

9  Mendall Marsh.

10  Q    You stated in your expert report that remedial measures

11  should be undertaken with caution to do as little harm as

12  possible.  Will you explain that?

13  A    I'm a firm believer, first of all, that especially in a

14  large complicated system, that you want to undertake remedies

15  that are consistent with the natural processes that are

16  occurring.  You're trying to enhance recovery, you're trying

17  to speed recovery, and so you -- you don't want to implement,

18  if you can avoid it, remedies that actually reverse the

19  progress that has been made.

20       And when possible, as a result of that, I often

21  recommend nonintrusive, nonremoval options simply because you

22  don't want to set the system back if you can avoid doing so.

23  There are certainly times when removal and dredging is

24  appropriate, and I've recommended it in other cases, other

25  situations.  I think in areas where you have a -- a strong --

1    an opportunity for buried contaminated sediments to be exposed

2    due to erosive forces, you have little choice but to try to

3    remove them.

4          But in an environment where sediments are generally

5    stable, you'd want to enhance that stability, and that's where

6    capping has -- has often been employed successfully.

7    Q    Dr. Reible, are you familiar with the remediation

8    activities the parties have put forth in the Proposed Consent

9    Decree?

10   A    I am.

11   Q    And what are your opinions of the proposed approach?

12   A    I believe that the proposed settlement agreement, the

13   remedies that are in there, are quite consistent with both my

14   own, as well as the Wood conceptual model of both the site and

15   the remedies, and I think generally consistent with both the

16   goals and the remedies, again, of both Wood and my own view.

17   Q    And what is proposed for the Orrington Reach?

18   A    In Orrington Reach, instead of the dredging that was

19   proposed by Wood, there is capping, which is, of course,

20   consistent with my view that this area is stable and it would

21   be amenable to capping, and so it's completely consistent with

22   the recommendations that I made in the Orrington Reach.

23   Q    And is it your understanding that the parties, or at

24   least Mallinckrodt, has committed 50 million to cap 130 acres

25   of intertidal sediment in the Orrington Reach?

1   A      I am, and this is the -- essentially the same area that

2   was proposed for removal by the Wood proposal, but examining

3   capping or suggesting capping in this area.  And, again,

4   completely consistent with what I believe would be the most

5   appropriate remedy in that area.

6   Q      What is your understanding of how -- what the parties

7   propose to do with respect to mobile sediments and surface

8   deposits?

9   A      Because of the uncertainties that I outlined relative to

10  those deposits that I don't believe that the case has been

11  made that they will effectively enhance natural recovery, I

12  think the settlement has allocated funds for addressing those

13  deposits but left open to final design what might be the most

14  appropriate way to intervene in those deposits, even for

15  dredging.

16         And so the particular locations, the -- how that might

17  occur has been left more flexible in the settlement, and I

18  think that's quite appropriate for the reasons that I outlined

19  before.

20  Q      And as you mentioned earlier, you would recommend

21  targeting VE-1 among all those settlement -- deposits?

22  A      Of the ones that have been identified so far, I think

23  that VE-1 has the most potential for enhancing the recovery of

24  the system.

25  Q      Do you have concerns with wide-scale dredging?

1    A      I certainly have concerns with wide-scale dredging, and

2    as I mentioned, the -- at -- in Orrington Reach, I gave

3    specific examples.  But in -- throughout much of the system,

4    there has been natural recovery, and if you look at depth, you

5    find much higher concentrations.

6         The residual to be left by wide-scale dredging will be

7    equal to -- approximately equal to what the average that has

8    been dredged, and as a result, that concentration will be

9    exposed at the surface until such time it can be backfilled

10   and capped.  There will be releases that could be -- in this

11   system could be certainly a few percent of the mass that is

12   being dredged.  And so as you move into those higher

13   concentrations, you would be concerned about the degree of

14   release and resuspension that will occur.

15        I believe there are ways that you can minimize this.  I

16   think they're much harder in a system that has the tidal range

17   and flows that you see in this river.  And -- and as a result,

18   I think there's no doubt that there would at least be some

19   resuspension and release of contaminants and redistribution of

20   contaminants and that will be a residual, and to the extent

21   that we can avoid that, for example, by capping in the East

22   Orrington Reach, I think it's prudent to do so.

23   Q      What is your understanding of what is proposed for the

24   Orland River and East Channel around Verona Island?

25   A      There, as well, because of the uncertainty in the

1    systems, $30 million has been allocated in a manner -- in a

2    flexible manner to allow final design to suggest what might be

3    most appropriate to speed recovery.

4         So the areas where there are significant uncertainties,

5    where I don't believe that the Phase III report adequately

6    supported specific remedies, there is flexibility in the

7    sediment to respond, although I should mention that when we

8    look at the $30 million that was allocated in the settlement

9    -- or proposed to be allocated in the settlement for the

10   Orland River, plus the $70 million for the dredging, you end

11   up with a total remedy for the deposits, if you will, that is

12   similar to what Wood proposed.

13        But in the settlement, it's proposed that this be

14   flexible, and I think that's appropriate given the

15   uncertainties.

16   Q    Are you familiar that the settlement also involves

17   beneficial environmental projects?

18   A    I am aware of that.  Twenty million dollars has been

19   allocated to -- for beneficial projects for -- throughout the

20   system that certainly could be of benefit throughout the

21   estuary.

22   Q    And do you support this proposal?

23   A    I do support the proposal.

24   Q    What about long-term monitoring?

25   A    Long-term monitoring is part of the proposal, 30 to 45

1   years of monitoring every three years.  Long-term monitoring

2   is an important part of any remedy because of the

3   uncertainties and difficulties of implementation and to make

4   sure that it's progressing towards the desired goal.

5        Often at sites we use five years as an interval to

6   balance significant change versus an opportunity to see

7   change, but three years is a -- a reasonable interval for that

8   long-term monitoring, as well, as proposed in the settlement

9   agreement.

10  Q    So you propose the -- you support the proposal made by

11  the parties?

12  A    I do support the proposal.  I believe that it is

13  consistent with both the -- the thrust of -- of Wood's

14  proposed remedies, as well as what I felt what might be most

15  appropriate to speed natural recovery in the system, and I

16  certainly support the proposal.

17  Q    Based upon your three decades of experience in managing

18  contaminants in the environment, do you believe that the

19  proposed remedies have a meaningful chance of accelerating

20  recovery in the Penobscot River Estuary?

21  A    I believe that it does have a meaningful chance of -- of

22  speeding natural recovery.  As I indicated, I think that many

23  of -- of the activities that have been proposed, for example,

24  the capping in the Orrington Reach, which I think is

25  critically important, will directly speed natural recovery.

1    It will be the equivalent of 10 to 20 years or more of

2    deposition of clean sediments and occur quite quickly.  And so

3    recovery will occur that much more quickly by addressing these

4    high-concentration areas with a remedy that is consistent with

5    the natural approaches, the natural processes.

6    Q    Do you feel the proposal strikes the right balance

7    between accelerating recovery while minimizing risk in a

8    complicated system?

9    A    I do believe that the -- the proposed settlement does

10   that, and I -- I think the proposed settlement provides

11   flexibility to address those areas where I was most uncertain

12   about Wood's proposal.

13   Q    And, overall, do you support the settlement proposal?

14   A    Absolutely.

15          MR. TALBERT:  No further questions.

16          THE COURT:  Thank you very much, Mr. Talbert.

17      Mr. Bernard?

18          MR. BERNARD:  No questions, Your Honor.

19          THE COURT:  Thank you.  Thank you very much, sir.

20   Appreciate your testimony.

21      (The witness left the witness stand.)

22          THE COURT:  Next witness?

23          MR. BERNARD:  The parties jointly call Cynthia

24   Brooks.  Your Honor, if it's acceptable, we're going -- going

25   to divide the examination of Ms. Brooks, and Ms. Rideout will

1    go first for Mallinckrodt and I will follow.

2              THE COURT:  That's fine.  Thank you.

3              THE CLERK:  Can you please raise your right hand.

4    Do you solemnly swear that the testimony you shall give in the

5    matter now in hearing shall be the truth, the whole truth, and

6    nothing but the truth, so help you God?

7              THE WITNESS:  I do.

8              THE CLERK:  Thank you.  Please be seated.  Can you

9    please state your name for the record and spell both your

10   first and last name?

11             THE WITNESS:  My name is Cynthia, C-y-n-t-h-i-a,

12   Brooks, B-r-o-o-k-s.

13             MS. RIDEOUT:  Good morning, Your Honor, Laura

14   Rideout for Mallinckrodt US LLC.

15             THE COURT:  Good morning.

16   CYNTHIA BROOKS, having been duly sworn, was examined and

17   testified as follows:

18                        DIRECT EXAMINATION

19   BY MS. RIDEOUT:

20   Q    Good morning, Ms. Brooks.

21   A    Good morning.

22   Q    Would you please describe your educational background?

23   A    I have a bachelor of science in engineering, which I

24   earned in 1979 summa cum laude from Duke University.  I also

25   received a master's in business administration in 1989 from

BROOKS - DIRECT EXAMINATION/RIDEOUT

1   Harvard University.

2   Q    Have you taught or presented on any topics that are

3   relevant to trusts for environmental remediation?

4   A    I have.  I have most recently been a guest lecturer and

5   speaker at several events coordinated by the Department of

6   Justice.  Prior -- immediately prior to COVID, I was the guest

7   speaker at the National Association of Attorneys General

8   bankruptcy conference.  For three years, I have taught the

9   course in contaminated property remediation and redevelopment

10  at the Center for Real Estate at the Massachusetts Institute

11  of Technology, and I've also been a cochair of a number of

12  international conferences on contaminated site redevelopment

13  -- excuse me -- remediation and redevelopment.

14  Q    Where are you currently employed?

15  A    I am currently employed by the Greenfield Environmental

16  Trust Group.

17  Q    And what does the Greenfield Environmental Trust Group

18  do?

19  A    Greenfield is a company that is dedicated to serving as

20  a court-appointed or court-approved trustee for environmental

21  response and custodial trusts.

22  Q    What is your role with Greenfield?

23  A    I am the founder, president, and owner.

24  Q    Now, I understand that prior to founding Greenfield, you

25  cofounded another company called Resources for Responsible

1   Site Management; is that right?

2   A    That's correct.

3   Q    And what was the professional focus of Resources for

4   Responsible Site Management?

5   A    Resources was incorporated to serve as the

6   court-appointed trustee for the Industri-Plex Superfund site

7   -- federal Superfund site in Woburn, Massachusetts.

8   Q    What was your role with that company?

9   A    I managed the activities of the Custodial Trust to

10  address both remediation and redevelopment of what was then

11  the fifth most contaminated waste site in the country.

12  Q    And how long were you with Resources for Responsible

13  Site Management before founding Greenfield?

14  A    Three and a half years.

15  Q    And you started that company in 1989; is that right?

16  A    Correct.

17  Q    So you've worked in the field of management of

18  contaminated sites for over 30 years.

19  A    I have.

20  Q    Prior to your work with Resources for Responsible

21  Management, did you hold any positions with any other

22  companies?

23  A    I worked for the production department of Exxon Company,

24  U.S.A., most recently managing its operating interests in a

25  field called Prudhoe Bay in the North Slope of Alaska.

1  Q     And how long were you with ExxonMobil?

2  A     I believe all told six years, six to seven years.  I had

3  an educational leave of absence during that time.

4  Q     I want to discuss in greater detail what services

5  Greenfield offers relative to contaminated sediment sites.

6        How long has Greenfield been in the business of

7  providing environmental response and custodial trust services

8  to address contaminated site remediation?

9  A     Including Resources, 31 years.

10 Q     Are there any other organizations specializing in this

11 type of work that have been in business as long as Greenfield

12 has?

13 A     I am not aware of any other organizations that have

14 worked as an environmental response and custodial trust as old

15 as Greenfield is.

16 Q     Historically, how many environmental remediation trusts

17 has Greenfield managed?

18 A     We've had seven different appointments as trustee.

19 Currently there are five that we are serving in, four that are

20 active.

21 Q     So looking at the seven trusts that historically

22 Greenfield has been appointed to manage, how many sites fell

23 under the purview of those seven trusts?

24 A     For large state and federal hazardous waste sites, total

25 approximately 30 sites.  We also are responsible for the

1    cleanup of a portfolio of gas station, former service station,

2    sites throughout the country, and those number in excess of

3    250 sites.

4    Q     Does Greenfield currently have capacity to effectively

5    and efficiently manage the two contemplated Trusts for

6    remediation and beneficial environmental projects in the

7    Penobscot River Estuary?

8    A     Absolutely do.

9    Q     What is the total amount of funds that Greenfield

10   currently oversees in trust?

11   A     We are currently holding cash assets in excess of $1

12   billion for the benefit of the beneficiaries of the trusts for

13   which we serve as trustee.

14   Q     And what is the range of funding that is available for

15   individual sites that Greenfield oversees?

16   A     It can range from as little as 500,000 to as much as 290

17   million.  We have had 290 million earmarked for a hazardous

18   waste site in Alabama.

19   Q     I would like to take a moment to discuss a few of the

20   more complex sites that Greenfield has managed as

21   environmental remediation trustee.  Will you please describe

22   for the court Greenfield's work in connection with the Montana

23   Environmental Custodial Trust?

24   A     Greenfield was appointed trustee in Montana in 2009.  We

25   were given responsibility for two federal hazardous waste

1   sites and two state hazardous waste sites, and we received

2   total funding of 146 million.

3        At the largest site, which is a former lead smelter in

4   East Helena, we implemented corrective measures under RCRA to

5   clean up the site.  In a matter of four years, the cleanups

6   that we implemented demonstrated measurable benefit and

7   differences in -- in water quality, which is very unique.  For

8   most hazardous waste sites it makes many, many years, and in

9   East Helena we were able to see those results in a matter of

10  four years.

11  Q    Now, how much land was subject to remediation work in

12  connection with that trust?

13  A    The -- this property consisted of more than 2,000 acres.

14  Q    Now, is Greenfield able to achieve any cost savings in

15  connection with its administration of the trust in that case?

16  A    Yes, we received 96 million to clean up the East Helena

17  site, and we accomplished the majority of the cleanup for less

18  than half of that amount.

19  Q    What about the Multistate Environmental Response Trust?

20  A    Excuse me.

21           THE WITNESS:  May I take a glass of water?

22           MS. RIDEOUT:  Please.

23           THE COURT:  Yes.  Is there some water up there?

24           THE WITNESS:  Thank you.  Thank you.  My apologies.

25           MS. RIDEOUT:  Don't apologize.  I'll ask that

1    question again.

2    BY MS. RIDEOUT:

3    Q    What about the Multistate Environmental Response Trust?

4    A    Greenfield serves as the trustee for the Multistate

5    Environmental Response Trust.  We were appointed in 2011 by

6    the United States in 23 states.  In that appointment, we took

7    responsibility for hundreds of sites all over the country,

8    including 24 federal and state hazardous waste sites.

9    Q    Now, has Greenfield served as environmental remediation

10   trustee for any sites that are comparable to the Penobscot

11   River Estuary?

12   A    In terms of scale and complexity, I do believe there are

13   a number of sites that we have and are currently remediating

14   that have -- every site's different, but that are complicated

15   cleanups.  There's a federal Superfund site in Florida that we

16   are currently remediating.  It's a $95 million cleanup, and

17   that involves addressing contaminated sediments in the St.

18   Johns River, as well as a tidally influenced creek adjacent to

19   the site.

20   Q    I'd like to talk now about how Greenfield approaches

21   management at remediation at sites it has been appointed as

22   trustee.

23         Does Greenfield manage these sites for which it has been

24   appointed as trustee centrally or through the use of

25   affiliated entities?

40

1    A      Through the use of affiliated entities.  We typically

2    create a separate, single-purpose entity to serve as trustee

3    for each of our trust appointments, and that is really both

4    for liability, as well as the segregation of assets and

5    liabilities from trust to trust.

6    Q      Now, what type of internal team is at place at

7    Greenfield to manage an environmental remediation trust?

8    A      Greenfield has technical, scientific, and engineering

9    experts, people with significant experience in environmental

10   remediation.  We also have a team of in-house attorneys and

11   in-house accountants, CPAs, and financial specialists, a real

12   estate team, and a communications team.  So we're a very

13   multidisciplinary organization, and we approach each of our

14   trust appointments addressing that panoply of disciplines and

15   issues.

16   Q      Does Greenfield utilize outside consultants or experts

17   in connection with its work?

18   A      Extensively.  Greenfield retains numerous third-party

19   professionals, consultants, contractors that we hire and

20   essentially oversee for them to perform the remedial designs

21   and the construction at the sites where we are responsible for

22   the cleanup.

23   Q      Can you give the court a sense of how many contracts or

24   master services agreements Greenfield may enter into with

25   consultants or vendors on a project?

BROOKS - DIRECT EXAMINATION/RIDEOUT                    41

1   A     It can range from, you know, five to -- I mean, if

2   you're including vendors -- 50 or more.  We have signed master

3   service agreements and master contracts with more than 50

4   national, international, and regional environmental consulting

5   and engineering firms.

6   Q     How does Greenfield approach the process of identifying,

7   retaining, and then managing these consultants and vendors and

8   experts?

9   A     We go through a process of essentially determining what

10  the -- the overall approach to the cleanup of a site is going

11  to be, what is the -- you know, what are our performance

12  goals, both from a remedy, as well as the final outcome.  In

13  all of our trusts, we have finite funds that are used,

14  earmarked for each of our sites for which we are responsible

15  for managing the cleanup utilizing those finite funds.

16        So we oftentimes will retain subject-matter experts.

17  For large contracts, we will typically issue requests for

18  proposals and conduct a competitive bidding process.

19  Q     So is the idea to have in place a team that can manage

20  and facilitate the entire life cycle of a remediation project?

21  A     That is correct.

22  Q     I understand that another component of administering an

23  environmental remediation trust is developing and implementing

24  a technical strategy that is tailored to the particulars of

25  the site at issue; is that right?

1    A      That is correct.

2    Q      What does that process entail?

3    A      Developing a technical strategy really means looking at

4    both where you are in the life cycle of the cleanup, if it's

5    a, you know, site that's been fully characterized or partially

6    characterized, a big part of it is how do you leverage what's

7    known about the site and then developing how you're going to

8    approach the very important process of regulatory approvals

9    and regulatory compliance, and once those approvals have been

10   secured, designing and implementing the cleanup.

11   Q      And that segues nicely into another question I had,

12   which is, how does Greenfield approach the process of

13   interfacing with regulators?

14   A      In many of our trusts, the regulators, governmental

15   agencies are direct beneficiaries of our trusts.  Where

16   they're not -- and there are many instances when we have to

17   get clean -- regulatory approvals for cleanups that -- where

18   they're not beneficiaries -- our approach is very much

19   cooperative, collaborative.  We reach out to our -- the

20   governmental regulatory authorities early and often.

21   Q      How does Greenfield manage the trust assets from a

22   financial standpoint?

23   A      We manage the trust assets through compliance with both

24   the settlement agreements that govern our activities, as well

25   as prudent fiduciary management.  Are you asking about

BROOKS - DIRECT EXAMINATION/RIDEOUT                    43

1    investments, or are you asking about just generally holding

2    and managing assets for the benefit of our beneficiaries?

3    Q    My understanding is that Mr. Bernard will cover those

4    specifics in greater detail, so let me ask this question.

5         How does Greenfield manage the environmental Remediation

6    Trust to maximize the amount of funds that are available for

7    the benefit of the environment?

8    A    Both by identifying and implementing cost-effective

9    remedies and investing the funds in a program that maximizes

10   the life span of the available funding.

11   Q    Now, what about the more traditional project management

12   functions, like managing project schedules and controls, how

13   does that work?

14   A    You know, scopes, budgets, schedules are handled

15   internally.  We have a project controls team and we set up

16   those controls, and then we -- that is the way in which we

17   manage and oversee the large expenditures of consultants and

18   contractors.

19   Q    Is engagement of community stakeholders another

20   component of this process that is important?

21   A    It's critical for most of our sites, especially those

22   where there's an active, engaged community or potential

23   community interest, Greenfield prioritizes community

24   engagement.

25   Q    What are some of the ways that Greenfield engages the

1    community?

2    A     Well, certainly, you know, transparently sharing

3    information.  We have site-specific websites that we've set up

4    for a number of our trusts and sites and providing information

5    through that vehicle, but also, you know, physical information

6    distribution, regular routine and nonroutine public meetings,

7    stakeholder meetings, town hall-type meetings.  Those are

8    frequently what we include in our -- as part of our cleanup

9    programs.

10   Q     Has Greenfield previously worked with any of the parties

11   in this litigation?

12   A     No, we have not.

13   Q     Is independence and neutrality something that is

14   important when an entity serves as a trustee in these

15   circumstances?

16   A     Independence and neutrality is critical.

17   Q     How so?

18   A     An independent trusted fiduciary and environmental

19   response trustee is able to identify the critical, technical,

20   regulatory, and legal issues, collaborate with the

21   beneficiaries, but develop a -- the environmental solutions

22   based on the technical considerations, as well as available

23   funding.

24   Q     So to summarize what we've talked about, how would you

25   characterize the benefit that can be realized by engaging

1  Greenfield to manage the trust and oversee the remediation

2  work in a project like what's proposed at the Penobscot River

3  Estuary?

4  A    Greenfield is -- has dedicated its life span and history

5  to serving in these types of trust appointments, and I

6  personally have dedicated my professional identity to that for

7  the last 30 years.  I believe we are imminently qualified to

8  serve and would be honored to serve, if approved -- if the

9  settlement is approved by the court and our appointment is

10 supported by the parties.

11 Q    Has Greenfield received any recognition or accolades in

12 connection with its work at other contaminated sites?

13 A    We have.  We received -- in 2019, we received the

14 National Grand Award from the American Council on Engineering

15 for Environmental.  We also were awarded the Excellence in

16 Superfund Redevelopment in 2019 from the U.S. Environmental

17 Protection Agency.  We've also received two National Phoenix

18 Awards for Excellence in the Cleanup and Redevelopment of

19 Contaminated Sites, and those are both issued by the United

20 States.

21 Q    And what is the National Phoenix Award?

22 A    National Phoenix Award may be the highest honor for

23 those who work in the field of contaminated site remediation

24 and redevelopment.

25 Q    Ms. Brooks, are you confident that Greenfield has the

1  ability to effectively manage the funds consistent with the

2  goals and objectives of the two contemplated Trust agreements

3  in this case?

4  A    I am.

5         MS. RIDEOUT:  Thank you.  With that, I will turn it

6  over to Mr. Bernard.

7         THE COURT:  Thank you, Attorney Rideout.

8      Mr. Bernard?

9                     DIRECT EXAMINATION

10 BY MR. BERNARD:

11 Q    Good morning, Ms. Brooks.

12 A    Good morning.

13 Q    You testified about Greenfield more generally, and I

14 want to focus attention on this engagement now.  Okay?

15 A    Okay.

16 Q    How did you first become involved in this matter?

17 A    We were contacted in 2019 by the parties who expressed

18 some interest in learning about environmental response trusts.

19 Q    And did you submit a written response to a request for

20 the firms' qualifications to serve in this role?

21 A    We did.  We submitted a response to the request for

22 proposals to the parties in June of 2020, I believe.

23 Q    And after submitting that proposal, did you have

24 discussions with counsel for the parties?

25 A    We did.  We had several conference calls and virtual

1    meetings with the parties.

2    Q     And did that result in a supplemental written submission

3    by Greenfield?

4    A     That did.  We submitted an -- an additional proposal to

5    the parties in December of 20 -- excuse me -- November of

6    2020.

7    Q     Without going into great detail, because I don't think

8    it's necessary, in general, what did your written submissions

9    to the parties include?

10   A     Our submissions included a description of how we would

11   propose to approach a Trust appointment in -- with respect to

12   the Penobscot Estuary.  We also described the qualifications

13   of our key personnel, our relevant experience, both in

14   cleaning up complex hazardous waste sites in -- and in cold

15   climates.  We also described how we would approach from a

16   technical standpoint the cleanup of the Penobscot Estuary.

17   Q     And at the end of this process, you've described the

18   written submissions and the meetings with the parties.  Did

19   there come a time when the parties asked you to serve as the

20   trustee in the event the court approved the settlement?

21   A     That occurred at the end of 20 -- I guess early 2021,

22   yes.

23   Q     And did you accept that invitation?

24   A     We did.  We would be honored to serve.

25   Q     Now I want to turn your attention to some of the

1   relevant documents concerning the settlement.  For ease of

2   reference, there's a Consent Decree itself; is that correct?

3   A     Correct.

4   Q     Okay.  That's Joint Exhibit 1.  Then there is something

5   called a Statement of Work.  Are you familiar with that?

6   A     I am.

7   Q     And that's Appendix A to the Consent Decree, which is

8   Joint Exhibit 2.

9         And then there are two Trust Agreements.  Are you

10  familiar with those?

11  A     I am.

12  Q     Okay.  And those are Appendices B and C to the Consent

13  Decree and Joint Exhibits 3 and 4.

14        Can you just describe briefly for the court your

15  understanding of how those documents work with one another?

16  A     The documents are very interrelated.  The Consent Decree

17  essentially sets forth the basic framework for the settlement.

18  The Statement of Work provides more specific information about

19  the steps that the Trusts would go through to implement the

20  remediation of the site, and then there are two Trust

21  Agreements that really set forth the detailed duties,

22  responsibilities, issues of -- related to the financial

23  reporting and affairs of each of the Trusts, as well as

24  insurance and issues related to liability.

25  Q     You mentioned that there are two Trust Agreements.  Why

1    are there -- and two Trusts.  Why are there two separate

2    Trusts, to your knowledge?

3    A     The Remediation Trust is dedicated to the cleanup of the

4    Penobscot Estuary.  The Projects Trust is really designed to

5    implement what are called beneficial environmental projects

6    that benefit the public and address natural resource damages.

7    Q     So is it fair to say that the Remediation Trust deals

8    with the bulk of the remedial measures, with the exception of

9    the beneficial environmental projects that are provided for in

10   the Consent Decree?

11   A     Correct.

12   Q     And the Project Trust addresses only the beneficial

13   environmental projects?

14   A     That is correct.

15   Q     Okay.

16         MR. BERNARD:  Your Honor, that's -- that's explained

17   at Section 21 of the Consent Decree.

18         THE COURT:  Thank you.

19   BY MR. BERNARD:

20   Q     Who are the beneficiaries of the two Trusts, Ms. Brooks?

21   A     The beneficiaries are the -- the Maine People's

22   Alliance, the Natural Resources Defense Council, and

23   Mallinckrodt.

24   Q     Okay.  Are there any beneficiaries other than the

25   parties to this litigation?

1   A      No, there aren't.

2   Q      Okay.  Now, have the Trust Agreements been signed

3   already?

4   A      They have.

5   Q      And why were the Trust Agreements signed in advance of a

6   court decision whether or not to endorse the Consent Decree?

7   A      They were signed not -- not at all to presume any

8   outcome with respect to the court, but really to allow for

9   some initial funding so that the Trusts could perform -- set

10  up activities that would allow us to be positioned and ready

11  to start if and when the court approved the settlement.

12  Q      So is it a way, in kind of lay terms, that would enable

13  you as trustee to hit the ground running if and when the court

14  does enter the Consent Decree?

15  A      That is correct.

16  Q      And if the court does not enter the decree, what would

17  happen to the Trust Agreements?

18  A      I believe that the Trusts would be immediately voided or

19  dissolved and the funds that were provided by Mallinckrodt

20  would be returned.

21  Q      Returned to Mallinckrodt.

22  A      Yes, they would be.

23  Q      Okay.

24         MR. BERNARD:  Your Honor, that's covered in the

25  Remediation Trust Agreement, which is Joint Exhibit 3, at

BROOKS - DIRECT EXAMINATION/BERNARD                51

1   Section 2.8, and the Project Trust Agreement, which is Joint

2   Exhibit 4, at Section 2.8.2.

3           THE COURT:  Thank you.

4   BY MR. BERNARD:

5   Q    Ms. Brooks, in light of what you've described about the

6   relative content of the two Trusts, I want to ask you to focus

7   on the Remediation Trust, which is what you said is where the

8   most -- all of the remediation activities, except for the

9   beneficial projects, will be -- will -- will occur.  Okay?

10          What is the purpose of the Remediation Trust?

11  A    The Remediation Trust's purpose is to secure the

12  required permits and approvals, put together the design, and

13  implement the cleanups of the Penobscot, including identifying

14  and retaining third-party professionals, consultants,

15  contractors, and overseeing the work of those contractors to

16  actually clean up the river.

17  Q    Now, is it fair to say the Trusts have to be funded in

18  order to enable you to carry out the work?

19  A    They do have to be funded and --

20  Q    And has any funding been provided to date?

21  A    Yes, the Trusts received initial funding of 10 million,

22  of which 9.5 was allocated to the Remediation Trust.  And

23  should the court approve the settlement, then there is a

24  schedule for funding that's set forth in the documents.

25  Q    What is your best --

1          MR. BERNARD:  And this is covered, Your Honor, in

2    Consent Decree Section 19.

3    BY MR. BERNARD:

4    Q     What is your best recollection of the funding mechanism

5    going forward after the initial $10 million contribution that

6    you've testified to?

7    A     The next round of funding would -- that would be slated

8    for transfer to the Trust is 15 million.  That would be

9    received by the end of 2021.  And, thereafter, the Trusts

10   would receive 25 million annually until the 187 million in

11   Committed Funding is received by the Trusts.

12   Q     Okay.  And if the contingent funds that are also --

13   withdrawn.

14         Are you aware that beyond the 187 million, there is also

15   80 million in contingent funds that could be triggered under

16   the terms of the agreement?

17   A     Correct.

18   Q     And how, if at all, or when would those funds be

19   provided under the -- under the agreement?

20   A     They would only be provided if the conditions under

21   which those funds could be received have been satisfied.

22   Q     And would they be provided at that time, in other words,

23   when that trigger occurs, then the Contingent Funding would be

24   provided?

25   A     Correct.  There would be a call -- an invoice issued

BROOKS - DIRECT EXAMINATION/BERNARD                53

1   that it would be a call for the funding from Mallinckrodt.

2   Q    Okay.  And are all the funds that are to be contributed

3   to the Trusts going to come from the defendant, Mallinckrodt?

4   A    That is correct.

5   Q    Okay.  Now, is there any financial assurance that is

6   provided for in the settlement, to your knowledge?

7   A    There is a surety bond obligation that Mallinckrodt has

8   to establish and maintain in the amount of 65 million, the

9   purpose of which is essentially to guarantee their financial

10  obligations under the settlement structure.

11          MR. BERNARD:  That's covered in the Consent Decree

12  Section 20, Your Honor.

13  BY MR. BERNARD:

14  Q    Let's talk about financial management, which you

15  discussed generally earlier, but in particular here, is one of

16  the trustee's duties to hold and manage Trust assets?

17  A    It is, to hold and manage them in segregated accounts.

18  Q    So could you explain to the court how -- how you

19  organize that, in other words, how -- how many trust accounts

20  do you establish and how does that work?

21  A    In -- for this specific Trust appointment or as a -- as

22  a general matter?

23  Q    In this specific appointment.

24  A    So we estab -- we open the accounts through a company or

25  financial institution that we have selected and consult with

1    our beneficiaries on, and we hold the funds as earmarked in

2    each of those accounts.  And to the extent consistent with the

3    expenditure needs for that specific account, we implement an

4    investment policy designed to meet both the liquidity needs of

5    each of the Trust cleanups, as well as to maximize interest

6    and dividend incomes to -- for the benefit of the Trust

7    beneficiaries.

8    Q    Okay.  Now, you did mention the investment of Trust

9    assets.  How -- how will you approach the investment of Trust

10   assets in this situation?

11   A    Again, recognizing the obligation to maintain funds in

12   segregated accounts, we typically hire an experienced

13   investment advisor.  We develop an investment policy that is

14   obviously governed in the first instance by the preservation

15   of principal.  And then to the extent there can be interest

16   and dividend income earned for the benefit of those accounts

17   with no risk or limited risk, then we -- we invest the funds

18   accordingly.

19   Q    Is one of the reasons to invest Trust assets as a kind

20   of protection against inflation over time?

21   A    At a minimum, that's correct.  The -- the Trust

22   Agreements do set forth some basic provisions on investment

23   and safeguarding of Trust assets and set forth minimums.  So,

24   for example, half of the funding has to be placed in -- with

25   government-backed securities, and the other half can be

1    invested in other kinds of instruments that would, over a long

2    period of time, realize significant returns that you might not

3    get on -- on those investments where you're just trying to

4    beat inflation.

5    Q     Can we assume that, when you invest, you will keep

6    safety -- the safety of the funds in mind?

7    A     The preservation of principal is of paramount importance

8    for any -- any fiduciary and trustee.

9    Q     What kind of financial recordkeeping do you intend to

10   keep under the agreement?

11   A     We do maintain comprehensive financial books and

12   records, as well as routine financial reporting on the status

13   of each of our accounts.  Obviously when you're hiring

14   consultants and contractors and vendors, you know, there's --

15   there are disbursements of amounts that are owed to those

16   third parties, all of which have multiple controls built into

17   our process and our outside CPA.

18   Q     Are there any tax issues that you will have to address

19   as trustee?

20   A     The Trusts will have to file tax returns.  The trustees

21   will also provide information to Mallinckrodt for their tax

22   filings.

23   Q     Okay.  What kind of budgeting do you intend to do as

24   trustee?

25   A     We will prepare and submit draft and final annual

1  budgets, and those will be based on the work that we are

2  proposing to implement in that budget year, and those will be

3  accompanied by forecasts of quarterly spending projections for

4  both the budget year, the subsequent year, and a five-year

5  period.

6  Q    And will those budgets be submitted in advance to the

7  parties?

8  A    They will be submitted in draft form to the

9  beneficiaries of the Trust.  The trustee will receive and

10 incorporate comments from the beneficiaries and then issue and

11 finalize the -- the annual budget.

12 Q    You mentioned earlier that there's a schedule of

13 payments which is roughly $25 million per year for the next

14 five or six years.  Do you remember that?

15 A    Correct.  I think it's actually the last payment would

16 be made by December 31 of 2027.

17 Q    Right.  So what if in one of your annual budgets there's

18 a projection for expenditures that exceeds the $25 million in

19 a given year, what would happen then?

20 A    The trustees would have to provide notice to the

21 beneficiaries of a potential exceedance and consult with the

22 beneficiaries on the receipt of those funds.  And I believe

23 there's a time period of notice that is required to provide to

24 Mallinckrodt so they can make the funding arrangements.

25 Q    You mentioned earlier that you will create Trust

1    accounts for each of the elements of the remedial work.  Do

2    you remember that?

3    A     Yes.

4    Q     Okay.  So you'll have a separate account for the capping

5    work that is proposed in the Orrington Reach?

6    A     Correct.  That is correct.

7    Q     Okay.  Now, do you remember how much money is allocated

8    in the settlement to capping in the Orrington Reach?

9    A     There is a $50 million allocation for the 130-acre

10   capping of Orrington Reach.

11   Q     What if you do the capping work as you design it and it

12   costs $45 million, what happens to the other 5 million of

13   Committed Funding for that work item?

14   A     Under the documents, that 5 million -- once the trustee

15   has certified that the cleanup -- the Orrington Reach cleanup

16   has been accomplished, those funds would be available for

17   other work elements for other aspects of the Remediation Trust

18   responsibilities.

19            MR. BERNARD:  Your Honor, that's Section 17 of the

20   Consent Decree.

21   BY MR. BERNARD:

22   Q     The financial responsibilities that you've been

23   describing, Ms. Brooks, are they customary in the trust

24   arrangements that Greenfield has been engaged in?

25   A     Absolutely.  Our financial responsibilities include all

1   of the items we've discussed -- financial reporting, annual

2   budgeting, long-term forecasting, investment and management of

3   funds.

4   Q     You mentioned that you'll be acting in a fiduciary

5   capacity; is that right?

6   A     That is correct.

7   Q     And I know that's a word that has maybe slightly

8   different meanings in different contexts.  What -- what does

9   it mean to be a fiduciary in this context?

10  A     A fiduciary has a duty of -- of strict loyalty to its

11  beneficiaries, and in this case, it means that -- that all of

12  its actions and decisions are specifically made in the

13  interests of the beneficiaries of this Trust.

14  Q     Okay.  And is that how you would behave in this

15  assignment?

16  A     It is.

17  Q     Okay.  Let's turn now to the powers and the duties, more

18  specifically, of the trustee.  And I -- I think you mentioned

19  that -- earlier that you have the power to retain other

20  professionals; is that right?

21  A     That is correct.

22  Q     Okay.  And you're -- are you aware that in this case,

23  there have been a number of professionals -- scientists,

24  engineers -- who have been engaged up to this point?

25  A     I am aware, yes.

1    Q     Okay.  And do you intend to consider whether some of

2    those can be used in order to produce efficiencies and

3    economies going forward?

4    A     Absolutely.  We recognize there is a body of information

5    -- technical, scientific, and other information -- that has

6    been assembled by many, many parties, including the

7    beneficiaries of these Trusts, and we would fully intend to

8    leverage those and -- and build on them and consider those

9    options.

10   Q     That said, you would retain independence, I take it, to

11   make decisions about which, if any, of those professionals

12   would be prudent to engage?

13   A     That is correct, we would make those decisions.

14   Q     Okay.  What is the decision-making authority of the

15   trustee, as you understand it, under the settlement agreement?

16   A     The trustee is -- the trustee has broad powers to

17   develop cleanup plans, to identify and retain consultants and

18   contractors, to provide for and manage the funds, to -- to

19   keep books and records, et cetera.  It's -- I think the one

20   consideration that I would point out is that there are

21   significant consultation responsibilities, and certainly

22   Greenfield's approach would be to actively consult with the

23   beneficiaries.  But, generally speaking, the trustees have

24   presumptive approval over budgets.  They confer with the

25   beneficiaries, but they can hire and retain experts.

1          And unless one of the parties triggers the dispute

2     resolution provisions under the agreement, we would -- we

3     would basically implement the responsibilities of the Trust.

4     Q     Okay.

5               MR. BERNARD:  That's covered in Section 30 of the

6     Consent Decree, Your Honor.

7               THE COURT:  Thank you.

8     BY MR. BERNARD:

9     Q     There's something in the Consent Decree -- this is

10    Paragraph 31 -- that I think you're familiar with called a

11    standard of care; is that right?

12    A     Yes.

13    Q     What -- what is that?

14    A     For us, it's the standard of professionalism and

15    commitment to essentially what is, in -- in our understanding,

16    the highest standard of care in U.S. law, which is the care

17    that is owed by a fiduciary to its beneficiaries.

18    Q     Okay.  So to make this more concrete, I just want to

19    take you briefly through one element of the remedy, and maybe

20    it's easiest to use the Orrington Reach, the capping there, as

21    an example.

22          Could you just describe to the court briefly how you

23    would go about accomplishing that work that is prescribed in

24    the settlement agreement?

25    A     Certainly.  I mean, we would start initially by

1   developing the overall strategy for implementation of the

2   capping in Orrington Reach, including defining what the remedy

3   performance goals and criteria would be.  Once we had that

4   established, we would identify and retain certain experts to

5   assist, probably most immediately with identifying what

6   permits and approvals are required to actually design and

7   implement the Orrington Reach remedy, and then to retain those

8   consultants and contractors that would assist us with

9   developing the design plans, performing site investigation,

10  studies, et cetera, and then actually hiring the contractors

11  that will be implementing the cleanup, installing the cap in

12  Orrington Reach.

13  Q      And will you manage all of that activity -- will

14  Greenfield manage all of that activity and supervise it?

15  A      Yes, we will.

16  Q      And would that include up through the construction?

17  A      Up through construction, postconstruction monitoring,

18  and any O and M associated with that cap, any operations and

19  maintenance.  Excuse me.

20  Q      And in general, will the other elements of the remedies

21  set forth in the settlement go through a similar process?

22  A      They will.

23  Q      I just want to cover briefly your relationship to the

24  parties.  You've mentioned that they're the beneficiaries.

25          Is there an advisory committee that would be put

 1  together under the terms of the agreement?

 2  A     Should -- should Greenfield be appointed, yes, we would

 3  establish an advisory committee for each of the Trusts.  It's

 4  a -- in our understanding, it's a way in which the trustees

 5  can derive the benefit of all of the knowledge and work that's

 6  been done by the parties, that it would provide a forum for

 7  the exchange of ideas, bringing in technical experts that have

 8  viewed this river from a variety of -- of perspectives, and

 9  have an informal way to understand early both the base of

10  technical knowledge and the expectations, if you will, of our

11  beneficiaries.

12  Q     Beyond the advisory committee, would you intend to seek

13  input in an ongoing way from the beneficiaries?

14  A     We would, for a number of reasons, including the fact

15  that it's going to be far more efficient and -- more efficient

16  utilization of finite funds to have early consultation and the

17  exchange of ideas with the beneficiaries and thereby have a

18  more efficient consultation and potentially avoid the need for

19  going through a dispute resolution process.

20  Q     Okay.  Let's turn to communications with the court.  Are

21  you aware that the settlement asks the court to retain

22  jurisdiction over the implementation of the terms of the

23  Consent Decree?

24  A     I am.

25  Q     Okay.  And what reporting, if any, would you do as

1    trustee to the court?

2    A     We would provide, at a minimum, quarterly progress

3    reports to the court that would essentially provide a

4    financial update for each of the Trusts and the work

5    categories, progress made in the period covered by the report,

6    expected milestones, you know, issues encountered, and plans

7    for the resolution of those issues.  Those are the kinds of

8    things that we would expect to include in a quarterly report

9    to the -- to the court.

10             MR. BERNARD:  Your Honor, the report -- those

11   quarterly reports are discussed in the Consent Decree at

12   Section 37 and in the Statement of Work at Section 25.

13   BY MR. BERNARD:

14   Q     And in addition to the regular quarterly reporting,

15   should the court make any requests, will you be prepared to

16   respond to those?

17   A     Absolutely.

18   Q     Okay.  You mentioned earlier the importance of community

19   involvement and Greenfield's approach to community

20   involvement.  Would that be any different -- what you

21   testified to in response to Ms. Rideout's questions, would

22   that be any different in this case?

23   A     Certainly not be different.  In fact, in our view,

24   community acceptance of the entire approach to remediating the

25   Penobscot Estuary is -- is very, very important.

1   Q     Okay.  Is it fair to say that's kind of a -- a standard

2   part of Greenfield's approach to remediation projects is to

3   involve and inform the community?

4   A     We do.  It's essential.  Communities are most impacted

5   by contamination, the cleanup process, and any outcoming

6   restoration.

7   Q     And will you develop a website that -- where the members

8   of the community who are interested will be able to find

9   information about the cleanup?

10  A     Yes, we would develop a website, and we would deploy a

11  number of other programs to support com -- active community

12  engagement and information dispensation.

13  Q     The Statement of Work in paragraph -- or Section 24

14  calls for someone called the community involvement

15  coordinator.  Are you familiar with that?

16  A     I am.

17  Q     What would that person do?

18  A     That person would function as a point person on our

19  community -- engagement community relations activities, both

20  in terms of stakeholder groups, local government, and private

21  landowners.  I think the expectation is that there will be a

22  private landowners that we'll have to secure approval from in

23  order to implement significant portions of this cleanup.

24  Q     Will you keep a project database?

25  A     We will keep a project database.

1   Q     And are you aware that the Wood firm has already

2   developed a database?

3   A     Yes, we are, and we would integrate that database into a

4   larger, long-term database that would be available to the

5   beneficiaries, you know, all of the consultants and

6   contractors and -- and some of the educational institutions

7   that have been interested in this river for many years.

8   Q     You also mentioned earlier Greenfield's approach to

9   cooperating with regulators and interacting with regulators.

10  Would that be this -- excuse me -- what you testified to

11  before, would that be the way you would approach this project?

12  A     Absolutely, early, proactive, cooperative consultation.

13  Q     Okay.  Let's -- just a couple of questions on

14  compensation of the trustee.

15        Are you aware of how much is provided in the settlement

16  agreement for administrative expenses that Greenfield would

17  incur?

18  A     I am.

19  Q     How much is that?  Do you remember?

20  A     It's 7 million in Committed Funding for the

21  administrative accounts.

22  Q     And is there a contingent amount in addition to that?

23  A     There is a $10 million Contingent Funding amount.

24  Q     Okay.  So if you look at that range, between 7 and $17

25  million, is that within the range of what Greenfield's

1   customary compensation is in your various engagements across

2   the country?

3   A     It is very consistent, yes.

4   Q     Okay.  And you're aware that the settlement calls for a

5   ten-year term for the trustee?  You're familiar with that?

6   A     I am.

7   Q     Okay.  And you're also familiar that -- with provisions

8   for removal or resignation and replacement of the trustee; is

9   that right?

10  A     I am, and -- and I would add that we -- we proposed that

11  language because we wanted to make sure that our beneficiaries

12  were -- that we were meeting or exceeding their expectations.

13          MR. BERNARD:  Your Honor, those provisions are

14  embedded in Paragraph 25 -- 25 of the Consent Decree.

15  BY MR. BERNARD:

16  Q     So just some final questions, Ms. Brooks.  How do you

17  plan to -- let's -- we're assuming that this engagement goes

18  forward for the moment.

19          How do you plan to staff it out of Greenfield?

20  A     We would propose to have our Senior Director of

21  Environmental Programs, Lauri Gorton, serve as the program

22  manager for the Penobscot.  She has more than 30 years'

23  experience overseeing and implementing very complex

24  remediation projects, including sediment cleanups, as well as

25  she is regarded as a national expert in RCRA, Resource

1    Conservation Recovery, which is the regulatory framework under

2    which this -- the river will be cleaned up.

3    Q    Do you have a high degree of confidence in Ms. Gorton's

4    abilities to carry out this job?

5    A    Yes, I've known Ms. Gorton for years, and I have the

6    utmost confidence in her abilities.

7    Q    Okay.  Will you also staff the project with some

8    in-house law expertise?

9    A    We will, we will utilize, to the extent we can, our

10   in-house attorneys and accountants.  They are far less

11   expensive than outside counsel and they have significant

12   experience, so we would, yes --

13   Q    What --

14   A    -- as well as our communications team.

15   Q    What about your financial team, will they also take

16   part?

17   A    Absolutely, absolutely.

18   Q    And what will your personal role be, if any, in the --

19   the engagement?

20   A    I expect to play a significant role in the oversight and

21   setting strategy, direction, priorities for these two Trusts,

22   as well as, you know, conferring on major milestones and

23   decisions, including consultants and contractors that might be

24   retained by Greenfield.

25   Q    Do you expect to develop any physical presence in Maine

1    on the part of Greenfield personnel?

2    A    We do.  I expect that we'll open a small office within

3    the first year should we be appointed.

4    Q    Okay.  Now, is it fair to say that the settlement

5    provides a considerable amount of money that will be spent on

6    the variety of remediation and related activities that are set

7    forth in the Consent Decree?

8    A    I -- I think that is correct.

9    Q    And the trustee will be making decisions about who will

10   be earning those funds?

11   A    That is correct, and --

12   Q    In --

13   A    Yeah.

14   Q    In doing that, will you give any consideration to the

15   local economy, in other words, to expending those funds where

16   prudent and appropriate within the state of Maine?

17   A    Absolutely.  We have, you know, for decades, prioritized

18   at Greenfield investing cleanup funds in the local economy,

19   and so where possible and prudent from a financial standpoint,

20   we fully intend to maintain that model -- the local hiring

21   model.

22   Q    Okay.  Just one last question, Ms. Brooks.  The -- we --

23   we've been through a lot of the particulars from the relevant

24   documents.

25        In your own words, if -- if this goes forward, if the

1  court endorses the decree and Greenfield acts as trustee, what

2  fundamentally do you see as your job?

3  A     Our job would be to take on the remediation and

4  restoration activities for the Penobscot Estuary, to

5  accelerate the recovery of the estuary in terms of time frame

6  for addressing mercury contamination.  We would do that as an

7  independent, trusted fiduciary, and should we be appointed, we

8  would be truly honored to serve.

9          MR. BERNARD:  Thank you.  Nothing further, Your

10 Honor.

11         THE COURT:  Thank you.

12    Anything further?

13         MR. TALBERT:  Nothing further.

14         THE COURT:  I have some general questions and a

15 specific question.

16                       EXAMINATION

17 BY THE COURT:

18 Q     So you have described your fiduciary obligation to the

19 beneficiaries.  The beneficiaries are Mallinckrodt and the

20 Maine People's Alliance, along with the Natural Resources

21 Defense Council.

22 A     Correct.

23 Q     The beneficiaries, at least as this litigation has

24 revealed, are not -- or their motives and goals are not

25 entirely consistent.

1    A      Understood.

2    Q      And, in fact, here there's a built-in conflict

3    potentially between Mallinckrodt, which pays a minimum of 187

4    million and a maximum of 267 million, depending on your

5    decisions, right?

6    A      Correct.

7    Q      And Mallinckrodt is not in the business of spending more

8    money than it has to.

9    A      Understand.

10   Q      And the Maine People's Alliance and the Natural

11   Resources Defense Council will be interested in making certain

12   that, at least if not wasted, the maximum amount of

13   remediation is applied to this environmental catastrophe,

14   correct?

15   A      Correct.

16   Q      So tell me, how do you go about resolving two fiduciary

17   conflicting obligations which are inherent under the Proposed

18   Consent Decree?

19   A      That is our responsibility, Your Honor.  We have worked

20   in a number of other situations with beneficiaries that were

21   not aligned, both in policy and goals.  Our -- our duty here

22   would be to independently perform our responsibilities

23   consistent with our duties to both of those parties.

24   Q      Where -- where -- the ultimate beneficiary is the one

25   that's not a party and that is the river.

1   A      The river is the -- the primary resource, and

2   Greenfield's commitment to the people of Maine is to honor and

3   restore that community public resource.  That is foundational

4   to our outreach and our approach.

5            THE COURT:  And -- and perhaps the lawyers can tell

6   me, where is that in the agreement?

7            MR. BERNARD:  Your Honor, that -- so I understand,

8   you're asking where in the agreement is the statement that the

9   ultimate beneficiary is, in effect, the Penobscot River?

10            THE COURT:  Right.

11            MR. BERNARD:  I don't know that that's in -- written

12   into the agreement.  It is certainly, as you can imagine from

13   the plaintiffs' point of view, a true statement.

14            THE COURT:  It's implicit, but it's not explicit,

15   and other -- my concern and my question is directed to the

16   inherent conflict between the two beneficiaries as this is

17   established.  I think her statement is correct and your

18   statement is correct implicitly, that the goal of her

19   management -- or Greenfield's management would be ultimately

20   to benefit the river, but that's not the way it's constructed.

21            MR. BERNARD:  I don't know as a legal matter whether

22   the river could be a beneficiary -- I mean a -- a -- kind of

23   an explicit beneficiary.  There could be a statement, I

24   suppose, in the decree to that effect.

25            THE COURT:  Well, if you -- if you're -- the

1  statement would be that in resolving any disputes between the

2  beneficiaries, the -- Greenfield must consider that the

3  environmental impact of the decisions on the Penobscot River

4  is paramount, something to that effect.  I mean, it's not -- I

5  think the parties sort of agree on that, that's why we're

6  here, but that's not, under the terms of the agreement, what I

7  see.  And she's got, as I -- as I have explored here, an

8  inherent conflict between Mallinckrodt, which obviously is not

9  going to want to spend more money than it has to, and the

10  plaintiffs, which are going to be vigilant in terms of

11  attempting to make certain that the money is properly spent,

12  if necessary.

13       But the overall umbrella to that has not been -- how do

14  you resolve that conflict has not been made explicit as part

15  of the agreement.  That's my concern.

16            MR. BERNARD:  Right.  So I -- I hear that concern,

17  and, of course, I can share it to the extent that the decree

18  can be interpreted otherwise.  You know, our view is -- you

19  know, and as the First Circuit has said that, you know, this

20  is all an action under RCRA, it is a settlement of a RCRA

21  citizens' suit, in which the statute says that the goal is to

22  eliminate any danger posed by contaminants like mercury, and

23  where the First Circuit has said explicitly there's a finger

24  on the scale in favor of remediation.

25       So from the plaintiffs' point of view, that is at least

73

1  kind of an organizing principle, even if it's unstated.

2          THE COURT:  Right.  But my -- my issue is should

3  something unstated be stated if the court is going to approve

4  it.

5          MR. BERNARD:  I think that's --

6          THE COURT:  I think it's implicit and it underlies

7  the whole -- we don't need to keep her here for this purpose,

8  but it's a question that concerns me in terms of how she's

9  going to approach the resolution of a conflict -- an inherent

10 conflict which is built into the agreement.

11     Yes, Mr. Talbert, do you have something?

12         MR. TALBERT:  Yeah, if I may, Your Honor, and I -- I

13 understand where you're going.  I think throughout -- I guess

14 I'll -- we don't have any objection necessarily if you believe

15 additional language is necessary in the Consent Decree, but

16 that said, I'd like to just point out a couple things that are

17 in the Consent Decree and maybe concretely this concern about

18 the contingent funds.

19     So the -- the agreement calls for Mallinckrodt to commit

20 187 million.  Those -- those funds are going to go to either

21 remediation or to beneficial environmental projects.

22         THE COURT:  Right.  And that's -- that's not --

23 that's not really the issue from my perspective.  The issue is

24 the differential, the $80 million differential, which is

25 considerable; it's not chump change here.

1          MR. TALBERT:  Right.  So just to be explicit, the --
2   the Contingent Funding kicks in upon explicit triggers.  So,
3   for example, the bulk of the Contingent Funding, which is
4   associated with the -- the dredging and removal, would be a
5   disposal issue, so that difference called for when you heard
6   of something called beneficial environmental reuse.  I don't
7   think there's a difference between the parties in terms of
8   whether that would be a good thing if that material could be
9   beneficially reused.  If it can't be and it has to be
10  landfilled, that's where the bulk of that contingent funds
11  would go.
12      So I -- I don't foresee that type of conflict, unless
13  there's something that has happened that the plaintiffs have
14  changed their view on, beneficial reuse, and then with respect
15  to the other contingencies, they're -- they're to allot for,
16  you know, administration or long-term monitoring or for -- you
17  know, for example, in the Orrington Reach and the capping if
18  more is needed for -- for those measures.
19      So we built in dispute resolution that would be a way to
20  try to resolve if there were a conflict, but from our
21  perspective, we -- we did discuss how to avoid fights about
22  the contingent funds and what those were at the beginning, and
23  so we tried to be explicit about what those triggers are, to
24  give Greenfield some guidance on that, and -- and avoid those
25  conflicts.

1          THE COURT:  The reason --

2          MR. TALBERT:  I can't say any more than that.

3          THE COURT:  -- I raise it is that, you know, in a

4  more specific sense, we've heard over the last day and a half,

5  some very fine experts.  Mr. Walter and Dr. Driscoll have

6  suggested, at least that -- at least on the Orrington Reach,

7  because of erosion issues and similar issues which they've

8  discussed, that dredging would be the more appropriate

9  remedial action in that area.  I just heard today Dr. Reible,

10  who's obviously an expert in this matter, too, saying, well,

11  no, dredging will cause, in his view, more contamination than

12  the dredging is worth, and he suggested which -- and he's

13  explained it well, why capping would be appropriate.

14     Now, how -- my question really for her is, how do you

15  resolve that?

16          MR. TALBERT:  We --

17          THE COURT:  How does she resolve that?  She's not an

18  expert in this field.

19          MR. TALBERT:  We have already -- the parties have

20  actually -- and I apologize for the confusion.  Perhaps we

21  could do a better job -- or I could have done a better job

22  presenting this.

23     But the parties have already resolved that conflict, and

24  we -- we compromised and agreed to do capping, if that can be

25  accomplished, in that Orrington Reach, and the compromise on

1    the other areas, for example, the surface deposits, where

2    there was a disagreement, we compromised and we agreed that

3    those funds could be used to remove material.  So this

4    settlement calls for some dredging and some capping; in other

5    words, that's already been addressed by the parties.

6           MR. BERNARD:  The real issue I think in terms of

7    dollars, Your Honor, I agree with Mr. Talbert that this is a

8    -- it's only -- it's the 80 million in contingent, and of

9    that, it's really the 30 million because the 50 million for

10   the dredging contingent funds really relates exclusively to --

11   to the disposal option and whether the dredged sediment can be

12   beneficially reused, which I think everybody would want; I

13   mean, the plaintiffs would want that, too -- that's better for

14   the environment -- than sending it to a landfill.  And so I

15   don't think there's going to be a conflict about that.

16       There are two issues there:  One is, does it qualify

17   chemically to be beneficially reused, and that's a matter of

18   making measurements and meeting the regulatory requirements;

19   and the second is whether there's a market for it.  Even if

20   you could beneficially reuse it, you've got to find a place to

21   put it, and if you can't, then the contingent money would be

22   used to dispose of it in a landfill.

23       But $30 million is not chump change either, and you are

24   certainly correct that the plaintiffs are going to want

25   maximum productive remediation activity, and if that means you

1    tap into those contingent funds, we're going to want that to

2    happen.  And we do believe that there should be a finger on

3    the scale in -- if there's a dispute, a finger -- you know,

4    given the setting of this case, that the finger -- that there

5    should be weight placed, emphasis placed on remedial activity.

6        So we will -- we certainly believe that, and I guess we

7    believed it's implicit -- I think it would be -- if

8    Mallinckrodt doesn't object, as Mr. Talbert suggested it may

9    not, I think making that explicit for any of the contingent

10   funds that may be in dispute, that would be helpful and we

11   would like that, either for the trustee or for dispute

12   resolution, if it comes to that.

13       THE COURT:  So let me just give you an example so I

14   understand it.  So let's assume that the Orrington Reach is,

15   under her guidance and with the assistance of experts, capped

16   in the fashion just described earlier today by Dr. Reible, and

17   then we have another Hurricane Sandy and every -- in the next

18   few years -- we seem to be having these hurricanes more and

19   more frequently, perhaps due to climate change or whatever, we

20   just seem to be having more difficult weather -- and we have a

21   storm that basically removes a substantial portion of the cap

22   that he thought was going to be there for a number of years.

23       And it turns out, well, maybe in light of that

24   environmental event which has eroded more quickly than we ever

25   anticipated the cap, we do need to dredge and it's within the

1    first few years of this ten-year paydown.  What happens?

2           MR. BERNARD:  If the -- there is money left in the

3    -- up to 60 million, the 50 plus 10, in the Orrington Reach,

4    then we can do that if the trustee decides to do it.  If

5    altern -- another source of funds from the settlement would be

6    if less money is spent on one of the other designated

7    activities, there could be the transfer that Your Honor

8    inquired into on Friday, or there could be another source of

9    funds found outside the settlement.  Those are the

10   alternatives I see.

11          THE COURT:  All right.  Do you agree with that?

12          MR. TALBERT:  Yeah, that's right.  There's -- there

13   are contingent funds to try to address the situation you're

14   mentioning.  If there's some issue, there's 10 million set

15   aside that can be used for either fixing or if you had to

16   change gears -- I mean, the idea is that they design and would

17   run off these models to try to avoid the situation you're

18   mentioning.  But that's right, if there were some catastrophic

19   situation, you have a couple sources of different funding, and

20   I don't think that has been in dispute in terms of --

21          THE COURT:  And -- and how does Ms. Brooks make that

22   decision?

23          MR. TALBERT:  So we've built in I think in the --

24   and we -- we did discuss this as a matter of course -- that

25   you would -- you would try to cap and they would put all

1   efforts into that.  If that's -- if that's not possible and

2   there is -- they have to switch gears, there would be a

3   discussion amongst the parties, but we've already agreed that

4   we'd have to look at other alternatives and then we would work

5   with the consultants and do the design work and -- and move

6   through that process.

7       But I mean, effectively, the company's committed to the

8   187, you know, amount that -- that will be spent, and then,

9   you know, when you break that down, really the only

10  contingency that is -- I'll call it -- remediation-triggered

11  is that 10 million because the other is for monitoring or

12  administrative or beneficial reuse.

13      So -- but we've tried to talk through those issues and

14  think through them and then outline them, to the extent that

15  we can.

16          MR. BERNARD:  The monitoring is not an insignificant

17  issue.  You know, we have a minimum of 35 years, but up to 45

18  years, and we have an additional 10 million -- it's a 10

19  million base amount -- but an additional $10 million for

20  additional monitoring.  And as you heard from Dr. Driscoll,

21  you know, that's just a critical piece of this environmentally

22  because it will help not only in the settlement activities,

23  but the state and federal governments, who will have

24  jurisdiction over these waters forever.

25          MR. TALBERT:  I mean, and another --

1           THE COURT:  All right.

2           MR. TALBERT:  -- I'm sorry -- just one more point on

3    -- on -- that is a pragmatic point on the -- on the permitting

4    of this, right, you could go out and there could be issues

5    even permitting the remedy, so the parties have discussed what

6    happens in that event that you can't permit one of these

7    remedies, and it would either be switching gears or there is

8    the Project Trust that's set up so that the funds can shift

9    into that that would go to some beneficial projects for the

10   community.

11          THE COURT:  All right.

12          MR. TALBERT:  So there is a couple of different

13   layers.

14                          EXAMINATION

15   BY THE COURT:

16   Q    Well, I've raised this in the context of my questions to

17   you and I want to give you -- I've heard from the lawyers now.

18   Let me give you a chance to weigh in on this.

19   A    Your Honor, part of the responsibility of the trustee is

20   to develop the -- the plan for how -- including Orrington

21   Reach, for how the Trust is going to approach the cleanup and

22   that includes looking at both short-term performance of a cap

23   and long-term remedy performance.

24          So when the budget and the five-year forecast, et

25   cetera, are put together for Orrington Reach, they will have

1  to account for a period of time that, in our best judgment and

2  in the advice of our experts, allows us to confirm this remedy

3  is effective, and we, speaking for Greenfield, we would not

4  put forward a plan that didn't allow us to monitor performance

5  for a period consistent with the conditions and climate here.

6      I think it's been stated that there are permitting and

7  approval processes, and that is all correct, but we would

8  intend to at all times look at, if you're just focused on

9  Orrington Reach, look at how we, as the entity responsible for

10 the protection of public health and the environment, are going

11 to implement that cleanup.

12     There is a standard in the documents that is one of

13 feasibility.  Is a remedy or a project feasible?  And

14 feasibility can consider all of the issues that have been

15 described, including, you know, pragmatic remedy performance,

16 legal access agreements, permits.  If capping Orrington Reach

17 is not approved and permitted, we will not be able to

18 implement that remedy and we will have to put forward an

19 alternative remedy.

20         THE COURT:  All right.  Thank you.

21     Attorney Rideout, anything further?

22         MS. RIDEOUT:  Nothing further, Your Honor.

23         THE COURT:  From the plaintiffs?

24         MR. BERNARD:  Nothing further, Your Honor.

25         THE COURT:  Thank you.  You may stand down.

1      It's probably time for us to take our break.  I'll be

2  back in about 15, 20 minutes.

3      (The witness left the witness stand.)

4      (Court recessed from 10:48 a.m. to 11:13 a.m.)

5          THE COURT:  What's next?

6          MR. BERNARD:  Your Honor, the plaintiffs call Jesse

7  Graham.  Your Honor, my colleague Ms. Phillips will question

8  him.

9          THE COURT:  Very good.

10         THE CLERK:  Can you please raise your right hand.

11 Do you solemnly swear that the testimony you shall give in the

12 matter now in hearing shall be the truth, the whole truth, and

13 nothing but the truth, so help you God?

14         THE WITNESS:  Yes, I do.

15         THE CLERK:  Thank you.  Please be seated.  Can you

16 please state your name for the record and spell both your

17 first and last name?

18         THE WITNESS:  Sure.  Jesse Graham, J-e-s-s-e

19 G-r-a-h-a-m.

20         MS. PHILLIPS:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22 JESSE GRAHAM, having been duly sworn, was examined and

23 testified as follows:

24                     DIRECT EXAMINATION

25 BY MS. PHILLIPS:

GRAHAM - DIRECT EXAMINATION/PHILLIPS                 83

1    Q     Good morning, Mr. Graham.

2    A     Good morning.

3    Q     Let's start by talking a little bit about your

4    background.  Where do you live?

5    A     I live in Bar Harbor, Maine.

6    Q     And how long have you lived in Maine?

7    A     I've lived in Maine my entire life, except for a couple

8    of winters when I went to school in Vermont.

9    Q     What's your educational background?

10   A     I studied environmental studies and I have a bachelor's

11   degree in environmental studies from the University of

12   Vermont.

13   Q     And what do you do for a living?

14   A     I am codirector of the Maine People's Alliance.

15   Q     How long have you worked at the Maine People's Alliance?

16   A     I started there in 1999, so just about 22 years now.

17   Q     And have you had other roles in the organization during

18   that period?

19   A     Yeah, I became codirector in 2018.  But prior to that, I

20   was the sole director for about ten years, since 2007, and

21   even before that, I was a -- a canvass director, a door-to-

22   door canvass director and a community organizer here in the

23   Penobscot Valley region for about five years.

24   Q     And what are your current responsibilities in the

25   codirector role?

1   A      Yeah, typical nonprofit management work.  I do a lot of

2   fund-raising and budgets, manage some of our -- our staff, and

3   help advise on the campaigns that we're running.

4   Q      Going back 22 years ago, why did you decide to start

5   working at the Maine People's Alliance?

6   A      Well, I -- I had studied environmental studies at school

7   and I had done some work with Vermont Public Interest Research

8   Group around deformed frogs and pesticide registries and

9   limiting the amount of pesticides that were used, and I also

10   did a job with the Sierra Club on -- that we door-to-door

11   canvassed and raised money and signed up new members for the

12   Sierra Club.

13         And I had a chance to move back to Maine -- I was doing

14   that in Vermont -- after I graduated and I ran a door-to-door

15   summer canvass for Sierra Club in Portland, but I used to

16   carry my résumé in my bag when I went door-to-door and I met

17   people that worked at Maine People's Alliance and I was hired

18   there in September of 1999.

19   Q      So it's fair to say you have a very long-standing

20   interest in environmental issues?

21   A      Yeah, I was definitely attracted to MPA because of this

22   campaign, they were talking about mercury pollution at that

23   time, but also dioxin-free paper was a campaign that they were

24   talking about.

25   Q      Great.  Let's talk a little bit more about the Maine

1  People's Alliance.  In brief, what is the Maine People's

2  Alliance?

3  A    Yeah, we're a statewide community organization, a

4  membership organization, and we work on a whole variety of

5  social justice issues across the state.

6  Q    And is it a nonprofit organization?

7  A    Yes, definitely a nonprofit organization.

8  Q    When did it form?

9  A    It formed in 1982.  So, yeah, we're actually talking

10  about our 40th anniversary next year and events to celebrate

11  our 40th.

12  Q    And what is its mission, in brief?

13  A    Our mission is to create a society where no one -- no

14  one's left behind, everyone has what they need, everyone

15  contributes what they can, and no one's left behind, and we do

16  that through building community together, doing leadership

17  development work, and running campaigns that improve people's

18  lives.

19  Q    So on what kinds of issues does the Maine People's

20  Alliance engage?

21  A    We're definitely multiissue.  We work on dozens of

22  different things, but, historically, healthcare has been a big

23  issue for us and making sure that everyone has affordable

24  healthcare coverage, environmental issues like this have been

25  important, other economic justice issues for sure.

1    Q     And you said that the Maine People's Alliance has

2    members; is that right?

3    A     Yeah, we've extensively done door-to-door canvassing

4    everywhere in Maine, and we have 32,000 members across the

5    state.

6    Q     How does a person become a member?

7    A     Mostly by making a contribution, a membership

8    contribution, but also through volunteering they can be a

9    member, too.

10   Q     And you said the members live all around the state; is

11   that right?

12   A     Yeah, just almost every town across the state we've gone

13   door-to-door canvassing, so we certainly have people in every

14   county across the state that are members.

15   Q     What about staff, how many people does the Maine

16   People's Alliance have on staff?

17   A     Yeah, we have just under 50 right now.  Typically, in

18   the last four or five years, we've had 30 to 35 full-time

19   staff and 10 to 15 part-time staff.

20   Q     And in what -- what types of advocacy do you -- MPA, or

21   Maine People's Alliance, staff members engage in?

22   A     Well, we definitely do door-to-door canvassing and talk

23   to people, residents of Maine.  We do -- talk to legislators

24   about different issues that are in front of the Legislature.

25   We've been part of several different ballot initiatives across

1    the state.  Our members give testimony, write letters to the

2    editor, opinion editorials, things like that.

3    Q    Does the Maine People's Alliance have an interest in the

4    Penobscot River Estuary?

5    A    Yes, definitely.

6    Q    Can you describe that interest?

7    A    Well, we have hundreds, maybe thousands, of members that

8    live in the towns along the Penobscot River, and, yeah,

9    they're definitely concerned about -- concerned about it.

10   Q    Let's talk a little bit about Maine People's Alliance

11   involvement in this litigation.  What is the Maine People's

12   Alliance role in the case before the court today?

13   A    We're one of the plaintiffs.

14   Q    And when did Maine People's Alliance decide to get

15   involved in the case?

16   A    From the beginning, we were in talks with NRDC in 1999

17   about -- about being involved in it.

18   Q    And why did it decide to get involved?

19   A    Well, we were upset about the mercury pollution.

20   Actually, the HoltraChem facility had been previously

21   identified as a concern to members in that area about chlorine

22   leaks and learning about the mercury that was there, so it had

23   been a -- it had been a site that we had talked about and done

24   actions on even previous to this.

25   Q    What was your own first involvement in the case?

1   A     Well, I first learned about it shortly after I was

2   hired, and -- and right after, I did some door-to-door

3   organizing with MPA.  I was hired as our first -- first

4   environmental organizer.  So I -- I did a bunch of the

5   outreach, talking to members that lived along the river, about

6   the case.

7   Q     You mentioned outreach.  Can you describe as a plaintiff

8   how Maine People's Alliance has been involved in the case in

9   general as plaintiff?

10  A     Yeah, we've done door-to-door outreach about it, but

11  we've also e-mailed our members, updates throughout the years.

12  We have a newspaper that goes out to the membership.  We've

13  written articles whenever there's been a significant update in

14  the -- in the case.  We've also done press conferences and

15  press releases around any updates that we thought the public

16  would want to know about.

17  Q     Let's turn to the settlement.  What, if any, involvement

18  did you personally have in the settlement negotiations that

19  led to the Proposed Consent Decree?

20  A     Yeah, I talked pretty consistently with the lawyers from

21  NRDC, and then also I participated in a daylong negotiation in

22  September of 2020.

23  Q     Can you describe your participation in that daylong

24  negotiation?

25  A     Yeah, sure, it was a -- it was a -- like a Zoom-type

1  meeting over the computer, where both sides were there and

2  Judge Nivison helped guide us through a process to come to --

3  hash out some of the agreement, and there were breakout rooms

4  where Mitch and Jared and I discussed different things

5  throughout the day.

6  Q    When the settlement negotiations began, how did you feel

7  about potentially settling this case?

8  A    I was open to settling.

9  Q    Can you say more about that?

10 A    Well, we've been involved for a long time, you know,

11 20-plus years is a long time to be part of this, so we

12 definitely felt that if we could get significant recovery in

13 the river and clean up mercury pollution in the river and hold

14 Mallinckrodt accountable for it, then we're certainly open to

15 -- to settling.

16 Q    Could I just ask at the end of your sentences to make

17 sure you speak right into the microphone.

18 A    Yeah.

19 Q    So what is the Maine People's Alliance current position

20 on the settlement and the Proposed Consent Decree?

21 A    Yeah, we support the -- we support the settlement.  We,

22 you know, think that it serves the purpose of the original

23 lawsuit that'll lead to clean up and recovery of the river.

24 We also know that it's been a long time, and, you know, all

25 the litigation and all the research that the court has

1   directed and all the planning for how to clean it up has been

2   done.  So we think that it's -- it's time to -- time to clean

3   it up.

4        I think it's not without some reservation.  Me

5   personally and some of our members do have concerns like is

6   this enough, and with the power of the Penobscot River erosion

7   that's caused and the idea of climate change and bigger

8   storms, you know, we have some concerns, is this -- is this

9   enough for 20 -- you know, 20, 30 years that we're going to

10  monitor, but also for 50 or 500 or a thousand years from now,

11  is this enough that we can isolate the mercury effectively.

12       But, yeah, that said, and it doesn't seem like it's

13  possible to go in and get all of the mercury out and we

14  certainly -- at least we don't think we can go back in time

15  and stop it from happening, that we support -- we support the

16  settlement to go forward.

17  Q    Let's talk about process.  How did the Maine People's

18  Alliance decide to support the settlement internally?

19  A    Yeah, I brought -- brought the idea of settlement to our

20  management team and our board and we discussed it, and then

21  after that daylong settlement talks when we had a -- had a

22  tentative agreement in that moment, we talked about it with

23  our management team and -- and agreed, and then we also had a

24  longer discussion at our board meeting and the board voted to

25  support the settlement.

GRAHAM - DIRECT EXAMINATION/PHILLIPS                    91

1   Q    You said we.  So were you personally involved in those

2   discussions with the board?

3   A    Yes, definitely in all those discussions.

4   Q    Okay.  Can you briefly describe what you know about the

5   terms of the settlement?

6   A    Yeah, I've read -- I've read -- I've read through it --

7   through a lot of the materials and following what's been

8   happening here in -- in court.  I know that it will be some

9   dredging and removal of mercury sediments and some capping and

10  that Mallinckrodt's going to pay for it.

11  Q    You mentioned this briefly before, but can you elaborate

12  on what you think about the remedies proposed in the

13  settlement?

14  A    Yeah, I think they're smart remedies.  They're based on

15  -- on science, and even as far back as when I was studying --

16  studying environmental studies, 1994 to 1998, these were

17  things that were used back then, so they seem like tried and

18  trusted remedies for dealing with this type of pollution.

19  Q    Have Maine People's Alliance members expressed views

20  about the settlement?

21  A    Yes, I mean, many members have been involved throughout

22  this, but once we had the settlement, we -- we informed our

23  membership.  We sent an e-mail a few weeks ago.  You know,

24  hundreds of our members submitted comments that are -- that

25  are -- to the court in support of the settlement.

1        MS. PHILLIPS:  Your Honor, you can find all of the

2   submitted public comments at Joint Exhibits 104 through 106

3   and the MPA members' comments are at Joint Exhibit 105.  I

4   believe it's just over 100 or so comments.

5        THE COURT:  Thank you.

6   BY MS. PHILLIPS:

7   Q    Have you explored the history of river remediation

8   efforts in Maine?

9   A    Yes.

10  Q    Are you aware of any river remediation efforts in Maine,

11  either past or present, that are greater in magnitude than the

12  cleanup proposed in the Consent Decree?

13  A    No, I think this will be one of the largest cleanups --

14  environmental cleanups in Maine, and I think it, as far as I

15  know, will be the largest river restoration.

16  Q    Let's go back to members for a moment.  What do you

17  think the settlement will mean for the Maine People's

18  Alliance's members?

19  A    Well, even as far back as the early 2000s when I was

20  door-to-door canvassing along the Penobscot, our members had

21  stopped eating shellfish or lobsters or fishing and some of

22  them had even stopped swimming and kayaking in the river.  So

23  I think the settlement and the res -- you know, the recovery

24  of the river, if we can accelerate it, our members will go

25  back to enjoying the river the way that they had previously.

1  Q      And what do you think the settlement will mean for the

2  people of Maine in general?

3  A      Well, I think it's a -- I mean, the Penobscot River's a

4  big -- big deal for Maine, and I think it'll mean a lot to

5  people across -- across the state and certainly folks that

6  live along the river or live in the Penobscot Bay region.

7  Q      Is there anything else you'd like to share with the

8  court?

9  A      Just briefly, I was thinking back in terms of our -- our

10  members have been pretty upset about this when they learned

11  about the amount of mercury in the river, and I think -- we

12  know the only reason we're here today -- sorry -- is that --

13  that the law allowed for citizens to sue in this case and that

14  the court has ordered the -- all the research and all the

15  remedies that could happen, and, you know, it's been a long

16  time, so 20-plus years, all that litigation, all the research,

17  and all the cleanup plans.

18        So, you know, we're -- we're in support of moving

19  forward and doing work to recover and accelerate the cleanup,

20  and, yeah, the -- the settlement does what we set out to do,

21  which is to deal with the mercury that went into the river and

22  hold Mallinckrodt accountable for it, and while maybe not

23  perfect, we -- we really agreed that this is the best thing we

24  can do.

25             MS. PHILLIPS:  Thank you, Mr. Graham.  Your Honor, I

1   have nothing further.

2              THE COURT:  Thank you very much.  Cross-examination?

3              MR. TALBERT:  No questions, Your Honor.

4              THE COURT:  Thank you very much, Mr. Graham.

5              THE WITNESS:  Thank you.

6         (The witness left the witness stand.)

7              THE COURT:  Next witness?

8              MR. TALBERT:  Defendant calls David Kelley, and

9   Mr. Piper will complete the examination.

10             THE CLERK:  Can you please raise your right hand.

11  Do you solemnly swear that the testimony you shall give in the

12  matter now in hearing shall be the truth, the whole truth, and

13  nothing but the truth, so help you God?

14             THE WITNESS:  I do.

15             THE CLERK:  Thank you.  Please be seated.  Can you

16  please state your name for the record and spell both your

17  first and last name?

18             THE WITNESS:  Yes, my name is David Kelley,

19  D-a-v-i-d K-e-l-l-e-y.

20  DAVID KELLEY, having been duly sworn, was examined and

21  testified as follows:

22                        DIRECT EXAMINATION

23  BY MR. PIPER:

24  Q    Good morning, Mr. Kelley.

25  A    Good morning.

1    Q     What do you do for a living?

2    A     I'm a senior program manager for environmental

3    remediation.

4    Q     And how long have you worked in the environmental field?

5    A     About 30-plus years.

6    Q     And how long have you been in your current role?

7    A     In the current role, just over five.

8    Q     What do you do in that role?

9    A     Currently I manage a variety of environmental

10   remediation projects -- some large, some small, some federal

11   actions like Superfund, some state actions like RCRA cleanup.

12   I direct various environmental consultants, contractors in the

13   cleanup of the work as directed.

14   Q     And do you have any familiarity with the former

15   HoltraChem site in Orrington, Maine?

16   A     Yes, I do.

17   Q     What is your familiarity with that?

18   A     Currently I am the active project manager for the

19   HoltraChem site in Orrington.  I've been in that role,

20   transitioned in the latter part of 2018, so I am familiar with

21   the issues associated with historic mercury releases there.

22   Q     And how much of your work time do you currently devote

23   to HoltraChem?

24   A     Oh, some days all of it, but, typically, I would say, on

25   average, upwards of 50 percent; it's my No. 1 priority.

1    Q      And has that been the case since you initially began

2    working on the site in late 2018?

3    A      Yes, generally, for the most part.

4    Q      Have you had any involvement with this litigation

5    related to the Penobscot River Estuary?

6    A      Not so much with the litigation, but I have been

7    familiar with the issues associated with the site, not only

8    with my work on the HoltraChem site the last couple of years

9    and knowledge of historic releases, but when I took over the

10   position of senior program manager, I was -- it was in 2016,

11   and the Amec, or Wood, Phase III Engineering Study was in the

12   process of being implemented.  So I had a role in monitoring

13   the work and progress of Amec, also processing invoices.  I

14   reviewed some of the reports that were the outputs from the

15   Phase III Engineering Studies.

16          So I've some real familiarity and -- and kept apprised

17   over the years on this.

18   Q      And are you testifying today on behalf of the defendant?

19   A      Yes, I am.

20   Q      So does your testimony represent the position of the

21   defendant?

22   A      Yes, it does.

23   Q      Do you have an understanding regarding the settle --

24          THE COURT:  Could you -- could you just clarify for

25   the record who his employer is?

1  BY MR. PIPER:

2  Q     Can you clarify your employer for the record?

3  A     Yes, I can.  My employer is -- is Medtronic, Inc.

4  They're a wholly owned indirect -- I'm sorry -- indirect

5  wholly owned affiliate of Medtronic PLC, as is Mallinckrodt.

6  Mallinckrodt is an indirect wholly owned affiliate of

7  Medtronic PLC.

8  Q     So do you have an understanding generally regarding the

9  settlement of this matter?

10  A     Yes, I do.

11  Q     What is that understanding?

12  A     My understanding is the settlement provides for

13  activities in various portions or, as we refer to it, reaches

14  of the river where implementation of these remedies will have

15  a material impact.  It involves activities, as we've heard, in

16  different reaches -- capping in the Orrington Reach, work as

17  identified for areas of the Orland River and the channel east

18  of Verona.  There's some plans for removing surface deposits

19  in various locations on the river, as well as going after some

20  of the mobile sediment pool.  It provides for long-term

21  monitoring, which is extremely important, and it involves --

22  it provides for the beneficial environmental projects, and

23  last, but not least, it provides for the appointment of an

24  independent project manager to manage the project.

25  Q     And do you have an understanding of the funding called

1   for in the Proposed Consent Decree?

2   A     Yes, I do.  I believe it's a minimum of $187 million

3   that Mallinckrodt will pay to fund these various activities

4   outlined, and then there's a -- another 80 million that could

5   become available if certain contingencies do -- do occur, for

6   a total of 267 million.

7   Q     Do you have any understanding of the objectives of the

8   remedial work called for in the Proposed Consent Decree?

9   A     Yes, the objective is to accelerate recovery in -- in

10  the river system, and Mallinckrodt believes, based on the

11  extensive study that's occurred, that the measures provided

12  for in the proposed settlement are reasonably likely to

13  accomplish this.

14        But Mallinckrodt's also aware this is a highly complex

15  system and there are significant uncertainties involved with

16  remediating mercury contamination.  So there's really no

17  silver bullet remedy here.

18        We're also aware that anytime you intervene with an

19  ecosystem, it presents some risk.  Mallinckrodt feels that the

20  proposed settlement balances the benefits of trying to

21  accelerate recovery in the system with the uncertainties and

22  risk of doing further harm.

23        As a company, as we have gone through and negotiated

24  with the plaintiffs for this settlement, we have been guided

25  by the principle of do no further harm.

1   Q     What's your view of the significance of the settlement

2   for Mallinckrodt?

3   A     It's a significant financial commitment, and obviously,

4   a financial commitment of this magnitude is not something we

5   would enter into lightly.  It's a product of 20 years of -- of

6   extensive study and more than a year and a half of

7   negotiations with the plaintiffs, so it's something, as a

8   company, we've invested a lot of time and -- and resources

9   into.

10  Q     And why does Mallinckrodt support the settlement?

11  A     We feel it's more productive for the parties to agree on

12  science-based measures, which we all believe will accelerate

13  the recovery of the river, rather than continuing litigation,

14  and this settlement provides a substantial amount of money to

15  -- to forward that effort.

16        It provides certainty.  It provides certainty as to what

17  work will be done, and it also provides certainty to

18  Mallinckrodt as to how much money it will cost to accomplish

19  this work.

20        It gets us out of a holding pattern and allows us to

21  move forward with developing actionable plans, which can

22  improve and protect the river.  We can start work fairly

23  quickly and it allows us to not be in an adversarial posture.

24        So Mallinckrodt believes that this settlement agreement

25  is in the best interests of the parties to the litigation, as

1    well as to the public.

2    Q    And are you familiar with the bar order that's been

3    requested by Mallinckrodt in connection with the settlement?

4    A    I am.

5    Q    What's your understanding of that?

6    A    As I understand it, the bar order would prevent -- if --

7    if granted, the bar order would prevent future litigation

8    against Mallinckrodt by third parties for the mercury

9    contamination.  It would not bar actions by state or federal

10   agencies or natural resource damage -- damages, nor would --

11   would it bar Mallinckrodt from having to fulfill its existing

12   responsibilities, such as the -- the state-enforced cleanup at

13   the HoltraChem site.

14   Q    Why is Mallinckrodt seeking a bar order?

15   A    The mercury releases occurred decades ago, and it's been

16   in litigation for 20-plus years.  This litigation has not been

17   done in secret, and the public is well informed of the issues.

18   And with the significant financial commitment that

19   Mallinckrodt is making, we feel some meaningful degree of

20   certainty or finality should come with that.

21        Moreover, the proposed remedy is based on extensive

22   study and characterization.  As I understand it, the Penobscot

23   Estuary is one of the most studied estuaries in the country.

24   The proposed settlement was thoughtfully and deliberately

25   crafted and future claims could serve to second-guess or

 1    intervene with that.

 2    Q      And is the bar order an important component of the

 3    settlement for Mallinckrodt?

 4    A      Yes, it is.

 5              MR. PIPER:  Thank you, Mr. Kelley.  Nothing further.

 6              THE COURT:  Cross-examination?

 7              MR. BERNARD:  No questions, Your Honor.

 8              THE COURT:  Thank you very much, Mr. Kelley.

 9              THE WITNESS:  Thank you.

10         (The witness left the witness stand.)

11              THE COURT:  Next witness?

12              MR. BERNARD:  I think that's it for the parties'

13    witnesses, Your Honor.  I think what remains is witnesses from

14    members of the public tomorrow.

15              THE COURT:  All right.  And they've been informed

16    that they can appear here tomorrow for that purpose?

17              MR. BERNARD:  Yes, Your Honor.

18              THE COURT:  All right.  Anything further today?

19              MR. TALBERT:  No, Your Honor.

20              THE COURT:  Very good.  Court will stand in recess.

21         (Proceedings concluded at 11:39 a.m.)

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Julie G. Edgecomb                    October 4, 2021
Julie G. Edgecomb, RMR, CRR             Date
Official Court Reporter