1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF MAINE

3   MAINE PEOPLE'S ALLIANCE      )
    and NATURAL RESOURCES        )
4   DEFENSE COUNCIL, INC.,       )
                                 )
5             Plaintiffs         )
                                 )                 CIVIL ACTION
6                                )
          vs.                    )     Docket No. 1:00-cv-00069-JAW
7                                )
                                 )              FAIRNESS HEARING
8   HOLTRACHEM MANUFACTURING     )
    COMPANY, LLC, and            )
9   MALLINCKRODT US LLC,         )
                                 )
10            Defendants.        )

11                      VOLUME III of III

12                   TRANSCRIPT OF PROCEEDINGS

13       Pursuant to notice, the above-entitled matter came

14  on for FAIRNESS HEARING before the HONORABLE JOHN A.

15  WOODCOCK, JR., in the United States District Court, Bangor,

16  Maine, on the 5th day of October, 2021, at 8:49 a.m.

17  APPEARANCES:

18  For the Plaintiffs:          Mitchell S. Bernard, Esquire
                                 Lauren Patricia Phillips, Esquire
19                               Jared J. Thompson, Esquire

20  For the Defendants:          Patricia H. Duft, Esquire
                                 Benjamin S. Piper, Esquire
21                               Jeffrey D. Talbert, Esquire

22

23                   Julie G. Edgecomb, RMR, CRR
                        Official Court Reporter

24

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer.

1          (Counsel present in open court.)

2              THE COURT:  Good morning.

3              MR. BERNARD:  Good morning.

4              MR. TALBERT:  Good morning.

5              THE COURT:  This is the matter of Maine People's

6    Alliance versus Mallinckrodt, which is extraordinarily

7    00-cv-69.

8        Would counsel -- so that people are in the audience

9    understand who the players are, would counsel please introduce

10   themselves.

11             MR. BERNARD:  Good morning, Your Honor.  For the

12   plaintiffs, Mitchell Bernard, and with me are Jared Thompson

13   and Lauren Phillips.

14             THE COURT:  Good morning.

15             MR. TALBERT:  For defendant, Jeffrey Talbert,

16   Patricia Duft, Benjamin Piper, and Morgan Surkin.

17             THE COURT:  Good morning.

18       So I'd like to welcome everyone here.  We have had a

19   couple of days of hearing on -- hearing from experts, for the

20   most part, also representatives of the plaintiffs and the

21   defendant.  The purpose of the hearing today is to hear from

22   you, hear from members of the public, and it concerns the

23   approval that the court is required to make or not to make

24   under the law as to whether a Proposed Consent Decree between

25   the plaintiffs and the defendant, Mallinckrodt, is fair,

1    adequate, and reasonable, will not violate the Constitution,

2    and is consistent with the objectives of Congress.

3         There are -- this is a complicated matter; there are a

4    lot of moving parts to it.  And one of the things I'm anxious

5    to do is to hear from members of the public and get your views

6    as to what the court should do given the fact that members of

7    the public are the ones most affected by the Penobscot River

8    and its health and safety.

9         I have a few guidelines for you:  First, as you all know

10   because you're masked, we're in the midst of this terrible

11   pandemic, and it appears that we may -- let's hope -- be

12   seeing a corner or a plateau of the delta variant and its

13   impact on Penobscot County and Maine in general, as well as

14   the country.  However, we want to be cautious, and what I've

15   asked people to do is as follows:  I've asked everyone to mask

16   except when they're speaking, and that's why I'm not wearing a

17   mask now, but I'm six feet away from anybody.

18        So what I'm going to do is I -- the last thing we want to

19   do is to have a fairness hearing which is directed to health

20   and safety become a superspreader event in which people become

21   sick.  So I'm going to ask you all to maintain your masking.

22   I'm going to ask you also to maintain social distancing, and

23   that means staying about six feet from each other if you don't

24   know each other.  If you're in the same group, you're

25   perfectly able to make that decision by yourself.  But if

1   you're not, there are little signs on the benches that will

2   allow you to be sure that you're appropriately distanced.

3        We do have an overflow.  That overflow is right around

4   the corner; it's in the jury assembly room.  And if you feel

5   uncomfortable and you want to watch by that proceeding, you're

6   going to be able to see the proceeding itself by

7   videoconference in the other room.  So when your turn comes,

8   you'll be able to come in and then step forward and tell me

9   anything you want me to know about what you think of the

10  proposed settlement and what you think I should know before I

11  make this very important decision.

12       What I've agreed to do in terms of the process is this:

13  Anyone who wishes to speak is invited up; they can approach

14  the podium; at that point, you can unmask, if you choose to do

15  so; and you can tell me anything you think I ought to know

16  about the Penobscot River, about the Proposed Consent Decree,

17  anything you think is important for someone in my position

18  who's evaluating the fairness and the reasonableness of this

19  Proposed Consent Decree.

20       There is a line somewhere -- and I'm not going to draw it

21  -- I'll explain to you how I'm going to resolve it -- between

22  simply stating a public opinion, which anyone has a right to,

23  and stating -- going further and stating expert opinions, and

24  I've talked to the lawyers about that.

25       To give you an example, if someone in the audience wants

1   me to know that they love the Penobscot River, that they use

2   the Penobscot River, they canoe, they fish, they lobster on

3   the Penobscot River, and it's a valuable resource

4   environmentally, that's important for me to know and hear your

5   perspective.  That's traditionally what I would describe as

6   lay testimony and what the law describes as lay testimony.

7        If someone stands up and says I'm a Ph.D. from the

8   University of Maine in biochemistry and I'd like to talk to

9   you about methylation rates and biomagnification and to inform

10  you about my expert opinions, then I will hear that.  I will

11  give the lawyers, however, an opportunity to ask, to

12  cross-examine you, and I will not require you to be -- to

13  testify.  They can say I'd like to ask Dr. So-and-so to

14  testify, and then if that person is willing to do so, we'll

15  put them under oath and they will be subject to

16  cross-examination.  If the person's not willing to be placed

17  under oath and cross-examined, then, obviously, their

18  testimony -- or their opinions will be received, but they

19  won't have the same weight as somebody who has been subjected

20  to cross-examination and under-oath testimony would have.

21        So I'm not going to make that decision; I'm going to let

22  the lawyers make the decision.  If the lawyers want to -- me

23  to place somebody under oath or ask that you be placed under

24  oath, they can make the request, and I may or may not ask you

25  to do that.  If -- if I decide that you should be asked, you

1    can either say yes or you can say respectfully no, I would

2    prefer not to go under oath.  So those are the ground rules.

3    I think they're fairly straightforward.

4        Is there anything, before we start this public aspect of

5    the proceeding, from the plaintiffs?

6            MR. BERNARD:  Nothing, Your Honor.

7            THE COURT:  Anything from the defendant?

8            MR. TALBERT:  No, Your Honor.

9            THE COURT:  All right.  So what I'm going to ask you

10   to do, whoever wishes to speak to step forward to the podium,

11   to introduce yourself, just tell me who you are and where you

12   reside -- I don't need a -- I just need a town and a state --

13   tell me where you reside, and then tell me what you want me to

14   know.

15       Who wants to go first?  Come right up.

16           MS. SCARBOROUGH:  Good morning.  My name is Rebecca

17   Scarborough and I'm a resident of Camden, Maine.  I am here

18   today in support of the proposal to clean up mercury in the

19   Penobscot River.

20           THE COURT:  Okay, wait, wait, wait.  People -- one

21   thing I should tell is people tend to read things really,

22   really fast.

23           MS. SCARBOROUGH:  Okay.

24           THE COURT:  And you almost can't read it slowly

25   enough.  The court reporter has to take you down.

1          MS. SCARBOROUGH:  Understood.

2          THE COURT:  And you're --

3          MS. SCARBOROUGH:  Okay.

4          THE COURT: -- just calm down and let me know what

5  you want me to know.  Just be measured in how you speak.

6  Okay?  Thank you.

7          MS. SCARBOROUGH:  Yes.

8          THE COURT:  And keep your voice up so we can all

9  hear you, ma'am.

10          MS. SCARBOROUGH:  Absolutely.  I'll step forward.

11      Mercury runoff has contaminated the river for decades.

12  In 2002 and again in 2015, the court found that a

13  contamination may endanger public health and the environment.

14  Waterfowl and shellfish found in the river were not safe for

15  people to eat due to the levels of mercury.

16      This seems simple for me.  This company was found

17  responsible for contamination.  They have responsibility to

18  clean up the contamination.  It is long overdue and will mean

19  -- will protect this important river.

20      I thank you for your time.

21          THE COURT:  Thank you very much, ma'am.  I

22  appreciate your coming.  Yes, sir.

23          MR. GILLWAY:  Good morning, Your Honor.

24          THE COURT:  Good morning.

25          MR. GILLWAY:  My name is James Gillway.  I am the

1    town manager for the town of Searsport.  I've been working for

2    the town of Searsport for 34, 35 years, both as the town

3    manager and previously as its police chief.

4         I basically grew up -- grew up on the Penobscot River.

5    My family owned camps on Islesboro, and every summer, we would

6    fish, clam, recreate, boat, swim in -- in the Penobscot.  So I

7    have a real close connection to it.  In fact, as -- as an

8    adult, I've lived my entire life near the river, both in

9    Winterport, Frankfort, and Searsport.

10        I was a -- I am a former legislator from 2010 to 2018

11   representing my district 98, which includes Winterport,

12   Frankfort, Searsport, and Monroe.  So as the manager of

13   Searsport, we find the river's very important to our commerce.

14   We have fishermen; we have a small commercial fleet that

15   fishes the river; we have applications and licenses out there

16   for fish culturing, both shellfish and -- and fin fish off

17   from Sears Island.  Of course, we have a port; that's our name

18   -- Searsport.

19        We understand, also, that dredging is very essential.

20   Dredging for navigational purposes is extremely important from

21   -- from commerce standpoint, but also as an environmental

22   importance because, of course, we don't want ships to hit the

23   bottom, so occasionally we have to dredge.

24        I was involved in application that the state put in for

25   dredging about 12 years ago to do an expanded dredge in the

1  harbor Searsport.  The last time that harbor has been dredged
2  is 1964.  So that process is very difficult.  It involves a
3  lot of environmental testing, coring, sampling, and hearings
4  in front of the Army Corps of Engineers.

5      I attended those hearings.  I heard a lot.  I heard the
6  expert testimony; I heard laymen testimony.  And, basically,
7  that project was abandoned because it was called the expanded
8  dredge and it went further than the maintenance dredge that
9  was required to safely operate the port.  So we ended up
10 putting that on the shelf.

11     I do understand and I've been briefed a little bit about
12 what the agreement has and understand a bit about
13 environmental dredging, as well.  I did attend a -- a port
14 managers' training in Portland a few years ago, and we really
15 went into depth about the importance of both environmental and
16 navigational dredging.

17     We -- we are very concerned about environmental dredging
18 upriver because everything floats down to us in Searsport
19 being the bottom -- at the bottom of the -- of the river.  So
20 we -- we do support the -- the agreement that's been reached,
21 mostly because it does involve a limited amount of dredging
22 and monitoring -- monitoring's very important -- but we also
23 feel that to a great extent, the mercury that is present
24 probably should be left alone until we have some better
25 technology in how to remove it, and whenever you dredge

1    sediments, you stir up everything at the bottom that -- that,

2    again, it all floats down to Searsport, and we have great

3    concern about that.

4         So we do -- we do support the agreement.

5              THE COURT:  All right.  Thank you very much, sir.

6              MR. GILLWAY:  Thank you.

7              THE COURT:  I appreciate you coming.  I think --

8    actually, I think you were -- you stood up first and then I'll

9    call on you.  Good morning.

10             MR. BAILEY:  Good morning.  My name is Phil Bailey.

11   I'm from Camden.  I'm a member of the Maine People's Alliance,

12   and I have followed this issue for over 20 years, and I'm here

13   today to both commend the participants and the court in this

14   agreement.  I support the agreement, and I actually also think

15   that it's long overdue.

16        As I mentioned, it's been a long time coming and I hope

17   that it follows through, and thank you.

18             THE COURT:  Thank you very much, sir.

19        Yes.

20             MS. KOPEC:  Thank you, Your Honor.

21        Before I give my comments, I have a question based on the

22   guidance you gave at the beginning of the trial.  My comments

23   were developed in coordination with several members of the

24   Study Panel who have signed on to what I'm about to say.

25   Would you like me to name those people, or should I just give

1   those comments are from myself?

2           THE COURT:  Well, why don't you tell me who you are.

3           MS. KOPEC:  Excuse me?

4           THE COURT:  Why don't you tell me who you are first.

5           MS. KOPEC:  Oh, my name is Dianne Kopec.

6           THE COURT:  And --

7           MS. KOPEC:  I got ahead of myself there.

8           THE COURT:  Sure, no problem.  And where do you

9   live, ma'am?

10          MS. KOPEC:  Old Town.

11          THE COURT:  And when you say they're members --

12  other individuals who signed on, how -- how many are we

13  talking about?

14          MS. KOPEC:  Two other people.  I was a member of the

15  study group for Phase I and Phase II.

16          THE COURT:  Right.  It's fine if you tell me -- if

17  you want to tell me who they are.  That'd be fine.

18          MS. KOPEC:  Sure.  So I'm speaking on behalf of

19  myself, Dr. Drew Bodaly, and Dr. Nicholas Fisher.

20          THE COURT:  Very good.  Thank you.

21          MS. KOPEC:  You're welcome.

22      So thank you for the opportunity to comment on this

23  proposed settlement.  We applaud the level of funding agreed

24  to by the defendants, and we recognize the compromises both

25  sides have made to reach this agreement.

1    It is extremely gratifying to see our years of research

2  documenting the extent of mercury contamination in the river

3  translated into a remediation plan that will help restore the

4  river.  By avoiding another bench trial, the important work of

5  remediating the environment can begin years earlier than would

6  otherwise be possible.

7    We support adoption of the settlement, while recognizing

8  that plans can always be improved.  That said, we have

9  concerns that the amount of funding dedicated to the

10  remediation, both committed and provisional, may not be

11  adequate to fully address the complex problems existing in the

12  lower river; yet we recognize that an ideal world is rarely

13  attainable.

14    Based on our understanding of the system, we would like

15  to offer several suggestions to strengthen the proposed

16  remediation plan.

17    In the Orrington Reach, we anticipate problems in the

18  plan to cap the highly contaminated sediment in the pocket

19  marshes lining the main stem of the river.  As Dr. Reible

20  pointed out yesterday, those pocket marshes contain mudflats

21  where fine sediment laden with mercury from the HoltraChem

22  plant have been deposited and buried since the plant opened in

23  1967.

24    However, it is not just the current in the main stem of

25  the river that threatens erosion of those contaminated

1    sediments.  It is also the slews that channel surface water

2    from the land across the mudflats to the river.  Erosion of

3    the sides of those slew channels eats away at all sediment

4    layers, carrying the contaminated sediment from the sides of

5    the slew down to the river and contributing to the mobile pool

6    of sediment that is sloshing up and down the river itself.

7         This erosion is most pronounced when heavy storm runoff

8    from the land crosses the mudflat during low tide when slew

9    channels can sometimes carve a new path or change their course

10   through the mud flat.  We suggest that instead of mandating

11   the remediation of the Orrington Reach be done using capping,

12   that similar to the plan for the east channel and the Orland

13   River, the trustees are given the latitude to decide the best

14   method to address the contaminated sediment in those pocket

15   marshes.

16        Our second point, mercury contamination in Mendall Marsh

17   requires a dedicated, proactive remediation strategy with

18   funding set aside through the Remediation Trust.  Mendall

19   Marsh is among the most contaminated areas in the estuary

20   causing dietary mercury exposure to wildlife and humans.  The

21   mercury health advisory for waterfowl in the lower river

22   remains in place because there has not been a significant

23   decline in mercury concentrations in black ducks at Mendall

24   Marsh and nearby marshes.

25        Mercury in songbirds breeding at Mendall Marsh remain the

1  highest reported anywhere in the country.  They exceed levels

2  associated with reproductive toxicity, and based on the 2016

3  samples collected by Wood in July of that year, there has been

4  no significant decline in blood mercury concentrations.

5      Mendall Marsh is not a system slowly recovering, but

6  instead a tidal marsh with persistent high levels of

7  contamination.  The remediation of Mendall Marsh should not

8  compete with funding with other beneficial environmental

9  projects through the Project Trust.  Beneficial environmental

10  projects are a great idea for funding secondary restoration

11  work, but not the fundamental remediation needed at Mendall

12  Marsh.  That remediation would likely require pilot studies

13  and complicated permitting and need to be sequenced after

14  other projects in the main stem of the river.

15      Notably, such sequencing may delay the work on Mendall

16  Marsh beyond the preferred four-year pay-out period of the

17  Project Trust.  Repairing Mendall Marsh, which is known to be

18  contaminated by the HoltraChem facility, should take

19  precedence and not be in competition with other environmental

20  projects.

21      Number three, remediation goals in the larger system

22  should clearly aim to reduce mercury concentrations in

23  waterfowl and lobster below Maine's mercury action level of

24  200 parts per billion in muscle tissue.  Eliminating the need

25  for water -- waterfowl consumption advisories and fishery

1  closures zones for lobster and crab.  Section 1M of the
2  Consent Decree states that this goal may not be achieved due
3  to background concentrations and site-specific
4  characteristics.

5      Our data do not support that statement.  The Phase III
6  report calculated that Maine's mercury action level could be
7  met when sediment concentrations are at 300 parts per billion.
8  Background sediment mercury concentrations are generally far
9  below that.  As described in our Phase II Report, mercury
10  concentrations in the surface sediments in the Saint George
11  River on the west side of the Penobscot and the Narraguagus
12  River on the east side ranged from 28 to 51 parts per billion,
13  far below concentrations that would elevate mercury exposure
14  to waterfowl or lobster.

15      Similarly, in the surface sediments upstream of the
16  Veazie Dam, or the former Veazie Dam, above the aquatic
17  influence of the HoltraChem plant, mean total mercury
18  concentrations in the main stem of the river have been below
19  50 parts per billion in all years tested, and in one site,
20  OV-4, which is a depositional logan (phonetic) on the west
21  side of the river, mercury has declined significantly from the
22  2007 peak of 310 parts per billion down to its current level
23  of 85 parts per billion.

24      Background concentrations are not the problem in the
25  lower Penobscot.  Legacy contamination from HoltraChem is the

1    problem.

2        And while Mendall Marsh does have an extremely high

3    methylation rate, and perhaps those are the site-specific

4    characteristics referred to in the Consent Decree, the amount

5    of bioavailable methylmercury is directly linked to the

6    concentration of inorganic mercury in surface sediment.

7    Effective remediation of Mendall Marsh will reduce those total

8    mercury concentrations to levels where the methylation rate is

9    of less consequence.

10        We recognize that goals are not always met, but we also

11    know that they are rarely met if they are not actively sought.

12    The remediation goal should include reducing mercury

13    concentrations in waterfowl and lobster to at or below Maine's

14    mercury action level of 200 parts per billion.

15        We agree that remediation of the river is not possible

16    without dredging and removal of the most contaminated sediment

17    in the river's mobile pool and surface deposits.  However, we

18    stress the importance of timing those operations to minimize

19    disruption and contamination of migrating anadromous fish

20    returning to freshwater to spawn.

21        Further, research over the last 15 years has documented

22    habitats for two species of sturgeon -- the endangered

23    shortnose sturgeon, many of whom are year-round residents in

24    the lower Penobscot, and Atlantic sturgeon, summer residents

25    of the river whose regional population are listed as

1    threatened.  Sturgeon, like other benthic organisms, are

2    vulnerable to effects from dredging.  The work must be done,

3    but we ask that biologically critical periods and habitats are

4    recognized and accommodated wherever possible in the work

5    plan.

6         Finally, consideration could be given to adding sturgeon

7    to the list of species included in the long-term monitoring

8    program.  Their presence was not known when the study first

9    began, but as a benthic fish that forages on invertebrates and

10   mollusks, documenting mercury concentrations in their blood

11   could be an effective mechanism to monitor changes in

12   bioavailable mercury in the sediment in the river.  Sturgeon

13   blood integrates mercury exposure over recent months, making

14   them an effective indicator of bioavailable mercury and blood

15   samples can be collected from live fish.  They're caught

16   briefly and then released in the water.

17        Finally, the people of Maine want this project to

18   succeed.  Success is defined by leaving our land and waters in

19   a healthy state where ducks and lobster are safe for human

20   consumption, where fishery closures and waterfowl consumption

21   advisories are no longer necessary, and where the fish and

22   wildlife themselves are no longer exposed to harmful levels of

23   mercury that was dumped in their environment 50 years ago.

24        Thank you.

25             THE COURT:  Thank you very much, ma'am.

1          MS. KOPEC:  Is that it?  Thank you.

2          THE COURT:  That appears to be it.

3          MS. KOPEC:  Good.

4          THE COURT:  Yes, sir.

5          MR. LIPPINCOTT:  Your Honor, my name is Bill

6    Lippincott.  I'm the chair of Don't Waste ME, a coalition of

7    people across Maine, including members of the Penobscot

8    Nation, advocating for responsible policies that protect the

9    health of communities most at risk from the negative impacts

10   of landfill, incinerator, and other operations that release

11   toxic materials into our environment.

12        I'm also a resident of Hampden, which is on the opposite

13   bank of the Penobscot River to where the HoltraChem plant was

14   located.

15        My concern is for the devastating impact of mercury to

16   the water quality of the river and to the fish, birds, and

17   mammals that depend on the river, and also the danger to human

18   beings who might eat any of the fish or shellfish with high

19   mercury levels from HoltraChem's contamination of the

20   Penobscot.

21        Sediments downstream from the closed plant contain the

22   highest concentrations of mercury in Maine, possibly in the

23   country.  The plant was licensed to discharge up to five

24   pounds of mercury a year directly into the river, and hundreds

25   of pounds a year into the air, from 1967 into the early 1970s,

1    an estimated six to twelve metric tons.

2        The Penobscot River's a traditional source of sustenance

3    for the Penobscot Nation.  We've made great strides in

4    removing dams that block migratory fish from going upstream,

5    but the mercury levels of migratory fish on the river remain a

6    threat to the health of the Nation.  Fish consumption

7    advisories for the Penobscot Nation for fish taken on that

8    river are no more than one meal a month for children and

9    pregnant women no fish at all.

10        According to a recent study, which was done in -- August

11   10th, 2021, risks for mercury in anadromous fish collected on

12   Penobscot River levels of mercury found in several fish

13   species analyzed pose a potential risk for wildlife that's

14   important to the Penobscot Nation, such as mink, otter, and

15   eagle, rainbow smelt, striped bass, and sea lamprey all

16   contain levels of mercury that exceeded safe wildlife values.

17        In 2014, state officials closed an area of the Penobscot

18   River in Penobscot Bay to commercial fishing after mercury was

19   found in lobsters and crabs caught there, and they expanded

20   that area in 2016.

21        I have concern that my wife and I may have eaten crab and

22   lobster for years in that area before it was closed.  My wife

23   had a severe reaction, after eating crab meat several years

24   ago, before that was closed.  After taking a test, she

25   discovered she had high levels of mercury.  The explanation at

1   the time was that she must have ingested mercury from
2   something she ate.

3       My house borders the Souadabscook Stream, a tributary of
4   the Penobscot, which is tidal at the mouth of the stream.  In
5   1998 and 1999, two dams were removed to aid the comeback of
6   migratory fish.  But the same concerns about mercury levels in
7   migratory fish, and the threat to the wildlife that feeds on
8   the fish, apply to the stream, as well as to the river.

9       I first learned about HoltraChem when the Maine People's
10  Alliance filed suit against Mallinckrodt in the federal
11  district court in the year 2000, and I attended hearings to
12  find out more.  I am dismayed that it's taken this long for a
13  full remediation plan to go into effect -- 21 years later --
14  with the impacts of mercury contamination continuing to pose a
15  threat to the fish, wildlife, and to human consumption.

16      I urge the court to approve this cleanup plan.  Thank
17  you.

18          THE COURT:  Thank you very much, sir.  Good morning.

19          MS. PRESTON-SCHRECK:  Hello, Your Honor.  My name is
20  Catherine Preston-Schreck and I live in Bar Harbor.

21      In the early 2000s, I lived in Old Town and was involved
22  with the Penobscot Alliance for Mercury Elimination.  We
23  pushed for cleanup of the mercury that was released by
24  Mallinckrodt into the Penobscot River at the former HoltraChem
25  site in Orrington.

1     I'm the daughter of scientists.  As part of my father's

2     career, he conducted research at the center for membrane

3     toxicology studies at MDI Biological Laboratory.  Research

4     that focused on the impacts of mercury on cellular physiology.

5     Having grown-up around conversations about the dangers of

6     mercury in the environment, I was extremely concerned and

7     upset by the decades of reckless mercury contamination of the

8     Penobscot River by Mallinckrodt.

9     I vividly remember a conversation I had with my father

10    around this time as I was describing to him the former

11    HoltraChem site and its role in discharging mercury into the

12    Penobscot River.  Decades later, I can still see my father's

13    expression and the moment when his understanding of the

14    situation shifted from concern to alarm.

15    Twenty years has passed since that conversation and the

16    river has yet to be cleaned.  In those 20 years, people have

17    dedicated themselves to bringing public awareness to the

18    dangers of mercury in the Penobscot River watershed.  People

19    have spent countless hours collecting and analyzing data,

20    years of deliberation in court, and have built relationships

21    and learned from individuals whose lives have been affected by

22    mercury contamination.

23    With these efforts and commitment, they've carried

24    forward the demand for accountability.  Twenty years is a long

25    time.  This courtroom would look different had we gathered to

1  discuss a settlement years ago.  It would be filled with the

2  faces of those impacted by mercury contamination, many of whom

3  are now older, less mobile, and even gone.  Individuals like

4  Nancy Galland and Richard Stander, who could not harvest

5  mussels on their land near Stockton Springs because of the

6  presence of mercury in shellfish.  Nancy was unable to be with

7  us today and has submitted written testimony, while Richard

8  passed away in 2011.

9       It's important to acknowledge that the process of justice

10 has been so slow that some who began the difficult work of

11 holding Mallinckrodt accountable have been denied this moment

12 in which parties are ready to move forward with a plan of

13 reckoning.

14      In 20 years, my life has also changed.  The most

15 significant transformation being that I am now a mother of

16 four children.  As a mother, beginning in pregnancy, there's a

17 burden of living with a constant fear that harm may come to

18 one's child.  Do not eat freshwater fish is one of the first

19 warnings for all pregnant women and even for women who may one

20 day become pregnant.  Do not eat freshwater fish because of

21 mercury contamination.  Before life begins, mercury is even a

22 threat.

23      What warnings are given to women in the Penobscot River

24 Watershed who carry a particularly heavy burden of

25 Mallinckrodt decision-making?  My son Rowan is 13, a lifetime

1  that is shorter than the legal life of this case.  Rowan is an

2  avid outdoorsman with a deep love of fishing, but his

3  connection to the outdoors goes beyond the challenge of a

4  catch.  Before he could speak, he could mimic the sound of

5  crows.  When he could walk, he slept under the stars with only

6  a blanket; and from the very beginning, he has been drawn to

7  water and the life that it holds.

8      Watching him in this way, I've come to learn that our

9  relationship to our land and water is similar to our

10  relationship with a person.  The outdoors and Rowan's way of

11  engaging with it is as fundamental to him as having a mother

12  and a father.  I will never forget the evening years ago when,

13  after a long day of fishing, Rowan brought home a beautiful

14  brown trout that he had planned to eat for dinner.  I told

15  Rowan that he could not eat it because it had -- he had

16  already eaten a brown trout earlier that month.  This moment

17  changed him.

18      Trust in his environment shifted, as did his relationship

19  to Maine waters.  He learned that corporate decision-making

20  can lead to damage to a living system that he depends on like

21  family.  Since then, he's had the sobering experience of

22  negotiating the legacy of mercury pollution and its direct

23  impact on his life.

24      As we know in the case of Mallinckrodt, a particular kind

25  of harm has traveled through decades of indifference.  Now

1  we've gathered to move forward to repair the damage.  At the

2  core of repair is accountability.  Accountability is not only

3  a conversation about who is responsible for paying for the

4  cleanup of the Penobscot River and its waterways, but it's

5  also about repairing relationships.

6      True accountability is a dialogue, and the humans who

7  have lived, depended upon, and thrived on the Penobscot for

8  millennia must be part of the conversation of environmental

9  and social restoration as this process unfolds.

10     I support the settlement of Maine People's Alliance

11  versus HoltraChem Manufacturing Company not only as a tangible

12  way towards healing decades of environmental trauma to the

13  Penobscot River and its life and people, but also as an

14  acknowledgment that historical wrongs endure through time in

15  companionship with the obligation for accountability.

16     Thank you.

17          THE COURT:  Thank you very much, ma'am.

18          MS. DODGE:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MS. DODGE:  I am Jan Dodge of Belfast, representing

21  House District No. 97 -- Belfast, Northport, and Waldo -- in

22  the Maine State Legislature.

23     Thank you for this opportunity to voice support of the

24  mercury remediation plan for the Penobscot River and Penobscot

25  Bay.  My roots in the area run deep with multigenerations of

1    ancestors on the Penobscot Bay island of Islesboro.

2        I grew up in Belfast, was a teacher for 30 years in a

3    coastal school district a couple bays east of Belfast, and

4    returned to Belfast in retirement.  I speak for many people

5    who feel strong connections to the river, watershed, and

6    midcoast.  This area is my geographic center.

7        HoltraChem's mercury pollution has negatively affected

8    life and livelihoods in Orrington and downriver.  The

9    confirmation and later reaffirmation of the presence of

10   dangerous chemicals was alarming and saddening.  Calls for

11   precautions and prohibitions on consumption of fish and

12   waterfowl and the restrictions on lobster fishing have

13   impacted people's work, recreation, and belief that this area

14   is a safe and healthy place.  That these negative public

15   health and environmental consequences have not been corrected

16   is not appropriate.

17       I hope the remediation plan will move forward in a timely

18   way.  There are four aspects of the plan that I find

19   particularly encouraging:  First, it appears the research has

20   provided data directing the use of dredging methods to

21   capture, and specifically prevent, further dispersement of

22   volatile sediment that is mobile and circulating with ocean

23   currents and tides.

24       Second is the identifying of sediment that is too

25   dangerous to be dredged or disturbed.  Employing capping of

1  these contaminants will also prevent spread downriver and

2  around the bay.

3      The third positive facet is the project's monitoring

4  components.  I hope the monitoring will be conducted by more

5  than one independent entity and will utilize the latest

6  approved methods, as well as encompassing an area well larger

7  than the identified hotspots.  This is crucial to stop the

8  possible widening of negative mercury impacts.

9      The fourth positive point is the allocation of funds to

10  guarantee future assessment of mercury levels for 30 to 45

11  years.  We owe this to future generations of visitors and

12  residents.

13      I'm thankful for the time to speak to you.  It is an

14  honor to add my endorsement of the plan to remediate Maine's

15  iconic Penobscot River.  I urge the court's approval.

16      Thank you.

17          THE COURT:  Thank you, ma'am.

18          MR. DIETRICH:  I thank you for this opportunity to

19  -- to testify.  My name's David Dietrich.  I live in Blue

20  Hill.  I grew up in Orrington, and when I was a kid, we were

21  drawn to that river like iron filings to a magnet.  Of course,

22  back then, it was pretty polluted, this is before the Clean

23  Water Act, but it got better, especially after the Clean Water

24  Act was passed.

25      Later on, when I was a teenager, my brother and I

1    lobstered off from Cape Rosier.  So when I read a few years

2    back that lobstering was closed in the Stockton Springs area,

3    I was shocked.  I'd been following this case and what had

4    taken place in HoltraChem for years, but that's why I'm here.

5    I -- I don't want to see any more contamination of mercury in

6    any more areas.  I want this cleanup to be just as good as it

7    possibly can be.

8        And, yeah, thank you.

9            THE COURT:  Thank you, sir.

10           MS. MIDDLESWART:  Good morning.

11           THE COURT:  Good morning.

12           MS. MIDDLESWART:  My name is Debbie Middleswart, and

13   I, too, have been a resident of Searsport my entire life, for

14   over 60 years.

15       My children and my grandchildren are also residents of

16   Waldo County, where the Penobscot River travels through and

17   into our beautiful Penobscot Bay.  I'm a recently retired

18   middle school teacher, and while teaching, my students and I

19   became aware of the contamination of the Penobscot River and

20   were mortified that little had been done in 20 years to

21   address it.

22       I am very, very concerned about the damage that this

23   pollution has caused to our ecosystems all along the river,

24   not only to the plant life, the wildlife, and the marine life,

25   but to the people who also live in the area.  I understand

1  this settlement is being considered after over two decades of

2  study to help improve the damage done by the mercury which

3  lies in our riverbeds.

4      But I have two big areas of concern:  First, my

5  understanding is that there are tons of mercury contamination

6  below the biologically active layer of the almost 700 acres of

7  Mendall Marsh.  This isn't a little spot; this is huge.  I go

8  by it probably a couple times a week.  This settlement is not

9  to remove the contaminants in this marsh -- no, uh-uh, but to

10  only monitor the marsh's natural recovery for the next 30 to

11  45 years.

12      However, in researching this, my concern is that the

13  estimate for this recovery by nature will extend into maybe a

14  hundred years.  They're hoping that it might seep out and

15  leech into the river and into the Penobscot Bay, where it will

16  do less damage.  That means that my children and my

17  grandchildren -- seven of them -- and possibly even my

18  great-grandchildren will not see this river marsh free of

19  mercury pollution.

20      Additionally, I have a serious question.  Has this

21  mercury seeped into the aquifers connected to the river and

22  contaminated any wells which draw from this area?  I graduated

23  from Searsport, Searsport, Frankfort, Stockton Springs.  Is it

24  in our wells and all the other areas along the river?  We know

25  the rate of cancer is high.  Have there been -- have they been

1  tested?

2       I also understand that it is recommended that no one eat

3  waterfowl from this marsh.  They're saying pregnant women and

4  children, but I don't think I'd take the chance, which leads

5  me to question about all the living things that live along

6  this river.  Are they safe from the harmful mercury pollution?

7  I understand there's well over a hundred different types of

8  even birds that come into that marsh.

9       Secondly, as the Penobscot River empties into Penobscot

10  Bay at the river's mouth, it passes by Sandy Point Beach.  If

11  you haven't been there, you should.  You should know that it

12  is a beautiful beach that is frequently visited.  I even chose

13  to get married there, along the beach, with the waves crashing

14  and my grandchildren playing in the surf.  But this beauty is

15  deceiving, you see.  The 12 square miles of the river mouth

16  area north of Fort Point have been closed to crab and lobster

17  harvesting since 2014, '16, when they extended the area

18  because of high mercury concentrations.  If that is a health

19  concern, why aren't the rest of the marine life, such as say

20  the clams in the flats, the wildlife that drink from the

21  water, the plant life, and the area wells also contaminated?

22  I think we should know for sure.

23       Also, I understand from some reading that the company in

24  the suit has filed for bankruptcy.  They wish to settle this

25  to remove any further liability and something about

1    restructuring.

2        After two decades, this is noble, but if this settlement

3    is made, as is before you, Your Honor, will the money actually

4    ever be fully paid?  Even if it is, the polluting facility in

5    Orrington, from my understanding, still continues to leak

6    mercury into the river even today.  How is this money really

7    helping ecosystems which rely upon this river?  It seems like

8    a lot of money to observe nature trying to undo this mess by

9    just letting it break down.

10        Dredging may release the heavy metals causing more damage

11   and covering it may give us more protection.  The money

12   offered in this suit is to be placed into an account to be

13   used over the next few years, but how long will that last?

14   Then what happens?  The long-term damage has already been

15   done.  Tragically, our marine life, our wildlife, our plant

16   life, and ourselves will suffer the consequences of this

17   contamination for many, many years to come.

18        Thank you for listening.

19            THE COURT:  Thank you, ma'am.

20            MS. MIDDLESWART:  Thank you.

21            MR. GELINAS:  Your Honor, my name is David Gelinas.

22   I'm a resident of the town of Camden in Knox County, and I am

23   president of the Penobscot Bay & River Pilots Association,

24   whose office is located in Searsport.

25        As a licensed Maine state pilot, I have, for the past 27

1  years, been engaged in piloting oceangoing vessels from sea to

2  midcoast Maine ports, including the Penobscot River ports of

3  Bangor, Brewer, Winterport, and Bucksport.  I appear before

4  you today to testify in support of the Proposed Consent Decree

5  between the Maine People's Alliance and Mallinckrodt.

6      The history and extent of mercury contamination in the

7  Penobscot River is well documented by now and it is time to

8  move forward on a remediation plan to restore the river's

9  health.

10      While this monumental task is being undertaken, it is my

11 sincere hope that the use of the river for current and future

12 transportation purposes is not overlooked.  Presently,

13 oceangoing ships of up to 35 feet in draft routinely transit

14 the lower river to the port of Bucksport.  Further upriver, a

15 federally maintained channel ostensibly provides a minimum

16 depth of 22 feet to South Brewer and then 14 feet to Bangor.

17 This channel has not been maintained for decades, resulting in

18 shoaling that has, in at least one location, reduced the

19 available depth of water for navigation by 7 feet.

20      While commercial vessel traffic to Bangor and Winterport

21 ceased over the last decade or more, the port of Brewer has

22 experienced several flurries of activity in this same time

23 period from oceangoing tugs and barges calling at the Cianbro

24 modular manufacturing facility.  It is imperative that

25 commercial oceangoing vessels are accommodated in their use of

1   the waterway during the remediation process.  The oil terminal

2   in Bucksport receives jet fuel to serve civilian and military

3   aircraft flying from Bangor International Airport, as well as

4   receives diesel fuel and heating oil bound for users in

5   midcoast and downeast Maine.

6      In the cyclical world of the construction industry, the

7   Cianbro manufacturing facility in Brewer can become a beehive

8   of fabrication activity seemingly overnight.  The competitive

9   advantage that this facility brings by being located on a

10  navigable waterway cannot be overstated.  Building modules

11  have been built on the banks of the Penobscot River and been

12  shipped by tug and barge as far away as the Gulf of Mexico and

13  Newfoundland to serve various industries.  Any impact to

14  navigation for vessels bound for this facility would bring a

15  true hardship to this employee-owned company.

16     While Bangor's heyday as an oil port has long past, it

17  should be noted that two oil terminals are still in operation

18  on the banks of the Penobscot River.  These terminals, with a

19  combined storage capacity in excess of 10 million gallons, are

20  vital to the economy of the greater Bangor region.  The

21  terminals are presently supplied by a pipeline from the port

22  of Portland.  Should this critical piece of infrastructure

23  suffer a failure that took it out of service for weeks or

24  months, the most efficient way to supply these terminals would

25  be by barge.

1    I urge the court and the trustee to take into

2 consideration the commercial uses of the waterway.  While

3 vessel traffic is of low volume on the river, it is

4 nonetheless vital to the economy of the region.

5    Additionally, it would be encouraging to see the trustee

6 work in conjunction with the Army Corps of Engineers to craft

7 a workable solution for dredging and dredge spoil disposal

8 that would allow the court to fulfill its mandate to maintain

9 the federal navigation channels.

10    One example of how the trustee and Army Corps could work

11 together to achieve their respective goals would be to address

12 the 15-foot spot located in the middle of the 20-foot channel

13 -- 22-foot channel in the vicinity of Lawrence Cove.  This

14 shoal is of primary concern when navigating deep-draft vessels

15 to Winterport, Bangor, and Brewer.  It was explained to me by

16 Captain Bill Abbott that this shoal was primarily comprised of

17 sawdust dumped into the river during many decades of lumber

18 mill activity further upriver.  Bill learned this information

19 from his father, who was a Penobscot River pilot before him.

20 He explained that there was a natural tendency for sawdust and

21 silt that came down the river to drop out at that location

22 causing persistent shoaling, which, in previous decades, would

23 have received periodic dredging to maintain the 22-foot depth.

24 Dredging at this location last occurred in the 1980s, which is

25 why now it is so significantly reduced in available depth of

1  navigable water.

2      If I understand correctly the concept of capturing a

3  portion of the mobile mercury sediment traveling in the lower

4  portion of the river as described in the cleanup plan, it

5  would seem that this naturally shoaling area might be a viable

6  location for the placement of a sediment trap, thereby

7  restoring the channel to its project depth while being used to

8  remove contaminated sediment from the water column.

9      The infrastructure necessary to accommodate the vessels,

10 equipment, and material required of this remediation will be

11 significant.  As the trustee formulates a long-range vision

12 for the cleanup, I hope that future transportation uses of the

13 waterway will be one of the many ideas they consider as a

14 legacy of their efforts.  Marine transportation is

15 substantially less fuel-intensive than truck transportation.

16 A modest size barge of 3,000 tons can carry as much cargo as

17 100 trucks and does so while using four and a half times less

18 fuel per ton mile.

19     The Mills Administration has made emission reduction a

20 cornerstone of their environmental policy, passing a law with

21 bipartisan support that mandates a 45-percent reduction in

22 emissions from 1990 levels by 2030 and 80 percent by 2050.

23 Per Maine DEP reports, the transportation sector was

24 responsible for 54 percent of Maine's $CO_2$ emissions in 2017,

25 an increase from the 1990 contribution of 44 percent.  Barge

1  transportation emits around three and a half times less $CO_2$

2  per ton mile than truck transportation.  Diverting even a

3  small portion of Maine's freight from truck to barge would

4  yield a measurable decrease in the state's

5  transportation-generated $CO_2$ emissions.

6       I applaud the Maine People's Alliance and Mallinckrodt

7  for coming to an agreement on a plan that moves restoration of

8  the river forward.  The Penobscot River has a 200-year history

9  of shipping that has seen products transported to and from the

10  Bangor hinterland, providing countless jobs and economic

11  activity for the region.  It is my sincere hope that in

12  addition to the primary goal of mercury remediation to the

13  watershed, the history of shipping on the Penobscot River will

14  guide the trustees in their planning and be a legacy that

15  continues for the next 200 years.

16       The members of the Penobscot Bay & River Pilots support

17  the Proposed Consent Decree, and we appreciate the opportunity

18  to offer this testimony.  Thank you.

19            THE COURT:  Thank you, sir.

20            MR. GELINAS:  Your Honor, is there an ability to

21  submit some written testimony to the court?

22            THE COURT:  Yes.  Maybe the thing to do -- have --

23  have -- what's counsel's position on this?

24            MR. BERNARD:  No objection from the plaintiffs.

25            MR. TALBERT:  No objection.  He can submit them for

1   the record.

2   THE COURT:  All right.  Why don't you hand it, if

3   you would, to the clerk and she can receive it.  I'm going to

4   ask the clerk to mark that as Court Exhibit No. 1.

5   MR. GELINAS:  Thank you for that.

6   THE COURT:  Thank you.

7   MS. TOPPAN:  Good morning, Your Honor.

8   THE COURT:  Good morning.

9   MS. TOPPAN:  My name is Ragan Toppan.  I am 19.  I'm

10  a sophomore at the University of Maine.

11  So this has been going on longer than I've been alive;

12  I'll be 20 next month, so almost.  But I have grown up in

13  Maine.  I've lived in Portland and Machias and now Orono, and

14  so I've fallen in love with all that Maine has to offer, and I

15  was saddened to hear that the Penobscot River had so much

16  mercury in it.  I mean, after hearing everyone speak, I think

17  it's obvious that it's such an important part of Maine's

18  ecosystem and fishing community.  Before this contamination,

19  people would actually eat from the river when it was allowed,

20  so it's just -- it's obviously a really important part of what

21  Maine has to offer.

22  And because the cleanup will take so long and monitoring

23  the mercury levels will take so long, it's important that --

24  that this cleanup starts now.  And, obviously, I support the

25  cleanup plan, and I ask that -- that you rule quickly and --

1   so that we can begin restoration of this -- this beautiful

2   river.

3       Thank you.

4           THE COURT:  Thank you, ma'am.

5           MR. CONMEE:  Hello.  My name is Tim Conmee.  First

6   off, I would like to thank the court and Judge Woodcock for

7   giving me the opportunity to speak today.

8       Secondly, I live in Orrington and am ecstatic to see the

9   years of litigation and backroom bargaining coming to an end.

10   My fingers are crossed this settlement gets final approval.

11       I am a board member of both MPA and the Penobscot Chapter

12   of Maine Audubon.  My audubon experiences color my thoughts.

13   Several years ago, one of our Inez Boyd grant winners utilized

14   the funds and studied the sturgeon.  He gave us a fascinating

15   presentation on his graduate-level research.  The Penobscot

16   River has a small population of shortnose sturgeon, but they

17   are currently listed as vulnerable with a declining

18   population.

19       I go to watch the songbirds in the Mendall Marsh knowing

20   their mercury levels are exceedingly high.  I worry for the

21   Great Blue Heron, who wade in the water and fish for a meal,

22   as they accumulate ever higher levels of mercury.  I don't

23   even know what to say about the black ducks and their mercury

24   levels.  Then there are the lobster and those fisher folk

25   whose lives were turned upside down downriver.

1     There is a human cost associated with this mercury plume.

2 I spent the last 26 years of my life working as a registered

3 nurse; much of that time was spent working in ICUs.  I

4 understand the significance of environmental insults on the

5 human body; they take a toll.  We have an opportunity to

6 mitigate this insult.  I hope we take that leap.

7     It seems I had had a front row seat to polluted bodies of

8 water, the litigation, and then the eventual remediation my

9 whole life.  I was born in Syracuse, New York, by Onondaga

10 Lake, which is widely considered the most polluted lake in the

11 country courtesy of the Solvay Process.  I then spent my

12 formative years in the Troy, New York area next to the Hudson

13 River and its PCB problem courtesy of GE.  The cleanup

14 continues there.

15     I think it's high time we get moving on the Penobscot

16 River cleanup.  It deserves no less than Onondaga Lake or the

17 Hudson River.  Thank you for listening to me.

18         THE COURT:  Thank you, sir.

19         MS. LOWE:  Good morning.

20         THE COURT:  Good morning.

21         MS. LOWE:  My name is Negina Lowe.  I am living in

22 Orono.  I am attending the University of Maine, but I live

23 there regardless of going to school there.

24     I am studying social work, and part of that is finding

25 jobs in the field before you graduate.  So I have been a BHP

1  for almost two years.  So I work with children with behavioral

2  health needs, and a lot of my clients have been in the Orono

3  and Old Town area.

4      There is a park that overlooks the Penobscot River, and

5  there's even like a little pathway to get down to the water.

6  But oftentimes parents of my clients have concerns about their

7  children even just stepping into the water, which is kind of

8  an issue during the summertime when all these kids want to go

9  play in the water.  And the nature of the work, you know, I'm

10  oftentimes working with kids whose only outing is really only

11  with me.  So it's a -- it's a little bit unfortunate when you

12  have to say maybe next time every time they want to go play in

13  the water.

14      And I won't pretend to be an expert on everything, but I

15  do think that hearing publicly about a cleanup may help some

16  parents really be comfortable with that, and I urge, if even

17  for just those -- that small population, that -- I urge the

18  court to go through and approve this.  I just -- I think that

19  there are many learning opportunities to be had if they see

20  fish, I -- I -- I -- or any animals really, but I think it

21  would add to their summertime, especially because if they're

22  not in school, oftentimes they're just home unless I'm taking

23  them out or someone else is taking them out.

24      So thank you.

25          THE COURT:  Thank you very much, ma'am.

1        We did receive a -- a letter from a member of the

2   Penobscot Nation.  And -- I don't know -- have you seen that

3   letter?

4               MR. BERNARD:  Yes Your Honor, and one of the

5   witnesses who has a relationship with the Nation was going to

6   read it as part of his testimony, if that's acceptable.

7               THE COURT:  Sure.

8        Have you seen the letter?

9               MR. TALBERT:  Yes, we have, Your Honor.

10              THE COURT:  All right.

11              MR. BERNARD:  Do you want him to do that now, Your

12  Honor?

13              THE COURT:  That -- that'd be fine, sure.

14              MR. BERNARD:  I don't think we have a hard copy of

15  it yet, but we can put it -- we have an electronic copy and we

16  can put it up on the screen, if that's okay.

17              THE COURT:  Whatever you'd prefer.  It has been

18  e-mailed to the clerk, which is why I got the -- a note from

19  the clerk indicating that we have received it, and my

20  suggestion is, because we do have an e-mailed copy, I admit it

21  as Court Exhibit No. 2.  Any objection to that?

22              MR. BERNARD:  None, Your Honor.

23              THE COURT:  Any objection?

24              MR. TALBERT:  No objection.

25              THE COURT:  Okay.  Thank you.  Yes, sir.

1           MR. DIEFFENBACHER-KRALL:  Good morning, Judge

2    Woodcock.  My name is John Dieffenbacher-Krall.  I live in Old

3    Town.  I appear before the court in support of the Proposed

4    Consent Decree in Maine People's Alliance and Natural

5    Resources Defense Council versus HoltraChem Manufacturing and

6    Mallinckrodt.

7           I have been directly involved in many of the significant

8    decisions by plaintiffs in this case from its earliest

9    conception in the late 1990s through 2005.  From the period

10   when this case was first contemplated and until early June

11   2005, I served either as the executive director or codirector

12   of the Maine People's Alliance.  I actually filed the original

13   complaint in this case in this courthouse on behalf of the

14   plaintiffs in April 2000.

15          Beyond my personal involvement in this case, I have

16   considerable expertise in the general subject matter of toxic

17   pollution of the environment, having worked professionally as

18   an environmental advocate in three states, and have served on

19   several policy advisory groups related to environmental

20   matters.  I have testified on environmental issues before the

21   New York State and Maine Legislatures and appeared as an

22   expert witness in the pro -- in a proceeding of the Maine

23   Waste Management Agency.

24          In addition, I have provided formal testimony before

25   multiple regulatory and governmental entities, including the

1    New York Legislative Commission on Solid Waste Management, the

2    New York Legislative Commission on the Water Resource Needs of

3    Long Island, New York Department of Environmental

4    Conservation, Maine Department of Environmental Protection,

5    and Maine Waste Management Agency.

6        I have authored or coauthored several reports on

7    toxics-related issues, including Poisons in Our Neighborhoods:

8    Toxic Pollution in Maine, Pollution Prevention...or Public

9    Relations? An Examination of the Environmental Protection

10   Agency's 33/50 Program, and The Persistent Polluters of Maine:

11   The Routine Release of Persistent, Bioaccumulative and Toxic

12   Chemicals to Air, Water and Land by Major Industries in Maine.

13       The Penobscot River, in a western or settler point of

14   view, should be seen as part of the commons, belonging to all

15   people and for all people's use.  Mallinckrodt and the other

16   owner-operators of the defunct chlor-alkali plant located in

17   Orrington usurped the rights of the public to that common

18   resource to serve its private interests.  Such a taking is

19   wrong.

20       That is why I advised the Maine People's Alliance Board

21   of Directors in 1999-2000 to join NRDC in this case.  I was

22   convinced that neither the Maine Department of Environmental

23   Protection, nor the Environmental Protection Agency were

24   likely to take action on the downriver contamination and its

25   potential threat to human health and the environment that has

1    been the focus of this case.  I believe the record in this

2    case proves the Maine People's Alliance and Natural Resources

3    Defense Council assessment to be correct.

4        The Consent Decree before this court is the product of

5    21 years of litigation and thousands of hours of time spent by

6    the plaintiffs to address the serious harm caused by

7    Mallinckrodt's pollution.  I am pleased that the parties are

8    now prepared to work together on addressing that harm instead

9    of battling in federal court whether a harm exists and, if so,

10   what to be done about it.

11       I understand that the court must determine whether this

12   Proposed Consent Decree is, quote, fair, reasonable, and in

13   the public interest.  I believe it is.  Through the proposed

14   trustee, remedial work will commence informed by three phases

15   of environmental study to effectuate the contemplated cleanup.

16       I believe the Consent Decree is fair as the proposed

17   remedial activities are designed to address the most serious

18   environmental and potential human health harms that denied

19   many public uses of the Penobscot River to thousands of

20   potential users.  Yet those activities are specifically

21   delineated and limited, recognizing Mallinckrodt has finite

22   financial resources.

23       The Consent Decree is reasonable.  Though some observers

24   may comment on the large sum of money, such a proposed

25   expenditure has been justified by the extensive environmental

1    study done.  When tons of mercury are allowed to enter one of

2    the largest watersheds in New England, serious harm will

3    occur.

4         In my judgment, the public interest is served by the

5    approval of this Consent Decree, focusing the parties'

6    resources on addressing the original reason MPA and NRDC

7    brought the citizens' suit in the first place -- to address

8    the harm unlikely to be addressed by governmental agencies

9    instead of prolonged litigation.  The focus belongs on how to

10   restore the full use of the Penobscot River to all users as

11   soon as possible.

12        I also strongly support this Consent Decree as someone

13   who has lived in the Penobscot Valley 30 years, as an avid

14   angler and outdoorsperson, and as a father.  I have a personal

15   family heritage of fishing that is extremely important to me.

16   My practice of that tradition is impaired by the mercury

17   pollution in the Penobscot River.  I deliberately avoid eating

18   Penobscot River fish in part because of the legacy of

19   Mallinckrodt's pollution.

20        The result is a polluter controls my diet and my family's

21   diet in a small way -- a fundamental infringement on my

22   freedom.  Addressing the most contaminated and most mobile

23   mercury sediments as this Consent Decree and the environmental

24   studies informing it propose present the potential of

25   restoring some of my lost freedom and choice sooner than

1   otherwise would be the case.

2       I have expressed my strong support for this Consent

3   Decree.  I do have one concern about the use of a particular

4   term on Page 14.  In Section 2, the definition section,

5   Subsection 1, Paragraph TT, the place name Squaw Point

6   appears.  I was shocked to read this term in the Consent

7   Decree.

8       The court probably knows most indigenous citizens

9   consider this word to be a slur.  Maine law considers the

10  designation squaw, s-q-u-a, or any derivation of s-q-u-a as a

11  separate word or as a separate syllable in a word as an

12  offensive name.  Title 1 Section 1102 of Maine law states, a

13  place in this state may not have or be given an offensive

14  name.

15      Upon alerting counsel for MPA and NRDC to the presence of

16  this offensive and wrong term in the Consent Decree, I was

17  informed, quote, it appears that the old name still appears on

18  the current version of NOAA Navigational Charts for Penobscot

19  Bay.  So I suspect that's why the Department of Marine

20  Resources and Amec both used the old name in their materials.

21      I have been told the only cure for removing this slur is

22  if some situation arised that would cause the parties to

23  refile the Consent Decree.  If the court has an ability to fix

24  this issue, I urge it to exercise the power to avoid this

25  offensive term being memorialized in this agreement for all

1    time.

2        Thank you, Your Honor.

3            THE COURT:  Thank you, sir, and thank you for

4    bringing that to my attention.

5            MR. DIEFFENBACHER-KRALL:  Now, how should we handle

6    me reading the letter of Ambassador Dana into the record?

7            THE COURT:  Why don't you just go ahead and read it.

8            MR. DIEFFENBACHER-KRALL:  Okay.

9            MR. BERNARD:  Your Honor, we're going -- can we put

10   it up on the screen --

11           THE COURT:  Sure.

12           MR. BERNARD:  -- because he doesn't have a hard

13   copy?

14           THE COURT:  Oh, yes.

15           MR. BERNARD:  Can everybody see that now?

16           MR. DIEFFENBACHER-KRALL:  Yeah, it's just a little

17   problem with the glare, but -- Dear Honorable Judge Woodcock,

18   please accept this as official support from the Penobscot

19   Nation for the Maine People's Alliance and the settlement to

20   clean the mercury discharge in the Penobscot River.  I

21   apologize for not testifying in person.  It was a personal

22   decision to not attend indoor gatherings due to the ongoing

23   case count of COVID-19 in Penobscot County.

24       Panawahpskewi in our language means, quote, where the

25   white rocks spread out.  Our name for our tribal nation comes

1    from the most sacred connection to our homeland and ancestral

2    territory.  We are not separate from the lands and waters; we

3    are a part of them.  This sacred relationship is what has

4    sustained our people since time immemorial through countless

5    atrocities, attacks, theft, and oppression due to colonization

6    and attempted genocide.  We are stewards of the earth, but it

7    is deeper than that.  We are part of the earth and see the

8    health and well-being of ourselves as inextricably linked to

9    that of the earth.

10         The Penobscot Nation Reservation Territory consists of

11   some of the islands and the river that we are named for.  Our

12   ancestral territory is far more widespread and would include

13   all of the islands and the tidal watershed.  The discharge

14   into any part of the river affects our people and our way of

15   life.  We have been in litigation, in some form or another,

16   with the State of Maine for most of my adult life over the

17   health and cleanliness of the river, which has suffered

18   greatly at the hands of paper mills and other industries.  We

19   have high rates of cancer and other diseases and have not yet

20   established a link between these illnesses and cleanliness --

21   excuse me, Your Honor -- and the chemicals in the river, but

22   our lived experience tells us that the pollution has taken a

23   toll on the vitality of our people.

24         We have sustenance fishing rights, but cannot live on the

25   fish.  When I was a child, the river was thick with foam, had

1   an odor at all times, and if you swam in it, your clothing

2   would be stained and skin would break out.  We have fought

3   back and breathed a lot of life back into the river through

4   tribal efforts and collaborations with other entities.  We

5   cannot afford to go backwards.

6         At our annual general meeting in 2018, the tribal

7   citizenship voted to make the Penobscot River a citizen of our

8   tribe.  We view the river as a relative and as having rights.

9   We fully support any effort to remedy the abuse and disrespect

10   that the river has been a victim of.  We thank Maine People's

11   Alliance and all who have taken a stand for this cleanup of

12   deadly mercury.

13         All my relations, Maulian Dana, Penobscot Nation Tribal

14   Ambassador.

15               THE COURT:  Thank you, sir.

16               MR. DIEFFENBACHER-KRALL:  Your Honor, if it would be

17   beneficial for the court, I do have a written copy of my

18   statement.  Would that -- and would that help?

19               THE COURT:  That -- that would be fine.  If you want

20   to present it to the clerk, we can mark that as Exhibit 3.

21               MR. DIEFFENBACHER-KRALL:  Thank you.

22               THE COURT:  I take it there's no objection from the

23   plaintiffs?

24               MR. BERNARD:  None, Your Honor.

25               THE COURT:  And none from the defendant?

1          MR. TALBERT:  No objection.

2          THE COURT:  Okay.  Thank you.

3          MS. BULLARD:  Hello, Your Honor.  I am Sam Bullard,

4    and before I get going, I'm wondering if Jesse is here with --

5    awesome.  Thanks so much.

6          My name is Sam Bullard and I use she/they pronouns.  I am

7    here as a resident of Bangor and as the Co-Program Director of

8    the Peace & Justice Center of Eastern Maine.  Today I am

9    testifying in support of the proposed Penobscot River mercury

10   cleanup in the case of Maine People's Alliance because I

11   believe in protecting Maine's waterways from mistreatment.

12         Can you hear me through the mask okay?

13         THE COURT:  Yes.

14         MS. BULLARD:  Okay.  In my area of Maine we have all

15   been hurt witnessing the blatant pollution of our lands and

16   waters by companies such as Juniper Ridge Landfill, Nine

17   Dragons Paper Mill, and HoltraChem.  Every day countless

18   gallons of leachate containing minimally tested --

19         THE COURT:  You're going to have to -- I can see the

20   court reporter's having a struggle with you.  You're -- you're

21   going to, one, have to speak up, and, number two, you're going

22   to have to slow down.

23         MS. BULLARD:  Okay.  Here.

24         THE COURT:  Okay.

25         MS. BULLARD:  Okay.  Every day countless gallons of

1    leachate containing minimally tested peat mosses are permitted

2    by the government's current regulations to be dumped straight

3    into the Penobscot River.  The landfill continues to take

4    toxic waste from other places outside Maine that are not even

5    permitted to be dumped in their places of origin.  We have

6    witnessed companies like HoltraChem pollute our waterways for

7    decades with mercury.  This is an issue that the Peace &

8    Justice Center has been fighting for more than 20 years.

9        In that time, we've seen valuable fisheries shut down and

10   our environmental health degraded due to the effects of

11   mercury contamination.  We are allowing our state's natural

12   integrity to be violated by out-of-state interests purely out

13   of convenience for them and the disregard of our own lands.

14       At the very least, our state could do better to uphold

15   cases like MPA's that further protect our ecosystems from

16   harmful chemicals.  This issue also lives at the heart of

17   Maine's community.  So much of Maine is made up of our

18   beautiful rivers, lakes, and other natural resources.  These

19   are incredibly important to the Wabanaki people who have

20   always been stewards and protectors of the lands.

21       With the current levels of pollution permitted in our

22   waters, we are seeing what was once clean drinking water and

23   fishing waters turn into toxic landscapes, slowly poisoning

24   our wildlife and our communities who depend on these

25   waterways.  For far too long the colonial mind-set has

1    desecrated and polluted vital parts of ourselves and the world

2    that we live in.  Allowing such levels of waste into our

3    ecosystems is an attack on the Penobscot Nation --

4              THE COURT:  You're -- you're -- I'm getting a signal

5    from the court reporter that you're -- could you go back a

6    little bit --

7              MS. BULLARD:  Yeah.

8              THE COURT:  -- and then slow down?

9              MS. BULLARD:  Sorry.

10             THE COURT:  Okay.  Thank you.

11             MS. BULLARD:  With current levels of pollution

12   permitted in our waters, we are seeing that what was once

13   clean drinking and fishing waters turn into toxic landscapes,

14   slowly poisoning our wildlife and our communities who depend

15   on these waterways.

16        For far too long the colonial mind-set has desecrated and

17   polluted vital parts of ourselves and the world that we live

18   in.  Allowing such levels of waste into our ecosystems is an

19   attack on the Penobscot Nation and on all of our community.

20        It is for these reasons that the Peace & Justice Center's

21   in support of this case.  I urge you to approve the settlement

22   so that we can work together to protect and uphold the

23   integrity of the state's ecosystem.

24             THE COURT:  Thank you very much, ma'am.

25             MS. BULLARD:  Okay.

1          MR. WHITE:  Good morning.

2          THE COURT:  Good morning.

3          MR. WHITE:  My name is David White.  I own a small

4     business on Mt. Desert Island.  I live there, also.

5          I just wanted to suggest that small business people also

6     support this.  It is our community.  It was never right that

7     this should have occurred -- this kind of waste dumping into

8     our -- our environment.

9          Ten years of research, five years of calculating the

10    repair, I don't like the idea of dredging, but people that

11    know more than I do have already worked this out.  This is

12    what has to happen.  I'm suggesting that you approve this.

13         This has been 21 years.  I was seven years on the Maine

14    People's Alliance board.  This was a very big topic.  This

15    subject is studied in -- in environmental classes.  Please do

16    this.  Thank you.

17         THE COURT:  Thank you, sir.

18         MR. TIPPING:  Thank you for the opportunity to speak

19    today.  My name is Ryan Tipping.  I live in Orono.

20         I grew up on the Stillwater River.  My parents still live

21    there.  As you probably know, it's just a part of the

22    Penobscot really.  The same river -- water that went by my

23    parents' house that I used to swim in, take kayaks and canoes

24    out into, flowed downstream at the time over the Veazie Dam,

25    over the dam in Orono, over the Veazie Dam, and then by the

1     site of the former HoltraChem facility.

2          After I graduated from Orono High and I was in college, I

3     had the opportunity to do some work with the Maine People's

4     Alliance as a canvasser and then an organizer, and it was

5     astonishing the amount of pollution that was there.  I know a

6     lot of people knew about it, and I know it was in the -- in

7     the common knowledge, but it's something that's hidden from

8     sight.  Even if you know it's there, it's still hidden in a

9     lot of ways.

10         As an organizer, I did a lot of work trying to empower

11    people to find their voice, use the system we've built to

12    participate in a process where they can build a better state,

13    a better country.  And it was shocking when you engage with

14    volunteers who are so fearful, scared, angry, and shocked

15    because of the actions of this company or series of companies.

16         I am hopeful that this is a path to resolution, and I am

17    hopeful that you, Your Honor, and -- and everyone involved in

18    this system can show some sort of resolution because I know

19    there's a lot of doubt in this process.

20         I'm 35.  When I was -- started as an organizer, I was in

21    my late teens.  After I left MPA, I went on to serve four

22    consecutive terms in the State Legislature representing Orono,

23    and there are times when people throw up their hands when they

24    hear something about this -- something like this.  There are

25    times when people just assume an amount of power and wealth

1   can skirt our laws.  People can get away with actions like
2   this because of the way the system's set up.  And this is a
3   very important instance of science and the law, some element
4   of justice working its way to a point where we can actually
5   see a positive resolution, which is why I'm here testifying in
6   support of the settlement.

7        Like many of the people who've spoken before, I'm not an
8   expert, but I know that people who have been working on this
9   case for a long time, the scientists, have our best interests
10  at heart, and I hope the settlement goes through.

11           THE COURT:  Thank you very much, sir.

12           MR. TIPPING:  Thank you.

13           THE COURT:  This is sort of like a Quaker meeting
14  where we're waiting to see if the spirit moves you.  Is there
15  anyone else who'd like to speak?

16       Seeing no one, I need to talk with the lawyers about
17  what's next.  Mr. Bernard, Mr. Talbert, do you have some ideas
18  of what we do next?

19           MR. BERNARD:  We do, Your Honor.  Assuming we want
20  to abide by the prehearing scheduling order, there would be a
21  post-hearing submission, a brief, which is due in 30 days.  I
22  think that's November 4th.  And assuming Your Honor would -- I
23  think from plaintiffs' point of view, that would probably be
24  useful to try to address some of what we've heard in the
25  testimony and kind of put that all together.

1          MR. TALBERT:  That's -- that's the same as my

2    understanding, Your Honor.  We have a brief due in 30 days.

3    We also think that that would be helpful, and we would do our

4    -- our best to basically summarize the issues for you and make

5    our final request.

6          THE COURT:  All right.  Very good.  So I'll hear --

7    I'll receive the post-hearing memoranda of counsel and will

8    then at that point take the matter under advisement.

9       Is there anything further at this time from the

10   plaintiffs?

11         MR. BERNARD:  Just a couple of quick things, Your

12   Honor:  One is Mallinckrodt, as you know, filed an amended

13   motion for a bar order.

14         THE COURT:  Yes.

15         MR. BERNARD:  And under the rules, our response

16   would be due in a week or so.  We would like to -- and I think

17   that Mallinckrodt has consented -- to have until the date of

18   the post-hearing submission to respond to the amended motion.

19         THE COURT:  I take it there's no objection?

20         MR. TALBERT:  No objection, Your Honor.

21         THE COURT:  That's granted.

22         MR. BERNARD:  Okay.  We may file it sooner, but it

23   won't be later than November 4th.

24      The only other thing is there's an additional public

25   comment -- written comment, not somebody who appeared today,

1   that arrived just last night that I think, also by consent,

2   we'd like to put into the record just in the spirit of

3   openness.  And I don't know whether you want to mark that as a

4   court exhibit or whether you want to mark it as a joint

5   exhibit.

6           THE COURT:  Why don't we mark it as a court exhibit.

7   What is it?

8           MR. BERNARD:  Court Exhibit 4, and it's an e-mail

9   that went to the Web site from a citizen named Christopher

10  Johnson.

11      And, Julie, do you have this?

12          THE CLERK:  I don't.

13          MR. BERNARD:  Okay.  If I can -- I can provide it.

14          THE COURT:  Okay.  Thank you.  Do you have any

15  objection to that?

16          MR. TALBERT:  No objection.

17          THE COURT:  Okay.  Thank you.

18          MR. BERNARD:  The only other thing, Your Honor, is I

19  did want to, on the part of the plaintiffs, thank Susan

20  Calkins for her service in the remedy phase -- Phases II and

21  III.  She was attentive, responsive, fair, and I think a real

22  credit to the court.

23          THE COURT:  Thank you.

24          MR. TALBERT:  I share that sentiment.  She did an

25  excellent job and we appreciate her time.

1          THE COURT:  All right.  Well, thank you very much.

2     Is there anything further from the plaintiffs?

3          MR. BERNARD:  Nothing further, Your Honor.

4          THE COURT:  Anything further from the defendant?

5          MR. TALBERT:  Nothing, Your Honor.

6          THE COURT:  Thank you.  Court will stand in recess.

7     (Proceedings concluded at 10:24 a.m.)

8                         CERTIFICATION

9     I certify that the foregoing is a correct transcript from

10    the record of proceedings in the above-entitled matter.

11

12

13    /s/ Julie G. Edgecomb_____          October 5, 2021____
      Julie G. Edgecomb, RMR, CRR           Date
14    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25