UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MAINE PEOPLE'S ALLIANCE and | ) | |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:00-cv-00069-JAW |
| | ) | |
| HOLTRACHEM MANUFACTURING | ) | |
| COMPANY, LLC, and | ) | |
| MALLINCKRODT US LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON CONSENT DECREE AND PROPOSED BAR ORDER**

For over fifty years, mercury contamination from a former chlor-alkali plant has polluted Maine's Penobscot River.  Twenty years ago, environmental groups invoked the Resource Conservation and Recovery Act's (RCRA) citizen suit provision in an effort to force the responsible party to fund widespread remediation.  This Court held two bench trials to decide liability and endangerment issues, and ordered three phases of rigorous, independent scientific and engineering studies to evaluate the severity of the problem and assess potential remediation strategies.  The Court then ordered an engineering firm to develop appropriate and effective remedies to mitigate the harm to the people, biota, and environment of the Penobscot estuary.  After extensive negotiations, the parties used the engineering firm's report to inform a settlement that would avert a third contentious trial and instead would commence one of the largest environmental cleanups in Maine history.  The Court conditionally

approves the parties' proposed Consent Decree, which commits at least $187 million—and up to $267 million—to an independent remediation trustee, as fair, adequate, and reasonable, and as consistent with congressional objectives. The Court denies the defendant's request for a bar order barring future claims upon entry of the Consent Decree.

## I.     BACKGROUND

### A.     Factual Background[1]

From December 9, 1967, through April 30, 1982, Mallinckrodt US LLC[2] (Mallinckrodt) or one of its affiliates owned and operated a chlor-alkali plant on a 240-acre site in Orrington, Maine. Between 1982 and 1994, the plant was owned and operated by Hanlin Group, Inc. (d/b/a LCP Chemicals and Plastics, Inc.) (Hanlin), which bought the site from Mallinckrodt's predecessor.[3] Hanlin and its related companies filed a Chapter 11 bankruptcy petition in 1991. HoltraChem Manufacturing Company, LLC (HoltraChem) owned and operated the plant from 1994 until it closed the plant in September 2000.

While Mallinckrodt owned and operated the plant, facility production included the use of approximately eighty-two tons of mercury on site at any given time. The plant sent mercury-contaminated brine sludge into its sewer, and then through the facility's outfall directly into the Penobscot River; this occurred every day, repeatedly,

---

[1]     The recitation of relevant historical facts comes from Judge Carter's 2002 Order. *Me. People's Alliance v. HoltraChem Mfg. Co.*, 211 F. Supp. 2d 237, 241-46 (D. Me. 2002). The facts were "either stipulated by the parties or found by the Court based on the evidence presented at trial." *Id.* at 241.
[2]     Mallinckrodt US, LLC was once known as Mallinckrodt, Inc.
[3]     Hanlin is not a defendant in this action.

from December 9, 1967, through June 1970. Although the plant estimated that 1.5 to 2.5 pounds of mercury were discharged per day through the facility's outfall during this period, this estimate did not include mercury discharged through air emissions or groundwater. In fact, Mallinckrodt admitted that more mercury was discharged through air emissions than through the facility outfall. In addition, the state of Maine was unaware that the facility was discharging mercury into the Penobscot River during this period. Although the volume of discharges declined between 1970 and 1982, Mallinckrodt continued to discharge mercury through 1982.

In response to a federal suit filed against it by the United States in 1970, Mallinckrodt constructed Hickel's Pond to divert process waste. The pond was located close to the Penobscot River on a downward slope from the plant buildings. The operation manager of the plant indicated in a 1972 letter that the facility took periodic river, fish, and sediment samples and kept the results on file, but to his knowledge in 2002, the facility did not conduct any further sampling.

In 1994, upon buying the plant, HoltraChem assumed (1) Hanlin's obligations under a 1993 consent decree with the Environmental Protection Agency (EPA) that required Hanlin to conduct a site investigation and corrective measures study under the corrective action provisions of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a); and (2) Hanlin's obligations under a 1991 settlement agreement between it and Mallinckrodt regarding expenses for completion of the study. Under the 1993 Consent Decree, a three-phase process was instituted: (1) site investigation; (2) a study of possible corrective measures; and (3) remediation.

## B.     Procedural History; Further Background

This case has a lengthy procedural history.  On April 10, 2000, the Plaintiffs filed suit against HoltraChem and Mallinckrodt, alleging violation of RCRA, 42 U.S.C. § 6972(a)(1)(B).  *Compl.* (ECF No. 1).  The Complaint alleged that Mallinckrodt caused an "imminent and substantial endangerment to health and the environment" as a result of discharging mercury into the Penobscot River.  *Id.* ¶ 1.  The Plaintiffs sought injunctive relief, requesting an order "requiring that Mallinckrodt undertake an independent scientific study of mercury contamination in that portion of the Penobscot downriver of the plant and to develop and implement a remediation plan." *Me. People's All. v. HoltraChem Mfg. Co.*, 211 F. Supp. 2d 237, 241 (D. Me. 2002).

Following a nine-day bench trial that concluded on March 14, 2002, *Tr.* (ECF No. 134), in which the "evidence focused on the status of the Penobscot River south of the plant and the upper Penobscot Bay [a/k/a Penobscot downriver]," *HoltraChem*, 211 F. Supp. 2d at 240-41, Judge Gene Carter[4] found Mallinckrodt liable under RCRA on July 29, 2002, *id.* at 251 ("[T]he Court concludes that the methylmercury downriver of the plant, resulting, in part, from Mallinckrodt's actions at the plant site, may present an imminent and substantial endangerment to public health and the environment").  Mallinckrodt filed a notice of appeal on August 26, 2002.  *Def. Mallinckrodt Inc.'s Notice of Appeal* (ECF No. 149).

### 1.     Judge Carter's Implementing Order; The Study Panel and

---

[4]     Retired United States District Judge Gene Carter, who presided over this case with distinction from April 10, 2000, to July 14, 2008, passed away on November 17, 2021.  The Court previously expressed its gratitude to Judge Carter for his skill and wisdom in making the visionary decision to appoint an independent panel of experts to study the Penobscot River and make recommendations to the Court.  *Order on Remediation Plan* at 35-36 (ECF No. 829).

**Its Purposes; First Circuit Ruling**

While Mallinckrodt's appeal was pending, Judge Carter ordered Mallinckrodt

to fund a two-phase study of mercury in the Penobscot River on November 25, 2003.

*Implementing Order for Penobscot River Study Pursuant to Mem. of Decision and*

*Order Dated July 29, 2002* ¶¶ 5-8 (ECF No. 159) (*Implementing Order*).[5]  The study

was to be executed by a study panel, the purpose of which was to resolve the following

issues:

> (1)    the extent of the existing harm <u>resulting from mercury</u>
> <u>contamination</u> to the Penobscot River/Bay system south of the
> Holtrachem plant site at Orrington, Maine ("the site");
>
> (2)    the need for and feasibility of a remediation plan to effectively
> address the present effects of such existing harm, if any; and
>
> (3)    the elements of and timetable for the execution of the appropriate
> remediation plan to address the harm existing <u>as a result of</u>
> <u>mercury contamination</u>.

*Id.* ¶ 1 (emphasis in original).  In resolving these three issues, Judge Carter ordered

the Study Panel to answer six questions:

> (A)    What physical, chemical, and biological processes are presently at
> work that effect or govern the distribution and fate of mercury
> and methyl mercury in the sediments and biota of the Penobscot
> River/Bay system south of the immediate area of the site?
>
> (B)    What is the extent to which any mercury in the Penobscot
> River/Bay system is being meth[y]lated and bioconcentrated and
> biomagnified in aquatic organisms and food webs of the Penobscot
> River/Bay system?

---

[5]       The Court amended this order several times.  *Order Amending Implementing Order for Penobscot River Study Pursuant to Mem. of Decision and Order Dated July 29, 2002* (ECF No. 172); *Second Order Amending Implementing Order for Penobscot River Study Pursuant to Mem. of Decision and Order Dated July 29, 2002* (ECF No. 199).

(C)     Is any mercury in the Penobscot River/Bay system having significantly adverse effects on populations of organisms in the lower Penobscot River/Bay system?

(D)     Is any mercury in the Penobscot River/Bay system posing an unacceptable risk to human health?

(E)     Do the scientific data lead to the conclusion that a mercury remediation program is necessary and feasible to effectively remediate the effects of any such harm caused by mercury contamination in the Penobscot River/Bay system?

(F)     If remediation is deemed necessary and feasible, what are the elements of and schedule required for the execution and completion of such a remediation program, addressing the effects of mercury contamination in the Penobscot River/Bay system, and what additional information is needed in order to design the remediation program?

*Id.* While the Study Panel completed its judicially assigned tasks, the Court retained jurisdiction of the case. *Id.* ¶ 13.

The purpose of the Phase I Study was to "assess (i) whether mercury within the study site presently poses an unacceptable risk to human health and/or the environment; and (ii) answer the specific questions (A) through (E)" set forth above. *Id.* ¶ 5. Following completion of this part of the study, the Court would evaluate the findings and recommendations of the Phase I Study and "determine the purposes and scope of the work to be required by the Phase 2 Study Plan." *Id.* ¶ 8.

The Court, with input from the parties, appointed a three-member Study Panel, and met with members of the Panel on April 20, 2004. *Order of Notice* (ECF No. 170); *Min. Entry* (ECF No. 173). On July 22, 2005, the Study Panel submitted its proposed Phase I Study Plan to the Court. *Order of Notice*, Attach. 1, *A Study Plan for Evaluation of the Mercury Contamination of the Penobscot River / Estuary, Maine* (ECF No. 259) (*Phase I Study Plan*). On August 10, 2005, after reviewing the parties'

6

comments and objections, the Court approved the Phase I Study Plan. *Order Approving Study Plan* (ECF No. 266).

On December 22, 2006, the First Circuit fully affirmed Judge Carter's 2002 order. *Me. People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 298 (1st Cir. 2006) ("[W]e uphold the district court's rulings in all respects").

### 2.    Phase I Report Findings and Recommendations

On January 25, 2008, the Study Panel submitted its 117-page report. *Penobscot River Mercury Study, Phase I of the Study: 2006-2007* (ECF No. 382) (*Phase I Report*). The Phase I Report explained that the Study Panel used four criteria

> to decide whether the environment and biota of the Penobscot River and estuary have high enough levels of mercury to be of concern to an extent that justifies us proceeding to Phase II of the project and whether the source of that mercury appears to [be from] the HoltraChem plant site.

*Id.* at 5. Based on these criteria, the Phase I Report concluded

> there is sufficient weight of scientific evidence to conclude that the Penobscot River and estuary are contaminated with [mercury] to an extent that poses endangerment to some wildlife species and possibly some limited risk for human consumers of fish and shellfish. We further conclude that these data justify our recommendation for the study to proceed to its second phase.

*Id.*

The Plaintiffs "wholeheartedly endorse[d]" the Phase I Report, *Pls.' Comments on Phase I Report* at 1 (ECF No. 387), but Mallinckrodt objected to its recommendations and findings, *Def. Mallinckrodt LLC's Comments On and Objections to Phase 1 Study Report* (ECF No. 388). The Court subsequently approved

and adopted the Phase I Report on March 7, 2008, and ordered Phase II to proceed.

*Order Approving Phase I Report* (ECF No. 390).

### 3.   Phase II and Its Purposes; Case Reassignment; Special Master Appointment; Phase I Update

In ordering Phase II, the Court explained that

> [t]he central issues to be addressed . . . are whether it is necessary and feasible to ameliorate mercury and the methylation of mercury in the Penobscot River now and in the future by means that will exceed the benefits likely to be had by allowing the natural attenuation processes in operation in the River to accomplish over time and, if so, what reasonable human processes will accomplish that end.

*Id.* at 3.

On March 10, 2008, the Study Panel submitted its proposed Phase II Study Plan to the Court. *Phase II Study Plan* (ECF No. 391) (*Phase II Study Plan*). The Court ordered the Study Panel to revise the Phase II Study Plan on April 18, 2008. *Order Requiring Study Panel to Revise Phase II Study Plan* (ECF No. 402). The Study Panel submitted a revised proposed study plan on May 21, 2008. *Revised Phase II Study Plan* (ECF No. 407). On July 2, 2008, after reviewing the parties' comments and objections, the Court approved the Phase II Study Plan. *Order Approving Phase II Study Plan* (ECF No. 413).

On July 14, 2008, the case was reassigned to this Judge. On October 17, 2008, the Court appointed Susan Calkins, a former Justice of the Maine Supreme Judicial Court, as Special Master overseeing the Study Group under Federal Rule of Civil Procedure 53. *Order of Reference* (ECF No. 434).

The Study Panel filed an update to the Phase I Report on July 27, 2009. *Update to the Phase I Report* (ECF No. 480) (*Phase I Update*). The Phase I Update added additional data and analysis to the Phase I Report and concluded that these data and analyses supported the original conclusions of the Phase I Report. *Id.* at xxiii ("Most of the results presented in this report are confirmatory of those presented in the Phase I report and strengthen the conclusions presented in that report, that the lower Penobscot River and upper Penobscot estuary are significantly contaminated with [mercury]").

### 4.   Phase II Report Findings and Recommendations

On April 19, 2013, the Study Panel submitted its Phase II Report. *Final Report* (ECF No. 652) (*Phase II Report*). The Phase II Report was over 1,800 pages long and contained twenty-three chapters. *Id.* The Phase II Report concluded that mercury discharged from HoltraChem is present in high concentrations in the upper estuary of the Penobscot River, as well as in the sediments "of the upper and lower Penobscot estuary." *Id.*, Attach. 1, *Executive Summ.*, at ES-6 (*Phase II Summ.*). It also concluded that mercury is being converted by bacteria into methylmercury, an organic form of mercury that enters and persists in the bodies of animals exposed to it. *Id.* Furthermore, it concluded that methylmercury "biomagnifies" in the food chain, meaning it becomes more concentrated as it passes from prey to predator. *Id.* The Phase II Report noted that total mercury levels declined in some areas, but at the current rate of decline it would take "about 33 years for [mercury] concentrations to be low enough in the main stem of the river to not cause problem levels in biota,"

and a longer period of 60 years in Mendall Marsh. *Id.* at ES-6 to -7. The Report ascribed this slow rate of decline to "the presence of a large pool of [mercury] contaminated mobile sediments (estimated at 320,000 tonnes)[6] that has been trapped in the upper estuary" through "hydrodynamic processes." *Id.* at ES-7.

Due to the "continuing risk to biota and human consumers," the Phase II Report "recommend[ed] the establishment of a Remediation Program" that would "involve[] three types of active remediation procedures." *Id.* These include some targeted "removal of contaminated mobile sediments" and "replacement with clean sediments," as well as dispersal of a mercury "binding agent" in Mendall Marsh to lower total mercury concentrations and retard the production of methylmercury. *Id.* The Phase II Report set targets for total mercury concentrations of 450 ng/g dry weight in the upper estuary and 100 ng/g dry weight in Mendall Marsh. *Id.* It suggested that, if the Court ordered its recommended remediation program, and assuming certain "uncertainties for the treatments" were resolved, the recovery time could be reduced to "about 5 years." *Id.*

Both parties filed objections to the Phase II Report on July 3, 2013. *Pls.' Challenges to Phase II Report* (ECF No. 663) (*Pls.' Challenges*); *Mallinckrodt US LLC's Challenges to Phase II Report* (ECF No. 664) (*Def.'s Challenges*). Plaintiffs argued that the Phase II Report did not go far enough in its recommendations, *Pls.' Challenges* at 2-5, while Mallinckrodt argued that the Report was "riddled with errors

---

[6]    The Report uses the English spelling, "tonnes," and not the American spelling, "tons," but the Court has retained the British spelling because the British tonne is a metric measurement, slightly heavier than the American ton.

and unsupported findings." *Def.'s Challenges* at 1.  On February 28, 2014, the Court dismissed both objections without prejudice, preferring to address the challenges in the course of the anticipated bench trial.  *Order* (ECF No. 721).

### 5.    Bench Trial: June 3, 2014 to June 27, 2014

The Court held a bench trial between June 3, 2014, and June 27, 2014, to determine the next step in light of the findings and recommendations in the Phase II Report.  *Min. Entry* (ECF No. 754); *Min. Entry* (ECF No. 796).

Over the course of trial, the Court heard the testimony of twenty-three witnesses, discussing various issues relating to the Phase II Report.  The testimony heard at trial totaled over 3,000 transcript pages (not including relevant testimony taken by deposition and admitted into evidence).  *See Order on Remediation Plan* at 1, 11 (ECF No. 829) (*Order on Remediation Plan*).

On September 2, 2015, the Court concluded that the Plaintiffs had demonstrated that the Penobscot River estuary continues to suffer irreparable injury from ongoing mercury contamination caused by Mallinckrodt.  *Id.* at 54.  The Court observed that "despite the passage of thirteen years since Judge Carter's [2002 order finding 'imminent and substantial endangerment to public health and the environment,'] the Penobscot River estuary remains unacceptably contaminated with mercury."  *Id.*  The Court subsequently ordered an "essential" Phase III engineering study to assess potential solutions, with the hope that the river cleanup was finally on the horizon after more than a decade of litigation.  *Id.* at 57.

### 6.    Phase III Engineering Study

On October 16, 2015, the Court appointed Amec Foster Wheeler, now known as Wood Environment & Infrastructure Solutions (Wood), to independently "identify feasible, effective, and cost-effective remedies" to speed the recovery of the Penobscot River estuary, with a "focus in particular on the region from the site of the former Veazie Dam south to Upper Penobscot Bay, including Mendall Marsh and the Orland River." *Order for Evaluation of Potential Active Remedies* at 1 (ECF No. 836). On October 2, 2018, Wood submitted to the Court its Phase III Report. *Phase III Engineering Study Report* (ECF No. 972) (*Phase III Report*).

After assessing remedial alternatives for the Penobscot estuary, Wood recommended:

- Placement of a thin layer cap (approximately three inches thick) on approximately 50% of the Mendall Marsh platform;
- Dredging to remove 950,000 cubic yards (cy) of mercury contaminated subtidal surface deposits;
- Dredging/excavation of 215,000 cy of mercury contaminated sediments in the Orrington Reach intertidal east and marsh platform east (the area adjacent to and immediately downstream of the former HoltraChem facility);
- Comprehensive long-term monitoring to evaluate Estuary response to these active remediation activities; and
- Initiation of modeling and pilot studies to evaluate enhanced MNR for the Orland River and the channel on the east side of Verona Island.

*Id.* at ES-1.

Wood's recommended remedial alternatives, including long term monitoring, would cost an estimated $172 million to $500 million and additional adaptive management could cost up to an additional $1 billion. *Id.* at Table 8-2; *Pls.' Prehr'g Br.* at 8 (ECF No. 1157) (*Pls.' Prehr'g Br.*). Under Wood's recommendations, the

surface deposits to be dredged are in the Frankfort Flats, Verona East, and Orland River as well as the Orrington Reach. *Phase III Report* at ES-4 to -5. Wood proposed additional measures if their remedial plan fails to meet mitigation targets. *Id.* at ES-7 to -8. Wood suggested placing clean sediment in the Orland River to be distributed naturally, a remediation strategy called enhanced monitored natural recovery (EMNR), or dredging about 1.8 million cubic yards of contaminated sediment from the Orland River and areas on the northeast and east sides of Verona Island. *Id.* at ES-8 to -9. Wood estimated the total cost of its proposed remediation strategy to equal between $246,068,000 and $333,378,000, depending on whether the removed material is landfilled or beneficially reused. *Id.* at Table 8-2. Significantly, Wood acknowledged that its "[c]ost estimates were developed with a target accuracy of plus 50 percent/minus 30 percent." *Id.* at ES-9.

### 7.    Consent Decree Negotiations

In late 2018, after Wood released its Phase III findings, the parties began preparing for a third trial to resolve outstanding disputes—namely over which remedial strategies should be implemented, where, for how long, and at what cost to Mallinckrodt. They identified sixty-four potential expert and fact witnesses and engaged in depositions and discovery. *See, e.g., Scheduling Order* (ECF No. 987); *Joint Mot. to Amend Schedule and for New Date Certain for Trial* (ECF No. 1007). In 2019, the parties engaged in earnest settlement negotiations. *See Pls.' Prehr'g Br.* at 9-10; *Joint Mot. to Amend Scheduling Order and Set New Trial Date* (ECF No. 1041). On September 29, 2020, Magistrate Judge Nivison presided over a full-day settlement

conference, which continued on October 15, 2020. *Order Setting Settlement Conference* (ECF No. 1077); *Min. Entry* (ECF No. 1082). After extensive further negotiations, the parties filed their initial proposed Consent Decree on March 19, 2021. *Joint Mot. to Approve Proposed Consent Decree* (ECF No. 1114).

### 8.  Mallinckrodt's Proposed Bar Order

On March 19, 2021, after the parties successfully negotiated a settlement, Mallinckrodt requested that, in connection with the proposed Consent Decree, the Court issue an order barring future lawsuits on past discharges. *Def. Mallinckrodt US LLC's Mot. for Entry of a Bar Order* (ECF No. 1116) (*Def.'s Mot.*). On March 26, 2021, the Plaintiffs responded, expressing partial support for Mallinckrodt's request. *Pls.' Resp. to Mallinckrodt US LLC's Mot. for Entry of a Bar Order* (ECF No. 1118) (*Pls.' First Resp.*). Mallinckrodt then filed an unopposed motion to stay briefing on its motion for entry of a bar order until after the fairness hearing. *Def. Mallinckrodt US LLC's Mot. to Stay Briefing on its Mot. for Entry of a Bar Order* (ECF No. 1120). At the April 30, 2021, conference of counsel, Mallinckrodt withdrew its motion and the Court "confirmed that it will not rule on the motion for bar order until after the state and federal governments and third parties had been notified of the potential resolution, including the potential bar order, and until after the Court has held a fairness hearing on the proposed resolution." *Order* (ECF No. 1127). On May 10, 2021, Mallinckrodt replied to the Plaintiffs' response to its motion for a bar order. *Def. Mallinckrodt US LLC's Reply in Support of Mot. for Entry of a Bar Order* (ECF No. 1128) (*Def.'s First Reply*).

On June 25, 2021, the parties informed the Court that they "jointly . . . met with state officials, the Special Master, the Court-appointed Phase III engineering firm, and municipal officials from several communities along the Penobscot River to explain the proposed settlement." *Joint Letter* (ECF No. 1133). On July 14, 2021, the parties submitted a proposed plan for public notice and hearing on their proposed settlement and Consent Decree. *Joint Mot. to Approve Proposed Plan for Fairness Hr'g and Set Hr'g Schedule* (ECF No. 1136).

On September 21, 2021, Mallinckrodt filed an amended motion, changing the language of its proposed bar order to exclude claims by the state and federal governments. *Def. Mallinckrodt US LLC's Am. Mot. for Entry of a Bar Order* (ECF No. 1151) (*Def.'s Am. Mot.*). It explained:

> [S]ince [filing its original motion for entry of a bar order] Mallinckrodt has been in contact with the United States and State of Maine regarding the request for entry of a bar order. As a result of those discussions, Mallinckrodt . . . agreed to narrow the scope of the requested bar order so as not to bar claims brought by the United States or the State of Maine.

*Id.* at 1.

### 9.   The Public Comment Period and Fairness Hearing

On July 20, 2021, the Court scheduled a fairness hearing to hear from the parties and from members of the public regarding the proposed consent decree. *Order* (ECF No. 1137); *Notice of Hr'g* (ECF No. 1138). On July 23, 2021, as requested by the Court, the parties submitted their proposed public notice of the fairness hearing for approval. *See Order* (ECF No. 1137); *Joint Mot. to Approve Public Notice* (ECF No. 1139). The Court ordered the parties to revise the public notice "to emphasize

the bar order," by adding conspicuous information regarding the "proposed bar order's contents and its implications for potential claims of third parties." *Order* (ECF No. 1140).  On August 6, 2021, the Court approved the parties' amended public notice. *Joint Mot. to Approve Am. Public Notice*; *Order* (ECF No. 1142).

In its August 6, 2021 order, the Court required the parties to give notice of the hearing to the public, which they did through newspaper advertisements, a central website on the case and proposed settlement, and by reaching out directly to local, state, and community stakeholders.  *See Joint Mot. to Approve Am. Public Notice* (ECF No. 1141).  On September 24, 2021, the parties filed more than 500 written comments from the public and from members of the Plaintiffs' organizations: Maine People's Alliance and Natural Resources Defense Council.  *Notice of Written Public Comments* (ECF No. 1156).  Mallinckrodt and the Plaintiffs submitted briefs before the fairness hearing.  *Pls.' Prehr'g Br.*; *Def. Mallinckrodt US LLC's Pre-Fairness-Hr'g Br.* (ECF No. 1155).

In early October 2021, the Court held a three-day fairness hearing in Bangor, Maine.  *See Min. Entries* (ECF Nos. 1162, 1163, 1165).  The parties presented six witnesses and over one-hundred exhibits.  *Ct. Ex. and Witness Lists* (ECF Nos. 1166, 1167).  On October 1, 2021, the Court heard the parties' opening statements, and testimony from Nelson Walter, Wood's project and program manager, and Dr. Charles Driscoll, Plaintiffs' mercury remediation and engineering expert.  *See Hr'g Day 1 Tr.* at 2. On October 4, 2021, the parties called the following witnesses: Dr. Danny Reible, Mallinckrodt's mercury remediation expert; Cynthia Brooks, president and founder

of Greenfield Environmental Trust Group, Inc. (Greenfield); Jesse Graham, codirector of Plaintiff Maine People's Alliance; and David Kelley, Mallinckrodt's corporate representative. *See Hr'g Day 2 Tr.* at 2.

On October 5, 2021, the Court invited members of the public to comment on the proposed Consent Decree. The Court heard from eighteen public commenters, including seventeen in-person commenters and a participant who read into the record a letter from Penobscot Nation Ambassador Maulian Dana. *See Fairness Hr'g, Volume III of III, Tr. of Proceedings* (*Hr'g Day 3 Tr.*).

After the fairness hearing, on November 4, 2021, the Plaintiffs filed their response to Mallinckrodt's amended motion requesting a bar order. *Pls.' Resp. to Mallinckrodt US LLC's Am. Mot. for Entry of a Bar Order* (ECF No. 1174) (*Pls.' Second Resp.*). Mallinckrodt replied on November 18, 2021. *Def. Mallinckrodt US LLC's Reply in Supp. of Am. Mot for Entry of a Bar Order* (ECF No. 1178) (*Def.'s Second Reply*).

Also on November 4, 2021, the parties filed post-hearing briefs in support of the proposed Consent Decree. *Def. Mallinckrodt US LLC's Post-Fairness-Hr'g Br* (ECF No. 1172) (*Def.'s Post-Hr'g Br.*); *Pls.' Post-hr'g Br.* (ECF No. 1173) (*Pls.' Post-Hr'g Br.*).

## II.     THE PROPOSED CONSENT DECREE

### A.     The Settlement Terms[7]

---

[7]     On November 4, 2021, the parties jointly filed a corrected proposed Consent Decree that removes "an inadvertent reference to an outdated name" for the southern tip of Cape Jellison, as brought to the parties' and the Court's attention during the fairness hearing. *Notice of Corrected*

### 1.    An Overview

The Consent Decree is a nuanced, complicated, and dense document.   In general terms, the Consent Decree requires Mallinckrodt to provide at least $187 million and up to $267 million if certain contingencies are met.   *Notice of Corrected Proposed Consent Decree*, Attach. 1., *[Proposed] Consent Decree*, at 28-29 (ECF No. 1176) (*Consent Decree*).    Modeled on, although not identical to Wood's recommendations, the Decree funds four types of active remediation initiatives, long-term monitoring, and beneficial environmental projects.   *See id.* at 19-26.   Also, the parties propose that if funding allocated for a particular project or remedy is not used, because the remedy costs less than expected or is infeasible, it will be redirected to other remedies or generally reallocated to support Beneficial Environmental Projects. *Id.* at 27-28.

### 2.    The Site

To understand the significance of the Consent Decree, it is necessary to picture the Penobscot River particularly as it flows in a generally southerly direction from above Bangor to the mouth of Penobscot Bay.   *Order on Remediation Plan* at 43-44. The Penobscot River system flows entirely within the state of Maine.   *Id.* at 43.   The second largest river in New England, the Penobscot stretches 264 miles from its sources in northern Maine to Penobscot Bay, draining an area of 22,300 km, the largest estuary in New England with a surface area of about 90 km.   *Id.*   The Penobscot River is a powerful, dynamic, and complex system mixing fresh and salt

---

*Proposed Consent Decree* at 1 (ECF No. 1176).  The paragraph 1(tt) and Appendix E of the proposed Decree now refer to the "Defence Point."  *Id.*

water, with downward momentum from its catchment area and upward and intermittent countervailing forces from incoming and outgoing tides, affected seasonally by ice, snowmelt, and a comparatively dry season as the River approaches late summer and early fall.  *Id.* at 43-46.

Even though Holtra-Chem deposited mercury directly into the Penobscot River and the contamination affected the entire Estuary from the former Veazie Dam to Penobscot Bay, the entire downriver Estuary was not affected to the same degree. After exhaustive and intensive study, the scientists focused on four areas of the Estuary that require intervention because they still represent mercury hotspots. These four areas present separate remedial challenges based on their topography and the extent of residual mercury pollution.  Accordingly, the Consent Decree proposes remedies tailored to individual areas.

The Consent Decree uses the term "Site" to describe the "Penobscot River Estuary" from "the location of the former Veazie Dam to upper Penobscot Bay." *Consent Decree* at 14.  The Consent Decree divides the Site into four subdivisions from north to south: the Orrington Reach, Mendall Marsh, the East Channel, and the Orland River.[8]  *Id.* at 12.  As the Court understands these areas, the Orrington Reach

---

[8]     The Consent Decree defines most of these areas by reference to Appendix E of the Consent Decree, which is a map.  *See Consent Decree* at 6-12.  However, Appendix E does not mark the reference points mentioned in the Consent Decree.  For example, the Consent Decree defines the "Orrington Reach" as the "area defined as the Orrington Reach in Appendix E."  *Id.* at 11.  But Appendix E nowhere defines "Orrington Reach."  The same is true with most of the locations purported to be labeled in Appendix E.  Through its experience with this case and the other evidence presented at the fairness hearing, the Court understands what the parties mean to refer to.  Nevertheless, so that the Consent Decree is accurate and may be accurately interpreted by a third party, the Court urges the parties to revisit Appendix E, ensure the consistency of defined terms in the Consent Decree as a whole, and supplement the Consent Decree with a map that accurately describes each subdivision described in the Consent Decree.

is on the east bank of the Penobscot River immediately below the former HoltraChem plant, Mendall Marsh is on the west bank of the Penobscot River in the towns of Frankfort and Prospect, the East Channel is the portion of the Penobscot River that flows easterly from the town of Bucksport to the southeasterly end of Verona Island, and the Orland River flows southwesterly into the East Channel.

As a matter of common sense, it is not surprising that these four areas would be affected differently than the Site as a whole. The Orrington Reach is just below the area of discharge so it would be expected that the concentrations of mercury would be higher near the source than further downstream. Mendall Marsh, which was thoroughly studied in Phase II, is unusual in that its waters flow northeasterly into a southbound river. Therefore, contaminated water flowing from the Penobscot into Mendall Marsh is forced into a geographic cul de sac and, except for tidal action, once in the marsh, the mercury does not have a natural escape route. Finally, at Bucksport, the main force of the Penobscot carries to the west of Verona Island. As the Penobscot approaches the town of Bucksport, it is met by Verona Island and some of the Penobscot's waters flow southeasterly around Verona Island, rejoining the main current of the Penobscot at the southern tip of Verona Island. Called the East Channel, this semicircle of water from Bucksport to the east side of Verona Island is much more quiescent, protected, and placid than the main body of the Penobscot and therefore, experiences less force and volume to carry the contamination downstream. Instead, the mercury tends to accumulate, and this contamination has affected the Orland River, which flows southwesterly into the East Channel.

### 3.   The Remedial Proposals

#### a.   Capping in the Orrington Reach

First, the settlement proposes capping roughly 130 acres of intertidal sediment in the Orrington Reach.  *Id.* at 20-21.  A "cap" of clean sediment would create a barrier between mercury-contaminated sediment and the water and wildlife.  *Id.* Mallinckrodt pledges $50 million for the design, implementation, and monitoring of the capping, and up to an additional $10 million if necessary.  *Id.*

#### b.   Dredging of Mobile Sediments and Surface Deposits

Second, Mallinckrodt commits $70 million to dredge and remove mercury-contaminated mobile sediments and surface deposits from the Site.  *Id.* at 21-23.  For reasons the Court describes later, the parties leave up to the Trustee exactly if, where, and how much dredging is to be done.  *Id.* at 22.  If dredging becomes necessary, the parties intend removed material to be beneficially reused whenever possible; however, Mallinckrodt agrees to pay up to an additional $50 million if all or some of the material must be disposed of in a landfill.  *Id.* at 23.

#### c.   Remediation in the Orland River and Verona Island

Third, the proposed Consent Decree commits $30 million for remediation in the Orland River and the Eastern Channel around Verona Island.  *Id.* at 23-24.  The parties propose that the Trustee decide to fund EMNR, capping, dredging, or some combination of these approaches.  *Id.*

#### d.   Funding for Beneficial Environmental Projects

Fourth, Mallinckrodt agrees to fund $20 million in Beneficial Environmental Projects (BEPs), intended to offset past harm done by the mercury pollution and generally improve environmental conditions along the Penobscot. *Id.* at 24. BEPs are:

> projects undertaken to provide tangible environmental or public benefits to affected communities or the environment that are intended to mitigate or offset potential adverse impact(s) directly or indirectly caused by mercury contamination at the Site. Beneficial Environmental Projects may include any project that (i) benefits the natural environment of the Penobscot River estuary; (ii) improves recreational and aesthetic enjoyment of the Penobscot River estuary; or (iii) reduces human exposures in Maine to mercury or other neurotoxins.

*Id.* at 6. The Decree provides that some of the BEPs may be used to satisfy or offset state and federal natural resource damages claims against Mallinckrodt. *Id.* at 24.

### e.    Long-term Monitoring

The Consent Decree also commits $10 million for long term monitoring of the Penobscot, to be conducted in three-year intervals, for up to a maximum of forty-five years. *Id.* at 25. After a minimum of thirty years, the Trustee will assess the need for ongoing monitoring based on mercury levels and trends, regulatory input, the amount of funding remaining, and up to date science. *Id.* at 26. Mallinckrodt agrees to pay up to an additional $10 million in contingent funding should continued long-term monitoring be necessary. *Id.* at 25.

### f.    Trust Administration

The parties selected Greenfield Environmental Trust Group to oversee the remediation work and implement the terms of the Consent Decree, pursuant to two trusts: the Penobscot Estuary Mercury Remediation Trust (Remediation Trust) and

22

the Penobscot Estuary Beneficial Environmental Project Trust (Project Trust).[9]  *Id.* at 36, 42.  The Remediation Trust will fund the bulk of the work, while the Project Trust will fund BEPs, including Restoration Projects to meet Mallinckrodt's separate natural resource damages claims.  *Id.* at 37-39.  Greenfield is a specialized project manager and fiduciary with over thirty years of experience overseeing site cleanups all over the United States. *See Hr'g Day 2 Tr.* at 34-40.  The Consent Decree allocates $7 million for project administration (and up to an additional $10 million if necessary).  *Consent Decree* at 27.

### 4.   Following the Money

#### a.   Committed Funding: $187,000,000

The Consent Decree defines the concept of "Committed Funding":

> "Committed Funding" shall mean those portions of funding for the remedial activities set forth in Paragraphs 10 through 15 (Orrington Reach through Trust Administrative Costs) that are required to be paid by Mallinckrodt to the Trusts.

*Id.* at 7.  The total amount of Committed Funding from Mallinckrodt is $187,000,000. *Id.* at 28-29.  The Consent Decree sets out the following categories of remediation work to which the $187,000,000 in Committed Funding will be applied:

#### i.   Orrington Reach: $50,000,000

Mallinckrodt is committed to spending up to $50,000,000 to cap 130 acres of intertidal sediments.  This work would include design, permitting, implementation, remedy-specific monitoring, and maintenance in the Orrington Reach.  *Id.* at 20.

---

[9]    As just described, the Consent Decree creates two trusts, but the parties recommend one trustee.  Referring to Greenfield's proposed role in the two trusts, the Court uses Trustee in the singular in this Order.

ii.      **Mobile Sediments and Surface Deposits:**

**$70,000,000**

Mallinckrodt is committed to spending up to $70,000,000 to remove a portion of mobile sediments and surface deposits from the Site. *Id.* at 21-22. The Consent Decree defines "Mobile Sediment" as:

> "Mobile Sediment" shall mean any mineral or organic sediment, including wood waste, that may be mobilized and homogenized by natural processes in the Penobscot River over timescales relevant to affect the fate and transport of mercury within the Site. Mobile Sediment includes sediment described as "mobile" or as components of the "mobile pool" in Chapter 7 of the Phase II Report (ECF No. 652-43) or in the Phase III Engineering Study Report, ECF No. 972.

*Id.* at 10. The Consent Decree also defines "Surface Deposit":

> "Surface Deposit" shall mean any subtidal or intertidal region of Mobile Sediment accumulation, including any commingled materials or debris, that can be identified by physical, chemical, geophysical, or other scientific methods. Surface Deposit generally refers to the types of sediment beds described as a "surface deposit" in the Phase III Engineering Study but does not necessarily refer to the same spatial extent as the specific Surface Deposits delineated and identified in the Phase III Engineering Study, which are depicted on the map attached as Appendix E.

*Id.* at 14-15. Because these definitions refer to other documents on the docket, the Court turns to those documents to describe the significance of these definitions.

First, regarding "Mobile Sediment," the Consent Decree definition refers to the "sediment described as 'mobile' or as components of the 'mobile pool' in Chapter 7 of the Phase II Report." Chapter 7 of the Phase II Report is a fifty-three-page document. *See Phase II Report* (ECF No. 652), Attach. 43, *R.W. Geyer and D.K. Ralston, Penobscot River Mercury Study, Ch. 7, Field Investigations of Hydrodynamics and*

*Particle Transport in Penobscot River and Bay*.  The Geyer-Ralston section of the Phase II Report described a complex process by which mercury attaches to sediment, travels down the Penobscot River toward Penobscot Bay, and is remobilized and redistributed by the salinity of the ocean water and tidal forces.  *Id*. at 7-1 to -2. Authors Geyer and Ralston surveyed Mendall Marsh in their analysis of the distribution and impact of mobile sediment.  *See id*. at 7-31 to -34.  Similarly, the Phase III Engineering Study Report acknowledged a "large pool of mercury-affected mobile sediment retained in the Estuary and its associated recycling within the Estuary under the influence of the tide."  *Phase III Report* at ES-2.  The Phase III Report suggested alternative remedies to address mobile sediments.  *Id*. at ES-3 to - 7.

Next, the Consent Decree refers to "Surface Deposits," defined in the Phase III Report as "mixed mineral sediment and wood waste characterized by mercury concentrations generally greater than system-wide average."  *Id*. at ES-4.  The term would seem self-explanatory but for purposes of remediation, the Phase III Report refers to surface deposits mostly in the context of dredging.  *See id*. at 8-22, 8-24, 8- 27.

The Court notes that this part of the Consent Decree is not geographically limited within the Estuary.  *Consent Decree* at 21-22.  Instead, the $70,000,000 may fund remedial action to remove mobile sediments and surface deposits from the "Site."

<h3>iii.          Orland River and East Channel:</h3>

25

**$30,000,000**

Mallinckrodt has committed $30,000,000 for remediation of the Orland River and East Channel area. *Id.* at 23-24. This funding will first be directed to "remedy selection, design, implementation, and remedy-specific monitoring in these Reaches." *Id.* at 23. The Consent Decree expressly provides that the remedies may include "EMNR, capping, and/or dredging." *Id.* The Consent Decree acknowledges that these remedies "may need to be coordinated or sequenced with other remedies, such as the Mobile Sediment or Surface Deposit removals." *Id.*

### iv.   Beneficial Environmental Projects: $20,000,000

In addition to the funds Mallinckrodt has committed to remedial projects at the Site, Mallinckrodt has also committed to fund $20,000,000 for so-called Beneficial Environmental Projects. *Id.* at 24. The Consent Decree defines Beneficial Environmental Projects:

> "Beneficial Environmental Projects" shall mean projects undertaken to provide tangible environmental or public benefits to affected communities or the environment that are intended to mitigate or offset potential adverse impact(s) directly or indirectly caused by mercury contamination at the Site. Beneficial Environmental Projects may include any project that (i) benefits the natural environment of the Penobscot River estuary; (ii) improves recreational and aesthetic enjoyment of the Penobscot River estuary; or (iii) reduces human exposures in Maine to mercury or other neurotoxins.

*Id.* at 6.

### v.   Long-Term Monitoring: $10,000,000

The parties recognize that the Site (and appropriate off-Site) will require long-term monitoring to assess the ongoing health of the estuary and the effectiveness of the remedial measures. *Id.* at 25-26. The Consent Decree provides Committed Funding of $10,000,000 to complete this task at three-year intervals for a period of at least thirty years and not more than forty-five years. *Id.*

### vi.  Trust Administration Costs: $7,000,000

The Consent Order requires administration by a knowledgeable and active Trustee, and it provides for payment of the Trustee. Mallinckrodt agrees to commit $7,000,000 to pay trust administration costs, *id.* at 27, which are broadly defined in the Consent Order. *Id.* at 16.

### b.  Over or Under Funding

The committed funding figures represent estimates of the cost of the proposed remediation projects, and the parties implicitly acknowledge that they are subject to significant variability. The Consent Decree therefore anticipates that it is possible the actual cost of the projects may exceed the amounts Mallinckrodt has committed to fund.

For the Orrington Reach project, if the actual cost exceeds $50,000,000, Mallinckrodt has agreed to up to an additional $10,000,000 for remediation. *Id.* at 21. The Consent Decree provides that if the cost of the work exceeds $60,000,000, Mallinckrodt will not be responsible for additional funding and instead the scope of the work will be altered to fit within the total of committed and contingent funding of $60,000,000. *Id.*

The second area of committed funding is $70,000,000 to remove mobile sediment and surface deposits from the Site. *Id.* This commitment contemplates the removal of contaminated material, and the natural question is, once removed, where is this material going to go. The Consent Decree anticipates this issue and proposes that the Trustee "shall make all best efforts to" direct dredged material for so-called Beneficial Reuse, as defined in the state of Maine's Solid Waste Management Regulations, as an alternative to landfill disposal. *Id.* at 6, 22. If beneficial reuse is not feasible, the Consent Decree provides up to $50,000,000 in contingent funding for "the actual costs incurred for waste processing, water treatment, transportation, disposal, and other costs necessary for landfill disposal." *Id.* at 23.

It is also possible that Mallinckrodt's specific funding commitments will exceed the actual costs of one or more of the projects. If so, the Consent Decree provides that Mallinckrodt's committed funds may be reallocated to other categories of committed funding. Thus, for example, if the work on the Orrington Reach comes to $40,000,000, the unused $10,000,000 may be applied to any of the other remedial projects. In terms of the transference of funds for other approved purposes, the Consent Decree is addressing only committed, not contingent funding. Except for the specific provisions for contingent funding, limited to specific projects, if the total cost of a remedy exceeds its total amount of committed funding, Mallinckrodt will have no obligation to make up the shortfall.

### c.    Contingent Funding: $80,000,000

The Consent Decree defines "Contingent Funding":

28

"Contingent Funding" shall mean those portions of funding for the remedial activities set forth in Paragraphs 10 through 15 (Orrington Reach through Trust Administrative Costs) that Mallinckrodt shall be required to pay to the Trusts only if certain contingencies occur or are encountered as set forth in Paragraphs 10 through 15 (Orrington Reach through Trust Administrative Costs).

*Id.* at 7.

### i.      Orrington Reach: $10,000,000

Mallinckrodt has agreed to pay an additional $10,000,000 in Contingent Funding to remediate the Orrington Reach but only "if the cost of capping 130 acres in the Orrington Reach, including remedy-specific monitoring and maintenance, exceeds $50,000,000." *Id.* at 21. If this provision is triggered, the Consent Decree provides that this additional funding "shall be the lesser of the actual cost of the Work in the Orrington Reach or $60 million." *Id.* If the total cost of the Orrington Reach remediation work exceeds $60,000,000, the "scope of the Work shall be altered to fit within the Capped Funding amount, taking into account the availability, if any, of Remaining Funding from other Work Categories." *Id.*

### ii.      Mobile Sediments and Surface Deposits: $50,000,000

Mallinckrodt has agreed to an additional $50,000,000 in Contingent Funding for the portion of the remediation related to disposal of contaminated mobile sediments and surface deposits, but this contingent funding is narrowly circumscribed. *Id.* at 23. To this end, the parties agree that the "Beneficial Reuse of any sediment, debris, and other materials removed from the Site is preferable to landfill disposal and is the appropriate method for management of materials removed

from the Site if such Beneficial Reuse will be permissible, as determined by the granting of all necessary permits and approvals for such reuse, and is Feasible." *Id.* at 22. However, if "the Trustee determines it is not Feasible to Beneficially Reuse all of some materials removed from the Site, the Trustee will consult with the Parties on appropriate next steps for disposal and to discuss reasonable alternatives." *Id.* If, after such discussions, landfilling the material is necessary and the Trustee has made all best efforts to identify the least costly means of disposal, then Mallinckrodt will pay "up to $50 million in Contingent Funding." *Id.* at 22-23. Again, Mallinckrodt's contingent commitment is for "actual costs . . . up to a maximum of $50 million." *Id.* at 23.

### iii.    Orland River and East Channel: None

Mallinckrodt is not obligated to pay any Contingent Funding to remediate the East Channel and Orland River beyond its $30,000,000 commitment, and the Trustee is to design and implement remedies within that budget. However, if unused funding from other projects is available, those funds may be used "to supplement the funding for these Reaches." *Id.* at 23-24.

### iv.    Long-Term Monitoring: $10,000,000

In addition to the $10,000,000 Mallinckrodt has committed to the cost of long-term monitoring, Mallinckrodt has committed an additional $10,000,000 in Contingent Funding to be paid on an actual cost basis for further long-term monitoring. *Id.* at 25. The total commitment for long-term monitoring "shall be the lesser of the actual cost of the Work or $20 million." *Id.*

### v.    Trust Administrative Costs: $10,000,000

In addition to the $7,000,000 in Committed Funding for Trust Administrative Costs, Mallinckrodt will pay up to $10,000,000 in Contingent Funding for such costs, again based on an actual cost not to exceed a total of $17,000,000. *Id.* at 27.

### 5.    The Trusts

To fund its objectives, the Consent Decree establishes two trusts, the Remediation Trust and the Project Trust, each administered by the same trustee. *Consent Decree*, Attach. 3, *Penobscot Estuary Mercury Remediation Trust Agreement* (*Remediation Trust*); *id.*, Attach. 4, *Penobscot Estuary Beneficial Environmental Projects Trust Agreement* (*Project Trust*). As the Plaintiffs summarized the purposes of these trusts, the "Remediation Trust would be responsible for most of the work" and the "Project Trust would only fund beneficial environmental projects." *Pls.' Post-Hr'g Br.* at 15. These are dense and finely tuned trust agreements and, as their terms effectively replace the parties' legal rights and defenses, the provisions require close analysis.

### a.    Common Provisions Between the Two Trusts

Both trusts contain several important common provisions concerning appointment of the trustee and the administration of the trusts.

First, Mallinckrodt is the Settlor of both trusts, *Remediation Trust* at 2; *Project Trust* at 2, Greenfield is the Trustee for both trusts[10], *Remediation Trust* ¶ 4.1.1;

---

[10]    Specifically, the trust agreements appoint Greenfield Penobscot Estuary Remediation Trust, LLC as Trustee for the remediation work and Greenfield Penobscot Estuary Project Trust, LLC as Trustee for the Project Trust and Trust Accounts. *Remediation Trust* ¶ 4.1.1; *Project Trust* ¶ 4.1.1.

*Project Trust* ¶ 4.1.1, and the Beneficiaries of both trusts are Mallinckrodt, Maine People's Alliance (MPA), and the Natural Resources Defense Council (NRDC). *Remediation Trust* ¶ 1.1.3; *Project Trust* ¶ 1.1.4.  Once Mallinckrodt initially funds the Remediation Trust, it will not retain any ownership "whatsoever" in the Trust assets.  *Remediation Trust* ¶ 2.7.1, 2.7.2.  However, once all remediation work has been completed, if there are unclaimed funds in the Remediation Trust, namely in the form of unused Contingent Funding, those funds will be returned to Mallinckrodt upon termination of the Trust.  *Id.* ¶¶ 2.8, 3.5.

By contrast, regarding the Project Trust, Mallinckrodt is "treated as the owner of the Trust Assets for federal tax purposes." *Project Trust* ¶ 2.7.  Any assets remaining in the Project Trust at its termination must be transferred to the Remediation Trust.  *Id.* ¶ 3.5.

Next, the Trustee is granted broad authority "to perform any and all acts necessary to accomplish the purposes of" both trusts.  *Remediation Trust* ¶ 4.3; *Project Trust* ¶ 4.3.  For both trusts, the Trustee is held to exercise its broad authority "in a fiduciary capacity" and "shall not be required to take action or omit to take action if, after the advice of counsel, the Trustee believes in good faith such action or omission is not consistent with the Trustee's fiduciary duties." *Remediation Trust* ¶ 4.2; *Project Trust* ¶ 4.2.  There are outer limits to the Trustee's authority.  *See Remediation Trust* ¶ 4.5; *Project Trust* ¶ 4.5.  The Trustee is not allowed to act unless in good faith it determines that its actions are "reasonably necessary or proper for the conservation

or protection of the Trust Assets or the fulfillment of the purposes of the Remediation [or Project] Trust." *Remediation Trust* ¶ 4.5.1; *Project Trust* ¶ 4.5.1.

Fourth, as the Trustee is the same for both trusts, the trust agreements address how the Trustee is to function in its dual roles.  The Remediation Trust Trustee is required to "coordinate with the trustee of the Project Trust" and to "work in good faith with the trustee of the Project Trust to facilitate transfer of the Project Trust's assets and liabilities to the Remediation Trust in accordance with . . . the Consent Decree." *Remediation Trust* ¶ 4.5.2.  Similarly, the Project Trust Trustee is required to "coordinate with the trustee of the Remediation Trust," to "work in good faith with the trustee of the Remediation Trust to facilitate the transfer of the Trust's Assets and liability to the Remediation Trust," and to "take such actions with respect to the Trust Assets, and liabilities, as reasonably requested by the trustee of the Remediation Trust, unless the Trustee reasonably determines that such actions would violate the Trustee's fiduciary duties to the Project Trust or another obligation of the Trustee created in this Agreement or the Consent Decree." *Project Trust* ¶ 4.5.4.

Fifth, although the Trust terms require the Trustee to consult with the Beneficiaries about the nature and allocation of investments, both trusts restrict the Trustee's investment discretion to certain enumerated investment vehicles. *Remediation Trust* ¶ 2.5.1; *Project Trust* ¶ 2.5.1.  After listing permissible investments, the terms allow the Beneficiaries to approve in writing "[a]ny other investment vehicle." *Remediation Trust* ¶ 2.5.1(7); *Project Trust* ¶ 2.5.1(7).

Sixth, both trusts provide for cost reimbursement and compensation of the Trustee from the Trust Assets. *Remediation Trust* ¶¶ 4.7.1, 4.7.2, 4.7.3; *Project Trust* ¶¶ 4.7.1, 4.7.2, 4.7.3. The trusts require the Trustee to prepare an annual budget or fee schedule subject to approval by the Beneficiaries. *Remediation Trust* ¶ 4.7.1; *Project Trust* ¶ 4.7.1. In each trust agreement, this compensation provision refers to paragraph 3.2 of the respective trusts. *Id.* Paragraph 3.2 of each trust requires the Trustee, on or before October 1 of each calendar year, to provide the Beneficiaries "to the extent required in the Consent Decree, with balance statements, proposed budgets, work plans, and forecasts." *Remediation Trust* ¶ 3.2.1; *Project Trust* ¶ 3.2.1. Except for emergency funding, *see Remediation Trust* ¶ 3.2.2; *Project Trust* ¶ 3.2.2, the Trustee may not pay any expense not provided for in a budget that "the Beneficiaries have not objected to pursuant to the terms of this Agreement and the Consent Decree." *Remediation Trust* ¶ 3.2.1; *Project Trust* ¶ 3.2.1. Disputes about payments to the Trustee are subject to the dispute resolution process established by the Consent Decree and the trust agreements. *Remediation Trust* ¶ 4.7.1; *Project Trust* ¶ 4.7.1.

Seventh, the trust agreements contain an extremely densely worded provision on the mutual covenant not to sue:

> Except as specifically provided herein and without limiting the Beneficiaries' or the Trustee's, if applicable, right to seek to enforce the terms of the Consent Decree and this Agreement and to seek dispute resolution as provided in the Consent Decree . . . the Beneficiaries covenant not to sue or assert any claims or causes of action against any of the Trust Parties with respect to the matters addressed herein, except to the extent such claim or causes of action are attributable to a Trust Party's fraud or willful misconduct as determined by the Court, and the

> Trust Parties covenant not to sue or assert any claims or causes of action against any Beneficiary.

*Remediation Trust* ¶ 4.14; *Project Trust* ¶ 4.14.

Eighth, the trusts refer to and incorporate the dispute resolution provisions in the Consent Decree. *Remediation Trust* ¶ 7.4; *Project Trust* ¶ 7.4. The Consent Decree first provides that the Plaintiffs have the right under the Consent Decree to enforce Mallinckrodt's obligations to fund the trusts. *Consent Decree* at 77. The Decree provides that the parties will submit their disputes (including disputes about payment or the interpretation of its terms) to informal dispute resolution. *Id.* at 78. The parties must attempt to resolve any dispute informally, submit to mediation, and then formally subject the dispute to the United States Magistrate Judge, as a pretrial matter under Federal Rule of Civil Procedure 72. *Id.* at 77-80.

### b.      The Remediation Trust

With that groundwork in mind, the Court turns to the terms of the Remediation Trust, the so-called working trust. The Remediation Trust is formally known as the Penobscot Estuary Mercury Remediation Trust. The Remediation Trust is a twenty-nine-page document, which is referred to in and attached to the proposed Consent Decree. *Remediation Trust*; *Consent Decree* at 36. The Remediation Trust Agreement is a complex and significant document.

The Remediation Trust provides that the "exclusive purposes and functions of the Remediation Trust are to hold the Trust Assets, carry out administrative functions related to the Trust Assets, oversee, implement and fund Work at the Site, oversee, implement and fund Beneficial Environmental Projects, pay future oversight

costs and other costs as provided [therein] and in the Consent Decree, and carry out Long-Term Monitoring at the Site." *Remediation Trust* ¶ 2.2.1.

Mallinckrodt has committed a grand total of $167 million to the Remediation Trust and is contingently responsible for an additional $80 million. *See Consent Decree* at 28-29.

Within twenty days of the effective date of the Remediation Trust, Mallinckrodt is required to transfer $9.5 million as "Initial Funding." *Id.* at 29. Mallinckrodt will supply further funding based on invoices from the Trustee consistent with the Trustee's budget forecasts and its specific remediation project commitments. *Id.* at 29-30. However, Mallinckrodt will not be required to fund any amounts beyond the Capped Funding in the Consent Decree. *Id.*

### c.   The Project Trust

The second trust is the Project Trust, formerly known as the Penobscot Estuary Beneficial Environmental Project Trust Agreement. The Project Trust is a thirty-page document, which is referred to and attached to the proposed Consent Decree. *Project Trust*; *Consent Decree* at 36. Like the Remediation Trust, the Project Trust Agreement is a complex and significant document.

The purpose of the Project Trust is "hold the Trust Assets, carry out administrative functions related to the Trust Assets, and oversee, implement, and fund Work at the Site through Beneficial Environmental Projects." *Project Trust* ¶ 2.2.1. Under the terms of the Project Trust, Beneficial Environmental Projects "may

include, but are not limited to, Restoration Projects and/or Tidal Marsh Projects, subject to the requirements of the Consent Decree." *Id.*

Mallinckrodt has committed a total of $20 million "for Work on Beneficial Environmental Projects." *Consent Decree* at 24. Within twenty days of the effective date of the Project Trust, Mallinckrodt is required to transfer $500,000 as "Initial Funding." *Id.* at 29. Mallinckrodt will supply further funding based on invoices from the Trustee consistent with the Trustee's budget forecasts. *Id.* at 29-30. However, Mallinckrodt will not be required to fund any amounts beyond the Capped Funding in the Consent Decree. *Id.*

### B.    Positions of the Parties

#### 1.    The Plaintiffs' Pre-Hearing Brief

The Plaintiffs explain that "the Proposed Consent Decree would satisfy Plaintiffs' interest in 'corrective justice and accountability' by ensuring that Mallinckrodt, which has been held liable, would 'bear the cost of [remedying] the harm for which it is legally responsible.'" *Pls.' Prehr'g Br.* at 17 (alterations in *Pls.' Prehr'g Br.*) (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 (1st Cir. 1990)). They urge that targeted active remediation is both necessary and "long overdue," as the "the dangerous conditions underlying the Study Panel's recommendation have not changed materially" and "the rate of natural recovery in sediments, already slow, is slowing down." *Id.* at 18 (citing the *Phase III Report*). The Plaintiffs note that the Consent Decree "would build on the foundation laid by the three phases of Court-ordered studies" by following Wood's recommendation that

"active remedies focus on targeted areas with unacceptable levels of risk" and "where work is most likely to accelerate recovery." *Id.* at 19.

Addressing the specific ways in which the Consent Decree differs from Wood's recommendations, the Plaintiffs say that capping (instead of dredging) in the Orrington Reach offers "similar remediation benefits but can be implemented faster and with lower costs" and poses "less risk of remobilizing" mercury-contaminated sediments than dredging. *Id.* at 20. They also suggest that the Consent Decree's targeted mobile sediment and surface deposit dredging is an efficient remedy, "akin to hot spot removal," that can be "expected to have broad[] benefits for the ecosystem." *Id.* at 22. Although dredging has its risks, as compared less invasive remedial options, Plaintiffs emphasize that "[a]ll remediation work would be required to 'minimize[] environmental risks and adverse impacts' and incorporate 'monitoring and control measures to protect human health and the environment.'" *Id.* (quoting *Consent Decree*, Attach. 2, *Statement of Work* at 13). The Plaintiffs highlight the importance of remediation work in the Orland River and Verona Island area, a key habitat area with particularly high mercury concentrations where ecological recovery could help to lift state lobster fishery closures. *Id.* at 24.

The Plaintiffs explain that Mallinckrodt's $20 million commitment to fund Beneficial Environmental Projects may include "Tidal Marsh Projects" and "Restoration Projects" to "provide tangible environmental or public benefits to affected communities and the environment." *Id.* at 25-26. Noting the parties "strongly held, diverging positions regarding the severity of mercury contamination

in Mendall Marsh, and what, if anything, to do about it," the Plaintiffs reason that the Beneficial Environmental Projects funding will give the Trustee flexibility for remediation in the Marsh, an "ecological[ly] sensitiv[e]" state wildlife management area which may be subject to special permitting or mitigation requirements. *Id.* at 26.

Next, the Plaintiffs say that the need for long-term monitoring in the Estuary is "undisputed" and that such ongoing study is necessary to "provide information about mercury contamination trends" and "assess the long-term results of active remediation." *Id.* at 27. They note, in particular, that the parties' proposal is "similar in duration and potential cost [to Wood's suggested 45 years of triennial monitoring] but leaves flexibility to adjust the specific duration depending on future data and monitoring needs." *Id.* at 28.

Regarding Greenfield's implementation of the Consent Decree, Plaintiffs reason that "[t]he independence of the trusts and trustees will help to secure public trust in the remediation process." *Id.* They urge the Court to conclude that the Consent Decree "strikes a reasonable balance" because "[e]ach side bears litigation risk, and further contention would consume valuable time and money better spent on active remediation." *Id.* at 29. Moreover, the Plaintiffs submit that the terms of the Consent Decree "follow a central command of RCRA: They compel [Mallinckrodt] 'to provide a remedy that ameliorates' the risks and harms in the Estuary caused by [its] mercury discharges," *id.* at 30 (quoting *Meghrig*, 516 U.S. at 486), "and, by ensuring that the remediation costs are not borne by the public, they 'compensate[] the public

for the [anticipated] costs of remedial and response measures.'" *Id.* (alterations in *Pls.' Prehr'g Br.*) (quoting *Cannons Eng'g Corp.*, 899 F.2d at 90).

## 2.    The Plaintiffs' Post-Hearing Brief

In their briefing following the fairness hearing, the Plaintiffs emphasize that the parties are still divided on key issues, and thus the "proposed Decree avoids further litigation that would be complex, contested, and delay remediation in the River." *Pls.' Post-Hr'g Br.* at 14.  For example, the Plaintiffs say that if the case were to go to a third trial, they "would present evidence that Wood underestimated risks to human health" while "Mallinckrodt would argue the opposite." *Id.* at 15.  The parties would also dispute "a wide range of engineering issues" as well as "the basis for and significance of the Maine Department of Marine Resources' (DMR's) lobster and crab fishery closures" and the "risks to songbirds in Mendall Marsh." *Id.*  The Plaintiffs note that the Consent "Decree resolves or avoids these disputes by specifying certain remediation work . . ., setting budgets for active remediation activities, and creating a decision-making process led by an independent remediation trustee." *Id.* at 16.

Turning to the fairness and reasonableness of the Consent Decree, Plaintiffs highlight that the "negotiations were informed by extensive (albeit unfinished) discovery, which provided 'openness, and bargaining balance'" *Id.* (quoting *Cannons Eng'g Corp.*, 899 F.2d at 86).  They reason that "the Parties were well-equipped to weigh their litigation risks" and that the proposed settlement agreement "serves RCRA's goals to avoid, if possible, litigation delays that would result from an

unnecessary trial." *Id.* (citing *City of Bangor v. Citizen Commc'ns Co.*, No. 02-cv-183-B-S, 2007 U.S. Dist. LEXIS 38762, at *37 (D. Me. May 25, 2007)).  The Plaintiffs recount the "tradeoffs" made by each side, pointing out that "because no one could 'go back in time and stop [the mercury contamination] from happening,' [they] recognized that no cleanup would ever be perfect" and "moving forward with the settlement 'is the best thing [we could] do' to accelerate recovery of the River."  *Id.* at 17 (quoting *Hr'g Day 2 Tr.* at 90, 93).  After recounting expert testimony at the fairness hearing in support of the Consent Decree proposals, the Plaintiffs explain that the decision not to require any specific remedies in Mendall Marsh is "a difficult but reasonable compromise to ensure efficient, effective use of limited remediation funds."  *Id.* at 28.

The Plaintiffs also address Greenfield's role "as an independent, trusted fiduciary," explaining that Greenfield will "consult regularly with the Parties, as trust beneficiaries, to build consensus and avoid disputes."  *Id.* at 31.  They quote Cynthia Brook's testimony to highlight that Greenfield will "pursue 'early, proactive cooperative consultation' with regulators and engage with local communities" and "plans to open an office in Maine and, 'where possible and prudent,' would prioritize 'investing cleanup funds in the local economy.'"  *Id.* (quoting Hr'g Day 2 Tr. at 65, 67-68).

Turning to the Court's concern that the Trustee will have to resolve conflicts among beneficiaries with fundamentally divergent interests, particularly as to the contingent funding provisions of the Consent Decree, the Plaintiffs say that the "decision criteria are mostly linked to actual costs for remediation and project

management." *Id.* at 32.  They explain that the Decree "articulates six factors for deciding how long monitoring will last," and that "the Trustees' decisions will be informed by state and federal regulators, whose role is to protect the public interest and whose permit conditions may help determine whether contingencies are triggered." *Id.*  They note that "if a catastrophic storm or other unforeseen event compromises the effectiveness of the remedies," the Consent Decree would "empower the Trustees to adapt if changed circumstances make a prescribed remedy infeasible" and reallocate funds if necessary.  *Id.* at 33.  They acknowledge that the Consent Decree "cannot fully anticipate every possible future scenario," but reassure the Court that "[i]f circumstances change drastically and the funding provided by the proposed Decree is depleted or insufficient, Maine or federal regulators could step in to protect health and the environment if needed."  *Id.* at 33-34 (citing *Def.'s Am. Mot. for Bar Order* (narrowing bar order request to exclude State or federal government claims)).

As to the Court's question of whether the Decree should include a statement that "in resolving any disputes between the beneficiaries, . . . Greenfield must consider the environmental impact of the decisions on the Penobscot River" or that "the ultimate beneficiary . . . is the river," *id.* at 32-33 (quoting *Hr'g Day 2 Tr.* at 72), "Plaintiffs believe that the fundamental principle of doing what is best for the River is implicit." *Id.* at 33.

Finally, the Plaintiffs highlight some of the more than 500 written public comments to argue that the Consent Decree serves the public interest and has broad

public support.  *Id.* at 37.  They note that the Maine Department of Environmental Protection, which will oversee permitting, "takes no position on specific settlement terms, but 'supports efforts to remediate and accelerate recovery'" of the Estuary and writes that none of the Decree proposals "are expressly prohibited by the applicable state laws it administers."  *Id.* at 37-38 (quoting *Notice of Written Public Comments,* Attach. 1, *Public Comments Submitted to PenobscotRiverRemediation.com*, at 50-52 (*Notice of Public Comments*)).

The Plaintiffs also point to the Penobscot Nation's support for the settlement, as expressed by Tribal Ambassador, Maulian Dana, who wrote in a letter to the Court that "'the Penobscot River [is] a citizen of our tribe," the River is viewed 'as a relative and as having rights,' and the tribe 'fully support[s] any efforts to remedy the abuse and disrespect that the river has been a victim of.'"  *Id.* at 38 (quoting *Hr'g Day 3 Tr.* at 46-48).  The Plaintiffs also note that "30 organizations in Maine jointly submitted a letter supporting the settlement" and that of the 17 public commenters who spoke at the fairness hearing "[e]very one of them supported a cleanup of the River."  *Id.*

The Plaintiffs conclude by highlighting the common themes of "justice" and the "importance and majesty of the Penobscot River" expressed in the public's comments in support of the settlement  *Id.* at 40.  The Penobscot River "runs through the heart of Maine, literally and figuratively, sustaining fish, wildlife, people, and communities."  *Id.*  The Plaintiffs say that "[i]t has been polluted and the people to whom it belongs to want it cleaned up."  *Id.*  They urge the Court, now that "Mallinckrodt has agreed to accept a measure of responsibility for the pollution it

created," to enter the Consent Decree and "set in motion the largest river restoration in the history of Maine," which "would provide, at long last, a measure of justice to the River and the people who care so deeply about its health and vitality." *Id.*

Plaintiffs ask the Court to find that the Consent Decree is "consistent with the objectives of Congress," concluding that this "case has vindicated the purpose of RCRA's citizen suit provision" in the more than twenty years since they filed this suit. Id. at 34-35.

### 3.   Mallinckrodt's Pre-Hearing Brief

In its pre-hearing brief, Mallinckrodt emphasized that there is no "silver bullet" to clean up the mercury pollution, pointing out that "if there was an obvious solution that could be implemented safely and cost-effectively studies would not have lasted two decades." *Def.'s Pre-Hr'g Br.* at 1.  Mallinckrodt notes Wood's "uncertain timeline for recovery," particularly as the scientific and engineering recommendations rely on many assumptions and variables and "removal or sequestration of a mass of mercury does not necessarily equate to a reduction in toxicity." *Id.* at 11-12, 22.  It says Wood "confirmed that there is no perfect remedy," and that after assessing all potential remedies Wood rejected the "most aggressive" options of system-wide dredging and enhanced monitored natural attenuation. *Id.* at 23.  Mallinckrodt contends that "background levels of mercury concentrations" in the Estuary further complicate predicting the efficacy of alternative remedies. *Id.* at 24.  However, Mallinckrodt also submits that the Consent Decree proposals will require less challenging permitting than Wood's proposed remedies. *Id.* at 25.

Mallinckrodt says its "guiding principle throughout Phase III has been 'do no harm,'" and suggests that "[t]he relatively low risk of harm [to human health and the environment] presented by the current condition of the Penobscot River Estuary underscores [that] imperative." *Id.* at 25-26.  It submits that "[t]he natural recovery of the system, its visible improvement in recent decades, and its thriving present and future uses are important considerations when striking the balance between aggressive cleanup measures and the potential adverse consequences of remediation." *Id.* at 28.

Mallinckrodt explains that the Consent Decree calls for less extensive, more targeted dredging than that in Wood's proposal in order to "strike[] an appropriate balance between risk, cost, and uncertainty, on the one hand, and potential acceleration of recovery, on the other." *Id.* at 29.  It similarly reasons that "marsh projects are an appropriate alternative to intrusive remedies in Mendall Marsh" and "the flexible approach proposed for the Orland River and the channel east of Verona Island is appropriate given the uncertainties associated with that reach." *Id.* at 30-31.

### 4.   Mallinckrodt's Post-Hearing Brief

In its post-hearing brief, Mallinckrodt submits that the settlement calls for "technically sound" remedies, is "designed to accelerate recovery while minimizing risk to human health and the environment," and reflects a "reasonable resolution" of the parties' conflicting views.  *Def.'s Post-Hr'g Br.* at 1.  It further notes the "consensus" among the public commenters and the parties' experts "that this

negotiated resolution is preferable to continued litigation and the cleanup should begin right away."[11]  *Id.*  Mallinckrodt explains that there are different recovery strategies, but each one carries associated risks because of "the complexity of the system and uncertainties associated with remediation of mercury-contaminated sites generally and the Penobscot in particular."  *Id.*

Recounting the testimony of Nelson Walter, project manager for the Phase III study, Mallinckrodt highlights Wood's endorsement of the proposed Consent Decree. *Id.* at 4.  Mr. Walter noted the "uncertainties with everything in this project," in a complicated river system where "nothing is certain."  *Id.* (quoting *H'rg Day 1 Tr.* at 112:6-11).  Mallinckrodt explains that "[t]o the extent the remedies proposed in the Consent Decree differ from those recommended by Wood, Wood believes those differences are reasonable."  *Id.*

In particular, Mallinckrodt points to Mr. Walter's testimony acknowledging that a properly designed and constructed cap can be an effective dredging alternative in the Orrington Reach, that more targeted dredging is still likely to accelerate recovery, and that the parties could have reasonably concluded that the risks and costs associated with Wood's proposal to cap Mendall Marsh outweighed the benefits. *Id.* at 4-5 (citing *Hr'g Day 1 Tr.* at 176-182).  It notes that Mr. Walter deemed the

---

[11]     Several of the Phase II Study Panel scientists participated in the fairness hearing and offered their opinions regarding the remedial alternatives that Wood and the parties considered.  *See Hr'g Day 3 Tr.* at 10:20-17:23.  Mallinckrodt says that their comments "contained a view of what theoretically could be done that is at odds with what Wood and the Parties concluded can practically be implemented and accomplished" and "lack any grounding in engineering expertise or analysis of feasibility (not to mention their inability to modify the agreement reached by the Parties)."  *Def.'s Post-Hr'g Mot.* at 8-9.  Mallinckrodt urges the Court not to give any "weight to their 'suggestions to strengthen the proposed remediation plan,' including in the Orrington Reach and Mendall Marsh."  *Id.* at 8 (quoting *Hr'g Day 3 Tr.* at 12:14-14:20).

proposed funding and duration of long-term monitoring appropriate and consistent with Wood's recommendations and that the Phase III Report deemed capping "a proven technology." *Id.* at 5 (citing *Hr'g Day 1 Tr.* at 183); *Def.'s Pre-Hr'g Br.* at 30 (citing *Phase III Report* at 8-8).

In support of the parties' compromise to cap the Orrington Reach, despite their differing opinions, Mallinckrodt cites the testimony of its capping remediation expert, Dr. Reible, to argue that "capping is the appropriate remedial alternative [to Wood's proposed dredging] in the Orrington Reach because (1) the intertidal flats are relatively stable; (2) removal would disrupt significantly higher concentrations at depth; (3) capping is consistent with the natural depositional processes in the system; and (4) capping would ensure that the sediments remain stable "even under extreme events." *Def.'s Post-Hr'g Br.* at 6-7 (citing *Hr'g Day 2 Tr.* at 14-16).

Mallinckrodt highlights Greenfield's independence and specialized experience, noting that its two "single-purpose trust entities created pursuant to the Consent Decree would be obligated to perform their fiduciary duties in furtherance of accelerating recovery of the Penobscot River Estuary." *Id.* at 11. Recounting the Court's concern about the "inherent conflict" between the parties as beneficiaries, and whether Greenfield should consider the Penobscot River the ultimate beneficiary, Mallinckrodt submits that "the trustees are obligated to exercise their fiduciary duties consistent with and in furtherance of the Consent Decree, which is intended to accelerate the recovery of the Penobscot River Estuary." *Id.* at 12.

Finally, Mallinckrodt emphasizes that the Consent Decree has public and stakeholder support. It says that "[o]f those 18 commenters [that testified before the Court], at least 16 explicitly stated their support for the settlement and urged entry of the proposed Consent Decree." *Id.* According to Mallinckrodt, "[t]he other two [commenters] . . . apparently support the settlement but did not say so quite as explicitly," and suggests that one commenter's "concern apparently stemmed from her mistaken understanding that Mallinckrodt has filed for bankruptcy" and would be unable to actually fund the cleanup.[12] *Id.* at 12-13.

Mallinckrodt concludes by acknowledging that some members of the public "expressed anger at Mallinckrodt and call[ed] for accountability." *Id.* at 13. It maintains, however, that, consistent with RCRA's remedial, not punitive, purpose, "the Court's consideration of the Consent Decree should not weigh public desire to punish Mallinckrodt." *Id.* at 14. As to "commenters who expressed preference for different or additional remedies," Mallinckrodt says "none purported to press those preferences at the expense of returning the case to litigation" and cautions that the "Parties' settlement is carefully negotiated and cannot be modified without risk that the whole deal falls apart." *Def.'s Pre-Hr'g Br.* at 33.

## C. DISCUSSION

### 1. Legal Standard

---

[12] Mallinckrodt explains that in 2020, "an entity known as Mallinckrodt plc filed for bankruptcy in United States Bankruptcy Court for the District of Delaware." *Id.* at 13. As "Mallinckrodt plc is in no way affiliated with Mallinckrodt US LLC," the commenter's "concerns regarding Mallinckrodt's ability to fund the settlement are unfounded." *Id.* Mallinckrodt notes that "the Consent Decree contains provisions to ensure the settlement is adequately funded." *Id.* (citing Consent Decree ¶ 20).

Addressing the criteria a court must apply when assessing a proposed consent decree in the analogous context of a Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) case, the First Circuit wrote that a trial court must ensure that a proposed consent decree "is fair, adequate, and reasonable; that the proposed decree will not violate the Constitution, a statute or other authority; [and] that it is consistent with the objectives of Congress." *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 93 (1st Cir. 2008) (alteration in original) (quoting *Conservation L. Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 58 (1st Cir. 1993)).

"To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons Eng'g Corp.*, 899 F.2d at 86. "There is little need for a court to police the substantive fairness of a settlement as among settling parties" because "[s]ophisticated actors know how to protect their own interests, and they are well equipped to evaluate risks and rewards." *United States v. Charles George Trucking*, 34 F.3d 1081, 1088 (1st Cir. 1994); *see also Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) ("[A] district court's discretion is restrained by the clear policy in favor of encouraging settlements." (internal citation and question marks omitted)).

To determine the appropriate standard of review, the Court looks to caselaw on CERCLA consent decrees. In the "multifaceted" assessment of the reasonableness of an environmental consent decree, courts consider at least three factors: (1) "the

49

decree's likely efficaciousness as a vehicle for cleansing the environment;" (2) "whether the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures;" and (3) "the relative strength of the parties' litigating positions." *Cannons Eng'g Corp.*, 899 F.2d at 89-90 (determining whether a CERCLA consent decree was reasonable); *see also City of Bangor*, 532 F.3d at 94 ("Here there can be no concern that the Decree is inadequate to ensure a proper cleanup since the settling parties are together covering one hundred percent of cleanup costs"). Because "RCRA's citizen suit provision is not directed at providing compensation for past cleanup efforts," the Court looks for satisfactory compensation for anticipated remedial costs. *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996).

Finally, courts consider a consent decree's consistency with relevant statutory objectives and "Congress' discerned intent . . . implicating fairness and reasonableness." *Cannons Eng'g Corp.*, 899 F.2d at 90. Here, the "national policy behind RCRA is 'to minimize the present and future threat to human health and the environment'" posed by hazardous waste. *Meghrig*, 516 U.S. at 486 (citing 42 U.S.C. § 6902(b)). RCRA's citizen suit provision, 42 U.S.C. § 6972(a)(1)(B), "was designed to provide a remedy that ameliorates present or obviates the risk of future 'imminent' harms." *Id.*

### 2.     Fairness and Consistency with RCRA

RCRA citizen suits are "intended to empower private citizens by granting them relatively broad authority to litigate when [the] EPA ha[s] not acted in the face of a

reasonable prospect of serious, near-term harm." *Me. People's All.*, 471 F.3d at 295. The Court concludes that the proposed Consent Decree fulfills RCRA's purpose by "minimiz[ing] the present and future threat to human health and the environment" from mercury pollution in the Penobscot. *Meghrig*, 516 U.S. at 483 (quoting 42 U.S.C. § 6902(b)). Moreover, the Court finds that the settlement's funding for anticipated remedial costs "provide[s] a remedy that ameliorate[s] present or obviate[s] the risk of future 'imminent' harms." *Meghrig*, 516 U.S. at 486.

The parties engaged in three years of extensive negotiations, including a productive judicial settlement conference, that culminated in a settlement that embodies principles of "corrective justice and accountability." *Cannons Eng'g Corp.*, 899 F.2d at 87. The parties' sophistication and skilled legal representation in coming to a negotiated agreement that balances their disparate interests and risks for an action-oriented path forward further speaks to the procedural fairness of the Consent Decree.

### 3.     The Transfer of Authority from Court to Trustee

The first notable consequence of the proposed Consent Decree is that it effectively removes the federal court from oversight of the Penobscot River's mercury contamination and cleanup issues and transfers judicial authority to a trustee, who assumes effective authority over an extremely significant natural resource in Maine.

### a.     The Court's Continuing Role

The Consent Decree envisions a markedly limited role for this Court. In the event of a dispute that the parties and the Trustee are not able to informally resolve

or mediate, the parties shall ask the Court to refer the dispute to the United States Magistrate Judge.  The Consent Decree contemplates that the Magistrate Judge may issue an order, which is deemed a ruling on a pretrial matter pursuant to Federal Rule of Civil Procedure 72.  *Consent Decree* at 79-80.  Pretrial rulings under Federal Rule of Civil Procedure 72(a) are subject to review by the Court, but the Court is authorized to modify or set aside only a Magistrate Judge's pretrial ruling "that is clearly erroneous or is contrary to law."   FED. R. CIV. P. 72(a).  The Consent Decree does not mention whether the Court's decision under Rule 72(a) would itself be appealable to the Court of Appeals for the First Circuit, but the Court assumes that it must be.  Nevertheless, under the Consent Decree, except at the margins, the role of the federal judiciary in monitoring mercury contamination in the Penobscot River will essentially be over.

The Consent Decree does provide that the Court will retain jurisdiction over both the subject matter of the Consent Decree and Mallinckrodt for the duration of the Consent Decree "for the purpose of enabling any of the Parties to apply to the Court for such further order, direction, or relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to preserve the integrity of the Consent Decree, or to resolve disputes in accordance with [the Dispute Resolution provisions]."  *Consent Decree* at 88.

From the Court's perspective, a transfer of authority from the federal court to a trustee is desirable at this stage in the process.  This lawsuit has been pending in

the United States District Court for over two decades.  The federal judiciary is designed to accord parties to a lawsuit their due process rights, to assure the orderly discovery, to hold trials and resolve disputed facts, and to rule on issues of law.  Of course, the rulings of this Court, like those of any federal trial court, are subject to appellate review.

In the Court's view, the dispute between the Plaintiffs and Mallinckrodt has matured beyond the traditional adjudicative functions of the federal court.  Moreover, the federal court cannot be as nimble and creative as a private trustee at the remedial stage.  At the same time, a private trustee may not have the same degree of transparency, objectivity, and public trust as the federal court and, unlike the Court, the trustee charges the trusts for its work.  Much depends, therefore, on who the trustee is and what the trustee's powers are.

### b.    The Trustee's Roles

The Consent Decree grants the Trustee an extraordinary degree of authority over the fate of the Penobscot River and the estuary.  It is difficult to overstate the significance of the Penobscot River to the economy, ecology, and people of Maine and, of course, the Penobscot River flows into Penobscot Bay, which itself is a priceless and precious Maine resource.  The Court is mindful that the Consent Decree essentially creates in the Trustee a remediation czar for the Penobscot River, affecting Penobscot Bay, and it is important therefore to understand the role of Trustee as delineated in the Consent Decree.

Comparing the authority of the Trustee against the authority of the Court, the Trustee assumes a significantly more powerful position under the Consent Decree than the Court has under the law. The Court is constrained by the language of RCRA, interpretations of RCRA and analogous statutes by the United States Supreme Court and by the Court of Appeals for the First Circuit, the Federal Rules of Evidence, the right of public access to its proceedings, the obligation to explain its decisions either in writing or orally, and the oversight on appeal of the First Circuit and the Supreme Court. The Court is also required to obey its own oath of office and the mandates of judicial ethics.

None of these restraints applies to the Trustee under the Consent Decree and the trust documents. The Consent Decree provides that "[n]o Trustee or Trust Party shall be personally liable unless the Court, by a final order, finds that it was grossly negligent or committed fraud or willful misconduct." *Consent Decree* at 65. The Consent Decree and the Trusts broadly empower the Trustee to "perform any and all acts necessary to accomplish the purposes of the [Trusts]." *Remediation Trust* ¶ 4.3; *Project Trust* ¶ 4.3; *see Consent Decree* at 44 ("Each Trust's Trustee shall manage such Trust to fulfill and carry out such Trust's purposes set out in this Consent Decree and in such Trust's attached form of its Trust Agreement").

Cynthia Brooks testified that Greenfield would seek public input into its decisions. The Consent Decree incorporates a Statement of Work, which "sets forth the procedures and requirements for implementation of the Work by the [Trusts]." *Notice of Corrected Proposed Consent Decree*, Attach. 2, *Statement of Work for*

*Remediation Activities* at 3.  The Statement of Work makes the Trustee responsible for "developing and implementing community involvement activities to notify the public of planned Work activities and create opportunities for the public to provide comments regarding Work activities."  *Id.* at 25.  The Trustee is also required to develop a Community Involvement Plan (CIP) and submit the CIP to the Beneficiaries for comment.  *Id.*  The Trustee is also required to designate a Community Involvement Coordinator to develop and implement the CIP.  *Id.* at 26. At a minimum, the Trustee is required to maintain a "publicly available website."  *Id.* Under the Consent Decree and Trust documents, however, the Trustee is allowed to make its decisions regardless of public input, and its decisions are effectively final, except for the limited objection process set out in the Consent Decree and the Trust documents.

To place this issue into one context, the Consent Decree contemplates remediation to the Orland River and the East Channel.  *Consent Decree* at 23-24.  But the Consent Decree does not stipulate which form of remediation is going to be employed.  *Id.*  Among the potential remedies, the Decree mentions "EMNR [(enhanced monitored natural recovery)], capping, and/or dredging."  *Id.*  Which remedy is selected and how it is accomplished are both sensitive, significant, and potentially controversial.  On February 22, 2014, the Maine Department of Marine Resources (MDMR) closed a large swath of the area from Verona Island to the upper reaches of Penobscot Bay to all lobster and crab fishing based on the mercury levels discovered in shellfish in that area. *See Order on Remediation Plan* at 52 (ECF No.

829).  On May 14, 2014, the MDMR made the emergency closure permanent and extended the closure area to a line from the town of Castine across Penobscot Bay to the town of Stockton Springs.  *Id.* at 53.  Under the Consent Decree, the entity that will have the final say on the remedial plan for this ecologically and economically critical area is Greenfield, and Greenfield will not only have the final say, but will also decide who to listen to in making its decision.  This is true not only of the Verona Island and East Channel remediation but of all the Trustee's obligations under the Consent Decree and trust agreements.

Similarly, as the parties concede, they do not agree on the need for and the proper method for remediating Mendall Marsh and they leave that decision to the Trustee.

There are several other matters that bear on the Trustee and the Court's consideration of the proposed Consent Decree.  The first obvious fact is that the parties have chosen a Trustee with no affiliation with the state of Maine.  According to the corporate Trustee's founder, president and owner, Cynthia Brooks, Greenfield would operate in Maine, as it has in past cleanup appointments, through "affiliated entities."  *Hr'g Day 2 Tr.* at 40:1-5 (ECF No. 1164).  The Remediation Trust refers to the Greenfield Penobscot Estuary Remediation Trust, LLC, and the Project Trust refers to the Greenfield Penobscot Estuary Project Trust, LLC, which presumably are the affiliated entities Ms. Brooks referenced.  *Remediation Trust* at 5; *Project Trust* at 5.

The Remediation Trust and the Project Trust list Greenfield's key personnel and none is a resident of Maine.  Ms. Brooks' office is in Cambridge, Massachusetts, Lauri Gorton's in Milwaukee, Wisconsin, Craig Kaufman's in Washington, D.C., and Jennifer Roberts' in Helena, Montana.  *Remediation Trust* at 24; *Project Trust* at 23-24.  When asked about Greenfield's contemplated physical presence in Maine, Ms. Brooks testified that she expected to open a "small office within the first year should we be appointed."  *Hr'g Day 2 Tr.* at 67:25-68:3.

The Consent Decree, therefore, proposes to turn over the fate of the Penobscot River to people "from away," a Maine colloquialism for people who do not live year-round in Maine.   Given Maine's historic struggle for economic and political independence, *see* COLIN WOODARD, THE LOBSTER COAST: REBELS, RUSTICATORS, AND THE STRUGGLE FOR A FORGOTTEN FRONTIER (2004), which is engrained in its character, the Consent Decree runs against the grain of history in entrusting one of Maine's most significant natural resources to people who may not appreciate the uniqueness of the state itself and in particular the area of the state tied to the Penobscot River.

The Consent Decree provides for some limited input from Maine sources.  One of the Plaintiffs, the Maine People's Alliance, has obvious local roots and will act as one of the Beneficiaries under the Consent Decree.  *Consent Decree* at 6.

Also, there is a role for the so-called Natural Resource Damage Trustees in advising Greenfield on the Beneficial Environmental Projects undertaken under the Project Trust and upon termination of the Remediation Trust.  *Consent Decree* at 24. The Natural Resource Damage Trustees are "the State of Maine Trustees, including,

but not limited to, the Maine Department of Environmental Protection and Maine Department of Inland Fisheries and Wildlife, and Federal Trustees, including the Department of Commerce and the Department of the Interior." *Id.* at 11. Of course, Greenfield will not be above the law. It will have to comply with state and federal law and regulations and satisfy the requirements of state and federal oversight agencies in carrying out its trustee duties.

In addition, Ms. Brooks testified that Greenfield "prioritizes community engagement." *Hr'g Day 2 Tr.* at 43:19-24. In addition to maintaining "site-specific websites," Greenfield physically distributes information and holds "regular routine and nonroutine public meetings, stakeholder meetings, town hall-type meetings," all as part of its "cleanup programs." *Id.* at 43:25-44:9. But the exact nature of Greenfield's commitment to meaningfully engage with the public is not spelled out in either the Consent Decree or the Statement of Work and its only clear obligation is to maintain a publicly accessible website and develop a general CIP. Greenfield as trustee is authorized to make decisions critical to the environment and economy of the Penobscot in a fashion it deems best and it will be for the people of the Penobscot Estuary to live with the consequences.

To be clear, none of the Court's concerns about the structure of the Consent Decree and the Trusts is intended to cast doubt on the competence and integrity of Greenfield. Instead, the Court is addressing the structure of the proposed Consent Decree as presented by the parties. Against this concern is the reality that the job of

acting as a trustee for a clean-up site such as the Penobscot River estuary is highly complex and requires specialized expertise. As Ms. Brooks explained:

> Greenfield has technical, scientific, and engineering experts, people with significant experience in environmental remediation. We also have a team of in-house attorneys and in-house accountants, CPAs, and financial specialists, a real estate team, and a communications team. So we're a very multidisciplinary organization, and we approach each of our trust appointments addressing that panoply of disciplines and issues.

*Hr'g Day 2 Tr.* at 40:8-15. Ms. Brooks also testified that Greenfield "retains numerous third-party professionals, consultants, contractors that we hire and essentially oversee for them to perform the remedial designs and the construction at the sites where we are responsible for the cleanup." *Id.* at 40:16-22. Furthermore, Greenfield has extensive experience with cleanup sites across the United States. *Id.* at 36:4-39:19.

But, given the Trustee's sweeping powers, this limited participation by state and federal agencies in one somewhat collateral aspect of the Consent Decree does not satisfy the need for public involvement. The absence of any provisions—beyond Greenfield's general obligation to provide public access to certain "deliverables" and remediation work updates—requiring meaningful public input in the Trustee's decision-making strikes the Court as an omission and one that should be corrected. After all, what the Court is seeking is what Ms. Brooks herself testified that Greenfield intends to do; namely to prioritize community engagement. The Court sees community involvement not as optional, but essential, and will require the parties to propose terms in the Consent Decree consistent with Ms. Brooks' testimony. To be clear, the Court is not requiring a detailed description of how

59

Greenfield intends to solicit community input, this is something within its expertise. But the Court will require a template for how Greenfield has attained community engagement in its other remediation work. The Court will insist that the Consent Decree and the trust agreements contain greater specificity to reflect this obligation as one of the Trustee's enforceable duties.

As one of the public participants at the fairness hearing stressed:

> Accountability is not only a conversation about who is responsible for paying for the cleanup of the Penobscot River and its waterways, but it's also about repairing relationships. True accountability is a dialogue, and the humans who have lived, depended upon, and thrived on the Penobscot for millennia must be part of the conversation of environmental and social restoration as this process unfolds.

*Hr'g Day 3 Tr.* at 24:2-9.

A second area of concern is the Trustee's financial self-dealing. Under the terms of the Trusts, "[a]ll compensation and other amounts payable to the Trustee shall be paid from the Trust Assets." *Remediation Trust* ¶ 4.7.3; *Project Trust* ¶ 4.7.3. The Trusts expressly provide that the Remediation Trust and the Project Trust "shall [each] pay its own reasonable and necessary costs and expenses and shall reimburse the Trustee for the actual reasonable out-of-pocket fees, costs, and expenses to the extent incurred by the Trustee in connection with the Trustee's duties hereunder . . . all in accordance with an [approved] annual budget or fee schedule." *Remediation Trust* ¶ 4.7.1; *Project Trust* ¶ 4.7.1. The Trusts further provide:

> The Trust Assets shall be subject to the claims of the Trustee, and the Trustee shall be entitled to reimburse itself out of any available cash in the Trust Administrative Account, or for services performed in furtherance of the Work on a Beneficial Environmental Project [or for any Work Category at the Site], in accordance with the provisions of

60

Section 2.4.1, out of available funds in the Trust Remediation Account, and the [Trusts] shall be obligated to pay for actual out-of-pocket expenses and for actual hours worked.

*Project Trust* ¶ 4.7.2; *see Remediation Trust* ¶ 4.7.2.   The net effect of these provisions, as the Court understands them, is that Greenfield will invoice the Trusts for its work and will approve its own payments to itself, an unusual arrangement.

Apart from Greenfield's general obligation to act as a fiduciary, there are two constraints to Greenfield's self-payment.   The first is the mechanism of funding. Under the Consent Decree, the Trustee is allowed to establish a "separate Trust Administrative Account for each Trust to hold the funds provided by Paragraph 15 (Trust Administrative Costs)." *Consent Decree* at 41.  Furthermore, "[t]he funds in a Trust's Trust Administrative Account shall be used by the Trustee to fund such Trust's Trust Administrative Costs as approved and authorized pursuant to the terms of this Consent Decree and such Trust's Trust Agreement." *Id.*  The Consent Decree requires Mallinckrodt to fund a "total of $7 million in Committed Funding to pay the Trust Administrative Costs of the Remediation Trust and the Project Trust." *Consent Decree* at 27.  Mallinckrodt is also obligated to pay up to an additional $10 million in Contingent Funding "if the aggregate Trust Administrative Costs for both Trusts exceed the Committed Funding amount." *Id.*  The Consent Decree stipulates that "Mallinckrodt's Capped Funding for Trust Administrative Costs shall be the lesser of the actual Trust Administrative Costs or $17 million." *Id.*  Finally, the Consent Decree states that "[i]f any funds remain in the Project Trust's Trust Administrative Account upon termination of the Project Trust . . ., such funds will [be] distributed to

61

the Remediation Trust's Trust Administrative Account to be used for the Remediation Trust's Trust Administrative Costs." *Id.*

Once Mallinckrodt pays the initial Committed Funding of $7 million, it will have an interest in making sure that Greenfield stays within the initial $7 million and, if Greenfield uses all of its initial budget for administrative costs, Mallinckrodt will have a continued interest in making certain that Greenfield does not expend more than necessary of the $10 million in Contingent Funding. If Greenfield's Trust Administrative Costs exceed $17 million, Mallinckrodt, Maine People's and the NRDC will each have an interest in making sure that as little as possible go to trust administration as opposed to the beneficent purposes of the Trusts. Accordingly, there are some constraints inherent in the Consent Decree and Trusts that will act as a brake on Greenfield paying itself.

Another constraint on the Trustee's self-dealing is the budget process. By October 1 of each year, the Consent Decree requires Greenfield to prepare "drafts of an annual budget, work plans, and cash flow projections by quarter for the next calendar year for such Trust's Trust Remediation Account and Trust Administrative Account."[13] *Consent Decree* at 54. Greenfield is required to provide the draft budgets

---

[13] The language of this provision is confusing: "By October 1 of each year, the Trustee of <u>each</u> Trust shall prepare drafts of an annual budget, work plans, and cash flow projections by quarter for the next calendar year for such Trust's <u>Trust Remediation Account</u> and <u>Trust Administrative Account</u>." *Consent Decree* at 54 (emphasis added). Based on the Consent Decree's contemplation that Greenfield will act as Trustee to two trusts, the Remediation Trust and the Project Trust, it seems confusing that the remainder of the sentence mentions only the Trust Remediation Account and the Trust Administrative Account.

The answer seems to be in the nomenclature chosen by the parties for the segregated sub-accounts the Trustee is authorized to create within the two trusts. The Remediation Trust requires the Trustee to "create two segregated Trust Accounts within the Remediation Trust: the Trust Remediation Account and the Trust Administrative Account." *Remediation Trust* ¶ 2.1.4. "The

to the Beneficiaries each year, and the Beneficiaries may comment and object to the draft budgets. *Id.* at 55. Greenfield is required to consider the Beneficiaries' comments and objections and propose final budgets. *Id.* The Beneficiaries may file objections and use the Dispute Resolution process to resolve any issues with the final budgets. *Id.* at 55.

A final financial constraint is an audit. Greenfield is authorized under the terms of the Remediation and Project Trusts to hire "one or more public accounting firms to perform such bookkeeping functions, reviews, and/or audits of the financial books and records of the [Trusts] as may be appropriate in the Trustee's reasonable discretion and to prepare and file any tax returns or informational returns for the [Trusts] or the Trust Accounts as may be required." *Remediation Trust* ¶ 4.4; *Project Trust* ¶ 4.4.

The First Circuit has described outside accountants who perform financial audits as the "natural guardians" against fraud. *Young v. Lepone*, 305 F.3d 1, 4 (1st Cir. 2002). Here, where over a hundred million dollars and perhaps over two hundred million dollars will flow through the Trusts for beneficent and critical environmental and public purposes, the Court views as essential an annual outside audit of the

---

purpose of the Trust Remediation Account is to fund the work of the Remediation Trust." *Id.* The Trustee of the Project Trust is also required to "create two segregated trust accounts within the Project Trust." *Project Trust* ¶ 2.1.4, Strangely, the Project Trust names these trust accounts "the Trust Remediation Account and the Trust Administrative Account." *Id.*

This may simply be a typographical error. The Court is uncertain whether the Consent Decree contemplates that the Trustee create two or four accounts. As the Trustee is otherwise required to keep the Remediation and Project trusts separate, it would seem preferable for the Trustee to keep separate the trust accounts for each trust and commingle the proceeds. The Court assumes that the budget process described in the Consent Decree must apply to the Project Trust as well as the Remediation Trust.

financial records of the Trusts by a reputable outside auditor. This added precaution seems especially appropriate as the Consent Decree reposes such substantial discretion in financial matters in the Trustee, including self-payment for its own services.

With these considerations in mind, the Court views the proposed Consent Decree as deficient in three respects. First, whether to retain a public accounting firm to audit the financial books and records of the Trusts is discretionary with the Trustee. *Remediation Trust* ¶ 4.4; *Project Trust* ¶ 4.4 ("such . . . audits of the financial books and records of the [Trusts] as may be appropriate in the Trustee's reasonable discretion"). In the Court's view, an annual audit should be mandatory, not discretionary. Second, the way the Court reads these provisions, the audit function could be subsumed within the Trustees' own accountants. The Court sees regular bookkeeping and accounting services, which may include an internal audit, as distinct from an annual audit, which is typically performed, as the First Circuit noted, by "outside accountants." *Young*, 305 F.3d at 4. The Court will require a provision in the Consent Judgment that imposes a requirement of an annual audit by an outside accounting firm. Furthermore, not all outside accounting firms are equal. Allegations that auditors through neglect or fraud contributed to a wider fraud are "distressingly familiar." *Id.*; *see SEC v. David G. Friehling, C.P.A.*, Civ. No. 09-cv-2467 (S.D.N.Y. 2009) (SEC alleged that auditors in the Bernie Madoff Ponzi scheme did not perform meaningful audits and filed false annual reports). Therefore, the Court finds that it is important that the auditors be a reputable firm, one approved

64

by the Court upon recommendation of the parties, and not one selected by the Trustee alone.

### 4.      Reasonableness and Adequacy of the Remedies

As Mallinckrodt points out, nearly twenty years of study have not produced a "silver bullet to remediating mercury in the Lower Penobscot Estuary." *Def.'s Post-Hr'g Br.* at 3.  The Consent Decree proposals represent compromises: capping versus dredging in the Orrington Reach; targeted rather than system-wide dredging; and beneficial projects rather than capping in Mendall Marsh.  As Plaintiffs point out, "[i]n each instance, there is a remedy that is somewhat less than what Plaintiffs would like and more than what [Mallinckrodt] would like." *Pls.' Pre-Hrg. Br.* at. 30.

The first Study Panel recommended active remediation strategies for the Penobscot back in 2013.  The Phase III engineering study found that the mercury hazard not only remains a threat, but that any natural recovery was actually slowing down. *Phase III Report* at 3-35.  Consistent with earlier scientific analyses, and after considering more and less invasive approaches, Wood endorsed the parties' plan to use targeted active remediation strategies in areas with the highest mercury concentrations, where erosion or accumulation are a likely to foster especially hazardous conditions, or where biota exposure risks are particularly high.  *Id.* at 8-1. The parties' experts testified that natural recovery alone could take many decades, while full systemwide dredging would be costly and risk disturbing the ecosystem. The proposed Consent Decree is similar to Wood's recommendation and incorporates the lessons from the three phases of Court-ordered studies.

### a.  The Wood Report Recommendations

In its Phase III study, Wood considered six remedial alternatives to address mercury contamination in the Site: 1) monitored natural recovery, which would "assess progress toward system-wide ecological recovery," 2) enhanced monitored natural recovery, which in addition to long term monitoring would add "clean sediment to the system" to reduce total mercury concentrations, 3) dredging, which would mechanically remove "either/both subtidal/intertidal sediment and fringing and pocket marsh sediments," 4) thin layer capping, which would "broadcast[] imported clean sediment" onto a contaminated area, 5) amendment application, which would add clean sediment to Mendall Marsh in an effort to reduce biological mercury accumulation, and 6) dredging in intertidal and subtidal zones and thin layer capping, which would combine thin layer capping and dredging strategies. *Phase III Report* at ES-3 to -4.

Wood recommended different remedies depending on the area.  For the Orrington Reach, Wood recommended dredging or excavation of the intertidal east and marsh platform east sediments.  *Id.* at ES-4 to -5.  For Mendall Marsh, Wood recommended placement of a thin layer cap on portions of the marsh and dredging to remove subtidal surface deposits.  *Id.* at ES-4.  For the East Channel and the Orland River, Wood recommended adaptive management strategies and studies to evaluate enhanced monitored natural recovery.  *Id.* at ES-7 to -9.

### b.  The Consent Decree Proposal

66

One major difference between the Wood recommendations and the Consent Decree is the proposed remedy for the Orrington Reach.  Wood suggested targeted dredging because sediments in this area have some of the highest average mercury concentrations in the Site.  *Consent Decree* at 20.  As just noted, Wood recommended that the intertidal east and marsh platform east sediments be dredged.

Instead of dredging the Orrington Reach, the Consent Decree contemplates as an alternative capping roughly 130 acres of the intertidal zone in the Orrington Reach.  As proposed, this cap would isolate and dilute contaminated sediments to prevent or minimize ecosystem mercury exposure and uptake.

At the fairness hearing, the parties' experts testified that, in their assessment, a cap can be designed and implemented successfully in the Reach, instead of Wood's recommendation of dredging, and that this remedy can be implemented more quickly, for less money, and with a lower risk of remobilizing contaminated sediments in the River.  While the parties do not have a specific timeline for designing and implementing the Orrington cap, they expect it to take less time than Wood's proposed dredging remedy, and far less time than natural remediation.  *See Phase III Report* at 8-26.

Mallinckrodt committed $50 million, and up to $10 million more, for the Orrington Reach capping, which should be sufficient to cover the engineers' cost estimates and fund any needed monitoring and maintenance.

The Consent Decree's most invasive—and thus controversial—proposal calls for dredging in the Estuary.  Wood located "surface deposits" of contaminated mobile

sediments first identified in the Phase II study and estimated that removing approximately 950,000 cubic yards of the sediment could significantly accelerate recovery of the Estuary. Phase III Report at ES-4, 8-11. At the fairness hearing, the Parties' experts explained that removing mercury "hot-spots" is an efficient way to approach remediation.

Multiple participants in the fairness hearing expressed concerned about the proposed dredging, namely that it could stir up buried mercury and further harm the ecosystem. *See Hr'g Day 3 Tr.* at 8-9, 52. Although there was also some disagreement among experts as to the appropriateness of dredging, and to what extent, the experts acknowledged that "dredging is a proven technology and has been widely used." *Hr'g Tr. Day 1* at 134, 167. The dredging remedy is designed to capture and prevent further disbursement of volatile sediments that, by their inherent nature, are already mobile in the currents and tides in the powerful Penobscot River system.

As Mr. Walter testified, Wood evaluated alternatives but concluded that mobile sediments and surface deposits could only be effectively remediated with dredging. *Hr'g Day 1 Tr.* at 116-18. The surface deposits are "well mixed" with "significant concentrations of mercury at the surface" and, "because of their movement, they're not really susceptible to monitored natural recovery." *Id.* at 116. Mr. Walter further testified that capping the mobile sediments and surface deposits "wasn't likely going to be an effective remedy" because "these materials are soft and . . . if you put heavier material that might stay in place on top of it, . . . the material that you're trying to

cap squishes out . . . and comes up through the surface" like strawberries sinking into whipped cream. *Id.* at 118.

The Court acknowledges that dredging in a river system as complex and powerful as the Penobscot presents irreducible risks. For example, if, during the dredging, Orrington were beset by the rains and winds of a Nor'easter combined with a high tide, the obvious worry would be that harsh weather could cause a release of previously buried mercury deposits. Even so, Wood, after assessing these risks, concluded that the best alternative was dredging the Orrington Reach.

Based on Wood's recommendation that alternatives are not feasible and the experts' assurance that dredging is a proven technology that can be implemented in a way that mitigates inherent risks, the parties reasonably concluded that dredging mobile materials would remove mercury from the system, reduce biota exposure and mixing, and accelerate the recovery of the Penobscot. *Id.* at 135, 139, 167, 179-180. As part of the parties' compromise to implement targeted, rather than system-wide dredging, the Consent Decree builds in flexibility as to the precise areas to be dredged given the uncertainties of remediation. *See id.* at 180. The Consent Decree requires that any remediation work "minimize[] environmental risks and adverse impacts" and incorporate "monitoring and control measures to protect human health and the environment." *Consent Decree*, Attach. 2, *Statement of Work* ¶ 9(e)-(f). The Decree sets out suggested best management practices to minimize the risk of mercury spillage or resuspension, and to protect estuary biota. *See id.; Phase III Report* at 8-11 to -12; *Consent Decree* at 9, 26. Dredging, like the rest of the remediation work,

will require federal, state, and local permitting and regulatory approval. *See Consent Decree* ¶¶ 16, 40.

        **c.**      **The Beneficial Environmental Projects Compromise**

The Parties submit that their "agreement to fund Beneficial Environmental Projects is a reasonable compromise and provides a path through this thicket of complexities and conflicting positions that will ensure that remediation funds are spent on effective, practical projects that provide tangible, verifiable, near-term benefits to the affected environment." *Pls.' Pre-Hr'g Br.* at 27. Dr. Driscoll testified that the $20 million in flexible funding "could be used very effectively" and could help improve critical wetlands habitat. *Hr'g Day 1 Tr.* at 143:25.

As the Court understands it, the main reason for the creation of the Project Trust is a compromise to address divergent views on Mendall Marsh. Wood recommended the "[p]lacement of a thin layer cap on portions of Mendall Marsh." *Phase III Report* at ES-3. Wood estimated that the total cost of thin layer capping in Mendall Marsh would equal $60,198,000. *Id.* at Table ES-1.

The Plaintiffs acknowledge that the "Proposed Consent Decree departs from Wood's recommendation of thin-layer capping in Mendall Marsh and would not require any specific remedies in Mendall Marsh." *Pls.' Pre-Hr'g Br.* at 26. The Plaintiffs explain that the parties and their experts "have strongly held, diverging positions regarding the severity of mercury contamination in Mendall Marsh and what, if anything, to do about it." *Id.*

Mallinckrodt frames it differently.  It writes that "[i]n Mendall Marsh, the Parties have proposed long-term monitoring and beneficial environmental projects in lieu of the more invasive thin layer capping of the marsh platform that Wood proposed."  *Def.'s Pre-Hr'g Br.* at 30.  After reviewing the risks with thin layer capping, Mallinckrodt represents that "[t]he Parties do not consider these risks worthwhile given the relative health of Mendall Marsh."  *Id.* at 31.  Mallinckrodt points out that "[a]s an alternative to thin layer capping in Mendall Marsh, Mallinckrodt has committed $20 million to Beneficial Environmental Projects."  *Id.*

Regardless of whether the parties agree on the specifics of the risks and efficacy of Wood's thin-layer proposal for Mendall Marsh, the parties have agreed to compromise on this potential remedy.  On balance, the Court approves of this part of the proposed Consent Decree as a reasonable compromise.  As Mr. Walter explained, the thin layer cap proposal for Mendall Marsh would have been to place a three-inch layer of sediment or sand on top of the marsh, over all the lower elevation areas and twenty percent of the higher elevation areas.  *Hr'g Day 1 Tr.* at 155:2-18.  First, as Mr. Walter  explained, the thin layer proposal presented some risks.  *Id.* at 156:5-12. Wood did not want to create a "big swath of dead grass in the marsh" and was concerned about "whether there would be sufficient or adequate biota recovery as a result of the capping."  *Id.* at 156:5-23.  To address these issues, Wood suggested "two pilot tests": the first to assess potential "impacts to the plant life in the marsh" and a second to evaluate the stability of the cap, whether it would stay in place over time, and the longer-term impact on marsh biota.  *Id.* 156:23-157:7.  There was also a risk

71

that the relevant state authorities would not approve capping in a sensitive habitat area. *Id.* at 157:17-23.  Mr. Wood concurred that "reasonable minds could differ" on whether "active remedies" should be implemented in Mendall Marsh.  *Id.* at 182:14-20.

In light of these legitimate concerns, the Court agrees that the parties' negotiated agreement to fund $20 million for Beneficial Environmental Projects, which could include projects to improve marsh habitat is a reasonable compromise.

### d.      Long-Term Monitoring

Long-term monitoring is "absolutely critical" because it "helps track . . . the rate of recovery" and "provides guidance on the effectiveness of remediation," *Hr'g Day 1 Tr.* at 144, particularly given the "uncertainties and difficulties of implement[ing]" the Consent Decree remedies.  *Hr'g Day 2 Tr.* at 31.  The Consent Decree also calls for remedy-specific monitoring, during and after implementation, for each active remedy.  *Consent Decree* at 20-23.  The parties determined the scope, duration, and budget for long-term monitoring consistent with Wood's proposal, and built in flexibility to adapt and adjust as needed.  *Consent Decree* at 25-26.  The Consent Decree sets out specific factors for the Trustee and the parties to consider before they determine that the long-term monitoring program is no longer necessary. *Id.*

### 5.      Trust Administration

The Court agrees with the parties that the Consent Decree should be implemented, and the settlement funds managed, by an independent, experienced

trustee.   The proposed trust agreements state that "[t]he Trustee's powers are exercisable solely in a fiduciary capacity and solely for the benefit of the Beneficiaries consistent with, and in furtherance of, the purposes of the [] Trust[s] and the Consent Decree."   *Notice of Corrected Proposed Consent Decree*, Attach 3, *Remediation Trust Agreement* at 13.   Both the Project Trust and the Remediation Trust are "established . . . for the sole purpose of resolving Plaintiffs' claims asserting environmental liabilities of Mallinckrodt."   *Id.*, Attach. 4, *Project Trust Agreement* at 6; *Remediation Trust Agreement* at 7.   The Consent Decree itself expressly provides that it "is intended to accelerate the recovery of the Site" and its prescribed remedies are "intended to reduce mercury exposures and accelerate the recovery of the Penobscot River estuary."   *Consent Decree* at 4-5.

Aware that both parties are trust beneficiaries with diverging interests, namely the Plaintiffs' desire to maximize remediation investment and Mallinckrodt desire to minimize its ongoing financial liability, the Court asked Greenfield's founder, Cynthia Brooks, how the Trustee would resolve "two . . . conflicting [fiduciary] obligations which are inherent under the Proposed Consent Decree."   *Hr'g Day 2 Tr.* at 69:18-70:18.   Ms. Brooks testified that Greenfield will look at both the "short-term . . . and long-term remedy performance," in addition to budgetary and feasibility concerns, and that they understand their role "as the entity responsible for the protection of public health and the environment" in implementing the Penobscot River cleanup.   *Id.* at 80:18-81:11.

Mallinckrodt says "the answer to . . . [whether the fundamental obligation to benefit the river and the public is reflected in the agreement] is, 'yes.'"  *Id.*  It concludes that "given the structure and language of the Consent Decree and trust agreements, the Court can be confident that Greenfield will act independently and in the interest of accelerating recovery of the system." *Id.* at 11-12

Plaintiffs similarly submit that "[a]lthough there is no such explicit statement in the proposed Decree . . . the fundamental principle of doing what is best for the River is implicit." *Pls.' Post-Hr'g Br.* at 33.  They say "[t]hat principle underlies the Parties' agreement to move forward cooperatively with active remediation 'intended to reduce mercury exposures and accelerate the recovery' of the Estuary, . . . the Parties' establishment of independent trusts to carry out the remediation work, . . . and the requirement that the Trustees make decisions and recommendations using 'generally accepted environmental principles' and 'best professional knowledge and judgment.'" *Id.* (quoting the Consent Decree).  Plaintiffs would, however, "welcome [the] addition" of more explicit language to "specify that, consistent with the terms and underlying purpose of the proposed Decree, the Trustees' decisions and any dispute resolution should prioritize what is best for the Penobscot River." *Id.*

### 6.    Fairness and the Public Interest

Citing the criteria set out in the Court's 2015 Order, Mallinckrodt says "the proposed remedies are well-established, relatively cost-effective, can be permitted and implemented relatively quickly, present a reasonable likelihood of accelerating recovery, and pose less potential for environmental harm than other remedies that

have been considered." *Def.'s Pre-Hr'g Br.* at 28.   Plaintiffs agree that the "scientifically sound" remediation plan will "accelerate the Penobscot River's recovery," and emphasize that their settlement followed "a procedurally and substantively fair negotiation process that allowed the Parties to balance their litigation goals and risks and avoid further complex, costly, and lengthy litigation." *Pls.' Post-Hr'g Br.* at 14.

The Court has considered both the substantive and procedural fairness of the Decree.  As articulated in its September 2015 Order on the remediation plan and suggested by the parties, the Court reviewed the Decree and Wood's recommendations, with an emphasis on: "(1) whether the proposed solution has been successfully attempted previously or is innovative; (2) the likely cost of the solutions; (3) the length of time to complete the recommendations; (4) the likely effectiveness of the solution; and (5) any potential environmental harm that may be caused by the proposed solution." *Order on Remediation Plan* at 59 (ECF No. 829); *see Joint Letter to the Ct.* at 2.

As recommended by the parties "in light of the public interest in this case and the public's investment in the health and remediation of the Penobscot River Estuary," the Court also exercised its discretion to invite public participation in a fairness hearing and solicit written comments regarding the proposed Consent Decree.  *See Joint Letter to the Ct.* at 2-3 (ECF No. 1100) (*Joint Letter to the Ct.*); *Notice Public Comments*.  Participants expressed support for the cleanup process beginning as soon as possible and emphasized the toll that mercury pollution has

taken on the local community and economy. For example, "precautions and prohibitions on consumption of fish and waterfowl and the restrictions on lobster fishing have impacted people's work, recreation, and belief that this area is a safe and healthy place." *Hr'g Day 3 Tr.* at 25:10-14.

In arriving at its conclusion that the Consent Decree should be approved substantially as proposed by the parties, the Court has considered what is gained and lost by the proposal. The Court acknowledges that Mallinckrodt benefits significantly from the Consent Decree. First, Mallinckrodt extracts itself from litigation that has persisted since 2000. Second, Wood estimated that the total cost of remediation would range from $246,068,000 and $333,378,000 depending on whether the removed material can be beneficially reused. *Phase III Report* at Table ES-1. Rather than face this range of costs, Mallinckrodt is committed to pay $187,000,000 and is responsible for paying an additional amount of contingent funding of $80,000,000 for a total obligation that will be capped at $267,000,000. Accepting the Wood estimates, if Mallinckrodt does not end up having to pay any contingent funding, the Consent Decree would save Mallinckrodt at least $59,068,000 and at most $146,378,000: $246,068,000 - $187,000,000 = $59,068,000; $333,378,000 - $187,000,000 = $146,378,000. If Mallinckrodt is required to pay the full $80,000,000 in contingent funding, the Consent Decree would require Mallinckrodt to pay $20,931,000 more than Wood's lowest estimate: $246,068,000 - $267,000,000 = $20,932,000. But Mallinckrodt's liability would still be $66,378,000 less than the highest Wood figure: $333,378,000 - $267,000,000 = $66,378,000.

These calculations reveal that the Consent Decree has the potential to result in a substantial economic benefit to Mallinckrodt.  But there are several caveats.  First, Wood itself conceded that its estimated costs of recommended remedial alternatives are speculative: "Cost estimates were developed with a target accuracy of plus 50 percent/minus 30 percent."  *Phase III Report* at 8-24.  Second, as noted earlier, the parties do not agree on all the remedial alternatives that Wood recommended.  If this case were not resolved by Consent Decree, the parties would contest and litigate the recommended remedies with the attendant costs, delays, and uncertainty inherent in litigation.  Third, for similar reasons, there is a decided benefit to ending this litigation, which has been ongoing for over two decades.  The Consent Decree offers the prospect of conclusively turning the parties' focus from litigation to actual remediation.  Finally, for the reasons the Court earlier discussed, the Court sees a benefit in substituting a knowledgeable and sophisticated trustee for a federal judge during the upcoming remedial phase, who will have the authority to efficiently make critical decisions about these projects without the constraints of federal court litigation.

The Court agrees with the parties that the Consent Decree is in the public interest, particularly "[g]iven the need to move forward in the face of lingering uncertainty after nearly 20 years of study."  *Def.'s Pre-Hr'g Br.* at 28.  The Court concludes that the Consent Decree is consistent with RCRA's objectives and there is no just cause for further delaying a resolution to this case, because "[s]uch a delay clearly would not serve the goals of . . . RCRA."  *City of Bangor*, 2007 U.S. Dist. LEXIS

38762, at *37 ("While a Phase Two trial also could have ultimately crafted a remedy that would have achieved these same goals, there is no doubt that such a trial would have ultimately delayed remediation").  The Consent Decree was crafted to address RCRA's statutory goals, *see id.*, and its commitment, beyond addressing past harms, to fund Beneficial Environmental Projects in the larger ecosystem will confer additional public benefits.

### 7.   The Need for Further Injunctive Relief

The First Circuit has explained that "[a] consent decree is both a settlement and an injunction." *Healey v. Spencer*, 765 F.3d 65, 75 (1st Cir. 2014).  In approving the Consent Decree, the Court concludes that the circumstances of this case continue to justify injunctive relief.  *See Order on Remediation Plan* at 39-57.  In 2015, the Court held that "the Penobscot River estuary continues to suffer irreparable injury from ongoing mercury contamination caused by Mallinckrodt." *Id.* at 54.  As both parties submit and expert testimony at the fairness hearing reflects, the extent and severity of the mercury pollution, and the Estuary's natural recovery, has not improved materially in the years since, and the Court finds that there continues to be no adequate remedy at law. *See id.* at 55-56; *Phase III Report* at ES-1 to ES-9, 2-7.  In arriving at a settlement and agreeing to certain remedies, the parties themselves balanced the hardships at issue and the Court reaffirms its conclusion that the public has an "obvious and compelling interest in reducing mercury contamination in the Penobscot River." *Id.* at 56.  "Once liability has been found, equitable relief in RCRA citizen suits is largely in the informed discretion of the trial

court" and this case continues to meet the four-part test for injunctive relief. *Me. People's All.*, 471 F.3d at 298.

## III.  THE BAR ORDER

### A.    The Positions of the Parties

#### 1.    Mallinckrodt's Motion for Entry of a Bar Order

In approving the proposed Consent Decree to bring this litigation to a close, Mallinckrodt requests that the Court enter the following amended bar order:

> Any and all claims against Mallinckrodt Related Entities, except those claims expressly reserved in the Consent Decree entered [DATE] in the above-captioned matter, or claims to enforce existing obligations, for remediation of or damage to natural resources arising from mercury contamination relating to the Penobscot River Estuary or the former chlor-alkali plant site in Orrington, regardless of when such claims are asserted or by whom, are barred.  Such claims are barred regardless of whether they are brought pursuant to CERCLA, RCRA, or any other federal or state legal authority.  Provided, however, nothing in this bar order shall impair, affect, or bar any claim by the United States or the State of Maine, including but not limited to claims by Federal or State trustees for natural resource damages under subparagraph (C) of subsection (a) of CERCLA Section 107, which is codified at 42 U.S.C. § 9607(a)(C) or by the State of Maine under the Uncontrolled Hazardous Substances Sites law, 38 M.R.S.A., Chapter 13-B.

*Def.'s Am. Mot.* at 2.  After tracing the procedural history of this case and summarizing the Phase I, II, and III studies' findings, Mallinckrodt reasoned that a bar order is appropriate because "various Maine State and federal government agencies" were involved in and kept apprised of the studies.[14]  *Def.'s Mot.* at 5.

---

[14]      In its first motion requesting a bar order, Mallinckrodt pointed to the Maine Department of Inland Fisheries and Wildlife's guidance that Mendall Marsh waterfowl is unsafe for consumption by children and pregnant women due to high mercury content, and the MDMR's decision to close a portion of the Penobscot estuary to "lobster and crab fishing due to elevated levels of mercury found in lobster tissue taken from the closed area."  *Def.'s Mot.* at 5.  With its motion, Mallinckrodt submitted the MDMR's Notices of Rulemaking for its 2016 decision to expand the closed fishing area.  *Id.*, Attachs. 1-2, *Notices of Rulemaking Adoption (Emergency Rule and Permanent Rule)*.  Following discussions

Mallinckrodt recounts that it "informed [the] Plaintiffs that a bar order would be an important settlement term" during the 2019 negotiations, and that "[s]ubsequent settlement outlines—including outlines prepared and circulated by [the] Plaintiffs—identified bar orders as a proposed term to provide Mallinckrodt closure and certainty." *Id.* at 6. Following the settlement conference with Magistrate Judge Nivison in September 2020, Mallinckrodt says "the parties drafted and negotiated a Consent Decree, Remediation Trust Agreement, Project Trust Agreement, and a Statement of Work to establish the structure and final details of the settlement." *Id.* at 6-7. Mallinckrodt proposed a bar order term but the "Plaintiffs expressed discomfort with agreeing to a bar order given their status as public-interest organizations whose missions include facilitating and encouraging public access to the courts." *Id.*

Mallinckrodt says that "[b]ar orders are particularly common in settlements under" CERCLA and although such orders typically "bar future contribution or indemnity claims, they are not limited to that context." *Id.* at 7-8 (collecting cases). It submits that courts have barred "both future contribution and cost recovery claims" in order to encourage settlement and reduce uncertainty. *Id.* at 8 (emphasis omitted) (citing *San Gabriel Basin Water Quality Auth. v. Aerojet-General Corp.*, No. 2:02 Civ. 4565, slip op. at 3 (ECF No. 784) (C.D. Cal. July 15, 2008)). Mallinckrodt points out that the "Ninth Circuit has recognized that bar orders may extend to non-parties

---

with the United States and the state of Maine, Mallinckrodt agreed to narrow the scope of the requested bar order so as not to bar future claims brought by the United States or the state of Maine, including claims related to these natural resources. *See Def.'s Am. Mot.* at 1-2.

where they have at least constructive notice that their claims stand to be extinguished." *Id.* at 9 (citing *City of Emeryville v. Robinson*, 621 F.3d 1251, 1265 (9th Cir. 2010)). It reasons that bar orders are appropriate "[w]here an environmental settlement provides for cleanup obligations by the settling party that further ameliorates the risk of extinguishing non-parties' claims." *Id.*

Mallinckrodt asserts that it needs a bar order "to justify funding a nine-figure settlement." *Id.* at 10. "[I]f it is to forgo its right to a Phase III trial and fund remediation at a level satisfactory to Plaintiffs and other interested parties, Mallinckrodt needs to know that it is buying peace for itself and the shareholders of its publicly traded parent company." *Id.* Mallinckrodt reasons that because "40 years [have passed] since the last discharge for which [it] is responsible, [its] financial commitment should be deemed full satisfaction and discharge of its liability." *Id.*

Mallinckrodt invokes RCRA's citizen suit provisions which "allowed other private or public entities to join [Plaintiffs'] suit or independently enforce their rights, while precluding overlapping or conflicting actions." *Id.* It argues that "[h]aving failed to intervene after 20 years of litigation," despite the Plaintiffs' compliance with all public and government notice requirements, "the public's right to seek recourse for the 40 to 55-year-old discharges at issue here should be deemed waived." *Id.* at 11. It concludes that "[d]espite extensive public activity related to mercury contamination in the Penobscot River estuary, no additional interested parties have endeavored to intervene in this action." *Id.* at 12. Turning to the proposed Consent Decree before the Court, Mallinckrodt reasons the public opportunity for notice and

comment during the fairness hearing process "further mitigates the possibility of prejudice arising from a bar order." *Id.*

Citing the Court's statute-of-limitations analysis in *Wyman v. United States Surgical Corporation*, 456 F. Supp. 3d 224 (D. Me. 2020), Mallinckrodt asserts that future state law tort claims are unlikely to be viable anyways, "unless a claimant can establish that the mercury contamination can readily be removed and thus abated." *Id.* It contends that future claimants would face a laches issue and that abatability would not only be "immensely difficult to prove" but "would likely involve intervention in or disruption of the remedial activities contemplated by this settlement." *Id.* at 13. Mallinckrodt contends that "[a] bar order would therefore have little, if any, effect on a private plaintiff's ability to vindicate its rights but would advance the salutary purposes of this settlement." *Id.*

Finally, Mallinckrodt submits that its proposed bar order is in the public interest and reasonable in scope. *Id.* at 13-14. Mallinckrodt reasons that the "parties should be free to pursue [the Consent Decree's measures] without interruption from conflicting demands for injunctive relief" and says its "ability to fund the work is contingent on its continuing financial viability." *Id.* at 13. Mallinckrodt emphasizes that its proposed bar order "does not seek to bar natural resources claims by federal or state trustees under CERCLA Section 107(a)(C)," prevent enforcement of the Maine Bureau of Environmental Protection's remediation order for the former chlor-alkali facility in Orrington, or hinder implementation or funding of the Consent Decree. *Id.* at 13-14. It concludes by requesting that if the Court finds its proposed

82

terms overly broad, "the Court enter a bar order as broad as it deems appropriate." *Id.* at 14.

### 2.    The Plaintiffs' Response

In their response to Mallinckrodt's initial motion for entry of a bar order, the Plaintiffs say they "are sympathetic to Mallinckrodt's desire for finality and share Mallinckrodt's goal of working cooperatively to implement the proposed settlement of this matter without conflicting or inconsistent demands for alternative relief in other actions" but "are unable to join Mallinckrodt's motion in full due to the breadth of relief that Mallinckrodt seeks." *Pls.' First Resp.* at 1.  As "Plaintiffs are non-profit, membership-based citizen groups" dedicated to enforcing environmental law, "they cannot endorse restrictions on citizen or other enforcement suits beyond those already provided by the law." *Id.* at 3.  They say that such bar orders "more typically arise in the context of CERCLA," not RCRA, but express their support for "a similar claims bar in this matter that would shield Mallinckrodt from contribution or cost-recovery actions by other potentially responsible parties, including non-parties that have actual or constructive notice of the proposed Consent Decree." *Id.* at 2.

In their second response, the Plaintiffs explain that although Mallinckrodt's amended motion "resolves [their] concern about barring federal or State actions," they "continue to oppose a bar against future suits by other nonparties to this case, including other private plaintiffs or local governments." *Pls.' Second Resp.* at 1.  First, the Plaintiffs say Mallinckrodt's argument that their suit should bar future citizen suits because it is analogous to a government enforcement action "is inconsistent with

the purpose and text of RCRA." *Id.* at 2.  They reason that RCRA sets specific notice and preclusion terms, however "[t]here is no corresponding provision that a RCRA citizen suit precludes any other suit." *Id.*

The Plaintiffs further argue that they "may not represent the full spectrum of interests held by all members of the public," such as "private landowners or towns" with interests that differ from the general remediation of the Penobscot as a whole. *Id.* at 3.  They reason that "[i]n a future suit, Mallinckrodt would be free to argue that a nonparty plaintiff was adequately represented in this case but that issue should be decided based on specific claims and facts at the time." *Id.*  The Plaintiffs submit that Mallinckrodt could turn to "statutes of limitations, laches, and issue or claim preclusion" to defend against future claims, where appropriate, or ask the Court for writs or injunctions to effectuate the final Consent Decree. *Id.* at 4.  They maintain that they "share Mallinckrodt's goal of avoiding inconsistent remedial orders" but express concern that "unforeseeable circumstances, such as a catastrophic storm, could undermine the remedies provided in the proposed Decree." *Id.*

Finally, the Plaintiffs say that they "continue to support contribution and cost recovery protection for Mallinckrodt," before offering two final observations as to what is "appropriate." *Id.* at 5.  First, the Plaintiffs explain that "after Mallinckrodt filed its initial motion, the Supreme Court held that '[a] settlement must resolve a CERCLA liability to trigger a contribution action under [CERCLA].'" *Id.* (alteration in *Pls.' Second Resp.*) (quoting *Territory of Guam v. United States*, 141 S. Ct. 1608, 1612 (2021)).

Second, the Plaintiffs note that Georgia-Pacific LLC submitted a written comment on the proposed Consent Decree urging that "it would be unfair to bar crossclaims or counterclaims against Mallinckrodt if Mallinckrodt initiates contribution or cost recovery actions against other parties that may have contributed to the mercury" pollution. *Id.* The Plaintiffs say that "they did not anticipate or intend that result" and "believe Georgia-Pacific LLC's concern has merit" if this is a contested issue. *Id.* at 6.

### 3.    Mallinckrodt's Reply

In reply, Mallinckrodt asserts that the "Plaintiffs' request that the Court limit the scope of the proposed bar order is not justified" and ignores "authority establishing that courts may bar non-parties from future litigation when they have been adequately represented in a prior suit." *Def.'s Reply* at 1.  Citing "a well-developed body of federal common law authorizing courts to bar future claims even in the absence of express Congressional authority," Mallinckrodt submits it is not asking the Court "to extend CERCLA's contribution-protection provision." *Id.* at 1-2.

According to Mallinckrodt, the Plaintiffs mischaracterize *Taylor v. Sturgell*, 553 U.S. 880, 903 (2008).  It says the Supreme Court's refusal to bar successive citizen suits was limited to FOIA actions, which "result[] in a grant of relief to the individual plaintiff, not a decree benefitting the public at large," *id.* at 2 (quoting *Taylor*, 553 U.S. at 903), and cannot be extended to environmental citizen suits that culminate in a cleanup benefitting the public at large.  *Id.*

As to the Plaintiffs' suggestion that they may not have adequately represented potential future claimants, Mallinckrodt says "[t]his ignores both Plaintiffs' legal role in this action" and "the facts establishing Plaintiffs' adequate representation of the public." *Id.* at 2. It characterizes the Plaintiffs' role as "private attorneys general on behalf of the public" and thus the outcome of this litigation "is binding on the public." *Id.* Mallinckrodt emphasizes that (1) "Plaintiffs' action sought and obtained relief," (2) their "ability to prosecute this action was contingent on their first" giving notice to the state and federal governments, which both declined to prosecute, (3) "[a]ny interested person had the right to join Plaintiffs' suit," (4) "[t]he public has had actual or constructive notice of the mercury contamination and its potential impact on the Penobscot River Estuary for decades," and (5) "[t]he Court weighed the public interest in ordering equitable relief in 2002 and 2015." *Id.* at 3. Mallinckrodt also points to the public notice of the proposed settlement and the opportunity for public comment at the fairness hearing. *Id.*

Next, "Mallinckrodt agrees with Plaintiffs that it would have numerous legal doctrines available to defend against future claims" but submits that this "underscores, rather than obviates, the need for a bar order." *Id.* at 4. Mallinckrodt reasons that "these defenses illustrate the futility of future actions and the lack of prejudice imposed by a bar order." *Id.* It submits that "[a] bar order would deter unmeritorious claims" and "save Mallinckrodt from the significant time and expense it could incur." *Id.*

Mallinckrodt maintains that "federal common law authorizes the requested bar order," although "CERCLA cases are relevant to Mallinckrodt's request" as they "demonstrate the authority to invoke federal common law to bar future claims and the importance of doing so to confer finality of environmental settlements." *Id.* However, "Mallinckrodt does not ask the Court to apply CERCLA 113 to this RCRA case; nor is it necessary for the Court to do so to grant the relief requested." *Id.* Finally, Mallinckrodt urges the Court not to narrow the language of the bar order as proposed by Georgia-Pacific LLC. *Id.* at 6.

## B.    Discussion

### 1.    Legal Standard

"[I]n order to encourage settlement [in cases involving multiple defendants], modern settlements increasingly incorporate settlement bar orders into partial settlements." *Eichenholtz v. Brennan*, 52 F.3d 478, 486 (3d Cir. 1995). A settlement bar order "constitutes a final discharge of all obligations of the settling defendants." *Id.* (quoting *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1225 (9th Cir. 1989)).

RCRA lacks a statutory provision expressly authorizing bar orders in private settlements nor does it address contribution actions or bars on contribution actions. *Meghrig v. KFC W.*, 516 U.S. 479, 484-85 (1996) ("RCRA's citizen suit provision was not intended to provide a remedy for past cleanup costs"). Courts have, however, authorized such bars in settlements of claims brought under CERCLA, which was "designed to address many of the same toxic waste problems that inspired the passage of RCRA." *Id.* at 485.

Although CERCLA, like RCRA, does not explicitly provide protection against future contribution claims after a settlement between private parties, "a number of courts have held that it is permissible to bar contribution claims against the settling parties in a CERCLA contribution action, in accordance with the federal common law as exemplified by § 6 of the Uniform Comparative Fault Act or § 4 of the Uniform Contribution Among Tortfeasors Act." *Responsible Envtl. Solutions All. v. Waste Mgmt.*, No. 3:04cv013, 2011 U.S. Dist. LEXIS 14204, at *19-20 (S.D. Ohio Feb. 3, 2011) (citing *Stearns & Foster Bedding Co. v. Franklin Holding Corp.*, 947 F. Supp. 790, 813 (D.N.J. 1996); *Foamseal, Inc. v. Dow Chemical Co.*, 991 F. Supp. 883, 886 (E.D. Mich. 1998); *Barton Solvents, Inc. v. Sw. Petro-Chem, Inc.*, 834 F. Supp. 342, 345-46 (D. Kan. 1993); *Am. Cyanamid Co. v. King Indus., Inc.*, 814 F. Supp. 215, 219 (D.R.I. 1993); *Comerica Bank-Detroit v. Allen Indus., Inc.*, 769 F. Supp. 1408, 1413 (E.D. Mich. 1991)).

### 2.    Analysis

In its analysis of Mallinckrodt's request for a bar order, the Court sees the bar order differently than the parties and is skeptical that Mallinckrodt's proposal is either necessary or appropriate.  The Court turns to its understanding of the proposed bar order, breaking down the categories of potential claims and analyzing the potential practical impact of Mallinckrodt's request to be shielded from future liability.

### a.    Mallinckrodt's Justification for a Bar Order

Mallinckrodt urges that it "should be afforded finality, both as consideration for its extraordinary financial commitment and to ensure that the work it is funding may proceed with as little interruption as possible" through a settlement bar order. *Def.'s Mot.* at 14.  Mallinckrodt's corporate representative, David Kelley, affirmed at the fairness hearing that the bar order is an important component of the settlement for Mallinckrodt.  *Hr'g Day 2 Tr.* at 100:16-20; 101:2-4.

The Court perceives Mallinckrodt's main point in favor of the proposed bar order to be that it has committed a large sum of money to remediate the mercury in the Penobscot River estuary and thus it is entitled to buy its peace.  *Def.'s Mot.* at 1 ("Under the proposed settlement, Mallinckrodt will commit nine figures in funding to remediation measures and environmental projects.  These commitments are intended to accelerate recovery of the Penobscot River Estuary.  For this extraordinary financial commitment to be workable for Mallinckrodt and the shareholders of its parent company, Mallinckrodt requires certainty that it will not be subject to further claims relating to mercury contamination in the estuary").

Although the Court understands Mallinckrodt's well-expressed desire for finality, the fact remains that the terms of the Consent Decree represent a compromise between well-represented parties, a compromise beneficial to Mallinckrodt and to the Plaintiffs and by extension to the Penobscot River.  Thus, although Mallinckrodt congratulates itself on its commitment of "nine figures in funding to remediation measures and environmental projects," *Def.'s Mot.* at 1, the Court views the proposed settlement as financially in Mallinckrodt's best interest.

As the Court has described, the Consent Decree caps Mallinckrodt's financial exposure substantially below its full potential exposure, and it relieves Mallinckrodt from expensive and complex federal litigation, which has persisted for over two decades. There is nothing wrong with Mallinckrodt agreeing to a resolution that is in its own financial interest, but it is hardly praiseworthy and not a reason to grant Mallinckrodt the extraordinary relief of a bar order.

Moreover, there is nothing "final" about the yet-to-be implemented remedial interventions and associated risks, both known and unknown. Although substantial, the Court does not view the amounts in the Consent Decree, including the contingent funds, as outside the range, under Wood's impartial assessment, of what it would need to spend as the responsible party so as to entitle Mallinckrodt to a judicial order releasing it from third party claims. This is especially true since there is no guarantee that the end point in further litigation might not be amounts greater than the amounts Mallinckrodt has agreed to in the Consent Decree.

### b. Whether the Court has the Authority to Impose a Bar Order

Other district courts have recognized their authority under federal common law to approve contribution bars in resolving private party litigation, based on CERCLA's policy of encouraging settlement. For example, in *United States v. Mallinckrodt, Inc.*, No. 4:02-CV-01488, 2006 U.S. Dist. LEXIS 83211 (E.D. Mo. Nov. 15, 2006), the district court approved, over the United States' objection, a private party settlement agreement barring contribution claims against the settling defendants "by any Person (whether or not a Party to the lawsuit) in relation to the

Site." *Id.* at *13 n.2.  The district court rejected the government's argument that contribution protection is only available in settlements with the state or federal government as expressly authorized by CERCLA § 133(f)(2), reasoning that barring "future cross-claims for contribution" was necessary "in order to facilitate settlement in environmental cleanup cases" and invoking its "broad powers to allocate clean up costs using . . . equitable factors." *Id.* at *17-18.

Similarly, the District Court for the Southern District of Ohio explained that it "was inclined to follow the decisions adopting a contribution bar as part of the federal common law, even though such a bar is not authorized by [CERCLA] § 113(f)(2), because such a holding is in accordance with § 113(f)(1) of CERCLA, which provides that, '[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate' given that the imposition of such a bar rests on equitable considerations, and, further, since contribution bars will foster the voluntary settlement of complex CERCLA lawsuits, a goal which is worthy of being furthered." *Responsible Envtl. Solutions All.*, 2011 U.S. Dist. LEXIS 14204, at *20-21 (internal citations omitted) (quoting 42 U.S.C. § 9613(f)(1)).

Here, the Court concludes that it has discretionary authority as a matter of federal common law to bar future claims related to the subject matter of the settlement.  *See Eichenholtz*, 52 F.3d at 486.  The Court seeks to strike a balance "between the public interest and private needs" in approving the Consent Decree and overseeing the long-awaited remedy in this case. *Me. People's All.*, 471 F.3d at 298

(quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).  As other courts have observed in the CERCLA context, an appropriately tailored bar order can encourage settlement and help further RCRA's underlying purpose.  As the First Circuit emphasized in its affirmance of Judge Carter's 2005 liability finding in this case, the district court possesses broad "equitable discretion" in crafting and overseeing an appropriate remedy under RCRA and the specific nature of that remedy "is largely in the informed discretion of the trial court."  *Me. People's All.*, 471 F.3d at 297, 298.  The Court now turns to whether a bar against future suits is appropriate in this case, and if so, how broad the bar order should be.

### c.  The Proposed Scope of the Bar Order

As originally proposed, Mallinckrodt requested a bar order prohibiting "[a]ny and all claims against Mallinckrodt Related Entities, except those claims expressly reserved in the Consent Decree . . . or claims to enforce existing obligations" for remediation or damage to the Penobscot.  *Def.'s Mot.* at 2.  On September 21, 2021, Mallinckrodt amended its request to exempt any claims by the state and federal governments.  *Def.'s Am. Mot.* at 1-2 ("Provided, however, nothing in this bar order shall impair, affect, or bar any claim by the United States or the State of Maine . . ..").

The Plaintiffs have balked at the scope of the proposed bar order.  They first are uncomfortable with the notion that others who might wish to initiate a RCRA citizen lawsuit against Mallinckrodt would be barred from doing so.  *Pls.' Second Resp.* at 2-3.  The Plaintiffs point out that they "may not represent the full spectrum

of interests held by all members of the public." *Id.* at 3.  If a private landowner or a town, for example, wished to file suit against Mallinckrodt, the Plaintiffs point out that Mallinckrodt would be able to claim that their rights had been subsumed by the Plaintiffs' lawsuit.  *Id.*  Noting that there are "unforeseen circumstances," the Plaintiffs suggest that the decision about whether to allow future lawsuits to proceed should be resolved on a case-by-case basis.  *Id.* at 3-4.  Even so, the Plaintiffs support "contribution and cost recovery protection for Mallinckrodt." *Id.* at 5.

In deciding whether to approve consent decrees that include similarly broad bar orders, courts have considered the adequacy of the sum to be paid by the settling defendant in satisfaction of its potential liability.  *See Kelley ex rel. Mich. Dep't of Envtl. Quality v. Wagner*, at 930 F. Supp. 293, 298-99 (E.D. Mich. 1996) (declining to approve a consent decree containing an "unfair" broad contribution bar that would have made it impossible for other potentially responsible parties to seek contribution against the defendant, which paid very little under the settlement terms, for the remainder of its liability).

Courts have also focused on issues of procedural fairness, notice, and due process related to potential third party claimants.  In *Foamseal, Inc. v. Dow Chem. Co.*, a group of nonsettling defendants contended that a proposed contribution bar would unjustly prevent them from seeking contribution from settling defendants in other cost recovery actions brought by the State of Michigan and the United States.  991 F. Supp. at 886.  The district court approved the CERCLA settlement contribution bar, reasoning that "Congress intended the disparities that inevitably

93

arise under such a legislative scheme to act as a catalyst for early and inexpensive settlements." *Id.*

During the public comment period, Georgia-Pacific LLC partially objected to the proposed bar order. *See Notice of Written Public Comments*, Attach. 1, *Georgia-Pacific LLC's Comments on Proposed Settlement for Restoration of the Penobscot River Estuary* at 31 (*Georgia-Pacific Letter*). Georgia-Pacific pointed out that Mallinckrodt could, if it chose to do so, file suit against other potential contributors of mercury along the Penobscot River and seek "contribution from such potentially responsible parties (PRPs), who are not parties to this litigation and proposed settlement, for its costs arising from this and future suits related to its pollution of the Penobscot River system." *Id.* at 27. Georgia-Pacific proposed that if Mallinckrodt sought contribution or cost recovery from non-party PRPs, the non-party PRPs should be allowed to bring affirmative claims against Mallinckrodt. *Id.* Mallinckrodt objects to Georgia-Pacific's suggested exception for lawsuits Mallinckrodt itself files against third parties and reiterates its position that the Court should issue its amended bar order as drafted. *Def.'s Second Reply* at 3, 7.

From the Court's perspective, if the Court were to issue a bar order, Georgia-Pacific's proposed partial exemption would be sensible. After all, Mallinckrodt itself would trigger the partial exemption for cross and counter claims. If Mallinckrodt elects not to seek contribution or cost recovery, the partial exemption would never become effective, but if Mallinckrodt decides to sue others, the others would be entitled to a full defense, as Mallinckrodt was in *Wyman* and in this case. If the Court

94

approved the bar order, it would likely approve Georgia-Pacific's proposed partial exemption. As the Consent Decree allows Mallinckrodt to seek response costs from other alleged contributors of mercury into the river, doing so would protect the due process rights of PRPs who had no say in the settlement and are not before this Court. *See Kelley ex rel. Michigan Dep't of Envtl. Quality*, 930 F. Supp. at 298 (concluding that it may constitute a denial of due process to prohibit non-settling PRPs from attempting to claim contribution).

But these exemptions would create another inequity. Setting aside the governmental exemption, the Georgia-Pacific partial exemption would only come into play if Mallinckrodt initiates a suit for contribution or cost recovery and the likelihood that Mallinckrodt would do so against a small business or private individual is—as a practical matter—remote. Thus, if the Court issued the amended bar order as Georgia-Pacific proposes, the state and federal governments and large, asset-heavy businesses would be exempt, leaving only small businesses or private individuals constrained by the full weight of the bar order. The Court is chary indeed about issuing an order which so starkly favors the powerful and disfavors the interests of the common citizen.

### d. A Bar on Contribution and Cost Recovery Claims

### i. Terminology

The Court is not certain that the parties are using the same language in the same way. Because Mallinckrodt's request for a bar to contribution claims "is premised, in part, on CERCLA principles as extended by federal common law," the

Plaintiffs submit that *Territory of Guam v. United States*' "broader discussion of CERCLA contribution principles and whether they extend to settlements under other statutes may inform the Court's analysis." *Pls.' Second Resp.* at 5. In *Guam*, the United States Supreme Court defined CERCLA "contribution" to mean "money from another responsible individual." *Guam*, 141 S. Ct. at 1611. Typically, as in *Guam*, the party seeking contribution has "resolved its liability." *Id.* (quoting 42 U.S.C. § 113(f)(3)(B)).

In Mallinckrodt's and Georgia-Pacific's submissions, they use the phrase, "potentially responsible party" (PRP). The Court is not confident that this phrase accurately fits the situation presented here. RCRA itself does not address contribution or bars on contribution actions, nor does it define PRPs. *See Meghrig*, 516 U.S. at 484 ("RCRA's citizen suit provision is not directed at providing compensation for past cleanup efforts").

The parties appear to have borrowed the concept of PRPs from CERCLA and environmental law more generally. CERCLA § 107(a)(1)-(4) imposes strict liability for environmental contamination upon four broad classes of PRPs, defined as:

1. The owner and operator of . . . [the] facility,

2. Any person who at the time of disposal of any hazardous substance owned or operated . . . [the] facility . . .,

3. Any person who . . . arranged for disposal or treatment . . . of hazardous substances . . . at [the] facility . . ., and

4. Any person who accepts . . . hazardous substances for transport to disposal or treatment facilities . . . from which there is a release . . . of a hazardous substance

42 U.S.C. § 9607(a)(1)-(4); *see also* 40 CFR § 304.12 (m) ("Potentially responsible party or PRP means any person who may be liable pursuant to section 107(a) of CERCLA, 42 U.S.C. 9607(a), for response costs incurred and to be incurred by the United States").

> CERCLA § 107(a)(4)(A) and (B) makes PRPs liable for:
>
> (A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan;
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan
>
> (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
>
> (D) the costs of any health assessment or health effects study . . ..

42 U.S.C. § 9607(a)(4)(A)-(D).  Section 113(f)(1) of CERCLA provides for an express right of contribution among PRPs so that "[a]ny person may seek contribution from any other person who is liable or potentially liable under 9607(a) of this title . . .."  *See Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 608-10 (2009) ("[T]he question whether § 9607(a)(3) liability attaches is fact intensive and case specific" because, for example, "CERCLA does not specifically define what it means to 'arrang[e] for' disposal of a hazardous substance").

Unlike RCRA, CERCLA establishes PRP criteria, which courts can use to assess proposed bar orders related to CERCLA settlements.  Courts have reasoned that it is fair to bar identified PRPs—formally on notice that CERCLA's liability hook extends to them—from seeking contribution later.  In *City of Emeryville*, the Ninth

Circuit reasoned that "CERCLA seeks to 'encourage' settlement by penalizing identified non-settling PRPs with a bar on contribution claims, and the corresponding risk of having to pay a disproportionate share of response costs."  621 F.3d at 1264. (concluding that "[i]n these circumstances, application of a contribution bar [to intervenors who were unidentified, non-settling PRPs at a particular site and could not have participated in the specific settlement] would be irrational and punitive").

Thus, the Ninth Circuit resolved the bar order issue in part on the PRP status of potential claimants.  It "rejected the argument that the non-settling PRPs' contribution rights were too 'contingent and speculative' because they had not yet been found liable for any response costs or made to bear a disproportionate share of response costs."  *Id.* at 1260.  The appeals court concluded that the non-settling potential claimants "faced imminent extinction of their state law rights of contribution for Site B clean-up costs" related to a settlement "of which they had no effective prior notice, and as to which they were not PRPs—and they could not count [on another party] to defend their interests in the federal court proceedings."  *Id.*

This RCRA case does not involve other formally identified PRPs.  As the Court understands it, CERCLA's PRP framework is primarily designed to impose formal accountability for past environmental response costs, including government reimbursement.  From the Court's perspective, the Mallinckrodt facts might fit within these CERCLA definitions, but the fit is not easy, and the Court wonders about applying the borrowed concept of PRP from CERCLA to this RCRA action.

### ii.    Contribution and Cost Recovery Suits Initiated by Mallinckrodt

98

The Court first considers the impact of Mallinckrodt's proposed bar order on other potentially responsible parties (PRPs).

Upon payment of the millions of dollars committed in the Consent Decree, Mallinckrodt would have the theoretic right to sue other businesses or individuals who contributed to mercury pollution in the Penobscot River estuary, thereby causing some of the damage that Mallinckrodt is paying for.  Maine law[15] has long recognized the right of contribution among nonintentional joint tortfeasors.  *Hobbs v. Hurley*, 117 Me. 449., 104 A. 815 (1918).  The Maine Supreme Judicial Court described the right of contribution:

> [W]hen the parties are not intentional and willful wrongdoers, but are made wrongdoers by legal inference or intendment, are involuntary and unintentional tort-feasors . . .. [Contribution] is an equitable right founded on acknowledged principles of natural justice and enforceable in a court of law.

*Id.* at 451.

Assuming the right of contribution could be available to Mallinckrodt, it would face significant hurdles in recovering from others.   First, Maine law forbids tortfeasors who acted intentionally and with conduct that is morally blameworthy from seeking contribution.  *Bedard*, 409 A.2d at 677 ("Contribution is denied in cases of intentional wrong and is permitted only where liability is imposed for conduct that is not morally blameworthy"); *Hobbs*, 117 Me. at 451.  Maine contribution law also may not apply to consecutive as opposed to concurrent conduct.  Second, Maine law

---

[15]     Federal common law, not Maine law, may well be applicable.  However, in the absence of briefing on federal common law contribution principles, the Court referred to Maine law as a proxy.

recognizes the right of contribution under a rule of proportional contribution. *Packard v. Whitten*, 274 A.2d 169, 181 (Me. 1971) ("[A]ny contribution by joint tort-feasors shall be in proportion to the contributions of each one to the damages suffered by the [p]laintiff").

To prevail in a claim for contribution under Maine law against a third party, Mallinckrodt would have to establish that its dumping of "between six and twelve tons of mercury into the Penobscot River," was unintentional or merely negligent, which, from the Court's knowledge of the case, would be a tall order. *See Order on Remediation Plan* at 36 ("According to the Study Panel Report, between 1967 and the early 1970s, the HoltraChem chlor-alkali plant in Orrington discharged between six and twelve tons of mercury into the Penobscot River").

Also, as the relative liability for contribution would be proportional to the amount of the mercury discharged, Mallinckrodt would have to demonstrate that the third party contributed enough mercury to the Penobscot River estuary to make its lawsuit worthwhile. Again, the Court's impression is that this would be a significant challenge. As the Court's September 2, 2015 order reflects, "there was a comparatively modest amount of sediment coming over what was the Veazie dam north and upriver from the HoltraChem plant site in Orrington." *Id*. at 45. Assuming any upriver mercury contributions were modest, there may be some potential sources of mercury other than Mallinckrodt downriver from Orrington.

However, as best the Court can recall, amid thousands of pages of documents and hundreds of hours of testimony, there was no evidence of a significant third-party

source of the mercury in the Penobscot River estuary. Even if there were such a source, the third party's contribution under Maine law would have to be commensurate to the tons of mercury dumped by Mallinckrodt. With these assumptions, the Court wonders whether Mallinckrodt is insisting on a right of contribution more theoretical than real.

Even if Mallinckrodt could make the argument that it has the right to sue third parties who contributed mercury to the Penobscot River estuary, the Court is not at all convinced that it should equitably bar those third parties from asserting legal defenses to a newly filed Mallinckrodt lawsuit. It is understandable that Mallinckrodt would like to obtain a court order, barring its chosen defendant from asserting otherwise available defenses to its contribution action, but it hardly seems equitable to allow Mallinckrodt to initiate contribution litigation but to bar third parties from fully defending Mallinckrodt's lawsuit. In 2020, when a Penobscot Bay lobster and crab fisherman filed suit against Mallinckrodt, Mallinckrodt did not hesitate to assert a host of affirmative defenses, and Mallinckrodt was largely successful in obtaining summary judgment against the most viable legal theories, based on Maine's statute of limitations, the accrual date for causes of actions, and similar arguments, earnestly pressed. *See Wyman*, 456 F. Supp. 3d at 224-57. The Court does not understand why it would be unfair to allow the parties Mallinckrodt elects to sue to assert the same defenses against Mallinckrodt that Mallinckrodt asserted against Mr. Wyman.

In sum, the Court is not convinced that it should issue a bar order against third parties who may have contributed to the mercury pollution in the Penobscot River estuary.

### iii.    Third Party Polluter Suits Initiated Against Mallinckrodt

A second possible source of further litigation is lawsuits initiated by third party polluters (using the parties' phrase – PRPs) against Mallinckrodt.  To fit within this category, a third party who also polluted the Penobscot River with mercury would have had to sustain some damage or loss and thereby seek contribution or cost reimbursement from Mallinckrodt for its part.  Here, the likelihood of such a lawsuit seems beyond remote.  To bring a lawsuit, a third party (presumably a business) would have to step forward and admit they polluted the Penobscot River with mercury in sufficient quantities to cause damage, had sustained some type of economic loss from the combination of their and Mallinckrodt's pollution, and thus assert a right to seek contribution from Mallinckrodt.

Other courts have imposed bar orders, consistent with CERCLA's PRP liability scheme, to get multiple PRP defendants to stop finger pointing and commit to remediation funding, even where questions of relative culpability persist.  *See Ford Motor Co. v. Mich. Consol. Gas Co.*, 993 F. Supp. 2d 693, 703 n.8 (E.D. Mich. 2014) ("recogniz[ing] that there are CERCLA cases which bar *contribution claims* of parties against private settling defendants based on judicial economy and consistency with CERCLA' objectives to obtain quick cleanups . . . [but concluding it] could not find,

any case law in any district barring cost recovery claims of private settling defendants for these reasons") (citing *Resp. Envtl. Solutions All.*, 2011 U.S. Dist. LEXIS 14204; *Foamseal, Inc.*, 991 F. Supp. 883). This justification, while perhaps compelling in complex litigation with unclear relative fault as to the contaminated site, fails to justify a bar order following the Plaintiffs' settlement with Mallinckrodt, the sole defendant and sole known contributor of a high volume of mercury into the Penobscot.

Here, there is simply no evidence that such culpable third parties exist or that there are any such lawsuits in the offing, and therefore Mallinckrodt's request for a bar order seems more rhetorical than real. In addition, if a third-party polluter initiated such a claim, it would face the same steep climb over Mallinckrodt's legal defenses that Kenneth Wyman faced.

Given the speculative nature of such claims, the difficulties they would present if pressed, and the fact that any dispute would be between culpable mercury polluters, the Court is not inclined to issue an order barring contribution or cost recovery claims and will leave the polluters to fight among themselves without judicial protection one way or the other.

### iv.    Other Non-Polluter Third Party Suits

A final category of potential litigants would be third parties who seek to prove they have suffered property damage or personal injury because of Mallinckrodt's mercury pollution of the Penobscot River estuary. In their response to Mallinckrodt's amended proposal, the Plaintiffs point out that "private landowners or towns along the Penobscot River may have an interest in specific remediation of their properties

or waterfronts that differs from the general interest in remediating the River as a whole." *Pl.'s Second Resp.* at 3.   The Court accepts the Plaintiffs' example as a plausible example of parties whose rights could be affected by a bar order.   If a landowner abutting the Penobscot discovered and remediated mercury pollution on her beach, it is possible she might wish to file a claim against Mallinckrodt as the source of the pollution.

It is important to note, however, that as a natural consequence of sleeping so soundly and for so long[16] on its rights, a non-polluter third party could be barred under Maine's statutes of limitations doctrine from proceeding against Mallinckrodt. *See Wyman*, 456 F. Supp. 3d at 243-45.   It seems appropriate, therefore, to allow non-polluter third parties to bring a lawsuit and equally appropriate to allow Mallinckrodt to fully defend itself against such claims, including the statute of limitations and laches defenses.   Mallinckrodt successfully invoked such defenses against a nonpolluter third party claimant in the past.

In 2020, this Court addressed claims by a lobster and crab fisherman who had fished in two areas of the Penobscot estuary that, in 2016, the Maine Department of Marine Resources closed permanently to fishing.   *Wyman*, 456 F. Supp. 3d at 231-33. Mr. Wyman and his business proceeded against United States Surgical Corp. and its wholly owned subsidiary Mallinckrodt on seven counts: (1) continuing public nuisance, (2) permanent public nuisance, (3) continuing tort – strict liability, 4)

---

[16]   Mallinckrodt last owned the chlor-alkali plant in Orrington, Maine on April 30, 1982, more than forty years ago, and this lawsuit has been pending since April 10, 2000, over twenty-two years ago.   *See Me. People's Alliance v. Holtrachem Mfg. Co., L.L.C.*, 211 F. Supp. 2d 237, 241 (D. Me. 2002) (finding that Mallinckrodt sold the Orrington plant on April 30, 1982); *Compl.* (ECF No. 1).

permanent strict liability, (6) continuing tort – negligence, (7) permanent negligence, and (8) punitive damages.[17]  *Wyman*, No. 1:18-cv-00095-JAW, *First Am. Compl.* at 1-17 (ECF No. 31).  The parties filed dueling motions for summary judgment on the claims of public nuisance and common law strict liability.  In *Wyman*, based on statute of limitations grounds, this Court granted summary judgment to Mallinckrodt on the permanent public nuisance and statutory strict liability claims and denied summary judgment to Mallinckrodt on the continuing public nuisance and common law strict liability claims.  *Wyman*, 456 F. Supp. 3d at 257.

The parties in *Wyman* did not ask the Court to address how Maine's statute of limitations, as interpreted by the Maine Supreme Judicial Court would apply to the negligence claims.  Nevertheless, the Court's analysis of the Maine Law Court's restrictive application of the discovery rule for purposes of accrual suggests that if a new lawsuit were filed against Mallinckrodt based on standard common law or statutory claims, the lawsuit would face significant statute of limitations hurdles. *See id.* at 249-51 (citing *Jacques v. Pioneer Plastics*, 676 A.2d 504, 506 (Me. 1996); *Stromberg-Carlson Corp. v. State Tax Assessor*, 2001 ME 11, ¶ 13, 765 A.2d 566 ("[t]he purpose of the statute [of limitations], in general, is to provide repose for potential defendants and to avoid the necessity of defending stale claims")).

---

[17]  After the Court's order on the motions for summary judgment, Mr. Wyman moved to dismiss his separate punitive damages count, acknowledging that he should have sought punitive damages as an element of damages for the remaining counts.  *Wyman*, No. 1:18-cv-00095-JAW, *Pls.' Req. for an Order to Allow a Voluntary Dismissal of Count VII of the First Am. Compl. and a Reassertion of Punitive Damages as Part of the Damage Claims for the Remaining Counts* (ECF No. 98).  The Court granted the motion. *Wyman*, No. 1:18-cv-00095-JAW, *Order Granting Mot. to Dismiss Count VII of the First Am. Compl.* (ECF No. 108).

This leaves the theoretic possibility that a unique claimant could bring a new lawsuit against Mallinckrodt based on claims of public nuisance and common law strict liability.  In *Wyman*, the Court observed that under Maine law, if a public nuisance is continuing then "a new cause of action accrues each day the hazardous materials remain . . .." *Id.* at 251 (quoting *Jacques*, 676 A.2d at 506).  But Maine law deems a nuisance continuing, rather than permanent, when "the thing that constitutes the nuisance 'is not of such a permanent nature that it can not readily be removed and thus abated.'" *Id.* (quoting *Jacques*, 676 A.2d at 507) (quoting *Caron v. Margolin*, 128 Me. 339, 343, 147 A. 419 (1929)).

The Court concluded that whether the mercury contamination in the Penobscot River, which Mr. Wyman contended presented a continuing nuisance, was reasonably abatable was a question of fact that precluded summary judgment.  *Id.* at 252 (citing *Jacques*, 676 A.2d at 508).  Thus, as Mallinckrodt wrote, the still unresolved abatability question constitutes another potential barrier to new claims. *See Def.'s Mot.* at 6.

Moreover, once Mallinckrodt raised the statute of limitations as an affirmative defense, the Court concluded that it was the plaintiff's burden to "make a prima facie showing of facts that would support the tolling of the statute of limitations." *Id.* at 252 (quoting *Halliday v. Henry*, 2015 ME 61, ¶ 9, 116 A.3d 1270 (alterations omitted) (quoting *Angell v. Hallee*, 2012 ME 10, ¶ 11, 36 A.3d 922)).  The Court deferred ruling on Mallinckrodt's statute of limitations defense to the common law strict liability

count "prior to the resolution of the abatability question, which may render such an analysis moot." *Wyman*, 456 F. Supp. 3d at 256.

Thus, Mallinckdrodt has already successfully raised statute of limitations defenses to third-party claims related to the mercury pollution. In the Court's view, a potential future plaintiff may be unable to sustain its burden to avoid being time-barred. This is especially true because the Consent Decree itself proposes multi-million-dollar remediation in existing polluted areas and, although the scientists have made constructive recommendations, there is no guarantee that the remediation efforts in the Consent Decree will remove and thus abate the mercury pollution. As such, the likelihood that, without special circumstances, a member of the public could successfully sue Mallinckrodt in the future seems remote on statute of limitations grounds alone. As Mallinckrodt points out, it would have other defenses available, including laches and issue and claim preclusion. *Def.'s Mot.* at 12-13; *Pls.' Second Resp.* at 4. As the Plaintiffs have pointed out, Mallinckrodt could also argue that any new lawsuit could not undermine the integrity of this Court's orders. *Pls.' Second Resp.* at 4.

### e.    The Merits and Drawbacks of a Bar Order

Mallinckrodt contends that "[b]ecause of the complexity, duration, cost, and public significance of the proposed settlement measures, the fairness hearing process should be viewed as an opportunity for interested parties to speak or forever hold their peace." *Def.'s Mot.* at 12. At the fairness hearing, its corporate representative Mr. Kelley testified that a bar order will avoid future "second-guess[ing]" of the

107

Consent Decree and emphasized that "[t]his litigation has not been done in secret, and the public is well informed of the issues."  *Hr'g Day 2 Tr.* at 100:16-25, 101:2-4. The Plaintiffs oppose Mallinckrodt's request that this Court bar all future claims by nonparty plaintiffs, reasoning that "[i]f Congress wanted a RCRA citizen suit to preclude other suits, it would have said so."  *Pls.' Second Resp.* at 2 (citing *Taylor*, 553 U.S. at 903 ("Congress' provision for FOIA suits with no statutory constraint on successive actions counsels against judicial imposition of constraints through extraordinary application of the common law of preclusion")).

To inform its decision on Mallinckrodt's request to bar future non-party suits, the Court invited input from community stakeholders and the public at large.  The Court notes that although the amended public notice of the fairness hearing provided conspicuous notice of the bar order, none of the fairness hearing participants expressed specific opposition to the proposed bar order.  *Def.'s Post-Hr'g Br.* at 14-15; *see Hr'g Day 3 Tr.*  Out of the over five hundred written comments collected and submitted by the parties, aside from Georgia-Pacific LLC's letter, only one other comment mentioned the bar order, asking if the Penobscot Nation or any other native tribes' "future involvement or action [would] be allowed to negate the agreement and bar order[.]"  *Notice of Public Comments* at 43.

### i.      The Court's Legal Concerns

The Court considered the approach of "the overwhelming majority of courts that have imposed or enforced a CERCLA contribution bar in a private-party settlement . . . only where the persons subject to the bar were either parties to the

action, PRPs who were involved in or aware of settlement discussions, or non-parties who otherwise had at least constructive notice that their contribution claims stood to be extinguished." *City of Emeryville*, 621 F.3d at 1265. Under the statutory regime that applies here, the Court also considered whether a broad bar order would be consistent with RCRA's purpose, as discussed previously, and the fact that Congress did not set a statutory constraint on successive actions.

Although Mallinckrodt differentiates *Taylor* as inapplicable beyond the FOIA context, *Def.'s Reply* at 2, the Court finds its reasoning helpful here. The *Taylor* Court explained that:

> Congress, in providing for actions vindicating a public interest, may "limit the number of judicial proceedings that may be entertained." [*Richards v. Jefferson Cnty.*, 571 U.S. 793, 803 (1996)] It hardly follows, however, that *this* Court should proscribe or confine successive FOIA suits by different requesters. Indeed, Congress' provision for FOIA suits with no statutory constraint on successive actions counsels against judicial imposition of constraints through extraordinary application of the common law of preclusion.

*Taylor*, 553 U.S. at 903 (emphasis in original). As the Plaintiffs point out, RCRA sets out specific notice and preclusion requirements regarding potential government enforcement actions but is silent on any preclusive effect between successive private suits. *See Chico Serv. Station, Inc. v. SOL P.R. Ltd.*, 633 F.3d 20, 28 (1st Cir. 2011) ("Despite the broad ambit of the statute, RCRA citizen suits are subject to a handful of clearly delineated limitations. These limitations fall into two categories, both intended to avert citizen suit interference with state and federal enforcement activities"). Moreover, the *Taylor* court contrasted an individual's right to citizen suit

relief under FOIA from a "public-law litigation" challenge to the constitutionality of a tax law in *Richards*. *See Taylor*, 553 U.S. at 902-03.

Although Mallinckrodt is correct that the public stands to benefit from the settlement remediation funding, the circumstances here are not as easily distinguishable from those in *Taylor* as Mallinckrodt makes them out to be. There may be parties whose unique interests were not adequately represented by the Plaintiffs who could bring legitimate claims against Mallinckrodt for individualized harm. Particularly as Congress set explicit limits on RCRA citizen suits but was silent regarding successive claims, the Court will not broadly deny them their day in court without knowing who they are or the nature of their claims.

### ii.    The Court's Policy Concerns

To address these legal issues in the abstract does not bring home the potential impact of Mallinckrodt's bar order.

### A.    Whether the Plaintiffs Adequately Represented Future Claimants

Mallinckrodt emphasizes the lengthy history of this case and related federal and state cleanup and response actions, "including a waterfowl consumption advisory in 2011 and lobster and crab fishery closures in 2014 and 2016," to argue that it is fair to bar any future claims not-yet brought by members of the public, despite years of public litigation and regulatory scrutiny. *Def.'s Mot.* at 11-12. Mallinckrodt further argues that future claims would be inevitably futile for proximate cause reasons. *Def.'s Reply* at 4.

In response to the Plaintiffs' concern that worthy claimants may arise from "unforeseeable circumstances" or future events, Mallinckrodt invokes proximate cause to reason that its "decades-old mercury releases would not be the legal cause of any unforeseen future harm." *Id.* Given all the Court has learned about this dynamic estuary system, the Court is skeptical of Mallinckrodt's attempt to minimize the direct link between its mercury releases and risks inherent to the impending remediation work.

Although the Consent Decree provides a benefit to the public in general, that does not mean that it remedies all potential interests that may not have been adequately represented by the Plaintiffs, particularly given the persistent degree of scientific uncertainty surrounding the Penobscot Estuary, despite its current status as one of the best studied estuaries in the world, *see Hr'g Day 1 Tr.* at 18, and the potential for future changes in the system. As explained above, at the fairness hearing, the Court noted its concern that a future catastrophic storm, unforeseen event, or accidental release could compromise the remediation plan or pose an entirely new threat to the Estuary and the surrounding area. As Wood and the parties' scientific and engineering experts have acknowledged, the mercury cleanup will not be without risk. The Court agrees with the Plaintiffs that leaving the door open for potentially viable nonparty claims "would help to provide a backstop if an unforeseeable future event fundamentally alters the state of the Penobscot River ecosystem," *Pls.' Second Resp.* at 4, and will not prospectively release Mallinckrodt from any and all future suits arising from this risk that it created.

Going forward, Mallinckrodt will be free to argue that a nonparty was adequately represented by the Plaintiffs and should be precluded. Moreover, as both parties recognize, Mallinckrodt has a spectrum of available defenses against meritless claims. Mallinckrodt expresses concern that future suits could interfere with the implementation of the settlement; however, the Court will continue to oversee implementation of the consent decree and can address any impediments should they arise. The bar order, as already amended, would not bar actions by state or federal agencies for natural resource damages or affect Mallinckrodt's fulfillment of its existing responsibilities, namely state-ordered cleanup of the former HoltraChem site.

To explain its reticence against barring individuals who may have suffered harm that cannot be addressed by general remediation of the river as a whole, the Court considered its own example. During the June 2014 trial, there was extensive evidence about the potentially deleterious impact of mercury on pregnant women and their babies. In its September 2, 2015 order, this Court wrote:

> Scientists have recognized that there is a significant human health risk with methylmercury. The impact is most acute in the fetuses of exposed pregnant women. Children born to women who had high mercury levels during pregnancy tend to experience a neurological developmental lag when compared with children born to women without elevated levels. Once the mercury-exposed child reaches school age, they have been documented to have slower motor speed, a poor concentration span, delays in language acquisition, and impaired cognitive function.

*Order on Remediation Plan* at 40. Thus, a powerful example of a potential claim is one from a new mother living in the Penobscot Estuary region who delivered a baby with high mercury levels. Although Mallinckrodt is the undisputed source of

112

thousands of pounds of the toxin into the river system, its proposed bar order would prohibit the mother and baby's lawsuit against Mallinckrodt.

The Court is not convinced it should protect Mallinckrodt more than the law already does from the consequences of its mercury pollution of the Penobscot River estuary, especially from the potential, however remote, of claims from otherwise innocent nonpolluter third parties. Nor is the Court convinced that upon its approval of the consent decree, Mallinckrodt will be inundated with third-party lawsuits. This lawsuit has been pending for over twenty-two years and has been the subject of extensive publicity and commentary, and yet, with the exception of the *Wyman* lawsuit, the Court is not aware of any other mercury-based claims that have been filed against Mallinckrodt in Maine. Again, the Court is not inclined to protect Mallinckrodt more than the law otherwise allows.

## B. Potential Claims Related to Future Remediation Efforts

Given its breadth, Mallinckrodt's proposed bar order disallows all claims, even claims brought about by the remediation efforts contemplated by the Consent Decree. The witnesses at the fairness hearing established that the proposed interventions are not risk free. For example, Mr. Walter testified that during the Orrington dredging, as "with any dredging," there is a risk that some of the sediments could become resuspended and migrate. *Hr'g Day 1 Tr.* at 109:2-10. Regarding the capping strategy, Mr. Walter expressed concerns about erosion of the Orrington Reach cap and the potential for recontamination in a "fairly turbulent system." *Id.* at 131:7-17.

113

Dr. Reible summarized the risks inherent to dredging alone by the "four Rs": resuspension, contaminant release, residuals left behind, and the risk of resuspension and release during the process. *Hr'g Day 2 Tr.* at 16:16-21.

The Court must consider not only whether things will go right, but also whether they will go wrong.  For example, if the dredging in the Orrington Reach results in a plume of mercury-ladened water to be washed down the Penobscot River and if a pregnant woman ingested it, the Court would be leery of issuing a bar order that would prohibit a mother who delivers a baby with high mercury levels from making a claim that Mallinckrodt's pollution caused personal injury— either from the original mercury dumping or from releases during the remediation process.  If this were to occur, the cause of action might or might not be barred by the Maine statutes of limitation, but regardless the proposed bar order would not allow the mother and child to make the claim, even though the mother was not pregnant and the child not alive at the time of the Consent Decree.  This prospect seems patently unjust.

A similar, though less evocative analysis would apply to property damage sustained by downriver landowners and others who could trace the damage to the release of mercury caused by the remediation efforts.  Given the risks involved, the Court does not consider it equitable to bar future claims caused by the remediation efforts to undo the underlying damage caused by Mallinckrodt's mercury pollution.

The Court concludes that a broad order precluding future remediation claims is inappropriate and potentially unenforceable for due process and policy reasons.

Compare *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 93-99 (1st Cir. 2008) ("non-settling third and fourth parties" that were "active" in the case as PRPs after settlement discussions began unsuccessfully challenged a Consent Decree containing a bar order), *with City of Emeryville*, 621 F.3d at 1260-62 (rejecting the settling defendant's argument that CERCLA "§ 113(f)(1) provides district courts with 'authority' to bar contribution claims of persons who neither had notice of nor participated in a CERCLA action that was resolved with a court-approved settlement").

### C.    Summary

The Court assumes it has the discretionary authority to issue a bar order, but the Court declines to exercise its discretion in favor of Mallinckrodt's proposed bar order.   The Court's analysis of the policy implications of the bar order with the proposed exemptions leads the Court to reject the bar order as proposed and to leave Mallinckrodt and its potential claimants on the same square footing with the burdens and defenses that the law allows.

## IV.   THE PARAMOUNT INTERESTS OF THE PENOBSCOT RIVER

During the fairness hearing, the Court raised the question of whether the Penobscot River itself should be deemed the ultimate beneficiary of the Consent Decree. *Hr'g Day 2 Tr.* at 70:24-25.  Greenfield's founder Ms. Brooks responded that "[t]he river is the - - primary resource, and Greenfield's commitment to the people of Maine is to honor and restore that community public resource.  That is foundational to our outreach and our approach." *Id.* at 71:1-4.  Although Mallinckrodt's counsel

did not express its position in the same way, the Court still considers that the Consent Decree lacks an express directive to the Trustee, namely that in resolving any conflicts, the Trustee be charged with considering the interests of the Penobscot River estuary as paramount in guiding its decisions.

## V.   CONCLUSION

For over twenty years, the Plaintiffs have maintained this action to enforce the public's right to be free of toxic pollution.  The parties have now reached agreement to craft one of the largest environmental settlements in Maine history.  The settlement will fund extensive work to accelerate the recovery of the Penobscot Estuary.  The Court concludes that the remedies in the proposed Consent Decree are reasonable, adequate, and consistent with the Resource Conservation and Recovery Act's purpose of mitigating imminent and substantial endangerment.  *See* 42 U.S.C. § 6972(a).

Upon full consideration, the Court issues the following conditional order.  The Court APPROVES the terms of the Consent Decree as proposed by the parties subject to the following conditions:

1) The parties include in the Consent Decree a statement that in implementing the terms of the Consent Decree, in executing the terms of the trusts, and in resolving any disputes, the Trustee must consider as paramount the interests of the Penobscot River estuary, including the River itself, its flora and fauna, and its nearby inhabitants;

2)  The parties include in the Consent Decree and Trust agreements a provision for a mandatory annual audit by an independent outside auditor approved by the Court upon recommendation of the parties;

3)  The parties provide a template for the Court's review on how the Trustee proposes to obtain public input into its activities and the parties propose more specific language in the Consent Decree for how the Trustee is to obtain input from the residents of the Penobscot River estuary before making decisions critical to their well-being and the health of the River.

The Court DENIES Defendant Mallinckrodt US LLC's Amended Motion for Entry of a Bar Order (ECF No. 1151).

The Court will schedule a conference of counsel within two weeks of the date of this Order to allow counsel to consult with their respective clients and to discuss with counsel how they wish to proceed in light of this Order.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 4th day of August, 2022