UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| MAINE PEOPLE'S ALLIANCE and NATURAL RESOURCES DEFENSE COUNCIL, INC., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:00-cv-00069-JAW |
| | ) | |
| HOLTRACHEM MANUFACTURING COMPANY, LLC and MALLINCKRODT US LLC, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CONSENT DECREE**

19482152.3

# Table of Contents

Table of Contents ........................................................................................................ i

I.      Background ..................................................................................................... 1

II.     Definitions ...................................................................................................... 5

III.    Jurisdiction and Venue ............................................................................... 17

IV.     Parties Bound, Succession, and Assignment ......................................... 18

V.      Findings & Non-Admissions of Liability ................................................ 19

VI.     Commitments by Mallinckrodt ................................................................ 19

VII.    Formation and Purpose of Penobscot Estuary Mercury Remediation Trust and Penobscot Estuary Beneficial Environmental Projects Trust ................................ 36

VIII.   Powers and Duties of Trustees ................................................................. 45

IX.     Cooperation and Obligations of the Parties Regarding the Trustees ................. 64

X.      Limitations on Liability and Indemnifications ...................................... 65

XI.     Covenants ...................................................................................................... 69

XII.    Additional Agreements Between the Parties ......................................... 72

XIII.   Reservations of Rights ................................................................................ 79

XIV.    Dispute Resolution ...................................................................................... 80

XV.     Notice ............................................................................................................. 82

XVI.    Miscellaneous Provisions ........................................................................... 84

XVII.   Retention of Jurisdiction ........................................................................... 90

XVIII.  Final Judgment............................................................................................. 90

19482152.3

## CONSENT DECREE

I.      **Background**

A.      In 2000, Plaintiffs Maine People's Alliance (MPA) and Natural Resources Defense Council (NRDC), on behalf of their affected members, filed a complaint in this matter pursuant to the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(B). Plaintiffs' complaint alleged that Defendants Mallinckrodt US LLC (Mallinckrodt) and HoltraChem Manufacturing Company, LLC (HoltraChem) caused mercury discharges into the Penobscot River Estuary from a chlor-alkali plant in Orrington, Maine, that present or may present an imminent and substantial endangerment to health and the environment. ECF No. 1.

B.      In their complaint, Plaintiffs sought, *inter alia*: (1) an independent, comprehensive, scientific study to determine the nature and extent of the endangerment; (2) an independent, comprehensive study of appropriate, effective, environmentally-sound means to eliminate the endangerment; and (3) development and implementation of an appropriate and effective remediation plan based on these studies. *Id.*

C.      The Court held a liability trial in 2002 and subsequently issued a decision and order that found that mercury in the Penobscot River may present an endangerment to public health and the environment, held Mallinckrodt jointly and severally liable as a source of the mercury, and ordered Mallinckrodt to fund an independent study of the need for, feasibility of, and elements of a remediation plan for the mercury. ECF No. 147 at 22, 29-31.

19482152.3

D.      HoltraChem dissolved as a corporate entity in 2001, and the Court entered a default judgment holding HoltraChem jointly and severally liable with Mallinckrodt for funding the independent study. *Id.* at 4 n.3, 31.

E.      In 2006, the United States Court of Appeals for the First Circuit affirmed the Court's 2002 decision and subsequent implementing orders. ECF No. 321 at 48 (*Me. People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 298 (1st Cir. 2006)).

F.      The Court-ordered independent scientific study lasted from 2005 to 2013 and proceeded in two phases, ultimately resulting in a Phase I Report, ECF No. 382, an Update to the Phase I Report, ECF No. 480, and a Phase II Report, ECF Nos. 652-1—652-65. It was directed by a Study Panel of three scientists: one nominated by Plaintiffs, one nominated by Mallinckrodt, and a chairperson selected by the other two. ECF Nos. 166, 169.

G.      The Phase II Report summarized and synthesized a variety of scientific studies regarding the fate and transport of mercury in the Penobscot Estuary and the potential risks to human health and the environment in 23 chapters spanning over 1,800 pages.

H.      In 2014, the Court held a trial to hear testimony justifying and critiquing the Study Panel's Phase II Report and recommendations. ECF No. 829 at 1. Based on the evidence presented, the Court issued an Order on Remediation Plan in 2015 that found that the ongoing mercury contamination continued to create an irreparable injury to the Estuary and present an endangerment to human health and the environment. *Id.* at 39, 54. The Court ordered a Phase III Engineering Study and the appointment of an

2

independent engineering firm to "develop cost-effective and effective remedies to clean up the remaining mercury" and "propose potential solutions to mitigate the current harm to the people, biota, and environment of the Penobscot River estuary." *Id.* at 1, 61; *see also* ECF No. 836 at 1. The Court also set out at least five factors to be used for evaluating the engineering firm's recommendations, including "(1) whether the proposed solution has been successfully attempted previously or is innovative; (2) the likely cost of the solutions; (3) the length of time to complete the recommendations; (4) the likely effectiveness of the solution; and (5) any potential environmental harm that may be caused by the proposed solution." ECF No. 829 at 59.

I.      To conduct the Phase III Engineering Study, the Court appointed Amec Foster Wheeler, now known as Wood Environment & Infrastructure Solutions, Inc. (hereinafter referred to as "Amec" for simplicity and to avoid confusion). Amec was jointly proposed by the Parties and the Court's Special Master following a competitive bidding and interview process. ECF Nos. 836 at 2-3; 845.

J.      Amec was charged to develop and evaluate a suite of potential remedies and recommend to the Court a remedial plan that would be effective and cost-justified, or explain why, in the firm's expert judgment, there is no viable remedy. ECF No. 836 at 4-5. The engineering study generated numerous technical reports and memoranda, *see* ECF Nos. 903, 944-45, 972-86, and culminated in Amec's Phase III Engineering Study Report in 2018, ECF Nos. 972–972-2.

K.      In the Phase III Engineering Study Report, Amec presented its recommendations for a "remedial strategy for the Estuary" based on the evaluation

criteria established by the Court. ECF No. 972 at ES-2. Amec recommended an initial suite of remedial actions that would include a combination of capping, dredging, and long-term monitoring, and a set of adaptive management recommendations that could include additional dredging or the addition of clean sediment in a strategy called enhanced monitored natural recovery (EMNR). *Id.* at ES-3–ES-9. Amec estimated that its proposed initial remedies would cost about $246 to $333 million and its possible adaptive management remedies would cost about $15 to $676 million. *Id.* at ES-10, 8-27–8-28. All of Amec's cost estimates included a broad uncertainty range such that the actual costs might be up to thirty percent lower than the estimates or up to fifty percent higher than the estimates. *Id.* at ES-9.

L.      The Court's 2015 Order preserved the Parties' rights to object to Amec's recommendations and anticipated that the Court would resolve any disputes about the proposal and its implementation. ECF No. 829 at 1-2. From late 2018 through late 2019, the Parties took discovery from Amec related to Amec's study, conclusions, and recommendations. Before such discovery was complete, the Parties sought a stay of the case to pursue settlement discussions. The Court has not yet made any final determination regarding the recommendations set forth in Amec's Phase III Engineering Study Report.

M.      The Parties each believe that it is in their mutual interest to resolve their differences regarding remediation issues without further adjudication or admissions of fact or law so as to avoid the delay, costs, and uncertainty of proceeding with litigation, and move forward cooperatively and productively with remediation actions intended to

19482152.3

reduce mercury exposures and accelerate the recovery of the Penobscot River estuary. In doing so, the Parties recognize that the Penobscot Estuary is a complex ecosystem, that uncertainties remain even after the Court-ordered studies, that technical experts have varying opinions regarding the remediation options for the Site, and that the remediation measures set forth in this Consent Decree are intended to accelerate the recovery of the Site but the benefits of the remediation measures are difficult to predict and measure with certainty. Due in part to regional background levels of mercury and Site-specific characteristics, the remediation actions implemented under this Consent Decree will not necessarily reduce mercury concentrations in all species of concern at the Site, such as ducks and lobsters, below the State of Maine's Fish Tissue Action Level for methylmercury of 200 nanograms per gram.

N.     The Parties recognize, and the Court by entering this Consent Decree finds, that this Decree has been negotiated by the Parties in good faith, that implementation of the Decree is intended to accelerate the recovery of the Site and will avoid prolonged and complicated litigation between the Parties, and that the Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.     Definitions

1.     Whenever terms listed below are used in this Consent Decree, the following definitions shall apply:

a.     "Amec" shall mean the engineering firm that was appointed to carry out the Court-ordered Phase III Engineering Study, which was known at the time

5

as Amec Foster Wheeler Environment & Infrastructure, Inc. and subsequently became part of Wood Environment & Infrastructure Solutions, Inc.

b.      "Beneficial Environmental Projects" shall mean projects undertaken to provide tangible environmental or public benefits to affected communities or the environment that are intended to mitigate or offset potential adverse impact(s) directly or indirectly caused by mercury contamination at the Site. Beneficial Environmental Projects may include any project that (i) benefits the natural environment of the Penobscot River estuary; (ii) improves recreational and aesthetic enjoyment of the Penobscot River estuary; or (iii) reduces human exposures in Maine to mercury or other neurotoxins.

c.      "Beneficial Reuse" shall mean "beneficial use" as defined in Maine's Solid Waste Management Regulations, Code Me. R. tit. 06-096 Ch. 400, § 1(T), and/or as used in Chapter 418 of Maine's Solid Waste Management Regulations, Code Me. R. tit. 06-096 Ch. 418.

d.      "Beneficiary" or "Beneficiaries" shall mean, with respect to the Remediation Trust, Mallinckrodt, NRDC, MPA, and their successors, and, with respect to the Project Trust, Mallinckrodt, NRDC, MPA, their successors, and the Remediation Trust.

e.      "Capping" shall mean the placement of a covering or cap of clean material over contaminated sediment that is intended to remain in place in order to create a physical, biological, and/or chemical barrier between contaminated sediment and the water column.

6

f.     "Capped Funding" shall mean the maximum amount of funding that may be provided by Mallinckrodt to the Trusts, which shall be $267 million in the aggregate. Mallinckrodt will have no obligation to pay more than the aggregate of the Capped Funding amounts stated in Paragraphs 10 through 15 (Orrington Reach through Trust Administrative Costs) to the Trusts.

g.     "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9601-9675.

h.     "Committed Funding" shall mean those portions of funding for the remedial activities set forth in Paragraphs 10 through 15 (Orrington Reach through Trust Administrative Costs) that are required to be paid by Mallinckrodt to the Trusts.

i.     "Contingent Funding" shall mean those portions of funding for the remedial activities set forth in Paragraphs 10 through 15 (Orrington Reach through Trust Administrative Costs) that Mallinckrodt shall be required to pay to the Trusts only if certain contingencies occur or are encountered as set forth in Paragraphs 10 through 15 (Orrington Reach through Trust Administrative Costs).

j.     "Consent Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Paragraph 70). In the event of a conflict between the main text of this Consent Decree and any appendix, the main text of this Consent Decree shall control.

k.     "Court" shall mean the United States District Court for the District of Maine.

7

l.      "Day" or "Days" shall mean, unless otherwise specified, calendar days including weekends and holidays. In the event that the date for a required action falls on a day that is a weekend or federal holiday, the date for the required action shall be automatically extended to the next day that is not a weekend or federal holiday.

m.      "Defendant" shall mean defendant Mallinckrodt US LLC.

n.      "East Channel" shall mean the portion of the Penobscot River along the entire eastern side of Verona Island from the northernmost tip of Verona Island to the southernmost tip of Verona Island. It corresponds with the Verona Northeast and Verona East Reaches as shown in Appendix E.

o.      "Effective Date" shall mean the date upon which the approval of this Consent Decree is recorded on the Court's docket.

p.      "EMNR" or "enhanced monitored natural recovery" shall mean a remediation strategy involving the addition of clean sediment with the expectation that tides and currents will naturally disperse the clean sediment and mix it with contaminated sediments, thereby diluting the concentration of contaminants in sediments.

q.      "Feasible" shall mean capable of being accomplished with reasonable professional efforts, taking into account scientific, technical, legal, practicability, and other relevant constraints. With respect to the remedial activities contemplated by this Consent Decree, determinations of feasibility will be made by the Trustee of each Trust, subject to the Dispute Resolution provisions

8

of this Consent Decree. These determinations may take into account, among other factors: cost; time to implement; potential benefits and risks; engineering, legal, and permitting considerations and processes; and input from stakeholders. A determination of feasibility does not require or imply that a harm or risk is readily quantifiable or abatable, or that a particular increment of risk reduction or harm abatement will occur.

      r.     "HoltraChem" shall mean defendant HoltraChem Manufacturing Company, LLC and its successors and assigns.

      s.     "HoltraChem Site" shall mean the location of the former chlor-alkali facility on the east bank of the Penobscot River in Orrington, Maine, which was most recently operated by HoltraChem and is undergoing a separate cleanup being overseen by the Maine Department of Environmental Protection. The plant operated under several owners from 1967 through 2000, including a corporate predecessor to Mallinckrodt.

      t.     "Long-Term Monitoring" shall mean the triennial monitoring activities required by this Consent Decree that are intended to provide repeated, readily comparable data over time regarding mercury concentrations in biota, sediment, and water at the Site. Long-Term Monitoring does not include remedy-specific monitoring that may be undertaken before, during, or after Work in a particular Work Category to monitor the effects of that specific Work, which will be designed, funded, and carried out along with other Work in the particular Work Category.

9

u.    "Mallinckrodt" shall mean defendant Mallinckrodt US LLC, its successors and assigns, and any corporate parent(s) responsible for the liabilities of Mallinckrodt US LLC. As of the Effective Date, Mallinckrodt is a subsidiary of United States Surgical Corporation, and an affiliate of Medtronic plc, the ultimate parent company of both entities.

v.    "Mallinckrodt Related Entities" shall mean Mallinckrodt and its corporate parents, subsidiaries, and affiliates.  A Mallinckrodt Related Entity does not include a captive insurance company or self-insurer.

w.    "Mendall Marsh" shall mean the tidal portions of the north and south branches of the Marsh River and all adjacent intertidal areas in Frankfort and Prospect, Maine, which generally corresponds to the Mendall Marsh Reach shown in Appendix E. Mendall Marsh includes, but is not limited to, the intertidal and subtidal portions of the Howard L. Mendall (Marsh Stream) Wildlife Management Area.

x.    "Mobile Sediment" shall mean any mineral or organic sediment, including wood waste, that may be mobilized and homogenized by natural processes in the Penobscot River over timescales relevant to affect the fate and transport of mercury within the Site. Mobile Sediment includes sediment described as "mobile" or as components of the "mobile pool" in Chapter 7 of the Phase II Report, ECF No. 652-43 or in the Phase III Engineering Study Report, ECF No. 972.

10

19482152.3

y.      "MPA" shall mean plaintiff Maine People's Alliance and its successors and assigns.

z.      "Natural Resource Damage Trustees" shall mean the State of Maine Trustees, including, but not limited to, the Maine Department of Environmental Protection and Maine Department of Inland Fisheries and Wildlife, and Federal Trustees, including the Department of Commerce and the Department of the Interior.

aa.      "NRDC" shall mean plaintiff Natural Resources Defense Council and its successors and assigns.

bb.      "Orland River" shall mean the tidal portion of the Orland River, and adjacent intertidal areas, from the head of tide at the Orland Dam to the junction of the Orland River and the East Channel at Gross Point. It corresponds with the Orland River Reach as shown in Appendix E.

cc.      "Orrington Reach" shall mean the area defined as the Orrington Reach in Appendix E.

dd.      "Paragraph" or "¶" shall mean a portion of this Consent Decree identified by an Arabic numeral and/or an upper- or lower-case letter and/or lower-case Roman numeral. A reference to any Paragraph denoted by an Arabic numeral or upper-case letter shall include any subparagraphs denoted by lower-case letters and lower-case Roman numerals, and a reference to any subparagraph denoted by a lower-case letter shall include any subparagraphs denoted by a lower-case Roman numeral.

11

ee.    "Parties" shall mean Plaintiffs MPA and NRDC and Defendant Mallinckrodt.

ff.    "Penobscot Estuary" or "Penobscot River Estuary" shall be synonymous with the "Site," as that term is defined herein.

gg.    "Phase III Engineering Study" shall mean all the work conducted by, and reports prepared by, Amec with respect to the Site and in fulfillment of Amec's appointment as the Phase III Engineering Firm.

hh.    "Plaintiffs" shall mean MPA and NRDC.

ii.    "Project Trust" shall mean the Penobscot Estuary Beneficial Environmental Projects Trust, as established by this Consent Decree and the Project Trust Agreement, the form of which is attached as Appendix C.

jj.    "RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901-6992, also known as the Resource Conservation and Recovery Act.

kk.    "Reach" shall mean a defined portion or component of the Site subject to the remediation activities set forth in this Consent Decree, which portion or component may be defined geographically (e.g., East Channel, Mendall Marsh, Orland River, and Orrington Reach) or based on hydrodynamic, geophysical, or other scientific bases (e.g., Mobile Sediments and Surface Deposits). The defined portions and components of the Site included in this definition are as follows: East Channel, Mendall Marsh, Mobile Sediments, Orland River, Orrington Reach, and Surface Deposits.

19482152.3

ll.     "Remaining Funding" shall mean Committed Funding for a particular Work Category that is unused after the completion of the Work in that Work Category, as further discussed in Paragraph 17 (Remaining Funding). Remaining Funding does not include any Contingent Funding. Remaining Funding also does not include Committed Funding set aside for future operation, monitoring, and/or maintenance of Work in a Work Category until such Committed Funding is no longer foreseeably needed for such future operation, monitoring, and/or maintenance.

mm.     "Remediation Trust" shall mean the Penobscot Estuary Mercury Remediation Trust, as established by this Consent Decree and the Remediation Trust Agreement, the form of which is attached as Appendix B.

nn.     "Restoration Projects" shall mean a subcategory of Beneficial Environmental Projects, the funding or Work with respect to which is used to satisfy future potential or actual natural resource damage claims with respect to the Site, whether such potential claims would be against Mallinckrodt or Mallinckrodt Related Entities, in accordance with separate agreements, if any, between the Natural Resource Damage Trustees and Mallinckrodt. Restoration Projects may also be Tidal Marsh Projects but are not required to be Tidal Marsh Projects.

oo.     "Section" shall mean a portion of this Consent Decree identified by an upper-case Roman numeral.

13

pp.    "Site" shall mean the Penobscot River Estuary, which generally includes the tidal portions of the Penobscot River from the location of the former Veazie Dam to upper Penobscot Bay. Specifically, the Site includes each of the Study Reaches shown in Appendix E, including any intertidal areas that fringe the Study Reaches.

qq.    "Standard of Care" shall mean the level of care and skill to be exercised by the Trustees by and through their environmental, engineering and/or technical consultants and contractors, and other third-party professionals in completing all Work and Deliverables required by this Consent Decree, as defined in Paragraph 31(b) (Standard of Care).

rr.    "State" shall mean the State of Maine.

ss.    "Statement of Work" or "SOW" shall mean the document describing the Work that must be performed to implement the remediation activities at the Site required by this Consent Decree, which is attached as Appendix A.

tt.    "Study Reach" shall mean each of the portions of the Penobscot River from the former Veazie Dam to a line between Defence Point and Perkins Point at the northern end of Penobscot Bay, as depicted on the map in Figure 1-1 of Amec's Phase III Engineering Study Report, ECF No. 972-1, which is attached as Appendix E.

uu.    "Surface Deposit" shall mean any subtidal or intertidal region of Mobile Sediment accumulation, including any comingled materials or debris, that can be identified by physical, chemical, geophysical, or other scientific methods.

19482152.3

Surface Deposit generally refers to the types of sediment beds described as a "surface deposit" in the Phase III Engineering Study but does not necessarily refer to the same spatial extent as the specific Surface Deposits delineated and identified in the Phase III Engineering Study, which are depicted on the map attached as Appendix F.

vv. "Tidal Marsh Projects" shall mean a subcategory of Beneficial Environmental Projects that are reasonably anticipated to restore, enhance, or preserve tidal marsh functions and habitat anywhere in the State of Maine. Tidal Marsh Projects may include Work in areas adjacent to a tidal marsh that benefits the tidal marsh, such as preservation of upland buffers to allow marsh expansion with sea level rise or infrastructure modifications that improve or restore tidal marsh hydrology. Tidal Marsh Projects also include projects intended to provide benefits to avian species that use Mendall Marsh, including Nelson's sparrows and other tidal marsh obligate birds, regardless of whether such projects take place in Mendall Marsh or elsewhere in Maine. Tidal marshes include all marshes in Maine subject to periodic tidal fluctuations. Tidal Marsh Projects may also be Restoration Projects but are not required to be Restoration Projects.

ww. "Trust" or "Trusts" shall mean the Remediation Trust and the Project Trust, individually or collectively.

xx. "Trust Administrative Account" shall mean the account established pursuant to Paragraph 24 (Creation of Trust Accounts), including any

15

subaccounts, to hold funds to be used by a Trustee to pay Trust Administrative Costs of the respective Trust.

yy.    "Trust Administrative Costs" shall mean, with respect to each Trust, all costs, obligations, or liabilities incurred in the administration and management of such Trust, as may be further described in the respective Trust Agreement for each Trust.

zz.    "Trust Agreement" shall mean, with respect to the Remediation Trust, the document establishing the Remediation Trust and setting forth the duties and obligations of Mallinckrodt and the Trustee of the Remediation Trust, in a form substantially similar to the Remediation Trust Agreement that is attached as Appendix B, and, with respect to the Project Trust, the document establishing the Project Trust and setting forth the duties and obligations of Mallinckrodt and the Trustee of the Project Trust, in a form substantially similar to the Project Trust Agreement that is attached as Appendix C.

aaa.    "Trust Parties"  shall mean, collectively, the Trusts, the Trustees, and the Trustees' member's shareholders, officers, directors, employees, and managers; for the avoidance of doubt, "Trust Parties" shall not include environmental, engineering, or technical consultants and contractors, and other third-party professionals retained by the Trustees to assist the Trustees in carrying out their responsibilities under this Consent Decree and the Trust Agreements.

bbb.  "Trust Remediation Account" shall mean the account established pursuant to Paragraph 24 (Creation of Trust Accounts), including any

16

subaccounts, to hold funds to be used by the Trustee of such Trust for Work at the Site.

ccc.    "Trustee" or "Trustees" shall mean, individually or collectively, the trustee of the Remediation Trust and the trustee of the Project Trust, each as designated in Paragraph 25 (Trustees) of this Consent Decree, or their successors.

ddd.    "Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "hazardous substance" under the Maine Uncontrolled Hazardous Substance Sites Law, Me. Rev. Stat. tit. 38, §§ 1361-71.

eee.    "Work" shall mean all activities and obligations the performance of which the Remediation Trust or the Project Trust, and their respective Trustees, is required to cause under this Consent Decree, including all remediation activities.

fff.    "Work Category" or "Work Categories" shall mean, individually or collectively, the remedial activities described in each of Paragraphs 10 through 14 (Orrington Reach through Long-Term Monitoring) to which funding is specifically allocated.

III.    **Jurisdiction and Venue**

2.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 6972(a)(1)(B). The Court has personal jurisdiction over the Parties. Venue in this Court is proper pursuant to 28 U.S.C. § 1391. Solely for the

19482152.3

purposes of this Consent Decree and the underlying complaint, the Parties waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this district for this matter. The Parties shall not challenge the Court's jurisdiction to enter and enforce a Consent Decree in this matter or the terms of this Consent Decree.

## IV.    Parties Bound, Succession, and Assignment

3.      This Consent Decree is binding upon Plaintiffs and Mallinckrodt and their heirs, successors, and assigns. Any change in ownership or corporate or other legal status of Mallinckrodt including, but not limited to, any transfer of assets or real or personal property, shall in no way alter Mallinckrodt's responsibilities under this Consent Decree. Mallinckrodt shall give notice within seven (7) days to the Plaintiffs and Trustees if there is a change in its ownership or corporate or other legal status.

4.      Mallinckrodt shall provide a copy of this Consent Decree to the Trustees appointed to perform the Work required by this Consent Decree, including its appendices, and to each person representing Mallinckrodt with respect to the Site or the Work. The Trustees shall ensure that they and their environmental, engineering, and technical consultants and contractors provide written notice of this Consent Decree to all consultants, contractors, or subcontractors hired to perform any portion of the Work. Any time a Trust or Trustee enters into a contract to fulfill its duties under this Consent Decree, such contracts shall be conditioned upon performance of the Work in conformity with the terms of this Consent Decree. To the extent that Mallinckrodt is required to contract directly with any person or entity to carry out Work required by this Consent Decree,

19482152.3

Mallinckrodt shall ensure that its contractors and subcontractors perform the Work in accordance with the terms of this Consent Decree.

**V.      Findings & Non-Admissions of Liability**

5.      Unless specifically stated in this Consent Decree or contained in a separate order of the Court, nothing contained in this Consent Decree shall be considered an admission by Mallinckrodt or by Plaintiffs, or a finding by the Court, on any issue of material fact or law as to any matter that could have been raised regarding the potential impacts of mercury to the Site and Penobscot River from prior operations at the HoltraChem Site.

6.      Mallinckrodt's performance of Section IV (Parties Bound, Succession, and Assignment), Paragraphs 3-4, Section V (Findings & Non-Admissions of Liability), Paragraphs 5-6, Section VI (Commitments by Mallinckrodt), Paragraphs 7-20, Section VII (Formation and Purpose of Penobscot Estuary Mercury Remediation Trust and Penobscot Estuary Beneficial Environmental Projects Trust), Paragraphs 21-26, Section VIII (Powers and Duties of Trustees), Paragraphs 27-42, Section IX (Cooperation and Obligations of the Parties Regarding the Trustee), Paragraphs 43-44, and Section XI (Covenants), Paragraphs 48-51, is restitution, remediation, or required to come into compliance with law.

**VI.      Commitments by Mallinckrodt**

7.      Mallinckrodt agrees to create and fund the Trusts up to the Capped Funding, consistent with the terms of this Consent Decree and the attached Trust Agreements.

19482152.3

8.      **Geographic Scope of Work.** Unless otherwise specified in this Consent Decree or in the attached Statement of Work, the Parties and Court intend that all Work will take place within the Site, except that facilities to support the Work may be located in areas outside the Site boundaries, reference locations for monitoring purposes will include locations outside the Site boundaries, and Beneficial Environmental Projects may take place outside the Site boundaries.

9.      **Work and Funding.** The Parties agree to the Work and funding commitments set forth in Paragraphs 10 through 15 (Orrington Reach through Trust Administrative Costs).

10.     **Orrington Reach.**

a.      The remediation Work in the Orrington Reach shall be capping 130 acres of intertidal sediments, primarily on the east side of the Orrington Reach. Mallinckrodt shall fund a total of $50 million in Committed Funding to the Remediation Trust's Trust Remediation Account for this Work. These funds shall be allocated to any and all Work, including remedy design, permitting, implementation, remedy-specific monitoring, and maintenance in the Orrington Reach. If this Work is not Feasible or if any Committed Funding remains after the completion of the Orrington Reach Work, including after setting aside a reasonable sum for future cap monitoring and maintenance as needed, such Remaining Funding will be used as provided in Paragraph 17 (Remaining Funding).

20

b.     As a contingent obligation for the Orrington Reach, Mallinckrodt will pay to the Remediation Trust's Trust Remediation Account up to an additional $10 million as Contingent Funding if the cost of capping 130 acres in the Orrington Reach, including remedy-specific monitoring and maintenance, exceeds $50 million. If this contingency is triggered, Mallinckrodt's Capped Funding amount for the Orrington Reach Work Category, including Committed and Contingent Funding, shall be the lesser of the actual cost of the Work in the Orrington Reach or $60 million. If the cost of the Work in the Orrington Reach is projected to exceed $60 million, then the scope of the Work shall be altered to fit within the Capped Funding amount, taking into account the availability, if any, of Remaining Funding from other Work Categories.

11.    **Mobile Sediments and Surface Deposits.**

a.     The remediation Work for Mobile Sediments and Surface Deposits will be removal of a portion of these materials from the Site. Mallinckrodt will fund a total of $70 million in Committed Funding to the Remediation Trust's Trust Remediation Account for this Work consistent with the budgeting and funding schedules established in Paragraphs 19, 34, and 35. These funds shall be allocated to any and all Work for Mobile Sediments and Surface Deposits, including delineation, design, permitting, any approvals needed to perform the Work, implementation, and remedy-specific monitoring for removal of Mobile Sediments and/or Surface Deposits. If this Work is not Feasible or if any funds from this Committed Funding remain after the completion of Work on Mobile

21

Sediments and Surface Deposits, such Remaining Funding will be used as provided in Paragraph 17 (Remaining Funding). Unless the contingency set forth in Paragraph 11(b) is triggered or there is Remaining Funding from other Work Categories available to supplement the funding for this Work Category, the Trustee shall design the Work for this Work Category to fit within the Committed Funding amount of $70 million. The Work for this Work Category may include debris removal, dredging, backfilling, creation of access channels, construction of landside and waterside staging and support facilities, and other reasonable activities consistent with good engineering practices that are necessary to carry out the safe and effective removal of Mobile Sediments and/or Surface Deposits.

b.      The Parties agree that Beneficial Reuse of any sediment, debris, and other materials removed from the Site is preferable to landfill disposal and is the appropriate method for management of materials removed from the Site if such Beneficial Reuse will be permissible, as determined by the granting of all necessary permits and approvals for such reuse, and is Feasible. The Trustee shall make all best efforts to incorporate Beneficial Reuse for all sediment, debris, and other materials removed from the Site, including reuse in locations outside of Maine. If after all such efforts, the Trustee determines it is not Feasible to Beneficially Reuse all or some materials removed from the Site, the Trustee will consult with the Parties on appropriate next steps for disposal and to discuss reasonable alternatives. If after such discussions, landfilling the material is necessary, the Trustee shall make all best efforts to identify the least costly means of disposal. As

22

a contingent obligation for Mobile Sediments and Surface Deposits, Mallinckrodt will pay up to $50 million in Contingent Funding to the Remediation Trust's Trust Remediation Account for this Work Category if the Work set forth in Paragraph 11 (Mobile Sediments and Surface Deposits) is deemed Feasible but landfill disposal is required because it is not Feasible to Beneficially Reuse some or all of the materials removed from Mobile Sediments and Surface Deposits. Mallinckrodt's additional contingent financial liability shall be the actual costs incurred for waste processing, water treatment, transportation, disposal, and other costs necessary for landfill disposal, up to a maximum of $50 million in Contingent Funding.

12. **Orland River and East Channel around Verona Island.**

a.      Mallinckrodt will fund a total of $30 million in Committed Funding to the Remediation Trust's Trust Remediation Account for remediation Work in the Orland River and/or East Channel. These funds shall be allocated for remedy selection, design, implementation, and remedy-specific monitoring in these Reaches. If this Work is not Feasible or if any funds from this Committed Funding remain after the completion of the Work in these Reaches, such Remaining Funding will be used as provided in Paragraph 17 (Remaining Funding).

b.      Remediation Work that may be considered in these Reaches includes EMNR, capping, and/or dredging. Such remedies may need to be coordinated or sequenced with other remedies, such as the Mobile Sediment or Surface Deposit removals. The Trustee shall design any remedies for these Reaches to fit within the

23

$30 million budget, however, Remaining Funding from other Work Categories may be used, if available, to supplement the funding for these Reaches.

13.   **Beneficial Environmental Projects.**

a.      Mallinckrodt will fund a total of $20 million in Committed Funding for Work on Beneficial Environmental Projects. These funds may be, but are not required to be, used for Beneficial Environmental Projects selected in consultation with the Natural Resource Damage Trustees. Unless there is Remaining Funding from other Work Categories available to supplement the Committed Funding for this Work Category, the Trustees shall recommend and fund Beneficial Environmental Projects that fit within the $20 million in Committed Funding for this Work Category.

b.      The Committed Funding for this Work Category will be allocated to the Trust Remediation Account of the Project Trust to fund Beneficial Environmental Projects, including but not limited to Restoration Projects and Tidal Marsh Projects. Any funding for this Work Category that is not yet allocated to Beneficial Environmental Projects by the Project Trust shall be allocated to the Trust Remediation Account of the Remediation Trust to fund Beneficial Environmental Projects upon termination of the Project Trust, as provided in Paragraph 33 (Termination of the Project Trust).

c.      Beneficial Environmental Projects may be recommended by the Beneficiaries or the Trustees. Decisions regarding Beneficial Environmental Projects, including Restoration Projects, to be undertaken by the Project Trust shall

24

be made by following the decision-making procedures set forth in Paragraph 32 (Limit on Decisions Regarding Work by the Project Trust).

14. **Long-Term Monitoring.**

a.      Mallinckrodt shall fund a total of $10 million in Committed Funding to the Remediation Trust's Trust Remediation Account to be used for Long-Term Monitoring of the Site (including any appropriate off-Site reference areas). This Work shall include Long-Term Monitoring at three-year intervals for a minimum period of 30 years (through 2050-2051) and a maximum period of 45 years (through 2065-2066).[1]

b.      As a contingency for Long-Term Monitoring, Mallinckrodt will pay to the Remediation Trust's Trust Remediation Account up to $10 million in Contingent Funding if the actual cost of Long-Term Monitoring exceeds the Committed Funding amount for this Work Category. If this contingency is triggered, Mallinckrodt's Capped Funding amount for Work related to Long-Term Monitoring, including Committed and Contingent Funding, shall be the lesser of the actual cost of the Work or $20 million.

---

[1] Long-Term Monitoring shall continue to take place primarily in the Spring, Summer, and Fall, with additional monitoring of seasonally migratory species during the immediately following Winter. The most recent such Long-Term Monitoring cycle was in 2020-2021. Accordingly, Long-Term Monitoring will take place in 2023-2024, 2026-2027, 2029-2030, 2032-2033, 2035-2036, 2038-2039, 2041-2042, 2044-2045, 2047-2048, and 2050-2051, and Long-Term Monitoring may take place in 2053-2054, 2056-2057, 2059-2060, 2062-2063, and/or 2065-2066.

19482152.3

c.      Beginning in advance of the Long-Term Monitoring cycle scheduled for 2053-2054, and triennially thereafter until Long-Term Monitoring is complete, the Beneficiaries and Trustee of the Remediation Trust shall attempt to reach consensus on whether to continue Long-Term Monitoring and in what form. Any disputes will be resolved as provided in Section XIV, Paragraphs 58 through 63 (Dispute Resolution). Decisions regarding Long-Term Monitoring during this period shall be based on factors including, but not limited to: (i) the mercury concentrations in biota, sediments, and water at the Site; (ii) the trends in such mercury concentrations or lack thereof; (iii) the current state of science regarding the risks of mercury; (iv) the status of any institutional controls at the Site, including fishery closures, and the need for monitoring related to such institutional controls; (v) input from State and federal regulators or other stakeholders; and (vi) the amount of Committed or Contingent Funding that remains for this Work Category and the availability, if any, of Remaining Funding from other Work Categories. Monitoring shall not continue for more than 30 years if the funding for this Work Category, including Contingent Funding for this Work Category and Remaining Funding from other Work Categories, is insufficient. If any funds from the Committed Funding for this Work Category remain after the completion of the Long-Term Monitoring, such Remaining Funding will be used as provided in Paragraph 17 (Remaining Funding).

26

15.    **Trust Administrative Costs.**

a.    Mallinckrodt will fund a total of $7 million in Committed Funding to pay the Trust Administrative Costs of the Remediation Trust and the Project Trust. As a contingency, Mallinckrodt will pay up to $10 million in Contingent Funding to pay the Trust Administrative Costs of the Remediation Trust and the Project Trust if the aggregate Trust Administrative Costs for both Trusts exceed the Committed Funding amount. Mallinckrodt's Capped Funding for Trust Administrative Costs shall be the lesser of the actual Trust Administrative Costs or $17 million.

b.    If any funds remain in the Project Trust's Trust Administrative Account upon termination of the Project Trust, as determined in accordance with the Project Trust's Trust Agreement, such funds will distributed to the Remediation Trust's Trust Administrative Account to be used for the Remediation Trust's Trust Administrative Costs.

16.    **Permitting and Regulatory Oversight Costs.** Costs and fees incurred by the Trusts to prepare and submit applications for permits and other regulatory approvals, and to pay for other regulatory oversight costs, required for Work in any Work Category shall be paid from a Trust Remediation Account using the funding allocated to that Work Category.

17.    **Remaining Funding.**

a.    Remaining Funding, as defined in Paragraph 1(ll), will be used preferentially to supplement the funding for Work in other Work Categories

27

described in Paragraphs 10 through 13 (Orrington Reach through Beneficial Environmental Projects) undertaken by the Remediation Trust. Such Remaining Funding may be used, *inter alia*, to make up any funding shortfalls for Work in other Work Categories, to fund additional remedy-specific monitoring or adaptive management, or to allow the scope of Work in other Work Categories to be expanded. The Trustee for the Remediation Trust shall determine when Work in each Work Category is complete and shall recommend any reallocation(s) of Remaining Funding, in consultation with the Beneficiaries of the Remediation Trust. Any Remaining Funding will be allocated to and expended by the Remediation Trust and will not be available to the Project Trust, however, the Trustees may coordinate Work between the Trusts if appropriate and if such coordination would not affect the tax treatment of either Trust, and subject to notice to, comment from, and opportunity for objection by the Beneficiaries.

b.      After all Work at the Site is complete, or after sufficient funds are reserved to ensure the completion of all Work at the Site, any Remaining Funding will be used for and allocated to Beneficial Environmental Projects undertaken by the Remediation Trust. Any such Beneficial Environmental Projects will be proposed by the Beneficiaries or Trustee of the Remediation Trust, subject to the decision-making procedures set forth in Paragraph 31 (Decisions Regarding Work and Deliverables).

18.     **Capped Funding.** Mallinckrodt's financial obligations under this Consent Decree will not exceed $267 million, including no more than $187 million in Committed

Funding, and no more than $80 million in Contingent Funding. Upon Mallinckrodt's complete funding of the Remediation Trust and the Project Trust as set forth in Paragraphs 10 through 15 (Orrington Reach through Trust Administrative Costs), including the distribution of any remaining Project Trust funds into the Remediation Trust upon termination of the Project Trust, and upon compliance with all other obligations imposed by this Consent Decree, Mallinckrodt's liability under this Consent Decree shall be satisfied.

19.    **Initial Funding of the Trusts.**

a.    Within 20 days after execution of the Remediation Trust Agreement, Mallinckrodt will pay to the Remediation Trust $9.5 million to be allocated as follows: $9 million to the Trust Remediation Account and $500,000 to the Trust Administrative Account.

b.    Within 20 days after execution of the Project Trust Agreement, Mallinckrodt will pay to the Project Trust $500,000 to be allocated as follows: $450,000 to the Trust Remediation Account for Beneficial Environmental Projects and $50,000 to the Trust Administrative Account, unless another allocation is agreed upon by the Parties, after consulting with the Project Trust prior to establishment of the Trusts.

c.    On or before December 31, 2022, Mallinckrodt will pay to the Trusts an additional aggregate amount of $15 million.

d.    On or before December 31 in the years 2023 through 2027, Mallinckrodt will pay to the Trusts an aggregate amount of $25 million each year,

19482152.3

unless additional funds are needed to satisfy Work and a request for such additional funds is made pursuant to Paragraph 35 (Financial Forecasts and Invoices to Mallinckrodt).

e.      On or before December 31, 2028, Mallinckrodt will pay to the Trusts an aggregate amount that will fully satisfy Mallinckrodt's obligations for Committed Funding.

f.      The Trustees shall provide annual budget forecasts for each Trust to the Parties as provided in Paragraphs 34 (Decisions Regarding Annual Budgets, Work Plans, and Cash Flow Projections) and 35 (Financial Forecasts and Invoices to Mallinckrodt). The Trustee of each Trust shall invoice Mallinckrodt as provided in Paragraph 35 (Financial Forecasts and Invoices to Mallinckrodt).

20.   **Financial Assurance.**

a.      In order to ensure adequate funding of the Trusts, Mallinckrodt shall secure financial assurance, in the form of a surety bond, initially in the aggregate amount of $65 million, for the benefit of the Trusts. The surety bond guaranteeing payment for the Work will be issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury and will be substantially in the form attached hereto as Appendix D.

b.      The Parties have selected, and the Trustee of the Remediation Trust and Plaintiffs have found satisfactory, a surety bond as the initial form of financial assurance. Within 60 days after the Effective Date, Mallinckrodt shall secure all

30

executed and/or otherwise finalized mechanisms or other documents consistent with the approved form of financial assurance and shall submit such mechanisms and documents to the Trustee of the Remediation Trust and to Plaintiffs as specified in Paragraph 64 (Notice).

      c.     If the difference between the aggregate Capped Funding and the total funding previously paid into both Trusts becomes less than $65 million, then from that time forward the amount of the surety bond shall be adjusted annually to be sufficient to ensure payment to the Trusts of the difference between the aggregate Capped Funding amount and the total funding previously paid into both Trusts.

      d.     <u>Adequacy of Financial Assurance.</u> Mallinckrodt and the Trustee of the Remediation Trust shall diligently monitor the adequacy of the financial assurance. If Mallinckrodt becomes aware of any information indicating that the financial assurance provided under Paragraph 20 is inadequate, will be cancelled, or otherwise no longer satisfies the requirements of Paragraph 20, Mallinckrodt shall notify Plaintiffs and the Trustees of such information in writing within ten (10) business days. If the Trustees and/or Plaintiffs determine that the financial assurance provided under Paragraph 20 is inadequate or otherwise no longer satisfies the requirements of Paragraph 20, Plaintiffs or the Trustees will notify in writing Mallinckrodt and the Trustees or Plaintiffs of such determination within ten (10) business days. Within thirty (30) days after any Party or the Trustees notifies the other Parties and/or Trustees of such a determination, the Parties and

31

the Trustees shall meet and confer to attempt to reach agreement on a revised or alternative financial assurance mechanism(s). If the Parties and Trustees cannot reach agreement, they shall follow the Dispute Resolution provisions of this Consent Decree. If the Parties and Trustees agree on a revised or alternative financial assurance mechanism(s), Mallinckrodt shall, within thirty (30) days after such agreement, secure and submit such mechanism(s) and documents to the Trustees and Plaintiffs as specified in Paragraph 64 (Notice). Mallinckrodt shall follow the procedures of Paragraph 20(f) (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism.

      e.    <u>Drawdown.</u> The Trustees shall have authority to require or demand a drawdown of the financial assurance in the circumstances and up to the amounts listed in subparagraphs 20(e)(i)-(iv) below.

      i.    If Mallinckrodt fails to make a required payment to a Trust within thirty (30) days of an Invoice Due Date, then the Trustee of such Trust has the authority to require a drawdown of the financial assurance mechanism(s) in an amount equal to 100% of the unpaid Invoice Amount for the Trust.

      ii.    If Mallinckrodt fails to perform any obligation under the terms of Paragraph 20 (Financial Assurance) and does not cure such failure within thirty (30) days of the Remediation Trust's Trustee providing notice of such failure, then within sixty (60) days after notice of such failure, the

32

Parties and the Trustees shall meet and confer to attempt to reach agreement on the amount to be drawn down from the financial assurance mechanism(s). If the Parties and Trustees cannot reach agreement, they shall follow the Dispute Resolution provisions of this Consent Decree.

       iii.    In the event of a notice of Mallinckrodt or its ultimate corporate parent (i) discontinuing business, (ii) applying for or consenting to the appointment of a receiver, a custodian, a trustee, an interim trustee, or liquidator of all or a substantial part of its assets, (iii) being adjudicated a debtor or having entered against it an order for relief under Title 11 of the United States Code, as the same may be amended from time to time, (iv) filing a voluntary petition in bankruptcy or filing a petition or an answer seeking reorganization or an arrangement with creditors or seeking to take advantage of any other law (whether federal or state) relating to relief of debtors, or admitting (by answer, by default or otherwise) the material allegations of a petition filed against it in any bankruptcy, reorganization, insolvency or other proceeding (whether federal or state) relating to relief of debtors, (v) suffering or permitting to continue unstayed and in effect for thirty (30) consecutive days any judgment, decree, or order entered by a court of competent jurisdiction that approves a petition seeking its reorganization or appoints a receiver, custodian, trustee, interim trustee, or liquidator of all or a substantial part of its assets, or (vi) taking any action in order thereby to effect or authorize any of the foregoing, or omitting to

take any action in order to prevent any of the foregoing, in such event each Trustee has the authority to require a drawdown of any financial assurance up to an aggregate amount equal to the sum of all not-yet-invoiced Committed Funding plus all not-yet-invoiced Contingent Funding for which the contingency's triggering condition has been met.

iv.      If a Trustee is notified by Mallinckrodt or by the issuer or guarantor of a financial assurance mechanism that the issuer or guarantor intends to cancel the mechanism, and if Mallinckrodt fails to provide an alternative financial assurance mechanism in accordance with this Paragraph 20 at least thirty (30) days prior to the cancellation date, the Trustees are authorized to require that the funds guaranteed under such mechanism must be paid to the Trusts prior to cancellation. The Trustees shall take any actions necessary to secure such payment before the mechanism is cancelled.

f.      <u>Modification of Financial Assurance.</u> To the extent that Mallinckrodt, a Plaintiff, or the Trustee of the Remediation Trust desires to change the amount(s) or mechanism(s) of the financial assurance, including discontinuance of the surety bond set forth in Paragraph 20, such Party or Trustee may submit a proposal to the other Parties and Trustee in accordance with Paragraph 64 (Notice), which must include a description of the proposed changes to the financial assurance mechanism(s) and/or amount(s) and a justification for the proposed changes. The Parties and the Trustee of the Remediation Trust shall

34

meet and confer to attempt to reach agreement on any such proposal. If the Parties and Trustee cannot reach agreement, they shall follow the Dispute Resolution provisions of this Consent Decree. Mallinckrodt may modify the financial assurance mechanism(s) and amount(s) only in accordance with: (i) the provisions of this Paragraph 20(f); (ii) the Trustee's and Plaintiffs' agreement; or (iii) if there is a dispute, the agreement or final decision resolving such dispute under Paragraphs 58 through 63 (Dispute Resolution). Within thirty (30) days after the agreement of the Trustee and Plaintiffs to, or a decision resolving a dispute relating to, any requested modifications pursuant to this Paragraph, Mallinckrodt shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the modified amount(s) and/or mechanism(s) of financial assurance and shall submit such mechanisms and documents to the Trustee and Plaintiffs as specified in Paragraph 64 (Notice).

g.      Release, Cancellation, or Discontinuation of Financial Assurance. Mallinckrodt may release, cancel, or discontinue any financial assurance provided under this Paragraph only: (i) with the agreement of Plaintiffs and the Trustees; (ii) upon the completion of the Work required by this Consent Decree and the termination of the Trusts; (iii) upon aggregate funding into the Trusts of an amount equal to the aggregate Capped Funding amount; or (iv) if there is a dispute regarding the release, cancellation, or discontinuance of any financial assurance, in accordance with the agreement or final decision resolving such dispute under

19482152.3

Paragraphs 58 through 63 (Dispute Resolution) if such agreement or final decision allows for such release, cancellation, or discontinuation of the financial assurance.

h.      Mallinckrodt's obligation to provide financial assurance consistent with this Paragraph 20 shall not limit Mallinckrodt's liability under this Consent Decree to the financial assurance it provides.

## VII.   Formation and Purpose of Penobscot Estuary Mercury Remediation Trust and Penobscot Estuary Beneficial Environmental Projects Trust

21.      **Objectives of the Parties.** The Parties agree that Mallinckrodt shall create two separate trusts, the Penobscot Estuary Mercury Remediation Trust (the Remediation Trust) and the Penobscot Estuary Beneficial Environmental Projects Trust (the Project Trust). Both Trusts shall be independent entities that, collectively, will hold the remediation funds and carry out the Work provided for in this Consent Decree. The Remediation Trust will be managed by a Trustee as set forth in this Consent Decree and the attached form of the Remediation Trust Agreement. The Project Trust will be managed by a Trustee as set forth in this Consent Decree and the attached form of the Project Trust Agreement.

22.      **Creation and purpose of the Remediation Trust.**

a.      Not later than ten (10) days after the Effective Date of this Consent Decree, and simultaneously with receipt of the initial payment to the Trust Accounts under Paragraph 19 (Initial Funding of the Trusts), the Remediation Trust shall be established. The Remediation Trust shall be funded as specified in

36

Paragraphs 19 (Initial Funding of the Trusts) and 35 (Financial Forecasts and Invoices to Mallinckrodt).

b.      As provided in this Consent Decree and in the attached Statement of Work and form of the Remediation Trust Agreement, the purpose of the Remediation Trust shall be to hold the remediation funds, other than those held by the Project Trust, provided by this Consent Decree, and, consistent with its fiduciary obligations to the Beneficiaries of the Remediation Trust and to the extent of available funding in the Trust Administrative Account and/or Trust Remediation Account, carry out administrative functions related to the Trust's operations, and develop, oversee, fund, and implement all Work at the Site in the Work Categories, pay future oversight costs and other costs as provided herein, and carry out Long-Term Monitoring at the Site. Pursuant to this Consent Decree and the attached form of the Remediation Trust Agreement, the Remediation Trust, as appropriate, shall contract with environmental, engineering, and technical consultants, contractors, and other third-party professionals to assist the Trustee in carrying out the activities necessary to achieve the purposes of the Consent Decree, and the Remediation Trust, as appropriate, shall be the entity that seeks all regulatory permits and approvals for Work required under Work Categories by this Consent Decree and the attached Statement of Work.

c.      The Remediation Trust and its Trustee shall not and are not authorized to engage in any trade or business with respect to the Trust assets or any proceeds therefrom except as and to the extent the same is deemed in good

faith by the Trustee to be reasonably necessary or proper for the conservation or protection of the Trust assets or the fulfillment of the purposes of the Remediation Trust.

d.      The Remediation Trust is intended to be a qualified settlement fund ("QSF"), for which no grantor trust election has been made, pursuant to Section 468B of the Internal Revenue Code of 1986, as amended (the "Code"), and related Treasury Regulations. The Remediation Trust and its Trustee shall not take any actions that would cause the Remediation Trust to fail to qualify as a QSF or fail to take any actions necessary to cause the Remediation Trust to qualify as a QSF.

e.      The Remediation Trust is intended to be governed by the terms of this Consent Decree and the attached form of the Remediation Trust Agreement and shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any state, now or in the future.

23.     **Creation and purpose of the Project Trust.**

a.      Not later than ten (10) days after the Effective Date of this Consent Decree, and simultaneously with receipt of the initial payment to the Trust Accounts under Paragraph 19 (Initial Funding of the Trusts), the Project Trust shall be established. The Project Trust shall be funded as specified in Paragraphs 19 (Initial Funding of the Trusts) and 35 (Financial Forecasts and Invoices to Mallinckrodt).

b.      As provided in this Consent Decree and in the attached Statement of Work and form of the Project Trust Agreement, the purpose of the Project Trust

38

shall be to hold remediation funds for Beneficial Environmental Projects as provided by this Consent Decree, and, to the extent of available funding in the Trust Administrative Account and/or Trust Remediation Account as appropriate, carry out administrative functions related to the Trust operations, and oversee, fund, and implement Beneficial Environmental Projects funded under Paragraph 13 (Beneficial Environmental Projects), including all Restoration Projects, pay costs as provided herein, and provide funding to the Remediation Trust as provided herein. The Project Trust, as appropriate, shall contract with environmental, engineering, and technical consultants, contractors, or other third-party professionals to assist the Trustee in carrying out the activities necessary to achieve the purposes of the Consent Decree relating to Beneficial Environmental Projects, and the Project Trust, as appropriate, shall be an entity that seeks regulatory permits and approvals for Work required under Beneficial Environmental Projects by this Consent Decree and the attached Statement of Work except that Mallinckrodt shall be responsible for any agreement(s) with the Natural Resource Damage Trustees.

c.     The Project Trust and its Trustee shall not and are not authorized to engage in any trade or business with respect to the Trust assets or any proceeds therefrom except as and to the extent the same is deemed in good faith by the Trustee to be reasonably necessary or proper for the conservation or protection of the Trust assets or the fulfillment of the purposes of the Project Trust.

19482152.3

d.      Upon a determination by the Project Trust's Trustee, in consultation with the Beneficiaries, all in accordance with the process set forth in Paragraph 33 (Termination of the Project Trust), that the Site and the Beneficiaries are not reasonably likely to benefit from funding or implementing a future Restoration Project and all Work on Restoration Projects previously funded and implemented by the Project Trust is complete, the Project Trust shall be terminated and any then remaining Trust assets shall be distributed to the Remediation Trust, all in accordance with Paragraph 33 (Termination of the Project Trust).

e.      The Project Trust is intended to be governed by the terms of this Consent Decree and the attached form of the Project Trust Agreement and shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any state, now or in the future.

24.    **Creation of Trust Accounts.**

a.      The Trustees shall create a Trust Remediation Account for each Trust. In its discretion, each Trustee may create subaccounts within the Trust Remediation Account, provided however, that the Trustee of the Remediation Trust shall at least create a subaccount within the Trust Remediation Account for each Work Category and shall allocate funding paid to the Remediation Trust's Trust Remediation Account between the Work Categories in accordance with the allocation stated on the invoice to which the funding relates. The purpose of the Trust Remediation Accounts shall be to provide funding and proceeds for Work

40

as selected, approved, and authorized pursuant to the terms of this Consent Decree, attached Statement of Work, and such Trust's Trust Agreement.

b.      The Trustees shall create a separate Trust Administrative Account for each Trust to hold the funds provided by Paragraph 15 (Trust Administrative Costs). The funds in a Trust's Trust Administrative Account shall be used by the Trustee to fund such Trust's Trust Administrative Costs as approved and authorized pursuant to the terms of this Consent Decree and such Trust's Trust Agreement.

c.      Assets of each Trust shall be held in trust solely for these purposes subject to any reallocation in accordance with the terms of this Consent Decree and such Trust's Trust Agreement.

d.      Pursuant to each Trust's respective Trust Agreement, each Trustee shall have the ability to engage an investment manager and to invest and reinvest the principal and income of such Trust's assets in investments that are reasonably calculated to preserve the principal value, taking into account the need for the safety and liquidity of principal as may be required to fund the Work and costs of administration of such Trust and as further limited by such Trust's Trust Agreement. Any and all earnings, interest, and other investment income realized on the investment of a Trust's assets held in a Trust Account shall be retained in the respective Trust Account and used only for the same purposes as the principal in that account as provided in such Trust's Trust Agreement and this Consent Decree, provided, however, that the Trustee shall first deduct from any income

41

realized an amount equal to the estimated taxes owed on such income and costs associated with investment of such Trust's assets to which such income relates, all as in accordance with the Trust's Trust Agreement, and deposit that sum into the Trust Administrative Account of such Trust to be used to pay such taxes and costs. The Trustee of the Trusts shall be solely responsible for the investment of the Trusts' assets in accordance with these guidelines. Mallinckrodt shall have no responsibility for, interest in, or liability whatsoever with respect to investment decisions or the actions of a Trustee, or any transactions executed by a Trustee, and such actions, decisions, or transactions shall in no event increase Mallinckrodt's financial obligations as set forth in Paragraph 18 (Capped Funding). Mallinckrodt and Plaintiffs shall have no responsibility for or liability whatsoever with respect to any investment or tax decisions, actions, transactions, or inactions of a Trustee.

25.    **Trustees.**

a.    The Court hereby approves the selection and appointment of Greenfield Penobscot Estuary Remediation Trust LLC, not individually, but solely in its representative capacity as Trustee, to be the Trustee of the Remediation Trust to administer and manage the Remediation Trust and the Remediation Trust's Trust Accounts, to implement the Work at the Site, and to fulfill all other responsibilities set forth in this Consent Decree, the attached Statement of Work, and the Remediation Trust Agreement executed by the Parties and Trustee substantially in the form attached hereto as Appendix B.

b.        The Court hereby approves the selection and appointment of Greenfield Penobscot Estuary Project Trust LLC, not individually, but solely in its representative capacity as Trustee, to be the Trustee of the Project Trust to administer and manage the Project Trust and the Project Trust's Trust Accounts, to oversee Work on Beneficial Environmental Projects, and to fulfill all other responsibilities set forth in this Consent Decree, the attached Statement of Work, and the Project Trust Agreement executed by the Parties and Trustee substantially in the form attached hereto as Appendix C.

c.        One entity, or affiliated entities, may serve as the Trustee of both Trusts. If at any point the functions of the Trustee for each Trust are assigned to separate entities, the Trustees shall enter into such contracts or agreements as are necessary to coordinate the documentation, activities, and invoices set forth in this Consent Decree and the Trust Agreements.

d.        The Trustees shall be appointed for an initial term of ten (10) years. The Trustees may resign or be terminated in accordance with the procedures set forth in the respective Trust's attached form of the Trust Agreement. Any successor Trustee of a Trust shall be jointly proposed by the Beneficiaries and appointed by the Court. If the Beneficiaries cannot agree on a successor Trustee for a Trust, a successor Trustee shall be appointed by the Court at the conclusion of the Dispute Resolution procedures of this Consent Decree.

26.    **Designation of Beneficiaries; Advisory Committee.**

a.    The Beneficiaries of each Trust shall be the sole beneficiaries of each such Trust and such Trust's Trust Accounts.

b.    Each Trustee shall, on behalf of the Trust for which it is appointed, create an informal Advisory Committee composed of representatives of the Beneficiaries, including at least one representative for Plaintiffs and one representative for Mallinckrodt. The role of any such Advisory Committee shall be to (i) facilitate dialogue between the Trustee and Beneficiaries of such Trust, (ii) seek to build consensus among the Beneficiaries, (iii) coordinate Work by the two Trusts, including facilitating dialogue between the Trustees of the Trusts and seeking to build consensus regarding transfer of the Project Trust's assets, and related liabilities, to the Remediation Trust upon termination of the Project Trust, and (iv) provide informal consultation to the Trust's Trustee regarding management of such Trust and execution of the Work required by this Consent Decree. The Advisory Committees shall not have any formal approval or decision-making authority. A Trust's Advisory Committee shall meet at the request of its Trustee, on a schedule and by means that are mutually agreeable to the Beneficiaries and Trustee. If requested by the Trustee, each Beneficiary and the other Trust shall designate one or more representatives to the Advisory Committee, each of whom may be an employee, attorney, consultant, or Trustee for the Beneficiary or other Trust. Consistent with Paragraph 50, Plaintiffs and Mallinckrodt shall not make any claim to the Trusts for, and the Trusts shall not

44

pay to any Plaintiff or Mallinckrodt, such Party's fees or costs for participation in an Advisory Committee.

## VIII.  Powers and Duties of Trustees.

27.    Each Trust's Trustee shall manage such Trust to fulfill and carry out such Trust's purposes set out in this Consent Decree and in such Trust's attached form of its Trust Agreement. The Trustees shall use each Trust Remediation Account and Trust Administrative Account only for the purposes for each account set out in this Consent Decree and in the respective Trust's attached form of its Trust Agreement. In implementing the terms of  the Consent Decree, in executing the terms of the Trusts, and in resolving any disputes, the Trustees must consider as paramount the interests of the Penobscot River Estuary, including the River itself, its flora and fauna, and its nearby inhabitants.

28.    **Remediation Trust QSF Duties**. The Trustee of the Remediation Trust shall at all times seek to have the Trust and the Trust Accounts treated as a QSF for which no grantor trust election has been made. For purposes of complying with Section 468B(g)(2) of the Internal Revenue Code, this Consent Decree shall constitute a consent decree between the Parties. Approval of the Court shall be sought, and the Court shall retain continuing jurisdiction over the Trust and the Trust Accounts sufficient to satisfy the requirements of Treasury Regulation section 1.468B-1. The Trustee will not elect to have the Trust treated as a grantor trust. The Trust shall be treated as a separate taxable entity. The Trustee shall cause taxes, if any, imposed on the earnings or holdings in any Trust Account to be paid out of such earnings or holdings and shall comply with all tax

reporting and withholding requirements imposed on the Trust under applicable tax laws. The Trustee shall be the "administrator" of the Trust pursuant to Treasury Regulation section 1.468B2(k)(3).

29.     **Project Trust's Restoration Project Duties**. The Parties intend that Work related to any Restoration Project be performed in a manner consistent with the conditions and obligations set forth in any applicable separate agreement between Mallinckrodt and the Natural Resource Damage Trustees to which such Restoration Project relates.

30.     **Decision-making Generally.** It is the intent of the Parties that the Trustee of each Trust will carry out such Trust's Work required by this Consent Decree with limited need for input or oversight from the Parties. Accordingly, except as otherwise specifically provided in this Consent Decree, the recommendations of the Trustee regarding budgeting, financial, and remediation Work issues are presumptively approved unless a Party, as a Beneficiary of such Trust, objects through the procedures set forth in this Consent Decree.

31.     **Decisions Regarding Work and Deliverables.**

a.     The Trustee of a Trust, assisted by environmental, engineering, and technical consultants, contractors, and other third-party professionals as needed, shall ensure the preparation of all appropriate work plans, schedules, design documents, contracts, permit applications, and other deliverables (collectively, the "Deliverables") necessary to carry out the Work of such Trust required by this Consent Decree and the attached Statement of Work. Each Trustee shall provide

46

draft and final copies of the Deliverables to the Trust's Beneficiaries as detailed in the attached Statement of Work.

b.      **Standard of Care**. The Deliverables, and all Work at the Site pursuant to this Consent Decree, shall be completed in a professional manner and in accordance with the level of care and skill ordinarily exercised by similar members of the profession performing similar services and practicing under similar conditions using generally accepted environmental principles and best professional practices. All services and products provided by a Trustee, or its contractor or subcontractor, shall be fit for the intended purposes and shall reflect the best professional knowledge and judgment of the Trustee.

c.      The Beneficiaries may provide comments on the draft versions of the Deliverables to the Trustee, within a timeframe specified by the Trustee that is appropriate for each particular Deliverable but not less than ten (10) business days. If a Beneficiary wishes to object to any element of any Deliverable, that Beneficiary shall initiate the Dispute Resolution process provided by this Consent Decree and, in doing so, the Beneficiary shall identify with specificity the element(s) of the Deliverable to which it objects.

d.      A Beneficiary's objection or the pendency of dispute resolution procedures shall not delay or stay any Work of a Trust unless a delay or stay is mutually agreed to by the Beneficiaries or ordered by the Court (including by a Magistrate Judge during Dispute Resolution). In deciding whether a stay is appropriate, the Beneficiaries shall consider, among other factors, the underlying

47

remedial purposes of the Consent Decree and whether a stay would result in a Trust, its Trustee, or any of its contractors or subcontractors being in breach of contract and shall seek to avoid any such breaches of contract. A dispute about a severable element of a Deliverable shall not delay or prevent implementation of other elements of the Deliverable during the pendency of the dispute. Subject to the Dispute Resolution provisions of this Consent Decree, the Trustee, after consultation with the Beneficiaries, shall determine whether elements of a Deliverable are severable.

e.      Except as provided in the Dispute Resolution provisions of this Consent Decree or in other specific provisions of this Consent Decree, no additional action or approval by the Court or any Party or Beneficiary is required for a Trustee to carry out the Work required by this Consent Decree and attached Statement of Work.

32.     **Limit on Decisions Regarding Work by the Project Trust.**

a.      The Trustee of the Project Trust shall recommend Beneficial Environmental Projects to be funded and implemented by the Project Trust, and each of the Beneficiaries may propose Beneficial Environmental Projects to the Trustee. Mallinckrodt shall notify the Trustee and other Beneficiaries if a proposed project qualifies as a Restoration Project. For projects that qualify as a Restoration Project, the Trustee shall propose to fund such project in the Project Trust's budget and work plans unless such project would violate a provision of this Consent Decree and subject to any Beneficiary's right to comment on or object to the project

48

or its budget or work plans. In determining what projects to recommend and fund as Beneficial Environmental Projects, the Trustee shall consider, among other factors, whether the project was recommended by a Beneficiary, the requirements of Paragraph 13 (Beneficial Environmental Projects), and the funding schedule established in Paragraph 32(b).

      b.      The Trustee of the Project Trust shall make all Feasible efforts to fully allocate or commit the funding provided in Paragraph 13 for the Beneficial Environmental Projects Work Category within four (4) years after the Effective Date, although the Work to implement such projects may continue after that time. It is the intent of the Parties and the Court that, if Feasible, the funding provided in Paragraph 13 (Beneficial Environmental Projects) shall be fully committed or spent within six (6) years after the Effective Date, except for any funds reserved for operations, maintenance, or monitoring related to a Beneficial Environmental Project. The time limits in this Paragraph for allocating and spending funding may be modified or waived by agreement of the Parties or extended as necessary and appropriate to Feasibly implement the Beneficial Environmental Projects Work Category, as recommended by the Trustee of the Project Trust subject to comment or objection by the Parties. The Trustee of the Project Trust shall not delay the recommendation, selection, funding, and implementation of Beneficial Environmental Projects on account of Mallinckrodt's efforts to secure agreements with the Natural Resource Damage Trustees regarding Restoration Projects if such

19482152.3

delay would jeopardize the Project Trust's ability to meet the timelines set forth in this subparagraph.

      c.     With respect to Beneficial Environmental Projects that may qualify as Restoration Projects:

      i.     Mallinckrodt is solely responsible for coordination and negotiation with the Natural Resource Damage Trustees regarding Restoration Projects and for timely obtaining agreements, if any, with the Natural Resource Damage Trustees regarding Restoration Projects. The Trustee of the Project Trust shall work in good faith with Mallinckrodt to successfully implement Restoration Projects and shall supply all information reasonably requested by Mallinckrodt in negotiating with the Natural Resource Damage Trustees regarding Restoration Projects.

      ii.     The Natural Resource Damage Trustees are not parties to this Consent Decree and this Consent Decree does not create, extinguish, or alter any rights, duties, or obligations of the Natural Resource Damage Trustees. This Consent Decree does not require any action by, impose any duties or procedures on, or in any way constrain the discretion of, the Natural Resource Damage Trustees. References to the Natural Resource Damage Trustees in this Consent Decree are solely to acknowledge the possibility of voluntary interactions between Mallinckrodt and the Natural Resource Damage Trustees with respect to the Project Trust and the Beneficial Environmental Projects implemented thereby. The Project Trust shall not

50

be obligated to directly negotiate with the Natural Resource Damage Trustees, and fulfillment of the Project Trust's purpose is not contingent on it undertaking any Restoration Projects.

d.      The Trustee shall deliver copies of each Beneficial Environmental Project recommendation, including details relating to the cost, Work, whether such Beneficial Environmental Project will be used to satisfy a separate agreement with Natural Resource Damage Trustees, and reasons for recommendation of the Beneficial Environmental Project, to the Beneficiaries. The Beneficiaries may comment on or object to the Beneficial Environmental Project recommendation within a timeframe that is specified by the Trustee that is appropriate for analysis of such recommendations, but not less than thirty (30) days. Within ten (10) business days of selecting a Beneficial Environmental Project for funding and implementation, the Trustee shall notify the Beneficiaries. If a Beneficiary wishes to object to the funding and implementation of a Beneficial Environmental Project, that Beneficiary shall initiate the Dispute Resolution process provided by this Consent Decree and, in doing so, the Beneficiary shall identify with specificity the element(s) of the project to which it objects.

e.      A Beneficiary's objection or the pendency of dispute resolution procedures with respect to a Beneficial Environmental Project shall not delay or stay any funding or Work on such project unless a delay or stay is mutually agreed to by the Beneficiaries or ordered by the Court (including by a Magistrate Judge during Dispute Resolution). In deciding whether a stay is appropriate, the

51

Beneficiaries shall consider, among other factors, the underlying remedial purposes of the Consent Decree and whether a stay would result in the Trust, its Trustee, or any of its contractors or subcontractors being in breach of contract and shall seek to avoid any such breaches of contract.

33.  **Termination of the Project Trust**.

a.  Upon the fifth (5th) anniversary of the Effective Date and annually thereafter, the Trustee of the Project Trust, in consultation with the Project Trust's Advisory Committee, shall review and analyze the extent, if any, of Work outstanding on current Restoration Projects and the likelihood of any future Restoration Projects. The Trustee shall prepare in these years, to be delivered with the annual budgets, work plans, and cash flow projections set forth in Paragraph 34 (Decisions Regarding Annual Budgets, Work Plans, and Cash Flow Projections), a forecast of when the Trustee reasonably expects all Work on Restoration Projects to be completed with no future Restoration Projects foreseeable.

b.  In any year in which the Trustee of the Project Trust, in consultation with the Advisory Committee, determines that the Site and Beneficiaries are not reasonably likely to benefit from funding or implementing a future Restoration Project and that all Work on Restoration Projects previously funded and implemented under the Project Trust is complete, the Trustee shall deliver its determination to the Beneficiaries of the Project Trust, which shall include the reasoning for such determination, a statement of the Trust assets currently held in

its Trust Accounts, the status of any Beneficial Environmental Projects with Work still outstanding, and the Trustee's proposal for a timeline to terminate the Project Trust and the extent of any Beneficial Environmental Projects that are proposed to be transferred to the Remediation Trust.

        c.     The Beneficiaries may provide comments on this proposed timeline of termination within a timeframe that is specified by the Trustee that is appropriate for analysis of such recommendations, but not less than ninety (90) days. The Trustee shall consider the Beneficiaries' comments and objections, if any, and determine that the Project Trust shall not then proceed to terminate or that the Trustee shall move forward with the process of terminating the Trust, in which latter case the Trustee shall deliver to the Beneficiaries a final timeline for termination. In deciding whether termination is appropriate, the Trustee shall consider, among other factors, any new information regarding the foreseeability of the Site or a Beneficiary benefiting from a future Restoration Project and whether the Trustee of the Remediation Trust has objected to the transfer of an outstanding Beneficial Environmental Project to the Remediation Trust. The Trustee shall not terminate the Project Trust unless all Work on Beneficial Environmental Projects has been completed or the Trustee of the Remediation Trust has agreed to accept the distribution of outstanding Beneficial Environmental Projects into the Remediation Trust. If a Beneficiary wishes to object to any such final timeline of termination, that Beneficiary shall initiate the Dispute Resolution process provided by this Consent Decree and, in doing so, the

53

Beneficiary shall identify with specificity the element(s) of the timeline or termination decision to which it objects. A Beneficiary's objection, or the pendency of dispute resolution procedures with respect to the termination of the Project Trust, shall delay or stay any activities to move forward with such termination unless otherwise mutually agreed to by the Beneficiaries or ordered by the Court.

d.      In terminating the Project Trust, the Trustee shall coordinate with the Remediation Trust's Trustee to distribute all Trust assets held in the Project Trust's Trust Accounts, and all liabilities relating thereto, to the Remediation Trust.

34.    **Decisions Regarding Annual Budgets, Work Plans, and Cash Flow Projections.**

a.      By October 1 of each year, the Trustee of each Trust shall prepare drafts of an annual budget, work plans, and cash flow projections by quarter for the next calendar year for such Trust's Trust Remediation Account and Trust Administrative Account. Such budgets, work plans, and cash flow projections shall be sufficiently detailed to distinguish clearly the budgets and work proposed for each separate Work Category and for other general categories of work, such as Long-Term Monitoring, oversight costs, administrative costs, and permitting costs, and an explanation of any contingency that has or is reasonably likely to occur and trigger Contingent Funding for a particular Work Category and Trust Account. The Trustees of the Trusts shall coordinate in preparing and providing such budgets, work plans, and cash flow projections for each Trust.

54

b.      The Trustees' initial draft budgets, cash flow projections, and work plans shall be provided to the Beneficiaries within sixty (60) days after the Effective Date of this Consent Decree and shall cover at least the period through the next calendar year. Thereafter, draft budgets, cash flow projections, and work plans for each Trust shall be provided to the Beneficiaries by October 1 each year. A Beneficiary may comment on or object to any element of a Trustee's draft budgets, cash flow projections, and work plans by providing written notice of such comments or objections to the other Beneficiaries and such Trustee by December 1 each year or, in the first year, within thirty (30) days after receipt of the initial draft budgets, cash flow projections, and work plans.

c.      Such Trustee shall consider the Beneficiaries' comments and objections, if any, and propose final budgets, cash flow projections, and work plans to the Beneficiaries by January 1 each year or, in the first year, within thirty (30) days after receipt of all comments from the Beneficiaries. A Beneficiary must lodge any objection to any element of a proposed final budget, cash flow projection, or work plan by initiating the Dispute Resolution provisions of this Consent Decree within ten (10) days after receiving the proposed final budgets, cash flow projections, and work plans from a Trustee. Each severable element of a proposed final budget, cash flow projection, or work plan shall be deemed approved unless it is objected to with specificity through the procedures set out in this Paragraph. Subject to the Dispute Resolution provisions of this Consent

19482152.3

Decree, a Trustee shall determine whether elements of a budget or work plan are severable.

d.      The Trustees shall provide to the Beneficiaries the final annual budgets, cash flow projections, and work plans for each Trust's Trust Remediation Account and the Trust Administrative Account by January 15 each year or, in the first year, within fifteen (15) days after the proposed final budgets, cash flow projections and work plans have been issued. Such final budgets, cash flow projections, and work plans shall denote any element that is subject to ongoing dispute resolution, and updated versions shall be provided to the Beneficiaries following the resolution of any such dispute.

e.      Each Trust's Trustee shall implement each final budget, cash flow projection, and work plan for such Trust. The Trustee may cause such Trust to pay any expense included in an approved element, or element to which the Parties do not object, of a final budget for such Trust without any additional authorization, subject to the Dispute Resolution provisions of this Consent Decree regarding stay of an element as to which a dispute exists.

35.   **Financial Forecasts and Invoices to Mallinckrodt.**

a.      Beginning no later than the first regular budget cycle described in Paragraph 34 (Decisions Regarding Annual Budgets, Work Plans, and Cash Flow Projections), the Trustee of each Trust shall develop a five-year budget forecast by quarter and update the budget forecast for such Trust at least annually (Five-Year Forecast). The Five-Year Forecast shall include proposed dates and amounts for

56

Mallinckrodt's future payments to such Trust. The Trustees shall provide the Five-Year Forecasts to the Parties on the same schedule as the budgets, cash flow projections, and work plans required by Paragraph 34 (i.e., draft by October 1, proposed final by January 1, and final by January 15).

b.      The Trustees shall invoice Mallinckrodt annually for payments to the respective Trusts at least sixty (60) days prior to the due date stated on the invoice (the "Invoice Due Date"), with copies to Plaintiffs. It is the intent of the Parties and the Court that the Trusts will hold sufficient funds, including reserves, to ensure continuation of the Work at the Site without interruption and to allow the Trustees to enter into contracts on favorable terms. As provided in Paragraph 19 (Initial Funding of the Trusts), Mallinckrodt will pay an aggregate amount of $25 million to the Trusts by December 31, 2021. Thereafter, and until the remaining Committed Funding has been paid to the Trusts, the Trustees shall endeavor to hold in the Remediation Trust, in aggregate, an amount in reserves equal to at least $25 million (the "Reserve"), which amount shall not be taken into consideration in determining the amount to invoice Mallinckrodt for purposes of the Trusts holding sufficient funds to ensure continuation of Work at the Site without interruption. The Reserve shall be used after all other Committed Funding other than the Reserve has been spent on Work.

c.      Beginning in 2022 and annually thereafter until 2026, the amount of each invoice shall be $25 million or a greater amount if necessary to maintain a balance in each Trust that is sufficient to continue the Trust's Work at the Site

19482152.3

without interruption for at least the upcoming 36-month period following the Invoice Due Date, satisfy all executed contracts, and avoid any delay in continuous Work at the Site (the "Invoice Amount"), subject to the following additional conditions:

i.      Until all Committed Funding is fully invoiced, the Trustees shall invoice, and Mallinckrodt shall pay to the Trusts, an aggregate annual amount of Committed Funding of $25 million through 2026, subject to the overall cap on Committed Funding of $187 million. Any invoice amounts for Contingent Funding are not subject to these limits.

ii.      The Trustees shall provide written notice to Mallinckrodt in an annual budget or Five-Year Forecast of an upper limit on the Invoice Amount(s) to be invoiced in any 12-month period by the Trustees, collectively, at least 12 months prior to the Invoice Due Date(s). Mallinckrodt shall not be obligated to pay in any 12-month period, and the Trustees, collectively, shall not invoice in any 12-month period, through one or multiple invoices, an aggregate amount greater than $25 million or the amounts previously disclosed with at least 12 months' notice in the Trustees' annual budgets or Five-Year Forecasts.

iii.      The Trustees of the Trusts shall coordinate in preparing and providing such invoices to Mallinckrodt to ensure the Invoice Amounts and information contained in the invoices comply with this Paragraph.

58

iv.     Mallinckrodt shall fund the Invoice Amount(s) by their respective Invoice Due Dates and has the option, but not the obligation, to fund at any time any or all of its not-yet-invoiced Committed Funding obligations. The Trustees shall continue to invoice Mallinckrodt for payments to the Trusts until Mallinckrodt's financial obligations under this Consent Decree are fully satisfied.

d.     The Trustee of the Remediation Trust shall not invoice Mallinckrodt for any Work on Beneficial Environmental Projects funded under Paragraph 13 (Beneficial Environmental Projects) unless the Remediation Trust's right, if any, to Committed Funding for that Work Category vests in accordance with Paragraph 33 (Termination of the Project Trust).

e.     Each invoice shall include the Invoice Due Date, the Work Categories and Trust Accounts to be funded by the Invoice Amount, and the portions of the Invoice Amount that are Committed Funding and Contingent Funding for each Trust Account. After the Committed Funding is fully paid to the Trusts, the Trustees need not prepare an invoice in any year in which no Contingent Funding is due to the Trusts but shall notify the Parties that there will be no invoice in any such year.

f.     If Mallinckrodt fails, in whole or in part, to make a required payment to a Trust by the Invoice Due Date, the Trustee of such Trust shall follow the procedures in Paragraph 20(e) (Drawdown) to obtain funds for such Trust from the financial assurance(s), unless (i) Mallinckrodt has initiated the Dispute

59

Resolution process with regard to the payment, or a portion of the payment, to the Trust, and (ii) a stay of the Invoice Due Date has been mutually agreed to by the Parties or ordered by the Court (including a Magistrate Judge during Dispute Resolution).

36.   **Recordkeeping Requirements.** The Trustees shall maintain proper books, records, and accounts relating to all transactions pertaining to the Trusts, and the assets and liabilities of, and claims against or assumed by, the Trusts in such detail and for such period of time as may be necessary to enable the Trustees to make a full and proper accounting thereof and to comply with applicable provisions of law and good accounting practices.

37.   **Annual Audit.** Every calendar year, a public accounting firm independent of the Trustees and the Parties shall audit the books and records of each Trust. Such independent public accounting firm shall be recommended by the Parties and approved by the Court in accordance with the following procedures: Not later than thirty (30) days after the Effective Date of the Trust Agreements, the Parties shall meet and confer in an effort to agree upon the selection of a recommended public accounting firm to perform the annual audit of the Trusts. If the Parties agree on a recommended public accounting firm, then within sixty (60) days after the Effective Date of the Trust Agreement, they shall submit to the Court a request for approval of such recommendation. If the Court denies approval,  then the Parties shall further confer and, if they reach agreement, submit an alternative recommendation within thirty (30) days after the Court's denial. If the Parties cannot agree on a recommended public accounting firm, a public accounting

60

firm shall be selected by the Court at the conclusion of the Dispute Resolution procedures of this Consent Decree. The public accounting firm selected to perform annual audits may be modified from time to time in accordance with the procedures provided herein.  The costs of each annual audit shall be paid by the Remediation Trust and Project Trust, respectively as Trust Administrative Costs pursuant to Paragraph 15.

38.     **Quarterly Reporting Requirements.** Within ninety (90) days after the end of each calendar quarter (which shall end on March 31, June 30, September 30, and December 31), beginning with the quarter ended after assets are first received by a Trust and ending as soon as practicable upon termination of such Trust, the Trustee of each Trust shall submit to the Beneficiaries, and the Trustee shall file with the Court, a written report on such Trust, including all contents required by the attached Statement of Work and at least:

a.     Financial statements of the Trust and Trust Accounts at the end of such calendar quarter and the receipts and disbursements of the Trust for such quarter; and

b.     A description of the cumulative actions taken to date by the Trust or Trustee in the performance of the duties set out in this Consent Decree and its attachments, including plans for upcoming Work.

39.     **Selection and Hiring of Contractors.** Each Trust and its Trustee may retain environmental, engineering, and technical consultants, contractors, and other third-party professionals to carry out the Work required by this Consent Decree. Such technical consultants, contractors, and other third-party professionals shall be recommended by

61

the Trustee and shall contract with such Trust, and the Beneficiaries shall have a reasonable opportunity to comment on or object to these recommendations, in accordance with Paragraph 31 (Decisions Regarding Work and Deliverables) and the terms of the Trust's Trust Agreement and the Statement of Work, prior to finalizing any such contracts.

40.     **Contracting and Permitting Contingency**. It is the intent of the Parties that the Trusts will carry out the functions assigned to them in this Consent Decree including, but not limited to, entering into contracts and applying for permits to carry out the Work. If any Trustee determines that, for any reason, it is not Feasible for a Trust to take an action contemplated by this Consent Decree including, but not limited to, entering into contracts, applying for permits, or accepting the terms and conditions of any permit related to the Work, such Trustee shall notify the Beneficiaries of such Trust within ten (10) business days. The Trustee and Beneficiaries of such Trust shall meet and confer and attempt to reach agreement on an alternative method to allow the Trust to carry out the Work required by this Consent Decree and, if necessary, may propose modifications to this Consent Decree, a Trust Agreement, or the Statement of Work, subject to the dispute resolution and modification terms in Paragraphs 58 through 63 and 69 (Dispute Resolution; Modifications).

41.     **Community Involvement.**

a.      The Trustees shall actively solicit community input and facilitate community engagement, and will consider the following:  frequent outreach to key stakeholders, elected and community leaders, community organizations,

and media representatives; community and public meetings, focus groups, availability sessions, open houses and other community events; establishment of a website with an online information and document repository; correspondence and distribution of all electronic information files via email; online contact forms for submission of comments and questions by the public; a 24-hour hotline phone number, emergency response numbers and contact information while Work is occurring at the Site so that residents and stakeholders can ask questions and report concerns on a real-time basis; distribution of materials, such as newsletters, community event flyers, fact sheets, project updates, community surveys, and notices of comment periods, by U.S. mail, email, and hand delivery; placement of online and print advertising; outdoor signage; one-on-one meetings with individual residents and stakeholders; and engagement of a Community Involvement Coordinator.  The Trustee itself, not its consultants, will lead the Penobscot community involvement efforts.

      b.    The Trustees shall make themselves available and accessible to the community residing near, or interested in, the Penobscot River Estuary. They will seek early input, listen carefully to stakeholder feedback, and follow up on requests and questions so that individuals and groups are certain about their impact on the cleanup process and results.  In approaching the Work, the Trustees shall strive to engage all key stakeholders—local government representatives, local businesses (including those whose livelihoods depend on the River), landowners and residents, educators and students, environmental groups, local

63

fishing associations, and the Penobscot Nation. The Trustee shall take into account divergent goals, interests, and views of various stakeholders and incorporate community feedback wherever possible to support efficient, cost-effective cleanup of the River, mindful that finite cleanup funds must be dedicated to restoration of the Estuary.

c.      The Trustees shall establish a physical presence, including an office and community resource center, in the vicinity of the Penobscot River Estuary. The Trustees will also incorporate Maine-based people into their teams and, wherever possible, invest in the local economy, including by hiring local businesses, contractors, and vendors. The Trustees will issue advance notice to ensure businesses are aware of the Trustees' upcoming needs.

42.     **Compliance with Applicable Laws.** In carrying out their duties under this Consent Decree, the Trustees shall abide by all applicable laws, including any local, state, and federal permitting requirements for Work undertaken in fulfillment of this Consent Decree.

## IX.     Cooperation and Obligations of the Parties Regarding the Trustees.

43.     Not later than thirty (30) days after the Effective Date of the Trust Agreements, Mallinckrodt shall provide, or cause to be provided, to the Trustees, as applicable, all final reports, technical memoranda, and/or data regarding the Site from the Court-ordered Phase I, Phase II, and Phase III Studies that were generated by the Study Panel or Amec, including a copy of the Phase III Engineering Study project database, with notice to the Plaintiffs of such transmittal. No Party is required to provide

to the Trustees information, reports, or data prepared by that Party, its attorneys, consultants, or representatives, and this Paragraph does not require disclosure of information protected by the attorney-client privilege, work-product doctrine, or other legally recognized privileges; provided, however, that the Trusts will not incorporate into the Work, or be responsible for, any non-public information withheld by any Party under any claim of privilege. After providing the required materials to the Trustees, any Party may provide to the Trustees any additional relevant environmental information, reports, and/or data regarding the Site from the Court-ordered Phase I, Phase II, and Phase III Studies, with notice to the other Parties. Such environmental information, reports, and/or data shall be provided to the Trustees in the state and condition in which such information, reports, and/or data are found.

44.     Upon reasonable notice, Mallinckrodt shall not unreasonably deny access to a Trustee or any consultants, contractors, and/or third-party professionals hired to fulfill the Work required by this Consent Decree to any property owned by Mallinckrodt or a Mallinckrodt Related Entity at the HoltraChem Site for any use consistent with this Consent Decree. Mallinckrodt need not provide such access if doing so would create an irreconcilable conflict with ongoing remediation work overseen by the State of Maine at the HoltraChem Site.

## X.     Limitations on Liability and Indemnifications.

### 45.     Limitations on Liability of the Trusts, Trustees, and Trust Parties.

a.     The Parties acknowledge that neither the Trust, the Trustees, nor the Trust Parties created, caused, or contributed to the circumstances that give rise to

65

the need to perform the Work, including existing conditions or existing contamination at the Site. Therefore, nothing in this Consent Decree, Statement of Work, or the Trust Agreement shall require the Trust, the Trustees, or the Trust Parties to take or assume any liability pursuant to CERCLA, RCRA, the Maine Uncontrolled Hazardous Substance Sites Law, or any other statute, regulation, or other applicable requirements associated with Work due to existing contamination or conditions.

b.      In no event shall a Trust, Trustee, or Trust Party be held liable to any third-party entity or person for any liability, action, or inaction of any third-party entity or person. In the event of any claim or cause of action by a third party, including but not limited to a governmental entity, against a Trust, Trustee, or Trust Party and arising out of the discharge of the powers and duties conferred by this Consent Decree or the applicable Trust Agreement, such liability shall be satisfied first from any available insurance and then, if necessary, from the assets already in the applicable Trust Administrative Account not including any not-yet-invoiced Committed or Contingent Funding; provided, however, that the assets of the Trust shall not be used to the extent the Trust, Trustee, or Trust Party's acts or omissions leading to such claims constitute(s) gross negligence, willful misconduct, or fraud as determined by the Court.

c.      Unless otherwise provided for in the Trust Agreements, the liability of a Trust, Trustee, or Trust Party for any actions or inactions taken pursuant to this Consent Decree, the attached Trust Agreements, or any order of Court entered

66

pursuant to or in furtherance of this Consent Decree, the attached Trust Agreements, or applicable law, including any liability incurred as a result of the Trust's application for or receipt of permits or other regulatory approvals for Work conducted pursuant to this Consent Decree or actions carried out pursuant to the terms of the Trust Agreements, shall be limited to such Trust's insurance coverage and, if such liability is in excess of available insurance coverage, to assets already in the applicable Trust Administrative Account not including any not-yet-invoiced Committed or Contingent Funding. A Trust's liability or indemnification of a Trust Party for a liability shall be satisfied first from insurance and then, if necessary, from available funding already in the applicable Trust Administrative Account, and a Trust's aggregate liability or indemnification shall not exceed the combination of the limits of applicable insurance coverage and the available funding already in the Trust Administrative Account.

d.      No Trustee or Trust Party shall be personally liable unless the Court, by a final order, finds that it was grossly negligent or committed fraud or willful misconduct after the earlier of the Effective Date or the date on which either Trust receives funds pursuant to Paragraph 19 (Initial Funding of the Trusts), in relation to such Trustee's or Trust Party's duties.

e.      Except as may otherwise be provided herein or in the Trust Agreements: (i) the Trust Parties may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to

67

19482152.3

have been signed or presented by the proper entity(ies) or representative(s) pursuant to this Consent Decree; (ii) the Trust Parties may retain and rely on the advice of legal counsel, financial or accounting advisors, and other professionals and experts, within the approved budget allowances for such expenses, and no Trust Party shall be personally liable for any action taken or not taken in accordance with the advice thereof unless this Court, by a final order, finds that such Trust Party committed fraud or willful misconduct; and (iii) persons dealing with a Trust Party shall look only to such Trust's insurance and indemnification, consistent with this Consent Decree, to satisfy any liability incurred by such Trust Party to such person(s) in carrying out the terms of this Consent Decree or any order of the Court, and a Trust Party shall have no personal obligations to satisfy any such liability, other than as provided in Paragraph 45(d).

46.     **Limitations on Plaintiffs' Liability.** Plaintiffs MPA and NRDC shall not be deemed to be an owner, operator, trustee, partner, agent, shareholder, officer, or director of the Trusts, Trustees, or Trust Parties on account of this Consent Decree or actions contemplated thereby. Plaintiffs at no time will become an owner or operator of the Site or an owner, operator, generator, handler, arranger, or transporter of any Waste Material at the Site under CERCLA, RCRA, the Maine Uncontrolled Hazardous Substance Sites Law, or similar laws on account of this Consent Decree or actions contemplated thereby. Plaintiffs shall not be liable for any injury or damages to persons or property resulting from acts or omissions of any entity in implementing the requirements of this Consent Decree. In addition, liability shall not arise from the Plaintiffs' actions to enforce

68

provisions of this Consent Decree, provide comments or make objections, or trigger dispute resolution, as provided in this Consent Decree. Notwithstanding these limitations, if Plaintiffs are held liable for any injury or damages to persons or property resulting from acts or omissions of any Trust, or its Trustee or Trust Party, such Trust shall indemnify Plaintiffs and shall satisfy such liability first from the Trust's insurance and then, if necessary, from the Trust assets.

47. **Insurance Policies.** The Trustees, and any consultants or contractors retained by a Trust or a Trustee, shall maintain insurance policies consistent with the requirements in the attached Statement of Work and forms of the Trust Agreements. On all such insurance policies, MPA, NRDC, and Mallinckrodt shall receive insured protection with a right to defense by the insurer.

## XI.   Covenants

48. Except as provided in Paragraph 55 (Plaintiffs' Attorneys' Fees and Costs) and Paragraphs 58 through 63 (Dispute Resolution), MPA and NRDC covenant not to sue Mallinckrodt pursuant to RCRA or any other legal authority for remediation of or damage to natural resources arising from mercury contamination relating to the Site or the HoltraChem Site. MPA and NRDC covenant not to intervene or participate as amicus curiae in any administrative or judicial proceeding or cause of action against Mallinckrodt arising from mercury contamination relating to the Site or the HoltraChem Site, except that MPA and NRDC may intervene or participate as amicus curiae, for the purpose of ensuring and defending the implementation of this Consent Decree, in any administrative or judicial proceeding that may affect, impede, delay, interfere with, result

69

in relief inconsistent with, or otherwise frustrate the implementation of the Work required by this Consent Decree. These covenants shall take effect upon the Effective Date, except that these covenants are conditioned upon Mallinckrodt's satisfactory performance of its duties and obligations under this Consent Decree and shall not in any way impair Plaintiffs' right to seek to enforce the terms of this Consent Decree. These covenants extend only to Mallinckrodt and Mallinckrodt Related Entities and do not extend to any other person or entity. These covenants bind NRDC and MPA to the full extent allowed by Federal Rule of Civil Procedure 65(d)(2), including any person or entity, if any, that was in privity with NRDC or MPA or is otherwise bound by this judgment as a matter of law.

49.    Except through the Dispute Resolution provisions in Paragraphs 58 through 63 and the comment and objection procedures provided by this Consent Decree, MPA, NRDC, and Mallinckrodt covenant not to oppose or impede, directly or indirectly, any actions taken by the Trusts or Trustees to fulfill their duties and obligations, and carry out the Work, required by this Consent Decree. For purposes of this Paragraph, "oppose" or "impede" includes any action to delay, hinder, obstruct, disparage, or undermine the actions of the Trusts or Trustees through any process or public statement including, but not limited to, opposing or challenging any permit sought or obtained by the Trusts or Trustees or publicly opposing or challenging any Work proposed or undertaken by the Trusts or Trustees. For purposes of this Paragraph, "directly or indirectly" means that a Party shall not fund, assist, encourage, abet, or otherwise support any third party in taking any action that the Party is prohibited from taking. To the fullest extent possible,

70

the Parties agree and covenant to fully cooperate to efficiently and effectively carry out the intent of this Consent Decree and the Trust Agreements, but nothing in this paragraph requires the Parties to expend funds, to accept liability or responsibility, or to indemnify or hold harmless the Trusts, the Trustees, or the Trust Parties except to the extent such is required elsewhere in this Consent Decree or the Trust Agreements.

50.     MPA, NRDC, and Mallinckrodt shall make no claim on the Trusts or the Trust Accounts for payment or reimbursement of any past costs incurred up to the Effective Date, nor for any future costs incurred by a Party after the Effective Date, except that Mallinckrodt shall have a claim to distributions from the interest and earnings of funds in the Project Trust solely for the purpose of paying taxes owed upon such interest and earnings of such Trust, as provided in the Project Trust Agreement.

51.     **Mutual Covenants Not to Sue Between Parties and Trust Parties**.  Except as specifically provided herein or in the Trust Agreements, and without limiting the Parties' or the Trustees', if applicable, rights to seek to enforce the terms of the Consent Decree, Statement of Work, Remediation Trust Agreement, or Project Trust Agreement and to seek dispute resolution as provided in this Consent Decree, upon the earlier of the Effective Date or the date on which either Trust receives funds pursuant to Paragraph 19 (Initial Funding of the Trusts), the Parties covenant not to sue or assert any claims or causes of action against any of the Trust Parties with respect to the matters addressed herein, except to the extent such claims or causes of action are attributable to a Trust Party's fraud or willful misconduct as determined by the Court, and the Trust Parties covenant not to sue or assert any claims or causes of action against any Party.

## XII.   Additional Agreements Between the Parties

52.   **Penobscot River Study Panel Fund.** After the Effective Date, the Penobscot River Study Panel Fund shall not be used to pay any costs or fees other than those incurred for long-term monitoring activities in 2020 and 2021 that were approved in the Consent Order for 2020 Monitoring, ECF No. 1053, or fees or costs of the Special Master incurred up to the Effective Date. Mallinckrodt may move to close the Penobscot River Study Panel Fund and to refund any funds remaining in the Penobscot River Study Panel Fund after the Effective Date and at such time as there are no reasonably foreseeable costs or fees chargeable to the Penobscot River Study Panel Fund.

53.   **Bar on Inconsistent or Duplicative Claims or Remedies.**

a.   The Parties agree, and the Court by endorsing this Consent Decree finds, that:

i.   Mercury discharges from the HoltraChem Site commenced when the chlor-alkali plant on the HoltraChem Site began operations in late 1967. ECF No. 147 at 4;

ii.   In 1970, the United States brought suit against Mallinckrodt's predecessor, then owner and operator of the HoltraChem Site, related to mercury discharges from the HoltraChem Site. *Id.* at 5;

iii.   In 1972, Mallinckrodt's predecessor entered a consent decree with the United States authorizing some limited discharge of mercury into the Penobscot River;

72

iv.      Mallinckrodt's predecessor sold the HoltraChem Site to Hanlin Group, Inc. ("Hanlin") on or around April 30, 1982, ECF No. 147 at 3, and Mallinckrodt is not responsible for any mercury discharge from plant operations at the HoltraChem Site after that date;

v.      In 1986, the United States Environmental Protection Agency ("EPA") filed a RCRA administrative action against Hanlin related to discharges of hazardous substances, including mercury, from the HoltraChem Site. That action resulted in a consent agreement entered that same year. *Id.* at 6;

vi.      EPA brought a subsequent action in 1991 to enforce the 1986 consent agreement, and, in 1993, the Court entered a consent decree between EPA and Hanlin that superseded the 1986 consent agreement. *Id.* at 7;

vii.      In the ensuing years, the Maine Department of Environmental Protection worked closely with EPA in commenting on and overseeing work performed under the 1993 consent decree. *Id.* at 7-8;

viii.      In 2000, Plaintiffs filed their complaint in this matter under the RCRA, 42 U.S.C. § 6972(a)(1)(B), alleging that mercury contamination in the Penobscot River Estuary presented or may have presented an imminent and substantial endangerment to health and the environment. ECF No. 1;

ix.      The Court has previously found in 2002 and 2015 that the mercury contamination in the Penobscot River estuary presents or may

73

present an imminent and substantial endangerment to health and to the environment under RCRA. ECF No. 147 at 22; ECF No. 829 at 39. Evidence of such endangerment was presented publicly during the trials in this matter in 2002 and 2014, and in the Court's orders in 2002 and 2015;

x.      The Court found in 2002 that mercury concentrations in various Penobscot River Estuary organisms, including killifish, lobster tomalley, blue mussels, and cormorants, were elevated. ECF No. 147 at 17-20;

xi.     The Court found in 2002 that individuals who lived on or near the Penobscot River suffered injuries fairly traceable to the mercury discharged from the HoltraChem Site, including from elevated levels of mercury in fish and shellfish. *Id.* at 26-27;

xii.    In November 2003, the Court ordered the creation of a Study Panel to conduct a two-phase study of mercury in the Penobscot River Estuary. ECF No. 159;

xiii.   The purpose of the study was to determine the following: (1) the extent of the existing harm resulting from mercury contamination to the Penobscot River Estuary south of the HoltraChem Site; (2) the need for and feasibility of a remediation plan to effectively address the present effects of such existing harm, if any; and (3) the elements of and timetable for the execution of the appropriate remediation plan to address the harm existing as a result of mercury contamination. *Id.* at 1-2;

74

xiv.   Among the questions the Study Panel was charged with answering was whether mercury in the Penobscot River Estuary was "having significantly adverse effects on populations of organisms" in the Penobscot River Estuary. *Id.* at 2;

xv.   The Study Panel submitted a 117-page report ("Phase I Report") on January 25, 2008. ECF No. 382. The Phase I Report concluded that the Penobscot River Estuary was "contaminated with [mercury] to an extent that poses endangerment to some wildlife species and possibly some limited risk for human consumers of fish and shellfish." *Id.* at 5. It further concluded that the data justified the study proceeding to a second phase. *Id.*;

xvi.   In March 2008, the Court ordered the Study Panel to proceed to its second phase (the "Phase II Study") to address "whether it is necessary and feasible to ameliorate mercury and the methylation of mercury in the Penobscot River now and in the future by means that will exceed the benefits likely to be had by allowing the natural attenuation processes in operation in the River to accomplish over time and, if so, what reasonable human processes will accomplish that end." ECF No. 390;

xvii.   The Study Panel submitted its Phase II Report on April 19, 2013. ECF Nos. 652-1–652-65;

xviii.   The Plaintiffs and Mallinckrodt each filed objections to the Phase II Report. ECF Nos. 663, 664;

75

xix.    The Court dismissed the objections, preferring to address the challenges in the course of the anticipated bench trial. ECF No. 721;

xx.    The Court held a bench trial between June 3, 2014 and June 27, 2014 to hear testimony and evaluate the findings and recommendations in the Phase II Report;

xxi.    As a result of the 2014 trial, the Court found that the mercury contamination of the Penobscot River Estuary caused by Mallinckrodt continued to present an imminent and substantial endangerment to human health and the environment. ECF No. 829 at 39;

xxii.    The Court ordered that an engineering firm be appointed to investigate the feasibility of potential remedies to the mercury contamination. *Id.* at 1, 61;

xxiii.    In January 2016, the Court selected Amec to perform an evaluation of potential active remedies to speed the recovery of the Penobscot River estuary from its state of mercury contamination. ECF Nos. 836, 845;

xxiv.    In September 2018, Amec completed its Phase III Engineering Study Report containing the conclusions of its evaluation, which was filed with the Court in October 2018. ECF Nos. 972—972-2;

xxv.    Throughout Phases I, II, and III, various State of Maine and federal government agencies were kept apprised of the studies and had involvement in various aspects of the studies;

76

19482152.3

xxvi.   In 2011, the Maine Department of Inland Fisheries and Wildlife advised that pregnant women and young children not consume waterfowl from Mendall Marsh due to elevated mercury levels found in the tissue of black duck taken from Mendall Marsh;

xxvii.   By emergency and permanent rulemakings in 2014, the Maine Department of Marine Resources closed an area of the upper Penobscot estuary to lobster and crab fishing due to elevated levels of mercury found in lobster tissue taken from the closed area. ECF No. 829 at 52-53. By emergency and permanent rulemakings in 2016, the Department of Marine Resources expanded the closed area; and

xxviii.   Despite continuing scientific uncertainties, the Work required by this Consent Decree, and the Court's injunction to require such Work, is appropriate, and reasonably calculated to accelerate the recovery of the Penobscot River Estuary and thereby ameliorate the endangerment that is presented or may be presented by mercury contamination in the Penobscot River Estuary.

b.   To the fullest extent allowed by law, it is the intent of the Parties and the Court that the Work required by this Consent Decree will not be interfered with or delayed by later causes of action.

c.   As provided in Paragraph 76 (Retention of Jurisdiction), the Court shall retain jurisdiction over this matter and this Consent Decree, including jurisdiction to issue all writs necessary or appropriate to effectuate and preserve

77

the integrity of this Court's injunction, this Consent Decree, and the Work ordered herein.

       d.     Mallinckrodt reserves all defenses permitted to it by law as to other causes of action regarding mercury contamination at the Site. Such defenses may include, but are not limited to: (i) statutes of limitations, including any that may have been triggered by the public disclosures of conditions at the Site in this matter; (ii) laches; (iii) issue or claim preclusion; (iv) the contribution bars provided by CERCLA, 42 U.S.C. § 9613(f)(2), the Uniform Comparative Fault Act, and/or federal common law, as interpreted and expanded in subsequent judicial decisions; and (v) the right to seek relief from this Court to enjoin any action seeking relief that would interfere with the integrity of this Consent Decree.

54.     The Parties agree to make best efforts to cooperate with one another to secure the Court's endorsement of this Consent Decree and then to ensure prompt and effective implementation of the remedies set forth in this Decree. To the extent practicable, the Parties will work together regarding any public notice, outreach, comment process, and/or hearing that the Court may prescribe as part of the Court's review of this Consent Decree. The Parties intend that a spirit of cooperation will endure through the life of the Consent Decree and inform their conduct in connection with implementing the terms of the Consent Decree.

55.     **Plaintiffs' Attorneys' Fees and Costs.** The Parties will make best efforts to resolve through a separate agreement Plaintiffs' claims for recovery of reasonable attorneys' fees, expert fees, and costs from Mallinckrodt. The Parties agree to resolve any

dispute concerning Plaintiffs' recovery of reasonable attorneys' fees, expert fees, and costs, including any dispute arising from such separate agreement, through the Dispute Resolution procedures in Section XIV of this Consent Decree. Should this issue be submitted for Dispute Resolution, the Parties reserve their respective rights, defenses, and claims. The Court's retention of jurisdiction to enforce the terms of this Consent Decree extends to the issue of recovery of Plaintiffs' attorneys' fees, expert fees, and costs.

## XIII.   Reservations of Rights

56.     Mallinckrodt reserves all rights, defenses, claims, and causes of action that it may have with respect to any matter relating to this Consent Decree against any third party or person not party to this Consent Decree, including the right to seek contribution from other potentially responsible parties, excluding the Trusts, Trustees, and Trust Parties.

57.     Plaintiffs reserve all rights, defenses, claims, and causes of action that they may have with respect to any matters related to this Consent Decree against any third parties or other persons not party to this Consent Decree, except the Trusts, Trustees, and Trust Parties. Plaintiffs reserve all rights, defenses, claims, and causes of action that they may have with respect to matters unrelated to this Consent Decree. Except as provided in Paragraph 49, this Consent Decree does not limit Plaintiffs' rights to communicate with their members and the public regarding this matter, this Consent Decree, the Site, the HoltraChem Site, or related matters.

## XIV.   Dispute Resolution

58.   **Enforcement.** Plaintiffs shall have the right to enforce the obligations of Mallinckrodt under this Consent Decree to fund the Trusts. This right exists regardless of whether rights of enforcement against the Trusts, Trustees, or any other entity are provided in this Consent Decree or by other agreements.

59.   **Dispute Resolution Generally.** Disputes between the Parties arising under this Consent Decree, including but not limited to any enforcement actions by Plaintiffs under Paragraph 58, shall be resolved by following sequentially the informal dispute resolution, mediation, and, if necessary, formal dispute resolution procedures in this Section. Unless otherwise expressly provided herein, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes between the Parties arising under this Consent Decree, including disputes regarding the meaning or enforcement of its terms.

60.   **Informal Dispute Resolution**

a.      A dispute shall be considered to have arisen as of the date at the Site when one Party or a Trustee sends to the other Parties and/or a Trustee a written Notice of Dispute. The Trustees shall be included in Dispute Resolution procedures only to the extent the dispute relates to a duty, obligation, or right of the Trustees, Trusts, and/or Trust Parties under this Consent Decree.

b.      Any dispute regarding this Consent Decree shall in the first instance be the subject of informal negotiations between the Parties and, if necessary, the affected Trustee(s), to attempt to resolve the dispute cooperatively. The period for

80

informal negotiations shall not exceed twenty (20) calendar days from the date the dispute arises, unless the parties to the dispute mutually agree to modify that period by written agreement.

61. **Mediation**

a.    Any dispute that cannot be resolved by the Parties and, if applicable, the Trustee(s), through informal negotiations shall be presented to a Magistrate Judge of the Court for mediation. The Party that raised the dispute shall give written notice to the Magistrate Judge, other Parties and, if applicable, the Trustee(s). Such written notice shall describe the dispute, the Party's position, and the informal negotiations that have taken place so far, and shall be transmitted to the Magistrate Judge within three (3) business days after the expiration of the informal negotiation period in Paragraph 60(b).

b.    Upon receiving written notice that a dispute has arisen that the Parties and, if applicable, the Trustee(s), have been unable to resolve informally, the Magistrate Judge shall, as promptly as possible, mediate the dispute. In doing so the Magistrate Judge may prescribe such procedures as the Magistrate Judge deems appropriate. The precise schedule of the mediation proceedings shall be at the discretion of the Magistrate Judge, but the Magistrate Judge shall endeavor to mediate the dispute within thirty (30) days after the Magistrate Judge receives notice of the dispute. The Parties, and, if applicable, the Trustee(s), shall cooperate fully with any procedures, processes, and requirements that the Magistrate Judge may set for the mediation proceedings.

19482152.3

62.    **Formal Dispute Resolution**

a.    In the event of a dispute that cannot be resolved by the informal negotiation and mediation specified in Paragraphs 60 and 61, any Party or, if applicable, Trustee may request that the Court formally refer the dispute to the Magistrate Judge for resolution. The Magistrate Judge's referral shall be filed publicly on the Court's docket and shall be treated as a pretrial matter referred to the Magistrate Judge under Federal Rule of Civil Procedure 72.

b.    For any disputes presented to the Court, the Parties shall not oppose, and may jointly propose, expedited briefing if briefing is necessary.

63.    **Stays Pending Dispute Resolution.** The invocation of dispute resolution procedures under this Section does not extend, postpone, stay, or affect in any way any obligation of Mallinckrodt or the Trustees under this Consent Decree, except as mutually agreed in writing by the Parties or ordered by the Court or Magistrate Judge. In any event, if a stay is issued pursuant to this Paragraph as to an element of a Deliverable that is severable from other related elements, continued progress on the related elements shall not be stayed or otherwise delayed by the dispute.

**XV.    Notice.**

64.    **Notice.** When a notice, comment, objection, submission, report, or request is to be given or is allowed under this Consent Decree, either by a Party or Trustee, such notice, comment, objection, submission, report, or request shall be written, shall be conveyed electronically by email, and shall be provided at the same time to the designated representatives of all of the Parties and the applicable Trustee(s). The Parties

82

and Trustees shall give notice if their designated representatives change or have a change in contact information. As of the Effective Date, the designated representatives are:

a.      <u>For Plaintiffs:</u>

        i.      Mitchell Bernard, NRDC, 40 West 20th Street, New York, NY 10011; (212) 727-4469; mbernard@nrdc.org.

        ii.      Jared Thompson, NRDC, 1152 15th Street NW, Suite 300, Washington, DC 20005; (202) 513-6249; jared.thompson@nrdc.org.

b.      <u>For Mallinckrodt:</u>

        i.      Patricia Hitt Duft, on behalf of Mallinckrodt US LLC, 710 Medtronic Parkway, LC 300, Minneapolis, MN 55432; (314) 753-0413; patricia.h.duft@medtronic.com.

        ii.      Jeffrey Talbert, Preti Flaherty, One City Center, Portland, ME 04112; (207) 791-3000; jtalbert@preti.com.

        iii.      Lisa Palin, Tax Director, Medtronic, 15 Hampshire St., Mansfield, MA 02048; (508) 542-4272; lisa.palin@medtronic.com.

c.      <u>For the Greenfield Penobscot Estuary Remediation Trust LLC:</u>

        i.      Cynthia Brooks, Greenfield Penobscot Estuary Remediation Trust LLC c/o Greenfield Environmental Trust Group, Inc., 11 Flagg Street, Unit 1, Cambridge, MA 02138; (617) 448-9762; cb@g-etg.com.

        ii.      Lauri Gorton, Greenfield Penobscot Estuary Remediation Trust LLC c/o Greenfield Environmental Trust Group, Inc., 2116 East Estes Street, Milwaukee, WI 53207; (414) 732-4514; lg@g-etg.com.

19482152.3

iii.     Craig Kaufman, Greenfield Penobscot Estuary Remediation Trust LLC c/o Greenfield Environmental Trust Group, Inc., 1506 D Street, SE, Washington, DC 20003; (215) 837-3702; ck@g-etg.com.

d.     For the Greenfield Penobscot Estuary Project Trust LLC:

i.     Cynthia Brooks, Greenfield Penobscot Estuary Project Trust LLC c/o Greenfield Environmental Trust Group, Inc., 11 Flagg Street, Unit 1, Cambridge, MA 02138; (617) 448-9762; cb@g-etg.com.

ii.     Lauri Gorton, Greenfield Penobscot Estuary Project Trust LLC c/o Greenfield Environmental Trust Group, Inc., 2116 East Estes Street, Milwaukee, WI 53207; (414) 732-4514; lg@g-etg.com.

iii.     Craig Kaufman, Greenfield Penobscot Estuary Project Trust LLC c/o Greenfield Environmental Trust Group, Inc., 1506 D Street, SE, Washington, DC 20003; (215) 837-3702; ck@g-etg.com.

## XVI.   Miscellaneous Provisions

### 65.   Force Majeure

a.     For purposes of this Consent Decree, a "Force Majeure-Affected Entity" may include Mallinckrodt or a Trustee, and shall refer to whichever entity having obligations under this Consent Decree asserts that a Force Majeure has occurred. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of a Force Majeure-Affected Entity, of any entity controlled by a Force Majeure-Affected Entity, or of any contractor hired by a Force Majeure-Affected Entity that delays or prevents the performance

84

of any obligation under this Consent Decree despite the Force Majeure-Affected Entity's reasonable efforts to fulfill the obligation. The requirement that a Force Majeure-Affected Entity exercise "reasonable efforts to fulfill the obligation" includes using reasonable efforts to anticipate any potential Force Majeure and using reasonable efforts to address the effects of any potential Force Majeure as it is occurring and following the potential Force Majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force Majeure" does not include insufficient funds to complete the Work.

b.      If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree for which a Force Majeure-Affected Entity intends or may intend to assert a claim of Force Majeure, the Force Majeure-Affected Entity shall notify the Parties within three (3) days of when the Force Majeure-Affected Entity first knew that the event may cause a delay. Within seven (7) days after providing such notice, the Force Majeure-Affected Entity shall provide in writing to the Parties an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; the Force Majeure-Affected Entity's rationale for attributing such delay to a Force Majeure; and a statement as to whether, in the opinion of the Force Majeure-Affected Entity, such event may cause or contribute to an endangerment to public health or welfare, or the environment. The Force Majeure-Affected Entity shall include with

85

any notice all available, non-privileged documentation supporting its claim that the delay was attributable to a Force Majeure. A Force Majeure-Affected Entity shall be deemed to know of any circumstances of which the Force Majeure-Affected Entity, any entity controlled by the Force Majeure-Affected Entity, or the Force Majeure-Affected Entity's contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude a Force Majeure-Affected Entity from asserting any claim of Force Majeure regarding that event. Any disputes regarding the existence, mitigation, or resolution of a Force Majeure shall be resolved through the Dispute Resolution provisions in Paragraphs 58 through 63.

66.    **Third-Party Rights**. This Consent Decree does not create rights or benefits for, or grant any cause of action to or rights of enforcement by, any third party not named in this Consent Decree.

67.    **Joint Authorship**. In the event of a dispute under this Consent Decree, the Parties shall be considered joint authors of this Consent Decree and no provision shall be interpreted against any Party because of authorship.

68.    **Successors to NRDC or MPA.** In the event that NRDC or MPA disbands or otherwise ceases operations, it shall assign its rights under this Consent Decree to the remaining Plaintiff organization. If the remaining Plaintiff organization also disbands or otherwise ceases operations, it shall assign its rights under this Consent Decree to another qualified nonprofit organization. A nonprofit organization shall be qualified for assignment under this Consent Decree if it: (a) is a charitable organization under Section

86

501(c)(3) of the Internal Revenue Code, a social welfare organization under Section 501(c)(4) of the Internal Revenue Code, or the substantial equivalent; and (b) has an established record of working to enhance or preserve public health and the environment. Any such assignment shall be subject to approval by the Court, and Mallinckrodt shall have the right to object to any proposed assignment. Any successor organization shall have the duty to assign its rights under this Consent Decree to another qualified nonprofit organization in the event that the successor disbands or otherwise ceases operations. In the event that a successor is not appointed at any given time, the Trustee of the Remediation Trust shall propose the appointment of a qualified successor subject to approval by the Court and objection by Mallinckrodt.

69. **Modifications.**

a. <u>Modifications to Consent Decree.</u> Modifications to this Consent Decree shall be in writing, signed by authorized representatives of Plaintiffs and Mallinckrodt, and shall be effective upon approval by the Court.

b. <u>Modifications of Statement of Work and Trust Agreements.</u> Modifications to the Statement of Work or Trust Agreements shall be in writing, signed by authorized representatives of Plaintiffs, Mallinckrodt, and the applicable Trustee(s), and shall be effective immediately upon the Parties' and Trustee's(s') written agreement without further action by the Court. The Trustees shall cause any such modified Statement of Work or Trust Agreement to be filed on the Court's docket, along with a brief statement identifying any material modifications.

87

c.     <u>Disputes Regarding Modifications.</u> Any dispute regarding modifications to this Consent Decree, the Statement of Work, or a Trust Agreement shall be resolved through the Dispute Resolution provisions of this Consent Decree.

70.   **List of Appendices.**

a.     "Appendix A" is the Statement of Work.

b.     "Appendix B" is the form of the Remediation Trust Agreement.

c.     "Appendix C" is the form of the Project Trust Agreement.

d.     "Appendix D" is the form of the surety bond for financial assurance.

e.     "Appendix E" is the Study Reaches Map, Figure 1-1 from Amec's Phase III Engineering Study Report, ECF No. 972-1.

f.     "Appendix F" is the Surface Deposits Map, Figure 8-3 from Amec's Phase III Engineering Study Report, ECF No. 972-2.

71.   **Entire Agreement.** This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in this Consent Decree. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

72.   **Severability.** The various terms, provisions and covenants contained in this Consent Decree shall be deemed separable and severable, and the invalidity or unenforceability of any of them shall in no manner affect or impair the validity or enforceability of the remainder of this Consent Decree.

19482152.3

73.     **Effective Date.** This agreement shall go into effect immediately as of the date of final entry by the Court.

74.     **Construction and Choice of Law.** This Consent Decree shall be interpreted and construed under federal law as a settlement under the citizen suit provision of RCRA, 42 U.S.C. § 6972. To the extent that state law is applicable to the interpretation and construction of this Consent Decree, this Consent Decree shall be interpreted and construed in accordance with the laws of the State of Maine, without regard to the conflict-of-laws principles. To the extent reasonably possible, the provisions of this Consent Decree shall be interpreted in a manner consistent with the Statement of Work and the Trust Agreements. Where the provisions of this Consent Decree are irreconcilable with the provisions of the Statement of Work or a Trust Agreement, the provisions of this Consent Decree shall control.

75.     **Advice of counsel; Authority to Enter into Agreement; Counterparts.**

a.     Each Party represents and warrants that this Consent Decree has been negotiated in good faith and that the Party has sought and obtained any appropriate legal advice it deems necessary prior to entering into this Consent Decree.

b.     The undersigned representatives for each Party represent and warrant that they are duly authorized to enter into the terms of this Consent Decree and to bind such Party legally to this Consent Decree, and that such Party has the right, power, and authority to enter into this Consent Decree, to become a Party to this Consent Decree, and to perform its obligations under this Consent

89

Decree. This Consent Decree is a legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms.

   c.  This Consent Decree may be signed electronically in counterparts and such counterpart signature pages shall be given full force and effect.

## XVII.  Retention of Jurisdiction

76.  This Court retains jurisdiction over both the subject matter of this Consent Decree and Mallinckrodt for the duration of the performance of the terms and provisions of this Consent Decree for the purpose of enabling any of the Parties to apply to the Court for such further order, direction, or relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to preserve the integrity of the Consent Decree, or to resolve disputes in accordance with Section XIV, Paragraphs 58 through 63 (Dispute Resolution).

## XVIII. Final Judgment

77.  **Finding of Fairness.** After considering the positions of the Parties and all of the evidence, by entering this Consent Decree the Court finds that this Consent Decree is fair, reasonable, and in the public interest.

78.  **Final Judgment.** Upon entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among Plaintiffs and Mallinckrodt pursuant to which Mallinckrodt has, as of the Effective Date, resolved liability to Plaintiffs within the meaning of 42 U.S.C. § 6972(a)(1)(B). The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment pursuant to Fed. R. Civ. P. 54 and 58.

19482152.3

SO ORDERED.

Dated this 11th day of October, 2022

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

19482152.3

Signature Page for the Consent Decree in
*Maine People's Alliance v. HoltraChem Mfg. Co., LLC*, No. 1:00-cv-00069-JAW (D. Me)

### FOR MAINE PEOPLE'S ALLIANCE:

Date: September 19, 2022                    /s/ Mitchell S. Bernard
                                            _____
                                            Mitchell S. Bernard, Esq., *pro hac vice*
                                            (NY Bar No. 1684307)
                                            Jared J. Thompson, Esq., *pro hac vice*
                                            (DC Bar No. 1004120)
                                            Natural Resources Defense Council, Inc.
                                            40 West 20th Street
                                            New York, NY 10011
                                            Phone: (212) 727-4469
                                            mbernard@nrdc.org
                                            jared.thompson@nrdc.org

Date: September 19, 2022                    /s/ Eric J. Uhl
                                            _____
                                            Eric J. Uhl, Esq., Bar No. 7244
                                            Richardson, Whitman, Large & Badger
                                            465 Congress Street, P.O. Box 9545
                                            Portland, ME 04112-9545
                                            Phone: (207) 774-7474
                                            euhl@rwlb.com

                                            Attorneys for MPA

19482152.3

Signature Page for the Consent Decree in
*Maine People's Alliance v. HoltraChem Mfg. Co., LLC*, No. 1:00-cv-00069-JAW (D. Me)


**FOR NATURAL RESOURCES DEFENSE COUNCIL, INC.:**


Date: September 19, 2022                  /s/ Mitchell S. Bernard
                                          _____
                                          Mitchell S. Bernard, Esq., *pro hac vice*
                                          (NY Bar No. 1684307)
                                          Jared J. Thompson, Esq., *pro hac vice*
                                          (DC Bar No. 1004120)
                                          Natural Resources Defense Council, Inc.
                                          40 West 20th Street
                                          New York, NY 10011
                                          Phone: (212) 727-4469
                                          mbernard@nrdc.org
                                          jared.thompson@nrdc.org


Date: September 19, 2022                  /s/ Eric J. Uhl
                                          _____
                                          Eric J. Uhl, Esq., Bar No. 7244
                                          Richardson, Whitman, Large & Badger
                                          465 Congress Street, P.O. Box 9545
                                          Portland, ME 04112-9545
                                          Phone: (207) 774-7474
                                          euhl@rwlb.com

                                          Attorneys for NRDC

93

19482152.3

Signature Page for the Consent Decree in
*Maine People's Alliance v. HoltraChem Mfg. Co., LLC*, No. 1:00-cv-00069-JAW (D. Me)

**FOR MALLINCKRODT US LLC:**

Date: September 19, 2022

/s/ Jeffrey D. Talbert
_____

Jeffrey D. Talbert, Esq., Bar No. 4358
Benjamin S. Piper Esq., Bar No. 4720
Preti Flaherty Beliveau & Pachios LLP
One City Center, P.O. Box 9546
Portland, Maine 04112-9546
Phone: 207-791-3000
jtalbert@preti.com
bpiper@preti.com

Attorneys for Mallinckrodt US LLC

94

19482152.3